

1   LIONEL Z. GLANCY (#134180)
2   GLANCY BINKOW & GOLDBERG LLP
    1801 Avenue of the Stars, Suite 311
3   Los Angeles, California 90067
    Telephone:    (310) 201-9150
4   Facsimile:    (310) 201-9160

5   Attorneys for Plaintiff I.B.L. Investments, Ltd.

6

7

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA          **MJJ**

10

11  I.B.L. INVESTMENTS LTD., Individually    No.
    and On Behalf of All Others Similarly
12  Situated,                                 06   3936

13                      Plaintiff,

14             v.                            **CLASS ACTION COMPLAINT
                                             FOR VIOLATIONS OF FEDERAL
15  TERAYON COMMUNICATION              SECURITIES LAW**
    SYSTEMS, INC., ZAKI RAKIB, JERRY D.
16  CHASE, MARK A. RICHMAN and
    EDWARD LOPEZ,
17                                           **JURY TRIAL DEMANDED**

18                      Defendants.

19

20

21      Plaintiff I.B.L. Investments Ltd., individually and on behalf of all other persons similarly

22  situated, by plaintiff's undersigned attorneys, for plaintiff's Class Action Complaint against

23  defendants, alleges upon personal knowledge as to himself and his own acts, and upon

24  information and belief as to all other matters, based on, *inter alia*, the investigation conducted by

25  and through his attorneys, which included, among other things, a review of the defendants'

26  public documents, conference calls and announcements, United States and Securities Exchange

27  Commission ("SEC") filings, wire and press releases published by and concerning Terayon

28

FILED BY FAX
PURSUANT TO LOCAL RULES
WESTERN ATTORNEY SERVICES

ORIGINAL FILED
'06 JUN 23 PM 2:56
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

Communication Systems Inc. ("Terayon" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet, as follows:

## NATURE OF ACTION

1.      This is a securities fraud class action on behalf of public investors who purchased the common stock of Terayon between October 28, 2004 and March 1, 2006, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Named as individual defendants are Zaki Rakib, Jerry D. Chase, Mark A. Richman and Edward Lopez.

2.      Throughout the Class Period, defendants' representations concerning the Company's financial condition, impressive income growth, and various other statements in the Company's quarterly and annual financial results and SEC filings were materially false and misleading because defendants knew or recklessly disregarded that the Company's reported financial results and growth were attributable to improper accounting practices, including improper revenue recognition practices, which resulted in an overstatement of the Company's revenues. Unbeknownst to investors, the Company's internal controls and procedures and, as a result, the Company's projections and reported financial results were seriously flawed. Furthermore, the Company's earnings were not increasing in the amounts that had been represented by defendants, and the Company's reported earnings statements for the interim periods were in violation of Generally Accepted Accounting Principles ("GAAP").

3.      On November 7, 2005, after the market closed, Terayon announced that the Company "is reviewing the recognition of revenue for certain transactions during prior periods." More specifically, an internal review was initiated after the Company determined "that certain revenues recognized in the second half of fiscal year 2004 from a customer may have been

recorded in incorrect periods."

4.     Then, on March 1, 2006, Terayon issued a press release announcing that the Company's "consolidated financial statements for the year ended December 31, 2004 and for the four quarters of 2004 and the first two quarters of 2005 should no longer be relied upon and will be restated." In response to these revelations, the next day, March 2, 2006, Terayon's stock price fell $0.37 per share – a more than 13% decline in the stock's value – on extremely heavy trading volume of more than four million shares.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Terayon conducts business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, the Company's principal executive offices are situated in Santa Clara, California, which is within this District.

8.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW

## PARTIES

### Plaintiff

9.      Plaintiff I.B.L. Investments Ltd., as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Terayon at artificially inflated prices during the Class Period and has been damaged thereby.

### Defendants

10.      Defendant Terayon is a Delaware corporation headquartered at 4988 Great America Parkway, Santa Clara, California 95054. The aggregate number of shares of Terayon common stock outstanding as of July 29, 2005, is approximately 77.2 million. As of December 31, 2004, Terayon had approximately 255 full-time employees. Terayon common stock is actively traded on the NASDAQ National Market ("NASDAQ") under the ticker symbol "TERN."

11.      Defendant Zaki Rakib ("Rakib") served at all times relevant hereto as the Company's Chairman of the Board of Directors and Secretary. Rakib co-founded the Company in 1993. From January 1993 to September 2004, Rakib served as the Chief Executive Officer, and from January 1993 to July 1998, he also served as Chief Financial Officer.

12.      Defendant Jerry D. Chase ("Chase") served at all times relevant hereto as the Company's Chief Executive Officer and a Director. He has been serving as President of the Company since March 2005.

13.      Defendant Mark A. Richman ("Richman") has served as the Company's Senior Vice President Finance and Administration and Chief Financial Officer since November 2004.

14.      Defendant Edward Lopez ("Lopez") served as the Company's Senior Vice

President, General Counsel and Human Resources until he resigned on December 31, 2004.
Lopez served as the Company's Acting Chief Financial Officer between August 2004 and
November 2004.

15.    The defendants referenced above in ¶¶ 11-14 are referred to herein as the
"Individual Defendants."

## CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or
otherwise acquired the common stock of Terayon between October 28, 2004 and March 1, 2006,
both dates inclusive (the "Class Period"), and who were damaged thereby (the "Class").
Excluded from the Class are defendants herein, the officers and directors of the Company, at all
relevant times, members of their immediate families and their legal representatives, heirs,
successors or assigns and any entity in which defendants have or had a controlling interest.

17.    The members of the Class are so numerous that joinder of all members is
impracticable. Throughout the Class Period, Terayon common shares were actively traded on the
Nasdaq. While the exact number of Class members is unknown to plaintiff at this time and can
only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or
thousands of members in the proposed Class. Record owners and other members of the Class
may be identified from records maintained by Terayon or its transfer agent and may be notified
of the pendency of this action by mail, using the form of notice similar to that customarily used
in securities class actions.

18.    Plaintiff's claims are typical of the claims of the members of the Class as all
members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

19. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

20. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Terayon;

(c) whether the Individual Defendants caused Terayon to issue false and misleading financial statements during the Class Period;

(d) whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the market price of Terayon securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

21. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

22.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the securities of the Company traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    plaintiff and members of the Class purchased their Terayon stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

23.    Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Defendant Terayon, a Delaware corporation, develops, markets and sells equipment to broadband service providers for delivering broadband voice, digital video solutions (DVS), and data services to residential and business subscribers in the United States.

## Defendants' Materially False And/Or Misleading Statements

25.    On October 28, 2004, Terayon issued a press release announcing the Company's financial results for the third quarter ended September 30, 2004. The press release noted that the results were in line with preliminary results for the quarter as announced on October 8, 2004. The press release stated, in relevant part:

> Revenues for the third quarter of 2004 were $37.2 million, down 1% from $37.6 million in the third quarter of 2003, and down 13% from $42.8 million in the second quarter of 2004. Net loss for the third quarter of 2004 was $13.5 million, or $0.18 per share, as compared to a net loss of $7.2 million, or $0.10 per share, in the third quarter of 2003, and a net loss of $4.9 million, or $0.06 per share, in the second quarter of 2004. The results for the third quarter of 2004 include an inventory charge of $7.3 million, or $0.10 per share, primarily related to a write-down of excess CMTS inventory, and a charge of $1.4 million, or $0.02 per share, related to an executive separation payment. The results for the second quarter of 2004 included an inventory benefit of $0.8 million, or $0.01 per share, related to the sale of previously reserved inventory, and a charge of $3.6 million, or $0.04 per share, related to restructuring activities and executive separation payments.
>
> The Digital Video Solutions product line had revenues of $10.8 million in the third quarter of 2004, compared to $4.6 million in the third quarter of 2003 and $7.5 million in the second quarter of 2004. The Subscriber product line had revenues of $19.8 million in the third quarter of 2004, compared to $16.2 million in the third quarter of 2003 and $25.0 million in the second quarter of 2004. The CMTS product line had revenues of $6.6 million in the third quarter of 2004, compared to $16.8 million in the third quarter of 2003 and $10.3 million in the second quarter of 2004.
>
>                                * * *
>
> Terayon ended the third quarter with $111.9 million in cash, cash equivalents and short-term investments, and $65.1 million in convertible debt due in 2007. Accounts receivable days sales outstanding (DSO) as of September 30, 2004 was 50 days, compared with 59 days reported as of June 30, 2004.

Looking ahead to fourth quarter 2004, the Company represented in the press release the following:

> Terayon expects to report revenues in the range of $27 million to $31 million and anticipates a net loss in the range of $0.12 to $0.15 per share, including the effects of the estimated $3.2 million to $3.6 million severance charge. Excluding the effects of the estimated severance charge, Terayon expects a net loss in the range

of $0.08 to $.11 per share.

26.     On November 9, 2004, Terayon filed its quarterly report with the SEC on Form 10-Q for the period ended September 30, 2004. This report was signed by defendant Lopez and reaffirmed the Company's previously announced financial results. Pursuant to certification requirements under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the Form 10-Q was also certified by defendants Chase and Lopez.

27.     On February 9, 2005, Terayon issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2004. The press release stated, in relevant part:

> Revenue for the fourth quarter of 2004 was $29.4 million, down 32% compared to $43.0 million for the same quarter a year ago, and a 21% decrease compared to the $37.2 million for the third quarter 2004. Revenue for the 12 months ended December 31, 2004 was $150.5 million, a 12.7% increase compared to $133.5 million for the 12 months ended December 31, 2003.

> Net loss for the fourth quarter of 2004 was $7.9 million, or $0.10 per share, compared to a net loss of $6.0 million, or $0.08 per share, for the same quarter a year ago, and a net loss of $13.5 million, or $0.18 per share, for the third quarter of 2004. Net loss for the 12 months ended December 31, 2004 was $36.5 million, or $0.48 per share, compared to a net loss for the 12 months ended December 31, 2003 of $50.4 million, or $0.68 per share.

> Digital video networking applications product line revenues were $12.6 million in the fourth quarter of 2004, up 91% compared to $6.6 million in the fourth quarter of 2003 and 17% compared to $10.8 million in the third quarter of 2004. Revenues for the full year 2004 were $37.0 million, up 109% compared to $17.7 million in 2003.

> The home access product line had revenues of $13.7 million in the fourth quarter of 2004, compared to $18.5 million in the fourth quarter of 2003 and $19.8 million in the third quarter of 2004. The CMTS product line had revenues of $3.1 million in the fourth quarter of 2004, compared to $17.5 million in the fourth quarter of 2003 and $6.6 million in the third quarter of 2004. As of December 31, 2004, Terayon had $97.7 million in cash, cash equivalents and short-term investments, and $65.1 million in convertible debt due in 2007.

The Company also provided the following outlook for first quarter 2005:

For the first quarter of 2005, Terayon expects to report revenues in the range of $25 million to $30 million and anticipates a net loss in the range of $3 million to $6 million. Earnings per share is estimated to be a loss in the range of $0.04 to $0.08. Cash usage during the first quarter of 2005 is estimated to be in the range of $6 million to $9 million.

28.    On March 15, 2005, Terayon filed its annual report with the SEC on Form 10-K for the period ended December 31, 2004. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results. Pursuant to certification requirements of Sarbanes-Oxley, the Form 10-K was also individually certified by defendants Chase and Richman.

29.    As part of the Form 10-K, the Company's independent registered public accounting firm, Ernst & Young LLP, issued a report on the Company's internal control over financial reporting. The report stated, in relevant part, the following:

> We have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting in Item 9a, that Terayon Communication Systems, Inc ("Terayon") did not maintain effective internal control over financial reporting as of December 31, 2004 because of the effect of the material weaknesses described in management's assessment, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria).
>
> * * *
>
> A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:
>
> > Management identified a material weakness due to insufficient controls related to the identification, capture, and timely communication of financially significant information between certain parts of the organization and the financial department to enable the finance department to account for transactions in a complete and timely manner. As a result of this material weakness, management recorded an adjustment in the quarter ended September 30, 2004 to record termination benefits paid to a former executive.

Management also identified a material weakness for insufficient controls related to the preparation and review of the annual consolidated financial statements and accompanying footnote disclosures. The insufficient controls include a lack of sufficient personnel with technical accounting expertise in the financial department and inadequate review and approval procedures to prepare external financial statements in accordance with generally accounting principles (GAAP).

30.    On May 3, 2005, Terayon issued a press release announcing its financial results for the first quarter ended March 31, 2005. The press release stated, in relevant part:

Revenue for the first quarter of 2005 was $26.4 million, a 10% decrease compared to $29.4 million for the fourth quarter of 2004 and down 36% compared to $41.2 million for the first quarter of 2004.

Digital video networking applications product line revenues were $13.0 million in the first quarter of 2005 up from $12.6 million in the fourth quarter of 2004 and $6.1 million in the first quarter of 2004. The home access product line had revenues of $11.6 million in the first quarter of 2005, compared to $13.7 million in the fourth quarter of 2004 and $23.8 million in the first quarter of 2004. The Cable Modem Termination System (CMTS) product line had revenues of $1.7 million in the first quarter of 2005, compared to $3.1 million in the fourth quarter of 2004 and $11.1 million in the first quarter of 2004.

Net loss for the first quarter of 2005 narrowed to $2.6 million, or $0.03 per share, compared to a net loss of $7.9 million, or $0.10 per share, for the fourth quarter of 2004 and a net loss of $10.2 million, or $0.14 per share, for the first quarter of 2004.

31.    On May 10, 2005, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended March 3, 2005. The Company's Form 10-Q was signed by defendant Richman and reaffirmed the Company's previously announced financial results. Pursuant to certification requirements of Sarbanes-Oxley, the Form 10-Q was also individually certified by defendants Chase and Richman.

32.    On July 28, 2005, Terayon issued a press release announcing the Company's financial results for second quarter 2005. The press release stated, in relevant part:

Revenue for the second quarter of 2005 was $29.5 million, a 12% increase compared to $26.4 million for the first quarter of 2005 and down 31% compared to $42.8 million for the second quarter of 2004.

Digital video networking applications product line revenues were $17.3 million in the second quarter of 2005 up from $13.0 million in the first quarter of 2005 and $7.5 million in the second quarter of 2004. The home access product line had revenues of $10.6 million in the second quarter of 2005, compared to $11.6 million in the first quarter of 2005 and $25.0 million in the second quarter of 2004. The Cable Modem Termination System (CMTS) product line had revenues of $1.5 million in the second quarter of 2005, compared to $1.7 million in the first quarter of 2005 and $10.3 million in the second quarter of 2004.

Net loss for the second quarter of 2005 was $508,000, or $0.01 per share, compared to a net loss of $2.6 million, or $0.03 per share, for the first quarter of 2005 and a net loss of $4.9 million, or $0.06 per share, for the second quarter of 2004.

The Company also provided the following business outlook for third quarter 2005:

For the third quarter of 2005, Terayon expects to report revenues in the range of $26 million to $30 million with digital video revenues in the range of $14 million to $18 million. Net income/loss is expected to be in the range of a loss of $1 million to positive $2 million of profitability, or a loss of $0.01 to income of $0.03 per share. The balances of cash and cash equivalents are expected to increase in range of $0 to $3 million during the third quarter of 2005.

33.     On August 1, 2005, the Company filed a Form 8-K with the SEC announcing that on July 26, 2005, the Company was advised by Ernst & Young that it was resigning "as the Company's independent registered public accounting firm following the earlier of the completion of services related to the review of the Company's interim financial statements for the quarter ending September 30, 2005 or the filing due date of that quarterly report."

34.     On August 9, 2005, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended June 30, 2005. The Company's Form 10-Q was signed by defendant Richman and reaffirmed the Company's previously announced financial results. Pursuant to certification requirements of Sarbanes-Oxley, the Form 10-Q was also individually certified by defendants Chase and Richman.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW

35.    On September 30, 2005, the Company issued a press release titled

"Terayon Signs New Independent Auditor." Specifically, effective September 21, 2005, the

Company engaged Stonefield Josephson, Inc. as the Company's new independent auditor.

Furthermore, in the press release, the Company noted that Stonefield Josephson "will

immediately take over responsibilities as the external auditor beginning with the review of the

Company's third quarter fiscal calendar."

36.    On November 7, 2005, after the market closed, Terayon issued a

press release titled "Terayon Announces Accounting Review and Delay in Release of

Third Quarter 2005 Results." The press release stated, in relevant part, the following:

> Terayon Communication Systems, Inc. a leading provider of digital video
> networking applications and home access solutions, today announced that it is
> reviewing the recognition of revenue for certain transactions during prior periods.
> Terayon initiated the review after determining that certain revenues recognized in
> the second half of fiscal year 2004 from a customer may have been recorded in
> incorrect periods. The revenue matters under examination relate to the timing of
> revenue recognition and may result in a restatement of prior period financials.
>
> Pending completion of the accounting review, the filing of Terayon's Form 10-Q
> for the third quarter of fiscal year 2005 will be delayed, and this delay will extend
> beyond the Form 10-Q's filing deadline of November 9, 2005. Terayon also will
> delay the filing of its third quarter 2005 earnings release and conference call,
> originally scheduled for November 8, 2005.
>
> The accounting review includes an examination of whether a restatement of prior
> period financial statements may be required as it relates to the customer
> transactions in question, in addition to an examination of Terayon's revenue
> recognition policies and practices for current and past periods and an examination
> of Terayon's internal control over financial reporting as it relates to these items.
> There can be no assurance that Terayon or its independent auditors will not
> identify additional issues or other considerations in connection with the current
> review, and that these issues or considerations will not require further adjustments
> to the company's prior financial results for one or more prior fiscal years or
> quarters.

37.    As a result of this news, by the end of the trading session on the next

---

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW

day, November 8, 2005, Terayon's stock price fell $0.32 per share and closed at $2.25, on unusually heavy trading volume of over 2.5 million shares.

38.    Defendants' statements as described in ¶¶ 25-28 and 30-36, above, were each materially false and/or misleading when made as they misrepresented and/or failed to fully disclose the following adverse facts which then existed and the full disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)    the Company improperly recognized certain revenues, which materially inflated its revenue figures;

(b)    the Company lacked requisite internal controls and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

(c)    the Company's financial statements were presented in violation of Generally Accepted Accounting Principles ("GAAP");

(d)    the Company lacked the necessary personnel to issue accurate financial reports and projections; and

(e)    as a consequence, the Company's financial statements were grossly inflated and lacked in all reasonable basis when made.

## Disclosures at the End of the Class Period

39.    On March 1, 2006, the last day of the Class Period, the Company

1   stunned investors when it issued a press release, titled "Terayon Announces Expected

2   Restatement of Prior Periods," announcing that, as a result of improper accounting practices, "the

3   Company's consolidated financial statements for the year ended December 31, 2004 and for the

4   four quarters of 2004 and the first two quarters of 2005 should no longer be relied upon and will

5   be restated." The press release stated, in relevant part, the following:

6

7       Terayon Announces Expected Restatement of Prior Periods
        Santa Clara, California - March 01 2006

8

9       Terayon Communication Systems, Inc. (NASDAQ: TERNE) today announced
        that the Audit Committee of the Board of Directors has concluded that the
10      Company's consolidated financial statements for the year ended December 31,
        2004 and for the four quarters of 2004 and the first two quarters of 2005 should no
11      longer be relied upon and will be restated. This conclusion was based in part on
        the final results of the previously announced Audit Committee inquiry. The
12      inquiry focused on the circumstances surrounding the timing of revenue
        recognition in the second half of 2004 from a customer of the Company. The
13      principal findings of the inquiry were: that there was no intent by Company
        personnel to recognize revenue in contravention of what Company personnel
14      understood to be the applicable accounting rules at the time; that Company
        personnel nevertheless did not consider or sufficiently focus on the application of
15      certain relevant accounting rules; and that there was no intent by Company
        personnel to mislead the Company's auditors or engage in other wrongful
16      conduct. The Audit Committee inquiry noted that counsel was not able to
        interview a senior official of the customer involved in the transaction. Based on
17      the results of the inquiry, the Audit Committee did not recommend any actions
        against current or former Company personnel. The Audit Committee and
18      management are continuing to consider possible enhancements to the Company's
        internal controls in light of the results of the Audit Committee inquiry.
19

20      The Audit Committee and management have reviewed the Company's revenue
        recognition practices and policies with respect to the delivery of certain products
21      and services (including the development and customization of software) to a
        single customer under a series of contractual arrangements. Management and the
22      Audit Committee have also discussed management's conclusions with Stonefield
        Josephson, Inc., the Company's independent auditor. It was previously
23      determined under the SEC Staff Accounting Bulletin 104, "Revenue
        Recognition," that revenue under this series of contractual arrangements was to be
24      recognized in two phases under two separate revenue arrangements. Based on the
        guidance under American Institute of Certified Public Accountants Statement of
25      Position (SOP) 97-2, "Software Revenue Recognition," and SOP 81-1,
        "Accounting for Performance of Construction-Type and Certain Production-Type
26

27

28

Contracts," management has determined that this series of contractual arrangements should have been treated as a single contract, and therefore a single revenue arrangement for accounting purposes.

Using the completed-contract method as indicated under SOP 81-1, all revenue from this series of contractual arrangements should have been deferred until the completion of all Company obligations under these arrangements in the fourth quarter of 2005. Accordingly, revenue recognized in the third and fourth quarters of 2004 and in the first two quarters of 2005 under this series of contractual arrangements should be deferred to the fourth quarter of 2005. Also, under SOP 81-1 in relation to contract costs, expenses previously recognized in each quarter of 2004 and in the first two quarters of 2005 should be deferred to the fourth quarter of 2005.

The Company has also reviewed its revenue recognition policies relating to the recognition of the sales of software and other products bundled with post customer service contracts and has considered the guidance under SOP 97-2, Financial Accounting Standards Board Technical Bulletin 90-1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts," as well as Financial Accounting Standards Board, Emerging Issues Task Force 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," in relation to multiple-element revenue arrangements. Under this guidance management has determined that during 2004, the Company did not establish vendor specific objective evidence for its post contract service revenue element as it related to digital video customer service. Consequently, management anticipates an additional deferral of revenue from each quarter of 2004 in which the revenue was recognized, in order to recognize the revenue from software bundled with post customer service contracts over the life of the customer service contract period.

The actual amounts of revenue and expenses to be deferred are being reviewed by the Company and its independent auditors. The restatement will have no impact on the Company's cash balances for the restated periods. There can be no assurance that the Company or its independent auditors will not identify additional issues or other considerations in connection with the restatement and continuing review, and that these issues or considerations will not require additional adjustments to the Company's prior financial results for one or more prior annual or quarterly periods.

The filing of the Company's Form 10-Q for the quarter ended September 30, 2005 will be further delayed pending the completion of the restated consolidated historical financial statements. Because of the delay in filing the Form 10-Q, the Company is not in compliance with The Nasdaq Stock Market's continued listing requirement set forth in Nasdaq Marketplace Rule 4310(c)(14). As previously announced, the Company received letters from The Nasdaq Stock Market dated November 17, 2005 and January 4, 2006 regarding the Company's failure to file

its Form 10-Q for the quarter ended September 30, 2005, and its failure to solicit proxies and hold an annual meeting of shareholders on or before December 31, 2005, respectively. On January 17, 2006, a NASDAQ Listing Qualifications Panel agreed to continue the listing of the Company's common stock on The Nasdaq National Market subject to three conditions: (1) on or before January 31, 2006, the Company was required to provide NASDAQ with certain information related to the Audit Committee's inquiry; (2) on or before March 31, 2006, the Company must file the Form 10-Q for the quarter ended September 30, 2005 and all required restatements; (3) on or before March 31, 2006, the Company must file the proxy statement for the 2005 annual meeting, with a record date set and a meeting to be held as soon thereafter as possible. While the Company provided NASDAQ with a response to questions relating to the internal accounting review on January 31, 2006 and is making every effort to comply with the remaining requirements, there can be no assurance that the Company will be able to do so within the Panel's deadlines, or that the Company's common stock will continue to be listed on the Nasdaq National Market.

Management and the Audit Committee have concluded that the restatement constitutes a material weakness within the meaning of the PCAOB's Audit Standard No. 2. In addition to this material weakness, additional control deficiencies may be identified which individually or in the aggregate may constitute additional material weaknesses. Management and the Audit Committee are continuing to evaluate whether there are additional material weaknesses.

Additionally, the Company has engaged a financial advisor, Chanin Capital Partners, to explore alternatives with respect to restructuring its outstanding 5% Convertible Subordinated Notes due 2007. The Notes currently outstanding have an aggregate principal amount of $65 million. As previously announced, on January 12, 2006, the Company received a letter from holders of more than 25% in aggregate principal amount of Notes outstanding providing written notice to the Company that it is in default based on the Company's failure to file its Form 10-Q for the quarter ended September 30, 2005. If the default is not cured within 60 days of this notice, March 13, 2006, an event of default will occur and the trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding, upon notice to the Company, may accelerate the maturity of the Notes and declare the entire principal amount of the Notes, together with all accrued and unpaid interest thereon, to be due and payable immediately.

The Company previously announced in November 2005 that the SEC had initiated an informal inquiry with regard to the subject matter of the Company's accounting review. The Company understands that the SEC has since issued a formal order of investigation with regard to this matter. The Company has been and is continuing to cooperate fully with the SEC.

40.   Also on March 1, 2006, *Bloomberg News* reported that the SEC had

begun a formal inquiry of Terayon, apparently in response to the Company's accounting and

revenue recognition practices. The *Bloomberg News* article stated the following:

> SEC Formally Probing Terayon Communication Systems
>
> By Steven Bodzin
>     March 1 (Bloomberg) · The U.S. Securities and Exchange
> Commission has increased its scrutiny of Terayon Communication
> Systems Inc., elevating an informal inquiry to a formal
> investigation, the company said in a statement.
>
>     The company, a maker of video networking software, had said
> in November that the SEC was conducting an informal inquiry.
> Terayon also said today it would restate earnings for 2004 and
> the first two quarters of 2005 because of the timing of its
> accounting for sales.
>
>     The Santa Clara, California-based company defaulted on its
> loans when it missed filing an earnings report for the quarter
> ended Sept. 30, 2005. Terayon has hired Chanin Capital Partners
> to help it restructure the debt before March 13, when bondholders
> will be able to demand immediate repayment of the loans.
>
>     Kirsten Chapman, a spokeswoman for Terayon at
> Lippert/Heilshorn & Associates in San Francisco, said she
> couldn't comment on how the investigation, restatement and debt
> restructuring might affect the company's operations until she
> spoke with lawyers in the morning. Terayon's auditors, Stonefield
> Josephson Inc., found the early sales recognition to be
> unintentional, according to the statement.

41.     These revelations shocked the market. The next day, March 2, 2006,

Terayon stock plummeted $0.37 per share, or 13.7% percent below the previous day's closing

price of $2.70, which was before the full extent of the Company's restatement was disclosed to

investors. Terayon shares closed on March 2, 2006, at $2.25 per share, on extremely heavy

trading volume of over 4.8 million shares.

## UNDISCLOSED ADVERSE FACTS

41.     The market for Terayon securities was open, well-developed and efficient

at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Terayon securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Terayon securities relying upon the integrity of the market price of Terayon securities and market information relating to Terayon, and have been damaged thereby

42.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Terayon securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein

43.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Terayon's business, operations and financial performance. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Terayon and its business, operations and financial performance, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

44.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.    During the Class Period, Plaintiff and the Class purchased securities of Terayon at artificially inflated prices and were damaged thereby. The price of Terayon common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER

46.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Terayon, their control over, and/or receipt and/or modification of Terayon's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Terayon, participated in the fraudulent scheme alleged herein.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

47.    At all relevant times, the market for Terayon securities was an efficient market for the following reasons, among others:

(a)    Terayon stock met the requirements for listing, and was listed and

1   actively traded on the Nasdaq, a highly efficient and automated market;

2       (b)    As a regulated issuer, Terayon filed periodic public reports with the

3   SEC and the Nasdaq;

4

5       (c)    Terayon regularly communicated with public investors via

6   established market communication mechanisms, including through regular disseminations of

7   press releases on the national circuits of major newswire services and through other wide-ranging

8   public disclosures, such as communications with the financial press and other similar reporting

9   services; and

10

11      (d)    Terayon was followed by several securities analysts employed by

12  major brokerage firms who wrote reports, which were distributed to the sales force and certain

13  customers of their respective brokerage firms. Each of these reports was publicly available and

14  entered the public marketplace.

15      48.    As a result of the foregoing, the market for Terayon securities promptly

16  digested current information regarding Terayon from all publicly available sources and reflected

17  such information in Terayon's stock price. Under these circumstances, all purchasers of Terayon

18  securities during the Class Period suffered similar injury through their purchase of Terayon

19  securities at artificially inflated prices and a presumption of reliance applies.

20

21                          **NO SAFE HARBOR**

22      49.    The statutory safe harbor provided for forward-looking statements under

23  certain circumstances does not apply to any of the allegedly false statements pleaded in this

24  Complaint. Many of the specific statements pleaded herein were not identified as

25  "forward-looking statements" when made. To the extent there were any forward-looking

26  statements, there were no meaningful cautionary statements identifying important factors that

27

28

---

could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Terayon who knew that those statements were false when made.

## COUNT I

### For Violations of Section 10(b)
### And Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Terayon

common stock; and (iii) cause plaintiff and other members of the Class to purchase Terayon securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

52.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Terayon common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Terayon's finances and business prospects.

53.     By virtue of their positions at Terayon, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from Terayon's bonus policy, as well as the sale of Terayon common stock from their personal portfolios.

55.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and directors of Terayon, the Individual Defendants had knowledge of the details of Terayon's internal affairs.

56.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Terayon. As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Terayon's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Terayon common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Terayon's business and financial condition which were concealed by defendants, plaintiff and the other members of the Class purchased Terayon common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by defendants and were damaged thereby.

57.     During the Class Period, Terayon common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Terayon common stock at prices artificially inflated by defendants' wrongful conduct. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not

have purchased them at the inflated prices that were paid. At the time of the purchases by plaintiff and the Class, the true value of Terayon stock was substantially lower than the prices paid by plaintiff and the other members of the Class. The market price of Terayon common stock declined sharply upon public disclosure of the facts alleged in this Complaint.

58.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchase and sales of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

60.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61.     During the Class Period, defendants Rakib, Chase, Richman, and Lopez participated in the operation and management of Terayon, and conducted and participated, directly and indirectly, in the conduct of Terayon's business affairs. Because of their senior positions, they knew the adverse non-public information about Terayon's misstatement of income and expenses and false financial statements.

62.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Terayon's financial condition and results of operations, and to correct promptly any public statements issued by Terayon which had become materially false or misleading.

63.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Terayon disseminated in the marketplace during the Class Period concerning Terayon's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Terayon to engage in the wrongful acts complained herein. The Individual Defendants therefore, were "controlling persons" of Terayon within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Terayon common stock.

64.     Each of the Individual Defendants, therefore, acted as a controlling person of Terayon. By reason of their senior management positions at Terayon, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Terayon to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Terayon and possessed the power to control the specific activities which comprise the primary violations about which plaintiff and the other members of the Class complain.

65.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20 of the Exchange Act for the violations committed by Terayon.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, and certifying the plaintiff as the Class representative and Lead Plaintiff;

B.     Requiring defendants to pay damages sustained by plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues so triable

Dated: June 23, 2006

**GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I _I.B.L.  Investments_ make this declaration pursuant to Section 21D(a)(2) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed the Complaint against Terayon Communications, Inc. ("Terayon") and authorize the firm of Glancy Binkow & Goldberg LLP to move on my behalf for appointment as lead plaintiff

3.    I did not purchase Terayon securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased Terayon securities during October 28, 2004 through March 1, 2006, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action and that the firm of Glancy Binkow & Goldberg LLP may exercise its discretion in determining whether to move on my behalf for appointment as lead plaintiff.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in Terayon securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed   _12/6/06_   , at   _tel-Aviv, Israel_
     **(Date)**                   **(City, State)**

I.B.L. Investments      _אי.בי.אל_
                               _Blum השקעות_
                               **(Signature)**
                               513501965:ע.מ.

                               **(Type or Print Name)**

_אי.בי.אל_
_השקעות בע"מ_
_ח.פ:513501965_

20/06 2006 18:18 FAX 035652011          REBHAN, MANN & CO.                    ☑003

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 5/04/2005 | Sale | 6,000 | $ 3.15 |
| 6/05/2005 | Sale | 5,000 | 3.41 |
| 7/29/2005 | Purchase | 2,500 | 3.02 |
| 8/24/2005 | Sale | 2,500 | 3.42 |
| 8/29/2005 | Purchase | 4,000 | 3.32 |
| 9/12/2005 | Sale | 2,000 | 3.65 |
| 9/13/2005 | Sale | 2,000 | 3.63 |
| 9/21/2005 | Purchase | 3,000 | 3.88 |
| 9/26/2005 | Purchase | 1,000 | 3.96 |
| 9/26/2005 | Purchase | 1,000 | 3.97 |
| 9/26/2005 | Purchase | 1,000 | 3.97 |
| 10/12/2005 | Purchase | 1,000 | 3.29 |
| 10/18/2005 | Purchase | 3,000 | 3.34 |
| 10/19/2005 | Purchase | 2,000 | 3.08 |
| 10/25/2005 | Purchase | 1000 | 2.83 |
| 10/26/2005 | Purchase | 2,000 | 2.74 |
| 10/28/2005 | Purchase | 2,000 | 2.4 |
| 11/7/2005 | Sale | 2,000 | 2.54 |
| 11/8/2005 | Purchase | 6,000 | 2.32 |
| 11/9/2005 | Sale | 6,000 | 2.33 |
| 23/12/2005 | Sale | 6,000 | 2.31 |
| | | | |

מ. סלומון... אלי אייטק: ...
השקעות בע"מ ב.מ.
שלומה סאלומון...