1  Michael D. Braun (167416)
   BRAUN LAW GROUP, P.C.
2  12400 Wilshire Blvd., Suite 920
   Los Angeles, CA 90025
3  Tel:    (310) 442-7755
   Fax:    (310) 442-7756
4
   **Liaison Counsel for Plaintiff and the Class**
5
   Maya Saxena                              Michael A. Swick
6  Joseph E. White, III                     Kim E. Miller
   SAXENA WHITE P.A.                        KAHN GAUTHIER SWICK, LLC
7  2424 North Federal Highway, Suite 257    114 E. 39th Street
   Boca Raton, FL 33431                     New York, NY 10016
8  Tel:    (561) 394-3399                   Tel:    (212) 920-4310
   Fax:    (561) 394-3382                   Fax:    (504) 455-1498
9
   Lewis Kahn
10 KAHN GAUTHIER SWICK, LLC
   650 Poydras Street, Suite 2150
11 New Orleans, LA 70130
   Tel:    (504) 455-1400
12 Fax:    (504) 455-1498

13 **Lead Counsel for Plaintiff and the Class**

14

15                    **UNITED STATES DISTRICT COURT**

16                    **NORTHERN  DISTRICT OF CALIFORNIA**

17

18 ADRIAN MONGELI, Individually, And    )   **CASE NO.: 3-06-CV-03936 MJJ**
   On Behalf Of All Others Similarly Situated, )
19                                       )   **CLASS ACTION**
                                         )
20              Plaintiff,               )   **AMENDED CLASS ACTION**
                                         )   **COMPLAINT FOR VIOLATIONS OF**
21        vs.                            )   **FEDERAL SECURITIES LAWS**
                                         )
22 TERAYON COMMUNICATIONS          )       **JURY TRIAL DEMANDED**
   SYSTEMS, INC., ZAKI RAKIB, JERRY )
23 D. CHASE, MARK A. RICHMAN,       )
   EDWARD LOPEZ, RAY FRITZ,  CAROL )
24 LUSTENADER, MATTHEW MILLER,      )
   SHLOMO RAKIB, DOUG SABELLA,      )
25 CHRISTOPHER SCHAEPE, MARK        )
   SLAVEN, LEWIS SOLOMON, HOWARD )
26 W. SPEAKS, ARTHUR T. TAYLOR,     )
   DAVID WOODROW, and ERNST &       )
27 YOUNG, LLP                       )
                                    )
28              Defendants.         )
                                    )
   _____ )

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1

## INTRODUCTION

2      1.      This is a federal class action on behalf of purchasers of the common stock of Terayon

3   Communication Systems, Inc. ("Terayon" or the "Company") between June 28, 2001 and March 1,

4   2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act

5   of 1934 (the "Exchange Act"). During the Class Period, defendants knowingly or recklessly

6   published a series of statements which were materially false and misleading at the time of such

7   publication, and which omitted information necessary to make defendants' statements, in light of

8   such omissions, not materially false and misleading.

9      2.      Throughout the Class Period, defendants' representations concerning the Company's

10  financial condition, purported record-setting income, growth, results, profitability and the like which

11  were published in press releases, stated in conference calls or at investor conferences, and/or filed in

12  quarterly or annual reports with the U.S. Securities and Exchange Commission ("SEC"), were

13  materially false and misleading. In fact, as defendants knew or recklessly disregarded throughout

14  that time, Terayon's reported financial results and growth were attributable to improper accounting

15  practices – including improper revenue recognition – which resulted in a significant and material

16  overstatement of the Company's revenues.

17     3.      At the time these false and misleading statements were being issued throughout the

18  Class Period – which artificially inflated the price of Terayon stock – several of the individual

19  defendants were engaging in improper insider sales, collectively making millions of dollars in

20  proceeds at the direct expense of Plaintiff and the Class.

21     4.      Unbeknownst to investors, throughout the Class Period, the Company's internal

22  controls and procedures and, as a result, the Company's projections and reported financial results

23  were seriously flawed, misleading and lacking in rational basis. Furthermore, the Company's

24  earnings were *not* increasing in the amounts that had been represented by defendants, and the

25  Company's reported earnings statements for interim and annual periods were in violation of

26  Generally Accepted Accounting Principles ("GAAP") and SEC reporting regulations.

27     5.      Moreover, regardless of the many "red-flags" that surrounded Terayon during the

28  Class Period that should have raised the suspicions of the Company's outside auditor, Ernst &

1

1  Young, LLP, and that should have forced this purportedly independent auditor to conduct significant

2  testing and review of defendants' disclosures and reports, during that time Ernst & Young *never*

3  reported any material problems with the Company's financial reporting. In fact, Ernst & Young had

4  no public objection to Terayon's characterization of certain control deficiencies as one-time events

5  that had already been substantially remedied or cured, and that were *not* expected to continue to

6  have a material impact on the Company, nor were they having a material adverse impact on its

7  financial reporting. In truth, these control errors – as the Company now concedes – were only the

8  tip of the iceberg and certainly had not been adequately addressed or cured. However, rather than

9  expose one of its clients to civil and possible criminal liability – after billing the Company for

10  millions of dollars in fees and expenses – in the fall of 2005, Ernst & Young simply resigned as

11  Terayon's auditor.

12       6.       Soon thereafter, however, on November 7, 2005, after the market closed and after

13  Terayon had hired new outside auditors, Terayon announced that the Company was "reviewing the

14  recognition of revenue for certain transactions during prior periods." At that time, defendants also

15  belatedly disclosed that an internal review had been initiated after the Company determined that

16  "certain revenues recognized in the second half of fiscal year 2004 from a customer may have been

17  recorded in incorrect periods." As one former employee who worked in the accounting department

18  during the Class Period noted, the Company "*knew* there were … bigger problems with revenue

19  recognition [not limited to problems with a single customer]."

20       7.       On March 1, 2006, however, Terayon published a press release revealing for the first

21  time that *the Company's "consolidated financial statements for the years ended December 31,*

22  *2004 and for the four quarters of 2004 and the first two quarters of 2005 should no longer be*

23  *relied upon and will be restated." Thereafter, defendants belatedly revealed that Terayon would*

24  *be forced to restate its financial results all the way back to 2000!* According to defendants, these

25  financial restatements would, *inter alia*, correct improper revenue recognition as well as errors

26  relating to the valuation of an "embedded derivative option associated with the Company's 5%

27  convertible subordinated notes," issued in July 2000.

28

2

8.    In response to these belated revelations, following the final day of the Class Period, shares of the Company declined more than 13% in a single trading day – a substantial decline, particularly in light of the stock's already dramatic descent that had occurred in the period following defendants' initial disclosures. Moreover, by the time defendants revealed the true magnitude of the Company's restatement in November 2006, Terayon shares traded to just over $1.00 – a far cry from the Class Period trading high of almost $15.00 per share.

9.    As a result of defendants' illegal and wrongful actions, as alleged herein, Plaintiff and the other members of the Class have sustained millions of dollars in damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b). Terayon maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

13.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Lead Plaintiff**

14.    Lead Plaintiff, Adrian G. Mongeli ("Plaintiff"), as appointed by Order of this Court on or about November 8, 2006, and as set forth in the certification accompanying the application therewith and incorporated by reference herein, purchased the common stock of Terayon at artificially-inflated prices during the Class Period and has been damaged thereby.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1    **The Entity Defendants**

2    15.    Defendant Terayon is a Delaware corporation with its principal place of business at

3    4988 Great America Parkway, Santa Clara, California 95054. According to the Company's profile,

4    Terayon provides digital video and home access solutions for broadband providers, cable

5    companies, satellite operators and broadcasters for the delivery of advanced, carrier-class voice, data

6    and video services. As a result of the Company's ongoing restructuring activities and following the

7    sale of certain assets to ATI Technologies Inc., ("ATI"), as of March 2005 Terayon had

8    approximately 180 employees, the majority located in the United States.

9    16.    Defendant Ernst & Young, LLP ("Ernst & Young") is a global business service and

10    accounting organization comprised of over 114,000 partners and staff, with offices in Palo Alto,

11    California, that served as the Company's auditors. Ernst & Young purports to provide accounting,

12    auditing, tax preparation and general business, support and advisory services to thousands of public

13    and private clients around the globe. Ernst & Young served as Terayon's outside auditor prior to

14    and throughout the Class Period, and until such time that Ernst & Young announced its unscheduled

15    resignation from this position of trust and authority in September 2005. Prior to its resignation,

16    Ernst & Young was responsible for reviewing the Company's financial reports and for testing the

17    assumptions used by Terayon preparing these reports. As the Company's outside auditor, Ernst &

18    Young was charged with using a reasonable amount of diligence, as determined by the unique

19    circumstances of its engagement at Terayon, and to assure that the Company's financial statements

20    were true, accurate and reliable.

21    17.    While Ernst & Young extricated itself from the Company prior to executing a Report

22    for 2005, at the time it resigned from the Company, defendants represented to investors that there

23    were no material disagreements with these auditors and, further, that Ernst & Young had approved

24    Terayon's interim financial reports through September 30, 2005. Accordingly, Ernst & Young

25    either knew of defendants' fraud at the time of its resignation and did nothing to report or expose it,

26    or Ernst & Young recklessly failed to take notice of, and therefore did not reveal, the blatant

27    accounting fraud that existed within the Company throughout the Class Period. Instead, Ernst &

28

4

Young reaped millions of dollars in fees and then dropped Terayon as a client just before the defendants' scheme was ultimately discovered.

**Individual Defendants**

18.     Defendant Zaki Rakib was, during the Class Period, Chairman of the Board of Directors of the Company. Defendant Zaki Rakib also served as Chief Executive Officer of the Company, from the Company's formation until May 2005. During the Class Period, defendant Zaki Rakib signed certain of the Company's SEC filings, including Terayon's Forms 10-Q and Forms 10-K and also made or was responsible for other materially false and misleading statements about the Company. On February 16, 2005, Zaki Rakib sold 150,000 shares of Terayon stock at artificially-inflated prices, resulting in proceeds of $530,145. One former employee described Zaki Rakib as a "fist slammer" who "could have bullied the auditors."

19.     Defendant Shlomo Rakib was, during the Class Period, a member of the Board of Directors of the Company. Defendant Shlomo Rakib is the brother of defendant Zaki Rakib. During the Class Period, Shlomo Rakib signed certain of the Company's SEC filings, including Terayon's 2005 Form 10-K and also made or was responsible for other materially false and misleading statements about the Company. Defendant Shlomo Rakib also held the position of President and Chief Technology Officer of the Company, until his resignation therefrom on October 1, 2004. During the Class Period – and in fact on the same day that Zaki Rakib sold 150,000 shares on February 16, 2005 – Shlomo Rakib also sold 150,000 shares of Terayon stock at artificially inflated prices, resulting in proceeds of $530,145.

20.     Defendant Carol Lustenader was, during the Class Period, Chief Financial Officer of the Company, having assumed this position on or about October 29, 2001, until her resignation on or about February 26, 2003. During the Class Period, defendant Lustenader signed and certified certain of the Company's SEC filings, including Terayon's 3Q:01 Form 10-Q, 2002 Form 10-K, 1Q:02 Form 10-Q, 2Q:02 Form 10-Q, and 3Q:02 Form 10-Q, and also made or was responsible for other materially false and misleading statements about the Company. During the Class Period, defendant Lustenader sold approximately 138,829 shares of Terayon stock at artificially-inflated prices for total proceeds of approximately $754,040.

5

1    21.    Defendant Christopher Schaepe was, during the Class Period, a member of the Board

2    of Directors of the Company.  During the Class Period, defendant Schaepe signed certain of the

3    Company's SEC filings, including Terayon's 2002 Form 10-K, 2003 Form 10-K and 2004 Form 10-

4    K, and also made or was responsible for other materially false and misleading statements about the

5    Company.  During the Class Period, defendant Schaepe sold approximately 229,431 shares of

6    Terayon stock at artificially-inflated prices for total proceeds of approximately $2,102,405.

7    22.    Defendant Jerry D. Chase was, during the Class Period, Chief Executive Officer and

8    a member of the Board of Directors of the Company.  During the Class Period, defendant Chase

9    signed certain of the Company's SEC filings, including Terayon's Forms 10-Q and Forms 10-K.

10    Defendant Chase also made or was responsible for the publication of other materially false and

11    misleading statements about the Company during the Class Period.

12    23.    Defendant Mark A. Richman was, beginning on or about November 30, 2004

13    through the end of the Class Period, Chief Financial Officer and Principal Financial and Accounting

14    Officer of the Company.  During the Class Period, defendant Richman signed certain of the

15    Company's SEC filings, including Terayon's Forms 10-Q and Forms 10-K, and also made or was

16    responsible for other materially false and misleading statements about the Company.

17    24.    Defendant Edward Lopez was, during the Class Period, Acting Chief Financial

18    Officer and Principal Financial and Accounting Officer of the Company.  Defendant Lopez also

19    served as General Counsel of the Company from 1999 until his resignation as Senior Vice President,

20    General Counsel and Human Resources Director effective December 31, 2004.  During the Class

21    Period, defendant Lopez signed and certified certain of the Company's SEC filings, including

22    Terayon's 3Q:04 Form 10-Q and also made or was responsible for other materially false and

23    misleading statements about the Company.

24    25.    Defendant Lewis Solomon was, during the Class Period, a member of the Board of

25    Directors of the Company.  During the Class Period, defendant Solomon signed certain of the

26    Company's SEC filings, including Terayon's 2005 Form 10-K and also made or was responsible for

27    other materially false and misleading statements about the Company.  During the Class Period,

28

6

1  defendant Solomon also served as Chairman of the Compensation Committee and a member of the

2  Nominating and Governance Committee of the Board of Directors of the Company.

3      26.    Defendant Matthew Miller was, during the Class Period, a member of the Board of

4  Directors of the Company.  During the Class Period, defendant Miller signed certain of the

5  Company's SEC filings, including Terayon's 2005 Form 10-K, and also made or was responsible

6  for other materially false and misleading statements about the Company.

7      27.    Defendant Mark Slaven was, during the Class Period, a member of the Board of

8  Directors of the Company.  During the Class Period, defendant Slaven also served as Chairman of

9  the Audit Committee and a member of the Nominating and Governance Committee of the Board of

10  Directors of the Company.  During the Class Period, defendant Slaven signed certain of the

11  Company's SEC filings, including Terayon's 2005 Form 10-K and also made or was responsible for

12  other materially false and misleading statements about the Company.

13      28.    Defendant David Woodrow was, during the Class Period, a member of the Board of

14  Directors of the Company.  During the Class Period, defendant Woodrow also served as a member

15  of the Audit Committee and as Chairman of the Nominating and Governance Committee of the

16  Board of Directors of the Company.  During the Class Period, defendant Woodrow signed certain of

17  the Company's SEC filings, including Terayon's 2005 Form 10-K and also made or was responsible

18  for other materially false and misleading statements about the Company.

19      29.    Defendant Howard W. Speaks was, during the Class Period, a member of the Board

20  of Directors of the Company.  During the Class Period, defendant Speaks also served as member of

21  the Audit Committee and a member of the Compensation Committee of the Board of Directors of

22  the Company.  During the Class Period, defendant Speaks signed certain of the Company's SEC

23  filings, including Terayon's 2005 Form 10-K, and also made or was responsible for other materially

24  false and misleading statements about the Company.

25      30.    Defendant Ray Fritz was, during the Class Period, Chief Financial Officer of the

26  Company, having held this position until his departure from the Company on or about October 29,

27  2001.  During the Class Period, defendant Fritz signed certain of the Company's SEC filings,

28

7

1   including Terayon's 2Q:01 Form 10-Q, and also made or was responsible for other materially false

2   and misleading statements about the Company.

3       31.    Defendant Doug Sabella was, from July 2003 until his sudden resignation on July 14,

4   2004, Chief Operating Officer of the Company. During the Class Period, defendant Sabella made or

5   was responsible for materially false and misleading statements about the Company.

6       32.    Defendant Arthur T. Taylor was, during the Class Period, Senior Vice President and

7   Chief Financial Officer of the Company. He assumed this position on or about February 26, 2003,

8   following the resignation of defendant Lustenader, and remained until his resignation on or about

9   July 26, 2004. During the Class Period, defendant Taylor signed and certified certain of the

10  Company's SEC filings, including Terayon's 2003 Form 10-K, 1Q:03 Form 10-Q, 2Q:03 Form 10-

11  Q, 3Q:03 Form 10-Q, 2004 Form 10-K, 1Q:04 Form 10-Q, and 2Q:04 Form 10-Q, and also made or

12  was responsible for other materially false and misleading statements about the Company.

13      33.    The defendants referenced above in ¶¶ 18-32 are referred to herein as the "Individual

14  Defendants."

15      34.    Because of the Individual Defendants' positions with the Company, they had access

16  to the adverse undisclosed information about its business, operations, products, operational trends,

17  financial statements, markets, and present and future business prospects *via* access to internal

18  corporate documents (including the Company's operating plans, budgets and forecasts and reports

19  of actual operations), conversations and connections with other corporate officers and employees,

20  attendance at management and Board of Directors meetings and committees thereof and *via* reports

21  and other information provided to them in connection therewith.

22      35.    It is appropriate to treat the Individual Defendants as a group for pleading purposes

23  and to presume that the false, misleading and incomplete information conveyed in the Company's

24  public filings, press releases and other publications as alleged herein are the collective actions of the

25  narrowly defined group of defendants identified above. Each of the Individual Defendants, by

26  virtue of his or her high-level position with the Company, directly participated in the management

27  of the Company, was directly involved in the day-to-day operations of the Company at the highest

28  levels and was privy to confidential proprietary information concerning the Company and its

8

1   business, operations, products, growth, financial statements, and financial condition, as alleged

2   herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the

3   false and misleading statements and information alleged herein, knew, or recklessly disregarded,

4   that the false and misleading statements were being issued regarding the Company, and approved or

5   ratified these statements, in violation of the federal securities laws.

6          36.    As officers and/or controlling persons of a publicly-held company whose common

7   stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

8   Nasdaq National Market Exchange (the "Nasdaq"), and governed by the provisions of the federal

9   securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and

10  truthful information with respect to the Company's financial condition and performance, growth,

11  operations, financial statements, business, products, markets, management, earnings, and present

12  and future business prospects, and to correct any previously-issued statements that were materially

13  misleading or untrue, so that the market price of the Company's publicly-traded common stock

14  would be based upon truthful and accurate information. The Individual Defendants'

15  misrepresentations and omissions during the Class Period violated these specific requirements and

16  obligations.

17         37.    The Individual Defendants participated in the drafting, preparation, and/or approval

18  of the various public reports and other communications complained of herein, and knew of, or

19  recklessly disregarded, the misstatements contained therein and omissions therefrom, and were

20  aware of their materially false and misleading nature. Because of their Board membership and/or

21  executive and managerial positions with Terayon, each of the Individual Defendants had access to

22  the adverse undisclosed information about Terayon's business prospects and financial condition and

23  performance as particularized herein and knew or recklessly disregarded that these adverse facts

24  rendered the positive representations made by or about Terayon and its business issued or adopted

25  by the Company materially false and misleading.

26         38.    The Individual Defendants, because of their positions of control and authority as

27  officers and/or directors of the Company, were able to and did control the content of the various

28  SEC filings, press releases and other public statements pertaining to the Company during the Class

9

1  Period. Each Individual Defendant was provided with copies of the documents alleged herein to be
2  misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent
3  their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is
4  responsible for the accuracy of the public reports and releases detailed herein and is therefore
5  primarily liable for the representations contained therein.

6      39.    Each of the defendants is liable as a participant in a fraudulent scheme and course of
7  business that deceived purchasers of Terayon common stock by disseminating materially false and
8  misleading statements and/or concealing material adverse facts during the Class Period. The
9  scheme: (i) deceived the investing public regarding Terayon's business, operations, management
10 and the intrinsic value of Terayon common stock; (ii) enabled defendants to artificially inflate the
11 price of Terayon common stock; (iii) enabled Terayon insiders to sell millions of dollars of their
12 privately held Terayon shares while in possession of material, adverse non-public information about
13 the Company; and (iv) caused Plaintiff and other members of the Class to purchase Terayon
14 common stock at artificially-inflated prices and to be damaged, thereby.

15                           **SUBSTANTIVE ALLEGATIONS**

16                                   **Background**

17     40.    Terayon was founded in 1993, to provide cable operators with a cable data system
18 that provided high-speed, broadband Internet access to subscribers. By 1999, the Company was
19 primarily selling its cable data system – comprised of cable modems and cable modem termination
20 systems (CMTS) – that utilized some proprietary Synchronous Code Division Multiple Access (S-
21 CDMA) technology.

22     41.    Fueled by an aggressive acquisition strategy and a relentless marketing campaign
23 involving a seemingly endless number of press releases and Internet advertisements, Terayon
24 promoted itself aggressively and its stock soared. In fact, between January 1999 and March 2000,
25 shares of the Company exploded, trading from around $40.00 per share to over $235.00 per share.
26 Also during that time the Company used millions of shares of Terayon stock to enable several large
27 acquisitions, including the $400 million acquisition of Telegate in 1999, and the $50 million
28 acquisition of Radwiz the prior year.

                                      10

42.    Accordingly, in a quest to become a purported "one stop shop" for broadband communications technology products, in the late 1990's Terayon spent just under $950 million in stock and cash to acquire the assets of third parties. In the end, however, these acquisitions provided only small incremental revenue growth, and Terayon took a whopping charge of approximately $500 million related to the write-off of purported "good will" accounting. By the end of 2005, Terayon had over $1 billion in accumulated losses.

43.    Thus, following the technology-market downturn in 2000, Terayon was forced to "refocus" its business, and the Company began selling data and voice products based on industry standard specifications, particularly the Data Over Cable System Interface Specification (DOCSIS). At or about that time, Terayon also began transitioning its proprietary-based products to standards-based products, and expanded sales of its digital video solutions (DVS) products to cable operators and satellite providers.

44.    Having undergone two substantial restructurings in its first decade of operations, by 2004 the Company announced a third restructuring intended to refocus Terayon's business and place DVS at the center of the Company's strategic operations. At that time, the Company began expanding its focus beyond cable operators, and more aggressively pursued opportunities for DVS products with television broadcasters, telecom carriers and satellite television providers. As part of this restructuring, and in response to lagging sales, Terayon also ceased investment in its CMTS product line.

45.    Since 2000, Terayon effectively terminated all of its telecom and satellite-focused businesses and incurred substantial restructuring charges. Just prior to the inception of the Class Period, as part of Terayon's decision to cease investment in the CMTS product line, the Company incurred over $23 million in restructuring and asset impairment charges.

46.    This is not the first time that Terayon and the Rakib brothers have been charged with securities fraud by a class of investors in federal court. In April 2000, in a case captioned *In re Terayon Communication Systems, Inc. Sec. Litig.* (N.D. Cal.) (the "Terayon Earlier Securities Fraud Action"), a class of investors filed suit in this District Court asserting that the Company and certain officers and directors (including certain of the defendants named herein) violated federal securities

11

1  laws by issuing false and misleading statements about the Company and thereby artificially inflating
2  the price of Terayon shares.

3      47.    In the Terayon Earlier Securities Fraud Action, plaintiff alleged that certain officers
4  and directors of Terayon sold over 180,000 of their personally-held Terayon shares while such
5  shares were artificially inflated by defendants' omissions of material information and publication of
6  materially false and misleading information about the Company, while these insiders were in
7  possession of material adverse non-public information about Terayon.  Terayon insiders allegedly
8  reaped illicit gross proceeds of over $30 million from their insider stock sales – including $7.2
9  million each by Zaki Rakib and Shlomo Rakib.

10     48.    Terayon ultimately agreed to pay over $15 million to settle the Terayon Earlier
11  Securities Fraud Action, with a significant amount of the settlement being paid in cash by the
12  Company.

13     49.    The allegations of fraud and misrepresentation in the Terayon Earlier Securities
14  Fraud Action raised significant red flags and ongoing concerns regarding the accuracy and
15  completeness of the Company's disclosures and the adequacy of the Company's controls and
16  procedures.  These red flags reasonably should have given Ernst & Young cause to approach the
17  Company's audits with a very high level of skepticism and to critically approach defendants'
18  disclosures and representations – especially those related to revenues and related-party transactions.
19  As independent auditors, Ernst & Young knew that investors placed the utmost reliance upon its
20  opinions and reports, and that such reliance was misplaced unless Ernst & Young made a very
21  critical investigation into Terayon's financial reports and operational statements.

22                **Ernst & Young's Knowing or Reckless Disregard of Obvious Cautionary Signs**

23     50.    Had Ernst & Young not knowingly or recklessly disregarded the most obvious
24  cautionary signs that existed at the Company, even before the inception of the Class Period, they
25  would necessarily have uncovered defendants' financial fraud and accounting scheme that existed
26  just under the surface of the Company throughout the Class Period.  As the Company's auditor
27  knew or recklessly disregarded, the Terayon insiders' stock sales were highly unusual in their timing
28  and amounts, and these sales support the reasonable inference that the Company insiders who sold

                                          12

1    stock during that time were in possession of material, adverse non-public information about the

2    Company.

3       51.    The sale of millions of dollars worth of insiders' personally-held Terayon stock

4    occurred at a time when, Terayon now admits, its financial statements were not true, accurate or

5    reliable. Rather than pay heed to these obvious cautionary signs that would have allowed them to

6    uncover defendants' accounting fraud, and given the complete lack of internal controls at the

7    Company that ultimately led Terayon to restate over 72 months of financial results, Ernst & Young

8    simply resigned from the Company as its purported independent auditor in September 2005.

9       52.    A former employee in the accounting department during the Class Period noted that

10   Ernst & Young *"was not clean on this stuff."* The former employee noted that Ernst & Young

11   "virtually closed the books for year end 2001 and 2000 – a 'no-no.'" These periods were, of course,

12   ultimately restated or significantly adjusted. According to the former employee, the auditor "did not

13   try to learn the Company's business." The former employee indicated that Lisa Portnoy, the Ernst &

14   Young partner on the account until sometime in 2005, did not focus on the account. Ernst & Young

15   also failed, in the course of its supposed due diligence, to have any material discussions with the

16   vice presidents of Terayon who ran each of its three business areas – video, modem, and CMTS.

17   Instead, Ernst & Young looked only at the paper trial, and the paper trail was incomplete. The

18   former employee also noted that problems with the accounting with respect to Verilink and RNI

19   [goods received but not invoiced] were based on recommendations by Ernst & Young that were "not

20   valid – they should have amortized over time." The former employee further noted that the

21   Company lacked the accounting personnel with the appropriate skills and qualifications to properly

22   perform necessary functions.

23      53.    With respect to the Thomson transaction, discussed below, according to the former

24   employee, the Company asked Ernst & Young what it needed to do to recognize the revenue. The

25   defendants "really wanted to recognize the revenue [because they] knew the third quarter 2004 for

26   CMTS was gonna be bad." Ernst & Young instructed the Company to simply "get an acceptance

27   letter from Thomson." "Terayon followed this guidance and it turned out to be wrong."

28

13

54.     The former employee further noted there was a possibility that not everything that the Company knew about the deliverables for the Thomson Transaction was disclosed to Ernst & Young, but that Ernst & Young failed to ask the appropriate and necessary questions in the course of its due diligence.  The former employee also noted that, at least by the time of the Thomson Transaction, the Company "knew their were other issues – bigger problems with revenue recognition."

55.     According to the former employee in the accounting department, another Ernst & Young partner, Mike Turner, specifically asked defendant Richman: "have you considered [SOP] 97-2?"  Defendant Richman's response was: "we are not a software company, we are not a software company."  Therefore, SOP 97-2 was not applied.  In the Restatement process, the Company admitted SOP 97-2 should have been applied but was not, as discussed below.

56.     At the time Ernst & Young abandoned the Company it failed to expose the fraud at Terayon and, instead, allowed the Company to file with the SEC the Company's financial statements certified as reliable.  At that time, Ernst & Young had no public objection to Terayon characterizing certain control deficiencies as one-time events that had already been substantially remedied or cured, and that were *not* expected to continue to have a material impact on the Company, nor were they having a material adverse impact on its financial reporting.

57.     Instead of disclosing the accounting fraud, Ernst & Young reaped millions of dollars in fees, and then dropped Terayon as a client immediately before the defendants' scheme was revealed.

58.     Ernst & Young was motivated to, and did, conceal Terayon and the Individual Defendants' accounting fraud because the auditor did not want to risk having the reputation of exposing its own clients to regulatory, civil or criminal sanctions.  As Ernst & Young well knew, exposing the accounting fraud at Terayon could, and foreseeably would, have cost them customers, business, revenues and earnings.  Accordingly, Ernst & Young disregarded the obvious  problems and "red-flags" within Terayon that a full, critical and independent inspection would have necessarily revealed.

14

59.    Ernst & Young's statements contained in the Company's SEC filings during the Class Period were each materially false and misleading when made for the following reasons, among others:

*    Terayon's financial statements and operational reports were *not* true, accurate or reliable. To the contrary, the value of Terayon's net income, earnings per share, results, and shareholders' equity had been materially overstated and its loss contingencies materially understated.

*    Ernst & Young had certified Terayon's financial statements as being GAAP compliant when they were not. In truth, in violation of GAAP, defendants failed to make proper and timely adjustments to Terayon's stated reports. As a result, the Company's profitability was materially overstated and costs and expenses understated.

*    Terayon's internal financial accounting and disclosure controls were grossly inadequate an ineffective and had not been properly tested by Ernst & Young, so as to prevent material misrepresentation of the Company's financial results and conditions.

*    Terayon's internal control deficiencies were material and pervasive, and had not been corrected by management at any time during the Class Period. Ernst & Young failed to refute defendants' denials and omissions during the Class Period, as a means of explaining away the obvious material internal control deficiencies.

**Defendants' Materially False and Misleading
Statements Made During the Class Period**

*June 28, 2001 Press Release*

60.    On June 28, 2001, the inception of the Class Period, Terayon published a release announcing preliminary results for the second quarter ended June 30, 2001, which provides, in part, as follows:

15

1     *Terayon expects to report total revenues in the range of $62 to $65 million.*

2     Excluding a $30 to $40 million charge, ***the company expects a preliminary pro***
3     ***forma loss for the second quarter of 2001 in the range of $0.38 to $0.40 per***
    ***share....***

4     <u>*July 24, 2001 Press Release*</u>

5     61.    On July 24, 2001, Terayon published a release announcing results for the second

6 quarter ended June 30, 2001. In addition to providing more financial information about the

7 Company, this release also quoted defendant Zaki Rakib, in part, as follows:

8     ***Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of***
    ***broadband access systems, today reported revenues of $65.7 million. Excluding a***
9     ***charge of $28.7 million for inventory related reserves and vendor cancellation***
    ***charges the pro forma net loss was $25.8 million, or $0.38 per share, for the***
10     ***second quarter ended June 30, 2001....***

11     ***Revenues for the second quarter of 2001 sequentially grew 22% to $65.7 million,***
    ***up from $54.0 million in the first quarter of 2001. Pro forma net loss in the first***
12     ***quarter of 2001 was $29.3 million, or $0.43 per share.***

13     "Given the challenging economic conditions, ***we are very pleased with our results***
    ***for the second quarter of 2001, and we are also optimistic about the quarter***
14     ***ahead,***" said Zaki Rakib, chief executive officer of Terayon. [Emphasis added.]

15     <u>*Form 10-Q for Second Quarter 2001*</u>

16     62.    On or about August 14, 2001, defendants filed with the SEC the Company's Form

17 10-Q for the quarter ended June 30, 2001 ("2Q:01 Form 10-Q"), signed by defendant Fritz. In

18 addition to making substantially similar statements concerning the Company's operations as were

19 contained in the June 28, 2001 and July 24, 2001 releases, the 2Q:01 Form 10-Q also stated, in part,

20 the following:

21     ***The accompanying consolidated financial statements have been prepared in***
    ***accordance with generally accepted accounting principles for interim financial***
22     ***information .... In the opinion of management, all adjustments (consisting***
    ***primarily of normal recurring accruals) necessary for a fair presentation of the***
23     ***financial statements at June 30, 2001 and for the three months and six months***
    ***ended June 30, 2001 and 2000 have been included.*** [Emphasis added.]
24

25     63.    The Company's 2Q:01 Form 10-Q also reported Terayon's "Liquidity and Capital

26 Resources," in part, as follows:

27     ***At June 30, 2001, we had approximately $250.9 million in cash and cash***
    ***equivalents, $143.1 million in short-term investments and a $2.5 million revolving***
28     ***line of credit. ...***

16

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1     ***In July 2000, we issued $500 million of 5% Convertible Subordinated Notes due in***

2     ***August 2007, resulting in net proceeds to us of approximately $484.5 million. The***
***notes are our general unsecured obligation and are subordinated in right of***

3     ***payment to all of our existing and future senior indebtedness and to all of the***
***liabilities of our subsidiaries.*** The Convertible Notes are convertible into shares of

4     our common stock at a conversion price of $84.01 per share at any time on or after
October 24, 2000 through maturity, unless previously redeemed or repurchased.

5     Interest is payable semiannually. ***Debt issuance costs related to the notes were***
***approximately $15.5 million.***

6     In February 2001, we repurchased approximately $195.6 million of the Convertible
Subordinated Notes for $68.5 million in cash, resulting in a pretax extraordinary gain

7     of approximately $121.5 million. ***In addition, in July and August 2001, we***
***repurchased approximately $104.3 million of the Convertible Subordinated Notes***

8     ***for $45.0 million in cash, resulting in a pretax extraordinary gain of***
***approximately $56.5 million.*** [Emphasis added.]

9

10       64.     The statements contained in Terayon's June 28, 2001 and July 24, 2001 release and

11 those statements contained in the Company's 2Q:01 Form 10-Q, referenced above, were each

12 materially false and misleading when made, and were known by defendants to be false at that time

13 or were recklessly disregarded as such, for the following reasons, among others:

14       (a)     At all times during the Class Period, Terayon's financial statements and operational

15 reports were *not* true, accurate or reliable. In fact, Terayon's net income, earnings per share,

16 reported results, and shareholders' equity had been materially overstated and its loss contingencies

17 understated;

18       (b)     At all times during the Class Period, unbeknownst to investors, the Individual

19 Defendants had certified Terayon's financial statements as being GAAP compliant despite the fact

20 that in truth the Company's profitability was materially overstated and costs and expenses

21 understated, as a result of defendants' failure to make true disclosures regarding the Company's

22 convertible note offering, and defendants' failure to make proper and timely adjustments to

23 Terayon's stated financial reports;

24       (c)     Throughout the Class Period, Terayon did not have adequate systems of internal

25 operational or financial controls, and the Company's financial results or operational reports were *not*

26 true, accurate or reliable. In truth, Terayon's internal financial accounting and disclosure controls

27 were not adequate nor effective and failed to prevent material fraud in the presentation of the

28 Company's financial results and condition;

1    (d)    Throughout the Class Period, the Company's financial statements and reports were

2  *not* prepared in accordance with GAAP and SEC rules;

3    (e)    The Company did not properly account for deferred revenue and related cost of

4  goods sold. For example, the Company did not sufficiently evaluate its video products and

5  improperly accounted for them in accordance with the revenue recognition criteria in SAB 104

6  when revenue should have been accounted for in accordance with the software revenue recognition

7  principles under SOP 97-2 – which requires the Company to establish vendor specific objective

8  evidence of fair value for each element within a multiple-element arrangement;

9    (f)    In at least 2003, 2004, and 2005 the Company improperly recognized revenue for

10  transactions where the Company did not properly apply SAB 101, as amended by SAB 104. The

11  Company improperly recognized a deferred revenue liability and a deferred cost of goods sold asset,

12  thereby overstating assets and liabilities, and during the Restatement determined that deferred

13  revenues and deferred cost of goods should not be recognized for these transactions. As a result, the

14  Company adjusted deferred revenues by $1.6 million, $1.0 million and $0.9 million for the years

15  ended 2003 and 2004 and the first two quarters of 2005, respectively, and adjusted deferred cost of

16  goods sold by $0.9 million, $0.3 million, and $0.6 million for the years ended 2003 and 2004 and

17  for the first two quarters of 2005;

18    (g)    The Company did not account for a significant transaction whereby it developed a

19  broadcast platform based on its DM 6400 product to sell to its customer Thomson Broadcast. As a

20  result, revenue was improperly and prematurely recognized in violation of SOP 97-2, and in

21  violation of SOP 81-1, which sets forth criteria for completed contract recognition. As a result, $7.8

22  million of revenue previously recognized in 2004 and $1.8 million related to direct development

23  costs previously recognized from the fourth quarter of 2003 through the second quarter of 2005

24  were also deferred and ultimately recognized in the quarter ended December 31, 2005;

25    (h)    The Company made improper allowances for doubtful accounts until at least 2004;

26    (i)    The Company did not effectively monitor and adjust reserves related to its

27  restructuring charges during the Class Period. The Company also over accrued reserves related to

28  legal fees, taxes and other liabilities owed to third-party vendors;

18

(j)    The Company did not have adequate internal control over financial reporting, including: (i) insufficient controls related to identification, capture, and timely communication of financially significant information between certain parts of the organization and the accounting and finance department to enable accounting for transactions in a complete and timely manner; (ii) lack of sufficient personnel with technical accounting expertise in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP; (iii) failure to properly recognize revenue in accordance with GAAP, including revenue recognized in accordance with the following principles: Statement of Position ("SOP") 97-2, "Software Revenue Recognition;" Staff Accounting Bulletin ("SAB") No. 101, "Revenue Recognition," as amended by SAB 104; "Accounting for Performance of Construction Type and Certain Production-Type Contracts" (SOP 81-1); and Financial Accounting Standards Board, Emerging Issues Task Force (EITF) 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables; (iv) improper use of estimates, including monitoring and adjustment balances related to certain accruals and reserves, including allowance for doubtful accounts, legal charges, license fees, restructuring charges, taxes, warranty obligations and fixed assets; (v) lack of sufficient analysis and documentation of the application of GAAP; and (vi) ineffective controls over the documentation, authorization and review of manual journal entries and ineffective controls to ensure the accuracy and completeness of certain general ledger account reconciliations conducted in connection with period end financial reporting; and

(k)    The Company's Convertible Subordinated Notes contained several imbedded derivatives. First, the Notes contain a contingent put where in the event of any default by the Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all unpaid principal and interest to be due and immediately payable. In fact, this provision was triggered and the Company was forced to pay off the entire principal amount for a total of $65.6 million in the quarter ending March 31, 2006. This provision was not disclosed to investors and was affirmatively concealed from them from the beginning of the Class Period until a California newspaper revealed the truth in January of 2006, shortly before the end of the Class Period. Two additional embedded derivatives – an investor conversion option and a liquidated

19

1  damages provision – did not comply with SFAS 133, which requires that an embedded derivative

2  must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone

3  derivative if the economic characteristics and risks of the embedded derivative would not be

4  considered clearly and closely related to the host contract.

5  *October 23, 2001 Press Release*

6  65.    On October 23, 2001, Terayon published a release announcing results for the third

7  quarter ended September 30, 2001.  In addition to providing financial information about the

8  Company, this release also quoted defendant Zaki Rakib, in part, as follows:

9  > **Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
   > broadband access systems, today reported revenues of $79.6 million.** Excluding a
10  > charge of $6.4 million for inventory related reserves and vendor cancellation charges,
   > **the pro forma net loss was $21.2 million, or $0.31 per share, for the third quarter
11  > ended September 30, 2001 …. Revenues for the third quarter of 2001 grew to $79.6
   > million, up from $65.7 million in the second quarter of 2001. Pro forma net loss in
12  > the second quarter 2001, excluding a charge of $28.7 million for inventory related
   > reserves and vendor cancellation charges, was $25.8 million, or $0.38 per share.**

13

14  > \*\*\*

15  > "Given the challenging economic conditions, *we are very pleased with our
   > achievements and results in the third quarter of 2001*," said **Zaki Rakib**, chief
16  > executive officer of Terayon. [Emphasis added.]

17  *Form 10-Q for Third Quarter 2001*

18  66.    On or about November 14, 2001, defendants filed with the SEC the Company's

19  3Q:01 Form 10-Q for the quarter ended September 30, 2001 ("3Q:01 Form 10-Q"), signed by

20  defendant Lustenader.  In addition to making substantially similar statements concerning the

21  Company's operations as were contained in Terayon's October 23, 2001 release, the 3Q:01 Form

22  10-Q also stated, in part, the following:

23  > **The accompanying consolidated financial statements have been prepared in
   > accordance with generally accepted accounting principles for interim financial
24  > information …. In the opinion of management, all adjustments (consisting
   > primarily of normal recurring accruals) necessary for a fair presentation of the
25  > financial statements at September 30, 2001 and for the three months and nine
   > months ended September 30, 2001 and 2000 have been included.**
26  > [Emphasis added.]

27  67.    The Company's 3Q:01 Form 10-Q also reported Terayon's Liquidity and Capital

28  Resources, in part, as follows:

20

1

2

3

4

5

*In July 2000, we issued $500 million of 5% Convertible Subordinated Notes due in August 2007, resulting in net proceeds to us of approximately $484.5 million. The notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries.* The Convertible Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semiannually. *Debt issuance costs related to the notes were approximately $15.5 million.*

6

7

8

9

*In February 2001, we repurchased approximately $195.6 million of the Convertible Subordinated Notes for $68.5 million in cash, resulting in a pretax extraordinary gain of approximately $121.5 million.* In addition, in July and August 2001, we repurchased approximately $104.3 million of the Convertible Subordinated Notes for $45.0 million in cash, resulting in an extraordinary gain of approximately $51.8 million. [Emphasis added.]

10   68.    The statements contained in Terayon's October 23, 2001 release and those statements

11   contained in the Company's 3Q:01 Form 10-Q, referenced above, were each materially false and

12   misleading when made and were known by defendants to be false at that time or were recklessly

13   disregarded as such, for the reasons stated herein in ¶ 64.

14                          *January 28, 2002 Press Release*

15   69.    On January 28, 2002, Terayon published a release announcing results for the fourth

16   quarter and full year ended December 31, 2001. In addition to announcing revenues of $279 million

17   for the year, this release stated, in part, the following:

18

19

20

*Terayon Communication Systems, Inc. (Nasdaq: TERN), the world's second largest provider of cable broadband modems and headends, today reported revenues of $80.2 million for the fourth quarter 2001, an increase of 27% from $62.9 million for the fourth quarter 2000.*

                              *    *    *

21

22

23

24

*For the full fiscal year, revenues were $279.5 million, down 18% compared to $339.5 million for the previous year.* Excluding $33.5 million in special charges related to inventory reserves and vendor cancellation exposures, *the pro forma loss in fiscal year 2001 was $86.1 million or $1.26 per share, compared to a full year 2000 pro forma loss of $15.5 million or $0.25 per share.*

                              *    *    *

25

26

27

28

At the end of December 2001, cash and short-term investments were $334 million. *The convertible debt outstanding at the end of December 2001 was $174 million down from $500 million as of December 2000.* The net cash position (cash less long term debt) improved to $160 million compared to $62 million at the end of 2000. [Emphasis added.]

21

1    70.    The Company's January 28, 2002 release also quoted defendant Zaki Rakib, in part,

2  as follows:

3      "*The key to success in 2001 was focus*," said Dr. Zaki Rakib, Terayon CEO. "We
         focused on strengthening our financial position while continuing to invest in
4      technology. Terayon realized a return on its efforts when the S-CDMA technology
         was included in the completed DOCSIS™ 2.0 specification issued in December
5      2001. This opened a new window of opportunity for us in the U.S. market. Eight of
         the top nine U.S. MSOs are currently in different stages of testing our new TJ 615
6      DOCSIS 2.0-based modem and one of the top three already has indicated its intent to
         deploy the modem shortly." [Emphasis added.]

7

8                                    *2001 10-K*

9    71.    On or about April 1, 2002, defendants filed with the SEC the Company's 2001 Form

10  10-K for the year ended December 31, 2001, signed by defendants Zaki Rakib, Lustenader, Shlomo

11  Rakib, Schaepe, and Solomon.  In addition to making substantially similar statements concerning

12  the Company's operations as were contained in Terayon's January 28, 2002 release, the Company's

13  2001 Form 10-K also contained statements attesting to the "Critical Accounting Policies" that were

14  purported to then be in place at Terayon, in part, as follows:

15    **Critical Accounting Policies**

16    We consider certain accounting policies related to revenue recognition, bad debt
       reserves, inventory reserves, impairment of long-lived assets, warranty returns and
17    contingencies to be critical policies due to the estimation processes involved in each.

18                                 *    *    *

19    **Revenue Recognition**. We recognize revenue in accordance with SEC Staff
       Accounting Bulletin No. 101, Revenue Recognition in Financial Statements (SAB
20    101), as amended by SAB 101A and 101B. SAB 101 requires that four basic criteria
       must be met before revenue can be recognized: (1) persuasive evidence of an
21    arrangement exists; (2) delivery has occurred or services rendered; (3) the selling
       price is fixed and determinable; and (4) collectibility is reasonably assured.
22    Determination of criteria (4) is based on management's judgments regarding the
       collectibility of the selling price. Should changes in conditions cause management to
23    determine these criteria are not met for certain future transactions, revenue
       recognized for any reporting period could be adversely affected.

24                                 *    *    *

25    **Revenue Recognition**

26    The Company sells its products directly to broadband access service providers,
       system resellers and distributors and recognizes revenue upon shipment to the
27    customer when title is transferred. *Revenues related to product sales are generally
       recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery*

28

                                      22

1    *has occurred or services have been rendered, (3) the seller's price to the buyer is*
     *fixed or determinable, and (4) collectibility is reasonably assured. The Company's*
2    *existing agreements with its system resellers and distributors do not contain price*
     *protection provisions and do not grant return rights beyond those provided by the*
3    *Company's standard warranty.*   [Emphasis added.]

4         72.    The Company's 2001 Form 10-K also reported on Terayon's Liquidity and Capital

5    Resources, in part, as follows:

6         At December 31, 2001, we had approximately $100.3 million in cash and cash
          equivalents and $233.6 million in short-term investments.
7

8         *In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of*
          *approximately $484.4 million. The Notes are our general unsecured obligation*
9         *and are subordinated in right of payment to all of our existing and future senior*
          *indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
10        convertible into shares of our common stock at a conversion price of $84.01 per
          share at any time on or after October 24, 2000 through maturity, unless previously
11        redeemed or repurchased. Interest is payable semiannually. *Debt issuance costs*
          *related to the Notes were approximately $15.6 million.*
12

13        *In 2001, we repurchased approximately $325.9 million of the Notes for $113.4*
          *million in cash and $17.9 million in stock, resulting in an extraordinary gain of*
14        *approximately $185.3 million* net of $9.3 million of previously unamortized debt
          issuance costs. [Emphasis added.]
15

16                         *January 28, 2002 Ernst & Young Report*

17        73.    For full year 2001, Ernst & Young charged the Company over $500,000 in audit fees.

18   In return for payment of these fees, Ernst & Young provided an audit of the Company's reported

19   year-end financial results.  After completing that review at year end 2001, Ernst & Young provided

20   a report, dated January 28, 2002, to the Board of Directors and Stockholders of the Company that

21   stated, in part, as follows:

22        *We have audited the accompanying consolidated balance sheets of Terayon*
          *Communication Systems, Inc. as of December 31, 2001 and 2000, and the related*
23        *consolidated statements of operations, stockholders' equity, and cash flows for*
          *each of the three years in the period ended December 31, 2001…. Our*
24        *responsibility is to express an opinion on these financial statements and schedule*
          *based on our audits.*
25
          *We conducted our audits in accordance with auditing standards generally accepted*
26        *in the United States…. In our opinion, the consolidated financial statements*
          *referred to above present fairly, in all material respects, the consolidated financial*
27        *position of Terayon Communication Systems, Inc. at December 31, 2001 and 2000,*

28

                                          23

1    *and the consolidated results of its operations and its cash flows for each of the
     three years in the period ended December 31, 2001, in conformity with accounting*
2    *principles generally accepted in the United States.* [Emphasis added.]

3        74.    The statements made by defendants and contained in the Company's January 28,

4    2002 press release and in the 2001 Form 10-K, were each materially false and misleading and were

5    know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons

6    stated herein in ¶ 64.

7                          *April 29, 2002 Press Release and Conference Call*

8        75.    On April 29, 2002, Terayon published a release announcing results for the first

9    quarter ended March 31, 2002. This release provided financial information about the Company, in

10   part, as follows:

11       *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
         broadband access systems, today reported revenues of $57.2 million for the first*
12       *quarter 2002, an increase of 6% from $54.0 million for the first quarter 2001. The
         pro forma net loss for the first quarter 2002 was $3.9 million or $0.05 per share,*
13       *compared to a pro forma net loss of $29.3 million or $0.43 per share for the same
         period in 2001.*
14
                                            *    *    *
15
         The GAAP net loss for the first quarter 2002 was $4.1 million or $0.06 per share,
16       compared to $508.2 million or $7.53 per share for the same period in 2001. Gross
         margin in the first quarter of 2002 was 45%. *Excluding the benefit of reversing*
17       *$11.4 million in inventory reserves and vendor cancellation charges, the gross
         margin was 25%.* [Emphasis added.]
18

19       76.    The Company's April 29, 2002 release also quoted defendant Zaki Rakib, in part, as

20   follows:

21       *"Given the current economic environment, we are pleased with these results.*
         However, revenues for the telecom business were significantly below our
22       expectations due to continued weakness in telecom capital spending. In addition,
         revenues for the cable business were lower than expected due to the inability to ship
23       all of the cable modems on order for shipment during the quarter. The combination
         of these factors resulted in lower total revenues than expected for the quarter," said
24       Terayon's CEO Dr. Zaki Rakib. "*Despite these challenges, we were pleased with the
         progress we made this quarter in DOCSIS CMTS sales, which accounted for*
25       *approximately $8 million in revenues.*" [Emphasis added.]

26       77.    Later the same day, on April 29, 2002, defendants also conducted a conference call

27   for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

28   defendants reiterated the same or substantially similar material false and misleading statements

                                              24

1  concerning Terayon's revenues, earnings, gross margins and projected growth, as had been made

2  previously and contained in the Company's press release and its prior SEC filings. These

3  statements were false and misleading and failed to disclose that defendants had purposely failed to

4  report the Company's financial results in conformity with GAAP and SEC rules. These statements

5  were also false and misleading for the reasons set forth at ¶ 64.

6  *Form 10-Q for First Quarter of 2002*

7    78.    On or about May 15, 2002, defendants filed with the SEC the Company's Form 10-Q

8  for the quarter ended March 31, 2002 ("1Q:02 Form 10-Q"), signed by defendant Lustenader. In

9  addition to making substantially similar statements concerning the Company's finances and

10  operations as had been made in the April 29, 2002 press release and conference call, the 1Q:02

11  Form 10-Q also stated, in part, the following:

12    ***The accompanying consolidated financial statements have been prepared in
    accordance with generally accepted accounting principles in the United States for***
13    ***interim financial information and in accordance with the instructions to Form 10-
    Q and Article 10 of Regulation S-X.... In the opinion of management, all***
14    ***adjustments (consisting of normal recurring adjustments) necessary for a fair
    presentation of the financial statements at March 31, 2002 and for the three***
15    ***months ended March 31, 2002 and 2001 have been included.*** [Emphasis added.]

16    79.    The Company's 1Q:02 Form 10-Q also contained additional statements regarding

17  Terayon's critical accounting policies – including its revenue recognition policies – in part, as

18  follows:

19    **Revenue Recognition**

20    The Company sells its products directly to broadband access service providers,
    system resellers and distributors and recognizes revenue upon shipment to the
21    customer when title is transferred. ***Revenues related to product sales are generally
    recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery***
22    ***has occurred or services have been rendered, (3) the seller's price to the buyer is
    fixed or determinable, and (4) collectibility is reasonably assured. The Company's***
23    ***existing agreements with its system resellers and distributors do not contain price
    protection provisions and do not grant return rights beyond those provided by the***
24    ***Company's standard warranty.*** [Emphasis added.]

25    80.    The statements made by defendants and contained in the Company's April 29, 2002

26  press release, those statements made by defendants during the quarterly conference call, and those

27  statements contained in Terayon's 1Q:02 Form 10-Q, were each materially false and misleading and

28

25

1    were know by defendants to be false at that time, or were recklessly disregarded as such, for the

2    reasons stated herein in ¶ 64.

3                    *July 29, 2002 Press Release and Conference Call*

4        81.    On July 29, 2002, Terayon published a release announcing results for the second

5    quarter ended June 30, 2002. This release provided financial and operational information about the

6    Company, in part, as follows:

> ***Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
> broadband solutions, today reported revenues of $22.4 million for the second
> quarter 2002***, a decrease of 66% from $65.7 million for the second quarter 2001.
> For the six months ended June 30, 2002, revenues were $79.6 million, a decrease of
> 33% from $119.7 million for the same period 2001. ***The pro forma net loss for the
> second quarter 2002 was $28.3 million or $0.39 per share, compared to a pro
> forma net loss of $54.5 million or $0.81 per share for the same period 2001***. The
> pro forma net loss for the six months ended June 30, 2002 was $32.2 million or
> $0.44 per share, compared to a pro forma net loss of $83.8 million or $1.24 for the
> same period 2001.
>
>                              *    *    *
>
> In the second quarter, the gain resulting from the retirement of debt was $33.3
> million, and the write down of investments totaled $4.5 million. In addition, in the
> second quarter 2002, Terayon recorded a $4.0 million charge related to the
> impairment of goodwill and other intangible assets. ***The GAAP net loss for the
> second quarter 2002 was $3.7 million or $0.05 per share, compared to $62.5
> million or $0.93 per share for the same period 2001.***
>
> ***The GAAP net loss for the six months ended June 30, 2002 was $7.8 million or
> $0.11 per share, compared to $570.7 million or $8.45 per share for the same period
> 2001.*** [Emphasis added.]

19       82.    The Company's July 29, 2002 release again quoted defendant Zaki Rakib, in part, as

20   follows:

> Terayon's CEO **Zaki Rakib** said, "***Our revenues reflect the challenge of
> transitioning from proprietary to standards-based products during a period of
> difficult market conditions. While disappointed by the short-term outlook, we are
> encouraged by the growing demand for DOCSIS 2.0-based products***. In the
> previous quarter and during this quarter we have and will be fulfilling orders for our
> DOCSIS 2.0-based modems from three of the top four U.S. MSOs. The early
> adoption of DOCSIS 2.0 benefits Terayon given our leadership in its
> implementation." [Emphasis added.]

25       83.    The Company's July 29, 2001 release also noted:

> ***Terayon expects revenues in the third quarter to be in the range of $15 to $25
> million and the pro forma net loss to be in the range of $0.35 to $0.39 per share.***

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1    *For the full year, Terayon expects revenues, excluding Imedia Semiconductor, to
     be in the range of $110 to $130 million, and the pro forma per share loss to be in
2    the range of $1.15 to $1.41 per share.* Terayon plans to fund Imedia at a cost of
     approximately $5 to $6 million per quarter.
3

4    *Through aligning company resources to its strategic areas and to market
     conditions, Terayon will be able to achieve a reduction in its operating expenses in
     the near term.* With the exclusion of Imedia Semiconductor, Terayon expects
5    operating expenses to be below $20 million in the first quarter, 2003. [Emphasis
     added.]
6

7        84.    Later the same day, on July 29, 2002, defendants also conducted a conference call for

8    analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

9    defendants reiterated the same or substantially similar material false and misleading statements

10   concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

11   contained in the Company's press releases and SEC filings. These statements too were false and

12   misleading for the reasons set forth at ¶ 64.

13                            *Form 10-Q for Second Quarter of 2002*

14       85.    On or about July 29, 2002, defendants filed with the SEC the Company's Form 10-Q

15   for the quarter ended June 30, 2002 ("2Q:02 Form 10-Q"), signed by defendant Lustenader. In

16   addition to making substantially similar statements concerning the Company's operations as were

17   contained in Terayon's July 29, 2002 release, the 2Q:02 Form 10-Q also stated, in part, the

18   following:

19       *The accompanying condensed consolidated financial statements have been
         prepared in accordance with generally accepted accounting principles in the
20       United States for interim financial information and in accordance with the
         instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of
21       management, all adjustments (consisting of normal recurring adjustments
         necessary for a fair presentation of the financial statements at June 30, 2002 and
22       for the three and six months ended June 30, 2002 and 2001 have been included.*
         [Emphasis added.]
23

24       86.    The 2Q:02 Form 10-Q reported the Company's critical accounting policies –

25   including its revenue recognition policies – in part, as follows:

26   **Revenue Recognition**

27       The Company sells its products directly to broadband access service providers,
         system resellers and distributors and recognizes revenue upon shipment to the
28       customer when title is transferred. *Revenues related to product sales are generally*

                                              27

1    *recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery
     has occurred or services have been rendered, (3) the seller's price to the buyer is*
2    *fixed or determinable, and (4) collectibility is reasonably assured. The Company's
     existing agreements with its system resellers and distributors do not contain price*
3    *protection provisions and do not grant return rights beyond those provided by the
     Company's standard warranty.* [Emphasis added.]

4

5        87.    Regarding the Company's 5% Convertible Subordinated Notes, the 2Q:02 Form 10-

6    Q stated, in part, the following:

7    **Convertible Subordinated Notes**

8        *In the first six months of 2001, the Company repurchased approximately $195.6
         million of its Convertible Subordinated Notes (Notes) for $68.5 million in cash,*
9        *resulting in a gain of approximately $121.5 million,* net of related unamortized
         issuance costs of $5.6 million. In April 2002, the Company adopted SFAS No. 145
10       and determined that the extinguishment of its debt did not meet the criteria of an
         extraordinary item as set forth in SFAS No. 145. Accordingly, the Company will
11       now report its gain from retirement of its Notes in its results of operations. All prior
         periods will reflect the adoption of SFAS No. 145. *In the first six months of 2002,*
12       *the Company repurchased approximately $74 million of its Notes for $39.2 million
         in cash, resulting in a gain included in operations of approximately $33.3 million*
13       net of related unamortized issuance costs of $1.5 million. [Emphasis added.]

14       88.    The statements made by defendants and contained in the Company's July 29, 2002

15   press release, those statements made by defendants during the quarterly conference call, and those

16   statements contained in Terayon's 2Q:02 Form 10-Q, were each materially false and misleading and

17   were know by defendants to be false at that time, or were recklessly disregarded as such, for the

18   reasons stated herein in ¶ 64.

19                    *October 28, 2002 Press Release and Conference Call*

20       89.    On October 28, 2002, Terayon published a release announcing results for the third

21   quarter ended September 30, 2002.  This release provided financial and operational information

22   about the Company, in part, as follows:

23       *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
         broadband solutions, today reported revenues of $24.5 million for the third quarter*
24       *2002,* a decrease of 69% from $79.6 million for the third quarter 2001. For the nine
         months ended September 30, 2002, revenues were $104.1 million, a decrease of 48%
25       from $199.3 million for the same period 2001.

26   ///

27   ///

28   ///

28

1                                              *    *    *

2    In the third quarter of 2002, Terayon retired $35.1 million of debt, resulting in a gain
     of $15.8 million.
3

4    *The GAAP net loss for the third quarter 2002 was $16.0 million or $0.22 per
     share, compared to net income of $13.1 million or $0.19 per share for the same
     period 2001.* The GAAP net loss for the nine months ended September 30, 2002 was
5    $23.7 million or $0.33 per share, compared to a net loss of $557.6 million or $8.23
     per share for the same period 2001. [Emphasis added.]
6

7        90.    The Company's October 28, 2002 release again quoted defendant Zaki Rakib, in part,

8    as follows:

9        "*We're encouraged by the progress we made during the third quarter in
         transitioning from a leading manufacturer of proprietary cable broadband
10       solutions to a leader in standards-based offerings,*" said **Zaki Rakib**, Terayon's
         CEO. "During the quarter, we made significant progress with the top U.S. MSOs.
11       Four of the top six are currently deploying our DOCSIS 2.0 based TJ 615 and TJ 715
         cable modems. Though the telecommunications industry remains challenging, we
12       believe that the growing deployments of our DOCSIS 2.0-based modems, combined
         with our expanded relationships with the top MSOs, should present opportunities for
13       our DOCSIS 2.0-based CMTS." [Emphasis added.]

14       91.    Later the same day, on October 28, 2002, defendants also conducted a conference

15   call for analysts and investors, hosted by defendants Lustenader and Zaki Rakib.  During this call,

16   defendants reiterated the same or substantially similar material false and misleading statements

17   concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

18   contained in the Company's press releases and SEC filings.  These statements too were false and

19   misleading and failed to disclose that defendants had not reported  the Company's financial results

20   in conformity with GAAP and SEC rules.

21                                *Form 10-Q for Third Quarter 2002*

22       92.    On or about November 15, 2002, defendants filed with the SEC the Company's Form

23   10-Q for the quarter ended September 30, 2002 ("3Q:02 Form 10-Q"), signed by defendant

24   Lustenader.  In addition to making substantially similar statements concerning the Company's

25   operations as were contained in Terayon's October 28, 2002 relelase, the 3Q:02 Form 10-Q also

26   stated, in part, the following:

27       *The accompanying condensed consolidated financial statements have been
         prepared in accordance with generally accepted accounting principles in the
28       United States for interim financial information …. In the opinion of management,*

                                              29

*all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the financial statements at September 30, 2002 and for the three and nine months ended September 30, 2002 and 2001 have been included.* [Emphasis added.]

93.    The 3Q:02 Form 10-Q also reported the Company's critical accounting policies – including its revenue recognition policies – in part, as follows:

**Revenues.** We sell our products directly to broadband service providers, and to a lesser extent, resellers and integrators. *Revenues related to product sales are generally recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery has occurred or services rendered, (3) the selling price is fixed or determinable, and (4) collectibility is reasonably assured. A provision is made for estimated product returns as product shipments are made. Our existing agreements typically do not grant return rights beyond those provided by the warranty.* [Emphasis added.]

94.    Regarding the Company's 5% Convertible Subordinated Notes, the 3Q:02 Form 10-Q also stated, in part, the following:

**Convertible Subordinated Notes**

*In the three and nine months ended September 30, 2001, the Company repurchased approximately $104.3 million and $299.9 million, respectively, of Convertible Subordinated Notes (Notes) for $45.0 million and $113.4 million, respectively, in cash, resulting in a gain of approximately $51.8 million and $173.3 million, respectively,* net of related unamortized issuance costs and accrued taxes of $7.5 million and $13.2 million, respectively. In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, the Company is now reporting its gain from retirement of its Notes in its results of operations. All prior periods reflect the adoption of SFAS No. 145.

*In the first three and nine months of 2002, the Company repurchased approximately $35.1 million and $109.1 million, respectively, of Notes for $18.4 million and $57.6 million, respectively, in cash, resulting in a gain included in operations of approximately $15.8 million and $49.1 million, respectively,* net of related unamortized issuance costs of $0.9 million and $2.4 million, respectively. [Emphasis added.]

95.    The 3Q:02 Form 10-Q also contained statements that attested to the purported adequacy of the Company's controls and procedures, in part, as follows:

Within the 90 days prior to the date of filing this Quarterly Report on Form 10-Q, *we carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to*

30

1     *material information relating to us (including its consolidated subsidiaries) which is required to be included in our periodic SEC filings.*. [Emphasis added.]

2

3     *Certifications of Form 10-Q for Third Quarter of 2002*

4     96.    The 3Q:02 Form 10-Q also contained Certifications by defendants Lustenader and

5 Zaki Rakib that certified, in part, as follows:

6     *Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the*

7     *statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;*

8

9     *Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the*

10     *financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;*

11

                         \*   \*   \*

12

13     [The registrant's other certifying officers and I] *evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (11/14/02); and... presented in this quarterly*

14     *report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;*

15

16                          \*   \*   \*

17     [The registrant's other certifying officers and I have disclosed] *all significant deficiencies in the design or operation of internal controls which could adversely*

18     *affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in*

19     *internal controls; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's*

20     *internal controls...*

21     97.    In connection with the 3Q:02 Form 10-Q, defendants Lustenader and Zaki Rakib also

22 provided certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the

23 Sarbanes-Oxley Act of 2002 ("SOX") that *"the information contained in the Report fairly*

24 *presents, in all material respects, the financial condition and results of operations of the*

25 *Company."* [Emphasis added].

26     98.    The statements made by defendants and contained in the Company's October 28,

27 2002 press release, those statements made by defendants during the quarterly conference call, and

28 those statements contained in Terayon's 3Q:02 Form 10-Q, were each materially false and

31

1    misleading and were know by defendants to be false at that time, or were recklessly disregarded as

2    such, for the reasons stated herein in ¶ 64.

3                                    *January 30, 2003 Release*

4           99.    On January 30, 2003, Terayon published a release announcing results for the fourth

5    quarter and full year ended December 31, 2002. This release stated, in part, the following:

6           **Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of**
             **broadband solutions, today reported revenues of $25.3 million for the fourth**
7            **quarter 2002, a decrease of 68% from $80.2 million for the same period 2001. For**
             **the 12 months ended December 31, 2002, revenues were $129.4 million**, a decrease
8            of 54% from $279.5 million for the same period 2001.

9
             **The net loss for the fourth quarter 2002 was $20.5 million or $0.28 per share,**
10           **compared to a net loss of $6.2 million or $0.09 per share for the same period 2001.**
             The net loss for the 12 months ended December 31, 2002 was $44.2 million or $0.61
11           per share, compared to a net loss of $563.8 million, or $8.25 per share for the same
             period 2001.
12
                                           *    *    *
13
             **During the fourth quarter of 2002, Terayon made additional progress in aligning**
14           **the company's operating expenses with current market conditions**. Operating
             expenses for the fourth quarter 2002 were $18.9 million, excluding Imedia
15           Semiconductor. This is ahead of the company's stated goal of reducing expenses
             below $20 million, excluding Imedia Semiconductor, in the first quarter of 2003.
16           [Emphasis added.]

17          100.   The Company's January 30, 2003 release also quoted defendant Zaki Rakib, in part,

18   as follows:

19           Commenting on Terayon's accomplishments during the year, Terayon's CEO, Zaki
             Rakib said, "*We met many of our key strategic goals during 2002*, including: (1)
20           achieving DOCSIS™ 2.0 certification and qualification for our cable modems and
             CMTS; (2) increasing sales of data products to the top U.S. MSOs, as evidenced by
21           sales to divisions of Adelphia, Comcast, Cox and Time Warner Cable; (3) ramping
             up volume production of our DOCSIS 2.0 products; (4) cost-reducing our products,
22           in particular our cable modems; (5) maintaining our leadership position in digital
             video with our CherryPicker; (6) strengthening Imedia Semiconductor's position as a
23           broadband silicon provider; and (7) *maintaining a strong balance sheet: during*
             *2002*, despite a challenging economy and significant investments in research and
24           development, our net cash position (cash and equivalents minus the face value of
             convertible debt) decreased by $18.3 million. Our ending cash and equivalents on
25           hand is $206.5 million and the face value of convertible debt is $65.1 million."
             [Emphasis added.]
26

27          101.   Later the same day, on January 30, 2003, defendants also conducted a conference call

28   for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

                                               32

1  defendants reiterated the same or substantially similar material false and misleading statements

2  concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

3  contained in the Company's press releases and SEC filings. These statements were false and

4  misleading for the reasons set forth at ¶ 64.

5                              *Abrupt Resignation of Defendant Lustenader*

6         102.    On February 26, 2003, defendants announced that Lustenader had resigned as Chief

7  Financial Officer of the Company, and was being replaced by Arthur T. Taylor. At the time of her

8  resignation, defendants led the market to believe that there was no disagreement over the

9  Company's financial reporting, and that defendant Lustenader had left Terayon "to pursue other

10 interests."

11                              *Restructuring in 2003: Plant Closings and Layoffs*

12        103.    On March 14, 2003, defendants published a release announcing that the Company

13 was undergoing a complete restructuring designed to rationalize products and staff and reduce costs.

14 At that time, defendants published a release that quoted defendant Zaki Rakib and that stated, in

15 part, the following:

16        Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
          broadband solutions, today announced a *worldwide restructuring designed to reduce*
17        *its operating costs, improve efficiencies and re-align resources to focus on its core*
          *product offerings for the world's leading cable operators. Measures implemented*
18        *include a reduction in force of approximately 100 employees, or 20 percent of the*
          *workforce, and the closure of certain remote facilities. Terayon anticipates*
19        *realizing approximately $12 million to $15 million in annualized savings from*
          *these actions, combined with related operational savings including curtailment of*
20        *certain program and discretionary expenses. The company expects to record total*
          *charges in the range of approximately $4 million to $5 million associated with the*
21        *realignment and the writedown of certain related assets in the quarter ending*
          *March 31, 2003.*
22
          *"We are committed to achieving profitability and are taking the necessary steps to*
23        *facilitate reaching this key milestone,"* said **Zaki Rakib**, Terayon's CEO. "We have
          identified areas of our operations to streamline and consolidate, while retaining the
24        key resources to deliver upon the commitments we have made to our customers and
          to continue investing strategically for the future. *We are encouraged by the strong*
25        *interest customers are showing in Terayon's data, video and voice product lines*
          *and are looking to generate positive momentum in the coming quarters."*
26        [Emphasis added.]

27

28

                                              33

1

*2002 Form 10-K*

2    104.    On or about March 27, 2003, defendants filed with the SEC the Company's 2002

3    Form 10-K for the year ended December 31, 2002, signed by defendants Zaki Rakib, Taylor,

4    Shlomo Rakib, Schaepe, Solomon and Woodrow.  In addition to making substantially similar

5    statements concerning the Company's operations as were contained in the Company's January 30,

6    2003 and March 14, 2003 releases, the 2002 Form 10-K also described Terayon's Critical

7    Accounting Policies, in part, as follows:

8    **Critical Accounting Policies**

9    We consider certain accounting policies related to revenue recognition, bad debt
reserves, inventory valuation, impairment of long-lived assets, warranty returns,
10   restructuring, accounting for share based compensation and contingencies to be
critical policies due to the estimation processes involved in each. *We discuss each of*
11   *our critical accounting policies, in addition to certain less significant accounting*
*policies, with senior members of management and the audit committee, as*
12   *appropriate.*

13

14   **Use of Estimates**. The preparation of the consolidated financial statements and
related disclosures in conformity with accounting principles generally accepted in the
United States requires us to establish accounting policies that contain estimates and
15   assumptions that affect the amounts reported in the consolidated financial statements
and accompanying notes. *On an on-going basis, we evaluate our estimates,*
16   *including those related to product returns, bad debts, inventories, investments,*
*intangible assets and contingencies and litigation. We base our estimates on*
17   *historical experience and on various other assumptions that are believed to be*
*reasonable under the circumstances, the results of which form the basis for*
18   *making judgments about the carrying values of assets and liabilities that are not*
*readily apparent from other sources*. These policies include:

19

20   -    *revenue recognition;*

21   -    the allowance for doubtful accounts, which impacts revenue;

22   -    the valuation of exposures associated with the contract manufacturing operations and

23   estimating future warranty costs, which impact cost of goods sold and gross margins;

24   and

25   -    *the valuation of certain long-lived assets, especially goodwill and other purchased*

26   *intangible assets, which has resulted in impairment, which impacts operating*

27   *expenses.*

28

34

We have other equally important accounting policies and practices which may not require us to make significant estimates or assumptions. Despite our intention to establish accurate estimates and assumptions, actual results could differ from those estimates under different assumptions or conditions.

**Revenue Recognition.** We recognize revenue in accordance with SEC Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements (SAB 101), as amended by *SAB 101A and 101B. SAB 101 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services rendered; (3) the selling price is fixed and determinable; and (4) collectibility is reasonably assured. Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price*. Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected. [Emphasis added.]

105.    Regarding the Company's 5% Convertible Subordinated Notes, the 2002 Form 10-K stated, in part, the following:

**Convertible Subordinated Notes**

*In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes due in August 2007 (Convertible Notes) resulting in net proceeds to the Company of approximately $484.4 million.* The Convertible Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Convertible Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company may redeem some or all of the Convertible Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Convertible Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeds 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company will also make an additional payment of $193.55 per $1,000 principal amount of Convertible Notes, less the amount of any interest actually paid on the Convertible Notes before the date of redemption. The Company may redeem the Convertible Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. *Debt issuance costs related to the Convertible Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2002 amortization of debt issuance costs totaled $14.2 million.*

*In 2001, the Company repurchased approximately $325.9 million of Convertible Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of approximately $185.3 million,* net of related unamortized issuance costs of $9.3 million. In 2002, the Company repurchased approximately $109.1 million of Convertible Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million.

35

1                                    *    *    *

2       Approximately $65.1 million of Convertible Notes were outstanding at December
        31, 2002.  [Emphasis added.]
3

4       106.    The Company's 2002 Form 10-K also reported Terayon's Liquidity and Capital

5  Resources, in part, as follows:

6       At December 31, 2002, we had approximately $117.1 million in cash and cash
        equivalents and $89.4 million in short-term investments. *At December 31, 2001, we*
7       *had approximately $100.3 million in cash and cash equivalents and $233.6 million*
        *in short-term investments.*
8

9       *In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of*
        *approximately $484.4 million.* The Notes are our general unsecured obligation and
10      are subordinated in right of payment to all of our existing and future senior
        indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible
11      into shares of our common stock at a conversion price of $84.01 per share at any
        time on or after October 24, 2000 through maturity, unless previously redeemed or
12      repurchased. Interest is payable semi-annually. *Debt issuance costs related to the*
        *Notes were approximately $15.6 million.*
13

14      *Through December 31, 2002, we had repurchased approximately $434.9 million of*
        *the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain*
15      *on early retirement of debt of approximately $234.4 million* net of related
        unamortized issuance costs of $11.6 million. [Emphasis added.]
16

17      107.    The Company's 2002 Form 10-K also contained statements that purported to attest to

18  the adequacy of Terayon's controls and procedures, in part, as follows:

19      (a)  Evaluation of disclosure controls and procedures. Our Chief Executive Officer
        and our Chief Financial Officer, after evaluating the effectiveness of the company's
20      "disclosure controls and procedures" (as defined in the Securities Exchange Act of
        1934 Rules 13a-14(c) and 15-d-14(c)) as of a date (Evaluation Date) within 90 days
21      before the filing date of this annual report, have concluded that as of the Evaluation
        Date, *our disclosure controls and procedures were adequate and designed to*
22      *ensure that material information relating to us and our consolidated subsidiaries*
        *would be made known to them by others within those entities.*
23

24      (b)Changes in internal controls. There were no significant changes in our internal
        controls or to our knowledge, in other factors that could significantly affect our
25      disclosure controls and procedures subsequent to the Evaluation Date. [Emphasis
        added.]
26

27      108.    The Company's 2002 Form 10-K also contained SOX Certifications signed by

28  defendants Taylor and Zaki Rakib and filed with the SEC.  These Certifications stated, in part that

                                        36

1    *"the information contained in the Report fairly presents, in all material respects, the financial*

2    *condition and results of operations of the Company at the dates and for the periods indicated."*

3    <u>*January 24, 2003 Ernst & Young Report*</u>

4    109.    For full year 2002, Ernst & Young charged the Company over $610,000 for audit

5    related fees.  After completing that review at year end 2002, Ernst & Young provided its report,

6    dated January 24, 2003, to the Board of Directors and Stockholders of the Company.  The Report

7    read in part as follows:

8    *We have audited the accompanying consolidated balance sheets of Terayon*
     *Communication Systems, Inc. as of December 31, 2002 and 2001, and the related*
9    *consolidated statements of operations, stockholders' equity, and cash flows for*
     *each of the three years in the period ended December 31, 2002.... Our*
10   *responsibility is to express an opinion on these financial statements and schedule*
     *based on our audits.*
11

12   *We conducted our audits in accordance with auditing standards generally accepted*
     *in the United States.... We believe that our audits provide a reasonable basis for*
13   *our opinion.*

14   *In our opinion, the consolidated financial statements referred to above present*
     *fairly, in all material respects, the consolidated financial position of Terayon*
15   *Communication Systems, Inc. at December 31, 2002 and 2001, and the*
     *consolidated results of its operations and its cash flows for each of the three years*
16   *in the period ended December 31, 2002, in conformity with accounting principles*
     *generally accepted in the United States.*
17   [Emphasis added.]

18   110.    The statements made by defendants and contained in the Company's January 30,

19   2003 press release, those statements made by defendants during the quarterly conference call, and

20   those statements contained in Terayon's 2002 Form 10-K, were each materially false and misleading

21   and were know by defendants to be false at that time, or were recklessly disregarded as such, for the

22   reasons stated herein in ¶ 64.

23   <u>*April 29, 2003 Press Release and Conference Call re:1Q:03 Results*</u>

24   111.    On April 29, 2003, Terayon published a release announcing results for the quarter

25   ended March 31, 2003.  This release provided financial and operational information about the

26   Company, in part, as follows:

27

28

37

**Terayon Reports First Quarter 2003 Financial Results**

> *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of broadband solutions, today reported revenues of $22.3 million for the first quarter 2003,* a decrease of 61% from $57.2 million for the first quarter 2002. The net loss for the first quarter was $24.0 million or $0.33 per share, compared to a net loss of $4.1 million or $0.06 per share for the same period in 2002. These results include the impact of a restructuring charge of $3.2 million, or $0.04 per share, associated with the workforce reduction announced in March 2003.

*    *    *

> *Terayon took several steps during the first quarter to accelerate its path to profitability.* These included a workforce reduction and further realignment of the company's operating expenses with current market conditions. [Emphasis added.]

112.    The Company's April 29, 2003 release also quoted defendant Zaki Rakib, in part, as follows:

> *"Identifying areas to streamline and further consolidation of operations to meet our financial goals, while still investing strategically for the future, remain key objectives for Terayon in 2003*," said **Rakib**.

> *"Despite difficult market conditions, we came within our previously announced revenue target range for the first quarter,"* said **Zaki Rakib**, Terayon's CEO. "Like other equipment providers serving the cable industry, Terayon is experiencing a challenging and uncertain spending environment in 2003. *However, we are encouraged by the growing orders for our DOCSIS 2.0* (Data Over Cable Service Interface Specification) cable modems and that four of the top five U.S. cable operators are in various stages of testing or conducting field trials of our DOCSIS 2.0 CMTS (Cable Modem Termination System)." [Emphasis added.]

113.    Later the same day, on April 29, 2003, defendants also conducted a conference call for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call, defendants reiterated the same or substantially similar material false and misleading statements concerning Terayon's revenues, earnings, and gross margins as had been made previously and contained in the Company's press releases and SEC filings. These statements were false and misleading for the reasons set forth at ¶ 64.

*Form 10-Q for First Quarter 2003*

114.    On or about May 15, 2003, defendants filed with the SEC the Company's Form 10-Q for the quarter ended March 31, 2003 ("1Q:03 Form 10-Q"), signed by defendant Taylor. In addition to making substantially similar statements concerning the Company's operations as had been made by defendants previously, the 1Q:03 Form 10-Q also stated, in part, the following:

38

1
2
3
4
5

*The accompanying condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States for interim financial information and in accordance with the instructions to Form 10-Q and Article 10 of Regulation S-X. ... In the opinion of management, all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the financial statements at March 31, 2003 and for the three months ended March 31, 2003 and 2002 have been included.*
[Emphasis added.]

6    115.    The Company's 1Q:03 Form 10-Q also reported Terayon's Liquidity and Capital

7   Resources, in part, as follows:

8
9
10

At September 30, 2003, we had approximately $42.4 million in cash and cash equivalents and $107.0 million in short-term investments. *As of September 30, 2003, we had approximately $68.4 million of long-term obligations, principally relating to our 5% Convertible Subordinated Notes.*

11
12
13
14
15

*In July 2000, we issued $500 million of 5% Convertible Subordinated Notes, or Notes, due in August 2007, resulting in net proceeds to us of approximately $484.4 million. The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries.* The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million.*

16
17
18
19

*Through September 30, 2003, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4* million net of related unamortized issuance costs of $11.6 million. We did not repurchase any Notes during the first nine months of 2003. [Emphasis added.]

20    116.    The 1Q:03 Form 10-Q also contained statements that reported the adequacy and

21   sufficiency of the Company's Controls and Procedures, in part, as follows:

22
23
24
25
26
27
28

Within the 90 days prior to the date of filing this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. *Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information relating to us (including its consolidated subsidiaries) which is required to be included in our periodic SEC filings. Subsequent to the date of that evaluation, there have been no significant changes in our internal controls or in other factors that could significantly affect internal controls, nor were any corrective actions required with regard to significant deficiencies and material weaknesses.* [Emphasis added.]

39