*SOX Certifications Regarding First Quarter 2003*

117.    The Company's 1Q:03 Form 10-Q also contained SOX Certifications signed by defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, *"the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."* [Emphasis added.]

118.    The statements made by defendants and contained in the Company's April 29, 2003 press release, those statements made by defendants during the quarterly conference call, and those statements contained in Terayon's 1Q:03 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

*July 30, 2003 Press Release and Conference Call re: 2Q:03 Results*

119.    On July 30, 2003, Terayon published a release announcing results for the second quarter ended June 30, 2003. This release provided financial and operational information about the Company, in part, as follows:

**Terayon Reports Second Quarter 2003 Financial Results**

> Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of broadband solutions, *today announced financial results in line with its previously-raised guidance for the second quarter ended June 30, 2003.*
>
> *Revenues for the second quarter of 2003 were $30.6 million, an increase of 37% compared to $22.4 million for the second quarter of 2002, and an increase of 37% from $22.3 million for the first quarter of 2003.* Net loss for the second quarter of 2003 was $13.1 million, or $0.18 per share, compared to a net loss of $3.7 million, or $0.05 per share, for the second quarter of 2002, and a net loss of $24.0 million, or $0.33 per share, for the first quarter of 2003. [Emphasis added.]

120.    The Company's July 30, 2003 release also quoted defendant Zaki Rakib, in part, as follows:

> *"We are pleased with our progress this quarter and the continued positive momentum we are seeing with cable operator interest in our DOCSIS 2.0 solutions,"* said **Zaki Rakib**, Terayon's Chief Executive Officer. "In addition, we believe we are well positioned to capitalize on our DOCSIS 2.0 and digital video leadership positions as the cable industry works to meet the bandwidth management challenges presented by the expected growth of High Definition TV (HDTV), Video

40

on Demand, and new IP based services required to compete against telecom and satellite offerings. ***Going into the second half of 2003, we remain focused on achieving sustainable profitability through growing revenues, improving margins via product cost reductions, and prudent operating expense management.***" [Emphasis added.]

121.    Later the same day, on July 30, 2003, defendants also conducted a conference call for analysts and investors, hosted by defendants Taylor and Zaki Rakib.  During this call, defendants reiterated the same or substantially similar material false and misleading statements concerning Terayon's revenues, earnings, and gross margins as had been made previously and contained in the Company's press release and prior SEC filings.  In addition, during this call, defendant Rakib also stated, in part, the following:

ZAKI RAKIB, CEO, TERAYON COMMUNICATIONS SYSTEMS: Thanks Art. As you may have noted from our press release this afternoon, ***our revenues and loss per share for Q2, we're in line with the ranges we pre-announced on July third, and were better than the guidance we provided on our last earnings call. We are pleased with our progress in the second quarter, and believe we are generating increased momentum going into the second half of this year....***  [Emphasis added.]

122.    Also, during the July 30, 2003 conference call, defendant Taylor also stated, in part, the following:

ARTHUR TAYLOR: Thank you Zaki. I would like to present the financial highlights for the second quarter an outline our revenue and loss per share expectations in the third quarter. ***Looking at the second quarter P&L we reported $30.6m in net revenues, which was within the range we provided in our press release of July 3rd. As we noted in our press release, revenues came in higher than the anticipated range of $24m-$28m we provided in our last earnings call due primarily to the following three reasons.***

*        *        *

***Moving down the balance sheet, total current liabilities declined by $1.7m to $56.2m as of June 30th due in part to the reduction in the previously mentioned vendor cancellation charges.*** As of June 30th the vendor cancellation liability on the balance sheet stood at $6.5m. We ended the quarter with 404 employees compared to 406 employees as of March 31st. Over the next two quarters we anticipate this number will increase slightly to support the anticipated growth in CMTS deployment and in completion of important milestones on our product development roadmaps.

*        *        *

***We are targeting revenues for Q3 to be in the range of $33.0m to $36.0m.*** We have factored in the absence of the Telco Mini Flex revenue stream due to our sale of the product line early this month, as well substantially lower demand for our Legacy SCMA products. The net loss per share is anticipated to be in the range of 14 cents to

41

16 cents per share, based on 74.5m average shares outstanding. *We are targeting to end the quarter with approximately $144m to $147m in cash and equivalence and re anticipating no change in the amount of debt on our balance sheet.* [Emphasis added.]

### *Form 10-Q for Second Quarter 2003*

123.    On or about August 14, 2003, defendants filed with the SEC the Company's Form 10-Q for the quarter ended June 30, 2003 ("2Q:03 Form 10-Q"), signed by defendant Taylor and certified by defendants Taylor and Zaki Rakib. In addition to making substantially similar statements concerning the Company's operations as were contained in Terayon's July 30, 2003 release, the 2Q:03 Form 10-Q also reported the Company's critical accounting policies, in part, as follows:

> *The accompanying condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States for interim financial information and in accordance with the instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of management, all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the financial statements at June 30, 2003 and for the three and six months ended June 30, 2003 and 2002 have been included.* [Emphasis added.]

124.    The Company's 2Q:03 Form 10-Q also reported Terayon's Liquidity and Capital Resources, in part, as follows:

> At June 30, 2003, we had approximately $68.5 million in cash and cash equivalents and $93.4 million in short-term investments. *As of June 30, 2003, we had approximately $69.0 million of long-term obligations.*
>
> *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007, resulting in net proceeds to us of approximately $484.4 million.* The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million.*
>
> *Through June 30, 2003, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million.* We did not repurchase any Notes during the first six months of 2003. [Emphasis added.]

42

1    125.    The Company's 2Q:03 Form 10-Q also contained statements that purported to attest

2    to the adequacy of Terayon's controls and procedures, in part, as follows:

3         As of the end of the period covered by report, we carried out an evaluation, under the
          supervision and with the participation of our Chief Executive Officer and Chief
4         Financial Officer, of the effectiveness of the design and operation of our disclosure
          controls and procedures. ***Based on this evaluation, our Chief Executive Officer and***
5         ***Chief Financial Officer concluded that our disclosure controls and procedures are***
          ***effective in timely alerting them to material information this report.***
6
          ***There has been no change in our internal controls over financial reporting that***
7         ***occurred during our most recent fiscal quarter*** that has materially affected or is
          reasonably likely to materially affect our internal controls over financial reporting.
8         [Emphasis added.]

9                    *SOX Certifications Regarding Second Quarter 2003*

10   126.    The Company's 2Q:03 Form 10-Q also contained SOX Certifications signed by

11   defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "***the***

12   ***information contained in the Report fairly presents, in all material respects, the financial***

13   ***condition and results of operations of the Company at the dates and for the periods indicated.***"

14   [Emphasis added.]

15   127.    The statements made by defendants and contained in the Company's July 30, 2003

16   press release, those statements made by defendants during the quarterly conference call, and those

17   statements contained in Terayon's 2Q:03 Form 10-Q, were each materially false and misleading and

18   were know by defendants to be false at that time, or were recklessly disregarded as such, for the

19   reasons stated herein in ¶ 64.

20                    *October 7, 2003 Announcement of Shelf Registration*

21   128.    Attempting to take further advantage of the artificial inflation in the price of Terayon

22   stock caused by defendants' publication of materially false and misleading statements about the

23   Company, on October 7, 2003, defendants announced that Terayon would file with the SEC a Shelf

24   Registration Statement in connection with the planned sale of at least $125 million in Company

25   securities. This shelf registration would allow the Company, from time to time, to sell Terayon

26   stock on an expedited basis.

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1
*October 7, 2004 Revenue Update Regarding 3Q:03*

2     129.    Also, on October 7, 2003, defendants announced purported consensus beating

3  financial results for 3Q:03.  This release stated, in part, the following;

4     ***Terayon Provides Update on Better Than Expected Third Quarter Financial
      Performance***

5

6     ***Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of
      broadband solutions, today announced it expects revenues for its third quarter
      ending September 30, 2003 to be in the range of $37 million to $38 million. Net***

7     ***loss per share for the quarter is now expected to be in the range of $0.10 to $0.12.***
      Included in the expected net loss per share is approximately $0.02 of non-recurring

8     gain resulting from the reversal of a liability from a previously acquired company,
      and the Company's previously announced sale of its telco Miniplex product line and

9     related inventory.

10    ***This revised guidance compares favorably with previously provided estimates by
      the Company that revenues for the third quarter would be in the range of $33***

11    ***million to $36 million, and that the net loss per share would be in the range of
      $0.14 to $0.16***, including an expected $0.01 non-recurring gain from the Miniplex

12    transaction.

13    ***In its second quarter ending June 30, 2003, Terayon reported net revenues of
      $30.6 million and a net loss per share of $0.18.***

14
      ***"Our better than expected revenue performance for the third quarter stems***

15    ***primarily from higher unit shipments of our DOCSIS 2.0 CMTS (Cable Modem
      Termination System), stronger sales of our video headend product line, and higher***

16    ***than anticipated sales of our legacy S-CDMA products, partially offset by
      somewhat lower than expected DOCSIS 2.0 modem sales***," said Zaki Rakib,

17    Terayon's CEO. "We are particularly pleased with the growing customer
      acknowledgement of the economic and performance advantages of our DOCSIS 2.0

18    BW CMTS, as evidenced by the revenue growth we have seen over the last three
      quarters. ***Our better than anticipated net loss performance for the quarter is***

19    ***attributable to higher sales, a favorable product mix resulting in higher gross
      margin, and lower operating expenses due to continued cost containment efforts***."

20    [Emphasis added.]

21    *October 22, 2003 Press Release and Conference Call re: Results for 3Q:03*

22     130.    On October 22, 2003, Terayon published a release announcing results for the third

23  quarter ended September 30, 2003.  This release provided financial information about the Company,

24  in part, as follows:

25    **Terayon Reports Third Quarter 2003 Financial Results**

26    Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading innovator of
      intelligent broadband access, ***today announced financial results in line with its***

27    ***previously-raised guidance for the third quarter ended September 30, 2003.***

28

44

1   *Revenues for the third quarter of 2003 were $37.6 million, an increase of 54% compared to $24.5 million for the third quarter of 2002, and an increase of 23% from $30.6 million for the second quarter of 2003.* Net loss for the third quarter of 2003 was $7.2 million, or $0.10 per share, which compares to a net loss of $16.0 million, or $0.22 per share, for the third quarter of 2002 and a net loss of $13.1 million, or $0.18 per share, for the second quarter of 2003.

*   *   *

*Included in non-operating income for the third quarter of 2003 is a non-recurring gain of approximately $1.3 million, or $0.02 per share,* due to the sale of the Company's telco Miniplex product line and the reversal of a liability related to an overseas government R&D grant. [Emphasis added.]

131.    The Company's October 22, 2003 release also quoted defendant Zaki Rakib, in part, as follows:

"*We are pleased with our performance this quarter, as cable operators continue to validate the economic and performance advantages of our DOCSIS 2.0 and digital video solutions in the face of increasing competition from telecom and satellite offerings,*" said Zaki Rakib, Terayon's Chief Executive Officer. "The growing need for cable operators to offer competitive services such as high-speed data access, High Definition TV (HDTV), and Video on Demand creates bandwidth management challenges that they are addressing using Terayon solutions such as the DOCSIS 2.0 BW CMTS, DOCSIS 2.0 cable modems, and the DM 6400 Network CherryPicker. *We are encouraged by an improving trend in cable operator capital spending and believe that we are well positioned for revenue growth in the fourth quarter due to our industry leading solutions and our continued focus on operational execution.*" [Emphasis added.]

132.    Later the same day, on October 22, 2003, defendants also conducted a conference call for analysts and investors, hosted by defendants Taylor and Zaki Rakib. During this call, defendants reiterated the same or substantially similar material false and misleading statements concerning Terayon's revenues, earnings, and gross margins as had been made previously and contained in the Company's press releases and SEC filings. In addition, during this call, defendant Rakib also stated, in part, the following:

*I am pleased to report that our revenues and loss per share were better than the guidance we provided during our last earnings call, and we are in line with the ranges we pre-announced at October 7. Versus Q2 we grew revenues 23% sequentially, increased our gross margins, reduced our operating expenses, and continued to manage the balance sheet closely. I am pleased with our overall execution and the progress we are making towards achieving profitability.* We are seeing improved capital spending by key cable operators for CMTS equipment and digital video management systems, due in part to increase competition from Telco and satellite companies. This competition is accelerating the roll out of new cable-

45

based services, including video-on-demand, high-definition TV, voice-over IP, and higher rates for high speed data subscribers. Since these new offerings require both more bandwidth and bandwidth management, many cable operators are looking to vendors such as Terayon to provide the solutions to help them grow revenue, reduce subscriber churn, and lower their total cost of ownership. *We believe we are very well positioned to assist cable operators successfully addressing these critical objectives due to DOCSIS 2.0 and digital video leadership position.*

\*   \*   \*

*Looking forward, we are very encouraged by the improved market conditions and the favorable industry dynamics going into the fourth quarter.* We believe the cable operators will increasingly compete against the telecom and satellite companies with more service offerings and increased throughput, which we think bodes very well for both DOCSIS 2.0 and digital video management system adoption rates into 2004. We also believe we strengthened our ability to capitalize on the increasing numbers of opportunities through the investments made in people, processes, and systems over the past three quarters. *We believe that our value proposition is resonating with our customers and our ability to deliver upon those promises continues to improve. We feel we are well positioned to meet the growing needs of our customers and to have that reflected in improving financial performance in the quarters ahead.* [Emphasis added.]

133.    During the October 22, 2003 conference call, defendant Taylor  stated, in part, the following:

**ARTHUR TAYLOR**: Thank you Zaki. I would like to present the financial highlights for the third quarter and outline our revenue and loss per share expectations for the fourth quarter. *Looking at the third quarter P&L, we reported $37.6m in net revenues, which was within the range we provided in our press release of October 7. As we noted in our press release, revenues came in higher than the anticipated range of $33-36m we reported in our last earnings call due primarily to the following three reasons.* First, our DOCSIS CMTS business was stronger than expected due to increased demand in Japan and North America as Zaki outlined earlier. Second, sales of our digital video head-end product line were higher than expected due to increased demand coming largely from both escalating MSO rollout of HDTV offerings, VOD, and digital ad insertion, coupled with our own overall improved sales execution. The third reason our revenues exceeded our original target was higher than anticipated sales from our legacy S-CDMA product lines. Total S-CDMA revenues were approximately $1.3m, which was much higher than expected. As we have aligned the Company's focus and resources behind extending our DOCSIS 2.0 leadership division, we expect sales of proprietary products to be minimal going forward. Partially offsetting the higher than expected performance was lower, DOCSIS 2.0 modem revenues due in part to lower than expected unit sales overseas combined with the slower than expected ramp in unit orders from certain U.S. based MSO's. We believe this latter issue is now resolving itself and we are anticipating stronger cable modem revenue growth in Q4. [Emphasis added.]

46

1

*November 6, 2003 Release Regarding Defendants' Intention
to Sell Shares in Registered Offering*

2

3      134.    Attempting to take further advantage of the artificial inflation in the price of Terayon

4    shares caused by defendants' publication of false and materially misleading information, on

5    November 6, 2003, Terayon published a release announcing defendants' intention to sell 10.8

6    million shares of equity to the public in a registered offering.[1]  Gross proceeds from this sale were

7    expected to be at least $75.0 million – not including a 15% over-subscription allotment.

8

*Form 10-Q for Third Quarter 2003*

9      135.    On or about November 10, 2003, defendants filed with the SEC the Company's Form

10    10-Q for the quarter ended September 30, 2003 ("3Q:03 Form 10-Q"), signed by defendant Taylor

11    and certified by defendants Taylor and Zaki Rakib.  In addition to making substantially similar

12    statements concerning the Company's operations as were contained in Terayon's October 22, 2003

13    release and conference call, the Company's the 3Q:03 Form 10-Q also stated, in part, the following:

14        *The accompanying condensed consolidated financial statements have been
        prepared in accordance with generally accepted accounting principles in the*
15        *United States for interim financial information and in accordance with the
        instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of*
16        *management, all adjustments (consisting of normal recurring adjustments)
        necessary for a fair presentation of the financial statements at September 30, 2003*
17        *and for the three and nine months ended September 30, 2003 and 2002 have been
        included.*  [Emphasis added.]

18

19      136.    The Company's 3Q:03 Form 10-Q reported Terayon's Liquidity and Capital

20    Resources, in part, as follows:

21        At September 30, 2003, we had approximately $42.4 million in cash and cash
        equivalents and $107.0 million in short-term investments. *As of September 30, 2003,*
22        *we had approximately $68.4 million of long-term obligations, principally relating
        to our 5% Convertible Subordinated Notes.*

23
        *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes, or*
24        *Notes, due in August 2007, resulting in net proceeds to us of approximately $484.4
        million.*  The Notes are our general unsecured obligation and are subordinated in right
25        of payment to all of our existing and future senior indebtedness and to all of the

26

27      [1]   On November 14, 2003, as a result of an unfavorable reception by the institutional
    investment community, this offering was withdrawn.  At that time, however, defendant Zaki Rakib
28    stated that the withdrawal was not expected to adversely impact the Company because Terayon was
    "fortunate to be in a position where [it does] not need additional funds for operations."

47

liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. ***Debt issuance costs related to the Notes were approximately $15.6 million.***

***Through September 30, 2003, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million.*** We did not repurchase any Notes during the first nine months of 2003. [Emphasis added.]

137.    The Company's 3Q:03 Form 10-Q also contained statements that attested to the adequacy of Terayon's purported controls and procedures. In this regard, the 3Q:03 Form 10-Q stated, in part, the following:

As of the end of the period covered by report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information required to be presented in this report.*** [Emphasis added.]

*SOX Certifications Regarding First Quarter 2003*

138.    The Company's 3Q:03 Form 10-Q also contained SOX Certifications signed by defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "***the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.***" [Emphasis added.]

139.    The statements made by defendants and contained in the Company's October 7, 2003 and October 22, 2003 press releases, those statements made by defendants during the quarterly conference call, and those statements contained in Terayon's 3Q:03 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

///

///

///

48

*January 27, 2004 Release and Conference Call re FY:03*

140.   On January 27, 2004, Terayon published a release announcing results for the quarter ended December 31, 2003. This release provided financial information about the Company, in part, as follows:

**Terayon Reports Fourth Quarter and Full Year 2003 Results
And Announces Restructuring to Enhance Path to Profitability**

Terayon Communication Systems, Inc. (Nasdaq: TERN), the leading innovator of intelligent broadband access, *today announced financial results in line with its previous guidance for the fourth quarter and year ended December 31, 2003.*

*Revenue for the fourth quarter of 2003 was $43.0 million, a 70% increase compared to $25.3 million for the same quarter a year ago, and a 14% increase compared to $37.6 million for the third quarter of 2003.* Revenue for the twelve months ended December 31, 2003 was $133.5 million, a 3% increase compared to $129.4 million for the twelve months ended December 31, 2002.

*Net loss for the fourth quarter of 2003 was $6.0 million, or $0.08 per share, compared to a net loss of $20.5 million, or $0.28 per share, for the same quarter a year ago and a net loss of $7.2 million, or $0.10 per share, for the third quarter of 2003.* Net loss for the twelve months ended December 31, 2003 was $50.4 million, or $0.68 per share, compared to a net loss for the twelve months ended December 31, 2002 of $44.2 million, or $0.61 per share. [Emphasis added.]

141.   The January 27, 2004 release also quoted defendant Zaki Rakib, in part, as follows:

*"2003 was a critical year of transition and milestone achievements for Terayon,"* said **Zaki Rakib,** Terayon's Chief Executive Officer. "*We successfully completed the company migration from proprietary, baseline access products to standards-based and intelligent access products that lead the market, enabling broadband providers to deliver faster speeds and new services like voice and video conferencing through more economical, efficient networks.* Further, we have begun to execute on our plan to expand the market applicability of intelligent access products as evidenced by our selection by FOX Network for its broadcast high definition distribution system for its affiliates nationwide beginning in 2004."

\*   \*   \*

"Cable operators are responding to customer needs and competitive pressures by offering more bandwidth-intensive services such as faster high-speed data access, voice over the Internet (VoIP), HDTV, and Video on Demand in response to consumer and enterprise requirements and increasing competition from telecom and satellite operators," continued **Rakib.** *"Our goals for 2004 include: (1) capitalizing on our technology leadership and the opportunities created by these favorable market conditions to increase share across our CMTS, Subscriber and Digital Video businesses, (2) leveraging our best-of-breed digital video processing product*

49

*line into other vertical markets including satellite, broadcast and telecom, and (3) achieving sustainable profitability through a combination of revenue growth, operational efficiencies, expense management, and strategic partnerships.*"

*        *        *

"*As we announced in December 2003, we are targeting profitability beginning in the second quarter of 2004. The steps we are taking now provide us with a clearer path towards this objective by lowering our breakeven revenue point, re-sequencing our R&D pipeline to better align with customer timing requirements, and improving our overall efficiency by streamlining the organization and bolstering core processes,*" said **Doug Sabella,** Terayon's Chief Operating Officer. "Now that we have introduced our CableLabs-certified, low cost IM6130 modem chip into production and established market acceptance of our Terayon BW 3000 DOCSIS 2.0-qualified CMTS product line, we are able to free up and re-deploy certain engineering and technical resources. We remain committed to our position as technology leader and innovator in the broadband access space, and to our reputation for unparalleled customer service and support." [Emphasis added.]

142.    The January 27, 2004 release also reported the Company's Restructuring Activities that purportedly had recently taken place at the Company, including, the following:

**Restructuring Activities**

Terayon today announced its plans to reduce operating expenses and realign resources during the first quarter of 2004. This action is designed to advance the company towards sustainable profitability while retaining the resources necessary to drive innovation to capitalize on the growing market need for intelligent broadband access solutions. Related actions include: (1) a reduction in workforce of approximately 17%, or 70 employees, (2) the consolidation of certain facilities, (3) the write-down of related facility assets, and (4) a reduction in targeted areas of discretionary spending. The effect of these actions is expected to yield annualized operating savings of approximately $10 million to $12 million. Terayon expects to record a charge of approximately $5 million to $7 million in the quarter ending March 31, 2004 as a result of these actions.

*2003 Form 10-K*

143.    On or about March 15, 2004, defendants filed with the SEC the Company's 2003 Form 10-K for fourth quarter and fiscal year ended December 31, 2003, signed by defendants Zaki Rakib, Taylor, Shlomo Rakib, Solomon, Woodrow, and Slaven. In addition to making substantially similar statements concerning the Company's operations as had been announced by defendants on January 27, 2004, the 2003 Form 10-K also contained additional statements attesting to the critical accounting policies that were purported to then be in place at Terayon, including its revenue recognition policies, in part, as follows:

50

**Critical Accounting Policies**

We consider certain accounting policies related to our use of estimates, revenue recognition, bad debt reserves, inventory valuation, impairment of long-lived assets, warranty returns, restructuring, income taxes and contingencies to be critical policies due to the estimation processes involved in each. We discuss each of our critical accounting policies, in addition to certain less significant accounting policies, with senior members of management and the audit committee, as appropriate.

**Use of Estimates.** The preparation of the consolidated financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to establish accounting policies that contain estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. *We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.* These policies include:

- *revenue recognition*;

- the allowance for doubtful accounts, which impacts revenue;

- the valuation of exposures associated with the contract manufacturing operations and estimating future warranty costs, which impact cost of good sold and gross margins; and

- *the valuation of certain long-lived assets, especially goodwill and other purchased intangible assets, which has resulted in impairment, which impacts operating expenses*.

\* \* \*

**Revenue Recognition.** We recognize revenue in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), as amended by *SAB 101A and 101B and updated by SAB 104. SAB 101 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services rendered; (3) the selling price is fixed and determinable; and (4) collectibility is reasonably assured. Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price.* Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

\* \* \*

Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as we generally do not grant return rights beyond those provided by the warranty. [Emphasis added.]

51

144.    The Company's 2003 Form 10-K also reported Terayon's Liquidity and Capital Resources, in part, as follows:

> At December 31, 2003, we had approximately $30.2 million in cash and cash equivalents and $108.5 million in short-term investments.
>
> *    *    *
>
> In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of approximately $484.4 million. The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. **Debt issuance costs related to the Notes were approximately $15.6 million.**
>
> **Through December 31, 2003, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million.** No Notes were repurchased in 2003. [Emphasis added.]

145.    Regarding the Company's 5% Convertible Subordinated Notes, the Form 2003 10-K stated, in part, the following:

> **Convertible Subordinated Notes**
>
> **In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.4 million.** The Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company could have redeemed some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company would also make an additional payment of $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. **Debt issuance costs related to the Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2003, amortization of debt issuance costs totaled $14.5 million.**
>
> **In 2002, the Company repurchased approximately $109.1 million of the Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million. In 2001, the Company repurchased approximately $325.9 million of the Notes for $113.4 million in cash**

52

*and $17.9 million in stock, resulting in a gain of approximately $185.3 million, net of related unamortized issuance costs of $9.3 million.* The Company did not repurchase any Notes during 2003. [Emphasis added.]

146.    The Company's 2003 Form 10-K also contained statements that purported to attest to the adequacy of Terayon's controls and procedures, in part, as follows:

As of the end of the period covered by this Annual Report on Form 10-K, the Company carried out an evaluation, under the supervision and with the participation of the Company's Disclosure Committee and the Company's management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b); and whether any change has occurred in the Company's internal control over financial reporting pursuant to Exchange Act Rules 13a-15(d) and 15d-15(d). *Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in the Company's periodic Securities and Exchange Commission filings; and that no change in the Company's internal control over financial reporting occurred during the Company's most recent fiscal quarter that materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.* [Emphasis added.]

### SOX Certifications Regarding 2003 Form 10-K

147.    The Company's Form 10-K for 2003 also contained SOX Certifications signed by defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "*the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.*" [Emphasis added.]

### January 23, 2004 Ernst & Young Report

148.    For full year 2003, Ernst & Young charged the Company over $500,000 for audit related fees. After completing that review at year end 2003, Ernst & Young provided a report to the Board of Directors and Stockholders of the Company that stated, in part, as follows:

*We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2003....We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement....We believe that our audits provide a reasonable basis for our opinion.*

53

1
*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States....*

2

3

4

5    149.    The statements made by defendants and contained in the Company's December 8,

6    2003 and January 14, 2004 press releases, those statements made by defendants during the quarterly

7    conference call, and those statements contained in Terayon's 2003 Form 10-K, were each materially

8    false and misleading and were know by defendants to be false at that time, or were recklessly

9    disregarded as such, for the reasons stated herein in ¶ 64.

10    *April 29, 2004 Release and Conference Call Regarding Results for 1Q:04*

11    150.    On April 29, 2004, Terayon published a release announcing results for the quarter

12    ended March 31, 2004.  This release provided financial information about the Company, in part, as

13    follows:

14    Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of broadband access, delivery and management solutions, *today reported financial*

15    *results in line with prior guidance for the quarter ended March 31, 2004.*

16    *Revenues for the first quarter of 2004 were $41.2 million, an increase of 85% compared to $22.3 million for the first quarter of 2003, and a decrease of 4% from*

17    *$43.0 million for the fourth quarter of 2003. Net loss for the first quarter of 2004 was $10.2 million, or $0.14 per share, which compares to a net loss of $24.0*

18    *million, or $0.33 per share, for the first quarter of 2003 and a net loss of $6.0 million, or $0.08 per share, for the fourth quarter of 2003.* The results for the first

19    quarter of 2004 include a charge of $3.4 million, or $0.05 per share, related to restructuring activities and related asset write-offs. The results for the fourth quarter

20    of 2003 include a non-operating gain of $0.01 per share related to a favorable litigation settlement.  [Emphasis added.]

21

22    151.    The Company's April 29, 2004 release also quoted defendant Zaki Rakib, in part, as

23    follows:

24    "*We are pleased with the performance of our digital video solutions and subscriber product lines, which had higher than anticipated sales for the quarter. While our*

25    *CMTS sales in North America were also strong, they were offset by weaker CMTS sales in Asia as several customers extended their original deployment timeframes,*"

26    said Zaki Rakib, Terayon's Chief Executive Officer. "Important milestones for us during the quarter include: (i) the introduction of our award-winning Terayon BP

27    5100-HD broadcast platform, and its adoption by FOX Broadcasting Company to power their HDTV delivery system; (ii) a record number of shipments of our TJ 700

28    family of DOCSIS 2.0-certified modems, which we believe will further solidify our

54

position as number two worldwide cable modem supplier as first reported by Kinetic Strategies for the fourth quarter of 2003; and (iii) surpassing the 2,500 unit shipment mark for DOCSIS 2.0 CMTS line cards since our qualification by CableLabs in December 2002. *Going forward, we believe having the only proven end-to-end DOCSIS 2.0 solution and the best-of-breed digital video processing product line positions us to capitalize on the accelerating growth of new, bandwidth-intensive service offerings such as HDTV, VOD, VoIP and commercial services."* [Emphasis added.]

152.    The Company's April 29, 2004 release also provided an update on the Company's purported Restructuring Activities, in part, as follows:

**Restructuring Activities**

The first quarter 2004 restructuring activities announced by Terayon on January 27, 2004 have extended into the second quarter of 2004. During the first quarter of 2004 Terayon recognized a $3.4 million charge related to first quarter restructuring activities, as compared to the original estimated charge of $5 million to $7 million. During the second quarter of 2004 Terayon expects to record an additional charge of approximately $1.5 million to $2.0 million related to the completion of these restructuring activities. The cumulative effect of the actions taken over the first and second quarters of 2004 is expected to yield annualized operating savings of approximately $10 million beginning in the second quarter of 2004.

*For the second quarter of 2004, Terayon expects to report revenues in the range of $42 million to $46 million and anticipates a net loss in the range of $0.02 to $0.04 per share, excluding the effects of the estimated $1.5 million to $2.0 million charge.* Including the effects of the estimated charge, the net loss is expected to be in the range of $0.04 to $0.07 per share.   [Emphasis added.]

153.    Later the same day, on April 29, 2004, defendants also conducted a conference call for analysts and investors, hosted by defendants Taylor and Zaki Rakib.  During this call, defendants reiterated the same or substantially similar material false and misleading statements concerning Terayon's revenues, earnings, gross margins and projected growth, as had been made previously and contained in the Company's press releases and SEC filings.  In addition, during this call, defendant Rakib also stated, in part, the following:

**ZAKI RAKIB**, CEO, TERAYON COMMUNICATION SYSTEMS: Hello. Thank you for joining us. *I'm pleased to report that our financial results for the first-quarter were in line with our previous guidance. Art will provide additional details on these results later in the call. I would like to begin by highlighting the progress that we made over the last few quarters toward achieving sustainable profitability.* First, we have been able to grow revenues across all three of our businesses compared to first quarter of last year driven by the introduction of our DOCSIS 2.0 qualified product CMTS, growing our market share in cable modem from the number five vendor worldwide a year ago to the number two position today, and capitalizing on the increased demand for digital video band width management and ad-insertion solutions with cable and satellite operators and most recently extending these

55

offerings into the broadcast sector. Secondly, we have been able to improve gross margins over the past year through improved product mix, transitioning to lower cost manufacturing environments and implementing product cost reduction programs.

*While not there yet, we believe we are closing in our the target gross model as Art will outline for you later*. Finally over the last year we have taken strong measures to lower our operating expenses through head count reductions, resequencing of engineering programs, facility consolidations and other cost containment efforts. Our Q1 R&D and SG&A expenses are down 18% compared to Q1 of last year. *Revenues are up 85%.*

*We are pleased with the improving trend in our performance over the past year and anticipate making significant progress in Q2 towards achieving sustainable profitability.* We continue focusing on tight execution and extending our market leadership through innovations and unparalleled customer service.

\*    \*    \*

*In summary, I am pleased with the progress made over the past year in improving our operating performance and bringing innovation to the marketplace.* We are excited about the opportunities we believe are opening up to us for through the market dynamics being experienced by the cable, Teleco, and satellite providers. We continue to focus our efforts on execution to ensure that we're able to capitalize on these opportunities and drive towards sustainable profitability. With that, I would like to turn the call over to Art who will review the our first-quarter financial results in detail. [Emphasis added.]

154.    Also, during the April 29, 2004 conference call, defendant Taylor also stated, in part, the following:

ART TAYLOR: Thank you Zaki. I would like to present our financial highlights for the first-quarter and follow-up with our revenue and loss per share expectations for the second-quarter of 2004. *Today we reported net revenues of 41.2 million for the first quarter in line with our previous guidance. This is also is an 85% increase compared to the 22.3 million in net revenues for the same quarter last year and a 4% sequential decrease from the 43 million posted in Q4 last year.*

\*    \*    \*

*Moving down the balance sheet, total current liabilities decreased by 7.2 million to 48.2 million versus the prior quarter due mainly for payments for inventory purchases.* We ended the quarter with 367 employees compared to 423 as of the end of December. As previously discussed, we eliminated approximately 60 positions during the quarter, which was partially offset by head count additions reflecting the increased emphasis that we are placing this area in 2004...
[Emphasis added.]

56

1

*Form 10-Q for First Quarter 2004*

2      155.    On or about May 10, 2004, defendants filed with the SEC the Company's Form 10-Q

3    for the quarter ended March 31, 2004 ("1Q:04 Form 10-Q"), signed by defendant Taylor and

4    certified by defendants Taylor and Zaki Rakib.  In addition to making substantially similar

5    statements concerning the Company's operations as were contained in Terayon's April 29, 2004

6    release, the Company's the 1Q:04 Form 10-Q also stated, in part, the following:

7          *The accompanying condensed consolidated financial statements have been*
           *prepared in accordance with generally accepted accounting principles in the*
8          *United States for interim financial information and in accordance with the*
           *instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of*
9          *management, all adjustments (consisting of normal recurring adjustments)*
           *necessary for a fair presentation of the financial statements at March 31, 2004 and*
10         *for the three months ended March 31, 2004 and 2003 have been included.*
           [Emphasis added.]

11

12         The Company's 1Q:04 Form 10-Q also contained statements attesting to Terayon's
           Liquidity and Capital Resources that were purported to exist at that time.

13

14         **Liquidity and Capital Resources**

15         At March 31, 2004, we had approximately $76.1 million in cash and cash equivalents
           and $47.2 million in short-term investments.

16

17                                    *    *    *

18         *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of*
           *approximately $484.4 million.* The Notes are a general unsecured obligation and are
19         subordinated in right of payment to all of our existing and future senior indebtedness
           and to all of the liabilities of our subsidiaries. The Notes are convertible into shares
20         of our common stock at a conversion price of $84.01 per share at any time on or after
           October 24, 2000 through maturity, unless previously redeemed or repurchased.
21         Interest is payable semi-annually. *Debt issuance costs related to the Notes were*
           *approximately $15.6 million.*

22

23         *Through March 31, 2004, we had repurchased approximately $434.9 million of*
           *the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain*
24         *on early retirement of debt of approximately $234.4 million* net of related
           unamortized issuance costs of $11.6 million. [Emphasis added.]

25

26      156.    The Company's 1Q:04 Form 10-Q also contained statements that purported to attest

27    to the adequacy of Terayon's controls and procedures, as  follows:

28

57

1    **ITEM 4. CONTROLS AND PROCEDURES**

2    As of the end of the period covered by report, we carried out an evaluation, under the
     supervision and with the participation of our Chief Executive Officer and Chief
3    Financial Officer, of the effectiveness of the design and operation of our disclosure
     controls and procedures. ***Based on this evaluation, our Chief Executive Officer and***
4    ***Chief Financial Officer concluded that our disclosure controls and procedures are***
     ***effective in timely alerting them to material information required to be presented***
5    ***in this report.***

6    ***There has been no change in our internal controls over financial reporting that***
     ***occurred during our most recent fiscal quarter that has materially affected or is***
7    ***reasonably likely to materially affect our internal controls over financial reporting.***
     [Emphasis added.]
8

9    <u>*SOX Certifications Regarding First Quarter 2004*</u>

10   157.    The Company's 1Q:04 Form 10-Q also contained SOX Certifications signed by

11   defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "***the***

12   ***information contained in the Report fairly presents, in all material respects, the financial***

13   ***condition and results of operations of the Company at the dates and for the periods indicated.***"

14   [Emphasis added.]

15   158.    The statements made by defendants and contained in the Company's April 29, 2004

16   press release, those statements made by defendants during the quarterly conference call, and those

17   statements contained in Terayon's 1Q:04 Form 10-Q, were each materially false and misleading and

18   were know by defendants to be false at that time, or were recklessly disregarded as such, for the

19   reasons stated herein in ¶ 64.

20   <u>*Resignation of Zaki Rakib*</u>

21   159.    On May 27 2004, Terayon announced the resignation of defendant Zaki Rakib as

22   CEO of the Company, effective August 31, 2004, as well as the expansion of the Board of Directors

23   to include defendant Speaks. Upon the effectiveness of this resignation, defendant Zaki Rakib was

24   appointed Chairman of the Board of Directors of Terayon, replacing Shlomo Rakib in that capacity.

25   Defendant Shlomo Rakib continued to serve as President, Chief Technology Officer, and a member

26   of the Board of Directors. At that time, defendants also characterized Zaki Rakib's resignation as

27   being for "family reasons," and he was quoted in the Company's release as follows:

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

*"For the past 10 years, I have dedicated my time, my energy and my focus to Terayon, in large part at the expense of attention to my family. I feel now is the time to reverse the order of my priorities,"* said Dr. **Rakib**. *"I have led Terayon through its phenomenal growth phase and through its survival of the telecommunication industry's recession to where it is now – back on the path to growth. I pass to my successor the helm of a strong organization with a healthy balance sheet;* an organization recognized for its leadership in digital video, and pioneering efforts in high-speed cable data. Terayon's leadership position in many product areas, combined with its technology assets can deliver on promises to customers and shareholders." [Emphasis added.]

### *June 14, 2004 Announcement of Retirement of Defendant Sabella as COO*

160.    On June 14, 2004, defendant Sabella also announced his retirement as Chief

Operation Officer of the Company, effective July 16, 2004.  While defendant Sabella had served as

COO of the Company since July 2003, according to the Company's release, his sudden and

unscheduled departure from the Company had occurred so that he too could "pursue other interests."

### *July 26, 2004 Releases and Conference Call Regarding Results for 2Q:04, Resignation of CFO Arthur Taylor*

161.    On July 26, 2004, Terayon published a release announcing results for the quarter

ended June 30, 2004.  This release provided financial information about the Company, in part, as

follows:

Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of broadband access, delivery and management platforms, *today reported financial results in line with previous guidance for the quarter ended June 30, 2004.*

*Revenues for the second quarter of 2004 were $42.8 million, an increase of 40% compared to $30.6 million for the second quarter of 2003, and an increase of 4% from $41.2 million for the first quarter of 2004. Net loss for the second quarter of 2004 was $4.9 million, or $0.06 per share, which compares favorably to a net loss of $13.1 million, or $0.18 per share, for the second quarter of 2003 and a net loss of $10.2 million, or $0.14 per share*, for the first quarter of 2004. The results for the second quarter of 2004 include a charge of $3.6 million, or $0.04 per share, related to restructuring activities and executive separation payments.  The results for the first quarter of 2004 included a charge of $3.4 million, or $0.05 per share, related to restructuring activities and related asset write-offs. [Emphasis added.]

162.    The Company's July 26, 2004 release also quoted defendant Zaki Rakib, in part, as

follows:

*"We are pleased with the record sales of our Digital Video Solutions product line, and the strong sales performance of our Subscriber product line,"* said Zaki Rakib, Terayon's Chief Executive Officer. "Our video business is benefiting from the

59

increased number of HDTV offerings by cable and satellite operators, combined with growing demand for the Terayon CherryPicker's unique digital ad insertion capabilities. While our CMTS sales were weaker than expected due to slower than anticipated deployments from existing customers - particularly in Asia and to a lesser degree in Europe – combined with increased competition, *we believe recent actions we've undertaken will enable us to improve our sales execution and win new business in these regions.*"

\* \* \*

"Today we've also announced that Jerry Chase is joining Terayon as its new CEO. *We believe that under Jerry, Terayon is well positioned to capitalize on its leadership in digital video solutions and on our one year plus industry leadership in delivering the only end to end DOCSIS 2.0 solutions as cable operators accelerate the roll out of advanced services to their customers*," said **Rakib**. "In my new role as Chairman of the Board, I look forward to assisting Terayon achieve its mission of bringing the power of broadband to anyone, anywhere, at any time." [Emphasis added.]

163.    The Company's July 26, 2004 release also provided a Management Update, in part, as follows:

**Management Updates**

In a separate press release today, Terayon announced the appointment of Jerry D. Chase as Chief Executive Officer.

Today, Terayon also announced the resignation of Arthur T. Taylor from his role as Senior Vice President, CFO. Taylor is leaving to assume the role of CFO of a larger, publicly traded company. Edward Lopez, Terayon's Senior Vice President, General Counsel since 1999, has been appointed acting CFO. Terayon has begun a search for Taylor's successor.

164.    Later the same day, on July 26, 2004, defendants also conducted a conference call for analysts and investors, hosted by defendants Taylor and Zaki Rakib. During this call, defendants reiterated the same or substantially similar material false and misleading statements concerning Terayon's revenues, earnings, and gross margins as had been made previously and contained in the Company's press releases and SEC filings. In addition, during this call, defendant Rakib also stated, in part, the following:

**ZAKI RAKIB,** CEO, TERAYON COMMUNICATION SYSTEMS: Good afternoon everyone and thank you for joining us. Today we are reporting financial results for the second quarter that are in-line with our previous guidance. *Revenues were $42.8 million and the reported loss per share is 6 cents. As you will note our loss per share excluding restructuring and special charges was 2 cents, which was at the favorable end of the 2 to 4 cent guidance range we targeted on our last earnings call. It also is a substantial improvement over Q1's 9 cent loss per share*

60

1    *performance on a comparable basis*. Art will provide additional details on the
     financials later on the call.

2
                                        *    *    *
3

4    *In summary, I am pleased with the progress made over the past quarter and in
     bringing innovation to the marketplace*. We continue to monitor the opportunit-ies
     we believe are opening up for us through the market dynamics being experienced by
5    the cable, telco, satellite providers and broadcasters. *We continue to focus our
     efforts on execution to ensure we are able to capitalize on these opportunities and
6    drive towards sustainable profitability*. [Emphasis added.]

7    165.    Also, during the July 26, 2004 conference call, defendant Taylor also stated, in part,

8    the following:

9    ARTHUR TAYLOR: I would like now to present our financial highlights for the
     second quarter ....
10
     Today we reported net revenues of 42.8 million for the second quarter, in line with
11   our previous guidance. This is a 40 percent increase compared to the 30.6 million in
     net revenues recorded for the same quarter last year, and a 4 percent sequential
12   increase from the 41.2 million posted in Q1. [Emphasis added.]

13                          *Form 10-Q for Second Quarter 2004*

14   166.    On or about July 27, 2004, defendants filed with the SEC the Company's  Form 10-Q

15   for the quarter ended June 30, 2004 ("2Q:04 Form 10-Q"), signed by defendant Taylor and certified

16   by defendants Taylor and Zaki Rakib.  In addition to making substantially similar statements

17   concerning the Company's operations as were contained in Terayon's July 26, 2004 release, the

18   2Q:04 Form 10-Q also stated, in part, the following:

19   *The accompanying condensed consolidated financial statements have been
     prepared in accordance with generally accepted accounting principles in the
20   United States for interim financial information and in accordance with the
     instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of
21   management, all adjustments (consisting of normal recurring adjustments)
     necessary for a fair presentation of the financial statements at June 30, 2004 and
22   for the three and six months ended June 30, 2004 and 2003 have been included.*

23                                      *    *    *

24   **Critical Accounting Policies**

25   *There have been no material change to any of our critical accounting policies and
     estimates* as disclosed in our annual report on Form 10-K for the year ended
26   December 31, 2003.  [Emphasis added.]

27

28

                                          61

1    167.    The Company's 2Q:04 Form 10-Q also reported Terayon's Liquidity and Capital

2  Resources, in part, as follows:

3         At June 30, 2004, we had approximately $47.8 million in cash and cash equivalents
          and $68.5 million in short-term investments.
4
                                          *    *    *
5
          *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of*
6         *approximately $484.4 million. The Notes are a general unsecured obligation and*
          *are subordinated in right of payment to all of our existing and future senior*
7         *indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
          convertible into shares of our common stock at a conversion price of $84.01 per
8         share at any time on or after October 24, 2000 through maturity, unless previously
          redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs*
9         *related to the Notes were approximately $15.5 million.*

10        *Through June 30, 2004, we had repurchased approximately $434.9 million of the*
          *Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on*
11        *early retirement of debt of approximately $234.4 million net of related*
          *unamortized issuance costs of $11.6 million.* We did not repurchase any Notes in
12        2003 or 2004. [Emphasis added.]

13    168.    The Company's 2Q:04 Form 10-Q also contained statements that purported to attest

14  to the adequacy of Terayon's controls and procedures.  In this regard, the 2Q:04 Form 10-Q stated,

15  in part, the following:

16        As of the end of the period covered by report, we carried out an evaluation, under the
          supervision and with the participation of our Chief Executive Officer and Chief
17        Financial Officer, of the effectiveness of the design and operation of our disclosure
          controls and procedures. *Based on this evaluation, our Chief Executive Officer and*
18        *Chief Financial Officer concluded that our disclosure controls and procedures are*
          *effective in timely alerting them to material information required to be presented*
19        *in this report.*

20        *There has been no change in our internal controls over financial reporting that*
          *occurred during our most recent fiscal quarter* that has materially affected or is
21        reasonably likely to materially affect our internal controls over financial reporting.
          [Emphasis added.]
22

23            *SOX Certifications for Second Quarter of 2004 by Taylor and Zaki Rakib*

24    169.    The Company's 2Q:04 Form 10-Q also contained SOX Certifications signed by

25  defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "*the*

26  *information contained in the Report fairly presents, in all material respects, the financial*

27  *condition and results of operations of the Company at the dates and for the periods indicated.*"

28  [Emphasis added.]

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

170.    The statements made by defendants and contained in the Company's May 27, 2004 and July 26, 2004 press releases, those statements made by defendants during the quarterly conference call, and those statements contained in Terayon's 2Q:04 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

*Press Release and Conference Call Regarding "Record" Third Quarter 2004 Results*

171.    On October 28, 2004, Terayon published a release announcing results for the quarter ended September 30, 2004. This release provided financial information about the Company, in part, as follows:

> ***Revenues for the third quarter of 2004 were $37.2 million, down 1% from $37.6 million in the third quarter of 2003, and down 13% from $42.8 million in the second quarter of 2004.*** Net loss for the third quarter of 2004 was $13.5 million, or $0.18 per share, as compared to a net loss of $7.2 million, or $0.10 per share, in the third quarter of 2003, and a net loss of $4.9 million, or $0.06 per share, in the second quarter of 2004. The results for the third quarter of 2004 include an inventory charge of $7.3 million, or $0.10 per share, primarily related to a write-down of excess CMTS inventory, and a charge of $1.4 million, or $0.02 per share, related to an executive separation payment. The results for the second quarter of 2004 included an inventory benefit of $0.8 million, or $0.01 per share, related to the sale of previously reserved inventory, and a charge of $3.6 million, or $0.04 per share, related to restructuring activities and executive separation payments.
>
> The Digital Video Solutions product line had revenues of $10.8 million in the third quarter of 2004, compared to $4.6 million in the third quarter of 2003 and $7.5 million in the second quarter of 2004. The Subscriber product line had revenues of $19.8 million in the third quarter of 2004, compared to $16.2 million in the third quarter of 2003 and $25.0 million in the second quarter of 2004. The CMTS product line had revenues of $6.6 million in the third quarter of 2004, compared to $16.8 million in the third quarter of 2003 and $10.3 million in the second quarter of 2004. [Emphasis added].

172.    The Company's October 28, 2004 release also quoted defendant Chase, in part, as follows:

> ***"We are very pleased with our second consecutive quarter of <u>record revenues</u> in our Digital Video Solutions product line and the continued strong sales performance of our Subscriber product line,"*** said **Jerry Chase,** CEO, Terayon. "Important milestones for us during the quarter include: (i) the debut of the Terayon BP 5100 as the enabling technology behind Fox Broadcasting Company's launch of high definition broadcasts of National Football League games, and (ii) the Euro-DOCSIS 2.0 certification of the Terayon TJ721X cable modem, which delivers another level of assurance to cable operators seeking to build more efficient networks that meet regional specifications. In contrast to those strong performances, we are

63

1    disappointed by our weak CMTS sales, which reflect slower deployments by existing
2    customers and our ongoing challenge in winning new accounts."

3                                    *    *    *

4    "Despite Terayon's undisputed technology leadership in the DOCSIS 2.0 CMTS
     market, we have been unable to successfully translate that into a profitable CMTS
5    market leadership position," said Chase. "After careful evaluation of Terayon's
     overall product portfolio and strategy, we have decided to cease further investment in
6    our CMTS product line and halt development on future hardware upgrades.[2] We
     intend to work with existing customers to create agreeable support plans and
7    minimize disruption."

8    "*These changes do not alter our vision for the company,*" said **Chase**. "Terayon
     continues to provide broadband solutions for video, voice and data through its
9    existing Digital Video and Subscriber product lines, and *we will leverage our head-
     end intellectual property through our advanced technology group as market
10   opportunities arise in the future.*"

11   "As we look to future quarters, we see significant growth opportunities in our Digital
     Video Solutions product line driven by increased HDTV offerings and the move
12   from analog to digital content. In addition, we are seeing increased interest in more
     strategic applications of our digital video technology such as on-screen branding and
13   customer-relevant digital ad insertion," continued Chase. "Our Subscriber product
     line should benefit from the accelerating rollout of VoIP services by cable operators
14   as well as the continuing need to find new bandwidth within existing networks. We
     anticipate that our market leadership position and strong business models across both
15   product lines will position us well to leverage these compelling market dynamics,
     which offer a significant growth opportunity and an accelerated path to profitability
16   going forward." [Emphasis added.]

17                       *10-Q for Third Quarter 2004*

18        173.    On or about November 15, 2004, defendants filed with the SEC the Company's Form

19   10-Q for the quarter ended September 30, 2004 ("3Q:04 Form 10-Q"), signed and/or certified by

20   defendants Chase and Lopez. In addition to making substantially similar statements concerning the

21

22   _____

23        [2] By contrast, on November 18, 2004, it was reported that worldwide CMTS revenue was up
     an astounding 3% from 2Q04 to 3Q04, "triggered by a huge surge in cable IAD uptake," and "lifted
24   by strong performances from Cisco Systems and Motorola in all regions, especially North America,"
     according to Infonetics Research Cable Aggregation Hardware quarterly market share and forecast
25   report. According to this source, at that time, the worldwide CMTS market was projected to be
     $673 million in 2007. The major drivers were more bandwidth for consumers and businesses and
26   new packet telephone services. According to Michael Howard, principal analyst of Infonetics
     Research and lead author of Cable Aggregation Hardware, "Cable broadband subscriber growth in
27   North America continues unabated, with all major MSOs showing healthy single-digit quarterly
     subscriber growth this year... MSOs are maintaining a competitive advantage, despite the
28   momentum growing behind DSL..."

                                         64

1  Company's operations as had been made by defendants previously, the Company's 3Q:04 Form 10-

2  Q also stated, in part, the following:

3      *The accompanying condensed consolidated financial statements have been
       prepared in accordance with U.S. generally accepted accounting principles for
4      interim financial information and in accordance with the instructions to Form 10-
       Q and Article 10 of Regulation S-X.... In the opinion of management, all
5      adjustments (consisting of normal recurring adjustments) necessary for a fair
       presentation of the financial statements at September 30, 2004 and for the three
6      and nine months ended September 30, 2004 and 2003 have been included.*
       [Emphasis added.]
7

8      174.    The Company's 3Q:04 Form 10-Q also contained additional statements attesting to

9  the "Critical Accounting Policies" that were purported to then be in place at Terayon, as follows:

10     **Critical Accounting Policies**

11     *There have been no material change to any of our critical accounting policies and
       estimates as disclosed in our annual report on Form 10-K* for the year ended
12     December 31, 2003. [Emphasis added.]

13     175.    The Company's 3Q:04 Form 10-Q also contained statements attesting to Terayon's

14 Liquidity and Capital Resources that was purported to exist at that time, in part, as follows:

15     At September 30, 2004, we had approximately $64.1 million in cash and cash
       equivalents and $47.8 million in short-term investments.
16

17                                  *   *   *

18     *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of
       approximately $484.4 million. The Notes are a general unsecured obligation and
19     are subordinated in right of payment to all of our existing and future senior
       indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
20     convertible into shares of our common stock at a conversion price of $84.01 per
       share at any time on or after October 24, 2000 through maturity, unless previously
21     redeemed or repurchased. Interest is payable semi-annually. Debt issuance costs
       related to the Notes were approximately $15.5 million. [Emphasis added].
22

23     176.    The Company's 3Q:04 Form 10-Q also contained statements that purported to attest

24 to the adequacy of Terayon's controls and procedures. *While the 3Q:04 Form 10-Q did*

25 *acknowledge "a deficiency" in the Company's communications protocols, it also reported that*

26 *this problem had been substantially remedied and that, following a review of the Board of*

27 *Directors, the Company's internal controls and procedures were reasonably adequate.*

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

177.     As evidence of this, the 3Q:04 Form 10-Q also stated, in part, the following:

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer identified *a deficiency in our disclosure controls and procedures as of September 30, 2004, due to an inadequacy of communication between certain parts of the organization and the finance department.* In connection with the review of our financial statements for the third quarter of 2004, Ernst & Young LLP, our independent registered public accountants, advised our Audit Committee that they considered this deficiency to be a material weakness under standards established by the Public Company Accounting Oversight Board. *This material weakness related to an accrual of severance for an executive officer in an incorrect reporting period, which Ernst & Young LLP believed to be related to the inadequacy of communication between certain parts of the organization and the finance department.* The accrual is reflected in the condensed consolidated financial statements for the three and nine month period ended September 30, 2004.

Under the direction of our Audit Committee and with the participation of our senior management, *we have taken steps designed to strengthen our disclosure controls and procedures and internal controls to address the material weakness identified by Ernst and Young. We have, on an immediate basis, taken steps to improve our internal controls and our control environment. We have implemented steps to ensure that senior members of our finance department review all press releases before they are released and all resignations of executive staff are communicated promptly to senior members of our finance department.* We will continue to monitor the communication channels between our senior management and our finance department and will take prompt action, as necessary, to further strengthen our disclosure controls and procedures and internal controls to comply with Sarbanes-Oxley compliance procedures. Moreover, we will continue our efforts to identify, assess and correct any additional material weaknesses in our internal controls.

*We believe the corrective steps taken to improve our disclosure controls and procedures and internal controls described above have enabled our Chief Executive Officer and Chief Financial Officer to conclude that our disclosure controls and procedures are now effective in timely alerting them to material information required to be included in this Quarterly Report on Form 10-Q for the quarter ended September 30, 2004.*

*     *     *

**We intend to review and evaluate the design and effectiveness of our disclosure controls and procedures on an ongoing basis** and to improve our controls and procedures over time and to correct any deficiencies that we may discover in the future. Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our business. While *we believe the present design of our disclosure controls and procedures is effective* to achieve our goal, future events affecting our business may cause us to significantly modify our disclosure controls and procedures.  [Emphasis added.]

66

1    178.    The statements concerning the Company's controls and procedures were also

2 critically important to investors as a result of the related-party nature of a material amount of the

3 Company's revenues. Accordingly, the Company's 3Q:04 Form 10-Q described these related party

4 transactions, in part, as follows:

**Related Party Transactions**

Lewis Solomon, a member of the Company's Board of Directors and a member of the Company's Nominating and Governance Committee and Compensation Committee, is also a member of the Board of Directors of Harmonic, Inc. (Harmonic). Harmonic is an authorized, non-exclusive reseller of certain of the Company's video products. For the three and nine months ended September 30, 2004, related party revenue included $1.5 million and $4.9 million, respectively, of revenue from Harmonic. For the three and nine months ended September 30, 2003, related party revenue included $0.5 million and $1.5 million, respectively, of revenue from Harmonic.

Alek Krstajic, a member of the Company's Board of Directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers Communications, Inc. (Rogers) until January 2003. Beginning April 1, 2003, the Company no longer recognized revenues related to Rogers as related party revenue because Rogers was no longer considered to be a related party. For the first quarter of 2003, the Company recognized $1.4 million of Rogers's related party revenue, net of amortization of co-marketing expense.

In the nine months ended September 30, 2004, the Company paid Mr. Krstajic $30,000 for consulting services provided to the Company.

In December 2001, the Company entered into a co-marketing arrangement with Rogers to promote the Company's brand its products. The Company paid $0.9 million to Rogers, and recorded this amount as other current assets. In July 2002, the Company began amortizing this prepaid asset and charging it against revenue in accordance with the Emerging Issues Task Force 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in the three and nine months ended September 30, 2003, totaled approximately $1.4 million and $4.2 million, respectively. This asset was fully amortized during 2003.

Cost of related party revenues in the Company's consolidated statements of operations consists of direct and indirect costs. Accounts receivable from Harmonic totaled approximately $0.7 million at September 30, 2004. None of the related parties is a supplier to the Company.

1

*Certifications for Third Quarter 2004*

2    179.    The Company's 3Q:04 Form 10-Q also contained SOX Certifications signed by

3    defendants Chase and Lopez and filed with the SEC. These Certifications stated, in part, *"the*

4    *information contained in the Report fairly presents, in all material respects, the financial*

5    *condition and results of operations of the Company at the dates and for the periods indicated."*

6    [Emphasis added.]

7    180.    The 3Q:04 Form 10-Q also contained additional Certifications by defendants Chase

8    and Lopez that certified, in part, as follows:

9    **Based on my knowledge, this quarterly report does not contain any untrue**
**statement of a material fact or omit to state a material fact necessary to make the**
10    **statements made, in light of the circumstances under which such statements were**
**made, not misleading with respect to the period covered by this quarterly report;**

11

**Based on my knowledge, the financial statements, and other financial information**
12    **included in this quarterly report, fairly present in all material respects the**
**financial condition, results of operations and cash flows of the registrant as of,**
13    **and for, the periods presented in this quarterly report;**

14

\*    \*    \*

15

[The registrant's other certifying officers and I] *evaluated the effectiveness of the*
16    *registrant's disclosure controls and procedures as of a date within 90 days prior to*
*the filing date of this quarterly report (11/14/02); and... presented in this quarterly*
17    *report our conclusions about the effectiveness of the disclosure controls and*
*procedures based on our evaluation as of the Evaluation Date;*

18

19    \*    \*    \*

20    [The registrant's other certifying officers and I have disclosed] *all significant*
*deficiencies in the design or operation of internal controls which could adversely*
21    *affect the registrant's ability to record, process, summarize and report financial*
*data and have identified for the registrant's auditors any material weaknesses in*
22    *internal controls; and b) any fraud, whether or not material, that involves*
*management or other employees who have a significant role in the registrant's*
23    *internal controls...*

24    181.    The statements contained in Terayon's October 28, 2004 release and those statements

25    contained in the Company's 3Q:04 Form 10-Q, referenced above, were each materially false and

26    misleading when made, and were known by defendants to be false at that time or were recklessly

27    disregarded as such thereby, for the reasons stated herein, in ¶ 64.

28

1     *February 9, 2005 Release and Conference Call Regarding Results for 4Q and FY:2004*

2          182.    On February 9, 2005, Terayon published a release announcing results for the fourth

3    quarter and full year ended December 31, 2004.  This release announced very strong financial and

4    operational results with purported digital video revenue growth of more than 100% year-over-year.

5    In addition, this release also stated, in part, the following:

6          ***Revenue for the fourth quarter of 2004 was $29.4 million, down 32% compared to
           $43.0 million for the same quarter a year ago, and a 21% decrease compared to***
7          ***the $37.2 million for the third quarter 2004.*** Revenue for the 12 months ended
           December 31, 2004 was $150.5 million, a 12.7% increase compared to $133.5
8          million for the 12 months ended December 31, 2003.

9          ***Net loss for the fourth quarter of 2004 was $7.9 million, or $0.10 per share,
           compared to a net loss of $6.0 million, or $0.08 per share, for the same quarter a***
10         ***year ago, and a net loss of $13.5 million, or $0.18 per share, for the third quarter
           of 2004.*** Net loss for the 12 months ended December 31, 2004 was $36.5 million, or
11         $0.48 per share, compared to a net loss for the 12 months ended December 31, 2003
           of $50.4 million, or $0.68 per share. [Emphasis added.]

12

13         183.    Commenting on these purported strong financial results, defendants Chase and

14   Richman were quoted in this release, as follows:

15         "Our fourth quarter results reflect our decision to focus Terayon on our digital video
           network applications and home access solutions and to cease investment in future
16         development of our CMTS products. ***The strong performance of our digital video
           products during the fourth quarter and 2004 clearly shows why we have moved***
17         ***video to the center of our corporate strategy,***" said Jerry Chase, Terayon's Chief
           Executive Officer. "We took big steps in 2004 to strengthen our leadership in digital
18         video networking by working with customers to accelerate their evolution to all-
           digital networks, expanding the market applicability for our solutions, and launching
19         new and innovative products and functionality. Those actions resulted in a ***strong
           financial performance in the fourth quarter and 2004*** for digital video
20         networking."

21
                                        *    *    *
22
           ***"Our restructuring activities and increased focus on cost management in 2004 will
23         greatly benefit the company as we drive operations to positive net income***", said
           Mark Richman, Terayon's Chief Financial Officer. "By focusing our capital and
24         human resources on our growth market – digital video networking applications – ***we
           expect to deliver profitable top line growth to achieve net income profits and***
25         ***positive cash flow generation.***" [Emphasis added.]

26   ///

27   ///

28   ///

1    184.    Later the same day, on February 9, 2005, defendants also conducted a conference call

2    for analysts and investors, hosted by defendants Richman and Chase.  During this call, defendant

3    Chase stated, in part, the following:

4        **JERRY CHASE**, CEO, TERAYON COMMUNICATION SYSTEMS: Hello,
         everyone, and thank you for joining us for the Terayon Q4 and full 2004 earnings
5        conference call. I've now been with Terayon for about five months, and Mark, our
         CFO, has been here for just a little over two months. During that short period of time
6        *we have begun to make many changes that will enable us to accentuate and build
         on our strengths, move out of product lines in which we were underperforming*
7        *and put the Company on a track towards better financial performance.*

8        *I've shared with many people why I came to Terayon. I believe it had a unique
         position and opportunity to be a part of the growing video market, and my belief is*
9        *stronger today than it was ever.* We believe that the proliferation of video applications will
         correlate closely to how consumers and businesses have adopted mobile phones.
10       These video applications will be delivered across any network to any device at any
         time, instant access.

11

12       During my call last October, we discussed the product evaluation criteria we are
         using to evaluate sustainable, profitable corporate growth. They are, we must be the
13       market leader or a very strong influential player in the markets in which we compete.
         Our customer base must be diversified buying now and have an ongoing plan to buy
14       from us, and also we must have the cost structure to grow earnings faster than sales.
         *Our 2004 performance and several Q4 actions have put Terayon in a stronger
15       position on these three criteria and position us well for the path to sustainable
         profitability.*

16

17                              *    *    *

18       **JERRY CHASE:** ...I'm optimistic about Terayon's ability to focus and deliver
         favorably against our strategy and business model. It's a great time to be involved in
19       digital video and it truly will change how we communicate, entertain and stay
         informed. Mark and I look forward to providing you with updates on our progress as
20       we transition Terayon to a digital video networking company.

21       185.    During this call, defendant Richman also stated, in part, the following:

22       **MARK RICHMAN:** Thank you, Jerry. *I am very pleased to announce we've met or
         exceeded all previously announced guidance as it relates to our P&L performance
23       objectives. Starting with our top line, today we reported net revenues of 29.4
         million for the fourth quarter, a 32 percent decrease from the 43 million recorded
24       in the fourth quarter 2003 and down 21 percent sequentially from 37.2 million
         reported in third quarter 2004. However, for the full year of 2004 we reported
25       150.5 million in revenues, a 12.7 percent increase compared to 133.5 million for
         the 12 months ended December 2003.*

26
         *The quarter over quarter decline in revenues is primarily attributable to reduction
27       in revenue from legacy product lines,* including CMTS equipment sales. Legacy

28

product revenues declined to 3 million for the fourth quarter of 2004, down from 20.5 million in the fourth quarter of 2003 and compared to 7.6 million in the third quarter of 2004.

* * *

Including severance and separation charges, net loss for the fourth quarter was 7.9 million or $.10 per share as compared to a net loss of 6 million or $.08 per share in the fourth quarter of 2003 and a net loss of 13.5 million or $.18 per share in the third quarter of 2004. Excluding these charges, net loss for the quarter was 5.2 million or $.07 per share. Net loss for the year was 36.5 million or $.48 per share compared to a loss of 50.4 million or $.68 per share in the 12 months ended December 31, 2003. [Emphasis added.]

186.    The statements contained in the February 9, 2005 release and conference call regarding results for the Fourth Quarter and Fiscal Year 2004 were materially false and misleading for the reasons set forth in ¶ 64.

*2004 Form 10-K*

187.    On or about March 8, 2005, defendants filed with the SEC the Company's 2004 Form 10-K for the fourth quarter and full year ended December 31, 2004, certified by defendants Chase and Richman, and signed by defendants Chase, Richman, Zaki Rakib, Shlomo Rakib, Solomon, Krstajic, Woodrow, Slaven, Miller and Speaks.  In addition to making statements substantially similar to those that had been made by defendants previously, concerning the Company's financial and operational results, the 2004 Form 10-K also stated, in part, the following:

**Net Loss Per Share**

Basic and diluted net loss per share was computed using the weighted average number of common shares outstanding. Options, warrants, restricted stock, and convertible debt were not included in the computation of diluted net loss per share because the effect would be anti-dilutive.

Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

///

///

///

71

| | **Years Ended December 31,** | | |
| --- | --- | --- | --- |
| | **2004** | **2003** | **2002** |
| Net Loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) |

188.    Providing more "color" on the Company's revenues, the 2004 Form 10-K also reported Terayon's purported Revenue Recognition accounting policies, in part, as follows:

**Revenue Recognition**

The Company recognizes revenue in accordance with SEC Staff Accounting Bulletin (SAB) No. 104 "Revenue Recognition" ("SAB 104"). *SAB 104 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services were rendered; (3) the selling price is fixed or determinable; and (4) collectibility is reasonably assured.* [Emphasis added.]

189.    The Company's 2004 Form 10-K also contained statements attesting to Terayon's Liquidity and Capital Resources that was purported to exist at that time, in part, as follows:

At December 31, 2004, we had approximately $43.2 million in cash and cash equivalents and $54.5 million in short-term investments.

\*   \*   \*

*In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of approximately $484.4 million.* The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity on August 2007, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million.* [Emphasis added.]

190.    In addition to the foregoing, the Company's 2004 Form 10-K also contained statements that attested to the purported adequacy of Terayon's controls and procedures.  While the 2004 Form 10-K did again acknowledge minor defects in certain communications protocols, the 2004 Form 10-K also reported that this problem had been substantially remediated and that,

72

following a review of the Board of Directors, the Company's internal controls and procedures were

reasonably adequate.  As evidence of this, the 2004 Form 10-K also stated, in part, the following:

> *We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended (Exchange Act), is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's (SEC) rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure....*

*   *   *

> As disclosed in our Quarterly Report on Form 10-Q for the period ended September 30, 2004, in connection with the preparation of that report, we determined that, due to a deficiency in communication of financially significant information between certain parts of our organization and the finance department, our disclosure controls and procedures and internal controls over financial reporting were not effective. Particularly in the third quarter of 2004, the finance department did not review our press release and communication of information to our finance department regarding the resignation of an executive was not timely, which resulted in adjustments to the internal accounting for the executive's termination benefits. *As previously disclosed, under the direction of our Audit Committee and with the participation of our senior management, we took steps to ensure that senior members of our finance department review all press releases before they are released and undertook to enhance the communication between our senior management and our finance department to further strengthen our controls.*

> *In connection with our review of our disclosure controls and procedures as of December 31, 2004, we determined that the controls implemented to enhance communication between our senior management and our finance department lacked sufficient documentation to permit verification of their operation.* As a result, as discussed below in Management's Report on Internal Control over Financial Reporting, we have concluded that the aforementioned deficiency represents a material weakness in internal control over financial reporting as of December 31, 2004.

> In connection with our review of our disclosure controls and procedures as of December 31, 2004, we determined that procedures related to controls over the preparation and review of the Annual Report on Form 10-K were not effective, for the following reasons. *In the latter part of 2004 and in early 2005, key persons involved in the preparation and review of our periodic reports under the Exchange Act including the Controller and Assistant Controller responsible for SEC reporting departed the Company and we retained consultants to participate in the preparation of our Annual Report. This resulted in providing an initial draft of the financial statements and footnotes included in our Annual Report to our independent registered public accountants that did not provide adequate disclosures in the accompanying notes in accordance with GAAP.* We have concluded that this deficiency represents a material weakness in internal control over financial reporting as of December 31, 2004.

73

*Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, in light of the deficiencies described above, our management, including our CEO and CFO, concluded that our disclosure controls and procedures as of December 31, 2004 were not effective.*

\*    \*    \*

**Changes in internal control over financial reporting.**

*Other than as described above in the third paragraph of Evaluation of Disclosure Controls and Procedures, there has been no change in our internal control over financial reporting during our most recently completed fiscal quarter* that has materially affected or is likely to materially affect our internal control over financial reporting.

**Remediation Steps to Address Material Weaknesses.**

Subsequent to year end, we are taking the following steps to remediate the deficiencies in our disclosure controls and procedures and material weaknesses in our internal control over financial reporting identified above:

***Documentation of Internal Communication with Our Finance Department.*** We implemented procedures to document review of press releases and other financially significant communications in accordance with the policy that we implemented in connection with preparation of our Quarterly Report on Form 10-Q for the period ended September 30, 2004.
Additional Experienced Finance Personnel. We are taking the following steps to address our need for additional experienced finance personnel and to improve our controls over financial reporting:

    (i)     a commitment to promptly hire a permanent Vice President of Finance/controller;

    (ii)     hiring into our finance department an additional person with SEC reporting experience;

    (iii)     increasing staffing in the finance department;

    (iv)     developing procedures to train new employees and/or consultants in the finance department on our disclosure procedures and controls, our company and our actions in the previous reporting periods; and

    (v)     improving the review process that occurs prior to providing the initial draft of the periodic report to our independent auditors for review. [Emphasis added.]

191.     The statements concerning the Company's controls and procedures were also important to investors as a result of the related-party nature of a material amount of the Company's revenues. Accordingly, again the Company's 2004 Form 10-K described these related party transactions, in part, as follows:

74

1 **Related Party Transactions**

2 During the years ended December 31, 2004, 2003 and 2002, the Company
recognized revenue of $9.9 million, $4.7 million and $9.1 million, respectively in
3 connection with product shipments made to related parties. Related party revenues in
2004 were from Harmonic, Inc. (Harmonic). Related party revenues in 2003 and
4 2002 included revenues from Harmonic and Rogers Communications, Inc. (Rogers).
Lewis Solomon, a member the Company's board of directors, is a member of the
5 board of directors of Harmonic. All revenues attributable to Harmonic were included
in related party revenues in 2004 and 2003. Alek Krstajic, another member of our
6 board of directors, was the Senior Vice President of Interactive Services, Sales and
Product Development for Rogers until January 2003. Effective in April 2003, Rogers
7 was no longer a related party to us. Consequently, revenues attributable to Rogers are
only classified as related party revenues in the first quarter of 2003. Neither of these
8 related parties are a supplier to the Company.

9 Cost of related party product revenues in the Company's consolidated statements of
operations consists of direct and indirect product costs. Accounts receivable from
10 Rogers and Harmonic totaled approximately $3.1 million and $0.6 million at
December 31, 2004 and 2003, respectively.
11
In December 2001, the Company entered into co-marketing arrangements with Shaw
12 Communications, Inc. (Shaw) and Rogers. The Company paid $7.5 million to Shaw
and $0.9 million to Rogers, and recorded these amounts as other current assets. In
13 July 2002, the Company began amortizing these prepaid assets and charging them
against related party revenues in accordance with EITF 01-09, "Accounting for
14 Consideration given by a Vendor to a Customer or Reseller in Connection with the
Purchase or Promotion of the Vendor's Products." The Company charged $1.4
15 million per quarter of the amortization of these assets against total revenues through
December 31, 2003. Amounts charged against total revenues in the year ended
16 December 31, 2002 and December 31, 2003, totaled approximately $2.8 million and
$5.6 million, respectively. Of the co-marketing amortization charged to total
17 revenues, $0.15 million and $0.3 million were charged to related party revenues in
the year ended 2003 and 2002, respectively. No further amounts of these co-
18 marketing arrangements are included in other current assets at December 31, 2003
and no further amortization occurred in 2004.
19
In October 2002, the Company incurred a marketing expense of $150,000 for Team
20 Honor, an organization that supports a professional sailing team. One of the
Company's Board members, Alek Krstajic is the founder and President of Team
21 Honor.

22 ### *Certifications Regarding 2004 10-K*

23 192.    To further assure investors as to the purported accuracy and completeness of the

24 Company's financial and operational reports, as well to further assure investors as to the adequacy

25 of the Company's financial controls and operational procedures, the Company's 2004 Form 10-K

26 also contained certifications by defendants Chase and Richman that certified, in part, as follows:

27 ***Based on my knowledge, this quarterly report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make the***
28

1   *statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;*

2

3   *Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;*

4

5   \*   \*   \*

6   [The registrant's other certifying officers and I] *evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (11/14/02); and… presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;*

7

8

9   \*   \*   \*

10  [The registrant's other certifying officers and I have disclosed] all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls…

11

12

13

14  193.    The Company's 2004 Form 10-K also contained SOX Certifications signed by

15  defendants Richman and Chase and filed with the SEC. These Certifications stated, in part, *"the*

16  *information contained in the Report fairly presents, in all material respects, the financial*

17  *condition and results of operations of the Company at the dates and for the periods indicated."*

18  194.    In addition to the foregoing, the 2004 Form 10-K also contained a report by Ernst &

19  Young, the Company's Independent Auditors that stated, in part, the following:

20  *We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2004….*

21

22

23  *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.*

24

25

26

27  *In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2004 and 2003, and the consolidated results of its operations and its cash flows for each of the three years*

28

76

*in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles....*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Terayon Communication Systems, Inc.'s internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and *our report dated March 14, 2005 expressed an unqualified opinion on management's assessment and an adverse opinion on the effectiveness of internal control over financial reporting.*

\*   \*   \*

### Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting

We have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting in Item 9a, that Terayon Communication Systems, Inc ("Terayon") did not maintain effective internal control over financial reporting as of December 31, 2004 because of the effect of the material weaknesses described in management's assessment, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria). Terayon's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. *Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.*

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). *Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.* Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. *We believe that our audit provides a reasonable basis for our opinion.*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or

77

1    disposition of the company's assets that could have a material effect on the financial
2    statements.

                                    *    *    *

3
4    **In our opinion, management's assessment that Terayon Communication Systems,
     Inc. _did not maintain effective internal control_ over financial reporting as of
5    December 31, 2004 is fairly stated, in all material respects, based on the COSO
     control criteria.** Also, in our opinion, because of the effect of the material
6    weaknesses described above on the achievement of the objectives of the control
     criteria, Terayon Communication Systems, Inc. has not maintained effective internal
7    control over financial reporting as of December 31, 2004, based on the COSO
     control criteria. [Emphasis added.]

8        195.    The statements made by defendants and contained in Terayon's 2004 Form 10-K,

9    were materially false and misleading and were know by defendants to be false at that time, or were

10   recklessly disregarded as such, for the reasons stated herein in ¶ 64. In addition, the statements

11   made by Ernst & Young and contained in the Company's 10-K were also materially false and

12   misleading for, among other reasons, the following:

13           a.    At all times during the Class Period, Terayon's financial statements and

14   operational reports were *not* true accurate or reliable. In truth, Ernst & Young knew or recklessly

15   disregarded that reported results, expenses, and cost accounting were materially false and

16   misleading, and Terayon's, net income, earnings per share and shareholders equity had been

17   materially overstated and its loss contingencies understated;

18           b.    At all times during the relevant period, unbeknownst to investors, Ernst &

19   Young had certified Terayon's financial statements as being GAAP compliant despite the fact that

20   the Company's profitability was materially overstated and costs and expenses understated, as a

21   result of defendants' failure to make proper and timely adjustments to Terayon's stated reports;

22           c.    Throughout the Class Period, it was not true that Terayon contained adequate

23   systems of internal operational or financial controls, such that the Company's financial results or

24   operational reports were true, accurate or reliable. As investors ultimately learned, Terayon's

25   internal financial accounting and disclosure controls were not adequate or effective and they had not

26   been properly tested or retested by the Ernst & Young, so as to prevent material fraud in the

27   presentation of the Company's financial results and condition; and

28

                                        78

1      d.      Terayon's internal control deficiencies were material and pervasive, and they

2    had not been adequately corrected or overridden by management at any time during the Class

3    Period. Accordingly, it was further false and misleading that Ernst & Young failed to respond to the

4    Company's denials and omissions, made time after time, by the Individual Defendants, during the

5    Class Period, as a means of explaining away the obvious material control deficiencies and

6    procedural weaknesses.

7      <u>May 3, 2005 Press Release and Conference Call Regarding "Record" 1Q:05 Results</u>

8      196.    On May 3, 2005, Terayon published a release announcing purported "record" setting

9    results for the first quarter ended March 31, 2005.  This release reported, in part, the following

10   financial information about the Company:

**Digital Video Applications Revenue Grows to a Record $13 Million for the
Quarter, Increasing for the Fourth Consecutive Quarter**

*    *    *

***Revenue for the first quarter of 2005 was $26.4 million, a 10% decrease compared
to $29.4 million for the fourth quarter of 2004*** and down 36% compared to $41.2
million for the first quarter of 2004.

*    *    *

Net loss for the first quarter of 2005 narrowed to $2.6 million, or $0.03 per share,
compared to a net loss of $7.9 million, or $0.10 per share, for the fourth quarter of
2004 and a net loss of $10.2 million, or $0.14 per share, for the first quarter of 2004.

19     197.    This release also quoted defendants Chase and Richman, in part, as follows:

***"We are pleased with our first quarter results and our progress in moving digital
video to the center of our corporate strategy,"*** said **Jerry Chase**, Terayon Chief
Executive Officer. "Our performance and momentum in digital video applications
reflect the market's growing need for real-time video stream management as
companies migrate to all-digital networks. *As we maintain our focus on
transitioning the company, our first quarter results confirm the market acceptance
and unique position of Terayon's digital video solutions."*

*    *    *

***"Our first quarter actions enhanced our market leadership in digital video and
enabled us to better manage the costs of our home access products*,"** **Chase** said.
"CherryPicker's enabling technologies such as ad insertion and logo overlay,
improve the ability for our customers to generate advertising revenues by increasing
the competitiveness of digital video as a preferred method of branding, entertaining,
communicating and informing."