1                                          *   *   *

2    *"Our focus and resources are clearly aligned to drive our strength*—digital video
     networking applications—and we expect to continue to deliver top line growth that
3    will achieve net income profits and positive cash flow," said Mark Richman, Terayon
     Chief Financial Officer. *"Our restructuring activities and increased focus on*
4    *operational cost management in 2005 support this drive to net income."*
     [Emphasis added.]
5

6        198.    Later the same day, on May 3, 2005, defendants also conducted a conference call for

7    analysts and investors, hosted by defendants Richman and Chase.  During this call, defendant Chase

8    stated, in part, the following:

9        **JERRY CHASE,** CEO, TERAYON COMMUNICATION SYSTEMS: Thanks,
         Mark. Hello, everyone, and thank you for joining us for Terayon's Q1 2005 earnings
10       conference call. *As you can see from our earnings press release issued earlier*
         *today, Terayon had a good first quarter, showing notable progress in moving*
11       *digital video to the center of our corporate strategy. In addition, we took important*
         *steps toward sustainable profitability*. Let's begin our update with digital video
12       applications.

13                                          *   *   *

14       *While there is much work to be done, we are pleased with our progress during the*
         *first quarter*. A strong second quarter pipeline indicates continued growth as we
15       remain focused on driving to sustainable profits and positive cash flow. To do this,
         we will continue to invest in digital video, to strengthen our current cable market
16       leadership position, and grow across associated vertical markets like satellite,
         broadcast and Telco. We'll build on our market-leading digital video applications,
17       particularly in the area of advertising. We'll expand our strong video partner program
         to integrate our solutions into new types of video systems and markets, and we'll
18       manage our home access business to re-establish profitable growth and cash
         contributions. *By executing on these objectives, we expect to continue healthy*
19       *improvements.* [Emphasis added.]

20       199.    During this call, defendant Richman also stated, in part, the following:

21       **MARK RICHMAN:** Thank you, Jerry. *I am very pleased to announce that we have*
         *met or exceeded all previously-announced financial guidance for the first quarter*
22       *of 2005. We report net revenues of $26.4 million down from $29.4 million in the*
         *fourth quarter of 2004.* Most importantly, we grew our digital video revenue in the
23       first quarter of 2005 to our record $13 million, despite capital expenditure patterns
         that often experience reduced Q4 to Q1 CapEx activity. In addition, we launched the
24       7600G, and while we did not ship or record revenues in the first quarter, demand for
         the 7600G should support continued revenue growth beginning in the second quarter
25       2005.

26   ///

27   ///

28   ///

                                            80

1                                              *   *   *

2    ***Our net loss in the first quarter of 2005 was $2.6 million or $0.03 per share,
     compared to $7.9 million or $0.10 per share in the fourth quarter of 2004.***
3    Excluding the previously mentioned benefits of a reversal of warranty reserves and
     bad debt recoveries, we would have recorded a net loss of approximately $3.7
4    million or $0.05 a share, which we believe is a better indicator of our current period
     performance. ***This still compares favorably to our previously-announced guidance***
5    ***of a loss from $3 to $6 million.***  [Emphasis added.]

6        200.    As a direct result of the statements made or published by defendants, the following

7    day, May 4, 2005, *MarketWatch.com* reported that Terayon shares soared.   According to this report,

8    shares of Terayon rose 17%, to $3.22 per share, in afternoon trading Wednesday after the Company

9    posted overnight a narrower-than-expected first-quarter loss. The perceived improvement in its

10   performance prompted brokerage Merriman Curhan Ford & Co. to upgrade the Company to "Buy"

11   from "Neutral," citing optimism over the value, growth and earnings power of its digital video unit.

12   The Thomson First Call average estimate was for a loss of four cents a share on revenues of $27.9

13   million.

14                              *10-Q for First Quarter 2005*

15       201.    On or about May 10, 2005, defendants filed with the SEC the Company's Form 10-Q

16   for the quarter ended March 31, 2005 ("1Q:05 Form 10-Q"), signed by defendant Richman and

17   certified by defendants Richman and Case.  In addition to making substantially similar statements

18   concerning the Company's procedures and its financial operations as had been made by defendants

19   previously, the 1Q:05 Form 10-Q also stated, in part, the following:

20       The accompanying condensed consolidated financial statements have been prepared
         in accordance with U.S. generally accepted accounting principles for interim
21       financial information and in accordance with the instructions to Form 10-Q and
         Article 10 of Regulation S-X…. ***In the opinion of management, all adjustments***
22       ***(consisting of normal recurring adjustments) necessary for a fair presentation of***
         ***the condensed consolidated financial statements at March 31, 2005 and for the***
23       ***three months ended March 31, 2005 and 2004 have been included.*** [Emphasis
         added.]
24

25       202.    The Company's 1Q:05 Form 10-Q also reported Terayon's Liquidity and Capital

26   Resources, in part, as follows:

27       At March 31, 2005, we had approximately $30.6 million in unrestricted cash and
         cash equivalents and $69.2 million in short-term investments.
28

                                              81

1
2
3
4
5

> *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of approximately $484.4 million. The Notes are a general unsecured obligation and are subordinated in right of payment to all of our existing and future senior senior indebtedness and to all of the liabilities of our subsidiaries.* The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million*. The Notes mature in August 2007.

6
7
8

> Through March 31, 2005, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million in prior periods. No Notes were repurchased in 2003, 2004, or 2005. [Emphasis added.]

9    203.    In addition to the foregoing, the Company's 1Q:05 Form 10-Q also contained

10  statements that attested to the purported sufficiency of Terayon's controls and procedures.  While

11  the 1Q:05 Form 10-Q did again acknowledge certain defects in the Company's communications

12  protocols, the 1Q:05 Form 10-Q also reported that these problems had been substantially resolved

13  and that, following a review of the Board of Directors, the Company's internal controls and

14  procedures were reasonably adequate.  As evidence of this, the 1Q:05 Form 10-Q also stated, in

15  part, the following:

16
17
18
19
20

> Under the supervision and with the participation of our senior management, including our CEO and CFO, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2005. *Based on that evaluation, as of the date of the evaluation, our management, including our CEO and CFO, concluded that our disclosure controls and procedures were not effective as of March 31, 2005 because of the material weakness described below. We have already implemented, and will continue to implement, corrective actions with respect to this material weakness, as further described below.*

21                                  *    *    *

22
23
24
25
26
27

> As part of the evaluation of our disclosure controls and procedures as of March 31, 2005, we determined that we have remediated the material weakness related to our procedures and controls over the preparation and review of our consolidated financial statements and accompanying footnote disclosures contained in this Quarterly Report on Form 10-Q. *The insufficient controls, which were originally identified during the preparation of the Annual Report on Form 10-K, included a lack of sufficient personnel with technical accounting expertise in our finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP. As a result of the new procedures and controls we implemented for the preparation and review of this Quarterly Report on Form 10-Q and the remediation steps described below, we believe we have*

28

82

1  *remediated this material weakness*. Senior management will continue to monitor the
technical accounting expertise of finance personnel staff closely to ensure that
2  adequate review and approval of our financial statements is maintained.

3

As part of the same evaluation, we determined, however, that we have not completed
4  implementation of the changes we believe are required to remediate the previously
reported material weakness related to the inadequacy of communication between our
5  senior management and the finance department. During their review of our interim
financial results for the three months ended March 31, 2005, our independent
6  registered public accounting firm identified two significant adjustments to our
financial statements as part of their quarterly review procedures. These two
7  adjustments were the result of the continued lack of communication within the
Company with regards to certain severance obligations and our policy for the
8  allowance for doubtful accounts. *These two adjustments were corrected prior to the
issuance of our financial statement for the three months ended March 31, 2005.*
9  [Emphasis added.]

10      204.    In addition to the foregoing, the 1Q:05 Form 10-Q also contained a series of

11  statements that purported to attest to the fact that the Company had *already* remediated the control

12  weaknesses and other problems that were then adversely impacting the Company, including that:

13  **Remediation Steps**

14      During the quarter ended March 31, 2005 and through to the date of the filing of this
Form 10-Q, and in response to the material weaknesses identified as of December 31,
15      2004, we implemented the following steps to remediate the deficiencies in our
disclosure controls and procedures and material weaknesses in our internal control
16      over financial reporting.

17              (i)  Established procedures to document the review of press releases to
account for transactions in a complete and timely manner;
18
              (ii)  Engaged the former Assistant Controller, who has significant SEC
19      reporting experience, to serve as our Controller, in part to supervise our financial
reporting to ensure compliance with SEC requirements;
20
              (iii)  Promoted our Consolidations Reporting Manager to Director of
21      Accounting to provide greater individual management of all accounting functions;
and
22
              (iv)  Improved our internal process of drafting and reviewing periodic reports
23      by implementing additional management and external legal counsel review prior to
their submission to our independent registered public accounting firm.
24

25      Moreover, we intend to implement the following additional remediation steps to
address the material weakness related to the inadequacy of communication between
26      our senior management and the finance department;

27

28

83

1

(i)  Continue to monitor the communication channels between our senior management and our finance department and take prompt action, as necessary, to further strengthen these communication channels;

2

3

(ii)  Increase staffing in the finance department;

4

(iii)  Re-allocate duties to persons within the finance organization to maximize their skills and experience;

5

6

(iv)  Implement training procedures for new employees and/or consultants in the finance department on our disclosure procedures and controls, our Company and our actions in previous reporting periods; and

7

8

(v)  Take steps to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.

9

**Changes in internal control over financial reporting.**

10

***Other than as described above, there has been no change in our internal control over financial reporting during our most recently completed fiscal quarter*** that has materially affected or is likely to materially affect our internal control over financial reporting. [Emphasis added.]

11

12

13

205.  Again, the statements concerning the Company's controls and procedures was also

14  critically important to investors as a result of the related-party nature of a material amount of the

15  Company's revenues.  Accordingly, the Company's 1Q:05 Form 10-Q described these related party

16  transactions, in part, as follows:

17

**Related Party Transactions**

18

Lewis Solomon, a member of the Company's Board of Directors is also a member of the Board of Directors of Harmonic, Inc. (Harmonic).  Harmonic is an authorized, non-exclusive reseller of certain of the Company's video products.  For the three months ended March 31, 2005 and March 31, 2004, related party revenue from Harmonic was $8.8 million and $0.7 million, respectively.

19

20

21

Cost of related party revenues in the Company's consolidated statements of operations consists of direct and indirect costs.  Accounts receivable from Harmonic totaled approximately $6.4 million at March 31, 2005.  Harmonic is not a supplier to the Company.

22

23

24

*SOX Certifications for 1Q:05 Form 10-Q*

25

206.  The 1Q:05 Form 10-Q also contained SOX signed by defendants Chase and Richman

26  and filed with the SEC.  These Certifications stated, in part, "***the information contained in the***

27  ***Report fairly presents, in all material respects, the financial condition and results of operations***

28  ***of the Company at the dates and for the periods indicated.***"  [Emphasis added.]

84

207.    The statements made by defendants and contained in the Company's May 3, 2005 press release, those statements made by defendants during the quarterly conference call, and those statements contained in Terayon's 1Q:05 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

### <u>July 28, 2005 Release and Conference Call Announcing Results for 2Q:05</u>

208.    On July 28, 2005, Terayon published a release announcing results for the second quarter ended June 30, 2005 – the fifth purported consecutive quarter of increasing revenues.  This release reported quarterly financial information about the Company, in part, as follows:

> **Terayon Reports Second Quarter 2005 Results; Digital Video Applications Revenue Grows to a Record $17.3 Million for the Quarter, Increasing for the Fifth Consecutive Quarter**
>
> ***Revenue for the second quarter of 2005 was $29.5 million, a 12% increase compared to $26.4 million for the first quarter of 2005*** and down 31% compared to $42.8 million for the second quarter of 2004.
>
> *       *       *
>
> ***Net loss for the second quarter of 2005 was $508,000, or $0.01 per share, compared to a net loss of $2.6 million, or $0.03 per share, for the first quarter of 2005 and a net loss of $4.9 million***, or $0.06 per share, for the second quarter of 2004.

209.    Commenting on the purported strength and financial operations of the Company, the July 28, 2005 release also quoted defendants Chase and Richman, in part, as follows:

> ***"Second quarter results indicate solid progress in moving digital video to the center of our corporate strategy,***" said **Jerry Chase**, Terayon Chief Executive Officer. "***The second quarter marks the fifth consecutive quarter of record revenue for our digital video solutions. We believe this is due to Terayon's unique ability to address fundamental changes occurring in the market.***"
>
> *       *       *
>
> ***"Our digital video revenue growth coupled with reduced operating expenses positions us closer to our goal of profitability,***" said **Mark Richman**, Terayon Chief Financial Officer. "Our focus remains on execution to drive revenues and asset and expense management to drive net income profitability." [Emphasis added.]

///

///

///

85

210.     Later the same day, defendants also conducted a conference call for analysts and investors, hosted by defendants Richman and Chase.  During this call, defendant Chase stated, in part, the following:

**JERRY CHASE,** CEO, TERAYON COMMUNICATION SYSTEMS: Thank you, Mark, and hello everyone. Thank you for joining us for the call. Earlier this afternoon, we released our second quarter results. I am pleased with the ongoing progress we are making towards executing on a unique market position that is driving us towards profitability. We are fortunate that market factors continue to trend in our direction. We have become a solid player in real time digital video networking applications and our product quality across our video and home access product lines remain high. ***Terayon has achieved a number of milestones this past quarter, including video revenues were up for the fifth straight quarter to 17.3 million, giving us the best video quarter we've ever had. We are cash flow positive for the second consecutive quarter, indicative of an increased focus on asset and expense management, and customer diversification continues to improve each quarter.***

*     *     *

With the market trends moving toward what we do best, coupled with a steady focus on strengthening customer relationships, broadening customer diversity, delivering new product innovations and building a stronger partner channel, ***Terayon has made steady and solid progress against our digital video goals this past quarter.***

*     *     *

***The second quarter has been a good one for us and we are confident in our ability to continue this progress.*** Market trends continue to shift toward what Terayon does best and we are in a great position to capture the opportunity. The initial phase of Comcast digital simulcast projects has generated not only sales but also strengthened our relationship with them. We are winning new customers and expanding our business within our current base. We expect all these trends will continue over the long run as the job of building revenue producing all digital networks is at the beginning of the cycle. We do expect a small fall-off in demand in the third quarter as our customers absorb what they have bought and now must implement. This is a timing issue, not a demand issue. We expect orders from Comcast to be lower in the third quarter. However, it will be offset slightly through sales to other MSOs which also diversify their customer base. ***We are winning market share and expect that trend to continue in the third quarter despite the projected small decline in revenue.***

*     *     *

JERRY CHASE: ***Thank you, Mark. Our second quarter results certainly indicate the effectiveness of our plan and execution to date. I am optimistic about our ability to maintain its focus and deliver favorably against our business plan.*** Our customers have honored us by making us a vendor in high standing and our products earned high marks for their excellent performance in quality. While there's always more to be done, Mark and I look forward to providing you with updates on our progress as we continue to transition Terayon to a digital video company.  [Emphasis added.]

86

211.    During this call, defendant Richman also stated, in part, the following:

**MARK RICHMAN**: Thank you, Jerry. *I am very pleased to announce that we have met or exceeded all previously announced financial guidance for the second quarter of 2005 and reporting second quarter revenues of 29.5 million, we have returned to top line growth, up from 26.4 million in the first quarter of 2005. Most importantly, we grew our digital video revenue in the second quarter of 2005 to a record 17.3 million, up from 13 million in the first quarte*r. This growth was in large part attributable to market acceptance of our CP 7600G edge decoder that contributed 6.6 million of revenues in Q2. The CP 7600G revenue contribution exceeded expectations reflecting the growing trend of building out all digital networks.

*    *    *

*Our net loss in the second quarter was near break-even at half a million dollars, or $0.01 per share compared to a loss of 2.6 million or $0.03 per share in the first quarter of 2005.*

*    *    *

As a final comment and as we will shortly announce in an SEC 8-K filing, *we were recently advised by Ernst and Young that it resigned as the Company's independent registered public accounting firm effective upon the completion of services related to the review of the Company's interim financial statements for the quarter ending September 30th, 2004. While we consider this development to be unfortunate, we understand that Terayon and other companies are losing the services of a Big 4 accounting firm.* We are immediately working to resolve this issue and our audit committee and management have commenced the search for a new, independent registered public accountant. *This development will not impact our market opportunities and will not diminish the confidence and optimism that we have with regard to our business prospects. I would like to thank you for listening and will now turn the call back to Jerry.* [Emphasis added.]

212.    The statements made in the July 28, 2005 release and conference call were false and misleading for the reasons set forth at ¶ 64. The statement in the conference call that "Terayon and other companies are losing the services of a Big 4 accounting firm" is also false and misleading because it implies that the reason for the departure of Ernst & Young is not related to Terayon's massive accounting irregularities, GAAP violations, and the like, but rather simply stems from the fact that the "Big 4" cannot service Terayon and other companies.

*August 1, 2005 8-K Regarding Sudden Resignation of Ernst & Young*

213.    On August 1, 2005, defendants filed with the SEC pursuant to Form 8-K, a report announcing that Terayon had retained a new Independent Auditor. Of critical importance to investors, at that time, this report stated that the *selection of its new auditors did not result from*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1 | *any disagreement or problem with its prior auditors, Ernst & Young.* The Company's August 1,

2 | 2005 form 8-K, signed by Defendant Richman, stated, in substantial part, the following:

3 | **Item 4.01. Changes in Registrant's Certifying Accountant.**

4 |     On July 26, 2005, Terayon Communication Systems, Inc. (the "Company"), was
advised by Ernst & Young LLP ("Ernst & Young") that Ernst & Young will resign as

5 |     the Company's independent registered public accounting firm following the earlier of
the completion of services related to the review of the Company's interim financial

6 |     statements for the quarter ending September 30, 2005 or the filing due date of that
quarterly report.

7 |

8 |     *The reports of Ernst & Young on the Company's financial statements as of and
for the years ended December 31, 2004 and 2003 did not contain an adverse
opinion or a disclaimer of opinion and were not qualified or modified as to*

9 |     *uncertainty, audit scope, or accounting principles.*

10 |

11 |     *In connection with the audits of the Company's most recent two years ended
December 31, 2004 and 2003 and in the subsequent interim period, there were no
disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K) between*

12 |     *Ernst & Young and the Company on any matter of accounting principles or
practices, financial statement disclosure, or auditing scope and procedures, that, if*

13 |     *not resolved to the satisfaction of Ernst & Young, would have caused Ernst &
Young to make reference to the subject matter of the disagreement in connection*

14 |     *with its reports on the Company's financial statements for such years.*

15 |

16 |     *During the years ended December 31, 2004 and 2003, and through July 26, 2005,
there were no "reportable events" as described in Item 304(a)(1)(v) of Regulation
S-K, other than the two material weaknesses disclosed in the Company's Form 10-*

17 |     *K* filed on March 15, 2005 and as described below:

18 |

19 |     First, management identified a material weakness due to insufficient controls related
to the identification, capture, and timely communication of financially significant

20 |     information between certain parts of the organization and the finance department to
enable the finance department to account for transactions in a complete and timely
manner. As a result of this material weakness, management recorded an adjustment

21 |     in the quarter ended September 30, 2004 to record termination benefits paid to a
former executive.

22 |

23 |     Second, management also identified a material weakness for insufficient controls
related to the preparation and review of the annual consolidated financial statements

24 |     and accompanying footnote disclosures. The insufficient controls include a lack of
sufficient personnel with technical accounting expertise in the finance department

25 |     and inadequate review and approval procedures to prepare external financial
statements in accordance with generally accepted accounting principles (GAAP). As

26 |     a result of this material weakness, management made substantial revisions to its 2004
annual consolidated financial statements and footnote disclosures before they were

27 |     issued.

28 |

1
2
*Ernst & Young did not seek the Company's consent to its resignation. As a result, the Company's audit committee did not recommend or approve the resignation of Ernst & Young.*

3
4
5
The Company has provided Ernst & Young with a copy of the foregoing disclosures and requested that Ernst & Young furnish a letter to the Securities and Exchange Commission stating whether or not Ernst & Young agrees with the above statements. Ernst & Young furnished such a letter, dated August 1, 2005, a copy of which is attached hereto as Exhibit 16.1.

6
7
8
The Company's audit committee has commenced the process of selecting an independent registered public accounting firm to replace Ernst & Young. [Emphasis added.]

9    214.    Also attached to the Company's September 28, 2005 Form 8-K was an August 1,

10   2005 letter from Ernst & Young to the SEC (Office of Chief Accountant), that stated the following:

11
12
13
*We have read Item 4.01 of Form 8-K dated July 26, 2005, of Terayon Communication Systems, Inc. and are in agreement with the statements contained in paragraphs 1 through 6 and the first sentence of paragraph 7 on page 2 therein. We have no basis to agree or disagree with other statements of the registrant contained therein.*

14
15
16
*Regarding the registrant's statements concerning the lack of internal control to prepare financial statements, included in paragraphs 4 through 6 on page 2 therein, we had considered such matters in determining the nature, timing and extent of procedures performed in our audit of the registrant's 2004 financial statements.* [Emphasis added.]

17                                 *Form 10-Q for Second Quarter 2005*

18   215.    On or about August 9, 2005, defendants filed with the SEC the Company's Form 10-

19   Q for the quarter ended June 30, 2005 ("2Q:05 Form 10-Q"), signed by defendant Richman and

20   certified by defendants Richman and Case. In addition to making substantially similar statements

21   concerning the Company operations and its financial operations as had been made by defendants

22   previously, the 2Q:05 Form 10-Q also stated, in part, the following:

23   **2.    Summary of Significant Accounting Policies**

24   **Basis of Presentation**

25
26
27
The accompanying condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and in accordance with the instructions to Form 10-Q and Article 10 of Regulation S-X.... *In the opinion of management, all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of*

28

89

*the condensed consolidated financial statements at June 30, 2005 and for the three and six months ended June 30, 2005 and 2004 have been included.* [Emphasis added.]

216.    The Company's 2Q:05 Form 10-Q also reported Terayon's Liquidity and Capital Resources, in part, as follows:

At June 30, 2005, we had approximately $38.6 million in unrestricted cash and cash equivalents and $66.4 million in short-term investments.

*In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of approximately $484.4 million.* The Notes are a general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million.* The Notes mature in August 2007.

*Through June 30, 2005, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million* net of related unamortized issuance costs of $11.6 million in prior periods. No Notes were repurchased in 2003, 2004, or 2005. [Emphasis added.]

217.    The Company's 1Q:05 Form 10-Q also contained statements that attested to the purported adequacy of Terayon's controls and procedures.  While the 1Q:05 Form 10-Q did acknowledge certain minor defects in its communications protocols, the 1Q:05 Form 10-Q also reported that these problems had been substantially remedied and that, following a review of the Board of Directors, the Company's internal controls and procedures continued to be reasonably adequate.  As evidence of this, the 1Q:05 Form 10-Q also stated, in part, the following:

*Under the supervision and with the participation of our senior management, including our CEO and CFO, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of June 30, 2005. Based on that evaluation, as of the date of the evaluation, our management, including our CEO and CFO, concluded that our disclosure controls and procedures were effective as of June 30, 2005.*

\*    \*    \*

*As part of the evaluation of our disclosure controls and procedures as of June 30, 2005, we determined that we have remediated the material weakness related to our procedures and controls over the preparation and review of our consolidated financial statements and accompanying footnote disclosures contained in this Quarterly Report on Form 10-Q.* The insufficient controls, which were originally identified during the preparation of the Annual Report on Form 10-K, included a lack of sufficient personnel with technical accounting expertise in our finance department and inadequate review and approval procedures to prepare external financial

90

statements in accordance with GAAP. *As a result of the new procedures and controls we implemented for the preparation and review of this Quarterly Report on Form 10-Q and the remediation steps described below, we believe we have remediated this material weakness.* Senior management will continue to monitor the technical accounting expertise of finance personnel staff closely to ensure that adequate review and approval of our financial statements is maintained.

During their review of our interim financial results for the three months ended March 31, 2005, our independent registered public accounting firm identified two significant adjustments to our financial statements as part of their quarterly review procedures. These two adjustments were the result of the continued lack of communication within the Company with regards to certain severance obligations and our policy for the allowance for doubtful accounts. These two adjustments were corrected prior to the issuance of our financial statements for the three months ended March 31, 2005. *As part of an evaluation we conducted at June 30, 2005, we determined, however, that we have completed implementation of the changes we believe are required to remediate the previously reported material weakness related to the inadequacy of communication between our senior management and the finance department, which caused these two adjustments.*

**Remediation Steps**

During the quarter ended June 30, 2005 and through to the date of the filing of this Form 10-Q, and in response to the material weaknesses identified as of December 31, 2004 and March 31, 2005, we implemented the following steps to remediate the deficiencies in our disclosure controls and procedures and material weaknesses in our internal control over financial reporting.

(i)     Established procedures to document the review of press releases to account for transactions in a complete and timely manner;

(ii)    Engaged the former Assistant Controller, who has significant SEC reporting experience, to serve as our Controller, in part to supervise our financial reporting to ensure compliance with SEC requirements;

(iii)   Promoted our Consolidations Reporting Manager to Director of Accounting to provide greater individual management of all accounting functions; and

(iv)    Improved our internal process of drafting and reviewing periodic reports by implementing additional management and external legal counsel review prior to their submission to our independent registered public accounting firm.

Moreover, we implemented the following additional remediation steps to address the material weakness related to the inadequacy of communication between our senior management and the finance department;

(i)     Continue to monitor the communication channels between our senior management and our finance department and take prompt action, as necessary, to further strengthen these communication channels;

91

1              (ii)      Increase staffing in the finance department;

2              (iii)     Re-allocate duties to persons within the finance organization to
        maximize their skills and experience;

3
               (iv)     Implement training procedures for new employees and/or consultants
4       in the finance department on our disclosure procedures and controls, our Company
        and our actions in previous reporting periods; and
5
               (v)      Take steps to ensure that our senior management has timely access to
6       all material financial and non-financial information concerning our business.

7
        Changes in internal control over financial reporting. Other than as described above,
8       there has been no change in our internal control over financial reporting during our
        most recently completed fiscal quarter that has materially affected or is likely to
9       materially affect our internal control over financial reporting. [Emphasis added.]

10          218.    Again the statements concerning the Company's controls and procedures were of

11    critical important to investors, as a result of the related-party nature of a material amount of the

12    Company's revenues. Accordingly, the Company's 1Q:05 Form 10-Q again described these related

13    party transactions, in part, as follows:

14       **Related Party Transactions**

15       Lewis Solomon, a member of the Company's Board of Directors is also a member of
        the Board of Directors of Harmonic, Inc. (Harmonic). Harmonic is an authorized,
16       non-exclusive reseller of certain of the Company's video products. For the six
        months ended June 30, 2005 and June 30, 2004, related party revenue from
17       Harmonic was $13.7 million and $3.4 million, respectively.

18
        Cost of related party revenues in the Company's consolidated statements of
19       operations consists of direct and indirect costs. Accounts receivable from Harmonic
        totaled approximately $2.3 million at June 30, 2005. Harmonic is not a supplier to
20       the Company.

21              *SOX Certifications for Form 10-Q for First Quarter 2005*

22          219.    The 1Q:05 Form 10-Q also contained SOX Certifications signed by defendants

23    Chase and Richman, and filed with the SEC. These Certifications stated, in part *"the information*

24    *contained in the Report fairly presents, in all material respects, the financial condition and*

25    *results of operations of the Company at the dates and for the periods indicated."* [Emphasis

26    added.]

27

28

                                            92

1    220.    The statements made by defendants contained in Terayon's 2Q:05 Form 10-Q and its

2    August 1, 2005 Form 8-K, were each materially false and misleading and were know by defendants

3    to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

4    *September 27, 2005 8-K re: Change of Independent Auditor*

5    221.    On September 27, 2005, defendants filed with the SEC pursuant to Form 8-K, in

6    part, the following statement regarding the change of Terayon's independent auditors:

7    **Item 4.01. Changes in Registrant's Certifying Accountant.**

8    (a)    As previously disclosed by Terayon Communication Systems, Inc.
(the "Company") in its Current Report on Form 8-K filed on August 1, 2005, the
9    Company's former independent registered public accounting firm, Ernst & Young
LLP, ("Ernst & Young") informed the Company that it would resign as the
10    Company's independent registered public accounting firm effective upon the earlier
of completion of services related to the review of the Company's interim financial
11    statements for the quarter ending September 30, 2005 or the filing due date of that
quarterly report. Ernst & Young did not seek the Company's consent to its
12    resignation. As a result, the Company's Audit Committee did not recommend or
approve the resignation of Ernst & Young.

13

14    On August 9, 2005, the Company filed its Quarterly Report on Form 10-Q for
the quarter ended June 30 2005. Ernst & Young served as the Company's
15    independent registered public accounting firm in reviewing the Company's interim
financial statements for the quarter ended June 30, 2005 for purposes of that
16    quarterly report.

17    On September 21, 2005, the Audit Committee of the Board of Directors of
the Company engaged Stonefield Josephson, Inc. ("Stonefield Josephson") as the
18    Company's new independent registered public accounting firm to audit the
Company's financial statements for the fiscal year ended December 31, 2005, and to
19    perform certain procedures related to the financial statements to be included in the
Company's quarterly reports on Form 10-Q. Effective as of such date, Ernst &
20    Young resigned as the Company's independent registered public accounting firm.

21    ***The reports of Ernst & Young on the Company's financial statements as of and
for the years ended December 31, 2004 and 2003 did not contain an adverse***
22    ***opinion or a disclaimer of opinion and were not qualified or modified as to
uncertainty, audit scope, or accounting principles.***

23
    ***In connection with the audits of the Company's most recent two years ended***
24    ***December 31, 2004 and 2003 and in the subsequent interim periods, there were no
disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K) between***
25    ***Ernst & Young and the Company on any matter of accounting principles or
practices, financial statement disclosure, or auditing scope and procedures, that, if***
26    ***not resolved to the satisfaction of Ernst & Young, would have caused Ernst &
Young to make reference to the subject matter of the disagreement in connection***
27    ***with its reports on the Company's financial statements for such years.***

28

93

1  *During the years ended December 31, 2004 and 2003, and through September 21,*
*2005, there were no "reportable events" as described in Item 304(a)(1)(v) of*
2  *Regulation S-K, other than the two material weaknesses disclosed in the*
*Company's Annual Report* on Form 10-K filed on March 15, 2005 and as described
3  below:

4                                    *   *   *

5  *The Company has provided Ernst & Young with a copy of the foregoing*
*disclosures* and requested that Ernst & Young furnish a letter to the Securities and
6  Exchange Commission stating whether or not Ernst & Young agrees with the above
statements. Ernst & Young furnished such a letter, dated September 23, 2005, a copy
7  of which is attached hereto as Exhibit 16.1.

8         (b)    On September 21, 2005, the Audit Committee of the Board of
Directors of the Company engaged Stonefield Josephson as the Company's new
9  independent registered public accounting firm to audit the Company's financial
statements for the fiscal year ended December 31, 2005, and to perform certain
10  procedures related to the financial statements to be included in the Company's
quarterly reports on Form 10-Q. The Company did not consult Stonefield Josephson
11  on any matter or event described in Item 304(a)(2)(i) or (ii) of Regulation S-K during
the Company's two most recent fiscal years and through September 21, 2005, the
12  effective date of the Company's engagement of Stonefield Josephson. [Emphasis
added.]
13

14        222.    Also attached to the Company's September 28, 2005 Form 8-K was a September 23,

15  2005 letter from Ernst & Young to the SEC, that stated, in relevant part:

16  We have read Item 4.01 of Form 8-K dated September 21, 2005, of Terayon
Communication Systems, Inc. and are in agreement with the statements contained in
17  the first and second sentences of paragraph 1, the second sentence of paragraphs 2
and 3, and paragraphs 4 through 8 on page 2 therein. *We have no basis to agree or*
18  *disagree with other statements of the registrant contained therein.*

19  *Regarding the registrant's statements concerning the lack of internal control to*
*prepare financial statements, included in paragraphs 6 through 8 on page 2*
20  *therein, we had considered such matters in determining the nature, timing and*
*extent of procedures performed in our audit of the registrant's 2004 financial*
21  *statements.* [Emphasis added.]

22           *September 30, 2005 Release re: Change in Independent Auditor*

23        223.    On September 30, 2005, defendants published a release announcing that Terayon had

24  retained a new independent auditor.  This release stated that its new auditors were an "excellent fit,"

25  and again defendants implied that this change was *not the result of any disagreement or problem*

26  *with its prior auditors, Ernst & Young*.  Accordingly, as evidence of this, the Company's

27  September 30, 2005 release stated, in substantial part, the following:

28

                                        94

**Terayon Signs New Independent Auditor**

Terayon Communication Systems, Inc. (NASDAQ:TERN), a leading provider of digital video networking applications and home access solutions, today announced that it engaged Stonefield Josephson, Inc., a Santa Monica-based accounting firm with Bay Area offices, as the company's new independent auditor effective September 21, 2005.

"Through our extensive search for an external audit firm with strong SEC experience, we identified and signed Stonefield Josephson, which precisely meets our auditing requirements," said Mark Richman, Terayon Chief Financial Officer. "Their full range of audit services and Sarbanes-Oxley experience make them an excellent fit for Terayon."

Stonefield Josephson will immediately take over responsibilities as the external auditor beginning with the review of the Company's third quarter fiscal calendar.

224.    The statements made by defendants and contained in the Company's September 30, 2005 press release, those statements made by defendants during the investor conferences, and those statements contained in Terayon's Form 8-K, referenced above, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

**DEFENDANTS CONTINUE TO MAKE FALSE AND MISLEADING STATEMENTS EVEN AFTER THE TRUTH SLOWLY BEGINS TO EMERGE**

225.    Only weeks after Terayon replaced its auditors, on November 7, 2005, defendants published a release announcing that the Company would delay the announcement and filing of its third quarter financial results.  At the same time, defendants also announced that certain revenues from "a customer" *may have been recognized improperly and in violation of the Company's stated revenue recognition policies.*

226.    In this regard, the Company's November 7, 2005 release stated, in part, the following:

**Terayon Announces Accounting Review and Delay in Release of Third Quarter 2005 Results**

Terayon Communication Systems, Inc. (NASDAQ: TERN), a leading provider of digital video networking applications and home access solutions, ***today announced that it is reviewing the recognition of revenue for certain transactions during prior periods. Terayon initiated the review after determining that certain revenues recognized in the second half of fiscal year 2004 from a customer may have been***

95

*recorded in incorrect periods. The revenue matters under examination relate to the timing of revenue recognition and may result in a restatement of prior period financials.*

Pending completion of the accounting review, the filing of Terayon's Form 10-Q for the third quarter of fiscal year 2005 will be delayed, and this delay will extend beyond the Form 10-Q's filing deadline of November 9, 2005. Terayon also will delay the filing of its third quarter 2005 earnings release and conference call, originally scheduled for November 8, 2005.

*The accounting review includes an examination of whether a restatement of prior period financial statements may be required as it relates to the customer transactions in question, in addition to an examination of Terayon's revenue recognition policies and practices for current and past periods and an examination of Terayon's internal control over financial reporting as it relates to these items.* There can be no assurance that Terayon or its independent auditors will not identify additional issues or other considerations in connection with the current review, and that these issues or considerations will not require further adjustments to the company's prior financial results for one or more prior fiscal years or quarters.

*"We are committed to accurate and transparent financial reporting and are taking this matter very seriously," said Jerry Chase, CEO, Terayon. "I want to emphasize that our cash position and market leadership remain strong and are not affected by the accounting issues under review.* We remain focused on executing on our strategies and continuing to expand our product innovations to strengthen the overall position of the company."

Terayon and the Audit Committee of Terayon's Board of Directors are working closely with the company's independent auditors in connection with the accounting review. In addition, the Audit Committee has decided to conduct an independent inquiry into the circumstances relating to the accounting treatment of certain of the transactions at issue with the assistance of independent legal counsel. The timing and possible outcome of the Audit Committee's inquiry cannot be predicted at this time. [Emphasis added.]

227.    The November 7, 2006 release was false and misleading when made because it continued to conceal the true, adverse facts – known but concealed by defendants – that the Company's financial problems were not limited to issues regarding the improper recording of revenue relating to a single customer for two quarters in 2004 but rather sweeping issues relating to a need to restate the financials for nearly the entire Class Period and massive, overarching internal control problems.

228.    As a result of defendants' failure to file the Company's quarterly Form 10-Q report, with the SEC within the prescribed time, on November 22, 2006, Terayon announced that it had received a letter from the Nasdaq Stock Market notifying the Company that Terayon's stock was

1  subject of delisting (for violation of Rule 4310(c)(14), that requires the timely filing of periodic

2  reports with the SEC).  Also, as a result of defendants' failures to make a timely Form 10-Q filing

3  with the SEC, Terayon's trading symbol was changed to "TERNE" from "TERN," on or about

4  November 21, 2005.

5          229.    The Company's November 22, 2005 release also stated, in part, the following:

6          Terayon announced on November 7, 2005 its delay in filing the Form 10-Q as the
           company is reviewing the recognition of revenue for certain transactions during prior
7          periods. Terayon initiated the review after determining that certain revenues
           recognized in the second half of fiscal year 2004 from a customer may have been
8          recorded in incorrect periods. The revenue matters under examination relate to the
           timing of revenue recognition and may result in a restatement of prior period
9          financials. Terayon cannot determine at this time when the investigation will be
           completed, but the company intends to file its Form 10-Q for the third quarter of
10         2005 as soon as practicable following the conclusion of the investigation. The SEC
           has informed Terayon that it has initiated an informal inquiry into the matters
11         discussed in the November 7, 2005 press release. Terayon intends to cooperate fully
           with the SEC's inquiry.
12

13         230.    On January 10 2006, defendants published a release that provided a purported

14 "update" on the Company's continuing accounting review, also announcing that Terayon had

15 received a letter from the Nasdaq stating that the Commission had already began investigating:

16         **Terayon Provides Update on Accounting Review**

17         Company Also Receives Letter from NASDAQ Regarding its 2005 Shareholder
           Meeting
18

19         Terayon Communication Systems, Inc. (NASDAQ: TERNE), a leading provider of
           digital video networking applications and home access solutions, announced on
20         November 7, 2005 that the filing of its Form 10-Q for the third quarter of 2005
           would be delayed and that it had commenced an accounting review after determining
21         that certain revenues recognized in the second half of fiscal year 2004 may have been
           recorded in incorrect periods. The delayed filing of Terayon's Form 10-Q for the
22         third quarter of 2005 caused Terayon to be in violation of NASDAQ Marketplace
           Rule 4310(c)(14), which requires the timely filing of periodic reports with the U.S.
23         Securities and Exchange Commission (SEC). While steady progress has been made,
           Terayon cannot determine at this time when the accounting review will be
24         completed. The company intends to file its Form 10-Q for the third quarter of 2005
           as soon as practicable following the conclusion of the accounting review.
25

26         *In addition, as a result of the delay in the filing of its Form 10-Q for the quarterly
           period ended September 30, 2005, Terayon is not in compliance with its obligation*
27         *under the Indenture with respect to Terayon's 5% Convertible Subordinated Notes
           due 2007 (Notes) to file with the SEC and the trustee of the Notes (Trustee) all*
28         *reports, information and other documents required pursuant to Sections 13 or*

                                        97

1   ***15(d) of the Securities Exchange Act of 1934. If holders of at least 25% in
2   aggregate principal amount of the Notes outstanding provide written notice to the
    Trustee or to Terayon and the Trustee of a default based on Terayon's failure to
3   file its Form 10-Q Report for the quarterly period ended September 30, 2005 and
    such default is not cured within 60 days of such notice, an event of default will
4   occur and the Trustee or holders of at least 25% in aggregate principal amount of
    the Notes then outstanding may accelerate the maturity of the Notes and declare
5   the entire principal amount of the Notes, together with all accrued and unpaid
    interest thereon, to be due and payable immediately. The Notes currently
6   outstanding have an aggregate principal amount of $65 million. The company
    ended 2005 with $101 million of Cash and cash equivalents plus Short-term
7   investments.*** [Emphasis added].

8   231.    The Company's January 10, 2006 release also provided a purported "Update" on

9   Terayon's trading status on the Nasdaq, in part, as follows:

10  **NASDAQ Update**

11  Terayon also announced today that it received a letter from The Nasdaq Stock
    Market (NASDAQ), dated January 4, 2006, notifying the company that its common
12  stock is subject to delisting based on its failure to satisfy NASDAQ Marketplace
    Rules 4350(e) and 4350(g), which required the company to solicit proxies and hold
13  an annual meeting of shareholders before December 31, 2005. Terayon held its 2004
    annual shareholder meeting in December 2004 and the company's 2005 annual
14  shareholder meeting was originally planned for December 2005. However, Terayon
    was unable to hold its 2005 annual shareholder meeting due in part to its ongoing
15  accounting review.

16
    As previously disclosed on November 22, 2005, Terayon received a letter from
17  NASDAQ, dated November 17, 2005, stating that as a result of Terayon's failure to
    timely file its Form 10-Q for the third quarter of 2005 with the SEC, Terayon's
18  common stock is subject to delisting from the NASDAQ National Market. In
    response to the November 17, 2005 letter, Terayon requested a hearing with a
19  NASDAQ Listing Qualifications Panel which automatically stayed the delisting
    action pending the issuance of a written decision from the Panel. Terayon presented
20  its plan to evidence compliance with all NASDAQ listing criteria at a hearing before
    the Panel on December 15, 2005. Terayon has not yet received a determination from
21  the Panel as a result of the hearing.

22
    In NASDAQ's January 4, 2006 letter, Terayon was informed that the Panel will
23  consider the company's failure to comply with NASDAQ's proxy solicitation and
    annual meeting requirements in rendering its decision regarding the continued listing
24  of Terayon's common stock. Terayon discussed the proxy solicitation and annual
    meeting deficiencies with the Panel at the hearing on December 15, 2005 and plans
25  to submit additional materials for the Panel's review with respect to those issues by
    the January 11, 2006 deadline. There can be no assurance that the Panel will grant the
26  company's request for the continued listing of its common stock on the NASDAQ.

27

28

232.    The same day, January 10, 2006, the *San Jose Business Journal* reported that defendants had warned of a possible $65 million bond default. According to this report, the Company had stated that the delays in filing its financials may put it in default on $65 million in bonds. As a result of this default, the Company's **5% Convertible Subordinated Notes due in 2007 become immediately payable if holders of at least 25% of the aggregate principal amount of the bonds provide written notice of a default that isn't cured within 60 days. Days later, on January 13, 2006, Terayon was served with notice of default from holders of over 25% of the outstanding Convertible Subordinated Notes.**

233.    On January 26, 2006, defendants announced yet another purported "restructuring" – this time as a "pure play digital video company." That day, Terayon published another release that stated, in part, the following:

**Terayon Restructures to Pure-Play Digital Video Company**

Terayon Communication Systems, Inc. (NASDAQ: TERNE), a leading provider of video localization-on-demand solutions, today announced a restructuring to focus the company's strategy solely on its digital video applications and reduce its overall cost structure as a pure-play video business.

*"Our decision to concentrate solely on digital video applications enables us to laser-focus the company on a growing market for real-time network digital video processing and expand our applications and services,"* said **Jerry Chase**, Terayon, CEO. "Network operators worldwide in cable, satellite, telco and mobile, understand that they must customize digital video programming services and advertising tobecome more relevant to their individual customers. The move to customizing content delivered the instant before viewing creates substantial opportunity for Terayon, particularly in the area of digital video advertising, as it builds on our existing core competencies and market leadership. Localizing services and advertising plays strongly to the core strength exhibited in our award winning CherryPicker® product line."

As part of the company's move to a pure-play video business, Terayon is reviewing strategic alternatives for its Home Access Solutions product line including the opportunity to monetize its current investment in working capital. As part of the restructuring, Terayon expects to record charges of approximately $0.6 million for employee related costs in addition to other restructuring costs, the majority of which are expected to occur in the first quarter of 2006.

Chase continued, *"We are now structured to take advantage of what we do best.* By focusing on digital video, we expect to drive our strategic goals of increased market penetration and improved financial performance. With the savings we obtain from the restructuring, we intend to allocate additional resources for digital video software application development to pursue new revenue-generating video opportunities.

99

1   Through our focus and partnerships with key industry players and existing customer
2   relationships in the cable, satellite and telco markets, *Terayon is well positioned for success.*" [Emphasis added.]

3   234.   The January 26, 2006 release was false and misleading because the restructuring

4   move did not make the Company "well positioned for success" but was actually a last-ditch effort to

5   spin a very negative situation quickly enveloping all aspects of the company – from financials, to

6   internal controls, to performance and results – in a positive light despite the true fact that defendants

7   well knew that massive financial and accounting improprieties were severely undermining the

8   Company and its ability to function prospectively, and a massive restatement was both unavoidable

9   and imminent.

10
11
### THE TRUE FINANCIAL AND OPERATIONAL
### CONDITION OF TERAYON IS BELATEDLY DISCLOSED

12   235.   On March 1, 2006, the last day of the Class Period, defendants finally revealed to

13   investors the secret truth behind that Company's reported purported successes: still more financial

14   and accounting improprieties!  That day, defendants published a release announcing that the Audit

15   Committee of the Board of Directors of the Company had revealed that defendants artificially

16   inflated the Company's financial results in the prior periods and it concluded that *Terayon's*

17   *consolidated financial statements for the year ended December 31, 2004 and the first two*

18   *quarters of 2005 should no longer be relied upon and would be restated*.  This release stated, in

19   part, the following:

20   **Terayon Announces Expected Restatement of Prior Periods**

21   Terayon Communication Systems, Inc. (NASDAQ: TERNE) today announced that
     the Audit Committee of the Board of Directors has concluded that the Company's
22   consolidated financial statements for the year ended December 31, 2004 and for the
     four quarters of 2004 and the first two quarters of 2005 should no longer be relied
23   upon and will be restated.  This conclusion was based in part on the final results of
     the previously announced Audit Committee inquiry.  The inquiry focused on the
24   circumstances surrounding the timing of revenue recognition in the second half of
     2004 from a customer of the Company ....
25
                                    *    *    *
26
     The Company has also reviewed its revenue recognition policies relating to the
27   recognition of the sales of software and other products bundled with post customer
     service contracts and has considered the guidance under SOP 97-2, Financial
28   Accounting Standards Board Technical Bulletin 90-1, "Accounting for Separately

                                        100

1  Priced Extended Warranty and Product Maintenance Contracts," as well as Financial
   Accounting Standards Board, Emerging Issues Task Force 00-21, "Accounting for
2  Revenue Arrangements with Multiple Deliverables," in relation to multiple-element
   revenue arrangements. Under this guidance management has determined that during
3  2004, the Company did not establish vendor specific objective evidence for its post
   contract service revenue element as it related to digital video customer service.
4  Consequently, management anticipates an additional deferral of revenue from each
   quarter of 2004 in which the revenue was recognized, in order to recognize the
5  revenue from software bundled with post customer service contracts over the life of
   the customer service contract period.

6

7                                    *    *    *

8  The filing of the Company's Form 10-Q for the quarter ended September 30, 2005
   will be further delayed pending the completion of the restated consolidated historical
9  financial statements. Because of the delay in filing the Form 10-Q, the Company is
   not in compliance with The Nasdaq Stock Market's continued listing requirement set
10 forth in Nasdaq Marketplace Rule 4310(c)(14). As previously announced, the
   Company received letters from The Nasdaq Stock Market dated November 17, 2005
11 and January 4, 2006 regarding the Company's failure to file its Form 10-Q for the
   quarter ended September 30, 2005, and its failure to solicit proxies and hold an
12 annual meeting of shareholders on or before December 31, 2005, respectively. On
   January 17, 2006, a NASDAQ Listing Qualifications Panel agreed to continue the
13 listing of the Company's common stock on The Nasdaq National Market subject to
   three conditions: (1) on or before January 31, 2006, the Company was required to
14 provide NASDAQ with certain information related to the Audit Committee's
   inquiry; (2) on or before March 31, 2006, the Company must file the Form 10-Q for
15 the quarter ended September 30, 2005 and all required restatements; (3) on or before
   March 31, 2006, the Company must file the proxy statement for the 2005 annual
16 meeting, with a record date set and a meeting to be held as soon thereafter as
   possible. While the Company provided NASDAQ with a response to questions
17 relating to the internal accounting review on January 31, 2006 and is making every
   effort to comply with the remaining requirements, there can be no assurance that the
18 Company will be able to do so within the Panel's deadlines, or that the Company's
   common stock will continue to be listed on the Nasdaq National Market.

19

20 **Management and the Audit Committee have concluded that the restatement
   constitutes a material weakness within the meaning of the PCAOB's Audit**
21 **Standard No. 2. In addition to this material weakness, additional control
   deficiencies may be identified which individually or in the aggregate may**
22 **constitute additional material weaknesses.** Management and the Audit Committee
   are continuing to evaluate whether there are additional material weaknesses.

23

24                                   *    *    *

25 **The Company previously announced in November 2005 that the SEC had initiated
   an informal inquiry with regard to the subject matter of the Company's accounting**
26 **review. The Company understands that the SEC has since issued a formal order
   of investigation with regard to this matter.** The Company has been and is continuing
27 to cooperate fully with the SEC. [Emphasis added.]

28

                                     101

1     236.    The same day, the Company filed with the SEC pursuant to Form 8-K, a notice of

2    Non-Reliance on Terayon's Previously Filed Financial Statements and Related Audit Reports, that

3    stated, in part, the following:

4    **Item 4.02(a). Non-Reliance on Previously Issued Financial Statements or a**
     **Related Audit Report or Completed Interim Review**

5

6    On March 1, 2006, the Audit Committee of the Board of Directors of Terayon
     Communication Systems, Inc. ("Terayon") concluded that the previously issued

7    financial statements contained in Terayon's Annual Report on Form 10-K for the
     fiscal year ended December 31, 2004 and as of and for the four quarters of 2004 and

8    the first two quarters of 2005 should no longer be relied upon. *Terayon expects to*
     *restate its financial statements for the above listed periods to correct errors*

9    *identified in Terayon's revenue recognition practices and policies with respect to*
     *the timing of revenue recognition. The restatement will have no impact on*

10   *Terayon's cash balances for the restated periods. The errors may also affect*
     *financial information relating to periods in addition to the periods described above*

11   *and other matters besides revenue recognition.* [Emphasis added.]

12    237.    Based on the huge disparity between defendants' prior guidance, the Company's past

13   performance and the results announced by defendants that day, on March 1, 2006 Terayon stock

14   declined precipitously – falling almost 15% in the single trading day, in regular trading, as

15   exceptionally heavy trading volume of over 4 million Terayon shares traded.

16   **Post Class Period Events that Further Confirm the Full Extent of Defendants' Fraud**

17    238.    Thereafter, after failing to file the Company's year end report with the SEC in a

18   timely manner, by March 31, 2006, Terayon received a notice of delisting from the Nasdaq National

19   Market Listing Qualifications Panel, stating that the Company's stock would be barred from trading

20   on the Nasdaq National Market effective the opening of trading on April 4, 2006.

21    239.    On May 26, 2006, defendants also published a release that stated that Terayon

22   management was continuing to review the financial statements and the Company's revenue

23   recognition policies to determine whether it will recommend to the Audit Committee of its Board of

24   Directors, that the previously announced restatement of the Company's consolidated financial

25   statements for 2004 would require additional restatements or audits for any prior periods, such as

26   2003. At that time, defendants stated that, *"there can be no assurance that management or the*

27   *Company's independent auditor will not identify additional issues or other considerations in*

28   *connection with the restatement and the audit and review process, or that these issues or*

102

1  *considerations will not require additional adjustments to the Company's prior financial results*
2  *for annual or quarterly periods in addition to 2004."*

3      240.    At the same time, defendants also stated that, "in light of the uncertainty over the
4  timing of the completion of the restatements," the Company had withdrawn its appeal to the Nasdaq
5  Listing and Hearing Review Council to review the Nasdaq Listing Qualifications Panel's March 31,
6  2006 decision to delist the Company's securities from The Nasdaq National Market.

7      241.    On June 19, 2006, Terayon also announced the resignation of defendant Slaven from
8  the Board of Directors of the Company and from his positions as Chairman of the Audit Committee
9  and member of the Nominating and Governance Committee, effective August 2, 2006. The
10  Company also announced the resignation of Krstajic, effective immediately. At the time defendants
11  announced these defections, the Company stated that Slaven had retired "as a result of the increased
12  demands on his time from his duties as Senior Vice President, Chief Financial Officer and Treasurer
13  of Cross Match Technologies Inc. in Palm Beach Gardens, Florida," and that Krstajic had resigned
14  as a result of "increased travel and demands on his time from his duties as President and Chief
15  Executive Officer of Bell Vanguard Inc."

16      242.    On November 8, 2006, investors were further informed of the truly massive scope of
17  defendants' fraudulent accounting scheme, after the Company published a release that belatedly
18  revealed that investors could not rely on any of Terayon's financial statements *dating back to at*
19  *least 2000*! This release stated, in part, the following:

20          Terayon Announces Expected Restatement of Financial Statements
            Wednesday November 8, 8:00 am ET
21

22          SANTA CLARA, Calif., Nov. 8 /PRNewswire-FirstCall/ – Terayon Communication
            Systems, Inc. (Pink Sheets: TERN.PK - News) today announced that the Audit
23          Committee of the Board of Directors, upon the recommendation of management, has
            concluded that the Company's consolidated financial statements for the years ended
24          December 31, 2003, 2002 and 2000 and for the quarters of 2003, 2002 and 2000
            should no longer be relied upon. The restatement of financial statements for 2003
25          will correct errors primarily relating to the recognition of revenue, cost of goods sold
            and estimates of reserves. The restatement of financial statements for 2000 and 2002
26          will correct errors primarily relating to the need to separately value and account for
            an embedded derivative option associated with the Company's 5% convertible
27          subordinated notes issued in July 2000, and other accrual estimates. While no
            determination was made that the financial statements for 2001 cannot be relied upon,
28          adjustments will be made to 2001 that will be reflected in the financial statements

103

1    that the Company will include in its periodic reports to be filed with the Securities
2    and Exchange Commission. Management currently expects the audit, re-audit and
     restatement process, as well as the filings of its periodic reports with restated
3    financial statements, to be completed by the end of the 2006 calendar year.

4    The Audit Committee's determination represents the completion of the Company's
     previously announced review of accounting policies and practices for periods prior to
5    2004. In March 2006, the Company announced that it will restate its consolidated
     financial statements for the year ended December 31, 2004, and for the four quarters
6    of 2004 and the first two quarters of 2005. The restatements are not expected to
     affect reported cash balances for any restated period.

7        243.    On December 29, 2006, the Company filed its latest 10-K which disclosed the

8    sweeping Restatement that the Company had hinted at in March and then November of 2006. The

9    Restatement process, as reflected in the 10-K, included a restatement of financials for the years

10   ended December 31, 2004, December 31, 2003, and December 31, 2002. The Restatement also

11   included adjusted financial statements for the year ended December 13, 2001. The first two quarters

12   of 2005 and the quarterly information for all four quarters of 2004 were also restated.

13       244.    The 10-K is incorporated herein by reference and includes admissions concerning

14   massive financial improprieties, including improper revenue recognition, failure to properly account

15   for reserves and doubtful accounts, myriad GAAP violations, and major internal control weaknesses

16   during the Class Period. Among the disclosures contained in that Form 10-K are the following:

17   * *Improper Recognition of Deferred Revenue*:

18       – The Company did not properly account for deferred revenue and related cost of goods

19   sold. For example, the Company did not sufficiently evaluate its video products and improperly

20   accounted for them in accordance with the revenue recognition criteria in SAB 104 when revenue

21   should have been accounted for in accordance with the software revenue recognition principles

22   under SOP 97-2 – which requires the Company to establish vendor specific objective evidence of

23   fair value for each element within a multiple element arrangement. As part of the Restatement

24   process, revenue and cost of goods sold previously recognized based on meeting the criteria in SAB

25   104 for the individual elements for digital video products sold in conjunction with PCS in each

26   quarter of 2003, 2004, and 2005 were deferred and recognized ratably over the contract service

27   period.

28

1    – The Company was required to make various additional adjustments in 2003, 2004, and
2    2005 to correct the recognition of revenue for transactions where the Company did not properly
3    apply SAB 101, as amended by SAB 104. As part of Restatement process, the Company
4    determined that it did not properly account for deferred revenue as it related to specific transactions
5    to certain customers where transactions did not satisfy revenue recognition criteria of SAB 104
6    related to customers where the arrangement fee was not fixed or determinable or customers where
7    collectibility was not reasonably assured. The Company improperly recognized a deferred revenue
8    liability and a deferred cost of goods sold asset, thereby overstating assets and liabilities, and during
9    the Restatement determined that deferred revenues and deferred cost of goods should not be
10   recognized for these transactions. As a result, the Company adjusted deferred revenues by $1.6
11   million, $1.0 million and $0.9 million for the years ended 2003 and 2004 and the first two quarters
12   of 2005, respectively, and adjusted deferred cost of goods sold by $0.9 million, $0.3 million, and
13   $0.6 million for the years ended 2003 and 2004 and for the first two quarters of 2005.
14   * *Improper Revenue Recognition Concerning Thomson Broadcast*: The Company also did not
15   account for a significant transaction whereby it developed a broadcast platform based on its DM
16   6400 product to sell to its customer Thomson Broadcast. As a result, revenue was improperly and
17   prematurely recognized in violation of SOP 97-2, and in violation of SOP 81-1, which sets forth
18   criteria for completed contract recognition. As a result, $7.8 million of revenue previously
19   recognized in 2004 and $1.8 million related to direct development costs previously recognized from
20   the fourth quarter of 2003 through the second quarter of 2005 were also deferred and ultimately
21   recognized in the quarter ended December 31, 2005.
22   * *Improper Allowance for Doubtful Accounts:* The Company was required to reassess its
23   allowance for doubtful accounts which contained various material errors in the pre-2004
24   methodology. During the Restatement, the Company adjusted the allowance for doubtful accounts
25   and bad debt with a reduction of $5.2 million, an increase of $1.9 million and an increase of $0.6
26   million for the years ended December 31, 2000, 2001, and 2002, respectively. The Company made
27   adjustments to the allowance for doubtful accounts of $0.1 million, $0.6 million, and $0.3 million
28   for the years ended December 31, 2003 and 2004 and the first two quarters of 2005, respectively.

105

1    The Company also, during the Restatement, made other adjustments to doubtful accounts to offset

2    accounts receivable and related reserve concerning customers where collectibility was not

3    reasonably assured, eliminative the receivable and related reserve for these customers by an increase

4    of $5.7 million, a decrease of $4.4 million for years ended December 31, 2003 and 2004 and the

5    first two quarters of 2005.  In summary, the above restatements gave rise to an adjustment to the

6    allowance for doubtful accounts of an increase of $5.8 million, a decrease of $3.8 million and an

7    increase of $0.3 million for the years ended December 31, 2003 and 2004 and the first two quarters

8    of 2005, respectively.

9    * ***Reserves related to Restructuring***: The Company did not effectively monitor and adjust reserves

10   related to its restructuring charges.  For example, a portion of certain leased facilities in Israel had

11   restructuring reserves exceeding the amount due under the lease.  The Company also over accrued

12   reserves related to legal fees, taxes and other liabilities owed to third party vendors.

13   * ***Inadequate Personnel***: The Company did not have adequate personnel in its accounting and

14   financial department, and additionally lacked sufficient qualified accounting and finance personnel

15   to identify and resolve complex accounting issues in accordance with GAAP.

16   * ***Inadequate Control***: The Company did not have adequate internal control over financial

17   reporting, including: (i) insufficient controls related to identification, capture, and timely

18   communication of financially significant information between certain parts of the organization and

19   the accounting and finance department to enable accounting for transactions in a complete and

20   timely manner; (ii) lack of sufficient personnel with technical accounting expertise in the accounting

21   and finance department and inadequate review and approval procedures to prepare external financial

22   statements in accordance with GAAP; (iii) failure to properly recognize revenue in accordance with

23   GAAP, including revenue recognized in accordance with the following principles: Statement of

24   Position ("SOP") 97-2, "Software Revenue Recognition;" Staff Accounting Bulletin ("SAB") No.

25   101, "Revenue Recognition," as amended by SAB 104; "Accounting for Performance of

26   Construction Type and Certain Production-Type Contracts" (SOP 81-1); and Financial Accounting

27   Standards Board, Emerging Issues Task Force (EITF) 00-21, "Accounting for Revenue

28   Arrangements with Multiple Deliverables; (iv) improper use of estimates, including monitoring and

106

1  adjustment balances related to certain accruals and reserves, including allowance for doubtful

2  accounts, legal charges, license fees, restructuring charges, taxes, warranty obligations and fixed

3  assets; (v) lack of sufficient analysis and documentation of the application of GAAP; and (vi)

4  ineffective controls over the documentation, authorization and review of manual journal entries and

5  ineffective controls to ensure the accuracy and completeness of certain general ledger account

6  reconciliations conducted in connection with period end financial reporting.

7  * Finally, the Company's Convertible Subordinated Notes contained several imbedded derivatives.

8  First, the Notes contain a contingent put where in the even of any default by the Company, the

9  Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all

10  unpaid principal and interest to be due and immediately payable. In fact, this provision was

11  triggered and the Company was forced to pay off the entire principal amount for a total of $65.6

12  million in the quarter ending March 31, 2006. This provision was not disclosed to investors until it

13  was revealed to the market by a California newspaper in January 2006. Two additional embedded

14  derivatives – an investor conversion option and a liquidated damages provision – did not comply

15  with SFAS 133, which requires that an embedded derivative must be separated from its host

16  contract (i.e., the Notes) and accounted for as a stand-alone derivative if the economic

17  characteristics and risks of the embedded derivative would not be considered clearly and closely

18  related to the host contract.

19              **EFFICIENT MARKET ALLEGATIONS: PRESUMPTION OF RELIANCE**

20         245.   Throughout the Class Period, the market for Terayon's common stock was an

21  efficient market for the following reasons, among others:

22              a.    Terayon's stock met the requirements for listing, and was listed and actively

23  traded on the Nasdaq national market exchange, a highly efficient and automated market;

24              b.    As a regulated issuer, Terayon filed periodic public reports with the SEC and

25  the Nasdaq;

26              c.    Terayon regularly communicated with public investors *via* established market

27  communication mechanisms, including regular disseminations of press releases on the national

28

107

1  circuits of major newswire services and through other wide-ranging public disclosures, such as
2  communications with the financial press and other similar reporting services; and

3          d.      Terayon was followed by several securities analysts employed by major
4  brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers
5  of their respective brokerage firm(s). Each of these reports was publicly available and entered the
6  public marketplace.

7      246.    As a result of the foregoing, the market for Terayon securities promptly digested
8  current information regarding Terayon from all publicly available sources and reflected such
9  information in Terayon stock price. Under these circumstances, all purchasers of Terayon common
10  stock during the Class Period suffered similar injury through their purchase of Terayon common
11  stock at artificially-inflated prices and a presumption of reliance applies.

12                          **CAUSATION AND ECONOMIC LOSS**

13      247.    During the Class Period, as detailed herein, defendants engaged in a scheme to
14  deceive the market, and a course of conduct that artificially inflated Terayon's stock price and
15  operated as a fraud or deceit on Class Period purchasers of Terayon's stock by misrepresenting the
16  Company's financial results and by improperly recognizing revenues. Defendants improperly
17  inflated the Company's financial results by making false and misleading statements about the
18  Company and by filing false financial statements with the SEC.

19      248.    Ultimately, however, when defendants' prior misrepresentations and fraudulent
20  conduct came to be revealed to investors, shares of Terayon declined precipitously – evidence that
21  the prior artificial inflation in the price of Terayon's shares was eradicated. As a result of their
22  purchases of Terayon stock during the Class Period, Plaintiff and other members of the Class
23  suffered economic losses, *i.e.* damages under the federal securities laws.

24      249.    By improperly characterizing the Company's financial results and misrepresenting its
25  prospects, defendants presented a misleading image of Terayon's business and growth prospects.
26  During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor
27  and control its operations and financial reporting, and consistently reported results within the range
28  of guidance sponsored or endorsed by the Company. These claims caused and maintained the

                                                  108

1   artificial inflation in Terayon's stock price throughout the Class Period and until the truth about the

2   Company was ultimately revealed to investors.

3       250.    As a direct result of defendants' statements on March 1, 2006, that the Company

4   would be forced to restate its financial results and take significant, and yet undetermined, charges

5   for at least the periods of 2004 through the first half of 2005, and probably longer, Terayon's stock

6   price declined over 13% in the single trading day, compared to the trading price prior to news of

7   defendants' illegal and improper accounting scheme reached the market.  This dramatic share price

8   decline, eliminated much of the artificial inflation from Terayon's share price, causing real

9   economic loss to investors who purchased this stock during the Class Period.

10      251.    In sum, as the truth about defendants' fraud and illegal course of conduct became

11  known to investors, and as the artificial inflation in the price of Terayon shares was eliminated,

12  Plaintiff and the other members of the Class were damaged, suffering direct economic loss.

13      252.    The decline in Terayon's stock price at the end of the Class Period was a direct result

14  of defendants' fraud being revealed to investors and the market.  The timing and magnitude of

15  Terayon's stock price decline negates any inference that the losses suffered by Plaintiff and the other

16  members of the Class was caused by changed market conditions, macroeconomic or industry factors

17  or even Company-specific facts unrelated to defendants' fraudulent conduct.  When Terayon's share

18  price fell over 13% as a result of defendants fraud being revealed, the Standard & Poor's 500

19  securities index was relatively unchanged.

20      253.    The economic loss, *i.e.* damages suffered by Plaintiff and other members of the

21  Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of

22  Terayon's stock and the subsequent significant decline in the value of the Company's shares when

23  defendants' prior misstatements and other fraudulent conduct was revealed.

24                  **VIOLATIONS OF GAAP AND SEC REPORTING RULES**

25      254.    During the Class Period, defendants materially misled the investing public, thereby

26  inflating the price of the Company's securities, by publicly issuing false and misleading statements

27  and omitting to disclose material facts necessary to make defendants' statements, as set forth herein,

28  not false and misleading. Said statements and omissions were materially false and misleading in that

109

1 | they failed to disclose material adverse information and misrepresented the truth about the

2 | Company, its financial performance, accounting, reporting, and financial condition in violation of

3 | the federal securities laws and GAAP.

4 |       255.   GAAP consists of those principles recognized by the accounting profession as the

5 | conventions, rules, and procedures necessary to define accepted accounting practice at the particular

6 | time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

7 | C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

8 | in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13

9 | requires issuers to file quarterly reports.

10 |       256.   SEC Rule 12b-20 requires that periodic reports contain such further information as is

11 | necessary to make the required statements, in light of the circumstances under which they are made,

12 | not misleading.

13 |       257.   In addition, Item 303 of Regulation S-K requires that, for interim periods, the

14 | Management Division and Analysis Section ("MD&A") must include, among other things, a

15 | discussion of any material changes in the registrant's results of operations with respect to the most

16 | recent fiscal year-to-date period for which an income statement is provided. Instructions to Item

17 | 303 require that the this discussion identify any significant elements of registrant's income or loss

18 | from continuing operations that are not necessarily representative of the registrant's ongoing

19 | business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a

20 | company's publicly filed reports with the SEC:

21 |         Describe any known trends or uncertainties that have had or that the registrant
        reasonably expects will have a material favorable or unfavorable impact on net sales

22 |         or revenues or income from continuing operations. If the registrant knows of events
        that will cause a material change in the relationship between costs and revenues

23 |         (such as known future increases in costs of labor or materials or price increases or
        inventory adjustments), the change in relationship shall be disclosed.

24 |

25 | Paragraph 3 of the Instructions to Item 303 states in relevant part:

26 |         The discussion and analysis shall focus specifically on material events and
        uncertainties known to management that would cause reported financial information

27 |         not to be necessarily indicative of future operating results or of future financial
        condition. This would include descriptions and amounts of (A) matters that would

28 |         have an impact on future operations and have not had an impact in the past. . . .

110

1    258.    The GAAP requirement for recognition of an adequate provision for foreseeable

2  costs and an associated allowance applies to interim financial statements as required by Accounting

3  Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement states that:

4         The amounts of certain costs and expenses are frequently subjected to year-end
           adjustments even though they can be reasonably approximated at interim dates. To
5         the extent possible such adjustments should be estimated and the estimated costs and
           expenses assigned to interim periods so that the interim periods bear a reasonable
6         portion of the anticipated annual amount.

7    259.    The Company's financial statements contained in the fiscal 2004 Form 10-K and/or

8  the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the

9  Class Period were presented in a manner that violated the principle of fair financial reporting and

10  the following GAAP, among others:

11         a.    The principle that financial reporting should provide information that is

12  useful to present and potential investors and creditors and other users in making rational investment,

13  credit and similar decisions (FASB Statement of Concepts No. 1).

14         b.    The principle that financial reporting should provide information about an

15  enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

16         c.    The principle that financial reporting should be reliable in that it represents

17  what it purports to represent (FASB Statement of Concepts No. 2).

18         d.    The principle of completeness, which means that nothing material is left out

19  of the information that may be necessary to ensure that it validly represents underlying events and

20  conditions (FASB Statement of Concepts No. 2).

21         e.    The principle that conservatism be used as a prudent reaction to uncertainty to

22  try to ensure that uncertainties and risks inherent in business situations are adequately considered

23  (FASB Statement of Concepts No. 2).

24         f.    The principle that contingencies and other uncertainties that affect the

25  fairness of presentation of financial data at an interim date shall be disclosed in interim reports in

26  the same manner required for annual reports (APB Opinion No. 28).

27

28

1      g.      The principle that disclosures of contingencies shall be repeated in interim

2   and annual reports until the contingencies and have been removed, resolved, or have become

3   immaterial (APB Opinion No. 28).

4      h.      The principle that management should provide commentary relating to the

5   effects of significant events upon the interim financial results (APB Opinion No. 28).

6      260.    In addition, during the Class Period, defendants violated SEC disclosure rules:

7      a.      defendants failed to disclose the existence of known trends, events or

8   uncertainties that they reasonably expected would have a material, unfavorable impact on net

9   revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in

10  a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17

11  C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made

12  during the Class Period materially false and misleading; and

13      b.      by failing to file financial statements with the SEC that conformed to the

14  requirements of GAAP, such financial statements were presumptively misleading and inaccurate

15  pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

16      261.    Defendants were required to disclose, in the Company's financial statements, the

17  existence of the material facts described herein and to appropriately recognize and report assets,

18  revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures

19  and to account for and to report its financial statements in conformity with GAAP.  Defendants

20  knew, or were reckless in not knowing, the facts which indicated that the fiscal 2004 Form 10-K and

21  all of the Company's interim financial statements, press releases, public statements, and filings with

22  the SEC, which were disseminated to the investing public during the Class Period, were materially

23  false and misleading for the reasons set forth herein.  Had the true financial position and results of

24  operations of the Company been disclosed during the Class period, the Company's common stock

25  would have traded at prices well below that which it did.

26                          **ADDITIONAL SCIENTER ALLEGATIONS**

27      262.    As alleged herein, defendants acted with scienter in that each defendant knew that the

28  public documents and statements issued or disseminated in the name of the Company were

112

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Terayon, their control over, and/or receipt and/or modification of Terayon's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Terayon, participated in the fraudulent scheme alleged herein.

263.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it enabled them to deceive the investing public regarding Terayon's business, operations, management and the intrinsic value of Terayon common stock; (ii) it enabled defendants to artificially inflate the price of Terayon common stock; (iii) *it enabled Terayon insiders to sell approximately four million dollars worth of their privately- held Terayon shares while in possession of material adverse non-public information about the Company;* and (iv) it caused Plaintiff and other members of the Class to purchase Terayon common stock at artificially-inflated prices and to be damaged, thereby.

264.    The insider stock sales by defendants which occurred within the Class Period are set forth below:

| Defendant | Date | No. of Shares | Price/Share | Value |
|---|---|---|---|---|
| Zaki Rakib | 2/17/05 | 150,000 | $3.53 | $530,145 |
| Shlomo Rakib | 2/17/05 | 150,000 | $3.53 | $530,145 |
| Carol Lustenader | 3/4/02 -/8/02 | 5,747 | $6.56-7.57 | $39,138 |
| Carol Lustenader | 5/6/03 | 7,132 | $2.50 | $17,830 |
| Carol Lustenader | 7/2/03-7/3/03 | 50,000 | $2.94-3.63 | $167,700 |
| Carol Lustenader | 8/20/03 | 75,950 | $6.97 | $529,372 |
| Christopher Schaepe | 10/29/01-10/31/01 | 57,610 | $11.35-11.80 | $662,923 |
| Christopher Schaepe | 11/1/01 | 62,500 | $11.08 | $692,500 |
| Christopher Schaepe | 2/1/02-2/13/02 | 80,345 | $6.83-$7.03 | $548,832 |

113

| Defendant | Date | No. of Shares | Price/Share | Value |
|-----------|------|---------------|-------------|-------|
| Christopher Schaepe | 3/6/02 | 20,775 | $6.83 | $141,893 |
| Christopher Schaepe | 11/3/03 | 2,800 | $6.89-6.98 | $19,313 |
| Christopher Schaepe | 10/31/03 | 5,400 | $6.84 | $36,945 |
| **TOTAL** | | **668,259** | | **$3,916,736** |

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

265.    Lead Plaintiff brings th1is action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Terayon between June 28, 2001 and March 1, 2006, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

266.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Terayon common shares were actively traded on the Nasdaq. As of October 31, 2004, the Company had over 76 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Terayon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

267.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

268.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

114

1    269.    Common questions of law and fact exist as to all members of the Class and

2    predominate over any questions solely affecting individual members of the Class. Among the

3    questions of law and fact common to the Class are:

4           a.    whether the federal securities laws were violated by defendants' acts as

5    alleged herein;

6           b.    whether statements made by defendants to the investing public during the

7    Class Period misrepresented material facts about the business, operations and management of

8    Terayon; and

9           c.    to what extent the members of the Class have sustained damages and the

10   proper measure of damages.

11   270.    A class action is superior to all other available methods for the fair and efficient

12   adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

13   damages suffered by individual Class members may be relatively small, the expense and burden of

14   individual litigation make it impossible for members of the Class to individually redress the wrongs

15   done to them. There will be no difficulty in the management of this action as a class action.

16                            **BASIS OF ALLEGATIONS**

17   271.    Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel,

18   which included a review of SEC filings by Terayon, as well as regulatory filings and reports,

19   securities analysts' reports and advisories about the Company, press releases and other public

20   statements issued by the Company, and media reports about the Company, and Plaintiff believes

21   that substantial additional evidentiary support will exist for the allegations set forth herein after a

22   reasonable opportunity for discovery.

23                            **COUNT I**
                     **Violation Of Section 10(b) Of**
24                 **The Exchange Act And Rule 10b-5**
          **Promulgated Thereunder Against All Defendants**
25

26   272.    Plaintiff repeats every allegation contained above as if fully set forth herein.

27   273.    During the Class Period, defendants carried out a plan, scheme and course of conduct

28   which was intended to and, throughout the Class Period, did: (i) deceive the investing public

                                    115

1    regarding Terayon's business, operations, management and the intrinsic value of Terayon common
2    stock; (ii) enable defendants to artificially inflate the price of Terayon common stock; (iii) enable
3    Terayon insiders to sell nearly four million dollars of their privately-held Terayon shares while in
4    possession of material adverse non-public information about the Company; and (iv) cause Plaintiff
5    and other members of the Class to purchase Terayon common stock at artificially inflated prices and
6    to be damaged, thereby.  In furtherance of this unlawful scheme, plan and course of conduct,
7    defendants, jointly and individually (and each of them) took the actions set forth herein.

8         274.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue
9    statements of material fact and/or omitted to state material facts necessary to make the statements
10   not misleading; and (c) engaged in acts, practices, and a course of business which operated as a
11   fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain
12   artificially high market prices for Terayon's common stock in violation of Section 10(b) of the
13   Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the
14   wrongful and illegal conduct charged herein or as controlling persons as alleged below.

15        275.    Defendants, individually and in concert, directly and indirectly, by the use, means or
16   instrumentalities of interstate commerce and/or of the mails, engaged and participated in a
17   continuous course of conduct to conceal adverse material information about the business, operations
18   and future prospects of Terayon as specified herein.

19        276.    These defendants employed devices, schemes and artifices to defraud, while in
20   possession of material adverse non-public information and engaged in acts, practices, and a course
21   of conduct as alleged herein in an effort to assure investors of Terayon's value and performance and
22   continued substantial growth, which included the making of, or the participation in the making of,
23   untrue statements of material facts and omitting to state material facts necessary in order to make
24   the statements made about Terayon and its business operations and future prospects in the light of
25   the circumstances under which they were made, not misleading, as set forth more particularly
26   herein, and engaged in transactions, practices and a course of business which operated as a fraud and
27   deceit upon the purchasers of Terayon common stock during the Class Period.

28

                                               116

1    277.    Each of the Individual Defendants' primary liability, and controlling-person liability,

2    arises from the following facts: (i) the Individual Defendants were high-level executives and/or

3    directors at the Company during the Class Period and members of the Company's management team

4    or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as

5    a senior officer and/or director of the Company was privy to and participated in the creation,

6    development and reporting of the Company's internal budgets, plans, projections and/or reports;

7    (iii) each of these defendants enjoyed significant personal contact and familiarity with the other

8    defendants and was advised of and had access to other members of the Company's management

9    team, internal reports and other data and information about the Company's finances, operations, and

10    sales at all relevant times; and (iv) each of these defendants was aware of the Company's

11    dissemination of information to the investing public which they knew or recklessly disregarded was

12    materially false and misleading.

13    278.    The defendants had actual knowledge of the misrepresentations and omissions of

14    material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to

15    ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions

16    were done knowingly or recklessly to conceal Terayon's operating condition and future business

17    prospects from the investing public and supporting the artificially inflated price of its common

18    stock. As demonstrated by defendants' overstatements and misstatements of the Company's

19    business, operations and earnings throughout the Class Period, defendants, if they did not have

20    actual knowledge of the misrepresentations and omissions alleged, were deliberate in failing to

21    obtain such knowledge by deliberately refraining from taking those steps necessary to discover

22    whether those statements were false or misleading.

23    279.    As a result of the dissemination of the materially false and misleading information

24    and failure to disclose material facts, as set forth above, the market price of Terayon common stock

25    was artificially inflated during the Class Period. In ignorance of the fact that market prices of

26    Terayon's publicly traded common stock were artificially inflated, and relying directly or indirectly

27    on the false and misleading statements made by defendants, or upon the integrity of the market in

28    which the securities trade, and/or on the absence of material adverse information that was known to

117

1  or recklessly disregarded by defendants but not disclosed in public statements by defendants during

2  the Class Period, Plaintiff and the other members of the Class acquired Terayon common stock

3  during the Class Period at artificially-high prices and were damaged thereby.

4      280.    At the time of said misrepresentations and omissions, Plaintiff and other members of

5  the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other

6  members of the Class and the marketplace known the truth regarding the problems that Terayon was

7  experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class

8  would not have purchased or otherwise acquired their Terayon common stock, or, if they had

9  acquired such common stock during the Class Period, they would not have done so at the artificially

10 inflated prices which they paid.

11     281.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

12 Act, and Rule 10b-5 promulgated thereunder.

13     282.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

14 other members of the Class suffered damages in connection with their respective purchases and

15 sales of the Company's common stock during the Class Period.

16                          **COUNT II**
                      Violation Of Section 20(a) Of
17           **The Exchange Act Against the Individual Defendants**

18     283.    Plaintiff repeats every allegation contained above as if fully set forth herein.

19     284.    The Individual Defendants acted as controlling persons of Terayon within the

20 meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

21 positions, and their ownership and contractual rights, participation in and/or awareness of the

22 Company's operations and/or intimate knowledge of the false financial statements filed by the

23 Company with the SEC and disseminated to the investing public, the Individual Defendants had the

24 power to influence and control and did influence and control, directly or indirectly, the decision-

25 making of the Company, including the content and dissemination of the various statements which

26 Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had

27 unlimited access to copies of the Company's reports, press releases, public filings and other

28 statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

                                      118

1  issued and had the ability to prevent the issuance of the statements or cause the statements to be
2  corrected.

3      285.    In particular, each of these defendants had direct and supervisory involvement in the
4  day-to-day operations of the Company and, therefore, is presumed to have had the power to control
5  or influence the particular transactions giving rise to the securities violations as alleged herein, and
6  exercised the same.

7      286.    As set forth above, Terayon and the Individual Defendants each violated Section
8  10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their
9  positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of
10 the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and
11 other members of the Class suffered damages in connection with their purchases of the Company's
12 common stock during the Class Period.

13 **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

14     A.    Determining that this action is a proper class action, and certifying Plaintiff as a class
15 representative under Rule 23 of the Federal Rules of Civil Procedure;

16     B.    Awarding compensatory damages in favor of Plaintiff and the other Class members
17 against all defendants, jointly and severally, for all damages sustained as a result of defendants'
18 wrongdoing, in an amount to be proven at trial, including interest thereon;

19     C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this
20 action, including counsel fees and expert fees;

21     D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity
22 and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate
23 state law remedies to assure that the Class has an effective remedy; and

24     E.    Such other and further relief as the Court may deem just and proper.

25

26 ///
27 ///
28 ///

119

1

## JURY TRIAL DEMANDED

2

Plaintiff hereby demands a trial by jury.

3

4

Dated: January 8, 2007
                                    Michael D. Braun
                                    BRAUN LAW GROUP, P.C.

5

6

                              By:    _____/S/_____
                                     Michael D. Braun

7                                    12400 Wilshire Boulevard
                                     Suite 920

8                                    Los Angeles, CA 90025
                                     Tel:    (310) 442-7755

9                                    Fax:    (310) 442-7756

10                                   **Liaison Counsel for Plaintiff and the Class**

11                                   Maya Saxena
                                     Joseph E. White, III

12                                   SAXENA WHITE P.A.
                                     2424 North Federal Highway, Suite 257

13                                   Boca Raton, FL 33431
                                     Tel:    (561) 394-3399

14                                   Fax:    (561) 394-3382

15                                   Lewis Kahn
                                     KAHN GAUTHIER SWICK, LLC

16                                   650 Poydras Street, Suite 2150
                                     New Orleans, LA  70130

17                                   Tel:    (504) 455-1400
                                     Fax:    (504) 455-1498

18
                                     Michael A. Swick

19                                   Kim E. Miller
                                     KAHN GAUTHIER SWICK, LLC

20                                   114 E. 39th Street
                                     New York, NY 10016

21                                   Tel:    (212) 920-4310
                                     Fax:    (504) 455-1498

22
                                     **Lead Counsel for Plaintiff  and the Class**

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1

**PROOF OF SERVICE**

2    STATE OF CALIFORNIA                )
                                        )ss.:
3    COUNTY OF LOS ANGELES              )

4        I am employed in the county of Los Angeles, State of California, I am over the age of 18 and
     not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 920, Los
5    Angeles, CA 90025.

6        On January 8, 2007, using the Northern District of California's Electronic Case Filing
     System, with the ECF ID registered to Michael D. Braun, I filed and served the document(s)
7    described as:

8        **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL
                           SECURITIES LAWS**

9
         The ECF System is designed to automatically generate an e-mail message to all parties in the
10   case, which constitutes service. According to the ECF/PACER system, for this case, the parties
     served are as follows:

11
     Lionel Z. Glancy, Esq.                                    info@glancylaw.com
12
     Michael M. Goldberg, Esq.                                 info@glancylaw.com
13
     **Attorneys for Plaintiffs**
14
     Patrick Edward Gibbs                                      patrick.gibbs@lw.com
15                                                             zoila.aurora@lw.com

16   **Attorneys for Defendants**

17       On January 8, 2007, I served the document(s) described as:

18       **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL
                           SECURITIES LAWS**

19
     by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:
20
     Maya Saxena, Esq.
21   Joseph E. White, III,. Esq.
     SAXENA WHITE P.A.
22   2424 North Federal Highway, Suite 257
     Boca Raton, FL 33431
23   Tel:    (561) 394-3399
     Fax:    (561) 394-3382
24
     Lewis Kahn, Esq.
25   KAHN GAUTHIER SWICK, LLC
     650 Poydras Street, Suite 2150
26   New Orleans, LA 70130
     Tel:    (504) 455-1400
27   Fax:    (504) 455-1498

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1 | Michael A. Swick, Esq.
2 | Kim E. Miller, Esq.
    | KAHN GAUTHIER SWICK, LLC
    | 114 E. 39th Street
3 | New York, NY 10016
    | Tel:    (212) 920-4310
4 | Fax:    (504) 455-1498

5 | **Attorneys for Proposed Lead Plaintiff**
    | **Movant Adrian G. Mongeli and the Class**

6

7 | Zaki Rakib
    | c/o Terayon Communications Systems, Inc.
    | 4988 Great America Parkway
8 | Santa Clara, CA 95054

9 | Jerry D. Chase
    | c/o Terayon Communications Systems, Inc.
10 | 4988 Great America Parkway
    | Santa Clara, CA 95054

11

12 | Mark A. Richman
    | c/o Terayon Communications Systems, Inc.
    | 4988 Great America Parkway
13 | Santa Clara, CA 95054

14 | Edward Lopez
    | c/o Terayon Communications Systems, Inc.
15 | 4988 Great America Parkway
    | Santa Clara, CA 95054

16

    | **Defendants**

17

        I served the above document(s) as follows:

18

        BY MAIL. I am familiar with the firm's practice of collection and processing
19 | correspondence for mailing. Under that practice it would be deposited with U.S. postal service on
    | that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of
20 | business. I am aware that on motion of the party served, service is presumed invalid if postal
    | cancellation date or postage meter date is more than one day after date of deposit for mailing in an
21 | affidavit.

22 |     I declare, pursuant to Civil L.R. 23-2, that on the date hereof I served a copy of the above-
    | listed document(s) on the Securities Class Action Clearinghouse by electronic mail through the
23 | following electronic mail address provided by the Securities Class Action Clearinghouse:

24 |                                    **scac@law.stanford.edu**

25 |     I am employed in the office of a member of the bar of this Court at whose direction the
    | service was made.

26

27

28

                                            122

1

     I declare under penalty of perjury under the laws of the United States that the above is true and correct.

2

     Executed on January 8, 2007, at Los Angeles, California 90025.

3

4

5

6

                             /S/ LEITZA MOLINAR
                                 Leitza Molinar

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

123