1  LATHAM & WATKINS LLP
       Patrick E. Gibbs (SBN 183174)
2      Jennie Foote Feldman (SBN 248375)
   140 Scott Drive
3  Menlo Park, California  94025
   Telephone:  (650) 328-4600
4  Facsimile:  (650) 463-2600

5

6  Attorneys for Defendants Terayon Communication
   Systems, Inc., Zaki Rakib, Jerry D. Chase, Mark A.
   Richman, Edward Lopez, Ray Fritz, Carol
7  Lustenader, Matthew Miller, Shlomo Rakib, Doug
   Sabella, Christopher Schaepe, Mark Slaven, Lewis
8  Solomon, Howard W. Speaks, Arthur T. Taylor, and
   David Woodrow

9

10                UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13  ADRIAN MONGELI, Individually, And On       CASE NO.: 3-06-CV-03936 MJJ
    Behalf Of All Others Similarly Situated,
14                                              **CLASS ACTION**
                      Plaintiffs,
15                                              _____
        v.
16                                              **NOTICE OF MOTION AND MOTION TO
    TERAYON COMMUNICATION                       DISMISS AMENDED CLASS ACTION
17  SYSTEMS, INC., ZAKI RAKIB, JERRY D.         COMPLAINT FOR VIOLATIONS OF
    CHASE, MARK A. RICHMAN, EDWARD              FEDERAL SECURITIES LAWS BY
18  LOPEZ, RAY FRITZ, CAROL                     TERAYON AND THE INDIVIDUAL
    LUSTENADER, MATTHEW MILLER,                 DEFENDANTS; MEMORANDUM OF
19  SHLOMO RAKIB, DOUG SABELLA,                 POINTS AND AUTHORITIES IN SUPPORT
    CHRISTOPHER SCHAEPE, MARK                   THEREOF**
20  SLAVEN, LEWIS SOLOMON, HOWARD
    W. SPEAKS, ARTHUR T. TAYLOR,                Judge:     Honorable Martin J. Jenkins
21  DAVID WOODROW, and ERNST &                  Date:      June 5, 2007
    YOUNG, LLP,                                 Time:      9:30 a.m.
22                                              Courtroom: 11, 19th Floor
                      Defendants.
23

24

25

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ............................................................................ 1

STATEMENT OF ISSUE TO BE DECIDED.................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

ARGUMENT .................................................................................................................. 7

I.     THE LENGTHY, PUZZLE-STYLE PLEADING OF THE AMENDED
       COMPLAINT WARRANTS DISMISSAL UNDER FRCP 8 AND THE
       PSLRA .................................................................................................................. 7

II.    PLAINTIFFS' CLAIM UNDER SECTION 10(B) AND RULE 10B-5
       SHOULD BE DISMISSED ................................................................................... 8

       A.     Statements of Corporate Optimism or Mere Puffery Are Not
              Actionable. ................................................................................................. 9

       B.     Forward-Looking Statements Are Immune from Liability Under
              the PSLRA's Safe Harbor Provision........................................................ 10

       C.     Plaintiffs Have Failed to Provide Any Factual Basis That Many
              Statements Are Even False. ....................................................................... 10

       D.     Plaintiffs Cannot Plead an Actionable Omission Based on
              Disclosed Facts. ......................................................................................... 11

       E.     Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong
              Inference of Scienter as to Statements Corrected in the
              Restatement................................................................................................. 11

              1.     Plaintiffs cannot satisfy their burden of pleading scienter by
                     merely alleging that a restatement occurred. ............................. 12

              2.     Terayon's disclosures regarding its internal controls belie
                     scienter. ...................................................................................... 14

              3.     Plaintiffs' generic and conclusory allegations that
                     Defendants knew about accounting issues because of their
                     positions are inadequate............................................................. 15

              4.     No inference of scienter is raised by either the fact that four
                     executives left the Company at different times over the
                     course of the nearly five-year Class Period, or that the
                     Company changed accountants..................................................... 16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

i

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

5.  Sarbanes-Oxley certifications fail to raise any inference of scienter. .................................................................. 17

6.  Plaintiffs' "confidential source" allegations fail to create a strong inference of scienter. ......................................... 17

a.  Plaintiffs' "confidential source" allegations fail to meet well-established reliability standards. .......................... 18

b.  Plaintiffs' "confidential source" allegations fail to show knowledge by Terayon or any Individual Defendant. ............................................................... 18

7.  Plaintiffs' "motive and opportunity" allegations fail to create a strong inference of deliberate recklessness. .............. 20

a.  The fact that Terayon and the majority of Individual Defendants did not sell stock negates any inference of scienter against all of the Defendants. .................................... 21

b.  Total stock sales by Zaki Rakib, Shlomo Rakib, and Christopher Schaepe were too small as a percentage of holdings to raise any inference of scienter. ............................. 21

c.  Individual stock sales by Zaki Rakib, Shlomo Rakib, Carol Lustenader and Christopher Schaepe were not suspiciously timed. ....................................................... 22

F.  Plaintiffs Have Failed To Plead Loss Causation:  A Causal Connection Between an Alleged Misrepresentation and a Loss. ......................... 23

III.  PLAINTIFFS' "CONTROL PERSON" CLAIMS UNDER SECTION 20(A) FAIL FOR LACK OF A PREDICATE SECURITIES VIOLATION. .................................................................................. 24

CONCLUSION ............................................................................................ 25

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

**TABLE OF AUTHORITIES**

Page

<u>CASES</u>

*DSAM Global Value Fund v. Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ........................................................................ 12, 14

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................... 8, 24

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) .......................................................................... 9, 13

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .............................................................................. 25

*In re Aspeon, Inc. Sec. Litig.*,
    No. 04-5561, 2006 WL 448793 (9th Cir. Feb. 23, 2006) .................................... 16

*In re Bus. Objects S.A. Sec. Litig.*,
    No. C 04-2401 MJJ, 2005 U.S. Dist. LEXIS 20215 (N.D. Cal. July 27, 2005) ............ 18, 19

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) .................................................................... 20

*In re Conner Peripherals, Inc.*,
    No. C-95-2244 MHP, 1996 WL 193811 (N.D. Cal. Jan. 18, 1996) ...................... 7

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ................................................................ 10

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ....................................................... passim

*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................................ 13

*In re Dura Pharm., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................................... 20

*In re Hypercom Corp. Sec. Litig.*,
    No. CV-05-0455-PHX-NVW, 2006 WL 1836181 (D. Ariz. July 5, 2006) ................... 14, 16

*In re Invision Tech. Inc. Sec. Litig.*,
    No. C04-03181 MJJ, 2006 U.S. Dist. Lexis 12166 (N.D. Cal. Jan. 21, 2006) ................ 17

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 WL 538756 (D. Or. Jan. 3, 2006) ............................ 13

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (D. Wash. 2003) .......................................................... 19

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ...................................................... 21, 22

*In re Portal Software, Inc. Sec. Litig.*,
    No. C-03-5138 VRW, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ................................ 18

*In re Redback Networks, Inc. Sec. Litig.*,
    No. C03-5642 JF (HLR) 2006 WL 1805579 (N.D. Cal. March 20, 2006) ........................ 23

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .......................................................... passim

*In re Software Toolworks, Inc., Sec. Litig.*,
    50 F.3d 615 (9th Cir. 1994) .......................................................... 12

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .......................................................... 7, 8

*In re Textainer P'ship Sec. Litig.*,
    No. C-05-0969 MMC, 2007 WL 108320 (N.D. Cal. Jan. 10, 2007) ................................ 25

*In re The Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .......................................................... 16

*In re Verisign Corp. Sec. Litig.*,
    No. C 02-02270 JW, 2005 WL 2893783 (N.D. Cal. Nov. 2, 2005) ............................ 24, 25

*In re Verifone Sec. Litig.*, 11 F.3d 865
    11 F.3d 865 (9th Cir. 1993) .......................................................... 25

*In re Watchguard Sec. Litig.*,
    No. C05-678J, 2006 WL 2038656 (W.D. Wash. April 21, 2006) ........................ 12, 13, 17

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006) .......................................................... 17

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .......................................................... 15

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .......................................................... 20, 21, 23

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .......................................................... 11

*The WU Group v. Synopsys, Inc.*,
    No. C 04-3580 MJJ, 2005 WL 1926626 (N.D. Cal. Aug. 10, 2005) ................................ 22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iv

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ........................................................................... 7, 23

## STATUTES

15 U.S.C. § 78j(b) .................................................................................................................... 8

15 U.S.C. § 78u-4(b)(1) ................................................................................................. 7, 8, 11

15 U.S.C. § 78u-4(b)(2) ............................................................................................................ 8

15 U.S.C. § 78u-4(b)(3)(A) ....................................................................................................... 9

15 U.S.C. § 78u-5(a) ............................................................................................................... 10

15 U.S.C. § 78u-5(c) ............................................................................................................... 11

15 U.S.C. § 78u-5(i)(1) ........................................................................................................... 10

17 C.F.R. § 240.10b-5 .............................................................................................................. 8

## RULES

Fed. R. Civ. P. 8 ....................................................................................................................... 7

Fed. R. Civ. P. 8(a) .................................................................................................................. 7

Fed. R. Civ. P. 8(e) .................................................................................................................. 7

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

v

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1 **NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that Terayon Communication Systems, Inc. ("Terayon" or the

3 "Company") and Zaki Rakib, Jerry D. Chase, Mark A. Richman, Edward Lopez, Ray Fritz,

4 Carol Lustenader, Matthew Miller, Shlomo Rakib, Doug Sabella, Christopher Schaepe, Mark

5 Slaven, Lewis Solomon, Howard W. Speaks, Arthur T. Taylor, and David Woodrow (the

6 "Individual Defendants") hereby move to dismiss this action under 12(b)(6) of the Federal Rules

7 of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4

8 et seq. ("PSLRA" or the "Reform Act").  The Motion is to be heard at 9:30 a.m. on June 5, 2007,

9 in the courtroom of the Honorable Martin J. Jenkins, in the United States District Court for the

10 Northern District of California, 450 Golden Gate Avenue, San Francisco, California.  With this

11 Motion, Terayon and the Individual Defendants request that Plaintiffs' Amended Class Action

12 Complaint for Violations of Federal Securities Laws be dismissed with prejudice.

13 **STATEMENT OF ISSUE TO BE DECIDED**

14      Whether Plaintiffs have alleged particularized facts giving rise to a strong inference that

15 Terayon and the Individual Defendants made actionable misrepresentations of material fact, with

16 the requisite scienter, under the Private Securities Litigation Reform Act.

17 **MEMORANDUM OF POINTS AND AUTHORITIES**

18 **INTRODUCTION**

19      In March 2006, Terayon announced that it expected to restate revenues for 2004 and the

20 first two quarters of 2005, due to an adjustment in the timing of revenue recognition relating to a

21 single customer.  At the same time, Terayon announced that its Audit Committee, with the

22 assistance of independent counsel, had investigated the revenue recognition issue relating to the

23 customer and found no intentional misconduct by anyone at the Company.  The Audit

24 Committee found, rather, that Company personnel had not considered or sufficiently focused on

25 the application of certain accounting rules.  Terayon announced that the restatement work was

26 ongoing, as the Company and its independent auditors continued to review the amounts of

27 revenue and expenses to be reported in different periods.

28      Ignoring the findings of the Company's Audit Committee, and lacking any facts showing

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SILICON VALLEY

1

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    that the expected restatement was the result of fraud, I.B.L. Investments, Limited filed a class

2    action complaint on June 23, 2006 based on the yet-to-be completed restatement.  The case was

3    stayed while a new party, Adrian Mongeli, assumed the role of lead plaintiff.  The restatement

4    process at Terayon continued through 2006, as the Company voluntarily re-audited earlier

5    periods and examined issues outside of revenue recognition.

6           The results of Terayon's restatement were announced in the 2005 10-K, filed on

7    December 29, 2006.  The Company ultimately made several types of accounting adjustments, all

8    of which related to either misapplication of the appropriate accounting principles or to changes in

9    estimates, some of which were modified based on new information.  Despite a wide-ranging, in-

10   depth review of the Company's books and records involving the Company's outside auditor,

11   accounting consultants, an outside law firm, and management, Terayon did not identify a single

12   instance of intentional manipulation of the Company's financials or purposeful disregard of the

13   appropriate accounting principles.

14          In spite of these findings, Plaintiffs filed an Amended Complaint on January 9, 2007,

15   alleging claims based on the completed restatement.[1]  Since the restatement affected the

16   Company's historical financials in earlier periods, Plaintiffs expanded the alleged Class Period to

17   June 28, 2001 – March 1, 2006.  In the Amended Complaint, Plaintiffs challenge nearly sixty

18   separate statements by Terayon and the Individual Defendants.  Lacking any coherent theory of

19   fraud, Plaintiffs fail to explain how each statement was knowingly false.  Instead, Plaintiffs refer

20   the reader to a three-page paragraph which purports to include reasons why all of the fifty-plus

21   statements were materially false and known to be false when made.

22                              **STATEMENT OF FACTS**

23          Terayon, based in Santa Clara, develops, markets, and sells digital video equipment to

24   network operators and content aggregators who provide video services.[2]  ¶ 15; *See* RJN Ex. 1 at

---

[1]   The Amended Class Action Complaint is referred to as the "Amended Complaint" and is
      cited to as "¶__."

[2]   Unless otherwise indicated, the following facts are based on allegations in the Amended
      Complaint, Terayon's SEC filings, or other publicly available information.  *See Request for
      Judicial Notice in Support of Motion to Dismiss Amended Class Action Complaint for
      Violations of Federal Securities Laws by Terayon and the Individual Defendants*.  The

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

10.  Since it was founded in 1993, Terayon has never been profitable on a yearly basis.  *Id.* at 80. Over the years, the Company has adjusted its business focus to adapt to market changes. Terayon's offerings have included a cable modem termination system ("CMTS") that enabled cable operators to offer high-speed, broadband internet access to subscribers; data and voice products, for cable and satellite providers; and digital video products.

In 2004, Terayon made digital video the core of its business.  *Id.* at 10.  In February 2004, Fox Broadcasting Company ("Fox") chose Terayon's new BP 5100 broadcast platform to run its high-definition broadcast delivery system.  *See* RJN Ex. 2 at Ex. 99.1.  Fox used the BP 5100 as the technology behind its launch of high definition broadcasts of National Football League games in the fall of 2004.  *See* RJN Ex. 3.

Terayon recognized revenue associated with Fox's successful deployment of the BP 5100 in the third and fourth quarters of 2004 and the first and second quarter of 2005.  *See* RJN Ex. 4 at 18; RJN Ex. 5 at 19.  Terayon fully disclosed its basis for recognizing revenue to the public. In both the 2003 and 2004 10-K, Terayon stated that its policy is to recognize revenue in accordance with the general rule for all products and services, Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition" ("SAB 101"), as amended by SAB 104 ("SAB 104").  *See* RJN Ex. 5 at 32; RJN Ex. 6 at 31.

In the summer of 2005, Terayon announced that Ernst & Young LLP ("Ernst & Young") would resign as the Company's outside auditors.  *See* RJN Ex. 7 at 2.  Both Ernst & Young and the Company stated that there were no disagreements between the parties on any matter of accounting principles or practices, financial statements disclosure, or auditing scope and procedure, that if not resolved would have been reported by Ernst & Young in connection with its audit reports.  *See* RJN Ex. 7 at Ex. 16.01.  On a conference call with investors, Terayon's CFO Mark Richman explained that other companies, in addition to Terayon, were also losing the services of a "Big 4" accounting firm.  ¶ 211.  Thereafter, the Company announced it had retained Stonefield Josephson to audit the Company's financial statements for the year ended

---

Request for Judicial Notice is referred to as "RJN" and exhibits contained therein are cited to as "RJN Ex.__."

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   December 31, 2005, and to perform certain procedures related to the financial statements to be

2   included in the Company's quarterly SEC reports.  *See* RJN Ex. 8.

3   During a review of the Company's previous accounting policies that began in the fall of

4   2005, the Company determined that revenue relating to the Fox transaction may have been

5   recorded in incorrect periods.  *See* RJN Ex. 9.  Upon reaching this determination, the Company,

6   with the assistance of its new auditors, Stonefield Josephson, and the Audit Committee, launched

7   a wide-ranging accounting review to determine if a restatement was necessary.  The Company's

8   review encompassed not only the accounting for the Fox transaction, but also current and past

9   revenue recognition practices and internal controls over financial reporting.  In addition to this

10  internal review, the Audit Committee, with the assistance of independent outside counsel,

11  launched a full investigation into circumstances surrounding the original accounting for the Fox

12  transaction.  *Id*.  The Company also warned the market that there could be no assurance that

13  Terayon or its auditors would not identify additional issues.  *Id*.

14  On March 1, 2006, Terayon announced that as a result of the Audit Committee

15  investigation and management's accounting review, it had identified issues relating to revenue

16  recognition that would require restatement of financial statements for 2004 and the first two

17  quarters of 2005.  *See* RJN Ex. 10.  The details of the restatement were not yet known because

18  the Company was still examining the actual amounts of revenue and expenses that would need to

19  be restated.  *Id*.  As it had done in November 2005, Terayon warned the public that additional

20  issues may be identified in connection with the restatement.  *Id*.

21  Terayon disclosed detailed findings of the Audit Committee's investigation into the

22  accounting for the Fox transaction in the March 1, 2006 announcement.  The Audit Committee

23  found that while the Company had previously recognized revenue for the deal pursuant to SAB

24  104, the revenue recognition rule that applies to hardware products, the Company should have

25  relied on guidance from the American Institute of Certified Public Accountants Statement of

26  Position ("SOP") 97-2, "Software Revenue Recognition" and SOP 81-1, "Accounting for

27  Performance of Construction-Type and Certain Production-Type Contracts."  *See* RJN Ex. 10.

28  The Audit Committee did not find that this mistaken application of accounting principles was the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

4

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1  result of fraud.  To the contrary, the Audit Committee found:

- that there was no intent by Company personnel to recognize revenue in contravention of what Company personnel understood to be the applicable accounting rules at the time;

- that Company personnel nevertheless did not consider or sufficiently focus on the application of certain relevant accounting rules; and

- that there was no intent by Company personnel to mislead the Company's auditors or engage in other wrongful conduct.

*Id*.  Based on the results of the inquiry, the Audit Committee did not recommend any actions against current or former Company personnel.  *Id*.

Even after the conclusion of the Audit Committee inquiry, the Company continued to thoroughly review its prior accounting, examine prior periods, and look beyond the issue of revenue recognition.  On May 26, 2006, Terayon announced it had asked Stonefield Josephson to re-audit the Company's financial statements for 2004, and if necessary re-audit 2003, in addition to continuing its ongoing work related to 2005.  For a third time, the Company warned that additional issues may be identified in connection with the restatement.  *See* RJN Ex. 11.

By November 2006, Terayon determined that there were other accounting errors that would need to be corrected, and the restatement would extend to prior periods.  *See* RJN Ex. 12. This news was inconsequential to the market, as Terayon's stock price climbed two cents, from a closing price of $1.38 on November 8 to $1.40 on November 9, 2006.  *See* RJN Ex. 13.  Terayon completed the restatement process by the end of 2006 and filed its 2005 10-K on December 29, 2006.  The 2005 10-K included restated and audited consolidated financial statements for 2004 and 2003; restated financial statements for 2002; and adjusted financial statements for 2001.  The correction of errors fell generally into five categories:  (1) revenue recognition; (2) the allowance for doubtful accounts; (3) deferred revenues and cost of goods sold; (4) use of estimates and (5) assessment of the convertible subordinated notes.  *See generally* RJN Ex. 1 at 4-9.

Although Terayon's accounting review identified other issues, most of the restatement's financial impact resulted from the Company's determination that revenue for its new Digital Video Services products ("DVS"), including the BP 5100 that was the subject of the Fox

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

1  transaction, should be recognized pursuant to the software accounting rules, not the rule (SAB

2  104) that Terayon had previously used for all of its products.  The issue is complex.  The key

3  issue in determining what rule applies is whether the software component of a product is "more

4  than incidental."  If it is, revenue should be recognized under the rules relating to software, SOP

5  97-2 and SOP 81-1.  *See* RJN Ex. 1 at 102.  During the restatement process, the Company

6  determined that software in DVS products is more than incidental.  The Company found that

7  even though its software is not sold on a stand-alone basis and cannot operate on a third party

8  hardware platform, the DVS hardware product did contain multiple embedded software

9  applications, the software was actively marketed, and the Company had a practice of providing

10  upgrades and enhancements for the software to its existing users periodically.[3]  *Id.*

11       The Company's determination that SOP 97-2 and SOP 81-1 were the correct accounting

12  principles to apply to DVS products changed the timing of revenue recognition for those

13  products, as some of the revenue that was previously recorded in certain periods was re-

14  categorized as deferred revenue (revenue that has been billed, but not yet earned), rather than

15  revenue earned during the period.  The amounts billed for DVS products were not restated.  Only

16  the timing of revenue recognition changed.  *See* RJN Ex. 1 at 102.

17       Two other categories of accounting errors identified in the restatement also resulted from

18  simple mis-application of the appropriate accounting principles.  These are the accounting for a

19  series of convertible subordinated notes, and the accounting for deferred revenues and cost of

20  goods sold.  The remaining two issues, use of estimates and the allowance for doubtful accounts,

21  both involved the correction of certain estimates.  These adjustments result from the fact that

22  during the restatement process, the Company had access to additional information that may not

23  have been available at the time the estimates were originally made.

24       To summarize, in the restatement, Terayon did not identify a single error that was the

25

26  [3]  Ernst & Young has not withdrawn its prior audit opinions.  When the Company changed
     auditors, it announced that "the reports of Ernst & Young on the Company's financial

27  statements as of and for the years ended December 31, 2004 and 2003 did not contain an
     adverse opinion or a disclaimer of opinion and were not qualified or modified as to

28  uncertainty, audit scope, or accounting principles."  *See* RJN Ex. 8 at Item 4.01.  Ernst &
     Young agreed with this statement.  *Id.* at Ex. 16.1.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

6

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   result of intentional misconduct or fraud.  Rather, it identified categories of errors that resulted

2   from mistakes in the application of accounting principles, and changes in estimates resulting

3   from new information or subsequent developments.

4                                   **ARGUMENT**

5   **I.    THE LENGTHY, PUZZLE-STYLE PLEADING OF THE AMENDED
        COMPLAINT WARRANTS DISMISSAL UNDER FRCP 8 AND THE PSLRA**

6

7            Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain

8   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Each

9   averment "shall be simple, concise, and direct."  Fed. R. Civ. P. 8(e).  In order to state a claim for

10  securities fraud under the PSLRA, a complaint must also specify each misleading statement, and

11  the reason why the statement is misleading.  15 U.S.C. § 78u-4(b)(1).  The Amended Complaint

12  does not comply with either of these requirements.

13           First, at 286 paragraphs across 119 pages, the Amended Complaint is so lengthy as to

14  violate these rules.  *In re Splash Tech. Holdings, Inc. Sec. Litig*., 160 F. Supp. 2d 1059, 1073

15  (N.D. Cal. 2001) (124-page securities complaint violated Rule 8 and the PSLRA); *see also In re*

16  *Conner Peripherals, Inc*., No. C-95-2244 MHP, 1996 WL 193811, *1 (N.D. Cal. Jan. 18, 1996)

17  (133-page securities complaint consisting of numerous SEC filings and public statements was

18  not the "short and plain statement" required by Rule 8).

19           Second, the puzzle-style pleading used by Plaintiffs in the Amended Complaint has been

20  criticized by courts in this District.  Instead of offering specific reasons why each challenged

21  statement is false and misleading, Plaintiffs repeatedly refer the reader back to Paragraph 64,

22  which contains eleven sub-sections and stretches across three pages.  That catch-all paragraph

23  purports to provide all of the reasons why the statements were "materially false and misleading

24  when made, and were known by defendants to be false at that time or were recklessly

25  disregarded as such."  ¶ 64.  When reviewing each challenged statement, the reader is forced to

26  scroll through Paragraph 64 to search for facts supporting the inference that the statement was

27  knowingly false.  Courts have dismissed pleadings that place this burden on the reader.  *See In re*

28  *Splash Tech.,* 160 F. Supp. 2d at 1075; *Wenger v. Lumisys, Inc*., 2 F. Supp. 2d 1231, 1243-44

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   (N.D. Cal. 1998) (dismissing complaint where plaintiff "throws the statements and the alleged

2   true facts together in an undifferentiated clump and apparently expects the reader to sort out and

3   pair each statement with a supposedly relevant true fact").[4]

4         The dismissed complaint in *Splash* followed the same organizational style as the

5   Amended Complaint.  In that case, plaintiffs alleged several types of misleading statements and

6   provided a list of between five and nineteen "reasons" why the statements were false, "without

7   identifying which alleged false statement(s) are belied by the facts stated in each reason."  *In re*

8   *Splash Tech.*, *160 F. Supp. 2d*. at 1073.  The Court held that because plaintiffs had "left it up to

9   defendants and the court to try and figure out what the misleading statements are, and to match

10  the statements up with the reasons they are false and misleading," the complaint violated Rule 8

11  and the PSLRA.  *Id.*

12  **II.     PLAINTIFFS' CLAIM UNDER SECTION 10(B) AND RULE 10B-5 SHOULD BE**
13          **DISMISSED**

14        To state a claim for relief under Section 10(b) of the Securities Exchange Act of 1934 and

15  Securities and Exchange Commission Rule 10b-5, plaintiffs must allege that (1) defendants made

16  a material misrepresentation or omission of fact; (2) with scienter – that is, with a wrongful state

17  of mind; (3) in connection with the purchase or sale of a security; (4) plaintiffs relied on the

18  misrepresentation or omission; (5) plaintiffs suffered an economic loss; and (6) plaintiffs' loss

19  was caused by the material misstatement or omission.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-

20  5; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Under the PSLRA, two of these

21  elements – falsity and scienter – must be pleaded with particularity.  15 U.S.C. § 78u-4(b)(1) and

22  (2).  With regard to falsity, the Reform Act requires Plaintiffs' complaint to "specify each

23  statement alleged to have been misleading" and "the reason or reasons why the statement is

24  misleading."  15 U.S.C. § 78u-4(b)(1).  In pleading scienter, the Reform Act requires Plaintiffs to

25  "state with particularity facts giving rise to a strong inference that the defendant acted with the

26  requisite state of mind."  15 U.S.C. § 78u-4(b)(2).

27        Congress enacted the PSLRA to establish uniform and stringent pleading requirements

28

---

[4]   Throughout this brief, internal citations and quotations are omitted.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SILICON VALLEY

8

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    for securities fraud actions, and to "put an end to the practice of pleading fraud by hindsight."  *In*

2    *re Silicon Graphics Sec. Litig*., 183 F.3d 970, 988 (9th Cir. 1999).  The PSLRA thus modifies the

3    "customary latitude" extended to a plaintiff on a motion to dismiss under Fed. R. Civ. P.

4    12(b)(6).  *Gompper v. VISX, Inc*., 298 F.3d 893, 896 (9th Cir. 2002).  Under the PSLRA,

5    plaintiffs must show that an inference of fraud is the most plausible of competing inferences.  *Id*.

6    at 897.  A strong inference – as opposed to a merely plausible or reasonable inference – arises

7    only when plaintiffs "plead, in great detail, facts that constitute strong circumstantial evidence of

8    deliberately reckless or conscious misconduct."  *In re Silicon Graphics*, 183 F.3d at 974, 979

9    (holding that "deliberate recklessness" is a state of mind "that strongly suggests actual intent").

10   Because Congress intended to prevent the filing of meritless strike suits, it mandated that where

11   plaintiffs fail to meet these strict pleading requirements, the court "shall" dismiss the complaint.

12   15 U.S.C. § 78u-4(b)(3)(A).

13           Not one of the challenged statements gives rise to a securities fraud claim.  The

14   statements fall into five categories:  (A) immaterial statements of corporate optimism; (B)

15   forward-looking statements about financial performance that are immune from liability; (C)

16   statements for which Plaintiffs fail to provide any factual basis of falsity, including statements

17   about the resignation of certain executives, the Company's change in auditor, and plans for

18   corporate restructuring; (D) a purported omission relating to characteristics of the Company's

19   Convertible Subordinated Notes, which in fact were fully disclosed; and (E) statements corrected

20   in the Company's restatement, as to which Plaintiffs have alleged no facts giving rise to an

21   inference of scienter.  As such, not one of these allegations meets the heightened pleading

22   requirements of the Private Securities Litigation Reform Act.

23           **A.      Statements of Corporate Optimism or Mere Puffery Are Not Actionable.**

24           Plaintiffs' claim is based in part on a number of vague expressions of optimism, such as

25   statements that Terayon is "pleased," "very pleased," "optimistic," or "encouraged" about its

26   prospects.  *See* Appendix A: Non-Actionable Statements of Puffery or Corporate Optimism.

27   "[V]ague, generalized, and unspecific assertions of corporate optimism or statements of mere

28   puffing cannot state actionable material misstatements of fact under federal securities laws."  *In*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

9

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1  *re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005)

2  (claims of "industry leading" growth, "measurable progress," and "outstanding retail results" not

3  actionable).  Plaintiffs' claims based on these statements must be dismissed.

### B.    Forward-Looking Statements Are Immune from Liability Under the PSLRA's Safe Harbor Provision.

6      Plaintiffs also challenge several forward-looking statements regarding Terayon's

7  financial projections (¶¶ 60, 83, 103, 129), anticipated benefits of corporate restructuring (¶¶ 83,

8  103), and expectations of profitability (¶¶ 141, 183).  *See* Appendix B:  Forward Looking-

9  Statements and Accompanying Cautionary Language.  Forward-looking statements that are

10  identified as such and accompanied by meaningful cautionary statements are immune from

11  liability under the PSLRA's safe harbor provision.  *See* 15 U.S.C. § 78u-5(a) and (c).  Protected

12  statements include projections of forward-looking performance, descriptions of management's

13  plans for future operations, or the stated assumptions underlying these projections.  *See* 15

14  U.S.C. § 78u-5(i)(1).

15      With each of these forward-looking statements, Terayon disclosed the relevant risk

16  factors.  *See* Appendix B.  The statements in Appendix B fall within the safe harbor because they

17  speak to future events and warn of specific risks.  *See In re Copper Mountain Sec. Litig.*, 311 F.

18  Supp. 2d 857, 882 (N.D. Cal. 2004) (holding that "cautionary warning[s] ought to be precise and

19  relate directly to the forward-looking statements at issue").

### C.    Plaintiffs Have Failed to Provide Any Factual Basis That Many Statements Are Even False.

22      Plaintiffs challenge statements about certain executive resignations, the Company's

23  change in auditor, and plans for corporate restructuring, without providing any factual basis from

24  which to infer that the statements are false.  *See, e.g.,* ¶¶ 102, 103, 159, 160, 213.  With regard to

25  the Company's announcement of the resignation of Chief Financial Officer Carol Lustenader in

26  February 2003, for example, Plaintiffs claim, "defendants led the market to believe that there

27  was no disagreement over the Company's financial reporting, and that Defendant Lustenader had

28  left Terayon 'to pursue other interests.'"  ¶ 102.  Plaintiffs do not allege a single fact showing

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

10

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    why this statement is false.  Nor have Plaintiffs offered any facts that would contradict Terayon's

2    previously disclosed reasons for other executive departures, restructuring its business, or for the

3    change in its auditor.  Plaintiffs have not stated a claim regarding these statements because they

4    have failed to state, with the required specificity, why they are false.  15 U.S.C. § 78u-4(b)(1).

5         **D.    Plaintiffs Cannot Plead an Actionable Omission Based on Disclosed Facts.**

6         Plaintiffs erroneously claim that the Company failed to disclose that its Convertible

7    Subordinated Notes contained a contingent put which provided that in the event of default, the

8    Notes could become due and immediately payable.  ¶ 64(k).  The complete Indenture governing

9    the Notes (the "Indenture") was filed as Exhibit 4.2 to the Company's Registration Statement on

10   Form S-3 filed with the SEC on October 24, 2000 (the "Form S-3").  See RJN Ex. 14.  The Form

11   of Security for the Notes was filed as Exhibit 4.1 to the Form S-3.  *See id*.  These documents

12   include all terms of the contingent put that Plaintiffs claim was not disclosed.  *Id.* at 49-59.  The

13   Indenture and Form of Security were subsequently filed as Exhibit 4.5 and Exhibit 4.3,

14   respectively, to the Company's Form 10-K for the 2001 through 2005 fiscal years.[5]  A court may

15   disregard allegations, such as these, that are "contradicted by documents referred to in the

16   complaint."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

17
18        **E.    Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong Inference
           of Scienter as to Statements Corrected in the Restatement.**

19        The bulk of the challenged statements in the Amended Complaint relate to the

20   Company's recent restatement.  This category includes not only statements about earnings and

21   the Company's financial position, but also statements about the Company's adherence to

22   Generally Accepted Accounting Principles ("GAAP"), and statements about the adequacy of

23   internal controls.  By restating, Terayon recognized that these previous statements were not

24   accurate.  Contrary to Plaintiffs' suggestions, however, that determination in no way amounts to

25   a conclusion that any Defendant was deliberately recklessness when he or she made the

26   statements at issue.

27        To satisfy the PSLRA's heightened pleading requirements for scienter, Plaintiffs must

28   _____
     [5]   *See* RJN Exs. 15-19.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

11

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1  allege "particular facts giving rise to a strong inference of deliberate recklessness, at a

2  minimum." *In re Silicon Graphics*, 183 F.3d at 974.  Plaintiffs have not alleged any direct

3  evidence – such as emails, reports, memoranda, meetings, or competent witnesses – that supports

4  a strong inference that any defendant knew their statements about Terayon's financial

5  performance were false or misleading at the time they were made.  Instead, Plaintiffs ask the

6  Court to draw the requisite strong inference of scienter from (1) the mere fact that a restatement

7  occurred; (2) the Company's acknowledgement of certain control weaknesses during the

8  restatement process; (3) generalized allegations that Defendants knew their statements were false

9  by virtue of their positions; (4) the fact that a handful of executives left the Company over the

10  Class Period; (5) Sarbanes-Oxley certifications; (6) undated comments by an unnamed witness

11  that do not demonstrate knowledge by any Defendant; and (7) "motive and opportunity"

12  allegations regarding minimal stock sales by only four of the fifteen Individual Defendants.

13  These allegations do not raise any inference of scienter, let alone the strong inference the Reform

14  Act requires.

15              **1.    Plaintiffs cannot satisfy their burden of pleading scienter by merely
                        alleging that a restatement occurred.**
16

17        Plaintiffs contend that Terayon's recent restatement, made voluntarily to correct

18  accounting errors, gives rise to the inference that Defendants knowingly or recklessly made false

19  statements when they originally issued the financial statements.  *See, e.g.*, ¶ 64.  The Ninth

20  Circuit has repeatedly rejected the notion that either a restatement or a failure to follow GAAP,

21  standing alone, establishes the requisite strong inference of scienter.  *See DSAM Global Value

22  Fund v. Altris Software, Inc*., 288 F.3d 385, 390 (9th Cir. 2002); *In re Software Toolworks, Inc.,

23  Sec. Litig*., 50 F.3d 615, 627-628 (9th Cir. 1994); *In re Watchguard Sec. Litig*., No. C05-678J,

24  2006 WL 2038656, *12 (W.D. Wash. April 21, 2006) (noting that "corporate restatements of

25  earnings are commonplace").  Allegations of GAAP violations "may" provide evidence of

26  scienter, but only where plaintiffs have alleged enough information for a court to discern whether

27  the allegations were "minor or technical in nature, or whether they constituted widespread and

28  significant inflation of revenue." *In re Lattice Semiconductor Corp. Sec. Litig.,* No. CV04-1255-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

12

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    AA, 2006 WL 538756, *12 (D. Or. Jan. 3, 2006).

2           To evaluate whether Plaintiffs have pled facts giving rise to a strong inference of

3    fraudulent intent, the Court must consider "all reasonable inferences to be drawn from the

4    allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

5    Here, several facts contradict any inference that Terayon's restatement was the result of fraud.

6    First, with regard to Terayon's correction of accounting errors relating to revenue recognition,

7    the Company's use of SAB 101 and 104 as its policy for recognizing revenue was fully disclosed

8    in its SEC filings. *See* RJN Ex. 6 at 31; RJN Ex. 5 at 32.  It is reasonable to infer from this

9    disclosure that Defendants did not knowingly apply the incorrect revenue recognition principles.

10   *See In re Watchguard,* 2006 WL 2038656 at *5 (finding that company's consistent disclosure in

11   its 10-Q filings of the "erroneous premise that led to the repeated mis-classification is consistent

12   with [the issuer's] ignorance of the error, not with any Defendant's intent to deceive or deliberate

13   recklessness").

14          Second, the restatement adjustments impacted historical earnings both positively and

15   negatively, and thus the errors did not all provide obvious benefit to Defendants. *See generally*

16   RJN Ex. 1 at 133-136.  To give but one example, adjustments to the accounting for a 1999

17   License Agreement resulted in increases to net income of $187,537 and $762,639 in 2002 and

18   2003, respectively, and decreases of $499,861, $406,271, and $45,792 for the years 2004, 2005,

19   and 2006.  *See id.* at 7 and 135.  The increases and decreases essentially cancel each other out, as

20   the total increase to net income over the years affected is less than $2,000.  This undercuts any

21   inference of scienter. *See In re Watchguard,* 2006 WL 2038656 at *6 (intentional misconduct

22   not a reasonable inference from company's mis-classification of expenses that was "perhaps

23   beneficial" to defendant in that it "slightly" inflated revenue).

24          Third, with regard to the Fox transaction, there is no question that the Company actually

25   delivered the product to Fox before the revenue was originally recognized, as Fox had received

26   Terayon's BP 5100 and used it during the 2004 NFL football season.  *See* RJN Ex. 3.  This is not

27   a situation where revenue was recognized without regard to performance.  *Cf. In re Daou Sys.,*

28   *Inc. Sec. Litig.*, 411 F.3d 1006, 1018 (9th Cir. 2005) (plaintiffs alleged the amount of revenue

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

13

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    recognized by defendants was "completely unrelated to the amount of labor incurred").

2        Finally, the fact that Terayon voluntarily decided to re-audit its financial statements for

3    prior periods after discovering the single issue relating to revenue recognition for the Fox

4    transaction leads to the inference that the Company was committed to correcting any prior

5    mistakes in its accounting, not concealing them.  *See* RJN Ex. 11.  Similarly, the fact that

6    Terayon has placed its financial reporting under scrutiny by outside entities such as its

7    independent accounting firm (which started working with the Company in the fall of 2005 and

8    was not responsible for the prior auditing work), independent legal counsel, accounting

9    consultants, and the SEC, also negates scienter.  *See* RJN Exs. 9-11.

10        **2.    Terayon's disclosures regarding its internal controls belie scienter.**

11        Plaintiffs point to Terayon's identification of material weaknesses in its internal controls

12    during the restatement process as evidence that the Company was knowingly reckless in making

13    statements about its financial results and condition, even though Terayon did not find that any

14    Defendant intentionally caused or had contemporaneous knowledge of prior accounting errors.

15    *See* ¶¶ 4, 64(c) *and* (j), 244.  The Ninth Circuit has held that "recklessness only satisfies scienter

16    under §10(b) to the extent that it reflects some degree of intentional or conscious misconduct."

17    *In re Silicon Graphics*, 183 F.3d at 977.  Even allegations amounting to "egregiously high levels

18    of accounting disarray and disregard for truthful accounting" are insufficient to infer scienter,

19    absent particularized facts showing fraudulent intent.  *In re CornerStone*, 355 F. Supp. 2d at

20    1090; *see also DSAM*, 288 F.3d at 391.

21        First, the weaknesses identified by Terayon demonstrate – at most – mismanagement and

22    inefficiency, for they describe problems in the finance and accounting departments such as lack

23    of technical knowledge and expertise, inadequate communication with management, and

24    insufficient staffing.  ¶ 64(j).  As the District of Arizona recently recognized in *In re Hypercom*

25    *Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 1836181, *9 (D. Ariz. July 5, 2006):

26        The fact that Hypercom issued a press release recognizing a lack of
         effective internal controls, is not overly probative as to whether

27        [the CFO] intentionally misclassified the leases.  Presumably every
         company that issues a financial restatement because of GAAP

28        errors will cite as the reason a lack of effective internal controls.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

14

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1  As in *Hypercom*, Plaintiffs here have failed to allege how Terayon's acknowledged control

2  weaknesses demonstrate scienter.

3        Second, the fact that Terayon identified and disclosed certain weaknesses in its internal

4  controls well before it recognized that there might be a restatement negates any inference that

5  Defendants intended to conceal defects in internal controls or accounting errors.  *See* RJN Ex. 4

6  at 46; RJN Ex. 5 at 93-95.  If, as Plaintiffs claim, Defendants were aware there was accounting

7  fraud at Terayon, it would make no sense for the Company to disclose internal control

8  weaknesses.  The more plausible inference from Terayon's disclosure of certain weaknesses in

9  2004 and 2005 is that the Company did not believe the weaknesses rendered the financials

10  unreliable.

11        Third, any inference of scienter is undercut by Defendants' conduct in addressing internal

12  control issues as they became known, including self-investigation, prompt disclosure, full

13  investigation by the Audit Committee, with the assistance of outside counsel, and the wide-

14  ranging scope of the Company's restatement process, which took over a year to complete.  *See,*

15  *e.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) (fact that Company hired

16  an outside consultant to investigate problems in Company's accounting and internal control

17  systems counters an inference that defendants were trying to keep the alleged problems hidden).

18  As noted in Section II(E)(1), Terayon has placed its financial reporting under tremendous

19  scrutiny by outside entities.  *See* RJN Exs. 9-11.  These factors negate any inference Defendants

20  tried to conceal problems at the company.

21            **3.    Plaintiffs' generic and conclusory allegations that Defendants knew
                     about accounting issues because of their positions are inadequate.**

22

23        Plaintiffs allege no specific facts showing that Defendants knew their statements about

24  Terayon's financial performance were false when they were made.  Instead, they rely on the

25  weak, impermissible inference that the Defendants must have known of the errors, based on their

26  positions at the Company and access to "adverse undisclosed information" through unspecified

27  internal corporate documents, conversations with others within the company, attendance at

28  management and Board of Directors meetings, and receipt of reports.  ¶¶ 34, 37, 262.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

15

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   Plaintiffs fail to include a single corroborating detail about this "adverse undisclosed

2   information." *Id.*  The Ninth Circuit routinely dismisses this sort of allegation because it would

3   defeat the necessity for specially pleading scienter, as any corporate officer could be said to have

4   knowledge by virtue of his or her position.  *See In re Aspeon, Inc. Sec. Litig.,* No. 04-55651,

5   2006 WL 448793, *2 (9th Cir. Feb. 23, 2006); *In re The Vantive Corp. Sec. Litig.*, 283 F.3d

6   1079, 1087 (9th Cir. 2002); *In re Silicon Graphics,* 183 F.3d at 985.  To rely on the existence of

7   internal reports as a means of establishing knowledge, the Ninth Circuit requires adequate

8   corroborating details, such as "sources of her information with respect to the reports, how she

9   learned of the reports, who drafted them . . . which officers received them" and "an adequate

10  description of their contents."  *In re Silicon Graphics,* 183 F.3d at 985.  Such details are utterly

11  lacking here.

12  **4.    No inference of scienter is raised by either the fact that four executives
           left the Company at different times over the course of the nearly five-
13         year Class Period, or that the Company changed accountants.**

14  Plaintiffs allege that the resignations of four Terayon executives over the course of the

15  nearly five year Class Period is evidence of scienter.  *See* ¶¶ 102, 159, 160, 163.  Plaintiffs fail to

16  allege any facts that would raise an inference that these individuals knew about any wrongdoing

17  at the Company, and there is no allegation that any individual left because of a disagreement

18  over accounting or any other issue.  A departure does not give rise to scienter unless there is

19  evidence that the employee was fired for cause or the Company offered a reason, such as fraud,

20  for the departure.  *See In re CornerStone*, 355 F. Supp. 2d at 1093; *In re Hypercom*, 2006 WL

21  1836181 at *8 (executive's resignation was only "minimally probative in a scienter analysis"

22  where the executive was not fired for cause, and the company did not publicly offer a reason,

23  such as fraud, for the resignation).

24  Plaintiffs' allegations about the resignation of Ernst & Young as the Company's auditor

25  fail for similar reasons.  In July 2005, the Company reported that Ernst & Young would resign as

26  its accountant.  *See* RJN Ex. 7.  The Company reported that there were no reportable

27  disagreements between the two entities.  *Id.*  Aside from conjecture and innuendo, Plaintiffs have

28  offered no facts that would indicate that this statement was knowingly false, or that Ernst &

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

16

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    Young's resignation means anything at all.

2        **5.    Sarbanes-Oxley certifications fail to raise any inference of scienter.**

3        It is not entirely clear from their complaint, but Plaintiffs appear to be alleging that

4    Defendants' Sarbanes-Oxley certifications demonstrate scienter because the certifying

5    Defendants either knew about Terayon's accounting issues as a result of the accounting controls

6    that they certified were in existence, or they were deliberately reckless in that they knew the

7    internal controls were not adequate.  *See, e.g.*, ¶¶ 64(c), 117, 138, 147.  Where plaintiffs fail to

8    plead facts giving rise to the inference that the Sarbanes-Oxley certifications were knowingly

9    false, these certifications do not demonstrate scienter.  *See In re Invision Tech. Inc. Sec. Litig.*,

10   No. C04-03181 MJJ, 2006 U.S. Dist. Lexis 12166, *21 and n. 3 (N.D. Cal. Jan. 21, 2006); *In re*

11   *Watchguard*, 2006 WL 2038656 at *10; *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160

12   (W.D. Wash. 2006) (SOX certifications not actionable absent other evidence of scienter).

13   Absent any evidence that any Individual Defendant was aware his or her Sarbanes-Oxley

14   certifications were false, Plaintiffs' allegations about them add nothing to the Amended

15   Complaint.

16       **6.    Plaintiffs' "confidential source" allegations fail to create a strong
             inference of scienter.**

17

18       Without any reports, emails, meetings, or other specific evidence to support their claim,

19   Plaintiffs rely on statements attributed to a single confidential informant ("CI") in an attempt to

20   show that Defendants' statements were knowingly false.  According to Plaintiffs, the CI claims:

21   • The Company "knew there were . . . bigger problems with revenue recognition
         [not limited to problems with a single customer]."  ¶ 6
22

23   • Zaki Rakib was a "fist slammer" who "could have bullied the auditors."  ¶ 18

24   • The Company lacked the accounting personnel with the appropriate skills and
         qualifications to properly perform necessary functions.  ¶ 52
25

26   • The Company asked Ernst & Young what it needed to do to recognize the revenue
         regarding the Fox transaction.  ¶ 53

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

17

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

- Ernst & Young partner, Mike Turner, asked Terayon's Mark Richman, "have you considered [SOP] 97-2?" Richman's response was: "we are not a software company." ¶ 55

The CI's statements fail to raise a strong inference of scienter because they are not sufficiently reliable and they fail to establish facts relating to the culpable mind of any individual defendant. *See, e.g.*, *In re CornerStone*, 355 F. Supp. 2d at 1089-90; *In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ, 2005 U.S. Dist. LEXIS 20215, *15-*18 (N.D. Cal. July 27, 2005).

### a. Plaintiffs' "confidential source" allegations fail to meet well-established reliability standards.

Plaintiffs' description of the CI as a "former employee who worked in the accounting department during the Class Period" fails to provide any of the requisite detail for reliance on unnamed sources. ¶ 6. Analyzing Plaintiffs' anonymous source evidence involves an evaluation of "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2006 WL 2385250, *6 (N.D. Cal. Aug. 17, 2006). The complaint must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Here, Plaintiffs do not provide the CI's actual title, the years of his tenure at the Company, any description of his actual job functions, or information about the individuals he worked with. There is no allegation that the CI had any training as an accountant, knowledge of GAAP, or of Terayon's particular accounting policies. Thus, Plaintiffs' description of the CI provides an insufficient basis on which to assess his reliability. *In re Bus. Objects*, 2005 U.S. Dist. LEXIS 20215 at *17 (complaint failed to sufficiently describe confidential witnesses where it provided "no more than the job title" of the witnesses and failed to provide "any other detail regarding his or her job description and responsibilities").

### b. Plaintiffs' "confidential source" allegations fail to show knowledge by Terayon or any Individual Defendant.

Even if the CI is deemed reliable, the statements attributed to him fail to raise any

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

18

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    inference of scienter.  First, the Amended Complaint does not does not refer to any memoranda,

2    reports, meetings, or conversations to back up the CI's statement that Terayon "knew there were

3    bigger problems with revenue recognition."  ¶¶ 6, 54.  The statement cannot be credited under

4    the PSLRA because it does not identify who at Terayon knew of the problems, how they knew,

5    or when they knew.  *See In re CornerStone,* 355 F. Supp. 2d at 1090; *In re Bus. Objects*, 2005

6    U.S. Dist. LEXIS 20215 at * 18.  The statement also fails because it is impossible to tell whether

7    it is based on personal knowledge, or mere rumors.  *See In re Metawave Commc'ns Corp. Sec.*

8    *Litig.*, 298 F. Supp. 2d 1056, 1068 (W. D. Wash. 2003) ("The Court must be able to tell whether

9    a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and

10   innuendo.")

11        Second, the statement that Zaki Rakib "*could have* bullied the auditors" (¶ 18) (emphasis

12   added) does not say anything at all about his state of mind, or whether he thought Terayon's

13   accounting was right or wrong.

14        Third, Plaintiffs offer no basis for the CI's opinion that the Company "lacked the

15   accounting personnel with the appropriate skills and qualifications to properly perform necessary

16   functions."  ¶ 52.  It is impossible to evaluate whether the CI is in a position to opine about what

17   skills and qualifications are necessary to perform necessary accounting functions, as the

18   Amended Complaint does not describe his position or responsibilities.  If the CI was a data-entry

19   clerk, for example, he may not be in a position to make such judgments.  *See In re Metawave*,

20   298 F. Supp. 2d at 1070 (rejecting statement of software engineer about proposed change in

21   revenue recognition policy, as engineer might not have had expertise concerning the implications

22   of the change).

23        Fourth, the CI's claim that the Company asked Ernst & Young what it needed to do to

24   recognize revenue for the Fox transaction fails to raise any inference of scienter because

25   Plaintiffs provide no support for the idea that the desire to recognize revenue is improper.  ¶ 53.

26   Indeed, Terayon's request to its auditor for advice about how to recognize the revenue negates a

27   finding of scienter, as it implies that the Company was interested in recognizing revenue only if

28   it was proper to do so.  *See In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446 (N.D. Cal. 1996)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

19

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    (consultation with outside auditor is conduct that tends to negate an inference of scienter).

2       Fifth, even if the purported conversation between Ernst & Young partner Mike Turner

3    and Mark Richman of Terayon took place, it raises no inference of scienter because Plaintiffs do

4    not offer any facts to indicate that Mr. Richman misspoke when he said Terayon was not a

5    software company.  Nor do Plaintiffs allege that Mr. Richman knew SOP 97-2 was the

6    appropriate rule to apply to the Fox transaction.  Indeed, Plaintiffs do not allege any substantive

7    discussion about the possible application of SOP 97-2 that would have alerted anyone at Terayon

8    to the applicability of the rule, let alone any actual advice that the rule should be used.  The CI

9    offers no evidence to contradict the conclusion of Terayon's Audit Committee Investigation that

10   the errors regarding the accounting for the Fox transaction were unintentional, and that Company

11   personnel "did not consider or sufficiently focus on the application of certain relevant accounting

12   rules."  *See* RJN Ex. 10.

13           **7.    Plaintiffs' "motive and opportunity" allegations fail to create a strong
                      inference of deliberate recklessness.**

14

15       Plaintiffs attempt to plead scienter by alleging that stock trades by four out of fifteen

16   Defendants demonstrate the "motive and opportunity" to commit fraud.  ¶¶ 263-64.[6]  To plead

17   scienter on the basis of insider stock sales, Plaintiff must allege a *dramatic departure* from

18   Defendants' prior trading practices, and must provide context that shows (1) the amount and

19   percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

20   consistent with the insider's prior trading history.  *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir.

21   2001).  Plaintiffs fail to provide any of the required details about Defendants' prior trading

22   history, which, by itself, dooms these allegations.  *See id*. (dismissing claim where plaintiffs did

23   not allege sufficient trading history for court to conclude that defendant's trading was

24   dramatically out of line with prior practices).  Moreover, when viewed in context, any inference

---

25   [6]    Plaintiffs also allege that Terayon announced a shelf registration "to take advantage of the
26        artificial inflation in the price of Terayon stock…" ¶ 128.  As Plaintiffs acknowledge, a shelf
          registration would simply "allow [Terayon] to sell stock on an expedited basis."  *Id*.  The
27        ability to sell stock quickly is a generic motive shared by all public companies, and raises no
          inference of scienter.  *In re Dura Pharm., Inc. Sec. Litig*., 452 F. Supp. 2d 1005, 1032 (S.D.
28        Cal. 2006)  ("need to obtain capital is a generic business motive courts have found
          insufficient to base the requisite mental intent").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

20

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

of scienter regarding these stock sales is negated.

### a. The fact that Terayon and the majority of Individual Defendants did not sell stock negates any inference of scienter against all of the Defendants.

Plaintiffs allege that only four out of fifteen Individual Defendants made improper stock sales during the Class Period. As officers, directors and executives, all fifteen Individual Defendants were "equally knowledgeable insiders."[7] Yet three quarters of the Individual Defendants did not even attempt to profit from the alleged fraud, even though they too supposedly shared the "motive and opportunity" to do so. ¶ 264. This Court has held that the failure to allege that even one insider defendant engaged in suspicious trading undermines any motive and opportunity allegations against all defendants. *In re Pixar Sec. Litig*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal. 2006); *see also Ronconi*, 253 F.3d at 436 (where a securities fraud complaint alleges that some insiders traded while others did not, any inference of scienter against all defendants is negated).

### b. Total stock sales by Zaki Rakib, Shlomo Rakib, and Christopher Schaepe were too small as a percentage of holdings to raise any inference of scienter.

The stock sales by Zaki Rakib, Shlomo Rakib, and Christopher Schaepe are too insignificant to raise an inference of scienter. Zaki Rakib and Shlomo Rakib each sold only 3.7% of their holdings over the nearly five-year Class Period.[8] Christopher Schaepe, who resigned as a Director of the Company on September 26, 2003, sold only 13% of his holdings during the time he was a company insider.[9] These sales are too small to give rise to an inference of scienter. *In re Silicon Graphics*, 183 F.3d at 987 (individual sales of between 6.9% and 7.7%

---

[7] *Ronconi,* 253 F.3d at 436 (no scienter where one insider sold a large amount of stock while other "equally knowledgeable insiders" made sales that were either not suspicious in timing or amount).

[8] These numbers reflect sales as a percentage of stock holdings and vested stock options. Inclusion of stock options is required to provide the true context of sales. *See In re Silicon Graphics*, 183 F.3d at 986-87. The percentage sold was derived by dividing the stock sales during the class period by the total holdings during the Class Period. These calculations rely on publicly-available documents. *See* RJN Exs. 20-23.

[9] *See* RJN Ex. 5 at 95; RJN Exs. 24-28. It appears that Plaintiffs have overstated the amount of Terayon stock sold by Christopher Schaepe by including transactions by certain corporate entities with which Mr. Schaepe is affiliated. *See*, RJN Exs. 29-31 *and* 49-51. Plaintiffs have not alleged facts showing Mr. Schaepe had any involvement with these sales.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

21

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   of total holdings too small to give rise to inference of scienter); *In re Pixar*, 450 F. Supp. 2d at

2   1105 (sale of nearly 25% of individual holdings over five month period not suspicious); *The WU*

3   *Group v. Synopsys, Inc.*, No. C 04-3580 MJJ, 2005 WL 1926626, *10 (N.D. Cal. Aug. 10, 2005)

4   (6% and 38% not suspicious taken in context).

5          Because Zaki Rakib and Shlomo Rakib retained the vast majority of their stock and

6   vested options throughout the Class Period, they have shared the fate of investors whom they

7   purportedly defrauded.  Shlomo and Zaki Rakib each lost approximately $33 million in value as

8   Terayon stock price tumbled from a Class Period high of $14.15 on December 6, 2001 to $2.70

9   on March 1, 2006, the end of the Class Period.[10]  These losses dwarf the $530,145 in proceeds

10  that each made from their single sale during the Class Period.  This is hardly the conduct one

11  would expect from individuals engaged in securities fraud for personal profit.

12         Although Carol Lustenader sold all of her holdings, this is not indicative of fraud for at

13  least two reasons.  First, Ms. Lustenader resigned from Terayon on February 23, 2003.  *See* RJN

14  Ex. 24 at 11.  The majority of Ms. Lustenader's stock sales were made in July and August of

15  2003, months after her resignation from Terayon precluded access to any insider information.

16  *See* RJN Exs. 36-38.  Second, the fact that Ms. Lustenader left the Company provides an

17  innocent and totally rational motive to sell at that time.

18                     c.      **Individual stock sales by Zaki Rakib, Shlomo Rakib, Carol**
19                             **Lustenader and Christopher Schaepe were not suspiciously**
                               **timed.**

20         Plaintiffs have failed to allege that stock sales by Zaki Rakib, Shlomo Rakib, Carol

21  Lustenader and Christopher Schaepe were made on dates "calculated to maximize the personal

22  benefit from the undisclosed inside information."  *In re Silicon Graphics,* 183 F.3d at 986.  Nor

23  could they, as not one of the challenged sales occurred within eight months of any announcement

24  about the restatement.  The most recent sales, by Zaki and Shlomo Rakib, occurred on February

25

---

26  [10]  Excluding stock options, Shlomo and Zaki Rakib each owned at least 2,910,000 shares
         throughout the Class Period.  *See* RJN Exs. 22-23 *and* 32-33.  The highest closing price of
27       Terayon stock during the Class Period was $14.15, on December 6, 2001.  *See* RJN Ex. 34.
         On that date, Shlomo and Zaki Rakib each held Terayon stock valued at $41,176,500.  By the
28       last day of the Class Period, the value of that stock had fallen to $2.70 per share, and the
         holdings of Shlomo and Zaki Rakib were each valued at $7,857,000.  *See* RJN Ex. 35.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY
                                            22
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    17, 2005, well in advance of November 7, 2005 release in which Terayon announced an

2    accounting review into revenue recognition issues.  ¶ 264.  Every single one of the other sales

3    took place prior to 2004, well before the Company had even entered into the agreement with Fox

4    that would eventually trigger the accounting review, and which accounted for the vast majority

5    of the restatement.  *Id.*  As this Court has explained, where trades do not occur "immediately

6    before a negative earnings announcement" or other event that might drive down the stock price,

7    any inference of scienter based on a theory of suspiciously-timed trades is undermined.  *Wenger*

8    *v. Lumisys, Inc.,* 2 F. Supp. 2d at 1251.

9    Moreover, the fact that Plaintiffs do not allege sales at the Class Period high of $14.15

10   per share undermines any inference that their later sales were suspiciously timed.  ¶ 264.  Shlomo

11   and Zaki Rakib lost tens of millions of dollars by holding on to Terayon stock as its value

12   declined during the Class Period.  As Judge Kleinfeld explained, "[w]hen insiders miss the boat

13   this dramatically, their sales do not support an inference that they are preying on ribbon clerks

14   who do not know what the insiders know."  *Ronconi,* 253 F.3d at 435.

## F.    Plaintiffs Have Failed To Plead Loss Causation:  A Causal Connection Between an Alleged Misrepresentation and a Loss.

17   To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must plead "loss causation

18   – i.e., a causal connection between the material misrepresentation and the [plaintiffs'] loss."

19   *Dura Pharm.*, 544 U.S. at 341.  Plaintiffs fail to meet their burden of showing the requisite

20   causal connection for at least two reasons.

21   First, Plaintiffs improperly claim injury based on purchases of Terayon stock at inflated

22   prices – "almost $15.00 per share" – throughout the Class Period.  ¶¶ 8, 235, 248.  At the time of

23   Terayon's March 1, 2006 disclosure, the Company's stock was trading at less than $3 per share.

24   *See* RJN Ex. 35.  Where the stock price has already collapsed before the truth was allegedly

25   revealed – the precise situation in this case – Plaintiffs cannot demonstrate the necessary causal

26   connection to state a claim.  *Dura Pharm.*, 544 U.S. at 336 (holding that it is insufficient to

27   allege that plaintiffs purchased stock at prices that were inflated as a result of defendants' fraud);

28   *In re Redback Networks, Inc. Sec. Litig.*, No. C03-5642 JF (HLR), 2006 WL 1805579 (N.D. Cal.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

23

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1    March 20, 2006) ("The Court is at a loss to understand how Plaintiffs' injury for [earlier

2    purchases] was caused by the alleged fraud when the stock price already had fallen to $4 per

3    share before [the truth became known]").

4          Second, Plaintiffs have failed to establish a causal link between a disclosure of any issue

5    other than accounting for the Fox transaction and any decline in the Company's stock price.

6    Plaintiffs allege that Defendants issued numerous misleading statements throughout the Class

7    Period.  As discussed in Section I, Plaintiffs challenge over fifty statements that relate to

8    numerous subjects.  Yet in their attempt to demonstrate loss causation for all the alleged

9    misstatements, Plaintiffs point to a March 1, 2006 press release in which the Company disclosed

10    only one accounting issue:  revenue recognition relating to a single customer, which affected the

11    financials for 2004 and the first two quarters of 2005.  ¶¶ 7, 8.  The Amended Complaint

12    contains no allegations that Defendants' purported misrepresentations about any other subject or

13    time period caused or had any relation to the decline in value of Plaintiffs' investments, and thus

14    the Amended Complaint fails to provide notice of the purported causal connection between their

15    loss and the other categories of alleged misrepresentations.  *See In re Verisign Corp. Sec. Litig.*,

16    No. C 02-02270 JW, 2005 WL 2893783 (N.D. Cal. Nov. 2, 2005) (dismissing claims relating to

17    four out of five categories of allegedly misleading statements, where the disclosures cited by

18    plaintiffs as having caused loss did not relate to any of the four categories of misstatements

19    alleged in the complaint).  Indeed, when the non-revenue related accounting issues were

20    disclosed for the first time on November 8, 2006, Terayon's stock price rose two cents.  *See* RJN

21    Ex. 13.  Because the Amended Complaint fails to plead facts supporting the fundamental

22    requirement of loss causation, it must be dismissed.

23    **III.     PLAINTIFFS' "CONTROL PERSON" CLAIMS UNDER SECTION 20(A) FAIL**

24           **FOR LACK OF A PREDICATE SECURITIES VIOLATION**

25          "In order to prove a prima facie case under § 20(a) [of the Exchange Act], a plaintiff must

26    prove:  (1) a primary violation of federal securities laws ... and (2) that the defendant exercised

27    actual power or control over the primary violator."  *Howard v. Everex Sys., Inc.,* 228 F.3d 1057,

28    1065 (9th Cir. 2000).  Because Plaintiffs fail to state a primary violation of the securities laws,

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SILICON VALLEY

24

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

1   their secondary Section 20(a) "control person" liability claim also fails.  *In re Verifone Sec.*

2   *Litig.,* 11 F.3d 865, 872 (9th Cir. 1993); *see also, In re Textainer P'ship Sec. Litig.*, No. C-05-

3   0969 MMC, 2007 WL 108320, *11 (N.D. Cal. Jan. 10, 2007).

4                                    **<u>CONCLUSION</u>**

5          For the foregoing reasons, Terayon and the Individual Defendants respectfully request

6   that this Court dismiss Plaintiffs' Amended Complaint with prejudice.

7

8   Dated:  March 9, 2007                    LATHAM & WATKINS LLP

9

10

11                                           By _____/s/_____
                                                         Patrick E. Gibbs
12
                                             Attorneys for Terayon Communication Systems,
13                                           Inc. and the Individual Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

25

MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS BY TERAYON AND THE INDIVIDUAL DEFENDANTS
CASE NO.: 3-06-CV-03936 MJJ

**APPENDIX A:  NON-ACTIONABLE STATEMENTS OF PUFFERY OR CORPORATE OPTIMISM**

| ¶ 61[1] | Given the challenging economic conditions, we are very pleased with our results for the second quarter of 2001, and we are also optimistic about the quarter ahead.  (Zaki Rakib, Terayon CEO, July 24, 2001 Press Release). |
|---|---|
| ¶ 65 | Given the challenging economic conditions, we are very pleased with our achievements and results in the third quarter of 2001 . . .  (Zaki Rakib, Terayon CEO, October 23, 2001 Press Release). |
| ¶ 70 | The key to success in 2001 was focus . . .  (Zaki Rakib, Terayon CEO, January 28, 2002 Press Release). |
| ¶ 76 | Given the current economic environment, we are pleased with these results . . . Despite these challenges, we were pleased with the progress we made this quarter in DOCSIS CMTS sales . . .  (Zaki Rakib, Terayon CEO, April 29, 2002 Press Release). |
| ¶ 82 | Our revenues reflect the challenge of transitioning from proprietary to standards-based products during a period of difficult market conditions. While disappointed by the short-term outlook, we are encouraged by the growing demand for DOCSIS 2.0-based products . . .  (Zaki Rakib, Terayon CEO, July 29, 2002 Press Release). |
| ¶ 90 | We're encouraged by the progress we made during the third quarter in transitioning from a leading manufacturer of proprietary cable broadband solutions to a leader in standards-based offerings . . .  (Zaki Rakib, Terayon CEO, July 24, 2001 Press Release). |
| ¶ 99 | During the fourth quarter of 2002, Terayon made additional progress in aligning the company's operating expenses with current market conditions . . .  (Zaki Rakib, Terayon CEO, October 28, 2002 Press Release). |
| ¶ 100 | We met many of our key strategic goals during 2002 . . .  (Zaki Rakib, Terayon CEO, January 30, 2003 Press Release). |
| ¶ 103 | We are committed to achieving profitability and are taking the necessary steps to facilitate reaching this key milestone . . . We are encouraged by the strong interest customers are showing in Terayon's data, video and voice product lines and are looking to generate positive momentum in the coming quarters.  (Zaki Rakib, Terayon CEO, March 14, 2003 Press Release). |
| ¶ 111 | Terayon took several steps during the first quarter to accelerate its path to profitability . . .  (April 29, 2003 Press Release). |
| ¶ 112 | Despite difficult market conditions, we came within our previously announced revenue target range for the first quarter . . . Like other equipment providers serving the cable industry, Terayon is experiencing a challenging and uncertain spending environment in 2003. However, we are encouraged by the growing orders for our DOCSIS 2.0.  (Zaki |

---

[1] The Amended Complaint is cited to as "¶ __."

| | Rakib, Terayon CEO, April 29, 2003 Press Release). |
|---|---|
| ¶ 120 | We are pleased with our progress this quarter and the continued positive momentum we are seeing with cable operator interest in our DOCSIS 2.0 solutions . . . we remain focused on achieving sustainable profitability . . . (Zaki Rakib, Terayon CEO, July 30, 2003 Press Release). |
| ¶ 121 | We are pleased with our progress in the second quarter, and believe we are generating increased momentum going into the second half of this year.  (Zaki Rakib, Terayon CEO, July 30, 2003 Conference Call). |
| ¶ 129 | Our better than expected revenue performance for the third quarter stems primarily from higher unit shipments of our DOCSIS 2.0 CMTS (Cable Modem Termination System), stronger sales of our video headend product line, and higher than anticipated sales of our legacy S-CDMA products, partially offset by somewhat lower than expected DOCSJS 2.0 modem sales . . . We are particularly pleased with the growing customer acknowledgement of the economic and performance advantages of our DOCSIS 2.0 BW CMTS . . . Our better than anticipated net loss performance for the quarter is attributable to higher sales, a favorable product mix resulting in higher gross margin, and lower operating expenses due to continued cost containment efforts.  (Zaki Rakib, Terayon CEO, October 7, 2003 Press Release). |
| ¶ 131 | We are pleased with our performance this quarter, as cable operators continue to validate the economic and performance advantages of our DOCSIS 2.0 and digital video solutions in the face of increasing competition from telecom and satellite offerings . . . We are encouraged by an improving trend in cable operator capital spending and believe that we are well positioned for revenue growth in the fourth quarter due to our industry leading solutions and our continued focus on operational execution.  (Zaki Rakib, Terayon CEO, October 22, 2003 Press Release). |
| ¶ 132 | I am pleased to report that our revenues and loss per share were better than the guidance we provided during our last earnings call, and we are in line with the ranges we pre-announced at October 7.  Versus Q2 we grew revenues 23% sequentially, increased our gross margins, reduced our operating expenses, and continued to manage the balance sheet closely.  I am pleased with our overall execution and the progress we are making towards achieving profitability . . . We believe we are very well positioned to assist cable operators successfully addressing these critical objectives due to DOCSIS 2.0 and digital video leadership position.  Looking forward, we are very encouraged by the improved market conditions and the favorable industry dynamics going into the fourth quarter.  We believe the cable operators will increasingly compete against the telecom and satellite companies with more service offerings and increased throughput, which we think bodes very well for both DOCSIS 2.0 and digital video management system adoption rates into 2004.  We also believe we strengthened our ability to capitalize on the increasing numbers of opportunities through the investments made in people, processes, and systems over the past three quarters.  We believe that our value proposition is resonating with our customers and our ability to deliver upon those |

|  | promises continues to improve.  We feel we are well positioned to meet the growing needs of our customers and to have that reflected in improving financial performance in the quarters ahead.  (Zaki Rakib, Terayon CEO, October 22, 2003 Conference Call). |
|---|---|
| ¶ 141 | 2003 was a critical year of transition and milestone achievements for Terayon  . . . We successfully completed the company migration from proprietary, baseline access products to standards based and intelligent access products that lead the market . . . Our goals for 2004 include: (1) capitalizing on our technology leadership and the opportunities created by these favorable market conditions to increase share across our CMTS, Subscriber and Digital Video businesses, (2) leveraging our best-of-breed digital video processing product line into other vertical markets including satellite, broadcast and telecom, and (3) achieving sustainable profitability through a combination of revenue growth, operational efficiencies, expense management, and strategic partnerships . . . As we announced in December 2003, we are targeting profitability beginning in the second quarter of 2004.  The steps we are taking now provide us with a clearer path towards this objective by lowering our breakeven revenue point, re-sequencing our R&D pipeline to better align with customer timing requirements, and improving our overall efficiency by streamlining the organization and bolstering core processes . . .  (Zaki Rakib, Terayon CEO, January 27, 2004 Press Release). |
| ¶ 151 | We are pleased with the performance of our digital video solutions and subscriber product lines, which had higher than anticipated sales for the quarter.  While our 25 CMTS sales in North America were also strong, they were offset by weaker CMTS sales in Asia as several customers extended their original deployment timeframes . . . Going forward, we believe having the only proven end-to-end 3 DOCSIS 2.0 solution and the best-of-breed digital video processing product line positions us to capitalize on the accelerating growth of new, bandwidth-intensive service offerings such as HDTV, VOD, VoIP and commercial services . . .  (Zaki Rakib, Terayon CEO, April 29, 2004 Press Release). |
| ¶ 153 | I'm pleased to report that our financial results for the first-quarter were in line with our previous guidance . . . While not there yet, we believe we are closing in our the target gross model . . . Finally over the last year we have taken strong measures to lower our operating expenses through head count reductions, re-sequencing of engineering programs, facility consolidations and other cost containment efforts . . . We are pleased with the improving trend in our performance over the past year and anticipate making significant progress in Q2 towards achieving sustainable profitability . . . I am pleased with the progress made over the past year in improving our operating performance and bringing innovation to the marketplace.  (Zaki Rakib, Terayon CEO, April 29, 2004 Conference Call). |
| ¶ 159 | I have led Terayon through its phenomenal growth phase and through its survival of the telecommunication industry's recession to where it is now – back on the path to growth. I pass to my successor the helm of a strong organization with a healthy balance sheet . . . (Zaki Rakib, Terayon CEO, May 27, 2004 Press Release). |

| ¶ 162 | We are pleased with the record sales of our Digital Video Solutions product line, and the strong sales performance of our Subscriber product line . . . we believe recent actions we've undertaken will enable us to improve our sales execution and win new business in these regions . . . We believe that under Jerry, Terayon is well positioned to capitalize on its leadership in digital video solutions and on our one year plus industry leadership in delivering the only end to end DOCSIS 2.0 solutions as cable operators accelerate the roll out of advanced services to their customers.  (Zaki Rakib, Terayon CEO, July 26, 2004 Press Release). |
|---|---|
| ¶ 164 | In summary, I am pleased with the progress made over the past quarter and in bringing innovation to the marketplace.  We continue to monitor the opportunities we believe are opening up for us through the market dynamics being experienced by the cable, telco, satellite providers and broadcasters.  We continue to focus our efforts on execution to ensure we are able to capitalize on these opportunities and drive towards sustainable profitability.  (Zaki Rakib, Terayon CEO, July 26, 2004 Conference Call). |
| ¶ 172 | We are very pleased with our second consecutive quarter of record revenues in our Digital Video Solutions product line and the continued strong sales performance of our Subscriber product line . . . These changes do not alter our vision for the company . . . to provide broadband solutions for video, voice and data through its existing Digital Video and Subscriber product lines, and we will leverage our headend intellectual properly through our advanced technology group as market opportunities arise in the future.  (Jerry Chase, Terayon CEO, October 28, 2004 Press Release). |
| ¶ 183 | The strong performance of our digital video products during the fourth quarter and 2004 clearly shows why we have moved video to the center of our corporate strategy . . . Our restructuring activities and increased focus on cost management in 2004 will greatly benefit the company as we drive operations to positive net income . . . By focusing our capital and human resources on our growth . . . we expect to deliver profitable top line growth to achieve net income profits and positive cash flow generation.  (Jerry Chase, Terayon CEO, and Mark Richman, Terayon CFO, February 9, 2005 Press Release). |
| ¶ 184 | We have begun to make many changes that will enable us to accentuate and build on our strengths, move out of product lines in which we were underperforming and put the Company on a track towards better financial performance.  I've shared with many people why I came to Terayon.  I believe it had a unique position and opportunity to be a part of the growing video market, and my belief is stronger today than ever . . . Our 2004 performance and several Q4 actions have put Terayon in a stronger position on these three criteria and position us well for the path to sustainable profitability . . . I'm optimistic about Terayon's ability to focus and deliver favorably against our strategy and business model.  (Jerry Chase, Terayon CEO, February 9, 2005 Conference Call). |
| ¶ 185 | I am very pleased to announce we've met or exceeded all previously announced guidance . . .  (Mark Richman, Terayon CFO, February 9, 2005 Conference Call). |

| ¶ 197 | We are pleased with our first quarter results and our progress in moving digital video to the center of our corporate strategy . . . Our performance and momentum in digital video applications reflect the market's growing need for real-time video stream management as companies migrate to all-digital networks.  As we maintain our focus on transitioning the company, our first quarter results confirm the market acceptance and unique position of Terayon's digital video solutions.  Our first quarter actions enhanced our market leadership in digital video and enabled us to better manage the costs of our home access products . . . Our focus and resources are clearly aligned to drive our strength – digital video networking applications – and we expect to continue to deliver top line growth that will achieve net income profits and positive cash flow . . . Our restructuring activities and increased focus on operational cost management in 2005 support this drive to net income.  (Jerry Chase, Terayon CEO, and Mark Richman, Terayon CFO, May 3, 2005 Press Release). |
|---|---|
| ¶ 198 | While there is much work to be done, we are pleased with our progress during the first quarter . . . By executing on these objectives, we expect to continue healthy improvements . . .  (Jerry Chase, Terayon CEO, May 3, 2005 Conference Call). |
| ¶ 199 | I am very pleased to announce that we have met or exceeded all previously-announced financial guidance . . .  (Mark Richman, Terayon CFO, May 3, 2005 Conference Call). |
| ¶ 209 | Second quarter results indicate solid progress in moving digital video to the center of our corporate strategy . . . We believe this is due to Terayon's unique ability to address fundamental changes occurring in the market . . . Our digital video revenue growth coupled with reduced operating expenses positions us closer to our goal of profitability.  (Jerry Chase, Terayon CEO, and Mark Richman, Terayon CFO, July 28, 2005 Press Release). |
| ¶ 210 | Terayon has achieved a number of milestones this past quarter, including video Revenues were up for the fifth straight quarter to 17.3 million, giving us the best video quarter we've ever had.  We are cash flow positive for the second consecutive quarter, indicative of an increased focus on asset and expense management, and customer diversification continues to improve each quarter . . . Terayon has made steady and solid progress against our digital video goals this past quarter . . . The second quarter has been a good one for us and we are confident in our ability to continue this progress . . . We are winning market share and expect that trend to continue in the third quarter despite the projected small decline in revenue . . . Our second quarter results certainly indicate the effectiveness of our plan and execution to date.  I am optimistic about our ability to maintain its focus and deliver favorably against our business plan.  (Jerry Chase, Terayon CEO, July 28, 2005 Conference Call). |
| ¶ 211 | I am very pleased to announce that we have met or exceeded all previously announced financial guidance . . . we have returned to top line growth, up from 26.4 million in the first quarter of 2005.  (Mark Richman, Terayon CFO, July 28, 2005 Conference Call). |

| ¶ 226 | We are committed to accurate and transparent financial reporting and are taking this matter very seriously . . . I want to emphasize that our cash position and market leadership remain strong and are not affected by the accounting issues under review. (Jerry Chase, Terayon CEO, November 7, 2005 Press Release). |
|---|---|
| ¶ 233 | We are now structured to take advantage of what we do best . . . Terayon is well positioned for success.  (Jerry Chase, Terayon CEO, January 26, 2006 Press Release). |

**APPENDIX B:  FORWARD-LOOKING STATEMENTS & ACCOMPANYING CAUTIONARY LANGUAGE**

| Am. Compl. | FORWARD-LOOKING STATEMENTS | RJN EX. | CAUTIONARY LANGUAGE AND RISK FACTORS |
|---|---|---|---|
| ¶ 60[1] | June 28, 2001 Press Release, "Terayon Announces Preliminary Results for Second Quarter 2001": <br><br> "Terayon expects to report total revenues in the range of $62 to $65 million.  Excluding a $30 to $40 million charge, the Company expects a preliminary pro forma loss for the second quarter of 2001 in the range of $0.38 to $0.40 per share . . ." | 39 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by the Company and other parties that involve risks and uncertainties . . ." <br><br> Risk Factors: <br><br> • the Company's ability to reorganize successfully and better address customer needs, <br><br> • the Company's ability to reduce its operating costs, <br><br> • the Company's ability to improve its operating results, <br><br> • the Company's ability to gain new business and offer new products, <br><br> • the expansion of operations by the Company's customers, <br><br> • the deployment of the Company's products in specific markets. |
| ¶ 83 | July 29, 2002 Press Release, "Terayon Reports Second Quarter 2002 Financial Results": <br><br> "Terayon expects revenues in the third quarter to be in the range of $15 to $25 million and the pro forma net loss to be in the range of $0.35 to $0.39 per share.  For the full year, Terayon expects revenues, excluding Imedia Semiconductor, to be in the range of $110 to $130 million, and the pro forma per share loss to be in the range of $1.15 to $1.41 per share.  Terayon plans to | 40 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by the Company and other parties that involve risks and uncertainties . . ." <br><br> Risk Factors: <br><br> • Terayon's ability to develop and bring to market new products, <br><br> • the acceptance of Terayon's new |

---

[1] The Amended Complaint is cited to as "¶ __."

1

| | | | |
|---|---|---|---|
| | fund Imedia at a cost of approximately $5 to $6 million per quarter. Through aligning company resources to its strategic areas and to market conditions, Terayon will be able to achieve a reduction in its operating expenses in the near term. With the exclusion of Imedia Semiconductor, Terayon expects 5 operating expenses to be below $20 million in the first quarter, 2003." | | products in the market,<br><br>• Terayon's ability to gain new business,<br><br>• the expansion of operations by Terayon's customers,<br><br>• the deployment of Terayon's products in specific markets and Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 103 | March 14, 2003 Press Release, "Terayon Announces Restructuring":<br><br>"Terayon anticipates realizing approximately $12 million to $15 million in annualized savings from these actions, combined with related operational savings including curtailment of certain program and discretionary expenses. The company expects to record total charges in the range of approximately $4 million to $5 million associated with the realignment and the write down of certain related assets in the quarter ending March 31, 2003." | 41 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by the Company and other parties that involve risks and uncertainties . . ."<br><br>Risk Factors:<br><br>• Terayon's ability to reduce its operating expenses,<br><br>• Terayon's ability to improve its efficiencies,<br><br>• Terayon's ability to re-align its resources,<br><br>• Terayon's ability to recognize annualized savings from its restructuring activities,<br><br>• the deployment of Terayon's products in specific markets,<br><br>• Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 120 | July 30, 2003 Press Release, "Terayon Reports Second Quarter 2003 Financial Results":<br><br>"Going into the second half of 2003, we | 42 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates and assumptions by Terayon that involve risk and uncertainties, |

| | | | |
|---|---|---|---|
| | remain focused on achieving sustainable profitability through growing revenues, improving margins via product cost reductions, and prudent operating expense management." | | including the preliminary guidance on third quarter 2003 revenues and net loss per share. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information.  In addition, the events described in these forward-looking statements may not actually arise.  Terayon's actual results could differ materially from those described in this press release . . ." <br><br> Risk Factors: <br><br> • Terayon's ability to gain new business, <br><br> • the acceptance of Terayon's new products in the market, <br><br> • the expansion of operations by Terayon's customers, <br><br> • the deployment of Terayon's products in specific markets, <br><br> • Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 122 | Terayon's July 30, 2003 Earnings Conference Call: <br><br> "We are targeting revenues for Q3 to be in the range of $33.0m to $36.0m . . . We are targeting to end the quarter with approximately $144m to $147m in cash and equivalence and are anticipating no change in the amount of debt on our balance sheet." | 43 | Cautionary Language: "Before we begin, I would like to remind our listeners that statements made during our discussion here today, regarding future performance reflect our perspective as of today.  All statements we make, other than statements as historical fact, are forward-looking.  These include without limitations, statements regarding our future financial performance.  We wish to caution you that such statements are projections, and that actual results may differ materially from these projections, because our operations involve a number of variables, uncertainties and risks . . ." <br><br> Risk Factors: |

| | | | |
|---|---|---|---|
| | | | • Terayon's ability to grow revenues,<br><br>• Terayon's ability to better address customer needs,<br><br>• Terayon's ability to reduce its product and operating cost,<br><br>• Terayon's ability to gain new business and developed and offer new products. |
| ¶ 129 | October 7, 2003 Press Release, "Terayon Provides Update on Better Than Expected Third Quarter Financial Performance": <br><br>"Terayon . . . expects revenues for its third quarter ending September 30, 2003 to be in the range of $37 million to $38 million. Net loss per share for the quarter is now expected to be in the range of $0.10 to $0.12." | 44 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by Terayon that involve risks and uncertainties, including the preliminary guidance on third quarter 2003 revenues and net loss per share and the revenue growth with respect to Terayon's DOCSIS 2.0 BW CMTS. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information. In addition, the events described in these forward-looking statements may not actually arise. Terayon's actual results could differ materially from those described in this press release as a result of various factors . . ." <br><br>Risk Factors: <br><br>• Terayon's ability to develop and bring to market new products,<br><br>• the acceptance of Terayon's new products in the market,<br><br>• Terayon's ability to gain new business, the expansion of operations by Terayon's customers,<br><br>• the deployment of Terayon's products in specific markets,<br><br>• the continued revenue growth with respect to Terayon's DOCSIS 2.0 BW |

4

| | | | |
|---|---|---|---|
| | | | CMTS,<br><br>• the product mix that Terayon sells each quarter which may affect gross margins,<br><br>• Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 141 | Terayon's January 27, 2004 Press Release:<br><br>Our goals for 2004 include: (1) capitalizing on our technology leadership and the opportunities created by these favorable market conditions to increase share across our CMTS, Subscriber and Digital Video businesses, (2) leveraging our best-of-breed digital video processing product line into other vertical markets including satellite, broadcast and telecom, and (3) achieving sustainable profitability through a combination of revenue growth, operational efficiencies, expense management, and strategic partnerships . . . As we announced in December 2003, we are targeting profitability beginning in the second quarter of 2004. The steps we are taking now provide us with a clearer path towards this objective by lowering our breakeven revenue point, re-sequencing our R&D pipeline to better align with customer timing requirements, and improving our overall efficiency by streamlining the organization and bolstering core processes . . ." | 45 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by Terayon that involve risks and uncertainties, including Terayon's guidance on first quarter 2004 revenues, net loss per share, estimated restructuring charge, estimated operating cost savings, and Terayon's estimated timeline for profitability. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information. In addition, the events described in these forward-looking statements may not actually arise. Terayon's actual results could differ materially from those described in this press release as a result of various factors, risks and uncertainties . . ."<br><br>Risk Factors:<br><br>• Terayon's ability to develop and bring to market new products,<br><br>• the acceptance of Terayon's new products in the market,<br><br>• Terayon's ability to gain new business,<br><br>• the expansion of operations by Terayon's customers,<br><br>• the deployment of Terayon's products in specific markets,<br><br>• the continued revenue growth with |

| | | | |
|---|---|---|---|
| | | | respect to the Terayon BW 3000 CMTS product line, the Terayon TJ700 Cable Modem product line, and the Terayon Network CherryPicker product line<br><br>• the product mix that Terayon sells each quarter which may affect gross margins<br><br>• Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 151 | April 29, 2004 Press Release, "Terayon Reports First Quarter 2004 Financial Results":<br><br>"Going forward, we believe having the only proven end-to-end 3 DOCSIS 2.0 solution and the best-of-breed digital video processing product line positions us to capitalize on the accelerating growth of new, bandwidth-intensive service offerings such as HDTV, VOD, VoIP and commercial services . . ." | 46 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates and assumptions by Terayon that involve risks and uncertainties. These statements include the continued validation by cable operators of the advantages of Terayon's DOCSIS 2.0 and digital video solutions and the preliminary guidance on second quarter 2004 revenues, restructuring charge, net loss per share and expected operational savings as a result of restructuring activities. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information. In addition, the events described in these forward-looking statements may not actually arise. Terayon's actual results could differ materially from those described in this press release . . ."<br><br>Risk Factors:<br><br>• Terayon's ability to gain new business,<br><br>• Terayon's ability to develop and bring to market new, technologically advanced products,<br><br>• the acceptance of Terayon's new |

| | | | |
|---|---|---|---|
| | | | products in the market,<br><br>• the expansion of operations by Terayon's customers,<br><br>• the deployment of Terayon's products in specific markets,<br><br>• Terayon's ability to lower and align its operating expenses with market conditions,<br><br>• the continuation of improving trends in the cable industry. |
| ¶ 152 | April 29, 2004 Press Release, "Terayon Reports First Quarter 2004 Financial Results":<br><br>"For the second quarter of 2004, Terayon expects to report revenues in the range of $42 million to $46 million and anticipates a net loss in the range of $0.02 to $0.04 per share, excluding the effects of the estimated $1.5 million to $2.0 million charge . . ." | 46 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates and assumptions by Terayon that involve risks and uncertainties. These statements include the continued validation by cable operators of the advantages of Terayon's DOCSIS 2.0 and digital video solutions and the preliminary guidance on second quarter 2004 revenues, restructuring charge, net loss per share and expected operational savings as a result of restructuring activities. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information. In addition, the events described in these forward-looking statements may not actually arise. Terayon's actual results could differ materially from those described in this press release . . ."<br><br>Risk Factors:<br><br>• Terayon's ability to gain new business,<br><br>• Terayon's ability to develop and bring to market new, technologically advanced products,<br><br>• the acceptance of Terayon's new |

| | | | products in the market, |
|---|---|---|---|
| | | | • the expansion of operations by Terayon's customers, |
| | | | • the deployment of Terayon's products in specific markets, |
| | | | • Terayon's ability to lower and align its operating expenses with market conditions, |
| | | | • the continuation of improving trends in the cable industry. |
| ¶ 183 | February 9, 2005 Release, "Terayon Reports Fourth Quarter and Full Year 2004 Results Digital Video Revenue Grows 109% Year over Year": <br><br> "Our restructuring activities and increased focus on cost management in 2004 will greatly benefit the company as we drive operations to positive net income . . . we expect to deliver profitable top line growth to achieve net income profits and positive cash flow generation." | 47 | Cautionary Language: "Except for the historical information contained herein, this news release contains forward-looking statements, estimates, and assumptions by Terayon that involve risks and uncertainties, including Terayon's guidance on first quarter 2005 revenues, net loss per share, estimated restructuring charge and estimated operating cost savings. These forward-looking statements are based on current expectations and Terayon assumes no obligation to update this information. In addition, the events described in these forward-looking statements may not actually arise. Terayon's actual results could differ materially from those described in this press release as a result of various factors, risks and uncertainties . . ." <br><br> Risk Factors: <br><br> • Terayon's ability to develop and bring to market new products, <br><br> • the acceptance of Terayon's new products in the market, <br><br> • Terayon's ability to gain new business; the expansion of operations by Terayon's customers, <br><br> • the deployment of Terayon's products |

| | | | |
|---|---|---|---|
| | | | in specific markets,<br><br>• the continued revenue growth,<br><br>• the product mix that Terayon sells each quarter which may affect gross margins,<br><br>• Terayon's ability to lower and align its operating expenses with market conditions. |
| ¶ 198 | Terayon's May 3, 2005 Earnings Conference Call:<br><br>"By executing on these objectives, we expect to continue healthy improvements." | 48 | Cautionary Language: "I would like to remind our listeners that statements made during our discussion here today regarding the future performance reflects our perspectives as of today. All statements we make, other than statements of historical fact, are forward-looking statements. These include, without limitation, statements regarding our future financial performance. We wish to caution you that such statements are projections and that actual results may differ materially from the projections because our operations involve a number of variables. Uncertainties and risks, including . . ."<br><br>Risk Factors:<br><br>• Terayon's ability to grow revenues,<br><br>• Terayon's ability to better address customer needs,<br><br>• Terayon's ability to reduce its product and operating cost,<br><br>• Terayon's ability to gain new business and develop and offer new products. |