1  LATHAM & WATKINS LLP
      Patrick E. Gibbs (SBN 183174)
2      Jennie Foote Feldman (SBN 248375)
   140 Scott Drive
3  Menlo Park, California  94025
   Telephone:  (650) 328-4600
4  Facsimile:  (650) 463-2600

5

6  Attorneys for Defendants Terayon Communication
   Systems, Inc., Zaki Rakib, Jerry D. Chase, Mark A.
   Richman, Edward Lopez, Ray Fritz, Carol
7  Lustenader, Matthew Miller, Shlomo Rakib, Doug
   Sabella, Christopher Schaepe, Mark Slaven, Lewis
8  Solomon, Howard W. Speaks, Arthur T. Taylor, and
   David Woodrow

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  ADRIAN MONGELI, Individually, And On      CASE NO.: 3-06-CV-03936 MJJ
    Behalf Of All Others Similarly Situated,
14                                            **CLASS ACTION**
                    Plaintiffs,
15                                            
         v.                                   **REQUEST FOR JUDICIAL NOTICE IN
16                                            SUPPORT OF MOTION TO DISMISS
    TERAYON COMMUNICATION                     AMENDED CLASS ACTION COMPLAINT
17  SYSTEMS, INC., ZAKI RAKIB, JERRY D.       FOR VIOLATIONS OF FEDERAL
    CHASE, MARK A. RICHMAN, EDWARD            SECURITIES LAWS BY TERAYON AND
18  LOPEZ, RAY FRITZ, CAROL                   THE INDIVIDUAL DEFENDANTS
    LUSTENADER, MATTHEW MILLER,
19  SHLOMO RAKIB, DOUG SABELLA,
    CHRISTOPHER SCHAEPE, MARK                 Judge:      Honorable Martin J. Jenkins
20  SLAVEN, LEWIS SOLOMON, HOWARD             Date:       June 5, 2007
    W. SPEAKS, ARTHUR T. TAYLOR,              Time:       9:30 a.m.
21  DAVID WOODROW, and ERNST &                Courtroom:  11, 19th Floor
    YOUNG, LLP,
22
                    Defendants.
23

24

25

26

27

28

1      Pursuant to Federal Rule of Evidence 201, Defendant Terayon Communication

2  Systems, Inc., and Zaki Rakib, Jerry D. Chase, Mark A. Richman, Edward Lopez, Ray Fritz,

3  Carol Lustenader, Matthew Miller, Shlomo Rakib, Doug Sabella, Christopher Schaepe, Mark

4  Slaven, Lewis Solomon, Howard W. Speaks, Arthur T. Taylor, and David Woodrow (the

5  "Individual Defendants") hereby request the Court to take judicial notice of the content of the

6  following documents in support of their Motion to Dismiss Plaintiffs' Amended Class Action

7  Complaint For Violations Of Federal Securities Laws (the "Amended Complaint"[1]):

8

| | |
|---|---|
| **RJN Ex. 1**: | Terayon's December 29, 2006 Form 10-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 2**: | Terayon's February 4, 2004 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 3**: | Terayon's October 28, 2004 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 4**: | Terayon's November 9, 2004 Form 10-Q, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 5**: | Terayon's March 15, 2005 Form 10-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 6**: | Terayon's March 15, 2004 Form 10-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |

---

[1] The Amended Complaint is cited to as "¶ __."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

2

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | |
|---|---|
| **RJN Ex. 7**: | Terayon's August 1, 2005 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 8**: | Terayon's September 27, 2005 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 9**: | Terayon's November 7, 2005 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 10**: | Terayon's March 2, 2006 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 11**: | Terayon's May 30, 2006 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 12**: | Terayon's November 8, 2006 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 13**: | The closing stock price of Terayon common stock from November 1, 2006 to November 30, 2006, represented in the Table of Historical Prices.  *Available at* http://finance.yahoo.com/q/hp?s=TERN.PK&a=10&b=1&c=2006&d=10&e=30 &f=2006&g=d.  Attached hereto is a true and correct copy of that publicly available information. |
| **RJN Ex. 14**: | Terayon's October 24, 2000 Form S-3, filed pursuant to the Securities Act of 1933.  Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 15**: | Terayon's April 1, 2002 Form 10-K (Exhibit Index), filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

3

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | | |
|---|---|---|
| | | correct copy of the relevant portions. |
| | **RJN Ex. 16**: | Terayon's March 27, 2003 Form 10-K (Exhibit Index), filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 17**: | Terayon's March 15, 2004 Form 10-K (Exhibit Index), filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 18**: | Terayon's March 15, 2005 Form 10-K (Exhibit Index), filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 19**: | Terayon's December 29, 2006 Form 10-K (Exhibit Index), filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 20**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Zaki Rakib on February 17, 2005, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 21**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Shlomo Rakib on February 17, 2005, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 22**: | Schedule 13G filed by, or on behalf of, Zaki Rakib on February 14, 2006, pursuant to Rule 13d-1(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex 23**: | Schedule 13G filed by, or on behalf of, Shlomo Rakib on February 14, 2006, |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

4

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | | |
|---|---|---|
| | | pursuant to Rule 13d-1(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 24**: | Terayon's Schedule 14A Definitive Proxy Statement filed with the SEC on April 29, 2003, pursuant to Section 14(a) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 25**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on August 10, 2001, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 26**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on October 18, 2001, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 27**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on July 25, 2002, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 28**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on December 19, 2002, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 29**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on November 13, 2001, pursuant to Section 16(a) of the |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

5

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | |
|---|---|
| | Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 30**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on April 5, 2002, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 31**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on March 11, 2002, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 32**: | Schedule 13G, filed by, or on behalf of, Zaki Rakib on July 24, 2001, pursuant to Rule 13d-1(c) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 33**: | Schedule 13G, filed by, or on behalf of, Shlomo Rakib on July 25, 2001, pursuant to Rule 13d-1(c) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 34**: | The closing stock price of Terayon common stock from December 1, 2001 to December 31, 2001, represented in the Table of Historical Prices. *Available at* http://finance.yahoo.com/q/hp?s=TERN.PK&a=10&b=30&c=2001&d=11&e=31&f=2001&g=d. Attached hereto is a true and correct copy of that publicly available information. |
| **RJN Ex. 35**: | The closing stock price of Terayon common stock from February 1, 2006 to March 31, 2006, represented in the Table of Historical Prices. *Available at* http://finance.yahoo.com/q/hp?s=TERN.PK&a=01&b=1&c=2006&d=02&e=31 |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

6

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | | |
|---|---|---|
| | | &f=2006&g=d.  Attached hereto is a true and correct copy of that publicly available information. |
| | **RJN Ex. 36**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Carol Lustenader on May 7, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940.  Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 37**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Carol Lustenader on July 8, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940.  Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 38**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Carol Lustenader on August 22, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940.  Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 39**: | Terayon's June 28, 2001 Press Release, titled "*Terayon Announces Preliminary Results for Second Quarter 2001.*" |
| | **RJN Ex. 40**: | Terayon's July 29, 2001 Press Release, titled "*Terayon Reports Second Quarter 2002 Financial Results.*" |
| | **RJN Ex. 41**: | Terayon's March 14, 2003 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |
| | **RJN Ex. 42**: | Terayon's July 31, 2003 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  Attached hereto is a true and correct copy of the relevant portions. |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

| | |
|---|---|
| **RJN Ex. 43** | Transcript of Terayon's Second Quarter 2003 Earnings Conference Call, held on July 30, 2003. |
| **RJN Ex. 44**: | Terayon's October 7, 2003 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 45**: | Terayon's January 27, 2004 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 46**: | Terayon's April 30, 2004 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 47**: | Terayon's February 15, 2005 Form 8-K, filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 48**: | Transcript of Terayon's First Quarter 2005 Earnings Conference Call, held on May 3, 2005. |
| **RJN Ex. 49**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on October 30, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 50**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf of, Christopher Schaepe on November 3, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions. |
| **RJN Ex. 51**: | Form 4 (Statement of Beneficial Ownership of Securities) filed by, or on behalf |

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SILICON VALLEY

8

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

of, Christopher Schaepe on November 4, 2003, pursuant to Section 16(a) of the Securities Exchange Act of 1934, or Section 17(a) of the Public Utility Holding Company Act of 1935, or Section 30(h) of the Investment Company Act of 1940. Attached hereto is a true and correct copy of the relevant portions.

I.    **ARGUMENT**

Judicial notice of the documents listed above is appropriate because they were directly referenced or relied upon in the Amended Complaint, were required to be filed with the SEC, and/or their validity is not subject to honest dispute.

   A.    **Judicial Notice of Documents Referenced in the Complaint is Proper.**

Request for Judicial Notice Exhibits ("RJN Exs.") 1, 3-12, 15-21, 31, 36-48, and 50-51 are referenced and relied upon in Plaintiffs' Amended Complaint. *See*, *e.g.*, ¶¶ 229, 243-244 (RJN Ex. 1); ¶¶ 171-172 (RJN Ex. 3); ¶¶ 173-181 (RJN Ex. 4); ¶¶ 187-195 (RJN Ex. 5); ¶¶ 143-149 (RJN Ex. 6); ¶¶ 213-214 (RJN Ex. 7); ¶¶ 221-223 (RJN Ex. 8); ¶¶ 225-227 (RJN Ex. 10); ¶¶ 235-237 (RJN Ex. 11); ¶¶ 239-240 (RJN Ex. 11); ¶ 242 (RJN Ex. 12); ¶¶ 71-72 (RJN Ex. 15); ¶¶ 104-108 (RJN Ex. 16); ¶¶ 143-147 (RJN Ex. 17); ¶¶ 187-195 (RJN Ex. 18); ¶¶ 19, 25-29, 243-244 (RJN Ex. 19); ¶ 264 (RJN Exs. 20, 21, 31, 36-38, 50-51); ¶ 60 (RJN Ex. 39); ¶¶ 81-84 (RJN Ex. 40); ¶ 103 (RJN Ex. 41); ¶¶ 119-120 (RJN Ex. 42); ¶¶ 121-122 (RJN Ex. 43); ¶ 129 (RJN Ex. 44); ¶¶ 140-142 (RJN Ex. 45); ¶¶ 150-152 (RJN Ex. 46); ¶¶ 182-183 (RJN Ex. 47); ¶¶ 196-197 (RJN Ex. 48).

On a motion to dismiss, a district court may properly consider the full content of documents that are either referenced or relied upon in the complaint, provided their authenticity is not in dispute. *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003). Moreover, the Court may consider the full text of any document that Plaintiffs partially quote or reference in their Complaint. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996). Therefore, it is appropriate for the Court to take judicial notice of the contents of RJN Exhibits 1, 3-12, 15-21, 31, 36-48, and 50-51.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

9

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

1    **B.    Judicial Notice of Documents Required to be Filed with the SEC is Proper.**

2         Additionally, RJN Exhibits 1-12, 14-33, 36-38, 41-42, 44-47, and 49-51 are

3    documents that Terayon was required to file with the SEC.  On a motion to dismiss, the Court

4    may take judicial notice of the contents of these required public disclosures.  *See In re Turnstone*

5    *Sys. Sec. Litig.*, No. C 01-1256 SBA, 2003 U.S. Dist. LEXIS 26709, at *106 (N.D. Cal. Feb. 4,

6    2003); *In re Calpine*, 288 F. Supp. 2d at 1076; *In re Silicon Graphics Sec. Litig.*, 970 F. Supp.

7    746, 758 (N.D. Cal. 1997) ("[A] district court may take judicial notice of the contents of relevant

8    public disclosure documents required to be filed with the SEC as facts capable of accurate and

9    ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

10   Therefore, the Court should take judicial notice of the contents of RJN Exhibits 1-12, 14-33, 36-

11   38, 41-42, 44-47, and 49-51.

12   **C.    Judicial Notice of the Closing Price of a Company's Publicly Traded**

13   **Common Stock is Proper.**

14        RJN Exhibits 13, 34, and 35 are tabular or graphical representations of the

15   historical closing price of Terayon's publicly traded common stock for the periods of November

16   1, 2006 through November 30, 2006, November 30, 2001 through December 31, 2001, and

17   February 1, 2006 through March 31, 2006, respectively, compiled using readily available public

18   information, which is available at

19   - http://finance.yahoo.com/q/hp?s=TERN.PK&a=10&b=1&c=2006&d=10&e=30&f=200

20     6&g=d (November 1, 2006 through November 30, 2006);

21   - http://finance.yahoo.com/q/hp?s=TERN.PK&a=10&b=30&c=2001&d=11&e=31&f=20

22     01&g=d (November 30, 2001 through December 31, 2001); and

23   - http://finance.yahoo.com/q/hp?s=TERN.PK&a=01&b=1&c=2006&d=02&e=31&f=200

24     6&g=d (February 1, 2006 through March 31, 2006).

25        The Court may take judicial notice of the content of these exhibits because they

26   are "capable of accurate and ready determination by resort to sources whose accuracy cannot

27   reasonably be questioned." *In re Turnstone*, 2003 U.S. Dist. LEXIS 26709, at *107-108 (taking

28   judicial notice of a tabular representation of Turnstone Systems' historical stock price, as "[n]o

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SILICON VALLEY

10

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

1    one seriously disputes that readily available and accurate information about the daily prices of

2    publicly traded stocks is ubiquitous in this country"); *see also Plevy v. Haggerty*, 38 F. Supp. 2d

3    816, 821 (C.D. Cal. 1998) (taking judicial notice of the contents of a tabular representation of the

4    defendant-corporation's stock price).  Therefore, it is proper for the Court to take judicial notice

5    of the contents of RJN Exhibits 13, 34, and 35.

6

7    Dated:  March 9, 2007                            LATHAM & WATKINS LLP

8

9                                                    By _____
                                                            /s/
10                                                        Patrick E. Gibbs

11                                                   Attorneys for Terayon Communication Systems,
                                                     Inc. and the Individual Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

11

TERAYON AND THE INDIVIDUAL DEFENDANTS' RJN
ISO MOTION TO DISMISS AMENDED COMPLAINT
CASE NO.: 3- 06 CV-03936 MJJ

# EXHIBIT 1

Table of Contents

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
Form 10-K

(Mark One)

p   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005

OR

o   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM      TO      .

COMMISSION FILE NUMBER: 0000-24647
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact Name of Registrant as Specified in Its Charter)

Delaware        77-0328533
(State or Other Jurisdiction of    (IRS Employer
Incorporation or Organization Identification No.)

2450 WALSH AVENUE
SANTA CLARA, CALIFORNIA 95051
(408) 235-5500
(Address, Including Zip Code, and Telephone Number,
Including Area Code, of the Registrant's Principal Executive Offices)
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

Title of Each Class:Name of Each Exchange on Which Registered:
None               None

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, par value $0.001 per share
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes o     No p
Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o     No p
Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days. Yes o     No p
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o
Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one).
Large Accelerated Filer o     Accelerated Filer p    Non-Accelerated Filer o
Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes o     No p
The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant was approximately $186,172,000 on June 30, 2006. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers and owners of more than ten percent of its common stock. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.
Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.001 par value, 77,637,177 shares outstanding as of November 30, 2006.
DOCUMENTS INCORPORATED BY REFERENCE
None

--------------------------------------------------------------------------------

INDEX
TERAYON COMMUNICATION SYSTEMS, INC.

Page
No.

Introductory Note
2
PART I
Item 1. Business
10
Item 1A.Risk Factors
20
Item 1B.Unresolved Staff Comments
42
Item 2. Properties
42
Item 3. Legal Proceedings
42
Item 4. Submission of Matters to a Vote of Security Holders
45
PART II
Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer
        Purchases of Equity Securities
46
Item 6. Selected Financial Data
48
Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
50
Item 7A.Quantitative and Qualitative Disclosures About Market Risk
106
Item 8. Financial Statements and Supplementary Data
108
Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
186
Item 9A.Controls and Procedures
186
Item 9B.Other Information
194
PART III
Item 10.Directors and Executive Officers of the Registrant
194
Item 11.Executive Compensation
198
Item 12.Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters
203
Item 13.Certain Relationships and Related Transactions
204
Item 14.Principal Accountant Fees and Services
204
PART IV
Item 15.Exhibits, Financial Statement Schedules
205
Signatures
209
EXHIBIT 10.18
EXHIBIT 10.27
EXHIBIT 10.28
EXHIBIT 10.31
EXHIBIT 10.32
EXHIBIT 10.33
EXHIBIT 10.34
EXHIBIT 10.35
EXHIBIT 21.1
EXHIBIT 31.1
EXHIBIT 31.2
EXHIBIT 32.1
EXHIBIT 32.2
EXHIBIT 99.1
EXHIBIT 99.2
EXHIBIT 99.3

INTRODUCTORY NOTE

The Company's Annual Report on Form 10-K (Form 10-K) for the year ended December
31, 2005, includes restated and audited consolidated financial statements for
the years ended December 31, 2004 and 2003, restated financial statements for
the year ended December 31, 2002, and adjusted financial statements for the year
ended December 31, 2001. This Form 10-K also includes information for the
quarterly periods ended September 30, 2005 and December 31, 2005 and the
restated quarterly information for the first two quarters of 2005 and for the
four quarters of 2004. This information is disclosed in Note 3, "Restatement of
Consolidated Financial Statements," and Note 18, "2005 Unaudited Condensed
Consolidated Quarterly Information," to Consolidated Financial Statements.

2

--------------------------------------------------------------------------------

Table of Contents

Background of the Restatement

On November 7, 2005, the Company announced that it initiated a review of its revenue recognition policies after determining that certain revenues recognized in the second half of the year ended December 31, 2004 from a customer may have been recorded in incorrect periods. The review included the Company's revenue recognition policies and practices for current and past periods and its internal control over financial reporting. Additionally, the Audit Committee of the Board of Directors (Audit Committee) conducted an independent inquiry into the circumstances related to the accounting treatment of certain of the transactions at issue and retained independent legal counsel to assist with the inquiry. On March 1, 2006, the Company announced that the Audit Committee had completed its independent inquiry and that the Company would restate its consolidated financial statements for the year ended December 31, 2004 and for the four quarters of 2004 and the first two quarters of 2005. The principal findings of the Audit Committee review were: there was no intent by Company personnel to recognize revenue in contravention of what Company personnel understood to be the applicable rules at the time; that Company personnel did not consider or sufficiently focus on relevant accounting rules; and there was no intent by Company personnel to mislead the Company's auditors or engage in other wrongful conduct. Additionally, the Audit Committee and management reviewed the Company's revenue recognition practices and policies as they related to the delivery of certain products and services (including the development and customization of software) to Thomson Broadcast (Thomson) under a series of contractual arrangements (Thomson Contract). The Company had recognized revenue under this series of contractual arrangements under two separate revenue arrangements in accordance with Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition" (SAB 101), as amended by SAB No. 104 (SAB 104). However, based on the guidance under American Institute of Certified Public Accountants Statement of Position (SOP) 97-2, "Software Revenue Recognition" (SOP 97-2), SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" (SOP 81-1), SAB 104 and Financial Accounting Standards Board (FASB), Emerging Issues Task Force (EITF) 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables" (EITF 00-21), management determined that this series of contractual arrangements should have been treated as a single contract, and therefore a single revenue arrangement for accounting purposes. Factors that contributed to the determination of a single revenue arrangement included the documentation of the series of contractual arrangements under a single memorandum of understanding (MOU) and the ongoing nature of discussions between parties to define product specifications and deliverables that extended beyond the initial agreed upon contracted deliverables. Additionally, the Company determined it could not reasonably estimate progress towards completion of the project, and therefore, in accordance with SOP 81-1, used the completed contract method. As a result, revenue previously recognized in the third and fourth quarters of 2004 and in the first two quarters of 2005 under this series of contractual arrangements was deferred and ultimately recognized as revenue in the quarter ended December 31, 2005 upon completion of the Thomson Contract and final acceptance received from Thomson for all deliverables under the Thomson Contract. Direct contract expenses, primarily research and development, associated with the completion of the project previously recognized in each quarter of 2004 and in the first two quarters of 2005 were also deferred and ultimately recognized in the quarter ended December 31, 2005 in accordance with the completed contract methodology under SOP 81-1.

On March 1, 2006, the Company announced a further review of the Company's revenue recognition policies relating to the recognition of products and related software sold in conjunction with post-contract support (PCS) under SOP 97-2, SAB 104, EITF 00-21 and FASB Technical Bulletin 90-1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts." As a result, management determined that the Company did not account properly for the sale of digital video products under SOP 97-2 and did not establish vendor specific objective evidence (VSOE) of fair value for its PCS revenue element related to these sales. Accordingly, revenue for digital video products sold in conjunction with PCS and previously recognized as separate elements in each quarter of 2003 and 2004, and also in the first and second quarters of 2005, was deferred and recognized ratably over the contract service period.

On November 8, 2006, the Company announced that the Audit Committee, upon the recommendation of management, had concluded that the Company's consolidated financial statements for the years ended December 31, 2003, 2002 and 2000 and for the quarters of 2003, 2002 and 2000 should no longer be relied upon. The restatement of financial statements for 2003 would correct errors primarily relating to revenue

3

--------------------------------------------------------------------------------

recognition, cost of goods sold and estimates of reserves. The restatement of financial statements for 2000 and 2002 would correct errors primarily relating to the need to separately value and account for embedded derivatives associated with the Company's 5% convertible subordinated notes issued in July 2000, and other estimates. While no determination was made that the financial statements for 2001 could not be relied upon, adjustments would be made to 2001 that would be reflected in the financial statements to be included in its periodic reports to be filed with the Securities and Exchange Commission (Commission) and reported as "adjusted."

The Company's previous auditors resigned effective as of September 21, 2005 and on that date, the Audit Committee engaged Stonefield Josephson, Inc. (Stonefield) as the Company's new independent registered public accounting firm. On May 26, 2006, the Company announced that it had engaged Stonefield, its current independent auditor, to also re-audit the Company's consolidated financial statements for the year ended December 31, 2004 and, if necessary, to re-audit the Company's consolidated financial statements for the year ended December 31, 2003. On November 8, 2006, the Company announced that it had engaged Stonefield to re-audit the Company's consolidated financial statements for the year ended December 31, 2003.

In June 2006, the Company, through outside counsel, retained FTI Consulting, Inc. to provide an independent accounting perspective in connection with the accounting issues under review.

In connection with the Company's accounting review of the Thomson Contract, the Commission initiated a formal investigation. This matter was previously the subject of an informal Commission inquiry. The Company has been cooperating fully with the Commission and will continue to do so in order to bring the investigation to a conclusion as promptly as possible.

Restatement of Historical Financial Statements

The following is a description of the significant adjustments to previously reported financial statements resulting from the restatement process and additional matters addressed in the course of the restatement. While this description does not purport to explain each correcting entry, the Company believes that it fairly describes the significant factors underlying the adjustments and the overall impact of the restatement in all material respects.

Revenue Recognition.  The Company did not properly account for revenue as described below. As part of the restatement process, the Company applied the appropriate revenue recognition methods to each element of all multiple-element contracts, corrected other errors related to revenue recognition and corrected errors to other accounts, including cost of goods sold and deferred revenue resulting in adjustments to these accounts in each period covered by the restatement.

Video Product and Post Contract Support.  The Company did not properly recognize revenue in accordance with generally accepted accounting principles (GAAP), specifically SOP 97-2 for its digital video products. The Company previously recognized revenue for its digital video products in accordance with SAB 101, as amended by SAB 104 based upon meeting the revenue recognition criteria in SAB 104. In order for the Company to recognize revenue from individual elements within a multiple element arrangement under SOP 97-2, the Company must establish vendor specific objective evidence (VSOE) of fair value for each element. The Company determined that it did not establish VSOE of fair value for the undelivered element of PCS on the digital video products. Therefore, as part of the restatement process the Company corrected this error and recognized revenue of the hardware element sold in conjunction with the undelivered PCS element ratably over the period of the customer support contract. The cost of goods sold for the sale for the hardware element and the PCS element was also recognized ratably over the period of the customer support contract. Accordingly, revenue and cost of goods sold previously recognized based on meeting the revenue recognition criteria in SAB 104 for the individual elements for digital video products sold in conjunction with PCS in each quarter of 2003, 2004 and 2005 were deferred and recognized ratably over the contract service period.

Thomson Contract.  The Company recognized revenue as it related to the delivery of certain products and services (including the development and customization of software) to Thomson under a series of contractual arrangements in accordance with SAB 101, as amended by SAB 104. However, based on SOP 97-2 and SOP 81-1, this series of contractual arrangements under a single memorandum of understanding (MOU) should have been treated as a single contract, and therefore as a single revenue arrangement for accounting

4

--------------------------------------------------------------------------------

purposes. Factors that contributed to the determination of a single revenue arrangement included the documentation of the series of contractual arrangements under a single MOU and the ongoing nature of discussions between parties to define product specifications and deliverables that extended beyond the initial agreed upon contracted deliverables. In accordance with SOP 81-1, the Company determined it could not reasonably estimate progress towards completion of the project and therefore used the completed contract methodology. As a result, $7.8 million of revenue previously recognized in the third and fourth quarters of 2004 and $0.3 million of revenue previously recognized in the first two quarters of 2005 were deferred and ultimately recognized as revenue in the quarter ended December 31, 2005 upon completion of the Thomson Contract and final acceptance received from Thomson for all deliverables under the Thomson Contract. Additionally, $1.2 million of cost of goods sold previously recognized in 2004 and $1.8 million related to direct development costs previously recognized from the fourth quarter of 2003 through the second quarter of 2005 were also deferred and ultimately recognized in the quarter ended December 31, 2005.

Inventory Consignment.  During the quarter ended December 31, 2003, the Company entered into an agreement to consign specific spare parts inventory to a certain customer for the customer's demonstration and evaluation purposes. The consignment period was to terminate during the quarter ended March 31, 2004, at which time the customer would either purchase or return the spare parts inventory to the Company. During the quarter ended March 31, 2004, the Company notified the customer that the consignment period terminated and in accordance with the agreement, the customer should either return or purchase the spare parts inventory. The Company did not receive a reply and subsequently invoiced the customer $0.9 million for the spare parts inventory in the quarter ended March 31, 2004. During the quarter ended June 30, 2004, the customer agreed to purchase a portion of the spare parts inventory and returned the remaining spare parts inventory to the Company. Accordingly, for the quarter ended June 30, 2004, the Company issued the customer a credit memo for $0.9 million, which was the amount of the sale that was invoiced in the quarter ended March 31, 2004 and was the entire amount originally consigned to the customer. During the course of the restatement, it was determined that at March 31, 2004, accounts receivable was overstated by $0.9 million, inventory was understated by $0.5 million and both deferred revenue and deferred cost of goods sold were overstated by $0.9 million and $0.5 million, respectively. As a result, the consolidated balance sheets for the quarters ending March 31, 2004 and June 30, 2004 were appropriately revised to correct these errors.

Other Revenue Adjustments.  The Company also made other adjustments in 2003, 2004 and 2005 to correct the recognition of revenue for transactions where the Company did not properly apply SAB 101, as amended by SAB 104. The Company made other immaterial adjustments for certain transactions related to revenue. See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Allowance for Doubtful Accounts.  During the restatement process, the Company reassessed its accounting regarding the allowance for doubtful accounts based on its visibility of its collections and write-offs of the allowance for doubtful accounts. Prior to 2004, the Company's policy was to estimate the allowance for doubtful accounts and the corresponding bad debt expense based on a fixed percentage of revenue during a specific period. Beginning in 2004, the Company adopted a specific reserve methodology for estimating the allowance for doubtful accounts and corresponding bad debt expense. During the restatement, the Company adjusted the allowance for doubtful accounts and bad debt with a reduction of $5.2 million, an increase of $1.9 million and an increase of $0.6 million for the years ended December 31, 2000, 2001 and 2002, respectively, to reflect the specific reserve methodology and to correct errors resulting from the Company's former policy. The Company made adjustments to the allowance for doubtful accounts of $0.1 million, $0.6 million, and $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. In addition, during the restatement, the Company made other adjustments to the allowance for doubtful accounts to offset the accounts receivable and related reserve related to customers who were granted extended payment terms, experiencing financial difficulties or where collectibility was not reasonably assured. Accordingly, the Company classifies these customers as those with "extended payment terms" or with "collectibility issues." For these customers, the Company historically deferred all revenue and recognized the revenue when the fee was fixed or determinable or collectibility reasonably assured or cash was received, assuming all other criteria for revenue recognition were met. The Company adjusted the allowance for doubtful accounts, eliminating the receivable and

5

--------------------------------------------------------------------------------

related reserve, for these customers by an increase of $5.7 million, a decrease of $4.4 million and by an immaterial amount for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively.

In summary, the above restatements gave rise to an adjustment to the allowance for doubtful accounts of an increase of $5.8 million, a decrease of $3.8 million and an increase of $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. The allowance for doubtful accounts related to international customers was reduced by $0.5 million based on the activity for the year ended December 31, 2004.

Deferred Revenues and Deferred Cost of Goods Sold.  As part of the restatement process, the Company determined that it did not properly account for deferred revenue as it related to specific transactions to certain customers where the transaction did not satisfy revenue recognition criteria of SAB 104 related to customers with acceptance terms, transactions with free-on-board (FOB) destination shipping terms, customers where the arrangement fee was not fixed or determinable or customers where collectibility was not reasonably assured. While revenue was generally not recognized for these customers, the Company improperly recognized a deferred revenue liability and a deferred cost of goods sold asset, thereby overstating assets and liabilities, and during the restatement determined that deferred revenues and deferred cost of goods sold should not be recognized for these transactions. As a result, the Company adjusted deferred revenues by $1.6 million, $1.0 million and $0.9 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively, and adjusted deferred cost of goods sold by $0.9 million, $0.3 million and $0.6 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively.

Use of Estimates.  The Company did not correctly estimate, monitor and adjust balances related to certain accruals and provisions as set forth below.

Access Network Electronics.  In July 2003, the Company sold certain assets related to its Miniplex products to Verilink Corporation (Verilink). The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in April 2000. As part of the agreement with Verilink, Verilink agreed to assume all warranty obligations related to ANE products sold by the Company prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of warranty obligations for ANE products sold by the Company prior to July 2003 related to certain power supply failures of the product and other general warranty repairs (Warranty Obligation). The $2.4 million Warranty Obligation negotiated with Verilink included up to $1.0 million for each of two specific customers issues and a general warranty obligation of $0.4 million that expired in the quarter ended March 31, 2005. During the sale process, the Company disclosed to Verilink that it had received an official specific customer complaint related to the sale of the Miniplex product from one of the two customers. In accordance with SFAS No. 5, "Accounting for Contingencies," the Company established a reserve as a result of this complaint. Under the agreement with Verilink, the Company was able to quantify its exposure at $1.0 million based upon the terms of the Warranty Obligation. No other obligations were accrued by the Company related to the Miniplex products because the Company had not received formal notice of any complaints from other customers. Formerly, the Company amortized the $1.0 million warranty accrual starting in the quarter ended March 31, 2004 through the expiration of the Warranty Obligation in the quarter ended March 31, 2005. However, during the course of the restatement, the Company determined that the warranty obligation accrual should not have been reduced unless there were actual expenses incurred in connection with the obligation or upon the expiration of the Warranty Obligation in the quarter ended March 31, 2005. Since the Company did not incur any expenses in connection with this obligation and did not establish a basis for this reduction, during the restatement, the Company corrected the reduction of this accrual by $0.2 million in each of the four quarters of 2004 and deferred the reduction of the warranty accrual until the warranty period expired in the quarter ended March 31, 2005. Accordingly, the $1.0 million reduction of the warranty obligation in the quarter ended March 31, 2005, reduced cost of goods sold by $0.8 million for that period and increased cost of goods sold by $0.2 million in each quarter of 2004.

Israel Restructuring Reserve.  During 2001, the Board of Directors approved a restructuring plan and the Company incurred restructuring charges in the amount of $12.7 million for excess leased facilities of which $7.4 million related to Israel and $1.7 million remained accrued at December 31, 2004. In 2002, the Company did not include in its assessment the ability to generate and collect sublease income in its Israel facility. As a

6

--------------------------------------------------------------------------------

result, the Company increased its reserve by $1.2 million due to lowered sublease assumptions. In the quarter ended December 31, 2004, the Company analyzed the reserve and reduced the reserve by $1.5 million to $1.7 million, reducing operating expenses. During the restatement process, the Company determined that $1.2 million of the $1.5 million reserve reduction recognized in the quarter ended December 31, 2004 properly related to the year ended December 31, 2002. As a result, the Company reversed the previously recorded $1.2 million increase in restructuring reserve expense in 2002, thereby decreasing the net loss for the quarter ended December 31, 2002. The Company also corrected the entry that reduced the restructuring reserve in 2004 by reversing the $1.2 million decrease in the reserve that occurred in 2004.

License Fee.  In 1999, the Company entered into an intellectual property (IP) license agreement (License Agreement) with a third party. Pursuant to the License Agreement, the Company recorded a prepaid asset of $2.0 million related to its licensing of the IP. The License Agreement allowed the Company to incorporate the IP into "manufactured products" for the cost of the license fee which was $2.0 million. Additionally, the Agreement also incorporated a clause for the Company to pay a royalty fee of $1 per unit of "component products" sold to third parties by the Company. During 1999, the Company began designing semiconductor chips using this IP and paying the license fee for the IP. In June 2000, the Company made its final payment on the $2.0 million license, and the Company had a $2.0 million prepaid asset. The Company amortized the prepaid asset based on applying the royalty rate of $1 per unit established in the License Agreement. However, the Company incorrectly applied the $1 per unit rate to units produced rather than units sold. As part of correcting this error, the Company adjusted the amortization rate of the prepaid asset to reflect actual units sold resulting in a reduction in the per unit amortization rate. Adjustments to cost of goods sold were a decrease of $0.8 million in 2003, an increase of $0.5 million in 2004 and an increase of $0.2 million during the first two quarters of 2005.

Goods Received Not Invoiced.  The Company maintains an account to accrue for obligations arising from instances in which the Company has received goods but has not yet received an invoice for the goods (RNI). During 2002 the Company established the reserve after management determined that the process being used to track RNI obligations was not properly stating the liability. During the quarter ended March 31, 2004, the Company analyzed the RNI account and determined that it was carrying an excess reserve of $0.8 million and began amortizing the $0.8 million excess reserve at the rate of $0.2 million per quarter thereby decreasing operating expenses by that amount in each quarter of 2004. During the restatement, the Company determined that the excess reserve should have been reduced to zero as of December 31, 2002 and adjusted the financial statements accordingly. The impact of this change is to decrease operating expenses by $0.8 million in 2002 and increase operating expenses by $0.8 million during 2004.

Other.  In conjunction with the restatement, the Company also made other adjustments and reclassifications to its accounting for various other errors for the periods presented, including: (1) correction of estimates of legal expenses, property tax and excess and obsolete inventory accruals; (2) reclassification to the proper accounting period of: bonus accruals to employees, federal income taxes payable, and operating expenses related to an operating lease; (3) correction of accounting for impaired and disposed assets; and (4) expenses related to an extended warranty provided to a customer. See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Convertible Subordinated Notes.  In July 2000, the Company issued $500 million of 5% convertible subordinated notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484 million. The Notes were convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133), the Notes are considered a hybrid instrument since, and as described below, they contained multiple embedded derivatives.

The Notes contained several embedded derivatives. First, the Notes contain a contingent put (Contingent Put) where in the event of any default by the Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all unpaid principal and accrued interest to be due and payable immediately. Second, the Notes contain an investor conversion option (Investor Conversion Option) where the holder of the Notes

7

--------------------------------------------------------------------------------

may convert the debt security into Company common stock at any time after 90 days from original issuance and prior to August 1, 2007. The number of shares of common stock that is issued upon conversion is determined by dividing the principal amount of the security by the specified conversion price in effect on the conversion date. The initial conversion price was $84.01 which was subject to adjustment under certain circumstances described in the Indenture. Third, the Notes contain a liquidated damages provision (Liquidated Damages Provision) that obligated the Company to pay liquidated damages to investors of 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter, in the event that the Company did not file an initial shelf registration for the underlying securities within 90 days of the closing date. In the event that the Company filed its initial shelf registration within 90 days but failed to keep it effective for a two year period from the closing date, the Company would pay 50 basis points and 100 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter. Fourth, the Notes contain an Issuer's call option (Issuer Call Option) that allowed the Company to redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01, for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of the mailing of the redemption notice. In addition, if the Company redeemed the Notes, it was also required to make a cash payment of $193.55 per $1,000 principal amount of the Notes less the amount of any interest actually paid on the Notes prior to redemption. The Company had the option to redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest.

Under SFAS 133, an embedded derivative must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone derivative if the economic characteristics and risks of the embedded derivative are not considered "clearly and closely related" to those of the host. An embedded derivative would not be considered clearly and closely related to the host if there was a possible future interest rate scenario (even though it may be remote) in which the embedded derivative would at least double the initial rate of return on the host contract and the effective interest rate would be twice the current market rate as a contract that had similar terms as the host and was issued by a debtor with similar credit quality. Furthermore, per SFAS 133, the embedded derivative would not be considered clearly and closely related to the host contract if the hybrid instrument could be settled in such a way the investor would not recover substantially all of its initial investment.

During the restatement process, the Company determined under SFAS 133 that both the Issuer Call Option and the Liquidated Damages Provision represented an embedded derivative that was not clearly and closely related to the host contract, and therefore needed to be bifurcated from the Notes and valued separately. As it related to the Liquidated Damages Provision and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $0.4 million. Based on the need to amortize the $0.4 million over the 7-year life of the Notes, the impact to the Company's financial results related to the Liquidated Damages Provision was not material. As it related to the Issuer Call Option and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $11.9 million. As a result, at the time the Notes were issued in July 2000, the Company should have created an asset to record the value of the Issuer Call Option for $11.9 million and created a bond premium to the Notes for $11.9 million. In accordance with SFAS 133, the asset value would then be marked to market at the end of each accounting period and the bond premium would be amortized against interest expense at the end of each accounting period. Due to the decrease in the price of the Company's common stock, the value of the Issuer Call Option became effectively zero and the Company should have written off the asset related to the Issuer Call Option in 2000. Additionally, as part of the bond repurchase activity where the Company repurchased $325.9 million and $109.1 million of face value of the Notes (for a total of $435.0 million) that occurred in 2001 and 2002, the Company should have recognized an additional gain from the retirement of the bond premium associated with the Issuer Call Option of $7.0 million in 2001 and $1.9 million in 2002. The Company determined that the $7.0 million non-cash gain on the early retirement of the premium to be immaterial to 2001 financial results.

In the quarter ended March 31, 2006, the Company paid off the entire principal amount of the outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million. In addition, the

--------------------------------------------------------------------------------

Table of Contents

Company recognized $0.3 million into other income, net representing the remaining unamortized bond premium associated with the Issuer Call Option. For further discussion of the restatement adjustments and the net effects of all of the restatement adjustments on the Company's balance sheet and statements of operations, please refer to Item 7 -- Management's Discussion and Analysis of Financial Condition and Results of Operations and Note 3 to the Consolidated Financial Statements.

Reliance on Prior Consolidated Financial Statements.  The Company has not amended its previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10-K. As such, other than the Company's Form 10-K for the year ended December 31, 2005, the Company does not anticipate amending its previously filed Annual Reports on Form 10-K or its Quarterly Reports on Form 10-Q for any prior periods.

9

--------------------------------------------------------------------------------

Table of Contents

PART I

Item 1.Business

Overview

We currently develop, market and sell digital video equipment to networks operators and content aggregators who offer video services. Our primary products include the Network CherryPicker(R) line of digital video processing systems and the CP 7600 line of digital-to-analog decoders. Our products are used for multiple digital video applications, including the rate shaping of video content to maximize the bandwidth for standard definition (SD) and high definition (HD) programming, grooming customized channel line-ups, carrying local ads for local and national advertisers and branding by inserting corporate logos into programming. Our products are sold primarily to cable operators, television broadcasters, telecom carriers and satellite providers in the United States, Europe and Asia.

This Report on Form 10-K includes trademarks and registered trademarks of Terayon Communication Systems, Inc. and its consolidated subsidiaries. As used in this report, the terms "Terayon," the "Company," "we," "us" or "our" refer to Terayon Communication Systems, Inc. and its consolidated subsidiaries. Products or service names of other companies mentioned in this Report on Form 10-K may be trademarks or registered trademarks of their respective owners.

We were incorporated in California and reincorporated in Delaware in 1998. Our principal executive headquarters are located at 2450 Walsh Avenue, Santa Clara, California 95051. Our telephone number is (408) 235-5500.

History of the Company

We were founded in 1993 to provide cable operators with a cable data system enabling them to offer high-speed, broadband Internet access to their subscribers. By 1999, we were primarily selling this cable data system -- composed of cable modems and cable termination systems (CMTS) -- which utilized our proprietary Synchronous Code Division Multiple Access (S-CDMA) technology. Also in 1999, we initiated an acquisition strategy that ultimately included the acquisition of ten companies to expand our product offerings within the cable industry and outside of the cable industry to the telecom and satellite industries. With the market downturn in 2000, we refocused our business to target the cable industry and began selling data and voice products based on industry standard specifications, particularly the Data Over Cable System Interface Specification (DOCSIS), thereby beginning our transition from proprietary-based products to standards-based products. Also at this time, we focused our business on providing digital video products to cable operators and satellite providers. Since 2000, we have terminated our data-over-satellite business and all of our acquired telecom-focused businesses and incurred restructuring charges in connection with these actions.

In 2004, we refocused the Company to make digital video solutions (DVS) the core of our business. In particular, we began expanding our focus beyond cable operators to more aggressively pursue opportunities for our digital video products with television broadcasters, telecom carriers and satellite television providers. As part of this strategic refocus, we elected to continue selling our home access solutions (HAS) product, including cable modems, embedded multimedia terminal adapters (eMTA) and home networking devices, but ceased future investment in our CMTS product line. This decision was based on weak sales of the CMTS products and the anticipated extensive research and development investment required to support the product line in the future. As part of our decision to cease investment in the CMTS product line, we incurred severance, restructuring and asset impairment charges and were subject to litigation from Adelphia, one of the principal purchasers of our CMTS product. In March 2005, we sold certain cable modem semiconductor assets to ATI Technologies, Inc. and terminated our internal semiconductor division.

In January 2006, we announced that the Company would focus solely on digital video product lines, and as a result, we discontinued our HAS product line. We determined that there were no short or long-term synergies between our HAS product line and digital video product lines which made the HAS products increasingly irrelevant given our core business of digital video. Though we continued to sell our remaining inventory of HAS products and

10

--------------------------------------------------------------------------------

Table of Contents

CMTS products in 2006, the profit margins for our cable modems and eMTAs have continued to decrease due to competitive pricing pressures and the ongoing commoditization of the products.

Industry Dynamics

We participate in the worldwide market for equipment sold primarily to network operators, including cable operators, television broadcasters, telecom carriers and satellite providers. Our business is influenced by the following significant trends in our industry:

Migration of cable operators to all-digital networks

During the next several years, we believe that most North American and many foreign cable operators will continue to migrate their networks to all-digital operations in order to deliver new services and substantially improve network efficiency. Current efforts in this migration include digital simulcasting, which is a transition step to an all-digital network infrastructure. Digital simulcasting is being adopted by all major U.S. cable operators, and we further expect it to be adopted by second and third-tier cable operators in the U.S. and by major operators worldwide.

Ability to leverage network infrastructures to offer multiple products and services

Within the last few years, several cable operators and telecom carriers have begun offering a "triple play" bundle of services that includes video, voice and high-speed data over a single network. Their key objectives are to capture higher average revenues per subscriber, secure market share and reduce the "churn" of subscribers. The delivery of "triple play" services has led to increased competition between the cable operators and telecom carriers. This competition has led network operators to upgrade their infrastructure by purchasing equipment that allows them to provide the "triple play" of services. Delivering digital video services is a key area of growing competition between cable operators and telecom carriers. Verizon and AT&T, the two largest telecom carriers in the U.S., are currently rolling out digital video services in select cities nationwide. We believe that as telecom carriers expand their digital video service rollouts, they will increasingly require products that have technology like our Network CherryPicker(R) products to generate advertising revenues. Additionally, we are currently working with Alcatel, Motorola, Inc. (Motorola), and other leading telecom equipment vendors which have been selected by several large telecom carriers to serve as systems integrators responsible for the carriers' deployment of digital video services.

Network operators and content aggregators must combat ad skipping technologies

Consumers' increasing use of digital video recorders (DVRs) capable of skipping over commercial advertisements is a growing threat to network operators and content aggregators, which face the possibility of lower advertising revenues from advertisers who pay in large part based on the number of viewers watching a program. To overcome the reduction of advertising viewers because of ad skipping DVRs, network operators and content aggregators are increasingly seeking solutions based on digital overlay techniques to directly insert ads into the program being aired. These "overlaid ads" typically appear in a lower corner of the television picture and cannot be skipped by DVRs since they appear within the TV program itself. This approach has already been proven by programmers such as SpikeTV and MTV, and we believe that network operators and content aggregators will increasingly rely on overlay techniques to maintain or even increase their advertising revenues.

Continued network investment to support new product requirements in competitive and emerging markets

The cable, digital broadcast satellite and telecom companies will continue their investments in equipment to provide advanced services in a cost-effective manner to increase average revenues per unit from their subscribers. According to Kagan Research, LLC, in 2005 U.S. cable operators spent $10.6 billion on infrastructure, compared to $10.1 billion in 2004, an increase of 5%. In addition, we believe that telecom carriers (in particular Verizon and AT&T) will become an increasing source of competition to traditional video service providers as they continue to upgrade their networks to offer video services, including high definition digital television (HDTV) services. While

11

--------------------------------------------------------------------------------

in the early stages, the development of a mobile video network is underway, and we expect that digital program insertion video application capabilities will play an important part in the growth of this emerging market.

Consolidation of the cable industry

In the late 1990s, U.S. cable operators began an unprecedented wave of consolidation, with several of the larger operators initiating aggressive growth strategies primarily through the acquisition of small, medium and large cable operators. Comcast Corporation (Comcast) -- the largest U.S. operator today with more than 21 million subscribers -- took the top spot in 2002 when it acquired AT&T Broadband, which had become the nation's largest operator after acquiring TCI and MediaOne in 1999. In August 2006, Adelphia Communications Corporation (Adelphia), formerly the fifth largest operator with approximately 4.8 million subscribers, was purchased by Comcast and Time Warner Cable (TWC). Currently, 58.2 million of the estimated 65.6 million cable subscribers in the U.S. are served by the top ten U.S. cable operators, representing more than 89 percent of the market. With fewer -- but much larger -- cable operators to sell to, cable equipment vendors must continue adding new products and services to win business.

This has led to a consolidation of cable equipment vendors seeking to expand their product lines and to strengthen relationships with key operators. For example, General Instrument Corporation and Scientific-Atlanta, Inc. (Scientific-Atlanta) were acquired by Motorola, Inc. and Cisco Systems, Inc. (Cisco), respectively. Consolidation amongst smaller vendors has also taken place, including the acquisition of BroadBus by Motorola; Arroyo Video Solutions by Cisco; Entone by Harmonic, Inc. (Harmonic); nCUBE by C-COR, and BigBand Network's purchase of ADC Telecommunications' CMTS business.

Business

We currently develop, market and sell digital video equipment, including our Network CherryPicker(R) digital video processing systems and our CP 7600 line of digital-to-analog decoders. Our products are sold to and used by cable, telecom, broadcast and satellite operators for multiple digital video applications, including the rate shaping of video content to maximize the bandwidth for SD and HD programming, grooming customized channel line-ups, carrying local ads for local and national advertisers, and branding themselves by inserting their corporate logos into their programming. We also continue to sell our remaining inventory of CMTS and HAS products, including cable modems and eMTAs, that we discontinued in January 2006.

The design of digital video processing equipment requires expertise in Motion Picture Experts Group (MPEG) digital video formats and Internet Protocol (IP). Our expertise in MPEG and IP, coupled with our experience in designing, developing and manufacturing complex equipment, has helped us secure a leadership position in statistical remultiplexing (rate shaping) which provides the cable and satellite operators with bandwidth management capabilities for their SD and HD digital video services. We believe we are well positioned to capitalize on the growing demand for network operators to provide advanced bandwidth intensive video services such as adding additional HDTV channels. Our DVS products are designed to enable "localization on-demand," or the delivery of on-demand, real-time video constructed to meet the advertising needs of local and regional markets. Further, we believe our digital video products enable network operators and content aggregators to more cost-effectively overlay advertisements directly into their programming. This approach is more efficient compared to the traditional approach which requires the advertisements and the program to first be converted from digital to analog video, the insertion of the overlaid advertisements, and the subsequent re-encoding of the program and the advertisements back to digital. Since our method works entirely in the digital domain, there is no need for decoders to convert the digital video to analog or for separate re-encoders to then convert the analog video back to digital. To complement our cable and satellite product offerings, we developed new software for the DM 6400 model of our Network CherryPicker(R) line to support the new MPEG-4/AVC digital video format that most telecom carriers have chosen for their video services.

--------------------------------------------------------------------------------

Table of Contents

Business Strategy

Our goal is to be the leading provider of digital video products that enable network operators and content aggregators to more efficiently deliver digital video services to meet the needs of local and regional markets, thereby reducing costs and generating new revenues. To achieve this goal, we are pursuing the following strategies:

*capitalize on the increasing demand for advanced digital video services, including HDTV and video on demand, by leveraging our strengths in bandwidth management, ad insertion, grooming applications and products;

*continue to develop video applications with enhanced capabilities that meet the localization on-demand and personalized advertising needs of network operators, and to address emerging markets, such as mobile video;

*increase the distribution opportunities for our digital video products through reseller channels by developing new relationships and expanding existing system integration partnerships with partners such as Harmonic, Alcatel and Motorola; and

*improve margins through focused product cost-reduction efforts and by streamlining operational activities across our product lines.

The ongoing migration of network operators to all-digital IP-based networks represents a significant opportunity for companies like us with products and technologies that enable these operators to maximize their bandwidth and to manipulate their digital video content completely within the digital domain, which maximizes flexibility and reduces costs. We believe we are well positioned to capitalize on this expanding market in large part because of the success that our digital video products have had with the major U.S. cable operators and satellite providers.

Products

Historically, we had multiple product lines that we sold to cable operators, satellite providers and telecom carriers. Our cable data product line consisted initially of a proprietary system composed of a CMTS and cable modems. We later expanded our cable data product line with standards-based offerings, including CMTS, cable modems and eMTA products meeting the DOCSIS and EuroDOCSIS specifications. We discontinued sales of our CMTS products in 2004 and our modems and eMTAs in 2006. Our cable data products were complemented by our Multigate voice-over-cable solution, which we inherited through our acquisition of Telegate Ltd. We discontinued the Multigate product line in 2004. Our telecom product line consisted of our IPTL digital subscriber line access multiplexer, MainSail multi-service access platform and MiniPlex digitally added main line products, all of which we acquired through our acquisitions of Radwiz, MainSail Systems and the Access Network Electronics division of Tyco International. We discontinued these telecom products in 2003. Our Internet-over-satellite product line consisted of the SatStream system we inherited via our acquisition of ComBox. We discontinued our satellite product in 2002.

We continue to sell our digital video product lines, which currently consist of the Network CherryPicker(R) products and our CP 7600 digital-to-analog decoder. Our Network CherryPicker(R) line of digital video processing systems give cable, telecom and satellite operators flexibility in managing their digital video content, including the rate shaping of video content to maximize the bandwidth for SD and HD programming, grooming customized channel line-ups, carrying ads for local advertisers and branding themselves by inserting their corporate logos into their programming. To date, cable, satellite and telecommunications providers have deployed more than 7,500 of our digital video systems.

Our CherryPicker(R) DM line is currently composed of two models, the DM 6400 and the DM 3200. Our DM 6400 helps cable operators seamlessly insert commercials for local advertisers into their digital programming without the need for a cumbersome and inefficient digital-to-analog-back-to-digital process that requires additional equipment. The newest version of software for our DM 6400 is designed for telecom carriers and specifically supports the new MPEG-4/AVC digital video format that most telecom carriers have chosen for their video services. According to Kagan Research, LLC, in 2005, U.S. cable operators earned more than $4.6 billion running local ads, a 12% increase over the $4.1 billion billed in 2004. We believe this market will continue to grow and that we are well

13

--------------------------------------------------------------------------------

positioned in this space based on our current success in digital ad insertion and the relationships we have with the major advertising server companies, particularly SeaChange and C-Cor. Our DM 3200 provides statistical remultiplexing functionality, ad insertion and advance stream processing for smaller capacity architectures.

Our CherryPicker(R) BP 5100 broadcast platform system has been developed specifically for television broadcasters utilizing the same proven statistical remultiplexing technology and components from the DM line. The BP 5100 provides broadcasters with exceptional flexibility in managing their digital video content, including rate shaping their video content to maximize the bandwidth for SD and HD programming, switching seamlessly between local and national video feeds and branding themselves by overlaying their corporate logos onto their programming.

Our CP 7600 digital-to-analog video decoder is used by cable operators to implement a "digital simulcast" architecture to improve the bandwidth efficiency of their networks. All major U.S. cable operators have adopted digital simulcasting and both second and third-tier operators are in the process of deploying the architecture. Prior to digital simulcasting, operators had to send all of their programming in both digital and analog formats to support both groups of subscribers. This traditional approach consumes enormous amounts of bandwidth within their networks. With simulcasting, operators now deliver just one set of programming digitally and use the CP 7600 at the 'edge' of their networks (just before reaching subscribers' homes) to decode the programming to analog for their analog subscribers, and to pass the digital programming on to their digital subscribers untouched. This more bandwidth-efficient approach is an evolutionary step towards an architecture that is completely digital and IP-based and that will support the delivery of a new generation of services.

Our CP 7585 off-air demodulator allows cable and satellite operators to convert SD or HD programming transmitted over-the-air by television broadcasters in the 8VSB format to the ASI format used by cable and satellite operators. This allows cable and satellite providers to retransmit broadcasters' programming over their own networks. We discontinued the CP 7585 in April 2006 after selling off our inventory and determining the cost of developing and building new models was not warranted.

We continue to develop video applications to enable advanced capabilities for digital video programming, more localized advertising and other digital video services. Upcoming digital video products include a suite of overlay applications that enable static and motion graphics to be superimposed on digital video programs and advertising, and applications for statistical re-multiplexing for MPEG-4 high definition sources.

Product research and development

We maintain ongoing research and development activities for our digital video product line. Our research and development efforts are focused on developing new software applications and improved hardware platforms designed to address customer requirements across multiple industries and to obtain a competitive technological leadership of our products. Another key goal is to improve the gross margins of our existing products by reducing their component and manufacturing costs.

Our research and development expense is $17.7 million for the year ended December 31, 2005 compared with $33.2 million and $42.6 million for the years ended December 31, 2004 and 2003, respectively. We currently anticipate that overall research and development spending in 2006 will decline compared to 2005, and will focus almost entirely on developing new hardware platforms and software applications for digital video solutions.

Developing new and innovative solutions is important for us to remain competitive with larger companies that devote considerably more resources to product development.

Customers

We market and sell our digital video products to multiple vertical target markets consisting of the largest cable, satellite and telecom operators in North America.

Some of our principal customers include the following:

*Comcast;

*Cox Communications Inc. (Cox);

14

--------------------------------------------------------------------------------

Table of Contents

*TWC;

*EchoStar Communications Corporation; and

*Harmonic.

We believe that a substantial majority of our revenues will continue to be derived from sales to a relatively small number of customers located in the United States for the foreseeable future. For example, Harmonic, Thomson Broadcast and Comcast accounted for approximately 12%, 11% and 10%, respectively, of our total revenue for the year ended December 31, 2005. For the year ended December 31, 2004, two customers, Adelphia and Comcast accounted for approximately 20% and 13%, respectively, of our total revenue. Three customers, Adelphia, Cross Beam Networks and Comcast, accounted for approximately 21%, 16% and 13%, respectively, of our total revenues for the year ended December 31, 2003. With the discontinuation of our data products, our sales have become increasingly concentrated in the United States and our presence outside the United States has decreased. A small percentage of our total digital video revenue has historically been derived from customers located outside the United States. We expect that trend will continue. The loss of any of our significant customers generally could have a material adverse effect on our business and results of operations.

Market Competition

The market for broadband equipment vendors is extremely competitive and is characterized by rapid technological change and, more recently, market consolidation. With our digital video products, we believe that we are currently the market leader in ad insertion, grooming and remultiplexing with our Network CherryPicker(R) line of digital video processing systems. However, several companies have entered this market, including Cisco through its acquisition of Scientific-Atlanta, Scopus Video Networks Ltd., BigBand Networks and RGB Networks, Inc. (RGB). We believe that this increase in competition may lead to additional pricing pressures and declining gross margins.

The principal competitive factors in our market include the following:

*quality of product performance, features and reliability;

*customer technical support and service;

*price;

*size and financial stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*relationships with network operators and content aggregators; and

*meeting current or prospective industry or customer standards applicable to our products.

Many of our competitors and potential competitors are substantially larger and have significant advantages over us, including, without limitation:

*larger and more established selling and marketing capabilities;

*greater economies of scale;

*significantly greater financial, technical, engineering, marketing, distribution, customer support and other resources;

*greater name recognition and a larger installed base of customers; and

*well-established relationships with our existing and potential customers.

Some of the above competitive factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. Additionally, there may be pressure to develop new or alternative industry standards and specifications for video products and applications. The broader adoption

15

--------------------------------------------------------------------------------

of any such standards and specifications would necessitate greater spending on developing new products. The development and market acceptance of new or alternative technologies could decrease the demand for our products or render them obsolete, and could impact the pricing and gross margin of our digital video products. Our competitors, many of which have greater resources than we do, may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products. These competitive pressures have impacted and are likely to continue to adversely impact our business. Given these competitive and other market factors, we continually look for opportunities to compete effectively and create value for our stockholders. We may, at any time and from time to time, be in the process of identifying or evaluating product development initiatives, partnerships, strategic alliances or transactions and other alternatives in order to maintain market position and maximize shareholder value. Market and other competitive factors may cause us to change our strategic direction, and we may not realize the benefits of any such initiatives, partnerships, alliances or transactions. We cannot assure you that any such initiatives, partnerships, alliances or transactions that we identify and pursue would actually result in our competing effectively, maintaining market position or increasing stockholder value. Our failure to realize any expected benefits from such initiatives, partnerships, alliances or transactions could negatively impact our financial position, results of operations, cash flows and stock price.

Sales and Marketing

We market and sell our products directly to network operators and content aggregators through our direct sales forces in North America and our limited sales forces in EMEA and Asia. We also market and sell our products through distributors, system integrators and resellers throughout the world and rely on this network to sell the majority of our products sold outside the United States.

We support our sales activities through marketing communication vehicles, such as industry press, trade shows, advertising and the Internet. Through our marketing efforts, we strive to educate network operators and content aggregators on the technological and business benefits of our products, as well as our ability to provide quality support and service. We participate in the major trade shows and industry events in the United States and limited events outside the United States. Industry referrals and reference accounts are significant marketing tools we develop and utilize.

We also make our products available for customers to test, which is very often a prerequisite for making a sale of our more complex products. These tests can be comprehensive and lengthy, and can dramatically increase the sales cycle for these products. Participating in these tests often requires us to devote considerable time and resources from our engineering and customer support organizations.

International Sales

We have international sales offices in Brussels, Belgium; Hong Kong; Seoul, South Korea; and Tel Aviv, Israel. In the years ended December 31, 2005, 2004 and 2003, approximately 42%, 47% and 45%, respectively, of our net revenues were derived from customers outside of the United States. Japan and Israel were the only international countries into which we made sales in excess of 10% of net revenues in 2003. Sales to Japan were 2%, 7% and 16%, of net revenues while sales to Israel were 8%, 12% and 12% of net revenues in the years ended December 31, 2005, 2004 and 2003, respectively. During 2005, we focused our business on the sale of our digital video products, which have historically had much higher sales in the United States, and placed our sales emphasis on the U.S. market. However, we focused sales of our data products, which have historically had much higher sales outside the United States, on those markets outside the United States, including Israel and Europe. In 2005, we placed a lower emphasis on customers in certain locations outside the United States, such as Asia Pacific, Canada and South America. Additionally, we expect the portion of our overall revenue generated from outside the United States to continue to decrease in 2006 with the discontinuance of our HAS products and our data business.

The majority of our international sales are currently invoiced in U.S. dollars. However, we do enter into certain transactions in Euros and other currencies. Invoicing in other currencies subjects us to risks associated with foreign exchange rate fluctuations. Although we do not currently have any foreign currency hedging arrangements in place, we will consider the need for hedging or other strategies to minimize these risks if the amount of invoicing in non-dollar denominated transactions materially increases.

16

--------------------------------------------------------------------------------

Table of Contents

Our international operations are subject to certain risks common to foreign operations in general, such as governmental regulations and import restrictions. In addition, there are social, political, labor and economic conditions in specific countries or regions, difficulties in staffing and managing foreign operations and potential adverse foreign tax consequences, among other factors, that could also have an adverse impact on our business and results of operations outside of the United States.

Customer Service and Technical Support

We believe that our ability to provide consistently high quality service and support will continue to be a key factor in attracting and retaining customers. Our technical services and support organization, with personnel in North America, Europe, Israel and Asia, offers support 24 hours a day, seven days per week. Prior to the deployment of our products, each customer's needs are assessed and proactive solutions are implemented, including various levels of training, periodic management and coordination meetings and problem escalation procedures.

Backlog

We typically ship product and invoice customers shortly upon receipt of a purchase order as our customers typically request the immediate delivery of product. Assuming product availability, our practice is to ship our products promptly upon the receipt of purchase orders from our customers. We only have backlog if the product is not available to ship to the customer. Therefore, we have limited backlog and believe that backlog information is not material to an understanding of our business.

Manufacturing

Our finished goods are produced by subcontract manufacturers. Our digital video products are single sourced from a manufacturer in San Jose, California. Our HAS products, which were discontinued in January 2006, were single sourced from a manufacturer in China.

Our manufacturing operations employ semiconductors, electromechanical components and assemblies as well as raw materials such as plastic resins and sheet metal. Although we believe the materials and supplies necessary for our manufacturing operations are currently available in the quantities we require, we sometimes experience a shortage in the supply of certain component parts as a result of strong demand in the industry for those parts.

Our subcontractors purchase materials, supplies and product subassemblies from a substantial number of vendors. For many of our products, there are existing alternate sources of supply. However, we sole source certain components contained in our products, such as the semiconductors used in our products. While this has not resulted in material disruptions in the past, should any change in these relationships or disruptions to our vendors' operations occur, our business and results of operations could be adversely affected.

In an effort to prevent shortages of supplies used in the manufacturing process by some of our subcontractors, we source and inventory various raw products and components as part of our supply chain program. In doing so we may put ourselves at risk of carrying inventory that may become excessive based on our future sales failing to meet current sales forecasts or become obsolete before utilization by those manufacturers. We have recorded costs as a result of vendor cancellation charges.

Intellectual Property

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are associated risks. Our pending patent applications may not be granted. Even if they are granted, the claims covered by the patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

We have entered into confidentiality and invention assignment agreements with our employees and consultants, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as

17

--------------------------------------------------------------------------------

well as statutory protections, may not prove to be sufficient to prevent misappropriation of our technology or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. Litigation may be necessary to enforce our intellectual property rights.

The development of standards or specifications is common in our industry, as is the contribution of intellectual property to associated intellectual property pools. These standards and specifications allow for the development and availability of intellectual property pools, such as the MPEG pool, the standardization of delivery and techniques and the interoperability of products. CableLabs, the research and development consortium representing the cable operators, developed the DOCSIS standard to allow for the interoperability of products used by the cable operators. In connection with the development of the DOCSIS 2.0 specification by CableLabs, we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis all of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to others, including manufacturers that compete with us in the marketplace for DOCSIS based products. There may be pressure to develop new industry standards and specifications for video products and applications. Vendors like us may have to build products that meet these standards in order to sell to network operators.

The contractual arrangements, as well as statutory protections, we employ may not prove to be sufficient to prevent misappropriation of our technology or deter independent third-party development of similar technologies. We have in the past received letters claiming that our technology infringes the intellectual property rights of others. We have consulted with our patent counsel and have or are in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that our products infringe third party intellectual property rights. If we are found to have infringed third party rights, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert our management's resources, cause product shipment delays or require us to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to us, if at all.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

Employees

As of December 31, 2005, we had 156 employees, of which 128 were located in the United States, and 28 were located outside the United States in Israel, Canada, Europe and Asia. We had 46 employees in research and development, 63 in marketing, sales and customer support, 19 in operations and 28 in general and administrative functions.

As of December 19, 2006, we had 114 employees, of which 99 were located in the United States, and 15 were located outside the United States in Israel, Canada, Europe and Asia. We had 49 employees in research and development, 33 in marketing, sales and customer support, 16 in operations and 16 in general and administrative functions. In connection with our most recent decision in January 2006 to discontinue HAS products, we implemented a headcount reduction that resulted in a charge of $0.6 million through December 31, 2006. None of our employees are represented by collective bargaining agreements. We believe that our relations with our employees are good.

Access to Our Reports

Our Internet Web site address is www.terayon.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to

18

--------------------------------------------------------------------------------

Table of Contents

Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (Exchange Act) are available free of charge through our Web site as soon as reasonably practicable after they are electronically filed with, or furnished to, the Commission. We will also provide those reports in electronic or paper form free of charge upon a request made to Mark A. Richman, Chief Financial Officer, c/o Terayon Communication Systems, Inc., 2450 Walsh Avenue, Santa Clara, CA 95051. Furthermore, all reports we file with the Commission are available free of charge via EDGAR through the Commission's Web site at www.sec.gov. In addition, the public may read and copy materials filed by us at the Commission's public reference room located at 100 F. Street, N.E., Washington, D.C., 20549 or by calling 1-800-SEC-0330.

19

--------------------------------------------------------------------------------

Table of Contents

Item 1A.Risk Factors

The following is a summary description of some of the many risks we face in our business. You should carefully review the risks described below before making an investment decision. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment. You should also consider the other information described in this report.
Risks Related to the Restatement
The restatement of our consolidated financial statements has had a material adverse impact on us, including increased costs, the delisting of our common stock from The NASDAQ Stock Market, the increased possibility of legal or administrative proceedings, and a default under our subordinated note agreement. As a result of the restatement process, we have become subject to a number of additional risks and uncertainties, including the following:

*We have incurred substantial unanticipated costs for accounting and legal fees in the year ended December 31, 2005 and continue to incur such costs in the year ended December 31, 2006 in connection with the restatement. Although the restatement is complete, we expect to incur additional costs as indicated below.

*We face an increased risk of being subject to legal or administrative proceedings. In December 2005, the Commission issued a formal order of investigation in connection with our accounting review of certain customer transactions. This investigation has diverted and will continue to divert more of our management's time and attention and continue to cause us to incur substantial costs. Such investigations can also lead to fines or injunctions or orders with respect to future activities, as well as further substantial costs and diversion of management's time and attention.

*On June 23, 2006, a securities litigation lawsuit based on the events concerning the restatement was filed against us and certain of our current and former executive officers. In connection with this litigation and any further litigation that is pursued or other relief sought by persons asserting claims for damages allegedly resulting from or based on this restatement or events related thereto, we will incur defense costs that may include the amount of our deductible and defense costs exceeding our insurance coverage regardless of the outcome. Additionally, we may incur costs if the insurers of our directors and our liability insurers deny coverage for the costs and expenses related to any litigation. Likewise, such events may divert our management's time and attention away from the operation of the business. If we do not prevail in any such actions, we could be required to pay substantial damages or settlement costs.

*We were de-listed from The NASDAQ Stock Market because we were unable to file our periodic reports with the Commission on a timely basis. This failure was attributable to our inability to complete the restatement of our consolidated financial statements for prior periods. As previously disclosed on our Current Reports on
Form 8-K
filed on November 22, 2005 and January 20, 2006, NASDAQ notified us of its intention to de-list our common stock based on our failure to timely file our Quarterly Report on
Form 10-Q
for the quarter ended September 30, 2005, and our failure to solicit proxies and hold an annual shareholders' meeting during 2005. On March 31, 2006, The NASDAQ Listing and Qualifications Panel determined to de-list our securities from The NASDAQ Stock Market effective as of the opening of business on April 4, 2006, and our common stock currently trades on the Pink Sheets. See our risk factor entitled "Our common stock has been de-listed from The NASDAQ Stock Market and trades on the Pink Sheets." We may be unable to relist on The NASDAQ Stock Market because we may not be able to meet the initial listing requirements.

*Because we were unable to timely file our Quarterly Report on Form
10-Q
for September 30, 2005, we defaulted on our Notes. On March 21, 2006, we paid off the entire principal amount of outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million. As a result, our repayment of the Notes reduced our unrestricted cash, decreased our liquidity and could materially impair our ability to operate our business especially if we are unable to generate positive cash flow from operations.

20

--------------------------------------------------------------------------------

Table of Contents

\*The restatement may also result in other negative ramifications, including the potential loss of confidence by suppliers, customers, employees, investors, and security analysts, the loss of institutional investor interest and fewer business development opportunities.

Material weaknesses or deficiencies in our internal control over financial reporting could harm stockholder and business confidence in our financial reporting, our ability to obtain financing and other aspects of our business. Maintaining an effective system of internal control over financial reporting is necessary for us to provide reliable financial reports. We have restated our consolidated financial statements for the years ended December 31, 2000, 2002, 2003 and 2004 and for the four quarters in 2004 and the first two quarters of 2005. As described in Item 9A -- Controls and Procedures of this Form 10-K, management, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO), conducted an evaluation of disclosure controls and procedures. Based on that evaluation, the CEO and CFO concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2005 and as of the filing date of this Form 10-K due to the material weaknesses discussed below. Because the material weaknesses described below have not been remediated as of the filing date of this Form 10-K, the CEO and CFO continue to conclude that our disclosure controls and procedures are not effective as of the filing date of this Form 10-K. A material weakness in internal control over financial reporting is defined by the Public Company Accounting Oversight Board's Audit Standard No. 2 as being a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements would not be prevented or detected. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects our ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles (GAAP) such that there is more than a remote likelihood that a misstatement of the annual or interim financial statements that is more than inconsequential will not be prevented or detected.
We were not able to fully execute the remediation plans that were established to address material weaknesses previously identified in 2004. As a result, these material weaknesses were not fully remediated and remain ongoing as of December 31, 2005 and as of the date of this filing.
We have identified the following material weaknesses as of December 31, 2005:

\*insufficient controls related to the identification, capture and timely communication of financially significant information between certain parts of the organization and the accounting and finance department to enable these departments to account for transactions in a complete and timely manner;

\*lack of sufficient personnel with technical accounting experience in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP;

\*failure in identifying the proper recognition of revenue in accordance with GAAP, including revenue recognized in accordance with American Institute of Certified Accountants Statement of Position (SOP) 97-2,
\*Software Revenue Recognition"
(SOP 97-2),
SOP 81-1,
\*Accounting for Performance of Construction-Type and Certain Production-Type Contracts"
(SOP 81-1),
Financial Accounting Standards Board, Emerging Issues Task Force (EITF) 00-21,
\*Accounting for Revenue Arrangements with Multiple Deliverables" (EITF 00-21);

\*the use of estimates, including monitoring and adjusting balances related to certain accruals and reserves, including allowance for doubtful accounts, legal charges, license fees, restructuring charges, taxes, warranty obligations, fixed assets and bond issue costs;

\*lack of sufficient analysis and documentation of the application of GAAP; and

\*ineffective controls over the documentation, authorization and review of manual journal entries and ineffective controls to ensure the accuracy and completeness of certain general ledger account reconciliations conducted in connection with period end financial reporting.

21

--------------------------------------------------------------------------------

Table of Contents

For further information about these material weaknesses, please see Item 9A -- Controls and Procedures -- Management's Report on Internal Control over Financial Reporting included in this Form 10-K. Because of these material weaknesses, management concluded that, as of December 31, 2005, our internal control over financial reporting was not effective.

Because we have concluded that our internal control over financial reporting is not effective and our independent registered public accountants issued an adverse opinion on the effectiveness of our internal controls, and to the extent we identify future weaknesses or deficiencies, there could be material misstatements in our consolidated financial statements and we could fail to meet our financial reporting obligations.

While we are in the process of implementing the remediation efforts described in Item 9A -- Controls and Procedures -- Remediation Steps to Address Material Weaknesses, we may continue to experience difficulties or delays in implementing measures to remediate the material weaknesses. Additionally, if the remedial measures are insufficient to address the identified material weaknesses or if additional material weaknesses or significant deficiencies in our internal controls are discovered in the future, we may fail to meet our future reporting obligations on a timely basis, our financial statements may contain material misstatements, our operating results may be harmed, and we may be subject to litigation.

Any failure to address the identified material weaknesses or any additional material weaknesses or significant deficiencies in our internal controls could also adversely affect the results of future management evaluations and auditor attestation reports regarding the effectiveness of our internal control over financial reporting that are required under Section 404 of the Sarbanes-Oxley Act of 2002.

Any material weakness or unsuccessful remediation could affect investor confidence in the accuracy and completeness of our financial statements. As a result, our ability to obtain any additional financing, or additional financing on favorable terms, could be materially and adversely affected, which, in turn, could materially and adversely affect our business, our strategic alternatives, our financial condition and the market value of our securities. In addition, perceptions of us among customers, lenders, investors, securities analysts and others could also be adversely affected. Current material weaknesses or any weaknesses or deficiencies identified in the future could also hurt confidence in our business and the accuracy and completeness of our financial statements, and adversely affect our ability to do business with these groups.

We can give no assurances that the measures we have taken to date, or any future measures we may take, will remediate the material weaknesses identified or that any additional material weaknesses will not arise in the future due to our failure to implement and maintain adequate internal controls over financial reporting. In addition, even if we are successful in strengthening our controls and procedures, those controls and procedures may not be adequate to prevent or identify irregularities or ensure the fair presentation of our financial statements included in our periodic reports filed with the Commission.

Our revenue recognition policy on digital video products has been corrected.

We now recognize revenue from our digital video products under SOP 97-2, SAB 104 and EITF 00-21. Our new revenue recognition policy under these accounting standards is complex. We rely upon key accounting personnel and consultants to maintain and implement the controls surrounding such policy. If the policy is not applied on a consistent basis or if we lose any of our key accounting personnel or consultants the accuracy of our consolidated financial statements could be materially affected. This could cause future delays in our earnings announcements, regulatory filings with the Commission and potential delays in listing with a securities exchange.

Our common stock has been de-listed from The NASDAQ Stock Market and trades on the Pink Sheets.

Effective April 4, 2006, our common stock was delisted from The NASDAQ Stock Market and was subsequently quoted by the National Quotation Service Bureau (Pink Sheets). The trading of our common stock on the Pink Sheets may reduce the price of our common stock and the levels of liquidity available to our stockholders. In addition, the trading of our common stock on the Pink Sheets may materially and adversely affect our access to the capital markets, and the limited liquidity and reduced price of our common stock could materially and adversely affect our ability to raise capital through alternative financing sources on terms acceptable to us or at

22

--------------------------------------------------------------------------------

Table of Contents

all. Stocks that trade on the Pink Sheets are no longer eligible for margin loans, and a company trading on the Pink Sheets cannot avail itself of federal preemption of state securities or "blue sky" laws, which adds substantial compliance costs to securities issuances, including pursuant to employee option plans, stock purchase plans and private or public offerings of securities. Our delisting from The NASDAQ Stock Market and quotation on the Pink Sheets may also result in other negative ramifications, including the potential loss of confidence by suppliers, customers, employees, investors, and security analysts, the loss of institutional investor interest and fewer business development opportunities.

If we are not able to become or remain current in our filings with the Commission, we will face several adverse consequences.

If we are unable to become and remain current in our financial filings, we will face several restrictions. We will not be able to have a registration statement under the Securities Act of 1933, covering a public offering of securities, declared effective by the Commission, or make offerings pursuant to existing registration statements; we will not be able to make an offering to any purchasers not qualifying as "accredited investors" under certain "private placement" rules of the Commission under Regulation D; we will not be eligible to use a "short form" registration statement on Form S-3 for a period of at least 12 months after the time we become current in our periodic and current reports under the Securities Exchange Act of 1934, as amended (Exchange Act); we will not be able to deliver the requisite annual report and proxy statement to our stockholders to hold our annual stockholders meeting; our employees cannot be granted stock options, nor will they be able to exercise stock options registered on Form S-8, as Form S-8 is currently not available to us; and our common stock may not be eligible for re-listing on The NASDAQ Stock Market or alternative exchanges. These restrictions may impair our ability to raise funds in the public markets, should we desire to do so, and to attract and retain employees.

Risks Related to Our Business

We have a history of losses and may continue to incur losses in the future. It is difficult to predict our future operating results. We began shipping products commercially in June 1997, and we have been shipping products in volume since the quarter ended March 31, 1998. As of December 31, 2005, we had an accumulated deficit of approximately $1.1 billion. We believe that we will continue to experience challenges in selling our products at a profit and may continue to operate with net losses for the foreseeable future.

As a result of our losses, we have had to use available cash and cash equivalents to supplement the operation of our business. Additionally, we generally have been unable to significantly reduce our short-term expenses in order to compensate for unexpected decreases in anticipated revenues or delays in generating anticipated revenues. For example, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price irrespective of whether we can subsequently use such quantities in our products. In addition, we have significant operating lease commitments for facilities and equipment that generally cannot be cancelled in the short-term without substantial penalties, if at all.

We depend on capital spending from the cable, satellite and telecommunications industries for our revenues, and any decrease or delay in capital spending in these industries would negatively impact our revenues, financial condition and cash flows.

Historically, a significant portion of our revenues have been derived from sales to cable television operators. Future demand for our products will depend on the magnitude and timing of capital spending by cable television operators, satellite operators, telephone companies and broadcasters for constructing and upgrading their systems. Customers view the purchase of our products as a significant and strategic decision. Digital video, movie and broadcast products are relatively complex and their purchase generally involves a significant commitment of capital. Our customers' capital spending patterns are dependent on a variety of factors, including:

*Cable and satellite operators and telecom providers' access to financing;

*Annual budget cycles, and the typical reduction in upgrade projects during the winter months;

*Impact of industry consolidation and financial restructuring;

23

--------------------------------------------------------------------------------

Table of Contents

*Federal, local and foreign government regulation of telecommunications and
 television broadcasting;

*Overall demand for communication services and acceptance of new video, voice
 and data services;

*Evolving industry standards and network architecture;

*Delays associated with the evaluation of new services, new standards, and
 system architectures by cable and satellite operators and telecom providers;

*An emphasis on generating revenue from existing customers by operators instead
 of new construction or network upgrades;

*Competitive pressures, including pricing pressures; and

*General economic conditions.

Financial and budgetary pressures on our existing and potential customers in the
cable, satellite and telecom industries will adversely impact purchasing
decisions and may cause delays in the purchase of our products. Any one of the
above factors could impact spending by cable operators on digital video
equipment and thus could impact our business and result in excess inventory,
decreased sales and revenue or other adverse effects.
Due to the lengthy sale cycle involved in the sale of our products, our
financial results may vary and should not be relied on as an indication of
future performance.
Our products have a lengthy and unpredictable sales cycle that contributes to
the uncertainty of our operating results. Our customers' decision to purchase
our products is often accompanied by delays frequently associated with large
capital expenditures and implementation procedures within an organization. Our
customers generally conduct significant technical evaluations, including
customer trials, of our products as well as competing products prior to making a
purchasing decision. Moreover, the purchase of these products typically requires
coordination and agreement among a potential customer's corporate headquarters
and regional and local operations. Even if corporate headquarters agrees to
purchase our products, local operations may retain a significant amount of
autonomy and may not elect to purchase our products. Additionally, a portion of
our expenses related to anticipated orders is fixed and is difficult to reduce
or change, which may further impact our revenues and operating results for a
particular period.
We expect that there will be fluctuations in the number and value of orders
received. Because of the lengthy sales cycle and the size of customer orders, if
orders forecasted for a specific customer for a particular period do not occur
in that period, our revenues and operating results for that particular period
could suffer. As a result, period-to-period comparisons of our results of
operations are not necessarily meaningful, and these comparisons should not be
relied upon as indications of future performance.
Additionally, because of the lengthy sales cycle combined with a lengthy product
development cycle, our customers may elect not to purchase our products or new
features or functionality because they have elected to select alternate
technologies or vendors. We may be unable to forecast the new products, features
or functionality desired by our customers. We may spend considerable research
and development dollars without having our products, features or functionality
be accepted in the market. Because we are now focused solely on the development
of digital video products, our inability to develop products, features and
functionality that our customers might purchase would have a significant impact
on us, and would adversely affect sales, revenue, margins and the cash available
for future development efforts.
We may continue to experience fluctuations in our operating results and face
unpredictability in our future revenues.
Our revenues have fluctuated and are likely to continue to fluctuate
significantly in the future due to a number of factors, many of which we cannot
control. Period-to-period comparisons of our operating results are not
necessarily meaningful, and these comparisons should not be relied upon as
indications of the future. Because these factors are difficult for us to
forecast, our business, financial condition and results of operations from one
period or a series of periods may be adversely affected and may be below the
expectations of analysts and investors, resulting in

24

--------------------------------------------------------------------------------

Table of Contents

a decrease in the market price of our common stock. Our business and product mix has also changed in the past several years based on our business restructuring, making historical comparisons more unreliable as indicators of future performance.

Factors that affect our revenues include, among others, the following:

*The sales cycle and timing of significant customer orders, which are dependent on the capital spending budgets of cable and satellite operators, telecom providers and other customers;

*Variations in the size of the orders by our customers and pricing concessions on volume sales;

*Competitive market conditions, including pricing actions by our competitors;

*New product introductions or the introduction of added features or functionality to products by competitors or by us;

*Delays in our introduction of new products, in our introduction of added features or functionality to our products, or our commercialization of products that are competitive in the marketplace;

*International conflicts, including the continuing conflict in Iraq, and acts of terrorism, and the impact of adverse economic, market and political conditions worldwide;

*The ability of our products to be qualified or certified as meeting industry standards
and/or
customer standards;

*Changes in market demand;

*Economic and financial conditions specific to the cable, satellite and telecom industries, and general economic conditions;

*Timing of revenue recognition;

*Changes in domestic and international regulatory environments;

*Market acceptance of new and existing products;

*The mix of our customer base, sales channels and our products sold;

*The level of international sales; and

*Delays in our receipt of, or cancellation of, orders forecasted by customers.

Our financial results are affected by the gross margin we achieve for the year relative to our gross revenues. A variety of factors influence our gross margin for a particular period, including, among others, the following:

*The sales mix of our products, the volume of products manufactured, and the average selling prices (ASPs) of our products;

*The costs of manufacturing our products;

*Delays in reducing the cost of our products and the effectiveness of our cost reduction measures;

*The type of distribution channel through which we sell our products; and

*Our ability to manage excess and obsolete inventory.

Our expenses for any given quarter are based on expected sales and if sales are below expectations, our operating results may be adversely impacted by our inability to adjust spending to compensate for the shortfall in revenue. We often recognize a substantial portion of our revenues in the last month of the quarter. We establish our expenditure levels for product development and other operating expenses based on projected sales levels, and expenses are relatively fixed, particularly in the short term. For example, a significant percentage of these operating expenses are fixed due to operating leases for our facilities and equipment. Also, we have fixed commitments with

25

--------------------------------------------------------------------------------

Table of Contents

some of our suppliers that require us to purchase minimum quantities of their products at a specified price. Because we have in the past been unable to use all of the products that we purchased from our suppliers, we have taken vendor cancellation charges as a result of these fixed commitments, and we may have to take additional charges in the future if we are unable to use all of the products that we purchase from our suppliers. As of December 31, 2005, $12.1 million of purchase obligations were outstanding. The obligations are generally expected to become payable at various times throughout 2006. Our expenses for any given quarter are typically based on expected sales and if sales are below expectations, our operating results may be adversely impacted by our inability to adjust spending to compensate for the shortfall. Moreover, our research and development expenses fluctuate in response to new product development, changing industry requirements and customer demands.

Because our customer base is highly concentrated among a limited number of large customers, the loss of or reduced demand from these customers could have a material adverse effect on our business, financial condition and results of operations.

Our customers in the cable industry have undergone and continue to undergo significant consolidation in both North America and internationally, as a limited number of cable operators control an increasing number of systems. We expect this consolidation to continue in the foreseeable future. As of June 2006, the top ten US Multiple System Operators (MSOs) (based on total subscribers) collectively served 58.2 million cable subscribers, which is approximately 89% of the total 65.6 million cable subscribers in the US, according to Kagan Research, LLC. The top 10 MSOs are Comcast Corporation; Time Warner Cable; Cox Communications, Inc.; Charter Communications, Inc.; Adelphia Communications Corporation; Cablevision System Corporation; Brighthouse Networks; Mediacom LLC; Insight Communications Company, Inc.; and CableOne. As a result of the consolidation among cable operators, our revenues from digital video products has been and will continue to be highly concentrated among a limited number of large customers.

Typically, our sales are made on a purchase order or system contract basis, and none of our customers has entered into a long-term agreement requiring it to purchase our products. Moreover, we do not typically require our customers to purchase a minimum quantity of our products, and our customers can generally cancel or significantly reduce their orders on short notice without significant penalties. Our sales to these customers tend to vary significantly from year to year depending on the customer's budget for capital expenditures and our new product introductions and improvements. A significant amount of our revenues will continue to be derived from a limited number of large customers. The loss of or reduced demand for products from any of our major customers could have a material adverse effect on our business, financial condition and results of operations. Also, we may not succeed in attracting new customers as many of our potential customers have pre-existing relationships with our current or potential competitors and the continued consolidation of the cable industry may also reduce the number of potential customers. To attract new customers and retain existing customers, we may be faced with price competition, which may adversely affect our gross margins and revenues.

A portion of our sales are made to a small number of resellers, who often incorporate our products and applications in systems that are sold to an end-user customer, which is typically a cable operator, satellite provider or broadcast operator. If one or more of these resellers develop their own products or elect to purchase similar products from another vendor, our ability to generate revenue and our results of operations may suffer.

We are attempting to diversify our customer base beyond cable and satellite customers, principally into the telecom market, as well as the broadcast market. Major telecom operators have begun to implement plans to rebuild or upgrade their networks to offer bundled video, voice and data services. In order to be successful in this market, we may need to build alliances with integrators that sell telecom equipment to the telecom operators, adapt our products for telecom applications, adopt pricing specific to the telecom industry and the integrators that sell to the telecom operators, and build internal expertise to handle particular contractual and technical demands of the telecom industry. As a result of these and other factors, we cannot give any assurances that we will be able to increase our revenues from the telecom market, or that we can do so profitably, and any failure to generate revenues and profits from telecom customers could adversely affect our business, financial condition and results of operations.

26

--------------------------------------------------------------------------------

Table of Contents

The reductions in workforce associated with our restructuring efforts could disrupt the operation of our business, distract our management from focusing on revenue-generating efforts, result in the erosion of employee morale, and impair our ability to respond rapidly to growth opportunities in the future.

We have implemented a number of restructuring plans since 2001. The employee reductions and changes in connection with our restructuring activities, as well as any future changes in senior management and key personnel, could result in an erosion of morale, and affect the focus and productivity of our remaining employees, including those directly responsible for revenue generation and the management and administration of our accounting and finance department, which in turn may adversely affect our future revenues or cause other administrative deficiencies. Additionally, employees directly affected by the reductions may seek future employment with our business partners, customers or competitors. Although all employees are required to sign a proprietary information agreement with us at the time of hire, there can be no assurances that the confidential nature of our proprietary information will be maintained in the course of such future employment. Additionally, we may face wrongful termination, discrimination, or other claims from employees affected by the reductions related to their employment and termination. We could incur substantial costs in defending ourselves or our employees against such claims, regardless of the merits of such actions. Furthermore, such matters could divert the attention of our employees, including management, away from our operations, harm productivity, harm our reputation and increase our expenses. We cannot assure you that our restructuring efforts will be successful, and we may need to take additional restructuring efforts, including additional personnel reductions, in the future.

We are dependent on key personnel.

Due to the specialized nature of our business, we are highly dependent on the continued service of and on our ability to attract and retain qualified senior management, accounting and finance, engineering, sales and marketing personnel and employees with significant experience and expertise in video, data networking and radio frequency design. The competition for some of these personnel is intense, particularly for engineers with Motion Picture Experts Group (MPEG), Internet Protocol (IP) and real time processing experience. We may incur additional expenses to attract and retain key personnel. We have also recently experienced turnover in our accounting and finance organization and have augmented internal resources to address staffing deficiencies primarily through the engagement of external contractors. Additionally, we have retained FTI Consulting, Inc. to provide accounting services, which has increased operating expenses, and we may be unable to prepare our financial statements without their assistance. There can be no assurances that the additional expenses we may incur, or our efforts to recruit such individuals, will be successful. Additionally, we do not have key person insurance coverage for the loss of any of our employees. Any officer or employee can terminate his or her relationship with us at any time. Our employees generally are not bound by non-competition agreements. The loss of the services of any key personnel, or our inability to attract or retain qualified personnel could have a material adverse effect on our business, financial condition and results of operations.

Our future growth depends on developments in the digital video industry, on the adoption of new technologies and on several other industry trends.

Future demand for our products will depend significantly on the growing market acceptance of several emerging services, including digital video, high definition television (HDTV), IP-based TV, ad insertion, and logo overlays. The effective delivery of these services will depend, in part, on a variety of new network architectures and standards, such as: FTTP and DSL networks designed to facilitate the delivery of video services by telecom operators; new video compression standards such as MPEG-4/H.264; the greater use of protocols such as IP; and the introduction of new consumer devices, such as advanced set-top boxes and DVRs. If adoption of these emerging services and/or technologies is not as widespread or as rapid as we expect, or if we are unable to develop new products based on these technologies on a timely basis, our net sales growth will be materially and adversely affected.

Furthermore, other technological, industry and regulatory trends will affect the growth of our business. These trends include the following:

*Convergence, or the desire of certain network operators to deliver a package of
 video, voice and data services to consumers, also known as the "triple play;"

27

--------------------------------------------------------------------------------

*The use of digital video applications by businesses, governments and educators;

*The entry of telecom providers into the video business to allow them to offer the "triple play" purchase of services;

*Efforts by regulators and governments in the United States and abroad to encourage the adoption of broadband and digital technologies; and

*The extent and nature of regulatory attitudes towards such issues as competition between operators, access by third parties to networks of other operators, and local franchising requirements for telecom companies to offer video.

If, for instance, operators do not pursue the "triple play" or new video products and technology aggressively or in the timeline we expect, our ability to sell our digital video products and grow our revenues will be materially and adversely affected.
The markets in which we operate are characterized by rapidly changing technology, and we need to develop and introduce new and enhanced products in a timely manner to remain competitive.
The markets in which we operate are characterized by rapidly changing technologies, evolving industry standards, frequent new product introductions and relatively short product life. To compete successfully in the markets in which we operate, we must design, develop, manufacture and sell new or enhanced products that provide increasingly higher levels of performance and reliability. Digital video markets are relatively immature, making it difficult to accurately predict the markets' future growth rates, sizes or technological directions. In view of the evolving nature of these markets, network operators and content aggregators may decide to adopt alternative architectures, industry standards or technologies that are incompatible with our current or future video products and applications. The development and greater market acceptance of new architectures, industry standards or technologies could decrease the demand for our products or render them obsolete, and could negatively impact the pricing and gross margin of our digital video products. Our competitors, many of which have greater resources than we do, may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products. If we are unable to design, develop, manufacture and sell products that incorporate or are compatible with these new architectures, industry standards or technologies, our business and financial results will be materially and adversely impacted. Our ability to realize revenue growth depends on our ability to:

*Develop, in a timely manner, new products and applications that keep pace with developments in technology;

*Develop products that are cost effective;

*Meet evolving customer requirements;

*Enhance our current product and applications offerings; and

*Achieve market acceptance.

The pursuit of necessary technological advances and the development of new products require substantial time and expense. We may not be able to successfully develop or introduce new or enhanced products if they are not cost effective, are not brought to the market in a timely manner, are not in accordance with evolving industry standards and architecture, fail to achieve market acceptance, or are ahead of the market. If the technologies we are currently developing or intend to develop do not achieve feasibility or widespread market acceptance, our business will be materially and adversely impacted. In addition, in order to successfully develop and market certain of our current or future digital video products, we may be required to enter into technology development or licensing agreements with third parties. Failure to enter into development or licensing agreements, when necessary, could limit our ability to develop and market new products and could cause our operating results to suffer. The entry into such development or licensing agreements may not be on terms favorable to us and could negatively impact our gross margins.

--------------------------------------------------------------------------------

Table of Contents

Average selling prices of our digital video products may decline, which would materially and adversely affect our financial performance.

The ASPs for our digital video products may decline due to the introduction of new products, the adoption of new industry standards, the entry into licensing agreements, an increase in the number of competitors, competitive pricing pressures, promotional programs and customers possessing strong negotiating positions which require price reductions as a condition of purchase. The adoption of industry standards and specifications may erode ASPs on our digital video products if the adoption of such standards lead to the commoditization of products similar to ours. The entry into technology development or licensing agreements, as necessitated by industry developments and business needs, could also reduce our ASPs. Decreasing ASPs may also require us to sell our products at much lower gross margins than in the past, and could result in decreased revenues even if the number of units that we sell increases. We may experience substantial period-to-period fluctuations in future revenue, gross margin and operating results due to ASP erosion in our digital video products. Therefore, we must continue to develop and introduce on a timely basis and a cost-effective manner new products or next-generation products with enhanced functionalities that can be sold at higher gross margins. If we fail to do so, our revenues and gross margins may decline further.

We must achieve cost reductions or increase revenues to attain profitability.

In order to achieve profitability, we must significantly increase our revenues, continue to reduce the cost of our products, and maintain or reduce our operating expenses. In prior years, we experienced revenue declines which were, in large part, due to declining product ASPs resulting from our transition from a proprietary platform to the Data Over Cable System Interface Specification (DOCSIS) standards platform. Although we have implemented expense reduction and restructuring plans in the past that have focused on cost reductions and operating efficiencies, we continue to operate at a loss. A large portion of our expenses, including rent and operating lease expenditures, is fixed and difficult to reduce or change. Accordingly, if our revenue does not meet our expectations, we may not be able to adjust our expenses quickly enough to compensate for the shortfall in revenue which, in turn, could materially and adversely impact our business, financial condition and results of operations. While we continue to work to reduce the cost of our products through design and engineering changes, we may not be successful in redesigning our products, and, even if we are successful, our efforts may be delayed or our redesigned products may contain significant errors and product defects. In addition, any redesign may not result in sufficient cost reductions to allow us to reduce significantly the prices of our products or improve our gross margins. Reduction in our product costs may require us to use lower-priced components that are highly integrated in future products and may require us to enter into high volume or long-term purchase or manufacturing agreements. Volume purchase or manufacturing agreements may not be available on acceptable terms, if at all, and we could incur significant expenses without related revenues if we cannot use the products or services offered by such agreements. We have incurred significant vendor cancellation charges related to volume purchases and manufacturing agreements in the past and may incur such charges in the future.

Our repayment of our Notes could adversely affect our financial condition, and we may not be able to raise additional funds to continue operating our business.

Our main source of liquidity continues to be our unrestricted cash and cash equivalents on hand. As a result of our history of operating losses, we expect to continue to use our unrestricted cash to fund operating losses in the future. Our unrestricted cash, cash equivalents and short-term investments totaled $101.3 million and $97.7 million as of December 31, 2005 and 2004, respectively. On March 21, 2006, we paid off the entire principal amount of the outstanding Notes due August 2007, including all accrued and unpaid interest thereon and related fees, for an aggregate amount of $65.6 million. Our repayment in full of the Notes reduced our unrestricted cash, decreased our liquidity and could materially impair our ability to operate our business, especially if we are unable to generate positive cash flow from operations.

If our operating losses are more severe than expected or continue longer than expected, we may find it necessary to seek other sources of financing to support our operations and to provide available funds for working capital. We may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to

29

--------------------------------------------------------------------------------

Table of Contents

unanticipated requirements. We may seek to raise additional funds through private or public sales of securities, strategic relationships, bank debt, and financing under leasing arrangements or otherwise. If additional funds are raised through the issuance of equity securities, the percentage ownership of our current stockholders will be reduced, stockholders may experience additional dilution or such equity securities may have rights, preferences or privileges senior to those of the holders of our common stock. No assurances can be given that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition, operating results and liquidity.

Substantially all of our future revenue will be derived from the sale of our digital video products, and our operating results, financial conditions and cash flows will depend upon our ability to generate sufficient revenue from the sale of our digital video products.

In January 2006 we announced that we will focus solely on our digital video products and applications. Accordingly, we are susceptible to adverse trends affecting this market segment, including technological obsolescence and the entry of new competition. We expect that this market may continue to account for substantially all of our revenue in the near future. As a result, our future success depends on our ability to continue to sell our digital video products and applications, the gross margin of such sales, our ability to maintain and increase our market share by providing other value-added services to the market, and our ability to successfully adapt our technology and services to other related markets. Markets for our existing services and products may not continue to expand and we may not be successful in our efforts to penetrate new markets.

We may be unable to provide adequate customer support.

Our ability to achieve our planned sales growth and retain current and future customers will depend in part upon the quality of our customer support operations. Our customers generally require significant support and training with respect to our products, particularly in the initial deployment and implementation stages. Spikes in demand of our support services may cause us to be unable to serve our customers adequately. We may not have sufficient personnel to provide the levels of support that our customers may require during initial product deployment or on an ongoing basis especially during peak periods. Our inability to provide sufficient support to our customers could delay or prevent the successful deployment of our products. In addition, our failure to provide adequate support could harm our reputation and relationships with our customers and could prevent us from selling products to existing customers or gaining new customers.

Furthermore, we may experience transitional issues relating to customer support in connection with our decision to dispose of or discontinue various investments and product lines. We may incur liability associated with customers' dissatisfaction with the level of customer support maintained for discontinued product lines.

The deployment process for our equipment may be lengthy and may delay the receipt of new orders and cause fluctuations in our revenues.

The timing of deployment of our equipment can be subject to a number of other risks, including the availability of skilled engineering and technical personnel, the availability of other equipment such as fiber optic cable, and the need for local zoning and licensing approvals. We believe that changes in our customers' deployment plans have delayed, and may in the future delay, the receipt of new orders. Since the majority of our sales have been to relatively few customers, a delay in equipment deployment with any one customer could have a material adverse effect on our sales for a particular period.

We may have financial exposure to litigation.

We and/or our directors and officers are defendants in a number of lawsuits, including securities litigation lawsuits and patent litigation. See Item 3 -- Legal Proceedings for more information regarding our litigation. As a result, we may have financial exposure to litigation as a defendant and because we are obligated to indemnify our officers and members of our Board of Directors for certain actions taken by our officers and directors on our behalf.

30

--------------------------------------------------------------------------------

Table of Contents

In order to limit financial exposure arising from litigation and/or our obligation to indemnify our officers and directors, we have historically purchased directors' and officers' insurance (D&O Insurance). There can be no assurance that D&O Insurance will be available to us in the future or, if D&O Insurance is available, that it will not be prohibitively expensive.

If there is no insurance coverage for the litigation or, even if there is insurance coverage, if a carrier is subsequently liquidated or placed into liquidation, we will be responsible for the attorney fees and costs resulting from the litigation. The incurrence of significant fees and expenses in connection with the litigation could have a material adverse effect on our results of operations.

The loss of existing reseller and system integrator relationships or the failure to establish new relationships or strategic partnerships could have a material adverse effect on our business, financial conditions and results of operations. Our products have been traditionally sold to large cable operators and satellite operators with recent, limited sales to television broadcasters. A portion of our sales are made to a small number of resellers and system integrators, who often incorporate our products and applications in systems that are sold to an end-user customer, which is typically a cable operator, satellite provider or broadcast operator. The resale relationships provide an opportunity to sell our products to our resellers' customer bases. We rely upon these resellers for recommendations of our products during the evaluation stage of the purchasing process, as well as for implementation and customer support services. A number of our competitors also have strong relationships with the resellers. Although we intend to establish new strategic relationships with leading resellers worldwide to gain access to new customers, including telecom providers, we may not succeed in establishing these relationships. Even if we do establish and maintain these relationships, our resellers or strategic partners may not succeed in marketing our products to their customers. Some of our competitors have established long-standing relationships with cable, satellite and telecom operators that may limit our and our resellers' ability to sell our products to those customers. Even if we were to sell our products to those customers, it would likely not be based on long-term commitments, and those customers would be able to terminate their relationships with us at any time without significant penalties. Our resellers or strategic partners may also terminate their relationship with us upon short notice without significant penalties.

Based on our sole focus on our digital video products, the reduction of our sales force, and our increasing focus on the telecom market, we are increasingly reliant on resellers and system integrators. In order to successfully market to telecom companies, we believe we will need to build alliances with system integrators that sell telecom equipment to the telecom operators. We may be unsuccessful in maintaining our current reseller and system integrator relationships as well as attracting system integrators that sell to telecom companies.

Some of our resellers and system integrators have sold in the past, and may sell in the future, products that compete with our products. The loss of existing reseller and system integrator relationships or the failure to establish new relationships or strategic partnerships could have a material adverse effect on our business, financial condition and results of operations.

We may fail to accurately forecast customer demand for our products, which could have a negative impact on our customer relationships and our revenues. The nature of the broadband industry makes it difficult for us to accurately forecast demand for our products. Our inability to forecast accurately the actual demand for our products may result in too much or too little supply of products or an over/under capacity of manufacturing or testing resources at any given point in time. The existence of any one or more of these situations could have a negative impact on our business, operating results or financial condition. We have incurred significant vendor cancellation charges related to volume purchase and manufacturing agreements in the past and may incur such charges in the future. We had purchase obligations of approximately $12.1 million as of December 31, 2005, related to purchase minimum quantities of materials and components used to manufacture our products. We may be obligated to fulfill these purchase obligations even if demand for our products is lower than we anticipate.

Forecasting to meet our customers' demand is particularly difficult for our products. Our ability to meet customer demand will depend significantly on the availability of our single contract manufacturer. In recent years,

31

--------------------------------------------------------------------------------

in response to lower sales and falling ASPs, we significantly reduced our headcount and other expenses. As a result, we may be unable to respond to customer demand that increases more quickly than we expect. If we fail to meet customers' supply expectations, our sales would be adversely affected and we may lose key customer relationships.

We may not be able to manage expenses and inventory risks associated with meeting the demand of our customers.

From time to time, we receive indications from our customers as to their future plans and requirements to ensure that we will be prepared to meet their demand for our products. If actual orders differ materially from these indications, our ability to manage inventory and expenses may be affected. If we enter into purchase commitments to acquire materials, or expend resources to manufacture products and such products are not purchased by our customers, our business and operating results could suffer.

Although we generally do not have long term supply agreements with our customers and have limited backlog of orders for our products, we must maintain or have available sufficient inventory levels to satisfy anticipated demand on a timely basis. Maintaining sufficient inventory levels to ensure prompt delivery of our products increases the risk of inventory obsolescence and associated write-offs, which could harm our business, financial conditions and results of operations.

We are dependent on a key third-party manufacturer and any failure of our manufacturer could materially adversely affect our financial condition and operating results.

Our products are single sourced from a manufacturer in San Jose, California. Any interruption in the operations of our manufacturer could adversely affect our ability to meet our scheduled product deliveries to customers. If we experience delays or quality control problems or any failure from our current manufacturer, we may be unable to supply products in a timely manner to our customers. While we believe that there are alternative manufacturers available, we believe that the procurement from alternative suppliers could take several months. In addition, these alternative suppliers may not be able to supply us products that are functionally equivalent, or make our products available to us on a timely basis or on similar terms. Resulting delays, quality control problems or reductions in product shipments could materially and adversely affect on our financial performance, damage customer relationships, and expose us to potential damages that may arise from our inability to supply our customers with products. Further, a significant increase in the price of underlying components, such as our semiconductor components, could harm our gross margins or operating results. There may not be manufacturers that are able to meet our future volume or quality requirements at a price that is favorable to us. Any financial, operational, production or quality assurance difficulties experienced by our single manufacturer could harm our business and financial results.

Additionally, we attempt to limit this risk by maintaining safety stocks of these components, subassemblies and modules. As a result of this investment in inventories, we have in the past been and in the future may be subject to risk of excess and obsolete inventories, which could harm our business. In this regard, our gross margins and operating results could be adversely affected by excess and obsolete inventory.

Our products are assembled and tested by our single manufacturer using testing equipment that we provide. As a result of our dependence on the contract manufacturer for the assembly and testing of our products, we do not directly control product delivery schedules or product quality. Any product shortages or quality assurance problems could increase the costs of manufacturing, assembling or testing our products. In addition, as manufacturing volume increases, we will need to procure and assemble additional testing equipment and provide it to our contract manufacturer. The production and assembly of testing equipment typically require significant lead times. We could experience significant delays in the shipment of our products if we are unable to provide this testing equipment to our contract manufacturers in a timely manner.

We are dependent upon international sales and there are many risks associated with international operations, any of which could harm our financial condition and results of operations.

We are dependent upon international sales, even though we expect sales to customers outside of the United States to represent a significantly smaller percentage of our revenues for the foreseeable future compared to our historical

32

--------------------------------------------------------------------------------

revenues. For the years ended December 31, 2005, 2004 and 2003, approximately 42%, 47% and 45%, respectively, of our net revenues were from customers outside of the United States. We may be unable to maintain or increase international sales of our products. International sales are subject to a number of risks, including the following:

*Changes in foreign government regulations and communications standards;

*Import and export license requirements, tariffs and taxes, trade barriers and trade disputes;

*The uncertainty of laws and enforcement in certain countries relating to the protection of intellectual property;

*Difficulty in complying with environmental laws;

*Difficulty in collecting accounts receivable and longer payment cycles for international customers than those for customers in North America;

*Currency and exchange rate fluctuations;

*The burden of complying with a wide variety of foreign laws, treaties and technical standards;

*Difficulty in staffing and managing foreign operations;

*Specific social, political, labor and economic conditions, and political changes in international markets; and

*Multiple and possibly overlapping tax structures, potentially adverse tax consequences.

One or more of these factors may have a material adverse effect on our future operations and consequently, on our business, financial conditions and operating results.

While we generally invoice our foreign sales in U.S. dollars, we invoice some of our sales in Europe in Euros and local currency in other countries. Since we have also elected to take payment from our customers in local currencies and may elect to take payment in other foreign currencies in the future, we are exposed to losses as the result of foreign currency fluctuations. We currently do not engage in foreign currency hedging transactions. We may in the future choose to limit our exposure by the purchase of forward foreign exchange contracts or through similar hedging strategies. No currency hedging strategy can fully protect against exchange-related losses. In addition, if the relative value of the U.S. dollar in comparison to the currency of our foreign customers should increase, the resulting effective price increase of our products to our foreign customers could result in decreased sales. If our customers are affected by currency devaluations or general economic downturns, their ability to purchase our products could be reduced significantly.

We are subject to regulation by U.S. and foreign governments and qualification requirements by non-governmental agencies. If we are unable to obtain and maintain regulatory qualifications for our existing and future products, our financial results may be adversely affected.

The cable, satellite and telecom industries are subject to extensive regulation in the United States and in foreign countries, which may affect the sale of our products and the growth of our business domestically and internationally. The growth of our business and our financial performance depend in part on regulations in these industries. Our products are also subject to qualification, clearance, and approval in certain countries, and we cannot make any assurances that we will be able to maintain these qualifications, clearances or approvals in all the countries in which we operate. If we do not comply with the applicable regulatory requirements in each of the jurisdictions where our products are sold, we may be subject to regulatory enforcement actions which could require us to, among other things, cease selling our products.

We are subject to the Foreign Corrupt Practices Act (FCPA) and other laws which prohibit improper payments or offers of payments to foreign governments and their officials and political parties by U.S. and other business entities for the purpose of obtaining or retaining business. We make sales in countries known to experience corruption. Our sales activities in such countries create the risk of unauthorized payments or offers of payments by one of our employees, consultants, sales agents or distributors which could be in violation of various laws including the FCPA, even though such parties are not always subject to our control. We have attempted to implement

33

--------------------------------------------------------------------------------

Table of Contents

safeguards to prevent losses from such practices and to discourage such practices by our employees, consultants, sales agents and distributors. However, our safeguards may prove to be less than effective and our employees, consultants, sales agents or distributors may engage in conduct for which we might be held responsible. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could adversely affect our business, financial condition and results of operations. Furthermore, foreign countries may decide to prohibit, terminate or delay the construction of new infrastructure or the adoption of new technology for a variety of reasons. These reasons include environmental issues, economic downturns, availability of favorable pricing for other communications services and the availability and cost of related equipment. Regulations dealing with access by competitors to the networks of incumbent operators could slow or stop additional construction or expansion of these operators. Increased regulation of our customers' pricing or service offerings could limit their investments and consequently the sale of our products. Changes in regulations could have an adverse impact on our business and financial results.

The markets in which we operate are intensely competitive and many of our competitors are larger and more established.

The markets for digital video products and applications are extremely competitive and have been characterized by rapid technological changes. Competitors vary in size and in the scope and breadth of the products and services they offer. Our current competitors include Scopus Video Networks Ltd.; RGB Networks, Inc.; BigBand Networks; and Cisco Systems, Inc. through its acquisition of Scientific-Atlanta, Inc. Competitors who could enter into the digital video applications and products market include larger and more established players such as Motorola, Inc. Companies that have historically not had a large presence in digital video applications and products market have recently begun to expand their market share through mergers and acquisitions. Further, our competitors may bundle their products or incorporate functionality into existing products in a manner that discourages users from purchasing our products or which may require us to lower our selling prices resulting in lower gross margins. Consolidation in the industry also may result in larger competitors that may have significant combined resources with which to compete against us. We also face competition from early stage companies with access to significant financial backing that seek to improve existing technologies or develop new technologies. Increased competition could result in reductions in price and revenues, lower profit margins, loss of customers and loss of market share. Any one of these factors could materially and adversely affect our business, financial condition and operating results.

The principal competitive factors in our market include the following:

*Product performance, features and reliability;

*Price;

*Size and stability of operations;

*Breadth of product line;

*Sales and distribution capabilities;

*Technical support and service;

*Relationships with network operators and content aggregators; and

*Compliance with industry standards.

Many of our competitors and potential competitors are substantially larger and have significant advantages over us, including, without limitation:

*Larger and more established selling and marketing capabilities;

*Greater economies of scale;

*Significantly greater financial, technical, engineering, marketing, distribution, customer support and other resources;

*Greater name recognition and a larger installed base of customers; and

*Well-established relationships with our existing and potential customers.

34

--------------------------------------------------------------------------------

Table of Contents

Our competitors and potential competitors may be in a better position to withstand any significant reduction in capital spending by customers in these markets or to reduce selling prices for competitive reasons. They often have broader product lines and market focus and may not be as susceptible to downturns in a particular market. In addition, many of our competitors and potential competitors have been in operation longer than we have and therefore have more long-standing and established relationships with domestic and foreign customers.

If any of our competitors' products or technologies were to become the industry standard, our business could be seriously harmed. If our competitors are successful in bringing these products to market earlier, or if these products are more technologically capable than ours, then our sales could be materially and adversely affected. Our competitors may be in a stronger position to respond quickly to new or emerging technologies and changes in customer requirements. Our competitors may also be able to devote greater resources to the development, promotion and sale of their products and services than we can. Accordingly, we may not be able to maintain or expand our revenues if competition increases and we are unable to respond effectively.

Given these competitive and other market factors, we continually look for opportunities to compete effectively and create value for our stockholders. We may, at any time and from time to time, be in the process of identifying or evaluating product development initiatives, partnerships, strategic alliances or transactions and other alternatives in order to maintain market position and maximize shareholder value. Market and other competitive factors may cause us to change our strategic direction, and we may not realize the benefits of any such initiatives, partnerships, alliances or transactions. We cannot assure you that any such initiatives, partnerships, alliances or transactions that we identify and pursue would actually result in our competing effectively, maintaining market position or increasing stockholder value. Our failure to realize any expected benefits from such initiatives, partnerships, alliances or transactions could negatively impact our financial position, results of operations, cash flows and stock price.

Our business is subject to the risks of warranty returns, product liability and product defects.

Products like ours are very complex and can frequently contain undetected errors or failures, especially when first introduced or when new versions are released. Despite testing, errors may occur. Product errors could affect the performance or interoperability of our products, delay the development or release of new products or new versions or upgrades of products, and adversely affect our reputation, our customers' willingness to buy products from us, and market acceptance and perception of our products. Any such errors or delays in releasing new products or new versions or upgrades of products or allegations of unsatisfactory performance could cause us to lose revenue or market share, increase our service costs, cause us to incur substantial costs in redesigning the products, subject us to liability for damages and divert our resources from other tasks, any one of which could materially and adversely affect our business, results of operations and financial condition. Although we have limitation of liability provisions in our standard terms and conditions of sale, they may not be effective as a result of federal, state or local laws or ordinances or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation and divert management's time and other resources.

We may be unable to adequately protect or enforce our intellectual property rights.

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. There are no assurances that any patent, trademark, copyright or other intellectual property rights owned by us will not be invalidated, circumvented or challenged, that such intellectual property rights will provide competitive advantages to us or that any of our pending or future patent applications will be issued with the scope of the claims sought by us, if at all. There are no assurances that others will not develop technologies that are similar or superior to our technology, duplicate our technology, or design around the patents that we own. In addition, effective patent, copyright and trade secret protection may be unavailable or limited in certain foreign countries in which we do business or may do business in the future.

--------------------------------------------------------------------------------

Table of Contents

Our pending patent applications may not be granted. Even if they are granted, the claims covered by any patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.
We believe that the future success of our business will depend on our ability to translate the technological expertise and innovation of our employees into new and enhanced products. We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove sufficient or effective to prevent misappropriation of our technology, trade secrets or other proprietary information or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. We may, in the future, take legal action to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect our business, operating results, financial position and liquidity.
We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.
Third party claims of infringement or other claims against us could adversely affect our ability to market our products, require us to redesign our products or seek licenses from third parties, and seriously harm our operating results and disrupt our business.
The industry in which we operate is characterized by vigorous protection of intellectual property rights, which on occasion have resulted in significant and often protracted litigation. As is typical in our industry, we have been and may from time to time be notified of claims asserting that we are infringing intellectual property rights owned by third parties. We also have in the past agreed to, and may from time to time in the future agree to, indemnify customers of our technology or products for claims against such customers by a third party based on claims that our technology or products infringe patents of that third party. Currently, in the cable industry, there is industry-wide patent litigation involving the DOCSIS standard and certain video technologies. Our customers have been sued for using certain DOCSIS complaint products and video products, including our products. Our customers have requested indemnity pursuant to the terms and conditions of our sales to them, and we are contributing to the legal fees and costs of these litigations. Additionally, we may have further liability under indemnity obligations if there is a settlement or judgment. Please see Item 3 -- Legal Proceedings for additional information.
We further believe that companies may be increasingly subject to infringement claims as distressed companies and individuals attempt to generate cash by enforcing their patent portfolio against a wide range of products. These types of claims, meritorious or not, may result in costly and time-consuming litigation; divert management's attention and other resources; require us to enter into royalty arrangements; subject us to significant damages or injunctions restricting the sale of our products; require us to indemnify our customers for the use of the allegedly infringing products; require us to refund payment of allegedly infringing products to our customers or to forgo future payments; require us to redesign certain of our products; invalidate our proprietary rights; or damage our reputation. Although we carry general liability insurance, our insurance may not cover potential claims of this type and may not be adequate to indemnify us for all liability that may be imposed. Our failure to obtain a license for key intellectual property rights from a third party for technology used by us could cause us to incur substantial liabilities and prevent us from manufacturing and selling products utilizing the technology. Alternatively, we could be required to expend significant resources to develop non-infringing technology with no assurances that we would be successful in such endeavors. The occurrence of any of the above events could materially and adversely affect our business, results of operations and financial condition.

--------------------------------------------------------------------------------

We are exposed to the credit risk of our customers and to credit exposures in weakened markets, which could result in material losses.

Most of our sales are on an open credit basis. Payment terms in the United States are typically 30 to 60 days, and because of local customs or conditions, longer in some markets outside the United States. Beyond our open credit arrangements, we have also experienced a request for customer financing and facilitation of leasing arrangements, which we have not provided to date and do not expect to provide in the future. We expect demand for enhanced open credit terms, for example, longer payment terms, customer financing and leasing arrangements, to continue and believe that such arrangements are a competitive factor in obtaining business. Our decision not to provide these types of financing arrangements may adversely affect our ability to sell products, and therefore, our revenue, operations and business.

Because of current conditions in the global economy, our exposure to credit risks relating to sales on an open credit basis has increased. Although we monitor and attempt to mitigate the associated risk, there can be no assurance that our efforts will be effective in reducing credit risk. Additionally, there have been significant insolvencies and bankruptcies among our customers, which have caused and may continue to cause us to incur economic and financial losses. There can be no assurance that additional losses would not be incurred and that such losses would not be material. Although these losses have generally not been material to date, future losses, if incurred, could harm our business and have a material adverse effect on our operating results and financial condition.

We have and we may seek to expand our business through acquisitions which could disrupt our business operations and harm our operating results.

In order to expand our business, we may make strategic acquisitions of other companies or certain assets. We plan to continue to evaluate opportunities for strategic acquisitions from time to time, and may make an acquisition at some future point. However, the current volatility in the stock market and the current price of our common stock may adversely affect our ability to make such acquisitions. Any acquisition that we make involves substantial risks, including the following:

*Difficulties in integrating the operations, technologies, products and personnel of an acquired company;

*Diversion of management's attention from normal daily operations of the business;

*Potential difficulties in completing projects associated with in-process research and development;

*Difficulties in entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions;

*Initial dependence on unfamiliar supply chains or relatively small supply partners;

*Insufficient revenues to offset increased expenses associated with acquisitions; and

*The potential loss of key employees of the acquired companies.

Acquisitions may also cause us to:

*Issue common stock that would dilute our current stockholders' percentage ownership;

*Assume liabilities;

*Record goodwill and non-amortizable intangible assets that will be subject to impairment testing and potential periodic impairment charges;

*Incur amortization expenses related to certain intangible assets;

*Incur large and immediate write-offs; or

*Become subject to litigation.

For example, we made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses, other than the digital video products, have achieved the level of market acceptance that was forecasted at the time of their acquisitions. Additionally, certain product

37

--------------------------------------------------------------------------------

Table of Contents

groups have not achieved the level of technological development needed to be marketable or to expand the market. Mergers and acquisitions of high-technology companies are inherently risky, and no assurance can be given that our future acquisitions will be successful and will not materially adversely affect our business, operating results or financial condition. Failure to manage and successfully integrate acquisitions we make could materially harm our business and operating results. Even when an acquired company has already developed and marketed products, there can be no assurance that product enhancements will be made in a timely fashion or that all pre-acquisition due diligence will have identified all possible issues that might arise with respect to such products.

Our products are subject to safety approvals and certifications.

In the United States, our products are required to meet certain safety requirements. For example, we are required to have our video products certified by Underwriters Laboratory in order to meet federal requirements. Outside the United States, our products are subject to the regulatory requirements of each country in which the products are manufactured or sold. These requirements are likely to vary widely. We may be unable to obtain on a timely basis, or at all, the regulatory approvals that may be required for the manufacture, marketing and sale of our products.

Compliance with current and future environmental regulations may be costly which could impact our future earnings.

We may be subject to environmental and other regulations due to our production and marketing of products in certain states and countries. In addition, we could face significant costs and liabilities in connection with product take-back legislation, which enables customers to return a product at the end of its useful life and charges us with financial and other responsibility for environmentally safe collection, recycling, treatment and disposal. We also face increasing complexity in our product design and procurement operations as we adjust to new and upcoming requirements relating to the materials composition of our products, including the restrictions on lead and certain other substances in electronics that will apply to specified electronics products put on the market in the European Union as of July 1, 2006 (Restriction of Hazardous Substances in Electrical and Electronic Equipment Directive (EU RoHS)). The European Union has also finalized the Waste Electrical and Electronic Equipment Directive (WEEE), which makes producers of electrical goods financially responsible for specified collection, recycling, treatment and disposal of past and future covered products. The deadline for enacting and implementing this directive by individual European Union governments was August 13, 2004 (WEEE Legislation), although extensions were granted in some countries. Producers became financially responsible under the WEEE Legislation beginning in August 2005. Other countries, such as the United States, China and Japan, have enacted or may enact laws or regulations similar to the EU RoHS or WEEE Legislation. Other environmental regulations may require us to reengineer our products to utilize components which are more environmentally compatible. Such reengineering and component substitution may result in additional costs to us. Although we currently do not anticipate any material adverse effects based on the nature of our operations and the effect of such laws, there is no assurance that such existing laws or future laws will not have a material adverse effect on us.

Various export licensing requirements could materially and adversely affect our business or require us to significantly modify our current business practices.

Various government export regulations may apply to the encryption or other features of our products. We may have to make certain filings with the government in order to obtain permission to export certain of our products. In the past, we may have inadvertently failed to file certain export applications and notices, and we may have to make certain filings and request permission to continue exportation of any affected products without interruption while these applications are pending. If we do have to make such filings, there are no assurances that we will obtain permission to continue exporting the affected products or that we will obtain any required export approvals now or in the future. If we do not receive the required export approvals, we may be unable to ship those products to certain customers located outside of the United States. In addition, we may be subject to fines or other penalties due to the failure to file certain export applications and notices.

38

--------------------------------------------------------------------------------

Table of Contents

Compliance with changing laws and regulations relating to corporate governance and public disclosure has resulted, and will continue to result, in the incurrence of additional expenses.

New and changing laws and regulations, including the Sarbanes-Oxley Act of 2002, new Commission regulations and NASDAQ Stock Market Rules, impose stricter corporate governance requirements, greater disclosure obligations, and greater focus on disclosure and internal controls. These new laws and regulations have had the effect of increasing the complexity and cost of our Company's corporate governance compliance, diverting the time and attention of our management from revenue-generating activities to compliance activities, and increasing the risk of personal liability for our board members and executive officers involved in our Company's corporate governance process. Our efforts to comply with evolving laws and regulations have resulted, and will continue to result, in increased general and administrative expenses, and increased professional and independent auditor fees. In addition, it has become more difficult and expensive for us to obtain director and officer liability insurance.

In order to meet the new corporate governance and financial disclosure obligations, we have been taking, and will continue to take, steps to improve our controls and procedures, including disclosure and internal controls, and related corporate governance policies and procedures to address compliance issues and correct any deficiencies that we may discover. Our efforts to correct the deficiencies in our disclosure and internal controls have required, and will continue to require, the commitment of significant financial and managerial resources. In addition, we anticipate the costs associated with the continued testing and remediation of our internal controls will be significant and material in the year ended December 31, 2006 and may continue to be material in future years as these controls are maintained and continually evaluated and tested.

Furthermore, changes in our operations and the growth of our business may require us to modify and expand our disclosure controls and procedures, internal controls and related corporate governance policies. In addition, the new and changed laws and regulations are subject to varying interpretations in many cases due to their lack of specificity, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. If our efforts to comply with new or changed laws and regulations differ from the conduct intended by regulatory or governing bodies due to ambiguities or varying interpretations of the law, we could be subject to regulatory sanctions, our reputation may be harmed and our stock price may be adversely affected.

Recent and proposed regulations related to equity compensation could adversely affect earnings, our ability to raise capital and affect our ability to attract and retain key personnel.

Since our inception, we have used stock options as a fundamental component of our employee compensation packages. We believe that our stock option plans are an essential tool to link the long-term interests of stockholders and employees, especially executive management, and serve to motivate management to make decisions that will, in the long run, give the best returns to stockholders. The Financial Accounting Standards Board has announced changes to GAAP that requires us to record a charge to earnings for employee stock option grants and employee stock purchase plan rights for all future periods beginning on January 1, 2006. In the event that the assumptions used to compute the fair value of our stock-based awards are later determined to be inaccurate or if we change our assumptions significantly in future periods, our stock-based compensation expense and results of operations could be materially affected which could impede any capital raising efforts. Additionally, to the extent that new accounting standards make it more difficult or expensive to grant options to employees, we may incur increased compensation costs, change our equity compensation strategy or find it difficult to attract, retain and motivate employees, each of which could materially and adversely affect our business.

Our stock price has been and is likely to continue to be highly volatile. The market price of our common stock has fluctuated significantly in the past and is likely to fluctuate in the future. Investors may be unable to resell our common stock at or above their purchase price. In the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation.

39

--------------------------------------------------------------------------------

Our stock price could be subject to extreme fluctuations in response to a variety of factors, including the following:

*Actual or anticipated variations in quarterly operating results;

*Announcements of technological innovations;

*New products or services offered by us or our competitors;

*Changes in financial estimates by securities analysts;

*Conditions or trends in the broadband services and technologies industry;

*Changes in the economic performance
 and/or
 market valuations of technology, Internet, online service or broadband service
 industries;

*Announcement of significant acquisitions, strategic partnerships, joint
 ventures or capital commitments, by us or our current or potential competitors;

*Adoption of industry standards and the inclusion or compatibility of our
 technology with such standards;

*Adverse or unfavorable publicity regarding us or our products;

*Additions or departures of key personnel;

*Sales of common stock; and

*Other events or factors that may be beyond our control.

In addition, the stock markets in general, including the Pink Sheets and The NASDAQ Stock Market, and the stock price of broadband services and technology companies in particular, have experienced extreme price and volume volatility. This volatility and decline have affected many companies irrespective of or disproportionately to the operating performance of these companies. Additionally, industry factors may materially adversely affect the market price of our common stock.
We have adopted a stockholder rights plan, which, together with provisions in our charter documents and Delaware law, may delay or prevent an acquisition of us, which could decrease the value of our stock.
We adopted a stockholder rights plan pursuant to which we distributed one right for each outstanding share of common stock held by our stockholders of record as of February 20, 2001. If our Board of Directors believes that a particular acquisition is undesirable, the rights may substantially dilute the stock ownership of a person or group attempting a take-over of us, even if such a change in control is beneficial to our stockholders. As a result, the plan could make it more difficult for a third party to acquire us, or a significant percentage of our outstanding capital stock, without first negotiating with our Board of Directors.
Provisions of our Certificate of Incorporation and our Bylaws could make it more difficult for a third party to acquire control of us in a transaction not approved by our Board of Directors. We are also subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law. Any provision of our Certificate of Incorporation, Bylaws, stockholder rights plan or Delaware law that has the effect of delaying or preventing a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock.
We rely on complex information technology systems and networks to operate our business. Any significant system or network disruption could have a material adverse impact on our operations, sales and financial performance.
We rely on the efficient and uninterrupted operation of complex information technology systems and networks. All information technology systems are potentially vulnerable to damage or interruption from a variety of sources, including but not limited to computer viruses, security breach, energy blackouts, natural disasters, terrorism, war and telecommunication failures. There also may be system or network disruptions if new or upgraded business management systems are defective or are not installed properly. We have implemented various measures to

--------------------------------------------------------------------------------

Table of Contents

manage our risks related to system and network disruptions, but a system failure or security breach could negatively impact our operations and financial results. In addition, we may incur additional costs to remedy the damages caused by these disruptions or security breaches.

We, our sole manufacturer and our customers are vulnerable to earthquakes, disruptions to power supply, labor issues and other unexpected events. Our corporate headquarters, the majority of our research and development activities and our sole source manufacturer are located in California, an area known for seismic activity. An earthquake, or other significant natural disaster, could result in an interruption in our business or the operations of our manufacturer. Some of the other locations in which we and our customers conduct business are prone to natural disasters. If there is a natural disaster in any of the locations where our customers are located, we face the risk that our customers may incur losses or substantial business interruptions which may impair their ability to continue to purchase their products from us.

Our California operations may also be subject to disruptions in power supply, such as those that occurred in 2001. In addition, the cost of electricity and natural gas has risen significantly. Power outages could disrupt our business operations and those of our suppliers, and could cause us to fail to meet the commitments to our customers. Our business may also be impacted by labor issues related to our operations and/or those of our manufacturer, network operators and content aggregators, or customers. Such an interruption could harm our current and prospective business relationships and adversely impact our operating results. We may not carry sufficient business interruption insurance to compensate for any losses that we may sustain as a result of any natural disasters or other unexpected events. Disruptions in power supply, labor issues and other unexpected events impacting our customers may affect their purchasing decisions and thus adversely impact our financial performance.

SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 which are subject to the safe harbor created by those sections. All statements included or incorporated by reference in this report, other than statements that are purely historical in nature, are forward-looking statements. Forward-looking statements are generally written in the future tense and/or are preceded by words such as may, will, should, expect, plan, anticipate, believe, estimate, predict, future, intend, or certain or the negative of these terms or similar expressions to identify forward-looking statements. Forward-looking statements include, among other things, statements regarding:

*Our belief that our current cash balances will be sufficient to satisfy our
 cash requirements for at least the next 12 months;

*Our belief that we are well positioned to capitalize on the emerging digital
 video market because of the success our digital video products have had with
 the major U.S. cable operators and satellite providers, as well as our current
 success in digital ad insertion;

*Our belief that by focusing our business on higher margin digital video
 products, our margins may increase;

*Our belief that we are well positioned to capitalize on the growing demand for
 network operators to provide advanced video services to their subscribers;

*Our belief that the ongoing migration of network operators and content
 aggregators to all-digital networks represents a significant opportunity for
 companies similar to ours with products and technologies that enable our
 customers to maximize their bandwidth, to utilize important new transport
 methods and to deploy new services;

*Our belief that networks operators and content aggregators will increasingly
 rely on overlay to maintain or even increase their advertising revenues and
 that our digital video processing systems will enable them to do this more
 cost-effectively;

*Our belief that network operators will continue their investments in equipment
 to provide advanced services in a cost-effective manner to increase average
 revenues per unit from their subscribers;

41

--------------------------------------------------------------------------------

Table of Contents

*Our belief that there will be increasing competition to our digital video
 products, which may increase price competition and lead to decreased revenue
 and margins;

*Our expectation that research and development expenses will decrease in 2006;
 and

*Our expectation that general and administrative expenses will increase in 2006
 due in part to the restatement process.

Forward-looking statements are not guarantees of future performance and involve
risks and uncertainties, including those discussed in Item 1A of this Report.
The forward-looking statements contained in this report are based on information
that is currently available to us and expectations and assumptions that we
deemed reasonable at the time the statements were made. We do not undertake any
obligation to update any forward-looking statements in this report or in any of
our other communications, except as required by law. All such forward-looking
statements should be read as of the time the statements were made and with the
recognition that these forward-looking statements may not be complete or
accurate at a later date. The business risks discussed in Item 1A of this Report
on Form 10-K, among other things, should be considered in evaluating our
prospects and future financial performance.


Item 1B.Unresolved Staff Comments

Not applicable.


Item 2.Properties

Our principal executive offices are located in Santa Clara, California, where we
lease approximately 63,069 square feet under a lease that expires in September
2009. We sub-sublease approximately 141,000 square feet of space in Santa Clara,
California under a sublease that expires in October 2009 with the sub-sublease
expiring on the same date as the sublease. In the United States, we also leased
an additional facility in Costa Mesa, California that was subleased; the lease
expired in March 2006 and the sublease expired in September 2005.
In addition, we lease properties worldwide. We had a facility in Tel Aviv,
Israel consisting of approximately 136,000 square feet under a lease that
expired in October 2005. We subleased approximately 107,000 square feet of the
Israel property, and those subleases expired in October 2005. We have offices in
Brussels, Belgium; Hong Kong; Shanghai, China; Tel Aviv, Israel; and Seoul,
Korea. We had a facility in Ottawa, Ontario, Canada that we subleased and the
lease and sublease expired in June 2006. We believe that our existing facilities
are adequate to meet our needs for the foreseeable future. For additional
information regarding obligations under leases, see Note 5, "Commitments," to
Consolidated Financial Statements.


Item 3.Legal Proceedings

Beginning in April 2000, several plaintiffs filed class action lawsuits in
federal court against us and certain of our officers and directors. Later that
year, the cases were consolidated in the United States District Court for the
Northern District of California (Court) as In re Terayon Communication Systems,
Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed
an amended complaint. In 2001, the Court granted in part and denied in part
defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002,
the Court denied defendants' motion to dismiss that complaint, which, like the
earlier complaints, alleged that the defendants violated the federal securities
laws by issuing materially false and misleading statements and failing to
disclose material information regarding our technology. On February 24, 2003,
the Court certified a plaintiff class consisting of those who purchased or
otherwise acquired our securities between November 15, 1999 and April 11, 2000.
On September 8, 2003, the Court heard defendants' motion to disqualify two of
the lead plaintiffs and to modify the definition of the plaintiff class. On
September 10, 2003, the Court issued an order vacating the hearing date for the
parties' summary judgment motions, and, on September 22, 2003, the Court issued
another order staying all discovery until further notice and vacating the trial
date, which had been scheduled for November 4, 2003. On February 23, 2004, the
Court issued an order disqualifying two of the lead plaintiffs and ordered
discovery, which was conducted. In February 2006, we mediated the case with
plaintiffs' counsel. As part of the mediation, we reached a settlement of $15.0
million. After this mediation, our insurance carriers agreed to tender their
remaining limits of coverage, and we contributed approximately $2.2 million to
the settlement. On March 17, 2006, we, along with plaintiffs' counsel,

42

--------------------------------------------------------------------------------

Table of Contents

submitted the settlement to the Court and the shareholder class for approval. The Court held a hearing to review the settlement of the shareholder litigation on September 25, 2006. To date, the Court has not approved the settlement. On October 16, 2000, a lawsuit was filed against us and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the Superior Court of California, San Luis Obispo County. This lawsuit was titled Bertram v. Terayon Communication Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint. Plaintiffs appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

In 2002, two shareholders filed derivative cases purportedly on behalf of us against certain of its current and former directors, officers and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the Superior Court of California, County of Santa Clara. We are a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the securities class action filed in April 2000. In that securities class action, we disputed making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants. On September 15, 2006, we entered into a Stipulation of Settlement of Derivative Claims. On September 18, 2006, the Superior Court of California, County of Santa Clara approved the final settlement of the derivative litigation entitled In re Terayon Communication Systems, Inc. Derivative Litigation (Case No. CV 807650). In connection with the settlement, we paid $1.0 million in attorney's fees and expenses to the derivative plaintiffs' counsel and agreed to adopt certain corporate governance practices.

On June 23, 2006, a putative class action lawsuit was filed against us in the United States District Court for the Northern District of California by I.B.L. Investments Ltd. purportedly on behalf of all persons who purchased our common stock between October 28, 2004 and March 1, 2006. Zaki Rakib, Jerry D. Chase, Mark Richman and Edward Lopez are named as individual defendants. The lawsuit focuses on the our March 1, 2006 announcement of the restatement of our financial statements for the year ended December 31, 2004, and for the four quarters of 2004 and the first two quarters of 2005. The plaintiffs are seeking damages, interest, costs and any other relief deemed proper by the court. An unfavorable ruling in this legal matter could materially and adversely impact our results of operations.

In January 2005, Adelphia Communications Corporation (Adelphia) sued us in the District Court of the City and County of Denver, Colorado. Adelphia's complaint alleged, among other things, breach of contract and misrepresentation in connection with our sale of cable modem termination systems (CMTS) products to Adelphia and our announcement to cease future investment in the CMTS market. Adelphia sought damages in excess of $25.0 million and declaratory relief. We moved to dismiss the complaint seeking an order blocking the case from going forward at a preliminary stage. The court denied our motion to dismiss the complaint, thereby permitting the case and discovery to go forward. We filed a response to Adelphia's complaint and discovery began. On October 21, 2005, the parties settled the litigation in exchange for (i) full mutual releases of the other party for claims related to the CMTS and customer premise equipment products and (ii) a payment to Adelphia consisting of $3.0 million in cash, $0.8 million of DM 6400 products at list price and $0.8 million of modems at a price of $33.50 each. On December 1, 2005, the United States Bankruptcy Court of the Southern District of New York approved the settlement. On December 15, 2005, the court dismissed the case with prejudice.

On April 22, 2005, we filed a lawsuit in the Superior Court of California, County of Santa Clara against Adam S. Tom (Tom) and Edward A. Krause (Krause) and a company founded by Tom and Krause, RGB Networks, Inc. (RGB). We sued Tom and Krause for breach of contract and RGB for intentional interference with contractual relations based on breaches of the Noncompetition Agreements entered into between us and Tom and Krause, respectively. On May 24, 2006, RGB, Tom and Krause filed a Notice of Motion and Motion For Leave To File a Cross-Complaint, in which the defendants stated that they intended to file counter-claims against us for misappropriation of trade secrets, unfair competition, tortious interference with contractual relations and tortious interference with prospective economic advantage. On July 6, 2006, the court granted the defendants' motion, and on July 20, defendants filed a cross-complaint for misappropriation of trade secrets, unfair competition, tortious

43

--------------------------------------------------------------------------------

Table of Contents

interference with contractual relations and tortious interference with prospective economic advantage. On August 21, 2006, we filed a demurrer to certain of those claims. The court granted our demurrer as to RGB's request for declaratory judgment. On November 9, 2006, we filed our answer to RGB's complaint. Damages in this matter are not capable of determination at this time and the case may be lengthy and expensive to litigate.

On September 13, 2005, a case was filed by Hybrid Patents, Inc. (Hybrid) against Charter Communications, Inc. (Charter) in the United States District Court for the Eastern District of Texas for patent infringement related to Charter's use of equipment (cable modems, CMTS and embedded multimedia terminal adapters (eMTAs)) meeting the Data Over Cable System Interface Specification (DOCSIS) standard and certain video equipment. Hybrid has alleged that the use of such products violates its patent rights. Charter has requested that we and others supplying it with equipment indemnify Charter for these claims. We and others have agreed to contribute to the payment of the legal costs and expenses related to this case. On May 4, 2006, Charter filed a cross-complaint asserting its indemnity rights against us and a number of companies that supplied Charter with cable modems, and to date, this cross-complaint has not been dismissed. Trial is scheduled on Hybrid's claims for July 2, 2007. At this point, the outcome is uncertain and we can not assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Hybrid is successful in its claim against Charter and then elects to pursue other cable operators that use the allegedly infringing products.

On July 14, 2006, a case was filed by Hybrid against Time Warner Cable (TWC), Cox Communications Inc. (Cox), Comcast Corporation (Comcast), and Comcast of Dallas, LP (together, the MSOs) in the United States District Court for the Eastern District of Texas for patent infringement related to the MSOs' use of data transmission systems and certain video equipment. Hybrid has alleged that the use of such products violate its patent rights. No trial date is known yet. To date, we have not been named as a party to the action. The MSOs have requested that we and others supplying them with cable modems and equipment indemnify the MSOs for these claims. We and others have agreed to contribute to the payment of legal costs and expenses related to this case. At this point, the outcome is uncertain and we cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Hybrid is successful in its claim against the MSOs and then elects to pursue other cable operators that use the allegedly infringing products.

On September 16, 2005, a case was filed by Rembrandt Technologies, LP (Rembrandt) against Comcast in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by Comcast infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, we have not been named as a party in the action, but we have received a subpoena for documents and a deposition related to the products we sold to Comcast. We continue to comply with this subpoena. Comcast requested that we and others supplying them with products for indemnity related to the products that we sold to them. We and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial is scheduled on Rembrandt's claims for August 6, 2007. At this point, the outcome is uncertain and we cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against Comcast and then elects to pursue other cable operators that use the allegedly infringing products.

On June 1, 2006, a case was filed by Rembrandt against Charter, Cox, CSC Holdings, Inc. (CSC) and Cablevisions Systems Corp. (Cablevision) in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by Charter infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, we have not been named as a party in the action, but Charter has made a request for indemnity related to the products that we sold to them. We have not received an indemnity request from Cox, CSC and Cablevision but we expect that such request will be forthcoming shortly. To date, we and others have not agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome is uncertain and we cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against Charter and then elects to pursue other cable operators that use the allegedly infringing products.

On June 1, 2006, a case was filed by Rembrandt against TWC in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by

--------------------------------------------------------------------------------

Table of Contents

TWC infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, we have not been named as a party in the action, but TWC has made a request for indemnity related to the products that we and others have sold to them. We and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome is uncertain and we cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against TWC and then elects to pursue other cable operators that use the allegedly infringing products.

On September 13, 2006, a second case was filed by Rembrandt against TWC in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by TWC infringe certain patents related to the DOCSIS standard. To date, we have not been named as a party in the action, but TWC has made a request for indemnity related to the products that we and others have sold to them. We and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome is uncertain and we cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against TWC and then elects to pursue other cable operators that use the allegedly infringing products.

We have received letters claiming that our technology infringes the intellectual property rights of others. We have consulted with our patent counsel and reviewed the allegations made by such third parties. If these allegations were submitted to a court, the court could find that our products infringe third party intellectual property rights. If we are found to have infringed third party rights, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert our management's resources, cause product shipment delays or require us to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to us, if at all.

Furthermore, we have in the past agreed to, and may from time to time in the future agree to, indemnify a customer of our technology or products for claims against the customer by a third party based on claims that its technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation, divert management's attention and other resources, require us to enter into royalty arrangements, subject us to damages or injunctions restricting the sale of our products, require us to indemnify our customers for the use of the allegedly infringing products, require us to refund payment of allegedly infringing products to our customers or to forgo future payments, require us to redesign certain of our products, or damage our reputation, any one of which could materially and adversely affect our business, results of operations and financial condition.

We may, in the future, take legal action to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect our business, results of operations and financial condition.

In December 2005, the Commission issued a formal order of investigation in connection with our accounting review of the Thomson Contract. These matters were previously the subject of an informal Commission inquiry. We have been cooperating fully with the Commission and will continue to do so in order to bring the investigation to a conclusion as promptly as possible.

We are currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While we currently believe that the ultimate outcome of these proceedings, individually and in the aggregate, will not have a material adverse effect on our financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of our legal proceedings, there exists the possibility of a material adverse impact on our financial condition and results of operations for the period in which the ruling occurs. The estimate of the potential impact on our financial position and overall results of operations for any of the above legal proceedings could change in the future.

Item 4. Submission of Matters to a Vote of Security Holders

There were no matters submitted to a vote of security holders during the year ended December 31, 2005.

--------------------------------------------------------------------------------

Table of Contents

PART II

Item 5. Market for the Registrant's Common Equity, Related Stockholder Matters
and Issuer Purchases of Equity Securities

(a) Prior to April 4, 2006, our common stock was traded on The NASDAQ Stock Market under the symbols "TERN" and "TERNE." Our common stock was delisted from The NASDAQ Stock Market on April 4, 2006 and currently is quoted on the Pink Sheets under the symbol "TERN.PK." The following table sets forth, for the periods indicated, the high and low per share sale prices of our common stock as reported on The NASDAQ Stock Market, for the respective periods.

|  | High | Low |
|---|---|---|
| Year Ended December 31, 2005 |  |  |
| First Quarter | $3.73 | $1.99 |
| Second Quarter | $3.78 | $2.52 |
| Third Quarter | $4.10 | $2.91 |
| Fourth Quarter | $3.95 | $1.97 |
| Year Ended December 31, 2004 |  |  |
| First Quarter | $6.25 | $2.96 |
| Second Quarter | $3.99 | $1.66 |
| Third Quarter | $2.38 | $1.44 |
| Fourth Quarter | $2.98 | $1.52 |

As of December 19, 2006, the closing price of our common stock on the Pink Sheets was $1.87.
(b) As of November 30, 2006, there were approximately 522 holders of record of our common stock, as shown on the records of our transfer agent. The number of record holders does not include shares held in "street name" through brokers.
(c) We have not declared or paid any cash dividends on our common stock. We currently expect to retain future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future.
(d) The following table provides certain information about our common stock that may be issued under our equity compensation plans as of December 31, 2005. Information is included for both equity compensation plans approved by our stockholders and equity compensation plans not approved by our stockholders.

| Plan Category | Common Stock to be Issued Upon Exercise of Outstanding Options and Rights (a) | Weighted Average Exercise Price of Outstanding Options and Rights (b) | Common Stock Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by Terayon stockholders(1) | 10,132,904 | $   4.23 | 4,065,127 |
| Equity compensation plans not approved by Terayon stockholders(2) | 2,899,082 | $   6.70 | 1,465,798 |
| Total | 13,031,986 | $   4.78 | 5,530,925 |

(1) Includes options to purchase common stock outstanding under the Terayon Communication Systems, Inc. 1995 Stock Option Plan, as amended (1995 Plan), the Terayon Communication Systems, Inc. 1997 Equity Incentive Plan, as amended (1997 Plan), and the Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan, as amended (1998 Plan). Does not include 600,371 shares of our common stock that were available for issuance under the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan, as

46

--------------------------------------------------------------------------------

Table of Contents

amended, which was also approved by our stockholders, including the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan Offering for Foreign Employees. The 1997 Plan was amended on June 13, 2000 to, among other things, provide for an increase in the number of shares of our common stock on each January 1 beginning January 1, 2001 through January 1, 2007, by the lesser of 5% of our common stock outstanding on such January 1 or 3,000,000 shares. In May 2003, the 1997 Plan was amended to reduce the number of authorized shares in the 1997 Plan by 6,237,826 shares. In May 2005, the 1997 Plan was amended to reduce the number of authorized shares in the 1997 Plan by 4,000,000 shares.

(2) Includes options to purchase common stock outstanding under the Terayon Communication Systems, Inc. 1999 Non-Officer Equity Incentive Plan, as amended (1999 Plan), Mainsail Equity Incentive Plan, TrueChat Equity Incentive Plan, and options issued outside of any equity incentive plan. See Note 10, "Stockholder's Equity," to Consolidated Financial Statements for additional information regarding the provisions of the 1999 Plan.

47

--------------------------------------------------------------------------------

Table of Contents

Item 6. Selected Financial Data

The following selected consolidated financial data has been restated or adjusted, as applicable, and is derived from our consolidated financial statements and should be read in conjunction with the consolidated financial statements and notes thereto and with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other financial data included elsewhere in this report. Our historical results of operations are not necessarily indicative of results of operations to be expected for any future period. We have not amended our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10-K.

See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements for more detailed information regarding the restatement of our consolidated financial statements for the years ended December 31, 2005, 2004 and 2003 and our selected consolidated financial data as of and for the years ended December 31, 2005, 2004, 2003, 2002 and 2001.

| | | Year Ended December 31, | | | |
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | (as restated)(1) | (as restated)(1) | (as restated) | (as adjusted)(5) |
| | | | (in thousands, except per share data) | | |
| Consolidated statement of operations data: | | | | | |
| Revenues | $ 90,664 | $ 136,484 | $ 130,187 | $ 130,730 | $ 279,481 |
| Cost of goods sold | 55,635 | 101,887 | 103,835 | 101,808 | 263,117 |
| Gross profit | 35,029 | 34,597 | 26,352 | 28,922 | 16,364 |
| Operating expenses | | | | | |
| Research and development | 17,650 | 33,199 | 42,634 | 58,696 | 79,927 |
| Sales and marketing | 22,534 | 24,145 | 26,781 | 35,704 | 55,701 |
| General and administrative | 20,356 | 12,039 | 11,934 | 15,639 | 33,163 |
| Goodwill amortization | -- | -- | -- | -- | 25,410 |
| Restructuring charges, executive severance and asset write-offs(2) | 2,257 | 12,336 | 2,803 | 8,922 | 587,149 |
| Total operating expenses | 62,797 | 81,719 | 84,152 | 118,961 | 781,350 |
| Loss from operations | (27,768) | (47,122) | (57,800) | (90,039) | (764,986) |
| Interest income (expense) and other income (expense), net | 966 | (59) | 1,891 | (618) | 1,645 |
| Gain on early extinguishment of debt(3) | -- | -- | -- | 50,983 | 192,303 |
| Income tax benefit (expense) | (149) | 76 | (316) | (238) | 13,915 |
| Net loss | $ (26,951) | $ (47,105) | $ (56,225) | $ (39,912) | $ (557,123) |
| Basic and diluted net loss per share | $ (0.35) | $ (0.62) | $ (0.76) | $ (0.55) | $ (8.17) |
| Shares used in computing basic and diluted net loss per share(4) | 77,154 | 75,751 | 74,074 | 72,718 | 68,164 |
| Consolidated Balance Sheet Data: | | | | | |
| Cash, cash equivalents and short-term investments | $ 101,301 | $ 97,735 | $ 138,640 | $ 206,503 | $ 333,888 |
| Working capital | 22,045 | 107,052 | 138,035 | 178,091 | 320,150 |
| Total assets | 146,648 | 156,981 | 213,099 | 279,169 | 469,981 |
| Convertible debentures | 65,367 | 65,588 | 65,809 | 66,030 | 177,368 |
| Long-term obligations (less current portion) | 1,455 | 2,076 | 1,356 | 1,936 | 181,868 |
| Accumulated deficit | (1,062,438) | (1,035,487) | (988,382) | (932,157) | (892,245) |
| Total stockholders' equity | 20,657 | 44,943 | 90,563 | 142,191 | 181,052 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

48

--------------------------------------------------------------------------------

Table of Contents

(2) See Note 6, "Accrued Severance Pay," and Note 7, "Restructuring Charges and Asset Write-offs," to Consolidated Financial Statements for an explanation for restructuring charges, executive severance and asset write-offs.

(3) See Note 8, "Convertible Subordinated Notes," to Consolidated Financial Statements for an explanation of the repurchase of subordinated convertible notes and reclassification of related gains.

(4) See Note 2, "Summary of Significant Accounting Policies," to Consolidated Financial Statements for an explanation of the method employed to determine the number of shares used to compute per share data.

(5) We made three adjustments to the financial statements for the year ended December 31, 2001 which resulted in a decrease in accumulated net loss of $6.7 million. The largest adjustment of $7.9 million gain related to the redemption of a portion of the embedded derivative (Issuer Call Option) contained in our $500.0 million of 5% convertible subordinated Notes due August 2007 (Notes) and the remaining $1.9 million and $0.6 million related to our analysis of the allowance for doubtful accounts and an adjustment for a previously recorded tax accrual, respectively. During 2001, we repurchased $325.9 million of face value of Notes, requiring $7.0 million of the bond premium to be redeemed. An additional $1.0 million was recorded to reflect the amortization of the bond premium. As part of our review of the allowance for doubtful accounts, we determined that an adjustment to increase bad debt expense and the corresponding allowance for doubtful accounts by $1.9 million was necessary for the year ended December 31, 2001. In 2001, we recorded a foreign income tax contingent expense to accrue for potential tax liabilities related to post-acquisition activities of foreign subsidiaries. During the restatement process, it was determined that this original accrual was not substantiated and accordingly, should not have been recorded, and we adjusted the balance accordingly as of December 31, 2001.

49

--------------------------------------------------------------------------------

Table of Contents

Item 7. Management's Discussion and Analysis of Financial Condition and Results
        of Operations

The discussion and analysis set forth below reflects the restatement as
described below and in Note 3, "Restatement of Consolidated Financial
Statements," to Consolidated Financial Statements. For this reason, the data set
forth in this section may not be comparable to discussions and data in our
previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q.
Restatement of Consolidated Financial Statements and Related Proceedings
On November 7, 2005, the Company announced that it initiated a review of its
revenue recognition policies after determining that certain revenues recognized
in the second half of the year ended December 31, 2004 from a customer may have
been recorded in incorrect periods. The review included the Company's revenue
recognition policies and practices for current and past periods and its internal
control over financial reporting. Additionally, the Audit Committee of the Board
of Directors (Audit Committee) conducted an independent inquiry into the
circumstances related to the accounting treatment of certain of the transactions
at issue and retained independent legal counsel to assist with the inquiry.
On March 1, 2006, the Company announced that the Audit Committee had completed
its independent inquiry and that the Company would restate its consolidated
financial statements for the year ended December 31, 2004 and for the four
quarters of 2004 and the first two quarters of 2005. The principal findings of
the Audit Committee review were: there was no intent by Company personnel to
recognize revenue in contravention of what Company personnel understood to be
the applicable rules at the time; that Company personnel did not consider or
sufficiently focus on relevant accounting rules; and there was no intent by
Company personnel to mislead the Company's auditors or engage in other wrongful
conduct. Additionally, the Audit Committee and management reviewed the Company's
revenue recognition practices and policies as they related to the delivery of
certain products and services (including the development and customization of
software) to Thomson Broadcast (Thomson) under a series of contractual
arrangements (Thomson Contract). The Company had recognized revenue under this
series of contractual arrangements under two separate revenue arrangements in
accordance with Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition"
(SAB 101), as amended by SAB No. 104 (SAB 104). However, based on the guidance
under American Institute of Certified Public Accountants Statement of Position
(SOP) 97-2, "Software Revenue Recognition" (SOP 97-2), SOP 81-1, "Accounting for
Performance of Construction-Type and Certain Production-Type Contracts" (SOP
81-1), SAB 104 and Financial Accounting Standards Board (FASB), Emerging Issues
Task Force (EITF) 00-21, "Accounting for Revenue Arrangements with Multiple
Deliverables" (EITF 00-21), management determined that this series of
contractual arrangements should have been treated as a single contract, and
therefore a single revenue arrangement for accounting purposes. Factors that
contributed to the determination of a single revenue arrangement included the
documentation of the series of contractual arrangements under a single
memorandum of understanding (MOU) and the ongoing nature of discussions between
parties to define product specifications and deliverables that extended beyond
the initial agreed upon contracted deliverables. Additionally, the Company
determined it could not reasonably estimate progress towards completion of the
project, and therefore, in accordance with SOP 81-1, used the completed contract
method. As a result, revenue previously recognized in the third and fourth
quarters of 2004 and in the first two quarters of 2005 under this series of
contractual arrangements was deferred and ultimately recognized as revenue in
the quarter ended December 31, 2005 upon completion of the Thomson Contract and
final acceptance received from Thomson for all deliverables under the Thomson
Contract. Direct contract expenses, primarily research and development,
associated with the completion of the project previously recognized in each
quarter of 2004 and in the first two quarters of 2005 were also deferred and
ultimately recognized in the quarter ended December 31, 2005 in accordance with
the completed contract methodology under SOP 81-1.
On March 1, 2006, the Company announced a further review of the Company's
revenue recognition policies relating to the recognition of products and related
software sold in conjunction with post-contract support (PCS) under SOP 97-2,
SAB 104, EITF 00-21 and FASB Technical Bulletin 90-1, "Accounting for Separately
Priced Extended Warranty and Product Maintenance Contracts." As a result,
management determined that the Company did not account properly for the sale of
digital video products under SOP 97-2 and did not establish vendor specific
objective evidence (VSOE) of fair value for its PCS revenue element related to
these sales. Accordingly, revenue for digital video products sold in conjunction
with PCS and previously recognized as separate elements in each quarter

50

--------------------------------------------------------------------------------

Table of Contents

of 2003 and 2004, and also in the first and second quarters of 2005 was deferred and recognized over the contract service period.

On November 8, 2006, the Company announced that the Audit Committee, upon the recommendation of management, had concluded that the Company's consolidated financial statements for the years ended December 31, 2003, 2002 and 2000 and for the quarters of 2003, 2002 and 2000 should no longer be relied upon. The restatement of financial statements for 2003 would correct errors primarily relating to revenue recognition, cost of goods sold and estimates of reserves. The restatement of financial statements for 2000 and 2002 would correct errors primarily relating to the need to separately value and account for embedded derivatives associated with the Company's 5% convertible subordinated notes issued in July 2000, and other estimates. While no determination was made that the financial statements for 2001 could not be relied upon, adjustments would be made to 2001 that would be reflected in the financial statements to be included in its periodic reports to be filed with the Securities and Exchange Commission (Commission) and reported as "adjusted."

The Company's previous auditors resigned effective as of September 21, 2005 and on that date, the Audit Committee engaged Stonefield Josephson, Inc. (Stonefield) as the Company's new independent registered public accounting firm. On May 26, 2006, the Company announced that it had engaged Stonefield, its current independent auditor, to re-audit the Company's consolidated financial statements for the year ended December 31, 2004 and, if necessary, to audit the Company's consolidated financial statements for the year ended December 31, 2003. On November 8, 2006, the Company announced that it had engaged Stonefield to re-audit the Company's consolidated financial statements for the year ended December 31, 2003.

In June 2006, the Company, through outside counsel, retained FTI Consulting, Inc. to provide an independent accounting perspective in connection with the accounting issues under review.

In connection with the Company's accounting review of the Thomson Contract referred to above, the Commission initiated a formal investigation. This matter was previously the subject of an informal Commission inquiry. The Company has been cooperating fully with the Commission and will continue to do so in order to bring the investigation to a conclusion as promptly as possible.

The Restatement and Other Related Matters

The following is a description of the significant adjustments to previously reported financial statements resulting from the restatement process and additional matters addressed in the course of the restatement. While this description does not purport to explain each correcting entry, the Company believes that it fairly describes the significant factors underlying the adjustments and the overall impact of the restatement in all material respects.

Revenue Recognition.  The Company did not properly account for revenue as described below. As part of the restatement process, the Company applied the appropriate revenue recognition methods to each element of all multiple-element contracts, corrected other errors related to revenue recognition and corrected errors to other accounts, including cost of goods sold and deferred revenue resulting in adjustments to these accounts in each period covered by the restatement.

Video Product and Post Contract Support.  The Company did not properly recognize revenue in accordance with generally accepted accounting principles (GAAP), specifically SOP 97-2 for its digital video products. The Company previously recognized revenue for its digital video products in accordance with SAB 101, as amended by SAB 104 based upon meeting the revenue recognition criteria in SAB 104. In order for the Company to recognize revenue from individual elements within a multiple element arrangement under SOP 97-2, the Company must establish vendor specific objective evidence (VSOE) of fair value for each element. The Company determined that it did not establish VSOE of fair value for the undelivered element of PCS on the digital video products. Therefore, as part of the restatement process the Company corrected this error and recognized revenue of the hardware element sold in conjunction with the undelivered PCS element ratably over the period of the customer support contract. The cost of goods sold for the sale for the hardware element and the PCS element was also recognized ratably over the period of the customer support contract. Accordingly, revenue and cost of goods sold previously recognized based on meeting the revenue recognition

51

--------------------------------------------------------------------------------

Table of Contents

criteria in SAB 104 for the individual elements for digital video products sold in conjunction with PCS in each quarter of 2003, 2004 and 2005 were deferred and recognized ratably over the contract service period.

Thomson Contract.   The Company recognized revenue as it related to the delivery of certain products and services (including the development and customization of software) to Thomson under a series of contractual arrangements under a single memorandum of understanding (MOU) in accordance with SAB 101, as amended by SAB 104. However, based on SOP 97-2 and SOP 81-1, this series of contractual arrangements should have been treated as a single contract, and therefore as a single revenue arrangement for accounting purposes. Factors that contributed to the determination of a single revenue arrangement included the documentation of the series of contractual arrangements under a single MOU and the ongoing nature of discussions between parties to define product specifications and deliverables that extended beyond the initial agreed upon contracted deliverables. In accordance with SOP 81-1, the Company determined it would not reasonably estimate progress towards completion of the project and therefore used the completed contract methodology. As a result, $7.8 million of revenue previously recognized in the third and fourth quarters of 2004 and $0.3 million of revenue previously recognized in the first two quarters of 2005 were deferred and ultimately recognized as revenue in the quarter ended December 31, 2005 upon completion of the Thomson Contract and final acceptance received from Thomson for all deliverables under the Thomson Contract. Additionally, $1.2 million of cost of goods sold previously recognized in 2004 and $1.8 million related to direct development costs previously recognized from the fourth quarter of 2003 through the second quarter of 2005 were also deferred and ultimately recognized in the quarter ended December 31, 2005.

Inventory Consignment.   During the quarter ended December 31, 2003, the Company entered into an agreement to consign specific spare parts inventory to a certain customer for the customer's demonstration and evaluation purposes. The consignment period was to terminate during the quarter ended March 31, 2004, at which time the customer would either purchase or return the spare parts inventory to the Company. During the quarter ended March 31, 2004, the Company notified the customer that the consignment period terminated and in accordance with the agreement, the customer should either return or purchase the spare parts inventory. The Company did not receive a reply and subsequently invoiced the customer $0.9 million for the spare parts inventory in the quarter ended March 31, 2004. During the quarter ended June 30, 2004, the customer agreed to purchase a portion of the spare parts inventory and returned the remaining spare parts inventory to the Company. Accordingly, for the quarter ended June 30, 2004, the Company issued the customer a credit memo for $0.9 million, which was the amount of the sale that was invoiced in the quarter ended March 31, 2004 and was the entire amount originally consigned to the customer. During the course of the restatement, it was determined that at March 31, 2004, accounts receivable was overstated by $0.9 million, inventory was understated by $0.5 million and both deferred revenue and deferred cost of goods sold were overstated by $0.9 million and $0.5 million, respectively. As a result, the consolidated balance sheets for the quarters ended March 31, 2004 and June 30, 2004 were appropriately revised to correct these errors.

Other Revenue Adjustments.   The Company also made other adjustments in 2003, 2004 and 2005 to correct the recognition of revenue for transactions where the Company did not properly apply SAB 101, as amended by SAB 104. The Company made other immaterial adjustments for certain transactions related to revenue. See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Allowance for Doubtful Accounts.   During the restatement process, the Company reassessed its accounting regarding the allowance for doubtful accounts based on its visibility of its collections and write-offs of the allowance for doubtful accounts. Prior to 2004, the Company's policy was to estimate the allowance for doubtful accounts and the corresponding bad debt expense based on a fixed percentage of revenue during a specific period. Beginning in 2004, the Company adopted a specific reserve methodology for estimating the allowance for doubtful accounts and corresponding bad debt expense. During the restatement, the Company adjusted the allowance for doubtful accounts and bad debt with a reduction of $5.2 million, an increase of $1.9 million and an increase of $0.6 million for the years ended December 31, 2000, 2001 and 2002, respectively, to reflect the specific reserve methodology and to correct errors resulting from the Company's former policy. The Company made adjustments to the allowance for doubtful accounts of $0.1 million, $0.6 million, and $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively.

--------------------------------------------------------------------------------

Table of Contents

In addition, during the restatement, the Company made other adjustments to the allowance for doubtful accounts to offset the accounts receivable and related reserve related to customers who were granted extended payment terms, experiencing financial difficulties or where collectibility was not reasonably assured. Accordingly, the Company classifies these customers as those with "extended payment terms" or with "collectibility issues." For these customers, the Company historically deferred all revenue and recognized the revenue when the fee was fixed or determinable or collectibility reasonably assured or cash was received, assuming all other criteria for revenue recognition were met. The Company adjusted the allowance for doubtful accounts, eliminating the receivable and related reserve, for these customers by an increase of $5.7 million, a decrease of $4.4 million and by an immaterial amount for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. In summary, the above restatements gave rise to an adjustment to the allowance for doubtful accounts of an increase of $5.8 million, a decrease of $3.8 million and an increase of $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. The allowance for doubtful accounts related to international customers was reduced by $0.5 million based on the activity for the year ended December 31, 2004.

Deferred Revenues and Deferred Cost of Goods Sold.  As part of the restatement process, the Company determined that it did not properly account for deferred revenue as it related to specific transactions to certain customers where the transaction did not satisfy revenue recognition criteria of SAB 104 related to customers with acceptance terms, transactions with free-on-board (FOB) destination shipping terms, customers where the arrangement fee was not fixed or determinable or customers where collectibility was not reasonably assured. While revenue was generally not recognized for these customers, the Company improperly recognized a deferred revenue liability and a deferred cost of goods sold asset, thereby overstating assets and liabilities, and during the restatement determined that deferred revenues and deferred cost of goods sold should not be recognized for these transactions. As a result, the Company adjusted deferred revenues by $1.6 million, $1.0 million and $0.9 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively, and adjusted deferred cost of goods sold by $0.9 million, $0.3 million and $0.6 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively.

Use of Estimates.  The Company did not correctly estimate, monitor and adjust balances related to certain accruals and provisions as set forth below.

Access Network Electronics.  In July 2003, the Company sold certain assets related to its Miniplex products to Verilink Corporation (Verilink). The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in April 2000. As part of the agreement with Verilink, Verilink agreed to assume all warranty obligations related to ANE products sold by the Company prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of warranty obligations for ANE products sold by the Company prior to July 2003 related to certain power supply failures of the product and other general warranty repairs (Warranty Obligation). The $2.4 million Warranty Obligation negotiated with Verilink included up to $1.0 million for each of two specific customer issues and a general warranty obligation of $0.4 million that expired in the quarter ended March 31, 2005. During the sale process, the Company disclosed to Verilink that it had received an official specific customer complaint related to the sale of the Miniplex product to one of the two customers. In accordance with SFAS No. 5, "Accounting for Contingencies," the Company established a reserve as a result of this complaint. Under the agreement with Verilink, the Company was able to quantify its exposure at $1.0 million based upon the terms of the Warranty Obligation. No other obligations were accrued by the Company related to the Miniplex products because the Company had not received formal notice of any complaints from other customers. The Company amortized the $1.0 million warranty accrual starting in the quarter ended March 31, 2004 through the expiration of the Warranty Obligation in the quarter ended March 31, 2005. However, during the course of the restatement, the Company determined that the warranty obligation accrual should not have been reduced unless there were actual expenses incurred in connection with either the obligation or upon the expiration of the Warranty Obligation in the quarter ended March 31, 2005. Since the Company did not incur any expenses in connection with this obligation and did not establish a basis for this reduction, during the restatement, the Company corrected the reduction of this accrual by $0.2 million in each of the four quarters of 2004 and deferred the reduction of the warranty accrual until the warranty period expired in the quarter ended March 31, 2005. Accordingly, the $1.0 million reduction of the warranty obligation in the quarter ended March 31, 2005,

53

--------------------------------------------------------------------------------

reduced cost of goods sold by $0.8 million for that period and increased cost of goods sold by $0.2 million in each quarter of 2004.

Israel Restructuring Reserve.  During 2001, the Board of Directors approved a restructuring plan and the Company incurred restructuring charges in the amount of $12.7 million for excess leased facilities of which $7.4 million related to Israel and $1.7 million remained accrued at December 31, 2004. In 2002, the Company did not include in its assessment the ability to generate and collect sublease income in its Israel facility. As a result, the Company increased its reserve by $1.2 million due to lowered sublease assumptions. In the quarter ended December 31, 2004, the Company analyzed the reserve and reduced the reserve by $1.5 million to $1.7 million reducing operating expenses. During the restatement process, the Company determined that $1.2 million of the $1.5 million reserve reduction recognized in the quarter ended December 31, 2004 properly related to the year ended December 31, 2002. As a result, the Company reversed the previously recorded $1.2 million increase in restructuring reserve expense in 2002, thereby decreasing the net loss for the quarter ended December 31, 2002. The Company also corrected the entry that reduced the restructuring reserve in 2004 by reversing the $1.2 million decrease in the reserve that occurred in 2004.

License Fee.  In 1999, the Company entered into an intellectual property (IP) license agreement (License Agreement) with a third party. Pursuant to the License Agreement, the Company recorded a prepaid asset of $2.0 million related to its licensing of the IP. The License Agreement allowed the Company to incorporate the IP into "manufactured products" for the cost of the license fee which was $2.0 million. Additionally, the Agreement also incorporated a clause for the Company to pay a royalty fee of $1 per unit of "component products" sold to third parties by the Company. During 1999, the Company began designing semiconductor chips using this IP and paying the license fee for the IP. In June 2000, the Company made its final payment on the $2.0 million license, and the Company had a $2.0 million prepaid asset. The Company amortized the prepaid asset based on applying the royalty rate of $1 per unit established in the License Agreement. However, the Company incorrectly applied the $1 per unit rate to units produced rather than units sold. As part of correcting this error, the Company adjusted the amortization rate of the prepaid asset to reflect actual units sold resulting in a reduction in the per unit amortization rate. Adjustments to cost of goods sold were a decrease of $0.8 million in 2003, an increase of $0.5 million in 2004 and an increase of $0.2 million during the first two quarters of 2005.

Goods Received Not Invoiced.  The Company maintains an account to accrue for obligations arising from instances in which the Company has received goods but has not yet received an invoice for the goods (RNI). During 2002 the Company established the reserve after management determined that the process being used to track RNI obligations was not properly stating the liability. During the quarter ended March 31, 2004, the Company analyzed the RNI account, determined that it was carrying an excess reserve of $0.8 million and began amortizing the $0.8 million excess reserve at the rate of $0.2 million per quarter thereby decreasing operating expenses by that amount in each quarter of 2004. During the restatement, the Company determined that the excess reserve should have been reduced to zero as of December 31, 2002 and adjusted the financial statements accordingly. The impact of this change is to decrease operating expenses by $0.8 million in 2002 and increase operating expenses by $0.8 million during 2004.

Other.  In conjunction with the restatement, the Company also made other adjustments and reclassifications to its accounting for various other errors for the periods presented, including: (1) correction of estimates of legal expenses, property tax and excess and obsolete inventory accruals; (2) reclassification to the proper accounting period of: bonus accruals to employees; federal income taxes payable; and operating expenses related to an operating lease; (3) correction of accounting for impaired and disposed assets; and (4) expenses related to an extended warranty provided to a customer. See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Convertible Subordinated Notes.  In July 2000, the Company issued $500.0 million of 5% convertible subordinated notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.0 million. The Notes were convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133),

--------------------------------------------------------------------------------

the Notes are considered a hybrid instrument since, and as described below, they contained multiple embedded derivatives.

The Notes contained several embedded derivatives. First, the Notes contain a contingent put (Contingent Put) where in the event of any default by the Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all unpaid principal and accrued interest to be due and payable immediately. Second, the Notes contain an investor conversion option (Investor Conversion Option) where the holder of the Notes may convert the debt security into Company common stock at any time after 90 days from original issuance and prior to August 1, 2007. The number of shares of common stock that is issued upon conversion is determined by dividing the principal amount of the security by the specified conversion price in effect on the conversion date. The initial conversion price was $84.01 which was subject to adjustment under certain circumstances described in the Indenture. Third, the Notes contain a liquidated damages provision (Liquidated Damages Provision) that obligated the Company to pay liquidated damages to investors of 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter, in the event that the Company did not file an initial shelf registration for the securities within 90 days of the closing date. In the event that the Company filed its initial shelf registration within 90 days but failed to keep it effective for a two year period from the closing date, the Company would pay 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter. Fourth, the Notes contain an issuer's call option (Issuer Call Option) that allowed the Company to redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01, for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of the mailing of the redemption notice. In addition, if the Company redeemed the Notes, it was also required to make a cash payment of $193.55 per $1,000 principal amount of the Notes less the amount of any interest actually paid on the Notes prior to redemption. The Company had the option to redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest.

Under SFAS 133, an embedded derivative must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone derivative if the economic characteristics and risks of the embedded derivative are not considered "clearly and closely related" to those of the host. An embedded derivative would not be considered clearly and closely related to the host if there was a possible future interest rate scenario (even though it may be remote) in which the embedded derivative would at least double the initial rate of return on the host contract and the effective rate would be twice the current market rate as a contract that had similar terms as the host and was issued by a debtor with similar credit quality. Furthermore, per SFAS 133, the embedded derivative would not be considered clearly and closely related to the host contract if the hybrid instrument could be settled in such a way the investor would not recover substantially all of its initial investment.

During the restatement process, the Company determined under SFAS 133 that both the Issuer Call Option and the Liquidated Damages Provision represented an embedded derivative that was not clearly and closely related to the host contract, and therefore needed to be bifurcated from the Notes and valued separately. As it related to the Liquidated Damages Provision and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $0.4 million. Based on the fact we amortize the $0.4 million over the 7-year life of the Notes, the impact to the Company's financial results related to the Liquidated Damages Provision was not material. As it related to the Issuer Call Option and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $11.9 million. As a result, at the time the Notes were issued in July 2000, the Company should have created an asset to record the value of the Issuer Call Option for $11.9 million and created a bond premium to the Notes for $11.9 million. In accordance with SFAS 133, the asset value would then be marked to market at the end of each accounting period and the bond premium would be amortized against interest expense at the end of each accounting period. Due to the decrease in the price of the Company's common stock, the value of the Issuer Call Option became effectively zero and the Company should have written off the asset related to the Issuer Call Option in 2000. Additionally, as part of the bond repurchase activity where the Company repurchased $325.9 million and $109.1 million of face value of the Notes (for a total of $435.0 million) that occurred in 2001 and 2002, the Company should have recognized an additional gain from the retirement of the bond premium associated

55

--------------------------------------------------------------------------------

Table of Contents

with the Issuer Call Option of $7.0 million in 2001 and $1.9 million in 2002. The Company determined that the $7.0 million non-cash gain on the early retirement of the premium to be immaterial to 2001 financial results.

In the quarter ended March 31, 2006, the Company paid off the entire principal amount of the outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million. In addition, the Company recognized $0.3 million into other income, net representing the remaining unamortized bond premium associated with the Issuer Call Option.

--------------------------------------------------------------------------------

Table of Contents

The following tables present the effect of the restatement adjustments by financial statement line item for the consolidated statements of income, balance sheets and statements of cash flows:

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)

| | As Previously Reported | Cumulative Effect of Prior Year Adjustments | Current Year Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $ 30,188 | $ -- | $ -- | 30,188 | |
| Short-term investments | 108,452 | | | 108,452 | |
| Accounts receivable, net of allowance for doubtful accounts | 29,799 | 2,723 | (7,587) | 24,935 | (a),(b) |
| Other current receivables | 3,662 | | | 3,662 | |
| Inventory, net | 16,364 | | 913 | 17,277 | (c) |
| Other current assets | 2,885 | | | 3,205 | |
| Short-term Deferred cost of goods sold | | | 522 | | (d) |
| | | | | | |
| Total current assets | 191,348 | 2,723 | (6,352) | 187,719 | |
| Property and equipment, net | 11,871 | | | 12,059 | |
| Fixed asset | | 548 | (360) | | (e) |
| Restricted cash | 9,212 | | | 9,212 | |
| Other assets, net | 2,809 | | | 4,109 | |
| Long-term Deferred cost of goods sold | | | 950 | | (f) |
| License fee | | 188 | 762 | | (g) |
| | | | | | |
| Total assets | $ 215,240 | $ 3,459 | $ (5,600) | 213,099 | |
| | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable | $ 26,049 | $ -- | $ -- | 26,286 | |
| Israel restructuring | | 1,177 | | | (h) |
| Received not invoiced | | (1,940) | | | (i) |
| Common area maintenance | | 515 | (513) | | (j) |
| Accrued payroll and related expenses | 6,537 | | | 6,537 | |
| Deferred revenues | 5,423 | | | 1,890 | |
| Thomson direct development costs | | | (205) | | (k) |
| Short-term deferred revenue | | | (1,228) | | (l) |
| Accrued warranty expenses | 5,509 | | | 5,229 | |
| Warranty reserve | | (280) | | | (m) |
| Accrued restructuring and executive severance | 2,447 | 1,834 | | 1,586 | (n) |
| Israel restructuring | | (1,178) | | | (h) |
| Restructuring reclass between short-term and long-term | | | (1,717) | | (o) |
| Accrued vendor cancellation charges | 2,869 | | | 2,869 | |
| Accrued other liabilities | 5,284 | (229) | | 4,706 | (n) |
| Reclass short-term portion of deferred rent | | | 249 | | (p) |
| Tax accrual | | (431) | 33 | | (q) |
| Interest payable | 1,390 | (1) | (1) | 1,386 | |
| Current portion of capital lease obligations | 126 | 1 | 1 | 126 | |
| | | | | | |
| Total current liabilities | 53,800 | (934) | (5,181) | 49,685 | |
| Long-term obligations | 3,118 | (1,514) | (248) | 1,356 | (n),(p) |
| Long-term deferred revenue | | | 2,207 | 2,207 | (r) |
| Accrued restructuring and executive severance | 1,863 | (80) | 1,716 | 3,479 | (n),(o) |
| Convertible subordinated notes | 65,081 | 949 | (331) | 65,809 | (a) |
| | | | | | |
| Total liabilities | 123,862 | (1,589) | 273 | 122,536 | |
| **Stockholders' equity:** | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| | 75 | | | 75 | |
| Additional paid-in capital | 1,082,036 | (1) | (1) | 1,082,034 | |
| Accumulated deficit | (987,560) | 5,048 | (5,870) | (988,382) | (1) |
| Deferred compensation | (22) | 1 | (2) | (23) | |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,368) | | | (2,368) | |
| | | | | | |
| Total stockholders' equity | 91,388 | 5,048 | (5,873) | 90,563 | |
| | | | | | |
| Total liabilities and stockholders' equity | $ 215,240 | $ 3,459 | $ (5,600) | 213,099 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Table of Contents

Explanation of Current Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped
free-on-board
destination or with acceptance provisions and to adjust the allowance for
doubtful accounts based on the Company's reassessment of the account.
(b) To reflect other adjustments and reclassifications.
(c) To reflect the cumulative effects of adjustments for transactions shipped
free-on-board
destination or with acceptance provisions.
(d) To reflect the cumulative effects of adjustments for the short-term portion
of deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped
free-on-board
destination or with acceptance provisions.
(e) To adjust for the reversal of a fixed asset write off reserve and to
recognize a loss on the disposal of assets.
(f) To reflect the cumulative effects of adjustments for the long-term portion of
deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped
free-on-board
destination or with acceptance provisions.
(g) To correct pre-paid amortization on license fee based on a new royalty rate.
(h) To correct an adjustment originally recorded during the quarter ended
December 31, 2004 that wrote-off excess Israel restructuring liabilities.
During the restatement, management concluded the adjustment should have
occurred during 2002.
(i) To correct an adjustment originally recorded during each quarter of 2004 to
the received not invoiced (RNI) account. During the restatement, management
concluded that the adjustment should have occurred in 2002.
(j) To adjust for an unrecorded liability for common area maintenance in prior
period.
(k) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(l) To reflect the cumulative effects of adjustments for the short-term portion
of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped
free-on-board
destination or with acceptance provisions.
(m) To adjust the accrual to reflect an updated extended warranty model.
(n) To reflect a reclassification adjustment made after the filing of the
original financial statements.
(o) To reflect short-term and long-term portion of restructuring liabilities.
(p) To reflect the short-term portion of deferred rent.
(q) To reverse an accrual of income taxes payable recorded in prior periods.
(r) To reflect the cumulative effects of adjustments for the long-term portion of
deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped
free-on-board
destination or with acceptance provisions.
(s) To record amortization of bond premium to interest income.
(t) To reflect cumulative effects of restatement adjustments on accumulated
deficit.

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

March 31, 2004

|  | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current assets:** | | | | | |
| Cash and cash equivalents | $ 76,060 $ | -- $ | -- $ | 76,060 | |
| Short-term investments | 47,151 | | | 47,151 | |
| Accounts receivable, net of allowance for doubtful accounts | 29,041 | (4,864) | 1,108 | 25,285 | (a),(n) |
| Inventory, net | 19,267 | 913 | (336) | 20,307 | (b) |
| Inventory consignment | | | 463 | | (c) |
| Other current assets | 4,623 | 322 | | 5,465 | |
| Short-term deferred cost of goods sold | | | 520 | | (d) |
| Total current assets | 176,142 | (3,629) | 1,755 | 174,268 | |
| Property and equipment, net | 10,821 | 188 | (94) | 10,915 | |
| Intangibles and other assets, net | 11,609 | 1,300 | | 13,198 | |
| Long-term deferred cost of goods sold | -- | | 210 | | (e) |
| License fee | -- | | 79 | | (f) |
| Total Assets | $ 198,572 $ | (2,141)$ | 1,950 $ | 198,381 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts payable | $ 21,362 $ | (763)$ | -- $ | 20,791 | |
| Received not invoiced | | | 192 | | (g) |
| Accrued payroll and related expenses | 5,072 | | | 5,072 | |
| Deferred revenues | 4,451 | (1,433) | | 3,449 | |
| Inventory consignment | | | (398) | | (c) |
| Short-term deferred revenue | | | 1,168 | | (h) |
| Thomson direct development costs | | | (339) | | (i) |
| Accrued warranty expenses | 4,605 | (280) | | 4,524 | |
| Access Network Electronics | | | 199 | | (j) |
| Accrued restructuring and executive severance | 6,598 | (2,895) | | 2,797 | (k) |
| Restructuring reclass between short-term and long-term | | | (906) | | (l) |
| Accrued vendor cancellation charges | 1,399 | | | 1,399 | |
| Accrued other liabilities | 4,137 | (349) | | 3,799 | (k) |
| Reclass short-term portion of deferred rent | | | (248) | | (m) |
| Rebate obligation | | | 215 | | (n) |
| Tax accrual | | | 44 | | (o) |
| Other current obligations | 570 | | | 570 | |
| Interest payable | | | (2) | | |
| Current portion of capital lease obligations | | | 2 | | |
| Total current liabilities | 48,194 | (5,720) | (73) | 42,401 | |
| Long-term obligations | 3,472 | 1,468 | 1,156 | 6,096 | (k),(l),(m) |
| Long-term deferred revenue | | 2,207 | 1,168 | 3,375 | (p) |
| Convertible subordinated notes | 65,081 | 728 | (55) | 65,754 | (q) |
| Total liabilities | 116,747 | (1,317) | 2,196 | 117,626 | |
| **Stockholders' equity:** | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,082,770 | (1) | 1 | 1,082,770 | |
| Accumulated deficit | (997,807) | (822) | (248) | (998,877) | (r) |
| Treasury stock, at cost | (773) | (1) | 1 | (773) | |
| Accumulated other comprehensive loss | (2,441) | | | (2,441) | |
| Total stockholders' equity | 81,825 | (824) | (246) | 80,755 | |
| Total liabilities and stockholders' equity | $ 198,572 $ | (2,141)$ | 1,950 $ | 198,381 | |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.
(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.
(c) To reverse invoicing of consigned inventory sale and related deferral of net revenue and COGS.
(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(e) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(f) To correct pre-paid amortization on license fee based on a new royalty rate.
(g) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.
(h) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(i) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.
(j) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.
(k) The cumulative amount was adjusted from the prior period to reflect the reclassification adjustment made after the filing of the original financial statements.
(l) To reflect short-term and long-term portion of restructuring liabilities.
(m) To reflect the short-term portion of deferred rent.
(n) To reclassify to accrued other liabilities rebate obligations with a single customer previously recorded as contra-accounts receivable during the quarter.
(o) To reverse an accrual of income taxes payable recorded in prior periods.
(p) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(q) To record amortization of bond premium to interest income.
(r) To reflect cumulative effects of restatement adjustments on accumulated deficit.

60

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

|  | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| | | | June 30, 2004 | | |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 47,783 | $ -- | $ -- | $ 47,783 | |
| Short-term investments | 68,489 | | | 68,489 | |
| Accounts receivable, net of allowance for doubtful accounts | 27,884 | (3,756) | 4,641 | 28,769 | (a),(l) |
| Inventory, net | 21,403 | 1,040 | (177) | 21,803 | (b) |
| Inventory consignment | | | (463) | | (c) |
| Other current assets | 4,321 | 842 | | 5,432 | |
| Short-term deferred cost of goods sold | | | 269 | -- | (d) |
| Total current assets | 169,880 | (1,874) | 4,270 | 172,276 | |
| Property and equipment, net | 10,045 | 94 | | 10,139 | |
| Other assets, net | 11,432 | 1,589 | | 13,271 | |
| Long-term deferred cost of goods sold | | | 447 | | (e) |
| License fee | | | (197) | | (f) |
| Total Assets | $ 191,357 | $ (191) | $ 4,520 | $ 195,686 | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 16,480 | $ (571) | $ -- | $ 16,102 | |
| Received not invoiced | | | 193 | | (g) |
| Accrued payroll and related expenses | 4,919 | | | 4,919 | |
| Deferred revenues | 5,091 | (1,002) | | 3,813 | |
| Inventory consignment | | | (463) | | (c) |
| Short-term deferred revenue | | | 567 | | (h) |
| Thomson direct development costs | | | (380) | | (i) |
| Accrued warranty expenses | 4,191 | (81) | | 4,311 | |
| Access Network Electronics | | | 201 | | (j) |
| Accrued restructuring and executive severance | 9,070 | (3,801) | | 5,343 | |
| Restructuring reclass between short-term and long-term | | | 74 | | (k) |
| Accrued vendor cancellation charges | 713 | | | 713 | |
| Accrued other liabilities | 4,382 | (338) | | 4,413 | |
| Rebate obligation | | | 520 | | (l) |
| Tax accrual | | | (151) | | (m) |
| Other current obligations | 1,362 | | | 1,362 | |
| Total current liabilities | 46,208 | (5,793) | 561 | 40,976 | |
| Long-term obligations | 3,156 | 2,624 | (73) | 5,707 | (k) |
| Long-term deferred revenue | | 3,375 | 2,901 | 6,276 | (n) |
| Convertible subordinated notes | 65,081 | 673 | (56) | 65,698 | (o) |
| Total liabilities | 114,445 | 879 | 3,333 | 118,657 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,082,811 | | (2) | 1,082,809 | |
| Accumulated deficit | (1,002,668) | (1,070) | 1,189 | (1,002,549) | (p) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,534) | | | (2,534) | |
| Total stockholders' equity | 76,912 | (1,070) | 1,187 | 77,029 | |
| Total liabilities and stockholders' equity | $ 191,357 | $ (191) | $ 4,520 | $ 195,686 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

61

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reverse invoicing of consigned inventory sale and related deferral of net revenue and COGS.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(f) To correct pre-paid amortization on license fee based on a new royalty rate.

(g) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.

(h) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(i) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(j) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.

(k) To reflect short-term and long-term portion of restructuring liabilities.

(l) To reclassify to accrued other liabilities rebate obligations with a single customer previously recorded as contra-accounts receivable during the quarter.

(m) To reverse an accrual of income taxes payable recorded in prior periods.

(n) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(o) To record amortization of bond premium to interest income.

(p) To reflect cumulative effects of restatement adjustments on accumulated deficit.

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| | | September 30, 2004 | | | |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 64,150 | $ -- | $ -- | $ 64,150 | |
| Short-term investments | 47,757 | | 1 | 47,758 | |
| Accounts receivable, net of allowance for doubtful accounts | 20,475 | 885 | (2,054) | 19,306 | (a),(k) |
| Inventory, net | 15,529 | 400 | (278) | 15,651 | (b) |
| Other current assets | 3,586 | 1,111 | | 4,599 | |
| Short-term deferred cost of goods sold | | | (98) | | (c) |
| Total current assets | 151,497 | 2,396 | (2,429) | 151,464 | |
| Property and equipment, net | 9,134 | 94 | | 9,228 | |
| Other assets, net | 10,865 | 1,839 | | 12,866 | |
| Long-term deferred cost of goods sold | | | 385 | | (d) |
| License fee | | | (223) | | (e) |
| Total Assets | $ 171,496 | $ 4,329 | $ (2,267) | $ 173,558 | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 11,128 | $ (378) | $ -- | $ 10,942 | |
| Received not invoiced | | | 192 | | (f) |
| Accrued payroll and related expenses | 4,368 | | | 4,368 | |
| Deferred revenues | 4,345 | (1,278) | | 3,541 | |
| Short-term deferred revenue | | | 867 | | (g) |
| Thomson direct development costs | | | (393) | | (h) |
| Accrued warranty expenses | 4,043 | 120 | | 4,363 | |
| Access Network Electronics | | | 200 | | (i) |
| Accrued restructuring and executive severance | 7,914 | (3,727) | | 4,604 | |
| Restructuring reclass between short-term and long-term | | | 417 | | (j) |
| Accrued vendor cancellation charges | 2,133 | | | 2,133 | |
| Accrued other liabilities | 4,459 | 31 | | 3,813 | |
| Rebate obligation | | | (736) | | (k) |
| Tax accrual | | | 59 | | (l) |
| Interest payable and current portion of capital lease obligations | 542 | | | 542 | |
| Total current liabilities | 38,932 | (5,232) | 606 | 34,306 | |
| Long-term obligations | 3,417 | 2,551 | (418) | 5,550 | (j) |
| Long-term deferred revenue | | 6,276 | 2,643 | 8,919 | (m) |
| Convertible subordinated notes | 65,081 | 617 | (55) | 65,643 | (n) |
| Total liabilities | 107,430 | 4,212 | 2,776 | 114,418 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,083,420 | (2) | 2 | 1,083,420 | |
| Accumulated deficit | (1,016,188) | 119 | (5,044) | (1,021,113) | (o) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,469) | | (1) | (2,470) | |
| Total stockholders' equity | 64,066 | 117 | (5,043) | 59,140 | |
| Total liabilities and stockholders' equity | $ 171,496 | $ 4,329 | $ (2,267) | $ 173,558 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
Consolidated Financial Statements.

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(d) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To correct pre-paid amortization on license fee based on a new royalty rate.

(f) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.

(g) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(h) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(i) To reflect short-term and long-term portion of restructuring liabilities.

(j) To reflect short-term and long-term portion of restructuring liabilities.

(k) To reverse the reclassification to accrued other liabilities of rebate obligations with a single customer previously recorded as contra-receivables originally recorded in the quarter ended September 30, 2004. The correcting reclassification was performed for the quarter ended March 31, 2004 and June 30, 2004 as part of the restatement.

(l) To reverse an accrual of income taxes payable recorded in prior periods.

(m) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(n) To record amortization of bond premium to interest income.

(o) To reflect cumulative effects of restatement adjustments on accumulated deficit.

64

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| | December 31, 2004 | | | | |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 43,218 | $ -- | $ -- | $ 43,218 | |
| Short-term investments | 54,517 | 1 | (1) | 54,517 | |
| Accounts receivable, net of allowance for doubtful accounts | 19,660 | (1,169) | 68 | 18,559 | (a) |
| Other current receivables | 1,044 | | | 1,044 | |
| Inventory, net | 17,144 | 122 | (49) | 17,666 | (b) |
| E&O vendor cancellation | | | 449 | | (c) |
| Other current assets | 2,042 | 1,013 | | 3,516 | |
| Short-term deferred cost of goods sold | | | 461 | | (d) |
| | | | | | |
| Total current assets | 137,625 | (33) | 928 | 138,520 | |
| Property and equipment, net | 5,760 | 94 | | 5,854 | |
| Restricted cash | 8,827 | | | 1,241 | |
| Non-current deposits reclass | | | (7,586) | | (e) |
| Other assets, net | 1,522 | 2,001 | | 11,366 | |
| Long-term deferred cost of goods sold | | | 415 | | (f) |
| License fee | | | (159) | | (g) |
| Non-current deposits reclass | | | 7,587 | | (e) |
| | | | | | |
| Total Assets | $ 153,734 | $ 2,062 | $ 1,185 | $ 156,981 | |
| | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 7,845 | $ (186) | $ -- | $ 7,846 | |
| Received not invoiced | | | 187 | | (h) |
| Accrued payroll and related expenses | 4,181 | | | 4,493 | |
| Tax accrual reclass | | | (245) | | (e) |
| Bonus accrual | | | 557 | | (i) |
| Deferred revenues | 2,579 | (804) | | 4,965 | |
| Short-term deferred revenue | | | 3,395 | | (j) |
| Thomson direct development costs | | | (205) | | (k) |
| Accrued warranty expenses | 3,870 | 320 | | 4,670 | |
| Access Network Electronics | | | 200 | | (l) |
| Warranty reserve | | | 280 | | (m) |
| Accrued restructuring and executive severance | 3,902 | (3,310) | | 3,744 | |
| Israel restructuring | | | 1,177 | | (n) |
| Restructuring reclass between short-term and long-term | | | 1,975 | | (o) |

| | | | | | |
|---|---|---|---|---|---|
| Accrued vendor cancellation charges | 521 | | | 521 | |
| Accrued other liabilities | 4,317 | (646) | | 3,873 | |
| Legal accrual | | | (448) | | (p) |
| Property tax | | | (240) | | (q) |
| Tax accrual | | | 645 | | (r) |
| Tax accrual reclass | | | 245 | | (e) |
| Interest payable and current portion of capital lease obligations | 1,356 | | | 1,356 | |
| | | | | | |
| Total current liabilities | 28,571 | (4,626) | 7,523 | 31,468 | |
| Long-term obligations | 2,077 | | (1) | 2,076 | |
| Long-term deferred revenue | | 8,919 | 2,165 | 11,084 | (s) |
| Accrued restructuring and executive severance | 1,664 | 2,133 | (1,975) | 1,822 | (o) |
| Convertible subordinated notes | 65,081 | 562 | (55) | 65,588 | (t) |
| | | | | | |
| Total liabilities | 97,393 | 6,988 | 7,657 | 112,038 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,083,711 | | (2) | 1,083,709 | |
| Accumulated deficit | (1,024,091) | (4,925) | (6,471) | (1,035,487) | (u) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,582) | (1) | 1 | (2,582) | |
| | | | | | |
| Total stockholders' equity | 56,341 | (4,926) | (6,472) | 44,943 | |
| | | | | | |
| Total liabilities and stockholders' equity | $  153,734 | $   2,062 | $   1,185 | $  156,981 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

65

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.
(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.
(c) To reverse E&O reserves related to CMTS product based on revised demand forecast.
(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(e) To reflect other adjustments and reclassifications.
(f) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(g) To correct pre-paid amortization on license fee based on a new royalty rate.
(h) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.
(i) To accrue for retention and other miscellaneous bonuses earned by employees in 2004.
(j) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(k) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.
(l) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.
(m) To adjust the accrual to reflect an updated extended warranty model.
(n) To correct an adjustment originally recorded during the quarter ended December 31, 2004 that wrote-off excess Israel restructuring liabilities. During the restatement, management concluded the adjustment should have occurred during 2002.
(o) To reflect short-term and long-term portion of restructuring liabilities.
(p) To correct legal accrual adjustment recorded as of December 31, 2004 and to reflect a liability at March 31, 2005.
(q) To reverse an accrual of property taxes related to the Santa Clara facility.
(r) To reverse an accrual of income taxes payable recorded in prior periods.
(s) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.
(t) To record amortization of bond premium to interest income.
(u) To reflect cumulative effects of restatement adjustments on accumulated deficit.

66

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustment | As Restated(1) | Notes |
|---|---|---|---|---|---|
| | | | March 31, 2005 | | |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 30,637 | $ -- | $ -- | $ 30,637 | |
| Short-term investments | 69,180 | | | 69,180 | |
| Accounts receivable, net of allowance for doubtful accounts | 19,736 | (1,101) | (782) | 17,853 | (a) |
| Other current receivables | 1,242 | | | 1,242 | |
| Inventory, net | 18,611 | 522 | 437 | 19,342 | (b) |
| E&O vendor cancellation | | | (228) | | (c) |
| Other current assets | 1,634 | 1,474 | | 5,126 | |
| Short-term deferred cost of goods sold | | | 2,018 | | (d) |
| Total current assets | 141,040 | 895 | 1,445 | 143,380 | |
| Property and equipment, net | 4,840 | 94 | 1 | 4,935 | |
| Restricted cash | 8,817 | (7,586) | | 1,261 | |
| Restricted cash - long-term reclass | | | 10 | | (e) |
| Other assets, net | 710 | 9,844 | | 9,638 | |
| Long-term deferred cost of goods sold | | | (777) | | (f) |
| License fee | | | (129) | | (g) |
| Restricted cash - long-term reclass | | | (10) | | (e) |
| Total Assets | $ 155,407 | $ 3,247 | $ 540 | $ 159,194 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 8,278 | $ 1 | $ (1) | $ 8,278 | |
| Accrued payroll and related expenses | 3,601 | 557 | | 3,601 | (h) |
| Bonus accrual | | | (557) | | (i) |
| Deferred revenues | 9,072 | 2,386 | | 25,283 | |
| Thomson direct development costs | | | (154) | | (j) |
| Short-term deferred revenue | | | 13,979 | | (k) |
| Accrued warranty expenses | 3,141 | 800 | | 3,140 | |
| Access Network Electronics | | | (801) | | (l) |
| Accrued restructuring and executive severance | 3,092 | (158) | | 3,093 | (m) |
| Restructuring reclass between short-term and long-term | | | 159 | | |
| Accrued vendor cancellation charges | 373 | | | 373 | |
| Accrued other liabilities | 4,031 | (689) | | 3,791 | (h) |
| Legal accrual | | | 449 | | (n) |
| Interest payable and current portion of capital lease obligations | 542 | | | 542 | |
| Total current liabilities | 32,130 | 2,897 | 13,074 | 48,101 | |
| Long-term obligations | 1,725 | (1) | | 1,724 | |
| Long-term deferred revenue | | 11,084 | (5,693) | 5,391 | (o) |
| Accrued restructuring and executive severance | 1,772 | 158 | (158) | 1,772 | (m) |
| Convertible subordinated notes | 65,081 | 507 | (56) | 65,532 | (p) |
| Total liabilities | 100,708 | 14,645 | 7,167 | 122,520 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 77 | | | 77 | |
| Additional paid-in capital | 1,085,008 | (2) | 2 | 1,085,008 | |
| Accumulated deficit | (1,026,695) | (11,396) | (6,629) | (1,044,720) | (q) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,918) | | | (2,918) | |
| Total stockholders' equity | 54,699 | (11,398) | (6,627) | 36,674 | |
| Total liabilities and stockholders' equity | $ 155,407 | $ 3,247 | $ 540 | $ 159,194 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

67

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reverse E&O reserves related to CMTS product based on revised demand forecast.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To reflect other adjustments and reclassifications.

(f) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(g) To correct pre-paid amortization on license fee based on a new royalty rate.

(h) The cumulative amount was adjusted from the prior period to reflect the reclassification adjustment made after the filing of the original financial statements.

(i) To accrue for retention and other miscellaneous bonuses earned by employees in 2004.

(j) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(k) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(l) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.

(m) To reflect short-term and long-term portion of restructuring liabilities.

(n) To correct legal accrual adjustment recorded as of December 31, 2004 and to reflect the liability at March 31, 2005.

(o) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(p) To record amortization of bond premium to interest income.

(q) To reflect cumulative effects of restatement adjustments on accumulated deficit.

68

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated(1) | Notes |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 38,605 $ | -- $ | -- $ | 38,605 | |
| Short-term investments | 66,383 | | | 66,383 | |
| Accounts receivable, net of allowance for doubtful accounts | 19,957 | (1,883) | (1,620) | 16,454 | (a) |
| Other current receivables | 1,758 | | | 1,758 | |
| Inventory, net | 12,759 | 731 | 672 | 13,942 | (b) |
| E&O vendor cancellation | -- | | (220) | -- | (c) |
| Other current assets | 2,100 | 3,492 | | 8,546 | |
| Short-term deferred cost of goods sold | -- | | 2,954 | | (d) |
| Total current assets | 141,562 | 2,340 | 1,786 | 145,688 | |
| Property and equipment, net | 4,538 | 95 | (1) | 4,632 | |
| Restricted cash | 8,763 | (7,576) | | 1,241 | |
| Restricted cash - long-term reclass | | | 54 | | (e) |
| Other assets, net | 633 | 8,928 | | 11,949 | |
| Long-term deferred cost of goods sold | | | 2,545 | | (f) |
| License fee | | | (103) | | (g) |
| Restricted cash - long-term reclass | | | (54) | | (e) |
| Total assets | $ 155,496 $ | 3,787 $ | 4,227 $ | 163,510 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 4,572 $ | -- $ | -- $ | 4,572 | |
| Accrued payroll and related expenses | 3,147 | | | 3,147 | |
| Deferred revenues | 14,005 | 16,211 | | 34,431 | |
| Thomson direct development costs | | | (173) | | (h) |
| Short-term deferred revenue | | | 4,388 | | (i) |
| Accrued warranty expenses | 2,722 | (1) | 1 | 2,722 | |
| Accrued restructuring and executive severance | 1,991 | 1 | (1) | 1,991 | |
| Accrued vendor cancellation charges | 374 | | | 374 | |
| Accrued other liabilities | 3,609 | (240) | | 3,369 | |
| Interest payable and current portion of capital lease obligations | 1,356 | | | 1,356 | |
| Total current liabilities | 31,776 | 15,971 | 4,215 | 51,962 | |
| Long-term obligations | | | | | |
| Long-term deferred revenue | | 5,390 | 6,049 | 11,439 | (j) |
| Accrued restructuring and executive severance | 3,441 | | | 3,441 | |
| Convertible subordinated notes | 65,081 | 451 | (55) | 65,477 | (k) |
| Total liabilities | 100,298 | 21,812 | 10,209 | 132,319 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 77 | | | 77 | |
| Additional paid-in capital | 1,085,820 | | (2) | 1,085,818 | |
| Accumulated deficit | (1,027,203) | (18,025) | (5,980) | (1,051,208) | (l) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,723) | | | (2,723) | |
| Total stockholders' equity | 55,198 | (18,025) | (5,982) | 31,191 | |
| Total liabilities and stockholders' equity | $ 155,496 $ | 3,787 $ | 4,227 $ | 163,510 | |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

69

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
destination and to adjust the allowance for doubtful accounts based on the
Company's reassessment of the account.
(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
destination.
(c) To reverse E&O reserves related to CMTS product based on revised demand
forecast.
(d) To reflect the cumulative effects of adjustments for the short-term portion
of deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably
assured or when revenue and related costs were deferred for transactions
shipped
free-on-board
destination.
(e) To reflect other adjustments and reclassifications.
(f) To reflect the cumulative effects of adjustments for the long-term portion of
deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably
assured or when revenue and related costs were deferred for transactions
shipped
free-on-board
destination.
(g) To correct pre-paid amortization on license fee based on a new royalty rate.
(h) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(i) To reflect the cumulative effects of adjustments for the short-term portion
of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably
assured or when revenue and related costs were deferred for transactions
shipped
free-on-board
destination.
(j) To reflect the cumulative effects of adjustments for the long-term portion of
deferred revenue to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments when collectibility was not reasonably
assured or when revenue and related costs were deferred for transactions
shipped
free-on-board
destination.
(k) To record amortization of bond premium to interest income.
(l) To reflect cumulative effects of restatement adjustments on accumulated
deficit.

70

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands, except per share data)

| | | Year Ended December 31, | | | |
| | 2004 | | | 2003 | |
| | As Previously Reported | Adjustments | As Restated(1) | As Previously Reported | Adjustments | As Restated(1) |
|---|---|---|---|---|---|---|
| Revenues | $ 150,538 | $ (14,054) | $ 136,484 | $ 133,485 | $ (3,298) | $ 130,187 |
| Cost of goods sold | 106,920 | (5,033) | 101,887 | 101,034 | 2,801 | 103,835 |
| Gross profit | 43,618 | (9,021) | 34,597 | 32,451 | (6,099) | 26,352 |
| Operating expenses: | | | | | | |
| Research and development | 33,959 | (760) | 33,199 | 42,839 | (205) | 42,634 |
| Sales and marketing | 24,145 | -- | 24,145 | 26,781 | -- | 26,781 |
| General and administrative | 11,216 | 823 | 12,039 | 12,127 | (193) | 11,934 |
| Restructuring charges, executive severance and asset write-offs | 11,159 | 1,177 | 12,336 | 2,803 | -- | 2,803 |
| Total operating expenses | 80,479 | 1,240 | 81,719 | 84,550 | (398) | 84,152 |
| Loss from operations | (36,861) | (10,261) | (47,122) | (52,099) | (5,701) | (57,800) |
| Interest expense, net | (1,312) | 222 | (1,090) | (362) | 221 | (141) |
| Other income, net | 1,566 | (535) | 1,031 | 2,424 | (392) | 2,032 |
| Loss before tax benefit (expense) | (36,607) | (10,574) | (47,181) | (50,037) | (5,872) | (55,909) |
| Income tax benefit (expense) | 76 | -- | 76 | (316) | -- | (316) |
| Net loss | $ (36,531) | $ (10,574) | $ (47,105) | $ (50,353) | $ (5,872) | $ (56,225) |
| Basic and diluted net loss per share | $ (0.48) | | $ (0.62) | $ (0.68) | | $ (0.76) |
| Shares used in computing basic and diluted net loss per share | 75,861 | | 75,751 | 74,212 | | 74,074 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

71

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | Notes |
| | (as restated)(1) | (as restated)(1) | |
| Net loss, as previously reported | $ (36,531) | $ (50,353) | |
| Adjustments to net loss (increase) decrease: | | | |
| Revenues | | | |
| DVS | (12,858) | (3,226) | (a),(b) |
| HAS | (291) | 659 | (b) |
| CMTS | (905) | (741) | (b),(c) |
| Other | -- | 10 | (d) |
| Cost of goods sold | | | |
| Revenue analysis (cost of goods sold) | 6,166 | (3,564) | (e) |
| Access Network Electronics | (800) | -- | (f) |
| Warranty reserve | (281) | -- | (g) |
| License fee | (500) | 763 | (h) |
| E&O vendor cancellation | 448 | -- | (i) |
| Research and development | | | |
| Bonus accrual | (556) | -- | (j) |
| Thomson (cost of goods sold) | 273 | 34 | (k) |
| Thomson direct development costs | 1,043 | 171 | (1) |
| General and administrative | | | |
| Legal accrual | 448 | -- | (m) |
| Bad debt expense | (590) | (120) | (n) |
| Common area maintenance | -- | 313 | (o) |
| Property tax | 156 | -- | (p) |
| Tax accrual | (73) | -- | (q) |
| Received not invoiced | (764) | -- | (r) |
| Restructuring charges, executive severance and asset write-offs | | | |
| Israel restructuring reserve | (1,177) | -- | (s) |
| Interest income (expense), net | | | |
| Convertible subordinated notes | 222 | 221 | (t) |
| Other income (expense), net | | | |
| Tax accrual | (441) | (33) | (q) |
| Fixed asset | (94) | (359) | (u) |
| | | | |
| Net loss, as restated | $ (47,105) | $ (56,225) | |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

72

--------------------------------------------------------------------------------

Table of Contents

Explanation of Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue
recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred
revenue and revenue for product sales when the fee was not fixed or
determinable or when collectibility was not reasonably assured and to reflect
other adjustments to the account.
(c) To reflect a $1.6 million reduction in revenue that was identified during the
Company's reassessment of the allowance for doubtful accounts and bad debt
expense account in the quarter ended September 30, 2004.
(d) To reflect other adjustments and reclassifications.
(e) To reflect adjustments to cost of goods sold related to the change in revenue
recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable or when collectibility was not reasonably assured.
(f) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
quarter ended March 31, 2005.
(g) To adjust the accrual to reflect an updated extended warranty model.
(h) To correct pre-paid amortization on license fee based on a new royalty rate.
(i) To reverse E&O reserves related to CMTS product based on revised demand
forecast.
(j) To accrue for retention and other miscellaneous bonuses earned by employees
in 2004.
(k) To defer cost of goods sold costs based on
SOP 81-1
until recognition of revenue at completion of contract . The costs were
previously recognized in the period incurred.
(l) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(m) To correct legal accrual adjustment recorded as of December 31, 2004 and to
properly reflect liability at March 31, 2005.
(n) To reflect adjustments to the allowance for doubtful accounts and bad debt
expense based on the Company's reassessment of the accounts.
(o) To adjust for an unrecorded liability for common area maintenance to reflect
expense in the prior period.
(p) To reverse an accrual of property taxes related to the Santa Clara facility.
(q) To reverse an accrual of income taxes payable recorded in prior periods.
(r) To correct an adjustment originally recorded during each quarter of 2004 to
the received not invoiced (RNI) account. During the restatement, management
concluded that the adjustment should have occurred in 2002.
(s) To correct an adjustment originally recorded during the quarter ended
December 31, 2004 that wrote-off excess Israel restructuring liabilities.
During the restatement, management concluded the adjustment should have
occurred during 2002.
(t) To record amortization of bond premium to interest income.
(u) To adjust for the reversal of a fixed asset write off reserve and to
recognize a loss on the disposal of assets.

73

--------------------------------------------------------------------------------

Table of Contents

For explanatory purposes and to assist in analysis of our consolidated financial statements, we have summarized the adjustments that were affected by the restatement below:

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)
(as restated)(1)

|  | Three Months Ended | | | | |
|  | March 31, | June 30, | September 30, | December 31, | Notes |
|  | 2004 | 2004 | 2004 | 2004 |  |
|  | (unaudited) | (unaudited) | (unaudited) | (unaudited) |  |
| Net loss, as previously reported | $ (10,247) | $ (4,861) | $ (13,520) | $ (7,903) |  |
| Adjustments to net loss (increase) decrease: | | | | | |
| Revenues | | | | | |
| DVS | (1,453) | (751) | (5,634) | (5,020) | (a),(b) |
| HAS | 309 | (744) | 104 | 40 | (b) |
| CMTS | 44 | 69 | (1,112) | 94 | (b),(c) |
| Cost of goods sold | | | | | |
| Revenue analysis (cost of goods sold)-2004 | 1,405 | 3,016 | 962 | 783 | (e) |
| Access Network Electronics | (200) | (200) | (200) | (200) | (f) |
| Warranty reserve | -- | -- | -- | (281) | (g) |
| License fee | 79 | (197) | (223) | (159) | (h) |
| E&O vendor cancellation | -- | -- | -- | 448 | (i) |
| Research and Development | | | | | |
| Bonus accrual | -- | -- | -- | (556) | (j) |
| Thomson (other) | 51 | 46 | 139 | 37 | (k) |
| Thomson direct development costs | 288 | 334 | 254 | 167 | (l) |
| General and administrative | | | | | |
| Legal accrual | -- | -- | -- | 448 | (m) |
| Bad debt expense | (496) | (396) | 861 | (559) | (n) |
| Property tax | -- | -- | -- | 156 | (o) |
| Tax accrual | -- | -- | (60) | (13) | (p) |
| Received not invoiced | (192) | (192) | (193) | (187) | (q) |
| Restructuring charges, executive severance and asset write-offs | | | | | |
| Israel restructuring reserve | -- | -- | -- | (1,177) | (r) |
| Interest income (expense), net Convertible subordinated notes | 55 | 55 | 56 | 56 | (s) |
| Other income (expense), net | | | | | |
| Tax accrual | (44) | 151 | -- | (548) | (p) |
| Fixed asset | (94) | -- | -- | -- | (t) |
| Net loss, as restated | $ (10,495) | $ (3,670) | $ (18,566) | $ (14,374) |  |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

74

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred
    revenue and revenue for product sales when the fee was not fixed or
    determinable or when collectibility was not reasonably assured and to reflect
    other adjustments to the account.
(c) To reflect a $1.6 million reduction in revenue that was identified during the
    Company's reassessment of the allowance for doubtful accounts and bad debt
    expense account in the quarter ended September 30, 2004.
(d) To reflect adjustments to cost of goods sold related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable or when collectibility was not reasonably assured.
(e) To reflect adjustments to cost of goods sold related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable or when collectibility was not reasonably assured.
(f) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
    quarter ended March 31, 2005.
(g) To adjust the accrual to reflect an updated extended warranty model.
(h) To correct pre-paid amortization on license fee based on a new royalty rate.
(i) To reverse E&O reserves related to CMTS product based on revised demand
    forecast.
(j) To accrue for retention and other miscellaneous bonuses earned by employees
    in 2004.
(k) To defer cost of goods sold costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(l) To defer direct development costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(m) To correct legal accrual adjustment recorded as of December 31, 2004 and to
    reflect the liability for the quarter ended March 31, 2005.
(n) To reflect adjustments to the allowance for doubtful accounts and bad debt
    expense based on the Company's reassessment of the accounts.
(o) To reverse an accrual of property taxes related to the Santa Clara facility.
(p) To reverse an accrual of income taxes payable recorded in prior periods.
(q) To correct an adjustment originally recorded during each quarter of 2004 to
    the received not invoiced (RNI) account. During the restatement, management
    concluded that the adjustment should have occurred in 2002.
(r) To correct an adjustment originally recorded during the quarter ended
    December 31, 2004 that wrote-off excess Israel restructuring liabilities.
    During the restatement, management concluded the adjustment should have
    occurred during 2002.
(s) To record amortization of bond premium to interest income.
(t) To adjust for the reversal of a fixed asset write off reserve and to
    recognize a loss on the disposal of assets.

75

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | Three Months Ended | | |
|---|---|---|---|
| | March 31, | June 30, | |
| | 2005 | 2005 | Notes |
| | (as restated)(1) | (as restated)(1) | |
| Net loss, as previously reported | $ (2,604) | $ (508) | |
| Adjustments to net loss (increase) decrease: | | | |
| Revenues | | | |
| DVS | (8,513) | (10,563) | (a) |
| HAS | 36 | (58) | (b) |
| CMTS | (73) | 13 | (b) |
| Cost of goods sold | | | |
| Revenue analysis (cost of goods sold) | 1,337 | 5,446 | (c) |
| Access Network Electronics | 800 | -- | (d) |
| License fee | (129) | (103) | (e) |
| E&O vendor cancellation | (228) | (220) | (f) |
| Research and development | | | |
| Bonus accrual | 556 | -- | (g) |
| Thomson (other) | 20 | 23 | (h) |
| Thomson direct development costs | 134 | 150 | (i) |
| Sales and marketing | | | |
| General and administrative | | | |
| Legal accrual | (448) | -- | (k) |
| Bad debt expense | (176) | (723) | (1) |
| Restructuring charges, executive severance and asset write-offs | | | |
| Interest income (expense), net | | | |
| Convertible subordinated notes | 55 | 56 | (m) |
| Net loss, as restated | $ (9,233) | $ (6,487) | |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

76

--------------------------------------------------------------------------------

Table of Contents

Explanation of Current Quarterly Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue
recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred
revenue and revenue for product sales when the fee was not fixed or
determinable or when collectibility was not reasonably assured and to reflect
other adjustments to the account.
(c) To reflect adjustments to cost of goods sold related to the change in revenue
recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable or when collectibility was not reasonably assured.
(d) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
quarter ended March 31, 2005.
(e) To correct pre-paid amortization on license fee based on a new royalty rate.
(f) To reverse E&O reserves related to CMTS product based on revised demand
forecast available in March 2005.
(g) To reverse expenses for retention and other miscellaneous bonuses earned by
employees in 2004.
(h) To defer cost of goods sold costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(i) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(j) To reflect other adjustments and reclassifications.
(k) To correct legal accrual adjustment recorded as of December 31, 2004 and to
reflect the liability for the quarter ended March 31, 2005.
(l) To reflect adjustments to the allowance for doubtful accounts and bad debt
expense based on the Company's reassessment of the accounts.
(m) To record amortization of bond premium to interest income.

77

--------------------------------------------------------------------------------

Table of Contents

CONSOLIDATED STATEMENT OF CASH FLOWS
EFFECTS OF THE RESTATEMENT
TERAYON COMMUNICATION SYSTEMS, INC.
(in thousands)

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | | | 2003 | | |
| | As Previously Reported | Adjustments | As Restated(1) | As Previously Reported | Adjustments | As Restated(1) |
| **Operating activities:** | | | | | | |
| Net loss | $ (36,531) | $ (10,574) | $ (47,105) | $ (50,353) | $ (5,872) | $ (56,225) |
| Adjustments to reconcile net loss to net cash (provided by) used in operating activities: | | | | | | |
| Depreciation and amortization | 6,416 | (556) | 5,860 | 9,369 | (147) | 9,222 |
| Amortization of deferred compensation | 17 | -- | 17 | 53 | -- | 53 |
| Amortization of subordinated convertible note premium | -- | (221) | (221) | -- | (221) | (221) |
| Accretion of discounts on short-term investments | -- | (107) | (107) | -- | (440) | (440) |
| Realized gains on sales of short-term investments | -- | (2) | (2) | -- | (127) | (127) |
| Inventory provision | 11,980 | (430) | 11,550 | 4,086 | (61) | 4,025 |
| Provision for doubtful accounts | -- | 590 | 590 | -- | 120 | 120 |
| Restructuring provision | -- | 6,513 | 6,513 | -- | 2,184 | 2,184 |
| Write-off of fixed assets | 2,393 | 652 | 3,045 | 497 | 322 | 819 |
| Warranty provision | -- | 3,075 | 3,075 | -- | 2,353 | 2,353 |
| Vendor cancellation provision | -- | 387 | 387 | -- | 1,362 | 1,362 |
| Compensation expense for issuance of common stock | -- | -- | -- | 70 | -- | 70 |
| Value of common and preferred stock warrants issued | -- | -- | -- | 45 | -- | 45 |
| Net changes in operating assets and liabilities: | | -- | | | -- | |
| Accounts receivable, net | 10,139 | (1,735) | 8,404 | (12,602) | 6,402 | (6,200) |
| Inventory | (12,760) | 821 | (11,939) | (12,193) | (852) | (13,045) |
| Other assets | 5,131 | (4,728) | 403 | 7,281 | (370) | 6,911 |
| Accounts payable | (18,204) | 764 | (17,440) | 2,129 | -- | 2,129 |
| Accrued payroll and related expenses | (2,356) | 372 | (1,984) | 310 | -- | 310 |
| Deferred revenues | (844) | 12,696 | 11,852 | 2,926 | 774 | 3,700 |
| Accrued warranty expenses | (1,639) | (1,995) | (3,634) | (3,098) | (2,353) | (5,451) |
| Accrued restructuring charges | 1,066 | (5,421) | (4,355) | (4,254) | (2,004) | (4,258) |
| Accrued vendor cancellation charges | (2,348) | (387) | (2,735) | (12,335) | 887 | (11,448) |
| Accrued other liabilities | (2,008) | 178 | (1,830) | (2,331) | (1,073) | (3,404) |
| Interest payable | (2) | 2 | -- | 3 | (3) | -- |
| Net cash provided by (used in) operating activities | (39,550) | (106) | (39,656) | (68,397) | 881 | (67,516) |
| **Investing activities:** | | | | | | |
| Purchases of short-term investments | (54,517) | (35,440) | (89,957) | (243,652) | (9,381) | (253,033) |
| Proceeds from sales and maturities of short-term investments | 107,931 | 35,549 | 143,480 | 224,154 | 9,947 | 234,101 |
| Purchases of property and equipment | (2,698) | (2) | (2,700) | (3,831) | 185 | (3,646) |
| Net cash provided by (used in) investing activities | 50,716 | 107 | 50,823 | (23,329) | 751 | (22,578) |
| **Financing activities:** | | | | | | |
| Principal payments on capital leases | (124) | (2) | (126) | (66) | (1,631) | (1,697) |
| Proceeds from issuance of common stock | 1,681 | 1 | 1,682 | 3,729 | (1) | 3,728 |
| Net cash provided by financing activities | 1,557 | (1) | 1,556 | 3,663 | (1,632) | 2,031 |
| Effect of foreign currency exchange rate changes | 307 | -- | 307 | 1,172 | -- | 1,172 |
| Net (decrease) increase in cash and cash equivalents | 13,030 | -- | 13,030 | (86,891) | -- | (86,891) |
| Cash and cash equivalents at beginning of year | 30,188 | -- | 30,188 | 117,079 | -- | 117,079 |
| Cash and cash equivalents at end of year | $ 43,218 | $ -- | $ 43,218 | $ 30,188 | $ -- | $ 30,188 |
| **Supplemental disclosures of cash flow information:** | | | | | | |
| Cash paid for income taxes | $ 138 | $ 37 | $ 175 | $ 194 | -- | 194 |
| Cash paid for interest | $ 3,268 | $ -- | $ 3,268 | $ 3,262 | -- | 3,262 |
| Supplemental non-cash investing and financing activities: Deferred compensation relating to common stock issued to non-employees | $ 17 | $ -- | $ 17 | $ 53 | $ -- | $ 53 |

(1) See Note 3, "Restatement of Consolidated Financial Statements" to Consolidated Financial Statements.

78

---

Table of Contents

Adjustments for Years Ended December 31, 2000, 2001 and 2002.
In view of the above adjustments, the Company determined that certain
adjustments were also necessary to previously reported financial statements for
the years ended December 31, 2000, 2001 and 2002. After further review of these
adjustments, it was determined that the financial statements for the years ended
December 31, 2000 and 2002, and the four quarters of 2000 and the four quarters
of 2002 could no longer be relied upon. While no determination was made that the
financial statements for the year ended December 31, 2001 cannot be relied upon,
adjustments are being made to 2001 that are reflected in the financial
statements included elsewhere in this Form 10-K. The following is a discussion
of the adjustments for the years ended December 31, 2000, 2001 and 2002.
Year Ended December 31, 2000.  The Company made adjustments to the financial
statements for the year ended December 31, 2000 which resulted in an increase in
accumulated net loss of $6.0 million. This included $11.2 million of costs
related to an embedded derivative (Issuer Call Option) with respect to the
Company's Notes, offset by a $5.2 million adjustment related to the Company's
analysis of the allowance for doubtful accounts. In prior periods, the Company
accrued a fixed percentage of revenue to bad debt expense that contributed to an
over-accrual of the allowance for doubtful accounts. In 2004, the Company
adopted a specific reserve methodology for determining required bad debt
allowances. The allowance for doubtful accounts was adjusted $5.2 million to
reflect the retroactive implementation of this methodology.
Related to the embedded derivative, in July 2000 the Company issued $500 million
of Notes due in August 2007. The Notes contained an Issuer Call Option and,
during the restatement process the Company determined that the Issuer Call
Option needed to be bifurcated from the Notes and valued separately in
accordance with SFAS No. 133. Based on a separate valuation that included
Black-Scholes valuation methodologies, the Company assigned a valuation of $11.9
million to the Issuer Call Option and a corresponding premium on the Notes. In
accordance with SFAS 133, the asset value related to the Issuer Call Option
would then be marked to market at the end of each accounting period and the
premium related to the Notes would be amortized against interest expense at the
end of each accounting period. Due to the decline in the price of the Company's
common stock, $11.2 million of the Issuer Call Option was required to be written
off.
During the restatement process, the Company determined under SFAS 133 that the
Liquidated Damages Provision represented an embedded derivative that was not
clearly and closely related to the host contract, and therefore needed to be
bifurcated from the Notes and valued separately. As it related to the Liquidated
Damages Provision and based on a separate valuation that included Black-Scholes
valuation methodologies, the Company assessed a valuation of $0.4 million. Based
on the need to amortize the $0.4 million over the 7-year life of the Notes, the
impact to the Company's financial results related to the Liquidated Damages
Provision was not material.
Year Ended December 31, 2001.  The Company made adjustments to the financial
statements for the year ended December 31, 2001 which resulted in a decrease in
accumulated net loss of $6.7 million. The largest adjustment of $7.9 million
gain related to the redemption of a portion of the Issuer Call Option and the
remaining $1.9 million and $0.6 million related to the Company's analysis of the
allowance for doubtful accounts and an adjustment for a previously recorded tax
accrual. During 2001, the Company repurchased $325.9 million of face value of
Notes, requiring $7.0 million of the bond premium to be redeemed. An additional
$1.0 million was recorded to reflect the amortization of the bond premium. As
part of the Company's review of the allowance for doubtful accounts, it
determined that an adjustment to increase bad debt expense and the corresponding
allowance for doubtful accounts of $1.9 million was necessary for the year ended
December 31, 2001. In 2001, the Company recorded a foreign income tax contingent
expense of $0.6 million to accrue for potential tax liabilities related to
post-acquisition activities of foreign subsidiaries. During the restatement
process, it was determined that this original accrual should not have been
recorded and the Company adjusted the balance accordingly as of December 31,
2001.
Year Ended December 31, 2002.  The Company made adjustments to the financial
statements for the year ended December 31, 2002 which resulted in a decrease in
accumulated net loss of $4.3 million. The adjustments include a $1.9 million
gain related to the redemption of a portion of Issuer Call Option; $0.4 million
related to the amortization of the bond premium; $1.2 million related to a
restructuring reserve for Israel; $0.6 million related to the allowance for
doubtful accounts; $1.9 million related to write-off a received not invoiced
account; $0.5 million

79

--------------------------------------------------------------------------------

related to a reconciliation of the fixed asset account between the general ledger and fixed asset subledger; $0.2 million related to the prepaid fee under the License Agreement; $0.3 million related to a correction for an initial warranty accrual to reflect an updated model; and $0.3 million related to a common area maintenance expense which should have been expensed in 2002. The Company recorded a $1.3 million increase in revenues and a $1.3 million increase in cost of goods sold during 2002 related to a warranty agreement with a customer, which was previously accounted for as a reduction in revenues. Under EITF 01-09, "Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)," the Company determined the cost of the warranty should have been characterized as an expense.

Reliance on Prior Consolidated Financial Statements.  The Company has not amended its previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10-K. As such, other than the Company's Form 10-K for the year ended December 31, 2005, the Company does not anticipate amending its previously filed Annual Reports on Form 10-K or its Quarterly Reports on Form 10-Q for any prior periods.

Executive Overview

We currently develop, market and sell digital video equipment to network operators and content aggregators who offer video services. Our primary products include the Network CherryPicker(R) line of digital video processing systems and the CP 7600 line of digital-to-analog decoders. Our products are used for multiple digital video applications, including the rate shaping of video content to maximize the bandwidth for standard definition (SD) and high definition (HD) programming, grooming customized channel line-ups, carrying local ads for local and national advertisers, and branding by inserting corporate logos into programming. Our products are sold primarily to cable operators, television broadcasters, telecom carriers and satellite providers in the United States, Europe and Asia.

We were founded in 1993 to provide cable operators with a cable data system enabling them to offer high-speed, broadband Internet access to their subscribers. By 1999, we were primarily selling this cable data system -- composed of cable modems and cable modem termination systems (CMTS) -- which utilized our proprietary Synchronous Code Division Multiple Access (S-CDMA) technology. Also in 1999, we initiated an acquisition strategy that ultimately included the acquisition of ten companies to expand our product offerings within the cable industry and outside of the cable industry to the telecom and satellite industries. With the market downturn in 2000, we refocused our business to target the cable industry and began selling data and voice products based on industry standard specifications, particularly the Data Over Cable System Interface Specification (DOCSIS), thereby beginning our transition from proprietary-based products to standards-based products. Also at this time, we focused our business on providing digital video products to cable operators and satellite providers. Since 2000, we have terminated our data-over-satellite business and all of our acquired telecom-focused businesses and incurred restructuring charges in connection with these actions.

In 2004, we refocused the Company to make digital video the core of our business. In particular, we began expanding our focus beyond cable operators to more aggressively pursue opportunities for our digital video products with television broadcasters, telecom carriers and satellite television providers. As part of this strategic refocus, we elected to continue selling our home access solutions (HAS) product, including cable modems, embedded multimedia terminal adapters (eMTA) and home networking devices, but ceased future investment in our CMTS product line. This decision was based on weak sales of the CMTS products and the anticipated extensive research and development investment required to support the product line in the future. As part of our decision to cease investment in the CMTS product line, we incurred severance, restructuring and asset impairment charges. The decision to cease investment in the CMTS product line was also the basis of the lawsuit filed by Adelphia against us. In March 2005, we sold certain modem semiconductor assets to ATI Technologies, Inc. and terminated our internal semiconductor group.

In January 2006, we announced that the Company would focus solely on digital video product lines, and as a result, we discontinued our HAS product line. We determined that there were no short- or long-term synergies between our HAS product line and digital video product lines which made the HAS products increasingly irrelevant

--------------------------------------------------------------------------------

given our core business of digital video. Though we continued to sell our remaining inventory of HAS products and CMTS products in 2006, the profit margins for our cable modems and eMTAs have continued to decrease due to competitive pricing pressures and the ongoing commoditization of the products. We have not been profitable since our inception. At December 31, 2005, our accumulated deficit was approximately $1.1 billion. We had a net loss of $27.0 million or $0.35 per share for the year ended December 31, 2005, a net loss of $47.1 million or $0.62 per share for the year ended December 31, 2004, and a net loss of $56.2 million or $0.76 per share for the year ended December 31, 2003. Our ability to grow our business and attain profitability is dependent on our ability to effectively compete in the marketplace with our current products and services, develop and introduce new products and services, contain operating expenses and improve our gross margins, as well as continued investment in equipment by network operators and content aggregators. Finally, we expect to benefit from a lower expense base resulting in part from the series of cost reduction initiatives that occurred in 2005 and 2006, along with continued focus on cost containment. However, despite these efforts, we may not succeed in attaining profitability in the near future, or at all.

At December 31, 2005, we had approximately $101.3 million in cash, cash equivalents and short-term investments as compared to approximately $97.7 million at December 31, 2004 and $138.6 million at December 31, 2003. As of September 30, 2006, we had approximately $27.5 million in cash, cash equivalents and short-term investments. The decrease from December 31, 2005 to September 30, 2006 is primarily related to the repurchase in full of our outstanding convertible subordinated notes due August 2007 (Notes) including all accrued and unpaid interest and related fees in March 2006 for $65.6 million, operating activities and legal, accounting and consulting costs associated with our internal investigation and the re-audit and restatement of our 2003, 2004 and 2005 financial statements. The increase in the amount of cash and cash equivalents in 2005 as compared to 2004 primarily resulted from the lower uses of cash for operating activities, payments for inventory and restructuring charges and the monetization of CMTS inventory. The decrease in the amount of cash and cash equivalents in 2004 as compared to 2003 primarily resulted from significant uses of cash for operating activities, payments for inventory, restructuring charges and executive severance in 2004. Although we believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months, we may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. There can be no assurance that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition, operating results and liquidity.

A more detailed description of the risks to our business can be found in Item 1A -- Risk Factors in this Form 10-K.

Restated Results of Operations

Comparison of Years Ended December 31, 2005 and 2004 (as restated)

Revenues

Our revenues declined 34% to $90.7 million for the year ended December 31, 2005 from $136.5 million in 2004, due to sales of HAS and CMTS products decreasing from 2004 to 2005 by $41.0 million or 50% of HAS revenue, and $22.4 million or 74% of CMTS revenue, respectively. The decline in CMTS revenue is directly related to our announcement in October 2004 that we would cease investment in future development of CMTS. The decline in our HAS revenue resulted from decreased market demand for traditional, data-only modems and the inability for our voice-enabled eMTA modems to find widespread market acceptance. In addition, in January 2006, we announced our plans to focus solely on our digital video product lines and to discontinue our HAS business. We will continue to sell our remaining HAS inventory and collect subsequent receivables to generate cash to fund ongoing operations. Revenue from our remaining product line, digital video solutions (DVS), increased 74% to $41.8 million in 2005, up from $24.1 million in 2004. The increase in DVS revenue was driven primarily by demand from our MSO customers in the United States which continued to upgrade their networks as part of their efforts to implement

81

--------------------------------------------------------------------------------

Table of Contents

all-digital simulcast (ADS) networks that included digital program insertion
capabilities as well as ADS build out by the second tier MSOs.
Revenue in 2004 and 2005 was impacted by the recognition of sales invoiced in
prior periods as well as sales invoiced in the current period recognized in
future periods. In 2004 and 2005, $9.7 million and $15.9 million, respectively,
of revenue was recognized from sales invoiced in prior periods including
deferred revenues. Deferred revenue recognized in 2005 includes $7.8 million of
revenue related to sales of our BP 5100 product to Thomson that was previously
recognized in 2004 but deferred to the quarter ended December 31, 2005 in
connection with the restatement. In 2004 and 2005, $15.6 million and $30.4
million, respectively, of revenue billed in the current period was deferred to
future periods.
Our ability to grow DVS revenues will depend upon several factors including the
continued investment of our MSO customers in their digital video network
infrastructure; our ability to compete on quality and price in an increasingly
competitive marketplace; our ability to maintain or improve market share with
MSOs; our ability to diversify our customer base to additional MSOs; our ability
to increase sales and revenues from overseas customers; our ability to sell
outside of the cable industry, namely to digital broadcast satellite operators,
telecom companies and potential new video service providers; and our ability to
continue to develop product modifications and upgrades that meet customers'
needs.
We expect revenues from the sale of our DVS products in 2006 to increase,
primarily due to the recognition of revenue deferred from prior periods. Given
that the amounts were billed and the majority of the cash was collected in
periods prior to 2006, the recognition of revenue deferred from prior periods
will have a limited impact on the Company's cash position in 2006. We expect the
amount of revenue deferred to future periods to decrease in 2006 because we
determined beginning in the first quarter of 2006 that we established VSOE of
fair value as it relates to the sale of DVS products under multiple element
arrangements. Consequently, for our DVS products, we expect to be able to
recognize revenue from the sale of the hardware sold in conjunction with PCS at
the time of the sale, rather than deferring the revenue of the hardware element
ratably over the period of the PCS.
Despite the expected increase in revenues in 2006, we expect the amount of our
product revenue invoiced in 2006 to decrease. As a result of the substantial
build-out by MSOs of their ADS systems in 2005, we anticipate major MSOs to
decrease their ADS capital expenditures in 2006. Smaller MSOs may accelerate the
build out of their ADS networks in 2006, but it is not anticipated to offset the
reduction in demand from the major MSO's attributed to a slowdown in ADS
investment. In addition, we expect demand for our DVS products and revenue
generated from the telecom industry to be modest in 2006. We believe that
telecoms may increase their capital expenditures on video equipment in 2007 in
connection with the telecom industry's build out of its video delivery
architecture. However, it is difficult to predict the potential impact of this
expected build out by the telecom industry on our revenue. Additionally, the
telecoms are in a relatively early stage of construction for their video
delivery architecture networks, and as a result experience difficulties and
delays in the adoption of new technologies and the construction of their
networks. We believe that future expenditures for all video delivery systems
will benefit from increased competition between video service providers as they
increase their product offerings and system capabilities.
Revenues by Groups of Similar Products
The following table presents revenues for groups of similar products (in
thousands, except percentages):

|  | Year Ended December 31, |  | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|
|  | 2005 | 2004 |  |  |
|  | (as restated)(1) | (as restated)(1) | (as restated)(1) |  |
| Revenues by product: |  |  |  |  |
| DVS | $41,806 | $ 24,102 | $ 17,704 | 73.5% |
| HAS | 41,061 | 82,068 | (41,007) | (50.0)% |
| CMTS | 7,797 | 30,210 | (22,413) | (74.2)% |
| Other | -- | 104 | (104) | (100.0)% |
| Total | $90,664 | $ 136,484 | $ (45,820) | (33.6)% |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

82

--------------------------------------------------------------------------------

Table of Contents

Revenue from the sale of our HAS products decreased from $82.1 million or 60% of revenue for the year ended December 31, 2004 to $41.1 million or 45% of revenue for the year ended December 31, 2005. The decrease in HAS product revenue was primarily driven by the failure of our eMTA modems to find widespread market acceptance among MSOs due to the lack of features and functionality demanded by MSOs and provided by our competitors in their eMTA modems. In 2005, MSOs increasingly purchased eMTA modems versus traditional modems, which resulted in the decline of our traditional modem revenues. As a result of this decrease and the failure of our eMTA modems to gain widespread market acceptance, our overall modem revenues decreased. HAS sales were also negatively impacted by our decision to cease investment in our CMTS products in 2004, as we were no longer able to bundle and sell our HAS and CMTS products as an end-to-end solution, as well as customer concerns regarding our commitment to continue to sell and support modems in future periods. In January 2006, we announced that we would focus solely on our DVS products.

Revenue from the sale of our CMTS products decreased 74% from $30.2 million and 22% of revenue as of December 31, 2004, to $7.8 million and 9% of revenue as of December 31, 2005. The decrease in CMTS product revenue resulted from our decision to cease investment in CMTS products in the fourth quarter of 2004 and the resulting decrease in CMTS sales. CMTS also decreased as a percentage of revenue due to a significant decrease in sales of CMTS products and an increase in sales of the DVS products.

Revenue from the sale of our DVS products increased from $24.1 million or 18% of revenue, for the year ended December 31, 2004 to $41.8 million or 46% of revenue, for the year ended December 31, 2005. The increase in the revenue of the DVS products as a percentage of sales in 2005 compared to 2004 was driven by increased sales of DVS products and the recognition of $7.8 million of revenue related to the sale of our BP 5100 product and service to Thomson Broadcast that was deferred from 2004 to the fourth quarter of 2005. DVS also increased as a percentage of revenue due to a significant decline in sales of and revenue generated by the sale of HAS and CMTS products in 2005 compared to 2004. The following is a breakdown of DVS revenue by period invoiced (in millions, except percentages):

| | Year Ended December 31, | | Variance in | Variance in |
| | 2005 | 2004 | Dollars | Percent |
| --- | --- | --- | --- | --- |
| | (as restated)(1) | (as restated)(1) | (as restated)(1) | |
| DVS product revenue invoiced and recognized in current period: | | | | |
| Total invoiced in current period | $ 53.9 | $ 36.8 | $ 17.1 | 46.5% |
| Less: Invoiced in current period and recognized in future periods | 27.4 | 15.0 | 12.4 | 82.7% |
| Total invoiced and recognized in current period | 26.5 | 21.8 | 4.7 | 21.6% |
| DVS product revenue invoiced in prior fiscal years and recognized in current period | 15.3 | 2.3 | 13.0 | 565.2% |
| Total DVS product revenue recognized in current period | $ 41.8 | $ 24.1 | $ 17.7 | 73.4% |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Total DVS product revenue recognized in the current period increased significantly in the year ended December 31, 2005 compared to 2004. Total DVS product revenue recognized in the years ended December 31, 2005 and 2004 was $41.8 million and $24.1 million, respectively, which represented an increase of $17.7 million, or 73%, in 2005 compared to 2004. The total DVS product revenue invoiced during the current period increased in the year ended December 31, 2005 compared to 2004. In the years ended December 31, 2005 and 2004, the amount of DVS product revenue invoiced was $53.9 million and $36.8 million, respectively, which represents an increase of $17.1 million, or 47%, in 2005 compared to 2004. In the years ended December 31, 2005 and 2004, the amount of DVS product revenue invoiced and recognized during the period invoiced was $26.5 million and $21.8 million,

83

--------------------------------------------------------------------------------

Table of Contents

respectively, with an increase of $4.7 million, or 22%, in 2005 compared to 2004. Of the DVS product revenue invoiced, $27.4 million and $15.0 million, respectively, was recognized in future periods, which represented an increase of $12.4 million, or 83%, in 2005 compared to 2004. During the years ended December 31, 2005 and 2004, $15.3 million and $2.3 million of DVS product revenue recognized, respectively, had been invoiced in prior periods, which represents an increase of $13.0 million, or 565%.

In 2006, we expect that our overall revenues will increase, but products sold and invoiced will decrease. The decrease in products sold and invoiced will be largely driven by significant declines in the sales of our HAS and CMTS products as we exhaust remaining inventories, and a decrease in the sales of DVS products. However, we expect total recognized revenue from DVS products to increase due to the recognition of deferred revenue from prior periods and our no longer having to fully defer revenue on the sale of our DVS products to future periods due to our establishment of VSOE of fair value on all elements of our DVS products sold beginning in 2006. Revenues from our DVS products will continue to increase as a percentage of our overall revenue in future periods as revenue from our CMTS and HAS products continues to decline, and eventually cease, due to our decision to discontinue our CMTS and HAS product lines.

Revenues by Geographic Region

The following table is a breakdown of revenues by geographic region (in thousands, except percentages):

|  | Year Ended December 31, | | Variance in | Variance in |
|  | 2005 | 2004 | Dollars | Percent |
|  | | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Revenues by geographic region: | | | | |
| United States | $52,838 | $ 72,838 | $ (20,000) | (27.5)% |
| Americas, excluding United States | 1,871 | 4,930 | (3,059) | (62.0)% |
| Europe, Middle East and Africa (EMEA), excluding Israel | 15,314 | 17,640 | (2,326) | (13.2)% |
| Israel | 7,645 | 16,645 | (9,000) | (54.1)% |
| Asia, excluding Japan | 11,544 | 15,259 | (3,715) | (24.3)% |
| Japan | 1,452 | 9,172 | (7,720) | (84.2)% |
| Total | $90,664 | $ 136,484 | $ (45,820) | (33.6)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Revenues in all geographic markets declined due to decreased sales of HAS and CMTS products to MSOs. Revenues in the United States decreased 28% to $52.8 million in the year ended December 31, 2005, down from $72.8 million in 2004. However, revenue in the United States increased as a percentage of sales from 53% of total revenues at December 31, 2004 to 58% of total revenues at December 31, 2005 due primarily to a decrease in sales of HAS and CMTS products, where sales were concentrated outside the United States. Revenues in EMEA, excluding Israel, decreased 13% to $15.3 million in the year ended December 31, 2005, compared with $17.6 million in 2004, due to decreased sales of our CMTS and HAS products, partially offset by sales of the remaining CMTS and HAS inventory to MSOs in Eastern Europe. Sales of our DVS product in Europe were nominal in both the years ended December 31, 2005 and December 31, 2004. Revenue for Israel decreased 54% to $7.6 million in the year ended December 31, 2005, down from $16.6 million in the year ended December 31, 2004, as a result of decreased HAS sales. Sales of our DVS product in Israel were not material. Revenue in Asia, excluding Japan, decreased 24% to $11.5 million in the year ended December 31, 2005, down from $15.3 million in 2004. This decrease resulted from the significant decline in the sale of CMTS and HAS products due to our decision to cease investment in the CMTS product line in 2004. Sales of our DVS product in Asia, excluding Japan, were nominal. Revenue in Japan decreased 84% to $1.5 million from $9.2 million in 2004. This decrease was a result of a significant decline in the sale of CMTS and HAS products due to our decision to cease investment in the CMTS product line in 2004. Sales of our DVS product in Japan were nominal.

In 2005, we focused our sales activities on selling DVS products in the United States, which is the primary geographic market for our DVS products. As a result of increased revenues from MSO customers in the

--------------------------------------------------------------------------------

Table of Contents

United States, our revenues from sales of DVS products outside the United States decreased from 18% of total DVS sales to 9% of total DVS sales between 2004 and 2005. We anticipate nominal growth of DVS revenues outside the United States in 2006 and expect that growth to be concentrated in the European marketplace. We anticipate that total revenue generated from sales of our products outside the United States will decrease in 2006 based on the continued decline in sales of our CMTS and HAS products as we exhaust the remaining inventory of these products. We expect the United States to remain the dominant market for our products due to our decision in January 2006 to focus solely on the sale of our DVS products.

Significant Customers

Three customers, Harmonic, Inc. (Harmonic), Thomson Broadcast and Comcast Corporation (Comcast) (12%, 11% and 10%, respectively), accounted for more than 10% each of our total revenues for the year ended December 31, 2005. Two customers, Adelphia Communications Corporation (Adelphia) and Comcast (20% and 13%, respectively), accounted for more than 10% each of our total revenues for the year ended December 31, 2004. In 2005, Adelphia ceased to be a significant customer following our decision to cease investment in the CMTS products. In 2006, we expect that we will continue to have a concentrated customer base given that we largely sell to MSOs and do not anticipate significant sales outside the cable sector. However, we do not expect that Thomson will continue to be a significant customer in 2006 given that product sales to Thomson resulted from a specific project that was completed in 2005. If we are successful in selling our DVS products in other markets, such as the telecom and satellite markets, we expect our total number of customers to increase, decreasing our customer concentration.

Cost of Goods Sold and Gross Profit

Cost of goods sold consists of direct product costs as well as the cost of our manufacturing operations. The cost of manufacturing includes contract manufacturing, test and quality assurance for products, warranty costs and associated costs of personnel and equipment. In 2005, cost of goods sold was $55.6 million, or 61% of revenues, compared to $101.9 million, or 75% of revenues in 2004. Cost of goods sold in 2005 included the recognition of $2.7 million of direct development costs related to the sale of our BP 5100 product and service to Thomson that was deferred from prior periods.

The cost of goods sold for our HAS products was $33.3 million and $60.4 million, respectively, for the years ended December 31, 2005 and 2004. The cost of goods sold for HAS decreased as total unit sales of HAS products decreased due to declining sales and improved pricing on component pricing. The cost of goods sold for our CMTS products was $4.8 million and $12.1 million, respectively, for the years ended December 31, 2005 and 2004. The cost of goods sold for our CMTS products decreased as total units sold for our CMTS products decreased due to our decision to cease investment in the CMTS product line and the related write-off of CMTS inventory in the three months ended December 31, 2004 that was deemed excess and obsolete.

85

--------------------------------------------------------------------------------

Table of Contents

The following is a breakdown of DVS cost of goods sold by period invoiced (in millions, except percentages):

|  | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|
|  | 2005 | 2004 | | |
|  | | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| DVS product cost of goods sold invoiced and recognized in current period: | | | | |
| Total invoiced in current period | $ 13.4 | $ 7.8 | 5.6 | 71.8% |
| Less: Invoiced in current period and recognized in future periods | 7.4 | 2.7 | 4.7 | 174.1% |
| Total invoiced and recognized in current period | 6.0 | 5.1 | 0.9 | 17.6% |
| DVS product cost of goods sold invoiced in prior fiscal years and recognized in current period | 2.7 | 0.5 | 2.2 | 440.0% |
| Total DVS product cost of goods sold recognized in current period | $ 8.7 | $ 5.6 | 3.1 | 55.4% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Total DVS product of cost goods sold recognized in the current period increased significantly in the year ended December 31, 2005 compared to 2004. Total DVS product cost of goods sold recognized in the years ended December 31, 2005 and 2004 was $8.7 million and $5.6 million, respectively, which represents an increase of $3.1 million, or 55%, in 2005 compared to 2004. Total DVS product cost of goods sold in the current period increased in the year ended December 31, 2005 compared to 2004. In the years ended December 31, 2005 and 2004, the cost of goods sold related to DVS products invoiced in the current period was $13.4 million and $7.8 million, respectively, which represents an increase of $5.6 million, or 72%, in 2005 compared to 2004. Cost of goods related to revenue invoiced and recognized on DVS products during the years ended December 31, 2005 and 2004 was $6.0 million and $5.1 million, respectively, which represents an increase of $0.9 million, or 18%, in 2005 compared to 2004. In the years ended December 31, 2005 and 2004, cost of goods sold related to DVS products invoiced in the current period and recognized in future periods was $7.4 million and $2.7 million, respectively, which represents an increase of $4.7 million, or 174%. Cost of goods sold related to revenue on DVS products invoiced in prior periods and recognized in the current period was $2.7 million and $0.5 million in the years ended December 31, 2005 and 2004, respectively, which represents an increase of $2.2 million, or 440%, in the year ended December 31, 2005 compared to 2004.

Our gross profit increased $0.4 million to $35.0 million, or 39% of revenue, in the year ended December 31, 2005 compared to $34.6 million, or 25% of revenue, in 2004. Offsetting the reduction in revenues, our increase in gross profit in 2005 was primarily related to the sales mix which consisted of increased sales of higher margin DVS products, as well as the sale of product previously reserved as excess and obsolete.

Cost of goods sold in 2005 included a $4.5 million benefit related to the sale of inventories that were reserved in prior periods as excess and obsolete and accrued vendor cancellation charges compared to $3.8 million for the year ended December 31, 2004. The $4.5 million benefit in 2005 was offset by a $3.1 million increase in excess and obsolete inventory reserve requirements and vendor cancellation charges. The $3.8 million benefit in 2004 was offset by a $13.0 million increase in excess and obsolete inventory reserve requirements and vendor cancellation charges. Excess and obsolete and vendor cancellation charges in 2004 included net charges of $9.0 million related to our decision to cease investment in the CMTS product line.

During 2006, we do not anticipate that our average selling prices (ASPs) and consequently, gross margin percentages for our DVS products will change materially. However, the cost of manufacturing our DVS products may increase as a result of fixed overhead charges passed along by our contract manufacturer that were formerly absorbed by that manufacturer in connection with the production of our CMTS product. We will continue to focus on improving our sales mix to concentrate on selling a greater percentage of our higher margin DVS products. In 2006, our gross profit will be primarily driven by our ability to increase total revenues, and to the extent that we can obtain this revenue growth, we expect our gross margins to increase, in part because we no longer sell the low margin HAS products and may sell product previously reserved as excess and obsolete.

--------------------------------------------------------------------------------

Table of Contents

Operating Expenses
Research and development, sales and marketing, general and administrative
expenses and restructuring charges, executive severance and asset write-offs are
summarized in the following table (in thousands, except percentages):

| | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|
| | 2005 | 2004 | | |
| | (as restated)(1) | (as restated)(1) | (as restated)(1) | |
| Research and development | $17,650 | $ 33,199 | $ (15,549) | (46.8)% |
| Sales and marketing | 22,534 | 24,145 | (1,611) | (6.7)% |
| General and administrative | 20,356 | 12,039 | 8,317 | 69.1% |
| Restructuring charges, executive severance and asset write-offs | 2,257 | 12,336 | (10,079) | (81.7)% |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

Research and Development
Research and development expenses consist primarily of personnel costs,
internally designed prototype material expenditures, and expenditures for
outside engineering consultants, equipment and supplies required in developing
and enhancing our products. For the year ended December 31, 2005, research and
development expenses were $17.7 million, or 19% of revenue. This was a decrease
of $15.5 million from research and development expenses in 2004, which were
$33.2 million, or 24% of revenue. The reduction in research and development
resulted from our decision in the quarter ended December 31, 2004 to cease
investment in future development of our CMTS product line, decreased spending on
research and development for the HAS products and the sale of our semiconductor
division to ATI in March 2005.
We anticipate that our overall research and development levels will remain
constant or decline slightly in 2006. We have significantly reduced research and
development efforts for CMTS and HAS products following our discontinuation of
these product lines, and we outsourced the sustaining engineering efforts for
these products. However, we believe that this decrease will be offset by an
increase in spending on research and development efforts for our DVS products,
including outsourcing certain development and software maintenance efforts to
third parties. We believe it is critical to continue to make significant
investments in research and development to create innovative technologies and
products that meet the current and future requirements of our customers.
Accordingly, in 2006 we expect to increase our investment in research and
development as it relates to the continued development of our DVS product line.
Sales and Marketing
Sales and marketing expenses consist primarily of personnel costs, including
salaries and commissions for sales personnel, salaries for marketing and support
personnel, costs related to trade shows, consulting and travel. For the year
ended December 31, 2005 sales and marketing expenses were $22.5 million or 25%
of revenue. This was a $1.6 million decrease compared to 2004 where sales and
marketing expenses were $24.1 million or 18% of revenue. However, sales and
marketing expenses increased as a percentage of revenue from 2004 to 2005. The
largest component of the decrease in total sales and marketing expenses was a
$1.9 million reduction in compensation related expenses related to reductions in
headcount, offset by a $0.9 million increase related to advertising and
tradeshow expenses.
In 2006, sales and marketing expenditures are expected to decline as a result of
the downsizing of our marketing department, decreasing marketing communication
efforts and decreasing our international sales force as we focus on distributors
for international sales.
General and Administrative
General and administrative expenses consist primarily of personnel costs of
administrative officers and support personnel, and legal, accounting and
consulting fees. For the year ended December 31, 2005, general and
administrative expenses were $20.4 million, or 22% of revenue. This was an
increase of $8.3 million from general and

87

--------------------------------------------------------------------------------

Table of Contents

administrative expenses in 2004, which were $12.0 million, or 9% of revenue. Factors that contributed to the increase included a $2.6 million net expense related to the Adelphia litigation settlement; $3.2 million related to the settlement of our shareholder class action and derivative litigation; an increase in outside legal fees of $2.5 million, of which $0.9 million related to the independent investigation and $1.0 million related to increased litigation expenses; and an increase of $0.2 million in financial audit fees.

In 2006, we expect that general and administrative expenses will increase significantly as compared to 2005. We expect that this increase will be driven by accounting, legal and consulting costs related to the independent investigation and restatement. Additionally, we incurred significant costs related to the settlement of one of our securities class action lawsuits and the derivative lawsuit, as well as considerable legal fees related to the litigation.

Restructuring Charges, Executive Severance and Asset Write-offs

Restructuring charges, executive severance and asset write-offs are summarized as follows (in thousands, except percentages):

|  | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
|  | 2005 | 2004 | | |
|  | | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Restructuring charges | $1,003 | $ 6,784 | $ (5,781) | (85.2)% |
| Executive severance | 15 | 3,451 | (3,436) | (99.6)% |
| Long-lived assets written-off | 85 | 2,401 | (2,316) | (96.5)% |
| Subtotal | 1,103 | 12,636 | (11,533) | (91.3)% |
| Restructuring (recovery/change in estimate in prior year plans) | 1,154 | (300) | 1,454 | (484.7)% |
| Restructuring charges, executive severance and asset write-offs | $2,257 | $ 12,336 | $ (10,079) | (81.7)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Restructuring

During 2005, we continued restructuring activities related to our decision to cease investment in our CMTS product line. In the quarters ended March 31, 2005 and June 30, 2005, we incurred net restructuring charges of $0.7 million and $0.3 million, respectively, related to employee termination costs.

In the first three quarters of 2005, we re-evaluated the charges for leased facilities accrued as part of the 2001 restructuring plan and the 2004 restructuring plan. During the three quarters ended September 30, 2005, we decreased the accrual by $0.3 million for the 2001 restructuring plan and increased the accrual by $0.9 million for the 2004 restructuring plan. During the fourth quarter of 2005, we incurred restructuring charges in the amount of $0.3 million related to excess leased facilities for the 2004 restructuring plan.

Net charges for restructuring that occurred in 2005 totaled $2.2 million, comprised of $1.0 million for employee terminations, $1.1 million for excess leased facilities and $0.1 million related to the aircraft lease.

As of December 31, 2005, $0.1 million remains accrued for the 2001 restructuring plan related to excess leased facilities, and $2.6 million remains accrued for the 2004 restructuring plan, which is comprised of $0.5 million for the aircraft lease and $2.1 million for excess leased facilities.

We anticipate the remaining restructuring accrual related to the aircraft lease, net of the sublease income related to the aircraft, to be substantially utilized for servicing operating lease payments through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments through October 2009.

The reserve for leased facilities, net of sublease income, approximates the difference between our current costs for the excess leased facilities, which is our former principal executive offices located in Santa Clara, California,

88

--------------------------------------------------------------------------------

Table of Contents

and the estimated income derived from subleasing the facilities, which was based on information derived by our brokers that estimated real estate market conditions as of the date of our implementation of the restructuring plan and the time it would likely take to fully sublease the excess leased facilities. We sub-subleased the Santa Clara facility effective as of August 2006, with the sub-sublease commencing on October 1, 2006.

Executive Severance

In August 2004, we entered into an employment agreement with an executive officer who resigned effective December 31, 2004 with a termination date of February 3, 2005. We recorded a severance provision of $0.4 million related to termination costs for this officer in the quarter ended December 31, 2004. Most of the severance costs related to this officer were paid in the quarter ended March 31, 2005 with nominal amounts for employee benefits payable through the quarter ended March 31, 2006.

Asset Write-offs

There were no material asset write-offs in 2005. As a result of CMTS product line restructuring activities in 2004, we recognized a fixed asset impairment charge of $2.4 million. The impairment charge reflected a write-down of the assets' carrying value to a fair value based on a third party valuation.

Non-operating Expenses

Interest expense, net and other income, net were as follows (in thousands, except percentages):

|  | Year Ended December 31, | | Variance in | Variance in |
|  | 2005 | 2004 | Dollars | Percent |
|  |  | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Interest expense, net | $ (189) | $ (1,090) | $ 901 | (82.7)% |
| Other income, net | 1,155 | 1,031 | 124 | 12.0% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Interest expense, net relates primarily to interest on our Notes, offset by interest income generated from investments in high quality fixed income securities.

Other income (expense), net is generally comprised of realized foreign currency gains and losses, realized gains or losses on investments, and income attributable to non-operational gains and losses.

Income Tax (Expense) Benefit

We have generated losses since our inception. In 2005 we recorded an income tax expense of $0.1 million which was primarily related to foreign taxes, and in 2004 we recorded an income tax benefit of $0.1 million. The foreign tax expense of approximately $0.3 million in 2004 was offset by a tax benefit resulting principally from the reversal of tax accruals due to the sale of certain subsidiaries.

Comparison of the Years Ended December 31, 2004 and 2003 (as restated)

Revenues

Our revenues increased 5% to $136.5 million for the year ended December 31, 2004 from $130.2 million in 2003, primarily due to increased sales of DVS and HAS products, particularly in the second half of 2004, which are partially offset by declining sales of our CMTS products and proprietary S-CDMA CMTS products.

In December 2001, we entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers). We paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, we began amortizing these prepaid assets and charging them against related party revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." We charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003.

89

---

Table of Contents

Amounts charged against total revenues in the year ended December 31, 2003
totaled approximately $5.6 million. These co-marketing arrangements were fully
amortized at December 31, 2003.

Revenues by Groups of Similar Products

The following table presents revenues for groups of similar products (in
thousands, except percentages):

|  | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
|  | 2004 | 2003 | | |
|  | (as restated)(1) | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Revenues by product: | | | | |
| DVS | $ 24,102 | $ 14,484 | $ 9,618 | 66.4% |
| HAS | 82,068 | 65,532 | 16,536 | 25.2% |
| CMTS | 30,210 | 46,709 | (16,499) | (35.3)% |
| Other | 104 | 3,462 | (3,358) | (97.0)% |
| Total | $ 136,484 | $ 130,187 | $ 6,297 | 4.8% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

The increase in revenues from DVS products to $24.1 million, or 18% of revenue,
for the year ended December 31, 2004 compared to $14.5 million, or 11% of
revenue, for the year ended December 31, 2003 was due primarily to the beginning
of the ADS rollout at Comcast in the second half of 2004, which resulted in an
increase in sales of our Network CherryPicker(R) platform. Additionally, we
continued to sell Network CherryPicker(R) products to MSOs and satellite
providers for the remultiplexing functionality.

The increase in HAS product revenues in the year ended December 31, 2004
compared to 2003 was primarily due to an aggregate increase in modem volume, 1.8
million units in 2004 as compared to 1.4 million units in 2003, offset by
decreases in ASPs. The number of DOCSIS modems sold increased to 1.7 million
units in 2004 from 1.3 million units in 2003. The intensely competitive nature
of the market for broadband products resulted in significant price erosion.

The decrease in CMTS product revenues in 2004 compared to 2003 was due to slower
than anticipated adoption of our DOCSIS 2.0 CMTS platform. Due to declining
sales, we made an announcement in October 2004 to cease investment in the CMTS
product line.

The decrease in other product revenues in 2004 compared to 2003 was principally
due to a decline in the sales of our legacy voice and telecom products.

90

--------------------------------------------------------------------------------

Table of Contents

Revenues by Geographic Regions
The following table is a breakdown of revenues by geographic region (in thousands, except percentages):

|  | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
|  | 2004 (as restated)(1) | 2003 (as restated)(1) | (as restated)(1) | (as restated)(1) |
| --- | --- | --- | --- | --- |
| Revenues by geographic areas: |  |  |  |  |
| United States | $    72,838 | $    71,945 | $     893 | 1.2% |
| Americas, excluding United States | 4,930 | 3,081 | 1,849 | 60.0% |
| Europe, Middle East and Africa (EMEA), excluding Israel | 17,640 | 9,450 | 8,190 | 86.7% |
| Israel | 16,645 | 15,274 | 1,371 | 9.0% |
| Asia, excluding Japan | 15,259 | 9,094 | 6,165 | 67.8% |
| Japan | 9,172 | 21,343 | (12,171) | (57.0)% |
| Total | $   136,484 | $   130,187 | $   6,297 | 4.8% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

The increase in revenues in the United States to $72.8 million or 53% of revenues for the year ended December 31, 2004 from $71.9 million or 55% of revenues for the year ended December 31, 2003 was due to increased sales of HAS and DVS products to MSOs and television broadcasters, offset by a decrease in CMTS revenues and sales of our telecom products. The increase in revenues for EMEA, excluding Israel, to $17.6 million or 13% of revenue in the year ended December 31, 2004 from $9.5 million or 7% of revenue in the year ended December 31, 2003 was principally due to emphasized sales efforts to our customers in EMEA and their purchase of CMTS and HAS equipment. We placed a greater emphasis in sales to our customers in the United States, EMEA, Japanese and other Asian markets while placing a lower emphasis on other locations such as Canada and South America. The decrease in revenues for Japan to $9.2 million in 2004 compared with $21.3 million in 2003 was principally due to a significant decrease in CMTS and HAS sales to a single Japanese customer.

Significant Customers
Two customers, Adelphia and Comcast (20%, and 13%, respectively), each accounted for more than 10% of our total revenues for the year ended December 31, 2004. Three customers, Adelphia, Cross Beam Networks and Comcast (21%, 16% and 13%, respectively), each accounted for more than 10% of our total revenues for the year ended December 31, 2003. The decrease in significant customers resulted from the failure of MSOs other than J-Com, Adelphia and Cross Beam Networks to adopt our CMTS platform in which we ultimately ceased investments in 2004. Adelphia did not remain one of our core customers subsequent to 2004 as Adelphia sued the Company after our announcement to cease investment in the CMTS product.

Cost of Goods Sold and Gross Profit
Cost of goods sold consists of direct product costs as well as the cost of our manufacturing operations. The cost of manufacturing includes contract manufacturing, test and quality assurance for products, warranty costs and associated costs of personnel and equipment. In 2004, cost of goods sold was $101.9 million or 75% of revenues compared to $103.8 million or 80% of revenues in 2003.
Cost of goods sold in 2004 included a $3.8 million benefit related to the sale of inventories that were reserved in prior periods as excess and obsolete compared to $8.1 million for the year ended December 31, 2003. The $3.8 million benefit in 2004 was offset by a $13.0 million increase in excess and obsolete inventory reserve requirements and vendor cancellation charges. Excess and obsolete inventory and vendor cancellation charges in 2004 included net charges of $9.0 million related to our decision to cease investment in the CMTS product line. The $8.1 million benefit in 2003 was offset by a $2.6 million increase in excess and obsolete inventory reserve requirements and vendor cancellation charges.

--------------------------------------------------------------------------------

Table of Contents

Our gross profit increased $8.2 million or 31% to $34.6 million, or 25% of revenue, in the year ended December 31, 2004 compared to $26.4 million, or 20% of revenue, in 2003. The factors that contributed to the increase in our gross profit in 2004 were primarily related to an improved sales mix, increased sales of the higher margin DVS product line and lower manufacturing costs for certain HAS products. These positive factors were offset by sales of lower margin CMTS products during the same period and increased CMTS reserve for excess and obsolete inventory.

Operating Expenses

Research and development, sales and marketing, general and administrative expenses and restructuring charges, executive severance and asset write-offs are summarized in the following table (in thousands, except percentages):

|  | Year Ended December 31, | | Variance in | Variance in |
|  | 2004 | 2003 | Dollars | Percent |
|  | (as restated)(1) | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Research and development | $      33,199 | $      42,634 | $      (9,435) | (22.1)% |
| Sales and marketing | 24,145 | 26,781 | (2,636) | (9.8)% |
| General and administrative | 12,039 | 11,934 | 105 | 0.9% |
| Restructuring charges, executive severance and asset write-offs | 12,336 | 2,803 | 9,533 | 340.1% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Research and Development

Research and development expenses consist primarily of personnel costs, prototype materials, outside engineering consultants and equipment and supplies required in developing and enhancing our products. For the year ended December 31, 2004, research and development expenses were $33.2 million, or 24% of revenue. This was a $9.4 million decrease from research and development expenses in 2003, which were $42.6 million, or 33% of revenue. The decrease was attributable to $3.9 million of reductions in employee related expenses and $0.5 million in depreciation and amortization, and also included reductions of $0.7 million in expenses for outside engineering consultants, $2.5 million of reductions in materials costs incurred to develop prototypes, and $1.0 million in other costs as a result of the reduction in research and development personnel for the CMTS product line. The personnel reduction resulted from decreased spending in the HAS and semiconductor division as well as the discontinuation of research and development on our telecom products.

Sales and Marketing

Sales and marketing expenses consist primarily of personnel costs, including salaries and commissions for sales personnel, salaries for marketing and support personnel, costs related to trade shows, consulting and travel. For the year ended December 31, 2004, sales and marketing expenses were $24.1 million, or 18% of revenue. This was a decrease of $2.6 million from sales and marketing expenses in 2003, which were $26.8 million, or 21% of revenue. The largest components of the decrease in sales and marketing expenses in 2004 compared to 2003 were $2.5 million related to savings realized from discontinuing operations of the corporate aircraft in the first quarter of 2004 and subleasing our corporate aircraft, $0.9 million of decreased travel and facilities costs, and $0.4 million of reduction in depreciation and amortization. These savings were offset by increased expenses of $1.1 million for outside consultants.

General and Administrative

General and administrative expenses consist primarily of personnel costs of administrative officers and support personnel, travel expenses and legal, accounting and consulting fees. General and administrative expenses were $12.0 million, or 9% of revenue, and $11.9 million, or 9% of revenue, for the years ended December 31, 2004 and

92

--------------------------------------------------------------------------------

Table of Contents

2003, respectively. Reduced employee expenses due to lower headcount were offset by an increase in executive recruitment costs.

Restructuring Charges, Executive Severance and Asset Write-offs

Restructuring charges, executive severance and asset write-offs are summarized as follows (in thousands, except percentages):

| | Year Ended December 31, | | Variance in Dollars | Variance in Percent |
| | 2004 | 2003 | | |
| | (as restated)(1) | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Restructuring charges | $ 6,784 | $ 2,658 | $ 4,126 | 155.2% |
| Executive severance | 3,451 | -- | 3,451 | -- |
| Long-lived assets written-off | 2,401 | 417 | 1,984 | 475.8% |
| Subtotal | 12,636 | 3,075 | 9,561 | 310.9% |
| Restructuring (recovery/change in estimate in prior year plans) | (300) | (272) | (28) | 10.3% |
| Restructuring charges, executive severance and asset write-offs | $ 12,336 | $ 2,803 | $ 9,533 | 340.1% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Restructuring

During 2004, we initiated a restructuring plan to bring operating expenses in line with revenue and as a result of ceasing investment in our CMTS product line. In the quarter ended March 31, 2004, we incurred 2004 restructuring plan charges in the amount of $3.3 million of which $1.0 million was related to employee termination costs, $0.9 million related to termination costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. Net charges accrued under this first quarter plan included estimated sublease income from the aircraft and the excess leased facilities. We incurred 2004 restructuring plan charges in the amount of $1.1 million in the quarter ended June 30, 2004 related to additional costs for excess leased facilities. In the fourth quarter, to further conform our expenses to revenues and to cease investment in the CMTS product line, we terminated employees resulting in a charge in the amount of $1.3 million.

In the second, third and fourth quarters of 2004, we re-evaluated the first and second quarter 2004 restructuring charges for the employee severance, excess leased facilities and the aircraft lease termination. Based on market conditions, changes in estimates provided by our broker, and the terms of the aircraft sublease agreement, which we entered into in the quarter ended September 30, 2004, we increased the restructuring charge for the aircraft lease by a total of $1.0 million, the facilities accrual was increased $0.3 million and the employee severance accrual was decreased by $0.2 million.

Net charges for the 2004 restructuring plans totaled $6.8 million, comprised of $2.1 million for employee terminations, $1.9 million in aircraft lease and $2.8 million for leased facilities. A total of 168 employees worldwide, or 40% of our workforce, was terminated in connection with these restructuring plans.

As of December 31, 2004, $3.3 million remained accrued for all of the 2004 plans. This was comprised of $0.6 million for employee termination, $0.7 million for aircraft lease and $2.0 million for facilities.

As part of the restructuring plan initiated during the quarter ended March 31, 2003 (2003 Plan), we incurred restructuring charges in the amount of $2.6 million related to employee termination costs. As of December 31, 2003, 81 employees had been terminated and we had paid $2.5 million in termination costs. In the quarter ended June 30, 2003, we reversed $0.1 million of previously accrued termination costs due to a change in estimate. At December 31, 2004, no restructuring charges remained accrued for the 2003 Plan.

93

--------------------------------------------------------------------------------

Table of Contents

As part of the restructuring plan initiated in 2001 (2001 Plan), we incurred restructuring charges in the amount of $12.7 million of which $1.8 million remained accrued at December 31, 2004 for excess leased facilities in Israel and the United States. During 2002, another restructuring plan (2002 Plan) increased the reserve for excess leased facilities due to the exiting of additional space within the same facility in Israel as in the 2001 Plan. We incurred restructuring charges in the amount of $3.6 million for the 2002 Plan. Improved real estate market conditions in Israel in the early part of 2004 gave rise to our improved tenant sublease assumptions thereby creating a change in estimate in the 2001 Plan and the 2002 Plan of $0.3 million, resulting in an accrual of $1.9 million at December 31, 2004 for these plans.

The restructuring accrual as of December 31, 2004 for all plans totals $5.1 million of which $0.6 million was accrued for employee terminations, $0.7 million for aircraft lease termination and $3.8 million for leased facilities. The balance of the employee termination charges was paid in the quarter ended September 30, 2005.

Executive Severance

In June 2004, we entered into separation agreements with two executive officers. One officer resigned in the quarter ended June 30, 2004 and the other officer resigned in the quarter ended September 30, 2004. We recorded a severance provision of $1.7 million related to termination costs for these officers in the quarter ended June 30, 2004 and $1.4 million in the quarter ended September 30, 2004. Most of the severance costs were paid in the quarter ended September 30, 2004 with nominal amounts for employee benefits payable through the quarter ended September 30, 2005.

In August 2004, we entered into an employment agreement with another executive officer. The executive officer resigned effective as of December 31, 2004. We recorded a severance provision of $0.4 million related to termination costs for this officer in the quarter ended December 31, 2004. Most of the severance costs related to this officer were paid in the quarter ended March 31, 2005 with nominal amounts for employee benefits payable into the quarter ended March 31, 2006.

Asset Write-offs

As a result of CMTS product line restructuring activities in 2004, we recognized a fixed asset impairment charge of $2.4 million. The impairment charge reflected a write-down of the assets carrying value to a fair value based on a third party valuation. In connection with our restructuring activities in 2003, we wrote-off $0.4 million of fixed assets which were determined to have no remaining useful life.

Non-operating Expenses

Interest expense, net and other income, net were as follows (in thousands, except percentages):

|  | Year Ended | | Variance in | Variance in |
|  | December 31, | | Dollars | Percent |
|  | 2004 | 2003 | | |
|  | (as restated)(1) | (as restated)(1) | (as restated)(1) | (as restated)(1) |
| Interest expense, net | $ (1,090) | $ (141) | $ (949) | 673.0% |
| Other income, net | 1,031 | 2,032 | (1,001) | (49.3)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Interest expense, net relates primarily to interest on our Notes, offset by interest income generated from investments in high quality fixed income securities. Interest income decreased 31% to $2.0 million in 2004 compared to $2.9 million in 2003. The decrease in interest income was primarily due to lower invested average cash balances due to usage of cash for operations, restructuring and management severances. Interest expense, which related primarily to interest on our Notes due 2007, remained constant at $3.1 million during 2004 compared to $3.1 million in 2003.

Other income (expense), net is generally comprised of realization of foreign currency gains and losses, realized gains or losses on investments, and income attributable to non-operational gains and losses.

Income Tax Benefit (Expense)

We have generated losses since our inception. In 2004 we recorded an income tax benefit of $0.1 million and in 2003 we recorded an income tax expense of $0.3 million, which was related primarily to foreign taxes. The foreign

94

--------------------------------------------------------------------------------

tax expense of approximately $0.3 million in 2003 was offset by a tax benefit resulting principally from the reversal of tax accruals due to the sale of certain subsidiaries.

Quarterly Review

Set forth is an overview of the trends affecting the quarterly financial periods in 2005 and 2004. Additionally, set forth below is a discussion of the significant changes to our quarterly 2005 and 2004 consolidated financial statements as a result of the restatement. The effects of the restatement are discussed elsewhere in this discussion under the caption "The Restatement and Other Related Matters."

Revenue

Our revenue for the quarters ended March 31, June 30, September 30 and December 31, 2005, respectively, was $17.8 million, $18.9 million, $23.4 million and $30.5 million. Our revenue for the quarters ended March 31, June 30, September 30 and December 31, 2004, respectively, was $40.1 million, $41.4 million, $30.6 million and $24.5 million. With the exception of the fourth quarter, the decrease in year over year revenues for comparable periods was due to our decision to cease investment in the CMTS product line and the wind down of the HAS business. For the year ended December 31, 2005, revenue from CMTS and HAS products declined $22.4 million and $41.0 million, respectively, from the year ended December 31, 2004. The increase in revenue in the fourth quarter of 2005 over the comparable period in 2004 was attributable to a $12.6 million increase in DVS revenues that included $9.1 million in revenue that resulted from the sale of product, support and a software upgrade related to the Thomson contract of which $7.8 million was deferred from 2004 and recognized in the fourth quarter of 2005.

Changes to our previously reported quarterly earnings in 2005 and 2004 primarily reflect the effects of our change in the method of revenue recognition to comply with the requirements of SOP 97-2 regarding sales under multiple element arrangements of our DVS products. Our sales of DVS products include both hardware and PCS elements. We did not establish VSOE of fair value under SOP 97-2 for the undelivered PCS element sold in the quarters of 2005, 2004 and 2003, and therefore, we recognized revenue for the sale of both the hardware element and PCS element ratably over the period of the customer support contract and the cost of goods sold for these DVS product sales was also recognized ratably over the period of the customer support contract. Previously, revenue and the related cost of goods sold on the DVS product hardware were recognized in the quarter of sale, and PCS revenue was deferred over the PCS period. As a result of the change in revenue recognition methodology, the deferred revenue significantly increased, the deferred cost of goods sold increased and revenue and cost of goods sold were materially different in the 2005 and 2004 quarterly periods than previously reported. The deferral of revenue and cost of goods sold also materially impacted the previously reported revenue and cost of goods sold in the quarters in 2005 and 2004.

For the quarter ended March 31, 2005, $10.8 million of DVS revenue was deferred to future periods compared to $13.1 million of sales that were invoiced during the period. For the quarter ended June 30, 2005, $16.2 million of revenue was deferred to future periods compared to $18.8 million of revenues that were invoiced during the period. For the quarter ended September 30, 2005, $8.8 million of revenue was deferred to future periods compared to $12.5 million of revenues that were invoiced during the period. The quarter ended December 31, 2005 benefited from the recognition of revenue deferred from prior periods, including $8.1 million of revenue from the Thomson Contract, of which $7.8 million and $0.3 million constituted deferred revenue invoiced during 2004 and the first two quarters of 2005, respectively.

The third and fourth quarters of 2004 and the first and second quarters of 2005 were also affected by the change in accounting for the development and sale of certain products and services to Thomson Broadcast under a series of contractual arrangements from SAB 104 to SOP 97-2 and SOP 81-1. Under the guidance of SOP 97-2 and SOP 81-1, we determined that this series of contractual arrangements should have been treated as a single revenue arrangement for accounting purposes under the completed contract methodology for purposes of revenue and cost recognition. Under the completed contract methodology, $7.8 million of revenue previously recognized in the third and fourth quarters of 2004 and $0.3 million of revenue in the first two quarters of 2005 were deferred until the contract's completion during the fourth quarter of 2005. Additionally, in accordance with the completed contract methodology

95

--------------------------------------------------------------------------------

under SOP 81-1, an aggregate of $1.2 million of previously recognized cost of goods sold in 2004 and $2.1 million of direct development costs previously recognized in operating costs in the fourth quarter of 2003, each quarter of 2004, and the first three quarters of 2005 were deferred to the fourth quarter of 2005.

As a result of the review of revenue recognition policies that occurred during the restatement, we determined that we would continue to recognize revenue for the HAS and CMTS products under SAB 101, as amended by SAB 104. For sales of the CMTS products that included PCS, we recognized revenue from the delivery of the hardware sales and amortized the revenue from the undelivered PCS revenue element as a result of establishing fair and reliable evidence of value for PCS in accordance with EITF 00-21.

Gross Profit

Gross profit was $6.6 million, $7.3 million, $6.4 million and $14.7 million for the quarters ended March 31, June 30, September 30 and December 31, 2005, respectively. This compares to gross profit of $12.6 million, $16.3 million, $0.2 million and $5.5 million for the quarters ended March 31, June 30, September 30 and December 31, 2004, respectively. The higher gross profit in the first two quarters of 2004 compared to the first two quarters of 2005 was attributable to a higher CMTS gross margin contribution in the first half of 2004. However, the Company's decision to cease investment in CMTS negatively impacted gross profits in the third and fourth quarter of 2004 due to higher excess and obsolete inventory expenses included in the cost of goods sold and a decrease in CMTS revenues, which contributed to a decrease in gross profit. The improvement in gross profit for the third and fourth quarters of 2005 over the third and fourth quarters of 2004 is attributed to a higher gross profit contribution from DVS revenues. In particular, the fourth quarter of 2005 included $9.1 million in revenue offset by $3.4 million of direct costs included in cost of goods sold that resulted from the sale of product, support and a software upgrade related to the Thomson Broadcast contract.

Additionally, for all quarters of 2005 and as it related to DVS products, cost of goods sold was impacted by the deferral of cost of goods sold related to the deferral of revenue invoiced during the period as well as the recognition of cost of goods sold related to deferred revenue invoiced in prior periods but recognized in the current period. For multiple element arrangements, we were unable to establish VSOE of fair value for the PCS element of the sale. As a result, we recognized the revenue and cost of goods sold of the hardware element ratably over the period of the PCS contract. For the quarter ended March 31, 2005, $1.9 million of cost of goods sold was deferred to future periods compared to $2.4 million of cost of goods sold related to revenues invoiced during the period. For the quarter ended June 30, 2005, $5.1 million of cost of goods sold was deferred to future periods compared to $5.8 million of cost of goods sold related to revenues invoiced during the period. For the quarter ended September 30, 2005, $2.3 million of cost of goods sold was deferred to future periods compared to $3.2 million of cost of goods sold that were invoiced during the period. The quarter ended December 31, 2005 benefited from the recognition of revenue deferred from prior periods, including $8.1 million of revenue that resulted from the sale of product and support to Thomson Broadcast that was recognized in the quarter ended December 31, 2005.

Changes in certain use of estimates also affected gross profit in the quarters in 2005 and 2004. In July 2003, we sold certain of our assets. As part of the asset sale agreement, we agreed to provide a warranty for up to $2.4 million, of which $2.0 million related to a specific issue affecting two customers and a general warranty of $0.4 million. In June 2003 we established a reserve of $1.0 million related to a formal customer complaint received by us prior to the sale of the assets. This warranty obligation expired in the first quarter of 2005. We previously amortized the $1.0 million accrued warranty obligation by reversing $0.2 million of warranty expense in each quarter of 2004 and the first quarter of 2005. As part of the restatement, we determined that the obligation should not have been reduced unless there were actual expenses incurred in connection with the obligation or upon expiration of the warranty period in the quarter ended March 31, 2005. Since we did not incur any expenses in connection with this obligation and did not establish a basis for this reduction, during the restatement, we corrected the reduction of this accrual by $0.2 million in each of the four quarters of 2004 and deferred the reduction of the warranty accrual until the warranty period expired in the quarter ended March 31, 2005. Accordingly, the $1.0 million reduction of the warranty obligation in the quarter ended March 31, 2005, reduced cost of goods sold by $0.8 million for that period and increased cost of goods sold by $0.2 million in each quarter of 2004.

96

--------------------------------------------------------------------------------

Table of Contents

During 2002, we entered into a warranty agreement with a customer with projected warranty obligation of approximately $1.3 million. During the restatement, we learned that the model that established management's estimated warranty obligation had an error that resulted in an overstatement of the estimated obligation by $0.3 million during 2002, 2003, and the first, second and third quarters of 2004. This model had been adjusted for the error in the fourth quarter of 2004. Accordingly, the excess warranty obligation of $0.3 million that was originally recorded in 2002 was reversed in 2002, resulting in a $0.3 million reduction of the warranty accrual. Additionally, during the fourth quarter of 2004 additional warranty expense and warranty accrual of $0.3 million were recorded, increasing cost of goods sold by $0.3 million.

We had a $2.0 million prepaid licensing expense that was amortized using a royalty of $1 per unit based on the third party royalty rate established in the license agreement. The prepaid license would be amortized over units of modems sold that incorporated the semiconductor chip beginning in the second quarter of 2002. However, we inadvertently amortized the semiconductor units on a per-unit-produced basis rather than a per-unit-sold basis, in which the semiconductors were incorporated into the modems. In the restatement, we corrected this error and used the useful life method of amortization rather than the third party royalty rate method of amortization, which affected the reported quarters. The adjustments to cost of goods sold were a decrease of $0.8 million in 2003, and increases of $0.5 million and $0.4 million during 2004 and 2005, respectively.

In the fourth quarter of 2004, we calculated our excess and obsolete (E&O) and vendor cancellation (VC) reserves as it related to our CMTS products. In order to remain consistent with our existing policy methodology in determining E&O and VC reserves, we should have recalculated the demand forecast related to CMTS based upon information available in late March prior to filing our Form 10-K for the year ended December 31, 2004. With the then higher re-forecasted demand, the accrued E&O expense was reduced $0.4 million in the fourth quarter of 2004, thereby decreasing cost of goods sold related to CMTS in the first and second quarters of 2005.

Operating Expenses

Our operating expenses in each quarter for the year ended December 31, 2005 were $15.6 million, $13.7 million, $15.7 million and $17.8 million, compared to $22.8 million, $20.7 million, $18.4 million and $19.8 million for the comparable periods in 2004. Research and development and sales and marketing expenses decreased in each of the quarters compared to the same periods in 2004. Research and development expenses decreased primarily due to headcount reductions specific to our decision to cease investment in the CMTS product line, and included the termination of employees in our internal semiconductor division when we sold our modem silicon assets to ATI Technologies, Inc. These decreases were offset by an increase in DVS research and development, particularly in the quarters ended September 30 and December 31, 2005 when we outsourced certain development efforts to third parties. Sales and marketing expenses decreased due to headcount reductions related to our CMTS and HAS product lines. General and administrative expenses mostly remained constant in the quarters ended March 31 and June 30, 2005 compared to the same periods in 2004. General and administrative expenses increased in the quarters ended September 30 and December 31, 2005 compared to the same quarters in 2004. This increase was the result of increased legal expenses related to the independent investigation and restatement, litigation expenses, litigation settlement expenses and general legal expenses.

Changes in certain use of estimates also affected operating expenses in the quarters in 2005 and 2004. We determined our accrual for legal expenses as a part of general and administrative expenses in the fourth quarter of 2004 was over estimated by $0.4 million. As a result, a correcting entry was made to decrease reported general and administrative expenses by $0.4 million in the fourth quarter of 2004 and increase general and administrative expenses by $0.4 million in the first quarter of 2005.

We determined our accrual for bonus expenses in the fourth quarter of 2004 was underestimated by $0.6 million, thus we increased the accrued payroll and related expenses accrual as well as research and development expenses in the fourth quarter of 2004 by $0.6 million. As a result of this correcting entry, research and development expenses in the first quarter of 2005 were reduced by $0.6 million.

We determined that during the fourth quarter of 2004 that we overestimated our Santa Clara County property tax liability by approximately $0.2 million. Correction of this overestimate lowered general and administrative

--------------------------------------------------------------------------------

expenses during the fourth quarter of 2004 by $0.2 million and decreased accrued other liabilities in the fourth quarter of 2004.

We reassessed the accounting for the allowance for doubtful accounts and reclassified certain adjustments that were booked in error in 2005 and prior periods. In addition, we assessed our former policy of accruing a fixed percentage of revenue to bad debt expense during 2004 and prior periods that contributed to an over-accrual of the allowance for doubtful accounts. In 2004, we adopted a specific reserve methodology for determining required bad debt allowances. The allowance for doubtful accounts was adjusted to reflect implementation of this methodology. The net adjustments to bad debt expense and the allowance for doubtful accounts were a $0.1 million expense reduction in 2003, a $0.6 million increase in expense in 2004, and a $0.9 million increase to expense in the first two quarters of 2005.

During 2001, the Board of Directors approved a restructuring plan of which $1.7 million remained accrued at December 31, 2004 for excess leased facilities in Israel. In the fourth quarter of 2004, we reduced the restructuring reserve $1.4 million largely due to the ability to sublease a portion of the lease obligation. Beginning in 2002, improved real estate market conditions in Israel allowed us to sublease a substantial portion of the restructured Israel facility. However, in 2002, we failed to include in our assessment of the remaining net lease obligation, the ability to continue to generate sublease income and thereby reduce our net lease obligation, and in 2002 increased our Israel restructuring reserve by $1.2 million. During the restatement process, we determined that $1.2 million of the change in estimate recognized in the fourth quarter of 2004 properly related to the year ended December 31, 2002. As a result, we reversed the previously recorded $1.2 million decrease in restructuring reserve in 2004.

During 2004, we determined that we were carrying excess reserves related to received-not-invoiced in the amount of $0.8 million. We amortized this excess reserve by approximately $0.2 million per quarter during 2004. During the restatement, we determined that this excess reserve should have been written-off during 2002. As a result of the restatement, operating expenses during each quarter of 2004 have increased approximately $0.2 million.

Additional Adjustments to Quarterly Financial Statements Resulting from the Restatement

During the first and second quarters of 2004, we recorded increases of $0.7 million to our accounts receivables. These increases arose from a marketing promotion whereby we granted rebates to a customer in exchange for the customer removing a competitor's product and replacing it with our product. During the third quarter of 2004, we determined that the treatment of the rebates as a contra-receivable was inappropriate under EITF 01-09. Because we should have recorded a liability for these sales incentives, we previously recorded a reclassification of the contra-receivables to accrued other liabilities. Subsequently, we determined that the contra-receivables should have been reclassified to accrued other liabilities during the first and second quarter of 2004. Correction of this error increased accounts receivable and accrued other liabilities in the first and second quarters of 2004 by $0.2 million and $0.5 million, respectively.

During the quarter ended December 31, 2003, we entered into an agreement to consign specific spare parts inventory to a certain customer for the customer's demonstration and evaluation purposes. The consignment period was to terminate during the quarter ended March 31, 2004, at which time the customer would either purchase or return the spare parts inventory to us. During the quarter ended March 31, 2004, we notified the customer that the consignment period terminated and in accordance with the agreement, the customer should either return or purchase the spare parts inventory. We did not receive a reply and subsequently invoiced the customer for the spare parts inventory in the quarter ended March 31, 2004. During the quarter ended June 30, 2004, the customer agreed to purchase a portion of the spare parts inventory and returned the remaining spare parts inventory to us. Accordingly, for the quarter ended June 30, 2004, we issued the customer a credit memo for the amount of the sale that was invoiced in the quarter ended March 31, 2004 and was the entire amount originally consigned to the customer. During the course of the restatement, it was determined that at March 31, 2004, accounts receivable was overstated by $0.9 million. Inventory was understated by $0.5 million and both deferred revenue and deferred cost of goods sold were overstated by $0.9 million and $0.5 million, respectively. As a result, the consolidated balance sheets for the quarters ended at March 31, 2004 and June 30, 2004 were appropriately revised to correct this error.

In July 2000, we issued $500.0 million of Notes resulting in net proceeds to us of approximately $484.0 million. The Notes were convertible into shares of our common stock at a conversion price of $84.01 per share at any time on

98

--------------------------------------------------------------------------------

or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Notes contained an embedded derivative (Issuer Call Option) that allowed us to redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if the closing price of our stock exceeded 150% of the conversion price, or $126.01, for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of the mailing of the redemption notice. In addition, upon redemption, we were also required to make cash payment of $193.55 per $1,000 principal amount of the Notes less the amount of any interest actually paid on the Notes prior to redemption. Thereafter, we had the option to redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. In 2001 and 2002, we repurchased approximately $435.0 million of the Notes. On March 21, 2006, we paid off the entire principal amount of the outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million.

During the restatement process, we determined that the Issuer Call Option under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," represented an embedded derivative that was not clearly and closely related to the host contract and therefore needed to be bifurcated from the Notes and valued separately. Based on a separate valuation that included the Black-Scholes valuation methodologies, we assigned a valuation of $11.9 million to the Issuer Call Option. As a result, at the time the Notes were issued in July 2000, we should have created an asset to record the value of the Issuer Call Option for $11.9 million and create a bond premium to the Notes for $11.9 million. The asset value would then be marked to market at the end of each accounting period and the bond premium would be amortized against interest expense at the end of each accounting period. Due to the decrease in the price of our common stock, we wrote off the asset related to the Issuer Call Option in 2000. Additionally, as part of the bond repurchase activity in 2001 and 2002, we needed to recognize an additional gain from the retirement of the bond premium associated with the Issuer Call Option of $7.0 million in 2001 and $1.9 million in 2002. As a result of the large reported net loss of $557.1 million in 2001, we determined the $7.0 million non-cash gain on the early retirement of the premium to be immaterial to 2001 financial results. Including the impact of the Notes repurchasing activity in 2001 and 2002 that reduced the face value of Notes from $500.0 million to $65.1 million, we recorded a reduction to interest expense of approximately $55,000 in each quarter during the years ended December 31, 2003, 2004 and 2005 to amortize the remaining bond premium.

During 2002, we recorded $0.5 million of balance sheet reclassification entries in order to reconcile fixed assets to the fixed asset sub-ledger, which established a contra-fixed asset account. Subsequently, in 2003 we wrote off $0.5 million of impaired and disposed assets against the contra-fixed asset account. Upon review of the accounting treatment, we determined that the proper accounting should have been to record the adjustments for the reconciliation of the fixed asset accounts as a gain in 2002 rather than establishing a contra-fixed asset account. As a result of this correction, fixed assets and other income during 2002 have increased $0.5 million, and fixed assets and other income during the second and fourth quarters of 2003 have decreased $0.2 million and $0.2 million, respectively.

During 2003, 2004 and 2005 we maintained liabilities as a result of our restructuring obligations. We determined that certain classifications of these liabilities as short-term and long-term should be corrected. During the fourth quarter of 2003 and first quarter of 2004, we reclassified approximately $1.7 million and $0.9 million, respectively, of restructuring obligations from short-term to long-term liabilities. During the second, third, and fourth quarters of 2004, we reclassified approximately $0.1 million, $0.4 million and $2.0 million, respectively, of restructuring obligations from long-term to short-term liabilities. In the first quarter of 2005, we reclassified approximately $0.2 million of restructuring obligations from long-term to short-term liabilities.

Off-Balance Sheet Financings and Liabilities

Other than lease commitments and unconditional purchase obligations incurred in the normal course of business, we do not have any off-balance sheet financing arrangements or liabilities, guarantee contracts, retained or contingent interests in transferred assets or any obligation arising out of a material variable interest in an unconsolidated entity. We do not have any majority-owned subsidiaries that are not included in the consolidated financial statements.

--------------------------------------------------------------------------------

Table of Contents

Liquidity and Capital Resources
At December 31, 2005, we had approximately $101.3 million in cash, cash
equivalents and short-term investments ($28.9 million in cash and cash
equivalents and $72.4 million in short-term investments) as compared to
approximately $97.7 million at December 31, 2004 and $138.6 million at December
31, 2003. As of September 30, 2006, we had approximately $27.5 million in cash,
cash equivalents and short-term investments.
The increase in cash, cash equivalents and short-term investments from December
31, 2004 to December 31, 2005 was primarily related to the sale of certain
assets to ATI Technologies, Inc. (ATI). In the first quarter of 2005, we
received $8.6 million for the sale of certain of our cable modem semiconductor
assets to ATI. In the second quarter of 2005, ATI paid us an additional $2.5
million for meeting certain milestones. In July 2006, we received $1.1 million
from ATI when it released the funds held in escrow in June 2006. Despite
receiving cash payments for the sale of assets to ATI, we did not recognize the
gain on the ATI transaction until the quarter ended June 30, 2006 when all
milestones under the agreement had been completed. In the quarter ended June 30,
2006, we recognized the gain based upon the completion of milestones and the
termination of the supply arrangement between us and ATI. In 2004, we received
$0.3 million from the sale of three of our Israeli entities. In 2003, we
received $0.6 million for the sale of assets to Verilink.
Cash from operating activities for the year ended December 31, 2005 was $2.6
million compared to a usage of $39.7 million in the year ended December 31,
2004. In 2005, the net loss of $27.0 million was offset by a net contribution of
cash of $8.0 million from accounts receivable, $4.0 million from inventory and a
$12.6 million increase in deferred revenue. In 2004, contributing to the $39.7
million usage of cash were the net loss of $47.1 million, a $11.9 million in
increased inventory and a $17.4 million reduction in accounts payable offset by
a $11.6 million non-cash inventory provision, a $8.4 million decrease in
accounts receivable and an $11.9 million increase in deferred revenues. In 2003,
contributing to the $67.5 million usage of cash were the net loss of $56.2
million, a $13.0 million increase in inventory and a $6.2 million increase in
accounts receivable offset by a $6.9 million decrease in other assets, $4.0
million non-cash inventory provision and a $3.7 million increase in deferred
revenues.
Cash usage from investing activities for the year ended December 31, 2005 was
$19.6 million compared to cash provided of $50.8 million in the year ended
December 31, 2004. Cash provided by financing activities was $3.1 million and
$1.6 million for the years ended December 31, 2005 and 2004, respectively,
primarily due to proceeds from the exercise of stock options. In the year ended
December 31, 2003, cash usage from investing activities was $22.6 million and
cash provided by financing was $2.0 million.
On November 7, 2005, we announced that the filing of our periodic report on Form
10-Q for the quarter ending on September 30, 2005 would be delayed pending
completion of the accounting review. We were required under our Indenture, dated
July 26, 2000 (Indenture), to file with the Commission and the trustee of our
Notes all reports, information and other documents required pursuant to Section
13 or 15(d) of the Exchange Act. On January 12, 2006, holders of more than 25%
of the aggregate principal amount of the Notes, in accordance with the terms of
the Indenture, provided written notice to us that we were in default under the
Indenture based on our failure to file our Form 10-Q for the quarter ending
September 30, 2005. We were unable to cure the default within 60 days of the
written notice, March 13, 2006, which triggered an Event of Default under the
Indenture. The Event of Default enabled the holders of at least 25% in aggregate
principal amount of Notes outstanding to accelerate the maturity of the Notes by
written notice and declare the entire principal amount of the Notes, together
with all accrued and unpaid interest thereon, to be due and payable immediately.
On March 16, 2006, we received a notice of acceleration from holders of more
than 25% of the aggregate principal amount of the Notes. On March 21, 2006, we
paid in full the entire principal amount of the outstanding Notes, including all
accrued and unpaid interest thereon and related fees, for a total of $65.6
million.
Including the early repayment of the Notes, we currently believe that our
current unrestricted cash, cash equivalents, and short term investment balances
will be sufficient to satisfy our cash requirements for at least the next 12
months. In order to achieve profitability in the future, we will need to
increase revenues, primarily through sales of more profitable products, and
decrease costs. These statements are forward-looking in nature and involve risks
and uncertainties. Actual results may vary as a result of a number of risk
factors, including those discussed in Item 1A -- Risk Factors. We may need to
raise additional funds in order to support more rapid expansion, develop

100

--------------------------------------------------------------------------------

Table of Contents

new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated cash requirements. We may seek to raise additional funds through private or public sales of securities, strategic relationships, bank debt, and financing under leasing arrangements or otherwise. If additional funds are raised through the issuance of equity securities, the percentage ownership of our current stockholders will be reduced, stockholders may experience additional dilution or such equity securities may have rights, preferences or privileges senior to those of the holders of our common stock. We cannot assure that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

Contractual Obligations

The following summarizes our contractual obligations at December 31, 2005, and the effect such obligations are expected to have on our liquidity and cash flows in future periods (in millions):

|  | | Payments Due by Period | | |
|  | Total | Less Than 1 Year | 1 - 3 Years | 4 - 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Unconditional purchase obligations | $12.1 | $12.1 | $ -- | $ -- | -- |
| Long-term debt | 65.1 | -- | 65.1 | -- | -- |
| Operating lease obligations | 12.2 | 3.4 | 6.3 | 2.5 | -- |
| Aircraft lease obligation | 1.6 | 1.5 | 0.1 | -- | -- |
| Total | $91.0 | $82.1 | $6.4 | $2.5 | -- |

We have unconditional purchase obligations to certain of our suppliers that support our ability to manufacture our products. The obligations require us to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2005, we had approximately $12.1 million of purchase obligations, of which $1.5 million is included in our Consolidated Balance Sheets as accrued vendor cancellation charges, and the remaining $10.6 million is attributable to open purchase orders. The remaining open purchase order obligations are expected to become payable at various times through 2006. However, in March 2006, the Company paid off the principal amount of the outstanding Notes, which was $65.1 million.

Other commercial commitments, primarily required to support operating leases, are as follows (in millions):

|  | | Amount of Commitment Expiration per Period | | |
|  | Total | Less Than 1 Year | 1 - 3 Years | 4 - 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Deposits | $ 8.2 | $ 0.7 | $ 7.5 | $ -- | $ -- |
| Standby letters of credit | 0.5 | 0.2 | -- | 0.3 | -- |
| Total | $ 8.7 | $ 0.9 | $ 7.5 | $ 0.3 | $ -- |

In 2002, we entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit. The letter of credit was reduced to $7.5 million in February 2003. During 2004, the $7.5 million letter of credit was converted to a cash deposit. This lease commitment is included in the table above. In March 2004, in connection with our worldwide restructuring, we notified the lessor of our intentions to locate a purchaser for our remaining obligations under this lease. In August 2004, we subleased the corporate aircraft through December 2006.

Critical Accounting Policies

We consider certain accounting policies related to revenue recognition, allowance for doubtful accounts, inventory valuation, warranty reserves, restructuring, contingencies and income taxes to be critical policies due to the estimation processes involved in each. We discuss each of our critical accounting policies, in addition to certain less significant accounting policies, with senior members of management and the audit committee, as appropriate.

101

--------------------------------------------------------------------------------

Table of Contents

Revenue Recognition

In accordance with Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition" (SAB 101), as amended by SAB 104, for all products and services, we recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred or services are rendered, the fee is fixed or determinable, and collectibility is reasonably assured. In instances where final acceptance of the product, system, or solution is specified by the customer, revenue is not recognized until all acceptance criteria have been met. Contracts and customer purchase orders are used to determine the existence of an arrangement. Delivery occurs when product is delivered to a common carrier. Certain products are delivered on a free-on-board (FOB) destination basis and the Company does not recognize revenue associated with these transactions until the delivery has occurred to the customers' premises. We assess whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. We assess collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

In establishing its revenue recognition policies for our products, we assess software development efforts, marketing and the nature of post contract support (PCS). Based on its assessment, we determined that the software in the HAS and CMTS products is incidental and therefore, we recognize revenue on HAS and CMTS products under SAB 101, as specifically provided under SAB 104. Additionally, based on our assessment of the DVS products, we determined that software was more than incidental, and therefore, we recognize revenue on the DVS products under American Institute of Certified Public Accountants Statement of Position (SOP) 97-2, "Software Revenue Recognition" (SOP 97-2) and SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" (SOP 81-1).

We determined that the software in the DVS products is more than incidental because the DVS platforms contained multiple embedded software applications, the software is actively marketed and we have a practice of providing upgrades and enhancements for the software to its existing users periodically. While the software is not sold on a stand-alone basis with the ability to operate on a third party hardware platform, the software is marketed and sold separately in the form of software license keys to activate embedded software applications. Additionally, as part of our customer support contracts, we routinely provide our customers with unspecified software upgrades and enhancements.

When a sale involves multiple elements, such as sales of products that include services, the entire fee from the arrangement is allocated to each respective element based on its fair value and recognized when revenue recognition criteria for each element are met. Fair value for each element is established based on the sales price charged when the same element is sold separately. In order to recognize revenue from individual elements within a multiple element arrangement under SOP 97-2, we must establish vendor specific objective evidence (VSOE) of fair value for each element.

Prior to 2006, for DVS products, we determined that we did not establish VSOE of fair value for the undelivered element of PCS, which required us to recognize revenue and the cost of goods sold of both the hardware element and PCS element ratably over the period of the customer support contract. We amortized the cost of goods sold for DVS products ratably over the period of the customer support contract. Revenue and the related cost of goods sold for DVS products that contain multiple element arrangements in each quarter of 2003, 2004 and 2005 were restated to reflect this accounting policy.

Beginning in the first quarter of 2006, we determined that we established VSOE of fair value of the PCS element for DVS product sales as a result of maintaining consistent pricing practices for PCS, including consistent pricing of renewal rates for PCS. For DVS products sold beginning in 2006 that contain a multiple element arrangement, we recognize revenue from the hardware component when all criteria of SAB 104 and SOP 97-2 have been met and revenue related to PCS element ratably over the period of the PCS.

We sell our products directly to broadband service providers, and to a lesser extent, resellers. Revenue arrangements with resellers are recognized when product meets all criteria of SAB 104 and SOP 97-2.

----------------------------------------------------------------------------------

Table of Contents

Deferred Revenue, Deferred Cost of Goods Sold
Deferred revenue and deferred cost of goods sold are a result of our recognizing revenues on the DVS under SOP 97-2. Under SOP 97-2, we must establish VSOE of fair value for each element of a multiple element arrangement. Until the first quarter of 2006, we did not establish VSOE of fair value for PCS when PCS was sold as part of a multiple element arrangement. As such, for DVS products sold with PCS, revenue and the cost of goods sold related to the delivered element, the hardware component, were deferred and recognized ratably over the period of the PCS.

Allowance for Doubtful Accounts
We perform ongoing credit evaluations of our customers and generally require no collateral. We evaluate our trade receivables based upon a combination of factors. Credit losses have historically been within management's expectations. When we become aware of a customer's inability to pay, such as in the case of bankruptcy or a decline in the customer's operating results or financial position, we record an allowance to reduce the related receivable to an amount we reasonably believe is collectible. We maintain an allowance for potentially uncollectible accounts receivable based on an estimate of collectibility. We assess collectibility based on a number of factors, including history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of our clients' customers and other factors that we believe are relevant. If circumstances related to a specific customer change, our estimates of the recoverability of receivables could be further reduced. In addition, during the restatement, we made other adjustments to the allowance for doubtful accounts to offset the accounts receivable and related reserve related to customers who were granted extended payment terms, experiencing financial difficulties or where collectibility was not reasonably assured. Accordingly, we classify these customers as those with "extended payment terms" or with "collectibility issues." At December 31, 2005 and 2004, the allowance for potentially uncollectible accounts was $2.8 million and $2.3 million, respectively.

Inventory Valuation
We value inventory at the lower of cost or market in accordance with Chapter 3 of Accounting Research Bulletin No. 43. Our policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires us to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid technological change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by our customers, we believe that assessing the value of inventory using generally a six-month time horizon is appropriate.

The estimates of future demand that we use in the valuation of inventory are the basis for the revenue forecast, which is also consistent with our short-term manufacturing plan. Based on this analysis, we reduce the cost of inventory that we specifically identify and consider obsolete or excessive to fulfill future sales estimates. We define excess inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using our best estimate of future demand at the time, based upon information then available. We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. During the normal course of business, in order to manage manufacturing lead times (often ranging from three to six months) and to help ensure adequate component supply, we enter into agreements with contract manufacturers and suppliers that either allow them to procure inventory based upon criteria as defined by us or that establish the parameters defining our component supply requirements. If we were to curtail or cease production of certain products or terminate these agreements, we may be liable for vendor cancellation charges.

We record losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Research Bulletin No. 43. We accrue for vendor cancellation charges (which increase cost of goods sold) which represent management's estimate of our financial exposure to vendors should our management curtail

103

---------------------------------------------------------------------------------

or cease production of certain products or terminate a vendor or supplier agreement. Estimates of exposure are determined using vendor inventory data. Should we change our short-term manufacturing plans such that further products or components would no longer be used, additional vendor cancellation charges may occur. If product is received and booked into inventory for which a vendor cancellation reserve had been previously established, the vendor cancellation reserve attributable to this inventory is transferred to the reserve for excess and obsolete inventory. At December 31, 2005, accrued vendor cancellation charges were $1.5 million, which are expected to become payable in the next three to six months. From time to time we have been able to reverse portions of our vendor cancellation accrual as we were able to negotiate downward certain vendor cancellation charges. Such reversals of vendor cancellation charges cause a decrease in cost of goods sold in the period during which such charges are reversed. For the year ended December 31, 2005, we reversed nominal amounts of vendor cancellation charges accrued at December 31, 2004. For the years ended December 31, 2004 and 2003, we reversed $2.4 million and $5.6 million, respectively, of vendor cancellation charges accrued at December 31, 2003 and 2002, as a result of favorable negotiations with vendors and revised forecasts of demand.

Warranty Reserves

We provide a standard warranty for most of our products, ranging from one to five years from the date of purchase. We provide for the estimated cost of product warranties at the time revenue is recognized. Our warranty obligations are affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Our estimate of costs to service our warranty obligations is based on historical experience and our expectation of future conditions. Should actual product failure rates, material usage or service delivery costs differ from our estimates, revision to the warranty liability would be required, resulting in decreased gross profits. Warranty reserves totaled $2.9 million and $4.7 million, for the years ended December 31, 2005 and 2004, respectively.

Restructuring and Other Related Charges

During 2004, 2003, 2002 and 2001, we implemented restructuring programs to focus and streamline our business and reduce operating expenses. In connection with these programs, we reduced headcount, abandoned facilities and wrote off inventory. As a result of these actions, we recorded restructuring and other related charges primarily consisting of cash severance payments made to terminated employees, lease payments related to property abandoned as a result of our facilities consolidation and lease payments related to an aircraft lease. Each reporting period, we review these estimates based on the execution of our restructuring plans and changing market conditions, such as the real estate market and other assumptions and, as needed, record appropriate adjustments. To the extent that these assumptions change, the ultimate restructuring expenses could vary.

Contingencies

We are subject to proceedings, lawsuits and other claims related to labor, acquisitions and other matters. We are required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. In order to establish any reserve for contingent obligations, the contingent obligation must be probable and quantifiable. A determination of the amount of reserves required, if any, for these contingencies is made after careful analysis of each individual issue. The required reserves may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters, any of which may result in higher net loss.

Income Taxes

We determine our provision for income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax effects of temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Future tax benefits of tax loss and credit carryforwards are also recognized as deferred tax assets. We evaluate the realizability of our deferred tax assets by assessing the likelihood of future profitability and available tax planning strategies that could be implemented to realize our net deferred tax assets. The ultimate realization of our net deferred tax assets will require profitability. We have assessed the future profit plans and tax planning strategies together with the years of

expiration of carryforward benefits, and have concluded that the deferred tax assets will be not be currently realized and have recorded a valuation allowance against the entire amount of the deferred tax assets. Should our operating performance improve future assessments could conclude that a reduction to the valuation allowance will be needed to reflect deferred tax assets. In addition, we operate within multiple taxing jurisdictions and are subject to tax audits in these jurisdictions. These audits can involve complex issues, which may require an extended period of time to resolve. While we believe we have provided adequately for our income tax liabilities in our consolidated financial statements, adverse determinations by taxing authorities could have a material adverse effect on our consolidated financial condition and results of operations.

Recently Issued Accounting Standards

In November 2004, the FASB issued SFAS No. 151, "Inventory Costs" (SFAS 151), which revised Accounting Research Bulletin (ARB) 43, relating to inventory costs. This revision is to clarify the accounting for abnormal amounts of idle facility expense, freight, handling costs and wasted material (spoilage). SFAS 151 requires that these items be recognized as a current period charge regardless of whether they meet the criteria specified in ARB 43. In addition, SFAS 151 requires the allocation of fixed production overhead to the costs of conversion be based on normal capacity of the production facilities. SFAS 151 is effective for inventory costs incurred during years beginning after June 15, 2005. The adoption of SFAS 151 is not expected to have a material impact on our financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004), or SFAS 123(R), "Share-Based Payment." This statement replaces SFAS 123, "Accounting for Stock-Based Compensation" and supersedes Accounting Principles Board's Opinion (APB) 25, "Accounting for Stock Issued to Employees" (APB 25). SFAS 123(R) requires the measurement of all employee share-based payments to employees, including grants of employee stock options, using a fair-value-based method and the recording of such expense in our consolidated statements of income. In April 2005, the Commission announced that the accounting provisions of SFAS 123(R) are to be applied in the first quarter of the year beginning after June 15, 2005. As a result, we are now required to adopt SFAS 123(R) in the quarter ended March 31, 2006. The non-GAAP (pro forma) disclosures previously permitted under SFAS 123 no longer will be an alternative to financial statement recognition. See Note 2, "Summary of Significant Accounting Policies," to Consolidated Financial Statements for information related to the non-GAAP (pro forma) effects on our reported net income and net earnings per share. In the future, the adoption may have a significant adverse impact on our results of operations.

In March 2005, the Commission issued SAB 107, "Share-Based Payment." SAB 107 provides guidance on the initial implementation of SFAS 123(R). In particular, the statement includes guidance related to share-based payment awards with non-employees, valuation methods and selecting underlying assumptions such as expected volatility and expected term. It also gives guidance on the classification of compensation expense associated with share-based payment awards and accounting for the income tax effects of share-based payment awards upon the adoption of SFAS 123(R).

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections" (SFAS 154), which replaces APB 20, "Accounting Changes" (APB 20), and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements." SFAS 154 applies to all voluntary changes in accounting principle, and changes the requirements for accounting for and reporting of a change in accounting principle. SFAS 154 requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle unless it is impracticable. APB 20 previously required that most voluntary changes in accounting principle be recognized with a cumulative effect adjustment in net income of the period of the change. SFAS 154 is effective for accounting changes made in annual periods beginning after December 15, 2005. The adoption of SFAS 154 is not expected to have a material impact on our financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" (SFAS 155) which amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133) and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" (SFAS 140). Specifically, SFAS 155 amends SFAS 133 to permit fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided the

105

Table of Contents

whole instrument is accounted for on a fair value basis. Additionally, SFAS 155 amends SFAS 140 to allow a qualifying special purpose entity to hold a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS 155 applies to all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006, with early application allowed. The adoption of SFAS 155 is not expected to have a material impact on our results of operations or financial position.

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets" (SFAS 156), to simplify accounting for separately recognized servicing assets and servicing liabilities. SFAS 156 amends SFAS 140. Additionally, SFAS 156 applies to all separately recognized servicing assets and liabilities acquired or issued after the beginning of an entity's fiscal year that begins after September 15, 2006, although early adoption is permitted. The adoption of SFAS 156 is not expected to have a material impact on our results of operations or financial position.

In July 2006, the FASB issued FASB Interpretation (FIN) 48, "Accounting for Uncertainty in Income Taxes" (FIN 48) -- an interpretation of FASB No. 109, "Accounting for Income Taxes." FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether or not to file in a particular jurisdiction. FIN 48 is effective for years beginning after December 15, 2006. If there are changes in net assets as a result of application of FIN 48 these will be accounted for as an adjustment to retained earnings. We are currently assessing the impact of FIN 48 on its consolidated financial position and results of operations.

In September 2006, the FASB issued Statement SFAS No. 157, "Fair Value Measurements" (SFAS 057), which defines fair value, establishes guidelines for measuring fair value and expands disclosures regarding fair value measurements. SFAS 157 does not require any new fair value measurements but rather eliminates inconsistencies in guidance found in various prior accounting pronouncements. SFAS 157 is effective for fiscal years beginning after November 15, 2007. Earlier adoption is permitted, provided the company has not yet issued financial statements, including for interim periods, for that fiscal year. We are currently evaluating the impact of SFAS 157, but do not expect the adoption of SFAS 157 to have a material impact on its consolidated financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (SFAS 158), an amendment of FASB Statement No. 87, 88, 106 and 132(R) (SFAS 158). Under SFAS 158, companies must recognize a net liability or asset to report the funded status of their defined benefit pension and other postretirement benefit plans (collectively referred to herein as "benefit plans") on their balance sheets, starting with balance sheets as of December 31, 2006 if they are calendar year-end public company. SFAS 158 also changed certain disclosures related to benefit plans. The adoption of SFAS 158 is not expected to have a material impact on our results of operations or financial position.

In September 2006, the Commission released Staff Accounting Bulletin (SAB) No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements" (SAB 108). SAB 108 provides guidance on how the effects of prior-year uncorrected financial statement misstatements should be considered in quantifying a current year misstatement. SAB 108 requires registrants to quantify misstatements using both an income statement (rollover) and balance sheet (iron curtain) approach and evaluate whether either approach results in a misstatement that, when all relevant quantitative and qualitative factors are considered, is material. If prior year errors that had been previously considered immaterial are now considered material based on either approach, no restatement is required as long as management properly applied its previous approach and all relevant facts and circumstances were considered. If prior years are not restated, the cumulative effect adjustment is recorded in opening retained earnings as of the beginning of the fiscal year of adoption. SAB 108 is effective for fiscal years ending on or after November 15, 2006. The adoption of SAB 108 is not expected to have a material impact on our financial statements.

Item 7A.Quantitative and Qualitative Disclosures About Market Risk

Interest Rate Risk.  Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing

--------------------------------------------------------------------------------

Table of Contents

yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. A hypothetical 50 basis point increase in interest rates would not have a material impact on the fair value of our available-for-sale securities. Foreign Currency Risk.  A substantial majority of our revenue, expense and capital purchasing activity are transacted in U.S. dollars. However, we do enter into transactions from Belgium, United Kingdom, Hong Kong and Canada. If foreign currency rates were to fluctuate by 10% from the rates at December 31, 2005, our financial position, results of operations and cash flows would not be materially affected. However, we cannot guarantee that there will not be a material impact in the future.

107

--------------------------------------------------------------------------------

Table of Contents

Item 8.Financial Statements and Supplementary Data

TERAYON COMMUNICATION SYSTEMS, INC.
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Stonefield Josephson, Inc., Independent Registered Public Accounting Firm | 109 |
| Consolidated Balance Sheets | 110 |
| Consolidated Statements of Operations | 111 |
| Consolidated Statements of Stockholders' Equity | 112 |
| Consolidated Statements of Cash Flows | 113 |
| Notes to Consolidated Financial Statements | 114 |

108

--------------------------------------------------------------------------------

Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and
Stockholders of Terayon Communication Systems, Inc.:

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2005 and 2004, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the years in the three year period ended December 31, 2005. We have also audited the schedule listed in the accompanying Item 15. These consolidated financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements and schedule are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements and schedule. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements and schedule. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Terayon Communication Systems, Inc. as of December 31, 2005 and 2004, and the results of its operations and its cash flows for each of the years in the three year period ended December 31, 2005 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying Item 15 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

We also have audited, in accordance with the standards of Public Company Accounting Oversight Board (United States), the effectiveness of Terayon Communication Systems, Inc.'s internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control -- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated December 6, 2006 expressed an unqualified opinion on management's assessment of internal control over financial reporting and an adverse opinion on the effectiveness of internal control over financial reporting.

As described in Note 3, the Company has restated its previously issued consolidated financial statements for the years ended December 31, 2004 and 2003.

/s/ Stonefield Josephson, Inc.
San Francisco, California
December 6, 2006

109

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

(in thousands)

| | December 31, | |
| | 2005 | 2004 |
| | | (as restated)(1) |
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 28,867 | $ 43,218 |
| Short-term investments | 72,434 | 54,517 |
| Accounts receivable, net of allowance for doubtful accounts | 9,879 | 18,559 |
| Other current receivables | 1,606 | 1,044 |
| Inventory, net | 10,915 | 17,666 |
| Other current assets | 6,778 | 3,516 |
| Total current assets | 130,479 | 138,520 |
| Property and equipment, net | 3,915 | 5,854 |
| Restricted cash | 332 | 1,241 |
| Other assets, net | 11,922 | 11,366 |
| Total assets | $ 146,648 | $ 156,981 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable | $ 5,036 | $ 7,846 |
| Accrued payroll and related expenses | 2,105 | 4,493 |
| Deferred revenues | 13,952 | 4,965 |
| Deferred gain on asset sale | 8,631 | -- |
| Accrued warranty expenses | 2,887 | 4,670 |
| Accrued restructuring and executive severance | 1,305 | 3,744 |
| Accrued vendor cancellation charges | 1,508 | 521 |
| Accrued other liabilities | 6,287 | 3,873 |
| Interest payable | 1,356 | 1,356 |
| Current portion of subordinated convertible notes | 65,367 | -- |
| Total current liabilities | 108,434 | 31,468 |
| Long-term obligations | 1,455 | 2,076 |
| Accrued restructuring and executive severance | 1,381 | 1,822 |
| Long-term deferred revenue | 14,721 | 11,084 |
| Convertible subordinated notes | -- | 65,588 |
| Total liabilities | 125,991 | 112,038 |
| Commitments and contingencies (Notes 9 and 17) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: 5,000,000 shares authorized; no shares issued and outstanding | -- | -- |
| Common stock: $0.001 par value, 200,000,000 shares authorized | | |
| Issued -- 77,794,186 in 2005 and 76,453,074 in 2004 | | |
| Outstanding -- 77,638,177 in 2005 and 76,297,065 in 2004 | 78 | 76 |
| Additional paid-in capital | 1,086,817 | 1,083,709 |
| Accumulated deficit | (1,062,438) | (1,035,487) |
| Treasury stock, at cost; 156,009 shares | (773) | (773) |
| Accumulated other comprehensive loss | (3,027) | (2,582) |
| Total stockholders' equity | 20,657 | 44,943 |
| Total liabilities and stockholders' equity | $ 146,648 | $ 156,981 |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

See accompanying notes.

110

--------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share data)

|  | Year Ended December 31, | | |
|  | 2005 | 2004 | 2003 |
|  |  | (as restated)(1) | (as restated)(1) |
| Revenues | $ 90,664 | $ 136,484 | $ 130,187 |
| Cost of goods sold | 55,635 | 101,887 | 103,835 |
| Gross profit | 35,029 | 34,597 | 26,352 |
| Operating expenses: |  |  |  |
| Research and development | 17,650 | 33,199 | 42,634 |
| Sales and marketing | 22,534 | 24,145 | 26,781 |
| General and administrative | 20,356 | 12,039 | 11,934 |
| Restructuring charges, executive severance and asset write-offs | 2,257 | 12,336 | 2,803 |
| Total operating expenses | 62,797 | 81,719 | 84,152 |
| Loss from operations | (27,768) | (47,122) | (57,800) |
| Interest expense, net | (189) | (1,090) | (141) |
| Other income, net | 1,155 | 1,031 | 2,032 |
| Loss before income tax benefit (expense) | (26,802) | (47,181) | (55,909) |
| Income tax benefit (expense) | (149) | 76 | (316) |
| Net loss | $(26,951) | $ (47,105) | $ (56,225) |
| Basic and diluted net loss per share | $ (0.35) | $ (0.62) | $ (0.76) |
| Shares used in computing basic and diluted net loss per share | 77,154 | 75,751 | 74,074 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
Consolidated Financial Statements.

See accompanying notes.

111

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(in thousands)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Loss | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | Shares | Amount | |
| Balance at December 31, 2002 (as restated)(1) | 73,069,519 | $73 | $1,078,143 | $ (932,157) | $ (25) | $ (3,071) | 156,009 | $ (773) | $ 142,190 |
| Exercise of option for cash to purchase common stock | 592,672 | 1 | 2,530 | | | | | | 2,531 |
| Revaluation of options to non-employees | | | 50 | | (50) | | | | |
| Amortization of deferred compensation | | | | | 53 | | | | 53 |
| Issuance of restricted common stock from stock option plan for services | 9,600 | | 70 | | | | | | 70 |
| Issuance of common stock for employee stock purchase plan | 1,202,210 | 1 | 1,196 | | | | | | 1,197 |
| Issuance of warrant to purchase common stock | | | 45 | | | | | | 45 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | (470) | | | (470) |
| Cumulative translation adjustment | | | | | | 1,172 | | | 1,172 |
| Net loss | | | | (56,225) | | | | | (56,225) |
| Comprehensive loss | | | | | | | | | (55,523) |
| Balance at December 31, 2003 (as restated)(1) | 74,874,001 | 75 | 1,082,034 | (988,382) | (22) | (2,368) | 156,009 | (773) | 90,563 |
| Exercise of option for cash to purchase common stock | 225,645 | | 494 | | | | | | 494 |
| Revaluation of options to non-employees | | | (5) | | 5 | | | | |
| Amortization of deferred compensation | | | | | 17 | | | | 17 |
| Issuance of common stock for employee stock purchase plan | 1,197,419 | 1 | 1,186 | | | | | | 1,187 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | (520) | | | (520) |
| Cumulative translation adjustment | | | | | | 307 | | | 307 |
| Net loss | | | | (47,105) | | | | | (47,105) |
| Comprehensive loss | | | | | | | | | (47,319) |
| Balance at December 31, 2004 (as restated)(1) | 76,297,065 | 76 | 1,083,709 | (1,035,487) | | (2,582) | 156,009 | (773) | 44,943 |
| Exercise of option for cash to purchase common stock | 1,341,112 | 2 | 3,056 | | | | | | 3,058 |
| Accelerated vesting of stock options | | | 52 | | | | | | 52 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | 16 | | | 16 |
| Cumulative translation adjustment | | | | | | (461) | | | (461) |
| Net loss | | | | (26,951) | | | | | (26,951) |
| Comprehensive loss | | | | | | | | | (27,396) |
| Balance at December 31, 2005 | 77,638,177 | 78 | $1,086,817 | $(1,062,438) | $ -- | $ (3,027) | 156,009 | $(773) | 20,657 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

See accompanying notes.

112

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

(in thousands)

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| | | (as restated)(1) | (as restated)(1) |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net loss | $(26,951) | $(47,105) | $(56,225) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 3,148 | 5,860 | 9,222 |
| Amortization of subordinated convertible notes premium | (221) | (221) | (221) |
| Amortization of deferred compensation | -- | 17 | 53 |
| Accretion of discounts on short-term investments | (114) | (107) | (440) |
| Realized gains on sales of short-term investments | -- | (2) | (127) |
| Inventory provision | 2,732 | 11,550 | 4,025 |
| Provision for doubtful accounts | 132 | 590 | 120 |
| Restructuring provision | 2,068 | 6,513 | 2,184 |
| Write-off of fixed assets | 602 | 3,045 | 819 |
| Warranty provision | (165) | 3,075 | 2,353 |
| Vendor cancellation provision | 1,143 | 387 | 1,362 |
| Compensation expense for issuance of common stock | -- | -- | 70 |
| Value of common and preferred stock warrants issued | -- | -- | 45 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable, net | 7,986 | 8,404 | (6,200) |
| Inventory | 4,019 | (11,939) | (13,045) |
| Other assets | 5,722 | 403 | 6,911 |
| Accounts payable | (2,810) | (17,440) | 2,129 |
| Accrued payroll and related expenses | (2,829) | (1,984) | 310 |
| Deferred revenues | 12,624 | 11,852 | 3,700 |
| Accrued warranty expense | (1,618) | (3,634) | (5,451) |
| Accrued restructuring charges | (4,507) | (4,355) | (4,258) |
| Accrued vendor cancellation charges | (156) | (2,735) | (11,448) |
| Accrued other liabilities | 1,793 | (1,830) | (3,404) |
| Net cash provided by (used in) operating activities | 2,598 | (39,656) | (67,516) |
| Cash flows from investing activities: | | | |
| Purchases of short-term investments | (44,707) | (89,957) | (253,033) |
| Proceeds from sales and maturities of short-term investments | 26,919 | 143,480 | 234,101 |
| Purchases of property and equipment | (1,811) | (2,700) | (3,646) |
| Net cash provided by (used in) investing activities | (19,599) | 50,823 | (22,578) |
| Cash flows from financing activities: | | | |
| Principal payments on capital leases | -- | (126) | (1,697) |
| Debt extinguishment of convertible debt | -- | -- | -- |
| Proceeds from issuance of common stock | 3,110 | 1,682 | 3,728 |
| Net cash provided by financing activities | 3,110 | 1,556 | 2,031 |
| Effect of foreign currency exchange rate changes | (460) | 307 | 1,172 |
| Net decrease in cash and cash equivalents | (14,351) | 13,030 | (86,891) |
| Cash and cash equivalents at beginning of year | 43,218 | 30,188 | 117,079 |
| Cash and cash equivalents at end of year | $ 28,867 | $ 43,218 | $ 30,188 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for income taxes | $ 168 | $ 175 | $ 194 |
| Cash paid for interest | $ 3,254 | $ 3,268 | $ 3,262 |
| Deferred compensation relating to common stock issued to non-employees | $ -- | $ 17 | $ 53 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

113

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Note 1.Organization

Description of Business
Terayon Communication Systems, Inc. (Company) was incorporated under the laws of the State of California on January 20, 1993. In June 1998, the Company reincorporated in the State of Delaware.
The Company develops, markets and sells digital video equipment to network operators and content aggregators who offer video services.
In 2004, the Company refocused to make digital video the core of its business. As part of this strategic refocus, the Company elected to continue selling its home access solutions (HAS) product, including cable modems, embedded multimedia terminal adapters (eMTA) and home networking devices, but ceased future investment in its cable modem termination systems (CMTS) product line. In January 2006, the Company announced it was discontinuing its HAS product line.

Note 2.Summary of Significant Accounting Policies

Basis of Consolidation
The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated.
Use of Estimates
The preparation of the consolidated financial statements in conformity with generally accepted accounting principles (GAAP) in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates are based on historical experience, input from sources outside of the Company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's revenue recognition policy, the valuation of its accounts receivable and inventory, warranty obligations, accrued vendor cancellation charges, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of restructuring liabilities.
Foreign Currency Translation
The Company records the effect of foreign currency translation in accordance with Statement of Financial Accounting Standards (SFAS) No. 52, "Foreign Currency Translation." For operations outside the United States that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end-of-period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in stockholders' equity. Realized foreign currency transaction gains and losses are included in results of operations as incurred.
Treasury Stock
The Company accounts for treasury stock under the cost method and discloses treasury stock as a separate line item in the shareholders' equity section of the consolidated balance sheet.
Concentrations of Credit Risk, Customers, Suppliers and Products
The Company performs ongoing credit evaluations of its customers and generally requires no collateral. Credit losses have historically been within management's expectations. The Company maintains an allowance for potentially uncollectible accounts receivable based on an assessment of collectibility. The Company assesses

114

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of the Company's clients' customers and other factors that the Company believes are relevant. At December 31, 2005 and 2004, the allowance for potentially uncollectible accounts was $2.8 million and $2.3 million, respectively. A relatively small number of customers account for a significant percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in several financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/AA or better, or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

In accordance with Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition" (SAB 101), as amended by SAB 104, for all products and services, the Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred or services were rendered, the fee is fixed or determinable, and collectibility is reasonably assured. In instances where final acceptance of the product, system, or solution is specified by the customer, revenue is not recognized until all acceptance criteria have been met. Contracts and customer purchase orders are used to determine the existence of an arrangement. Delivery occurs when product is delivered to a common carrier. Certain products are delivered on a free-on-board (FOB) destination basis and the Company does not recognize revenue associated with these transactions until the delivery has occurred to the customers' premises. The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. The Company assesses collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

In establishing its revenue recognition policies for its products, the Company assesses software development efforts, marketing and the nature of post contract support (PCS). Based on its assessment, the Company determined that the software in the HAS and CMTS products is incidental and therefore, the Company recognizes revenue on HAS and CMTS products under SAB 101, as specifically amended by SAB 104. Additionally, based on its assessment of the DVS products, the Company determined that software was more than incidental, and therefore, the Company recognizes revenue on the DVS products under American Institute of Certified Public Accountants Statement of Position (SOP) 97-2, "Software Revenue Recognition" (SOP 97-2) and SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" (SOP 81-1).

The Company determined that the software in the DVS products is more than incidental because the DVS platforms contained multiple embedded software applications, the software is actively marketed and the Company has a practice of providing upgrades and enhancements for the software to its existing users periodically. While the software is not sold on a stand-alone basis with the ability to operate on a third party hardware platform, the software is marketed and sold separately in the form of software license keys to activate embedded software applications. Additionally, as part of the Company's customer support contracts, the Company routinely provides its customers with unspecified software upgrades and enhancements.

115

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

When a sale involves multiple elements, such as sales of products that include services, the entire fee from the arrangement is allocated to each respective element based on its fair value and recognized when revenue recognition criteria for each element are met. Fair value for each element is established based on the sales price charged when the same element is sold separately. In order to recognize revenue from individual elements within a multiple element arrangement under SOP 97-2, the Company must establish vendor specific objective evidence (VSOE) of fair value for each element.

Prior to 2006, for the DVS product, the Company determined that it did not establish VSOE of fair value for the undelivered element of PCS, which required the Company to amortize the sale price of both the hardware element and PCS element ratably over the period of the customer support contract. The Company amortized the cost of goods sold for the DVS product ratably over the period of the customer support contract. Revenue and the related cost of goods sold for DVS products that contain multiple element arrangements in each quarter of 2003, 2004 and 2005 were deferred and recognized ratably over the contract service period.

Beginning in the first quarter of 2006, the Company determined that it established VSOE of fair value of the PCS element for DVS product sales as a result of maintaining consistent pricing practices for PCS, including consistent pricing of renewal rates for PCS. For DVS products sold beginning in 2006 that contain a multiple element arrangement, the Company recognizes revenue from the hardware component when all criteria of SAB 104 and SOP 97-2 have been met and revenue related to PCS element ratably over the period of the PCS.

The Company sells its products directly to broadband service providers, and to a lesser extent, resellers. Revenue arrangements with resellers are recognized when product meets all criteria of SAB 104 and SOP 97-2.

Deferred Revenue, Deferred Cost of Goods Sold

Deferred revenue and deferred cost of goods are a result of the Company recognizing revenues on the DVS under SOP 97-2. Under SOP 97-2, the Company must establish VSOE of fair value for each element of a multiple element arrangement. Until the first quarter of 2006, the Company did not establish VSOE of fair value for PCS when PCS was sold as part of a multiple element arrangement. As such, for DVS products sold with PCS, revenue and the cost of goods sold related to the delivered element, the hardware component, were deferred and recognized ratably over the period of the PCS.

Accounts Receivable, Net of Allowance for Doubtful Accounts

The Company performs ongoing credit evaluations of its customers and generally require no collateral. The Company evaluates its trade receivables based upon a combination of factors. Credit losses have historically been within management's expectations. When the Company becomes aware of a customer's inability to pay, such as in the case of bankruptcy or a decline in the customer's operating results or financial position, it records an allowance to reduce the related receivable to an amount it reasonably believes is collectible. The Company maintains an allowance for potentially uncollectible accounts receivable based on an estimate of collectibility. The Company assesses collectibility based on a number of factors, including history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of its clients' customers and other factors that it believes are relevant. If circumstances related to a specific customer change, its estimates of the recoverability of receivables could be further altered. In addition, during the restatement, the Company made other adjustments to the allowance for doubtful accounts to offset the accounts receivable and related reserve related to customers who were granted extended payment terms, experiencing financial difficulties or where collectibility was not reasonably assured. Accordingly, the Company classifies these customers as those with "extended payment terms" or with "collectibility issues."

116

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Research and Development Expenses
With the exception of the series of contractual arrangements with Thomson entered into to develop a customized product, research and development expenses are charged to expense as incurred. As a part of the restatement, the Company recognized revenue under this series of contractual arrangements in accordance with SOP 97-2, SAB 104 and SOP 81-1. As a result, all revenue and research and development expenses associated with the contract were recognized in the quarter ended December 31, 2005. The Company generally does not engage in project based contracts with its customers that may result in the future of the deferral of research and development expenditures.

Shipping and Handling Costs
Costs related to shipping and handling are included in cost of goods sold for all periods presented.

Advertising Expenses
The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2005, 2004 and 2003 were $0.6 million, $0.1 million, and $0.1 million, respectively.

Net Loss Per Share
Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

|  | Year Ended December 31, | | |
|  | 2005 | 2004 | 2003 |
|  |  | (as restated)(1) | (as restated)(1) |
| Net loss | $(26,951) | $ (47,105) | $ (56,225) |
| Basic and diluted net loss per share | $ (0.35) | $ (0.62) | $ (0.76) |
| Shares used in computing basic and diluted net loss per share | 77,154 | 75,751 | 74,074 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Options to purchase 13,031,986, 16,802,838 and 17,463,959 shares of common stock were outstanding at December 31, 2005, 2004 and 2003, respectively, and warrants to purchase 200,000 shares of common stock were outstanding at December 31, 2003. These common stock equivalents were not included in the computation of diluted net loss per share since the effect would have been anti-dilutive. There were no warrants outstanding at December 31, 2005 and 2004.

Cash, Cash Equivalents and Short-Term Investments
The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of 90 days or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company determines impairment related to its debt and equity investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities," and Staff Accounting Bulletin (SAB) 59, "Accounting for Noncurrent Marketable Equity Securities," which provide guidance on determining

117

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost, the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information and the Company's intent and ability to hold the investment. The Company also relies upon guidance from Financial Accounting Standards Board (FASB), Emerging Issues Task Force (EITF) 03-01 "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments," in determining possible impairment as it relates to its debt investments. As of December 31, 2005, the Company had $0.5 million in unrealized losses on cash, cash equivalents and short term investments in Other Comprehensive Loss on the Consolidated Balance Sheet. The unrealized losses relating to investments in federal agency securities were caused by interest rate increases. The Company purchased these securities at par, and the contractual cash flows of these investments are guaranteed by an agency of the U.S. government. Accordingly, it is expected that the securities would not be settled at a price less than the amortized cost of the Company's investment. Because the decline in market value is attributable to changes in interest rates and not credit quality and because the Company has the ability and intent to hold these investments until a recovery of fair value, which may be at maturity, the Company does not consider these investments to be other-than-temporarily impaired at December 31, 2005. Further the Company has a history of holding these types of investments to maturity and assesses this issue quarterly.

The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities are classified as available-for-sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short-term equity securities at December 31, 2005 and 2004.

Other Current Receivables

As of December 31, 2005 and 2004, other current receivables are primarily composed of interest, taxes, and non-trade receivables, and included approximately $0.2 million and $0.2 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
|  | | (as restated)(1) |
| Raw materials | $ 58 | $ 1,113 |
| Work-in-process | -- | 1,500 |
| Finished goods | 10,857 | 15,053 |
| Total | $ 10,915 | $ 17,666 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Research Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date, which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well

118

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

as product lifecycle and product development plans. Given the rapid change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by the Company's customers, the Company believes that assessing the value of inventory using generally a six-month time horizon is appropriate.

The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available.

Other Current Assets

Other current assets consists of various prepaid assets and deposits and includes $3.4 million and $1.5 million for deferred cost of goods sold for years ended December 31, 2005 and 2004, respectively.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, the Company recorded $0.1 million, $2.5 million and $0.5 million, respectively, in asset impairments primarily related to restructuring activities for the years ended December 31, 2005, 2004 and 2003. Property and equipment are as follows (in thousands):

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
|  |  | (as restated)(1) |
| Software and computers | $ 11,117 | $    21,415 |
| Furniture and fixtures | 357 | 995 |
| Office and equipment | 175 | 171 |
| Leasehold improvements | 2,455 | 5,021 |
| Machinery and equipment | 14,231 | 20,472 |
| Property and equipment | 28,335 | 48,074 |
| Accumulated depreciation and amortization | (24,420) | (42,220) |
| Property and equipment, net | $   3,915 | $     5,854 |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Depreciation expense for the years ended December 31, 2005, 2004 and 2003 was $3.1 million, $5.9 million and $9.2 million, respectively.

Restricted Cash

Restricted cash at December 31, 2005 and 2004 primarily relate to securing real estate leases.

119

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Other Assets, Net

Other assets, net at December 31, 2005 and 2004 consists primarily of a deposit related to the Company's corporate aircraft lease and deferred cost of goods sold.

Warranty Obligations

The Company provides a standard warranty for most of its products, ranging from one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Expense estimates are based on historical experience and expectation of future conditions. See Note 15, "Product Warranty."

Stock-Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principals Board's Opinion (APB) 25, "Accounting for Stock Issued to Employees" (APB 25) and includes the disclosure-only provisions as required under SFAS 123, "Accounting for Stock-Based Compensation." The Company provides additional pro forma disclosures as required under SFAS 123 and SFAS 148, "Accounting for Stock-Based Compensation, Transition and Disclosure."

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the fair value method of SFAS 123, the Company's net loss and net loss per share would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| | | (as restated)(1) | (as restated)(1) |
|---|---|---|---|
| Net loss | $(26,951)$ | (47,105)$ | (56,225) |
| Add: stock-based compensation under APB 25 | 52 | 17 | 123 |
| Less: Stock-based compensation expense determined under the fair value-based method | 4,144 | 13,741 | 22,224 |
| Less: Employee stock purchase plan compensation expense determined under the fair value-based method | -- | 206 | 1,026 |
| Pro forma net loss | $(31,043)$ | (61,035)$ | (79,352) |
| Pro forma basic and diluted net loss per share | $ (0.40)$ | (0.81)$ | (1.07) |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Equity instruments granted to non-employees are accounted for under the fair value method, in accordance with SFAS 123 and EITF 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black-Scholes method and are recorded in the equity section of the Company's consolidated balance sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

120

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Accumulated Other Comprehensive Loss
Accumulated other comprehensive loss presented in the accompanying consolidated balance sheets and consolidated statements of stockholders' equity consists of net unrealized gain (loss) on cash equivalents and short-term investments and accumulated net foreign currency translation losses.
The following are the components of accumulated other comprehensive loss (in thousands):

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
|  | | (as restated)(1) |
| Cumulative translation adjustments, net | $    (2,554) | $    (2,093) |
| Unrealized gain (loss) on available-for-sale investments, net | (473) | (489) |
| Total accumulated other comprehensive loss | $    (3,027) | $    (2,582) |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Reclassification
Certain prior year amounts have been reclassified to conform to the current year presentation.
Recently Issued Accounting Standards
In November 2004, the FASB issued SFAS No. 151, "Inventory Costs" (SFAS 151), which revised Accounting Research Bulletin (ARB) 43 (ARB 43), relating to inventory costs. This revision is to clarify the accounting for abnormal amounts of idle facility expense, freight, handling costs and wasted material (spoilage). SFAS 151 requires that these items be recognized as a current period charge regardless of whether they meet the criteria specified in ARB 43. In addition, SFAS 151 requires the allocation of fixed production overheads to the costs of conversion be based on normal capacity of the production facilities. SFAS 151 is effective for inventory costs incurred during years beginning after June 15, 2005. The adoption of SFAS 151 is not expected to have a material impact on the Company's financial statements.
In December 2004, the FASB issued SFAS No. 123 (revised 2004), or SFAS 123(R), "Share-Based Payment." This statement replaces SFAS 123, "Accounting for Stock-Based Compensation" and supersedes Accounting Principles Board's Opinion (APB) 25, "Accounting for Stock Issued to Employees" (APB 25). SFAS 123(R) requires the measurement of all employee share-based payments to employees, including grants of employee stock options, using a fair-value-based method and the recording of such expense in the Company's consolidated statements of income. In April 2005, the Commission announced that the accounting provisions of SFAS 123(R) are to be applied in the first quarter of the year beginning after June 15, 2005. As a result, the Company is now required to adopt SFAS 123(R) in the quarter ended March 31, 2006. The non-GAAP (pro forma) disclosures previously permitted under SFAS 123 no longer will be an alternative to financial statement recognition. See Note 2, "Summary of Significant Accounting Policies," to Consolidated Financial Statements for information related to the non-GAAP (pro forma) effects on the Company's reported net income and net earnings per share. In the future, the adoption may have a significant adverse impact on the Company's results of operations.
In March 2005, the Commission issued SAB 107, "Share-Based Payment." SAB 107 provides guidance on the initial implementation of SFAS 123(R). In particular, the statement includes guidance related to share-based payment awards with non-employees, valuation methods and selecting underlying assumptions such as expected volatility and expected term. It also gives guidance on the classification of compensation expense associated with share-based payment awards and accounting for the income tax effects of share-based payment awards upon the adoption of SFAS 123(R).

121

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

In May 2005 the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections" (SFAS 154), which replaces APB 20, "Accounting Changes" (APB 20), and SFAS No. 3, "Reporting Accounting Changes in Interim Financial Statements." SFAS 154 applies to all voluntary changes in accounting principle, and changes the requirements for accounting for and reporting of a change in accounting principle. SFAS 154 requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle unless it is impracticable. APB 20 previously required that most voluntary changes in accounting principle be recognized with a cumulative effect adjustment in net income of the period of the change. SFAS 154 is effective for accounting changes made in annual periods beginning after December 15, 2005. The adoption of SFAS 154 is not expected to have a material impact on the Company's financial statements.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments" (SFAS 155) which amends SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133) and SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities" (SFAS 140). Specifically, SFAS 155 amends SFAS 133 to permit fair value remeasurement for any hybrid financial instrument with an embedded derivative that otherwise would require bifurcation, provided the whole instrument is accounted for on a fair value basis. Additionally, SFAS 155 amends SFAS 140 to allow a qualifying special purpose entity to hold a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. SFAS 155 applies to all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006, with early application allowed. The adoption of SFAS 155 is not expected to have a material impact on the Company's results of operations or financial position.

In March 2006, the FASB issued SFAS No. 156, "Accounting for Servicing of Financial Assets" (SFAS 156), to simplify accounting for separately recognized servicing assets and servicing liabilities. SFAS 156 amends SFAS 140. Additionally, SFAS 156 applies to all separately recognized servicing assets and liabilities acquired or issued after the beginning of an entity's fiscal year that begins after September 15, 2006, although early adoption is permitted. The adoption of SFAS 156 is not expected to have a material impact on the Company's results of operations or financial position.

In July 2006, the FASB issued FASB Interpretation (FIN) 48, "Accounting for Uncertainty in Income Taxes" (FIN 48) -- an interpretation of FASB No. 109, "Accounting for Income Taxes." FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether or not to file in a particular jurisdiction. FIN 48 is effective for years beginning after December 15, 2006. If there are changes in net assets as a result of application of FIN 48 these will be accounted for as an adjustment to retained earnings. The Company is currently assessing the impact of FIN 48 on its consolidated financial position and results of operations.

In September 2006, the FASB issued Statement SFAS No. 157, "Fair Value Measurements" (SFAS 157), which defines fair value, establishes guidelines for measuring fair value and expands disclosures regarding fair value measurements. SFAS 157 does not require any new fair value measurements but rather eliminates inconsistencies in guidance found in various prior accounting pronouncements. SFAS 157 is effective for fiscal years beginning after November 15, 2007. Earlier adoption is permitted, provided the company has not yet issued financial statements, including for interim periods, for that fiscal year. The Company is currently evaluating the impact of SFAS 157, but does not expect the adoption of SFAS 157 to have a material impact on its consolidated financial position, results of operations or cash flows.

In September 2006, the FASB issued SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans," an amendment of FASB Statement No. 87, 88, 106 and 132(R) (SFAS 158). Under SFAS 158, companies must recognize a net liability or asset to report the funded status of their defined benefit pension and other postretirement benefit plans (collectively referred to herein as "benefit plans") on their balance sheets, starting with balance sheets as of December 31, 2006 if they are calendar year-end public company.

122

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

SFAS 158 also changed certain disclosures related to benefit plans. The adoption of SFAS 158 is not expected to have a material impact on the Company's results of operations or financial position.

In September 2006, the Commission released Staff Accounting Bulletin (SAB) No. 108, "Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements" (SAB 108). SAB 108 provides guidance on how the effects of prior-year uncorrected financial statement misstatements should be considered in quantifying a current year misstatement. SAB 108 requires registrants to quantify misstatements using both an income statement (rollover) and balance sheet (iron curtain) approach and evaluate whether either approach results in a misstatement that, when all relevant quantitative and qualitative factors are considered, is material. If prior year errors that had been previously considered immaterial are now considered material based on either approach, no restatement is required as long as management properly applied its previous approach and all relevant facts and circumstances were considered. If prior years are not restated, the cumulative effect adjustment is recorded in opening retained earnings as of the beginning of the fiscal year of adoption. SAB 108 is effective for fiscal years ending on or after November 15, 2006. The adoption of SAB 108 is not expected to have a material impact on the Company's financial statements.

Note 3.Restatement of Consolidated Financial Statements

The Company has restated its consolidated financial statements as of and for the years ended December 31, 2004 and 2003, and as of and for the four quarters of 2004 and the first two quarters of 2005.

The following is a description of the significant adjustments to previously reported financial statements resulting from the restatement process and additional matters addressed in the course of the restatement. While this description does not purport to explain each correcting entry, the Company believes that it fairly describes the significant factors underlying the adjustments and the overall impact of the restatement in all material respects.

Revenue Recognition.  The Company did not properly account for revenue as described below. As part of the restatement process, the Company applied the appropriate revenue recognition methods to each element of all multiple-element contracts, corrected other errors related to revenue recognition and corrected errors to other accounts, including cost of goods sold and deferred revenue resulting in adjustments to these accounts in each period covered by the restatement.

Video Product and Post Contract Support.  The Company did not properly recognize revenue in accordance with generally accepted accounting principles (GAAP), specifically SOP 97-2 for its digital video products. The Company previously recognized revenue for its digital video products in accordance with SAB 101, as amended by SAB 104 based upon meeting the revenue recognition criteria in SAB 104. In order for the Company to recognize revenue from individual elements within a multiple element arrangement under SOP 97-2, the Company must establish vendor specific objective evidence (VSOE) of fair value for each element. The Company determined that it did not establish VSOE of fair value for the undelivered element of PCS on the digital video products. Therefore, as part of the restatement process the Company corrected this error and recognized revenue of the hardware element sold in conjunction with undelivered PCS element ratably over the period of the customer support contract. The cost of goods sold for the sale for the hardware element and the PCS element was also recognized ratably over the period of the customer support contract. Accordingly, revenue and cost of goods sold previously recognized based on meeting the revenue recognition criteria in SAB 104 for the individual elements for digital video products sold in conjunction with PCS in each quarter of 2003, 2004 and 2005 were deferred and recognized ratably over the contract service period.

Thomson Contract.  The Company recognized revenue as it related to the delivery of certain products and services (including the development and customization of software) to Thomson under a series of contractual arrangements under a single memorandum of understanding (MOU) in accordance with SAB 101, as amended by SAB 104. However, based on SOP 97-2 and SOP 81-1, this series of contractual arrangements should have been treated as a single contract, and therefore as a single revenue arrangement for accounting

123

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

purposes. Factors that contributed to the determination of a single revenue arrangement included the documentation of the series of contractual arrangements under a single MOU and the ongoing nature of discussions between parties to define product specifications and deliverables that extended beyond the initial agreed upon contracted deliverables. In accordance with SOP 81-1, the Company determined it could not reasonably estimate progress towards completion of the project and therefore used the completed contract methodology. As a result, $7.8 million of revenue previously recognized in the third and fourth quarters of 2004 and $0.3 million of revenue previously recognized in the first two quarters of 2005 were deferred and ultimately recognized as revenue in the quarter ended December 31, 2005 upon completion of the Thomson Contract and final acceptance received from Thomson for all deliverables under the Thomson Contract. Additionally, $1.2 million of cost of goods sold previously recognized in 2004 and $1.8 million related to direct development costs previously recognized from the fourth quarter of 2003 through the second quarter of 2005 were also deferred and ultimately recognized in the quarter ended December 31, 2005.

Inventory Consignment. During the quarter ended December 31, 2003, the Company entered into an agreement to consign specific spare parts inventory to a certain customer for the customer's demonstration and evaluation purposes. The consignment period was to terminate during the quarter ended March 31, 2004, at which time the customer would either purchase or return the spare parts inventory to the Company. During the quarter ended March 31, 2004, the Company notified the customer that the consignment period terminated and in accordance with the agreement, the customer should either return or purchase the spare parts inventory. The Company did not receive a reply and subsequently invoiced the customer $0.9 million for the spare parts inventory in the quarter ended March 31, 2004. During the quarter ended June 30, 2004, the customer agreed to purchase a portion of the spare parts inventory and returned the remaining spare parts inventory to the Company. Accordingly, for the quarter ended June 30, 2004, the Company issued the customer a credit memo for $0.9 million, which was the amount of the sale that was invoiced in the quarter ended March 31, 2004 and was the entire amount originally consigned to the customer. During the course of the restatement, it was determined that at March 31, 2004, accounts receivable was overstated by $0.9 million, inventory was understated by $0.5 million and both deferred revenue and deferred cost of goods sold were overstated by $0.9 million and $0.5 million, respectively. As a result, the consolidated balance sheets for the quarters ending March 31, 2004 and June 30, 2004 were appropriately revised to correct these errors.

Other Revenue Adjustments. The Company also made other adjustments in 2003, 2004 and 2005 to correct the recognition of revenue for transactions where the Company did not properly apply SAB 101, as amended by SAB 104. The Company made other immaterial adjustments for certain transactions related to revenue.

Allowance for Doubtful Accounts. During the restatement process, the Company reassessed its accounting regarding the allowance for doubtful accounts based on its visibility of its collections and write-offs of the allowance for doubtful accounts. Prior to 2004, the Company's policy was to estimate the allowance for doubtful accounts and the corresponding bad debt expense based on a fixed percentage of revenue during a specific period. Beginning in 2004, the Company adopted a specific reserve methodology for estimating the allowance for doubtful accounts and corresponding bad debt expense. During the restatement, the Company adjusted the allowance for doubtful accounts and bad debt with a reduction of $5.2 million, an increase of $1.9 million and an increase of $0.6 million for the years ended December 31, 2000, 2001 and 2002, respectively, to reflect the specific reserve methodology and to correct errors resulting from the Company's former policy. The Company made adjustments to the allowance for doubtful accounts of $0.1 million, $0.6 million, and $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. In addition, during the restatement, the Company made other adjustments to the allowance for doubtful accounts to offset the accounts receivable and related reserve related to customers who were granted extended payment terms, experiencing financial difficulties or where collectibility was not reasonably assured. Accordingly, the Company classifies these customers as those with "extended payment terms" or with "collectibility issues." For

124

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

these customers, the Company historically deferred all revenue and recognized the revenue when the fee was fixed or determinable or collectibility reasonably assured or cash was received, assuming all other criteria for revenue recognition were met. The Company adjusted the allowance for doubtful accounts, eliminating the receivable and related reserve, for these customers by an increase of $5.7 million, a decrease of $4.4 million and by an immaterial amount for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively.

In summary, the above restatements gave rise to an adjustment to the allowance for doubtful accounts of an increase of $5.8 million, a decrease of $3.8 million and an increase of $0.3 million for the years ended December 31, 2003 and 2004 and for the first two quarters of 2005, respectively. The allowance for doubtful accounts related to international customers was reduced by $0.5 million based on the activity for the year ended December 31, 2004.

Deferred Revenues and Deferred Cost of Goods Sold.  As part of the restatement process, the Company determined that it did not properly account for deferred revenue as it related to specific transactions to certain customers where transactions did not satisfy revenue recognition criteria of SAB 104 related to customers with acceptance terms, transactions with free-on-board (FOB) destination shipping terms, customers where the arrangement fee was not fixed or determinable or customers where collectibility was not reasonably assured. While revenue was generally not recognized for these customers, the Company improperly recognized a deferred revenue liability and a deferred cost of goods sold asset, thereby overstating assets and liabilities, and during the restatement determined that deferred revenues and deferred cost of goods sold should not be recognized for these transactions. As a result, the Company adjusted deferred revenues by $1.6 million, $1.0 million and $0.9 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively, and adjusted deferred cost of goods sold by $0.9 million, $0.3 million and $0.6 million for the years ended 2003 and 2004 and the first two quarters of 2005, respectively.

Use of Estimates.  The Company did not correctly estimate, monitor and adjust balances related to certain accruals and provisions as set forth below.

Access Network Electronics.  In July 2003, the Company sold certain assets related to its Miniplex products to Verilink Corporation (Verilink). The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in April 2000. As part of the agreement with Verilink, Verilink agreed to assume all warranty obligations related to ANE products sold by the Company prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of warranty obligations for ANE products sold by the Company prior to July 2003 related to certain power supply failures of the product and other general warranty repairs (Warranty Obligation). The $2.4 million Warranty Obligation negotiated with Verilink included up to $1.0 million for each of two specific customer issues and a general warranty obligation of $0.4 million that expired in the quarter ended March 31, 2005. At that time the Company disclosed to Verilink that it had received an official specific customer complaint related to the sale of the Miniplex product from one of the two customers. In accordance with SFAS No. 5, "Accounting for Contingencies," a reserve was established as a result of this complaint. Under the agreement with Verilink, the Company was able to quantify its exposure at $1.0 million based upon the terms of the Warranty Obligation. No other obligations were accrued by the Company related to the Miniplex products because the Company had not received formal notice of any complaints from other customers. The Company amortized the $1.0 million warranty accrual starting in the quarter ended March 31, 2004 through the expiration of the Warranty Obligation in the quarter ended March 31, 2005. However, during the course of the restatement, the Company determined that the warranty obligation accrual should not have been reduced unless there were actual expenses incurred either in connection with the obligation or upon the expiration of the Warranty Obligation in the quarter ended March 31, 2005. Since the Company did not incur any expenses in connection with this obligation and did not establish a basis for this reduction, during the restatement, the Company corrected the reduction of this accrual by $0.2 million in each of the four quarters of 2004 and deferred the reduction of the warranty accrual until the warranty period expired in the quarter ended March 31, 2005. Accordingly, the

125

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

$1.0 million reduction of the warranty obligation in the quarter ended March 31, 2005 reduced cost of goods sold by $0.8 million for that period and increased cost of goods sold by $0.2 million in each quarter of 2004.

Israel Restructuring Reserve.  During 2001, the Board of Directors approved a restructuring plan and the Company incurred restructuring charges in the amount of $12.7 million for excess leased facilities of which $7.4 million related to Israel and $1.7 million remained accrued at December 31, 2004. In 2002, the Company did not include in its assessment the ability to generate and collect sublease income in its Israel facility. As a result, the Company increased its reserve by $1.2 million due to lowered sublease assumptions. In the quarter ended December 31, 2004, the Company analyzed the reserve and reduced the reserve by $1.5 million to $1.7 million, reducing operating expenses. During the restatement process, the Company determined that $1.2 million of the $1.5 million reserve reduction recognized in the quarter ended December 31, 2004 properly related to the year ended December 31, 2002. As a result, the Company reversed the previously recorded $1.2 million increase in restructuring reserve expense in 2002, thereby decreasing the net loss for the quarter ended December 31, 2002. The Company also corrected the entry that reduced the restructuring reserve in 2004 by reversing the $1.2 million decrease in the reserve that occurred in 2004.

License Fee.  In 1999, the Company entered into an intellectual property (IP) license agreement (License Agreement) with a third party. Pursuant to the License Agreement, the Company recorded a prepaid asset of $2.0 million related to its licensing of the IP. The License Agreement allowed the Company to incorporate the IP into "manufactured products" for the cost of the license fee which was $2.0 million. Additionally, the Agreement also incorporated a clause for the Company to pay a royalty fee of $1 per unit of "component products" sold to third parties by the Company. During 1999, the Company began designing semiconductor chips using this IP and paying the license fee for the IP. In June 2000, the Company made its final payment on the $2.0 million license, and the Company had a $2.0 million prepaid asset. The Company amortized the prepaid asset based on applying the royalty rate of $1 per unit established in the License Agreement. However, the Company incorrectly applied the $1 per unit rate to units produced rather than units sold. As part of correcting this error, the Company adjusted the amortization rate of the prepaid asset to reflect actual units sold resulting in a reduction in the per unit amortization rate. Adjustments to cost of goods sold were a decrease of $0.8 million in 2003, an increase of $0.5 million in 2004 and an increase of $0.2 million during the first two quarters of 2005.

Goods Received Not Invoiced.  The Company maintains an account to accrue for obligations arising from instances in which the Company has received goods but has not yet received an invoice for the goods (RNI). During 2002 the Company established the reserve after management determined that the process being used to track RNI obligations was not properly stating the liability. During the quarter ended March 31, 2004 the Company analyzed the RNI account and determined that it was carrying an excess reserve of $0.8 million and began amortizing the $0.8 million excess reserve at the rate of $0.2 million per quarter thereby decreasing operating expenses by that amount in each quarter of 2004. During the restatement, the Company determined that the excess reserve should have been reduced to zero as of December 31, 2002 and adjusted the financial statements accordingly. The impact of this change is to decrease operating expenses by $0.8 million in 2002 and increase operating expenses by $0.8 million during 2004.

Other.  In conjunction with the restatement, the Company also made other adjustments and reclassifications to its accounting for various other errors for periods presented, including: (1) correction of estimates of legal expenses, property tax and excess and obsolete inventory accruals; (2) reclassification to the proper accounting period of: bonus accruals to employees, federal income taxes payable, and operating expenses related to an operating lease; (3) correction of accounting for impaired and disposed assets; and (4) expenses related to an extended warranty provided to a customer.

Convertible Subordinated Notes.  In July 2000, the Company issued $500.0 million of 5% convertible subordinated notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.0 million. The Notes were convertible into shares of the Company's common stock at a conversion price of

126

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

$84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133), the Notes are considered a hybrid instrument since, and as described below, they contained multiple embedded derivatives.

The Notes contained several embedded derivatives. First, the Notes contained a contingent put (Contingent Put) where in the event of any default by the Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all unpaid principal and accrued interest to be due and payable immediately. Second, the Notes contain an investor conversion option (Investor Conversion Option) where the holder of the Notes may convert the debt security into Company common stock at any time after 90 days from original issuance and prior to August 1, 2007. The number of shares of common stock that is issued upon conversion is determined by dividing the principal amount of the security by the specified conversion price in effect on the conversion date. The initial conversion price was $84.01 which was subject to adjustment under certain circumstances described in the Indenture. Third, the Notes contain a liquidated damages provision (Liquidated Damages Provision) that obligated the Company to pay liquidated damages to investors of 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter, in the event that the Company did not file an initial shelf registration for the securities within 90 days of the closing date. In the event that the Company filed its initial shelf registration within 90 days but failed to keep it effective for a two year period from the closing date, the Company would pay 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter. Fourth, the Notes contain an issuer's call option (Issuer Call Option) that allowed the Company to redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01, for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of the mailing of the redemption notice. In addition, if the Company redeemed the Notes, it was also required to make a cash payment of $193.55 per $1,000 principal amount of the Notes less the amount of any interest actually paid on the Notes prior to redemption. The Company had the option to redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest.

Under SFAS 133, an embedded derivative must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone derivative if the economic characteristics and risks of the embedded derivative are not considered "clearly and closely related" to those of the host. An embedded derivative would not be considered clearly and closely related to the host if there was a possible future interest rate scenario (even though it may be remote) in which the embedded derivative would at least double the initial rate of return on the host contract and the effective rate would be twice the current market rate as a contract that had similar terms as the host and was issued by a debtor with similar credit quality. Furthermore, per SFAS 133, the embedded derivative would not be considered clearly and closely related to the host contract if the hybrid instrument could be settled in such a way the investor would not recover substantially all of its initial investment.

During the restatement process, the Company determined under SFAS 133 that both the Issuer Call Option and the Liquidated Damages Provision represented an embedded derivative that was not clearly and closely related to the host contract, and therefore needed to be bifurcated from the Notes and valued separately. As it related to the Liquidated Damages Provision and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $0.4 million. Based on the need to amortize the $0.4 million over the 7-year life of the Notes, the impact to the Company's financial results related to the Liquidated Damages Provision was not material. As it related to the Issuer Call Option and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $11.9 million. As a result, at the time the Notes were issued in July 2000, the Company should have created an asset to record the value of the Issuer Call Option for $11.9 million and created a bond premium to the Notes for $11.9 million. In accordance with SFAS 133, the asset value would

127

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

then be marked to market at the end of each accounting period and the bond premium would be amortized against interest expense at the end of each accounting period. Due to the decrease in the price of the Company's common stock, the value of the Issuer Call Option became effectively zero and the Company should have written off the asset related to the Issuer Call Option in 2000. Additionally, as part of the bond repurchase activity where the Company repurchased $325.9 million and $109.1 million of face value of the Notes (for a total of $435 million) that occurred in 2001 and 2002, the Company should have recognized an additional gain from the retirement of the bond premium associated with the Issuer Call Option of $7.0 million in 2001 and $1.9 million in 2002. The Company determined that the $7.0 million non-cash gain on the early retirement of the premium to be immaterial to 2001 financial results.

In the quarter ended March 31, 2006, the Company paid off the entire principal amount of the outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million. In addition, the Company recognized $0.3 million into other income, net representing the remaining unamortized bond premium associated with the Issuer Call Option.

Reliance on Prior Consolidated Financial Statements. The Company has not amended its previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10-K. As such, other than this Form 10-K for the year ended December 31, 2005, the Company does not anticipate amending its previously filed Annual Reports on Form 10-K or its Quarterly Reports on Form 10-Q for any prior periods.

128

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following tables present the effects of the restatement adjustments by financial statement line item for the consolidated statements of income, balance sheets and statements of cash flow:

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)

| | As Previously Reported | Cumulative Effect of Prior Year Adjustments | Current Year Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| | | December 31, 2003 | | | |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 30,188 | $ -- | $ -- | $ 30,188 | |
| Short-term investments | 108,452 | | | 108,452 | |
| Accounts receivable, net of allowance for doubtful accounts | 29,799 | 2,723 | (7,587) | 24,935 | (a), (b) |
| Other current receivables | 3,662 | | | 3,662 | |
| Inventory, net | 16,364 | | 913 | 17,277 | (c) |
| Other current assets | 2,883 | | | 3,205 | |
| Short-term deferred cost of goods sold | | | 322 | | (d) |
| Total current assets | 191,348 | 2,723 | (6,352) | 187,719 | |
| Property and equipment, net | 11,871 | | | 12,059 | |
| Fixed asset | | 548 | (360) | | (e) |
| Restricted cash | 9,212 | | | 9,212 | |
| Other assets, net | 2,809 | | | 4,109 | |
| Long-term deferred cost of goods sold | | | 350 | | (f) |
| License fee | | 188 | 762 | | (g) |
| Total assets | $ 215,240 | $ 3,459 | $ (5,600) | $ 213,099 | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 26,049 | $ | $ | $ 25,286 | |
| Israel restructuring | | 1,177 | | | (h) |
| Received not invoiced | | (1,940) | | | (i) |
| Common area maintenance | | 313 | (313) | | (j) |
| Accrued payroll and related expenses | 6,537 | | | 6,537 | |
| Deferred revenues | 3,423 | | | 1,990 | |
| Thomson direct development costs | | | (205) | | (k) |
| Short-term deferred revenue | | | (1,228) | | (l) |
| Accrued warranty expenses | 5,509 | | | 5,229 | |
| Warranty reserve | | (280) | | | (m) |
| Accrued restructuring and executive severance | 2,647 | 1,834 | | 1,586 | (n) |
| Israel restructuring | | (1,178) | | | (h) |
| Restructuring reclass between short-term and long-term | | | (1,717) | | (o) |
| Accrued vendor cancellation charges | 2,869 | | | 2,869 | |
| Accrued other liabilities | 5,284 | (229) | | 4,706 | (n) |
| Reclass short-term portion of deferred rent | | | 249 | | (p) |
| Tax accrual | | (631) | 33 | | (q) |
| Interest payable | 1,358 | (1) | (1) | 1,356 | |
| Current portion of capital lease obligations | 124 | 1 | 1 | 126 | |

| | | | | |
|---|---|---|---|---|
| Total current liabilities | 53,800 | (934) | (3,181) | 49,685 |
| Long-term obligations | 3,118 | (1,514) | (248) | 1,356 (n), (p) |
| Long-term deferred revenue | | | 2,207 | 2,207 (r) |
| Accrued restructuring and executive severance | 1,853 | (90) | 1,716 | 3,479 (n), (o) |
| Convertible subordinated notes | 65,081 | 949 | (221) | 65,809 (s) |
| | | | | |
| Total liabilities | 123,852 | (1,589) | 273 | 122,536 |
| Stockholders' equity: | | | | |
| Preferred stock, $0.001 par value: | | | | |
| Authorized shares | | | | |
| Common stock, $0.001 par value: | | | | |
| Authorized shares | 75 | | | 75 |
| Additional paid-in capital | 1,082,036 | (1) | (1) | 1,082,034 |
| Accumulated deficit | (987,560) | 5,048 | (5,870) | (988,382) (t) |
| Deferred compensation | (22) | 1 | (2) | (23) |
| Treasury stock, at cost | (773) | | | (773) |
| Accumulated other comprehensive loss | (2,368) | | | (2,368) |
| | | | | |
| Total stockholders' equity | 91,388 | 5,048 | (5,873) | 90,563 |
| | | | | |
| Total liabilities and stockholders' equity | $ 215,240 $ | 3,459 $ | (5,600)$ | 213,099 |

129

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Year Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect other adjustments and reclassifications.

(c) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To adjust for the reversal of a fixed asset write off reserve and to recognize a loss on the disposal of assets.

(f) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(g) To correct pre-paid amortization on license fee based on a new royalty rate.

(h) To correct an adjustment originally recorded during the quarter ended December 31, 2004 that wrote-off excess Israel restructuring liabilities. During the restatement, management concluded the adjustment should have occurred during 2002.

(i) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.

(j) To adjust for an unrecorded liability for common area maintenance in prior period.

(k) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(l) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(m) To adjust the accrual to reflect an updated extended warranty model.

(n) To reflect a reclassification adjustment made after the filing of the original financial statements.

(o) To reflect short-term and long-term portion of restructuring liabilities.

(p) To reflect the short-term portion of deferred rent.

(q) To reverse an accrual of income taxes payable recorded in prior periods.

(r) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(s) To record amortization of bond premium to interest income.

(t) To reflect cumulative effects of restatement adjustments on accumulated deficit.

130

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| | | | March 31, 2004 | | |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 76,060 | $ -- | $ -- | $ 76,060 | |
| Short-term investments | 47,151 | | | 47,151 | |
| Accounts receivable, net of allowance for doubtful accounts | 29,041 | (4,864) | 1,108 | 25,285 | (a)(n) |
| Inventory, net | 19,267 | 913 | (336) | 20,307 | (b) |
| Inventory consignment | | | 463 | | (c) |
| Other current assets | 4,623 | 322 | | 5,465 | |
| Short-term deferred cost of goods sold | | | 520 | | (d) |
| Total current assets | 176,142 | (3,629) | 1,755 | 174,268 | |
| Property and equipment, net | 10,821 | 188 | (94) | 10,915 | |
| Intangibles and other assets, net | 11,609 | 1,300 | | 13,198 | |
| Long-term deferred cost of goods sold | -- | | 210 | | (e) |
| License fee | -- | | 79 | | (f) |
| Total Assets | $ 198,572 | $ (2,141) | $ 1,950 | $ 198,381 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 21,362 | $ (763) | $ -- | $ 20,791 | |
| Received not invoiced | | | 192 | | (g) |
| Accrued payroll and related expenses | 5,072 | | | 5,072 | |
| Deferred revenues | 4,451 | (1,433) | | 3,449 | |
| Inventory consignment | | | (398) | | (c) |
| Short-term deferred revenue | | | 1,168 | | (h) |
| Thomson direct development costs | | | (339) | | (i) |
| Accrued warranty expenses | 4,605 | (280) | | 4,524 | |
| Access Network Electronics | | | 199 | | (j) |
| Accrued restructuring and executive severance | 6,598 | (2,895) | | 2,797 | (k) |
| Restructuring reclass between short-term and long-term | | | (906) | | (l) |
| Accrued vendor cancellation charges | 1,399 | | | 1,399 | |
| Accrued other liabilities | 4,137 | (349) | | 3,799 | (k) |
| Reclass short-term portion of deferred rent | | | (248) | | (m) |
| Rebate obligation | | | 215 | | (n) |
| Tax accrual | | | 44 | | (o) |

| | | | | |
|---|---|---|---|---|
| Other current obligations | 570 | | | 570 |
| Interest payable | | (2) | | |
| Current portion of capital lease obligations | | 2 | | |
| Total current liabilities | 48,194 | (5,720) | (73) | 42,401 |
| Long-term obligations | 3,472 | 1,468 | 1,156 | 6,096 (k),(l),(m) |
| Long-term deferred revenue | | 2,207 | 1,168 | 3,375 (p) |
| Convertible subordinated notes | 65,081 | 728 | (55) | 65,754 (q) |
| Total liabilities | 116,747 | (1,317) | 2,196 | 117,626 |
| Stockholders' equity: | | | | |
| Preferred stock, $0.001 par value: | | | | |
| Authorized shares | | | | |
| Common stock, $0.001 par value: | | | | |
| Authorized shares | 76 | | | 76 |
| Additional paid-in capital | 1,082,770 | (1) | 1 | 1,082,770 |
| Accumulated deficit | (997,807) | (822) | (248) | (998,877) (r) |
| Treasury stock, at cost | (773) | (1) | 1 | (773) |
| Accumulated other comprehensive loss | (2,441) | | | (2,441) |
| Total stockholders' equity | 81,825 | (824) | (246) | 80,755 |
| Total liabilities and stockholders' equity | $   198,572 $ | (2,141)$ | 1,950 $ | 198,381 |

131

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reverse invoicing of consigned inventory sale and related deferral of net revenue and COGS.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(f) To correct pre-paid amortization on license fee based on a new royalty rate.

(g) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.

(h) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(i) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(j) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.

(k) The cumulative amount was adjusted from the prior period to reflect the reclassification adjustment made after the filing of the original financial statements.

(l) To reflect short-term and long-term portion of restructuring liabilities.

(m) To reflect the short-term portion of deferred rent.

(n) To reclassify to accrued other liabilities rebate obligations with a single customer previously recorded as contra-accounts receivable during the quarter.

(o) To reverse an accrual of income taxes payable recorded in prior periods.

(p) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(q) To record amortization of bond premium to interest income.

(r) To reflect cumulative effects of restatement adjustments on accumulated deficit.

132

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| | | June 30, 2004 | | | |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 47,783 $ | -- $ | -- $ | 47,783 | |
| Short-term investments | 68,489 | | | 68,489 | |
| Accounts receivable, net of allowance for doubtful accounts | 27,884 | (3,756) | 4,641 | 28,769 | (a)(1) |
| Inventory, net | 21,403 | 1,040 | (177) | 21,803 | (b) |
| Inventory consignment | | | (463) | | (c) |
| Other current assets | 4,321 | 842 | | 5,432 | |
| Short-term deferred cost of goods sold | | | 269 | | (d) |
| Total current assets | 169,880 | (1,874) | 4,270 | 172,276 | |
| Property and equipment, net | 10,045 | 94 | | 10,139 | |
| Other assets, net | 11,432 | 1,589 | | 13,271 | |
| Long-term deferred cost of goods sold | | | 447 | | (e) |
| License fee | | | (197) | | (f) |
| Total Assets | $ 191,357 $ | (191)$ | 4,520 $ | 195,686 | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 16,480 $ | (571)$ | -- $ | 16,102 | |
| Received not invoiced | | | 193 | | (g) |
| Accrued payroll and related expenses | 4,919 | | | 4,919 | |
| Deferred revenues | 5,091 | (1,002) | | 3,813 | |
| Inventory consignment | | | (463) | | (c) |
| Short-term deferred revenue | | | 567 | | (h) |
| Thomson direct development costs | | | (380) | | (i) |
| Accrued warranty expenses | 4,191 | (81) | | 4,311 | |
| Access Network Electronics | | | 201 | | (j) |
| Accrued restructuring and executive severance | 9,070 | (3,801) | | 5,343 | |
| Restructuring reclass between short-term and long-term | | | 74 | | (k) |
| Accrued vendor cancellation charges | 713 | | | 713 | |
| Accrued other liabilities | 4,382 | (338) | | 4,413 | |
| Rebate obligation | | | 520 | | (l) |
| Tax accrual | | | (151) | | (m) |
| Other current obligations | 1,362 | | | 1,362 | |
| Total current liabilities | 46,208 | (5,793) | 561 | 40,976 | |
| Long-term obligations | 3,156 | 2,624 | (73) | 5,707 | (k) |
| Long-term deferred revenue | | 3,375 | 2,901 | 6,276 | (n) |
| Convertible subordinated notes | 65,081 | 673 | (56) | 65,698 | (o) |
| Total liabilities | 114,445 | 879 | 3,333 | 118,657 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,082,811 | | (2) | 1,082,809 | |
| Accumulated deficit | (1,002,668) | (1,070) | 1,189 | (1,002,549) | (p) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,534) | | | (2,534) | |
| Total stockholders' equity | 76,912 | (1,070) | 1,187 | 77,029 | |
| Total liabilities and stockholders' equity | $ 191,357 $ | (191)$ | 4,520 $ | 195,686 | |

133

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reverse invoicing of consigned inventory sale and related deferral of net revenue and COGS.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(f) To correct pre-paid amortization on license fee based on a new royalty rate.

(g) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.

(h) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(i) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(j) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.

(k) To reflect short-term and long-term portion of restructuring liabilities.

(l) To reclassify to accrued other liabilities rebate obligations with a single customer previously recorded as contra-accounts receivable during the quarter.

(m) To reverse an accrual of income taxes payable recorded in prior periods.

(n) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments for product sales when the fee was not fixed or determinable, when collectibility was not reasonably assured, or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(o) To record amortization of bond premium to interest income.

(p) To reflect cumulative effects of restatement adjustments on accumulated deficit.

134

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

|  | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| **September 30, 2004** | | | | | |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 64,150 | $ -- | $ -- | $ 64,150 | |
| Short-term investments | 47,757 | | 1 | 47,758 | |
| Accounts receivable, net of allowance for doubtful accounts | 20,475 | 885 | (2,054) | 19,306 | (a)(k) |
| Inventory, net | 15,529 | 400 | (278) | 15,651 | (b) |
| Other current assets | 3,586 | 1,111 | | 4,599 | |
| Short-term deferred cost of goods sold | | | (98) | | (c) |
| Total current assets | 151,497 | 2,396 | (2,429) | 151,464 | |
| Property and equipment, net | 9,134 | 94 | | 9,228 | |
| Other assets, net | 10,865 | 1,839 | | 12,866 | |
| Long-term deferred cost of goods sold | | | 385 | | (d) |
| License fee | | | (223) | | (e) |
| Total Assets | $ 171,496 | $ 4,329 | $ (2,267) | $ 173,558 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 11,128 | $ (378) | $ -- | $ 10,942 | |
| Received not invoiced | | | 192 | | (f) |
| Accrued payroll and related expenses | 4,368 | | | 4,368 | |
| Deferred revenues | 4,345 | (1,278) | | 3,541 | |
| Short-term deferred revenue | | | 867 | | (g) |
| Thomson direct development costs | | | (393) | | (h) |
| Accrued warranty expenses | 4,043 | 120 | | 4,363 | |
| Access Network Electronics | | | 200 | | (i) |
| Accrued restructuring and executive severance | 7,914 | (3,727) | | 4,604 | |
| Restructuring reclass between short-term and long-term | | | 417 | | (j) |
| Accrued vendor cancellation charges | 2,133 | | | 2,133 | |
| Accrued other liabilities | 4,459 | 31 | | 3,813 | |
| Rebate obligation | | | (736) | | (k) |
| Tax accrual | | | 59 | | (l) |
| Interest payable and current portion of capital lease obligations | 542 | | | 542 | |
| Total current liabilities | 38,932 | (5,232) | 606 | 34,306 | |
| Long-term obligations | 3,417 | 2,551 | (418) | 5,550 | (j) |
| Long-term deferred revenue | | 6,276 | 2,643 | 8,919 | (m) |
| Convertible subordinated notes | 65,081 | 617 | (55) | 65,643 | (n) |
| Total liabilities | 107,430 | 4,212 | 2,776 | 114,418 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | 76 | | | 76 | |
| Additional paid-in capital | 1,083,420 | (2) | 2 | 1,083,420 | |
| Accumulated deficit | (1,016,188) | 119 | (5,044) | (1,021,113) | (o) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,469) | | (1) | (2,470) | |
| Total stockholders' equity | 64,066 | 117 | (5,043) | 59,140 | |
| Total liabilities and stockholders' equity | $ 171,496 | $ 4,329 | $ (2,267) | $ 173,558 | |

135

--------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
    destination or with acceptance provisions and to adjust the allowance for
    doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
    destination or with acceptance provisions.

(c) To reflect the cumulative effects of adjustments for the short-term portion
    of deferred cost of goods sold related to the change in revenue recognition
    policy to
    SOP 97-2,
    EITF 00-21 and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable, when collectibility was not reasonably assured, or when
    revenue and related costs were deferred for transactions shipped
    free-on-board destination or with acceptance provisions.

(d) To reflect the cumulative effects of adjustments for the long-term portion of
    deferred cost of goods sold related to the change in revenue recognition
    policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable, when collectibility was not reasonably assured, or when
    revenue and related costs were deferred for transactions shipped
    free-on-board
    destination or with acceptance provisions.

(e) To correct pre-paid amortization on license fee based on a new royalty rate.

(f) To correct an adjustment originally recorded during each quarter of 2004 to
    the received not invoiced (RNI) account. During the restatement, management
    concluded that the adjustment should have occurred in 2002.

(g) To reflect the cumulative effects of adjustments for the short-term portion
    of deferred revenue related to the change in revenue recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable, when collectibility was not reasonably assured, or when
    revenue and related costs were deferred for transactions shipped
    free-on-board
    destination or with acceptance provisions.

(h) To defer direct development costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.

(i) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
    quarter ended March 31, 2005.

(j) To reflect short-term and long-term portion of restructuring liabilities.

(k) To reverse the reclassification to accrued other liabilities of rebate
    obligations with a single customer previously recorded as contra-receivables
    originally recorded in the quarter ended September 30, 2004. The correcting
    reclassification was performed for the quarter ended March 31, 2004 and June
    30, 2004 as part of the restatement.

(l) To reverse an accrual of income taxes payable recorded in prior periods.

(m) To reflect the cumulative effects of adjustments for the long-term portion of
    deferred revenue related to the change in revenue recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable, when collectibility was not reasonably assured, or when
    revenue and related costs were deferred for transactions shipped
    free-on-board
    destination or with acceptance provisions.

(n) To record amortization of bond premium to interest income.

(o) To reflect cumulative effects of restatement adjustments on accumulated
    deficit.

136

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| | | December 31, 2004 | | | |
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $    43,218 | $      -- | $      -- | $    43,218 | |
| Short-term investments | 54,517 | 2 | (1) | 54,517 | |
| Accounts receivable, net of allowance for doubtful accounts | 19,460 | (1,169) | 68 | 18,359 | (a) |
| Other current receivables | 1,044 | | | 1,044 | |
| Inventory, net | 17,144 | 122 | (49) | 17,666 | (b) |
| BaU vendor cancellation | | | 449 | | (c) |
| Other current assets | 2,042 | 1,513 | | 3,516 | (d) |
| Short-term deferred cost of goods sold | | | 461 | | (d) |
| | | | | | |
| Total current assets | 137,625 | (53) | 928 | 138,500 | |
| Property and equipment, net | 5,760 | 94 | | 5,854 | |
| Restricted cash | 8,827 | | | 1,241 | |
| Non-current deposits reclass | | | (7,586) | | (e) |
| Other assets, net | 1,522 | 2,001 | | 11,366 | |
| Long-term deferred cost of goods sold | | | 415 | | (f) |
| License fee | | | (159) | | (g) |
| Non-current deposits reclass | | | 7,587 | | (e) |
| | | | | | |
| Total Assets | $   155,734 | $    2,042 | $    1,185 | $  156,981 | |
| | | | | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $     7,945 | $     (186) | $      -- | $     7,844 | |
| Received not invoiced | | | 187 | | (h) |
| Accrued payroll and related expenses | 4,181 | | | 4,493 | |
| Tax accrual reclass | | | (245) | | (e) |
| Bonus accrual | | | 557 | | (i) |
| Deferred revenue | 2,579 | (824) | | 4,905 | |
| Short-term deferred revenue | | | 3,395 | | (j) |
| Thomson direct development costs | | | (205) | | (k) |
| Accrued warranty expenses | 3,870 | 320 | | 4,470 | |
| Access Network Electronics | | | 200 | | (l) |
| Warranty reserve | | | 280 | | (m) |
| Accrued restructuring and executive severance | 3,902 | (3,310) | | 3,744 | |
| Israel restructuring | | | 1,177 | | (n) |
| Restructuring reclass between short-term and long-term | | | 1,975 | | (o) |
| Accrued vendor cancellation charges | 521 | | | 521 | |
| Accrued other liabilities | 4,317 | (446) | | 3,873 | |
| Legal accrual | | | (448) | | (p) |
| Property tax | | | (240) | | (q) |
| Tax accrual | | | 845 | | (r) |
| Tax accrual reclass | | | 245 | | (e) |
| Interest payable and current portion of capital lease obligations | 1,398 | | | 1,398 | |
| | | | | | |
| Total current liabilities | 28,571 | (4,626) | 7,523 | 31,468 | |
| Long-term obligations | 2,077 | | (1) | 2,076 | |
| Accrued restructuring and executive severance | 1,664 | 2,133 | (1,975) | 1,822 | (o) |
| Long-term deferred revenue | | 8,919 | 2,165 | 11,084 | (s) |
| Convertible subordinated notes | 65,081 | 562 | (55) | 65,588 | (t) |
| | | | | | |
| Total liabilities | 97,393 | 6,988 | 7,657 | 112,038 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Issued shares | 76 | | | 76 | |
| Additional paid-in capital | 1,083,711 | | (2) | 1,083,709 | |
| Accumulated deficit | (1,026,091) | (4,926) | (8,471) | (1,039,487) | (u) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,582) | (1) | 1 | (2,582) | |
| | | | | | |
| Total stockholders' equity | 58,341 | (4,926) | (8,472) | 44,943 | |
| | | | | | |
| Total liabilities and stockholders' equity | $   155,734 | $    2,042 | $    1,185 | $  156,981 | |

137

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
destination or with acceptance provisions and to adjust the allowance for
doubtful accounts based on the Company's reassessment of the account.
(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
destination or with acceptance provisions.
(c) To reverse E&O reserves related to CMTS product based on revised demand
forecast.
(d) To reflect the cumulative effects of adjustments for the short-term portion
of deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped free-on-board
destination or with acceptance provisions.
(e) To reflect other adjustments and reclassifications.
(f) To reflect the cumulative effects of adjustments for the long-term portion of
deferred cost of goods sold related to the change in revenue recognition
policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped free-on-board
destination or with acceptance provisions.
(g) To correct pre-paid amortization on license fee based on a new royalty rate.
(h) To correct an adjustment originally recorded during each quarter of 2004 to
the received not invoiced (RNI) account. During the restatement, management
concluded that the adjustment should have occurred in 2002.
(i) To accrue for retention and other miscellaneous bonuses earned by employees
in 2004.
(j) To reflect the cumulative effects of adjustments for the short-term portion
of deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped free-on-board
destination or with acceptance provisions.
(k) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were
previously recognized in the period incurred.
(l) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
quarter ended March 31, 2005.
(m) To adjust the accrual to reflect an updated extended warranty model.
(n) To correct an adjustment originally recorded during the quarter ended
December 31, 2004 that wrote-off excess Israel restructuring liabilities.
During the restatement, management concluded the adjustment should have
occurred during 2002.
(o) To reflect short-term and long-term portion of restructuring liabilities.
(p) To correct legal accrual adjustment recorded as of December 31, 2004 and to
reflect a liability at March 31, 2005.
(q) To reverse an accrual of property taxes related to the Santa Clara facility.
(r) To reverse an accrual of income taxes payable recorded in prior periods.
(s) To reflect the cumulative effects of adjustments for the long-term portion of
deferred revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed
or determinable, when collectibility was not reasonably assured, or when
revenue and related costs were deferred for transactions shipped free-on-board
destination or with acceptance provisions.
(t) To record amortization of bond premium to interest income.
(u) To reflect cumulative effects of restatement adjustments on accumulated
deficit.

138

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

| | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| | | March 31, 2005 | | | |
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 30,637 | $ -- | $ -- | $ 30,637 | |
| Short-term investments | 69,180 | | | 69,180 | |
| Accounts receivable, net of allowance for doubtful accounts | 19,736 | (1,101) | (782) | 17,853 | (a) |
| Other current receivables | 1,242 | | | 1,242 | |
| Inventory, net | 18,611 | 522 | 437 | 19,342 | (b) |
| E&O vendor cancellation | | | (228) | | (c) |
| Other current assets | 1,634 | 1,474 | | 5,126 | |
| Short-term deferred cost of goods sold | | | 2,018 | | (d) |
| Total current assets | 141,040 | 895 | 1,445 | 143,380 | |
| Property and equipment, net | 4,840 | 94 | 1 | 4,935 | |
| Restricted cash | 8,817 | (7,586) | | 1,241 | |
| Restricted cash - long-term reclass | | | 10 | | (e) |
| Other assets, net | 710 | 9,844 | | 9,638 | |
| Long-term deferred cost of goods sold | | | (777) | | (f) |
| License fee | | | (129) | | (g) |
| Restricted cash - long-term reclass | | | (10) | | (e) |
| Total Assets | $ 155,407 | $ 3,247 | $ 540 | $ 159,194 | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 8,278 | $ 1 | (1) | $ 8,278 | |
| Accrued payroll and related expenses | 3,601 | 557 | | 3,601 | (h) |
| Bonus accrual | | | (557) | | (i) |
| Deferred revenues | 9,072 | 2,386 | | 25,283 | |
| Thomson direct development costs | | | (154) | | (j) |
| Short-term deferred revenue | | | 13,979 | | (k) |
| Accrued warranty expenses | 3,141 | 800 | | 3,140 | |
| Access Network Electronics | | | (801) | | (l) |
| Accrued restructuring and executive severance | 3,092 | (158) | | 3,093 | (m) |
| Restructuring reclass between short-term and long-term | | | 159 | | |
| Accrued vendor cancellation charges | 373 | | | 373 | |
| Accrued other liabilities | 4,031 | (689) | | 3,791 | (h) |
| Legal accrual | | | 449 | | (n) |
| Interest payable and current portion of capital lease obligations | 542 | | | 542 | |
| Total current liabilities | 32,130 | 2,897 | 13,074 | 48,101 | |
| Long-term obligations | 1,725 | (1) | | 1,724 | |
| Long-term deferred revenue | | 11,084 | (5,693) | 5,391 | (o) |
| Accrued restructuring and executive severance | 1,772 | 158 | (158) | 1,772 | (m) |
| Convertible subordinated notes | 65,081 | 507 | (56) | 65,532 | (p) |
| Total liabilities | 100,708 | 14,645 | 7,167 | 122,520 | |
| Stockholders' equity: | | | | | |
| Preferred stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Common stock, $0.001 par value: | | | | | |
| Authorized shares | | | | | |
| Authorized shares | 77 | | | 77 | |
| Additional paid-in capital | 1,085,008 | (2) | 2 | 1,085,008 | |
| Accumulated deficit | (1,026,695) | (11,396) | (6,629) | (1,044,720) | (q) |
| Treasury stock, at cost | (773) | | | (773) | |
| Accumulated other comprehensive loss | (2,918) | | | (2,918) | |
| Total stockholders' equity | 54,699 | (11,398) | (6,627) | 36,674 | |
| Total liabilities and stockholders' equity | $ 155,407 | $ 3,247 | $ 540 | $ 159,194 | |

139

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions and to adjust the allowance for doubtful accounts based on the Company's reassessment of the account.

(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board destination or with acceptance provisions.

(c) To reverse E&O reserves related to CMTS product based on revised demand forecast.

(d) To reflect the cumulative effects of adjustments for the short-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(e) To reflect other adjustments and reclassifications.

(f) To reflect the cumulative effects of adjustments for the long-term portion of deferred cost of goods sold related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(g) To correct pre-paid amortization on license fee based on a new royalty rate.

(h) The cumulative amount was adjusted from the prior period to reflect the reclassification adjustment made after the filing of the original financial statements.

(i) To accrue for retention and other miscellaneous bonuses earned by employees in 2004.

(j) To defer direct development costs based on SOP 81-1 until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.

(k) To reflect the cumulative effects of adjustments for the short-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(l) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.

(m) To reflect short-term and long-term portion of restructuring liabilities.

(n) To correct legal accrual adjustment recorded as of December 31, 2004 and to reflect the liability at March 31, 2005.

(o) To reflect the cumulative effects of adjustments for the long-term portion of deferred revenue related to the change in revenue recognition policy to SOP 97-2, EITF 00-21 and SOP 81-1, and to reflect other adjustments when collectibility was not reasonably assured or when revenue and related costs were deferred for transactions shipped free-on-board destination or with acceptance provisions.

(p) To record amortization of bond premium to interest income.

(q) To reflect cumulative effects of restatement adjustments on accumulated deficit.

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED BALANCE SHEET
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

|  | June 30, 2005 | | | | |
|  | As Previously Reported | Cumulative Effect of Prior Period Adjustments | Current Quarter Adjustments | As Restated | Notes |
|---|---|---|---|---|---|
| ASSETS |  |  |  |  |  |
| Current assets: |  |  |  |  |  |
| Cash and cash equivalents | $   38,605 | $      -- | $      -- | $   38,605 |  |
| Short-term investments | 66,383 |  |  | 66,383 |  |
| Accounts receivable, net of allowance for doubtful accounts | 19,957 | (1,883) | (1,620) | 16,454 | (a) |
| Other current receivables | 1,758 |  |  | 1,758 |  |
| Inventory, net | 12,759 | 731 | 672 | 13,942 | (b) |
| E&O vendor cancellation |  |  | (220) |  | (c) |
| Other current assets | 2,100 | 3,492 |  | 8,546 |  |
| Short-term deferred cost of goods sold |  |  | 2,954 |  | (d) |
| Total current assets | 141,562 | 2,340 | 1,786 | 145,688 |  |
| Property and equipment, net | 4,538 | 95 | (1) | 4,632 |  |
| Restricted cash | 8,763 | (7,576) |  | 1,241 |  |
| Restricted cash - long-term reclass |  |  | 54 |  | (e) |
| Other assets, net | 633 | 8,928 |  | 11,949 |  |
| Long-term deferred cost of goods sold |  |  | 2,545 |  | (f) |
| License fee |  |  | (103) |  | (g) |
| Restricted cash - long-term reclass |  |  | (54) |  | (e) |
| Total assets | $  155,496 | $  3,787 | $  4,227 | $ 163,510 |  |
| LIABILITIES AND STOCKHOLDERS' EQUITY |  |  |  |  |  |
| Current liabilities: |  |  |  |  |  |
| Accounts payable | $    4,572 | $       | $       | $    4,572 |  |
| Accrued payroll and related expenses | 3,147 |  |  | 3,147 |  |
| Deferred revenues | 14,005 | 16,211 |  | 34,431 |  |
| Thomson direct development costs |  |  | (173) |  | (h) |
| Short-term deferred revenue |  |  | 4,388 |  | (i) |
| Accrued warranty expenses | 2,722 | (1) | 1 | 2,722 |  |
| Accrued restructuring and executive severance | 1,991 | 1 | (1) | 1,991 |  |
| Accrued vendor cancellation charges | 374 |  |  | 374 |  |
| Accrued other liabilities | 3,609 | (240) |  | 3,369 |  |
| Interest payable and current portion of capital lease obligations | 1,356 |  |  | 1,356 |  |
| Total current liabilities | 31,776 | 15,971 | 4,215 | 51,962 |  |
| Long-term obligations |  |  |  |  |  |
| Long-term deferred revenue |  | 5,390 | 6,049 | 11,439 | (j) |
| Accrued restructuring and executive severance | 3,441 |  |  | 3,441 |  |
| Convertible subordinated notes | 65,081 | 451 | (55) | 65,477 | (k) |
| Total liabilities | 100,298 | 21,812 | 10,209 | 132,319 |  |
| Stockholders' equity: |  |  |  |  |  |
| Preferred stock, $0.001 par value: |  |  |  |  |  |
| Authorized shares |  |  |  |  |  |
| Common stock, $0.001 par value: |  |  |  |  |  |
| Authorized shares | 77 |  |  | 77 |  |
| Additional paid-in capital | 1,085,820 |  | (2) | 1,085,818 |  |
| Accumulated deficit | (1,027,203) | (18,025) | (5,980) | (1,051,208) | (l) |
| Treasury stock, at cost | (773) |  |  | (773) |  |
| Accumulated other comprehensive loss | (2,723) |  |  | (2,723) |  |
| Total stockholders' equity | 55,198 | (18,025) | (5,982) | 31,191 |  |
| Total liabilities and stockholders' equity | $  155,496 | $  3,787 | $  4,227 | $ 163,510 |  |

141

--------------------------------------------------------------------------------

Table of Contents

```
                    TERAYON COMMUNICATION SYSTEMS, INC.
             NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)
```

Explanation of Current Quarterly Adjustments:

(a) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
    destination and to adjust the allowance for doubtful accounts based on the
    Company's reassessment of the account.
(b) To reflect the cumulative effects of adjustments for transactions shipped free-on-board
    destination.
(c) To reverse E&O reserves related to CMTS product based on revised demand
    forecast.
(d) To reflect the cumulative effects of adjustments for the short-term portion
    of deferred cost of goods sold related to the change in revenue recognition
    policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments when collectibility was not reasonably
    assured or when revenue and related costs were deferred for transactions
    shipped
    free-on-board
    destination.
(e) To reflect other adjustments and reclassifications.
(f) To reflect the cumulative effects of adjustments for the long-term portion of
    deferred cost of goods sold related to the change in revenue recognition
    policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments when collectibility was not reasonably
    assured or when revenue and related costs were deferred for transactions
    shipped
    free-on-board
    destination.
(g) To correct pre-paid amortization on license fee based on a new royalty rate.
(h) To defer direct development costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(i) To reflect the cumulative effects of adjustments for the short-term portion
    of deferred revenue related to the change in revenue recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments when collectibility was not reasonably
    assured or when revenue and related costs were deferred for transactions
    shipped
    free-on-board
    destination.
(j) To reflect the cumulative effects of adjustments for the long-term portion of
    deferred revenue to the change in revenue recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments when collectibility was not reasonably
    assured or when revenue and related costs were deferred for transactions
    shipped
    free-on-board
    destination.
(k) To record amortization of bond premium to interest income.
(l) To reflect cumulative effects of restatement adjustments on accumulated
    deficit.

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED STATEMENT OF OPERATIONS
(in thousands, except per share data)

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | | 2003 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| Revenues | $ 150,538 | $ (14,054) | $136,484 | $ 133,485 | $ (3,298) | $130,187 |
| Cost of goods sold | 106,920 | (5,033) | 101,887 | 101,034 | 2,801 | 103,835 |
| Gross profit | 43,618 | (9,021) | 34,597 | 32,451 | (6,099) | 26,352 |
| Operating expenses: | | | | | | |
| Research and development | 33,959 | (760) | 33,199 | 42,839 | (205) | 42,634 |
| Sales and marketing | 24,145 | -- | 24,145 | 26,781 | -- | 26,781 |
| General and administrative | 11,216 | 823 | 12,039 | 12,127 | (193) | 11,934 |
| Restructuring charges, executive severance and asset write-offs | 11,159 | 1,177 | 12,336 | 2,803 | -- | 2,803 |
| Total operating expenses | 80,479 | 1,240 | 81,719 | 84,550 | (398) | 84,152 |
| Loss from operations | (36,861) | (10,261) | (47,122) | (52,099) | (5,701) | (57,800) |
| Interest expense, net | (1,312) | 222 | (1,090) | (362) | 221 | (141) |
| Other income, net | 1,566 | (535) | 1,031 | 2,424 | (392) | 2,032 |
| Loss before tax benefit (expense) | (36,607) | (10,574) | (47,181) | (50,037) | (5,872) | (55,909) |
| Income tax benefit (expense) | 76 | -- | 76 | (316) | -- | (316) |
| Net loss | $ (36,531) | $ (10,574) | $(47,105) | $ (50,353) | $ (5,872) | $(56,225) |
| Basic and diluted net loss per share | $ (0.48) | | $ (0.62) | $ (0.68) | | $ (0.76) |
| Shares used in computing basic and diluted net loss per share | 75,861 | | 75,751 | 74,212 | | 74,074 |

143

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)

| | Year Ended December 31, | | |
| | 2004 | 2003 | Notes |
| --- | --- | --- | --- |
| Net loss, as previously reported | $ (36,531) | $ (50,353) | |
| Adjustments to net loss (increase) decrease: | | | |
| Revenues | | | |
| DVS | (12,858) | (3,226) | (a),(b) |
| HAS | (291) | 659 | (b) |
| CMTS | (905) | (741) | (b),(c) |
| Other | -- | 10 | (d) |
| Cost of goods sold | | | |
| Revenue analysis (cost of goods sold) | 6,166 | (3,564) | (e) |
| Access Network Electronics | (800) | -- | (f) |
| Warranty reserve | (281) | -- | (g) |
| License fee | (500) | 763 | (h) |
| E&O vendor cancellation | 448 | -- | (i) |
| Research and development | | | |
| Bonus accrual | (556) | -- | (j) |
| Thomson (cost of goods sold) | 273 | 34 | (k) |
| Thomson direct development costs | 1,043 | 171 | (l) |
| General and administrative | | | |
| Legal accrual | 448 | -- | (m) |
| Bad debt expense | (590) | (120) | (n) |
| Common area maintenance | -- | 313 | (o) |
| Property tax | 156 | -- | (p) |
| Tax accrual | (73) | -- | (q) |
| Received not invoiced | (764) | -- | (r) |
| Restructuring charges, executive severance and asset write-offs | | | |
| Israel restructuring reserve | (1,177) | -- | (s) |
| Interest income (expense), net | | | |
| Convertible subordinated notes | 222 | 221 | (t) |
| Other income (expense), net | | | |
| Tax accrual | (441) | (33) | (q) |
| Fixed asset | (94) | (359) | (u) |
| Net loss, as restated | $ (47,105) | $ (56,225) | |

144

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred
    revenue and revenue for product sales when the fee was not fixed or
    determinable or when collectibility was not reasonably assured and to reflect
    other adjustments to the account.
(c) To reflect a $1.6 million reduction in revenue that was identified during the
    Company's reassessment of the allowance for doubtful accounts and bad debt
    expense account in the quarter ended September 30, 2004.
(d) To reflect other adjustments and reclassifications.
(e) To reflect adjustments to cost of goods sold related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable or when collectibility was not reasonably assured.
(f) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
    quarter ended March 31, 2005.
(g) To adjust the accrual to reflect an updated extended warranty model.
(h) To correct pre-paid amortization on license fee based on a new royalty rate.
(i) To reverse E&O reserves related to CMTS product based on revised demand
    forecast.
(j) To accrue for retention and other miscellaneous bonuses earned by employees
    in 2004.
(k) To defer cost of goods sold costs based on
    SOP 81-1
    until recognition of revenue at completion of contract . The costs were
    previously recognized in the period incurred.
(l) To defer direct development costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(m) To correct legal accrual adjustment recorded as of December 31, 2004 and to
    properly reflect liability at March 31, 2005.
(n) To reflect adjustments to the allowance for doubtful accounts and bad debt
    expense based on the Company's reassessment of the accounts.
(o) To adjust for an unrecorded liability for common area maintenance to reflect
    expense in the prior period.
(p) To reverse an accrual of property taxes related to the Santa Clara facility.
(q) To reverse an accrual of income taxes payable recorded in prior periods.
(r) To correct an adjustment originally recorded during each quarter of 2004 to
    the received not invoiced (RNI) account. During the restatement, management
    concluded that the adjustment should have occurred in 2002.
(s) To correct an adjustment originally recorded during the quarter ended
    December 31, 2004 that wrote-off excess Israel restructuring liabilities.
    During the restatement, management concluded the adjustment should have
    occurred during 2002.
(t) To record amortization of bond premium to interest income.
(u) To adjust for the reversal of a fixed asset write off reserve and to
    recognize a loss on the disposal of assets.

145

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

For explanatory purposes and to assist in analysis of our consolidated financial statements, we have summarized the adjustments that were affected by the restatement below:

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | March 31, | June 30, | September 30, | December 31, | |
| | 2004 | 2004 | 2004 | 2004 | Notes |
| | (unaudited) | (unaudited) | (unaudited) | (unaudited) | |
| Net loss, as previously reported | $ (10,247)$ | (4,861)$ | (13,520)$ | (7,903) | |
| Adjustments to net loss (increase) decrease: | | | | | |
| Revenues | | | | | |
| DVS | (1,453) | (751) | (5,634) | (5,020) | (a),(b) |
| HAS | 309 | (744) | 104 | 40 | (b) |
| CMTS | 44 | 69 | (1,112) | 94 | (b),(c) |
| Cost of goods sold | | | | | |
| Revenue analysis (cost of goods sold)-2004 | 1,405 | 3,016 | 962 | 783 | (e) |
| Access Network Electronics | (200) | (200) | (200) | (200) | (f) |
| Warranty reserve | -- | -- | -- | (281) | (g) |
| License fee | 79 | (197) | (223) | (159) | (h) |
| E&O vendor cancellation | -- | -- | -- | 448 | (i) |
| Research and Development | | | | | |
| Bonus accrual | -- | -- | -- | (556) | (j) |
| Thomson (other) | 51 | 46 | 139 | 37 | (k) |
| Thomson direct development costs | 288 | 334 | 254 | 167 | (l) |
| General and administrative | | | | | |
| Legal accrual | -- | -- | -- | 448 | (m) |
| Bad debt expense | (496) | (396) | 861 | (559) | (n) |
| Property tax | -- | -- | -- | 156 | (o) |
| Tax accrual | -- | -- | (60) | (13) | (p) |
| Received not invoiced | (192) | (192) | (193) | (187) | (q) |
| Restructuring charges, executive severance and asset write-offs | | | | | |
| Israel restructuring reserve | -- | -- | -- | (1,177) | (r) |
| Interest income (expense), net Convertible subordinated notes | 55 | 55 | 56 | 56 | (s) |
| Other income (expense), net | | | | | |
| Tax accrual | (44) | 151 | -- | (548) | (p) |
| Fixed asset | (94) | -- | -- | -- | (t) |
| | | | | | |
| Net loss, as restated | $ (10,495)$ | (3,670)$ | (18,566)$ | (14,374) | |

146

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Quarterly Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred revenue and revenue for product sales when the fee was not fixed or determinable or when collectibility was not reasonably assured and to reflect other adjustments to the account.
(c) To reflect a $1.6 million reduction in revenue that was identified during the Company's reassessment of the allowance for doubtful accounts and bad debt expense account in the quarter ended September 30, 2004.
(d) To reflect adjustments to cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable or when collectibility was not reasonably assured.
(e) To reflect adjustments to cost of goods sold related to the change in revenue recognition policy to
SOP 97-2,
EITF
00-21
and
SOP 81-1,
and to reflect other adjustments for product sales when the fee was not fixed or determinable or when collectibility was not reasonably assured.
(f) To reverse 2004 amortization of ANE warranty reserve and to recognize in the quarter ended March 31, 2005.
(g) To adjust the accrual to reflect an updated extended warranty model.
(h) To correct pre-paid amortization on license fee based on a new royalty rate.
(i) To reverse E&O reserves related to CMTS product based on revised demand forecast.
(j) To accrue for retention and other miscellaneous bonuses earned by employees in 2004.
(k) To defer cost of goods sold costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.
(l) To defer direct development costs based on
SOP 81-1
until recognition of revenue at completion of contract. The costs were previously recognized in the period incurred.
(m) To correct legal accrual adjustment recorded as of December 31, 2004 and to reflect the liability for the quarter ended March 31, 2005.
(n) To reflect adjustments to the allowance for doubtful accounts and bad debt expense based on the Company's reassessment of the accounts.
(o) To reverse an accrual of property taxes related to the Santa Clara facility.
(p) To reverse an accrual of income taxes payable recorded in prior periods.
(q) To correct an adjustment originally recorded during each quarter of 2004 to the received not invoiced (RNI) account. During the restatement, management concluded that the adjustment should have occurred in 2002.
(r) To correct an adjustment originally recorded during the quarter ended December 31, 2004 that wrote-off excess Israel restructuring liabilities. During the restatement, management concluded the adjustment should have occurred during 2002.
(s) To record amortization of bond premium to interest income.
(t) To adjust for the reversal of a fixed asset write off reserve and to recognize a loss on the disposal of assets.

147

---------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED STATEMENT OF OPERATIONS
EFFECTS OF THE RESTATEMENT
(in thousands)
(unaudited)

|  | Three Months Ended | | |
|  | March 31, | June 30, | |
|  | 2005 | 2005 | Notes |
|  | (as restated) | (as restated) | |
| Net loss, as previously reported | $ (2,604) | $ (508) | |
| Adjustments to net loss (increase) decrease: | | | |
| Revenues | | | |
| DVS | (8,513) | (10,563) | (a) |
| HAS | 36 | (58) | (b) |
| CMTS | (73) | 13 | (b) |
| Cost of goods sold | | | |
| Revenue analysis (cost of goods sold) | 1,337 | 5,446 | (c) |
| Access Network Electronics | 800 | -- | (d) |
| License fee | (129) | (103) | (e) |
| E&O vendor cancellation | (228) | (220) | (f) |
| Research and development | | | |
| Bonus accrual | 556 | -- | (g) |
| Thomson (other) | 20 | 23 | (h) |
| Thomson direct development costs | 134 | 150 | (i) |
| Sales and marketing | | | |
| General and administrative | | | |
| Legal accrual | (448) | -- | (k) |
| Bad debt expense | (176) | (723) | (l) |
| Restructuring charges, executive severance and asset write-offs | | | |
| Interest income (expense), net | | | |
| Convertible subordinated notes | 55 | 56 | (m) |
| Net loss, as restated | $ (9,233) | $ (6,487) | |

148

--------------------------------------------------------------------------------

Table of Contents

                       TERAYON COMMUNICATION SYSTEMS, INC.
                 NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Explanation of Current Quarterly Adjustments:

(a) To reflect adjustments to revenue related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1.
(b) To reflect adjustments for timing difference identified between deferred
    revenue and revenue for product sales when the fee was not fixed or
    determinable or when collectibility was not reasonably assured and to reflect
    other adjustments to the account.
(c) To reflect adjustments to cost of goods sold related to the change in revenue
    recognition policy to
    SOP 97-2,
    EITF
    00-21
    and
    SOP 81-1,
    and to reflect other adjustments for product sales when the fee was not fixed
    or determinable or when collectibility was not reasonably assured.
(d) To reverse 2004 amortization of ANE warranty reserve and to recognize in the
    quarter ended March 31, 2005.
(e) To correct pre-paid amortization on license fee based on a new royalty rate.
(f) To reverse E&O reserves related to CMTS product based on revised demand
    forecast.
(g) To reverse expenses for retention and other miscellaneous bonuses earned by
    employees in 2004.
(h) To defer cost of goods sold costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(i) To defer direct development costs based on
    SOP 81-1
    until recognition of revenue at completion of contract. The costs were
    previously recognized in the period incurred.
(j) To reflect other adjustments and reclassifications.
(k) To correct legal accrual adjustment recorded as of December 31, 2004 and to
    reflect the liability for the quarter ended March 31, 2005.
(l) To reflect adjustments to the allowance for doubtful accounts and bad debt
    expense based on the Company's reassessment of the accounts.
(m) To record amortization of bond premium to interest income.

                                      149

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONSOLIDATED STATEMENT OF CASH FLOWS
EFFECTS OF THE RESTATEMENT
(in thousands)

| | Year Ended December 31, | | | | | |
| | 2004 | | | 2003 | | |
| | As Previously Reported | Adjustments | As Restated(1) | As Previously Reported | Adjustments | As Restated(1) |
|---|---|---|---|---|---|---|
| Operating activities: | | | | | | |
| Net loss | $ (36,531)$ | (10,574)$ | (47,105)$ | (50,353)$ | (5,872)$ | (56,225) |
| Adjustments to reconcile net loss to net cash (provided by) used in operating activities: | | | | | | |
| Depreciation and amortization | 6,416 | (556) | 5,860 | 9,369 | (147) | 9,222 |
| Amortization of deferred compensation | 17 | -- | 17 | 53 | -- | 53 |
| Amortization of subordinated convertible note premium | -- | (221) | (221) | -- | (221) | (221) |
| Accretion of discounts on short-term investments | -- | (107) | (107) | -- | (440) | (440) |
| Realized gains on sales of short-term investments | -- | (2) | (2) | -- | (127) | (127) |
| Inventory provision | 11,980 | (430) | 11,550 | 4,086 | (61) | 4,025 |
| Provision for doubtful accounts | -- | 590 | 590 | -- | 120 | 120 |
| Restructuring provision | -- | 6,513 | 6,513 | -- | 2,184 | 2,184 |
| Write-off of fixed assets | 2,393 | 652 | 3,045 | 497 | 322 | 819 |
| Warranty provision | -- | 3,075 | 3,075 | -- | 2,353 | 2,353 |
| Vendor cancellation provision | -- | 387 | 387 | -- | 1,362 | 1,362 |
| Compensation expense for issuance of common stock | -- | -- | -- | 70 | -- | 70 |
| Value of common and preferred stock warrants issued | -- | -- | -- | 45 | -- | 45 |
| Net changes in operating assets and liabilities: | | -- | | | -- | |
| Accounts receivable, net | 10,139 | (1,735) | 8,404 | (12,602) | 6,402 | (6,200) |
| Inventory | (12,760) | 821 | (11,939) | (12,193) | (852) | (13,045) |
| Other assets | 5,131 | (4,728) | 403 | 7,281 | (370) | 6,911 |
| Accounts payable | (18,204) | 764 | (17,440) | 2,129 | -- | 2,129 |
| Accrued payroll and related expenses | (2,356) | 372 | (1,984) | 310 | -- | 310 |
| Deferred revenues | (844) | 12,696 | 11,852 | 2,926 | 774 | 3,700 |
| Accrued warranty expenses | (1,639) | (1,995) | (3,634) | (3,098) | (2,353) | (5,451) |
| Accrued restructuring charges | 1,066 | (5,421) | (4,355) | (2,254) | (2,004) | (4,258) |
| Accrued restructuring and executive severance | (2,348) | (387) | (2,735) | (12,335) | 887 | (11,448) |
| Accrued other liabilities | (2,008) | 178 | (1,830) | (2,331) | (1,073) | (3,404) |
| Interest payable | (2) | 2 | -- | 3 | (3) | -- |
| Net cash provided by (used in) operating activities | (39,550) | (106) | (39,656) | (68,397) | 881 | (67,516) |
| Investing activities: | | | | | | |
| Purchases of short-term investments | (54,517) | (35,440) | (89,957) | (243,652) | (9,381) | (253,033) |
| Proceeds from sales and maturities of short-term investments | 107,931 | 35,549 | 143,480 | 224,154 | 9,947 | 234,101 |
| Purchases of property and equipment | (2,698) | (2) | (2,700) | (3,831) | 185 | (3,646) |
| Net cash provided by (used in) investing activities | 50,716 | 107 | 50,823 | (23,329) | 751 | (22,578) |
| Financing activities: | | | | | | |
| Principal payments on capital leases | (124) | (2) | (126) | (66) | (1,631) | (1,697) |
| Proceeds from issuance of common stock | 1,681 | 1 | 1,682 | 3,729 | (1) | 3,728 |
| Net cash provided by financing activities | 1,557 | (1) | 1,556 | 3,663 | (1,632) | 2,031 |
| Effect of foreign currency exchange rate changes | 307 | -- | 307 | 1,172 | -- | 1,172 |
| Net (decrease) increase in cash and cash equivalents | 13,030 | -- | 13,030 | (86,891) | -- | (86,891) |
| Cash and cash equivalents at beginning of year | 30,188 | -- | 30,188 | 117,079 | -- | 117,079 |
| Cash and cash equivalents at end of year | $ 43,218 $ | -- $ | 43,218 $ | 30,188 $ | -- $ | 30,188 |
| Supplemental disclosures of cash flow information: | | | | | | |
| Cash paid for income taxes | $ 138 $ | 37 $ | 175 $ | 194 $ | -- | 194 |
| Cash paid for interest | $ 3,268 $ | -- $ | 3,268 $ | 3,262 $ | -- | 3,262 |
| Deferred compensation relating to common stock issued to non-employees | $ 17 $ | -- $ | 17 $ | 53 $ | -- $ | 53 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

150

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Note 4.Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents approximate fair value due to
their short-term maturities. The fair value for the Company's investments in
marketable debt and equity securities is estimated based on quoted market
prices.
The fair value of short-term and long-term capital lease and debt obligations is
estimated based on current interest rates available to the Company for debt
instruments with similar terms, degrees of risk and remaining maturities. The
carrying values of these obligations, as of each period presented, approximate
their respective fair values.
The following estimated fair value amounts have been determined using available
market information. However, considerable judgment is required in interpreting
market data to develop the estimates of fair value. Accordingly, the estimates
presented herein are not necessarily indicative of the amounts that the Company
could realize in a current market exchange.

|  |  | Gross | Gross |  |
| --- | --- | --- | --- | --- |
|  |  | Unrealized | Unrealized |  |
| December 31, 2005 | Amortized Cost | Gains | Losses | Fair Value |
|  |  | (in thousands) |  |  |
| Investments maturing in less than 1 year: |  |  |  |  |
| Commercial paper | $    7,950 | $    -- | $    (3) | $   7,947 |
| Government agency obligations | 47,000 | -- | (325) | 46,675 |
| Subtotal | 54,950 | -- | (328) | 54,622 |
| Investments maturing in 1-2 years: |  |  |  |  |
| Fixed income corporate securities | 3,959 | -- | (9) | 3,950 |
| Government agency obligations | 13,998 | -- | (136) | 13,862 |
| Subtotal | 17,957 | -- | (145) | 17,812 |
| Total | $   72,907 | $    -- | $   (473) | $  72,434 |

|  |  | Gross | Gross |  |
| --- | --- | --- | --- | --- |
|  |  | Unrealized | Unrealized |  |
| December 31, 2004 | Amortized Cost | Gains | Losses | Fair Value |
|  |  | (in thousands) |  |  |
| Investments maturing in less than 1 year: |  |  |  |  |
| Government agency obligations | $    8,000 | $    -- | $   (72) | $   7,928 |
| Investments maturing in 1-2 years: |  |  |  |  |
| Government agency obligations | 47,006 | -- | (417) | 46,589 |
| Total | $   55,006 | $    -- | $   (489) | $  54,517 |

There were no realized gains or losses on short-term investments in either the
year ended December 31, 2005 or 2004, respectively.

Note 5.Commitments

Leases
The Company leases its facilities and certain equipment under operating leases.
Effective in August 2006, the Company entered into a sub-sublease agreement to
sub-sublease its then current principal executive offices located in Santa
Clara, California and consisting of approximately 141,000 square feet of office
space. The sub-sublease agreement expires on October 31, 2009 which is the same
day as the Company's agreement to sublease the premises

151

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

expires. Concurrently, the Company entered into a lease agreement to lease approximately 63,069 square feet of office space through September 2009 at another location in Santa Clara, California to serve as the Company's new principal executive offices. The facility in Belgium is leased through June 30, 2013 with a right to terminate at the end of each three-year period commencing on July 1, 2004. The Company has a lease in Israel that expires in February 2007. The Company rents the remainder of its facilities on a month-to-month basis. Rent expense was approximately $5.6 million, $6.5 million and $6.8 million, for the years ended December 31, 2005, 2004 and 2003, respectively. Prior to the expiration of certain leases, the Company subleased a portion of its facilities to third parties and currently subleases its former principal executive offices to a third party. See Note 7, "Restructuring Charges and Asset Write-offs." The Company's sublease rental income was approximately $2.6 million, $1.9 million and $1.5 million for the years ended December 31, 2005, 2004 and 2003, respectively.

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit at December 31, 2002. The letter of credit was reduced to $7.5 million in February 2003. The $7.5 million letter of credit was converted to a cash deposit in 2004. In August 2004, the Company entered into a 28-month aircraft sublease terminating on December 31, 2006. The lease commitment for the aircraft is included in the table below.

Future minimum lease payments under non-cancelable operating leases as of December 31, 2005 are as follows (in thousands):

|  | Operating Leases |
|---|---|
| 2006 | $  4,898 |
| 2007 | 3,221 |
| 2008 | 3,105 |
| 2009 | 2,578 |
| 2010 | -- |
| Thereafter | -- |
| Total minimum payments | $  13,802 |

As of December 31, 2005 there are approximately $1.3 million of future minimum sublease payments for the Company's corporate jet and leased facility in Ottawa, Canada to be received under non-cancelable subleases not reflected in the table above.

Purchase Obligations and Special Charges

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of open purchase orders placed with vendors for goods and services of the vendors' products at a specified price. As of December 31, 2005, $12.1 million of purchase obligations were outstanding. As a result of declines in its forecasts, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand, or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges in amounts that represented management's estimate of the Company's exposure to vendors for its inventory commitments. At December 31, 2005, accrued vendor cancellation charges were $1.5 million and the remaining $10.6 million was attributable to open purchase orders that are expected to be utilized in the normal course of business and are expected to become payable at various times throughout 2006.

Letters of Credit

As of December 31, 2005, the Company had $0.5 million in available letters of credit primarily required to support operating leases which expire at various dates through 2009.

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Royalties

The Company has various royalty arrangements, which require it to pay nominal amounts to various suppliers for usage of licensed property. Royalties are generally calculated on a per-unit basis, and to a lesser extent, as a percentage of sales. The Company's total accrued obligations for royalties at December 31, 2005 and 2004 were $50,000 and $0.4 million, respectively.

The Company has purchased, through its acquisition of Radwiz Ltd. (Radwiz), certain technology that utilized funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade (Chief Scientist). Additionally, Terayon Communication Systems Ltd. (Terayon Ltd.) received certain funding from the Chief Scientist to develop technology used in one of the products developed by the Company. The Company has committed to pay royalties to the Government of Israel based on proceeds from sales of products using this technology. The Company sold Radwiz to a third party in 2004, which included any future Chief Scientist liabilities related to the sale of technology developed by Radwiz. The Company discontinued the product developed by Terayon Ltd. and does not expect to sell any products using this technology in 2006 or any future periods.


Note 6. Accrued Severance Pay

In June 2004, we entered into separation agreements with two executive officers. One officer resigned in the quarter ended June 30, 2004 and the other officer resigned in the quarter ended September 30, 2004. We recorded a severance provision of $1.7 million related to termination costs for one of the officers in the quarter ended June 30, 2004, along with another executive officer who resigned in the quarter effective July 2003. We recorded a severance provision of $1.4 million in the quarter ended September 30, 2004 for the other executive officer. Most of the severance costs were paid in the quarters ended September 30, 2004 and December 31, 2004 with nominal amounts for employee benefits payable through the quarter ended September 30, 2005.

In August 2004, we entered into an employment agreement with another executive officer. The executive officer resigned effective as of December 31, 2004 with a termination date of February 3, 2005. We recorded a severance provision of $0.4 million related to termination costs for this officer in the quarter ended December 31, 2004. Most of the severance costs related to this officer were paid in the quarter ended March 31, 2005 with nominal amounts for employee benefits payable into the quarter ended December 31, 2005.

This table summarizes the executive severance balance as of December 31, 2005 (in thousands):

|  | December 31, 2005 |
| --- | --- |
| Balance at December 31, 2004 | $ 431 |
| Charges | 14 |
| Cash payments | (444) |
| Balance at December 31, 2005 | $ 1 |

The 2004 charge for executive severance of $3.5 million is included within restructuring charges, executive severance and asset write-off in the Consolidated Statement of Operations. The $0.4 million in executive severance is accrued on the Consolidated Balance Sheet within accrued restructuring and executive severance at December 31, 2004.

One of the Company's subsidiaries is subject to Israeli law and labor agreements, under which it is required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. This subsidiary's severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment, is included in the Company's consolidated balance sheets on the accrual basis, and is partially funded by a purchase of insurance policies in the subsidiary's name. At December 31, 2005 and 2004, $0.4 million and

153

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

$1.3 million, respectively, for accrued severance pay was included in long-term obligations. In accordance with EITF 88-1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $0.2 million and $0.7 million which related to the amounts funded by the purchase of insurance policies for the Israeli severance liabilities in its consolidated balance sheets as current liabilities and other assets at December 31, 2005 and 2004, respectively.

Note 7.Restructuring Charges and Asset Write-offs

The Company accrues for termination costs in accordance with paragraph 3 of SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities," and SFAS No. 112, "Employers' Accounting for Post Employment Benefits." Liabilities are initially measured at their fair value on the date in which they are incurred based on plans approved by the Company's Board of Directors. Accrued employee termination costs principally consist of three components: (i) a lump-sum severance payment based upon years of service (e.g. two weeks per year of service); (ii) COBRA insurance based on years of service and rounded up to the month; and (iii) an estimate of costs for outplacement services immediately provided to the affected employees. Substantially all employees were terminated on the date of notification, so there was no additional service period required to be included in the determination of accrued termination costs. Where such services were required for a period over 60 days, the Company amortized termination costs ratably over the required service period.

2004 Restructurings

During the quarter ended March 31, 2004, the Company initiated a restructuring plan to bring operating expenses in line with revenue levels. In the quarter ended March 31, 2004, the Company incurred 2004 restructuring plan charges in the amount of $3.3 million of which $1.0 million related to employee termination costs, $0.9 million related to termination costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. In the quarter ended June 30, 2004, the Company incurred 2004 restructuring plan charges in the amount of $1.1 million related to additional costs for excess leased facilities. In the quarter ended December 31, 2004, to further conform the Company's expenses to its revenues and to cease investment in the CMTS product line, the Company's Board of Directors approved a restructuring plan with a charge in the amount of $1.3 million related to employee terminations. In the second, third and fourth quarters of 2004, the Company re-evaluated the first and second quarter 2004 restructuring charges for the employee severance, excess facilities and the aircraft lease termination. Based on market conditions, new assumptions provided by its real estate broker, and the terms of the aircraft sublease agreement, which the Company entered into in the quarter ended September 30, 2004, the Company increased the restructuring charge for the aircraft lease by a total of $1.0 million, the facilities accrual was increased by $0.3 million and employee severance accrual was decreased by $0.2 million, for the year ended December 31, 2004.

The Company anticipates the remaining restructuring accrual related to the aircraft lease to be substantially utilized for servicing operating lease payments through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments through October 2009.

The reserve for the aircraft lease approximates the difference between the Company's current costs for the aircraft lease and the estimated income derived from subleasing.

The amount of net charges accrued under the 2004 restructuring plans assumes that the Company will successfully sublease excess leased facilities. The reserve for the excess leased facilities includes the estimated income derived from subleasing, which is based on information from the Company's real estate brokers, who estimated it based on assumptions relevant to the real estate market conditions as of the date of the Company's implementation of the restructuring plan and the time it would likely take to sub-lease the excess leased facility. The Company sub-subleased its former principal executive offices in August 2006.

154

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

This table summarizes the accrued restructuring balances related to the 2004 restructurings as of December 31, 2005 (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities | Aircraft Lease Termination | Total |
|---|---|---|---|---|
| Charges | $ 2,298 | $ 2,523 | $ 933 | $ 5,754 |
| Cash payments | (1,467) | (850) | (1,194) | (3,511) |
| Changes in estimates | (239) | 324 | 954 | 1,039 |
| Balance at December 31, 2004 | 592 | 1,997 | 693 | 3,282 |
| Charges | 1,037 | -- | -- | 1,037 |
| Cash payments | (1,534) | (1,190) | (344) | (3,068) |
| Changes in estimates | (95) | 1,246 | 149 | 1,300 |
| Balance at December 31, 2005 | $ -- | $ 2,053 | $ 498 | $ 2,551 |

2003 Restructuring

During the quarter ended March 31, 2003, the Company initiated a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 restructuring. As of December 31, 2003, 81 employees were terminated throughout the Company, and the Company paid $2.6 million in termination costs. In the quarter ended June 30, 2003, the Company reversed approximately $0.1 million of previously accrued termination costs due to a change in estimate. At December 31, 2005 and 2004, no restructuring charges remained accrued related to the 2003 restructurings.

2002 Restructuring

During 2002, another restructuring plan (2002 Plan) increased the reserve for excess leased facilities due to the exiting of additional space within the same facility in Israel as in the 2001 Plan. The Company incurred restructuring charges in the amount of $3.6 million for the 2002 Plan. Improving real estate market conditions in Israel in the early part of 2004 gave rise to our improved tenant sublease assumptions thereby creating a change in estimate of $0.1 million in the 2002 Plan, leaving nominal accrued restructuring charges at December 31, 2004.

155

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

This table summarizes the accrued restructuring balances related to the 2002 restructurings as of December 31, 2005 (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Balance at December 31, 2002 | $  88 | $  1,423 | $ 1,511 |
| Cash payments | (88) | (220) | (308) |
| Changes in estimates | -- | (1,103) | (1,103) |
| Balance at December 31, 2003 | -- | 100 | 100 |
| Charges | -- | 20 | 20 |
| Cash payments | -- | (5) | (5) |
| Changes in estimates | -- | (100) | (100) |
| Balance at December 31, 2004 | -- | 15 | 15 |
| Changes in estimates | -- | (15) | (15) |
| Balance at December 31, 2005 | $  -- | $  -- | $  -- |

2001 Restructurings
As part of the restructuring plan initiated in 2001 (2001 Plan), the Company incurred restructuring charges in the amount of $12.7 million. In 2003, the Company increased the restructuring reserve by $0.8 million primarily related to excess leased facilities that had previously been part of the excess leased facilities reserve in the 2002 restructuring plan. In 2004, the Company decreased the reserve by $0.2 million due to improving real estate market conditions in Israel that gave rise to the Company's improved tenant sublease assumption that resulted in a change of estimate to the 2001 Plan. In 2005, the Company decreased the reserve by $0.3 million to reflect a decrease for improving tenant sublease conditions in Israel that was partially offset by an increase in the reserve for excess leased facilities due to the use of the wrong lease term in its initial estimate. At December 31, 2005, $0.1 million remained accrued for excess leased facilities.

156

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

This table summarizes the accrued restructuring balances related to the 2001 restructurings as of December 31, 2005 (in thousands):

|  | Excess Leased Facilities and Cancelled Contracts |
|---|---|
| Balance at December 31, 2002 | $ 4,066 |
| Charges | -- |
| Cash payments | (1,676) |
| Changes in estimates | 813 |
| Balance at December 31, 2003 | 3,203 |
| Charges | -- |
| Cash payments | (1,165) |
| Changes in estimates | (200) |
| Balance at December 31, 2004 | 1,838 |
| Charges | -- |
| Cash payments | (1,450) |
| Changes in estimates | (253) |
| Balance at December 31, 2005 | $ 135 |

Asset Write-offs
As a result of CMTS product line restructuring activities in 2004, the Company wrote down $2.4 million of fixed assets, which were determined to have no remaining useful life or identified by management as being impaired. As a result of restructuring activities in 2003, the Company wrote off $0.4 million of fixed assets in 2003, which were determined to have no remaining useful life. As a result of restructuring activities in 2002, approximately $1.4 million of fixed assets were determined to have no remaining useful life.

Note 8. Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% convertible subordinated notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484 million. The Notes were convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133), the Notes are considered a hybrid instrument since, and as described below, they contained multiple embedded derivatives. The Notes contained several embedded derivatives. First, the Notes contain a contingent put (Contingent Put) where in the event of any default by the Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding may declare all unpaid principal and accrued interest to be due and payable immediately. Second, the Notes contain an investor conversion option (Investor Conversion Option) where the holder of the Notes may convert the debt security into Company common stock at any time after 90 days from original issuance and prior to August 1, 2007. The number of shares of common stock that is issued upon conversion is determined by dividing the principal amount of the security by the specified conversion price in effect on the conversion date. The initial conversion price was $84.01 which was subject to adjustment under certain circumstances described in the Indenture. Third, the Notes contain a liquidated damages provision (Liquidated Damages Provision) that obligated

157

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

the Company to pay liquidated damages to investors of 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter, in the event that the Company did not file an initial shelf registration for the securities within 90 days of the closing date. In the event that the Company filed its initial shelf registration within 90 days but failed to keep it effective for a two year period from the closing date, the Company would pay 50 basis points on the amount of outstanding securities for the first 90 days and 100 basis points thereafter. Fourth, the Notes contain an issuer's call option (Issuer Call Option) that allowed the Company to redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01, for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of the mailing of the redemption notice. In addition, if the Company redeemed the Notes, it was also required to make cash payment of $193.55 per $1,000 principal amount of the Notes less the amount of any interest actually paid on the Notes prior to redemption. The Company had the option to redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest.

Under SFAS 133, an embedded derivative must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone derivative if the economic characteristics and risks of the embedded derivative are not considered "clearly and closely related" to those of the host. An embedded derivative would not be considered clearly and closely related to the host if there was a possible future interest rate scenario (even though it may be remote) in which the embedded derivative would at least double the initial rate of return on the host contract and the effective rate would be twice the current market rate as a contract that had similar terms as the host and was issued by a debtor with similar credit quality. Furthermore, per SFAS 133, the embedded derivative would not be considered clearly and closely related to the host contract if the hybrid instrument could be settled in such a way the investor would not recover substantially all of its initial investment.

During the restatement process, the Company determined under SFAS 133 that both the Issuer Call Option and the Liquidated Damages Provision represented an embedded derivative that was not clearly and closely related to the host contract, and therefore needed to be bifurcated from the Notes and valued separately. As it related to the Liquidated Damages Provision and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $0.4 million. Based on the need to amortize the $0.4 million over the 7-year life of the Notes, the impact to the Company's financial results related to the Liquidated Damages Provision was not material. As it related to the Issuer Call Option and based on a separate valuation that included Black-Scholes valuation methodologies, the Company assessed a valuation of $11.9 million. As a result, at the time the Notes were issued in July 2000, the Company should have created an asset to record the value of the Issuer Call Option for $11.9 million and created a bond premium to the Notes for $11.9 million. In accordance with SFAS 133, the asset value would then be marked to market at the end of each accounting period and the bond premium would be amortized against interest expense at the end of each accounting period. Due to the decrease in the price of the Company's common stock, the value of the Issuer Call Option became effectively zero and the Company should have written off the asset related to the Issuer Call Option in 2000. Additionally, as part of the bond repurchase activity where the Company repurchased $325.9 million and $109.1 million of face value of the Notes (for a total of $435 million) that occurred in 2001 and 2002, the Company should have recognized an additional gain from the retirement of the bond premium associated with the Issuer Call Option of $7.0 million in 2001 and $1.9 million in 2002. The Company determined that the $7.0 million non-cash gain on the early retirement of the premium to be immaterial to 2001 financial results.

In the quarter ended March 31, 2006, the Company paid off the entire principal amount of the outstanding Notes, including all accrued and unpaid interest and related fees, for a total of $65.6 million. In addition, the Company recognized $0.3 million into other income, net representing the remaining unamortized bond premium associated with the Issuer Call Option.

158

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Note 9.Contingencies

Litigation
Beginning in April 2000, several plaintiffs filed class action lawsuits in
federal court against the Company and specific officers and directors of the
Company. Later that year, the cases were consolidated in the United States
District Court for the Northern District of California (Court) as In re Terayon
Communication Systems, Inc. Securities Litigation. The Court then appointed lead
plaintiffs who filed an amended complaint. In 2001, the Court granted in part
and denied in part defendants' motion to dismiss, and plaintiffs filed a new
complaint. In 2002, the Court denied defendants' motion to dismiss that
complaint, which, like the earlier complaints, alleged that the defendants
violated the federal securities laws by issuing materially false and misleading
statements and failing to disclose material information regarding the Company's
technology. On February 24, 2003, the Court certified a plaintiff class
consisting of those who purchased or otherwise acquired the Company's securities
between November 15, 1999 and April 11, 2000. On September 8, 2003, the Court
heard defendants' motion to disqualify two of the lead plaintiffs and to modify
the definition of the plaintiff class. On September 10, 2003, the Court issued
an order vacating the hearing date for the parties' summary judgment motions,
and, on September 22, 2003, the Court issued another order staying all discovery
until further notice and vacating the trial date, which had been scheduled for
November 4, 2003. On February 23, 2004, the Court issued an order disqualifying
two of the lead plaintiffs and ordered discovery, which was conducted. In
February 2006, the Company mediated the case with plaintiffs' counsel. As part
of the mediation, the Company reached a settlement of $15.0 million. After this
mediation, the Company's insurance carriers agreed to tender their remaining
limits of coverage, and the Company contributed approximately $2.2 million to
the settlement. On March 17, 2006, the Company, along with plaintiffs' counsel,
submitted the settlement to the Court and the shareholder class for approval. As
a result, the Company accrued $2.2 million to litigation settlement expense in
the fourth quarter of 2005. The Court held a hearing to review the settlement of
the shareholder litigation on September 25, 2006. To date, the Court has not
approved the settlement.
On October 16, 2000, a lawsuit was filed against the Company and the individual
defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the Superior Court of
California, San Luis Obispo County. This lawsuit was titled Bertram v. Terayon
Communication Systems, Inc. The factual allegations in the Bertram complaint
were similar to those in the federal class action, but the Bertram complaint
sought remedies under state law. Defendants removed the Bertram case to the
United States District Court, Central District of California, which dismissed
the complaint. Plaintiffs appealed this order, and their appeal was heard on
April 16, 2004. On June 9, 2004, the United States Court of Appeals for the
Ninth Circuit affirmed the order dismissing the Bertram case.
In 2002, two shareholders filed derivative cases purportedly on behalf of the
Company against certain of its current and former directors, officers and
investors. (The defendants differed somewhat in the two cases.) Since the cases
were filed, the investor defendants have been dismissed without prejudice, and
the lawsuits have been consolidated as Campbell v. Rakib in the Superior Court
of California, County of Santa Clara. The Company is a nominal defendant in
these lawsuits, which allege claims relating to essentially the same purportedly
misleading statements that are at issue in the securities class action filed in
April 2000. In that securities class action, the Company disputed making any
misleading statements. The derivative complaints also allege claims relating to
stock sales by certain of the director and officer defendants. On September 15,
2006, the Company entered into a Stipulation of Settlement of Derivative Claims.
On September 18, 2006, the Superior Court of California, County of Santa Clara
approved the final settlement of the derivative litigation entitled In re
Terayon Communication Systems, Inc. Derivative Litigation (Case No. CV 807650).
In connection with the settlement, the Company paid $1.0 million in attorney's
fees and expenses to the derivative plaintiffs' counsel and agreed to adopt
certain corporate governance practices. As a result, the Company accrued $1.0
million to litigation settlement expense in the fourth quarter of 2005.
On June 23, 2006, a putative class action lawsuit was filed against the Company
in the United States District Court for the Northern District of California by
I.B.L. Investments Ltd. purportedly on behalf of all persons who

159

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

purchased the Company's common stock between October 28, 2004 and March 1, 2006. Zaki Rakib, Jerry D. Chase, Mark Richman and Edward Lopez are named as individual defendants. The lawsuit focuses on the Company's March 1, 2006 announcement of the restatement of the Company's financial statements for the year ended December 31, 2004, and for the four quarters of 2004 and the first two quarters of 2005. The plaintiffs are seeking damages, interest, costs and any other relief deemed proper by the court. An unfavorable ruling in this legal matter could materially and adversely impact the Company's results of operations.

In January 2005, Adelphia Communications Corporation (Adelphia) sued the Company in the District Court of the City and County of Denver, Colorado. Adelphia's complaint alleged, among other things, breach of contract and misrepresentation in connection with the Company's sale of cable modem termination systems (CMTS) products to Adelphia and the Company's announcement to cease future investment in the CMTS market. Adelphia sought damages in excess of $25.0 million and declaratory relief. The Company moved to dismiss the complaint seeking an order blocking the case from going forward at a preliminary stage. The court denied the Company's motion to dismiss the complaint, thereby permitting the case and discovery to go forward. The Company filed a response to Adelphia's complaint and discovery began. On October 21, 2005, the parties settled the litigation in exchange for (i) full mutual releases of the other party for claims related to the CMTS and customer premise equipment products and (ii) a payment to Adelphia consisting of $3.0 million in cash, $0.8 million of DM 6400 products at list price and $0.8 million of modems at a price of $33.50 each. On December 1, 2005, the United States Bankruptcy Court of the Southern District of New York approved the settlement. On December 15, 2005, the court dismissed the case with prejudice.

On April 22, 2005, the Company filed a lawsuit in the Superior Court of California, County of Santa Clara against Adam S. Tom (Tom) and Edward A. Krause (Krause) and a company founded by Tom and Krause, RGB Networks, Inc. (RGB). The Company sued Tom and Krause for breach of contract and RGB for intentional interference with contractual relations based on breaches of the Noncompetition Agreements entered into between the Company and Tom and Krause, respectively. On May 24, 2006, RGB, Tom and Krause filed a Notice of Motion and Motion For Leave To File a Cross-Complaint, in which the defendants stated that they intended to file counter-claims against the Company for misappropriation of trade secrets, unfair competition, tortious interference with contractual relations and tortious interference with prospective economic advantage. On July 6, 2006, the court granted the defendants' motion, and on July 20, defendants filed a cross-complaint for misappropriation of trade secrets, unfair competition, tortious interference with contractual relations and tortious interference with prospective economic advantage. On August 21, 2006, the Company filed a demurrer to certain of those claims. The court granted the Company's demurrer as to RGB's request for declaratory judgment. On November 9, 2006, the Company filed the Company's answer to RGB's complaint. Damages in this matter are not capable of determination at this time and the case may be lengthy and expensive to litigate.

On September 13, 2005, a case was filed by Hybrid Patents, Inc. (Hybrid) against Charter Communications, Inc. (Charter) in the United States District Court for the Eastern District of Texas for patent infringement related to Charter's use of equipment (cable modems, CMTS and embedded multimedia terminal adapters (eMTAs)) meeting the Data Over Cable System Interface Specification (DOCSIS) standards and certain video equipment. Hybrid has alleged that the use of such products violates its patent rights. Charter has requested that the Company and others supplying it with equipment indemnify Charter for these claims. The Company and others have agreed to contribute to the payment of the legal costs and expenses related to this case. On May 4, 2006, Charter filed a cross-complaint asserting its indemnity rights against the Company and a number of companies that supplied Charter with cable modems, and to date, this cross-complaint has not been dismissed. Trial is scheduled on Hybrid's claims for July 2, 2007. At this point, the outcome is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Hybrid is successful in its claim against Charter and then elects to pursue other cable operators that use the allegedly infringing products.

On July 14, 2006, a case was filed by Hybrid against Time Warner Cable (TWC), Cox Communications Inc. (Cox), Comcast Corporation (Comcast), and Comcast of Dallas, LP (together, the MSOs) in the United States

160

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

District Court for the Eastern District of Texas for patent infringement related to the MSOs' use of data transmission systems and certain video equipment. Hybrid has alleged that the use of such products violate its patent rights. No trial date is known yet. To date, the Company has not been named as a party to the action. The MSOs have requested that the Company and others supplying them with cable modems and equipment indemnify the MSOs for these claims. The Company and others have agreed to contribute to the payment of legal costs and expenses related to this case. At this point, the outcome is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Hybrid is successful in its claim against the MSOs and then elects to pursue other cable operators that use the allegedly infringing products.

On September 16, 2005, a case was filed by Rembrandt Technologies, LP (Rembrandt) against Comcast in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by Comcast infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, the Company has not been named as a party in the action, but the Company has received a subpoena for documents and a deposition related to the products the Company sold to Comcast. The Company continues to comply with this subpoena. Comcast requested that the Company and others supplying them with products for indemnity related to the products that the Company sold to them. The Company and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial is scheduled on Rembrandt's claims for August 6, 2007. At this point, the outcome is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against Comcast and then elects to pursue other cable operators that use the allegedly infringing products.

On June 1, 2006, a case was filed by Rembrandt against Charter, Cox, CSC Holdings, Inc. (CSC) and Cablevisions Systems Corp. (Cablevision) in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by Charter infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, the Company has not been named as a party in the action, but Charter has made a request for indemnity related to the products that the Company and others have sold to them. The Company has not received an indemnity request from Cox, CSC, and Cablevision but the Company expects that such request will be forthcoming shortly. To date, the Company and others have not agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against Charter and then elects to pursue other cable operators that use the allegedly infringing products.

On June 1, 2006, a case was filed by Rembrandt against TWC in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by TWC infringe certain patents related to cable modem, voice-over internet, and video technology and applications. To date, the Company has not been named as a party in the action, but TWC has made a request for indemnity related to the products that the Company and others have sold to them. The Company and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against TWC and then elects to pursue other cable operators that use the allegedly infringing products.

On September 13, 2006, a second case was filed by Rembrandt against TWC in the United States District Court for the Eastern District of Texas alleging patent infringement. In this matter, Rembrandt alleged that products and services sold by TWC infringe certain patents related to the DOCSIS standard. To date, the Company has not been named as a party in the action, but TWC has made a request for indemnity related to the products that the Company and others have sold to them. The Company and others have agreed to contribute to the payment of legal costs and expenses related to this case. Trial date of this matter is not known at this time. At this point, the outcome

161

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

is uncertain and the Company cannot assess damages. However, the case may be expensive to defend and there may be substantial monetary exposure if Rembrandt is successful in its claim against TWC and then elects to pursue other cable operators that use the allegedly infringing products.

The Company has received letters claiming that its technology infringes the intellectual property rights of others. The Company has consulted with its patent counsel and reviewed the allegations made by such third parties. If these allegations were submitted to a court, the court could find that the Company's products infringe third party intellectual property rights. If the Company is found to have infringed third party rights, the Company could be subject to substantial damages and/or an injunction preventing the Company from conducting its business. In addition, other third parties may assert infringement claims against the Company in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert the Company's management's resources, cause product shipment delays or require the Company to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to the Company, if at all.

Furthermore, the Company has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that its technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation, divert management's attention and other resources, require the Company to enter into royalty arrangements, subject the Company to damages or injunctions restricting the sale of its products, require the Company to indemnify its customers for the use of the allegedly infringing products, require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments, require the Company to redesign certain of its products, or damage its reputation, any one of which could materially and adversely affect its business, results of operations and financial condition.

The Company has also provided an indemnity to ATI where the Company's liability is set at $14.0 million for breaches of representations and warranties made by the Company and assumed by the Company. This indemnity is provided for a period of three years for non-tax issues and six years for tax issues.

The Company may, in the future, take legal action to enforce its patents and other intellectual property rights, to protect its trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect the Company's business, results of operations and financial condition

In December 2005, the Commission issued a formal order of investigation in connection with the Company's accounting review of a certain customer transaction. These matters were previously the subject of an informal Commission inquiry. We have been cooperating fully with the Commission and will continue to do so in order to bring the investigation to a conclusion as promptly as possible.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these proceedings, individually and in the aggregate, will not have a material adverse effect on its financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the possibility of a material adverse impact on the Company's financial condition and results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position and overall results of operations for any of the above legal proceedings could change in the future.

162

--------------------------------------------------------------------------------

Table of Contents

                    TERAYON COMMUNICATION SYSTEMS, INC.
              NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)


Note 10.Stockholders' Equity

Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw
Communications Inc. (Shaw) a warrant (Anti-Dilution Warrant) to purchase an
indeterminate number of shares of common stock. The Anti-Dilution Warrant was
exercisable at the option of Shaw during the period that Shaw owned equity in
the Company and in the event the Company issued new equity securities at below
the current market price defined in the Anti-Dilution Warrant. The aggregate
exercise price was $0.50. The Company issued certain equity securities that, as
of December 31, 2003 and 2002, respectively, required the Company to issue an
additional 37,283 and 17,293 shares of common stock under the Anti-Dilution
Warrant. The Company recorded expenses of approximately $45,000 and $26,000
relating to the issuance of warrants pursuant to the Anti-Dilution Warrant in
2003 and 2002, respectively. The expense was calculated by multiplying the
annualized fair market value of the Company's stock by the share dilution
attributable to the Anti-Dilution Warrant. As of May 31, 2003, Shaw transferred
all of its outstanding shares of common stock to a third party and consequently,
the Anti-Dilution Warrant expired unexercised.

In October 1999, a customer of the Company entered into an agreement with
Telegate Ltd., an Israeli company (Telegate), which was negotiating with the
Company to be acquired by the Company, whereby the customer committed to an
investment in Telegate in connection with the acquisition of all the outstanding
shares of Telegate by the Company. The customer committed to provide this
investment in the event that the acquisition of Telegate by the Company did not
close. In January 2000, the Company issued the customer a warrant to purchase
2,000,000 shares of the Company's common stock at a price of $30.75 per share,
the closing price of the Company's common stock on the date the warrant was
issued. The warrant was fully vested, non-forfeitable, and immediately
exercisable and had a term of three years. The fair value of the warrant,
determined as approximately $34.6 million using the Black-Scholes method, was
included in the Telegate purchase price and was associated with the value of the
customer relationship. The value of the warrant resulted in a non-cash charge to
cost of goods sold to be amortized over the three-year term of the warrant. For
the year ended December 2003, the Company incurred no amortization expense
related to the warrant. The Telegate warrant expired unexercised in January
2003.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the
Company's common stock at a price of $5.4375 per share, the closing price of the
Company's common stock on the date the warrant was issued, in connection with
the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under the terms of
the warrant, 100,000 shares were vested and exercisable immediately and the
remaining 100,000 shares vested and became exercisable at the rate of 1/24th per
month, beginning January 31, 2001. The fair value of the warrant of
approximately $0.7 million was calculated using the Black-Scholes method and was
recorded as additional consideration relating to the purchase of TrueChat. As of
December 31, 2003, the TrueChat warrant was exercisable for an aggregate of
200,000 shares of the Company's common stock. The TrueChat warrant expired
unexercised in February 2004.

Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a
Stockholder Rights Plan under which all stockholders of record as of February
20, 2001 received rights to purchase shares of a new series of preferred stock.
The rights were distributed as a non-taxable dividend and will expire in ten
years from the record date. The rights will be exercisable only if a person or
group acquires 15% or more of the Company's common stock or announces a tender
offer for 15% or more of the Company's common stock. If a person or group
acquires 15% or more of the Company's common stock, all rights holders except
the buyer will be entitled to acquire the Company's common stock at a discount.
The Board of Directors may terminate the Stockholder Rights Plan at any time or
redeem the rights prior to the time a person or group acquires more than 15% of
the Company's common stock.


                                     163

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Common Stock Reserved
Common stock reserved for issuance is as follows:

|  | December 31, 2005 |
| --- | --- |
| Common stock options | 18,392,821 |
| Employee stock purchase plan | 600,371 |
| Total | 18,993,192 |

Stock Option and Stock Purchase Plans

The Company's 1995 Stock Option Plan (1995 Plan) and 1997 Equity Incentive Plan (1997 Plan) provide for incentive stock options and nonqualified stock options to be issued to employees, directors and consultants of the Company. Exercise prices of incentive stock options may not be less than the fair market value of the common stock at the date of grant. Exercise prices of nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire six to ten years after the date of grant. The 1997 Plan also provides for the sale of restricted shares of common stock to employees, directors and consultants, and the Company has provided such awards in prior years and may provide such awards in the future.

The Company's 1998 Non-Employee Directors' Stock Option Plan (1998 Plan) provides for non-discretionary nonqualified stock options to be issued to the Company's non-employee directors automatically as of the effective date of their election to the Board of Directors and annually following each annual stockholder meeting. Exercise prices of nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

The Company's 1999 Non-Officer Equity Incentive Plan (1999 Plan) provides for nonqualified stock options to be issued to non-officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant. The 1999 Plan also provides for the sale of restricted shares of common stock to employees, directors and consultants and the Company has provided such awards in prior years and may provide such awards in the future.

As of December 31, 2005, and from inception, the Company had authorized an aggregate of 2,643,442, 16,796,362, 800,000 and 7,208,501 shares of common stock for issuance under the 1995 Plan, the 1997 Plan, the 1998 Plan and the 1999 Plan, respectively. As of December 31, 2005, a total of 4,518 shares, 3,980,642 shares, 79,967 shares, and 1,305,392 shares were available for issuance under the 1995 Plan, the 1997 Plan, the 1998 Plan and the 1999 Plan, respectively. During the year ended December 31, 2002, the Company recorded aggregate deferred compensation of approximately $38,000 representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. During the years ended December 31, 2004 and 2003, the Company did not record any additional deferred compensation. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be re-measured. For the years ended December 31, 2005, 2004 and 2003 the amortization expense was approximately $0.1 million, $17,000 and $0.1 million, respectively.

164

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following is a summary of additional information with respect to the 1995
Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, Mainsail Equity Incentive
Plan, TrueChat Equity Incentive Plan, other outside equity plans and outstanding
options assumed by the Company in conjunction with its business acquisitions and
option grants made outside the plans:

| | Options Available for Grant | Options Outstanding Number of Shares | Weighted Average Exercise Price |
|---|---|---|---|
| Balance at December 31, 2002 | 28,991,401 | 14,619,825 | $ 8.02 |
| Options authorized | (17,000,000) | -- | -- |
| Options granted | (7,153,320) | 7,153,320 | 3.05 |
| Options exercised | -- | (602,272) | 4.20 |
| Options canceled | 3,706,914 | (3,706,914) | 7.61 |
| | | | |
| Balance at December 31, 2003 | 8,544,995 | 17,463,959 | $ 6.20 |
| Options authorized | 3,000,000 | -- | -- |
| Options granted | (4,738,944) | 4,738,944 | 1.96 |
| Options exercised | -- | (225,645) | 2.19 |
| Options canceled | 5,174,420 | (5,174,420) | 5.19 |
| | | | |
| Balance at December 31, 2004 | 11,980,471 | 16,802,838 | $ 5.37 |
| Options authorized | (8,500,000) | -- | -- |
| Options granted | (2,911,675) | 2,911,675 | 3.01 |
| Options exercised | -- | (1,341,112) | 2.28 |
| Options canceled | 5,341,415 | (5,341,415) | 6.31 |
| Shares expired | (379,286) | -- | -- |
| | | | |
| Balance at December 31, 2005 | 5,530,925 | 13,031,986 | $ 4.78 |

In addition, the following table summarizes information about stock options that
were outstanding and exercisable at December 31, 2005:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Shares Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Exercisable Options | Weighted Average Exercise Price |
| $0.00 - $1.99 | 2,692,641 | 8.59 | $ 1.76 | 1,078,710 | $ 1.74 |
| $2.01 - $2.95 | 2,606,963 | 7.62 | 2.52 | 2,154,490 | 2.47 |
| $2.97 - $3.49 | 2,612,493 | 5.50 | 3.04 | 437,250 | 3.04 |
| $3.50 - $6.52 | 1,250,704 | 6.13 | 5.53 | 973,743 | 5.58 |
| $6.81 - $66.37 | 3,869,185 | 5.00 | 9.33 | 3,858,293 | 9.33 |
| | | | | | |
| Total | 13,031,986 | 6.48 | $ 4.78 | 8,502,486 | $ 5.88 |

At December 31, 2005, there were no shares of the Company's common stock subject
to repurchase by the Company.
  Employee Stock Purchase Plan
In June 1998, the Board of Directors approved, and the Company adopted, the 1998
Employee Stock Purchase Plan (ESPP), which is designed to allow eligible
employees of the Company to purchase shares of common stock at

165

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

semi-annual intervals through periodic payroll deductions. An aggregate of 4,400,000 shares of common stock are reserved for the ESPP, and 3,799,629 shares had been issued through December 31, 2005. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the final offering period expired on July 31, 2004.

The Company has elected to follow APB 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS 123 and is calculated as if the Company had accounted for its employee stock options and for its ESPP shares to be issued under the fair value method of SFAS 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black-Scholes method using the following weighted average assumptions:

|  | Risk-free Interest Rates | Expected Volatility | Expected Life | Dividend Yield |
|---|---|---|---|---|
|  |  |  | (in years) |  |
| **2003** |  |  |  |  |
| Stock option plans | 2.67% | 0.87 | 5.0 | 0.0% |
| Employee stock purchase plan | 1.27% | 1.54 | 0.5 | 0.0% |
| **2004** |  |  |  |  |
| Stock option plans | 3.47% | 0.78 | 5.0 | 0.0% |
| Employee stock purchase plan | 1.16% | 0.80 | 0.5 | 0.0% |
| **2005** |  |  |  |  |
| Stock option plans | 3.93% | 0.58 | 2.1 | 0.0% |

As discussed above, the valuation models used under SFAS 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS 123, was $1.42, $1.28 and $2.14, for options granted during 2005, 2004 and 2003, respectively. The weighted average grant date fair value of ESPP shares to be issued was $0.99 and $0.99 for the years ended December 31, 2004 and 2003, respectively. There were no ESPP shares issued in 2005.

166

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)


Note 11.Income Taxes

The benefit (expense) for income taxes consists of (in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  |  | (as restated)(1) | (as restated)(1) |
| Current: |  |  |  |
| Federal | $    -- | $    -- | $    -- |
| State | -- | (40) | -- |
| Foreign | (149) | 116 | (316) |
| Total current | (149) | 76 | (316) |
| Deferred: |  |  |  |
| Federal | -- | -- | -- |
| State | -- | -- | -- |
| Foreign | -- | -- | -- |
| Total deferred | -- | -- | -- |
|  | $ (149) | $    76 | $   (316) |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

The reconciliation of income tax benefit attributable to net loss applicable to
common stockholders computed at the U.S. federal statutory rates to income tax
benefit (expense) (in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
|  |  | (as restated)(1) | (as restated)(1) |
| Tax benefit at U.S. statutory rate | $ 9,418 | $   16,513 | $  19,568 |
| Loss for which no tax benefit is currently recognizable | (9,418) | (16,513) | (19,568) |
| Other, net | (149) | 76 | (316) |
|  | $  (149) | $     76 | $    (316) |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to
   Consolidated Financial Statements.

Deferred income taxes reflect the net tax effects of temporary differences
between the carrying amounts of assets and liabilities for financial reporting
purposes and the amounts used for income tax purposes. Significant

167

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

components of the Company's deferred tax assets and liabilities as of December 31, 2005 and 2004 are as follows (in thousands):

| | Year Ended December 31, | |
| | 2005 | 2004 |
| | | (as restated)(1) |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 156,229 | $ 156,608 |
| Tax credit carryforwards | 13,607 | 13,336 |
| Reserves and accruals | 9,469 | 10,533 |
| Capitalized research and development | 2,270 | 2,959 |
| Intangible asset amortization | 24,929 | 27,482 |
| Deferred revenue | 14,239 | 4,738 |
| Other, net | 9,078 | 10,904 |
| Gross deferred tax assets | 229,821 | 226,560 |
| Valuation allowance | (229,821) | (226,560) |
| Net deferred tax assets | $ -- | $ -- |

(1)See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2005 and 2004. The valuation allowance increased $3.3 million for the year ended December 31, 2005 as compared to 2004. Approximately $44.3 million of the valuation allowance at December 31, 2005 related to stock options benefits to be credited to equity when realized.

As of December 31, 2005 and 2004, the Company had federal and California net operating loss carryforwards of approximately $391.7 million and $312.8 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $8.8 million and $11.2 million, respectively, as of December 31, 2005. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2006 through 2025, if not utilized. The federal research credits expire at various dates beginning in the years 2009 through 2022, if not utilized. The California research credits have no expiration date.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carry-forwards before full utilization.

Note 12.Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2005, 2004 and 2003.

Note 13.Segment Information

In late 2000, the worldwide telecom and satellite industries experienced severe downturns that resulted in significantly reduced purchases of equipment. Because of that decrease in demand, the Company refocused its efforts on sales of its data products to the cable industry and its digital video products to the cable and satellite

168

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

industry, and significantly reduced and then ultimately eliminated its telecom and satellite businesses. Consequently, beginning in 2003, the Company's previously reported telecom segment no longer meets the quantitative threshold for disclosure and the Company now operates as one business segment.

Since 2004, the Company increased its focus on the development, marketing and sale of its digital video products versus its data products, which consisted of the CMTS, modem and eMTA products, and ultimately, refocused the Company as a digital video company. The decreased focus on the data products was due to the pressures of competing in a standards based marketplace versus a proprietary based marketplace. In 2001 and 2002, the Company switched from selling proprietary data products based on its Synchronous Code Division Multiple Access (S-CDMA) technology to Data Over Cable System Interface Specification (DOCSIS) compliant products. Additionally, in 2001, the Company licensed its S-CDMA technology to CableLabs on a non-exclusive, perpetual, worldwide, royalty-free basis for inclusion in the DOCSIS 2.0 standard (and later standards) and therefore, any competitive edge previously provided by the proprietary technology was eliminated. In 2004, the Company ceased investment in its CMTS product line due to these competitive pressures, declining sales and costs associated with research and development efforts to develop the next generation of CMTS products. In January 2006, the Company discontinued its line of modems and eMTAs for the same reasons.

The Company operates solely in one business segment, the development and marketing of digital video products and related services. However, the Company will continue to sell through the existing inventory of its modem and eMTA products. The Company's foreign operations consist of sales, marketing and support activities through its foreign subsidiaries. The Company's Chief Executive Officer has responsibility as the chief operating decision maker (CODM) as defined by SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information." The CODM reviews financial information presented on a consolidated basis, accompanied by disaggregated information about revenues and certain direct expenses by geographic region for purposes of making operating decisions and assessing financial performance. The Company's assets are primarily located in its corporate office in the United States and are not allocated to any specific region, therefore the Company does not produce reports for, or measure the performance of, its geographic regions based on any asset-based metrics. As a result, geographic information is presented only for revenues and long-lived assets (in thousands):

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| | | (as restated)(1) | (as restated)(1) |
| Geographic areas: | | | |
| Revenues: | | | |
| United States | $52,838 | $ 72,838 | $ 71,945 |
| Americas, excluding United States | 1,871 | 4,930 | 3,081 |
| Europe, Middle East and Africa (EMEA), excluding Israel | 15,314 | 17,640 | 9,450 |
| Israel | 7,645 | 16,645 | 15,274 |
| Asia excluding Japan | 11,544 | 15,259 | 9,094 |
| Japan | 1,452 | 9,172 | 21,343 |
| Total | $90,664 | $ 136,484 | $ 130,187 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

169

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
|  |  | (as restated)(1) |
| Long-lived assets: |  |  |
| United States | $ 3,701 | $ 4,517 |
| Americas, excluding United States | 5 | 402 |
| Europe, Middle East and Africa (EMEA), excluding Israel | 65 | 132 |
| Israel | 16 | 687 |
| Asia | 128 | 116 |
| Total | $ 3,915 | $ 5,854 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

Three customers, Harmonic, Inc. (Harmonic), Thomson Broadcast, and Comcast
Corporation (Comcast) each accounted for 10% or more of total revenues for the
year ended December 31, 2005 (12%, 11% and 10%, respectively). Two customers,
Adelphia Communications Corporation (Adelphia) and Comcast accounted for more
than 10% each of total revenues for the year ended December 31, 2004 (20% and
13%, respectively). Three customers, Adelphia, Cross Beam Networks and Comcast
each accounted for more than 10% of total revenues for the year ended December
31, 2003 (21%, 16% and 13%, respectively). Four customers, Comcast, HOT Telecom,
Wharf T&T Limited and CSC Holdings, each accounted for 10% or more of total
accounts receivable as of December 31, 2005 (16%, 11%, 11%, and 11%,
respectively). Two customers, Comcast and Harmonic, each accounted for 10% or
more of total accounts receivable as of December 31, 2004 (17% and 15%,
respectively).

Note 14. Related Party Transactions

Aleksander Krstajic, a member of the Company's Board of Directors until June 19,
2006, was the Senior Vice President of Interactive Services, Sales and Product
Development for Rogers Communications, Inc. (Rogers) until January 2003.
Effective in April 2003, Rogers was no longer a related party to the Company.
Revenues attributable to Rogers are only classified as related party revenues in
the first and second quarters of 2003, which were not material. The Company
recognized revenues of $1.5 million from sales to Rogers during the combined
periods of the first and second quarters of 2003.

Note 15. Product Warranty

The Company provides a standard warranty for most of its products, ranging from
one to five years from the date of purchase. The Company estimates product
warranty expenses at the time revenue is recognized. The Company's warranty
obligations are affected by product failure rates, material usage and service
delivery costs incurred in correcting a product failure. The estimate of costs
to service its warranty obligations is based on historical experience and the
Company's expectation of future conditions. Should actual product failure rates,
material usage or service delivery costs differ from our estimates, revision to
the warranty liability would be required. An analysis of changes in the
liability for product warranties is as follows (in thousands):

|  | Year Ended December 31, | |
|  | 2005 | 2004 |
|  |  | (as restated)(1) |
| Balance at beginning of period | $ 4,670 | $ 5,229 |
| Additions (reductions) charged to costs and expenses | (166) | 3,075 |
| Settlements | (1,617) | (3,634) |
| Balance at end of period | $ 2,887 | $ 4,670 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

170

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Guarantees, Including Indirect Guarantees of Indebtedness of Others
In addition to product warranties, the Company, from time to time, in the normal course of business, indemnifies other parties with whom it enters into contractual relationships, including customers, lessors, and parties to other transactions with the Company, with respect to certain matters. These obligations primarily relate to certain agreements with the Company's officers, directors and employees, under which the Company may be required to indemnify such persons for liabilities arising out of their employment relationship. The Company has agreed to hold the other party harmless against specified losses, such as those arising from a breach of representations or covenants, third party claims that the Company's products when used for their intended purpose(s) infringe the intellectual property rights of such third party, or other claims made against certain parties. It is not possible to determine the maximum potential amount of liability under these indemnification obligations due to the limited history of prior indemnification claims and the unique facts and circumstances that are likely to be involved in each particular claim. Historically, payments made by the Company under these obligations were not material and no liabilities have been recorded for these obligations on the balance sheets as of December 31, 2005 and 2004.

Note 16.Sale of Certain Assets

In July 2003, the Company entered into an agreement with Verilink Corporation (Verilink) to sell certain assets to Verilink for up to a maximum of $0.9 million. The Company received $0.6 million 2003. During 2004, the Company received an additional $0.1 million toward the asset sale. The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in February 2000. Additionally, Verilink agreed to purchase at least $2.1 million of related inventory from the Company on or before December 31, 2004. During 2005 and 2004, Verilink had purchased $0.5 million and $0.6 million, respectively, of this inventory. As of December 2005, Verilink owed the Company approximately $0.3 million as part of its purchase of inventory, which Verilink did not pay to the Company. All inventories purchased by Verilink had been fully reserved as excess and obsolete in prior periods.
As part of this agreement, Verilink also agreed to assume all warranty obligations related to ANE products sold prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of certain warranty obligations for ANE products sold prior to July 2003. Further, Verilink assumed the obligation for one of the Company's operating leases.
In May 2005, Verilink attempted to make a claim under the agreement for the Company to reimburse Verilink for certain warranty obligations provided by Verilink to its customers. The Company denied Verilink's claim. In April 2006, Verilink filed for bankruptcy. In August 2006, the Company and Verilink entered into a settlement agreement, which was approved by the bankruptcy court, whereby both the Company and Verilink waived any and all claims against the other party. The Company waived its rights to claims of approximately $0.3 million owed to it, and Verilink waived any and all current or future claims for reimbursement of warranty expenses.
On April 2, 2004, the Company sold all of its ownership interests in Radwiz, Ltd., Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a cash payment of $0.2 million. In connection with this disposition, the acquirer received obsolete inventories with no book value, $0.2 million of selected net assets, and assumed $1.4 million of net liabilities related to these subsidiaries. The Company recorded a net gain of $1.1 million, which is included as a component of other income (expense) in the accompanying condensed consolidated statement of operations.
On March 9, 2005, the Company sold certain of its cable modem semiconductor assets to ATI Technologies, Inc. (ATI). Under the agreement, ATI acquired the Company's cable modem silicon intellectual property and related software, entered into a sublease and hired approximately 25 employees from the Company's design team. Under the terms of the agreement, ATI was required to pay the Company $7.0 million at the closing, with a balance of $7.0 million subject to its achieving milestones for certain conditions, services and deliverables up to June 9, 2006. Upon closing, the Company received $8.6 million in cash, which was comprised of the $7.0 million for the initial

171

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

payment and $1.9 million for having met the first milestone, minus $0.3 million to pay for Company funded retention bonuses for employees that accepted employment with ATI. In June 2005, ATI paid the Company $2.5 million for delivering certain documentation and validation deliverables. On September 9, 2005, the Company forfeited $0.8 million for failing to obtain vendor author status for ATI with CableLabs. In June 2006, ATI paid the Company $1.1 million from the amount that was released from escrow and the Company forfeited $0.8 million, the amount that was held in escrow, for failing to obtain vendor author status for ATI with CableLabs by June 9, 2006. Additionally, in June 2006, the Company and ATI amended the agreement to (i) transfer assets related to the manufacture of the semiconductors to ATI and (ii) engage ATI to provide technical assistance to the Company. The Company's maximum liability is set at $14.0 million for breaches of representations and warranties made by the Company and obligations assumed by the Company. In June 2006, the Company recognized a $9.9 million gain from the sale of assets to ATI, which represented the purchase price of $12.5 million, less transaction related costs of $2.6 million. Despite receiving cash payments for the sale of assets to ATI, the Company did not recognize the gain on the ATI transaction until the quarter ended June 30, 2006, based upon the completion of milestones and the termination of the supply arrangement between the Company and ATI.

On August 31, 2005, the Company sold all of its ownership in Terayon Communication Systems Ltd. (formerly known as Telegate Ltd. (Telegate)) to a third party for a cash payment of NIS 1. In connection with this disposition, the acquirer received obsolete inventory with no book value, $1.6 million of selected net assets, and assumed $1.9 million of net liabilities related to this subsidiary. Additionally, the third party agreed to assume all warranty and service obligations related to the Telegate product. The Company recognized a net gain of $0.7 million which is included as a component of other income (expense) net in the accompanying condensed consolidated statement of operations. The $0.7 million gain includes a $0.3 million gain due to the recognition of cumulative translation adjustment related to Telegate previously included in accumulated other comprehensive loss component of total shareholders' equity.

Note 17.Subsequent Events

Events Related to the Company Accounting Review and the Restatement
On November 7, 2005, the Company announced that it initiated a review of revenue recognition after determining that certain revenues recognized in the second half of the year ended December 31, 2004 from a customer may have been recorded in incorrect periods. The review included the Company's revenue recognition policies and practices for current and past periods and its internal control over financial reporting as it related to those items. Additionally, the Audit Committee of the Board of Directors conducted an independent inquiry into the circumstances related to the accounting treatment of certain of the transactions at issue and retained independent legal counsel to assist with the inquiry.
On March 1, 2006, the Company announced that the Audit Committee had completed its independent inquiry and that the Company would restate its consolidated financial statements for the year ended December 31, 2004 and for the four quarters for 2004 and the first two quarters of 2005.
On November 8, 2006, the Company announced that the Audit Committee, upon the recommendation of management, had concluded that the Company's consolidated financial statements for the years ended December 31, 2003, 2002 and 2000 and for the quarters of 2003, 2002 and 2000 should no longer be relied upon. The restatement of financial statements for 2003 would correct errors primarily relating to revenue recognition, cost of goods sold and estimates of reserves. The restatement of financial statements for 2000 and 2002 would correct errors primarily relating to the need to separately value and account for an embedded derivative option associated with the Company's 5% convertible subordinated notes issued in July 2000, and other estimates. While no determination was made that the financial statements for 2001 could not be relied upon, adjustments would be made to 2001 that would be reflected in the financial statements to be included in its periodic reports to be filed with the Commission.

172

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The Company's previous auditors resigned effective as of September 21, 2005 and on that date, the Audit Committee engaged Stonefield Josephson, Inc. (Stonefield) as the Company's new independent registered public accounting firm. On May 26, 2006, the Company announced that it had engaged Stonefield to re-audit the Company's consolidated financial statements for the year ended December 31, 2004 and, if necessary, to re-audit the Company's consolidated financial statements for the year ended December 31, 2003. On November 8, 2006, the Company announced that it had engaged Stonefield to re-audit the Company's consolidated financial statements for the year ended December 31, 2003. The Company, through outside counsel, retained FTI Consulting, Inc. to provide an independent accounting perspective in connection with the accounting issues under review.

In connection with the Company's accounting review of the customer contract referred to above, the Commission initiated a formal investigation. This matter was previously the subject of an informal Commission inquiry. The Company has been cooperating fully with the Commission and will continue to do so in order to bring the investigation to a conclusion as promptly as possible.

Repayment in full of 5% Convertible Subordinated Notes due 2007

On November 7, 2005, the Company announced that the filing of its periodic report on Form 10-Q for the quarter ending on September 30, 2005 would be delayed pending completion of the accounting review. The Company was required under its Indenture, dated July 26, 2000 (Indenture), to file with the Commission and the trustee of the Company's Notes all reports, information and other documents required pursuant to Section 13 or 15(d) of the Exchange Act. On January 12, 2006, holders of more than 25% of the aggregate principal amount of the Notes, in accordance with the terms of the Indenture, provided written notice to the Company that it was in default under the Indenture based on the Company's failure to file its Form 10-Q for the quarter ending September 30, 2005. The Company was unable to cure the default within 60 days of the written notice, March 13, 2006, which triggered an Event of Default under the Indenture. The Event of Default enabled the holders of at least 25% in aggregate principal amount of Notes outstanding to accelerate the maturity of the Notes by written notice and declare the entire principal amount of the Notes, together with all accrued and unpaid interest thereon, to be due and payable immediately. On March 16, 2006, the Company received a notice of acceleration from holders of more than 25% of the aggregate principal amount of the Notes. On March 21, 2006, the Company paid in full the entire principal amount of the outstanding Notes, including all accrued and unpaid interest thereon and related fees, for a total of $65.6 million.

De-listing by The NASDAQ Stock Market

The Company received a letter from The NASDAQ Stock Market (NASDAQ), dated November 17, 2005, notifying the Company that its common stock was subject to delisting based on its failure to file its Form 10-Q for the quarter ending September 30, 2005 as required by NASDAQ Marketplace Rule 4310(c)(14). On November 25, 2005, the Company requested a hearing before a NASDAQ Listing Qualifications Panel to request an extension to comply with the periodic filing requirements. NASDAQ stayed the delisting process and a hearing was held on December 15, 2005. The Company received a second letter from NASDAQ on January 4, 2006, notifying the Company that its common stock was subject to delisting based on its failure to satisfy NASDAQ Marketplace Rules 4350(e) and 4350(g), which required the Company to solicit proxies and hold an annual meeting of shareholders before December 31, 2005. The Company held its 2004 annual shareholder meeting in December 2004 and the Company's 2005 annual shareholder meeting was originally planned for December 2005, but the Company was unable to hold its 2005 annual shareholder meeting due in part to its ongoing accounting review. On January 17, 2006, The NASDAQ Listing Qualifications Panel (Panel) granted the Company's request for continued listing subject to certain conditions. On March 28, 2006, the Company announced it had concluded that the restatement will not be completed by the March 31, 2006 deadline, and had communicated this information to the Panel.

173

----------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

On March 31, 2006, the Company received a letter from The NASDAQ Stock Market notifying the Company that the Panel had determined to de-list the Company's securities from The NASDAQ National Market effective as of the opening of business on Tuesday, April 4, 2006. Upon de-listing, the quotations for the Company's common stock appeared in the Pink Sheets, a centralized quotation service that collects and publishes market maker quotes for over-the-counter securities in real time, under the trading symbol TERN.PK.

Settlement of Securities Class Action Lawsuit

On March 17, 2006, the Company entered into a Memorandum of Understanding (MOU) providing for the settlement of the securities class action entitled In re Terayon Communication Systems, Inc. Securities Litigation, Case No. C-00-1967-MHP, pending in the United States District Court for the Northern District of California. As previously disclosed, the amended complaint alleged that the Company and certain of its officers and directors (collectively, Defendants) violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding the Company's technology. The class action included claims for damages on behalf of those who purchased or otherwise acquired the Company's securities (Affected Securities) during the class period of November 15, 1999 to April 11, 2000 (Plaintiff Class).

In accordance with the settlement outlined in the MOU, the Defendants agreed to pay to the Plaintiff Class $15.0 million with the Company contributing approximately $2.2 million of this amount, and its insurance carriers paying the remaining amount. As a result, the Company accrued $2.2 million to litigation settlement expense in the fourth quarter of 2005. The Court held a hearing to review the settlement of the shareholder litigation on September 25, 2006. To date, the Court has not approved the settlement.

In consideration of the payment of the settlement funds described above, the Plaintiff Class agreed, upon final court approval, to dismiss the class action with prejudice and release all known and unknown claims arising out of or relating to, or in connection with the purchase or acquisition of the Affected Securities during the class period which have been or could have been asserted by any member of the Plaintiff Class.

Settlement of Derivative Lawsuit

On September 15, 2006, the Company entered into a Stipulation of Settlement of Derivative Claims with respect to the derivative litigation entitled In re Terayon Communication Systems, Inc. Derivative Litigation, Case No. CV 807650, pending in the Superior Court of California, County of Santa Clara. As previously reported, the Company is a nominal defendant in the derivative litigation and the claims are the same as those that were in the securities class action, essentially that the Company made certain misleading statements. On September 18, 2006, the court approved the final settlement of the derivative litigation. In connection with the settlement, the Company paid $1.0 million in attorney's fees and expenses to the derivative plaintiffs' counsel and agreed to adopt certain corporate governance practices. As a result, the Company accrued $1.0 million to litigation settlement expense in the fourth quarter of 2005.

Costs of Restatement and Legal Activities

The Company has incurred substantial expenses for legal, accounting, tax and other professional services in connection with the internal review of its historical financial statements, the audit of the Company's historical financial statements for the years ended December 31, 2004 and 2003 and the review of the four quarters of 2004 and 2005, the preparation of the restated financial statements, the Commission investigation and inquiries from other government agencies, the related class action litigation and the repayment in full of the Notes. Excluding the $65.6 million that the Company was required to pay to the holders of the Notes, which consisted of the face value of the Notes, the accrued and unpaid interest and related costs, the Company estimates these expenses to date to be in excess of $7.5 million in aggregate through the quarter ended September 30, 2006. The Company expects to continue to incur significant expenses in connection with these matters until these matters are completed.

174

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Asset Sales
In June 2006, the Company and ATI amended the agreement to (i) transfer assets related to the manufacture of the semiconductors to ATI and (ii) engage ATI to provide technical assistance to the Company. Additionally, in June 2006, ATI paid the Company $1.1 million from the amount that was released from escrow and the Company forfeited $0.8 million of the amount that was held in escrow, for failing to obtain vendor author status for ATI with CableLabs by June 9, 2006. In June 2006, the Company recognized a $9.9 million gain from the sale of assets to ATI, which represented the purchase price of $12.5 million, less transaction related costs of $2.6 million.

Reliance Settlement
In 2001, the insurer of the second layer of the Company's directors and officers' insurance, Reliance Insurance Company (Reliance), filed for liquidation under the laws of the Commonwealth of Pennsylvania. Because of Reliance's filing for liquidation, the Company self-insured the Reliance layer of $2.5 million and paid the $2.5 million as part of the securities class action lawsuit filed against the Company and certain of its officers and directors in 2000. The Company filed a claim for $2.5 million against Reliance with its liquidator. In April 2005, the liquidator for Reliance provided the Company with a notice of determination that allowed its claim against Reliance. In June 2006, the Company sold its claim against Reliance to Prime Shares World Market LLC for $1.0 million.

Discontinued Products
In January 2006 the Company reviewed its operational effectiveness and determined that it would discontinue its modem and eMTA products in order to focus the Company's strategy solely on its digital video applications and reduce its overall cost structure. As part of this decision, the Company implemented a global reduction in headcount, with a resulting expense of $0.6 million.

Commitments and Obligations
Effective in August 2006, the Company entered into an agreement to sub-sublease its then current principal executive offices located in Santa Clara, California consisting of approximately 141,000 square feet of office space. The sublease agreement expires on the same day as the Company's agreement to sub-sublease the premises, which is in October 2009. Concurrently, the Company entered into a lease agreement to lease approximately 63,069 square feet of office space through September 2009 at another location in Santa Clara, California to serve as the Company's new principal executive offices. In addition, in the third quarter of 2006, the Company recorded an impairment of leasehold improvements of $1.0 million relating to the Company's former headquarters.

Changes in Membership and Reduction in Size of the Board of Directors
On June 19, 2006, the Company announced that two members of the Board of Directors resigned, and that the Board of Directors approved a reduction in size from nine to seven members. Mark Slaven, Chair of the Audit Committee and member of the Board of Directors of the Company, resigned effective August 2, 2006 as a result of the increased demands on his time from his duties as Senior Vice President, Chief Financial Officer and Treasurer of Cross Match Technologies Inc. in Palm Beach Garden, Florida, and not as a result of any matter concerning the Company. Aleksander Krstajic resigned, effective June 19, 2006, as a result of the increased travel and demands on his time from his duties as President and Chief Executive Officer of Bell Vanguard Inc., and not as a result of any matter concerning the Company. The Company appointed Lewis Solomon, currently a member of the Board of Directors, to be a member of the Audit Committee effective August 2, 2006. With four independent directors on the seven member board, the Board of Directors is currently comprised of a majority of independent directors.

175

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Note 18. 2005 and 2004 Unaudited Condensed Consolidated Quarterly Information

The Company did not file its periodic quarterly report on Form 10-Q for the third quarter 2005. The Company did not timely file its periodic report for the year ended December 31, 2005 and is currently filing the information required in this Form 10-K for the fiscal year ended December 31, 2005. The Company is including the unaudited results of the third and fourth quarter 2005 and management discussion and analysis on the third quarter 2005 in this Note 18. Summarized quarterly financial data for 2005 and 2004 is as follows (in thousands, except per share data):

| | | (unaudited) | | |
| Year Ended December 31, 2005 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | (as restated)(1) | (as restated)(1) | | |
|---|---|---|---|---|
| Revenues | $ 17,813 | $ 18,925 | $23,440 | $30,486 |
| Cost of goods sold | 11,263 | 11,578 | 16,999 | 15,795 |
| Gross profit | 6,550 | 7,347 | 6,441 | 14,691 |
| Operating expenses: | | | | |
| Research and development | 5,234 | 4,254 | 3,555 | 4,607 |
| Sales and marketing | 5,674 | 5,610 | 6,326 | 4,924 |
| General and administrative | 3,419 | 3,601 | 5,570 | 7,766 |
| Restructuring charges, executive severance and asset write-offs | 1,282 | 282 | 235 | 458 |
| Total operating expenses | 15,609 | 13,747 | 15,686 | 17,755 |
| Loss from operations | (9,059) | (6,400) | (9,245) | (3,064) |
| Interest income (expense), net | (190) | (86) | 21 | 66 |
| Other income (expense), net | 66 | (51) | 1,180 | (40) |
| Loss before income tax benefit (expense) | (9,183) | (6,537) | (8,044) | (3,038) |
| Income tax benefit (expense) | (50) | 50 | (76) | (73) |
| Net loss | (9,233) | (6,487) | (8,120) | (3,111) |
| Basic and diluted net loss per share | $ (0.12) | $ (0.08) | $ (0.11) | $ (0.04) |
| Shares used in computing basic and diluted net loss per share | 76,645 | 76,444 | 76,445 | 76,381 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Loss per share is computed independently for each of the quarters presented. The sum of the quarterly loss per share in 2005 and 2004 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

176

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

|  | | | (unaudited) | | | | |
|---|---|---|---|---|---|---|---|
| Year Ended December 31, 2004 | | First Quarter | | Second Quarter | Third Quarter | | Fourth Quarter |
|  | | (as restated)(1) | (as restated)(1) | | (as restated)(1) | | (as restated)(1) |
| Revenues | $ | 40,069 | $ | 41,355 $ | 30,560 | $ | 24,500 |
| Cost of goods sold | | 27,487 | | 25,039 | 30,393 | | 18,968 |
| Gross profit | | 12,582 | | 16,316 | 167 | | 5,532 |
| Operating expenses: | | | | | | | |
| Research and development | | 9,129 | | 8,136 | 8,304 | | 7,630 |
| Sales and marketing | | 7,221 | | 5,411 | 6,222 | | 5,291 |
| General and administrative | | 3,124 | | 3,542 | 2,384 | | 2,989 |
| Restructuring charges, executive severance and asset write-offs | | 3,367 | | 3,579 | 1,463 | | 3,927 |
| Total operating expenses | | 22,841 | | 20,668 | 18,373 | | 19,837 |
| Loss from operations | | (10,259) | | (4,352) | (18,206) | | (14,305) |
| Interest expense, net | | (310) | | (310) | (232) | | (238) |
| Other income (expense), net | | 141 | | 1,071 | (45) | | (136) |
| Loss before income tax benefit (expense) | | (10,428) | | (3,591) | (18,483) | | (14,679) |
| Income tax benefit (expense) | | (67) | | (79) | (83) | | 305 |
| Net loss | | (10,495) | | (3,670) | (18,566) | | (14,374) |
| Basic and diluted net loss per share | $ | (0.14) | $ | (0.05)$ | (0.24)$ | | (0.19) |
| Shares used in computing basic and diluted net loss per share | | 75,305 | | 74,884 | 75,275 | | 74,897 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Loss per share is computed independently for each of the quarters presented. The sum of the quarterly loss per share in 2005 and 2004 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

177

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following unaudited quarterly financial information is presented for the quarter ended September 30, 2005.

CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands)

|  | September 30, 2005 | December 31, 2004 |
|---|---|---|
|  | (unaudited) | (as restated)(1) |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $    37,547 | $    43,218 |
| Short-term investments | 72,322 | 54,517 |
| Accounts receivable, net allowance for doubtful accounts | 11,610 | 18,559 |
| Other current receivables | 1,438 | 1,044 |
| Inventory | 9,751 | 17,666 |
| Other current assets | 8,225 | 3,516 |
| Total current assets | 140,893 | 138,520 |
| Property and equipment, net | 4,093 | 5,854 |
| Restricted cash | 317 | 1,241 |
| Other assets, net | 11,901 | 11,366 |
| Total assets | $   157,204 | $   156,981 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $     5,989 | $     7,846 |
| Accrued payroll and related expenses | 1,819 | 4,493 |
| Deferred revenues | 23,992 | 4,965 |
| Deferred gain on asset sale | 8,631 | -- |
| Accrued warranty expenses | 2,655 | 4,670 |
| Accrued restructuring and executive severance | 1,212 | 3,744 |
| Accrued vendor cancellation charges | 248 | 521 |
| Accrued other liabilities | 6,340 | 3,873 |
| Interest payable | 542 | 1,356 |
| Current portion of convertible subordinated notes | 65,422 | -- |

| | | |
|---|---:|---:|
| Total current liabilities | 116,850 | 31,468 |
| Long-term obligations | 1,583 | 2,076 |
| Accrued restructuring and executive severance | 1,554 | 1,822 |
| Long-term Deferred revenues | 13,783 | 11,084 |
| Convertible subordinated notes | -- | 65,588 |
| Total liabilities | 133,770 | 112,038 |
| Stockholders' equity: | | |
| Preferred stock | -- | -- |
| Common stock | 78 | 76 |
| Additional paid-in capital | 1,086,623 | 1,083,709 |
| Accumulated deficit | (1,059,327) | (1,035,487) |
| Treasury stock, at cost | (773) | (773) |
| Accumulated other comprehensive loss | (3,167) | (2,582) |
| Total stockholders' equity | 23,434 | 44,943 |
| Total liabilities and stockholders' equity | $    157,204 | $    156,981 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

178

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| | | (as restated)(1) | | (as restated)(1) |
| Revenues | $ 23,440 | $ 30,560 | $ 60,178 | $ 111,984 |
| Cost of goods sold | 16,999 | 30,393 | 39,840 | 82,919 |
| Gross profit | 6,441 | 167 | 20,338 | 29,065 |
| Operating expenses: | | | | |
| Research and development | 3,555 | 8,304 | 13,043 | 25,569 |
| Sales and marketing | 6,326 | 6,222 | 17,611 | 18,854 |
| General and administrative | 5,570 | 2,384 | 12,589 | 9,050 |
| Restructuring charges, executive severance and asset write-offs | 235 | 1,463 | 1,799 | 8,408 |
| Total operating expenses | 15,686 | 18,373 | 45,042 | 61,881 |
| Loss from operations | (9,245) | (18,206) | (24,704) | (32,816) |
| Interest income (expense), net | 21 | (232) | (255) | (853) |
| Other income (expense), net | 1,180 | (45) | 1,195 | 1,167 |
| Loss before income tax expense | (8,044) | (18,483) | (23,764) | (32,502) |
| Income tax expense | (76) | (83) | (76) | (229) |
| Net loss | $ (8,120) | $ (18,566) | $ (23,840) | $ (32,731) |
| Net loss per share, basic and diluted | $ (0.11) | $ (0.25) | $ (0.31) | $ (0.43) |
| Shares used in computing, basic and diluted net loss per share | 76,445 | 75,275 | 76,998 | 75,604 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
Consolidated Financial Statements.

179

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Management Discussion and Analysis of Financial Condition and Results of
Operations for the three months and nine months ended September 30, 2005 and
2004, respectively.

Revenues

The following table presents revenues for groups of similar products (in
thousands, except percentages) (unaudited):

| | Three Months Ended | | | | Nine Months Ended | | | |
| | Sept. 30, 2005 | Sept. 30, 2004 | Variance in Dollars | Variance in Percent | Sept. 30, 2005 | Sept. 30, 2004 | Variance in Dollars | Variance in Percent |
| | | (as restated)(1) | | | | (as restated)(1) | | |
|---|---|---|---|---|---|---|---|---|
| Revenues by product: | | | | | | | | |
| DVS | $ 10,293$ | 5,168$ | 5,125 | 99.2% | $ 21,601$ | 16,544 | 5,057 | 30.6% |
| HAS | 10,116 | 19,915 | (9,799) | (49.2)% | 32,448 | 68,231 | (35,783) | (52.4)% |
| CMTS | 3,031 | 5,477 | (2,446) | (44.7)% | 6,129 | 27,105 | (20,976) | (77.4)% |
| Other | -- | -- | -- | -- | -- | 104 | (104) | (100.0)% |
| Total | $ 23,440$ | 30,560$ | (7,120) | (23.3)% | $ 60,178$ | 111,984$ | (51,806) | (46.3)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
Consolidated Financial Statements.

The Company's revenues decreased 23% from $30.6 million to $23.4 million for the
quarter ended September 30, 2005 compared to the quarter ended September 30,
2004, and decreased 46% from $112.0 million to $60.2 million for the nine months
ended September 30, 2005 compared to the nine months ended September 30, 2004.
While sales of DVS products increased, HAS and CMTS products declined
significantly driven by the discontinuation of the CMTS product line in October
2005, and a decrease in the sale of HAS products that resulted from the lack of
widespread adoption of the eMTA modems. With the decision to cease investment in
CMTS products, the Company has limited revenue opportunities for this product as
it attempts to sell existing inventory levels. In addition, modem revenues were
increasingly being driven by voice enabled eMTA products. The Company was also
relatively late in developing and qualifying an eMTA product for the North
American market.

The Company's revenue was impacted by its adoption of SOP 97-2 for DVS products.
In 2003, 2004 and 2005, the Company was unable to establish VSOE of fair value
for sales of DVS products that contained PCS as part of a multiple element
arrangement, which required the Company to recognize revenue for the hardware
and PCS ratably over the period of the PCS. This resulted in significant levels
of deferred revenue in 2004 and 2005, including in the third quarter of 2005.
For the three months ended September 30, 2005, $10.3 million of recognized DVS
product revenue consisted of $12.5 million of DVS product revenue invoiced
during the period of which $8.8 million was deferred and will be recognized in
future periods, and $6.6 million of DVS product revenue recognized in the
current period that was invoiced in prior periods. For the nine months ended
September 30, 2005, $21.6 million of recognized DVS product revenue consisted of
$44.4 million of DVS product revenue invoiced during the period of which $28.7
million was deferred and will be recognized in future periods, and $5.9 million
of DVS product revenue recognized in the current period that was invoiced in
prior periods.

The Company expects shipments of DVS product in 2006 to decrease as a result of
the slowdown in purchases by major MSOs due to their completion of a substantial
portion of the build out of their all-digital simulcast networks. However,
reported revenue will increase as a result of the recognition of revenue
previously deferred in prior periods.

180

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following table is a breakdown of revenues by geographic region (in thousands, except percentages) (unaudited):

| | Three Months Ended | | | | Nine Months Ended | | | |
| | Sept. 30, 2005 | Sept. 30, 2004 (as restated)(1) | Variance in Dollars | Variance in Percent | Sept. 30, 2005 | Sept. 30, 2004 (as restated)(1) | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|---|---|---|---|
| Revenues: | | | | | | | | |
| United States | $ 14,173 | $ 19,050 | $ (4,877) | (25.6)% | $ 32,146 | $ 58,446 | $ (26,300) | (45.0)% |
| Americas, excluding United States | 418 | 603 | (185) | (30.7)% | 1,235 | 4,209 | (2,974) | (70.7)% |
| Europe, Middle East and Africa (EMEA), excluding Israel | 3,481 | 2,678 | 803 | 30.0% | 10,393 | 13,348 | (2,955) | (22.1)% |
| Israel | 1,441 | 1,807 | (366) | (20.3)% | 5,525 | 14,858 | (9,333) | (62.8)% |
| Asia, excluding Japan | 3,546 | 3,055 | 491 | 16.1% | 9,814 | 12,069 | (2,255) | (18.7)% |
| Japan | 381 | 3,367 | (2,986) | (88.7)% | 1,065 | 9,054 | (7,989) | (88.2)% |
| Total | $ 23,440 | $ 30,560 | $ (7,120) | (23.3)% | $ 60,178 | $ 111,984 | $ (51,806) | (46.3)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Revenues in the United States as a percentage of overall sales in the three and nine months ended September 30, 2005 was relatively constant compared to the same periods in 2004. Revenues in EMEA and Asia increased in the three months ended September 30, 2005 compared to 2004 due to increased sales of eMTA modems in Eastern Europe, as well as sales of existing inventory of CMTS in Eastern Europe and to a reseller in Asia. Revenues in EMEA, Israel and Asia decreased in the three months ended September 30, 2005, primarily due to a reduction in HAS sales. Revenues in EMEA, Asia and Israel decreased in the nine months ended September 30, 2005 compared to 2004 due to decreased sales of CMTS and traditional modem products. During the third quarter of 2005, the Company continued to emphasize sales to the United States, EMEA and Israel customers while placing a lower emphasis on other locations such as Canada, South America and Asia. For the remainder of 2005, the Company expects revenue to remain constant or slightly decrease in the U.S. and EMEA markets.

Two customers, Harmonic, Inc. (Harmonic), and Cox Communications, Inc. (Cox) each accounted for 10% or more of total revenues (16% and 10%, respectively) for the three months ended September 30, 2005. One customer, Harmonic, accounted for 10% or more of total revenues (13%) for the nine months ended September 30, 2005. Three customers, Comcast, Cross Beam Networks and Adelphia Communications Corporation (Adelphia), each accounted for 10% or more of total revenues (24%, 11% and 18%, respectively) for the three months ended September 30, 2004. Two customers, Adelphia and Comcast, each accounted for 10% or more of total revenues (21% and 11%, respectively) for the nine months ended September 30, 2004.

Adelphia ceased purchasing product from the Company in the fourth quarter of 2004 when the Company ceased investment in its CMTS products. The Company expects that sales to customers located in the United States will increase in 2006 as a percentage of sales to customers, since the Company expects DVS product sales to become a larger percentage of total products sold, HAS sales to decrease and CMTS sales to cease. DVS product sales have historically been concentrated in the United States and the Company expects that trend to continue.

Cost of Goods Sold and Gross Profit

Cost of goods sold consists of direct product costs as well as the cost of manufacturing operations. The cost of manufacturing includes contract manufacturing, test and quality assurance for products, warranty costs and associated costs of personnel and equipment. In the three and nine months ended September 30, 2005, cost of goods

181

---

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

sold was approximately 73% and 66% of revenues, respectively, compared to 99% and 74% of revenues, respectively, in the same periods in 2004.

Gross profit decreased in the three and nine months ended September 30, 2005 compared to the same period in 2004. The decrease in gross profit was due to the decrease in revenues from HAS and CMTS products. The gross margin percentage was 27% and 34% for the three and nine months ended September 30, 2005, respectively, compared to 1% and 26% for the comparable periods in 2004. The improvement in gross margin percentage is due to the larger percentage of revenues derived from higher margin DVS products, as well as higher excess and obsolete reserves that were expensed in 2004 primarily attributable to the winding down of the CMTS product line.

During 2005, the Company continued to focus on improving sales of higher margin DVS products and reducing product manufacturing costs, and expects gross profit as a percentage of revenues to increase. In January 2006, the Company announced that it would focus solely on its DVS products. Consequently, its revenue mix will consist of higher margin DVS product as the sales of CMTS and HAS products decline.

Operating Expenses

The following summarizes expenses for research and development, sales and marketing and general and administrative and restructuring charges (in thousands, except percentages) (unaudited):

| | Three Months Ended | | | | Nine Months Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | Sept. 30, 2005 | Sept. 30, 2004 (as restated)(1) | Variance in Dollars | Variance in Percent | Sept. 30, 2005 | Sept. 30, 2004 (as restated)(1) | Variance in Dollars | Variance in Percent |
| Research and development | $ 3,555 | $ 8,304 | $ (4,749) | (57.2)% | $ 13,043 | $ 25,569 | $ (12,526) | (49.0)% |
| Sales and marketing | 6,326 | 6,222 | 104 | 1.7% | 17,611 | 18,854 | (1,243) | (6.6)% |
| General and administrative | 5,570 | 2,384 | 3,186 | 133.6% | 12,589 | 9,050 | 3,539 | 39.1% |
| Restructuring charges, executive severance and asset write-offs | 235 | 1,463 | (1,228) | (83.9)% | 1,799 | 8,408 | (6,609) | (78.6)% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Research and Development

Research and development expenses consist primarily of personnel costs, internally designed prototype material expenditures, and expenditures for outside engineering consultants, equipment and supplies required in developing and enhancing products. In the three months ended September 30, 2005, research and development expenses were $3.6 million, or 15% of revenues. This is a $4.7 million decrease from research and development expenses for the three months ended September 30, 2004, in which expenses were $8.3 million, or 27% of revenues.

The decrease in research and development expenses was attributable to the reduction in employee expenses related to the decision to cease investment in the CMTS product line as announced in the third quarter of 2004 and CMTS related employees being terminated in the fourth quarter 2004 and first quarter 2005; reduction in employee expenses from the semiconductor division after the sale of certain assets to ATI Technologies, Inc. (ATI) in the first quarter 2005; decrease in allocations of facility and overhead related support costs to research and development; and reduction of other expenses, partially offset by an increase in utilization of outside engineering consultants. The increase in utilization of outside engineering consultants is related to the transfer of sustaining engineering efforts of the CMTS, eMTA modems and DVS products to Infosys, an engineering consulting company in India. The Company believes that it is critical to continue to make significant investments in research and development in digital video products to create innovative technologies and products that meet the current and

182

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

future requirements of customers. Accordingly, the Company intends to increase its investment in research and development in its digital video products in 2006.

Sales and Marketing

Sales and marketing expenses consist primarily of personnel costs, including salaries and commissions for sales personnel and salaries for marketing and support personnel, costs related to marketing communications, consulting and travel. Sales and marketing expenses remained consistent year over year at $6.3 million, or 27% of revenues for the three months ended September 30, 2005 compared to $6.2 million, or 20% of revenues for the comparable period in 2004. For the nine months ended September 30, 2005, sales and marketing expenses were $17.6 million, or 29% of revenues. This is a $1.2 million decrease from sales and marketing expenses for the nine months ended September 30, 2004, in which expenses were $18.9 million or 17% of revenues. The Company expects expenses for sales and marketing to decline in 2006 as a result of headcount reductions, shifting its distribution model to rely more on distribution partners for international sales, and reducing advertising expenditures.

General and Administrative

General and administrative expenses consist primarily of salary and benefits for administrative officers and support personnel, travel expenses and legal, accounting and consulting fees. In the three months ended September 30, 2005, general and administrative expenses were $5.6 million or 24% of revenues. This is an increase of $3.2 million from general and administrative expenses for the three months ended September 30, 2004, in which expenses were $2.4 million or 8% of revenues. The increase was primarily attributable to a $2.6 million net expense for the settlement of the litigation with Adelphia in the third quarter of 2005. In the nine months ended September 30, 2005, general and administrative expenses were $12.6 million or 21% of revenues. This is a $3.5 million increase from general and administrative expenses for the nine months ended September 30, 2004, in which expenses were $9.1 million or 8% of revenues. The Company currently expects general and administrative expenses to increase significantly in 2006 when compared to 2005 because of increased audit, consulting and legal costs associated with the restatement.

Restructuring Costs

During 2005, the Company continued restructuring activities related to its decision to cease investment in its CMTS product line. In the quarters ended March 31, 2005 and June 30, 2005, the Company incurred net restructuring charges of $0.7 million and $0.3 million, respectively, related to employee termination costs.

In the first three quarters of 2005, the Company re-evaluated the charges for excess leased facilities accrued as part of the 2001 and 2004 restructuring plans. During the three quarters ended September 30, 2005, the Company decreased accrual by $0.3 million for the 2001 restructuring plan and increased the accrual by $0.9 million for the 2004 restructuring plan.

Net charges for restructuring that occurred in 2005 totaled $2.2 million, comprised of $1.0 million for employee terminations, $1.1 million for excess leased facilities and $0.1 million related to the aircraft lease.

The Company anticipates the remaining restructuring accrual related to the aircraft lease, net of the sublease income related to the aircraft, to be substantially utilized for servicing operating lease payments through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments through October 2009.

The reserve for leased facilities, net of sublease income, approximates the difference between the Company's current costs for the excess leased facilities, which is its former principal executive offices located in Santa Clara, California, and the estimated income derived from subleasing the facilities, which was based on information derived by brokers that estimated real estate market conditions as of the date of the implementation of the

183

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

restructuring plan and the time it would likely take to fully sublease the
excess leased facilities. The Company sub-subleased the Santa Clara facility
effective as of August 2006, with the sub-sublease commencing on October 1,
2006.

Executive Severance

In August 2004, the Company entered into an employment agreement with an
executive officer who resigned effective December 31, 2004 with a termination
date of February 3, 2005. The Company recorded a severance provision of $0.4
million related to termination costs for this officer in the quarter ended
December 31, 2004. Most of the severance costs related to this officer were paid
in the quarter ended March 31, 2005 with nominal amounts for employee benefits
payable through the quarter ended March 31, 2006.

Asset Write-offs

There were no material asset write-offs in 2005. As a result of CMTS product
line restructuring activities in 2004, the Company recognized a fixed asset
impairment charge of $2.4 million. The impairment charge reflected a write-down
of the assets' carrying value to a fair value based on a third party valuation.

Non-operating Expenses

The following summarizes interest income (expense), net and other income
(expense), net for the three and nine months ended September 30, 2005 and 2004
(in thousands, except percentages) (unaudited):

|  | Three Months Ended | | | | Nine Months Ended | | | |
|  | Sept. 30, 2005 | Sept. 30, 2004 | Variance in Dollars | Variance in Percent | Sept. 30, 2005 | Sept. 30, 2004 | Variance in Dollars | Variance in Percent |
|  | (as restated)(1) | (as restated)(1) | (as restated)(1) | | (as restated)(1) | (as restated)(1) | (as restated)(1) | |
| Interest income (expense), net | $    21 | $ (232) | $    253 | (109.1)% | $ (255) | $ (853) | $    598 | (70.1)% |
| Other income (expense), net | 1,180 | (45) | 1,225 | (2,722.2)% | 1,195 | 1,167 | 28 | 2.4% |

(1) See Note 3, "Restatement of Consolidated Financial Statements," to
    Consolidated Financial Statements.

Interest Income.  Interest income increased in the three and nine months ended
September 30, 2005 compared to the same periods in 2004. The increase in
interest income was primarily due to slightly higher interest rates.

Interest Expense.  Interest expense, which related primarily to interest payment
of the Notes, remained constant in the three and nine months ended September 30,
2005 compared to the same periods in 2004.

Other Income.  Other income is generally comprised of realization of foreign
currency gains and losses, realized gains or losses on investments, and
non-operational gains and losses. In the third quarter of 2005, the Company sold
all of its ownership in Terayon Communication Systems Ltd. (formerly known as
Telegate Ltd. (Telegate)) to a third party for a cash payment of NIS 1. In
connection with this disposition, the acquirer received obsolete inventory with
no book value, $1.6 million of selected net assets, and assumed $1.9 million of
net liabilities related to this subsidiary. Additionally, the third party agreed
to assume all warranty and service obligations related to the Telegate product.
The Company recognized a net gain of $0.7 million, which is included as a
component of other income (expense), net.

184

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Contractual Obligations

The following summarizes the Company's contractual obligations at September 30, 2005, and the effect such obligations are expected to have on the Company's liquidity and cash flows in future periods (in millions) (unaudited):

| | | Payments Due by Period | | | |
| | Total | Less Than 1 Year | 1 - 3 Years | 4 - 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Unconditional purchase obligations | $15.4 | $ 15.3 | $ 0.1 | $ -- | $ -- |
| Long-term debt | 65.1 | -- | 65.1 | -- | -- |
| Operating lease obligations | 12.9 | 3.4 | 6.2 | 3.3 | -- |
| Aircraft lease obligation | 1.9 | 1.5 | 0.4 | -- | -- |
| Total | $95.3 | $ 20.2 | $71.8 | $ 3.3 | $ -- |

The Company has unconditional purchase obligations to certain of suppliers that support the Company's ability to manufacture its products. The obligations require the Company to purchase minimum quantities of the suppliers' products at a specified price. As of September 30, 2005, the Company had approximately $15.4 million of purchase obligations, of which $0.2 million is included in the Condensed Consolidated Balance Sheet as accrued vendor cancellation charges, and the remaining $15.2 million is attributable to open purchase orders. The remaining obligations are expected to become payable at various times through 2005. However, in March 2006, the Company paid off the principal amount of the Outstanding Notes, which was $65.1 million.

Other commercial commitments, primarily required to support operating leases, are as follows (in millions) (unaudited):

| | | Amount of Commitment Expiration per Period | | | |
| | Total | Less Than 1 Year | 1 - 3 Years | 4 - 5 Years | After 5 Years |
|---|---|---|---|---|---|
| Deposits | $ 8.2 | $ 0.7 | $ 7.5 | $ -- | $ -- |
| Standby letters of credit | 0.5 | 0.2 | -- | 0.3 | -- |
| Total | $ 8.7 | $ 0.9 | $ 7.5 | $ 0.3 | $ -- |

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit. The letter of credit was reduced to $7.5 million in February 2003. During 2004 the $7.5 million letter of credit was converted to a cash deposit. This lease commitment is included in the table above. In March 2004, in connection with the worldwide restructuring, the Company notified the lessor of its intentions to locate a purchaser for its remaining obligations under this lease. In August 2004, the Company entered into an agreement with a third party to sublease the corporate aircraft through December 31, 2006.

185

--------------------------------------------------------------------------------

Table of Contents

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Information regarding the change in accountants is incorporated herein by reference to Forms 8-K and 8-K/A filed on September 27, 2005 and October 17, 2005, respectively.

Item 9A. Controls and Procedures

Evaluation of Disclosure Controls and Procedures

The Company is required to maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in its reports under the Securities Exchange Act of 1934, as amended (Exchange Act), is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms, and that such information is accumulated and communicated to management, including the Company's Chief Executive Officer (CEO) and Chief Financial Officer (CFO) as appropriate, to allow timely decisions regarding required disclosure.

In connection with the preparation of this Form 10-K for the year ended December 31, 2005, management, under the supervision of the CEO and CFO, conducted an evaluation of disclosure controls and procedures. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control systems are met. Based on that evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2005 due to the material weaknesses discussed below. Because the material weaknesses described below have not been remediated as of the filing date of this Form 10-K, the CEO and CFO continue to conclude that the Company's disclosure controls and procedures are not effective as of the filing date of this Form 10-K.

Management's Report on Internal Control over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control structure and procedures over financial reporting (as defined in Rules 13a-15(e) and 15d-15(e)) under the Exchange Act. Management conducted an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005 based on the framework set forth in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Internal control over financial reporting cannot provide absolute assurance of achieving financial reporting objectives because of its inherent limitations. Internal control over financial reporting is a process that involves human diligence and compliance and is subject to lapses in judgment and breakdowns resulting from human failures. Because of such limitations, there is a risk that material misstatements may not be prevented or detected on a timely basis by internal control over financial reporting. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management engaged experienced consultants to assist management with the Company's assessment of the effectiveness of internal control over financial reporting.

A material weakness in internal control over financial reporting is defined by the Public Company Accounting Oversight Board's Audit Standard No. 2 as being a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements would not be prevented or detected. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Company's ability to initiate, authorize, record, process or report external financial data reliably in accordance with generally accepted accounting principles (GAAP) such that there is more than a remote likelihood that a misstatement of the Company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.

Based on the results of management's assessment and evaluation of the remediation steps listed below, the CEO and CFO concluded that the remediation initiatives undertaken in response to material weaknesses identified in 2004 (failure to prepare the Company's periodic reports in accordance with GAAP due to the lack of sufficient accounting and finance personnel with technical accounting expertise and inadequate review and approval procedures and the inadequacy of communication of financially significant information between certain parts

186

--------------------------------------------------------------------------------

of the Company's organization and the accounting and finance organization) did not result in the remediation of the material weaknesses.

During the quarter ended June 30, 2005 and through the date of the filing of this Form 10-K, and in response to the material weaknesses identified as of December 31, 2004 and March 31, 2005, the Company implemented the following steps to remediate the deficiencies in disclosure controls and procedures and material weaknesses in internal control over financial reporting:

*established procedures to document the review of press releases to account for transactions in a complete and timely manner;

*engaged the former Assistant Controller, who had significant SEC reporting experience, to serve as the Company's Controller and to supervise the Company's financial reporting to ensure compliance with SEC requirements. During the quarter ended June 30, 2006, the Controller left the Company, and the Company then engaged experienced accounting consultants to act as the VP Finance, Corporate Controller and Revenue Recognition Accountant; and

*improved the internal process of drafting and reviewing periodic reports by implementing additional management and external legal counsel review prior to their submission to the Company's independent registered public accounting firm.

Because management was not able to fully execute the remediation plans that were established to address the material weaknesses identified in 2004, these material weaknesses were unremediated and remained ongoing as of December 31, 2005 and as of the date of this filing. Management's process for assessing internal control over financial reporting, as of December 31, 2005, was delayed as a result of the restatement of the Company's prior years' consolidated financial statements, which did not conclude until December 2006. Additional material weaknesses were identified during the restatement process. Management identified the following material weaknesses as of December 31, 2005 and during the restatement process relating to the Company's internal control over financial reporting:

*insufficient controls related to the identification, capture and timely communication of financially significant information between certain parts of the organization and the accounting and finance department to enable these departments to account for transactions in a complete and timely manner;

*lack of sufficient personnel with technical accounting expertise in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP;

*failure in identifying the proper recognition of revenue in accordance with GAAP, including revenue recognized in accordance with Statement of Position (SOP) 97-2, "Software Revenue Recognition" (SOP 97-2), Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition" (SAB 101), as amended by SAB No. 104 (SAB 104), SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" (SOP 81-1), Financial Accounting Standards Board, Emerging Issues Task Force (EITF) 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables" (EITF 00-21);

*the use of estimates, including monitoring and adjusting balances related to certain accruals and reserves, including allowance for doubtful accounts, legal charges, license fees, restructuring charges, taxes, warranty obligations and fixed assets;

*lack of sufficient analysis and documentation of the application of GAAP; and

*ineffective controls over the documentation, authorization and review of manual journal entries and ineffective controls to ensure the accuracy and completeness of certain general ledger account reconciliations conducted in connection with period end financial reporting.

Because of the material weaknesses, the CEO and CFO concluded that the Company did not maintain effective internal control over financial reporting at a reasonable assurance level as of December 31, 2005 or at the date of this filing.

187

--------------------------------------------------------------------------------

Table of Contents

The Company's independent registered public accounting firm, Stonefield Josephson, Inc. (Stonefield), has issued an attestation report on management's assessment and the effectiveness of the Company's internal control over financial reporting. The attestation report is included in the Report of Stonefield and appears under Item 8 -- Financial Statements and Supplementary Data.

Changes in Internal Control over Financial Reporting

As disclosed in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, in connection with the preparation of that report and in consultation with Ernst & Young LLP, the Company's former independent registered public accountants, the Company determined that, due to deficiencies in communication of financially significant information between certain parts of the Company's organization and the accounting and finance organization (in particular the sales organization and the accounting and finance department), its disclosure controls and procedures and internal control over financial reporting were not effective. As previously disclosed, under the direction of the Company's Audit Committee and with the participation of senior management, the Company took steps designed to ensure that organizations within it would communicate with one another to further strengthen the Company's internal controls. These steps include increasing the scope of executive staff meetings held on a weekly basis, quarterly disclosure committee meetings, which include the heads of operational groups (including sales, accounting and finance), the completion of disclosure committee procedures by each member of the disclosure committee, training provided to employees on the procedures followed for reporting transactions to finance and emphasizing the importance of promptly communicating with the accounting and finance organization, and additional training provided to the sales organization on prompt communication and appropriate documentation.

In addition, in connection with our review of our disclosure controls and procedures as of December 31, 2004, we determined that procedures related to controls over the preparation and review of the 2004 Annual Report on Form 10-K were not effective. The insufficient controls included a lack of sufficient personnel with technical accounting expertise in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP.

In connection with the review of disclosure controls and procedures as of December 31, 2005, the Company determined that its revised communication procedures lacked sufficient documentation to permit verification of the operation of this control. Since the Company was not reporting its financial information, this lack of documentation resulted from the suspension of regular meetings of the disclosure committee. Additionally, the Company did not complete the disclosure procedures required by disclosure committee members on a quarterly basis during the period that the Company was preparing the restatement of its financials, as well as a lack of documentation related to the training of the sales organization. In addition, the Company has been relying on experienced accounting consultants to provide the technical accounting expertise and has not yet hired permanent personnel with this expertise. As a result, as discussed above in Management's Report of Internal Controls over Financial Reporting, the Company concluded that it failed to remediate the previously identified material weaknesses; therefore, the following material weaknesses constitute ongoing material weaknesses in internal control over financial reporting as of December 31, 2005 and at the date of this filing:

*insufficient controls related to the identification, capture and timely communication of financially significant information between certain parts of the organization and the accounting and finance department to enable these departments to account for transactions in a complete and timely manner; and

*lack of sufficient personnel with technical accounting expertise in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP.

Detailed Discussion of Material Weaknesses

In addition to the two ongoing material weaknesses described above, management identified four additional material weaknesses as of December 31, 2005 and during the restatement process.

188

--------------------------------------------------------------------------------

Table of Contents

Revenue Recognition.  The Company did not properly recognize revenue on its video products in accordance with GAAP, specifically SOP 97-2, SAB 104 and EITF 00-21. The Company also did not properly account for a product development project in accordance with SOP 81-1 and did not properly account for deferred revenue and related cost of goods sold.

*The Company acquired its video products as part of acquisitions completed by the Company in 1999 and 2000, and at that time determined that the products would be accounted for under SAB 101, as amended by SAB 104. The Company did not sufficiently evaluate its video products and continued to account for its video products in accordance with SAB 104 when revenue on the video products should have been accounted for in accordance with the software revenue recognition principles under
SOP 97-2.
Additionally, the Company sold maintenance support contracts that included software upgrades with its video products and did not establish vendor specific objective evidence (VSOE) of fair value on the pricing of such maintenance contracts in accordance with
SOP 97-2,
SAB 104 and EITF
00-21.
Because the Company continued to account for the video products and maintenance sold with the video products under SAB 104, the Company did not take the steps necessary to establish VSOE of fair value on the pricing of its maintenance products and revenue was recognized during incorrect periods.

*The Company did not properly account for a significant transaction whereby it developed a broadcast platform based on its DM 6400 product to sell to its customer Thomson Broadcast (Thomson) in accordance with project accounting under
SOP 81-1,
SAB 104 and EITF
00-21.
The Company entered into an agreement with Thomson in December 2003 where it agreed to develop a statistical remultiplexing product that would include certain features and functionality (BP 5100) agreed upon by the parties, as well as maintenance of the products purchased by Thomson for a period of one year. In September 2004, Thomson accepted the BP 5100 and the Company recognized revenue on the products sold through September 2004 and the maintenance provided through September 2004. In December 2004, the Company recognized revenue on the BP 5100s sold to Thomson and the maintenance provided to Thomson in the quarter ended December 31, 2004. In December 2004, the Company extended its agreement with Thomson by agreeing to develop an additional software release containing additional features and functionality that were not developed under the original agreement and providing product maintenance for an additional period of one year. The Company should have accounted for the transaction as a multiple element arrangement under
SOP 97-2
and adopted the completed contract recognition criteria under
SOP 81-1,
which would have required the Company to delay recognizing revenue under its agreement with Thomson until December 2005 when the Company completed its deliverables under the agreement.

*The Company incorrectly recorded deferred revenue and cost of goods sold on the balance sheet for certain transactions. As a result of the Company's focus on revenue recognition more generally as described above, the Company identified specific invoices for which deferred revenue for these sales had been recognized but the criteria for revenue recognition had not been met, including the criteria that delivery or performance had occurred, the fees were fixed or determinable or that collectibility was reasonably assured. Accordingly, the Company corrected these errors in deferred revenue, deferred cost of goods sold, inventory and accounts receivable accounts and recognized revenue when title transferred or customer payments were reasonably assured and all criteria for revenue recognition were met.

The Use of Estimates.  The Company lacked policies and procedures for determining estimates and monitoring and adjusting balances related to certain accruals and provisions, and also lacked support for its conclusions on those estimates.

*The Company did not effectively monitor and adjust reserves related to its restructuring charges. In 2001, the Company restructured a portion of its leased facilities in Israel. The Company did not sufficiently review its restructuring charges to account for its rental of the restructured facilities such that at one point, the restructuring reserve exceeded the amount of rent due under the lease.

*The Company over accrued reserves related to the payment of legal fees, taxes and other liabilities owed to third party vendors. The Company did not have controls in place to accurately estimate the accruals.

--------------------------------------------------------------------------------

Table of Contents

*The Company used the wrong methodology to account for a prepaid license fee associated with the research and development of one of its product lines. The Company prepaid a license fee of $2.0 million to license technology to incorporate into the semiconductor chip used in its cable modem and eMTA products. Additionally, as part of the license agreement, the Company was required to pay a royalty of $1.00 per semiconductor chip sold to a third party. When the Company selected the method of amortization to be applied to the $2.0 million license fee, the Company opted to amortize $1.00 per chip for each chip utilized in the modem and eMTA products based on the third party rate established in the license agreement. However, the Company amortized the $2.0 million over the production of the semiconductor chips and not the sale of the modem and eMTA products containing the semiconductor chips. In hindsight, the Company should have used the useful life method, which resulted in quarterly adjustments as the royalty of $1.00 was overstated.

*The Company did not properly account for warranty obligations related to the sale of certain assets. In July 2003, the Company sold certain assets related to one of its products to a third party. Under the terms of the sale, the Company agreed to assume up to $1.0 million warranty obligation on the product related to the complaint of one customer. The Company recorded the $1.0 million as an accrued warranty liability. The Company amortized $0.8 million of the $1.0 million obligation during 2004. However, during the course of the restatement, the Company determined that the obligation should not have been relieved unless either there was other actual expenses incurred in connection with the obligation or upon the actual expiration of the warranty. Since the Company did not incur any expenses in connection with this obligation, the Company corrected this error by increasing the accrual $0.2 million in each quarter of 2004. Accordingly, the warranty obligation of $1.0 million was relieved at March 31, 2005 at the expiration of the warranty term.

Qualified Accounting Personnel.  The Company did not have adequate personnel in its accounting and finance department, and additionally lacked sufficient qualified accounting and finance personnel to identify and resolve complex accounting issues in accordance with GAAP.
Inadequate Controls over Documentation and Record Keeping.

*The Company did not have sufficient controls to address the amendment of sales orders with its customers. Sales orders could be amended through the amendment of the sales orders, purchase orders and agreements. When sales were amended through sales or purchase orders, the person processing the amendments would exercise discretion in inputting the revised terms and conditions and there was no consistent policy requiring the accounting and finance department to approve such amendments or even informing the accounting and finance department of such amendments.

*The Company did not retain certain corporate records in conjunction with the sale of certain subsidiaries to third parties.

*The Company did not have sufficient controls in place to ensure the proper authorization and review of manual journal entries and the associated support documentation. Additionally, the Company did not keep adequate documentation related to the reconciliation of certain general ledger accounts.

Remediation Steps to Address Material Weaknesses
In an effort to remediate the identified material weaknesses, management is in the process of implementing the following steps. As of the date of the filing of this Form 10-K, the material weaknesses identified by management (and discussed above) have not been remediated. Management does not anticipate that the material weaknesses will be remediated until the second half of the year ended December 31, 2007.
Communication of Financial Information.

*During the quarter ended June 30, 2005, the Company established procedures to document the review of press releases to account for transactions in a complete and timely manner.

190

--------------------------------------------------------------------------------

Table of Contents

*During the quarter ended June 30, 2005, the Company also improved the internal process of drafting and reviewing periodic reports by implementing additional management and external legal counsel review prior to their submission to the Company's independent registered public accounting firm.

*Continue to monitor the communication channels between our senior management and our accounting and finance department and take prompt action, as necessary, to further strengthen these communication channels;

*Increase staffing in the accounting and finance department;

*Re-allocate duties to persons within the accounting and finance organization to maximize their skills and experience;

*Implement training procedures for new employees and/or consultants in the accounting and finance department on our disclosure procedures and controls, our Company and our actions in previous reporting periods; and

*Take steps to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.

Revenue Recognition.

*During the first three quarters of 2006, the Company's accounting and finance department, with the assistance of outside consultants, implemented procedures to recognize sales of its video products under the software accounting rules under
SOP 97-2
in accordance with GAAP.

*In 2006, the Company established pricing guidelines and internal procedures to ensure consistent pricing to allow for the establishment of VSOE of fair value for sales made with multiple element arrangements.

*During the second and third quarters of 2005, the accounting and finance department established procedures surrounding the month-end close process to ensure that the information and estimates necessary for recognizing revenue in accordance with
SOP 97-2
were available.

*The Company will provide its accounting staff with training on revenue recognition, including software accounting and project accounting, and GAAP, including attending seminars and conferences. Additional training will be provided on a regular and periodic basis and updated as considered necessary.

*During the quarter ended March 31, 2006, the Company hired an experienced revenue accountant to review all revenue transactions and to ensure that revenues, cost of goods sold, deferred revenue and deferred cost of goods sold are properly accounted for in accordance with GAAP and the Company's policies. This accountant will leave the Company following the completion of the restatement, and the Company intends to hire a replacement.

Use of Estimates.

*The Company has engaged the services of experienced accounting consultants to review the Company's books and close procedures on a monthly basis to assist management in ensuring that the Company's financial statements are being recorded in accordance with GAAP.

*The Company continues to engage the services of an outside tax accounting firm to assist with the calculation of the Company's tax liabilities.

*During the quarter ended September 30, 2006, the Company established a process where all significant accruals must be reviewed and approved by the Corporate Controller.

*During the quarter ended June 30, 2006, the Company implemented a process to obtain and assess accruals for legal costs and expenses owed to third party vendors whereby the Company's legal department obtains monthly estimates from the third party vendors and reviews the amount reported by third party vendors for accuracy.

--------------------------------------------------------------------------------

Table of Contents

Accounting Personnel.

*During the quarter ended June 30, 2006, the Company engaged experienced
 accounting consultants to act as the VP Finance, Corporate Controller and
 Revenue Recognition Accountant.

*During the second, third and fourth quarters of 2006, the Company engaged
 expert accounting consultants to assist the Company's accounting and finance
 department with the management and implementation of controls surrounding
 revenue recognition, the administration of existing controls and procedures,
 the preparation of the Company's periodic reports and the documentation of
 complex accounting transactions.

*The Company continues to take steps to recruit additional qualified senior
 accounting personnel, including certified public accountants personnel with
 recent public accounting firm experience.

Record Keeping and Documentation.

*During the quarter ended March 31, 2007, the Company's employees involved in
 order entry will receive training regarding the controls and procedures
 surrounding the amendment of sales orders. Additional training will be provided
 on a regular and periodic basis and updated as necessary to reflect any changes
 in the Company's or its customers' business practices or activities.

*During the quarter ended June 30, 2006, the Company entered into agreements
 with third parties that purchased assets from the Company in Israel. These
 agreements provide the Company with access to the corporate records and require
 the third parties to retain documents in accordance with Israeli law.

*The Company has adopted a policy requiring it to retain a copy of all corporate
 records in connection with dispositions of assets to third parties.

*The Company has established policies and procedures for the review and
 approvals of all manual journal entries.

*Improving the review process that occurs prior to providing the initial draft
 of the periodic report to our independent auditors for review.

*The Company has developed monthly close schedules which include the timeline
 for completion and approval of reconciliations by the Corporate Controller.

Subsequent Changes in Internal Control over Financial Reporting
Except for the changes in connection with the remediation subsequent to December
31, 2005 of the material weaknesses described above, there were no changes in
the Company's internal control over financial reporting that occurred during the
year ended December 31, 2005 that have materially affected, or are reasonably
likely to materially affect, its internal control over financial reporting.
Report of Independent Registered Public Accounting Firm
         REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON
               INTERNAL CONTROL OVER FINANCIAL REPORTING
The Board of Directors and
Shareholders of Terayon Communication Systems, Inc.
We have audited management's assessment, included in Management's Report on
Internal Control Over Financial Reporting in Item 9A, that Terayon Communication
Systems, Inc. ("Terayon") did not maintain effective internal control over
financial reporting as of December 31, 2005 because of the effect of the
material weaknesses described in management's assessment, based on criteria
established in Internal Control -- Integrated Framework issued by the Committee
of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria).
Terayon's management is responsible for maintaining effective internal control
over financial reporting and for its assessment of the effectiveness of internal
control over financial reporting. Our responsibility is to express an

                                    192

--------------------------------------------------------------------------------

Table of Contents

opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit. We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:

Management identified a material weakness due to insufficient controls related to the identification, capture, and timely communication of financially significant information between certain parts of the organization and the accounting and finance department to enable these departments to account for transactions in a complete and timely manner

Management also identified a material weakness due to the lack of sufficient personnel with technical accounting expertise in the accounting and finance department and inadequate review and approval procedures to prepare external financial statements in accordance with generally accepted accounting principles (GAAP).

Management identified a material weakness due to its failure in identifying proper revenue recognition in accordance with GAAP, including revenue recognized on long term construction and production type contracts, accounting for revenue arrangements with multiple deliverables and software revenue recognition.

Management identified a material weakness in the use of estimates, including monitoring and adjusting balances related to certain accruals and reserves, including allowance for doubtful accounts, legal charges, license fees, restructuring charges, taxes, warranty obligations and fixed assets.

Management identified a material weakness in the lack of sufficient analysis and documentation of the application of GAAP.

Management identified a material weakness in its ineffective controls over the documentation, authorization and review of manual journal entries and ineffective controls to ensure the accuracy and completeness of certain general ledger account reconciliations conducted in connection with period end financial reporting.

As a result of these material weaknesses, management restated its financial statements for certain prior periods and made substantial revisions to its 2005 consolidated financial statements and footnote disclosures before they

193

--------------------------------------------------------------------------------

Table of Contents

were issued, including: recording numerous adjustments and restatements to
certain accruals and reserves, including the provision for bad debts, deferred
revenues and cost of revenues, legal and professional charges, license fees, and
fixed assets warranty obligations, restructuring charges, bond issue costs and
identification of embedded derivatives; and making adjustments for revenue
recognition and related cost of goods sold.

These material weaknesses were considered in determining the nature, timing, and
extent of audit tests applied in our audit of the 2005 consolidated financial
statements, and this report does not affect our report dated December 6, 2006 on
those financial statements.

In our opinion, management's assessment that Terayon Communication Systems, Inc.
did not maintain effective internal control over financial reporting as of
December 31, 2005 is fairly stated, in all material respects, based on the COSO
control criteria. Also, in our opinion, because of the effect of the material
weaknesses described above on the achievement of the objectives of the control
criteria, Terayon Communication Systems, Inc. has not maintained effective
internal control over financial reporting as of December 31, 2005, based on the
COSO control criteria.

We have also audited, in accordance with the standards of the Public Company
Accounting Oversight Board (United States), the consolidated balance sheets of
Terayon Communication Systems, Inc. as of December 31, 2005 and 2004 and the
related consolidated statements of operations, stockholders' equity and cash
flows for each of the three years in the period ended December 31, 2005, and our
report dated December 6, 2006, expressed an unqualified opinion on those
consolidated financial statements.

/s/ Stonefield Josephson, Inc.
San Francisco, California
December 6, 2006
Item 9B.  Other Information
Not applicable.

PART III


Item 10.Directors and Executive Officers of the Registrant

Certain information regarding the Company's directors and executive officers as
of December 1, 2006, is set forth below.


| Name | Age | Position |
| --- | --- | --- |
| Jerry D. Chase | 47 | Chief Executive Officer and Director |
| Mark A. Richman | 46 | Chief Financial Officer and Senior Vice President, Finance and Administration |
| Matthew J. Aden | 50 | Senior Vice President, Global Sales and Customer Support |
| Zaki Rakib | 48 | Chairman of the Board and Director |
| Matthew Miller(2) | 59 | Director |
| Shlomo Rakib | 49 | Director |
| Lewis Solomon(1)(2)(3) | 73 | Director |
| Howard W. Speaks, Jr.(1)(2) | 58 | Director |
| David Woodrow(1)(3) | 60 | Director |


(1)Member of Audit Committee
(2)Member of Compensation Committee
(3)Member of Nominating and Governance Committee

194

--------------------------------------------------------------------------------

Table of Contents

Jerry D. Chase has served as Chief Executive Officer and a director of the Company since September 2004. He was the Chairman and Chief Executive Officer of Thales Broadcast & Multimedia (TBM), a telecom and test equipment supplier, from 2001 to August 2004, and was President and Chief Executive Officer of the U.S. subsidiary of TBM from 1998 to 2001. During Mr. Chase's tenure, TBM took a leading market position in providing systems solutions for MPEG and IP video over DSL networks and won two Technical Emmy Awards. Mr. Chase is a former United States Marine Corps Officer and a recipient of the American Legion Aviator's Valor Award. He holds a Bachelor of Science degree in Business Administration from East Carolina University and an MBA from Harvard University.

Mark A. Richman has served as Chief Financial Officer and Senior Vice President, Finance and Administration of the Company since November 2004. Prior to joining the Company, Mr. Richman served as Senior Vice President and Chief Financial Officer of Covad Communication Systems, Inc. (Covad), a broadband communications provider, beginning in September 2001 and became Executive Vice President and Chief Financial Officer of Covad in May 2002. Mr. Richman was appointed Chief Financial Officer of Covad after it filed for Chapter 11 bankruptcy protection. Prior to joining Covad, Mr. Richman served as Vice President and Chief Financial Officer of Main Street Networks from June 2000 to August 2001. From October 1996 to June 2000, Mr. Richman served as Vice President and Corporate Treasurer of Adecco S.A. and as Vice President of Finance and Administration for its subsidiary, Adecco U.S. From February 1994 to October 1996, he was Director of Finance for Merisel, Inc. Mr. Richman holds a B.S. degree in Managerial Economics from the University of California, Davis and an MBA from the University of California, Los Angeles.

Mathew J. Aden joined the Company in July 2005 as Senior Vice President, Global Sales and Customer Support. Prior to joining the Company, Mr. Aden served at Motorola Connected Home Solutions, a division of Motorola, Inc. At Motorola Connected Home Solutions, Mr. Aden served as Senior Vice President, Sales and Customer Operations from July 2002 to 2004, Senior Vice President and General Manager of the Digital Media Group from January 2002 to June 2002, and Corporate Vice President, Director Worldwide Sales and Support from January 2000 to December 2001. Mr. Aden holds a Bachelors Degree in Business Administration from the University of Nebraska.

Dr. Zaki Rakib co-founded the Company in 1993 and serves as the Chairman of the Board of Directors and the Secretary of the Company. From January 1993 to September 2004, Dr. Rakib served as the Chief Executive Officer of the Company and from January 1993 to July 1998, Dr. Rakib also served as Chief Financial Officer of the Company. Currently, Dr. Rakib is the Chief Executive Officer of Novafora, Inc., a privately held semiconductor company, and owns and is the Chairman of Zaki Enterprises, a corporation engaged in developing new businesses and venture opportunities in various industries. Prior to co-founding the Company, Dr. Rakib served as Director of Engineering for Cadence Design Systems (Cadence), an electronic design automation software company, from 1990 to 1994, when he joined the Company. Prior to joining Cadence, Dr. Rakib was Vice President of Engineering at Helios Software, which was acquired by Cadence in 1990. Dr. Rakib is also a director of a privately held company. Dr. Rakib holds B.S., M.S. and Ph.D. degrees in engineering from Ben-Gurion University in Israel. Dr. Rakib is the brother of Shlomo Rakib, a director of the Company.

Dr. Matthew Miller has served as a director of the Company since July 2004. Since February 2004, Dr. Miller has been the President and Chief Executive Officer of Multispectral Imaging, Inc., a venture-financed company developing applications for night vision and thermal imaging. Dr. Miller served as Chief Executive Officer of NxtWave Communications, a leading supplier of semiconductor chips for emerging digital television markets worldwide, from 1997 until its acquisition in 2002 by ATI Technologies, Inc. Prior to NxtWave, Dr. Miller was Vice President of Technology at General Instrument Corporation from 1988 to 1994, where he made major contributions to the development of digital television, optical communications for cable television and cable modems. Dr. Miller also serves on the board of a privately held company. Dr. Miller holds a bachelor's degree from Harvard University and a Ph.D. from Princeton University.

Shlomo Rakib co-founded the Company in 1993 and currently serves as a director. Mr. Rakib served as Chairman of the Board of the Company from January 1993 until September 2004 and as Chief Technical Officer and President from February 1995 until October 2004. Currently, Mr. Rakib is the Chief Technology Officer of Novafora, Inc., a privately held semiconductor company. Prior to co-founding the Company, Mr. Rakib served as

195

--------------------------------------------------------------------------------

Table of Contents

Chief Engineer at PhaseCom, Inc., a communications products company, from 1981 to 1993, where he pioneered the development of data and telephony applications over cable. Mr. Rakib is the inventor of several patented technologies in the area of data and telephony applications over cable. Mr. Rakib is a director of several privately held companies. Mr. Rakib holds a B.S.E.E. degree from Technion University in Israel. Mr. Rakib is the brother of Zaki Rakib, the Company's Chairman of the Board and Secretary.

Lewis Solomon has served as a director of the Company since March 1995. Mr. Solomon has been a principal of G&L Investments, a consulting firm, since 1989. From 1983 to 1988, Mr. Solomon served as Executive Vice President at Alan Patricof Associates, a venture capital firm focused on high technology, biotechnology and communications industries. Prior to that, Mr. Solomon served in various capacities with General Instrument Corporation, most recently as Senior Vice President. From April 1986 to January 1997, he served as Chairman of the Board of Cybernetic Services, Inc., a LED systems manufacturer, which commenced a Chapter 7 bankruptcy proceeding in April 1997. From October 1999 until July 2004, Mr. Solomon was Chief Executive Officer of Broadband Services, Inc., which commenced a Chapter 7 bankruptcy proceeding in July 2004. Mr. Solomon serves on the boards of Anadigics, Inc., a manufacturer of integrated circuits, and Harmonic, Inc., a company that designs, manufacturer and markets digital and fiberoptic systems. Mr. Solomon also serves on the board of a privately held company. Mr. Solomon holds a Bachelor of Science degree in Physics from St. Joseph's College.

Howard W. Speaks, Jr. has served as a director of the Company since May 2004. Mr. Speaks has been the Chief Executive Officer of Rosum Corporation, a maker of global positioning system products, since August 2003. Previously, Mr. Speaks was President and Chief Executive Officer of Kyocera Wireless Corporation, a developer and manufacturer of wireless phones and accessories, from August 2001 to August 2003; President and Chief Executive Officer of Triton Network Systems, Inc., a wireless communications equipment company, from September 1999 to August 2001; Executive Vice President and General Manager, Network Operators Group of Ericsson, Inc. from 1998 to 1999; Executive Vice President and General Manager, Wireless Division of Ericsson, Inc. from 1997 to 1998; and Vice President, Western Region of Ericsson, Inc. from 1995 to 1997. Mr. Speaks is a director of Glenayre Technologies, a supplier of wireless data infrastructure and a manufacturer and distributor of pre-recorded entertainment products. Mr. Speaks also serves on the board of a privately held company. Mr. Speaks holds a Bachelor of Science degree in Civil Engineering from West Virginia Institute of Technology.

David Woodrow has served as a director of the Company since June 2002. From September 2000 until March 2002, Mr. Woodrow served as the Chief Executive Officer and President of Qwest Digital Media LLC, a production and digital media management company. From 1982 until September 2000, Mr. Woodrow held a number of senior management positions, most recently serving as the Executive Vice President, Broadband Services, with Cox Communications, Inc., a major cable operator in the United States. Mr. Woodrow is a director of several privately held companies. Mr. Woodrow holds B.S. and M.S. degrees in mechanical engineering from Purdue University and an M.B.A. from the University of Connecticut.

Board Committees and Meetings

Audit Committee

The Audit Committee of the Board of Directors oversees the Company's financial reporting process. For this purpose, the Audit Committee reviews auditing, accounting, financial reporting and internal control functions and selects and engages the Company's independent auditors. In discharging its duties, the Audit Committee reviews and approves the scope of the annual audit, non-audit services to be performed by the independent auditors and the independent auditors' audit and non-audit fees; recommends to the Board of Directors that the audited financial statements be included in the Annual Report on Form 10-K for filing with the Commission; meets independently with the Company's independent auditors and senior management; and reviews the general scope of the Company's accounting, financial reporting, annual audit and matters relating to internal control systems, as well as the results of the annual audit and interim financial statements, auditor independence issues and the adequacy of the Audit Committee charter. The Audit Committee monitors the Company's compliance with laws and regulations and standards of business conduct. The Audit Committee has also established procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or

--------------------------------------------------------------------------------

Table of Contents

auditing matters, and (b) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

The current members of the Audit Committee are Messrs. Solomon, Speaks and Woodrow. Mr. Slaven, who formerly served as the Chair of the Audit Committee, resigned as of August 2, 2006. After considering transactions and relationships between each member of the Audit Committee or his immediate family and the Company and its subsidiaries and reviewing the qualifications of the members of the Audit Committee, the Board of Directors has determined that all current members of the Audit Committee are: (1) "independent" as that term is defined in Section 10A of the Securities and Exchange Act; (2) "independent" as that term is defined in Rule 4200 of the listing standards of The NASDAQ Stock Market; and (3) financially literate and have the requisite financial sophistication as required by the NASDAQ rules applicable to issuers listed on The NASDAQ Stock Market.

The Audit Committee operates under a written charter adopted by the Board of Directors. The Board of Directors adopted a new Audit Committee Charter on August 2, 2006, which is included herein as Exhibit 99.1.

Audit Committee Financial Expert

The Board of Directors has determined that the Audit Committee does not have a member who is an "audit committee financial expert" as such term is defined by the rules and regulations of the Commission. While the Board of Directors recognizes that no individual Board member meets the qualifications required of an "audit committee financial expert," the Board of Directors believes that the level of financial knowledge and experience of the current members of the Audit Committee is cumulatively sufficient to discharge adequately the Audit Committee's responsibilities.

Compensation Committee

The Compensation Committee makes recommendations concerning salaries and incentive compensation, awards stock options to employees and consultants pursuant to the Company's stock option plans and performs other functions regarding compensation as the Board of Directors may delegate.

The current members of the Compensation Committee are Messrs. Solomon and Speaks, and Dr. Miller. The current Chair of the Compensation Committee is Mr. Solomon. The Board of Directors has determined that all current members of the Compensation Committee are "independent" as that term is defined in Rule 4200 of the listing standards of The NASDAQ Stock Market.

The Compensation Committee operates under a written charter adopted by the Board of Directors. The Board of Directors adopted a new Compensation Committee Charter on August 2, 2006, which is included herein as Exhibit 99.2.

Nominating and Governance Committee

The Nominating and Governance Committee was established in February 2003 and was reconstituted as the Nominating and Governance Committee in May 2004. The committee recommends director nominees to stand for election at the Company's annual meeting of stockholders, monitors the Board of Director's composition and reviews corporate governance issues. The Nominating and Governance Committee has the authority under its charter to hire and approve fees paid to consultants or search firms to assist in the process of identifying and evaluating potential director candidates.

The current members of the Nominating and Governance Committee are Messrs. Solomon and Woodrow. The current Chair of the Nominating and Governance Committee is Mr. Woodrow. The Board of Directors has determined that all current members of the Nominating and Governance Committee are "independent" as that term is defined in Rule 4200 of the listing standards of The NASDAQ Stock Market.

The Nominating and Governance Committee operates under a written charter adopted by the Board of Directors. The Board of Directors adopted a new Nominating and Governance Committee Charter on August 2, 2006, which is included herein as Exhibit 99.3.

--------------------------------------------------------------------------------

Table of Contents

Legal Committee
The Legal Committee reviews the Company's compliance with applicable laws and regulations, significant pending litigation or regulatory actions, as well as oversees the development of the Company's compliance policies and procedures. The current members of the Legal Committee are Messrs. Solomon and Woodrow, and Dr. Rakib. The Chair of the Legal Committee is Mr. Woodrow.

Section 16(a) Beneficial Ownership Reporting Compliance
Section 16(a) of the Exchange Act requires the Company's directors and executive officers, as well as persons who own more than ten percent of a registered class of the Company's equity securities, to file with the Commission initial reports of ownership and report of changes in ownership of common stock and other equity securities of the Company. Officers, directors and ten percent beneficial owners are required by Commission regulation to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on review of the copies of such reports provided to the Company and written representations that no other reports were required, during the year ended December 31, 2005, all Section 16(a) filing requirements applicable to the Company's directors, officers and greater than ten percent beneficial owners were complied with, and all applicable Section 16(a) reports were filed on a timely basis.

Code of Ethics
The Board of Directors adopted a Code of Business Conduct on January 14, 2004, and amended the Code of Business Conduct on November 10, 2006. The Code of Business Conduct is applicable to all members of the Board of Directors, executive officers and employees, including the Company's chief executive officer, chief financial officer and principal accounting officer. The Code of Business Conduct is available on the Company's Investor Relations website (www.terayon.com/investor) under "Corporate Governance." The Code of Business Conduct satisfies the requirements under the Sarbanes-Oxley Act of 2002, as well as NASDAQ rules applicable to issuers listed on The NASDAQ Stock Market. The Code of Business Conduct addresses, among other things, issues relating to conflicts of interests, including internal reporting of violations and disclosures, and compliance with applicable laws, rules and regulations. The purpose of the Code of Business Conduct is to deter wrongdoing and to promote, among other things, honest and ethical conduct and to ensure to the greatest possible extent that the Company's business is conducted in a legal and ethical manner. The Company intends to promptly disclose (1) the nature of any amendment to the Company's code of ethics that applies to executive officers and (2) the nature of any waiver, including an implicit waiver, from a provision of the Company's Code of Business Conduct that is granted to one of these specified officers, the name of such person who is granted the waiver and the date of the waiver on the Company's website in the future.


Item 11.Executive Compensation

Summary Compensation Table
The following table shows for the years ended December 31, 2005 and 2004, compensation awarded or paid to, or earned by, the Company's Chief Executive Officer and each of the other two executive officers who were serving

198

--------------------------------------------------------------------------------

Table of Contents

as executive officers as of December 31, 2005 (Named Executive Officers). None of the Named Executive Officers served as executive officers during the year ended December 31, 2003.

| Name and Principal Position in Fiscal 2005 | Year | Annual Compensation Salary ($) | Bonus ($) | Long-Term Compensation Securities Underlying Options/ SARs (#) | All Other Compensation ($) |
|---|---|---|---|---|---|
| Jerry D. Chase(1) | 2004 | 125,897 | -- | 800,000 | 52,656(4) |
| Chief Executive Officer | 2005 | 400,000 | -- | -- | 450(5) |
| Mark A. Richman(2) | 2004 | 26,154 | -- | 500,000 | 38(5) |
| Chief Financial Officer and Senior Vice President, Finance and Administration | 2005 | 300,000 | -- | -- | 450(5) |
| Matthew J. Aden(3) Senior Vice President, Global Sales and Customer Support | 2005 | 139,167 | 42,066 | 500,000 | 206(5) |

(1) Mr. Chase was appointed the Chief Executive Officer the Company effective September 2004.
(2) Mr. Richman was appointed the Chief Financial Officer and Senior Vice President, Finance and Administration of the Company effective November 2004.
(3) Mr. Aden was appointed Senior Vice President, Global Sales and Customer Support of the Company effective July 2005.
(4) Represents $52,544 moving expenses paid to Mr. Chase in connection with the commencement of his employment and $112 in taxable insurance premiums.
(5) Represents taxable insurance premiums.

The following tables show for the year ended December 31, 2005, certain information regarding options granted to, and held at year-end by, the Named Executive Officers. No options were exercised by the Named Executive Officers during the year ended December 31, 2005. In accordance with the rules of the Commission, also shown in the below table is the potential realizable value over the term of the option (the period from the grant date to the expiration date) based on assumed rates of stock appreciation of 5% and 10%, compounded annually. These amounts are based on certain assumed rates of appreciation specified by the Commission and do not represent the Company's estimate of future stock price. Actual gains, if any, on stock option exercises will be dependent on the future performance of the Company's common stock.

Option Grants in Last Fiscal Year

| Name | Individual Grants Number of Securities Underlying Options Granted (#) | Percentage of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price ($/Sh) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Jerry D. Chase | -- | -- | -- | -- | -- | -- |
| Mark A. Richman | -- | -- | -- | -- | -- | -- |
| Matthew J. Aden | 500,000 | 17.2% | 3.17 | 7/31/2015 | 996,798 | 2,526,082 |

The exercise price of the option granted to Mr. Aden is the closing selling price per share of the Company's common stock on The NASDAQ Stock Market on August 1, 2005. The option will vest over a four year period, twenty-five percent of which vested on July 27, 2006, and the remainder vesting on a monthly basis thereafter. The grant was made pursuant to the Company's 1997 Equity Incentive Plan. The shares subject to the option granted will immediately vest in full in the event Mr. Aden's employment is terminated following certain changes in control of the Company.

199

--------------------------------------------------------------------------------

Table of Contents

Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values

The Named Executive Officers did not exercise options to purchase common stock of the Company in the fiscal year ended December 31, 2005. No stock appreciation rights are held by the Named Executive Officers.

| Name | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) Exercisable/Unexercisable | Value of Unexercised In-the-Money Options at Fiscal Year-End ($) Exercisable/Unexercisable(1) |
|------|------|------|
| Jerry D. Chase | 250,000/550,000 | 160,000/352,000 |
| Mark A. Richman | 135,416/364,584 | 43,333/116,667 |
| Matthew J. Aden | 0/500,000 | --/-- |

(1) Calculated on the basis of the closing price of the Company's common stock as reported on The NASDAQ Stock Market on December 30, 2005, $2.31, minus the exercise price.

Compensation of Directors

Members of the Board of Directors who are not employees of the Company, whom the Company will refer to as outside directors, are entitled to receive cash compensation and are granted stock options for their services on the Board of Directors, as described below. All directors with the exception of Mr. Chase are outside directors.

Cash Compensation

Cash compensation for the Company's outside directors is as follows:

*a monthly retainer of $2,000;

*a per meeting attendance fee of $1,000 for each Board of Directors or committee meeting attended; and

*for the chairs of the Audit Committee, the Compensation Committee and the Nominating and Governance Committee, an additional $500 for each committee meeting attended.

The outside directors are eligible for reimbursement for their expenses incurred in connection with attendance at Board of Directors and committee meetings in accordance with Company policy.

Equity Compensation

None of the Company's outside directors was granted stock options during the year ended December 31, 2005.

In 2006, the Company amended its 1997 Equity Incentive Plan to provide for a non-employee director equity compensation policy, which the Company will refer to as the Company's director equity policy. The outside directors will be automatically granted the following stock options on a non-discretionary basis under the Company's director equity policy:

*for each outside director, an option to purchase 60,000 shares of common stock on the date of such director's initial election or appointment;

*an annual grant of options to purchase 25,000 shares of common stock on the date of each annual meeting of stockholders, prorated for the 12-month period prior to the annual meeting of stockholders if the director has not continuously served as director during such period; and

*for each outside director who is then serving as a member of a committee of the Company's Board of Directors, an option to purchase 6,000 shares of common stock for service on each such committee on the date of each annual meeting of stockholders, prorated for the 12-month period prior to the annual meeting of stockholders if the director has not continuously served as a committee member during such 12-month period.

200

--------------------------------------------------------------------------------

Table of Contents

The exercise price of stock options granted under the Company's director equity policy will be equal to the fair market value of the common stock on the date of grant. These non-discretionary options vest and become exercisable as to 33% of the underlying shares on the first anniversary of the date of grant and as to 1/36th of the underlying shares on a monthly basis thereafter. An outside director whose service relationship with the Company or any affiliate (whether as a non-employee director or subsequently as an employee, director or consultant of either the Company or an affiliate) ceases for any reason may exercise vested options during the post-termination exercise period provided in the option agreement (three months generally, 12 months in the event of disability and 18 months in the event of death). In the event of certain changes in control of the Company, the vesting and exercisability of all outstanding options granted under the director equity policy will accelerate automatically to the extent they are not assumed or substituted for by the surviving entity.

Employment and Severance Agreements with Named Executive Officers

Jerry D. Chase and Mark A. Richman

On July 22, 2005, Mr. Chase and Mr. Richman entered into employment agreements with the Company, which superseded their previous agreements governing their employment and severance arrangements with the Company, providing for, in the case of Mr. Chase, his employment as the Chief Executive Officer of the Company, and in the case of Mr. Richman, his employment as Chief Financial Officer and Senior Vice President, Finance and Administration of the Company. Pursuant to their respective agreements, Mr. Chase and Mr. Richman receive an annual salary of $400,000 and $300,000, respectively. The executive officers also are eligible to receive an annual bonus in an amount of up to seventy-five percent of their respective base salaries to the extent bonus arrangements are established for the executive officers, the payment of which is based on the achievement of specified goals to be defined by the Board of Directors or the Compensation Committee.

In the event the Company terminates the executive officers' employment for any reason other than for "cause," "permanent disability" (as these terms are defined in their agreement) or the executive officer's death, or if the executive resigns his employment within 30 days following the occurrence of specified events detailed in the executive's agreement, including, a material reduction in the executive's title, authority or responsibility, a material reduction in the executive's base salary or a relocation of the executive's work place beyond a specified distance, the executive would be entitled to the following severance benefits:

*a lump sum cash payment equal to 12 months of the executive's then base salary;

*a lump sum cash payment equal to the greater of (1) the executive's annual performance bonus for the most recent completed calendar year or (2) the executive's target performance bonus in effect for the year of the termination; and

*payment for the cost of COBRA continuation premiums for the medical, dental and vision care benefits for the executive officer and his dependents for a period of up to 12 months.

In the event the executive's employment is terminated under the circumstances described in the preceding paragraph within twelve months following a "change in control" (as this term is defined in his agreement) of the Company, the executive officer would be entitled to the following severance benefits:

*a lump sum cash payment equal to, in the case of Mr. Chase, 2.5 times, and in the case or Mr. Richman, 2 times, the sum of (1) the executive officer's then base salary and (2) an amount that is equal to the greater of (a) the executive's annual performance bonus for the most recent completed calendar year or (b) the executive's target performance bonus in effect for the year of the termination;

*payment for the cost of COBRA continuation premiums for the medical, dental and vision care benefits for the executive officer and his dependents for a period of up to 30 months in the case of Mr. Chase, and 24 months in the case of Mr. Richman; and

*full vesting of all of the executive officer's unvested stock options.

201

--------------------------------------------------------------------------------

Table of Contents

To the extent any payments made to the executive officer are subject to the excise tax imposed by Section 4999 of the Internal Revenue Code (pursuant to Section 280G of the Internal Revenue Code), then the executive will receive a gross-up payment for the amount exceeding the first $200,000 in excise taxes (and all other taxes resulting from the excise tax and the gross-up payment) imposed on the executive officer.

Any severance benefits provided to the executive in connection with an employment termination will be offset and reduced by the value of any severance benefits that the executive receives pursuant to a federal or state statute. The payment of the severance benefits is subject to, among other requirements, the executive's execution and delivery of an effective general release against the Company.

Matthew J. Aden

On July 27, 2005, Mr. Aden entered into an employment agreement with the Company providing for his employment as Senior Vice President, Global Sales and Customer Support of the Company. Pursuant to the agreement, Mr. Aden receives an annual salary of $325,000. Mr. Aden is also eligible to participate in the Company's sales commission plan with a target incentive payout equal to 100% of his base salary, the payment of which will be based on the achievement of sales goals to be defined by the Chief Executive Officer and approved by the Board of Directors. In the event the Company terminates Mr. Aden's employment for any reason other than for "cause" or "permanent disability" (as these terms are defined in his agreement) or his death, or if Mr. Aden resigns from his employment within 30 days following the occurrence of specified events detailed in his agreement, including a material reduction in his title, authority or responsibility, a material reduction in his base salary or a relocation of his work place beyond a specified distance, Mr. Aden would be entitled to the following severance benefits:

*a lump sum cash payment equal to 12 months of his then base salary and

*payment for the cost of COBRA continuation premiums for the medical, dental and vision care benefits for Mr. Aden and his dependents for a period of up to 12 months.

In the event Mr. Aden's employment with the Company is terminated under the circumstances described in the preceding paragraph within twelve months of a "change in control" (as this term is defined in his agreement) of the Company, Mr. Aden would be entitled to the following severance benefits:

*a lump sum cash payment equal to 2 times his then base salary;

*a lump sum cash payment equal to 2 times the greater of (1) Mr. Aden's sales commission payments for the most recent completed calendar year or (2) Mr. Aden's target sales commission payment in effect for the year of the termination;

*payment for the cost of COBRA continuation premiums for the medical, dental and vision care benefits for Mr. Aden and his dependents for a period of up to 24 months; and

*full vesting of all of his unvested stock options.

Any severance benefits paid to Mr. Aden will be offset and reduced by the value of any severance benefits that Mr. Aden may be entitled to receive pursuant to federal or state statute. The payment of the severance benefits is subject to, among other requirements, Mr. Aden's execution and delivery of an effective general release against the Company.

Compensation Committee Interlocks and Insider Participation

During the year ended December 31, 2005, the Compensation Committee consisted of Messrs. Solomon and Speaks and Dr. Miller, and Mr. Solomon served as Chair of the Compensation Committee. Messrs. Solomon and Speaks and Dr. Miller are not, and have never been, officers or employees of the Company. No executive officer of the Company served on the Board of Directors or compensation committee of any other entity that has one or more executive officers serving as a member of the Company's Board of Directors or Compensation Committee. Each of the Company's directors holds securities of the Company.

--------------------------------------------------------------------------------

Table of Contents

Item 12.Security Ownership of Certain Beneficial Owners and Management and
        Related Stockholder Matters

The following table sets forth certain information regarding the ownership of
the Company's common stock as of November 30, 2006 by: (i) each director; (ii)
each Named Executive Officer; (iii) all Named Executive Officers and directors
of the Company as a group; and (iv) all those known by the Company to be
beneficial owners of more than five percent of its common stock. All shares of
the Company's common stock subject to options currently exercisable or
exercisable within 60 days of November 30, 2006, are deemed to be outstanding
for the purpose of computing the percentage of ownership of the person holding
such options, but are not deemed to be outstanding for computing the percentage
of ownership of any other person. This table is based upon information supplied
by officers, directors and principal stockholders and Schedules 13D and 13G
filed with the Commission. Unless otherwise indicated in the footnotes to this
table and subject to community property laws where applicable, the Company
believes that each of the stockholders named in this table has sole voting and
investment power with respect to the shares indicated as beneficially owned.
Applicable percentages are based on 77,637,177 shares outstanding on November
30, 2006, adjusted as required by rules promulgated by the Commission. Unless
otherwise indicated in the table, the address of each party listed in the table
is 2450 Walsh Avenue, Santa Clara, California 95051.

|                                                      | Beneficial Ownership | |
| ---------------------------------------------------- | ---------: | ---------: |
| Beneficial Owner                                     | Number of Shares | Percentage Ownership |
| Kern Capital Management, LLC(1)                      | 11,080,800 | 14.3% |
| 114 West 47th Street, Suite 1926                     |            |       |
| New York, New York 10036                             |            |       |
| Zaki Rakib(2)                                        | 4,302,040  | 5.5%  |
| Shlomo Rakib(3)                                      | 4,302,040  | 5.5%  |
| Jerry D. Chase(4)                                    | 466,666    | *     |
| Lewis Solomon(5)                                     | 352,692    | *     |
| Mark A. Richman(6)                                   | 260,416    | *     |
| Matthew J. Aden(7)                                   | 187,500    | *     |
| David M. Woodrow(8)                                  | 128,302    | *     |
| Howard W. Speaks, Jr.(9)                             | 67,593     | *     |
| Matthew Miller(10)                                   | 57,183     | *     |
| All executive officers and directors as a group (9 persons)(11) | 10,124,432 | 13.0% |

(1)Kern Capital Management, LLC filed an amendment to Schedule 13G, dated as of
   February 14, 2006, with the Commission. Kern Capital Management, LLC reported
   beneficial ownership of 11,080,800 shares.
(2)Shares beneficially owned by Dr. Zaki Rakib include 240,000 shares of common
   stock held by the Shlomo Rakib Children's Trust of which Dr. and Mrs. Rakib
   are trustees, and 1,300,000 shares of common stock underlying stock options,
   which are exercisable within 60 days of November 30, 2006. Dr. Rakib
   disclaims beneficial ownership of these shares held by the Zaki Rakib
   Children's Trust and stock and stock options held by Dr. Rakib's family
   members, totaling 4,302,040 shares.
(3)Shares beneficially owned by Shlomo Rakib include 240,000 shares of common
   stock held by the Zaki Rakib Children's Trust of which Mr. And Mrs. Rakib are
   trustees, and 1,300,000 shares of common stock underlying stock options which
   are exercisable within 60 days of November 30, 2006. Mr. Rakib disclaims
   beneficial ownership of these shares held by the Shlomo Rakib Children's
   Trust and stock and stock options held by Mr. Rakib's family members,
   totaling 4,302,040 shares.
(4)Shares beneficially owned include 466,666 shares of common stock underlying
   stock options that are exercisable within 60 days of November 30, 2006.
(5)Shares beneficially owned include 292,692 shares of common stock underlying
   stock options that are exercisable within 60 days of November 30, 2006, as
   well as 60,000 shares of common stock.

--------------------------------------------------------------------------------

Table of Contents

(6) Shares beneficially owned include 260,416 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.
(7) Shares beneficially owned include 187,500 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.
(8) Shares beneficially owned include 128,302 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.
(9) Shares beneficially owned include 67,593 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.
(10) Shares beneficially owned include 57,183 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.
(11) Shares beneficially owned by the Company's current directors and executive
    officers as a group include 4,060,352 shares of common stock underlying
    stock options that are exercisable within 60 days of November 30, 2006.


Item 13. Certain Relationships and Related Transactions

The Company has entered into indemnity agreements with all directors and
executive officers of the Company. The indemnity agreement provides, among other
things, that the Company will indemnify such officer or director, under the
circumstances and to the extent provided for therein, for expenses, damages,
judgments, fines and settlements he may be required to pay in actions or
proceedings which he or she is or may be made a party by reason of his position
as a director, officer or other agent of the Company, and otherwise to the
fullest extent permitted under Delaware law and the Company's Bylaws.


Item 14. Principal Accountant Fees and Services

On September 21, 2005, the Company appointed Stonefield Josephson, Inc.
(Stonefield) as its independent registered public accounting firm to replace
Ernst & Young LLP, which resigned effective as of that date. The aggregate fees
billed by Stonefield for professional services rendered in 2005 are summarized
in the following table (in thousands):

|                       | 2005  |
|-----------------------|-------|
| Audit fees(1)         | $637  |
| Audit-related fees(2) | --    |
| Tax fees(3)           | --    |
| All other fees        | --    |
|                       | $637  |

(1) Audit fees consist of fees for professional services rendered for the audit
    of the Company's consolidated annual financial statements and review of the
    interim consolidated financial statements included in quarterly reports and
    services that are normally provided in connection with statutory and
    regulatory filings or engagements. In 2005, audit fees include fees for
    professional services rendered for the audits of (i) management's assessment
    of the effectiveness of internal control over financial reporting and (ii)
    the effectiveness of internal control over financial reporting.
(2) Audit-related fees consist of fees billed for professional services that are
    reasonably related to the performance of the audit or review of the Company's
    consolidated financial statements but are not reported under "Audit Fees."
    Such fees include, among other things, employee benefit plan audits and
    certain consultations concerning financial accounting and reporting
    standards.
(3) Tax fees consist of fees for professional services rendered for assistance
    with federal, state and international tax compliance.

In considering the nature of the services provided by Stonefield, the Audit
Committee determined that such services are compatible with the provision of
independent audit services. The Audit Committee discussed these

204

--------------------------------------------------------------------------------

Table of Contents

services with Stonefield and Company management to determine that they are
permitted under the rules and regulation concerning auditor independence
promulgated by the Commission to implement the Sarbanes-Oxley Act of 2002, as
well as the American Institute of Certified Public Accountants.
The services performed by Stonefield in 2005 were pre-approved in accordance
with the requirements of the Audit Committee Charter.
Except as stated above, there were no other fees billed by Stonefield for 2005.
The Audit Committee considers the provision of these services to be compatible
with maintaining the independence of the Company's independent auditors. None of
the fees paid to the independent auditors under the categories Audit-Related
Fees and Tax Fees described above were approved by the Audit Committee after
services were rendered pursuant to the de minimus exception established by the
Commission.

PART IV


Item 15.Exhibits, Financial Statement Schedules

(a) (1) The following documents are included as part of this Form 10-K.
Reference is made to the Index to Consolidated Financial Statements of Terayon
Communication Systems, Inc. under Item 8 in Part II of this Form 10-K.
(2) Financial Statement Schedules:
Schedules not included herein have been omitted because they are not applicable
or the required information is in the consolidated financial statements or notes
thereto.
(3) The following exhibits are filed as a part of this Form 10-K and this list
includes the Exhibit Index.


Exhibit

Number                                          Exhibit Description

   3.1 Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(11)

   3.2 Bylaws of Terayon Communication Systems, Inc.(11)

   3.3 Certificate of Amendment to Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(11)

   3.4 Certificate of Designation of Series A Junior Participating Preferred Stock.(4)

   4.1 Specimen Common Stock Certificate.(2)

   4.2 Amended and Restated Information and Registration Rights Agreement, dated April 6, 1998.(1)

   4.3 Form of Security for Terayon Communication Systems, Inc.'s 5% Convertible Subordinated Notes due August 1, 2007.(3)

   4.4 Registration Rights Agreement, dated July 26, 2000, among Terayon Communication Systems, Inc. and Deutsche Bank Securities,
       Inc. and Lehman Brothers, Inc.(3)
   4.5 Indenture, dated July 26, 2000, between Terayon Communication Systems, Inc. and State Street Bank and Trust Company of
       California, N.A.(3)
   4.6 Rights Agreement, dated February 6, 2001, between Terayon Communication Systems, Inc. and Fleet National Bank.(4)

  10.1 Form of Indemnification Agreement between Terayon Communication Systems, Inc. and each of its directors and officers.(16)

  10.2 1995 Stock Option Plan, as amended.(1)

  10.3 1997 Equity Incentive Plan, as amended.(6)

  10.4 1998 Employee Stock Purchase Plan, as amended.(9)

  10.5 1998 Non-Employee Directors' Stock Option Plan, as amended.(9)

  10.6 1998 Employee Stock Purchase Plan Offering for Foreign Employees.(5)

  10.7 1999 Non-Officer Equity Incentive Plan, as amended.(10)

205

Table of Contents

Exhibit

Number                                          Exhibit Description

10.8  Azrieli Center Offices Lease Agreement, dated January 23, 2000, between Canit HaShalom Investments Ltd. and Terayon
      Communication Systems, Inc.(6)
10.9  Azrieli Center Agreement to Transfer Lease Rights, dated January 23, 2000.(8)

10.10 Data Over Cable Service Interface Specifications License Agreement, dated December 21, 2001, between Terayon Communication
      Systems, Inc. and Cable Television Laboratories, Inc.(6)
10.11 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated December 21, 2002, between Terayon Communication Systems, Inc.
      and Cable Television Laboratories, Inc.(6)
10.12 Lease Agreement, dated September 18, 1996, between Sobrato Interests III and VeriFone.(7)

10.13 Triple Net Sublease, dated April 1, 2002, by and between Terayon Communication Systems, Inc. and
      Hewlett-Packard
      Company.(7)
10.14 Aircraft Lease Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
      Corporation.(8)
10.15 Letter of Credit Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
      Corporation.(8)
10.16 Agreement, dated January 23, 2004, between Terayon Communication Systems, Inc. and YAS Corporation.(12)

10.17 First Amendment to Aircraft Lease Agreement, dated December 31, 2003, between Terayon Communication Systems, Inc. and General
      Electric Capital Corporation.(14)
10.18 Code of Business Conduct.

10.19 Notification Letter of Intent to Terminate or Sublease the Aircraft Lease Agreement, dated March 12, 2004.(14)

10.20 Employment Agreement, dated July 22, 2005, between Terayon Communication Systems, Inc. and Jerry Chase.(17)

10.21 Proprietary Information and Inventions Agreement, dated July 22, 2004, between Terayon Communication Systems, Inc. and Jerry
      Chase.(13)
10.22 Aircraft Sublease Agreement, dated August 24, 2004, between Terayon Communication Systems, Inc. and United Furniture
      Equipment Rental, Inc.(13)
10.23 Employment Agreement, dated July 22, 2005, between Terayon Communication Systems, Inc. and Mark Richman. (17)

10.24 Proprietary Information and Inventions Agreement, dated November 10, 2004, between Terayon Communication Systems, Inc. and
      Mark Richman.(16)
10.25 Form of Option Agreement for the Terayon Communication Systems, Inc. 1997 Equity Incentive Plan.(15)

10.26 Form of Option Agreement for the Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan.(16)

10.27 Lease, dated August 9, 2006 between Sobrato Development Companies #871 and Terayon Communication Systems, Inc.

10.28 Triple Net
      Sub-Sublease
      Agreement, effective as of August 9, 2006, as amended, between Terayon Communication Systems, Inc. and Citrix Systems, Inc.
10.29 Employment Agreement, dated July 27, 2005, between Terayon Communication Systems, Inc. and Matt Aden. (17)

10.30 Proprietary Information and Inventions Agreement, dated July 27, 2005, between Terayon Communication Systems, Inc. and
      Matthew J. Aden.(17)
10.31 Amendment No. 1 to the Terayon Communication Systems, Inc. 1997 Equity Incentive Plan.

10.32 Non-Employee Director Equity Compensation Policy.

10.33 Non-Employee Director Equity Compensation Policy Nonstatutory Stock Option Agreement.

10.34 2006 Executive Sales Commission Plan.

10.35 2006 Section 16 Executive Officer Bonus Plan.

--------------------------------------------------------------------------------

Table of Contents

Exhibit

Number                                    Exhibit Description

21.1 List of Subsidiaries.

24.1 Power of Attorney (see signatures of this
     Form 10-K).

31.1 Certification of the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2 Certification of the Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1 Certification of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2 Certification of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

99.1 Audit Committee Charter of Terayon Communication Systems, Inc.

99.2 Compensation Committee Charter of Terayon Communication Systems, Inc.

99.3 Nominating and Governance Committee Charter of Terayon Communication Systems, Inc.

(1)Incorporated by reference to exhibits to our Registration Statement on
   Form S-1
   filed on June 16, 1998 (File
   No. 333-56911).
(2)Incorporated by reference to exhibits to our Registration Statement on
   Form S-1/A
   filed on July 31, 1998 (File
   No. 333-56911).
(3)Incorporated by reference to our Registration Statement on
   Form S-3
   filed on October 24, 2000 (File
   No. 333-48536).
(4)Incorporated by reference to our Report on
   Form 8-K
   filed on February 9, 2001.
(5)Incorporated by reference to our Report on
   Form 10-K
   filed on April 2, 2001.
(6)Incorporated by reference to our Report on
   Form 10-K
   filed on April 1, 2002.
(7)Incorporated by reference to our Report on
   Form 10-Q
   filed on May 15, 2002.
(8)Incorporated by reference to our Report on
   Form 10-K
   filed on March 27, 2003.
(9)Incorporated by reference to our Report on Registration Statement on
   Form S-8
   filed on August 30, 2002.
(10)Incorporated by reference to our Report on
    Form 10-Q
    filed on August 14, 2003.
(11)Incorporated by reference to our Report on
    Form 8-K
    filed on November 21, 2003.
(12)Incorporated by reference to our Report on
    Form 10-Q
    filed on July 27, 2004.
(13)Incorporated by reference to our Report on
    Form 10-Q
    filed on November 9, 2004.
(14)Incorporated by reference to our Report on
    Form 10-K
    filed on March 15, 2004.
(15)Incorporated by reference to our Report on
    Form 8-K
    filed on September 14, 2004.
(16)Incorporated by reference to our Report on
    Form 10-K
    filed on March 15, 2005.
(17)Incorporated by reference to our Report on
    Form 10-Q
    filed on August 9, 2005.

--------------------------------------------------------------------------------

Table of Contents

(4)(d) Financial Statement Schedules
Schedules not included herein have been omitted because they are not applicable
or the required information is in the consolidated financial statements or notes
thereto.
Schedule II -- Valuation and Qualifying Accounts (in thousands):

| | Balance at Beginning of Period | Charges | Deductions | Balance at End of Period |
|---|---|---|---|---|
| December 31, 2005: | | | | |
| Allowance for doubtful accounts -- U.S. | $ 2,254 | $ 5,036 | $ (4,481) | $ 2,809 |
| Allowance for doubtful accounts -- International | -- | -- | -- | -- |
| Total Allowance for doubtful accounts | 2,254 | 5,036 $ | (4,481) | 2,809 |
| Reserve for inventory valuation | 12,267 | 2,732 | (7,146) | 7,853 |
| Valuation allowance on deferred tax assets | 226,560 | 3,261 | -- | 229,821 |
| December 31, 2004 (as restated): | | | | |
| Allowance for doubtful accounts -- U.S. | $ 6,037 | $ 4,014 | $ (7,797) | $ 2,254 |
| Allowance for doubtful accounts -- International | 473 | -- | (473) | -- |
| Total Allowance for doubtful accounts | 6,510 | 4,014 | (8,270) | 2,254 |
| Reserve for inventory valuation | 12,291 | 11,550 | (11,574) | 12,267 |
| Valuation allowance on deferred tax assets | 227,978 | -- | (1,418) | 226,560 |
| December 31, 2003 (as restated): | | | | |
| Allowance for doubtful accounts -- U.S. | $ 201 | $ 6,131 | $ (295) | $ 6,037 |
| Allowance for doubtful accounts -- International | 1,576 | -- | (1,103) | 473 |
| Total Allowance for doubtful accounts | 1,777 | 6,131 | (1,398) | 6,510 |
| Reserve for inventory valuation | 25,473 | 4,025 | (17,207) | 12,291 |
| Valuation allowance on deferred tax assets | 244,803 | -- | (16,825) | 227,978 |

208

--------------------------------------------------------------------------------

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto due authorized, in County of Santa Clara, State of California, on the 29 day of December, 2006.

TERAYON COMMUNICATION SYSTEMS, INC.

/s/  Jerry D. Chase

Jerry D. Chase
Chief Executive Officer

Each person whose signature appears below constitutes Jerry D. Chase his true and lawful attorney-in-fact and agent, each acting alone, with full power of substitution and re-substitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments to this Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Commission, granting unto said attorney-in- fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, each acting alone, or his or her substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/  Jerry D. Chase | Chief Executive Officer and Director | December 29, 2006 |
| Jerry D. Chase | | |
| /s/  Mark A. Richman | Chief Financial Officer (Principal Financial Officer, Principal Accounting Officer) | December 29, 2006 |
| Mark A. Richman | | |
| /s/  Zaki Rakib | Chairman of the Board of Directors | December 29, 2006 |
| Dr. Zaki Rakib | | |
| /s/  Shlomo Rakib | Director | December 29, 2006 |
| Shlomo Rakib | | |
| /s/  Lewis Solomon | Director | December 29, 2006 |
| Lewis Solomon | | |
| /s/  David Woodrow | Director | December 29, 2006 |
| David Woodrow | | |
| /s/  Matthew Miller | Director | December 29, 2006 |
| Dr. Matthew Miller | | |
| /s/  Howard W. Speaks | Director | December 29, 2006 |
| Howard W. Speaks, Jr. | | |

209

# EXHIBIT 2

Table of Contents

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------------------

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report:  February 2, 2004
                 ----------------
(Date of earliest event reported)

TERAYON COMMUNICATION SYSTEMS, INC.
-----------------------------------------------------------
(Exact name of Registrant as specified in its charter)

Delaware            000-24647      77-0328533
-----------------------------------------------------------
(State or other jurisdiction(Commission  (I.R.S. employer
   of incorporation)        file number)identification no.)

4988 Great America Parkway, Santa Clara, CA 95054
-----------------------------------------------------------
(Address of principal executive offices and zip code)

Registrant's telephone number, including area code:(408) 235-5500
                                                    --------------

--------------------------------------------------------------------------------

TABLE OF CONTENTS

Item 9. Regulation FD Disclosure.
Item 7. Exhibits.
SIGNATURES
INDEX OF EXHIBITS
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

Item 9. Regulation FD Disclosure.

On February 2, 2004, Terayon Communication Systems, Inc. (Company) issued a press release announcing that FOX Broadcasting Company has chosen the new Terayon BP 5100 broadcast platform to power its HD broadcast delivery system. Terayon is working in concert with Thomson Broadcast & Media Solutions in this effort.

Item 7. Exhibits.


99.1  Press Release, dated as of February 2, 2004, entitled Terayon Broadcast Platform Powers FOX Broadcasting Company's High Definition Distribution System at Affiliates Nationwide.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Terayon Communication Systems, Inc.

By:/s/ Edward Lopez
   ------------------------------------------------------------
   Edward Lopez
   Senior Vice President, General Counsel and Human Resources

Date: February 4, 2004

--------------------------------------------------------------------------------

Table of Contents

INDEX OF EXHIBITS

99.1 Press Release, dated as of February 2, 2004, entitled Terayon Broadcast Platform Powers FOX Broadcasting Company's High Definition Distribution System at Affiliates Nationwide.

Exhibit 99.1

TERAYON BROADCAST PLATFORM POWERS FOX BROADCASTING COMPANY'S
HIGH DEFINITION DISTRIBUTION SYSTEM AT AFFILIATES NATIONWIDE

New Terayon BP 5100 Provides Broadcasters a Cost Effective Solution for
Delivering High Quality HD Broadcast Content

Santa Clara, California - February 2, 2004 - Terayon Communication Systems, Inc.
(Nasdaq: TERN), the leading innovator of intelligent broadband access for data,
voice and video, today announced that FOX Broadcasting Company, which last year
announced its plans to deliver at least one-half of its prime-time schedule in
high-definition (HD) for the fall TV season, has chosen the new Terayon BP 5100
broadcast platform to power its HD broadcast delivery system. Terayon is working
in concert with Thomson (Euronext Paris: 18453; NYSE: TMS), FOX' prime
technology partner, in this effort. The Terayon BP 5100 enables the integration
of high quality HD programming at its affiliated stations, while at the same
time allowing localized on-screen branding.

Terayon designed the Terayon BP 5100 to meet broadcasters' unique needs as
they continue to evolve their networks to support the wide-scale deployment of
high definition broadcast programming. In addition to delivering the highest
resolution and purest picture quality that sets high definition programming
apart from current standard definition digital programming, broadcast networks
and their affiliates must also maintain the capability to achieve marketing and
profitability goals through localized HD logo insertion, stream quality
management and digital-to-digital splicing between local and network HD content.
The BP 5100 enables broadcasters and their affiliates to implement such services
without ever leaving the digital domain or requiring any additional decoding and
encoding equipment at each affiliate site, thereby delivering a cost effective,
reliable and high quality solution for delivering HD content.

"Terayon has a long history of video innovations and the BP 5100, the
latest evolution of our core technology, addresses unique needs in the broadcast
market as networks move to HD," said Jeff Barco, vice president and general
manager, Terayon's Digital Video Solutions. "Terayon's expansion into the
broadcast market represents the first of many new markets where

our technology can be applied."

"FOX has set an aggressive set of goals for its rollout of HD, including long term economic sustainability, the highest possible picture and sound quality, and preservation of station bandwidth," said Andrew G. Setos, President of Engineering, FOX Group. "The partnership that we have formed with Thomson and Terayon is essential to realizing these goals."

"We are very pleased to continue to deepen our relationship with News Corp. and support its innovative HD distribution model," said Marc Valentin, president, Thomson Broadcast & Media Solutions. "We have worked with Terayon for many years and look forward to providing the FOX Broadcasting Company and its affiliates the best possible support and technology in this endeavor."

TERAYON BP 5100 BROADCAST PLATFORM

The Terayon BP 5100 broadcast platform is based on the company's core video processing expertise and technologies already available in its Network CherryPicker(TM) line of digital stream management systems. In deployment worldwide since 1999, the CherryPicker products have consistently proven to be a flexible, reliable and cost effective means for statistical multiplexing, grooming, rate shaping and digital program and ad insertion in cable and satellite environments, and the BP 5100 delivers those same benefits to the broadcast industry. In addition to the qualities available in the CherryPicker product line, the BP 5100 also delivers benefits specifically designed to meet the needs of broadcasters including localized HD logo insertion, remote management and software update capabilities and HD into HD program splicing, while continuing to offer substantial cost savings, higher reliability and superior picture quality compared to the multi-box baseband approach.

ABOUT TERAYON

Terayon Communication Systems, Inc. is the leading innovator of intelligent broadband access for operators who want to deliver the widest range of advanced data, video and voice services. Terayon maintains its headquarters in Santa Clara, California, and has sales and support offices worldwide. The company is traded on the Nasdaq under the symbol TERN and

can be found on the web at www.terayon.com.

# # #

PRESS CONTACTS:                                            INVESTOR CONTACT:

John Giddings             Margaret Huang                  Kristin Stokan
PR Manager                Atomic Public Relations          Director, Finance
(408) 486-5223            (415) 703-9454                   (408) 486-5206
john.giddings@terayon.com margaret@atomicpr.com            kristin.stokan@terayon.com

"Safe Harbor" Statements under the Private Securities Litigation Reform Act of 1995: Except for the historical information contained herein, this news release contains forward-looking statements, estimates and assumptions by Terayon and other parties that involve risks and uncertainties, including Terayon's ability to gain new business; Terayon's ability to develop and bring to market new, technologically advanced products; the acceptance of Terayon's new products in the market; the expansion of operations by Terayon's customers and the deployment of Terayon's products in new or specific markets; as well as the other risks detailed from time to time in Terayon's filings with the Securities and Exchange Commission.

Note: Terayon and the Terayon logo are registered trademarks of Terayon Communication Systems, Inc. All other trademarks are property of their respective owners.

Exhibit 99.1

TERAYON BROADCAST PLATFORM POWERS FOX BROADCASTING COMPANY'S
HIGH DEFINITION DISTRIBUTION SYSTEM AT AFFILIATES NATIONWIDE

New Terayon BP 5100 Provides Broadcasters a Cost Effective Solution for
Delivering High Quality HD Broadcast Content

Santa Clara, California - February 2, 2004 - Terayon Communication Systems, Inc.
(Nasdaq: TERN), the leading innovator of intelligent broadband access for data,
voice and video, today announced that FOX Broadcasting Company, which last year
announced its plans to deliver at least one-half of its prime-time schedule in
high-definition (HD) for the fall TV season, has chosen the new Terayon BP 5100
broadcast platform to power its HD broadcast delivery system. Terayon is working
in concert with Thomson (Euronext Paris: 18453; NYSE: TMS), FOX' prime
technology partner, in this effort. The Terayon BP 5100 enables the integration
of high quality HD programming at its affiliated stations, while at the same
time allowing localized on-screen branding.

Terayon designed the Terayon BP 5100 to meet broadcasters' unique needs as
they continue to evolve their networks to support the wide-scale deployment of
high definition broadcast programming. In addition to delivering the highest
resolution and purest picture quality that sets high definition programming
apart from current standard definition digital programming, broadcast networks
and their affiliates must also maintain the capability to achieve marketing and
profitability goals through localized HD logo insertion, stream quality
management and digital-to-digital splicing between local and network HD content.
The BP 5100 enables broadcasters and their affiliates to implement such services
without ever leaving the digital domain or requiring any additional decoding and
encoding equipment at each affiliate site, thereby delivering a cost effective,
reliable and high quality solution for delivering HD content.

"Terayon has a long history of video innovations and the BP 5100, the
latest evolution of our core technology, addresses unique needs in the broadcast
market as networks move to HD," said Jeff Barco, vice president and general
manager, Terayon's Digital Video Solutions. "Terayon's expansion into the
broadcast market represents the first of many new markets where

our technology can be applied."

    "FOX has set an aggressive set of goals for its rollout of HD, including long term economic sustainability, the highest possible picture and sound quality, and preservation of station bandwidth," said Andrew G. Setos, President of Engineering, FOX Group. "The partnership that we have formed with Thomson and Terayon is essential to realizing these goals."

    "We are very pleased to continue to deepen our relationship with News Corp. and support its innovative HD distribution model," said Marc Valentin, president, Thomson Broadcast & Media Solutions. "We have worked with Terayon for many years and look forward to providing the FOX Broadcasting Company and its affiliates the best possible support and technology in this endeavor."

TERAYON BP 5100 BROADCAST PLATFORM

    The Terayon BP 5100 broadcast platform is based on the company's core video processing expertise and technologies already available in its Network CherryPicker(TM) line of digital stream management systems. In deployment worldwide since 1999, the CherryPicker products have consistently proven to be a flexible, reliable and cost effective means for statistical multiplexing, grooming, rate shaping and digital program and ad insertion in cable and satellite environments, and the BP 5100 delivers those same benefits to the broadcast industry. In addition to the qualities available in the CherryPicker product line, the BP 5100 also delivers benefits specifically designed to meet the needs of broadcasters including localized HD logo insertion, remote management and software update capabilities and HD into HD program splicing, while continuing to offer substantial cost savings, higher reliability and superior picture quality compared to the multi-box baseband approach.

ABOUT TERAYON

    Terayon Communication Systems, Inc. is the leading innovator of intelligent broadband access for operators who want to deliver the widest range of advanced data, video and voice services. Terayon maintains its headquarters in Santa Clara, California, and has sales and support offices worldwide. The company is traded on the Nasdaq under the symbol TERN and

can be found on the web at www.terayon.com.

# # #

PRESS CONTACTS:                                              INVESTOR CONTACT:

John Giddings          Margaret Huang              Kristin Stokan
PR Manager             Atomic Public Relations     Director, Finance
(408) 486-5223         (415) 703-9454              (408) 486-5206
john.giddings@terayon.com  margaret@atomicpr.com   kristin.stokan@terayon.com

"Safe Harbor" Statements under the Private Securities Litigation Reform Act of 1995: Except for the historical information contained herein, this news release contains forward-looking statements, estimates and assumptions by Terayon and other parties that involve risks and uncertainties, including Terayon's ability to gain new business; Terayon's ability to develop and bring to market new, technologically advanced products; the acceptance of Terayon's new products in the market; the expansion of operations by Terayon's customers and the deployment of Terayon's products in new or specific markets; as well as the other risks detailed from time to time in Terayon's filings with the Securities and Exchange Commission.

Note: Terayon and the Terayon logo are registered trademarks of Terayon Communication Systems, Inc. All other trademarks are property of their respective owners.

# EXHIBIT 3

Table of Contents

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

------------------

FORM 8-K

------------------

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report: October 28, 2004
(Date of earliest event reported)

TERAYON COMMUNICATION SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

| Delaware | 000-24647 | 77-0328533 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

4988 Great America Parkway, Santa Clara, CA 95054
(Address of principal executive offices and zip code)

Registrant's telephone number, including area code: (408) 235-5500

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

TABLE OF CONTENTS

ITEM 2.02. RESULTS OF OPERATIONS AND FINANCIAL CONDITION
ITEM 8.01. OTHER EVENTS
ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.
SIGNATURES
EXHIBIT INDEX
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

ITEM 2.02. RESULTS OF OPERATIONS AND FINANCIAL CONDITION

On October 28, 2004, Terayon Communication Systems, Inc. (the "Company") announced its financial results for the quarter ended September 30, 2004. A copy of the press release, dated October 28, 2004, is attached and filed herewith as Exhibit 99.1, and is incorporated herein by reference.

ITEM 8.01. OTHER EVENTS

The Company is holding its 2004 Annual Meeting of Stockholders on December 16, 2004 (the "2004 Annual Meeting"). In 2003, the annual meeting of stockholders was held on May 28, 2003. As the date of the 2004 Annual Meeting is delayed by more than 30 days from the date of the Company's previous annual meeting, in accordance with the applicable rules of the Securities and Exchange Commission, the Company is hereby notifying its stockholders of the new meeting date for the 2004 Annual Meeting. The Company will be mailing the proxy statement and related materials in connection with the 2004 Annual Meeting on or about November 17, 2004. In light of this anticipated mailing schedule and in accordance with the Company's bylaws, the Company is hereby notifying its stockholders that November 7, 2004 will be the new date for submitting stockholder proposals for inclusion in the Company's proxy statement for the 2004 Annual Meeting. The Company believes that such a deadline provides a reasonable time before the Company begins the mailing of its proxy materials for the 2004 Annual Meeting. Stockholder proposals received by the Company after November 7, 2004 will be considered untimely and will not be included in the Company's proxy statement for the 2004 Annual Meeting.

ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.

c. Exhibits

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press Release of Terayon Communication Systems, Inc., dated October 28, 2004. |

Table of Contents

SIGNATURES

     Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.


Terayon Communication Systems, Inc.
By:            /s/ Jerry Chase
               Jerry Chase
               Chief Executive Officer

Date: October 28, 2004

--------------------------------------------------------------------------------

Table of Contents

EXHIBIT INDEX

Exhibit
No.                              Description
---------------------------------------------------------------------------
99.1    Press Release of Terayon Communication Systems, Inc., dated October 28,
        2004.

EXHIBIT 99.1

FOR IMMEDIATE DISTRIBUTION

Terayon Reports Third Quarter 2004 Financial Results

Santa Clara, California -- October 28, 2004 -- Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of broadband access, delivery and management platforms, today announced financial results for the quarter ended September 30, 2004. The results are in line with preliminary results for the quarter as announced on October 8, 2004.

Revenues for the third quarter of 2004 were $37.2 million, down 1% from $37.6 million in the third quarter of 2003, and down 13% from $42.8 million in the second quarter of 2004. Net loss for the third quarter of 2004 was $13.5 million, or $0.18 per share, as compared to a net loss of $7.2 million, or $0.10 per share, in the third quarter of 2003, and a net loss of $4.9 million, or $0.06 per share, in the second quarter of 2004. The results for the third quarter of 2004 include an inventory charge of $7.3 million, or $0.10 per share, primarily related to a write-down of excess CMTS inventory, and a charge of $1.4 million, or $0.02 per share, related to an executive separation payment. The results for the second quarter of 2004 included an inventory benefit of $0.8 million, or $0.01 per share, related to the sale of previously reserved inventory, and a charge of $3.6 million, or $0.04 per share, related to restructuring activities and executive separation payments.

The Digital Video Solutions product line had revenues of $10.8 million in the third quarter of 2004, compared to $4.6 million in the third quarter of 2003 and $7.5 million in the second quarter of 2004. The Subscriber product line had revenues of $19.8 million in the third quarter of 2004, compared to $16.2 million in the third quarter of 2003 and $25.0 million in the second quarter of 2004. The CMTS product line had revenues of $6.6 million in the third quarter of 2004, compared to $16.8 million in the third quarter of 2003 and $10.3 million in the second quarter of 2004.

"We are very pleased with our second consecutive quarter of record revenues in our Digital Video Solutions product line and the continued strong sales performance of our Subscriber product line," said Jerry Chase, CEO, Terayon. "Important milestones for us during

--------------------------------------------------------------------------------

Terayon Reports Third Quarter 2004 Financial Results -- October 28, 2004
Page 2

the quarter include: (i) the debut of the Terayon BP 5100 as the enabling
technology behind Fox Broadcasting Company's launch of high definition
broadcasts of National Football League games, and (ii) the Euro-DOCSIS 2.0
certification of the Terayon TJ721X cable modem, which delivers another level of
assurance to cable operators seeking to build more efficient networks that meet
regional specifications. In contrast to those strong performances, we are
disappointed by our weak CMTS sales, which reflect slower deployments by
existing customers and our ongoing challenge in winning new accounts."

    Terayon ended the third quarter with $111.9 million in cash, cash
equivalents and short-term investments, and $65.1 million in convertible debt
due in 2007. Accounts receivable days sales outstanding (DSO) as of September
30, 2004 was 50 days, compared with 59 days reported as of June 30, 2004.

Product Line Update

    Terayon announced today its intention to cease investment in future
development of its Cable Modem Termination System (CMTS) product line. Terayon
is committed to working with its CMTS customers to ensure that customer support
requirements are understood and that appropriate support resources are made
available going forward.

    "Despite Terayon's undisputed technology leadership in the DOCSIS 2.0 CMTS
market, we have been unable to successfully translate that into a profitable
CMTS market leadership position," said Chase. "After careful evaluation of
Terayon's overall product portfolio and strategy, we have decided to cease
further investment in our CMTS product line and halt development on future
hardware upgrades. We intend to work with existing customers to create agreeable
support plans and minimize disruption."

    "These changes do not alter our vision for the company," said Chase.
"Terayon continues to provide broadband solutions for video, voice and data
through its existing Digital Video and Subscriber product lines, and we will
leverage our head-end intellectual property through our advanced technology
group as market opportunities arise in the future."

    "As we look to future quarters, we see significant growth opportunities in
our Digital Video Solutions product line driven by increased HDTV offerings and
the move from analog to digital content. In addition, we are seeing increased
interest in more strategic applications of our digital video technology such as
on-screen branding and customer-relevant digital ad insertion,"

-------------------------------------------------------------------------------

Terayon Reports Third Quarter 2004 Financial Results -- October 28, 2004
Page 3

continued Chase. "Our Subscriber product line should benefit from the
accelerating rollout of VoIP services by cable operators as well as the
continuing need to find new bandwidth within existing networks. We anticipate
that our market leadership position and strong business models across both
product lines will position us well to leverage these compelling market
dynamics, which offer a significant growth opportunity and an accelerated path
to profitability going forward."

    In connection with this action, the Company currently anticipates a
severance charge of approximately $3.2 million to $3.6 million in the quarter
ending December 31, 2004.

Business Outlook

    For the fourth quarter of 2004, Terayon expects to report revenues in the
range of $27 million to $31 million and anticipates a net loss in the range of
$0.12 to $0.15 per share, including the effects of the estimated $3.2 million to
$3.6 million severance charge. Excluding the effects of the estimated severance
charge, Terayon expects a net loss in the range of $0.08 to $0.11 per share.

    Terayon will host a conference call today at 2 p.m. Pacific Time to further
discuss its third quarter 2004 financial performance. A live audio webcast of
the call will be available to the public from Terayon's website at
www.terayon.com/investor. In addition, a replay of the conference call will be
available via telephone beginning October 28 at approximately 4 p.m. Pacific
Time, and will be available through the close of business on November 28, 2004.
Participants can access the replay by dialing 877-213-9653 (U.S.) or
630-652-3041 (international). The access code for the replay is 10131841. A
replay of the audio webcast will also be available online at
www.terayon.com/investor.

About Terayon

    Terayon Communication Systems, Inc. provides access, delivery and
management platforms for broadband providers, cable companies, satellite
operators and broadcasters for the delivery of advanced, carrier-class voice,
data and video services. Terayon, headquartered in Santa Clara, California, has
sales and support offices worldwide, and is traded on the Nasdaq under the
symbol TERN. Terayon can be found on the web at www.terayon.com.

                                 # # #

--------------------------------------------------------------------------------

Terayon Reports Third Quarter 2004 Financial Results -- October 28, 2004
Page 4

Press contact:        Investor contact:
Rebecca West           Kristin Stokan
AtomicPR               Terayon Director, Finance
(415) 703-9454         (408) 486-5206
rebecca@atomicpr.comkristin.stokan@terayon.com

"Safe Harbor" Statements under the Private Securities Litigation Reform Act of
1995:

Except for the historical information contained herein, this news release
contains forward-looking statements, estimates and assumptions by Terayon that
involve risks and uncertainties. These statements include statements relating to
(i) significant growth opportunity and accelerated path to profitability for
Terayon's Digital Video Solutions and Subscriber product lines as a result of
market dynamics and industry developments, including increased HDTV offerings
and roll-out of VoIP services, and Terayon's ability to leverage this growth
opportunity; (ii) the timetable for ceasing investment in the CMTS product line,
the estimates for currently contemplated related charges and the timetable for
when these charges will be incurred; and (iii) the expected range of revenues
and net loss per share for the fourth quarter of 2004. These forward-looking
statements are based on current expectations and Terayon assumes no obligation
to update this information. In addition, the events described in these
forward-looking statements may not actually arise or actual results may differ
materially from those described in this press release, including Terayon's
ability to develop and bring to market new, technologically advanced products
that receive market acceptance; the convergence of industry developments and
market dynamics contributing to the growth of Terayon's Digital Video Solutions
and Subscriber product lines and Terayon's ability to leverage these
opportunities; the expansion of operations by Terayon's customers; the
deployment of Terayon's products in specific markets; Terayon's ability to lower
and align its operating expenses with market conditions; the continuation of
improving trends in the cable industry; transitional challenges as a result of
the changes in senior management staff; and the success of ceasing investment in
the CMTS product line, including successfully implementing the reduction in work
force, closing of certain facilities, managing the support needs of customers
that have previously deployed Terayon's CMTS products and anticipating the range
of related costs, as well as the other risks detailed from time to time in
Terayon's filings with the Securities and Exchange Commission. For more
information about these and other potential factors that could affect Terayon's
business and financial results, see the discussion of "Risk Factors" in
Terayon's most recent 10-K and 10-Q filings, available on the SEC's website at
www.sec.gov.

Note: Terayon and the Terayon logo are registered trademarks of Terayon
Communication Systems, Inc. All other trademarks are property of their
respective owners.

--------------------------------------------------------------------------------

Terayon Communication Systems, Inc.
Unaudited Condensed Consolidated Statements of Operations
(In thousands, except per share amounts)

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | September 30, 2004 | June 30, 2004 | September 30, 2003 |
| Revenues | $ 37,202 | $ 42,782 | $ 37,628 |
| Cost of product revenues | 30,932 | 27,660 | 27,434 |
| Gross profit | 6,270 | 15,122 | 10,194 |
| Operating expenses: | | | |
| Research and development | 8,697 | 8,516 | 9,363 |
| Sales and marketing | 6,222 | 5,411 | 6,452 |
| General and administrative | 2,993 | 2,953 | 2,783 |
| Executive severance, restructuring costs and asset write-offs | 1,462 | 3,579 | (244) |
| Total operating expense | 19,374 | 20,459 | 18,354 |
| Loss from operations | (13,104) | (5,337) | (8,160) |
| Interest income | 524 | 460 | 583 |
| Interest expense | (812) | (826) | (787) |
| Other income (expense) | (45) | 921 | 1,238 |
| Loss before income tax expense | (13,437) | (4,782) | (7,126) |
| Income tax expense | (83) | (79) | (84) |
| Net loss | $ (13,520) | $ (4,861) | $ (7,210) |
| Net loss per share, basic and diluted | $ (0.18) | $ (0.06) | $ (0.10) |
| Shares used in per share calculation, basic and diluted | 76,166 | 75,551 | 74,551 |

--------------------------------------------------------------------------------

Terayon Communication Systems, Inc.
Unaudited Condensed Consolidated Statements of Operations
(In thousands, except per share amounts)

|                                                                  | Nine Months Ended | |
|------------------------------------------------------------------|--------------------:|--------------------:|
|                                                                  | September 30, 2004 | September 30, 2003 |
| Revenues                                                         | $    121,151 | $     90,495 |
| Cost of product revenues                                         | 87,361 | 70,762 |
| Gross profit                                                     | 33,790 | 19,733 |
| Operating expenses:                                              | | |
| Research and development                                         | 26,680 | 32,797 |
| Sales and marketing                                              | 18,854 | 19,741 |
| General and administrative                                       | 8,382 | 9,510 |
| Executive severance, restructuring costs and asset write-offs    | 8,409 | 2,803 |
| Total operating expense                                          | 62,325 | 64,851 |
| Loss from operations                                             | (28,535) | (45,118) |
| Interest income                                                  | 1,437 | 2,394 |
| Interest expense                                                 | (2,456) | (2,438) |
| Other income                                                     | 1,155 | 1,038 |
| Loss before income tax expense                                   | (28,399) | (44,124) |
| Income tax expense                                               | (229) | (214) |
| Net loss                                                         | $    (28,628) | $    (44,338) |
| Net loss per share, basic and diluted                            | $      (0.38) | $      (0.60) |
| Shares used in per share calculation, basic and diluted          | 75,745 | 73,994 |

--------------------------------------------------------------------------------

Terayon Communication Systems, Inc.
Unaudited Condensed Consolidated Balance Sheets
(In thousands)

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| ASSETS Current assets: |  |  |
| Cash and cash equivalents | $ 64,150 | $ 30,188 |
| Short-term investments | 47,757 | 108,452 |
| Accounts receivable, net | 20,475 | 29,799 |
| Other receivables, net | 926 | 3,662 |
| Inventories, net | 15,529 | 16,364 |
| Prepaid expenses and other assets | 2,660 | 2,883 |
| Total current assets | 151,497 | 191,348 |
| Property and equipment, net | 9,134 | 11,871 |
| Restricted cash and other assets, net | 10,865 | 12,021 |
| Total assets | $ 171,496 | $ 215,240 |
| LIABILITIES AND STOCKHOLDERS' EQUITY Current liabilities: |  |  |
| Accounts payable | $ 11,128 | $ 26,049 |
| Accrued payroll and other liabilities | 27,804 | 29,356 |
| Total current liabilities | 38,932 | 55,405 |
| Non-current liabilities | 68,497 | 68,447 |
| Stockholders' equity | 64,067 | 91,388 |
| Total liabilities and stockholders' equity | $ 171,496 | $ 215,240 |

# EXHIBIT 4

Table of Contents
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-Q

x QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

FOR THE QUARTERLY PERIOD ENDED September 30, 2004
OR

o TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM                    TO                    .

--------------------

TERAYON COMMUNICATION SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

DELAWARE                    77-0328533
(STATE OR OTHER JURISDICTION OF    (IRS EMPLOYER
INCORPORATION OR ORGANIZATION) IDENTIFICATION NO.)

4988 GREAT AMERICA PARKWAY
SANTA CLARA, CALIFORNIA 95054
(408) 235-5500
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF
THE REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

--------------------

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes x  No o

Indication by check mark whether the registrant is an accelerated file (as
defined by Rule 12b-2 of the Exchange Act)  Yes x  No o

As of October 31, 2004 registrant had outstanding 76,168,800 shares of
Common Stock.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This Report on Form 10-Q contains forward-looking statements within the
meaning of Section 27A of the Securities Act of 1933 and Section 21E of the
Securities Exchange Act of 1934 which are subject to the "safe harbor" created
by those sections. These forward-looking statements include, but are not limited
to: statements related to industry trends and future growth in the markets for
cable modem systems; our strategies for reducing the cost of our products; our
product development efforts; the effect of GAAP accounting pronouncements on our
recognition of revenues; our future research and development; the timing of our
introduction of new products; the timing and extent of deployment of our
products by our customers; and future profitability. We usually use words such
as "may," "will," "should," "expect," "plan," "anticipate," "believe,"
"estimate," "predict," "future," "intend," or "certain" or the negative of these
terms or similar expressions to identify forward-looking statements. Discussions
containing such forward-looking statements may be found throughout the document.
These forward-looking statements involve certain risks and uncertainties that
could cause actual results to differ materially from those in such
forward-looking statements. We disclaim any obligation to update these
forward-looking statements as a result of subsequent events. The business risks
discussed in Part 1, Item 2 of this Report on Form 10-Q, among other things,
should be considered in evaluating our prospects and future financial
performance.

ITEM 1. FINANCIAL STATEMENTS

PART I. FINANCIAL INFORMATION

TERAYON COMMUNICATION SYSTEMS, INC.
INDEX TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

|                                                                                          | Page |
|------------------------------------------------------------------------------------------|------|
| Condensed Consolidated Balance Sheets as of September 30, 2004 (unaudited) and December 31, 2003 | 3    |
| Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2004 and 2003 (unaudited) | 4 |
| Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2004 and 2003 (unaudited) | 5 |
| Notes to Condensed Consolidated Financial Statements (unaudited)                          | 6    |
| EXHIBIT 10.32 |
| EXHIBIT 10.33 |
| EXHIBIT 10.34 |
| EXHIBIT 10.35 |
| EXHIBIT 10.36 |
| EXHIBIT 31.1 |
| EXHIBIT 31.2 |
| EXHIBIT 32.1 |
| EXHIBIT 32.2 |

2

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands)

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
|  | (unaudited) |  |
| **ASSETS** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $ 64,150 | $ 30,188 |
| Short-term investments | 47,757 | 108,452 |
| Accounts receivable, net | 19,752 | 29,199 |
| Accounts receivable from related parties | 723 | 600 |
| Other current receivables | 926 | 3,662 |
| Inventory | 15,529 | 16,364 |
| Other current assets | 2,660 | 2,883 |
| Total current assets | 151,497 | 191,348 |
| Property and equipment, net | 9,134 | 11,871 |
| Restricted cash | 8,727 | 9,212 |
| Other assets, net | 2,138 | 2,809 |
| Total assets | $ 171,496 | $ 215,240 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ 11,128 | $ 26,049 |
| Accrued payroll and related expenses | 4,368 | 6,537 |
| Deferred revenues | 4,345 | 3,423 |
| Warranty reserves | 4,043 | 5,509 |
| Accrued executive severance and restructuring charges | 7,914 | 4,500 |
| Accrued vendor cancellation charges | 2,133 | 2,869 |
| Other accrued liabilities | 4,459 | 5,036 |
| Interest payable and current portion of long-term debt | 542 | 1,358 |
| Other current obligations | -- | 124 |
| Total current liabilities | 38,932 | 55,405 |
| Long-term obligations | 3,417 | 3,366 |
| Convertible subordinated notes | 65,081 | 65,081 |
| Commitments and contingencies |  |  |
| Stockholders' equity: |  |  |
| Common stock | 76 | 75 |
| Additional paid in capital | 1,083,420 | 1,082,036 |
| Accumulated deficit | (1,016,188) | (987,560) |
| Deferred compensation | -- | (22) |
| Treasury stock, at cost | (773) | (773) |
| Accumulated other comprehensive loss | (2,469) | (2,368) |
| Total stockholders' equity | 64,066 | 91,388 |
| Total liabilities and stockholders' equity | $ 171,496 | $ 215,240 |

See accompanying notes.

3

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Revenues | $ 35,659 | $37,168 | $116,218 | $ 87,568 |
| Related party revenues | 1,543 | 460 | 4,933 | 2,927 |
| Total revenues | 37,202 | 37,628 | 121,151 | 90,495 |
| Cost of revenues | 30,393 | 27,296 | 86,014 | 69,500 |
| Cost of related party revenues | 539 | 138 | 1,348 | 1,262 |
| Total cost of revenues | 30,932 | 27,434 | 87,362 | 70,762 |
| Gross profit | 6,270 | 10,194 | 33,789 | 19,733 |
| Operating expenses: | | | | |
| Research and development | 8,696 | 9,363 | 26,680 | 32,797 |
| Sales and marketing | 6,222 | 6,452 | 18,854 | 19,741 |
| General and administrative | 2,993 | 2,783 | 8,381 | 9,510 |
| Executive severance, restructuring costs and asset write-offs | 1,463 | (244) | 8,409 | 2,803 |
| Total operating expenses | 19,374 | 18,354 | 62,324 | 64,851 |
| Loss from operations | (13,104) | (8,160) | (28,535) | (45,118) |
| Interest income | 525 | 583 | 1,437 | 2,394 |
| Interest expense | (812) | (787) | (2,456) | (2,438) |
| Other income (expense) | (46) | 1,238 | 1,155 | 1,038 |
| Loss before income tax expense | (13,437) | (7,126) | (28,399) | (44,124) |
| Income tax expense | (83) | (84) | (229) | (214) |
| Net loss | $(13,520) | $(7,210) | $(28,628) | $(44,338) |
| Net loss per share, basic and diluted | $ (0.18) | $ (0.10) | $ (0.38) | $ (0.60) |
| Shares used in per share calculation, basic and diluted | 76,164 | 74,551 | 75,744 | 73,994 |

See accompanying notes.

4

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(in thousands)
(unaudited)

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2004 | 2003 |
| **Operating activities:** | | |
| Net loss | $(28,628) | $(44,338) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 4,788 | 7,155 |
| Amortization related to stock options | 17 | 17 |
| Lower of cost or market inventory reserve (recovery) | 6,432 | (8,138) |
| Write-off and disposal of fixed assets | 210 | 497 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | 9,447 | (13,031) |
| Accounts receivable from related parties | (123) | 642 |
| Inventory | (5,597) | 12,826 |
| Other current and non-current assets | 4,116 | 5,844 |
| Accounts payable | (14,921) | (590) |
| Accrued payroll and related expenses | (2,169) | (180) |
| Deferred revenues | 922 | 1,675 |
| Warranty reserves | (1,466) | (2,398) |
| Accrued executive severance and restructuring charges | 3,414 | (1,917) |
| Accrued vendor cancellation charges | (736) | (11,274) |
| Other accrued liabilities. | (1,338) | (3,911) |
| Net cash used in operating activities | (25,632) | (57,121) |
| **Investing activities:** | | |
| Purchases of short-term investments | (77,748) | (200,239) |
| Proceeds from sales and maturities of short-term investments | 138,160 | 182,231 |
| Purchases of property and equipment | (2,261) | (2,716) |
| Net cash provided by (used in) investing activities | 58,151 | (20,724) |
| **Financing activities:** | | |
| Principal payments on capital leases | (128) | (116) |
| Proceeds from issuance of common stock | 1,390 | 2,411 |
| Net cash provided by financing activities | 1,262 | 2,295 |
| Effect of exchange rate changes | 181 | 909 |
| Net increase (decrease) in cash and cash equivalents | 33,962 | (74,641) |
| Cash and cash equivalents at beginning of period | 30,188 | 117,079 |
| Cash and cash equivalents at end of period | $ 64,150 | $ 42,438 |

See accompanying notes.

5

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

1. Organization and Summary of Significant Accounting Policies

Description of Business

Terayon Communication Systems, Inc., or the Company, was incorporated under the laws of the State of California on January 20, 1993. In July 1998, the Company reincorporated in the State of Delaware.

The Company develops, manufactures, markets and sells equipment to broadband service providers who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers.

Basis of Presentation

The accompanying condensed consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information and in accordance with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by U.S. generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the financial statements at September 30, 2004 and for the three and nine months ended September 30, 2004 and 2003 have been included.

Results for the three and nine months ended September 30, 2004 are not necessarily indicative of results for the entire fiscal year or future periods. These financial statements should be read in conjunction with the consolidated financial statements and the accompanying notes included in the Company's Form 10-K dated March 15, 2004, as filed with the U.S. Securities and Exchange Commission. The accompanying balance sheet at December 31, 2003 is derived from audited consolidated financial statements at that date.

Reclassifications

Certain amounts in the 2003 financial statements have been reclassified to conform to the 2004 presentation.

Basis of Consolidation

The condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated.

Use of Estimates

The preparation of the condensed consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates. Estimates are based on historical experience, input from sources outside of the Company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's valuation of its accounts receivable and inventory reserves, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of warranty and restructuring reserves.

6

--------------------------------------------------------------------------------

Table of Contents

Stock-Based Compensation

The Company accounts for stock-based compensation for its employees using the intrinsic value method presented in Accounting Principles Board (APB) Opinion No. 25, "Accounting for Stock Issued to Employees," (APB No. 25), and includes the disclosure-only provisions as required under Statement of Financial Accounting Standards (SFAS) No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123). The Company provides additional pro forma disclosures as required under SFAS No. 123 and SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure".

For purposes of pro forma disclosures, the estimated fair value of the options granted and employee stock purchase plan shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of SFAS No. 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common stockholders would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net loss, as reported | $(13,520) | $ (7,210) | $(28,628) | $(44,338) |
| Add: Stock-based compensation under APB No. 25 | -- | 9 | 17 | 17 |
| Deduct: Stock option compensation expense determined under fair value-based method | (3,071) | (5,602) | (11,284) | (17,201) |
| Employee stock purchase plan compensation expense determined under fair value-based method | (159) | (366) | (872) | (1,646) |
| Pro forma net loss | $(16,750) | $(13,169) | $(40,767) | $(63,168) |
| Net loss per share, basic and diluted, as reported | $ (0.18) | $ (0.10) | $ (0.38) | $ (0.60) |
| Pro forma net loss per share, basic and diluted | $ (0.22) | $ (0.18) | $ (0.54) | $ (0.85) |
| Shares used in computing pro forma net loss per share, basic and diluted | 76,164 | 74,551 | 75,744 | 73,994 |

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Raw materials | $    683 | $  1,440 |
| Work-in-process | 159 | 660 |
| Finished goods | 14,687 | 14,264 |
| Total inventory | $ 15,529 | $ 16,364 |

7

--------------------------------------------------------------------------------

Table of Contents

During the three and nine months ended September 30, 2004, the Company reversed approximately $0.6 million and $1.9 million, respectively, of inventory reserves, which were previously recorded as cost of goods sold. During the three and nine months ended September 30, 2003, the Company reversed approximately $1.0 million and $2.7 million, respectively of inventory reserves. The Company reversed these reserves as it was able to sell inventory originally considered to be excess or obsolete.

Purchase Obligations

    The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of purchase orders placed with vendors for goods and services and require the Company to purchase minimum quantities of the suppliers' products at a specified price. As of September 30, 2004, $26.5 million of purchase obligations were outstanding. The Company accrues for vendor cancellation charges in amounts, which represent management's estimate of the Company's exposure to vendors when management curtails or ceases production of certain products or terminates a vendor or supplier agreement. Estimates of exposure are determined using vendor inventory data. At September 30, 2004, accrued vendor cancellation charges were $2.1 million and the remaining $24.4 million was attributable to open purchase orders in the normal course of business. The remaining obligations are expected to become payable at various times through the first quarter of 2005. For the three and nine months ended September 30, 2004, the Company reversed approximately $23,000 and $3.4 million, respectively, of vendor cancellation charges. For the three and nine months ended September 30, 2003, the Company reversed $1.0 million and $5.4 million, respectively, of accrued vendor cancellation charges. The Company reversed these amounts as a result of favorable negotiations with vendors.

Net Loss Per Share

    A reconciliation of the numerator and denominator of basic and diluted net loss per share is provided as follows (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net loss | $(13,520) | $(7,210) | $(28,628) | $(44,338) |
| Shares used in computing basic and diluted net loss per share | 76,164 | 74,551 | 75,744 | 73,994 |
| Basic and diluted net loss per share | $ (0.18) | $ (0.10) | $ (0.38) | $ (0.60) |

    Options and warrants to purchase 17,664,919 and 17,634,021 shares of common stock were outstanding at September 30, 2004 and September 30, 2003, respectively, but were not included in the computation of diluted net loss per share, since the effect would have been antidilutive.

Accumulated Other Comprehensive Loss

    Accumulated other comprehensive loss presented in the accompanying condensed consolidated balance sheets consist of net unrealized gains or losses on short-term investments and accumulated net foreign currency translation gains or losses.

The following are the components of comprehensive loss (in thousands):

8

--------------------------------------------------------------------------------

Table of Contents

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Net loss | $(13,520) | $(7,210) | $(28,628) | $(44,338) |
| Cumulative translation adjustments | (188) | 360 | 180 | 910 |
| Change in unrealized loss on available- for-sale investments | 252 | (67) | (282) | (478) |
| Total comprehensive net loss | $(13,456) | $(6,917) | $(28,730) | $(43,906) |

Impact of Recently Issued Accounting Standards

    In March 2004, the FASB issued a proposed Statement, "Share-Based Payment, an amendment of FASB Statements Nos. 123 and 95," that addresses the accounting for share-based payment transactions in which a Company receives employee services in exchange for either equity instruments of the Company or liabilities that are based on the fair value of the Company's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using the intrinsic method that the Company currently uses and generally would require that such transactions be accounted for using a fair-value-based method and recognized as expense in the consolidated statement of operations. The effective date of the proposed standard is for periods beginning after June 15, 2005. It is expected that the final standard will be issued before December 31, 2004 and should it be finalized in its current form, it will have a significant impact on the Company's consolidated statement of operations as the Company will be required to expense the fair value of stock option grants.

2. Contingencies

    Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against the Company and certain of its officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding the Company's technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired the Company's securities between November 15, 1999 and April 11, 2000.

    On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

    On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's

--------------------------------------------------------------------------------

Table of Contents

relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery. On March 24, 2004, plaintiffs submitted certain documents to the Court in response to its order, and, on April 16, 2004, the Company responded to this submission. The Company also has initiated discovery pursuant to the Court's February 23, 2004 order.

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

The Court of Appeals' opinion affirming dismissal of the Bertram case does not end the class action. The Company believes that the allegations in the class action are without merit, and the Company intends to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

In 2002, two shareholders filed derivative cases purportedly on behalf of the Company against certain of the Company's current and former directors, officers, and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the California Superior Court, Santa Clara County. The Company is a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In the securities class action, the Company disputes making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants.

The Company believes that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the Company's breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of the Company's wholly-owned subsidiaries. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. Omniband appealed the Zurich Chamber of Commerce's decision, which was affirmed in its ruling of October 15, 2004. The Company believes that the allegations are without merit and intends to present a vigorous defense in the arbitration proceedings.

From time to time, the Company receives letters claiming that the Company's technology and products may infringe on intellectual property rights of third parties. The Company also has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that the Company's technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require the Company to enter into royalty arrangements; subject the Company to damages or injunctions restricting the sale of its products, require the Company to indemnify its customers for the use of the allegedly infringing products; require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments; require the Company to redesign certain of its products; or damage the Company's reputation, any one of which could materially and adversely affect the Company's business, results of operations and financial condition.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on its financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position and overall results of operations for any of the above legal proceedings could change in the future.

10

--------------------------------------------------------------------------------

Table of Contents

3. Operating Segment Information

    The Company operates as one business segment.

| (in thousands) | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Revenues by product: | | | | |
| CMTS products | $ 6,492 | $16,825 | $ 27,917 | $29,979 |
| CPE products | 18,899 | 15,654 | 67,658 | 46,320 |
| Video products | 10,802 | 4,577 | 24,381 | 11,109 |
| Other products | 1,009 | 572 | 1,195 | 3,087 |
| Total revenues | $ 37,202 | $37,628 | $ 121,151 | $90,495 |
| Revenues by geographic areas: | | | | |
| United States | $ 25,130 | $16,653 | $ 68,188 | $47,832 |
| Canada | 401 | 370 | 2,239 | 1,106 |
| Europe, Middle East, Africa Region (EMEA), excluding Israel | 3,379 | 5,173 | 18,344 | 15,873 |
| Israel | 1,663 | 638 | 10,879 | 1,449 |
| Japan | 3,876 | 11,047 | 9,563 | 17,859 |
| Asia, excluding Japan | 2,743 | 3,246 | 11,875 | 5,856 |
| South America | 10 | 501 | 63 | 520 |
| Total | $ 37,202 | $37,628 | $ 121,151 | $90,495 |

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Long-lived assets: | | |
| United States | $ 15,874 | $ 19,630 |
| Canada | 494 | 810 |
| Europe | 157 | 175 |
| Israel | 3,344 | 3,104 |
| Asia | 130 | 173 |
| Total long-lived assets | 19,999 | 23,892 |
| Total current assets | 151,497 | 191,348 |
| Total assets | $ 171,496 | $ 215,240 |

    Three customers accounted for 10% or more of total revenues (20%, 15%, and 14%) for the three months ended September 30, 2004. Two customers accounted for 10% or more of total revenues (21% and 11%) for the nine months ended September 30, 2004. Three customers accounted for 10% or more of total revenues (29%, 13%, and 13%) for the three months ended September 30, 2003. Three customers accounted for 10% or more of total revenues (20%, 17%, and 12%) for the nine months ended September 30, 2003.

4. Executive Severance, Restructuring Charges and Asset Write-offs

Executive Severance

11

---

Table of Contents

In June 2004, the Company entered into an employment agreement with an executive officer. The executive officer resigned effective as of October 1, 2004. The Company recorded a severance provision of $1.4 million related to termination costs for this officer in the third quarter of 2004. Most of the separation costs related to this officer are expected to be paid in the fourth quarter of 2004 with nominal amounts for employee benefits paid into the fourth quarter of 2005.

In June 2004, the Company entered into separation agreements with two other executive officers. Both executive officers resigned from the Company during the third quarter of 2004. The Company recorded a severance provision of $1.7 million related to termination costs for these officers in the second quarter of 2004. Most of the separation costs were paid in the third quarter of 2004 with nominal amounts for employee benefits paid through the third quarter of 2005.

Restructuring

First and Second Quarter 2004 Restructurings

During the first quarter of 2004, the Company approved a restructuring plan. The Company incurred restructuring charges in the amount of $3.3 million in the first quarter of 2004, of which $1.0 million related to employee termination costs, $0.9 million related to costs to exit an aircraft lease, and $1.4 million related to costs for excess leased facilities. The Company incurred restructuring charges in the amount of $1.15 million in the second quarter of 2004 related to additional costs for excess leased facilities, which were contemplated in the first quarter restructuring plan. Net costs accrued under this restructuring plan, included estimated sublease income from the aircraft and the excess leased facilities. As of September 30, 2004, the employment of 58 employees had been terminated, and the Company had paid $0.8 million in termination costs. The amount of net costs accrued under the first quarter 2004 restructuring plan assumed that the Company would successfully sublease the aircraft and excess leased facilities. The reserve for the aircraft lease and excess leased facilities was based on information provided by the Company's brokers that estimated, based on assumptions relevant to the aircraft and real estate market conditions as of the date of the Company's restructuring plan, the time it would likely take to fully sublease the aircraft and excess facilities. In the third quarter of 2004, the Company entered into an agreement with a third party to sublease the aircraft. Even though it is the intent of the Company to sublease its interests in the excess facilities at the earliest possible time, the Company cannot determine with certainty a fixed date by which this event may occur. In light of this uncertainty, based on estimates, the Company periodically re-evaluates and adjusts the reserve, as necessary. The Company currently anticipates the remaining restructuring accrual related to employee termination costs to be substantially utilized by the end of 2004. The remaining restructuring accrual related to the aircraft lease is expected to be substantially utilized for servicing operating lease payments of operating lease commitments, through January 2007, and the remaining restructuring accrual related to excess leased facilities, is expected to be utilized for servicing operating lease payments through October 2009.

In the second and third quarters of 2004, the Company re-evaluated the first and second quarter 2004 restructuring charges for the excess facilities and the aircraft lease termination. Based on market conditions, new assumptions provided by the Company's broker, and the terms of the aircraft sublease agreement, which the Company entered into in the third quarter of 2004, the Company increased the restructuring charge by a total of $0.85 million in the nine months ended September 30, 2004.

A summary of the first and second quarter 2004 accrued restructuring charges is as follows (in thousands):

| | Involuntary Terminations | Aircraft Lease Termination | Excess Leased Facilities | Total |
|---|---|---|---|---|
| Total charge for the first quarter of 2004 | $ 952 | $ 934 | $ 1,375 | $ 3,261 |
| Additional charges for the second quarter of 2004 | | | 1,148 | 1,148 |
| Cash payments | (795) | (947) | (549) | (2,291) |
| Revaluation | -- | 899 | (54) | 845 |
| Balance at September 30, 2004 | $ 157 | $ 886 | $ 1,920 | $ 2,963 |

2003 Restructuring

12

--------------------------------------------------------------------------------

During the first quarter of 2003, a restructuring plan was approved. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs. All accrued restructuring costs related to the 2003 restructuring had been paid as of December 31, 2003.

2002 and 2001 Restructurings

During 2001, a restructuring plan was approved and the Company incurred restructuring charges in the amount of $12.7 million of which $2.3 million remained accrued at September 30, 2004, for excess leased facilities. During 2002, another restructuring plan was approved, which increased the reserve for excess leased facilities due to the exiting of additional space within the same facility. The Company incurred restructuring charges in the amount of $3.6 million for the 2002 restructuring of which $1.2 million remained accrued at September 30, 2004 for excess leased facilities. The Company currently anticipates the remaining restructuring accrual relating to excess leased facilities, will be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments, through 2005.

The following table summarizes the costs and activities during 2004, related to the 2002 and 2001 restructuring (in thousands):

|  | Excess Leased Facilities |
| --- | --- |
| Balance at December 31, 2003 | $    4,500 |
| Cash Payments | (940) |
| Balance at September 30, 2004 | $    3,560 |

Asset Write-offs

For the nine months ended September 30, 2004, the Company wrote off $0.1 million, of fixed assets, which were determined to have no remaining useful life. For the nine months ended September 30, 2003, the Company wrote off $0.4 million of fixed assets, which were determined to have no remaining useful life. For the three months ended September 30, 2003, the Company wrote off $17,000 of fixed assets, which were determined to have no remaining useful life. The Company did not write-off any fixed assets during the three months ended September 30, 2004.

5. Related Party Transactions

Lewis Solomon, a member of the Company's Board of Directors and a member of the Company's Nominating and Governance Committee and Compensation Committee, is also a member of the Board of Directors of Harmonic, Inc. (Harmonic). Harmonic is an authorized, non-exclusive reseller of certain of the Company's video products. For the three and nine months ended September 30, 2004, related party revenue included $1.5 million and $4.9 million, respectively, of revenue from Harmonic. For the three and nine months ended September 30, 2003, related party revenue included $0.5 million and $1.5 million, respectively, of revenue from Harmonic.

Alek Krstajic, a member of the Company's Board of Directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers Communications, Inc. (Rogers) until January 2003. Beginning April 1, 2003, the Company no longer recognized revenues related to Rogers as related party revenue because Rogers was no longer considered to be a related party. For the first quarter of 2003, the Company recognized $1.4 million of Rogers's related party revenue, net of amortization of co-marketing expense.

In the nine months ended September 30, 2004, the Company paid Mr. Krstajic $30,000 for consulting services provided to the Company.

In December 2001, the Company entered into a co-marketing arrangement with Rogers to promote the Company's brand its products. The Company paid $0.9 million to Rogers, and recorded this amount as other current assets. In July 2002, the Company began amortizing this prepaid asset and

13

--------------------------------------------------------------------------------

Table of Contents

charging it against revenue in accordance with the Emerging Issues Task Force 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in the three and nine months ended September 30, 2003, totaled approximately $1.4 million and $4.2 million, respectively. This asset was fully amortized during 2003.

Cost of related party revenues in the Company's consolidated statements of operations consists of direct and indirect costs. Accounts receivable from Harmonic totaled approximately $0.7 million at September 30, 2004. None of the related parties is a supplier to the Company.

6. Sale of Assets

On April 2, 2004, the Company sold all of its ownership in Radwiz, Ltd., Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a cash payment of $0.15 million. In connection with this disposition, the acquirer received obsolete inventories with no book value, $0.2 million of selected net assets, and assumed $1.35 million of net liabilities related to these subsidiaries. The Company recorded a net gain of $1.3 million on this transaction in the second quarter of 2004, which is included as an element of other income (expense) in the accompanying condensed consolidated statement of operations.

7. Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts based on the best available information -- mostly historical claims experience -- claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties for the nine months ended September 30, 2003 and 2004, is as follows (in thousands):

| | Balance at Beginning of Period | Additions Charged to Expenses | Expiration of Accrued Warranty | Charges for Warranty Services Provided | Balance at End of Period |
|---|---|---|---|---|---|
| Nine months ended September 30, 2003 Warranty reserve | $  8,607 | 1,350 | -- | (3,748) | $  6,209 |
| Nine months ended September 30, 2004 Warranty reserve | $  5,509 | 2,943 | (1,829) | (2,580) | $  4,043 |

7. Subsequent Event

In October 2004, the Company announced its intention to cease investment in future development of its Cable Modem Termination System (CMTS) product line. In connection with this announcement, the Company initiated a worldwide reduction in force, which is expected to result in a restructuring charge of approximately $3.2 million to $3.6 million in the quarter ending December 31, 2004.

14

--------------------------------------------------------------------------------

Table of Contents

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with our condensed consolidated financial statements and notes thereto.

Overview

We develop manufacture, market and sell cable modem termination systems (CMTS), digital video management systems and customer premise equipment (CPE), including cable modems to broadband service providers who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers. Our revenues have been generated principally from sales of these three major product groups either directly to broadband service providers through direct sales forces primarily in North America, Europe and Asia or indirectly through resellers.

In October 2004, after careful evaluation of our overall product portfolio and strategy, we announced our intention to cease investment in future development of our CMTS product line and halt development on future hardware upgrades. In connection with this action, we initiated a worldwide reduction in force, which is likely to result in a restructuring charge of approximately $3.2 million to $3.6 million in the quarter ending December 31, 2004. Although we currently expect the outcome of this action to generate future savings, we will incur additional material charges associated with our decision to cease investment in the CMTS product line and the currently anticipated employee termination costs may increase, perhaps materially.

Our gross margins fluctuate from period to period primarily as a result of the sales volume and mix of products we sell. Specifically, we derive substantially higher margins from sales of our CMTS and digital video equipment products than we do from sales of our CPE products, which are subject to intense price competition. Due to disappointing CMTS sales in the third quarter, we undertook an evaluation of our overall product portfolio and strategy and decided to cease investing in our current CMTS product line. Moreover, to date a majority of our total revenues have been generated from sales of our CPE products. Historically, erosion of average selling prices (ASPs) of our CPE products has had a negative impact on our gross margins. However, we believe that the decline of ASPs will continue to decline moderately in the future. We are working to mitigate pressures on our gross margins by focusing on increasing sales of our higher margin digital video equipment and by continuing to focus on product manufacturing cost reductions for our CPE products. In the first quarter of 2004, we largely completed our transition to a new original design manufacturer (ODM) in Asia for our CPE products. To the extent that the containment of our product costs do not keep pace with ASP declines, our gross margins will be adversely affected.

We have not been profitable since our inception. For the three and nine months ended September 30, 2004, we had a net loss of $13.5 million and $28.6 million, respectively. We believe our ability to achieve profitability in the long term will depend primarily on three factors. The first factor is our ability to achieve improved gross margins through an improved sales mix by increasing sales of higher margin digital video products relative to the sales of CPE products. To increase sales of digital video products, we are targeting new markets such as the broadcast sector and promoting new applications such as high definition television (HDTV) and digital insertion to cable and satellite operators. To the extent that sales of CPE products continue to comprise a greater proportion of our total revenues, our ability to achieve profitability in the future could be adversely affected. Second, we will continue to focus on lowering product costs for our CPE products through our ODM relationships in Asia. Finally, as discussed below, we expect to benefit from a lower expense base resulting in part from restructuring activities in the first, second and fourth quarters of 2004 combined with continued focus on cost containment. Furthermore, as part of our restructuring efforts, we will continue to divest and cease investment in unprofitable product lines in an effort to focus on growing our business and redirect our resources.

15

--------------------------------------------------------------------------------

Table of Contents

However, despite these efforts, we may not succeed in attaining profitability in the near future, if at all.

At September 30, 2004, we had approximately $111.9 million in cash, cash equivalents and short-term investments as compared to approximately $138.6 million at December 31, 2003. The decrease in the first nine months of 2004 primarily resulted from the use of cash for operating activities. Although we believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months, we may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. There can be no assurance that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

Our ability to grow our business and attain profitability is dependent on our ability to effectively compete in the marketplace with our current products and services, develop and introduce new products and services, contain operating expenses and improve our gross margins, as well as the continued recovery of the communications industry. A more detailed description of the risks to our business can be found in the section captioned "Risk Factors".

In the third quarter of 2004, after the resignation of Zaki Rakib, our former Chief Executive Officer, Jerry Chase was appointed as our Chief Executive Officer. During the same period, Arthur Taylor, our Chief Financial Officer, and Douglas Sabella, our Chief Operating Officer, resigned. On October 1, 2004, Shlomo Rakib, our President and Chief Technology Officer, resigned.

Critical Accounting Policies

Inventory Valuation and Purchase Obligations

We record losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Research Bulletin No. 43. Our policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires us to perform a detailed assessment of inventory at each balance sheet date, which assessment includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months as well as product lifecycle and product development plans. Given the rapid technological change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by our customers and therefore demand for our products, we believe that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that we use in the valuation of inventory are the basis for our revenue forecast, which is also consistent with our short-term manufacturing plan. Based on this analysis, we reduce the cost of inventory that we specifically identify and consider obsolete or excessive to fulfill future sales estimates. We define obsolete inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using our best estimate of future demand at the time, based upon information then available.

We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for the manufacture of our products. During the normal course of business, in order to manage manufacturing lead times (often ranging from three to six months) and to help ensure adequate component supply, we enter into agreements with contract manufacturers and suppliers that either allow them to procure inventory based upon criteria as defined by us or that establish the parameters defining our component supply requirements. If we were to curtail or cease production of certain products or terminate these agreements, we may be liable for vendor cancellation charges.

We accrue for vendor cancellation charges (which increase cost of goods sold) which represent management's estimate of our financial exposure to vendors when our management curtails or ceases production of certain products or terminates a vendor or supplier agreement. Estimates of exposure are determined using

16

--------------------------------------------------------------------------------

Table of Contents

vendor inventory data. Should we change our short-term manufacturing plans such that further products or components would no longer be used, additional vendor cancellation charges may occur. At September 30, 2004, accrued vendor cancellation charges were $4.3 million which are expected to become payable in the next three to six months. Historically, we have been able to reverse portions of our vendor cancellation accrual as we were able to negotiate downward certain vendor cancellations to more favorable terms. Such reversals of vendor cancellation charges cause a decrease in cost of goods sold in the period during which such charges are settled. For the three and nine months ended September 30, 2004, we reversed approximately $23,000 and $3.4 million, respectively, of vendor cancellation charges as a result of favorable negotiations with vendors.

There have been no material change to any of our critical accounting policies and estimates as disclosed in our annual report on Form 10-K for the year ended December 31, 2003.

Results of Operations

Three and Nine Months Ended September 30, 2004 and September 30, 2003

Revenues

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months ended 2004/2003 | % Change for the nine months ended 2004/2003 |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | | |
| Revenues | $37,202 | $37,628 | $121,151 | $90,495 | (1)% | 34% |

We sell directly to our customers, principally broadband service providers and broadcasters, and to a lesser extent, indirectly through resellers. Revenues from sales of our products are recognized when: (1) persuasive evidence of a sales arrangement exists, (2) product delivery has occurred or services have been rendered, (3) the selling price is fixed or determinable, and (4) collectibility of revenue is reasonably assured. A provision is made for estimated product returns as product warranty shipments are made. Our existing agreements typically do not grant return rights beyond those provided by our product warranty. Revenue from product sales to resellers are generally recognized when product is shipped as we generally do not grant return rights beyond those provided by the warranty.

Our revenues decreased 1% to $37.2 million for the quarter ended September 30, 2004 compared to $37.6 million in the quarter ended September 30, 2003, primarily due to decreased deployments of our CMTSs by cable operators across all geographics, which decline in CMTS revenue was offset by increased sales of our video products and CPE.

Our revenues increased 34% to $121.2 million for the nine months ended September 30, 2004 compared to $90.5 million for the nine months ended September 30, 2003, primarily due to increased sales of our CPE and video products, and increased sales of our legacy circuit-switch voice product, which increased sales were offset by decreased sales of our CMTS products due to decreased deployments of our CMTSs by cable operators across all geographics. We expect total revenues to continue to decline in the fourth quarter of 2004 compared to the third quarter of 2004 primarily due to a slow-down in the market for our products as well as our decision to cease investment in future development of our CMTS product line.

Revenues by Groups of Similar Products

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months ended 2004/2003 | % Change for the nine months ended 2004/2003 |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | | |
| Revenues by product: | | | | | | |
| CMTS products | $6,492 | $16,825 | $27,917 | $29,979 | (61)% | (7)% |

17

---

Table of Contents

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months endedSeptember 30, | % Change for the nine months ended September 30, |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | 2004/2003 | 2004/2003 |
| CPE products | 18,899 | 15,654 | 67,658 | 46,320 | 21% | 46% |
| Video products | 10,802 | 4,577 | 24,381 | 11,109 | 136% | 119% |
| Other products | 1,009 | 572 | 1,195 | 3,087 | 76% | (61%) |
| Total revenues | $37,202 | $37,628 | $121,151 | $90,495 | (1)% | 34% |

CMTS revenues decreased 61% and 7%, respectively for the three and nine months ended September 30, 2004 compared to the three and nine months ended September 30, 2003. This decrease was due to slower CMTS deployments by existing customers and our ongoing challenge in winning new CMTS accounts. In October 2004, we announced our intention to cease investment in future development of our CMTS product line. Consequently, we expect CMTS revenues to significantly decrease in the fourth quarter of 2004 and future periods.

CPE revenues increased 21% for the quarter ended September 30, 2004 compared to the quarter ended September 30, 2003, due to an increase in modem sales. The number of modems sold increased from approximately 0.3 million units in the third quarter of 2003 to approximately 0.5 million units in the third quarter of 2004. CPE revenues increased 46% for the nine months ended September 30, 2004 compared to the nine months ended September 30, 2003, due to an increase in modem sales, as well as an increase in sales of our legacy circuit-switch voice product especially in the second quarter of 2004. The number of modems sold increased from approximately 0.9 million units in the nine months ended September 30, 2003 to approximately 1.5 million units in the nine months ended September 30, 2004. The intensely competitive nature of the market for our products has led to significant ASP erosion for our CPE products over time, and we expect this price erosion to continue, but to a lesser extent. We believe that our full transition to an ODM in Asia, which was substantially completed in the first quarter of 2004, may allow us to remain competitive in the marketplace and maintain favorable margins on these products. Additionally, during the second quarter of 2004, we experienced exceptionally strong demand for our legacy Multigate circuit-switch product line, which is sold primarily to one customer in Europe. Going forward, we anticipate the level of circuit switch business to continue to remain relatively low. We expect total CPE revenues to decline in the fourth quarter of 2004 due to lower expected sales and continued ASP declines.

Revenues from video products increased 136% for the quarter ended September 30, 2004 compared to the quarter ended September 30, 2003, and increased 119% for the nine months ended September 30, 2004 compared to the nine months ended September 30, 2003, due to increased sales of our DM 6400 Cherrypicker video product to US multiple system operators MSOs as well as revenue recognized in the third quarter of 2004 from shipments of our BP5100 platform through August 31, 2004. We currently anticipate that video revenues will likely be flat in the fourth quarter of 2004 when compared to the third quarter of 2004 due to the rapid growth in video revenues in the third quarter of 2004. However, we are encouraged by the prospects for our video business to grow in the future and currently believe that we will continue to see increased sales of video products as demand for high definition television (HDTV) and other digital video services, including digital ad insertion, grows in 2005.

We had $1.0 million of sales of our legacy telecom products in the third quarter of 2004, up 76% from the same period in 2003. Other revenues decreased 61% for the nine months ended September 30, 2004 compared to the nine months ended September 30, 2003, due to significantly decreased sales of our legacy telecom products. We expect sales of telecom products to be minimal in the fourth quarter of 2004.

Revenues by Geographic Region

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months endedSeptember 30, | % Change for the nine months ended September 30, |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | 2004/2003 | 2004/2003 |

Revenues by geographic areas:

18

--------------------------------------------------------------------------------

Table of Contents

| (in thousands) | For the three months ended September 30, 2004 | 2003 | For the nine months ended September 30, 2004 | 2003 | % Change for the three months ended September 30, 2004/2003 | % Change for the nine months ended September 30, 2004/2003 |
|---|---|---|---|---|---|---|
| North America | $25,531 | $17,023 | $ 70,427 | $48,938 | 50% | 44% |
| Europe, Middle East, Africa Region (EMEA), excluding Israel | 3,379 | 5,173 | 18,344 | 15,873 | (35)% | 16% |
| Israel | 1,663 | 638 | 10,879 | 1,449 | 161% | 651% |
| Asia | 6,619 | 14,293 | 21,438 | 23,715 | (54)% | (10)% |
| South America | 10 | 501 | 63 | 520 | (98)% | (88)% |
| Total | $37,202 | $37,628 | $121,151 | $90,495 | (1)% | 34% |

Revenues in North America increased 50% to $25.5 million in the third quarter of 2004 compared to the same period in 2003, and increased 44% to $70.4 million in the nine months ended September 30, 2004, compared to the same period in 2003, primarily due to increased sales of our CPE and video products to US MSOs and sales of our BP5100 to our broadcast customer, Fox. Revenues in Israel increased due to increased sales of our legacy Multigate circuit-switch product. Revenues in Asia decreased due to decreased sales of DOCSIS 2.0 CMTS products. During the nine months ended September 30, 2004, we emphasized sales to our US customers while placing a lower emphasis on sales internationally due to our increased success with US opportunities. We expect revenue in international locations to continue declining in the fourth quarter of 2004, especially since we announced our decision to stop investing in our CMTS product line. Overall revenues are expected to be significantly lower in the fourth quarter of 2004, due to decreased deployment of our CPE and video products and our intention to cease investment in future development of our CMTS product line. Three customers accounted for 10% or more of total revenues (20%, 15%, and 14%) for the three months ended September 30, 2004. Two customers accounted for 10% or more of total revenues (21% and 11%) for the nine months ended September 30, 2004. Three customers accounted for 10% or more of total revenues (29%, 13%, and 13%) for the three months ended September 30, 2003. Three customers accounted for 10% or more of total revenues (20%, 17%, and 12%) for the nine months ended September 30, 2003. No other customer accounted for more than 10% of revenues during these periods.

Related Party Revenues

| (in thousands) | For the three months ended September 30, 2004 | 2003 | For the nine months ended September 30, 2004 | 2003 | % Change for the three months ended September 30, 2004/2003 | % Change for the nine months ended September 30, 2004/2003 |
|---|---|---|---|---|---|---|
| Related party revenues: | | | | | | |
| Harmonic revenues | $ 1,543 | $460 | $4,933 | $1,474 | 235% | 235% |
| Rogers' revenues | -- | -- | -- | 1,453 | -- | -- |
| Total related party revenues | $ 1,543 | $460 | $4,933 | $2,927 | 235% | 69% |

Related party revenues increased 235% in the third quarter of 2004, compared to the third quarter of 2003. Related party revenues increased 69% in the nine months ended September 30, 2004, compared to the nine months ended September 30, 2003. Related party revenues in the first quarter of 2003 included revenues from Rogers Communications, Inc. (Rogers) and Harmonic, Inc. (Harmonic). Alek Krstajic, a member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers were not classified as related party revenues after the first quarter of 2003. Lewis Solomon, another member of our board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2004 and 2003. The increase in related party revenues was primarily due to an increase in sales of our video

19

--------------------------------------------------------------------------------

Table of Contents

products to Harmonic in 2004 as compared to the same periods in 2003. None of
our related parties is a supplier to us.

     In December 2001, we entered into a co-marketing arrangement with Rogers.
We paid $0.9 million to Rogers, and recorded this amount as other current
assets. In July 2002, we began amortizing this prepaid asset and charging it
against related party revenues in accordance with Emerging Issues Task Force
(EITF) 01-09, "Accounting for Consideration given by a Vendor to a Customer or
Reseller in Connection with the Purchase or Promotion of the Vendor's Products."
We charged $0.15 million per quarter of the amortization of this asset against
total revenues through December 31, 2003. Approximately $0.15 million of
amortization was charged against total revenues in the first quarter of 2003. No
further amounts of this co-marketing arrangement were included in other current
assets after December 31, 2003 and no further amortization has or will occur in
2004.

Cost of Goods Sold and Gross Profit

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months ended 2004/2003 | % Change for the nine months ended 2004/2003 |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | | |
| Cost of revenues | 30,393 | 27,296 | 86,014 | 69,500 | 13% | 23% |
| Cost of related party revenues | 539 | 138 | 1,348 | 1,262 | 291% | 7% |
| Total cost of goods sold | 30,932 | 27,434 | 87,362 | 70,762 | 13% | 23% |
| Gross profit | $ 6,270 | $10,194 | $33,789 | $19,733 | (38)% | 71% |

     Cost of goods sold consists of direct product costs as well as the cost of
our manufacturing operations. The cost of manufacturing includes contract
manufacturing, test and quality assurance for products, warranty costs and
associated costs of personnel and equipment. In the three and nine months ended
September 30, 2004, cost of goods sold was approximately 83% and 72% of
revenues, respectively, compared to 73% and 78% of revenues, respectively, in
the same periods in 2003. For the three and nine months ended September 30,
2004, we reversed approximately $23,000 and $3.4 million, respectively, of
vendor cancellation charges. For the three and nine months ended September 30,
2003, we reversed $1.0 million and $5.4 million, respectively, of vendor
cancellation charges. We reversed these charges as we were able to negotiate
downward certain vendor cancellation to more favorable terms. Additionally,
during the three and nine months ended September 30, 2004, we reversed
approximately $0.6 million and $1.9 million, respectively, of inventory
reserves, which were previously recorded as cost of goods sold. During the three
and nine months ended September 30, 2003, we reversed approximately $1.0 million
and $2.7 million, respectively of inventory reserves. We reversed these reserves
as we were able to sell inventory originally considered to be excess or
obsolete.

     In the three and nine months ended September 30, 2004, related party cost
of revenues increased compared to the same periods in 2003 primarily due to
higher sales of our video products to Harmonic.

     Our gross profit decreased 38% to $6.3 million or 17% of sales in the three
months ended September 30, 2004 compared to $10.2 million, or 27% of sales in
the same period in 2003. Our gross profit increased 71% to $33.8 million or 28%
of sales in the nine months ended September 30, 2004 compared to $19.7 million,
or 22% of sales in the same period in 2003. The decrease in our gross profit for
the three months ended September 30, 2004 compared to the same period in 2003,
was primarily related to relatively flat revenues and an unfavorable product
line sales mix. The increase in our gross profit for the nine months ended
September 30, 2004 was primarily related to an increase in revenues compared to
the same period in 2003, as well as a favorable product line sales mix, as we
generated a larger proportion of sales from our higher margin digital video
products, and the continued effective cost management of our CPE products due
largely to the benefits gained from moving manufacturing operations to on ODM in
Asia. For the three and nine months ended September 30, 2004, we accrued $2.0
million and $3.3 million, respectively, of vendor cancellation charges. For the
three months ended September 30, 2003, we did not accrue any vendor cancellation
charges. For the nine months ended September 30, 2003, we accrued $2.2 million
of vendor cancellation charges. We accrued these charges, which represent
management's estimate of our exposure to vendors should we curtail or cease
production of certain products or terminate a vendor or supplier agreement.
Additionally, during the three and nine months ended September 30, 2004, we
accrued $5.5 million and $7.7 million, respectively, of inventory reserves to
cost of goods sold. During the three and nine months ended September 30, 2003,
we accrued $1.0 million and $3.6 million, respectively of inventory reserves to
cost of goods sold. Based on a detailed analysis of our inventory, we accrued
these reserves to reduce the cost of our inventory by the amounts we
specifically identified and considered obsolete or excessive to fulfill future
sales estimates.

                                       20

--------------------------------------------------------------------------------

Table of Contents

We will continue to focus on improving sales of higher margin products and reducing product-manufacturing costs. We are now partnering with contract manufacturers in Asia primarily for our CPE products, which may provide us with more competitive component pricing, economies of scale, and improved manufacturing capabilities. However, there are no assurances that we will succeed in selling a greater percentage of higher margin products or reducing our product manufacturing costs. Primarily due to our intention to cease investment in future development of our CMTS product line and halt development on future hardware upgrades, we believe our lower margin CPE products will comprise a larger percentage of our revenue and cost of good sold. Consequently, we expect margins to decline beginning in the fourth quarter of 2004.

Operating Expenses

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months ended September 30, 2004/2003 | % Change for the nine months ended September 30, 2004/2003 |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | | |
| Research and development | $8,696 | $9,363 | $26,680 | $32,797 | (7)% | (19%) |
| Sales and marketing | $6,222 | $6,452 | $18,854 | $19,741 | (4)% | (4)% |
| General and administrative | $2,993 | $2,783 | $ 8,381 | $ 9,510 | 8% | (12)% |

Research and Development. Research and development expenses consist primarily of personnel costs, internally designed prototype material expenditures, and expenditures for outside engineering consultants, and equipment and supplies required to develop and enhance our products. Research and development expenses decreased 7% to $8.7 million or 23% of sales in the three months ended September 30, 2004 from $9.4 million or 25% of sales in the same period in 2003. The $0.7 million decrease in research and development expenses was attributable to $0.5 million of reductions in employee related expenses. The decrease in research and development expenses also included reductions of $0.5 million in purchases of materials, costs incurred to develop prototypes, and other research and development expenses, and a decrease of $0.1 million of outside engineering consultants, partially offset by an increase of $0.4 million related to the implementation of an incentive compensation plan for research and development personnel in the third quarter of 2004.

Research and development expenses decreased 19% to $26.7 million or 22% of sales in the nine months ended September 30, 2004 from $32.8 million or 36% of sales in the same period in 2003. The $6.1 million decrease in research and development expenses was attributable to $2.6 million of reductions in employee related expenses due to restructuring actions in 2004. The decrease in research and development expenses also included reductions of $0.3 million of outside engineering consultants and $3.6 million of reductions in purchases of materials, costs incurred to develop prototypes, and other research and development expenses partially offset by an increase of $0.4 million related to the implementation of an incentive compensation plan for research and development personnel in the third quarter of 2004. In connection with our intention to cease investment in future development of our CMTS product line and halt development on future CMTS hardware upgrades, we currently expect research and development expenses to continue to decrease in the fourth quarter of 2004. However, we believe it is critical for us to continue to make significant investments in research and development to create innovative technologies and products that meet the current and future requirements of our customers. Accordingly, we intend to continue our investment in research and development specifically related to our video and CPE product lines.

Sales and Marketing. Sales and marketing expenses consist primarily of salaries and commissions for sales personnel, and marketing and support personnel, and costs related to trade shows, consulting and travel. Sales and marketing expenses decreased 4% to $6.2 million or 17% of sales in the three months ended September 30, 2004 from $6.5 million or 17% of sales in the same period in 2003. The $0.3 million decrease in sales and marketing expenses was primarily due to $0.2 million of decreased travel costs, $0.7 million of reductions related to leased aircraft costs now included in restructuring charges, and $0.2 million of overall sales and marketing cost reductions. These reductions were partially offset by $0.2 million in increased employee expenses in sales and marketing and $0.5 million of increased spending for outside consultants, and $0.1 million related to the implementation of an incentive compensation plan for sales and marketing personnel in the third quarter of 2004.

21

--------------------------------------------------------------------------------

Table of Contents

Sales and marketing expenses decreased 4% to $18.9 million or 16% of sales in the nine months ended September 30, 2004 from $19.7 million or 22% of sales in the same period in 2003. The $0.9 million decrease in sales and marketing expenses was primarily due to $1.6 million of reductions related to leased aircraft costs now included in restructuring charges, $0.2 million of decreased travel costs, a decrease in accrued bonuses in 2004 of $0.1 million due to the discontinuation of the executive bonus plan in 2004, and $1.0 million of overall sales and marketing cost reductions. These reductions were partially offset by $0.8 million in increased employee expenses in sales and marketing, and $1.2 million of increased spending for outside consultants. We currently expect sales and marketing expenses to be slightly higher for the fourth quarter of 2004 compared to the third quarter of 2004.

General and Administrative. General and administrative expenses consist primarily of salary and benefits for administrative and support personnel, travel expenses and legal, accounting and consulting fees. Overall general and administrative expenses increased 8% to $3.0 million or 8% of sales for the three months ended September 30, 2004 from $2.8 million or 7% of sales in the same period in 2003. Prior to the second quarter of 2004, we included severance expense related to the termination of an executive officer in general and administrative expenses. In the first quarter of 2003, $0.3 million of general and administrative expense included severance expense related to the termination of the executive officer. Beginning the second quarter of 2004, we now record all severance expenses associated with the termination of executive officers in the statements of operations under the caption, "Executive Severance, Restructuring Costs and Asset Write-offs". The $0.2 million increase in general and administrative expenses for the three months ended September 30, 2004, compared to the same period in 2003 was primarily due to $0.7 million of increased spending for outside consultants, $0.1 million of increased severance expense, $0.1 million increase of travel and other expenses, partially offset by a $0.2 million decrease related to the discontinuation of the executive bonus plan in 2004, and $0.5 million in decreased employee expenses.

General and administrative expenses decreased by $1.1 million to $8.4 million or 7% of sales for the nine months ended September 30, 2004 from $9.5 million or 11% of sales in the same period in 2003. The $1.1 million decrease was primarily due to $1.6 million in reduced employee expenses including a decrease of $0.5 million of accrued bonuses in 2004 due to the discontinuation of the executive bonus plan in 2004, $0.2 million of decreased severance cost, and $0.8 million of overall general and administrative cost decreases, partially offset by $1.3 million of increased spending for outside consultants and $0.2 million increase of travel expenses. We currently expect general and administrative expenses to be slightly lower for the fourth quarter of 2004 compared to the third quarter of 2004.

Executive Severance, Restructuring Costs and Asset Write-offs

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2004 | 2003 |
| Executive severance charges | $ 1,366 | $    -- | $ 3,048 | $    -- |
| Restructuring charges (recovery) | -- | (261) | 4,409 | 2,398 |
| Long-lived assets written-off | -- | 17 | 106 | 405 |
| Revaluation of restructuring charges | 97 | -- | 846 | -- |
| Executive severance, restructuring costs and asset write-offs | $ 1,463 | $ (244) | $ 8,409 | $ 2,803 |

Executive Severance Charges In June 2004, we entered into an employment agreement with an executive officer. Although this executive officer resigned effective as of October 1, 2004, we recorded a severance provision of $1.4 million related to termination cost for this officer in the third quarter of 2004. Most of the separation costs related to this officer are expected to be paid in the fourth quarter of 2004 with nominal amounts for employee benefits paid into the fourth quarter of 2005.

In June 2004, we entered into separation agreements with two executive officers. Both executive officers resigned in the third quarter of 2004. We recorded a severance provision of $1.7 million related to termination costs for these officers in the second quarter of 2004. Most of the separation costs were paid in the third quarter of 2004 with nominal amounts for employee benefits paid through the third quarter of 2005.

--------------------------------------------------------------------------------

Table of Contents

Restructuring Costs During the first quarter of 2004, we initiated a restructuring plan to bring operating expenses in line with revenue levels. We incurred restructuring charges in the amount of $3.3 million of which $1.0 million related to employee termination costs, $0.9 million related to exit costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. We incurred restructuring charges in the amount of $1.15 million in the second quarter of 2004 related to additional costs for excess leased facilities, which were contemplated in the first quarter restructuring plan. As of September 30, 2004, the employment of 58 employees had been terminated, and we paid $0.8 million in termination costs, $0.9 million of costs related to the aircraft lease, and $0.6 million of costs related to excess leased facilities. We anticipate the remaining restructuring accrual related to the aircraft lease to be substantially utilized for servicing operating lease payments, through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments through October 2009. In the second and third quarters of 2004, we re-evaluated the first and second quarter 2004 restructuring charges for the excess facilities and the aircraft lease termination. Based on market conditions, new assumptions provided by our broker, and the terms of aircraft sublease agreement, which we entered into in the third quarter of 2004, we increased the restructuring charge by a total of $0.8 million in the nine months ended September 30, 2004.

The amount of net costs accrued under the 2004 restructuring plan assumes that we will successfully sublease the aircraft and excess leased facilities. The reserve for the aircraft lease and excess leased facilities approximates the difference between our current costs for the aircraft and excess leased facilities and the estimated income derived from subleasing, which is based on information derived by our brokers that estimated, based on assumptions relevant to the aircraft lease and real estate market conditions as of the date of our implementation of the restructuring plan, the time it would likely take to fully sub-lease the aircraft and excess leased facilities. In the third quarter of 2004, we entered into an agreement with a third party to sublease the aircraft. Even though it is our intent to sublease our interests in the excess facility at the earliest possible time, we cannot determine with certainty a fixed date by which such events will occur, if at all. In light of this uncertainty, we will continue to periodically re-evaluate and adjust the reserve, as necessary.

During the first quarter of 2003, we initiated a restructuring program. We incurred restructuring charges in the amount of $2.7 million related to employee termination costs and paid $2.7 million in termination costs. At September 30, 2004, no restructuring charges remain accrued.

In the third quarter of 2002, we initiated a restructuring program. As part of this program, we restructured our worldwide operations including a worldwide reduction in workforce and the consolidation of excess facilities. We incurred additional restructuring charges of $3.6 million in 2002. Of the total restructuring charge, $2.3 million was related to employee termination costs. The remaining $1.3 million related primarily to costs for excess leased facilities. At September 30, 2004, restructuring charges of $1.2 million remained accrued. As of September 30, 2004, the employment of 153 employees had been terminated, and we paid $2.2 million in termination costs and $0.2 million in excess facility costs. We currently anticipate the remaining restructuring accrual, primarily relating to excess leased facilities, will be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments, through 2005.

In 2001 we incurred restructuring charges of $12.7 million. Of the total restructuring charges recorded, $3.2 million related to employee termination costs covering 293 technical, production, and administrative employees. The remaining $9.5 million of restructuring charges related primarily to costs for excess leased facilities. As of September 30, 2004, restructuring charges of $2.4 million remained accrued. We anticipate utilizing the remaining restructuring accrual, which relates to servicing operating lease payments or negotiating a buyout of operating lease commitments, through 2005.

In October 2004, we announced our intention to cease investment in future development of our CMTS product line. In connection with this announcement, we initiated a worldwide reduction in force, which is expected to result in a restructuring charge of approximately $3.2 million to $3.6 million related to employee termination costs in the quarter ending December 31, 2004. We may incur additional material charges associated, and may further reduce our workforce in connection, with this determination.

Asset Write-offs For the nine months ended September 30, 2004 and September 30, 2003, we wrote off $0.1 million and $0.4 million, respectively, of fixed assets, which were determined to have no remaining useful life. We did not write-off any fixed assets during the three months ended September 30, 2004. For the nine months ended September 30, 2003, we wrote off $17,000 of fixed assets, which were

23

--------------------------------------------------------------------------------

Table of Contents

determined to have no remaining useful life. We did not write-off any fixed assets during the three months ended September 30, 2003.

Non-Operating Expenses

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | | % Change for the three months ended September 30, 2004/2003 | % Change for the nine months ended September 30, 2004/2003 |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 | | |
| Interest income | $ 525 | $ 583 | $ 1,437 | $ 2,394 | (10%) | (40%) |
| Interest expense | $(812) | $ (787) | $(2,456) | $(2,348) | 3% | 1% |
| Other income (expense) | $ (46) | $1,238 | $ 1,155 | $ 1,038 | -- | 11% |

    Interest Income. Interest income decreased 10% to $0.5 million in the third quarter of 2004 compared to $0.6 million in the same period in 2003. Interest income decreased 40% to $1.4 million in the nine months ended September 30, 2004 compared to $2.4 million in the same period in 2003. The decrease in interest income in both periods was primarily due to lower invested average cash balances, slightly off-set by higher interest rates.

    Interest Expense. Interest expense, which related primarily to interest on our Convertible Subordinated Notes (Notes) due in 2007, remained relatively flat in the third quarter of 2004 and the nine months ended September 30, 2004, compared to the same periods in 2003 as no Notes were repurchased in 2003 or 2004.

    Other Income (Expense). Other income (expense) is generally comprised of the impact of foreign currency transaction gains and losses and realized gains or losses on investments. In the second quarter of 2004, we sold all of our ownership in Radwiz, Ltd., Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a cash payment of $150,000. In connection with this disposition, the acquirer received obsolete inventories with no book value, $0.2 million of selected net assets, and $1.35 million of net liabilities related to these subsidiaries. We recorded other income of $1.3 million on this transaction in the second quarter of 2004.

Income Taxes

| (in thousands) | For the three months ended September 30, | | For the nine months ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Income tax expense | $ (83) | $ (84) | $ (229) | $ (214) |

    We have generated losses since our inception. In the three and nine months ended September 30, 2004 and 2003, we recorded an income tax expense related primarily to foreign taxes.

Litigation

    Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against us and certain of our officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003,

24

--------------------------------------------------------------------------------

Table of Contents

the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery. On March 24, 2004, plaintiffs submitted certain documents to the Court in response to its order, and, on April 16, 2004, we responded to this submission. We also have initiated discovery pursuant to the Court's February 23, 2004 order.

On October 16, 2000, a lawsuit was filed against us and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

The Court of Appeals' opinion affirming dismissal of the Bertram case does not end the class action. We believe that the allegations in the class action are without merit, and we intend to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

In 2002, two shareholders filed derivative cases purportedly on behalf of us against certain of our current and former directors, officers, and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the California Superior Court, Santa Clara County. We are a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In the securities class action, we dispute making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants.

We believe that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by our breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of our wholly-owned subsidiaries. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. Omniband appealed the Zurich Chamber of Commerce's decision, which was affirmed in its ruling of October 15, 2004. We believe that the allegations are without merit and intend to present a vigorous defense in the arbitration proceedings.

From time to time, we receive letters claiming that our technology and products may infringe on intellectual property rights of third parties. We also have in the past agreed to, and may from time to time in the future agree to, indemnify a customer of our technology or products for claims against the customer by a third party based on claims that our technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require us to enter into royalty arrangements; subject us to damages or injunctions restricting the sale of its products, require us to indemnify its customers for the use of the allegedly infringing products; require us to refund payment of allegedly infringing products to our customers or to forgo future payments; require us to redesign certain of our products; or damage our reputation, any one of which could materially and adversely affect our business, results of operations and financial condition.

25

--------------------------------------------------------------------------------

Table of Contents

We are currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While we currently believe that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on our financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of our legal proceedings, there exists the possibility of a material adverse impact on our results of operations for the period in which the ruling occurs. The estimate of the potential impact on our financial position and overall results of operations for any of the above legal proceedings could change in the future.

Off-Balance Sheet Financings and Liabilities

Other than lease commitments and unconditional purchase obligations incurred in the normal course of business, we do not have any off-balance sheet financing arrangements or liabilities, guarantee contracts, retained or contingent interests in transferred assets or any obligation arising out of a material variable interest in an unconsolidated entity. We do not have any majority-owned subsidiaries that are not included in the consolidated financial statements.

Liquidity and Capital Resources

At September 30, 2004, we had approximately $64.1 million in cash and cash equivalents and $47.8 million in short-term investments.

Cash used in operating activities for the nine months ended September 30, 2004 was $25.6 million compared to $57.1 million used in the same period in 2003. In the nine months ended September 30, 2004, significant uses of cash from operating activities included $28.6 million loss from operations, $14.9 million decrease in accounts payable, and $5.6 million of increase in gross inventory, offset by a $6.4 million write-off of CMTS and modem inventories in 2004. In the nine months ended September 30, 2003, significant uses of cash from operating activities included a $44.3 million loss from operations, and a $11.3 million decrease in vendor cancellation reserves as we paid down these obligations, $13.0 million decrease in accounts payable, partially offset by a $5.8 million increase in other assets, and $4.7 million net increase in inventory.

Cash provided by investing activities for the nine months ended September 30, 2004, was $58.2 million compared to cash used in investing activities of $20.7 million in the same period in 2003. Investing activities consisted primarily of net purchases and sales of short-term investments in 2004 and 2003. The increase in cash provided by investing activities in the nine months ended September 30, 2004, was primarily due to the maturity of short-term investments during the period. The decrease in cash used in investing activities in the nine months ended September 30, 2003 was primarily due to movement of short-term investments to cash and cash equivalents to fund operations.

Cash provided by financing activities was $1.3 million in the nine months ended September 30, 2004 compared to $2.3 million in the same period in 2003 primarily due to proceeds from the exercise of stock options and the sale of shares of common stock through our Employee Stock Purchase Plan.

In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of approximately $484.4 million. The Notes are a general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.5 million.

Through September 30, 2004, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million. We did not repurchase any Notes in 2003 or 2004.

26

--------------------------------------------------------------------------------

Table of Contents

We believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months. In order to obtain profitability in the future, we will need to increase revenues from the sale of our more profitable products while decreasing costs. We also may need to raise additional funds in order to support more rapid expansion, develop new or enhanced products and services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. We may seek to raise additional funds through private or public sales of securities, strategic relationships, bank debt, and financing under leasing arrangements or otherwise. If additional funds are raised through the issuance of equity securities, the percentage ownership of our current stockholders will be reduced, stockholders may experience additional dilution or such equity securities may have rights, preferences or privileges senior to those of the holders of our common stock. We cannot assure you that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, or services take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

Contractual Obligations

The following summarizes our contractual obligations at September 30, 2004, and the effect such obligations are expected to have on our liquidity and cash flows in future periods (in millions):

|  | | Payments Due by Period | | |
|  | Total | Less than 1 year | 1-3 years | 4-5 years | After 5 years |
| --- | --- | --- | --- | --- | --- |
| Unconditional Purchase Obligations | $ 26.5 | $ 26.5 | $ -- | $ -- | $ -- |
| Long Term Debt | 68.5 | -- | 1.6 | 65.1 | 1.8 |
| Operating Lease Obligations | 19.7 | 6.6 | 6.5 | 6.2 | 0.4 |
| Aircraft Lease | 3.4 | 1.5 | 1.9 | -- | -- |
| Total Contractual Commitments | $118.1 | $ 34.6 | $10.0 | $71.3 | $ 2.2 |

We have unconditional purchase obligations to certain of our suppliers that support our ability to manufacture our products. The obligations require us to purchase minimum quantities of the suppliers' products at a specified price. As of September 30, 2004, we had approximately $26.5 million of purchase obligations, of which $2.1 million is included in the consolidated balance sheets as accrued vendor cancellation charges, and the remaining $24.4 million is attributable to open purchase orders in the ordinary course of business. The remaining obligations are expected to become payable at various times through the first quarter of 2005.

In the third quarter of 2004, the Company entered into an agreement with a third party to sublease the aircraft. The aircraft lease commitment above does not include an estimated reduction of $100,000 per month related to this sublease income.

We had restricted cash of $8.7 million at September 30, 2004. Restricted cash related to commitments primarily required to support operating leases, are as follows (in millions):

|  | Amount of Commitment Expiration Per Period | | | | |
|  | Total Amounts Committed | Less than 1 year | 1-3 years | 4-5 years | Over 5 years |
| --- | --- | --- | --- | --- | --- |
| Deposits | $ 1.0 | $ 0.3 | $ 0.7 | $ -- | $ -- |
| Standby Letters of Credit | 7.7 | -- | -- | 7.5 | 0.2 |
| Total Commercial Commitments | $ 8.7 | $ 0.3 | $ 0.7 | $ 7.5 | $ 0.2 |

27

--------------------------------------------------------------------------------

Table of Contents

    In 2002, we entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit. The letter of credit was reduced to $7.5 million in February 2003. This lease commitment is included in the table above. As discussed above, in the third quarter of 2004, we entered into an agreement with a third party to sublease the aircraft.

Impact of Recently Issued Accounting Standards

    In March 2004, the FASB issued a proposed Statement, "Share-Based Payment, an amendment of FASB Statements Nos. 123 and 95," that addresses the accounting for share-based payment transactions in which a Company receives employee services in exchange for either equity instruments of the Company or liabilities that are based on the fair value of the Company's equity instruments or that may be settled by the issuance of such equity instruments. The proposed statement would eliminate the ability to account for share-based compensation transactions using the intrinsic method that the Company currently uses and generally would require that such transactions be accounted for using a fair-value-based method and recognized as expense in the consolidated statement of operations. The effective date of the proposed standard is for periods beginning after June 15, 2005. It is expected that the final standard will be issued before December 31, 2004 and should it be finalized in its current form, it will have a significant impact on our consolidated statement of operations as we will be required to expense the fair value of stock option grants.

RISK FACTORS

    You should carefully consider the risks described below before making an investment decision. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment.

Risks Related to Our Business

We have a history of losses and may continue to incur losses in the future.

    It is difficult to predict our future operating results. We began shipping products commercially in June 1997, and we have been shipping products in volume since the first quarter of 1998. As of September 30, 2004, we had an accumulated deficit of $1.0 billion. We believe that we will continue to experience challenges in selling our products at a profit and may continue to operate with net losses for the foreseeable future. In the past few years, we experienced a decrease in revenues, which was, in large part, due to the erosion of average selling prices (ASPs) of our products and a drop in CMTS sales volume due to our transition from a proprietary platform to the DOCSIS standards platform. Although our revenues increased in the first half of 2004 as compared to 2003, we still incurred losses of $13.5 million and $28.6 million, respectively, in the three and nine months ended September 30, 2004. As a result of the operating deficiencies, we have had to use available cash and cash equivalents to supplement the operation of our business. Cash used in operating activities for the nine months ended September 30, 2004 was $25.6 million compared to $57.1 million used in the same period in 2003. Additionally, we generally have been

28

--------------------------------------------------------------------------------

Table of Contents

unable to significantly reduce our short-term expenses in order to compensate for unexpected decreases in anticipated revenues or delays in generating anticipated revenues. For example, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price irrespective of whether we can subsequently use such quantities in our produced. Further, we have experienced and will likely continue to experience declining ASPs of our products. We record an inventory charge to reduce our inventory to the lower of cost or market if ASPs fall below the cost of these products. In addition, we have significant operating lease commitments for facilities and equipment that generally cannot be cancelled in the short-term without substantial penalties.

Our business may be adversely affected by delays in, or our failure to, commercialize new products, or reduce the cost of manufacturing our current products. Moreover, given the conditions in the broadband equipment market, the profit potential of our business remains unproven.

We may experience fluctuations in our operating results and face unpredictability in our future revenues.

Our quarterly revenues have fluctuated and are likely to continue to fluctuate significantly in the future due to a number of factors, many of which are outside our control. Factors that affect our revenues include, among others, the following:

* variations in the timing of orders and shipments of our products;

* variations in the size of the orders by our customers and pricing concessions on volume sales;

* competitive market conditions;

* unpredictable sales cycles;

* new product introductions by competitors or by us;

* delays in our introduction of new products;

* delays in our introduction of added features to our products;

* delays in the commercialization of products that are competitive in the marketplace;

* delays in our receipt of and cancellation of orders forecasted by customers;

* variations in capital spending budgets of cable operators and other broadband service providers;

* international conflicts, including the continuing conflict in Iraq, and acts of terrorism and the impact of adverse economic, market and political conditions worldwide; and

* ability of our products to be qualified or certified as meeting industry standards.

Our quarterly results are affected by the gross margin we achieve for the quarter relative to our gross revenues. A variety of factors influence our gross margin for a particular quarter, including, among others, the following:

* the sales mix of our products;

* the volume of products manufactured;

* the type of distribution channel through which we sell our products;

* the ASPs of our products;

* the ability to manage excess and obsolete inventory;

* delays in reducing the cost of our products;

* the costs of manufacturing our products; and

* the effectiveness of our cost reduction measures.

We often recognize a substantial portion of our revenues in the last month of the quarter. We establish our expenditure levels for product development and other operating expenses based on projected sales levels, and expenses are relatively fixed, particularly in the short term. For example, a significant percentage of these operating expenses are fixed due to operating leases for our facilities and equipment. Also, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price. Because in the past, we have been unable to use all of the products that we purchased from our suppliers, we have taken vendor cancellation charges as a result of

29

--------------------------------------------------------------------------------

Table of Contents

these fixed commitments, and we may have to take additional charges in the future if we are unable to use all of the products that we purchase from our suppliers. As of September 30, 2004, $26.5 million of purchase obligations were outstanding. Accordingly, variations in timing of sales can cause significant fluctuations in operating results. In addition, because a significant portion of our business is derived from orders placed by a limited number of large customers, the timing of such orders can also cause significant fluctuations in our operating results. Our expenses for any given quarter are typically based on expected sales and if sales are below expectations, our operating results may be adversely impacted by our inability to adjust spending to compensate for the shortfall. Moreover, our research and development expenses fluctuate in response to new product development, and changing industry requirements and customer demands.

Additionally, the unit ASPs of our products declined considerably in 2002, 2003, and 2004, and we anticipate that unit ASPs of our products will continue to decline in the future. This has caused and will continue to cause a decrease in our gross margins if we are unable to off-set the decline in ASPs with cost reduction measures. In addition, the gross margins we realize from the sale of our products are affected by the mix of product sales between higher margin, lower volume head-end equipment, such as digital video management systems, and lower margin, higher volume Customer Premise Equipment (CPE) products, such as modems. We are attempting to increase our gross margin by shifting our product mix from CPE revenues to higher margin digital video product revenues, and cease investment in our CMTS product line. However there are no assurances that we will succeed. For the reminder of 2004 and 2005, we expect that sales of our low-margin CPE products will continue to make up a significant portion of our revenues. Revenues for our video products will remain flat for the remainder of 2004. Moreover, we are in the early stages of development with respect to our video product line. Historically, video product revenues represented less than 30% of our total revenues. If our video product line does not receive broader market acceptance and we do not generate a greater percentage of total revenues from video product revenues, we will not succeed in greatly improving our gross margin.

We are dependent on a small number of customers and our business could be harmed by the loss of any of these customers or reductions in their purchasing volumes.

Our customers have undergone and continue to undergo significant consolidation in both North America and internationally, as a limited number of cable operators control an increasing number of systems. For example, the top nine cable operators in the United States operate systems that service approximately 90% of homes that receive cable services in the United States. As a result of the consolidation among cable operators, our revenue has been and will continue to be dependent on sales to the few leading cable operators worldwide. Three customers accounted for 10% or more of total revenues (20%, 15%, and 14%) for the three months ended September 30, 2004. Two customers accounted for 10% or more of total revenues (21% and 11%) for the nine months ended September 30, 2004. Three customers accounted for 10% or more of total revenues (29%, 13%, and 13%) for the three months ended September 30, 2003. Three customers accounted for 10% or more of total revenues (20%, 17%, and 12%) for the nine months ended September 30, 2003.

As is common in our industry, we typically do not enter into contracts with our customers in which they commit to purchase products from us. Typically, our sales are made on a purchase order or system contract basis, and none of our customers has entered into a long-term agreement requiring it to purchase our products. Moreover, we do not typically require our customers to purchase a minimum quantity of our products, and our customers can generally cancel or significantly reduce their orders on short notice without significant penalties. The loss of any of our customers can have a material adverse effect on our results of operations. Further, any reduction in orders from a given customer can likewise have a material adverse affect on our results of operations.

Also, we may not succeed in attracting new customers as many of our potential customers have pre-existing relationships with our current or potential competitors and the continued consolidation of the cable industry reduces the number of potential customers. To attract new customers, we may be faced with intense price competition, which may affect our gross margins. We may also face losing existing customers or business from our existing customers because of our decision to cease investment in our CMTS product line.

--------------------------------------------------------------------------------

Table of Contents

The sales cycle for certain of our products is lengthy, which makes forecasting of our customer orders and revenue difficult.

   The sales cycle for certain of our products is lengthy, often lasting nine months to more than a year. Our customers generally conduct significant technical evaluations, including customer trials, of our products as well as competing products prior to making a purchasing decision. In addition, purchasing decisions may also be delayed because of a customer's internal budget approval processes. Because of the lengthy sales cycle and the size of customer orders, if orders forecasted for a specific customer for a particular period do not occur in that period, our revenues and operating results for that particular quarter could suffer. Moreover, a portion of our expenses related to an anticipated order is fixed and difficult to reduce or change, which may further impact our revenues and operating results for a particular period.

We are dependent on key personnel.

   Due to the specialized nature of our business, we are highly dependent on the continued service of, and on our ability to attract and retain, qualified senior management, engineering, sales, and marketing personnel. The competition for some of these personnel is intense. The loss of any of these individuals may significantly disrupt and be harmful to our business. In addition, if we are unable to hire qualified personnel as needed in a timely manner, we may be unable to adequately manage and grow our business.

   Highly skilled employees with the education and training that we require, especially employees with significant experience and expertise in video, data networking and radio frequency design, are in high demand. We may incur additional expenses to attract and retain key personnel. We cannot assure you that the additional expenses we may incur will enable us to attract and retain qualified personnel necessary for the development of our business. We do not have key person insurance coverage for the loss of any of our employees. Any officer or employee can terminate his or her relationship with us at any time. Although a few of our executive officers have limited non-competition agreements with us, our employees generally are not bound by non-competition agreements.

   Additionally, we have recently experienced and may continue to experience significant changes in key personnel, including the resignation of our Chief Executive Officer and his appointment as Chairman of the Board of Directors, the resignation of our Chairman, President and Chief Technology Officer although he remains a member of the Board, and the resignation of our Chief Operating Officer and Chief Financial Officer, as well as the appointment of a new Chief Executive Officer and the appointment of our General Counsel and Head of Human Resources as the Acting Chief Financial Officer. Turnover in personnel, and the recruitment and retention of a new senior management staff, has created and could continue to create a number of transitional challenges for us. For instance, we are currently actively engaged in the search for a new Chief Financial Officer. Although we have an Acting Chief Financial Officer, we may experience transitional difficulties in financial management and administration during the period until a new Chief Financial Officer is appointed. These transitional issues have caused, and may cause, disruptions to our business. We cannot assure you that the steps we have taken will succeed in establishing a smooth transition of our senior management staff, or result in the orderly continuation of our operations during the interim period. As a result of these and other changes, including the search for a new Chief Financial Officer, we also may experience additional turnover in management. Further, we cannot assure you that the integration of our new senior management staff will occur in a timely manner, or that such integration will not present additional transitional challenges for us.

There are many risks associated with our participation in industry standards.

   In connection with the development of the DOCSIS 2.0 specification by Cable Television Laboratories, Inc., a cable industry consortium that establishes cable technology standards and administers compliance testing (CableLabs), we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis any of our intellectual property rights, including rights to

our proprietary S-CDMA technology, to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products. As a result of this license to CableLabs, our competitors that produce DOCSIS-based products have access to our technology without having to pay us any royalties or other compensation for the use of our technology. As a result of our contribution of technology to the DOCSIS intellectual property pool, we may have foregone significant revenue from the potential licensing of our proprietary technology, and we may be unable to recoup the investment in the research and development of intellectual property contributed to the DOCSIS technology pool.

Additionally, the agreement that we signed with CableLabs to participate in the DOCSIS intellectual property pool may make it difficult for us to enforce our intellectual property rights against other companies. Certain cable equipment vendors manufacture and sell DOCSIS based and DOCSIS certified and qualified products without sublicensing from CableLabs the technology in the CableLabs intellectual property pool. Due to the interests of cable operators in having as many equipment vendors as possible, we may feel constrained by competitive pressures from pursuing the enforcement of our intellectual property rights against our competitors that have not entered into sublicenses with CableLabs. Moreover, if we seek to enforce our intellectual property rights against other equipment manufacturers that access technology from the CableLabs intellectual property pool, our license to the technology in the pool may be jeopardized. Certain contributors of technology to the CableLabs intellectual property pool are our competitors and may elect to revoke our license to their technology if we attempt to enforce our intellectual property rights against them.

We may have lost any competitive advantage that our proprietary S-CDMA technology may have provided us in the marketplace by licensing it to CableLabs, and we may face increased competition because our competitors have the ability to incorporate our technology into their products. We believe that this increased competition could come from existing competitors or from new competitors who enter the market and that such competition is likely to result in lower product ASPs, which could harm our revenues and gross margins. Additionally, because our competitors will be able to incorporate our technology into their products, our current customers may choose alternate suppliers or choose to purchase DOCSIS-compliant products from multiple suppliers. We may be unable to effectively compete with the other vendors if we cannot produce DOCSIS compliant cable products more quickly or at lower cost than our competitors.

DOCSIS specifications have not yet been accepted in Asia, although an increasing number of Asian cable operators are requiring product to be DOCSIS qualified or certified. An alternate specification for cable products, called the Euro-DOCSIS specification, has been formalized by TComLabs, a cable

31

--------------------------------------------------------------------------------

technology consortium of European cable operators, and European and some Asian cable operators have embraced it. We have contributed certain of our technologies, including our proprietary S-CDMA technology, to the Euro-DOCSIS specification. We may develop and sell products that comply with the Euro-DOCSIS specification, and we may be unsuccessful in these efforts. Even if we are successful in our efforts, we may face some of the same risks associated with our contribution of intellectual property to the CableLabs DOCSIS intellectual property pool.

We need to certify and qualify our new and existing products to meet industry specifications in order to remain competitive.

    Major cable operators worldwide have endorsed the DOCSIS, Euro-DOCSIS and PacketCable specifications and rarely purchase equipment that is not certified or qualified as compliant with these specifications. Cable operators have chosen to purchase only products meeting industry specifications because the specifications enable interoperability among products from multiple vendors, which leads to increased competition among equipment manufacturers and consequently lowers product ASPs. Consequently, our future success depends on our ability to compete effectively in this marketplace by developing, marketing and selling products that are certified and qualified to industry standards in a timely fashion and in a cost effective manner.

    The DOCSIS and PacketCable specifications are promulgated by CableLabs. Currently these specifications have been widely adopted by cable operators in North America and by some cable operators in Asia, Latin America and Europe. The Euro-DOCSIS specifications have been developed by TComLabs specifically to meet the requirements of European operators, and have found some acceptance in China as well. There is no guarantee that our products will be DOCSIS, EuroDOCSIS or PacketCable certified or qualified. If we are unable to certify or qualify our products as DOCSIS, EuroDOCSIS or PacketCable compliant in a timely manner, we may be unable to sell our products and may lose some or all of any advantage we might otherwise have had, and our future operating results may be adversely affected.

    Although we sell certified and qualified products, there have been and may continue to be instances where our existing customers and potential new customers elect to purchase products from one or more of our competitors rather than from us. In response to this situation, we have reduced our prices and continue to experience customer demand to further reduce our prices in order to promote sales of our current products. This has had and may continue to have an adverse impact on our revenues, operating results and gross margin.

    Developing products to meet these various industry specifications has several risks. The first is the cost and effort to engineer standards-based products and to then prepare them for compliance testing. Not only do we have to certify or qualify new products, but any of our currently certified or qualified products must be re-certified or re-qualified should they be changed in any way. Second, there is no guarantee that these products will be certified or qualified as meeting these specifications in a timely fashion, if ever. Because most cable operators purchase only those products that have been certified or qualified as meeting these specifications, it is highly unlikely that we will be able to sell our products until they achieve certification or qualification, which can be a lengthy process. As a result, we may incur significant research and development expenses to develop new products that may not receive certification or qualification and we cannot recoup the costs of these research and development expenses by marketing uncertified or unqualified products. Moreover, a consequence of cable operators only purchasing products certified or qualified as meeting industry specifications is the increased competition between equipment vendors, which has resulted in a steady and ongoing decline in equipment prices as vendors compete for cable operators' business. Third, there is no guarantee that we will be able to support all future cable industry specifications, which will likely have an adverse impact on our future revenues.

Average selling prices of broadband equipment continue to decline, which is decreasing our gross margins.

    The broadband equipment market has been characterized by erosion of product ASPs, particularly for CPE devices. This erosion may continue. The ASPs for our products are likely to continue to decline

--------------------------------------------------------------------------------

Table of Contents

due to competitive pricing pressures, promotional programs and customers possessing strong negotiating positions who require price reductions as a condition of purchase. In addition, we believe that the widespread adoption of industry specifications, such as the DOCSIS and EuroDOCSIS specifications, is further eroding ASPs as cable modems and other similar CPE products become commodity products. Decreasing ASPs could result in decreased revenues even if the number of units sold increases. Decreasing ASPs may also require us to sell our products at much lower gross margin than in the past, and in fact, we may sell products at a loss. The primary reason that our gross profits have declined year-over year is the decline in product ASPs. As a result, we may experience substantial period-to-period fluctuations in future revenue, gross margin and operating results due to ASP erosion. Therefore, we must continue to develop and introduce on a timely basis and a cost-effective manner new products or next-generation products with enhanced functionalities that can be sold at higher gross margins. Our failure to do this could cause our revenues and gross margin to decline further.

We must achieve cost reductions or increase revenues to attain profitability.

In prior years, we have experienced a decrease in revenue, which was, in large part, due to declining product ASPs and a drop in CMTS sales volume due to our transition from a proprietary platform to the DOCSIS standards platform. Most recently, we have experienced a decrease in revenue derived from our DOCSIS CMTS sales. This has resulted in increased losses and made it difficult for us to attain profitability. In order to achieve profitability, we must significantly increase our revenues, reduce the cost of our products, and maintain or reduce our operating expenses.

Although we have implemented expense reduction and restructuring plans in the past, including the latest restructurings in the first and second quarters of 2004, that have focused on cost reductions and operating efficiencies, our operating expenses are still higher than our gross margins. A large portion of our expenses, including rent, and operating lease expenditures, is fixed and difficult to reduce or change. Accordingly, if our revenue does not meet our expectations, we may not be able to adjust our expenses quickly enough to compensate for the shortfall in revenue. In that event, our business, financial condition and results of operations could be materially and adversely affected.

As product ASPs decline, we need to reduce the cost of our products through design and engineering changes. We may not be successful in redesigning our products, and, even if we are successful, our efforts may be delayed or our redesigned products may contain significant errors and product defects. In addition, any redesign may not result in sufficient cost reductions to allow us to reduce significantly the prices of our products or improve our gross margin. Reductions in our product costs may require us to use lower-priced components that are highly integrated in future products and may require us to enter into high volume or long-term purchase or manufacturing agreements. Volume purchase or manufacturing agreements may not be available on acceptable terms, if at all, and we could incur significant expenses without related revenues if we cannot use the products or services offered by such agreements. We have incurred significant vendor cancellation charges related to volume purchase and manufacturing agreements in the past and may incur such charges in the future.

Broadband services delivered by cable operators have not achieved widespread market acceptance, and other competing service providers exist.

Our success will depend upon the widespread acceptance of broadband services delivered by cable television operators. The markets for these services are growing, but are not fully developed nor exploited. Additionally, these markets may not grow as cable operators may elect not to increase available bandwidth over which they can offer new services, such as high-speed Internet access, High Definition Television (HDTV), Video on Demand, and internet telephony. Cable operators may elect not to provide any or all of these new services to their customers or may not aggressively market these services to their customers. If cable operators elect not to deploy such new services or if customers elect not to subscribe to such services, it may affect our ability to sell products to cable operators as their existing equipment may meet their current infrastructure demands. We depend on cable operators to provide new services and maintain their infrastructure in such a manner that allows us to continue to sell products to them.

33

--------------------------------------------------------------------------------

Table of Contents

Cable operators must also compete with other service providers in the delivery of services to their customers. Regional Bell Operating Companies (RBOCs), Competitive Local Exchange Carriers (CLECs), Incumbent Local Exchange Carriers (ILECs), satellite TV and other broadband service providers are aggressively competing with the cable industry to deliver broadband services via Digital Subscriber Lines or satellite broadcast technologies. We cannot accurately predict the future growth rate or the ultimate size of the market for broadband services delivered via cable. The success of RBOCs, CLECs, ILECs, satellite TV and other broadband service providers may slow or hamper the continued acceptance of cable operators in delivering broadband services, which in turn may impact demand for our products by cable operators.

We need to develop additional distribution channels to market and sell our products.

The vast majority of our sales are to large cable operators. However, we currently have limited access to smaller or geographically diverse cable operators. Although we intend to establish strategic relationships with leading distributors worldwide to access these customers, we may not succeed in establishing these relationships. Even if we do establish these relationships, the distributors may not succeed in marketing our products to their customers. Some of our competitors have established, long-standing relationships with these cable operators that may limit our and our distributors' ability to sell our products to those customers. Even if we were to sell our products to those customers, it would likely not be based on long-term commitments, and those customers would be able to terminate their relationships with us at any time without significant penalties.

We depend on cable industry capital spending for a substantial portion of our revenue and any decrease or delay in capital spending by cable operators would negatively impact our operating results and financial condition.

Historically, almost all of our sales had been derived from sales to cable operators, and we expect these sales to constitute a significant portion of net sales for the foreseeable future. Demand for our products will depend on the magnitude and timing of capital spending by cable television operators. These capital spending patterns are dependent on a variety of factors including:

*the availability of financing;

*annual budget cycles, as well as the typical reduction in upgrade projects during the winter months;

*the status of federal, local and foreign government regulation and deregulation of the telecommunications industry;

*overall demand for broadband services and the acceptance of new data, video and voice services;

*evolving industry standards and network architectures;

*competitive pressures (including the availability of alternative data transmission and access technologies);

*discretionary consumer spending patterns; and

*general economic conditions.

In recent years, the cable market has been characterized by consolidation. Furthermore, cable operators may undertake additional business combinations to expand their business. We cannot predict the effect, if any, this will have on overall capital spending patterns by cable operators. The effect on our business of further industry consolidations and combinations also is uncertain.

We may fail to accurately forecast customer demand for our products.

The nature of the cable industry makes it difficult for us to accurately forecast demand for our products. Our inability to forecast accurately the actual demand for our products may result in too much or too little supply of products or an over/under capacity of manufacturing or testing resources at any given point in time. The existence of any one or more of these situations could have a negative impact on our business, operating results or financial condition. We had purchase obligations of approximately $26.5

34

--------------------------------------------------------------------------------

Table of Contents

million as of September 30, 2004, primarily to purchase minimum quantities of materials and components used to manufacture our products. We may be obligated to fulfill these purchase obligations even if demand for our products is lower than we anticipate.

We may not be able to manage expenses and inventory risks associated with meeting the demand of our customers.

From time to time, we receive indications from our customers as to their future plans and requirements to ensure that we will be prepared to meet their demand for our products. If actual orders differ materially from these indications, our ability to manage inventory and expenses may be affected. In addition, if we fail to meet customers' supply expectations, we may lose business from such customers. If we enter into purchase commitments to acquire materials, or expend resources to manufacture products and such products are not purchased by our customers, our business and operating results could suffer.

We may have financial exposure to litigation.

We and/or our directors and officers are defendants in a number of lawsuits, including securities litigation lawsuits. As a result, we may have financial exposure to litigation as a defendant and because we are obligated to indemnify our officers and members of our board of directors for certain actions taken by our officers and directors on our behalf.

In order to limit financial exposure arising from litigation and/or our obligation to indemnify our officers and directors, we have historically purchased directors and officers insurance (D&O Insurance). However, the availability of D&O Insurance is becoming more difficult for companies to attain as a number of insurance underwriters no longer offer D&O Insurance and the remaining insurance underwriters offering D&O Insurance have significantly increased the premiums of such coverage. In recent years, we have experienced a significant increase in the cost of our D&O Insurance. Although the cost of our D&O insurance decreased in fiscal year 2003, our coverage amount did as well. There can be no assurance that D&O Insurance will be available to us in the future or, if D&O Insurance is available, it may be prohibitively expensive. Additionally, some insurance underwriters who offered D&O Insurance in the past have been placed into liquidation or may be, at some future point, placed into liquidation. In October 2001, one of the insurance underwriters from which we purchased D&O Insurance, Reliance Insurance Co. (Reliance) was placed into liquidation by the state of Pennsylvania. Reliance was the underwriter for one excess layer of our D&O Insurance for the period covering the claims made against us and our officers in the pending securities litigation. Because Reliance is in liquidation, in 2003 we paid for the amount insured under the Reliance policy, which was $2.5 million.

We are dependent on key third-party suppliers and any failure by them to deliver components could limit our ability to satisfy customer demand.

We manufacture all of our products using components or subassemblies procured from third-party suppliers, including semiconductors. Some of these components are available from a sole source and others are available from limited sources. A majority of our sales are from products containing one or more components that are available only from sole source suppliers. Additionally, some of our components are custom parts that are produced to our specifications, and it may be difficult to move the manufacturing of such components from one vendor to another vendor.

Any interruption in the operations of our vendors of sole source or custom product parts could adversely affect our ability to meet our scheduled product deliveries to customers. If we are unable to obtain a sufficient supply of components, including semiconductors, from our current sources, we could experience difficulties in obtaining alternative sources or in altering product designs to use alternative components. Resulting delays or reductions in product shipments could damage customer relationships and expose us to potential damages that may arise from our inability to supply our customers with products. Further, a significant increase in the price of one or more of these components, such as our semiconductor components, could harm our gross margin or operating results. Additionally, we attempt to limit this risk by maintaining safety stocks of these components, subassemblies and modules. As a result of this

35

----------------------------------------------------------------------------

Table of Contents

investment in inventories, we have in the past and in the future may be subject to risk of excess and obsolete inventories, which could harm our business. In this regard, our gross margins and operating results could be adversely affected by excess and obsolete inventory.

We may be unable to migrate to new semiconductor process technologies successfully or on a timely basis.

Our future success will depend in part upon our ability to develop products that utilize new semiconductor process technologies. These technologies change rapidly and require us to spend significant amounts on research and development. We continuously evaluate the benefits of redesigning our integrated circuits using smaller geometry process technologies to improve performance and reduce costs. The transition of our products to integrated circuits with increasingly smaller geometries will be important to our competitive position. Other companies have experienced difficulty in migrating to new semiconductor processes and, consequently, have suffered reduced yields, delays in product deliveries and increased expense levels. Moreover, we depend on our relationship with our third-party manufacturers to migrate to smaller geometry processes successfully.

Our ability to directly control product delivery schedules and product quality is dependent on third-party contract manufacturers.

Most of our products are assembled and tested by contract manufacturers using testing equipment that we provide. As a result of our dependence on these contract manufacturers for the assembly and testing of our products, we do not directly control product delivery schedules or product quality. Any product shortages or quality assurance problems could increase the costs of manufacturing, assembling or testing our products. In addition, as manufacturing volume increases, we will need to procure and assemble additional testing equipment and provide it to our contract manufacturers. The production and assembly of testing equipment typically requires significant lead times. We could experience significant delays in the shipment of our products if we are unable to provide this testing equipment to our contract manufacturers in a timely manner.

We are dependent upon international sales and there are many risks associated with international operations.

We expect sales to customers outside of the United States to continue to represent a significant percentage of our revenues for the foreseeable future. For the three months ended September 30, 2004 and September 30, 2003, approximately 32% and 56%, respectively, of our net revenues were from customers outside of the U.S. For the nine months ended September 30, 2004 and September 30, 2003, approximately 44% and 47%, respectively, of our net revenues were from customers outside of the U.S. International sales are subject to a number of risks, including the following:

*changes in foreign government regulations and communications standards;

*import and export license requirements, tariffs and taxes;

*trade barriers;

*difficulty in protecting intellectual property;

*difficulty in collecting accounts receivable;

*currency fluctuations;

*the burden of complying with a wide variety of foreign laws, treaties and technical standards;

*difficulty in staffing and managing foreign operations; and

*political and economic instability.

If our customers are affected by currency devaluations or general economic downturns their ability to purchase our products could be reduced significantly. Payment cycles for international customers typically are longer than those for customers in North America.

While we generally invoice our foreign sales in U.S. dollars, we invoice some of our sales in Europe in Euros and other sales in the United Kingdom, Belgium, Canada, Japan, Hong Kong, Korea, China and

36

--------------------------------------------------------------------------------

Table of Contents

Brazil in local currencies. Since we have also elected to take payment from our customers in local currencies and may elect to take payment in other foreign currencies in the future, we are exposed to losses as the result of foreign currency fluctuations. Additionally, we have an Israel based operation whose expenses are denominated in Israeli NIS. We currently do not engage in foreign currency hedging transactions. We may in the future choose to limit our exposure by the purchase of forward foreign exchange contracts or through similar hedging strategies. No currency hedging strategy can fully protect against exchange-related losses. In addition, if the relative value of the U.S. dollar in comparison to the currency of our foreign customers should increase, the resulting effective price increase of our products to those foreign customers could result in decreased sales.

Furthermore, foreign countries may decide to prohibit, terminate or delay the construction of new cable infrastructures for a variety of reasons. These reasons include environmental issues, economic downturns and availability of favorable pricing for other communications services or the availability and cost of related equipment. Any such action by foreign countries would reduce the market for our products.

Our business may be affected by conditions in Israel.

We have significant operations in Israel. Our operations in Israel consist primarily of research and development, and to a lesser extent sales and manufacturing. Revenues generated by our business in Israel were $1.0 million and $3.5 million for the three months ended September 30, 2004 and September 30, 2003, respectively. Revenues generated by our business in Israel were $9.7 million and $9.0 million for the nine months ended September 30, 2004 and September 30, 2003, respectively. Our research and development operations may be significantly affected by conditions in Israel. Since the establishment of the State of Israel in 1948, a number of armed conflicts have taken place between Israel and its Arab neighbors and a state of hostility, varying in degree and intensity, has led to security and economic problems for Israel. Hostilities within Israel have continued over the past year, which could disrupt some of our operations. We could be adversely affected by any major hostilities involving Israel. As a result of the hostilities and unrest presently occurring within Israel, the future of the peace efforts between Israel and its Arab neighbors is uncertain. A number of our employees based in Israel are currently obligated to perform annual military reserve duty and are subject to being called to active duty at any time under emergency circumstances. We cannot assess the full impact of these requirements and the hostilities on our workforce, business or operations if conditions should change, and we cannot predict the effect of any expansion or reduction of these obligations or the hostilities.

We may be unable to provide adequate customer support.

Our ability to achieve our planned sales growth and retain current and future customers will depend in part upon the quality of our customer support operations. Our customers generally require significant support and training with respect to our products, particularly in the initial deployment and implementation stages. Spikes in demand of our support services may cause us to be unable to serve our customers. We may not have adequate personnel to provide the levels of support that our customers may require during initial product deployment or on an ongoing basis especially during peak periods. Our inability to provide sufficient support to our customers could delay or prevent the successful deployment of our products. In addition, our failure to provide adequate support could harm our reputation and relationships with our customers and could prevent us from selling product to existing customers or gaining new customers.

The deployment process for our equipment may be lengthy and may delay the receipt of new orders and cause fluctuations in our revenues.

The timing of deployment of our equipment can be subject to a number of other risks, including the availability of skilled engineering and technical personnel, the availability of other equipment such as fiber optic cable, and the need for local zoning and licensing approvals. We believe that changes in our customers' deployment plans have delayed, and may in the future delay, the receipt of new orders. Since the majority of our sales have been to relatively few customers, a delay in equipment deployment with any

37

--------------------------------------------------------------------------------

Table of Contents

one customer has in the past had, and could in the future, have a material adverse effect on our sales for a particular quarter.

Our industry is highly competitive with many larger and more established competitors.

   The market for our products is extremely competitive and is characterized by rapid technological change. Our direct competitors include Ambit Microsystems Corporation, Cisco Systems, ADC, Arris, BigBand Networks, Motorola, Scientific-Atlanta and Toshiba. Additionally, we face competition from early stage companies with access to significant financial backing that improve existing technologies or develop new technologies. The principal competitive factors in our market include the following:

*product performance, features and reliability;

*price;

*size and stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*technical support and service;

*relationships with providers of service providers; and

*compliance with industry standards.

   Some of these factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products.

   Many of our current and potential competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do. The widespread adoption of DOCSIS and other industry standards has and is likely to continue to cause increased price competition. We believe that the adoption of these standards have resulted in and are likely to continue to result in lower ASPs for our products. Any increased price competition or reduction in sales of our products, particularly our higher margin head-end products, has resulted and will continue to result in decreased revenue and downward pressure on our gross margin. These competitive pressures have and are likely to continue to have an adverse impact on our business.

38

--------------------------------------------------------------------------------

Table of Contents

Our business is subject to the risks of product returns, product liability and product defects.

Products like ours are very complex and can frequently contain undetected errors or failures, especially when first introduced or when new versions are released. Despite testing, errors may occur. Product errors could affect the performance or interoperability of our products, delay the development or release of new products or new versions of products, adversely affect our reputation and our customers' willingness to buy products from us and adversely affect market acceptance or perception of our products. Any such errors or delays in releasing new products or new versions of products or allegations of unsatisfactory performance could cause us to lose revenue or market share, increase our service costs, cause us to incur substantial costs in redesigning the products, subject us to liability for damages and divert our resources from other tasks, any one of which could materially and adversely affect our business, results of operations and financial condition. Although we have limitation of liability provisions in our standard terms and conditions of sale, they may not be effective as a result of federal, state or local laws or ordinances or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation and divert management's time and other resources.

We may be unable to adequately protect or enforce our intellectual property rights.

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. We cannot be assured that any patent, trademark, copyright or other intellectual property rights owned by us will not be invalidated, circumvented or challenged, that such intellectual property rights will provide competitive advantages to us or that any of our pending or future patent applications will be issued with the scope of the claims sought by us, if at all. We cannot be assured that others will not develop technologies that are similar or superior to our technology, duplicate our technology or design around the patents that we own. In addition, effective patent, copyright and trade secret protection may be unavailable or limited in certain foreign countries in which we do business or may do business in the future.

Our pending patent applications may not be granted. Even if they are granted, the claims covered by any patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

We believe that the future success of our business will depend on our ability to translate the technological expertise and innovation of our employees into new and enhanced products. We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove sufficient to prevent misappropriation of our trade secrets or technology or deter independent third-party development of similar technologies. In addition, the laws of

39

--------------------------------------------------------------------------------

Table of Contents

some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. We may, in the future, take legal action to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect our business, operating results, financial position and liquidity.

CableLabs DOCSIS 2.0 specification includes two modulation techniques, S-CDMA and A-TDMA. In connection with the development of the DOCSIS 2.0 specification by CableLabs, we entered into an agreement with CableLabs, on a royalty-free basis, whereby we licensed to CableLabs many of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS-based products, including DOCSIS 2.0-based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

Third party claims of infringement or other claims against us could adversely affect our ability to market our products, require us to redesign our products or seek licenses from third parties, and seriously harm our operating results and disrupt our business.

As is typical in the industry in which we operate, we have been and may from time to time be notified of claims that we may be infringing intellectual property rights owned by third parties. We also have in the past agreed to, and may from time to time in the future agree to, indemnify a customer of our technology or products for claims against the customer by a third party based on claims that our technology or products infringe patents of that third party. We further believe that companies may be increasingly subject to infringement claims as distressed companies and individuals attempt to generate cash by enforcing their patent portfolio against a wide range of products. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require us to enter into royalty arrangements; subject us to damages or injunctions restricting the sale of our products, require us to indemnify our customers for the use of the allegedly infringing products; require us to refund payment of allegedly infringing products to our customers or to forgo future payments; require us to redesign certain of our products; or damage our reputation. Our failure to obtain a license for key intellectual property rights from a third party for technology used by us could cause us to incur substantial liabilities and to suspend the manufacturing of products utilizing the technology. Alternatively, we could be required to expend significant resources to develop non-infringing technology with no assurances that we would be successful in such endeavors. The occurrence of any of the above events could materially and adversely affect our business, results of operations and financial condition.

Our indebtedness could adversely affect our financial condition; we may incur substantially more debt.

As of September 30, 2004, we had approximately $68.5 million of long-term obligations of which $65.1 million is long-term debt associated with our Notes. This level of indebtedness may adversely affect our stockholders by:

*making it more difficult for us to satisfy our obligations with respect to our indebtedness;

*increasing our vulnerability to general adverse economic and industry conditions;

*limiting our ability to obtain additional financing;

*requiring the dedication of a substantial portion of our cash flow from operations to the payment of principal of, and interest on, our indebtedness, thereby reducing the availability of

40

--------------------------------------------------------------------------------

Table of Contents

our cash flow to fund our growth strategy, working capital, capital expenditures and other general corporate purposes;

*limiting our flexibility in planning for, or reacting to, changes in our business and the industry; and

*placing us at a competitive disadvantage relative to our competitors with less debt.

We may incur substantial additional debt in the future. The terms of our outstanding debt do not fully prohibit us from doing so. If new debt is added to our current levels, the related risks described above could intensify.

We may not be able to raise additional funds to continue operating our business.

Our main source of liquidity continues to be our unrestricted cash on hand. As a result of our history of operating losses, we expect to continue to use our unrestricted cash to fund operating losses in the future. Our cash, cash equivalents, and short-term investments decreased to $111.9 million at September 30, 2004, from $138.6 million at December 31, 2003. If our operating losses are more severe than expected or continue longer than expected, we may find it necessary to seek other sources of financing to support our capital needs and provide available funds for working capital. Given the current condition of the capital markets, there are few sources of financing available to us. Commercial bank financing may not be available to us on acceptable terms. Accordingly, any plan to raise additional capital, if available to us, would likely involve an equity-based or equity-linked financing, such as the issuance of convertible debt, common stock or preferred stock, which would be dilutive to our stockholders. If we are unable to procure additional working capital, as necessary, we may be unable to continue operations.

On October 7, 2003, we filed a registration statement on Form S-3 with the Securities and Exchange Commission. This shelf registration statement, which was declared effective by the SEC on November 4, 2003, will allow us to issue various types of securities, including common stock, preferred stock, debt securities and warrants to purchase common stock, from time to time up to an aggregate of $125.0 million, subject to market conditions and our capital needs. On November 7, 2003, we filed a prospectus supplement with reference to our intention to offer 10,800,000 shares of common stock, which would have result in gross proceeds of $75.0 million. On November 14, 2003, we withdrew our previously announced public offering of 10,800,000 shares of common stock under the shelf registration statement.

Our restructuring efforts and recent changes in senior management could result in the erosion of employee morale, legal actions against us and management distractions, and could impair our ability to respond rapidly to growth opportunities in the future.

As a result of the significant economic downturn and the related uncertainties in the technology sector, we have implemented a number of restructuring plans, including the most recent in the first and second quarters of 2004, which has resulted in personnel reduction. We also have experienced a number of recent changes in senior management and other key personnel. These employee reductions and changes, as well as future changes in senior management and key personnel, could result in an erosion of morale, and affect the focus and productivity of our remaining employees, including those directly responsible for revenue generation and the management and administration of our finances which in turn may affect our revenue in the future or cause other administrative deficiencies. Additionally, employees directly affected by the reductions may seek future employment with our business partners, customers or competitors. Although all employees are required to sign a proprietary information agreement with us at the time of hire, there can be no assurances that the confidential nature of our proprietary information will be maintained in the course of such future employment. Additionally, we may face wrongful termination, discrimination, or other claims from employees affected by the reduction related to their employment and termination. We could incur substantial costs in defending ourselves or our employees against such claims, regardless of the merits of such actions. Furthermore, such matters could divert the attention of our employees, including management, away from our operations, harm productivity, harm our reputation and increase our expenses. We cannot assure you that our restructuring efforts will be successful, and we may need to take additional restructuring efforts, including additional personnel reduction, in the future.

Furthermore, in October 2004, we announced our intention to cease investment in future development of our CMTS product line and halt development on future hardware upgrades. In connection with this action, we initiated a worldwide reduction in force, which is likely to result in a restructuring charge of approximately $3.2 million to $3.6 million in the quarter ending December 31, 2004. We may incur additional material charges associated, and may further reduce our workforce in connection, with this determination. We also may face the same risks associated with our prior restructuring, as discussed above, in connection with our determination to cease investment in our CMTS product line.

41

--------------------------------------------------------------------------------

Table of Contents

We may dispose of or discontinue existing product lines, which may adversely impact our future results.

On an ongoing basis, we evaluate our various product offerings in order to determine whether any should be discontinued or, to the extent possible, divested. Moreover, the worldwide downturn in the telecommunications industry led us to reassess our business strategy, which in turn caused us to discontinue investment in certain product lines. Specifically, we have reduced our investment in the telecom and satellite spaces. Beginning in July 2003, we entered into two transactions to further decrease our telecom business. In July 2003, we discontinued our Mainsail line of products and entered into an agreement with a third party to supply warranty services for the Mainsail products.

In July 2003, we entered into an agreement with Verilink Corporation (Verilink) to sell certain telecom assets associated with the Miniplex product line to Verilink. Additionally, Verilink agreed to purchase related inventory from us and assume all telecom warranty obligations with the exception of $2.4 million, which will continue to be our responsibility. To date, only nominal claims have been made against this warranty obligation and we believe that the likelihood of any material claim being made against us is remote.

On April 2, 2004, we sold all of our ownership in Radwiz, Ltd., Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a cash payment of $150,000. In connection with this disposition, the acquirer received obsolete inventories with no book value, $0.2 million of selected net assets, and $1.35 million of net liabilities related to these subsidiaries. We recorded a net gain of $1.3 million on this transaction in the second quarter of 2004.

In October 2004, we also announced our determination to cease investment in the CMTS product line and halt development of future CMTS hardware. In connection with this determination, we expect to incur charges in the range of $3.2 to $3.6 million related to employee termination costs, and may incur additional material charges in connection with this decision.

We cannot assure you that we correctly forecasted the right product lines to dispose of or discontinue or that our decision to dispose of or discontinue various investments and product lines is prudent if market conditions change. In addition, we cannot assure you that the discontinuance of various product lines will reduce our operating expenses or cause us to incur material charges associated with such decision. Furthermore, future plans to discontinue existing product lines entail various risks, including the risks that we will not be able to find a buyer for a product line or the purchase price obtained will not be equal to the book value of the assets for the product line. Other risks include managing the expectations of, and maintaining good relations with, our customers who previously purchased disposed or discontinued product lines, which could prevent us from selling other products to them in the future. We may also incur other liabilities and costs associated with our disposal or discontinuance of product lines.

We need to develop and introduce new and enhanced products in a timely manner to remain competitive.

The markets in which we operate are characterized by rapidly changing technologies, evolving industry standards, frequent new product introductions and relatively short product life. The pursuit of necessary technological advances and the development of new products require substantial time and expense. For example, we made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses have achieved the level of market acceptance that was forecasted at the time of their acquisitions. Additionally, certain product groups have not achieved the level of technological development needed to be marketable or to expand the market. As a result, we recorded an aggregate of approximately $576.8 million related to impairment charges and write-down of in-process research and development related to the acquired technologies, both of which negatively impacted our operating results in 2001 and 2002.

To compete successfully in the markets in which we operate, we must design, develop, manufacture and sell new or enhanced products that provide increasingly higher levels of performance and reliability. However, we may not be able to successfully develop or introduce these products, if our products are not (i) cost effective, (ii) brought to market in a timely manner, (iii) in accordance with evolving industry standards and architecture or (iv) fail to achieve market acceptance. There is no assurance that the technologies we are currently developing or intend to develop will achieve feasibility, or that even if we are successful, the developed product will be accepted by the market. We may not be able to recover the costs of existing and future product developments and our failure to do so may materially and adversely impact our business, financial condition and results of operations.

We are exposed to the credit risk of our customers and to credit exposures in weakened markets, which could result in material losses.

--------------------------------------------------------------------------------

Table of Contents

Most of our sales are on an open credit basis, with payment terms of 30 to 60 days typically in the United States, and because of local customs or conditions, longer in some markets outside the United States. Beyond our open credit arrangements, we have also experienced a request for customer financing and facilitation of leasing arrangements, which we have not provided to date and do not expect to provide in the future. We expect demand for enhanced open credit terms, for example, longer payment terms, customer financing and leasing arrangements to continue and believe that such arrangements are a competitive factor in obtaining business. Our decision not to provide these types of financing arrangements may adversely affect our ability to sell product, and therefore, our revenue, operations and business.

Because of the current condition in the global economy, our exposure to credit risks relating to sales on an open-credit basis has increased. Although we monitor and attempt to mitigate the associated risk, there can be no assurance that our efforts will be effective in reducing credit risk. Additionally, there have been significant insolvencies and bankruptcies among our customers, which have and may continue to cause us to incur economic and financial losses. There can be no assurance that additional losses would not be incurred and that such losses would not be material. Although these losses have generally not been material to date, future losses, if incurred, could harm our business and have a material adverse effect on our operating results and financial condition.

We have and we may seek to expand our business through acquisitions; acquisitions could disrupt our business operations and harm our operating results.

In order to expand our business, we may make strategic acquisitions of other companies or certain assets. We plan to continue to evaluate opportunities for strategic acquisitions from time to time, and may make an acquisition at some future point. However, the current volatility in the stock market and the current price of our common stock may adversely affect our ability to make such acquisitions. Any acquisition that we make involves substantial risks, including the following:

*difficulties in integrating the operations, technologies, products and personnel of an acquired company;

*diversion of management's attention from normal daily operations of the business;

*potential difficulties in completing projects associated with in-process research and development;

*difficulties in entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions;

*initial dependence on unfamiliar supply chains or relatively small supply partners;

*insufficient revenues to offset increased expenses associated with acquisitions; and

*the potential loss of key employees of the acquired companies.

Acquisitions may also cause us to:

*issue common stock that would dilute our current stockholders' percentage ownership;

*assume liabilities;

*record goodwill and non-amortizable intangible assets that will be subject to impairment testing and potential periodic impairment charges;

*incur amortization expenses related to certain intangible assets;

*incur large and immediate write-offs; or

*become subject to litigation.

Mergers and acquisitions of high-technology companies are inherently risky, and no assurance can be given that our future acquisitions will be successful and will not materially adversely affect our business, operating results or financial condition. Failure to manage and successfully integrate acquisitions we make could harm our business and operating results in a material way. Even when an acquired company has already developed and marketed products, there can be no assurance that product enhancements will be made in a timely fashion or that all pre-acquisition due diligence will have identified all possible issues that might arise with respect to such products.

43

--------------------------------------------------------------------------------

Table of Contents

We made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses have achieved the level of market acceptance that was forecasted at the time of their acquisitions. Additionally, certain product groups have not achieved the level of technological development needed to be marketable or to expand the market. We recorded impairment losses of approximately $4.0 million and $572.8 million of intangible assets related to these acquisitions in December 31, 2002 and 2001, respectively. As of September 30, 2004, no intangible assets from these acquisitions remained.

Our products are subject to safety approvals and certifications.

In the United States, our products are required to meet certain safety requirements. For example, we are required to have our products certified by Underwriters Laboratory in order to meet federal requirements relating to electrical appliances to be used inside the home. Outside the United States, our products are subject to the regulatory requirements of each country in which the products are manufactured or sold. These requirements are likely to vary widely. We may be unable to obtain on a timely basis or at all the regulatory approvals that may be required for the manufacture, marketing and sale of our products.

We are vulnerable to earthquakes, disruptions to our power supply, labor issues and other unexpected events.

Our corporate headquarters, as well as the majority of our research and development activities and some manufacturing operations are located in California, an area known for seismic activity. In addition, the operations of some of our key suppliers and manufacturers are also located in this area and in other areas known for seismic activity, such as Taiwan. An earthquake, or other significant natural disaster, could result in an interruption in our business or the operations of one or more of our key suppliers. Our California operations may also be subject to disruptions in power supply, such as those that occurred in 2001. Our business may also be impacted by labor issues related to our operations and/or those of our suppliers, service providers, or customers. Such an interruption could harm our operating results. We may not carry sufficient business interruption insurance to compensate for any losses that we may sustain as a result of any natural disasters or other unexpected events.

Various export licensing requirements could materially and adversely affect our business or require us to significantly modify our current business practices.

Various government export regulations may apply to the encryption or other features of our products. We may have to make certain filings with the government in order to obtain permission to export certain of our products. In the past, we may have inadvertently failed to file certain export applications and notices, and we may have to make certain filings and request permission to continue exportation of any affected products without interruption while these applications are pending. If we do have to make such filings, we cannot assure you that we will obtain permission to continue exporting the affected products or that we will obtain any required export approvals now or in the future. If we do not receive the required export approvals, we may be unable to ship those products to certain customers located outside of the United States. In addition, we may be subject to fines or other penalties due to the failure to file certain export applications and notices.

New laws and regulations affecting corporate governance may impede our ability to retain and attract board members and executive officers, and increase the costs associated with being a public company.

On July 30, 2002, President George W. Bush signed into law the Sarbanes-Oxley Act of 2002. The new act is designed to enhance corporate responsibility through new corporate governance and disclosure obligations, increase auditor independence, and tougher penalties for securities fraud. In addition, the Securities and Exchange Commission and Nasdaq have adopted rules in furtherance of the act. This act and the related new rules and regulations will likely have the effect of increasing the complexity and cost of our company's corporate governance and the time our executive officers spend on such issues, and may increase the risk of personal liability for our board members, chief executive officer, chief

44

--------------------------------------------------------------------------------

Table of Contents

financial officer and other executives involved in our company's corporate governance process. As a result, it may become more difficult for us to attract and retain board members and executive officers involved in the corporate governance process. In addition, we have experienced, and will continue to experience, increased costs associated with being a public company, including additional professional and independent auditor fees.

Our stock price has been and is likely to continue to be highly volatile.

The trading price of our common stock has been and is likely to continue to be highly volatile. Our stock price could be subject to extreme fluctuations in response to a variety of factors, including the following:

*actual or anticipated variations in quarterly operating results;

*announcements of technological innovations;

*new products or services offered by us or our competitors;

*changes in financial estimates by securities analysts;

*conditions or trends in the broadband services industry;

*changes in the economic performance and/or market valuations of Internet, online service or broadband service industries;

*our announcement of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

*adoption of industry standards and the inclusion or compatibility of our technology with such standards;

*adverse or unfavorable publicity regarding us or our products;

*additions or departures of key personnel;

*sales of common stock; and

*other events or factors that may be beyond our control.

In addition, the stock markets in general, and the Nasdaq National Market and the stock price of broadband services and technology companies in particular, have experienced extreme price and volume volatility. This volatility and decline has affected many companies irrespective of or disproportionately to the operating performance of these companies. Additionally, industry factors may materially adversely affect the market price of our common stock, regardless of our actual operating performance.

We have adopted a stockholder rights plan, which, together with provisions in our charter documents and Delaware law, may delay or prevent an acquisition of us, which could decrease the value of our stock.

We adopted a stockholder rights plan pursuant to which we distributed one right for each outstanding share of common stock held by stockholders of record as of February 20, 2001. Because the rights may substantially dilute the stock ownership of a person or group attempting a take-over of us, even if such a change in control is beneficial to our stockholders, without the approval of our board of directors, the plan could make it more difficult for a third party to acquire us, or a significant percentage of our outstanding capital stock, without first negotiating with our board of directors. Additionally, provisions

of our Certificate of Incorporation and our Bylaws could make it more difficult for a third party to acquire control of us in a transaction not approved by our Board of Directors, and we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which could also have the effect of delaying or preventing our acquisition by a third party.

In the event we are unable to satisfy regulatory requirements relating to internal controls, or if these internal controls over financial reporting are not effective, our business and our stock price could suffer.

Section 404 of Sarbanes-Oxley requires companies to do a comprehensive and costly evaluation of their internal controls. As a result, during our fiscal year ending December 31, 2004, we will be required to perform an evaluation of our internal controls over financial reporting and have our auditor publicly attest to such evaluation. We have prepared an internal plan of action for compliance, which includes a timeline and scheduled activities with respect to preparation of such evaluation. Our efforts to comply with Section 404 and related regulations regarding our management's required assessment of internal control over financial reporting and our independent auditors' attestation of that assessment has required, and continues to require, the commitment of significant financial and managerial resources. While we anticipate being able to fully implement the requirements relating to internal controls and all other aspects of Section 404 in a timely fashion, we cannot be certain as to the timing of completion of our evaluation, testing and remediation actions or the impact of the same on our operations since there is no precedent available by which to measure compliance adequacy. If we fail to timely complete this evaluation, or if our auditors cannot timely attest to our evaluation, we could be subject to regulatory investigations or sanctions, costly litigation or a loss of public confidence in our internal controls, which could have an adverse effect on our business and our stock price.

ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Interest Rate Risk.

Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing

45

--------------------------------------------------------------------------------

Table of Contents

yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. A hypothetical 50 basis point increase in interest rates would result in an approximate $8,000 decline (less than 1%) in the fair value of our available-for-sale securities.

Foreign Currency Risk.

A substantial majority of our revenue, expense and capital purchasing activity are transacted in U.S. dollars. However, we do enter into transactions from Belgium, United Kingdom, Hong Kong, Canada, Japan, Brazil, Korea, China and Israel denominated in local currencies and invoice some of our sales in Europe in Euros. A hypothetical adverse change of 10% in exchange rates would result in a decline in income before taxes of approximately $36,000.

All of the potential changes noted above are based on sensitivity analyses performed on our financial positions at September 30, 2004. Actual results may differ materially.

ITEM 4. CONTROLS AND PROCEDURES

As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer identified a deficiency in our disclosure controls and procedures as of September 30, 2004, due to an inadequacy of communication between certain parts of the organization and the finance department. In connection with the review of our financial statements for the third quarter of 2004, Ernst & Young LLP, our independent registered public accountants, advised our Audit Committee that they considered this deficiency to be a material weakness under standards established by the Public Company Accounting Oversight Board. This material weakness related to an accrual of severance for an executive officer in an incorrect reporting period, which Ernst & Young LLP believed to be related to the inadequacy of communication between certain parts of the organization and the finance department. The accrual is reflected in the condensed consolidated financial statements for the three and nine month period ended September 30, 2004.

Under the direction of our Audit Committee and with the participation of our senior management, we have taken steps designed to strengthen our disclosure controls and procedures and internal controls to address the material weakness identified by Ernst and Young. We have, on an immediate basis, taken steps to improve our internal controls and our control environment. We have implemented steps to ensure that senior members of our finance department review all press releases before they are released and all resignations of executive staff are communicated promptly to senior members of our finance department. We will continue to monitor the communication channels between our senior management and our finance department and will take prompt action, as necessary, to further strengthen our disclosure controls and procedures and internal controls to comply with Sarbanes-Oxley compliance procedures. Moreover, we will continue our efforts to identify, assess and correct any additional material weaknesses in our internal controls.

We believe the corrective steps taken to improve our disclosure controls and procedures and internal controls described above have enabled our Chief Executive Officer and Chief Financial Officer to conclude that our disclosure controls and procedures are now effective in timely alerting them to material information required to be included in this Quarterly Report on Form 10-Q for the quarter ended September 30, 2004.

Other than as described above, there has been no other change in our internal control over financial reporting that occurred during our most recent fiscal quarter that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

We intend to review and evaluate the design and effectiveness of our disclosure controls and procedures on an ongoing basis and to improve our controls and procedures over time and to correct any deficiencies that we may discover in the future. Our goal is to ensure that our senior management has timely access to all material financial and non-financial information concerning our business. While we believe the present design of our disclosure controls and procedures is effective to achieve our goal, future events affecting our business may cause us to significantly modify our disclosure controls and procedures.

PART II. OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

See "Litigation" under Part I, Item 2, Management's Discussion and Analysis of Financial Condition and Results of Operations.

ITEM 5. OTHER INFORMATION

As reported in a recent Current Report on Form 8-K filed with the Securities and Exchange Commission, we had determined to defer the 2004 annual meeting of stockholders, originally scheduled for August 10, 2004, for a brief period of time. We have now scheduled the 2004 annual meeting for December 16, 2004, with a record date of October 20, 2004.

ITEM 6. EXHIBITS

    (a) EXHIBITS

--------------------------------------------------------------------------------

Table of Contents

10.32  Employment Agreement dated August 2, 2004, between the Registrant and
       Edward Lopez.

10.33  Letter Agreement dated July 22, 2004, between the Registrant and Jerry
       Chase.

10.34  Severance Agreement dated July 22, 2004, between the Registrant and Jerry
       Chase.

10.35  Proprietary Information and Inventions Agreement dated July 22, 2004
       between the Registrant and Jerry Chase.

10.36  Aircraft Sublease Agreement dated August 24, 2004 between the Registrant
       and United Furniture Equipment Rental, Inc.

31.1  Certification of the Chief Executive Officer Pursuant to Section 302 of the
      Sarbanes-Oxley Act of 2002.

31.2  Certification of the Chief Financial Officer Pursuant to Section 302 of the
      Sarbanes-Oxley Act of 2002.

32.1  Certification of the Chief Executive Officer Pursuant to Section 906 of the
      Sarbanes-Oxley Act of 2002.

32.2  Certification of the Chief Financial Officer Pursuant to Section 906 of the
      Sarbanes-Oxley Act of 2002.

47

--------------------------------------------------------------------------------

Table of Contents

SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

        Date: November 9, 2004TERAYON COMMUNICATION SYSTEMS, INC.

                By /s/ Edward Lopez
                --------------------------------

                Edward Lopez
                Acting Chief Financial Officer

        48

--------------------------------------------------------------------------------

Table of Contents

INDEX TO EXHIBITS

NUMBER                              DESCRIPTION
---------------------------------------------------------------------------
10.32  Separation Agreement dated August 2, 2004, between the Registrant and
       Edward Lopez.

10.33  Employment Agreement dated July 22, 2004, between the Registrant and Jerry
       Chase.

10.34  Severance Agreement dated July 22, 2004, between the Registrant and Jerry
       Chase.

10.35  Proprietary Information and Inventions Agreement dated July 22, 2004
       between the Registrant and Jerry Chase.

10.36  Aircraft Sublease Agreement dated August 24, 2004 between the Registrant
       and United Furniture Equipment Rental, Inc.

 31.1  Certification of the Chief Executive Officer Pursuant to Section 302 of
       the Sarbanes-Oxley Act of 2002.

 31.2  Certification of the Chief Financial Officer Pursuant to Section 302 of
       the Sarbanes-Oxley Act of 2002.

 32.1  Certification of the Chief Executive Officer Pursuant to Section 906 of
       the Sarbanes-Oxley Act of 2002.

 32.2  Certification of the Chief Financial Officer Pursuant to Section 906 of
       the Sarbanes-Oxley Act of 2002.

Exhibit 10.32

EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), made as of the 2nd day of August, 2004 (the "Effective Date"), by and between Terayon Communications Systems, Inc., a Delaware corporation (the "Company"), and Edward Lopez (the "Executive");

W I T N E S S E T H   T H A T:

WHEREAS, Executive is currently employed by the Company;

WHEREAS, the Company and Executive desire for this Employment Agreement to set forth certain terms and conditions that shall apply to Executive's employment; and

WHEREAS, the Executive has a Severance Agreement with the Company dated January 14, 2003 (the "Change of Control Agreement");

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

1. Employment.

(a) While employed by the Company, Executive shall devote his full time and attention and his best efforts to the performance of his duties, subject to direction by the Company, and to such other duties as may be reasonably requested or assigned by the Company.

(b) Executive's employment with the Company shall be on an at-will basis and may be terminated by either the Company or Executive at any time, with or without notice and with or without cause, subject to the provisions of Section 3 below and/or Executive's Change of Control Agreement, as amended herein. All benefits and perquisites of employment will cease as of the date Executive's employment is terminated for any reason, subject to the provisions of Section 3 below and/or Executive's Change of Control Agreement, as amended herein.

2. Compensation and Benefits. While employed by the Company, Executive's annual base salary shall continue to be $230,000.00 ("Base Salary"), which shall be paid in accordance with the Company's normal payroll cycle. Moreover, Executive shall continue to be eligible to participate in the Company's incentive compensation plan(s) if and when established by the Board of Directors of the Company and on the terms and conditions set forth in any such plan. During Executive's employment, Company will continue to provide Executive with employee benefits under the Company's health and welfare benefit plans generally provided to other similarly-situated employees, subject to the terms and conditions of each such plan. Executive will accrue paid vacation and will be granted paid sick leave, in accordance with the

vacation and sick leave policies of Company in effect for similarly-situated employees from time to time.

3. Compensation and Benefits Following Termination. In the event that Executive (y) voluntarily resigns from employment after October 1, 2004 for "Good Reason" (as defined in Executive's Change of Control Agreement) or for any other reason whatsoever, or (z) is involuntarily terminated by the Company without "Cause" (as defined in Executive's Change of Control Agreement) at any time following the Effective Date of this Agreement, the Company shall provide Executive with the following compensation and benefits described in Sections 3(a)-(d) (collectively referred to as the "Severance Benefits") in consideration for and subject to his having complied with the terms and conditions hereof, and subject to Executive having first signed the Release attached hereto as Exhibit A following the effective date of his resignation or termination (the "Termination Date") and having not revoked his release of ADEA claims under that Release:

(a) The Company shall pay Executive a lump sum severance payment (the "Severance Payment"), the gross amount of which will be equal to Three Hundred Forty Five Thousand Dollars ($345,000.00), consisting of (i) twelve (12) months' pay at Executive's current Base Salary ($230,000.00 per year), plus (ii) an amount equal to Executive's target annual bonus for 2003 ($115,000.00). The Severance Payment described in this paragraph shall be subject to required taxes and withholdings, and shall be paid to Executive in a lump sum within ten (10) business days after Executive signs the Release attached hereto as Exhibit A, provided that Executive does not revoke his release of ADEA claims under that Release.

(b) For a period of one year following the Termination Date, the Company will continue to provide Executive and Executive's dependents and beneficiaries with the same employee benefits for which Executive was enrolled immediately prior to the Termination Date under the Company's health, disability, life insurance and other welfare benefit plans, and will continue to pay for Executive's and Executive's dependents' and beneficiaries' participation in such welfare benefit plans to the same extent as the Company did immediately prior to the Termination Date; provided, however, Executive's health insurance shall be continued through COBRA (so long as Executive properly elects continued coverage under COBRA) and Company shall pay for Executive's COBRA premiums for the foregoing one-year period following the Termination Date. The coverage and benefits (including deductibles and costs) provided in this Section 3(b) during the foregoing one-year period shall be no less favorable to Executive and Executive's dependents and beneficiaries than the coverages and benefits at the time immediately prior to the Termination Date.

(c) For a period of one year following the Termination Date, the Company shall, at its expense, provide Executive with outplacement and career counseling services of the Executive's choice (the "Outplacement Benefits"), provided, however, that the Company's obligation to pay for the Outplacement Benefits shall in no event exceed an aggregate amount equal to 25% of Executive's Base Salary ($230,000.00 per year). Executive may elect not to use the Outplacement Benefits to be provided to him under this Section 3(c), so long as Executive provides the Company with written notice his election not to use such Benefits within 30 days of

his Termination Date. If Executive elects not to use the Outplacement Benefits to be provided to him under this Section 3(c) and provides the Company with timely notice of his election (as set forth above), the Company shall pay Executive a lump sum payment equal to $57,500 (25% of Executive's Base Salary of $230,000.00 per year) within ten (10) business days of Company's receipt of Executive's written notice.

(d) Vesting of Executive's outstanding unvested stock options for a period of one year following the Termination Date (the "Vesting Acceleration Period") shall be accelerated. The vesting of any unvested stock options not so accelerated shall otherwise cease at the Termination Date. Following the Termination Date, Executive shall be entitled to exercise any vested stock options (inclusive of any stock options the vesting of which is accelerated pursuant to the foregoing sentence) for a period not later than twelve (12) months following the Termination Date, notwithstanding anything to the contrary in the terms and conditions of the applicable stock option plan(s) and agreement(s) for each such option (such stock option plan(s) and agreement(s) collectively referred to hereinafter as the "Stock Option Documents").

(e) Executive acknowledges and agrees that the Severance Benefits to be provided to him under Sections 3(a)-(d) above constitute reasonable and adequate consideration for his covenants and obligations under this Agreement. Executive further acknowledges and agrees that he will not be entitled to receive or accrue any right to any other compensation or employee benefits following the Termination Date, except as otherwise set forth in this Agreement or in his Change of Control Agreement (as amended herein). The Severance Benefits to be provided to Executive under Sections 3(a)-(d) above shall offset and reduce any severance payments or benefits that Executive is to receive or has received pursuant to his Change of Control Agreement, and Executive shall not receive any Severance Benefits pursuant to this Section 3 if Executive already is to receive or already has received any severance payments or benefits under his Change of Control Agreement.

(f) Executive understands and agrees that he shall not be entitled to the Severance Benefits described in Sections 3(a)-(d) above if he voluntarily resigns from employment for any reason before October 1, 2004. Notwithstanding the foregoing, the Company may, in its discretion, terminate Executive's employment before October 1, 2004, subject to the terms and conditions of this Section 3. In the event that Executive voluntarily terminates his employment for any reason before October 1, 2004 or the Company terminates Executive's employment for "Cause" (as defined in Executive's Change of Control Agreement) at any time following the Effective Date of this Agreement, the Company shall pay Executive all compensation due and owing through the date his employment is terminated, and shall have no further obligations under this Agreement. For purposes of this Agreement, a termination of Executive's employment due to death or Disability (as defined in Executive's Change of Control Agreement) shall not constitute a termination without "Cause" and a termination for either of those reasons shall be treated in a manner consistent with the terms of Executive's Change of Control Agreement.

4. Mutual Release of Claims.

(a) In exchange for the consideration described above and subject to Executive's right and the rights of his heirs, successors and assigns to enforce Executive's Indemnity Agreement (as defined below), Change of Control Agreement and Stock Option Documents, Executive (on behalf of himself and his heirs, successors and assigns) hereby releases, covenants not to sue, and forever discharges Company, its subsidiaries, divisions, parent and/or affiliated corporations or entities, and each of their current and former directors, officers, shareholders, agents, employees, attorneys, heirs, assigns, predecessors and successors, (the "Company Released Parties"), of and from any and all claims, demands, actions and causes of action, liabilities, losses, costs, attorneys fees or expenses, known or unknown, suspected or unsuspected, that Executive now has, or may ever have against the Company Released Parties, or any of them, that arise out of, or are in any way related to: (1) Executive's employment by the Company; (2) any changes or modifications as to the terms of Executive's employment with the Company; and (3) any transactions, occurrences, acts or omissions by the Company Released Parties, or any of them, occurring prior to Executive's execution of this Agreement. Without limiting the foregoing, Executive understands and agrees that the foregoing release provisions waive and release claims alleging violations of any federal or state employment discrimination law, including without limitation Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Family Medical Leave Act, the California Fair Employment and Housing Act, as well as claims arising out of or related to any alleged violations of state and federal wage and hour laws, all common law and statutory claims, including without limitation, breach of contract, fraud, violation of public policy, unfair competition and business practices, defamation, infliction of emotional distress, invasion of privacy, wrongful termination, or any other state or federal law, rule, or regulation, and any claims for attorneys' fees and costs.

(b) Executive further acknowledges that he is waiving and releasing any rights he may have under the Age Discrimination in Employment Act ("ADEA") and that this waiver and release is knowing and voluntary. Executive further acknowledges by this writing that: (a) he is waiving rights or claims for age discrimination under the ADEA in exchange for the payments described herein, which are in addition to anything of value to which he otherwise is entitled; (b) he has been given an opportunity to consider fully the terms of this Agreement for twenty-one (21) days, although he is not required to wait twenty-one (21) days before signing this Agreement; (c) he has been advised by an attorney of his choosing regarding the terms and conditions of this Agreement; (d) he understands he has seven (7) days in which to revoke his release of ADEA claims within seven (7) days of signing this Agreement, provided, however, that his release and waiver of all other claims will become effective when he executes this Agreement and, provided further, that Executive shall not be entitled to receive the Severance Benefits under Section 3 above if he revokes his release of ADEA claims under this Section 4(b).

(c) Company on behalf of itself and the Company Released Parties hereby releases Executive, covenants not to sue, and forever discharges Executive, his heirs, successors, agents and attorneys (the "Executive Released Parties") of and from any and all claims, demands, actions and causes of action, liabilities, losses, costs, attorneys fees or expenses, known or unknown, suspected or unsuspected, that Company and the other Company Released

Parties now has, or may ever have against the Executive Released Parties, or any of them, that arise out of, or are in any way related to: (i) Executive's employment by Company, (ii) any changes or modifications as to the terms of Executive's employment with the Company, and (iii) any transactions, occurrences, acts or omissions by the Executive Released Parties or any of them occurring prior to the execution of this Agreement ("Claims"), and Company agrees to indemnify and hold harmless Executive Released Parties from any Claims made by any Company Released Party. Without limiting the foregoing, Company understands and agrees that the foregoing provisions waive and release and indemnify against all common law and statutory claims, including without limitation, breach of contract, fraud, violation of public policy, unfair competition and business practices, defamation, infliction of emotional history, invasion of privacy, or any other state or federal law, rule or regulation, and any claim for attorneys' fees and costs.

(d) Notwithstanding the foregoing, the above releases shall not affect (i) any rights of the Executive to the enforcement of the terms of the Indemnity Agreement (as hereafter defined), the Change of Control Agreement, the Stock Option Documents and this Agreement or in respect of any malfeasance or fraud on the part of the Company or the Company Released Parties, and (ii) any rights of the Company to the enforcement of the terms of the PIIAA (as hereafter defined) and this Agreement or in respect of any malfeasance or fraud on the part of the Executive or the Executive Released Parties.

(e) Section 1542 Waiver. Executive acknowledges that he is aware of and familiar with the provisions of Section 1542 of the California Civil Code, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor." Executive hereby waives and relinquishes all rights and benefits that he may have under Section 1542 of the California Civil Code, or the law of any other state or jurisdiction, or common law principle, to the same or similar effect.

5. Proprietary Information and Invention Assignment Agreement. Executive acknowledges he signed a Proprietary Information and Invention Assignment Agreement ("PIIAA") as a condition of his employment with the Company, a copy of which is attached hereto as Exhibit B. Executive further acknowledges that his PIIAA shall continue to remain in effect following the effective date of this Employment Agreement, and that he shall continue to be bound by the PIIAA following the termination of his employment for any reason.

6. Indemnity Agreement. Company acknowledges that it made and entered into on July 7, 2004, an Indemnity Agreement with Executive ("Indemnity Agreement") as a condition of his employment with the Company. Company further acknowledges that, notwithstanding any other provision of this Agreement, Company shall continue to be bound by the Indemnity Agreement following the effective date of this Agreement and that the Indemnity Agreement shall survive such effective date.

7. Assignment; Successors and Assigns. Executive agrees that he will not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement, nor shall Executive's rights be subject to encumbrance or the claims of creditors. Any purported assignment, transfer, or delegation shall be null and void. Nothing in this Agreement shall prevent the consolidation of the Company with, or its merger into, any other corporation, or the sale by the Company of all or substantially all of its properties or assets, or the assignment by the Company of this Agreement and the performance of its obligations hereunder to any successor in interest or any Affiliated Company. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors, and permitted assigns, and shall not benefit any person or entity other than those enumerated above.

8. Entire Agreement. The terms of this Agreement and the attached Exhibits are intended by the parties to be the final expression of their agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous agreement, except to the extent that the provisions of any such agreement are expressly referred to in this Agreement as having continued effect. The parties further intend that this Agreement shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial, administrative, or other legal proceeding involving this Agreement. This Agreement fully supersedes any prior or contemporaneous agreements representations, or understandings between Executive and the Company, whether written or oral. Notwithstanding the foregoing, Executive's Change of Control Agreement shall remain in effect as amended herein and as so amended the Severance Benefits to be provided to Executive under this Agreement shall reduce the amount of any compensation and severance benefits that Executive may be entitled to receive under the Change of Control Agreement, as described more fully in Section 9 below.

9. Amendment of Change of Control Agreement. Executive and Company hereby amend Section 3.1(d) of Executive's Change of Control Agreement such that it reads as follows: "Notwithstanding the provisions of Section 3.2(a) and (b) below, Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, provided, however, that the payments and benefits to be provided to Executive under Sections 3.1(i)-(v) above shall be offset and mitigated by the Severance Benefits that Executive is to receive or has received under Section 3 of the Employment Agreement between him and the Company dated as of August 2, 2004."

10. Amendments; Waivers. This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by the Executive and by the Chief Executive Officer of the Company. By an instrument in writing similarly executed, either party may waive compliance by the other party with any provision of this Agreement that such other party was or is obligated to comply with or perform, provided, however, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power

hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity.

11. Severability. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect.

12. Governing Law. This Agreement is to be construed in accordance with and governed by the internal laws of the State of California without regard to principles of conflicts of laws. Any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement may be brought or otherwise commenced in any state or federal court located in the County of Santa Clara, California. Each party to this Agreement (a) expressly and irrevocably consents and submits to the jurisdiction of the state and federal courts located in County of Santa Clara, California in connection with any such legal proceeding, (b) agrees that each state and federal court located in the County of Santa Clara County, California shall be deemed to be a convenient forum; and (c) agrees not to assert, by way of motion, as a defense or otherwise, in any such legal proceeding commenced in any state or federal court located in the County of Santa Clara, California, any claim that such party is not subject personally to the jurisdiction of such court, that such legal proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper, or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

13. Counterparts. This Agreement may be executed in two or more counterparts, each of which will be deemed an original and all of which together will constitute one and same document.

14. Acknowledgments. Executive acknowledges, consents and agrees that (a) he has consulted with independent counsel of his own choice or has had the opportunity to consult with independent counsel of his own choice concerning this Agreement and has been advised to do so by the Company, and (b) that he has read and understands the Agreement, is fully aware of its legal effect, and has entered into it freely based on his own judgment.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EXECUTIVE:                              TERAYON COMMUNICATION SYSTEMS, INC.:

By: /s/Edward Lopez                     By: /s/David Woodrow
    --------------------                    -------------------------------
        Edward Lopez

EXHIBIT A

RELEASE AND WAIVER OF CLAIMS

In exchange for providing me with the Severance Benefits described in
Section 3 of my Employment Agreement with Terayon Communications Systems, Inc.
(the "Company"), to which this form is attached, I, Edward Lopez, hereby furnish
the Company with the following release and waiver ("Release"):

I (on behalf of myself and my heirs, successors and assigns) hereby
release, covenant not to sue, and forever discharge the Company, its
subsidiaries, divisions, parent and/or affiliated corporations or entities, and
each of their current and former directors, officers, shareholders, agents,
employees, attorneys, heirs, assigns, predecessors and successors, (the
"Released Parties"), of and from any and all claims, demands, actions and causes
of action, liabilities, losses, costs, attorneys fees or expenses, known or
unknown, suspected or unsuspected, that I now have, or may ever have against the
Released Parties, or any of them, that arise out of, or are in any way related
to: (1) my employment by the Company; (2) the termination of my employment with
the Company; and (3) any transactions, occurrences, acts or omissions by the
Released Parties, or any of them, occurring prior to my execution of this
Release. Without limiting the foregoing, I understand and agree that the
foregoing release provisions waive and release claims alleging violations of any
federal or state employment discrimination law, including without limitation
Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act,
the Family Medical Leave Act, the California Fair Employment and Housing Act, as
well as claims arising out of or related to any alleged violations of state and
federal wage and hour laws, all common law and statutory claims, including
without limitation, breach of contract, fraud, violation of public policy,
unfair competition and business practices, defamation, infliction of emotional
distress, invasion of privacy, wrongful termination, or any other state or
federal law, rule, or regulation, and any claims for attorneys' fees and costs.

I understand and agree this Release specifically covers known and unknown
claims, and hereby waive my rights under Section 1542 of the California Civil
Code or under any other comparable law of another jurisdiction that limits a
general release to claims that are known to exist at the date of this agreement.
Section 1542 of the California Civil Code states as follows: "A general release
does not extend to claims which the creditor does not know or suspect to exist
in his favor at the time of executing the release, which if known by him must
have materially affected his settlement with the debtor."

I acknowledge that I am also waiving and releasing any rights I may have
under the Age Discrimination in Employment Act (the "ADEA"), that this waiver
and release is knowing and voluntary. I also acknowledge by this writing that:
(a) I am waiving rights or claims for age discrimination under the ADEA in
exchange for the payments described herein, which are in addition to anything of
value to which I otherwise am entitled; (b) I have been given an opportunity to
consider fully the terms of this Release for twenty-one (21) days, although I am
not required to wait twenty-one (21) days before signing this Release; (c) I
have been advised to consult with an attorney of my choosing before signing this
Release; (d) I understand I have

seven (7) days in which to revoke my release of ADEA claims within seven (7) days of signing this Release, provided, however, that my release and waiver of all other claims will become effective when I execute this Release, and provided further, that I shall not be entitled to the Severance Benefits under Section 3 of my Employment Agreement if I revoke my release of ADEA claims under this Release.

Notwithstanding the foregoing, this releases shall not affect (i) any rights I have to the enforcement of the terms of my Indemnity Agreement, Change of Control Agreement, Stock Option Documents and Employment Agreement, each with the Company, or in respect of any malfeasance or fraud on the part of the Company or the Company Released Parties, and (ii) any rights of the Company to the enforcement of the terms of my Proprietary Information and Invention Assignment Agreement with the Company and my Employment Agreement or in respect of any malfeasance or fraud on the part of the Executive or the Executive Released Parties.

I understand and agree that I shall continue to be bound by my obligations under my Proprietary Information and Inventions Agreement with the Company following the termination of my employment for any reason, and that my receipt of the Severance Benefits under Section 3 of my Employment Agreement is contingent upon my fulfillment of and continued adherence to those obligations.

Finally, I acknowledge that (a) I have read this Release or have been afforded every opportunity to do so, (b) I am fully aware of the its contents and legal effect, and (c) I have chosen to enter into it freely, without coercion and based upon my own judgment and not in reliance upon any promises made by the Company other than those contained therein.

Date: _____          _____
                                                           Edward Lopez

EXHIBIT B

[PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT]

EXHIBIT 10.33

[Terayon Letterhead]

July 22, 2004

Jerry Chase

Dear Jerry:

    On behalf of the Board of Directors of Terayon Communication Systems, Inc. (hereafter referred to as "Terayon" or the "Company"), I am pleased to offer you the position of Chief Executive Officer ("CEO") of the Company, pursuant to the following terms.

    1. Title. As the Company's CEO, you report to the Company's Board of Directors (the "Board") and your principal place of work will be at the Company's headquarters, currently at 4988 Great America Parkway in Santa Clara, California. You also will be appointed to serve as a Director on the Company's Board and shall serve as a Director, subject to the Company's bylaws.

    2. Salary and Benefits. Your annual base salary will be $400,000.00, less payroll deductions and all required withholdings. This salary will be paid to you semi-monthly, in accordance with the Company's normal payroll cycle. You will be eligible to participate in the Company's standard employee benefit programs (e.g., health insurance, 401(k) plan, life insurance, short and long-term disability insurance, flexible spending accounts), subject to the terms and conditions of those benefit plans. Details about these benefit plans will be sent to you under separate cover. You also will be eligible for Company-paid holidays, vacation and sick time, subject to Company policy.

    3. Annual Bonus. You will be eligible for an annual bonus of up to 75% of your base salary (which shall be pro-rated for fiscal year 2004), the payment of which will be based on the achievement of certain goals to be defined by the Board.

    4. Relocation Assistance. The Company will assist you with the costs associated with your relocation to California, and will reimburse you for certain costs that you and your family will incur as a result of your relocation, in accordance with the Company's standard policy and/or practices for similarly-situated executives.

    5. Stock Options. Pursuant to Terayon's stock option plan and subject to the approval of Terayon's Compensation Committee, you will be granted an option to purchase 800,000 shares of the Company's Common Stock under the Company's 1997 Equity Incentive Plan (the "Plan"). The exercise price per share of the stock granted subject to this option will be equal to the fair market value of Terayon's Common Stock on the date of grant, as determined by the Compensation Committee. The option grant will be subject to the terms and conditions of the Plan and standard stock option agreement, and the option will vest over a four (4) year period, with 1/4th or 25% of the total option shares vesting on the first anniversary of your employment start date with the Company and 1/48th of the total option shares vesting monthly thereafter.

6. At Will Employment. Your employment with Terayon will be at-will, subject to paragraphs 7 and 8 below. This means that either you or the Company may terminate your employment at any time for any reason, with or without notice and with or without cause.

7. Severance Protection. Notwithstanding the at-will employment relationship between you and the Company, the Company agrees that, in the event your employment is terminated by the Company without "Cause" or by you for "Good Reason" (as those terms are defined in the Severance Agreement attached as Exhibit B) at any time on or before the third anniversary of your employment start date, you will be entitled to the following Severance Benefits: (a) a severance payment equal to twelve (12) months of your then current base salary, which will be payable in a lump sum or via salary continuation payments, in the Company's sole discretion, and (b) continuation of your employee benefits, at the Company's expense, for the duration of such twelve (12) month period, to the extent such continuation is permissible under the Company's employee benefit plans and subject to the terms and conditions of those benefit plans. If the continuation of any employee benefit following your termination is not permissible under the Company's employee welfare benefit plans, the Company shall have no obligation to continue those benefits; however, you may continue your health insurance coverage under COBRA and the Company will pay for your COBRA premiums for a period of up to 12 months following your termination. Your receipt of these Severance Benefits will be contingent upon you signing the general release of claims attached hereto as Exhibit A, and these Severance Benefits shall reduce the amount of any compensation or severance benefits that you may be entitled to receive under the Severance Agreement described in paragraph 8 below (which is also attached hereto as Exhibit B). For purposes of this offer letter, a termination due to death or Disability (as defined in the Severance Agreement attached as Exhibit B) shall not constitute a termination without Cause or for Good Reason, and a termination for either of those reasons shall be treated in a manner consistent with the Severance Agreement attached hereto as Exhibit B.

8. Severance Agreement. In addition to the severance protection described in paragraph 7 above, you also will be given a change in control/severance agreement (entitled "Severance Agreement," the form of which is attached hereto as Exhibit B), which shall provide for, among other things, a severance payment equal to 100% of your base salary and target bonus (defined as "Base Amount" and "Bonus Amount" in the attached Severance Agreement) and 100% vesting of unvested stock options upon a termination other than for "Cause" or with "Good Reason" within 12 months after a "Change in Control" (as those terms are defined in the Severance Agreement). However, the severance benefits to be provided to you under the attached Severance Agreement shall be offset and reduced by the value of the Severance Benefits that you may be entitled to receive under paragraph 7 above.

9. Proprietary Information and Invention Assignment Agreement. As a Terayon employee, you will be exepcted to abide by Company rules and regulations, and will be required to sign and comply with a Proprietary Information and Inventions Agreement (the "PIIAA"), a copy of which is attached hereto as Exhibit C, that prohibits the unauthorized use or disclosure of proprietary information of Terayon.

10. Integration. The employment terms in this offer letter and the attached Exhibits supersede any other agreements or promises made to you by anyone, whether written or oral. No modification or amendment to this letter, nor any waiver of any rights under this letter, will be

effective unless in writing signed by a Director of Terayon (other than you). This offer letter and the attached Exhibits are to be construed in accordance with and governed by the internal laws of the State of California without regard to principles of conflicts of laws.

As required by law, this offer is subject to satisfactory proof of your right to work in the United States. Please sign and date this letter, and return it to me by July 22, 2004, if you wish to accept this offer of employment. We would you like to start as soon as possible. We look forward to your favorable reply and to a productive and enjoyable work relationship.

Sincerely,

/s/ Zaki Rakib

Zaki Rakib

Accepted by: /s/ Jerry Chase                    Date: July 22, 2004
             ------------------
                Jerry Chase

Start Date: September 2004

EXHIBIT A

RELEASE AND WAIVER OF CLAIMS

In exchange for providing me with the Severance Benefits described in Section 7 of my offer letter from Terayon Communications Systems, Inc. (the "Company"), to which this form is attached, I, Jerry Chase, hereby furnish the Company with the following release and waiver ("Release"):

I (on behalf of myself and my heirs, successors and assigns) hereby release, covenant not to sue, and forever discharge the Company, its subsidiaries, divisions, parent and/or affiliated corporations or entities, and each of their current and former directors, officers, shareholders, agents, employees, attorneys, heirs, assigns, predecessors and successors, (the "Released Parties"), of and from any and all claims, demands, actions and causes of action, liabilities, losses, costs, attorneys fees or expenses, known or unknown, suspected or unsuspected, that I now have, or may ever have against the Released Parties, or any of them, that arise out of, or are in any way related to: (1) my employment by the Company; (2) the termination of my employment with the Company for any reason; and (3) any transactions, occurrences, acts or omissions by the Released Parties, or any of them, occurring prior to my execution of this Release. Without limiting the foregoing, I understand and agree that the foregoing release provisions waive and release claims alleging violations of any federal or state employment discrimination law, including without limitation Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Family Medical Leave Act, the California Fair Employment and Housing Act, as well as claims arising out of or related to any alleged violations of state and federal wage and hour laws, all common law and statutory claims, including without limitation, breach of contract, fraud, violation of public policy, unfair competition and business practices, defamation, infliction of emotional distress, invasion of privacy, wrongful termination, or any other state or federal law, rule, or regulation, and any claims for attorneys' fees and costs.

I understand and agree this Release specifically covers known and unknown claims, and hereby waive my rights under Section 1542 of the California Civil Code or under any other comparable law of another jurisdiction that limits a general release to claims that are known to exist at the date of this agreement. Section 1542 of the California Civil Code states as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

I acknowledge that I am also waiving and releasing any rights I may have under the Age Discrimination in Employment Act (the "ADEA"), that this waiver and release is knowing and voluntary. I also acknowledge by this writing that: (a) I am waiving rights or claims for age discrimination under the ADEA in exchange for the payments described herein, which are in addition to anything of value to which I otherwise am entitled; (b) I have been given an opportunity to consider fully the terms of this Release for twenty-one (21) days, although I am not required to wait twenty-one (21) days before signing this Release; (c) I have been advised to consult with an attorney of my choosing before signing this Release; (d) I understand I have

seven (7) days in which to revoke my release of ADEA claims within seven (7) days of signing this Release, provided, however, that my release and waiver of all other claims will become effective when I execute this Release, and provided further, that I shall not be entitled to the Severance Benefits under paragraph 7 of my offer letter if I revoke my release of ADEA claims under this Release.

I understand and agree that I shall continue to be bound by my obligations under my Proprietary Information and Inventions Agreement with the Company, and that my receipt of the Severance Benefits under paragraph 7 of my offer letter is contingent upon my fulfillment of and continued adherence to those obligations.

Finally, I acknowledge that (a) I have read this Release or have been afforded every opportunity to do so, (b) I am fully aware of the its contents and legal effect, and (c) I have chosen to enter into it freely, without coercion and based upon my own judgment and not in reliance upon any promises made by the Company other than those contained therein.

Date: July 22, 2004                           /s/ Jerry Chase
                                              ----------------------
                                              Jerry Chase

EXHIBIT B

[SEVERANCE AGREEMENT]

EXHIBIT C

[PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT]

EXHIBIT 10.34

EXHIBIT B

SEVERANCE AGREEMENT

This Agreement, dated as of July 22, 2004, is entered into between Terayon Communication Systems, Inc., a corporation organized under the laws of the State of Delaware (the "Company"), and Jerry Chase (the "Executive").

WHEREAS, the Board of Directors, of the Company (the "Board") recognizes that the possibility of a Change in Control (as hereinafter defined) exists and that the threat or the occurrence of a Change in Control can result in significant distractions to its key management personnel because of the uncertainties inherent in such a situation;

WHEREAS, the Board has determined that it is essential and in the best interest of the Company and its stockholders to retain the services of the Executive in the event of a threat or occurrence of a Change in Control and to ensure the Executive's continued dedication and efforts in such event without undue concern for the Executive's personal, financial and employment security; and

WHEREAS, in order to induce the Executive to remain in the employ of the Company, particularly in the event of a threat or the occurrence of a Change in Control, the Company desires to enter into this Agreement with the Executive to provide the Executive with certain benefits in the event that the Executive's employment is terminated as a result of, or in connection with, a Change in Control.

NOW, THEREFORE, in consideration of the respective agreements of the parties contained herein, it is agreed as follows:

1.      Term of Agreement. This Agreement shall commence as of September 8, 2004 and shall continue in effect until _____; provided, however, that commencing on _____ and on each _____ thereafter, the term of this Agreement shall automatically be extended for one (1) year unless the Company or the Executive shall have given written notice to the other at least ninety (90) days prior thereto that the term of this Agreement shall not be so extended; and provided, further, however, that notwithstanding any such notice by the Company not to extend, the term of this Agreement shall not expire prior to the expiration of twelve (12) months after the occurrence of a Change in Control.

2.      Definitions.

2.1. Accrued Compensation. For purposes of this Agreement, "Accrued Compensation" shall mean an amount which shall include all amounts earned or accrued through the "Termination Date" (as hereinafter defined) but not paid as of the Termination Date, including (i) base salary, (ii) reimbursement for reasonable and necessary expenses incurred by

the Executive on behalf of the Company during the period ending on the Termination Date, (iii) vacation pay and (iv) bonuses and incentive compensation (other than the "Pro Rata Bonus" (as hereinafter defined)).

2.2 Base Amount. For purposes of this Agreement, "Base Amount" shall mean the greater of the Executive's annual base salary (a) at the rate in effect on the Termination Date or (b) at the highest rate in effect at any time during the ninety (90) day period prior to the Change in Control, and shall include all amounts of base salary that are deferred under the employee benefit plans of the Company or any other agreement or arrangement.

2.3 Bonus Amount. For purposes of this Agreement, "Bonus Amount" shall mean the greatest of: (a) 100% of the annual bonus payable to the Executive under the Company's cash bonus incentive plan for the fiscal year in which the Termination Date occurs; (b) the annual bonus paid or payable to the Executive under the Company's cash bonus incentive plan for the full fiscal year ended prior to the fiscal year during which the Termination Date occurred; or (c) the annual bonus paid or payable to the Executive under the Company's cash bonus incentive plan for the full fiscal year ended prior to the fiscal year during which a Change in Control occurred.

2.4. Cause. For purposes of this Agreement, a termination of employment is for "Cause" if the basis of the termination is fraud, misappropriation, embezzlement or willful engagement by the Executive in misconduct which is demonstrably and materially injurious to the Company and its subsidiaries taken as a whole (no act, or failure to act, on the part of the Executive shall be considered "willful" unless done, or omitted to be done, by the Executive not in good faith and without a reasonable belief that the action or omission was in the best interests of the Company and its subsidiaries); provided, however, that the Executive shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to the Executive a Notice of Termination (as hereinafter defined) and copy of a resolution duly adopted by the affirmative vote of not less than three-quarters of those members of the Company's Board of Directors who are not then employees of the Company at a meeting of the Board called and held for the purpose (after reasonable notice to the Executive and an opportunity for the Executive, together with the Executive's counsel, to be heard before the Board), finding that, in the good faith opinion of the Board, the Executive was guilty of the conduct set forth in the first sentence of this Section 2.4 and specifying the particulars thereof in detail.

2.5. Change in Control. For purposes of this Agreement, a "Change in Control" shall mean any of the following events:

(a) An acquisition (other than directly from the Company) of any voting securities of the Company (the "Voting Securities") by any "Person" (as the term is used for purposes of Section 13(d) or 14(d) of the Securities Exchange Act of 1934, as amended (the 1934 Act")) immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of greater than fifty percent (50%) of the combined voting power of the Company's then outstanding Voting Securities; provided, however, that in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which

-2-

would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (1) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any corporation or other Person of which a majority of its voting power or its equity securities or equity interest is owned directly or indirectly by the Company (a "Subsidiary"), (2) the Company or any Subsidiary, or (3) any Person in connection with a "Non-Control Transaction" (as hereinafter defined); or

(b) Approval by stockholders of the Company of a merger, consolidation or reorganization involving the Company, unless the stockholders of the Company immediately before such merger, consolidation or reorganization, own immediately following such merger, consolidation or reorganization, directly or indirectly, at least fifty-one percent (51%) of the combined voting power of the outstanding voting securities of the corporation resulting from such merger or consolidation or reorganization (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation or reorganization (a "Non-Control Transaction");

(c) A complete liquidation or dissolution of the Company; or

(d) An agreement for the sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Person, provided, however, that, if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and after such share acquisition by the Company the Subject Person becomes the Beneficial Owner of any additional voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

2.6. Company. For purposes of this Agreement, the "Company" shall mean Terayon Communication Systems, Inc. and its Subsidiaries and shall include Terayon's "Successors and Assigns" (as hereinafter defined).

2.7. Disability. For purposes of this Agreement, "Disability" shall mean a physical or mental infirmity which impairs the Executive's ability to substantially perform the Executive's duties with the Company for a period of one hundred eighty (180) consecutive days and the Executive has not returned to full time employment prior to the Termination Date as stated in the "Notice of Termination".

2.8. Good Reason.

-3-

(a) For purposes of this Agreement, "Good Reason" shall mean the occurrence after a Change in Control of any of the events or conditions described in subsections (1) through (8) hereof:

(1) a change in the Executive's status, title, position or responsibilities (including reporting responsibilities) which, in the Executive's reasonable judgment, represents an adverse change from the Executive's status, title, position or responsibilities as in effect at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter; the assignment to the Executive of any duties or responsibilities which, in the Executive's reasonable judgment, are inconsistent with the Executive's status, title, position or responsibilities as in effect at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter; or any removal of the Executive from or failure to reappoint or reelect the Executive to any of such offices or positions, except in connection with the termination of the Executive's employment for Disability, Cause, as a result of the Executive's death or by the Executive other than for Good Reason;

(2) A reduction in the Executive's base salary or any failure to pay the Executive any compensation or benefits to which the Executive is entitled within five (5) days of the date due;

(3) the Company's requiring the Executive to be based at any place outside a 60-mile radius from Santa Clara, California, except for reasonably required travel on the Company's business which is not materially greater than such travel requirements prior to the Change in Control;

(4) the failure by the Company to (A) continue in effect (without reduction in benefit level and/or reward opportunities) any material compensation or employee benefit plan in which the Executive was participating at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter, unless such plan is replaced with a plan that provides substantially equivalent compensation or benefits to the Executive, or (B) provide the Executive with compensation and benefits, in the aggregate, at least equal (in terms of benefit levels and/or reward opportunities) to those provided for under each other employee benefit plan, program and practice in which the Executive was participating at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter;

(5) the insolvency or the filing (by any party, including the Company) of a petition for bankruptcy of the Company, which petition is not dismissed within sixty (60) days;

(6) any material breach by the Company of any provision of this Agreement;

(7) any purported termination of the Executive's employment for Cause by the Company which does not comply with the terms of Section 2.4; or

-4-

(8) the failure of the Company to obtain an agreement, satisfactory to the Executive, from any Successors and Assigns to assume and agree to perform this Agreement, as contemplated in Section 6 hereof.

(b) The Executive's right to terminate the Executive's employment pursuant to this Section 2.8 shall not be affected by the Executive's incapacity due to physical or mental illness.

2.9.  Notice of Termination. For purposes of this Agreement, following a Change in Control, "Notice of Termination" shall mean a written notice of termination of the Executive's employment from the Company, which notice indicates the specific termination provision in this Agreement relied upon and which sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so, indicated.

2.10.  Pro Rata Bonus. For purposes of this Agreement, "Pro Rata Bonus" shall mean an amount equal to the Bonus Amount multiplied by a fraction the numerator of which is the number of days in the fiscal year through the Termination Date and the denominator of which is 365.

2.11.  Successors and Assigns. For purposes of this Agreement, "Successors and Assigns" shall mean a corporation or other entity acquiring all or substantially all of the assets and business of the Company (including this Agreement) whether by operation of law or otherwise.

2.12.  Termination Date. For purposes of this Agreement, "Termination Date" shall mean in, the case of the Executive's death, the Executive's date of death, in the case of Good Reason, the last day of the Executive's employment and, in all other cases, the date specified in the Notice of Termination; provided, however, that if the Executive's employment is terminated by the Company for Cause or due to Disability, the date specified in the Notice of Termination shall be at least 30 days from the date the Notice of Termination is given to the Executive, provided that, in the case of Disability, the Executive shall not have returned to the full-time performance of the Executive's duties during such period of at least 30 days.

3.    Termination of Employment.

3.1. If, during the term of this Agreement, the Executive's employment with the Company shall be terminated within twelve (12) months following a Change in Control, the Executive shall be entitled to the following compensation and benefits:

(a) If the Executive's employment with the Company shall be terminated (1) by the Company for Cause or Disability, (2) by reason of the Executive's death or (3) by the Executive other than for Good Reason, the Company shall pay to the Executive the Accrued Compensation.

-5-

(b) If the Executive's employment with the Company shall be terminated for any reason other than as specified in Section 3.1(a), the Executive shall be entitled to the following:

(i) the Company shall pay the Executive all Accrued Compensation;

(ii) the Company shall pay the Executive as severance pay and in lieu of any further compensation for periods subsequent to the Termination Date, in a single payment, an amount in cash equal to the sum of (A) the Base Amount and (B) the Bonus Amount;

(iii) for a number of months equal to twelve (12) (the "Continuation Period"), the Company shall, at its expense, continue on behalf of the Executive and the Executive's dependents and beneficiaries the life insurance, disability, medical, dental, and hospitalization benefits provided (A) to the Executive at any time during the 90-day period prior to the Change in Control or at any time thereafter or (B) to other similarly situated executives who continue in the employ of the Company during the Continuation Period. The coverage and benefits (including deductibles and costs) provided in this Section 3. 1 (b)(iii) during the Continuation Period shall be no less favorable to the Executive and the Executive's dependents and beneficiaries, than the most favorable of such coverages and benefits during any of the periods referred to in clauses (A) and (B) above. The Company's obligation hereunder with respect to the foregoing benefits shall be limited to the extent that the Executive obtains any such benefits pursuant to a subsequent employer's benefit plans, in which case the Company may reduce the coverage of any benefits it is required to provide the Executive hereunder as long as the aggregate coverages and benefits of the combined benefit plans are no less favorable to the Executive than the coverages and benefits required to be provided hereunder. This subsection (iii) shall not be interpreted so as to limit any benefits to which the Executive or the Executive's dependents or beneficiaries may be entitled under any of the Company's employee benefit plans, programs or practices following the Executive's termination of employment, including without limitation, retiree medical and life insurance benefits;

(iv) the restrictions on any outstanding equity incentive awards, including stock options and restricted stock, granted to the Executive under the Company's stock option plans or any other incentive plan or arrangement shall lapse and such incentive award shall become one hundred percent (100%) vested and, in the case of stock options, immediately exercisable;

-6-

(v) for the duration of the Continuation Period, the Company shall, at its expense, provide the Executive with outplacement and career counseling services of the Executive's choice, provided, however, that the Company's obligation to pay for such services shall in no event exceed an aggregate amount equal to 25% of the Base Amount.

(c) The amounts provided for in Sections 3.1 (a) and 3.1 (b)(i) and (ii) shall be paid in a single lump sum cash payment within forty five (45) days after the Executive's Termination Date (or earlier, if required by applicable law).

(d) The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, and no such payment shall be offset or reduced by the amount of any compensation or benefits provided to the Executive in any subsequent employment except as provided in Section 3.1 (b)(iii).

3.2. (a) The severance pay and benefits provided for in this Section 3 shall be in lieu of any other severance or termination pay to which the Executive may be entitled under any Company severance or termination plan, program, practice, agreement or arrangement.

(b) The Executive's entitlement to any other compensation or benefits shall be determined in accordance with the Company's employee benefit plans and other applicable programs, policies and practices then in effect,

4.    Notice of Termination. Following a Change in Control, any purported termination of the Executive's employment shall be communicated by Notice of Termination to the Executive. For purposes of this Agreement, no such purported termination shall be effective without such Notice of Termination.

5.    Excise Tax Limitation.

(a) Notwithstanding anything contained in this Agreement, in the event that any payment or benefit (within the meaning of Section 280G(b)(2) of the Internal Revenue Code of 1986, as amended (the "Code")), to the Executive or for the Executive's benefit paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise in connection with, or arising out of, the Executive's employment with the Company or a Change in Control (a "Payment" or "Payments") would be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), the Payments shall be reduced (but not below zero) if and to the extent necessary so that no Payment to be made or benefit to be provided to the Executive shall be subject to the Excise Tax (such reduced Payments being hereinafter referred to as the "Limited Payment Amount"). Unless the Executive shall have given prior written notice specifying a different order to the Company to effectuate the Limited Payment Amount, the Company shall reduce or eliminate the Payments by first reducing or eliminating cash payments and then by reducing those payments or benefits which are not payable in cash, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined). Any notice given by the Executive pursuant to the

-7-

preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Executive's rights and entitlements to any benefits or compensation,

(b) An initial determination as to whether the Payments shall be reduced to the Limited Payment Amount and the amount of such Limited Payment Amount shall be made, at the Company's expense, by the accounting firm that is the Company's independent accounting firm as of the date of the Change in Control (the "Accounting Firm"). The Accounting Firm shall provide its determination (the "Determination,), together with detailed supporting calculations and documentation, to the Company and the Executive within twenty (20) days of the Termination Date if applicable, or such other time as requested by the Company or by the Executive (provided the Executive reasonably believes that any of the Payments may be subject to the Excise Tax), and if the Accounting Firm determines that there is substantial authority (within the meaning of Section 6662 of the Code) that no Excise Tax is payable by the Executive with respect to a Payment or Payments, it shall furnish the Executive with an opinion reasonably acceptable to the Executive that no Excise Tax will be imposed with respect to any such Payment or Payments. Within ten (10) days of the delivery of the Determination to the Executive, the Executive shall have the right to dispute the Determination (the "Dispute"). If there is no Dispute, the Determination shall be binding, final and conclusive upon the Company and the Executive subject to the application of Section 5(c) below.

(c) As a result of the uncertainty in the application of Sections 4999 and 280G of the Code, it is possible that the Payments to be made to, or provided for the benefit of, the Executive either will be greater (an "Excess Payment") or less (an "Underpayment") than the amounts provided for by the limitations contained in Section 5(a). If it is established pursuant to a final determination of a court or an Internal Revenue Service (the "IRS") proceeding which has been finally and conclusively resolved that an Excess Payment has been made, such Excess Payment shall be deemed for all purposes to be a loan to the Executive made on the date the Executive received the Excess Payment and the Executive shall repay the Excess Payment to the Company on demand (but not less than ten (10) days after written notice is received by the Executive) together with interest on the Excess Payment at the "Applicable Federal Rate" (as defined in Section 1274(d) of the Code) from the date of the Executive's receipt of such Excess Payment until the date of such repayment. In the event that it is determined by (i) the Accounting Firm, the Company (which shall include the position taken by the Company, or together with its consolidated group, on its federal income tax return) or the IRS, (ii) pursuant to a determination by a court, or (iii) upon the resolution to the Executive's satisfaction of the Dispute that an Underpayment has occurred, the Company shall pay an amount equal to the Underpayment to the Executive within ten (10) days of such determination or resolution, together with interest on such amount at the Applicable Federal Rate from the date such amount would have been paid to the Executive until the date of payment.

6.    Successors: Binding Agreement.

(a) This Agreement shall be binding upon and shall inure to the benefit of the Company, its Successors and Assigns and the Company shall require any Successors and Assigns to expressly assume and agree to perform this Agreement in the same manner and to the same

extent that the Company would be required to perform it if no such succession or assignment had taken place.

(b) Neither this Agreement nor any right or interest hereunder shall be assignable or transferable by the Executive or the Executive's beneficiaries or legal representatives, except by will or by the laws of descent and distribution. This Agreement shall inure to the benefit of and be enforceable by the Executive's legal personal representative.

7.    Fees and Expenses. The Company shall pay all legal fees and related expenses (including the costs of experts, evidence and counsel) incurred by the Executive as they become due as a result of (a) the Executive's termination of employment (including all such fees and expenses, if any, incurred in contesting or disputing any such termination of employment), (b) the Executive seeking to obtain or enforce any right or benefit provided by this Agreement (including, but. not limited to, any such fees and expenses incurred in connection with the Dispute whether as a result of any applicable government taxing authority proceeding, audit or otherwise) or by any other plan or arrangement maintained by the Company under which the Executive is or may be entitled to receive benefits, and (c) the Executive's hearing before the Board as contemplated in Section 2.4 of this Agreement; provided, however, that the circumstances set forth in clauses (a) and (b) occurred on or after a Change in Control.

8.    Notice. For the purposes of this Agreement, notices and all other communications provided for in the Agreement (including the Notice of Termination) shall be in writing and shall be deemed to have been duly given when personally delivered or sent by certified mail, return receipt requested, postage prepaid, addressed to the respective addresses last given by each party to the other, provided that all notices to the Company shall be directed to the attention of the Board with a copy to the Secretary of the Company. All notices and communications shall be denied to have been received on the date of delivery thereof or on the third business day after the mailing thereof, except that notice of change of address shall be effective only upon receipt.

9.    Non-exclusivity of Rights. Nothing in this Agreement shall prevent or limit the Executive's continuing or future participation in any benefit, bonus, incentive or other plan or program provided by the Company (except for any severance or termination policies, plans, programs or practices) and for which the Executive may qualify, nor shall anything herein limit or reduce such rights as the Executive may have under any other agreements with the Company (except for any severance or termination agreement). Amounts which are vested benefits or which the Executive is otherwise entitled to receive under any plan or program of the Company shall be payable in accordance with such plan or program, except as explicitly modified by this Agreement.

10.    Settlement of Claims. The Company's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any circumstances, including, without limitation, any set-off, counterclaim, recoupment, defense or other right which the Company may have against an Executive or others.

-9-

11.    Miscellaneous. No provision of this Agreement may be modified, waived or discharged, unless such waiver, modification or discharge is agreed to in writing and signed by the Executive and the Company. No waiver by either party hereto at any time of any breach by the other party hereto, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreement or representation, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement.

12.    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California without giving effect to the conflict of laws principles thereof. Any action brought by any party to this Agreement shall be brought and maintained in a court of competent jurisdiction in Santa Clara County in the State of California.

13.    Severability. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

14.    Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, if any, understandings and arrangements, oral or written, between the parties hereto with respect to the subject matter hereof

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and the Executive has executed this Agreement as of the day and year first above written.

TERAYON COMMUNICATION                    EXECUTIVE
    SYSTEMS, INC.

By:/s/ Zaki Rakib                        /s/ Jerry Chase
   ------------------------------------  ----------------------------------
                                         Jerry Chase
Its:
    _____

-10-

EXHIBIT 10.35

EXHIBIT C

TERAYON COMMUNICATION SYSTEMS, INC.

PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

As an employee of Terayon Communication Systems, Inc., a Delaware corporation, and/or any of its subsidiaries or affiliates (together, the "Company"), and as a condition of my employment by the Company and in consideration of the compensation now and hereafter paid to me, I agree to the following:

1.    Maintaining Confidential Information.

    (a)    Company Information. I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation, without the written authorization of the Board of Directors of the Company, any trade secrets, confidential knowledge or data, proprietary materials, or other proprietary information of the Company. By way of illustration and not limitation, such proprietary materials and information shall include proprietary and/or confidential materials and information relating to software, test data, protocols, assay components, procedures and formulations, products, processes, know-how, designs, formulas, methods, developmental or experimental work, improvements, discoveries, plans for research, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers, and information regarding the skills and compensation of other employees of the Company.

    (b)    Former Employer Information. I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of my former or concurrent employers or companies, if any, and that I will not bring onto the premises of the Company any unpublished documents or property belonging to my former or concurrent employers or companies unless consented to in writing by said employers or companies.

    (c)    Third Party Information. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and, in some cases, to use in only for certain limited purposes. I agree that I owe the Company and such third parties, both during the term of my employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation (except in a manner that is consistent with the Company's agreement with the third party) or use it for the benefit of anyone other than the Company or such third party (consistent with the Company's agreement with the third party.)

2.    Assignment of Inventions and Original Works.

    (a)    Inventions and Original Works Retained by Me. I have attached hereto as Exhibit A a complete list of all inventions, original works or authorship, developments, improvements, and trade secrets, relating in any way to the Company's present or anticipated business, that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of the Agreement. If disclosure of an item in Exhibit A would cause me to violate any prior confidentiality agreement, I understand that I am not to list such in Exhibit A but am to inform the Company that all items have not been listed for that reason. A space is provided on Exhibit A for such purposes. If no list is attached, I represent that there are no such items.

(b)   Inventions and Original Works Assigned to the Company. I agree that I will make prompt written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will assign to the Company all my right, title and interest in and to any ideas, inventions, compositions of matter, original works of authorship, developments, improvements or trade secrets which I solely or jointly conceive or reduced to practice, during the period of my employment with the Company. I recognize that the Agreement does not require assignment of any invention which qualifies fully for protection under Section 2870 of the California Labor Code (hereinafter "Section 2870"), which provides as follows:

(1)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(a)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer;

(b)   Result from any work performed by the employee for the employer.

(2)   To the extent a provision in an employment agreement proports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," as that term is defined by the United States Copyright Act (17 U.S.C., Section 101).

(a)   Inventions and Original Works Assigned to the United States. I agree to assign to the United States government all my right, title and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets whenever full title to same is required to be in the Untied States by a contract between the Company and the United States or any of its agencies.

(d)   Obtaining Letters Patent, Copyright Registrations and Other Protections. I will assist the Company in every proper way to obtain and enforce the United States and foreign proprietary rights relating to any and all inventions, original works or authorship, developments, improvements, or trade secrets of the Company in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearing as a witness) the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such proprietary rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such proprietary rights to the Company or its designee. My obligation to assist the company with respect to proprietary rights in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding

paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company and all claims of any nature whatsoever which I now or may hereafter have for infringement of any and all proprietary rights assigned to the Company.

(c) Obligation to Keep the Company Informed. In addition to my obligations under paragraph 2(b) above, during the period of my employment and for one year after termination of my employment for any reason, I will promptly disclose to the Company fully and in writing all patent applications filed by me on my behalf. At the time of each such disclosure, I will advise the Company in writing of any inventions that I believe fully qualify for protection under Section 2870; and I will at that time provide the Company in writing all evidence necessary to substantiate that belief. I understand that the Company will keep in confidence and will not disclose to third parties without my consent any proprietary information disclosed in writing to the Company pursuant to the Agreement relating to inventions that qualify for protection under Section 2870; will preserve the confidentiality of any invention that does not qualify for protection under Section 2870. I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all proprietary information developed by me and all inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

3.    No Conflicting Employment: No Inducement of Other Employees.

I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any other employment or business activity directly related to the business in which the Company is now involved or becomes involved, nor will I engage in any other activities which conflict with my obligations to the Company. For the period of my employment by the Company and for one (1) year after the date of termination of my employment by the Company, I will not induce any employee of the company to leave the employment of the company.

4.    No Conflicting Obligations.

I represent that my performance of all terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

5.    Return of Company Documents and Materials.

When I leave the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, software, test data, protocols, assay components, or other property, together with all copies, thereof (in whatever medium recorded belonging to the Company, its successors or assigns. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement for technical and management personnel.

I have been informed and acknowledge that the unauthorized taking of Company's trade secrets

(I)     could result in civil liability under California Civil Code Section 3426, and that, if willful, could result in an award for triple the amount of the Company's damages and attorney's fees; and

(II)    is a crime under California Penal Code Section 444(c), punishable by imprisonment for a time not exceeding a year, or by a fine not exceeding five thousand dollars ($5,000), or by both.

6.     Notification of New Employer.

In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

7.     Legal and Equitable Remedies.

Because my services are personal and unique and because I may have access to and become acquainted with the proprietary information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, without prejudice to any other rights and remedies that the Company may have for a breach of Agreement.

8.     General Provisions.

(a) Not an Employment Contract. I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the company's right to terminate my employment at any time, with or without cause.

(b) Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by and constructed according to the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Santa Clara County, California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

(c) Entire Agreement. This Agreement sets forth the final, complete and exclusive agreement and understanding between the Company and me relating to the subject matter hereof and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by both the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

(d) Severability. If one or more of the provisions in the Agreement are deemed unenforceable by law, such provisions shall be deemed severed from the Agreement and the remaining provisions will continue in full force and effect.

(e) Successors and Assigns. This Agreement will be binding upon heirs, executors, administrators and other legal representatives and will not be for the benefit of the Company, its successors and its assigns.

(f) Survival. The provisions of this Agreement shall survive the termination or my employment and the assignment of this Agreement by the company to any successor in interest or other assignee.

(g) Waiver. No waiver by the company of any breach of this Agreement shall be a waiver of any proceeding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

This Agreement shall be effective as of the first day of my employment with the Company, which is _____, 2004.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS MY RIGHTS TO INVENTIONS I MAKE DURING MY EMPLOYMENT, AND RESTRICTS MY RIGHT TO DISCLOSE OR USE THE COMPANY'S PROPRIETARY INFORMATION DURING OR SUBSEQUENT TO MY EMPLOYMENT.

I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.

Dated:  July 22, 2004.                    /s/ Jerry Chase
                                          -----------------------------------------
                                          Signature

ACCEPTED AND AGREED TO:                   Jerry Chase
                                          -----------------------------------------
                                          Jerry Chase

TERAYON COMMUNICATION SYSTEMS, INC.

                                          [ILLEGIBLE]
                                          -----------------------------------------
By: /s/ Zaki Rakib                                Address
    -------------------------------
    Zaki Rakib

EXHIBIT A

Terayon Communication Systems, Inc.
4988 Great America Parkway
Santa Clara, CA 95054

Gentlemen:

1.   The following is a complete list of all inventions, original works
     of authorship, developments, improvements, and trade secrets,
     relating in any way to the present or anticipated business of
     Terayon Communication Systems, Inc. (the "Company") that have been
     made or conceived or first reduced to practice by me alone or
     jointly with others prior to my engagement by the Company:

-    No inventions or improvements.

-    See below.

-    Due to confidentiality agreements with prior employer, I cannot
     disclose certain inventions that would otherwise be included on the
     above-described list.

-    Additional sheets attached.

2.   I propose to bring to my employment the following devices, materials
     and documents of a former employer or other person to whom I have an
     obligation of confidentiality that are not generally available to
     the public, which materials and documents may be used in my
     employment pursuant to the express written authorization of my
     former employer or such other person (a copy of which is attached
     hereto):

-    No inventions or improvements.

-    See below.

-    Additional sheets attached.

Date:  July 22, 2004.                        Very truly yours,

                                             /s/ Jerry Chase
                                             ------------------------------
                                             Jerry Chase

EXHIBIT 10.36

AIRCRAFT SUBLEASE AGREEMENT

THIS AIRCRAFT SUBLEASE AGREEMENT (the "Sublease or Agreement") is dated as of this 24th day of August 2004, by and between Terayon Communication Systems, Inc., a Delaware corporation ("Sublessor") and United Furniture Equipment Rental, Inc., an Ohio corporation ("Sublessee").

RECITALS

WHEREAS, Sublessor has leased that certain Canadair Challenger 604 aircraft, United States Registration Number N881TW; Manufacturer's Serial No. 5348, together with two (2) General Electric CF34-3B engines bearing manufacturer's serial numbers 872196 and 872198 (the "Engines") (the "Aircraft"); and

WHEREAS, Sublessor wishes to sublease the Aircraft to the Sublessee, and the Sublessee wishes to sublease the Aircraft from the Sublessor upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained, Sublessee and Sublessor agree as follows:

AGREEMENTS

1. Aircraft Subleased. The Sublessor hereby subleases the Aircraft to the Sublessee and the Sublessee hereby subleases the Aircraft from the Sublessor, effective as of August [23], 2004 (the "Commencement Date"). The Aircraft includes the Miscellaneous and Optional Equipment set forth on Exhibit "A" hereto.

(a) General Electric Capital Corporation Lease. Sublessee acknowledges that Sublessor has heretofore leased the Aircraft from General Electric Capital Corporation ("GECC"), all as more particularly set forth in that certain Aircraft Lease Agreement, as amended (the "GECC Lease") and related documents between Sublessor and GECC (the "GECC Documents"). A copy of the GECC Lease is attached hereto as Exhibit "B" and incorporated by reference herein. Sublessee acknowledges and agrees that Sublessee's rights to the Aircraft, as herein established, are subject and subordinate to the interests of GECC pursuant to the GECC Documents, and that the effectiveness of this Sublease is dependant on Sublessor obtaining the consent of GECC to this Sublease.

(b) Sublessee's Conditions Precedent. Sublessee's obligation to sublease the Aircraft from Sublessor is conditioned upon the following conditions having been met (or waived by Sublessee) as follows:

(i) Sublessor delivers the Aircraft on or before August 24, 2004, unless the delivery is delayed due to work being performed on the Aircraft at the direction of Sublessee and the Aircraft is in compliance with the requirements of Sections 5 and 9 of

this Sublease with a U.S. Standard Certificate of Airworthiness, effective on the date of delivery;

(ii) Sublessee shall have received a certificate executed by the President of the Sublessor certifying that the stockholders and directors of Sublessor, as required, have taken all steps necessary to authorize the entry into and performance by Sublessor of this Sublease and its obligations hereunder and certifying that the representations and warranties of Sublessor set forth in this Agreement are true and correct as of the date of delivery;

(iii) On the date of delivery of the Aircraft, the following statements shall be true and Sublessee shall have received evidence that (A) GECC has good and valid title to the Aircraft, free and clear of all liens, claims and encumbrances of every type and nature, (B) the GECC Lease is in full force and effect and there is no continuing Event of Default under the GECC Lease and (C) the Aircraft is fully registered in the name of GECC with the Federal Aviation Administration;

(iv) Sublessee shall have received written evidence of GECC's consent to this Sublease, including (i) Sublessor's rights with respect to the Aircraft purchase option under the GECC Lease, and (ii) nondisturbance provisions acceptable to Sublessee and GECC; and

(v) The MSP and JSSI programs with respect to the Aircraft shall be in full force and effect without any outstanding amounts or payments due thereunder from Sublessor and the benefits of such programs shall be available to Sublessee in accordance with Paragraph 9 hereof.

2. Term of Sublease. The term of this Sublease shall be for a period of twenty eight (28) months, commencing on the Commencement Date, and terminating on December 31, 2006 (the "Sublease Term").

3. Rental Payments.

(a) The Sublessee agrees to pay to Sublessor as rent for the use of the Aircraft the sum of One Hundred Thousand Dollars ($100,000.00) per month during the Term, subject to the adjustment provided in Paragraph 12 hereof ("Rent"). Rent shall be payable as follows:

(b) Rent shall be paid without deduction or setoff to Sublessor, or at any other place that may be designated by the Sublessor. Rent shall be payable by wire transfer on or before the Commencement Date, and thereafter on or before the 1st business day of each month during the Sublease Term. If delivery date of the Aircraft is not on the first calendar day of the month, the Rent for month 2 of the Sublease Term shall be reduced by an amount equal to One Hundred Thousand Dollars ($100,000) Dollars divided by thirty (30) and multiplied by the number of calendar days in month 1 that have elapsed from and including the first day of month 1 until the day immediately preceding the date of delivery

2.

of the Aircraft to Sublessee, as evidenced on the Certificate of Acceptance.

The instructions for wire transfers to Sublessor are as follows:

            Silicon Valley Bank
            3003 Tasman Drive
            Santa Clara, CA 95054
            408-654-5539
            Routing number:
            Swift Code:

            For Credit of:
            Terayon Communication Systems Inc
            4988 Great America Parkway
            Santa Clara, CA 95054
            408-235-5500
            Credit Account #:

    (c) Notwithstanding anything to the contrary contained in this Sublease, except as provided in subparagraph 3(d) below and in Paragraph 35 hereof, in the event that the Sublessor's covenant of quiet enjoyment in Paragraph 24(e) hereof is breached by Sublessor and Sublessor, or another person claiming by, through or on behalf of Sublessor, or GECC, deprives Sublessee of the possession and use of the Aircraft or the Aircraft becomes ineligible for U.S. registration or Sublessee is otherwise deprived of use or possession of the Aircraft by the failure of any representation or warranty of Sublessor contained herein to be true when given or any breach by Sublessor of any covenant or undertaking contained herein, and Sublessee does not terminate this Agreement pursuant to Paragraph 22 hereof, Sublessee shall not be required to perform any obligations imposed on it under this Sublease including but not limited to obligations to pay Rent or maintain insurance with respect to the Aircraft during the period in which Sublessee is deprived of use or possession of the Aircraft; provided, however, if Sublessee retains care, custody and control of the Aircraft during any such period of ineligibility of U.S. registration or loss of use or possession of the Aircraft, Sublessee shall (i) only be relieved of the Rent obligations under this Sublease and all other obligations shall remain in full force and effect and (ii) cooperate with Sublessor and GECC in good faith and take such steps, at Sublessor's expense, as are necessary to cause the Aircraft to be re-registered with the FAA in a manner which does not impose restrictions on the location or use of the Aircraft or otherwise restrict Sublessee's ability to operate the Aircraft in the ordinary course of its business or increase its cost associated therewith. Sublessee shall be entitled to a refund of any Rent paid in respect of any period during which Sublessee is deprived of use or possession of the Aircraft directly resulting from the circumstances described in the preceding sentence.

    (d) Notwithstanding the foregoing subparagraph, in the event the FAA imposes requirements upon the use or operation of the Aircraft which require the addition of equipment, avionics, or other items during the term of this Sublease in order for the

                                3.

Aircraft to be operated in accordance with the Federal Aviation Regulations during the Sublease Term, then Sublessor agrees to be responsible for up to a maximum of $100,000 of the cost of installation of such equipment, avionics or other items. Sublessee shall be responsible for all costs in excess of $100,000, necessary to meet the requirements imposed by the FAA. If Sublessee does not pay such excess costs, then Sublessee shall not be entitled to terminate this Sublease as provided in Paragraph 22 hereof, and shall continue to be obligated to pay Rent and perform all of its obligations under this Sublease. If Sublessor fails to pay for the cost of installation of such equipment, avionics or other items as provided herein after ten (10) days written notice from Sublessee, then Sublessee shall have the right to set-off such unpaid amounts against the Rent due to Sublessor up to the maximum amount of $100,000 as provided herein.

(e) Copies of GECC Lease Rent Payments. Concurrently with Sublessor's quarterly payment of rent to GECC under the GECC Lease, Sublessor shall provide Sublessee with a copy of each rent check and a copy of the airbill to GECC for each such payment made by Sublessor to GECC during the Sublease Term.

4. Security Deposit. Sublessee has paid to Insured Aircraft Title Service, Inc., 4848 S.W. 36th Street, Oklahoma City, Oklahoma 73179, Attention Kirk Woford, Telephone (800) 654-4882, Facsimile (405) 681-5356 (the "Escrow Agent"), the sum of One Hundred Thousand Dollars ($100,000.00) to be held in an interest bearing escrow account, as a security deposit to secure all obligations of Sublessee hereunder, and to secure that upon the expiration or earlier termination of this Sublease, the Aircraft shall be returned to Sublessor in a condition that conforms in all respects to the "return conditions" for the Aircraft, as set forth in Paragraph 18 of this Sublease (the "Sublease Deposit"). Interest shall accrue on the Sublease Deposit for the benefit of the Sublessee, but shall become a part of the Sublease Deposit available to Sublessor as provided herein. Sublessor shall have the right to direct the Escrow Agent to disburse funds from the Sublease Deposit as follows:

(a) If Sublessee fails to pay Rent to Sublessor, after five (5) days advance written notice to Sublessee and Escrow Agent, Sublessor may demand and receive payment of the delinquent Rent from Escrow Agent, without any consent of Sublessee being required; and

(b) If Sublessee fails to pay any of its other financial obligations under this Sublease when due, and Sublessor makes payment of such obligations on behalf of Sublessee, then after five (5) days advance written notice to Sublessee and Escrow Agent, Sublessor may demand and receive payment of the delinquent amounts from Escrow Agent, without any consent of Sublessee being required; and

(c) If on return of the Aircraft, whatever the cause, the Aircraft does not conform to the conditions set forth in Paragraph 18 of this Sublease and Sublessor is required to incur expense in order to correct such deficiencies, then Sublessor shall invoice Sublessee for all such expenses. If Sublessee fails to pay any such invoices when due, after five (5) days advance written notice to Sublessee and Escrow Agent, then Sublessor

4.

may demand and receive payment from Escrow Agent for such invoices, without any consent of Sublessee being required. Upon payment of all amounts due to Sublessor by Sublessee pursuant to this Sublease, Sublessor shall promptly refund the Sublease Deposit (or balance thereof) to Sublessee, plus any interest accrued thereon. Sublessor's return of the Deposit to Sublessee within a thirty (30) day period shall be deemed to be a prompt refund of the Deposit.

If Sublessor is required to use some or all of the Sublease Deposit to pay any of Sublessee's obligations hereunder, then Sublessee shall deposit an equivalent sum with the Escrow Agent within ten (10) business days of any such disbursement to Sublessor. Sublessee's failure or refusal to make any such additional deposits to the Escrow Agent shall be cause for Sublessor to terminate this Sublease.

5. Aircraft Delivery; Pre-Delivery Inspection. The Sublessor shall deliver the Aircraft to the Sublessee on August 24, 2004, or as soon as practical after the pre-lease inspection and installation of EGPWS, at Columbus, Ohio. On receipt of the Aircraft, the Sublessee shall execute and deliver to Sublessor a receipt evidencing delivery and acceptance of the Aircraft in the form attached hereto as Exhibit "C". Sublessee shall have the right, at its sole cost and expense, to conduct an industry standard pre-delivery inspection of the Aircraft, the scope of which shall be defined by Sublessee. The scope of the pre-delivery inspection shall be subject to the prior approval of Sublessor. Sublessee shall use its commercially reasonable best efforts to cause the pre-delivery inspection to be scheduled and completed so as not to delay the delivery date of the Aircraft as set forth herein. Prior to delivery to Sublessee, Sublessor shall, at its sole cost and expense, correct any Aircraft discrepancies determined during the pre-delivery inspection to be "unairworthy" or any Aircraft systems, equipment or accessories not operating normally and within the manufacturer's specifications (collectively, the "Pre-Delivery Discrepancies"). In the event Sublessee completes the pre-delivery inspection but Sublessor elects to not correct the Pre-Delivery Discrepancies in accordance with this Paragraph 5, Sublessor shall promptly notify Sublessee in writing and reimburse Sublessee for the cost of the pre-delivery inspection. Thereafter, this Agreement shall terminate and neither party shall have any further obligation to the other.

6. Sublessee's Operations. At all times during the Term of this Sublease, Sublessee shall have complete and absolute "operational control" of the Aircraft and shall maintain "possession, command and control" of the Aircraft (as determined by the Internal Revenue Service) pursuant to this Sublease. "Operational control" as defined in 14 C.F.R. Paragraph 1.1 and for the purpose of this Agreement, with respect to a flight, means the exercise of authority over initiating, conducting or terminating a flight. Sublessee represents and warrants that its operation of the Aircraft shall not be "predominantly" outside of the United States, as defined in Section 168(g)(10)(A) of the Internal Revenue Code of 1986, as amended. Sublessee shall defend, indemnify, and hold Sublessor, and its officers, directors, partners, employees, shareholders, and affiliates, harmless from any and all liabilities, claims, demands, suits, causes of action, losses, penalties, fines, expenses (including without limitation attorney's fees and costs) or damages, relating to or arising

5.

out of Sublessee's breach of the representations and warranties contained in this Paragraph 6.

7. Net Sublease; Operating Expenses. Sublessor and Sublessee agree that this is a net Sublease. Thus, in addition to the Rent payable pursuant to Paragraph 3, Sublessee shall pay all costs related to Sublessee's flights, including, but not limited to, fuel and other lubricant expenses, landing or departure fees, hangar rental, tie down fees, pilot compensation, lodging, subscriptions, and travel expenses, catering, and any and all other expenses incurred as a result of Sublessee's possession or use of the Aircraft.

8. Storage and Maintenance. During the Sublease Term, Sublessee shall use its best efforts to store the Aircraft in covered hangar facilities. During the Sublease Term, Sublessee shall maintain the Aircraft, including the airframe, Engines, instruments, equipment, appliances and accessories in (i) fully operable condition, (ii) in compliance with all applicable maintenance and safety requirements of the FAA and the manufacturer's computerized aircraft maintenance program ("CIMMS") as well as Chapter 5 of the manufacturer's maintenance manual (the "Maintenance Manual"), and (iii) in full compliance with the maintenance provisions contained in Section 7 of the GECC Lease. All maintenance and repair work shall be performed by personnel duly certified to perform such work by the FAA. All such work shall be performed in accordance with minimum standards of the FAA and in accordance with standards set forth in the Maintenance Manual, and Section 7 of the GECC Lease. The costs of scheduled maintenance events and the replacement of life limited components shall be reasonably prorated with the portion used or consumed during the Sublease Term paid by the Sublessee and the balance paid by the Sublessor. The costs of unscheduled maintenance events occurring during the Sublease Term shall be paid for by Sublessee. Sublessor shall cause the Aircraft's APU to be enrolled in a MSP program, the monthly cost of which shall be paid by Sublessee. The Aircraft's Engines are to remain enrolled on the Jet Support Systems International ("JSSI") program, and the JSSI hourly cost for each Engine during the Sublease Term shall be paid by Sublessee. Sublessor shall notify JSSI and Honeywell of the existence of this Sublease, and that Sublessee shall be entitled to the benefits of the MSP and JSSI programs during the Sublease Term. If Engine maintenance is required during the Sublease Term, any such cost not paid by JSSI shall be paid by Sublessor, unless caused by the negligence, abuse or misconduct of Sublessee. Sublessor shall make available to Sublessee the benefits of all manufacturer, vendor and repair facility warranties relating to the Aircraft or any part thereof to the extent permitted by the terms of such warranties.

9. Alterations/Improvements. Upon (i) the execution of this Sublease by both Sublessor and Sublessee, (ii) Sublessor's receipt of GECC's consent to this Sublease, and (iii) confirmation from the Escrow Agent of receipt of the Sublease Deposit, Sublessor shall, at its sole cost and expense, cause the Gulfstream Service Center in Dallas, Texas, or such other Service Center selected by Sublessor, to install an Enhanced Ground Proximity Warning System ("EGPWS") in the Aircraft prior to the Commencement Date.

(a) Sublessor agrees that Sublessee may paint the Aircraft, provided (i) the paint work shall be performed by a Service Center approved in writing by Sublessor, (ii)

6.

Sublessor shall be responsible to reimburse Sublessee for up to a maximum of $50,000 of the cost to paint the Aircraft, and Sublessee shall be responsible for all remaining costs and expenses of the paint work, (iii) the paint scheme chosen by Sublessee shall be approved in writing in advance by GECC, (iv) the approved paint work shall be completed prior to the expiration or earlier termination of the Sublease Term, unless Sublessee exercises its purchase option pursuant to Paragraph 19 hereof, in which case the Sublessor will pay Sublessee $50,000 towards the cost of new paint to be completed by Sublessee. In this respect, Sublessee shall open a work order with the Service Center for its account to pay all costs and expenses of the paint work. The approved paint work performed pursuant to the work order shall (i) become a part of the Aircraft, (ii) and shall become the property of Sublessor. If Sublessor fails to reimburse Sublessee for the cost of such paint work as provided herein after ten (10) days written notice from Sublessee, then Sublessee shall have the right to set-off such unpaid amount against the Rent due to Sublessor up to the maximum amount of $50,000 as provided herein.

(b) Sublessee shall be entitled from time to time during the Sublease Term to acquire and install on the Aircraft at Sublessee's expense, any additional accessory, device or equipment as Sublessee may desire (each such accessory, device or equipment, an "Addition"), but only so long as such Addition (i) is ancillary to the Aircraft; (ii) is not required to render the Aircraft complete for its intended use by Sublessee; (iii) does not alter or impair the originally intended function or use of the Aircraft; and (iv) can be readily removed without causing material damage. Title to each Addition which is not removed by Sublessee prior to the return of the Aircraft to Sublessor shall vest in Sublessor upon such return. Sublessee shall repair all damage to the Aircraft resulting from the installation or removal of any Addition so as to restore the Aircraft to its condition prior to installation, ordinary wear and tear excepted.

(c) Except as otherwise provided herein, the Sublessee shall make no other change or alteration to the Aircraft without first submitting in writing a full description of the proposed change and obtaining prior written approval of the proposed change from the Sublessor. The Sublessor may withhold approval of any such proposed change or alteration in its sole and absolute discretion. Any approved work performed shall (i) become a part of the Aircraft, (ii) and shall become the property of Sublessor.

10. Conduct of Flight Operations. The Aircraft shall be operated at all times in full compliance with applicable rules, regulations, and requirements of the United States Department of Transportation, the FAA, and other federal, state, local and foreign regulations, and the Sublessee shall be responsible for any fines, penalties, or forfeitures occasioned by any violation of such regulations. Sublessee may operate the Aircraft only for the purposes and within the geographical limits set forth in the insurance policy or policies obtained in compliance with Paragraph 12 of this Agreement. Sublessee shall operate the Aircraft at all times in accordance with the flight manual, and all manufacturers' suggested operating procedures. Subject to the restrictions set forth herein, the Aircraft may be operated anywhere in the world, except that the Aircraft shall not be operated knowingly within the borders of any country with known national interests hostile to the United States of America. Subject to the prior written consent of GECC and

7.

Sublessor, Sublessee shall have the right to place the Aircraft on AirNet's (or other GECC approved charter operator's) FAR Part 135 Certificate for use in charter operations, so long as throughout the Sublease Term, the Aircraft is predominately based and operated within the United States of America. Except as provided herein, under no circumstances shall Sublessee charter, sublease or otherwise make the Aircraft available for use by any other person or entity without Sublessor's consent, which may be withheld in Sublessor's sole and absolute discretion and GECC's consent.

11. Liens. The Sublessee shall be liable for and is required to discharge promptly any liens, claims, or demands that may attach to the Aircraft in connection with, or as a result of, the Sublessee's operation, repair, maintenance, or storage of the Aircraft, other than those which result from (i) the respective rights of Sublessor and Sublessee as herein provided; (ii) liens arising from the acts of Sublessor; (iii) liens for taxes not yet due; and (iv) inchoate materialmen's, mechanics', workmen's, repairmen's, employees' or other like liens arising in the ordinary course of business of Sublessee for sums not yet delinquent or being contested in good faith (and for the payment of which adequate assurances in Sublessor's judgment have been provided Sublessor). In the event any such liens are filed against the Aircraft and not removed within ten (10) days thereafter, Sublessor shall have the right to demand and receive payment from the Escrow Agent of an amount equal to such lien for payment thereof, without any consent of Sublessee being required. However, the Sublessee shall not be responsible for any liens, claims, or demands resulting from any act or omission of the Sublessor. Sublessor represents and warrants that it has not heretofore taken any action or omitted to take any action which would result or permit the imposition of any hangarkeeper's, mechanic or materialman's lien or encumbrance on the Aircraft, other than any security interest associated with the GECC lease, and in particular, Sublessor has not taken any action or omitted to take any action which would permit the imposition of any lien under, inter alia, California Code of Civil Procedure Section 1208.61 et., seq., California Civil Code Section 2782 et, seq., or Section 3051, or California Business and Professions Code Section 9792 or 9798.1 et., seq.

12. Insurance. In consideration of Sublessee's anticipated use and operation of the Aircraft, Sublessee shall have the option to either (i) pay the cost to maintain the Aircraft hull and liability insurance currently maintained by Sublessor, or (ii) provide replacement hull and liability insurance for the Aircraft, with liability limits equal to or greater than the current insurance ($200,000,000), with deductibles and other terms, and with an insurance carrier, reasonably acceptable to Sublessor and GECC. Any replacement insurance policy obtained by Sublessee must be approved in writing by Sublessor, shall name Sublessor as an additional insured, and shall conform, in all respects, to the insurance requirements set forth in the GECC Lease. Sublessor and Sublessee acknowledge and agree that the GECC Lease requires that the Aircraft hull insurance coverage at all times equal the Capitalized Lessor's Cost of the Aircraft as specified in Annex F of the GECC Lease. The parties further acknowledge that the Capitalized Lessor's Cost of the Aircraft is presently $19,500,000. Accordingly, Sublessee shall insure the hull of the Aircraft for not less than $19,500,000 throughout the Sublease Term, provided however, that Sublessee shall be entitled to deduct from the payment of Rent each month an amount equal to l/12th

8.

of 3.5/19.5ths of the annual premium for such hull coverage throughout the Sublease Term.

In the event of damage to the Aircraft to an extent less than total destruction, the Sublessee is required, during the period of repair, to continue paying Rent hereunder. However, in the event of a total loss, or damage to the Aircraft beyond economical repair as determined by the insurance carrier or carriers furnishing the insurance covering damage to the Aircraft, this Sublease shall terminate, and the Sublessee shall be relieved of any further obligation to pay Rent hereunder. In the event of a partial destruction of the Aircraft, the proceeds from the insurance shall be paid to the Sublessee, and such proceeds shall be used to repair the Aircraft. Otherwise, the insurance proceeds shall be paid to the Sublessor, and Sublessor shall, at its sole option, use such proceeds to repair or replace the Aircraft.

13. Aircraft Management. Concurrent with the execution of this Sublease, Sublessee shall engage AirNet ("AirNet"), or such other management company reasonably acceptable to Sublessor and GECC, to manage the operation of the Aircraft at all times during the Sublease Term. Such management shall include, but not be limited to, the provision of oversight in connection with all scheduled and unscheduled maintenance of the Aircraft.

14. Pilots; Pilot Qualifications. At all times during the Sublease Term, Sublessee shall be responsible for obtaining qualified pilots to operate the Aircraft for Sublessee's use, all of whom shall meet or exceed the pilot warranty provisions of the aircraft insurance policy and shall be approved by the insurance carrier. Sublessee shall have the responsibility to ascertain that any pilots selected meet the criteria established by the insurer of the Aircraft. Such pilots shall also be subject to review and approval of both AirNet, or such other management company reasonably acceptable to Sublessor, and Sublessor, prior to conducting any flights of the Aircraft.

15. Accidents; Incidents and Losses. Sublessee shall immediately notify Sublessor, or Sublessor's designated agent, of any accident or incident involving the Aircraft, which notification shall specify, to the extent known, the time, place, and nature of the accident, incident or damage, the names and addresses of all parties involved, persons injured, witnesses, passengers, and owners of properties damaged, and such other information as may be known about the accident, incident or damage. Sublessor and Sublessee shall advise each other of all correspondence, papers, notices, and documents whatsoever received by them in connection with any claim or demand involving or relating to the Aircraft or its operation, and shall aid in any investigation instituted and in the recovery of damages from third persons liable therefor.

16. INDEMNIFICATION. SUBLESSEE AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS SUBLESSOR AND ITS OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, SHAREHOLDERS, ATTORNEYS, AGENTS AND AFFILIATES, FROM ANY CLAIM, DAMAGE, LOSS, OR REASONABLE EXPENSE, INCLUDING ANY INSURANCE DEDUCTIBLE, AND REASONABLE ATTORNEY'S FEES RESULTING FROM ANY BODILY INJURY OR PROPERTY DAMAGE CAUSED BY AN OCCURRENCE AND ARISING OUT OF OR IN

9.

CONNECTION WITH SUBLESSEE'S POSSESSION, USE, STORAGE, OPERATION OR MAINTENANCE OF THE AIRCRAFT DURING THE SUBLEASE TERM, UNLESS CAUSED BY THE WILLFUL AND INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF SUBLESSOR, ITS EMPLOYEES AND AGENTS.

IN NO EVENT SHALL SUBLESSOR BE LIABLE FOR OR HAVE ANY DUTY FOR INDEMNIFICATION OR CONTRIBUTION TO SUBLESSEE FOR ANY CLAIMED INDIRECT, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, OR FOR ANY DAMAGES CONSISTING OF DAMAGES FOR LOSS OF USE OF THE AIRCRAFT, DIMINUTION IN VALUE, OR LOSS OF PROFIT.

SUBLESSEE ALSO WAIVES ANY SIMILAR PROVISIONS PROVIDED UNDER ANY OTHER STATE OR FEDERAL LAW.

17. DISCLAIMER. EXCEPT FOR THE WARRANTIES SET FORTH IN PARAGRAPH 24 OF THIS SUBLEASE, THE AIRCRAFT AND EACH PART THEREOF IS BEING SUBLEASED HEREUNDER IN ITS "AS IS, WHERE IS" CONDITION, WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTEE OF ANY KIND BEING MADE OR GIVEN BY SUBLESSOR, ITS DIRECTORS, SHAREHOLDERS, OFFICERS, AFFILIATES, PARTNERS, AGENTS, EMPLOYEES, ATTORNEYS AND ASSIGNS, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING STRICT LIABILITY IN TORT) AND SUBLESSOR DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS. SUBLESSEE HEREBY WAIVES ANY CLAIM (INCLUDING, WITHOUT LIMITATION, INCIDENTAL OR CONSEQUENTIAL DAMAGE) OR EXPENSE CAUSED BY THE AIRCRAFT OR BY SUBLESSEE'S LOSS OF USE THEREOF FOR ANY REASON WHATSOEVER, EXCEPT FOR ANY CLAIM ARISING OUT OF THE WARRANTIES SET FORTH IN PARAGRAPH 24 HEREIN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND EXCEPT AS RESPECTS THE WARRANTIES OF PARAGRAPH 24, SUBLESSOR SHALL NOT BE LIABLE OR RESPONSIBLE FOR ANY DEFECTS, EITHER PATENT OR LATENT IN THE AIRCRAFT, OR FOR ANY DIRECT OR INDIRECT DAMAGE TO PERSONS OR PROPERTY RESULTING THEREFROM, OR FOR SUBLESSEE'S LOSS OF USE OF THE AIRCRAFT OR FOR ANY INTERRUPTION IN SUBLESSEE'S BUSINESS CAUSED BY SUBLESSEE'S INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER.

18. Return on Termination/Expiration. On the expiration or earlier termination of this Sublease whatever the cause, the Sublessee agrees to return the Aircraft to the Sublessor at the San Jose International Airport, or at such other place as mutually acceptable to Sublessor and Sublessee. Sublessee covenants and agrees that it shall, at Sublessee's sole cost and expense (i) return the Aircraft to Sublessor in the same condition as received at the time of delivery, normal wear and tear excepted, (ii) return the Aircraft to Sublessor in full compliance with each of the following at Sublessee's sole cost and expense: (a) correction of all airworthiness discrepancies identified during the 24 month

10.

inspection on the Aircraft, which inspection shall be arranged and paid for by Sublessor, (b) ensure that each Engine is paid up in full for the hours of usage by Sublessee during the term of the Sublease Agreement on JSSI, and the APU is paid up in full on MSP, (c) ensure that the Aircraft is airworthy, with all systems, equipment, and accessories operating normally according to the manufacturer's specifications, (d) ensure that all maintenance on the Aircraft is current, with all due items complied with according to the manufacturer's recommended maintenance procedures as outlined in CIMMS, and all manuals and equipment installed on the Aircraft shall be up to date and current per the latest revisions. The Sublessee covenants and agrees that it will, upon expiration or earlier termination of this Sublease, return the Aircraft to the Sublessor with the identical equipment, Engines and Auxiliary Power Unit that were on the Aircraft at delivery to Sublessee save and except as otherwise herein provided. The Sublessee agrees that it will, if requested, supply the Sublessor with an FAA Standard Certificate of Airworthiness dated immediately prior to the return of the Aircraft.

19. Option to Purchase Aircraft. Provided that Sublessee is not in default under this Sublease, then Sublessee shall have the option to purchase the Aircraft at the expiration of the Sublease Term pursuant to the terms and conditions of Section 19 of the GECC Lease at the Aircraft's then fair market value. Sublessee may exercise the option by providing written notice to Sublessor at least one hundred and ten (110) days, but not more than one hundred and eighty (180) days, prior to the date of expiration of the Sublease Term. In the event that Sublessee fails to timely exercise the option as provided herein, then the option shall automatically expire, and shall be of no force and effect. Prior to the Commencement Date of this Sublease, Sublessor shall obtain GECC's consent to Sublessor's assignment to Sublessee of its option to purchase the Aircraft pursuant to Section 19 of the GECC Lease.

20. Assignment and Sublease. Except as provided in Paragraph 10 of this Sublease, the Sublessee shall not assign this Sublease, nor shall the Sublessee charter, sublease or otherwise allow the Aircraft to be used by third parties, without the prior written consent of the Sublessor, which consent may be withheld in Sublessor's sole and absolute discretion, and GECC.

21. Taxes. The Sublessee agrees to pay all taxes, interest and penalties, if any, accruing to the Sublessee as operator of the Aircraft, and the Sublessee agrees to defend, indemnify and hold the Sublessor and its officers, directors, partners, employees, shareholders, and affiliates, harmless from any claim or losses as the result of the imposition of any such taxes; provided, however, that the Sublessee shall not be responsible for any taxes attributable to the period, or any event occurring, prior to the delivery of the Aircraft to Sublessee (including personal property ad velorem taxes relating to the Aircraft or any part thereof for the calendar or tax year 2004, including any California taxes assessed as a result of the Sublessor's domicile or Aircraft's previous base in California or for any income, franchise, or other taxes imposed on Sublessor, or any California sales or use taxes that may be imposed on the Rent which taxes shall be the obligation of the Sublessor. On the Commencement Date, Sublessee shall execute and deliver to Sublessor a California Use Tax Exemption Certificate in a form acceptable to

11.

Sublessor. In the event that property taxes for the Aircraft for tax years with a lien date arising prior to the Commencement Date are claimed by the County of Santa Clara, California, Sublessor shall be solely responsible for such property taxes. Sublessee shall be responsible for all other property taxes arising out of its use and operation of the Aircraft during the Sublease Term.

(a) Contests. If claim is made against Sublessor for taxes with respect to which Sublessee is liable for a payment or indemnity under this Sublease, Sublessor will promptly give Sublessee notice in writing of such claim; provided, however, that Sublessor's failure to give notice will not relieve Sublessee of its obligations hereunder unless such failure materially impairs or precludes Sublessee's ability to contest the claim. So long as (i) a contest of such taxes does not involve any material risk of the sale, forfeiture or loss of the Aircraft or any interest therein, (ii) if Sublessor or GECC so requests, Sublessee has provided Sublessor and GECC with an opinion of independent tax counsel that a reasonable basis exists for contesting such claim, and (iii) adequate reserves have been made for such taxes or, if required, an adequate bond has been posted, then Sublessor, at Sublessee's written request, will in good faith, with due diligence and at Sublessee's expense, permit Sublessee to contest (in the name of Sublessee or Sublessor) the validity, applicability or amount of such taxes.

(b) Refunds. Upon receipt by Sublessor of a refund of all or any part of any taxes that Sublessee has paid, Sublessor will promptly pay to Sublessee the amount of such taxes refunded.

(c) Cooperation in Filing Tax Returns. Sublessee and Sublessor will cooperate with one another in providing information which may be reasonably required to fulfill each party's tax filing requirements and any audit information request arising from such filing.

22. Default. Except with respect to the payment of Rent, in the event that either party is in default of any of the covenants or agreements contained in this Sublease, the party not in default shall give the party in default notice of the default and shall have the option of terminating this Sublease if the default is not cured within ten (10) days after the party in default receives the notice. In the event of a default in the payment of Rent, the Sublessee shall have five (5) days after notice from the Sublessor within which to cure the default. If such default is not cured within such five (5) day period, the Sublessor may immediately terminate the Sublease, demand and receive payment of the Rent due as of the date of termination from the Sublease Deposit per Paragraph 4 herein, and pursue all such other legal remedies as may be available to the Sublessor.

12.

23. Notices. Any notice to be given under this Sublease shall be addressed as follows:

|  |  |
|---|---|
| To the Sublessor: | Terayon Communication Systems, Inc.<br>4988 Great America Parkway<br>Santa Clara, CA 95054<br>Facsimile No.: (408)-235-5858<br>Confirming No.: (408)-235-5500<br>Attn: Kristin Stokan |
| With a Copy To: | Groom & Cave, LLP<br>1570 The Alameda, Suite 100<br>San Jose, CA 95126<br>Facsimile No.: (408)286-3423<br>Confirming No.: (408)286-3300<br>Attn: Michael P. Groom, Esq. |
| To the Sublessee: | United Furniture Equipment Rental, Inc.<br>2950 E. Broad Street<br>Columbus, Ohio 43209<br>Facsimile No.:<br>Confirming No.:<br>Email<br>Attn: David Belford, President |
| With a Copy To: | Powell, Goldstein, Frazer & Murphy LLP<br>191 Peachtree Street, N.E.<br>Sixteenth Floor<br>Atlanta, Georgia 30303<br>Facsimile No.: (404)572-6999<br>Confirming No.: (404)572-6600<br>Attn: Amy L. Blackburn, Esq. |

or to such other address as either party may designate to the other in writing, pursuant to the notice provisions of this Paragraph 23. Any such notice shall have been deemed duly given (i) three days after such notice is enclosed in a properly sealed envelope, addressed as aforesaid, registered or certified mail, and deposited (postage and registry or certificate fee prepaid) in the United States Mail, (ii) when actually delivered by hand, or (iii) when actually delivered by any nationally recognized overnight courier service.

24. Warranties. The Sublessor represents, covenants and warrants to the Sublessee as follows:

(a) The Sublessor has been issued a Standard Certificate of Airworthiness for the Aircraft by the FAA, and the Aircraft shall be in an airworthy condition as of the Commencement Date.

13.

(b) The Sublessor has complied with all applicable laws, regulations, and requirements of all governmental authorities pertaining to a sublease of the Aircraft to the Sublessee and no consent of any third party is required except as such as has already been obtained. This Agreement and the performance by Sublessor of its obligations thereunder have been duly authorized, executed and delivered by Sublessor and constitute valid, legal and binding agreements, enforceable against Sublessor in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws.

(c) The Sublessor shall perform all of its obligations to GECC under the GECC Lease. The entry into and performance by Sublessor of this Agreement will not: (i) violate any judgment, order, law or regulation applicable to Sublessor or any provision of Sublessor's Certificate of Incorporation or Bylaws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon the Aircraft pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument to which Sublessee is a party.

(d) Sublessor shall not take any actions during the Sublease term which might interfere with the ability of the Aircraft to remain, without interruption, fully registered with the FAA without restriction under 49 U.S.C. subtitle VII, as amended, or any successor statute thereto. If Sublessor interferes with the registration of the Aircraft with the FAA per the preceding sentence, Sublessee shall have the right to terminate this Sublease upon giving notice thereof to Sublessor as provided in Paragraph 22 hereof, and Sublessor shall, whether or not Sublessee exercises such right of termination, be liable to Sublessee for any damages suffered by Sublessee as the result of such failure of registration.

(e) Sublessor shall not, and shall not permit any third party acting by or through Sublessor, to interfere with Sublessee's quiet possession and enjoyment of the Aircraft or otherwise interfere with Sublessee's exercise of its rights hereto unless a default by Sublessee has occurred and is not cured in accordance with Paragraph 22 hereof.

25. Personal Guaranty of Sublessee's Obligations. All of Sublessee's financial and other obligations under this Sublease shall be guaranteed by the Personal Guaranty of David Belford in the form attached hereto as Exhibit "D." The Personal Guaranty shall be executed and delivered to Sublessor simultaneously with the execution and delivery of this Sublease.

26. Entire Agreement. This Agreement cannot be changed orally and constitutes the entire contract between Sublessor and Sublessee hereto. It shall not be modified nor changed by any expressed or implied promises, warranties, guarantees, representations or other information unless expressly and specifically set forth in this Agreement or any addendum thereto properly executed by Sublessor and Sublessee.

14.

27. Delays or Omissions; Cumulative Rights. No delay or omission to exercise any right, power or remedy accruing upon any breach, default or noncompliance under this Agreement shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence thereof or of any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent, or approval of any kind or character of any breach, default or noncompliance under this Agreement, or any waiver of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All rights and remedies, either under this Agreement, by law, in equity or otherwise, shall be cumulative and not alternative, and the exercise of any right or remedy shall be without prejudice to the enforcement of any other right or remedy.

28. Status of the Parties. Nothing herein shall be construed to create a partnership, joint venture, franchise, employer-employee relationship or to create any relationship of principal and agent, but rather the relationship of the parties shall be that of Sublessor and Sublessee of personal property. No party shall have the authority to commit or bind any other party without such party's prior written consent.

29. Attorneys' Fees. If any action (whether legal or equitable and whether litigation, arbitration or some other proceeding, including an action for declaratory relief, enforcement of judgments or any appeals) is commenced under this Agreement, the prevailing party (as shall be determined by the court or other adjudicator) shall be entitled to recover its reasonable attorneys' fees and costs of suit from the other party in addition to such other relief as may be granted.

30. Binding Effect. This Agreement shall be binding upon the parties hereto and their respective successors and assigns. Neither this Agreement nor any right hereunder may be assigned by Sublessee without the prior written consent of the Sublessor, which consent may be withheld in Sublessor's sole and absolute discretion.

31. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to agreements made and to be performed entirely within the State of California. The proper venue for any action or other proceeding shall be Santa Clara County, California.

32. Counterparts. This Agreement may be executed in any number of counterparts, each of which for all purposes shall be deemed to be an original, but all of such counterparts shall together constitute one and the same instrument; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart. It is not necessary that each party hereto execute the same counterpart, so long as identical counterparts are executed by all parties.

33. Captions. The captions used in this Agreement are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

15.

34. Waivers. Any consent to any assignment or sublease, or any waiver of any provision of this Agreement or of any default of the Sublessee, shall not constitute a waiver of any other provision of this Agreement.

35. Force Majeure. Neither Sublessee nor Sublessor shall have liability for, and neither Sublessee nor Sublessor shall be in default under this Sublease as a result of, any delay or failure to perform their respective obligations as contemplated by this Sublease when such delay or failure is caused by Force Majeure as defined below. For purposes of this Sublease, "Force Majeure" shall mean an act of God, strike or lockout or other labor dispute, act of the public enemy, war (declared or undeclared), blockade, revolution, civil commotion, terrorist activity, lightning, fire, storm, flood, earthquake, explosion, governmental restraint, embargo, grounding of the Aircraft, inability to obtain or delay in obtaining governmental approvals, permits, licenses or allocations and any other cause whether of the kind specifically enumerated above or otherwise, provided that in order for any of the foregoing to constitute Force Majeure, it must not be reasonably within the control of the Sublessor. Notwithstanding the foregoing, Sublessee's obligation to pay Rent to Sublessor shall not be excused by any "Force Majeure" as defined herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

16.

36. Truth-in-Leasing Clause. SUBLESSOR CERTIFIES THAT DURING THE TWELVE (12) MONTHS PRECEDING THE DATE OF THIS AGREEMENT, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER THE PROVISIONS OF FEDERAL AVIATION REGULATIONS PART 91. SUBLESSEE CERTIFIES THAT (i) AT ALL TIMES DURING THE TERM HEREOF, THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER THE PROVISIONS OF FEDERAL AVIATION REGULATIONS PART 91 AND/OR PART 135, (ii) DURING THE TERM OF THIS LEASE, SUBLESSEE, AND NOT SUBLESSOR, SHALL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT, AND (iii) SUBLESSEE UNDERSTANDS ITS RESPONSIBILITY FOR COMPLIANCE WITH RESPECT TO ALL APPLICABLE FEDERAL AVIATION REGULATIONS. THE PARTIES UNDERSTAND THAT AN EXPLANATION OF THE FACTORS BEARING ON OPERATIONAL CONTROL OF THE AIRCRAFT AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE. SUBLESSEE AGREES TO KEEP A COPY OF THIS LEASE IN THE AIRCRAFT AT ALL TIMES DURING THE TERM HEREOF.

IN WITNESS WHEREOF, the parties have executed and delivered this Sublease Agreement as of the date first written above.

SUBLESSOR:

Terayon Communication Systems, Inc., a Delaware corporation,

By: /s/ Dr. Zaki Rakib
------------------------------------
Title:  Dr. Zaki Rakib, CEO

SUBLESSEE:

United Furniture Equipment Rental, Inc. a Ohio corporation,

By:
----------------------------------
Title:
------------------------------

17.

36. Truth-in-Leasing Clause. SUBLESSOR CERTIFIES THAT DURING THE TWELVE (12) MONTHS PRECEDING THE DATE OF THIS AGREEMENT, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER THE PROVISIONS OF FEDERAL AVIATION REGULATIONS PART 91. SUBLESSEE CERTIFIES THAT (i) AT ALL TIMES DURING THE TERM HEREOF, THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER THE PROVISIONS OF FEDERAL AVIATION REGULATIONS PART 91 AND/OR PART 135, (ii) DURING THE TERM OF THIS LEASE, SUBLESSEE, AND NOT SUBLESSOR, SHALL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT, AND (iii) SUBLESSEE UNDERSTANDS ITS RESPONSIBILITY FOR COMPLIANCE WITH RESPECT TO ALL APPLICABLE FEDERAL AVIATION REGULATIONS. THE PARTIES UNDERSTAND THAT AN EXPLANATION OF THE FACTORS BEARING ON OPERATIONAL CONTROL OF THE AIRCRAFT AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE. SUBLESSEE AGREES TO KEEP A COPY OF THIS LEASE IN THE AIRCRAFT AT ALL TIMES DURING THE TERM HEREOF.

IN WITNESS WHEREOF, the parties have executed and delivered this Sublease Agreement as of the date first written above.

SUBLESSOR:

Terayon Communication Systems, Inc., a Delaware corporation,

By:
    ----------------------------------

Title:
    ----------------------------------

SUBLESSEE:

United Furniture Equipment Rental, Inc. a Ohio Corporation

By: /s/ [ILLEGIBLE]
    ----------------------------------

Title:
    ----------------------------------

EXHIBIT "A"

MISCELLANOUS AND OPTIONAL EQUIPMENT
Challenger 604, Serial No. 5348, N881TW

- 1 ea Airframe Log Book s/n 5348

- 2 ea Engine Logs CF34-3B

  - s/n 872198 L/H Engine

  - s/n 872196 R/H Engine

- 1 ea APU Log Book #1 and #2 s/n P378

- 1 ea Flammability Test Report, s/n 5348, Dec. 11 1997

- 1 ea Bombardier Completion Center Manual. S/N 5348 Equipment List, Weight and Balance Report, 337 and SJC.

- 2 ea sets (8 binders ea) Supplemental Maintenance Manuals

- 1 ea set Airframe/Engine Maintenance Manuals (5 ea C.D.)

- 3 ea Box of Historical Maintenance Records

- 1 set Seat Covers

- 1 set Floor Runners

- 1 set Airframe Plugs and covers

- 1 box misc interior spares

- Galley has 1 set glasses + dishes + flatware

- 1 spare Mlg. wheel assembly

  - P/N 604-85123-1

  - S/W APR 97-0320

- 1 spare Nlg. wheel assembly

  - P/N 601R85003-01

  - S/N JUL98-1632

EXHIBIT "B"

GECC LEASE
Challenger 604, Serial No. 5348, N881TW

19.

EXHIBIT "C"

CERTIFICATE OF ACCEPTANCE
Challenger 604, Serial No. 5348, N881TW

This Certificate of Acceptance is being provided by Sublessee pursuant to the Aircraft Sublease Agreement dated as of August 24, 2004 (the "Aircraft Sublease"), between Terayon Communication Systems, Inc., as Sublessor (the "Sublessor"), and United Furniture Equipment Rental, Inc., as Sublessee (the "Sublessee").

A. Acceptance of the Aircraft: Sublessee hereby certifies that the Aircraft as set forth and described in the Sublease has been delivered to Sublessee, inspected by Sublessee, found to be in good order and fully equipped to operate as required under applicable law for its intended purpose, and is, on the date set forth below, fully and finally accepted under the Sublease.

B. Representations by Sublessee: Sublessee hereby represents and warrants to Sublessor that on the date hereof:

(1) The representations and warranties of Sublessee set forth in the Aircraft Sublease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof; and

(2) Sublessee has satisfied or complied with all conditions precedent and requirements set forth in the Aircraft Sublease which are required to be or to have been satisfied or complied with on or prior to the date hereof; and

(3) No Default or Event of Default under the Aircraft Sublease has occurred and is continuing on the date hereof; and

(4) Sublessee has obtained, and there are in full force and effect, such insurance policies with respect to the Aircraft, as are required to be obtained under the terms of the Aircraft Sublease; and

(5) Sublessee has furnished no equipment for the Aircraft other than as permitted as an addition thereto pursuant to the Aircraft Sublease; and

(6) Sublessee has inspected the Aircraft and all pertinent records therefor and the Aircraft has no damage history.

Date of Acceptance: August 24, 2004

Location of Acceptance: _____

20.

Aircraft Total time: _____      Landings: _____

Engine Hours:                                 Cycles:

Left: _____                        _____

Right: _____                        _____

IN WITNESS WHEREOF, Sublessee has caused this Certificate of Acceptance to be duly executed by its officers thereunto duly authorized.

Sublessee:

UNITED FURNITURE EQUIPMENT RENTAL, INC.,
an Ohio corporation,

By: _____

Title: _____

21.

EXECUTION COPY

CERTIFICATE OF ACCEPTANCE
Challenger 604, Serial No. 5348, N881TW

This Certificate of Acceptance is being provided by Sublessee pursuant to the Aircraft Sublease Agreement dated as of August 26, 2004 (the "Aircraft Sublease"), between Terayon Communication Systems, Inc., as Sublessor (the "Sublessor"), and United Furniture Equipment Rental, Inc., as Sublessee (the "Sublessee").

A. Acceptance of the Aircraft: Sublessee hereby certifies that the Aircraft as set forth and described in the Sublease has been delivered to Sublessee, inspected by Sublessee, found to be in good order and fully equipped to operate as required under applicable law for its intended purpose, and is, on the date set forth below, fully and finally accepted under the Sublease.

B. Representations by Sublessee: Sublessee hereby represents and warrants to Sublessor that on the date hereof:

(1)    The representations and warranties of Sublessee set forth in the Aircraft Sublease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof; and

(2)    Sublessee has satisfied or complied with all conditions precedent and requirements set forth in the Aircraft Sublease which are required to be or to have been satisfied or complied with on or prior to the date hereof; and

(3)    No Default or Event of Default under the Aircraft Sublease has occurred and is continuing on the date hereof; and

(4)    Sublessee has obtained, and there are in full force and effect, such insurance policies with respect to the Aircraft, as are required to be obtained under the terms of the Aircraft Sublease; and

(5)    Sublessee has furnished no equipment for the Aircraft other than as permitted as an addition thereto pursuant to the Aircraft Sublease; and

(6)    Sublessee has inspected the Aircraft and all pertinent records therefor and the Aircraft has no damage history.

Date of Acceptance: August 26, 2004

Location of Acceptance: Columbus, Ohio

Aircraft Total time: 3238.6            Landings: 1890

Engine Hours:                         Cycles:

Left: 3238.6                          1890

Right: 3238.6                         1890

EXECUTION COPY

IN WITNESS WHEREOF, Sublessee has caused this Certificate of Acceptance to be duly executed by its officers thereunto duly authorized.

Sublessee:

UNITED FURNITURE EQUIPMENT RENTAL, INC.,
an Ohio corporation,

By: /s/ [ILLEGIBLE]
    ----------------------------------

Title: President

EXHIBIT "D"

GUARANTY OF DAVID BELFORD
Challenger 604, Serial No. 5348, N881TW

GUARANTY

To: TERAYON COMMUNICATION SYSTEMS, INC.

This guaranty dated as of August 24, 2004 (the "Guaranty") is being given by DAVID BELFORD (the "Guarantor"), an individual residing in the State of Ohio, in connection with that certain Aircraft Sublease Agreement (the "Aircraft Sublease"), dated as of August 24, 2004, between Terayon Communication Systems, Inc., a Delaware corporation ("Sublessor"), and United Furniture Equipment Rental, Inc., an Ohio corporation ("Sublessee"), with respect to that certain Canadair Challenger 604 aircraft, United States Registration Number N881TW, Manufacturer's Serial Number 5348 (the "Aircraft").

The Guarantor requests you enter into the foregoing Aircraft Sublease and to induce you to do so and in consideration hereof and of benefits to accrue to the Guarantor therefrom, the Guarantor, as primary obligor, unconditionally guarantees to you or to any of your direct or indirect affiliates and subsidiaries, (each hereinafter called an "Affiliate"), that Sublessee will fully and promptly pay and perform all its obligations to you under the Aircraft Sublease, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured, unmatured or matured by acceleration and whether originally contracted with you or otherwise acquired by you, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor and notwithstanding any waiver or limitation of liability of Sublessee under the Aircraft Sublease.

Guarantor agrees, without your first having to proceed against Sublessee or to liquidate paper or any security therefor, to pay on written demand all sums due and to become due to you from Sublessee and all losses, costs, attorneys' fees or expenses which may be suffered by you by reason of Sublessee's default or default of the undersigned and agrees to be bound by and on written demand to pay any amount owed under the Aircraft Sublease, with or without notice to the Guarantor. This Guaranty is an unconditional guarantee of payment and performance, rather than a guarantee of collection. The Guarantor shall not be released or discharged, either in whole or in part, by your failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of Sublessee to you under the Aircraft Sublease or of the Guarantor to you under this Guaranty, or to protect the property covered by any such security interest. No termination hereof shall be effected by Guarantor's death.

The Guarantor hereby waives: notice of acceptance hereof; presentment, demand, protest and notice of nonpayment or protest as to the Aircraft Sublease; any and all rights

22.

of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against Sublessee or any other person directly or contingently liable for the obligations guaranteed hereunder, or against or with respect to Sublessee's property (including, without limitation, property collateralizing its obligations to you), arising from the existence or performance of this Guaranty; all exemptions and homestead laws and any other demands and notices required by law; all setoffs and counterclaims; and any duty on your part (should any such exist) to disclose to the Guarantor any manner, fact or thing related to the business operations or condition (financial or otherwise) of Sublessee or its affiliates or property, whether now or hereafter known by you.

You may at any time without the Guarantor's consent, without notice to the Guarantor and without affecting or impairing the Guarantor's obligations hereunder, do any of the following:

1. renew, extend (including extensions beyond the original term of the Aircraft Sublease), modify, release or discharge any obligations of Sublessee, the Guarantor or of other guarantors (under a separate instrument) or of any other party at any time directly or contingently liable for the payment of Sublessee's obligations under the Aircraft Sublease;

2. accept partial payments of Sublessee's obligations under the Aircraft Sublease;

3. accept new or additional documents, instruments or agreements relating to or in substitution of Sublessee's obligations under the Aircraft Sublease;

4. settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of Sublessee's obligations under the Aircraft Sublease and any security therefor in any manner;

5. consent to the transfer or return of any security, and take and hold additional security or guaranties for Sublessee's obligations under the Aircraft Sublease; or

6. amend, exchange, release or waive any security or guaranty.

If any claim is made upon you at any time for repayment or recovery of any amount(s) or other value received by you, from any source, in payment of or on account of the obligations of Sublessee guaranteed hereunder and you repay or otherwise become liable for all or any part of such claim by reason of:

(a)    any judgment, decree or order of any court or administrative body having competent jurisdiction; or

(b)    any settlement or compromise of any such claim, (a)

23.

the Guarantor shall remain liable to you hereunder for the amount so repaid or for which you are otherwise liable to the same extent as if such amount(s) had never been received by you, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of Sublessee.

Prior to the commencement of the Aircraft Sublease, and at any time after written request upon a default by Sublessee under the Aircraft Sublease, Guarantor agrees to furnish to you, within five (5) days of such request, Guarantor's personal financial statements, in form and detail satisfactory to you, and copies of Guarantor's tax returns, as soon as available and in any event not later than 15 days after such tax returns are required to be filed.

Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of Sublessee's obligations under the Aircraft Sublease are rescinded, invalidated, declared to be fraudulent or preferential, or must otherwise be returned, refunded, repaid or restored by you upon the bankruptcy or reorganization of Sublessee or the Guarantor or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Sublessee or the Guarantor, or otherwise, all as though such payments had not been made.

Until the indefeasible payment in full of all Sublessee's obligations under the Aircraft Sublease, the Guarantor shall not have (and hereby waives) any right by way of subrogation or otherwise as a result of the payment of any sums hereunder. Guarantor agrees that Guarantor will never have, and hereby waives and disclaims, any claim or right against Sublessee by way of subrogation or otherwise in respect of any payment hereunder.

This Guaranty shall bind the Guarantor's respective heirs, administrators, representatives, successors, and assigns, and shall inure to your successors and assigns, including, but not limited to, any party to whom you may assign the Aircraft Sublease (the Guarantor hereby waives notice of any such assignment). All of your rights are cumulative and not alternative.

THIS GUARANTY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF. Guarantor hereby consents (i) that any action or proceeding against it may be commenced and maintained in any federal or state court in the State of California by service of process on Guarantor, and (ii) that such courts shall have jurisdiction with respect to the subject matter hereof and the person of the undersigned.

Guarantor:

_____
David Belford

Address: 2950 E. Broad Street
         Columbus, Ohio 43209

24.

EXECUTION COPY

GUARANTY OF DAVID BELFORD
Challenger 604, Serial No. 5348, N881TW

GUARANTY

To: TERAYON COMMUNICATION SYSTEMS, INC.

This guaranty dated as of August 26, 2004 (the "Guaranty") is being given by DAVID BELFORD (the "Guarantor"), an individual residing in the State of Ohio, in connection with that certain Aircraft Sublease Agreement (the "Aircraft Sublease"), dated as of August 26, 2004, between Terayon Communication Systems, Inc., a Delaware corporation ("Sublessor"), and United Furniture Equipment Rental, Inc., an Ohio corporation ("Sublessee"), with respect to that certain Canadair Challenger 604 aircraft, United States Registration Number N881TW, Manufacturer's Serial Number 5348 (the "Aircraft").

The Guarantor requests you enter into the foregoing Aircraft Sublease and to induce you to do so and in consideration hereof and of benefits to accrue to the Guarantor therefrom, the Guarantor, as primary obligor, unconditionally guarantees to you or to any of your direct or indirect affiliates and subsidiaries, (each hereinafter called an "Affiliate"), that Sublessee will fully and promptly pay and perform all its obligations to you under the Aircraft Sublease, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured, unmatured or matured by acceleration and whether originally contracted with you or otherwise acquired by you, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor and notwithstanding any waiver or limitation of liability of Sublessee under the Aircraft Sublease.

Guarantor agrees, without your first having to proceed against Sublessee or to liquidate paper or any security therefor, to pay on written demand all sums due and to become due to you from Sublessee and all losses, costs, attorneys' fees or expenses which may be suffered by you by reason of Sublessee's default or default of the undersigned and agrees to be bound by and on written demand to pay any amount owed under the Aircraft Sublease, with or without notice to the Guarantor. This Guaranty is an unconditional guarantee of payment and performance, rather than a guarantee of collection. The Guarantor shall not be released or discharged, either in whole or in part, by your failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of Sublessee to you under the Aircraft Sublease or of the Guarantor to you under this Guaranty, or to protect the property covered by any such security interest. No termination hereof shall be effected by Guarantor's death.

The Guarantor hereby waives: notice of acceptance hereof; presentment, demand, protest and notice of nonpayment or protest as to the Aircraft Sublease; any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against Sublessee or any other person directly or contingently liable for the obligations guaranteed hereunder, or against or with

respect to Sublessee's property (including, without limitation, property collateralizing its obligations to you), arising from the existence or performance of this Guaranty; all exemptions and homestead laws and any other demands and notices required by law; all setoffs and counterclaims; and any duty on your part (should any such exist) to disclose to the Guarantor any manner, fact or thing related to the business operations or condition (financial or otherwise) of Sublessee or its affiliates or property, whether now or hereafter known by you.

You may at any time without the Guarantor's consent, without notice to the Guarantor and without affecting or impairing the Guarantor's obligations hereunder, do any of the following:

1.    renew, extend (including extensions beyond the original term of the Aircraft Sublease), modify, release or discharge any obligations of Sublessee, the Guarantor or of other guarantors (under a separate instrument) or of any other party at any time directly or contingently liable for the payment of Sublessee's obligations under the Aircraft Sublease;

2.    accept partial payments of Sublessee's obligations under the Aircraft Sublease;

3.    accept new or additional documents, instruments or agreements relating to or in substitution of Sublessee's obligations under the Aircraft Sublease;

4.    settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of Sublessee's obligations under the Aircraft Sublease and any security therefor in any manner;

5.    consent to the transfer or return of any security, and take and hold additional security or guaranties for Sublessee's obligations under the Aircraft Sublease; or

6.    amend, exchange, release or waive any security or guaranty.

If any claim is made upon you at any time for repayment or recovery of any amount(s) or other value received by you, from any source, in payment of or on account of the obligations of Sublessee guaranteed hereunder and you repay or otherwise become liable for all or any part of such claim by reason of:

(a)    any judgment, decree or order of any court or administrative body having competent jurisdiction; or

(b)    any settlement or compromise of any such claim,

the Guarantor shall remain liable to you hereunder for the amount so repaid or for which you are otherwise liable to the same extent as if such amount(s) had never been received by

2.

EXECUTION COPY

you, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of Sublessee.

Prior to the commencement of the Aircraft Sublease, and at any time after written request upon a default by Sublessee under the Aircraft Sublease, Guarantor agrees to furnish to you, within five (5) days of such request, Guarantor's personal financial statements, in form and detail satisfactory to you, and copies of Guarantor's tax returns, as soon as available and in any event not later than 15 days after such tax returns are required to be filed.

Guarantor agrees that its guaranty hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of Sublessee's obligations under the Aircraft Sublease are rescinded, invalidated, declared to be fraudulent or preferential, or must otherwise be returned, refunded, repaid or restored by you upon the bankruptcy or reorganization of Sublessee or the Guarantor or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Sublessee or the Guarantor, or otherwise, all as though such payments had not been made.

Until the indefeasible payment in full of all Sublessee's obligations under the Aircraft Sublease, the Guarantor shall not have (and hereby waives) any right by way of subrogation or otherwise as a result of the payment of any sums hereunder. Guarantor agrees that Guarantor will never have, and hereby waives and disclaims, any claim or right against Sublessee by way of subrogation or otherwise in respect of any payment hereunder.

This Guaranty shall bind the Guarantor's respective heirs, administrators, representatives, successors, and assigns, and shall inure to your successors and assigns, including, but not limited to, any party to whom you may assign the Aircraft Sublease (the Guarantor hereby waives notice of any such assignment). All of your rights are cumulative and not alternative.

THIS GUARANTY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF. Guarantor hereby consents (i) that any action or proceeding against it may be commenced and maintained in any federal or state court in the State of California by service of process on Guarantor, and (ii) that such courts shall have jurisdiction with respect to the subject matter hereof and the person of the undersigned.

Guarantor

/s/ David Belfbrd
---------------------------------------
      David Belfbrd

Address: 2950 E. Broad Street
         Columbus, Ohio 43209

3.

Exhibit 31.1

CERTIFICATION

I, Jerry Chase, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Terayon Communication Systems, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  November 9, 2004

/s/ Jerry Chase
-----------------------
Jerry Chase
Chief Executive Officer

Exhibit 31.2

CERTIFICATION

I, Edward Lopez, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Terayon Communication Systems, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2004

/s/ Edward Lopez
----------------------
Edward Lopez
Acting Chief Financial Officer

Exhibit 32.1

TERAYON COMMUNICATION SYSTEMS, INC.

CERTIFICATION

In connection with the periodic report of Terayon Communication Systems, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2004 as filed with the Securities and Exchange Commission (the "Report"), I, Jerry Chase, Chief Executive Officer of the Company, hereby certify as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, that to the best of my knowledge:

    (1)   the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

    (2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

This Certification has not been, and shall not be deemed, "filed" with the Securities and Exchange Commission.

Date: November 9, 2004

                              /s/ Jerry Chase
                              -----------------------
                              Jerry Chase
                              Chief Executive Officer

Exhibit 32.2

TERAYON COMMUNICATION SYSTEMS, INC.

CERTIFICATION

In connection with the periodic report of Terayon Communication Systems, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2004 as filed with the Securities and Exchange Commission (the "Report"), I, Edward Lopez, Acting Chief Financial Officer of the Company, hereby certify as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, that to the best of my knowledge:

    (3)    the Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

    (4)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

This Certification has not been, and shall not be deemed, "filed" with the Securities and Exchange Commission.

Date: November 9, 2004                /s/ Edward Lopez
                                           -----------------------------
                                          Edward Lopez
                              Acting Chief Financial Officer

# EXHIBIT 5

Table of Contents

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
Form 10-K

(Mark one)

p    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934
     FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004
                          OR
o    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934
     FOR THE TRANSITION PERIOD FROM          TO          .

COMMISSION FILE NUMBER: 000-24647
TERAYON COMMUNICATION SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

DELAWARE                    77-0328533
(STATE OR OTHER JURISDICTION OF   (IRS EMPLOYER
 INCORPORATION OR ORGANIZATION IDENTIFICATION NO.)

4988 GREAT AMERICA PARKWAY
SANTA CLARA, CALIFORNIA 95054
(408) 235-5500
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF THE
REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)
SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

Title of Each Class:Name of Each Exchange on Which Registered:

None                              None

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, par value $0.001 per share
(TITLE OF CLASS)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirement for the past 90 days.    Yes p    No o
    Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K.    o
    Indicate by check mark whether the registrant is an accelerated filer (as
defined in Rule 12b-2 of the Act).    Yes p    No o
    The aggregate market value of the voting stock held by non-affiliates of
the registrant was approximately $140,449,000 on June 30, 2004. For purposes of
this calculation only, the registrant has excluded stock beneficially owned by
directors and officers. By doing so, the registrant does not admit that such
persons are affiliates within the meaning of Rule 405 under the Securities Act
of 1933 or for any other purpose.
    Indicate the number of shares outstanding of each of the registrant's
classes of common stock, as of the latest practicable date: Common Stock, $0.001
par value, 76,786,521 shares outstanding as of February 28, 2005.
                  DOCUMENTS INCORPORATED BY REFERENCE
    LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN
INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH
INFORMATION IS INCORPORATED:
    Terayon Communication Systems, Inc definitive Proxy Statement, to be filed
not later than 120 days after the end of the fiscal year covered by this report
Part III

--------------------------------------------------------------------------------

INDEX
TERAYON COMMUNICATION SYSTEMS, INC.

|  | Page No. |
|---|---|
| PART I | |
| Item 1. BUSINESS | 3 |
| Item 2. PROPERTIES | 11 |
| Item 3. LEGAL PROCEEDINGS | 11 |
| Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 13 |
| PART II | |
| Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 13 |
| Item 6. SELECTED FINANCIAL DATA | 16 |
| Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 17 |
| Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 54 |
| Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 56 |
| Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURES | 93 |
| Item 9A.CONTROLS AND PROCEDURES | 93 |
| Item 9B.OTHER INFORMATION | 95 |
| PART III | |
| Item 10.DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 95 |
| Item 11.EXECUTIVE COMPENSATION | 95 |
| Item 12.SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDERS MATTERS | 95 |
| Item 13.CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 95 |
| Item 14.PRINCIPAL ACCOUNTANT FEES AND SERVICES | 96 |
| PART IV | |
| Item 15.EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 96 |
| SIGNATURES | 100 |
| EXHIBIT 10.1 | |
| EXHIBIT 10.26 | |
| EXHIBIT 10.27 | |
| EXHIBIT 10.28 | |
| EXHIBIT 10.53 | |
| EXHIBIT 21.1 | |
| EXHIBIT 23.1 | |
| EXHIBIT 31.1 | |
| EXHIBIT 31.2 | |
| EXHIBIT 32.1 | |
| EXHIBIT 32.2 | |

1

--------------------------------------------------------------------------------

Table of Contents

SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 which are subject to the safe harbor created by those sections. All statements included or incorporated by reference in this report, other than statements that are purely historical in nature, are forward-looking statements. Forward-looking statements are generally written in the future tense and/or are preceded by words such as may, will, should, expect, plan, anticipate, believe, estimate, predict, future, intend, or certain or the negative of these terms or similar expressions to identify forward-looking statements. Forward-looking statements include statements regarding:

*Our belief our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months;

*Our belief that we are well positioned to capitalize on the emerging video market because of the success our digital video solution (DVS) products have had with the major U.S. cable operators and satellite providers, as well as our current success in digital ad insertion;

*Our belief that our full transition to an original design manufacturer in Asia during 2005 may allow us to remain competitive in the marketplace and maintain favorable margins on our products;

*Our expectation that, to the extent we are successful in shifting our product mix to higher margin DVS product revenues, our margins may increase;

*Our belief that we are well positioned to capitalize on the growing demand for broadband providers to provide advanced video services to their subscribers;

*Our belief that the ongoing migration of major broadband providers to all-digital networks represents a significant opportunity for companies like us with products and technologies that enable them to maximize their bandwidth and to utilize important new transport methods;

*Our belief that television providers will increasingly rely on overlay to maintain or even increase their advertising revenues and that our digital video processing systems will enable them to more cost-effectively do this;

*Our belief that cable, digital broadcast satellite and telecommunications companies will continue their investments in equipment to provide advanced services in a cost-effective manner to increase average revenues per unit from their subscribers;

*Our expectation that research and development expenses will continue to decrease in 2005; and

*Our expectation that general and administrative expenses will continue to decrease in 2005.

Forward-looking statements are not guarantees of future performance and involve risks and uncertainties. The forward-looking statements contained in this report are based on information that is currently available to us and expectations and assumptions that we deemed reasonable at the time the statements were made. We do not undertake any obligation to update any forward-looking statements in this report or in any of our other communications, except as required by law. All such forward-looking statements should be read as of the time the statements were made and with the recognition that these forward-looking statements may not be complete or accurate at a later date. The business risks discussed in Item 7 of this Report on Form 10-K, among other things, should be considered in evaluating our prospects and future financial performance.

This Report on Form 10-K includes trademarks and registered trademarks of Terayon Communication Systems, Inc. (Terayon or Company). Products or service names of other companies mentioned in this Report on Form 10-K may be trademarks or registered trademarks of their respective owners.

2

--------------------------------------------------------------------------------

Table of Contents

PART I

Item 1.Business

Overview

We were founded in 1993 to provide cable operators with a cable data system enabling them to offer high-speed, broadband Internet access to their subscribers. By 1999, we were primarily selling this cable data system -- composed of cable modems and cable modem termination systems (CMTS) -- which utilized our proprietary Synchronous Code Division Multiple Access (S-CDMA) technology. Also in 1999, we initiated an acquisition strategy to expand our product offerings within the cable industry and outside of the cable industry to the telecom and satellite industries. With the market downturn in 2000, we refocused our business to target the cable industry and began selling data and voice products based on industry standard specifications, particularly the Data Over Cable System Interface Specification (DOCSIS), thereby beginning our transition from proprietary-based products to standards-based products, and our digital video solutions (DVS) products to cable operators and satellite providers. Since 2000, we have terminated all of our acquired telecom and satellite-focused businesses and incurred restructuring charges in connection with these actions.

In 2004, we decided to refocus our business and make DVS the center of our strategic direction. In particular, we have begun expanding our focus beyond cable operators to more aggressively pursue opportunities for our DVS products with television broadcasters, telecom carriers and satellite television providers. Additionally, as part of this decision, we also determined that we would continue to sell equipment for home access solutions (HAS), including cable modems, embedded multimedia terminal adapters (eMTA) and home networking devices, but ceased future investment in our CMTS product line. This decision was based on weak sales of the CMTS products and the anticipated extensive research and development investment required to support the product line in the future. As part of our decision to cease investment in the CMTS product line, we have incurred severance, restructuring charges and asset impairment charges.

We were incorporated in California and reincorporated in Delaware in 1998. Our principal executive headquarters are located at 4988 Great America Parkway, Santa Clara, California 95054. Our telephone number is (408) 235-5500.

Industry Dynamics

We participate in the worldwide market for equipment sold primarily to broadband providers, including cable operators, television broadcasters, telecom carriers and satellite providers. Our business is influenced by the following significant trends in our industry:

Expansion of the all-digital network

During the next several years, we believe that broadband providers will, if they have not already done so, migrate their networks to all-digital operation in order to deliver new services and substantially improve network efficiency. This effort may require broadband providers to deploy new digital video products.

Ability to leverage network infrastructures to offer multiple products and services

Within the last few years, several broadband providers have begun offering a "triple play" bundle of services that includes video, voice and high-speed data, over a single network, with the objective of capturing higher average revenues per subscriber, typically referred to as average revenues per unit. The delivery of "triple play" services has led to increased competition between the broadband providers, particularly among the various verticals, i.e. increased competition between the cable operators and telecom carriers. This competition has led the broadband providers to improve their infrastructure by purchasing equipment that allows them to provide the "triple play" of services.

3

--------------------------------------------------------------------------------

Table of Contents

An example of the competition between the broadband providers is the delivery of voice services where cable operators and other Voice over Internet Protocol (VoIP) providers are challenging the traditional telecom carriers. Consumer acceptance of VoIP telephony services has increased substantially during 2004. U.S. cable operators have been rolling out VoIP service in many of their cable systems during the past year and are currently expanding the service to new systems. In addition to cable operators, there are several other growing VoIP service providers -- such as Vonage -- which do not have their own physical networks, but utilize existing cable and telecom broadband networks. To offer voice service, cable operators and other VoIP service providers require that their residential subscribers use an eMTA or other consumer premise equipment (CPE) device.

Broadband providers must combat ad skipping technologies

Consumers increasing use of personal video recorders (PVR) capable of skipping over commercial advertisements is a growing threat to broadband providers who face the possibility of lower advertising revenues from advertisers who are charged in large part on the number of viewers watching a program. To overcome the reduction of ad viewers because of ad skipping PVRs, broadband providers are increasingly seeking solutions of digital overlay techniques to directly insert ads into the program being aired. These "overlaid ads" typically appear in a lower corner of the television picture and cannot be skipped by PVRs as they appear within the TV program itself. We feel that television broadcasters will increasingly rely on overlay to maintain or even increase their advertising revenues.

Continued network investment to support new product requirements in competitive markets

The cable, digital broadcast satellite, and telecommunications companies will continue their investments in equipment to provide advanced services in a cost-effective manner to increase ARPU from their subscribers. Though U.S. cable operators continued to decrease their capital spending in 2004, the amount of the decline was substantially lower than the previous year. According to Kagen Research, LLC in 2004 U.S. cable operators spent $9.5 billion on capital equipment, compared to $10.6 billion in 2003, a decline of $1.1 billion or 10% year over year. However, this compares favorably to the $3.6 billion or 27% decrease from the $14.5 billion spent in 2002 to 2003's $10.6 billion. In addition, we believe that telecom carriers (in particular regional bell operating companies) offering low-priced broadband Internet services will become an increasing source of competition to traditional home video providers as they continue to upgrade their networks to offer video services including high definition digital television (HDTV) services.

Business

We develop, market and sell equipment for DVS including our CherryPicker line of products and equipment for HAS including cable modems, eMTAs and home networking devices. Our DVS equipment allows broadband providers to deliver advanced digital video services, such as HDTV to generate advertising revenue by carrying ads for local advertisers and to build their brand awareness by overlaying their corporate logo directly into their programming. Our HAS enable cable operators to deliver and manage cost-effective broadband Internet access and VoIP telephony service.

The delivery of broadband voice, video and data services requires expertise in radio frequency (RF) modulation, Motion Picture Experts Group (MPEG) digital video formats and Internet Protocol (IP). Our products leverage our expertise in these technologies and our experience in designing, developing and manufacturing complex equipment, such as digital video processing equipment. We provide our customers hardware and software products that allow them to deliver and manage cost-effective, robust broadband offerings for subscribers.

In the digital video management system market, our expertise in MPEG processing technologies has helped us secure a leadership position in statistical remultiplexing and providing the cable and satellite operators with bandwidth management capabilities for standard definition (SD) and HDTV. Our DVS products enable broadband providers to maximize their SD and HDTV digital programming through rate shaping, grooming and advertisement insertion. We believe we are well positioned to capitalize on the growing

4

--------------------------------------------------------------------------------

Table of Contents

demand for broadband providers to provide advanced video services to their subscribers, including bandwidth intensive applications such as HDTV and Video on Demand (VOD).

    We believe our DVS processing systems enable broadband providers to more cost-effectively overlay ads directly into their programming. Currently, our DM 6400 Network CherryPicker (for cable operators and satellite providers) and our BP 5100 (for television broadcasters) enable the overlay of ads completely within the digital domain. This approach is more efficient compared to the traditional approach which requires the ad and the program to first be converted from digital to analog video, at which point the ad is overlaid and then both are re-encoded back to digital. Since our method works entirely in the digital domain, there is no need for costly decoders to convert the digital video to analog and separate re-encoders to then convert the analog video back to digital.

Business Strategy

    Our goal is to be the leading provider of DVS and HAS in order to optimize the delivery of video, voice and data for broadband service providers on a worldwide solution basis. To achieve this goal, we are pursuing the following strategies:

*capitalize on the increasing demand for advanced video services, including HDTV and VOD, by leveraging our strength in the market for digital video bandwidth management products;

*use our expertise in DOCSIS, IP, MPEG and RF technologies to evolve our solutions into an intelligent access platform capable of more effectively delivering and managing "triple play" bundled services for broadband providers;

*increase the distribution capabilities of our DVS products through reseller channels including developing new and expanding existing system integration partnerships such as Harmonic, Inc, Tandberg Television, Ltd, and Thomson Electronics

*selectively enhance our HAS product portfolio to increase the value-added services for broadband providers to offer to their subscribers; and

*improve margins through focused product cost-reduction efforts and by streamlining operational activities across all product lines.

    The ongoing migration of major broadband providers to all-digital networks represents a significant opportunity for companies like us with products and technologies that enable them to maximize their bandwidth and to utilize important new transport methods such as Gigabit Ethernet. We feel we are well positioned to capitalize on this emerging market in large part because of the success our proven DVS products have had with the major U.S. cable operators and satellite providers.

Products

DVS products

    Our CherryPicker line of digital video processing systems give cable, telecom and satellite operators exceptional flexibility in managing their digital video content, including the rate shaping of video content to maximize the bandwidth for SD and high definition (HD) programming, grooming customized channel line-ups, carrying ads for local advertisers and branding themselves by inserting their corporate logos into their programming.

    The CherryPicker line currently includes two models, the DM 6400 and the DM 3200. Our DM 6400 helps cable operators seamlessly insert commercials for local advertisers into their digital programming without the need for a cumbersome and inefficient digital-to-analog-back-to-digital process that requires additional equipment. According to Kagen Research LLC, in 2004, U.S. cable operators earned more than $4.3 billion running ads for local advertisers, a 13% increase over the $3.8 billion billed in 2003. We believe this market will continue to grow and that we are well positioned in this space based on our current success in digital ad insertion and the relationships we have with the major advertising server companies, primarily

5

--------------------------------------------------------------------------------

Table of Contents

SeaChange and C-Cor. Our DM6200 provides statistical remultiplexing functionality, ad insertion, and advance stream processing.

Our BP5100 digital video processing system has been developed specifically for television broadcasters, utilizing the same proven statistical remultiplexing technology and components from the CherryPicker line. The BP5100 provides broadcasters with exceptional flexibility in managing their digital video content, including the rate shaping of video content to maximize the bandwidth for SD and HD programming, grooming customized channel line-ups, carrying ads for local advertisers and branding themselves by inserting their corporate logos into their programming.

Our CP 7600 professional grade digital-to-analog multichannel integrated decoder enables operators to optimize their digital infrastructure by reducing the need for analog equipment and pushing what is needed to the "edge' of their networks. This in turn allows operators to focus their efforts on transitioning the rest of the networks to all digital operation.

Our CP 7585 off-air demodulator allows cable and satellite operators to convert SD or HDTV programming transmitted over-the-air by television broadcasters from the 8VSB format to the ASI format used by cable and satellite operators. This allows cable and satellite providers to retransmit broadcasters programming over their own networks.

HAS products

Our Terayon TJ 700x series cable modems have been deployed by cable operators worldwide to deliver high-speed Internet access, online gaming and other broadband services. The TJ 700x cable modem series currently includes the TJ 715x DOCSIS 2.0 certified modem, the Euro-DOCSIS 1.1 certified TJ 720x and the TJ 735x, which has been designed specifically for Japanese cable television operators.

Our terminal adapter (TA) series of eMTA are cable modems that support the delivery of VoIP-based cable telephony service, in addition to high-speed Internet access. The TA eMTAs are designed specifically for VoIP cable telephony and are based on the PacketCable standard, which Cable Television Laboratories, Inc (CableLabs) has developed for cable VoIP. Our eMTAs are also based on the DOCSIS and Euro-DOCSIS specifications so they can be deployed by cable operators worldwide.

Our Wx-54G wireless networking module can be attached to any member of our TJ 700x family of cable modems to provide high-speed, wireless Internet connectivity to multiple PCs and other devices within a cable subscriber"s home.

Product research and development

We maintain ongoing research and development activities for our current product lines and to determine the potential of possible future products.

For current product lines, our research and development efforts are focused on developing new features and functionality that address customer requirements and which keep our products competitive with products from other vendors. Another key goal of our ongoing research and development activities is to improve the gross margins for our existing products by reducing the component and manufacturing costs of these products.

We are engaged in substantial research and development activities to investigate the potential of possible future products and to improve our existing products by adding new functionality and by reducing their cost of manufacture. We currently anticipate that overall research and development spending in 2005 will decrease compared to 2004, but will be more focused on DVS products and applications, which have strategic importance to the company. A key area for ongoing research and development will be to develop new applications for our DVS products.

Developing new and innovative solutions is important for us to remain competitive with larger companies that devote considerably more resources to product development.

6

--------------------------------------------------------------------------------

Table of Contents

Customers

    We market and sell our DVS and HAS products to multiple vertical target markets consisting of the largest cable and satellite operators and broadcasters in each major geographic area, including North America; Europe, Middle East and Africa (EMEA), and Asia.

    Our principal customers include the following:

Adelphia Communications

Comcast
Cox Communications
EchoStar
Harmonic
Hughes Electronics (DirectTV)
i-CABLE Communications
J-Com (Cross Beam Networks), a subsidiary of Sumitomo Corporation (Sumitomo)
Thomson Electronics (a prime technology partner of FOX Broadcasting Company)

    We believe that a substantial majority of our revenues will continue to be derived from sales to a relatively small number of customers for the foreseeable future. For example, two customers, Adelphia and Comcast accounted for approximately 18% and 12%, respectively, of our total revenues for the year ended December 31, 2004. Three customers Adelphia, Cross Beam Networks and Comcast accounted for approximately 22%, 16% and 13%, respectively of our total revenues for the year ended December 31, 2003. In connection with our decision in October 2004 to cease future investment in our CMTS product line, Adelphia, one of our largest CMTS customers, indicated that it will no longer purchase CMTS products from us. Although the majority of revenue in prior years from Adelphia has primarily been derived from the sale of CMTS products, we have also sold our DVS and HAS products to Adelphia and may be unable to continue to sell DVS and HAS products to Adelphia, and this loss may have a material adverse effect on our business or results of operations in 2005. Additionally, the loss of any other of our significant customers, especially customers who generate a significant amount of DVS revenue, generally could have a material adverse effect on our business and results of operations.

Market Competition

    The market for broadband equipment vendors is extremely competitive and is characterized by rapid technological change, and more recently, market consolidation. In the past, most cable data systems were based on vendors' proprietary technology. As a result, modems only worked with CMTSs from the same vendor, and therefore operators generally had to purchase CMTSs and modems from the same vendor. With the advent of DOCSIS certified and qualified products, customers can purchase interoperable CMTSs and CPE products from a variety of equipment manufacturers. The move to standards-based products may lead to additional pricing pressures and further declining gross margins in our HAS product line. Additionally, we believe that there may be pressure to develop industry standards and specifications for video products and applications, and such standards and specifications could impact pricing and gross margins of our DVS products in the same way it has affected the cable data systems.

    In the market for DVS solutions, we believe we are the market leader in video grooming and remultiplexing with our CherryPicker digital video processing system. However, several companies have entered this market from time to time, including Motorola and privately held BigBand Networks. We believe that there may be pressure to develop industry standards and specifications for DVS products and applications, and such standards and specifications could impact pricing and gross margins of the DVS products and applications in the same way it has affected the cable data systems.

    Our main competitors in the sale of HAS products are Ambit, Arris, Motorola, Scientific-Atlanta and Thomson.

7

--------------------------------------------------------------------------------

Table of Contents

The principal competitive factors in our market include the following:

*product performance, features and reliability;

*price;

*size and financial stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*technical support and service;

*relationships with service providers; and

*in the HAS market, compliance with industry specifications and standards.

Some of the above competitive factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products. Many of our current and potential competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do. These competitive pressures have impacted and are likely to continue to adversely impact our business.

Sales and Marketing

We market and sell our products directly to broadband providers through our direct sales forces in North America, EMEA, and Asia. We also market and sell our products through distributors, system integrators, and resellers throughout the world.

We support our sales activities through marketing communication vehicles, such as industry press, trade shows, advertising and the Internet. Through our marketing efforts, we strive to educate broadband service providers on the technological and business benefits of our products, as well as our ability to provide quality support and service. We participate in the major trade shows and industry events in the United States and throughout the world. Industry referrals and reference accounts are significant marketing tools we develop and utilize.

We also make our products available for customers to test, which is very often a prerequisite for making a sale of our more complex products. These tests can be very comprehensive and lengthy, which can dramatically increase the sales cycle for these products. Participating in these tests often requires us to devote considerable time and resources from our engineering and customer support organizations.

International Sales

We have international sales offices in Brussels, Belgium, Hong Kong, Shanghai, China and Tel Aviv, Israel. In fiscal 2004, 2003 and 2002, approximately 45%, 44% and 68%, respectively of our net revenues were from customers outside of the U.S. Sales to Japan which is the only other country into which we made sales in excess of 10% of net revenues in the preceding three years, were 6%, 16% and 28%, in fiscal 2004, 2003 and 2002, respectively. During 2004, we emphasized sales to U.S., Japanese and EMEA customers while placing a lower emphasis on other locations, such as Canada and South America. See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations -- Risks Related to Our Business, including the information under the heading "We are dependent upon international sales and there are many risks associated with international operations" for information about the risks associated with our international operations. Also see Note 13 in the Notes to Consolidated Financial Statements.

The majority of our international sales are currently invoiced in U.S. dollars. However, we do enter into certain transactions in Euros and other currencies. Invoicing in other currencies subjects us to risks associated

8

--------------------------------------------------------------------------------

Table of Contents

with foreign exchange rate fluctuations. Although we do not currently have any foreign currency hedging arrangements in place, we will consider the need for hedging or other strategies to minimize these risks if the amount of invoicing in non-dollar denominated transactions materially increases.

Our international operations are subject to certain risks common to foreign operations in general, such as governmental regulations and import restrictions. In addition, there are social, political, labor and economic conditions in specific countries or regions as well as difficulties in staffing and managing foreign operations, and potential adverse foreign tax consequences, among other factors that could also have an impact on our business and results of operations outside of the United States.

Customer Service and Technical Support

We believe that our ability to provide consistently high quality service and support will continue to be a key factor in attracting and retaining customers. Our technical services and support organization, with personnel in North America, EMEA and Asia, offers support 24 hours a day, seven days per week. Prior to the deployment of our products, each customer's needs are assessed and proactive solutions are implemented, including various levels of training, periodic management and coordination meetings and problem escalation procedures.

Backlog

Most of our revenues are generated from orders booked and shipped within the current quarter. Assuming product availability, our practice is to ship our products promptly upon the receipt of purchase orders from our customers. Therefore, we believe that backlog information is not material to an understanding of our business.

Manufacturing

Our finished goods are produced by subcontract manufacturers. Our video equipment is single sourced from a manufacturer in San Jose, California. Our modems are sourced from a manufacturer in China.

Our manufacturing operations employ semiconductors, electromechanical components and assemblies and raw materials such as plastic resins and sheet metal. Although we believe the materials and supplies necessary for our manufacturing operations are currently available in the quantities required, we sometimes experience a short supply of certain component parts as a result of strong demand in the industry for those parts.

Our subcontractors purchase materials, supplies and product subassemblies from a substantial number of vendors. For many of our products, there are existing alternate sources of supply. However, we sole source certain components contained in our products, such as the semiconductors used in our products. While this has not resulted in material disruptions in the past, should any change in these relationships or disruptions to our vendors' operations occur, our business and results of operations could be adversely affected.

In an effort to prevent shortages of supplies used in the manufacturing process by some of our subcontractors, we source and inventory various raw products and components, as part of our supply chain program. In doing so we may put ourselves at risk of carrying inventory that may become excessive for our future sales, based on current sales forecasts or become obsolete before utilization by those manufactures.

Intellectual Property

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. Our pending patent applications may not be granted. Even if they are granted, the claims covered by the patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

9

---

Table of Contents

We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove to be sufficient to prevent misappropriation of our technology or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. Litigation may be necessary to enforce our intellectual property rights.

In connection with the development of the DOCSIS 2.0 specification by CableLabs, the research and development consortium, which the cable operators help fund we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis all of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to others, including manufacturers that compete with us in the marketplace for DOCSIS based products.

To migrate their networks to all-digital operation, Comcast, Time-Warner and Cox, the three largest cable operators in the U.S., started their Next-Generation Network Architecture (NGNA) initiative in 2003 to develop a common approach to transform their cable systems into all-digital networks. Working as a group the operators can work more effectively with equipment vendors in defining the products and product capabilities required for the migration. In 2004 the participating operators commissioned CableLabs to manage the NGNA initiative and to develop a set of standards to which equipment vendors like us can build our products. The NGNA initiative is so far following the model successfully proven with the earlier DOCSIS initiative, which enabled the development of interoperable cable modems, CMTSs and other associated equipment that allowed U.S. operators to rollout broadband cable modem service much faster, more broadly and with greater success than telecom carriers could offer their competing DSL service. As it has with data services, CableLabs may request companies to contribute their video technologies to a DOCSIS-like technology pool on a royalty-free basis.

The contractual arrangements, as well as statutory protections, we employ may not prove to be sufficient to prevent misappropriation of our technology or deter independent third-party development of similar technologies. We have in the past received letters claiming that our technology infringes the intellectual property rights of others. We have consulted with our patent counsel and have or are in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that our products infringe third party intellectual property rights. If we are found to have infringed third party rights, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert our management's resources, cause product shipment delays or require us to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to us, if at all.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

Access to our reports

Our Internet Web site address is www.terayon.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15 (d) of the Exchange Act are available free of charge through our Web site as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission (SEC). We will also provide those reports in electronic or paper form free of charge upon a

10

--------------------------------------------------------------------------------

Table of Contents

request made to Mark A. Richman, Chief Financial Officer, c/o Terayon Communication Systems, Inc., 4988 Great America Parkway, Santa Clara, CA 94054. Furthermore, all reports we file with the Commission are available free of charge via EDGAR through the Commission's Web site at www.sec.gov. In addition, the public may read and copy materials filed by us at the Commission's public reference room located at 450 Fifth St., N.W., Washington, D.C., 20549 or by calling 1-800-SEC-0330.

Employees

As of December 31, 2004, we had 255 employees, of which 178 were located in the United States, 37 in Israel and an aggregate of 40 in Canada, Europe, South America and Asia. We had 124 employees in research and development, 65 in marketing, sales and customer support, 21 in operations and 45 in general and administrative functions. In connection with our most recent restructuring plans that occurred throughout 2004, we terminated the employment of approximately 168 employees or 40% of our workforce. In addition, as a result of our ongoing restructuring activities and sale of certain assets to ATI Technologies Inc., (ATI) as of March 11, 2005, we had approximately 182 employees. None of our employees are represented by collective bargaining agreements. We believe that our relations with our employees are good.


Item 2.Properties

Our principal executive offices are located in Santa Clara, California where we lease approximately 141,000 square feet under a lease that expires in October 2009. In connection with our restructuring plans announced January 27, 2004, we are seeking to sublease approximately 56,400 square feet of this space. In the United States, we have additional facilities in Costa Mesa, California. One of the facilities in Costa Mesa is subleased.

In addition, we lease properties worldwide. We have a facility in Tel Aviv, Israel consisting of approximately 136,000 square feet under a lease that expires in October 2005. We currently sublease approximately 107,000 square feet of the Israel property. We have offices in Brussels, Belgium, Hong Kong, Shanghai, China, and Ottawa, Ontario, Canada. We currently sublease the facility in Ottawa, Ontario, Canada. We believe that our existing facilities are adequate to meet our needs for the foreseeable future. For additional information regarding obligations under leases, see Note 4 to the Notes to Consolidated Financial Statements.


Item 3.Legal Proceedings

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against us and certain of our officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery. On March 24, 2004, plaintiffs submitted certain documents to the Court in response to its order, and, on April 16,

11

--------------------------------------------------------------------------------

Table of Contents

2004, we responded to this submission. We also have initiated discovery pursuant to the Court's February 23, 2004 order.

On October 16, 2000, a lawsuit was filed against us and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

The Court of Appeals' opinion affirming dismissal of the Bertram case does not end the class action. We believe that the allegations in the class action are without merit, and we intend to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

In 2002, two shareholders filed derivative cases purportedly on behalf of us against certain of our current and former directors, officers, and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the California Superior Court, Santa Clara County. We are a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In the securities class action, we dispute making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants.

We believe that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company (Omniband), filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in the amount of $2,094,970 allegedly caused by the breach of an agreement by us, Terayon Communications Systems Ltd. (Terayon Ltd.), a wholly owned subsidiary, Radwiz Ltd, (Radwiz), a former wholly-owned subsidiary to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz but dismissed the proceeding against us and Terayon Ltd. Omniband appealed the Zurich Chamber of Commerce's decision to dismiss the proceeding against us and Terayon Ltd. and the decision was affirmed on October 15, 2004. On January 13, 2005, the Zurich Chamber of Commerce dismissed the case with prejudice after Omniband failed to respond and pay the arbitration fees.

In January 2005, Adelphia Corporation sued us in the District Court of the City and County of Denver, Colorado. Adelphia's complaint alleges, among other things, breach of contract and misrepresentation in connection with our sale of CMTS products to Adelphia and our announcement to cease future investment in the CMTS market. Adelphia seeks unspecified monetary damages and declaratory relief. We filed a motion to dismiss the complaint on February 24, 2005. As we believe that Adelphia's allegations are without merit, we intend to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome

We have received letters claiming that our technology infringes the intellectual property rights of others. We have consulted with our patent counsel and have or are in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that our products infringe third party intellectual property rights. If we are found to have infringed third party rights, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert our management's resources,

12

--------------------------------------------------------------------------------

Table of Contents

cause product shipment delays or require us to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to us, if at all.

Furthermore, we have in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that our technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require us to enter into royalty arrangements; subject us to damages or injunctions restricting the sale of our products; require us to indemnify our customers for the use of the allegedly infringing products; require us to refund payment of allegedly infringing products to our customers or to forgo future payments; require us to redesign certain of our products; or damage our reputation, any one of which could materially and adversely affect our business, results of operations and financial condition.

We are currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While we currently believe that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on our financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of our legal proceedings, there exists the possibility of a material adverse impact on our results of operations for the period in which the ruling occurs. The estimate of the potential impact on our financial position and overall results of operations for any of the above legal proceedings could change in the future.


Item 4.Submission of Matters to a Vote of Security Holders

(a) The registrant's Annual Meeting of Stockholders was held on December 16, 2004.
(b) The meeting involved the election of three directors: Jerry D. Chase, Zaki Rakib and Mark Slaven. The following directors' terms continued after the meeting: Alek Krstajic, Matthew D. Miller, Selim (Shlomo) Rakib, Lewis Solomon, Howard W. Speaks, Jr. and David Woodrow.
(c) There were two matters voted on at the Meeting. A brief description of each of these matters and the results of the votes thereon, are as follows:

Election of Directors
1.


| Nominee | For | Withheld |
|---------|-----|----------|
| Jerry D. Chase | 67,458,655 | 1,038,909 |
| Zaki Rakib | 67,227,409 | 1,270,155 |
| Mark Slaven | 67,334,317 | 1,163,247 |


Ratification of the appointment of Ernst & Young LLP as the registrant's
2.auditors for the fiscal year ended December 31, 2004


| For | Against | Abstain |
|-----|---------|---------|
| 67,855,478 | 558,429 | 53,657 |


PART II


Item 5.Market for the Registrant's Common Equity, Related Stockholder Matters
and Issuer Purchases of Equity Securities

Our common stock is traded on the NASDAQ National Market under the symbol "TERN". Public trading of our common stock commenced on August 18, 1998. Prior to that time, there was no public market

13

--------------------------------------------------------------------------------

Table of Contents

for our common stock. The following table sets forth, for the periods indicated, the high and low per share sale prices of our common stock, as reported by the NASDAQ National Market.

|  | High | Low |
|---|---|---|
| **2004:** | | |
| First Quarter | $6.25 | $2.96 |
| Second Quarter | $3.99 | $1.66 |
| Third Quarter | $2.38 | $1.44 |
| Fourth Quarter | $2.98 | $1.52 |
| **2003:** | | |
| First Quarter | $2.84 | $1.39 |
| Second Quarter | $3.20 | $1.57 |
| Third Quarter | $8.25 | $2.52 |
| Fourth Quarter | $8.04 | $4.05 |

As of February 28, 2005, there were approximately 588 holders of record of our common stock, as shown on the records of our transfer agent. The number of record holders does not include shares held in "street name" through brokers.

We do not pay any cash dividends on our common stock. We currently expect to retain future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future.

The following table summarizes our equity compensation plan information as of December 31, 2004. Information is included for both equity compensation plans approved by our stockholders and equity compensation plans not approved by our stockholders.

| Plan Category | Common stock to be issued upon exercise of outstanding options and rights (a) | Weighted-average exercise price of outstanding options and rights (b) | Common stock available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by Terayon stockholders(1) | 9,875,526 | $ 4.16 | 6,704,961 |
| Equity compensation plans not approved by Terayon stockholders(2) | 6,927,312 | $ 6.96 | 5,212,115 |
| Totals | 16,802,838 | $ 5.32 | 11,917,076(3) |

1. Includes options to purchase common stock outstanding under the Terayon Communication Systems, Inc. 1995 Stock Option Plan as amended, Terayon Communication Systems, Inc. 1997 Equity Incentive Plan as amended, Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan as amended, Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan as amended, and the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan Offering for Foreign Employees.
2. Includes options to purchase common stock outstanding under the Terayon Communication Systems, Inc. 1999 Non-Officer Equity Incentive Plan, as amended. See Note 10 in Notes to Consolidated Financial Statements.
3. Includes 1,202,733 shares of common stock available for purchase under the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan.

14

--------------------------------------------------------------------------------

Table of Contents

1995 Plan

In March 1995, our Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of our common stock. As of December 31, 2004 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

In March 1997, our Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of our common stock. In June 1998, our Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (5,000,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than 5% of our outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares.

The 1997 Plan was amended on June 13, 2000 to increase the shares authorized for issuance by 3,770,000 additional shares and to provide for an increase in the number of shares of common stock beginning January 1, 2000 through January 1, 2007, by the lesser of 5% of the common stock outstanding on such January 1 or 3,000,000 shares. In May 2003, the Company's Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1997 Plan by 6,237,826 shares. As of December 31, 2004, a total of 15,516,702 shares have been authorized for issuance related to the 1997 Plan.

1998 Plan

In June 1998, our Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of our common stock have been reserved for future issuance to our non-employee directors. In 2002, our Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2004, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

1999 Plan

In September 1999, our Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of our common stock have been reserved for future issuance to our non-officer employees. Additionally, in May 2003, our Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1999 Plan by 13,762,174 shares. As of December 31, 2004, a total of 14,737,826 shares have been authorized for issuance related to the 1999 Plan.

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to our employees, directors, and consultants. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by us at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1998 Plan provides for non-discretionary nonqualified stock options to be issued to our non-employee directors automatically as of the effective date of their election to the Board of Directors and annually following each annual stockholder meeting. Prices for nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

15

--------------------------------------------------------------------------------

Table of Contents

The 1999 Plan provides for nonqualified stock options to be issued to our non-officer employees and consultants. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of the grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

Item 6.Selected Financial Data

The following tables contain selected financial data as of and for each of the five years ended December 31, 2004, 2003, 2002, 2001 and 2000 and are derived from our financial statements. The selected financial data are qualified by reference to, and should be read in conjunction with, our financial statements and the notes to those financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations.

|  | Years Ended December 31, | | | | |
|  | 2004 | 2003 | 2002 | 2001 | 2000 |
|  | (In thousands, except per share data) | | | | |
| Consolidated statement of operations data: | | | | | |
| Revenues | $150,538 | $133,485 | $129,403 | $ 279,481 | $ 339,549 |
| Cost of goods sold | 106,920 | 101,034 | 100,949 | 263,117 | 289,531 |
| Gross profit | 43,618 | 32,451 | 28,454 | 16,364 | 50,018 |
| Operating expenses: | | | | | |
| Research and development | 33,959 | 42,839 | 58,696 | 79,927 | 68,270 |
| Cost of product development assistance agreement | -- | -- | -- | -- | 9,563 |
| In-process research and development | -- | -- | -- | -- | 30,535 |
| Sales and marketing | 24,145 | 26,781 | 35,704 | 55,701 | 45,261 |
| General and administrative | 11,216 | 12,127 | 14,715 | 31,309 | 24,809 |
| Goodwill amortization | -- | -- | -- | 25,410 | 59,057 |
| Restructuring charges (net), executive severance and asset write-offs(1) | 11,159 | 2,803 | 8,922 | 587,149 | -- |
| Total operating expenses | 80,479 | 84,550 | 118,037 | 779,496 | 237,495 |
| Loss from operations | (36,861) | (52,099) | (89,583) | (763,132) | (187,477) |
| Interest income (expense) and other income (expense), net | 254 | 2,062 | (3,481) | 44 | 6,710 |
| Gain on early retirement of debt(2) | -- | -- | 49,089 | 185,327 | -- |
| Income tax benefit (expense) | 76 | (316) | (238) | 13,915 | -- |
| Net loss | $(36,531) | $(50,353) | $(44,213) | $(563,846) | $(180,767) |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) | $ (8.25) | $ (2.95) |
| Shares used in computing basic and diluted net loss per share(3) | 75,861 | 74,212 | 72,803 | 68,331 | 61,349 |

16

--------------------------------------------------------------------------------

Table of Contents

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 |
| | (In thousands, except per share data) | | | | |
| Consolidated Balance Sheet Data: | | | | | |
| Cash, cash equivalents and short-term investments | $ 97,735 | $ 138,640 | $ 206,503 | $ 333,888 | $ 562,457 |
| Working capital | 109,054 | 137,548 | 172,829 | 316,175 | 547,938 |
| Total assets | 153,734 | 215,240 | 275,710 | 466,646 | 1,426,727 |
| Long-term obligations (less current portion) | 68,049 | 68,199 | 68,580 | 178,641 | 500,477 |
| Accumulated deficit | (1,024,091) | (987,560) | (937,207) | (892,994) | (329,148) |
| Total stockholders' equity | $ 56,341 | $ 91,388 | $ 137,142 | $ 180,304 | $ 702,681 |

(1) See Notes 5 and 6 of Notes to Consolidated Financial Statements for an
    explanation for restructuring charges, executive severance and asset
    write-offs.
(2) See Note 8 of Notes to Consolidated Financial Statements for an explanation
    of the repurchase of subordinated convertible notes and reclassification of
    related gains.
(3) See Note 2 of Notes to Consolidated Financial Statements for an explanation
    of the method employed to determine the number of shares used to compute per
    share amounts.


Item 7. Management's Discussion and Analysis of Financial Condition and Results
        of Operations

    The following discussion and analysis is intended to provide an investor
with a narrative of our financial results and an evaluation of our financial
condition and results of operations. The discussion should be read in
conjunction with our consolidated financial statements and notes thereto.

Overview

    We sell our DVS products to cable operators, satellite providers and
television broadcasters. Additionally, we sell our HAS products, including cable
modems, eMTAs, home networking devices, and CMTS product line to cable
operators. However, in 2004 we ceased investment in our CMTS product line and
currently anticipate very limited sales of this product line in 2005.
    When the downturn in the communications industry started in fiscal 2000
and became fully evident to us in fiscal 2001, we began to implement
restructuring plans to cease certain product lines, reduce operating expenses
and capital spending and to narrow the focus of our business. Furthermore, in
2002, 2003 and 2004, as part of our restructuring efforts to refocus our
business, we sold or ceased investing in certain product lines and took
additional measures to align our cost structure with revenues. Our most recent
restructuring plans, beginning in the first quarter of 2004 and continuing
throughout 2004, resulted in a worldwide reduction in force of approximately 168
employees, or 40% of the workforce, consolidation of certain facilities, and
reduction or elimination of certain discretionary costs and programs. We may
continue to divest unprofitable product lines in an effort to focus on growing
our business profitably and redirect our resources to our DVS product line.
However, despite these actions, we may not be able to meet expected revenue
levels in any particular period or attain profitability in any future period.
    In 2004, we repositioned ourselves to make DVS the center of our business
strategy. As part of this vision, we began expanding our focus and our efforts
beyond cable operators to more aggressively pursue opportunities for our DVS
products with other broadband providers and television broadcasters.
Additionally, as part of this decision, we also determined that we would
continue to sell HAS products but cease future investment in our CMTS product
line. This decision was based on weak and declining sales of the CMTS products
and the anticipated costs associated with the extensive research and development
investment required to support the product line. As part of our decision to
cease investment in the CMTS product line, we have incurred severance,
restructuring charges and asset impairment charges.

                                   17

--------------------------------------------------------------------------------

Table of Contents

The emerging market trend to standardize the digital video technology may challenge our ability to continue to grow our DVS business. Comcast, Time-Warner and Cox, the three largest cable operators in the U.S., started their NGNA initiative in 2003 to develop a common approach to transform their cable systems into all-digital networks. In 2004 the participating operators commissioned CableLabs to manage the NGNA initiative and to develop a set of standards to which equipment vendors can build their products to enable the migration to all-digital networks. As it has with data services, CableLabs may request or even require companies to contribute their video technologies to a DOCSIS-like technology pool on a royalty-free basis. If this initiative is successful, we expect that cable operators would seek to purchase video products that have been certified or qualified by CableLabs, in which case we will not be able to sell our video products until they achieve certification or qualification, which can be a lengthy process. As a result, we may incur significant research and development expenses to develop new video products that may not receive certification or qualification in which case we may not be able to recoup the costs of these research and development expenses. Moreover, there is no guarantee that we will be able to support all future cable industry specifications relating to video products, which would likely have an adverse impact on our future revenues. Furthermore, a potential consequence of cable operators purchasing only certified or qualified products is the increased competition between equipment vendors, which could result in declining prices. Consequently, our future success may depend on our ability to compete effectively in the video marketplace by developing, marketing and selling products that are certified and qualified to industry standards in a timely fashion and in a cost effective manner.

On February 8, 2005, we announced the signing of an agreement with ATI Technologies, Inc (ATI) relating to the sale of certain cable modem semiconductor assets. The agreement calls for ATI to acquire our cable modem silicon intellectual property and related software, assume a lease and hire approximately twenty-five employees of our design team. Under the terms of the agreement, ATI will pay us $6.95 million upon closing, with a balance of $7.05 million subject to us achieving milestones for certain conditions, services and deliverables spanning a period of 15 months. On March 9, 2005 we signed closing documents with ATI for this agreement. Upon closing we received $8.6 million in cash which was comprised of the $6.95 million for the initial payment and $1.65 million of the $1.9 million for having met the first milestone. The difference between the $1.9 million milestone and the payment of $1.65 million was money retained by ATI to pay for Company funded retention bonuses for employees that accepted employment with ATI. The balance of $5.2 million will be subject to our achieving the remaining milestones over the subsequent 15 months. The maximum liability for us is set at $11.5 million or the total amount of the purchase price paid by ATI plus $1.5 million. Total purchase price payable to us upon achieving all terms and conditions is $14.0 million. As set forth in this agreement are representations and warranties made by us that may cause us to incur liabilities and penalties arising out of our failure to meet certain conditions and milestones.

We have not been profitable since our inception. We had a net loss of $36.5 million or $0.48 per share for the year ended December 31, 2004, and a net loss of $50.4 million or $0.68 per share for the year ended December 31, 2003. Our ability to grow our business and attain profitability is dependent on our ability to effectively compete in the marketplace with our current products and services, develop and introduce new products and services, contain operating expenses and improve our gross margins, as well as continued investment in equipment by the broadband provider industry. Finally, we expect to benefit from a lower expense base resulting in part from the series of restructurings that occurred in 2004 along with continued focus on cost containment. However, despite these efforts, we may not succeed in attaining profitability in the near future, if at all.

At December 31, 2004, we had approximately $97.7 million in cash, cash equivalents and short-term investments as compared to approximately $138.6 million at December 31, 2003. The decrease in the amount of cash and cash equivalents in 2004 as compared to 2003 primarily resulted from significant uses of cash for operating activities, payments for inventory, restructuring charges and executive severance in 2004. Although we believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months, we may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or

18

--------------------------------------------------------------------------------

Table of Contents

respond to unanticipated requirements. There can be no assurance that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop products, take advantage of future opportunities, respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results

A more detailed description of the risks to our business can be found in the section captioned "Risk Factors" in this annual report.

Results of Operations

Comparison of the years ended December 31, 2004 and 2003

Revenues

|  | For the Year Ended December 31, | | Annual % Change 2004/2003 |
|  | 2004 | 2003 | |
|  | (In thousands) | | |
| Revenues | $ 150,538 | $133,485 | 13% |

Our revenues increased 13% to $150.5 million for the twelve months ended December 31, 2004 from $133.5 million in 2003, primarily due to increased sales of DVS and HAS products, particularly in the second half of 2004, partially offset by declining sales of our CMTS products and proprietary S-CDMA CMTS products.

Revenues by Groups of Similar Products

|  | For the Year Ended December 31, | | Annual % Change 2004/2003 |
|  | 2004 | 2003 | |
|  | (In thousands) | | |
| Revenues by product: | | | |
| DVS | $  36,979 | $ 17,710 | 109% |
| HAS | 72,152 | 64,808 | 11% |
| CMTS | 31,539 | 47,486 | (34)% |
| Other | 9,868 | 3,481 | 183% |
| Total | $  150,538 | $133,485 | 13% |

Revenues from DVS products increased 109% in 2004 compared to 2003, due to increased demand for our HD and Ad insertion applications. We introduced several new products in 2004, one of which (the BP5100) serves the Broadcast market segment.

HAS product revenues increased 11% in 2004 compared to 2003, primarily due to an aggregate increase in modem volume, 1.9 million units in 2004 as compared to 1.5 million units in 2003, offset by decreases in average selling price (ASP). The number of DOCSIS modems sold increased to 1.7 million units in 2004 from 1.2 million units in 2003. The intensely competitive nature of the market for broadband products resulted in significant price erosion. We anticipate that modem unit price erosion will continue in the first half of 2005. However, we believe that our full transition to an Original Design Manufacturer (ODM) in Asia during 2005 may allow us to remain competitive in the marketplace and maintain favorable margins on these products.

Our CMTS product revenues decreased 34% in 2004 compared to 2003, as new customer adoption of DOCSIS 2.0 CMTS platform was not as robust as originally anticipated. Due to declining sales, we made an announcement in October 2004 to cease investment in the CMTS product line. We expect CMTS revenues to continue to decline in 2005 as we phase out this product line and focus on our growth areas.

19

--------------------------------------------------------------------------------

Table of Contents

Other product revenues increased 183% in 2004 compared to 2003, due to large, last time purchases of our legacy voice products. We do not expect any sales of our legacy voice products in 2005.

Revenues by Geographic Region

|  | For the Year Ended December 31, | | Annual % Change 2004/2003 |
|---|---|---|---|
|  | 2004 | 2003 |  |
|  | (In thousands) | | |
| Revenues by geographic areas: | | | |
| United States | $ 83,212 | $ 74,341 | 12% |
| Americas, excluding United States | 4,126 | 3,713 | 11% |
| EMEA, excluding Israel | 29,348 | 17,635 | 66% |
| Israel | 6,681 | 7,038 | (5)% |
| Asia, excluding Japan | 17,999 | 9,575 | 88% |
| Japan | 9,172 | 21,183 | (57)% |
| Total | $ 150,538 | $ 133,485 | 13% |

Revenues in the United States increased 12% to $83.2 million in 2004, up from $74.3 million in 2003, due to increased sales of HAS and DVS products to major system operators (MSO) and television broadcasters. Revenues for EMEA, excluding Israel, increased 66% to $29.3 million in 2004 up from $17.6 million in 2003. During 2004, we emphasized sales to our U.S., EMEA, Japanese and other Asian customers while placing a lower emphasis on other locations such as Canada and South America. In 2005, we expect revenues to increase in the United States, Asian and EMEA markets.

Significant Customers

Two customers, Adelphia and Comcast, (18%, and 12%, respectively) accounted for more than 10% of our total revenues for the year ended December 31, 2004. Three customers, Adelphia, Cross Beam Networks and Comcast, (22%, 16% and 13%, respectively) accounted for more than 10% of our total revenues for the year ended December 31, 2003. In connection with our decision in October 2004 to cease future investment in our CMTS product line and their related lawsuit, we do not expect Adelphia to continue to purchase equipment from us. While sales in prior years from Adelphia were primarily related to CMTS products, we expect this to have a material adverse impact on our HAS product line in 2005 and may affect DVS sales as well.

Related Party Revenues

|  | For the Year Ended December 31, | | Annual % Change 2004/2003 |
|---|---|---|---|
|  | 2004 | 2003 |  |
|  | (In thousands) | | |
| Related party revenues: | | | |
| Rogers revenues | $ 0 | $ 1,453 | (100)% |
| Harmonic revenues | 9,916 | 3,241 | 206% |
| Total related party revenues | $ 9,916 | $ 4,694 | 111% |

Related party revenues increased 111% in 2004 compared to 2003. Related party revenues in 2004 were from Harmonic, Inc. (Harmonic). Related party revenues in 2003 included revenues from Harmonic and Rogers Communications, Inc. (Rogers). Lewis Solomon, a member of our board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2004 and 2003. Alek Krstajic, another member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in

20

--------------------------------------------------------------------------------

Table of Contents

April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. The increase in related party revenues was primarily due to increase in sales to Harmonic in 2004. Neither Harmonic nor Rogers is a supplier to us.

In December 2001, we entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers. We paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, we began amortizing these prepaid assets and charging them against related party revenues in accordance with Emerging Issues Task Force (EITF) 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." We charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003. Amounts charged against total revenues in the year ended December 31, 2003, totaled approximately $5.6 million. Of the co-marketing amortization charged to total revenues, $0.15 million was charged to related party revenues in the year ended 2003. These co-marketing arrangements were fully amortized at December 31, 2003 and no further amortization has occurred in 2004.

Cost of Goods Sold and Gross Profit

| | For the Year Ended December 31, | | |
| | 2004 | 2003 | Annual % Change 2004/2003 |
|---|---|---|---|
| | (In thousands) | | |
| Cost of product revenues | $ 103,150 | $ 99,261 | 4% |
| Cost of related party revenues | 3,770 | 1,773 | 113% |
| Total cost of goods sold | 106,920 | 101,034 | 6% |
| Gross profit | $ 43,618 | $ 32,451 | 34% |

Cost of goods sold consists of direct product costs as well as the cost of our manufacturing operations. The cost of manufacturing includes contract manufacturing, test and quality assurance for products, warranty costs and associated costs of personnel and equipment. In 2004, cost of goods sold was approximately 71% of revenues compared to 76% of revenues in 2003. Cost of goods sold in 2004 and 2003 included the benefit of reversals of approximately $3.3 million and $10.0 million, respectively, in special charges taken in 2001 and 2000 for vendor cancellation charges and inventory previously reserved as excess and obsolete. We reversed these provisions as we were able to sell inventory originally considered to be excess and obsolete. In addition, we were able to negotiate downward certain vendor cancellation claims on terms more favorable to us. During 2004, we recorded inventory charges of $12.0 million, principally due to our decision to cease investment in the CMTS product line. In 2003, we recorded inventory charges of $4.1 million to reduce our inventory due to excess and obsolescence.

In 2004, related party cost of goods increased compared to 2003 due to increased sales of our products to Harmonic.

Our gross profit increased $11.1 million or 34% to $43.6 million or 29% of revenue in the year ended December 31, 2004 compared to $32.5 million, or 24% of revenue in 2003. The factors that contributed to the increase in our gross profit in 2004 were primarily related to an improved sales mix; increased sales of the higher margin DVS product line and lower manufacturing costs for certain HAS products. These positive factors were offset by sales of CMTS products during the same period and increased CMTS reserve for excess and obsolete inventory.

During 2005 we anticipate further decreases in our ASPs and continued pressure on our HAS margins. Consequently, we continue to focus on improving sales of higher margin products and reducing product manufacturing costs for all our products, but most particularly for our HAS products. We are now partnering with contract manufacturers in Asia and the U.S. for our HAS and DVS products, respectively, which may provide us with more competitive component pricing, economies of scale and improved manufacturing capabilities. In addition, we are currently evaluating possible outsourcing partnerships for certain of our supply chain functions, with the objective of increasing our focus on our core competencies, reducing our costs, and

21

----------------------------------------------------------------------------------

Table of Contents

leveraging our target partners' capabilities. To the extent that we are successful in shifting our product mix to higher margin DVS product revenues, we expect our margins to increase.

Operating Expenses

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2004 | 2003 | 2004/2003 |
|  | (In thousands) | | |
| Research and development | $ 33,959 | $42,839 | (21)% |
| Sales and marketing | $ 24,145 | $26,781 | (10)% |
| General and administrative | $ 11,216 | $12,127 | (8)% |

Research and Development Research and development expenses consist primarily of personnel costs, internally designed prototype material expenditures, and expenditures for outside engineering consultants, equipment and supplies required in developing and enhancing our products. Research and development expenses decreased $8.9 million or 21% to $34.0 million or 23% of revenue in the year ended December 31, 2004 from $42.8 million or 32% of revenue in 2003. The $8.9 million decrease in research and development expenses was attributable to $4.0 million of reductions in employee related expenses and $0.5 million in depreciation and amortization. The decrease in research and development expense also included reductions of $0.5 million in expenses for outside engineering consultants, $2.5 million of reductions in materials costs incurred to develop prototypes, and $1.4 million in other costs as a result of the reduction in research and development personnel for CMTS product line. We believe it is critical to continue to make significant investments in research and development to create innovative technologies and products that meet the current and future requirements of our customers. Accordingly, we intend to continue our investment in research and development although at slightly lower levels. In connection with our ongoing restructuring activities, we currently expect research and development expenses to continue to decrease in 2005.

Sales and Marketing Sales and marketing expenses consist primarily of personnel costs, including salaries, commissions for sales, marketing and support personnel, and costs related to trade shows, consulting and travel. Sales and marketing expenses decreased by $2.6 million or 10% to $24.1 million or 16% of revenue in the year ended December 31, 2004 from $26.8 million or 20% of revenue in 2003. The largest components of the decrease in sales and marketing expenses were $2.5 million related to savings realized from subleasing our corporate jet, $0.9 million of decreased travel and facilities costs, and $0.4 million of reduction in depreciation and amortization. These savings were offset by increased expenses of $1.1 million for outside consultants. In connection with our ongoing restructuring activities, we currently expect sales and marketing expenses to continue to decrease in 2005.

General and Administrative General and administrative expenses consist primarily of personnel costs of administrative officers and support personnel, travel expenses and legal, accounting and consulting fees. General and administrative expenses decreased by $0.9 million or 8% to $11.2 million or 7% of revenue in the year ended December 31, 2004 from $12.1 million or 9% of revenue in 2003. The decrease was primarily due to $2.0 million in reduced employee expenses due to lower headcount, partially offset by an increase of $0.4 million attributable to executive recruitment costs, $1.7 million of decreased spending for facilities related to the restructuring plans and a decrease of $0.8 million depreciation and amortization costs. In connection with our ongoing restructuring activities, we currently expect general and administrative expenses to continue to decrease in 2005.

22

--------------------------------------------------------------------------------

Table of Contents

Restructuring Charges, Executive Severance and Asset Write-offs

| | For the Year Ended December 31, | |
|---|---|---|
| | 2004 | 2003 |
| | (In thousands) | |
| Restructuring charges | $ 6,792 | $2,745 |
| Executive severance | 3,451 | -- |
| Long-lived assets written-off | 2,393 | 417 |
| Subtotal | 12,636 | 3,162 |
| Restructuring (recovery/change in estimate in prior year plans) | (1,477) | (359) |
| Restructuring charges, executive severance and asset write-offs | $ 11,159 | $2,803 |

Restructuring  During the 2004 year, we initiated a series of restructuring plans approved by our board of directors to bring operating expenses in line with our revenue levels and to cease investment in our CMTS product line. In the first quarter, we incurred restructuring charges in the amount of $3.3 million of which $1.0 million was related to employee termination costs, $0.9 million related to termination costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. Net charges accrued under this first quarter plan, included estimated sublease income from the aircraft and the excess leased facilities. We incurred restructuring charges in the amount of $1.1 million in the second quarter of 2004 related to additional costs for excess leased facilities, which were contemplated in the first quarter restructuring plan. In the fourth quarter to further conform our expenses to revenue and to cease investment in the CMTS product line, we initiated a third restructuring plan that resulted in a charge in the amount of $1.3 million related to employee terminations

In the second, third and fourth quarters of 2004, we re-evaluated the first and second quarter 2004 restructuring charges for the employee severance, excess leased facilities and the aircraft lease termination. Based on market conditions, changes in estimates provided by our broker, and the terms of the aircraft sublease agreement, which we entered into in the third quarter of 2004, we increased the restructuring charge for the aircraft lease by a total of $1.0 million, the facilities accrual was increased $0.3 million and employee severance accrual was decreased by $0.2 million.

Net charges for the 2004 restructuring plans totaled $6.8 million, comprised of $2.0 million for employee terminations, $1.9 million in aircraft lease and $2.9 million for leased facilities. A total of 168 employees worldwide or 40% of our workforce has been terminated.

We anticipate the remaining 2004 restructuring accrual, net of the sublease income related to the aircraft, to be substantially utilized for servicing operating lease payments through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments through October 2009.

The amount of net charges accrued under the 2004 restructuring plans assumes that we will successfully sublease excess leased facilities. The reserve for the aircraft lease and excess leased facilities approximates the difference between our current costs for the aircraft and excess leased facilities and the estimated income derived from subleasing, which is based on information derived by our brokers that estimated real estate market conditions as of the date of our implementation of the restructuring plan and the time it would likely take to fully sublease the excess leased facilities. Even though it is our intent to sublease our interests in the excess facility at the earliest possible time, we cannot determine with certainty a fixed date by which such events will occur, if at all. In light of this uncertainty, we will continue to periodically re-evaluate and adjust the reserve, as necessary.

As of December 31, 2004, $3.3 million remained accrued for all of the 2004 plans. This is comprised of $0.6 million for employee termination, $0.7 million for aircraft lease and $2.0 million for facilities.

23

--------------------------------------------------------------------------------

Table of Contents

During the first quarter of 2003, our board of directors approved a restructuring plan (2003 Plan) to conform our expenses to our revenue levels and to better position us for future growth and eventual profitability. We incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 Plan. As of December 31, 2003, 81 employees had been terminated and we had paid $2.7 million in termination costs. In the second quarter of 2003, we reversed $86,000 of previously accrued termination costs due to a change in estimate. At December 31, 2004, no restructuring charges remained accrued for the 2003 Plan.

During 2001, a restructuring plan (2001 Plan) was approved by our board of directors and we incurred restructuring charges in the amount of $12.7 million of which $1.8 million remained accrued at December 31, 2004 for excess leased facilities in Israel. During 2002, another restructuring plan (2002 Plan) was approved by the board of directors, which increased the reserve for excess leased facilities due to the exiting of additional space within the same facility in Israel. We incurred restructuring charges in the amount of $3.6 million for the 2002 Plan. Improving real estate market conditions in Israel in the early part of 2004 gave rise to our improved tenant sublease assumptions thereby creating a change in estimate in the 2001 Plan and 2002 Plans of $1.5 million, leaving an accrual of $1.8 million at December 31, 2004 for these plans.

The restructuring accrual as of December 31, 2004 for all plans totals $5.1 million of which $0.6 million is accrued for employee terminations, $0.7 million for aircraft lease termination and $3.8 million for leased facilities. The balance of the employee termination charges were paid in the first quarter of 2005.

Executive Severance In June 2004, we entered into an employment agreement with an executive officer. This executive officer resigned effective as of October 1, 2004, and we recorded a severance provision of $1.4 million related to termination costs for this officer in the third quarter of 2004. Most of the severance costs related to this officer were paid in the fourth quarter of 2004 with nominal amounts for employee benefits payable into the fourth quarter of 2005.

In June 2004, we entered into separation agreements with two executive officers. One officer resigned in the second quarter of 2004 and the other officer resigned in the third quarter of 2004. We recorded a severance provision of $1.7 million related to termination costs for these officers in the second quarter of 2004. Most of the severance costs were paid in the third quarter of 2004 with nominal amounts for employee benefits payable through the third quarter of 2005.

In August 2004, we entered into an employment agreement with another executive officer. The executive officer resigned effective as of December 31, 2004. We recorded a severance provision of $403,000 related to termination costs for this officer in the fourth quarter of 2004. Most of the severance costs related to this officer were paid in the first quarter of 2005 with nominal amounts for employee benefits payable into the fourth quarter of 2005.

Asset Write-offs As a result of CMTS product line restructuring activities in 2004, we recognized a fixed asset impairment charge of $2.4 million. The impairment charge reflects a write-down of the assets carrying value to a fair value based on a third party valuation. In connection with our restructuring activities in 2003, we wrote-off $0.4 million of fixed assets which were determined to have no remaining useful life.

Non-operating Expenses

|  | For the Year Ended December 31, | | |
|  | 2004 | 2003 | Annual % Change 2004/2003 |
|  | (In thousands) | | |
| Interest income | $ 1,982 | $ 2,917 | (32)% |
| Interest expense | $ (3,294) | $(3,279) | 0% |
| Other income | $ 1,566 | $ 2,424 | (35)% |

Interest Income Interest income decreased 32% to $2.0 million in 2004 compared to $2.9 million in 2003. The decrease in interest income was primarily due to lower invested average cash balances due to usage of cash for operations, restructuring and management severances.

24

--------------------------------------------------------------------------------

Table of Contents

Interest Expense Interest expense, which related primarily to interest on our Notes due in 2007, remained constant at $3.3 million during 2004 compared to $3.3 million in 2003.

Other Income Other income is generally comprised of realization of foreign currency transactions and realized gains or losses on investments. Other income of $1.6 million in 2004 is primarily comprised a gain on the sale of certain foreign subsidiaries.

Income Taxes

| | For the Year Ended December 31, | |
|---|---|---|
| | 2004 | 2003 |
| | (In thousands) | |
| Income tax (expense) benefit | $ 76 | $(316) |

We have generated losses since our inception. In 2004 we recorded an income tax benefit of $76,000 and in 2003 we recorded an income tax expense of $316,000, which was related primarily to foreign taxes. The current year foreign tax expense of approximately $0.3 million is offset by a tax benefit resulting principally from the reversal of tax accruals due to the sale of certain subsidiaries.

Comparison of the years ended December 31, 2003 and 2002

Revenues

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2003 | 2002 | 2003/2002 |
| | (In thousands) | | |
| Revenues | $133,485 | $129,403 | 3% |

Revenues consist primarily of sales of products to new and existing customers providing broadband services. Prior to December 31, 2002, we operated primarily in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). Beginning in 2003, the Telecom segment no longer met the quantitative threshold for disclosure and we operated as one business segment.

Our revenues increased 3% to $133.5 million for the year ended December 31, 2003 from $129.4 million in 2002, primarily due to increased sales of DOCSIS CMTS and HAS products, particularly in the second half of 2003. The revenue increase derived from increased sales of DOCSIS CMTS and HAS products was partially offset by declining sales of our proprietary S-CDMA, CMTS and HAS products and Telecom products.

Revenues by Groups of Similar Products

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2003 | 2002 | 2003/2002 |
| | (In thousands) | | |
| Revenues by product: | | | |
| CMTS | $ 47,486 | $ 28,159 | 69% |
| HAS | 64,808 | 69,469 | (7)% |
| DVS | 17,710 | 20,832 | (15)% |
| Other | 3,481 | 10,943 | (68)% |
| Total | $ 133,485 | $129,403 | 3% |

25

--------------------------------------------------------------------------------

Table of Contents

CMTS product revenues increased 69% in 2003 compared to 2002, due to increased deployment of our DOCSIS products into new markets, primarily in the U.S.

HAS product revenues decreased 7% in 2003 compared to 2002, due to a continuing decline in ASPs, partially offset by increases in the volume of modem sales. The number of DOCSIS modems sold increased from 0.4 million units in 2002 to 1.2 million units in 2003. The intensely competitive nature of the market for broadband products resulted in significant price erosion. HAS revenues also decreased due to the shift in product mix from our higher-priced proprietary S-CDMA modems to our lower-priced DOCSIS modems. The number of S-CDMA modems sold decreased from 0.4 million units in 2002 to 0.1 million units in 2003.

Revenues from video products decreased 15% in 2003 compared to 2002, due to decreased sales to U.S. MSOs. We attribute this decline to lower capital spending by MSOs, primarily in the first half of 2003.

Other product revenues decreased 68% in 2003 compared to 2002, due to decreased sales of our legacy Telecom products.

Revenues by Geographic Region

|  | For the Year Ended December 31, | | Annual % Change 2003/2002 |
|  | 2003 | 2002 | |
|  | (In thousands) | | |
| Revenues by geographic areas: | | | |
| United States | $ 74,341 | $ 41,150 | 81% |
| Americas excluding United States | 3,713 | 20,530 | (82)% |
| EMEA excluding Israel | 17,635 | 11,381 | 55% |
| Israel | 7,038 | 8,283 | (15)% |
| Asia excluding Japan | 9,575 | 11,845 | (19)% |
| Japan | 21,183 | 36,214 | (42)% |
| Total | $ 133,485 | $129,403 | 3% |

Revenues in the United States increased 81% to $74.3 million in 2003, up from $41.2 million in 2002, due to increased sales of DOCSIS 2.0 CMTSs, modems and video products to U.S. MSOs. During 2003, we emphasized sales to our U.S., EMEA, Japanese and other Asian customers while placing a lower emphasis on other locations such as Canada, Israel and South America.

Significant Customers

Three customers, Adelphia, Cross Beam Networks and Comcast, (22%, 16% and 13%, respectively) each accounted for more than 10% of our total revenues for the year ended December 31, 2003. One customer, Cross Beam Networks, accounted for 28% of our total revenues for the year ended December 31, 2002.

Related Party Revenues

|  | For the Year Ended December 31, | | Annual % Change 2003/2002 |
|  | 2003 | 2002 | |
|  | (In thousands) | | |
| Related party revenues: | | | |
| Rogers revenues | $ 1,453 | $ 8,040 | (82)% |
| Harmonic revenues | 3,241 | 1,057 | 207% |
| Total related party revenues | $ 4,694 | $ 9,097 | (48)% |

Related party revenues decreased 48% in 2003 compared to 2002. Related party revenues in 2002 included revenues from Rogers and Harmonic. Alek Krstajic, a member of our board of directors, was the

26

--------------------------------------------------------------------------------

Table of Contents

Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. Lewis Solomon, another member of our board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2003 and 2002. The decline in related party revenues was primarily due to the classification of revenues attributable to Rogers as general revenues instead of related party revenues after the first quarter of 2003, as well as lower overall sales to Rogers, offset by an increase of sales to Harmonic in 2003. None of our related parties is a supplier to us.

    In December 2001, we entered into co-marketing arrangements with Shaw and Rogers. We paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, we began amortizing these prepaid assets and charging them against related party revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." We charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003. Amounts charged against total revenues in the year ended December 31, 2002 and December 31, 2003, totaled approximately $2.8 million and $5.6 million, respectively. Of the co-marketing amortization charged to total revenues, $0.15 million and $0.3 million were charged to related party revenues in the years ended 2003 and 2002, respectively.

Cost of Goods Sold and Gross Profit

|  | For the Year Ended December 31, | | |
|  | 2003 | 2002 | Annual % Change 2003 |
|  | (In thousands) | | |
| Cost of product revenues | $  99,261 | $ 92,497 | 7% |
| Cost of related party revenues | 1,773 | 8,452 | (79)% |
| Total cost of goods sold | $ 101,034 | $100,949 | -- |
| Gross profit | $  32,451 | $ 28,454 | 14% |

    In 2003, cost of goods sold was approximately 76% of revenues compared to 78% of revenues in 2002. Cost of goods sold in 2003 and 2002 included the benefit of reversals of approximately $10.0 million and $15.3 million, respectively, in special charges taken in 2001 and 2000 for vendor cancellation charges and inventory previously reserved for excess and obsolete. We reversed those provisions as we were able to sell inventory originally considered to be in excess and obsolete. In addition, we were able to negotiate downward certain vendor cancellation claims to terms more favorable to us. Additionally, during 2003 and 2002, we recorded inventory charges of $4.1 million and $6.1 million, respectively, to reduce some of our inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value in 2002 as ASPs fell below the cost of these products and to record charges for excess and obsolete inventory.

    In 2003, related party cost of revenues decreased compared to 2002 due to increased sales of our higher margin DVS products to Harmonic in 2003 as well as fewer sales of our lower margin HAS products to Rogers classified as related party revenue in 2003 compared to 2002. Additionally, in the first quarter of 2003, we sold $0.8 million of software to Rogers, which was classified as related party revenues, with no cost of related party revenues associated with this sale.

    Our gross profit increased 14% to $32.5 million or 24% of sales in the year ended December 31, 2003 compared to $28.5 million, or 22% of sales in 2002. The increase in our gross profit was primarily related to an improved sales mix, with higher margin video and CMTS products constituting a larger proportion of sales particularly in the second half of 2003, and improved product manufacturing costs for modems.

27

--------------------------------------------------------------------------------

Table of Contents

Operating Expenses

| | For the Year Ended December 31, | | Annual % Change |
| | 2003 | 2002 | 2003/2002 |
| --- | --- | --- | --- |
| | (In thousands) | | |
| Research and development | $ 42,839 | $58,696 | (27)% |
| Sales and marketing | $ 26,781 | $35,704 | (25)% |
| General and administrative | $ 12,127 | $14,715 | (18)% |

Research and Development Research and development expenses decreased 27% to $42.8 million or 32% of sales in the year ended December 31, 2003 from $58.7 million or 45% of sales in 2002. The $15.9 million decrease in research and development expenses was attributable to $4.2 million of reductions in employee related expenses, partially offset by an increase of $0.1 million attributable to an executive incentive plan implemented in 2003. The decrease in research and development expense also included reductions of $0.6 million of outside engineering consultants and $7.1 million of reductions in purchases of materials, costs incurred to develop prototypes, and other research and development expenses. Additionally, we have reduced research and development efforts by $4.1 million due to the elimination of our Telecom-related products.

Sales and Marketing Sales and marketing expenses decreased by $8.9 million to $26.8 million or 20% of sales in the year ended December 31, 2003 from $35.7 million or 28% of sales in 2002. The decrease in sales and marketing expenses was primarily due to $5.2 million in reduced employee expenses due to lower headcount, partially offset by an increase of $0.3 million attributable to an executive incentive plan. The decrease in sales and marketing expenses also included $0.8 million of decreased spending for outside consultants, $0.9 million of decreased travel costs, and $2.3 million of overall sales and marketing cost reductions.

General and Administrative General and administrative expenses decreased by $2.6 million or 18% of sales to $12.1 million or 9% of sales in the year ended December 31, 2003 from $14.7 million or 11% of sales in 2002. The decrease was primarily due to $1.4 million in reduced employee expenses due to lower headcount, partially offset by an increase of $0.4 million attributable to an executive incentive plan, $2.8 million of decreased spending for outside consultants, partially offset by $0.3 million of severance expense related to the termination of an executive officer and $0.9 million of overall general and administrative cost increases.

Restructuring Charges and Asset Write-offs

| | For the Year Ended December 31, | |
| | 2003 | 2002 |
| --- | --- | --- |
| | (In thousands) | |
| Restructuring charges | $ 2,745 | $ 3,641 |
| Restructuring (recovery) | (359) | -- |
| Long-lived assets written-off | 417 | 1,309 |
| Intangible assets written off | -- | 3,972 |
| Restructuring charges and asset write-offs | $ 2,803 | $ 8,922 |

Restructuring Charges During the first quarter of 2003, we initiated a restructuring program to align our expenses to our revenue levels and to better position us for future growth and eventual profitability. We incurred restructuring charges in the amount of $2.7 million related to employee termination costs. At December 31, 2003, no restructuring charges remain accrued, 81 of our employees have been terminated under the 2003 restructuring plan, and we paid $2.7 million in termination costs. In the second and third quarter of 2003, we reversed $0.4 million of previously accrued termination costs related to this restructuring.

In the third quarter of 2002, we initiated a restructuring program to conform our expense to our revenue levels and to better position us for future growth and eventual profitability. As part of this program, we restructured our worldwide operations including a worldwide reduction in workforce and the consolidation of

28

--------------------------------------------------------------------------------

Table of Contents

excess facilities. We incurred additional restructuring charges of $3.6 million in 2002. Of the total restructuring charge, $2.3 million was related to employee termination costs. The remaining $1.3 million related primarily to costs for excess leased facilities. During 2002, 153 employees had been terminated under the 2002 restructuring plan, and we made cash payments of $2.2 million against the restructuring accrual. Additionally, in 2002, we reclassified $0.1 million from employee termination costs to excess leased facilities costs.

In 2001 we incurred restructuring charges of $12.7 million. Of the total restructuring charges recorded, $3.2 million related to employee termination costs covering 293 technical, production, and administrative employees. The remaining $9.5 million of restructuring charges related primarily to costs for excess leased facilities. During 2003, we made cash payments and recoveries of $1.9 million against the restructuring accrual. As of December 31, 2003, restructuring charges of $3.3 million remained accrued, primarily related to excess facility costs. During 2003, we reversed $0.3 million of previously accrued termination costs due to a change in estimate.

Asset Write-offs In connection with our restructuring in 2003, we wrote-off $0.4 million of fixed assets which were determined to have no remaining useful life. In connection with our restructuring in 2002, we wrote-off $1.3 million of fixed assets which were determined to have no remaining useful life.

We adopted SFAS "Goodwill and Other Intangible Assets," (SFAS 142) on January 1, 2002. We tested goodwill for impairment using the two-step process prescribed in SFAS 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. We completed the initial goodwill impairment review as of the beginning of 2002, and found no impairment. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, we experienced a significant drop in our market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on our forecast, the estimated undiscounted future cash flows from the use of the goodwill would be less than its carrying amount. We determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill in 2002, of which $3.0 million was related to the Cable segment and $1.0 million was related to the Telecom segment.

Non-operating Expenses

|  | For the Year Ended December 31, | | Annual % Change 2003/2002 |
|---|---|---|---|
|  | 2003 | 2002 |  |
|  | (In thousands) | | |
| Interest income | $ 2,917 | $ 6,838 | (57)% |
| Interest expense | $ (3,279) | $(6,174) | (47)% |
| Other expense | $ (2,424) | $(4,145) | (42)% |
| Gain on early retirement of debt | $ -- | $49,089 | -- |

Interest Income Interest income decreased 57% to $2.9 million in 2003 compared to $6.8 million in 2002. The decrease in interest income was primarily due to lower invested average cash balances due to the use of cash to repurchase Convertible Subordinated Notes (Notes) in 2002 and usage of cash for operations, as well as lower interest rates.

Interest Expense Interest expense, which related primarily to interest on our Notes due in 2007, decreased 47% to $3.3 million during 2003 compared to $6.2 million in 2002, primarily due to the repurchase of $109.1 million of our Notes in 2002.

Other Expense Other expense is generally comprised of realization of foreign currency transactions and realized gains or losses on investments. Other expense of $2.4 million in 2003 was primarily comprised of a $0.9 million gain on the sale of the Miniplex product line and related inventory to Verilink, a $0.6 million reversal of a liability associated with an overseas government grant which is now satisfied, and $0.7 million

29

--------------------------------------------------------------------------------

from a favorable legal settlement. Other expense in 2002 included a write-down of a $4.5 million long-term investment.

Gain on early retirement of debt In 2002, we repurchased approximately $109.1 million of our Notes for $57.6 million in cash, resulting in a gain included in operations of approximately $49.1 million net of related unamortized issuance costs of $2.4 million. We did not repurchase any Notes during 2003.

Income Taxes

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2003 | 2002 |
| | (In thousands) | |
| Income tax expense | $ (316) | $(238) |

We have generated losses since our inception. In 2003 and 2002, we recorded an income tax expense of $316,000 and $238,000, respectively, which was related primarily to foreign taxes.

Litigation

See "Item 3 Legal Proceedings" for a discussion of litigation in which we are involved.

Off-Balance Sheet Financings and Liabilities

Other than lease commitments and unconditional purchase obligations incurred in the normal course of business, we do not have any off-balance sheet financing arrangements or liabilities, guarantee contracts, retained or contingent interests in transferred assets or any obligation arising out of a material variable interest in an unconsolidated entity. We do not have any majority-owned subsidiaries that are not included in the consolidated financial statements.

Liquidity and Capital Resources

At December 31, 2004, we had approximately $43.2 million in cash and cash equivalents and $54.5 million in short-term investments.

Cash used in operating activities for the year ended December 31, 2004 decreased to $39.5 million compared to $68.4 million used in 2003. In 2004, significant uses of cash from operating activities included $36.5 million net loss from operations, $18.2 million decrease in accounts payable, $2.3 million of settlement and payment of vendor cancellation liabilities offset by a decrease of $10.1 million in accounts receivable, an increase of $12.8 million in inventory, offset by a $12.0 million inventory provision. In 2003, significant uses of cash from operating activities included $50.4 million loss from operations, a $12.6 million increase in accounts receivable, $12.3 million of settlement and payment of vendor cancellation liabilities, and a $12.2 million increase in gross inventory. Accounts receivable increased as our sales in the fourth quarter of 2003 increased when compared to the same period in 2002.

Cash provided by investing activities in 2004 was $50.7 million compared to cash used in investing activities of $23.3 million in 2003. Investing activities consisted primarily of net sales of short-term investments and $2.7 million and $3.8 million used in the purchases of property and equipment in 2004 and 2003, respectively. Cash provided by investing activities increased in 2004 due to our usage of investments to fund operations and movement to cash and cash equivalents from short-term investments.

Cash provided by financing activities was $1.6 million in 2004 compared to $3.7 million of cash provided by financing activities in 2003. In 2004 we received proceeds from the exercise of stock options and the sale of shares of common stock through our Employee Stock Purchase Plan of $1.7 million compared to $3.7 million in 2003.

In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of approximately $484.4 million. The Notes are our general unsecured obligation and are subordinated in right of payment to all

30

Table of Contents

of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity on August 2007, unless previously redeemed or repurchased. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million.

Through December 31, 2004, we had repurchased approximately $434.9 million of the Notes. No Notes were repurchased in 2004 or 2003.

We believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months. As noted previously, we are working to achieve profitability. To do so, we will need to increase revenues, primarily through sales of more profitable products, and decrease costs. Starting in the first quarter of 2004 and continuing throughout 2004, we initiated a series of worldwide reductions in force of approximately 168 employees, or 40% of the workforce, consolidations of certain facilities, and reductions or eliminations of discretionary costs and programs. These statements are forward-looking in nature and involve risks and uncertainties. Actual results may vary as a result of a number of factors, including those discussed under the risk factor "Our Operating Results May Fluctuate" below and elsewhere. We may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. We may seek to raise additional funds through private or public sales of securities, strategic relationships, bank debt, and financing under leasing arrangements or otherwise. If additional funds are raised through the issuance of equity securities, the percentage ownership of our current stockholders will be reduced, stockholders may experience additional dilution or such equity securities may have rights, preferences or privileges senior to those of the holders of our common stock. We cannot assure that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

On October 7, 2003, we filed a registration statement on Form S-3 with the SEC. This shelf registration statement, which was declared effective by the SEC on November 4, 2003, will allow us to issue various types of securities, including common stock, preferred stock, debt securities and warrants to purchase common stock from time to time up to an aggregate of $125.0 million, subject to market conditions and our capital needs.

Contractual Obligations

The following summarizes our contractual obligations at December 31, 2004, and the effect such obligations are expected to have on our liquidity and cash flows in future periods (in millions):

|  | | Payments Due by Period | | |
| --- | --- | --- | --- | --- |
|  | Total | Less than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| Unconditional Purchase Obligations | $ 30.0 | $ 30.0 | $ -- | $ -- | $ -- |
| Long Term Debt and other Long Term Obligations | 67.2 | 0.1 | 65.8 | -- | 1.3 |
| Facilities Operating Lease Obligations | 18.3 | 6.0 | 6.5 | 5.6 | 0.2 |
| Aircraft Operating Lease Obligations | 3.1 | 1.5 | 1.6 | -- | -- |
| Total Contractual Commitments | $118.6 | $ 37.6 | $73.9 | $ 5.6 | $ 1.5 |

We have unconditional purchase obligations to certain of our suppliers that support our ability to manufacture our products. The obligations require us to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2004, we had approximately $30.0 million of purchase obligations, of which $0.5 million is included in the Consolidated Balance Sheets as accrued vendor cancellation charges, and the remaining $29.5 million is attributable to open purchase orders. The remaining open purchase order obligations are expected to become payable at various times through 2005.

31

--------------------------------------------------------------------------------

Table of Contents

Other commercial commitments, primarily required to support operating leases, are as follows (in millions):

| | Total Amounts Committed | Less than 1 Year | 1-3 Years | 4-5 Years | Over 5 Years |
|---|---|---|---|---|---|
| | | | Amount of Commitment Expiration Per Period | | |
| Deposits | $   7.5 | $   0.0 | $   7.5 | $   -- | $   -- |
| Standby Letters of Credit | 0.5 | 0.0 | 0.2 | 0.3 | -- |
| Total Commercial Commitments | $   8.0 | $   -- | $   7.7 | $   0.3 | $   -- |

In 2002, we entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit. The letter of credit was reduced to $7.5 million in February 2003. During 2004 the $7.5 million letter of credit was converted to a cash deposit. This lease commitment is included in the table above. In March 2004, in connection with our worldwide restructuring, we notified the lessor of our intentions to locate a purchaser for our remaining obligations under this lease. In August 2004, we entered into a 28 month aircraft sublease terminating on December 31, 2006 From time to time, our Chairman of the Board, Dr. Rakib, used the aircraft for personal use and the charge is reported by him as compensation. Dr. Rakib did not use the aircraft for personal use in fiscal 2004 and was charged approximately $62,000 for personal aircraft usage during fiscal 2003.
Critical Accounting Policies

We consider certain accounting policies related to our use of estimates, revenue recognition, bad debt reserves, inventory valuation, impairment of long-lived assets, warranty returns, restructuring, income taxes and contingencies to be critical policies due to the estimation processes involved in each. We discuss each of our critical accounting policies, in addition to certain less significant accounting policies, with senior members of management and the audit committee, as appropriate.

Use of Estimate The preparation of the consolidated financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to establish accounting policies that contain estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. These policies include:

*revenue recognition;

*the allowance for doubtful accounts, which impacts revenue;

*the valuation of exposures associated with the contract manufacturing operations and estimating future warranty costs, which impact cost of good sold and gross margins; and

*the valuation of certain long-lived assets, especially goodwill and other purchased intangible assets, which has resulted in impairment, which impacts operating expenses.

We employ other equally important accounting policies and practices, which may not require us to make significant estimates or assumptions. Despite our intention to establish accurate estimates and assumptions, actual results could differ from those estimates under different assumptions or conditions.

Revenue Recognition We recognize revenue in accordance with SEC Staff Accounting Bulletin No. 104 "Revenue Recognition" (SAB 104). SAB 104 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services were rendered; (3) the selling price is fixed or determinable; and (4) collectibility is reasonably assured.

Contracts and customer purchase orders are used to determine the existence of an arrangement. Delivery occurs when product is delivered to a common carrier. Certain of our products are delivered on an FOB

32

--------------------------------------------------------------------------------

destination basis. We defer our revenue associated with these transactions until the delivery has occurred to the customers' premises. We assess whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. We assess collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

We sell our products directly to broadband service providers, and to a lesser extent resellers. Revenue arrangements with resellers are recognized when product is shipped to the resellers as we do not grant return rights beyond those provided by the warranty.

Our service revenue, which is sold separately from product lines represented approximately 2.4% and 1.3% of revenue for the year ended December 31, 2004 and 2003, respectively. It is generated from service arrangements for product support, which is recognized ratably over the term of the arrangement, typically one year. Product support includes internet access to technical content, software updates, as well as internet and telephone access to technical support personnel.

Allowance for Doubtful Accounts We perform ongoing credit evaluations of our customers and generally require no collateral. We evaluate our trade receivables based upon a combination of factors. Credit losses have historically been within management's expectations. When we become aware of a customer's inability to pay, such as in the case of bankruptcy or a decline in the customer's operating results or financial position, we record an allowance to reduce the related receivable to an amount we reasonably believe is collectible. We maintain an allowance for potentially uncollectible accounts receivable based on an assessment of collectibility. We assess collectibility based on a number of factors, including history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of our client's customers and other factors that we believe are relevant. If circumstances related to a specific customer change, our estimates of the recoverability of receivables could be further reduced. In 2004, we experienced better than expected collections of $2.1 million offset by write-offs of $201,000. At December 31, 2004 and 2003, the allowance for potentially uncollectible accounts was $1.3 million and $3.6 million, respectively.

Inventory Valuation We record losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. Our policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires us to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid technological change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by our customers, we believe that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that we use in the valuation of inventory are the basis for the revenue forecast, which is also consistent with our short-term manufacturing plan. Based on this analysis, we reduce the cost of inventory that we specifically identify and consider obsolete or excessive to fulfill future sales estimates. We define excess inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using our best estimate of future demand at the time, based upon information then available.

We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. During the normal course of business, in order to manage manufacturing lead times (often ranging from three to six months) and to help ensure adequate component supply, we enter into agreements with contract manufacturers and suppliers that either allow them to procure inventory based upon criteria as defined by us or that establish the parameters defining our component supply

33

--------------------------------------------------------------------------------

Table of Contents

requirements. If we were to curtail or cease production of certain products or terminate these agreements, we may be liable for vendor cancellation charges.

We accrue for vendor cancellation charges (which increase cost of goods sold) which represent management's estimate of our financial exposure to vendors should our management curtail or cease production of certain products or terminate a vendor or supplier agreement. Estimates of exposure are determined using vendor inventory data. Should we change our short-term manufacturing plans such that further products or components would no longer be used, additional vendor cancellation charges may occur. At December 31, 2004, accrued vendor cancellation charges were $0.5 million which are expected to become payable in the next three to six months. From time to time we have been able to reverse portions of our vendor cancellation accrual as we were able to negotiate downward certain vendor cancellation charges. Such reversals of vendor cancellation charges cause a decrease in cost of goods sold in the period during which such charges are reversed. For the twelve months ended December 31, 2004, we reversed approximately $2.3 million of vendor cancellation charges as a result of consumed inventory and favorable negotiations with vendors.

Impairment of Long-Lived Assets Our long-lived assets have principally included long-term investments, goodwill and other intangible assets. Our estimate of the fair value of the long-term investments was dependent on the performance of the companies in which we have invested, as well as the volatility inherent in the external markets for these investments. If the companies' business forecasts were not met, we had to record additional impairment charges. At December 31, 2003, all of our long-term investments, goodwill and other intangible assets had been written-off and we had no such assets recorded on the Consolidated Balance Sheets at December 31, 2004 and 2003

Warranty Reserves We provide a standard warranty for most of our products, ranging from one to five years from the date of purchase. We provide for the estimated cost of product warranties at the time revenue is recognized. Our warranty obligations are affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Our estimate of costs to service our warranty obligations is based on historical experience and our expectation of future conditions. Should actual product failure rates, material usage or service delivery costs differ from our estimates, revision to the warranty liability would be required, resulting in decreased gross profits.

Restructuring and Other Related Charges During 2004, 2003 and 2002 we implemented restructuring programs to focus and streamline our business and reduce operating expenses. In connection with these programs, we reduced headcount, abandoned facilities and wrote off inventory. As a result of these actions, we recorded restructuring and other related charges primarily consisting of cash severance payments made to terminated employees, lease payments related to property abandoned as a result of our facilities consolidation and lease payments related to an aircraft lease. Each reporting period, we review these estimates based on the execution of our restructuring plans and changing market conditions, such as the real estate market and other assumptions and, as needed, record appropriate adjustments. To the extent that these assumptions change, the ultimate restructuring expenses could vary.

Contingencies We are subject to proceedings, lawsuits and other claims related to labor, acquisitions and other matters. We are required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. A determination of the amount of reserves required, if any, for these contingencies is made after careful analysis of each individual issue. The required reserves may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters, any of which may result in higher net loss.

Taxes We determine our provision for income taxes using the liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax effects of temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Future tax benefits of tax loss and credit carryforwards are also recognized as deferred tax assets. We evaluate the realizability of our deferred tax assets by assessing the likelihood of future profitability and available tax planning strategies that could be implemented to realize our net deferred tax assets. The ultimate realization of our net deferred tax assets will require profitability. We have assessed the future profit plans and tax

34

--------------------------------------------------------------------------------

Table of Contents

planning strategies together with the years of expiration of carryforward benefits, and have concluded that the deferred tax assets will be not be currently realized and have recorded a valuation allowance against the entire amount of the deferred tax assets. Should our operating performance improve future assessments could conclude that a reduction to the valuation allowance will be needed to reflect deferred tax assets. In addition, we operate within multiple taxing jurisdictions and are subject to tax audits in these jurisdictions. These audits can involve complex issues, which may require an extended period of time to resolve. However, we believe we have made adequate provision for income taxes for all years that are subject to audit.

Impact of Recently Issued Accounting Standards

On December 16, 2004, the Financial Accounting Standards Board (FASB) issued FASB Statement No. 123 (revised 2004) (SFAS 123(R)), Share-Based Payment, which is a revision of FASB Statement No. 123, Accounting for Stock-Based Compensation. SFAS 123(R) supersedes APB Opinion No. 25, Accounting for Stock Issued to Employees, and amends FASB Statement No. 95, Statement of Cash Flows. Generally, the approach in SFAS 123(R) is similar to the approach described in Statement 123. However, SFAS 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. SFAS 123(R) must be adopted no later than July 1, 2005. Early adoption will be permitted in periods in which financial statements have not yet been issued. We expect to adopt SFAS 123(R) on July 1, 2005. A component of SFAS 123(R) includes one of the following options: (a) modified-prospective method, (b) the modified-retrospective method, restating all prior periods or (c) the modified-retrospective method, restating only the prior interim periods of 2005. A determination as to which of the three options we will adopt will be made at a later date.

As permitted by SFAS 123, we currently account for share-based payments to employees using APB Opinion No 25's intrinsic value method and, as such, generally recognize no compensation expense for employee stock options. Accordingly, the adoption of SFAS 123(R)'s fair value method will have a significant impact on our result of operations, although it will have no impact on our overall financial position. The impact of adoption of SFAS 123(R) cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had we adopted SFAS 123(R) in prior periods, the impact of that standard would have approximated the impact of SFAS 123 as described in the disclosure of pro forma net income and earnings per share in Note 2 to our consolidated financial statements. SFAS 123(R) also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as required under current literature. This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. While we cannot estimate what those amounts will be in the future (because they depend on, among other things, when employees exercise stock options), we have not recognized any operating cash flows for such excess tax deductions in any of the periods presented.

--------------------------------------------------------------------------------

Table of Contents

RISK FACTORS

You should carefully consider the risks described below before making an investment decision. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment.

Risks Related to Our Business

We have a history of losses and may continue to incur losses in the future

It is difficult to predict our future operating results. We began shipping products commercially in June 1997, and we have been shipping products in volume since the first quarter of 1998. As of December 31, 2004, we had an accumulated deficit of approximately $1.0 billion. We believe that we will continue to experience challenges in selling our products at a profit and may continue to operate with net losses for the foreseeable future. In the past few years, we experienced a decrease in revenues compared to 2001 and 2000, which was, in large part, due to the erosion of ASPs of our products due to our transition from a proprietary platform to the DOCSIS standards platform and a drop in CMTS sales volume. Although our revenues increased throughout 2004 as compared to 2003 and 2003 compared to 2002, we still incurred losses of $36.5 million and $50.4 million, respectively, in the twelve months ended December 31, 2004 and 2003. As a result of the operating deficiencies, we have had to use available cash and cash equivalents to supplement the operation of our business. Cash used in operating activities for the twelve months ended December 31, 2004 was $39.5 million compared to $68.4 million used in the same period in 2003. Additionally, we generally have been unable to significantly reduce our short-term expenses in order to compensate for unexpected decreases in anticipated revenues or delays in generating anticipated revenues. For example, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price irrespective of whether we can subsequently use such quantities in our products. Further, we have experienced and will likely continue to experience declining ASPs of our products. We record an inventory charge to reduce our inventory to the lower of cost or market if ASPs fall below the cost of these products. In addition, we have significant operating lease commitments for facilities and equipment that generally cannot be cancelled in the short-term without substantial penalties.

Our business may be adversely affected by delays in or our failure to, commercialize new products, or reduce the cost of manufacturing our current products. Moreover, given the conditions in the broadband equipment market, the profit potential of our business remains unproven.

We may experience fluctuations in our operating results and face unpredictability in our future revenues

Our quarterly revenues have fluctuated and are likely to continue to fluctuate significantly in the future due to a number of factors, many of which are outside our control. Factors that affect our revenues include, among others, the following:

*variations in the timing of orders and shipments of our products;

*variations in the size of the orders by our customers and pricing concessions on volume sales;

*competitive market conditions;

*unpredictable sales cycles;

*new product introductions by competitors or by us;

*delays in our introduction of new products;

*delays in our introduction of added features to our products;

*delays in the commercialization of products that are competitive in the marketplace;

*delays in our receipt of and cancellation of orders forecasted by customers;

36

--------------------------------------------------------------------------------

Table of Contents

*variations in capital spending budgets of cable operators and other broadband
 service providers;

*international conflicts, including the continuing conflict in Iraq, and acts of
 terrorism and the impact of adverse economic, market and political conditions
 worldwide; and

*ability of our products to be qualified or certified as meeting industry
 standards.

     Our quarterly results are affected by the gross margin we achieve for the
quarter relative to our gross revenues. A variety of factors influence our gross
margin for a particular quarter, including, among others, the following:

*the sales mix of our products;

*the volume of products manufactured;

*the type of distribution channel through which we sell our products;

*the ASPs of our products;

*the ability to manage excess and obsolete inventory;

*delays in reducing the cost of our products;

*the costs of manufacturing our products; and

*the effectiveness of our cost reduction measures.

     We often recognize a substantial portion of our revenues in the last month
of the quarter. We establish our expenditure levels for product development and
other operating expenses based on projected sales levels, and expenses are
relatively fixed, particularly in the short term. For example, a significant
percentage of these operating expenses are fixed due to operating leases for our
facilities and equipment. Also, we have fixed commitments with some of our
suppliers that require us to purchase minimum quantities of their products at a
specified price. Because in the past, we have been unable to use all of the
products that we purchased from our suppliers, we have taken vendor cancellation
charges as a result of these fixed commitments, and we may have to take
additional charges in the future if we are unable to use all of the products
that we purchase from our suppliers. As of December 31, 2004, $30.0 million of
purchase obligations were outstanding. Accordingly, variations in timing of
sales can cause significant fluctuations in operating results. In addition,
because a significant portion of our business is derived from orders placed by a
limited number of large customers, the timing of such orders can also cause
significant fluctuations in our operating results. Our expenses for any given
quarter are typically based on expected sales and if sales are below
expectations; our operating results may be adversely impacted by our inability
to adjust spending to compensate for the shortfall. Moreover, our research and
development expenses fluctuate in response to new product development, and
changing industry requirements and customer demands.
     Additionally, the unit ASPs of our products declined considerably in 2004,
2003, and 2002, and we anticipate that unit ASPs of our products will continue
to decline in the future. This has caused and will continue to cause a decrease
in our gross margins if we are unable to offset the decline in ASPs with cost
reduction measures. In addition, the gross margins we realize from the sale of
our products are affected by the mix of product sales between higher margin,
lower volume head-end equipment, such as our DVS products and applications, and
lower margin, higher volume HAS products, such as modems. We are attempting to
increase our gross margin by shifting our product mix from HAS revenues to
higher margin DVS product and application revenues and ceasing investment in our
CMTS product line. However, there are no assurances that we will succeed. For
2005, we expect that sales of our low-margin HAS products will continue to make
up a significant portion of our revenues. Moreover, we are in the early stages
of development with respect to our DVS product line. Historically, DVS product
revenues represented less than 30% of our total revenues. If our DVS product
line does not receive broader market acceptance and we do not generate a greater
percentage of total revenues from DVS product revenues, we will not succeed in
greatly improving our gross margin.

                                      37

--------------------------------------------------------------------------------

Table of Contents

**We are dependent on a small number of customers and resellers and our business could be harmed by the loss of any of these customers or reductions in their purchasing volumes**

Our customers have undergone and continue to undergo significant consolidation in both North America and internationally, as a limited number of cable operators control an increasing number of systems. For example, the top nine cable operators in the United States operate systems that service approximately 90% of homes that receive cable services in the United States. As a result of the consolidation among cable operators, our revenue has been and will continue to be dependent on sales to the few leading cable operators worldwide. Two customers, Adelphia and Comcast, (18% and 12%, respectively), accounted for 10% or more of total revenues, for the twelve months ended December 31, 2004. Adelphia is not expected to be a customer in 2005 due to our decision to cease investment in our CMTS product line and this may have a material adverse effect on our business or results of operations in 2005. Three customers, Adelphia, Cross Beam Networks and Comcast, (22%, 16% and 13%, respectively), accounted for 10% or more of total revenues, for the twelve months ended December 31, 2003. As is common in our industry, we typically do not enter into contracts with our customers in which they commit to purchase products from us. Typically, our sales are made on a purchase order or system contract basis, and none of our customers has entered into a long-term agreement requiring it to purchase our products. Moreover, we do not typically require our customers to purchase a minimum quantity of our products, and our customers can generally cancel or significantly reduce their orders on short notice without significant penalties. The loss of any of our customers can have a material adverse effect on our results of operations. Further, any reduction in orders from a given customer can likewise have a material adverse affect on our results of operations.

Significant sales of our DVS products are made to a small number of resellers, who often incorporate our DVS products and applications in systems that are sold to an end-user customer, which is typically a cable operator, satellite provider or broadcast operator. If one or more of these resellers develop their own products or elect to purchase similar products from another vendor, such an action may have a significant impact on our revenue and results of operations.

Also, we may not succeed in attracting new customers as many of our potential customers have pre-existing relationships with our current or potential competitors and the continued consolidation of the cable industry reduces the number of potential customers. To attract new customers, we may be faced with intense price competition, which may affect our gross margins.

We may also lose existing customers or experience declining business from our existing customers because of our decision to cease investment in our CMTS product line. For example, Adelphia, one of our largest CMTS customers, indicated that it will no longer purchase CMTS products from us and may no longer purchase HAS or DVS products from us. The loss of Adelphia and the loss of any additional CMTS customers may be material and could materially adversely affect our business and results of operations, especially if we are unable to offset such losses with increased revenue from our DVS and HAS products.

**Recent changes in senior management and the reductions in workforce associated with our restructuring efforts could disrupt the operation of our business, distract our management from focusing on revenue- generating efforts, result in the erosion of employee morale, and impair our ability to respond rapidly to growth opportunities in the future**

We have experienced a number of recent changes in senior management and other key personnel. Our Chief Executive Officer, President and Chief Technology Officer, Chief Operating Officer, Chief Financial Officer and General Counsel all resigned within the latter half of 2004. Our new Chief Executive Officer was appointed in September 2004 and our new Chief Financial Officer was appointed in late November 2004. We also have recently experienced increased turnover in our video engineering group and finance organization. The recruitment and retention of a new senior management staff and turnover in key personnel has created and could continue to create a number of transitional challenges for us. These transitional issues have caused, and may cause, disruptions to our business. We cannot be assured that a smooth transition of our senior management staff has occurred or that we have taken the necessary steps to affect an orderly continuation of our operations during the transitional period. Further, the process of locating personnel with the combination

38

--------------------------------------------------------------------------------

Table of Contents

of skills and attributes required to carry out our goals and integrating such personnel once they are recruited is often lengthy. We cannot be assured that the integration of our new senior management staff will occur in a timely manner, or that such integration will not present additional transitional challenges for us or adversely affect the operation of our business.

Moreover, we have implemented a number of restructuring plans since 2001, including the most recent restructuring activities in 2004 which has resulted in personnel reduction of 40%. The employee reductions and changes in connection with our restructuring activities, as well as future changes in senior management and key personnel, could result in an erosion of morale, and affect the focus and productivity of our remaining employees, including those directly responsible for revenue generation and the management and administration of our finances, which in turn may affect our revenue in the future or cause other administrative deficiencies. Additionally, employees directly affected by the reductions may seek future employment with our business partners, customers or competitors. Although all employees are required to sign a proprietary information agreement with us at the time of hire, there can be no assurances that the confidential nature of our proprietary information will be maintained in the course of such future employment. Additionally, we may face wrongful termination, discrimination, or other claims from employees affected by the reduction related to their employment and termination. We could incur substantial costs in defending ourselves or our employees against such claims, regardless of the merits of such actions. Furthermore, such matters could divert the attention of our employees, including management, away from our operations, harm productivity, harm our reputation and increase our expenses. We cannot assure you that our restructuring efforts will be successful, and we may need to take additional restructuring efforts, including additional personnel reduction, in the future.

We are dependent on key personnel

Due to the specialized nature of our business, we are highly dependent on the continued service of, and on our ability to attract and retain qualified senior management, engineering, sales and marketing personnel. The competition for some of these personnel is intense, particularly for engineers with MPEG experience. The loss of any of these individuals or our inability to recruit such individuals may significantly disrupt and be harmful to our business. In addition, if we are unable to hire qualified personnel as needed in a timely manner, we may be unable to adequately manage and grow our business.

Highly skilled employees with the education and training that we require, especially employees with significant experience and expertise in video, data networking and radio frequency design, are in high demand. We may incur additional expenses to attract and retain key personnel. We cannot be assured that the additional expenses we may incur will enable us to attract and retain qualified personnel necessary for the development of our business. We do not have key person insurance coverage for the loss of any of our employees. Any officer or employee can terminate his or her relationship with us at any time. Our employees generally are not bound by non-competition agreements.

There are many risks associated with our participation in industry standards

In connection with the development of the DOCSIS 2.0 specification by CableLabs, a cable industry consortium that establishes cable technology standards and administers compliance testing, we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis any of our intellectual property rights, including rights to our proprietary S-CDMA technology, to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products. As a result of this license to CableLabs, our competitors that produce DOCSIS-based products have access to our technology without having to pay us any royalties or other compensation for the use of our technology. As a result of our contribution of technology to the DOCSIS intellectual property pool, we may have foregone significant revenue from the potential licensing of our proprietary technology, and we may be unable to recoup the investment in the research and development of intellectual property contributed to the DOCSIS technology pool.

39

--------------------------------------------------------------------------------

Table of Contents

Additionally, the agreement that we signed with CableLabs to participate in the DOCSIS intellectual property pool may make it difficult for us to enforce our intellectual property rights against other companies. Certain cable equipment vendors manufacture and sell DOCSIS based and DOCSIS certified and qualified products without sublicensing the technology from CableLabs in the CableLabs intellectual property pool. Due to the interests of cable operators in having as many equipment vendors as possible, we may feel constrained by competitive pressures from pursuing the enforcement of our intellectual property rights against our competitors that have not entered into sublicenses with CableLabs. Moreover, if we seek to enforce our intellectual property rights against other equipment manufacturers that access technology from the CableLabs intellectual property pool, our license to the technology in the pool may be jeopardized. Certain contributors of technology to the CableLabs intellectual property pool are our competitors and may elect to revoke our license to their technology if we attempt to enforce our intellectual property rights against them.

We may have lost any competitive advantage that our proprietary S-CDMA technology may have provided us in the marketplace by licensing it to CableLabs, and we may face increased competition because our competitors have the ability to incorporate our technology into their products. We believe that this increased competition could come from existing competitors or from new competitors who enter the market and that such competition is likely to result in lower product ASPs, which could harm our revenues and gross margins. Additionally, because our competitors will be able to incorporate our technology into their products, our current customers may choose alternate suppliers or choose to purchase DOCSIS-compliant products from multiple suppliers. We may be unable to effectively compete with the other vendors if we cannot produce DOCSIS compliant cable products more quickly or at lower cost than our competitors.

DOCSIS specifications have not yet been accepted in Asia, although an increasing number of Asian cable operators are requiring product to be DOCSIS qualified or certified. A related specification for cable products, called the Euro-DOCSIS specification, has been formalized by TComLabs, a cable technology consortium of European cable operators, and European and some Asian cable operators have embraced it. We have contributed certain of our technologies, including our proprietary S-CDMA technology, to the Euro-DOCSIS specification. We may develop and sell products that comply with the Euro-DOCSIS specification, and we may be unsuccessful in these efforts. Even if we are successful in our efforts, we may face some of the same risks associated with our contribution of intellectual property to the CableLabs DOCSIS intellectual property pool.

We need to certify and qualify our new and existing products to meet industry specifications in order to remain competitive

Major cable operators worldwide have endorsed the DOCSIS, Euro-DOCSIS and PacketCable specifications and rarely purchase data and voice equipment that is not certified or qualified as compliant with these specifications. Although there is currently no specification for DVS products, if such a specification is adopted, then we will not only need to certify our video products in addition to the current requirement that we certify our HAS products. Traditionally, cable operators have chosen to purchase only products meeting industry specifications because the specifications enable interoperability among products from multiple vendors, which leads to increased competition among equipment manufacturers and consequently lowers product ASPs. Consequently, our future success depends on our ability to compete effectively in this marketplace by developing, marketing and selling products that are certified and qualified to industry standards in a timely fashion and in a cost effective manner.

The DOCSIS and PacketCable specifications are promulgated by CableLabs. Currently these specifications have been widely adopted by cable operators in North America and by some cable operators in Asia, Latin America and Europe. The Euro-DOCSIS specifications have been developed by TComLabs specifically to meet the requirements of European operators, and have found some acceptance in China as well. There is no guarantee that our products will continue to be DOCSIS, EuroDOCSIS or PacketCable certified or qualified, or will be certified for any new standards that may emerge. If we are unable to certify or qualify our products as compliant with DOCSIS, EuroDOCSIS or PacketCable or other applicable standards in a timely manner, we may be unable to sell our products and may lose some or all of any advantage we might otherwise have had, and our future operating results may be adversely affected.

40

--------------------------------------------------------------------------------

Table of Contents

Although we sell certified and qualified data and voice products, there have been and may continue to be instances where our existing customers and potential new customers elect to purchase products from one or more of our competitors rather than from us. In response to this situation, we have reduced our prices and continue to experience customer demand to further reduce our prices in order to promote sales of our current products. This has had and may continue to have an adverse impact on our revenues, operating results and gross margin.

Developing products to meet these various industry specifications has several risks. The first is the cost and effort to engineer standards-based products and to then prepare them for compliance testing. Not only do we have to certify or qualify new products, but any of our currently certified or qualified products must be re-certified or re-qualified should they be changed in any way. Second, there is no guarantee that these products will be certified or qualified as meeting these specifications in a timely fashion, if ever. Because most cable operators purchase only those products that have been certified or qualified as meeting these specifications, it is highly unlikely that we will be able to sell our products until they achieve certification or qualification, which can be a lengthy process. As a result, we may incur significant research and development expenses to develop new products that may not receive certification or qualification and we cannot recoup the costs of these research and development expenses by marketing uncertified or unqualified products. Moreover, a consequence of cable operators' only purchasing products certified or qualified as meeting industry specifications is the increased competition between equipment vendors, which has resulted in a steady and ongoing decline in equipment prices as vendors compete for cable operators' business. Third, there is no guarantee that we will be able to support all future cable industry specifications, which will likely have an adverse impact on our future revenues.

Our video products and applications must achieve widespread market acceptance to advance the growth of our digital video solutions business

Our success will depend upon the widespread acceptance of our video products and applications by broadband providers. Traditionally, we have had success selling our CherryPicker and DM products to cable operators and satellite providers; however, there is no guarantee that this success will continue as the products and applications evolve and as new competitors enter the market. In 2004, we introduced our BP5100, which is our product geared towards television broadcasters. Currently, we have had one large deployment of BP5100 and have had limited sales of the BP5100 through resale channels. We are currently developing technology for the deployment of video for the telecom carriers; however, there is no guarantee that we will continue to pursue the development, that our product will work or that our product will find widespread acceptance among the telecom carriers.

The emerging market trend to standardize the digital video technology may challenge our ability to continue to grow our digital video business

Comcast, Time-Warner and Cox, the three largest cable operators in the U.S., started their NGNA initiative in 2003 to develop a common approach to transform their cable systems into all-digital networks. This initiative could potentially impact video technology, including our video technology and products. Working as a group the operators can work more effectively with equipment vendors in defining the products and product capabilities required for the migration. In 2004 the participating operators commissioned CableLabs to manage the NGNA initiative and to develop a set of standards to which equipment vendors can build their products. The NGNA initiative is so far following the model successfully proven with the earlier DOCSIS initiative, which enabled the development of interoperable cable modems, CMTSs and other associated equipment that allowed U.S. operators to rollout broadband cable modem service much faster, more broadly and with greater success than telecom carriers could offer their competing DSL service. As it has with data services, CableLabs may request or even require companies to contribute their video technologies to a DOCSIS-like technology pool on a royalty-free basis. If we contribute any of our video technology to a DOCSIS-like technology pool, our video technology is subject to the same risks as those associated with the standards-based technology for our data services, which are discussed above. Subject to the success of the initiative, cable operators would want to purchase only video products that have been

41

--------------------------------------------------------------------------------

Table of Contents

certified or qualified by CableLabs, in which case we will not be able to sell our video products until they achieve certification or qualification, which, based on our experience with our data services, can be a lengthy process. As a result, we may incur significant research and development expenses to develop new video products that may not receive certification or qualification and we may not be able to recoup the costs of these research and development expenses by marketing uncertified or unqualified products. Moreover, there is no guarantee that we will be able to support all future cable industry specifications relating to video products, which would likely have an adverse impact on our future revenues. Furthermore, a consequence of cable operators purchasing only certified or qualified products, based on our experience with the data services, is the increased competition between equipment vendors, which would result in a steady and ongoing decline in equipment prices as vendors compete for cable operators' business. Consequently, our future success may depend on our ability to compete effectively in the video marketplace by developing, marketing and selling products that are certified and qualified to industry standards in a timely fashion and in a cost effective manner.

We depend on broadband providers' capital spending for a substantial portion of our revenue and any decrease or delay in capital spending would negatively impact our operating results and financial condition

        Historically, almost all of our sales had been derived from sales to broadband providers and, more specifically, cable operators, and we expect these sales to constitute a significant portion of net sales for the foreseeable future. Demand for our products will depend on the magnitude and timing of capital spending by broadband providers. These capital spending patterns are dependent on a variety of factors including:

*the availability of financing;

*annual budget cycles, as well as the typical reduction in upgrade projects during the winter months;

*the status of federal, local and foreign government regulation and deregulation of the telecommunications industry;

*overall demand for broadband services and the acceptance of new data, video and voice services;

*evolving industry standards and network architectures;

*competitive pressures (including the availability of alternative data transmission and access technologies);

*discretionary consumer spending patterns; and

*general economic conditions.

Average selling prices of broadband equipment may continue to decline, decreasing our gross margins

        The broadband equipment market has been characterized by erosion of product ASPs, particularly for HAS devices. This erosion may continue. The ASPs for our products are likely to continue to decline due to competitive pricing pressures, promotional programs and customers possessing strong negotiating positions which require price reductions as a condition of purchase. In addition, we believe that the widespread adoption of industry specifications, such as the DOCSIS and EuroDOCSIS specifications, is further eroding ASPs as cable modems and other similar HAS products become commodity products. If a specification is adopted for video technology, our DVS products may experience the same ASP erosion. Decreasing ASPs could result in decreased revenues even if the number of units sold increases. Decreasing ASPs may also require us to sell our products at much lower gross margin than in the past, and in fact, we may sell products at a loss. The primary reason that our gross profits have generally declined in recent years is the decline in product ASPs. As a result, we may experience substantial period-to-period fluctuations in future revenue, gross margin and operating results due to ASP erosion. Therefore, we must continue to develop and introduce on a timely basis and a cost-effective manner new products or next-generation products with enhanced functionalities that can be sold at higher gross margins. If we fail to do so our revenues and gross margins may decline further.

42

--------------------------------------------------------------------------------

Table of Contents

We must achieve cost reductions or increase revenues to attain profitability

In prior years, we experienced revenue declines, which were, in large part, due to declining product ASPs due to our transition from a proprietary platform to the DOCSIS standards platform. Most recently, we have experienced a decrease in revenue derived from our DOCSIS CMTS sales. This has resulted in increased losses and made it difficult for us to attain profitability. In order to achieve profitability, we must significantly increase our revenues, reduce the cost of our products, and maintain or reduce our operating expenses.

Although we have implemented expense reduction and restructuring plans in the past, including the latest restructurings in the fourth quarter of 2004, that have focused on cost reductions and operating efficiencies, we still operate at a loss. A large portion of our expenses, including rent, and operating lease expenditures, is fixed and difficult to reduce or change. Accordingly, if our revenue does not meet our expectations, we may not be able to adjust our expenses quickly enough to compensate for the shortfall in revenue. In that event, our business, financial condition and results of operations could be materially and adversely affected.

As product ASPs decline, we need to reduce the cost of our products through design and engineering changes. We may not be successful in redesigning our products, and, even if we are successful, our efforts may be delayed or our redesigned products may contain significant errors and product defects. In addition, any redesign may not result in sufficient cost reductions to allow us to reduce significantly the prices of our products or improve our gross margins. Reductions in our product costs may require us to use lower-priced components that are highly integrated in future products and may require us to enter into high volume or long-term purchase or manufacturing agreements. Volume purchase or manufacturing agreements may not be available on acceptable terms, if at all, and we could incur significant expenses without related revenues if we cannot use the products or services offered by such agreements. We have incurred significant vendor cancellation charges related to volume purchase and manufacturing agreements in the past and may incur such charges in the future.

We may not be able to raise additional funds to continue operating our business

Our main source of liquidity continues to be our unrestricted cash on hand. As a result of our history of operating losses, we expect to continue to use our unrestricted cash to fund operating losses in the future. Our cash, cash equivalents and short-term investments decreased to $97.7 million at December 31, 2004, from $138.6 million at December 31, 2003. If our operating losses are more severe than expected or continue longer than expected, we may find it necessary to seek other sources of financing to support our capital needs and provide available funds for working capital. Furthermore, as of December 31, 2004, we had $65.1 million of notes outstanding that mature in August 2007 and may need to seek additional financing to repay the notes at maturity.

Given the current condition of the capital markets, there are few sources of financing available to us. Commercial bank financing may not be available to us on acceptable terms. Accordingly, any plan to raise additional capital, if available to us, would likely involve an equity-based or equity-linked financing, such as the issuance of convertible debt, common stock or preferred stock, which would be dilutive to our stockholders. If we are unable to procure additional working capital, as necessary, we may be unable to continue operations.

On October 7, 2003, we filed a registration statement on Form S-3 with the SEC. This shelf registration statement, which was declared effective by the SEC on November 4, 2003, will allow us to issue various types of securities, including common stock, preferred stock, debt securities and warrants to purchase common stock, from time to time up to an aggregate of $125.0 million, subject to market conditions and our capital needs.

We may dispose of or discontinue existing product lines, which may adversely impact our future results

On an ongoing basis, we evaluate our various product offerings in order to determine whether any should be discontinued or, to the extent possible, divested. Moreover, the worldwide downturn in the telecommunications industry led us to reassess our business strategy, which in turn caused us to discontinue investment in

43

--------------------------------------------------------------------------------

Table of Contents

certain product lines. We have ceased investment in the telecom and satellite businesses and largely sold or discontinued the various businesses we acquired in 1999 and 2000. In October 2004, we also announced our determination to cease investment in the CMTS product line and halt development of future CMTS hardware. In February 2005, we agreed to sell to ATI Technologies Inc. certain of our cable modem semiconductor assets.

We cannot be assured that we have correctly forecasted, or will correctly forecast in the future, the right product lines to dispose or discontinue or that our decision to dispose of or discontinue various investments and product lines is prudent if market conditions change. In addition, we cannot be assured that the discontinuance of various product lines will reduce our operating expenses or will not cause us to incur material charges associated with such decision. Furthermore, the discontinuance of existing product lines entails various risks, including the risks that we will not be able to find a buyer for a product line or the purchase price obtained will not be equal to the book value of the assets for the product line. Other risks include managing the expectations of, and maintaining good relations with, our customers who previously purchased disposed or discontinued product lines, which could prevent us from selling other products to them in the future. We may also incur other liabilities and costs associated with our disposal or discontinuance of product lines.

We may be unable to provide adequate customer support

Our ability to achieve our planned sales growth and retain current and future customers will depend in part upon the quality of our customer support operations. Our customers generally require significant support and training with respect to our products, particularly in the initial deployment and implementation stages. Spikes in demand of our support services may cause us to be unable to serve our customers. We may not have adequate personnel to provide the levels of support that our customers may require during initial product deployment or on an ongoing basis especially during peak periods. Our inability to provide sufficient support to our customers could delay or prevent the successful deployment of our products. In addition, our failure to provide adequate support could harm our reputation and relationships with our customers and could prevent us from selling product to existing customers or gaining new customers.

Furthermore, we may experience transitional issues relating to customer support in connection with our decision to dispose of or discontinue various investments and product lines. We may incur liability associated with customers' dissatisfaction with the level of customer support maintained for discontinued product lines. For example, in January 2005, Adelphia sued us in Colorado state court, alleging, among other things, breach of contract and misrepresentation in connection with our sale of CMTS (Cable Modem Termination System) products to Adelphia and our announcement to cease future investment in the CMTS market.

We may have financial exposure to litigation

We and/or our directors and officers are defendants in a number of lawsuits, including securities litigation lawsuits and the lawsuit with Adelphia discussed above (See Item 3 -- Legal Proceedings for more information regarding our litigation). As a result, we may have financial exposure to litigation as a defendant and because we are obligated to indemnify our officers and members of our board of directors for certain actions taken by our officers and directors on our behalf.

In order to limit financial exposure arising from litigation and/or our obligation to indemnify our officers and directors, we have historically purchased directors' and officers' insurance (D&O Insurance). However, the availability of D&O Insurance may become more difficult and more costly for companies to attain. In recent years, we have experienced a significant increase in the cost of our D&O Insurance. There can be no assurance that D&O Insurance will be available to us in the future or, if D&O Insurance is available, it may be prohibitively expensive. Additionally, some insurance underwriters who offered D&O Insurance in the past have been placed into liquidation or may be, at some future point, placed into liquidation.

If there is no insurance coverage for the litigation or, even if there is insurance coverage, if a carrier is subsequently liquidated or placed into liquidation, we will be responsible for the attorney fees and costs resulting from the litigation. The incurrence of significant fees and expenses in connection with the litigation could have a material adverse effect on our results of operations.

44

--------------------------------------------------------------------------------

Table of Contents

**The sales cycle for certain of our products is lengthy, which makes forecasting of our customer orders and revenues difficult**

The sales cycle for certain of our products is lengthy, often lasting nine months to more than a year. Our customers generally conduct significant technical evaluations, including customer trials, of our products as well as competing products prior to making a purchasing decision. In addition, purchasing decisions may also be delayed because of a customer's internal budget approval processes. Because of the lengthy sales cycle and the size of customer orders, if orders forecasted for a specific customer for a particular period do not occur in that period, our revenues and operating results for that particular quarter could suffer. Moreover, a portion of our expenses related to an anticipated order is fixed and difficult to reduce or change, which may further impact our revenues and operating results for a particular period.

**We need to develop additional distribution channels to market and sell our products**

The vast majority of our data and voice product sales have traditionally been to large cable operators. Our DVS products have been traditionally sold to large cable operators and satellite operators with recent, limited sales to television broadcasters. We have not had access to smaller broadband providers. Although we intend to establish strategic relationships with leading distributors worldwide to new customers, we may not succeed in establishing these relationships. Even if we do establish these relationships, the distributors may not succeed in marketing our products to their customers. Some of our competitors have established long-standing relationships with these cable operators that may limit our and our distributors' ability to sell our products to those customers. Even if we were to sell our products to those customers, it would likely not be based on long-term commitments, and those customers would be able to terminate their relationships with us at any time without significant penalties.

**We may fail to accurately forecast customer demand for our products**

The nature of the broadband industry makes it difficult for us to accurately forecast demand for our products. Our inability to forecast accurately the actual demand for our products may result in too much or too little supply of products or an over/under capacity of manufacturing or testing resources at any given point in time. The existence of any one or more of these situations could have a negative impact on our business, operating results or financial condition. We have incurred significant vendor cancellation charges related to volume purchase and manufacturing agreements in the past and may incur such charges in the future. We had purchase obligations of approximately $30.0 million as of December 31, 2004, primarily to purchase minimum quantities of materials and components used to manufacture our products. We may be obligated to fulfill these purchase obligations even if demand for our products is lower than we anticipate.

**We may not be able to manage expenses and inventory risks associated with meeting the demand of our customers**

From time to time, we receive indications from our customers as to their future plans and requirements to ensure that we will be prepared to meet their demand for our products. If actual orders differ materially from these indications, our ability to manage inventory and expenses may be affected. In addition, if we fail to meet customers' supply expectations, we may lose business from such customers. If we enter into purchase commitments to acquire materials, or expend resources to manufacture products and such products are not purchased by our customers, our business and operating results could suffer.

**We are dependent on key third-party suppliers and any failure by them to deliver components could limit our ability to satisfy customer demand**

We manufacture all of our products using components or subassemblies procured from third-party suppliers, including semiconductors. Some of these components are available from a sole source and others are available from limited sources. A majority of our sales are from products containing one or more components that are available only from sole source suppliers. For example, our video equipment is single sourced from a manufacturer in San Jose, California. Our modems are sourced from a manufacturer in China. Additionally,

45

--------------------------------------------------------------------------------

Table of Contents

some of our components are custom parts that are produced to our specifications, and it may be difficult to move the manufacturing of such components from one vendor to another vendor.

Any interruption in the operations of our vendors of sole source or custom product parts could adversely affect our ability to meet our scheduled product deliveries to customers. If we are unable to obtain a sufficient supply of components, including semiconductors, from our current sources, we could experience difficulties in obtaining alternative sources or in altering product designs to use alternative components. Resulting delays or reductions in product shipments could damage customer relationships and expose us to potential damages that may arise from our inability to supply our customers with products. Further, a significant increase in the price of one or more of these components, such as our semiconductor components, could harm our gross margin or operating results. Additionally, we attempt to limit this risk by maintaining safety stocks of these components, subassemblies and modules. As a result of this investment in inventories, we have in the past and in the future may be subject to risk of excess and obsolete inventories, which could harm our business. In this regard, our gross margins and operating results could be adversely affected by excess and obsolete inventory.

We may be unable to migrate to new semiconductor process technologies successfully or on a timely basis

Our future success will depend in part upon our ability to develop products that utilize new semiconductor process technologies. These technologies change rapidly and require us to spend significant amounts on research and development. We continuously evaluate the benefits of redesigning our integrated circuits using smaller geometry process technologies to improve performance and reduce costs. The transition of our products to integrated circuits with increasingly smaller geometries will be important to our competitive position. Other companies have experienced difficulty in migrating to new semiconductor processes and, consequently, have suffered reduced yields, delays in product deliveries and increased expense levels. Moreover, we depend on our relationship with our third-party manufacturers to migrate to smaller geometry processes successfully.

Our ability to directly control product delivery schedules and product quality is dependent on third-party contract manufacturers

Most of our products are assembled and tested by contract manufacturers using testing equipment that we provide. As a result of our dependence on these contract manufacturers for the assembly and testing of our products, we do not directly control product delivery schedules or product quality. Any product shortages or quality assurance problems could increase the costs of manufacturing, assembling or testing our products. In addition, as manufacturing volume increases, we will need to procure and assemble additional testing equipment and provide it to our contract manufacturers. The production and assembly of testing equipment typically requires significant lead times. We could experience significant delays in the shipment of our products if we are unable to provide this testing equipment to our contract manufacturers in a timely manner.

We are dependent upon international sales and there are many risks associated with international operations

We expect sales to customers outside of the United States to continue to represent a significant percentage of our revenues for the foreseeable future. For the year ended December 31, 2004, 2003 and 2002 approximately 45%, 44% and 68%, respectively, of our net revenues were from customers outside of the U.S. International sales are subject to a number of risks, including the following:

*changes in foreign government regulations and communications standards;

*import and export license requirements, tariffs and taxes;

*trade barriers;

*difficulty in protecting intellectual property;

*difficulty in collecting accounts receivable;

*currency fluctuations;

46

--------------------------------------------------------------------------------

Table of Contents

*the burden of complying with a wide variety of foreign laws, treaties and technical standards;

*difficulty in staffing and managing foreign operations; and

*political and economic instability.

     If our customers are affected by currency devaluations or general economic downturns their ability to purchase our products could be reduced significantly. Payment cycles for international customers typically are longer than those for customers in North America.
     Our international operations are subject to certain risks common to foreign operations in general, such as governmental regulations and import restrictions. In addition, there are social, political, labor and economic conditions in specific countries or regions as well as difficulties in staffing and managing foreign operations, and potential adverse foreign tax consequences, among other factors that could also have an impact on our business and results of operations outside of the United States.
     Furthermore, foreign countries may decide to prohibit, terminate or delay the construction of new broadband infrastructures for a variety of reasons. These reasons include environmental issues, economic downturns and availability of favorable pricing for other communications services or the availability and cost of related equipment. Any such action by foreign countries would reduce the market for our products.
     Like other companies operating or selling internationally, we are subject to the Foreign Corrupt Practices Act (FCPA) and other laws which prohibit improper payments or offers of payments to foreign governments and their officials and political parties by U.S. and other business entities for the purpose of obtaining or retaining business. We make sales in countries known to experience corruption. Our sales activities in such countries create the risk of an unauthorized payments or offers of payments by one of our employees, consultants, sales agents or distributors which could be in violation of various laws including the FCPA, even though such parties are not always subject to our control. We have attempted to implement safeguards to prevent losses from such practices and to discourage such practices by our employees, consultants, sales agents and distributors. However, our safeguards may prove to be less than effective and our employees, consultants, sales agents or distributors may engage in conduct for which we might be held responsible. Violations of the FCPA may result in severe criminal or civil sanctions, and we may be subject to other liabilities, which could negatively affect our business, financial condition and results of operations.

Exchange rate fluctuations could cause a decline in our financial condition and results of operations

     While we generally invoice our foreign sales in U.S. dollars, we invoice some of our sales in Europe in Euros and other sales in the United Kingdom, Belgium, Canada, Japan, Hong Kong, Korea and China in local currencies. Since we have also elected to take payment from our customers in local currencies and may elect to take payment in other foreign currencies in the future, we are exposed to losses as the result of foreign currency fluctuations. We currently do not engage in foreign currency hedging transactions. We may in the future choose to limit our exposure by the purchase of forward foreign exchange contracts or through similar hedging strategies. No currency hedging strategy can fully protect against exchange-related losses. In addition, if the relative value of the U.S. dollar in comparison to the currency of our foreign customers should increase, the resulting effective price increase of our products to those foreign customers could result in decreased sales.
     Furthermore, foreign countries may decide to prohibit, terminate or delay the construction of new broadband infrastructures for a variety of reasons. These reasons include environmental issues, economic downturns and availability of favorable pricing for other communications services or the availability and cost of related equipment. Any such action by foreign countries would reduce the market for our products.

The deployment process for our equipment may be lengthy and may delay the receipt of new orders and cause fluctuations in our revenues

     The timing of deployment of our equipment can be subject to a number of other risks, including the availability of skilled engineering and technical personnel, the availability of other equipment such as fiber optic cable, and the need for local zoning and licensing approvals. We believe that changes in our customers'

47

--------------------------------------------------------------------------------

Table of Contents

deployment plans have delayed, and may in the future delay the receipt of new orders. Since the majority of our sales have been to relatively few customers, a delay in equipment deployment with any one customer has in the past had, and could in the future, have a material adverse effect on our sales for a particular quarter.

Our industry is highly competitive with many larger and more established competitors

The market for our products is extremely competitive and is characterized by rapid technological change. Our direct competitors include Ambit Microsystems Corporation, Cisco Systems, BigBand Networks, Motorola, Scientific-Atlanta and Toshiba. Additionally, we face competition from early stage companies with access to significant financial backing that improve existing technologies or develop new technologies. The principal competitive factors in our market include the following:

*product performance, features and reliability;

*price;

*size and stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*technical support and service;

*relationships with providers of service providers; and

*compliance with industry standards.

Some of these factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products. Many of our current and potential competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do. The widespread adoption of DOCSIS and other industry standards has and is likely to continue to cause increased price competition. We believe that the adoption of these standards have resulted in and are likely to continue to result in lower ASPs for our products. Any increased price competition or reduction in sales of our products, particularly our higher margin head-end products, has resulted and will continue to result in decreased revenue and downward pressure on our gross margin. These competitive pressures have and are likely to continue to have an adverse impact on our business.

Our business is subject to the risks of warranty returns, product liability and product defects

Products like ours are very complex and can frequently contain undetected errors or failures, especially when first introduced or when new versions are released. Despite testing, errors may occur. Product errors could affect the performance or interoperability of our products, delay the development or release of new products or new versions of products, adversely affect our reputation and our customers' willingness to buy products from us and adversely affect market acceptance or perception of our products. Any such errors or delays in releasing new products or new versions of products or allegations of unsatisfactory performance could cause us to lose revenue or market share, increase our service costs, cause us to incur substantial costs in redesigning the products, subject us to liability for damages and divert our resources from other tasks, any one of which could materially and adversely affect our business, results of operations and financial condition. Although we have limitation of liability provisions in our standard terms and conditions of sale, they may not be effective as a result of federal, state or local laws or ordinances or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that

48

--------------------------------------------------------------------------------

ultimately are unsuccessful could result in our expenditure of funds in litigation and divert management's time and other resources.

**We may be unable to adequately protect or enforce our intellectual property rights**

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. We cannot be assured that any patent, trademark, copyright or other intellectual property rights owned by us will not be invalidated, circumvented or challenged, that such intellectual property rights will provide competitive advantages to us or that any of our pending or future patent applications will be issued with the scope of the claims sought by us, if at all. We cannot be assured that others will not develop technologies that are similar or superior to our technology, duplicate our technology or design around the patents that we own. In addition, effective patent, copyright and trade secret protection may be unavailable or limited in certain foreign countries in which we do business or may do business in the future.

Our pending patent applications may not be granted. Even if they are granted, the claims covered by any patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

We believe that the future success of our business will depend on our ability to translate the technological expertise and innovation of our employees into new and enhanced products. We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove sufficient to prevent misappropriation of our trade secrets or technology or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. We may, in the future, take legal action to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively affect our business, operating results, financial position and liquidity.

CableLabs DOCSIS 2.0 specification includes two advanced physical layer technologies, S-CDMA and A-TDMA. In connection with the development of the DOCSIS 2.0 specification by CableLabs, we entered into an agreement with CableLabs, on a royalty-free basis, whereby we licensed to CableLabs many of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS-based products, including DOCSIS 2.0-based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

**Third party claims of infringement or other claims against us could adversely affect our ability to market our products, require us to redesign our products or seek licenses from third parties, and seriously harm our operating results and disrupt our business**

As is typical in the industry in which we operate, we have been and may from time to time be notified of claims that we may be infringing intellectual property rights owned by third parties. We also have in the past agreed to, and may from time to time in the future agree to, indemnify a customer of our technology or

--------------------------------------------------------------------------------

products for claims against the customer by a third party based on claims that our technology or products infringe patents of that third party. We further believe that companies may be increasingly subject to infringement claims as distressed companies and individuals attempt to generate cash by enforcing their patent portfolio against a wide range of products. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require us to enter into royalty arrangements; subject us to damages or injunctions restricting the sale of our products, require us to indemnify our customers for the use of the allegedly infringing products; require us to refund payment of allegedly infringing products to our customers or to forgo future payments; require us to redesign certain of our products; or damage our reputation. Our failure to obtain a license for key intellectual property rights from a third party for technology used by us could cause us to incur substantial liabilities and to suspend the manufacturing of products utilizing the technology. Alternatively, we could be required to expend significant resources to develop non-infringing technology with no assurances that we would be successful in such endeavors. The occurrence of any of the above events could materially and adversely affect our business, results of operations and financial condition.

Our indebtedness could adversely affect our financial condition; we may incur substantially more debt

    As of December 31, 2004, we had approximately $67.2 million of long-term obligations of which $65.1 million is long-term debt associated with our Notes. This level of indebtedness may adversely affect our stockholders by:

*making it more difficult for us to satisfy our obligations with respect to our indebtedness;

*increasing our vulnerability to general adverse economic and industry conditions;

*limiting our ability to obtain additional financing;

*requiring the dedication of a substantial portion of our cash flow from operations to the payment of principal of, and interest on, our indebtedness, thereby reducing the availability of our cash flow to fund our growth strategy, working capital, capital expenditures and other general corporate purposes;

*limiting our flexibility in planning for, or reacting to, changes in our business and the industry; and

*placing us at a competitive disadvantage relative to our competitors with less debt.

    We may incur substantial additional debt in the future. The terms of our outstanding debt do not fully prohibit us from doing so. If new debt is added to our current levels, the related risks described above could intensify.

We need to develop and introduce new and enhanced products in a timely manner to remain competitive

    The markets in which we operate are characterized by rapidly changing technologies, evolving industry standards, frequent new product introductions and relatively short product life. The pursuit of necessary technological advances and the development of new products require substantial time and expense. For example, we made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses have achieved the level of market acceptance that was forecasted at the time of their acquisitions. Additionally, certain product groups have not achieved the level of technological development needed to be marketable or to expand the market. As a result, we recorded an aggregate of approximately $576.8 million related to impairment charges and write-down of in-process research and development related to the acquired technologies, both of which negatively impacted our operating results in 2001 and 2002.
    To compete successfully in the markets in which we operate, we must design, develop, manufacture and sell new or enhanced products that provide increasingly higher levels of performance and reliability. However, we may not be able to successfully develop or introduce these products, if our products are not:

*cost effective;

*brought to market in a timely manner;

--------------------------------------------------------------------------------

*in accordance with evolving industry standards and architecture; or

*fail to achieve market acceptance.

There is no assurance that the technologies we are currently developing or intend to develop will achieve feasibility or that even if we are successful, the developed product will be accepted by the market. We may not be able to recover the costs of existing and future product developments and our failure to do so may materially and adversely impact our business, financial condition and results of operations.

We are exposed to the credit risk of our customers and to credit exposures in weakened markets, which could result in material losses

Most of our sales are on an open credit basis, with payment terms of 30 to 60 days typically in the United States, and because of local customs or conditions, longer in some markets outside the United States. Beyond our open credit arrangements, we have also experienced a request for customer financing and facilitation of leasing arrangements, which we have not provided to date and do not expect to provide in the future. We expect demand for enhanced open credit terms, for example, longer payment terms, customer financing and leasing arrangements to continue and believe that such arrangements are a competitive factor in obtaining business. Our decision not to provide these types of financing arrangements may adversely affect our ability to sell products, and therefore, our revenue, operations and business.

Because of the current condition in the global economy, our exposure to credit risks relating to sales on an open-credit basis has increased. Although we monitor and attempt to mitigate the associated risk, there can be no assurance that our efforts will be effective in reducing credit risk. Additionally, there have been significant insolvencies and bankruptcies among our customers, which have and may continue to cause us to incur economic and financial losses. There can be no assurance that additional losses would not be incurred and that such losses would not be material. Although these losses have generally not been material to date, future losses, if incurred, could harm our business and have a material adverse effect on our operating results and financial condition.

We have and we may seek to expand our business through acquisitions; acquisitions could disrupt our business operations and harm our operating results

In order to expand our business, we may make strategic acquisitions of other companies or certain assets. We plan to continue to evaluate opportunities for strategic acquisitions from time to time, and may make an acquisition at some future point. However, the current volatility in the stock market and the current price of our common stock may adversely affect our ability to make such acquisitions. Any acquisition that we make involves substantial risks, including the following:

*difficulties in integrating the operations, technologies, products and personnel of an acquired company;

*diversion of management's attention from normal daily operations of the business;

*potential difficulties in completing projects associated with in-process research and development;

*difficulties in entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions;

*initial dependence on unfamiliar supply chains or relatively small supply partners;

*insufficient revenues to offset increased expenses associated with acquisitions; and

*the potential loss of key employees of the acquired companies.

Acquisitions may also cause us to:

*issue common stock that would dilute our current stockholders' percentage ownership;

*assume liabilities;

51

--------------------------------------------------------------------------------

Table of Contents

*record goodwill and non-amortizable intangible assets that will be subject to impairment testing and potential periodic impairment charges;

*incur amortization expenses related to certain intangible assets;

*incur large and immediate write-offs; or

*become subject to litigation.

   For example, we made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses have achieved the level of market acceptance that was forecasted at the time of their acquisitions. As a result, we recorded an aggregate of approximately $576.8 million related to impairment charges and write-down of in-process research and development related to the acquired technologies, both of which negatively impacted our operating results in 2001 and 2002.
   Mergers and acquisitions of high-technology companies are inherently risky, and no assurance can be given that our future acquisitions will be successful and will not materially adversely affect our business, operating results or financial condition. Failure to manage and successfully integrate acquisitions we make could harm our business and operating results in a material way. Even when an acquired company has already developed and marketed products, there can be no assurance that product enhancements will be made in a timely fashion or that all pre-acquisition due diligence will have identified all possible issues that might arise with respect to such products.

Our products are subject to safety approvals and certifications

   In the United States, our products are required to meet certain safety requirements. For example, we are required to have our products certified by Underwriters Laboratory in order to meet federal requirements relating to electrical appliances to be used inside the home. Outside the United States, our products are subject to the regulatory requirements of each country in which the products are manufactured or sold. These requirements are likely to vary widely. We may be unable to obtain on a timely basis or at all the regulatory approvals that may be required for the manufacture, marketing and sale of our products.

We are vulnerable to earthquakes, disruptions to our power supply, labor issues and other unexpected events

   Our corporate headquarters, as well as the majority of our research and development activities and some manufacturing operations are located in California, an area known for seismic activity. In addition, the operations of some of our key suppliers and manufacturers are also located in this area and in other areas known for seismic activity, such as Taiwan. An earthquake, or other significant natural disaster, could result in an interruption in our business or the operations of one or more of our key suppliers. Our California operations may also be subject to disruptions in power supply, such as those that occurred in 2001. Our business may also be impacted by labor issues related to our operations and/or those of our suppliers, service providers, or customers. Such an interruption could harm our operating results. We may not carry sufficient business interruption insurance to compensate for any losses that we may sustain as a result of any natural disasters or other unexpected events.

Various export licensing requirements could materially and adversely affect our business or require us to significantly modify our current business practices

   Various government export regulations may apply to the encryption or other features of our products. We may have to make certain filings with the government in order to obtain permission to export certain of our products. In the past, we may have inadvertently failed to file certain export applications and notices, and we may have to make certain filings and request permission to continue exportation of any affected products without interruption while these applications are pending. If we do have to make such filings, we cannot be assured that we will obtain permission to continue exporting the affected products or that we will obtain any required export approvals now or in the future. If we do not receive the required export approvals, we may be

52

--------------------------------------------------------------------------------

Table of Contents

unable to ship those products to certain customers located outside of the United States. In addition, we may be subject to fines or other penalties due to the failure to file certain export applications and notices.

Compliance with changing laws and regulations relating to corporate governance and public disclosure has resulted, and will continue to result, in the incurrence of additional expenses associated with being a public company

New and changing laws and regulations, including the Sarbanes-Oxley Act of 2002, new SEC regulations and NASDAQ National Market Rules, impose stricter corporate governance requirements, greater disclosure obligations, and greater focus on disclosure and internal controls. These new laws and regulations have had the effect of increasing the complexity and cost of our company's corporate governance compliance, diverting the time and attention of our management from revenue-generating activities to compliance activities, and increasing the risk of personal liability for our board members and executive officers involved in our company's corporate governance process. Our efforts to comply with evolving laws and regulations have resulted, and will continue to result, in increased general and administrative expenses, and increased professional and independent auditor fees. In addition, it has become more difficult and expensive for us to obtain director and officer liability insurance.

In order to meet the new corporate governance and financial disclosure obligations, we have been taking, and will continue to take, steps to improve our controls and procedures, including disclosure and internal controls, and related corporate governance policies and procedures to address compliance issues and correct any deficiencies that we may discover. For example, pursuant to the requirements of Section 404 of Sarbanes-Oxley, we undertook a comprehensive and costly evaluation of our internal controls. Based on this evaluation and as set forth in the Section 404 management report included in this annual report, our management determined that our internal controls over financial reporting were ineffective. Our management further determined that our disclosure controls and procedures were ineffective. In response to these deficiencies, our management has commenced the necessary processes and procedures to remediate the deficiencies in our disclosure and internal control by establishing, implementing and testing additional controls. Our efforts to correct the deficiencies in our disclosure and internal controls have required, and will continue to require, the commitment of significant financial and managerial resources. In addition, we anticipate the costs associated with the testing and evaluation of our internal controls will be significant and material in fiscal year 2005 and may continue to be material in future fiscal years as these controls are maintained and continually evaluated and tested.

Furthermore, changes in our operations and the growth of our business may require us to modify and expand our disclosure controls and procedures, internal controls and related corporate governance policies. In addition, the new and changed laws and regulations are subject to varying interpretations in many cases due to their lack of specificity, and as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. If our efforts to comply with new or changed laws and regulations differ from the conduct intended by regulatory or governing bodies due to ambiguities or varying interpretations of the law, we could be subject to regulatory sanctions, our reputation may be harmed and our stock price may be adversely affected.

Our stock price has been and is likely to continue to be highly volatile

The trading price of our common stock has been and is likely to continue to be highly volatile. Our stock price could be subject to extreme fluctuations in response to a variety of factors, including the following:

*actual or anticipated variations in quarterly operating results;

*announcements of technological innovations;

*new products or services offered by us or our competitors;

*changes in financial estimates by securities analysts;

*conditions or trends in the broadband services industry;

53

--------------------------------------------------------------------------------

Table of Contents

*changes in the economic performance and/or market valuations of Internet, online service or broadband service industries;

*our announcement of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

*adoption of industry standards and the inclusion or compatibility of our technology with such standards;

*adverse or unfavorable publicity regarding us or our products;

*additions or departures of key personnel;

*sales of common stock; and

*other events or factors that may be beyond our control.

       In addition, the stock markets in general, and the Nasdaq National Market and the stock price of broadband services and technology companies in particular, have experienced extreme price and volume volatility. This volatility and decline has affected many companies irrespective of or disproportionately to the operating performance of these companies. Additionally, industry factors may materially adversely affect the market price of our common stock, regardless of our actual operating performance.

We have adopted a stockholder rights plan, which, together with provisions in our charter documents and Delaware law, may delay or prevent an acquisition of us, which could decrease the value of our stock

       We adopted a stockholder rights plan pursuant to which we distributed one right for each outstanding share of common stock held by stockholders of record as of February 20, 2001. Because the rights may substantially dilute the stock ownership of a person or group attempting a take-over of us, even if such a change in control is beneficial to our stockholders, without the approval of our board of directors, the plan could make it more difficult for a third party to acquire us, or a significant percentage of our outstanding capital stock, without first negotiating with our board of directors. Additionally, provisions of our Certificate of Incorporation and our Bylaws could make it more difficult for a third party to acquire control of us in a transaction not approved by our Board of Directors, and we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which could also have the effect of delaying or preventing our acquisition by a third party.

Newly adopted accounting regulations that require companies to expense stock options will result in a decrease in our earnings and our stock price may decline.

       The Financial Accounting Standards Board recently adopted the previously proposed regulations that will eliminate the ability to account for share-based compensation transactions using the intrinsic method that we currently use and generally would require that such transactions be accounted for using a fair-value-based method and recognized as an expense in our consolidated statement of operations. We will be required to expense stock options effective in periods after July 1, 2005. Currently, we generally only disclose such expenses on a pro forma basis in the notes to our consolidated financial statements in accordance with accounting principles generally accepted in the United States. The adoption of this new accounting regulation will have a significant impact on our results of operations and our stock price could decline accordingly.

Item 7a.      Quantitative and Qualitative Disclosures About Market Risk
       Interest Rate Risk Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. A hypothetical 50 basis point increase in interest rates would result in an approximate $275,000 decline (less than 1%) in the fair value of our available-for-sale securities.

54

--------------------------------------------------------------------------------

Table of Contents

    Foreign Currency Risk A substantial majority of our revenue, expense and capital purchasing activity are transacted in U.S. dollars. However, we do enter into transactions from Belgium, United Kingdom, Hong Kong and Canada. A hypothetical adverse change of 10% in exchange rates would result in a decline in income before taxes of approximately $356,000. All of the potential changes noted above are based on sensitivity analyses performed on our financial positions at December 31, 2004. Actual results may differ materially.

55

--------------------------------------------------------------------------------

Table of Contents

Item 8.Financial Statements and Supplementary Data

TERAYON COMMUNICATION SYSTEMS, INC.
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

                                                                      Page

Reports of Ernst & Young LLP, Independent Registered Public Accounting Firm   57
Consolidated Balance Sheets                                             60
Consolidated Statements of Operations                                  61
Consolidated Statements of Stockholders' Equity                        62-63
Consolidated Statements of Cash Flows                                  64
Notes to Consolidated Financial Statements                             65

56

--------------------------------------------------------------------------------

Table of Contents

Report Of Ernst & Young LLP, Independent Registered
Public Accounting Firm

The Board of Directors and Stockholders
Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2004. Our audits also included the financial statement schedule listed in the index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2004 and 2003, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Terayon Communication Systems, Inc.'s internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control -- Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 14, 2005 expressed an unqualified opinion on management's assessment and an adverse opinion on the effectiveness of internal control over financial reporting.

/s/ Ernst & Young LLP

Palo Alto, California
March 14, 2005

57

--------------------------------------------------------------------------------

Table of Contents

Report of Independent Registered Public Accounting Firm on Internal Control over
Financial Reporting

The Board of Directors and Shareholders of
Terayon Communications System, Inc.

    We have audited management's assessment, included in Management's Report
on Internal Control Over Financial Reporting in Item 9a, that Terayon
Communication Systems, Inc ("Terayon") did not maintain effective internal
control over financial reporting as of December 31, 2004 because of the effect
of the material weaknesses described in management's assessment, based on
criteria established in Internal Control -- Integrated Framework issued by the
Committee of Sponsoring Organizations of the Treadway Commission (the "COSO"
criteria). Terayon's management is responsible for maintaining effective
internal control over financial reporting and for its assessment of the
effectiveness of internal control over financial reporting. Our responsibility
is to express an opinion on management's assessment and an opinion on the
effectiveness of the company's internal control over financial reporting based
on our audit.

    We conducted our audit in accordance with the standards of the Public
Company Accounting Oversight Board (United States). Those standards require that
we plan and perform the audit to obtain reasonable assurance about whether
effective internal control over financial reporting was maintained in all
material respects. Our audit included obtaining an understanding of internal
control over financial reporting, evaluating management's assessment, testing
and evaluating the design and operating effectiveness of internal control, and
performing such other procedures as we considered necessary in the
circumstances. We believe that our audit provides a reasonable basis for our
opinion.

    A company's internal control over financial reporting is a process
designed to provide reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles. A company's internal
control over financial reporting includes those policies and procedures that (1)
pertain to the maintenance of records that, in reasonable detail, accurately and
fairly reflect the transactions and dispositions of the assets of the company;
(2) provide reasonable assurance that transactions are recorded as necessary to
permit preparation of financial statements in accordance with generally accepted
accounting principles, and that receipts and expenditures of the company are
being made only in accordance with authorizations of management and directors of
the company; and (3) provide reasonable assurance regarding prevention or timely
detection of unauthorized acquisition, use, or disposition of the company's
assets that could have a material effect on the financial statements.

    Because of its inherent limitations, internal control over financial
reporting may not prevent or detect misstatements. Also, projections of any
evaluation of effectiveness to future periods are subject to the risk that
controls may become inadequate because of changes in conditions, or that the
degree of compliance with the policies or procedures may deteriorate.

    A material weakness is a control deficiency, or combination of control
deficiencies, that results in more than a remote likelihood that a material
misstatement of the annual or interim financial statements will not be prevented
or detected. The following material weaknesses have been identified and included
in management's assessment:

    Management identified a material weakness due to insufficient controls
related to the identification, capture, and timely communication of financially
significant information between certain parts of the organization and the
finance department to enable the finance department to account for transactions
in a complete and timely manner. As a result of this material weakness,
management recorded an adjustment in the quarter ended September 30, 2004 to
record termination benefits paid to a former executive.

    Management also identified a material weakness for insufficient controls
related to the preparation and review of the annual consolidated financial
statements and accompanying footnote disclosures. The insufficient controls
include a lack of sufficient personnel with technical accounting expertise in
the finance department and inadequate review and approval procedures to prepare
external financial statements in accordance with generally accepted accounting
principles (GAAP). As a result of this

58

--------------------------------------------------------------------------------

Table of Contents

material weakness, management made substantial revisions to its 2004 annual
consolidated financial statements and footnote disclosures before they were
issued.

     These material weaknesses were considered in determining the nature,
timing, and extent of audit tests applied in our audit of the 2004 consolidated
financial statements, and this report does not affect our report dated March 14,
2005 on those financial statements.
     In our opinion, management's assessment that Terayon Communication
Systems, Inc. did not maintain effective internal control over financial
reporting as of December 31, 2004 is fairly stated, in all material respects,
based on the COSO control criteria. Also, in our opinion, because of the effect
of the material weaknesses described above on the achievement of the objectives
of the control criteria, Terayon Communication Systems, Inc. has not maintained
effective internal control over financial reporting as of December 31, 2004,
based on the COSO control criteria.

/s/ Ernst & Young LLP

Palo Alto, California
March 14, 2005

                                   59
--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|  | 2004 | 2003 |
|  | (In thousands, except share data) | |
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 43,218 | $ 30,188 |
| Short-term investment | 54,517 | 108,452 |
| Accounts receivable, less allowance for doubtful accounts of $1,289 in 2004 and $3,591 in 2003 | 16,554 | 29,199 |
| Accounts receivable from related parties | 3,106 | 600 |
| Other current receivables | 1,044 | 3,662 |
| Inventory, net | 17,144 | 16,364 |
| Other current assets | 2,042 | 2,883 |
| Total current assets | 137,625 | 191,348 |
| Property and equipment, net | 5,760 | 11,871 |
| Restricted cash | 8,827 | 9,212 |
| Other assets, net | 1,522 | 2,809 |
| Total assets | $ 153,734 | $ 215,240 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 7,845 | $ 26,049 |
| Accrued payroll and related expenses | 4,181 | 6,537 |
| Deferred revenues | 2,579 | 3,423 |
| Accrued warranty expenses | 3,870 | 5,509 |
| Accrued restructuring and executive severance | 3,902 | 2,647 |
| Accrued vendor cancellation charges | 521 | 2,869 |
| Accrued other liabilities | 4,317 | 5,284 |
| Interest payable | 1,356 | 1,358 |
| Current portion of capital lease obligations | -- | 124 |
| Total current liabilities | 28,571 | 53,800 |
| Long-term obligations | 2,077 | 3,118 |
| Accrued restructuring and executive severance | 1,664 | 1,853 |
| Convertible subordinated notes | 65,081 | 65,081 |
| Commitments and contingencies | | |
| **Stockholders' equity:** | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares -- 5,000,000 | | |
| Issued and outstanding shares -- none in 2004 and 2003 | -- | -- |
| Common stock, $0.001 par value: | | |
| Authorized shares -- 200,000,000 | | |
| Issued -- 76,454,161 in 2004 and 75,031,097 in 2003 | | |
| Outstanding -- 76,298,152 in 2004 and 74,875,088 in 2003 | 76 | 75 |
| Additional paid in capital | 1,083,711 | 1,082,036 |
| Accumulated deficit | (1,024,091) | (987,560) |
| Deferred compensation | -- | (22) |
| Treasury stock, at cost; 156,009 shares in 2004 and 2003 | (773) | (773) |
| Accumulated other comprehensive loss | (2,582) | (2,368) |
| Total stockholders' equity | 56,341 | 91,388 |
| Total liabilities and stockholders' equity | $ 153,734 | $ 215,240 |

See accompanying notes.

60

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|  | (In thousands, except per share data) | | |
| Revenues: | | | |
| Product revenues | $ 140,622 | $ 128,791 | $ 120,306 |
| Related party product revenues | 9,916 | 4,694 | 9,097 |
| Total revenues | 150,538 | 133,485 | 129,403 |
| Cost of goods sold: | | | |
| Cost of product revenues | 103,150 | 99,261 | 92,497 |
| Cost of related party product revenue | 3,770 | 1,773 | 8,452 |
| Total cost of goods sold | 106,920 | 101,034 | 100,949 |
| Gross profit | 43,618 | 32,451 | 28,454 |
| Operating expenses: | | | |
| Research and development | 33,959 | 42,839 | 58,696 |
| Sales and marketing | 24,145 | 26,781 | 35,704 |
| General and administrative | 11,216 | 12,127 | 14,715 |
| Restructuring charges (net), executive severance and asset write-offs | 11,159 | 2,803 | 8,922 |
| Total operating expenses | 80,479 | 84,550 | 118,037 |
| Loss from operations | (36,861) | (52,099) | (89,583) |
| Interest income | 1,982 | 2,917 | 6,838 |
| Interest expense | (3,294) | (3,279) | (6,174) |
| Other income (expense) | 1,566 | 2,424 | (4,145) |
| Gain on early retirement of debt | -- | -- | 49,089 |
| Loss before tax (expense) benefit | (36,607) | (50,037) | (43,975) |
| Income tax (expense) benefit | 76 | (316) | (238) |
| Net loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |

See accompanying notes.

61

--------------------------------------------------------------------------------

Table of Contents

## TERAYON COMMUNICATION SYSTEMS, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | |
| Balance at December 31, 2001 | 71,943,930 | $ 73 | $1,074,203 | $ (892,994) | $ (458) | $ 248 | 127,839 | $ (768) | $ 180,304 |
| Exercise of options for cash to purchase common stock | 422,073 | | 1,721 | | | | | | 1,721 |
| Repurchase or return of common stock | (1,068) | | | | | | 28,170 | (5) | (5) |
| Return of escrow shares from Telegate acquisition | (25,077) | | | | | | | | |
| Issuance of options to non-employees | | | 38 | | (38) | | | | -- |
| Amortization of deferred compensation | | | 1 | | 471 | | | | 472 |
| Issuance of restricted common stock from stock option plan for services provided | 205,001 | | 290 | | | | | | 290 |
| Acceleration of vesting of employee stock options and stock protection payment | | | 1 | | | | | | 1 |
| Issuance of common stock for Employee Stock Purchase Plan | 539,186 | | 1,864 | | | | | | 1,864 |
| Issuance of warrant to purchase common stock | | | 26 | | | | | | 26 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | (519) | | | (519) |
| Cumulative translation adjustment | | | | | | (2,799) | | | (2,799) |
| Net loss | | | | (44,213) | | | | | (44,213) |
| Comprehensive loss | | | | | | | | | (47,531) |
| Balance at December 31, 2002 | 73,084,045 | 73 | 1,078,144 | (937,207) | (25) | (3,070) | 156,009 | (773) | 137,142 |
| Exercise of options for cash to purchase common stock | 579,233 | 1 | 2,533 | | | | | | 2,534 |
| Re-valuation of options to non-employees | | | 50 | | (50) | | | | |
| Amortization of deferred compensation | | | | | 53 | | | | 53 |
| Issuance of restricted common stock from stock option plan for services provided | 9,600 | | 70 | | | | | | 70 |
| Issuance of common stock for Employee Stock Purchase Plan | 1,202,210 | 1 | 1,194 | | | | | | 1,195 |
| Issuance of warrant to purchase common stock | | | 45 | | | | | | 45 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | (470) | | | (470) |
| Cumulative translation adjustment | | | | | | 1,172 | | | 1,172 |
| Net loss | | | | (50,353) | | | | | (50,353) |
| Comprehensive loss | | | | | | | | | (49,651) |
| Balance at December 31, 2003 | 74,875,088 | 75 | 1,082,036 | (987,560) | (22) | (2,368) | 156,009 | (773) | 91,388 |
| Exercise of options for cash to purchase common stock | 225,645 | | 490 | | | | | | 490 |
| Amortization of deferred compensation | | | | | 17 | | | | 17 |
| Cancellation of unvested stock options | | | (5) | | 5 | | | | -- |
| Issuance of common stock for Employee Stock Purchase Plan | 1,197,419 | 1 | 1,190 | | | | | | 1,191 |

62

--------------------------------------------------------------------------------

Table of Contents

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | (521) | | | (521) |
| Cumulative translation adjustment | | | | | | 307 | | | 307 |
| Net loss | | | | (36,531) | | | | | (36,531) |
| Comprehensive loss | | | | | | | | | (36,745) |
| Balance at December 31, 2004 | 76,298,152 | $76 | $1,083,711 | $(1,024,091) | $ -- | $ (2,582) | 156,009 | $ (773) | $ 56,341 |

See accompanying notes

63

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|  | (In thousands) | | |
| Operating activities: | | | |
| Net loss | $(36,531) | $(50,353) | $(44,213) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Settlement of Net Servicos account receivable | -- | -- | 1,118 |
| Depreciation and amortization | 6,416 | 9,369 | 11,572 |
| Write-off and amortization of intangible assets | -- | -- | 3,972 |
| Amortization of deferred compensation | 17 | 53 | 476 |
| Gain on early retirement of debt | -- | -- | (49,089) |
| Inventory provision | 11,980 | 4,086 | 6,109 |
| Impairment of investment | -- | -- | 4,500 |
| Write-off of fixed assets | 2,393 | 497 | 2,987 |
| Compensation expense for issuance of common stock | -- | 70 | -- |
| Value of common and preferred stock warrants issued | -- | 45 | 26 |
| Net changes in operating assets and liabilities: | | | |
| Accounts receivable, net | 12,645 | (12,844) | 26,211 |
| Accounts receivable from related parties | (2,506) | 242 | 3,164 |
| Inventory | (12,760) | (12,193) | 4,065 |
| Other assets | 5,131 | 7,281 | 443 |
| Accounts payable | (18,204) | 2,129 | (18,901) |
| Accrued payroll and related expenses | (2,356) | 310 | (3,214) |
| Deferred revenues | (844) | 2,926 | (3,672) |
| Accrued warranty expenses | (1,639) | (3,098) | 239 |
| Accrued restructuring charges | 1,066 | (2,254) | (1,443) |
| Accrued vendor cancellation charges | (2,348) | (12,335) | (3,426) |
| Other accrued liabilities | (2,008) | (2,331) | (6,725) |
| Interest payable | (2) | 3 | (1,918) |
| Net cash used in operating activities | (39,550) | (68,397) | (67,719) |
| Investing activities: | | | |
| Purchases of short-term investments | (54,517) | (243,652) | (288,186) |
| Proceeds from sales and maturities of short-term investments | 107,931 | 224,154 | 434,346 |
| Purchases of property and equipment | (2,698) | (3,831) | (7,186) |
| Net cash provided by (used in) investing activities | 50,716 | (23,329) | 138,974 |
| Financing activities: | | | |
| Principal payments on capital leases | (124) | (66) | (127) |
| Payments on repurchase of common stock | -- | -- | (5) |
| Repurchase of convertible subordinated notes | -- | -- | (57,627) |
| Proceeds from issuance of common stock | 1,681 | 3,729 | 3,872 |
| Net cash provided by (used in) financing activities | 1,557 | 3,663 | (53,887) |
| Effect of foreign currency exchange rate changes | 307 | 1,172 | (563) |
| Net (decrease) increase in cash and cash equivalents | (13,030) | (86,891) | 16,805 |
| Cash and cash equivalents at beginning of year | 30,188 | 117,079 | 100,274 |
| Cash and cash equivalents at end of year | $43,218 | $30,188 | $117,079 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for income taxes | $138 | $194 | $714 |
| Cash paid for interest | $3,268 | $3,262 | $8,387 |
| Supplemental non-cash investing and financing activities: | | | |
| Deferred compensation relating to common stock issued to non-employees | $-- | $53 | $38 |

See accompanying notes.

64

--------------------------------------------------------------------------------

Table of Contents

                    TERAYON COMMUNICATION SYSTEMS, INC.
                 NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.Organization


Description of Business

    Terayon Communication Systems, Inc. (Company) was incorporated under the
laws of the State of California on January 20, 1993. In June 1998, the Company
reincorporated in the State of Delaware.
    The Company develops, markets and sells equipment to broadband service
providers who use the Company's products to deliver broadband voice, digital
video solutions (DVS) and data services to residential and business subscribers.

2.Summary of Significant Accounting Policies


Basis of Consolidation

    The consolidated financial statements include the accounts of the Company
and its wholly owned subsidiaries. All intercompany balances and transactions
have been eliminated.

Use of Estimates

    The preparation of the consolidated financial statements in conformity
with United States generally accepted accounting principles requires management
to make estimates and assumptions that affect the amounts reported in the
consolidated financial statements and accompanying notes. Estimates are based on
historical experience, input from sources outside of the Company, and other
relevant facts and circumstances. Actual results could differ from those
estimates. Areas that are particularly significant include the Company's revenue
recognition policy, the valuation of its accounts receivable and inventory, the
assessment of recoverability and the measurement of impairment of fixed assets,
and the recognition of restructuring liabilities.

Foreign Currency Translation

    The Company records the effect of foreign currency translation in
accordance with Statement of Financial Account Standards (SFAS) No. 52, "Foreign
Currency Translation." For operations outside the United States that prepare
financial statements in currencies other than the U.S. dollar, results of
operations and cash flows are translated at average exchange rates during the
period, and assets and liabilities are translated at end-of-period exchange
rates. Translation adjustments are included as a separate component of
accumulated other comprehensive loss in stockholders' equity. For the three
years ended December 31, 2004, translation gains and losses were not
significant. Realized foreign currency transaction gains and losses are included
in results of operations as incurred, and have not been significant to the
Company's operating results in any year presented.

Concentrations of Credit Risk, Customers, Suppliers, and Products

    The Company performs ongoing credit evaluations of its customers and
generally requires no collateral. Credit losses have historically been within
management's expectations. The Company maintains an allowance for potentially
uncollectible accounts receivable based on an assessment of collectibility. The
Company assesses collectibility based on a number of factors, including past
history, the number of days an amount is past due (based on invoice due date),
changes in credit ratings of customers, current events and circumstances
regarding the business of the Company's client's customers and other factors
that the Company believes are relevant. At December 31, 2004 and 2003, the
allowance for potentially uncollectible accounts was $1.3 million and $3.6
million, respectively. In 2004, we experienced better than expected collections
of $2.1 million offset by write-offs of $201,000. A relatively small number of
customers account for a significant

                                    65

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in several financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/ AA- or better or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

The Company recognizes revenue in accordance with SEC Staff Accounting Bulletin (SAB) No. 104 "Revenue Recognition" ("SAB 104"). SAB 104 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services were rendered; (3) the selling price is fixed or determinable; and (4) collectibility is reasonably assured.

Contracts and customer purchase orders are used to determine the existence of an arrangement. Delivery occurs when product is delivered to a common carrier. Certain of our products are delivered on an FOB destination basis. The Company defers revenue associated with these transactions until the delivery has occurred to the customers' premises. The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. The Company assesses collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

The Company's service revenue, which is sold separately from product lines represents approximately 2.4% and 1.3% of revenue for the years ended December 31, 2004 and 2003, respectively. It is generated from service arrangements for product support, which is recognized ratably over the term of the arrangement, typically one year. Product support includes internet access to technical content, software upgrades, as well as internet and telephone access to technical support personnel.

Research and Development Expenses

Research and development expenses are charged to expense as incurred.

Shipping and Handling Costs

Costs related to shipping and handling are included in cost of goods sold for all periods presented.

Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2004, 2003 and 2002 were $0.1 million, $0.1 million, and $0.4 million, respectively.

66

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers). The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against revenues in accordance with the Financial Accounting Standards Board (FASB) Emerging Issues Task Force (EITF) No. 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively, and none in 2004. The Company charged the amortization of these assets against revenues through the six quarters ended in December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter. See Note 14.

Net Loss Per Share

Basic and diluted net loss per share was computed using the weighted average number of common shares outstanding. Options, warrants, restricted stock, and convertible debt were not included in the computation of diluted net loss per share because the effect would be anti-dilutive.

Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
| Net loss | $(36,531) | $(50,353) | $(44,213) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) |

Options to purchase 16,802,838, 17,463,959 and 14,635,025 shares of common stock were outstanding at December 31, 2004, 2003 and 2002, respectively, and warrants to purchase 200,000 and 2,325,593 shares of common stock were outstanding at December 31, 2003 and 2002, respectively, and none in 2004 but were not included in the computation of diluted net loss per share, since the effect is anti-dilutive.

Cash, Cash Equivalents and Short-Term Investments

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company determines impairment related to its debt and equity investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities", and SAB 59, "Accounting for Noncurrent Marketable Equity Securities", which provide guidance on determining when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost, the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and the Company's intent and ability to hold the investment. The Company also relies upon guidance from EITF 03-01 "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments" in determining possible impairment as it relates to its debt investments. In 2004, the Company recorded approximately $0.5 million in unrealized losses on investments in Other

67

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Comprehensive Loss on the Consolidated Balance Sheet. The unrealized losses relating to investments in federal agency securities were caused by interest rate increases. The Company purchased these securities at par, and the contractual cash flows of these investments are guaranteed by an agency of the U.S. government. Accordingly, it is expected that the securities would not be settled at a price less than the amortized cost of the Company's investment. Because the decline in market value is attributable to changes in interest rates and not credit quality and because the Company has the ability and intent to hold these investments until a recovery of fair value, which may be at maturity, the Company does not consider these investments to be other-than-temporarily impaired at December 31, 2004. Further the Company has a history of holding these types on investments to maturity and assesses this issue quarterly.

The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities are classified as available-for-sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short-term equity securities at December 31, 2004 or 2003.

Other Current Receivables

As of December 31, 2004 and 2003, other current receivables are primarily composed of interest, taxes, and non-trade receivables, and include approximately $0.2 million and $1.8 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2003 |
| Finished goods | $13,763 | $14,264 |
| Work-in process | 1,501 | 660 |
| Raw materials | 1,880 | 1,440 |
| | $17,144 | $16,364 |

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date, which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by the Company's customers, the Company believes that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available. See Note 4.

68

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Cost of goods sold for the years ended December 31, 2004 and 2003 included reversals of $3.3 million ($0.04 per share) and $10.0 million ($0.13 per share), respectively, of special charges originally recorded in 2001 and 2000 for vendor cancellation charges and inventory considered to be excess and obsolete. The Company changed its previous estimates and was able to reverse the provisions in 2004 and 2003, as it was able to sell inventory originally considered to be excess and obsolete. In addition, the Company was able to negotiate downward certain vendor cancellation claims to terms more favorable to the Company.

During 2004, 2003 and 2002, the Company recorded inventory charges of $12.0 million, $4.1 million and $6.1 million, respectively, to write down some of its inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value in 2002 as average selling prices fell below the cost of these products and to record charges for excess and obsolete inventory.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, for the years ended December 31, 2004, 2003 and 2002, the Company recorded $2.4 million, $0.5 million and $1.3 million, respectively in asset impairments primarily related to restructuring activities.

Property and equipment are as follows (in thousands):

|  | December 31, | |
|  | 2004 | 2003 |
| Software and computers | $ 21,415 | $ 23,273 |
| Furniture and equipment | 21,623 | 23,816 |
| Leasehold improvements | 5,021 | 4,935 |
| Automobiles | 16 | 16 |
| Property and equipment | 48,075 | 52,040 |
| Accumulated depreciation and Amortization | (42,315) | (40,169) |
| Property and equipment, net | $ 5,760 | $ 11,871 |

Depreciation expense was $5.9 million and $8.9 million for the twelve months ended December 31, 2004 and 2003, respectively. Amortization expense for the twelve months ended December 31, 2004 and 2003 were both $0.5 million.

Restricted Cash

Restricted cash at both December 31, 2004 and 2003 primarily related to approximately $7.5 million to secure an aircraft lease as well as $1.3 million and $1.7 million, respectively, to secure real estate leases.

Goodwill and Other Intangible Assets

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2002, the Company recorded impairment charges for goodwill, assembled workforce, and other intangible assets (see Note 6). At December 31, 2004 and 2003, all goodwill had either been amortized or written-off the Company's books.

69

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Goodwill and other long-lived assets were reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicated that the carrying amount may not have be recoverable. When such events occurred, the Company compared the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicated that there was an impairment, the amount of the impairment was typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows was based on the Company's weighted average cost of capital, which represented the blended costs of debt and equity.

Warranty Obligations

The Company provides a standard warranty for most of its products, ranging from one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Expense estimates are based on historical experience and expectation of future conditions. See Note 15.

Stock-Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25), and includes the disclosure-only provisions as required under SFAS No. 123, "Accounting for Stock-Based Compensation" (SFAS 123). The Company provides additional pro forma disclosures as required under SFAS 123 and SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure".

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the fair value method of SFAS 123, the Company's net loss and net loss per share would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
| Net loss | $(36,531) | $(50,353) | $(44,213) |
| Add: Stock-based compensation under APB 25 | 22 | 123 | 476 |
| Deduct: Stock option compensation expense determined under fair value-based method | (13,741) | (22,210) | (33,718) |
| Employee stock purchase plan compensation expense determined under fair value-based method | (928) | (1,712) | (1,990) |
| Pro forma net loss | $(51,178) | $(74,152) | $(79,445) |
| Pro forma basic and diluted net loss per share | $ (0.67) | $ (1.00) | $ (1.09) |

Equity instruments granted to non-employees are accounted for under the fair value method, in accordance with SFAS 123 and EITF No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black-Scholes option pricing model and are recorded in the equity section of the Company's consolidated balance sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

70

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Accumulated Other Comprehensive Loss

Accumulated other comprehensive loss presented in the accompanying consolidated balance sheets and consolidated statements of stockholders' equity consists of net unrealized gain (loss) on short-term investments and accumulated net foreign currency translation losses.

The following are the components of accumulated other comprehensive loss (in thousands):

|  | Years Ended December 31, | |
|  | 2004 | 2003 |
| Cumulative translation adjustments | $(2,093) | $(2,400) |
| Unrealized gain/(loss) on available-for-sale investments | (489) | 32 |
| Total accumulated other comprehensive loss | $(2,582) | $(2,368) |

Reclassification

Certain amounts of revenues reported by geographical areas in previous years have been reclassified to conform to the 2004 presentation. Such reclassifications had no effect on previously reported results of operations, total assets or accumulated deficit.

Impact of Recently Issued Accounting Standards

On December 16, 2004, FASB issued SFAS 123(R) which is a revision of SFAS Statement No. 123, Accounting for Stock-Based Compensation. SFAS 123(R) supersedes APB 25, Accounting for Stock Issued to Employees, and amends SFAS Statement No. 95, Statement of Cash Flows. Generally, the approach in SFAS 123(R) is similar to the approach described in Statement 123. However, SFAS 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. SFAS 123(R) must be adopted no later than July 1, 2005. Early adoption will be permitted in periods in which financial statements have not yet been issued. The Company expects to adopt SFAS 123(R) on July 1, 2005. A component of SFAS 123(R) includes one of the following options: (a) modified-prospective method, (b) the modified-retrospective method, restating all prior periods or (c) the modified-retrospective method, restating only the prior interim periods of 2005. A determination as to which of the three options the Company will adopt will be made at a later date.

As permitted by SFAS 123, the Company currently accounts for share-based payments to employees using APB 25's intrinsic value method and, as such, generally recognizes no compensation cost for employee stock options. Accordingly, the adoption of SFAS 123(R)'s fair value method will have a significant impact on the Company's result of operations, although it will have no impact on our overall financial position. The impact of adoption of SFAS 123(R) cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had we adopted SFAS 123(R) in prior periods, the impact of that standard would have approximated the impact of SFAS 123 as described in the disclosure of pro forma net income and earnings per share in Note 2 to our consolidated financial statements. SFAS 123(R) also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as required under current literature. This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. While the Company cannot estimate what those amounts will be in the future (because they depend on, among other things, when employees exercise stock options), the Company has not recognized any operating cash flows for such excess tax deductions in any of the periods presented.

71

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

3.Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents approximate fair value due to their short-term maturities. The fair value for the Company's investments in marketable debt and equity securities is estimated based on quoted market prices.

The fair value of short-term and long-term capital lease and debt obligations is estimated based on current interest rates available to the Company for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations, as of each period presented approximate their respective fair values.

The following estimated fair value amounts have been determined using available market information. However, considerable judgment is required in interpreting market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

| | December 31, 2004 | | | |
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| --- | --- | --- | --- | --- |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Government agency obligations | $  8,000 | $  -- | $  (72) | $  7,928 |
| Total | 8,000 | -- | (72) | 7,928 |
| Investments maturing in 1-2 years: | | | | |
| Government agency obligations | 47,006 | -- | (417) | 46,589 |
| Total | 47,006 | -- | (417) | 46,589 |
| Total | $ 55,006 | $  -- | $  (489) | $ 54,517 |

| | December 31, 2003 | | | |
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| --- | --- | --- | --- | --- |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 38,940 | $  -- | $  (12) | $ 38,928 |
| Fixed income corporate securities | 2,223 | 1 | -- | 2,224 |
| Government agency obligations | 7,918 | 1 | -- | 7,919 |
| Total | 49,081 | 2 | (12) | 49,071 |
| Investments maturing in 1-2 years: | | | | |
| Fixed income corporate securities | 1,333 | -- | -- | 1,333 |
| Government agency obligations | 58,006 | 68 | (26) | 58,048 |
| Total | $ 59,339 | $ 68 | $  (26) | $ 59,381 |
| Total | $ 108,420 | $ 70 | $  (38) | $ 108,452 |

There were no realized gains or losses on short term investments in either the year ended December 31, 2004 or 2003, respectively.

72

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

4. Commitments

Leases

The Company leases its facilities and certain equipment under operating leases. The operating lease for the Company's corporate headquarters expires in 2009. The operating lease for the Company's Israel headquarters expires in 2005. The Company's other operating leases expire at various times through 2006. Rent expense was approximately $6.3 million, $7.1 million, and $7.9 million, for the years ended December 31, 2004, 2003, and 2002, respectively. The Company subleases a portion of its facilities to third parties. In connection with the restructuring plans announced January 27, 2004, the Company is seeking to sublease approximately 56,400 square feet of its Santa Clara, California facility. See Note 6. The Company's sublease rental income was approximately $1.7 million, $1.1 million, and $0.4 million for the years ended December 31, 2004, 2003 and 2002, respectively.

The Company leases certain equipment under non-cancelable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment totaled $0.0 and $0.3 million at December 31, 2004 and 2003, respectively. Related accumulated amortization was $0.0 and $0.3 million at December 31, 2004 and 2003, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit at December 31, 2002. The letter of credit was reduced to $7.5 million in February 2003. The $7.5 million letter of credit was converted to a cash deposit in 2004. In August 2004 the Company entered into a 28 month aircraft sublease terminating on December 31, 2006. The lease commitment for the aircraft is included in the table below.

Future minimum lease payments under non-cancelable operating leases as of December 31, 2004 are as follows (in thousands):

|  | Operating Leases |
|---|---|
| 2005 | $  7,452 |
| 2006 | 4,900 |
| 2007 | 3,177 |
| 2008 | 3,087 |
| 2009 | 2,579 |
| Thereafter | 188 |
| Total minimum payments | $  21,383 |

As of December 31, 2004 there are approximately $2.4 million of future minimum sublease payments to be received under non-cancelable subleases not reflected in the table above.

Purchase Obligations and Special Charges

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of open purchase orders placed with vendors for goods and services of the vendors' products at a specified price. As of December 31, 2004, $30.0 million of purchase obligations were outstanding. As a result of declines in its forecasts, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand, or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges in amounts that represented management's estimate of the Company's exposure to vendors for its

73

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)
inventory commitments. At December 31, 2004, accrued vendor cancellation charges
were $0.5 million and the remaining $29.5 million is attributable to open
purchase orders that are expected to be utilized in the normal course of
business and are expected to become payable at various times throughout 2005.

On February 26, 2003, the Company entered into an agreement with Solectron
Corporation (Solectron) to settle all outstanding obligations under three
manufacturing agreements between the Company and Solectron. Under the terms of
the settlement agreement, the Company paid Solectron approximately $3.9 million,
and each party released any and all claims that it may have had against the
other party. Additionally, the Company received selected inventory from
Solectron. The Company previously accrued $6.0 million toward the settlement of
the Solectron matter as a vendor cancellation charge in the fourth quarter of
2000 and the second quarter of 2001. In 2003, in connection with the Solectron
settlement, the Company reversed $2.1 million of the accrued vendor cancellation
charges included in cost of goods sold.

On September 29, 2003, the Company entered into an agreement with
Flextronics (Israel) Ltd., an Israeli company (Flextronics), to purchase
inventory from Flextronics and settle all outstanding claims between the Company
and Flextronics. Under the terms of the settlement agreement, the Company paid
Flextronics approximately $1.5 million to be applied toward the purchase of
future inventory from Flextronics, if any. Additionally, each party released any
and all claims that it may have had against the other party. The Company
previously accrued $2.0 million toward the settlement of the Flextronics matter
as a vendor cancellation charge in the second quarter of 2001. In 2003, in
connection with the Flextronics settlement, the Company reversed $0.5 million of
the accrued vendor cancellation charges included in cost of goods sold.

Letters of Credit

As of December 31, 2004, the Company had $0.5 million in unused
outstanding letters of credit primarily required to support operating leases,
which expire at various dates through 2009.

Royalties

The Company has various royalty arrangements, which require it to pay
nominal amounts to various suppliers for usage of licensed property. Royalties
are generally calculated on a per-unit basis, and to a lesser extent, as a
percentage of sales. The Company's total accrued obligations for royalties at
December 31, 2004 and 2003 were $0.4 million and $1.3 million, respectively.

The Company has purchased, through its acquisition of Radwiz Ltd.
(Radwiz), certain technology that utilized funding provided by the Israeli Chief
Scientist of the Ministry of Industry and Trade. The Company has committed to
pay royalties to the Government of Israel on proceeds from sales of products
based on this technology at rates of 3%-5% per sale. The Company does not expect
sales of products using this technology to be material in 2005.

5. Accrued Severance Pay

In June 2004, the Company entered into an employment agreement with an
executive officer. The executive officer resigned effective as of October 1,
2004. The Company recorded a severance provision of $1.4 million related to
termination costs for this officer in the third quarter of 2004. Most of the
severance costs related to this officer were paid in the fourth quarter of 2004
with nominal amounts for employee benefits payable into the fourth quarter of
2005.

In June 2004, the Company entered into separation agreements with two
other executive officers. One officer resigned in the second quarter of 2004 and
the other officer resigned from the Company during the third quarter of 2004.
The Company recorded a severance provision of $1.7 million related to
termination costs for these officers in the second quarter of 2004. Most of the
severance costs were paid in the third quarter of 2004 with nominal amounts for
employee benefits payable through the third quarter of 2005.

74

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

In August 2004, the Company entered into an employment agreement with another executive officer. The executive officer resigned effective as of December 31, 2004. The Company recorded a severance provision of $403,000 related to termination costs for this officer in the fourth quarter of 2004. Most of the severance costs related to this officer were paid in the first quarter of 2005 with nominal amounts for employee benefits payable into the fourth quarter of 2005.

This table summarizes the executive severance balance as of December 31, 2004 (in thousands):

|  | Executive Severance |
|---|---|
| Balance at December 31, 2003 | $    -- |
| Charges | 3,451 |
| Cash payments | (3,020) |
| Balance at December 31, 2004 | $   431 |

The 2004 charge for executive severance of $3.5 million is included within restructuring charges (net), executive severance and asset write-off in the Consolidated Statement of Operations. The $0.4 million in executive severance is accrued on the Consolidated Balance Sheet within accrued restructuring and executive severance at December 31, 2004.

One of the Company's subsidiaries is subject to Israeli law and labor agreements, under which it is required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment, is included in the Company's consolidated balance sheets on the accrual basis, and is partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2004 and 2003, $1.3 million and $1.9 million, respectively, for accrued severance pay was included in long-term obligations. In accordance with EITF No. 88-1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $0.7 million and $1.3 million relating to the amounts funded by the purchase of insurance policies for the Israeli severance liability in its consolidated balance sheets as other assets at December 31, 2004 and 2003, respectively.

6.    Restructuring Charges, net and Asset Write-offs

The Company accrues for termination costs in accordance with SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities," (SFAS 146) and SFAS No. 112 "Employers' Accounting for Post Employment Benefits." Liabilities are initially measured at their fair value on the date in which they are incurred based on plans approved by the Company's Board of Directors. Accrued employee termination costs principally consist of three components: 1) a lump-sum severance payment based upon years of service (e.g. two weeks per year of service); 2) COBRA insurance based on years of service and rounded up to the month; and 3) an estimate of costs for outplacement services immediately provided to the affected employees. Substantially all employees were terminated on the date of notification, so there was no additional service period required to be included in the determination of accrued termination costs. Where such services were required for a period over 60 days, the Company ratably amortized termination cost over the required service period.

2004 Restructurings

During the first quarter of 2004, the Company initiated a Board of Directors approved restructuring plan to bring operating expenses in line with revenue levels. The Company incurred restructuring charges in the amount of $3.3 million of which $1.0 million related to employee termination costs, $0.9 million related to

75

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

termination costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. The Company incurred restructuring charges in the amount of $1.1 million in the second quarter of 2004 related to additional costs for excess leased facilities, which were contemplated in the first quarter restructuring plan. In the fourth quarter to further conform the Company's expenses to its revenue and to cease investment in the cable modem termination systems (CMTS) product line the Company's Board of Directors approved a third restructuring plan with a charge in the amount of $1.3 million related to employee terminations.

In the second, third and fourth quarters of 2004, the Company re-evaluated the first and second quarter 2004 restructuring charges for the employee severance, excess facilities and the aircraft lease termination. Based on market conditions, new assumptions provided by its real-estate broker, and the terms of aircraft sublease agreement, which the Company entered into in the third quarter of 2004, the Company increased the restructuring charge for the aircraft lease by a total of $1.0 million, the facilities accrual was increased $0.3 million and employee severance accrual was decreased by $0.2 million, for the year ended December 31, 2004.

As of December 31, 2004, $3.3 million remained accrued. The employment of 168 employees had been terminated, and we had paid $1.5 million in termination costs, $1.2 million of costs related to the aircraft lease, and $0.9 million of costs related to excess leased facilities. The balance of the employee termination charges were paid in the first quarter of 2005.

The Company anticipates the remaining restructuring accrual related to the aircraft lease to be substantially utilized for servicing operating lease payments, through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments through October 2009.

The reserve for the aircraft lease approximates the difference between the Company's current costs for the aircraft lease and the estimated income derived from subleasing.

The amount of net charges accrued under the 2004 restructuring plans assumes that the Company will successfully sublease excess leased facilities. The reserve for the excess leased facilities includes the estimated income derived from subleasing, which is based on information from the Company's real-estate brokers, who estimated it based on assumptions relevant to the real estate market conditions as of the date of the Company's implementation of the restructuring plan and the time it would likely take to sublease the excess leased facilities. Even though it is the Company's intent to sublease its interests in the excess facility at the earliest possible time, the Company cannot determine with certainty a fixed date by which such events will occur, if at all. In light of this uncertainty, the Company will continue to periodically re-evaluate and adjust the accrual, as necessary.

This table summarizes the accrued restructuring balances related to the 2004 restructurings as of December 31, 2004 (in thousands):

| | Involuntary Terminations | Aircraft Lease Termination | Excess Leased Facilities | Total |
|---|---|---|---|---|
| Balance at December 31, 2003 | $ -- | $ -- | $ -- | $ -- |
| Charges | 2,297 | 934 | 2,523 | 5,754 |
| Cash payments | (1,467) | (1,194) | (850) | (3,511) |
| Changes in estimates | (238) | 952 | 325 | 1,039 |
| Balance at December 31, 2004 | $ 592 | $ 692 | $ 1,998 | $ 3,282 |

76

---

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

2003 Restructuring

During the first quarter of 2003, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 restructuring. As of December 31, 2003, 81 employees were terminated throughout the Company, and the Company paid $2.7 million in termination costs. In the second quarter of 2003, the Company reversed $86,000 of previously accrued termination costs due to a change in estimate. At December 31, 2004, no restructuring charges remained accrued.

2002 Restructuring

During 2002, a restructuring plan (2002 Plan) was approved by the Board of Directors and the Company incurred restructuring charges in the amount of $3.6 million of which $15,000 remained accrued at December 31, 2004, for excess leased facilities in Israel. The 2002 Plan increased the reserve for excess leased facilities due to the exiting of additional space within the same facility in Israel as in the 2001 Plan. As part of the 2002 Plan 153 employees were terminated throughout the Company. During 2004, improving real estate market conditions in Israel gave rise to the Company's improved tenant sublease assumptions, thereby creating a change in estimate of $100,000. Additionally, a reclassification between the 2002 Plan and 2001 Plan correcting the application of cash payments to the appropriate reserve, decreased the reserve for the 2002 Plan by $1.1 million. The Company currently anticipates the remaining restructuring accrual relating to excess leased facilities, will be utilized for servicing operating lease payments through 2005.

This table summarizes the accrued restructuring balances related to the 2002 restructurings as of December 31, 2004 (in thousands):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Charges | $    2,319 | $  1,322 | $ 3,641 |
| Cash payments | (2,131) | -- | (2,131) |
| Reclassifications | (100) | 100 | -- |
| Balance at December 31, 2002 | 88 | 1,422 | 1,510 |
| Cash payments | (88) | (219) | (307) |
| Balance at December 31, 2003 | -- | 1,203 | 1,203 |
| Cash payments | -- | -- | -- |
| Reclassifications | -- | (1,088) | (1,088) |
| Change in estimate | -- | (100) | (100) |
| Balance at December 31, 2004 | $    -- | $      15 | $    15 |

2001 Restructuring

During 2001, the Board of Directors approved a restructuring plan (2001 Plan) and the Company incurred restructuring charges in the amount of $12.7 million of which $1.8 million remained accrued at December 31, 2004, for excess leased facilities in Israel. Terminations covering 293 technical, production and administrative employees occurred as part of the 2001 Plan. During 2004, improving real estate market conditions in Israel gave rise to the Company's improved tenant sublease assumptions thereby creating a change in estimate of $1.4 million. Additionally, a reclassification between the 2002 Plan and 2001 Plans

77

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

correcting the application of cash payments to the appropriate reserve, increased the reserve for the 2001 Plan by $1.1 million. The Company currently anticipates the remaining restructuring accrual relating to excess leased facilities, will be utilized for servicing operating lease payments through 2005.

This table summarizes the accrued restructuring balances related to the 2001 restructurings as of December 31, 2004 (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Charges | $ 3,168 | $ 9,501 | $12,669 |
| Cash payments | (1,891) | (2,580) | (4,471) |
| Balance at December 31, 2001 | 1,277 | 6,921 | 8,198 |
| Cash payments | (100) | (2,855) | (2,955) |
| Reclassifications | (1,177) | 1,177 | -- |
| Balance at December 31, 2002 | -- | 5,243 | 5,243 |
| Cash payments | -- | (1,685) | (1,685) |
| Change in estimate | -- | (261) | (261) |
| Balance at December 31, 2003 | -- | 3,297 | 3,297 |
| Cash payments | -- | (1,170) | (1,170) |
| Reclassifications | -- | 1,088 | 1,088 |
| Change in estimate | -- | (1,377) | (1,377) |
| Balance at December 31, 2004 | $ -- | $ 1,838 | $ 1,838 |

Asset Write-offs

As a result of CMTS product line restructuring activities in 2004, the Company recognized a fixed asset impairment charge of $2.4 million. The impairment charge reflects a write-down of the assets' carrying value to a fair value based on a third party valuation in 2004.

Primarily as a result of restructuring activities in 2003, the Company wrote off $0.4 million of fixed assets in 2003, which were determined to have no remaining useful life. As a result of restructuring activities in 2002 certain property and equipment were determined to have no remaining useful life. During 2002, $1.3 million of fixed assets were written-off. The impaired fixed assets in each period represented the net book value of idle manufacturing equipment, leasehold, and office equipment.

The Company adopted SFAS No. 142 on January 1, 2002. The Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption. The Company tests goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, the Company experienced a significant drop in its market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on the forecast, the estimated undiscounted future cash flows from the use of the goodwill would have been less than its carrying amount. The Company determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million in

78

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

2002 was related to the Cable segment and $1.0 million was related to the former Telecom segment. Subsequent to this write-off, the Company had no intangible assets, that were deemed to have indefinite useful lives.

7. Impairment of Long-Term Investment

The Company's long-lived assets previously included long-term equity investments. During 2002, the Company determined that one long term equity investment in a privately-held company was impaired. The investee's forecasts were not met and market conditions significantly deteriorated and accordingly, the Company recorded an impairment charge of $4.5 million. The net book value of the Company's long term equity investments was zero as of December 31, 2004 and 2003.

8. Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.4 million. The Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company could have redeemed some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company would also make an additional payment of $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2004 and 2003, accumulated amortization of debt issuance costs totaled $15.3 million and $14.5 million, respectively.

In 2002, the Company repurchased approximately $109.1 million of the Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million. In 2001, the Company repurchased approximately $325.9 million of the Notes. The Company did not repurchase any Notes during 2004 or 2003.

In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, in 2002, the Company began reporting the gain from retirement of the Notes in operating results.

Approximately $65.1 million of the Notes were outstanding at December 31, 2004 and 2003.

9. Contingencies

Litigation

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against the Company and certain of the Company's officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading

79

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

statements and failing to disclose material information regarding the Company's technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired the Company's securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery. On March 24, 2004, plaintiffs submitted certain documents to the Court in response to its order, and, on April 16, 2004, the Company responded to this submission. The Company has also have initiated discovery pursuant to the Court's February 23, 2004 order.

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

The Court of Appeals' opinion affirming dismissal of the Bertram case does not end the class action. The Company believes that the allegations in the class action are without merit, and we intend to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

In 2002, two shareholders filed derivative cases purportedly on behalf of the Company against certain of its current and former directors, officers, and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the California Superior Court, Santa Clara County. The Company is a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In the securities class action, the Company disputes making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants.

The Company believes that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company (Omniband) filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the breach of an agreement by the Company, Terayon Communication Systems Ltd., a wholly-owned subsidiary of the Company, and Radwiz Ltd (Radwiz), a former wholly-owned subsidiary of the Company, to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz but dismissed the proceedings against the Company and Terayon Ltd. Omniband appealed the Zurich Chamber of Commerce's decision to dismiss the proceedings against the Company and Terayon Ltd., and the decision was affirmed on October 15, 2004. On January 13, 2005, the

80

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Zurich Chamber of Commerce dismissed the case with prejudice after Omniband failed to respond and pay the arbitration fees.

In January 2005, Adelphia Corporation sued the Company in the District Court of the City and County of Denver, Colorado. Adelphia's complaint alleges, among other things, breach of contract and misrepresentation in connection with the Company's sale of CMTS products to Adelphia and the Company's announcement to cease future investment in the CMTS market. Adelphia seeks unspecified monetary damages and declaratory relief. The Company filed a motion to dismiss the complaint on February 24, 2005. As the Company believes that Adelphia's allegations are without merit, it intends to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

From time to time, the Company receives letters claiming that the Company's technology and products may infringe on intellectual property rights of third parties. The Company also has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that the Company's technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require the Company to enter into royalty arrangements; subject the Company to damages or injunctions restricting the sale of its products, require the Company to indemnify its customers for the use of the allegedly infringing products; require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments; require the Company to redesign certain of its products; or damage the Company's reputation, any one of which could materially and adversely affect the Company's business, results of operations and financial condition.

The Company has received letters claiming that its technology infringes the intellectual property rights of others. The Company has consulted with its patent counsel and is in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that the Company's products infringe third party intellectual property rights. If the Company is found to have infringed third party rights, the Company could be subject to substantial damages and/or an injunction preventing the Company from conducting its business. In addition, other third parties may assert infringement claims against the Company in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert the Company's management's resources cause product shipment delays or require the Company to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to the Company, if at all.

Furthermore, the Company has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that its technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require the Company to enter into royalty arrangements; subject the Company to damages or injunctions restricting the sale of its products; require the Company to indemnify its customers for the use of the allegedly infringing products; require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments; require the Company to redesign certain of its products; or damage its reputation, any one of which could materially and adversely affect the Company's business, results of operations and financial condition.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on its financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the

81

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position and overall results of operations for any of the above legal proceedings could change in the future.

10. Stockholders' Equity

Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw a warrant (Anti-Dilution Warrant) to purchase an indeterminate number of shares of common stock. The Anti-Dilution Warrant was exercisable at the option of Shaw during the period that Shaw owned equity in the Company and in the event the Company issued new equity securities at below the current market price defined in the Anti-Dilution Warrant. The aggregate exercise price was $0.50. The Company issued certain equity securities that, as of December 31, 2003 and 2002, required the Company to issue an additional 37,283 and 17,293 warrants, respectively, to purchase shares of common stock pursuant to the Anti-Dilution Warrant. The Company recorded expenses of approximately $45,000 and $26,000 relating to the issuance of warrants pursuant to the Anti-Dilution Warrant, in 2003 and 2002, respectively. The expense was calculated by multiplying the annualized fair market value of the Company's stock by the share dilution attributable to the Anti-Dilution Warrant. In February 2003, Shaw transferred its ownership to a third party and the Anti-Dilution Warrant expired unexercised. As of December 31, 2003, the Anti-Dilution Warrant had expired and was not exercised.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24th per month, beginning January 31, 2001. The fair value of the warrant of approximately $0.7 million was calculated using the Black-Scholes method and was recorded as additional consideration relating to the purchase of TrueChat. As of December 31, 2003, the TrueChat warrant was exercisable for an aggregate of 200,000 shares of the Company's common stock. The TrueChat warrant expired unexercised in February 2004.

Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of preferred stock. The rights were distributed as a non-taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15% or more of the Company's common stock or announces a tender offer for 15% or more of the Company's common stock. If a person or group acquires 15% or more of the Company's common stock, all rights holders except the buyer will be entitled to acquire the Company's common stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15% of the Company's common stock.

82

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Common Stock Reserved

Common stock reserved for issuance is as follows:

|  | December 31, 2004 |
| --- | --- |
| Common stock options | 28,719,914 |
| Employee stock purchase plan | 1,202,733 |
| Total | 29,922,647 |

Stock Option and Stock Purchase Plans

1995 Plan

    In March 1995, the Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of our common stock. As of December 31, 2004 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

    In March 1997, the Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of our common stock. In June 1998, the Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (5,000,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than 5% of our outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares.
    The 1997 Plan was amended on June 13, 2000 to increase the shares authorized for issuance by 3,770,000 additional shares and to provide for an increase in the number of shares of common stock beginning January 1, 2000 through January 1, 2007, by the lesser of 5% of the common stock outstanding on such January 1 or 3,000,000 shares. In May 2003, the Company's Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1997 Plan by 6,237,826 shares. As of December 31, 2004, a total of 15,516,702 shares have been authorized for issuance related to the 1997 Plan.

1998 Plan

    In June 1998, the Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of our common stock have been reserved for future issuance to our non-employee directors. In 2002, the Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2004, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

1999 Plan

    In September 1999, our Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of our common stock have been reserved for future issuance to our non-officer employees Additionally, in May 2003, our Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1999 Plan by 13,762,174 shares.

83

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

As of December 31, 2004, a total of 14,737,826 shares have been authorized for issuance related to the 1999 Plan.

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non-officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of the grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

During the year ended December 31, 2002, the Company recorded aggregate deferred compensation of approximately $38,000 representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. During the years ended December 31, 2004 and 2003, the Company did not record any additional deferred compensation. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be re-measured. For the years ended December 31, 2004, 2003, and 2002, the amortization expense was approximately $22,000, $53,000, and $0.5 million, respectively.

84

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following is a summary of additional information with respect to the 1995 Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, outstanding options assumed by the Company in conjunction with its business acquisitions and option grants made outside the plans (if any):

| | | Options Outstanding | |
| | Options Available for Grant | Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|
| Balance at December 31, 2001 | 20,397,666 | 20,007,686 | $ 9.75 |
| Options authorized | 3,400,000 | -- | |
| Options granted | (1,734,400) | 1,734,400 | $ 5.40 |
| Options exercised | -- | (257,521) | $ 3.95 |
| Options canceled | 6,849,540 | (6,849,540) | $ 12.66 |
| Balance at December 31, 2002 | 28,912,806 | 14,635,025 | $ 8.05 |
| Options authorized | 3,000,000 | -- | |
| Options reduced | (20,000,000) | -- | |
| Options granted | (7,153,320) | 7,153,320 | $ 3.05 |
| Options exercised | -- | (602,272) | $ 4.20 |
| Options canceled | 3,722,114 | (3,722,114) | $ 7.58 |
| Balance at December 31, 2003 | 8,481,600 | 17,463,959 | $ 6.20 |
| Options authorized | 3,000,000 | -- | |
| Options granted | (4,738,944) | 4,738,944 | $ 1.95 |
| Options exercised | -- | (225,645) | $ 2.19 |
| Options canceled | 5,174,420 | (5,174,420) | $ 5.18 |
| Balance at December 31, 2004 | 11,917,076 | 16,802,838 | $ 5.37 |

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2004:

| | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | Shares Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Exercisable Options | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.00 - $1.99 | 3,777,098 | 9.48 | $ 1.74 | 162,549 | $ 1.26 |
| $2.46 - $4.26 | 3,562,965 | 8.40 | 2.44 | 1,963,959 | 2.45 |
| $4.27 - $6.50 | 3,312,257 | 7.22 | 4.59 | 1,998,096 | 4.85 |
| $6.51 - $8.39 | 5,348,910 | 6.12 | 6.80 | 5,220,337 | 6.80 |
| $8.51 - $123.50 | 801,608 | 5.34 | 29.23 | 735,213 | 30.94 |
| Total | 16,802,838 | 7.54 | $ 5.37 | 10,080,154 | $ 7.24 |

At December 31, 2004, there were no shares of the Company's common stock subject to repurchase by the Company.

Employee Stock Purchase Plan

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (ESPP), which is designed to allow eligible employees of the Company to purchase shares of

85

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

common stock at semi-annual intervals through periodic payroll deductions. In 2002, the ESPP was amended to add an additional 3,000,000 shares to the ESPP. An aggregate of 4,400,000 shares of common stock are reserved for the ESPP, and 3,197,267 shares have been issued through December 31, 2004. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that can be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the final offering period expired on July 31, 2004.

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS No. 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS No. 123 and is calculated as if the Company had accounted for its employee stock options and for its ESPP shares to be issued under the fair value method of SFAS No. 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black-Scholes model using the following weighted average assumptions:

|  | Risk Free Interest Rates | Volatility Factor | Weighted Average Expected Life | Dividend Yield |
|---|---|---|---|---|
| 2002 |  |  |  |  |
| Stock option plans | 4.22% | 1.50 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 4.36% | 1.50 | 0.5 yrs | 0.0% |
| 2003 |  |  |  |  |
| Stock option plans | 2.67% | 0.87 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 2.88% | 1.54 | 0.5 yrs | 0.0% |
| 2004 |  |  |  |  |
| Stock option plans | 3.47% | 0.79 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 1.27% | 1.54 | 0.5 yrs | 0.0% |

As discussed above, the valuation models used under SFAS No. 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS No. 123, was $1.28, $2.14, and $4.98, for options granted during 2004, 2003 and 2002, respectively. The weighted average grant date fair value of ESPP shares to be issued was $0.99, $1.00 and $2.25 for the years ended December 31, 2004, 2003 and 2002, respectively.

86

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

11. Income Taxes

For the years ended December 31, 2004, 2003 and 2002, the Company had an income tax (benefit) expense of $(76,000), $316,000 and $238,000, respectively.

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|  | (In thousands) | | |
| Current: | | | |
| Federal | $  -- | $ -- | $ -- |
| State | 40 | -- | 20 |
| Foreign | (116) | 316 | 218 |
| Total current | (76) | 316 | 238 |
| Deferred: | -- | -- | -- |
| Federal | -- | -- | -- |
| State | -- | -- | -- |
| Foreign | -- | -- | -- |
| Total deferred | -- | -- | -- |
| Total | $ (76) | $316 | $238 |

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (expense)(in thousands):

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
| Tax benefit at U.S. statutory rate | $(12,812) | $(17,624) | $(15,391) |
| Loss for which no tax benefit is currently recognizable | 12,747 | 17,536 | 15,391 |
| Other, net | (11) | 404 | 238 |
|  | $ (76) | $ 316 | $ 238 |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

87

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Significant components of the Company's deferred tax assets and liabilities as of December 31, 2003 and 2002 are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2004 | 2003 |
| Deferred tax assets: | | |
| Net operating loss carry forwards | $ 145,066 | $ 149,862 |
| Tax credit carry forwards | 16,245 | 19,505 |
| Reserves and accruals | 10,132 | 9,949 |
| Capitalized research and development | 4,172 | 8,761 |
| Intangible asset amortization | 30,051 | 38,864 |
| Other, net | 14,891 | 12,130 |
| Gross deferred tax assets | 220,557 | 239,071 |
| Valuation allowance | (220,557) | (239,071) |
| Total deferred tax assets | $    -- | $    -- |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2004 and 2003. The change in the valuation allowance was a net decrease of $18.5 million and $5.7 million and a net increase of approximately $26.4 million for the years ended December 31, 2004, 2003 and 2002, respectively. Approximately $45.6 million of the valuation allowance related to stock options benefits will be credited to equity when realized.

As of December 31, 2004, the Company had federal, California and foreign net operating loss carryforwards of approximately $366.6 million, $184.3 million and $49.8 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $9.1 million and $16.7 million, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2005 through 2024, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carry forwards before full utilization.

12. Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2004, 2003 and 2002.

13. Segment Information

Since late 2000, the worldwide telecom and satellite industries have experienced severe downturns that have resulted in significantly reduced purchases of new broadband equipment. Because of this overall drop in demand, the Company has refocused its efforts on the cable industry, and has significantly reduced its investment in the telecom and satellite businesses. Consequently, beginning in 2003, the Company's previously reported Telecom segment no longer meets the quantitative threshold for disclosure and the Company now operates as one business segment.

88

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The Company operates solely in one business segment, the development and marketing of CMTS, home access solutions (HAS), DVS products and related services. The Company's foreign operations consist of sales, marketing and support activities through its foreign subsidiaries. The Company's Chief Executive Officer has responsibility as the chief operating decision maker (CODM) as defined by Statement of Financial Accounting Standards Number 131, "Disclosures about Segments of an Enterprise and Related Information". The CODM reviews financial information presented on a consolidated basis, accompanied by disaggregated information about revenues and certain direct expenses by geographic region for purposes of making operating decisions and assessing financial performance. The Company's assets are primarily located in its corporate office in the United States and are not allocated to any specific region, therefore the Company does not produce reports for, or measure the performance of, its geographic regions based on any asset-based metrics. As a result, geographic information is presented only for revenues and long-lived assets.

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| Geographic areas: | | | |
| Revenues: | | | |
| United States | $ 83,212 | $ 74,341 | $ 41,150 |
| Americas, excluding United States | 4,126 | 3,713 | 20,530 |
| EMEA excluding Israel | 29,348 | 17,635 | 11,381 |
| Israel | 6,681 | 7,038 | 8,283 |
| Asia excluding Japan | 17,999 | 9,575 | 36,214 |
| Japan | 9,172 | 21,183 | 11,845 |
| Total | $150,538 | $133,485 | $129,403 |

| | December 31, | |
|---|---|---|
| | 2004 | 2003 |
| | (In thousands) | |
| Long-lived assets: | | |
| United States | $ 4,423 | $ 9,555 |
| Americas, excluding United States | 402 | 810 |
| EMEA excluding Israel | 131 | 176 |
| Israel | 687 | 1,157 |
| Asia | 117 | 173 |
| Total long-lived assets | 5,760 | 11,871 |
| Total current assets | 137,625 | 191,348 |
| Other assets | 10,349 | 12,021 |
| Total assets | $153,734 | $215,240 |

Two customers, Adelphia and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2004; 18% and 12%, respectively. Three customers, Adelphia, Cross Beam Networks and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2003; 22%, 16% and 13%, respectively. Three customers, Comcast, Harmonic and Sumitronics, accounted for 10% or more of total accounts receivable for the year ended December 31, 2004; 18%, 16% and 10%, respectively and two customers, Adelphia and Comcast, accounted for 10% of more of total accounts receivable for the year ended December 31, 2003; 24% and 20%, respectively.

89

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

14. Related Party Transactions

During the years ended December 31, 2004, 2003 and 2002, the Company recognized revenue of $9.9 million, $4.7 million and $9.1 million, respectively in connection with product shipments made to related parties. Related party revenues in 2004 were from Harmonic, Inc. (Harmonic). Related party revenues in 2003 and 2002 included revenues from Harmonic and Rogers Communications, Inc. (Rogers). Lewis Solomon, a member the Company's board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2004 and 2003. Alek Krstajic, another member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. Neither of these related parties are a supplier to the Company.

Cost of related party product revenues in the Company's consolidated statements of operations consists of direct and indirect product costs. Accounts receivable from Rogers and Harmonic totaled approximately $3.1 million and $0.6 million at December 31, 2004 and 2003, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against related party revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." The Company charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003. Amounts charged against total revenues in the year ended December 31, 2002 and December 31, 2003, totaled approximately $2.8 million and $5.6 million, respectively. Of the co-marketing amortization charged to total revenues, $0.15 million and $0.3 million were charged to related party revenues in the year ended 2003 and 2002, respectively. No further amounts of these co-marketing arrangements are included in other current assets at December 31, 2003 and no further amortization occurred in 2004.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Alek Krstajic is the founder and President of Team Honor.

15. Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts that are based on the best available information -- mostly historical claims experience -- claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties is as follows (in thousands):

| | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Settlements | Balance at End of Period |
|---|---|---|---|---|
| Year ended December 31, 2002 | | | | |
| Accrued warranty expenses | $ 8,368 | 2,730 | (2,491) | $ 8,607 |
| Year ended December 31, 2003 | | | | |
| Accrued warranty expenses | $ 8,607 | 2,287 | (5,385) | $ 5,509 |
| Year ended December 31, 2004 | | | | |
| Accrued warranty expenses | $ 5,509 | 1,450 | (3,089) | $ 3,870 |

90

--------------------------------------------------------------------------------

Table of Contents

                    TERAYON COMMUNICATION SYSTEMS, INC.
              NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Guarantees, Including Indirect Guarantees of Indebtedness of Others

       In addition to product warranties, the Company, from time to time, in the
normal course of business, indemnifies other parties with whom it enters into
contractual relationships, including customers, lessors, and parties to other
transactions with the Company, with respect to certain matters. These
obligations primarily relate to certain agreements with the Company's officers,
directors and employees, under which the Company may be required to indemnify
such persons for liabilities arising out of their employment relationship The
Company has agreed to hold the other party harmless against specified losses,
such as those arising from a breach of representations or covenants, third party
claims that the Company's products when used for their intended purpose(s)
infringe the intellectual property rights of such third party or other claims
made against certain parties. It is not possible to determine the maximum
potential amount of liability under these indemnification obligations due to the
limited history of prior indemnification claims and the unique facts and
circumstances that are likely to be involved in each particular claim.
Historically, payments made by the Company under these obligations were not
material and no liabilities have been recorded for these obligations on the
balance sheets as of December 31, 2004 or 2003.

16. Sale of Certain Assets

       In July 2003, the Company entered into an agreement with Verilink
Corporation (Verilink) to sell certain assets to Verilink for up to a maximum of
$0.9 million. The Company received $0.45 million in July 2003 and an additional
$0.13 million by year end December 31, 2003. During 2004, the Company received
an additional $0.11 million toward the asset sale. The assets were originally
acquired through the Company's acquisition of Access Network Electronics (ANE)
in February 2000. Additionally, Verilink agreed to purchase at least $2.1
million of related inventory from the Company on or before December 31, 2004. As
of December 31, 2004 and 2003, Verilink had purchased $0.56 million and $0.73
million, respectively, of this inventory.

       As part of this agreement, Verilink agreed to assume all warranty
obligations related to ANE products sold prior to, on, or after July 2003. The
Company agreed to reimburse Verilink for up to $2.4 million of certain warranty
obligations for ANE products sold prior to July 2003. Further, Verilink assumed
the obligation for one of the Company's operating leases, previously accrued as
restructuring, resulting in a recovery of restructuring charges of $0.3 million
in 2003.

       On April 2, 2004, the Company sold all of its ownership in Radwiz, Ltd.,
Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a
cash payment of $0.15 million. In connection with this disposition, the acquirer
received obsolete inventories with no book value, $0.2 million of selected net
assets, and assumed $1.35 million of net liabilities related to these
subsidiaries. The Company recorded a net gain of $1.5 million, which is included
as a component of other income (expense) in the accompanying condensed
consolidated statement of operations.

17. Subsequent Events

       On February 8, 2005, the Company announced the signing of an agreement
with ATI Technologies, Inc (ATI) relating to the sale of certain Company cable
modem semiconductor assets. The agreement calls for ATI to acquire the Company's
cable modem silicon intellectual property and related software, assume a lease
and hire approximately twenty-five employees from the Company's design team.
Under the terms of the agreement, ATI will pay the Company $6.95 million upon
the closing, with a balance of $7.05 million subject to the Company achieving
milestones for certain conditions, services and deliverables spanning a period
of 15 months. On March 9, 2005 ATI and the Company signed closing documents for
this agreement. Upon closing the Company received $8.6 million in cash which was
comprised of the $6.95 million for the initial payment and $1.65 million of the
$1.9 million for having met the first milestone. The difference between the $1.9
million milestone and the payment of $1.65 million was money retained by ATI to
pay for Company

                                       91

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

funded retention bonuses for employees that accepted employment with ATI. The balance of $5.2 million will be subject to the Company achieving the remaining milestones over the subsequent 15 months. The maximum liability for the Company is set at $11.5 million or the total amount of the purchase price paid by ATI plus $1.5 million which would be offset from the purchase price. Total purchase price payable to the Company upon achieving all terms and conditions is $14.0 million. Also set forth in this agreement are representations and warranties made by the Company that may cause it to incur liabilities and penalties arising out of the Company's failure to meet certain conditions and milestones.

18. Unaudited Quarterly Financial Data

Summarized quarterly financial data for 2004 and 2003 is as follows (in thousands, except per share data):

|  | Quarter | | | |
| --- | --- | --- | --- | --- |
| 2004 | First | Second | Third | Fourth |
| Total revenues | $ 41,168 | $42,782 | $ 37,202 | $29,386 |
| Gross profit | 12,397 | 15,122 | 6,270 | 9,829 |
| Restructuring charges (net), executive severance and asset write-offs(1) | 3,367 | 3,579 | 1,463 | 2,750 |
| Net loss | (10,247) | (4,861) | (13,520) | (7,903) |
| Basic and diluted net loss per share | $ (0.14) | $ (0.06) | $ (0.18) | $ (0.10) |

|  | Quarter | | | |
| --- | --- | --- | --- | --- |
| 2003 | First | Second | Third | Fourth |
| Total revenues | $ 22,268 | $ 30,599 | $37,628 | $42,990 |
| Gross profit | 2,675 | 6,863 | 10,194 | 12,719 |
| Restructuring charges (net), executive severance and asset write-offs(1) | (3,162) | 115 | 244 | -- |
| Net loss | (23,989) | (13,139) | (7,210) | (6,015) |
| Basic and diluted net loss per share | $ (0.33) | $ (0.18) | $ (0.10) | $ (0.08) |

Loss per share are computed independently for each of the quarters presented. The sum of the quarterly loss per share in 2004 and 2003 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

(1) See Note 6 for an explanation for restructuring charges and asset write-offs.

92

---------------------------------------------------------------------------------

Table of Contents

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosures

    Not applicable.

Item 9A.                        Controls and Procedures

Evaluation of Disclosure Controls and Procedures.

    We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended (Exchange Act), is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's (SEC) rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO), as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives as designed to do.

    In connection with the preparation of this Annual Report on Form 10-K (Annual Report), an evaluation was performed under the supervision and with the participation of our management, including the CEO and CFO, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of December 31, 2004.

    As disclosed in our Quarterly Report on Form 10-Q for the period ended September 30, 2004, in connection with the preparation of that report, we determined that, due to a deficiency in communication of financially significant information between certain parts of our organization and the finance department, our disclosure controls and procedures and internal controls over financial reporting were not effective. Particularly in the third quarter of 2004, the finance department did not review our press release and communication of information to our finance department regarding the resignation of an executive was not timely, which resulted in adjustments to the internal accounting for the executive's termination benefits. As previously disclosed, under the direction of our Audit Committee and with the participation of our senior management, we took steps to ensure that senior members of our finance department review all press releases before they are released and undertook to enhance the communication between our senior management and our finance department to further strengthen our controls.

    In connection with our review of our disclosure controls and procedures as of December 31, 2004, we determined that the controls implemented to enhance communication between our senior management and our finance department lacked sufficient documentation to permit verification of their operation. As a result, as discussed below in Management's Report on Internal Control over Financial Reporting, we have concluded that the aforementioned deficiency represents a material weakness in internal control over financial reporting as of December 31, 2004.

    In connection with our review of our disclosure controls and procedures as of December 31, 2004, we determined that procedures related to controls over the preparation and review of the Annual Report on Form 10-K were not effective, for the following reasons. In the latter part of 2004 and in early 2005, key persons involved in the preparation and review of our periodic reports under the Exchange Act including the Controller and Assistant Controller responsible for SEC reporting departed the Company and we retained consultants to participate in the preparation of our Annual Report. This resulted in providing an initial draft of the financial statements and footnotes included in our Annual Report to our independent registered public accountants that did not provide adequate disclosures in the accompanying notes in accordance with GAAP. We have concluded that this deficiency represents a material weakness in internal control over financial reporting as of December 31, 2004.

    Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, in light of the deficiencies described above, our management, including our CEO and CFO, concluded that our disclosure controls and procedures as of December 31, 2004 were not effective.

--------------------------------------------------------------------------------

Table of Contents

Management's Report on Internal Control over Financial Reporting.

We are responsible for establishing and maintaining an adequate internal control structure and procedures for our financial reporting. We have assessed the effectiveness of internal control over financial reporting as of December 31, 2004. Our assessment was based on criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control -- Integrated Framework (COSO Framework).

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles (GAAP). Our internal control over financial reporting includes those policies and procedures that:

(1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect our transactions and dispositions of assets;

(2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and board of directors; and

(3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness in internal control over financial reporting is a control deficiency (within the meaning of Public Company Accounting Oversight Board (PCAOB) Auditing Standard No. 2), or combination of control deficiencies, that results in there being more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. As of December 31, 2004, we have identified two material weaknesses, which are described further below.

We have identified a material weakness due to insufficient controls related to the identification, capture, and timely communication of financially significant information between certain parts of our organization and the finance department to enable the finance department to account for transactions in a complete and timely manner. As a result of this material weakness, we recorded an adjustment in the quarter ended September 30, 2004 to record termination benefits paid to a former executive.

We have also identified a material weakness for insufficient controls related to the preparation and review of the annual consolidated financial statements and accompanying footnote disclosures. The insufficient controls include a lack of sufficient personnel with technical accounting expertise in our finance department and inadequate review and approval procedures to prepare external financial statements in accordance with GAAP. As a result of this material weakness, we made substantial revisions to our 2004 annual consolidated financial statements and footnote disclosures before they were issued.

Based on the material weaknesses described above and the criteria set forth by the COSO Framework, we have concluded that our internal control over financial reporting at December 31, 2004 was not effective.

Ernst & Young LLP has issued an attestation report on management's assessment of internal control over financial reporting. The attestation report is included in the Report of Ernst & Young LLP, Independent Registered Public Accounting Firm that appears under Item 8 -- Financial Statements and Supplementary Data.

Changes in internal control over financial reporting. Other than as described above in the third paragraph of Evaluation of Disclosure Controls and Procedures, there has been no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected or is likely to materially affect our internal control over financial reporting.

94

--------------------------------------------------------------------------------

Table of Contents

Remediation Steps to Address Material Weaknesses.

        Subsequent to year end, we are taking the following steps to remediate the deficiencies in our disclosure controls and procedures and material weaknesses in our internal control over financial reporting identified above:
        Documentation of Internal Communication with Our Finance Department. We implemented procedures to document review of press releases and other financially significant communications in accordance with the policy that we implemented in connection with preparation of our Quarterly Report on Form 10-Q for the period ended September 30, 2004.
        Additional Experienced Finance Personnel. We are taking the following steps to address our need for additional experienced finance personnel and to improve our controls over financial reporting:

        (i) a commitment to promptly hire a permanent Vice President of Finance/controller;

        (ii) hiring into our finance department an additional person with SEC reporting experience;

        (iii) increasing staffing in the finance department;

        (iv) developing procedures to train new employees and/or consultants in the finance department on our disclosure procedures and controls, our company and our actions in the previous reporting periods; and

        (v) improving the review process that occurs prior to providing the initial draft of the periodic report to our independent auditors for review.


Item 9B.Other Information

        Not applicable.
                        PART III

Item 10.Directors and Officers of the Registrant

        Information relating to our directors and executive officers will be presented in our definitive proxy statement for the 2005 annual stockholders meeting and is incorporated herein by reference. Our definitive proxy statement will be filed no later than 120 days after the end of the fiscal year covered by this report.


Item 11.Executive Compensation

        Information relating to execution compensation will be presented in our definitive proxy statement for the 2005 annual stockholders meeting and is incorporated herein by reference. Our definitive proxy statement will be filed no later than 120 days after the end of the fiscal year covered by this report.


Item 12.Security Ownership of Certain Beneficial Owners and Management and
        Related Stockholder Matters

        Information relating to security ownership will be presented in our definitive proxy statement for the 2005 annual stockholders meeting and is incorporated herein by reference. Our definitive proxy statement will be filed no later than 120 days after the end of the fiscal year covered by this report.


Item 13.Certain Relationship and Related Transactions

        Information relating to related party transactions will be presented in our definitive proxy statement for the 2005 annual stockholders meeting and is incorporated herein by reference. Our definitive proxy statement will be filed no later than 120 days after the end of the fiscal year covered by this report.

                                95

--------------------------------------------------------------------------------

Table of Contents

Item 14.Principal Accountant Fees and Services

    Information relating to our principal accountant fees and services will be presented in our definitive proxy statement for the 2005 annual stockholders meeting and is incorporated herein by reference. Our definitive proxy statement will be filed no later than 120 days after the end of the fiscal year covered by this report.

                              PART IV

Item 15.Exhibits, Financial Statement Schedules

    (a) The following documents are filed as part of this report on Form 10-K:

    1. Consolidated Financial Statements. The following consolidated financial statements of Terayon Communication Systems, Inc. and related Independent Auditors' Report are filed as part of this report of Form 10-K:

*Reports of Independent Registered Public Accounting Firm.

*Consolidated Balance Sheets, as of December 31, 2004 and 2003.

*Consolidated Statements of Operations, Consolidated Statements of Stockholders' Equity, Consolidated Statements of Cash Flows and Notes to Consolidated Financial Statements for the years ended December 31, 2004, 2003, and 2002.

    2. Consolidated Financial Statement Schedules. The following consolidated financial statement schedule of Terayon Communication Systems, Inc. is filed as part of this report on Form 10-K and should be read in conjunction with the consolidated financial statements of Terayon Communication Systems, Inc:

*Schedule II of Valuation and Qualifying Accounts for the years ended December 31, 2004, 2003 and 2002.

Schedules not listed above are omitted because they are not required, they are not applicable or the information is already included in the consolidated financial statements or notes thereto.

    3. Exhibits. The exhibits listed on the accompanying Index to Exhibits are filed or incorporated by reference as part of this report on Form 10-K.

    Exhibit
    Number                      Exhibit Description

        3.1Amended and Restated Certificate of Incorporation of Terayon
            Communication Systems, Inc.(14)
        3.2Bylaws of Terayon Communication Systems, Inc.(14)
        3.3Certificate of Amendment to Amended and Restated Certificate
            of Incorporation of Terayon Communication Systems, Inc.(14)
        3.4Certificate of Designation of Series A Junior Participating
            Preferred Stock.(6)
        4.1Specimen Common Stock Certificate.(2)
        4.2Amended and Restated Information and Registration Rights
            Agreement dated April 6, 1998.(1)
        4.3Form of Security for Terayon Communication Systems, Inc.'s 5%
            Convertible Subordinated Notes due August 1, 2007.(5)
        4.4Registration Rights Agreement by and among Terayon
            Communication Systems, Inc. and Deutsche Bank Securities, Inc.
            and Lehman Brothers, Inc.(5)
        4.5Indenture between Terayon Communication Systems, Inc. and
            State Street Bank and Trust Company of California, N.A. dated
            July 26, 2000.(5)
        4.6Rights Agreement between Terayon Communication Systems, Inc.
            and Fleet National Bank dated February 6, 2001.(6)
       10.1Form of Indemnity Agreement between Terayon Communication
            Systems, Inc. and each of its directors and officers.

                               96
--------------------------------------------------------------------------------

Table of Contents

Exhibit
Number                        Exhibit Description

10.2  1995 Stock Option Plan, as amended.(1)
10.3  1997 Equity Incentive Plan, as amended.(9)
10.4  1998 Employee Stock Purchase Plan, as amended.(12)
10.5  1998 Non-Employee Directors Stock Option Plan as amended.(1)
10.6  1998 Employee Stock Purchase Plan Offering for Foreign
      Employees.(7)
10.7  1999 Non-Officer Equity Incentive Plan, as amended.(13)
10.8  Azrieli Center Offices Lease Agreement, dated January 23,
      2002, between Canit HaShalom Investments Ltd. and Terayon
      Communication Systems, Inc.(9)
10.9  Azrieli Center Agreement to Transfer Lease Rights dated 23rd
      day of January, 2000(11)
10.10 Data Over Cable Service Interface Specifications License
      Agreement, dated December 21, 2001, between Terayon
      Communication Systems, Inc. and Cable Television Laboratories,
      Inc.(9)
10.11 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated
      December 21, 2001, between Terayon Communication Systems, Inc.
      and Cable Television Laboratories, Inc.(9)
10.12 Data Over Cable Service Interface Specifications License
      Agreement, dated December 21, 2001, between Imedia
      Semiconductor Corporation and Cable Television Laboratories,
      Inc.(9)
10.13 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated
      December 21, 2001, between Imedia Semiconductor Corporation
      and Cable Television Laboratories, Inc.(9)
10.14 Lease Agreement, dated September 18, 1996, between Sobrato
      Interests III and VeriFone.(10)
10.15 Sublease, dated April 1, 2002, by and between Terayon
      Communication Systems, Inc. and Hewlett-Packard Company.(10)
10.16 Aircraft Lease Agreement, dated February 8, 2002, between
      Terayon Communication Systems, Inc. and General Electric
      Capital Corporation.(11)
10.17 Letter of Credit Agreement, dated February 8, 2002, between
      Terayon Communication Systems, Inc. and General Electric
      Capital Corporation.(11)
10.18 Agreement dated January 23, 2004, between Terayon
      Communication Systems, Inc. and YAS Corporation(15).
10.19 First Amendment to Aircraft Lease Agreement, dated December
      31, 2003, between Terayon Communication Systems, Inc. and
      General Electric Capital Corporation.(17)
10.20 Code of Business Conduct.(17)
10.21 Notification Letter of Intent to Terminate or Sublease the
      Aircraft Lease Agreement dated March 12, 2004.(17)
10.22 Employment Agreement dated July 22, 2004 between Terayon
      Communication Systems, Inc. and Jerry D. Chase(16).
10.23 Severance Agreement dated July 22, 2004, between Terayon
      Communication Systems, Inc. and Jerry D. Chase(16).
10.24 Proprietary Information and Inventions Agreement dated July
      22, 2004 between Terayon Communication Systems, Inc. and Jerry
      D. Chase(16).
10.25 Aircraft Sublease Agreement dated August 24, 2004 between
      Terayon Communication Systems, Inc. and United Furniture
      Equipment Rental, Inc.(16).
10.26 Employment Agreement dated November 8, 2004 between Terayon
      Communication Systems, Inc. and Mark A. Richman.
10.27 Form of Severance Agreement between Terayon Communication
      Systems, Inc. and Mark A. Richman.
10.28 Proprietary Information and Inventions Agreement dated
      November 10, 2004 between Terayon Communication Systems, Inc.
      and Mark A. Richman.
10.29 Separation Agreement dated August 2, 2004 between Terayon
      Communication Systems, Inc. and Edward Lopez(16).

97

--------------------------------------------------------------------------------

Table of Contents

| Exhibit Number | Exhibit Description |
|---|---|
| 10.30 | Form of Option Agreement for the Terayon Communication Systems, Inc. 1997 Equity Incentive Plan(18). |
| 10.31 | Transition Agreement dated June 21, 2004, between Terayon Communication Systems, Inc. and Zaki Rakib(15). |
| 10.32 | Employment Agreement dated June 21, 2004, between Terayon Communication Systems, Inc. and Selim (Shlomo) Rakib(15). |
| 10.33 | Form of Option Agreement for the Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan |
| 21.1 | List of Subsidiaries. |
| 23.1 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 24.1 | Power of Attorney (see signatures of this Annual Report Form 10-K) |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1) Incorporated by reference to exhibits to our Registration Statement on Form S-1 filed on June 16, 1998 (File No. 333-56911).

(2) Incorporated by reference to exhibits to our Registration Statement on Form S-1/A filed on July 31, 1998 (File No. 333-69699).

(3) Incorporated by reference to our Report on Form 10-Q filed on November 15, 1999.

(4) Incorporated by reference to our Registration Statement on Form S-8 filed on December 29, 1999.

(5) Incorporated by reference to our Registration Statement on Form S-3 filed on October 24, 2000 (File No. 333-48536).

(6) Incorporated by reference to our Report on Form 8-K filed on February 9, 2001.

(7) Incorporated by reference to our Report on Form 10-K filed on April 2, 2001.

(8) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2001.

(9) Incorporated by reference to our Report on Form 10-K filed on April 1, 2002.

(10) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2002.
(11) Incorporated by reference to our Report on Form 10-K filed on March 27, 2003.
(12) Incorporated by reference to our Report on Registration Statement on Form S-8 filed on August 30, 2002.
(13) Incorporated by reference to our Report on Form 10-Q filed on August 14, 2003.
(14) Incorporated by reference to our Report on Form 8-K filed on November 21, 2003.
(15) Incorporated by reference to our Report on Form 10-Q filed on July 27, 2004.
(16) Incorporated by reference to our Report on Form 10-Q filed on November 9, 2004.
(17) Incorporated by reference to our Report on Form 10-K filed on March 15, 2004.
(18) Incorporated by reference to our Report on Form 8-K filed on September 14, 2004

98

--------------------------------------------------------------------------------

Table of Contents

SCHEDULE II
VALUATION AND QUALIFYING ACCOUNTS

| | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Write-offs | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| Year ended December 31, 2002 | | | | |
| Allowance for doubtful accounts | $ 7,207 | 1,090 | 4,778 | $ 3,519 |
| Excess and obsolescence | $ 37,181 | 4,336 | 16,044 | $ 25,473 |
| Year ended December 31, 2003 | | | | |
| Allowance for doubtful accounts | $ 3,519 | 166 | 94 | $ 3,591 |
| Excess and obsolescence | $ 25,473 | 4,086 | 17,269 | $ 12,290 |
| Year ended December 31, 2004 | | | | |
| Allowance for doubtful accounts | $ 3,591 | (2,101) | 201 | $ 1,289 |
| Excess and obsolescence | $ 12,290 | 11,980 | 11,554 | $ 12,716 |

99

-------------------------------------------------------------------------------

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto due authorized, in County of Santa Clara, State of California, on the 15th day of March, 2005.

TERAYON COMMUNICATION SYSTEMS, INC.

/s/ Jerry D. Chase

Jerry D. Chase
Chief Executive Officer

Each person whose signature appears below constitutes Jerry D. Chase his true and lawful attorney-in-fact and agent, each acting alone, with full power of substitution and re-substitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the SEC, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, each acting alone, or his or her substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Jerry D. Chase<br>Jerry D. Chase | Chief Executive Officer and Director (Principal Executive Officer) | March 15, 2005 |
| /s/ Mark A. Richman<br>Mark A. Richman | Chief Financial Officer (Principal Financial and Accounting Officer) | March 15, 2005 |
| /s/ Dr. Zaki Rakib<br>Dr. Zaki Rakib | Chairman of the Board of Directors | March 15, 2005 |
| /s/ Shlomo Rakib<br>Shlomo Rakib | Director | March 15, 2005 |
| /s/ Lewis Solomon<br>Lewis Solomon | Director | March 15, 2005 |
| /s/ Alek Krstajic<br>Alek Krstajic | Director | March 15, 2005 |
| /s/ David Woodrow<br>David Woodrow | Director | March 15, 2005 |
| /s/ Mark Slaven<br>Mark Slaven | Director | March 15, 2005 |

100

--------------------------------------------------------------------------------

Table of Contents

| Signature | Title | Date |
|-----------|-------|------|
| /s/ Dr. Matthew Miller<br>Dr. Matthew Miller | Director | March 15, 2005 |
| /s/ Howard W. Speaks, Jr.<br>Howard W. Speaks, Jr. | Director | March 15, 2005 |

101

--------------------------------------------------------------------------------

Table of Contents

INDEX TO EXHIBITS

Exhibit
Number                          Exhibit Description

3.1 Amended and Restated Certificate of Incorporation of Terayon
    Communication Systems, Inc.(14)
3.2 Bylaws of Terayon Communication Systems, Inc.(14)
3.3 Certificate of Amendment to Amended and Restated Certificate
    of Incorporation of Terayon Communication Systems, Inc.(14)
3.4 Certificate of Designation of Series A Junior Participating
    Preferred Stock.(6)
4.1 Specimen Common Stock Certificate.(2)
4.2 Amended and Restated Information and Registration Rights
    Agreement dated April 6, 1998.(1)
4.3 Form of Security for Terayon Communication Systems, Inc.'s 5%
    Convertible Subordinated Notes due August 1, 2007.(5)
4.4 Registration Rights Agreement by and among Terayon
    Communication Systems, Inc. and Deutsche Bank Securities, Inc.
    and Lehman Brothers, Inc.(5)
4.5 Indenture between Terayon Communication Systems, Inc. and
    State Street Bank and Trust Company of California, N.A. dated
    July 26, 2000.(5)
4.6 Rights Agreement between Terayon Communication Systems, Inc.
    and Fleet National Bank dated February 6, 2001.(6)
10.1 Form of Indemnity Agreement between Terayon Communication
     Systems, Inc. and each of its directors and officers.
10.2 1995 Stock Option Plan, as amended.(1)
10.3 1997 Equity Incentive Plan, as amended.(9)
10.4 1998 Employee Stock Purchase Plan, as amended.(12)
10.5 1998 Non-Employee Directors Stock Option Plan as amended.(1)
10.6 1998 Employee Stock Purchase Plan Offering for Foreign
     Employees.(7)
10.7 1999 Non-Officer Equity Incentive Plan, as amended.(13)
10.8 Azrieli Center Offices Lease Agreement, dated January 23,
     2002, between Canit HaShalom Investments Ltd. and Terayon
     Communication Systems, Inc.(9)
10.9 Azrieli Center Agreement to Transfer Lease Rights dated 23rd
     day of January, 2000(11)
10.10 Data Over Cable Service Interface Specifications License
      Agreement, dated December 21, 2001, between Terayon
      Communication Systems, Inc. and Cable Television Laboratories,
      Inc.(9)
10.11 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated
      December 21, 2001, between Terayon Communication Systems, Inc.
      and Cable Television Laboratories, Inc.(9)
10.12 Data Over Cable Service Interface Specifications License
      Agreement, dated December 21, 2001, between Imedia
      Semiconductor Corporation and Cable Television Laboratories,
      Inc.(9)
10.13 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated
      December 21, 2001, between Imedia Semiconductor Corporation
      and Cable Television Laboratories, Inc.(9)
10.14 Lease Agreement, dated September 18, 1996, between Sobrato
      Interests III and VeriFone.(10)
10.15 Sublease, dated April 1, 2002, by and between Terayon
      Communication Systems, Inc. and Hewlett-Packard Company.(10)
10.16 Aircraft Lease Agreement, dated February 8, 2002, between
      Terayon Communication Systems, Inc. and General Electric
      Capital Corporation.(11)
10.17 Letter of Credit Agreement, dated February 8, 2002, between
      Terayon Communication Systems, Inc. and General Electric
      Capital Corporation.(11)
10.18 Agreement dated January 23, 2004, between Terayon
      Communication Systems, Inc. and YAS Corporation(15).
10.19 First Amendment to Aircraft Lease Agreement, dated December
      31, 2003, between Terayon Communication Systems, Inc. and
      General Electric Capital Corporation.(17)

--------------------------------------------------------------------------------

Table of Contents

```
Exhibit
Number                        Exhibit Description
```

10.20 Code of Business Conduct.(17)

10.21 Notification Letter of Intent to Terminate or Sublease the Aircraft Lease Agreement dated March 12, 2004.(17)

10.22 Employment Agreement dated July 22, 2004 between Terayon Communication Systems, Inc. and Jerry D. Chase(16).

10.23 Severance Agreement dated July 22, 2004, between Terayon Communication Systems, Inc. and Jerry D. Chase(16).

10.24 Proprietary Information and Inventions Agreement dated July 22, 2004 between Terayon Communication Systems, Inc. and Jerry D. Chase(16).

10.25 Aircraft Sublease Agreement dated August 24, 2004 between Terayon Communication Systems, Inc. and United Furniture Equipment Rental, Inc.(16).

10.26 Employment Agreement dated November 8, 2004 between Terayon Communication Systems, Inc. and Mark A. Richman.

10.27 Form of Severance Agreement between Terayon Communication Systems, Inc. and Mark A. Richman.

10.28 Proprietary Information and Inventions Agreement dated November 10, 2004 between Terayon Communication Systems, Inc. and Mark A. Richman.

10.29 Separation Agreement dated August 2, 2004 between Terayon Communication Systems, Inc. and Edward Lopez(16).

10.30 Form of Option Agreement for the Terayon Communication Systems, Inc. 1997 Equity Incentive Plan(18).

10.31 Transition Agreement dated June 21, 2004, between Terayon Communication Systems, Inc. and Zaki Rakib(15).

10.32 Employment Agreement dated June 21, 2004, between Terayon Communication Systems, Inc. and Selim (Shlomo) Rakib(15).

10.33 Form of Option Agreement for the Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan

21.1 List of Subsidiaries.

23.1 Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm.

24.1 Power of Attorney (see signatures of this Annual Report Form 10-K)

31.1 Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2 Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1 Certification of the Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2 Certification of the Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

(1) Incorporated by reference to exhibits to our Registration Statement on Form S-1 filed on June 16, 1998 (File No. 333-56911).

(2) Incorporated by reference to exhibits to our Registration Statement on Form S-1/A filed on July 31, 1998 (File No. 333-69699).

(3) Incorporated by reference to our Report on Form 10-Q filed on November 15, 1999.

(4) Incorporated by reference to our Registration Statement on Form S-8 filed on December 29, 1999.

(5) Incorporated by reference to our Registration Statement on Form S-3 filed on October 24, 2000 (File No. 333-48536).

(6) Incorporated by reference to our Report on Form 8-K filed on February 9, 2001.

--------------------------------------------------------------------------------

Table of Contents

(7) Incorporated by reference to our Report on Form 10-K filed on April 2, 2001.

(8) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2001.

(9) Incorporated by reference to our Report on Form 10-K filed on April 1, 2002.


(10) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2002.

(11) Incorporated by reference to our Report on Form 10-K filed on March 27, 2003.

(12) Incorporated by reference to our Report on Registration Statement on Form S-8 filed on August 30, 2002.

(13) Incorporated by reference to our Report on Form 10-Q filed on August 14, 2003.

(14) Incorporated by reference to our Report on Form 8-K filed on November 21, 2003.

(15) Incorporated by reference to our Report on Form 10-Q filed on July 27, 2004.

(16) Incorporated by reference to our Report on Form 10-Q filed on November 9, 2004.

(17) Incorporated by reference to our Report on Form 10-K filed on March 15, 2004.

(18) Incorporated by reference to our Report on Form 8-K filed on September 14, 2004