# EXHIBIT 6

Table of Contents
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---------------------

Form 10-K

---------------------

(Mark One)

p    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934
     For the Fiscal Year Ended December 31, 2003
                              or
o    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
     EXCHANGE ACT OF 1934
     For the Transition Period from          to          .

Commission file number: 000-24647

---------------------

Terayon Communication Systems, Inc.
(Exact name of registrant as specified in its charter)

Delaware                      77-0328533
(State or other jurisdiction of   (IRS employer
 incorporation or organization identification no.)

4988 Great America Parkway
Santa Clara, California 95054
(408) 235-5500
(Address, including zip code, and telephone number, including area code,
of the registrant's principal executive offices)

---------------------

Securities registered pursuant to Section 12(b) of the Act:

Title of Each Class:Name of Each Exchange on Which Registered:
-------------------------------------------------------------
       None                         None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, par value $0.001 per share
(Title of Class)

     Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.     Yes p        No o

     Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of the registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K.     o

     Indicate by check mark whether the registrant is an accelerated filer (as

defined in Rule 12b-2 of the Act). Yes p        No o

    The aggregate market value of the voting stock held by non-affiliates of
the registrant, based upon the closing sale price of the common stock on June
30, 2003 as reported on the Nasdaq National Market, was approximately
$159,297,437. Shares of common stock held by each officer and director and by
each person known to the registrant who owns 5% or more of the outstanding
common stock have been excluded in that such persons may be deemed to be
affiliates. This determination of affiliate status is not necessarily a
conclusive determination for other purposes.

    As of February 29, 2004, the registrant had outstanding 75,536,192 shares
of common stock.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.

INDEX

Page No.
--------

PART I

Item 1. BUSINESS                                                                    1
Item 2. PROPERTIES                                                                 8
Item 3. LEGAL PROCEEDINGS                                                          8
Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS                        10

PART II

Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS      10
Item 6. SELECTED FINANCIAL DATA                                                    13
Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITIONAL AND RESULTS OF OPERATIONS  14
Item 7A.QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK                 52
Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA                                53
Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE  90
Item 9A.CONTROLS AND PROCEDURES                                                    90

PART III

Item 10.DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT                         90
Item 11.EXECUTIVE COMPENSATION                                                     93
Item 12.SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT             100
Item 13.CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS                             102
Item 14.PRINCIPAL ACCOUNTANT FEES AND SERVICES                                     103

PART IV

Item 15.EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K           103
SIGNATURES                                                                         108
EXHIBIT 10.24
EXHIBIT 10.25
EXHIBIT 10.26
EXHIBIT 10.27
EXHIBIT 10.28
EXHIBIT 21.1
EXHIBIT 23.1
EXHIBIT 31.1
EXHIBIT 31.2
EXHIBIT 32.1
EXHIBIT 32.2

--------------------------------------------------------------------------------

Table of Contents

SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS

This Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 which are subject to the safe harbor created by those sections. These forward-looking statements include, but are not limited to: statements related to industry trends and future growth in the markets for broadband delivery systems; our strategies for reducing the cost of our products; our product development efforts; the effect of GAAP accounting pronouncements on our recognition of revenues; our future research and development; the timing of our introduction of new products; the timing and extent of deployment of our products by our customers; and future profitability. We usually use words such as may, will, should, expect, plan, anticipate, believe, estimate, predict, future, intend, or certain or the negative of these terms or similar expressions to identify forward-looking statements. Discussions containing such forward-looking statements may be found throughout the document. These forward-looking statements involve certain risks and uncertainties that could cause actual results to differ materially from those in such forward-looking statements. We disclaim any obligation to update these forward-looking statements as a result of subsequent events. The business risks discussed in Item 7 of this Report on Form 10-K, among other things, should be considered in evaluating our prospects and future financial performance.

This Report on Form 10-K includes trademarks and registered trademarks of Terayon. Products or service names of other companies mentioned in this Report on Form 10-K may be trademarks or registered trademarks of their respective owners.

--------------------------------------------------------------------------------

Table of Contents

PART I

Item 1. Business

Overview

We were founded in 1993 to provide broadband cable data equipment for cable operators based on our proprietary Synchronous Code Division Multiple Access (S-CDMA) technology, which forms the basis of our current technology. By 1999, we were primarily selling proprietary-based modems and cable modem termination systems (CMTS). Also in 1999 we initiated an acquisition strategy to expand our product offerings beyond the cable industry to the telecom and satellite industries. With the market downturn in 2000, we refocused our business by concentrating our resources on the cable industry and began selling products based on industry standard specifications, particularly the Data Over Cable System Interface Specification (DOCSIS), thereby transitioning from proprietary-based products to standards-based products. We also have terminated all of our acquired businesses, which included exiting the telecom business, and wrote down the value of those assets to zero. Today we primarily sell standards-based products to cable operators.

We were incorporated in California and reincorporated in Delaware in 1998. Our principal executive headquarters are located at 4988 Great America Parkway, Santa Clara, California 95054. Our telephone number is (408) 235-5500.

Industry Dynamics

We participate in the worldwide market for equipment sold primarily to cable and satellite operators. Our business is influenced by the following significant changes in our industry:

Increased broadband penetration.

As Internet usage by households continues to increase, more consumers are electing to switch from dial up access services to high-speed access services, particularly those offered by cable operators in the United States. The Dell'Oro Group, an industry research firm, estimates the number of worldwide cable modem users in 2003 was approximately 30.6 million, up nearly 30% from 22.9 million in 2002. Dell'Oro further projects that the number of cable modem users will continue to grow in 2004, reaching approximately 38.7 million worldwide, an increase of approximately 25% over 2003. By 2004, cable modem users are expected to represent 59.5% and 28.9% of all high-speed data subscribers in North America and on a worldwide basis, respectively, based on data from Dell'Oro.

Increased demand for "triple play" broadband services.

Within the last few years, certain cable operators have begun to offer a "triple play" bundle of services that includes voice, video and high-speed data, over a single network, with the objective of capturing higher average revenues per subscriber. We believe cable operators are well positioned to deliver next-generation voice, video and data services because:

*cable operators have invested significantly over the past few years to upgrade their cable plants to digital networks; these upgrades allow them to leverage their incumbent video and high speed data positions further;

*many cable operators have well equipped networks to offer video and two-way high speed data services to over 90% of their subscribers; and

*cable operators' existing Hybrid Fiber Co-axial (HFC) infrastructure is capable of delivering symmetrical high-bandwidth video, voice and data to the subscribers.

Cable operators face increased competition from telecom operators for high-speed data solutions.

As competition from telecom operators continues to increase, many cable operators are looking to their equipment vendors, such as us, to provide cost-effective solutions to enable the delivery of differentiated,

1

--------------------------------------------------------------------------------

Table of Contents

robust service offerings to residential and commercial subscribers. As cable operators add new subscribers for these services, they must deploy CMTSs and customer premise equipment (CPE), such as cable modems and embedded multimedia terminal adapters. Cable operators have sought to compete with telecom and satellite operators by delivering a differentiated cost-effective bundled video, data and voice solution to their subscribers or by providing more value such as guaranteed downstream and upstream data rate speeds.

Cable operators face increased competition from satellite operators and telecom providers for video services.

Cable operators have responded to the increasing satellite operator digital video offerings by upgrading their networks to provide comparable digital quality video as well as other video services such as video-on-demand (VOD) and pay-per-view (PPV). Recently several telecom operators have undertaken initiatives such as fiber-to-the-premises (FTTP) to potentially provide triple play services to their subscribers. Certain telecom providers have successfully deployed video over a digital subscriber line (DSL) to a few markets and are exploring opportunities for additional roll-outs. In addition, both cable and satellite operators have recently begun providing high definition television (HDTV) services to their subscribers. HDTV and VOD are bandwidth intensive applications often requiring additional hardware and software that vendors like us provide.

Improved financial prospects for many cable operators.

Beginning in 2001, the communications industry overall experienced a severe downturn, which resulted in a significant reduction in capital spending for communications equipment. Many cable operators were constrained by high debt loads and, in a few cases, filed for bankruptcy. In addition, consolidation in the cable industry, such as the merger of Comcast Corporation (Comcast) and AT&T Broadband, also contributed to a temporary reduction in capital spending. We believe that the recent integration efforts in the industry, as well as the completion of certain financial restructuring actions, will allow many cable operators to increase their investments in access equipment to provide advanced services to their subscribers in a cost-effective manner. However, the cable industry continues to face challenges. One of the largest US cable companies, Adelphia, is still in bankruptcy and other large cable operators continue to be constrained by significant amounts of debt. In addition, cable operators may attempt to expand their business through business combinations, such as the unsolicited stock offering by Comcast for Disney Corporation. Consequently, capital equipment expenditures by cable operators may be limited for the near future, which may adversely affect our revenues.

Business

We develop, market and sell CMTSs, CPE (including cable modems), imbedded multimedia terminal adapters, and digital video equipment. Our CMTS and CPE products enable cable operators to deliver and manage cost-effective broadband Internet access and voice over Internet Protocol (VoIP) telephone service. Our digital video equipment allows cable operators, satellite providers and broadcasters to deliver advanced digital video services. We focus on the development of cable broadband access technologies that will improve cable operators' return on investment by leveraging their existing infrastructure to deliver new broadband services to residential and commercial subscribers at lower expense. We believe this strategy will provide the following benefits to cable operators: a competitive edge in winning new subscribers, a reduction in subscriber turnover, faster recovery of subscriber acquisition costs, increased revenues and reduced operational and capital expenditures.

Over the last year, we completed the transition from selling proprietary-based products to selling standards-based products using the DOCSIS 2.0 specification. Due primarily to the adoption of DOCSIS and our current position as the only vendor of a DOCSIS 2.0 CMTS, qualified by Cable Television Laboratories, Inc. (CableLabs), a cable industry consortium that establishes cable technology standards and administers compliance testing, we now generate DOCSIS CMTS and cable modem sales to U.S. cable operators as well as to our legacy global customers.

The delivery of broadband communication, which includes voice, video and data, requires expertise in radio frequency (RF), motion picture experts group (MPEG), and Internet Protocol (IP). Our products

2

--------------------------------------------------------------------------------

Table of Contents

leverage our expertise in these disciplines and our experience in designing, developing and manufacturing complex equipment, such as CMTSs and digital video headend equipment. We provide our customers with an end-to-end set of software and hardware products that allow them to deliver and manage cost-effective, robust broadband offerings for subscribers. Currently, we are the only vendor to the cable industry with an end-to-end DOCSIS 2.0 cable data system qualified and certified by CableLabs. We believe our standards-based DOCSIS 2.0 cable data products enable cable operators to deliver high-speed, symmetrical bandwidth to subscribers cost-effectively. Our cable data equipment is DOCSIS 2.0 qualified and backwards compatible with DOCSIS 1.0 and DOCSIS 1.1 CMTSs and cable modems. The DOCSIS 2.0 standard incorporates advanced physical layer technologies, including S-CDMA. With DOCSIS 2.0, we believe many cable operators can realize compelling economic and performance advantages over existing CMTSs through higher data rate channel throughput, higher spectral efficiency and greater noise resiliency.

DOCSIS 2.0 increases the upstream throughput of cable networks up to three times the capacity of DOCSIS 1.0 or 1.1. This greater upstream throughput is important for cable operators as it enables them to more easily handle the greater amount of upstream traffic on their networks as residential subscribers increasingly host their own websites, swap music and video files (this is commonly known as "peer-to-peer" computing) and send large email attachments. Further, upstream capacity is expected to become an increasingly important issue as cable operators rollout residential VoIP cable telephony, which is a symmetric two-way service that consumes as much upstream bandwidth as it does downstream bandwidth.

In addition to enabling cable operators to deliver as much upstream bandwidth as downstream bandwidth over their networks, DOCSIS 2.0 is also more resistant to the noise interference inherent in cable networks, allowing for more reliable broadband service delivery. This greater reliability is particularly important as cable operators increasingly seek to expand their customer base beyond residential subscribers to include small office/home office (SOHO) and small-to-medium enterprise (SME) commercial customers. Providing commercial voice and data services to these customers is potentially quite lucrative, but requires very reliable service delivery in order to lure these customers away from the telecom carriers they have traditionally relied on.

In the digital video management system market, our expertise in MPEG processing technologies has helped us secure a leadership position in statistical remultiplexing and providing the cable and satellite operators with bandwidth management capabilities for standard (SD) and high definition digital television (HDTV). Our digital video products enable cable operators, satellite providers and broadcasters to maximize their SD and HDTV digital programming through rate shaping, grooming and advertisement insertion. We believe we are well positioned to capitalize on the growing demand for cable and satellite operators to provide advanced video services to their subscribers, including bandwidth intensive applications such as HDTV and VOD.

Business Strategy

Our goal is to be the leading provider of intelligent broadband access and delivery solutions that optimize the delivery of voice, video and data for broadband service providers, primarily cable operators, on a worldwide basis. To achieve this goal, we are pursuing the following strategies:

*increase our CMTS market share by exploiting our DOCSIS 2.0 expertise;

*capitalize on the increasing demand for advanced video services, including HDTV and VOD, by leveraging our leading position in the market for digital video bandwidth management products;

*use our expertise in DOCSIS, IP, MPEG and RF technologies to evolve our solutions into an intelligent access platform capable of more effectively delivering and managing "triple play" bundled services for cable operators;

3

--------------------------------------------------------------------------------

Table of Contents

*selectively enhance our CPE product portfolio to increase the value-add for cable operators to offer to their subscribers; and

*improve margins through focused product cost-reduction efforts and by streamlining operational activities across all product lines.

Products

DOCSIS 2.0 CMTS Products -- Our DOCSIS 2.0 BlueWave (BW) 3000 CMTS product line includes a scalable, carrier-class solution for cable operators with demanding broadband applications and a compact solution ideal for smaller or segmented cable networks. This product family was designed from the outset to support integrated voice, video and data broadband services. CMTSs are used by cable operators to provide broadband services to cable modems and other devices installed in their subscribers' homes or businesses.

Cable Modem Products -- Our TeraJet (TJ) 700 series of cable modems includes models that are certified to meet the DOCSIS 1.1 and 2.0 and Euro-DOCSIS 1.0 cable modem specifications. Our cable modems are being deployed by eight of the largest cable operators based in North America.

Embedded Multimedia Terminal Adapter Products -- Our terminal adapter (TA) series of embedded multimedia terminal adapters (eMTA) are cable modems that support the delivery of VoIP-based cable telephony service, in addition to high-speed Internet access. The TA eMTAs are designed specifically for VoIP cable telephony and are based on the PacketCable standard, which CableLabs has developed for cable VoIP. Our eMTAs are also based on the DOCSIS and Euro-DOCSIS specifications so they can be deployed by cable operators worldwide.

Video Products -- Our CherryPicker DM 6400 and the BP5100 are both digital video management systems utilizing advanced statistical remultiplexing technology to give cable and satellite operators (using the DM 6400) and broadcasters (using the BP5100) unprecedented flexibility in managing their digital video content. The DM6400 and BP5100 are both used for a variety of digital video applications, including rate shaping to maximize bandwidth for SD and HD programming, grooming customized channel line-ups, and seamlessly inserting digital advertisements for local companies.

New Products -- We maintain ongoing research and development activities for our current product lines and to determine the potential of possible future products.

For current product lines, our research and development efforts are focused on developing new features and functionality that address customer requirements and which keep our products competitive with products from other vendors. Another key goal of our ongoing research and development activities is to improve the gross margins for our existing products by reducing the component and manufacturing costs of these products.

We also put a great deal of research and development effort into investigating potential future products and technologies. Developing new and innovative solutions is important for Terayon to remain competitive with larger companies that devote considerably more resources to product development.

Customers

We market and sell our data products to cable operators that provide broadband services to both residential and business subscribers. We market and sell our video products to cable operators, satellite providers and broadcasters. Our target market consists of the largest cable and satellite operators and broadcasters in each major geographic area, including North America, Europe and Asia.

4

--------------------------------------------------------------------------------

Table of Contents

Our principal customers include the following:

Adelphia Communications Corporation
Comcast
Cox Communications, Inc.
Hughes Electronics (DirectTV)
EchoStar
J-Com (Cross Beam Networks), a subsidiary of Sumitomo Corporation(Sumitomo)
i-CABLE Communications Limited
Thomson Electronics (Fox Broadcasting Company)

We believe that a substantial majority of our revenues will continue to be derived from sales to a relatively small number of customers for the foreseeable future. For example, three customers (Adelphia, Cross Beam Networks, a subsidiary of Sumitomo, and Comcast) accounted for approximately 22%, 16% and 13%, respectively, of our total revenues for the year ended December 31, 2003. One customer (Cross Beam Networks) accounted for approximately 28% of our total revenues for the year ended December 31, 2002. Two customers (Shaw Communications, Inc. (Shaw) and Cross Beam Networks) accounted for approximately 33% and 13%, respectively, of the total revenues for the year ended December 31, 2001. The loss of any one of our significant customers could have a material adverse effect on our business and results of operations.

Market Competition

The market for cable equipment vendors is extremely competitive and is characterized by rapid technological change, and more recently, market consolidation. In the past, most cable data systems were based on vendors' proprietary technology. As a result, CPE products, such as modems, only worked with CMTSs from the same vendor, and therefore operators generally had to purchase CMTSs and modems from the same vendor. With the advent of DOCSIS certified and qualified products, customers can purchase interoperable CMTSs and CPE products from a variety of equipment manufacturers. The move to standards-based products may lead to additional pricing pressures and further declining gross margins.

In the market for cable data products our main competitors in the sale of CMTSs are ADC, Arris, Cisco Systems and Motorola. Our main competitors in the sale of CPE products are Ambit, Motorola, Thomson and Toshiba.

In the market for video grooming and remultiplexing, we believe we are the market leader with our CherryPicker digital video management system. However, several companies have entered this market, including Motorola and privately held BigBand Networks.

The principal competitive factors in our market include the following:

*product performance, features and reliability;

*price;

*size and financial stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*technical support and service;

*relationships with providers of service providers; and

*compliance with industry standards.

Some of the above competitive factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater

5

--------------------------------------------------------------------------------

Table of Contents

market acceptance than our products. Many of our current and potential competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do. These competitive pressures have and are likely to continue to adversely impact our business.

Sales and Marketing

We market and sell our products directly to broadband service providers through our direct sales forces in North America, Europe and Asia. We also market and sell our products through distributors and resellers throughout the world.

We support our sales activities through marketing communication vehicles, such as industry press, trade shows, advertising and the web. Through our marketing efforts, we strive to educate broadband service providers on the technological and business benefits of our products, as well as our ability to provide quality support and service. We participate in the major trade shows and industry events for the cable industry in the United States and throughout the world. Industry referrals and reference accounts are significant marketing tools we develop and utilize.

We also make our products available for customers to test, which is very often a prerequisite for making a sale of our CMTS or other complex products. These tests can be very comprehensive and lengthy, which can dramatically increase the sales cycle for these products. Participating in these tests often requires us to devote considerable time and resources from our engineering and customer support organizations.

International Sales

We have international sales offices in Belgium, China (Shanghai), Hong Kong and Israel. In fiscal 2003, 2002 and 2001, approximately 44%, 68% and 82%, respectively of our net revenues were from customers outside of the U.S. Sales to Japan were 16%, 28% and 13%, in fiscal 2003, 2002 and 2001, respectively. During 2003, we emphasized sales to U.S., Japanese and other Asian customers while placing a lower emphasis on other locations such as Canada, Israel and South America. See Note 12 in our Notes to Consolidated Financial Statements.

The majority of our international sales are currently invoiced in U.S. dollars. However, we do enter into certain transactions in Euros and other currencies. Invoicing in other currencies subjects us to risks associated with foreign exchange rate fluctuations. Although we do not currently have any foreign currency hedging arrangements in place, we will consider the need for hedging or other strategies to minimize these risks if the amount of invoicing in non-dollar denominated transactions materially increases.

Our international operations are subject to certain risks common to foreign operations in general, such as governmental regulations and import restrictions. In addition, there are social, political, labor and economic conditions in specific countries or regions as well as difficulties in staffing and managing foreign operations, and potential adverse foreign tax consequences, among other factors that could also have an impact on our business and results of operations outside of the United States.

Customer Service and Technical Support

We believe that our ability to provide consistently high quality service and support will be a key factor in attracting and retaining customers. Our technical services and support organization, with personnel in North America, Europe, Israel and Asia, offers support 24 hours a day, seven days per week. Prior to the deployment of our products, each customer's needs are assessed and proactive solutions are implemented, including various levels of training, periodic management and coordination meetings and problem escalation procedures.

Backlog

Most of our revenues are generated from orders booked and shipped within the current quarter. Assuming product availability, our practice is to ship our products promptly upon the receipt of purchase orders from our customers. Therefore, we believe that backlog information is not material to an understanding of our business.

6

--------------------------------------------------------------------------------

Table of Contents

## Manufacturing

Most of our finished goods are produced by subcontract manufacturers. During 2003, we produced modems primarily in Thailand. Currently, we dual source our modems from manufacturers in Thailand and Taiwan. Our data and video headend equipment are dual sourced from manufacturers in San Jose, California and Fremont, California.

Our manufacturing operations employ a wide variety of semiconductors, electromechanical components and assemblies and raw materials such as plastic resins and sheet metal. Although we believe the materials and supplies necessary for our manufacturing operations are currently available in the quantities required, we sometimes experience a short supply of certain component parts as a result of strong demand in the industry for those parts.

Our subcontractors purchase materials, supplies and product subassemblies from a substantial number of vendors. For many of our products, there are existing alternate sources of supply. However, we sole source certain components contained in our products, such as the semiconductors used in our products. While this has not resulted in material disruptions in the past, should any change in these relationships or disruptions to our vendors' operations occur, our business and results of operations could be adversely affected.

We are engaged in substantial research and development activities to investigate the potential of possible future products and to improve our existing products by adding new functionality and by reducing their cost of manufacture. We currently anticipate that overall research and development spending in 2004 will decrease compared to 2003, but will be more focused on product lines with more strategic importance to the company. A key area for ongoing research and development will be to develop new products and features that exploit the capabilities of the Flexible CMTS architecture of our BW CMTSs.

## Intellectual Property

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. Our pending patent applications may not be granted. Even if they are granted, the claims covered by the patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove to be sufficient to prevent misappropriation of our technology or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. Litigation may be necessary to enforce our intellectual property rights.

In connection with the development of the DOCSIS 2.0 specification by CableLabs, we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis all of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products.

We have received letters claiming that our technology infringes the intellectual property rights of others. We have consulted with our patent counsel and are in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that our products infringe third party intellectual property rights. If we are found to have infringed third party rights, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. A claim of infringement, whether

7

--------------------------------------------------------------------------------

Table of Contents

meritorious or not, could be time-consuming, result in costly litigation, divert our management's resources, cause product shipment delays or require us to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to us, if at all.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

Access to Our Reports

Our Internet Web site address is www.terayon.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15 (d) of the Exchange Act are available free of charge through our Web site as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission. We will also provide those reports in electronic or paper form free of charge upon a request made to Arthur T. Taylor, Chief Financial Officer, c/o Terayon Communications Systems, Inc., 4988 Great America Parkway, Santa Clara, CA 95054. Furthermore, all reports we file with the Commission are available free of charge via EDGAR through the Commission's Web site at www.sec.gov. In addition, the public may read and copy materials filed by us at the Commission's public reference room located at 450 Fifth St., N.W., Washington, D.C., 20549.

Employees

As of December 31, 2003, we had 423 employees, of which 290 were located in the United States, 95 in Israel and an aggregate of 38 in Canada, Europe, South America and Asia. We had 229 employees in research and development, 88 in marketing, sales and customer support, 41 in operations and 65 in general and administrative functions. In connection with our most recent restructuring that occurred in the first quarter of 2004, we terminated the employment of approximately 70 employees or 17% of our workforce. None of our employees are represented by collective bargaining agreements. We believe that our relations with our employees are good.

Item 2.Properties

Our principal executive offices are located in Santa Clara, California where we lease approximately 141,000 square feet under a lease that expires in October 2009. In connection with our restructuring plans announced January 27, 2004, we are seeking to sublease approximately 56,400 square feet of this space. In the United States, we have additional facilities in Costa Mesa, California and Denver, Colorado. A nominal amount of the additional facilities space is subleased.

In addition, we lease properties worldwide. We have a facility in Tel Aviv, Israel consisting of approximately 136,000 square feet under a lease that expires in October 2005. We currently sublease approximately 107,000 square feet of the Israel property. We have offices in Hong Kong; Brussels; Belgium; Shanghai, China; and Ontario, Canada. We believe that our existing facilities are adequate to meet our needs for the foreseeable future. For additional information regarding obligations under leases, see Note 3 to the Notes to Consolidated Financial Statements.

Item 3.Legal Proceedings

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against us and certain of our officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants

8

--------------------------------------------------------------------------------

Table of Contents

violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery.

On October 16, 2000, a lawsuit was filed against us and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal has been set for oral argument on April 16, 2004.

We believe that the allegations in both the class action and the Bertram case are without merit, and we intend to contest these matters vigorously. These matters, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by our breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of our wholly-owned subsidiaries. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. We believe that the allegations are without merit and intend to present a vigorous defense in the arbitration proceedings.

We, as well as our customers, have received letters from third parties claiming that our technology and products infringe on the third parties' patents. We have consulted with our patent counsel and are in the process of reviewing the allegations made by such third parties. We do not know whether the third parties will pursue their claims of patent infringement in court, and if they do, whether we will be found to infringe the third parties' patents. If we are found to have infringed such third party patents, we could be subject to substantial damages and/or an injunction preventing us from selling our products and conducting our business. Additionally, additional third parties could assert infringement claims against us in the future. Any such claim of patent infringement, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require us to enter into royalty or licensing agreements. Such royalty or licensing agreements may not be available on terms acceptable to us, if at all.

We are currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While we currently believe that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on our financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of our legal proceedings, there exists the possibility of a material adverse impact on our results of operations for the period in which the ruling occurs. The estimate of the potential impact on our financial position and overall results of operations for any of the above legal proceedings could change in the future.

9

Table of Contents

Item 4.Submission of Matters to a Vote of Security Holders

     There were no matters submitted to a vote of security holders in the fourth quarter of 2003.

PART II

Item 5.Market for the Registrant's Common Equity and Related Stockholder Matters

     Our common stock is traded on the Nasdaq National Market under the symbol "TERN". Public trading of our common stock commenced on August 18, 1998. Prior to that time, there was no public market for our common stock. The following table sets forth, for the periods indicated, the high and low per share sale prices of our common stock, as reported by the Nasdaq National Market.

| | High | Low |
|---|---|---|
| 2003: | | |
| First Quarter | $2.84 | $1.39 |
| Second Quarter | $3.20 | $1.57 |
| Third Quarter | $8.25 | $2.52 |
| Fourth Quarter | $8.04 | $4.05 |
| 2002: | | |
| First Quarter | $9.35 | $5.48 |
| Second Quarter | $8.48 | $0.86 |
| Third Quarter | $3.62 | $1.10 |
| Fourth Quarter | $2.97 | $1.51 |

     As of March 1, 2004, there were approximately 632 holders of record of our common stock, as shown on the records of our transfer agent. The number of record holders does not include shares held in "street name" through brokers.

     We do not pay any cash dividends on our common stock. We currently expect to retain future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future.

10

---

Table of Contents

The following table summarizes our equity compensation plan information as of December 31, 2003. Information is included for both equity compensation plans approved by our stockholders and equity compensation plans not approved by our stockholders.

| Plan Category | Common Stock to be Issued upon Exercise of Outstanding Options and Rights | Weighted-Average Exercise Price of Outstanding Options and Rights | Common Stock Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by Terayon stockholders(1) | 8,364,757 | $ 5.17 | 16,134,118 |
| Equity compensation plans not approved by Terayon stockholders(2) | 9,099,202 | $ 7.06 | 12,211,593 |
| Totals | 17,463,959 | $ 6.20 | 28,345,711(3) |

--------------

(1) Includes options to purchase common stock outstanding under the Terayon Communication Systems, Inc. 1995 Stock Option Plan as amended, Terayon Communication Systems, Inc. 1997 Equity Incentive Plan as amended, Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan as amended, Terayon Communication Systems, Inc. 1998 Non-Employee Directors Stock Option Plan as amended, and the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan Offering for Foreign Employees.
(2) Includes options to purchase the Terayon Communication Systems, Inc. 1999 Non-Officer Equity Incentive Plan, as amended. See Note 9 in Notes to Consolidated Financial Statements.
(3) Includes 2,400,152 shares of common stock available for purchase under the Terayon Communication Systems, Inc. 1998 Employee Stock Purchase Plan.

1995 Plan

In March 1995, our Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of our common stock. As of December 31, 2003 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

In March 1997, our Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of our common stock. In June 1998, our Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (5,000,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than 5% of our outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares.

The 1997 Plan was amended on June 13, 2000 to increase the shares authorized for issuance by 3,770,000 additional shares and to provide for an increase in the number of shares of common stock beginning January 1, 2000 through January 1, 2007, by the lesser of 5% of the common stock outstanding on such January 1 or 3,000,000 shares. In May 2003, the Company's Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1997 Plan by 6,237,826 shares. As of December 31, 2003, a total of 15,516,702 shares have been authorized for issuance related to the 1997 Plan.

11

--------------------------------------------------------------------------------

Table of Contents


1998 Plan

    In June 1998, the our Board of Directors authorized the adoption of the
1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which
400,000 shares of our common stock have been reserved for future issuance to our
non-employee directors. In 2002, our Board of Directors amended the 1998 Plan to
increase the shares authorized for issuance by 400,000 additional shares. As of
December 31, 2003, a total of 800,000 shares have been authorized for issuance
related to the 1998 Plan.

1999 Plan

    In September 1999, our Board of Directors authorized the adoption of the
1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000
shares of our common stock have been reserved for future issuance to our
non-officer employees. The plan has been amended by our Board of Directors to
increase the amount of authorized shares available. Additionally, in May 2003,
our Board of Directors authorized the adoption of an amendment to reduce the
number of authorized shares in the 1999 Plan by 13,762,174 shares. As of
December 31, 2003, a total of 14,737,826 shares have been authorized for
issuance related to the 1999 Plan.

    The 1995 and 1997 Plans provide for incentive stock options or
nonqualified stock options to be issued to employees, directors, and our
consultants. Prices for incentive stock options may not be less than the fair
market value of the common stock at the date of grant. Prices for nonqualified
stock options may not be less than 85% of the fair market value of the common
stock at the date of grant. Options are immediately exercisable and vest over a
period not to exceed five years from the date of grant. Any unvested stock
issued is subject to repurchase by us at the original issuance price upon
termination of the option holder's employment. Unexercised options expire ten
years after the date of grant.

    The 1998 Plan provides for non-discretionary nonqualified stock options to
be issued to our non-employee directors automatically as of the effective date
of their election to the Board of Directors and annually following each annual
stockholder meeting. Prices for nonqualified options may not be less than 100%
of the fair market value of the common stock at the date of grant. Options
generally vest and become exercisable over a period not to exceed three years
from the date of grant. Unexercised options expire ten years after the date of
grant.

    The 1999 Plan provides for nonqualified stock options to be issued to our
non-officer employees and consultants. Prices for nonqualified stock options may
not be less than 85% of the fair market value of the common stock at the date of
the grant. Options generally vest and become exercisable over a period not to
exceed five years from the date of grant. Unexercised options expire ten years
after date of grant.

                                      12

--------------------------------------------------------------------------------

Table of Contents

Item 6.Selected Financial Data

The following tables contain selected financial data as of and for each of the five years ended December 31, 2003, 2002, 2001, 2000, and 1999 and are derived from our financial statements. The selected financial data are qualified by reference to, and should be read in conjunction with, our financial statements and the notes to those financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | (In thousands, except per share data) | | | | |
| Consolidated statement of operations data: | | | | | |
| Revenues | $133,485 | $129,403 | $ 279,481 | $ 339,549 | $ 97,009 |
| Cost of goods sold | 101,034 | 100,949 | 263,117 | 289,531 | 72,044 |
| Gross profit | 32,451 | 28,454 | 16,364 | 50,018 | 24,965 |
| Operating expenses: | | | | | |
| Research and development | 42,839 | 58,696 | 79,927 | 68,270 | 17,579 |
| Cost of product development assistance agreement | -- | -- | -- | 9,563 | 35,147 |
| In-process research and development | -- | -- | -- | 30,535 | 14,600 |
| Sales and marketing | 26,781 | 35,704 | 55,701 | 45,261 | 15,727 |
| General and administrative | 12,127 | 14,715 | 31,309 | 24,809 | 7,476 |
| Goodwill amortization | -- | -- | 25,410 | 59,057 | 3,524 |
| Restructuring and asset write-offs(1) | 2,803 | 8,922 | 587,149 | -- | -- |
| Total operating expenses | 84,550 | 118,037 | 779,496 | 237,495 | 94,053 |
| Loss from operations | (52,099) | (89,583) | (763,132) | (187,477) | (69,088) |
| Interest income (expense) and other income (expense), net | 2,062 | (3,481) | 44 | 6,710 | 5,008 |
| Gain on early retirement of debt(2) | -- | 49,089 | 185,327 | -- | -- |
| Income tax (expense) benefit | (316) | (238) | 13,915 | -- | -- |
| Net loss | $(50,353) | $(44,213) | $(563,846) | $(180,767) | $(64,080) |
| Basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (8.25) | $ (2.95) | $ (1.55) |
| Shares used in computing basic and diluted net loss per share(3) | 74,212 | 72,803 | 68,331 | 61,349 | 41,260 |

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2000 | 1999 |
| | (In thousands) | | | | |
| Consolidated Balance Sheet Data: | | | | | |
| Cash, cash equivalents and short-term investments | $ 138,640 | $ 206,503 | $ 333,888 | $ 562,457 | $ 112,992 |
| Working capital | 135,943 | 172,829 | 316,175 | 547,938 | 112,374 |
| Total assets | 215,240 | 275,710 | 466,646 | 1,426,727 | 301,236 |
| Long-term obligations (less current portion)(3) | 68,447 | 68,580 | 178,641 | 500,477 | 37 |
| Accumulated deficit | (987,560) | (937,207) | (892,994) | (329,148) | (148,381) |
| Total stockholders' equity | $ 91,388 | $ 137,142 | $ 180,304 | $ 702,681 | $ 258,655 |

--------------

(1)See Note 5 of Notes to Consolidated Financial Statements for an explanation for restructuring and asset write-offs.
(2)See Note 7 of Notes to Consolidated Financial Statements for an explanation of the repurchase of subordinated convertible notes and reclassification of related gains.
(3)See Note 1 of Notes to Consolidated Financial Statements for an explanation of the method employed to determine the number of shares used to compute per share amounts.

--------------------------------------------------------------------------------

Table of Contents

Item 7. Management's Discussion and Analysis of Financial Condition and Results
of Operations

The following discussion and analysis is intended to provide an investor
with a narrative of our financial results and an evaluation of our financial
condition and results of operations. The discussion should be read in
conjunction with our consolidated financial statements and notes thereto.

Overview

We develop, market and sell cable modem termination systems (CMTS),
customer premise equipment (CPE) products, including cable modems, and digital
video equipment. Our revenues are generated principally from sales of these
three major product groups either directly to broadband service providers
through direct sales forces primarily in North America, Europe and Asia and
through resellers.

Over the last year, we completed the transition from selling
proprietary-based products to selling standards-based products using the Data
Over Cable System Interface Specification (DOCSIS) 2.0 specification. We now
generate DOCSIS CMTS and cable modem sales to U.S. cable operators as well as to
our legacy global customers.

Over the last year, we completed the transition from selling
proprietary-based products to selling standards-based products using the Data
Over Cable System Interface Specification (DOCSIS) 2.0 specification. Due
primarily to the adoption of DOCSIS 2.0 and our current position as the only
vendor with qualified DOCSIS 2.0 CMTS, we now generate DOCSIS CMTS and cable
modem sales to U.S. cable operators as well as to global customers.

Our gross margins fluctuate from period to period primarily as a result of
the mix of products we sell. Specifically, we derive substantially higher
margins from sales of our CMTS and digital video equipment products than we do
from sales of our CPE products, which are subject to intense price competition.
To date a majority of our total revenues are generated by sales of our CPE
products. We also believe that the widespread adoption of industry
specifications, such as the DOCSIS specifications, will further erode ASPs. We
anticipate that the erosion of ASPs of our CPEs will continue, and price erosion
will accelerate in the first half of 2004. We are working to mitigate pressures
on our gross margins by continuing to focus on product manufacturing cost
reductions, especially for our CPE products, by transitioning to a new Original
Design Manufacturer (ODM) in Asia during the first half of 2004. To the extent
that the containment of our product costs do not keep pace with ASP declines,
our gross margins will be adversely affected.

We have not been profitable since our inception. We had a net loss of
$50.4 million or $0.68 per share for the year ended December 31, 2003, and a net
loss of $44.2 million or $0.61 per share for the year ended December 31, 2002.
We are targeting profitability to begin in the second quarter of 2004, and we
believe our ability to achieve profitability in the long term will depend
primarily on three factors. The first factor is our ability to achieve improved
gross margins through an improved sales mix by increasing sales of higher margin
digital video and CMTS products relating to expected CPE product growth. To
increase sales of digital video products, we are targeting new markets such as
the broadcast sector and promoting new applications such as high definition
television (HDTV) and digital insertion to cable satellite operators. To grow
the CMTS business, we will attempt to capitalize on our DOCSIS 2.0 expertise and
provide application solutions for DOCSIS 2.0 advanced services, including voice
over Internet Protocol (VoIP) and commercial services. To the extent that sales
of CPE products continue to comprise a greater proportion of our total revenues,
our ability to achieve profitability could be adversely affected. Secondly, we
will continue to focus on lowering product costs for modems through our new ODM
relationship in Asia and the introduction of our new lower cost semiconductor,
which is used in cable modems. In our CMTS business, we will continue to reduce
costs through improved designs, better leveraging of our contract manufacture
supply network, and the reduction of sole source components. Finally, as
discussed below, we expect to benefit from a lower expense base resulting in
part from a restructuring in the first quarter of 2004 combined with continued
focus on cost containment. However, despite these efforts, we may not succeed in
attaining profitability in the near future, if at all.

When the downturn in the communications industry became evident in fiscal
2001, we began to implement restructuring plans to reduce operating expenses and
capital spending and to narrow the focus of

14

--------------------------------------------------------------------------------

Table of Contents

our business. As it became evident in fiscal 2002 that our industry was experiencing an even more pronounced and prolonged economic downturn, we took additional measures to align our cost structure. Our most recent restructuring occurred in the first quarter of 2004 whereby, we initiated a worldwide reduction in force of approximately 70 employees, or 17% of the workforce, consolidated certain facilities, and reduced or eliminated certain discretionary costs and programs. We expect to record total charges in the range of approximately $5.0 million to $7.0 million associated with this realignment in the quarter ending March 31, 2004. Beginning in the second quarter of 2004, we anticipate annual savings to be approximately $10.0 million to $12.0 million. Furthermore, as part of our restructuring efforts to refocus our business, we sold or discontinued certain lines of products. We may continue to divest unprofitable product lines in an effort to focus on growing our business profitably and redirect our resources. However, despite these restructuring actions, we may not be able to meet expected revenue levels in any particular period or attain profitability in any future period.

At December 31, 2003, we had approximately $138.6 million in cash, cash equivalents and short-term investments as compared to approximately $206.5 million at December 31, 2002. The significant decrease in the amount of cash and cash equivalents in 2003 as compared to 2002 primarily resulted from significant uses of cash for operating activities in 2003. Although we believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months, we may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. There can be no assurance that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

Our ability to grow our business and attain profitability is dependent on our ability to effectively compete in the marketplace with our current products and services, develop and introduce new products and services, contain operating expenses and improve our gross margins, as well as the continued recovery of the communications industry. A more detailed description of the risks to our business can be found in the section captioned "Risk Factors" in this annual report.

Results of Operations

Comparison of the Years Ended December 31, 2003 and 2002

Revenues

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2003 | 2002 | 2003/2002 |
| --- | --- | --- | --- |
|  | (In thousands) | | |
| Revenues | $ 133,485 | $129,403 | 3% |

We sell our products directly to broadband service providers, and to a lesser extent resellers. Revenues related to product sales are recognized when: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred or services rendered, (3) the selling price is fixed or determinable, and (4) collectibility is reasonably assured. A provision is made for estimated product returns as product shipments are made. Our existing agreements typically do not grant return rights beyond those provided by the warranty. Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as we generally do not grant return rights beyond those provided by the warranty.

Revenues consist primarily of sales of products to new and existing customers providing broadband services. Prior to December 31, 2002, we operated primarily in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). Beginning in 2003, the Telecom segment no longer met the quantitative threshold for disclosure and we operated as one business segment.

15

--------------------------------------------------------------------------------

Table of Contents

Our revenues increased 3% to $133.5 million for the year ended December 31, 2003 from $129.4 million in 2002, primarily due to increased sales of DOCSIS CMTS and CPE products, particularly in the second half of 2003, partially offset by declining sales of our proprietary S-CDMA CMTS and CPE products and Telecom products.

Revenues by Groups of Similar Products

|  | For the Year Ended December 31, | | Annual % Change |
| --- | --- | --- | --- |
|  | 2003 | 2002 | 2003/2002 |
|  | (In thousands) | | |
| Revenues by product: | | | |
| CMTS products | $ 47,486 | $ 28,159 | 69% |
| CPE products | 64,808 | 69,469 | (7)% |
| Video products | 17,710 | 20,832 | (15)% |
| Other products | 3,481 | 10,943 | (68)% |
| Total | $ 133,485 | $129,403 | 3% |

CMTS product revenues increased 69% in 2003 compared to 2002, due to increased deployment of our DOCSIS products into new markets, primarily in the U.S. We expect CMTS revenues to continue to increase in 2004 as we continue to expand sales into the U.S., Asia and Europe.

CPE product revenues decreased 7% in 2003 compared to 2002, due to a continuing decline in ASPs, partially offset by increases in the volume of modem sales. The number of DOCSIS modems sold increased from 0.4 million units in 2002 to 1.2 million units in 2003. The intensely competitive nature of the market for broadband products resulted in significant price erosion. We anticipate that modem unit price erosion will continue in the first half of 2004. However, we believe that our full transition to an ODM in Asia during the first half of 2004 and the introduction of our new lower cost modem semiconductor may allow us to remain competitive in the marketplace and maintain favorable margins on these products. CPE revenues also decreased due to the shift in product mix from our higher-priced proprietary S-CDMA modems to our lower-priced DOCSIS modems. The number of S-CDMA modems sold decreased from 0.4 million units in 2002 to 0.1 million units in 2003.

Revenues from video products decreased 15% in 2003 compared to 2002, due to decreased sales to U.S. Multiple System Operators (MSOs). We attribute this decline to lower capital spending by MSOs, primarily in the first half of 2003. However, we have seen growth in sales of our Network Cherrypicker 6400, especially in the second half of 2003, and we believe that we will continue to see increased sales of video products as demand for high definition television (HDTV) and other video services grows in 2004.

Other product revenues decreased 68% in 2003 compared to 2002, due to decreased sales of our legacy Telecom products. We expect sales of Telecom products to be minimal in 2004.

16

---------------------------------------------------------------------------------

Table of Contents

Revenues by Geographic Region

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2003 | 2002 | 2003/2002 |
| | (In thousands) | | |
| Revenues by geographic areas: | | | |
| United States | $ 74,341 | $ 41,150 | 81% |
| Canada | 3,145 | 17,247 | (82)% |
| Europe | 17,635 | 11,381 | 55% |
| Israel | 7,038 | 8,283 | (15)% |
| Japan | 21,183 | 36,214 | (42)% |
| Asia, excluding Japan | 9,575 | 11,845 | (19)% |
| South America | 568 | 3,283 | (83)% |
| Total | $ 133,485 | $ 129,403 | 3% |

     Revenues in the United States increased 81% to $74.3 million in 2003, up from $41.2 million in 2002, due to increased sales of DOCSIS 2.0 CMTSs, modems and video products to U.S. MSOs. During 2003, we emphasized sales to our U.S., European, Japanese and other Asian customers while placing a lower emphasis on other locations such as Canada, Israel and South America. In 2004, we expect revenues to increase in the United States, Asian and European markets. Three customers, Adelphia Communications Corporation (Adelphia), J-Com (Cross Beam Networks), a subsidiary of Sumitomo, and Comcast each accounted for more than 10% of our total revenues for the year ended December 31, 2003 (22%, 16%, 13%). One customer, Cross Beam Networks accounted for more than 10% of our total revenues for the year ended December 31, 2002 (28%).

Related Party Revenues

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2003 | 2002 | 2003/2002 |
| | (In thousands) | | |
| Related party revenues: | | | |
| Rogers revenues | $ 1,453 | $ 8,040 | (82)% |
| Harmonic revenues | 3,241 | 1,057 | 207% |
| Total related party revenues | $ 4,694 | $ 9,097 | (48)% |

     Related party revenues decreased 48% in 2003 compared to 2002. Related party revenues in 2002 included revenues from Rogers Communications, Inc. (Rogers) and Harmonic, Inc. (Harmonic). Alek Krstajic, a member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. Lewis Solomon, another member of our board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2003 and 2002. The decline in related party revenues was primarily due to the classification of revenues attributable to Rogers as general revenues instead of related party revenues after the first quarter of 2003, as well as lower overall sales to Rogers, offset by an increase of sales to Harmonic in 2003. None of our related parties is a supplier to us.

     In December 2001, we entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers. We paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, we began amortizing these prepaid assets and charging them against related party revenues in accordance with Emerging Issues Task Force (EITF) 01-09, *Accounting for Consideration

17

---------------------------------------------------------------------------------

Table of Contents

given by a Vendor to a Customer or Reseller in Connection with the Purchase or
Promotion of the Vendor's Products." We charged $1.4 million per quarter of the
amortization of these assets against total revenues through December 31, 2003.
Amounts charged against total revenues in the year ended December 31, 2002 and
December 31, 2003, totaled approximately $2.8 million and $5.6 million,
respectively. Of the co-marketing amortization charged to total revenues, $0.15
million and $0.3 million were charged to related party revenue in the year ended
2003 and 2002, respectively. No further amounts of these co-marketing
arrangements are included in other current assets at December 31, 2003 and no
further amortization will occur in 2004.

Cost of Goods Sold and Gross Profit

|  | For the Year Ended December 31, | | Annual % Change |
| --- | --- | --- | --- |
|  | 2003 | 2002 | 2003 |
|  | (In thousands) | | |
| Cost of product revenues | $ 99,261 | $ 92,497 | 7% |
| Cost of related party revenues | 1,773 | 8,452 | (79)% |
| Total cost of goods sold | $ 101,034 | $100,949 | -- |
| Gross profit | $ 32,451 | $ 28,454 | 14% |

     Cost of goods sold consists of direct product costs as well as the cost of
our manufacturing operations. The cost of manufacturing includes contract
manufacturing, test and quality assurance for products, warranty costs and
associated costs of personnel and equipment. In 2003, cost of goods sold was
approximately 76% of revenues compared to 78% of revenues in 2002. Cost of goods
sold in 2003 and 2002 included the benefit of reversals of approximately $10.0
million and $15.3 million, respectively, in special charges taken in 2001 and
2000 for vendor cancellation charges and inventory previously reserved for as
excess and obsolete. We reversed these provisions as we were able to sell
inventory originally considered to be in excess and obsolete. In addition, we
were able to negotiate downward certain vendor cancellation claims to terms more
favorable to us. Additionally, during 2003 and 2002, we recorded inventory
charges of $4.1 million and $6.1 million, respectively, to reduce some of our
inventory due to excess and obsolescence and to reduce the inventory to the
lower of cost or market value in 2002 as ASPs fell below the cost of these
products and to record charges for excess and obsolete inventory.

     In 2003, related party cost of revenues decreased compared to 2002 due to
increased sales of our higher margin video products to Harmonic in 2003 as well
as fewer sales of our lower margin CPE products to Rogers classified as related
party revenue in 2003 compared to 2002. Additionally, in the first quarter of
2003, we sold $0.8 million of software to Rogers, which was classified as
related party revenues, with no cost of related party revenues associated with
this sale.

     Our gross profit increased 14% to $32.5 million or 24% of sales in the
year ended December 31, 2003 compared to $28.5 million, or 22% of sales, in
2002. The increase in our gross profit was primarily related to an improved
sales mix, with higher margin video and CMTS products constituting a higher
proportion of sales particularly in the second half of 2003, and improved
product manufacturing costs for modems.

     During 2004, we anticipate further decreases in our ASPs and continued
pressure on our CPE margins. Consequently, we continue to focus on improving
sales of higher margin products and reducing product manufacturing costs. We are
now partnering with contract manufacturers in Asia and the U.S. for our CMTS,
CPE, and video products, which may provide us with more competitive component
pricing, economies of scale, and improved manufacturing capabilities. In
addition, we are currently evaluating possible outsourcing partnerships for
certain of our supply chain functions, with the objective of increasing our
focus on our core competencies, reducing our costs, and leveraging our target
partners' capabilities. As we endeavor to shift our product mix from CPE
revenues to higher margin CMTS and digital video product revenues, we expect our
margins to increase.

18

--------------------------------------------------------------------------------

Table of Contents

Operating Expenses

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2003 | 2002 | 2003/2002 |
| | (In thousands) | | |
| Research and development | $ 42,839 | $58,696 | (27)% |
| Sales and marketing | $ 26,781 | $35,704 | (25)% |
| General and administrative | $ 12,127 | $14,715 | (18)% |

Research and Development. Research and development expenses consist primarily of personnel costs, internally designed prototype material expenditures, and expenditures for outside engineering consultants, equipment and supplies required to develop and enhance our products. Research and development expenses decreased 27% to $42.8 million or 32% of sales in the year ended December 31, 2003 from $58.7 million or 45% of sales in 2002. The $15.9 million decrease in research and development expenses was attributable to $4.2 million of reductions in employee related expenses, partially offset by an increase of $0.1 million attributable to an executive incentive plan implemented in 2003. The decrease in research and development expense also included reductions of $0.6 million of outside engineering consultants and $7.1 million of reductions in purchases of materials, costs incurred to develop prototypes, and other research and development expenses. Additionally, we have reduced research and development efforts by $4.1 million due to the elimination of our Telecom-related products. We believe it is critical to continue to make significant investments in research and development to create innovative technologies and products that meet the current and future requirements of our customers. Accordingly, we intend to continue our investment in research and development although at slightly lower levels. In connection with our worldwide restructuring plan announced in January 2004, we currently expect research and development expenses to continue to decrease in 2004.

Sales and Marketing. Sales and marketing expenses consist primarily of salaries and commissions for sales personnel, and marketing and support personnel, and costs related to trade shows, consulting and travel. Sales and marketing expenses decreased by $8.9 million to $26.8 million or 20% of sales in the year ended December 31, 2003 from $35.7 million or 28% of sales in 2002. The decrease in sales and marketing expenses was primarily due to $5.2 million in reduced employee expenses due to lower headcount, partially offset by an increase of $0.3 million attributable to an executive incentive plan. The decrease in sales and marketing expenses also included $0.8 million of decreased spending for outside consultants, $0.9 million of decreased travel costs, and $2.3 million of overall sales and marketing cost reductions. In connection with our worldwide restructuring plan announced in January 2004, we currently expect sales and marketing expenses to continue to decrease in 2004.

General and Administrative. General and administrative expenses consist primarily of salary and benefits for administrative officers and support personnel, travel expenses and legal, accounting and consulting fees. General and administrative expenses decreased by $2.6 million or 18% of sales to $12.1 million or 9% of sales in the year ended December 31, 2003 from $14.7 million or 11% of sales in 2002. The decrease was primarily due to $1.4 million in reduced employee expenses due to lower headcount, partially offset by an increase of $0.4 million attributable to an executive incentive plan, $2.8 million of decreased spending for outside consultants, partially offset by $0.3 million of severance expense related to the termination of an executive officer and $0.9 million of overall general and administrative cost increases. In connection with our worldwide restructuring plan announced in January 2004, we currently expect general and administrative expenses to continue to decrease in 2004.

19

--------------------------------------------------------------------------------

Table of Contents

Restructuring Costs and Asset Write-offs

|  | For the Year Ended December 31, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands) | |
| Restructuring charges | $ 2,745 | $3,641 |
| Restructuring (recovery) | (359) | -- |
| Long-lived assets written-off | 417 | 1,309 |
| Intangible assets written off | -- | 3,972 |
| Restructuring costs and asset write-offs | $ 2,803 | $8,922 |

Restructuring Costs. During the first quarter of 2003, we initiated a restructuring program to conform our expenses to our revenue levels and to better position us for future growth and eventual profitability. We incurred restructuring charges in the amount of $2.7 million related to employee termination costs. At December 31, 2003, no restructuring charges remain accrued, 81 of our employees have been terminated under the 2003 restructuring plan, and we paid $2.7 million in termination costs. In the second and third quarter of 2003, we reversed $0.4 million of previously accrued termination costs related to this restructuring.

In the third quarter of 2002, we initiated a restructuring program to conform our expense to our revenue levels and to better position us for future growth and eventual profitability. As part of this program, we restructured our worldwide operations including a worldwide reduction in workforce and the consolidation of excess facilities. We incurred additional restructuring charges of $3.6 million in 2002. Of the total restructuring charges, $2.3 million was related to employee termination costs. The remaining $1.3 million related primarily to costs for excess leased facilities. During 2002, 153 employees have been terminated under the 2002 restructuring plan, and we made cash payments of $2.2 million against the restructuring accrual. Additionally, in 2002, we reclassified $0.1 million from employee termination costs to excess leased facilities costs. We anticipate the remaining restructuring accrual, primarily relating to excess leased facilities, will be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

In 2001 we incurred restructuring charges of $12.7 million. Of the total restructuring charges recorded, $3.2 million related to employee termination costs covering 293 technical, production, and administrative employees. The remaining $9.5 million of restructuring charges related primarily to costs for excess leased facilities. During 2003, we made cash payments and recoveries of $1.9 million against the restructuring accrual. As of December 31, 2003, restructuring charges of $3.3 million remain accrued, primarily related to excess facility costs. During 2003, we reversed $0.3 million of previously accrued termination costs due to a change in estimate. We anticipate utilizing the remaining restructuring accrual of $3.3 million, which relates to servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

Asset Write-offs. In connection with our restructuring in 2003, we wrote-off $0.4 million of fixed assets which were determined to have no remaining useful life. In connection with our restructuring in 2002, we wrote-off $1.3 million of fixed assets which were determined to have no remaining useful life.

We adopted Statement of Financial Accounting Standards "Goodwill and Other Intangible Assets," (SFAS No. 142) on January 1, 2002. We tested goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. We completed the initial goodwill impairment review as of the beginning of 2002, and found no impairment. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, we experienced a significant drop in our market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on our forecast, the estimated undiscounted future cash flows from the use of the goodwill would be less than its carrying amount. We determined that the outcome of this test reflected that the fair value of the goodwill was zero. This

20

--------------------------------------------------------------------------------

Table of Contents

resulted in a non-cash charge of $4.0 million to write off the remaining goodwill in 2002, of which $3.0 million was related to the Cable segment and $1.0 million was related to the Telecom segment.

Non-Operating Expenses

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2003 | 2002 | 2003/2002 |
|  | (In thousands) | | |
| Interest income | $ 2,917 | $ 6,838 | (57)% |
| Interest expense | $ (3,279) | $(6,174) | (47)% |
| Other expense | $ (2,424) | $(4,145) | (42)% |
| Gain on early retirement of debt | $    -- | $49,089 | -- |

Interest Income. Interest income decreased 57% to $2.9 million in 2003 compared to $6.8 million in 2002. The decrease in interest income was primarily due to lower invested average cash balances due to the use of cash to repurchase Convertible Subordinated Notes (Notes) in 2002 and usage of cash for operations, as well as lower interest rates.

Interest Expense. Interest expense, which related primarily to interest on our Notes due in 2007, decreased 47% to $3.3 million during 2003 compared to $6.2 million in 2002, primarily due to the repurchase of $109.1 million of our Notes in 2002.

Other Expense. Other expense is generally comprised of realization of foreign currency translations and realized gains or losses on investments. Other expense of $2.4 million in 2003, was primarily comprised of a $0.9 million gain on the sale of the Miniplex product line and related inventory to Verilink, a $0.6 million reversal of a liability associated with an overseas government grant which is now satisfied, and $0.7 million from a favorable legal settlement. Other expense in 2002 included a write-down of a $4.5 million long-term investment.

Gain on Early Retirement of Debt. In 2002, we repurchased approximately $109.1 million of our Notes for $57.6 million in cash, resulting in a gain included in operations of approximately $49.1 million net of related unamortized issuance costs of $2.4 million. We did not repurchase any Notes during 2003.

Income Taxes

|  | For the Year Ended December 31, | |
|  | 2003 | 2002 |
|  | (In thousands) | |
| Income tax expense | $ (316) | $ (238) |

We have generated losses since our inception. In 2003 and 2002, we recorded an income tax expense of $0.3 million and $0.2 million, respectively, which was related primarily to foreign taxes.

Comparison of the Years Ended December 31, 2002 and 2001

Revenues

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2002 | 2001 | 2002/2001 |
|  | (In thousands) | | |
| Product revenues: | | | |
| Cable revenues | $ 118,929 | $245,828 | (52)% |
| Telecom revenues | 10,474 | 33,653 | (69)% |
| Total revenues | $ 129,403 | $279,481 | (54)% |

21

--------------------------------------------------------------------------------

Table of Contents

Prior to December 31, 2002, we operated primarily in two principal operating segments: Cable and Telecom. We determined these reportable operating segments based upon how the businesses were managed and operated.

Cable Broadband Access Systems (Cable) Revenue. Revenues from Cable were $118.9 million for the year ended December 31, 2002, down 52% from $245.8 million in 2001 due to lower shipments of modems and head-ends in 2002 than in 2001, as well as a continued decline in ASPs of products year over year as ongoing competitive pricing pressures affected revenue performance in several of our Cable products.

Telecom Carrier Access Systems (Telecom) Revenue. Revenues from Telecom were $10.5 million, down 69% from $33.7 million in 2001. We had a small customer base, and revenues were impacted by significant declines in telecom industry spending. Additionally, we continued to decrease focus on our Telecom segment and apply our resources to our Cable segment.

During 2002, the cable industry moved to purchase more standards-based DOCSIS products as opposed to our proprietary modems and head-ends, and we faced increased competition from multiple vendors, which unfavorably impacted revenues. Further, during 2001 and 2002, we were unfavorably impacted by declines in ASPs of our modems. In addition, revenues from our Telecom segment were impacted by declines in telecom industry spending. The intensely competitive nature of the market for broadband products resulted in significant price erosion in 2002.

Revenues by Groups of Similar Products

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2002 | 2001 | 2002/2001 |
|  | (In thousands) | | |
| Revenues by product: | | | |
| CMTS products | $ 28,159 | $ 43,355 | (35)% |
| CPE products | 69,469 | 186,111 | (63)% |
| Video products | 20,832 | 16,363 | 27% |
| Other (Telecom) products | 10,943 | 33,652 | (67)% |
| Total | $ 129,403 | $279,481 | (54)% |

CMTS, CPE and other product revenues decreased in 2002 compared to 2001, due to the slowdown in the general economy, constraints on technology-related capital spending by cable service providers, increased competition, and the decline of ASPs in 2001 and 2002. Additionally, our CMTS and CPE revenues decreased in 2002 as we transitioned from our proprietary S-CDMA products to DOCSIS products. Sales of our Video products increased primarily due to sales of our Network Cherrypicker products. Other product revenue decreased due to the de-emphasis of our legacy Telecom products.

22

--------------------------------------------------------------------------------

Table of Contents

Revenues by Geographic Region

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2002 | 2001 | 2002/2001 |
| | (In thousands) | | |
| Revenues by geographic areas: | | | |
| United States | $ 41,150 | $ 50,291 | (18)% |
| Canada | 17,247 | 113,300 | (85)% |
| Europe | 11,381 | 34,952 | (67)% |
| Israel | 8,283 | 16,528 | (50)% |
| Japan | 36,214 | 37,721 | (4)% |
| Asia, excluding Japan | 11,845 | 24,094 | (51)% |
| South America | 3,283 | 2,595 | 27% |
| Total | $ 129,403 | $ 279,481 | (54)% |

Revenues in North America, which included the United States and Canada decreased 64% to $58.4 million in 2002, down from $163.6 million in 2001. Revenues from international locations decreased 39% to $71.0 million in 2002 down from $115.9 million in 2001. One customer, Cross Beam Networks, a subsidiary of Sumitomo, accounted for more than 10% of our total revenues for the year ended December 31, 2002 (28%). Two customers, Cross Beam Networks and Shaw, each accounted for more than 10% of our total revenues for the year ended December 31, 2001 (33% and 13%). Decrease in revenues, year over year and decrease in North American revenues were primarily due to the slowdown in the general economy, over-capacity of broadband products especially in North America, and constraints on technology-related capital spending, in particular by the cable service providers.

Related Party Revenues

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2002 | 2001 | 2002/2001 |
| | (In thousands) | | |
| Related party revenues: | | | |
| Rogers revenues | $ 8,040 | $ 21,045 | (62)% |
| Harmonic revenues | 1,057 | -- | -- |
| Shaw revenue | -- | 31,400 | -- |
| Total revenues | $ 9,097 | $ 52,445 | (83)% |

Related party revenues decreased 83% to $9.1 million for the year ended December 31, 2002 from $52.4 million in 2001. Related party revenues in 2002 included revenues from Rogers and Harmonic. Alek Krstajic, a member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Lewis Solomon, another member of our board of directors, is a member of the board of directors of Harmonic. The decline in related party revenues was primarily due to the same economic and competitive pressures discussed above. In addition, Shaw was a related party during the first three quarters of 2001. In the fourth quarter of 2001, Shaw was no longer determined to be a related party as they no longer exercised voting rights over their shares of our stock, and a board member that was an employee of Shaw resigned from our board of directors. Accordingly, revenues from Shaw were no longer included in related party revenues beginning in the fourth quarter of 2001. None of our related parties is a supplier to us.

23

--------------------------------------------------------------------------------

Table of Contents

Cost of Goods Sold and Gross Profit

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2002 | 2001 | 2002 |
| | (In thousands) | | |
| Cost of product revenues | $ 92,497 | $229,936 | (60)% |
| Cost of related party revenues | 8,452 | 33,181 | (75)% |
| Total cost of goods sold | $100,949 | $263,117 | (62)% |
| Gross profit | $ 28,454 | $ 16,364 | 74% |

Cost of goods sold consists of direct product costs as well as the cost of our manufacturing operations. The cost of manufacturing includes contract manufacturing, test and quality assurance for products, warranty costs and associated costs of personnel and equipment. In 2002, cost of goods sold decreased 62% to $100.9 million or 78% of revenues from $263.1 million or 94% of revenues in 2001. Cost of goods sold in 2002 included the benefit of a reversal of approximately $15.3 million in special charges taken in 2001 and 2000 for vendor cancellation charges and inventory previously reserved for obsolescence. We reversed this provision as we were able to sell inventory originally considered to be in excess. In addition, we were able to negotiate downward certain vendor cancellation claims to terms more favorable to us. Cost of goods sold for the year ended December 31, 2001 included special charges of $33.5 million and approximately $13.9 million of amortization of acquired intangible assets. Additionally, during 2002, we recorded an inventory charge of $6.1 million to reduce some of our inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value as ASPs fell below the cost of these products. No charge to record a lower of cost or market value was recorded by us in 2001. In accordance with SFAS No. 142, there was no amortization of acquired intangible assets in 2002.

We achieved a gross profit of $28.5 million or 22% of sales in the year ended December 31, 2002 compared to $16.4 million or 6% of sales in 2001. The increase in our gross profit was primarily related to a reversal of special charges in 2002. This decrease in gross profit excluding special charges and amortization was primarily due to decreases in ASPs. We were not able to decrease our cost of goods sold as quickly as the decrease in ASPs.

In 2002, related party cost of revenues decreased compared to 2001 primarily due to Shaw no longer being a related party to us beginning in the fourth quarter of 2001.

Operating Expenses

| | For the Year Ended December 31, | | Annual % Change |
|---|---|---|---|
| | 2002 | 2001 | 2002/2001 |
| | (In thousands) | | |
| Research and development | $ 58,696 | $79,927 | (27)% |
| Sales and marketing | $ 35,704 | $55,701 | (36)% |
| General and administrative | $ 14,715 | $31,309 | (53)% |
| Goodwill amortization | -- | $25,410 | -- |

Research and Development. Research and development expenses consist primarily of personnel costs, internally designed prototype material expenditures, expenditures for outside engineering consultants, and equipment and supplies required to develop and enhance our products. Research and development expenses decreased to $58.7 million or 45% of sales in the year ended December 31, 2002 from $79.9 million or 29% of sales in 2001. The decrease of $21.2 million was attributable to a $7.5 million decline in spending in our Cable segment, an $8.0 million decline in spending in our Telecom segment, and a $5.7 million reduction in amortization of intangible assets. Research and development expenses in the Cable segment decreased primarily due to reductions in employee related expenses and expenditures for outside engineering consultants. Discontinuing the development of our Digitrans product line contributed to $1.6 million of the Cable segment

24

--------------------------------------------------------------------------------

Table of Contents

expense reduction. Additionally, we reduced research and development efforts in our Telecom segment by $8.0 million due to market conditions in the Telecom sector. In 2001, we recorded amortization of acquired intangible assets of $5.7 million. In accordance with SFAS No. 142, there was no amortization in 2002.

Sales and Marketing. Sales and marketing expenses consist primarily of salaries and commissions for sales personnel, marketing and support personnel, and costs related to trade shows, consulting and travel. Sales and marketing expenses decreased by $20.0 million to $35.7 million or 28% of sales in the year ended December 31, 2002 from $55.7 million or 20% of sales in 2001. The decrease in sales and marketing expenses was primarily due to $8.5 million in decreased headcount from the restructuring and other expenses in our Telecom segment, and $7.2 million in decreased spending for promotional activities in our Cable segment. The decreased spending for promotional activities in the Cable segment, included a $2.2 million decrease in employee salaries and related costs, a $2.0 million decrease in co-marketing activities, a $1.8 million decrease for advertising, a $1.8 million decrease for field trials, a $1.1 million decrease for tradeshows, a $1.1 million decrease for public relations and other consulting services, and a $0.8 million decrease in promotional literature. These spending decreases were partially offset by $3.6 million of additional expenses in 2002 related to an aircraft lease obtained in early 2002. Additionally, in 2001, we recorded amortization of acquired intangible assets of $4.3 million. In accordance with SFAS No. 142, there was no amortization in 2002.

General and Administrative. General and administrative expenses consist primarily of salary and benefits for administrative officers and support personnel, travel expenses and legal, accounting and consulting fees. General and administrative expenses decreased 53% to $14.7 million or 11% of sales in the year ended December 31, 2002 from $31.3 million or 11% of sales in 2001. The decrease was primarily due to lower headcount from the restructuring and reduced legal and information technology expenditures in 2002. Additionally, in 2001, general and administrative expenses included $4.6 million of amortization of acquired intangible assets. In accordance with SFAS No. 142, there was no amortization in 2002.

Goodwill Amortization. The amortization of goodwill arising from acquisitions completed during 1999 and 2000 was $25.4 million for the year ended December 31, 2001.

Upon adoption of SFAS No. 142, effective January 1, 2002, we were no longer required to amortize the goodwill of assets associated with our acquisitions in 1999 and 2000. Consequently, we recorded no amortization in 2002.

Restructuring Costs and Asset Write-offs

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2002 | 2001 |
| | (In thousands) | |
| Restructuring charges | $ 3,641 | $ 12,669 |
| Long-lived assets written-off | 1,309 | 1,688 |
| Intangible assets written off | 3,972 | 572,792 |
| Restructuring costs and asset write-offs | $ 8,922 | $587,149 |

Restructuring Costs. In the third quarter of 2002, we initiated a restructuring program to conform our expense and revenue levels and to better position us for future growth and eventual profitability. As part of this program, we restructured our worldwide operations including a worldwide reduction in workforce and the consolidation of excess facilities. We incurred additional restructuring charges of $3.6 million in 2002. Of the total restructuring charge, $2.3 million was related to employee termination costs. The remaining $1.3 million related primarily to costs for excess leased facilities. During 2002, the employment of 147 employees was terminated and we made cash payments of $2.1 million against the restructuring accrual. Additionally, in 2002, we reclassified $0.1 million from employee termination costs to excess leased facilities costs.

We incurred restructuring charges of $12.7 million in 2001. Of the total restructuring charges recorded, $3.2 million related to employee termination costs covering 293 technical, production, and administrative employees. The remaining $9.5 million of restructuring charges related primarily to costs for excess leased

25

--------------------------------------------------------------------------------

Table of Contents

facilities. During 2002, we made cash payments of $2.9 million against the restructuring accrual. In 2002, we reclassified $1.1 million, which had originally been accrued for as employee termination costs to accrued excess lease facility costs due to a revision in estimate.

Asset Write-offs. In connection with our restructuring in 2002, we wrote-off $1.3 million of fixed assets which were determined to have no remaining useful life. In 2001, we wrote-off $1.6 million of impaired fixed assets, which were determined to have no remaining useful life.

Downturns in the broadband services and telecommunications markets created unique circumstances with regard to the assessment of goodwill and other intangible assets for recoverability during 2001. As a result of our decision to suspend certain product lines and product development efforts during the first quarter of 2001, intangible assets totaling $163.1 million related to certain acquisitions were deemed to be impaired with no future value and were written off. Further, the aforementioned downturns in the principal markets in which we continue to operate, negatively impacted the forecasted revenues and cash flows from certain other companies acquired during fiscal 1999 and 2000. In accordance with our policy and accounting standards applicable at that date, the comparison of the discounted expected future cash flows to the carrying amount of the related intangible assets resulted in a write-down of these assets related to both our Cable and Telecom segments of $409.7 million during the first quarter 2001.

As described above, we recorded a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million was related to the Cable segment and $1.0 million was related to the Telecom segment.

Non-Operating Expenses

|  | For the Year Ended December 31, | | Annual % Change |
|  | 2002 | 2001 | 2002/2001 |
|---|---|---|---|
|  | (In thousands) | | |
| Interest income | $ 6,838 | $ 18,132 | (62)% |
| Interest expense | $ 6,174 | $ 15,224 | (59)% |
| Other expense | $ 4,145 | $ 2,864 | 45% |
| Gain on early retirement of debt | $ 49,089 | $185,327 | (74)% |

Interest Income. Interest income decreased 62% to $6.8 million in 2002 compared to $18.1 million in 2001. The decrease in interest income was primarily due to lower invested average cash balances due to the use of cash to repurchase our Notes in 2001 and 2002 and usage of cash for operations, as well as lower interest rates.

Interest Expense. Interest expense, which relates primarily to interest on our Notes due in 2007, decreased 59% to $6.2 million during 2002 compared to $15.2 million in 2001, primarily due to the repurchase of $325.9 million of our Notes in 2001 and $109.1 million of our Notes in 2002.

Other Expense. We accounted for our equity investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities" (SFAS No. 115), and Securities and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) 59, "Accounting for Noncurrent Marketable Equity Securities" (SAB 59), which provides guidance in determining when an investment is other-than-temporarily impaired. In applying this guidance we evaluated, among other factors, the duration and extent to which the fair value of the investment was less than its cost, the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and our intent and ability to hold the investment. During 2001, based upon this analysis, we wrote off $2.5 million of our long-term equity investment, which was included in our Cable segment and was charged to other expense. During 2002, based upon additional analysis, we wrote off an additional $4.5 million of our long-term equity investment, which was charged to other expense in the Consolidated Statements of Operations.

Gain on early retirement of debt. In 2001, we repurchased approximately $325.9 million of our Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of approximately $185.3 million net of

26

--------------------------------------------------------------------------------

Table of Contents

related unamortized issuance costs of $9.3 million. In 2002, we repurchased approximately $109.1 million of our Notes for $57.6 million in cash, resulting in a gain included in operations of approximately $49.1 million net of related unamortized issuance costs of $2.4 million.

Income Taxes

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2002 | 2001 |
| | (In thousands) | |
| Income tax (expense) benefit | $ (238) | $13,915 |

During 2001 we recorded a benefit of $14.7 million, which consisted of a reduction of deferred tax liabilities related to the Telegate, Radwiz, Ultracom, and ComBox acquisitions and a $0.8 million provision for foreign taxes. In 2002, we recorded an income tax expense of $0.2 million, which was related primarily to foreign taxes.

Litigation

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against us and certain of our officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery.

On October 16, 2000, a lawsuit was filed against us and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal has been set for oral argument on April 16, 2004.

We believe that the allegations in both the class action and the Bertramcase are without merit, and we intend to contest these matters vigorously. These matters, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by our breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of our wholly-owned subsidiaries. On December 18, 2003, the

27

--------------------------------------------------------------------------------

Table of Contents

panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. We believe that the allegations are without merit and intend to present a vigorous defense in the arbitration proceedings.

We, as well as our customers, have received letters from third parties claiming that our technology and products infringe on the third parties' patents. We have consulted with our patent counsel and are in the process of reviewing the allegations made by such third parties. We do not know whether the third parties will pursue their claims of patent infringement in court, and if they do, whether we will be found to infringe the third parties' patents. If we are found to have infringed such third party patents, we could be subject to substantial damages and/or an injunction preventing us from selling our products and conducting our business. Additionally, additional third parties could assert infringement claims against us in the future. Any such claim of patent infringement, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require us to enter into royalty or licensing agreements. Such royalty or licensing agreements may not be available on terms acceptable to us, if at all.

We are currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While we currently believe that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on our financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of our legal proceedings, there exists the possibility of a material adverse impact on our results of operations for the period in which the ruling occurs. The estimate of the potential impact on our financial position and overall results of operations for any of the above legal proceedings could change in the future.

Off-Balance Sheet Financings and Liabilities

Other than lease commitments and unconditional purchase obligations incurred in the normal course of business, we do not have any off-balance sheet financing arrangements or liabilities, guarantee contracts, retained or contingent interests in transferred assets or any obligation arising out of a material variable interest in an unconsolidated entity. We do not have any majority-owned subsidiaries that are not included in the consolidated financial statements.

Liquidity and Capital Resources

At December 31, 2003, we had approximately $30.2 million in cash and cash equivalents and $108.5 million in short-term investments.

Cash used in operating activities for the year ended December 31, 2003 was $68.4 million compared to $67.7 million used in 2002. In 2003, significant uses of cash from operating activities included $50.4 million loss from operations, $12.6 million increase in accounts receivable, $12.3 million of settlement and payment of vendor cancellation liabilities, and $12.2 million of increase in gross inventory. Accounts receivable increased as our sales in the fourth quarter of 2003 increased when compared to the same period in 2002. Inventory levels increased at December 31, 2003 when compared to December 31, 2002 due to increased modem inventories in the fourth quarter of 2003 in order to meet service levels established with our key customers. In 2002, significant uses of cash from operating activities included $44.2 million loss from operations, $49.1 million of gain on the repurchase of a portion of the Notes, and $18.9 million decrease in accounts payable. Net cash used in operating activities were partially offset by decreases in accounts receivable of $29.4 million in 2002. We did not repurchase any Notes in 2003.

Cash used in investing activities in 2003 was $23.3 million compared to cash provided by investing activities of $139.0 million in 2002. Investing activities consisted primarily of net purchases of short-term investments and purchases of property and equipment in 2003 and 2002. Cash used in investing activities increased in 2003 due to our usage of investments to fund operations and movement from cash and cash equivalents to short-term investments in 2003.

28

--------------------------------------------------------------------------------

Table of Contents

Cash provided by financing activities was $3.7 million in 2003 compared to $53.9 million of cash used in financing activities in 2002. In 2003 we received proceeds from the exercise of stock options and the sale of shares of common stock through our Employee Stock Purchase Plan of $3.7 million. In 2002, we paid approximately $57.6 million to repurchase a portion of the Notes. In 2002, we received a total of $1.7 million from the exercise of stock options and the sale of shares of common stock through our Employee Stock Purchase Plan.

In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of approximately $484.4 million. The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million.

Through December 31, 2003, we had repurchased approximately $434.9 million of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on early retirement of debt of approximately $234.4 million net of related unamortized issuance costs of $11.6 million. No Notes were repurchased in 2003.

We believe that our current cash balances will be sufficient to satisfy our cash requirements for at least the next 12 months. As noted above, we are working to achieve profitability by the second quarter of 2004. To do so, we will need to increase revenues, primarily through sales of more profitable products, and decrease costs. In the first quarter of 2004, we initiated a worldwide reduction in force of approximately 70 employees, or 17% of the workforce, consolidation of certain facilities, and reduction or elimination of discretionary costs and programs. We expect to record total charges in the range of approximately $5.0 million to $7.0 million associated with this realignment in the quarter ending March 31, 2004. Beginning in the second quarter of 2004, we anticipate annual savings to be approximately $10.0 to $12.0 million. These statements are forward-looking in nature and involve risks and uncertainties. Actual results may vary as a result of a number of factors, including those discussed under the risk factor "Our Operating Results May Fluctuate" below and elsewhere. We may need to raise additional funds in order to support more rapid expansion, develop new or enhanced services, respond to competitive pressures, acquire complementary businesses or technologies or respond to unanticipated requirements. We may seek to raise additional funds through private or public sales of securities, strategic relationships, bank debt, and financing under leasing arrangements or otherwise. If additional funds are raised through the issuance of equity securities, the percentage ownership of our current stockholders will be reduced, stockholders may experience additional dilution or such equity securities may have rights, preferences or privileges senior to those of the holders of our common stock. We cannot assure that additional financing will be available on acceptable terms, if at all. If adequate funds are not available or are not available on acceptable terms, we may be unable to continue operations, develop our products, take advantage of future opportunities or respond to competitive pressures or unanticipated requirements, which could have a material adverse effect on our business, financial condition and operating results.

On October 7, 2003, we filed a registration statement on Form S-3 with the Securities and Exchange Commission. This shelf registration statement, which was declared effective by the SEC on November 4, 2003, will allow us to issue various types of securities, including common stock, preferred stock, debt securities and warrants to purchase common stock from time to time up to an aggregate of $125.0 million, subject to market conditions and our capital needs. On November 7, 2003, we filed a prospectus supplement with reference to our intention to offer 10,800,000 shares of common stock, which would result in gross proceeds of $75.0 million. On November 14, 2003, we withdrew our previously announced public offering of 10,800,000 shares of common stock under the shelf registration statement.

29

--------------------------------------------------------------------------------

Table of Contents

Contractual Obligations

The following summarizes our contractual obligations at December 31, 2003, and the effect such obligations are expected to have on our liquidity and cash flows in future periods (in millions):

|  | | Payments Due by Period | | |
|---|---|---|---|---|
|  | Total | Less Than 1 Year | 1-3 Years | 4-5 Years | After 5 Years |
| Capital Lease Obligations | $ 0.1 | $ 0.1 | $ -- | $ -- | $ -- |
| Unconditional Purchase Obligations | 54.4 | 54.4 | -- | -- | -- |
| Long Term Debt | 68.4 | -- | 1.6 | 65.1 | 1.7 |
| Operating Lease Obligations | 24.4 | 6.8 | 9.0 | 6.1 | 2.5 |
| Aircraft Lease | 4.4 | 1.4 | 2.9 | 0.1 | -- |
| Total Contractual Commitments | $151.7 | $ 62.7 | $13.5 | $71.3 | $ 4.2 |

We have unconditional purchase obligations to certain of our suppliers that support our ability to manufacture our products. The obligations require us to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2003, we had approximately $54.4 million of purchase obligations, of which $2.9 million is included in the Consolidated Balance Sheets as accrued vendor cancellation charges, and the remaining $51.5 is attributable to open purchase orders. The remaining obligations are expected to become payable at various times through 2004.

Other commercial commitments, primarily required to support operating leases, are as follows (in millions):

|  | | Amount of Commitment Expiration Per Period | | |
|---|---|---|---|---|
|  | Total Amounts Committed | Less Than 1 Year | 1-3 Years | 4-5 Years | Over 5 Years |
| Deposits | $ 1.0 | $ 0.3 | $ 0.7 | $ -- | $ -- |
| Standby Letters of Credit | 8.2 | 0.5 | -- | 7.5 | 0.2 |
| Total Commercial Commitments | $ 9.2 | $ 0.8 | $ 0.7 | $ 7.5 | $ 0.2 |

In 2002, we entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit. The letter of credit was reduced to $7.5 million in February 2003. This lease commitment is included in the table above. In March 2004, in connection with our worldwide restructuring, we notified the lessor of our intentions to locate a purchaser for our remaining obligations under this lease. From time to time, our Chief Executive Officer, Dr. Rakib, uses the aircraft for personal use and the charge is reported by him as compensation. Dr. Rakib was charged approximately $62,000 for personal aircraft usage during fiscal 2003.

Critical Accounting Policies

We consider certain accounting policies related to our use of estimates, revenue recognition, bad debt reserves, inventory valuation, impairment of long-lived assets, warranty returns, restructuring, income taxes and contingencies to be critical policies due to the estimation processes involved in each. We discuss each of our critical accounting policies, in addition to certain less significant accounting policies, with senior members of management and the audit committee, as appropriate.

Use of Estimates. The preparation of the consolidated financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to establish accounting policies that contain estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which

30

form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. These policies include:

*revenue recognition;

*the allowance for doubtful accounts, which impacts revenue;

*the valuation of exposures associated with the contract manufacturing operations and estimating future warranty costs, which impact cost of good sold and gross margins; and

*the valuation of certain long-lived assets, especially goodwill and other purchased intangible assets, which has resulted in impairment, which impacts operating expenses.

   We have other equally important accounting policies and practices, which may not require us to make significant estimates or assumptions. Despite our intention to establish accurate estimates and assumptions, actual results could differ from those estimates under different assumptions or conditions.

   Revenue Recognition. We recognize revenue in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), as amended by SAB 101A and 101B and updated by SAB 104. SAB 101 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services rendered; (3) the selling price is fixed and determinable; and (4) collectibility is reasonably assured. Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price. Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

   Contracts and customer purchase orders are generally used to determine the existence of an arrangement. Shipping documents and customer acceptance, when applicable, are used to verify delivery. We assess whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. We assess collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

   Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as we generally do not grant return rights beyond those provided by the warranty.

   Allowance for Doubtful Accounts. We perform ongoing credit evaluations of our customers and generally require no collateral. We evaluate our trade receivables based upon a combination of factors. Credit losses have historically been within management's expectations. When we become aware of a customer's inability to pay, such as in the case of bankruptcy or a decline in the customer's operating results or financial position, we record a specific reserve for bad debt to reduce the related receivable to an amount we reasonably believe is collectible. We maintain a reserve for potentially uncollectible accounts receivable based on an assessment of collectibility. We assesses collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of our client's customers and other factors that we believe are relevant. If circumstances related to a specific customer change, our estimates of the recoverability of receivables could be further reduced. Charges for uncollectible accounts are included as a component of net revenue in the consolidated statement of operations. At December 31, 2003 and 2002, the reserve for potentially uncollectible accounts was $3.6 million and $3.5 million, respectively. A relatively small number of customers account for a significant percentage of our revenues and accounts receivable. We expect the sale of our products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

   Inventory Valuation. We record losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. Our policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires us to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid technological change in the

31

--------------------------------------------------------------------------------

technology and communications equipment industries as well as significant, unpredictable changes in capital spending by our customers, we believe that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that we use in the valuation of inventory are the basis for the revenue forecast, which is also consistent with our short-term manufacturing plan. Based on this analysis, we reduce the cost of inventory that we specifically identify and consider obsolete or excessive to fulfill future sales estimates. We define excess inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using our best estimate of future demand at the time, based upon information then available.

Impairment of Long-Lived Assets. Our long-lived assets have principally included long-term investments, goodwill and other intangible assets. Our estimate of the fair value of the long-term investments was dependent on the performance of the companies in which we have invested, as well as the volatility inherent in the external markets for these investments. If the companies' business forecasts were not met, we had to record additional impairment charges. At December 31, 2003, all of our intangible assets had been written-off and we had no intangible assets recorded on the Consolidated Balance Sheets.

We adopted Statement of Financial Accounting Standards (SFAS) No. 142, "Goodwill and Other Intangible Assets," (SFAS No. 142) on January 1, 2002. We reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption of this standard. We test goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. We completed the initial goodwill impairment review as of the beginning of 2002, and found no impairment. During the first and second quarters of 2002, we completed a restructuring and impairment review as further discussed in Note 5 of the Notes to the Consolidated Financial Statements. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the second quarter of 2002, we experienced a significant drop in our market capitalization and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment. The outcome of this test resulted in a non-cash charge of $4.0 million to write-off goodwill in both the Cable and Telecom segments during the second quarter of 2002. At December 31, 2002 and 2003, we had no goodwill or intangible assets recorded on the Consolidated Balance Sheets.

Warranty Reserves. We provide a standard warranty for most of our products, generally lasting one to five years from the date of purchase. We provide for the estimated cost of product warranties at the time revenue is recognized. Our warranty obligations are affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Our estimate of costs to service our warranty obligations is based on historical experience and our expectation of future conditions. Should actual product failure rates, material usage or service delivery costs differ from our estimates, revision to the warranty liability would be required, resulting in decreased gross profits.

Restructuring and Other Related Charges. During 2001, 2002, and 2003, we implemented restructuring programs to focus and streamline our business and reduce operating expenses. In connection with these programs, we reduced headcount and abandoned facilities. As a result of these actions, we recorded restructuring and other related charges primarily consisting of cash severance payments made to severed employees and lease payments related to property abandoned as a result of our facilities consolidation. Each reporting period, we review these estimates based on the execution of our restructuring plans and changing market conditions, such as the real estate market. To the extent that these assumptions change, the ultimate restructuring expenses could vary.

Contingencies. We are subject to proceedings, lawsuits and other claims related to labor, acquisitions and other matters. We are required to assess the likelihood of any adverse judgments or outcomes to these matters as well as potential ranges of probable losses. A determination of the amount of reserves required, if any, for these contingencies are made after careful analysis of each individual issue. The required reserves may change in the future due to new developments in each matter or changes in approach such as a change in settlement strategy in dealing with these matters, any of which may result in higher net loss.

32

--------------------------------------------------------------------------------

Table of Contents

Taxes. We determine our provision for income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the future tax effects of temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Future tax benefits of tax loss and credit carryforwards are also recognized as deferred tax assets. We evaluate the realizability of our deferred tax assets by assessing the likelihood of future profitability and available tax planning strategies that could be implemented to realize our net deferred tax assets. The ultimate realization of our net deferred tax assets will require profitability. We have assessed the future profit plans and tax planning strategies together with the years of expiration of carryforward benefits, and have concluded that the deferred tax assets will be not be currently realized and have recorded a valuation allowance against the entire amount of the deferred tax assets. Should our operating performance improve, future assessments could conclude that a reduction to the valuation allowance will be needed to reflect deferred tax assets. In addition, we operate within multiple taxing jurisdictions and are subject to tax audits in these jurisdictions. These audits can involve complex issues, which may require an extended period of time to resolve. However, we believe we have made adequate provision for income taxes for all years that are subject to audit.

Impact of Recently Issued Accounting Standards

In May 2003, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 150, "Accounting For Certain Financial Instruments with Characteristics of Both Liabilities and Equity" which establishes standards for how an issuer of financial instruments classifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on a fixed monetary amount known at inception, variations in something other than the fair value of the issuer's equity shares or variations inversely related to changes in the fair value of the issuer's equity shares. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of SFAS No. 150 did not have a material impact on our financial position or results of operations.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." This statement is effective for contracts entered into or modified after June 30, 2003, and did not have a material impact on our financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which was revised in December 2003. Interpretation No. 46, as revised, clarifies the application of Accounting Research Bulletin No. 51 and applies immediately to any variable interest entities created after January 31, 2003 and to variable interest entities in which an interest is obtained after that date. This Interpretation is applicable in the quarter ending March 31, 2004, for interests acquired in variable interest entities prior to February 1, 2003. This Interpretation requires variable interest entities to be consolidated if the equity investment at risk is not sufficient to permit an entity to finance its activities without support from other parties or the equity investors lack specified characteristics. The adoption of Interpretation No. 46, as revised, is not expected to have a material impact on our financial position or results of operations.

In November 2002, the EITF reached a consensus on Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables". EITF Issue No. 00-21 provides guidance on how to account for certain arrangements that involve the delivery or performance of multiple products, services and/or rights to use assets. The provisions of EITF Issue No. 00-21 apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. The adoption of EITF Issue No. 00-21did not have any significant impact on our financial position or results of operations.

In July 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standard No. 146, Accounting for Costs Associated with Exit or Disposal Activities (FAS 146). FAS 146

33

--------------------------------------------------------------------------------

Table of Contents

addresses the financial accounting and reporting for costs associated with exit or disposal activities, and supersedes Emerging Issues Task Force Issue No. 94-3, Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, including Certain Costs Incurred in a Restructuring (EITF 94-3). FAS 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In addition, FAS No. 146 establishes that fair value is the objective for initial measurement of the liability. FAS 146 is effective for exit or disposal activities initiated after December 31, 2002. The adoption of FAS 146 did not have any significant impact on our financial position or results of operations.

In June 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS No. 142). SFAS No. 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. SFAS No. 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with definite lives will continue to be amortized over their estimated useful lives. Additionally, SFAS No. 142 requires that goodwill included in the carrying value of equity method investments no longer be amortized.

We adopted SFAS No. 142 on January 1, 2002. Identifiable intangible assets with indefinite lives were reclassified, as defined by SFAS No. 142, to goodwill at the date of adoption. We tested goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. See Note 5.

The following pro forma information reflects the impact on net loss and basic and diluted net loss per share assuming the adoption of SFAS No. 142 had occurred on January 1, 2001 (in thousands):

|  | Years ended December 31, | | |
| --- | --- | --- | --- |
|  | 2003 | 2002 | 2001 |
|  |  |  | (Pro forma) |
| Reported net loss | $(50,353) | $(44,213) | $(563,846) |
| Amortization of goodwill and intangible assets with indefinite lives | -- | -- | 53,846 |
| Pro forma net loss | $(50,353) | $(44,213) | $(510,000) |
| Basic and diluted net loss per share: |  |  |  |
| Reported net loss | $ (0.68) | $ (0.61) | $ (8.25) |
| Adjustment related to amortization of goodwill and intangible assets with indefinite lives | -- | -- | 0.79 |
| Pro forma basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (7.46) |

RISK FACTORS

You should carefully consider the risks described below before making an investment decision. The risks and uncertainties described below are not the only ones facing us. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment.

Risks Related to Our Business

We have a history of losses and may continue to incur losses in the future.

It is difficult to predict our future operating results. We began shipping products commercially in June 1997, and we have been shipping products in volume since the first quarter of 1998. As of December 31, 2003, we had an accumulated deficit of $987.6 million. We believe that we will continue to experience challenges in selling our products at a profit and may continue to operate with net losses for the foreseeable future. Moreover, from 2000 to 2002, we have had declining revenue year over year. Although our revenues increased in 2003 as compared to 2002, we still incurred losses of $50.4 million in 2003. As a result of the operating deficiencies, we have had to use available cash and cash equivalents to supplement the operation of our

34

--------------------------------------------------------------------------------

Table of Contents

business. Cash, cash equivalents and short term investments used in the twelve months ended December 31, 2003 was $67.9 million as compared to $127.4 million used in the same period in 2002. At December 31, 2003, we had approximately $138.6 million in cash, cash equivalents and short-term investments as compared to approximately $206.5 million at December 31, 2002. Additionally, we generally are unable to significantly reduce our short-term expenses in order to compensate for unexpected decreases in anticipated revenues or delays in generating anticipated revenues. For example, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price irrespective of whether we can subsequently use such quantities in our products. Further, we have been experiencing and will continue to experience declining average selling prices (ASPs) of our products. We record an inventory charge to reduce our inventory to the lower of cost or market if average selling prices fall below the cost of these products. In addition, we have significant operating lease commitments for facilities and equipment that generally cannot be cancelled in the short-term without substantial penalties.

Our business may be adversely affected by delays in, or our failure to, commercialize new products, or reduce the cost of manufacturing our current products. Moreover, given the conditions in the broadband equipment market, the profit potential of our business remains unproven.

We may experience fluctuations in our operating results and face unpredictability in our future revenues.

Our quarterly revenues have fluctuated and are likely to continue to fluctuate significantly in the future due to a number of factors, many of which are outside our control. Factors that affect our revenues include, among others, the following:

*variations in the timing of orders and shipments of our products;

*variations in the size of the orders by our customers and pricing concessions on volume sales;

*competitive market conditions;

*unpredictable sales cycles;

*new product introductions by competitors or by us;

*delays in our introduction of new products;

*delays in our introduction of added features to our products;

*delays in the commercialization of products that are competitive in the marketplace;

*delays in our receipt of and cancellation of orders forecasted by customers;

*variations in capital spending budgets of cable operators and other broadband service providers;

*international conflicts, including the continuing conflict in Iraq, and acts of terrorism and the impact of adverse economic, market and political conditions worldwide; and

*ability of our products to be qualified or certified as meeting industry standards.

A variety of factors affecting our gross margin include, among others, the following:

*the sales mix of our products;

*the volume of products manufactured;

*the type of distribution channel through which we sell our products;

*the ASPs of our products;

*the ability to manage excess an obsolete inventory;

*delays in reducing the cost of our products;

--------------------------------------------------------------------------------

Table of Contents

*the costs of manufacturing our products; and

*the effectiveness of our cost reduction measures.

We often recognize a substantial portion of our revenues in the last month of the quarter. We establish our expenditure levels for product development and other operating expenses based on projected sales levels, and expenses are relatively fixed, particularly in the short term. For example, a significant percentage of these operating expenses are fixed due to operating leases for our facilities and equipment. Also, we have fixed commitments with some of our suppliers that require us to purchase minimum quantities of their products at a specified price. Because in the past, we have been unable to use all of the products that we purchased from our suppliers, we have taken vendor cancellation charges as a result of these fixed commitments, and we may have to take additional charges in the future if we are unable to use all of the products that we purchase from our suppliers. Recently, we have begun to negotiate clauses with vendors to push-out or reschedule inventory purchases at our discretion. These clauses should help to minimize the impact of vendor cancellation charges in the future. As of December 31, 2003, $54.4 million of purchase obligations were outstanding. Accordingly, variations in timing of sales can cause significant fluctuations in operating results. In addition, because a significant portion of our business is derived from orders placed by a limited number of large customers, the timing of such orders can also cause significant fluctuations in our operating results. Our expenses for any given quarter are typically based on expected sales and if sales are below expectations, our operating results may be adversely impacted by our inability to adjust spending to compensate for the shortfall. Moreover, our research and development expenses fluctuate in response to new product development, and changing industry requirements and customer demands.

Additionally, the unit ASPs of our products declined considerably in 2002 and 2003, and we anticipate that unit ASPs of our products may continue to decline in the future. This has caused and will continue to cause a decrease in our gross margins if we are unable to off-set the decline in ASPs with cost reduction measures. In addition, the gross margins we realize from the sale of our products are affected by the mix of product sales between higher margin, lower volume head-end equipment, such as Cable Modem Termination Systems (CMTSs) and digital video management systems, and lower margin, higher volume Customer Premise Equipment (CPE) products, such as modems. In 2004, we expect that sales of our low-margin CPE will continue to make up a significant portion of our revenues.

We are dependent on a small number of customers and our business could be harmed by the loss of any of these customers or reductions in their purchasing volumes.

Our customers have undergone and continue to undergo significant consolidation in both North America and internationally, as a limited number of cable operators control an increasing number of systems. For example, the top nine cable operators in the United States operate cable systems that service approximately 90% of homes that receive cable services in the United States. As a result of the consolidation among cable operators, our revenue has been and will continue to be dependent on sales to the few leading cable operators worldwide and the continued consolidation may also reduce the number of potential customers. For example, three customers, Adelphia, Cross Beam Networks, a subsidiary of Sumitomo, and Comcast each accounted for more than 10% of our total revenues for the year ended December 31, 2003 (22%, 16%, and 13%). One customer, related to the Cable segment, Cross Beam Networks, accounted for more than 10% of our total revenues for the year ended December 31, 2002 (28%). Two customers, Shaw and Cross Beam Networks, both related to the Cable segment, accounted for 10% or more of the total revenues for the year ended December 31, 2001 (33% and 13%). Two customers accounted for 10% or more of total accounts receivable for the year ended December 31, 2003 (24% and 20%). One customer, related to the Cable segment, accounted for 10% or more of total accounts receivable for the year ended December 31, 2002 (23%).

As is common in our industry, we typically do not enter into contracts with our customers in which they commit to purchase products from us. Typically, our customers purchase products from us on a purchase order basis. We may not succeed in attracting new customers as many of our potential customers have pre-existing relationships with our current or potential competitors and the continued consolidation of the cable industry reduces the number of potential customers. To attract new customers, we may be faced with intense price

36

--------------------------------------------------------------------------------

Table of Contents

competition, which may affect our gross margins. Our sales are made on a purchase order or system contract basis, and none of our customers has entered into a long-term agreement requiring it to purchase our products. Moreover, we do not typically require our customers to purchase a minimum quantity of our products, and our customers can generally cancel their orders on short notice without significant penalties. The loss of any of our customers can have a material adverse effect on our results of operations. Further, any reduction in orders from a given customer can likewise have a material adverse affect on our results of operations.

The sales cycle for certain of our products is lengthy, which makes forecasting of our customer orders and revenue difficult.

    The sales cycle for certain of our products, such as our CMTSs, is lengthy, often lasting nine months to more than a year. Our customers generally conduct significant technical evaluations, including customer trials, of our products as well as competing products prior to making a purchasing decision. In addition, purchasing decisions may also be delayed because of a customer's internal budget approval processes. Because of the lengthy sales cycle and the size of customer orders, if orders forecasted for a specific customer for a particular period do not occur in that period, our revenues and operating results for that particular quarter could suffer. Moreover, a portion of our expenses related to an anticipated order is fixed and difficult to reduce or change, which may further impact our revenues and operating results for a particular period.

There are many risks associated with our participation in industry standards.

    In connection with the development of the DOCSIS 2.0 specification by Cable Television Laboratories, Inc., a cable industry consortium that establishes cable technology standards and administers compliance testing (CableLabs), we entered into an agreement with CableLabs whereby we licensed to CableLabs on a royalty-free basis any of our intellectual property rights, including rights to our proprietary S-CDMA technology, to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS based products, including DOCSIS 2.0 based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products. As a result of this license to CableLabs, our competitors that produce DOCSIS-based products have access to our technology without having to pay us any royalties or other compensation for the use of our technology. As a result of our contribution of technology to the DOCSIS intellectual property pool, we may have foregone significant revenue from the potential licensing of our proprietary technology, and we may be unable to recoup the investment in the research and development of intellectual property contributed to the DOCSIS technology pool.

    Additionally, the agreement that we signed with CableLabs to participate in the DOCSIS intellectual property pool may make it difficult for us to enforce our intellectual property rights against other companies. Certain cable equipment vendors manufacture and sell DOCSIS based and DOCSIS certified and qualified products without sublicensing from CableLabs the technology in the CableLabs intellectual property pool. Due to the interests of cable operators in having as many equipment vendors as possible, we may feel constrained by competitive pressures from pursuing the enforcement of our intellectual property rights against our competitors that have not entered into sublicenses with CableLabs. Moreover, if we seek to enforce our intellectual property rights against other equipment manufacturers that access technology from the CableLabs intellectual property pool, our license to the technology in the pool may be jeopardized. Certain contributors of technology to the CableLabs intellectual property pool are our competitors and may elect to revoke our license to their technology if we attempt to enforce our intellectual property rights against them.

    We may have lost any competitive advantage that our proprietary S-CDMA technology may have provided us in the marketplace by licensing it to CableLabs, and we may face increased competition because our competitors have the ability to incorporate our technology into their products. We believe that this increased competition could come from existing competitors or from new competitors who enter the market and that such competition is likely to result in lower product ASPs, which could harm our revenues and gross margins. Additionally, because our competitors will be able to incorporate our technology into their products, our current customers may choose alternate suppliers or choose to purchase DOCSIS-compliant products

37

--------------------------------------------------------------------------------

Table of Contents

from multiple suppliers. We may be unable to effectively compete with the other vendors if we cannot produce DOCSIS compliant cable products more quickly or at lower cost than our competitors.

DOCSIS specifications have not yet been accepted in Europe and Asia, although an increasing number of Asian cable operators are requiring product to be DOCSIS qualified or certified. An alternate specification for cable products, called the Euro-DOCSIS specification, has been formalized by TComLabs, a cable technology consortium of European cable operators, and some European and Asian cable operators have embraced it. We have contributed certain of our technologies, including our proprietary S-CDMA technology, to the Euro-DOCSIS specification. We may develop and sell products that comply with the Euro-DOCSIS specification, and we may be unsuccessful in these efforts. Even if we are successful in our efforts, we may face some of the same risks associated with our contribution of intellectual property to the CableLabs DOCSIS intellectual property pool.

We need to certify and qualify our new and existing products to meet industry specifications in order to remain competitive.

Major cable operators worldwide have endorsed the DOCSIS, Euro-DOCSIS and PacketCable specifications and rarely purchase equipment that is not certified or qualified as compliant with these specifications. Cable operators have chosen to purchase only products meeting industry specifications because the specifications enable interoperability among products from multiple vendors, which leads to increased competition among equipment manufacturers and consequently lowers product ASPs. Consequently, our future success depends on our ability to compete effectively in this marketplace by developing, marketing and selling products that are certified and qualified to industry standards in a timely fashion and in a cost effective manner.

The DOCSIS and PacketCable specifications are promulgated by CableLabs. Currently these specifications have been widely adopted by cable operators in North America and by some cable operators in Asia, Latin America and Europe. The Euro-DOCSIS specifications have been developed by TComLabs specifically to meet the requirements of European operators, and have found some acceptance in China as well. There is no guarantee that our products will be DOCSIS, EuroDOCSIS or PacketCable certified or qualified. If we are unable to certify or qualify our products as DOCSIS, EuroDOCSIS or PacketCable compliant in a timely manner, we may be unable to sell our products and may lose some or all of any advantage we might otherwise have had, and our future operating results may be adversely affected.

Although we sell certified and qualified products, there have been and may continue to be instances where our existing customers and potential new customers elect to purchase products from one or more of our competitors rather than from us. In response to this situation, we have reduced our prices and continue to experience customer demand to further reduce our prices in order to promote sales of our current products. This has had and may continue to have an adverse impact on our revenues, operating results and gross margin.

Developing products to meet these various industry specifications has several risks. The first is the cost and effort to engineer standards-based products and to then prepare them for compliance testing. Not only do we have to certify or qualify new products, but any of our currently certified or qualified products must be re-certified or re-qualified should they be changed in any way. Second, there is no guarantee that these products will be certified or qualified as meeting these specifications in a timely fashion, if ever. Because most cable operators purchase only those products that have been certified or qualified as meeting these specifications, it is highly unlikely that we will be able to sell our products until they achieve certification or qualification, which can be a lengthy process. As a result, we may incur significant research and development expenses to develop new products that may not receive certification or qualification and we cannot recoup the costs of these research and development expenses by marketing uncertified or unqualified products. Moreover, a consequence of cable operators only purchasing products certified or qualified as meeting industry specifications is the increased competition between equipment vendors, which has resulted in a steady and ongoing decline in equipment prices as vendors compete for cable operators' business. Third, there is no guarantee that we will be able to support all future cable industry specifications, which will likely have an adverse impact on our future revenues.

38

--------------------------------------------------------------------------------

Table of Contents

**Average selling prices of broadband equipment continue to decline, which is decreasing our gross margins.**

The broadband equipment market has been characterized by erosion of product ASPs, particularly for CPE devices. We expect this erosion to continue. The ASPs for our products are likely to continue to decline due to competitive pricing pressures, promotional programs and customers possessing strong negotiating positions who require price reductions as a condition of purchase. In addition, we believe that the widespread adoption of industry specifications, such as the DOCSIS and EuroDOCSIS specifications, is further eroding ASPs as cable modems and other similar CPE become commodity products. Decreasing ASPs could result in decreased revenues even if the number of units sold increases. Decreasing ASPs may also require us to sell our products at much lower gross margin than in the past, and in fact, we may sell products at a loss. The primary reason that our gross profits have declined year-over year is the decline in product ASPs. As a result, we may experience substantial period-to-period fluctuations in future revenue, gross margin and operating results due to ASP erosion. Therefore, we must continue to develop and introduce on a timely basis and a cost-effective manner new products or next-generation products with enhanced functionalities that can be sold at higher gross margins. Our failure to do this could cause our revenues and gross margin to decline further.

**We must achieve cost reductions to attain profitability.**

As product ASPs and revenue have declined in recent years, we have not sufficiently decreased our costs, including operating expenses and the costs associated with our products, to offset declining ASPs and revenue. This has resulted in increased losses and made it difficult for us to attain profitability. We have experienced a decrease in revenue, which was, in large part, due to declining product ASPs and a drop in CMTS volume due to our transition from a proprietary platform to the DOCSIS standards platform. In order to achieve profitability, we must significantly increase our revenues, reduce the cost of our products, and maintain or reduce our operating expenses.

We have undertaken several actions to lower our operating expenses. Although we have implemented expense reduction and restructuring plans in the past, including the latest restructuring in January 2004, that have focused on cost reductions and operating efficiencies, our operating expenses are still higher than our gross margins. A large portion of our expenses, including rent, and operating lease expenditures, is fixed and difficult to reduce or change. Accordingly, if our revenue does not meet our expectations, we may not be able to adjust our expenses quickly enough to compensate for the shortfall in revenue. In that event, our business, financial condition and results of operations could be materially and adversely affected.

As product ASPs rapidly decline, we need to reduce the cost of our products through design and engineering changes. We may not be successful in redesigning our products, and, even if we are successful, our efforts may be delayed or our redesigned products may contain significant errors and product defects. In addition, any redesign may not result in sufficient cost reductions to allow us to reduce significantly the prices of our products or improve our gross margin. Reductions in our product costs may require us to use lower-priced components that are highly integrated in future products and may require us to enter into high volume or long-term purchase or manufacturing agreements. Volume purchase or manufacturing agreements may not be available on acceptable terms, if at all, and we could incur significant expenses without related revenues if we cannot use the products or services offered by such agreements. We have incurred significant cancellation charges related to volume purchase and manufacturing agreements in the past and may incur such charges in the future.

**Broadband services delivered by cable operators have not achieved widespread market acceptance, and other competing service providers exist.**

Our success will depend upon the widespread acceptance of broadband services delivered by cable television operators. The markets for these services are growing, but are not fully developed nor exploited. Additionally, these markets may not grow as cable operators may elect not to increase available bandwidth over which they can offer new services, such as high-speed Internet access, High Definition Television (HDTV), Video on Demand, and telephony. Cable operators may elect not to provide any or all of these new

39

--------------------------------------------------------------------------------

Table of Contents

services to their customers or may not aggressively market these services to their customers. If cable operators elect not to deploy such new services or if customers elect not to subscribe to such services, it may affect our ability to sell products to cable operators as their existing equipment may meet their current infrastructure demands. We depend on cable operators to provide new services and maintain their infrastructure in such a manner that allows us to continue to sell products to them.

Cable operators must also compete with other service providers in the delivery of services to their customers. RBOCs, CLECs, ILECs, satellite TV and other broadband service providers are aggressively competing with the cable industry to deliver broadband services via DSL or satellite broadcast technologies. We cannot accurately predict the future growth rate or the ultimate size of the market for broadband services delivered via cable. The success of RBOCs, CLECs, ILECs, satellite TV and other broadband service providers may slow or hamper the continued acceptance of cable operators in delivering broadband services, which in turn may impact demand for our products by cable operators.

We need to develop additional distribution channels to market and sell our products.

The vast majority of our sales are to large cable operators. However, we currently have limited access to smaller or geographically diverse cable operators. Although we intend to establish strategic relationships with leading distributors worldwide to access these customers, we may not succeed in establishing these relationships. Even if we do establish these relationships, the distributors may not succeed in marketing our products to their customers. Some of our competitors have established, long-standing relationships with these cable operators that may limit our and our distributors' ability to sell our products to those customers. Even if we were to sell our products to those customers, it would likely not be based on long-term commitments, and those customers would be able to terminate their relationships with us at any time without significant penalties.

We depend on cable industry capital spending for a substantial portion of our revenue and any decrease or delay in capital spending by cable operators would negatively impact our operating results and financial condition.

Historically, almost all of our sales had been derived from sales to cable operators, and we expect these sales to constitute a significant portion of net sales for the foreseeable future. Demand for our products will depend on the magnitude and timing of capital spending by cable television operators. These capital spending patterns are dependent on a variety of factors including:

*the availability of financing;

*annual budget cycles, as well as the typical reduction in upgrade projects during the winter months;

*the status of federal, local and foreign government regulation and deregulation of the telecommunications industry;

*overall demand for broadband services and the acceptance of new data, video and voice services;

*evolving industry standards and network architectures;

*competitive pressures (including the availability of alternative data transmission and access technologies);

*discretionary consumer spending patterns; and

*general economic conditions.

In recent years, the cable market has been characterized by consolidation. For example, Comcast acquired AT&T Broadband in 2003. Furthermore, cable operators may undertake additional business combinations to expand their business as evidenced by the recent unsolicited stock offering by Comcast of the Disney Corporation. We cannot predict the effect, if any, that such consolidations and business combinations will have on overall capital spending patterns by cable operators. The effect on our business of further industry consolidations and combinations also is uncertain.

40

--------------------------------------------------------------------------------

Table of Contents

The timing of deployment of our equipment can be subject to a number of other risks, including the availability of skilled engineering and technical personnel, the availability of other equipment such as fiber optic cable, and the need for local zoning and licensing approvals. We believe that changes in our customers' deployment plans have, and may in the future delay, the receipt of new orders. Since the majority of our sales have been to relatively few customers, a delay in equipment deployment at any one customer has in the past, and could in the future, have a material adverse effect on our sales in a particular quarter.

We may fail to accurately forecast customer demand for our products.

The nature of the cable industry makes it difficult for us to accurately forecast demand for our products. Our inability to forecast accurately the actual demand for our products may result in too much or too little supply of products or an over/under capacity of manufacturing or testing resources at any given point in time. The existence of any one or more of these situations could have a negative impact on our business, operating results or financial condition. We had purchase obligations of approximately $54.4 million as of December 31, 2003, primarily to purchase minimum quantities of materials and components used to manufacture our products. We may be obligated to fulfill these even if demand for our products is lower than we anticipate.

We may not be able to manage expenses and inventory risks associated with meeting the demand of our customers.

From time to time, we receive indications from our customers as to their future plans and requirements to ensure that we will be prepared to meet their demand for our products. If actual orders differ materially from these indications, our ability to manage inventory and expenses may be affected. In addition, if we fail to meet customers' supply expectations, we may lose business from such customers. If we enter into purchase commitments to acquire materials, or expend resources to manufacture products and such products are not purchased by our customers, our business and operating results could suffer.

We may have financial exposure to litigation.

We and/or our directors and officers are defendants in a number of lawsuits, including securities litigation lawsuits. As a result, we may have financial exposure to litigation as a defendant and because we are obligated to indemnify our officers and members of our board of directors for certain actions taken by our officers and directors on our behalf.

In order to limit financial exposure arising from litigation and/or our obligation to indemnify our officers and directors, we have historically purchased directors and officers insurance (D&O Insurance). However, the availability of D&O Insurance is becoming more difficult for companies to attain as a number of insurance underwriters no longer offer D&O Insurance and the remaining insurance underwriters offering D&O Insurance have significantly increased the premiums of such coverage. In recent years, we have experienced a significant increase in the cost of our D&O Insurance, although the cost of our D&O insurance decreased in fiscal year 2003. There can be no assurance that D&O Insurance will be available to us in the future or, if D&O Insurance is available, it may be prohibitively expensive. Additionally, some insurance underwriters who offered D&O Insurance in the past have been placed into liquidation or may be, at some future point, placed into liquidation. In October 2001, one of the insurance underwriters from which we purchased D&O Insurance, Reliance Insurance Co. (Reliance), was placed into liquidation by the state of Pennsylvania. Reliance was the underwriter for one excess layer of our D&O Insurance for the period covering the claims made against us and our officers in the pending securities litigation. Because Reliance is in liquidation, we paid for the amount insured under the Reliance policy, which was $2.5 million.

We are dependent on key third-party suppliers and any failure by them to deliver components could limit our ability to satisfy customer demand.

We manufacture all of our products using components or subassemblies procured from third-party suppliers, including semiconductors. Some of these components are available from a sole source and others are available from limited sources. A majority of our sales are from products containing one or more components

41

--------------------------------------------------------------------------------

Table of Contents

that are available only from sole source suppliers. Additionally, some of our components are custom parts that are produced to our specifications, and it may be difficult to move the manufacturing of such components from one vendor to another vendor.

Any interruption in the operations of our vendors of sole source or custom product parts could adversely affect our ability to meet our scheduled product deliveries to customers. If we are unable to obtain a sufficient supply of components, including semiconductors, from our current sources, we could experience difficulties in obtaining alternative sources or in altering product designs to use alternative components. Resulting delays or reductions in product shipments could damage customer relationships and expose us to potential damages that may arise from our inability to supply our customers with products. Further, a significant increase in the price of one or more of these components, such as our semiconductor components, could harm our gross margin or operating results. Additionally, we attempt to limit this risk by maintaining safety stocks of these components, subassemblies and modules. As a result of this investment in inventories, we have in the past and in the future may be subject to risk of excess and obsolete inventories, which could harm our business. In this regard, our gross margins and operating results could be adversely affected by excess and obsolete inventory.

We may be unable to migrate to new semiconductor process technologies successfully or on a timely basis.

Our future success will depend in part upon our ability to develop products that utilize new semiconductor process technologies. These technologies change rapidly and require us to spend significant amounts on research and development. We continuously evaluate the benefits of redesigning our integrated circuits using smaller geometry process technologies to improve performance and reduce costs. The transition of our products to integrated circuits with increasingly smaller geometries will be important to our competitive position. Other companies have experienced difficulty in migrating to new semiconductor processes and, consequently, have suffered reduced yields, delays in product deliveries and increased expense levels. Moreover, we depend on our relationship with our third-party manufacturers to migrate to smaller geometry processes successfully.

Our ability to directly control product delivery schedules and product quality is dependent on third-party contract manufacturers.

Most of our products are assembled and tested by contract manufacturers using testing equipment that we provide. As a result of our dependence on these contract manufacturers for the assembly and testing of our products, we do not directly control product delivery schedules or product quality. Any product shortages or quality assurance problems could increase the costs of manufacturing, assembling or testing our products. In addition, as manufacturing volume increases, we will need to procure and assemble additional testing equipment and provide it to our contract manufacturers. The production and assembly of testing equipment typically requires significant lead times. We could experience significant delays in the shipment of our products if we are unable to provide this testing equipment to our contract manufacturers in a timely manner.

We are dependent upon international sales and there are many risks associated with international operations.

We expect sales to customers outside of the United States to continue to represent a significant percentage of our revenues for the foreseeable future. For the twelve months ended December 31, 2003 and December 31, 2002, approximately 44% and 68%, respectively, of our net revenues were from customers outside of the U.S. International sales are subject to a number of risks, including the following:

*changes in foreign government regulations and communications standards;

*import and export license requirements, tariffs and taxes;

*trade barriers;

*difficulty in protecting intellectual property;

42

--------------------------------------------------------------------------------

Table of Contents

*difficulty in collecting accounts receivable;

*currency fluctuations;

*the burden of complying with a wide variety of foreign laws, treaties and technical standards;

*difficulty in staffing and managing foreign operations; and

*political and economic instability.

If our customers are affected by currency devaluations or general economic downturns their ability to purchase our products could be reduced significantly. Payment cycles for international customers typically are longer than those for customers in North America.

While we generally invoice our foreign sales in U.S. dollars, we invoice some of our sales in Europe in Euros. Since we have also elected to take payment in Euros from our customers in Europe and may elect to take payment in other foreign currencies in the future, we are exposed to losses as the result of foreign currency fluctuations. Additionally, we have an Israel based operation whose expenses are denominated in Israeli NIS. We currently do not engage in foreign currency hedging transactions. We may in the future choose to limit our exposure by the purchase of forward foreign exchange contracts or through similar hedging strategies. No currency hedging strategy can fully protect against exchange-related losses. In addition, if the relative value of the U.S. dollar in comparison to the currency of our foreign customers should increase, the resulting effective price increase of our products to those foreign customers could result in decreased sales.

Furthermore, foreign countries may decide to prohibit, terminate or delay the construction of new cable infrastructures for a variety of reasons. These reasons include environmental issues, economic downturns and availability of favorable pricing for other communications services or the availability and cost of related equipment. Any such action by foreign countries would reduce the market for our products.

Our business may be affected by conditions in Israel.

We have significant operations in Israel. Our operations in Israel consist primarily of research and development, and to a lesser extent sales and manufacturing. Revenues generated by our business in Israel were $12.9 million and $8.3 million for the twelve months ending December 31, 2003 and December 31, 2002, respectively. Our research and development operations may be significantly affected by conditions in Israel. Since the establishment of the State of Israel in 1948, a number of armed conflicts have taken place between Israel and its Arab neighbors and a state of hostility, varying in degree and intensity, has led to security and economic problems for Israel. Hostilities within Israel have continued over the past year, which could disrupt some of our operations. We could be adversely affected by any major hostilities involving Israel. As a result of the hostilities and unrest presently occurring within Israel, the future of the peace efforts between Israel and its Arab neighbors is uncertain. A number of our employees based in Israel are currently obligated to perform annual military reserve duty and are subject to being called to active duty at any time under emergency circumstances. We cannot assess the full impact of these requirements and the hostilities on our workforce, business or operations if conditions should change, and we cannot predict the effect of any expansion or reduction of these obligations or the hostilities.

We may be unable to provide adequate customer support.

Our ability to achieve our planned sales growth and retain current and future customers will depend in part upon the quality of our customer support operations. Our customers generally require significant support and training with respect to our products, particularly in the initial deployment and implementation stages. Spikes in demand of our support services may cause us to be unable to serve our customers. We may not have adequate personnel to provide the levels of support that our customers may require during initial product deployment or on an ongoing basis especially during peak periods. Our inability to provide sufficient support to our customers could delay or prevent the successful deployment of our products. In addition, our failure to provide adequate support could harm our reputation and relationships with our customers and could prevent us from selling product to existing customers or gaining new customers.

43

--------------------------------------------------------------------------------

Table of Contents

Our industry is highly competitive with many larger and more established competitors.

The market for our products is extremely competitive and is characterized by rapid technological change. Our direct competitors include Cisco Systems, ADC, Arris, BigBand Networks, Motorola, Thomson Consumer Electronics (which markets products under the brand name RCA), Scientific-Atlanta and Toshiba. Additionally, we face competition from early stage companies with access to significant financial backing that improve existing technologies or develop new technologies. The principal competitive factors in our market include the following:

*product performance, features and reliability;

*price;

*size and stability of operations;

*breadth of product line;

*sales and distribution capabilities;

*technical support and service;

*relationships with providers of service providers; and

*compliance with industry standards.

Some of these factors are outside of our control. Conditions in the market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce products that are less costly, provide superior performance or achieve greater market acceptance than our products.

Many of our current and potential competitors have greater financial, technical, marketing, distribution, customer support and other resources, as well as better name recognition and access to customers than we do. The widespread adoption of DOCSIS and other industry standards has and is likely to continue to cause increased price competition. We believe that the adoption of these standards have resulted in and are likely to continue to result in lower ASPs for our products. Any increased price competition or reduction in sales of our products, particularly our higher margin head-end products, has resulted and will continue to result in decreased revenue and downward pressure on our gross margin. These competitive pressures have and are likely to continue to adversely impact our business.

We are dependent on key personnel.

Due to the specialized nature of our business, we are highly dependent on the continued service of, and on the ability to attract and retain, qualified engineering, sales, marketing and senior management personnel. The competition for some of these personnel is intense. The loss of any of these individuals may harm our business. In addition, if we are unable to hire qualified personnel as needed, we may be unable to adequately manage and grow our business.

Highly skilled employees with the education and training that we require, especially employees with significant experience and expertise in video, data networking and radio frequency design, are in high demand. We may be unable to continue to attract and retain qualified personnel necessary for the development of our business. We do not have key person insurance coverage for the loss of any of our employees. Any officer or employee can terminate his or her relationship with us at any time. Our employees are not bound by non-competition agreements with us.

Furthermore, in 2003, we hired a new Chief Financial Officer and a new Chief Operating Officer. Although the addition of these two executive officers has offered us an opportunity to expand our management team with persons that can assist in implementing our new direction, turnover in personnel and the recruitment and retention of a new executive staff may create a number of transitional challenges for us.

44

--------------------------------------------------------------------------------

Table of Contents

Our business is subject to the risks of product returns, product liability and product defects.

Products like ours are very complex and can frequently contain undetected errors or failures, especially when first introduced or when new versions are released. Despite testing, errors may occur. The occurrence of errors could result in product returns and other losses to us and/or our customers. This occurrence could result in the loss of or delay in market acceptance of our products. We have limitation of liability provisions in our standard terms and conditions of sale. However, these terms and conditions may not be effective as a result of federal, state or local laws or ordinances or unfavorable judicial decisions in the United States or other countries. The sale and support of our products entails the risk of product liability claims. In addition, any failure by our products to properly perform could result in claims against us by our customers. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation and divert management's time and other resources.

We may be unable to adequately protect or enforce our intellectual property rights.

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Even though we seek to establish and protect proprietary rights in our products, there are risks. We cannot be assured that any patent, trademark, copyright or other intellectual property rights owned by us will not be invalidated, circumvented or challenged, that such intellectual property rights will provide competitive advantages to us or that any of our pending or future patent applications will be issued with the scope of the claims sought by us, if at all. We cannot be assured that others will not develop technologies that are similar or superior to our technology, duplicate our technology or design around the patents that we own. In addition, effective patent, copyright and trade secret protection may be unavailable or limited in certain foreign countries in which we do business or may do business in the future.

Our pending patent applications may not be granted. Even if they are granted, the claims covered by any patent may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without a license from us.

We believe that the future success of our business will depend on our ability to translate the technological expertise and innovation of our employees into new and enhanced products. We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with many of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These contractual arrangements, as well as statutory protections, may not prove sufficient to prevent misappropriation of our trade secrets or technology or deter independent third-party development of similar technologies. In addition, the laws of some foreign countries may not protect our intellectual property rights to the same extent as do the laws of the United States. We may, in the future, take legal action to enforce our patents and other intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others, or to defend against claims of infringement or invalidity. Such litigation could result in substantial costs and diversion of resources and could negatively effect our business, operating results, financial position and liquidity.

CableLabs DOCSIS 2.0 specification includes two modulation techniques, S-CDMA and A-TDMA. In connection with the development of the DOCSIS 2.0 specification by CableLabs, we entered into an agreement with CableLabs, on a royalty-free basis, whereby we licensed to CableLabs many of our intellectual property rights to the extent that such rights may be asserted against a party desiring to design, manufacture or sell DOCSIS-based products, including DOCSIS 2.0-based products. This license agreement grants to CableLabs the right to sublicense our intellectual property, including our intellectual property rights in our S-CDMA patents, to manufacturers that compete with us in the marketplace for DOCSIS based products.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks throughout the world. However, the laws of certain foreign countries might

45

--------------------------------------------------------------------------------

Table of Contents

not protect our products or intellectual property rights to the same extent as the laws of the United States. Effective trademark, copyright, trade secret and patent protection may not be available in every country in which our products may be manufactured, marketed or sold.

Third party claims of infringement or other claims against us could adversely affect our ability to market our products, require us to redesign our products or seek licenses from third parties, and seriously harm our operating results and disrupt our business.

As is typical in the industry in which we operate, we have been and may from time to time be notified of claims that we may be infringing patents or intellectual property rights owned by third parties. We also believe that companies may be increasingly subject to infringement claims as distressed companies and individuals attempt to generate cash by enforcing their patent portfolio against a wide range of products. We have consulted with our patent counsel on the claims we have received and are in the process of reviewing the allegations made by such third parties. We cannot assure you that, if the issues were to be submitted to a court, such court will not find that our products infringe the third party patents, nor that such third parties will not continue to allege infringement. If we are found to have infringed such third party's patents, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. Additionally, we cannot assure you that other third parties will not assert infringement claims against us in the future. Any such claim, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require us to enter into royalty or licensing agreements. Such royalty or licensing agreements may not be available on terms acceptable to us, if at all, which could have a material adverse effect upon our business, operating results and financial condition. Our failure to obtain a license for key intellectual property rights from a third party for technology used by us could cause us to incur substantial liabilities and to suspend the manufacturing of products utilizing the technology. Alternatively, we could be required to expend significant resources to develop non-infringing technology. We cannot assure you that we would be successful in developing non-infringing technology.

Our business and our customers are subject to regulation.

Our business and customers are subject to varying degrees of regulation by regulatory bodies in the United States and foreign countries. Although these regulations have not materially restricted our operations to date or the operations of our customers, future regulations applicable to our business or customers could be adopted. The adoption of future regulations may adversely affect our customers, our ability to sell our products and therefore our operating results.

Our products are subject to safety approvals and certifications.

In the United States, our products are required to meet certain safety requirements. For example, we are required to have our products certified by Underwriters Laboratory in order to meet federal requirements relating to electrical appliances to be used inside the home. Outside the United States, our products are subject to the regulatory requirements of each country in which the products are manufactured or sold. These requirements are likely to vary widely. We may be unable to obtain on a timely basis or at all the regulatory approvals that may be required for the manufacture, marketing and sale of our products.

We are vulnerable to earthquakes, disruptions to our power supply, labor issues and other unexpected events.

Our corporate headquarters, as well as the majority of our research and development activities and some manufacturing operations are located in California, an area known for seismic activity. In addition, the operations of some of our key suppliers are also located in this area and in other areas known for seismic activity, such as Taiwan. An earthquake, or other significant natural disaster, could result in an interruption in our business or the operations of one or more of our key suppliers. Our California operations may also be subject to disruptions in power supply, such as occurred in 2001. Our business may also be impacted by labor issues related to our operations and/or those of our suppliers, service providers, or customers. Such an

46

--------------------------------------------------------------------------------

interruption could harm our operating results. We may not carry sufficient
business interruption insurance to compensate for any losses that we may sustain
as a result of any natural disasters or other unexpected events.

Our indebtedness could adversely affect our financial condition; we may incur
substantially more debt.

     As of December 31, 2003, we had approximately $68.4 million of long-term
obligations of which $65.1 million is long-term debt associated with our Notes.
This level of indebtedness may adversely affect our stockholders by:

*making it more difficult for us to satisfy our obligations with respect to our
 indebtedness;

*increasing our vulnerability to general adverse economic and industry
 conditions;

*limiting our ability to obtain additional financing;

*requiring the dedication of a substantial portion of our cash flow from
 operations to the payment of principal of, and interest on, our indebtedness,
 thereby reducing the availability of our cash flow to fund our growth strategy,
 working capital, capital expenditures and other general corporate purposes;

*limiting our flexibility in planning for, or reacting to, changes in our
 business and the industry; and

*placing us at a competitive disadvantage relative to our competitors with less
 debt.

     We may incur substantial additional debt in the future. The terms of our
outstanding debt do not fully prohibit us from doing so. If new debt is added to
our current levels, the related risks described above could intensify.

We may not be able to raise additional funds to continue operating our business.

     Our main source of liquidity continues to be our unrestricted cash on
hand. In addition and as a result of our history of operating losses, we expect
to continue to use our unrestricted cash to fund operating losses in the future.
Our cash and cash equivalents decreased to $30.2 million at December 31, 2003,
from $117.0 million at December 31, 2002. If our operating losses are more
severe than expected or continue longer than expected, we may find it necessary
to seek other sources of financing to support our capital needs and provide
available funds for working capital. Given the capital markets, there are few
sources of financing available to us. Commercial bank financing may not be
available to us on acceptable terms. Accordingly, any plan to raise additional
capital, if available to us, would likely involve an equity-based or
equity-linked financing, such as the issuance of convertible debt, common stock
or preferred stock, which would be dilutive to our stockholders. If we are
unable to procure additional working capital, as necessary, we may be unable to
continue operations.

     On October 7, 2003, we filed a registration statement on Form S-3 with the
Securities and Exchange Commission. This shelf registration statement, which was
declared effective by the SEC on November 4, 2003, will allow us to issue
various types of securities, including common stock, preferred stock, debt
securities and warrants to purchase common stock, from time to time up to an
aggregate of $125.0 million, subject to market conditions and our capital needs.
On November 7, 2003, we filed a prospectus supplement with reference to our
intention to offer 10,800,000 shares of common stock, which would result in
gross proceeds of $75.0 million. On November 14, 2003, we withdrew our
previously announced public offering of 10,800,000 shares of common stock under
the shelf registration statement.

Threatened terrorist attacks may negatively impact all aspects of our
operations, revenues, costs and stock price.

     The events of September 11, 2001, as well as future events occurring in
response to or in connection with them, including, without limitation, future
terrorist attacks against United States targets, or military or trade
disruptions impacting our domestic or foreign suppliers of components required
for the manufacturing of our products, may cause delays or losses of customer
orders. More generally, any of these events could cause consumer confidence and
spending to decrease or result in increased volatility in the United States and

--------------------------------------------------------------------------------

Table of Contents

worldwide financial markets. They also could result in economic recession in the
United States or abroad. Any of these occurrences could have a significant
impact on our operating results, revenues and costs.

Our restructuring efforts could result in the erosion of employee morale, legal
actions against us and management distractions, and could impair our ability to
respond rapidly to growth opportunities in the future.

       As a result of the significant economic downturn and the related
uncertainties in the technology sector, we have implemented a number of
restructuring plans, including the most recent in the first quarter of 2004,
which has resulted in personnel reduction. These reductions could result in an
erosion of morale, and affect the focus and productivity of our remaining
employees, including those directly responsible for revenue generation, which in
turn may affect our revenue in the future. Additionally, employees directly
affected by the reductions may seek future employment with our business
partners, customers or competitors. Although all employees are required to sign
a proprietary information agreement with us at the time of hire, there can be no
assurances that the confidential nature of our proprietary information will be
maintained in the course of such future employment. Our employees are not bound
by non-competition agreements with us. Additionally, we may face wrongful
termination, discrimination, or other claims from employees affected by the
reduction related to their employment and termination. We could incur
substantial costs in defending ourselves or our employees against such claims,
regardless of the merits of such actions. Furthermore, such matters could divert
the attention of our employees, including management, away from our operations,
harm productivity, harm our reputation and increase our expenses. We cannot
assure you that our restructuring efforts will be successful, and we may need to
take additional restructuring efforts, including additional personnel reduction,
in the future.

We may dispose of existing product lines, which may adversely impact our future
results.

       On an ongoing basis, we evaluate our various product offerings in order to
determine whether any should be discontinued or, to the extent possible,
divested. Moreover, the worldwide downturn in the telecommunications industry
led us to reassess our business strategy, which in turn caused us to discontinue
investment in certain product lines. Specifically, we have reduced our
investment in the telecom and satellite sectors. Beginning in July 2003, we
entered into two transactions to further decrease our telecom business. In July
2003, we discontinued our Mainsail line of products and entered into an
agreement with a third party to supply warranty services for the Mainsail
products. In July 2003, we entered into an agreement with Verilink Corporation
(Verilink) to sell certain telecom assets associated with the Miniplex product
line to Verilink. Additionally, Verilink agreed to purchase related inventory
from us and assume all telecom warranty obligations with the exception of $2.4
million, which will continue to be our responsibility.

       We cannot assure you that we correctly forecasted the right product lines
to discontinue or that our decision to discontinue various investments and
product lines is prudent if market conditions change. In addition, we cannot
assure you that the discontinuance of various product lines will reduce our
operating expenses. Furthermore, future plans to discontinue existing product
lines entail various risks, including the risks that we will not be able to find
a buyer for a product line or the purchase price obtained will not be equal to
the book value of the assets for the product line.

We need to develop and introduce new and enhanced products in a timely manner to
remain competitive.

       The markets in which we operate are characterized by rapidly changing
technologies, evolving industry standards, frequent new product introductions
and relatively short product life. The pursuit of necessary technological
advances and the development of new products require substantial time and
expense. For example, we made ten acquisitions during the period between 1999
and 2000. Due to various economic conditions, none of the products from our
acquired businesses have achieved the level of market acceptance that was
forecasted at the time of their acquisitions. Additionally, certain product
groups have not achieved the level of technological development needed to be
marketable or to expand the market. As a result, we recorded an aggregate of
approximately $576.8 million related to impairment charges and write-down of in-

--------------------------------------------------------------------------------

Table of Contents

process research and development related to the acquired technologies, both of which negatively impacted our operating results.

To compete successfully in the markets in which we operate, we must design, develop, manufacture and sell new or enhanced products that provide increasingly higher levels of performance and reliability. However, we may not be able to successfully develop or introduce these products, if our products are not (i) cost effective, (ii) brought to market in a timely manner, (iii) in accordance with evolving industry standards and architecture or (iv) fail to achieve market acceptance. There is no assurance that the technologies we are currently developing or intend to develop will achieve feasibility, or that even if we are successful, the developed product will be accepted by the market. We may not be able to recover the costs of existing and future product developments and our failure to do so may materially and adversely impact our business, financial condition and results of operations.

We are exposed to the credit risk of our customers and to credit exposures in weakened markets, which could result in material losses.

Most of our sales are on an open credit basis, with payment terms of 30 to 60 days typically in the United States, and because of local customs or conditions, longer in some markets outside the United States. Beyond our open credit arrangements, we have also experienced a request for customer financing and facilitation of leasing arrangements, which we have not provided to date and do not expect to provide in the future. We expect demand for enhanced open credit terms, for example, longer payment terms, customer financing and leasing arrangements to continue and believe that such arrangements are a competitive factor in obtaining business. Our decision not to provide these types of financing arrangements may adversely affect our ability to sell product, and therefore, our revenue, operations and business.

Because of the current condition in the global economy, our exposure to credit risks relating to sales on an open-credit basis has increased. Although we monitor and attempt to mitigate the associated risk, there can be no assurance that our efforts will be effective in reducing credit risk. Additionally, there have been significant insolvencies and bankruptcies among our customers, which have and may continue to cause us to incur economic and financial losses. There can be no assurance that additional losses would not be incurred and that such losses would not be material. Although these losses have generally not been material to date, future losses, if incurred, could harm our business and have a material adverse effect on our operating results and financial condition.

We have and we may seek to expand our business through acquisitions; acquisitions could disrupt our business operations and harm our operating results.

In order to expand our business, we may make strategic acquisitions of other companies or certain assets. We plan to continue to evaluate opportunities for strategic acquisitions from time to time, and may make an acquisition at some future point. However, the current volatility in the stock market and the current price of our common stock may adversely affect our ability to make such acquisitions. Any acquisition that we make involves substantial risks, including the following:

*difficulties in integrating the operations, technologies, products and personnel of an acquired company;

*diversion of management's attention from normal daily operations of the business;

*potential difficulties in completing projects associated with in-process research and development;

*difficulties in entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions;

*initial dependence on unfamiliar supply chains or relatively small supply partners;

*insufficient revenues to offset increased expenses associated with acquisitions; and

*the potential loss of key employees of the acquired companies.

49

--------------------------------------------------------------------------------

Table of Contents

Acquisitions may also cause us to:

*issue common stock that would dilute our current stockholders' percentage ownership;

*assume liabilities;

*record goodwill and non-amortizable intangible assets that will be subject to impairment testing and potential periodic impairment charges;

*incur amortization expenses related to certain intangible assets;

*incur large and immediate write-offs; or

*become subject to litigation.

Mergers and acquisitions of high-technology companies are inherently risky, and no assurance can be given that our future acquisitions will be successful and will not materially adversely affect our business, operating results or financial condition. Failure to manage and successfully integrate acquisitions we make could harm our business and operating results in a material way. Even when an acquired company has already developed and marketed products, there can be no assurance that product enhancements will be made in a timely fashion or that all pre-acquisition due diligence will have identified all possible issues that might arise with respect to such products.

We made ten acquisitions during the period between 1999 and 2000. Due to various economic conditions, none of the products from our acquired businesses have achieved the level of market acceptance that was forecasted at the time of their acquisitions. Additionally, certain product groups have not achieved the level of technological development needed to be marketable or to expand the market. We recorded impairment losses of approximately $4.0 million and $572.8 million of intangible assets related to these acquisitions in December 31, 2002 and 2001. As of December 31, 2003, no intangible assets from these acquisitions remained.

Various export licensing requirements could materially and adversely affect our business or require us to significantly modify our current business practices.

Various government export regulations may apply to the encryption or other features of our products. We may have to make certain filings with the government in order to obtain permission to export certain of our products. In the past, we may have inadvertently failed to file certain export applications and notices, and we may have to make certain filings and request permission to continue exportation of any affected products without interruption while these applications are pending. If we do have to make such filings, we cannot assure you that we will obtain permission to continue exporting the affected products or that we will obtain any required export approvals now or in the future. If we do not receive the required export approvals, we may be unable to ship those products to certain customers located outside of the United States. In addition, we may be subject to fines or other penalties due to the failure to file certain export applications and notices.

New laws and regulations affecting corporate governance may impede our ability to retain and attract board members and executive officers, and increase the costs associated with being a public company.

On July 30, 2002, President George W. Bush signed into law the Sarbanes-Oxley Act of 2002. The new act is designed to enhance corporate responsibility through new corporate governance and disclosure obligations, increase auditor independence, and tougher penalties for securities fraud. In addition, the Securities and Exchange Commission and Nasdaq have adopted rules in furtherance of the act and are considering adopting others. This act and the related new rules and regulations will likely have the effect of increasing the complexity and cost of our company's corporate governance and the time our executive officers spend on such issues, and may increase the risk of personal liability for our board members, chief executive officer, chief financial officer and other executives involved in our company's corporate governance process. As a result, it may become more difficult for us to attract and retain board members and executive officers involved in the corporate governance process. In addition, we have experienced, and will continue to

--------------------------------------------------------------------------------

Table of Contents

experience, increased costs associated with being a public company, including additional professional and independent auditor fees.

Our stock price has been and is likely to continue to be highly volatile.

The trading price of our common stock has been and is likely to continue to be highly volatile. Our stock price could be subject to extreme fluctuations in response to a variety of factors, including the following:

*actual or anticipated variations in quarterly operating results;

*announcements of technological innovations;

*new products or services offered by us or our competitors;

*changes in financial estimates by securities analysts;

*conditions or trends in the broadband services industry;

*changes in the economic performance and/or market valuations of Internet, online service or broadband service industries;

*our announcement of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

*adoption of industry standards and the inclusion or compatibility of our technology with such standards;

*adverse or unfavorable publicity regarding us or our products;

*additions or departures of key personnel;

*sales of common stock; and

*other events or factors that may be beyond our control.

In addition, the stock markets in general, and the Nasdaq National Market and the stock price of broadband services and technology companies in particular, have experienced extreme price and volume volatility. This volatility and decline has affected many companies irrespective of or disproportionately to the operating performance of these companies. Additionally, industry factors may materially adversely affect the market price of our common stock, regardless of our actual operating performance.

We have adopted a stockholder rights plan, which, together with provisions in our charter documents and Delaware law, may delay or prevent an acquisition of us, which could decrease the value of our stock.

We adopted a stockholder rights plan pursuant to which we distributed one right for each outstanding share of common stock held by stockholders of record as of February 20, 2001. Because the rights may substantially dilute the stock ownership of a person or group attempting a take-over of us, even if such a change in control is beneficial to our stockholders, without the approval of our board of directors, the plan could make it more difficult for a third party to acquire us, or a significant percentage of our outstanding capital stock, without first negotiating with our board of directors. Additionally, provisions of our Certificate of Incorporation and our Bylaws could make it more difficult for a third party to acquire control of us in a transaction not approved by our Board of Directors, and we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which could also have the effect of delaying or preventing our acquisition by a third party.

Future sales of shares by existing stockholders could affect our stock price.

The shares held by our stockholders, including our executive officers and directors, may be sold in the public market at any time and from time to time subject in certain cases to volume limitations under Rule 144 of the Securities Act of 1933 and various vesting agreements. If any of these stockholders sell substantial amounts of our common stock in the public market, the market price of our common stock could decline. In

51

--------------------------------------------------------------------------------

Table of Contents

addition, shares subject to outstanding options and shares reserved for future issuance under our stock option and purchase plans will continue to become eligible for sale in the public market to the extent permitted by the provisions of the various vesting agreements and the securities rules and regulations applicable to these shares.

Item 7A. Market Risk Disclosure Information

   Interest Rate Risk. Our exposure to market risk for changes in interest rates relates primarily to our investment portfolio. The primary objective of our investment activities is to preserve principal while maximizing yields without significantly increasing risk. This is accomplished by investing in widely diversified short-term investments, consisting primarily of investment grade securities, substantially all of which mature within the next twenty-four months. A hypothetical 50 basis point increase in interest rates would result in an approximate $217,000 decline (less than 1%) in the fair value of our available-for-sale securities.

   Foreign Currency Risk. A substantial majority of our revenue, expense and capital purchasing activity are transacted in U.S. dollars. However, we do enter into transactions from Belgium, United Kingdom, Hong Kong, Canada, and Israel. A hypothetical adverse change of 10% in exchange rates would result in a decline in income before taxes of approximately $0.1 million. All of the potential changes noted above are based on sensitivity analyses performed on our financial positions at December 31, 2003. Actual results may differ materially.

52

--------------------------------------------------------------------------------

Table of Contents

Item 8.Financial Statements and Supplementary Data

TERAYON COMMUNICATION SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|                                                          | Page |
| -------------------------------------------------------- | ---- |
| Report of Ernst & Young LLP, Independent Auditors        | 54   |
| Consolidated Balance Sheets                              | 55   |
| Consolidated Statements of Operations                   | 56   |
| Consolidated Statements of Stockholders' Equity         | 57   |
| Consolidated Statements of Cash Flows                   | 58   |
| Notes to Consolidated Financial Statements              | 59   |

53

--------------------------------------------------------------------------------

Table of Contents

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Board of Directors and Stockholders
Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the financial statement schedule listed in the index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2002, the Company adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" and Statement of Financial Accounting Standards No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145).

/s/ ERNST & YOUNG LLP

Palo Alto, California
January 23, 2004

54

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 30,188 | $ 117,079 |
| Short-term investments | 108,452 | 89,424 |
| Accounts receivable, less allowance for doubtful accounts of $3,591 in 2003 and $3,519 in 2002 | 29,199 | 16,355 |
| Accounts receivable from related parties | 600 | 842 |
| Other current receivables | 3,662 | 2,597 |
| Inventory | 16,364 | 8,257 |
| Other current assets | 2,883 | 8,263 |
| Total current assets | 191,348 | 242,817 |
| Property and equipment, net | 11,871 | 17,906 |
| Restricted cash | 9,212 | 9,945 |
| Prepaid expenses and other assets, net | 2,809 | 5,042 |
| Total assets | $ 215,240 | $ 275,710 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 26,049 | $ 23,920 |
| Accrued payroll and related expenses | 6,537 | 6,227 |
| Deferred revenues | 3,423 | 497 |
| Warranty reserves | 5,509 | 8,607 |
| Accrued restructuring charges | 4,500 | 6,754 |
| Accrued vendor cancellation charges | 2,869 | 13,865 |
| Other accrued liabilities | 5,036 | 8,609 |
| Interest payable and current portion of long-term debt | 1,358 | 1,355 |
| Current portion of capital lease obligations | 124 | 154 |
| Total current liabilities | 55,405 | 69,988 |
| Long-term obligations | 3,366 | 3,421 |
| Long-term portion of capital lease obligations | -- | 78 |
| Convertible subordinated notes | 65,081 | 65,081 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares -- 5,000,000 | | |
| Issued and outstanding shares -- none in 2003 and 2002 | -- | -- |
| Common stock, $0.001 par value: | | |
| Authorized shares -- 200,000,000 | | |
| Issued -- 75,031,097 in 2003 and 73,240,054 in 2002 | | |
| Outstanding -- 74,875,088 in 2003 and 73,084,045 in 2002 | 75 | 73 |
| Additional paid in capital | 1,082,036 | 1,078,144 |
| Accumulated deficit | (987,560) | (937,207) |
| Deferred compensation | (22) | (25) |
| Treasury stock, at cost; 156,009 shares in 2003 and 2002 | (773) | (773) |
| Accumulated other comprehensive loss | (2,368) | (3,070) |
| Total stockholders' equity | 91,388 | 137,142 |
| Total liabilities and stockholders' equity | $ 215,240 | $ 275,710 |

See accompanying notes.

55

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (In thousands, except per share data) | | |
| Revenues: | | | |
| Product revenues | $ 128,791 | $ 120,306 | $ 227,036 |
| Related party product revenues | 4,694 | 9,097 | 52,445 |
| Total revenues | 133,485 | 129,403 | 279,481 |
| Cost of goods sold: | | | |
| Cost of product revenues | 99,261 | 92,497 | 229,936 |
| Cost of related party product revenues | 1,773 | 8,452 | 33,181 |
| Total cost of goods sold | 101,034 | 100,949 | 263,117 |
| Gross profit | 32,451 | 28,454 | 16,364 |
| Operating expenses: | | | |
| Research and development | 42,839 | 58,696 | 79,927 |
| Sales and marketing | 26,781 | 35,704 | 55,701 |
| General and administrative | 12,127 | 14,715 | 31,309 |
| Goodwill amortization | -- | -- | 25,410 |
| Restructuring costs and asset write-offs | 2,803 | 8,922 | 587,149 |
| Total operating expenses | 84,550 | 118,037 | 779,496 |
| Loss from operations | (52,099) | (89,583) | (763,132) |
| Interest income | 2,917 | 6,838 | 18,132 |
| Interest expense | (3,279) | (6,174) | (15,224) |
| Other income (expense) | 2,424 | (4,145) | (2,864) |
| Gain on early retirement of debt | -- | 49,089 | 185,327 |
| Loss before tax (expense) benefit | (50,037) | (43,975) | (577,761) |
| Income tax (expense) benefit | (316) | (238) | 13,915 |
| Net loss | $ (50,353) | $ (44,213) | $(563,846) |
| Basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (8.25) |
| Shares used in computing basic and diluted net loss per share | 74,212 | 72,803 | 68,331 |

See accompanying notes.

56

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

(In thousands, except share amounts)

| | Common Stock Shares | Amount | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock Shares | Amount | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2000 | 67,266,986 | $ 68 | $1,037,964 | $(329,148) | $ (6,788) | $ (3) | $ 661 | 34,722 | $ (73) | $ 702,681 |
| Exercise of options for cash to purchase common stock | 2,507,582 | 4 | 12,494 | | | | | | | 12,498 |
| Repurchase of common stock | (93,117) | | 719 | | | | | 93,117 | (695) | (695) |
| Issuance of options | | | | | (719) | | | | | -- |
| Amortization of deferred compensation | | | | | 5,815 | | | | | 5,815 |
| Adjustments to deferred compensation due to employee terminations | | | (1,234) | | 1,234 | | | | | -- |
| Issuance of restricted common stock for services provided | 275,250 | | 1,237 | | | | | | | 1,237 |
| Issuance of common stock for Employee Stock Purchase Plan | 381,428 | | 1,966 | | | | | | | 1,966 |
| Issuance of warrants to purchase common stock | | | 1,187 | | | | | | | 1,187 |
| Issuance of common stock for tender offer | 141,442 | | 2,001 | | | | | | | 2,001 |
| Issuance of common stock for retirement of debt | 1,464,359 | 1 | 17,869 | | | | | | | 17,870 |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Comprehensive income: | | | | | | | | | | |
| Increase in unrealized gain on short-term investments | | | | | | | 208 | | | 208 |
| Cumulative translation adjustment | | | | | | | (621) | | | (621) |
| Net loss | | | | (563,846) | | | | | | (563,846) |
| Comprehensive loss | | | | | | | | | | (564,259) |
| Balance at December 31, 2001 | 71,943,930 | 73 | 1,074,203 | (892,994) | (458) | -- | 248 | 127,839 | (768) | 180,304 |
| Balance at December 31, 2001 (brought forward) | 71,943,930 | 73 | 1,074,203 | (892,994) | (458) | -- | 248 | 127,839 | (768) | 180,304 |
| Exercise of options for cash to purchase common stock | 422,073 | | 1,721 | | | | | | | 1,721 |
| Repurchase or return of common stock | (1,068) | | | | | | | 28,170 | (5) | (5) |
| Return of escrow shares from Telegate acquisition | (25,077) | | | | | | | | | |
| Issuance of options to non-employees | | | 38 | | (38) | | | | | -- |
| Amortization of deferred compensation | | | 1 | | 471 | | | | | 472 |
| Issuance of restricted common stock from stock option plan for services provided | 205,001 | | 290 | | | | | | | 290 |
| Acceleration of vesting of employee stock options and stock protection payment | | | 1 | | | | | | | 1 |
| Issuance of common stock for Employee Stock Purchase Plan | 539,186 | | 1,864 | | | | | | | 1,864 |
| Issuance of warrant to purchase common stock | | | 26 | | | | | | | 26 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | | (519) | | | (519) |
| Cumulative translation adjustment | | | | | | | (2,799) | | | (2,799) |
| Net loss | | | | (44,213) | | | | | | (44,213) |
| Comprehensive loss | | | | | | | | | | (47,531) |
| Balance at December 31, 2002 | 73,084,045 | 73 | 1,078,144 | (937,207) | (25) | -- | (3,070) | 156,009 | (773) | 137,142 |
| Balance at December 31, 2002 (brought forward) | 73,084,045 | 73 | 1,078,144 | (937,207) | (25) | -- | (3,070) | 156,009 | (773) | 137,142 |
| Exercise of options for cash to purchase common stock | 579,233 | 1 | 2,533 | | | | | | | 2,534 |
| Re-valuation of options to non-employees | | | 50 | | (50) | | | | | |
| Amortization of deferred compensation | | | | | 53 | | | | | 53 |
| Issuance of restricted common stock from stock option plan for services provided | 9,600 | | 70 | | | | | | | 70 |
| Issuance of common stock for Employee Stock Purchase Plan | 1,202,210 | 1 | 1,194 | | | | | | | 1,195 |
| Issuance of warrant to purchase common stock | | | 45 | | | | | | | 45 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | | (470) | | | (470) |
| Cumulative translation adjustment | | | | | | | 1,172 | | | 1,172 |
| Net loss | | | | (50,353) | | | | | | (50,353) |
| Comprehensive loss | | | | | | | | | | (49,651) |
| Balance at December 31, 2003 | 74,875,088 | $ 75 | $1,082,036 | $(987,560) | $ (22) | $ -- | $ (2,368) | 156,009 | $(773) | $ 91,388 |

See accompanying notes.

57

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
| | 2003 | 2002 | 2001 |
|---|---|---|---|
| | (In thousands) | | |
| Operating activities: | | | |
| Net loss | $ (50,353) | $ (44,213) | $(563,846) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
|   Settlement of Net Services account receivable | -- | 1,118 | -- |
|   Depreciation | 9,369 | 11,572 | 15,728 |
|   Write-off and amortization of intangible assets | -- | 3,972 | 619,157 |
|   Amortization related to stock options | 53 | 476 | 5,815 |
|   Gain on early retirement of debt | -- | (49,089) | (185,327) |
|   Lower of cost or market inventory provision | 4,086 | 6,109 | -- |
|   Impairment of investment | -- | 4,500 | -- |
|   Write-off of fixed assets | 497 | 2,987 | 1,600 |
|   Compensation expense for issuance of common stock | 70 | -- | 3,238 |
|   Value of common and preferred stock warrants issued | 45 | 26 | 505 |
| Changes in operating assets and liabilities: | | | |
|   Accounts receivable | (12,844) | 26,211 | (5,614) |
|   Accounts receivable from related parties | 242 | 3,164 | 13,448 |
|   Inventory | (12,193) | 4,065 | 71,109 |
|   Other assets | 7,281 | 443 | 16,606 |
|   Accounts payable | 2,129 | (18,901) | (81,173) |
|   Accrued payroll and related expenses | 310 | (3,214) | (3,664) |
|   Deferred revenues | 2,926 | (3,672) | (829) |
|   Warranty reserves | (3,098) | 239 | 2,443 |
|   Accrued restructuring charges | (2,254) | (1,443) | 8,197 |
|   Accrued vendor cancellation charges | (12,335) | (3,426) | (1,709) |
|   Other accrued liabilities | (2,331) | (6,725) | 8,000 |
|   Deferred taxes | -- | -- | (18,565) |
|   Interest payable | 3 | (1,918) | (7,580) |
| Net cash used in operating activities | (68,397) | (67,719) | (102,461) |
| Investing activities: | | | |
| Purchases of short-term investments | (243,652) | (288,186) | (402,653) |
| Proceeds from sales and maturities of short-term investments | 224,154 | 434,346 | 384,689 |
| Purchases of property and equipment | (3,831) | (7,186) | (9,074) |
| Net cash (used in) provided by investing activities | (23,329) | 138,974 | (27,038) |
| Financing activities: | | | |
| Principal payments on capital leases | (66) | (127) | (130) |
| Principal payments on debt | -- | -- | (16,835) |
| Payments on repurchase of common stock | -- | (5) | (695) |
| Principal payments on stockholder notes receivable | -- | -- | 3 |
| Repurchase of convertible subordinated notes | -- | (57,627) | (113,428) |
| Proceeds from issuance of common stock | 3,729 | 3,872 | 14,464 |
| Net cash provided by (used in) financing activities | 3,663 | (53,887) | (116,621) |
| Effect of exchange rate changes | 1,172 | (563) | (620) |
| Net (decrease) increase in cash and cash equivalents | (86,891) | 16,805 | (246,741) |
| Cash and cash equivalents at beginning of year | 117,079 | 100,274 | 347,015 |
| Cash and cash equivalents at end of year | $ 30,188 | $ 117,079 | $ 100,274 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for income taxes | $ 194 | $ 714 | $ 31 |
| Cash paid for interest | $ 3,262 | $ 8,387 | $ 20,810 |
| Supplemental noncash investing and financing activities: | | | |
| Common shares issued for settlement of convertible debt | $ -- | $ -- | $ 17,900 |
| Deferred compensation relating to common stock issued to non-employees | $ 53 | $ 38 | $ 684 |
| Reduction in deferred compensation due to termination of employees | $ -- | $ -- | $ 1,234 |
| Issuance of warrants in connection with purchase of TrueChat | $ -- | $ -- | $ 682 |

See accompanying notes.

58

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1. Organization and Summary of Significant Accounting Policies

Description of Business

Terayon Communication Systems, Inc. (Company) was incorporated under the laws of the State of California on January 20, 1993. In June 1998, the Company reincorporated in the State of Delaware.

The Company develops, markets and sells equipment to broadband service providers who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers.

Basis of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned and majority-owned subsidiaries. All intercompany balances and transactions have been eliminated.

Use of Estimates

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates are based on historical experience, input from sources outside of the Company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's revenue recognition policy, the valuation of its accounts receivable and inventory reserves, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of restructuring reserves.

Accounting Change

Effective the beginning of 2002, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." As required by SFAS No. 142, the Company discontinued amortizing the remaining balances of goodwill as of the beginning of fiscal 2002. See Note 5.

In April 2002, the Company adopted SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145). SFAS No. 145 allows only those gains and losses on the extinguishment of debt that meet the criteria of extraordinary items to be treated as such in the consolidated financial statements. Accordingly, the Company is now reporting the gain from retirement of Convertible Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Foreign Currency Translation

The Company records the effect of foreign currency translation in accordance with SFAS No. 52, "Foreign Currency Translation." For operations outside the United States that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end-of-period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in stockholders' equity. For the three years ended December 31, 2003, translation gains and losses were not significant. Realized foreign currency transaction gains and losses are included in results of operations as incurred, and have not been significant to the Company's operating results in any year presented.

59

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Concentrations of Credit Risk, Customers, Suppliers, and Products

The Company performs ongoing credit evaluations of its customers and generally requires no collateral. Credit losses have historically been within management's expectations. The Company maintains a reserve for potentially uncollectible accounts receivable based on an assessment of collectibility. The Company assesses collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of the Company's client's customers and other factors that the Company believes are relevant. Charges for uncollectible accounts are included as a component of net revenue in the consolidated statement of operations. At December 31, 2003 and 2002, the reserve for potentially uncollectible accounts was $3.6 million and $3.5 million, respectively. A relatively small number of customers account for a significant percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in several financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/AA- or better or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

The Company sells its products directly to broadband service providers, and to a lesser extent resellers. Revenues related to product sales are recognized in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), as amended, when: (1) persuasive evidence that an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. A provision is made for estimated product returns as product shipments are made. The Company's existing agreements typically do not grant return rights beyond those provided by the warranty.

Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price. Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

Contracts and customer purchase orders are generally used to determine the existence of an arrangement. Shipping documents and customer acceptance, when applicable, are used to verify delivery. The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. The Company assesses collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as the Company generally does not grant return rights beyond those provided by the warranty.

60

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Research and Development Expenses

Research and development expenses are charged to expense as incurred.

Shipping and Handling Costs

Costs related to shipping and handling are included in cost of goods sold for all periods presented.

Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2003, 2002 and 2001 were $0.1 million, $0.4 million, and $2.3 million, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers). The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against revenues in accordance with Emerging Issues Task Force (EITF) 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively. The Company charged the amortization of these assets against revenues through the six quarters ended in December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter. See Note 13.

Net Loss Per Share

Historical basic and diluted net loss per share was computed using the weighted average number of common stock outstanding. Options, warrants, restricted stock, preferred stock, and convertible debt were not included in the computation of historical diluted net loss per share because the effect would be antidilutive.

Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
| Net loss | $(50,353) | $(44,213) | $(563,846) |
| Shares used in computing basic and diluted net loss per share | 74,212 | 72,803 | 68,331 |
| Basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (8.25) |

Options to purchase 17,463,959, 14,635,025, and 20,007,686 shares of common stock were outstanding at December 31, 2003, 2002 and 2001, respectively, and warrants to purchase 200,000, 2,325,593, and 2,408,300 shares of common stock were outstanding at December 31, 2003, 2002 and 2001, respectively, but were not included in the computation of diluted net loss per share, since the effect is antidilutive.

Derivative Financial Instruments

The Company recognizes all derivative financial instruments, such as foreign exchange contracts, in the consolidated financial statements at fair value regardless of the purpose or the intent for holding the instrument. Changes in the fair value of derivative financial instruments are either recognized periodically in income or in stockholders' equity as a component of comprehensive income depending on whether the derivative financial instrument qualifies for hedging accounting, and if so, whether it qualifies as a fair value

61

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

hedge or cash flow hedge. Generally, changes in fair values of derivatives accounted for as fair value hedges are recorded in income along with the portions of the changes in the fair values of the hedged items that relate to the hedged risks. Changes in fair values of derivatives accounted for as cash flow hedges, to the extent they are effective as hedges, are recorded in other comprehensive income, net of deferred taxes. Changes in fair value of derivatives used as hedges of the net investment in foreign operations are reported in other comprehensive income as part of the cumulative translation adjustment. Changes in fair value of derivatives not qualifying as hedges are reported in income.

The Company had no derivative financial instruments outstanding as of December 31, 2003 or 2002.

Cash Equivalents and Short-Term Investments

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company determines impairment related to its equity investments in accordance with SFAS 115, "Accounting for Certain Investments in Debt and Equity Securities", and Securities and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) 59, "Accounting for Noncurrent Marketable Equity Securities", which provide guidance on determining when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost; the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and the Company's intent and ability to hold the investment.

The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities, are classified as available-for-sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short-term equity securities at December 31, 2003 or 2002.

During the third quarter of 2002, the Company received approximately 35.9 million shares of Net Servicos de Comunicacao SA (Net Servicos), a customer, valued at approximately $2.5 million as settlement for all outstanding accounts receivables due from Net Servicos. The shares of Net Servicos are traded on the Sao Paulo Stock Exchange. All revenue and the cost of sales relating to these receivables had been deferred due to extended payment terms offered in the original sales agreements. The Company recorded a loss on the settlement of the Net Servicos receivables of $0.9 million, which was charged to cost of goods sold in the third quarter of 2002.

The Company liquidated 32.9 million of these shares valued at $2.3 million in the fourth quarter of 2002. The Company liquidated 1.2 million of these shares valued at $0.1 million in the first quarter of 2003. The Company recorded revenue and the related cost of goods sold as the shares were sold and cash was received. Additionally, in the first quarter of 2003, 1.8 million shares of Net Servicos were paid to a consultant in Brazil who provided marketing and sales services to the Company. As of December 31, 2003, the Company no longer owns any shares of Net Servicos.

62

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Restricted Cash

Restricted cash at December 31, 2003 and 2002 primarily related to approximately $7.5 million and $9.0 million, respectively to secure an aircraft lease, as well as $0.7 million at December 31, 2003 to secure a real estate lease.

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Finished goods | $14,264 | $5,915 |
| Work-in process | 660 | 769 |
| Raw materials | 1,440 | 1,573 |
|  | $16,364 | $8,257 |

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by the Company's customers, the Company believes that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. The Company defines excess inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available. See Note 3.

Cost of goods sold for the years ended December 31, 2003 and 2002 included reversals of $10.0 million and $15.3 million, respectively, of special charges originally recorded in 2001 and 2000 for vendor cancellation charges and inventory considered to be excess and obsolete. The Company was able to reverse the provisions in 2003 and 2002, as it was able to sell inventory originally considered to be excess and obsolete. In addition, the Company was able to negotiate downward certain vendor cancellation claims to terms more favorable to the Company. Cost of goods sold for the year ended December 31, 2001 included $33.5 million of special charges for vendor cancellation and inventory considered to be excess and obsolete.

Additionally, during 2003 and 2002, the Company recorded inventory charges of $4.1 million and $6.1 million, respectively, to reduce some of its inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value in 2002 as ASPs fell below the cost of these products and to record charges for excess and obsolete inventory. No changes to reduce inventories to the lower of cost or market were recorded in 2003.

63

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Other Current Receivables

As of December 31, 2003 and 2002, other current receivables are primarily composed of interest, taxes, and non-trade receivables, and included approximately $1.8 million and $1.4 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, for the years ended December 31, 2003 and 2002, the Company recorded $0.5 million and $1.3 million, respectively in asset impairments primarily related to restructuring activities.

Property and equipment are as follows (In thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Software and computers | $ 23,273 | $ 25,531 |
| Furniture and equipment | 23,816 | 31,092 |
| Leasehold improvements | 4,935 | 5,018 |
| Automobiles | 16 | 16 |
| Property and equipment | 52,040 | 61,657 |
| Accumulated depreciation and amortization | (40,169) | (43,751) |
| Property and equipment, net | $ 11,871 | $ 17,906 |

Goodwill and Other Intangible Assets

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2002 and 2001, the Company recorded impairment charges for goodwill, assembled workforce, and other intangible assets (see Note 5). At December 31, 2003, all goodwill had either been amortized or written-off the Company's books. Consequently, no goodwill was included in the Company's condensed consolidated Balance Sheets at December 31, 2003.

Goodwill and other long-lived assets were reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicated that the carrying amount may not be recoverable. When such events occurred, the Company compared the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicated that there was an impairment, the amount of the impairment was typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows was based on the Company's weighted average cost of capital, which represented the blended costs of debt and equity.

Warranty Reserves

The Company provides a standard warranty for most of its products, generally lasting one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage

64

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

and service delivery costs incurred in correcting a product failure. Reserve estimates are based on historical experience and expectation of future conditions. See Note 14.

Stock-Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and includes the disclosure-only provisions as required under SFAS No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123). The Company provides additional pro forma disclosures as required under SFAS No. 123 and SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure" in Note 9.

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of SFAS No. 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common stockholders would have been increased to the pro forma amounts indicated below (see Note 9)(in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2003 | 2002 | 2001 |
| Net loss | $(50,353) | $(44,213) | $(563,846) |
| Stock option plans | (22,210) | (33,718) | (126,721) |
| Employee stock purchase plan | (1,712) | (1,990) | (2,212) |
| Pro forma net loss | $(74,275) | $(79,921) | $(692,779) |
| Pro forma basic and diluted net loss per share | $ (1.00) | $ (1.10) | $ (10.14) |

The pro forma impact of options granted and shares from the employee stock purchase plan to be issued for the years ended December 31, 2003, 2002 and 2001 is not representative of the effects on net income (loss) for future years, as future years will include the continued effects of options vesting as well as the impact of multiple years of stock option grants.

Equity instruments granted to non-employees are accounted for under the fair value method, in accordance with SFAS No. 123 and EITF No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black-Scholes option pricing model and are recorded in the equity section of the Company's consolidated balance sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

Accumulated Other Comprehensive Loss

Accumulated other comprehensive loss presented in the accompanying consolidated balance sheets and consolidated statements of stockholder's equity consists of net unrealized gain on short-term investments and accumulated net foreign currency translation losses.

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following are the components of accumulated other comprehensive loss (in thousands):

|  | Years Ended December 31, | |
|  | 2003 | 2002 |
| --- | --- | --- |
| Cumulative translation adjustments | $(2,400) | $(3,572) |
| Unrealized gain/(loss) on available-for-sale investments | 32 | 502 |
| Total accumulated other comprehensive loss | $(2,368) | $(3,070) |

Reclassification

Certain amounts reported in previous years have been reclassified to conform to 2003 presentation. Such reclassifications had no effect on previously reported results of operations, total assets or accumulated deficit.

Impact of Recently Issued Accounting Standards

In May 2003, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 150, "Accounting For Certain Financial Instruments with Characteristics of Both Liabilities and Equity" which establishes standards for how an issuer of financial instruments classifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on a fixed monetary amount known at inception, variations in something other than the fair value of the issuer's shares or variations inversely related to changes in the fair value of the issuer's equity shares. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position or results of operations.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." This statement is effective for contracts entered into or modified after June 30, 2003, and did not have a material impact on the Company's financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which was revised in December 2003. Interpretation No. 46, as revised, clarifies the application of Accounting Research Bulletin No. 51 and applies immediately to any variable interest entities created after January 31, 2003 and to variable interest entities in which an interest is obtained after that date. This Interpretation is applicable in the quarter ending March 31, 2004, for interests acquired in variable interest entities prior to February 1, 2003. This Interpretation requires variable interest entities to be consolidated if the equity investment at risk is not sufficient to permit an entity to finance its activities without support from other parties or the equity investors lack specified characteristics. The adoption of Interpretation No. 46, as revised, is not expected to have a material impact on the Company's financial position or results of operations.

In November 2002, the EITF reached a consensus on Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables". EITF Issue No. 00-21 provides guidance on how to account for certain arrangements that involve the delivery or performance of multiple products, services and/or rights to use assets. The provisions of EITF Issue No. 00-21 will apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. The adoption of EITF Issue No. 00-21 did not have any significant impact on the Company's financial position or results of operations.

66

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

In July 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standard No. 146, Accounting for Costs Associated with Exit or Disposal Activities (FAS 146). FAS 146 addresses the financial accounting and reporting for costs associated with exit or disposal activities, and supersedes Emerging Issues Task Force Issue No. 94-3, Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, including Certain Costs Incurred in a Restructuring (EITF 94-3). FAS 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In addition, FAS No. 146 establishes that fair value is the objective for initial measurement of the liability. FAS 146 is effective for exit or disposal activities initiated after December 31, 2002. The adoption of FAS 146 did not have any significant impact on the Company's financial position or results of operations.

In June 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS No. 142). SFAS No. 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. SFAS No. 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with definite lives will continue to be amortized over their estimated useful lives. Additionally, SFAS No. 142 requires that goodwill included in the carrying value of equity method investments no longer be amortized.

The Company adopted SFAS No. 142 on January 1, 2002. Identifiable intangible assets with indefinite lives were reclassified, as defined by SFAS No. 142, to goodwill at the date of adoption. The Company tested goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. See Note 5.

The following pro forma information reflects the impact on net loss and basic and diluted net loss per share assuming the adoption of SFAS No. 142 had occurred on January 1, 2001 (in thousands):

|  | Years ended December 31, | | |
|  | 2003 | 2002 | 2001 |
|  | | | (Pro forma) |
| Reported net loss | $(50,353) | $(44,213) | $(563,846) |
| Amortization of goodwill and intangible assets with indefinite lives | -- | -- | 53,846 |
| Pro forma net loss | $(50,353) | $(44,213) | $(510,000) |
| Basic and diluted net loss per share: | | | |
| Reported net loss | $ (0.68) | $ (0.61) | $ (8.25) |
| Adjustment related to amortization of goodwill and intangible assets with indefinite lives | -- | -- | 0.79 |
| Pro forma basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (7.46) |

In July 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standard No. 146, Accounting for Costs Associated with Exit or Disposal Activities (FAS 146). FAS 146 addresses the financial accounting and reporting for costs associated with exit or disposal activities, and supersedes Emerging Issues Task Force Issue No. 94-3, Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, including Certain Costs Incurred in a Restructuring (EITF 94-3). FAS 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In addition, FAS No. 146 establishes that fair value is the objective for initial measurement of the liability. FAS 146 is effective for exit or disposal activities initiated after December 31, 2002. The adoption of FAS 146 did not have any significant impact on the Company's financial position or results of operations.

67

---

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

2. Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities approximate fair value due to their short-term maturities. The fair value for the Company's investments in marketable debt and equity securities is estimated based on quoted market prices.

The fair value of short-term and long-term capital lease and debt obligations is estimated based on current interest rates available to us for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations, as of each period presented approximate their respective fair values.

The following estimated fair value amounts have been determined using available market information. However, considerable judgment is required in interpreting market data to develop the estimates of fair value.

68

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

| | December 31, 2003 | | | |
|---|---|---|---|---|
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 38,939 | $ -- | $ (11) | $ 38,928 |
| Fixed income corporate securities | 2,223 | 1 | -- | 2,224 |
| Government agency obligations | 7,918 | 1 | -- | 7,919 |
| Total | 49,080 | 2 | (11) | 49,071 |
| Investments maturing in 1-2 years: | | | | |
| Fixed income corporate securities | 1,333 | -- | -- | 1,333 |
| Government agency obligations | 58,006 | 68 | (26) | 58,048 |
| Total | 59,339 | 68 | (26) | 59,381 |
| Total | $108,419 | $ 70 | $ (37) | $108,452 |

| | December 31, 2002 | | | |
|---|---|---|---|---|
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 16,000 | $ -- | $ (26) | $ 15,974 |
| Fixed income corporate securities | 12,920 | 196 | -- | 13,116 |
| Government agency obligations | 18,300 | 260 | -- | 18,560 |
| Corporate equity securities | 202 | 151 | -- | 353 |
| Total | 47,422 | 607 | (26) | 48,003 |
| Investments maturing in 1-2 years: | | | | |
| Fixed income corporate securities | 2,000 | 145 | -- | 2,145 |
| Government agency obligations | 39,000 | 276 | -- | 39,276 |
| Total | 41,000 | 421 | -- | 41,421 |
| Total | $ 88,422 | $ 1,028 | $ (26) | $ 89,424 |

Realized gains and losses were insignificant for each of the years in the period ended December 31, 2003.

3. Commitments

Leases

The Company leases its facilities and certain equipment under operating leases. The operating lease for the Company's corporate headquarters expires in 2009. The operating lease for the Company's Israel headquarters expires in 2005. The Company's other operating leases expire at various times through 2006. Rent expense was approximately $7.1 million, $7.9 million, and $7.2 million, for the years ended December 31, 2003, 2002, and 2001, respectively. The Company subleases a portion of its facilities to third parties. In

69

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

connection with the restructuring plans announced January 27, 2004, the Company is seeking to sublease approximately 56,400 square feet of its Santa Clara, California facility. See Note 16. The Company's sublease rental income was approximately $1.1 million, $0.4 million, and $0.1 million for the years ended December 31, 2003, 2002, and 2001, respectively.

The Company leases certain equipment under noncancellable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment aggregated $0.3 million and $0.7 million at December 31, 2003 and 2002, respectively. Related accumulated amortization was $0.3 million and $0.6 million at December 31, 2003 and 2002, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit at December 31, 2002. The letter of credit was reduced to $7.5 million in February 2003. The lease commitment for the aircraft is included in the table below.

Future minimum lease payments under noncancelable operating leases and capital leases as of December 31, 2003 are as follows (in thousands):

|  | Operating Leases | Capital Leases |
|---|---|---|
| 2004 | $ 8,258 | $ 126 |
| 2005 | 7,188 | -- |
| 2006 | 4,660 | -- |
| 2007 | 3,165 | -- |
| 2008 | 3,045 | -- |
| Thereafter | 2,537 | -- |
| Total minimum payments | $ 28,853 | 126 |
| Less amount representing interest |  | 2 |
| Total current portion |  | $ 124 |

There are no future minimum sublease payments to be received under noncancelable subleases.

Purchase Obligations and Special Charges

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of purchase orders placed with vendors for goods and services and require the Company to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2003, $54.4 million of purchase obligations were outstanding. As a result of declines in forecast, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges in amounts, which represented management's estimate of the Company's exposure to vendors for its inventory commitments. At December 31, 2003, accrued vendor cancellation charges were $2.9 million and the remaining $51.5 million attributable to open purchase orders. The remaining obligations are expected to become payable at various times throughout 2004.

On February 26, 2003, the Company entered into an agreement with Solectron Corporation (Solectron) to settle all outstanding obligations under three manufacturing agreements between the Company and Solectron. Under the terms of the settlement agreement, the Company paid Solectron approximately

70

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

$3.9 million, and each party released any and all claims that it may have had against the other party. Additionally, the Company received selected inventory from Solectron. The Company previously accrued $6.0 million toward the settlement of the Solectron matter as a vendor cancellation charge in the fourth quarter of 2000 and the second quarter of 2001. In 2003, in connection with the Solectron settlement, the Company reversed $2.1 million of the accrued vendor cancellation charges included in cost of goods sold.

On September 29, 2003, the Company entered into an agreement with Flextronics (Israel) Ltd., an Israeli company (Flextronics), to purchase inventory from Flextronics and settle all outstanding claims between the Company and Flextronics. Under the terms of the settlement agreement, the Company paid Flextronics approximately $1.5 million to be applied toward the purchase of future inventory from Flextronics, if any. Additionally, each party released any and all claims that it may have had against the other party. The Company previously accrued $2.0 million toward the settlement of the Flextronics matter as a vendor cancellation charge in the second quarter of 2001. In 2003, in connection with the Flextronics settlement, the Company reversed $0.5 million of the accrued vendor cancellation charges included in cost of goods sold.

Letters of Credit

As of December 31, 2003, the Company had $9.2 million in unused outstanding letters of credit primarily required to support operating leases, which expire at various dates through 2009.

Royalties

The Company's total accrued obligation for royalties, at December 31, 2003 and 2002, was $1.3 million and $0.9 million, respectively.

The Company has purchased, through its acquisition of Radwiz Ltd. (Radwiz), certain technology that utilized funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade. The Company has committed to pay royalties to the Government of Israel on proceeds from sales of products based on this technology at rates of 3%--5% per sale. Sales of products using this technology are immaterial.

Additionally, the Company has various royalty arrangements, which require it to pay nominal amounts to various suppliers for usage of licensed property.

Guarantees

The Company from time to time enters into certain types of contracts that contingently require the Company to indemnify parties against third party claims. These obligations primarily relate to certain agreements with the Company's officers, directors and employees, under which the Company may be required to indemnify such persons for liabilities arising out of their employment relationship.

The terms of such obligations vary. Generally, a maximum obligation is not explicitly stated. Because the obligated amounts of these types of agreements often are not explicitly stated, the overall maximum amount of the obligations cannot be reasonably estimated. Historically, the Company has not been obligated to make any payments for these obligations, and no liabilities have been recorded for these obligations on its consolidated balance sheets as of December 31, 2003.

4. Accrued Severance Pay

Several of the Company's subsidiaries are subject to Israeli law and labor agreements, under which they are required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment is included in the Company's consolidated balance sheets on the accrual basis, and is

71

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2003, $1.9 million for accrued severance pay was included in long-term obligations. In accordance with EITF No. 88-1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $1.3 million relating to the amounts funded by the purchase of insurance policies for the Israeli severance liability in its consolidated balance sheets as other assets at December 31, 2003.

5. Restructuring Charges and Asset Write-offs

Restructuring

2003 Restructuring

    During the first quarter of 2003, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 restructuring. As of December 31, 2003, 81 employees were terminated throughout the Company, and the Company paid $2.7 million in termination costs. In the second quarter of 2003, the Company reversed $86,000 of previously accrued termination costs due to a change in estimate. At December 31, 2003, no restructuring charges remained accrued.

    A summary of the 2003 accrued restructuring charges is as follows (in thousands):

|                              | Involuntary Terminations |
| ---------------------------- | ------------------------ |
| Total charge                 | $ 2,745                  |
| Recovery of charge           | (86)                     |
| Cash payments                | (2,659)                  |
| Balance at December 31, 2003 | $ --                     |

2002 Restructuring

    During the third quarter of 2002, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $3.6 million of which $2.3 million related to employee termination costs and the remaining $1.3 million related to costs for excess leased facilities. At December 31, 2003, restructuring charges of $1.2 million remained accrued. As of December 31, 2003, 153 employees were terminated throughout the Company as part of the 2002 restructuring, and the Company paid $2.2 million in termination costs and $0.2 million in excess facility costs. During 2002, the Company reclassified $0.1 million of excess termination costs to leased facilities due to a change in estimate. The Company anticipates the remaining restructuring accrual, primarily relating to excess leased facilities, will be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

72

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following table summarizes the costs and activities related to the 2002 restructuring (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Total charge in 2002 | $  2,319 | $  1,322 | $ 3,641 |
| Cash Payments | (2,131) | -- | (2,131) |
| Reclassification | (100) | 100 | -- |
| Balance at December 31, 2002 | 88 | 1,422 | 1,510 |
| Cash Payments | (88) | (219) | (307) |
| Balance at December 31, 2003 | $    -- | $  1,203 | $ 1,203 |

### 2001 Restructuring

During 2001, the Company's Board of Directors approved a restructuring plan to streamline the Company's organizational structure worldwide. The Company incurred restructuring charges in the amount of $12.7 million in fiscal year 2001 of which $3.3 million remained accrued at December 31, 2003. Of the total restructuring charges recorded during fiscal year 2001, $3.2 million related to employee termination costs throughout the Company, and the remaining $9.5 million related primarily to costs for excess leased facilities. During 2003, the Company reversed $0.3 million of previously accrued termination costs due to a change in estimate. The Company anticipates utilizing the remaining restructuring accrual, which relates to servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

The following table summarizes the costs and activities related to the 2001 restructuring (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Total charges in 2001 | $  3,168 | $  9,501 | $12,669 |
| Cash payments | (1,891) | (2,580) | (4,471) |
| Balance at December 31, 2001 | 1,277 | 6,921 | 8,198 |
| Cash payments | (100) | (2,855) | (2,955) |
| Reclassification | (1,177) | 1,177 | -- |
| Balance at December 31, 2002 | -- | 5,243 | 5,243 |
| Recovery of charge | -- | (261) | (261) |
| Cash payments | -- | (1,685) | (1,685) |
| Balance at December 31, 2003 | $    -- | $  3,297 | $ 3,297 |

### Asset Write-offs

Primarily as a result of restructuring activities in 2003, the Company wrote off $0.4 million of fixed assets in 2003, which were determined to have no remaining useful life. As a result of restructuring activities in 2002 and 2001, and a rapid decline in demand for Access Network Electronics (ANE) products, certain property and equipment were determined to have no remaining useful life. During 2002, $1.3 million of fixed assets were written-off. During 2001, $1.6 million related to fixed assets acquired from ANE were determined to have no remaining useful life and were written-off. The impaired fixed assets in each period represent the net book value of idle manufacturing equipment, leasehold, and office equipment.

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

From September 1999 through December 2000, the Company acquired ten companies. In March 2001, the Company evaluated the carrying value of certain long-lived assets and acquired intangibles, consisting primarily of goodwill recorded on its consolidated balance sheet. Pursuant to accounting rules applicable at that time, during the first quarter of 2001, intangible assets totaling $163.1 million, related to certain acquisitions were deemed to be impaired with no future value and were written-off. Further, the aforementioned downturns in the principal markets in which the Company continues to operate, resulted in a write-down of these intangible assets related to both the Cable and Telecom segments of $409.7 million in the first nine months of 2001. These amounts were included in asset write-offs in the Company's consolidated statements of operations in 2001.

The Company adopted SFAS No. 142 on January 1, 2002. The Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption. The Company tests goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. The impairment tests were completed during the second quarter of 2002 and indicated no impairment. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, the Company experienced a significant drop in its market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on the forecast, the estimated undiscounted future cash flows from the use of the goodwill would have been less than its carrying amount. The Company determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million in 2002 was related to the Cable segment and $1.0 million was related to the Telecom segment. Subsequent to this write-off, the Company had no intangible assets, which were deemed to have indefinite useful lives.

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards related to a previous acquisition. Due to the impairment write-off, the deferred tax asset, and remaining net deferred tax liability were also written-off.

74

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following table describes the intangible assets written off during 2001:

| | Goodwill | Developed Technology | Trademark | Customer Relations | Customer Base | Assembled Workforce | Total |
|---|---|---|---|---|---|---|---|
| | | | (In thousands) | | | | |
| Cable Segment: | | | | | | | |
| Ultracom | $ 46.2 | $ 0.9 | $ -- | $ -- | $ -- | $ 0.3 | $ 47.4 |
| ComBox | 65.3 | 10.0 | -- | -- | -- | 0.2 | 75.5 |
| Imedia | 47.2 | 20.0 | 2.9 | -- | -- | 0.3 | 70.4 |
| Digitrans | 8.2 | 0.5 | -- | -- | -- | 0.3 | 9.0 |
| Telegate | 52.8 | 17.0 | -- | 20.2 | -- | 0.8 | 90.8 |
| Internet Telecom | 39.1 | 5.0 | -- | -- | -- | 0.1 | 44.2 |
| TrueChat | -- | -- | -- | -- | -- | -- | -- |
| Total Cable Segment | $ 258.8 | $ 53.4 | $ 2.9 | $ 20.2 | $ 0.0 | $ 2.0 | $337.3 |
| Telecom Segment: | | | | | | | |
| MainSail | 97.0 | 44.1 | -- | -- | -- | 0.6 | 141.7 |
| ANE | 33.5 | 10.3 | 0.5 | -- | 2.0 | 4.5 | 50.8 |
| Radwiz | 18.7 | 23.1 | 0.9 | -- | -- | 0.3 | 43.0 |
| Total Telecom Segment | $ 149.2 | $ 77.5 | $ 1.4 | $ 0.0 | $ 2.0 | $ 5.4 | $235.5 |
| Total Cable and Telecom | $ 408.0 | $ 130.9 | $ 4.3 | $ 20.2 | $ 2.0 | $ 7.4 | $572.8 |

The following table describes the intangible assets written off during 2002:

| | Goodwill | Assembled Workforce | Total |
|---|---|---|---|
| | | (In thousands) | |
| Cable Segment: | | | |
| Ultracom | $ -- | $ 0.1 | $0.1 |
| ComBox | -- | 0.1 | 0.1 |
| Digitrans | 0.2 | -- | 0.2 |
| Internet Telecom | -- | 0.1 | 0.1 |
| TrueChat | 2.5 | -- | 2.5 |
| Total Cable Segment | $ 2.7 | $ 0.3 | $3.0 |
| Telecom Segment: | | | |
| MainSail | -- | 0.5 | 0.5 |
| ANE | -- | 0.5 | 0.5 |
| Total Telecom Segment | $ -- | $ 1.0 | $1.0 |
| Total Cable and Telecom | $ 2.7 | $ 1.3 | $4.0 |

6. Impairment of Long-Term Investment

The Company's long-lived assets include long-term equity investments. During 2002, the Company determined that one such equity investment in a privately-held company was impaired. The investee's forecasts were not met and market conditions significantly deteriorated and accordingly, the Company recorded an impairment charge of $4.5 million.

75

---------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

7. Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.4 million. The Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company could have redeemed some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company would also make an additional payment of $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2003, amortization of debt issuance costs totaled $14.5 million.

In 2002, the Company repurchased approximately $109.1 million of the Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million. In 2001, the Company repurchased approximately $325.9 million of the Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of approximately $185.3 million, net of related unamortized issuance costs of $9.3 million. The Company did not repurchase any Notes during 2003.

In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, in 2002, the Company began reporting the gain from retirement of the Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Approximately $65.1 million of the Notes were outstanding at December 31, 2003.

8. Contingencies

Litigation

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against the Company and certain of its officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003. See Note 16 for subsequent activities related to this matter.

76

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal has been set for oral argument on April 16, 2004.

The Company believes that the allegations in both the class action and the Bertram case are without merit, and it intends to contest these matters vigorously. These matters, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the Company's breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of the Company's wholly-owned subsidiaries. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. The Company believes that the allegations are without merit and intends to present a vigorous defense in the arbitration proceedings.

The Company, as well as its customers, has received letters from third parties claiming that the Company's technology and products infringe on the third parties' patents. The Company has consulted with its patent counsel and is in the process of reviewing the allegations made by such third parties. The Company does not know whether the third parties will pursue their claims of patent infringement in court, and if they do, whether the Company would be found to infringe the third parties' patents. If the Company is found to have infringed such third party patents, the Company could be subject to substantial damages and/or an injunction preventing it from selling its products and conducting our business. Additionally, such third parties and additional third parties could assert infringement claims against the Company in the future. Any such claim of patent infringement, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require the Company to enter into royalty or licensing agreements. Such royalty or licensing agreements may not be available on terms acceptable to the Company or at all.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on the Company's financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position or overall results of operations for any of the above legal proceedings could change in the future.

9. Stockholders' Equity

Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw a warrant (Anti-Dilution Warrant) to purchase an indeterminate number of shares of common stock. The Anti-Dilution Warrant was exercisable at the option of Shaw during the period that Shaw owned equity in the Company and in the event the Company issued new equity securities at below the current market price defined in the Anti-Dilution Warrant. The aggregate exercise price was $0.50. The Company issued certain equity securities that, as of December 31, 2003, 2002, and 2001, required the Company to issue an additional 37,283, 17,293, and 35,982

77

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

warrants, respectively, to purchase shares of common stock pursuant to the Anti-Dilution Warrant. The Company recorded expenses of approximately $45,000, $26,000 and $0.2 million relating to the issuance of warrants pursuant to the Anti-Dilution Warrant, in 2003, 2002 and 2001, respectively. The expense was calculated by multiplying the annualized fair market value of the Company's stock by the share dilution attributable to the Anti-Dilution Warrant. In February 2003, Shaw transferred its ownership to a third party and the Anti-Dilution Warrant expired unexercised. As of December 31, 2003, the Anti-Dilution Warrant had expired and was not exercised.

In October 1999, a customer of the Company entered into an agreement with Telegate Ltd., an Israeli company (Telegate), which was negotiating with the Company to be acquired by the Company, whereby the customer committed to an investment in Telegate in connection with the acquisition of all the outstanding shares of Telegate by the Company. The customer committed to provide this investment in the event that the acquisition of Telegate by the Company did not close. In January 2000, the Company issued the customer a warrant to purchase 2,000,000 shares of the Company's common stock at a price of $30.75 per share; the closing price of the Company's common stock on the date the warrant was issued. The warrant was fully vested, non-forfeitable, and immediately exercisable and has a term of three years. The fair value of the warrant, determined as approximately $34.6 million using the Black Scholes model, was included in the Telegate purchase price and was associated with the value of the customer relationship. The value of the warrant resulted in a non-cash charge to cost of goods sold to be amortized over the three- year term of the warrant. In the first quarter of 2001, the Company wrote-off the intangible assets relating to the purchase of Telegate (see Note 5). For the year ended December 2003 and 2002, the Company incurred no amortization expense related to the warrant. For the year ended December 31, 2001, the Company incurred approximately $2.9 million in amortization expense related to the warrant. The Telegate warrant expired in January 2003 unexercised.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24th per month, beginning January 31, 2001. The fair value of the warrant of approximately $0.7 million was calculated using the Black-Scholes method and was recorded as additional consideration relating to the purchase of TrueChat. As of December 31, 2003, the TrueChat warrant was exercisable for an aggregate of 200,000 shares of the Company's common stock. The TrueChat warrant expired unexercised in February 2004.

Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of preferred stock. The rights were distributed as a non-taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15% or more of the Company's common stock or announces a tender offer for 15% or more of the Company's common stock. If a person or group acquires 15% or more of the Company's common stock, all rights holders except the buyer will be entitled to acquire the Company's common stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15% of the Company's common stock.

78

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Common Stock Reserved

Common stock reserved for issuance is as follows:

|  | December 31, 2003 |
| --- | --- |
| Common stock options | 25,945,559 |
| Common stock warrants | 200,000 |
| Employee stock purchase plan | 2,400,152 |
|  | 28,545,711 |

Stock Option and Stock Purchase Plans

1995 Plan

    In March 1995, the Company's Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of the Company's common stock. As of December 31, 2003 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

    In March 1997, the Company's Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of the Company's common stock. In 1998, 2000 and 2003, the Company's Board of Directors amended the 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to a total of 15,516,702 shares as of December 31, 2003.

1998 Plan

    In June 1998, the Company's Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of the Company's common stock have been reserved for future issuance to non-employee directors of the Company. In 2002, the Company's Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2003, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

    The 1998 Plan provides for non-discretionary nonqualified stock options to be issued to non-employee directors of the Company automatically as of the effective date of their election to the Board of Directors and annually following each annual stockholder meeting. Prices for nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

1999 Plan

    In September 1999, the Company's Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of the Company's common stock have been reserved for future issuance to non-officer employees of the Company. The plan has been amended by the Board of Directors to increase the amount of authorized shares available to a total of 14,737,826 shares as of December 31, 2003.

79

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non-officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of the grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

During the years ended December 31, 2002 and 2001, the Company recorded aggregate deferred compensation of approximately $38,000 and $35,000, respectively, representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. During the year ended December 31, 2003, the Company did not record any additional deferred compensation. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be remeasured. For the years ended December 31, 2003, 2002, and 2001, the amortization expense was approximately $53,000, $0.5 million, and $0.5 million, respectively.

During 2002, the Company issued 20,000 nonqualified stock options of common stock to a member of its Board of Advisors who is also a director and Chief Executive Officer of one of its customers, and recorded $38,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued of $1.95 per share.

During 2002, the Company issued 200,000 shares of common stock to a consultant and recorded $290,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued of $1.45 per share.

In June 2001, the Company issued 160,000 shares of the Company's common stock to members of its Board of Advisors and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $3.72 per share.

During 2001, the Company issued 115,250 shares of common stock to its employees, and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $5.57 per share.

80

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

The following is a summary of additional information with respect to the 1995 Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, outstanding options assumed by the Company in conjunction with its business acquisitions and option grants made outside the plans (if any):

|  | Options Available for Grant | Options Outstanding Number of Shares | Weighted-Average Exercise Price |
|---|---|---|---|
| Balance at December 31, 2000 | 8,840,090 | 21,489,536 | $ 39.27 |
| Options authorized | 13,000,000 | -- | -- |
| Options granted | (22,925,565) | 22,925,565 | $ 6.25 |
| Options exercised | -- | (2,924,274) | $ 4.59 |
| Options canceled | 21,483,141 | (21,483,141) | $ 35.99 |
| Balance at December 31, 2001 | 20,397,666 | 20,007,686 | $ 9.75 |
| Options authorized | 3,400,000 | -- | -- |
| Options granted | (1,734,400) | 1,734,400 | $ 5.40 |
| Options exercised | -- | (257,521) | $ 3.95 |
| Options canceled | 6,849,540 | (6,849,540) | $ 12.66 |
| Balance at December 31, 2002 | 28,912,806 | 14,635,025 | $ 8.05 |
| Options authorized | 3,000,000 | -- | |
| Options reduced | (20,000,000) | -- | |
| Options granted | (7,153,320) | 7,153,320 | $ 3.05 |
| Options exercised | -- | (602,272) | $ 4.20 |
| Options canceled | 3,722,114 | (3,722,114) | $ 7.58 |
| Balance at December 31, 2003 | 8,481,600 | 17,463,959 | $ 6.20 |

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2003:

| Range of Exercise Prices | Options Outstanding Weighted Number Outstanding | Average Remaining Contractual Life | Weighted Average Exercise Price | Options Exercisable Exercisable Options | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.01 - $ 2.45 | 5,480,406 | 9.23 | $ 2.34 | 201,017 | $ 1.22 |
| $2.46 - $ 4.26 | 1,599,731 | 8.05 | $ 3.77 | 532,214 | $ 3.51 |
| $4.38 - $ 6.50 | 2,819,153 | 7.86 | $ 5.70 | 1,197,386 | $ 5.66 |
| $6.52 - $ 8.39 | 6,483,914 | 7.23 | $ 6.85 | 5,152,720 | $ 6.82 |
| $8.51 - $123.50 | 1,080,755 | 6.42 | $ 26.86 | 884,176 | $ 27.56 |
| Total | 17,463,959 | 7.98 | $ 6.20 | 7,967,513 | $ 8.58 |

At December 31, 2003, there were no shares of the Company's common stock subject to repurchase by the Company.

Employee Stock Purchase Plan

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (ESPP), which is designed to allow eligible employees of the Company to purchase shares of common stock at semi-annual intervals through periodic payroll deductions. In 2002, the ESPP was amended

81

--------------------------------------------------------------------------------

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

to add an additional 3,000,000 shares to the ESPP. An aggregate of 4,400,000 shares of common stock are reserved for the ESPP, and 1,999,848 shares have been issued through December 31, 2003. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that can be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the current offering period expires (no later than July 31, 2004).

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS No. 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS No. 123 and is calculated as if the Company had accounted for its employee stock options granted during the years ended December 31, 2003, 2002, and 2001 and for its ESPP shares to be issued under the fair value method of SFAS No. 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black-Scholes model using the following weighted average assumptions:

|  | Risk Free Interest Rate 2003 | Risk Free Interest Rate 2002 | Risk Free Interest Rate 2001 |
| --- | --- | --- | --- |
| Stock option plans | 2.67% | 4.22% | 4.50% |
| Employee stock purchase plan | 2.88% | 4.36% | 4.14% |

|  | Dividend Yield All Years | Volatility Factor 2003 | Volatility Factor 2002 | Volatility Factor 2001 |
| --- | --- | --- | --- | --- |
| Stock option plans | 0.0 | 0.87 | 1.50 | 1.50 |
| Employee stock purchase plan | 0.0 | 1.54 | 1.50 | 1.50 |

|  | Weighted Average Expected Life 2003 | Weighted Average Expected Life 2002 | Weighted Average Expected Life 2001 |
| --- | --- | --- | --- |
| Stock option plans | 5.0 | 5.0 | 5.0 |
| Employee stock purchase plan | 0.5 | 0.5 | 0.5 |

As discussed above, the valuation models used under SFAS No. 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS No. 123, was $2.14, $4.98, and $5.83, for options granted during 2003, 2002, and 2001, respectively. The weighted average grant date fair value of ESPP shares to be issued was $1.00, $2.25, and $3.99 for the years ended December 31, 2003, 2002 and 2001, respectively.

82

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

10. Income Taxes

For the years ended December 31, 2003, 2002 and 2001, the Company had an income tax expense of $0.3 million, $0.2 million, and an income tax benefit of $13.9 million, respectively.

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2003 | 2002 | 2001 |
|  | (In thousands) | | |
| Current: | | | |
| Federal | $ -- | $ -- | $ -- |
| State | -- | 20 | -- |
| Foreign | 316 | 218 | 831 |
| Total current | 316 | 238 | 831 |
| Deferred: | -- | -- | -- |
| Federal | -- | -- | -- |
| State | -- | -- | -- |
| Foreign | -- | -- | (14,746) |
| Total deferred | -- | -- | (14,746) |
| Total | $ 316 | $ 238 | $(13,915) |

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2003 | 2002 | 2001 |
| Tax benefit at U.S. statutory rate | $(17,624) | $(15,391) | $(197,346) |
| Goodwill amortization | -- | -- | 2,849 |
| Loss for which no tax benefit is currently recognizable | 17,536 | 15,391 | 179,338 |
| Other, net | 404 | 238 | 1,244 |
|  | $ 316 | $ 238 | $ (13,915) |

83

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2003 and 2002 are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 149,862 | $ 118,021 |
| Tax credit carryforwards | 19,505 | 14,936 |
| Reserves and accruals | 9,949 | 96,428 |
| Capitalized research and development | 8,761 | 4,372 |
| Intangibles amortization | 38,864 | 2,616 |
| Other, net | 12,130 | 8,430 |
| Gross deferred tax assets | 239,071 | 244,803 |
| Valuation allowance | (239,071) | (244,803) |
| Total deferred tax assets | $ -- | $ -- |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2003 and 2002. The change in the valuation allowance was a net decrease of $5.7 million and a net increase of approximately $26.4 million and $86.7 million for the years ended December 31, 2003, 2002, and 2001, respectively. Approximately $44.2 million of the valuation allowance will be credited to equity when realized.

As of December 31, 2003, the Company had federal, California and foreign net operating loss carryforwards of approximately $340.0 million, $129.0 million and $107.0 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $9.0 million and $16.0 million, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2004 through 2023, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carryforwards before full utilization.

11. Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2003, 2002, and 2001.

12. Segments of an Enterprise and Related Information

Since late 2000, the worldwide telecom and satellite industries have experienced severe downturns that have resulted in significantly reduced purchases of new broadband equipment. Because of this overall drop in demand, the Company has refocused its efforts on the cable industry, and has significantly reduced its investment in the telecom and satellite businesses. Consequently, beginning in 2003, the Company's previously

84

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

reported Telecom segment no longer meets the quantitative threshold for disclosure and the Company now operates as one business segment. Therefore, operating segment disclosure for the year ended December 31, 2003 is not provided.

Prior to December 31, 2002, the Company operated primarily in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). The Cable segment consisted primarily of TeraComm System, TJ line of DOCSIS cable modems, Bluewave line of DOCSIS CMTS, and the CherryPicker family of Digital Video Management Systems that are sold primarily to cable operators for the deployment of data, video and voice services over the existing cable infrastructure. The Telecom segment consisted primarily of MiniPlex DSL Systems, IPTL Converged Voice and Data Service System and Mainsail products, which are sold to providers of broadband services for the deployment of voice and data services over the existing copper wire infrastructure. The Company determined these reportable operating segments based upon how the businesses were managed and operated.

Information on reportable segments is as follows (in thousands):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Cable Broadband Access Segment: | | |
| Revenues: | | |
| TeraComm System | $ 68,753 | $ 192,757 |
| TJ DOCSIS cable modems | 23,059 | 25,069 |
| Video products | 20,833 | 16,363 |
| Other | 6,284 | 11,639 |
| Total Cable revenues | $ 118,929 | $ 245,828 |
| Depreciation expense | $ 10,347 | $ 12,028 |
| Operating loss | $ (78,731) | $(465,435) |
| Telecom Broadband Access Segment: | | |
| Revenues: | | |
| MiniPlex DSL Systems | $ 8,366 | $ 23,417 |
| Other | 2,108 | 10,236 |
| Total Telecom revenues | $ 10,474 | $ 33,653 |
| Depreciation expense | $ 1,225 | $ 3,700 |
| Operating loss | $ (10,852) | $(297,697) |
| Total revenues | $ 129,403 | $ 279,481 |
| Total depreciation expense | $ 11,572 | $ 15,728 |
| Operating loss: | | |
| Operating loss by reportable segments | $ (89,583) | $(763,132) |
| Unallocated amounts: | | |
| Interest and other income (expense), net | (3,481) | 44 |
| Gain on early retirement of debt | 49,089 | 185,327 |
| Income tax (expense) benefit | (238) | 13,915 |
| Net loss | $ (44,213) | $(563,846) |

85

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
| Geographic areas: | | | |
| Revenues: | | | |
| United States | $ 74,341 | $ 41,150 | $ 50,291 |
| Canada | 3,145 | 17,247 | 113,300 |
| Europe | 17,635 | 11,381 | 34,952 |
| Israel | 7,038 | 8,283 | 16,528 |
| Japan | 21,183 | 36,214 | 37,721 |
| Asia, excluding Japan | 9,575 | 11,845 | 24,094 |
| South America | 568 | 3,283 | 2,595 |
| Total | $133,485 | $129,403 | $279,481 |

|  | December 31, 2002 |
|---|---|
| Assets: | |
| Cable Broadband Access Segment | $ 217,531 |
| Telecom Broadband Access Segment | 58,179 |
| Total assets | $ 275,710 |

|  | December 31, 2003 | December 31, 2002 |
|---|---|---|
| Long-lived assets: | | |
| United States | $ 19,630 | $ 28,169 |
| Canada | 810 | 787 |
| Europe | 175 | 170 |
| Israel | 3,104 | 3,442 |
| Asia | 173 | 207 |
| South America | -- | 118 |
| Total long-lived assets | 23,892 | 32,893 |
| Total current assets | 191,348 | 242,817 |
| Total assets | $ 215,240 | $ 275,710 |

Three customers, Adelphia, Cross Beam Networks, a subsidiary of Sumitomo, and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2003 (22%, 16%, and 13%). One customer, related to the Cable segment, Cross Beam Networks, accounted for more than 10% of total revenues for the year ended December 31, 2002 (28%). Two customers, Shaw and Cross Beam Networks, both related to the Cable segment, accounted for 10% or more of total revenues (33% and 13%) for the year ended December 31, 2001. Two customers accounted for 10% or more of total accounts receivable for the year ended December 31, 2003 (24% and 20%). One customer, related to the Cable segment, accounted for 10% or more of total accounts receivable for the year ended December 31, 2002 (24%).

86

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

13. Related Party Transactions

During the years ended December 31, 2003, 2002 and 2001, the Company recognized revenue of $4.7 million, $9.1 million, and $52.4 million, respectively in connection with product shipments made to related parties. Prior to the third quarter of 2001, both Shaw and Rogers, each of which had one representative on the Company's Board of Directors were significant stockholders and were related parties. Beginning in the third quarter of 2001, Shaw was no longer a significant stockholder because Shaw no longer exercised voting rights over its shares in the Company, and the board member from Shaw resigned. Accordingly, Shaw was no longer considered a related party. Revenues from Shaw have not been included as revenues from related parties after the second quarter of 2001, when Shaw ceased to be a related party. In 2001, the Company recognized $31.4 million of related party revenues in connection with product shipments to Shaw, net of amortization of co-marketing expense.

Alek Krstajic, a member of the Company's Board of Directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Beginning April 1, 2003, the Company no longer recognized revenues related to Rogers as related party revenues as Rogers was no longer considered to be a related party. For the year ended 2003, 2002 and 2001, the Company recognized $1.5 million, $8.0 million, and $21.0 million, respectively of related party revenues in connection with product shipments to Rogers, net of amortization of co-marketing expense.

Lewis Solomon, a member of the Company's Board of Directors and Chairman of the Company's Audit Committee is also a member of the Board of Directors of Harmonic, Inc. (Harmonic) a manufacturer and seller of broadband products. In April 2002, the Company entered into a reseller agreement with Harmonic to sell certain of the Company's products. The agreement appoints Harmonic as an authorized, non-exclusive reseller of certain of the Company's video products. For the years ended December 31, 2003 and 2002, revenues from Harmonic of $3.2 million and $1.1 million, respectively were included as revenues from related parties.

Cost of related party product revenues in the Company's consolidated statements of operations consists of direct and indirect product costs. Accounts receivable from Rogers and Harmonic totaled approximately $0.6 million and $0.8 million at December 31, 2003 and 2002, respectively. None of the related parties is a supplier to the Company.

In December 2001, the Company entered into co-marketing arrangements with Shaw and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. The Company entered into these arrangements with Shaw and Rogers to promote the Company's brand and identify its products In July 2002, the Company began amortizing these prepaid assets and charging them against Cable revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." The Company charged $1.4 million of amortization of these assets against revenues in each quarter beginning in the third quarter of 2002 through the fourth quarter of 2003. Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively. Of the co-marketing amortization charged to total revenue, approximately $0.15 million and $0.3 million were charged to related party revenues in the year ended 2003 and 2002, respectively.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Aleksander Krstajic is the founder and President of Team Honor.

14. Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts that are based on the best available information -- mostly historical

87

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

claims experience -- claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties is as follows (in thousands):

|  | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Write-Offs | Balance at End of Period |
|---|---|---|---|---|
| Year ended December 31, 2001 |  |  |  |  |
| Warranty reserve | $ 5,925 | 7,956 | (5,513) | $ 8,368 |
| Year ended December 31, 2002 |  |  |  |  |
| Warranty reserve | $ 8,368 | 2,730 | (2,491) | $ 8,607 |
| Year ended December 31, 2003 |  |  |  |  |
| Warranty reserve | $ 8,607 | 2,287 | (5,385) | $ 5,509 |

Guarantees, Including Indirect Guarantees of Indebtedness of Others

In addition to product warranties, the Company, from time to time, in the normal course of business, indemnifies other parties with whom it enters into contractual relationships, including customers, lessors, and parties to other transactions with the Company, with respect to certain matters. The Company has agreed to hold the other party harmless against specified losses, such as those arising from a breach of representations or covenants, third party claims that the Terayon's products when used for their intended purpose(s) infringe the intellectual property rights of such third party or other claims made against certain parties. It is not possible to determine the maximum potential amount of liability under these indemnification obligations due to the limited history of prior indemnification claims and the unique facts and circumstances that are likely to be involved in each particular claim. Historically, payments made by the Company under these obligations were not material and no liabilities have been recorded for these obligations on the balance sheets as of December 31, 2003 or 2002.

15. Sale of Certain Assets

In July 2003, the Company entered into an agreement with Verilink Corporation (Verilink) to sell certain assets to Verilink for up to a maximum of $0.9 million. The Company received $0.45 million in July 2003 and will receive additional payments totaling up to $0.45 million through December 31, 2004. The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in February 2000. Additionally, Verilink agreed to purchase at least $2.1 million of related inventory from the Company on or before December 31, 2004. As of December 31, 2003, Verilink had purchased $0.7 million of this inventory.

As part of this agreement, Verilink agreed to assume all warranty obligations related to ANE products sold prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of certain warranty obligations for ANE products sold prior to July 2003. Further, Verilink assumed the obligation for one of the Company's operating leases, previously accrued as restructuring, resulting in a recovery of restructuring charges of $0.3 million in 2003.

16. Subsequent Events (Unaudited)

In the first quarter of 2004, the Company initiated a worldwide reduction in force of approximately 70 employees, or 17% of the workforce, consolidation of certain facilities, and reduction or elimination of certain discretionary costs and programs. In connection with this restructuring, the Company will seek to sublease approximately 56,400 square feet of its Santa Clara, California facility. The Company expects to record total charges in the range of approximately $5.0 million to $7.0 million associated with this realignment in the quarter ending March 31, 2004.

88

--------------------------------------------------------------------------------

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (Continued)

On February 23, 2004, the United States District Court, Northern District of California, issued an order disqualifying two of the lead plaintiffs in the class action lawsuits against the Company. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery.

17. Unaudited Quarterly Financial Data

Summarized quarterly financial data for 2003 and 2002 is as follows (in thousands, except per share data):

| 2003 | Quarter | | | |
| | First | Second | Third | Fourth |
| --- | --- | --- | --- | --- |
| Total revenues | $ 22,268 | $ 30,599 | $37,628 | $42,990 |
| Gross profit (loss) | 2,675 | 6,863 | 10,194 | 12,719 |
| Restructuring costs (recovery) and asset write-offs(1) | (3,162) | 115 | 244 | -- |
| Net loss | (23,989) | (13,139) | (7,210) | (6,015) |
| Basic and diluted net loss per share | $ (0.33) | $ (0.18) | $ (0.10) | $ (0.08) |

| 2002 | Quarter | | | |
| | First | Second | Third | Fourth |
| --- | --- | --- | --- | --- |
| Total revenues | $57,218 | $22,407 | $ 24,475 | $ 25,303 |
| Gross profit (loss) | 25,491 | (27) | 296 | 2,694 |
| Restructuring costs and asset write-offs(1) | -- | (3,972) | (4,950) | -- |
| Net loss(2) | (4,090) | (3,685) | (15,972) | (20,466) |
| Basic and diluted net loss per share | $ (0.06) | $ (0.05) | $ (0.22) | $ (0.28) |

Earnings per share are computed independently for each of the quarters presented. The sum of the quarterly earnings per share in 2003 and 2002 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

--------------

(1) See Note 5 for an explanation for restructuring and asset write-offs.
(2) See Note 7 for an explanation of the gains on repurchase of subordinated Convertible Notes in the second quarter ($33,276) and third quarter ($15,813).

89

--------------------------------------------------------------------------------

Table of Contents

Item 9.  Changes in and Disagreements with Accountants on Accounting and Financial
         Disclosures

         Not applicable.


Item 9A. Controls and Procedures

         As of the end of the period covered by this Annual Report on Form 10-K,
the Company carried out an evaluation, under the supervision and with the
participation of the Company's Disclosure Committee and the Company's
management, including the Chief Executive Officer and the Chief Financial
Officer, of the effectiveness of the design and operation of the Company's
disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and
15d-15(b); and whether any change has occurred in the Company's internal control
over financial reporting pursuant to Exchange Act Rules 13a-15(d) and 15d-15(d).
Based upon that evaluation, the Chief Executive Officer and the Chief Financial
Officer concluded that the Company's disclosure controls and procedures are
effective in timely alerting them to material information relating to the
Company (including its consolidated subsidiaries) required to be included in the
Company's periodic Securities and Exchange Commission filings; and that no
change in the Company's internal control over financial reporting occurred
during the Company's most recent fiscal quarter that materially affected, or is
reasonably likely to materially affect, the Company's internal control over
financial reporting.

                                  PART III

Item 10. Directors and Officers of the Registrant

         Certain information regarding our executive officers as of March 15, 2004,
is set forth below.

|             Name            | Age | Position                                                     |
|-----------------------------|-----|--------------------------------------------------------------|
| Zaki Rakib(4)               | 45  | Chief Executive Officer, Secretary and Director              |
| Shlomo Rakib                | 47  | Chairman of the Board, President, Chief Technical Officer and Director |
| Arthur T. Taylor            | 47  | Chief Financial Officer                                      |
| Douglas Sabella             | 46  | Chief Operating Officer                                      |
| Edward Lopez                | 44  | Senior Vice President, General Counsel and Human Resources   |
| Alek Krstajic(2)            | 40  | Director                                                     |
| Mark Slaven(1)(2)(3)        | 47  | Director                                                     |
| Lewis Solomon(1)(3)         | 70  | Director                                                     |
| David Woodrow(1)(2)(3)      | 57  | Director                                                     |

                         --------------


(1) Member of Audit Committee
(2) Member of Compensation Committee
(3) Member of the Nominating Committee
(4) Member of the Non-Officer Option Committee

         The Board of Directors (Board) is divided into three classes, each having
a three-year term. Mr. Slaven and Dr. Zaki Rakib are Class III directors, whose
terms expire in 2004. Mr. Krstajic and Mr. Solomon are Class I directors, whose
terms expire in 2005. Mr. Woodrow and Mr. Shlomo Rakib are Class II directors,
whose terms expire in 2006.

         Zaki Rakib co-founded Terayon Communication Systems, Inc. (Company) and
has served as Chief Executive Officer, Secretary and as a director of the Board
since January 1993. From January 1993 to July 1998, Dr. Rakib also served as our
Chief Financial Officer. Prior to co-founding the Company, Dr. Rakib served as
Director of Engineering for Cadence Design Systems, an electronic design
automation software company, from 1990 to 1994. Prior to joining Cadence, Dr.
Rakib was Vice President of Engineering at Helios

                                     90

--------------------------------------------------------------------------------

Table of Contents

Software, which was acquired by Cadence in 1990. Dr. Rakib is a director of a privately held company. Dr. Rakib holds B.S., M.S. and Ph.D. degrees in engineering from Ben-Gurion University in Israel. Dr. Rakib is the brother of Shlomo Rakib, the Company's Chairman of the Board, President and Chief Technical Officer and a director on the Board.

Shlomo Rakib co-founded the Company in 1993 and has served as Chairman of the Board and President since January 1993 and as Chief Technical Officer since February 1995. Prior to co-founding the Company, Mr. Rakib served as Chief Engineer at PhaseCom, Inc. a communications products company, from 1981 to 1993, where he pioneered the development of data and telephony applications over cable. Mr. Rakib is the inventor of several patented technologies in the area of data and telephony applications over cable. Mr. Rakib is a director of a privately held company. Mr. Rakib holds a B.S.E.E. degree from Technion University in Israel. Mr. Rakib is the brother of Zaki Rakib, the Company's Chief Executive Officer, Secretary and a director on the Board.

Arthur T. Taylor joined the Company in February 2003 as Senior Vice President and Chief Financial Officer. Prior to joining the Company, Mr. Taylor served as Vice President, Chief Financial Officer and Secretary of Evolve Software, Inc., an enterprise software company, from July 2002 until February 2003. From March 2001 to July 2002, Mr. Taylor was Vice President and Chief Financial Officer for Docent, Inc., an eLearning enterprise software company. From August 1998 to March 2001, Mr. Taylor was Vice President and Corporate Treasurer for 3Com Corporation, a high technology networking company. From June 1997 to July 1998, Mr. Taylor was Chief Financial Officer, Treasurer, and Vice President, Finance for ReSound Corporation, a hearing health care company. Prior to that Mr. Taylor held several senior financial management positions at Allergan, Inc., an eye and skin care pharmaceutical and medical device company. Mr. Taylor received a Bachelor of Science in Business Administration from San Diego State University and an MBA from the University of Southern California. Mr. Taylor is also a Certified Management Accountant.

Douglas Sabella, joined the Company in July 2003 as the Chief Operating Officer. Prior to joining the Company, Mr. Sabella was the President and Chief Operating Officer of Tumbleweed Communications Corporation, a provider of secure internet communications software products, from March 2001 to May 2003. From February 2000 to March 2001, Mr. Sabella was the President and Chief Executive Officer of Bidcom (now Citadon, Inc.), an application service provider for the construction industry. From 1997 to February 2000, Mr. Sabella was the President of the Communications Application group at Lucent Technologies, an equipment provider. From February 1984 to March 2000, Mr. Sabella spent more than fifteen years in executive management at Lucent Technologies, with the last position being the President of the communications application group. Mr. Sabella holds a B.A. in Accounting and Economics from Hofstra University.

Edward Lopez, joined the Company in October 1999 as the Company's Vice President General Counsel and Human Resources. Prior to joining the Company, Mr. Lopez was Vice President, Business Development, General Counsel and Secretary of ReSound Corporation, a technology leader in the hearing device industry. From 1993 to 1998, Mr. Lopez served as Senior Corporate Counsel and Assistant Secretary of Nellcor Puritan Bennett, a medical device company, and prior to that was associated with Morrison & Foerster, an international law firm headquartered in San Francisco, California. Mr. Lopez earned his law degree from the Harvard Law School and holds a B.A. in economics from Columbia University.

Alek Krstajic has served as a director of the Company since July 1999. Since July 2003, Mr. Krstajic has been the Chief Marketing Officer at Bell Canada, a telecommunications company. Mr. Krstajic held a variety of senior management positions at Rogers Communications, Inc., most recently as Senior Vice President, Sales and Marketing, from 1994 through January of 2003. Mr. Krstajic is a director of Ontario Energy Savings Corporation and several privately held companies. Mr. Krstajic holds a B.A. degree in economics from the University of Toronto in Canada and attended the executive educational program at Wharton School of Business at the University of Pennsylvania.

Mark Slaven has served as a director of the Company since July 2003. Since March 2003, Mr. Slaven has been the Executive Vice President, Finance, and Chief Financial Officer of 3Com Corporation ("3Com"), a provider of networking products, services and solutions for enterprises. Mr. Slaven was 3Com's Senior Vice President, Finance, and Chief Financial Officer from June 2002 to March 2003 and prior to that the Vice

--------------------------------------------------------------------------------

Table of Contents

President of Treasury, Tax, Trade and Investor Relations and Vice President and Treasurer from August 2000 to June 2002. Prior to that, Mr. Slaven was Vice President of Finance for Supply Chain Operations since joining the company through 3Com's acquisition of U.S. Robotics in June 1997, where he was Vice President of Finance for U.S. Robotics' manufacturing division. Before joining U.S. Robotics, Mr. Slaven was Chief Financial Officer of the personal printer division at Lexmark International Inc. Mr. Slaven holds a B.S. degree from Tufts University and holds an M.B.A. from The University of Chicago.

Lewis Solomon has served as a director of the Company since March 1995. Mr. Solomon has been a principal of G&L Investments, a consulting firm, since 1989 and currently serves as Chief Executive Officer of Broadband Services, Inc. From 1983 to 1988, he served as Executive Vice President at Alan Patricof Associates, a venture capital firm focused on high technology, biotechnology and communications industries. Prior to that, Mr. Solomon served in various capacities with General Instrument Corporation, most recently as Senior Vice President. From April 1986 to January 1997, he served as Chairman of the Board of Cybernetic Services, Inc., a LED systems manufacturer, which commenced a Chapter 7 bankruptcy proceeding in April 1997. Mr. Solomon serves on the boards of Anadigics, Inc., a manufacturer of integrated circuits, Harmonic, Inc., a company that designs, manufacturers and markets digital and fiberoptic systems, and Artesyn Technologies, Inc., a power supply and power converter supply company. Mr. Solomon also serves on the boards of several privately held companies. Mr. Solomon holds a B.S. degree in Physics from St. Joseph's College.

David Woodrow has served as a director of the Company since June 2002. From September 2000 until March 2002, Mr. Woodrow served as the Chief Executive Officer and President of Qwest Digital Media LLC, a production and digital media management company. From 1982 until his retirement in September 2000, Mr. Woodrow held a number of senior management positions, most recently the Executive Vice President, Broadband Services, with Cox Communications, Inc., a major cable operator in the United States. Mr. Woodrow is a director of several privately held companies. Mr. Woodrow holds a B.S. and M.S. degree in mechanical engineering from Purdue University and a M.B.A. from the University of Connecticut.

Audit Committee and Financial Expert

The Audit Committee is responsible for reviewing the financial information, which will be provided to stockholders and others, the systems of internal controls, which management and the Board of Directors have established, the performance and selection of independent auditors, and the Company's audit and financial reporting processes. The Audit Committee consists of Mark Slaven, Lewis Solomon and David Woodrow. The Board of Directors has determined that Mr. Slaven is an "audit committee financial expert" as defined in Item 401(h) of Regulation S-K. Mr. Slaven and each of the other members of the Audit Committee is an "independent director" as defined in Rule 4200 of the Marketplace Rules of the National Association of Securities Dealers, Inc. and section 10A of the Exchange Act and is financially literate and have the requisite financial sophistication as required by the Nasdaq rules applicable to issuers listed on the Nasdaq National Market.

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires the Company's directors and executive officers, as well as persons who own more than ten percent of a registered class of the Company's equity securities, to file with the SEC initial reports of ownership and report of changes in ownership of common stock and other equity securities of the Company. Officers, directors and greater than ten percent stockholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

To the Company's knowledge, based solely on review of the copies of such reports furnished to us and written representations that no other reports were required, during the year ended December 31, 2003, all Section 16(a) filing requirements applicable to our directors, officers and greater than ten percent beneficial owners were complied with and filed on a timely basis.

92

--------------------------------------------------------------------------------

Table of Contents

Code of Ethics

The Company has a Code of Business Conduct, which is applicable to all employees, including the controller, executive officers, including the chief executive officer, and the chief financial officer, and members of the Board of Directors. The Code of Business Conduct is available on the Company's Investor Relations website (www.terayon.com/investor). The Code of Business Conduct satisfies the requirements under the Sarbanes-Oxley Act of 2002, as well as Nasdaq rules applicable to issuers listed on the Nasdaq National Market. The Code of Business Conduct, among other things, addresses issues relating to conflicts of interests, including internal reporting of violations and disclosures, and compliance with applicable laws, rules and regulations. The purpose of the code is to deter wrongdoing and to promote, among other things, honest and ethical conduct and to ensure to the greatest possible extent that our business is conducted in a legal and ethical manner. The Company intends to post amendments to or waivers from the Code of Business Conduct (to the extent applicable to the Company's executive officers and members of the Board of Directors) at this location on its website. The audit committee has also established procedures for (a) the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters.

Item 11.Executive Compensation

Summary of Compensation

The following table shows for the fiscal years ended December 31, 2003, 2002 and 2001, compensation awarded or paid to, or earned by, the Company's Chief Executive Officer and its other four most highly compensated executive officers at December 31, 2003 (Named Executive Officers). There were no other Named Executive Officers of the Company during 2003.

Summary Compensation Table

| | | Annual Compensation | | | Long-Term Compensation | | | |
| | | | | | Awards | | Payouts | |
| Name and Principal Position | Year | Salary ($) | Bonus ($)(9) | Other Annual Compensation ($) | Restricted Stock Awards ($) | Securities Underlying Options/ SARs (#)(10) | LTIP Payouts ($) | All Other Compensation ($) |
|---|---|---|---|---|---|---|---|---|
| Dr. Zaki Rakib | 2003 | 450,000 | -- | -- | -- | 500,000 | -- | 99,484(1)(3) |
| Chief Executive | 2002 | 450,000 | -- | -- | -- | -- | -- | 25,500(1)(4) |
| Officer and Secretary | 2001 | 450,000 | -- | -- | 44,374 | 800,000 | -- | 136,630(1)(2)(5) |
| Mr. Shlomo Rakib | 2003 | 450,000 | -- | -- | -- | 500,000 | -- | 450(3) |
| Chairman of the | 2002 | 450,000 | -- | -- | -- | -- | -- | 450(4) |
| Board and President | 2001 | 450,000 | -- | -- | 44,374 | 800,000 | -- | 95,324(2)(5) |
| Mr. Arthur Taylor(6) | 2003 | 213,542 | -- | -- | -- | 450,000 | -- | 394(3) |
| Senior Vice President and Chief Financial Officer | | | | | | | | |
| Mr. Douglas Sabella(7) | 2003 | 139,808 | -- | -- | -- | 500,000 | -- | 223(3) |
| Chief Operating Officer | | | | | | | | |
| Mr. Edward Lopez(8) | 2003 | 230,000 | -- | -- | -- | 250,000 | -- | 300(3) |
| Vice President, | 2002 | 230,000 | -- | -- | -- | -- | -- | 300(4) |
| General Counsel and | 2001 | 230,000 | -- | -- | 233,459 | 315,000 | -- | 313(5) |
| Human Resources | | | | | | | | |

--------------

(1)Includes $30,000, $25,200 and $24,700 of compensation paid by the Company on behalf of Dr. Rakib for an apartment in Israel in 2003, 2002 and 2001, respectively. In 2003, Dr. Rakib incurred $69,034 of incremental cost of personal usage of a corporate aircraft calculated in accordance with Internal Revenue Service guidelines. The amount of $69,034 was attributed to Dr. Rakib as compensation and included in "All Other Compensation" in 2003. In 2002, Dr. Rakib paid $35,000 to reimburse the Company for his cost related to personal usage of a corporate aircraft calculated in accordance with

93

--------------------------------------------------------------------------------

Table of Contents

Internal Revenue Service guidelines. The amount of $35,000 was not included in "All Other Compensation" in 2002, and may not be sufficient to cover all of the costs associated with his personal usage of the corporate aircraft in 2002.

(2) Includes $111,630 of accrued and unused vacation paid to Dr. Rakib in 2001 and $95,024 for accrued and unused vacation paid out to Mr. Rakib in 2001.

(3) Includes $450, $450, $394, $223 and $300 contributed by the Company for premiums under a group term life insurance policy on behalf of Dr. Rakib, Mr. Rakib, Mr. Taylor, Dr. Sabella, and Mr. Lopez, respectively, in 2003.

(4) Includes $300, $450, and $300 contributed by the Company for premiums under a group term life insurance policy on behalf of Dr. Rakib, Mr. Rakib, and Mr. Lopez, respectively, in 2002.

(5) Includes $300, $300, and $313 contributed by the Company for premiums under a group term life insurance policy on behalf of Dr. Rakib, Mr. Rakib, and Mr. Lopez, respectively, in 2001.

(6) Mr. Taylor joined the Company as Chief Financial Officer on February 24, 2003. On an annualized basis, Mr. Taylor's salary is $250,000.

(7) Mr. Sabella joined the Company as Chief Operating Officer on July 14, 2003. On an annualized basis, Mr. Sabella's salary is $300,000.

(8) Mr. Lopez became a Named Executive Officer of the Company on July 15, 2003.

(9) In 2003, Dr. Rakib and Mr. Rakib each accrued $216,563 of bonus related the Company's Executive Compensation Plan, which would have been paid in 2004. Dr. Rakib and Mr. Rakib voluntarily waived their right to receive their bonuses and consequently did not receive any payout under the Company's Executive Compensation Plan. In 2003, Mr. Taylor, Mr. Sabella, and Mr. Lopez accrued $111,429, $67,282, $110,688, respectively, of bonuses related the Company's Executive Compensation Plan, which were earned in 2003 but paid in 2004.

(10) On February 14, 2001, Dr. Rakib, Mr. Rakib, and Mr. Lopez each received a stock option grant for 800,000, 800,000 and 340,000 shares, respectively, of common stock at a price per share of $6.81. In November 2001, the Company's Board of Directors approved a stock option exchange offer, which permitted employees and members of the Board of Directors to exchange all stock options with an exercise price per share equal to or greater than $9.00 for a common stock award. Dr. Rakib, Mr. Rakib and Mr. Lopez participated in the Company's stock option exchange offer. On December 5, 2001, Dr. Rakib and Mr. Rakib each cancelled stock option grants for 800,000 shares of common stock at a price per share of $81.38. On December 5, 2001, Mr. Lopez cancelled stock option grants for 296,160, 20,000, and 23,840 shares of common stock at a price per share of $20.97, $31.41, $20.97, respectively. On December 6, 2001, Dr. Rakib, Mr. Rakib and Mr. Lopez received 3,136, 3,136, and 12,937 shares, respectively, of common stock in connection with the stock option exchange offer and those shares of common stock had a value of $44,374, $44,374, and $183,059, respectively, on that date.

The Company grants options to its executive officers under its 1997 Equity Incentive Plan, as amended, (1997 Plan) and options to its non-officer and non-director employees and consultants of the Company and Company officers under its 1999 Non-Officer Equity Incentive Plan (1999 Plan). As of December 31, 2003, options to purchase a total 7,794,701 shares and 9,099,202 shares were outstanding under the 1997 Plan and the 1999 Plan, respectively, and 4,513,436 shares and 3,112,391 shares remained available for grant under the 1997 Plan and the 1999 Plan, respectively.

94

--------------------------------------------------------------------------------

Table of Contents

The following tables show for the fiscal year ended December 31, 2003, certain information regarding options granted to, exercised by, and held at year-end by, the Named Executive Officers:

Option/ SAR Grants in Last Fiscal Year

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term | | Alternative to Grant Date Value |
| Name | Number of Securities Under-lying Options/ SARs Granted(#) | % of Total Options/ SARs Granted to Employees in Fiscal Year | Exercise or Base Price ($/Sh) | Expiration Date | 5%($) | 10%($) | Grant Date Present Value($) |
|------|------|------|------|------|------|------|------|
| Dr. Rakib | 500,000 | 7.21% | $ 2.45 | 05/28/2013 | $ 770,396 | $ 1,952,335 | $ 844,750 |
| Mr. Rakib | 500,000 | 7.21% | $ 2.45 | 05/28/2013 | $ 770,396 | $ 1,952,335 | $ 844,750 |
| Mr. Taylor | 325,000 | 4.69% | $ 2.04 | 02/24/2013 | $ 416,957 | $ 1,056,651 | $ 398,385 |
| Mr. Taylor | 125,000 | 1.80% | $ 2.45 | 05/28/2013 | $ 192,599 | $ 488,084 | $ 211,188 |
| Mr. Sabella | 500,000 | 7.21% | $ 4.26 | 07/15/2013 | $ 1,339,546 | $ 3,394,671 | $1,652,350 |
| Mr. Lopez | 250,000 | 3.61% | $ 2.45 | 05/28/2013 | $ 385,198 | $ 976,167 | $ 422,375 |

Aggregated Option/ SAR Exercises in Last Fiscal Year, and FY-End Option/ SAR Values

| Name | Shares Acquired on Exercise(#) | Value Realized($) | Number of Securities Underlying Unexercised Options/SARs at FY-End(#) Exercisable/ Unexercisable | Value of Unexercised In-the-Money Options/SARs at FY-End($) Exercisable/ Unexercisable |
|------|------|------|------|------|
| Dr. Rakib | -- | -- | 733,333/566,667 | --/-- |
| Mr. Rakib | -- | -- | 733,333/566,667 | --/-- |
| Mr. Taylor | -- | -- | --/450,000 | --/3,250 |
| Mr. Sabella | -- | -- | --/500,000 | --/-- |
| Mr. Lopez | -- | -- | 261,249/303,751 | --/-- |

COMPENSATION OF DIRECTORS

In October 2002, the Company adopted a compensation plan for non-employee board members whereby each non-employee director receives a monthly retainer of $2,000 and $1,000 per board or committee meeting attended. Committee chairs receive an additional $500 per committee meeting attended. In fiscal 2003, Mr. Krstajic received a total of $38,000, Mr. Slaven a total of $15,000, Mr. Solomon a total of $46,500 and Mr. Woodrow a total of $46,000 for their Board service. One of the Company's former Board members, Christopher Schaepe who resigned from the Company's board September 26, 2003, received $38,000 for his board service in 2003. The members of the board are eligible for reimbursement for their expenses incurred in connection with attendance at board and committee meetings in accordance with Company policy. Mr. Krstajic also received compensation of $30,000 in March of 2004 for consulting services that he provided to the Company in 2003.

Each non-employee director of the Company also receives stock option grants under the 1998 Non-Employee Directors' Stock Option Plan (Directors' Plan). Only non-employee directors, which are currently Messrs. Krstajic, Slaven, Solomon and Woodrow, are eligible to receive non-qualified stock options under the Directors' Plan. The Directors' Plan is administered by the board, unless the board delegates the administration of the Directors' Plan to a committee comprised of Board members.

The aggregate number of shares of common stock of the Company that may be issued pursuant to options granted under the Directors' Plan is 800,000 shares. Option grants under the Directors' Plan are non-discretionary. Pursuant to the Directors' Plan, non-employee directors automatically receive (i) an option to

--------------------------------------------------------------------------------

Table of Contents

purchase 60,000 shares of common stock on the date of his or her initial election or appointment to be a non-employee director and (ii) an option to purchase 25,000 shares of common stock on the date of each annual meeting of stockholders, which amount shall be prorated for the 12-month period prior to the annual meeting of stockholders if the non-employee director has not continuously served as an non-employee director during such period. In addition, each non-employee director who is then serving as a member of a committee automatically receives an option to purchase 6,000 shares of common stock for each such committee on the date of each annual meeting of stockholders, which amount shall be prorated for the 12 month period prior to the annual meeting of stockholders if the non-employee director has not continuously served as an committee member during such 12-month period. No other options may be granted at any time under the Directors' Plan. The exercise price of the options granted under the Directors' Plan will be equal to the fair market value of the common stock on the date of grant. Options granted under the Directors' Plan vest and become exercisable as to 33% of the shares on the first anniversary of the date of grant and 1/36th of the shares monthly thereafter. An optionee whose service relationship with the Company or any affiliate (whether as a non-employee director or subsequently as an employee, director or consultant of either the Company or an affiliate) ceases for any reason may exercise vested options for the term provided in the option agreement (three months generally, 12 months in the event of disability and 18 months in the event of death). Options granted under the Directors' Plan generally are non-transferable, however, an optionee may designate a beneficiary who may exercise the option following the optionee's death. In the event of certain changes in control of the Company, all outstanding awards under the Directors' Plan either will be assumed or substituted for by the surviving entity. If the surviving entity determines not to assume or substitute for such awards, the vesting and time during which such options may be exercised shall be accelerated prior to such event and the options will terminate if not exercised after such acceleration and at or prior to such event. The term of options granted under the Directors' Plan is 10 years. Unless terminated sooner by the board, the Directors' Plan will terminate in June 2008.

During fiscal 2003, the Company granted 211,527 stock options from the Directors' Plan to non-employee directors of the Company. These options were granted at an average exercise price of $2.95 per share to Messrs. Krstajic, Slaven, Solomon, Woodrow, and Schaepe. The exercise price was the respective fair market value of the common stock on the date of grant. As of February 29, 2004, 24,591 options had been exercised under the Directors' Plan. Directors who are employees of the Company do not receive separate compensation for their services as directors.

EMPLOYMENT CONTRACTS, TERMINATION OF EMPLOYMENT
AND CHANGE OF CONTROL AGREEMENTS

Dr. Rakib has an employment agreement with the Company, which establishes him as the Chief Executive Officer of the Company. Dr. Rakib's employment agreement does not provide for any specified compensation arrangement. In October 1999, the Company entered into an employment agreement with Mr. Lopez, which established Mr. Lopez as the Company's General Counsel beginning in October 1999 with his original salary set at $195,000 per year, and granted him an option to purchase 160,000 shares of the Company's common stock. In January 2003, the Company entered into an employment agreement with Arthur Taylor, which established Mr. Taylor as the Company's Chief Financial Officer beginning in February 2003 with a base salary of $250,000, and granted Mr. Taylor a stock option to purchase 325,000 shares of the Company's common stock. In July 2003, the Company entered into an employment agreement with Douglas Sabella, which established Mr. Sabella as the Company's Chief Operating Officer beginning in July 2003 with a base salary of $300,000, and granted Mr. Sabella a stock option agreement for 500,000 shares of the Company's common stock. The employment agreement between the Company and Mr. Sabella also provides for the payment of twelve months of base salary and continuation of benefits if Mr. Sabella is terminated by the Company without "cause," which is defined to include the commission of a crime against the Company, the conviction of a crime involving moral turpitude, willful failure to perform job duties as determined by the Board of Directors and misconduct that is materially injurious to the Company. There are no employment agreements with any of the Company's other executive officers, and other than Mr. Sabella's there are no

96

--------------------------------------------------------------------------------

Table of Contents

employment agreements that contain severance or change of control provisions for any of the Company's executive officers.

In January 2004, the Company entered into change of control agreements entitled Severance Agreement with each of its executive officers, Dr. Rakib and Messrs. Lopez, Rakib, Sabella and Taylor. The change of control agreements provide for the payment of severance and acceleration of stock option upon the termination of employment other than for "cause" or with "good reason" within twelve months of a "change of control," which is defined as an acquisition of more than 50% of the Company's outstanding voting securities, a stockholder approved merger, consolidation or reorganization of more than 51% of the Company's outstanding voting securities, a stockholder approved liquidation or dissolution of the Company or the agreement for the sale or dissolution of all or substantially all of the assets of the Company to a third party. Upon such termination, Dr. Rakib and Mr. Rakib will each receive a payment equal to 150% of his base and target incentive compensation and 100% vesting of unvested stock options and Messrs. Lopez, Sabella and Taylor will each receive a payment equal to 100% of his base and target incentive compensation and 100% vesting of unvested stock options. "Cause" is defined as fraud, misappropriation, embezzlement or willful engagement in misconduct that is demonstrably and materially injurious to the Company and its subsidiaries taken as a whole. "Good reason" is defined as a change in job duties, status, position, responsibilities or salary, a failure to pay compensation, material change in a benefit plan, breach of the Severance Agreement, insolvency, relocation that is more than 60 miles from Santa Clara, California or Company's termination attempts that do not comply with the Severance Agreement.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

In the fiscal year ended December 31, 2003, the Compensation Committee consisted of Messrs. Krstajic, Slaven and Woodrow and met three times. In February 2003, the Board of Directors reconstituted the Compensation Committee, which prior to that time had consisted of Dr. Rakib, the Company's Chief Executive Officer and Secretary, and Messrs. Krstajic and Schaepe. The Board of Directors reconstituted the Compensation Committee to consist of Messrs. Krstajic, Schaepe and Woodrow with Mr. Woodrow as Chairman of the Committee. Mr. Slaven joined the Compensation Committee in August 2003 and Mr. Schaepe resigned from the Board of Directors, including Board of Director committees, in September 2004. The Board members, Messrs. Krstajic, Schaepe, Slaven and Woodrow, are not and were not officers or employees of the Company in 2003. Each of the Company's directors holds securities of the Company. In January 1999, the Compensation Committee created a Non-Officer Stock Option Committee of the Board, which consists of Dr. Zaki Rakib. The function of the Non-Officer Stock Option Committee is to grant options to purchase shares of common stock to eligible persons who are not officers of the Company. No executive officer of the Company served on the board of directors or compensation committee of any entity, which has one or more executive officers serving as a member of the Company's Board or Compensation Committee.

REPORT OF THE COMPENSATION COMMITTEE
ON EXECUTIVE COMPENSATION

The material in this report is not "soliciting material," is not deemed "filed" with the Securities and Exchange Commission, and is not to be incorporated by reference into any filing of the Company under the Securities Act or Exchange Act, whether made before or after the date hereof and irrespective of any general incorporation language contained in such.

The Compensation Committee of the Board (Compensation Committee) has furnished the following report on executive compensation for fiscal year 2003.

97

--------------------------------------------------------------------------------

Table of Contents

Role of the Compensation Committee

The Compensation Committee Charter gives the Compensation Committee the direct responsibility to:

*review and approve corporate goals and objectives relevant to the compensation of the Company's Chief Executive Officer;

*evaluate the performance of the Chief Executive Officer and, either as a committee or together with the other independent members of the Board, determine and approve the compensation level for the Chief Executive Officer; and

*make recommendations to the Board regarding the compensation of the Company's officers and certain compensation plans.

The Committee's specific responsibilities include:

*periodic review of the Company's general compensation policies and strategies, including executive compensation;

*review and approve corporate goals and objectives relevant to executive officers and evaluation of their performance in light of those goals and objectives;

*approval of salaries, bonuses and all equity-based compensation of the Company's officers;

*review the Company's benefit programs and review and approval of all incentive performance-based and equity based plans, plus review and approve other plans submitted to the Compensation Committee by management; and

*review and approval of the terms of employment contracts of the Company's officers.

Compensation Philosophy

The goals of the Company, the Board and the Compensation Committee are to align compensation with business objectives and performance and to enable the Company to attract, retain and reward officers and other key employees who contribute to the long-term success of the Company and to motivate them to enhance long-term stockholder value. Key elements of this philosophy are:

*The Company pays competitively compared to leading technology companies with which the Company competes for talent. To ensure that pay is competitive, the Company regularly compares its pay practices with these companies and establishes its pay parameters based on this review.

*The Company considers individual and corporate performance and an individual's levels of responsibility, prior experience, breadth of knowledge and skill set in establishing an individual's level of compensation.

*The Company maintains annual incentive opportunities sufficient to provide motivation to achieve specific operating goals and to generate rewards that bring total compensation to competitive levels.

*The Company provides significant equity-based incentives for executives and other key employees to ensure that they are motivated over the long term to respond to the Company's business challenges and opportunities as owners and not just as employees.

Philosophy Regarding Section 162(m) of the Code. Section 162(m) of the Code limits the Company to a deduction for federal income tax purposes of no more than $1 million of compensation paid to certain named executive officers in a taxable year. Compensation above $1 million may be deducted if it is "performance-based compensation" within the meaning of the Code. While the Compensation Committee considers and attempts to preserve deductibility in executive compensation, it believes that stockholder interests are best preserved in not restricting the Compensation Committee's discretion and flexibility in crafting and adopting compensation programs, even if such programs may result in certain non-deductible compensation expenses. Accordingly, the Compensation Committee may in the future approve compensation arrangements for certain

98

--------------------------------------------------------------------------------

Table of Contents

officers that are not fully deductible. Further, because of ambiguities and
uncertainties as to the application and interpretation of Section 162(m) and the
regulations issued thereunder, no assurance can be given, notwithstanding any of
the Company's efforts, that compensation intended by the Company to satisfy the
requirements for deductibility under Section 162(m) does in fact do so.

The Compensation Committee has determined that stock options granted under
the Company's 1997 Equity Incentive Plan (1997 Plan) and 1999 Non-Officer Equity
Incentive Plan (1999 Plan) with an exercise price at least equal to the fair
market value of the Company's common stock on the date of grant shall be treated
as "performance-based compensation."

Long-Term Incentives. The Company believes in providing its employees,
including its executive officers, with equity incentive through the form of
stock option to provide employees with a personal incentive in the Company and
as a retention mechanism. The Company believes that providing employees with
such equity incentives builds long-term stockholder value and aligns the
interests of the employees and the stockholders. The Company's long-term equity
incentive program consists of the 1997 Plan and the 1999 Plan. The equity
incentive programs utilize vesting periods (generally four or five years for new
hire stock option grants and shorter periods for stock option refresh grants) to
encourage key employees to continue in the employ of the Company. Grants are
made at 100% of the fair market value on the date of grant. Executives receive
value from these grants only if the value of the Company's common stock
appreciates over the long-term. The size of option grants is determined based on
competitive practices of comparable and leading companies in the technology
industry and the Company's philosophy of significantly linking executive
compensation with stockholder interests.

Chief Executive Officer Compensation

Dr. Rakib's base salary in 2003 was $450,000, and Dr. Rakib was eligible
to receive a bonus of up to $216,563 under the Company's 2003 Executive
Incentive Compensation Plan (Compensation Plan), which would have been paid in
2004. Dr. Rakib voluntarily waived his right to receive his bonus and
consequently did not receive any payout under the Compensation Plan, which is
described below. The Compensation Committee, and the in the past -- the Board,
reviews Dr. Rakib's compensation annually and sets Dr. Rakib's compensation. The
Compensation Committee took into account (i) its belief that Dr. Rakib is the
Chief Executive Officer of a technology company that designs, develops and sells
broadband equipment, (ii) the scope of Dr. Rakib's responsibility and (iii) Dr.
Rakib's ability to lead the Company's continued development.

In 2003, the Board, upon the recommendation of the Compensation Committee,
implemented the Compensation Plan for certain of the Company's officers,
including the Chief Executive Officer and each of the executive officers. The
Compensation Plan was a bonus plan in which the Company's officers would be
eligible to receive a bonus based on (i) the Company's performance and (ii)
qualitative performance by the officer. The Chief Executive Officer would make a
recommendation to the Compensation Committee on the qualitative performance of
each of the officers and the Compensation Committee would evaluate the Chief
Executive Officer's performance. Any payment from the Compensation Plan would be
based on a percentage of the officer's base pay.

In 2003, the Board, upon the recommendation of the Compensation Committee,
implemented a stock option refresh program for all employees, including the
Chief Executive Officer and the other executive officers. In determining the
size of the stock option grant to the Chief Executive Officer (and other
employees, including the executive officers), the Compensation Committee and the
Board considered the Company's policy of providing officers with significant
equity incentives to retain such executives (and employees), stock option grants
being provided by other companies that design, develop and sell broadband
equipment and the size and value of outstanding stock option grants. The Board,
upon the recommendation of the Compensation Committee, provided Dr. Rakib with a
stock option grant of 500,000 that would vest fifty percent (50%) on each of the
first and second year anniversary (the vesting schedule was the same for all
other employees, including executive officers).

99

--------------------------------------------------------------------------------

Table of Contents

Other Executive Officers' Compensation

In 2003, the Company hired two of its executive officers, Messrs. Sabella and Taylor. In reviewing and approving the compensation, including base salary and incentive compensation (in both the form of equity in stock options and target compensation in the form of the Compensation Plan) of Messrs. Sabella and Taylor, as well as Messrs. Lopez and Rakib (the Company's two other executive officers), the Compensation Committee and the Board considered the recommendation of the Chief Executive Officer, to the extent available, the salary norms for persons in comparable positions at comparable companies and the person's experience. The fiscal 2003 salaries of Messrs. Lopez, Rakib, Sabella and Taylor are shown in the Executive Compensation Summary Table.

The Compensation Committee of the Board of Directors -- Fiscal 2003

Aleksander Krstajic
Mark Slaven
David Woodrow -- Chairman of the Compensation Committee

Item 12. Security Ownership of Certain Beneficial Owners and Management

The following table sets forth certain information regarding the ownership of the Company's common stock as of February 29, 2004 by: (i) each director and nominee for director; (ii) each of the Named Executive Officers; (iii) all executive officers and directors of the Company as a group; and (iv) all those known by the Company to be beneficial owners of more than five percent of its common stock. All shares of the Company's common stock subject to options currently exercisable or exercisable within 60 days of February 29, 2004, are deemed to be outstanding for the purpose of computing the percentage of ownership of the person holding such options, but are not deemed to be outstanding for computing the percentage of ownership of any other person. This table is based upon information supplied by officers, directors and principal stockholders and Schedules 13D and 13G filed with the SEC. Unless otherwise indicated in the footnotes to this table and subject to community property laws where applicable, the Company believes that each of the stockholders named in this table has sole voting and investment power with respect to the shares indicated as beneficially owned. Applicable percentages are based on 75,536,192 shares outstanding on February 29, 2004, adjusted as required by rules promulgated by the SEC. Unless otherwise indicated in the table, the address of each party listed in the table is 4988 Great America Parkway, Santa Clara, California 95054.

| Beneficial Owner | Beneficial Ownership | |
| --- | --- | --- |
| | Number of Shares | Percentage Ownership |
| FMR Corporation | 9,750,403 | 12.91% |
| 82 Devonshire Street | | |
| Boston, Massachusetts 02109(1) | | |
| Zaki Rakib(2) | 3,952,040 | 5.18% |
| Shlomo Rakib(3) | 3,952,040 | 5.18% |
| Edward Lopez(4) | 283,646 | * |
| Arthur T. Taylor(5) | 75,833 | * |
| Douglas Sabella(6) | -- | * |
| Lewis Solomon(7) | 278,749 | * |
| Aleksander Krstajic(8) | 207,394 | * |
| David M. Woodrow(9) | 36,550 | * |
| Mark Slaven(10) | -- | * |
| All executive officers and directors as a group (8 persons)(11) | 8,786,252 | 11.63% |

--------------

*Less than one percent.

100

--------------------------------------------------------------------------------

Table of Contents

(1) FMR Corporation filed an amendment to Schedule 13G, dated as of February 17, 2004, with the Securities and Exchange Commission. FMR Corporation reported beneficial ownership of 9,750,403 shares.

(2) Shares beneficially owned by Dr. Zaki Rakib include 240,000 shares of common stock held by the Shlomo Rakib Children's Trust of which Dr. and Mrs. Rakib are trustees and 800,000 shares of common stock underlying stock options, which are exercisable within 60 days of February 29, 2004. In addition, Mr. Rakib's family members hold 31,298 shares of common stock underlying stock options. Dr. Rakib disclaims beneficial ownership of these shares and stock options.

(3) Shares beneficially owned by Shlomo Rakib include 240,000 shares of common stock held by the Zaki Rakib Children's Trust of which Mr. And Mrs. Rakib are trustees and 800,000 shares of common stock underlying stock options which are exercisable within 60 days of February 29, 2004. In addition, Mr. Rakib's family members hold 31,298 shares of common stock underlying stock options. Mr. Rakib disclaims beneficial ownership of these shares and stock options.

(4) Shares beneficially owned include 282,999 shares of common stock underlying stock options, which are exercisable within 60 days of February 29, 2004.

(5) Shares beneficially owned include 75,833 shares of common stock underlying stock options, which are exercisable within 60 days of February 29, 2004. Mr. Taylor began employment with the Company as Chief Financial Officer on February 24, 2003.

(6) Mr. Sabella began employment with the Company as Chief Operating Officer on July 14, 2003.

(7) Shares beneficially owned include 218,749 shares of common stock underlying stock options that are exercisable within 60 days of February 29, 2004.

(8) Shares beneficially owned include 207,394 shares of common stock underlying stock options that are exercisable within 60 days of February 29, 2004.

(9) Shares beneficially owned include 36,550 shares of common stock underlying stock options that are exercisable within 60 days of February 29, 2004.

(10) Mr. Slaven joined the Company as a director in July 2003.

(11) Shares beneficially owned by the Company's current directors and officers as a group include 8,791,586 shares of common stock underlying stock options that are exercisable within 60 days of February 29, 2004.

--------------------------------------------------------------------------------

Table of Contents

PERFORMANCE MEASUREMENT COMPARISON

The following graph compares the cumulative total stockholder return of an investment of $100 in cash from August 18, 1998 through December 31, 2003 for (i) the Company's common stock, (ii) the Standards & Poor's 500 Index (S&P 500) and (iii) the Nasdaq Telecommunications Stock Index (Nasdaq Telecom). All values assume reinvestment of the full amount of all dividends and are calculated as of the last trading day of each month listed. The information contained in the performance graph shall not be deemed to be "soliciting material," is not deemed "filed" with the SEC and is not to be incorporated by reference in any filing of the Company under the Securities Act or the Exchange Act whether made before or after the date hereof and irrespective of any general incorporation language in any such filing.

| Data Points(1) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| Terayon | $ 37.00 | $ 62.81 | $ 4.06 | $ 8.27 | $ 2.05 | $ 4.50 | $ 4.42 |
| S&P 500 | $1,229.23 | $1,469.25 | $1,320.28 | $1,148.08 | $879.82 | $1,111.92 | $1,144.94 |
| NASDAQ Telecom | $ 500.91 | $1,015.40 | $ 463.44 | $ 236.63 | $108.79 | $ 183.57 | $ 191.57 |

| Conversion to Index Point(2) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| Terayon | 256 | 435 | 28 | 57 | 14 | 31 | 31 |
| S&P 500 | 112 | 133 | 120 | 104 | 80 | 101 | 104 |
| NASDAQ Telecom | 121 | 245 | 112 | 57 | 26 | 44 | 46 |

--------------

(1) Stock closing price
(2) Index Point = Data Point/ Baseline X 100

Item 13. Certain Relationship and Related Transactions

The Company has entered into indemnity agreements with certain officers and directors which provide, among other things, that the Company will indemnify such officer or director, under the circumstances and to the extent provided for therein, for expenses, damages, judgments, fines and settlements he or she may be required to pay in actions or proceedings which he or she is or may be made a party by reason of his or her position as a director, officer or other agent of the Company, and otherwise to the fullest extent permitted under Delaware law and the Company's Bylaws.

Mr. Krstajic, a director of the Company, was the Senior Vice President Interactive Services, Sales and Product Development for Rogers Cable, Inc., a wholly-owned subsidiary of Rogers Communications, Inc. until January 2003. Effective in April 2003, Rogers was no longer a related party to the Company. Consequently, revenues attributed to Rogers were classified as related party revenues in the first quarter of 2003. During the fiscal year ended December 31, 2003, Rogers Communications, Inc. purchased equipment and services from the Company, which accounted for approximately $1.5 million worth of the Company's related party revenues.

During the fiscal year ended December 31, 2003, Harmonic, Inc. purchased equipment and services from the Company, which accounted for approximately $3.2 million worth of the Company's revenues. Mr. Solomon, a director of the Company and chairman of the Company's audit committee is also a member of the Board of Directors of Harmonic, Inc.

During fiscal 2003, the Company employed Suzan Fishel, a sister of Dr. Rakib and Mr. Rakib. She was paid an aggregate salary of $97,363 for her services during the year.

102

--------------------------------------------------------------------------------

Table of Contents

    The Company believes that the terms of the transactions described above
were no less favorable to the Company than would have been obtained from an
unaffiliated third party. Any future transactions between the Company and any of
its officers, directors or principal stockholders will be on terms no less
favorable to the Company than could be obtained from unaffiliated third parties
and will be approved by a majority of the independent and disinterested members
of the Board.

Item 14.Principal Accounting Fees and Services

Audit Fees

    Ernst & Young LLP performed services for us in fiscal 2002 and 2003
related to financial statement audit work, quarterly reviews, tax services,
special projects and other ongoing consulting projects. Fees paid to Ernst &
Young in fiscal 2002 and 2003 were as follows:

|                   | 2003      | 2002      |
|-------------------|-----------|-----------|
| Audit Fees(1)     | $566,422  | $585,889  |
| Tax Fees(2)       | $ 54,991  | $162,874  |
| All Other Fees(3) | $ 43,670  | $ 15,187  |

    --------------

(1)Audit fees represent aggregate fees billed for the audit of consolidated
   financial statements for the fiscal year ended December 31, 2003 and 2002 and
   the review of financial statements included in our quarterly reports on Form
   10-Q.
(2)Tax fees represent fees for professional services provided in connection with
   the preparation of our federal and state tax returns and advisory services
   for other tax compliance matters.
(3)All other fees represent fees for international tax consulting.

    Under the Sarbanes-Oxley Act of 2002, all audit and non-audit services
performed by Ernst & Young must be approved in advance by our audit committee to
assure that such services do not impair the auditors' independence from the
company. Our audit committee specifically approved all audit and non-audit
services prior to them being performed by Ernst & Young in fiscal 2003.

Item 15.Exhibits, Financial Statement Schedules, and Reports on Form 8-K

    (a) The following documents are filed as part of this report on Form 10-K:

1. Consolidated Financial Statements. The following consolidated financial
statements of Terayon Communication Systems, Inc. and related Independent
Auditors' Report are filed as part of this report of Form 10-K:

* Independent Auditors' Report.

* Consolidated Balance Sheets, as of December 31, 2003 and 2002.

* Consolidated Statements of Operations, Consolidated Statements of
Stockholders' Equity, Consolidated Statements of Cash Flows and Notes to
Consolidated Financial Statements for the years ended December 31, 2003, 2002,
and 2001.

2. Consolidated Financial Statement Schedules. The following consolidated
financial statement schedules of Terayon Communication Systems, Inc. are filed
as part of this report on Form 10-K and should be read in conjunction with the
consolidated financial statements of Terayon Communication Systems, Inc:

* Schedule II of Valuation and Qualifying Accounts for the years ended December
31, 2003, 2002 and 2001.

Schedules not listed above are omitted because they are not required, they are
not applicable or the information is already included in the consolidated
financial statements or notes thereto.

                                103
--------------------------------------------------------------------------------

Table of Contents

3. Exhibits. The exhibits listed on the accompanying Index to Exhibits are filed or incorporated by reference as part of this report on Form 10-K.

  (b) Reports on Form 8-K in the fourth quarter of 2003:

1. On October 7, 2003, the Company filed a report on Form 8-K announcing that Comcast would use the Company's DOCSIS 2.0-qualified Cable Modem Termination System (CMTS) equipment in the development of Comcast's headend platforms as a way to expedite the ubiquitous adoption of DOCSIS 2.0 in Comcast's networks. The Company also announced the appointment of two new executives, Jeffrey Barco as Vice President and General Manager of Terayon's Digital Video Solutions Group, and William Rohrbach as Vice President of North America Sales. Additionally, the Company announced a better than expected third quarter financial performance.

2. On October 9, 2003, the Company filed a report on Form 8-K announcing the filing of a Form S-3 shelf registration statement with the Securities and Exchange Commission that would allow the Company to offer, from time to time, common stock, preferred stock, debt securities and/or warrants, with an aggregate public offering price up to $125 million.

3. On October 24, 2003, the Company filed a report on Form 8-K announcing the issuance of a press release on October 14, 2003 which stated that the Company will release financial results for its third quarter ended September 30, 2003 and announce the financial results for its third quarter ended September 30, 2003 via a press release on October 22, 2003.

4. On November 6, 2003, the Company filed a report on Form 8-K announcing it intention to offer common stock that would result in the issuance of approximately 10,800,000 shares of common stock.

5. On November 19, 2003, the Company filed a report on Form 8-K announcing that it had withdrawn its previously announced public offering of 10,800,000 shares of common stock under its shelf registration statement.

6. On November 21, 2003, the Company filed a report on Form 8-K announcing the filing of its Amended and Restated Certificate of Incorporation, Amendment to the Amended and Restated Certificate of Incorporation and Bylaws regarding indemnification of its officers, employees and other agents as set forth in the Delaware General Corporation Law.

7. On December 16, 2003, the Company filed a report on Form 8-K reaffirming its fourth quarter financial guidance and that profitability was targeted for second quarter 2004. The company also unveiled details of its patent-pending "FlexCMTS" architecture.

| Exhibit Number | Exhibit Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(14) |
| 3.2 | Bylaws of Terayon Communication Systems, Inc.(14) |
| 3.3 | Certificate of Amendment to Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(14) |
| 3.4 | Certificate of Designation of Series A Junior Participating Preferred Stock.(7) |
| 4.1 | Specimen Common Stock Certificate.(2) |
| 4.2 | Amended and Restated Information and Registration Rights Agreement dated April 6, 1998.(1) |
| 4.3 | Form of Security for Terayon Communication Systems, Inc.'s 5% Convertible Subordinated Notes due August 1, 2007.(5) |
| 4.4 | Registration Rights Agreement by and among Terayon Communication Systems, Inc. and Deutsche Bank Securities, Inc. and Lehman Brothers, Inc.(5) |
| 4.5 | Indenture between Terayon Communication Systems, Inc. and State Street Bank and Trust Company of California, N.A. dated July 26, 2000.(5) |
| 4.6 | Rights Agreement between Terayon Communication Systems, Inc. and Fleet National Bank dated February 6, 2001.(6) |

Table of Contents

Exhibit
Number                                    Exhibit Description
--------------------------------------------------------------------------------------------------------------------------------
10.1 Form of Indemnity Agreement between Terayon Communication Systems, Inc. and each of its directors and officers.(1)
10.2 1995 Stock Option Plan, as amended on March 26, 1996.(1)
10.3 1997 Equity Incentive Plan, as amended on July 31, 2000.(9)
10.4 1998 Employee Stock Purchase Plan, as amended on May 22, 2002.(12)
10.5 1998 Non-Employee Directors Stock Option Plan as amended on May 22, 2002.(1)
10.6 1998 Employee Stock Purchase Plan Offering for Foreign Employees, adopted July 31, 2000.(7)
10.7 1999 Non-Officer Equity Incentive Plan, as amended May 28, 2003.(13)
10.8 Form of Non-Statutory Stock Option Agreement Used in Connection with the 1999 Non-Officer Equity Incentive Plan.(4)
10.9 Azrieli Center Offices Lease Agreement, dated January 23, 2002, between Canit HaShalom Investments Ltd. and Terayon
     Communication Systems, Inc.(9)
10.10 Azrieli Center Agreement to Transfer Lease Rights dated 23rd day of January, 2000(11)
10.11 Employment Agreement, between Terayon Communication Systems, Inc. and Zaki Rakib dated February 1993.(1)
10.12 Data Over Cable Service Interface Specifications License Agreement, dated December 21, 2001, between Terayon Communication
     Systems, Inc. and Cable Television Laboratories, Inc.(9)
10.13 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated December 21, 2001, between Terayon Communication Systems, Inc.
     and Cable Television Laboratories, Inc.(9)
10.14 Data Over Cable Service Interface Specifications License Agreement, dated December 21, 2001, between Imedia Semiconductor
     Corporation and Cable Television Laboratories, Inc.(9)
10.15 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated December 21, 2001, between Imedia Semiconductor Corporation and
     Cable Television Laboratories, Inc.(9)
10.16 Lease Agreement, dated September 18, 1996, between Sobrato Interests III and VeriFone.(10)
10.17 Sublease, dated April 1, 2002, by and between Terayon Communication Systems, Inc. and Hewlett-Packard Company.(10)
10.18 Aircraft Lease Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
     Corporation.(11)
10.19 Letter of Credit Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
     Corporation.(11)
10.20 Employment Agreement, dated January 24, 2003, between Terayon Communication Systems, Inc. and Arthur T. Taylor.(11)
10.21 Employment Agreement dated July 3, 2003, between Terayon Communication Systems, Inc. and Doug Sabella.(13)
10.22 Employment Agreement dated September 28, 1999, between Terayon Communication Systems, Inc. and Edward Lopez.(13)
10.23 Executive Compensation Plan, as adopted May 28, 2003.(13)
10.24 Agreement dated January 9, 2004, between Terayon Communication Systems, Inc. and YAS Corporation.
10.25 First Amendment to Aircraft Lease Agreement, dated December 31, 2003, between Terayon Communication Systems, Inc. and General
     Electric Capital Corporation.
10.26 Form of Severance Agreements (Change of Control) entered into by Zaki Rakib, Shlomo Rakib, Edward Lopez, Arthur T. Taylor,
     and Douglas Sabella and the Registrant dated January 14, 2004.
10.27 Code of Business Conduct.
10.28 Notification Letter of Intent to Terminate or Sublease the Aircraft Lease Agreement, dated March 12, 2004.
21.1 List of Subsidiaries.

105

--------------------------------------------------------------------------------------------------------------------------------

Table of Contents

```
Exhibit
Number                                   Exhibit Description
-----------------------------------------------------------------------------------------------
  23.1 Consent of Ernst & Young LLP Independent Auditors.
  24.1 Power of Attorney (see page 108 of this Annual Report Form 10-K)
  31.1 Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.
  31.2 Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.
  32.1 Certification of the Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.
  32.2 Certification of the Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.
```

--------------

(1) Incorporated by reference to exhibits to our Registration Statement on Form
    S-1 filed on June 16, 1998 (File No. 333-56911).

(2) Incorporated by reference to exhibits to our Registration Statement on Form
    S-1/ A filed on July 31, 1998 (File No. 333-69699).

(3) Incorporated by reference to our Report on Form 10-Q filed on November 15,
    1999.

(4) Incorporated by reference to our Registration Statement on Form S-8 filed on
    December 29, 1999.

(5) Incorporated by reference to our Registration Statement on Form S-3 filed on
    October 24, 2000 (File No. 333-48536).

(6) Incorporated by reference to our Report on Form 8-K filed on February 9,
    2001.

(7) Incorporated by reference to our Report on Form 10-K filed on April 2, 2001.

(8) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2001.

(9) Incorporated by reference to our Report on Form 10-K filed on April 1, 2002.

(10) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2002.

(11) Incorporated by reference to our Report on Form 10-K filed on March 27,
     2003.

(12) Incorporated by reference to our Report on Registration Statement on Form
     S-8 filed on August 30, 2002.

(13) Incorporated by reference to our Report on Form 10-Q filed on August 14,
     2003.

(14) Incorporated by reference to our Report on Form 8-K filed on November 21,
     2003.

--------------------------------------------------------------------------------

Table of Contents

SCHEDULE II

VALUATION AND QUALIFYING ACCOUNTS

| | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Write-offs | Balance at End of Period |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Year ended December 31, 2001** | | | | |
| Allowance for doubtful accounts | $ 6,542 | 4,494 | 3,829 | $ 7,207 |
| Excess and obsolescence | $ 16,323 | 24,670 | 3,812 | $ 37,181 |
| **Year ended December 31, 2002** | | | | |
| Allowance for doubtful accounts | $ 7,207 | 1,090 | 4,778 | $ 3,519 |
| Excess and obsolescence | $ 37,181 | 4,336 | 16,044 | $ 25,473 |
| **Year ended December 31, 2003** | | | | |
| Allowance for doubtful accounts | $ 3,519 | 166 | 94 | $ 3,591 |
| Excess and obsolescence | $ 25,473 | 4,086 | 17,269 | $ 12,290 |

107

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has caused this report to be signed on its behalf by the undersigned, thereunto due authorized, in County of Santa Clara, State of California, on the 15th day of March, 2004.

TERAYON COMMUNICATION SYSTEMS, INC.

/s/ DR. ZAKI RAKIB
------------------------------------
    Dr. Zaki Rakib
    Chief Executive Officer

Each person whose signature appears below constitutes Dr. Zaki Rakib, Shlomo Rakib and Arthur Taylor his true and lawful attorney-in-fact and agent, each acting alone, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, each acting alone, or his or her substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ ZAKI RAKIB | Chief Executive Officer and Director (Principal Executive Officer) | March 15, 2004 |
| Dr. Zaki Rakib | | |
| /s/ ARTHUR T. TAYLOR | Chief Financial Officer (Principal Financial and Accounting Officer) | March 15, 2004 |
| Arthur T. Taylor | | |
| /s/ SHLOMO RAKIB | President and Chairman of the Board of Directors | March 15, 2004 |
| Shlomo Rakib | | |
| /s/ LEWIS SOLOMON | Director | March 15, 2004 |
| Lewis Solomon | | |
| /s/ ALEK KRSTAJIC | Director | March 15, 2004 |
| Alek Krstajic | | |
| /s/ DAVID WOODROW | Director | March 15, 2004 |
| David Woodrow | | |
| /s/ MARK SLAVEN | Director | March 15, 2004 |
| Mark Slaven | | |

108

Table of Contents

EXHIBIT INDEX

Exhibit
Number                          Exhibit Description
-----------------------------------------------------------------------------------------------------------------
  3.1 Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(14)
  3.2 Bylaws of Terayon Communication Systems, Inc.(14)
  3.3 Certificate of Amendment to Amended and Restated Certificate of Incorporation of Terayon Communication Systems, Inc.(7)
  3.4 Certificate of Designation of Series A Junior Participating Preferred Stock.(7)
  4.1 Specimen Common Stock Certificate.(2)
  4.2 Amended and Restated Information and Registration Rights Agreement dated April 6, 1998.(1)
  4.3 Form of Security for Terayon Communication Systems, Inc.'s 5% Convertible Subordinated Notes due August 1, 2007.(5)
  4.4 Registration Rights Agreement by and among Terayon Communication Systems, Inc. and Deutsche Bank Securities, Inc. and Lehman
      Brothers, Inc.(5)
  4.5 Indenture between Terayon Communication Systems, Inc. and State Street Bank and Trust Company of California, N.A. dated July
      26, 2000.(5)
  4.6 Rights Agreement between Terayon Communication Systems, Inc. and Fleet National Bank dated February 6, 2001.(6)
 10.1 Form of Indemnity Agreement between Terayon Communication Systems, Inc. and each of its directors and officers.(1)
 10.2 1995 Stock Option Plan, as amended on March 26, 1996.(1)
 10.3 1997 Equity Incentive Plan, as amended on July 31, 2000.(9)
 10.4 1998 Employee Stock Purchase Plan, as amended on May 22, 2002.(12)
 10.5 1998 Non-Employee Directors Stock Option Plan as amended on May 22, 2002.(1)
 10.6 1998 Employee Stock Purchase Plan Offering for Foreign Employees, adopted July 31, 2000.(7)
 10.7 1999 Non-Officer Equity Incentive Plan, as amended May 28, 2003.(13)
 10.8 Form of Non-Statutory Stock Option Agreement Used in Connection with the 1999 Non-Officer Equity Incentive Plan.(4)
 10.9 Azrieli Center Offices Lease Agreement, dated January 23, 2002, between Canit HaShalom Investments Ltd. and Terayon
      Communication Systems, Inc.(9)
 10.10 Azrieli Center Agreement to Transfer Lease Rights dated 23rd day of January, 2000(11)
 10.11 Employment Agreement, between Terayon Communication Systems, Inc. and Zaki Rakib dated February 1993.(1)
 10.12 Data Over Cable Service Interface Specifications License Agreement, dated December 21, 2001, between Terayon Communication
      Systems, Inc. and Cable Television Laboratories, Inc.(9)
 10.13 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated December 21, 2001, between Terayon Communication Systems, Inc.
      and Cable Television Laboratories, Inc.(9)
 10.14 Data Over Cable Service Interface Specifications License Agreement, dated December 21, 2001, between Imedia Semiconductor
      Corporation and Cable Television Laboratories, Inc.(9)
 10.15 Amendment to DOCSIS IPR Agreement to cover DOCSIS 2.0, dated December 21, 2001, between Imedia Semiconductor Corporation and
      Cable Television Laboratories, Inc.(9)
 10.16 Lease Agreement, dated September 18, 1996, between Sobrato Interests III and VeriFone.(10)
 10.17 Sublease, dated April 1, 2002, by and between Terayon Communication Systems, Inc. and Hewlett-Packard Company.(10)
 10.18 Aircraft Lease Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
      Corporation.(11)
 10.19 Letter of Credit Agreement, dated February 8, 2002, between Terayon Communication Systems, Inc. and General Electric Capital
      Corporation.(11)
 10.20 Employment Agreement, dated January 24, 2003, between Terayon Communication Systems, Inc. and Arthur T. Taylor.(11)


-----------------------------------------------------------------------------------------------------------------

Table of Contents

Exhibit
Number                                                      Exhibit Description
---------------------------------------------------------------------------------------------------------------------------
10.21 Employment Agreement dated July 3, 2003, between Terayon Communication Systems, Inc. and Doug Sabella.(13)
10.22 Employment Agreement dated September 28, 1999, between Terayon Communication Systems, Inc. and Edward Lopez.(13)
10.23 Executive Compensation Plan, as adopted May 28, 2003.(13)
10.24 Agreement dated January 9, 2004, between Terayon Communication Systems, Inc. and YAS Corporation.
10.25 First Amendment to Aircraft Lease Agreement, dated December 31, 2003, between Terayon Communication Systems, Inc. and General
      Electric Capital Corporation.
10.26 Form of Severance Agreements (Change of Control) entered into by Zaki Rakib, Shlomo Rakib, Edward Lopez, Arthur T. Taylor,
      and Douglas Sabella and the Registrant dated January 14, 2004.
10.27 Code of Business Conduct.
10.28 Notification Letter of Intent to Terminate or Sublease the Aircraft Lease Agreement, dated March 12, 2004.
21.1 List of Subsidiaries.
23.1 Consent of Ernst & Young LLP Independent Auditors.
24.1 Power of Attorney (see page 108 of this Annual Report Form 10-K)
31.1 Certification of the Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.
31.2 Certification of the Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.
32.1 Certification of the Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.
32.2 Certification of the Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

--------------

(1) Incorporated by reference to exhibits to our Registration Statement on Form
    S-1 filed on June 16, 1998 (File No. 333-56911).

(2) Incorporated by reference to exhibits to our Registration Statement on Form
    S-1/ A filed on July 31, 1998 (File No. 333-69699).

(3) Incorporated by reference to our Report on Form 10-Q filed on November 15,
    1999.

(4) Incorporated by reference to our Registration Statement on Form S-8 filed on
    December 29, 1999.

(5) Incorporated by reference to our Registration Statement on Form S-3 filed on
    October 24, 2000 (File No. 333-48536).

(6) Incorporated by reference to our Report on Form 8-K filed on February 9,
    2001.

(7) Incorporated by reference to our Report on Form 10-K filed on April 2, 2001.

(8) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2001.

(9) Incorporated by reference to our Report on Form 10-K filed on April 1, 2002.

(10) Incorporated by reference to our Report on Form 10-Q filed on May 15, 2002.
(11) Incorporated by reference to our Report on Form 10-K filed on March 27,
     2003.
(12) Incorporated by reference to our Report on Registration Statement on Form
     S-8 filed on August 30, 2002.
(13) Incorporated by reference to our Report on Form 10-Q filed on August 14,
     2003.
(14) Incorporated by reference to our Report on Form 8-K filed on November 21,
     2003.

# EXHIBIT 7

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): July 26, 2005
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

Delaware                000-24647        77-0328533

(State or other jurisdiction(Commission  (I.R.S. employer
    of incorporation)       file number)identification no.)

4988 Great America Parkway, Santa Clara, CA 95054
(Address of principal executive offices and zip code)
Registrant's telephone number, including area code: (408) 235-5500
Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):
    o Written communications pursuant to Rule 425 under the Securities Act (17
CFR 230.425)
    o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17
CFR 240.14a-12)
    o Pre-commencement communications pursuant to Rule 14d-2(b) under the
Exchange Act (17 CFR 240.14d-2(b))
    o Pre-commencement communications pursuant to Rule 13e-4(c) under the
Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

TABLE OF CONTENTS

Item 4.01. Changes in Registrant's Certifying Accountant.
Item 9.01. Financial Statements and Exhibits
SIGNATURES
Exhibit Index
EXHIBIT 16.01

--------------------------------------------------------------------------------

Table of Contents

Item 4.01. Changes in Registrant's Certifying Accountant.

On July 26, 2005, Terayon Communication Systems, Inc. (the "Company"), was advised by Ernst & Young LLP ("Ernst & Young") that Ernst & Young will resign as the Company's independent registered public accounting firm following the earlier of the completion of services related to the review of the Company's interim financial statements for the quarter ending September 30, 2005 or the filing due date of that quarterly report.

The reports of Ernst & Young on the Company's financial statements as of and for the years ended December 31, 2004 and 2003 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles.

In connection with the audits of the Company's most recent two years ended December 31, 2004 and 2003 and in the subsequent interim period, there were no disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K) between Ernst & Young and the Company on any matter of accounting principles or practices, financial statement disclosure, or auditing scope and procedures, that, if not resolved to the satisfaction of Ernst & Young, would have caused Ernst & Young to make reference to the subject matter of the disagreement in connection with its reports on the Company's financial statements for such years.

During the years ended December 31, 2004 and 2003, and through July 26, 2005, there were no "reportable events" as described in Item 304(a)(1)(v) of Regulation S-K, other than the two material weaknesses disclosed in the Company's Form 10-K filed on March 15, 2005 and as described below:

First, management identified a material weakness due to insufficient controls related to the identification, capture, and timely communication of financially significant information between certain parts of the organization and the finance department to enable the finance department to account for transactions in a complete and timely manner. As a result of this material weakness, management recorded an adjustment in the quarter ended September 30, 2004 to record termination benefits paid to a former executive.

Second, management also identified a material weakness for insufficient controls related to the preparation and review of the annual consolidated financial statements and accompanying footnote disclosures. The insufficient controls include a lack of sufficient personnel with technical accounting expertise in the finance department and inadequate review and approval procedures to prepare external financial statements in accordance with generally accepted accounting principles (GAAP). As a result of this material weakness, management made substantial revisions to its 2004 annual consolidated financial statements and footnote disclosures before they were issued.

Ernst & Young did not seek the Company's consent to its resignation. As a result, the Company's audit committee did not recommend or approve the resignation of Ernst & Young.

2

--------------------------------------------------------------------------------

Table of Contents

   The Company has provided Ernst &Young with a copy of the foregoing
disclosures and requested that Ernst & Young furnish a letter to the Securities
and Exchange Commission stating whether or not Ernst & Young agrees with the
above statements. Ernst & Young furnished such a letter, dated August 1, 2005, a
copy of which is attached hereto as Exhibit 16.1.
   The Company's audit committee has commenced the process of selecting an
independent registered public accounting firm to replace Ernst & Young.
Item 9.01. Financial Statements and Exhibits
(c) Exhibits


        Exhibit No.                 Description
        16.1          Letter of Ernst & Young LLP, dated August 1, 2005.
                              3

--------------------------------------------------------------------------------

Table of Contents

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Terayon Communication Systems, Inc.
By:          /s/ Mark Richman
             Mark Richman
Date: August 1, 2005          Chief Financial Officer

4

--------------------------------------------------------------------------------

Table of Contents

Exhibit Index


Exhibit No.                    Description
16.1        Letter of Ernst & Young LLP, dated August 1, 2005.

Exhibit 16.01

August 1, 2005
PCAOB Letter File
Office of the Chief Accountant
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549-7561
Gentlemen:

We have read Item 4.01 of Form 8-K dated July 26, 2005, of Terayon Communication Systems, Inc. and are in agreement with the statements contained in paragraphs 1 through 6 and the first sentence of paragraph 7 on page 2 therein. We have no basis to agree or disagree with other statements of the registrant contained therein.

Regarding the registrant's statements concerning the lack of internal control to prepare financial statements, included in paragraphs 4 through 6 on page 2 therein, we had considered such matters in determining the nature, timing and extent of procedures performed in our audit of the registrant's 2004 financial statements.

/s/ Ernst & Young LLP

# EXHIBIT 8

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): September 21, 2005
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

| Delaware | 000-24647 | 77-0328533 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission file number) | (I.R.S. employer identification no.) |

4988 Great America Parkway, Santa Clara, CA 95054
(Address of principal executive offices and zip code)
Registrant's telephone number, including area code: (408) 235-5500

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

TABLE OF CONTENTS

Item 4.01. Changes in Registrant's Certifying Accountant.
Item 9.01. Financial Statements and Exhibits.
SIGNATURES
Exhibit Index
EXHIBIT 16.1

--------------------------------------------------------------------------------

Table of Contents

Item 4.01. Changes in Registrant's Certifying Accountant.
        (a)      As previously disclosed by Terayon Communication Systems,
Inc. (the "Company") in its Current Report on Form 8-K filed on August 1, 2005,
the Company's former independent registered public accounting firm, Ernst &
Young LLP, ("Ernst & Young") informed the Company that it would resign as the
Company's independent registered public accounting firm effective upon the
earlier of completion of services related to the review of the Company's interim
financial statements for the quarter ending September 30, 2005 or the filing due
date of that quarterly report. Ernst & Young did not seek the Company's consent
to its resignation. As a result, the Company's Audit Committee did not recommend
or approve the resignation of Ernst & Young.
        On August 9, 2005, the Company filed its Quarterly Report on Form 10-Q
for the quarter ended June 30 2005. Ernst & Young served as the Company's
independent registered public accounting firm in reviewing the Company's interim
financial statements for the quarter ended June 30, 2005 for purposes of that
quarterly report.
        On September 21, 2005, the Audit Committee of the Board of Directors
of the Company engaged Stonefield Josephson, Inc. ("Stonefield Josephson") as
the Company's new independent registered public accounting firm to audit the
Company's financial statements for the fiscal year ended December 31, 2005, and
to perform certain procedures related to the financial statements to be included
in the Company's quarterly reports on Form 10-Q. Effective as of such date,
Ernst & Young resigned as the Company's independent registered public accounting
firm.
        The reports of Ernst & Young on the Company's financial statements as
of and for the years ended December 31, 2004 and 2003 did not contain an adverse
opinion or a disclaimer of opinion and were not qualified or modified as to
uncertainty, audit scope, or accounting principles.
        In connection with the audits of the Company's most recent two years
ended December 31, 2004 and 2003 and in the subsequent interim periods, there
were no disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K)
between Ernst & Young and the Company on any matter of accounting principles or
practices, financial statement disclosure, or auditing scope and procedures,
that, if not resolved to the satisfaction of Ernst & Young, would have caused
Ernst & Young to make reference to the subject matter of the disagreement in
connection with its reports on the Company's financial statements for such
years.
        During the years ended December 31, 2004 and 2003, and through
September 21, 2005, there were no "reportable events" as described in Item
304(a)(1)(v) of Regulation S-K, other than the two material weaknesses disclosed
in the Company's Annual Report on Form 10-K filed on March 15, 2005 and as
described below:
        First, management identified a material weakness due to insufficient
controls related to the identification, capture, and timely communication of
financially significant information between certain parts of the organization
and the finance department to enable the finance department to account for
transactions in a complete and timely manner. As a result of this material
weakness, management recorded an adjustment in the quarter ended September 30,
2004 to record termination benefits paid to a former executive.
        Second, management also identified a material weakness for
insufficient controls related to the preparation and review of the annual
consolidated financial statements and accompanying footnote disclosures. The
insufficient controls include a lack of sufficient personnel with technical
accounting expertise in the finance department and inadequate review and
approval procedures to prepare external financial statements in accordance with
generally accepted accounting principles (GAAP). As a result of this material
weakness, management made substantial revisions to its 2004 annual consolidated
financial statements and footnote disclosures before they were issued.
        The Company has provided Ernst &Young with a copy of the foregoing
disclosures and requested that Ernst & Young furnish a letter to the Securities
and Exchange Commission stating whether or not Ernst & Young agrees with the
above statements. Ernst & Young furnished such a letter, dated September 23,
2005, a copy of which is attached hereto as Exhibit 16.1.

2

------------------------------------------------------------------------------------

Table of Contents

        (b)      On September 21, 2005, the Audit Committee of the Board of Directors of the Company engaged Stonefield Josephson as the Company's new independent registered public accounting firm to audit the Company's financial statements for the fiscal year ended December 31, 2005, and to perform certain procedures related to the financial statements to be included in the Company's quarterly reports on Form 10-Q. The Company did not consult Stonefield Josephson on any matter or event described in Item 304(a)(2)(i) or (ii) of Regulation S-K during the Company's two most recent fiscal years and through September 21, 2005, the effective date of the Company's engagement of Stonefield Josephson. Item 9.01. Financial Statements and Exhibits.
(c) Exhibits

      Exhibit No.               Description
      16.1        Letter of Ernst & Young LLP, dated September 23, 2005.

3

--------------------------------------------------------------------------------

Table of Contents

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Terayon Communication Systems, Inc.

Date: September 27, 2005    By:        /s/ Mark Richman
                                       Mark Richman
                                       Chief Financial Officer

4

--------------------------------------------------------------------------------

Table of Contents

Exhibit Index

Exhibit
No.                        Description
16.1   Letter of Ernst & Young LLP, dated September 23, 2005.

Exhibit 16.1

September 23, 2005
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
Gentlemen:
We have read Item 4.01 of Form 8-K dated September 21, 2005, of Terayon
Communication Systems, Inc. and are in agreement with the statements contained
in the first and second sentences of paragraph 1, the second sentence of
paragraphs 2 and 3, and paragraphs 4 through 8 on page 2 therein. We have no
basis to agree or disagree with other statements of the registrant contained
therein.
Regarding the registrant's statements concerning the lack of internal control to
prepare financial statements, included in paragraphs 6 through 8 on page 2
therein, we had considered such matters in determining the nature, timing and
extent of procedures performed in our audit of the registrant's 2004 financial
statements.


/s/ Ernst & Young LLP

# EXHIBIT 9

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): November 7, 2005
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact name of Registrant as specified in its charter)

Delaware          000-24647              77-0328533

(State or other jurisdiction of incorporation)(Commission file number)(I.R.S. employer identification no.)

4988 Great America Parkway, Santa Clara, CA 95054
(Address of principal executive offices and zip code)
Registrant's telephone number, including area code: (408) 235-5500
Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions (see General Instruction A.2. below):

oWritten communications pursuant to Rule 425 under the Securities Act (17 CFR
 230.425)
oSoliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
 240.14a-12)
oPre-commencement communications pursuant to Rule 14d-2(b) under the Exchange
 Act (17 CFR 240.14d-2(b))
oPre-commencement communications pursuant to Rule 13e-4(c) under the Exchange
 Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

TABLE OF CONTENTS

Item 8.01. Other Events.
Item 9.01. Financial Statements and Exhibits.
SIGNATURES
Exhibit Index
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

Item 8.01. Other Events.
          On November 7, 2005, Terayon Communication Systems, Inc. (the
"Company"), announced via press release that it is reviewing the recognition of
revenue for certain transactions during prior periods. The Company initiated the
review after determining that certain revenues recognized in the second half of
fiscal year 2004 from a customer may have been recorded in incorrect periods.
The revenue matters under examination relate to the timing of revenue
recognition and may result in a restatement of prior period financial
statements.
          Pending completion of the accounting review, the filing of the
Company's Form 10-Q for the third quarter of fiscal year 2005 will be delayed,
and this delay will extend beyond November 9, 2005, the Securities and Exchange
Commission's filing deadline for the Company's Form 10-Q.
          The full text of the press release is attached hereto as Exhibit 99.1
and incorporated herein by reference.
Item 9.01. Financial Statements and Exhibits.
     (c) Exhibits


Exhibit
No.    Description
99.1   Press Release of Terayon Communication Systems, Inc., dated November 7,
       2005.

                                  2

--------------------------------------------------------------------------------

Table of Contents
                              SIGNATURES
     Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed on its behalf by the
undersigned thereunto duly authorized.


                    Terayon Communication Systems, Inc.
Date: November 7, 2005By:          /s/
                                  Mark Richman
                                  Mark Richman
                                  Chief Financial Officer
                                    3
------------------------------------------------------------------------------

Table of Contents

Exhibit Index

Exhibit
No.                          Description
99.1    Press Release of Terayon Communication Systems, Inc., dated November 7,
        2005.

4

Exhibit 99.1

NOT FOR RELEASE -- Draft v4
                    Terayon Announces Accounting Review and Delay
                       in Release of Third Quarter 2005 Results
Santa Clara, California -- November 7, 2005 -- Terayon Communication Systems,
Inc. (NASDAQ: TERN), a leading provider of digital networking video applications
and home access solutions, today announced that it is reviewing the recognition
of revenue for certain transactions during prior periods. Terayon initiated the
review after determining that certain revenues recognized in the second half of
fiscal year 2004 from a customer may have been recorded in incorrect periods.
The revenue matters under examination relate to the timing of revenue
recognition and may result in a restatement of prior period financials.
      Pending completion of the accounting review, the filing of Terayon's Form
10-Q for the third quarter of fiscal year 2005 will be delayed, and this delay
will extend beyond the Form 10-Q's filing deadline of November 9, 2005. Terayon
also will delay the filing of its third quarter 2005 earnings release and
conference call, originally scheduled for November 8, 2005.
      The accounting review includes an examination of whether a restatement of
prior period financial statements may be required as it relates to the customer
transactions in question, in addition to an examination of Terayon's revenue
recognition policies and practices for current and past periods and an
examination of Terayon's internal control over financial reporting as it relates
to these items. There can be no assurance that Terayon or its independent
auditors will not identify additional issues or other considerations in
connection with the current review, and that these issues or considerations will
not require further adjustments to the company's prior financial results for one
or more prior fiscal years or quarters.
      "We are committed to accurate and transparent financial reporting and are
taking this matter very seriously," said Jerry Chase, CEO, Terayon. "I want to
emphasize that our cash position and market leadership remain strong and are not
affected by the accounting issues under review. We remain focused on executing
on our strategies and continuing to expand our product innovations to strengthen
the overall position of the company."

--------------------------------------------------------------------------------

Terayon Announces Accounting Review and Delay in Release of Third Quarter 2005
Results
Page 2

Terayon and the Audit Committee of Terayon's Board of Directors are
working closely with the company's independent auditors in connection with the
accounting review. In addition, the Audit Committee has decided to conduct an
independent inquiry into the circumstances relating to the accounting treatment
of certain of the transactions at issue with the assistance of independent legal
counsel. The timing and possible outcome of the Audit Committee's inquiry cannot
be predicted at this time.

About Terayon

Terayon Communication Systems, Inc. (NASDAQ: TERN) provides digital
video networking applications and home access solutions that enable the delivery
of advanced digital video, voice and data services. Service providers worldwide
have deployed more than 6,000 of Terayon's digital video systems to brand their
programming, insert millions of digital ads, offer HDTV and other digital video
services. More than five million Terayon cable modems and other home access
solutions have been deployed by cable operators globally to provide broadband
Internet access and VoIP telephony. Terayon maintains its headquarters in Santa
Clara, California; has sales and support offices worldwide and is on the web at
www.terayon.com.

Investor Contact:                          Press Contact:
Kirsten Chapman/Moriah Shilton             John Giddings
Lippert/Heilshorn & Associates, Inc.       Corporate Communications
(415) 433-3777                             (408) 486-5260
moriah@lhai-sf.com                         john.giddings@terayon.com

# # #

"Safe Harbor" Statements under the Private Securities Litigation Reform Act of
1995:
This press release contains forward-looking statements, which involve a number
of risk and uncertainties. Any forward-looking information is not a guarantee of
future performance and actual results could differ materially from those
contained in the forward-looking information. Such forward-looking statements
include, but are not limited to, statements relating to the nature of Terayon's
accounting review, statements relating to the expected outcome of Terayon's
accounting review, statements relating to the nature of the Audit Committee's
independent inquiry of Terayon's accounting issues, statements regarding the
anticipated nature and scope of Terayon's accounting errors, statements relating
to the possible filing of restated financial results, statements relating to the
timing of Terayon's filing of its Form 10-Q for the third quarter of fiscal year
2005, and other statement that are not historical facts.
The following factors, among others, could cause actual results to differ from
those set forth in the forward-looking statements: the results of the completed
review into possible accounting errors, the timing of the filing of Terayon's
Form 10-Q for the third quarter of fiscal year 2005, the need for any corrective
actions in connection with Terayon's accounting practices, the actual timing and
extent of any restatement of prior financial results, the reaction to any such
restatement by Terayon's stockholders and customers, as well as changes in
economic, business, competitive, technological and/or regularly factors and
trends. Additional factors that may affect future results are contained in
Terayon's most recent Annual Report on Form 10-K and Quarterly Report on Form
10-Q, particularly in the "Risk Factors" and "Management Discussion and Analysis
of Financial Condition and Results of Operations" sections. Such filings are
available at the SEC's website www.sec.gov. Terayon disclaims any obligation to
update and revise statement contained in this release based on new information
or otherwise.
Note: Terayon and the Terayon logo are registered trademarks of Terayon
Communication Systems, Inc. All other trademarks are property of their
respective owners.

2

# EXHIBIT 10

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): March 1, 2006
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 000-24647 | 77-0328533 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

4988 Great America Parkway
Santa Clara, California 95054
(Address of Principal Executive Offices and Zip Code)
Registrant's telephone number, including area code: (408) 235-5500
Not Applicable
(Former Name or Former Address, if Changed Since Last Report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

# TABLE OF CONTENTS

Item 4.02(a). Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review
Item 9.01. Financial Statements and Exhibits.
SIGNATURE
INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED MARCH 1, 2006
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

Item 4.02(a). Non-Reliance on Previously Issued Financial Statements or a
Related Audit Report or Completed Interim Review
On March 1, 2006, the Audit Committee of the Board of Directors of Terayon
Communication Systems, Inc. ("Terayon") concluded that the previously issued
financial statements contained in Terayon's Annual Report on Form 10-K for the
fiscal year ended December 31, 2004 and as of and for the four quarters of 2004
and the first two quarters of 2005 should no longer be relied upon. Terayon
expects to restate its financial statements for the above listed periods to
correct errors identified in Terayon's revenue recognition practices and
policies with respect to the timing of revenue recognition. The restatement will
have no impact on Terayon's cash balances for the restated periods. The errors
may also affect financial information relating to periods in addition to the
periods described above and other matters besides revenue recognition.
The Audit Committee and management have discussed the matters discussed in this
Item 4.02(a) with Stonefield Josephson, Inc., Terayon's current independent
auditor.
The foregoing description is qualified in its entirety by reference to the
Registrant's Press Release dated March 1, 2006, a copy of which is attached
hereto as Exhibit 99.1 and incorporated herein by reference.
Item 9.01. Financial Statements and Exhibits.
(d) Exhibits.


                            Exhibit No.Description


99.1Press release issued by Terayon Communication Systems, Inc. on March 1, 2006 entitled "Terayon Announces Expected Restatement of
    Prior Periods"

--------------------------------------------------------------------------------

Table of Contents

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 1, 2006


Terayon Communication Systems, Inc.

By: /s/ Mark Richman
    Name:  Mark Richman
    Title: Chief Financial Officer

--------------------------------------------------------------------------------

Table of Contents

INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED MARCH 1, 2006


Exhibit No.Description


99.1Press release issued by Terayon Communication Systems, Inc. on March 1, 2006 entitled "Terayon Announces Expected Restatement of
Prior Periods"

Exhibit 99.1

**Terayon Announces Expected Restatement of Prior Periods**

Santa Clara, California - March 1, 2006 - Terayon Communication Systems, Inc. (NASDAQ: TERNE) today announced that the Audit Committee of the Board of Directors has concluded that the Company's consolidated financial statements for the year ended December 31, 2004 and for the four quarters of 2004 and the first two quarters of 2005 should no longer be relied upon and will be restated. This conclusion was based in part on the final results of the previously announced Audit Committee inquiry. The inquiry focused on the circumstances surrounding the timing of revenue recognition in the second half of 2004 from a customer of the Company. The principal findings of the inquiry were: that there was no intent by Company personnel to recognize revenue in contravention of what Company personnel understood to be the applicable accounting rules at the time; that Company personnel nevertheless did not consider or sufficiently focus on the application of certain relevant accounting rules; and that there was no intent by Company personnel to mislead the Company's auditors or engage in other wrongful conduct. The Audit Committee inquiry noted that counsel was not able to interview a senior official of the customer involved in the transaction. Based on the results of the inquiry, the Audit Committee did not recommend any actions against current or former Company personnel. The Audit Committee and management are continuing to consider possible enhancements to the Company's internal controls in light of the results of the Audit Committee inquiry.

The Audit Committee and management have reviewed the Company's revenue recognition practices and policies with respect to the delivery of certain products and services (including the development and customization of software) to a single customer under a series of contractual arrangements. Management and the Audit Committee have also discussed management's conclusions with Stonefield Josephson, Inc., the Company's independent auditor. It was previously determined under the SEC Staff Accounting Bulletin 104, "Revenue Recognition," that revenue under this series of contractual arrangements was to be recognized in two phases

--------------------------------------------------------------------------------

Terayon Announces Expected Restatement of Prior Periods
Page 2

under two separate revenue arrangements. Based on the guidance under American Institute of Certified Public Accountants Statement of Position (SOP) 97-2, "Software Revenue Recognition," and SOP 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts," management has determined that this series of contractual arrangements should have been treated as a single contract, and therefore a single revenue arrangement for accounting purposes.

Using the completed-contract method as indicated under SOP 81-1, all revenue from this series of contractual arrangements should have been deferred until the completion of all Company obligations under these arrangements in the fourth quarter of 2005. Accordingly, revenue recognized in the third and fourth quarters of 2004 and in the first two quarters of 2005 under this series of contractual arrangements should be deferred to the fourth quarter of 2005. Also, under SOP 81-1 in relation to contract costs, expenses previously recognized in each quarter of 2004 and in the first two quarters of 2005 should be deferred to the fourth quarter of 2005.

The Company has also reviewed its revenue recognition policies relating to the recognition of the sales of software and other products bundled with post customer service contracts and has considered the guidance under SOP 97-2, Financial Accounting Standards Board Technical Bulletin 90-1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts," as well as Financial Accounting Standards Board, Emerging Issues Task Force 00-21, "Accounting for Revenue Arrangements with Multiple Deliverables," in relation to multiple-element revenue arrangements. Under this guidance management has determined that during 2004, the Company did not establish vendor specific objective evidence for its post contract service revenue element as it related to digital video customer service. Consequently, management anticipates an additional deferral of revenue from each quarter of 2004 in which the revenue was recognized, in order to recognize the revenue from software bundled with post customer service contracts over the life of the customer service contract period.

The actual amounts of revenue and expenses to be deferred are being reviewed by the Company and its independent auditors. The restatement will have no impact on the Company's cash balances for the restated periods. There can be no assurance that the Company or its

--------------------------------------------------------------------------------

Terayon Announces Expected Restatement of Prior Periods
Page 3

independent auditors will not identify additional issues or other considerations
in connection with the restatement and continuing review, and that these issues
or considerations will not require additional adjustments to the Company's prior
financial results for one or more prior annual or quarterly periods.

The filing of the Company's Form 10-Q for the quarter ended September 30, 2005
will be further delayed pending the completion of the restated consolidated
historical financial statements. Because of the delay in filing the Form 10-Q,
the Company is not in compliance with The Nasdaq Stock Market's continued
listing requirement set forth in Nasdaq Marketplace Rule 4310(c)(14). As
previously announced, the Company received letters from The Nasdaq Stock Market
dated November 17, 2005 and January 4, 2006 regarding the Company's failure to
file its Form 10-Q for the quarter ended September 30, 2005, and its failure to
solicit proxies and hold an annual meeting of shareholders on or before December
31, 2005, respectively. On January 17, 2006, a NASDAQ Listing Qualifications
Panel agreed to continue the listing of the Company's common stock on The Nasdaq
National Market subject to three conditions: (1) on or before January 31, 2006,
the Company was required to provide NASDAQ with certain information related to
the Audit Committee's inquiry; (2) on or before March 31, 2006, the Company must
file the Form 10-Q for the quarter ended September 30, 2005 and all required
restatements; (3) on or before March 31, 2006, the Company must file the proxy
statement for the 2005 annual meeting, with a record date set and a meeting to
be held as soon thereafter as possible. While the Company provided NASDAQ with a
response to questions relating to the internal accounting review on January 31,
2006 and is making every effort to comply with the remaining requirements, there
can be no assurance that the Company will be able to do so within the Panel's
deadlines, or that the Company's common stock will continue to be listed on the
Nasdaq National Market.

Management and the Audit Committee have concluded that the restatement
constitutes a material weakness within the meaning of the PCAOB's Audit Standard
No. 2. In addition to this material weakness, additional control deficiencies
may be identified which individually or in the aggregate may constitute
additional material weaknesses. Management and the Audit Committee are
continuing to evaluate whether there are additional material weaknesses.

--------------------------------------------------------------------------------

Terayon Announces Expected Restatement of Prior Periods
Page 4

Additionally, the Company has engaged a financial advisor, Chanin Capital Partners, to explore alternatives with respect to restructuring its outstanding 5% Convertible Subordinated Notes due 2007. The Notes currently outstanding have an aggregate principal amount of $65 million. As previously announced, on January 12, 2006, the Company received a letter from holders of more than 25% in aggregate principal amount of Notes outstanding providing written notice to the Company that it is in default based on the Company's failure to file its Form 10-Q for the quarter ended September 30, 2005. If the default is not cured within 60 days of this notice, March 13, 2006, an event of default will occur and the trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding, upon notice to the Company, may accelerate the maturity of the Notes and declare the entire principal amount of the Notes, together with all accrued and unpaid interest thereon, to be due and payable immediately.

The Company previously announced in November 2005 that the SEC had initiated an informal inquiry with regard to the subject matter of the Company's accounting review. The Company understands that the SEC has since issued a formal order of investigation with regard to this matter. The Company has been and is continuing to cooperate fully with the SEC.

Meaningful Cautionary Statement Regarding Forward-Looking Statements

Except for historical information contained in this press release, the matters discussed in this press release are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results to differ materially from those contained in the forward-looking information. Such forward-looking statements include, but are not limited to, statements relating to the review of Terayon's accounting policies, the timing, nature and expected outcome of Terayon's accounting review and restatement process, audit and review of consolidated financial statements, new determinations and calculations which may result in additional restatements or may delay the filing of one or more periodic reports with the SEC, statements relating to the engagement of a financial adviser to explore alternatives with respect to the convertible notes, the delisting of the Company's common stock from the Nasdaq National Market in the event the Company does not comply with one or more of the Panel's conditions and is unable to secure an additional extension from the Panel, and other statements that are not historical facts. There can be no assurance that the restatements or subsequent processes or filings will be completed timely, that any modifications or changes can be timely or effectively implemented, that errors or internal

--------------------------------------------------------------------------------

Terayon Announces Expected Restatement of Prior Periods
Page 5

control deficiencies or material weaknesses will not be identified during the
preparation, audit or review of annual or quarterly consolidated financial
statements or that additional adjustments for other periods will not be
required. The following factors, among others, could cause actual results to
differ from those set forth in the forward-looking statements: the timing and
results of the ongoing accounting review into possible additional accounting
errors, whether the Company's former independent auditor agrees with the
Company's and Stonefield Josephson's conclusions regarding the need for and the
extent to which prior periods should be restated and agrees to reaudit the
Company's historical financial statements, the possibility that prior periods
may need to be audited by Stonefield Josephson if the Company's former
independent auditor does not agree with the conclusions, the timing of the
filing of Terayon's Form 10-Q for the third quarter of fiscal year 2005, the
adverse effect on liquidity and the Company's business if the event of default
is not cured by March 13, 2006, the timing and filing of Terayon's proxy
statement for its next annual shareholders meeting, the need for and effective
implementation of any corrective actions in connection with Terayon's accounting
practices or internal control deficiencies or material weaknesses, the timing
and extent of any restatement of prior financial results and subsequent
processes or filings, the identification of other errors in prior annual or
quarterly periods or internal control deficiencies or material weaknesses during
the preparation, audit or review of annual or quarterly consolidated financial
statements, the need for adjustments for other periods, the timing and extent of
the reaction to any such restatement by Terayon's stockholders, bondholders and
customers, as well as changes in economic, business, competitive, technological
and/or regularly factors and trends. In addition, the Company's financial
results and stock price may suffer as a result of this review, the restatement
process, any delay in filing periodic reports with the SEC, the delisting of our
common stock and any subsequent determinations from this process or any actions
taken by governmental or other regulatory bodies as a result of this process.
Additional factors that may affect future results are contained in Terayon's SEC
reports, including its most recent Annual Report on Form 10-K and Quarterly
Report on Form 10-Q, particularly in the "Risk Factors" and "Management
Discussion and Analysis of Financial Condition and Results of Operations"
sections. Such filings are available at the SEC's website www.sec.gov. Terayon
disclaims any obligation or intent to update and revise the statements contained
in this release based on new information or otherwise.

--------------------------------------------------------------------------------

Terayon Announces Expected Restatement of Prior Periods
Page 6
About Terayon
     Terayon Communication Systems, Inc. (NASDAQ: TERNE) provides real-time
digital video networking applications to cable, satellite and telecommunication
service providers worldwide, which have deployed more than 6,000 of Terayon's
digital video systems to localize services and advertising on-demand and brand
their programming, insert millions of digital ads, offer HDTV and other digital
video services. Terayon maintains its headquarters in Santa Clara, California;
has sales and support offices worldwide and is on the web at www.terayon.com.
                              # # #


            Press Contacts:      Investor Contact:
            Rebecca West         Kirsten Chapman / Moriah Shilton
            Atomic PR            Lippert/Heilshorn & Associates
            (415) 402-0230       (415) 433-3777
            rebecca@atomicpr.commoriah@lhai-sf.com

# EXHIBIT 11

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): May 26, 2006
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 000-24647 | 77-0328533 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

4988 Great America Parkway
Santa Clara, California 95054
(Address of Principal Executive Offices and Zip Code)
Registrant's telephone number, including area code: (408) 235-5500
Not Applicable
(Former Name or Former Address, if Changed Since Last Report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

TABLE OF CONTENTS

Item 1.01 Entry into a Material Definitive Agreement.
Item 8.01. Other Events.
Item 9.01. Financial Statements and Exhibits.
SIGNATURE
INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED MAY 26, 2006
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

Item 1.01 Entry into a Material Definitive Agreement.
On May 26, 2006, the Board of Directors of Terayon Communication Systems, Inc. (the "Company") approved the terms of the bonus arrangements for Jerry Chase, the Company's Chief Executive Officer, and Mark Richman, the Company's Chief Financial Officer. Under the approved bonus arrangements, Messrs. Chase and Richman are eligible to earn a target bonus equal to 75% of their respective base salaries in accordance with their employment agreements. Bonus awards, if any, will be based on achievement of specified EBITDA and revenue objectives, each of which will be weighted equally and will determine payment of the respective portion of the target bonus amount.
Item 8.01. Other Events.
On May 26, 2006, the Company announced that it has retained Stonefield Josephson, Inc., which is currently auditing the Company's consolidated financial statements for the year ended December 31, 2005, to audit the Company's consolidated financial statements for the year ended December 31, 2004 and review the quarters of 2004 and, if necessary, to audit the Company's consolidated financial statements for the year ended December 31, 2003 and review the quarters of 2003. Management is continuing to review the financial statements and the Company's revenue recognition policies to determine whether it will recommend to the Audit Committee that the previously announced restatement of the Company's consolidated financial statements for 2004 will require any additional restatements or audits for any prior periods, such as 2003. FTI Consulting has been retained to assist management in determining and implementing the Company's revenue recognition policies.
The foregoing description is qualified in its entirety by reference to the Registrant's Press Release dated May 26, 2006, a copy of which is attached hereto as Exhibit 99.1 and incorporated herein by reference.
Item 9.01. Financial Statements and Exhibits.
    (d) Exhibits.

Exhibit No. Description

99.1    Press release issued by Terayon Communication Systems, Inc. on May 26, 2006 entitled "Terayon Announces Retention of Current Auditor to Audit 2004 Financial Statements"

---------------------------------------------------------------------------

Table of Contents

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.
Date: May 26, 2006

Terayon Communication Systems, Inc.
By:          /s/ Mark Richman
Title: Chief Financial Officer

-------------------------------------------------------------------------------

Table of Contents

INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED MAY 26, 2006

ExhibitDescription

99.1    Press release issued by Terayon Communication Systems, Inc. on May 26,
        2006 entitled "Terayon Announces Retention of Current Auditor to Audit
        2004 Financial Statements"

Exhibit 99.1

Terayon Announces Retention of Current Auditor to Audit 2004 Financial
Statements

Santa Clara, California - May 26, 2006 - Terayon Communication Systems, Inc.
(Pink Sheets: TERN.PK) today announced that it has retained Stonefield
Josephson, Inc., which is currently auditing the Company's consolidated
financial statements for the year ended December 31, 2005, to audit the
Company's consolidated financial statements for the year ended December 31, 2004
and review the quarters of 2004 and, if necessary, to audit the Company's
consolidated financial statements for the year ended December 31, 2003 and
review the quarters of 2003. Management is continuing to review the financial
statements and the Company's revenue recognition policies to determine whether
it will recommend to the Audit Committee that the previously announced
restatement of the Company's consolidated financial statements for 2004 will
require any additional restatements or audits for any prior periods, such as
2003. FTI Consulting has been retained to assist management in determining and
implementing the Company's revenue recognition policies.

As previously disclosed, there can be no assurance that management or the
Company's independent auditor will not identify additional issues or other
considerations in connection with the restatement and the audit and review
process, or that these issues or considerations will not require additional
adjustments to the Company's prior financial results for annual or quarterly
periods in addition to 2004. The filing of the Company's Form 10-K for the
fiscal year ended December 31, 2005 and the Company's Form 10-Q's for the
quarters ended March 31, 2006 and September 30, 2005 will be delayed pending the
completion of the restated consolidated historical financial statements. In
light of the uncertainty over the timing of the completion of the restatements,
the Company has withdrawn its appeal to the NASDAQ Listing and Hearing Review
Council to review the NASDAQ Listing Qualifications Panel's March 31, 2006
decision to delist the Company's securities from The NASDAQ National Market.

In addition, the Company's Board of Directors approved the terms of the
bonus arrangements for Jerry Chase, the Company's Chief Executive Officer, and
Mark Richman, the Company's Chief Financial Officer. Under the approved bonus
arrangements, Messrs. Chase and Richman are eligible to earn a target bonus
equal to 75% of their respective base salaries in accordance with their
employment agreements. Bonus awards, if any, will be based on achievement of
specified EBITDA and revenue objectives, each of which will be weighted equally
and will determine payment of the respective portion of the target bonus amount.

--------------------------------------------------------------------------------

Terayon Announces Retention of Current Auditor to Audit 2004 Financial
Statements
Page 2
MEANINGFUL CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS
Except for historical information contained in this press release, the matters
discussed in this news release are forward-looking statements within the meaning
of Section 27A of the Securities Act of 1933 and Section 21E of the Securities
Exchange Act of 1934, as amended. These forward-looking statements are subject
to a number of risks and uncertainties that may cause actual results to differ
materially from those contained in the forward-looking information, and are
based on current expectations, estimates, forecasts and projections of future
Company or industry performance based on management's judgment, beliefs, current
trends and market conditions. Such forward-looking statements include, but are
not limited to, statements relating to Terayon's financial condition, cash
balances and liquidity, Terayon's ability to complete the restatement and
reaudit and regain compliance with SEC reporting and NASDAQ listing
requirements; any potential re-listing of the Company's securities on The NASDAQ
National Market, and the trading of Terayon's common stock on the Pink Sheets.
There can be no assurance as to when Terayon's processes, such as the
restatement of its annual and quarterly financial statements, the audit and
review, as applicable, of its annual and quarterly financial statements by its
independent auditor, the filing of its Forms 10-K and 10-Q and compliance with
SEC reporting and NASDAQ listing requirements, will be completed, that the
restatement will not result in a finding of one or more material weaknesses in
internal control over financial reporting, that other accounting errors or
control deficiencies which individually or in the aggregate constitute a
material weakness will not be identified during the preparation and audit of the
consolidated financial statements, that adjustments to and restatements of other
periods will not be required, the need for and effective implementation of any
related corrective actions, and the ability of our independent auditors to
complete the restatements. In addition, our financial results, liquidity and
stock price may suffer as a result of the previously announced restatement, the
de-listing of our common stock by NASDAQ, any subsequent action by NASDAQ and
the trading of Terayon's common stock on the Pink Sheets, the extent to which
market makers for our stock exist and quote our stock on the Pink Sheets, the
cost of completing the restatement and the audit and review of the Company's
financial statements, the Company's ability to control operating expenses and
maintain adequate cash balances for operating the business going forward,
disagreement by any of the parties to the proposed settlement of the pending
class action litigation, the ongoing SEC investigation, any adverse response of
the Company's vendors, customers, stockholders, media and others relating to the
delay or restatement of the Company's financial statements or the de-listing of
our common stock from NASDAQ, adverse changes in economic, business,
competitive, technological and regulatory factors and trends, the review and
application of the Company's accounting processes, policies and procedures, and
additional uncertainties related to accounting. Actual outcomes and results may
differ materially from what is expressed, expected, anticipated, or implied in
any forward-looking statement. Additional information concerning these and other
risk factors affecting Terayon's business can be found in prior press releases
as well as in Terayon's public periodic filings with the Securities and Exchange
Commission, available via Terayon's web site at www.terayon.com. Terayon
disclaims any intent or obligation to update these forward-looking statements
beyond the date of this release.

--------------------------------------------------------------------------------

Terayon Announces Retention of Current Auditor to Audit 2004 Financial
Statements
Page 3
Note: Terayon and the Terayon logo are registered trademarks of Terayon
Communication Systems, Inc. All other trademarks are property of their
respective owners.
About Terayon
        Terayon Communication Systems, Inc. (Pink Sheets: TERN.PK) provides
real-time digital video networking applications to cable, satellite and
telecommunication service providers worldwide, which have deployed more than
6,000 of Terayon's digital video systems to localize services and advertising
on-demand and brand their programming, insert millions of digital ads, offer
HDTV and other digital video services. Terayon maintains its headquarters in
Santa Clara, California; has sales and support offices worldwide and is on the
web at www.terayon.com.
                                        # # #


            Press Contacts:      Investor Contact:
            Rebecca West         Kirsten Chapman / Moriah Shilton
            Atomic PR            Lippert/Heilshorn & Associates
            (415) 402-0230       (415) 433-3777
            rebecca@atomicpr.commoriah@lhai-sf.com

# EXHIBIT 12

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): November 7, 2006
TERAYON COMMUNICATION SYSTEMS, INC.
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 000-24647 | 77-0328533 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

2450 Walsh Avenue
Santa Clara, California 95051
(Address of Principal Executive Offices and Zip Code)
Registrant's telephone number, including area code: (408) 235-5500
(Former Name or Former Address, if Changed Since Last Report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

o Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

--------------------------------------------------------------------------------

## TABLE OF CONTENTS

Item 4.02(a). Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review
Item 9.01. Financial Statements and Exhibits.
SIGNATURE
INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED NOVEMBER 7, 2006
EXHIBIT 99.1

--------------------------------------------------------------------------------

Table of Contents

Item 4.02(a). Non-Reliance on Previously Issued Financial Statements or a
Related Audit Report or Completed Interim Review
On November 7, 2006, the Audit Committee of the Board of Directors of Terayon
Communication Systems, Inc. ("Terayon") concluded that the previously issued
financial statements contained in Terayon's Annual Report on Form 10-K for the
years ended December 31, 2003, 2002 and 2000, and for the quarters of 2003, 2002
and 2000 should no longer be relied upon. The restatement of financial
statements for 2003 will correct errors primarily relating to the recognition of
revenue, cost of goods sold and estimates of reserves. The restatement of
financial statements for 2000 and 2002 will correct errors primarily relating to
the need to separately value and account for an embedded derivative option
associated with Terayon's 5% convertible subordinated notes issued in July 2000,
and other accrual estimates. In March 2006, Terayon announced that it will
restate its consolidated financial statements for the year ended December 31,
2004, and for the four quarters of 2004 and the first two quarters of 2005. The
restatements are not expected to affect reported cash balances for any restated
period.
The Audit Committee discussed management's conclusions with Stonefield
Josephson, Inc., Terayon's current independent auditor. Stonefield Josephson,
Inc. has been engaged to audit Terayon's consolidated financial statements for
the year ended December 31, 2003.
The foregoing description is qualified in its entirety by reference to the
Registrant's Press Release dated November 8, 2006, a copy of which is attached
hereto as Exhibit 99.1 and incorporated herein by reference.
Item 9.01. Financial Statements and Exhibits.

(d) Exhibits.


Exhibit No.                        Description
   99.1    Press release issued by Terayon Communication Systems, Inc. on
           November 8, 2006 entitled "Terayon Announces Expected Restatement of
           Financial Statements"

--------------------------------------------------------------------------------

Table of Contents

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: November 8, 2006

Terayon Communication Systems, Inc.

By: /s/ Mark Richman
    Name:  Mark Richman
    Title: Chief Financial Officer

--------------------------------------------------------------------------------

Table of Contents

INDEX TO EXHIBITS FILED WITH
THE CURRENT REPORT ON FORM 8-K DATED NOVEMBER 7, 2006

Exhibit                                    Description
  99.1  Press release issued by Terayon Communication Systems, Inc. on November
        8, 2006 entitled "Terayon Announces Expected Restatement of Financial
        Statements"

Exhibit 99.1

Terayon Announces Expected Restatement of Financial Statements

Santa Clara, California -- November 8, 2006 -- Terayon Communication Systems, Inc. (Pink Sheets: TERN.PK) today announced that the Audit Committee of the Board of Directors, upon the recommendation of management, has concluded that the Company's consolidated financial statements for the years ended December 31, 2003, 2002 and 2000 and for the quarters of 2003, 2002 and 2000 should no longer be relied upon. The restatement of financial statements for 2003 will correct errors primarily relating to the recognition of revenue, cost of goods sold and estimates of reserves. The restatement of financial statements for 2000 and 2002 will correct errors primarily relating to the need to separately value and account for an embedded derivative option associated with the Company's 5% convertible subordinated notes issued in July 2000, and other accrual estimates. While no determination was made that the financial statements for 2001 cannot be relied upon, adjustments will be made to 2001 that will be reflected in the financial statements that the Company will include in its periodic reports to be filed with the Securities and Exchange Commission. Management currently expects the audit, re-audit and restatement process, as well as the filings of its periodic reports with restated financial statements, to be completed by the end of the 2006 calendar year.

The Audit Committee's determination represents the completion of the Company's previously announced review of accounting policies and practices for periods prior to 2004. In March 2006, the Company announced that it will restate its consolidated financial statements for the year ended December 31, 2004, and for the four quarters of 2004 and the first two quarters of 2005. The restatements are not expected to affect reported cash balances for any restated period.

The Audit Committee discussed management's conclusions with Stonefield Josephson, Inc., the Company's current independent auditor. Stonefield Josephson, Inc. has been engaged to audit the Company's consolidated financial statements for the year ended December 31, 2003.

--------------------------------------------------------------------------------

The actual amounts of adjustments to be made in any annual or quarterly period are being determined by management and will be audited and reviewed, as applicable, by Stonefield Josephson, Inc. There can be no assurance that management or the Company's independent auditor will not identify additional issues or other considerations in connection with the restatement and the audit and review process, or that these issues or considerations will not require additional adjustments to the Company's prior financial results for additional annual or quarterly periods.

MEANINGFUL CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS
Certain matters discussed in this news release constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, as amended. These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results to differ materially from those contained in the forward-looking information, and are based on current expectations, estimates, forecasts and projections of future Company or industry performance based on management's judgment, beliefs, current trends and market conditions. Such forward-looking statements include, but are not limited to, statements relating to Terayon's ability to complete the restatements and file its periodic reports containing financial statements by the end of the 2006 calendar year in order to regain compliance with Securities and Exchange Commission ("SEC") reporting requirements. There can be no assurance as to when Terayon's processes, such as the restatements of its annual and quarterly financial statements, the audit and review, as applicable, of its annual and quarterly financial statements by its independent auditor, the filing of its Forms 10-K and 10-Q amendments thereto and compliance with SEC reporting requirements, will be completed, if at all, that the restatements will not result in a finding of one or more material weaknesses in internal control over financial reporting, that other accounting errors or control deficiencies which individually or in the aggregate constitute a material weakness will not be identified during the preparation, audit and review of the consolidated financial statements, that adjustments for other periods will not be required, the need for and effective implementation of any related corrective actions, and the ability of our independent auditors to complete the audit and review, as applicable, of the restated financial statements for prior periods. We may not be able to complete the audit, re-audit and restatement process by the end of the 2006 calendar year, or at all. In addition, our financial results, liquidity and stock price may suffer as a result of the restatements, the cost of completing the restatements and the audit and review of the Company's financial statements, the Company's ability to control operating expenses and

--------------------------------------------------------------------------------

maintain adequate cash balances for operating the business going forward, any adverse response of the Company's vendors, customers, stockholders, media and others relating to the delay or restatements of the Company's financial statements, the review and application of the Company's accounting processes, policies and procedures, and additional uncertainties related to accounting. Actual outcomes and results may differ materially from what is expressed, expected, anticipated, or implied in any forward-looking statement. Additional information concerning these and other risks affecting Terayon's business can be found in prior press releases as well as in Terayon's public periodic filings with the SEC, available via Terayon's web site at www.terayon.com. Terayon disclaims any intent or obligation to update these forward-looking statements beyond the date of this release.

Note: Terayon and the Terayon logo are registered trademarks of Terayon Communication Systems, Inc. All other trademarks are property of their respective owners.

About Terayon

Terayon Communication Systems, Inc. provides real-time digital video networking applications to cable, satellite and telecommunication service providers worldwide, which have deployed more than 6,000 of Terayon's digital video systems to localize services and advertising on-demand and brand their programming, insert millions of digital ads, offer HDTV and other digital video services. Terayon maintains its headquarters in Santa Clara, California; has sales and support offices worldwide and is on the web at www.terayon.com.

# # #

Press Contacts:
Paul Schneider
Paul Schneider Public Relations, Inc.
(215) 702-9784
pspr@att.net

Investor Contact:
Kirsten Chapman / Moriah Shilton
Lippert/Heilshorn & Associates
(415) 433-3777
moriah@lhai-sf.com

# EXHIBIT 13

TERN.PK - Historical Prices for TERAYON COMMUN SYS# (Yahoo! Finance    Page 2 of 2

Case 4:08-cv-05968-CW    Document 37-10    Filed 08/09/2007    Page 2 of 3

Yahoo!   My Yahoo!   Mail   More    New User? Make Y! your home page Sign In
Help

# YAHOO! FINANCE                    Web Search

Dow ↑ 0.30%  Nasdaq ↓ 0.06%          Wednesday, March 7, 2007, 2:04PM ET - **U.S. Markets close in 1 hour**

Enter Symbol(s)    [ GET QUOTES ]    Symbol Lookup    Finance Search

## TERAYON COMMUN SYS# (TERN.PK)                    At 1:15PM ET: **2.12** ↑






## Historical Prices                    Get **Historical Prices** for: [        ] [ GO ]

### SET DATE RANGE                                            ADVERTISEMENT

**Start Date:** Nov ▾ | 1 | 2006    Eg. Jan 1,     ● Daily
                                    2003            ○ Weekly
**End Date:** Nov ▾ | 30 | 2006                    ○ Monthly
                                                   ○ Dividends Only

          [ Get Prices ]



                    First | Prev | Next | Last

### PRICES



| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|-----------|
| 30-Nov-06 | 1.69 | 1.70 | 1.66 | 1.70 | 129,000 | 1.70 |
| 29-Nov-06 | 1.57 | 1.71 | 1.57 | 1.70 | 386,400 | 1.70 |
| 28-Nov-06 | 1.56 | 1.60 | 1.55 | 1.57 | 223,600 | 1.57 |
| 27-Nov-06 | 1.71 | 1.72 | 1.60 | 1.60 | 434,600 | 1.60 |
| 24-Nov-06 | 1.70 | 1.74 | 1.65 | 1.72 | 172,100 | 1.72 |
| 22-Nov-06 | 1.57 | 1.71 | 1.54 | 1.70 | 856,200 | 1.70 |
| 21-Nov-06 | 1.41 | 1.57 | 1.39 | 1.57 | 519,900 | 1.57 |
| 20-Nov-06 | 1.31 | 1.42 | 1.27 | 1.42 | 199,700 | 1.42 |
| 17-Nov-06 | 1.28 | 1.34 | 1.28 | 1.31 | 343,400 | 1.31 |
| 16-Nov-06 | 1.29 | 1.30 | 1.29 | 1.29 | 41,200 | 1.29 |
| 15-Nov-06 | 1.27 | 1.30 | 1.27 | 1.30 | 79,300 | 1.30 |
| 14-Nov-06 | 1.35 | 1.35 | 1.26 | 1.28 | 178,900 | 1.28 |
| 13-Nov-06 | 1.40 | 1.40 | 1.35 | 1.35 | 143,700 | 1.35 |
| 10-Nov-06 | 1.39 | 1.41 | 1.36 | 1.41 | 61,300 | 1.41 |
| 9-Nov-06 | 1.35 | 1.40 | 1.35 | 1.40 | 220,700 | 1.40 |
| 8-Nov-06 | 1.33 | 1.38 | 1.19 | 1.38 | 676,000 | 1.38 |
| 7-Nov-06 | 1.33 | 1.36 | 1.32 | 1.34 | 58,300 | 1.34 |
| 6-Nov-06 | 1.36 | 1.40 | 1.31 | 1.32 | 157,400 | 1.32 |

Case 4:06-cv-03936-CW   Document 37-10   Filed 03/09/2007

| 3-Nov-06 | 1.52 | 1.53 | 1.31 | 1.37 | 431,500 | 1.37 |
| 2-Nov-06 | 1.52 | 1.55 | 1.49 | 1.53 | 379,400 | 1.53 |
| 1-Nov-06 | 1.52 | 1.55 | 1.50 | 1.53 | 149,100 | 1.53 |

\* Close price adjusted for dividends and splits.

First | Prev | Next | Last

⚒ Download To Spreadsheet

✉ Add to Portfolio     ☝ Set Alert     ✉ Email to a Friend

Get **Historical Prices** for Another Symbol: [          ] [GO] Symbol Lookup

• Stock Screener                                    • Splits

• Mergers & Acquisitions

_____

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

# EXHIBIT 14

As filed with the Securities and Exchange Commission on October 24, 2000

Registration No. 333-_____

--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____

FORM S-3
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

_____

TERAYON COMMUNICATION SYSTEMS, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 3661 | 77-0328533 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

2952 Bunker Hill Lane
Santa Clara, California  95054
(408) 727-4400
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

Edward Lopez
General Counsel
2952 Bunker Hill Lane
Santa Clara, California 95054
(408) 727-4400

(Name, address, including zip code, and telephone number, including area code,
of agent for service)

_____

Copies to:

Karyn S. Tucker
Angelique C. Tremble
Rachel N. Halpren
Cooley Godward LLP
One Maritime Plaza, 20/th/ Floor
San Francisco, CA 94111
(415) 693-2000

_____

Approximate date of commencement of proposed sale to the public:
As soon as practicable after the Registration Statement becomes effective.

--------------------------------------------------------------------------------

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box. [X]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement number for the same offering. [_]

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. [_]

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. [_]

CALCULATION OF REGISTRATION FEE

| Title of Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price per Share | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| 5% Convertible Subordinated Notes due August 1, 2007 | $500,000,000 | 100% (1) | $500,000,000 (1) | $132,000 |
| Common Stock, par value $0.001 per share (2) | 5,951,673 shares (2) | -- (3) | -- (3) | -- (3) |

(1)  Estimated soley for purposes of calculating the registration fee in accordance with Rule 457(i) of the Securities Act of 1933.

(2)  This number represents the number of shares of common stock that are initially issuable upon the conversion of 5% Convertible Subordinated Notes due August 1, 2007 (the "Notes" or "Convertible Notes") registered hereby. For purposes of estimating the number of shares of common stock to be included in the Registration Statement upon the conversion of the Notes, we calculated the number of shares issuable upon conversion of the Notes based on a conversion rate of 11.9033 shares per $1,000 principal amount of the Notes. In addition to the shares set forth in the table, pursuant to Rule 416 under the Securities Act of 1933, as amended, the amount to be registered includes an indeterminate number of shares of common stock issuable upon conversion of the Notes, as this amount may be adjusted as a result of stock splits, stock dividends and antidilution provisions.

(3)  No additional consideration will be received for the common stock, and, therefore, no registration fee is required pursuant to Rule 457(i).

---------------

    The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment that specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission (the "SEC"), acting pursuant to said Section 8(a), may determine.

The information in this prospectus is not complete and may be changed. The selling holders may not sell these securities until the Registration Statement filed with the SEC is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion
(October 24, 2000)

TERAYON COMMUNICATION SYSTEMS, INC.

$500,000,000

of 5% Convertible Subordinated Notes Due 2007 and 5,951,673 Shares
of Common Stock Issuable Upon Conversion of the Notes

This prospectus relates to the Notes of Terayon Communication Systems, Inc., a Delaware Corporation, held by certain holders of the Notes who may offer for sale the Notes and the shares of common stock into which the Notes are convertible at any time at market prices prevailing at the time of the sale or at privately negotiated prices. The selling holders may sell the Notes or the common stock directly to purchasers or through underwriters, broker-dealers or agents, who may receive compensation in the firm of discounts, concessions or commissions.

The holders of the Notes may convert the Notes into shares of our common stock at any time at a conversion rate of 11.9033 shares per $1,000 principal amount of Notes. Interest on the Notes is payable on February 1 and August 1 of each year, commencing on February 1, 2001. After October 24, 2000, we may redeem the Notes, in whole or in part, at the redemption prices as set forth in this prospectus. However, we may not redeem the Notes on or after October 24, 2000 and before August 7, 2003 unless the closing price of our stock exceeds 150% of the conversion price then in effect for at least 20 trading days in a consecutive 30-day period preceding the date we mail the redemption notice. As of the date of this prospectus, the conversion price is $84.01 per share.

In the event of a change in control, defined in this prospectus, each holder of Notes may require us to repurchase the Notes for cash at 100% of the principal amount of the Notes plus accrued interest.

The Notes are unsecured obligations that are subordinated in right of payment to all of our existing and future senior indebtedness.

There are no sinking fund provisions.

Our common stock is listed on the Nasdaq National Market under the symbol "TERN." On October 23, 2000, the closing sale price of our common stock, as reported on the Nasdaq National Market, was $23.75.

The Notes are currently eligible for trading on the Portal Market of the National Association of Securities Dealers, Inc.

Investing in our common stock involves a high degree of risk. See "Risk Factors" beginning on page 6.

The securities offered or sold under this prospectus have not been approved by the SEC or any state securities commission, nor have these organizations determined that this prospectus is accurate or complete. Any representation to

the contrary is a criminal offense.

The date of this prospectus is _____, 2000

In connection with this offering, no person is authorized to give any information or to make any representations not contained in this prospectus. If information is given or representations are made, you may not rely on that information or those representations as having been authorized by us. This prospectus is neither an offer to sell nor a solicitation of an offer to buy an securities other than those registered by this prospectus, nor is it an offer to sell or a solicitation of an offer to buy securities where an offer or solicitation would be unlawful. You may not imply from the delivery of this prospectus, nor from any sale made under this prospectus, that our affairs are unchanged since the date of this prospectus or that the information contained in this prospectus is correct as of any time after the date of this prospectus.

Terayon, TeraComm, TeraLink, TeraPro, TeraView, CherryPicker and the Terayon logo are our trademarks. This prospectus also includes trade dress, trade names and trademarks of other companies. Our use or display of other parties' trademarks, trade dress or products is not intended to and does not imply a relationship with the trademark or trade dress owners.

Unless the context otherwise requires, the terms "we," "our," "us" or "Terayon" refers to Terayon Communication Systems, Inc., a Delaware corporation.

All share numbers in this prospectus reflect the two-for-one stock split effected by us on April 25, 2000.

DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

In addition to the historical information contained in this prospectus, this prospectus contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Exchange Act of 1934. We make "forward-looking statements" throughout this prospectus. Whenever you read a statement that is not simply a statement of historical fact (such as when we describe what we "believe," "expect" or "anticipate" will occur, and other similar statements), you must remember that our expectations may not be correct, even though we believe they are reasonable. We do not guarantee that the transactions and events described in this prospectus will happen as described (or that they will happen at all) and that actual results could differ materially. The sections entitled "Risk Factors" beginning on page 6 of this prospectus, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business" in our Annual Report, Quarterly Reports and Form 8-K filed in July 2000 contain a discussion of some of the factors that could contribute to those differences You should read this prospectus completely and with the understanding that actual future results may be materially different from what we expect. We will not update these forward-looking statements, even though our situation may change in the future. Whether actual results will conform with our expectations and predictions is subject to a number of risks and uncertainties including but not limited to:

. risks associated with the effect of economic conditions;

. future capital needs;

. our ability to identify, complete and integrate acquisitions successfully;

. risks associated with retaining our significant customers;

. our strategies for reducing the costs of our products;

. our product development efforts;

. the impact of competition and technological change on us;

. the timing of our introduction of new products and the extent of the deployment of our products by our customers;

. our dependence on industry trends and the future growth in the markets for cable modem systems and other broadband access systems;

. the impact of legislation and regulation;

. the loss of key employees; and

. the loss associated with future and pending ligitation matters, as they may arise

You should read carefully the section of this prospectus under the heading "Risk Factors" beginning on page 6. We assume no responsibility for updating forward-looking information contained in this prospectus.

1.

PROSPECTUS SUMMARY

The following is a summary of our business. You should carefully read the section entitled "Risk Factors" in this prospectus, our Annual Report on Form 10-K for the year ended December 31, 1999, our Quarterly Report on Form 10-Q for the quarter ended June 30, 2000, our Report on Form 8-K filed with the SEC on July 18, 2000 and our Report on Form 8-K filed with the SEC on October 23, 2000 for more information on our business and the risks involved in investing in our stock.

Terayon

Overview

We develop, market and sell broadband access systems that enable cable operators and other providers of broadband access services to cost effectively deploy reliable broadband access services over cable, copper wire utilizing digital subscriber line technology (or DSL) and wireless systems. We have substantial development and marketing resources focused on cable operators. However, through internal development and recent acquisitions of complementary technology and businesses, we also are focusing on service providers that offer broadband access through existing copper wire infrastructures and wireless systems.

In recent years, the volume of bandwidth-intensive data, voice and video traffic across existing cable infrastructure, the Internet, corporate intranets and other public networks has increased dramatically. International Data Corporation estimates that the number of worldwide Internet users will increase from approximately 200 million at the end of 2000 to more than one billion by the end of 2005. IDC estimates that the number of homes in the United States with broadband access will increase from two million at the end of 1999 to 20 million by the end of 2003. As a result of the rapid evolution of broadband access, cable operators, providers of telephone services and other service providers are providing a bundle of voice, data and video services to their residential and commercial subscribers over existing and new infrastructures.

Our objective is to be the leading provider of broadband access systems to providers of broadband services that use existing cable, copper wire (DSL) and wireless networks to offer services to residential and commercial customers. Key elements of our strategy include the following:

    . build a complete portfolio of broadband products;

    . supply leading broadband service providers worldwide;

    . increase our presence in existing and new markets;

    . extend technology leadership and advance industry standards; and

    . provide superior customer support.

Our primary product is the TeraComm system, which is based on our patented Synchronous Code Division Multiple Access or "S-CDMA" technology. Our S-CDMA technology enables reliable two-way broadband data communications over both pure coaxial and hybrid fiber/coax cable infrastructure and is designed to enable cable operators to maximize the capacity and reliability of broadband data services over any cable plant. In furtherance of our strategy to provide a complete portfolio of broadband products, we have recently completed several

acquisitions of complementary broadband technologies, including digital video
management systems, DSL and wireless.

2.

We sell our broadband access products to cable operators and other providers of broadband access services through direct sales forces in North America, South America, Europe and Asia. We also distribute our products via distributors and systems integrators. Companies currently using or distributing our TeraComm system include Rogers Communications, Inc., Shaw Communications, Inc., TCA Cable TV, Inc. (a subsidiary of Cox Communications, Inc.), United Pan-Europe Communications and Crossbeam Networks Corporation, a wholly owned subsidiary of Sumitomo Corporation. Companies currently using our DSL products include major ILEC's (Incumbent Local Exchange Carriers) in the United States, including SBC, Bell Atlantic, Bell South, U.S. West and GTE.

Our company was incorporated in California in January 1993 and reincorporated in Delaware in July 1998. Our executive offices are located at 2952 Bunker Hill Lane, Santa Clara, California 95054 and our telephone number is (408) 727-4400. Our Web site is located at www.terayon.com. Information contained on our Web site does not constitute part of this offering memorandum.

Recent Events

In July 2000, we issued the Notes, which resulted in net proceeds to us of approximately $484.5 million. The Notes are a general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and all of the liabilities of our subsidiaries. The Notes are convertible into shares of common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000, unless previously redeemed or repurchased. We may redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of our stock exceeds 150% of the conversion price for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. We may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semiannually. Our debt issuance costs related to the Notes are estimated at $15.5 million.

In September 2000, we acquired two companies: (i)Digital Transmission Equipment ("Digitrans"), a company that develops, markets and sells digital equipment solutions that enable broadcasters, satellite operators and cable television system operators to optimize network services; and (ii)Mainsail Networks, Inc., a company that develops and markets next-generation broadband networks that enable telecommunications carriers to deliver multiple services over a single network infrastructure.

3.

Summary Consolidated Financial Data
(in thousands, except per share data)

The following historical consolidated statement of operations data for the years ended December 31, 1997, 1998 and 1999 is derived from our audited financial statements. The unaudited statement of operations data for the six months ended June 30, 1999 and 2000 and consolidated balance sheet data as of June 30, 2000 is derived from our Quarterly Report on Form 10-Q filed on August 14, 2000 with the Securities and Exchange Commission. The unaudited pro forma combined condensed financial data is derived from the Current Report on Form 8-K/ A filed on October 18, 2000 incorporated by reference. The unaudited pro forma combined condensed financial information does not include the Internet Telecom Ltd. and Ultracom Communication Holdings (1995) Ltd. acquisitions, which were consummated in April 2000 and the Digitrans acquisition, which was consummated in September 2000 as these transaction are insignificant individually and in the aggregate. The purchase price for the Internet Telecom, Ultracom and Digitrans acquisitions is estimated at approximately $111 million. We believe that a significant portion of the Internet Telecom, Ultracom and Digitrans purchase price will be allocated to intangible assets, including goodwill. The intangible assets will be amortized over lives expected to range from two to five years.

| | Historical | | | Pro Forma | Six Months | Six Months | Pro Forma Six |
| | Years Ended December 31, | | | December 31, | Ended June | Ended June | Months Ended |
| | 1997 | 1998 | 1999 | 1999[1] | 30, 1999 | 30, 2000 | June 30, 2000[2] |
|---|---|---|---|---|---|---|---|
| Consolidated Statement of Operations Data: | | | | | | | |
| Revenues.................... | $ 2,118 | $ 31,696 | $ 97,009 | $ 182,743 | $ 34,955 | $ 151,356 | $ 169,322 |
| Cost of goods sold................ | 6,462 | 34,518 | 72,044 | 174,762 | 29,229 | 110,448 | 134,302 |
| Gross profit (loss)............... | (4,344) | (2,822) | 24,965 | 7,981 | 5,726 | 40,908 | 35,020 |
| Operating expenses: | | | | | | | |
| Research and development.......... | 11,319 | 10,685 | 17,579 | 55,116 | 7,106 | 27,134 | 38,709 |
| Cost of product development assistance agreement............. | --- | --- | 35,147 | 35,147 | 12,793 | 9,563 | 9,563 |
| In-process research and development........................ | --- | --- | 14,600 | --- | --- | 19,835 | 4,300 |
| Sales and marketing.............. | 4,468 | 6,947 | 15,727 | 35,391 | 5,852 | 18,472 | 24,135 |
| General and administrative.......... | 2,546 | 3,223 | 7,476 | 19,544 | 2,712 | 9,946 | 13,251 |
| Goodwill amortization............ | --- | --- | 3,524 | 68,758 | --- | 21,650 | 37,917 |
| Total operating expenses......... | 18,333 | 20,855 | 94,053 | 213,956 | 28,463 | 106,600 | 127,875 |
| Loss from operations............. | (22,677) | (23,677) | (69,088) | (205,975) | (22,737) | (65,692) | (92,855) |
| Net interest income | 128 | 449 | 5,008 | 3,946 | 2,197 | 2,934 | 2,780 |
| Net loss........................ | (22,549) | (23,228) | (64,080) | (202,029) | (20,540) | (62,758) | (90,075) |
| Series F convertible preferred | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| stock dividend.................. | --- | (23,910) | --- | --- | --- | --- | --- |
| | -------- | -------- | -------- | ---------- | ---------- | ---------- | --------------- |
| Net loss applicable to common stockholders..................... | $(22,549) | $(47,138) | $(64,080) | $ (202,029) | $ (20,540) | $ (62,758) | $ (90,075) |
| | ======== | ======== | ======== | ========== | ========== | ========== | =============== |
| Historical basis and diluted net loss per share applicable to common stockholders.............. | $ (2.63) | $ (2.62) | $ (1.55) | $ (3.70) | $ (0.53) | $ (1.09) | $ (1.51) |
| | ======== | ======== | ======== | ========== | ========== | ========== | =============== |
| Shares used in computing historical basic and diluted net loss per share applicable to common stockholders[5] | 8,578 | 17,972 | 41,260 | 54,650 | 38,850 | 57,696 | 59,489 |
| | ======== | ======== | ======== | ========== | ========== | ========== | =============== |

4.

|  | June 30, 2000 | | |
| Consolidated Balance Sheet Data: | Actual | Pro Forma [3] | Pro Forma As Adjusted [4] |
| --- | --- | --- | --- |
| Cash, cash equivalents and short-term investments............ | $ 121,347 | $ 124,891 | $ 609,366 |
| Working capital............................................. | 130,074 | 126,818 | 611,293 |
| Total assets................................................ | 746,307 | 891,539 | 1,391,539 |
| Long-term debt (less current portion)....................... | 876 | 876 | 500,876 |
| Accumulated deficit......................................... | (211,170) | (216,170) | (216,170) |
| Total stockholders' equity.................................. | $ 630,011 | $ 767,941 | $ 767,941 |

---

[1]  The pro forma consolidated statement of operations data for the year ended
     December 31, 1999 reflect Terayon's acquisition of Imedia Corporation,
     Radwiz Ltd and Telegate Ltd. as if they had taken place on January 1, 1999.
     See the Current Report on Form 8-K/A filed on October 18, 2000 incorporated
     by reference.

[2]  The pro forma consolidated statement of operations data for the six months
     ended June 30, 2000 reflect Terayon's acquisition of Access Network
     Electronics Division of Tyco Electronics Corporation ("ANE"), ComBox Ltd.
     and Mainsail as if they had taken place on January 1, 2000. See the Current
     Report on Form 8-K/A filed on October 18, 2000 incorporated by reference.

[3]  The pro forma balance sheet data reflects Terayon's acquisition of ANE,
     ComBox and Mainsail as if they had taken place on June 30, 2000. See the
     Current Report on Form 8-K/A filed on October 18, 2000 incorporated by
     reference .

[4]  Adjusted to give effect the net proceeds of the sale of the Notes.

[5]  Terayon's Board of Directors approved a two-for-one stock split in April
     2000. The split was paid in the form of a stock dividend to all
     stockholders of record on April 25, 2000, and was distributed on May 5,
     2000. All share numbers reflect the two-for-one split.

                                    5.

RISK FACTORS

You should carefully consider the risks described below before making an investment decision. The risks and uncertainties described below are not the only ones facing our company. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment.

We Have a Limited Operating History and a History of Losses.

We have a limited operating history, and it is difficult to predict our future operating results. We began shipping products commercially in June 1997, and we only have been shipping products in volume since the first quarter of 1998. As of June 30, 2000, we had an accumulated deficit of $211.2 million. We believe that we will continue to experience net losses for the foreseeable future. Most of our expenses are fixed in advance, and we generally are unable to reduce our expenses significantly in the short term to compensate for any unexpected delay or decrease in anticipated revenues. We expect to continue to increase expenses for the foreseeable future to support increased sales and marketing and technical support costs. Any significant delay in our anticipated revenues or commercialization of new products would harm our business. The revenue and profit potential of our business and our industry are unproven. We had negative gross margins from our inception until the fourth quarter of 1998, and any future revenue growth may not result in positive gross margins or operating profits in future periods.

Our Operating Results May Fluctuate.

Our quarterly revenues are likely to fluctuate significantly in the future due to a number of factors, many of which are outside our control. Factors that could affect our revenues include the following:

. variations in the timing of orders and shipments of our products;

. variations in the size of the orders by our customers;

. new product introductions by competitors;

. delays in our introduction of new products;

. delays in our receipt of orders forecasted by our customers;

. delays by our customers in the completion of upgrades to their cable infrastructure;

. variations in capital spending budgets of broadband access service providers;

. adoption of industry standards and the inclusion in or compatibility of our technology with any such standards; and

. delays in obtaining regulatory approval for commercial deployment of cable modem systems.

Our expenses generally will vary from quarter to quarter depending on the level of actual and anticipated business activities. Research and development

expenses will vary as we begin development of new products and as our development programs move to wafer fabrication and prototype development, which results in higher engineering expenses.

A variety of factors affect our gross margin, including the following:

. the sales mix of our products;

6.

. the volume of products manufactured;

. the type of distribution channel through which we sell our products;

. the average selling prices or "ASPs" of our products; and

. the effectiveness of our cost reduction measures.

We anticipate that unit ASPs of our products will decline in the future. This could cause a decrease in the gross margins for these products. In addition, the maturity of TeraComm system deployments affects our gross margin. New deployments of the TeraComm system involve the sale of headend equipment (which has higher margins) and generally involve smaller quantities of product. New deployments typically are sold at higher margins than the larger volume sales of product associated with more mature deployments of the TeraComm system. The sales mix of TeraLink 1000 Master Controllers, TeraLink Gateways and TeraPro cable modems also affects our gross margin. The TeraPro cable modems have significantly lower margins than the TeraLink 1000 Master Controller and TeraLink Gateway headend products. We expect to achieve significantly lower margins on the TeraPro cable modems for the foreseeable future. Further, we expect that sales of TeraPro cable modems will continue to constitute a significant portion of our revenues for the foreseeable future.

We also anticipate that our operating results will be impacted by sales, gross profit and operating expenses of acquired companies. The impact of these factors on our operating results will vary as we acquire additional companies.

We Are Dependent on a Small Number of Customers.

Two related party customers accounted for approximately 39% of our revenues for the quarter ended June 30, 2000 and two customers (one of which is a related party) accounted for approximately 46% of our revenues for the quarter ended June 30, 1999. In the six months ended June 30, 2000, three customers (two of which are related parties) accounted for approximately 51% of our revenues compared to approximately 58% of our revenues from three customers (one of which is a related party) for the same period last year. We believe that a substantial majority of our revenues will continue to be derived from sales to a relatively small number of customers for the foreseeable future. In addition, we believe that sales to these customers will be focused on a limited number of projects.

The cable industry is undergoing significant consolidation in North America and internationally, and a limited number of cable operators controls an increasing number of cable systems. Currently, ten cable operators in the United States own and operate facilities passing approximately 86% of total homes passed. In addition, the North American DSL market is concentrated with the major ILECs, constituting a significant percentage of the market. As a result, our sales will be largely dependent upon product acceptance by the leading broadband service providers. Currently, the timing and size of each customer's order is critical to our operating results. Our major customers are likely to have significant negotiating leverage and may attempt to change the terms, including pricing, upon which we do business with them. These customers also may require longer payment terms than we anticipate, which could require us to raise additional capital to meet our working capital requirements.

Acquisitions Could Result In Dilution, Operating Difficulties and Other Adverse Consequences.

We have acquired nine businesses since September 1999: Imedia in September 1999; Radwiz in November 1999; Telegate in January 2000; ANE in April 2000; ComBox in April 2000; some assets of Internet Telecom in April 2000; Ultracom in April 2000; Digitrans in September 2000; and Mainsail in September 2000. If appropriate opportunities present themselves, we intend to acquire additional businesses, technologies, services or products that we believe are strategic. The process of integrating any acquired business into our business and operations is risky and may create unforeseen operating difficulties and expenditures. The areas in which we may face difficulties include:

7.

. diversion of management time (both ours and that of the acquired
  companies) during the period of negotiation through closing and after
  closing from the ongoing development of our businesses, issues of
  integration and future products;

. decline in employee morale and retention issues resulting from changes in
  compensation, reporting relationships, future prospects or the direction
  of the business;

. the need to integrate each company's accounting, management information,
  human resource and other administrative systems to permit effective
  management, and the lack of control if this integration is delayed or not
  implemented; and

. the need to implement controls, procedures and policies appropriate for a
  larger public group of companies that prior to acquisition had been
  smaller, private companies.

We have very limited experience in managing this integration process.
Moreover, the anticipated benefits of any or all of these completed or pending
acquisitions may not be realized.

Future acquisitions could result in potentially dilutive issuances of equity
securities, the incurrence of additional debt, contingent liabilities or
amortization expenses related to goodwill and other intangible assets, any of
which could harm our business. Future acquisitions also could require us to
obtain additional equity or debt financing, which may not be available on
favorable terms or at all. Even if available, this financing may be dilutive.

The Sales Cycle for Our Products Is Lengthy.

The sales cycle associated with our products typically is lengthy, often
lasting six months to a year. Our customers typically conduct significant
technical evaluations of competing technologies prior to the commitment of
capital and other resources. In addition, purchasing decisions may be delayed
because of our customers' internal budget approval procedures. Sales also
generally are subject to customer trials, which typically last three months.
Because of the lengthy sales cycle and the large size of customers' orders, if
orders forecasted for a specific customer for a particular quarter do not occur
in that quarter, our operating results for that quarter could suffer.

There Are Many Risks Associated with Our Participation in the Establishment of
Advanced Physical Layer Specifications to Be Added to DOCSIS.

In November 1998, CableLabs selected us to co-author DOCSIS 1.2 (Data Over
Cable Service Interface Specifications), an enhanced version of the DOCSIS cable
modem specification based in part on our S-CDMA technology. In September 1999,
CableLabs indicated that it intended to proceed with the advanced physical layer
("PHY") work on two parallel tracks: one for the development of a prototype
based on our S-CDMA technology and one for the inclusion of Advanced TDMA
technology (Time Division Multiple Access), as proposed by other companies. In
February 2000, CableLabs further clarified the status of the advanced PHY
project regarding a separate release that will include TDMA technologies. In
addition, CableLabs reiterated that it is continuing to work with us on the
development of a DOCSIS specification that could include our S-CDMA technology.
To that end, CableLabs has requested that we submit a prototype of a DOCSIS
system that incorporates an S-CDMA advanced PHY capability for testing.
CableLabs has stated that if the testing of this prototype reveals that the S-

CDMA advanced PHY works as claimed (including proper backwards compatibility and coexistence with the other aspects of DOCSIS), and if the costs for adding S-CDMA to DOCSIS products are in line with estimates, then it is likely, but not certain, that S-CDMA advanced PHY capabilities will be included in a future version of the DOCSIS specification.  The prototype we submit to CableLabs may fail to demonstrate the level of performance that CableLabs seeks; even if it does meet performance expectations there can be no guarantee that CableLabs will incorporate the technology into a future version of DOCSIS specifications.  In addition, if CableLabs does proceed to include S-CDMA in a future DOCSIS specification, there can be no guarantee that the DOCSIS S-CDMA specification will be the same as the specification we incorporated in the prototype submitted for tests, which may require us to further develop our prototype.

Our future revenues and operating results are likely to suffer if S-CDMA is not included in a future release of

8.

DOCSIS. We also may incur substantial additional research and development expenditures to adapt our specifications to the version adopted by CableLabs. CableLabs has not established a schedule for adding the S-CDMA capabilities to the DOCSIS specifications. Delays in the establishment of a final specification for S-CDMA in DOCSIS could harm our plans to sell DOCSIS compatible modems and headend equipment. In particular, if the final DOCSIS S-CDMA specification is not approved prior to the time when we are ready to ship DOCSIS products with S-CDMA features included, then we may be required to delay the introduction of those products until the DOCSIS S-CDMA specification is released or to introduce the S-CDMA features as proprietary enhancements to a standard DOCSIS product. Either one of these events could harm revenues and operating results.

We have already given CableLabs assurances that we will contribute some aspects of our proprietary S-CDMA technology to a royalty-free intellectual property pool, if S-CDMA is included in a future version of DOCSIS specifications.  This royalty-free pool has been established by CableLabs to facilitate the participation of as many vendors as possible in providing equipment that is compatible with the DOCSIS specifications.  As a result, any of our competitors who join the DOCSIS intellectual property pool would have access to some aspects of our technology and would not be required to pay us any royalties or other compensation.  If a competitor is able to duplicate the functionality and capabilities of our technology, we could lose some or all of the time-to-market advantage we might otherwise have, which could harm our future revenues and operating results.

We believe the addition of advanced upstream PHY capabilities to DOCSIS will increase the overall market for DOCSIS-compatible products, and as such will result in increased competition in the cable modem market.  This competition could come from existing competitors or from new competitors who enter the market as a result of the enhancements to the specifications.  This increased competition is likely to result in lower ASPs of cable modem systems and could harm revenues and gross margins.  Because our competitors will be able to incorporate some aspects of our technology into their products, our current customers may choose alternate suppliers or choose to purchase DOCSIS-compliant cable modems with advanced PHY capabilities from multiple suppliers.  We may be unable to produce DOCSIS compliant cable modems with advanced PHY capabilities more quickly or at lower cost than our competitors.  The inclusion of our S-CDMA technology in future DOCSIS specification could result in increased competition for the services of our existing employees who have experience with S-CDMA.  The loss of these employees to one or more competitors could harm our business.

DOCSIS standards have not yet been accepted in Europe and Asia.  An alternate standard for cable modem systems, called the EuroModem standard, or Digital Video Audio Council ("DAVIC")/Digital Video Broadcasting ("DVB"), has been formalized, and some European cable system operators have embraced it.  We intend to develop and sell products that comply with the EuroModem standard and to pursue having portions of our S-CDMA technology included in a future version of the EuroModem standard.  We may be unsuccessful in these efforts.

We Need to Develop New Products in Order to Remain Competitive

Our future success will depend in part on our ability to develop, introduce and market new products in a timely manner.  We also must respond to competitive pressures, evolving industry standards and technological advances.  Our current S-CDMA products are not DOCSIS-compliant.  We are currently developing a prototype of a DOCSIS system that incorporates an S-CDMA advanced PHY capability for testing and eventual inclusion in the DOCSIS standard.  There is no guarantee that we will be successful in developing the prototype or that the

prototype, if successfully developed, will be included in a future release of the DOCSIS standard.  We anticipate that during the year 2000, existing or potential customers may delay purchases of our TeraComm system in order to purchase systems that comply with the DOCSIS standard.  In addition, potential new customers could decide to purchase DOCSIS-compliant products from one or more of our competitors rather than from us.  As a result, our product sales in the second half of the year 2000 may be lower than we anticipate.  In order to promote sales of our current products, we may be required to reduce our prices for sales to existing customers.  This would harm our operating results and gross margin.

As a result of the inclusion of TDMA technology in the new DOCSIS version announced by CableLabs in February 2000, we will have to incorporate advanced TDMA technology into our DOCSIS-compliant products.  If we are unable to do this effectively, or in a timely manner, we will lose some or all of the time-to-market advantage we might otherwise have had.

9.

Our future success will also depend on our ability to develop and market products for broadband applications over DSL and wireless networks. The markets for these broadband applications are also subject to evolving standards, such as NEBS compliance in the North American DSL market, and technological advances in these arenas. There is no guarantee that we will be successful in developing products that are compliant with these standards or that we will be successful in keeping pace with future technological advances in this arena.

Average Selling Prices of Broadband Access Equipment Typically Decrease.

The broadband access systems market has been characterized by erosion of average selling prices. We expect this to continue. This erosion is due to a number of factors, including competition, rapid technological change and price performance enhancements. The ASPs for our products may be lower than expected as a result of competitive pricing pressures, our promotional programs and customers who negotiate price reductions in exchange for longer term purchase commitments. We anticipate that ASPs and gross margins for our products will decrease over product life cycles. In addition, we believe that the widespread adoption of industry standards is likely to further erode ASPs, particularly for cable modems and other similar consumer premise equipment. It is likely that the widespread adoption of industry standards will result in increased retail distribution of cable modems and other similar consumer premise equipment, which could put further price pressure on our products. Decreasing ASPs could result in decreased revenue even if the number of units sold increases. As a result, we may experience substantial period-to-period fluctuations in future operating results due to ASP erosion. Therefore, we must continue to develop and introduce on a timely basis next-generation products with enhanced functionalities that can be sold at higher gross margins. Our failure to do this could cause our revenues and gross margin to decline.

We Must Achieve Cost Reductions.

Certain of our competitors currently offer products at prices lower than ours. Market acceptance of our products will depend in part on reductions in the unit cost of our products. We expect that as headend equipment becomes more widely deployed, the price of cable modems and other similar consumer premise equipment will decline. In particular, we believe that the widespread adoption of industry standards such as DOCSIS will cause increased price competition for consumer premise equipment. However, we may be unable to reduce the cost of our products sufficiently to enable us to compete with other suppliers. Our cost reduction efforts may not allow us to keep pace with competitive pricing pressures or lead to gross margin improvement.

Some of our competitors are larger and manufacture products in significantly greater quantities than we intend to for the foreseeable future. Consequently, these competitors have more leverage in obtaining favorable pricing from suppliers and manufacturers. In order to remain competitive, we must significantly reduce the cost of manufacturing our cable modems through design and engineering changes. We may not be successful in redesigning our products. Even if we are successful, our redesign may be delayed or may contain significant errors and product defects. In addition, any redesign may not result in sufficient cost reductions to allow us to significantly reduce the list price of our products or improve our gross margin. Reductions in our manufacturing costs will require us to use more highly integrated components in future products and may require us to enter into high volume or long-term purchase or manufacturing agreements. Volume purchase or manufacturing agreements may not be available on acceptable terms. We could incur expenses without related revenues if we enter into a high volume or long-term purchase or

manufacturing agreement and then decide that we cannot use the products or services offered by such agreement.

We Must Keep Pace with Rapid Technological Change to Remain Competitive.

     The markets for our products are characterized by rapid technological change, evolving industry standards, changes in end-user requirements and frequent new product introductions and enhancements.  Our future success will depend upon our ability to enhance our existing products and to develop and introduce new products that achieve market acceptance.  Providers of broadband access services may adopt alternative technologies or they may deploy alternative services that are incompatible with our products.

     The demand for broadband access services has resulted in the development of several competing modulation technologies.  For example, some of our cable products utilize a modulation technology known as S-CDMA, while several of our competitors utilize modulation technologies known as TDMA and Frequency Division Multiple

10.

Access or "FDMA." Our headend equipment and cable modem products currently are not interoperable with the headend equipment and modems of other suppliers of broadband access products. As a result, potential customers who wish to purchase broadband access products from multiple suppliers may be reluctant to purchase our products. Although our technology may be incorporated into a future version of a DOCSIS specification or another industry standard, we cannot be certain that major cable operators will adopt these standards. Major cable operators may not adopt products or technologies based on our current proprietary S-CDMA technology or on any future industry standard S-CDMA technology. Further, major cable operators may adopt products or standards technologies based on competing modulation technologies. If competitors using other modulation technologies can incorporate functionality and capabilities currently found in S-CDMA, the value of our S-CDMA technology would be diminished.

Broadband Access Services Have Not Achieved Widespread Market Acceptance, and Many Competing Technologies Exist.

    Our success will depend upon the widespread commercial acceptance of broadband access services by service providers and end users of broadband access services.  The market for these services is not fully developed.  We cannot accurately predict the future growth rate or the ultimate size of the market for broadband access services.  Potential users of our products may have concerns regarding the security, reliability, cost, ease of installation and use and capability of broadband access services in general.

    The market for our products may be impacted by the development of other technologies that enable the provisioning of broadband access services and the deployment of services over other media.  Widespread acceptance of other technologies or deployment of services over media not supported by our products could materially limit acceptance of our broadband access systems.  Broadband access services based on our products and technology may fail to gain widespread commercial acceptance by providers of broadband access services and end users. In addition, we only recently began to offer products based on alternate technologies such as DSL.  We may not be successful in marketing and selling these products.

We Need to Develop Additional Distribution Channels.

    We presently market our TeraComm system to cable operators and systems integrators.  We believe that much of the North American cable modem market may shift to a retail distribution model.  Accordingly, we may need to redirect our future marketing efforts to sell our cable modems directly to retail distributors and end users.  This shift would require us to establish new distribution channels for our products.

We May Be Unable to Establish These Additional Distribution Channels.

    If we do establish them, we may be unable to hire the additional personnel necessary to foster and enhance such distribution channels.  In addition, if the cable modem market shifts to a retail distribution model, we may not successfully establish a retail distribution presence.  To the extent that large consumer electronics companies enter the cable modem market, their well-established retail distribution capabilities would provide them with a significant competitive advantage.  We may be unable to market effectively to broadband access service providers.  Our growth and future success will be substantially dependent upon our ability to convince providers of broadband access services to adopt our technologies, purchase our products and effectively market our products to end users.  Our potential customers are likely to prefer

purchasing products from established manufacturing companies that can demonstrate the capability to supply large volumes of products on short notice. In addition, many of our potential customers may be reluctant to adopt technologies that have not gained acceptance among other providers of similar services. This reluctance could result in lengthy product testing and acceptance cycles for our products. Consequently, the impediments to our initial sales may be even greater than those to later sales.

No established distribution network in the cable modem industry exists that would provide us with easy access to smaller or geographically diverse cable operators. Therefore, our initial sales to larger, more established cable operators are critical to our business. Although we intend to establish strategic relationships with leading distributors worldwide, we may not succeed in establishing these relationships. Even if we do establish these relationships, the distributors may not succeed in marketing our products to cable operators. Some of our competitors have already established relationships with certain cable operators. These established relationships may

11.

further limit our ability to sell products to those cable operators. We do not have long, well-established relationships with those cable operators. If we were to sell our products to those cable operators, it would likely not be based on long-term contracts and those customers would be able to terminate their relationships with us at any time.

In addition, one or more of our current customers could cancel its relationship with us at any time.  We have recently begun marketing and selling our products to providers of DSL and wireless broadband services and thus we have very limited experience.  We do not have long, well-established relationships with these providers, and we may not be successful in establishing these relationships.

We Are Dependent on Broadband Service Providers Choosing to Offer Additional Services to Their Customers.

We depend on cable operators to purchase our cable modem systems and to provide our cable modems to end-users.  Cable operators have a limited amount of available bandwidth over which they can offer robust data services, and they may not choose to provide these data services to their customers.  If cable operators choose to provide these services, we also will depend upon them to market these services to cable customers, to install our equipment and to provide support to end-users.  In addition, we will be highly dependent on cable operators to continue to maintain their cable infrastructure in a manner that allows us to provide consistently high performance and reliable services.  Our success also will depend upon the acceptance of our products by other providers of services to the cable industry, such as Excite@Home's @Home Network and Road Runner, a joint venture between MediaOne Group, Inc. and Time Warner Cable. Sales of our DSL and wireless products are also dependent on service providers choosing to purchase our products and to provide additional services to their end users.

Sales of Our Cable Products Are Dependent on the Cable Industry Upgrading to Two-Way Cable Infrastructure.

Demand for our products will depend, to a significant degree, upon the magnitude and timing of capital spending by cable operators for implementation of access systems for data transmission over cable networks.  This involves the enabling of two-way transmission over existing coaxial cable networks and the eventual upgrade to HFC in areas of higher penetration of data services.  If cable operators fail to complete these upgrades of their cable infrastructures in a timely and satisfactory manner, the market for our products could be limited.  In addition, few businesses in the United States currently have cable access.  Cable operators may not choose to upgrade existing residential cable systems or to install new cable systems to serve business locations.

The success and future growth of our business will be subject to economic and other factors affecting the cable television industry generally, particularly its ability to finance substantial capital expenditures.  Capital spending levels in the cable industry in the United States have fluctuated significantly in the past, and we believe that such fluctuations will occur in the future. The capital spending patterns of cable operators are dependent on a variety of factors, including the following:

. the availability of financing;

. cable operators' annual budget cycles, as well as the typical reduction in upgrade projects during the winter months;

. the status of federal, local and foreign government regulation and
  deregulation of the telecommunications industry;

. overall demand for cable services;

. competitive pressures (including the availability of alternative data
  transmission and access technologies);

. discretionary consumer spending patterns; and

. general economic conditions.

12.

In recent periods, the United States cable market has been characterized by the acquisition of smaller and independent cable operators by large cable operators. We cannot predict the effect, if any, that consolidation in the United States cable industry will have on overall capital spending patterns by cable operators. The effect on our business of further industry consolidation also is uncertain.

Supply of Our Products May Be Limited by Our Ability to Forecast Demand Accurately.

The emerging nature of the broadband access services market makes it difficult for us to accurately forecast demand for our products. Our inability to accurately forecast the actual demand for our products could result in supply, manufacturing or testing capacity constraints. These constraints could result in delays in the delivery of our products or the loss of existing or potential customers, either of which could have a negative impact on our business, operating results or financial condition. In addition, we had unconditional purchase obligations of approximately $6,078,000 as of June 30, 2000, primarily to purchase minimum quantities of materials and components used to manufacture our products. We must fulfill these obligations even if demand for our products is lower than we anticipate.

We Are Dependent on Key Third-Party Suppliers.

We manufacture all of our products using components or subassemblies procured from third-party suppliers. Some of these components are available from a single source and others are available from limited sources. All of our sales are from products containing one or more components that are available only from single supply sources. In addition, some of the components are custom parts produced to our specifications. For example, we currently rely on Philips Semiconductors, Inc. to supply a custom ASIC that is used in our products. Other components, such as the radio frequency tuner and some surface acoustic wave filters, are procured from sole source suppliers. Any interruption in the operations of vendors of sole source parts could adversely affect our ability to meet our scheduled product deliveries to customers. We are dependent on semiconductor manufacturers and are affected by worldwide conditions in the semiconductor market. If we are unable to obtain a sufficient supply of components from our current sources, we could experience difficulties in obtaining alternative sources or in altering product designs to use alternative components. Resulting delays or reductions in product shipments could damage customer relationships. Further, a significant increase in the price of one or more of these components could harm our gross margin or operating results.

Shortages in Supplies of Components May Impair Our Ability to Meet Customer Demands.

Due to increasing demand for electronic and communications equipment, the worldwide market for component parts is currently constrained. Delays in key component or product deliveries may occur due to shortages resulting from a limited number of suppliers, the financial or other difficulties of such suppliers or a limitation in component product availability. Due to these current market conditions, we face the risk of possible shortages of certain key components that could result in product performance shortfalls and reduced control over or delay in delivery schedules, manufacturing capability, quality and costs, all of which could impair our ability to produce enough product to meet our customer demand. In addition, in order to fulfill demand for our products, we may have to purchase these components on the spot market at a price that may be higher than we have experienced in the past.

Although we work closely with our suppliers to avoid these types of shortages, there can be no assurance that we will not encounter these problems in the future.  While our suppliers have performed effectively and been relatively flexible to date, we believe that we will be faced with the following challenges going forward:

.   new markets in which we participate may grow quickly and consume component capacity; and

.   as we continue to acquire companies and new technologies, we are dependent, at least initially, on unfamiliar supply chains or relatively small supply partners.

Manufacturing capacity and component supply constraints could be significant issues for us.  If we were unable to obtain adequate quantities of significant component materials on a timely basis, our business and our customer relationships would be adversely affected.  If we are unable to satisfy our customers' demand, our

13.

customers could decide to purchase products from our competitors. Inability to meet demand, or a decision by one or more of our customers to purchase from our competitors, could harm our operating results.

We May Be Unable to Migrate to New Semiconductor Process Technologies Successfully or on a Timely Basis.

    Our future success will depend in part upon our ability to develop products that utilize new semiconductor process technologies. These technologies change rapidly and require us to spend significant amounts on research and development. We continuously evaluate the benefits of redesigning our integrated circuits using smaller geometry process technologies to improve performance and reduce costs. The transition of our products to integrated circuits with increasingly smaller geometries will be important to our competitive position. Other companies have experienced difficulty in migrating to new semiconductor processes and, consequently, have suffered reduced yields, delays in product deliveries and increased expense levels. Moreover, we depend on our relationship with our third-party manufacturers to migrate to smaller geometry processes successfully.

Our Ability to Directly Control Product Delivery Schedules and Product Quality Is Dependent on Third-Party Contract Manufacturers.

    Most of our products are assembled and tested by contract manufacturers using testing equipment that we provide. As a result of our dependence on these contract manufacturers for assembly and testing of our products, we do not directly control product delivery schedules or product quality. Any product shortages or quality assurance problems could increase the costs of manufacture, assembly or testing of our products. In addition, as manufacturing volume increases, we will need to procure and assemble additional testing equipment and provide it to our contract manufacturers. The production and assembly of testing equipment typically requires significant time. We could experience significant delays in the shipment of our products if we are unable to provide this testing equipment to our contract manufacturers in a timely manner.

There Are Many Risks Associated with International Operations.

    Sales to customers outside of the United States accounted for approximately 84% of our revenues in 1999 and approximately 74% of our revenues in 1998. We expect sales to customers outside of the United States to continue to represent a significant percentage of our revenues for the foreseeable future. International sales are subject to a number of risks, including the following:

    .  changes in foreign government regulations and communications standards;

    .  export license requirements, tariffs and taxes;

    .  other trade barriers;

    .  difficulty in protecting intellectual property;

    .  difficulty in collecting accounts receivable;

    .  difficulty in managing foreign operations; and

    .  political and economic instability.

    If our customers are affected by currency devaluations or general economic

crises, such as the recent economic crisis affecting many Asian and Latin American economies, their ability to purchase our products could be reduced significantly.  Payment cycles for international customers typically are longer than those for customers in the United States.  Foreign markets for our products may develop more slowly than currently anticipated.  Foreign countries may decide not to construct cable infrastructure or may prohibit, terminate or delay the construction of new cable plants for a variety of reasons.  These reasons include environmental issues, economic downturns, the availability of favorable pricing for other communications services or the availability and cost of related equipment.  Any action

14.

like this by foreign countries would reduce the market for our products.

We anticipate that our foreign sales generally will be invoiced in U.S. dollars, and we currently do not plan to engage in foreign currency hedging transactions. However, as we commence and expand our international operations, we may be paid in foreign currencies and exposure to losses in foreign currency transactions may increase. We may choose to limit our exposure by the purchase of forward foreign exchange contracts or through similar hedging strategies. No currency hedging strategy can fully protect against exchange-related losses. In addition, if the relative value of the U.S. dollar in comparison to the currency of our foreign customers should increase, the resulting effective price increase of our products to those foreign customers could result in decreased sales.

We May Be Unable to Provide Adequate Customer Support.

Our ability to achieve our planned sales growth and retain current and future customers will depend in part upon the quality of our customer support operations. Our customers generally require significant support and training with respect to our broadband access systems, particularly in the initial deployment and implementation stages. To date our sales have been concentrated in a small number of customers. We have limited experience with widespread deployment of our products to a diverse customer base. We may not have adequate personnel to provide the levels of support that our customers may require during initial product deployment or on an ongoing basis. Our inability to provide sufficient support to our customers could delay or prevent the successful deployment of our products. In addition, our failure to provide adequate support could harm our reputation and relationship with our customers and could prevent us from gaining new customers.

Our Industry Is Highly Competitive with Many Established Competitors.

The market for broadband access systems is extremely competitive and is characterized by rapid technological change. Our direct competitors in the cable access systems arena include Cisco Systems, Com21, General Instrument, Matsushita Electric Industrial (which markets products under the brand name "Panasonic"), Motorola, Nortel Networks, Vyyo, Thomson Consumer Electronics (which markets products under the brand name "RCA"), Samsung, Scientific-Atlanta, Sony, 3Com, Toshiba and Zenith Electronics. We also compete with companies that develop integrated circuits for broadband access products, such as Broadcom, Conexant and Texas Instruments. We also sell products that compete with existing data access and transmission systems utilizing the telecommunications networks, such as those of 3Com. Additionally, our controller and headend system products face intense competition from well-established companies such as Cisco, Nortel and 3Com. In addition, we compete with companies in the DSL arena such as ECI, Charles Industries, Pairgain, Copper Mountain, Accelerated Networks, Integral Access and VINA Technologies. As standards, such as DOCSIS, are developed for broadband access systems, other companies may enter the broadband access systems market. The principal competitive factors in our market include the following:

.  product performance, features and reliability;

.  price;

.  size and stability of operations;

.  breadth of product line;

. sales and distribution capability;

. technical support and service;

. relationships with providers of broadband access services; and

. compliance with industry standards.

15.

Some of these factors are outside of our control. The existing conditions in the broadband access market could change rapidly and significantly as a result of technological advancements. The development and market acceptance of alternative technologies could decrease the demand for our products or render them obsolete. Our competitors may introduce broadband access products that are less costly, provide superior performance or achieve greater market acceptance than our products.

Many of our current and potential competitors have significantly greater financial, technical, marketing, distribution, customer support and other resources, as well as greater name recognition and access to customers than we do. The anticipated widespread adoption of DOCSIS and other industry standards is likely to cause increased worldwide price competition, particularly in the North American market. The adoption of DOCSIS and these other standards also could result in lower sales of our TeraComm system, including the higher margin headend products. Any increased price competition or reduction in sales of our headend products would result in downward pressure on our gross margin. We cannot accurately predict how the competitive pressures that we face will affect our business.

Our Business Is Dependent on the Internet and the Development of the Internet Infrastructure.

Our success will depend in large part on increased use of the Internet to increase the need for high-speed broadband access networks. Critical issues concerning the commercial use of the Internet remain largely unresolved and are likely to affect the development of the market for our products. These issues include security, reliability, cost, ease of access and quality of service. Our success also will depend on the growth of the use of the Internet by businesses, particularly for applications that utilize multimedia content and thus require high bandwidth. The recent growth in the use of the Internet has caused frequent periods of performance degradation. This has required the upgrade of routers, telecommunications links and other components forming the infrastructure of the Internet by Internet service providers and other organizations with links to the Internet. Any perceived degradation in the performance of the Internet as a whole could undermine the benefits of our products. Potentially increased performance provided by our products and the products of others ultimately is limited by and reliant upon the speed and reliability of the Internet backbone itself. Consequently, the emergence and growth of the market for our products will depend on improvements being made to the entire Internet infrastructure to alleviate overloading and congestion.

Our Failure to Manage Growth Could Adversely Affect Us.

The growth of our business has placed, and is expected to continue to place, a significant strain on our limited personnel, management and other resources. Our management, personnel, systems, procedures and controls may be inadequate to support our existing and future operations. To manage any future growth effectively, we will need to attract, train, motivate, manage and retain employees successfully, to integrate new employees into our overall operations and to continue to improve our operational, financial and management systems.

We Are Dependent on Key Personnel.

Due to the specialized nature of our business, we are highly dependent on the continued service of, and on the ability to attract and retain qualified engineering, sales, marketing and senior management personnel. The competition for personnel is intense. The loss of any of these individuals, particularly our

Chairman, President and Chief Technical Officer, Shlomo Rakib, and our Chief Executive Officer, Zaki Rakib, would harm our business. In addition, if we are unable to hire additional qualified personnel as needed, we may be unable to adequately manage and complete our existing sales commitments and to bid for and execute additional sales. Further, we must train and manage our growing employee base, which is likely to require increased levels of responsibility for both existing and new management personnel. Our current management personnel and systems may be inadequate, and we may fail to assimilate new employees successfully.

Highly skilled employees with the education and training that we require, especially employees with significant experience and expertise in both data networking and radio frequency design, are in high demand. We may not be able to continue to attract and retain the qualified personnel necessary for the development of our business. We do not have "key person" insurance coverage for the loss of any of our employees. Any officer or employee of our company can terminate his or her relationship with us at any time. Our employees generally are not

16.

bound by non-competition agreements with us.

Our Business Is Subject to the Risks of Product Returns, Product Liability and Product Defects.

Products as complex as ours frequently contain undetected errors or failures, especially when first introduced or when new versions are released. Despite testing, errors may occur. The occurrence of errors could result in product returns and other losses to our company or our customers. This occurrence also could result in the loss of or delay in market acceptance of our products. Due to the recent introduction of our products, we have limited experience with the problems that could arise with this generation of products. However, the limitation of liability provision contained in our purchase agreements may not be effective as a result of federal, state or local laws or ordinances or unfavorable judicial decisions in the United States or other countries. We have not experienced any product liability claims to date, but the sale and support of our products entails the risk of such claims. In addition, any failure by our products to properly perform could result in claims against us by our customers. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation and management time and resources.

We May Be Unable to Adequately Protect or Enforce Our Intellectual Property Rights.

We rely on a combination of patent, trade secret, copyright and trademark laws and contractual restrictions to establish and protect proprietary rights in our products. Our pending patent applications may not be granted. Even if they are granted, the claims covered by the patents may be reduced from those included in our applications. Any patent might be subject to challenge in court and, whether or not challenged, might not be broad enough to prevent third parties from developing equivalent technologies or products without taking a license from us. We have entered into confidentiality and invention assignment agreements with our employees, and we enter into non-disclosure agreements with some of our suppliers, distributors and appropriate customers so as to limit access to and disclosure of our proprietary information. These statutory and contractual arrangements may not prove sufficient to prevent misappropriation of our technology or to deter independent third-party development of similar technologies. In addition, the laws of some foreign countries might not protect our products or intellectual property rights to the same extent as do the laws of the United States. Protection of our intellectual property might not be available in every country in which our products might be manufactured, marketed or sold.

In November 1998, CableLabs selected us to co-author DOCSIS 1.2, an enhanced version of the DOCSIS cable modem specification based in part on our S-CDMA technology. In September 1999, CableLabs indicated that it intended to proceed with the advanced PHY work on two parallel tracks: one for the development of a prototype based on our S-CDMA technology and one for the inclusion of Advanced TDMA technology, as proposed by other companies. In February 2000, CableLabs further clarified the status of the advanced PHY project regarding a separate release that will include TDMA technologies. In addition, CableLabs reiterated that it is continuing to work with us on the development of a DOCSIS specification that could include our S-CDMA technology. To that end, we have indicated to CableLabs that we would contribute some aspects of our S-CDMA technology to the DOCSIS intellectual property pool if and

when a DOCSIS specification is approved that includes our S-CDMA technology.

We would contribute our technology pursuant to a license agreement with CableLabs that we would execute at that time, and which contains the terms that CableLabs has established for the inclusion of any intellectual property from any source in the DOCSIS specifications. Under the terms of the proposed license agreement, we would grant to CableLabs a royalty-free license for those aspects of our S-CDMA technology that are essential for compliance with the DOCSIS cable modem standard. So-called "implementation know how" is not covered by this license-only those aspects of the technology that are essential to implementing a compliant product. CableLabs would have the right to extend royalty-free sublicenses to companies that wish to build DOCSIS-compatible products. These sublicenses would allow participating companies to utilize and incorporate the essential portions of the S-CDMA technology on a royalty-free basis for the limited use of making and selling products or systems that comply with the DOCSIS cable modem specification. We have already joined the DOCSIS intellectual property pool and, as a result, we have a royalty-free sublicense that allows us to ship DOCSIS-compatible products which contain intellectual property submitted by other companies. The scope of this license would not extend to the use of the S-CDMA technology in other areas; only for products that comply with the DOCSIS specifications. As a result, any

17.

of our competitors who join or have joined the DOCSIS intellectual property pool will have access to some aspects of our technology without being required to pay us any royalties or other compensation. If and when we submit S-CDMA to the DOCSIS Intellectual Property pool, we are in no way restricted from entering into royalty-bearing license agreements with companies that wish to use the S-CDMA technology for purposes other than implementing DOCSIS compatible products, or that do not wish to enter into the DOCSIS intellectual property pool. Further, some of our competitors have been successful in reverse engineering the technology of other companies, and the inclusion of S-CDMA in a future DOCSIS specification would expose some aspects of our technology to those competitors. DOCSIS specifications are available on an open basis once they are approved, not only to companies that are members of the DOCSIS IP Pool. If a competitor is able to duplicate the functionality and capabilities of our technology, we could lose all or some of the time-to-market advantage we might otherwise have. Under the terms of the proposed license agreement, if we sue certain parties to the proposed license agreement on claims of infringement of any copyright or patent right or misappropriation of any trade secret, those parties may terminate our license to the patents or copyrights they contributed to the DOCSIS intellectual property pool. If a termination like this were to occur, we would continue to have access to some aspects of the DOCSIS intellectual property pool, but we would not be able to develop products that fully comply with the DOCSIS cable modem specification. Also, even if we were to be removed from the IP pool, we would not be prevented from developing and selling products that fully comply with the DOCSIS specifications, but we would not be able to do this with the benefit of a royalty-free license, which would increase the cost of our products, assuming we were able to obtain a license agreement for the required technology. Because of these terms, we may find it difficult to enforce our intellectual property rights against certain companies, even in areas that are not directly related to DOCSIS specifications and products.

We anticipate that developers of cable modems increasingly will be subject to infringement claims as the number of products and competitors in our industry segment grows. We have received letters from two individuals claiming that our technology infringes patents held by these individuals. We have reviewed the allegations made by these individuals and, after consulting with our patent counsel, we do not believe that our technology infringes any valid claim of these individuals' patents. If the issues are submitted to a court, the court could find that our products infringe these patents. In addition, these individuals may continue to assert infringement. If we are found to have infringed these individuals' patents, we could be subject to substantial damages and/or an injunction preventing us from conducting our business. In addition, other third parties may assert infringement claims against us in the future. An infringement claim, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require us to enter into royalty or licensing agreements. These royalty or licensing agreements may not be available on terms acceptable to us or at all. Litigation also may be necessary to enforce our intellectual property rights.

We pursue the registration of our trademarks in the United States and have applications pending to register several of our trademarks. However, the laws of certain foreign countries might not protect our products or intellectual property rights to the same extent as the laws of the United States. This means that effective trademark, copyright, trade secret and patent protection might not be available in every country in which our products might be manufactured, marketed or sold.

Our Business Is Subject to Communications Industry Regulations.

Our business and our customers are subject to varying degrees of federal, state and local regulation. The jurisdiction of the Federal Communications Commission extends to the communications industry, including our broadband access products. The FCC has promulgated regulations that, among other things, set installation and equipment standards for communications systems. Although FCC regulations and other governmental regulations have not materially restricted our operations to date, future regulations applicable to our business or our customers could be adopted by the FCC or other regulatory bodies. For example, FCC regulatory policies affecting the availability of cable services and other terms on which cable companies conduct their business may impede our penetration of certain markets. In addition, regulation of cable television rates may affect the speed at which cable operators upgrade their cable infrastructures to two-way HFC. In addition, the increasing demand for communications systems has exerted pressure on regulatory bodies worldwide to adopt new standards for such products and services. This process generally involves extensive investigation of and deliberation over competing technologies. The delays inherent in this governmental approval process have in the past, and may in the future, cause the cancellation, postponement or rescheduling of the installation of communications systems by our customers.

18.

If other countries begin to regulate the cable modem industry more heavily or introduce standards or specifications with which our products do not comply, we will be unable to offer products in those countries until our products comply with those standards or specifications. In addition, we may have to incur substantial costs to comply with those standards or specifications. For instance, should the DAVIC standards for ATM-based digital video be established internationally, we will need to conform our cable modems to compete. Further, many countries do not have regulations for installation of cable modem systems or for upgrading existing cable network systems to accommodate our products. Whether we currently operate in a country without these regulations or enter into the market in a country where these regulations do not exist, new regulations could be proposed at any time. The imposition of regulations like this could place limitations on a country's cable operators' ability to upgrade to support our products. Cable operators in these countries may not be able to comply with these regulations, and compliance with these regulations may require a long, costly process. For example, we experienced delays in product shipments to a customer in Brazil due to delays in certain regulatory approvals in Brazil. Similar delays could occur in other countries in which we market or plan to market our products. In addition, our customers in certain parts of Asia, such as Japan, are required to obtain licenses prior to selling our products, and delays in obtaining required licenses could harm our ability to sell products to these customers.

Our Business Is Subject to Other Regulatory Approvals and Certifications.

In the United States, in addition to complying with FCC regulations, our products are required to meet certain safety requirements. For example, we are required to have our products certified by Underwriters Laboratory in order to meet federal requirements relating to electrical appliances to be used inside the home. Outside the United States, our products are subject to the regulatory requirements of each country in which the products are manufactured or sold. These requirements are likely to vary widely. We may be unable to obtain on a timely basis or at all the regulatory approvals that may be required for the manufacture, marketing and sale of our products. In addition to regulatory compliance, some cable industry participants may require certification of compatibility.

We Are Vulnerable to Earthquakes and Other Natural Disasters.

The facility housing our corporate headquarters, the majority of our research and development activities and our in-house manufacturing operations is located in an area of California known for seismic activity. In addition, the operations of some of our key suppliers are also located in this area and in other areas know for seismic activity, such as Taiwan. An earthquake, or other significant natural disaster, could result in an interruption in our business or that of one or more of our key suppliers. Such an interruption could harm our operating results.

Our Stock Price Has Been and Is Likely to Continue To Be Volatile.

The trading price of our common stock has been and is likely to be highly volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

  .   actual or anticipated variations in quarterly operating results;

  .   announcements of technological innovations;

. new products or services offered by us or our competitors;

. changes in financial estimates by securities analysts;

. conditions or trends in the broadband access services industry;

. changes in the economic performance and/or market valuations of Internet, online service or broadband access service industries;

. changes in the economic performance and/or market valuations of other Internet, online service or broadband access service companies;

19.

.    our announcement of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

.    adoption of industry standards and the inclusion of or compatibility of our technology with such standards;

.    adverse or unfavorable publicity regarding us or our products;

.    additions or departures of key personnel;

.    sales of common stock; and

.    other events or factors that may be beyond our control.

In addition, the stock markets in general, and the Nasdaq National Market and the market for broadband access services and technology companies in particular, have experienced extreme price and volume volatility and a significant cumulative decline in recent months. This volatility and decline has affected many companies irrespective of or disproportionately to the operating performance of these companies. Our stock price has declined significantly in recent weeks and months and these broad market and industry factors may materially adversely further affect the market price of our common stock, regardless of our actual operating performance.

On April 13, 2000, a lawsuit against us and certain of our officers and directors, entitled Birnbaum v. Terayon Comm. Systems, Inc., was filed in the United States District Court for the Central District of California. The plaintiff purports to be suing on behalf of a class of stockholders who purchased or committed to purchase our securities during the period from February 2, 2000 to April 11, 2000. The complaint alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. Several other lawsuits similar to the Birnbaum suit have since been filed. The lawsuits seek an unspecified amount of damages, in addition to other forms of relief. On August 24, 2000, the lawsuits against us and other named individual defendants were consolidated in the U.S. District Court of the Northern District of California and lead plaintiffs and lead plaintiffs' counsel was appointed pursuant to the Private Securities Litigation Reform Act. On September 21, 2000, plaintiffs filed a Consolidated Class Action Complaint for violation of federal securities laws. The consolidated complaint contains allegations nearly identical to the Birnbaum suit. We consider the lawsuit to be without merit and we intend to defend vigorously against these allegations.

Risks Related to the Notes

Our indebtedness could adversely affect our financial condition; we may incur substantially more debt.

After issuing the Notes, we had approximately $500.9 million of indebtedness outstanding. Our high level of indebtedness could have important consequences to you. For example, it could:

.    make it more difficult for us to satisfy our obligations with respect to our indebtedness, including the Notes;

.    increase our vulnerability to general adverse economic and industry conditions;

- limit our ability to obtain additional financing;

- require the dedication of a substantial portion of our cash flow from operations to the payment of principal of, and interest on, our indebtedness, thereby reducing the availability of such cash flow to fund our growth strategy, working capital, capital expenditures and other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry; and

20.

.    place us at a competitive disadvantage relative to our competitors
       with less debt.

    We may incur substantial additional debt in the future.  The terms of our
outstanding debt do not fully prohibit us from doing so.  If new debt is added
to our current levels, the related risks described above could intensify.

We may have insufficient cash flow to meet our debt service obligations.

    We are required to generate cash sufficient to pay all amounts due on the
Notes and to conduct our business operations. Currently, we have net losses, and
we may not be able to cover our anticipated debt service obligations. This may
materially hinder our ability to make payments on the Notes. Our ability to meet
our future debt service obligations will be dependent upon our future
performance, which will be subject to financial, business and other factors
affecting our operations, many of which are beyond our control.

The Notes are subordinated to Senior Indebtedness.

    The Notes are unsecured and subordinated in right of payment to all of our
existing and future Senior Indebtedness, as defined in "Description of
Notes-Subordination." As a result, in the event of bankruptcy, liquidation or
reorganization or upon acceleration of the Notes due to an event of default, as
defined below and in specific other events, our assets will be available to pay
obligations on the Notes only after all Senior Indebtedness has been paid in
full in cash or other payment satisfactory to the holders of Senior
Indebtedness. There may not be sufficient assets remaining to pay amounts due on
any or all of the Notes then outstanding. The Notes are also effectively
subordinated to the indebtedness and other liabilities, including trade payables
of our subsidiaries. The Indenture does not prohibit or limit the incurrence of
Senior Indebtedness or the incurrence of other indebtedness and other
liabilities by us. The incurrence of additional indebtedness and other
liabilities by us could adversely affect our ability to pay our obligations on
the Notes. As of June 30, 2000, we had no significant amount of indebtedness
that would have constituted Senior Indebtedness, and our subsidiaries had a
total of approximately $17 million of indebtedness and other liabilities
(excluding intercompany liabilities and liabilities of a type not required to be
disclosed on a balance sheet) to which the Notes would have been effectively
subordinated in right of payment. We anticipate that from time to time, we will
incur additional indebtedness, including Senior Indebtedness.

We may not be able to repurchase the Notes in the event of a change in control.

    Upon the occurrence of certain change in control events, holders of the
Notes may require us to offer to repurchase all of their Notes. We may not have
sufficient funds at the time of the change in control to make the required
repurchases. Additionally, a "change in control" (as defined in the indenture)
may be an event of default under any future credit facility, which could permit
the lenders to accelerate the debt, which could also cause an event of default
under the indenture.

    The source of funds for any repurchase required as a result of any change
in control will be our available cash or cash generated from operating
activities or other sources, including borrowings, sales of assets, sales of
equity or funds provided by a new controlling entity. We cannot assure you,
however, that sufficient funds will be available at the time of any change in
control to make any required repurchases of the Notes tendered. Furthermore, the
use of available cash to fund the potential consequences of a change in control

may impair our ability to obtain additional financing in the future.

21.

Because there is no current market for the Notes, you cannot be sure that an active trading market will develop.

There is no established trading market for the Notes. We were informed by the initial purchasers that they intend to make markets in the Notes after the offering of the Notes. However, the initial purchasers may cease their market-making at any time. Furthermore, the market price for the Notes may be adversely affected by changes in our financial performance, changes in the overall market of similar securities and performance or prospects for companies in our industry.

22.

RATIO OF EARNINGS TO FIXED CHARGES

Our earnings were insufficient to cover fixed charges in the years ended December 31, 1997, 1998 and 1999 and the six month periods ended June 30, 1999 and 2000. Additional earnings of $22.5 million, $47.1 million, $64.1 million, $14.7 million and $62.8 million were necessary to provide a 1:1 coverage ratio for the years ended December 31, 1997, 1998, 1999 and for the periods ended June 30, 1999 and 2000, respectively. For the purpose of these calculations, "earnings" consist of income before taxes, plus fixed charges, and "fixed charges" consist of interest expense incurred and the portion of rental expense deemed by us to be representative of the interest factor of rental payment under leases.

23.

PRICE RANGE OF COMMON STOCK

Our common stock began trading on the Nasdaq National Market under the
symbol "TERN" on August 18, 1998. Prior to that, there was no public market for
our common stock. The following table sets forth, for the periods indicated, the
high and low sales prices per share for our common stock, as reported on the
Nasdaq National Market for the periods indicated. All share prices reflect our
two-for-one stock split effective in April 2000.

| | High | Low |
|---|---|---|
| **2000** | | |
| First Quarter............................................. | $142.625 | $ 27.25 |
| Second Quarter............................................ | 100.00 | 28.00 |
| Third Quarter............................................. | 81.9375 | 30.25 |
| Fourth Quarter (through October 23, 2000)................. | 41.9375 | 17.6875 |
| **1999** | | |
| First Quarter............................................. | $25.0625 | $18.4375 |
| Second Quarter............................................ | 30.25 | 13.1875 |
| Third Quarter............................................. | 28.8125 | 15.625 |
| Fourth Quarter............................................ | 37.50 | 18.75 |
| **1998** | | |
| Third Quarter (from August 18, 1998)..................... | $ 7.593 | $ 3.50 |
| Fourth Quarter............................................ | 20.25 | 4.625 |

On October 23, 2000, the last reported sale price of our common stock as
reported on the Nasdaq National Market, was $23.75. On October 23, 2000, there
were approximately 655 holders of record of our common stock.

DIVIDEND POLICY

We have never declared or paid any cash dividends on our capital stock. We
intend to retain any future earnings to support operations and to finance the
growth and development of our business and we do not anticipate paying cash
dividends for the foreseeable future.

24.

SELLING HOLDERS

We originally issued the Notes and the Notes were sold by the initial purchasers in a transaction exempt from the registration requirements of the Securities Act to persons reasonably believed by the initial purchasers to be qualified institutional buyers or other institutional accredited investors. Selling holders, including their transferees, pledgees or donees or their successors, may from time to time offer and sell pursuant to this prospectus any or all of the Notes and common stock into which the Notes are convertible. We agreed to use reasonable efforts to keep the registration statement effective until July 26, 2002. Our registration of the Notes and the shares of common stock into which the Notes are convertible does not necessarily mean that the selling holders will sell any or all of the Notes or the shares of the common stock into which the Notes are convertible.

The following table sets forth information, as of October 23, 2000, with respect to the selling holders and the principal amounts of Notes beneficially owned by each selling holder that may be offered under this prospectus. The information is based on information provided by or on behalf of the selling holders. The selling holders may offer all, some or none of the Notes or common stock into which the Notes are convertible. Because the selling holders may offer all or some portion of the Notes or the common stock, no estimate can be given as to the amount of the Notes or the common stock that will be held by the selling holders upon termination of any sales. In addition, the selling holders identified below may have sold, transferred or otherwise disposed of all or a portion of their Notes since the date on which they provided the information regarding their Notes in transactions exempt from the registration requirements of the Securities Act.

| Selling Holder | Principal Amount of Notes Beneficially Owned and Offered | Common Stock Issuable upon Conversion of the Notes (1) | Common Stock Offered |
| --- | --- | --- | --- |
| OCM Convertible Trust | $    800,000 | 9,523 | 9,523 |
| Delta Air Lines Master Trust (c/o Oaktree Capital Management, LLC) | 715,000 | 8,511 | 8,511 |
| State Employees' Retirement Fund of the State of Delaware | 965,000 | 11,487 | 11,487 |
| Partner Reinsurance Company Ltd. | 380,000 | 4,524 | 4,524 |
| State of Connecticut Combined Investment Funds | 2,160,000 | 25,712 | 25,712 |
| Chrysler Corporation Master Retirement | 1,915,000 | 22,795 | 22,795 |

Trust

| | | | |
|---|---|---|---|
| Motion Picture Industry Health Plan - Active Member Fund | 220,000 | 2,619 | 2,619 |
| Motion Picture Industry Health Plan - Retiree Member Fund | 120,000 | 1,429 | 1,429 |
| Vanguard Convertible Securities Fund, Inc. | 2,225,000 | 26,485 | 26,485 |
| J.P. Morgan Securities, Inc. | 17,270,000 | 205,571 | 205,571 |
| JMG Capital Partners, LP | 2,500,000 | 29,758 | 29,758 |
| JMG Triton Offshore Fund, Ltd. | 13,000,000 | 154,743 | 154,743 |
| AAM/Zazove Institutional Income Fund, L.P. | 1,200,000 | 14,284 | 14,284 |
| San Diego County Employees Retirement Association | 3,100,000 | 36,901 | 36,901 |
| Zurich HFR Master Hedge Fund Index Ltd. | 300,000 | 3,571 | 3,571 |
| Delphi Financial Group, Inc. | 500,000 | 5,952 | 5,952 |
| Argent Convertible Arbitrage Fund Ltd. | 1,000,000 | 11,904 | 11,904 |
| Argent Classic Convertible Arbitrage Fund (Bermuda) L.P. | 18,500,000 | 220,212 | 220,212 |
| Goldman Sachs and Company | 50,000 | 596 | 596 |
| Kentfield Trading, Ltd. | 2,850,000 | 33,925 | 33,925 |
| LibertyView Funds L.P. | 750,000 | 8,928 | 8,928 |
| Lydian Overseas Partners Master Fund | 15,000,000 | 178,551 | 178,551 |

| | | | |
|---|---|---|---|
| Peoples Benefit Life Insurance Company (Teamsters Separate Account) | 4,250,000 | 50,590 | 50,590 |
| Deeprock + Co. | 2,000,000 | 23,807 | 23,807 |
| St. Albans Partners Ltd. | 2,000,000 | 23,807 | 23,807 |
| BankAmerica Pension Plan | 2,000,000 | 23,807 | 23,807 |
| Duckbill + Co. | 630,000 | 7,500 | 7,500 |
| General Motors Welfare Benefit Trust (St. Veba) | 2,000,000 | 23,807 | 23,807 |
| Retail Clerks Pension Trust | 2,000,000 | 23,807 | 23,807 |
| Peoples Benefit Life Insurance Company | 4,220,000 | 50,233 | 50,233 |
| Jersey (IMA) Ltd. | 250,000 | 2,976 | 2,976 |
| Grace Brothers, Ltd. | 3,000,000 | 35,710 | 35,710 |
| AIG Soundshore Holdings Ltd. | 1,327,000 | 15,796 | 15,796 |
| AIG Soundshore Strategic Holding Fund Ltd. (2) | 4,337,000 | 51,625 | 51,625 |
| AIG Soundshore Opportunity Holding Fund Ltd. (2) | 5,336,000 | 63,517 | 63,517 |
| Elf Aquitaine | 150,000 | 1,786 | 1,786 |
| Lord Abbett Bond Debenture Fund | 5,850,000 | 69,635 | 69,635 |
| Fuji U.S. Income Open | 500,000 | 5,952 | 5,952 |
| Cova Bond Debenture Fund | 500,000 | 5,952 | 5,952 |
| Oxford Lord Abbett + Co. | 1,000,000 | 11,904 | 11,904 |
| Value Realization Fund | 8,000,000 | 95,227 | 95,227 |
| Value Realization Fund B, LP | 500,000 | 5,952 | 5,952 |

| | | | |
|---|---|---|---|
| Canyon Value Realization (Cayman) Ltd. | 11,000,000 | 130,937 | 130,937 |
| Black Diamond Offshore, Ltd. | 665,000 | 7,916 | 7,916 |
| Double Black Diamond Offshore, LDC | 2,708,000 | 32,235 | 32,235 |
| CIBC World Markets | 4,450,000 | 52,970 | 52,970 |
| Janus Venture Fund | 19,025,000 | 226,462 | 226,462 |
| Janus Global Technology Fund | 16,665,000 | 198,370 | 198,370 |
| Aspen Global Technology Fund | 674,000 | 8,023 | 8,023 |
| JWF US Venture Fund | 1,990,000 | 23,688 | 23,688 |
| JWF Global Technology Fund | 1,154,000 | 13,737 | 13,737 |
| AST Janus Small Cap Growth Portfolio | 8,185,000 | 97,429 | 97,429 |
| Nomura/Janus Global Technology | 1,507,000 | 17,939 | 17,939 |
| Worldwide Transactions, Ltd. | 127,000 | 1,512 | 1,512 |
| Highbridge International LLC | 13,500,000 | 160,696 | 160,696 |
| CFFX, LLC | 1,000,000 | 11,904 | 11,904 |
| McMahan Securities Co. L.P. | 1,000,000 | 11,904 | 11,904 |
| Alexandria Global Investment Fund I LTD. | 3,000,000 | 35,710 | 35,710 |
| TQA Master Fund, LTD | 1,000,000 | 11,904 | 11,904 |
| Any other holders of Notes or future transferee from any holder (3) | 276,980,000 | 3,296,966 | 3,296,666 |
| Total | $500,000,000 | 5,951,673 | 5,951,673 |

(1)  Assumes a conversion rate of 11.9033 shares of common stock per $1,000 principal amount of Notes and a cash payment in lieu of any fractional interest.

(2)  AIG Soundshare Strategic Holding Fund Ltd. and AIG Soundshare Opportunity
     Holding Fund Ltd. each hold 75 shares of our common stock, in addition to
     any shares they would acquire upon conversion of the Notes.

(3)  Assumes that any other holders of Notes or any future transferee from any
     holder do not or will not beneficially own any common stock other than
     common stock into which the Notes are convertible at the conversion rate of
     11.9033 shares of common stock per $1,000 principal amount of Notes.

     None of the selling holders nor any of their affiliates, officers,
directors or principal equity holders has held any position or office or has had
any material relationship with us within the past three years. The selling
holders purchased all of the Notes in a private transaction. All of the Notes
and the shares of common stock into which the Notes are convertible are
"restricted securities" under the Securities Act.

                                    25.

Information concerning the selling holders may change from time to time and any changed information will be set forth in supplements to this prospectus if and when necessary. In addition, the conversion price, and therefore, the number of shares of common stock issuable upon conversion of the Notes, is subject to adjustment under certain circumstances. Accordingly, the aggregate principal amount of Notes and the number of shares of common stock into which the Notes are convertible may increase or decrease.

26.

PLAN OF DISTRIBUTION

The selling holders and their successors, including their transferees, pledgees or donees or their successors, may sell the Notes and the common stock into which the Notes are convertible directly to purchasers or through underwriters, broker-dealers or agents, who may receive compensation in the form of discounts, concessions or commissions from the selling holders or the purchasers. These discounts, concessions or commissions as to any particular underwriter, broker-dealer or agent may be in excess of those customary in the types of transactions involved.

The Notes and the common stock into which the Notes are convertible may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market prices, at varying prices determined at the time of sale, or at negotiated prices. These sales may be effected in transactions, which may involve crosses or block transactions:

- on any national securities exchange or U.S. inter-dealer system of a registered national securities association on which the Notes or the common stock may be listed or quoted at the time of sale;

- in the over-the-counter market;

- in transactions otherwise than on these exchanges or systems or in the over-the-counter market;

- through the writing of options, whether the options are listed on an options exchange or otherwise;

- by pledge to secure debts and other obligations;

- through the settlement of short sales; or

- a combination of any of the above transactions.

In connection with the sale of the Notes and the common stock into which the Notes are convertible or otherwise, the selling holders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of the Notes or the common stock into which the Notes are convertible in the course of hedging the positions they assume. The selling holders may also sell the Notes or the common stock into which the Notes are convertible short and deliver these securities to close out their short positions, or loan or pledge the Notes or the common stock into which the Notes are convertible to broker-dealers that in turn may sell these securities.

The aggregate proceeds to the selling holders from the sale of the Notes or common stock into which the Notes are convertible offered by them will be the purchase price of the Notes or common stock less discounts and commissions, if any. Each of the selling holders reserves the right to accept and, together with their agents from time to time, to reject, in whole or in part, any proposed purchase of Notes or common stock to be made directly or through agents. We will not receive any of the proceeds from this offering.

Our outstanding common stock is listed for trading on the Nasdaq National Market. We do not intend to list the Notes for trading on any national securities exchange or on the Nasdaq National Market and can give no assurance about the development of any trading market for the Notes.

In order to comply with the securities laws of some states, if applicable, the Notes and common stock into which the Notes are convertible may be sold in these jurisdictions only through registered or licensed brokers or dealers. In addition, in some states the Notes and common stock into which the Notes are convertible may not be sold unless they have been registered or qualified for sale or an exemption from registration or qualification requirements is available and is complied with.

The selling holders and any underwriters, broker-dealers or agents that participate in the sale of the Notes and common stock into which the Notes are convertible may be "underwriters" within the meaning of Section 2(11) of

27.

the Securities Act. Any discounts, commissions, concessions or profit they earn on any resale of the shares may be underwriting discounts and commissions under the Securities Act. Selling holders who are "underwriters" within the meaning of Section 2(11) of the Securities Act will be subject to the prospectus delivery requirements of the Securities Act. The selling holders have acknowledged that they understand their obligations to comply with the provisions of the Exchange Act and the rules thereunder relating to stock manipulation, particularly Regulation M.

In addition, any securities covered by this prospectus which qualify for sale pursuant to Rule 144 or Rule 144A of the Securities Act may be sold under Rule 144 or Rule 144A rather than pursuant to this prospectus. A selling holder may not sell any Notes or common stock described in this prospectus and may not transfer, devise or gift these securities by other means not described in this prospectus.

To the extent required, the specific Notes or common stock to be sold, the names of the selling holders, the respective purchase prices and public offering prices, the names of any agent, dealer or underwriter, and any applicable commissions or discounts with respect to a particular offer will be set forth in an accompanying prospectus supplement or, if appropriate, a post-effective amendment to the registration statement of which this prospectus is a part.

We entered into a registration rights agreement for the benefit of holders of the Notes to register their Notes and common stock under applicable federal and state securities laws under specific circumstances and at specific times. The registration rights agreement provides for cross-indemnification of the selling holders and us and their and our respective directors, officers and controlling persons against specific liabilities in connection with the offer and sale of the Notes and the common stock, including liabilities under the Securities Act.

A prospectus had not been and will not be filed under the securities laws of any province or territory of Canada to qualify the sale of Notes in such jurisdictions. The Notes are not being offered and may not be offered or sold, directly or indirectly, in Canada or to or for the account of any resident of Canada except in compliance with or pursuant to an exemption from the registration and prospectus requirements of applicable securities laws in Canada.

28.

DESCRIPTION OF NOTES

The Notes were issued under an Indenture between us and State Street Bank and Trust Company of California, N.A., as trustee (the "Trustee"). The following description is only a summary of the material provisions of the Indenture, the Notes and the registration rights agreement. We urge you to read the Indenture, the Notes and the registration rights agreement in their entirety because they, and not this description, define your rights as holders of the Notes. You may request copies of these documents at our address shown under the caption "Where You Can Find More Information." The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended. For purposes of this section, references to "we," "us," "ours" and "Terayon" include only Terayon Communication Systems, Inc. and not its subsidiaries.

General

We issued the Notes with a principal amount limited to $500,000,000.  The Notes are unsecured, subordinated obligations of Terayon and will mature on August 1, 2007, unless earlier redeemed at our option as described under "Optional Redemption of the Notes" or repurchased by us at a holder's option upon a change in control of Terayon as described under "Right to Require Purchase of Notes upon a Change in Control." Interest on the Notes will accrue at 5% per annum shown and will be payable semiannually in arrears on February 1 and August 1 of each year, commencing on February 1, 2001. Interest on the Notes will accrue from July 20, 2000 or, if interest has already been paid, from the date it was most recently paid. We will make each interest payment to the holders of record of the Notes on the immediately preceding January 15 and July 15, whether or not this day is a business day. Interest on the Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months. The Indenture does not contain any restriction on:

. the payment of dividends;
. the issuance of Senior Indebtedness (as defined below) or other indebtedness; or
. the repurchase of securities of Terayon

and does not contain any financial covenants.  Other than as described under "Right to Require Purchase of Notes upon a Change in Control," the Indenture contains no covenants or other provisions to afford protection to holders of Notes in the event of a highly leveraged transaction or a change in control of Terayon.

We will pay the principal of, premium, if any, and interest on the Notes at the office or agency maintained by us in the Borough of Manhattan in New York City.  Holders may register the transfer of their Notes at the same location. We reserve the right to pay interest to holders of the Notes by check mailed to the holders at their registered addresses or by wire transfer to holders of at least $5,000,000 aggregate principal amount of Notes.  Except under the limited circumstances described below, the Notes will be issued only in fully-registered book-entry form, without coupons, and will be represented by one or more global Notes.  There will be no service charge for any registration of transfer or exchange of Notes.  We may, however, require holders to pay a sum sufficient to cover any tax or other governmental charge payable in connection with any transfer or exchange.

Conversion Rights

A holder may, at any time after October 24, 2000 and before August 1, 2007, convert a Note or any portion of a Note (if the portions are $1,000 or whole multiples of $1,000) into shares of common stock initially at a conversion price of $84.01 per share (which is equivalent to a conversion rate of approximately 11.9033 shares per $1,000 principal amount of Notes), unless the Note or a portion of the Note has been previously redeemed or repurchased. The right to convert a Note called for redemption will terminate at the close of business on August 1, 2007 unless we default in making the payment due on the redemption date. For information as to notices of redemption, see "Redemption of the Notes." If a holder of a Note has delivered notice of its election to have the Note repurchased as a result of a Change in Control, the Note may be converted only if the notice of election is withdrawn as described under "Right to Require Purchase of Notes upon a Change in Control."

29.

We will adjust the conversion price if (without duplication):

(1) we issue common stock as a dividend or distribution on our common stock;

(2) we subdivide, combine or reclassify our common stock;

(3) we issue to substantially all holders of our common stock rights, warrants or options entitling them to subscribe for or purchase common stock at less than the then current market price;

(4) we distribute to substantially all holders of common stock evidences of our indebtedness, shares of capital stock, securities, cash, property, rights, warrants or options, excluding:

. those rights, warrants or options referred to in clause (3) above;
. any dividend or distribution paid exclusively in cash referred to in clause (5) below; and
. any dividend or distribution referred to in clause (1) above;

(5) we make a cash distribution to substantially all holders of our common stock, that together with all other all-cash distributions and consideration payable in respect of any tender or exchange offer by us or one of our subsidiaries for our common stock made within the preceding 12 months exceeds 15% of our aggregate market capitalization on the date of the distribution; or

(6) we complete a repurchase (including by way of a tender offer) of our common stock which involves an aggregate consideration that, together with:

. any cash and other consideration payable in respect of any tender or exchange offer by us or one of our subsidiaries for our common stock concluded within the preceding 12 months and

. the amount of any all-cash distributions to all holders of our common stock made within the preceding 12 months

exceeds 15% of our aggregate market capitalization on the expiration of the tender or exchange offer; or the conversion price will not be adjusted until adjustments amount to 1% or more of the conversion price as last adjusted. We will carry forward any adjustment we do not make and will include it in any future adjustment.

If our common stock is converted into the right to receive other securities, cash or other property as a result of reclassifications, consolidations, mergers, sales or transfers of assets or other transactions, each Note then outstanding would, without the consent of any holders of Notes, become convertible only into the kind and amount of securities, cash and other property receivable upon the transaction by a holder of the number of shares of common stock which would have been received by a holder immediately prior to the transaction if the holder had converted the Note.

We will not issue fractional shares of common stock to a holder who converts a Note. In lieu of issuing fractional shares, we will pay cash based upon the market price.

Except as described in this paragraph, no holder of Notes will be entitled, upon conversion of the Notes, to any actual payment or adjustment on account of accrued and unpaid interest or on account of dividends on shares of common stock issued in connection with the conversion. If any holder surrenders a Note for

conversion between the close of business on any record date for the payment of an installment of interest and the opening of business on the related interest payment date the holder must deliver payment to us of an amount equal to the interest payable on the interest payment date on the principal amount converted together with the Note being surrendered.  The foregoing sentence shall not apply to Notes called for redemption on a redemption date within the period between and including the record date and interest payment date.

30.

If we make a distribution of property to our stockholders which would be taxable to them as a dividend for federal income tax purposes and the conversion price of the Notes is reduced, this reduction may be deemed to be the receipt of taxable income to holders of the Notes.

In addition, we may make any reductions in the conversion price that our board of directors deems advisable to avoid or diminish any income tax to holders of our common stock resulting from any dividend or distribution of stock, or rights to acquire stock, or from any event treated as such for income tax purposes or for any other reasons.

Subordination

The payment of the principal of, premium, if any, and interest on the Notes will, to the extent described in the Indenture, be subordinated in right of payment to the prior payment in full of all our Senior Indebtedness.  The holders of all Senior Indebtedness will first be entitled to receive payment in full of all amounts due or to become due on the Senior Indebtedness, or provision for payment in money or money's worth, before the holders of the Notes will be entitled to receive any payment in respect of the Notes, when there is a payment or distribution of assets to creditors upon our:

.   liquidation;

.   dissolution;

.   winding up;

.   reorganization;

.   assignment for the benefit of creditors;

.   marshaling of assets;

.   bankruptcy;

.   insolvency; or

.   similar proceedings.

No payments on account of the Notes or on account of the purchase or acquisition of Notes may be made if a default in any payment with respect to Senior Indebtedness has occurred and is continuing.  If (1) there is a default on any Designated Senior Indebtedness other than a payment default that occurs that permits the holders of that Designated Senior Indebtedness to accelerate its maturity and (2) the Trustee and we receive the notice required by the Indenture, no payments may be made on the Notes for up to 179 days in any 365-day period unless the default is cured or waived.  By reason of this subordination, in the event of our insolvency, holders of the Notes may recover less, ratably, than holders of our Senior Indebtedness.

"Senior Indebtedness" means:

.   the principal of and premium, if any, and interest on, and fees, costs, enforcement expenses, collateral protection expenses and other reimbursement or indemnity obligations in respect of all of our indebtedness or obligations of us to any person for money borrowed that is evidenced by a Note, bond, debenture, loan agreement, or similar

instrument or agreement;

. commitment or standby fees due and payable to lending institutions with respect to credit facilities available to us;

If we opt to redeem less than all of the Notes at any time, the Trustee will select or cause to be selected the Notes to be redeemed by any method that it deems fair and appropriate. In the event of a partial redemption, the Trustee may provide for selection for redemption of portions of the principal amount of any Note of a denomination larger than $1,000.

Mandatory Redemption

Except as set forth below under "Right to Require Purchase of Notes upon a Change of Control," we are not required to make mandatory redemption or sinking fund payments with respect to the Notes.

Right to Require Purchase of Notes upon a Change in Control

If a Change in Control (as defined below) occurs, each holder of Notes may require that we repurchase the holder's Notes on the date fixed by us that is not less than 45 nor more than 60 days after we give notice of the Change in Control.  We will repurchase the Notes for an amount of cash equal to 100% of the principal amount of the Notes on the date of purchase, plus accrued and unpaid interest, if any, to the date of repurchase.

"Change in Control" means the occurrence of one or more of the following events: (i) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of Terayon and its subsidiaries, taken as a whole, to any person or group of related persons, as defined in Section 13(d) of the Exchange Act (a "Group"); (ii) the approval by the holders of our capital stock of any plan or proposal for the liquidation or dissolution of Terayon (whether or not otherwise in compliance with the provisions of the applicable indenture); (iii) any person or Group shall become the owner, directly or indirectly, beneficially or of record, of shares representing more than 50% of the aggregate ordinary voting power represented by our issued and outstanding voting stock of or any successor to all or substantially all of our assets; or (iv) the first day on which a majority of the members of our board of directors are not Continuing Directors.

The definition of Change in Control includes a phrase relating to the sale, lease, transfer, conveyance or other disposition of "all or substantially all" of the assets of Terayon and its subsidiaries taken as a whole. Although there is a developing body of case law interpreting the phrase "substantially all", there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a holder of Notes to require us to repurchase such Notes as a result of a sale, lease, transfer, conveyance or other disposition of less than all of the assets of Terayon and its subsidiaries taken as a whole to another person or group may be uncertain.

"Continuing Directors" means, as of any date of determination, any member of the board of directors of Terayon who (i) was a member of such board of directors on the date of the original issuance of the Notes or (ii) was nominated for election or elected to such board of directors with the approval of a majority of the Continuing Directors who were members of such board at the time of such nomination or election.

On or prior to the date of repurchase, we will deposit with a paying agent an amount of money sufficient to pay the aggregate repurchase price of the Notes which is to be paid on the date of repurchase.

We may not repurchase any Note at any time when the subordination

provisions of the Indenture otherwise would prohibit us from making payments of principal in respect of the Notes. If we fail to repurchase the Notes when required under the preceding paragraph, this failure will constitute an event of default under the Indenture whether or not repurchase is permitted by the subordination provisions of the Indenture.

On or before the 30th day after the Change in Control, we must mail to the Trustee and all holders of the Notes a notice of the occurrence of the Change in Control, stating:

.    the repurchase date;

.    the date by which the repurchase right must be exercised;

32.

If we opt to redeem less than all of the Notes at any time, the Trustee will select or cause to be selected the Notes to be redeemed by any method that it deems fair and appropriate. In the event of a partial redemption, the Trustee may provide for selection for redemption of portions of the principal amount of any Note of a denomination larger than $1,000.

Consolidation, Merger and Sale of Assets

We may, without the consent of the holders of any of the Notes, consolidate with or merge into any other person or convey, transfer or lease our properties and assets substantially as an entirety to, any other person, if:

.    we are the resulting or surviving corporation or the successor, transferee or lessee, if other than us, is a corporation organized under the laws of any U.S. jurisdiction and expressly assumes our obligations under the Indenture and the Notes by means of a supplemental Indenture entered into with the Trustee; and

.    after giving effect to the transaction, no event of default and no event which, with notice or lapse of time, or both, would constitute an event of default, shall have occurred and be continuing.

Under any consolidation, merger or any conveyance, transfer or lease of our properties and assets as described in the preceding paragraph, the successor company will be our successor and shall succeed to, and be substituted for, and may exercise every right and power of, Terayon under the Indenture.  Except in the case of a lease, if the predecessor is still in existence after the transaction, it will be released from its obligations and covenants under the Indenture and the Notes.

Modification and Waiver

We and the Trustee may enter into one or more supplemental Indentures that add, change or eliminate provisions of the Indenture or modify the rights of the holders of the Notes with the consent of the holders of at least a majority in principal amount of the Notes then outstanding.  However, without the consent of each holder of an outstanding Note, no supplemental Indenture may, among other things:

.    change the stated maturity of the principal of or any installment of interest on any Note;

33.

- reduce the principal amount of, or the premium or rate of interest on, any Note;

- change the currency in which the principal of any Note or any premium or interest is payable;

- impair the right to institute suit for the enforcement of any payment on or with respect to any Note when due;

- adversely affect the right provided in the Indenture to convert any Note;

- modify the subordination provisions of the Indenture in a manner adverse to the holders of the Notes;

- modify the provisions of the Indenture relating to our requirement to offer to repurchase Notes upon a Change in Control in a manner adverse to the holders of the Notes;

- reduce the percentage in principal amount of the outstanding Notes necessary to modify or amend the Indenture or to consent to any waiver provided for in the Indenture; or

- waive a default in the payment of principal of or any premium or interest on any Note.

The holders of a majority in principal amount of the outstanding Notes may, on behalf of the holders of all Notes:

- waive compliance by us with restrictive provisions of the Indenture other than as provided in the preceding paragraph; and

- waive any past default under the Indenture and its consequences, except a default in the payment of the principal of or any premium or interest on any Note or in respect of a provision which under the Indenture cannot be modified or amended without the consent of the holder of each outstanding Note affected.

Without the consent of any holders of Notes, we and the Trustee may enter into one or more supplemental Indentures for any of the following purposes:

- to cure any ambiguity, omission, defect or inconsistency in the Indenture;

- to evidence a successor to us and the assumption by the successor of our obligations under the Indenture and the Notes;

- to make any change that does not adversely affect the rights of any holder of the Notes;

- to comply with any requirement in connection with the qualification of the Indenture under the Trust Indenture Act; or

- to complete or make provision for certain other matters contemplated by the Indenture.

Events of Default

Each of the following is an "event of default":

(1)  a default in the payment of any interest upon any of the Notes when due and payable, continued for 30 days;

(2)  a default in the payment of the principal of and premium, if any, on any of the Notes when due, including on a redemption date;

34.

(3)  failure to pay when due the principal of or interest on indebtedness for money borrowed by us or our subsidiaries in excess of $20.0 million, or the acceleration of that indebtedness that is not withdrawn within 15 days after the date of written notice to us by the Trustee or to us and the Trustee by the holders of at least 25% in principal amount of the outstanding Notes;

(4)  a default by us in the performance, or breach, of any of our other covenants in the Indenture which are not remedied by the end of a period of 60 days after written notice to us by the Trustee or to us and the Trustee by the holders of at least 25% in principal amount of the outstanding Notes; or

(5)  events of bankruptcy, insolvency or reorganization of Terayon or any significant subsidiary of Terayon.

If an event of default described in clauses (1), (2), (3) or (4) occurs and is continuing, either the Trustee or the holders of at least 25% in principal amount of the outstanding Notes may declare the principal amount of and accrued interest on all Notes to be immediately due and payable.  This declaration may be rescinded if the conditions described in the Indenture are satisfied.  If an event of default of the type referred to in clause (5) occurs, the principal amount of and accrued interest on the outstanding Notes will automatically become immediately due and payable.

Within 90 days after a default, the Trustee must give to the registered holders of Notes notice of all uncured defaults known to it.  The Trustee will be protected in withholding the notice if it in good faith determines that the withholding of the notice is in the best interests of the registered holders, except in the case of a default in the payment of the principal of, or premium, if any, or interest on, any of the Notes when due or in the payment of any redemption obligation.

The holders of not less than a majority in principal amount of the outstanding Notes may direct the time, method and place of conducting any proceedings for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee.  Subject to the provisions of the Indenture relating to the duties of the Trustee, if an event of default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders of the Notes unless the holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense.  Except to enforce the right to receive payment of principal, premium, if any, or interest when due or the right to convert a Note in accordance with the Indenture, no holder may institute any proceeding or pursue any remedy with respect to the Indenture or the Notes unless it complies with the conditions provided in the Indenture, including:

.    holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy; and

.    holders have offered the Trustee security or indemnity satisfactory to the Trustee against any loss, liability or expense.

We are required to deliver to the Trustee annually a certificate indicating whether the officers signing the certificate know of any default by us in the performance or observance of any of the terms of the Indenture.  If the officers know of a default, the certificate must specify the status and nature of all defaults.

Book-Entry, Delivery and Form

We issued the Notes sold in the United States in reliance on Rule 144A and in offshore transactions in reliance on Regulation S in the form of a Global Note. The Global Note was deposited with DTC, the clearing agency that was designated to act as depositary for the Notes, and registered in the name of DTC.

Investors who are "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) and who purchase Notes in reliance on Rule 144A under the Securities Act may hold their interests in a Global Note directly through DTC if they are DTC participants, or indirectly through organizations that are DTC participants.

Investors who purchase Notes in offshore transactions in reliance on Regulation S under the Securities Act may hold their interests in a Global Note directly through Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System and Clearstream Banking, if they are participants in these systems, or indirectly through organizations that are participants in these systems.  Euroclear and/or Clearstream Banking will hold interests in a Global Note on behalf of their participants through their respective depositaries, which in turn will hold the interests in a Global Note in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A., is acting initially as depositary for Clearstream Banking and The Chase Manhattan Bank is acting initially as depositary for Euroclear.

Except as set forth below, a Global Note may be transferred, in whole or in part, only to another nominee of DTC or to a successor of DTC or its nominee.

DTC has advised us that DTC is:

.    a limited-purpose trust company organized under the laws of the State of New York;

.    a member of the Federal Reserve System;

.    a "clearing corporation" within the meaning of the New York Uniform Commercial Code; and

.    a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

DTC was created to hold securities of institutions that have accounts with DTC and to facilitate the clearance and settlement of securities transactions among its participants in securities through electronic book-entry changes in accounts of the participants, thereby eliminating the need for physical movement of securities certificates.  DTC's participants include:

.    securities brokers and dealers;

.    banks;

.    trust companies;

.    clearing corporations; and

.    certain other organizations.

Access to DTC's book-entry system is also available to others such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, whether directly or indirectly.

We expect that pursuant to the procedures established by DTC (1) upon the issuance of the Global Note, DTC credited, on its book-entry registration and transfer system, the respective principal amount of the individual beneficial interests represented by the Global Note to the accounts of participants and (2) ownership of beneficial interests in a Global Note will be shown on, and the transfer of those ownership interests will be effected only through, records maintained by DTC (with respect to participants' interests) and the participants (with respect to the owners of beneficial interests in the Global Note other than participants). Ownership of beneficial interests in the Global Note is limited to participants or persons that may hold interests through

participants.

So long as DTC or its nominee is the registered holder and owner of a Global Note, DTC or its nominee, as the case may be, will be considered the sole legal owner of the Notes represented by the Global Note for all purposes under the indenture and the Notes. Except as set forth below, owners of beneficial interests in a Global Note will not be entitled to receive definitive Notes and will not be considered to be the owners or holders of any Notes under the Global Note. We understand that under existing industry practice, in the event an owner of a beneficial interest in a Global Note desires to take any action that DTC, as the holder of the Global Note, is entitled to take, DTC

36.

would authorize the participants to take the action, and that participants would authorize beneficial owners owning through the participants to take the action or would otherwise act upon the instructions of beneficial owners owning through them. No beneficial owner of an interest in a Global Note will be able to transfer the interest except in accordance with DTC's applicable procedures, in addition to those provided for under the indenture and, if applicable, those of Euroclear and Clearstream Banking.

We will make payments of the principal of, and interest on, the Notes represented by a Global Note registered in the name of and held by DTC or its nominee to DTC or its nominee, as the case may be, as the registered owner and holder of the Global Note.

We expect that DTC or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note, will credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of the Global Note as shown on the records of DTC or its nominee. We also expect that payments by participants and indirect participants to owners of beneficial interests in a Global Note held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for accounts of customers registered in the names of nominees for these customers. The payments, however, will be the responsibility of the participants and indirect participants, and neither we, the Trustee nor any paying agent will have any responsibility or liability for:

.    any aspect of the records relating to, or payments made on account of, beneficial ownership interests in a Global Note;

.    maintaining, supervising or reviewing any records relating to the beneficial ownership interests;

.    any other aspect of the relationship between DTC and its participants; or

.    the relationship between the participants and indirect participants and the owners of beneficial interests in a Global Note.

Unless and until it is exchanged in whole or in part for definitive Notes, a Global Note may not be transferred except as a whole by DTC to a nominee of DTC or by a nominee of DTC to DTC or another nominee of DTC.

Participants in DTC will effect transfers with other participants in the ordinary way in accordance with DTC rules and will settle transfers in same-day funds. Participants in Euroclear and Clearstream Banking will effect transfers with other participants in the ordinary way in accordance with the rules and operating procedures of Euroclear and Clearstream Banking, as applicable. If a holder requires physical delivery of a definitive Note for any reason, including to sell Notes to persons in jurisdictions which require physical delivery or to pledge Notes, the holder must transfer its interest in a Global Note in accordance with the normal procedures of DTC and the procedures set forth in the indenture.

Cross-market transfers between DTC, on the one hand, and directly or indirectly through Euroclear or Clearstream Banking participants, on the other, will be effected in DTC in accordance with DTC rules on behalf Euroclear or Clearstream Banking, as the case may be, by its respective depositary; however, these cross-market transactions will require delivery of instructions to Euroclear or Clearstream Banking, as the case may be, by the counterparty in the

system in accordance with its rules and procedures and within its established deadlines (Brussels time).  Euroclear or Clearstream Banking, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Global Note in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream Banking participants may not deliver instructions directly to the depositaries for Euroclear or Clearstream Banking.

Because of time zone differences, the securities account of a Euroclear or Clearstream Banking participant purchasing an interest in a Global Note from a DTC participant will be credited during the securities settlement processing day (which must be a business day for Euroclear or Clearstream Banking, as the case may be) immediately following the DTC settlement date, and the credit of any transactions interests in a Global Note settled

37.

during the processing day will be reported to the relevant Euroclear or Clearstream Banking participant on that day. Cash received in Euroclear or Clearstream Banking as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream Banking participant to a DTC participant will be received with value on the DTC settlement date, but will be available in the relevant Euroclear or Clearstream Banking cash account only as of the business day following settlement in DTC.

We expect that DTC will take any action permitted to be taken by a holder of Notes (including the presentation of Notes for exchange as described below) only at the direction of one or more participants to whose accounts at the DTC interests in a Global Note are credited and only in respect of the portion of the aggregate principal amount of the Notes as to which the participant or participants has or have given direction. However, if there is an event of default under the Notes, DTC will exchange the Global Notes for definitive Notes, which it will distribute to its participants. These definitive Notes are subject to certain restrictions on registration of transfers and will bear appropriate legends restricting their transfer. Although we expect that DTC, Euroclear and Clearstream Banking will agree to the foregoing procedures in order to facilitate transfers of interests in Global Notes among participants of DTC, Euroclear, and Clearstream Banking, DTC, Euroclear and Clearstream Banking are under no obligation to perform or continue to perform these procedures, and these procedures may be discontinued at any time. Neither we nor the trustee have any responsibility for the performance by DTC, Euroclear or Clearstream Banking or their participants or indirect participants of their obligations under the rules and procedures governing their operations.

If DTC is at any time unwilling or unable to continue as a depositary for Global Notes or ceases to be a clearing agency registered under the Securities Exchange Act and we do not appoint a successor depositary within 90 days, we will issue definitive Notes in exchange for the Global Notes. The definitive Notes will be subject to certain restrictions on registration of transfers and will bear appropriate legends concerning these restrictions.

Registration Rights

We entered into a registration rights agreement with the initial purchasers of the Notes for the benefit of the holders of the Notes and the common stock issuable on conversion of the Notes. Under this agreement, we will, at our cost:

.    on or prior to October 24, 2000, file a registration statement with the Securities and Exchange Commission covering resales of the Notes and the common stock issuable on conversion of the Notes;

.    use all reasonable efforts to cause the registration statement to be declared effective under the Securities Act no later than January 22, 2001; and

.    use all reasonable efforts to keep the registration statement of which this prospectus forms a part effective after its effective date for as long as required to permit sales under Rule 144(k) under the Securities Act or any successor rule or regulation.

We have the right to suspend use of the registration statement during specified periods of time relating to pending corporate developments and public filings with the SEC and similar events. If we fail to file the registration statement on or prior to October 24, 2000, or if after the registration

statement has been declared effective, we fail to keep the registration statement effective or usable in accordance with and during the periods specified in the registration rights agreement, then, in each case, we will pay liquidated damages to all holders of Notes and all holders of common stock issued on conversion of the Notes equal to 0.5% per annum until such failure is cured.

A holder who elects to sell any securities pursuant to the registration statement:

- . will be required to be named as selling security holder;

- . will be required to deliver a prospectus to purchasers;

- . will be subject to the civil liability provisions under the Securities Act in connection with any sales; and

38.

.      will be bound by the provisions of the registration rights agreement which are applicable, including indemnification obligations.

We refer to the Notes and the common stock issuable on conversion of the Notes as "registrable securities." Promptly upon request from any holder of registrable securities, we will provide a form of notice and questionnaire to be completed and delivered by that holder to us at least three business days before any intended distribution of registrable securities under the shelf registration statement. If we receive from a holder of registrable securities a completed questionnaire, together with such other information as may be reasonably requested by us, after the effectiveness of the registration statement, we will file an amendment to the registration statement or supplement to the related prospectus to permit the holder to deliver a prospectus to purchasers of registrable securities. Any holder that does not complete and deliver a questionnaire or provide such other information will not be named as a selling securityholder in the prospectus and therefore will not be permitted to sell any registrable securities under the registration statement.

Governing Law

The Indenture and the Notes will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict of laws.

39.

DESCRIPTION OF CAPITAL STOCK

Our authorized capital stock consists of 200,000,000 shares of common stock, par value $0.001 per share, and 5,000,000 shares of preferred stock, par value $0.001 per share.

Common Stock

As of October 23, 2000, there were 66,555,559 shares of our common stock outstanding held of record by approximately 655 stockholders.

The holders of our common stock are entitled to one vote for each share held of record on all matters submitted to a vote of our stockholders. Subject to preferences that may be applicable to any outstanding shares of our preferred stock, the holders of our common stock are entitled to receive ratably such dividends as may be declared by our Board of Directors out of funds legally available therefor. In the event of a liquidation, dissolution or winding up of our company, holders of our common stock are entitled to share ratably in all assets remaining after payment of liabilities and the liquidation preferences of any outstanding shares of our preferred stock. Holders of our common stock have no preemptive rights and no right to convert our common stock into any other securities. There are no redemption or sinking fund provisions applicable to our common stock. All outstanding shares of our common stock are fully paid and non-assessable.

Preferred Stock

Pursuant to our Restated Certificate of Incorporation, our Board of Directors has the authority, without further action by our stockholders, to issue up to 5,000,000 shares of preferred stock in one or more series and to fix the designations, powers, preferences, privileges and relative participating, optional or special rights and the qualifications, limitations or restrictions thereof, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights of our common stock. None of the preferred stock has been issued. Our Board of Directors, without stockholder approval, can issue preferred stock with voting, conversion or other rights that could adversely affect the voting power and other rights of the holders of our common stock. Preferred stock could thus be issued quickly with terms calculated to delay, defer or prevent a change in control of our company or make removal of management more difficult. Additionally, the issuance of our preferred stock may have the effect of decreasing the market price of our common stock and may adversely affect the voting and other rights of the holders our common stock. No shares of preferred stock currently are outstanding, and we have no current plans to issue any shares of our preferred stock.

Warrants

In April 1998, we issued to Shaw a warrant that gives Shaw the right to purchase an indeterminate number of shares of our common stock for an aggregate price of $1.00.  This warrant allows Shaw to purchase additional shares of our common stock when we issue certain new equity securities at a price per share below $19.50.  Shaw's right to receive additional shares of our common stock pursuant to this warrant terminates when Shaw ceases to own shares of our common stock.  As of March 31, 2000, Shaw had the right to receive 72,318 shares pursuant to this warrant.

In October 1999, one of our customers entered into an agreement with

Telegate whereby the customer committed to an investment in Telegate in connection with our acquisition of all the outstanding shares of Telegate. The customer committed to provide this investment in the event that our acquisition of Telegate was not to have closed. In consideration of the customer making this commitment, we agreed to issue a warrant to purchase 2,000,000 shares of our common stock to be issued on the date of the Telegate closing. In January 2000, we issued the customer a warrant to purchase 2,000,000 shares of our common stock at a price of $30.75 per share, the closing price of our common stock on the date the warrant was issued. The warrant is fully vested, non-forfeitable, and immediately exercisable and has a term of three years.

40.

Pursuant to a registration rights agreement between us and the holders of the Notes, the holders of the Notes are entitled to have their Notes and Shares of common stock into which the Notes convert registered on a registration statement and keep the registration statement effective until July 26, 2002.

Convertible Notes

In July 2000, we issued $500,000,000 of 5% Convertible Subordinate Notes due in August 2007. The Notes are convertible into shares of common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000, unless previously redeemed or repurchased. We may redeem some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of our stock exceeds 150% of the conversion price for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. We may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semiannually.

Registration Rights

Pursuant to an agreement between us and the holders (or their permitted transferees) of approximately 12,472,318 shares of our common stock ("Holders"), the Holders are entitled to certain rights with respect to registration of such shares for sale in the public market.  The Holders are entitled to certain rights with respect to the registration of such shares under the Securities Act. If we propose to register our common stock, subject to certain exceptions, under the Securities Act, the Holders are entitled to notice of the registration and are entitled at our expense to include such shares therein, provided that the managing underwriters have the right to limit the number of such shares included in the registration or exclude such shares entirely.  In addition, certain of the Holders may require us, at our expense, on no more than six occasions, to file a registration statement under the Securities Act with respect to their shares of our common stock.  Further, certain Holders may require us at our expense on no more than four occasions, to register all or portion of their shares on Form S-3, subject to certain conditions and limitations.  These rights expire in August 2005.

Pursuant to a registration rights agreement between us and the holders of the Notes, the holders of the Notes are entitled to have their Notes and shares of common stock into which the Notes convert registered on a registration statement and to have the registration statement remain effective until July 26, 2002. See "Description of Notes--Registration Rights."

Anti-Takeover Effects of Provisions of Charter Documents and Delaware Law

Charter Documents

Our Restated Certificate and Restated Bylaws include a number of provisions that may have the effect of deterring hostile takeovers or delaying or preventing changes in control or management of our company.  First, the Restated Certificate provides that all stockholder action must be effected at a duly called meeting of holders and not by a consent in writing.  Second, the Restated Bylaws provide that special meetings of the holders may be called only by (i) the Chairman of the Board of Directors, (ii) the Chief Executive Officer or (iii) Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors.  Third, the Certificate and the Bylaws

provide for a classified Board of Directors.  The Certificate includes a provision requiring cumulative voting for directors only if required by applicable California law.  Under cumulative voting, a minority stockholder holding a sufficient percentage of a class of shares may be able to ensure the election of one or more directors.  As a result of the provisions of the Certificate and applicable California and Delaware law, at any annual meeting whereby the Company had at least 800 stockholders as of the end of the fiscal year prior to the record date for such annual meeting, stockholders will not be able to cumulate votes for directors.  Finally, the Restated Bylaws establish procedures, including advance notice procedures with regard to the nomination of candidates for election as directors and stockholder proposals.  These provisions of the Restated Certificate and Restated Bylaws could discourage potential acquisition proposals and could delay or prevent a change in control or management of our company.  These provisions also may have the effect of preventing changes in the management of our company.

Delaware Takeover Statute

    We are subject to the provisions of Section 203 of the Delaware General Corporation Law ("Section 203").  In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction pursuant to which the person became an interested stockholder, unless the business combination is approved in a manner prescribed by Delaware law.  For purposes of Section 203, a "business combination" includes a merger, asset sale or other transaction resulting in a financial benefit to the interested stockholder, and an "interested stockholder" is a person who, together with affiliates and associates, owns (or within three years prior, did own) 15% or more of the corporation's

41.

CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of certain U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes and common stock into which Notes may be converted, but does not purport to be a complete analysis of all the potential tax considerations relating thereto. This summary is based on laws, regulations, rulings and decisions now in effect, all of which are subject to change or differing interpretation possibly with retroactive effect. Except as specifically discussed below with regard to Non-U.S. Holders (as defined below), this summary applies only to beneficial owners that will hold Notes and common stock into which Notes may be converted as "capital assets" (within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code")) and who, for U.S. federal income tax purposes, are (i) individual citizens or residents of the U.S., (ii) corporations, partnerships or other entities created or organized in or under the laws of the U.S. or of any political subdivision thereof (unless, in the case of a partnership, Treasury Regulations otherwise provide), (iii) estates, the incomes of which are subject to U.S. federal income taxation regardless of the source of such income or (iv) trusts subject to the primary supervision of a U.S. court and the control of one or more U.S. persons ("U.S. Holders") or any trust that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. Persons other than U.S. Holders ("Non-U.S. Holders") are subject to special U.S. federal income tax considerations, some of which are discussed below. This discussion does not address tax considerations applicable to an investor's particular circumstances or to investors that may be subject to special tax rules, such as banks or other financial institutions, holders subject to the alternative minimum tax, tax-exempt organizations, insurance companies, regulated investment companies, foreign persons or entities (except to the extent specifically set forth below), dealers in securities, commodities or currencies, initial holders whose "functional currency" is not the U.S. dollar, persons that will hold Notes as a position in a hedging transaction, "straddle" or "conversion transaction" for tax purposes or persons deemed to sell Notes or common stock under the constructive sale provisions of the Code. This summary discusses the tax considerations applicable to initial holders of the Notes who purchase the Notes at their "issue price" as defined in Section 1273 of the Code and does not discuss the tax considerations applicable to subsequent purchasers of the Notes. We have not sought any ruling from the Internal Revenue Service (the "IRS") or an opinion of counsel with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements and conclusions. In addition, the IRS is not precluded from successfully adopting a contrary position. This summary does not consider the effect of the federal estate or gift tax laws or the tax laws (except as set forth below with respect to Non-U.S. Holders) of any applicable foreign, state, local or other jurisdiction.

INVESTORS CONSIDERING THE PURCHASE OF NOTES SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE UNITED STATES FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER THE FEDERAL ESTATE OR GIFT TAX RULES OR UNDER THE LAWS OF ANY STATE, LOCAL OR FOREIGN TAXING JURISDICTION OR UNDER ANY APPLICABLE TAX TREATY.

U.S. Holders

Taxation of Interest

Interest paid on the Notes will be included in the income of a U.S. Holder as ordinary income at the time it is treated as received or accrued, in

accordance with such holder's regular method of accounting for U.S. federal income tax purposes. Under Treasury Regulations, the possibility of an additional payment under a Note may be disregarded for purposes of determining the amount of interest or original issue discount income to be recognized by a holder in respect of such Note (or the timing of such recognition) if the likelihood of the payment, as of the date the Notes are issued, is remote. Our failure to file or cause to be declared effective a shelf registration statement as described under "Description of Notes--Registration Rights" may result in the payment of predetermined liquidated damages in the manner described therein. In addition, a holder may require us to redeem any and all of his Notes in the event of a Change in Control. We believe that the likelihood of a liquidated damages payment with respect to the Notes is remote and do not intend to treat such possibility as affecting the yield to maturity of any Note. Similarly, we intend to take the position that a Change in Control is remote under the Treasury Regulations, and likewise do not intend to treat the possibility of a "Change in Control" as affecting the yield to maturity of any Note. In the event either contingency occurs, it would affect the amount and timing of the income that must be recognized by a U.S. Holder of Notes. There can be no assurance that the IRS will agree with such positions. Our

42.

determination that there is a remote likelihood of paying additional interest on the Notes is binding on each U.S. Holder unless the holder explicitly discloses in the manner required by applicable Treasury Regulations that its determination is different from ours.

Sale, Exchange or Redemption of the Notes

Upon the sale, exchange (other than a conversion) or redemption of a Note, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of cash proceeds and the fair market value of any property received on the sale, exchange or redemption (except to the extent such amount is attributable to accrued interest income not previously included in income, which will be taxable as ordinary income, or is attributable to accrued interest that was previously included in income, which amount may be received without generating further income) and (ii) such holder's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will equal the cost of the Note to such holder. Such capital gain or loss will be long-term capital gain or loss if the U.S. Holder's holding period in the Note is more than one year at the time of sale, exchange or redemption. Long-term capital gains recognized by certain noncorporate U.S. Holders, including individuals, will generally be subject to a maximum federal rate of tax of 20%. The deductibility of capital losses is subject to limitations.

Market Discount

The resale of the Notes may be affected by the impact on a purchaser of the "market discount" provisions of the Code. For this purpose, the market discount on the Notes generally will be equal to the amount, if any, by which the stated redemption price at maturity of the Notes immediately after acquisition (other than at original issue) exceeds the holder's adjusted tax basis in the Notes. Subject to a de minimis exception, these provisions generally require a U.S. Holder who acquires Notes at a market discount to treat as ordinary income any gain recognized on the disposition of such Notes to the extent of the "accrued market discount" on such Notes at the time of disposition, unless the holder elects to include accrued market discount in income currently. This election to include market discount in income currently, once made, applies to all market discount obligations acquired on or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS. In general, market discount will be treated as accruing on a straight-line basis over the remaining term of the Notes at the time of acquisition, or, at the election of the holder, under a constant yield method. A holder who acquires Notes at a market discount and who does not elect to include accrued market discount in income currently may be required to defer the deduction of 89.a portion of the interest on any indebtedness incurred or maintained to purchase or carry the Notes until such Notes are disposed of in a taxable transaction. If a holder acquires Notes with market discount and receives our common stock upon conversion of such Notes, the amount of accrued market discount not previously included in income with respect to the converted Notes through the date of conversion will be treated as ordinary income upon the disposition of the common stock.

Under the President's recent budget proposal, accrual basis taxpayers could be required to accrue market discount currently, subject to certain limitations.

Amortizable Premium

A holder who purchases a Note at a premium over its stated principal amount, plus accrued interest, generally may elect to amortize such premium

("Section 171 premium") from the purchase date to the Note's maturity date under a constant-yield method that reflects semiannual compounding based on the Note's payment period. Amortizable premium, however, will not include any premium attributable to a Note conversion feature. The premium attributable to the conversion feature is the excess, if any, of the Note's purchase price over what the Note's fair market value would be if there were no conversion feature. Amortized Section 171 premium is treated as an offset to interest income on a Note and not as a separate deduction. The election to amortize a premium on a constant yield method, once made, applies to all debt obligations held or subsequently acquired by the electing U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS.

43.

Deductibility of Interest

Generally, under Section 279 of the Code, an interest deduction in excess of $5.0 million per year is not permitted with respect to certain "corporate acquisition indebtedness." Corporate acquisition indebtedness includes any indebtedness that is:

.    issued to provide consideration for the direct or indirect acquisition of stock or assets of another corporation;

.    subordinated;

.    convertible directly or indirectly into the stock of the issuing corporation; and

.    issued by a corporation that has a debt to equity ratio that exceeds 2 to 1.

Our ability to deduct all of the interest payable on the Notes will depend on the application of the foregoing tests to us. The availability of an interest deduction with respect to the Notes was not determinative in our issuance of the Notes pursuant to this offering.

Under Section 163(l) of the Code, no deduction is permitted for interest paid or accrued on any indebtedness of a corporation that is "payable in equity" of the issuer or a related party. Debt is treated as debt payable in equity of the issuer if the debt is part of an arrangement designed to result in payment of the instrument with or by reference to the equity. Such arrangements could include debt instruments that are convertible at the holder's option if it is substantially certain that the option will be exercised. The legislative history indicates that it is not expected the provision will affect debt with a conversion feature where the conversion price is significantly higher than the market price of the stock on the date of the debt issuance. Accordingly, we do not believe that our interest deduction with respect to interest payments on the Notes will be adversely affected by these rules.

Conversion of the Notes

A U.S. Holder generally should not recognize any income, gain or loss upon conversion of a Note into common stock except with respect to cash received in lieu of a fractional share of common stock and with respect to market discount, as described above under "Market Discount." A U.S. Holder's tax basis in the common stock received on conversion of a Note should be the same as such holder's adjusted tax basis in the Note at the time of conversion (reduced by any basis allocable to a fractional share interest), and the holding period for the common stock received on conversion should generally include the holding period of the Note converted.

Cash received in lieu of a fractional share of common stock upon conversion will be treated as a payment in exchange for the fractional share of common stock. Accordingly, the receipt of cash in lieu of a fractional share of common stock generally will result in capital gain or loss (measured by the difference between the cash received for the fractional share and the holder's adjusted tax basis in the fractional share).

Distributions on Common Stock

Distributions, if any, made on the common stock after a conversion

generally will be included in the income of a U.S. Holder as ordinary dividend income to the extent of our current or accumulated earnings and profits. Distributions in excess of Terayon's current and accumulated earnings and profits will be treated as a return of capital to the extent of the U.S. Holder's basis in the common stock and thereafter as capital gain. A dividend distribution to a corporate U.S. holder may qualify for a dividends received deduction.

Adjustment of Conversion Price

Holders of convertible debt instruments such as the Notes may, in certain circumstances, be deemed to have received distributions of stock if the conversion price of such instruments is adjusted. Adjustments to the conversion price made pursuant to a bona fide reasonable adjustment formula which has the effect of preventing the

44.

dilution of the interest of the holders of the debt instruments, however, will generally not be considered to result in a constructive distribution of stock. Certain of the possible adjustments provided in the Notes (including, without limitation, adjustments in respect of taxable dividends to our stockholders) will not qualify as being pursuant to a bona fide reasonable adjustment formula. If such adjustments are made, the U.S. Holders of Notes will be deemed to have received constructive distributions taxable as dividends to the extent of our current and accumulated earnings and profits even though they have not received any cash or property as a result of such adjustments. In certain circumstances, the failure to provide for such an adjustment may result in taxable dividend income to the U.S. Holders of common stock.

Sale of Common Stock

Upon the sale or exchange of common stock a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received upon the sale or exchange and (ii) such U.S. Holder's adjusted tax basis in the common stock. Such capital gain or loss will be long-term capital gain or loss if the U.S. Holder's holding period in common stock is more than one year at the time of the sale or exchange. Long-term capital gains recognized by certain non-corporate U.S. Holders, including individuals, will generally be subject to a maximum federal rate of tax of 20%. A U.S. Holder's basis and holding period in common stock received upon conversion of a Note are determined as discussed above under "Conversion of the Notes." The deductibility of capital losses is subject to limitations.

Backup Withholding and Information Reporting

Backup withholding of U.S. federal income tax at a rate of 31% may apply to payments pursuant to the terms of a Note or common stock to a U.S. Holder that is not an "exempt recipient" and that fails to provide certain identifying information (such as the holder's TIN) in the manner required. Generally, individuals are not exempt recipients, whereas corporations and certain other entities are exempt recipients. Payments made in respect of a Note or common stock must be reported to the Service, unless the U.S. Holder is an exempt recipient or otherwise establishes an exemption. The amount of any backup withholding from a payment to a U.S. Holder will be allowed as a credit against the U.S. Holder's federal income tax liability and may entitle such holder to a refund, provided that the required information is furnished to the IRS.

Treasury Regulations, generally effective after December 31, 2000, subject to certain transition rules, modify the currently effective information withholding and backup withholding procedures and requirements. U.S. Holders should consult their own tax advisors concerning the application of the new withholding regulations.

Special Tax Rules Applicable to Non-U.S. Holders

Taxation of Interest

In general, subject to the discussion below concerning backup withholding:

Payments of interest on the Notes by us or any paying agent to a beneficial owner of a Note that is a Non-U.S. Holder will not be subject to U.S. withholding tax, provided that, (i) such Non-U.S. Holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of stock entitled to vote within the meaning of Section 871(h)(3) of the Code,

(ii) such Non-U.S. Holder is not a "controlled foreign corporation" with respect to which we are a "related person" within the meaning of the Code, (iii) such Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Code, and (iv) the certification requirements under Section 871(h) or Section 881(c) of the Code and Treasury Regulations thereunder (discussed below) are satisfied.

Conversion of the Notes

A Non-U.S. Holder generally will not be subject to U.S. federal withholding tax on the conversion of a Note into common stock. To the extent a Non-U.S. Holder receives cash in lieu of a fractional share of common stock upon conversion, such cash may give rise to gain that would be subject to the rules described above with respect to

45.

the sale or exchange of a Note or common stock. See "Sale, Exchange or Redemption of the Notes or Common Stock" below.

Adjustment of Conversion Price

The conversion price of the Notes is subject to adjustment in certain circumstances. Any such adjustment could, in certain circumstances, give rise to a deemed distribution to Non-U.S. Holders of the Notes. See "U.S. Holders -- Adjustment of Conversion Price" above. In such case, the deemed distribution would be subject to the rules below regarding withholding of U.S. federal tax on dividends in respect of common stock.

Distributions on Common Stock

Distributions on common stock will constitute a dividend for U.S. federal income tax purposes to the extent of our current or accumulated earnings and profits as determined under U.S. federal income tax principles. Dividends paid on common stock held by a Non-U.S. Holder will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate, if applicable) unless the dividend is effectively connected with the conduct of a U.S. trade or business by the Non-U.S. Holder and, if required by a tax treaty, is attributable to a permanent establishment maintained in the United States, in which case the dividend will be subject to U.S. federal income tax on net income that applies to U.S. persons generally (and with respect to corporate holders under certain circumstances, the branch profits tax). A Non-U.S. Holder may be required to satisfy certain requirements in order to claim a reduction of or exemption from withholding under the foregoing rules. However, prior to January 1, 2001, for purposes of an applicable tax treaty, if a stockholder's address is outside the United States it will be assumed that such stockholder is a citizen or resident of that country absent the payor's knowledge to the contrary.

Sale, Exchange or Redemption of the Notes of Common Stock

A Non-U.S. Holder of a Note or common stock will not be subject to U.S. federal income tax on gains realized on the sale, exchange or other disposition of such Note or common stock unless (i) such Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of sale, exchange or other disposition, and certain conditions are met, (ii) such gain is effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the U.S. and, if certain U.S. income tax treaties apply, is attributable to a U.S. permanent establishment maintained by the Non-U.S. Holder, (iii) the Non-U.S. Holder is subject to Code provisions applicable to certain U.S. expatriates, or (iv) in the case of a Note or common stock held by a person who holds more than 5% of such stock, we are or have been, at any time within the shorter of the five-year period preceding such sale or other disposition or the period such Non-U.S. Holder held the common stock, a U.S. real property holding corporation (a "USRPHC") for U.S. federal income tax purposes. We do not believe that we currently are a USRPHC or that it will become one in the future.

Interest on Notes not excluded from U.S. withholding tax as described above generally will be a subject to U.S. withholding tax at a 30% rate, except where an applicable tax treaty provides for the reduction or elimination of such withholding tax.

To satisfy the certification requirements referred to in (iv) above, Sections 871(h) and 881(c) of the Code and currently effective Treasury Regulations thereunder require that either (i) the beneficial owner of a Note

must certify, under penalties of perjury, to us or our paying agent, as the case may be, that such owner is a Non-U.S. Holder and must-provide such owner's name and address, and U.S. taxpayer identification number ("TIN"), if any, or (ii) a securities clearing organization, bank or other financial institution that holds customer securities in the ordinary course of its trade or business (a "Financial Institution") and holds the Note on behalf of the beneficial owner thereof must certify, under penalties of perjury, to us or our paying agent, as the case may be, that such certificate has been received from the beneficial owner and must furnish the payor with a copy thereof. Such requirement will be fulfilled if the beneficial owner of a Note certifies on IRS Form W-8BEN or successor form, under penalties of perjury, that it is a Non-U.S. Holder and provides its name and address or any Financial Institution holding the Note on behalf of the beneficial owner files a statement with the withholding agent to the effect that it has received such a statement from the beneficial owner (and furnishes the withholding agent with a copy thereof).

46.

Treasury Regulations effective for payments made after December 31, 2000, will provide alternative methods for satisfying the certification requirements described above and below, subject to certain grandfathering provisions. These new regulations also require, in the case of Notes held by a foreign partnership, that (i) the certification be provided by the partners rather than by the foreign partnership and (ii) the partnership provide certain information, including a TIN. A look-through rule will apply in the case of tiered partnerships.

If a Non-U.S. Holder of a Note is engaged in a trade or business in the U.S. and if interest on the Note is effectively connected with the conduct of such trade or business (and, if certain tax treaties apply, is attributable to a U.S. permanent establishment maintained by the Non-U. S. Holder in the U.S.), the Non-U.S. Holder, although exempt from U.S. withholding tax (provided that the certification requirements discussed in the next sentence are met), will generally be subject to U.S. federal income tax on such interest on a net income basis in the same manner as if it were a U.S. Holder. In lieu of the certificate described above, such a Non-U. S. Holder will be required, under currently effective Treasury Regulations, to provide us with a properly executed IRS Form W-8ECI or 4224 or successor form in order to claim an exemption from withholding tax. In addition, if such Non-U.S. Holder is a foreign corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

U.S. Federal Estate Tax

A Note held by an individual who at the time of death is not a citizen or resident of the U.S. (as specially defined for U.S. federal estate tax purposes) will not be subject to U.S. federal estate tax if the individual did not actually or constructively own 10% or more of the total combined voting power of all classes of our stock and, at the time of the individual's death, payments with respect to such Note would not have been effectively connected with the conduct by such individual of a trade or business in the U.S. Common stock held by an individual who at the time of death is not a citizen or resident of the U.S. (as specially defined for U.S. federal estate tax purposes) will be included in such individual's estate for U.S. federal estate tax purposes, unless an applicable estate tax treaty otherwise applies.

Non-U.S. Holders should consult with their tax advisors regarding U.S. and foreign tax consequences with respect to the Notes and common stock.

Backup Withholding and Information Reporting

In the case of payments of interest on a Note to a Non-U.S. Holder, Treasury Regulations provide that backup withholding and information reporting will not apply to payments with respect to which either requisite certification has been received or an exemption has otherwise been established (provided that neither we nor our paying agent has actual knowledge that the holder is a U.S. Holder or that the conditions of any other exemption are not in fact satisfied).

Dividends on the common stock paid to Non-U.S. Holders that are subject to U.S. withholding tax, as described above, generally will be exempt from U.S. backup withholding tax but will be subject to certain information reporting.

Payments of the proceeds of the sale of a Note or common stock to or through a foreign office of a U.S. broker or a foreign broker that is a "controlled foreign corporation" within the meaning of the Code or a foreign

person, 50% or more of whose gross income from all sources for the three-year period ending with the close of its taxable year preceding the payment was effectively connected with the conduct of a trade or business within the U.S. are currently subject to certain information reporting requirements, unless the payee is an exempt recipient or such broker has evidence in its records that the payee is a non-U.S. holder and no actual knowledge that such evidence is false and certain other conditions are met. Temporary Treasury Regulations indicate that such payments are not currently subject to backup withholding.

Under current Treasury Regulations, payments of the proceeds of a sale of a Note or common stock to or through the U.S. office of a broker will be subject to information reporting and backup withholding unless the payee

47.

certifies under penalties of perjury as to his or her status as a Non-U.S. Holder and satisfies certain other qualifications (and no agent of the broker who is responsible for receiving or reviewing such statement has actual knowledge that it is incorrect) and provides his or her name and address or the payee otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules from a payment to a Non-U.S. Holder of a Note or common stock will be allowed as a credit against such holder's U.S. federal income tax, if any, or will be otherwise refundable provided that the required information is furnished to the IRS in a timely manner.

As noted above, new regulations will generally be applicable to payments made after December 31, 2000. In general, these new regulations do not significantly alter the substantive withholding and information reporting requirements but unify current certification procedures and forms and clarify reliance standards. Under these new regulations, special rules apply which permit the shifting of primary responsibility for withholding to certain financial intermediaries acting on behalf of beneficial owners. A Non-U.S. Holder of a Note or common stock should consult with its tax advisor regarding the application of the backup withholding rules to its particular situation, the availability of an exemption therefrom, the procedure for obtaining such an exemption, if available, and the impact of these new regulations on payments made with respect to Notes or common stock after December 31, 2000.

THE PRECEDING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN TAX ADVISER AS TO THE PARTICULAR U.S. FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF PURCHASING, HOLDING AND DISPOSING OF THE NOTES AND OUR COMMON STOCK. TAX ADVISORS SHOULD ALSO BE CONSULTED AS TO THE U.S. ESTATE AND GIFT TAX CONSEQUENCES AND THE FOREIGN TAX CONSEQUENCES OF PURCHASING, HOLDING AND DISPOSING OF OUR NOTES AND COMMON STOCK, AS WELL AS THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAWS.

LEGAL MATTERS

Certain legal matters with respect to the validity of the Notes offered by this prospectus and the common stock issuable upon conversion of the Notes are being passed upon for us by Cooley Godward LLP, San Francisco, California.

EXPERTS

Ernst & Young LLP, independent auditors, have audited our consolidated financial statements and schedule included in our Annual Report on Form 10-K, as amended on Form 10-K/A, for the year ended December 31, 1999, as set forth in their reports, which are incorporated by reference in the prospectus and elsewhere in the registration statement. Our financial statements and schedule are incorporated by reference in reliance of Ernst & Young LLP's report given on their authority as experts in accounting and auditing.

The financial statements of Mainsail Networks, Inc., appearing in Terayon Communication System, Inc.'s Current Report on Form 8-K/A filed October 18, 2000, have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon included therein and incorporated herein by reference. Mainsail Networks, Inc's financial statements included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed October 18, 2000 are incorporated by reference in reliance on Ernst & Young LLP given on the authority of such firm as experts in accounting and auditing.

Kost, Forer and Gabbay, a member of Ernst and Young International, independent auditors, have audited the financial statements of Telegate Ltd. included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed June 29, 2000, as set forth in their report, which is incorporated by reference in this prospectus and elsewhere in the Registration Statement. Telegate Ltd.'s financial statements included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed June 29, 2000 are incorporated by reference in reliance on Kost, Forer and Gabbay's report, given on their authority as experts in accounting and auditing.

Kost, Forer and Gabbay, a member of Ernst and Young International, independent auditors, have audited the consolidated financial statements of ComBox Ltd. included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed June 29, 2000, as set forth in their report, which is incorporated by reference in this prospectus and elsewhere in the Registration Statement. ComBox Ltd.'s consolidated financial statements included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed June 29, 2000 are incorporated by reference in reliance on Kost, Forer and Gabbay's report, given on their authority as experts in accounting and auditing.

The audited historical statements of assets acquired and liabilities assumed and of net sales and direct costs and operating expenses of the Access Network Electronics business of Tyco Electronics Corporation as of and for the year ended June 30, 1999, incorporated in this Registration Statement by reference to the Current Report on Form 8-K/A of Terayon Communication Systems, Inc. filed June 29, 2000, have been so incorporated in reliance on the report (which contains an explanatory paragraph relating to the limited presentation of such statements, as discussed in Note 2 to the statements) of PricewaterhouseCoopers LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

49.

WHERE YOU CAN GET MORE INFORMATION

We are a reporting company and file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy these reports, proxy statements and other information at the SEC's public reference rooms at Room 1024, 450 Fifth Street, N.W., Washington, D.C., as well as at the SEC's regional offices at 500 West Madison Street, Suite 1400, Chicago, Illinois 60661 and 7 World Trade Center, Suite 1300, New York, NY 10048. You can request copies of these documents by writing to the SEC and paying a fee for the copying cost. Please call the SEC at 1-800-SEC-0330 for more information about the operation of the public reference rooms. Our SEC filings are also available at the SEC's web site at "http://www.sec.gov." In addition, you can read and copy our SEC filings at the office of the National Association of Securities Dealers, Inc. at 1735 "K" Street, Washington, D.C. 20006.

The SEC allows us to "incorporate by reference" information that we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we will make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934:

.    Annual Report on Form 10-K for the year ended December 31, 1999, as amended on Form 10-K/A filed on April 28, 2000;

.    Quarterly Report on Form 10-Q for the quarter ended March 31, 2000;

.    Quarterly Report on Form 10-Q for the quarter ended June 30, 2000;

.    Current Report on Form 8-K filed on May 3, 2000, as amended on Form 8-K/A filed on May 8, 2000 and as amended on Form 8-K/A filed on June 29, 2000;

.    Current Report on Form 8-K filed on July 18, 2000;

.    Current Report on Form 8-K filed on October 5, 2000 and as amended on Form 8-K/A on October 18, 2000;

.    Current Report on Form 8-K filed on October 23, 2000; and

.    The description of the common stock contained in our Registration Statement on Form 8-A, as filed on July 20, 1998 with the SEC.

You may request a copy of these filings at no cost, by writing or telephoning us at the following address:

Terayon Communication Systems, Inc.
2952 Bunker Hill Lane
Santa Clara, CA 95054
(408) 727-4400

This prospectus is part of a Registration Statement we filed with the SEC. You should rely only on the information incorporated by reference or provided in this prospectus and the Registration Statement. We have authorized no one to provide you with different information. You should not assume that the information in this prospectus is accurate as of any date other than the date on

the front of the document.

50.

We have not authorized any dealer, sales person or other person to give any
information or to make any representations other than those contained in this
prospectus or any prospectus supplement. You must not rely on any unauthorized
information. This prospectus is not an offer of these securities in any state
where an offer is not permitted. The information in this prospectus is current
as of _____, 2000. You should not assume that this prospectus is
accurate as of any other date.

TABLE OF CONTENTS

|                                                                        | PAGE |
|------------------------------------------------------------------------|------|
| Forward-Looking Statements.................................. | 1 |
| Prospectus Summary......................................... | 2 |
| Risk Factors............................................... | 6 |
| Ratio of Earnings to Fixed Charges......................... | 23 |
| Price Range of Common Stock................................ | 24 |
| Selling Holders............................................ | 25 |
| Plan of Distribution....................................... | 27 |
| Description of Notes....................................... | 29 |
| Description of Capital Stock............................... | 40 |
| Certain United States Federal Income Tax Considerations...... | 42 |
| Legal Matters............................................. | 49 |
| Experts.................................................. | 49 |
| You Can Find More Information.............................. | 49 |

$500,000,000 OF 5% CONVERTIBLE
SUBORDINATED NOTES
DUE AUGUST 1, 2007

5,951,673 SHARES OF

COMMON STOCK ISSUABLE UPON
CONVERSION OF THE 5%
CONVERTIBLE NOTES
DUE AUGUST 1, 2007


PROSPECTUS


TERAYON COMMUNICATION SYSTEMS, INC.

_____, 2000

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

Item 14. Other Expenses of Issuance and Distribution.

The following table sets forth the costs and expenses, all of which will be paid by us, in connection with the distribution of our common stock being registered.  All amounts are estimated, except the SEC registration fee:

| | |
|---|---|
| SEC registration fee............................ | $132,000 |
| Accounting fees................................. | 70,000 |
| Legal fees and expenses......................... | 150,000 |
| Miscellaneous................................... | 20,000 |
| Printing and engraving.......................... | 40,000 |
| | -------- |
| Total........................................... | $412,000 |
| | ======== |

Item 15. Indemnification of Officers and Directors.

As permitted by Section 145 of the Delaware General Corporation Law, our Bylaws provide that (i) we are required to indemnify our directors and executive officers to the fullest extent permitted by the Delaware General Corporation Law, (ii) we may, in our discretion, indemnify other officers, employees and agents as set forth in the Delaware General Corporation Law, (iii) to the fullest extent permitted by the Delaware General Corporation Law, we are required to advance all expenses incurred by our directors and executive officers in connection with a legal proceeding (subject to certain exceptions), (iv) the rights conferred in our Bylaws are not exclusive, (v) we are authorized to enter into indemnification agreements with our directors, officers, employees and agents and (vi) we may not retroactively amend the Bylaws provisions relating to indemnity.

We have entered into agreements with our directors and executive officers that require us to indemnify such persons against expenses, judgments, fines, settlements and other amounts that such person becomes legally obligated to pay (including expenses of a derivative action) in connection with any proceeding, whether actual or threatened, to which any such person may be made a party by reason of the fact that such person is or was our director or officer or any of our affiliated enterprises, provided such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to our best interests. The indemnification agreements also set forth certain procedures that will apply in the event of a claim for indemnification thereunder.

Item 16. Exhibits and Financial Statement Schedules.

| Exhibit Number | Description of Document |
|---|---|
| 4.1 | Form of Security for Terayon Communication Systems, Inc.'s 5% Convertible Subordinated Notes due August 1, 2007. |
| 4.2 | Indenture between Terayon Communication Systems, Inc., as Issuer, and State Street Bank and Trust Company of California, N.A., as Trustee, dated July 26, 2000. |

| 4.3 | Purchase Agreement by and among Terayon Communication Systems, Inc. and Deutsche Bank Securities, Inc. and Lehman Brothers, Inc. dated July 20, 2000. |
| 4.4 | Registration Rights Agreement by and among Terayon Communication Systems, Inc. and Deutsche Bank Securities, Inc. and Lehman Brothers, Inc.. |
| 5.1 | Opinion of Cooley Godward LLP. |
| 12.1 | Statement regarding computation of ratios. |
| 23.1 | Consent of Ernst & Young LLP, Independent Auditors. |
| 23.2 | Consent of Ernst & Young LLP, Independent Auditors. |
| 23.3 | Consent of PricewaterhouseCoopers LLP, Independent Accountants. |
| 23.4 | Consent of Kost, Forer & Gabbay (a member of Ernst & Young International), Independent Auditors. |
| 23.5 | Consent of Kost, Forer & Gabbay (a member of Ernst & Young International), Independent Auditors. |

```
23.6    Consent of Cooley Godward LLP (reference is made to Exhibit 5.1).
24.1    Power of Attorney. Reference is made to the signature page.
25.1    Statement of Eligibility of Trustee.
```

Item 17. Undertakings.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to our directors, officers, and controlling persons pursuant to the provisions described in Item 14 or otherwise, we have been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by us of expenses incurred or paid by one of our directors, officers, or controlling persons in the successful defense of any action, suit, or proceeding) is asserted by such director, officer, or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

We hereby undertake:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information the registration statement;

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

We hereby undertake that, for purposes of determining any liability under the Securities Act of 1933, each filing of our annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to the initial bona fide offering thereof.

II-2

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant certifies that it has reasonable grounds to believe it meets all of the requirements for filing on Registration Statement on Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Santa Clara, State of California, on the 24th day of October, 2000.

TERAYON COMMUNICATION SYSTEMS, INC.

By: /s/ Dr.Zaki Rakib
    -------------------------------
    Dr. Zaki Rakib
    Chief Executive Officer

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Dr. Zaki Rakib and Ray M. Fritz, or either of them, each with the power of substitution, his attorney-in-fact, to sign any amendments to this Registration Statement (including post-effective amendments), with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|-----------|-------|------|
| /s/ Dr. Zaki Rakib<br>------------------------------<br>Dr. Zaki Rakib | Chief Executive Officer and Director (Principal Executive Officer) | October 24, 2000 |
| /s/ Ray M. Fritz<br>------------------------------<br>Ray M. Fritz | Chief Financial Officer (Principal Financial and Accounting Officer) | October 24, 2000 |
| /s/ Shlomo Rakib<br>------------------------------<br>Shlomo Rakib | President and Chairman of the Board of Directors<br>Director | October 24, 2000 |
| /s/ Michael D'Avella<br>------------------------------<br>Michael D'Avella | Director | October 24, 2000 |
| | Director | October 24, 2000 |

```
         /s/ Alek Krstajic
-------------------------------------
          Alek Krstajic
                                        Director                        October 24, 2000
  /s/ Christopher J. Schaepe
-------------------------------------
       Christopher J. Schaepe
                                        Director                        October 24, 2000
         /s/ Lewis Solomon
-------------------------------------
          Lewis Solomon
                                        Director                        October 24, 2000
         /s/ Mark Stevens
-------------------------------------
           Mark Stevens
```

II-3

EXHIBIT INDEX

Exhibit Number       Description of Document

4.1  Form of Security for Terayon Communication Systems, Inc.'s 5% Convertible
     Subordinated Notes due August 1, 2007.

4.2  Indenture between Terayon Communication Systems, Inc., as Issuer, and
     State Street Bank and Trust Company of California, N.A., as Trustee, dated
     July 26, 2000.

4.3  Purchase Agreement by and among Terayon Communication Systems, Inc. and
     Deutsche Bank Securities, Inc. and Lehman Brothers, Inc. dated July 20,
     2000.

4.4  Registration Rights Agreement by and among Terayon Communication Systems,
     Inc. and Deutsche Bank Securities, Inc. and Lehman Brothers, Inc..

5.1  Opinion of Cooley Godward LLP.

12.1  Statement regarding computation of ratios.

23.1  Consent of Ernst & Young LLP, Independent Auditors.

23.2  Consent of Ernst & Young LLP, Independent Auditors.

23.3  Consent of PricewaterhouseCoopers LLP, Independent Accountants.

23.4  Consent of Kost, Forer & Gabbay (a member of Ernst & Young International),
      Independent Auditors.

23.5  Consent of Kost, Forer & Gabbay (a member of Ernst & Young International),
      Independent Auditors.

23.6  Consent of Cooley Godward LLP (reference is made to Exhibit 5.1).

24.1  Power of Attorney. Reference is made to the signature page.

25.1  Statement of Eligibility of Trustee.

Exhibit 4.1

FORM OF SECURITY

GLOBAL NOTE LEGEND:

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO TERAYON COMMUNICATION SYSTEMS, INC. (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.
TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFER IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

RESTRICTED SECURITIES LEGEND:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY,
AGREES FOR THE BENEFIT OF THE COMPANY THAT THIS SECURITY MAY NOT BE RESOLD,
PLEDGED OR OTHERWISE TRANSFERRED (X) PRIOR TO THE EXPIRATION OF THE HOLDING
PERIOD UNDER RULE 144(k) (OR ANY SUCCESSOR THERETO) UNDER THE SECURITIES ACT
WHICH IS APPLICABLE TO THIS SECURITY OR (Y) BY ANY HOLDER THAT WAS AN
"AFFILIATE" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) OF THE
COMPANY AT ANY TIME DURING THE THREE MONTHS PRECEDING THE DATE OF SUCH TRANSFER,
IN EITHER CASE, OTHER THAN (1) TO THE COMPANY, (2) SO LONG AS THIS SECURITY IS
ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE
144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED
INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A, PURCHASING FOR ITS OWN
ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS
GIVEN THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON
RULE 144A, (3) IN AN OFFSHORE TRANSACTION (AS DEFINED IN REGULATION S UNDER THE
SECURITIES ACT) IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, (4)
PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY
RULE 144 (IF APPLICABLE) UNDER THE SECURITIES ACT OR (5) PURSUANT TO AN
EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN
ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED
STATES. THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, REPRESENTS AND AGREES
FOR THE BENEFIT OF THE COMPANY THAT IT IS (1) A QUALIFIED INSTITUTIONAL BUYER OR
(2) NOT A U.S. PERSON AND IS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF (OR
AN ACCOUNT SATISFYING THE REQUIREMENTS OF PARAGRAPH (k)(2) OF RULE 902 UNDER)
REGULATION S UNDER THE SECURITIES ACT. IN ANY CASE THE HOLDER HEREOF WILL NOT,
DIRECTLY OR INDIRECTLY, ENGAGE IN ANY HEDGING TRANSACTION WITH REGARD TO THIS
SECURITY OR ANY COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SECURITY EXCEPT AS
PERMITTED BY THE SECURITIES ACT.

[FORM OF FACE OF SECURITY]

TERAYON COMMUNICATION SYSTEMS, INC.

Number _____                                CUSIP No.  880775AA9
                                                         ---------

5% Convertible Subordinated Note Due 2007

    Terayon Communication Systems, Inc., a Delaware corporation (the "Company"), promises to pay to Cede & Co. or registered assigns, the principal sum of _____ Dollars ($_____) on August 1, 2007 and to pay interest on the principal amount of this Note beginning the most recent date to which interest has been paid or, if no interest has been paid, beginning July 26, 2000 at the rate of 5% per annum.

Interest Payment Dates:     February 1 and August 1
Record Dates:               January 15 and July 15

    This Note is convertible at such times and as specified on the other side of this Note. Additional provisions of this Note are set forth on the other side of this Note.

IN WITNESS WHEREOF, the Company has caused this 5% Convertible Subordinated Note due 2007 to be signed by its duly authorized officers.

Dated:_____                    TERAYON COMMUNICATION SYSTEMS, INC.

                                       By: _____
                                           Name: Zaki Rakib
                                           Title: Chief Executive Officer


                                       By: _____
                                           Name: Ray Fritz
                                           Title: Chief Financial Officer

Trustee's Certificate of
Authentication:

Dated:_____

This is one of the Securities
referred to in the within mentioned
Indenture.

STATE STREET BANK AND TRUST
 COMPANY OF CALIFORNIA, N.A., as Trustee


By: _____
       Authorized Signatory

FORM OF REVERSE SIDE OF SECURITY

Terayon Communication Systems, Inc.

5% Convertible Subordinated Note Due 2007

1.    Interest.
      --------

Terayon Communication Systems, Inc., a Delaware corporation (the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Company shall pay interest semi-annually on February 1 and August 1 of each year, commencing February 1, 2001. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from July 26, 2000. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Holder of this Note is entitled to the benefits of the Registration Rights Agreement, dated July 26, 2000, among the Company, Deutsche Bank Securities Inc. and Lehman Brothers, Inc.

2.    Method of Payment.
      -----------------

The Company will pay interest on this Note (except defaulted interest) to the person who is the registered Holder of this Note at the close of business on the January 15 and July 15 next preceding the interest payment date. The Holder must surrender this Note to the Paying Agent to collect payment of principal. The Company will pay principal and interest in money of the United States that at the time of payment is legal tender for payment of public and private debts. The Company, however, may pay principal and interest by its check payable in such money. It may mail an interest check to the Holder's registered address.

3.    Paying Agent, Registrar and Conversion Agent.
      ---------------------------------------------

Initially, State Street Bank and Trust Company of California, N.A. (the "Trustee") will act as Paying Agent, Registrar and Conversion Agent. The Company may change any Paying Agent, Registrar or Conversion Agent without notice to the holder. The Company or any of its Subsidiaries may act as Paying Agent, Registrar or Conversion Agent.

4.    Indenture; Limitations.
      ----------------------

This Note is one of a duly authorized issue of Notes of the Company designated as its 5% Convertible Subordinated Notes Due 2007 (the "Notes"), issued under an Indenture dated as of July 26, 2000 (the "Indenture"), between the Company and the Trustee. The terms of this Note include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. (S)(S) 77aaa-77bbbb), as amended by the Trust Indenture Reform Act of 1990, as in effect on the date hereof or, from and after the date that the Indenture shall be qualified thereunder, as in effect on such date. This Note is subject to all such terms, and the holder of this Note is referred to the Indenture and said Act for a statement of them.

The Notes are subordinated unsecured obligations of the Company limited to up to $500,000,000 aggregate principal amount plus an additional principal amount not exceeding $75,000,000 in the aggregate as may be issued upon the exercise by the Initial Purchasers, in whole or in part, of the Purchase Option.

5.    Provisional and Optional Redemption.
      ------------------------------------

The Notes may be redeemed at the Company's option, in whole or in part, at any time and from time to time on or after 90 days following the last day of original issuance and prior to August 7, 2003 (a "Provisional Redemption"), at a redemption price of $1,000 per $1,000 principal amount of Notes, plus accrued and unpaid interest, if any, to the date of redemption (the "Provisional Redemption Date") if (i) the trading price of the Company's Common Stock for 20 Trading Days (as defined in the Indenture) in a period of 30 consecutive Trading Days ending on the Trading Day prior to the date of mailing of the provisional notice of redemption exceeds 150% of the Conversion Price (as defined below) of the Notes and (ii) a shelf registration statement covering resales of the Notes and the Common Stock issuable upon conversion of the Notes is effective and available for use and is expected to remain effective for the 30 days following the provisional redemption date, unless registration is no longer required.

Upon any such Provisional Redemption, the Company shall make an additional payment in cash (the "Make Whole Payment") to holders of the Notes called for redemption, including those Notes converted into Common Stock between the date of mailing of the provisional notice of redemption and the Provisional Redemption Date, in an amount equal to $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption.

The Notes may be redeemed at the Company's option, in whole or in part, at any time and from time to time on and after August 7, 2003. The redemption price for the Notes, expressed as a percentage of the principal amount, is 102.857% if the Notes are redeemed in the period beginning August 7, 2003 and ending July 31, 2004, and is as follows for the 12-month periods beginning August 1 as follows:

| Year | Percentage |
| --- | --- |
| 2004 ................................ | 102.143 % |
| 2005 ................................ | 101.429 % |
| 2006 ................................ | 100.714 % |

and 100% of the principal amount on and after August 1, 2007, together in the case of any such redemption with accrued and unpaid interest to the date of redemption, but any interest payment that is due and payable on or prior to such date of redemption will be payable to the Holders of such Notes, or one or more predecessor Notes, of record at the close of business on the relevant record dates referred to on the face hereof, all as provided in the Indenture.

6.    Notice of Redemption.
      --------------------

     Notice of redemption will be mailed by first class mail at least 30 days
prior to the redemption date in the case of a Provisional Redemption, and at
least 20 days but not more than 60 days before the redemption date in the case
of an Optional Redemption, to each Holder of Notes to be redeemed at his
registered address. Notes in denominations larger than $1,000 may be redeemed in
part, but only in whole multiples of $1,000. On and after the redemption date,
subject to the deposit with the Paying Agent of funds sufficient to pay the
redemption price, interest ceases to accrue on Notes or portions of them called
for redemption.

7.    Repurchase of Notes at Option of Holder upon a Change in Control.
      ----------------------------------------------------------------

     If at any time that Notes remain outstanding there shall have occurred a
Change in Control (as defined in the Indenture), at the option of the Holder and
subject to the terms and conditions of the Indenture, the Company shall become
obligated to repurchase all or any part specified by the Holder (so long as the
principal amount of such part is $1,000 or an integral multiple thereof) of the
Notes held by such Holder on the Repurchase Date. The Holder shall have the
right to withdraw any Repurchase Notice by delivering a written notice of
withdrawal to the Paying Agent in accordance with the terms of the Indenture.
The Repurchase Price is payable in cash.

8.    Conversion.
      ----------

     At any time after 90 days following the latest date of original issuance of
the Notes and prior to the close of business on the business day immediately
preceding August 1, 2007, a Holder of a Note may convert such Note into shares
of Common Stock of the Company; provided, however, that if the Note is called
for redemption, the conversion right will terminate at the close of business on
the Business Day before the redemption date of such Note (unless the Company
shall default in making the redemption payment when due, in which case the
conversion right shall terminate at the close of business on the date such
default is cured and such Note is redeemed). The initial conversion price is
$84.01 per share, subject to adjustment under certain circumstances as described
in the Indenture (the "Conversion Price"). The number of shares issuable upon
conversion of a Note is determined by dividing the principal amount converted by
the Conversion Price in effect on the conversion date. Upon conversion, no
adjustment for interest or dividends will be made. No fractional shares will be
issued upon conversion; in lieu thereof, an amount will be paid in cash based
upon the current market price (as defined in the Indenture) of the Common Stock
on the last trading day prior to the date of conversion.

     To convert a Note, a Holder must (a) complete and sign the conversion
notice set forth below and deliver such notice to the Conversion Agent, (b)
surrender the Note to the Conversion Agent, (c) furnish appropriate endorsements
and transfer documents if required by the Registrar or the Conversion Agent, (d)
pay any transfer or similar tax, if required and (e) if the Note is held in
book-entry form, complete and deliver to the Depositary appropriate instructions
pursuant to the Depositary's book-entry conversion programs. If a Holder
surrenders a Note for conversion between the record date for the payment of an
installment of interest and the next interest payment date, the Note must be
accompanied by payment of an amount equal to the interest payable on such
interest payment date on the principal amount of the Note or portion thereof
then converted; provided,

however, that no such payment shall be required if such Note has been called for redemption on a redemption date within the period between and including such record date and such interest payment date, or if such Note is surrendered for conversion on the interest payment date. A Holder may convert a portion of a Note equal to $1,000 or any integral multiple thereof.

A Note in respect of which a Holder had delivered a Repurchase Notice exercising the option of such Holder to require the Company to repurchase such Note may be converted only if the notice of exercise is withdrawn as provided above and in accordance with the terms of the Indenture.

9.    Subordination.
      -------------

The indebtedness evidenced by the Notes is, to the extent and in the manner provided in the Indenture, subordinate and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company, as defined in the Indenture. Any Holder by accepting this Note agrees to and shall be bound by such subordination provisions and authorizes the Trustee to give them effect.

In addition to all other rights of Senior Indebtedness described in the Indenture, the Senior Indebtedness shall continue to be Senior Indebtedness and entitled to the benefits of the subordination provisions irrespective of any amendment, modification or waiver of any terms of any instrument relating to the Senior Indebtedness or any extension or renewal of the Senior Indebtedness.

10.   Denominations, Transfer, Exchange.
      ---------------------------------

The Notes are in registered form without coupons in denominations of $1,000 and integral multiples thereof. A Holder may register the transfer of or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes or other governmental charges that may be imposed by law or permitted by the Indenture.

Global Note Insert:

The aggregate principal amount of the Note in global form represented hereby may from time to time be reduced to reflect conversions or redemptions of a part of this Note in global form or cancellations of a part of this Note in global form, in each case, and in any such case, by means of notations on the Global Note Transfer Schedule on the last page hereof. Notwithstanding any provision of this Note to the contrary, conversions or redemptions of a part of this Note in global form and cancellations of a part of this Note in global form, may be effected without the surrendering of this Note in global form, provided that appropriate notations on the Schedule of Exchanges, Conversions, Redemptions, Cancellations and Transfers are made by the Trustee, or the Custodian at the direction of the Trustee, to reflect the appropriate reduction or increase, as the case may be, in the aggregate principal amount of this Note in a global form resulting therefrom or as a consequence thereof.

11. Persons Deemed Owners.
    ----------------------

    The registered holder of a Note may be treated as the owner of it for all
purposes.

12. Unclaimed Money.
    ---------------

    If money for the payment of principal, premium, if any, or interest remains
unclaimed for two years, the Trustee or Paying Agent will pay, subject to
applicable escheatment laws, the money back to the Company at its request. After
that, Holders entitled to money must look to the Company for payment unless an
abandoned property law designates another person.

13. Amendment, Supplement, Waiver.
    -----------------------------

    Subject to certain exceptions, the Indenture or the Notes may be amended or
supplemented with the consent of the Holders of a majority in aggregate
principal amount of the Notes then outstanding and any past default or
compliance with any provision may be waived in a particular instance with the
consent of the Holders of a majority in aggregate principal amount of the Notes
then outstanding. Without the consent of or notice to any Holder, the Company
and the Trustee may amend or supplement the Indenture or the Notes to, among
other things, cure any ambiguity, omission, defect or inconsistency or make any
other change that does not adversely affect the rights of any Holder.

14. Successor Corporation.
    ---------------------

    When a successor corporation assumes all the obligations of its predecessor
under the Notes and the Indenture, the predecessor corporation will be released
from those obligations.

15. Defaults and Remedies.
    ---------------------

    An Event of Default is: default for 30 days in payment of interest on the
Notes; default in payment of principal on the Notes when due; failure by the
Company for 60 days after appropriate notice to it to comply with any of its
other agreements contained in the Indenture or the Notes; default by the Company
or any Subsidiary with respect to its obligation to pay principal of or interest
on indebtedness for borrowed money aggregating more than $20.0 million or the
acceleration of such indebtedness if not withdrawn within 15 days from the date
of such acceleration; and certain events of bankruptcy, insolvency or
reorganization of the Company or any of its Significant Subsidiaries. If an
Event of Default (other than as a result of certain events of bankruptcy,
insolvency or reorganization) occurs and is continuing, the Trustee or the
Holders of at least 25% in principal amount of the Notes then outstanding may
declare all unpaid principal of and accrued interest to the date of acceleration
on the Notes then outstanding to be due and payable immediately, all as and to
the extent provided in the Indenture. If an Event of Default occurs as a result
of certain events of bankruptcy, insolvency or reorganization, all unpaid
principal of and accrued interest on the Notes then outstanding shall become due
and payable immediately without any declaration or other act on the part of the
Trustee or any Holder, all as and to the extent provided in the Indenture.
Holders may not enforce the Indenture or the Notes except as provided in the
Indenture. The Trustee may require indemnity satisfactory to it before it
enforces the Indenture or the Notes. Subject to certain limitations, Holders of
a majority in principal amount of the Notes then outstanding may

direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders notice of any continuing default (except a default in payment of principal or interest) if it determines that withholding notice is in their interests. The Company is required to file periodic reports with the Trustee as to the absence of default.

16.  Trustee Dealings with the Company.
     ----------------------------------

     State Street Bank and Trust Company of California, N.A., the Trustee under the Indenture, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or an Affiliate of the Company, and may otherwise deal with the Company or an Affiliate of the Company, as if it were not the Trustee.

17.  No Recourse Against Others.
     --------------------------

     A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Notes or the Indenture or for any claim based on, in respect or by reason of, such obligations or their creation. The Holder of this Note by accepting this Note waives and releases all such liability. The waiver and release are part of the consideration for the issue of this Note.

18.  Discharge Prior to Maturity.
     ---------------------------

     If the Company deposits with the Trustee or the Paying Agent money or U.S. Government Obligations sufficient to pay the principal of and interest on the Notes to maturity as provided in the Indenture, the Company will be discharged from the Indenture except for certain Sections thereof.

19.  Authentication.
     --------------

     This Note shall not be valid until the Trustee or an authenticating agent signs the certificate of authentication on the other side of this Note.

20.  Abbreviations and Definitions.
     -----------------------------

     Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A (= Uniform Gifts to Minors Act).

     All capitalized terms used in this Note and not specifically defined herein are defined in the Indenture and are used herein as so defined.

21.  Indenture to Control.
     --------------------

     In the case of any conflict between the provisions of this Note and the Indenture, the provisions of the Indenture shall control.

The Company will furnish to any Holder, upon written request and without charge, a copy of the Indenture. Requests may be made to: Terayon Communication Systems, Inc., 2952 Bunker Hill Lane, Santa Clara, California 95054, Attention: General Counsel.

TRANSFER NOTICE

This Transfer Notice relates to $_____ principal amount of the 5 %
Convertible Subordinated Notes Due 2007 of Terayon Communication Systems, Inc.,
a Delaware corporation, held by _____ (the
"Transferor").

      (I) or (we) assign and transfer this Convertible Note to

_____
     (Print or type assignee's name, address and zip code)

_____

_____
     (Insert assignee's social security or tax I.D. no.)

and irrevocably appoint _____ agent to transfer this
Note on the books of the Company.  The agent may substitute another to act for
him.
Your Signature:_____
    (Sign exactly as your name appears on the other side of this
Convertible Note)
  Date:_____

  Signature Guarantee/1/_____


In connection with any transfer of any of the Notes evidenced by this
certificate occurring prior to the date that is three years after the later of
the date of original issuance of such Notes and the last date, if any, on which
such Notes were owned by the Company or any Affiliate of the Company, the
undersigned confirms that such Notes are being transferred:

CHECK ONE BOX BELOW

   (1)  [_]    to Terayon Communication Systems, Inc.; or

   (2)  [_]    pursuant to and in compliance with Rule 144A under the
Securities Act of 1933, as amended; or

   (3)  [_]    pursuant to and in compliance with Regulation S under the
Securities Act of 1933, as amended; or

   (4)  [_]    pursuant to another available exemption from the registration
requirements of the Securities Act of 1933; or

_____

/1/ Signature must be guaranteed by a commercial bank, trust company or member
firm of the New York Stock Exchange.

(5) [_] pursuant to an effective registration statement under the Securities Act of 1933.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered holder thereof; provided, however, that if box (2), (3) or (4) is checked, the Trustee may require, prior to registering any such transfer of the Notes such legal opinions, certifications and other information as the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933, such as the exemption provided by Rule 144 under such Act.

Unless the box below is checked, the undersigned confirms that such Note is not being transferred to an "affiliate" of the Company as defined in Rule 144 under the Securities Act of 1933, as amended (an "Affiliate"):

(6) [_] The transferee is an Affiliate of the Company.

_____
Signature

_____
Date

_____
Signature Guarantee /1/


TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED.

_____

/1/ Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated:_____    _____

[Signature of executive officeer of purchaser]

Name:_____

Title:_____

CONVERSION NOTICE

To Terayon Communication Systems, Inc.:

The undersigned owner of this Note hereby irrevocably exercises the option to convert this Note, or the portion below designated, into Common Stock of Terayon Communication Systems, Inc. in accordance with the terms of the Indenture referred to in this Note, and directs that the shares issuable and deliverable upon conversion, together with any check in payment for fractional shares, be issued in the name of and delivered to the undersigned, unless a different name has been indicated in the assignment below. If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto.

Any holder of Notes, upon exercise of its conversion rights in accordance with the terms of the Indenture and the Security, agrees to be bound by the terms of the Registration Rights Agreement relating to the Common Stock issuable upon conversion of the Notes.

[_] Convert whole          [_]    Convert in part
                                  Amount of Note to be converted
                                  ($1,000 or integral multiples
                                  thereof):

                                  $_____

                           _____

                           Signature (sign exactly as name appears
                           on the other side of this Note)

                           _____

                                  Signature Guarantee:/1/


_____

    /1/ Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

If you want the stock certificate made out in another person's name, complete the following for such person:

_____
Name

_____
Social Security or Taxpayer Identification Number

_____
Street Address

_____
City, State and Zip Code

OPTION OF HOLDER TO ELECT REPURCHASE

If you want to elect to have this Note repurchased by the Company pursuant to Section 3.9 of the Indenture, check the box:

[_]

If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 3.9 of the Indenture, state the principal amount (which shall be $1,000 or a multiple thereof) to be repurchased:
$_____

Dated:_____    _____

Signature (sign exactly as name appears on the other side of this Note)

_____
Signature Guarantee:/1/

_____
/1/   Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

Global Note Transfer Schedule

Changes to Principal Amount of Global Security

| Date | Principal Amount of Securities by which this Global Security Is to Be Reduced and Reason for Reduction | Remaining Principal Amount of this Global Security (following decrease) | Authorized Signature of officer of Trustee or Note Custodian |
|------|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Schedule to be maintained by Depositary in cooperation with Trustee.

Exhibit 4.2
================================================================================


TERAYON COMMUNICATION SYSTEMS, INC.


5% Convertible Subordinated Notes
Due 2007


==================================


INDENTURE

Dated as of July 26, 2000


==================================


STATE STREET BANK AND TRUST COMPANY OF CALIFORNIA, N.A.,
as Trustee


================================================================================

TABLE OF CONTENTS/1/

Page

ARTICLE 1.

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.1.   Definitions.......................................................................   1
Section 1.2.   Other Definitions.................................................................   6
Section 1.3.   Incorporation by Reference of Trust Indenture Act.................................   7
Section 1.4.   Rules of Construction.............................................................   7

ARTICLE 2.

THE SECURITIES

Section 2.1.    Designation, Form and Dating.....................................................   8
Section 2.2.    Execution and Authentication.....................................................   8
Section 2.3.    Registrar, Paying Agent and Conversion Agent.....................................   9
Section 2.4.    Paying Agent To Hold Money in Trust..............................................   9
Section 2.5.    Securityholder Lists.............................................................  10
Section 2.6.    Transfer and Exchange............................................................  10
Section 2.7.    Replacement Securities...........................................................  16
Section 2.8.    Outstanding Securities...........................................................  16
Section 2.9.    Treasury Securities..............................................................  17
Section 2.10.   Temporary Securities.............................................................  17
Section 2.11.   Cancellation.....................................................................  18
Section 2.12.   CUSIP Numbers....................................................................  18

ARTICLE 3.

REDEMPTION AND REPURCHASE

Section 3.1.    Provisional and Optional Redemption by the Company...............................  18
Section 3.2.    Election To Redeem; Notice to Trustee............................................  19
Section 3.3.    Selection of Securities To Be Redeemed...........................................  19
Section 3.4.    Notice of Redemption.............................................................  19
Section 3.5.    Deposit of Redemption Price......................................................  20
Section 3.6.    Securities Payable on Redemption Date............................................  21
Section 3.7.    Securities Redeemed in Part......................................................  21

_____

/1/   This Table of Contents shall not, for any purpose, be deemed to be part
      of this Indenture.

i

Section 3.8.    Conversion Arrangement on Call for Redemption........................................ 21
Section 3.9.    Repurchase of Securities at Option of the Holder upon Change in Control............. 22
Section 3.10.   Notice; Method of Exercising Repurchase Right........................................... 23
Section 3.11.   Effect of Repurchase Notice............................................................. 25
Section 3.12.   Deposit of Repurchase Price............................................................. 25
Section 3.13.   Securities Repurchased in Part.......................................................... 26
Section 3.14.   Compliance with Securities Laws upon Repurchase of Securities........................ 26
Section 3.15.   Repayment to the Company................................................................ 26


                                    ARTICLE 4.

                                    CONVERSION

Section 4.1.    Conversion Privilege.................................................................... 26
Section 4.2.    Conversion Procedure.................................................................... 27
Section 4.3.    Adjustments Below Par Value............................................................. 28
Section 4.4.    Taxes on Conversion..................................................................... 28
Section 4.5.    Company To Provide Stock................................................................ 28
Section 4.6.    Adjustment of Conversion Price.......................................................... 29
Section 4.7.    No Adjustment........................................................................... 32
Section 4.8.    Equivalent Adjustments.................................................................. 33
Section 4.9.    Adjustment for Tax Purposes............................................................. 33
Section 4.10.   Notice of Adjustment.................................................................... 33
Section 4.11.   Notice of Certain Transactions.......................................................... 33
Section 4.12.   Effect of Reclassification, Consolidation, Merger or Sale on Conversion
                Privilege............................................................................... 34
Section 4.13.   Trustee's Disclaimer.................................................................... 35
Section 4.14.   Voluntary Reduction..................................................................... 35


                                    ARTICLE 5.

                                    SUBORDINATION

Section 5.1.    Securities Subordinated to Senior Indebtedness......................................... 36
Section 5.2.    Securities Subordinated to Prior Payment of All Senior Indebtedness on
                Dissolution, Liquidation, Reorganization, Etc., of the Company........................ 36
Section 5.3.    Securityholders To Be Subrogated to Right of Holders of Senior Indebtedness........... 37
Section 5.4.    Obligations of the Company Unconditional................................................ 38
Section 5.5.    Company Not To Make Payment with Respect to Securities in Certain
                Circumstances........................................................................... 38
Section 5.6.    Notice to Trustee....................................................................... 39
Section 5.7.    Application by Trustee of Monies Deposited with It...................................... 40
Section 5.8.    Subordination Rights Not Impaired by Acts or Omissions of the Company or
                Holders of Senior Indebtedness.......................................................... 40
Section 5.9.    Trustee To Effectuate Subordination..................................................... 40

ii

Section 5.10.   Right of Trustee To Hold Senior Indebtedness.........................................   41
Section 5.11.   Article 5 Not To Prevent Events of Default..........................................   41
Section 5.12.   No Fiduciary Duty Created to Holders of Senior Indebtedness.........................   41
Section 5.13.   Article Applicable to Paying Agents.................................................   41
Section 5.14.   Certain Conversion Deemed Payment...................................................   41

ARTICLE 6.

COVENANTS

Section 6.1.    Payment of Securities...............................................................   42
Section 6.2.    SEC Reports; 144A Information........................................................   42
Section 6.3.    Liquidation.........................................................................   43
Section 6.4.    Compliance Certificates.............................................................   44
Section 6.5.    Notice of Defaults..................................................................   44
Section 6.6.    Payment of Taxes and Other Claims...................................................   44
Section 6.7.    Corporate Existence.................................................................   44
Section 6.8.    Maintenance of Properties...........................................................   44
Section 6.9.    Further Instruments and Acts........................................................   45
Section 6.10.   Maintenance of Office or Agency.....................................................   45
Section 6.11.   Resale of Certain Securities; Reporting Issuer......................................   45
Section 6.12.   Registration Rights.................................................................   45
Section 6.13.   Additional Interest.................................................................   46
Section 6.14.   Stay, Extension and Usury Laws......................................................   46

ARTICLE 7.

SUCCESSOR CORPORATION

Section 7.1.    When Company May Merge, Etc.........................................................   47
Section 7.2.    Successor Corporation Substituted...................................................   47

ARTICLE 8.

DEFAULT AND REMEDIES

Section 8.1.    Events of Default...................................................................   48
Section 8.2.    Acceleration........................................................................   49
Section 8.3.    Other Remedies......................................................................   50
Section 8.4.    Waiver of Defaults and Events of Default............................................   50
Section 8.5.    Control by Majority.................................................................   51
Section 8.6.    Limitation on Suits.................................................................   51
Section 8.7.    Rights of Holders To Receive Payment................................................   51
Section 8.8.    Collection Suit by Trustee..........................................................   51
Section 8.9.    Trustee May File Proofs of Claim....................................................   52
Section 8.10.   Priorities..........................................................................   52

iii

Section 8.11.  Undertaking for Costs...................................................  53
Section 8.12.  Restoration of Rights and Remedies.....................................  53
Section 8.13.  Rights and Remedies Cumulative.........................................  53
Section 8.14.  Delay or Omission Not Waiver...........................................  53

ARTICLE 9.

TRUSTEE

Section 9.1.   Duties of Trustee......................................................  54
Section 9.2.   Rights of Trustee......................................................  55
Section 9.3.   Individual Rights of Trustee...........................................  56
Section 9.4.   Trustee's Disclaimer...................................................  56
Section 9.5.   Notice of Default or Events of Default.................................  56
Section 9.6.   Reports by Trustee to Holders..........................................  56
Section 9.7.   Compensation and Indemnity.............................................  57
Section 9.8.   Replacement of Trustee.................................................  57
Section 9.9.   Successor Trustee by Merger, Etc.......................................  58
Section 9.10.  Eligibility; Disqualification..........................................  58
Section 9.11.  Preferential Collection of Claims Against Company......................  59

ARTICLE 10.

ACTION AND DISCHARGE OF INDENTURE

Section 10.1.  Termination of Company's Obligations...................................  59
Section 10.2.  Application of Trust Money.............................................  60
Section 10.3.  Repayment to Company...................................................  60
Section 10.4.  Reinstatement..........................................................  60

ARTICLE 11.

DMENTS, SUPPLEMENTS AND WAIVERS

Section 11.1.  Without Consent of Holders.............................................  61
Section 11.2.  With Consent of Holders................................................  61
Section 11.3.  Compliance with Trust Indenture Act....................................  62
Section 11.4.  Revocation and Effect of Consents......................................  62
Section 11.5.  Notation on or Exchange of Securities..................................  63
Section 11.6.  Trustee To Sign Amendments, Etc.; Notices..............................  63

ARTICLE 12.

MISCELLANEOUS

Section 12.1.  Trust Indenture Act Controls...........................................  63

```
Section 12.2.   Notices...................................................................  63
Section 12.3.   Communications by Holders with Other Holders.............................  64
Section 12.4.   Certificate and Opinion as to Conditions Precedent.......................  65
Section 12.5.   Record Date for Vote or Consent of Securityholders.......................  65
Section 12.6.   Rules by Trustee, Paying Agent, Registrar................................  65
Section 12.7.   Legal Holidays...........................................................  66
Section 12.8.   Governing Law............................................................  66
Section 12.9.   No Adverse Interpretation of Other Agreements............................  66
Section 12.10.  No Recourse Against Others...............................................  66
Section 12.11.  Successors...............................................................  66
Section 12.12.  Multiple Counterparts....................................................  66
Section 12.13.  Separability.............................................................  66
Section 12.14.  Table of Contents, Headings, Etc.........................................  66

Signatures...............................................................................  S-1
Exhibit A................................................................................  A-1
```

v

INDENTURE dated as of July 26, 2000 between Terayon Communication Systems, Inc., a Delaware corporation (the "Company"), and State Street Bank and Trust Company of California, N.A. as trustee (the "Trustee").

Both parties agree as follows for the benefit of the other and for the equal and ratable benefit of the registered holders of the Company's 5% Convertible Subordinated Notes Due 2007.


ARTICLE 1.

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1.   Definitions.
               ------------

The terms defined in this Section 1.1 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.1.

"Affiliate" of any specified person means any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means any Registrar, Paying Agent or Conversion Agent.

"Board of Directors" means the Board of Directors of the Company or any authorized committee of the Board of Directors.

"Business Day" means a day that is not a Legal Holiday.

"Cash" or "cash" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"Closing Price" with respect to any securities on any day shall mean the closing sale price regular way on such day or, in case no such sale takes place on such day, the average of the reported closing bid and asked prices, regular way, in each case on the principal national security exchange or quotation system on which such security is quoted or listed or admitted to trading, or, if not quoted or listed or admitted to trading on any national securities exchange or quotation system, the average of the closing bid and asked prices of such security on the over-the-counter market on the day in question as reported by the National Quotation Bureau Incorporated, or a similar generally accepted reporting service, or if not so available, in such manner as furnished by any New York Stock Exchange member firm selected from time to time by the Board of Directors for that purpose, or a price determined in good faith by the Board of Directors or, to the extent permitted by applicable law, a duly authorized committee thereof, whose determination shall be conclusive.

1

"Common Stock" means any stock of any class of the Company which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which is not subject to redemption by the Company.  Subject to the provisions of Section 4.12, however, shares issuable on conversion of Securities shall include only shares of Common Stock, $0.001 par value per share (which is the class designated as Common Stock of the Company at the date of this Indenture), or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company and which are not subject to redemption by the Company; provided that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion to which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

"Company" means the party named as such in this Indenture until a successor replaces it pursuant to this Indenture and thereafter means the successor.

"Consolidated Net Worth" means, with respect to any Person, the consolidated stockholders' equity (excluding any capital stock that by its terms is, or upon the happening of an event or passage of time would be, required to be redeemed prior to the maturity of the Securities or is redeemable at the option of the holder thereof at any time prior to such maturity or is convertible or exchangeable for debt securities at any time prior to such maturity at the option of the holder thereof) of such Person and its consolidated subsidiaries, as determined in accordance with generally accepted accounting principles.

"Corporate Trust Office" of the Trustee means the office of the Trustee at which this Indenture is administered, which office initially is located at 633 West 5/th/ Street, 12/th/ Floor, Los Angeles, CA 90071, attention: Corporate Trust Administration.

"Default" or "default" means any event which is, or after notice or passage of time, or both, would be, an Event of Default.

"Depositary" means, with respect to the Securities issuable or issued in whole or in part in global form, The Depository Trust Company as the Depositary with respect to the Securities, until a successor shall have been appointed and becomes such pursuant to the applicable provisions of this Indenture, and thereafter, "Depositary" shall mean or include such successor.

"Designated Senior Indebtedness" means the Company's obligations under any particular Senior Indebtedness in which the instrument creating or evidencing the same or the assumption or guarantee thereof, or related agreements or documents to which the Company is party, expressly provides that such Indebtedness shall be "Designated Senior Indebtedness" for purposes of this Indenture.  The instrument, agreement or other document evidencing any Designated Senior Indebtedness may place limitations or conditions on the right of such Senior Indebtedness to exercise the rights of Designated Senior Indebtedness provided under this Indenture.

2

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Holder" or "Securityholder" means the person in whose name a Security is registered on the Registrar's books.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Initial Purchasers" means Deutsche Bank Securities Inc. and Lehman Brothers, Inc., as initial purchasers under the Purchase Agreement.

"Instrument" means any agreement, indenture, instrument or other document under which any obligation is evidenced, assumed, guaranteed or secured.

"Market Capitalization" means an amount determined by multiplying the number of shares of Common Stock outstanding on the applicable date by the current market price of the Common Stock (determined as provided in Section 4.6(e)) as of such date.

"Non-U.S. Person" means a Person that is not a U.S. Person.

"Officer" means the Chairman of the Board, the President, any Vice President, the Chief Executive Officer, the Chief Financial Officer, the General Counsel, the Treasurer or the Secretary of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company; provided, however, that for purposes of Section 6.4 "Officers' Certificate" means a certificate signed by the principal executive officer, principal financial officer or principal accounting officer of the Company.

"Opinion of Counsel" means a written opinion from legal counsel acceptable to the Trustee.  The counsel may be an employee of or counsel to the Company.

"Payment Dates" means February 1 and August 1, the payment dates of the Securities.

"Payment Default" means any default in the payment of principal of (or premium, if any) or interest on Senior Indebtedness.

"Payment in full" or "paid in full" means payment in full in cash.

"Person" or "person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof.

"PORTAL Market" means the Private Offerings, Resales and Trading through Automated Linkages Market operated by the National Association of Securities Dealers, Inc. or any successor thereto.

"Principal" or "principal" of a debt security, including the Securities, means the principal of the security plus, when appropriate, the premium, if any, on the security.

"Purchase Agreement" means the Purchase Agreement dated July 20, 2000 among the Company and the Initial Purchasers.

"Purchase Option" means the option to purchase up to $75,000,000 in aggregate principal amount of Securities granted by the Company to the Initial Purchasers pursuant to Section 4 of the Purchase Agreement.

"QIB" means a "Qualified Institutional Buyer" as that term is defined in Rule 144A.

"Record Dates" means January 15 and July 15, the record dates of the Securities.

"Redemption Date" or "redemption date," when used with respect to any Security to be redeemed, means the date fixed for such redemption pursuant to this Indenture, as set forth in the form of Security annexed as Exhibit A
                                                                  ---------
hereto.

"Redemption Price" or "redemption price," when used with respect to any Security to be redeemed, means the price fixed for such redemption pursuant to this Indenture, as set forth in the form of Security annexed as Exhibit A
                                                                  ---------
hereto.

"Registration Rights Agreement" means the Registration Rights Agreement dated as of the date hereof between the Company and the Initial Purchasers and certain permitted assigns.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Reorganization Securities" means securities of the Company or any other corporation provided for by a plan of reorganization or readjustment of the Company (a) which are equity securities that do not provide for any mandatory payments to holders thereof, including by way of dividends or mandatory redemption; or (b) the payment of which is subordinated, at least to the extent provided in Article 5 with respect to the Securities, to the payment of all Senior Indebtedness which may at the time be outstanding.

"Representative" means the indenture trustee or other trustee, agent or representative for any class of Senior Indebtedness.

"Rule 144" means Rule 144 as promulgated under the Securities Act.

"Rule 144A" means Rule 144A as promulgated under the Securities Act.

"SEC" or "Commission" means the Securities and Exchange Commission.

"Securities" means the 5% Convertible Subordinated Notes Due 2007 or any of them (each a "Security"), as amended or supplemented from time to time, that are issued under this Indenture.

4

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Senior Agent" means, on any date, the Representative of the class of Senior Indebtedness having the highest principal amount (including all revolving credit, letter of credit and other working capital commitments) then outstanding.

"Senior Indebtedness" means the following, whether outstanding upon issuance of the Securities or thereafter incurred or created: (a) the principal of and premium, if any, and interest on, and fees, costs, enforcement expenses, collateral protection expenses and other reimbursement or indemnity obligations in respect of all indebtedness or obligations of the Company to any Person for money borrowed that is evidenced by a note, bond, debenture, loan agreement, or similar instrument or agreement; (b) commitment or standby fees due and payable to lending institutions with respect to credit facilities available to the Company; (c) all noncontingent obligations of the Company (i) for the reimbursement of any obligor on any letter of credit, banker's acceptance, or similar credit transaction, (ii) under interest rate swaps, caps, collars, options, and similar arrangements, and (iii) under any foreign exchange contract, currency swap agreement, futures contract, currency option contract, or other foreign currency hedge; (d) all obligations of the Company for the payment of money relating to capitalized lease obligations; (e) any liabilities of others described in the preceding clauses that the Company has guaranteed or which are otherwise its legal liability; and (f) renewals, extensions, refundings, refinancings, restructurings, amendments, and modifications of any such indebtedness or guarantee; other than any indebtedness or other obligation of the Company that by its terms is not superior in right of payment to the Securities.

"Significant Subsidiary" means a "significant subsidiary" as defined in Reg. (S)210.1-02(w) of Regulation S-X under the Exchange Act.

"Subsidiary" means any corporation, association or other business entity of which at least a majority of the total capital stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the Company's other Subsidiaries or a combination thereof.

"TIA" means the Trust Indenture Act of 1939, as amended by the Trust Indenture Reform Act of 1990 and as in effect on the date of this Indenture, except as provided in Section 11.3, and except to the extent any amendment to the Trust Indenture Act expressly provides for application of the Trust Indenture Act as in effect on another date.

"Transfer Restricted Security" means securities that bear or are required to bear the legend set forth in Section 2.6(c) or (d).

"Trustee" means State Street Bank and Trust Company of California, N.A. until a successor replaces it in accordance with the provisions of this Indenture and thereafter means the successor.

"Trust Officer" means any officer in the Corporate Trust Office of the Trustee, including any senior vice president, vice president, assistant vice president, assistant secretary, assistant treasurer,

5

trust officer or any other officer customarily performing functions similar to those performed by any of the above-designated officers who shall, in any case, be responsible for the administration of this Indenture or have familiarity with it, and also means, with respect to a particular corporate matter, any other officer of the Trustee to whom corporate trust matters are referred because of his knowledge of and familiarity with the particular subject.

"U.S. Person" has the meaning specified in Regulation S.

SECTION 1.2.   Other Definitions.
               ------------------

| Term | Defined in Section |
| ---- | ------------------ |
| "Additional Interest" | 6.12(a) |
| "Aggregate Market Premium" | 4.6(d) |
| "Bankruptcy Law" | 8.1 |
| "beneficial owner" | 3.9 |
| "Change in Control" | 3.9 |
| "Clearstream" | 2.6(c) |
| "Code" | 3.1 |
| "Company Benefit Plan" | 4.6(c) |
| "Company Notice" | 3.10(a) |
| "Company Order" | 2.2 |
| "Continuing Directors" | 3.9 |
| "Conversion Agent" | 2.3 |
| "Conversion Price" | 4.6 |
| "Conversion Shares" | 4.1 |
| "Custodian" | 8.1 |
| "Distribution Date" | 4.6(c) |
| "Euroclear" | 2.6(c) |
| "Event of Default" | 8.1 |
| "Global Note" | 2.6(a) |
| "Group" | 3.9(1) |
| "Legal Holiday" | 12.7 |
| "Make-Whole Payment" | 3.1(a) |
| "Notice Date" | 3.1(a) |
| "Optional Redemption" | 3.1 |
| "Paying Agent" | 2.3 |
| "Payment Blockage Period" | 5.5 |
| "Payment of the Securities" | 5.5 |
| "Registrar" | 2.3 |
| "Registration Default" | 6.12 |
| "Registration Statement" | 6.12(a) |
| "Repurchase Date" | 3.9 |
| "Repurchase Price" | 3.9 |

6

| Term | Defined in Section |
|------|--------------------|
| "Repurchase Notice"................................................... | 3.10(b) |
| "Restricted Securities"............................................... | 2.6(c) |
| "Trading Days"........................................................ | 4.6(e) |
| "Trigger Event"....................................................... | 4.6(f) |
| "U.S. Government Obligations"......................................... | 10.1 |

SECTION 1.3.    Incorporation by Reference of Trust Indenture Act.
                ------------------------------------------------

        This Indenture is hereby made subject to, and shall be governed by, the
provisions of the TIA required to be part of and to govern indentures qualified
under the TIA.  The following TIA terms used in this Indenture have the
following meanings:

        "Commission" means the SEC.
        "indenture securities" means the Securities.
        "indenture security holder" means a Securityholder.
        "indenture to be qualified" means this Indenture.
        "indenture trustee" or "institutional trustee" means the Trustee.
        "obligor" on the indenture securities means the Company or any other
        obligor on the Securities.

        All other terms used in this Indenture that are defined in the TIA, defined
by a TIA reference to another statute or defined by SEC rule and not otherwise
defined herein have the meanings assigned to them therein.

SECTION 1.4.    Rules of Construction.
                ---------------------

        Unless the context otherwise requires:

        (1) a term has the meaning assigned to it;

        (2) an accounting term not otherwise defined has the meaning assigned to it
in accordance with generally accepted accounting principles in effect on the
date hereof, and any other reference in this Indenture to "generally accepted
accounting principles" refers to generally accepted accounting principles in
effect on the date hereof;

        (3) "or" is not exclusive;

        (4) words in the singular include the plural, and words in the plural
include the singular;

        (5) provisions apply to successive events and transactions; and

        (6) "herein," "hereof" and other words of similar import refer to this
Indenture as a whole and not to any particular Article, Section or other
subdivision.

7

ARTICLE 2.

THE SECURITIES

SECTION 2.1.   Designation, Form and Dating.
              -----------------------------

     (a) The Securities shall be designated as the "5 % Convertible Subordinated Notes Due 2007."  Other than as provided in Section 2.6, the Securities and the Trustee's certificate of authentication to be borne by the Securities shall be substantially in the form of Exhibit A attached hereto, which is incorporated in
                              ---------
and made part of this Indenture.  The Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to the terms and provisions of the Securities and to be bound thereby.  In addition to such legends as may be required pursuant to Section 2.6, any of the Securities may have imprinted thereon such legends or endorsements as the officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any stock exchange on which the Securities may be listed or any trading system in which the Securities may be admitted, or to conform to usage.  Each Security shall be dated the date of its authentication.

SECTION 2.2.   Execution and Authentication.
              -----------------------------

     Two Officers of the Company shall sign the Securities for the Company by manual or facsimile signature.  If an Officer whose signature is on a Security no longer holds that office at the time the Trustee authenticates the Security, the Security shall be valid nevertheless.  A Security shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Security.  The signature shall be conclusive evidence that the Security has been authenticated under this Indenture.

     The Trustee shall authenticate and make available for delivery Securities for original issue in the aggregate principal amount of up to $500,000,000, upon a written order or orders of the Company signed by two Officers or by an Officer and an Assistant Treasurer or Assistant Secretary of the Company (a "Company Order").  The Company Order shall specify the amount of Securities to be authenticated and the date on which the original issue of Securities is to be authenticated.  Upon the exercise of the Purchase Option by the Initial Purchasers, additional Securities in the aggregate principal amount of up to $75,000,000 shall be executed by the Company in the aforementioned manner and delivered to the Trustee for authentication, and shall thereupon be authenticated and delivered by the Trustee upon Company Order.  The aggregate principal amount of Securities outstanding under this Indenture at any time may not exceed $575,000,000, except as provided in Section 2.7.

     The Trustee shall act as the initial authenticating agent.  Thereafter, the Trustee may appoint an authenticating agent acceptable to the Company to authenticate Securities.  An authenticating agent may authenticate Securities whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with the Company or an Affiliate of the Company.

8

The Securities shall be issuable only in registered form without coupons only in denominations of $1,000 and any integral multiple thereof.

SECTION 2.3.    Registrar, Paying Agent and Conversion Agent.
            ----------------------------------------------

The Company shall maintain an office or agency where Securities may be presented for registration of transfer or for exchange (the "Registrar"), an office or agency where Securities may be presented for payment (the "Paying Agent"), an office or agency where Securities may be presented for conversion (the "Conversion Agent") and an office or agency for service of notices and demands to or upon the Company in respect of the Securities and this Indenture may be served.  The Registrar shall keep a register of the Securities and of their transfer and exchange.  The Company may have one or more co-Registrars, one or more additional Paying Agents and one or more additional Conversion Agents.  The term "Registrar" includes any co-Registrar, the term "Paying Agent" includes any additional Paying Agent and the term "Conversion Agent" includes any additional Conversion Agent.

The Company shall enter into an appropriate agency agreement with any Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee of the name and address of any Agent not a party to this Indenture.  If the Company fails to maintain a Registrar, Paying Agent or a Conversion Agent or fails to give the foregoing notice, the Trustee shall act as such.  The Company or any Affiliate of the Company may act as Paying Agent (except for the purposes of Section 6.3 and Article 10), Registrar or Conversion Agent.

The Company initially appoints the Trustee as Registrar, Paying Agent and Conversion Agent in connection with the Securities.

SECTION 2.4.    Paying Agent To Hold Money in Trust.
            --------------------------------------

If the Company shall at any time act as its own Paying Agent, it will, on or before each due date of the principal of and premium, if any, or interest (together with any Additional Interest in respect thereof) on any of the Securities, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal of, premium, if any, or interest on any of the Securities (together with any Additional Interest in respect thereof) so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee of its action or failure so to act.

Whenever the Company shall have one or more Paying Agents, it will, prior to 10:00 a.m., New York City time, on each due date of the principal of and premium, if any, or interest (together with any Additional Interest in respect thereof) on any Securities, deposit with a Paying Agent a sum sufficient to pay such amount, such sum to be held in trust for the benefit of the Persons entitled to such principal, premium, if any, or interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of its action or failure so to act.

9

The Company will cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section 2.4, that such Paying Agent will, subject to Section 5.7:

(1) hold all sums held by it for the payment of the principal of, premium, if any, or interest on Securities in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided;

(2) give the Trustee written notice of any default by the Company (or any other obligor upon the Securities) in the making of any payment of principal, premium, if any, or interest; and

(3) at any time during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company in trust for the payment of the principal of, and premium, if any, or interest (together with any Additional Interest in respect thereof) on any Security and remaining unclaimed for two years after such principal and premium, if any, or interest has become due and payable shall be paid, subject to applicable escheatment laws, to the Company on written request of the Company, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Security shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Company cause to be published once, in a newspaper selected by the Company and published in the English language, customarily published on each Business Day and of general circulation in the Borough of Manhattan, The City of New York, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Company.

SECTION 2.5.    Securityholder Lists.
                ---------------------

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of Securityholders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least five Business Days prior to each semi-annual interest Payment Date and at such other times as the Trustee may request in writing a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Securityholders.

SECTION 2.6.    Transfer and Exchange.
                ----------------------

(a) Upon surrender for registration of transfer of any Security to the Registrar or any co-registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.6, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Securities of any authorized denominations and of a like

10

aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Securities may be exchanged for other Securities of any authorized denominations and of a like aggregate principal amount, upon surrender of the Securities to be exchanged at any such office or agency maintained by the Company pursuant to Section 6.10. Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities which the Securityholder making the exchange is entitled to receive bearing registration numbers not contemporaneously outstanding.

All Securities issued upon any registration of transfer or exchange of Securities shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

All Securities presented or surrendered for registration of transfer or for exchange, redemption or conversion shall (if so required by the Company or the Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company, and the Securities shall be duly executed by the Securityholder thereof or his attorney duly authorized in writing.

No service charge shall be made for any registration of transfer or exchange of Securities, but the Company may require payment of a sum sufficient to cover any tax, assessment or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities.

Neither the Company nor the Trustee nor any Registrar or any Company registrar shall be required to exchange or register a transfer of (a) any Securities for a period of fifteen (15) days next preceding any selection of Securities to be redeemed or (b) any Securities or portions thereof called for redemption pursuant to Section 3.4 or (c) any Securities or portion thereof surrendered for conversion pursuant to Article 4.

So long as the Securities are eligible for book-entry settlement with the Depositary, or unless otherwise required by law, all Securities that upon initial issuance are beneficially owned by QIBs and all Securities that are beneficially owned by Non-U.S. Persons who acquired such Securities in accordance with Regulation S will be represented by a Security in global form registered in the name of the Depositary or the nominee of the Depositary (the "Global Note"). The transfer and exchange of beneficial interests in the Global Note shall be effected through the Depositary in accordance with this Indenture and the procedures of the Depositary therefor. The Trustee shall make appropriate endorsements to reflect increases or decreases in the principal amounts of the Global Note as set forth on the face of the Security to reflect any such transfers. Except as provided below, beneficial owners of the Global Note shall not be entitled to have certificates registered in their names, will not receive or be entitled to receive physical delivery of certificates in definitive form and will not be considered holders of such Securities in global form.

(b) Any Security in global form may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as

11

may be required by the Custodian, the Depositary or by the National Association of Securities Dealers, Inc. in order for the Securities to be tradeable on The PORTAL Market or as may be required for the Securities to be tradeable on any other market developed for trading of securities pursuant to Rule 144A or Regulation S or required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Securities may be listed or traded or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Securities are subject.

(c)  Every Security that bears or is required under this Section 2.6(c) to bear the legend set forth in this Section 2.6(c) (together with any Common Stock issued upon conversion of the Securities and required to bear the legend set forth in Section 2.6(d), collectively, the "Restricted Securities") shall be subject to the restrictions on transfer set forth in this Section 2.6(c) (including those set forth in the legend set forth below) unless such restrictions on transfer shall be waived by written consent of the Company, and the Holder of each such Transfer Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer.  As used in Sections 2.6(c) and 2.6(d), the term "transfer" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision), any certificate evidencing such Security (and all securities issued in exchange therefor or substitution thereof, other than Common Stock, if any, issued upon conversion thereof, which shall bear the legend set forth in Section 2.6(d), if applicable) shall bear a legend in substantially the following form, unless such Security has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer), or unless otherwise agreed by the Company in writing, with written notice thereof to the Trustee:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, AGREES FOR THE BENEFIT OF THE COMPANY THAT THIS SECURITY MAY NOT BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED (X) PRIOR TO THE EXPIRATION OF THE HOLDING PERIOD UNDER RULE 144(k) (OR ANY SUCCESSOR THERETO) UNDER THE SECURITIES ACT WHICH IS APPLICABLE TO THIS SECURITY OR (Y) BY ANY HOLDER THAT WAS AN "AFFILIATE" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY AT ANY TIME DURING THE THREE MONTHS PRECEDING THE DATE OF SUCH TRANSFER, IN EITHER CASE, OTHER THAN (1) TO THE COMPANY, (2) SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A, PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING

12

MADE IN RELIANCE ON RULE 144A, (3) IN AN OFFSHORE TRANSACTION (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 (IF APPLICABLE) UNDER THE SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, REPRESENTS AND AGREES FOR THE BENEFIT OF THE COMPANY THAT IT IS (1) A QUALIFIED INSTITUTIONAL BUYER OR (2) NOT A U.S. PERSON AND IS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF (OR AN ACCOUNT SATISFYING THE REQUIREMENTS OF PARAGRAPH (k)(2) OF RULE 902 UNDER) REGULATION S UNDER THE SECURITIES ACT. IN ANY CASE THE HOLDER HEREOF WILL NOT, DIRECTLY OR INDIRECTLY, ENGAGE IN ANY HEDGING TRANSACTION WITH REGARD TO THIS SECURITY OR ANY COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SECURITY EXCEPT AS PERMITTED BY THE SECURITIES ACT.

Any Security (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the foregoing legend set forth therein have been satisfied may, upon surrender of such Security for exchange to the Registrar in accordance with the provisions of this Section 2.6, be exchanged for a new Security or Securities, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.6(c).

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in Section 2.6(b) and in this Section 2.6(c)), the Global Note may not be transferred as a whole or in part except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

The Depositary shall be a clearing agency registered under the Exchange Act.  The Company initially appoints The Depository Trust Company to act as Depositary with respect to the Global Note.  Initially, the Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Custodian for Cede & Co.  The Global Note, to the extent that it represents the interests of Non-U.S. Persons, will be held by Cede & Co. for the accounts of designated agents on behalf of the Euroclear System ("Euroclear") and Clearstream Banking, Societe Anonyme ("Clearstream").  Non-U.S. Persons holding beneficial interests in the Global Note may do so only through Euroclear or Clearstream, and any resale or transfer of any such interest to a U.S. Person shall only be permitted if such Person is a QIB or is the Company or an Affiliate of the Company.

If at any time the Depositary for the Global Note notifies the Company that it is unwilling or unable to continue as Depositary for such Global Note, the Company may appoint a

13

successor Depositary with respect to such Global Note. If a successor Depositary is not appointed by the Company within ninety (90) days after the Company receives such notice, the Company will execute, and the Trustee, upon receipt of an Officers' Certificate for the authentication and delivery of Securities, will authenticate and deliver, Securities in certificated form, in aggregate principal amount equal to the principal amount of the Global Note, in exchange for such Global Note.

If a Security in certificated form is issued in exchange for any portion of the Global Note after the close of business at the office or agency where such exchange occurs on any record date and before the opening of business at such office or agency on the next succeeding interest payment date, interest will not be payable on such interest payment date in respect of such Security, but will be payable on such interest payment date, subject to the provisions of paragraphs 1 and 2 of the Security, only to the person to whom interest in respect of such portion of the Global Note is payable in accordance with the provisions of this Indenture and the Securities.

Securities in certificated form issued in exchange for all or a part of the Global Note pursuant to this Section 2.6 shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. Upon execution and authentication, the Trustee shall deliver such Securities in certificated form to the persons in whose names such Securities in certificated form are so registered.

At such time as all interests in the Global Note have been redeemed, converted, canceled, exchanged for Securities in certificated form, or transferred to a transferee who receives Securities in certificated form thereof, such Global Note shall, upon receipt thereof, be canceled by the Trustee in accordance with standing procedures and instructions existing between the Depositary and the Custodian. At any time prior to such cancellation, if any interest in the Global Note is redeemed, converted, repurchased or canceled, the principal amount of the Global Note shall, in accordance with the standing procedures and instructions existing between the Depositary and the Custodian, be appropriately reduced and an endorsement shall be made on such Global Note, by the Trustee or the Custodian, at the direction of the Trustee, to reflect such reduction.

(d) Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision), any stock certificate representing Common Stock issued upon conversion of such Security shall bear a legend in substantially the following form, unless such Common Stock has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and which continues to be effective at the time of such transfer) or such Common Stock has been issued upon conversion of Securities that have been transferred pursuant to a registration statement that has been declared effective under the Securities Act, or unless otherwise agreed by the Company in writing with written notice thereof to the transfer agent:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, AGREES FOR THE BENEFIT OF THE COMPANY THAT THIS SECURITY MAY NOT BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED (X) PRIOR TO THE EXPIRATION OF THE HOLDING PERIOD UNDER RULE 144(k) (OR ANY SUCCESSOR

14

THERETO) UNDER THE SECURITIES ACT WHICH IS APPLICABLE TO THIS
SECURITY OR (Y) BY ANY HOLDER THAT WAS AN "AFFILIATE" (WITHIN THE
MEANING OF RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY AT ANY
TIME DURING THE THREE MONTHS PRECEDING THE DATE OF SUCH TRANSFER, IN
EITHER CASE, OTHER THAN (1) TO THE COMPANY, (2) SO LONG AS THIS
SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE
SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY
BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF
RULE 144A, PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A
QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE
RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE
144A, (3) IN AN OFFSHORE TRANSACTION (AS DEFINED IN REGULATION S
UNDER THE SECURITIES ACT) IN ACCORDANCE WITH REGULATION S UNDER THE
SECURITIES ACT, (4) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER
THE SECURITIES ACT PROVIDED BY RULE 144 (IF APPLICABLE) UNDER THE
SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT
UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY
APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE
HOLDER HEREOF, BY PURCHASING THIS SECURITY, REPRESENTS AND AGREES FOR
THE BENEFIT OF THE COMPANY THAT IT IS (1) A QUALIFIED INSTITUTIONAL
BUYER OR (2) NOT A U.S. PERSON AND IS OUTSIDE THE UNITED STATES
WITHIN THE MEANING OF (OR AN ACCOUNT SATISFYING THE REQUIREMENTS OF
PARAGRAPH (k)(2) OF RULE 902 UNDER) REGULATION S UNDER THE SECURITIES
ACT. IN ANY CASE THE HOLDER HEREOF WILL NOT, DIRECTLY OR INDIRECTLY,
ENGAGE IN ANY HEDGING TRANSACTION WITH REGARD TO THIS SECURITY EXCEPT
AS PERMITTED BY THE SECURITIES ACT.

Any such Common Stock as to which such restrictions on transfer shall have
expired in accordance with their terms or as to which the conditions for removal
of the foregoing legend set forth therein have been satisfied may, upon
surrender of the certificates representing such shares of Common Stock for
exchange in accordance with the procedures of the transfer agent for the Common
Stock, be exchanged for a new certificate or certificates for a like number of
shares of Common Stock, which shall not bear the restrictive legend required by
this Section 2.6(d).

(e)  Any Security or Common Stock issued upon the conversion or exchange of
a Security that, prior to the expiration of the holding period applicable to
sales thereof under Rule 144(k) under the Securities Act (or any successor
provision), is purchased or owned by the Company or any Affiliate thereof may
not be resold by the Company or such Affiliate unless registered under the
Securities Act or resold pursuant to an exemption from the registration
requirements of the Securities Act in a transaction which results in such
Securities or Common Stock, as the case may be, no longer being "restricted
securities" (as defined under Rule 144).

15

(f)  Each Holder of a Security agrees to indemnify the Company and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Security in violation of any provision of this Indenture and/or applicable United States Federal or state securities law.

The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security (including any transfers between or among Depositary Participants or beneficial owners of interests in the Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.7.    Replacement Securities.
                ------------------------

If any mutilated Security is surrendered to the Company or the Trustee, or the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and there is delivered to the Company and the Trustee such Security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Company or the Trustee that such Security has been acquired by a bona fide purchaser, the Company shall execute, and upon its written request the Trustee shall authenticate and deliver, in exchange for any such mutilated Security or in lieu of any such destroyed, lost or stolen Security, a new Security of like tenor and principal amount, bearing a number not contemporaneously outstanding.

In case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, or is about to be redeemed by the Company pursuant to Article 3, the Company in its discretion may, instead of issuing a new Security, pay or redeem such Security, as the case may be.

Upon the issuance of any new Securities under this Section 2.7, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith.

Every new Security issued pursuant to this Section 2.7 in lieu of any destroyed, lost or stolen Security shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Indenture equally and proportionately with any and all other Securities duly issued hereunder.

The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

SECTION 2.8.    Outstanding Securities.
                -----------------------

16

Securities outstanding at any time are all Securities authenticated by the Trustee, except for those canceled by it, those delivered to it for cancellation and those described in this Section 2.8 as not outstanding.

If a Security is replaced pursuant to Section 2.7, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Security is held by a bona fide purchaser.

If the Paying Agent (other than the Company or an Affiliate of the Company) holds on a redemption date, repurchase date or maturity date money sufficient to pay the principal of, premium, if any, and accrued interest on Securities payable on that date, then on and after that date such Securities cease to be outstanding and interest on them ceases to accrue.

Subject to the restrictions contained in Section 2.9, a Security does not cease to be outstanding because the Company or an Affiliate of the Company holds the Security.

SECTION 2.9.    Treasury Securities.
                --------------------

In determining whether the Holders of the required principal amount of Securities have concurred in any notice, direction, waiver or consent, Securities owned by the Company or any other obligor on the Securities or by any Affiliate of the Company or of such other obligor shall be disregarded, except that for purposes of determining whether the Trustee shall be protected in relying on any such notice, direction, waiver or consent, only Securities which the Trustee knows are so owned shall be so disregarded. Securities so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Securities and that the pledgee is not the Company or any other obligor upon the Securities or any Affiliate of the Company or of such other obligor.

SECTION 2.10.    Temporary Securities.
                 ---------------------

Until definitive Securities are ready for delivery, the Company may prepare and execute, and, upon the order of the Company, the Trustee shall authenticate and deliver temporary Securities. Temporary Securities shall be substantially in the form of definitive Securities but may have variations that the Company with the consent of the Trustee considers appropriate for temporary Securities. Every such temporary Security shall be executed by the Company and authenticated by the Trustee upon the same conditions and in substantially the same manner, and with the same effect, as the definitive Securities. Without unreasonable delay the Company will execute and deliver to the Trustee definitive Securities and thereupon any or all temporary Securities may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 6.10 and the Trustee shall authenticate and deliver in exchange for such temporary Securities an equal aggregate principal amount at maturity of definitive Securities. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Securities shall in all respects be entitled to the same benefits under this Indenture as definitive Securities authenticated and delivered hereunder.

17

SECTION 2.11.  Cancellation.
             --------------

     The Company at any time may deliver Securities to the Trustee for
cancellation.  The Registrar, the Paying Agent and the Conversion Agent shall
forward to the Trustee any Securities surrendered to them for transfer,
exchange, payment or conversion.  The Trustee and no one else shall cancel all
Securities surrendered for transfer, exchange, payment (including redemption or
repurchase), conversion or cancellation and shall dispose of cancelled
Securities in accordance with its procedures for the disposition of cancelled
Securities in effect as of the date of such disposition and thereupon deliver a
certificate of cancellation to the Company.  The Company may not issue new
Securities to replace Securities it has paid or delivered to the Trustee for
cancellation or which have been converted.

SECTION 2.12.  CUSIP Numbers.
             --------------

     The Company in issuing the Securities may use "CUSIP" numbers (if then
generally in use), and if so, the Trustee shall use "CUSIP" numbers in notices
of redemption as a convenience to Holders; provided that any such notice may
state that no representation is made as to the correctness of such numbers
either as printed on the Securities or as contained in any notice of a
redemption and that reliance may be placed only on the other identification
numbers printed on the Securities, and any such redemption shall not be affected
by any defect in or omission of such numbers.  The Company will promptly notify
the Trustee of any change in the "CUSIP" numbers.

                              ARTICLE 3.

                       REDEMPTION AND REPURCHASE

SECTION 3.1.   Provisional and Optional Redemption by the Company.
             ----------------------------------------------------

     (a)  The Company may, at its option, redeem all or from time to time any
part of the Securities on any date on or after 90 days following the last day of
original issuance and prior to August 7, 2003 (a "Provisional Redemption"), upon
notice as set forth in Section 3.4, at a redemption price of $1,000 per $1,000
principal amount of Securities, plus accrued and unpaid interest, if any, if (i)
the trading price of the Company's Common Stock for 20 Trading Days in a period
of 30 consecutive Trading Days ending on the Trading Day prior to the date of
mailing of the provisional notice of redemption (the "Notice Date") exceeds 150%
of the Conversion Price of the Securities and (ii) the registration statement
covering resales of the Securities and the Common Stock issuable upon conversion
of the Securities is effective and available for use and is expected to remain
effective for the 30 days following the provisional redemption date, unless
registration is no longer required.

     Upon any such Provisional Redemption, the Company shall make an additional
payment in cash (the "Make Whole Payment") with respect to the Securities called
for redemption to holders on the Notice Date in an amount equal to $193.55 per
$1,000 principal amount of the Securities, less the amount of any interest
actually paid on such Securities prior to the date of redemption.  The

                                   18

Company shall make the Make-Whole Payment on all Securities called for
Provisional Redemption, including those Securities converted into Common Stock
between the Notice Date and the date of redemption.

        (b)  The Company may, at its option, redeem all or from time to time any
part of the Securities on any date on or after August 7, 2003 and prior to
maturity (an "Optional Redemption"), upon notice as set forth in Section 3.4,
and at the redemption prices set forth in paragraph 5 of the form of Security
attached hereto as Exhibit A, together with accrued interest to the date of
                 ---------
redemption.

SECTION 3.2.    Election To Redeem; Notice to Trustee.
                -------------------------------------

        If the Company elects to redeem Securities pursuant to paragraph 5 of the
Securities, it shall notify the Trustee at least 60 days prior to the redemption
date as fixed by the Company (unless a shorter notice shall be satisfactory to
the Trustee) of the redemption date and the principal amount of Securities to be
redeemed.  If fewer than all of the Securities are to be redeemed, the record
date relating to such redemption shall be selected by the Company and given to
the Trustee, which record date shall not be less than 10 days after the date of
notice to the Trustee.

SECTION 3.3.    Selection of Securities To Be Redeemed.
                --------------------------------------

        If less than all of the Securities are to be redeemed, the Trustee shall,
not more than 60 days prior to the redemption date, select the Securities to be
redeemed by lot, pro rata or by another method the Trustee considers fair and
appropriate; provided that such method is not prohibited by any stock exchange
or market on which the Securities are then listed.  The Trustee shall make the
selection from the Securities outstanding and not previously called for
redemption.  Securities in denominations of $1,000 may only be redeemed in
whole.  The Trustee may select for redemption portions (equal to $1,000 or any
multiple thereof) of the principal of Securities that have denominations larger
than $1,000.  Provisions of this Indenture that apply to Securities called for
redemption also apply to portions of Securities called for redemption.

SECTION 3.4.    Notice of Redemption.
                --------------------

        Notice of redemption shall be given at least 30 days prior to the
redemption date in the case of a Provisional Redemption and at least 20 days but
not more than 60 days before a redemption date in the case of an Optional
Redemption.  In each case, the Company shall mail or cause to be mailed a notice
of redemption by first-class mail to each Holder of Securities to be redeemed at
such Holder's address as it appears on the Registrar's books.

        The notice shall identify the Securities to be redeemed and shall state:

        (1)  the redemption date;

        (2)  the redemption price;

        (3)  the then-current Conversion Price;

19

(4)  the name and address of the Paying Agent and the Conversion Agent;

(5)  that Securities called for redemption must be presented and surrendered to the Paying Agent to collect the redemption price;

(6)  that the Securities called for redemption may be converted at any time before the close of business on the Business Day immediately preceding the redemption date;

(7)  that Holders who wish to convert Securities must satisfy the requirements in paragraph 8 of the Securities;

(8)  that, unless the Company defaults in making the redemption payment, interest on Securities called for redemption ceases to accrue on and after the redemption date and the only remaining right of the Holder is to receive payment of the redemption price upon presentation and surrender to the Paying Agent of the Securities;

(9)  if any Security is being redeemed in part, the portion of the principal amount of such Security to be redeemed and that, after the redemption date, upon presentation and surrender of such Security, a new Security or Securities in principal amount equal to the unredeemed portion thereof will be issued; and

(10) subject to Section 2.12, the CUSIP number of the Securities called for redemption.

At the Company's written request delivered at least 15 days prior to the date of the mailing of the notice of redemption, the Trustee shall give the notice of redemption in the Company's name and at the Company's expense.

SECTION 3.5.   Deposit of Redemption Price.
               ----------------------------

On or prior to any Redemption Date, the Company shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as its own Paying Agent, segregate and hold in trust) an amount of money sufficient to pay the Redemption Price of, and (except if the Redemption Date shall be an interest payment date) accrued interest on, all the Securities which are to be redeemed on that date other than any Securities called for redemption on that date which have been converted prior to the date of such deposit; provided that if such payment is made on the Redemption Date, it must be received by the Trustee or Paying Agent, as the case may be, by 10:00 a.m. New York City time on such date.

If any Security called for redemption is converted, any money deposited with the Trustee or with any Paying Agent or segregated and held in trust for the redemption of such Security shall (subject to any right of the Holder of such Security or any predecessor security to receive interest) be paid to the Company as soon as practicable upon written request by the Company or, if then held by the Company, shall be released from such trust.

20

SECTION 3.6.    Securities Payable on Redemption Date.
                ---------------------------------------

        Notice of redemption having been given as aforesaid, the Securities so to
be redeemed shall, on the Redemption Date, become due and payable at the
Redemption Price therein specified, and from and after such date (unless the
Company shall default in the payment of the Redemption Price and accrued
interest, if any) such Securities shall cease to bear or accrue any interest.
Upon surrender of any such Security for redemption in accordance with said
notice, such Security shall be paid by the Company at the Redemption Price,
together with accrued interest to (but not including) the Redemption Date;
provided, however, that installments of interest whose stated maturity is on or
prior to the Redemption Date shall be payable to the Holders of such Securities
registered as such at the close of business on the relevant Record Dates
according to their terms.

        If the Company shall fail to deposit the Redemption Price with the Trustee
and any Security called for redemption shall not be so paid upon surrender
thereof for redemption, the principal and premium, if any, shall, until paid,
bear and accrue interest from the Redemption Date at the rate borne by the
Security.

SECTION 3.7.    Securities Redeemed in Part.
                ----------------------------

        Any Security which is to be redeemed only in part shall be surrendered at
an office or agency of the Company designated for that purpose (with, if the
Company or the Trustee so requires, due endorsement by, or a written instrument
of transfer in form satisfactory to the Company and the Trustee duly executed
by, the Holder thereof or his attorney-in-fact duly authorized in writing), and
the Company shall execute, and the Trustee shall authenticate and deliver to the
Holder of such Security without service charge, a new Security or Securities, of
any authorized denomination as requested by such Holder, in aggregate principal
amount equal to and in exchange for the unredeemed portion of the principal
amount of the Security so surrendered.

SECTION 3.8.    Conversion Arrangement on Call for Redemption.
                ----------------------------------------------

        In connection with any redemption of Securities, the Company may arrange
for the purchase and conversion of any Securities by an agreement with one or
more investment bankers or other purchasers to purchase such Securities by
paying to the Trustee in trust for the Holders, on or before the Redemption
Date, an amount not less than the applicable Redemption Price of such
Securities, together with interest accrued to the Redemption Date.
Notwithstanding anything to the contrary contained in this Article 3, the
obligation of the Company to pay the Redemption Price of such Securities,
together with interest accrued to, but excluding, the Redemption Date shall be
deemed to be satisfied and discharged to the extent such amount is so paid by
such purchasers. If such an agreement is entered into, a copy of which shall be
filed with the Trustee prior to the Redemption Date, any Securities not duly
surrendered for conversion by the Holders thereof, may, at the option of the
Company, be deemed, to the fullest extent permitted by law, acquired by such
purchasers from such Holders and (notwithstanding anything to the contrary
contained in Article 4) surrendered by such purchasers for conversion, all as of
immediately prior to the close of business on the Redemption Date (and the right
to convert any such Securities shall be deemed to have been extended through
such time), subject to payment of the above amount as aforesaid. At the
direction of the Company, the Trustee shall hold and dispose of any such amount
paid to it in the same manner

                                      21

as it would monies deposited with it by the Company for the redemption of Securities. Without the Trustee's prior written consent, no arrangement between the Company and such purchasers for the purchase and conversion of any Securities shall increase or otherwise affect any of the powers, duties, responsibilities or obligations of the Trustee as set forth in this Indenture, and the Company agrees to indemnify the Trustee from, and hold it harmless against, any loss, liability or expense arising out of or in connection with any such arrangement for the purchase and conversion of any Securities between the Company and such purchasers, including the costs and expenses incurred by the Trustee in the defense of any claim or liability arising out of or in connection with the exercise or performance of any of its powers, duties, responsibilities or obligations under this Indenture. Nothing in the preceding sentence shall be deemed to limit the rights and protections afforded to the Trustee in Article 9, including, but not limited to, the right to the indemnification pursuant to Section 9.7.

SECTION 3.9.    Repurchase of Securities at Option of the Holder upon Change in
                --------------------------------------------------------------
                Control.
                -------

     If at any time that Securities remain outstanding there shall have occurred a Change in Control (as hereinafter defined), Securities shall be repurchased by the Company at the option of the Holder thereof, at a purchase price (the "Repurchase Price") equal to the principal amount thereof plus accrued interest up to and including the Repurchase Date (as hereinafter defined), on the date (the "Repurchase Date") fixed by the Company that is not less than 45 days nor more than 60 days after the date of the Company Notice (as hereinafter defined), subject to satisfaction by or on behalf of the Holder of the requirements set forth in Section 3.10(b).

     Whenever in this Indenture there is a reference to the principal of any Security as of any time, such reference shall be deemed to include reference to the Repurchase Price payable in respect of such Security to the extent that such Repurchase Price is, was or would be so payable at such time, and express mention of the Repurchase Price in any provision of this Indenture shall not be construed as excluding the Repurchase Price in those provisions of this Indenture when such express mention is not made.

     Any rights of Holders, contractual or otherwise, arising under or pursuant to any offer to repurchase Securities made by the Company under this Section 3.9 shall be subordinated in right of payment to all Senior Indebtedness to the same extent as the Securities are subordinated to Senior Indebtedness under the provisions of Article 5 and such offer to repurchase shall provide that, if at the time the Securities are required to be repurchased pursuant to such offer, payment of the Securities is not permitted pursuant to the provisions of Article 5, the Company shall use its best efforts to obtain all necessary waivers from, or to repay in full, the holders of Senior Indebtedness in order to permit such repurchase. Notwithstanding the foregoing, any failure by the Company to comply with this Section 3.9 to offer to repurchase, or to repurchase, the Securities shall be a default in the performance by the Company hereunder.

     A "Change in Control" shall be deemed to have occurred at such time after the original issuance of the Securities as any of the following occur:

     (1) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all or substantially all of the assets of the Company and its subsidiaries, taken as a

22

whole, to any person or group of related persons, as defined in Section 13(d) of the Exchange Act (a "Group");

(2) the approval by the holders of capital stock of the Company of any plan or proposal for the liquidation or dissolution of the Company (whether or not otherwise in compliance with the provisions of the applicable indenture);

(3) any person or Group shall become the owner, directly or indirectly, beneficially or of record, of shares representing more than 50% of the aggregate ordinary voting power represented by the Company's issued and outstanding voting stock of or any successor to all or substantially all of the Company's assets; or

(4) the first day on which a majority of the members of the Company's Board of Directors are not Continuing Directors.

"Beneficial owner" shall be determined in accordance with Rule 13d-3 promulgated by the SEC under the Exchange Act, as in effect on the date of execution of this Indenture, except that a person shall be deemed to be the "beneficial owner" of all securities that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who (i) was a member of such Board of Directors on the date of the original issuance of the Securities or (ii) was nominated for election or elected  to the Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election.

SECTION 3.10.    Notice; Method of Exercising Repurchase Right
                 ----------------------------------------------

(a) Within 30 days after the occurrence of a Change in Control, the Company shall mail a written notice (the "Company Notice") by first-class mail to the Trustee and to each Holder (and to beneficial owners as required by applicable law) and shall cause a copy of such notice to be published in a daily newspaper of national circulation. The notice shall include the form of a Repurchase Notice (as defined below) to be completed by the Holder and shall state:

(1) the date of such Change in Control and, briefly, the events causing such Change in Control;

(2) the date by which the Repurchase Notice pursuant to this Section 3.10 must be given;

(3) the Repurchase Date;

(4) the Repurchase Price;

(5) briefly, the conversion rights of the Securities including, without limitation, the current Conversion Price and any adjustments thereto;

(6) the name and address of the Paying Agent and the Conversion Agent;

23

(7) whether the holders of Senior Indebtedness will permit the payment of the Repurchase Price;

(8) that Securities as to which a Repurchase Notice has been given may be converted into Common Stock only to the extent that the Repurchase Notice has been withdrawn in accordance with the terms of this Indenture;

(9) the procedures that the Holder must follow to exercise rights under Section 3.9;

(10) the procedures for withdrawing a Repurchase Notice, including a form of notice of withdrawal;

(11) that the Holder must satisfy the requirements set forth in the Securities in order to convert the Securities; and

(12) the CUSIP number of the Securities as to which a Repurchase Notice has been given.

(b) A Holder may exercise its rights specified in Section 3.9 upon delivery of a written notice of the exercise of such rights (a "Repurchase Notice") to the Paying Agent at any time prior to the close of business on the third Business Day prior to the Repurchase Date, stating:

(1) the certificate number of each Security that the Holder will deliver to be repurchased;

(2) the portion of the principal amount of each Security that the Holder will deliver to be repurchased, which portion must be $1,000 or an integral multiple thereof; and

(3) that such Security shall be repurchased pursuant to the terms and conditions specified in this Indenture.

The delivery of such Security to the Paying Agent prior to, on or after the Repurchase Date (together with all necessary endorsements) at the office of the Paying Agent shall be a condition to the receipt by the Holder of the Repurchase Price therefor; provided, however, that such Repurchase Price shall be so paid pursuant to Section 3.9 only if the Security so delivered to the Paying Agent shall conform in all respects to the description thereof set forth in the related Repurchase Notice.

The Company shall repurchase from the Holder thereof, pursuant to Section 3.9, a portion of a Security if the principal amount of such portion is $1,000 or an integral multiple of $1,000. Provisions of this Indenture that apply to the repurchase of all of a Security pursuant to Sections 3.9 through 3.15 also apply to the repurchase of such portion of such Security.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Repurchase Notice contemplated by this Section 3.10(b) shall have the right to withdraw such Repurchase Notice in whole or in a portion thereof that is $1,000 or an integral multiple thereof at any time prior to the close of business on the Business Day prior to the Repurchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 3.11.

24

The Paying Agent shall promptly notify the Company of the receipt by it of any Repurchase Notice or written withdrawal thereof.

SECTION 3.11.    Effect of Repurchase Notice.
                 ---------------------------

Upon receipt by the Paying Agent of the Repurchase Notice specified in Section 3.10(b), the Holder of the Security in respect of which such Repurchase Notice was given shall (unless such Repurchase Notice is withdrawn as specified below) thereafter be entitled to receive solely the Repurchase Price with respect to such Security. Such Repurchase Price shall be paid to such Holder promptly following the later of (i) the Repurchase Date with respect to such Security (provided the conditions in Section 3.10(b) have been satisfied) and (ii) the time of delivery of such Security to the Paying Agent by the Holder thereof in the manner required by Section 3.10(b). Securities in respect of which a Repurchase Notice has been given by the Holder thereof may not be converted into shares of Common Stock on or after the date of the delivery of such Repurchase Notice unless such Repurchase Notice has first been validly withdrawn.

A Repurchase Notice may be withdrawn by means of a written notice of withdrawal delivered by the Holder, with such Holder's signature guaranteed in a manner satisfactory to the Paying Agent, to the office of the Paying Agent at any time prior to the close of business on the Business Day prior to the Repurchase Date to which it relates, specifying:

(1) the certificate number of each Security in respect of which such notice of withdrawal is being submitted;

(2) the principal amount of the Security or portion thereof with respect to which such notice of withdrawal is being submitted; and

(3) the principal amount, if any, of such Security that remains subject to the original Repurchase Notice and that has been or will be delivered for repurchase by the Company.

SECTION 3.12.    Deposit of Repurchase Price.
                 ---------------------------

On or before the Repurchase Date, the Company shall deposit with the Trustee or with the Paying Agent (or, if the Company is acting as the Paying Agent, shall segregate and hold in trust as provided in Section 2.4) an amount of money sufficient to pay the aggregate Repurchase Price of all the Securities or portions thereof that are to be repurchased as of such Repurchase Date. The manner in which the deposit required by this Section 3.12 is made by the Company shall be at the option of the Company; provided that such deposit shall be made in a manner such that the Trustee or the Paying Agent shall have immediately available funds on the Repurchase Date; provided further, that if such payment is made on the Repurchase Date it must be received by the Trustee or Paying Agent, as the case may be, by 10:00 a.m., New York City time, on such date.

If the Paying Agent holds, in accordance with the terms hereof, money sufficient to pay the Repurchase Price of any Security tendered for repurchase on the Business Day prior to the Repurchase Date, then, on and after the Repurchase Date, such Security will cease to be outstanding and interest on such Security will cease to accrue and will be deemed paid, whether or not such

25

Security is delivered to the Paying Agent, and all other rights of the Holder in respect thereof shall terminate (other than the right to receive the Repurchase Price upon delivery of such Security).

SECTION 3.13.    Securities Repurchased in Part.
                 -------------------------------

Any Security that is to be repurchased only in part shall be surrendered at the office of the Paying Agent (with due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing), and the Company shall execute and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities, or such authorized denomination or denominations as may be requested by such Holder, in aggregate principal amount equal to, and in exchange for, the portion of the principal amount of the Security so surrendered that is not repurchased.

SECTION 3.14.    Compliance with Securities Laws upon Repurchase of Securities.
                 -------------------------------------------------------------

In connection with any offer to repurchase or repurchase of Securities under Section 3.9 hereof (provided that such offer or repurchase constitutes an "issuer tender offer" for purposes of Rule 13e-4 (which term, as used herein, includes any successor provision thereto) at the time of such offer or repurchase), the Company shall (i) comply with Rule 13e-4 and Rule 14e-1 under the Exchange Act, (ii) file the related Schedule 13E-4 (or any successor schedule, form or report) under the Exchange Act, and (iii) otherwise comply with all federal and state securities laws so as to permit the rights of the Holders and obligations of the Company under Sections 3.9 through 3.14 to be exercised in the time and in the manner specified therein.

SECTION 3.15.    Repayment to the Company
                 ------------------------

Subject to the provisions of Section 5.7, to the extent that the aggregate amount of cash deposited by the Company pursuant to Section 3.12 exceeds the aggregate Repurchase Price of the Securities or portions thereof to be repurchased, then, promptly after the Business Day following the Repurchase Date, the Trustee or the Paying Agent, as the case may be, shall return any such excess to the Company.

ARTICLE 4.

CONVERSION

SECTION 4.1.    Conversion Privilege.
                --------------------

At any time after 90 days following the latest date of original issuance of the Securities and prior to the close of business on the Business Day immediately preceding August 1, 2007, a Holder of a Security may convert such Security into Common Stock (the shares of Common Stock issuable upon such conversion, the "Conversion Shares"), at the Conversion Price then in effect, together with those rights, warrants or options specified in the first sentence of Section 4.6(f) hereof, to the extent applicable; provided that, if such Security is called for redemption pursuant to Article 3, such conversion right shall terminate at the close of business on the Business Day before the redemption date for such Security (unless the Company shall default in making the redemption payment then

26

due, in which case the conversion right shall terminate on the date such default is cured and such Security is redeemed). The number of shares of Common Stock issuable upon conversion of a Security shall be determined by dividing the principal amount of the Security or portion thereof surrendered for conversion by the Conversion Price in effect on the conversion date. The initial Conversion Price is set forth in paragraph 8 of the Securities and is subject to adjustment as provided in this Article 4.

A Holder may convert a portion of a Security equal to $1,000 or any integral multiple thereof. Provisions of this Indenture that apply to conversion of all of a Security also apply to conversion of a portion of a Security.

A Security in respect of which a Holder has delivered a Repurchase Notice pursuant to Section 3.10(b) exercising the option of such Holder to require the Company to repurchase such Security may be converted only if such Repurchase Notice is withdrawn by a written notice of withdrawal delivered to the Paying Agent prior to the close of business on the Repurchase Date in accordance with Section 3.11.

A Holder of Securities is not entitled to any rights of a holder of Common Stock until such Holder has converted his Securities into Common Stock and, upon such conversion, only to the extent such Securities are deemed to have been converted into Common Stock pursuant to this Article 4.

SECTION 4.2.     Conversion Procedure.
                 --------------------

To convert a Security, a Holder must (i) complete and manually sign the conversion notice on the back of the Security and deliver such notice to the Conversion Agent, (ii) surrender the Security to the Conversion Agent, (iii) furnish appropriate endorsements and transfer documents to the Registrar or the Conversion Agent, (iv) pay any transfer or other tax, if required by Section 4.4 and (v) if the Security is held in book-entry form, complete and deliver to the Depositary appropriate instructions pursuant to the Depositary's book-entry conversion programs. The date on which the Holder satisfies all of the foregoing requirements is the conversion date. As soon as practicable after the conversion date, the Company shall deliver to the Holder through the Conversion Agent a certificate for the number of whole shares of Common Stock issuable upon the conversion and cash in lieu of any fractional shares pursuant to Section 4.5.

The person in whose name the certificate is registered shall be deemed to be a stockholder of record on the conversion date; provided, however, that no surrender of a Security on any date when the stock transfer books of the Company shall be closed shall be effective to constitute the person or persons entitled to receive the shares of Common Stock upon such conversion as the record holder or holders of such shares of Common Stock on such date, but such surrender shall be effective to constitute the person or persons entitled to receive such shares of Common Stock as the record holder or holders thereof for all purposes at the close of business on the next succeeding day on which such stock transfer books are open; provided, further, that such conversion shall be at the Conversion Price in effect on the date that such Security shall have been surrendered for conversion, as if the stock transfer books of the Company had not been closed. Upon conversion of a Security, such person shall no longer be a Holder of such Security.

27

No payment or adjustment will be made for accrued interest on a converted Security or for dividends or distributions on shares of Common Stock issued upon conversion of a Security, but if any Holder surrenders a Security for conversion between the record date for the payment of an installment of interest and the next interest payment date, then, notwithstanding such conversion, the interest payable on such interest payment date shall be paid to the Holder of such Security on such record date. In such event, such Security, when surrendered for conversion, must be accompanied by delivery of a check payable to the Conversion Agent in an amount equal to the interest payable on such interest payment date on the portion so converted. If such payment does not accompany such Security, the Security shall not be converted; provided, however, that no such check shall be required if such Security has been called for redemption on a redemption date within the period between and including such record date and such interest payment date, or if such Security is surrendered for conversion on the interest payment date. If the Company defaults in the payment of interest payable on the interest payment date, the Conversion Agent shall repay such funds to the Holder.

If a Holder converts more than one Security at the same time, the number of shares of Common Stock issuable upon the conversion shall be based on the aggregate principal amount of Securities converted.

Upon surrender of a Security that is converted in part, the Company shall execute, and the Trustee shall authenticate and deliver to the Holder, a new Security equal in principal amount to the unconverted portion of the Security surrendered.

SECTION 4.3.      Adjustments Below Par Value.
                  ---------------------------

Before taking any action which would cause an adjustment decreasing the Conversion Price so that the shares of Common Stock issuable upon conversion of the Securities would be issued for less than the par value of such Common Stock, the Company will take all corporate action which may be necessary in order that the Company may validly and legally issue fully paid and nonassessable shares of such Common Stock at such adjusted Conversion Price.

SECTION 4.4.      Taxes on Conversion.
                  -------------------

If a Holder converts a Security, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of shares of Common Stock upon such conversion. However, the Holder shall pay any such tax which is due because the Holder requests the shares to be issued in a name other than the Holder's name. The Conversion Agent may refuse to deliver the certificates representing the Common Stock being issued in a name other than the Holder's name until the Conversion Agent receives a sum sufficient to pay any tax which will be due because the shares are to be issued in a name other than the Holder's name. Nothing herein shall preclude any tax withholding required by law or regulations.

SECTION 4.5.      Company To Provide Stock.
                  ------------------------

The Company shall, prior to issuance of any Securities hereunder, and from time to time as may be necessary, reserve, out of its authorized but unissued Common Stock a sufficient number of shares of Common Stock to permit the conversion of all outstanding Securities for shares of

28

Common Stock. The shares of Common Stock or other securities issued upon conversion of the Securities shall bear any legend required in accordance with Section 2.6(d).

No fractional shares of Common Stock or scrip representing fractional shares shall be issued upon conversion of Securities. If more than one Security shall be surrendered for conversion at one time by the same holder, the number of full shares which shall be issuable upon conversion shall be computed on the basis of the aggregate principal amount of the Securities (or specified portions thereof to the extent permitted hereby) so surrendered. If any fractional share of Common Stock would be issuable upon the conversion of any Security or Securities, the Company shall make an adjustment thereof in cash at the current market value thereof. For these purposes, the current market value of a share of Common Stock shall be the Closing Price on the first day (which is not a Legal Holiday) immediately preceding the day on which the Securities (or specified portions thereof) are deemed to have been converted.

The Company covenants that all shares of Common Stock delivered upon conversion of the Securities shall be newly issued shares or treasury shares, shall be duly authorized, validly issued, fully paid and non-assessable and shall be free from preemptive rights and free of any lien or adverse claim.

The Company will endeavor promptly to comply with all federal and state securities laws regulating the offer and delivery of shares of Common Stock upon conversion of Securities, if any, and will list or cause to have quoted such shares of Common Stock on each national securities exchange or in the over-the-counter market or such other market on which the Common Stock is then listed or quoted.

SECTION 4.6.    Adjustment of Conversion Price. The conversion price (the
                -------------------------------
"Conversion Price") shall be that price set forth in paragraph 8 of the form of Security attached hereto as Exhibit A and shall be adjusted from time to time by
                                 ---------
the Company as follows:

    (a) In case the Company shall (i) pay a dividend or other distribution in shares of Common Stock to holders of Common Stock, (ii) subdivide its outstanding Common Stock into a greater number of shares, (iii) combine its outstanding Common Stock into a smaller number of shares or (iv) reclassify its outstanding Common Stock, the Conversion Price in effect immediately prior thereto shall be adjusted so that the Holder of any Security thereafter surrendered for conversion shall be entitled to receive the number of shares of Common Stock which it would have owned or have been entitled to receive had such Security been converted immediately prior to the happening of such event. An adjustment made pursuant to this subsection (a) shall become effective immediately after the record date in the case of a dividend or distribution and shall become effective immediately after the effective date in the case of subdivision, combination or reclassification.

    (b) In case the Company shall issue to all or substantially all holders of its Common Stock, rights, warrants or options entitling such holders (for a period commencing no earlier than the record date described below and expiring not more than 45 days after such record date) to subscribe for or purchase shares of Common Stock (or securities convertible into Common Stock) at a price per share less than the current market price per share of Common Stock (as determined in accordance with subsection (e) below) at the record date for the determination of stockholders

29

entitled to receive such rights, warrants or options, the Conversion Price in
effect immediately prior thereto shall be adjusted so that the Conversion Price
shall equal the price determined by multiplying the Conversion Price in effect
immediately prior to such record date by a fraction, the numerator of which
shall be the number of shares of Common Stock outstanding on such record date,
plus the number of shares which the aggregate subscription or purchase price for
the total number of shares of Common Stock offered by the rights, warrants or
options so issued (or the aggregate conversion price of the convertible
securities offered by such rights, warrants or options) would purchase at such
current market price, and the denominator of which shall be the number of shares
of Common Stock outstanding on such record date plus the number of additional
shares of Common Stock offered by such rights, warrants or options (or into
which the convertible securities so offered by such rights, warrants or options
are convertible). Such adjustment shall be made successively whenever any such
rights, warrants or options are issued, and shall become effective immediately
after such record date. If at the end of the period during which such rights,
warrants or options are exercisable not all rights, warrants or options shall
have been exercised, the adjusted Conversion Price shall be immediately
readjusted to what it would have been upon application of the foregoing
adjustment substituting the number of additional shares of Common Stock actually
issued (or the number of shares of Common Stock issuable upon conversion of
convertible securities actually issued) for the total number of shares of Common
Stock offered (or the convertible securities offered).

    (c) In case the Company shall distribute to all or substantially all
holders of its Common Stock any shares of capital stock of the Company (other
than Common Stock) or evidences of its indebtedness, cash, other securities or
other assets, or shall distribute to all or substantially all holders of its
Common Stock, rights, warrants or options to subscribe for or purchase any of
its securities (excluding (i) rights, options and warrants referred to in
subsection (b) above or (f) below; (ii) those dividends, distributions,
subdivisions and combinations referred to in subsection (a) above; and (iii)
dividends and distributions paid in cash in an aggregate amount that, combined
together with (A) all other such cash distributions made within the preceding 12
months in respect of which no adjustment has been made under this Section 4.6
and (B) the fair market value of consideration payable in respect of any
repurchases (including by way of tender offers) by the Company or any of its
Subsidiaries or Affiliates, of Common Stock concluded within the preceding 12
months, in each case in respect of which no adjustment has been made under this
Section 4.6, does not exceed 15% of Market Capitalization as of the record date
for such distribution), then in each such case the Conversion Price shall be
adjusted so that the same shall equal the price determined by multiplying the
Conversion Price in effect immediately prior to the date of such distribution or
purchase by a fraction, the numerator of which shall be the current market price
per share (as defined in subsection (e) below) of the Common Stock on the record
date mentioned below less the fair market value on such record date (as
determined by the Board of Directors of the Company, whose determination shall
be conclusive evidence of such fair market value) of the portion of the capital
stock or evidences of indebtedness, securities or assets so distributed or of
such rights, warrants or options, in each case as applicable to one share of
Common Stock, and the denominator of which shall be the current market price per
share (as defined in subsection (e) below) of the Common Stock on such record
date. Such adjustment shall become effective immediately after the record date
for the determination of stockholders entitled to receive such distribution.

    (d) In case the Company or any of its Subsidiaries shall repurchase
(including by way of tender offer) shares of Common Stock, and the fair market
value of the sum of (i) the aggregate

consideration paid for such Common Stock, (ii) the aggregate fair market value
of cash dividends and distributions of the type described in clause (iii) of the
preceding paragraph (c) paid within the twelve (12) months preceding the date of
purchase of such shares of Common Stock in respect of which no adjustment
pursuant to this Section 4.6 previously has been made, and (iii) the aggregate
fair market value of any amounts previously paid for the repurchase of Common
Stock of a type described in this paragraph (d) within the twelve (12) months
preceding the date of purchase of such shares of Common Stock in respect of
which no adjustment pursuant to this Section 4.6 previously has been made,
exceeds 15% of Market Capitalization on the date of, and after giving effect to,
such repurchase, then the Conversion Price shall be adjusted so that the same
shall equal the price determined by multiplying the Conversion Price in effect
immediately prior to the date of such distribution or purchase by a fraction,
the numerator of which shall be the current market price per share (as defined
in subsection (e) below) of the Common Stock on the date of such repurchase,
less the quotient obtained by dividing the Aggregate Market Premium involved in
such repurchase (as defined hereinafter) by the difference between the number of
shares of Common Stock outstanding before such repurchase and the number of
shares of Common Stock the subject of such repurchase, and the denominator of
which shall be the current market price per share (as defined in subsection (e)
below) of the Common Stock on the date of such repurchase. Such adjustment shall
become effective immediately after the date of such repurchase. For purposes of
this subsection (d), the "Aggregate Market Premium" is the excess, if any, of
the aggregate repurchase price paid for all such Common Stock over the aggregate
current market value per share (as defined in subsection (e) below) of all such
repurchased stock, determined with respect to each share involved in each such
repurchase as of the date of repurchase with respect to such share.

     (e) For the purpose of any computation under subsections (b), (c) and (d)
above, the current market price per share of Common Stock on any date shall be
deemed to be the average of the Closing Prices for 20 consecutive Trading Days
commencing 30 Trading Days before the record date with respect to any
distribution, issuance or other event requiring such computation. The Closing
Price for each day shall be (i) the last sale price, or the closing bid price if
no sale occurred, of such class of stock on the principal securities exchange on
which such class of stock is listed, if the Common Stock is listed or admitted
for trading on any national securities exchange, (ii) the last reported sale
price of Common Stock on The Nasdaq Stock Market, or any similar system of
automated dissemination of quotations of securities prices then in common use,
if so quoted, or (iii) if not quoted as described in clause (i), the mean
between the high bid and low asked quotations for Common Stock as reported by
the National Quotation Bureau Incorporated if at least two securities dealers
have inserted both bid and asked quotations for such class of stock on at least
5 of the 10 preceding days. If the Common Stock is quoted on a national
securities or central market system, in lieu of a market or quotation system
described above, the Closing Price shall be determined in the manner set forth
in clause (iii) of the preceding sentence if bid and asked quotations are
reported but actual transactions are not, and in the manner set forth in clause
(ii) of the preceding sentence if actual transactions are reported. If none of
the conditions set forth above is met, the Closing Price of Common Stock on any
day or the average of such last reported sale prices for any period shall be the
fair market value of such class of stock as determined by a member firm of the
New York Stock Exchange, Inc. selected by the Company. As used herein the term
"Trading Days" with respect to Common Stock means (i) if the Common Stock is
listed or admitted for trading on any national securities exchange, days on
which such national securities exchange is open for business or (ii) if the
Common Stock is quoted on The Nasdaq Stock Market or any similar

31

system of automated dissemination of quotations of securities prices, days on which trades may be made on such system.

(f)  If the Company implements a Stockholder Rights Plan (as defined below), the Company agrees that such Stockholder Rights Plan will provide that upon any conversion of the Securities by any Holder prior to a Trigger Event (as defined below), the Holders shall receive the rights, warrants or options issued under such plan. Rights, warrants or options distributed by the Company to all holders of Common Stock entitling the holders thereof to subscribe for or purchase shares of the Company's capital stock (either initially or under certain circumstances), which rights, warrants or options, until the occurrence of a specified event or events (a "Trigger Event"):

        (i)  are deemed to be transferred with such shares of Common Stock,

        (ii)  are not exercisable, and

        (iii)  are also issued in respect of future issuances of Common Stock,

(a "Stockholder Rights Plan") shall not be deemed distributed for purposes of this Section 4.6 and no adjustment to the Conversion Price shall be required to be made until the occurrence of the earliest Trigger Event. In addition, in the event of any Trigger Event with respect thereto, that shall have resulted in an adjustment to the Conversion Price under this Section 4.6, (1) in the case of any such rights, warrants or options which shall all have been redeemed or repurchased without exercise by any holders thereof, the Conversion Price shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a holder of Common Stock with respect to such rights, warrants or options (assuming such holder had retained such rights, warrants or options), made to all holders of Common Stock as of the date of such redemption or repurchase, and (2) in the case of any such rights, warrants or options all of which shall have expired without exercise by any holder thereof, the Conversion Price shall be readjusted as if such issuance had not occurred.

In any case in which this Section 4.6 shall require that an adjustment be made immediately following a record date established for purposes of Section 4.6, the Company may elect to defer (but only until five Business Days following the filing by the Company with the Trustee of the certificate described in Section 4.10) issuing to the holder of any Security converted after such record date the shares of Common Stock and other capital stock of the Company issuable upon such conversion over and above the shares of Common Stock and other capital stock of the Company issuable upon such conversion only on the basis of the Conversion Price prior to adjustment; and, in lieu of the shares the issuance of which is so deferred, the Company shall issue or cause its transfer agents to issue due bills or other appropriate evidence of the right to receive such shares.

Section 4.7.    No Adjustment.
                -------------

No adjustment in the Conversion Price shall be required unless the adjustment would require an increase or decrease of at least 1% in the Conversion Price as last adjusted; provided, however, that any adjustments which by reason of this Section 4.7 are not required to be made shall be carried

32

forward and taken into account in any subsequent adjustment. All calculations under this Article 4 shall be made to the nearest cent or to the nearest one-hundredth of a share, as the case may be.

No adjustment need be made for rights to purchase Common Stock or issuances of Common Stock pursuant to a Company plan for reinvestment of dividends or interest.

No adjustment need be made for a change in the par value or a change to no par value of the Common Stock.

To the extent that the Securities become convertible into cash, no adjustment need be made thereafter as to the cash. Interest will not accrue on the cash.

Section 4.8.     Equivalent Adjustments.
                 ----------------------

In the event that, as a result of an adjustment made pursuant to Section 4.6 above, the holder of any Security thereafter surrendered for conversion shall become entitled to receive any shares of capital stock of the Company other than shares of its Common Stock, thereafter the Conversion Price of such other shares so receivable upon conversion of any Securities shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the provisions with respect to Common Stock contained in this Article 4.

Section 4.9.     Adjustment for Tax Purposes.
                 ---------------------------

The Company shall be entitled to make such reductions in the Conversion Price, in addition to those required by Section 4.6, as it in its discretion shall determine to be advisable in order that any stock dividends, subdivision of shares, distribution of rights to purchase stock or securities, or a distribution or securities convertible into or exchangeable for stock hereafter made by the Company to its stockholders shall not be taxable.

Section 4.10.     Notice of Adjustment.
                  --------------------

Whenever the Conversion Price is adjusted, or Securityholders become entitled to other securities or due bills, the Company shall promptly mail to Securityholders a notice of the adjustment and file with the Trustee an Officers' Certificate briefly stating the facts requiring the adjustment and the manner of computing it. The certificate shall be conclusive evidence of the correctness of such adjustment and the Trustee may conclusively assume that, unless and until such certificate is received by it, no such adjustment is required.

Section 4.11.     Notice of Certain Transactions.
                  ------------------------------

In case:

(a) the Company shall declare a dividend (or any other distribution) on its Common Stock (other than in cash out of retained earnings); or

33

(b) the Company shall authorize the granting to the holders of its Common Stock of rights, warrants or options to subscribe for or purchase any share of any class or any other rights, warrants or options; or

(c) of any reclassification of the Common Stock of the Company (other than a subdivision or combination of its outstanding Common Stock, or a change in par value, or from par value to no par value, or from no par value to par value), or of any consolidation or merger to which the Company is a party and for which approval of any stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company; or

(d) of the voluntary or involuntary dissolution, liquidation or winding-up of the Company; the Company shall cause to be filed with the Trustee and to be mailed to each holder of Securities at its address appearing on the list provided for in Section 2.5, as promptly as possible but in any event at least ten days prior to the applicable date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution or rights, warrants or options, or, if a record is not to be taken, the date as of which the holders of Common Stock of record is to be entitled to such dividend, distribution or rights are to be determined, or (y) the date on which such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Stock of record shall be entitled to exchange their Common Stock for securities or other property deliverable upon such reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such dividend, distribution, reclassification, consolidation, merger, sale, transfer, dissolution, liquidation or winding-up.

Section 4.12.    Effect of Reclassification, Consolidation, Merger or Sale on
                 ------------------------------------------------------------
                 Conversion Privilege.
                 --------------------

If any of the following shall occur, namely: (i) any reclassification or change of outstanding shares of Common Stock (other than a change in par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination); (ii) any consolidation, combination or merger to which the Company is a party other than a merger in which the Company is the continuing corporation and which does not result in any reclassification of, or change (other than a change in name, or par value, or from par value to no par value, or from no par value to par value, or as a result of a subdivision or combination) in, outstanding shares of Common Stock; or (iii) any sale or conveyance of all or substantially all of the assets of the Company, then the Company, or such successor or purchasing corporation, as the case may be, shall, as a condition precedent to such reclassification, change, consolidation, merger, sale or conveyance, execute and deliver to the Trustee a supplemental indenture providing that the Holder of each Security then outstanding shall have the right to convert such Security into the kind and amount of shares of stock and other securities and property (including cash) receivable upon such reclassification, change, consolidation, merger, sale or conveyance by a holder of the number of shares of Common Stock deliverable upon conversion of such Security immediately prior to such reclassification, change, consolidation, merger, sale or conveyance. Such supplemental indenture shall provide for adjustments of the Conversion Price which shall be as nearly equivalent as may be practicable to the adjustments of the Conversion Price provided for in this Article 4. If, in the case of any such

34

consolidation, merger, sale or conveyance, the stock or other securities and property (including cash) receivable thereupon by a holder of Common Stock includes shares of stock or other securities and property of a corporation other than the successor or purchasing corporation, as the case may be, in such consolidation, merger, sale or conveyance, then such supplemental indenture shall also be executed by such other corporation and shall contain such additional provisions to protect the interests of the Holders of the Securities as the Board of Directors of the Company shall reasonably consider necessary by reason of the foregoing. The provision of this Section 4.12 shall similarly apply to successive consolidations, mergers, sales or conveyances. Notwithstanding the foregoing, a distribution by the Company to all or substantially all holders of its Common Stock for which an adjustment to the Conversion Price or provision for conversion of the Securities may be made pursuant to Section 4.6 shall not be deemed to be a sale or conveyance of all or substantially all of the assets of the Company for purposes of this Section 4.12.

In the event the Company shall execute a supplemental indenture pursuant to this Section 4.12, the Company shall promptly file with the Trustee an Opinion of Counsel stating that such supplemental indenture is authorized or permitted by this Indenture and an Officers' Certificate briefly stating the reasons therefor, the kind or amount of shares of stock or securities or property (including cash) receivable by Holders of the Securities upon the conversion of their Securities after any such reclassification, change, consolidation, merger, sale or conveyance, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.

Section 4.13.    Trustee's Disclaimer.
                 --------------------

The Trustee has no duty to determine when an adjustment under this Article 4 should be made, how it should be made or what such adjustment should be made, but may accept as conclusive evidence of the correctness of any such adjustment, and shall be protected in relying upon, the Officers' Certificate with respect thereto which the Company is obligated to file with the Trustee pursuant to Section 4.10. The Trustee shall not be accountable for and makes no representation as to the validity or value of any securities or assets issued upon conversion of Securities, and the Trustee shall not be responsible for the Company's failure to comply with any provisions of this Article 4. Each Conversion Agent (other than the Company or an Affiliate of the Company) shall have the same protection under this Section 4.13 as the Trustee.

The Trustee shall not be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture executed pursuant to Section 4.12, but may accept as conclusive evidence of the correctness thereof, and shall be protected in relying upon, the Officers' Certificate with respect thereto which the Company is obligated to file with the Trustee pursuant to Section 4.12.

Section 4.14.    Voluntary Reduction.
                 -------------------

The Company from time to time may reduce the Conversion Price by any amount for any period of time if the period is at least 20 days or such longer period as may be required by law and if the reduction is irrevocable during the period; provided that in no event may the Conversion Price be less than the par value of a share of Common Stock.

ARTICLE 5.

SUBORDINATION

Section 5.1.      Securities Subordinated to Senior Indebtedness.
                 --------------------------------------------------

The Company covenants and agrees, and each Holder of Securities by his acceptance thereof likewise covenants and agrees, that all Securities are subject to the provisions of this Article 5; and each Person holding any Security, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions and acknowledges that such provisions are for the benefit of, and shall be enforceable directly by, the holders of Senior Indebtedness.

Each Holder of Securities authorizes and directs the Trustee on such Holder's behalf to take such action as may be necessary or appropriate, in the sole discretion of the Trustee, to acknowledge or effectuate the subordination between the Holders of Securities and the holders of Senior Indebtedness as provided in this Article and appoints the Trustee as such Holder's attorney-in-fact for any and all such purposes.

The payment of the principal of, premium, if any, and interest on and any other payment due pursuant to this Indenture or any Securities issued hereunder (including, without limitation, the payment or deposit of the Redemption Price or Repurchase Price pursuant to Article 3 and any deposit pursuant to Section 6.3) shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter created, incurred, assumed or guaranteed.

Section 5.2.      Securities Subordinated to Prior Payment of All Senior
                 -------------------------------------------------------
                 Indebtedness on Dissolution, Liquidation, Reorganization, Etc.,
                 ----------------------------------------------------------------
                 of the Company.
                 --------------

Upon any payment or distribution of the assets of the Company of any kind or character, whether in cash, property or securities (including any collateral at any time securing the Securities), to creditors upon any dissolution, winding-up, total or partial liquidation, or reorganization of the Company (whether voluntary or involuntary, or in bankruptcy, insolvency, reorganization, liquidation, or receivership proceedings, or upon an assignment for the benefit of creditors, or any marshalling of the assets and liabilities of the Company, or otherwise), then in such event:

(a) all Senior Indebtedness (including principal thereof and interest thereon) shall first be paid in full before any Payment of the Securities (as defined in Section 5.5) is made;

(b) any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (including any collateral at any time securing the Securities) (other than Reorganization Securities), to which the Holders or the Trustee on behalf of the Holders would be entitled except for the provisions of this Article 5, including any such payment or distribution which may be payable or deliverable by reason of the payment of another debt of the Company being subordinated to the payment of the Securities, shall be paid or delivered by any debtor, Custodian or other person making such payment or distribution, directly to the holders of the

36

Senior Indebtedness or their Representative or Representatives, or to the trustee or trustees under any indenture pursuant to which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of and interest on the Senior Indebtedness held or represented by each, for application to payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution, or provision therefor, to the holders of such Senior Indebtedness; and

        (c) in the event that, notwithstanding the foregoing provisions of this Section 5.2, any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities (other than Reorganization Securities), shall be received by the Trustee or the Holders before all Senior Indebtedness is paid in full, such payment or distribution (subject to the provisions of Sections 5.6 and 5.7) shall be held in trust for the benefit of, and shall be immediately paid or delivered by the Trustee or such Holders, as the case may be, to the holders of Senior Indebtedness remaining unpaid, or their Representative or Representatives, ratably according to the aggregate amounts remaining unpaid on account of the principal of and interest on the Senior Indebtedness held or represented by each, for application to the payment of all Senior Indebtedness remaining unpaid, to the extent necessary to pay all Senior Indebtedness in full after giving effect to any concurrent payment or distribution, or provision therefor, to or for the holders of such Senior Indebtedness.

        The Company shall give prompt notice to the Trustee of any dissolution, winding-up, liquidation or reorganization of the Company.

        Upon any distribution of assets of the Company referred to in this Article 5, the Trustee, subject to the provisions of Sections 9.1 and 9.2, and the Holders shall be entitled to conclusively rely upon any order or decree by any court of competent jurisdiction in which such dissolution, winding-up, liquidation or reorganization proceeding is pending, or a certificate of the liquidating trustee or agent or other person making any distribution to the Trustee or to the Holders, for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of the Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article 5; provided that the foregoing shall apply only if such court, trustee, liquidating trustee or other person has been fully apprised of the provisions of this Article.

Section 5.3.    Securityholders To Be Subrogated to Right of Holders of Senior
                -------------------------------------------------------------
                Indebtedness.
                ------------

        Subject to the prior payment in full of all Senior Indebtedness, the Holders shall be subrogated (equally and ratably with the holders of all indebtedness of the Company which by its express terms is subordinated to indebtedness of the Company to substantially the same extent as the Securities are subordinated and is entitled to like rights of subrogation) to the rights of the holders of Senior Indebtedness to receive payments or distributions of assets of the Company applicable to the Senior Indebtedness until the principal of and interest on the Securities shall be paid in full, and for purposes of such subrogation, no payments or distributions to the holders of Senior Indebtedness of assets, whether in cash, property or securities, distributable to the holders of Senior Indebtedness

37

under the provisions hereof to which the Holders would be entitled except for
the provisions of this Article 5, and no payment pursuant to the provisions of
this Article 5 to the holders of Senior Indebtedness by the Holders shall, as
among the Company, its creditors other than the holders of Senior Indebtedness,
and the Holders, be deemed to be a payment by the Company to or on account of
Senior Indebtedness, it being understood that the provisions of this Article 5
are, and are intended, solely for the purpose of defining the relative rights of
the Holders, on the one hand, and the holders of Senior Indebtedness, on the
other hand.

Section 5.4.    Obligations of the Company Unconditional.
                -----------------------------------------

    Nothing contained in this Article 5 or elsewhere in this Indenture or in
any Security is intended to or shall impair the obligation of the Company, which
is absolute and unconditional, to pay to the Holders the principal of and
interest on the Securities, as and when the same shall become due and payable in
accordance with the terms of the Securities, or to affect the relative rights of
the Holders and other creditors of the Company other than the holders of Senior
Indebtedness, nor shall anything herein or therein prevent the Trustee or any
Holder from exercising all remedies otherwise permitted by applicable law upon
the happening of an Event of Default under this Indenture, subject to the
provisions of Article 8, and the rights, if any, under this Article 5 of the
holders of Senior Indebtedness in respect of assets, whether in cash, property
or securities, of the Company received upon the exercise of any such remedy.

Section 5.5.    Company Not To Make Payment with Respect to Securities in
                ----------------------------------------------------------
                Certain Circumstances
                ---------------------

    Upon the occurrence of a Payment Default, unless and until the amount of
Designated Senior Indebtedness effected by such Payment Default then due shall
have been paid in full, or such default shall have been cured or waived or shall
have ceased to exist, the Company shall not pay principal of, premium, if any,
or interest on the Securities or any other amount due pursuant to this Indenture
or any Securities or make any deposit pursuant to Article 3 or Section 6.3 or
10.1 and shall not repurchase, redeem or otherwise retire any Securities
(collectively, "Payment of the Securities").

    Unless Section 5.2 shall be applicable, upon (1) the occurrence of a
default on Designated Senior Indebtedness (other than a Payment Default) that
occurs and is continuing that permits the holders of such Designated Senior
Indebtedness (or their Representative or Representatives) to accelerate its
maturity and (2) receipt by the Company and the Trustee from the Senior Agent of
written notice of such occurrence and the imposition of a Payment Blockage
Period hereunder, then the Company shall not make any Payment of the Securities
for a period (the "Payment Blockage Period") commencing on the earlier of the
date of receipt by the Company or the Trustee of such notice from the Senior
Agent and ending on the earlier of (subject to any blockage of payments that may
then be in effect under this Section 5.5) (x) the date 179 days after such date,
(y) the date such default shall have been cured or waived in writing or shall
have ceased to exist or such Senior Indebtedness shall have been discharged, or
(z) the date such Payment Blockage Period shall have been terminated by written
notice to the Company or the Trustee from the Senior Agent, after which, in case
of clause (x), (y) or (z), as the case may be, the Company shall resume making
any and all required payments. Notwithstanding any other provision of this
Agreement, only one Payment Blockage Period may be commenced within any
consecutive 365-day period, and no event of default

with respect to any Designated Senior Indebtedness which existed or was continuing on the date of the commencement of any Payment Blockage Period with respect to such Designated Senior Indebtedness shall be, or can be made, the basis for the commencement of a second Payment Blockage Period whether or not within a period of 365 consecutive days unless such event of default shall have been cured or waived for a period of not less than 90 consecutive days. In no event will a Payment Blockage Period extend beyond 179 days.

In the event that, notwithstanding the foregoing provisions of this Section 5.5, any Payment of the Securities shall be made by or on behalf of the Company and received by the Trustee, any Holder or any Paying Agent (or, if the Company is acting as its own Paying Agent, money for any such payment shall be segregated and held in trust), which payment was prohibited by this Section 5.5, then, unless and until the amount of Designated Senior Indebtedness then due, as to which a default shall have occurred, shall have been paid in full, or such default shall have been cured or waived, such payment (subject, in each case, to the provisions of Sections 5.6 and 5.7) shall be held in trust for the benefit of, and shall be immediately paid over to, the holders of Designated Senior Indebtedness or their Representative or Representatives, ratably according to the aggregate amounts remaining unpaid on account of the principal of and interest on the Designated Senior Indebtedness held or represented by each, for application to the payment of all Designated Senior Indebtedness remaining unpaid to the extent necessary to pay all Designated Senior Indebtedness in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the benefit of the holders of Designated Senior Indebtedness. The Company shall give prompt written notice to the Trustee of any default under any Designated Senior Indebtedness or under any agreement pursuant to which Designated Senior Indebtedness may have been issued.

Section 5.6.    Notice to Trustee.
                -----------------

The Company shall give prompt written notice to the Trustee of any fact known to the Company which would prohibit the making of any payment to or by the Trustee in respect of the Securities. Notwithstanding the provisions of this Article 5 or any other provision of this Indenture, the Trustee shall not at any time be charged with knowledge of the existence of any facts which would prohibit the making of any payment to or by the Trustee, unless and until the Trustee shall have received written notice thereof from the Company or from the holder or holders of Senior Indebtedness or from their Representative or Representatives; and, prior to the receipt of any such notice, the Trustee, subject to the provisions of Sections 9.1 and 9.2, shall be entitled to assume conclusively that no such facts exist.

The Trustee shall be entitled to conclusively rely on the delivery to it of a written notice by a Person representing himself to be a holder of Senior Indebtedness (or a Representative of such holder) to establish that such notice has been given by a holder of Senior Indebtedness or a Representative of any such holder. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Indebtedness to participate in any payment or distribution pursuant to this Article 5, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Indebtedness held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of each Person under this Article 5,

and if such evidence is not furnished, the Trustee may defer any payment to such Person pending judicial determination as to the right of such Person to receive such payment.

Section 5.7.    Application by Trustee of Monies Deposited with It.
----------------------------------------------------

Money or U.S. Government Obligations deposited in trust with the Trustee pursuant to Sections 6.3 and 10.1 and not in violation of this Article 5 shall be for the sole benefit of Securityholders and shall thereafter not be subject to the subordination provisions of this Article 5. Otherwise, any deposit of monies by the Company with the Trustee or any Paying Agent (whether or not in trust) for the payment of the principal of or interest on any Securities shall be subject to the provisions of Sections 5.1, 5.2, 5.3 and 5.5; except that, if at least three Business Days prior to the date on which by the terms of this Indenture any such monies may become payable for any purpose (including, without limitation, the payment of either the principal of or interest on any Security), a Trust Officer of the Trustee shall not have received with respect to such monies the notice provided for in Section 5.6, then the Trustee or any Paying Agent shall have full power and authority to receive such monies and to apply such monies to the purpose for which they were received, and shall not be affected by any notice to the contrary which may be received by it within three Business Days prior to or after such date. This Section 5.7 shall be construed solely for the benefit of the Trustee and the Paying Agent and shall not otherwise affect the rights that holders of Senior Indebtedness may have to recover any such payments from the Holders in accordance with the provisions of this Article 5.

Section 5.8.    Subordination Rights Not Impaired by Acts or Omissions of the
------------------------------------------------------------
Company or Holders of Senior Indebtedness.
------------------------------------------

No right of any present or future holders of any Senior Indebtedness to enforce subordination, as herein provided, shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by the Company with the terms, provisions and covenants of this Indenture, regardless of any knowledge thereof which any such holder may have or be otherwise charged with. The holders of any Senior Indebtedness may extend, renew, modify or amend the terms of such Senior Indebtedness or any security therefor and release, sell or exchange such security and otherwise deal freely with the Company, all without affecting the liabilities and obligations of the parties to this Indenture or the Holders. No amendment of this Article 5 or any defined terms used herein or any other Sections referred to in this Article 5 which adversely affects the rights hereunder of holders of Senior Indebtedness, shall be effective unless the holders of such Senior Indebtedness (required pursuant to the terms of such Senior Indebtedness to give such consent) have consented thereto.

Section 5.9.    Trustee To Effectuate Subordination.
-----------------------------------

Each Holder of a Security by his acceptance thereof authorizes and directs the Trustee in his behalf to take such action as may be necessary or appropriate to acknowledge and effectuate the subordination provided in this Article 5 and appoints the Trustee his attorney-in-fact for any and all such purposes.

Section 5.10.          Right of Trustee To Hold Senior Indebtedness.
                       ----------------------------------------------

     The Trustee, in its individual capacity, shall be entitled to all of the
rights set forth in this Article 5 in respect of any Senior Indebtedness at any
time held by it to the same extent as any other holder of Senior Indebtedness,
and nothing in this Indenture shall be construed to deprive the Trustee of any
of its rights as such holder. Nothing in this Article 5 shall apply to claims
of, or payments to, the Trustee under or pursuant to Section 9.7.

Section 5.11.          Article 5 Not To Prevent Events of Default.
                       -------------------------------------------

     The failure to make a Payment of the Securities by reason of any provision
in this Article 5 shall not be construed as preventing the occurrence of an
Event of Default under Section 8.1.

Section 5.12.          No Fiduciary Duty Created to Holders of Senior Indebtedness.
                       -----------------------------------------------------------

     Notwithstanding any other provision in this Article 5, the Trustee shall
not be deemed to owe any fiduciary duty to the holders of Senior Indebtedness by
virtue of the provisions of this Article 5 or otherwise. With respect to the
holders of Senior Indebtedness, the Trustee undertakes to perform or to observe
only such of its covenants or obligations as are specifically set forth in this
Article 5 and no implied covenants or obligations with respect to holders of
Senior Indebtedness shall be read into this Indenture against the Trustee.

Section 5.13.          Article Applicable to Paying Agents.
                       ------------------------------------

     In case at any time any Paying Agent other than the Trustee shall have been
appointed by the Company and be then acting hereunder, the term "Trustee" as
used in this Article 5 shall in such case (unless the context shall otherwise
require) be construed as extending to and including such Paying Agent within its
meaning as fully for all intents and purposes as if such Paying Agent were named
in this Article 5 in addition to or in place of the Trustee; provided, however,
that Sections 5.6, 5.10 and 5.12 shall not apply to the Company if it acts as
Paying Agent.

Section 5.14.          Certain Conversion Deemed Payment.
                       ----------------------------------

     For the purposes of this Article only, (1) the issuance and delivery of
junior securities upon conversion of Securities in accordance with Article 4
shall not be deemed to constitute a payment or distribution on account of the
principal of or premium or interest on Securities or on account of the purchase
or other acquisition of Securities, and (2) the payment, issuance or delivery of
cash, property or securities (other than junior securities) upon conversion of a
Security shall be deemed to constitute payment on account of principal of such
Security. For the purposes of this Section, the term "junior securities" means
(a) shares of any stock of any class of the Company and (b) securities of the
Company which are subordinated in right of payment to all Senior Indebtedness
which may be outstanding at the time of issuance or delivery of such securities
to substantially the same extent as, or to a greater extent than, the Securities
are so subordinated as provided in this Article. Nothing contained in this
Article or elsewhere in this Indenture or in the Securities is intended to or
shall impair, as among the Company, its creditors other than holders of Senior
Indebtedness and the Holders of the Securities, the right, which is absolute and
unconditional, of the Holder of any Security to convert such Security in
accordance with Article 4.

ARTICLE 6.

COVENANTS

Section 6.1.    Payment of Securities.
               ----------------------

        The Company covenants and agrees that it will duly and punctually pay or
cause to be paid the principal amount at maturity, Redemption Price, Repurchase
Price and interest, in respect of each of the Securities at the places, at the
respective times and in the manner provided herein and in the Securities. Each
installment of interest on the Securities may be paid by mailing checks for the
interest payable to or upon the written order of the Holders of Securities
entitled thereto as they shall appear on the registry books of the Company;
provided that with respect to any Holder of Securities with an aggregate
principal amount equal to or in excess of $5 million, at the request of such
Holder in writing the Company shall pay interest on such Holder's Securities by
wire transfer in immediately available funds.

Section 6.2.    SEC Reports; 144A Information.
               -----------------------------

        The Company shall file all reports and other information and documents
which it is required to file with the SEC pursuant to Section 13 or 15(d) of the
Exchange Act, and within 15 days after it files them with the SEC, the Company
shall file copies of all such reports, information and other documents with the
Trustee. The Company will cause any quarterly and annual reports which it mails
to its stockholders to be mailed to the Holders of the Securities.

        In the event the Company is at any time no longer subject to the reporting
requirements of Section 13 or 15(d) of the Exchange Act, the Company will
prepare, for the first three quarters of each fiscal year, quarterly financial
statements substantially equivalent to the financial statements required to be
included in a report on Form 10-Q under the Exchange Act. The Company will also
prepare, on an annual basis, complete audited consolidated financial statements
including, but not limited to, a balance sheet, a statement of income and
retained earnings, a statement of cash flows and all appropriate notes. All such
financial statements will be prepared in accordance with generally accepted
accounting principles consistently applied, except for changes with which the
Company's independent accountants concur, and except that quarterly statements
may be subject to year-end adjustments. The Company will cause a copy of such
financial statements to be filed with the Trustee and mailed to the Holders of
the Securities within 60 days after the close for each of the first three
quarters of each fiscal year and within 105 days after the close of each fiscal
year. The Company will also comply with the other provisions of TIA 314(a).

        Delivery of such reports, information and documents to the Trustee is for
informational purposes only and the Trustee's receipt of such shall not
constitute constructive notice of any information contained therein or
determinable from information contained therein, including the Company's
compliance with any of its covenants hereunder (as to which the Trustee is
entitled to rely exclusively on Officers' Certificates).

        At any time when the Company is not subject to Section 13 or 15(d) of the
Exchange Act, upon the request of a Holder or beneficial owner of a Security,
the Company will promptly furnish

42

or cause to be furnished Rule 144A Information (as defined below) to such Holder, to such beneficial owner or to a prospective purchaser designated by such Securityholder or beneficial owner, as the case may be, in order to permit compliance by such Securityholder or beneficial owner with Rule 144A under the Securities Act in connection with the resale of such Security by such Securityholder or beneficial owner; provided, however, the Company shall not be required to furnish such information in connection with any request made on or after the date which is two years from the later of (i) the date such Security (or any predecessor Security) was acquired from the Company or (ii) the date such Security (or any predecessor Security) was last acquired from an "affiliate" of the Company within the meaning of Rule 144 under the Securities Act. "Rule 144A Information" shall be such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

Section 6.3.    Liquidation.
            -----------

        Subject to the provisions of Article 5, insofar as they may be applicable hereto, the Board of Directors or the stockholders of the Company may not adopt a plan of liquidation which plan provides for, contemplates, or the effectuation of which is preceded by (a) the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company otherwise than substantially as an entirety (Article 7 being the Article which governs any such sale, lease, conveyance or other disposition substantially as an entirety), and (b) the distribution of all or substantially all of the proceeds of such sale, lease, conveyance or other disposition and of the remaining assets of the Company to the holders of the capital stock of the Company, unless the Company shall in connection with the adoption of such plan make provision for, or agree that prior to making any liquidating distributions to the holders of capital stock of the Company it will make provision for, the satisfaction of the Company's obligations hereunder and under the Securities as to the payment of principal and interest. The Company shall be deemed to have made provision for such payments only if (1) the Company irrevocably deposits in trust with the Trustee money or U.S. Government Obligations maturing as to principal and interest in such amounts and at such times as are sufficient, without consideration of any reinvestment of such interest, to pay the principal of and interest on the Securities then outstanding to maturity and to pay all other sums payable by it hereunder, or (2) there is an express assumption of the due and punctual payment of the Company's obligations hereunder and under the Securities and the performance and observance of all covenants and conditions to be performed by the Company hereunder, by the execution and delivery of a supplemental indenture in form reasonably satisfactory to the Trustee by a person who acquires, or will acquire (otherwise than pursuant to a lease) a portion of the assets of the Company, and which person will have Consolidated Net Worth (immediately after the acquisition) equal to not less than the Consolidated Net Worth of the Company (immediately preceding such acquisition), and which is a corporation organized under the laws of the United States, any State thereof or the District of Columbia; provided, however, that the Company shall not make any liquidating distribution to the holders of capital stock of the Company described in the first sentence of this Section 6.3 until after the Company shall have certified to the Trustee with an Officers' Certificate at least five days prior to the making of any liquidating distribution that it has complied with the provisions of this Section 6.3.

43

Section 6.4.    Compliance Certificates.
                ------------------------

     The Company shall deliver to the Trustee within 105 days after the end of
each fiscal year of the Company, an Officers' Certificate as to the signer's
knowledge of the Company's compliance with all conditions and covenants on its
part contained in this Indenture and stating whether or not the signer knows of
any default or Event of Default. If such signer knows of such a default or Event
of Default, the Certificate shall describe the default or Event of Default and
the efforts to remedy the same. For the purposes of this Section 6.4, compliance
shall be determined without regard to any grace period or requirement of notice
provided pursuant to the terms of this Indenture. The Certificate need not
comply with Section 12.4.

Section 6.5.    Notice of Defaults.
                ------------------

     The Company will give notice to the Trustee, promptly, and in any event
within five days, upon becoming aware thereof, of the existence of any Event of
Default or an event which, with notice or the lapse of time or both would
constitute an Event of Default hereunder.

Section 6.6.    Payment Of Taxes And Other Claims.
                ---------------------------------

     The Company will pay or discharge or cause to be paid or discharged, before
the same shall become delinquent, (1) all material taxes, assessments and
governmental charges levied or imposed upon the Company, directly or by reason
of its ownership of any Subsidiary or upon the income, profits or property of
the Company; and (2) all material lawful claims for labor, materials and
supplies, which, if unpaid, might by law become a lien upon the property of the
Company; provided, however, that the Company shall not be required to pay or
discharge or cause to be paid or discharged any such tax, assessment, charge or
claim whose amount, applicability or validity is being contested in good faith
by appropriate proceedings and for which adequate provision has been made.

Section 6.7.    Corporate Existence.
                -------------------

     Subject to Section 6.3 and Article 7, the Company will do or cause to be
done all things necessary to preserve and keep in full force and effect its
corporate existence and rights (charter and statutory); provided, however, that
the Company shall not be required to preserve any right if the Company shall
determine that the preservation is no longer desirable in the conduct of the
Company's business and that the loss thereof is not, and will not be, adverse in
any material respect to the Holders.

Section 6.8.    Maintenance of Properties.
                -------------------------

     Subject to Section 6.3, the Company will cause all material properties
owned, leased or licensed in the conduct of its business to be maintained and
kept in good condition, repair and working order and supplied with all necessary
equipment and will cause to be made all necessary repairs, renewals,
replacements, betterments and improvements thereof and thereto, all as in the
judgment of the Company may be necessary so that the business carried on in
connection therewith may be properly and advantageously conducted at all times
while any Securities are outstanding; provided, however, that nothing in this
Section 6.8 shall prevent the Company from doing otherwise

                                      44

if, in the judgment of the Company, the same is desirable in the conduct of the Company's business and is not, and will not be, adverse in any material respect to the Holders.

Section 6.9.    Further Instruments and Acts.
                ----------------------------

Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

Section 6.10.    Maintenance of Office or Agency.
                -------------------------------

The Company will maintain in The City of New York an office or agency where Securities may be presented or surrendered for payment or repurchase, where Securities may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served. The office of the agent of the Trustee in The City of New York shall be such office or agency of the Company, unless the Company shall designate and maintain some other office or agency for one or more of such purposes. The Company will give prompt written notice to the Trustee of any change in the location of any such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

The Company may from time to time designate one or more other offices or agencies where the Securities may be presented or surrendered for any or all such purposes and may from time to time rescind such designation; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in The City of New York for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and any change in the location of any such office or agency.

Section 6.11.    Resale of Certain Securities; Reporting Issuer.
                -----------------------------------------------

During the period beginning on the last date of original issuance of the Securities and ending on the date that is two years from such date, the Company will not, and will use all reasonable efforts not to permit any of its "affiliates" (as defined under Rule 144 under the Securities Act or any successor provision thereto) to, resell (x) any Securities which constitute "restricted securities" under Rule 144 or (y) any securities into which the Securities have been converted under this Indenture which constitute "restricted securities" under Rule 144, that in either case have been reacquired by any of them, except pursuant to an effective registration statement under the Securities Act. The Trustee shall have no responsibility in respect of the Company's performance of its agreement in the preceding sentence.

Section 6.12.    Registration Rights.
                -------------------

(a)    The Company agrees that the Holders (and any Person that has a beneficial interest in a Security) from time to time of Registrable Securities (as such term is defined in the Registration

45

Rights Agreement) are entitled to the benefits of the Registration Rights Agreement. Pursuant to the Registration Rights Agreement, the Company has agreed for the benefit of the Holders from time to time of Registrable Securities, at the Company's expense, (i) to file within 90 days after the first date of original issuance of the Securities, a registration statement (the "Registration Statement") with the Commission with respect to resales of the Restricted Securities, (ii) to use all reasonable efforts to cause such Registration Statement to be declared effective by the Commission not later than 180 days after the first date of original issuance of the Securities, and (iii) to use all reasonable efforts to maintain such Registration Statement continuously effective under the Securities Act subject to and in accordance with the terms of the Registration Rights Agreement.

Additional interest (the "Additional Interest") with respect to the Securities shall be assessed if a Registration Default (as defined in the Registration Rights Agreement) occurs. Additional Interest shall accrue on the Securities over and above the interest set forth in the title of the Securities from and including the date on which any such Registration Default shall occur, to but excluding the date on which such Registration Default has been cured (in the manner described in the Registration Rights Agreement), at a rate of 0.50% per annum.

(b) Any amounts of Additional Interest due pursuant to clause (a) of this Section 6.12 shall be payable in cash on the regular interest Payment Dates. The amount of Additional Interest shall be determined by multiplying the applicable Additional Interest rate by the principal amount of the Securities, multiplied by a fraction, the numerator of such period (determined on the basis of a 360-day year comprised of twelve 30-day months), and the denominator of which is 360.

Whenever in this Indenture there is mentioned, in any context, the payment of the principal of, premium, if any, or interest on, or in respect of, any Security, such mention shall be deemed to include mention of the payment of Additional Interest provided for in this Section to the extent that, in such context, Additional Interest are, were or would be payable in respect thereof pursuant to the provisions of this Section 6.12 and express mention of the payment of Additional Interest (if applicable) in any provisions hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

Section 6.13.   Additional Interest.
                -------------------

If Additional Interest is payable pursuant to the Registration Rights Agreement, the Company shall deliver to the Trustee a certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such interest is payable.  Unless and until a Trust Officer receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such interest is payable.  If the Company has paid Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee a certificate setting forth the particulars of such payment.

Section 6.14.   Stay, Extension and Usury Laws.
                ------------------------------

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, which may affect the

covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE 7.

SUCCESSOR CORPORATION

Section 7.1.   When Company May Merge, Etc.
               ---------------------------

The Company shall not consolidate with or merge into any other Person, or convey, transfer or lease its properties and assets substantially as an entirety to any Person, and shall not permit any Person (other than a Subsidiary wholly-owned by the Company) to consolidate with or merge into the Company or convey, transfer or lease its properties and assets substantially as an entirety to the Company, unless:

(a)  in case the Company shall consolidate with or merge into another Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, the Person formed by such consolidation or into which the Company is merged or the Person which acquires by conveyance or transfer, or which leases, the properties and assets of the Company substantially as an entirety shall be a corporation, partnership or trust, shall be organized and validly existing under the laws of the United States of America, any State thereof or the District of Columbia and shall expressly assume, by an indenture supplemental thereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, the due and punctual payment of the principal of (and premium, if any) and interest on all the Securities and the performance or observance of every covenant of this Indenture on the part of the Company to be performed or observed and shall have provided for conversion rights in accordance with Section 4.12;

(b)  immediately after giving effect to such transaction and treating any indebtedness which becomes an obligation of the Company or a Subsidiary as a result of such transaction as having been incurred by the Company or such Subsidiary at the time of such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have happened and be continuing; and

(c)  the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with this Article and that all conditions precedent herein provided for relating to such transaction have been complied with.

Section 7.2.   Successor Corporation Substituted.
               ---------------------------------

Upon any consolidation of the Company with, or merger of the Company into, any other Person or any conveyance, transfer or lease of the properties and assets of the Company substantially

47

as an entirety in accordance with Section 7.1, the successor Person formed by such consolidation or into which the Company is merged or to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein, and thereafter, except in the case of a lease, the predecessor Person shall be relieved of all obligations and covenants under this Indenture and the Securities.

ARTICLE 8.

DEFAULT AND REMEDIES

Section 8.1.    Events of Default.
                -----------------

An "Event of Default" occurs if:

(1)  the Company defaults in the payment of any interest upon any of the Securities when due and payable and the default continues for a period of 30 days whether or not such payment is prevented by Article 5;

(2)  the Company defaults in the payment of the principal of and premium, if any, on any of the Securities when due, including on a redemption date, whether or not such payment is prevented by Article 5;

(3)  the Company fails to pay when due the principal of or interest on indebtedness for money borrowed by the Company or its subsidiaries in excess of $20.0 million, or the acceleration of that indebtedness that is not withdrawn within 15 days after the date of written notice to the Company by the Trustee or to the Company and the Trustee by the Holders of at least 25% in principal amount of the outstanding Securities;

(4)  a default by the Company in the performance, or breach, of any of the Company's other covenants in this Indenture which are not remedied by the end of a period of 60 days after written notice to the Trustee or to the Company and the Trustee by the Holders of at least 25% in principal amount of the outstanding Securities;

(5)  the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

A.    commences a voluntary case or proceeding;

B.    consents to the entry of an order for relief against it in an involuntary case or proceeding;

C.    consents to the appointment of a Custodian of it or for all or substantially all of its assets; or

D.    makes a general assignment for the benefit of its creditors; or

48

(6)   a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

    A.   is for relief against the Company or any Significant Subsidiary in an involuntary case or proceeding;

    B.   appoints a Custodian of the Company or any Significant Subsidiary or for all or substantially all of the assets of any of them; or

    C.   orders the liquidation of the Company or any Significant Subsidiary;

    and in each case the order or decree remains unstayed and in effect for 60 days.

The term "Bankruptcy Law" means Title 11, U.S. Code or any similar Federal or state law for the relief of debtors.  For purposes of this Section 8.1, the term "Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

A default under clause (4) is not an Event of Default until the Trustee notifies the Company or the Holders of at least 25% in principal amount of the Securities then outstanding notify the Company and the Trustee, of the default, and the Company does not cure the default within 60 days after receipt of such notice. The notice given pursuant to this Section 8.1 must specify the default, demand that it be remedied and state that the notice is a "Notice of Default." When a default is cured, it ceases.

Subject to the provisions of Sections 9.1 and 9.2, the Trustee shall not be charged with knowledge of any Event of Default unless written notice thereof shall have been given to a Trust Officer at the Corporate Trust Office of the Trustee by the Company, the Paying Agent, any Holder or an agent of any Holder. Within 90 days after a default, the Trustee must give to the registered Holders of Securities notice of all uncured defaults known to it.  The Trustee will be protected in withholding the notice if it in good faith determines that the withholding of the notice is in the best interests of the registered Holders, except for a default under clause (2) of this Section 8.1.

Section 8.2.   Acceleration.
    -------------

If an Event of Default (other than an Event of Default specified in Section 8.1(5) or (6)) occurs and is continuing, the Trustee may, by notice to the Company, or the Holders of at least 25% in principal amount of the Securities then outstanding may, by notice to the Company and the Trustee, and the Trustee shall, upon the request of such Holders, declare all unpaid principal of and accrued interest to the date of acceleration on the Securities then outstanding (if not then due and payable) to be due and payable upon any such declaration, and the same shall become and be immediately due and payable.  If an Event of Default specified in Section 8.1(5) or (6) occurs, all unpaid principal of and accrued interest on the Securities then outstanding shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Securityholder.

The Holders of a majority in principal amount of the Securities then outstanding by notice to the Trustee may rescind an acceleration and its consequences if (i) all existing Events of Default,

other than the nonpayment of the principal of and accrued interest on the Securities which has become due solely by such declaration of acceleration, have been cured or waived; (ii) the Company has paid or deposited with the Trustee a sum sufficient to pay (a) all overdue interest on the Securities, (b) the principal of any Security which has become due otherwise then by such declaration of acceleration, and (c) to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration; (iii) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and (iv) all payments due to the Trustee and any predecessor Trustee under Section 9.7 have been made. No such rescission shall affect any subsequent default or impair any right consequent thereon. Anything herein contained to the contrary notwithstanding, in the event of any acceleration pursuant to this Section 8.2, the Company shall not be obligated to pay any premium which it would have had to pay if it had then elected to redeem the Securities pursuant to paragraph 5 of the Securities, except in the case of any Event of Default occurring by reason of any willful action (or inaction) taken (or not taken) by or on behalf of the Company with the intention of avoiding payment of the premium which it would have had to pay if it had then elected to redeem the Securities pursuant to paragraph 5 of the form of Security attached hereto as Exhibit A, in which case an equivalent premium shall also
                 ----------
become and be immediately due and payable to the extent permitted by law.

Section 8.3.    Other Remedies.
                --------------

    In case of an Event of Default hereunder, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

    The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Securityholder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  All available remedies are cumulative to the extent permitted by law.

Section 8.4.    Waiver of Defaults and Events of Default.
                -----------------------------------------

    Subject to Section 8.7, the Holders of a majority in principal amount of the Securities then outstanding by notice to the Trustee may waive an existing default or Event of Default and its consequences, except a default in the payment of the principal of (or premium, if any) or interest on any Security as specified in clauses (1) and (2) of Section 8.1, or a default in respect of a covenant or provision hereof which cannot be modified or amended pursuant to Section 11.2 without the consent of the Holder of each Security affected thereby.  When a default or Event of Default is waived, it is cured and ceases.

50

Section 8.5.     Control by Majority.
                 --------------------

     The Holders of a majority in principal amount of the Securities then
outstanding may direct the time, method and place of conducting any proceeding
for any remedy available to the Trustee or exercising any trust or power
conferred on it.  However, the Trustee may refuse to follow any direction that
conflicts with law or this Indenture; provided that the Trustee may take any
other action deemed proper by the Trustee which is not inconsistent with such
direction.

Section 8.6.     Limitation on Suits.
                 --------------------

     A Securityholder may not pursue any remedy with respect to this Indenture
or the Securities (except actions for payment of overdue principal or interest
or for the conversion of the Securities pursuant to Article 4) unless:

     (1)  the Holder gives to the Trustee written notice of a continuing Event
of Default;

     (2)  the Holders of at least 25% in principal amount of the then
outstanding Securities make a written request to the Trustee to pursue the
remedy;

     (3)  such Holder or Holders offer to the Trustee indemnity reasonably
satisfactory to the Trustee against any loss, liability or expense;

     (4)  the Trustee does not comply with the request within 60 days after
receipt of the request and the offer of indemnity; and

     (5)  no direction inconsistent with such written request has been given to
the Trustee during such 60-day period by the Holders of a majority in principal
amount of the Securities then outstanding.

     A Securityholder may not use any provision of this Indenture to prejudice
the rights of another Securityholder or to obtain a preference or priority over
such other Securityholder, or to enforce any rights under this Indenture other
than in the manner herein provided and for the equal and ratable benefit of all
the Securityholders.

Section 8.7.     Rights of Holders To Receive Payment.
                 -------------------------------------

     Notwithstanding any other provision of this Indenture (but subject to
Article 5), the right of any Holder of a Security to receive payment of
principal of (and premium, if any) and interest on the Security, on or after the
respective dates on which such payments are due as expressed in the Security, or
to convert the Security, or to bring suit for the enforcement of any such
payment on or after such respective dates, is absolute and unconditional and
shall not be impaired or affected without the consent of the Holder.

Section 8.8.     Collection Suit by Trustee.
                 ---------------------------

     If an Event of Default in the payment of principal or interest specified in
Section 8.1(1) or (2) occurs and is continuing, the Trustee may recover judgment
in its own name and as trustee of an

                                      51

express trust against the Company or another obligor on the Securities for the whole amount of principal and accrued interest remaining unpaid, together with interest on overdue principal and, to the extent that payment of such interest is lawful, interest on overdue installments of interest, in each case at the rate per annum borne by the Securities and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 8.9.    Trustee May File Proofs of Claim.
                --------------------------------

     The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Securityholders allowed in any judicial proceedings relative to the Company (or any other obligor on the Securities), its creditors or its property and shall be entitled and empowered to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any Custodian in any such judicial proceeding is hereby authorized by each Securityholder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Securityholders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 9.7, and to the extent that such payment of the reasonable compensation, expenses, disbursements and advances in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property which the Securityholders may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or the Trustee to authorize or accept or adopt on behalf of any Securityholder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Securityholder in any such proceeding.

Section 8.10.   Priorities.
                ----------

     Subject to Article 5, if the Trustee collects any money pursuant to this Article 8, it shall pay out the money in the following order:

     First, to the Trustee for amounts due under Section 9.7;

     Second, to Securityholders for amounts due and unpaid on the Securities for principal and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Securities for principal and interest, respectively; and

     Third, to the Company.

     The Trustee may fix a record date and payment date for any payment to Securityholders pursuant to this Section 8.10.

Section 8.11.    Undertaking for Costs.
                 ----------------------

     In any suit for the enforcement of any right or remedy under this Indenture
or in any suit against the Trustee for any action taken or omitted by it as
Trustee, a court in its discretion may require the filing by any party litigant
in the suit of an undertaking to pay the costs of the suit, and the court in its
discretion may assess reasonable costs, including reasonable attorneys' fees,
against any party litigant in the suit, having due regard to the merits and good
faith of the claims or defenses made by the party litigant. This Section 8.11
does not apply to a suit made by the Trustee, a suit by a Holder pursuant to
Section 8.7, or a suit by any Holder, or group of Holders, of more than 10% in
principal amount of the Securities then outstanding.

Section 8.12.    Restoration of Rights and Remedies.
                 ----------------------------------

     If the Trustee or any Securityholder has instituted any proceeding to
enforce any right or remedy under this Indenture and such proceeding has been
discontinued or abandoned for any reason, or has been determined adversely to
the Trustee or to such Securityholder, then and in every such case, subject to
any determination in such proceeding, the Company, the Trustee and the
Securityholders shall be restored severally and respectively to their former
positions hereunder and thereafter all rights and remedies of the Trustee and
the Securityholders shall continue as though no such proceeding had been
instituted.

Section 8.13.    Rights and Remedies Cumulative.
                 ------------------------------

     Except as otherwise provided with respect to the replacement or payment of
mutilated, destroyed, lost or stolen Securities in the last paragraph of Section
2.7, no right or remedy herein conferred upon or reserved to the Trustee or to
the Securityholders is intended to be exclusive of any other right or remedy,
and every right and remedy shall, to the extent permitted by law, be cumulative
and in addition to every other right and remedy given hereunder or now or
hereafter existing at law or in equity or otherwise.  The assertion or
employment of any right or remedy hereunder, or otherwise, shall not prevent the
concurrent assertion or employment of any other appropriate right or remedy.

Section 8.14.    Delay or Omission Not Waiver.
                 ----------------------------

     No delay or omission of the Trustee or of any Securityholder to exercise
any right or remedy accruing upon any Event of Default shall impair any such
right or remedy or constitute a waiver of any such Event of Default or an
acquiescence therein.  Every right and remedy given by this Article or by law to
the Trustee or to the Securityholders may be exercised from time to time, and as
often as may be deemed expedient, by the Trustee or by the Securityholders, as
the case may be.

53

ARTICLE 9.

TRUSTEE

Section 9.1.   Duties of Trustee.
              -----------------

(a)  If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his own affairs.

(b)  Except during the continuance of an Event of Default:

(1)  the Trustee need perform only those duties as are specifically set forth in this Indenture and no others and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)  in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  The Trustee, however, shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)  The Trustee may not be relieved, and no provision of this Indenture shall be construed to relieve the Trustee, from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)  this paragraph does not limit the effect of paragraph (b) of this Section 9.1;

(2)  the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(3)  the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 8.5; and

(4)  no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)  The Trustee may refuse to perform any duty or exercise any right or power unless it receives indemnity reasonably satisfactory to it against any loss, liability, expense or fee.

(e)  Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (d) of this Section 9.1.

54

(f)  The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 9.2.   Rights of Trustee.
               -----------------

     Subject to Section 9.1:

     (a)  The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document.

     (b)  Whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, it may require an Officers' Certificate or an Opinion of Counsel, which shall conform to Section 12.4(b). The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Certificate or Opinion.

     (c)  The Trustee may act through its agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

     (d)  The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes in good faith to be authorized or within its rights or powers.

     (e)  The Trustee may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

     (f)  Any request or direction of the Company mentioned herein shall be sufficiently evidenced by a written Company request or Officers' Certificate and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution.

     (g)  The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the sole cost of the Company and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

     (h)  The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

55

(i)  The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Trust Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Securities and this Indenture.

(j)  The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

(k)  The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers of the Company authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

Section 9.3.    Individual Rights of Trustee.
                -----------------------------

The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or an Affiliate of the Company with the same rights it would have if it were not Trustee.  Any Agent may do the same with like rights.  However, the Trustee is subject to Sections 9.10 and 9.11.

Section 9.4.    Trustee's Disclaimer.
                --------------------

The Trustee makes no representation as to the validity or adequacy of this Indenture or the Securities, it shall not be accountable for the Company's use of the proceeds from the Securities, and it shall not be responsible for the recitals contained herein or any statement in the Securities other than its certificate of authentication.

Section 9.5.    Notice of Default or Events of Default.
                --------------------------------------

If a default or an Event of Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall mail to each Securityholder notice of the default or Event of Default within 90 days after it occurs. Except in the case of a default or an Event of Default in payment of the principal of or interest on any Security, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interest of Securityholders.

Section 9.6.    Reports by Trustee to Holders.
                -----------------------------

If such report is required by TIA 313, within 60 days after each June 30, beginning with the June 30 following the date of this Indenture, the Trustee shall mail to each Securityholder a brief report dated as of such June 30 that complies with TIA 313(a).  The Trustee also shall comply with TIA 313(b)(2) and (c).

A copy of each report at the time of its mailing to Securityholders shall be mailed to the Company and filed with the SEC and each stock exchange, if any, on which the Securities are listed.  The Company shall notify the Trustee whenever the Securities become listed on or delisted from any stock exchange and any changes in the stock exchanges on which the Securities are listed.

Section 9.7.    Compensation and Indemnity.
                --------------------------

The Company shall pay to the Trustee from time to time such compensation for its services hereunder as the Company and the Trustee shall from time to time agree in writing (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust).  The Company shall reimburse the Trustee upon request for all reasonable disbursements, expenses and advances incurred or made by it.  Such expenses may include the reasonable compensation, disbursements and expenses of Trustee's agents and counsel.

The Company shall indemnify the Trustee or any predecessor Trustee and their agents for, and hold them harmless against, any loss, liability or expense incurred by it in connection with its duties under this Indenture or any action or failure to act as authorized or within the discretion or rights or powers conferred upon the Trustee hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Company, or any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder.  The Trustee shall notify the Company promptly of any claim asserted against the Trustee for which it may seek indemnity.  The Trustee shall have the option of undertaking the defense of such claims at the Company's expense and may have separate counsel.  The reasonable fees and expenses of such counsel shall be paid by the Company.  The Company need not pay for any settlement without its written consent, which consent shall not be unreasonably withheld or delayed.

The Company need not reimburse the Trustee for any expense or indemnify it against any loss or liability incurred by it through its own negligent action, negligent failure to act or willful misconduct.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 8.1(5) or (6) occurs, such expenses and the compensation for such services are intended to constitute expenses of administration under any Bankruptcy Law.

The provisions of this Section 9.7 shall survive the termination of this Indenture.

Section 9.8.    Replacement of Trustee.
                ----------------------

The Trustee may resign by so notifying the Company; provided, however, no such resignation shall be effective until a successor Trustee has accepted its appointment pursuant to this Section 9.8.  The Holders of a majority in principal amount of the Securities then outstanding may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee with the Company's written consent.  The Company may remove the Trustee if:

    (1)  the Trustee fails to comply with Section 9.10;

    (2)  the Trustee is adjudged a bankrupt or an insolvent;

(3)  a receiver or other public officer takes charge of the Trustee or its property; or

(4) the Trustee becomes incapable of acting as trustee.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.

If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Company's expense), the Company or the Holders of 10% in principal amount of the Securities then outstanding may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 9.10, any Securityholder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.  Immediately after that, the retiring Trustee shall transfer all property held by it as Trustee to the successor Trustee and be released from its obligations (exclusive of any liabilities Trustee may have incurred while acting as Trustee) hereunder, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  A successor Trustee shall mail notice of its succession to each Securityholder.

Notwithstanding replacement of the Trustee pursuant to this Section 9.8, the Company's obligations under Section 9.7 shall continue for the benefit of the retiring Trustee.

Section 9.9.    Successor Trustee by Merger, Etc.
                ---------------------------------

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust assets (including the administration of this Indenture) to, another corporation, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided such transferee corporation shall qualify and be eligible under Section 9.10.

Section 9.10.  Eligibility; Disqualification.
               ------------------------------

There shall at all times be a Trustee hereunder which shall be a corporation organized and doing business under the laws of the United States of America, any State thereof or the District of Columbia, authorized under such laws to exercise corporate trust process, having (together with any Person directly or indirectly controlling the Trustee) a combined capital and surplus of at least $25,000,000, subject to supervision or examination by federal or state authority. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section 9.10, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 9.10, it shall resign immediately in the manner and with the effect specified above in this Article 9.

58

Section 9.11.  Preferential Collection of Claims Against Company.
              --------------------------------------------------

        The Trustee shall comply with TIA 311(a), excluding any creditor
relationship listed in TIA 311(b).  A trustee who has resigned or been removed
shall be subject to TIA 311(a) to the Government Obligations in accordance with
Section 10.1; provided, however, that if the Company has made any payment of the
principal of or premium, if any, or interest on any Securities because of the
reinstatement of its obligations, the Company shall be subrogated to the rights
of the Holders of such Securities to receive any such payment from the money or
U.S. Government Obligations held by the Trustee or the Paying Agent.


                                ARTICLE 10.

                  SATISFACTION AND DISCHARGE OF INDENTURE

Section 10.1.  Termination of Company's Obligations.
              -------------------------------------

        The Company may terminate all of its obligations under the Securities and
this Indenture (except those obligations referred to in the immediately
succeeding paragraph) if all Securities previously authenticated and delivered
(other than destroyed, lost or stolen Securities which have been replaced or
paid or Securities for whose payment money has theretofore been held in trust
and thereafter repaid to the Company, as provided in Section 10.3) have been
delivered to the Trustee for cancellation and the Company has paid all sums
payable by it hereunder, or if the Company irrevocably deposits in trust with
the Trustee money or U.S. Government Obligations maturing as to principal and
interest in such amounts and at such times as are sufficient, without
consideration of any reinvestment of such interest, to pay the principal of and
premium, if any, and interest on the Securities then outstanding to maturity or
to the date fixed for redemption and to pay all other sums payable by it
hereunder.  The Company may make an irrevocable deposit pursuant to this Section
10.1 only if at such time it is not prohibited from doing so under the
provisions of Article 5 and the Company shall have delivered to the Trustee and
any such Paying Agent an Officers' Certificate and Opinion of Counsel to that
effect and that all other conditions to such deposit have been complied with.

        The Company's obligations in paragraphs 8 and 12 of the Securities, in
Sections 6.1, 6.2, 9.7, 9.8 and 10.4, and in Articles 2 and 4 shall survive
until the Securities are no longer outstanding.  Thereafter, the Company's
obligations in such paragraph 12 and in Section 9.7 shall survive.

        After such irrevocable deposit, the Trustee upon request shall acknowledge
in writing the discharge of the Company's obligations under the Securities and
this Indenture, except for those surviving obligations specified above.

        "U.S. Government Obligations" means direct non-callable obligations of, or
non-callable obligations guaranteed by, the United States of America for the
payment of which guarantee or obligation the full faith and credit of the United
States is pledged.

                                    59

Section 10.2.   Application of Trust Money.
               --------------------------

     The Trustee or the Paying Agent shall hold in trust, for the benefit of the
Holders, money or U.S. Government Obligations deposited with it pursuant to
Section 10.1, and shall apply the deposited money and the money from U.S.
Government Obligations in accordance with this Indenture to the payment of the
principal of, premium, if any, and interest on the Securities.  Money and U.S.
Government Obligations so held in trust and deposited in compliance with Section
10.1 and Article 5 shall not be subject to the subordination provisions of
Article 5.

     The Company shall pay and indemnify the Trustee against any tax, fee or
other charge imposed on or assessed against the U.S. Government Obligations
deposited pursuant to Section 10.1 or the principal and interest received in
respect thereof other than any such tax, fee or other charge which by law is for
the account of the Holders of outstanding Securities.

Section 10.3.   Repayment to Company.
               --------------------

     Subject to Section 10.1, the Trustee and the Paying Agent shall promptly
pay to the Company upon request any excess money or U.S. Government Obligations
held by them at any time.

     The Trustee and the Paying Agent shall pay, subject to applicable
escheatment laws, to the Company upon request any money held by them for the
payment of principal, premium, if any, or interest that remains unclaimed for
two years after a right to such money has matured; provided, however, that the
Trustee or such Paying Agent, before being required to make any such payment,
may at the expense of the Company cause to be published once in a newspaper of
general circulation in The City of New York or mail to each Holder entitled to
such money notice that such money remains unclaimed and that after a date
specified therein, which shall be at least 30 days from the date of such
publication or mailing, any unclaimed balance of such money then remaining will
be repaid to the Company.  After that, Holders entitled to money must look to
the Company for payment unless an abandoned property law designates another
person.

Section 10.4.   Reinstatement.
               -------------

     If the Trustee or the Paying Agent is unable to apply any money or U.S.
Government Obligations in accordance with Section 10.1 by reason of any legal
proceeding or by reason of any order or judgment of any court or governmental
authority enjoining, restraining or otherwise prohibiting such application, the
Company's obligations under this Indenture and the Securities shall be revived
and reinstated as though no deposit had occurred pursuant to Section 10.1 until
such time as the Trustee or Paying Agent is permitted to apply all such money or
U.S. Government Obligations in accordance with Section 10.1; provided, however,
that if the Company has made any payment of the principal of or premium or
interest on any Securities because of the reinstatement of its obligations, the
Company shall be subrogated to the rights of the Holders of such Securities to
receive any such payment from the money or U.S. Government Obligations held by
the Trustee or the Paying Agent.

ARTICLE 11.

AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 11.1.  Without Consent of Holders.
              --------------------------

     The Company and the Trustee may amend or supplement this Indenture or the
Securities without notice to or consent of any Securityholder:

     (a)  to comply with Sections 4.12, 6.3 and 7.1;

     (b)  to cure any ambiguity, omission, defect or inconsistency, or to make
any other change that does not adversely affect the rights of any
Securityholder;

     (c)  to make provisions with respect to the conversion right of the Holders
pursuant to Section 4.6;

     (d)  to evidence and provide for the acceptance of appointment hereunder by
a successor Trustee with respect to the Securities; or

     (e)  to comply with the provisions of the TIA or with any requirement of
the SEC arising solely as a result of the qualification of this Indenture under
the TIA.

Section 11.2.  With Consent of Holders.
              -----------------------

     The Company and the Trustee may amend or supplement this Indenture or the
Securities without notice to any Securityholder but with the written consent of
the Holders of a majority in aggregate principal amount of the Securities then
outstanding.  The Holders of a majority in aggregate principal amount of the
Securities then outstanding may waive compliance by the Company with restrictive
provisions of this Indenture other than as set forth in this Section 11.2 below;
and waive any past default under this Indenture and its consequences, except a
default in the payment of the principal of or any premium or interest on any
Security or in respect of a provision which under this Indenture cannot be
modified or amended without the consent of the Holder of each outstanding
Security affected.

     Subject to Section 11.4, without the written consent of each Securityholder
affected, however, an amendment, supplement or waiver, including a waiver
pursuant to Section 8.4, may not:

     (a)  change the stated maturity date of the principal of, or any
installment of interest on, any Security;

     (b)  reduce the principal amount of, or the rate of interest on, or any
premium payable on, any Security, whether upon acceleration, redemption or
otherwise;

     (c)  change the currency for payment of principal of, or premium or
interest (including Additional Interest) on any Security;

(d)  impair the right to institute suit for the enforcement of any payment of principal of, or premium or interest on any Security when due;

(e)  adversely affect the conversion rights provided in Article 4;

(f)  modify the provisions of Article 5 with respect to the subordination of the Securities in a manner adverse to the Holders of the Securities;

(g)  modify the provisions of this Indenture requiring the Company to make an offer to repurchase Securities upon a Change in Control in a manner adverse to the Holders of the Securities;

(h)  reduce the percentage of principal amount of the outstanding Securities necessary to modify or amend this Indenture or to consent to any waiver provided for in this Indenture;

(i)  waive a default in the payment of the principal of or premium or interest (including Additional Interest) on any Security; or

(j)  make any changes in Section 8.4, 8.7 or this sentence.

It shall not be necessary for the consent of the Holders under this Section 11.2 to approve the particular form of any proposed amendment, supplement or waiver, but it shall be sufficient if such consent approves the substance thereof.

An amendment under this Section 11.2 may not make any change that adversely affects the rights under Article 5 of any holder of an issue of Senior Indebtedness unless the holders of that issue, pursuant to its terms, consent to the change.

Section 11.3.  Compliance with Trust Indenture Act.
             ------------------------------------

Every amendment to or supplement of this Indenture or the Securities shall comply with TIA as in effect at the date of such amendment or supplement.

Section 11.4.  Revocation and Effect of Consents.
             ----------------------------------

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Security or portion of a Security that evidences the same debt as the consenting Holder's Security, even if notation of the consent is not made on any Security. However, any such Holder or subsequent Holder may revoke the consent as to his Security or portion of a Security if the Trustee receives the notice of revocation before the date the amendment, supplement or waiver becomes effective.

After an amendment, supplement or waiver becomes effective, it shall bind every Securityholder, unless it makes a change described in any of clauses (a) through (j) of Section 11.2.  In that case the amendment, supplement or waiver shall bind each Holder of a Security who has consented to it and every subsequent Holder of a Security or portion of a Security that evidences the same debt as the consenting Holder's Security.

SECTION 11.5.   Notation on or Exchange of Securities.
               --------------------------------------

    If an amendment, supplement or waiver changes the terms of a Security, the
Trustee may require the Holder of the Security to deliver it to the Trustee. The
Trustee may place an appropriate notation on the Security about the changed
terms and return it to the Holder. Alternatively, if the Company or the Trustee
so determines, the Company in exchange for the Security shall issue and the
Trustee shall authenticate a new Security that reflects the changed terms.

SECTION 11.6.   Trustee To Sign Amendments, Etc.; Notices.
               -------------------------------------------

    The Trustee shall sign any amendment or supplement authorized pursuant to
this Article 11 if the amendment or supplement does not adversely affect the
rights, duties, liabilities or immunities of the Trustee. If it does, the
Trustee may but need not sign it. In signing or refusing to sign such amendment
or supplement, the Trustee shall be entitled to receive and, subject to Section
9.1, shall be fully protected in relying upon, an Opinion of Counsel stating
that such amendment or supplement is authorized or permitted by this Indenture.
The Company may not sign an amendment or supplement until the Board of Directors
approves it.

    After an amendment, supplement or waiver under this Article II becomes
effective, the Company shall mail to the Holders affected thereby a notice
briefly describing the amendment, supplement or waiver. Any failure of the
Company to mail such notice, or any defect therein, shall not, however, in any
way impair or affect the validity of any such amendment, supplement or waiver.

                               ARTICLE 12.

                              MISCELLANEOUS

SECTION 12.1.   Trust Indenture Act Controls.
               -----------------------------

    If any provision of this Indenture limits, qualifies or conflicts with the
duties imposed by any of Sections 310 to 317, inclusive, of the TIA through
operation of Section 318(c) thereof, upon qualification of this Indenture
thereunder such imposed duties shall control.

SECTION 12.2.   Notices.
               -------

    Any notice or communication shall be given in writing and delivered by
facsimile (with original to follow), in person, by overnight delivery or mailed
by first class mail, postage prepaid, addressed as follows:

                                    63

```
                 If to the Company:

                 Terayon Communication Systems, Inc.
                 2952 Bunker Hill Lane
                 Santa Clara, California 95054

                 Telecopier: (408) 727-6205

                 Attention: General Counsel

                 with a copy to:

                 Cooley Godward LLP
                 One Maritime Plaza, 20/th/ Floor
                 San Francisco, CA 94111

                 Telecopier: (415) 951-3699

                 Attention: Karyn S. Tucker

                 If to the Trustee:

                 State Street Bank and Trust Company of California, N.A.
                 633 West 5/th/ Street, 12/th/ Floor
                 Los Angeles, CA 90071

                 Telecopier: (213) 362-7357

                 Attention: Corporate Trust Administration
```

Such notices or communications shall be effective when received.

The Company or the Trustee by notice to the other may designate additional or different addresses for subsequent notice or communications.

Any notice or communication mailed to a Securityholder shall be mailed by first class mail to him at his address shown on the register kept by the Registrar.

Failure to mail a notice or communication to a Securityholder or any defect in it shall not affect its sufficiency with respect to other Securityholders. If a notice or communication to a Securityholder is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 12.3.   Communications by Holders with Other Holders.
                --------------------------------------------

Securityholders may communicate pursuant to TIA 312(b) with other Securityholders with respect to their rights under this Indenture or the Securities. The Company, the Trustee, the Registrar and any other person shall have the protection of TIA 312(c).

SECTION 12.4.   Certificate and Opinion as to Conditions Precedent.
             ---------------------------------------------------

     (a)  Upon any request or application by the Company to the Trustee to take
any action under this Indenture, the Company shall furnish to the Trustee at the
request of the Trustee:

     (1)  an Officers' Certificate stating that, in the opinion of the signers,
all conditions precedent (including any covenants compliance with which
constitutes a condition precedent), if any, provided for in this Indenture
relating to the proposed action have been complied with; and

     (2)  an Opinion of Counsel stating that, in the opinion of such counsel,
all such conditions precedent (including any covenants compliance with which
constitutes a condition precedent) have been complied with.

     (b)  Each Officers' Certificate and Opinion of Counsel with respect to
compliance with a condition or covenant provided for in this Indenture (other
than annual certificates provided pursuant to Section 6.4) shall include:

     (1)  a statement that the person making such certificate or opinion has
read such covenant or condition;

     (2)  a brief statement as to the nature and scope of the examination or
investigation upon which the statements or opinions contained in such
certificate or opinion are based;

     (3)  a statement that, in the opinion of such person, he has made such
examination or investigation as is necessary to enable him to express an
informed opinion as to whether or not such covenant or condition has been
complied with; and

     (4)  a statement as to whether or not, in the opinion of such person, such
condition or covenant has been complied with; provided, however, that with
respect to matters of fact an Opinion of Counsel may rely on Officers'
Certificates or certificates of public officials.

SECTION 12.5.  Record Date for Vote or Consent of Securityholders.
             ---------------------------------------------------

     The Company (or, in the event deposits have been made pursuant to Section
6.3 or 10.1, the Trustee) may set a record date for purposes of determining the
identity of Securityholders entitled to vote or consent to any action by vote or
consent authorized or permitted under this Indenture, which record date shall be
the later of 10 days prior to the first solicitation of such vote or consent or
the date of the most recent list of Securityholders furnished to the Trustee
pursuant to Section 2.5 prior to such solicitation. If a record date is fixed,
those persons who were Holders of Securities at such record date (or their duly
designated proxies), and only those persons, shall be entitled to take such
action by vote or consent or to revoke any vote or consent previously given,
whether or not such persons continue to be Holders after such record date.

SECTION 12.6.   Rules by Trustee, Paying Agent, Registrar.
             ------------------------------------------

     The Trustee may make reasonable rules for action by or at a meeting of
Holders. The Registrar or the Paying Agent may make reasonable rules for its
functions.

SECTION 12.7.  Legal Holidays.
            --------------

    A "Legal Holiday" is a Saturday, or a Sunday or a day on which state or
federally chartered banking institutions in New York (or, if the Trustee is not
located in New York, the state where the Trust Office of the Trustee is located)
are not required to be open. If a payment date is a Legal Holiday at a place of
payment, payment may be made at that place on the next succeeding day that is
not a Legal Holiday, and no interest shall accrue for the intervening period.

SECTION 12.8.  Governing Law.
            -------------

    The laws of the State of New York shall govern this Indenture and the
Securities without regard to principles of conflicts of law.

SECTION 12.9.  No Adverse Interpretation of Other Agreements.
            ----------------------------------------------

    This Indenture may not be used to interpret another indenture, loan or debt
agreement of the Company or a Subsidiary. Any such indenture, loan or debt
agreement may not be used to interpret this Indenture.

SECTION 12.10. No Recourse Against Others.
            --------------------------

    All liability described in paragraph 17 of the Securities of any director,
officer, employee or stockholder, as such, of the Company is waived and
released.

SECTION 12.11. Successors.
            ----------

    All agreements of the Company in this Indenture and the Securities shall
bind its successor. All agreements of the Trustee in this Indenture shall bind
its successor.

SECTION 12.12. Multiple Counterparts.
            ---------------------

    The parties may sign multiple counterparts of this Indenture. Each signed
counterpart shall be deemed an original, but all of them together represent the
same agreement.

SECTION 12.13. Separability.
            ------------

    In case any provision in this Indenture or in the Securities shall be
invalid, illegal or unenforceable, the validity, legality and enforceability of
the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 12.14. Table of Contents, Headings, Etc.
            --------------------------------

    The table of contents, cross-reference sheet and headings of the Articles
and Sections of this Indenture have been inserted for convenience of reference
only, are not to be considered a part hereof, and shall in no way modify or
restrict any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands as of the 26th day of July, 2000.

TERAYON COMMUNICATION SYSTEMS, INC.

By: /s/ Zaki Rakib
    -----------------------------------
    Name: Zaki Rakib
    Title: Chief Executive Officer and
    Secretary

STATE STREET BANK AND TRUST COMPANY OF CALIFORNIA, N.A.
    as Trustee

By: /s/ Scott Emmons
    -----------------------------------
    Name: Scott Emmons
    Title: Vice President

S-1

EXHIBIT A
---------

FORM OF SECURITY

GLOBAL NOTE LEGEND:

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE
DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO TERAYON
COMMUNICATION SYSTEMS, INC. (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF
TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE
NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED
REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER
ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER,
PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS
WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST
HEREIN.
TRANSFERS OF THIS GLOBAL NOTE SHALL BE LIMITED TO TRANSFER IN WHOLE, BUT NOT IN
PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE
AND TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE
INDENTURE REFERRED TO ON THE REVERSE HEREOF.

A-1

RESTRICTED SECURITIES LEGEND:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, AGREES FOR THE BENEFIT OF THE COMPANY THAT THIS SECURITY MAY NOT BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED (X) PRIOR TO THE EXPIRATION OF THE HOLDING PERIOD UNDER RULE 144(k) (OR ANY SUCCESSOR THERETO) UNDER THE SECURITIES ACT WHICH IS APPLICABLE TO THIS SECURITY OR (Y) BY ANY HOLDER THAT WAS AN "AFFILIATE" (WITHIN THE MEANING OF RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY AT ANY TIME DURING THE THREE MONTHS PRECEDING THE DATE OF SUCH TRANSFER, IN EITHER CASE, OTHER THAN (1) TO THE COMPANY, (2) SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A, PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (3) IN AN OFFSHORE TRANSACTION (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 (IF APPLICABLE) UNDER THE SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE HOLDER HEREOF, BY PURCHASING THIS SECURITY, REPRESENTS AND AGREES FOR THE BENEFIT OF THE COMPANY THAT IT IS (1) A QUALIFIED INSTITUTIONAL BUYER OR (2) NOT A U.S. PERSON AND IS OUTSIDE THE UNITED STATES WITHIN THE MEANING OF (OR AN ACCOUNT SATISFYING THE REQUIREMENTS OF PARAGRAPH (k)(2) OF RULE 902 UNDER) REGULATION S UNDER THE SECURITIES ACT. IN ANY CASE THE HOLDER HEREOF WILL NOT, DIRECTLY OR INDIRECTLY, ENGAGE IN ANY HEDGING TRANSACTION WITH REGARD TO THIS SECURITY OR ANY COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SECURITY EXCEPT AS PERMITTED BY THE SECURITIES ACT.

A-2

[FORM OF FACE OF SECURITY]

TERAYON COMMUNICATION SYSTEMS, INC.

Number _____                                CUSIP No.  880775AA9
                                                         ---------

5% Convertible Subordinated Note Due 2007

    Terayon Communication Systems, Inc., a Delaware corporation (the
"Company"), promises to pay to Cede & Co. or registered assigns, the principal
sum of _____ Dollars ($_____) on August 1, 2007 and to pay interest
on the principal amount of this Note beginning the most recent date to which
interest has been paid or, if no interest has been paid, beginning July 26, 2000
at the rate of 5% per annum.

Interest Payment Dates:      February 1 and August 1
Record Dates:                January 15 and July 15

    This Note is convertible at such times and as specified on the other side
of this Note. Additional provisions of this Note are set forth on the other side
of this Note.

A-3

IN WITNESS WHEREOF, the Company has caused this 5% Convertible Subordinated Note due 2007 to be signed by its duly authorized officers.

Dated:_____                TERAYON COMMUNICATION SYSTEMS, INC.

                                     By: _____
                                         Name: Zaki Rakib
                                         Title: Chief Executive Officer


                                     By: _____
                                         Name: Ray Fritz
                                         Title: Chief Financial Officer

Trustee's Certificate of
Authentication:

Dated:_____

This is one of the Securities
referred to in the within mentioned
Indenture.

STATE STREET BANK AND TRUST
 COMPANY OF CALIFORNIA, N.A., as Trustee


By: _____
        Authorized Signatory

A-4

FORM OF REVERSE SIDE OF SECURITY

Terayon Communication Systems, Inc.

5% Convertible Subordinated Note Due 2007

1.    Interest.
      --------

    Terayon Communication Systems, Inc., a Delaware corporation (the "Company"), promises to pay interest on the principal amount of this Note at the rate per annum shown above. The Company shall pay interest semi-annually on February 1 and August 1 of each year, commencing February 1, 2001. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from July 26, 2000. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

    The Holder of this Note is entitled to the benefits of the Registration Rights Agreement, dated July 26, 2000, among the Company, Deutsche Bank Securities Inc. and Lehman Brothers, Inc.

2.    Method of Payment.
      -----------------

    The Company will pay interest on this Note (except defaulted interest) to the person who is the registered Holder of this Note at the close of business on the January 15 and July 15 next preceding the interest payment date. The Holder must surrender this Note to the Paying Agent to collect payment of principal. The Company will pay principal and interest in money of the United States that at the time of payment is legal tender for payment of public and private debts. The Company, however, may pay principal and interest by its check payable in such money. It may mail an interest check to the Holder's registered address.

3.    Paying Agent, Registrar and Conversion Agent.
      --------------------------------------------

    Initially, State Street Bank and Trust Company of California, N.A. (the "Trustee") will act as Paying Agent, Registrar and Conversion Agent. The Company may change any Paying Agent, Registrar or Conversion Agent without notice to the holder. The Company or any of its Subsidiaries may act as Paying Agent, Registrar or Conversion Agent.

4.    Indenture; Limitations.
      ----------------------

    This Note is one of a duly authorized issue of Notes of the Company designated as its 5% Convertible Subordinated Notes Due 2007 (the "Notes"), issued under an Indenture dated as of July 26, 2000 (the "Indenture"), between the Company and the Trustee. The terms of this Note include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. (S)(S) 77aaa-77bbbb), as amended by the Trust Indenture Reform Act of 1990, as in effect on the date hereof or, from and after the date that the Indenture shall be qualified thereunder, as in effect on such date. This Note is subject to all such terms, and the holder of this Note is referred to the Indenture and said Act for a statement of them.

A-5

The Notes are subordinated unsecured obligations of the Company limited to up to $500,000,000 aggregate principal amount plus an additional principal amount not exceeding $75,000,000 in the aggregate as may be issued upon the exercise by the Initial Purchasers, in whole or in part, of the Purchase Option.

5.    Provisional and Optional Redemption.
      ------------------------------------

The Notes may be redeemed at the Company's option, in whole or in part, at any time and from time to time on or after 90 days following the last day of original issuance and prior to August 7, 2003 (a "Provisional Redemption"), at a redemption price of $1,000 per $1,000 principal amount of Notes, plus accrued and unpaid interest, if any, to the date of redemption (the "Provisional Redemption Date") if (i) the trading price of the Company's Common Stock for 20 Trading Days (as defined in the Indenture) in a period of 30 consecutive Trading Days ending on the Trading Day prior to the date of mailing of the provisional notice of redemption exceeds 150% of the Conversion Price (as defined below) of the Notes and (ii) a shelf registration statement covering resales of the Notes and the Common Stock issuable upon conversion of the Notes is effective and available for use and is expected to remain effective for the 30 days following the provisional redemption date, unless registration is no longer required.

Upon any such Provisional Redemption, the Company shall make an additional payment in cash (the "Make Whole Payment") to holders of the Notes called for redemption, including those Notes converted into Common Stock between the date of mailing of the provisional notice of redemption and the Provisional Redemption Date, in an amount equal to $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption.

The Notes may be redeemed at the Company's option, in whole or in part, at any time and from time to time on and after August 7, 2003. The redemption price for the Notes, expressed as a percentage of the principal amount, is 102.857% if the Notes are redeemed in the period beginning August 7, 2003 and ending July 31, 2004, and is as follows for the 12-month periods beginning August 1 as follows:

| Year | Percentage |
| --- | --- |
| 2004 ............................... | 102.143 % |
| 2005 ............................... | 101.429 % |
| 2006 ............................... | 100.714 % |

and 100% of the principal amount on and after August 1, 2007, together in the case of any such redemption with accrued and unpaid interest to the date of redemption, but any interest payment that is due and payable on or prior to such date of redemption will be payable to the Holders of such Notes, or one or more predecessor Notes, of record at the close of business on the relevant record dates referred to on the face hereof, all as provided in the Indenture.

A-6

6.    Notice of Redemption.
      --------------------

      Notice of redemption will be mailed by first class mail at least 30 days
prior to the redemption date in the case of a Provisional Redemption, and at
least 20 days but not more than 60 days before the redemption date in the case
of an Optional Redemption, to each Holder of Notes to be redeemed at his
registered address. Notes in denominations larger than $1,000 may be redeemed in
part, but only in whole multiples of $1,000. On and after the redemption date,
subject to the deposit with the Paying Agent of funds sufficient to pay the
redemption price, interest ceases to accrue on Notes or portions of them called
for redemption.

7.    Repurchase of Notes at Option of Holder upon a Change in Control.
      ----------------------------------------------------------------

      If at any time that Notes remain outstanding there shall have occurred a
Change in Control (as defined in the Indenture), at the option of the Holder and
subject to the terms and conditions of the Indenture, the Company shall become
obligated to repurchase all or any part specified by the Holder (so long as the
principal amount of such part is $1,000 or an integral multiple thereof) of the
Notes held by such Holder on the Repurchase Date. The Holder shall have the
right to withdraw any Repurchase Notice by delivering a written notice of
withdrawal to the Paying Agent in accordance with the terms of the Indenture.
The Repurchase Price is payable in cash.

8.    Conversion.
      ----------

      At any time after 90 days following the latest date of original issuance of
the Notes and prior to the close of business on the business day immediately
preceding August 1, 2007, a Holder of a Note may convert such Note into shares
of Common Stock of the Company; provided, however, that if the Note is called
for redemption, the conversion right will terminate at the close of business on
the Business Day before the redemption date of such Note (unless the Company
shall default in making the redemption payment when due, in which case the
conversion right shall terminate at the close of business on the date such
default is cured and such Note is redeemed). The initial conversion price is
$84.01 per share, subject to adjustment under certain circumstances as described
in the Indenture (the "Conversion Price"). The number of shares issuable upon
conversion of a Note is determined by dividing the principal amount converted by
the Conversion Price in effect on the conversion date. Upon conversion, no
adjustment for interest or dividends will be made. No fractional shares will be
issued upon conversion; in lieu thereof, an amount will be paid in cash based
upon the current market price (as defined in the Indenture) of the Common Stock
on the last trading day prior to the date of conversion.

      To convert a Note, a Holder must (a) complete and sign the conversion
notice set forth below and deliver such notice to the Conversion Agent, (b)
surrender the Note to the Conversion Agent, (c) furnish appropriate endorsements
and transfer documents if required by the Registrar or the Conversion Agent, (d)
pay any transfer or similar tax, if required and (e) if the Note is held in
book-entry form, complete and deliver to the Depositary appropriate instructions
pursuant to the Depositary's book-entry conversion programs. If a Holder
surrenders a Note for conversion between the record date for the payment of an
installment of interest and the next interest payment date, the Note must be
accompanied by payment of an amount equal to the interest payable on such
interest payment date on the principal amount of the Note or portion thereof
then converted; provided,

                                    A-7

however, that no such payment shall be required if such Note has been called for redemption on a redemption date within the period between and including such record date and such interest payment date, or if such Note is surrendered for conversion on the interest payment date. A Holder may convert a portion of a Note equal to $1,000 or any integral multiple thereof.

A Note in respect of which a Holder had delivered a Repurchase Notice exercising the option of such Holder to require the Company to repurchase such Note may be converted only if the notice of exercise is withdrawn as provided above and in accordance with the terms of the Indenture.

9.    Subordination.
      -------------

The indebtedness evidenced by the Notes is, to the extent and in the manner provided in the Indenture, subordinate and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company, as defined in the Indenture. Any Holder by accepting this Note agrees to and shall be bound by such subordination provisions and authorizes the Trustee to give them effect.

In addition to all other rights of Senior Indebtedness described in the Indenture, the Senior Indebtedness shall continue to be Senior Indebtedness and entitled to the benefits of the subordination provisions irrespective of any amendment, modification or waiver of any terms of any instrument relating to the Senior Indebtedness or any extension or renewal of the Senior Indebtedness.

10.   Denominations, Transfer, Exchange.
      ---------------------------------

The Notes are in registered form without coupons in denominations of $1,000 and integral multiples thereof. A Holder may register the transfer of or exchange Notes in accordance with the Indenture. The Registrar may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and to pay any taxes or other governmental charges that may be imposed by law or permitted by the Indenture.

Global Note Insert:

The aggregate principal amount of the Note in global form represented hereby may from time to time be reduced to reflect conversions or redemptions of a part of this Note in global form or cancellations of a part of this Note in global form, in each case, and in any such case, by means of notations on the Global Note Transfer Schedule on the last page hereof. Notwithstanding any provision of this Note to the contrary, conversions or redemptions of a part of this Note in global form and cancellations of a part of this Note in global form, may be effected without the surrendering of this Note in global form, provided that appropriate notations on the Schedule of Exchanges, Conversions, Redemptions, Cancellations and Transfers are made by the Trustee, or the Custodian at the direction of the Trustee, to reflect the appropriate reduction or increase, as the case may be, in the aggregate principal amount of this Note in a global form resulting therefrom or as a consequence thereof.

A-8

11.  Persons Deemed Owners.
     ---------------------

     The registered holder of a Note may be treated as the owner of it for all
purposes.

12.  Unclaimed Money.
     ---------------

     If money for the payment of principal, premium, if any, or interest remains
unclaimed for two years, the Trustee or Paying Agent will pay, subject to
applicable escheatment laws, the money back to the Company at its request. After
that, Holders entitled to money must look to the Company for payment unless an
abandoned property law designates another person.

13.  Amendment, Supplement, Waiver.
     -----------------------------

     Subject to certain exceptions, the Indenture or the Notes may be amended or
supplemented with the consent of the Holders of a majority in aggregate
principal amount of the Notes then outstanding and any past default or
compliance with any provision may be waived in a particular instance with the
consent of the Holders of a majority in aggregate principal amount of the Notes
then outstanding. Without the consent of or notice to any Holder, the Company
and the Trustee may amend or supplement the Indenture or the Notes to, among
other things, cure any ambiguity, omission, defect or inconsistency or make any
other change that does not adversely affect the rights of any Holder.

14.  Successor Corporation.
     ---------------------

     When a successor corporation assumes all the obligations of its predecessor
under the Notes and the Indenture, the predecessor corporation will be released
from those obligations.

15.  Defaults and Remedies.
     ---------------------

     An Event of Default is: default for 30 days in payment of interest on the
Notes; default in payment of principal on the Notes when due; failure by the
Company for 60 days after appropriate notice to it to comply with any of its
other agreements contained in the Indenture or the Notes; default by the Company
or any Subsidiary with respect to its obligation to pay principal of or interest
on indebtedness for borrowed money aggregating more than $20.0 million or the
acceleration of such indebtedness if not withdrawn within 15 days from the date
of such acceleration; and certain events of bankruptcy, insolvency or
reorganization of the Company or any of its Significant Subsidiaries. If an
Event of Default (other than as a result of certain events of bankruptcy,
insolvency or reorganization) occurs and is continuing, the Trustee or the
Holders of at least 25% in principal amount of the Notes then outstanding may
declare all unpaid principal of and accrued interest to the date of acceleration
on the Notes then outstanding to be due and payable immediately, all as and to
the extent provided in the Indenture. If an Event of Default occurs as a result
of certain events of bankruptcy, insolvency or reorganization, all unpaid
principal of and accrued interest on the Notes then outstanding shall become due
and payable immediately without any declaration or other act on the part of the
Trustee or any Holder, all as and to the extent provided in the Indenture.
Holders may not enforce the Indenture or the Notes except as provided in the
Indenture. The Trustee may require indemnity satisfactory to it before it
enforces the Indenture or the Notes. Subject to certain limitations, Holders of
a majority in principal amount of the Notes then outstanding may

A-9

direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders notice of any continuing default (except a default in payment of principal or interest) if it determines that withholding notice is in their interests. The Company is required to file periodic reports with the Trustee as to the absence of default.

16.  Trustee Dealings with the Company.
     ---------------------------------

     State Street Bank and Trust Company of California, N.A., the Trustee under the Indenture, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or an Affiliate of the Company, and may otherwise deal with the Company or an Affiliate of the Company, as if it were not the Trustee.

17.  No Recourse Against Others.
     --------------------------

     A director, officer, employee or stockholder, as such, of the Company shall not have any liability for any obligations of the Company under the Notes or the Indenture or for any claim based on, in respect or by reason of, such obligations or their creation. The Holder of this Note by accepting this Note waives and releases all such liability. The waiver and release are part of the consideration for the issue of this Note.

18.  Discharge Prior to Maturity.
     ---------------------------

     If the Company deposits with the Trustee or the Paying Agent money or U.S. Government Obligations sufficient to pay the principal of and interest on the Notes to maturity as provided in the Indenture, the Company will be discharged from the Indenture except for certain Sections thereof.

19.  Authentication.
     --------------

     This Note shall not be valid until the Trustee or an authenticating agent signs the certificate of authentication on the other side of this Note.

20.  Abbreviations and Definitions.
     ----------------------------

     Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian) and U/G/M/A (= Uniform Gifts to Minors Act).

     All capitalized terms used in this Note and not specifically defined herein are defined in the Indenture and are used herein as so defined.

21.  Indenture to Control.
     --------------------

     In the case of any conflict between the provisions of this Note and the Indenture, the provisions of the Indenture shall control.

The Company will furnish to any Holder, upon written request and without charge, a copy of the Indenture. Requests may be made to: Terayon Communication Systems, Inc., 2952 Bunker Hill Lane, Santa Clara, California 95054, Attention: General Counsel.

A-11

TRANSFER NOTICE

This Transfer Notice relates to $_____ principal amount of the 5 % Convertible Subordinated Notes Due 2007 of Terayon Communication Systems, Inc., a Delaware corporation, held by _____ (the "Transferor").

          (I) or (we) assign and transfer this Convertible Note to

_____
          (Print or type assignee's name, address and zip code)

_____

_____
          (Insert assignee's social security or tax I.D. no.)

and irrevocably appoint _____ agent to transfer this Note on the books of the Company.  The agent may substitute another to act for him.
Your Signature:_____
          (Sign exactly as your name appears on the other side of this Convertible Note)
  Date:_____

  Signature Guarantee/1/_____


In connection with any transfer of any of the Notes evidenced by this certificate occurring prior to the date that is three years after the later of the date of original issuance of such Notes and the last date, if any, on which such Notes were owned by the Company or any Affiliate of the Company, the undersigned confirms that such Notes are being transferred:

 CHECK ONE BOX BELOW

     (1)  [_]     to Terayon Communication Systems, Inc.; or

     (2)  [_]     pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended; or

     (3)  [_]     pursuant to and in compliance with Regulation S under the Securities Act of 1933, as amended; or

     (4)  [_]     pursuant to another available exemption from the registration requirements of the Securities Act of 1933; or

_____

 /1/ Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

A-12

(5) [_] pursuant to an effective registration statement under the Securities Act of 1933.

        Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered holder thereof; provided, however, that if box (2), (3) or (4) is checked, the Trustee may require, prior to registering any such transfer of the Notes such legal opinions, certifications and other information as the Company has reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act of 1933, such as the exemption provided by Rule 144 under such Act.

        Unless the box below is checked, the undersigned confirms that such Note is not being transferred to an "affiliate" of the Company as defined in Rule 144 under the Securities Act of 1933, as amended (an "Affiliate"):

(6) [_] The transferee is an Affiliate of the Company.

_____
Signature

_____
Date

_____
Signature Guarantee /1/


        TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED.

_____

    /1/ Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

A-13

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Company as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated:_____    _____
                                     [Signature of executive officeer of purchaser]

                                     Name:_____

                                     Title:_____

A-14

CONVERSION NOTICE

To Terayon Communication Systems, Inc.:

     The undersigned owner of this Note hereby irrevocably exercises the option to convert this Note, or the portion below designated, into Common Stock of Terayon Communication Systems, Inc. in accordance with the terms of the Indenture referred to in this Note, and directs that the shares issuable and deliverable upon conversion, together with any check in payment for fractional shares, be issued in the name of and delivered to the undersigned, unless a different name has been indicated in the assignment below. If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto.

     Any holder of Notes, upon exercise of its conversion rights in accordance with the terms of the Indenture and the Security, agrees to be bound by the terms of the Registration Rights Agreement relating to the Common Stock issuable upon conversion of the Notes.

[_] Convert whole        [_]    Convert in part
                                  Amount of Note to be converted
                                  ($1,000 or integral multiples
                                  thereof):

                                  $_____

                                _____

                                Signature (sign exactly as name appears
                                on the other side of this Note)

                                _____

                                  Signature Guarantee:/1/

_____

     /1/ Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

A-15

If you want the stock certificate made out in another person's name, complete the following for such person:

_____
Name

_____
Social Security or Taxpayer Identification Number

_____
Street Address

_____
City, State and Zip Code

A-16

OPTION OF HOLDER TO ELECT REPURCHASE

    If you want to elect to have this Note repurchased by the Company pursuant to Section 3.9 of the Indenture, check the box:

[_]

    If you want to elect to have only part of this Note repurchased by the Company pursuant to Section 3.9 of the Indenture, state the principal amount (which shall be $1,000 or a multiple thereof) to be repurchased:
$_____

Dated:_____     _____

                                             Signature (sign exactly as name appears on the other side of this Note)

_____
Signature Guarantee:/1/

_____
/1/   Signature must be guaranteed by a commercial bank, trust company or member firm of the New York Stock Exchange.

A-17

Schedule A to Exhibit A

Global Note Transfer Schedule

Changes to Principal Amount of Global Security

| Date | Principal Amount of Securities by which this Global Security Is to Be Reduced and Reason for Reduction | Remaining Principal Amount of this Global Security (following decrease) | Authorized Signature of officer of Trustee or Note Custodian |
|------|------|------|------|
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |
|      |      |      |      |

Schedule to be maintained by Depositary in cooperation with Trustee.

18

Exhibit 4.3

TERAYON COMMUNICATION SYSTEMS, INC.

5% CONVERTIBLE SUBORDINATED NOTES DUE 2007

_____

PURCHASE AGREEMENT
_____

July 20, 2000

Deutsche Bank Securities Inc.

Lehman Brothers, Inc.
c/o Deutsche Bank Securities Inc.
    1 South Street
    Baltimore, MD  21202

Ladies and Gentlemen:

        Terayon Communication Systems, Inc., a Delaware corporation (the
"Company"), proposes, subject to the terms and conditions stated herein, to
issue and sell to the several initial purchasers named in Schedule I hereto (the
"Initial Purchasers") $500,000,000 aggregate principal amount of its 5%
convertible subordinated notes due 2007 (the "Firm Securities") and, at the
election of the Initial Purchasers, up to an additional $75,000,000 aggregate
principal 5% convertible subordinated notes due 2007 (the "Optional
Securities").  The Firm Securities and the Optional Securities are herein
collectively referred to as the "Securities," and are issuable pursuant to the
provisions of an Indenture to be dated as of July 26, 2000 (the "Indenture")
between the Company and State Street Bank and Trust Company of California, N.A.,
as trustee (the "Trustee").  The Securities will be convertible into shares (the
"Underlying Securities") of common stock of the Company, par value $.001 per
share (the "Common Stock").

        The sale of the Securities to the Initial Purchasers will be made
without registration of the Securities under the Securities Act of 1933, as
amended (the "Act"), in reliance upon exemptions therefrom.

        It is understood and acknowledged that upon original issuance thereof,
and until such time as the same is no longer required under the applicable
requirements of the Act, each of the Securities (and each security issued in
exchange therefor or in substitution thereof) shall have the following legend:

        THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES
        ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND,
        ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT AS SET

FORTH BELOW. BY ITS ACQUISITION HEREOF, THE HOLDER (1)
REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER"
(AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (B) IT
IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN
OFFSHORE TRANSACTION, (2) AGREES THAT IT WILL NOT WITHIN TWO
YEARS AFTER THE ORIGINAL ISSUANCE OF THIS SECURITY RESELL OR
OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR
ANY SUBSIDIARY THEREOF, (B) INSIDE THE UNITED STATES TO A
QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A
UNDER THE SECURITIES ACT, (C) INSIDE THE UNITED STATES TO AN
ACCREDITED INVESTOR THAT, PRIOR TO SUCH TRANSFER, FURNISHES
TO THE TRUSTEE A SIGNED LETTER CONTAINING CERTAIN
REPRESENTATIONS AND AGREEMENTS (THE FORM OF WHICH LETTER CAN
BE OBTAINED FROM THE TRUSTEE), (D) OUTSIDE THE UNITED STATES
TO PERSONS OTHER THAN U.S. PERSONS IN OFFSHORE TRANSACTIONS
MEETING THE REQUIREMENTS OF RULE 904 UNDER REGULATION S
UNDER THE SECURITIES ACT, (E) PURSUANT TO THE EXEMPTION FROM
REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT
(IF AVAILABLE) OR (F) PURSUANT TO AN EFFECTIVE REGISTRATION
STATEMENT UNDER THE SECURITIES ACT AND (3) AGREES THAT IT
WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS
TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS
LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION,"
"UNITED STATES" AND "U.S. PERSON" HAVE THE RESPECTIVE
MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES
ACT.

In connection with the sale of the Securities, the Company has
prepared a preliminary offering memorandum dated July 7, 2000 (including the
documents incorporated by reference therein, the "Preliminary Memorandum") and a
final offering memorandum dated the date hereof (including the documents
incorporated by reference therein, the "Final Memorandum" and, with the
Preliminary Memorandum, collectively, the "Memorandum"), for the information of
the Initial Purchasers and for delivery to prospective purchasers of the
Securities.

The purchasers of the Securities and the Underlying Securities and
their direct and indirect transferees will be entitled to the benefits of a
registration rights agreement, to be dated as of the Closing Date (as defined
below) and to be substantially in the form attached hereto as Exhibit A (the
                                                                    ---------
"Registration Rights Agreement").  This Agreement, the Securities, the Indenture
and the Registration Rights Agreement are referred to herein as the "Operative
Agreements."

The Company hereby agrees with the Initial Purchasers as follows:

-2-

1.   The Company agrees to issue and sell the Firm Securities to the several Initial Purchasers as hereinafter provided, and each Initial Purchaser, upon the basis of the representations and warranties herein contained, but subject to the conditions hereinafter stated, agrees to purchase, severally and not jointly, from the Company the respective principal amount of Firm Securities set forth opposite such Initial Purchaser's name in Schedule I hereto at a price (the "Purchase Price") equal to 97.0% of their principal amount.  Deutsche Bank Securities Inc. shall be the sole bookrunning manager for the offering and sale of the Securities.

2.   The Company agrees that, without the prior written consent of Deutsche Bank Securities Inc., it will not, during the period ending ninety (90) days after the date of the Final Memorandum, (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock or (ii) enter into any swap or other agreement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise.  Notwithstanding the foregoing, the Company may without such consent (A) issue and sell the Securities to be sold hereunder and issue the Underlying Securities upon conversion of the Securities, (B) grant options or issue and sell stock upon the exercise of outstanding stock options or otherwise pursuant to the Company's stock option or employee stock purchase plans, (C) issue Common Stock upon the exercise of warrants outstanding on the date hereof, or (D) beginning on the date that is 46 days after the date of the Final Memorandum, issue Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock as consideration for pending or future acquisitions or strategic partner transactions.

3.   The Company understands that the Initial Purchasers intend to offer the Securities as soon after this Agreement has become effective as in the judgment of the Initial Purchasers is advisable, and initially to offer the Securities upon the terms set forth in the Memorandum.

The Company confirms that it has authorized the Initial Purchasers, subject to the restrictions set forth below, to distribute copies of the Memorandum in connection with the offering of the Securities.  Each Initial Purchaser hereby makes to the Company the following representations and agreements:

(i)  it is an institutional "accredited Investor" as defined in Rule 501(a) under the Act;

(ii) (A) it will not solicit offers for, or offer to sell, the Securities by any form of general solicitation or general advertising (as those terms are used in Regulation D under the Act ("Regulation D")) and (B) it will solicit offers for the Securities only from, and will offer the Securities only to, (1) persons whom it reasonably believes to be "qualified institutional buyers" within the meaning of Rule

-3-

144A under the Act or (2) non-U.S. persons (as defined in Regulation S under the Act) in compliance with Regulation S under the Act.

4.    Payment for the Firm Securities shall be made by wire transfer in immediately available funds to the account specified by the Company to the Initial Purchasers (which account shall be specified no later than noon the Business Day (as defined below) prior to the First Closing Date (as defined below)), on July 26, 2000, or on such other date as the Initial Purchasers and the Company may agree upon in writing.  The time and date of such payment are referred to herein as the "First Closing Date."  As used herein, the term "Business Day" means any day other than a day on which banks are permitted or required to be closed in New York City.

Payment for the Firm Securities shall be made against delivery to the nominee of The Depository Trust Company for the respective accounts of the several Initial Purchasers of the Firm Securities of one or more global notes representing the Firm Securities (collectively, the "Firm Global Securities"), with any transfer taxes payable in connection with the transfer to the Initial Purchasers of the Firm Securities duly paid by the Company.  The Firm Global Securities will be made available for inspection by the Initial Purchasers at the office of Deutsche Bank Securities Inc. at the address set forth above not later than 1:00 P.M., New York City time, on the Business Day prior to the First Closing Date.

In addition, the Initial Purchasers may, upon written notice (the "Notice") from Deutsche Bank Securities Inc. given to the Company from time to time, but in any event not more than thirty (30) days subsequent to the date of this Agreement, purchase all or less than all of the Optional Securities at the Purchase Price plus imputed interest from the First Closing Date to the related Optional Closing Date (as defined below) at the rate per annum equal to the interest rate borne by the Securities.  The Company agrees to sell to the Initial Purchasers the number of Optional Securities specified in such Notice and the Initial Purchasers agree, severally and not jointly, to purchase such Optional Securities.  Such Optional Securities shall be purchased, if at all, from the Company for the account of each Initial Purchaser in the same proportion as the amount of Firm Securities set forth opposite such Initial Purchaser's name in Schedule I hereto bears to the total amount of Securities
                    ----------
(subject to adjustment by Deutsche Bank Securities Inc. to eliminate fractions). No Optional Securities shall be sold or delivered unless the Firm Securities previously have been, or simultaneously are, sold and delivered.  Within thirty (30) days subsequent to the date of this Agreement, the right to purchase the Optional Securities or any portion thereof may be exercised from time to time and to the extent not previously exercised may be surrendered and terminated at any time upon notice by Deutsche Bank Securities Inc. to the Company.

Payment for the Optional Securities on an Optional Closing Date shall be made by the Initial Purchasers by wire transfer to the account specified by the Company to the Initial Purchasers (which account shall be specified no later than noon the Business Day prior to the Optional Closing Date).  The Optional Closing Date shall be determined by Deutsche Bank Securities Inc. and the Company, but not more than seven (7) full Business Days after Notice of the election to purchase the Optional Securities is given to the Company.  Each time for the delivery of and payment for the Optional Securities is referred to herein as the

-4-

"Optional Closing Date," which may be the First Closing Date (the First Closing Date and each Optional Closing Date, if any, being referred to, as applicable, as a "Closing Date").

Payment for the Optional Securities shall be made against delivery to the nominee of The Depository Trust Company for the respective accounts of the several Initial Purchasers of the Optional Securities of one or more global notes representing the Optional Securities (collectively, the "Optional Global Securities"), with any transfer taxes payable in connection with the transfer to the Initial Purchasers of the Optional Securities duly paid by the Company.  The Optional Global Securities will be made available for inspection by the Initial Purchasers at the office of Deutsche Bank Securities Inc. at the address set forth above not later than 1:00 P.M., New York City time, on the Business Day prior to the First Closing Date.

5.    The Company represents and warrants to each Initial Purchaser that:

(a)  The Preliminary Memorandum did not, as of its date, and the Final Memorandum will not, in the form used by the Initial Purchasers to confirm sales of the Securities or as of any Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  The Company and its subsidiaries have no material contingent obligations which are not disclosed in the Company's consolidated financial statements included or incorporated by reference in the Memorandum; provided, however, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished to the Company in writing by an Initial Purchaser through Deutsche Bank Securities Inc. expressly for use therein;

(b)  The financial statements, and the related notes thereto, included or incorporated by reference in the Memorandum present fairly the consolidated financial position of the Company and its consolidated subsidiaries as of the dates indicated and the results of their operations and the changes in their consolidated cash flows for the periods specified; said financial statements have been prepared in conformity with generally accepted accounting principles and practices applied on a consistent basis. The pro forma financial information included in the Memorandum presents fairly the information shown therein, has been prepared in accordance with the Commission's rules and guidelines with respect to pro forma financial statements, has been properly compiled on the pro forma bases described therein, and, in the opinion of the Company, the assumptions used in the preparation thereof are reasonable and the adjustments used therein are appropriate to give effect to the transactions or circumstances referred to therein;

(c)  The Company's only "Significant Subsidiaries" (as defined in Rule 1-02(w) of Regulation S-X promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), are Imedia Corporation, Telegate Ltd. and Combox Ltd.;

(d)  Neither the Company nor any of its Significant Subsidiaries has sustained since March 31,2000 any material loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Memorandum; and, since the respective dates as of which information is given in the Memorandum, there has not been any change in the capital stock or long-term debt of the Company, any of its Significant Subsidiaries or any material adverse change, or any development involving a prospective material adverse change, in or affecting the general affairs, management, consolidated financial position, stockholders' equity or results of operations of the Company and its Significant Subsidiaries taken as a whole, otherwise than as set forth or contemplated in the Memorandum;

(e)  The Company and its Significant Subsidiaries have good and indefeasible title to, or a valid leasehold interest in, all of their material assets, except as is described in the Memorandum or where the failure thereof would not have a material adverse effect on the earnings, business, management, properties, assets, rights, prospects, results of operations or condition (financial or otherwise) of the Company and its Significant Subsidiaries, taken as a whole (a "Material Adverse Effect");

(f)  Each of the Company and its Significant Subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation; each of the Company and its Significant Subsidiaries has the corporate power and authority to own its properties and to carry on its business as now being and hereafter proposed to be conducted as described in the Memorandum.  Each of the Company and its Significant Subsidiaries is duly qualified, in good standing and authorized to do business in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization, except where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect;

(g)  The Company has an authorized capitalization as set forth in the Memorandum, and all of the issued shares of capital stock of the Company have been duly and validly authorized and issued and are fully paid and nonassessable and conform to the description of the capital stock of the Company incorporated by reference in the Memorandum.  All of the outstanding shares of capital stock of each of its Significant Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable.  The shares of capital stock of its Significant Subsidiaries held by the Company are owned by the Company free and clear of all liens, encumbrances, equities and claims; and, to the Company's knowledge, no options, warrants or other rights to purchase, agreements or other obligations to issue or other rights to convert any obligations into shares of capital stock or ownership interest in its Significant Subsidiaries are outstanding;

(h)  The Underlying Securities have been duly authorized and duly reserved in sufficient numbers for issuance by the Company upon conversion of the Securities

-6-

and, when issued upon conversion of the Securities in accordance with the terms of the Securities, will be validly issued, fully paid and nonassessable, and the issuance of the Underlying Securities is not and upon issuance will not be subject to any preemptive rights or similar rights;

(i)    As of the First Closing Date, the Indenture will have been duly and validly authorized by the Company and, upon its execution and delivery by the Company, and assuming due authorization, execution and delivery by the Trustee, will be a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, except that the enforcement thereof may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity and the discretion of the court before which any proceeding therefor may be brought; the Indenture conforms in all material respects to the description thereof in the Memorandum;

(j)    As of the First Closing Date, the Securities will have been duly authorized by the Company, and when executed by the Company and authenticated by the Trustee in accordance with the Indenture and delivered to the Initial Purchasers against payment therefor in accordance with the terms hereof, will have been validly issued and delivered, and will constitute valid and binding obligations of the Company, entitled to the benefits of the Indenture and enforceable in accordance with their terms, except as enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and subject to the applicability of general principles of equity; the Securities conform in all material respects to the description thereof in the Memorandum;

(k)    The Company has all the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the Registration Rights Agreement; the execution and delivery of, and the performance by the Company of its obligations under, this Agreement and the Registration Rights Agreement have been duly and validly authorized by the Company and each of this Agreement and, as of the First Closing Date, the Registration Rights Agreement will have been duly executed and delivered by the Company and will constitute the valid and legally binding agreement of the Company, enforceable against the Company in accordance with its terms, except as the enforcement hereof and thereof may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally and subject to the applicability of general principles of equity, and except as rights to indemnity and contribution hereunder and thereunder may be limited by federal or state securities laws or principles of public policy; the Registration Rights Agreement conforms in all material respects to the description thereof in the Memorandum;

(l)    Neither the offering and sale of the Securities nor the use of the proceeds therefrom will violate or result in a violation of Section 7 of the Exchange Act, or any regulation promulgated thereunder, including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System;

-7-

(m)  The Company and its Significant Subsidiaries are in compliance in all material respects with all of the provisions of their respective certificates of incorporation or articles of incorporation, as applicable, and by-laws, and no event has occurred or failed to occur, which has not been remedied or waived, the occurrence or non-occurrence of which constitutes, or which with the passage of time or giving of notice or both would constitute, a violation or default by the Company or any of its Significant Subsidiaries under its certificate of incorporation or articles of incorporation, as applicable, or by-laws or any indenture, mortgage, deed of trust, loan agreement or other material agreement or instrument, or any judgment, decree or order to which the Company or any of its Significant Subsidiaries is a party or by which they or any of their respective properties is bound which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; the issue and sale by the Company of the Securities and the issuance of the Underlying Securities upon conversion of the Securities and the execution, delivery and performance by the Company of all its obligations under the Operative Agreements and the consummation of the transactions therein contemplated will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other material agreement or instrument to which the Company or any of its Significant Subsidiaries is a party or by which the Company or any of its Significant Subsidiaries is bound or to which any of the property or assets of the Company or any of its Significant Subsidiaries is subject, except for any such conflicts, breaches or violations that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, nor will any such action result in any violation of the provisions of the certificate of incorporation or articles of incorporation, as applicable, or by-laws of the Company or any of its subsidiaries or any applicable law or statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its subsidiaries or any of their respective properties, except for any such violations that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; and no consent, approval, authorization, order, license, registration or qualification of or with any such court or governmental agency or body is required for the issue and sale of the Securities or the consummation by the Company of the transactions contemplated by this Agreement, the Registration Rights Agreement or the Indenture, except such consents, approvals, authorizations, orders, licenses, registrations or qualifications as may be required (i) under state securities or Blue Sky Laws in connection with the purchase and distribution of the Securities by the Initial Purchasers, (ii) under the Act with respect to the registration of the Securities and the Underlying Securities pursuant to the terms of the Registration Rights Agreement or (iii) except where the failure to obtain any such consents, approvals, authorizations, orders, licenses, registrations or qualifications would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except for the Securities, none of the offerings by the Company of its securities before or during the Offering is part of the Offering or part of a single plan of financing together with the Offering;

(n)  The statements set forth in the Memorandum (i) under the caption "Description of Notes," insofar as they purport to constitute a summary of the terms of

the Securities, (ii) relating to the description of the common stock of the Company (as incorporated by reference in the Memorandum), (iii) under the caption "Certain United States Federal Income Tax Considerations," and (iv) under the caption "Plan of Distribution," insofar as they purport to describe the provisions of the laws and documents referred to therein, are accurate, complete and fair;

(o)  Other than as set forth in the Memorandum, there is no action, suit, proceeding or any other litigation pending or, to the best of the Company's knowledge, threatened against the Company or any of its Significant Subsidiaries, or in any other manner relating directly and materially adverse to the Company or any of its Significant Subsidiaries or any of their material properties, in any court or before any arbitrator of any kind or before or by any governmental body which would reasonably be expected to have a Material Adverse Effect or prevent the consummation of the transactions contemplated hereby;

(p)  All licenses, permits, consents, certificates of need, authorizations, certifications, accreditations, franchises, approvals, grants of rights by, or filings or registrations with, any federal, state, local or foreign court or governmental or public body, authority, or other instrumentality or third person (including, without limitation, the Federal Communications Commission (the "FCC")) (any of the foregoing a "License") necessary for the Company and its subsidiaries to own, build, maintain or operate their businesses or properties have been duly authorized and obtained and are in full force and effect except where the failure to be so obtained or in effect would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and the Company and its subsidiaries are and will continue to be in compliance in all material respects with all provisions thereof; to the Company's knowledge, no event has occurred which permits (or with the passage of time would permit) the revocation or termination of any License, or which could result in the imposition of any restriction thereon, which is of such a nature or the effect of which would reasonably be expected to have a Material Adverse Effect; no material License is the subject of any pending or, to the best of the Company's knowledge, threatened challenge or revocation which, if such License were revoked, would reasonably be expected to have a Material Adverse Effect;

(q)  The Company and its Significant Subsidiaries are in compliance in all material respects with all applicable laws; the Company and its Significant Subsidiaries have duly and timely filed all reports, statements and filings that are required to be filed by any of them under the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder, and are in all material respects in compliance therewith, including without limitation the rules and regulations of the FCC; the Company is not aware of any event or circumstance constituting noncompliance (or any person alleging noncompliance) with any rule or regulation of the FCC, which such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(r)  The Company is not required to register under the provisions of the Investment Company Act of 1940, as amended (the "Investment Company Act").

-9-

Neither the entering into or performance by the Company of this Agreement nor the offering and sale of the Securities violates any provision of such act or requires any consent, approval, or authorization of, or registration with, the Commission or any other governmental or public body or authority pursuant to any provisions of such act;

(s)   Each of Ernst & Young LLP, who have certified certain financial statements of the Company and its subsidiaries, and PricewaterhouseCoopers LLP, who have certified certain financial statements of the Asset Network Electronics Division of Tyco Electronics Corporation, are independent public accountants as required by the Act and the rules and regulations of the Commission thereunder;

(t)   Neither the Company nor, to the Company's knowledge, any affiliate (as defined in Rule 501(b) of Regulation D) of the Company has directly, or through any agent, sold, offered for sale, solicited offers to buy, or otherwise negotiated in respect of, any security (as defined in the Act) which is or will be integrated with the sale of the Securities in a manner that would require the registration under the Act of the offering contemplated by the Memorandum;

(u)   None of the Company nor, to the Company's knowledge, any affiliate (as defined in Rule 501(b) of Regulation D) of the Company or any person acting on its or their behalf has offered or sold the Securities by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Act or, with respect to Securities sold outside the United States to non-U.S. persons (as defined in Rule 902 under the Act), by means of any directed selling efforts within the meaning of Rule 902 under the Act, and the Company, and, to the Company's knowledge, any affiliate of the Company and any person acting on its or their behalf have complied with and will implement the "offering restrictions" within the meaning of such Rule 902;

(v)   The Securities satisfy the requirements set forth in Rule 144A(d)(3) under the Act;

(w)   Assuming the accuracy of the representations of the Initial Purchasers contained in Section 3 hereof, it is not necessary in connection with the offer, sale and delivery of the Securities in the manner contemplated by this Agreement to register the Securities under the Act or to qualify the Indenture under the Trust Indenture Act of 1939, as amended;

(x)   No relationship, direct or indirect, exists between or among any of the Company and its subsidiaries, on the one hand, and any affiliate, director, officer, stockholder, customer or supplier of any of them, on the other hand, which is required by the Act or by the rules and regulations enacted thereunder to be described in a registration statement on Form S-3 which is not so described in the Memorandum;

(y)   Except as permitted by the Act, the Company has not distributed and, prior to the later to occur of the Closing Date and completion of the distribution of the Securities, will not distribute any offering material in connection with the offering and

-10-

sale of the Securities other than the Preliminary Memorandum and the Final Memorandum (and any amendment or supplement thereto in accordance with Section 6(c) hereof);

(z)  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions of the Company and its subsidiaries are executed in accordance with management's general or specific authorization; (ii) transactions of the Company and its subsidiaries are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets of the Company and its subsidiaries is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets of the Company and its subsidiaries is compared with existing assets of the Company and its subsidiaries at reasonable intervals and appropriate action is taken with respect to any differences; and

(aa) Except as set forth in the Memorandum, no holder of any security of the Company (other than holders of the Securities) has any right to request or demand registration of any security of the Company because of the consummation of the transactions contemplated by the Operative Agreements.

(bb) The Company and its Significant Subsidiaries have good and marketable title to all of the properties and assets reflected in the financial statements (or as described in the Memorandum) hereinabove described, subject to no lien, mortgage, pledge, charge or encumbrance of any kind except those reflected in such financial statements (or as described in the Memorandum) or which are not material in amount.  The Company and its Significant Subsidiaries occupy their leased properties under valid and binding leases conforming in all material respects to the description thereof set forth in the Memorandum;

(cc) The Company and its subsidiaries have filed all federal, state, local and foreign income tax returns which have been required to be filed and have paid all taxes indicated by said returns and all assessments received by them or any of them to the extent that such taxes have become due.  All tax liabilities have been adequately provided for in the consolidated financial statements of the Company, and the Company does not know of any actual or proposed additional tax assessments;

(dd) The Company and each of its subsidiaries hold all material licenses, certificates and permits from governmental authorities which are necessary to the conduct of their respective businesses.  Except as specifically disclosed in the Memorandum, the Company and each of its subsidiaries owns or possesses adequate rights to use all trademarks, trade names, patents, patent rights, mask works, copyrights, licenses, approvals and governmental authorizations currently used in its business as now conducted and, to the Company's knowledge, as proposed to be conducted; and, to the Company's knowledge, neither the Company nor any of its subsidiaries has infringed any trademark, trade name, patent, patent right, mask work, copyright, license, trade secret or other similar right of others, and, except as disclosed in the Memorandum, no written claim has been made against the Company or any of its subsidiaries regarding trademark, trade name, patent, mask work,

-11-

copyright, license, trade secret or other infringement which would reasonably be expected to have a Material Adverse Effect. The Company knows of no material infringement by others of any trademark, trade name, patent, patent right, mask work, copyright, license, trade secret or other similar right owned by or licensed to the Company;

(ee) The Company and each of its Significant Subsidiaries carry, or are covered by, insurance in such amounts and covering such risks as the Company reasonably believes to be adequate for the conduct of their respective businesses and the value of their respective properties and as the Company reasonably believes to be customary for companies engaged in similar industries;

(ff) The Company is in compliance in all material respects with all presently applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, including the regulations and published interpretations thereunder ("ERISA"); no "reportable event" (as defined in ERISA) has occurred with respect to any "pension plan" (as defined in ERISA) for which the Company would have any liability; the Company has not incurred and does not expect to incur liability under (i) Title IV of ERISA with respect to termination of, or withdrawal from, any "pension plan" or (ii) Sections 412 or 4971 of the Internal Revenue Code of 1986, as amended, including the regulations and published interpretations thereunder (the "Code"); and each "pension plan" for which the Company would have any liability that is intended to be qualified under Section 401(a) of the Code is so qualified in all material respects and nothing has occurred, whether by action or by failure to act, which would cause the loss of such qualification;

(gg) The Company confirms as of the date hereof that it is in substantial compliance with all material provisions of Section 1 of Laws of Florida, Chapter 92-198, An Act Relating to Disclosure of Doing Business with
                              --------------------------------------------------
Cuba;
----

(hh) Except as disclosed to the Underwriters, the Company is not (nor did it permit any of its officers, directors, agents, representatives or affiliates to) directly or indirectly, other than as described in the Memorandum, taking any of the following actions:  (A) solicit, entertain, encourage, initiate or participate in any proposals, or conduct discussions with or engage in negotiations, relating to, (B) provide information with respect to it relating to, or otherwise cooperate with, facilitate or encourage any effort or attempt with regard to, (C) enter into an agreement providing for, or (D) make or authorize any statement, recommendation or solicitation in support of, any possible acquisition of the Company or any of its subsidiaries (whether by merger, purchase of assets, tender offer or otherwise), or any material portion of its or their capital stock or assets or any equity interest in the Company or any of its subsidiaries;

(ii) To the best of Company's knowledge, no labor disturbance by the employees of the Company or any of its subsidiaries exists or is imminent.  No collective bargaining agreement exists with any of the Company's employees and, to the best of the Company's knowledge, no such agreement is imminent;

-12-

(jj) The Company's Common Stock is duly and validly registered pursuant to the requirements of the Exchange Act and the rules and regulations promulgated thereunder.  The Company's Common Stock is listed on the Nasdaq National Market;

(kk) The Company has not at any time during the last four (4) years (A) made any unlawful contribution to any candidate for foreign office or failed to disclose fully any contribution in violation of law, or (B) made any payment to any federal or state governmental officer or official, or other person charged with similar public or quasi-public duties, other than payments required or permitted by the laws of the United States or any jurisdiction thereof;

(ll) (A) Each of the Company and its subsidiaries is in compliance with all rules, laws and regulations relating to the use, treatment, storage and disposal of toxic substances and protection of health or the environment ("Environmental Laws") which are applicable to its respective business, (B) neither the Company nor any of its subsidiaries has received notice from any governmental authority or third party of an asserted claim under Environmental Laws, which claim is required to be disclosed in the Memorandum and is not so disclosed, (C) to the Company's knowledge, neither the Company nor any of its subsidiaries will be required to make future material capital expenditures to comply with existing Environmental Laws, and (D) to the Company's knowledge, no property which is leased or occupied by the Company or any of its subsidiaries has been designated as a Superfund site pursuant to the Comprehensive Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. (S) 9601, et
                                                                        --
seq.), or otherwise designated as a contaminated site under applicable state or
---
local law;

(mm) There are no outstanding material loans, advances (except normal advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company or any of its subsidiaries to or for the benefit of any of the officers or directors of the Company or any of its subsidiaries or any of the members of the families of any of them, except as disclosed in the Memorandum;

Any certificate signed by any officer of the Company and delivered to you or to counsel for the Initial Purchasers shall be deemed a representation and warranty by the Company to each Initial Purchaser as to the matters covered thereby.

6.   The Company covenants and agrees with each of the several Initial Purchasers as follows:

(a)  to deliver to the Initial Purchasers as many copies of the Preliminary Memorandum and the Final Memorandum (including all amendments and supplements thereto) as the Initial Purchasers may reasonably request;

(b)  before distributing any amendment or supplement to the Memorandum, to furnish to the Initial Purchasers a copy of the proposed amendment or supplement for review and not to distribute any such proposed amendment or supplement to which the Initial Purchasers reasonably object in writing;

-13-

(c)  if, at any time prior to the completion of the initial placement of the Securities, any event shall occur as a result of which it is necessary to amend or supplement the Memorandum in order to make the statements therein, in the light of the circumstances when the Memorandum is delivered to a purchaser, not misleading, or if it is necessary to amend or supplement the Memorandum to comply with law, to notify you and upon your request, forthwith to prepare and furnish, at the expense of the Company, to the Initial Purchasers and to the dealers to which Securities may have been sold by the Initial Purchasers on behalf of the Initial Purchasers and to any other dealers upon request, such amendments or supplements to the Memorandum as may be necessary so that the statements in the Memorandum as so amended or supplemented will not, in the light of the circumstances when the Memorandum is delivered to a purchaser, be misleading;

(d)  to use its best efforts (i) to register or qualify the Securities for offering and sale by the Initial Purchasers and by dealers under the securities or Blue Sky laws of such jurisdictions as the Initial Purchasers shall reasonably request and to continue such qualifications in effect so long as reasonably required for distribution of the Securities and (ii) to pay all fees and expenses (including reasonable fees and disbursements of counsel for the Initial Purchasers) incurred in connection with the determination of the eligibility of the Securities for investment under the laws of such jurisdictions as the Initial Purchasers may designate; provided that in no event shall the Company be obligated to qualify to do
--------
business in any jurisdiction where it is not now so qualified or to take any action that would subject it to taxation or service of process in suits, other than those arising out of the offering or sale of the Securities, in any jurisdiction where it is not now so subject;

(e)  so long as the Securities are outstanding, to furnish to the Initial Purchasers copies of all reports or other communications (financial or other) furnished to holders of Securities;

(f)  to use the net proceeds received by the Company from the sale of the Securities pursuant to this Agreement in the manner specified in the Memorandum under the caption "Use of Proceeds";

(g)  to use its best efforts to cause the Securities to be eligible for The Portal Market of the National Association of Securities Dealers, Inc.;

(h)  to submit an application to have the Underlying Securities listed on the Nasdaq National Market;

(i)  to furnish to the holders of the Securities as soon as practicable after the end of each fiscal year an annual report (including a balance sheet and statements of income, stockholders' equity and cash flows of the Company and its consolidated subsidiaries certified by independent public accountants) and, as soon as practicable after the end of each of the first three quarters of each fiscal year (beginning with the fiscal quarter ending after the date of the Memorandum), consolidated summary

-14-

financial information of the Company and its Significant Subsidiaries of such quarter in reasonable detail;

(j)  the Company will not resell any of the Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them;

(k)  whether or not the transactions contemplated by this Agreement are consummated or this Agreement is terminated and in addition to any obligations it may have under any other agreements with you and/or your affiliates, to pay or cause to be paid all costs and expenses incident to the performance of its obligations hereunder, including without limiting the generality of the foregoing, all fees, costs and expenses (i) incident to the preparation, issuance, execution, authentication and delivery of the Securities, including any expenses of the Trustee, (ii) incident to the preparation, printing and distribution of the Preliminary Memorandum and the Final Memorandum (including in each case all exhibits, amendments and supplements thereto), (iii) incurred in connection with the registration or qualification and determination of eligibility for investment of the Securities under the laws of such jurisdictions as the Initial Purchasers may designate (including reasonable fees of counsel for the Initial Purchasers and their disbursements), (iv) in connection with the approval for trading of the Securities on any securities exchange or inter-dealer quotation system (as well as in connection with the designation of the Securities as Portal securities), (v) in connection with the printing (including word processing and duplication costs) and delivery of this Agreement, the Indenture, the Registration Rights Agreement and the Preliminary and Supplemental Blue Sky Memoranda and the furnishing to Initial Purchasers and dealers of copies of the Memorandum, including mailing and shipping, as herein provided, and (vi) any expenses incurred by the Company in connection with a "road show" presentation to potential investors;

(l)  while the Securities remain outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Act, the Company will, during any period in which it is not subject to Section 13 or 15(d) under the Exchange Act, make available to the Initial Purchasers and any holder of Securities in connection with any sale thereof and any prospective purchaser of Securities and securities analysts, in each case upon request, the information specified in, and meeting the requirements of, Rule 144A(d)(4) under the Act (or any successor thereto);

(m)  not to take any action prohibited by Regulation M under the Exchange Act in connection with the distribution of the Securities contemplated hereby;

(n)  not to solicit any offer to buy or offer or sell the Securities by means of any form of general solicitation or general advertising, including: (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio; and (ii) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising;

-15-

(o)  not to engage in any directed selling efforts with respect to the Securities within the meaning of Regulation S under the Act;

(p)  not to sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in the Act) which will be integrated with the sale of the Securities in a manner which would require the registration under the Act of the Securities or the Underlying Securities and the Company will take all action that is appropriate or necessary to assure that their offerings of other securities will not be integrated for purposes of the Act with the offerings contemplated hereby;

(q)  to comply with all of the terms and conditions of the Registration Rights Agreement; and

(r)  prior to any registration of the Securities pursuant to the Registration Rights Agreement, or at such earlier time as may be so required, to qualify the Indenture under the Trust Indenture Act of 1939, as amended, and to enter into any necessary supplemental indentures in connection therewith.

7.   The several obligations of the Initial Purchasers hereunder to purchase the Securities on the First Closing Date and the Optional Securities on each Optional Closing Date, if any, are subject to the performance by the Company of its obligations hereunder and to the following additional conditions:

(a)  The representations and warranties of the Company contained herein are true and correct on and as of the First Closing Date or the Optional Closing Date, as applicable, as if made on and as of such date and the Company shall have complied with all agreements and all conditions on its part to be performed or satisfied hereunder at or prior to the applicable Closing Date;

(b)  Wilson Sonsini Goodrich & Rosati, Professional Corporation, counsel for the Initial Purchasers, shall have furnished to you such written opinion or opinions dated such Closing Date, with respect to such matters as the Initial Purchasers may request;

(c)  Cooley Godward LLP (together with New York counsel satisfactory to the Initial Purchasers with respect to New York law opinions), counsel for the Company, shall have furnished to you their written opinion, dated such Closing Date, in form and substance satisfactory to you, to the effect that:

(i)  the Company is a corporation incorporated and validly existing as a corporation in good standing under the laws of the State of Delaware.  The Company has the corporate power and authority to own or lease its properties and conduct its business as described in the Memorandum;

(ii) to the best of such counsel's knowledge, the Company has been duly qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business as now conducted as described in

-16-

the Memorandum so as to require such qualifications, except where the failure to so qualify would not individually or in the aggregate reasonably be expected to have a Material Adverse Effect;

(iii)  Imedia Corporation is a corporation incorporated and validly existing as a corporation in good standing under the laws of the State of California;

(iv)   the Company has an authorized and outstanding capitalization as set forth in the Memorandum;

(v)    the Securities to be issued and sold by the Company to the Initial Purchasers under this Agreement have been duly and validly authorized by the Company for issuance and conform in all material respects to the description thereof in the Memorandum;

(vi)   the Underlying Securities have been duly and validly authorized and duly reserved in sufficient numbers for issuance by the Company upon conversion of the Securities and, when issued upon conversion of the Securities in accordance with the terms of the Securities, will be validly issued, fully paid and nonassessable, and the issuance of the Underlying Securities is not and upon issuance will not be subject to any preemptive rights or, to such counsel's knowledge, similar rights;

(vii)  the Indenture has been duly and validly authorized by the Company and conforms in all material respects to the description thereof in the Memorandum;

(viii) the Registration Rights Agreement has been duly and validly authorized by the Company and,

-17-

conforms in all material respects to the description thereof in the Memorandum;

(ix) the issue and sale of the Securities by the Company hereunder and the compliance by the Company with all of the provisions of this Agreement and the consummation of the transactions herein contemplated will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any agreement that (i) has been filed by the Company with the Commission pursuant to the Act or the Exchange Act, or (ii) the Company has advised such counsel as being material, nor will such action result in any violation of the provisions of the certificate of incorporation or by-laws of the Company or any statute, order, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or Imedia Corporation or any of their respective properties, except for state securities or Blue Sky laws, as to which such counsel need give no opinion;

(x)  to such counsel's knowledge and other than as set forth in the Memorandum, there are no legal or governmental proceedings pending or overtly threatened to which the Company or Imedia Corporation is a party or of which any property of the Company or Imedia Corporation is subject which would reasonably be expected to have a Material Adverse Effect;

(xi) to such counsel's knowledge, no consent, approval, authorization or order of or with any court or governmental agency or body is required for the issue and sale of the Securities or the consummation by the Company of the transactions contemplated by this Agreement, except such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or Blue Sky laws in connection with the purchase and distribution of the Securities by the Initial Purchasers, as to which no opinion need be rendered;

(xii) this Agreement has been duly authorized, executed and delivered by the Company;

(xiii)  the statements set forth in the Memorandum (i) under the caption "Description of Notes," insofar as they purport to constitute a summary of the terms of the Securities or the Indenture (ii) under the caption "Description of Capital Stock," insofar as they purport to constitute a description of the capital stock of the Company, (iii) under the caption "Certain United States Federal Income Tax Considerations," and (iv) under the caption "Plan of Distribution," insofar as they purport to describe the provisions of the

-18-

laws and documents referred to therein fairly present such matters in all material respects;

(xiv)  the Company is not an "investment company," as such term is defined in the Investment Company Act;

(xv)  Each document filed by the Company pursuant to the Exchange Act (other than the financial statements, schedules, related notes, other financial data and statistical data derived therefrom, as to which no opinion need be rendered), and incorporated by reference in the Memorandum complied when so filed as to form in all material respects with the Exchange Act and the regulations promulgated thereunder; and

(xvi)  Such counsel has no reason to believe that, as of the Closing Date, the Memorandum or any further amendment or supplement thereto made by the Company prior to such Closing Date (other than the financial statements, schedules, related notes, other financial data and statistical data derived therefrom, as to which no opinion need be rendered) contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading or that, as of its date, the Memorandum or any further amendment or supplement thereto made by the Company prior to such Closing Date (other than the financial statements, schedules, related notes, other financial data and statistical data derived therefrom included in the Memorandum, as to which no opinion need be rendered) contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  With respect to such statement, check and verification, such counsel may state that their belief is based upon the procedures set forth therein, but is without independent check or verification.

In rendering such opinion, such counsel may rely as to matters governed by the laws of states other than California, the corporate laws of Delaware or federal securities laws  on local counsel in such jurisdictions, provided that in each cases such counsel shall state that they believe that they and the Initial Purchasers are justified in relying on such other counsel.  Such counsel may state that they express no opinion as to the laws of any jurisdiction outside the United States;

(d)  On the date of the Final Memorandum and also at each Closing Date, Ernst & Young LLP shall have furnished to you a comfort letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to you, and PricewaterhouseCoopers LLP shall have furnished to you a comfort letter, dated the date of the Final Memorandum, in form and substance satisfactory to you.

(e) (i) Neither the Company or any of its Significant Subsidiaries shall have sustained since March 31, 2000 any loss or interference with its business board's

-19-

fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Memorandum, and (ii) since the respective dates as of which information is given in the Memorandum, there shall not have been any material adverse change in the capital stock or long-term debt of the Company or any of its Significant Subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, consolidated financial position, stockholders' equity or results of operations of the Company and its Significant Subsidiaries, taken as a whole, otherwise than as set forth or contemplated in the Memorandum, the effect of which, in any such case described in clause (i) or (ii), is in the judgment of the Initial Purchasers so material and adverse as to make it impracticable or inadvisable to proceed with the offering or the delivery of the Securities being delivered at such Closing Date on the terms and in the manner contemplated in the Memorandum;

(f)  On or after the date hereof (i) no downgrading shall have occurred in the rating accorded the Company's debt securities or preferred stock by any "nationally recognized statistical rating organization," as that term is defined by the Commission for purposes of Rule 436(g)(2) under the Act, and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Company's debt securities or preferred stock;

(g)  On or after the date hereof there shall not have occurred any of the following:  (i) since the respective dates as of which information is given in the Memorandum, any Material Adverse Effect, or any Material Adverse Effect is reasonably likely to occur; (ii) a suspension or material limitation in trading in securities generally on the New York Stock Exchange or the Nasdaq National Market; (iii) a suspension or material limitation in trading in the Company's securities on the Nasdaq National Market; (iv) the enactment, publication, decree or other promulgation of any statute, regulation, rule or order of any court or other governmental authority which in your opinion is reasonably likely to have a Material Adverse Effect; (v) a general moratorium on commercial banking activities declared by either Federal or New York State authorities; (vi) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, if the effect of any such event specified in this clause (vi) in the judgment of the Initial Purchasers makes it impracticable or inadvisable to proceed with the offering or the delivery of the Securities being delivered at such Closing Date on the terms and in the manner contemplated in the Memorandum; or (vii) the taking of any action by any governmental body or agency in respect of its monetary or fiscal affairs which in your reasonable opinion has a material adverse effect on the securities markets in the United States;

(h)  The Company has obtained and delivered to the Initial Purchasers executed copies of a "lock-up" agreement from Zaki Rakib, Selim Rakib and Ray Fritz, substantially to the effect set forth in Exhibit B attached
                                                            ---------
hereto;
------

-20-

(i)  The Company shall have furnished or caused to be furnished to you at such Closing Date certificates of officers of the Company satisfactory to you as to the accuracy of the representations and warranties of the Company herein at and as of such Closing Date, as to the performance by the Company of all of its obligations hereunder to be performed at or prior to such Closing Date, as to the matters set forth in subsections (a), (e)(i) and (ii) and (f) of this Section 7 and as to such other matters as you may reasonably request;

(j)  An application for the listing of additional shares relating to the Underlying Securities shall have been submitted to the Nasdaq National Market;

(k)  On or prior to the applicable Closing Date, the Company shall have furnished to the Initial Purchasers such further certificates and documents as the Initial Purchasers shall reasonably request; and

(l) The Company shall have executed and delivered the Registration Rights Agreement substantially in the form attached hereto as Exhibit A.
                                                        ----------

The Company agrees that it will use all reasonable efforts to cause its officers, counsel and auditors to deliver the certificates, opinions and letters contemplated by this Section 7 on each Closing Date.

8.    Indemnification and Contribution.

(a)  The Company  will indemnify and hold harmless each Initial Purchaser against any losses, claims, damages or liabilities, joint or several, to which such Initial Purchaser may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in any Preliminary Memorandum or Final Memorandum or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Initial Purchaser for any legal or other expenses reasonably incurred by such Initial Purchaser in connection with investigating or defending any such action or claim as such expenses are incurred; provided, however, that
                                                      --------  -------
the Company  shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Preliminary Memorandum or Final Memorandum or any such amendment or supplement in reliance upon and in conformity with written information furnished to the Company by any Initial Purchaser through Deutsche Bank Securities Inc. expressly for use therein.

(b)  Each Initial Purchaser will indemnify and hold harmless the Company against any losses, claims, damages or liabilities to which the Company may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue

-21-

statement of a material fact contained in any Preliminary Memorandum or Final Memorandum or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in any Memorandum or any such amendment or supplement in reliance upon and in conformity with written information furnished to the Company by such Initial Purchaser through Deutsche Bank Securities Inc. expressly for use therein; and will reimburse the Company for any legal or other expenses reasonably incurred by the Company in connection with investigating or defending any such action or claim as such expenses are incurred.

(c)   Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under such subsection.   In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation.   No indemnifying party shall, without the written consent of the indemnified party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (i) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any indemnified party.

(d)   If the indemnification provided for in this Section 8 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by each party to this Agreement from the offering of the Securities.   If, however, the allocation provided by the immediately preceding

-22-

sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (c) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of each party to this Agreement in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Company and the Initial Purchasers shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities purchased under this Agreement (before deducting expenses) received by the Company bear to the total discounts and commissions received by the Initial Purchasers with respect to the Securities purchased under this Agreement. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Initial Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Company and the Initial Purchasers agree that it would not be just and equitable if contributions pursuant to this subsection (d) were determined by pro rata allocation (even if the Initial Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), no Initial Purchaser shall be required to contribute any amount in excess of the amount by which the Purchase Price at which the Securities purchased by it and the price of Securities on the front cover of the Final Memorandum exceeds the amount of any damages which such Initial Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Initial Purchasers' obligations in this subsection (d) to contribute are several in proportion to their respective obligations as initial purchasers under this Agreement and not joint.

(e)    The obligations of the Company under this Section 8 shall be in addition to any liability that the Company may otherwise have and shall extend, upon the same terms and conditions, to each person, if any, who controls any Initial Purchaser within the meaning of the Act; and the obligations of the Initial Purchasers under this Section 8 shall be in addition to any liability that the respective Initial Purchasers may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Company and to each person, if any, who controls the Company within the meaning of the Act.

-23-

The remedies provided for in this Section 8 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any Indemnified Person at law or in equity.

The indemnity and contribution agreements contained in this Section 8 and the representations and warranties of the Company set forth in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Initial Purchaser or any person controlling any Initial Purchaser or by or on behalf of the Company, its respective officers or directors or any other person controlling Company and (iii) acceptance of and payment for any of the Securities.

9.    This Agreement shall become effective upon the execution and delivery hereof by the parties hereto.

10.    If, on any Closing Date, any one or more of the Initial Purchasers shall fail or refuse to purchase Securities which it or they have agreed to purchase hereunder on such date, and the aggregate principal amount of Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase is not more than one-tenth of the aggregate principal amount of the Securities to be purchased on such date, the other Initial Purchasers shall be obligated severally in the proportions that the principal amount of Securities set forth opposite their respective names in Schedule I bears to the aggregate principal amount of Securities set forth
----------
opposite the names of all such non-defaulting Initial Purchasers, or in such other proportions as the Initial Purchasers may specify, to purchase the Securities which such defaulting Initial Purchaser or Initial Purchasers agreed but failed or refused to purchase on such date; provided that in no event shall
--------
the principal amount of Securities that any Initial Purchaser has agreed to purchase pursuant to Section 1 be increased pursuant to this Section 10 by an amount in excess of one-tenth of such principal amount of Securities without the written consent of such Initial Purchaser. If, on any Closing Date, any Initial Purchaser or Initial Purchasers shall fail or refuse to purchase Securities which it or they have agreed to purchase hereunder on such date, and the aggregate principal amount of Securities with respect to which such default occurs is more than one-tenth of the aggregate principal amount of Securities to be purchased on such date, and arrangements satisfactory to the Initial Purchasers and the Company for the purchase of such Securities are not made within 36 hours after such default, this Agreement shall terminate without liability on the part of any non-defaulting Initial Purchaser or the Company. In any such case either the Initial Purchasers or the Company shall have the right to postpone the applicable Closing Date, but in no event for longer than seven days, in order that the required changes, if any, in the Memorandum or in any other documents or arrangements may be effected. Any action taken under this paragraph shall not relieve any defaulting Initial Purchaser from liability in respect of any default of such Initial Purchaser under this Agreement.

11.    If this Agreement shall be terminated by the Initial Purchasers, or any of them, because of any failure or refusal on the part of the Company to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company shall be unable to perform its obligations under this Agreement or any condition of the Initial

-24-

Purchasers' obligations cannot be fulfilled, the Company agrees to reimburse the Initial Purchasers or such Initial Purchasers as have so terminated this Agreement with respect to themselves, severally, for all out-of-pocket expenses (including the fees and expenses of their counsel) reasonably incurred by such Initial Purchasers in connection with this Agreement or the offering contemplated hereunder.

12.  This Agreement shall inure to the benefit of and be binding upon the Company, the Initial Purchasers, any affiliate of any Initial Purchaser which assists such Initial Purchaser in the distribution of the Securities, any controlling persons referred to herein and their respective successors and assigns.  Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any other person, firm or corporation any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained.  No purchaser of Securities from any Initial Purchaser shall be deemed to be a successor by reason merely of such purchase.

13.  Any action by the Initial Purchasers hereunder may be taken by the Initial Purchasers jointly or by Deutsche Bank Securities Inc. alone on behalf of the Initial Purchasers, and any such action taken by Deutsche Bank Securities Inc. alone shall be binding upon the Initial Purchasers.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication.  Notices to the Initial Purchasers shall be given to the Initial Purchasers c/o Deutsche Bank Securities Inc., 1 South Street, Baltimore, Maryland 21202; Attention:  Equity Syndicate, with a copy to Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, CA  94304-1050; Attention:  John A. Fore, Esq.  Notices to the Company shall be given to it at 2952 Bunker Hill Lane, Santa Clara, CA 95054; Attention:  Chief Financial Officer, with a copy to Cooley Godward LLP, One Maritime Plaza, 20/th/ Floor, San Francisco, CA  94111 (telefax:  (415) 951-3699), Attention:  Karyn S. Tucker, Esq.

14.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PROVISIONS THEREOF.

15.  This Agreement may be executed by any one or more of the parties hereto in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

-25-

If the foregoing is in accordance with your understanding, please sign and return to us counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Initial Purchasers, this letter and such acceptance hereof shall constitute a binding agreement between each of the Initial Purchasers and the Company.

Very truly yours,

TERAYON COMMUNICATION SYSTEMS, INC.

By: /s/ Shlomo Rakib
    ------------------
    Name: Shlomo Rakib
    Title: President and Chief Technical
           Officer

Accepted as of the date hereof:

DEUTSCHE BANK SECURITIES INC.

LEHMAN BROTHERS, INC.

By:  DEUTSCHE BANK SECURITIES INC.


       /s/ Tony Meneghetti
By: _____
Name: Tony Meneghetti
Title: Acting Director

SCHEDULE I
----------

| Initial Purchaser | Principal Amount of Firm Securities to be Purchased | Principal Amount of Optional Securities to be Purchased if Election Exercised |
|---|---|---|
| Deutsche Bank Securities Inc......................... | $325,000,000 | $48,750,000 |
| Lehman Brothers, Inc................................ | 175,000,000 | 26,250,000 |
| Total..................................... | $500,000,000 | $75,000,000 |
| | ============ | ============ |

EXHIBIT A
---------
FORM OF REGISTRATION RIGHTS AGREEMENT

EXHIBIT B
----------

FORM OF LOCK-UP AGREEMENT

Exhibit 4.4

REGISTRATION RIGHTS AGREEMENT
Dated as of July 26, 2000

By and Among

TERAYON COMMUNICATION SYSTEMS, INC.,

as Issuer,

and

DEUTSCHE BANK SECURITIES INC.,

and

LEHMAN BROTHERS INC.,

as Initial Purchasers

5 % Convertible Senior Notes Due 2007

TABLE OF CONTENTS

                                                                    Page
                                                                    ----
1.    Definitions......................................................   1
2.    Shelf Registration...............................................   4
      (a)     Shelf Registration.......................................   4
      (b)     Subsequent Shelf Registrations...........................   4
      (c)     Supplements and Amendments...............................   5
3.    Liquidated Damages...............................................   5
4.    Registration Procedures..........................................   7
5.    Registration Expenses............................................  12
6.    Indemnification..................................................  13
7.    Rules 144 and 144A...............................................  16
8.    Underwritten Registrations.......................................  16
9.    Miscellaneous....................................................  16
      (a)     No Inconsistent Agreements...............................  16
      (b)     Adjustments Affecting Registrable Securities............  17
      (c)     Amendments and Waivers..................................  17
      (d)     Notices.................................................  17
      (e)     Successors and Assigns..................................  18
      (f)     Counterparts............................................  18
      (g)     Headings................................................  18
      (h)     Governing Law...........................................  18
      (i)     Severability............................................  18
      (j)     Securities Held by the Company or Its Affiliates.......  18
      (k)     Third Party Beneficiaries...............................  19
      (l)     Entire Agreement........................................  19

REGISTRATION RIGHTS AGREEMENT

      This Registration Rights Agreement (the "Agreement") is dated as of
                   ---------
July 26, 2000, by and among TERAYON COMMUNICATION SYSTEMS, INC., a Delaware
corporation (the "Company"), DEUTSCHE BANK SECURITIES INC. and LEHMAN BROTHERS,
       -------
INC. (individually, an "Initial Purchaser," and together, the "Initial
                 -----------------                -------
Purchasers").
----------

      This Agreement is entered into in connection with the Purchase
Agreement, dated as of July 20, 2000 (the "Purchase Agreement"), by and among
                        ------------------
the Company and the Initial Purchasers, which provides for the sale by the
Company to the Initial Purchasers of $500,000,000 aggregate principal amount of
the Company's 5% Convertible Subordinated Notes Due 2007 (the "Firm Notes"),
                                                ----------
which are convertible into Common Stock of the Company, par value $.001 per
share (the "Underlying Shares"), plus up to an additional $75,000,000 aggregate
                 -----------------
principal amount of the same which the Initial Purchasers may subsequently elect
to purchase pursuant to the terms of the Purchase Agreement (the "Additional
                                       ----------
Notes" and together with the Firm Notes, the "Convertible Notes"). The Notes
-----                                -----------------
are being issued pursuant to an indenture dated as of the date hereof (the
"Indenture"), between the Company and State Street Bank and Trust Company of
 ---------
California, N.A., as trustee.

      In order to induce the Initial Purchasers to enter into the Purchase
Agreement, the Company has agreed to provide the registration rights set forth
in this Agreement for the benefit of the Initial Purchasers and any subsequent
holder or holders of the Convertible Notes or Underlying Shares as provided
herein. The execution and delivery of this Agreement is a condition to the
Initial Purchasers' obligation to purchase the Firm Notes under the Purchase
Agreement.

      The parties hereby agree as follows:

1.   Definitions.
    -----------

      As used in this Agreement, the following terms shall have the
following meanings:

      Agreement:  See the first introductory paragraph hereto.
      ---------

      Amount of Registrable Securities: (a) With respect to Convertible
      --------------------------------
Notes constituting Registrable Securities, the aggregate principal amount of all
such Convertible Notes outstanding, (b) with respect to Underlying Shares
constituting Registrable Securities, the aggregate number of such Underlying
Shares outstanding multiplied by the Conversion Price (as defined in the
Indenture relating to the Convertible Notes upon the conversion of which such
Underlying Shares were issued) in effect at the time of computing the Amount of
Registrable Securities or, if no such Convertible Notes are then outstanding,
the last Conversion Price that was in effect under such Indenture when any such
Convertible Notes were last outstanding, and (c) with respect to combinations
thereof, the sum of (a) and (b) for the relevant Registrable Securities.

Business Day:  Any day that is not a Saturday, Sunday or a day on
------------
which banking institutions in New York are authorized or required by law to be
closed.

Closing Date:  July 26, 2000.
------------

Company:  See the first introductory paragraph hereto.
-------

Convertible Notes:  See the second introductory paragraph hereto.
-----------------

Damages Payment Date:  See Section 3(c) hereof.
--------------------

Depositary:  The Depository Trust Company until a successor is
----------
appointed by the Company.

Effectiveness Date:  The 180th day after the Closing Date.
------------------

Effectiveness Period:  See Section 2(a) hereof.
--------------------

Exchange Act:  The Securities Exchange Act of 1934, as amended, and
------------
the rules and regulations of the SEC promulgated thereunder.

Filing Date:  The 90th day after the Closing Date.
-----------

Holder:  Any holder of Registrable Securities.
------

Indemnified Holder:  See Section 6 hereof.
------------------

Indemnified Person:  See Section 6 hereof.
------------------

Indemnifying Person:  See Section 6 hereof.
-------------------

Indenture:  See the second introductory paragraph hereto.
---------

Initial Purchasers:  See the first introductory paragraph hereto.
------------------

Initial Shelf Registration:  See Section 2(a) hereof.
--------------------------

Inspectors:  See Section 4(n) hereof.
----------

Liquidated Damages:  See Section 3(a) hereof.
------------------

NASD:  See Section 4(q) hereof.
----

Person:  An individual, partnership, corporation, limited liability
------
company, unincorporated association, trust or joint venture, or a governmental
agency or political subdivision thereof.

-2-

Prospectus:  The prospectus included in any Registration Statement
----------
(including, without limitation, any prospectus subject to completion and a
prospectus that includes any information previously omitted from a prospectus
filed as part of an effective registration statement in reliance upon Rule 430A
promulgated under the Securities Act), as amended or supplemented by any
prospectus supplement, and all other amendments and supplements to the
Prospectus, including post-effective amendments, and all material incorporated
by reference or deemed to be incorporated by reference in such Prospectus.

Purchase Agreement:  See the second introductory paragraph hereto.
------------------

QIU:  See Section 4(q) hereof.
---

Records:  See Section 4(n) hereof.
-------

Registrable Securities:  All Convertible Notes and all Underlying
----------------------
Shares upon original issuance thereof and at all times subsequent thereto until
the earliest to occur of (i) a Registration Statement covering such Convertible
Notes and Underlying Shares having been declared effective by the SEC and such
Convertible Notes and Underlying Shares having been disposed of in accordance
with such effective Registration Statement, (ii) such Convertible Notes and
Underlying Shares having been sold in compliance with Rule 144 or could (except
with respect to affiliates of the Company within the meaning of the Securities
Act) be sold in compliance with Rule 144(k), or (iii) such Convertible Notes and
any Underlying Shares ceasing to be outstanding.

Registration Default:  See Section 3(a) hereof.
--------------------

Registration Statement:  Any registration statement of the Company
----------------------
filed with the SEC pursuant to the provisions of this Agreement, including the
Prospectus, amendments and supplements to such registration statement, including
post-effective amendments, all exhibits and all material incorporated by
reference or deemed to be incorporated by reference in such registration
statement.

Rule 144:  Rule 144 promulgated under the Securities Act, as such Rule
--------
may be amended from time to time, or any similar rule (other than Rule 144A) or
regulation here-after adopted by the SEC providing for offers and sales of
securities made in compliance therewith resulting in offers and sales by
subsequent holders that are not affiliates of an issuer of such securities being
free of the registration and prospectus delivery requirements of the Securities
Act.

Rule 144A:  Rule 144A promulgated under the Securities Act, as such
---------
Rule may be amended from time to time, or any similar rule (other than Rule 144)
or regulation hereafter adopted by the SEC.

Rule 415:  Rule 415 promulgated under the Securities Act, as such Rule
--------
may be amended from time to time, or any similar rule or regulation hereafter
adopted by the SEC.

SEC:  The Securities and Exchange Commission.
---

-3-

Securities Act:  The Securities Act of 1933, as amended, and the rules
--------------
and regulations of the SEC promulgated thereunder.

Shelf Registration:  See Section 2(b) hereof.
------------------

Shelf Registration Statement:  See Section 2(b) hereof.
----------------------------

Subsequent Shelf Registration:  See Section 2(b) hereof.
-----------------------------

TIA:  The Trust Indenture Act of 1939, as amended, and the rules and
---
regulations of the SEC promulgated thereunder.

Trustee:  The Trustee under the Indenture.
-------

Underlying Shares:  See the second introductory paragraph hereto.
-----------------

Underwritten registration or underwritten offering:  A registration in
--------------------------------------------------
which securities of the Company are sold to an underwriter for reoffering to the
public.

2.    Shelf Registration.
      ------------------

(a)  Shelf Registration.  The Company shall use all reasonable efforts
     ------------------
to file with the SEC a Registration Statement for an offering to be made on a
continuous basis pursuant to Rule 415 covering all of the Registrable Securities
(the "Initial Shelf Registration") on or prior to the Filing Date. The Initial
      --------------------------
Shelf Registration shall be on Form S-3 or another appropriate form permitting
registration of such Registrable Securities for resale by Holders in the manner
or manners designated by them (including, without limitation, one or more
underwritten offerings). The Company shall not permit any securities other than
the Registrable Securities to be included in the Initial Shelf Registration or
any Subsequent Shelf Registration (as defined below).

The Company shall use all reasonable efforts to cause the Initial
Shelf Registration to be declared effective under the Securities Act on or prior
to the Effectiveness Date and to keep such Initial Shelf Registration
continuously effective under the Securities Act until the date that is two years
from the Closing Date (as it may be shortened pursuant to clause (i) or clause
(ii) immediately following, the "Effectiveness Period"), or such shorter period
                                 --------------------
ending when (i) all the shares of Registrable Securities covered by the Initial
Shelf Registration have been sold in the manner set forth and as contemplated in
the Initial Shelf Registration, (ii) the date on which all the Registrable
Securities (x) held by Persons who are not affiliates of the Company may be
resold pursuant to Rule 144(k) under the Securities Act or (y) cease to be
outstanding, or (iii) a Subsequent Shelf Registration covering all of the
Registrable Securities has been declared effective under the Securities Act.

(b)  Subsequent Shelf Registrations.  If the Initial Shelf
     ------------------------------
Registration or any Subsequent Shelf Registration ceases to be effective for any
reason at any time during the Effectiveness Period (other than because of the
sale of all of the securities registered thereunder), the

-4-

Company shall use all reasonable efforts to obtain the prompt withdrawal of any
order suspending the effectiveness thereof, and in any event shall within 45
days of such cessation of effectiveness amend the Initial Shelf Registration in
a manner to obtain the withdrawal of the order suspending the effectiveness
thereof, or file an additional "shelf" Registration Statement pursuant to Rule
415 covering all of the Registrable Securities (a "Subsequent Shelf
                                                   ----------------
Registration"). If a Subsequent Shelf Registration is filed, the Company shall
------------
use all reasonable efforts to cause the Subsequent Shelf Registration to be
declared effective under the Securities Act as soon as practicable after such
filing and to keep such Registration Statement continuously effective for a
period equal to the number of days in the Effectiveness Period less the
aggregate number of days during which the Initial Shelf Registration or any
Subsequent Shelf Registration was previously continuously effective. As used
herein the term "Shelf Registration" means the Initial Shelf Registration and
                 ------------------
any Subsequent Shelf Registration and the term "Shelf Registration Statement"
                                                 -----------------------------
means any Registration Statement filed in connection with a Shelf Registration.

        (c)  Supplements and Amendments.  The Company shall promptly
             ---------------------------
supplement and amend the Shelf Registration if required by the rules,
regulations or instructions applicable to the registration form used for such
Shelf Registration, if required by the Securities Act, or if reasonably
requested by the Holders of the majority in Amount of Registrable Securities
covered by such Registration Statement or by any underwriter of such Registrable
Securities.

3.    Liquidated Damages.
      ------------------

        (a)  The Company and the Initial Purchasers agree that the Holders of
Registrable Securities will suffer damages if the Company fails to fulfill its
obligations under Section 2 hereof and that it would not be feasible to
ascertain the extent of such damages with precision. Accordingly, the Company
agrees to pay liquidated damages on the Registrable Securities ("Liquidated
                                                                 ----------
Damages") under the circumstances and to the extent set forth below (each of
-------
which shall be given independent effect; each a "Registration Default"):
                                                 --------------------

        (i)  if the Initial Shelf Registration is not filed on or prior to the
Filing Date, then commencing on the day after the Filing Date, Liquidated
Damages shall accrue on the Registrable Securities at a rate of 0.50% per
annum on the Amount of Registrable Securities for the first 90 days
immediately following the Filing Date, such Liquidated Damages increasing
by an additional 0.50% per annum at the beginning of each subsequent 90-day
period;

        (ii)  if the Company fails to use all reasonable efforts and the
Initial Shelf Registration is not declared effective by the SEC on or prior
to the Effectiveness Date, then commencing one day after the Effectiveness
Date, Liquidated Damages shall accrue on the Registrable Securities at a
rate of 0.50% per annum on the Amount of Registrable Securities for the
first 90 days immediately following the day after such Effectiveness Date,
such Liquidated Damages increasing by an additional 0.50% per annum at the
beginning of each subsequent 90-day period; and

(iii)   if a Shelf Registration has been declared effective and such Shelf Registration ceases to be effective at any time during the Effectiveness Period (other than as permitted under Section 3(b)), then Liquidated Damages shall accrue on the Registrable Securities at a rate of 0.50% per annum on the Amount of Registrable Securities for the first 90 days commencing on the day such Shelf Registration ceases to be effective, such Liquidated Damages increasing by an additional 0.50% per annum at the beginning of each such subsequent 90-day period;

provided, however, that Liquidated Damages on the Registrable Securities may not
--------  -------
accrue under more than one of the foregoing clauses (i), (ii) or (iii) at any one time and at no time shall the aggregate amount of Liquidated Damages accruing exceed in the aggregate 1.0% per annum of the Amount of Registrable Securities; provided, further, however, that (1) upon the filing of the Shelf
                         --------  -------  -------
Registration as required hereunder (in the case of clause (a)(i) of this Section 3), (2) upon the effectiveness of the Shelf Registration as required hereunder (in the case of clause (a)(ii) of this Section 3), or (3) upon the effectiveness of a Shelf Registration which had ceased to remain effective (in the case of (a)(iii) of this Section 3), Liquidated Damages on the Registrable Securities as a result of such clause (or the relevant subclause thereof), as the case may be, shall cease to accrue. It is understood and agreed that, notwithstanding any provision to the contrary, so long as any Registrable Security is then covered by an effective Shelf Registration Statement, no Liquidated Damages shall accrue on such Registrable Security.

(b)   Notwithstanding paragraph (a) of this Section 3, the Company shall be permitted to suspend the effectiveness of a Shelf Registration for any reason whatsoever for up to 45 consecutive days in any 120 day period, for a total of not more than 90 days in any calendar year, without paying Liquidated Damages.

(c)   So long as Convertible Notes remain outstanding, the Company shall notify the Trustee within two Business Days after each and every date on which an event occurs in respect of which Liquidated Damages is required to be paid . Any amounts of Liquidated Damages due pursuant to (a)(i), (a)(ii) or (a)(iii) of this Section 3 will be payable in cash semi-annually on each February 1 and August 1 (each a "Damages Payment Date"), commencing with the
                               --------------------
first such date occurring after any such Liquidated Damages commences to accrue, to Holders to whom regular interest is payable on such Damages Payment Date with respect to Convertible Notes that are Registrable Securities and to Persons that are registered Holders on the January 15 or July 15 immediately preceding such Damages Payment Date with respect to Underlying Shares that are Registrable Securities. The amount of Liquidated Damages for Registrable Securities will be determined by multiplying the applicable rate of Liquidated Damages by the Amount of Registrable Securities outstanding on the Damages Payment Date following such Registration Default in the case of the first such payment of Liquidated Damages with respect to a Registration Default (and thereafter at the next succeeding Damages Payment Date until the cure of such Registration Default), multiplied by a fraction, the numerator of which is the number of days such Liquidated Damages rate was applicable during such period (determined on the basis of a 360-day year comprised of twelve 30-day months and, in the case of a partial month, the actual number of days elapsed), and the denominator of which is 360.

-6-

4.    Registration Procedures.
      -----------------------

        In connection with the filing of any Registration Statement pursuant
to Section 2 hereof, the Company shall effect such registrations to permit the
sale of the securities covered thereby in accordance with the intended method or
methods of disposition thereof, and pursuant thereto and in connection with any
Registration Statement filed by the Company hereunder the Company shall:

        (a)  Prepare and file with the SEC on or prior to the Filing Date, a
Registration Statement or Registration Statements as prescribed by Section 2
hereof, and use all reasonable efforts to cause each such Registration Statement
to become effective and remain effective as provided herein; provided, however,
                                                               --------  -------
that before filing any Registration Statement or Prospectus or any amendments or
supplements thereto, the Company shall furnish to and afford the Holders of the
Registrable Securities covered by such Registration Statement and the managing
underwriters, if any, a reasonable opportunity to review copies of all such
documents proposed to be filed (in each case, where possible, at least five
Business Days prior to such filing, or such later date as is reasonable under
the circumstances). The Company shall not file any Registration Statement or
Prospectus or any amendments or supplements thereto if the Holders of a majority
in Amount of Registrable Securities covered by such Registration Statement or
the managing underwriters, if any, shall reasonably object.

        (b)  Prepare and file with the SEC such amendments and post-effective
amendments to each Shelf Registration, as may be necessary to keep such
Registration Statement continuously effective for the Effectiveness Period;
cause the related Prospectus to be supplemented by any Prospectus supplement
required by applicable law, and as so supplemented to be filed pursuant to Rule
424 (or any similar provisions then in force) promulgated under the Securities
Act; and comply with the provisions of the Securities Act and the Exchange Act
applicable to it with respect to the disposition of all securities covered by
such Registration Statement as so amended or in such Prospectus as so
supplemented. The Company shall be deemed not to have used all reasonable
efforts to keep a Registration Statement effective during the Effectiveness
Period if it voluntarily takes any action that would result in selling Holders
of the Registrable Securities covered thereby not being able to sell such
Registrable Securities during that period unless such action is required by
applicable law or unless the Company complies with this Agreement, including
without limitation the provisions of Section 4(k) hereof.

        (c)  Notify the selling Holders of Registrable Securities and the
managing underwriters, if any, promptly (but in any event within two Business
Days), (i) when a Prospectus or any prospectus supplement or post-effective
amendment has been filed, and, with respect to a Registration Statement or any
post-effective amendment, when the same has become effective under the
Securities Act (including in such notice a written statement that any Holder
may, upon request, obtain, at the sole expense of the Company, one conformed
copy of such Registration Statement or post-effective amendment including
financial statements and schedules, documents incorporated or deemed to be
incorporated by reference and exhibits), (ii) of the issuance by the SEC of any
stop order suspending the effectiveness of a Registration Statement or of any
order preventing or

                                      -7-

suspending the use of any preliminary prospectus or the initiation of any proceedings for that purpose, (iii) of the happening of any event, the existence of any condition or any information becoming known that makes any statement made in such Registration Statement or related Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires the making of any changes in or amendments or supplements to such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and that in the case of the Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading and (iv) of the Company's determination that a post-effective amendment to a Registration Statement would be appropriate.

(d)   Use all reasonable efforts to prevent the issuance of any order suspending the effectiveness of a Registration Statement or of any order preventing or suspending the use of a Prospectus and, if any such order is issued, to use its reasonable best efforts to obtain the withdrawal of any such order at the earliest possible moment.

(e)   If requested by the managing underwriter or underwriters (if any) or the Holders of the majority in Amount of Registrable Securities being sold in connection with an underwritten offering (i) promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or underwriters (if any), or such Holders reasonably determine is necessary to be included therein, (ii) make all required filings of such prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received notification of the matters to be incorporated in such prospectus supplement or post-effective amendment and (iii) supplement or make amendments to such Registration Statement.

(f)   Deliver to each selling Holder of Registrable Securities, a single counsel to such Holders (chosen in accordance with Section 5(b)) and the underwriters, if any, at the sole expense of the Company, as many copies of the Prospectus (including each form of preliminary prospectus) and each amendment or supplement thereto and any documents incorporated by reference therein as such Persons may reasonably request; and, subject to the second paragraph of Section 4(s) hereof, the Company hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders of Registrable Securities and the underwriters or agents, if any, and dealers (if any), in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(g)   Prior to any public offering of Registrable Securities, to use all reasonable efforts to register or qualify, to the extent required by applicable law, and to cooperate with the selling Holders of Registrable Securities and the managing underwriter or underwriters, if any, in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities or offer and sale under the securities or Blue Sky laws of such jurisdictions within the United States as any selling Holder, or the managing underwriter or

-8-

underwriters, if any, reasonably request; provided, however, that where
                              --------  -------
Registrable Securities are offered other than through an underwritten offering,
the Company agrees to cause the Company's counsel to perform Blue Sky
investigations and file registrations and qualifications required to be filed
pursuant to this Section 4(g); keep each such registration or qualification (or
exemption therefrom) effective during the period such Registration Statement is
required to be kept effective and do any and all other acts or things reasonably
necessary or advisable to enable the disposition in such jurisdictions of the
Registrable Securities covered by the applicable Registration Statement;
provided, however, that the Company shall not be required to (A) qualify
--------  -------
generally to do business in any jurisdiction where it is not then so qualified,
(B) take any action that would subject it to general service of process in any
such jurisdiction where it is not then so subject or (C) subject itself to
taxation in excess of a nominal dollar amount in any such jurisdiction where it
is not then so subject.

        (h)  Cooperate with the selling Holders of Registrable Securities and
the managing underwriter or underwriters, if any, to facilitate the timely
preparation and delivery of certificates representing shares of Registrable
Securities to be sold, which certificates shall not bear any restrictive legends
and shall be in a form eligible for deposit with The Depository Trust Company;
and enable such shares of Registrable Securities to be in such denominations and
registered in such names as the managing underwriter or underwriters, if any, or
Holders may reasonably request.

        (i)  Use all reasonable efforts to cause the Registrable Securities
covered by any Shelf Registration Statement to be registered with or approved by
such other governmental agencies or authorities as may be reasonably necessary
to enable the seller or sellers thereof or the underwriter or underwriters, if
any, to consummate the disposition of such Registrable Securities, except as may
be required solely as a consequence of the nature of such selling Holder's
business, in which case the Company will cooperate in all reasonable respects
with the filing of such Registration Statement and the granting of such
approvals.

        (j)  Upon the occurrence of any event contemplated by paragraph
4(c)(ii), 4(c)(iii) or 4(c)(iv) hereof, as promptly as practicable prepare and
(subject to Section 4(a) hereof) file with the SEC, at the sole expense of the
Company, a supplement or post-effective amendment to the Registration Statement
or a supplement to the related Prospectus or any document incorporated or deemed
to be incorporated therein by reference, or file any other required document so
that, as thereafter delivered to the purchasers of the Registrable Securities
being sold thereunder, any such Prospectus will not contain an untrue statement
of a material fact or omit to state a material fact required to be stated
therein or necessary to make the statements therein, in the light of the
circumstances under which they were made, not misleading.

        (k)  Prior to the effective date of the first Registration Statement
relating to the Registrable Securities, (i) provide the Trustee with
certificates for the Registrable Securities in a form eligible for deposit with
The Depository Trust Company and (ii) provide a CUSIP number for the Registrable
Securities.

        (l)  In connection with any underwritten offering of Registrable
Securities pursuant to a Shelf Registration, enter into an underwriting
agreement as is customary in underwritten offerings of securities similar to the
Registrable Securities and take all such other

                                      -9-

actions as are reasonably requested by the managing underwriter or underwriters in order to expedite or facilitate the registration or the disposition of such Registrable Securities and, in such connection, (i) make such representations and warranties to, and covenants with, the underwriters with respect to the business of the Company and its subsidiaries (including any acquired business, properties or entity, if applicable) and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, as are customarily made by issuers to underwriters in underwritten offerings of securities similar to the Registrable Securities and confirm the same in writing if and when requested; (ii) obtain the written opinion of counsel to the Company and written updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters, addressed to the underwriters covering the matters customarily covered in opinions requested in underwritten offerings of securities similar to the Registrable Securities and such other matters as may be reasonably requested by the managing underwriter or underwriters; and (iii) obtain "cold comfort" letters and updates thereof in form, scope and substance reasonably satisfactory to the managing underwriter or underwriters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included or incorporated by reference in the Registration Statement), addressed to each of the underwriters, such letters to be in customary form and covering matters of the type customarily covered in "cold com-fort" letters in connection with underwritten offerings of securities similar to the Registrable Securities and such other matters as reasonably requested by the managing underwriter or underwriters as permitted by the Statement on Auditing Standards No. 72. The above shall be done as and to the extent required by such underwriting agreement.

       (m)  Make available for inspection by any selling Holder of such Registrable Securities being sold, any underwriter participating in any such disposition of Registrable Securities, if any, and any attorney, accountant or other agent retained by any such selling Holder, or underwriter (collectively, the "Inspectors"), at the offices where normally kept, during reasonable business hours at such time or times as shall be mutually convenient for the Company and the Inspectors as a group, all financial and other records, pertinent corporate documents and instruments of the Company and its subsidiaries (collectively, the "Records") as shall be reasonably necessary to enable them to exercise any applicable due diligence responsibilities, and cause the officers, directors and employees of the Company and its subsidiaries to supply all information reasonably requested by any such Inspector in connection with such Registration Statement. Records that the Company determines, in good faith, to be confidential and any Records that it notifies the Inspectors are confidential shall not be disclosed by any Inspector unless (i) the disclosure of such Records is necessary to avoid or correct a material misstatement or material omission in such Registration Statement, (ii) the release of such Records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction, (iii) disclosure of such information is, in the opinion of counsel for any Inspector, necessary or advisable in connection with any action, claim, suit or proceeding, directly involving or potentially involving such Inspector and arising out of, based upon, relating to, or involving this Agreement or any transactions contemplated hereby or arising hereunder or (iv) the information in such Records has been made generally available to the public other than through the acts of such Inspector; provided, however, that prior notice shall be provided as soon as practicable

-10-

to the Company of the potential disclosure of any information by such Inspector pursuant to clauses (ii) or (iii) of this sentence to permit the Company to obtain a protective order (or waive the provisions of this paragraph (n)). Each Inspector shall take such actions as are reasonably necessary to protect the confidentiality of such information (if practicable) to the extent such actions are otherwise not inconsistent with, an impairment of or in derogation of the rights and interests of the Holder or any Inspector, unless and until such information in such Records has been made generally available to the public other than as a result of a breach of this Agreement.

(n)  Provide (i) the Holders of the Registrable Securities to be included in such Registration Statement and not more than one counsel for all the Holders of such Registrable Securities chosen in accordance with Section 5(b), (ii) the underwriters (which term, for purposes of this Registration Rights Agreement, shall include a Person deemed to be an underwriter within the meaning of Section 2(11) of the Securities Act), if any, thereof, (iii) the sales or placement agent, if any, thereof, and (D) one counsel for such underwriters or agents, reasonable opportunity to participate in the preparation of such Registration Statement, each prospectus included therein or filed with the SEC, and each amendment or supplement thereto.

(o)  Comply with all applicable rules and regulations of the SEC and make generally available to its securityholders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act) no later than 45 days after the end of any 12-month period (or 90 days after the end of any 12-month period if such period is a fiscal year) (i) commencing at the end of any fiscal quarter in which Registrable Securities are sold to underwriters in a firm commitment or best efforts underwritten offering and (ii) if not sold to underwriters in such an offering, commencing on the first day of the first fiscal quarter of the Company after the effective date of a Registration Statement, which statements shall cover said 12-month periods.

(p)  Cooperate with each seller of Registrable Securities covered by any Registration Statement and each underwriter, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the National Association of Securities Dealers, Inc.  (the "NASD"), including, if the Conduct Rules of the
                                   ----
NASD or any successor thereto as amended from time to time so require, engaging a "qualified independent underwriter" ("QIU") as contemplated therein and making
                                                  ---
Records available to such QIU as though it were a participating underwriter for the purposes of Section 4(n) and otherwise applying the provisions of this Agreement to such QIU (including indemnification) as though it were a participating underwriter.

(q)  Cause the Indenture to be qualified under the TIA not later than the effective date of the first Registration Statement relating to the Registrable Securities; and in connection therewith, cooperate with the Trustee and the Holders of the Registrable Securities to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the TIA; and execute, and use all reasonable efforts to cause the Trustee to execute, all documents as may be required to effect such changes and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner.

-11-

(r)  Use all reasonable efforts to take all other steps necessary or advisable to effect the registration of the Registrable Securities covered by a Registration Statement contemplated hereby.

The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish to the Company such information regarding such seller and the distribution of such Registrable Securities as the Company may, from time to time, reasonably request to the extent necessary or advisable to comply with the Securities Act. The Company may exclude from such registration the Registrable Securities of any seller if such seller fails to furnish such information within 20 Business Days after receiving such request. Each seller as to which any Shelf Registration is being effected agrees to furnish promptly to the Company all information required to be disclosed so that the information previously furnished to the Company by such seller is not materially misleading and does not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made.

Each Holder of Registrable Securities agrees by acquisition of such Registrable Securities that, upon actual receipt of any notice from the Company of the happening of any event of the kind described in Section 4(c)(ii), 4(c)(iii) or 4(c)(iv) hereof, such Holder will forthwith discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by Section 4(j) hereof, or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amendments or supplements thereto.

5.    Registration Expenses.
      ----------------------

(a)  All fees and expenses incident to the performance of or compliance with this Agreement by the Company shall be borne by the Company, including, without limitation, (i) all registration and filing fees (including, without limitation, (A) fees with respect to filings required to be made with the NASD in connection with an underwritten offering and (B) fees and expenses of compliance with state securities or Blue Sky laws (including, without limitation, reasonable fees and disbursements of counsel in connection with Blue Sky qualifications of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as provided in Section 4(h) hereof), (ii) printing expenses, including, without limitation, expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing prospectuses if the printing of prospectuses is requested by the managing underwriter or underwriters, if any, or by the Holders of the majority in Amount of Registrable Securities included in any Registration Statement, (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company and reasonable fees and disbursements of one special counsel for the sellers of Registrable Securities (subject to the pro-visions of Section 5(b) hereof), (v) fees and disbursements of all independent certified public accountants referred to in Section 4(m)(iii) hereof (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to such performance), (vi) Securities

-12-

Act liability insurance, if the Company desires such insurance, (vii) fees and expenses of all other Persons retained by the Company, (viii) internal expenses of the Company (including, without limitation, all salaries and expenses of officers and employees of the Company performing legal or accounting duties), (ix) the expense of any annual audit, (x) the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, if applicable, and (xi) the expenses relating to printing, word processing and distributing all Registration Statements, underwriting agreements, securities sales agreements and any other documents necessary in order to comply with this Agreement. Notwithstanding anything in this Agreement to the contrary, each Holder shall pay all underwriting discounts and brokerage commissions with respect to any Registrable Securities sold by it.

        (b)   The Company shall reimburse the Holders of the Registrable Securities being registered in a Shelf Registration for the reasonable fees and disbursements of not more than one counsel chosen by the Holders of a majority in Amount of Registrable Securities to be included in such Registration Statement.

6.   Indemnification.
     ---------------

        The Company agrees to indemnify and hold harmless (i) each Initial Purchaser, (ii) each Holder, (iii) each Person, if any, who controls (within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act) any of the foregoing (any of the Persons referred to in this clause (iii) being hereinafter referred to as a "controlling person"), (iv) the respective officers, directors, partners, employees, representatives and agents of the Initial Purchasers, the Holders (including predecessor Holders) or any controlling person (any person referred to in clause (i), (ii), (iii) or (iv) may hereinafter be referred to as an "Indemnified Holder"), from and against any
                             ------------------
and all losses, claims, damages, liabilities and judgments (including, without limitation, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted) caused by any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus, or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages or liabilities are caused by any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information relating to any Holder furnished to the Company in writing by such Holder expressly for use in therein; provided, however, that the
                                                             --------  -------
Company shall not be liable to any Indemnified Holder under the indemnity agreement of this paragraph with respect to any preliminary prospectus to the extent that any such loss, claim, damage, liability, judgment or expense of such Indemnified Holder results from the fact that such Indemnified Holder sold Registrable Securities under a Registration Statement to a Person as to whom it shall be established that there was not sent or given, at or prior to the written confirmation of such sale, a copy of the Prospectus (or of the preliminary prospectus as then amended or supplemented if the Company shall have furnished such Indemnified Holder with such amendment or supplement thereto on a timely basis), in any case where such delivery is required by applicable law and the loss, claim, damage, liability or expense of such Indemnified Holder results from an untrue statement or omission of a material

fact contained in the preliminary prospectus which was corrected in the Prospectus (or in the preliminary prospectus as then amended or supplemented if the Company shall have furnished such Indemnified Holder with such amendment or supplement thereto, as the case may be, on a timely basis). The Company shall notify Indemnified Holder promptly of the institution, threat or assertion of any claim, proceeding (including any governmental investigation) or litigation in connection with the matters addressed by this Agreement which involves the Company or such Indemnified Holder.

Each Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors, officers and each Person who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to each Holder, but only with reference to such losses, claims, damages or liabilities which are caused by any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with information relating to a Holder furnished to the Company in writing by such Holder expressly for use in any Registration Statement or Prospectus, or any amendment or supplement thereto or any related preliminary prospectus.

If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any Person in respect of which indemnity may be sought pursuant to either of the two preceding paragraphs, such Per-son (the "Indemnified Person") shall promptly
                                                    ------------------
notify the Person or Persons against whom such indemnity may be sought (each an "Indemnifying Person") in writing, and such Indemnifying Person, upon request of
   --------------------
the Indemnified Person, shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 6 that the Indemnifying Person may designate in such proceeding and shall pay the fees and expenses of such counsel related to such proceeding. In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnifying Person unless (i) such Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary, (ii) such Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to such Indemnified Person or (iii) the named parties in any such proceeding (including any impleaded parties) include an Indemnifying Person and an Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that an Indemnifying Person shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such fees and expenses shall be reimbursed as they are incurred. Any such separate firm for the Indemnified Holders shall be designated in writing by the Holders of the majority in Amount of Registrable Securities, and any such separate firm for the Company, its directors, respective officers and such control Persons of the Company shall be designated in writing by the Company. The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, such Indemnifying Person agrees to indemnify any Indemnified Person from and against any loss or liability by reason of such settlement or judgment. No Indemnifying Person shall, without the prior written consent of

-14-

the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnity could have been sought hereunder by such Indemnified Person, unless such settlement includes an unconditional release of such Indemnified Person from all liability on claims that are the subject matter of such proceeding.

If the indemnification provided for in the first and second paragraphs of this Section 6 is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Indemnifying Person on the one hand and the Indemnified Person on the other hand pursuant to the Purchase Agreement or from the offering of the Registrable Securities pursuant to any Shelf Registration or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Indemnifying Per-son on the one hand and the Indemnified Person on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and any Indemnified Holder on the other shall be deemed to be in the same proportion as the total net proceeds from the initial offering and sale of Convertible Notes (before deducting expenses) received by the Company bear to the total net proceeds received by such Indemnified Holder from sales of Registrable Securities giving rise to such obligations. The relative fault of the parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or such Indemnified Holder and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

Each of the Company and the Initial Purchasers agrees that it would not be just and equitable if contribution pursuant to this Section 6 were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses incurred by such Indemnified Person in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 6, in no event shall any Holder be required to contribute any amount in excess of the amount by which the net proceeds received by such Holder from the sale of the Registrable Securities pursuant to a Shelf Registration Statement exceeds the amount of damages which such Holder would have otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(F) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

-15-

The remedies provided for in this Section 6 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any indemnified party at law or in equity.

The indemnity and contribution agreements contained in this Section 6 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Holder or any Person controlling any Holder or by or on behalf of the Company, its officers or directors or any other Person con-trolling any of the Company and (iii) acceptance of and payment for any of the Registrable Securities.

7.    Rules 144 and 144A.
      ------------------

The Company covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder in a timely manner in accordance with the requirements of the Securities Act and the Exchange Act and, for so long as any Registrable Securities remain outstanding, if at any time the Company is not required to file such reports, it will, upon the request of any Holder or beneficial owner of Registrable Securities, make available such information necessary to permit sales pursuant to Rule 144A under the Securities Act. The Company further covenants that, for so long as any Registrable Securities remain outstanding, it will use all reasonable efforts to take such further action as any Holder of Registrable Securities may reasonably request, all to the extent required from time to time to enable such holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144(k) and Rule 144A under the Securities Act, as such rules may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the SEC. Notwithstanding the foregoing, nothing in this Section 7 shall be deemed to require the Company to register any of its securities pursuant to the Exchange Act.

8.    Underwritten Registrations.
      --------------------------

If any of the Registrable Securities covered by any Shelf Registration are to be sold in an underwritten offering, the investment banker or investment bankers and manager or managers that will manage the offering will be selected by the Holders of the majority in Amount of Registrable Securities to be included in such offering and be reasonably acceptable to the Company.

No Holder of Registrable Securities may participate in any underwritten registration hereunder unless such Holder (a) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

9.    Miscellaneous.
      -------------

(a)  No Inconsistent Agreements.  The Company has not, as of the
     --------------------------
date hereof, and the Company shall not, after the date of this Agreement, enter into any agreement with respect to any of its securities that is inconsistent with the rights granted to the Holders of Registrable Securities in

-16-

this Agreement or otherwise conflicts with the provisions hereof. The Company has not entered and will not enter into any agreement with respect to any of its securities that will grant to any Person piggyback registration rights with respect to a Registration Statement, except to the extent any existing right has heretofore been waived.

     (b)   Adjustments Affecting Registrable Securities.  The Company shall
           ----------------------------------------------
not, directly or indirectly, take any action withrespect to the Registrable Securities as a class that would adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in a registration undertaken pursuant to this Agreement.

     (c)   Amendments and Waivers.  The provisions of this Agreement may
           -----------------------
not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, otherwise than with the prior written consent of the Company and the Holders of not less than the majority in Amount of Registrable Securities; provided, however, that Section 6 and this
                                        --------  -------
Section 9(c) may not be amended, modified or supplemented without the prior written consent of the Company and each Holder (including, in the case of an amendment, modification or supplement of Section 6, any Person who was a Holder of Registrable Securities disposed of pursuant to any Registration Statement). Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of Holders of Registrable Securities whose securities are being sold pursuant to a Registration Statement and that does not directly or indirectly affect, impair, limit or compromise the rights of other Holders of Registrable Securities may be given by Holders of at least a majority in Amount of the Registrable Securities being sold by such Holders pursuant to such Registration Statement.

     (d)   Notices.  All notices and other communications (including
           -------
without limitation any notices or other communications to the Trustee) provided for or permitted hereunder shall be made in writing by hand-delivery, registered first-class mail, next-day air courier or facsimile:

     (1)   if to a Holder of the Registrable Securities, at the most current address of such Holder set forth on the records of the registrar under the Indenture, in the case of Holders of Convertible Notes, and the stock ledger of the Company, in the case of Holders of common stock of the Company.

     (2)   if to the Initial Purchasers:
           DEUTSCHE BANK SECURITIES INC.
           LEHMAN BROTHERS, INC.
           c/o Deutsche Bank Securities Inc.
           1 South Street
           Baltimore, Maryland  21202
           Attention: Equity Syndicate

     (3)   if to the Company, at the addresses as follows:

           Terayon Communication Systems, Inc.
           2952 Bunker Hill Lane

Santa Clara, California 95054
Facsimile No.: (408) 727-6205
Attention: Chief Financial Officer

All such notices and communications shall be deemed to have been duly given: when delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; one Business Day after being timely delivered to a next-day air courier; and when the addressor receives facsimile confirmation, if sent by facsimile.

(e)  Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties hereto, including the Holders; provided, however, that this Agreement shall not inure to the benefit of or be binding upon a successor or assign of a Holder unless and except to the extent such successor or assign holds Registrable Securities.

(f)  Counterparts.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(g)  Headings.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(h)  Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AS APPLIED TO CONTRACTS MADE AND PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(i)  Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction. It is hereby stipulated and declared to be the intention of the parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(j)  Securities Held by the Company or Its Affiliates.  Whenever the consent or approval of Holders of a specified percentage in Amount of Registrable Securities is required hereunder, Registrable Securities held by the Company or its affiliates (as such term is defined in Rule 405 under the Securities Act) shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage.

-18-

     (k)  Third Party Beneficiaries.  Holders of Registrable Securities are
intended third party beneficiaries of this Agreement and this Agreement may be
enforced by such Persons.

     (l)  Entire Agreement.  This Agreement, together with the Purchase
Agreement and the Indenture, is intended by the parties as a final and exclusive
statement of the agreement and understanding of the parties hereto in respect of
the subject matter contained herein and therein and any and all prior oral or
written agreements, representations, or warranties, contracts, understandings,
correspondence, conversations and memoranda between the Initial Purchasers on
the one hand and the Company on the other, or between or among any agents,
representatives, parents, subsidiaries, affiliates, predecessors in interest or
successors in interest with respect to the subject matter hereof and thereof are
merged herein and replaced hereby.

-19-

        IN WITNESS WHEREOF, the parties have executed this Agreement as of the
date first written above.

                              TERAYON COMMUNICATION SYSTEMS, INC.

                              By:  /s/ Zaki Rakib
                                   --------------------------------------
                                   Name:  Zaki Rakib
                                   Title: Chief Executive Officer

                              DEUTSCHE BANK SECURITIES INC.
                              LEHMAN BROTHERS, INC.

                              By: DEUTSCHE BANK SECURITIES INC.

                              By: /s/ Tony Meneghetti
                                   _____
                                   Name: Tony Meneghetti
                                   Title: Acting Director

Exhibit 12.1

Statement Regarding Computation of Ratios

|  | Year Ended December 31, | | | Six months Ended June 30, | |
|  | 1997 | 1998 | 1999 | 1999 | 2000 |
| --- | --- | --- | --- | --- | --- |
| Fixed charges<br>-interest expense | $ 268 | $ 359 | $ 93 | $ 58 | $ 398 |
| -estimated interest<br> included in rent/<br> lease payments | 425 | 421 | 506 | 17 | 17 |
| Total Fixed charges | $ 693 | $ 780 | $ 599 | $ 75 | $ 415 |
|  |  |  |  |  |  |
| Earnings<br>Net income (loss) | $(22,549) | $(47,138) | $(64,080) | $(14,647) | $(62,758) |
| -Fixed charges per<br> above | 693 | 780 | 599 | 75 | 415 |
| Total earnings | $(21,856) | $(46,358) | $(63,481) | $(14,572) | $(62,343) |
|  |  |  |  |  |  |
| Deficiency of<br>earnings available to<br>cover fixed charges | $(22,549) | $(47,138) | $(64,080) | $(14,647) | $(62,758) |

Exhibit 23.1

CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS


We consent to the reference to our firm under the Caption "Experts" in the Registration Statement (Form S-3) and related Prospectus of Terayon Communication Systems, Inc. for the registration of $500,000,000 of 5% Convertible Subordinated Notes due August 1, 2007 (the "Notes") and 5,951,673 shares of its common stock issuable upon conversion of the Notes and to the incorporation by reference therein of our reports dated January 17, 2000, with respect to the consolidated financial statements and schedule of Terayon Communication Systems, Inc. included in its Annual Report (Form 10-K/A), as amended on April 28, 2000 for the year ended December 31, 1999, filed with the Securities and Exchange Commission.


/s/  Ernst & Young LLP


San Jose, California
October 24, 2000

Exhibit 23.2

CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS


    We consent to the reference to our firm under the Caption "Experts" in the Registration Statement (Form S-3) and related Prospectus of Terayon Communication Systems, Inc. for the registration of $500,000,000 of 5% Convertible Subordinated Notes due August 1, 2007 (the "Notes") and 5,951,673 shares of its common stock issuable upon conversion of the Notes and to the incorporation by reference therein of our report dated September 1, 2000, with respect to the financial statements of Mainsail Networks, Inc. included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed on October 18, 2000 with the Securities and Exchange Commission.


                              /s/ Ernst & Young LLP


San Jose, California
October 24, 2000

Exhibit 23.3

CONSENT OF PRICEWATERHOUSECOOPERS LLP, INDEPENDENT ACCOUNTANTS


We hereby consent to the incorporation by reference in this Registration Statement on Form S-3 of our report dated March 24, 2000 relating to the statement of assets acquired and liabilities assumed and the related statement of net sales and direct costs and operating expenses for the year then ended of Access Network Electronics Business of Tyco Electronic Corporation, included in the Terayon Communication Systems, Inc. Current Report on Form 8K/A dated June 29, 2000 for the year ended June 30, 1999. We also consent to the reference to us under the heading "Experts" in such Registration Statement.


/s/ PricewaterhouseCoopers LLP


San Jose, California
October 24, 2000

Exhibit 23.4

CONSENT OF KOST, FORER & GABBAY, INDEPENDENT AUDITORS

We consent to the reference to our firm under the Caption "Experts" in the Registration Statement (Form S-3) and related Prospectus of Terayon Communication Systems, Inc. for the registration of $500,000,000 of 5% Convertible Subordinated Notes due August 1, 2007 (the "Notes") and 5,951,673 shares of its common stock issuable upon conversion of the Notes and to the incorporation by reference therein of our report dated March 30, 2000, with respect to the financial statements of Telegate Ltd. included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed on June 29, 2000 with the Securities and Exchange Commission.

/s/ Kost, Forer and Gabbay
A Member of Ernst & Young International

Tel-Aviv, Israel
October 24, 2000

Exhibit 23.5

CONSENT OF KOST, FORER & GABBAY, INDEPENDENT AUDITORS


We consent to the reference to our firm under the Caption "Experts" in the Registration Statement (Form S-3) and related Prospectus of Terayon Communication Systems, Inc. for the registration of $500,000,000 of 5% Convertible Subordinated Notes due August 1, 2007 (the "Notes") and 5,951,673 shares of its common stock issuable upon conversion of the Notes and to the incorporation by reference therein of our report dated February 20, 2000 (except for Note 1c, as to which the date is April 18, 2000), with respect to the consolidated financial statements of ComBox Ltd. included in Terayon Communication Systems, Inc.'s Current Report on Form 8-K/A filed on June 29, 2000 with the Securities and Exchange Commission.


/s/ Kost, Forer and Gabbay
A Member of Ernst & Young International

Tel-Aviv, Israel
October 24, 2000

Exhibit 25.1

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549


FORM T-1
————————


STATEMENT OF ELIGIBILITY UNDER THE
TRUST INDENTURE ACT OF 1939 OF A
CORPORATION DESIGNATED TO ACT AS TRUSTEE

Check if an Application to Determine Eligibility
of a Trustee Pursuant to Section 305(b)(2)


STATE STREET BANK AND TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION
(Exact name of trustee as specified in its charter)


United States                                06-1143380
(Jurisdiction of incorporation or         (I.R.S. Employer
organization if not a U.S. national bank)    Identification No.)


633 West 5th Street, 12th Floor, Los Angeles, California    90071
(Address of principal executive offices)              (Zip Code)


Lynda A. Vogel, Senior Vice President and Managing Director
633 West 5th Street, 12th Floor, Los Angeles, California    90071
(213) 362-7399
(Name, address and telephone number of agent for service)


Terayon Communication Systems, Inc.
(Exact name of obligor as specified in its charter)


DELAWARE                                  77-0328533
(State or other jurisdiction of            (I.R.S. Employer
incorporation or organization)             Identification No.)

2952 Bunker Hill Lane
Santa Clara, CA 95054
(Address of principal executive offices)  (Zip Code)

5% Convertible Subordinated Notes due 2007
(TYPE OF SECURITIES)

GENERAL

Item 1.  General Information.

Furnish the following information as to the trustee:

(a) Name and address of each examining or supervisory authority to
    which it is subject.

    Comptroller of the Currency, Western District Office, 50 Fremont
Street, Suite 3900, San Francisco, California, 94105-2292

(b) Whether it is authorized to exercise corporate trust powers.
    Trustee is authorized to exercise corporate trust powers.

Item 2.  Affiliations with Obligor.

If the Obligor is an affiliate of the trustee, describe each such
affiliation.

    The obligor is not an affiliate of the trustee or of its parent,
State Street Bank and Trust Company.

    (See notes on page 2.)

Item 3. through Item 15.  Not applicable.

Item 16.  List of Exhibits.

List below all exhibits filed as part of this statement of
eligibility.

1.    A copy of the articles of association of the trustee as now in
effect.

    A copy of the Articles of Association of the trustee, as now
in effect, is on file with the Securities and Exchange Commission as
an Exhibit with corresponding exhibit number to the Form T-1of
Western  Digital Corporation, filed pursuant to Section 305(b)(2) of
the Trust Indenture Act of 1939, as amended (the "Act"), on May 12,
1998 (Registration No. 333-52463), and is incorporated herein
by reference.

2.    A copy of the certificate of authority of the trustee to
commence business, if not contained in the articles of association.

    A Certificate of Corporate Existence (with fiduciary powers)
from the Comptroller of the Currency, Administrator of National Banks
is on file with the Securities and Exchange Commission as an Exhibit
with corresponding exhibit number to the Form T-1 of Western Digital
Corporation, filed pursuant to Section 305(b)(2) of the Act, on
May 12, 1998 (Registration No. 333-52463), and is incorporated herein
by reference.

3.    A copy of the authorization of the trustee to exercise corporate
trust powers, if such authorization is not contained in the documents
specified in paragraph (1) or (2), above.

    Authorization of the Trustee to exercise fiduciary powers
(included in Exhibits 1 and 2; no separate instrument).

4.    A copy of the existing by-laws of the trustee, or instruments
corresponding thereto.

    A copy of the by-laws of the trustee, as now in effect, is
on file with the Securities and Exchange Commission as an Exhibit with
corresponding exhibit number to the Form T-1 of Western Digital
Corporation, filed pursuant to Section 305(b)(2) of the Act, on
May 12, 1998 (Registration No. 333-52463), and is incorporated
herein by reference.

1

5.    A copy of each indenture referred to in Item 4. if the obligor is in default.

        Not applicable.

6.    The consents of United States institutional trustees required by Section 321(b) of the Act.

        The consent of the trustee required by Section 321(b) of the Act is annexed hereto as Exhibit 6 and made a part hereof.

7.    A copy of the latest report of condition of the trustee published pursuant to law or the requirements of  its supervising or examining authority.

        A copy of the latest report of condition of the trustee published pursuant to law or the requirements of its supervising or examining authority is annexed hereto as Exhibit 7 and made a part hereof.

NOTES

        In answering any item of this Statement of Eligibility, which relates to matters peculiarly within the knowledge of the obligor or any underwriter for the obligor, the trustee has relied upon information furnished to it by the obligor and the underwriters, and the trustee disclaims responsibility for the accuracy or completeness of such information.

        The answer furnished to Item 2. of this statement will be amended, if necessary, to reflect any facts which differ from those stated and which would have been required to be stated if known at the date hereof.

SIGNATURE

        Pursuant to the requirements of the Trust Indenture Act of 1939, as amended, the trustee, State Street Bank and Trust Company of California, National Association, a national banking association, organized and existing under the laws of the United States of America, has duly caused this statement of eligibility to be signed on its behalf by the undersigned, thereunto duly authorized, all in the City of Los Angeles, and State of California, on the 20th day of October, 2000.

                            STATE STREET BANK AND TRUST COMPANY
                            OF CALIFORNIA, NATIONAL ASSOCIATION


                            By:    /S/   Scott C. Emmons
                                   -----------------------------
                                   NAME: Scott C. Emmons
                                   TITLE: Vice President
                            2

EXHIBIT 6

CONSENT OF THE TRUSTEE

Pursuant to the requirements of Section 321(b) of the Trust Indenture Act of 1939, as amended, in connection with the proposed issuance by Terayon Communication Systems, Inc. of its 5% Convertible Subordinated Notes due 2007, we hereby consent that reports of examination by Federal, State, Territorial or District authorities may be furnished by such authorities to the Securities and Exchange Commission upon request therefor.

STATE STREET BANK AND TRUST COMPANY
OF CALIFORNIA, NATIONAL ASSOCIATION

By:    /S/  Scott C. Emmons
       ----------------------------
       NAME: Scott C. Emmons
       TITLE: Vice President

Dated: October 20, 2000

3

EXHIBIT 7

Consolidated Report of Condition and Income for A Bank With Domestic Offices
Only and Total Assets of Less Than $100 Million of State Street Bank and Trust
Company of California, a national banking association duly organized and
existing under and by virtue of the laws of the United States of America, at the
close of business June 30, 2000, published in accordance with a call made by the
           -------------
Federal Deposit Insurance Corporation pursuant to the required law: 12 U.S.C.
Section 324 (State member banks); 12 U.S.C. Section 1817 (State nonmember
banks); and 12 U.S.C. Section 161 (National banks).

```
                                                                    Thousands
ASSETS                                                              of Dollars

Cash and balances due from depository institutions:
        Noninterest-bearing balances and currency and coin.............   5,727
        Interest-bearing balances....................................       0
Securities..............................................................      38
Federal funds sold and securities purchased under agreements to
        resell in domestic offices of the bank and its
        Edge subsidiary.................................................       0

Loans and lease financing receivables:
        Loans and leases, net of unearned income...........   0
        Allowance for loan and lease losses...............    0
        Allocated transfer risk reserve...................    0
        Loans and leases, net of unearned income and allowances........       0
Assets held in trading accounts........................................       0
Premises and fixed assets..............................................      18
Other real estate owned................................................       0
Investments in unconsolidated subsidiaries.............................       0
Customers' liability to this bank on acceptances outstanding...........       0
Intangible assets......................................................       0
Other assets...........................................................   1,281
                                                                          -----
Total assets...........................................................   7,064
                                                                          =====

LIABILITIES

Deposits:
        In domestic offices.............................................       0
               Noninterest-bearing........................    0
               Interest-bearing...........................    0
        In foreign offices and Edge subsidiary..........................       0
               Noninterest-bearing....................                         0
Interest-bearing .......................................................       0
Federal funds purchased and securities sold under agreements to
        repurchase in domestic offices of the bank and of its
        Edge subsidiary.................................................       0
Demand notes issued to the U.S. Treasury and Trading Liabilities.......        0
Other borrowed money...................................................        0
Subordinated notes and debentures......................................        0
Bank's liability on acceptances executed and outstanding...............        0
Other liabilities......................................................    2,872
                                                                          -----
Total liabilities......................................................    2,872
                                                                          =====

EQUITY CAPITAL

Perpetual preferred stock and related surplus..........................        0
Common stock...........................................................      500
Surplus................................................................      750
Undivided profits and capital reserves/Net unrealized
        holding gains (losses)...........................................   2,942
Cumulative foreign currency translation adjustments....................        0
Total equity capital...................................................    4,192
                                                                          -----
Total liabilities and equity capital...................................    7,064
                                                                          =====
```

4

I, John J. Saniuk, Vice President and Comptroller of the above named bank do hereby declare that this Report of Condition and Income for this report date have been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and is true to the best of my knowledge and belief.


                        /S/    John J. Saniuk


We, the undersigned directors, attest to the correctness of this Report of Condition and declare that it has been examined by us and to the best of our knowledge and belief has been prepared in conformance with the instructions issued by the appropriate Federal regulatory authority and is true and correct.


                        /S/    Alan D. Greene
                        /S/    Bryan R. Calder
                        /S/    Lynda A. Vogel
                        5