1
2
3
4
5

MORGAN, LEWIS & BOCKIUS LLP
    John H. Hemann (Bar No. 165823)
    Michael J. Lawson (Bar No. 66547)
    Sheila A. Jambekar (Bar No. 239101)
One Market
Spear Street Tower
San Francisco, CA 94105
Tel:  (415) 442-1000
Fax:  (415) 442-1001

6
7
8
9

ERNST & YOUNG LLP
    Bruce M. Cormier
    Joel E. Bonner (Bar No. 105492)
1225 Connecticut Avenue, NW
Washington, D.C. 20036
Tel:  (202) 327-7603
Fax:  (202) 327-7601

10
11

Attorneys for Defendant
ERNST & YOUNG LLP

12    UNITED STATES DISTRICT COURT

13    NORTHERN DISTRICT OF CALIFORNIA

14    SAN FRANCISCO DIVISION

15
16
17

ADRIAN MONGELI, Individually, And
On Behalf Of All Others Similarly
Situated,

18                    Plaintiff,

19                vs.

20
21
22
23
24
25

TERAYON COMMUNICATIONS
SYSTEMS, INC., ZAKI RAKIB, JERRY
D. CHASE, MARK A. RICHMAN,
EDWARD LOPEZ, RAY FRITZ, CAROL
LUSTENADER, MATTHEW MILLER,
SHLOMO RAKIB, DOUG SABELLA,
CHRISTOPHER SCHAEPE, MARK
SLAVEN, LEWIS SOLOMON,
HOWARD W. SPEAKS, ARTHUR T.
TAYLOR, DAVID WOODROW, and
ERNST & YOUNG LLP,

26                    Defendants.

Case No. 3-06-CV-03936 MJJ

**CLASS ACTION**

**DECLARATION OF SHEILA A.
JAMBEKAR IN SUPPORT OF
DEFENDANT ERNST & YOUNG LLP'S
MOTION TO DISMISS AND REQUEST
FOR JUDICIAL NOTICE**

Hearing Date:  June 26, 2007
Time:  9:30 a.m.
Dept.:  Courtroom 11
Judge:  Hon. Martin J. Jenkins
Action Filed:  June 23, 2006

27
28

1    I, Sheila A. Jambekar, declare as follows:

2    1.    I am an attorney at law, duly licensed to practice before this Court and the Courts

3    of the State of California.  I am an associate with the law firm of Morgan, Lewis & Bockius LLP,

4    attorneys for Defendant Ernst & Young LLP ("Ernst & Young").  The facts set forth herein are

5    known to me personally, and if called upon to testify, I could and would testify competently to

6    those facts.

7    2.    This Declaration is made in support of Defendant Ernst & Young's Request for

8    Judicial Notice in Support of Its Motion to Dismiss.

9    3.    On March 7, 2007, I searched LIVEDGAR via the website, www.gsionline.com,

10    for Terayon Communication Systems, Inc.'s ("Terayon's")10-K filings for the years ending

11    December 31, 2001, December 31, 2002, December 31, 2003, December 31, 2004 and December

12    31, 2005.  LIVEDGAR is a database through which U.S. Securities and Exchange Commission

13    filings can be obtained.

14    4.    Attached as Exhibit A is a true and correct copy of the cover page, table of

15    contents, and pages 35 through 73 of Terayon's 10-K filing for the year ending December 31,

16    2001, that I obtained from searching LIVEDGAR.

17    5.    Attached as Exhibit B is a true and correct copy of the cover page, table of

18    contents, and pages 54 through 103 of Terayon's 10-K filing for the year ending December 31,

19    2002, that I obtained from searching LIVEDGAR.

20    6.    Attached as Exhibit C is a true and correct copy of the cover page, index, and

21    pages 53 through 89 of Terayon's 10-K filing for the year ending December 31, 2003, that I

22    obtained from searching LIVEDGAR.

23    7.    Attached as Exhibit D is a true and correct copy of the cover page, index, and

24    pages 56 through 92 of Terayon's 10-K filing for the year ending December 31, 2004, that I

25    obtained from searching LIVEDGAR.

26    8.    Attached as Exhibit E is a true and correct copy of the cover page, index, and

27    pages 48 and 49 of Terayon's 10-K filing for the year ending December 31, 2005, that I obtained

28    from searching LIVEDGAR.

9.       On March 20, 2007, I went to the Yahoo! Finance website at http://finance.yahoo.com/, typed the ticker symbol for Terayon (TERN.PK) into a text box in the upper left corner of the page, and clicked on the link entitled "Get Quotes."  On the next page that opened, I then chose the link entitled "Historical Prices."  Then, on the next page that opened after that, I set the date range for June 1, 2001 until March 31, 2006 and clicked the link "Get Prices."  This opened a new page with a table containing daily stock price information for Terayon between June 1, 2001 until March 31, 2006.  I then clicked on the link "Download to Spreadsheet," which opened a new window containing the same stock price data in an Excel spreadsheet.  Attached as Exhibit F is a true and correct copy of the printout of that Excel spreadsheet containing information regarding Terayon's daily stock prices for the period of June 1, 2001 until March 31, 2006.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.  Executed on this 23rd day of March 2007, in San Francisco, California.

_____
/S/
Sheila A. Jambekar

Case Number: 3-06-CV-03936 MJJ
DECLARATION OF
SHEILA A. JAMBEKAR

# Exhibit A

# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

## Form 10−K

(Mark one)

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2001**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to          .**

### Commission File Number: 000−24647

# Terayon Communication Systems, Inc.
*(Exact name of registrant as specified in its charter)*

| Delaware | 77−0328533 |
|---|---|
| *(State or other jurisdiction of incorporation or organization* | *(IRS Employer Identification No.)* |

**2952 Bunker Hill Lane**

**Santa Clara, California 95054**
**(408) 727−4400**
*(Address, including zip code, and telephone number, including area code, of the registrant's principal executive offices)*

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class: | Name of each exchange on Which Registered: |
|---|---|
| None | None |

### Securities registered pursuant to Section 12(g) of the Act:

**Common Stock, par value $0.001 per share**
*(Title of Class)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K.

The aggregate market value of the voting stock held by non−affiliates of the registrant, based upon the closing sale price of the Common Stock on March 28, 2002 as reported on the Nasdaq National Market, was approximately $471,647,933. Shares of Common Stock held by each officer and director and by each person known to the Company who owns 5% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of March 28, 2002, registrant had outstanding 72,701,056 shares of Common Stock.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement to be filed with the Securities and Exchange Commission in May 2002, pursuant to Section 14 of the Securities Exchange Act of 1934, in connection with the 2001 Annual Meeting of Stockholders of Terayon Communication Systems, incorporated: Part III.

# TABLE OF CONTENTS

PART I
    Item 1. Business
    Item 2. Properties
    Item 3. Legal Proceedings
    Item 4. Submission of Matters to a Vote of Security Holders
PART II
    Item 5. Market for the Registrant's Common Equity and Related Stockholder Matters
    Item 6. Selected Financial Data
    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
    Item 7a. Market Risk Disclosure Information
    Item 8. Financial Statements and Supplementary Data
    Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosures
PART III
    Item 10. Directors and Officers of the Registrant
    Item 11. Executive Compensation
    Item 12. Security Ownership of Certain Beneficial Owners and Management
    Item 13. Certain Relationship and Related Transactions
PART IV
    Item 14. Exhibits, Financial Statement Schedules, and Reports on Form 8-K
SIGNATURES
EXHIBIT INDEX
EXHIBIT 10.3
EXHIBIT 10.14
EXHIBIT 10.15
EXHIBIT 10.16
EXHIBIT 10.17
EXHIBIT 10.18
EXHBIIT 21.1
EXHIBIT 23.1

Item 8.   *Financial Statements and Supplementary Data*

## TERAYON COMMUNICATION SYSTEMS, INC.

### INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Ernst & Young LLP, Independent Auditors | 36 |
| Consolidated Balance Sheets | 37 |
| Consolidated Statements of Operations | 38 |
| Consolidated Statements of Stockholders' Equity | 39–40 |
| Consolidated Statements of Cash Flows | 41 |
| Notes to Consolidated Financial Statements | 42–73 |

35

**REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS**

The Board of Directors and Stockholders

Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2001 and 2000, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2001. Our audits also included the financial statement schedule listed in the index at Item 14(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2001 and 2000, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ ERNST & YOUNG LLP

San Jose, California

January 28, 2002

36

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|  | 2001 | 2000 |
|  | (In thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 100,274 | $ 347,015 |
| Short–term investments | 233,614 | 215,442 |
| Accounts receivable, less allowance for doubtful accounts of $7,207 in 2001 and $6,542 in 2000 | 48,386 | 42,772 |
| Accounts receivable from related parties | 4,006 | 17,454 |
| Other current receivables | 7,476 | 32,027 |
| Inventory | 16,658 | 87,767 |
| Other current assets | 13,462 | 7,021 |
| Total current assets | 423,876 | 749,498 |
| Property and equipment, net | 25,279 | 33,533 |
| Intangibles and other assets, net | 17,491 | 643,696 |
| Total assets | $ 466,646 | $1,426,727 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 42,821 | $ 123,994 |
| Accrued payroll and related expenses | 9,441 | 13,105 |
| Deferred revenues | 4,169 | 4,998 |
| Warranty reserves | 8,368 | 5,925 |
| Accrued purchase price payable | — | 14,138 |
| Accrued restructuring charges | 8,197 | |
| Accrued vendor cancellation charges | 17,291 | 19,000 |
| Other accrued liabilities | 14,015 | 6,719 |
| Current portion of long–term debt | 3,273 | 10,853 |
| Short–term debt | — | 2,697 |
| Current portion of capital lease obligations | 126 | 131 |
| Total current liabilities | 107,701 | 201,560 |
| Long–term debt | 2,467 | 119 |
| Long–term portion of capital lease obligations | 233 | 358 |
| Other long–term obligations | 1,800 | 3,444 |
| Convertible subordinated notes | 174,141 | 500,000 |
| Deferred tax liability | — | 18,565 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares — 5,000,000 | | |
| Issued and outstanding shares — none in 2001 and 2000 | — | — |
| Common stock, $0.001 par value: | | |
| Authorized shares — 200,000,000 | | |
| Issued — 72,201,322 in 2001 and 67,431,261 in 2000 | | |
| Outstanding — 72,073,483 in 2001 and 67,396,539 in 2000 | 73 | 68 |
| Additional paid in capital | 1,074,203 | 1,037,964 |
| Accumulated deficit | (892,994) | (329,148) |
| Deferred compensation | (458) | (6,788) |
| Stockholders' notes receivable | — | (3) |
| Treasury Stock, at cost; 127,839 shares in 2001 and 34,722 shares in 2000 | (768) | (73) |
| Accumulated other comprehensive income | 248 | 661 |
| Total stockholders' equity | 180,304 | 702,681 |
| Total liabilities and stockholders' equity | $ 466,646 | $1,426,727 |

See accompanying notes.

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (In thousands, except per share data) | | |
| Revenues: |  |  |  |
| Product revenues | $ 227,036 | $ 220,228 | $ 57,345 |
| Related party product revenues | 52,445 | 119,321 | 39,664 |
| Total revenues | 279,481 | 339,549 | 97,009 |
| Cost of goods sold: |  |  |  |
| Cost of product revenues | 196,430 | 205,787 | 46,215 |
| Cost of related party product revenues | 33,181 | 64,744 | 25,829 |
| Special charges | 33,506 | 19,000 | — |
| Total cost of goods sold | 263,117 | 289,531 | 72,044 |
| Gross profit | 16,364 | 50,018 | 24,965 |
| Operating expenses: |  |  |  |
| Research and development | 79,927 | 68,270 | 17,579 |
| Cost of product development assistance agreement | — | 9,563 | 35,147 |
| In-process research and development | — | 30,535 | 14,600 |
| Sales and marketing | 55,701 | 45,261 | 15,727 |
| General and administrative | 31,309 | 24,809 | 7,476 |
| Goodwill amortization | 25,410 | 59,057 | 3,524 |
| Restructuring costs and asset write-offs | 587,149 | — | — |
| Total operating expenses | 779,496 | 237,495 | 94,053 |
| Loss from operations | (763,132) | (187,477) | (69,088) |
| Interest income | 18,132 | 19,794 | 5,101 |
| Interest expense | (15,224) | (11,265) | (93) |
| Other expense | (2,864) | (1,819) | — |
| Loss before extraordinary gain and tax benefit | (763,088) | (180,767) | (64,080) |
| Income tax benefit | (13,915) | — | — |
| Loss before extraordinary gain | (749,173) | (180,767) | (64,080) |
| Extraordinary gain on early retirement of debt | 185,327 | — | — |
| Net loss | $(563,846) | $(180,767) | $(64,080) |
| Basic and diluted net loss per share before extraordinary gain | $ (10.96) | $ (2.95) | $ (1.55) |
| Extraordinary gain on early retirement of debt | 2.71 | — | — |
| Basic and diluted net loss per share | $ (8.25) | $ (2.95) | $ (1.55) |
| Shares used in computing historical basic and diluted net loss per share applicable to common stockholders | 68,331 | 61,349 | 41,260 |

See accompanying notes.

38

## TERAYON COMMUNICATION SYSTEMS, INC.

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | | |
| Balance at December 31, 1998 | 32,916,242 | $ 16 | $ 114,594 | $ (84,301) | $ (2,184) | $ (22) | $ | | $ | $ 28,103 |
| Issuance of common stock, net issuance costs | 4,203,892 | 2 | 75,123 | | | | | | | 75,125 |
| Exercise of options for cash to purchase common stock | 1,927,986 | 1 | 2,486 | | | | | | | 2,487 |
| Exercise of common stock warrant for cash | 6,000,000 | 3 | 19,497 | | | | | | | 19,500 |
| Cash proceeds from payment on a Stockholder note receivable | — | | | | | 16 | | | | 16 |
| Amortization of unearned compensation related to stock | — | | | | 631 | | | | | 631 |
| Issuance of warrant to purchase common stock | — | | 35,587 | | | | | | | 35,587 |
| Issuance of common stock for Employee Stock Purchase Plan | 202,326 | | 1,170 | | | | | | | 1,170 |
| Compensation expense related to option acceleration for terminated employees | | | 856 | | | | | | | 856 |
| Compensation expense for common stock issued in exchange for services | | | 61 | | | | | | | 61 |
| Compensation expense for common stock issued in lieu of bonus | 1,192 | | 25 | | | | | | | 25 |
| Acquisition of Imedia Corporation | 1,714,814 | 1 | 106,737 | | | | | | | 106,738 |
| Acquisition of Radwiz Limited | 1,992,306 | 1 | 52,718 | | | | | | | 52,719 |
| Comprehensive income: Increase in unrealized gain on short-term investments | — | | | | | | (283) | | | (283) |
| Net loss | — | | | (64,080) | | | | | | (64,080) |
| Comprehensive loss | | | | | | | | | | (64,363) |
| Balance at December 31, 1999 | 48,958,758 | 24 | 408,854 | (148,381) | (1,553) | (6) | (283) | | | 258,655 |
| Exercise of option for cash to purchase common stock | 1,935,675 | 3 | 14,180 | | | | | | | 14,183 |
| Repurchase of common stock | (34,722) | | | | | | | 34,722 | (73) | (73) |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Unearned compensation related to stock options | | | 3,497 | | (3,497) | | | | | — |
| Amortization of unearned compensation related to stock | | | | | 3,465 | | | | | 3,465 |
| Issuance of warrant to purchase common stock | — | | 44,143 | | | | | | | 44,143 |
| Issuance of common stock for Employee Stock Purchase Plan | 277,060 | | 2,088 | | | | | | | 2,088 |
| Issuance of common stock in relation to Stock Split | | 22 | (22) | | | | | | | — |
| Cashless exercise of warrants | 3,687,618 | 4 | (4) | | | | | | | — |
| Acquisitions: | | | | | | | | | | |
| Telgate | 4,440,000 | 4 | 95,969 | | | | | | | 95,973 |
| ANE | 1,404,552 | 2 | 83,475 | | | | | | | 83,477 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Internet Telecom | 377,980 | | 46,473 | | | | | | | | 46,474 |
| Ultracom | 536,766 | 1 | 58,637 | | | | | | | | 58,638 |
| Combox | 1,547,770 | 2 | 98,782 | | | | | | | | 98,784 |
| Mainsail | 2,969,062 | 3 | 162,556 | | (4,719) | | | | | | 157,840 |
| Digitrans | 762,133 | 1 | 15,320 | | | | | | | | 15,321 |
| Truc Chat | 534,487 | 1 | 2,663 | | (484) | | | | | | 2,180 |
| Purchase price adjustment on 1999 acquisitions | | | 1,353 | | | | | | | | 1,353 |
| Comprehensive income: | | | | | | | | | | | — |
| Increase to unrealized gain on short-term investments | | | | | | (153) | | | | | (153) |
| Cumulative translation adjustment | | | | | | | 1,097 | | | | 1,097 |
| Net loss | | | | (180,767) | | | | | | | (180,767) |
| Comprehensive loss | | | | | | | | | | | (179,823) |
| Balance at December 31, 2000 | 67,396,539 | $ 68 | $1,037,964 | $ (329,148) | $ (6,788) | $ (3) | $ 661 | 34,722 | $ (73) | $ 702,681 | |

Table of Contents

**TERAYON COMMUNICATION SYSTEMS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY — (Continued)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | | |
| Exercise of option for cash to purchase common stock | 2,507,582 | $ 4 | $ 12,494 | | | | | | | $ 12,498 |
| Repurchase of common stock | (93,117) | | | | | | | 93,117 | (695) | (695) |
| Issuance of options | | | 719 | | (719) | | | | | — |
| Amortization of deferred compensation | | | | | 5,815 | | | | | 5,815 |
| Adjustments to deferred compensation due to employee terminations | | | (1,234) | | 1,234 | | | | | — |
| Issuance of restricted common stock for services provided | 275,250 | | 1,237 | | | | | | | 1,237 |
| Issuance of common stock for Employee Stock Purchase Plan | 381,428 | | 1,966 | | | | | | | 1,966 |
| Issuance of warrants to purchase common stock | | | 1,187 | | | | | | | 1,187 |
| Issuance of common stock for tender offer | 141,442 | | 2,001 | | | | | | | 2,001 |
| Issuance of common stock for retirement of debt | 1,464,359 | 1 | 17,869 | | | | | | | 17,870 |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Comprehensive income: Increase to unrealized gain on short-term investments | | | | | | | 208 | | | 208 |
| Cumulative translation adjustment | | | | | | | (621) | | | (621) |
| Net loss | | | | (563,846) | | | | | | (563,846) |
| Comprehensive loss | | | | | | | | | | (564,259) |
| Balance at December 31, 2001 | 72,073,483 | $ 73 | $ 1,074,203 | $ (892,994) | $ (458) | $ — | $ 248 | 127,839 | $ (768) | $ 180,304 |

See accompanying notes.

40

## TERAYON COMMUNICATION SYSTEMS, INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (In thousands) | | |
| **Operating activities:** |  |  |  |
| Net loss | $(563,846) | $(180,767) | $ (64,080) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: |  |  |  |
| Depreciation | 15,728 | 11,284 | 2,121 |
| Write-off and amortization of intangible assets | 619,157 | 106,305 | 6,089 |
| In-process research and development | — | 30,535 | 14,600 |
| Amortization related to stock options | 5,815 | 3,465 | 631 |
| Compensation expense relating to issuance of common stock to employees | 2,001 | — | 25 |
| Loss on disposal of fixed assets | 1,600 | — | 33 |
| Extraordinary gain on early retirement of debt | (185,327) | — | — |
| Compensation expense for common stock issued in exchange for consulting services | 1,237 | — | 61 |
| Value of common and preferred stock warrants issued | 505 | 9,563 | 35,587 |
| Option acceleration related to a terminated employee | — | — | 856 |
| Changes in operating assets and liabilities: |  |  |  |
| Accounts receivable | (5,614) | (28,757) | (11,925) |
| Accounts receivable from related parties | 13,448 | (10,173) | (5,732) |
| Inventory | 71,109 | (82,776) | (1,041) |
| Other assets | 16,606 | (18,876) | (2,305) |
| Accounts payable | (81,173) | 110,777 | 4,617 |
| Accrued payroll and related expenses | (3,664) | 7,167 | 3,463 |
| Deferred revenues | (829) | 457 | 4,541 |
| Warranty reserves | 2,443 | 3,240 | 1,621 |
| Accrued restructuring charges | 8,197 | — | — |
| Accrued vendor cancellation charges | (1,709) | 19,000 | — |
| Other accrued liabilities | 7,296 | 16,189 | 2,933 |
| Deferred taxes | (18,565) | 7,567 | — |
| Current portion of long term debt | — | 10,853 | — |
| Other non-current liabilities | 704 | 5,661 | 5 |
| Net cash (used in) provided by operating activities | (94,881) | 20,714 | (7,900) |
| **Investing activities:** |  |  |  |
| Purchases of short-term investments | (402,653) | (376,108) | (217,323) |
| Proceeds from sales and maturities of short-term Investments | 384,689 | 240,744 | 150,984 |
| Purchases of property and equipment | (9,074) | (38,534) | (4,718) |
| Officer note receivable | — | — | 100 |
| Purchase of developed technology | — | — | (1,850) |
| Purchase of other assets | — | (17,969) | (508) |
| Cash received from acquisitions | — | — | 2,659 |
| Cash paid for acquisition of businesses | — | (14,848) | (250) |
| Pre-acquisition loan to Imedia | — | — | (1,800) |
| Net cash (used in) investing activities | (27,038) | (206,715) | (72,706) |
| **Financing activities:** |  |  |  |
| Principal payments on capital leases | (130) | (12) | (28) |
| Principal payments on long-term debt | (24,415) | — | — |
| Proceeds from long-term debt | — | 484,429 | 43 |
| Increase in other non-current liabilities | — | — | 355 |
| Exercise of options and warrant to purchase common stock | 12,498 | 14,183 | 21,983 |
| Payments on repurchase of common stock | (695) | (73) | — |
| Principal payments on stockholder notes receivable | 3 | 3 | 16 |
| Debt repurchase of convertible notes | (113,428) | — | — |
| Proceeds from issuance of common stock | 1,966 | 2,088 | 76,293 |
| Net cash (used in) provided by financing activities | (124,201) | 500,618 | 98,662 |
| Effect of exchange rate changes | (621) |  |  |
| Net decrease in cash and cash equivalents | (246,741) | 314,617 | 18,056 |
| Cash and cash equivalents at beginning of year | 347,015 | 32,398 | 14,342 |
| Cash and cash equivalents at end of year | $ 100,274 | $ 347,015 | $ 32,398 |
| **Supplemental disclosures of cash flow information:** |  |  |  |
| Cash paid for income taxes | $      31 | $      — | $      — |
| Cash paid for interest | $ 20,810 | $    365 | $      — |
| **Supplemental noncash investing and financing activities:** |  |  |  |
| Common shares issued for settlement of convertible debt | $ 17,900 | $      — | $      — |

| | | | |
|---|---|---|---|
| Acquisition of businesses | $ — | $ 565,228 | $ 161,864 |
| Deferred Compensation relating to common stock issued to non–employees | $ 684 | — | $ — |
| Reduction in deferred compensation due to termination of employees | $ 1,234 | $ — | $ — |
| Issuance of warrants in connection with purchase of TrueChat | $ 682 | $ — | $ — |

See accompanying notes.

41

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.  **Organization and Summary of Significant Accounting Policies**

*Description of Business*

Terayon Communication Systems, Inc. (the Company) was incorporated under the laws of the state of California on January 20, 1993. In July 1998, the Company reincorporated in the State of Delaware.

The Company develops, markets and sells equipment to cable television operators, telecom carriers and satellite network operators who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers.

*Basis of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned and majority owned subsidiaries. All intercompany balances and transactions have been eliminated.

*Use of Estimates*

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

*Foreign Currency Translation*

For operations outside the U.S. that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end–of–period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive income (loss) in stockholders' equity. For the three years ended December 31, 2001, translation gains and losses were not significant.

*Concentrations of Credit Risk, Customers, Suppliers, and Products*

The Company operates in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Access Systems (Telecom). The Company sells primarily to customers within the cable and telecommunications industries, including related parties *(see Note 13)*. The Company performs ongoing credit evaluations of its customers and generally requires no collateral. A relatively small number of customers account for a significant percentage of the Company's revenues and accounts receivable. The Company expects that the sale of its products to a limited number of customers and resellers may continue to account for a high percentage of revenues for the foreseeable future.

Currently, the Company relies on single source suppliers of materials and labor for the significant majority of its product inventory but is actively pursuing additional supplier alternatives. As a result, should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

Substantially all of the Company's revenues have been attributable to sales of the TeraLink and the TeraPro. These products are expected to account for a significant part of the Company's revenues for the foreseeable future. As a result, a decline in demand for or failure to achieve broad market acceptance of the TeraLink or the TeraPro would adversely affect operating results.

In addition, market acceptance of the Company's products may be affected by the emergence and evolution of industry standards. While the Company expects its products to become compliant with industry standards, its inability to do so may adversely affect operating results.

42

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/ AA− or better or A1/ P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short−term investments.

### Revenue Recognition

The Company sells its products directly to broadband access service providers, system resellers and distributors and recognizes revenue upon shipment to the customer when title is transferred. Revenues related to product sales are generally recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. The Company's existing agreements with its system resellers and distributors do not contain price protection provisions and do not grant return rights beyond those provided by the Company's standard warranty.

### Research and Development Expenses

Research and development expenses are charged to expense as incurred.

### Shipping and Handling Costs

Costs related to shipping and handling are included in cost of sales for all periods presented.

### Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2001 and 2000 were $2.3 million and $1.0 million, respectively. Advertising expenses were not significant in 1999.

The Company has entered into co−marketing arrangements with Rogers Cablesystems, Inc. ("Rogers"), a related party (see Note 13) and Shaw Communications, Inc. ("Shaw"). Such amounts, totaling $7.5 million for Shaw and $2.9 million for Rogers, are included in other current assets. The Company may be required to charge such activities against revenues in accordance with EITF 01−09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products."

### Net Loss Per Share Applicable to Common Stockholders

Historical basic and diluted net loss per share was computed using the weighted average number of common shares outstanding. Options, warrants, restricted stock and preferred stock were not included in the computation of historical diluted net loss per share because the effect would be antidilutive.

Shares used in the calculation of historical basic and diluted net loss per share follows (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2001 | 2000 | 1999 |
| --- | --- | --- | --- |
| Net loss | $(563,846) | $(180,767) | $(64,080) |
| Shares used in computing historical basic and diluted net loss per share | 68,331 | 61,349 | 41,260 |
| Historical basic and diluted net loss per share | $  (8.25) | $  (2.95) | $  (1.55) |

43

Table of Contents

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Options to purchase 20,007,686, 21,489,536 and 10,342,338 shares of common stock were outstanding at December 31, 2001, 2000 and 1999, respectively, and warrants to purchase 2,408,300, 2,072,318 and 4,072,318 shares of common stock were outstanding at December 31, 2001, 2000 and 1999, respectively, but were not included in the computation of diluted net loss per share, since the effect is antidilutive.

*Derivative Financial Instruments*

As of January 1, 2001, the Company adopted Financial Accounting Standards Board Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). As a result of the adoption of SFAS 133, the Company will recognize all derivative financial instruments, such as foreign exchange contracts, in the consolidated financial statements at fair value regardless of the purpose or the intent for holding the instrument. Changes in the fair value of derivative financial instruments are either recognized periodically in income or in shareholders' equity as a component of comprehensive income depending on whether the derivative financial instrument qualifies for hedging accounting, and if so, whether it qualifies as a fair value hedge or cash flow hedge. Generally, changes in fair values of derivatives accounted for as fair value hedges are recorded in income along with the portions of the changes in the fair values of the hedged items that relate to the hedged risks. Changes in fair values of derivatives accounted for as cash flow hedges, to the extent they are effective as hedges, are recorded in other comprehensive income, net of deferred taxes. Changes in fair value of derivatives used as hedges of the net investment in foreign operations are reported in other comprehensive income as part of the cumulative translation adjustment. Changes in fair value of derivatives not qualifying as hedges are reported in income.

As the Company had no derivative financial instruments outstanding as of December 31, 2001 or December 31, 2000, the adoption of SFAS 133 had no impact on the financial statements of the Company at December 31, 2001 or December 31, 2000.

*Cash Equivalents and Short-Term Investments*

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company accounts for investments in accordance with Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities". Management determines the appropriate classification of debt securities at the time of purchase and reevaluates such designation as of each balance sheet date. The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities, are classified as available-for-sale and are carried at amortized cost which approximates fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in equity securities at either December 31, 2001 or December 31, 2000.

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Inventory*

Inventory is stated at the lower of cost (first–in, first–out) or market. The components of inventory are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Finished goods | $  6,433 | $64,987 |
| Work–in process | 236 | 1,736 |
| Raw materials | 9,989 | 21,044 |
|  | $16,658 | $87,767 |

*Other Current Receivables*

As of December 31, 2001, other current receivables included approximately $5.2 million due from contract manufacturers for raw materials purchased from the Company.

*Property and Equipment*

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight–line method over the estimated useful lives, generally three to five years. Leasehold improvements are amortized using the straight–line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, the Company recorded $1.6 million in asset impairment during 2001 related to assets acquired in the purchase of Access Network Electronics Division of Tyco Electronics Corporation ("ANE"). No asset impairment occurred in 2000 or 1999.

Property and equipment are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Software and computers | $ 25,328 | $ 20,448 |
| Furniture and equipment | 29,754 | 25,708 |
| Leasehold improvements | 3,573 | 3,090 |
| Automobiles | 37 | 58 |
| Construction in progress | 4,805 | 5,119 |
|  | 63,497 | 54,423 |
| Accumulated depreciation and amortization | (38,218) | (20,890) |
| Property and equipment, net | $ 25,279 | $ 33,533 |

45

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Intangibles and Other Assets*

Intangibles and other assets consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Goodwill | $ 3,072 | $ 503,606 |
| Assembled workforce | 20,769 | 28,300 |
| Other intangibles | — | 202,730 |
|  | 23,841 | 734,636 |
| Accumulated amortization | (20,074) | (112,394) |
| Intangibles, net | 3,767 | 622,242 |
| Other assets | 13,724 | 21,454 |
| Total intangibles and other assets | $ 17,491 | $ 643,696 |

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2001, $0.7 million was added to goodwill relating to an increase in the purchase price of TrueChat *(see Note 14)* and $4.5 million was added to assembled workforce relating to retention payments in conjunction with the acquisition of ANE *(see Note 14)*.

*Impairment of Goodwill and Other Long–Lived Assets*

Goodwill and other long–lived assets are reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, the Company compares the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on the Company's weighted average cost of capital, which represents the blended costs of debt and equity.

During 2001, the Company recorded impairment charges for goodwill and other intangible assets *(see Note 6)*.

*Warranty Reserves*

The Company provides a standard warranty for most of its products, generally lasting one year from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Reserve estimates are based on historical experience and expectation of future conditions.

*Stock–Based Compensation*

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and includes the disclosure–only provisions as required under Statement of Financial Accounting Standards No. 123, "Accounting for Stock–Based Compensation" (SFAS 123).

46

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Accumulated Other Comprehensive Income (Loss)*

Accumulated other comprehensive income presented in the accompanying consolidated balance sheets and statements of stockholders' equity consists of net unrealized gain on short–term investments and accumulated net foreign currency translation losses.

The following are the components of comprehensive income (loss):

|  | 2001 | 2000 | 1999 |
|---|---|---|---|
| Net loss | $(563,846) | $(180,767) | $(64,080) |
| Cumulative translation adjustments | (621) | (153) | — |
| Change in unrealized gain (loss) on available–for–sale investments | 208 | 1,097 | (283) |
| Total comprehensive loss | $(564,259) | $(179,823) | $(64,363) |

*Reclassification*

Certain amounts reported in previous years have been reclassified to conform to the 2001 presentation.

*Impact of Recently Issued Accounting Standards*

In August 2001, the Financial Accounting Standards Board issued FAS No. 144, "Accounting for the Impairment or Disposal of Long–lived Assets". FAS No. 144 supercedes FAS No. 121, "Accounting for the Impairment of Long–lived Assets and Assets to be Disposed of" and the accounting and reporting provisions of Accounting Principles Board Opinion No. 30, "Reporting the Results of Operations — Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transaction." FAS No. 144 also amends Accounting Research Bulletin No. 51, "Consolidated Financial Statements," to eliminate the exception to consolidation for a subsidiary for which control is likely to be temporary. The provisions of FAS No. 144 will be effective for fiscal years beginning after December 15, 2001. The effect of adopting FAS No. 144 has been evaluated by the Company, and does not have a material adverse effect on Terayon's financial position or results of operations.

In June 2001, the Financial Accounting Standards Board issued Statements of Financial Accounting Standards No. 141, Business Combinations, and No. 142, Goodwill and Other Intangible Assets. Statement 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. Statement 141 also includes guidance on the initial recognition and measurement of goodwill and other intangible assets arising from business combinations completed after June 30, 2001. Statement 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. Statement 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with finite lives will continue to be amortized over their estimated useful lives. Additionally, Statement 142 requires that goodwill included in the carrying value of equity method investments no longer be amortized.

The Company will apply Statement 142 beginning in the first quarter of 2002. Application of the nonamortization provisions of Statement 142 will significantly reduce amortization expense that was approximately $25.4 million in fiscal 2001. The Company will reclassify identifiable intangible assets with indefinite lives, as defined by Statement 142, to goodwill at the date of adoption. The Company will test goodwill for impairment using the two–step process prescribed in Statement 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. The Company expects to perform the first of the required impairment tests of goodwill and indefinite lived intangible assets as of January 1, 2002 in the first quarter of 2002. Any impairment charge resulting from these transitional impairment tests will be reflected as the cumulative effect of a change in accounting principle in the first

47

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

quarter of 2002. Based on the preliminary unaudited analysis completed to date, we do not believe that the application of these statements will have an adverse material impact on the earnings and financial position of the Company.

## 2. Fair Value of Financial Instruments

The following estimated fair value amounts have been determined using available market information and appropriate valuation methodologies. However, considerable judgment is required in interpreting market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

| | December 31, 2001 | | | |
|---|---|---|---|---|
| Short−term Investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| *Investments maturing in less than 1 year:* | | | | |
| Commercial paper | $ 77,670 | $ 24 | $ — | $ 77,694 |
| Fixed income corporate securities | 40,194 | 6 | — | 40,200 |
| Government agency obligations | 7,954 | (6) | — | 7,948 |
| Total | $125,818 | $ 24 | $ — | $125,842 |
| *Investments maturing in 1 − 2 years:* | | | | |
| Fixed income corporate securities | 31,276 | 568 | — | 31,844 |
| Government agency obligations | 75,498 | 430 | — | 75,928 |
| Total | $106,774 | $ 998 | $ — | $107,772 |
| Total | $232,592 | $1,022 | $ — | $233,614 |

| | December 31, 2000 | | | |
|---|---|---|---|---|
| Short−term Investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| *Investments maturing in less than 1 year:* | | | | |
| Commercial paper | $ 86,638 | $ — | $ — | $ 86,638 |
| Fixed income corporate securities | 84,557 | 190 | — | 84,747 |
| Government agency obligations | 44,000 | 57 | — | 44,057 |
| Total | $215,195 | $ 247 | $ — | $215,442 |

Realized gains and losses were insignificant for each of the years in the three year period ended December 31, 2001.

## 3. Commitments

### Leases

The Company leases its facilities and certain equipment under operating leases. The operating leases for the Company's facilities expire in 2002 and 2003. Rent expense was approximately $7,249,940, $4,165,600, and $1,013,000, for the years ended December 31, 2001, 2000, and 1999, respectively. In October 1999, the Company subleased the facilities formerly occupied by Imedia Corporation to a third party through 2003. Sublease rental income was approximately $90,914 and $243,600 for the years ended December 31, 2001 and

48

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

2000 and $57,400 for the period from September 16, 1999 (acquisition date) to December 31, 1999. The lease was terminated in 2001.

The Company leases certain equipment under noncancelable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment aggregated approximately $1,207,461 and $1,273,960 at December 31, 2001 and 2000, respectively. Related accumulated amortization was approximately $796,376 and $432,398 at December 31, 2001 and 2000, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.

Future minimum lease payments under noncancelable operating leases and capital leases are as follows (in thousands):

|  | December 31, 2001 | |
|  | Operating Leases | Capital Leases |
| --- | --- | --- |
| 2002 | $ 5,316 | $ 154 |
| 2003 | 3,954 | 169 |
| 2004 | 3,160 | 80 |
| 2005 | 2,391 | — |
| Total minimum payments | $14,821 | 403 |
| Less amount representing interest | | 44 |
| Less current portion | | 359 |
| | | 126 |
| Long term portion | | $ 233 |

There are no future minimum sublease payments to be received under noncancelable subleases due to the termination of the lease.

*Purchase Obligations*

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations require the Company to purchase minimum quantities of the suppliers' products at a specified price. During fiscal year 2001, the Company recorded special charges of $33.5 million relating to vendor cancellation fees. As of December 31, 2001, the Company had approximately $58.7 million of purchase obligations, of which $17.3 million is included on the balance sheet as accrued vendor cancellation charges. The remaining obligations are expected to become payable at various times through mid−2003.

As of December 31, 2001 the Company had $1.6 million in unused letters of credit outstanding.

*Royalties*

The Company has purchased, through its acquisition of Radwiz Limited ("Radwiz"), certain technology that was developed by Radwiz and a former sister company utilizing funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade ("OCS"). The purchase of the technology was approved by the OCS. As a condition for this approval, the Company has committed to pay royalties to the Government of Israel on proceeds from sales of products based on this technology. Royalty rates are 3% − 5%. Royalties are payable from the commencement of sales of products based on the technology until the cumulative amount of the royalties paid and accrued by the Company equals 100% of the funding received from the OCS. The

49

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Company's total obligation for royalties, based on royalty–bearing government participations received or accrued, net of royalties paid or accrued, totaled approximately $2.0 million at December 31, 2001.

**4. Debt Obligations**

In connection with the acquisition of Mainsail Networks the Company assumed $3,520,000 Senior Secured Promissory Note. The note is secured by the general assets of Mainsail Networks and bears an interest rate equal to ten percent per annum. Interest accrued monthly. The promissory note was subsequently paid in full on April 30, 2001.

**5. Accrued Severance Pay**

Several of the Company's subsidiaries are subject to Israeli law and labor agreements, under which they are required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment is included in the Company's consolidated balance sheet on the accrual basis, and is partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2001, approximately $1,800,000 for accrued severance pay was included in other long–term obligations. Approximately $1,115,000 relating to the amounts funded by the purchase of insurance policies was included in other assets at December 31, 2001.

**6. Restructuring Charges and Asset Write–offs**

The Company incurred restructuring charges in the amount of $12.7 million and a write–down of impaired assets in the amount of $1.6 million for the year ended December 31, 2001. The write–down of $1.6 million related to fixed assets acquired from ANE that were determined to have no remaining useful life. Of the total restructuring charges, $3.2 million relates to employee termination costs covering 293 technical, production and administrative employees. As of December 31, 2001, approximately 240 employees have been terminated and we paid approximately $2.0 million in termination costs. The remaining $9.5 million of restructuring charges relates primarily to costs for excess leased facilities. Included in the remaining $9.5 million are $3.4 million of charges incurred in the fourth quarter for revisions in estimates of excess facility charges. As of December 31, 2001, the Company paid approximately $2.5 million related to lease costs. At December 31, 2001, restructuring charges of $8.2 million remain accrued, primarily related to excess facility costs and employee terminations. The Company anticipates utilizing the remaining restructuring accrual, which relates to servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

Restructuring costs are summarized below (in millions):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Balance at December 31, 2000 | $ 0.0 | $ 0.0 | $ 0.0 |
| Additions | 3.2 | 9.5 | 12.7 |
| Cash Payments | (2.0) | (2.5) | (4.5) |
| Balance at December 31, 2001 | $ 1.2 | $ 7.0 | $ 8.2 |

In March 2001, the Company evaluated the carrying value of certain long–lived assets and acquired intangibles, consisting primarily of goodwill recorded on its balance sheet. Pursuant to accounting rules, the majority of the goodwill was recorded based on stock prices at the time acquisition agreements were executed

50

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

and announced. Goodwill and other long–lived assets are reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, the Company compares the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is based on the fair value of the assets, typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on the Company's weighted average cost of capital, which represents the blended costs of debt and equity.

Downturns in the broadband services and telecommunications markets created unique circumstances with regard to the assessment of goodwill and other intangible assets for recoverability. As a result of management's decision to suspend certain product lines and product development efforts during 2001, intangible assets totaling $163.1 million relating to certain acquisitions with no future value were written off. Further, the aforementioned downturns in the principal markets in which the Company continues to operate, have negatively impacted the forecasted revenues and cash flows from certain other businesses acquired during fiscal 1999 and 2000. As a result of these events, in accordance with the Company's policy, the comparison of the undiscounted expected future cash flows to the carrying amount of the related intangible assets resulted in an impairment and accordingly the Company recorded a write–down of these assets related to both of the Company's Cable and Telecom segments of $409.7 million during 2001 to reflect the fair value of such assets.

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards relating to a previous acquisition. Due to the impairment write–off, the deferred tax asset, and remaining net deferred tax liability were also written–off.

**7.    Convertible Subordinated Notes**

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes due in August 2007 (the "Convertible Notes") resulting in net proceeds to the Company of approximately $484.4 million. The Convertible Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Convertible Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company may redeem some or all of the Convertible Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Convertible Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeds 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company will also make an additional payment of $193.55 per $1,000 principal amount of Convertible Notes, less the amount of any interest actually paid on the Convertible Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semiannually. Debt issuance costs related to the Convertible Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2001 amortization of debt issuance costs totaled $1.1 million.

In 2001, the Company repurchased approximately $325.9 million of the Convertible Subordinated Notes for $113.4 million in cash and $17.9 million in stock, resulting in an extraordinary gain of approximately $185.3 million net of related unamortized issuance costs of $9.3 million.

51

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

8. Contingencies

*Litigation*

In September 1999, a group of prospective investors in Imedia Corporation (Imedia), now our subsidiary, named Imedia as a defendant in an action alleging that Imedia breached its term sheet with the plaintiffs when Imedia negotiated its acquisition by us and, as a result, did not permit plaintiffs to invest in Imedia. The plaintiffs sought damages in excess of $12.0 million. The terms of the Imedia Agreement and Plan of Merger and Reorganization provided that shares of our common stock that were to be issued to the former shareholders of Imedia were placed in escrow to indemnify us for any damages that are directly or indirectly suffered by us as a result of plaintiffs' claims. The value of the escrowed shares was approximately $10.0 million based on the market value of our common stock on or about the closing date of the acquisition.

On or about September 5, 2000, the Company received an amended complaint (Complaint), *Evergreen Canada Israel Management, Ltd. v. Imedia Corporation*, pending in the Superior Court of the State of California. The Complaint alleged both (i) intentional interference with contractual relations and (ii) intentional interference with prospective economic advantage against the Company, claiming that the Company formed and operated a conspiracy to deprive plaintiffs of the opportunity to invest in Imedia. Plaintiffs argued that, prior to the Company's purchase of the Imedia shares, the Company knew of an alleged, pre–existing financing agreement between the plaintiffs and Imedia that contained a "no shop" clause, prohibiting Imedia from seeking or obtaining financing from any other sources, including a prohibition against Imedia selling its own stock or engaging in related transactions that preceded the acquisition. The Company was subsequently served with the Complaint and filed a demurrer challenging the legal sufficiency of the two causes of action. Other defendants demurred also. The demurrer hearing was held on January 16, 2001. Prior to the Court issuing a final ruling at that hearing, the Plaintiffs agreed to amend their complaint. The Plaintiffs filed a second amended complaint and, in response, the Company filed demurrers challenging all the causes of action. The Company's demurrer was heard on May 22, 2001, and the Court ruled that three contract claims and the tortuous interference with the prospective economic advantage claims should be dismissed. The Court also dismissed the two fraud claims with leave to amend.

The Plaintiffs then filed a third amended complaint, and the defendants each filed demurrers and motions to strike challenging that pleading. The demurrers and motions to strike were argued in November 2001.

Prior to a ruling on the demurrers and motions to strike, the parties entered into a settlement agreement in which Plaintiffs dismissed all claims with prejudice. The parties agreed that the settlement agreement would not be construed to be an admission of any liability on the part of the Company or any of the other defendants. The lawsuit was dismissed with prejudice in March 2002.

Beginning in April 2000, several plaintiffs filed lawsuits against the Company and certain of its officers and directors in federal court. The plaintiff in the first of these lawsuits purported to represent a class whose members purchased our securities between February 2, 2000 and April 11, 2000. The complaint alleged that the defendants had violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. The allegations in the other lawsuits were substantially the same and, on August 24, 2000, all of these lawsuits were consolidated in the United States District Court, Northern District of California. The consolidated lawsuit is named In *re Terayon Communication Systems, Inc. Securities Litigation*. The court hearing the consolidated action has appointed lead plaintiffs and lead plaintiffs' counsel pursuant to the Private Securities Litigation Reform Act.

On September 21, 2000, the lead plaintiffs filed a consolidated class action complaint containing factual allegations nearly identical to those in the original lawsuits. The consolidated class action complaint, however, alleged claims on behalf of a class whose members purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000. On October 30, 2000, defendants moved to dismiss the consolidated class action complaint. On March 14, 2001, after defendants motion had been fully briefed and argued, the

52

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

court issued an order granting in part defendants' motion and giving plaintiffs leave to file an amended complaint. On April 13, 2001, plaintiffs filed their first amended consolidated class action complaint. On June 15, 2001, defendants moved to dismiss this new complaint and oral argument on the motion occurred on December 17, 2001. The Company has not received an order from the court regarding the motion to dismiss argued on December 17, 2001.

The lawsuit seeks an unspecified amount of damages, in addition to other forms of relief. The Company considers the lawsuits to be without merit and we intend to defend vigorously against these allegations. However, the litigation could prove to be costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib, and Raymond Fritz) in the superior court of San Luis Obispo County, California. This lawsuit is titled *Bertram v. Terayon Communications Systems, Inc* (Bertram). The Bertram complaint contains factual allegations similar to those alleged in the federal securities class action lawsuit. The complaint asserts causes of action for unlawful business practices, unfair and fraudulent business practices, and false and misleading advertising. Plaintiffs purport to bring the action on behalf of themselves and as representatives of "all persons or entities in the State of California and such other persons or entities outside California that have been and are adversely affected by defendants' activity, and as the Court shall determine is not inconsistent with the exercise of the Court's jurisdiction." Plaintiffs seek equitable and injunctive relief. Defendants removed the Bertram case to the United States District Court, Central District of California and, on January 19, 2001, filed a motion to dismiss the complaint. A hearing on defendants' motion was held March 26, 2001 and the court granted Defendants' motion to dismiss the action and denied Plaintiffs' motion requesting remand. On April 5, 2001, Defendants moved for an order requiring further proceedings, if any to take place in the Northern District of California. Plaintiffs did not oppose this motion and eventually entered into a stipulation to go forward in the Northern District. On July 9, 2001, a status conference was held in this case before Judge Patel. Plaintiffs did not appear for the conference, and the court requested that defendants submit an order dismissing the Bertram action with prejudice, which the defendants have submitted to the court. The Company believes that these allegations, as with the allegations in the federal securities case, are without merit and intends to contest the matter vigorously.

**9. Stockholders' Equity**

*Public Offerings*

In January 1999, the Company completed a public offering of 6,500,000 shares of common stock, of which 3,500,000 shares were offered by the Company and 3,000,000 shares were offered by existing stockholders. The public offering resulted in proceeds to the Company of approximately $62,500,000, net of underwriting discounts, commissions, and other offering costs. In February 1999, the underwriters purchased an additional 975,000 shares of common stock as a result of the exercise of the over–allotment option, of which 703,892 and 271,108 shares of common stock were purchased from the Company and certain existing stockholders, respectively. This additional sale of common stock resulted in additional proceeds of approximately $12,700,000 to the Company.

*Stockholder Rights Plan*

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of Preferred Stock. The rights were distributed as a non–taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15 percent or more of the Company's Common Stock or announces a tender offer for 15 percent or more of the Company's Common Stock. If a person or group acquires 15 percent or more of the Company's Common Stock, all rights holders

53

### TERAYON COMMUNICATION SYSTEMS, INC.

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

except the buyer will be entitled to acquire the Company's Common Stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15 percent of the Company's Common Stock.

#### Common Stock

In February 2000, the Company's board of directors approved a two-for-one split of the Company's outstanding shares of common stock to be effected in the form of a stock dividend, subject to stockholder approval of an increase in the Company's authorized shares of common stock. In April 2000, the Company's stockholders approved an increase in the Company's authorized shares to 200,000,000. The Company's Board of Directors subsequently established the record date for the stock split as April 25, 2000 and the stock dividend was distributed on May 5, 2000. The changes in the capital structure resulting from the split were given retroactive effect in the consolidated financial statements.

In June 2001, the Company issued 160,000 shares of the Company's common stock to members of their Board of Advisors and recorded $595,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued of $3.72 per share.

In November 2001, the Company's Board of Directors approved a tender offer which permitted employees and members of the Board of Directors the ability to exchange all unvested options granted with an exercise price per share equal to or greater than $9.00 for a common stock award. On December 6, 2001, 9,480,629 outstanding options were exchanged for 141,442 shares of common stock. The value of the common stock issued was $2,001,000, using the closing price of the Company's common stock on the date of issuance of $14.15 per share, and was recorded as compensation expense in 2001.

During 2001, the Company issued 115,250 shares of common stock to its employees, and recorded $642,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date of issuance.

#### Common Stock Warrants

In conjunction with a Series F convertible preferred stock financing in April 1998, the Company issued a warrant to purchase 6,000,000 shares of the Company's common stock at an exercise price of $3.25 per share to Shaw Communications, Inc. (the "Shaw Warrant"). In addition, the Company issued a warrant (the "Anti-Dilution Warrant") to purchase an indeterminate number of shares of common stock. The Anti-Dilution Warrant is exercisable at the option of Shaw Communications, Inc. ("Shaw") during the period that Shaw owns equity in the Company and in the event the Company issues new equity securities at below the current market price defined in the Anti-Dilution warrant. The aggregate exercise price is $0.50. The Company issued certain equity securities that, as of December 31, 2001 and 1999, required the Company to issue an additional 35,982 and 33,936 warrants to purchase shares of common stock, respectively, pursuant to the Anti-Dilution warrant. During the year ended December 31, 2000 no equity securities were issued that resulted in the increase in the number of shares issuable pursuant to the Anti-Dilution warrant. The Company recorded expenses of approximately $226,000 and $439,000 relating to the issuance of warrants pursuant to the Anti-Dilution Warrant, in 2001 and 1999, respectively, and none in 2000. As of December 31, 2001, the Anti-Dilution Warrant was exercisable for an aggregate of 108,300 shares of the Company's common stock.

In March 1999, Shaw purchased 3,000,000 shares of the Company's common stock at $3.25 per share and in November 1999 Shaw purchased an additional 3,000,000 shares of the Company's common stock at $3.25 per share, resulting in net proceeds to the Company of $19.5 million. The shares were purchased pursuant to the exercise of the Shaw Warrant.

54

## TERAYON COMMUNICATION SYSTEMS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

On March 18, 1999, the Company entered into a one–year Product Development Assistance Agreement ("Development Agreement") with Rogers Communications Inc ("Rogers"). Under the terms of the Development Agreement, Rogers agreed to provide the Company assistance with the characterization and testing of the Company's subscriber–end and head–end voice over cable equipment. In addition, Rogers agreed to provide the Company technology to assist the Company in connection with its efforts to develop high quality, field proven technology solutions that are DOCSIS (1.0, 1.1 and 1.2)–compliant and packet cable–compliant. In consideration of Rogers entering into the Development Agreement, the Company issued Rogers two fully vested and non–forfeitable warrants, each to purchase 2,000,000 shares of common stock. One warrant has an exercise price of $0.50 per share and one warrant has an exercise price of $18.50 per share. The warrants were exercisable in full or in part through March 31, 2000. The fair value of the two warrants was approximately $45,000,000 and resulted in a noncash charge included in operations over the term of the Product Development Assistance Agreement. As a result of the Development Agreement, the Company's results of operations for the years ended December 31, 2000 and 1999 include noncash charges of $9.6 million and $35.1 million, respectively. In February 2000, Rogers exercised the warrants on a cashless basis, resulting in the issuance of 3,687,618 shares of the Company's common stock and no proceeds to the Company.

In October 1999, a customer of the Company entered into an agreement with Telegate Ltd. whereby the Customer committed to an investment in Telegate in connection with the acquisition of all the outstanding shares of Telegate by the Company. The Customer committed to provide this investment in the event that the acquisition of Telegate by the Company were not to have closed. In January 2000, the Company issued the customer a warrant to purchase 2,000,000 shares of the Company's common stock at a price of $30.75 per share; the closing price of the Company's common stock on the date the warrant was issued. The warrant is fully vested, non–forfeitable, and immediately exercisable and has a term of three years. The fair value of the warrant, determined as approximately $34,600,000 using the Black Scholes model, was included in the Telegate purchase price and was associated with the value of the customer relationship. The value of the warrant resulted in a non–cash charge to cost of goods sold to be amortized over the three– year term of the warrant. For the year ended December 31, 2001 and 2000, the Company incurred approximately $2,900,000 and $11,500,000 in amortization expense related to the Warrant, respectively. The Company did not record any related amortization expense in 1999. In the first quarter of 2001, the Company wrote–off the intangible assets relating to the purchase of Telegate *(see Note 6)*.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24 per month, beginning January 31, 2001. The fair value of the warrant of approximately $682,000 was calculated using the Black–Scholes method and was recorded as additional consideration relating to the purchase of TrueChat, Inc.

In June 2001, the Company issued a fully vested, immediately exercisable, warrant to purchase 100,000 shares of the Company's Common Stock at a price of $5.98 per share to Philips Semiconductors Inc. in consideration for the continuation of their strategic relationship with the Company. The fair value of the warrant, calculated using the Black Scholes method of approximately $280,000 was recorded as cost of goods sold during 2001.

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Common Stock Reserved*

Common stock reserved for issuance is as follows:

|  | December 31, 2001 |
| --- | --- |
| Common stock options | 40,405,352 |
| Common stock warrants | 2,408,300 |
| Employee stock purchase plan | 539,186 |
|  | 43,352,838 |

*Stock−Based Compensation*

In March 1995, the Board of Directors approved a stock option plan (the "1995 Plan"), that authorized shares for future issuance to be granted as options to purchase shares of the Company's common stock. As of December 31, 2001 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

In February 1997, the Board of Directors approved an equity incentive plan (the "1997 Plan"), that authorized 2,100,000 shares for future issuance to be granted as options to purchase shares of the Company's common stock. In June 1998, the Company's Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (4,500,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than five percent (5%) of the Company's outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares.

The 1997 Plan was amended on June 13, 2000 to increase the number of shares of common stock from 8,984,528 to 12,754,528 (3,770,000 additional shares) and to provide for an increase in the number of shares of common stock ("Evergreen Provision") on January 1, 2000 through and including January 1, 2007, by the lesser of five percent (5%) of the common stock outstanding on such January 1 or 3,000,000 shares. On January 1, 2001, 3,000,000 shares were added to the 1997 plan pursuant to the evergreen provision.

In June 1998, the Company's Board of Directors authorized the adoption of the 1998 Non−Employee Directors' Stock Option Plan (the "1998 Plan"), pursuant to which 400,000 shares of the Company's common stock have been reserved for future issuance to non−employee directors of the Company.

In September 1999, the Company's Board of Directors authorized the adoption of the 1999 Non−Officers Equity Incentive Plan (the "1999 Plan"), pursuant to which 6,000,000 shares of the Company's common stock have been reserved for future issuance to non−officer employees of the Company. In 2000, the Company's Board of Directors amended the 1999 Plan to increase the number of authorized shares to 18,500,000. In 2001, the Company's Board of Directors amended the 1999 Plan to increase the number of authorized shares to 28,500,000.

At December 31, 2001, the total authorized number of shares under the 1995, 1997, 1998 and 1999 plans was 4,229,494, 15,754,528, 400,000 and 28,500,000 respectively. All Plans are administered by the Board of Directors.

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately

56

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1998 Plan provides for non–discretionary nonqualified stock options to be issued to non–employee directors of the Company automatically as of the effective date of their election to the Board of Directors and annually following each Annual Stockholder meeting. Prices for nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non–officer employees and consultants of the Company. Prices for nonqualified stock options many not be less than 85% of the fair market value of the common stock at the date of the grant. Options vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

During the year ended December 31, 2001 and 2000, the Company recorded aggregate deferred compensation of approximately $35,000 and $3,500,000, respectively, representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. For the years ended December 31, 2001, 2000 and 1999, the amortization expense was approximately $456,000, $631,000 and $631,000, respectively.

The following is a summary of additional information with respect to the 1995 Stock Option Plan, the 1997 Equity Incentive Plan, the 1998 Non–Employee Directors' Stock Option Plan, the 1999 Non–Officer Equity Incentive Plan, outstanding options assumed by Terayon in conjunction with its business acquisitions of *(see Note 14)* and option grants made outside the Plans:

|  | Options Available for Grant | Options Outstanding and Exercisable | |
|---|---|---|---|
|  |  | Number of Shares | Weighted–Average Exercise Price |
| Balance at December 31, 1998. | 4,157,483 | 5,382,468 | $  2.27 |
| Options authorized | 6,000,000 | — |  |
| Options granted | (7,826,568) | 7,826,568 | $ 22.00 |
| Options exercised | — | (1,927,986) | $  1.73 |
| Options canceled | 938,712 | (938,712) | $  5.83 |
| Balance at December 31, 1999. | 3,269,627 | 10,342,338 | $ 16.78 |
| Options authorized | 18,654,528 | — |  |
| Options granted | (15,937,301) | 15,937,301 | $ 51.14 |
| Options exercised | — | (1,936,867) | $  7.26 |
| Options canceled | 2,853,236 | (2,853,236) | $  1.36 |
| Balance at December 31, 2000 | 8,840,090 | 21,489,536 | $ 39.27 |
| Options authorized | 13,000,000 | — |  |
| Options granted | (22,925,565) | 22,925,565 | $  6.25 |
| Options exercised | — | (2,924,274) | $  4.59 |
| Options canceled | 21,483,141 | (21,483,141) | $ 35.99 |
| Balance at December 31, 2001 | 20,397,666 | 20,007,686 | $  9.75 |

57

Table of Contents

## TERAYON COMMUNICATION SYSTEMS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2001:

| | Options Outstanding and Exercisable | | |
|---|---|---|---|
| Range of Exercise Prices | Number of Shares | Weighted−Average Exercise Price | Weighted−Average Remaining Contractual Life (in Years) |
| $ 0.01 − $ 6.52 | 6,252,038 | $  4.65 | 8.69 |
| $ 6.54 − $ 6.81 | 10,594,391 | $  6.81 | 9.13 |
| $ 6.86 − $31.41 | 2,043,321 | $ 20.25 | 8.29 |
| $31.47 − $69.75 | 1,067,603 | $ 43.82 | 8.23 |
| $82.78 − $123.50 | 50,333 | $ 112.12 | 8.21 |
| Total | 20,007,686 | | |

At December 31, 2001, approximately 6,437,117 options issued and outstanding were exercisable and approximately 18,835 shares of common stock outstanding were subject to repurchase by the Company. Common stock subject to repurchase represents any unvested shares of common stock held by an optionholder which, upon termination of the optionholder's employment, may be repurchased by the Company. Such shares are subject to repurchase at their original issuance price. Repurchased shares are recorded as Treasury stock.

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (the "ESPP"), which is designed to allow eligible employees of the Company to purchase shares of common stock at semiannual intervals through periodic payroll deductions. An aggregate of 1,400,000 shares of common stock has been reserved for the ESPP, and 860,814 shares have been issued through December 31, 2001. The Purchase Plan is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that is to be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the Purchase Plan will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date.

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under FAS 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under FAS 123 and is calculated as if the Company had accounted for its employee stock options granted during the years ended December 31, 2001, 2000 and 1999 and for its ESPP shares to be issued under the fair value method of FAS 123. The fair value for employee stock options granted was estimated at the date of grant based on the Black−Scholes model using the following weighted average assumptions: risk−free interest rates of 4.50%, 5.98%, and 6.70%, for 2001, 2000, and 1999, respectively; no dividend yield; volatility factors of 1.50, 1.20, and 0.80 for 2001, 2000, and 1999, respectively and a weighted average expected life of the option of five years. The fair value for employee stock purchase plan shares to be issued was estimated using the following weighted average assumptions: risk−free interest rate of 4.14%, 6.35% and 6.71% for 2001, 2000 and 1999, respectively, no dividend yield, volatility factors of 1.50, 1.20, and 0.80 for 2001, 2000, and 1999, respectively and a weighted average expected life of the shares of six months.

58

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

As discussed above, the valuation models used under FAS 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of FAS 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common stockholders would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
| Pro forma net loss | $(692,779) | $(300,666) | $(75,321) |
| Pro forma basic and diluted net loss per share | $    (10.14) | $    (4.90) | $    (1.83) |

The pro forma impact of options granted and ESPP shares to be issued on the net loss applicable to common stockholders for the years ended December 31, 2001, 2000 and 1999 is not representative of the effects on net income (loss) for future years, as future years will include the effects of options vesting as well as the impact of multiple years of stock option grants.

The options' weighted average grant date fair value, which is the value assigned to the options under FAS 123, was $5.83, $43.81, and $28.31, for options granted during 2001, 2000, and 1999,respectively. The weighted average grant date fair value of ESPP shares to be issued was $3.99, $9.30 and $8.40 for the years ended December 31, 2001, 2000 and 1999, respectively.

59

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**10.   Income Taxes**

For the year ended December 31, 2001, the Company had a benefit from Income Taxes of $13.9 million. Due to operating losses and the inability to recognize the benefits, there is no provision for income taxes for the years ended December 31, 2000 and 1999.

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (In thousands) | | |
| Current: |  |  |  |
| Federal | $   — | $ — | $ — |
| State | $   — | $ — | $ — |
| Foreign | $    831 | $ — | $ — |
| Total current | $    831 | $ — | $ — |
| Deferred: |  |  |  |
| Federal | $   — | $ — | $ — |
| State | $   — | $ — | $ — |
| Foreign | $(14,746) | $ — | $ — |
| Total deferred | $(14,746) | $ — | $ — |
| Total | $(13,915) | $ — | $ — |

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards relating to a previous acquisition. Due to the impairment write−off, the deferred tax asset, and remaining net deferred tax liability were also written−off.

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
| Tax benefit at U.S. statutory rate | $(197,346) | $(63,268) | $(22,428) |
| Goodwill amortization | 2,849 | 19,405 | 1,233 |
| In−process research and development | — | 8,698 | 5,110 |
| Loss for which no tax benefit is currently recognizable | 179,338 | 34,529 | 16,085 |
| Other, net | 1,244 | 636 | — |
|  | $ (13,915) | $ — | $ — |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

## TERAYON COMMUNICATION SYSTEMS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Significant components of the Company's deferred tax assets and liabilities as of December 31, 2001 and 2000 are as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | **2001** | **2000** |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 130,321 | $ 100,477 |
| Tax credit carryforwards | 13,047 | 6,808 |
| Reserves and accruals | 58,418 | 8,760 |
| Capitalized research and development | 7,580 | 4,232 |
| Intangibles amortization | 8,396 | 9,078 |
| Deferred revenue | — | 1,353 |
| Other, net | 610 | 994 |
| Gross deferred tax assets | 218,372 | 131,702 |
| Valuation allowance | (218,372) | (131,702) |
| Total deferred tax assets | | |
| Deferred tax liabilities | | |
| Acquired intangibles | — | (18,565) |
| Net deferred tax liabilities | $ — | $ (18,565) |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2001 and 2000. The change in the valuation allowance was a net increase of approximately $86,670,000, $88,182,000, and $18,976,000 for the years ended December 31, 2001, 2000, and 1999, respectively. Approximately $47,172,000 of the valuation allowance will be credited to equity when realized.

As of December 31, 2001, the Company had federal, California and foreign net operating loss carryforwards of approximately $281,923,000, $126,338,000 and $111,283,000, respectively. The Company also had federal and California tax credit carryforwards of approximately $7,776,000 and $8,109,000, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2002 through 2021, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carryforwards before full utilization.

**11. Segments of an Enterprise and Related Information**

The Chief Executive Officer has been identified as the Chief Operating Decision Maker (CODM) because he has final authority over resource allocation decisions and performance assessment. The CODM allocates resources to each segment based on their business prospects, competitive factors, revenues and operating results.

The Company views its business as having two principal operating segments: Cable Broadband Access Systems ("Cable") and Telecom Carrier Access Systems ("Telecom"). The Cable segment consists primarily of the TeraComm system, the CherryPicker Digital Video Management Systems, and the Multigate Telephony and Data Access Systems which are sold primarily to cable operators for the deployment of data,

61

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

video and voice services over the existing cable infrastructure. The Telecom segment consists primarily of the Miniplex DSL Systems, the IPTL Converged Voice and Data Service System and the Highlink, which are sold to providers of broadband services for the deployment of voice and data services over the existing copper wire infrastructure.

Information on reportable segments is as follows (in thousands):

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2001 | 2000 | 1999 |
| Cable Broadband Access Segment: | | | |
| Revenues | $ 245,828 | $ 303,524 | $ 97,009 |
| Operating loss | (465,435) | (132,643) | (69,088) |
| Total assets | 455,836 | 902,262 | 301,236 |
| Telecom Broadband Access Segment: | | | |
| Revenues | 33,653 | 36,025 | — |
| Operating loss | (297,697) | (54,834) | — |
| Total assets | 10,810 | 524,465 | — |
| Total Revenues | $ 279,481 | $ 339,549 | $ 97,009 |
| Operating loss: | | | |
| Operating loss by reportable segments | $(763,132) | $ (187,477) | $ (69,088) |
| Unallocated amounts: | | | |
| Interest and other income, net | 44 | 6,710 | 5,008 |
| Extraordinary gain | 185,327 | — | — |
| Tax Benefit | 13,915 | — | — |
| Net loss | $(563,846) | $ (180,767) | $ (64,080) |
| Geographic areas: | | | |
| Revenues: | | | |
| United States | $ 50,291 | $ 83,974 | $ 15,598 |
| Canada | 113,300 | 118,491 | 41,008 |
| Europe and Israel | 51,480 | 61,741 | 24,746 |
| Asia | 61,815 | 60,985 | 12,755 |
| South America | 2,595 | 14,358 | 2,902 |
| Total | $ 279,481 | $ 339,549 | $ 97,009 |
| Long-lived assets: | | | |
| United States | $ 36,106 | $ 339,559 | |
| Canada | 256 | — | |
| Europe and Israel | 4,145 | 337,493 | |
| Asia | 243 | 177 | |
| South America | 2,020 | — | |
| Total Long-lived assets | 42,770 | 677,229 | |
| Total current assets | 423,876 | 749,498 | |
| Total Assets | $ 466,646 | $1,426,727 | |

62

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Two customers, both related to Cable, accounted for 10% or more of total revenues (33% and 13%) for the year ended December 31, 2001. Three customers, all of which related to Cable, accounted for 10% or more of total revenues (17%, 17%, and 11%) for the year ended December 31, 2000. Four customers accounted for 10% or more of total revenues (24%, 17%, 14% and 11%) for the year ended December 31, 1999. No other customer accounted for more than 10% of revenues during these years.

**12.    Defined Contribution Plan**

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2001, 2000, and 1999.

**13.    Related Party Transactions**

During the years ended December 31, 2001, 2000 and 1999, the Company recognized revenue of $52,445,000, $119,321,000 and $39,664,000, respectively in connection with product shipments made to Shaw and Rogers, each of which has one representative on the Company's Board of Directors and is a significant stockholder. Beginning in the third quarter of 2001, as Shaw was no longer a significant stockholder and the board member from Shaw resigned, Shaw was no longer considered a related party. Revenues from Shaw are not included as revenue from related parties after the second quarter of 2001, when Shaw ceased to be a related party. Cost of related party product revenues consists of direct product costs. Accounts receivable from Rogers totaled approximately $4,006,000 at December 31, 2001. At December 31, 2000, accounts receivable from Shaw and Rogers totaled approximately $17,454,000.

On March 18, 1999, the Company entered into a Supply Agreement with Rogers, formerly Rogers Cablesystems Limited, a subsidiary of Rogers Communications. The Supply Agreement and the Development Agreement did not constitute a commitment to purchase or deploy any particular volume or quantity of the Company's product. Such commitment was only made when a valid purchase order was issued to the Company. Under the Supply Agreement, the Company agreed to make available to Rogers its current TeraLink Gateway, TeraLink 1000 Master Controller, TeraPro Cable Modems and specified software. The Company also committed to certain product pricing and specifications. Under the terms of the Supply Agreement, Rogers retained the right to return to the Company all products purchased until certain conditions specified in the agreement were met by the Company. Accordingly, the Company did not recognize revenue on shipments to Rogers until the conditions specified in the Agreement were met or Rogers had waived the right to return the product. The Company deferred recognition of revenue for shipments to Rogers until the quarter ended September 30, 1999 when the first waiver was received from Rogers. The Company subsequently recognized revenue only to the extent that Rogers had waived the rights of return for such product. As of March 31, 2000, Rogers had waived all rights of return under the Supply Agreement; accordingly, the only rights of return that remain available to Rogers are those provided under the Company's standard warranty policy. The Supply Agreement expired on April 1, 2000.

During the years ended December 31, 1999, the Company incurred approximately $200,000 of expense related to consulting services performed by a member of the Company's Board of Directors. There were no consulting services performed by any member of the Company's Board of Directors during the year ended December 31, 2001 and 2000.

During 2001, the Company paid to Rogers a total of approximately $2,920,000 for co-marketing activities *(see Note 1)*.

63

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**14.    Business Combinations**

During 1999 and 2000, the Company completed a total of ten acquisitions. There were no acquisitions during 2001. Each of the acquisitions was accounted for under the purchase method of accounting. The respective purchase prices were allocated to the assets acquired and liabilities assumed based on a determination from an independent appraisal of their respective fair values. The methodologies used to value intangible assets acquired were consistently applied to each of the acquisitions.

To determine the value of the developed technology, the expected future cash flow attributed to all existing technology was discounted, taking into account risks related to the characteristics and application of the technology, existing and future markets and assessments of the life cycle stage of the technology.

The value of the in–process research and development was determined based on the expected cash flow attributed to the in–process projects, taking into account revenue that is attributable to previously developed technology, the level of effort to date in the in–process research and development, the percentage of completion of the project and the level of risk associated with the in–process technology. The projects identified as in–process are those that were underway at each of the acquisitions at the time of the acquisition and that required additional efforts in order to establish technological feasibility. The value of in–process research and development was included in the Company's results of operations during the period of the acquisition.

The value of the assembled workforce was derived by estimating the costs to replace the existing employees, including recruiting, hiring and training costs for each category of employee.

*Imedia Corporation*

In July 1999, the Company entered into an Agreement and Plan of Reorganization (the "Agreement") to acquire Imedia Corporation ("Imedia"), a California corporation. Imedia produces routing and re–multiplexing systems for digital video that enable cable operators to select and customize their program lineup for viewer preferences, while maximizing video capacity and quality over standards–based set–top boxes. The Imedia acquisition was completed on September 16, 1999 (the "Closing Date").

In accordance with the Agreement, the Company issued 1,714,814 shares of common stock and 309,256 options and warrants to purchase common stock to the vested and unvested optionholders and warrantholders of Imedia on the Closing Date.

Tangible assets acquired principally include cash, accounts receivable and property and equipment. Liabilities assumed principally include accounts payable and accrued liabilities. At the Closing Date, the Company forgave Imedia's note payable obligation of $1,000,000.

The analysis of the expected future cash flows attributed to all existing technology resulted in a valuation of approximately $27,000,000 for developed technology that had reached technological feasibility and therefore was capitalizable.

In–process technology acquired, valued at approximately $11,000,000, consists primarily of major additions to Imedia's core technology, which was related to Imedia's planned development of new features. The majority of the intended functionality of these new features was not supported by Imedia's existing technology. Intended new features included offering high quality video service over the Internet and multiplexing data with video. Development of this technology was completed in 2001.

*Radwiz Ltd.*

In October 1999, the Company entered into a Share Purchase Agreement to acquire Radwiz Ltd. ("Radwiz"), an Israeli company. Radwiz produced communication access systems based on high–speed IP

64

## TERAYON COMMUNICATION SYSTEMS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

routing, integrated with telephony. Radwiz's systems included both central office Digital Subscriber Line Access Multiplexers (DSLAMs) and customer premises equipment for small office, home office (SOHO) business broadband services. The Radwiz acquisition was completed on November 22, 1999.

In accordance with the acquisition agreement, the Company paid $250,000 in cash and issued 1,992,306 shares of Terayon common stock to the former shareholders of Radwiz and issued options to purchase 267,959 shares of Terayon common stock to the unvested optionholders of Radwiz on the Closing Date. In addition, the unvested optionholders of Radwiz options also received options to purchase the Company's common stock, the fair value of which was included in the purchase price.

The approximate purchase price was determined to be $52,700,000. This represents the minimum purchase price, as specified in the acquisition agreement, to be issued to the shareholders and vested option holders of Radwiz ($50,000,000) plus the value of the options issued to unvested option holders of Radwiz ($2,700,000) based on the market value of the Company's common stock on the date the acquisition was announced. Proceeds to be received from the Radwiz optionholders upon exercise of their options were not significant.

Tangible assets acquired principally included cash, accounts receivable, inventory and property and equipment. Liabilities assumed included accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $29,850,000 for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired in the transaction, valued at approximately $3,000,000 consists primarily of additions to Radwiz's core technology, which is related to Radwiz's planned development of new features. The majority of the intended functionality of these new features is not supported by Radwiz's current technology. Intended new features include offering: end-to-end carrier quality of service; allowing access via an ATM network; and, providing ISDN line functionality. The Company completed most of this development work in 2001, and the Company decided to no longer pursue the ISDN line functionality.

### Telegate Ltd.

In October 1999, the Company entered into a Share Purchase Agreement ("Telegate Agreement") to acquire Telegate Ltd ("Telegate"), an Israeli company. Telegate produces telephony and data access platforms that are deployed by service providers to deliver efficient carrier-class voice services over cable. Telegate also provides in-home networking capability for telephony and data, based on the Digital Enhanced Cordless Telephony (DECT) standard. The transaction was completed on January 2, 2000.

In accordance with the Telegate Agreement, the Company issued 4,440,000 shares of common stock and paid approximately $2,500,000 in cash on January 2, 2000. The Company made an additional cash payment of approximately $858,000 during the third quarter of 2000. In addition, the Company issued a warrant to purchase 2,000,000 shares of the Company's common stock, valued at approximately $34.6 million under the terms of an agreement between Telegate and a customer of the Company *(See Note 9)*. The value of the warrant was included in the purchase price and was associated with the value of the customer relationship.

Tangible assets acquired principally included cash, accounts receivable, inventory and property and equipment. Liabilities assumed principally included accounts payable and accrued liabilities.

The value of the customer relationship was determined as the value of the warrant using the Black Scholes model. The warrant was fully vested, non-forfeitable, and immediately exercisable and has a term of three years. The value of the customer relationship is being amortized to cost of goods sold on a straight-line basis over a three-year period.

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $21,500,000 for developed technology, that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $7,500,000, consisted primarily of major additions to Telegate's core technology, which was related to Telegate's planned development of new features. The majority of the intended functionality of these new features was not supported by Telegate's current technology. Intended new features included: connection on demand functionality to extend the product's ISDN compatibility; the ability to use cordless technology for either voice or data applications; and, a subscriber end unit that can be used in multi-dwelling units. During 2001, the Company decided to no longer pursue the cordless technology and the subscriber end unit technology.

*Access Network Electronics Division of Tyco Electronics Corporation*

In February 2000, the Company entered into an Asset Purchase Agreement (the "ANE Agreement") to acquire certain assets and assume certain liabilities of the Access Network Electronics Division (ANE) of Tyco Electronics Corporation, a subsidiary of Tyco International Ltd. ANE produces DSL (Digital Subscriber Line) systems that provide multiple phone lines over the existing copper telephony network. The transaction was completed on April 22, 2000.

In accordance with the ANE Agreement, the Company issued 1,404,552 shares of common stock, valued at approximately $83,500,000 based on the maximum purchase price specified in the ANE Agreement. In addition, the Company agreed to establish an employee retention program for purposes of retaining certain identified employees of ANE. The retention program provides for up to 3 annual payments to the identified employees in a total amount of approximately $4,200,000 provided the employees remain employed by the Company. The retention payments are being charged to expense over the employees' respective periods of service.

Tangible assets acquired principally included accounts receivable, inventory and property and equipment. Liabilities assumed principally included accounts payable and warranty obligations. During 2001, the Company increased its intangible assets for assembled workforce by $4.5 million relating to retention payments in conjunction with the acquisition of ANE.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $12,600,000 for developed technology, which had reached technological feasibility and therefore was capitalizable.

To determine the value of the customer base the expected future cash flows attributed to existing customers was discounted. The analysis yielded a valuation of approximately $2,400,000.

In-process technology acquired in the transaction, valued at approximately $750,000, consisted primarily of additions to ANE's core technology, which is related to ANE's planned development of new features. A portion of the intended functionality of these new features is not supported by ANE's current technology. The resultant technology is intended to allow the transmission from a 56Kbps modem without the loss of transmission rate. During 2001, the Company decided to no longer pursue the development of this technology.

*Combox Ltd.*

In February 2000, the Company entered into a Share Purchase Agreement (the "Combox Agreement") to acquire Combox Ltd ("Combox"), an Israeli company. Combox is a manufacturer of broadband data systems and satellite communications based on international standards. Combox's cable data access systems conform to the growing EuroModem international specification, based on the Digital Video Broadcasting (DVB) standard. The transaction was completed on April 18, 2000.

### TERAYON COMMUNICATION SYSTEMS, INC.

#### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In accordance with the Combox Agreement, the Company issued 1,547,770 shares of common stock and made a cash payment of approximately $250,000. In addition, the Company issued options to purchase common stock of the Company to the unvested option holders of Combox options. The approximate purchase price was determined as the value of Terayon's common stock issued at closing ($92,000,000) and the value of the options to purchase Terayon's shares issued to the unvested option holders ($6,800,000) based on the fair market value of Terayon's common stock on the days immediately preceding and following the date the acquisition was announced. In addition, the cash payment of approximately $250,000 was included in the purchase price. Proceeds to be received from the option holders and warrant holders upon exercise are not significant.

Tangible assets acquired principally include cash and cash equivalents and accounts receivable. Liabilities assumed principally include short and long term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $12,500,000 for developed technology, which had reached technological feasibility and therefore was capitalizable.

In–process technology acquired valued at approximately $8,000,000 consists primarily of additions to Combox's core technology, which was related to Combox's planned development of new features. A portion of the intended functionality of these new features was not supported by Combox's current technology. During 2001, the Company decided to no longer pursue these new features.

#### *Internet Telecom Ltd.*

In March 2000, the Company and Telegate, a subsidiary of the Company, entered into an Asset Purchase Agreement ("Internet Telecom Agreement") under which Telegate agreed to purchase certain assets of Internet Telecom Ltd. ("Internet Telecom" or "IT"), an Israeli company. Internet Telecom is a supplier of PacketCable and other standards–based, voice–over–IP ("Internet Protocol") systems and technologies. The transaction was completed on April 18, 2000.

In accordance with the Internet Telecom Agreement, the Company issued 377,380 shares of common stock valued at approximately $46,000,000 based on the fair market value of the Company's common stock on the days immediately preceding and following the announcement of the acquisition and issued options of 10,898 to purchase common stock of the Company to the unvested option holders of Internet Telecom and paid approximately $2,000,000 in cash. In addition, as a result of certain conditions in the Agreement with regards to the price of the Company's common stock, an additional accrued purchase price payable of approximately $14.1 million is included in the consolidated balance sheet as of December 31, 2000. This amount was paid during 2001.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $5,950,000 for developed technology, which had reached technological feasibility and therefore was capitalizable.

In–process technology acquired, valued at approximately $2,550,000, consists primarily of additions to Internet Telecom's core technology, which was related to Internet Telecom's planned development of new features. A portion of the intended functionality of these new features was not supported by Internet Telecom's current technology. During 2001, the Company decided to no longer develop the new features from Internet Telecom.

67

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Ultracom Ltd.*

In March 2000, the Company entered into a Share Purchase Agreement to acquire Ultracom Communication Holdings (1995) Ltd. ("Ultracom"), an Israeli company. Ultracom is a supplier of broadband systems−on−silicon. The transaction was completed on April 19, 2000.

In accordance with the Ultracom Agreement, the Company issued 536,766 shares of common stock, made a cash payment of approximately $245,000 and issued 14,403 options to purchase common stock of the Company to the shareholders and unvested option holders of Ultracom options. The approximate purchase price was determined as the value of Terayon's common stock issued at the closing ($57,600,000) and the value of the options to purchase Terayon's shares issued to the unvested option holders ($578,000) based on the fair market value of Terayon's common stock on the days immediately preceding and following the date the acquisition was announced. In addition, the cash payment of approximately $245,000 is included in the purchase price.

Tangible assets acquired principally included cash and cash equivalents, accounts receivable and property and equipment. Liabilities assumed principally included long−term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $1,050,000 for developed technology that had reached technological feasibility and therefore was capitalizable.

In−process technology acquired, valued at approximately $1,800,000, consisted primarily of additions to Ultracom's core technology, which is related to Ultracom's planned development of new features. A portion of the intended functionality of these new features was not supported by Ultracom's current technology. During 2001, the Company determined that it would no longer continue development on the Ultracom technology.

*Mainsail Networks*

In August 2000, the Company entered into an Agreement and Plan of Merger and Reorganization to acquire Mainsail Networks, Inc. ("Mainsail"). Mainsail develops and markets next−generation broadband networks that enable telecommunications carriers to deliver multiple services over a single network infrastructure. The transaction was completed on September 29, 2000.

In accordance with the Mainsail Agreement, the Company issued 2,969,062 shares of common stock and 138,193 options to purchase shares of common stock to the Mainsail shareholders and option holders. The approximate purchase price was determined based on the fair market value of Terayon's common stock on the days immediately preceding and following the date the acquisition was announced ($171,275,000) less the intrinsic value of the unvested options recorded as deferred compensation ($4,719,000). Deferred compensation is amortized over the option holders' vesting period.

Tangible assets acquired principally included cash, inventory and property and equipment. Liabilities assumed principally included accounts payable, accrued liabilities and notes payable.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $49,000,000 for developed technology that had reached technological feasibility and therefore was capitalizable.

In−process technology acquired, valued at approximately $5,000,000, consisted primarily of additions to Mainsail's core technology, which is related to Mainsail's planned development of new features. A portion of the intended functionality of these new features was not supported by Mainsail's current technology. The resultant technology was intended to provide a high capacity CPE (customer premise equipment) and low cost gateway. This development was completed in 2001.

68

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*Digitrans*

On September 27, 2000, the Company acquired Digital Transmission Equipment ("Digitrans") pursuant to the terms of a Stock Purchase Agreement between the Company and the former owner of Digitrans. Digitrans develops, markets and sells digital equipment solutions that enable broadcasters, satellite operators and cable television system operators to optimize network services.

In accordance with the Digitrans Agreement, the Company issued 394,329 shares of common stock. The approximate purchase price was $15,921,000 based on the fair market value of Terayon's common stock on the days immediately preceding and following the date the acquisition was announced. In addition, as a result of certain conditions stipulated in the Agreement with regards with the price of the Company's common stock, the company issued 367,804 additional shares of common stock to the former owner of Digitrans.

Tangible assets acquired principally included cash and cash equivalents, accounts receivable and property and equipment. Liabilities assumed principally included long-term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $550,000 for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $4,950,000, consists primarily of additions to Digitrans' core technology, which was related to Digitrans' planned development of new features. A portion of the intended functionality of these new features was not supported by Digitrans' current technology. Intended new features included system on chip solutions for DOCSIS and DVB/ DAVIC cable modems. During 2001, the Company decided not to pursue these development efforts.

*TrueChat*

On December 22, 2000, the Company, acquired TrueChat, Inc., ("TrueChat"), pursuant to the terms of an Agreement and Plan of Merger and Reorganization. TrueChat develops communication systems that enable multimedia teleconferencing and provide increased control over teleconference parameters.

In accordance with the TrueChat Agreement the Company issued 534,487 shares of common stock and made a cash payment of $209,928. In addition, the former option holders of TrueChat received options to purchase 126,061 shares of the Company's common stock. Deferred compensation relating to the options is amortized over the option holders' vesting period. Approximately $2.4 million of goodwill was recorded as part of this transaction. In addition, during 2001, the Company added $0.7 million to goodwill in conjunction with warrants issued subsequent to the acquisition *(see Note 9)*.

69

## TERAYON COMMUNICATION SYSTEMS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

A summary of the purchase price allocations pertaining to the above acquisitions and the amortization periods of the intangible assets acquired is as follows (in thousands):

| 2000 Acquisitions: | Telegate | ANE | Combox | IT | Ultracom | Mainsail | Digitrans | TrueChat |
|---|---|---|---|---|---|---|---|---|
| **Approximate purchase price** | | | | | | | | |
| Purchase price | $130,553 | $83,477 | $98,784 | $62,265 | $57,621 | $166,556 | $15,921 | $2,664 |
| Transaction and other direct acquisition costs | 4,483 | 265 | 672 | 1,486 | 598 | 2,641 | 116 | 210 |
| | $135,036 | $83,742 | $99,456 | $63,751 | $58,219 | $169,197 | $16,037 | $2,874 |
| **Allocation of purchase price:** | | | | | | | | |
| Historical net tangible assets acquired | $ (5,580) | $14,145 | $ 2,308 | | $ 1,116 | $ (15) | $ 306 | |
| Convertible loans | 12,482 | | | | | | | |
| | 6,902 | 14,145 | 2,308 | — | 1,116 | (15) | 306 | — |
| **Intangible assets acquired:** | | | | | | | | |
| Customer relationship or base | 34,580 | 2,400 | | | | | | |
| Developed technology | 21,500 | 12,600 | 12,500 | 5,950 | 1,050 | 49,000 | 550 | |
| Assembled workforce | 4,200 | 12,200 | 1,100 | 500 | 1,100 | 2,800 | 1,100 | |
| Trademark | | 600 | | | | | | |
| In-process research and development | 7,500 | 750 | 8,000 | 2,550 | 1,800 | 5,000 | 4,950 | |
| Goodwill | 66,382 | 44,047 | 80,444 | 54,751 | 53,927 | 107,692 | 9,131 | 2,390 |
| Deferred tax liability | (6,028) | | (4,896) | | (774) | | | 484 |
| Deferred compensation | | | | | | 4,719 | | |
| | $135,036 | $86,742 | $99,456 | $63,751 | $58,219 | $169,196 | $16,037 | $2,874 |
| **Amortization period (in years):** | | | | | | | | |
| Customer relationship or base | 3 | 5 | | | | | | |
| Developed technology | 6 | 5 | 5 | 6 | 6 | 5 | 5 | |
| Assembled workforce | 2 | 2 | 2 | 2 | 2 | 2 | 2 | |
| Trademark | | 5 | | | | | | |
| Goodwill | 6 | 5 | 5 | 6 | 6 | 5 | 5 | 5 |
| Deferred compensation | | | | | | 1.5 | | 1.5 |

70

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| 1999 Acquisitions: | Imedia | Radwiz |
|---|---|---|
| **Approximate purchase price:** | | |
| Purchase price | $ 106,347 | $ 52,667 |
| Transaction and other direct acquisition costs | 2,345 | 1,086 |
| | $ 108,692 | $ 53,753 |
| **Allocation of purchase price:** | | |
| Historical net tangible assets acquired | $ (355) | $ 3,058 |
| Forgiveness of note payable | 1,000 | |
| | 645 | 3,058 |
| **Intangible assets acquired:** | | |
| Developed technology | 27,000 | 29,850 |
| Assembled workforce | 2,500 | 2,800 |
| Trademark | 4,000 | 1,150 |
| In−process research and development | 11,000 | 3,600 |
| Goodwill | 63,547 | 24,293 |
| Deferred tax liability | | (10,998) |
| | $ 108,692 | $ 53,753 |
| **Amortization period (in years):** | | |
| Developed technology | 6 | 6 |
| Assembled workforce | 2 | 2 |
| Trademark | 6 | 6 |
| Goodwill | 6 | 6 |

As discussed in *Note 6*, the Company recorded impairment losses of approximately $572.8 million of intangible assets relating to these acquisitions. Approximately $3.8 million of intangible assets remained at December 31, 2001.

### *Pro Forma Financial Results*

The following selected unaudited pro forma combined results of operations for the year ended December 31, 2000 of the Company, Telegate, Combox, Ultracom, ANE, Internet Telecom, Mainsail, Digitrans and TrueChat have been prepared assuming that the acquisitions occurred at the beginning of the period presented. The following selected unaudited pro forma combined results of operations for the year ended December 31, 1999 of the Company, Radwiz and Imedia have been prepared assuming that the acquisitions occurred at the beginning of the period presented. The following selected unaudited pro forma financial information is not necessarily indicative of the results that would have occurred had the acquisitions

71

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

been completed at the beginning of the period indicated nor is it indicative of future operating results (in thousands, except per share data):

|  | Year Ended December 31, 2000 | Year Ended December 31, 1999 |
|---|---|---|
| Revenues | $358,559 | $189,213 |
| Net loss(1) | $ (71,343) | $ (40,728) |
| Net loss per share(1) | $ (1.16) | $ (0.70) |
| Shares used in calculation of net loss per share | 61,349 | 58,416 |

(1) Net loss and net loss per share excludes approximately $30,535,000 of in–process research and development charges for the years ended December 31, 2000.

**17. Subsequent Events (Unaudited)**

As discussed in *Note 8*, the Plaintiffs in the complaint *Evergreen Canada Israel Management, Ltd. v Imedia Corporation* voluntarily dismissed the complaint on March 7, 2002, and the lawsuit was dismissed with prejudice.

**18. Unaudited Quarterly Financial Data**

Summarized quarterly financial data for 2001 and 2000 is as follows (in thousands, except per share data):

|  | Quarter | | | |
|---|---|---|---|---|
| 2001 | First | Second | Third | Fourth |
| Revenues | $ 53,984 | $ 65,733 | $ 79,603 | $ 80,161 |
| Gross profit (loss)(4) | (869) | (15,731) | 10,368 | 22,445 |
| Restructuring costs and asset write–offs(2) | (574,744) | (2,549) | (5,301) | (3,449) |
| Net Loss before extraordinary gain | (629,694) | (62,504) | (38,752) | (18,223) |
| Extraordinary gain on early retirement of debt(3) | 121,494 | — | 51,834 | 11,999 |
| Net profit (loss) | (508,200) | (62,504) | 13,082 | (6,224) |
| Basic and diluted loss per common share before extraordinary gain(1) | $ (9.33) | $ (0.93) | $ (0.57) | $ (0.26) |
| Extraordinary gain on early retirement of debt per share, basic and diluted(3) | $ 1.80 | — | $ 0.76 | $ 0.17 |
| Basic and diluted loss per share after extraordinary gain | $ (7.53) | $ (0.93) | $ 0.19 | $ (0.09) |

|  | Quarter | | | |
|---|---|---|---|---|
| 2000 | First | Second | Third | Fourth |
| Revenues | $ 59,337 | $ 92,019 | $125,301 | $ 62,892 |
| Gross profit (loss)(5) | 15,389 | 25,519 | 34,170 | (25,060) |
| Net Loss | (28,394) | (34,364) | (26,454) | (91,555) |
| Net Loss per share, basic and diluted(1) | $ (0.52) | $ (0.57) | $ (0.43) | $ (1.38) |

(1) Earnings per share are computed independently for each of the quarters presented. The sum of the quarterly earnings per share in 2001 and 2000 does not equal the total computed for the year due to changes in shares outstanding and rounding.

72

Table of Contents

**TERAYON COMMUNICATION SYSTEMS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

(2)     See Note 6 of Notes to Consolidated Financial Statements for an explanation for restructuring and asset write-offs.

(3)     See Note 7 of Notes to Consolidated Financial Statements for an explanation of the repurchase of subordinated convertible notes.

(4)     The gross profit (loss) includes the effect of special charges of none in the first quarter of 2001, $28,704,000 in the second quarter of 2001, $6,424,000 in the third quarter of 2001 and ($1,622,000) in the fourth quarter of 2001.

(5)     The gross profit (loss) includes the effect of special charges of $19,000,000 in the fourth quarter of 2000 and none in any other quarter presented.

73

# Exhibit B

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10-K

(Mark One)

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from        to

Commission file number 000-24647

# Terayon Communication Systems, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 77-0328533 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

4988 Great America Parkway

Santa Clara, California 95054
(408) 235-5500
(Address, including zip code, and telephone number, including area code, of the registrant's principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| None | None |

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, par value $0.001 per share
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).    Yes ☑    No ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 30, 2002 as reported on the Nasdaq National Market, was approximately $61,237,967. Shares of common stock held by each officer and director and by each person known to the Company who owns 5% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of March 18, 2003, registrant had outstanding 73,717,018 shares of common stock.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement to be filed with the Securities and Exchange Commission in April 2003, pursuant to Regulation 14A of the Securities Exchange Act of 1934, in connection with the 2003 Annual Meeting of Stockholders of Terayon Communication Systems, are incorporated by reference into Part II, Item 5 and Part III of this Annual Report.

TABLE OF CONTENTS

SPECIAL NOTE ON FORWARD-LOOKING STATEMENTS
PART I
    Item 1. Business
DIRECTORS, EXECUTIVE OFFICERS AND KEY EMPLOYEES
    Item 2. Properties
    Item 3. Legal Proceedings
    Item 4. Submission of Matters to a Vote of Security Holders
PART II
    Item 5. Market for the Registrant's Common Equity and Related Stockholder Matters
    Item 6. Selected Financial Data
    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
RISK FACTORS
    Item 7a. Market Risk Disclosure Information
    ITEM 8. Financial Statements and Supplementary Data
REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS
TERAYON COMMUNICATION SYSTEMS, INC. CONSOLIDATED BALANCE SHEETS
TERAYON COMMUNICATION SYSTEMS, INC. CONSOLIDATED STATEMENTS OF OPERATIONS
TERAYON COMMUNICATION SYSTEMS, INC. CONSOLIDATED STATEMENTS OF STOCKHOLDERS'
EQUITY
TERAYON COMMUNICATION SYSTEMS, INC. CONSOLIDATED STATEMENTS OF CASH FLOWS
TERAYON COMMUNICATION SYSTEMS, INC. NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
    Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosures
PART III
    Item 10. Directors and Officers of the Registrant
    Item 11. Executive Compensation
    Item 12. Security Ownership of Certain Beneficial Owners and Management
    Item 13. Certain Relationship and Related Transactions
    Item 14. Controls and Procedures
PART IV
    Item 15. Exhibits, Financial Statement Schedules, and Reports on Form 8-K
EXHIBIT INDEX
SCHEDULE II VALUATION AND QUALIFYING ACCOUNTS
SIGNATURES
EXHIBIT INDEX
EXHIBIT 10.13
EXHIBIT 10.21
EXHIBIT 10.22
EXHIBIT 10.23
EXHIBIT 21.1
EXHIBIT 23.1
EXHIBIT 99.1
EXHIBIT 99.2

Table of Contents

ITEM 8.   Financial Statements and Supplementary Data

TERAYON COMMUNICATION SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Ernst & Young LLP, Independent Auditors | 55 |
| Consolidated Balance Sheets | 56 |
| Consolidated Statements of Operations | 57 |
| Consolidated Statements of Stockholders' Equity | 58 |
| Consolidated Statements of Cash Flows | 61 |
| Notes to Consolidated Financial Statements | 63 |

54

Table of Contents

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Board of Directors and Stockholders

Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2002 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2002. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2002 and 2001, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2002, the company adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets", and effective April 1, 2002 the Company adopted Statement of Financial Accounting Standards No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections."

/s/ Ernst & Young LLP

San Jose, California

January 24, 2003

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2002 | 2001 |
|  | (in thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 117,079 | $ 100,274 |
| Short-term investments | 89,424 | 233,614 |
| Accounts receivable, less allowance for doubtful accounts of $3,519 in 2002 and $7,207 in 2001 | 16,355 | 48,386 |
| Accounts receivable from related parties | 842 | 4,006 |
| Other current receivables | 2,597 | 7,478 |
| Inventory | 6,257 | 16,658 |
| Other current assets | 8,263 | 13,462 |
| Total current assets | 242,817 | 423,876 |
| Property and equipment, net | 17,906 | 25,279 |
| Intangibles and other assets, net | 14,987 | 17,491 |
| Total assets | $ 275,710 | $ 466,646 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 23,920 | $ 42,821 |
| Accrued payroll and related expenses | 6,227 | 9,441 |
| Deferred revenues | 497 | 4,169 |
| Warranty reserves | 8,607 | 8,368 |
| Accrued restructuring charges | 6,754 | 8,197 |
| Accrued vendor cancellation charges | 13,865 | 17,291 |
| Other accrued liabilities | 8,609 | 14,015 |
| Interest payable and current portion of long-term debt | 1,355 | 3,273 |
| Current portion of capital lease obligations | 154 | 126 |
| Total current liabilities | 69,988 | 107,701 |
| Long-term obligations | 3,421 | 4,267 |
| Long-term portion of capital lease obligations | 78 | 233 |
| Convertible subordinated notes | 65,081 | 174,141 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares — 5,000,000 | | |
| Issued and outstanding shares — none in 2002 and 2001 | — | — |
| Common stock, $0.001 par value: | | |
| Authorized shares — 200,000,000 | | |
| Issued — 73,240,054 in 2002 and 72,071,769 in 2001 | | |
| Outstanding — 73,084,045 in 2002 and 71,943,930 in 2001 | 73 | 73 |
| Additional paid-in capital | 1,078,144 | 1,074,203 |
| Accumulated deficit | (937,207) | (892,994) |
| Deferred compensation | (25) | (458) |
| Treasury Stock, at cost, 156,009 shares in 2002 and 127,839 shares in 2001 | (773) | (766) |
| Accumulated other comprehensive income (loss) | (3,070) | 246 |
| Total stockholders' equity | 137,142 | 180,304 |
| Total liabilities and stockholders' equity | $ 275,710 | $ 466,646 |

See accompanying notes.

56

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
|  | (in thousands, except per share data) | | |
| Revenues: | | | |
| Product revenues | $ 120,306 | $ 227,036 | $ 220,228 |
| Related party product revenues | 9,097 | 52,445 | 119,321 |
| Total revenues | 129,403 | 279,481 | 339,549 |
| Cost of goods sold: | | | |
| Cost of product revenues | 93,640 | 229,936 | 224,787 |
| Cost of related party product revenues | 7,309 | 33,181 | 64,744 |
| Total cost of goods sold | 100,949 | 263,117 | 289,531 |
| Gross profit | 28,454 | 16,364 | 50,018 |
| Operating expenses: | | | |
| Research and development | 58,696 | 79,927 | 68,270 |
| Cost of product development assistance agreement | — | | 9,563 |
| In-process research and development | | | 30,536 |
| Sales and marketing | 35,704 | 55,701 | 45,261 |
| General and administrative | 14,715 | 31,309 | 24,809 |
| Goodwill amortization | | 25,410 | 59,057 |
| Restructuring costs and asset write-offs | 8,922 | 587,149 | |
| Total operating expenses | 118,037 | 779,496 | 237,495 |
| Loss from operations | (89,583) | (763,132) | (187,477) |
| Interest income | 6,838 | 18,132 | 19,794 |
| Interest expense | (6,174) | (15,224) | (11,265) |
| Other expense | (4,145) | (2,864) | (1,819) |
| Gain on early retirement of debt | 49,089 | 185,327 | |
| Loss before tax (expense) benefit | (43,975) | (577,761) | (180,767) |
| Income tax (expense) benefit | (238) | 13,915 | |
| Net loss | $ (44,213) | $(563,846) | $(180,767) |
| Basic and diluted net loss per share | $ (0.61) | $ (8.25) | $ (2.95) |
| Shares used in computing basic and diluted net loss per share | 72,803 | 68,331 | 61,349 |

See accompanying notes.

57

Table of Contents

### TERAYON COMMUNICATION SYSTEMS, INC.

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | | |
| Balance at December 31, 1999 | 48,870,334 | $ 24 | $ 408,854 | $ (148,381) | $ (1,553) | $ (6) | $ (283) | — | $ — | $ 258,655 |
| Exercise of option for cash to purchase common stock | 1,935,675 | 3 | 14,180 | | | | | | | 14,183 |
| Repurchase of common stock | (34,722) | | | | | | | 34,722 | (73) | (73) |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Unearned compensation related to stock options | | | 3,497 | | (3,497) | | | | | — |
| Amortization of unearned compensation related to stock | | | | | 3,465 | | | | | 3,465 |
| Issuance of warrant to purchase common stock | — | | 44,143 | | | | | | | 44,143 |
| Issuance of common stock for Employee Stock Purchase Plan | 277,060 | | 2,088 | | | | | | | 2,088 |
| Issuance of common stock in relation to Stock Split | | 22 | (22) | | | | | | | — |
| Cashless exercise of warrants | 3,687,618 | 4 | (4) | | | | | | | — |
| Acquisitions: | | | | | | | | | | |
| Telegate | 4,400,000 | 4 | 95,969 | | | | | | | 95,973 |
| ANE | 1,404,552 | 2 | 83,475 | | | | | | | 83,477 |
| Internet Telecom | 378,251 | 1 | 46,473 | | | | | | | 46,474 |
| Ultracom | 536,766 | 1 | 58,637 | | | | | | | 58,638 |
| ComBox | 1,547,770 | 1 | 98,782 | | | | | | | 98,784 |
| MainSail | 2,969,062 | 3 | 162,556 | | (4,719) | | | | | 157,840 |
| Digitrans | 762,133 | 1 | 15,320 | | | | | | | 15,321 |
| TrueChat | 534,487 | 1 | 2,663 | | (484) | | | | | 2,180 |
| Purchase price adjustment on 1999 acquisitions | | | 1,353 | | | | | | | 1,353 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | | (153) | | | (153) |
| Cumulative translation adjustment | | | | | | | 1,097 | | | 1,097 |
| Net loss | | | | (180,767) | | | | | | (180,767) |
| Comprehensive loss | | | | | | | | | | (179,823) |
| Balance at December 31, 2000 | 57,266,986 | 68 | 1,037,964 | (329,148) | (6,788) | (3) | 661 | 34,722 | (73) | 702,681 |

58

Table of Contents

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | | |
| Balance at December 31, 2000 (brought forward) | 67,266,966 | 68 | 1,037,964 | (329,145) | (6,768) | (3) | 651 | 34,722 | (73) | 702,651 |
| Exercise of option for cash to purchase common stock | 2,507,582 | 4 | 12,494 | | | | | | | 12,498 |
| Repurchase of common stock | (93,117) | | | | | | | 93,117 | (695) | (695) |
| Issuance of options | | | 719 | | (719) | | | | | — |
| Amortization of deferred compensation | | | | | 5,815 | | | | | 5,815 |
| Adjustments to deferred compensation due to employee terminations | | | (1,234) | | 1,234 | | | | | — |
| Issuance of restricted common stock for services provided | 275,250 | | 1,237 | | | | | | | 1,237 |
| Issuance of common stock for Employee Stock Purchase Plan | 381,428 | | 1,966 | | | | | | | 1,966 |
| Issuance of warrants to purchase common stock | | | 1,187 | | | | | | | 1,187 |
| Issuance of common stock for tender offer | 141,442 | | 2,001 | | | | | | | 2,001 |
| Issuance of common stock for retirement of debt | 1,464,359 | 1 | 17,869 | | | | | | | 17,870 |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Comprehensive income | | | | | | | | | | — |
| Increase to unrealized gain on short-term investments | | | | | | | 208 | | | 208 |
| Cumulative translation adjustment | | | | | | | (621) | | | (621) |
| Net loss | | | | (563,846) | | | | | | (563,846) |
| Comprehensive loss | | | | | | | | | | (564,259) |
| Balance at December 31, 2001 | 71,943,530 | 73 | 1,074,203 | (892,994) | (458) | — | 248 | 127,839 | (768) | 180,304 |

Table of Contents

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | (In thousands, except share amounts) | | | | | | | | | |
| Balance at December 31, 2001 (brought forward) | 71,943,930 | 73 | 1,074,203 | (892,994) | (458) | — | 248 | 127,839 | (768) | 180,304 |
| Exercise of option for cash to purchase common stock | 422,073 | | 1,721 | | | | | | | 1,721 |
| Repurchase or return of common stock | (1,068) | | | | | | | 28,170 | (5) | (5) |
| Return of escrow shares from Telegate acquisition | (25,077) | | | | | | | | | |
| Issuance of options to non-employees | | | 38 | | (38) | | | | | — |
| Amortization of deferred compensation | | | 1 | | 471 | | | | | 472 |
| Issuance of restricted common stock from stock option plan for services provided | 205,001 | | 290 | | | | | | | 290 |
| Acceleration of vesting of employee stock options and stock protection payment | | | 1 | | | | | | | 1 |
| Issuance of common stock for Employee Stock Purchase Plan | 539,186 | | 1,864 | | | | | | | 1,864 |
| Issuance of warrant to purchase common stock | | | 26 | | | | | | | 26 |
| Comprehensive income | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | | (519) | | | (519) |
| Cumulative translation adjustment | | | | | | | (2,799) | | | (2,799) |
| Net loss | | | | (44,213) | | | | | | (44,213) |
| Comprehensive loss | | | | | | | | | | (44,531) |
| Balance at December 31, 2002 | 73,084,045 | $ 73 | $ 1,078,144 | $ (937,207) | $ (25) | $ — | $ (3,070) | 156,009 | $ (773) | $ 137,142 |

See accompanying notes

60

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | (in thousands) | | |
| **Operating activities:** | | | |
| Net loss | ($ 44,213) | ($ 563,846) | ($180,767) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | | |
| Settlement of Net Services account receivable | 1,118 | — | 11,284 |
| Depreciation | 11,572 | 15,728 | 11,284 |
| Write-off and amortization of intangible assets | 3,972 | 619,157 | 106,305 |
| In-process research and development | — | — | 30,535 |
| Amortization related to stock options | 476 | 5,815 | 3,465 |
| Gain on early retirement of debt | (49,089) | (185,327) | — |
| Lower of cost or market inventory provision | 6,109 | — | — |
| Impairment of investment | 4,500 | — | — |
| Write-off of fixed assets | 2,987 | 1,600 | — |
| Compensation expense for issuance of common stock | — | 3,238 | — |
| Value of common and preferred stock warrants issued | 26 | 505 | 9,563 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 26,211 | (5,614) | (28,757) |
| Accounts receivable from related parties | 3,164 | 13,448 | (10,173) |
| Inventory | 4,065 | 71,109 | (82,776) |
| Other assets | 443 | 16,606 | (18,876) |
| Accounts payable | (18,901) | (81,173) | 110,777 |
| Accrued payroll and related expenses | (3,214) | (3,604) | 7,167 |
| Deferred revenues | (3,872) | (823) | 457 |
| Warranty reserves | 239 | 2,445 | 3,240 |
| Accrued restructuring charges | (1,443) | 8,197 | — |
| Accrued vendor cancellation charges | (3,426) | (1,709) | 19,000 |
| Other accrued liabilities | (6,725) | 8,000 | 21,850 |
| Deferred taxes | — | (18,565) | 7,567 |
| Current portion of long term debt | — | — | 10,853 |
| Interest payable | (1,918) | (7,580) | — |
| Net cash (used in) provided by operating activities | (67,719) | (102,461) | 20,714 |

61

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS — (Continued)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| | | (in thousands) | |
| Investing activities: | | | |
| Purchases of short–term investments | (288,185) | (402,653) | (376,108) |
| Proceeds from sales and maturities of short–term investments | 434,346 | 384,689 | 240,744 |
| Purchases of property and equipment | (7,186) | (9,074) | (38,534) |
| Purchase of other assets | — | — | (17,989) |
| Cash paid for acquisition of businesses | — | — | (14,848) |
| Net cash provided by (used in) investing activities | 138,974 | (27,038) | (206,715) |
| Financing activities: | | | |
| Principal payments on capital leases | (127) | (130) | (12) |
| Principal payments on debt | — | (16,835) | — |
| Proceeds from long–term debt | — | — | 484,429 |
| Exercise of options and warrant to purchase common stock | 1,667 | 12,488 | 14,183 |
| Payments on repurchase of common stock | (5) | (695) | (73) |
| Principal payments on stockholder notes receivable | — | 3 | 3 |
| Repurchase of convertible notes | (57,627) | (113,428) | — |
| Proceeds from issuance of common stock | 2,205 | 1,966 | 2,088 |
| Net cash (used in) provided by financing activities | (53,887) | (116,621) | 500,618 |
| Effect of exchange rate changes | (563) | (620) | — |
| Net increase (decrease) in cash and cash equivalents | 16,805 | (246,741) | 314,617 |
| Cash and cash equivalents at beginning of year | 100,274 | 347,015 | 32,398 |
| Cash and cash equivalents at end of year | $ 117,079 | $ 100,274 | $ 347,015 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for income taxes | $ 714 | $ 31 | $ — |
| Cash paid for interest | $ 8,387 | $ 20,810 | $ 365 |
| Supplemental noncash investing and financing activities: | | | |
| Common shares issued for settlement of convertible debt | $ — | $ 17,900 | $ — |
| Acquisition of businesses | $ — | $ — | $ 585,228 |
| Deferred compensation relating to common stock issued to non-employees | $ 38 | $ 684 | — |
| Reduction in deferred compensation due to termination of employees | $ — | $ 1,234 | $ — |
| Issuance of warrants in connection with purchase of TrueChat | $ — | $ 682 | $ — |

See accompanying notes.

62

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.    Organization and Summary of Significant Accounting Policies

Description of Business

Terayon Communication Systems, Inc. (the Company) was incorporated under the laws of the state of California on January 20, 1993. In July 1998, the Company reincorporated in the State of Delaware.

The Company develops, markets and sells equipment to cable television operators, telecom carriers and satellite network operators who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers.

Basis of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned and majority owned subsidiaries. All intercompany balances and transactions have been eliminated.

Accounting Change

Effective the beginning of 2002, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." As required by SFAS No. 142, the Company discontinued amortizing the remaining balances of goodwill as of the beginning of fiscal 2002. See Note 5.

In April 2002, the Company adopted FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145). SFAS No. 145 allows only those gains and losses on the extinguishment of debt that meet the criteria of extraordinary items to be treated as such in the consolidated financial statements. Accordingly, the Company is now reporting the gain from retirement of Convertible Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Use of Estimates

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates are based on historical experience, input from sources outside of the company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's revenue recognition policy, the valuation of its accounts receivable and inventory reserves, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of restructuring reserves.

Foreign Currency Translation

The Company records the effect of foreign currency translation in accordance with SFAS No. 52, "Foreign Currency Translation." For operations outside the United States that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end-of-period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive income (loss) in stockholders' equity. For the three years ended December 31, 2002, translation gains and losses were not significant. Realized foreign currency transaction gains and losses are included in results of operations as incurred, and have not been significant to the Company's operating results in any year presented.

63

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Concentrations of Credit Risk, Customers, Suppliers, and Products

The Company operates in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). The Company sells primarily to customers within the cable and telecommunications industries, including related parties (see Note 12). The Company performs ongoing credit evaluations of its customers and generally requires no collateral. Credit losses have historically been within management's expectations. The Company maintains a reserve for potentially uncollectible accounts receivable based on an assessment of collectibility. The Company assesses collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of the Company's client's customers and other factors that the Company believes are relevant. Charges for uncollectible accounts are included as a component of net revenue in the consolidated statement of operations. At December 31, 2002 and 2001, the reserve for potentially uncollectible accounts was $3.5 million and $7.2 million, respectively. A relatively small number of customers account for a significant percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues. Cross Beam Networks, a subsidiary of Sumitomo, accounted for more than 10% of the Company's total revenues for the year ended December 31, 2002. Two customers, both related to the Cable segment, accounted for 10% or more of the total revenues (33% and 13%) for the year ended December 31, 2001. Three customers, all of whom related to the Cable segment, accounted for 10% or more of total revenues (17%, 17%, and 11%) for the year ended December 31, 2000.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in a variety of financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/AA– or better or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

The Company sells its products directly to broadband access global service providers, and to a lesser extent, resellers and integrators and recognizes revenue upon shipment to the customer when title is transferred. Revenues related to product sales are recognized in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101): (1) persuasive evidence that an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. A provision is made for estimated product returns under the warranty terms.

64

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Research and Development Expenses

Research and development expenses are charged to expense as incurred.

Shipping and Handling Costs

Costs related to shipping and handling are included in cost of sales for all periods presented.

Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2002, 2001 and 2000 were $0.4 million, $2.3 million, and $1.0 million, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers), a related party. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against Cable revenues in accordance with Emerging Issues Task Force (EITF) 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in 2002 totaled approximately $2.8 million. The Company will continue to charge the amortization of these assets against Cable revenues in each of the next four quarters through December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter (see Note 13).

Net Loss Per Share

Historical basic and diluted net loss per share was computed using the weighted average number of common shares outstanding. Options, warrants, restricted stock, preferred stock, and convertible debt were not included in the computation of historical diluted net loss per share because the effect would be antidilutive.

Shares used in the calculation of basic and diluted net loss per share follows (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
| --- | --- | --- | --- |
| Net loss | $(44,213) | $(563,846) | $(180,767) |
| Shares used in computing basic and diluted net loss per share | 72,803 | 68,331 | 61,349 |
| Basic and diluted net loss per share | $ (0.61) | $ (8.25) | $ (2.95) |

Options to purchase 14,635,025, 20,007,686, and 21,489,536 shares of common stock were outstanding at December 31, 2002, 2001 and 2000, respectively, and warrants to purchase 2,425,583, 2,408,300, and 2,072,318 shares of common stock were outstanding at December 31, 2002, 2001 and 2000, respectively, but were not included in the computation of diluted net loss per share, since the effect is antidilutive.

Derivative Financial Instruments

The Company recognizes all derivative financial instruments, such as foreign exchange contracts, in the consolidated financial statements at fair value regardless of the purpose or the intent for holding the instrument. Changes in the fair value of derivative financial instruments are either recognized periodically in income or in stockholders' equity as a component of comprehensive income depending on whether the derivative financial instrument qualifies for hedging accounting, and if so, whether it qualifies as a fair value

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

hedge or cash flow hedge. Generally, changes in fair values of derivatives accounted for as fair value hedges are recorded in income along with the portions of the changes in the fair values of the hedged items that relate to the hedged risks. Changes in fair values of derivatives accounted for as cash flow hedges, to the extent they are effective as hedges, are recorded in other comprehensive income, net of deferred taxes. Changes in fair value of derivatives used as hedges of the net investment in foreign operations are reported in other comprehensive income as part of the cumulative translation adjustment. Changes in fair value of derivatives not qualifying as hedges are reported in income.

The Company had no derivative financial instruments outstanding as of December 31, 2002, 2001 or 2000.

Cash Equivalents and Short-Term Investments

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company accounts for investments in accordance with Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities". Management determines the appropriate classification of debt securities at the time of purchase and reevaluates such designation as of each balance sheet date. The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities, are classified as available-for-sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short-term equity securities at December 31, 2002 or 2001.

During the third quarter of 2002, the Company received approximately 35.9 million shares of Net Servicos de Comunicacao SA (Net Servicos), a customer, valued at approximately $2.5 million as settlement for all outstanding accounts receivables due from Net Servicos. The shares of Net Servicos are traded on the Sao Paulo Stock Exchange. All revenue and the cost of sales relating to these receivables had been deferred due to extended payment terms offered in the original sales agreements. The Company recorded a loss on the settlement of the Net Servicos receivables of $0.9 million, which was charged to cost of goods sold in the third quarter of 2002.

The Company liquidated 32.9 million of these shares valued at $2.3 million in the fourth quarter of 2002. The Company recorded revenue and the related cost of sales as the shares were sold and cash was received. The remaining 3.0 million shares are classified as available-for-sale and are included in the consolidated balance sheet as short-term investments of $0.35 million.

66

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2002 | 2001 |
| Finished goods | $5,915 | $ 6,433 |
| Work-in process | 769 | 236 |
| Raw materials | 1,573 | 9,989 |
|  | $8,257 | $16,658 |

Gross inventory levels decreased during fiscal 2002 due to the transition of the Company's manufacturing functions to contract manufacturers, and as a result, the Company was able to significantly reduce its purchases of raw materials.

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less, as well as product lifecycle and product development plans. The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast, which is also consistent with its short-term manufacturing plan. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. The Company defines obsolete inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available. The Company disposes of excess and obsolete inventories in the normal course of business. See Note 3.

Cost of goods sold for the year ended December 31, 2002 included a reversal of $15.3 million of special charges taken in 2001 for vendor cancellation charges and inventory considered to be excess and obsolete. The Company was able to reverse the provision in 2002 as it was able to sell inventory originally considered to be excess and obsolete. In addition, the Company was able to negotiate downward certain vendor cancellation claims to terms more favorable to the Company.

Cost of goods sold for the year ended December 31, 2001 and 2000 included $33.5 million and $19.0 million of special charges for inventory considered to be excess and obsolete. During 2002, the Company recorded a charge to cost of sales of $6.1 million to reduce certain inventories to the lower of cost or market as average selling prices fell below the cost of these products.

Other Current Receivables

As of December 31, 2002 and 2001, other current receivables is primarily composed of interest, taxes, and non-trade receivables, and included approximately $1.4 million and $5.2 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line

67

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, the Company recorded $1.3 million in asset impairments primarily related to the Company's restructuring in 2002, and $1.6 million in asset impairments during 2001 related to assets acquired in the purchase of Access Network Electronics Division of Tyco Electronics Corporation (ANE). No asset impairment occurred in 2000.

Property and equipment are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Software and computers | $ 25,531 | $ 25,328 |
| Furniture and equipment | 31,092 | 29,754 |
| Leasehold improvements | 5,018 | 3,573 |
| Automobiles | 16 | 37 |
| Construction in progress | — | 4,805 |
| Property and equipment | 61,657 | 63,497 |
| Accumulated depreciation and amortization | (43,751) | (38,218) |
| Property and equipment, net | $ 17,906 | $ 25,279 |

Intangibles

Intangibles and other assets consisted of (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2002 | 2001 |
| Intangibles, net | $ — | $ 3,767 |
| Other assets | 14,987 | 13,724 |
| Total intangibles and other assets | $14,987 | $17,491 |

|  | 12/31/2002 | | |
| --- | --- | --- | --- |
|  | Gross | Accumulated Amortization | Net |
| Amortized intangible assets: |  |  |  |
| Goodwill | $20,974 | $20,974 | $ — |
| Assembled workforce | 3,072 | 3,072 | — |
| Total | $24,046 | $24,046 | $ — |

|  | 12/31/2001 | | |
| --- | --- | --- | --- |
|  | Gross | Accumulated Amortization | Net |
| Amortized intangible assets: |  |  |  |
| Goodwill | $20,769 | $(18,251) | $2,518 |
| Assembled workforce | 3,072 | (1,823) | 1,249 |
| Total | $23,841 | $(20,074) | $3,767 |

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2002, $0.2 million was added to goodwill relating to a reclassification of the original purchase price of Digitrans (see Note 14). During 2001, $4.5 million was added to assembled workforce relating to retention payments in conjunction with the acquisition of ANE (see Note 14). During 2002, the Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption of SFAS No. 142 see Note 14.

Other assets primarily consist of obligations supported by letters of credit. See Note 3.

Other Assets

Included in Other Assets on the consolidated Balance Sheet at December 31, 2002 is restricted cash of approximately $9 million related to the Company's aircraft lease. See Note 3.

Impairment of Goodwill and Other Long-Lived Assets

Goodwill and other long-lived assets are reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, the Company compares the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on the Company's weighted average cost of capital, which represents the blended costs of debt and equity.

During 2002 and 2001, the Company recorded impairment charges for goodwill, assembled workforce, and other intangible assets. See Note 5.

The Company determines impairment related to its equity investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities," and Securities and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) 59, "Accounting for Noncurrent Marketable Equity Securities", which provide guidance on determining when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost; the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and the Company's intent and ability to hold the investment. See Note 6.

Warranty Reserves

The Company provides a standard warranty for most of its products, generally lasting one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Reserve estimates are based on historical experience and expectation of future conditions. See Note 16.

Stock-Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and includes the disclosure-only provisions as required under Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123). The Company provides additional pro forma disclosures as required under SFAS No. 123 and SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure" in Note 10.

69

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Equity instruments granted to consultants are accounted for under the fair value method, in accordance with SFAS No. 123 and Emerging Issues Task Force No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black-Scholes option pricing model and are recorded in the equity section of the Company's Consolidated Balance Sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

SFAS No. 148 amends SFAS No. 123 in December 2002 to require that disclosures of the pro forma effect of using the fair value method of accounting for stock-based employee compensation, be displayed more prominently and in a tabular format. For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of SFAS No. 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common stockholders would have been increased to the pro forma amounts indicated below (in thousands, except per share data) (See Note 9):

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Net loss | $(44,213) | $(563,846) | $(180,767) |
| Stock option plans | (33,747) | (126,721) | (118,909) |
| Employee stock purchase plan | (1,990) | (2,212) | (990) |
| Pro forma net loss | $(79,950) | $(692,779) | $(300,666) |
| Pro forma basic and diluted net loss per share | $ (1.10) | $ (10.14) | $ (4.90) |

Accumulated Other Comprehensive Income (Loss)

Accumulated other comprehensive income (loss) presented in the accompanying consolidated balance sheets and consolidated statements of stockholder's equity consists of net unrealized gain on short-term investments and accumulated net foreign currency translation losses.

The following are the components of comprehensive income (loss) (in thousands):

|  | Years ended December 31, | |
|  | 2002 | 2001 |
|---|---|---|
| Net loss | $(44,213) | $(563,846) |
| Cumulative translation adjustments | (2,799) | (621) |
| Change in unrealized gain (loss) on available-for-sale investments | (519) | 208 |
| Total comprehensive loss | $(47,531) | $(564,259) |

Reclassification

Certain amounts reported in previous years have been reclassified to conform to 2002 presentation. Such reclassifications had no effect on previously reported results of operations, total assets or accumulated deficit.

Impact of Recently Issued Accounting Standards

In December 2002, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 148, "Accounting for Stock-Based Compensation — Transition and Disclosure — an amendment of SFAS 123" (SFAS No. 148). This statement amends SFAS No. 123,

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

"Accounting for Stock-Based Compensation," to provide alternative methods of transition for a voluntary change to the fair value based method of accounting for stock-based employee compensation. In addition, this statement amends the disclosure requirements of SFAS No. 123 to require prominent disclosures in both annual and interim financial statements about the method of accounting for stock-based employee compensation and the effect of the method used on reported results. The Company will adopt the annual disclosure provisions of SFAS No. 148 in its quarterly financial reports beginning in the first quarter of 2003. As the adoption of this standard involves disclosures only, the Company does not expect a material impact on its results of operations, financial position or liquidity.

In November 2002, the FASB issued SFAS Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others" (FIN 45). FIN 45 requires that upon issuance of a guarantee, a guarantor must recognize a liability for the fair value of an obligation assumed under a guarantee. FIN 45 also requires additional disclosures by a guarantor in its interim and annual financial statements about the obligations associated with guarantees issued. The recognition provisions of FIN 45 are effective for any guarantees issued or modified after December 31, 2002. The disclosure requirements are effective for financial statements of interim or annual periods ending after December 15, 2002. The adoption of FIN 45 is not anticipated to have a material effect on the Company's financial position, results of operations, or cash flows.

In November 2002, the EITF reached a consensus on Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables." EITF Issue No. 00-21 provides guidance on how to account for arrangements that involve the delivery or performance of multiple products, services and/or rights to use assets. The provisions of EITF Issue No. 00-21 will apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. The Company is currently evaluating the effect that the adoption of EITF Issue No. 00-21 will have on its results of operations and financial condition.

In July 2002, the FASB issued SFAS No. 146, "Accounting for Costs Associated with Exit or Disposal Activities" (SFAS No. 146), which requires the Company to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. SFAS No. 146 replaces Emerging Issues Task Force (EITF) Issue No. 94-3, "Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (including Certain Costs Incurred in a Restructuring)." The provisions of SFAS No. 146 are to be applied prospectively to exit or disposal activities initiated after December 31, 2002. The effect of adoption of SFAS No. 146 is dependant on the Company's related activities subsequent to the date of adoption.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145). SFAS No. 145 allows only those gains and losses on the extinguishment of debt that meet the criteria of extraordinary items to be treated as such in the consolidated financial statements. SFAS No. 145 also requires sales-leaseback accounting for certain lease modifications that have economic effects that are similar to lease-back transactions. The Company adopted the provisions of SFAS No. 145 in the second quarter of 2002. In accordance with its adoption of SFAS No. 145, all prior periods reflect the adoption of SFAS No. 145 in the consolidated financial statements.

In August 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-lived Assets" (SFAS No. 144). SFAS No. 144 supercedes SFAS No. 121, "Accounting for the Impairment of Long-lived Assets and Assets to be Disposed Of" and the accounting and reporting provisions of Accounting Principles Board Opinion No. 30, "Reporting the Results of Operations – Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions." SFAS No. 144 also amends Accounting Research Bulletin No. 51, "Consolidated Financial Statements," to eliminate the exception to consolidation for a subsidiary for which control is likely to be temporary. The provisions of SFAS No. 144 were adopted by the Company effective January 1, 2002. In

71

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

accordance with SFAS No. 144, the Company records impairment losses on long-lived assets used in operations when events and circumstances indicate that long-lived assets might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets. The Company recorded impairment losses during the second quarter of 2002 associated with the SFAS No. 144 impairment review as further described in Note 5.

In June 2001, the FASB issued SFAS No. 141, "Business Combinations", and SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS No. 141 and SFAS No. 142). SFAS No. 141 requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. SFAS No. 141 also includes guidance on the initial recognition and measurement of goodwill and other intangible assets arising from business combinations completed after June 30, 2001. SFAS No. 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. SFAS No. 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with definite lives will continue to be amortized over their estimated useful lives. Additionally, SFAS No. 142 requires that goodwill included in the carrying value of equity method investments no longer be amortized.

The Company adopted SFAS No. 142 on January 1, 2002. Identifiable intangible assets with indefinite lives were reclassified, as defined by SFAS No. 142, to goodwill at the date of adoption. The Company tested goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. See Note 5.

The following pro forma information reflects the impact on net income (loss) and net income (loss) per share assuming the adoption of SFAS No. 142 had occurred on January 1, 2000 (in thousands):

|  | Years ended December 31, | | |
|  | 2002 | 2001 (Pro forma) | 2000 (Pro forma) |
| --- | --- | --- | --- |
| Reported net loss | $(44,213) | $(563,846) | $(180,767) |
| Amortization of goodwill and intangible assets with indefinite lives | — | 53,846 | 104,015 |
| Pro forma net loss | $(44,213) | $(510,000) | $ (76,752) |
| Basic and diluted net loss per share: |  |  |  |
| Reported net loss | $ (0.61) | $ (8.25) | $ (2.95) |
| Adjustment related to amortization of goodwill and intangible assets with indefinite lives | — | 0.79 | 1.70 |
| Pro forma net loss per share | $ (0.61) | $ (7.46) | $ (1.25) |

## 2.  Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities approximate fair value due to their short-term maturities. The fair value for the Company's investments in marketable debt and equity securities is estimated based on quoted market prices.

The fair value of short-term and long-term capital lease and debt obligations is estimated based on current interest rates available to us for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations, as of each period presented approximate their respective fair values.

The following estimated fair value amounts have been determined using available market information. However, considerable judgment is required in interpreting market data to develop the estimates of fair value.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

| | December 31, 2002 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (in thousands) | | | |
| Short-term investments | | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 16,000 | $ — | $ (26) | $ 15,974 |
| Fixed income corporate securities | 12,920 | 196 | — | 13,116 |
| Government agency obligations | 18,300 | 260 | — | 18,560 |
| Corporate equity securities | 202 | 151 | — | 353 |
| Total | 47,422 | 607 | (26) | 48,003 |
| Investments maturing in 1–2 years | | | | |
| Fixed income corporate securities | 2,000 | 145 | — | 2,145 |
| Government agency obligations | 39,000 | 276 | — | 39,276 |
| Total | 41,000 | 421 | — | 41,421 |
| Total | $ 88,422 | $ 1,028 | $ (26) | $ 89,424 |

| | December 31, 2001 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (in thousands) | | | |
| Short-term investments | | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 77,670 | $ 24 | $ — | $ 77,694 |
| Fixed income corporate securities | 40,194 | 6 | — | 40,200 |
| Government agency obligations | 7,954 | (6) | — | 7,948 |
| Total | 125,818 | 24 | — | 125,842 |
| Investments maturing in 1–2 years | | | | |
| Fixed income corporate securities | 31,276 | 568 | — | 31,844 |
| Government agency obligations | 75,498 | 430 | — | 75,928 |
| Total | 106,774 | 998 | — | 107,772 |
| Total | $ 232,592 | $ 1,022 | $ — | $ 233,614 |

Realized gains and losses were insignificant for each of the years in the three year period ended December 31, 2002.

3. Commitments

Leases

The Company leases its facilities and certain equipment under operating leases. The operating lease for the Company's corporate headquarters expires in 2009. The operating lease for the Company's Israel

73

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

headquarters expires in 2005. The Company's other operating leases expire at various times through 2006. Rent expense was approximately $7.9 million, $7.2 million, and $4.2 million, for the years ended December 31, 2002, 2001, and 2000, respectively. The Company subleases a small portion of its facilities to third parties. The Company's sublease rental income was approximately $0.4 million, $0.1 million, and $0.2 million for the years ended December 31, 2002, 2001, and 2000.

The Company leases certain equipment under noncancelable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment aggregated $0.7 million and $1.2 million at December 31, 2002 and 2001, respectively. Related accumulated amortization was $0.6 million and $0.8 million at December 31, 2002 and 2001, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement is secured by a $9.0 million letter of credit at December 31, 2002. The Lease commitment for the aircraft is included in the table below.

Future minimum lease payments under noncancelable operating leases and capital leases as of December 31, 2002 are as follows (in thousands):

|  | Operating Leases | Capital Leases |
|---|---|---|
| 2003 | $ 8,356 | $ 169 |
| 2004 | 7,660 | 80 |
| 2005 | 6,723 | — |
| 2006 | 4,430 | — |
| 2007 | 3,107 | — |
| Thereafter | 5,582 | — |
| Total minimum payments | $ 35,858 | 249 |
| Less amount representing interest |  | 17 |
| Less current portion |  | 232 |
|  |  | 154 |
| Long term portion |  | $ 78 |

There are no future minimum sublease payments to be received under noncancelable subleases due to the termination of the lease.

Purchase Obligations and Special Charges

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of purchase orders placed with vendors for goods and services and require the Company to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2002, $45.5 million of purchase obligations are outstanding. As a result of declines in forecast, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges representing management's estimate of the Company's exposure to vendors for its inventory commitments. At December 31, 2002, accrued vendor cancellation charges were $13.9 million and are included on the Consolidated Balance Sheet as accrued vendor

74

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

cancellation charges, and the remaining $31.6 is attributable to open purchase orders. The remaining obligations are expected to become payable at various times throughout 2003.

Letters of Credit

As of December 31, 2002 the Company had $10.4 million in unused outstanding letters of credit primarily required to support operating leases, which expire at various date through 2009.

Royalties

The Company has purchased, through its acquisition of Radwiz Ltd. (Radwiz), certain technology that was developed by Radwiz and a former sister company utilizing funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade (OCS). The purchase of the technology was approved by the OCS. As a condition for this approval, the Company has committed to pay royalties to the Government of Israel on proceeds from sales of products based on this technology. Royalty rates are 3%–5%. Royalties are payable from the commencement of sales of products based on the technology until the cumulative amount of the royalties paid and accrued by the Company equals 100% of the funding received from the OCS.

Additionally, the Company has various royalty arrangements, which require it to pay nominal amounts to various suppliers for usage of licensed property primarily related to DOCSIS modems.

The Company's total accrued obligation for royalties, at December 31, 2002, was $0.6 million.

Guarantees

The Company from time to time enters into certain types of contracts that contingently require the Company to indemnify parties against third party claims. These obligations primarily relate to certain agreements with the Company's officers, directors and employees, under which the Company may be required to indemnify such persons for liabilities arising out of their employment relationship.

The terms of such obligations vary. Generally, a maximum obligation is not explicitly stated. Because the obligated amounts of these types of agreements often are not explicitly stated, the overall maximum amount of the obligations cannot be reasonably estimated. Historically, the Company has not been obligated to make any payments for these obligations, and no liabilities have been recorded for these obligations on its balance sheets as of December 31, 2002.

4.  Accrued Severance Pay

Several of the Company's subsidiaries are subject to Israeli law and labor agreements, under which they are required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment is included in the Company's consolidated balance sheet on the accrual basis, and is partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2002, $1.6 million for accrued severance pay was included in other long-term obligations. In accordance with EITF No. 88–1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $1.1 million relating to the amounts funded by the purchase of insurance policies for the Israeli severance liability in its consolidated balance sheets as other assets at December 31, 2002.

75

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

5.  Restructuring Charges and Asset Write-offs

Restructuring

During the third quarter of 2002, the Company's Board of Directors approved a restructuring plan to conform the expense and revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $3.6 million of which $2.3 million related to employee termination costs and the remaining $1.3 million related to costs for excess leased facilities. At December 31, 2002, restructuring charges of $1.5 million remain accrued. As of December 31, 2002, the employment of 147 employees has been terminated and the Company paid $2.1 million in termination costs. The remaining employee severance costs related to an additional 6 employees will be substantially paid in 2003. The Company anticipates the remaining restructuring accrual, primarily relating to excess leased facilities, included in the lease commitment table in Note 3, will be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

The Company reclassified $0.1 million, which had originally been accrued for as employee termination costs to accrued excess lease facility costs due to a revision in estimate.

A summary of the 2002 accrued restructuring charges is as follows (in millions):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Total Charge | $ 2.3 | $ 1.3 | $ 3.6 |
| Cash Payments | (2.1) | | (2.1) |
| Reclassification | (0.1) | 0.1 | |
| Balance at December 31, 2002 | $ 0.1 | $ 1.4 | $ 1.5 |

During 2001, the Company's Board of Directors approved a restructuring plan to streamline the Company's organizational structure worldwide. The Company incurred restructuring charges in the amount of $12.7 million in fiscal year 2001 of which $8.2 million remained accrued at December 31, 2001. Of the total restructuring charges recorded during fiscal year 2001, $3.2 million related to employee termination costs covering 293 technical, production and administrative employees. As of December 31, 2002, the Company had paid approximately $2.0 million in termination costs. At December 31, 2002, restructuring charges of $5.3 million remain accrued, primarily related to excess facility costs and employee terminations. The Company anticipates utilizing the remaining restructuring accrual, which relates to servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

In 2002, the Company reclassified $1.1 million, which had originally been accrued for as employee termination costs to accrued excess lease facility costs due to a revision in estimate.

76

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table summarizes the costs and activities during 2002, related to the 2001 restructuring (in millions):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Balance at December 31, 2000 | $ — | $ — | $ — |
| Additions | 3.2 | 9.5 | 12.7 |
| Cash Payments | (2.0) | (2.5) | (4.5) |
| Balance at December 31, 2001 | 1.2 | 7.0 | 8.2 |
| Cash Payments | (0.1) | (2.8) | (2.9) |
| Reclassification | (1.1) | 1.1 | — |
| Balance at December 31, 2002 | $ — | $ 5.3 | $ 5.3 |

**Asset Write-offs**

As a result of restructuring activities in 2002 and 2001, and a rapid decline in demand for ANE products, certain property and equipment was determined to have no remaining useful life. Accordingly, the assets were written down to fair value, which was deemed to be zero.

During 2002, $1.3 million of fixed assets became impaired and were written-off. The impaired fixed assets represent the net book value of idle manufacturing equipment, leasehold, and office equipment. During 2001, $1.6 million related to fixed assets acquired from ANE were determined to have no remaining useful life and were written-off.

In March 2001, the Company evaluated the carrying value of certain long-lived assets and acquired intangibles, consisting primarily of goodwill recorded on its consolidated balance sheet. Pursuant to accounting rules, the majority of the goodwill was recorded based on stock prices at the time acquisition agreements were executed and announced. Goodwill and other long-lived assets are reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicate that the carrying amount may not be recoverable. When such events occur, the Company compares the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicates that there is an impairment, the amount of the impairment is based on the fair value of the assets, typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows is based on the Company's weighted average cost of capital, which represents the blended costs of debt and equity.

From September 1999 through December 2000, the Company acquired ten companies. The intended result of these acquisitions was to offer customers and potential customers a robust family of product offerings that integrated many of the acquired technologies. In order to achieve the expected integration of the products and realize the synergies of combined infrastructures, the technologies needed to be further developed, and the products needed to obtain market acceptance.

None of the products from these acquired businesses achieved the level of market acceptance that was forecasted at the time of such acquisitions. Additionally, certain product groups have not achieved the level of technological development needed to be salable or to expand the market. This resulted in significantly lower than expected revenues. Additionally, the general economic slowdown, and the high technology slowdown in particular, had a significant impact on the Company's operating results, just as it had also impacted the results of similar companies in its sector. Prior to the fourth quarter of 2000, the Company had experienced significant quarter-over-quarter growth and consistently met the market's expectations.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company's stock price dramatically declined in the fourth quarter of 2000 with the decline in expected operating results for the quarter. The principal reason for the decline in operating results was a slowdown in orders for traditional cable products.

Downturns in the broadband services and telecommunications markets created unique circumstances with regard to the assessment of goodwill and other intangible assets for recoverability. As a result of the Company's decision to suspend certain product lines and product development efforts during the first quarter of 2001, intangible assets totaling $163.1 million, related to certain acquisitions were deemed to be impaired with no future value, were written-off and included in asset write-offs in the Company's consolidated statements of operations in 2001. Further, the aforementioned downturns in the principal markets in which the Company continues to operate, have negatively impacted the forecasted revenues and cash flows from certain other companies acquired during fiscal 1999 and 2000. In accordance with the Company's policy, the comparison of the discounted expected future cash flows to the carrying amount of the related intangible assets resulted in a write-down of these assets related to both the Cable and Telecom segments of $409.7 million in the first nine months of 2001. This amount was included in asset write-offs in the Company's consolidated statements of operations in 2001.

The Company adopted SFAS No. 142 on January 1, 2002. The Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption. The Company tests goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. The first step was completed during the second quarter of 2002. The company completed the initial goodwill impairment review as of the beginning of 2002, and found no impairment. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, the Company experienced a significant drop in its market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on the Company's forecast, the estimated undiscounted future cash flows from the use of the goodwill would be less than its carrying amount. The Company determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million is related to the Cable segment and $1.0 million is related to the Telecom segment. Subsequent to this write-off, the Company has no intangible assets, which are deemed to have indefinite useful lives.

The Company assigned goodwill to its reporting entities based on the nature of the underlying business acquired. The acquisitions made by the Company in 1999 and 2000 were designated to one of the Company's two reportable segments at the time of the acquisition.

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards relating to a previous acquisition. Due to the impairment write-off, the deferred tax asset, and remaining net deferred tax liability were also written-off.

78

# Exhibit B

(Cont.)

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued).

The Company did not write-off any intangible assets in 2000. The following table describes the intangible assets written off during 2001:

| | Goodwill | Developed Technology | Trademark | Customer Relations | Customer Base | Assembled Workforce | Total |
|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | |
| Cable Segment: | | | | | | | |
| Ultracom | $ 46.2 | $ 0.9 | $ — | $ — | $ — | $0.3 | $ 47.4 |
| ComBox | 65.3 | 10.0 | — | — | — | 0.2 | 75.5 |
| Imedia | 47.2 | 20.0 | 2.9 | — | — | 0.3 | 70.4 |
| Digitrans | 8.2 | 0.5 | — | — | — | 0.3 | 9.0 |
| Telegate | 52.8 | 17.0 | — | 20.2 | — | 0.8 | 90.8 |
| Internet Telecom | 39.1 | 5.0 | — | — | — | 0.1 | 44.2 |
| TrueChat | — | — | — | — | — | — | — |
| Total Cable Segment | $258.8 | $ 53.4 | $ 2.9 | $20.2 | $0.0 | $2.0 | $337.3 |
| Telecom Segment: | | | | | | | |
| MainSail | 97.0 | 44.1 | — | — | — | 0.6 | 141.7 |
| ANE | 33.5 | 10.3 | 0.5 | — | 2.0 | 4.5 | 50.8 |
| Radwiz | 18.7 | 23.1 | 0.9 | — | — | 0.3 | 43.0 |
| Total Telecom Segment | $149.2 | $ 77.5 | $1.4 | $ 0.0 | $2.0 | $5.4 | $235.5 |
| Total Cable and Telecom | $408.0 | $130.9 | $4.3 | $20.2 | $2.0 | $7.4 | $572.8 |

The following table describes the intangible assets written off during 2002:

| | Goodwill | Developed Technology | Trademark | Customer Relations | Customer Base | Assembled Workforce | Total |
|---|---|---|---|---|---|---|---|
| | | | (in thousands) | | | | |
| Cable Segment: | | | | | | | |
| Ultracom | $ — | $ — | $ — | $ — | $ — | $0.1 | $0.1 |
| ComBox | — | — | — | — | — | 0.1 | 0.1 |
| Digitrans | 0.2 | — | — | — | — | — | 0.2 |
| Internet Telecom | — | — | — | — | — | 0.1 | 0.1 |
| TrueChat | 2.5 | — | — | — | — | — | 2.5 |
| Total Cable Segment | $2.7 | $ — | $ — | $ — | $ — | $0.3 | $3.0 |
| Telecom Segment: | | | | | | | |
| MainSail | — | — | — | — | — | 0.5 | 0.5 |
| ANE | — | — | — | — | — | 0.5 | 0.5 |
| Total Telecom Segment | $ — | $ — | $ — | $ — | $ — | $1.0 | $1.0 |
| Total Cable and Telecom | $2.7 | $ — | $ — | $ — | $ — | $1.3 | $4.0 |

6.  Impairment of Long-Term Investment

   The Company's long-lived assets include long-term equity investments. During 2002, the Company determined that one such equity investment in a privately-held company was impaired and recorded an impairment charge of $4.5 million. In 2002, the investee's forecasts were not met and market conditions significantly deteriorated. The Company's estimate of the fair value of the long-term investment was dependent on the performance of the investment, as well as the volatility inherent in the external markets for this investment.

79

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

7.  Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes due in August 2007 (Convertible Notes) resulting in net proceeds to the Company of approximately $484.4 million. The Convertible Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Convertible Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company may redeem some or all of the Convertible Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Convertible Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeds 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company will also make an additional payment of $193.55 per $1,000 principal amount of Convertible Notes, less the amount of any interest actually paid on the Convertible Notes before the date of redemption. The Company may redeem the Convertible Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. Debt issuance costs related to the Convertible Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2002 amortization of debt issuance costs totaled $14.2 million.

In 2001, the Company repurchased approximately $325.9 million of Convertible Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of approximately $185.3 million, net of related unamortized issuance costs of $9.3 million. In 2002, the Company repurchased approximately $109.1 million of Convertible Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million.

In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, the Company is now reporting the gain from retirement of Convertible Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Approximately $65.1 million of Convertible Notes were outstanding at December 31, 2002.

8.  Contingencies

Litigation

Beginning in April 2000, several plaintiffs filed lawsuits against the Company and certain of its officers and directors in federal court. The plaintiff in the first of these lawsuits purported to represent a class whose members purchased the Company's securities between February 2, 2000 and April 11, 2000. The complaint alleged that the defendants had violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding the Company's technology. The allegations in the other lawsuits were substantially the same and, on August 24, 2000, all of these lawsuits were consolidated in the United States District Court, Northern District of California. The court hearing the consolidated action has appointed lead plaintiffs and lead plaintiffs' counsel pursuant to the Private Securities Litigation Reform Act.

On September 21, 2000, the lead plaintiffs filed a consolidated class action complaint containing factual allegations nearly identical to those in the original lawsuits. The consolidated class action complaint, however, alleged claims on behalf of a class whose members purchased or otherwise acquired the Company's securities between November 15, 1999 and April 11, 2000. On October 30, 2000, defendants moved to dismiss the consolidated class action complaint. On March 14, 2001, after defendants' motion had been fully briefed and

80

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

argued, the court issued an order granting in part defendants' motion and giving plaintiffs leave to file an amended complaint. On April 13, 2001, plaintiffs filed their first amended consolidated class action complaint. On June 15, 2001, defendants moved to dismiss this new complaint and oral argument on the motion occurred on December 17, 2001. On March 29, 2002, the court denied the defendants' motion to dismiss. The parties are now in the discovery process. In addition, the court has certified the plaintiffs' proposed class and scheduled trial to begin on November 4, 2003.

The lawsuit seeks an unspecified amount of damages, in addition to other forms of relief. The Company considers the lawsuits to be without merit and intends to defend vigorously against these allegations. However, the litigation could prove to be costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. (Bertram). The Bertram complaint contains factual allegations similar to those alleged in the federal securities class action lawsuit. The complaint asserts causes of action for unlawful business practices, unfair and fraudulent business practices, and false and misleading advertising. Plaintiffs purport to bring the action on behalf of themselves and as representatives of "all persons or entities in the State of California and such other persons or entities outside California that have been and are adversely affected by defendants' activity, and as the Court shall determine is not inconsistent with the exercise of the Court's jurisdiction." Plaintiffs seek equitable and injunctive relief. Defendants removed the Bertram case to the United States District Court, Central District of California and, on January 19, 2001, filed a motion to dismiss the complaint. A hearing on defendants' motion was held March 26, 2001 and the court granted Defendants' motion to dismiss the action and denied Plaintiffs' motion requesting remand. On April 5, 2001, Defendants moved for an order requiring further proceedings, if any to take place in the Northern District of California. Plaintiffs did not oppose this motion and eventually entered into a stipulation to go forward in the Northern District. On July 9, 2001, a status conference was held in this case before Judge Patel. Plaintiffs did not appear for the conference, and the court requested that defendants submit an order dismissing the Bertram action with prejudice, which the defendants have submitted to the court. On August 7, 2002, the court held another conference at which it entered an order dismissing the Bertram case. The court's order permits the individual plaintiffs in the Bertram case to pursue any claims that they may have as members of the purported class in the related, consolidated class action discussed above. Plaintiffs have appealed this order, and the Court of Appeals has set a briefing schedule for the appeal.

The Company believes that the allegations in the Bertram case, as with the allegations in the federal securities case, are without merit and intends to contest the matter vigorously.

On May 7, 2002, a shareholder filed a derivative lawsuit purportedly on behalf of the Company against five of its current directors, two former directors and two former officers. This lawsuit is titled Campbell vs. Rakib, et al., and is pending in the California Superior Court, Santa Clara County. The Company is a nominal defendant in this lawsuit, which alleges claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In that litigation, the Company disputes making any misleading statements. The derivative complaint also alleges claims relating to stock sales by certain of the director and officer defendants.

On July 12, 2002, a shareholder filed a derivative lawsuit purportedly on behalf of the Company against three of its current directors, one former officer and three former investors. This lawsuit is titled O'Brien vs. Rakib, et al., and is pending in the California Superior Court, San Francisco County. The Company is a nominal defendant in this lawsuit, which alleges claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In that litigation, the Company disputes making any misleading statements. The derivative complaint also alleges claims relating to stock sales by

81

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

certain of the director and officer defendants. The plaintiff in the O'Brien case has dismissed the investor defendants without prejudice.

Since the Campbell and O'Brien cases were filed, the parties have taken steps to have these cases consolidated in the California Superior Court, County of Santa Clara. On October 4, 2002, the California Superior Court, County of San Francisco entered an order providing for the transfer of the O'Brien case. On October 29, 2002, plaintiff in the O'Brien case submitted certain materials to the California Superior Court, County of Santa Clara to effectuate that transfer, which is now complete. The O'Brien case is now consolidated with the Campbell case.

The Company believes that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company, (Omniband) filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the Company's breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz Ltd., the Company's subsidiary, dated February 22, 2000. On February 10, 2003, the President of the Zurich Chamber of Commerce appointed the Chairman of a three member panel to preside over the arbitration proceedings. The Company believes that the allegations are without merit and intends to present a vigorous defense in the arbitration proceedings.

On September 3, 2002, Uniscor Ltd. (an Israeli company under voluntary liquidation) and Flextronics (Israel) Ltd., an Israeli company, (Flextronics) filed a claim with the Tel Aviv District Court in Israel against the Company and Radwiz, the Company's subsidiary, alleging that damages of NIS 25,000,000 (approximately) $5 million US dollars) were caused to them by the Company's alleged failure to comply with its contractual obligations to accept and pay for components manufactured by Flextronics in the first quarter of 2001 pursuant to projections it had received from Radwiz. The Company filed a statement of defense denying the allegations, after which the parties accepted the Court's recommendation to transfer the case to non-binding mediation.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on the Company's financial position or overall trends in results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position or overall results of operations for any of the above legal proceedings could change in the future.

9.  Stockholders' Equity

Common Stock

In February 2000, the Company's board of directors approved a two-for-one split of the Company's outstanding shares of common stock to be effected in the form of a stock dividend, subject to stockholder approval of an increase in the Company's authorized shares of common stock. In April 2000, the Company's stockholders approved an increase in the Company's authorized shares to 200,000,000. The Company's Board of Directors subsequently established the record date for the stock split as April 25, 2000 and the stock dividend was distributed on May 5, 2000. The changes in the capital structure resulting from the split were given retroactive effect in the consolidated financial statements.

In November 2001, the Company's Board of Directors approved a tender offer, which permitted employees and members of the Board of Directors the ability to exchange all unvested options granted with an

82

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

exercise price per share equal to or greater than $9.00 for a common stock award. On December 6, 2001, 9,480,629 outstanding options were exchanged for 141,442 shares of common stock. The value of the common stock issued was $2.0 million, using the closing price of the Company's common stock on the date of issuance of $14.15 per share, and was recorded as compensation expense in 2001.

Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw a warrant (Anti-Dilution Warrant) to purchase an indeterminate number of shares of common stock. The Anti-Dilution Warrant is exercisable at the option of Shaw during the period that Shaw owns equity in the Company and in the event the Company issues new equity securities at below the current market price defined in the Anti-Dilution Warrant. The aggregate exercise price is $0.50. The Company issued certain equity securities that, as of December 31, 2002 and 2001, required the Company to issue an additional 17,293 and 35,982 warrants to purchase shares of common stock, respectively, pursuant to the Anti-Dilution Warrant. During the year ended December 31, 2000 no equity securities were issued that resulted in the increase in the number of shares issuable pursuant to the Anti-Dilution Warrant. The Company recorded expenses of approximately $26,000 and $0.2 million relating to the issuance of warrants pursuant to the Anti-Dilution Warrant, in 2002 and 2001, respectively, and none in 2000. The expense is calculated by multiplying the annualized fair market value of the Company's stock by the share dilution attributable to the Anti-Dilution Warrant. As of December 31, 2002, the Anti-Dilution Warrant was exercisable for an aggregate of 125,583 shares of the Company's common stock.

On March 18, 1999, the Company entered into a one-year Product Development Assistance Agreement (Development Agreement) with Rogers. Under the terms of the Development Agreement, Rogers agreed to provide the Company assistance with the characterization and testing of the Company's subscriber-end and head-end voice over cable equipment. In addition, Rogers agreed to provide the Company technology to assist the Company in connection with its efforts to develop high quality, field proven technology solutions that are DOCSIS (1.0, 1.1 and 1.2)-compliant and packet cable-compliant. In consideration of Rogers entering into the Development Agreement, the Company issued Rogers two fully vested and non-forfeitable warrants, each to purchase 2,000,000 shares of common stock. One warrant has an exercise price of $0.50 per share and one warrant has an exercise price of $18.50 per share. The warrants were exercisable in full or in part through March 31, 2000. The fair value of the two warrants was approximately $45.0 million using the Black Scholes model, and resulted in a noncash charge included in operations over the term of the Development Agreement. As a result of the Development Agreement, the Company's results of operations for the years ended December 31, 2000 include noncash charges of $9.6 million. In February 2000, Rogers exercised the warrants on a cashless basis, resulting in the issuance of 3,657,618 shares of the Company's common stock and no proceeds to the Company. As of December 31, 2002, no further shares of the Company's stock were exercisable under this warrant.

In October 1999, a customer of the Company entered into an agreement with Telegate Ltd., an Israeli company (Telegate), which was negotiating with the Company to be acquired by the Company, whereby the customer committed to an investment in Telegate in connection with the acquisition of all the outstanding shares of Telegate by the Company. The Customer committed to provide this investment in the event that the acquisition of Telegate by the Company did not close. In January 2000, the Company issued the customer a warrant to purchase 2,000,000 shares of the Company's common stock at a price of $30.75 per share, the closing price of the Company's common stock on the date the warrant was issued. The warrant is fully vested, non-forfeitable, and immediately exercisable and has a term of three years. The fair value of the warrant, determined as approximately $34.6 million using the Black Scholes model, was included in the Telegate purchase price and was associated with the value of the customer relationship. The value of the warrant resulted in a non-cash charge to cost of goods sold to be amortized over the three-year term of the warrant. In the first quarter of 2001, the Company wrote-off the intangible assets relating to the purchase of Telegate (see

83

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Note 5). For the year ended December 2002, the Company incurred no amortization expense related to the warrant. For the years ended December 31, 2001 and 2000, the Company incurred approximately $2.9 million and $11.5 million in amortization expense related to the warrant, respectively. As of December 31, 2002, the Telegate warrant was exercisable for an aggregate of 2,000,000 shares of the Company's common stock. The Telegate warrant expired in January 2003.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24th per month, beginning January 31, 2001. The fair value of the warrant of approximately $0.7 million was calculated using the Black-Scholes method and was recorded as additional consideration relating to the purchase of TrueChat. As of December 31, 2002, the TrueChat warrant was exercisable for an aggregate of 200,000 shares of the Company's common stock.

In June 2001, the Company issued a fully vested, immediately exercisable, warrant to purchase 100,000 shares of the Company's common stock at a price of $5.98 per share to Philips Semiconductors Inc. (Philips) in consideration for the continuation of their strategic relationship with the Company. The fair value of the warrant, calculated using the Black Scholes method of approximately $0.3 million was recorded as cost of goods sold during 2001. As of December 31, 2002, the Philips warrant was exercisable for an aggregate of 100,000 shares of the Company's common stock.

Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of preferred stock. The rights were distributed as a non-taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15 percent or more of the Company's common stock or announces a tender offer for 15 percent or more of the Company's common stock. If a person or group acquires 15 percent or more of the Company's common stock, all rights holders except the buyer will be entitled to acquire the Company's common stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15 percent of the Company's common stock.

Common Stock Reserved

Common stock reserved for issuance is as follows:

|  | December 31, 2002 |
|---|---|
| Common stock options | 43,547,831 |
| Common stock warrants | 2,425,593 |
| Employee stock purchase plan | 3,000,000 |
|  | 48,973,424 |

Stock Option and Stock Purchase Plans

In March 1995, the Company's Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of the Company's common stock. As of December 31, 2002 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

84

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In March 1997, the Company's Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of the Company's common stock. In June 1998, the Company's Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (5,000,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than five percent (5%) of the Company's outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares.

The 1997 Plan was amended on June 13, 2000 to increase the shares authorized for issuance by 3,770,000 additional shares and to provide for an increase in the number of shares of common stock beginning January 1, 2000 through January 1, 2007, by the lesser of five percent (5%) of the common stock outstanding on such January 1 or 3,000,000 shares. As of December 31, 2002, a total of 18,754,528 shares have been authorized for issuance related to the 1997 Plan.

In June 1998, the Company's Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of the Company's common stock have been reserved for future issuance to non-employee directors of the Company. In 2002, the Company's Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2002, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

In September 1999, the Company's Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of the Company's common stock have been reserved for future issuance to non-officer employees of the Company. In 2000, the Company's Board of Directors amended the 1999 Plan to increase the number of authorized shares to 18,500,000. In 2001, the Company's Board of Directors amended the 1999 Plan to increase the number of authorized shares by 10,000,000. As of December 31, 2002, a total of 28,500,000 shares have been authorized for issuance related to the 1999 Plan.

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1998 Plan provides for non-discretionary nonqualified stock options to be issued to non-employee directors of the Company automatically as of the effective date of their election to the Board of Directors and annually following each annual stockholder meeting. Prices for nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non-officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of the grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

85

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

During the years ended December 31, 2002, 2001 and 2000, the Company recorded aggregate deferred compensation of approximately $38,000, $35,000 and $3.5 million, respectively, representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be remeasured. For the years ended December 31, 2002, 2001, and 2000, the amortization expense was approximately $0.5 million, $0.5 million, and $0.6 million, respectively.

In June 2001, the Company issued 160,000 shares of the Company's common stock to members of its Board of Advisors and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $3.72 per share.

During 2001, the Company issued 115,250 shares of common stock to its employees, and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $5.57 per share.

During 2002, the Company issued 20,000 nonqualified stock options of common stock to a member of its Board of Advisors and recorded $38,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $1.95 per share.

During 2002, the Company issued 200,000 shares of common stock to a consultant and recorded $290,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $1.45 per share.

The following is a summary of additional information with respect to the 1995 Stock Option Plan, the 1997 Equity Incentive Plan, the 1998 Non-Employee Directors' Stock Option Plan, the 1999 Non-Officer Equity Incentive Plan, outstanding options assumed by the Company in conjunction with its business acquisitions of (see Note 14) and option grants made outside the Plans (if any):

|  | Options Available for Grant | Options Outstanding | |
|---|---|---|---|
|  |  | Number of Shares | Weighted-Average Exercise Price |
| Balance at December 31, 1999 | 3,299,627 | 10,342,338 | $16.78 |
| Options authorized | 18,654,528 | — |  |
| Options granted | (15,937,301) | 15,937,301 | $51.14 |
| Options exercised |  | (1,936,867) | $ 7.26 |
| Options canceled | 2,853,236 | (2,853,236) | $ 1.36 |
| Balance at December 31, 2000 | 8,840,090 | 21,489,536 | $39.27 |
| Options authorized | 13,000,000 | — |  |
| Options granted | (22,925,565) | 22,925,565 | $ 6.25 |
| Options exercised | — | (2,924,274) | $ 4.59 |
| Options canceled | 21,483,141 | (21,483,141) | $35.99 |

86

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Options Available for Grant | Options Outstanding | |
| --- | --- | --- | --- |
| | | Number of Shares | Weighted–Average Exercise Price |
| Balance at December 31, 2001 | 20,397,686 | 20,007,686 | $ 9.75 |
| Options authorized | 3,400,000 | | |
| Options granted | (1,734,400) | 1,734,400 | $ 5.40 |
| Options exercised | | (257,521) | $ 3.95 |
| Options cancelled | 6,849,540 | (6,849,540) | $ 12.66 |
| Balance at December 31, 2002 | 28,912,806 | 14,635,025 | $ 8.05 |

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2002:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| | Weighted Number Outstanding | Number of Average Remaining Contractual Life | Weighted Average Exercise Price | Exercisable Options | Weighted Average Exercise Price |
| $0.01 – $5.53 | 4,228,212 | 7.89 | $ 4.08 | 1,744,353 | $ 4.03 |
| $5.67 – $6.50 | 944,357 | 8.32 | $ 6.12 | 262,658 | $ 6.21 |
| $6.50 – $6.81 | 7,493,268 | 8.15 | $ 6.80 | 4,478,550 | $ 6.80 |
| $6.84 – $82.78 | 1,933,188 | 7.93 | $ 20.35 | 877,926 | $ 27.63 |
| $123.50 | 36,000 | 7.20 | $123.50 | 19,800 | $123.50 |
| Total | 14,635,025 | 8.05 | $ 8.05 | 7,383,287 | $ 8.92 |

At December 31, 2002, approximately 667 shares of common stock outstanding were subject to repurchase by the Company. Common stock subject to repurchase represents any unvested shares of common stock held by an optionholder, which, upon termination of the optionholder's employment, may be repurchased by the Company. Such shares are subject to repurchase at their original issuance price. Repurchased shares are recorded as Treasury stock.

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (ESPP), which is designed to allow eligible employees of the Company to purchase shares of common stock at semi–annual intervals through periodic payroll deductions. In 2002, the ESPP was amended to add an additional 3,000,000 shares to the ESPP. An aggregate of 4,400,000 shares of common stock has been reserved for the ESPP, and 1,400,000 shares have been issued through December 31, 2002. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that is to be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the current Offering Period expires (no later than July 31, 2004).

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS No. 123 requires the use of valuation models that were not developed for use in valuing employee stock

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS No. 123 and is calculated as if the Company had accounted for its employee stock options granted during the years ended December 31, 2002, 2001 and 2000 and for its ESPP shares to be issued under the fair value method of SFAS No. 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black–Scholes model using the following weighted average assumptions:

|  | Risk Free Interest Rate 2002 | Risk Free Interest Rate 2001 | Risk Free Interest Rate 2000 |
|---|---|---|---|
| Stock option plans | 4.22% | 4.50% | 5.98% |
| Employee stock purchase plan | 4.36% | 4.14% | 6.35% |

|  | Dividend Yield All Years | Volatility Factor 2002 | Volatility Factor 2001 | Volatility Factor 2000 |
|---|---|---|---|---|
| Stock option plans | 0.0 | 1.50 | 1.50 | 1.20 |
| Employee stock purchase plan | 0.0 | 1.50 | 1.50 | 1.20 |

|  | Weighted Average Expected Life 2002 | Weighted Average Expected Life 2001 | Weighted Average Expected Life 2000 |
|---|---|---|---|
| Stock option plans | 5.0 | 5.0 | 5.0 |
| Employee stock purchase plan | 0.5 | 0.5 | 0.5 |

As discussed above, the valuation models used under SFAS No. 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

SFAS No. 148 amends SFAS No. 123 in December 2002 to require that disclosures of the pro forma effect of using the fair value method of accounting for stock–based employee compensation be displayed more prominently and in a tabular format. For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock–based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of SFAS No. 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common

88

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

stockholders would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Net loss | $(44,213) | $(563,846) | $(180,767) |
| Stock option plans | (33,747) | (126,721) | (118,909) |
| Employee stock purchase plan | (1,990) | (2,212) | (990) |
| Pro forma net loss | $(79,950) | $(692,779) | $(300,666) |
| Pro forma basic and diluted net loss per share | $ (1.10) | $ (10.14) | $ (4.90) |

The pro forma impact of options granted and ESPP shares to be issued for the years ended December 31, 2002, 2001 and 2000 is not representative of the effects on net income (loss) for future years, as future years will include the continued effects of options vesting as well as the impact of multiple years of stock option grants.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS No. 123, was $4.98, $5.83, and $43.81, for options granted during 2002, 2001, and 2000, respectively. The weighted average grant date fair value of ESPP shares to be issued was $2.25, $3.99, and $9.30 for the years ended December 31, 2002, 2001 and 2000, respectively.

10. Income Taxes

For the years ended December 31, 2002 and 2001, the Company had an income tax expense of $0.2 million, and an income tax benefit of $13.9 million, respectively. Due to operating losses and the inability to recognize the benefits, there is no provision for income taxes for the year ended December 31, 2000.

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
|  | (in thousands) | | |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $ — | $ — | $ — |
| State | 20 | — | — |
| Foreign | 218 | 831 | — |
| Total current | $238 | $831 | $ — |
| Deferred: |  |  |  |
| Federal | $ — | $ — | $ — |
| State | — | — | — |
| Foreign | — | $(14,746) | — |
| Total deferred | $ — | (14,746) | $ — |
| Total | $238 | $(13,915) | $ — |

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards relating to a previous acquisition. In fiscal 1999 and 2000, the Company acquired ten companies. In fiscal 2001, certain intangible assets from these acquisitions were written off. As part of recording the write-offs the related deferred tax liabilities were also written off. This resulted in the recording of a deferred tax benefit of $14.7 million in fiscal 2001. There were also foreign income taxes of $0.8 million for fiscal 2001.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (in thousands):

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| Tax benefit at U.S. statutory rate | $(15,391) | $(197,346) | $(63,268) |
| Goodwill amortization | — | 2,849 | 19,405 |
| In-process research and development | — | — | 8,898 |
| Loss for which no tax benefit is currently recognizable | 15,391 | 179,338 | 34,529 |
| Other, net | 238 | 1,244 | 636 |
|  | $   238 | $ (13,915) | $   — |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2002 and 2001 are as follows (in thousands):

|  | December 31, | |
|  | 2002 | 2001 |
|---|---|---|
| Deferred tax assets | | |
| Net operating loss carryforwards | $ 118,021 | $ 130,321 |
| Tax credit carryforwards | 14,936 | 13,047 |
| Reserves and accruals | 96,428 | 58,418 |
| Capitalized research and development | 4,372 | 7,580 |
| Intangibles amortization | 2,616 | 8,396 |
| Other, net | 8,430 | 610 |
| Gross deferred tax assets | 244,803 | 218,372 |
| Valuation allowance | (244,803) | (218,372) |
| Total deferred tax assets | $   — | $   — |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2002 and 2001. The change in the valuation allowance was a net increase of approximately $26.4 million, $86.7 million, and $88.2 million for the years ended December 31, 2002, 2001, and 2000, respectively. Approximately $44.2 million of the valuation allowance will be credited to equity when realized.

As of December 31, 2002, the Company had federal, California and foreign net operating loss carryforwards of approximately $244.5 million, $136.4 million and $113.5 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $8.7 million and $9.6 million, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2003 through 2022, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carryforwards before full utilization.

90

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## 11. Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2002, 2001, and 2000.

## 12. Segments of an Enterprise and Related Information

The Company's Chief Executive Officer has been identified as the Chief Operating Decision Maker (CODM) because he has final authority over resource allocation decisions and performance assessment. The CODM allocates resources to each segment based on their business prospects, competitive factors, revenues and operating results. The Company does not allocate non-operating income or expenses to its segments, as management does not use the information to measure the performance of the operating segments.

The Company views its business as having two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). The Cable segment consists primarily of its TeraComm System, TJ line of DOCSIS cable modems, Bluewave line of DOCSIS Cable Modem Termination Systems (CMTS), and the CherryPicker family of Digital Video Management Systems that are sold primarily to cable operators for the deployment of data, video and voice services over the existing cable infrastructure. The Telecom segment consists primarily of Mini Plex DSL Systems, IPTL Converged Voice and Data Service System and MainSail products, which are sold to providers of broadband services for the deployment of voice and data services over the existing copper wire infrastructure.

Information on reportable segments is as follows (in thousands):

|  | Years Ended December 31, | | |
|  | 2002 | 2001 | 2000 |
|---|---|---|---|
| **Cable Broadband Access Segment:** | | | |
| Revenues: | | | |
| TeraComm System | $ 68,753 | $ 192,757 | $ 238,358 |
| TJ DOCSIS cable modems | 23,059 | 25,069 | 24,736 |
| Video products | 20,833 | 16,363 | 19,714 |
| Other | 6,284 | 11,639 | 20,716 |
| Total Cable revenues | $118,929 | $ 245,828 | $ 303,524 |
| Depreciation expense | $ 10,347 | $ 12,028 | $ 10,699 |
| Operating loss | $ (78,731) | $(465,435) | $(132,643) |
| **Telecom Broadband Access Segment:** | | | |
| Revenues: | | | |
| Mini Plex DSL Systems | $ 8,366 | $ 23,417 | $ 33,363 |
| Other | 2,108 | 10,236 | 2,662 |
| Total Telecom revenues | $ 10,474 | $ 33,653 | $ 36,025 |
| Depreciation expense | $ 1,225 | $ 3,700 | $ 585 |
| Operating loss | $ (10,852) | $(297,697) | $ (54,834) |
| Total revenues | $129,403 | $ 279,481 | $ 339,549 |
| Total depreciation expense | $ 11,572 | $ 15,728 | $ 11,284 |

91

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2002 | 2001 | 2000 |
| **Operating loss:** | | | |
| Operating loss by reportable segments | $ (89,583) | $(763,132) | $(187,477) |
| Unallocated amounts: | | | |
| Interest and other income (expense), net | (3,481) | 44 | 6,710 |
| Gain on early retirement of debt | 49,089 | 185,327 | — |
| Income tax (expense) benefit | (238) | 13,915 | — |
| Net loss | $ (44,213) | $(563,846) | $(180,767) |
| **Geographic areas** | | | |
| Revenues: | | | |
| United States | $ 41,150 | $ 50,291 | $ 83,974 |
| Canada | 17,247 | 113,300 | 118,491 |
| Europe | 11,381 | 34,952 | 37,880 |
| Israel | 8,283 | 16,528 | 23,861 |
| Japan | 36,214 | 37,721 | 36,612 |
| Asia, excluding Japan | 11,845 | 24,094 | 24,373 |
| South America | 3,283 | 2,595 | 14,358 |
| Total | $129,403 | $ 279,481 | $ 339,549 |

| | December 31, 2002 | December 31, 2001 |
|---|---|---|
| **Assets:** | | |
| Cable Broadband Access Segment | $ 217,531 | $ 455,836 |
| Telecom Broadband Access Segment | 58,179 | 10,810 |
| Total assets | $ 275,710 | $ 466,646 |
| **Long-lived assets** | | |
| United States | $ 28,169 | $ 36,106 |
| Canada | 787 | 256 |
| Europe | 170 | 388 |
| Israel | 3,442 | 3,757 |
| Asia | 207 | 243 |
| South America | 118 | 2,020 |
| Total long-lived assets | 32,893 | 42,770 |
| Total current assets | 242,817 | 423,876 |
| Total assets | $ 275,710 | $ 466,646 |

One customer, related to the Cable segment, accounted for 10% or more of total revenues for the year ended December 31, 2002 (28%). Two customers, both related to the Cable segment, accounted for 10% or more of the total revenues (33% and 13%) for the year ended December 31, 2001. Three customers, all of whom related to the Cable segment, accounted for 10% or more of total revenues (17%, 17%, and 11%) for the

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

year ended December 31, 2000. No other customer accounted for more than 10% of revenues during these years. One customer, related to the Cable segment, accounted for 10% or more of total accounts receivable for the year ended December 31, 2002 (23%).

13.    Related Party Transactions

During the years ended December 31, 2002, 2001 and 2000, the Company recognized revenue of $9.1 million, $52.4 million, and $119.3 million, respectively in connection with product shipments made to related parties. Prior to the third quarter of 2001, both Shaw and Rogers, each of which had one representative on the Company's Board of Directors were significant stockholders and were related parties. Beginning in the third quarter of 2001, Shaw was no longer a significant stockholder because Shaw no longer exercised voting rights over its shares in the Company, and the board member from Shaw resigned. Accordingly, Shaw was no longer considered a related party. Revenues from Shaw are not included as revenue from related parties after the second quarter of 2001, when Shaw ceased to be a related party. Alek Krstajic, a member of the Company's board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. In May 2003, Rogers will no longer be a related party to the Company.

Lewis Solomon, a member of the Company's Board of Directors and chairman of the Company's Audit Committee is also a member of the Board of Directors of Harmonic, Inc. (Harmonic) a manufacturer and seller of broadband products. In April 2002, the Company entered a reseller agreement with Harmonic to sell certain of the Company's products. The agreement appoints Harmonic as an authorized, non-exclusive reseller of certain of the Company's video products. In the year ended December 31, 2002, revenues from Harmonic of $1.1 million are included as revenue from related parties.

Cost of related party product revenues consist of direct product costs in cost of goods sold in the Company's consolidated statements of operations. No indirect costs are applied to the cost of related party revenue. Accounts receivable from Rogers and Harmonic totaled approximately $0.8 million and $4.0 million at December 31, 2002 and 2001, respectively. None of the related parties is a supplier to the Company.

In December 2001, the Company entered into co-marketing arrangements with Shaw and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. The Company entered into these arrangements with Shaw and Rogers to promote the Company's brand and identify its products. The Company will charge the amortization of these assets against Cable revenues in each of the next four quarters through December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter. Amounts charged against revenues in 2002 totaled approximately $2.8 million. See Note 1.

Between April 1998 and March 1999, the Company issued various warrants to Shaw and Rogers to purchase shares of the Company's common stock. See Note 9.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Aleksander Krstajic is the founder and President of Team Honor.

14.    Business Combinations

During 1999 and 2000, the Company completed a total of ten acquisitions. There were no acquisitions during 2001. Each of the acquisitions was accounted for under the purchase method of accounting in accordance with Accounting Principles Board Opinion No. 16 (APB 16). The respective purchase prices were allocated to the assets acquired and liabilities assumed based on a determination from an independent appraisal of their respective fair values in accordance with Emerging Issues Task Forces No. 99-12

93

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(EITF 99-12). The methodologies used to value intangible assets acquired were consistently applied to each of the acquisitions.

To determine the value of the developed technology, the expected future cash flow attributed to all existing technology was discounted, taking into account risks related to the characteristics and application of the technology, existing and future markets and assessments of the life cycle stage of the technology.

The value of the in-process research and development was determined based on the expected cash flow attributed to the in-process projects, taking into account revenue that is attributable to previously developed technology, the level of effort to date in the in-process research and development, the percentage of completion of the project and the level of risk associated with the in-process technology. The projects identified as in-process are those that were underway at each of the acquired companies at the time of the acquisition and that required additional efforts in order to establish technological feasibility. The value of in-process research and development was included in the Company's results of operations during the period of the acquisition.

The value of the assembled workforce was derived by estimating the costs to replace the existing employees, including recruiting, hiring and training costs for each category of employee.

As discussed in Note 5, the Company recorded losses due to the impairment of goodwill and intangible assets of approximately $4.0 million and $572.8 million relating to these acquisitions in December 31, 2002 and 2001, respectively. No intangible assets remained at December 31, 2002.

In connection with the acquisitions of Imedia and Telegate, in 1999, the Company gave one of its directors, Lewis Solomon, a grant of 50,000 non-qualified stock options and an additional grant of 20,000 shares of restricted common stock for consulting services provided to the Company by Mr. Solomon for his assistance with the Company's strategic partnerships and acquisitions.

Imedia Corporation

In July 1999, the Company entered into an Agreement and Plan of Reorganization (Imedia Agreement) to acquire Imedia Corporation (Imedia), a California corporation. Imedia produces routing and re-multiplexing systems for digital video that enable cable operators to select and customize their program lineup for viewer preferences, while maximizing video capacity and quality over standards-based set-top boxes. The Imedia acquisition was completed on September 16, 1999 (Imedia Closing Date).

In accordance with the Imedia Agreement, the Company issued 1,714,814 shares of common stock and 309,256 options and warrants to purchase common stock to the vested and unvested option holders and warrant holders of Imedia on the Imedia Closing Date. The approximate purchase price of $91.0 million was determined as the value of the Company's common stock issued at closing ($77.0 million) and the value of the options to purchase the Company's shares issued to the unvested option holders ($14.0 million) based on the fair market value of the Company's common stock on the days immediately preceding and following the closing date of the acquisition.

Tangible assets acquired principally include cash, accounts receivable and property and equipment. Liabilities assumed principally include accounts payable and accrued liabilities. At the Imedia Closing Date, the Company forgave Imedia's note payable obligation of $1.0 million.

The analysis of the expected future cash flows attributed to all existing technology resulted in a valuation of approximately $27.0 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $11.0 million consisted primarily of major additions to Imedia's core technology, which was related to Imedia's planned development of new features.

94

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The majority of the intended functionality of these new features was not supported by Imedia's then-current technology. Intended new features included offering high quality video service over the Internet and multiplexing data with video. Development of this technology was completed in 2001.

Radwiz Ltd.

In October 1999, the Company entered into a Share Purchase Agreement (Radwiz Agreement) to acquire Radwiz. Radwiz produced communication access systems based on high-speed IP routing, integrated with telephony. Radwiz's systems included both central office Digital Subscriber Line Access Multiplexers (DSLAMs) and customer premises equipment for small office, home office (SOHO) business broadband services. The Radwiz acquisition was completed on November 22, 1999 (Radwiz Closing Date).

In accordance with the Radwiz Agreement, the Company paid $0.3 million in cash and issued 1,992,306 shares of the Company's common stock to the former shareholders of Radwiz and issued options to purchase 267,959 shares of the Company's common stock to the unvested optionholders of Radwiz on the Radwiz Closing Date. In addition, the unvested optionholders of Radwiz options also received options to purchase the Company's common stock, the fair value of which was included in the purchase price.

The approximate purchase price was determined to be $52.7 million. This represents the minimum purchase price, as specified in the Radwiz Agreement, to be issued to the shareholders and vested option holders of Radwiz ($50.0 million) plus the value of the options issued to unvested option holders of Radwiz ($2.7 million) based on the market value of the Company's common stock on the date the acquisition was announced. Proceeds to be received from the Radwiz optionholders upon exercise of their options were not significant.

Tangible assets acquired principally included cash, accounts receivable, inventory and property and equipment. Liabilities assumed included accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $29.9 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired in the transaction, valued at approximately $3.0 million consisted primarily of additions to Radwiz's core technology, which was related to Radwiz's planned development of new features. The majority of the intended functionality of these new features was not supported by Radwiz's then-current technology. Intended new features included offering: end-to-end carrier quality of service; allowing access via an ATM network; and, providing ISDN line functionality. The Company completed most of this development work in 2001, and the Company decided to no longer pursue the ISDN line functionality.

Telegate Ltd.

In October 1999, the Company entered into a Share Purchase Agreement (Telegate Agreement) to acquire Telegate. Telegate produces telephony and data access platforms that are deployed by service providers to deliver efficient carrier-class voice services over cable. Telegate also provides in-home networking capability for telephony and data, based on the Digital Enhanced Cordless Telephony (DECT) standard. The transaction was completed on January 2, 2000.

In accordance with the Telegate Agreement, the Company issued 4.4 million shares of common stock and paid approximately $2.5 million in cash on January 2, 2000. The Company made an additional cash payment of approximately $0.9 million during the third quarter of 2000. The approximate purchase price of $100.0 million was determined as the value of the Company's common stock issued at closing based on the fair market value of the Company's common stock on the days immediately preceding and following the announcement date of the acquisition.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In addition, the Company issued a warrant to purchase 2.0 million shares of the Company's common stock, valued at approximately $34.6 million under the terms of an agreement between Telegate and a customer of the Company (See Note 9). The value of the warrant was included in the purchase price and was classified as a customer relationship.

Tangible assets acquired principally included cash, accounts receivable, inventory and property and equipment. Liabilities assumed principally included accounts payable and accrued liabilities.

The value of the customer relationship was determined as the value of the warrant using the Black Scholes model. The warrant was fully vested, non-forfeitable, and immediately exercisable and has a term of three years. The value of the customer relationship is being amortized to cost of goods sold on a straight-line basis over a three-year period.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $21.5 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $7.5 million, consisted primarily of major additions to Telegate's core technology, which was related to Telegate's planned development of new features. The majority of the intended functionality of these new features was not supported by Telegate's then-current technology. Intended new features included: connection on demand functionality to extend the product's ISDN compatibility; the ability to use cordless technology for either voice or data applications; and, a subscriber end unit that can be used in multi-dwelling units. During 2001, the Company decided to no longer pursue the cordless technology and the subscriber end unit technology.

Access Network Electronics Division of Tyco Electronics Corporation

In February 2000, the Company entered into an Asset Purchase Agreement (ANE Agreement) to acquire certain assets and assume certain liabilities of ANE, a company that provides multiple phone lines over the existing copper telephony network. The transaction was completed on April 22, 2000.

In accordance with the ANE Agreement, the Company issued 1,404,552 shares of common stock, valued at approximately $83.5 million based on the fair market value of the Company's common stock on the days immediately preceding and following the announcement date of the acquisition. In addition, the Company agreed to establish an employee retention program for purposes of retaining certain identified employees of ANE. The retention program provides for up to three annual payments to the identified employees in a total amount of approximately $4.5 million provided the employees remain employed by the Company. The retention payments are being charged to expense over the employees' respective periods of service.

Tangible assets acquired principally included accounts receivable, inventory and property and equipment. Liabilities assumed principally included accounts payable and warranty obligations. During 2001, the Company increased its intangible assets for assembled workforce by $4.5 million related to retention payments in conjunction with the acquisition of ANE.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $12.6 million for developed technology, which had reached technological feasibility and therefore was capitalizable.

To determine the value of the customer base the expected future cash flows attributed to existing customers was discounted. The analysis yielded a valuation of approximately $2.4 million.

In-process technology acquired in the transaction, valued at approximately $0.8 million, consisted primarily of additions to ANE's core technology, which was related to ANE's planned development of new features. A portion of the intended functionality of these new features was not supported by ANE's then-

96

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

current technology. The resultant technology is intended to allow the transmission from a 56Kbps modem without the loss of transmission rate. During 2001, the Company decided to no longer pursue the development of this technology.

ComBox Ltd.

In February 2000, the Company entered into a Share Purchase Agreement (ComBox Agreement) to acquire ComBox Ltd (ComBox), an Israeli company. ComBox is a manufacturer of broadband data systems and satellite communications based on international standards. ComBox's cable data access systems conform to the growing EuroModem international specification, based on the Digital Video Broadcasting (DVB) standard. The transaction was completed on April 18, 2000.

In accordance with the ComBox Agreement, the Company issued 1,547,770 shares of common stock and made a cash payment of approximately $0.3 million. In addition, the Company issued options to purchase common stock of the Company to the unvested option holders of ComBox options. The approximate purchase price was determined as the value of the Company's common stock issued at closing ($92.0 million) and the value of the options to purchase the Company's shares issued to the unvested option holders ($8.8 million) based on the fair market value of the Company's common stock on the days immediately preceding and following the date the acquisition was announced. In addition, the cash payment of approximately $0.3 million was included in the purchase price. Proceeds to be received from the option holders and warrant holders upon exercise were not significant.

Tangible assets acquired principally include cash and cash equivalents and accounts receivable. Liabilities assumed principally include short and long term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $12.5 million for developed technology, which had reached technological feasibility and therefore was capitalizable.

In-process technology acquired valued at approximately $8.0 million consisted primarily of additions to ComBox's core technology, which was related to ComBox's planned development of new features. A portion of the intended functionality of these new features was not supported by ComBox's then-current technology. During 2001, the Company decided to no longer pursue these new features.

Internet Telecom Ltd.

In March 2000, the Company and Telegate, a subsidiary of the Company, entered into an Asset Purchase Agreement (Internet Telecom Agreement) under which Telegate agreed to purchase certain assets of Internet Telecom Ltd. (Internet Telecom), an Israeli company. Internet Telecom is a supplier of PacketCable and other standards-based, Voice-over-IP systems and technologies. The transaction was completed on April 18, 2000.

In accordance with the Internet Telecom Agreement, the Company issued 377,380 shares of common stock valued at approximately $46.0 million based on the fair market value of the Company's common stock on the days immediately preceding and following the announcement of the acquisition and issued options of 10,898 to purchase common stock of the Company to the unvested option holders of Internet Telecom and paid approximately $2.0 million in cash. In addition, as a result of certain conditions in the Internet Telecom Agreement with regards to the price of the Company's common stock, an additional accrued purchase price payable of approximately $14.1 million was included in the consolidated balance sheet as of December 31, 2000. This amount was paid during 2001.

97

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $6.0 million for developed technology, which had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $2.6 million, consisted primarily of additions to Internet Telecom's core technology, which was related to Internet Telecom's planned development of new features. A portion of the intended functionality of these new features was not supported by Internet Telecom's then-current technology. During 2001, the Company decided to no longer develop the new features from Internet Telecom.

Ultracom Ltd.

In March 2000, the Company entered into a Share Purchase Agreement to acquire Ultracom (Ultracom Agreement), an Israeli company. Ultracom is a supplier of broadband systems-on-silicon. The transaction was completed on April 19, 2000.

In accordance with the Ultracom Agreement, the Company issued 536,766 shares of common stock, made a cash payment of approximately $0.2 million and issued 14,403 options to purchase common stock of the Company to the shareholders and unvested option holders of Ultracom options. The approximate purchase price was determined as the value of the Company's common stock issued at the closing ($57.6 million) and the value of the options to purchase the Company's shares issued to the unvested option holders ($0.6 million) based on the fair market value of the Company's common stock on the days immediately preceding and following the date the acquisition was announced. In addition, the cash payment of approximately $0.2 million was included in the purchase price.

Tangible assets acquired principally included cash and cash equivalents, accounts receivable and property and equipment. Liabilities assumed principally included long-term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $1.1 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $1.8 million, consisted primarily of additions to Ultracom's core technology, which was related to Ultracom's planned development of new features. A portion of the intended functionality of these new features was not supported by Ultracom's then-current technology. During 2001, the Company determined that it would no longer continue development on the Ultracom technology.

MainSail Networks, Inc.

In August 2000, the Company entered into an Agreement and Plan of Merger and Reorganization (MainSail Agreement) to acquire MainSail. MainSail develops and markets next-generation broadband networks that enable telecommunications carriers to deliver multiple services over a single network infrastructure. The transaction was completed on September 29, 2000.

In accordance with the MainSail Agreement, the Company issued 2,969,062 shares of common stock and 138,193 options to purchase shares of common stock to the MainSail shareholders and option holders. The approximate purchase price was determined based on the fair market value of the Company's common stock on the days immediately preceding and following the date the acquisition was announced ($171.3 million) less the intrinsic value of the unvested options recorded as deferred compensation ($4.7 million). Deferred compensation is amortized over the option holders' vesting period.

98

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Tangible assets acquired principally included cash, inventory and property and equipment. Liabilities assumed principally included accounts payable, accrued liabilities and notes payable.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $49.0 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $5.0 million, consisted primarily of additions to MainSail's core technology, which was related to MainSail's planned development of new features. A portion of the intended functionality of these new features was not supported by MainSail's then-current technology. The resultant technology was intended to provide a high capacity CPE (customer premise equipment) and low cost gateway. This development was completed in 2001.

Digitrans

On September 27, 2000, the Company acquired Digital Transmission Equipment (Digitrans) pursuant to the terms of a Stock Purchase Agreement (Digitrans Agreement) between the Company and the former owner of Digitrans. Digitrans develops, markets and sells digital equipment solutions that enable broadcasters, satellite operators and cable television system operators to optimize network services.

In accordance with the Digitrans Agreement, the Company issued 394,329 shares of common stock. The approximate purchase price was $14.2 million based on the fair market value of the Company's common stock on the days subsequent to the closing date and immediately proceeding and following the removal of all contingencies. In addition, a provision in the Digitrans Agreement with Digitrans stipulated that if the value of the acquisition shares fell below the purchase price on the date the Registration Statement filed in connection with the acquisition was declared effective, the Company would pay the former shareholders of Digitrans, in the form of stock, the difference between the purchase price of $22.45 per share and the value of $43.13 per share of the acquisition shares, divided by the purchase price, multiplied by the original share issuance of 394,329 shares. As a result of this provision and an additional issuance of 4,455 shares, the Company issued a total of 367,804 additional shares of its common stock to the former stockholders of Digitrans in September 2000. Additionally, the Company forgave $2.0 million of convertible promissory notes, which were originally issued to Digitrans by the Company in June 2000.

Tangible assets acquired principally included cash and cash equivalents, accounts receivable and property and equipment. Liabilities assumed principally included long-term debt, accounts payable and accrued liabilities.

The analysis of the expected future cash flow attributed to all existing technology resulted in a valuation of approximately $0.6 million for developed technology that had reached technological feasibility and therefore was capitalizable.

In-process technology acquired, valued at approximately $5.0 million, consists primarily of additions to Digitrans' core technology, which was related to Digitrans' planned development of new features. A portion of the intended functionality of these new features was not supported by Digitrans' then-current technology. Intended new features included system on chip solutions for DOCSIS and DVB/DAVIC cable modems. During 2001, the Company decided not to pursue these development efforts.

TrueChat

On December 22, 2000, the Company, acquired TrueChat, pursuant to the terms of an Agreement and Plan of Merger and Reorganization (TrueChat Agreement). TrueChat develops communication systems that enable multimedia teleconferencing and provide increased control over teleconference parameters.

99

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In accordance with the TrueChat Agreement, the Company issued 534,487 shares of common stock and made a cash payment of $0.2 million. In addition, the former option holders of TrueChat received options to purchase 126,061 shares of the Company's common stock. The approximate purchase price was $2.9 million, based on the fair market value of the Company's common stock on the days immediately preceding and following the closing date of the acquisition ($2.2 million) and the value of the options to purchase the Company's shares issued to the unvested option holders ($0.5 million). Deferred compensation relating to the options is amortized over the option holders' vesting period. (see Note 9).

A summary of the purchase price allocations pertaining to the above acquisitions and the amortization periods of the intangible assets acquired is as follows (in thousands):

| | Telegate | ANE | ComBox | IT | Ultracom | MainSail | Digitrans | TrueChat |
|---|---|---|---|---|---|---|---|---|
| **2000 Acquisitions** | | | | | | | | |
| **Approximate purchase price** | | | | | | | | |
| Purchase price | $130,553 | $83,477 | $98,784 | $62,265 | $57,621 | $166,556 | $15,921 | $2,664 |
| Transaction and other direct acquisition costs | 4,483 | 265 | 672 | 1,486 | 598 | 2,641 | 116 | 210 |
| | $135,036 | $83,742 | $99,456 | $63,751 | $58,219 | $169,197 | $16,037 | $2,874 |
| **Allocation of purchase price:** | | | | | | | | |
| Historical net tangible assets acquired | ($ 5,580) | $14,145 | $ 2,308 | | $ 1,116 | ($ 15) | $ 306 | |
| Convertible loans | 12,482 | | | | | | | |
| | 6,902 | 14,145 | 2,308 | — | 1,116 | (15) | 306 | — |
| **Intangible assets acquired:** | | | | | | | | |
| Customer relationship or base | 34,580 | 2,400 | | | | | | |
| Developed technology | 21,500 | 12,600 | 12,500 | 5,950 | 1,050 | 49,000 | 550 | |
| Assembled workforce | 4,200 | 12,200 | 1,100 | 500 | 1,100 | 2,800 | 1,100 | |
| Trademark | | 600 | | | | | | |
| In-process research and development | 7,500 | 750 | 8,000 | 2,550 | 1,800 | 5,000 | 4,950 | |
| Goodwill | 66,382 | 44,047 | 80,444 | 54,751 | 53,927 | 107,692 | 9,131 | 2,390 |
| Deferred tax liability | (6,028) | | (4,896) | | (774) | | | |
| Deferred compensation | | | | | | 4,719 | | 484 |
| | $135,036 | $86,742 | $99,456 | $63,751 | $58,219 | $169,196 | $16,037 | $2,874 |
| **Amortization period (in years):** | | | | | | | | |
| Customer relationship or base | 3 | 5 | | | | | | |
| Developed technology | 6 | 5 | 5 | 6 | 6 | 5 | 5 | |
| Assembled workforce | 2 | 5 | 1,100 | 2 | 2 | 2 | 2 | |
| Trademark | | 5 | | | | | | |
| Goodwill | 6 | 5 | 5 | 6 | 6 | 5 | 5 | 5 |
| Deferred compensation | | | | | | 1.5 | | 1.5 |

100

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

|  | Imedia | Radwiz |
|---|---|---|
| **1999 Acquisitions** | | |
| Approximate purchase price: | | |
| Purchase price | $106,347 | $ 52,667 |
| Transaction and other direct acquisition costs | 2,345 | 1,086 |
|  | $108,692 | $ 53,753 |
| Allocation of purchase price: | | |
| Historical net tangible assets acquired | ($ 355) | $ 3,058 |
| Forgiveness of note payable | 1,000 | |
|  | 645 | 3,058 |
| Intangible assets acquired: | | |
| Developed technology | 27,000 | 29,850 |
| Assembled workforce | 2,500 | 2,800 |
| Trademark | 4,000 | 1,150 |
| In-process research and development | 11,000 | 3,600 |
| Goodwill | 63,547 | 24,293 |
| Deferred tax liability | | (10,998) |
|  | $108,692 | $ 53,753 |
| Amortization period (in years): | | |
| Developed technology | 6 | 6 |
| Assembled workforce | 2 | 2 |
| Trademark | 6 | 6 |
| Goodwill | 6 | 6 |

Pro Forma Financial Results

The following selected unaudited pro forma combined results of operations for the year ended December 31, 2000 of the Company, Telegate, ComBox, Ultracom, ANE, Internet Telecom, MainSail, Digitrane and TrueChat have been prepared assuming that the acquisitions occurred at the beginning of the period presented. The following selected unaudited pro forma financial information is not necessarily indicative of the results that would have occurred had the acquisitions been completed at the beginning of the period indicated nor is it indicative of future operating results (in thousands, except per share data):

|  | Year Ended December 31, 2000 |
|---|---|
| Revenues | $ 358,559 |
| Net loss(1) | $ (71,343) |
| Net loss per share(1) | $ (1.16) |
| Shares used in calculation of net loss per share | 61,349 |

(1)  Net loss and net loss per share excludes approximately $30.5 million of in-process research and development charges for the year ended December 31, 2000.

101

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

15.  Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts that are based on the best available information — mostly historical claims experience — claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties follows (in thousands):

| | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Write-offs | Balance at End of Period |
|---|---|---|---|---|
| Year ended December 31, 2000 | | | | |
| Warranty reserve | $2,685 | 5,991 | 2,751 | $5,925 |
| Year ended December 31, 2001 | | | | |
| Warranty reserve | $5,925 | 7,956 | 5,513 | $8,368 |
| Year ended December 31, 2002 | | | | |
| Warranty reserve | $8,368 | 2,730 | 2,491 | $8,607 |

16.  Subsequent Events (Unaudited)

On February 26, 2003, the Company and Solectron Corporation (Solectron) entered into an agreement to settle all outstanding obligations under two manufacturing agreements between the Company and Solectron. Under the terms of the settlement agreement, the Company paid Solectron approximately $3.9 million, and each party released any and all claims that it may have had against the other party. Additionally, Terayon received selected inventory from Solectron. The Company previously accrued the $3.9 million settlement as a vendor cancellation in the fourth quarter of 2000 and the second quarter of 2001.

On March 14, 2003, the Company initiated a worldwide reduction in force of approximately 100 employees, or 20 percent of the workforce, and the closure of certain remote facilities. The Company expects to record total charges in the range of approximately $4 million to $5 million associated with the realignment and the writedown of certain related assets in the quarter ending March 31, 2003.

17.  Unaudited Quarterly Financial Data

Summarized quarterly financial data for 2002 and 2001 is as follows (in thousands, except per share data):

| | Quarter | | | |
|---|---|---|---|---|
| 2002 | First | Second | Third | Fourth |
| Total revenues | $57,218 | $22,407 | $24,475 | $25,303 |
| Gross profit (loss) | 25,491 | (27) | 296 | 2,694 |
| Restructuring costs and asset write-offs(2) | — | (3,972) | (4,950) | — |
| Net loss(3) | (4,090) | (3,685) | (15,972) | (20,466) |
| Basic and diluted net loss per share | $ (0.06) | $ (0.05) | $ (0.22) | $ (0.28) |

102

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Quarter | | | |
|---|---|---|---|---|
| 2001 | First | Second | Third | Fourth |
| Total revenues | $ 53,964 | $ 65,733 | $79,603 | $80,161 |
| Gross profit (loss) | (869) | (15,731) | 10,368 | 22,445 |
| Restructuring costs and asset write-offs(2) | (574,744) | (2,549) | (5,301) | (3,449) |
| Net income (loss)(3) | (508,200) | (62,504) | 13,082 | (6,224) |
| Basic and diluted income (loss) per share | $ (7.53) | $ (0.93) | $ 0.19 | $ (0.09) |

(1)   Earnings per share are computed independently for each of the quarters presented. The sum of the quarterly earnings per share in 2002 and 2001 does not equal the total computed for the year due to changes in shares outstanding and rounding.

(2)   See Note 5 for an explanation for restructuring and asset write-offs.

(3)   See Note 7 for an explanation of the repurchase of subordinated convertible notes.

103

# Exhibit C

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10-K

(Mark One)

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Fiscal Year Ended December 31, 2003

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Transition Period from          to          .

Commission file number: 000-24647

# Terayon Communication Systems, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 77-0328533 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS employer identification no.) |

4988 Great America Parkway

Santa Clara, California 95054
(408) 235–5500
(Address, including zip code, and telephone number, including area code,
of the registrant's principal executive offices)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class: | Name of Each Exchange on Which Registered: |
|---|---|
| None | None |

Securities registered pursuant to Section 12(g) of the Act:

Common Stock, par value $0.001 per share
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☑    No ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 30, 2003 as reported on the Nasdaq National Market, was approximately $159,297,437. Shares of common stock held by each officer and director and by each person known to the registrant who owns 5% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of February 29, 2004, the registrant had outstanding 75,536,192 shares of common stock.

TERAYON COMMUNICATION SYSTEMS, INC.

INDEX

Page No.

PART I

| | | |
|---|---|---|
| Item 1. | BUSINESS | 1 |
| Item 2. | PROPERTIES | 8 |
| Item 3. | LEGAL PROCEEDINGS | 8 |
| Item 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 10 |

PART II

| | | |
|---|---|---|
| Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 10 |
| Item 6. | SELECTED FINANCIAL DATA | 13 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITIONAL AND RESULTS OF OPERATIONS | 14 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 52 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 53 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 90 |
| Item 9A. | CONTROLS AND PROCEDURES | 90 |

PART III

| | | |
|---|---|---|
| Item 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 90 |
| Item 11. | EXECUTIVE COMPENSATION | 93 |
| Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 100 |
| Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 102 |
| Item 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 103 |

PART IV

| | | |
|---|---|---|
| Item 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K | 103 |
| SIGNATURES | | 108 |
| EXHIBIT 10.24 | | |
| EXHIBIT 10.25 | | |
| EXHIBIT 10.26 | | |
| EXHIBIT 10.27 | | |
| EXHIBIT 10.28 | | |
| EXHIBIT 21.1 | | |
| EXHIBIT 23.1 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |

Table of Contents

Item 8.    Financial Statements and Supplementary Data

<div align="center">

TERAYON COMMUNICATION SYSTEMS, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

</div>

|  | Page |
|---|---|
| Report of Ernst & Young LLP, Independent Auditors | 54 |
| Consolidated Balance Sheets | 55 |
| Consolidated Statements of Operations | 56 |
| Consolidated Statements of Stockholders' Equity | 57 |
| Consolidated Statements of Cash Flows | 58 |
| Notes to Consolidated Financial Statements | 59 |

Table of Contents

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Board of Directors and Stockholders

Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2003. Our audits also included the financial statement schedule listed in the index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2003 and 2002, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, effective January 1, 2002, the Company adopted Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" and Statement of Financial Accounting Standards No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145).

/s/ ERNST & YOUNG LLP

Palo Alto, California

January 23, 2004

54

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED BALANCE SHEETS

|  | December 31, | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 30,188 | $ 117,079 |
| Short-term investments | 108,452 | 89,424 |
| Accounts receivable, less allowance for doubtful accounts of $3,591 in 2003 and $3,519 in 2002 | 29,199 | 16,355 |
| Accounts receivable from related parties | 600 | 842 |
| Other current receivables | 3,662 | 2,597 |
| Inventory | 16,364 | 8,257 |
| Other current assets | 2,883 | 8,263 |
| Total current assets | 191,348 | 242,817 |
| Property and equipment, net | 11,871 | 17,906 |
| Restricted cash | 9,212 | 9,945 |
| Prepaid expenses and other assets, net | 2,809 | 5,042 |
| Total assets | $ 215,240 | $ 275,710 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 26,049 | $ 23,920 |
| Accrued payroll and related expenses | 6,537 | 6,227 |
| Deferred revenues | 3,423 | 497 |
| Warranty reserves | 5,509 | 8,607 |
| Accrued restructuring charges | 4,500 | 6,754 |
| Accrued vendor cancellation charges | 2,869 | 13,865 |
| Other accrued liabilities | 5,036 | 8,609 |
| Interest payable and current portion of long-term debt | 1,358 | 1,355 |
| Current portion of capital lease obligations | 124 | 154 |
| Total current liabilities | 55,405 | 69,988 |
| Long-term obligations | 3,366 | 3,421 |
| Long-term portion of capital lease obligations | — | 78 |
| Convertible subordinated notes | 65,081 | 65,081 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares — 5,000,000 | | |
| Issued and outstanding shares — none in 2003 and 2002 | — | — |
| Common stock, $0.001 par value: | | |
| Authorized shares — 200,000,000 | | |
| Issued — 75,031,097 in 2003 and 73,240,054 in 2002 | | |
| Outstanding — 74,875,088 in 2003 and 73,084,045 in 2002 | 75 | 73 |
| Additional paid in capital | 1,082,036 | 1,078,144 |
| Accumulated deficit | (987,560) | (937,207) |
| Deferred compensation | (22) | (25) |
| Treasury stock, at cost; 156,009 shares in 2003 and 2002 | (773) | (773) |
| Accumulated other comprehensive loss | (2,368) | (3,070) |
| Total stockholders' equity | 91,388 | 137,142 |
| Total liabilities and stockholders' equity | $ 215,240 | $ 275,710 |

See accompanying notes.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | (In thousands, except per share data) | | |
| Revenues: | | | |
| Product revenues | $128,791 | $120,306 | $ 227,036 |
| Related party product revenues | 4,694 | 9,097 | 52,445 |
| Total revenues | 133,485 | 129,403 | 279,481 |
| Cost of goods sold: | | | |
| Cost of product revenues | 99,261 | 92,497 | 229,936 |
| Cost of related party product revenues | 1,773 | 8,452 | 33,181 |
| Total cost of goods sold | 101,034 | 100,949 | 263,117 |
| Gross profit | 32,451 | 28,454 | 16,364 |
| Operating expenses: | | | |
| Research and development | 42,839 | 58,696 | 79,927 |
| Sales and marketing | 26,781 | 35,704 | 55,701 |
| General and administrative | 12,127 | 14,715 | 31,309 |
| Goodwill amortization | — | — | 25,410 |
| Restructuring costs and asset write-offs | 2,803 | 8,922 | 587,149 |
| Total operating expenses | 84,550 | 118,037 | 779,496 |
| Loss from operations | (52,099) | (89,583) | (763,132) |
| Interest income | 2,917 | 6,838 | 18,132 |
| Interest expense | (3,279) | (6,174) | (15,224) |
| Other income (expense) | 2,424 | (4,145) | (2,864) |
| Gain on early retirement of debt | — | 49,089 | 185,327 |
| Loss before tax (expense) benefit | (50,037) | (43,975) | (577,761) |
| Income tax (expense) benefit | (316) | (238) | 13,915 |
| Net loss | $ (50,353) | $ (44,213) | $ (563,846) |
| Basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (8.25) |
| Shares used in computing basic and diluted net loss per share | 74,212 | 72,803 | 68,331 |

See accompanying notes.

56

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Stockholders' Notes Receivable | Accumulated Other Comprehensive Income | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | | |
| Balance at December 31, 2000 | 67,266,986 | $ 68 | $ 1,037,964 | $ (329,148) | $ (6,768) | $ (3) | $ 561 | 34,722 | $ (73) | $ 702,681 |
| Exercise of options for cash to purchase common stock | 2,507,582 | 4 | 12,494 | | | | | | | 12,498 |
| Repurchase of common stock | (50,117) | | | | | | | 93,117 | (695) | (695) |
| Issuance of options | | | 719 | | (719) | | | | | |
| Amortization of deferred compensation | | | | | 5,815 | | | | | 5,815 |
| Adjustments to deferred compensation due to employee terminations | | | (1,234) | | 1,234 | | | | | — |
| Issuance of restricted common stock for services provided | 275,250 | | 1,237 | | | | | | | 1,237 |
| Issuance of common stock for Employee Stock Purchase Plan | 381,428 | | 1,966 | | | | | | | 1,966 |
| Issuance of warrants to purchase common stock | | | 1,187 | | | | | | | 1,187 |
| Issuance of common stock for tender offer | 141,442 | | 2,001 | | | | | | | 2,001 |
| Issuance of common stock for retirement of debt | 1,464,359 | 1 | 17,869 | | | | | | | 17,870 |
| Cash proceeds from payment on stockholders notes receivable | | | | | | 3 | | | | 3 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | | 208 | | | 208 |
| Cumulative translation adjustment | | | | | | | (521) | | | (521) |
| Net loss | | | | (563,846) | | | | | | (563,846) |
| Comprehensive loss | | | | | | | | | | (564,259) |
| Balance at December 31, 2001 | 71,943,930 | 73 | 1,074,203 | (892,994) | (458) | — | 248 | 127,839 | (768) | 180,304 |
| Balance at December 31, 2001 (brought forward) | 71,943,930 | 73 | 1,074,203 | (892,994) | (458) | — | 248 | 127,839 | (768) | 180,304 |
| Exercise of options for cash to purchase common stock | 422,073 | | 1,721 | | | | | | | 1,721 |
| Repurchase or return of common stock | (1,058) | | | | | | | 28,170 | (5) | (5) |
| Return of escrow shares from Telegate acquisition | (25,077) | | | | | | | | | |
| Issuance of options to non-employees | | | 38 | | (38) | | | | | — |
| Amortization of deferred compensation | | | 1 | | 471 | | | | | 472 |
| Issuance of restricted common stock from stock option plan for services provided | 205,001 | | 290 | | | | | | | 290 |
| Acceleration of vesting of employee stock options and stock protection payment | | | 1 | | | | | | | 1 |
| Issuance of common stock for Employee Stock Purchase Plan | 539,196 | | 1,864 | | | | | | | 1,864 |

| | Shares | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Issuance of warrant to purchase common stock | | | 26 | | | | | | | 26 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | (519) | | | | (519) |
| Cumulative translation adjustment | | | | | | (2,799) | | | | (2,799) |
| Net loss | | | (44,213) | | | | | | | (44,213) |
| Comprehensive loss | | | | | | | | | | (47,531) |
| Balance at December 31, 2002 | 73,084,045 | 73 | 1,078,144 | (907,207) | (25) | — | (3,070) | 156,009 | (773) | 137,142 |
| Balance at December 31, 2002 (brought forward) | 73,084,045 | 73 | 1,078,144 | (907,207) | (25) | — | (3,070) | 156,009 | (773) | 137,142 |
| Exercise of options for cash to purchase common stock | 579,233 | 1 | 2,533 | | | | | | | 2,534 |
| Re-valuation of options to non-employees | | | 50 | | (50) | | | | | |
| Amortization of deferred compensation | | | | | 53 | | | | | 53 |
| Issuance of restricted common stock from stock option plan for services provided | 9,600 | | 70 | | | | | | | 70 |
| Issuance of common stock for Employee Stock Purchase Plan | 1,202,210 | 1 | 1,194 | | | | | | | 1,195 |
| Issuance of warrant to purchase common stock | | | 45 | | | | | | | 45 |
| Comprehensive income: | | | | | | | | | | |
| Increase to unrealized gain on short-term investments | | | | | | (470) | | | | (470) |
| Cumulative translation adjustment | | | | | | 1,172 | | | | 1,172 |
| Net loss | | | (50,353) | | | | | | | (50,353) |
| Comprehensive loss | | | | | | | | | | (49,651) |
| Balance at December 31, 2003 | 74,875,088 | $ 75 | $1,082,036 | $ (987,560) | $ (22) | $ — | $ (2,368) | 156,009 | $ (773) | $ 91,388 |

See accompanying notes.

57

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| | | (In thousands) | |
| **Operating activities:** | | | |
| Net loss | $ (50,353) | $ (44,213) | $(563,846) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Settlement of Net Services account receivable | — | 1,118 | |
| Depreciation | 9,369 | 11,572 | 15,728 |
| Write-off and amortization of intangible assets | — | 3,972 | 619,157 |
| Amortization related to stock options | 53 | 476 | 5,815 |
| Gain on early retirement of debt | — | (49,088) | (185,327) |
| Lower of cost or market inventory provision | 4,086 | 6,109 | — |
| Impairment of investment | — | 4,500 | |
| Write-off of fixed assets | 497 | 2,987 | 1,600 |
| Compensation expense for issuance of common stock | 70 | — | 3,238 |
| Value of common and preferred stock warrants issued | 45 | 28 | 505 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (12,844) | 26,211 | (5,614) |
| Accounts receivable from related parties | 242 | 3,164 | 13,448 |
| Inventory | (12,183) | 4,065 | 71,109 |
| Other assets | 7,281 | 443 | 16,606 |
| Accounts payable | 2,129 | (18,901) | (81,173) |
| Accrued payroll and related expenses | 310 | (3,214) | (3,664) |
| Deferred revenues | 2,826 | (3,672) | (829) |
| Warranty reserves | (3,098) | 239 | 2,443 |
| Accrued restructuring charges | (2,254) | (1,443) | 8,197 |
| Accrued vendor cancellation charges | (12,335) | (3,426) | (1,709) |
| Other accrued liabilities | (2,331) | (6,725) | 8,000 |
| Deferred taxes | — | — | (18,565) |
| Interest payable | 3 | (1,916) | (7,580) |
| Net cash used in operating activities | (68,397) | (67,719) | (102,461) |
| **Investing activities:** | | | |
| Purchases of short-term investments | (243,652) | (288,186) | (402,653) |
| Proceeds from sales and maturities of short-term investments | 224,154 | 434,346 | 384,689 |
| Purchases of property and equipment | (3,831) | (7,186) | (9,074) |
| Net cash (used in) provided by investing activities | (23,329) | 138,974 | (27,038) |
| **Financing activities:** | | | |
| Principal payments on capital leases | — | (68) | (127) | (130) |
| Principal payments on debt | — | (5) | (16,835) |
| Payments on repurchase of common stock | — | — | (695) |
| Principal payments on stockholder notes receivable | — | — | 3 |
| Repurchase of convertible subordinated notes | — | (57,627) | (113,428) |
| Proceeds from issuance of common stock | 3,729 | 3,872 | 14,464 |
| Net cash provided by (used in) financing activities | 3,653 | (53,887) | (116,621) |
| Effect of exchange rate changes | 1,172 | (563) | (620) |
| Net (decrease) increase in cash and cash equivalents | (86,901) | 16,805 | (246,741) |
| Cash and cash equivalents at beginning of year | 117,079 | 100,274 | 347,015 |
| Cash and cash equivalents at end of year | $ 30,188 | $ 117,079 | $ 100,274 |
| **Supplemental disclosures of cash flow information:** | | | |
| Cash paid for income taxes | $ 194 | $ 714 | $ 31 |
| Cash paid for interest | $ 3,262 | $ 8,387 | $ 20,810 |
| **Supplemental noncash investing and financing activities:** | | | |
| Common shares issued for settlement of convertible debt | $ — | $ — | $ 17,900 |
| Deferred compensation relating to common stock issued to non-employees | $ 53 | $ 38 | $ 684 |
| Reduction in deferred compensation due to termination of employees | $ — | $ — | $ 1,234 |
| Issuance of warrants in connection with purchase of TrueChat | $ — | $ — | $ 682 |

See accompanying notes.

58

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.    Organization and Summary of Significant Accounting Policies

Description of Business

Terayon Communication Systems, Inc. (Company) was incorporated under the laws of the State of California on January 20, 1993. In June 1998, the Company reincorporated in the State of Delaware.

The Company develops, markets and sells equipment to broadband service providers who use the Company's products to deliver broadband voice, video and data services to residential and business subscribers.

Basis of Consolidation

The consolidated financial statements include the accounts of the Company and its wholly owned and majority-owned subsidiaries. All intercompany balances and transactions have been eliminated.

Use of Estimates

The preparation of the consolidated financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates are based on historical experience, input from sources outside of the Company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's revenue recognition policy, the valuation of its accounts receivable and inventory reserves, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of restructuring reserves.

Accounting Change

Effective the beginning of 2002, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." As required by SFAS No. 142, the Company discontinued amortizing the remaining balances of goodwill as of the beginning of fiscal 2002. See Note 5.

In April 2002, the Company adopted SFAS No. 145, "Rescission of FASB Statements No. 4, 44 and 64, Amendment of FASB Statement No. 13, and Technical Corrections" (SFAS No. 145). SFAS No. 145 allows only those gains and losses on the extinguishment of debt that meet the criteria of extraordinary items to be treated as such in the consolidated financial statements. Accordingly, the Company is now reporting the gain from retirement of Convertible Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Foreign Currency Translation

The Company records the effect of foreign currency translation in accordance with SFAS No. 52, "Foreign Currency Translation." For operations outside the United States that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end-of-period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in stockholders' equity. For the three years ended December 31, 2003, translation gains and losses were not significant. Realized foreign currency transaction gains and losses are included in results of operations as incurred, and have not been significant to the Company's operating results in any year presented.

59

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Concentrations of Credit Risk, Customers, Suppliers, and Products

The Company performs ongoing credit evaluations of its customers and generally requires no collateral. Credit losses have historically been within management's expectations. The Company maintains a reserve for potentially uncollectible accounts receivable based on an assessment of collectibility. The Company assesses collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of the Company's client's customers and other factors that the Company believes are relevant. Charges for uncollectible accounts are included as a component of net revenue in the consolidated statement of operations. At December 31, 2003 and 2002, the reserve for potentially uncollectible accounts was $3.6 million and $3.5 million, respectively. A relatively small number of customers account for a significant percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in several financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/AA- or better or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

The Company sells its products directly to broadband service providers, and to a lesser extent resellers. Revenues related to product sales are recognized in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), as amended, when: (1) persuasive evidence that an arrangement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectibility is reasonably assured. A provision is made for estimated product returns as product shipments are made. The Company's existing agreements typically do not grant return rights beyond those provided by the warranty.

Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price. Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

Contracts and customer purchase orders are generally used to determine the existence of an arrangement. Shipping documents and customer acceptance, when applicable, are used to verify delivery. The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. The Company assesses collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as the Company generally does not grant return rights beyond those provided by the warranty.

60

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Research and Development Expenses

Research and development expenses are charged to expense as incurred.

Shipping and Handling Costs

Costs related to shipping and handling are included in cost of goods sold for all periods presented.

Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2003, 2002 and 2001 were $0.1 million, $0.4 million, and $2.3 million, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers). The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against revenues in accordance with Emerging Issues Task Force (EITF) 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively. The Company charged the amortization of these assets against revenues through the six quarters ended in December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter. See Note 13.

Net Loss Per Share

Historical basic and diluted net loss per share was computed using the weighted average number of common stock outstanding. Options, warrants, restricted stock, preferred stock, and convertible debt were not included in the computation of historical diluted net loss per share because the effect would be antidilutive.

Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2003 | 2002 | 2001 |
| --- | --- | --- | --- |
| Net loss | $ (50,353) | $ (44,213) | $ (563,846) |
| Shares used in computing basic and diluted net loss per share | 74,212 | 72,803 | 68,331 |
| Basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (8.25) |

Options to purchase 17,463,959, 14,635,025, and 20,007,686 shares of common stock were outstanding at December 31, 2003, 2002 and 2001, respectively, and warrants to purchase 200,000, 2,325,593, and 2,408,300 shares of common stock were outstanding at December 31, 2003, 2002 and 2001, respectively, but were not included in the computation of diluted net loss per share, since the effect is antidilutive.

Derivative Financial Instruments

The Company recognizes all derivative financial instruments, such as foreign exchange contracts, in the consolidated financial statements at fair value regardless of the purpose or the intent for holding the instrument. Changes in the fair value of derivative financial instruments are either recognized periodically in income or in stockholders' equity as a component of comprehensive income depending on whether the derivative financial instrument qualifies for hedging accounting, and if so, whether it qualifies as a fair value

61

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

hedge or cash flow hedge. Generally, changes in fair values of derivatives accounted for as fair value hedges are recorded in income along with the portions of the changes in the fair values of the hedged items that relate to the hedged risks. Changes in fair values of derivatives accounted for as cash flow hedges, to the extent they are effective as hedges, are recorded in other comprehensive income, net of deferred taxes. Changes in fair value of derivatives used as hedges of the net investment in foreign operations are reported in other comprehensive income as part of the cumulative translation adjustment. Changes in fair value of derivatives not qualifying as hedges are reported in income.

The Company had no derivative financial instruments outstanding as of December 31, 2003 or 2002.

Cash Equivalents and Short-Term Investments

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company determines impairment related to its equity investments in accordance with SFAS 115, "Accounting for Certain Investments in Debt and Equity Securities", and Securities and Exchange Commission (SEC) Staff Accounting Bulletin (SAB) 59, "Accounting for Noncurrent Marketable Equity Securities", which provide guidance on determining when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost; the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and the Company's intent and ability to hold the investment.

The Company's short-term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities, are classified as available-for-sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other-than-temporary on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short-term equity securities at December 31, 2003 or 2002.

During the third quarter of 2002, the Company received approximately 35.9 million shares of Net Servicos de Comunicacao SA (Net Servicos), a customer, valued at approximately $2.5 million as settlement for all outstanding accounts receivables due from Net Servicos. The shares of Net Servicos are traded on the Sao Paulo Stock Exchange. All revenue and the cost of sales relating to these receivables had been deferred due to extended payment terms offered in the original sales agreements. The Company recorded a loss on the settlement of the Net Servicos receivables of $0.9 million, which was charged to cost of goods sold in the third quarter of 2002.

The Company liquidated 32.9 million of these shares valued at $2.3 million in the fourth quarter of 2002. The Company liquidated 1.2 million of these shares valued at $0.1 million in the first quarter of 2003. The Company recorded revenue and the related cost of goods sold as the shares were sold and cash was received. Additionally, in the first quarter of 2003, 1.8 million shares of Net Servicos were paid to a consultant in Brazil who provided marketing and sales services to the Company. As of December 31, 2003, the Company no longer owns any shares of Net Servicos.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Restricted Cash**

Restricted cash at December 31, 2003 and 2002 primarily related to approximately $7.5 million and $9.0 million, respectively to secure an aircraft lease, as well as $0.7 million at December 31, 2003 to secure a real estate lease.

**Inventory**

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Finished goods | $14,264 | $5,915 |
| Work-in process | 660 | 769 |
| Raw materials | 1,440 | 1,573 |
|  | $16,364 | $8,257 |

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by the Company's customers, the Company believes that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. The Company defines excess inventory as inventory that will no longer be used in the manufacturing process. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available. See Note 3.

Cost of goods sold for the years ended December 31, 2003 and 2002 included reversals of $10.0 million and $15.3 million, respectively, of special charges originally recorded in 2001 and 2000 for vendor cancellation charges and inventory considered to be excess and obsolete. The Company was able to reverse the provisions in 2003 and 2002, as it was able to sell inventory originally considered to be excess and obsolete. In addition, the Company was able to negotiate downward certain vendor cancellation claims to terms more favorable to the Company. Cost of goods sold for the year ended December 31, 2001 included $33.5 million of special charges for vendor cancellation and inventory considered to be excess and obsolete.

Additionally, during 2003 and 2002, the Company recorded inventory charges of $4.1 million and $6.1 million, respectively, to reduce some of its inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value in 2002 as ASPs fell below the cost of these products and to record charges for excess and obsolete inventory. No changes to reduce inventories to the lower of cost or market were recorded in 2003.

63

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

Other Current Receivables

As of December 31, 2003 and 2002, other current receivables are primarily composed of interest, taxes, and non-trade receivables, and included approximately $1.8 million and $1.4 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, for the years ended December 31, 2003 and 2002, the Company recorded $0.5 million and $1.3 million, respectively in asset impairments primarily related to restructuring activities.

Property and equipment are as follows (In thousands):

|  | December 31, | |
|  | 2003 | 2002 |
| --- | --- | --- |
| Software and computers | $ 23,273 | $ 25,531 |
| Furniture and equipment | 23,816 | 31,092 |
| Leasehold improvements | 4,935 | 5,018 |
| Automobiles | 16 | 16 |
| Property and equipment | 52,040 | 61,657 |
| Accumulated depreciation and amortization | (40,169) | (43,751) |
| Property and equipment, net | $ 11,871 | $ 17,906 |

Goodwill and Other Intangible Assets

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2002 and 2001, the Company recorded impairment charges for goodwill, assembled workforce, and other intangible assets (see Note 5). At December 31, 2003, all goodwill had either been amortized or written-off the Company's books. Consequently, no goodwill was included in the Company's condensed consolidated Balance Sheets at December 31, 2003.

Goodwill and other long-lived assets were reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicated that the carrying amount may not have be recoverable. When such events occurred, the Company compared the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicated that there was an impairment, the amount of the impairment was typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows was based on the Company's weighted average cost of capital, which represented the blended costs of debt and equity.

Warranty Reserves

The Company provides a standard warranty for most of its products, generally lasting one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage

64

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

and service delivery costs incurred in correcting a product failure. Reserve estimates are based on historical experience and expectation of future conditions. See Note 14.

### Stock-Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB Opinion No. 25), and includes the disclosure-only provisions as required under SFAS No. 123, "Accounting for Stock-Based Compensation" (SFAS No. 123). The Company provides additional pro forma disclosures as required under SFAS No. 123 and SFAS No. 148, "Accounting for Stock-Based Compensation, Transition and Disclosure" in Note 9.

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock-based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the method of SFAS No. 123, the Company's net loss applicable to common stockholders and net loss per share applicable to common stockholders would have been increased to the pro forma amounts indicated below (see Note 9)(in thousands, except per share data):

| | Years Ended December 31, | | |
| | 2003 | 2002 | 2001 |
|---|---|---|---|
| Net loss | $(50,353) | $(44,213) | $(563,846) |
| Stock option plans | (22,210) | (33,718) | (126,721) |
| Employee stock purchase plan | (1,712) | (1,990) | (2,212) |
| Pro forma net loss | $(74,275) | $(79,921) | $(692,779) |
| Pro forma basic and diluted net loss per share | $ (1.00) | $ (1.10) | $ (10.14) |

The pro forma impact of options granted and shares from the employee stock purchase plan to be issued for the years ended December 31, 2003, 2002 and 2001 is not representative of the effects on net income (loss) for future years, as future years will include the continued effects of options vesting as well as the impact of multiple years of stock option grants.

Equity instruments granted to non-employees are accounted for under the fair value method, in accordance with SFAS No. 123 and EITF No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black-Scholes option pricing model and are recorded in the equity section of the Company's consolidated balance sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

### Accumulated Other Comprehensive Loss

Accumulated other comprehensive loss presented in the accompanying consolidated balance sheets and consolidated statements of stockholder's equity consists of net unrealized gain on short-term investments and accumulated net foreign currency translation losses.

65

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following are the components of accumulated other comprehensive loss (in thousands):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2003 | 2002 |
| Cumulative translation adjustments | $(2,400) | $(3,572) |
| Unrealized gain/(loss) on available-for-sale investments | 32 | 502 |
| Total accumulated other comprehensive loss | $(2,368) | $(3,070) |

Reclassification

Certain amounts reported in previous years have been reclassified to conform to 2003 presentation. Such reclassifications had no effect on previously reported results of operations, total assets or accumulated deficit.

Impact of Recently Issued Accounting Standards

In May 2003, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards (SFAS) No. 150, "Accounting For Certain Financial Instruments with Characteristics of Both Liabilities and Equity" which establishes standards for how an issuer of financial instruments classifies and measures certain financial instruments with characteristics of both liabilities and equity. It requires that an issuer classify a financial instrument that is within its scope as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on a fixed monetary amount known at inception, variations in something other than the fair value of the issuer's equity shares or variations inversely related to changes in the fair value of the issuer's equity shares. SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The adoption of SFAS No. 150 did not have a material impact on the Company's financial position or results of operations.

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." SFAS No. 149 amends and clarifies financial accounting and reporting for derivative instruments, including certain derivative instruments embedded in other contracts (collectively referred to as derivatives) and for hedging activities under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities." This statement is effective for contracts entered into or modified after June 30, 2003, and did not have a material impact on the Company's financial position or results of operations.

In January 2003, the FASB issued Interpretation No. 46, "Consolidation of Variable Interest Entities," which was revised in December 2003. Interpretation No. 46, as revised, clarifies the application of Accounting Research Bulletin No. 51 and applies immediately to any variable interest entities created after January 31, 2003 and to variable interest entities in which an interest is obtained after that date. This Interpretation is applicable in the quarter ending March 31, 2004, for interests acquired in variable interest entities prior to February 1, 2003. This Interpretation requires variable interest entities to be consolidated if the equity investment at risk is not sufficient to permit an entity to finance its activities without support from other parties or the equity investors lack specified characteristics. The adoption of Interpretation No. 46, as revised, is not expected to have a material impact on the Company's financial position or results of operations.

In November 2002, the EITF reached a consensus on Issue No. 00-21, "Revenue Arrangements with Multiple Deliverables". EITF Issue No. 00-21 provides guidance on how to account for certain arrangements that involve the delivery or performance of multiple products, services and/or rights to use assets. The provisions of EITF Issue No. 00-21 will apply to revenue arrangements entered into in fiscal periods beginning after June 15, 2003. The adoption of EITF Issue No. 00-21 did not have any significant impact on the Company's financial position or results of operations.

66

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In July 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standard No. 146, Accounting for Costs Associated with Exit or Disposal Activities (FAS 146). FAS 146 addresses the financial accounting and reporting for costs associated with exit or disposal activities, and supersedes Emerging Issues Task Force Issue No. 94–3, Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, including Certain Costs Incurred in a Restructuring (EITF 94–3). FAS 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In addition, FAS No. 146 establishes that fair value is the objective for initial measurement of the liability. FAS 146 is effective for exit or disposal activities initiated after December 31, 2002. The adoption of FAS 146 did not have any significant impact on the Company's financial position or results of operations.

In June 2001, the FASB issued SFAS No. 142, "Goodwill and Other Intangible Assets" (SFAS No. 142). SFAS No. 142 prohibits the amortization of goodwill and intangible assets with indefinite useful lives. SFAS No. 142 requires that these assets be reviewed for impairment at least annually. Intangible assets with definite lives will continue to be amortized over their estimated useful lives. Additionally, SFAS No. 142 requires that goodwill included in the carrying value of equity method investments no longer be amortized.

The Company adopted SFAS No. 142 on January 1, 2002. Identifiable intangible assets with indefinite lives were reclassified, as defined by SFAS No. 142, to goodwill at the date of adoption. The Company tested goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. See Note 5.

The following pro forma information reflects the impact on net loss and basic and diluted net loss per share assuming the adoption of SFAS No. 142 had occurred on January 1, 2001 (in thousands):

|  | Years ended December 31, | | |
|  | 2003 | 2002 | 2001 |
| --- | --- | --- | --- |
|  |  |  | (Pro forma) |
| Reported net loss | $(50,353) | $(44,213) | $(563,846) |
| Amortization of goodwill and intangible assets with indefinite lives | — | — | 53,846 |
| Pro forma net loss | $(50,353) | $(44,213) | $(510,000) |
| Basic and diluted net loss per share: |  |  |  |
| Reported net loss | $ (0.68) | $ (0.61) | $ (8.25) |
| Adjustment related to amortization of goodwill and intangible assets with indefinite lives | — | — | 0.79 |
| Pro forma basic and diluted net loss per share | $ (0.68) | $ (0.61) | $ (7.46) |

In July 2002, the Financial Accounting Standards Board issued Statement of Financial Accounting Standard No. 146, Accounting for Costs Associated with Exit or Disposal Activities (FAS 146). FAS 146 addresses the financial accounting and reporting for costs associated with exit or disposal activities, and supersedes Emerging Issues Task Force Issue No. 94–3, Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity, including Certain Costs Incurred in a Restructuring (EITF 94–3). FAS 146 requires companies to recognize costs associated with exit or disposal activities when they are incurred rather than at the date of a commitment to an exit or disposal plan. In addition, FAS No. 146 establishes that fair value is the objective for initial measurement of the liability. FAS 146 is effective for exit or disposal activities initiated after December 31, 2002. The adoption of FAS 146 did not have any significant impact on the Company's financial position or results of operations.

67

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

2.    Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities approximate fair value due to their short-term maturities. The fair value for the Company's investments in marketable debt and equity securities is estimated based on quoted market prices.

The fair value of short-term and long-term capital lease and debt obligations is estimated based on current interest rates available to us for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations, as of each period presented approximate their respective fair values.

The following estimated fair value amounts have been determined using available market information. However, considerable judgment is required in interpreting market data to develop the estimates of fair value.

68

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

|  | December 31, 2003 | | | |
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| --- | --- | --- | --- | --- |
|  | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 38,939 | $ — | $ (11) | $ 38,928 |
| Fixed income corporate securities | 2,223 | 1 | — | 2,224 |
| Government agency obligations | 7,918 | 1 | — | 7,919 |
| Total | 49,080 | 2 | (11) | 49,071 |
| Investments maturing in 1–2 years: | | | | |
| Fixed income corporate securities | 1,333 | — | — | 1,333 |
| Government agency obligations | 58,006 | 68 | (26) | 58,048 |
| Total | 59,339 | 68 | (26) | 59,381 |
| Total | $108,419 | $ 70 | $(37) | $108,452 |

|  | December 31, 2002 | | | |
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| --- | --- | --- | --- | --- |
|  | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $16,000 | $ — | $ (26) | $15,974 |
| Fixed income corporate securities | 12,920 | 196 | — | 13,116 |
| Government agency obligations | 18,300 | 260 | — | 18,560 |
| Corporate equity securities | 202 | 151 | — | 353 |
| Total | 47,422 | 607 | (26) | 48,003 |
| Investments maturing in 1–2 years: | | | | |
| Fixed income corporate securities | 2,000 | 145 | — | 2,145 |
| Government agency obligations | 39,000 | 276 | — | 39,276 |
| Total | 41,000 | 421 | — | 41,421 |
| Total | $88,422 | $1,028 | $ (26) | $89,424 |

Realized gains and losses were insignificant for each of the years in the period ended December 31, 2003.

3.    Commitments

Leases

The Company leases its facilities and certain equipment under operating leases. The operating lease for the Company's corporate headquarters expires in 2009. The operating lease for the Company's Israel headquarters expires in 2005. The Company's other operating leases expire at various times through 2006. Rent expense was approximately $7.1 million, $7.9 million, and $7.2 million, for the years ended December 31, 2003, 2002, and 2001, respectively. The Company subleases a portion of its facilities to third parties. In

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

connection with the restructuring plans announced January 27, 2004, the Company is seeking to sublease approximately 56,400 square feet of its Santa Clara, California facility. See Note 16. The Company's sublease rental income was approximately $1.1 million, $0.4 million, and $0.1 million for the years ended December 31, 2003, 2002, and 2001, respectively.

The Company leases certain equipment under noncancellable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment aggregated $0.3 million and $0.7 million at December 31, 2003 and 2002, respectively. Related accumulated amortization was $0.3 million and $0.6 million at December 31, 2003 and 2002, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.

In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit at December 31, 2002. The letter of credit was reduced to $7.5 million in February 2003. The lease commitment for the aircraft is included in the table below.

Future minimum lease payments under noncancelable operating leases and capital leases as of December 31, 2003 are as follows (in thousands):

| | Operating Leases | Capital Leases |
|---|---|---|
| 2004 | $ 8,258 | $126 |
| 2005 | 7,188 | — |
| 2006 | 4,660 | — |
| 2007 | 3,165 | — |
| 2008 | 3,045 | — |
| Thereafter | 2,537 | — |
| Total minimum payments | $28,853 | 126 |
| Less amount representing interest | | 2 |
| Total current portion | | $124 |

There are no future minimum sublease payments to be received under noncancelable subleases.

Purchase Obligations and Special Charges

The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of purchase orders placed with vendors for goods and services and require the Company to purchase minimum quantities of the suppliers' products at a specified price. As of December 31, 2003, $54.4 million of purchase obligations were outstanding. As a result of declines in forecast, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges in amounts, which represented management's estimate of the Company's exposure to vendors for its inventory commitments. At December 31, 2003, accrued vendor cancellation charges were $2.9 million and the remaining $51.5 million attributable to open purchase orders. The remaining obligations are expected to become payable at various times throughout 2004.

On February 26, 2003, the Company entered into an agreement with Solectron Corporation (Solectron) to settle all outstanding obligations under three manufacturing agreements between the Company and Solectron. Under the terms of the settlement agreement, the Company paid Solectron approximately

70

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

$3.9 million, and each party released any and all claims that it may have had against the other party. Additionally, the Company received selected inventory from Solectron. The Company previously accrued $6.0 million toward the settlement of the Solectron matter as a vendor cancellation charge in the fourth quarter of 2000 and the second quarter of 2001. In 2003, in connection with the Solectron settlement, the Company reversed $2.1 million of the accrued vendor cancellation charges included in cost of goods sold.

On September 29, 2003, the Company entered into an agreement with Flextronics (Israel) Ltd., an Israeli company (Flextronics), to purchase inventory from Flextronics and settle all outstanding claims between the Company and Flextronics. Under the terms of the settlement agreement, the Company paid Flextronics approximately $1.5 million to be applied toward the purchase of future inventory from Flextronics, if any. Additionally, each party released any and all claims that it may have had against the other party. The Company previously accrued $2.0 million toward the settlement of the Flextronics matter as a vendor cancellation charge in the second quarter of 2001. In 2003, in connection with the Flextronics settlement, the Company reversed $0.5 million of the accrued vendor cancellation charges included in cost of goods sold.

Letters of Credit

As of December 31, 2003, the Company had $9.2 million in unused outstanding letters of credit primarily required to support operating leases, which expire at various dates through 2009.

Royalties

The Company's total accrued obligation for royalties, at December 31, 2003 and 2002, was $1.3 million and $0.9 million, respectively.

The Company has purchased, through its acquisition of Radwiz Ltd. (Radwiz), certain technology that utilized funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade. The Company has committed to pay royalties to the Government of Israel on proceeds from sales of products based on this technology at rates of 3%—5% per sale. Sales of products using this technology are immaterial.

Additionally, the Company has various royalty arrangements, which require it to pay nominal amounts to various suppliers for usage of licensed property.

Guarantees

The Company from time to time enters into certain types of contracts that contingently require the Company to indemnify parties against third party claims. These obligations primarily relate to certain agreements with the Company's officers, directors and employees, under which the Company may be required to indemnify such persons for liabilities arising out of their employment relationship.

The terms of such obligations vary. Generally, a maximum obligation is not explicitly stated. Because the obligated amounts of these types of agreements often are not explicitly stated, the overall maximum amount of the obligations cannot be reasonably estimated. Historically, the Company has not been obligated to make any payments for these obligations, and no liabilities have been recorded for these obligations on its consolidated balance sheets as of December 31, 2003.

4.    Accrued Severance Pay

Several of the Company's subsidiaries are subject to Israeli law and labor agreements, under which they are required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment is included in the Company's consolidated balance sheets on the accrual basis, and is

71

# Exhibit C

( cont.)

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2003, $1.9 million for accrued severance pay was included in long-term obligations. In accordance with EITF No. 88-1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $1.3 million relating to the amounts funded by the purchase of insurance policies for the Israeli severance liability in its consolidated balance sheets as other assets at December 31, 2003.

5.    Restructuring Charges and Asset Write-offs

Restructuring

2003 Restructuring

During the first quarter of 2003, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 restructuring. As of December 31, 2003, 81 employees were terminated throughout the Company, and the Company paid $2.7 million in termination costs. In the second quarter of 2003, the Company reversed $86,000 of previously accrued termination costs due to a change in estimate. At December 31, 2003, no restructuring charges remained accrued.

A summary of the 2003 accrued restructuring charges is as follows (in thousands):

|  | Involuntary Terminations |
|---|---|
| Total charge | $ 2,745 |
| Recovery of charge | (86) |
| Cash payments | (2,659) |
| Balance at December 31, 2003 | $ — |

2002 Restructuring

During the third quarter of 2002, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $3.6 million of which $2.3 million related to employee termination costs and the remaining $1.3 million related to costs for excess leased facilities. At December 31, 2003, restructuring charges of $1.2 million remained accrued. As of December 31, 2003, 153 employees were terminated throughout the Company as part of the 2002 restructuring, and the Company paid $2.2 million in termination costs and $0.2 million in excess facility costs. During 2002, the Company reclassified $0.1 million of excess termination costs to leased facilities due to a change in estimate. The Company anticipates the remaining restructuring accrual, primarily relating to excess leased facilities, will be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

72

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table summarizes the costs and activities related to the 2002 restructuring (in thousands):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Total charge in 2002 | $ 2,319 | $ 1,322 | $ 3,641 |
| Cash Payments | (2,131) | — | (2,131) |
| Reclassification | (100) | 100 | — |
| Balance at December 31, 2002 | 88 | 1,422 | 1,510 |
| Cash Payments | (88) | (219) | (307) |
| Balance at December 31, 2003 | $ — | $ 1,203 | $ 1,203 |

**2001 Restructuring**

During 2001, the Company's Board of Directors approved a restructuring plan to streamline the Company's organizational structure worldwide. The Company incurred restructuring charges in the amount of $12.7 million in fiscal year 2001 of which $3.3 million related accrued at December 31, 2003. Of the total restructuring charges recorded during fiscal year 2001, $3.2 million related to employee termination costs throughout the Company, and the remaining $9.5 million related primarily to costs for excess leased facilities. During 2003, the Company reversed $0.3 million of previously accrued termination costs due to a change in estimate. The Company anticipates utilizing the remaining restructuring accrual, which relates to servicing operating lease payments or negotiated buyout of operating lease commitments, through 2005.

The following table summarizes the costs and activities related to the 2001 restructuring (in thousands):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Total charges in 2001 | $ 3,168 | $ 9,501 | $12,669 |
| Cash payments | (1,891) | (2,580) | (4,471) |
| Balance at December 31, 2001 | 1,277 | 6,921 | 8,198 |
| Cash payments | (100) | (2,855) | (2,955) |
| Reclassification | (1,177) | 1,177 | — |
| Balance at December 31, 2002 | — | 5,243 | 5,243 |
| Recovery of charge | — | (261) | (261) |
| Cash payments | — | (1,685) | (1,685) |
| Balance at December 31, 2003 | $ — | $ 3,297 | $ 3,297 |

**Asset Write-offs**

Primarily as a result of restructuring activities in 2003, the Company wrote off $0.4 million of fixed assets in 2003, which were determined to have no remaining useful life. As a result of restructuring activities in 2002 and 2001, and a rapid decline in demand for Access Network Electronics (ANE) products, certain property and equipment were determined to have no remaining useful life. During 2002, $1.3 million of fixed assets were written-off. During 2001, $1.6 million related to fixed assets acquired from ANE were determined to have no remaining useful life and were written-off. The impaired fixed assets in each period represent the net book value of idle manufacturing equipment, leasehold, and office equipment.

73

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

From September 1999 through December 2000, the Company acquired ten companies. In March 2001, the Company evaluated the carrying value of certain long-lived assets and acquired intangibles, consisting primarily of goodwill recorded on its consolidated balance sheet. Pursuant to accounting rules applicable at that time, during the first quarter of 2001, intangible assets totaling $163.1 million, related to certain acquisitions were deemed to be impaired with no future value and were written-off. Further, the aforementioned downturns in the principal markets in which the Company continues to operate, resulted in a write-down of these intangible assets related to both the Cable and Telecom segments of $409.7 million in the first nine months of 2001. These amounts were included in asset write-offs in the Company's consolidated statements of operations in 2001.

The Company adopted SFAS No. 142 on January 1, 2002. The Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption. The Company tests goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. The impairment tests were completed during the second quarter of 2002 and indicated no impairment. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, the Company experienced a significant drop in its market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on the forecast, the estimated undiscounted future cash flows from the use of the goodwill would have been less than its carrying amount. The Company determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million in 2002 was related to the Cable segment and $1.0 million was related to the Telecom segment. Subsequent to this write-off, the Company had no intangible assets, which were deemed to have indefinite useful lives.

During 2001, the Company recorded a deferred tax asset of approximately $4.0 million and corresponding reduction of goodwill, for the tax benefit of foreign net operating loss carryforwards related to a previous acquisition. Due to the impairment write-off, the deferred tax asset, and remaining net deferred tax liability were also written-off.

74

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table describes the intangible assets written off during 2001:

| | Goodwill | Developed Technology | Trademark | Customer Relations | Customer Base | Assembled Workforce | Total |
|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | |
| Cable Segment: | | | | | | | |
| Ultracom | $ 46.2 | $ 0.9 | $ — | $ — | $ — | $ 0.3 | $ 47.4 |
| ComBox | 65.3 | 10.0 | — | — | — | 0.2 | 75.5 |
| Imedia | 47.2 | 20.0 | 2.9 | — | — | 0.3 | 70.4 |
| Digitrans | 8.2 | 0.5 | — | — | — | 0.3 | 9.0 |
| Telegate | 52.8 | 17.0 | — | 20.2 | — | 0.8 | 90.8 |
| Internet Telecom | 39.1 | 5.0 | — | — | — | 0.1 | 44.2 |
| TrueChat | — | — | — | — | — | — | — |
| Total Cable Segment | $258.8 | $ 53.4 | $2.9 | $20.2 | $0.0 | $2.0 | $337.3 |
| Telecom Segment: | | | | | | | |
| MainSail | 97.0 | 44.1 | — | — | — | 0.6 | 141.7 |
| ANE | 33.5 | 10.3 | 0.5 | — | 2.0 | 4.5 | 50.8 |
| Radwiz | 18.7 | 23.1 | 0.9 | — | — | 0.3 | 43.0 |
| Total Telecom Segment | $149.2 | $ 77.5 | $1.4 | $ 0.0 | $2.0 | $5.4 | $235.5 |
| Total Cable and Telecom | $408.0 | $130.9 | $4.3 | $20.2 | $2.0 | $7.4 | $572.8 |

The following table describes the intangible assets written off during 2002:

| | Goodwill | Assembled Workforce | Total |
|---|---|---|---|
| | | (In thousands) | |
| Cable Segment: | | | |
| Ultracom | $ — | $0.1 | $0.1 |
| ComBox | — | 0.1 | 0.1 |
| Digitrans | 0.2 | — | 0.2 |
| Internet Telecom | — | 0.1 | 0.1 |
| TrueChat | 2.5 | — | 2.5 |
| Total Cable Segment | $2.7 | $0.3 | $3.0 |
| Telecom Segment: | | | |
| MainSail | — | 0.5 | 0.5 |
| ANE | — | 0.5 | 0.5 |
| Total Telecom Segment | $ — | $1.0 | $1.0 |
| Total Cable and Telecom | $2.7 | $1.3 | $4.0 |

6.    Impairment of Long–Term Investment

The Company's long–lived assets include long–term equity investments. During 2002, the Company determined that one such equity investment in a privately–held company was impaired. The investee's forecasts were not met and market conditions significantly deteriorated and accordingly, the Company recorded an impairment charge of $4.5 million.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

7.    Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.4 million. The Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company could have redeemed some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company would also make an additional payment of $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2003, amortization of debt issuance costs totaled $14.5 million.

In 2002, the Company repurchased approximately $109.1 million of the Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million. In 2001, the Company repurchased approximately $325.9 million of the Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of approximately $185.3 million, net of related unamortized issuance costs of $9.3 million. The Company did not repurchase any Notes during 2003.

In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, in 2002, the Company began reporting the gain from retirement of the Notes in operating results. As a result of adopting SFAS No. 145, the Company reclassified the $185.3 million previously recorded in 2001 as extraordinary gain as a component of operating results.

Approximately $65.1 million of the Notes were outstanding at December 31, 2003.

8.    Contingencies

Litigation

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against the Company and certain of its officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading statements and failing to disclose material information regarding our technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired our securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003. See Note 16 for subsequent activities related to this matter.

76

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal has been set for oral argument on April 16, 2004.

The Company believes that the allegations in both the class action and the Bertram case are without merit, and it intends to contest these matters vigorously. These matters, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

On January 19, 2003, Omniband Group Limited, a Russian company, or Omniband, filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the Company's breach of an agreement to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz, Ltd., one of the Company's wholly-owned subsidiaries. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz. The Company believes that the allegations are without merit and intends to present a vigorous defense in the arbitration proceedings.

The Company, as well as its customers, has received letters from third parties claiming that the Company's technology and products infringe on the third parties' patents. The Company has consulted with its patent counsel and is in the process of reviewing the allegations made by such third parties. The Company does not know whether the third parties will pursue their claims of patent infringement in court, and if they do, whether the Company would be found to infringe the third parties' patents. If the Company is found to have infringed such third party patents, the Company could be subject to substantial damages and/or an injunction preventing it from selling its products and conducting our business. Additionally, such third parties and additional third parties could assert infringement claims against the Company in the future. Any such claim of patent infringement, whether meritorious or not, could be time-consuming, result in costly litigation, cause product shipment delays or require the Company to enter into royalty or licensing agreements. Such royalty or licensing agreements may not be available on terms acceptable to the Company or at all.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on the Company's financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position or overall results of operations for any of the above legal proceedings could change in the future.

9.    Stockholders' Equity

Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw a warrant (Anti-Dilution Warrant) to purchase an indeterminate number of shares of common stock. The Anti-Dilution Warrant was exercisable at the option of Shaw during the period that Shaw owned equity in the Company and in the event the Company issued new equity securities at below the current market price defined in the Anti-Dilution Warrant. The aggregate exercise price was $0.50. The Company issued certain equity securities that, as of December 31, 2003, 2002, and 2001, required the Company to issue an additional 37,283, 17,293, and 35,982

77

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

warrants, respectively, to purchase shares of common stock pursuant to the Anti-Dilution Warrant. The Company recorded expenses of approximately $45,000, $26,000 and $0.2 million relating to the issuance of warrants pursuant to the Anti-Dilution Warrant, in 2003, 2002 and 2001, respectively. The expense was calculated by multiplying the annualized fair market value of the Company's stock by the share dilution attributable to the Anti-Dilution Warrant. In February 2003, Shaw transferred its ownership to a third party and the Anti-Dilution Warrant expired unexercised. As of December 31, 2003, the Anti-Dilution Warrant had expired and was not exercised.

In October 1999, a customer of the Company entered into an agreement with Telegate Ltd., an Israeli company (Telegate), which was negotiating with the Company to be acquired by the Company, whereby the customer committed to an investment in Telegate in connection with the acquisition of all the outstanding shares of Telegate by the Company. The customer committed to provide this investment in the event that the acquisition of Telegate by the Company did not close. In January 2000, the Company issued the customer a warrant to purchase 2,000,000 shares of the Company's common stock at a price of $30.75 per share; the closing price of the Company's common stock on the date the warrant was issued. The warrant was fully vested, non-forfeitable, and immediately exercisable and has a term of three years. The fair value of the warrant, determined as approximately $34.6 million using the Black Scholes model, was included in the Telegate purchase price and was associated with the value of the customer relationship. The value of the warrant resulted in a non-cash charge to cost of goods sold to be amortized over the three-year term of the warrant. In the first quarter of 2001, the Company wrote-off the intangible assets relating to the purchase of Telegate (see Note 5). For the year ended December 2003 and 2002, the Company incurred no amortization expense related to the warrant. For the year ended December 31, 2001, the Company incurred approximately $2.9 million in amortization expense related to the warrant. The Telegate warrant expired in January 2003 unexercised.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24th per month, beginning January 31, 2001. The fair value of the warrant of approximately $0.7 million was calculated using the Black-Scholes method and was recorded as additional consideration relating to the purchase of TrueChat. As of December 31, 2003, the TrueChat warrant was exercisable for an aggregate of 200,000 shares of the Company's common stock. The TrueChat warrant expired unexercised in February 2004.

Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of preferred stock. The rights were distributed as a non-taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15% or more of the Company's common stock or announces a tender offer for 15% or more of the Company's common stock. If a person or group acquires 15% or more of the Company's common stock, all rights holders except the buyer will be entitled to acquire the Company's common stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15% of the Company's common stock.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Common Stock Reserved

Common stock reserved for issuance is as follows:

|  | December 31, 2003 |
|---|---|
| Common stock options | 25,945,559 |
| Common stock warrants | 200,000 |
| Employee stock purchase plan | 2,400,152 |
|  | 28,545,711 |

Stock Option and Stock Purchase Plans

1995 Plan

In March 1995, the Company's Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of the Company's common stock. As of December 31, 2003 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

In March 1997, the Company's Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of the Company's common stock. In 1998, 2000 and 2003, the Company's Board of Directors amended the 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to a total of 15,516,702 shares as of December 31, 2003.

1998 Plan

In June 1998, the Company's Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of the Company's common stock have been reserved for future issuance to non-employee directors of the Company. In 2002, the Company's Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2003, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

The 1998 Plan provides for non-discretionary nonqualified stock options to be issued to non-employee directors of the Company automatically as of the effective date of their election to the Board of Directors and annually following each annual stockholder meeting. Prices for nonqualified options may not be less than 100% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed three years from the date of grant. Unexercised options expire ten years after the date of grant.

1999 Plan

In September 1999, the Company's Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of the Company's common stock have been reserved for future issuance to non-officer employees of the Company. The plan has been amended by the Board of Directors to increase the amount of authorized shares available to a total of 14,737,826 shares as of December 31, 2003.

79

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non-officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of the grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

During the years ended December 31, 2002 and 2001, the Company recorded aggregate deferred compensation of approximately $38,000 and $35,000, respectively, representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. During the year ended December 31, 2003, the Company did not record any additional deferred compensation. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be remeasured. For the years ended December 31, 2003, 2002, and 2001, the amortization expense was approximately $53,000, $0.5 million, and $0.5 million, respectively.

During 2002, the Company issued 20,000 nonqualified stock options of common stock to a member of its Board of Advisors who is also a director and Chief Executive Officer of one of its customers, and recorded $38,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued of $1.95 per share.

During 2002, the Company issued 200,000 shares of common stock to a consultant and recorded $290,000 in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued of $1.45 per share.

In June 2001, the Company issued 160,000 shares of the Company's common stock to members of its Board of Advisors and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $3.72 per share.

During 2001, the Company issued 115,250 shares of common stock to its employees, and recorded $0.6 million in related compensation expense. The compensation expense was calculated using the closing price of the Company's common stock on the date the stock was issued at $5.57 per share.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following is a summary of additional information with respect to the 1995 Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, outstanding options assumed by the Company in conjunction with its business acquisitions and option grants made outside the plans (if any):

| | Options Available for Grant | Options Outstanding | |
| --- | --- | --- | --- |
| | | Number of Shares | Weighted-Average Exercise Price |
| Balance at December 31, 2000 | 8,840,090 | 21,489,536 | $ 39.27 |
| Options authorized | 13,000,000 | — | |
| Options granted | (22,925,565) | 22,925,565 | $ 6.25 |
| Options exercised | — | (2,924,274) | $ 4.59 |
| Options canceled | 21,483,141 | (21,483,141) | $ 35.99 |
| Balance at December 31, 2001 | 20,397,666 | 20,007,686 | $ 9.75 |
| Options authorized | 3,400,000 | — | |
| Options granted | (1,734,400) | 1,734,400 | $ 5.40 |
| Options exercised | — | (257,521) | $ 3.95 |
| Options canceled | 6,849,540 | (6,849,540) | $ 12.66 |
| Balance at December 31, 2002 | 28,912,806 | 14,635,025 | $ 8.05 |
| Options authorized | 3,000,000 | — | |
| Options reduced | (20,000,000) | — | |
| Options granted | (7,153,320) | 7,153,320 | $ 3.05 |
| Options exercised | — | (602,272) | $ 4.20 |
| Options canceled | 3,722,114 | (3,722,114) | $ 7.58 |
| Balance at December 31, 2003 | 8,481,600 | 17,463,959 | $ 6.20 |

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2003:

| Range of Exercise Prices | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| | Weighted Number Outstanding | Number of Average Remaining Contractual Life | Weighted Average Exercise Price | Exercisable Options | Weighted Average Exercise Price |
| $0.01 – $ 2.45 | 5,480,406 | 9.23 | $ 2.34 | 201,017 | $ 1.22 |
| $2.46 – $ 4.26 | 1,599,731 | 8.05 | $ 3.77 | 532,214 | $ 3.51 |
| $4.38 – $ 6.50 | 2,819,153 | 7.86 | $ 5.70 | 1,197,386 | $ 5.88 |
| $6.52 – $ 8.39 | 6,483,914 | 7.23 | $ 6.85 | 5,152,720 | $ 6.82 |
| $8.51 – $123.50 | 1,080,755 | 6.42 | $ 26.86 | 884,176 | $ 27.56 |
| Total | 17,463,959 | 7.98 | $ 6.20 | 7,967,513 | $ 8.58 |

At December 31, 2003, there were no shares of the Company's common stock subject to repurchase by the Company.

Employee Stock Purchase Plan

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (ESPP), which is designed to allow eligible employees of the Company to purchase shares of common stock at semi-annual intervals through periodic payroll deductions. In 2002, the ESPP was amended

81

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

to add an additional 3,000,000 shares to the ESPP. An aggregate of 4,400,000 shares of common stock are reserved for the ESPP, and 1,999,848 shares have been issued through December 31, 2003. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that can be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the current offering period expires (no later than July 31, 2004).

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS No. 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS No. 123 and is calculated as if the Company had accounted for its employee stock options granted during the years ended December 31, 2003, 2002, and 2001 and for its ESPP shares to be issued under the fair value method of SFAS No. 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black-Scholes model using the following weighted average assumptions:

|  | Risk Free Interest Rate 2003 | Risk Free Interest Rate 2002 | Risk Free Interest Rate 2001 |
|---|---|---|---|
| Stock option plans | 2.67% | 4.22% | 4.50% |
| Employee stock purchase plan | 2.88% | 4.36% | 4.14% |

|  | Dividend Yield All Years | Volatility Factor 2003 | Volatility Factor 2002 | Volatility Factor 2001 |
|---|---|---|---|---|
| Stock option plans | 0.0 | 0.87 | 1.50 | 1.50 |
| Employee stock purchase plan | 0.0 | 1.54 | 1.50 | 1.50 |

|  | Weighted Average Expected Life 2003 | Weighted Average Expected Life 2002 | Weighted Average Expected Life 2001 |
|---|---|---|---|
| Stock option plans | 5.0 | 5.0 | 5.0 |
| Employee stock purchase plan | 0.5 | 0.5 | 0.5 |

As discussed above, the valuation models used under SFAS No. 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS No. 123, was $2.14, $4.98, and $5.83, for options granted during 2003, 2002, and 2001, respectively. The weighted average grant date fair value of ESPP shares to be issued was $1.00, $2.25, and $3.99 for the years ended December 31, 2003, 2002 and 2001, respectively.

82

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

10.    Income Taxes

For the years ended December 31, 2003, 2002 and 2001, the Company had an income tax expense of $0.3 million, $0.2 million, and an income tax benefit of $13.9 million, respectively.

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  | (In thousands) | | |
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | | 20 | |
| Foreign | 316 | 218 | 831 |
| Total current | 316 | 238 | 831 |
| Deferred: | | | |
| Federal | — | — | — |
| State | — | — | — |
| Foreign | — | — | (14,746) |
| Total deferred | — | — | (14,746) |
| Total | $316 | $238 | $(13,915) |

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
| Tax benefit at U.S. statutory rate | $(17,624) | $(15,391) | $(197,346) |
| Goodwill amortization | | | 2,849 |
| Loss for which no tax benefit is currently recognizable | 17,536 | 15,391 | 179,338 |
| Other, net | 404 | 238 | 1,244 |
|  | $ 316 | $ 238 | $ (13,915) |

83

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2003 and 2002 are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2003 | 2002 |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 149,862 | $ 118,021 |
| Tax credit carryforwards | 19,505 | 14,936 |
| Reserves and accruals | 9,949 | 96,428 |
| Capitalized research and development | 8,761 | 4,372 |
| Intangibles amortization | 38,864 | 2,616 |
| Other, net | 12,130 | 8,430 |
| Gross deferred tax assets | 239,071 | 244,803 |
| Valuation allowance | (239,071) | (244,803) |
| Total deferred tax assets | $ — | $ — |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2003 and 2002. The change in the valuation allowance was a net decrease of $5.7 million and a net increase of approximately $26.4 million and $86.7 million for the years ended December 31, 2003, 2002, and 2001, respectively. Approximately $44.2 million of the valuation allowance will be credited to equity when realized.

As of December 31, 2003, the Company had federal, California and foreign net operating loss carryforwards of approximately $340.0 million, $129.0 million and $107.0 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $9.0 million and $16.0 million, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2004 through 2023, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carryforwards before full utilization.

11.    Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2003, 2002, and 2001.

12.    Segments of an Enterprise and Related Information

Since late 2000, the worldwide telecom and satellite industries have experienced severe downturns that have resulted in significantly reduced purchases of new broadband equipment. Because of this overall drop in demand, the Company has refocused its efforts on the cable industry, and has significantly reduced its investment in the telecom and satellite businesses. Consequently, beginning in 2003, the Company's previously

84

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

reported Telecom segment no longer meets the quantitative threshold for disclosure and the Company now operates as one business segment. Therefore, operating segment disclosure for the year ended December 31, 2003 is not provided.

Prior to December 31, 2002, the Company operated primarily in two principal operating segments: Cable Broadband Access Systems (Cable) and Telecom Carrier Access Systems (Telecom). The Cable segment consisted primarily of TeraComm System, TJ line of DOCSIS cable modems, Bluewave line of DOCSIS CMTS, and the CherryPicker family of Digital Video Management Systems that are sold primarily to cable operators for the deployment of data, video and voice services over the existing cable infrastructure. The Telecom segment consisted primarily of MiniPlex DSL Systems, IPTL Converged Voice and Data Service System and Mainsail products, which are sold to providers of broadband services for the deployment of voice and data services over the existing copper wire infrastructure. The Company determined these reportable operating segments based upon how the businesses were managed and operated.

Information on reportable segments is as follows (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2002 | 2001 |
| **Cable Broadband Access Segment:** | | |
| Revenues: | | |
| TeraComm System | $ 68,753 | $ 192,757 |
| TJ DOCSIS cable modems | 23,059 | 25,069 |
| Video products | 20,833 | 16,363 |
| Other | 6,284 | 11,639 |
| Total Cable revenues | $ 118,929 | $ 245,828 |
| Depreciation expense | $ 10,347 | $ 12,028 |
| Operating loss | $ (78,731) | $ (465,435) |
| **Telecom Broadband Access Segment:** | | |
| Revenues: | | |
| MiniPlex DSL Systems | $ 8,366 | $ 23,417 |
| Other | 2,108 | 10,236 |
| Total Telecom revenues | $ 10,474 | $ 33,653 |
| Depreciation expense | $ 1,225 | $ 3,700 |
| Operating loss | $ (10,852) | $ (297,697) |
| Total revenues | $ 129,403 | $ 279,481 |
| Total depreciation expense | $ 11,572 | $ 15,728 |
| Operating loss: | | |
| Operating loss by reportable segments | $ (89,583) | $ (763,132) |
| Unallocated amounts: | | |
| Interest and other income (expense), net | (3,481) | 44 |
| Gain on early retirement of debt | 49,069 | 185,327 |
| Income tax (expense) benefit | (238) | 13,915 |
| Net loss | $ (44,213) | $ (563,846) |

85

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2003 | 2002 | 2001 |
| **Geographic areas:** | | | |
| Revenues: | | | |
| United States | $ 74,341 | $ 41,150 | $ 50,291 |
| Canada | 3,145 | 17,247 | 113,300 |
| Europe | 17,635 | 11,361 | 34,952 |
| Israel | 7,038 | 8,283 | 16,528 |
| Japan | 21,183 | 36,214 | 37,721 |
| Asia, excluding Japan | 9,575 | 11,845 | 24,094 |
| South America | 568 | 3,283 | 2,595 |
| Total | $133,485 | $129,403 | $279,481 |

| | December 31, 2002 |
|---|---|
| **Assets:** | |
| Cable Broadband Access Segment | $ 217,531 |
| Telecom Broadband Access Segment | 58,179 |
| Total assets | $ 275,710 |

| | December 31, 2003 | December 31, 2002 |
|---|---|---|
| **Long-lived assets:** | | |
| United States | $ 19,630 | $ 28,169 |
| Canada | 810 | 787 |
| Europe | 175 | 170 |
| Israel | 3,104 | 3,442 |
| Asia | 173 | 207 |
| South America | | 118 |
| Total long-lived assets | 23,892 | 32,893 |
| Total current assets | 191,348 | 242,817 |
| Total assets | $ 215,240 | $ 275,710 |

Three customers, Adelphia, Cross Beam Networks, a subsidiary of Sumitomo, and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2003 (22%, 16%, and 13%). One customer, related to the Cable segment, Cross Beam Networks, accounted for more than 10% of total revenues for the year ended December 31, 2002 (28%). Two customers, Shaw and Cross Beam Networks, both related to the Cable segment, accounted for 10% or more of total revenues (33% and 13%) for the year ended December 31, 2001. Two customers accounted for 10% or more of total accounts receivable for the year ended December 31, 2003 (24% and 20%). One customer, related to the Cable segment, accounted for 10% or more of total accounts receivable for the year ended December 31, 2002 (24%).

86

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

13.    Related Party Transactions

During the years ended December 31, 2003, 2002 and 2001, the Company recognized revenue of $4.7 million, $9.1 million, and $52.4 million, respectively in connection with product shipments made to related parties. Prior to the third quarter of 2001, both Shaw and Rogers, each of which had one representative on the Company's Board of Directors were significant stockholders and were related parties. Beginning in the third quarter of 2001, Shaw was no longer a significant stockholder because Shaw no longer exercised voting rights over its shares in the Company, and the board member from Shaw resigned. Accordingly, Shaw was no longer considered a related party. Revenues from Shaw have not been included as revenues from related parties after the second quarter of 2001, when Shaw ceased to be a related party. In 2001, the Company recognized $31.4 million of related party revenues in connection with product shipments to Shaw, net of amortization of co-marketing expense.

Alek Krstajic, a member of the Company's Board of Directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Beginning April 1, 2003, the Company no longer recognized revenues related to Rogers as related party revenues as Rogers was no longer considered to be a related party. For the year ended 2003, 2002 and 2001, the Company recognized $1.5 million, $8.0 million, and $21.0 million, respectively of related party revenues in connection with product shipments to Rogers, net of amortization of co-marketing expense.

Lewis Solomon, a member of the Company's Board of Directors and Chairman of the Company's Audit Committee is also a member of the Board of Directors of Harmonic, Inc. (Harmonic) a manufacturer and seller of broadband products. In April 2002, the Company entered into a reseller agreement with Harmonic to sell certain of the Company's products. The agreement appoints Harmonic as an authorized, non-exclusive reseller of certain of the Company's video products. For the years ended December 31, 2003 and 2002, revenues from Harmonic of $3.2 million and $1.1 million, respectively were included as revenues from related parties.

Cost of related party product revenues in the Company's consolidated statements of operations consists of direct and indirect product costs. Accounts receivable from Rogers and Harmonic totaled approximately $0.6 million and $0.8 million at December 31, 2003 and 2002, respectively. None of the related parties is a supplier to the Company.

In December 2001, the Company entered into co-marketing arrangements with Shaw and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. The Company entered into these arrangements with Shaw and Rogers to promote the Company's brand and identify its products In July 2002, the Company began amortizing these prepaid assets and charging them against Cable revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." The Company charged $1.4 million of amortization of these assets against revenues in each quarter beginning in the third quarter of 2002 through the fourth quarter of 2003. Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively. Of the co-marketing amortization charged to total revenue, approximately $0.15 million and $0.3 million were charged to related party revenues in the year ended 2003 and 2002, respectively.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Aleksander Krstajic is the founder and President of Team Honor.

14.    Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts that are based on the best available information — mostly historical

87

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

claims experience — claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties is as follows (in thousands):

|  | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Write-Offs | Balance at End of Period |
|---|---|---|---|---|
| Year ended December 31, 2001 |  |  |  |  |
| Warranty reserve | $5,925 | 7,956 | (5,513) | $ 8,368 |
| Year ended December 31, 2002 |  |  |  |  |
| Warranty reserve | $8,368 | 2,730 | (2,491) | $ 8,607 |
| Year ended December 31, 2003 |  |  |  |  |
| Warranty reserve | $8,607 | 2,287 | (5,385) | $ 5,509 |

Guarantees, Including Indirect Guarantees of Indebtedness of Others

In addition to product warranties, the Company, from time to time, in the normal course of business, indemnifies other parties with whom it enters into contractual relationships, including customers, lessors, and parties to other transactions with the Company, with respect to certain matters. The Company has agreed to hold the other party harmless against specified losses, such as those arising from a breach of representations or covenants, third party claims that the Terayon's products when used for their intended purpose(s) infringe the intellectual property rights of such third party or other claims made against certain parties. It is not possible to determine the maximum potential amount of liability under these indemnification obligations due to the limited history of prior indemnification claims and the unique facts and circumstances that are likely to be involved in each particular claim. Historically, payments made by the Company under these obligations were not material and no liabilities have been recorded for these obligations on the balance sheets as of December 31, 2003 or 2002.

15. Sale of Certain Assets

In July 2003, the Company entered into an agreement with Verilink Corporation (Verilink) to sell certain assets to Verilink for up to a maximum of $0.9 million. The Company received $0.45 million in July 2003 and will receive additional payments totaling up to $0.45 million through December 31, 2004. The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in February 2000. Additionally, Verilink agreed to purchase at least $2.1 million of related inventory from the Company on or before December 31, 2004. As of December 31, 2003, Verilink had purchased $0.7 million of this inventory.

As part of this agreement, Verilink agreed to assume all warranty obligations related to ANE products sold prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of certain warranty obligations for ANE products sold prior to July 2003. Further, Verilink assumed the obligation for one of the Company's operating leases, previously accrued as restructuring, resulting in a recovery of restructuring charges of $0.3 million in 2003.

16. Subsequent Events (Unaudited)

In the first quarter of 2004, the Company initiated a worldwide reduction in force of approximately 70 employees, or 17% of the workforce, consolidation of certain facilities, and reduction or elimination of certain discretionary costs and programs. In connection with this restructuring, the Company will seek to sublease approximately 56,400 square feet of its Santa Clara, California facility. The Company expects to record total charges in the range of approximately $5.0 million to $7.0 million associated with this realignment in the quarter ending March 31, 2004.

88

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

On February 23, 2004, the United States District Court, Northern District of California, issued an order disqualifying two of the lead plaintiffs in the class action lawsuits against the Company. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery.

17.    Unaudited Quarterly Financial Data

Summarized quarterly financial data for 2003 and 2002 is as follows (in thousands, except per share data):

| 2003 | Quarter | | | |
|---|---|---|---|---|
| | First | Second | Third | Fourth |
| Total revenues | $ 22,268 | $ 30,599 | $37,828 | $42,990 |
| Gross profit (loss) | 2,675 | 6,863 | 10,194 | 12,719 |
| Restructuring costs (recovery) and asset write-offs(1) | (3,162) | 115 | 244 | — |
| Net loss | (23,989) | (13,139) | (7,210) | (6,015) |
| Basic and diluted net loss per share | $ (0.33) | $ (0.18) | $ (0.10) | $ (0.08) |

| 2002 | Quarter | | | |
|---|---|---|---|---|
| | First | Second | Third | Fourth |
| Total revenues | $57,218 | $22,407 | $ 24,475 | $ 25,303 |
| Gross profit (loss) | 25,491 | (27) | 296 | 2,694 |
| Restructuring costs and asset write-offs(1) | — | (3,972) | (4,950) | — |
| Net loss(2) | (4,090) | (3,685) | (15,972) | (20,466) |
| Basic and diluted net loss per share | $ (0.06) | $ (0.05) | $ (0.22) | $ (0.28) |

Earnings per share are computed independently for each of the quarters presented. The sum of the quarterly earnings per share in 2003 and 2002 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

(1)    See Note 5 for an explanation for restructuring and asset write-offs.

(2)    See Note 7 for an explanation of the gains on repurchase of subordinated Convertible Notes in the second quarter ($33,276) and third quarter ($15,813).

89

# Exhibit D

Table of Contents

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

(Mark one)

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM        TO        .

COMMISSION FILE NUMBER: 000-24647

# TERAYON COMMUNICATION SYSTEMS, INC.
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 77-0328533 |
|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (IRS EMPLOYER IDENTIFICATION NO.) |

4988 GREAT AMERICA PARKWAY
SANTA CLARA, CALIFORNIA 95054
(408) 235-5500
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING AREA CODE, OF THE REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of Each Class: | Name of Each Exchange on Which Registered: |
|---|---|
| None | None |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, par value $0.001 per share
(TITLE OF CLASS)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).    Yes ☑    No ☐

The aggregate market value of the voting stock held by non-affiliates of the registrant was approximately $140,449,000 on June 30, 2004. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.001 par value, 76,786,521 shares outstanding as of February 28, 2005.

DOCUMENTS INCORPORATED BY REFERENCE
LIST HEREUNDER THE DOCUMENTS FROM WHICH PARTS THEREOF HAVE BEEN INCORPORATED BY REFERENCE AND THE PART OF THE FORM 10-K INTO WHICH SUCH INFORMATION IS INCORPORATED:

Terayon Communication Systems, Inc definitive Proxy Statement, to be filed not later than 120 days after the end of the fiscal year covered by this report Part III

---

## INDEX
### TERAYON COMMUNICATION SYSTEMS, INC.

|  |  | Page No. |
|---|---|---|
| | **PART I** | |
| Item 1. | BUSINESS | 3 |
| Item 2. | PROPERTIES | 11 |
| Item 3. | LEGAL PROCEEDINGS | 11 |
| Item 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 13 |
| | **PART II** | |
| Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 13 |
| Item 6. | SELECTED FINANCIAL DATA | 16 |

| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 17 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 54 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 56 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 93 |
| Item 9A. | CONTROLS AND PROCEDURES | 93 |
| Item 9B. | OTHER INFORMATION | 95 |
| | PART III | |
| Item 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 95 |
| Item 11. | EXECUTIVE COMPENSATION | 95 |
| Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 95 |
| Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 95 |
| Item 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 96 |
| | PART IV | |
| Item 15. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 96 |
| SIGNATURES | | 100 |
| EXHIBIT 10.1 | | |
| EXHIBIT 10.26 | | |
| EXHIBIT 10.27 | | |
| EXHIBIT 10.28 | | |
| EXHIBIT 10.33 | | |
| EXHIBIT 21.1 | | |
| EXHIBIT 23.1 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |

1

Table of Contents

Item 8.    Financial Statements and Supplementary Data

TERAYON COMMUNICATION SYSTEMS, INC.
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Reports of Ernst & Young LLP, Independent Registered Public Accounting Firm | 57 |
| Consolidated Balance Sheets | 60 |
| Consolidated Statements of Operations | 61 |
| Consolidated Statements of Stockholders' Equity | 62-63 |
| Consolidated Statements of Cash Flows | 64 |
| Notes to Consolidated Financial Statements | 65 |

56

Table of Contents

<div align="center">
Report Of Ernst & Young LLP, Independent Registered<br/>
Public Accounting Firm
</div>

The Board of Directors and Stockholders
Terayon Communication Systems, Inc.

We have audited the accompanying consolidated balance sheets of Terayon Communication Systems, Inc. as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2004. Our audits also included the financial statement schedule listed in the index at Item 15(a)(2). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Terayon Communication Systems, Inc. at December 31, 2004 and 2003, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Terayon Communication Systems, Inc.'s internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 14, 2005 expressed an unqualified opinion on management's assessment and an adverse opinion on the effectiveness of internal control over financial reporting.

<div align="center">/s/ Ernst & Young LLP</div>

Palo Alto, California
March 14, 2005

<div align="center">57</div>

Table of Contents

Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting

The Board of Directors and Shareholders of
Terayon Communications Systems, Inc.

We have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting in Item 9a, that Terayon Communication Systems, Inc ("Terayon") did not maintain effective internal control over financial reporting as of December 31, 2004 because of the effect of the material weaknesses described in management's assessment, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO" criteria). Terayon's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment:

Management identified a material weakness due to insufficient controls related to the identification, capture, and timely communication of financially significant information between certain parts of the organization and the finance department to enable the finance department to account for transactions in a complete and timely manner. As a result of this material weakness, management recorded an adjustment in the quarter ended September 30, 2004 to record termination benefits paid to a former executive.

Management also identified a material weakness for insufficient controls related to the preparation and review of the annual consolidated financial statements and accompanying footnote disclosures. The insufficient controls include a lack of sufficient personnel with technical accounting expertise in the finance department and inadequate review and approval procedures to prepare external financial statements in accordance with generally accepted accounting principles (GAAP). As a result of this

58

Table of Contents

material weakness, management made substantial revisions to its 2004 annual consolidated financial statements and footnote disclosures before they were issued.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2004 consolidated financial statements, and this report does not affect our report dated March 14, 2005 on those financial statements.

In our opinion, management's assessment that Terayon Communication Systems, Inc. did not maintain effective internal control over financial reporting as of December 31, 2004 is fairly stated, in all material respects, based on the COSO control criteria. Also, in our opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Terayon Communication Systems, Inc. has not maintained effective internal control over financial reporting as of December 31, 2004, based on the COSO control criteria.

/s/ Ernst & Young LLP

Palo Alto, California
March 14, 2005

59

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED BALANCE SHEETS

| | December 31, | |
| --- | --- | --- |
| | 2004 | 2003 |
| | (In thousands, except share data) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 43,218 | $ 30,188 |
| Short-term investment | 54,517 | 108,452 |
| Accounts receivable, less allowance for doubtful accounts of $1,289 in 2004 and $3,591 in 2003 | 16,554 | 29,199 |
| Accounts receivable from related parties | 3,106 | 600 |
| Other current receivables | 1,044 | 3,662 |
| Inventory, net | 17,144 | 16,364 |
| Other current assets | 2,042 | 2,883 |
| Total current assets | 137,625 | 191,348 |
| Property and equipment, net | 5,760 | 11,871 |
| Restricted cash | 8,827 | 9,212 |
| Other assets, net | 1,522 | 2,809 |
| Total assets | $ 153,734 | $ 215,240 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 7,845 | $ 26,049 |
| Accrued payroll and related expenses | 4,181 | 6,537 |
| Deferred revenues | 2,579 | 3,423 |
| Accrued warranty expenses | 3,870 | 5,509 |
| Accrued restructuring and executive severance | 3,902 | 2,647 |
| Accrued vendor cancellation charges | 521 | 869 |
| Accrued other liabilities | 4,317 | 5,284 |
| Interest payable | 1,356 | 1,358 |
| Current portion of capital lease obligations | — | 124 |
| Total current liabilities | 28,571 | 53,800 |
| Long-term obligations | 2,077 | 3,118 |
| Accrued restructuring and executive severance | 1,664 | 1,853 |
| Convertible subordinated notes | 65,081 | 65,081 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value: | | |
| Authorized shares — 5,000,000 | | |
| Issued and outstanding shares — none in 2004 and 2003 | — | — |
| Common stock, $0.001 par value: | | |
| Authorized shares — 200,000,000 | | |
| Issued — 76,454,161 in 2004 and 76,031,097 in 2003 | | |
| Outstanding — 76,298,152 in 2004 and 74,875,088 in 2003 | 76 | 75 |
| Additional paid-in capital | 1,083,711 | 1,082,036 |
| Accumulated deficit | (1,024,091) | (987,560) |
| Deferred compensation | — | (22) |
| Treasury stock, at cost, 156,009 shares in 2004 and 2003 | (773) | (773) |
| Accumulated other comprehensive loss | (2,682) | (2,368) |
| Total stockholders' equity | 56,341 | 91,388 |
| Total liabilities and stockholders' equity | $ 153,734 | $ 215,240 |

See accompanying notes.

60

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS

Years Ended December 31,

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  | (In thousands, except per share data) | | |
| **Revenues:** | | | |
| Product revenues | $ 140,622 | $ 128,791 | $ 120,306 |
| Related party product revenues | 9,916 | 4,694 | 9,097 |
| Total revenues | 150,538 | 133,485 | 129,403 |
| **Cost of goods sold:** | | | |
| Cost of product revenues | 103,150 | 99,261 | 92,497 |
| Cost of related party product revenue | 3,770 | 1,773 | 8,452 |
| Total cost of goods sold | 106,920 | 101,034 | 100,949 |
| Gross profit | 43,618 | 32,451 | 28,454 |
| **Operating expenses:** | | | |
| Research and development | 33,959 | 42,839 | 58,696 |
| Sales and marketing | 24,145 | 26,781 | 35,704 |
| General and administrative | 11,216 | 12,127 | 14,715 |
| Restructuring charges (net), executive severance and asset write-offs | 11,159 | 2,803 | 8,922 |
| Total operating expenses | 80,479 | 84,550 | 118,037 |
| Loss from operations | (36,861) | (52,099) | (89,583) |
| Interest income | 1,982 | 2,917 | 6,838 |
| Interest expense | (3,294) | (3,279) | (8,174) |
| Other income (expense) | 1,566 | 2,424 | (4,145) |
| Gain on early retirement of debt | — | — | 49,089 |
| Loss before tax (expense) benefit | (36,607) | (50,037) | (43,975) |
| Income tax (expense) benefit | 76 | (316) | (238) |
| Net loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |

See accompanying notes.

61

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

(In thousands, except share amounts)

| | Common Stock Shares | Amount | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Treasury Stock Shares | Amount | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2001 | 71,943,930 | $ 73 | $ 1,074,203 | $ (892,994) | $ (458) | $ 248 | 127,839 | $ (768) | $ 180,304 |
| Exercise of options for cash to purchase common stock | 422,073 | | 1,721 | | | | | | 1,721 |
| Repurchase or return of common stock | (1,068) | | | | | | 28,170 | (5) | (5) |
| Return of escrow shares from Telegate acquisition | (25,077) | | | | | | | | |
| Issuance of options to non-employees | | | 38 | | (38) | | | | — |
| Amortization of deferred compensation | | | 1 | | 471 | | | | 472 |
| Issuance of restricted common stock from stock option plan for services provided | 205,001 | | 290 | | | | | | 290 |
| Acceleration of vesting of employee stock options and stock protection payment | | | 1 | | | | | | 1 |
| Issuance of common stock for Employee Stock Purchase Plan | 539,186 | | 1,864 | | | | | | 1,864 |
| Issuance of warrant to purchase common stock | | | 26 | | | | | | 26 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | (2,799) | | | (2,799) |
| Cumulative translation adjustment | | | | | | (519) | | | (519) |
| Net loss | | | | (44,213) | | | | | (44,213) |
| Comprehensive loss | | | | | | | | | (47,531) |
| Balance at December 31, 2002 | 73,084,045 | 73 | 1,078,144 | (937,207) | (25) | (3,070) | 156,009 | (773) | 137,142 |
| Exercise of options for cash to purchase common stock | 579,233 | 1 | 2,533 | | | | | | 2,534 |
| Re-valuation of options to non-employee | | | 50 | | (50) | | | | |
| Amortization of deferred compensation | | | | | 53 | | | | 53 |
| Issuance of restricted common stock from stock option plan for services provided | 9,600 | | 70 | | | | | | 70 |
| Issuance of common stock for Employee Stock Purchase Plan | 1,202,210 | 1 | 1,194 | | | | | | 1,195 |
| Issuance of warrant to purchase common stock | | | 45 | | | | | | 45 |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | 1,172 | | | 1,172 |
| Cumulative translation adjustment | | | | | | (470) | | | (470) |
| Net loss | | | | (50,353) | | | | | (50,353) |
| Comprehensive loss | | | | | | | | | (49,651) |
| Balance at December 31, 2003 | 74,875,088 | 75 | 1,062,036 | (987,560) | (22) | (2,368) | 156,009 | (773) | 91,368 |
| Exercise of options for cash to purchase common stock | 225,645 | | 490 | | | | | | 490 |
| Amortization of deferred compensation | | | | | 17 | | | | 17 |
| Cancellation of unvested stock options | | | (5) | | 5 | | | | — |
| Issuance of common stock for Employee Stock Purchase Plan | 1,197,419 | 1 | 1,190 | | | | | | 1,191 |

Table of Contents

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Deferred Compensation | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | Shares | Amount | |
| | | | | (In thousands, except share amounts) | | | | | |
| Comprehensive loss: | | | | | | | | | |
| Increase to unrealized loss on short-term investments | | | | | | (521) | | | (521) |
| Cumulative translation adjustment | | | | | | 307 | | | 307 |
| Net loss | | | | (36,531) | | | | | (36,531) |
| Comprehensive loss | | | | | | | | | (36,745) |
| Balance at December 31, 2004 | 76,298,152 | $ 76 | $ 1,083,711 | $ (1,024,091) | $ — | $ (2,582) | 156,009 | $ (773) | $ 56,341 |

See accompanying notes

63

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| Operating activities: | | | |
| Net loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Settlement of Net Services account receivable | | | 1,118 |
| Depreciation and amortization | 6,416 | 9,360 | 11,572 |
| Write-off and amortization of intangible assets | | | 3,972 |
| Amortization of deferred compensation | 17 | 53 | 476 |
| Gain on early retirement of debt | | | (49,089) |
| Inventory provision | | | 8,109 |
| Impairment of investment | 11,980 | 4,086 | 4,500 |
| Write-off of fixed assets | | | 2,967 |
| Compensation expense for issuance of common stock | 2,303 | 497 | |
| Value of common and preferred stock warrants issued | | 70 | |
| | | 45 | 28 |
| Net changes in operating assets and liabilities: | | | |
| Accounts receivable, net | 12,846 | (12,844) | 28,211 |
| Accounts receivable from related parties | (2,506) | 242 | 3,164 |
| Inventory | (12,760) | (12,193) | 4,065 |
| Other assets | 5,131 | 7,281 | 443 |
| Accounts payable | (18,204) | 2,129 | (18,901) |
| Accrued payroll and related expenses | (2,356) | 310 | (3,214) |
| Deferred revenues | (844) | 2,626 | (3,672) |
| Accrued warranty expenses | (1,636) | (3,098) | 239 |
| Accrued restructuring charges | 1,066 | (2,254) | (1,443) |
| Accrued vendor cancellation charges | (2,348) | (12,335) | (3,426) |
| Other accrued liabilities | (2,008) | (2,331) | (6,725) |
| Interest payable | (2) | 3 | (1,918) |
| Net cash used in operating activities | (39,550) | (68,397) | (67,719) |
| Investing activities: | | | |
| Purchases of short-term investments | (54,517) | (243,652) | (288,180) |
| Proceeds from sales and maturities of short-term investments | 107,931 | 224,154 | 434,346 |
| Purchases of property and equipment | (2,698) | (3,831) | (7,180) |
| Net cash provided by (used in) investing activities | 50,716 | (23,329) | 138,974 |
| Financing activities: | | | |
| Principal payments on capital leases | | | (127) |
| Payments on repurchase of common stock | (124) | (66) | |
| Repurchase of convertible subordinated notes | | | (5) |
| Proceeds from issuance of common stock | 1,681 | 3,729 | (57,627) |
| | | | 3,872 |
| Net cash provided by (used in) financing activities | 1,557 | 3,663 | (53,887) |
| Effect of foreign currency exchange rate changes | 307 | 1,172 | (563) |
| Net (decrease) increase in cash and cash equivalents | (13,030) | (86,891) | 16,805 |
| Cash and cash equivalents at beginning of year | 30,188 | 117,079 | 100,274 |
| Cash and cash equivalents at end of year | $ 43,218 | $ 30,188 | $ 117,079 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for income taxes | $ 138 | $ 194 | $ 714 |
| Cash paid for interest | $ 3,268 | $ 3,262 | $ 8,387 |
| Supplemental non-cash investing and financing activities: | | | |
| Deferred compensation relating to common stock issued to non-employees | $ — | $ 53 | $ 38 |

See accompanying notes.

64

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1.    Organization
    Description of Business
    Terayon Communication Systems, Inc. (Company) was incorporated under the laws of the State of California on January 20, 1993. In June 1998, the Company reincorporated in the State of Delaware.
    The Company develops, markets and sells equipment to broadband service providers who use the Company's products to deliver broadband voice, digital video solutions (DVS) and data services to residential and business subscribers.
2.    Summary of Significant Accounting Policies
    Basis of Consolidation
    The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated.
    Use of Estimates
    The preparation of the consolidated financial statements in conformity with United States generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Estimates are based on historical experience, input from sources outside of the Company, and other relevant facts and circumstances. Actual results could differ from those estimates. Areas that are particularly significant include the Company's revenue recognition policy, the valuation of its accounts receivable and inventory, the assessment of recoverability and the measurement of impairment of fixed assets, and the recognition of restructuring liabilities.
    Foreign Currency Translation
    The Company records the effect of foreign currency translation in accordance with Statement of Financial Account Standards (SFAS) No. 52, "Foreign Currency Translation." For operations outside the United States that prepare financial statements in currencies other than the U.S. dollar, results of operations and cash flows are translated at average exchange rates during the period, and assets and liabilities are translated at end-of-period exchange rates. Translation adjustments are included as a separate component of accumulated other comprehensive loss in stockholders' equity. For the three years ended December 31, 2004, translation gains and losses were not significant. Realized foreign currency transaction gains and losses are included in results of operations as incurred, and have not been significant to the Company's operating results in any year presented.
    Concentrations of Credit Risk, Customers, Suppliers, and Products
    The Company performs ongoing credit evaluations of its customers and generally requires no collateral. Credit losses have historically been within management's expectations. The Company maintains an allowance for potentially uncollectible accounts receivable based on an assessment of collectibility. The Company assesses collectibility based on a number of factors, including past history, the number of days an amount is past due (based on invoice due date), changes in credit ratings of customers, current events and circumstances regarding the business of the Company's client's customers and other factors that the Company believes are relevant. At December 31, 2004 and 2003, the allowance for potentially uncollectible accounts was $1.3 million and $3.6 million, respectively. In 2004, we experienced better than expected collections of $2.1 million offset by write-offs of $201,000. A relatively small number of customers account for a significant

65

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

percentage of the Company's revenues and accounts receivable. The Company expects the sale of its products to a limited number of customers and resellers to continue to account for a high percentage of revenues.

The Company relies on single source suppliers of materials and labor for the significant majority of its product inventory. Should the Company's current suppliers not produce and deliver inventory for the Company to sell on a timely basis, operating results may be adversely impacted.

The Company places its cash and cash equivalents in several financial institutions and limits the amount of credit exposure through diversification and by investing in only high-grade government and commercial issuers.

The Company invests its excess cash in debt instruments of governmental agencies, and corporations with credit ratings of AA/AA− or better or A1/P1 or better, respectively. The Company has established guidelines relative to diversification and maturities that attempt to maintain safety and liquidity. The Company has not experienced any significant losses on its cash equivalents or short-term investments.

Revenue Recognition

The Company recognizes revenue in accordance with SEC Staff Accounting Bulletin (SAB) No. 104 "Revenue Recognition" ("SAB 104"). SAB 104 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services were rendered; (3) the selling price is fixed or determinable; and (4) collectibility is reasonably assured.

Contracts and customer purchase orders are used to determine the existence of an arrangement. Delivery occurs when product is delivered to a common carrier. Certain of our products are delivered on an FOB destination basis. The Company defers revenue associated with these transactions until the delivery has occurred to the customers' premises. The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to adjustment. The Company assesses collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

The Company's service revenue, which is sold separately from product lines represents approximately 2.4% and 1.3% of revenue for the years ended December 31, 2004 and 2003, respectively. It is generated from service arrangements for product support, which is recognized ratably over the term of the arrangement, typically one year. Product support includes internet access to technical content, software upgrades, as well as internet and telephone access to technical support personnel.

Research and Development Expenses

Research and development expenses are charged to expense as incurred.

Shipping and Handling Costs

Costs related to shipping and handling are included in cost of goods sold for all periods presented.

Advertising Expenses

The Company accounts for advertising costs as expense in the period in which they are incurred. Advertising expense for the years ended December 31, 2004, 2003 and 2002 were $0.1 million, $0.1 million, and $0.4 million, respectively.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers Communications, Inc. (Rogers). The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against revenues in accordance with the Financial Accounting Standards Board (FASB) Emerging Issues Task Force (EITF) No. 01–09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." Amounts charged against revenues in 2003 and 2002 totaled approximately $5.6 million and $2.8 million, respectively, and none in 2004. The Company charged the amortization of these assets against revenues through the six quarters ended in December 31, 2003, the term of the related arrangement, at the rate of $1.4 million per quarter. See Note 14.

Net Loss Per Share

Basic and diluted net loss per share was computed using the weighted average number of common shares outstanding. Options, warrants, restricted stock, and convertible debt were not included in the computation of diluted net loss per share because the effect is anti-dilutive.

Shares used in the calculation of basic and diluted net loss per share are as follows (in thousands, except per share data):

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2003 | 2002 |
| Net loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |
| Basic and diluted net loss per share | $ (0.48) | $ (0.68) | $ (0.61) |

Options to purchase 18,802,838, 17,463,959 and 14,635,025 shares of common stock were outstanding at December 31, 2004, 2003 and 2002, respectively, and warrants to purchase 200,000 and 2,325,593 shares of common stock were outstanding at December 31, 2003 and 2002, respectively, and none in 2004 but were not included in the computation of diluted net loss per share, since the effect is anti-dilutive.

Cash, Cash Equivalents and Short-Term Investments

The Company invests its excess cash in money market accounts and debt instruments and considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents. Investments with an original maturity at the time of purchase of over three months are classified as short-term investments regardless of maturity date as all investments are classified as available-for-sale and can be readily liquidated to meet current operational needs.

The Company determines impairment related to its debt and equity investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities", and SAB 59, "Accounting for Noncurrent Marketable Equity Securities", which provide guidance on determining when an investment is other-than-temporarily impaired. Applying this guidance requires judgment. In making this judgment, the Company evaluates, among other factors, the duration and extent to which the fair value of an investment is less than its cost, the financial health of and business outlook for the investee, including factors such as industry and sector performance, changes in technology, and operational and financing cash flow, available financial information, and the Company's intent and ability to hold the investment. The Company also relies upon guidance from EITF 03–01 "The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments" in determining possible impairment as it relates to its debt investments. In 2004, the Company recorded approximately $0.5 million in unrealized losses on investments in Other

67

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

Comprehensive Loss on the Consolidated Balance Sheet. The unrealized losses relating to investments in federal agency securities were caused by interest rate increases. The Company purchased these securities at par, and the contractual cash flows of these investments are guaranteed by an agency of the U.S. government. Accordingly, it is expected that the securities would not be settled at a price less than the amortized cost of the Company's investment. Because the decline in market value is attributable to changes in interest rates and not credit quality and because the Company has the ability and intent to hold these investments until a recovery of fair value, which may be at maturity, the Company does not consider these investments to be other–than–temporarily impaired at December 31, 2004. Further the Company has a history of holding these types on investments to maturity and assesses this issue quarterly.

The Company's short–term investments, which consist primarily of commercial paper, U.S. government and U.S. government agency obligations and fixed income corporate securities are classified as available–for–sale and are carried at fair market value. Realized gains and losses and declines in value judged to be other–than–temporary on available–for–sale securities are included in interest income. The cost of securities sold is based on the specific identification method. The Company had no material investments in short–term equity securities at December 31, 2004 or 2003.

Other Current Receivables

As of December 31, 2004 and 2003, other current receivables are primarily composed of interest, taxes, and non-trade receivables, and included approximately $0.2 million and $1.8 million, respectively, due from contract manufacturers for raw materials purchased from the Company.

Inventory

Inventory is stated at the lower of cost (first-in, first-out) or market. The components of inventory are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2004 | 2003 |
| Finished goods | $ 13,783 | $ 14,264 |
| Work–in process | 1,501 | 660 |
| Raw materials | 1,860 | 1,440 |
|  | $ 17,144 | $ 16,364 |

The Company records losses on commitments to purchase inventory in accordance with Statement 10 of Chapter 4 of Accounting Release Bulletin No. 43. The Company's policy for valuation of inventory and commitments to purchase inventory, including the determination of obsolete or excess inventory, requires it to perform a detailed assessment of inventory at each balance sheet date, which includes a review of, among other factors, an estimate of future demand for products within specific time horizons, generally six months or less as well as product lifecycle and product development plans. Given the rapid change in the technology and communications equipment industries as well as significant, unpredictable changes in capital spending by the Company's customers, the Company believes that assessing the value of inventory using generally a six month time horizon is appropriate.

The estimates of future demand that the Company uses in the valuation of inventory are the basis for the revenue forecast. Based on this analysis, the Company reduces the cost of inventory that it specifically identifies and considers obsolete or excessive to fulfill future sales estimates. Excess inventory is generally defined as inventory in excess of projected usage, and is determined using the Company's best estimate of future demand at the time, based upon information then available. See Note 4.

68

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

Cost of goods sold for the years ended December 31, 2004 and 2003 included reversals of $3.3 million ($0.04 per share) and $10.0 million ($0.13 per share), respectively, of special charges originally recorded in 2001 and 2000 for vendor cancellation charges and inventory considered to be excess and obsolete. The Company changed its previous estimates and was able to reverse the provisions in 2004 and 2003, as it was able to sell inventory originally considered to be excess and obsolete. In addition, the Company was able to negotiate downward certain vendor cancellation claims to terms more favorable to the Company.

During 2004, 2003 and 2002, the Company recorded inventory charges of $12.0 million, $4.1 million and $6.1 million, respectively, to write down some of its inventory due to excess and obsolescence and to reduce the inventory to the lower of cost or market value in 2002 as average selling prices fell below the cost of these products and to record charges for excess and obsolete inventory.

Property and Equipment

Property and equipment are carried at cost less accumulated depreciation and amortization. Property and equipment are depreciated for financial reporting purposes using the straight-line method over the estimated useful lives, generally three to seven years. Leasehold improvements are amortized using the straight-line method over the shorter of the useful lives of the assets or the terms of the leases. The recoverability of the carrying amount of property and equipment is assessed based on estimated future undiscounted cash flows, and if an impairment exists, the charge to operations is measured as the excess of the carrying amount over the fair value of the assets. Based upon this method of assessing recoverability, for the years ended December 31, 2004, 2003 and 2002, the Company recorded $2.4 million, $0.5 million and $1.3 million, respectively in asset impairments primarily related to restructuring activities.

Property and equipment are as follows (in thousands):

|  | December 31, | |
|  | 2004 | 2003 |
|---|---|---|
| Software and computers | $ 21,415 | $ 23,273 |
| Furniture and equipment | 21,623 | 23,816 |
| Leasehold improvements | 5,021 | 4,935 |
| Automobiles | 16 | 16 |
| Property and equipment | 48,075 | 52,040 |
| Accumulated depreciation and Amortization | (42,315) | (40,169) |
| Property and equipment, net | $ 5,760 | $ 11,871 |

Depreciation expense was $5.9 million and $8.9 million for the twelve months ended December 31, 2004 and 2003, respectively. Amortization expense for the twelve months ended December 31, 2004 and 2003 were both $0.5 million.

Restricted Cash

Restricted cash at both December 31, 2004 and 2003 primarily related to approximately $7.5 million to secure an aircraft lease as well as $1.3 million and $1.7 million, respectively, to secure real estate leases.

Goodwill and Other Intangible Assets

Goodwill is the excess of the purchase price over the fair value of identifiable net assets acquired in business combinations accounted for as purchases. During 2002, the Company recorded impairment charges for goodwill, assembled workforce, and other intangible assets (see Note 6). At December 31, 2004 and 2003, all goodwill had either been amortized or written-off the Company's books.

69

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

Goodwill and other long–lived assets were reviewed for impairment whenever events such as product discontinuance, plant closures, product dispositions or other changes in circumstances indicated that the carrying amount may not have be recoverable. When such events occurred, the Company compared the carrying amount of the assets to undiscounted expected future cash flows. If this comparison indicated that there was an impairment, the amount of the impairment was typically calculated using discounted expected future cash flows. The discount rate applied to these cash flows was based on the Company's weighted average cost of capital, which represented the blended costs of debt and equity.

Warranty Obligations

The Company provides a standard warranty for most of its products, ranging from one to five years from the date of purchase. The Company provides for the estimated cost of product warranties at the time revenue is recognized. The Company's warranty obligation is affected by product failure rates, material usage and service delivery costs incurred in correcting a product failure. Expense estimates are based on historical experience and expectation of future conditions. See Note 15.

Stock–Based Compensation

The Company accounts for its employee stock plans in accordance with Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25), and includes the disclosure–only provisions as required under SFAS No. 123, "Accounting for Stock–Based Compensation" (SFAS 123). The Company provides additional pro forma disclosures as required under SFAS 123 and SFAS No. 148, "Accounting for Stock–Based Compensation, Transition and Disclosure".

For purposes of pro forma disclosures, the estimated fair value of the options granted and ESPP shares to be issued is amortized to expense over their respective vesting periods. Had compensation cost for the Company's stock–based compensation plans been determined based on the fair value at the grant dates for awards under those plans consistent with the fair value method of SFAS 123, the Company's net loss and net loss per share would have been increased to the pro forma amounts indicated below (in thousands, except per share data):

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Net loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Add: Stock–based compensation under APB 25 | 22 | 123 | 476 |
| Deduct: Stock option compensation expense determined under fair value–based method | (13,741) | (22,210) | (33,718) |
| Employee stock purchase plan compensation expense determined under fair value–based method | (928) | (1,712) | (1,990) |
| Pro forma net loss | $ (51,178) | $ (74,152) | $ (79,445) |
| Pro forma basic and diluted net loss per share | $ (0.67) | $ (1.00) | $ (1.09) |

Equity instruments granted to non–employees are accounted for under the fair value method, in accordance with SFAS 123 and EITF No. 96–18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," using the Black–Scholes option pricing model and are recorded in the equity section of the Company's consolidated balance sheet as deferred compensation. These instruments are subject to periodic revaluations over their vesting terms. The expense is recognized as the instruments vest.

70

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

**Accumulated Other Comprehensive Loss**

Accumulated other comprehensive loss presented in the accompanying consolidated balance sheets and consolidated statements of stockholders' equity consists of net unrealized gain (loss) on short-term investments and accumulated net foreign currency translation losses.

The following are the components of accumulated other comprehensive loss (in thousands):

|  | Years Ended December 31, | |
|  | 2004 | 2003 |
|---|---|---|
| Cumulative translation adjustments | $ (2,093) | $ (2,400) |
| Unrealized gain/(loss) on available-for-sale investments | (489) | 32 |
| Total accumulated other comprehensive loss | $ (2,582) | $ (2,368) |

**Reclassification**

Certain amounts of revenues reported by geographical areas in previous years have been reclassified to conform to the 2004 presentation. Such reclassifications had no effect on previously reported results of operations, total assets or accumulated deficit.

**Impact of Recently Issued Accounting Standards**

On December 16, 2004, FASB issued SFAS 123(R) which is a revision of SFAS Statement No. 123, Accounting for Stock-Based Compensation. SFAS 123(R) supersedes APB 25, Accounting for Stock Issued to Employees, and amends SFAS Statement No. 95, Statement of Cash Flows. Generally, the approach in SFAS 123(R) is similar to the approach described in Statement 123. However, SFAS 123(R) requires all share-based payments to employees, including grants of employee stock options, to be recognized in the income statement based on their fair values. Pro forma disclosure is no longer an alternative. SFAS 123(R) must be adopted no later than July 1, 2005. Early adoption will be permitted in periods in which financial statements have not yet been issued. The Company expects to adopt SFAS 123(R) on July 1, 2005. A component of SFAS 123(R) includes one of the following options: (a) modified-prospective method, (b) the modified-retrospective method, restating all prior periods or (c) the modified-retrospective method, restating only the prior interim periods of 2005. A determination as to which of the three options the Company will adopt will be made at a later date.

As permitted by SFAS 123, the Company currently accounts for share-based payments to employees using APB 25's intrinsic value method and, as such, generally recognizes no compensation cost for employee stock options. Accordingly, the adoption of SFAS 123(R)'s fair value method will have a significant impact on the Company's result of operations, although it will have no impact on our overall financial position. The impact of adoption of SFAS 123(R) cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had we adopted SFAS 123(R) in prior periods, the impact of that standard would have approximated the impact of SFAS 123 as described in the disclosure of pro forma net income and earnings per share in Note 2 to our consolidated financial statements. SFAS 123(R) also requires the benefits of tax deductions in excess of recognized compensation cost to be reported as a financing cash flow, rather than as an operating cash flow as required under current literature. This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. While the Company cannot estimate what those amounts will be in the future (because they depend on, among other things, when employees exercise stock options), the Company has not recognized any operating cash flows for such excess tax deductions in any of the periods presented.

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

3.   Fair Value of Financial Instruments

The amounts reported as cash and cash equivalents approximate fair value due to their short-term maturities. The fair value for the Company's investments in marketable debt and equity securities is estimated based on quoted market prices.

The fair value of short-term and long-term capital lease and debt obligations is estimated based on current interest rates available to the Company for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations, as of each period presented approximate their respective fair values.

The following estimated fair value amounts have been determined using available market information. However, considerable judgment is required in interpreting market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

| | December 31, 2004 | | | |
|---|---|---|---|---|
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Government agency obligations | $ 8,000 | $ — | $ (72) | $ 7,928 |
| Total | 8,000 | — | (72) | 7,928 |
| Investments maturing in 1–2 years: | | | | |
| Government agency obligations | 47,006 | — | (417) | 46,589 |
| Total | 47,006 | — | (417) | 46,589 |
| Total | $ 55,006 | $ — | $ (489) | $ 54,517 |

| | December 31, 2003 | | | |
|---|---|---|---|---|
| Short-term investments | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| | (In thousands) | | | |
| Investments maturing in less than 1 year: | | | | |
| Commercial paper | $ 38,940 | $ — | $ (12) | $ 38,928 |
| Fixed income corporate securities | 2,223 | 1 | — | 2,224 |
| Government agency obligations | 7,918 | 1 | — | 7,919 |
| Total | 49,081 | 2 | (12) | 49,071 |
| Investments maturing in 1–2 years: | | | | |
| Fixed income corporate securities | 1,333 | — | — | 1,333 |
| Government agency obligations | 58,006 | 68 | (26) | 58,048 |
| Total | $ 59,339 | $ 68 | $ (26) | $ 59,381 |
| Total | $ 108,420 | $ 70 | $ (38) | $ 108,452 |

There were no realized gains or losses on short term investments in either the year ended December 31, 2004 or 2003, respectively.

72

# Exhibit D

( cont. )

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

4.    Commitments
    Leases
    The Company leases its facilities and certain equipment under operating leases. The operating lease for the Company's corporate headquarters expires in 2009. The operating lease for the Company's Israel headquarters expires in 2005. The Company's other operating leases expire at various times through 2006. Rent expense was approximately $6.3 million, $7.1 million, and $7.9 million, for the years ended December 31, 2004, 2003, and 2002, respectively. The Company subleases a portion of its facilities to third parties. In connection with the restructuring plans announced January 27, 2004, the Company is seeking to sublease approximately 56,400 square feet of its Santa Clara, California facility. See Note 6. The Company's sublease rental income was approximately $1.7 million, $1.1 million, and $0.4 million for the years ended December 31, 2004, 2003 and 2002, respectively.
    The Company leases certain equipment under non-cancelable lease agreements that are accounted for as capital leases. Equipment under capital lease arrangements included in property and equipment totaled $0.0 and $0.3 million at December 31, 2004 and 2003, respectively. Related accumulated amortization was $0.0 and $0.3 million at December 31, 2004 and 2003, respectively. Amortization expense related to assets under capital leases is included in depreciation expense. The capital leases are secured by the related equipment and the Company is required to maintain liability and property damage insurance.
    In 2002, the Company entered into an operating lease arrangement to lease a corporate aircraft. This lease arrangement was secured by a $9.0 million letter of credit at December 31, 2002. The letter of credit was reduced to $7.5 million in February 2003. The $7.5 million letter of credit was converted to a cash deposit in 2004. In August 2004 the Company entered into a 28 month aircraft sublease terminating on December 31, 2006. The lease commitment for the aircraft is included in the table below.
    Future minimum lease payments under non-cancelable operating leases as of December 31, 2004 are as follows (in thousands):

|  | Operating Leases |
| --- | --- |
| 2005 | $    7,452 |
| 2006 | 4,900 |
| 2007 | 3,177 |
| 2008 | 3,087 |
| 2009 | 2,579 |
| Thereafter | 188 |
| Total minimum payments | $    21,383 |

    As of December 31, 2004 there are approximately $2.4 million of future minimum sublease payments to be received under non-cancelable subleases not reflected in the table above.
    Purchase Obligations and Special Charges
    The Company has purchase obligations to certain of its suppliers that support the Company's ability to manufacture its products. The obligations consist of open purchase orders placed with vendors for goods and services of the vendors' products at a specified price. As of December 31, 2004, $30.0 million of purchase obligations were outstanding. As a result of declines in its forecasts, the Company has canceled certain purchase orders with its contract manufacturers that had existing inventory on hand, or on order in anticipation of the Company's earlier forecasts. Consequently, the Company accrued for vendor cancellation charges in amounts that represented management's estimate of the Company's exposure to vendors for its

73

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

inventory commitments. At December 31, 2004, accrued vendor cancellation charges were $0.5 million and the remaining $29.5 million is attributable to open purchase orders that are expected to be utilized in the normal course of business and are expected to become payable at various times throughout 2005.

On February 26, 2003, the Company entered into an agreement with Solectron Corporation (Solectron) to settle all outstanding obligations under three manufacturing agreements between the Company and Solectron. Under the terms of the settlement agreement, the Company paid Solectron approximately $3.9 million, and each party released any and all claims that it may have had against the other party. Additionally, the Company received selected inventory from Solectron. The Company previously accrued $6.0 million toward the settlement of the Solectron matter as a vendor cancellation charge in the fourth quarter of 2000 and the second quarter of 2001. In 2003, in connection with the Solectron settlement, the Company reversed $2.1 million of the accrued vendor cancellation charges included in cost of goods sold.

On September 29, 2003, the Company entered into an agreement with Flextronics (Israel) Ltd., an Israeli company (Flextronics), to purchase inventory from Flextronics and settle all outstanding claims between the Company and Flextronics. Under the terms of the settlement agreement, the Company paid Flextronics approximately $1.5 million to be applied toward the purchase of future inventory from Flextronics, if any. Additionally, each party released any and all claims that it may have had against the other party. The Company previously accrued $2.0 million toward the settlement of the Flextronics matter as a vendor cancellation charge in the second quarter of 2001. In 2003, in connection with the Flextronics settlement, the Company reversed $0.5 million of the accrued vendor cancellation charges included in cost of goods sold.

Letters of Credit

As of December 31, 2004, the Company had $0.5 million in unused outstanding letters of credit primarily required to support operating leases, which expire at various dates through 2009.

Royalties

The Company has various royalty arrangements, which require it to pay nominal amounts to various suppliers for usage of licensed property. Royalties are generally calculated on a per-unit basis, and to a lesser extent, as a percentage of sales. The Company's total accrued obligations for royalties at December 31, 2004 and 2003 were $0.4 million and $1.3 million, respectively.

The Company has purchased, through its acquisition of Radwiz Ltd. (Radwiz), certain technology that utilized funding provided by the Israeli Chief Scientist of the Ministry of Industry and Trade. The Company has committed to pay royalties to the Government of Israel on proceeds from sales of products based on this technology at rates of 3%–5% per sale. The Company does not expect sales of products using this technology to be material in 2005.

5.    Accrued Severance Pay

In June 2004, the Company entered into an employment agreement with an executive officer. The executive officer resigned effective as of October 1, 2004. The Company recorded a severance provision of $1.4 million related to termination costs for this officer in the third quarter of 2004. Most of the severance costs related to this officer were paid in the fourth quarter of 2004 with nominal amounts for employee benefits payable into the fourth quarter of 2005.

In June 2004, the Company entered into separation agreements with two other executive officers. One officer resigned in the second quarter of 2004 and the other officer resigned from the Company during the third quarter of 2004. The Company recorded a severance provision of $1.7 million related to termination costs for these officers in the second quarter of 2004. Most of the severance costs were paid in the third quarter of 2004 with nominal amounts for employee benefits payable through the third quarter of 2005.

74

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In August 2004, the Company entered into an employment agreement with another executive officer. The executive officer resigned effective as of December 31, 2004. The Company recorded a severance provision of $403,000 related to termination costs for this officer in the fourth quarter of 2004. Most of the severance costs related to this officer were paid in the first quarter of 2005 with nominal amounts for employee benefits payable into the fourth quarter of 2005.

This table summarizes the executive severance balance as of December 31, 2004 (in thousands):

|  | Executive Severance |
|---|---|
| Balance at December 31, 2003 | $    — |
| Charges | 3,451 |
| Cash payments | (3,020) |
| Balance at December 31, 2004 | $    431 |

The 2004 charge for executive severance of $3.5 million is included within restructuring charges (net), executive severance and asset write-off in the Consolidated Statement of Operations. The $0.4 million in executive severance is accrued on the Consolidated Balance Sheet within accrued restructuring and executive severance at December 31, 2004.

One of the Company's subsidiaries is subject to Israeli law and labor agreements, under which it is required to make severance payments to dismissed employees and employees leaving its employment in certain other circumstances. The subsidiaries' severance pay liability to its employees, which is calculated on the basis of the salary of each employee for the last month of the reported year multiplied by the years of such employee's employment is included in the Company's consolidated balance sheets on the accrual basis, and is partially funded by a purchase of insurance policies in the subsidiaries' name. At December 31, 2004 and 2003, $1.3 million and $1.9 million, respectively, for accrued severance pay was included in long-term obligations. In accordance with EITF No. 88-1, "Determination of Vested Benefit Obligation for a Defined Benefit Pension Plan," the Company included $0.7 million and $1.3 million relating to the amounts funded by the purchase of insurance policies for the Israeli severance liability in its consolidated balance sheets as other assets at December 31, 2004 and 2003, respectively.

6.    Restructuring Charges, net and Asset Write-offs

The Company accrues for termination costs in accordance with SFAS No. 146 "Accounting for Costs Associated with Exit or Disposal Activities," (SFAS 146) and SFAS No. 112 "Employers' Accounting for Post Employment Benefits." Liabilities are initially measured at their fair value on the date in which they are incurred based on plans approved by the Company's Board of Directors. Accrued employee termination costs principally consist of three components: 1) a lump-sum severance payment based upon years of service (e.g. two weeks per year of service); 2) COBRA insurance based on years of service and rounded up to the month; and 3) an estimate of costs for outplacement services immediately provided to the affected employees. Substantially all employees were terminated on the date of notification, so there was no additional service period required to be included in the determination of accrued termination costs. Where such services were required for a period over 60 days, the Company ratably amortized termination cost over the required service period.

2004 Restructurings

During the first quarter of 2004, the Company initiated a Board of Directors approved restructuring plan to bring operating expenses in line with revenue levels. The Company incurred restructuring charges in the amount of $3.3 million of which $1.0 million related to employee termination costs, $0.9 million related to

75

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

termination costs for an aircraft lease, and $1.4 million related to costs for excess leased facilities. The Company incurred restructuring charges in the amount of $1.1 million in the second quarter of 2004 related to additional costs for excess leased facilities, which were contemplated in the first quarter restructuring plan. In the fourth quarter to further conform the Company's expenses to its revenue and to cease investment in the cable modem termination systems (CMTS) product line the Company's Board of Directors approved a third restructuring plan with a charge in the amount of $1.3 million related to employee terminations.

In the second, third and fourth quarters of 2004, the Company re-evaluated the first and second quarter 2004 restructuring charges for the employee severance, excess facilities and the aircraft lease termination. Based on market conditions, new assumptions provided by its real-estate broker, and the terms of aircraft sublease agreement, which the Company entered into in the third quarter of 2004, the Company increased the restructuring charge for the aircraft lease by a total of $1.0 million, the facilities accrual was increased $0.3 million and employee severance accrual was decreased by $0.2 million, for the year ended December 31, 2004.

As of December 31, 2004, $3.3 million remained accrued. The employment of 168 employees had been terminated, and we had paid $1.5 million in termination costs, $1.2 million of costs related to the aircraft lease, and $0.9 million of costs related to excess leased facilities. The balance of the employee termination charges were paid in the first quarter of 2005.

The Company anticipates the remaining restructuring accrual related to the aircraft lease to be substantially utilized for servicing operating lease payments, through January 2007, and the remaining restructuring accrual related to excess leased facilities to be utilized for servicing operating lease payments or negotiating a buyout of operating lease commitments through October 2009.

The reserve for the aircraft lease approximates the difference between the Company's current costs for the aircraft lease and the estimated income derived from subleasing.

The amount of net charges accrued under the 2004 restructuring plans assumes that the Company will successfully sublease excess leased facilities. The reserve for the excess leased facilities includes the estimated income derived from subleasing, which is based on information from the Company's real-estate brokers, who estimated it based on assumptions relevant to the real estate market conditions as of the date of the Company's implementation of the restructuring plan and the time it would likely take to sublease the excess leased facilities. Even though it is the Company's intent to sublease its interests in the excess facility at the earliest possible time, the Company cannot determine with certainty a fixed date by which such events will occur, if at all. In light of this uncertainty, the Company will continue to periodically re-evaluate and adjust the accrual, as necessary.

This table summarizes the accrued restructuring balances related to the 2004 restructurings as of December 31, 2004 (in thousands):

| | Involuntary Terminations | Aircraft Lease Termination | Excess Leased Facilities | Total |
|---|---|---|---|---|
| Balance at December 31, 2003 | $ — | $ — | $ — | $ — |
| Charges | 2,297 | 934 | 2,523 | 5,754 |
| Cash payments | (1,467) | (1,194) | (850) | (3,511) |
| Changes in estimates | (238) | 952 | 325 | 1,039 |
| Balance at December 31, 2004 | $ 592 | $ 692 | $ 1,998 | $ 3,282 |

76

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

2003 Restructuring

During the first quarter of 2003, the Company's Board of Directors approved a restructuring plan to conform the Company's expenses to its revenue levels and to better position the Company for future growth and eventual profitability. The Company incurred restructuring charges in the amount of $2.7 million related to employee termination costs as part of the 2003 restructuring. As of December 31, 2003, 81 employees were terminated throughout the Company, and the Company paid $2.7 million in termination costs. In the second quarter of 2003, the Company reversed $86,000 of previously accrued termination costs due to a change in estimate. At December 31, 2004, no restructuring charges remained accrued.

2002 Restructuring

During 2002, a restructuring plan (2002 Plan) was approved by the Board of Directors and the Company incurred restructuring charges in the amount of $3.6 million of which $15,000 remained accrued at December 31, 2004, for excess leased facilities in Israel. The 2002 Plan increased the reserve for excess leased facilities due to the exiting of additional space within the same facility in Israel as in the 2001 Plan. As part of the 2002 Plan 153 employees were terminated throughout the Company. During 2004, improving real estate market conditions in Israel gave rise to the Company's improved tenant sublease assumptions, thereby creating a change in estimate of $100,000. Additionally, a reclassification between the 2002 Plan and 2001 Plan correcting the application of cash payments to the appropriate reserve, decreased the reserve for the 2002 Plan by $1.1 million. The Company currently anticipates the remaining restructuring accrual relating to excess leased facilities, will be utilized for servicing operating lease payments through 2005.

This table summarizes the accrued restructuring balances related to the 2002 restructurings as of December 31, 2004 (in thousands):

| | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Charges | $ 2,319 | $ 1,322 | $ 3,641 |
| Cash payments | (2,131) | — | (2,131) |
| Reclassifications | (100) | 100 | — |
| Balance at December 31, 2002 | 88 | 1,422 | 1,510 |
| Cash payments | (88) | (219) | (307) |
| Balance at December 31, 2003 | — | 1,203 | 1,203 |
| Cash payments | — | (1,088) | (1,088) |
| Reclassifications | — | (100) | (100) |
| Change in estimate | | | |
| Balance at December 31, 2004 | $ — | $ 15 | $ 15 |

2001 Restructuring

During 2001, the Board of Directors approved a restructuring plan (2001 Plan) and the Company incurred restructuring charges in the amount of $12.7 million of which $1.8 million remained accrued at December 31, 2004, for excess leased facilities in Israel. Terminations covering 293 technical, production and administrative employees occurred as part of the 2001 Plan. During 2004, improving real estate market conditions in Israel gave rise to the Company's improved tenant sublease assumptions thereby creating a change in estimate of $1.4 million. Additionally, a reclassification between the 2002 Plan and 2001 Plans

77

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

correcting the application of cash payments to the appropriate reserve, increased the reserve for the 2001 Plan by $1.1 million. The Company currently anticipates the remaining restructuring accrual relating to excess leased facilities, will be utilized for servicing operating lease payments through 2005.

This table summarizes the accrued restructuring balances related to the 2001 restructurings as of December 31, 2004 (in thousands):

|  | Involuntary Terminations | Excess Leased Facilities and Cancelled Contracts | Total |
|---|---|---|---|
| Charges | $        3,168 | $        9,501 | $        12,669 |
| Cash payments | (1,891) | (2,580) | (4,471) |
| Balance at December 31, 2001 | 1,277 | 6,921 | 8,198 |
| Cash payments | (100) | (2,855) | (2,955) |
| Reclassifications | (1,177) | 1,177 | — |
| Balance at December 31, 2002 | — | 5,243 | 5,243 |
| Cash payments | — | (1,685) | (1,685) |
| Change in estimate | — | (261) | (261) |
| Balance at December 31, 2003 | — | 3,297 | 3,297 |
| Cash payments | — | (1,170) | (1,170) |
| Reclassifications | — | 1,088 | 1,088 |
| Change in estimate | — | (1,377) | (1,377) |
| Balance at December 31, 2004 | $        — | $        1,838 | $        1,838 |

Asset Write-offs

As a result of CMTS product line restructuring activities in 2004, the Company recognized a fixed asset impairment charge of $2.4 million. The impairment charge reflects a write-down of the assets' carrying value to a fair value based on a third party valuation in 2004.

Primarily as a result of restructuring activities in 2003, the Company wrote off $0.4 million of fixed assets in 2003, which were determined to have no remaining useful life. As a result of restructuring activities in 2002 certain property and equipment were determined to have no remaining useful life. During 2002, $1.3 million of fixed assets were written-off. The impaired fixed assets in each period represented the net book value of idle manufacturing equipment, leasehold, and office equipment.

The Company adopted SFAS No. 142 on January 1, 2002. The Company reclassified $1.3 million of assembled workforce, net of accumulated amortization, with an indefinite life, to goodwill at the date of adoption. The Company tests goodwill for impairment using the two-step process prescribed in SFAS No. 142. The first step is a screen for potential impairment, while the second step measures the amount of the impairment, if any. Due to a difficult economic environment and heightened price competition in the modem and telecom businesses during the three months ended June 30, 2002, the Company experienced a significant drop in its market capitalization, and therefore proceeded to perform an interim test to measure goodwill and intangible assets for impairment at June 30, 2002. Based on the forecast, the estimated undiscounted future cash flows from the use of the goodwill would have been less than its carrying amount. The Company determined that the outcome of this test reflected that the fair value of the goodwill was zero. This resulted in a non-cash charge of $4.0 million to write off the remaining goodwill of which $3.0 million in

78

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

2002 was related to the Cable segment and $1.0 million was related to the former Telecom segment. Subsequent to this write-off, the Company had no intangible assets, that were deemed to have indefinite useful lives.

7.    Impairment of Long-Term Investment

The Company's long-lived assets previously included long-term equity investments. During 2002, the Company determined that one long term equity investment in a privately-held company was impaired. The investee's forecasts were not met and market conditions significantly deteriorated and accordingly, the Company recorded an impairment charge of $4.5 million. The net book value of the Company's long term equity investments was zero as of December 31, 2004 and 2003.

8.    Convertible Subordinated Notes

In July 2000, the Company issued $500 million of 5% Convertible Subordinated Notes (Notes) due in August 2007 resulting in net proceeds to the Company of approximately $484.4 million. The Notes are the Company's general unsecured obligation and are subordinated in right of payment to all existing and future senior indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are convertible into shares of the Company's common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity, unless previously redeemed or repurchased. The Company could have redeemed some or all of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued and unpaid interest, if any, if the closing price of the Company's stock exceeded 150% of the conversion price, or $126.01 for at least 20 trading days within a period of 30 consecutive trading days ending on the trading day prior to the date of mailing of the redemption notice. The Company would also make an additional payment of $193.55 per $1,000 principal amount of the Notes, less the amount of any interest actually paid on the Notes before the date of redemption. The Company may redeem the Notes at any time on or after August 7, 2003 at specified prices plus accrued and unpaid interest. Interest is payable semi-annually. Debt issuance costs related to the Notes were approximately $15.6 million and are amortized over seven years. At December 31, 2004 and 2003, accumulated amortization of debt issuance costs totaled $15.3 million and $14.5 million, respectively.

In 2002, the Company repurchased approximately $109.1 million of the Notes for $57.6 million in cash, resulting in a gain of approximately $49.1 million, net of related unamortized issuance costs of $2.4 million. In 2001, the Company repurchased approximately $325.9 million of the Notes. The Company did not repurchase any Notes during 2004 or 2003.

In April 2002, the Company adopted SFAS No. 145 and determined that the extinguishment of its debt did not meet the criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, in 2002, the Company began reporting the gain from retirement of the Notes in operating results. Approximately $65.1 million of the Notes were outstanding at December 31, 2004 and 2003.

9.    Contingencies

Litigation

Beginning in April 2000, several plaintiffs filed class action lawsuits in federal court against the Company and certain of the Company's officers and directors. Later that year, the cases were consolidated in the United States District Court, Northern District of California as In re Terayon Communication Systems, Inc. Securities Litigation. The Court then appointed lead plaintiffs who filed an amended complaint. In 2001, the Court granted in part and denied in part defendants' motion to dismiss, and plaintiffs filed a new complaint. In 2002, the Court denied defendants' motion to dismiss that complaint, which, like the earlier complaints, alleges that the defendants violated the federal securities laws by issuing materially false and misleading

79

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

statements and failing to disclose material information regarding the Company's technology. On February 24, 2003, the Court certified a plaintiff class consisting of those who purchased or otherwise acquired the Company's securities between November 15, 1999 and April 11, 2000.

On September 8, 2003, the Court heard defendants' motion to disqualify two of the lead plaintiffs and to modify the definition of the plaintiff class. On September 10, 2003, the Court issued an order vacating the hearing date for the parties' summary judgment motions, and, on September 22, 2003, the Court issued another order staying all discovery until further notice and vacating the trial date, which had been November 4, 2003.

On February 23, 2004, the Court issued an order disqualifying two of the lead plaintiffs. The order also states that plaintiffs' counsel must provide certain information to the Court about counsel's relationship with the disqualified lead plaintiffs, and it provides that defendants may serve certain additional discovery. On March 24, 2004, plaintiffs submitted certain documents to the Court in response to its order, and, on April 16, 2004, the Company responded to this submission. The Company has also initiated discovery pursuant to the Court's February 23, 2004 order.

On October 16, 2000, a lawsuit was filed against the Company and the individual defendants (Zaki Rakib, Selim Rakib and Raymond Fritz) in the California Superior Court, San Luis Obispo County. This lawsuit is titled Bertram v. Terayon Communications Systems, Inc. The factual allegations in the Bertram complaint were similar to those in the federal class action, but the Bertram complaint sought remedies under state law. Defendants removed the Bertram case to the United States District Court, Central District of California, which dismissed the complaint and transferred the case to the United States District Court, Northern District of California. That Court eventually issued an order dismissing the case. Plaintiffs have appealed this order, and their appeal was heard on April 16, 2004. On June 9, 2004, the United States Court of Appeals for the Ninth Circuit affirmed the order dismissing the Bertram case.

The Court of Appeals' opinion affirming dismissal of the Bertram case does not end the class action. The Company believes that the allegations in the class action are without merit, and we intend to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

In 2002, two shareholders filed derivative cases purportedly on behalf of the Company against certain of its current and former directors, officers, and investors. (The defendants differed somewhat in the two cases.) Since the cases were filed, the investor defendants have been dismissed without prejudice, and the lawsuits have been consolidated as Campbell v. Rakib in the California Superior Court, Santa Clara County. The Company is a nominal defendant in these lawsuits, which allege claims relating to essentially the same purportedly misleading statements that are at issue in the pending securities class action. In the securities class action, the Company disputes making any misleading statements. The derivative complaints also allege claims relating to stock sales by certain of the director and officer defendants.

The Company believes that there are many defects in the Campbell and O'Brien derivative complaints.

On January 19, 2003, Omniband Group Limited, a Russian company (Omniband) filed a request for arbitration with the Zurich Chamber of Commerce, claiming damages in an amount of $2,094,970 allegedly caused by the breach of an agreement by the Company, Terayon Communication Systems Ltd., a wholly-owned subsidiary of the Company, and Radwiz Ltd (Radwiz), a former wholly-owned subsidiary of the Company, to sell to Omniband certain equipment pursuant to an agreement between Omniband and Radwiz. On December 18, 2003, the panel of arbiters with the Zurich Chamber of Commerce allowed the arbitration proceeding to continue against Radwiz but dismissed the proceedings against the Company and Terayon Ltd. Omniband appealed the Zurich Chamber of Commerce's decision to dismiss the proceedings against the Company and Terayon Ltd., and the decision was affirmed on October 15, 2004. On January 13, 2005, the

80

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Zurich Chamber of Commerce dismissed the case with prejudice after Omniband failed to respond and pay the arbitration fees.

In January 2005, Adelphia Corporation sued the Company in the District Court of the City and County of Denver, Colorado. Adelphia's complaint alleges, among other things, breach of contract and misrepresentation in connection with the Company's sale of CMTS products to Adelphia and the Company's announcement to cease future investment in the CMTS market. Adelphia seeks unspecified monetary damages and declaratory relief. The Company filed a motion to dismiss the complaint on February 24, 2005. As the Company believes that Adelphia's allegations are without merit, it intends to contest this matter vigorously. This matter, however, could prove costly and time consuming to defend, and there can be no assurances about the eventual outcome.

From time to time, the Company receives letters claiming that the Company's technology and products may infringe on intellectual property rights of third parties. The Company also has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that the Company's technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require the Company to enter into royalty arrangements; subject the Company to damages or injunctions restricting the sale of its products; require the Company to indemnify its customers for the use of the allegedly infringing products; require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments; require the Company to redesign certain of its products; or damage the Company's reputation, any one of which could materially and adversely affect the Company's business, results of operations and financial condition.

The Company has received letters claiming that its technology infringes the intellectual property rights of others. The Company has consulted with its patent counsel and is in the process of reviewing the allegations made by such third parties. If these allegations were submitted to a court, the court could find that the Company's products infringe third party intellectual property rights. If the Company is found to have infringed third party rights, the Company could be subject to substantial damages and/or an injunction preventing the Company from conducting its business. In addition, other third parties may assert infringement claims against the Company in the future. A claim of infringement, whether meritorious or not, could be time-consuming, result in costly litigation, divert the Company's management's resources cause product shipment delays or require the Company to enter into royalty or licensing arrangements. These royalty or licensing arrangements may not be available on terms acceptable to the Company, if at all.

Furthermore, the Company has in the past agreed to, and may from time to time in the future agree to, indemnify a customer of its technology or products for claims against the customer by a third party based on claims that its technology or products infringe intellectual property rights of that third party. These types of claims, meritorious or not, can result in costly and time-consuming litigation; divert management's attention and other resources; require the Company to enter into royalty arrangements; subject the Company to damages or injunctions restricting the sale of its products; require the Company to indemnify its customers for the use of the allegedly infringing products; require the Company to refund payment of allegedly infringing products to its customers or to forgo future payments; require the Company to redesign certain of its products; or damage its reputation, any one of which could materially and adversely affect the Company's business, results of operations and financial condition.

The Company is currently a party to various other legal proceedings, in addition to those noted above, and may become involved from time to time in other legal proceedings in the future. While the Company currently believes that the ultimate outcome of these other proceedings, individually and in the aggregate, will not have a material adverse effect on its financial position or overall results of operations, litigation is subject to inherent uncertainties. Were an unfavorable ruling to occur in any of the Company's legal proceedings, there exists the

81

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

possibility of a material adverse impact on the Company's results of operations for the period in which the ruling occurs. The estimate of the potential impact on the Company's financial position and overall results of operations for any of the above legal proceedings could change in the future.

10.    Stockholders' Equity
         Common Stock Warrants

In conjunction with a 1998 preferred stock financing, the Company issued Shaw a warrant (Anti–Dilution Warrant) to purchase an indeterminate number of shares of common stock. The Anti–Dilution Warrant was exercisable at the option of Shaw during the period that Shaw owned equity in the Company and in the event the Company issued new equity securities at below the current market price defined in the Anti–Dilution Warrant. The aggregate exercise price was $0.50. The Company issued certain equity securities that, as of December 31, 2003 and 2002, required the Company to issue an additional 37,283 and 17,293 warrants, respectively, to purchase shares of common stock pursuant to the Anti–Dilution Warrant. The Company recorded expenses of approximately $45,000 and $26,000 relating to the issuance of warrants pursuant to the Anti–Dilution Warrant, in 2003 and 2002, respectively. The expense was calculated by multiplying the annualized fair market value of the Company's stock by the share dilution attributable to the Anti–Dilution Warrant. In February 2003, Shaw transferred its ownership to a third party and the Anti–Dilution Warrant expired unexercised. As of December 31, 2003, the Anti–Dilution Warrant had expired and was not exercised.

In February 2001, the Company issued a warrant to purchase 200,000 shares of the Company's common stock at a price of $5.4375 per share, the closing price of the Company's common stock on the date the warrant was issued, in connection with the December 2000 acquisition of TrueChat, Inc. (TrueChat). Under terms of the warrant 100,000 shares are vested and exercisable immediately and the remaining 100,000 shares vest and become exercisable at the rate of 1/24th per month, beginning January 31, 2001. The fair value of the warrant of approximately $0.7 million was calculated using the Black–Scholes method and was recorded as additional consideration relating to the purchase of TrueChat. As of December 31, 2003, the TrueChat warrant was exercisable for an aggregate of 200,000 shares of the Company's common stock. The TrueChat warrant expired unexercised in February 2004.
         Stockholder Rights Plan

In February 2001, the Company's Board of Directors approved the adoption of a Stockholder Rights Plan under which all stockholders of record as of February 20, 2001 received rights to purchase shares of a new series of preferred stock. The rights were distributed as a non–taxable dividend and will expire in ten years from the record date. The rights will be exercisable only if a person or group acquires 15% or more of the Company's common stock or announces a tender offer for 15% or more of the Company's common stock. If a person or group acquires 15% or more of the Company's common stock, all rightsholders except the buyer will be entitled to acquire the Company's common stock at a discount. The Board may terminate the Rights Plan at any time or redeem the rights prior to the time a person or group acquires more than 15% of the Company's common stock.

82

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Common Stock Reserved**

Common stock reserved for issuance is as follows:

| | December 31, 2004 |
|---|---|
| Common stock options | 28,719,914 |
| Employee stock purchase plan | 1,202,733 |
| Total | 29,922,647 |

**Stock Option and Stock Purchase Plans**

1995 Plan

In March 1995, the Board of Directors approved a stock option plan (1995 Plan) that authorized shares for future issuance to be granted as options to purchase shares of our common stock. As of December 31, 2004 a total of 4,229,494 shares have been authorized for issuance related to the 1995 Plan.

1997 Plan

In March 1997, the Board of Directors approved an equity incentive plan (1997 Plan) that authorized 1,600,000 shares for future issuance to be granted as options to purchase shares of our common stock. In June 1998, the Board of Directors authorized the adoption of the amended 1997 Plan, increasing the aggregate number of shares authorized for issuance under the 1997 Plan to 6,600,000 shares (5,000,000 additional shares). The amendment also provided for an increase to the authorized shares each year on January 1, starting with January 1, 1999, if the number of shares reserved for future issuance was less than 5% of our outstanding common stock, then the authorized shares would be increased to a balance equal to 5% of the common stock outstanding. There were no increases to the 1997 Plan in 1998 or 1999. On January 1, 2000, 2,384,528 shares were added to the 1997 Plan for a total of 8,984,528 shares. The 1997 Plan was amended on June 13, 2000 to increase the shares authorized for issuance by 3,770,000 additional shares and to provide for an increase in the number of shares of common stock beginning January 1, 2000 through January 1, 2007, by the lesser of 5% of the common stock outstanding on such January 1 or 3,000,000 shares. In May 2003, the Company's Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1997 Plan by 6,237,826 shares. As of December 31, 2004, a total of 15,516,702 shares have been authorized for issuance related to the 1997 Plan.

1998 Plan

In June 1998, the Board of Directors authorized the adoption of the 1998 Non-Employee Directors' Stock Option Plan (1998 Plan), pursuant to which 400,000 shares of our common stock have been reserved for future issuance to our non-employee directors. In 2002, the Board of Directors amended the 1998 Plan to increase the shares authorized for issuance by 400,000 additional shares. As of December 31, 2004, a total of 800,000 shares have been authorized for issuance related to the 1998 Plan.

1999 Plan

In September 1999, our Board of Directors authorized the adoption of the 1999 Non-Officers Equity Incentive Plan (1999 Plan), pursuant to which 6,000,000 shares of our common stock have been reserved for future issuance to our non-officer employees. Additionally, in May 2003, our Board of Directors authorized the adoption of an amendment to reduce the number of authorized shares in the 1999 Plan by 13,762,174 shares.

83

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

As of December 31, 2004, a total of 14,737,826 shares have been authorized for issuance related to the 1999 Plan.

The 1995 and 1997 Plans provide for incentive stock options or nonqualified stock options to be issued to employees, directors, and consultants of the Company. Prices for incentive stock options may not be less than the fair market value of the common stock at the date of grant. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options are immediately exercisable and vest over a period not to exceed five years from the date of grant. Any unvested stock issued is subject to repurchase by the Company at the original issuance price upon termination of the option holder's employment. Unexercised options expire ten years after the date of grant.

The 1999 Plan provides for nonqualified stock options to be issued to non–officer employees and consultants of the Company. Prices for nonqualified stock options may not be less than 85% of the fair market value of the common stock at the date of grant. Options generally vest and become exercisable over a period not to exceed five years from the date of grant. Unexercised options expire ten years after date of grant.

During the year ended December 31, 2002, the Company recorded aggregate deferred compensation of approximately $38,000 representing the difference between the grant price and the deemed fair value of the Company's common stock options granted during the period. During the years ended December 31, 2004 and 2003, the Company did not record any additional deferred compensation. The amortization of deferred compensation is being charged to operations and is being amortized over the vesting period of the options, which is typically five years. In each subsequent reporting period (through the vesting period) the remaining deferred compensation will be re-measured. For the years ended December 31, 2004, 2003, and 2002, the amortization expense was approximately $22,000, $53,000, and $0.5 million, respectively.

84

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following is a summary of additional information with respect to the 1995 Plan, the 1997 Plan, the 1998 Plan, the 1999 Plan, outstanding options assumed by the Company in conjunction with its business acquisitions and option grants made outside the plans (if any):

| | Options Available for Grant | Options Outstanding | |
| --- | --- | --- | --- |
| | | Number of Shares | Weighted-Average Exercise Price |
| Balance at December 31, 2001 | 20,397,668 | 20,007,686 | $ 9.75 |
| Options authorized | 3,400,000 | — | |
| Options granted | (1,734,400) | 1,734,400 | $ 5.40 |
| Options exercised | — | (257,521) | $ 3.95 |
| Options cancelled | 6,849,540 | (6,849,540) | $ 12.66 |
| Balance at December 31, 2002 | 28,912,806 | 14,635,025 | $ 8.05 |
| Options authorized | 3,000,000 | — | |
| Options reduced | (20,000,000) | | |
| Options granted | (7,153,320) | 7,153,320 | $ 3.05 |
| Options exercised | — | (602,272) | $ 4.20 |
| Options cancelled | 3,722,114 | (3,722,114) | $ 7.58 |
| Balance at December 31, 2003 | 8,481,600 | 17,463,959 | $ 6.20 |
| Options authorized | 3,000,000 | — | |
| Options granted | (4,738,944) | 4,738,944 | $ 1.95 |
| Options exercised | — | (225,645) | $ 2.19 |
| Options cancelled | 5,174,420 | (5,174,420) | $ 5.18 |
| Balance at December 31, 2004 | 11,917,076 | 16,802,838 | $ 5.37 |

In addition, the following table summarizes information about stock options that were outstanding and exercisable at December 31, 2004:

| | Options Outstanding | | | Options Exercisable | |
| --- | --- | --- | --- | --- | --- |
| Range of Exercise Prices | Shares Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Exercisable Options | Weighted Average Exercise Price |
| $0.00 – $1.99 | 3,777,098 | 9.48 | $ 1.74 | 162,549 | $ 1.26 |
| $2.46 – $4.26 | 3,562,965 | 8.40 | 2.44 | 1,963,959 | 2.45 |
| $4.27 – $6.50 | 3,312,257 | 7.22 | 4.59 | 1,998,086 | 4.85 |
| $6.51 – $8.39 | 5,348,910 | 6.12 | 6.80 | 5,220,337 | 6.80 |
| $8.51 – $123.50 | 801,608 | 5.34 | 29.23 | 735,213 | 30.94 |
| Total | 16,802,838 | 7.54 | $ 5.37 | 10,080,154 | $ 7.24 |

At December 31, 2004, there were no shares of the Company's common stock subject to repurchase by the Company.

Employee Stock Purchase Plan

In June 1998, the Board of Directors approved, and the Company adopted, the 1998 Employee Stock Purchase Plan (ESPP), which is designed to allow eligible employees of the Company to purchase shares of

85

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)

common stock at semi-annual intervals through periodic payroll deductions. In 2002, the ESPP was amended to add an additional 3,000,000 shares to the ESPP. An aggregate of 4,400,000 shares of common stock are reserved for the ESPP, and 3,197,267 shares have been issued through December 31, 2004. The ESPP is implemented in a series of successive offering periods, each with a maximum duration of 24 months. Eligible employees can have up to 15% of their base salary deducted that can be used to purchase shares of the common stock on specific dates determined by the Board of Directors (up to a maximum of $25,000 per year based upon the fair market value of the shares at the beginning date of the offering). The price of common stock purchased under the ESPP will be equal to 85% of the lower of the fair market value of the common stock on the commencement date of each offering period or the specified purchase date. In November 2002 the Company's Board of Directors suspended the ESPP after the final offering period expired on July 31, 2004.

The Company has elected to follow APB Opinion No. 25 and related interpretations in accounting for its employee stock plans because, as discussed below, the alternative fair value accounting provided for under SFAS No. 123 requires the use of valuation models that were not developed for use in valuing employee stock instruments. Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.

Pro forma information regarding net loss is required under SFAS No. 123 and is calculated as if the Company had accounted for its employee stock options and for its ESPP shares to be issued under the fair value method of SFAS No. 123. The fair value for employee stock options granted and ESPP shares was estimated at the date of grant based on the Black–Scholes model using the following weighted average assumptions:

| | Risk Free Interest Rates | Volatility Factor | Weighted Average Expected Life | Dividend Yield |
|---|---|---|---|---|
| **2002** | | | | |
| Stock option plans | 4.22% | 1.50 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 4.36% | 1.50 | 0.5 yrs | 0.0% |
| **2003** | | | | |
| Stock option plans | 2.67% | 0.87 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 2.88% | 1.54 | 0.5 yrs | 0.0% |
| **2004** | | | | |
| Stock option plans | 3.47% | 0.79 | 5.0 yrs | 0.0% |
| Employee stock purchase plan | 1.27% | 1.54 | 0.5 yrs | 0.0% |

As discussed above, the valuation models used under SFAS No. 123 were developed for use in estimating the fair value of traded options that have no vesting restrictions and are fully transferable. In addition, valuation models require the input of highly subjective assumptions, including the expected life of the option. Because the Company's employee stock options have characteristics significantly different from those of traded options and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of its employee stock instruments.

The options' weighted average grant date fair value, which is the value assigned to the options under SFAS No. 123, was $1.28, $2.14, and $4.98, for options granted during 2004, 2003 and 2002, respectively. The weighted average grant date fair value of ESPP shares to be issued was $0.99, $1.00 and $2.25 for the years ended December 31, 2004, 2003 and 2002, respectively.

86

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

11.    Income Taxes

For the years ended December 31, 2004, 2003 and 2002, the Company had an income tax (benefit) expense of $(76,000), $316,000 and $238,000, respectively.

|  | | Years Ended December 31, | |
|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
|  | | (In thousands) | |
| **Current:** | | | |
| Federal | $ — | $ — | $ — |
| State | 40 | — | 20 |
| Foreign | (116) | 316 | 218 |
| Total current | (76) | 316 | 238 |
| **Deferred:** | | | |
| Federal | — | — | — |
| State | — | — | — |
| Foreign | — | — | — |
| Total deferred | — | — | — |
| Total | $ (76) | $ 316 | $ 238 |

The reconciliation of income tax benefit attributable to net loss applicable to common stockholders computed at the U.S. federal statutory rates to income tax benefit (expense)(in thousands):

|  | Years Ended December 31, | | |
|  | 2004 | 2003 | 2002 |
| --- | --- | --- | --- |
| Tax benefit at U.S. statutory rate | $ (12,812) | $ (17,624) | $ (15,391) |
| Loss for which no tax benefit is currently recognizable | 12,747 | 17,536 | 15,391 |
| Other, net | (11) | 404 | 238 |
|  | $ (76) | $ 316 | $ 238 |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

87

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS— (Continued)
Significant components of the Company's deferred tax assets and liabilities as of December 31, 2003 and 2002 are as follows (in thousands):

|  | December 31, | |
|  | 2004 | 2003 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carry forwards | $ 145,066 | $ 149,862 |
| Tax credit carry forwards | 16,245 | 19,505 |
| Reserves and accruals | 10,132 | 9,949 |
| Capitalized research and development | 4,172 | 8,761 |
| Intangible asset amortization | 30,051 | 38,864 |
| Other, net | 14,891 | 12,130 |
| Gross deferred tax assets | 220,557 | 239,071 |
| Valuation allowance | (220,557) | (239,071) |
| Total deferred tax assets | $ — | $ — |

Realization of deferred tax assets is dependent on future earnings, if any, the timing and the amount of which are uncertain. Accordingly, a valuation allowance has been established to reflect these uncertainties as of December 31, 2004 and 2003. The change in the valuation allowance was a net decrease of $18.5 million and $5.7 million and a net increase of approximately $26.4 million for the years ended December 31, 2004, 2003 and 2002, respectively. Approximately $45.6 million of the valuation allowance related to stock options benefits will be credited to equity when realized.

As of December 31, 2004, the Company had federal, California and foreign net operating loss carryforwards of approximately $366.6 million, $184.3 million and $49.8 million, respectively. The Company also had federal and California tax credit carryforwards of approximately $9.1 million and $16.7 million, respectively. The federal and California net operating loss and credit carryforwards will expire at various dates beginning in the years 2005 through 2024, if not utilized. The foreign net operating losses have an unlimited carryover period.

Utilization of net operating loss and tax credit carryforwards may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of net operating loss and tax credit carry forwards before full utilization.

12.    Defined Contribution Plan

During 1995, the Company adopted a 401(k) Profit Sharing Plan and Trust that allows eligible employees to make contributions subject to certain limitations. The Company may make discretionary contributions based on profitability as determined by the Board of Directors. No amount was contributed by the Company to the plan during the years ended December 31, 2004, 2003 and 2002.

13.    Segment Information

Since late 2000, the worldwide telecom and satellite industries have experienced severe downturns that have resulted in significantly reduced purchases of new broadband equipment. Because of this overall drop in demand, the Company has refocused its efforts on the cable industry, and has significantly reduced its investment in the telecom and satellite businesses. Consequently, beginning in 2003, the Company's previously reported Telecom segment no longer meets the quantitative threshold for disclosure and the Company now operates as one business segment.

88

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The Company operates solely in one business segment, the development and marketing of CMTS, home access solutions (HAS), DVS products and related services. The Company's foreign operations consist of sales, marketing and support activities through its foreign subsidiaries. The Company's Chief Executive Officer has responsibility as the chief operating decision maker (CODM) as defined by Statement of Financial Accounting Standards Number 131, "Disclosures about Segments of an Enterprise and Related Information". The CODM reviews financial information presented on a consolidated basis, accompanied by disaggregated information about revenues and certain direct expenses by geographic region for purposes of making operating decisions and assessing financial performance. The Company's assets are primarily located in its corporate office in the United States and are not allocated to any specific region, therefore the Company does not produce reports for, or measure the performance of, its geographic regions based on any asset-based metrics. As a result, geographic information is presented only for revenues and long-lived assets.

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (In thousands) | | |
| **Geographic areas** | | | |
| Revenues: | | | |
| United States | $ 83,212 | $ 74,341 | $ 41,150 |
| Americas, excluding United States | 4,126 | 3,713 | 20,530 |
| EMEA excluding Israel | 29,348 | 17,635 | 11,381 |
| Israel | 6,681 | 7,038 | 8,283 |
| Asia excluding Japan | 17,999 | 9,575 | 36,214 |
| Japan | 9,172 | 21,183 | 11,845 |
| **Total** | $ 150,538 | $ 133,485 | $ 129,403 |

| | December 31, | |
|---|---|---|
| | 2004 | 2003 |
| | (In thousands) | |
| **Long-lived assets** | | |
| United States | $ 4,423 | $ 9,555 |
| Americas, excluding United States | 402 | 810 |
| EMEA excluding Israel | 131 | 176 |
| Israel | 687 | 1,157 |
| Asia | 117 | 173 |
| **Total long-lived assets** | 5,760 | 11,871 |
| Total current assets | 137,625 | 191,348 |
| Other assets | 10,349 | 12,021 |
| Total assets | $ 153,734 | $ 215,240 |

Two customers, Adelphia and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2004; 18% and 12%, respectively. Three customers, Adelphia, Cross Beam Networks and Comcast accounted for more than 10% of total revenues for the year ended December 31, 2003; 22%, 16% and 13%, respectively. Three customers, Comcast, Harmonic and Sumitronics, accounted for 10% or more of total accounts receivable for the year ended December 31, 2004; 18%, 16% and 10%, respectively and two customers, Adelphia and Comcast, accounted for 10% of more of total accounts receivable for the year ended December 31, 2003; 24% and 20%, respectively.

89

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

14.    Related Party Transactions

During the years ended December 31, 2004, 2003 and 2002, the Company recognized revenue of $9.9 million, $4.7 million and $9.1 million, respectively in connection with product shipments made to related parties. Related party revenues in 2004 were from Harmonic, Inc. (Harmonic). Related party revenues in 2003 and 2002 included revenues from Harmonic and Rogers Communications, Inc. (Rogers). Lewis Solomon, a member of the Company's board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2004 and 2003. Alek Krstajic, another member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. Neither of these related parties are a supplier to the Company.

Cost of related party product revenues in the Company's consolidated statements of operations consists of direct and indirect product costs. Accounts receivable from Rogers and Harmonic totaled approximately $3.1 million and $0.6 million at December 31, 2004 and 2003, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against related party revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." The Company charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003. Amounts charged against total revenues in the year ended December 31, 2002 and December 31, 2003, totaled approximately $2.8 million and $5.6 million, respectively. Of the co-marketing amortization charged to total revenues, $0.15 million and $0.3 million were charged to related party revenues in the year ended 2003 and 2002, respectively. No further amounts of these co-marketing arrangements are included in other current assets at December 31, 2003 and no further amortization occurred in 2004.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Alek Krstajic is the founder and President of Team Honor.

15.    Product Warranties

The Company provides for estimated product warranty expenses when it sells the related products. Because warranty estimates are forecasts that are based on the best available information — mostly historical claims experience — claims costs may differ from amounts provided. An analysis of changes in the liability for product warranties is as follows (in thousands):

| | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Settlements | Balance at End of Period |
|---|---|---|---|---|
| Year ended December 31, 2002 | | | | |
| Accrued warranty expenses | $    8,368 | 2,730 | (2,491) | $    8,607 |
| Year ended December 31, 2003 | | | | |
| Accrued warranty expenses | $    8,607 | 2,287 | (5,385) | $    5,509 |
| Year ended December 31, 2004 | | | | |
| Accrued warranty expenses | $    5,509 | 1,460 | (3,099) | $    3,870 |

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Guarantees, Including Indirect Guarantees of Indebtedness of Others

In addition to product warranties, the Company, from time to time, in the normal course of business, indemnifies other parties with whom it enters into contractual relationships, including customers, lessors, and parties to other transactions with the Company, with respect to certain matters. These obligations primarily relate to certain agreements with the Company's officers, directors and employees, under which the Company may be required to indemnify such persons for liabilities arising out of their employment relationship. The Company has agreed to hold the other party harmless against specified losses, such as those arising from a breach of representations or covenants, third party claims that the Company's products when used for their intended purpose(s) infringe the intellectual property rights of such third party or other claims made against certain parties. It is not possible to determine the maximum potential amount of liability under these indemnification obligations due to the limited history of prior indemnification claims and the unique facts and circumstances that are likely to be involved in each particular claim. Historically, payments made by the Company under these obligations were not material and no liabilities have been recorded for these obligations on the balance sheets as of December 31, 2004 or 2003.

16.    Sale of Certain Assets

In July 2003, the Company entered into an agreement with Verilink Corporation (Verilink) to sell certain assets to Verilink for up to a maximum of $0.9 million. The Company received $0.45 million in July 2003 and an additional $0.13 million by year end December 31, 2003. During 2004, the Company received an additional $0.11 million toward the asset sale. The assets were originally acquired through the Company's acquisition of Access Network Electronics (ANE) in February 2000. Additionally, Verilink agreed to purchase at least $2.1 million of related inventory from the Company on or before December 31, 2004. As of December 31, 2004 and 2003, Verilink had purchased $0.56 million and $0.73 million, respectively, of this inventory.

As part of this agreement, Verilink agreed to assume all warranty obligations related to ANE products sold prior to, on, or after July 2003. The Company agreed to reimburse Verilink for up to $2.4 million of certain warranty obligations for ANE products sold prior to July 2003. Further, Verilink assumed the obligation for one of the Company's operating leases, previously accrued as restructuring, resulting in a recovery of restructuring charges of $0.3 million in 2003.

On April 2, 2004, the Company sold all of its ownership in Radwiz, Ltd., Ultracom Communications Holdings Ltd. and Combox Ltd. to a third party for a cash payment of $0.15 million. In connection with this disposition, the acquirer received obsolete inventories with no book value, $0.2 million of selected net assets, and assumed $1.35 million of net liabilities related to these subsidiaries. The Company recorded a net gain of $1.5 million, which is included as a component of other income (expense) in the accompanying condensed consolidated statement of operations.

17.    Subsequent Events

On February 8, 2005, the Company announced the signing of an agreement with ATI Technologies, Inc (ATI) relating to the sale of certain Company cable modem semiconductor assets. The agreement calls for ATI to acquire the Company's cable modem silicon intellectual property and related software, assume a lease and hire approximately twenty-five employees from the Company's design team. Under the terms of the agreement, ATI will pay the Company $6.95 million upon the closing, with a balance of $7.05 million subject to the Company achieving milestones for certain conditions, services and deliverables spanning a period of 15 months. On March 9, 2005 ATI and the Company signed closing documents for this agreement. Upon closing the Company received $8.6 million in cash which was comprised of the $6.95 million for the initial payment and $1.65 million of the $1.9 million for having met the first milestone. The difference between the $1.9 million milestone and the payment of $1.65 million was money retained by ATI to pay for Company

91

Table of Contents

TERAYON COMMUNICATION SYSTEMS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

funded retention bonuses for employees that accepted employment with ATI. The balance of $5.2 million will be subject to the Company achieving the remaining milestones over the subsequent 15 months. The maximum liability for the Company is set at $11.5 million or the total amount of the purchase price paid by ATI plus $1.5 million which would be offset from the purchase price. Total purchase price payable to the Company upon achieving all terms and conditions is $14.0 million. Also set forth in this agreement are representations and warranties made by the Company that may cause it to incur liabilities and penalties arising out of the Company's failure to meet certain conditions and milestones.

18.    Unaudited Quarterly Financial Data

Summarized quarterly financial data for 2004 and 2003 is as follows (in thousands, except per share data):

|  | Quarter | | | |
|---|---|---|---|---|
| 2004 | First | Second | Third | Fourth |
| Total revenues | $ 41,168 | $ 42,782 | $ 37,202 | $ 29,386 |
| Gross profit | 12,397 | 15,122 | 6,270 | 9,829 |
| Restructuring charges (net), executive severance and asset write-offs(1) | 3,367 | 3,579 | 1,463 | 2,750 |
| Net loss | (10,247) | (4,861) | (13,520) | (7,903) |
| Basic and diluted net loss per share | $ (0.14) | $ (0.06) | $ (0.18) | $ (0.10) |

|  | Quarter | | | |
|---|---|---|---|---|
| 2003 | First | Second | Third | Fourth |
| Total revenues | $ 22,268 | $ 30,599 | $ 37,628 | $ 42,990 |
| Gross profit | 2,675 | 6,863 | 10,194 | 12,719 |
| Restructuring charges (net), executive severance and asset write-offs(1) | (3,162) | 115 | 244 | — |
| Net loss | (23,989) | (13,139) | (7,210) | (6,015) |
| Basic and diluted net loss per share | $ (0.33) | $ (0.18) | $ (0.10) | $ (0.08) |

Loss per share are computed independently for each of the quarters presented. The sum of the quarterly loss per share in 2004 and 2003 does not necessarily equal the total computed for the year due to changes in shares outstanding and rounding.

(1)    See Note 6 for an explanation for restructuring charges and asset write-offs.

92

# Exhibit E

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark One)

☑    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE TRANSITION PERIOD FROM        TO        .

COMMISSION FILE NUMBER: 0000-24647

# TERAYON COMMUNICATION SYSTEMS, INC.
(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| Delaware<br>(State or Other Jurisdiction of<br>Incorporation or Organization) | 77-0328533<br>(IRS Employer<br>Identification No.) |

2450 WALSH AVENUE
SANTA CLARA, CALIFORNIA 95051
(408) 235-5500
(Address, Including Zip Code, and Telephone Number,
Including Area Code, of the Registrant's Principal Executive Offices)

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title<br>of<br>Each<br>Class | Name<br>of<br>Each<br>Exchange<br>on<br>Which<br>Registered: |
|---|---|
| None | None |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, par value $0.001 per share
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirement for the past 90 days.  Yes ☐   No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one).
Large Accelerated Filer ☐    Accelerated Filer ☑    Non-Accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).  Yes ☐   No ☑

The aggregate market value of the voting and non-voting stock held by non-affiliates of the registrant was approximately $186,172,000 on June 30, 2006. For purposes of this calculation only, the registrant has excluded stock beneficially owned by directors and officers and owners of more than ten percent of its common stock. By doing so, the registrant does not admit that such persons are affiliates within the meaning of Rule 405 under the Securities Act of 1933 or for any other purpose.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: Common Stock, $0.001 par value, 77,637,177 shares outstanding as of November 30, 2006.

DOCUMENTS INCORPORATED BY REFERENCE

None

INDEX

TERAYON COMMUNICATION SYSTEMS, INC.

| | | Page No. |
|---|---|---|
| | Introductory Note | 2 |
| | **PART I** | |
| Item 1. | Business | 10 |
| Item 1A. | Risk Factors | 20 |
| Item 1B. | Unresolved Staff Comments | 42 |
| Item 2. | Properties | 42 |
| Item 3. | Legal Proceedings | 42 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 45 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 46 |
| Item 6. | Selected Financial Data | 48 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
| Item 8. | Financial Statements and Supplementary Data | 108 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 186 |
| Item 9A. | Controls and Procedures | 186 |
| Item 9B. | Other Information | 194 |
| | **PART III** | |
| Item 10. | Directors and Executive Officers of the Registrant | 194 |
| Item 11. | Executive Compensation | 198 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 203 |
| Item 13. | Certain Relationships and Related Transactions | 204 |
| Item 14. | Principal Accountant Fees and Services | 204 |
| | **PART IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | 205 |
| Signatures | | 209 |
| EXHIBIT 10.18 | | |
| EXHIBIT 10.27 | | |
| EXHIBIT 10.28 | | |
| EXHIBIT 10.31 | | |
| EXHIBIT 10.32 | | |
| EXHIBIT 10.33 | | |
| EXHIBIT 10.34 | | |
| EXHIBIT 10.35 | | |
| EXHIBIT 21.1 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32.1 | | |
| EXHIBIT 32.2 | | |
| EXHIBIT 99.1 | | |
| EXHIBIT 99.2 | | |
| EXHIBIT 99.3 | | |

INTRODUCTORY NOTE

The Company's Annual Report on Form 10-K (Form 10-K) for the year ended December 31, 2005, includes restated and audited consolidated financial statements for the years ended December 31, 2004 and 2003, restated financial statements for the year ended December 31, 2002, and adjusted financial statements for the year ended December 31, 2001. This Form 10-K also includes information for the quarterly periods ended September 30, 2005 and December 31, 2005 and the restated quarterly information for the first two quarters of 2005 and for the four quarters of 2004. This information is disclosed in Note 3, "Restatement of Consolidated Financial Statements," and Note 18, "2005 Unaudited Condensed Consolidated Quarterly Information," to Consolidated Financial Statements.

Table of Contents

Item 6.    Selected Financial Data

The following selected consolidated financial data has been restated or adjusted, as applicable, and is derived from our consolidated financial statements and should be read in conjunction with the consolidated financial statements and notes thereto and with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other financial data included elsewhere in this report. Our historical results of operations are not necessarily indicative of results of operations to be expected for any future period. We have not amended our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10-K.

See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements for more detailed information regarding the restatement of our consolidated financial statements for the years ended December 31, 2005, 2004 and 2003 and our selected consolidated financial data as of and for the years ended December 31, 2005, 2004, 2003, 2002 and 2001.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | (as restated)(1) | (as restated)(1) | (as restated) | (as adjusted)(5) |
| | | | (in thousands, except per share data) | | |
| Consolidated statement of operations data: | | | | | |
| Revenues | $ 90,664 | $ 136,484 | $ 130,187 | $ 130,730 | $ 279,481 |
| Cost of goods sold | 55,635 | 101,887 | 103,835 | 101,808 | 263,117 |
| Gross profit | 35,029 | 34,597 | 26,352 | 28,922 | 16,364 |
| Operating expenses | | | | | |
| Research and development | 17,650 | 33,199 | 42,634 | 58,696 | 79,927 |
| Sales and marketing | 22,534 | 24,145 | 26,781 | 35,704 | 55,701 |
| General and administrative | 20,356 | 12,039 | 11,934 | 15,639 | 33,163 |
| Goodwill amortization | — | — | — | — | 25,410 |
| Restructuring charges, executive severance and asset write-offs(2) | 2,257 | 12,336 | 2,803 | 8,922 | 587,149 |
| Total operating expenses | 62,797 | 81,719 | 84,152 | 118,961 | 781,350 |
| Loss from operations | (27,768) | (47,122) | (57,800) | (90,039) | (764,986) |
| Interest income (expense) and other income (expense), net | 966 | (59) | 1,891 | (618) | 1,645 |
| Gain on early extinguishment of debt(3) | — | — | — | 50,983 | 192,303 |
| Income tax benefit (expense) | (149) | 76 | (316) | (238) | 13,915 |
| Net loss | $ (26,951) | $ (47,105) | $ (56,225) | $ (39,912) | $ (557,123) |
| Basic and diluted net loss per share | $ (0.35) | $ (0.62) | $ (0.76) | $ (0.55) | $ (8.17) |
| Shares used in computing basic and diluted net loss per share(4) | 77,154 | 75,751 | 74,074 | 72,718 | 68,164 |
| Consolidated Balance Sheet Data: | | | | | |
| Cash, cash equivalents and short-term investments | $ 101,301 | $ 97,735 | $ 138,640 | $ 206,503 | $ 333,888 |
| Working capital | 22,046 | 107,052 | 138,035 | 178,091 | 320,150 |
| Total assets | 146,648 | 156,981 | 213,099 | 279,169 | 469,981 |
| Convertible debentures | 65,367 | 65,588 | 65,809 | 66,030 | 177,368 |
| Long-term obligations (less current portion) | 1,455 | 2,076 | 1,356 | 1,936 | 181,868 |
| Accumulated deficit | (1,062,438) | (1,035,487) | (988,382) | (932,157) | (892,245) |
| Total stockholders' equity | 20,657 | 44,943 | 90,563 | 142,191 | 181,052 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements.

Table of Contents

(2)  See Note 6, "Accrued Severance Pay," and Note 7, "Restructuring Charges and Asset Write-offs," to Consolidated Financial Statements for an explanation for restructuring charges, executive severance and asset write-offs.

(3)  See Note 8, "Convertible Subordinated Notes," to Consolidated Financial Statements for an explanation of the repurchase of subordinated convertible notes and reclassification of related gains.

(4)  See Note 2, "Summary of Significant Accounting Policies," to Consolidated Financial Statements for an explanation of the method employed to determine the number of shares used to compute per share data.

(5)  We made three adjustments to the financial statements for the year ended December 31, 2001 which resulted in a decrease in accumulated net loss of $6.7 million. The largest adjustment of $7.9 million gain related to the redemption of a portion of the embedded derivative (Issuer Call Option) contained in our $500.0 million of 5% convertible subordinated Notes due August 2007 (Notes) and the remaining $1.9 million and $0.6 million related to our analysis of the allowance for doubtful accounts and an adjustment for a previously recorded tax accrual, respectively. During 2001, we repurchased $325.9 million of face value of Notes, requiring $7.0 million of the bond premium to be redeemed. An additional $1.0 million was recorded to reflect the amortization of the bond premium. As part of our review of the allowance for doubtful accounts, we determined that an adjustment to increase bad debt expense and the corresponding allowance for doubtful accounts by $1.9 million was necessary for the year ended December 31, 2001. In 2001, we recorded a foreign income tax contingent expense to accrue for potential tax liabilities related to post-acquisition activities of foreign subsidiaries. During the restatement process, it was determined that this original accrual was not substantiated and accordingly, should not have been recorded, and we adjusted the balance accordingly as of December 31, 2001.

49

# Exhibit F

| Date | Open | High | Low | Close | Volume | Adj Close |
|------|------|------|-----|-------|--------|-----------|
| 3/31/2006 | 1.85 | 1.93 | 1.8 | 1.83 | 660400 | 1.83 |
| 3/30/2006 | 1.89 | 1.91 | 1.8 | 1.86 | 459100 | 1.86 |
| 3/29/2006 | 1.93 | 1.95 | 1.75 | 1.91 | 1146200 | 1.91 |
| 3/28/2006 | 1.94 | 2.05 | 1.94 | 1.96 | 289900 | 1.96 |
| 3/27/2006 | 2.01 | 2.02 | 1.92 | 1.95 | 302300 | 1.95 |
| 3/24/2006 | 2.07 | 2.08 | 2 | 2.01 | 576500 | 2.01 |
| 3/23/2006 | 2.05 | 2.19 | 2 | 2.05 | 850100 | 2.05 |
| 3/22/2006 | 1.78 | 2.01 | 1.73 | 1.88 | 1407300 | 1.88 |
| 3/21/2006 | 2.2 | 2.2 | 1.88 | 1.89 | 2954900 | 1.89 |
| 3/20/2006 | 2.26 | 2.28 | 2.1 | 2.22 | 862300 | 2.22 |
| 3/17/2006 | 2.31 | 2.35 | 2.27 | 2.29 | 692400 | 2.29 |
| 3/16/2006 | 2.32 | 2.32 | 2.21 | 2.31 | 297700 | 2.31 |
| 3/15/2006 | 2.32 | 2.33 | 2.24 | 2.31 | 231200 | 2.31 |
| 3/14/2006 | 2.28 | 2.33 | 2.25 | 2.3 | 196100 | 2.3 |
| 3/13/2006 | 2.3 | 2.34 | 2.25 | 2.29 | 290900 | 2.29 |
| 3/10/2006 | 2.25 | 2.27 | 2.16 | 2.26 | 254500 | 2.26 |
| 3/9/2006 | 2.26 | 2.35 | 2.2 | 2.25 | 475000 | 2.25 |
| 3/8/2006 | 2.18 | 2.33 | 2.18 | 2.24 | 459500 | 2.24 |
| 3/7/2006 | 2.23 | 2.24 | 2.16 | 2.18 | 436600 | 2.18 |
| 3/6/2006 | 2.31 | 2.33 | 2.23 | 2.23 | 918500 | 2.23 |
| 3/3/2006 | 2.38 | 2.43 | 2.26 | 2.27 | 1266300 | 2.27 |
| 3/2/2006 | 2.25 | 2.61 | 2.16 | 2.33 | 4873200 | 2.33 |
| 3/1/2006 | 2.66 | 2.82 | 2.66 | 2.7 | 641100 | 2.7 |
| 2/28/2006 | 2.81 | 2.84 | 2.65 | 2.68 | 1043500 | 2.68 |
| 2/27/2006 | 2.55 | 2.91 | 2.51 | 2.83 | 3214800 | 2.83 |
| 2/24/2006 | 2.51 | 2.61 | 2.44 | 2.52 | 263900 | 2.52 |
| 2/23/2006 | 2.47 | 2.54 | 2.42 | 2.5 | 335800 | 2.5 |
| 2/22/2006 | 2.45 | 2.48 | 2.4 | 2.45 | 140700 | 2.45 |
| 2/21/2006 | 2.37 | 2.49 | 2.35 | 2.45 | 358500 | 2.45 |
| 2/17/2006 | 2.42 | 2.45 | 2.3 | 2.38 | 256400 | 2.38 |
| 2/16/2006 | 2.38 | 2.45 | 2.3 | 2.4 | 317700 | 2.4 |
| 2/15/2006 | 2.29 | 2.36 | 2.22 | 2.36 | 330500 | 2.36 |
| 2/14/2006 | 2.22 | 2.35 | 2.21 | 2.29 | 237000 | 2.29 |
| 2/13/2006 | 2.25 | 2.26 | 2.15 | 2.23 | 108900 | 2.23 |
| 2/10/2006 | 2.23 | 2.27 | 2.17 | 2.24 | 238000 | 2.24 |
| 2/9/2006 | 2.19 | 2.28 | 2.19 | 2.25 | 366500 | 2.25 |
| 2/8/2006 | 2.24 | 2.32 | 2.12 | 2.21 | 257900 | 2.21 |
| 2/7/2006 | 2.24 | 2.35 | 2.16 | 2.26 | 213500 | 2.26 |
| 2/6/2006 | 2.17 | 2.29 | 2.13 | 2.26 | 155900 | 2.26 |
| 2/3/2006 | 2.23 | 2.29 | 2.13 | 2.19 | 236800 | 2.19 |
| 2/2/2006 | 2.35 | 2.39 | 2.25 | 2.25 | 230700 | 2.25 |
| 2/1/2006 | 2.37 | 2.39 | 2.28 | 2.36 | 314900 | 2.36 |
| 1/31/2006 | 2.41 | 2.44 | 2.35 | 2.39 | 392100 | 2.39 |
| 1/30/2006 | 2.34 | 2.44 | 2.29 | 2.43 | 1025100 | 2.43 |
| 1/27/2006 | 2.24 | 2.33 | 2.1 | 2.31 | 1373500 | 2.31 |
| 1/26/2006 | 2.03 | 2.28 | 2.01 | 2.23 | 897800 | 2.23 |
| 1/25/2006 | 2.06 | 2.1 | 2.02 | 2.05 | 223700 | 2.05 |
| 1/24/2006 | 2 | 2.05 | 1.97 | 2.05 | 383400 | 2.05 |
| 1/23/2006 | 2.12 | 2.13 | 2 | 2.02 | 373600 | 2.02 |
| 1/20/2006 | 2 | 2.15 | 1.97 | 2.08 | 1102000 | 2.08 |
| 1/19/2006 | 1.95 | 1.99 | 1.92 | 1.98 | 507700 | 1.98 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/18/2006 | 1.71 | 1.93 | 1.66 | 1.9 | 1336300 | 1.9 |
| 1/17/2006 | 1.87 | 1.92 | 1.63 | 1.75 | 2152300 | 1.75 |
| 1/13/2006 | 1.99 | 1.99 | 1.86 | 1.91 | 2421300 | 1.91 |
| 1/12/2006 | 2 | 2.01 | 1.94 | 1.97 | 568800 | 1.97 |
| 1/11/2006 | 2 | 2.05 | 1.83 | 2 | 2454700 | 2 |
| 1/10/2006 | 2.1 | 2.13 | 2.02 | 2.06 | 713100 | 2.06 |
| 1/9/2006 | 2.07 | 2.13 | 2.07 | 2.13 | 232900 | 2.13 |
| 1/6/2006 | 2.19 | 2.2 | 2.07 | 2.08 | 593200 | 2.08 |
| 1/5/2006 | 2.13 | 2.19 | 2.13 | 2.15 | 296200 | 2.15 |
| 1/4/2006 | 2.29 | 2.32 | 2.15 | 2.15 | 542400 | 2.15 |
| 1/3/2006 | 2.28 | 2.31 | 2.19 | 2.26 | 608500 | 2.26 |
| 12/30/2005 | 2.21 | 2.33 | 2.2 | 2.31 | 569800 | 2.31 |
| 12/29/2005 | 2.29 | 2.42 | 2.23 | 2.24 | 713800 | 2.24 |
| 12/28/2005 | 2.25 | 2.39 | 2.25 | 2.31 | 348300 | 2.31 |
| 12/27/2005 | 2.26 | 2.35 | 2.24 | 2.28 | 204800 | 2.28 |
| 12/23/2005 | 2.38 | 2.4 | 2.33 | 2.34 | 101800 | 2.34 |
| 12/22/2005 | 2.27 | 2.39 | 2.24 | 2.37 | 163800 | 2.37 |
| 12/21/2005 | 2.28 | 2.37 | 2.25 | 2.29 | 437500 | 2.29 |
| 12/20/2005 | 2.17 | 2.31 | 2.16 | 2.29 | 445700 | 2.29 |
| 12/19/2005 | 2.24 | 2.28 | 2.18 | 2.18 | 225800 | 2.18 |
| 12/16/2005 | 2.34 | 2.37 | 2.23 | 2.27 | 690900 | 2.27 |
| 12/15/2005 | 2.27 | 2.32 | 2.18 | 2.31 | 337000 | 2.31 |
| 12/14/2005 | 2.21 | 2.3 | 2.18 | 2.29 | 349600 | 2.29 |
| 12/13/2005 | 2.19 | 2.25 | 2.13 | 2.22 | 744300 | 2.22 |
| 12/12/2005 | 2.35 | 2.37 | 2.15 | 2.21 | 757400 | 2.21 |
| 12/9/2005 | 2.12 | 2.39 | 2.04 | 2.35 | 668600 | 2.35 |
| 12/8/2005 | 2.02 | 2.13 | 1.97 | 2.13 | 510400 | 2.13 |
| 12/7/2005 | 2.09 | 2.09 | 2.01 | 2.03 | 266900 | 2.03 |
| 12/6/2005 | 2.03 | 2.11 | 2.01 | 2.07 | 395300 | 2.07 |
| 12/5/2005 | 2.06 | 2.09 | 2.01 | 2.04 | 281100 | 2.04 |
| 12/2/2005 | 2.09 | 2.13 | 2.06 | 2.09 | 411600 | 2.09 |
| 12/1/2005 | 2.05 | 2.16 | 2.05 | 2.11 | 571200 | 2.11 |
| 11/30/2005 | 2.08 | 2.13 | 1.98 | 2.07 | 1040300 | 2.07 |
| 11/29/2005 | 2.23 | 2.23 | 2.02 | 2.11 | 922000 | 2.11 |
| 11/28/2005 | 2.38 | 2.4 | 2.18 | 2.24 | 859600 | 2.24 |
| 11/25/2005 | 2.39 | 2.44 | 2.37 | 2.37 | 99300 | 2.37 |
| 11/23/2005 | 2.52 | 2.52 | 2.36 | 2.42 | 415700 | 2.42 |
| 11/22/2005 | 2.38 | 2.59 | 2.36 | 2.55 | 436400 | 2.55 |
| 11/21/2005 | 2.45 | 2.46 | 2.36 | 2.43 | 356100 | 2.43 |
| 11/18/2005 | 2.44 | 2.59 | 2.4 | 2.43 | 504400 | 2.43 |
| 11/17/2005 | 2.38 | 2.47 | 2.35 | 2.41 | 350900 | 2.41 |
| 11/16/2005 | 2.35 | 2.41 | 2.32 | 2.38 | 313000 | 2.38 |
| 11/15/2005 | 2.4 | 2.41 | 2.31 | 2.37 | 292100 | 2.37 |
| 11/14/2005 | 2.34 | 2.5 | 2.32 | 2.39 | 448900 | 2.39 |
| 11/11/2005 | 2.29 | 2.36 | 2.29 | 2.31 | 541400 | 2.31 |
| 11/10/2005 | 2.32 | 2.36 | 2.22 | 2.31 | 715300 | 2.31 |
| 11/9/2005 | 2.26 | 2.39 | 2.23 | 2.34 | 478500 | 2.34 |
| 11/8/2005 | 2.37 | 2.37 | 2.17 | 2.25 | 2538400 | 2.25 |
| 11/7/2005 | 2.4 | 2.61 | 2.36 | 2.57 | 903400 | 2.57 |
| 11/4/2005 | 2.58 | 2.62 | 2.36 | 2.36 | 666100 | 2.36 |
| 11/3/2005 | 2.6 | 2.66 | 2.53 | 2.59 | 497900 | 2.59 |
| 11/2/2005 | 2.59 | 2.59 | 2.53 | 2.58 | 406700 | 2.58 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/1/2005 | 2.67 | 2.68 | 2.53 | 2.57 | 696300 | 2.57 |
| 10/31/2005 | 2.59 | 2.69 | 2.57 | 2.69 | 748700 | 2.69 |
| 10/28/2005 | 2.39 | 2.65 | 2.38 | 2.65 | 1592400 | 2.65 |
| 10/27/2005 | 2.66 | 2.66 | 2.38 | 2.39 | 2135600 | 2.39 |
| 10/26/2005 | 2.95 | 2.95 | 2.55 | 2.64 | 1572100 | 2.64 |
| 10/25/2005 | 2.93 | 2.95 | 2.74 | 2.94 | 882200 | 2.94 |
| 10/24/2005 | 3.05 | 3.1 | 2.89 | 2.95 | 828800 | 2.95 |
| 10/21/2005 | 3.14 | 3.2 | 3.03 | 3.05 | 552100 | 3.05 |
| 10/20/2005 | 3.27 | 3.33 | 3.14 | 3.14 | 237600 | 3.14 |
| 10/19/2005 | 3.2 | 3.29 | 3 | 3.26 | 819200 | 3.26 |
| 10/18/2005 | 3.47 | 3.5 | 3.22 | 3.22 | 792900 | 3.22 |
| 10/17/2005 | 3.57 | 3.58 | 3.3 | 3.51 | 419200 | 3.51 |
| 10/14/2005 | 3.37 | 3.57 | 3.34 | 3.57 | 675500 | 3.57 |
| 10/13/2005 | 3.26 | 3.5 | 3.15 | 3.4 | 1405600 | 3.4 |
| 10/12/2005 | 3.46 | 3.48 | 3.23 | 3.27 | 1047100 | 3.27 |
| 10/11/2005 | 3.55 | 3.57 | 3.42 | 3.49 | 492000 | 3.49 |
| 10/10/2005 | 3.6 | 3.65 | 3.49 | 3.53 | 822200 | 3.53 |
| 10/7/2005 | 3.59 | 3.68 | 3.57 | 3.62 | 171000 | 3.62 |
| 10/6/2005 | 3.6 | 3.65 | 3.5 | 3.56 | 595300 | 3.56 |
| 10/5/2005 | 3.81 | 3.81 | 3.6 | 3.63 | 728600 | 3.63 |
| 10/4/2005 | 3.89 | 3.95 | 3.78 | 3.79 | 508700 | 3.79 |
| 10/3/2005 | 3.91 | 3.92 | 3.77 | 3.84 | 467400 | 3.84 |
| 9/30/2005 | 3.88 | 3.95 | 3.76 | 3.9 | 478600 | 3.9 |
| 9/29/2005 | 3.74 | 3.93 | 3.65 | 3.9 | 681800 | 3.9 |
| 9/28/2005 | 3.83 | 3.87 | 3.7 | 3.76 | 575100 | 3.76 |
| 9/27/2005 | 3.89 | 3.91 | 3.8 | 3.8 | 546700 | 3.8 |
| 9/26/2005 | 4 | 4.04 | 3.84 | 3.9 | 1344300 | 3.9 |
| 9/23/2005 | 3.88 | 3.9 | 3.8 | 3.88 | 592200 | 3.88 |
| 9/22/2005 | 3.96 | 4 | 3.7 | 3.83 | 894700 | 3.83 |
| 9/21/2005 | 3.99 | 3.99 | 3.76 | 3.81 | 1072200 | 3.81 |
| 9/20/2005 | 3.92 | 4.1 | 3.84 | 3.92 | 1679000 | 3.92 |
| 9/19/2005 | 3.81 | 3.96 | 3.7 | 3.91 | 1315000 | 3.91 |
| 9/16/2005 | 3.67 | 3.8 | 3.6 | 3.8 | 1572500 | 3.8 |
| 9/15/2005 | 3.57 | 3.62 | 3.54 | 3.62 | 617500 | 3.62 |
| 9/14/2005 | 3.52 | 3.65 | 3.52 | 3.58 | 1005000 | 3.58 |
| 9/13/2005 | 3.75 | 3.75 | 3.54 | 3.54 | 293400 | 3.54 |
| 9/12/2005 | 3.64 | 3.72 | 3.54 | 3.67 | 999500 | 3.67 |
| 9/9/2005 | 3.52 | 3.67 | 3.41 | 3.62 | 1508000 | 3.62 |
| 9/8/2005 | 3.4 | 3.56 | 3.37 | 3.54 | 745100 | 3.54 |
| 9/7/2005 | 3.43 | 3.43 | 3.35 | 3.4 | 272300 | 3.4 |
| 9/6/2005 | 3.28 | 3.46 | 3.28 | 3.44 | 962700 | 3.44 |
| 9/2/2005 | 3.3 | 3.35 | 3.27 | 3.33 | 604300 | 3.33 |
| 9/1/2005 | 3.3 | 3.33 | 3.27 | 3.3 | 360700 | 3.3 |
| 8/31/2005 | 3.29 | 3.35 | 3.28 | 3.31 | 425000 | 3.31 |
| 8/30/2005 | 3.34 | 3.39 | 3.3 | 3.31 | 385700 | 3.31 |
| 8/29/2005 | 3.33 | 3.35 | 3.2 | 3.33 | 496900 | 3.33 |
| 8/26/2005 | 3.37 | 3.37 | 3.25 | 3.3 | 323400 | 3.3 |
| 8/25/2005 | 3.45 | 3.45 | 3.38 | 3.38 | 211000 | 3.38 |
| 8/24/2005 | 3.34 | 3.46 | 3.34 | 3.42 | 555900 | 3.42 |
| 8/23/2005 | 3.42 | 3.47 | 3.33 | 3.34 | 357500 | 3.34 |
| 8/22/2005 | 3.27 | 3.47 | 3.25 | 3.45 | 819900 | 3.45 |
| 8/19/2005 | 3.28 | 3.33 | 3.19 | 3.29 | 1754200 | 3.29 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/18/2005 | 3.27 | 3.31 | 3.22 | 3.3 | 739500 | 3.3 |
| 8/17/2005 | 3.25 | 3.32 | 3.25 | 3.3 | 537100 | 3.3 |
| 8/16/2005 | 3.25 | 3.34 | 3.17 | 3.28 | 1188400 | 3.28 |
| 8/15/2005 | 3.1 | 3.27 | 3.07 | 3.26 | 810300 | 3.26 |
| 8/12/2005 | 2.95 | 3.1 | 2.91 | 3.08 | 312400 | 3.08 |
| 8/11/2005 | 2.95 | 3 | 2.95 | 2.98 | 252700 | 2.98 |
| 8/10/2005 | 3.05 | 3.09 | 2.95 | 2.96 | 289200 | 2.96 |
| 8/9/2005 | 3.03 | 3.08 | 3.03 | 3.05 | 231800 | 3.05 |
| 8/8/2005 | 3.04 | 3.09 | 3.04 | 3.05 | 268800 | 3.05 |
| 8/5/2005 | 3.05 | 3.12 | 3.05 | 3.05 | 234900 | 3.05 |
| 8/4/2005 | 3.14 | 3.14 | 3.06 | 3.06 | 388200 | 3.06 |
| 8/3/2005 | 3.12 | 3.14 | 3.09 | 3.14 | 367700 | 3.14 |
| 8/2/2005 | 3.16 | 3.2 | 3.1 | 3.15 | 499300 | 3.15 |
| 8/1/2005 | 3.14 | 3.21 | 3.1 | 3.17 | 789200 | 3.17 |
| 7/29/2005 | 3.18 | 3.2 | 3.01 | 3.14 | 1580900 | 3.14 |
| 7/28/2005 | 3.27 | 3.35 | 3.18 | 3.23 | 1095300 | 3.23 |
| 7/27/2005 | 3.19 | 3.33 | 3.16 | 3.28 | 1034900 | 3.28 |
| 7/26/2005 | 3.15 | 3.28 | 3.15 | 3.27 | 414100 | 3.27 |
| 7/25/2005 | 3.19 | 3.28 | 3.14 | 3.15 | 742100 | 3.15 |
| 7/22/2005 | 3.23 | 3.28 | 3.18 | 3.25 | 573300 | 3.25 |
| 7/21/2005 | 3.4 | 3.4 | 3.22 | 3.24 | 386000 | 3.24 |
| 7/20/2005 | 3.24 | 3.43 | 3.21 | 3.39 | 2286400 | 3.39 |
| 7/19/2005 | 3.18 | 3.3 | 3.18 | 3.26 | 866400 | 3.26 |
| 7/18/2005 | 3.25 | 3.25 | 3.18 | 3.19 | 786400 | 3.19 |
| 7/15/2005 | 3.29 | 3.33 | 3.17 | 3.26 | 439300 | 3.26 |
| 7/14/2005 | 3.31 | 3.38 | 3.27 | 3.32 | 906600 | 3.32 |
| 7/13/2005 | 3.3 | 3.3 | 3.23 | 3.27 | 676600 | 3.27 |
| 7/12/2005 | 3.25 | 3.28 | 3.22 | 3.26 | 610300 | 3.26 |
| 7/11/2005 | 3.11 | 3.27 | 3.11 | 3.25 | 910900 | 3.25 |
| 7/8/2005 | 3.07 | 3.15 | 3.07 | 3.11 | 368000 | 3.11 |
| 7/7/2005 | 3.04 | 3.15 | 3.03 | 3.1 | 1194800 | 3.1 |
| 7/6/2005 | 3.03 | 3.11 | 3.03 | 3.08 | 522800 | 3.08 |
| 7/5/2005 | 3.05 | 3.1 | 3.04 | 3.08 | 633500 | 3.08 |
| 7/1/2005 | 3.1 | 3.1 | 3.05 | 3.09 | 411600 | 3.09 |
| 6/30/2005 | 3.1 | 3.11 | 2.98 | 3.09 | 1604100 | 3.09 |
| 6/29/2005 | 3.1 | 3.2 | 3.06 | 3.16 | 1241900 | 3.16 |
| 6/28/2005 | 2.98 | 3.11 | 2.98 | 3.1 | 894500 | 3.1 |
| 6/27/2005 | 3.05 | 3.1 | 2.89 | 3.01 | 949500 | 3.01 |
| 6/24/2005 | 3.2 | 3.26 | 3.03 | 3.09 | 1843800 | 3.09 |
| 6/23/2005 | 3.59 | 3.6 | 3.15 | 3.26 | 3757300 | 3.26 |
| 6/22/2005 | 3.55 | 3.65 | 3.47 | 3.49 | 668000 | 3.49 |
| 6/21/2005 | 3.6 | 3.65 | 3.52 | 3.58 | 343500 | 3.58 |
| 6/20/2005 | 3.69 | 3.77 | 3.61 | 3.61 | 421100 | 3.61 |
| 6/17/2005 | 3.76 | 3.78 | 3.61 | 3.7 | 799300 | 3.7 |
| 6/16/2005 | 3.47 | 3.74 | 3.45 | 3.7 | 1995800 | 3.7 |
| 6/15/2005 | 3.34 | 3.47 | 3.33 | 3.45 | 810400 | 3.45 |
| 6/14/2005 | 3.26 | 3.3 | 3.25 | 3.28 | 234200 | 3.28 |
| 6/13/2005 | 3.27 | 3.35 | 3.21 | 3.33 | 211400 | 3.33 |
| 6/10/2005 | 3.29 | 3.29 | 3.2 | 3.25 | 203600 | 3.25 |
| 6/9/2005 | 3.25 | 3.28 | 3.15 | 3.28 | 142300 | 3.28 |
| 6/8/2005 | 3.34 | 3.39 | 3.24 | 3.25 | 191000 | 3.25 |
| 6/7/2005 | 3.34 | 3.43 | 3.25 | 3.33 | 343600 | 3.33 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/6/2005 | 3.24 | 3.43 | 3.2 | 3.31 | 428900 | 3.31 |
| 6/3/2005 | 3.21 | 3.31 | 2.97 | 3.24 | 375500 | 3.24 |
| 6/2/2005 | 3.3 | 3.31 | 3.2 | 3.2 | 278600 | 3.2 |
| 6/1/2005 | 3.19 | 3.35 | 3.17 | 3.29 | 692700 | 3.29 |
| 5/31/2005 | 2.99 | 3.18 | 2.96 | 3.17 | 1027900 | 3.17 |
| 5/27/2005 | 2.9 | 3.04 | 2.9 | 3 | 443500 | 3 |
| 5/26/2005 | 2.95 | 3.04 | 2.95 | 3 | 309800 | 3 |
| 5/25/2005 | 2.96 | 2.99 | 2.93 | 2.95 | 179800 | 2.95 |
| 5/24/2005 | 2.94 | 3.04 | 2.93 | 2.97 | 151900 | 2.97 |
| 5/23/2005 | 2.96 | 3.05 | 2.95 | 2.99 | 246900 | 2.99 |
| 5/20/2005 | 2.97 | 3.04 | 2.93 | 2.99 | 174800 | 2.99 |
| 5/19/2005 | 2.9 | 3.04 | 2.87 | 3.03 | 345100 | 3.03 |
| 5/18/2005 | 2.89 | 2.98 | 2.86 | 2.94 | 276100 | 2.94 |
| 5/17/2005 | 2.75 | 2.87 | 2.75 | 2.87 | 144300 | 2.87 |
| 5/16/2005 | 2.78 | 2.8 | 2.72 | 2.78 | 227000 | 2.78 |
| 5/13/2005 | 2.76 | 2.85 | 2.72 | 2.78 | 377600 | 2.78 |
| 5/12/2005 | 2.9 | 2.95 | 2.72 | 2.74 | 336900 | 2.74 |
| 5/11/2005 | 3.03 | 3.06 | 2.88 | 2.91 | 324100 | 2.91 |
| 5/10/2005 | 3.03 | 3.08 | 3 | 3 | 185000 | 3 |
| 5/9/2005 | 3.08 | 3.14 | 3.05 | 3.12 | 363800 | 3.12 |
| 5/6/2005 | 3.09 | 3.15 | 3.06 | 3.09 | 243000 | 3.09 |
| 5/5/2005 | 3.1 | 3.14 | 2.99 | 3.08 | 397600 | 3.08 |
| 5/4/2005 | 3.05 | 3.24 | 2.92 | 3.09 | 1307300 | 3.09 |
| 5/3/2005 | 2.8 | 2.87 | 2.69 | 2.75 | 447300 | 2.75 |
| 5/2/2005 | 2.91 | 2.94 | 2.78 | 2.82 | 234300 | 2.82 |
| 4/29/2005 | 2.73 | 2.94 | 2.73 | 2.91 | 400600 | 2.91 |
| 4/28/2005 | 2.86 | 2.9 | 2.75 | 2.8 | 373500 | 2.8 |
| 4/27/2005 | 2.93 | 2.93 | 2.87 | 2.88 | 367800 | 2.88 |
| 4/26/2005 | 2.97 | 3.11 | 2.96 | 2.96 | 345100 | 2.96 |
| 4/25/2005 | 3.15 | 3.21 | 2.94 | 3.01 | 419200 | 3.01 |
| 4/22/2005 | 3.15 | 3.22 | 3.09 | 3.16 | 624100 | 3.16 |
| 4/21/2005 | 2.95 | 3.15 | 2.94 | 3.15 | 548700 | 3.15 |
| 4/20/2005 | 3.01 | 3.04 | 2.94 | 2.95 | 632200 | 2.95 |
| 4/19/2005 | 2.87 | 2.99 | 2.87 | 2.97 | 826700 | 2.97 |
| 4/18/2005 | 2.72 | 2.9 | 2.7 | 2.88 | 816800 | 2.88 |
| 4/15/2005 | 2.62 | 2.82 | 2.52 | 2.75 | 683100 | 2.75 |
| 4/14/2005 | 2.71 | 2.8 | 2.54 | 2.65 | 979700 | 2.65 |
| 4/13/2005 | 2.77 | 2.79 | 2.71 | 2.72 | 558100 | 2.72 |
| 4/12/2005 | 2.82 | 2.93 | 2.75 | 2.8 | 675200 | 2.8 |
| 4/11/2005 | 2.9 | 2.96 | 2.81 | 2.86 | 552500 | 2.86 |
| 4/8/2005 | 2.94 | 2.96 | 2.87 | 2.87 | 214100 | 2.87 |
| 4/7/2005 | 2.94 | 3 | 2.94 | 2.97 | 157700 | 2.97 |
| 4/6/2005 | 3 | 3.05 | 2.96 | 2.99 | 168200 | 2.99 |
| 4/5/2005 | 2.98 | 3.05 | 2.93 | 3 | 203300 | 3 |
| 4/4/2005 | 3.02 | 3.05 | 2.98 | 2.99 | 295400 | 2.99 |
| 4/1/2005 | 3.05 | 3.1 | 2.98 | 3.05 | 262100 | 3.05 |
| 3/31/2005 | 2.94 | 3.09 | 2.78 | 3.08 | 855400 | 3.08 |
| 3/30/2005 | 2.89 | 2.99 | 2.87 | 2.98 | 216900 | 2.98 |
| 3/29/2005 | 3.04 | 3.07 | 2.9 | 2.9 | 305700 | 2.9 |
| 3/28/2005 | 2.97 | 3.01 | 2.95 | 2.99 | 161500 | 2.99 |
| 3/24/2005 | 2.98 | 3.06 | 2.97 | 2.99 | 327800 | 2.99 |
| 3/23/2005 | 3 | 3.05 | 2.76 | 2.99 | 539100 | 2.99 |

http://ichart.finance.yahoo.com/table.csv

| Date | Open | High | Low | Close | Volume | Adj Close |
|---|---|---|---|---|---|---|
| 3/22/2005 | 3.13 | 3.17 | 2.99 | 3.03 | 262000 | 3.03 |
| 3/21/2005 | 3 | 3.18 | 3 | 3.16 | 285900 | 3.16 |
| 3/18/2005 | 3.04 | 3.12 | 3 | 3.05 | 698600 | 3.05 |
| 3/17/2005 | 3.22 | 3.28 | 3.06 | 3.08 | 376600 | 3.08 |
| 3/16/2005 | 3.28 | 3.33 | 3.22 | 3.27 | 209100 | 3.27 |
| 3/15/2005 | 3.24 | 3.29 | 3.2 | 3.24 | 235600 | 3.24 |
| 3/14/2005 | 3.21 | 3.36 | 3.21 | 3.27 | 276800 | 3.27 |
| 3/11/2005 | 3.26 | 3.32 | 3.24 | 3.29 | 226900 | 3.29 |
| 3/10/2005 | 3.31 | 3.4 | 3.26 | 3.26 | 420800 | 3.26 |
| 3/9/2005 | 3.09 | 3.37 | 3.05 | 3.26 | 1115000 | 3.26 |
| 3/8/2005 | 3.19 | 3.25 | 3.05 | 3.1 | 324900 | 3.1 |
| 3/7/2005 | 3.25 | 3.33 | 3.2 | 3.21 | 363800 | 3.21 |
| 3/4/2005 | 3.43 | 3.44 | 3.23 | 3.25 | 296000 | 3.25 |
| 3/3/2005 | 3.35 | 3.45 | 3.29 | 3.4 | 394600 | 3.4 |
| 3/2/2005 | 3.31 | 3.44 | 3.27 | 3.35 | 277400 | 3.35 |
| 3/1/2005 | 3.45 | 3.45 | 3.29 | 3.35 | 390000 | 3.35 |
| 2/28/2005 | 3.37 | 3.45 | 3.29 | 3.42 | 585200 | 3.42 |
| 2/25/2005 | 3.24 | 3.33 | 3.2 | 3.28 | 535000 | 3.28 |
| 2/24/2005 | 3.05 | 3.25 | 2.97 | 3.18 | 464400 | 3.18 |
| 2/23/2005 | 3.18 | 3.28 | 3.02 | 3.1 | 473200 | 3.1 |
| 2/22/2005 | 3.39 | 3.47 | 3.16 | 3.16 | 570600 | 3.16 |
| 2/18/2005 | 3.4 | 3.61 | 3.35 | 3.47 | 710800 | 3.47 |
| 2/17/2005 | 3.35 | 3.52 | 3.35 | 3.37 | 494300 | 3.37 |
| 2/16/2005 | 3.41 | 3.73 | 3.3 | 3.45 | 2114800 | 3.45 |
| 2/15/2005 | 3.17 | 3.53 | 3.05 | 3.49 | 2345100 | 3.49 |
| 2/14/2005 | 3 | 3.17 | 2.98 | 3.1 | 760300 | 3.1 |
| 2/11/2005 | 2.68 | 3 | 2.65 | 2.98 | 1539800 | 2.98 |
| 2/10/2005 | 2.65 | 2.81 | 2.63 | 2.7 | 1948200 | 2.7 |
| 2/9/2005 | 2.72 | 2.86 | 2.7 | 2.8 | 1031900 | 2.8 |
| 2/8/2005 | 2.85 | 2.93 | 2.68 | 2.72 | 1271800 | 2.72 |
| 2/7/2005 | 2.89 | 2.96 | 2.85 | 2.88 | 668800 | 2.88 |
| 2/4/2005 | 3.01 | 3.09 | 2.89 | 3 | 987200 | 3 |
| 2/3/2005 | 3.08 | 3.15 | 3.06 | 3.06 | 486700 | 3.06 |
| 2/2/2005 | 3.18 | 3.27 | 3.07 | 3.09 | 726600 | 3.09 |
| 2/1/2005 | 3.21 | 3.31 | 3.07 | 3.18 | 1228500 | 3.18 |
| 1/31/2005 | 3.08 | 3.3 | 3.05 | 3.2 | 1031300 | 3.2 |
| 1/28/2005 | 2.98 | 3.16 | 2.96 | 3.03 | 636000 | 3.03 |
| 1/27/2005 | 2.99 | 3.07 | 2.88 | 3.02 | 799400 | 3.02 |
| 1/26/2005 | 3 | 3.17 | 2.95 | 3.06 | 967000 | 3.06 |
| 1/25/2005 | 3.03 | 3.07 | 2.87 | 3.06 | 1412700 | 3.06 |
| 1/24/2005 | 2.94 | 3.1 | 2.81 | 3 | 2273000 | 3 |
| 1/21/2005 | 2.59 | 2.99 | 2.54 | 2.96 | 4493700 | 2.96 |
| 1/20/2005 | 2.6 | 2.65 | 2.5 | 2.59 | 558200 | 2.59 |
| 1/19/2005 | 2.77 | 2.78 | 2.53 | 2.62 | 1017700 | 2.62 |
| 1/18/2005 | 2.58 | 3.04 | 2.48 | 2.67 | 8123200 | 2.67 |
| 1/14/2005 | 2.25 | 2.45 | 2.25 | 2.44 | 828800 | 2.44 |
| 1/13/2005 | 2.28 | 2.29 | 2.19 | 2.24 | 917300 | 2.24 |
| 1/12/2005 | 2.19 | 2.32 | 1.99 | 2.29 | 1114500 | 2.29 |
| 1/11/2005 | 2.36 | 2.36 | 2.17 | 2.19 | 1063900 | 2.19 |
| 1/10/2005 | 2.38 | 2.44 | 2.33 | 2.41 | 488200 | 2.41 |
| 1/7/2005 | 2.43 | 2.45 | 2.33 | 2.37 | 522300 | 2.37 |
| 1/6/2005 | 2.5 | 2.61 | 2.33 | 2.46 | 1109300 | 2.46 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/5/2005 | 2.54 | 2.64 | 2.5 | 2.61 | 695000 | 2.61 |
| 1/4/2005 | 2.63 | 2.7 | 2.5 | 2.6 | 750600 | 2.6 |
| 1/3/2005 | 2.81 | 2.81 | 2.56 | 2.62 | 703000 | 2.62 |
| 12/31/2004 | 2.78 | 2.81 | 2.67 | 2.71 | 456100 | 2.71 |
| 12/30/2004 | 2.88 | 2.89 | 2.78 | 2.78 | 548300 | 2.78 |
| 12/29/2004 | 2.83 | 2.98 | 2.81 | 2.85 | 891900 | 2.85 |
| 12/28/2004 | 2.69 | 2.84 | 2.65 | 2.81 | 938000 | 2.81 |
| 12/27/2004 | 2.64 | 2.69 | 2.57 | 2.66 | 495400 | 2.66 |
| 12/23/2004 | 2.64 | 2.67 | 2.58 | 2.64 | 480300 | 2.64 |
| 12/22/2004 | 2.65 | 2.65 | 2.57 | 2.6 | 278300 | 2.6 |
| 12/21/2004 | 2.53 | 2.66 | 2.52 | 2.62 | 493300 | 2.62 |
| 12/20/2004 | 2.7 | 2.74 | 2.55 | 2.61 | 794800 | 2.61 |
| 12/17/2004 | 2.78 | 2.85 | 2.69 | 2.74 | 735400 | 2.74 |
| 12/16/2004 | 2.56 | 2.81 | 2.51 | 2.74 | 1675700 | 2.74 |
| 12/15/2004 | 2.55 | 2.64 | 2.5 | 2.56 | 727300 | 2.56 |
| 12/14/2004 | 2.65 | 2.73 | 2.51 | 2.57 | 911400 | 2.57 |
| 12/13/2004 | 2.85 | 2.88 | 2.59 | 2.61 | 1935800 | 2.61 |
| 12/10/2004 | 2.48 | 2.87 | 2.42 | 2.87 | 2869100 | 2.87 |
| 12/9/2004 | 2.29 | 2.43 | 2.15 | 2.43 | 826300 | 2.43 |
| 12/8/2004 | 2.27 | 2.35 | 2.2 | 2.32 | 491400 | 2.32 |
| 12/7/2004 | 2.32 | 2.38 | 2.29 | 2.3 | 918800 | 2.3 |
| 12/6/2004 | 2.18 | 2.39 | 2.13 | 2.3 | 1153900 | 2.3 |
| 12/3/2004 | 2.13 | 2.22 | 2.08 | 2.18 | 779200 | 2.18 |
| 12/2/2004 | 2.05 | 2.13 | 1.97 | 2.08 | 702600 | 2.08 |
| 12/1/2004 | 1.9 | 2.13 | 1.89 | 2.01 | 915800 | 2.01 |
| 11/30/2004 | 2.1 | 2.13 | 1.96 | 1.99 | 1065800 | 1.99 |
| 11/29/2004 | 2.23 | 2.23 | 2.06 | 2.12 | 538900 | 2.12 |
| 11/26/2004 | 2.3 | 2.3 | 2.05 | 2.11 | 402300 | 2.11 |
| 11/24/2004 | 2.2 | 2.28 | 2.1 | 2.21 | 1052000 | 2.21 |
| 11/23/2004 | 2.05 | 2.2 | 2 | 2.17 | 965200 | 2.17 |
| 11/22/2004 | 1.96 | 2.08 | 1.95 | 2.06 | 506600 | 2.06 |
| 11/19/2004 | 2.09 | 2.09 | 2 | 2.03 | 683500 | 2.03 |
| 11/18/2004 | 2.01 | 2.1 | 1.98 | 2.09 | 709800 | 2.09 |
| 11/17/2004 | 1.83 | 2.04 | 1.8 | 2.02 | 1566500 | 2.02 |
| 11/16/2004 | 1.8 | 1.85 | 1.79 | 1.79 | 244000 | 1.79 |
| 11/15/2004 | 1.81 | 1.88 | 1.78 | 1.84 | 480500 | 1.84 |
| 11/12/2004 | 1.87 | 1.91 | 1.78 | 1.86 | 617500 | 1.86 |
| 11/11/2004 | 1.89 | 1.95 | 1.85 | 1.88 | 703700 | 1.88 |
| 11/10/2004 | 1.91 | 1.93 | 1.83 | 1.89 | 594400 | 1.89 |
| 11/9/2004 | 1.85 | 1.92 | 1.8 | 1.89 | 1932400 | 1.89 |
| 11/8/2004 | 1.72 | 1.72 | 1.59 | 1.6 | 349300 | 1.6 |
| 11/5/2004 | 1.63 | 1.7 | 1.63 | 1.66 | 203300 | 1.66 |
| 11/4/2004 | 1.64 | 1.69 | 1.62 | 1.66 | 262900 | 1.66 |
| 11/3/2004 | 1.65 | 1.73 | 1.64 | 1.69 | 183000 | 1.69 |
| 11/2/2004 | 1.66 | 1.69 | 1.62 | 1.63 | 271700 | 1.63 |
| 11/1/2004 | 1.61 | 1.68 | 1.6 | 1.66 | 329100 | 1.66 |
| 10/29/2004 | 1.75 | 1.84 | 1.56 | 1.64 | 831300 | 1.64 |
| 10/28/2004 | 1.8 | 1.88 | 1.76 | 1.83 | 532100 | 1.83 |
| 10/27/2004 | 1.56 | 1.76 | 1.56 | 1.76 | 476000 | 1.76 |
| 10/26/2004 | 1.54 | 1.63 | 1.54 | 1.62 | 244400 | 1.62 |
| 10/25/2004 | 1.57 | 1.65 | 1.55 | 1.56 | 238000 | 1.56 |
| 10/22/2004 | 1.62 | 1.62 | 1.57 | 1.59 | 301500 | 1.59 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/21/2004 | 1.57 | 1.62 | 1.56 | 1.62 | 378600 | 1.62 |
| 10/20/2004 | 1.59 | 1.62 | 1.55 | 1.6 | 300700 | 1.6 |
| 10/19/2004 | 1.64 | 1.64 | 1.56 | 1.59 | 375800 | 1.59 |
| 10/18/2004 | 1.56 | 1.64 | 1.55 | 1.62 | 274700 | 1.62 |
| 10/15/2004 | 1.57 | 1.64 | 1.55 | 1.57 | 459200 | 1.57 |
| 10/14/2004 | 1.58 | 1.61 | 1.52 | 1.52 | 388100 | 1.52 |
| 10/13/2004 | 1.74 | 1.75 | 1.6 | 1.61 | 353300 | 1.61 |
| 10/12/2004 | 1.7 | 1.76 | 1.66 | 1.68 | 291800 | 1.68 |
| 10/11/2004 | 1.7 | 1.79 | 1.69 | 1.75 | 250900 | 1.75 |
| 10/8/2004 | 1.79 | 2 | 1.74 | 1.76 | 1363100 | 1.76 |
| 10/7/2004 | 2.01 | 2.09 | 1.99 | 2.01 | 258100 | 2.01 |
| 10/6/2004 | 2.08 | 2.1 | 2 | 2.07 | 321200 | 2.07 |
| 10/5/2004 | 2.18 | 2.18 | 2.05 | 2.1 | 193300 | 2.1 |
| 10/4/2004 | 2.13 | 2.18 | 2.02 | 2.13 | 387800 | 2.13 |
| 10/1/2004 | 2.2 | 2.2 | 2.02 | 2.06 | 421400 | 2.06 |
| 9/30/2004 | 2.18 | 2.18 | 2.01 | 2.12 | 302100 | 2.12 |
| 9/29/2004 | 2.06 | 2.12 | 2.02 | 2.08 | 327700 | 2.08 |
| 9/28/2004 | 2 | 2.08 | 2 | 2.04 | 289100 | 2.04 |
| 9/27/2004 | 2.06 | 2.1 | 1.97 | 1.99 | 1031300 | 1.99 |
| 9/24/2004 | 2.26 | 2.35 | 2.08 | 2.1 | 1778500 | 2.1 |
| 9/23/2004 | 2 | 2.23 | 1.96 | 2.2 | 2137000 | 2.2 |
| 9/22/2004 | 1.92 | 1.96 | 1.85 | 1.85 | 253000 | 1.85 |
| 9/21/2004 | 1.93 | 1.96 | 1.88 | 1.95 | 231900 | 1.95 |
| 9/20/2004 | 1.85 | 1.92 | 1.81 | 1.89 | 207000 | 1.89 |
| 9/17/2004 | 1.89 | 2.09 | 1.83 | 1.88 | 352800 | 1.88 |
| 9/16/2004 | 1.93 | 1.94 | 1.84 | 1.87 | 336100 | 1.87 |
| 9/15/2004 | 1.97 | 1.97 | 1.86 | 1.9 | 295200 | 1.9 |
| 9/14/2004 | 1.96 | 1.98 | 1.85 | 1.97 | 250900 | 1.97 |
| 9/13/2004 | 1.91 | 1.96 | 1.84 | 1.89 | 337100 | 1.89 |
| 9/10/2004 | 1.81 | 1.93 | 1.75 | 1.86 | 288400 | 1.86 |
| 9/9/2004 | 1.65 | 1.8 | 1.65 | 1.79 | 278600 | 1.79 |
| 9/8/2004 | 1.71 | 1.81 | 1.66 | 1.67 | 332400 | 1.67 |
| 9/7/2004 | 1.77 | 1.84 | 1.74 | 1.77 | 155900 | 1.77 |
| 9/3/2004 | 1.66 | 1.8 | 1.66 | 1.72 | 153000 | 1.72 |
| 9/2/2004 | 1.67 | 1.83 | 1.67 | 1.72 | 285700 | 1.72 |
| 9/1/2004 | 1.64 | 2.05 | 1.58 | 1.72 | 770800 | 1.72 |
| 8/31/2004 | 1.53 | 1.63 | 1.53 | 1.63 | 262200 | 1.63 |
| 8/30/2004 | 1.62 | 1.64 | 1.54 | 1.55 | 282700 | 1.55 |
| 8/27/2004 | 1.59 | 1.65 | 1.57 | 1.6 | 196100 | 1.6 |
| 8/26/2004 | 1.7 | 1.71 | 1.6 | 1.61 | 385700 | 1.61 |
| 8/25/2004 | 1.67 | 1.72 | 1.65 | 1.72 | 146900 | 1.72 |
| 8/24/2004 | 1.75 | 1.75 | 1.64 | 1.68 | 206200 | 1.68 |
| 8/23/2004 | 1.75 | 1.76 | 1.65 | 1.67 | 166700 | 1.67 |
| 8/20/2004 | 1.7 | 1.73 | 1.6 | 1.72 | 256200 | 1.72 |
| 8/19/2004 | 1.69 | 1.75 | 1.63 | 1.7 | 378300 | 1.7 |
| 8/18/2004 | 1.55 | 1.75 | 1.55 | 1.75 | 416800 | 1.75 |
| 8/17/2004 | 1.6 | 1.6 | 1.5 | 1.54 | 173100 | 1.54 |
| 8/16/2004 | 1.47 | 1.56 | 1.47 | 1.56 | 183300 | 1.56 |
| 8/13/2004 | 1.51 | 1.52 | 1.44 | 1.47 | 213600 | 1.47 |
| 8/12/2004 | 1.48 | 1.6 | 1.45 | 1.45 | 356800 | 1.45 |
| 8/11/2004 | 1.6 | 1.62 | 1.49 | 1.52 | 259300 | 1.52 |
| 8/10/2004 | 1.5 | 1.6 | 1.48 | 1.6 | 366600 | 1.6 |

| | | | | | |
|---|---|---|---|---|---|
| 8/9/2004 | 1.47 | 1.56 | 1.45 | 1.46 | 353100 | 1.46 |
| 8/6/2004 | 1.55 | 1.57 | 1.45 | 1.45 | 728500 | 1.45 |
| 8/5/2004 | 1.66 | 1.68 | 1.55 | 1.58 | 332300 | 1.58 |
| 8/4/2004 | 1.6 | 1.66 | 1.56 | 1.63 | 329100 | 1.63 |
| 8/3/2004 | 1.65 | 1.69 | 1.57 | 1.6 | 435900 | 1.6 |
| 8/2/2004 | 1.66 | 1.7 | 1.62 | 1.65 | 510800 | 1.65 |
| 7/30/2004 | 1.8 | 1.88 | 1.69 | 1.74 | 376600 | 1.74 |
| 7/29/2004 | 1.68 | 1.77 | 1.65 | 1.76 | 433700 | 1.76 |
| 7/28/2004 | 1.7 | 1.76 | 1.62 | 1.65 | 450000 | 1.65 |
| 7/27/2004 | 1.78 | 1.83 | 1.68 | 1.73 | 916100 | 1.73 |
| 7/26/2004 | 1.81 | 1.89 | 1.73 | 1.85 | 373300 | 1.85 |
| 7/23/2004 | 1.86 | 1.87 | 1.78 | 1.8 | 280300 | 1.8 |
| 7/22/2004 | 1.86 | 1.93 | 1.78 | 1.83 | 587900 | 1.83 |
| 7/21/2004 | 2.06 | 2.12 | 1.84 | 1.84 | 407000 | 1.84 |
| 7/20/2004 | 1.91 | 2.02 | 1.84 | 2.02 | 316300 | 2.02 |
| 7/19/2004 | 1.95 | 1.97 | 1.83 | 1.85 | 357400 | 1.85 |
| 7/16/2004 | 1.95 | 2.01 | 1.9 | 1.91 | 309800 | 1.91 |
| 7/15/2004 | 1.99 | 2.01 | 1.96 | 2.01 | 301000 | 2.01 |
| 7/14/2004 | 1.95 | 2.05 | 1.94 | 1.95 | 345500 | 1.95 |
| 7/13/2004 | 2.04 | 2.05 | 1.97 | 2 | 161400 | 2 |
| 7/12/2004 | 1.99 | 2.05 | 1.94 | 2.01 | 207800 | 2.01 |
| 7/9/2004 | 2 | 2.06 | 2 | 2 | 182000 | 2 |
| 7/8/2004 | 1.98 | 2.06 | 1.98 | 1.99 | 404000 | 1.99 |
| 7/7/2004 | 2.05 | 2.14 | 2.05 | 2.07 | 268000 | 2.07 |
| 7/6/2004 | 2.14 | 2.18 | 2.05 | 2.06 | 485500 | 2.06 |
| 7/2/2004 | 2.08 | 2.18 | 2.08 | 2.17 | 228800 | 2.17 |
| 7/1/2004 | 2.38 | 2.38 | 2.13 | 2.18 | 656500 | 2.18 |
| 6/30/2004 | 2.38 | 2.39 | 2.29 | 2.34 | 247500 | 2.34 |
| 6/29/2004 | 2.32 | 2.38 | 2.27 | 2.32 | 475700 | 2.32 |
| 6/28/2004 | 2.16 | 2.34 | 2.16 | 2.32 | 833300 | 2.32 |
| 6/25/2004 | 2.27 | 2.27 | 2.08 | 2.1 | 1672100 | 2.1 |
| 6/24/2004 | 2.46 | 2.49 | 2.22 | 2.26 | 1114900 | 2.26 |
| 6/23/2004 | 2.13 | 2.38 | 2.05 | 2.31 | 1328000 | 2.31 |
| 6/22/2004 | 2.08 | 2.13 | 2 | 2.04 | 772700 | 2.04 |
| 6/21/2004 | 1.95 | 2.04 | 1.88 | 1.98 | 672800 | 1.98 |
| 6/18/2004 | 1.9 | 2 | 1.66 | 1.92 | 2064000 | 1.92 |
| 6/17/2004 | 2.09 | 2.09 | 1.99 | 2 | 654000 | 2 |
| 6/16/2004 | 2.08 | 2.12 | 2.03 | 2.05 | 578200 | 2.05 |
| 6/15/2004 | 2.04 | 2.1 | 1.98 | 2.06 | 1875900 | 2.06 |
| 6/14/2004 | 2.19 | 2.24 | 1.95 | 2.01 | 2661700 | 2.01 |
| 6/10/2004 | 2.28 | 2.34 | 2.23 | 2.25 | 619900 | 2.25 |
| 6/9/2004 | 2.35 | 2.43 | 2.28 | 2.3 | 786700 | 2.3 |
| 6/8/2004 | 2.45 | 2.45 | 2.39 | 2.41 | 539600 | 2.41 |
| 6/7/2004 | 2.55 | 2.59 | 2.34 | 2.45 | 985300 | 2.45 |
| 6/4/2004 | 2.48 | 2.6 | 2.43 | 2.44 | 697400 | 2.44 |
| 6/3/2004 | 2.61 | 2.64 | 2.48 | 2.48 | 749900 | 2.48 |
| 6/2/2004 | 2.63 | 2.68 | 2.56 | 2.61 | 590000 | 2.61 |
| 6/1/2004 | 2.7 | 2.79 | 2.58 | 2.65 | 897900 | 2.65 |
| 5/28/2004 | 2.85 | 2.97 | 2.71 | 2.75 | 1673100 | 2.75 |
| 5/27/2004 | 3.1 | 3.18 | 3 | 3.04 | 508100 | 3.04 |
| 5/26/2004 | 2.93 | 3.08 | 2.88 | 3.07 | 464600 | 3.07 |
| 5/25/2004 | 2.96 | 2.99 | 2.88 | 2.95 | 426300 | 2.95 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/24/2004 | 2.98 | 2.98 | 2.83 | 2.91 | 220100 | 2.91 |
| 5/21/2004 | 2.85 | 2.95 | 2.83 | 2.9 | 238500 | 2.9 |
| 5/20/2004 | 2.96 | 3.02 | 2.82 | 2.86 | 654800 | 2.86 |
| 5/19/2004 | 3.05 | 3.1 | 2.95 | 2.98 | 490200 | 2.98 |
| 5/18/2004 | 3.02 | 3.1 | 2.92 | 2.99 | 486700 | 2.99 |
| 5/17/2004 | 3.09 | 3.11 | 2.99 | 3 | 472700 | 3 |
| 5/14/2004 | 3.18 | 3.27 | 3.15 | 3.16 | 243400 | 3.16 |
| 5/13/2004 | 3.21 | 3.38 | 3.16 | 3.24 | 302900 | 3.24 |
| 5/12/2004 | 3.4 | 3.4 | 3.11 | 3.24 | 552200 | 3.24 |
| 5/11/2004 | 3.22 | 3.41 | 3.15 | 3.37 | 306300 | 3.37 |
| 5/10/2004 | 3.09 | 3.26 | 3.05 | 3.13 | 580700 | 3.13 |
| 5/7/2004 | 3.37 | 3.38 | 3.16 | 3.16 | 550600 | 3.16 |
| 5/6/2004 | 3.24 | 3.48 | 3.14 | 3.46 | 539200 | 3.46 |
| 5/5/2004 | 3.41 | 3.55 | 3.3 | 3.3 | 558000 | 3.3 |
| 5/4/2004 | 3.08 | 3.33 | 3.06 | 3.24 | 401300 | 3.24 |
| 5/3/2004 | 2.92 | 3.16 | 2.87 | 3.11 | 1130300 | 3.11 |
| 4/30/2004 | 3.2 | 3.27 | 2.85 | 2.9 | 2023100 | 2.9 |
| 4/29/2004 | 3.45 | 3.48 | 3.19 | 3.2 | 752000 | 3.2 |
| 4/28/2004 | 3.69 | 3.7 | 3.45 | 3.45 | 392100 | 3.45 |
| 4/27/2004 | 3.73 | 3.78 | 3.61 | 3.72 | 385400 | 3.72 |
| 4/26/2004 | 3.78 | 3.95 | 3.73 | 3.74 | 428100 | 3.74 |
| 4/23/2004 | 3.4 | 3.78 | 3.4 | 3.78 | 532200 | 3.78 |
| 4/22/2004 | 3.55 | 3.58 | 3.4 | 3.5 | 270000 | 3.5 |
| 4/21/2004 | 3.49 | 3.6 | 3.42 | 3.57 | 420100 | 3.57 |
| 4/20/2004 | 3.48 | 3.68 | 3.35 | 3.35 | 430800 | 3.35 |
| 4/19/2004 | 3.36 | 3.63 | 3.35 | 3.54 | 519700 | 3.54 |
| 4/16/2004 | 3.31 | 3.53 | 3.3 | 3.36 | 408400 | 3.36 |
| 4/15/2004 | 3.39 | 3.44 | 3.3 | 3.31 | 350500 | 3.31 |
| 4/14/2004 | 3.39 | 3.47 | 3.29 | 3.38 | 548400 | 3.38 |
| 4/13/2004 | 3.75 | 3.84 | 3.43 | 3.43 | 524800 | 3.43 |
| 4/12/2004 | 3.83 | 3.89 | 3.68 | 3.75 | 276700 | 3.75 |
| 4/8/2004 | 3.97 | 3.99 | 3.8 | 3.8 | 410800 | 3.8 |
| 4/7/2004 | 3.58 | 3.84 | 3.56 | 3.84 | 439100 | 3.84 |
| 4/6/2004 | 3.78 | 3.79 | 3.58 | 3.65 | 437700 | 3.65 |
| 4/5/2004 | 3.73 | 3.8 | 3.63 | 3.8 | 349800 | 3.8 |
| 4/2/2004 | 3.63 | 3.74 | 3.55 | 3.72 | 620700 | 3.72 |
| 4/1/2004 | 3.37 | 3.52 | 3.35 | 3.5 | 357000 | 3.5 |
| 3/31/2004 | 3.33 | 3.56 | 3.32 | 3.42 | 588100 | 3.42 |
| 3/30/2004 | 3.62 | 3.63 | 3.53 | 3.59 | 260700 | 3.59 |
| 3/29/2004 | 3.57 | 3.65 | 3.51 | 3.63 | 558100 | 3.63 |
| 3/26/2004 | 3.47 | 3.55 | 3.31 | 3.54 | 638300 | 3.54 |
| 3/25/2004 | 3.24 | 3.45 | 3.19 | 3.4 | 673500 | 3.4 |
| 3/24/2004 | 3.11 | 3.24 | 3.07 | 3.12 | 450300 | 3.12 |
| 3/23/2004 | 3.11 | 3.24 | 3.1 | 3.12 | 591900 | 3.12 |
| 3/22/2004 | 3.1 | 3.15 | 3.02 | 3.06 | 713600 | 3.06 |
| 3/19/2004 | 3.21 | 3.29 | 3.1 | 3.1 | 541200 | 3.1 |
| 3/18/2004 | 3.01 | 3.19 | 3 | 3.18 | 589900 | 3.18 |
| 3/17/2004 | 3.18 | 3.26 | 3.11 | 3.2 | 693600 | 3.2 |
| 3/16/2004 | 3.24 | 3.36 | 2.96 | 3.1 | 1791600 | 3.1 |
| 3/15/2004 | 3.31 | 3.39 | 3.2 | 3.21 | 890300 | 3.21 |
| 3/12/2004 | 3.43 | 3.55 | 3.35 | 3.38 | 1192900 | 3.38 |
| 3/11/2004 | 3.67 | 3.87 | 3.28 | 3.29 | 1269700 | 3.29 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/10/2004 | 3.92 | 3.99 | 3.72 | 3.75 | 449300 | 3.75 |
| 3/9/2004 | 4.04 | 4.09 | 3.74 | 3.89 | 686200 | 3.89 |
| 3/8/2004 | 4.12 | 4.28 | 4 | 4.01 | 678200 | 4.01 |
| 3/5/2004 | 4.2 | 4.25 | 4.15 | 4.18 | 451000 | 4.18 |
| 3/4/2004 | 4.22 | 4.26 | 4.18 | 4.25 | 384500 | 4.25 |
| 3/3/2004 | 4.41 | 4.52 | 4.18 | 4.19 | 515500 | 4.19 |
| 3/2/2004 | 4.62 | 4.63 | 4.34 | 4.34 | 450300 | 4.34 |
| 3/1/2004 | 4.49 | 4.63 | 4.4 | 4.58 | 428800 | 4.58 |
| 2/27/2004 | 4.38 | 4.5 | 4.35 | 4.42 | 409600 | 4.42 |
| 2/26/2004 | 4.25 | 4.43 | 4.2 | 4.41 | 433700 | 4.41 |
| 2/25/2004 | 4.12 | 4.28 | 4.09 | 4.23 | 356500 | 4.23 |
| 2/24/2004 | 4.16 | 4.34 | 4.06 | 4.16 | 478400 | 4.16 |
| 2/23/2004 | 4.39 | 4.4 | 4.12 | 4.18 | 724600 | 4.18 |
| 2/20/2004 | 4.39 | 4.5 | 4.26 | 4.42 | 686000 | 4.42 |
| 2/19/2004 | 4.65 | 4.7 | 4.31 | 4.4 | 615100 | 4.4 |
| 2/18/2004 | 4.75 | 4.8 | 4.6 | 4.6 | 404400 | 4.6 |
| 2/17/2004 | 4.61 | 4.77 | 4.58 | 4.69 | 527900 | 4.69 |
| 2/13/2004 | 4.75 | 4.81 | 4.5 | 4.56 | 579100 | 4.56 |
| 2/12/2004 | 4.79 | 4.85 | 4.66 | 4.72 | 406100 | 4.72 |
| 2/11/2004 | 4.86 | 4.9 | 4.71 | 4.71 | 359100 | 4.71 |
| 2/10/2004 | 4.75 | 4.87 | 4.7 | 4.85 | 428200 | 4.85 |
| 2/9/2004 | 4.8 | 4.87 | 4.7 | 4.77 | 707900 | 4.77 |
| 2/6/2004 | 4.45 | 4.8 | 4.34 | 4.75 | 807900 | 4.75 |
| 2/5/2004 | 4.3 | 4.5 | 4.29 | 4.44 | 505900 | 4.44 |
| 2/4/2004 | 4.61 | 4.65 | 4.25 | 4.25 | 875900 | 4.25 |
| 2/3/2004 | 4.83 | 4.85 | 4.6 | 4.61 | 544700 | 4.61 |
| 2/2/2004 | 4.87 | 4.99 | 4.79 | 4.79 | 791000 | 4.79 |
| 1/30/2004 | 4.86 | 4.93 | 4.72 | 4.79 | 645500 | 4.79 |
| 1/29/2004 | 5.05 | 5.09 | 4.6 | 4.84 | 1695000 | 4.84 |
| 1/28/2004 | 5.2 | 5.4 | 4.93 | 5 | 3116200 | 5 |
| 1/27/2004 | 5.72 | 5.75 | 5.53 | 5.6 | 1122800 | 5.6 |
| 1/26/2004 | 5.73 | 5.85 | 5.67 | 5.78 | 593300 | 5.78 |
| 1/23/2004 | 5.73 | 5.89 | 5.51 | 5.8 | 942600 | 5.8 |
| 1/22/2004 | 6 | 6.11 | 5.6 | 5.63 | 943100 | 5.63 |
| 1/21/2004 | 6.17 | 6.21 | 5.72 | 5.9 | 941100 | 5.9 |
| 1/20/2004 | 5.99 | 6.25 | 5.75 | 6.2 | 2241200 | 6.2 |
| 1/16/2004 | 5.47 | 5.95 | 5.32 | 5.83 | 2292400 | 5.83 |
| 1/15/2004 | 5.55 | 5.59 | 5.27 | 5.36 | 894900 | 5.36 |
| 1/14/2004 | 5.67 | 5.71 | 5.46 | 5.58 | 496900 | 5.58 |
| 1/13/2004 | 5.74 | 5.77 | 5.43 | 5.6 | 628500 | 5.6 |
| 1/12/2004 | 5.67 | 5.8 | 5.55 | 5.79 | 645200 | 5.79 |
| 1/9/2004 | 5.6 | 5.9 | 5.4 | 5.57 | 789100 | 5.57 |
| 1/8/2004 | 5.59 | 5.79 | 5.51 | 5.61 | 1176700 | 5.61 |
| 1/7/2004 | 5.15 | 5.6 | 5.1 | 5.5 | 2358000 | 5.5 |
| 1/6/2004 | 5 | 5.17 | 4.93 | 5 | 1212700 | 5 |
| 1/5/2004 | 4.73 | 4.96 | 4.72 | 4.93 | 1190700 | 4.93 |
| 1/2/2004 | 4.67 | 4.7 | 4.56 | 4.7 | 541300 | 4.7 |
| 12/31/2003 | 4.64 | 4.71 | 4.5 | 4.5 | 682000 | 4.5 |
| 12/30/2003 | 4.8 | 4.82 | 4.46 | 4.68 | 660000 | 4.68 |
| 12/29/2003 | 4.61 | 4.78 | 4.55 | 4.78 | 902600 | 4.78 |
| 12/26/2003 | 4.48 | 4.6 | 4.41 | 4.59 | 374500 | 4.59 |
| 12/24/2003 | 4.4 | 4.68 | 4.3 | 4.4 | 302200 | 4.4 |

| | | | | | |
|---|---|---|---|---|---|
| 12/23/2003 | 4.38 | 4.49 | 4.29 | 4.49 | 521000 | 4.49 |
| 12/22/2003 | 4.29 | 4.43 | 4.27 | 4.42 | 347300 | 4.42 |
| 12/19/2003 | 4.53 | 4.54 | 4.25 | 4.29 | 538600 | 4.29 |
| 12/18/2003 | 4.26 | 4.49 | 4.21 | 4.38 | 830300 | 4.38 |
| 12/17/2003 | 4.12 | 4.26 | 4.07 | 4.23 | 557800 | 4.23 |
| 12/16/2003 | 4.28 | 4.32 | 4.05 | 4.17 | 1235100 | 4.17 |
| 12/15/2003 | 4.75 | 4.77 | 4.26 | 4.27 | 709500 | 4.27 |
| 12/12/2003 | 4.55 | 4.68 | 4.45 | 4.5 | 568800 | 4.5 |
| 12/11/2003 | 4.21 | 4.55 | 4.16 | 4.5 | 814200 | 4.5 |
| 12/10/2003 | 4.35 | 4.38 | 4.11 | 4.18 | 1391000 | 4.18 |
| 12/9/2003 | 4.69 | 4.7 | 4.24 | 4.26 | 2262600 | 4.26 |
| 12/8/2003 | 5.19 | 5.38 | 4.55 | 4.57 | 4507500 | 4.57 |
| 12/5/2003 | 4.88 | 5.05 | 4.44 | 4.55 | 4308400 | 4.55 |
| 12/4/2003 | 6.3 | 6.37 | 5.71 | 5.77 | 983500 | 5.77 |
| 12/3/2003 | 6.48 | 6.48 | 6.24 | 6.3 | 955400 | 6.3 |
| 12/2/2003 | 6.2 | 6.41 | 6.2 | 6.29 | 828800 | 6.29 |
| 12/1/2003 | 5.98 | 6.24 | 5.93 | 6.23 | 690700 | 6.23 |
| 11/28/2003 | 5.81 | 6 | 5.81 | 5.98 | 143300 | 5.98 |
| 11/26/2003 | 5.76 | 5.94 | 5.74 | 5.83 | 419000 | 5.83 |
| 11/25/2003 | 5.85 | 5.97 | 5.72 | 5.75 | 586900 | 5.75 |
| 11/24/2003 | 5.8 | 5.9 | 5.67 | 5.78 | 575900 | 5.78 |
| 11/21/2003 | 5.81 | 5.85 | 5.5 | 5.79 | 609700 | 5.79 |
| 11/20/2003 | 5.74 | 5.93 | 5.62 | 5.75 | 611800 | 5.75 |
| 11/19/2003 | 5.98 | 6 | 5.75 | 5.93 | 489200 | 5.93 |
| 11/18/2003 | 5.9 | 6.15 | 5.75 | 5.75 | 996200 | 5.75 |
| 11/17/2003 | 6 | 6 | 5.77 | 5.84 | 1081000 | 5.84 |
| 11/14/2003 | 6.49 | 6.75 | 6 | 6.04 | 2197400 | 6.04 |
| 11/13/2003 | 6.01 | 6.06 | 5.69 | 5.84 | 2111400 | 5.84 |
| 11/12/2003 | 6 | 6.16 | 5.84 | 6.05 | 1071200 | 6.05 |
| 11/11/2003 | 6.21 | 6.28 | 5.85 | 6 | 1158500 | 6 |
| 11/10/2003 | 6.6 | 6.7 | 6.06 | 6.23 | 1166800 | 6.23 |
| 11/7/2003 | 6.8 | 6.83 | 6.5 | 6.51 | 1331000 | 6.51 |
| 11/6/2003 | 7.19 | 7.23 | 6.84 | 6.92 | 581700 | 6.92 |
| 11/5/2003 | 7.05 | 7.26 | 6.92 | 6.94 | 410600 | 6.94 |
| 11/4/2003 | 6.99 | 7.2 | 6.84 | 7.07 | 549100 | 7.07 |
| 11/3/2003 | 6.8 | 7.14 | 6.8 | 7 | 469300 | 7 |
| 10/31/2003 | 6.91 | 7.1 | 6.71 | 6.87 | 583500 | 6.87 |
| 10/30/2003 | 7.4 | 7.65 | 6.96 | 7 | 1023600 | 7 |
| 10/29/2003 | 6.83 | 7.29 | 6.67 | 7.29 | 776700 | 7.29 |
| 10/28/2003 | 7 | 7.09 | 6.66 | 6.89 | 665700 | 6.89 |
| 10/27/2003 | 6.85 | 7.09 | 6.73 | 6.84 | 625900 | 6.84 |
| 10/24/2003 | 7.15 | 7.25 | 6.85 | 6.91 | 606600 | 6.91 |
| 10/23/2003 | 7.22 | 7.49 | 6.65 | 7.21 | 1639900 | 7.21 |
| 10/22/2003 | 7.49 | 7.72 | 7.2 | 7.23 | 793500 | 7.23 |
| 10/21/2003 | 7.3 | 7.65 | 7.2 | 7.49 | 589900 | 7.49 |
| 10/20/2003 | 7.38 | 7.65 | 7.2 | 7.63 | 748000 | 7.63 |
| 10/17/2003 | 7.8 | 7.8 | 7.44 | 7.53 | 829800 | 7.53 |
| 10/16/2003 | 7.77 | 7.88 | 7.51 | 7.82 | 877400 | 7.82 |
| 10/15/2003 | 8 | 8.02 | 7.6 | 7.76 | 1057700 | 7.76 |
| 10/14/2003 | 7.73 | 7.96 | 7.7 | 7.9 | 951800 | 7.9 |
| 10/13/2003 | 7.78 | 8.04 | 7.64 | 7.79 | 877400 | 7.79 |
| 10/10/2003 | 7.86 | 7.87 | 7.44 | 7.8 | 1116300 | 7.8 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/9/2003 | 7.25 | 8.03 | 7.25 | 7.73 | 3006500 | 7.73 |
| 10/8/2003 | 7.36 | 7.5 | 7.1 | 7.23 | 1844500 | 7.23 |
| 10/7/2003 | 6.71 | 7.8 | 6.65 | 7.71 | 6742400 | 7.71 |
| 10/6/2003 | 6.2 | 6.3 | 6 | 6.21 | 1126800 | 6.21 |
| 10/3/2003 | 6.3 | 6.4 | 6.05 | 6.08 | 1355700 | 6.08 |
| 10/2/2003 | 6.3 | 6.74 | 6.03 | 6.04 | 3691100 | 6.04 |
| 10/1/2003 | 5.94 | 6 | 5.52 | 5.72 | 1129500 | 5.72 |
| 9/30/2003 | 5.99 | 6.18 | 5.7 | 5.76 | 607300 | 5.76 |
| 9/29/2003 | 5.95 | 6.01 | 5.42 | 6 | 1493100 | 6 |
| 9/26/2003 | 5.9 | 6.2 | 5.74 | 5.76 | 799100 | 5.76 |
| 9/25/2003 | 6.22 | 6.42 | 5.87 | 5.91 | 604700 | 5.91 |
| 9/24/2003 | 6.8 | 6.84 | 6.15 | 6.15 | 1029400 | 6.15 |
| 9/23/2003 | 6.97 | 7.15 | 6.71 | 6.74 | 998800 | 6.74 |
| 9/22/2003 | 6.43 | 6.98 | 6.4 | 6.95 | 1236200 | 6.95 |
| 9/19/2003 | 6.55 | 6.84 | 6.42 | 6.84 | 1541800 | 6.84 |
| 9/18/2003 | 6.51 | 6.9 | 6.5 | 6.78 | 1550900 | 6.78 |
| 9/17/2003 | 6 | 6.45 | 5.9 | 6.38 | 1898700 | 6.38 |
| 9/16/2003 | 5.57 | 5.99 | 5.54 | 5.9 | 1738500 | 5.9 |
| 9/15/2003 | 6.1 | 6.12 | 5.56 | 5.62 | 2915000 | 5.62 |
| 9/12/2003 | 6.59 | 6.64 | 6.04 | 6.09 | 2057900 | 6.09 |
| 9/11/2003 | 6.39 | 6.86 | 6.16 | 6.7 | 1943500 | 6.7 |
| 9/10/2003 | 7.13 | 7.37 | 6.71 | 6.73 | 3076200 | 6.73 |
| 9/9/2003 | 7.99 | 8.12 | 7.84 | 8.01 | 1277000 | 8.01 |
| 9/8/2003 | 7.85 | 8.1 | 7.84 | 8 | 1095300 | 8 |
| 9/5/2003 | 7.8 | 8.25 | 7.52 | 7.86 | 1626900 | 7.86 |
| 9/4/2003 | 7.09 | 8.16 | 7.03 | 7.99 | 2825700 | 7.99 |
| 9/3/2003 | 6.88 | 7 | 6.64 | 6.99 | 1096700 | 6.99 |
| 9/2/2003 | 6.6 | 6.93 | 6.4 | 6.87 | 1399700 | 6.87 |
| 8/29/2003 | 6.47 | 6.75 | 6.47 | 6.51 | 498700 | 6.51 |
| 8/28/2003 | 6.7 | 7.1 | 6.68 | 6.73 | 947900 | 6.73 |
| 8/27/2003 | 6.37 | 6.71 | 6.2 | 6.71 | 753300 | 6.71 |
| 8/26/2003 | 6.2 | 6.5 | 6.05 | 6.3 | 834100 | 6.3 |
| 8/25/2003 | 6.39 | 6.4 | 6.03 | 6.18 | 510400 | 6.18 |
| 8/22/2003 | 6.85 | 6.89 | 6.21 | 6.48 | 1398100 | 6.48 |
| 8/21/2003 | 7.15 | 7.2 | 6.5 | 6.6 | 1964400 | 6.6 |
| 8/20/2003 | 6.54 | 7.1 | 6.25 | 7 | 2323300 | 7 |
| 8/19/2003 | 6.03 | 6.67 | 5.82 | 6.65 | 2480100 | 6.65 |
| 8/18/2003 | 5.05 | 5.98 | 4.92 | 5.95 | 1762700 | 5.95 |
| 8/15/2003 | 5.08 | 5.09 | 4.91 | 5 | 199700 | 5 |
| 8/14/2003 | 4.91 | 5.04 | 4.91 | 5.03 | 389200 | 5.03 |
| 8/13/2003 | 4.95 | 5 | 4.85 | 4.96 | 471700 | 4.96 |
| 8/12/2003 | 4.64 | 4.98 | 4.55 | 4.98 | 466600 | 4.98 |
| 8/11/2003 | 4.95 | 5.04 | 4.5 | 4.63 | 818300 | 4.63 |
| 8/8/2003 | 4.9 | 4.98 | 4.63 | 4.92 | 466100 | 4.92 |
| 8/7/2003 | 4.7 | 4.9 | 4.51 | 4.88 | 581500 | 4.88 |
| 8/6/2003 | 4.7 | 4.9 | 4.67 | 4.7 | 556500 | 4.7 |
| 8/5/2003 | 5.05 | 5.06 | 4.67 | 4.77 | 768500 | 4.77 |
| 8/4/2003 | 4.95 | 5.09 | 4.92 | 5 | 855800 | 5 |
| 8/1/2003 | 4.87 | 5.06 | 4.61 | 5 | 1395800 | 5 |
| 7/31/2003 | 4.52 | 5.13 | 4.5 | 4.94 | 3831000 | 4.94 |
| 7/30/2003 | 4.15 | 4.19 | 3.98 | 4.08 | 899000 | 4.08 |
| 7/29/2003 | 4.2 | 4.25 | 4.06 | 4.21 | 559900 | 4.21 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/28/2003 | 4.3 | 4.4 | 4.03 | 4.2 | 1573200 | 4.2 |
| 7/25/2003 | 4.3 | 4.55 | 4.3 | 4.52 | 458700 | 4.52 |
| 7/24/2003 | 4.23 | 4.52 | 4.23 | 4.41 | 676100 | 4.41 |
| 7/23/2003 | 4.36 | 4.4 | 3.93 | 4.25 | 300100 | 4.25 |
| 7/22/2003 | 4.3 | 4.4 | 4.02 | 4.29 | 608700 | 4.29 |
| 7/21/2003 | 4.21 | 4.7 | 4.19 | 4.21 | 1357500 | 4.21 |
| 7/18/2003 | 3.8 | 3.98 | 3.75 | 3.95 | 264300 | 3.95 |
| 7/17/2003 | 4.1 | 4.11 | 3.69 | 3.75 | 670400 | 3.75 |
| 7/16/2003 | 4.28 | 4.35 | 4.1 | 4.14 | 276000 | 4.14 |
| 7/15/2003 | 4.16 | 4.45 | 4.16 | 4.26 | 475500 | 4.26 |
| 7/14/2003 | 4.13 | 4.34 | 4.07 | 4.16 | 753200 | 4.16 |
| 7/11/2003 | 4.21 | 4.38 | 4.01 | 4.13 | 2003500 | 4.13 |
| 7/10/2003 | 3.5 | 4.39 | 3.5 | 4.25 | 1824600 | 4.25 |
| 7/9/2003 | 3.6 | 3.66 | 3.49 | 3.59 | 345800 | 3.59 |
| 7/8/2003 | 3.5 | 3.62 | 3.28 | 3.61 | 576100 | 3.61 |
| 7/7/2003 | 3.74 | 3.75 | 3.5 | 3.55 | 1228900 | 3.55 |
| 7/3/2003 | 3.42 | 3.74 | 3.35 | 3.5 | 2581000 | 3.5 |
| 7/2/2003 | 2.67 | 2.97 | 2.67 | 2.91 | 553700 | 2.91 |
| 7/1/2003 | 2.58 | 2.77 | 2.52 | 2.71 | 147200 | 2.71 |
| 6/30/2003 | 2.62 | 2.76 | 2.53 | 2.71 | 302900 | 2.71 |
| 6/27/2003 | 2.56 | 2.79 | 2.45 | 2.67 | 223500 | 2.67 |
| 6/26/2003 | 2.69 | 2.69 | 2.53 | 2.6 | 121200 | 2.6 |
| 6/25/2003 | 2.63 | 2.68 | 2.53 | 2.56 | 183900 | 2.56 |
| 6/24/2003 | 2.65 | 2.73 | 2.61 | 2.64 | 111200 | 2.64 |
| 6/23/2003 | 2.65 | 2.72 | 2.5 | 2.7 | 295600 | 2.7 |
| 6/20/2003 | 2.55 | 2.71 | 2.55 | 2.71 | 150800 | 2.71 |
| 6/19/2003 | 2.53 | 2.76 | 2.52 | 2.62 | 290400 | 2.62 |
| 6/18/2003 | 2.52 | 2.7 | 2.52 | 2.6 | 260200 | 2.6 |
| 6/17/2003 | 2.58 | 2.61 | 2.49 | 2.57 | 346500 | 2.57 |
| 6/16/2003 | 2.73 | 2.78 | 2.57 | 2.6 | 276000 | 2.6 |
| 6/13/2003 | 2.83 | 2.85 | 2.62 | 2.73 | 303300 | 2.73 |
| 6/12/2003 | 2.69 | 2.89 | 2.69 | 2.83 | 444800 | 2.83 |
| 6/11/2003 | 2.7 | 2.75 | 2.64 | 2.7 | 162700 | 2.7 |
| 6/10/2003 | 2.65 | 2.76 | 2.54 | 2.7 | 300900 | 2.7 |
| 6/9/2003 | 2.74 | 2.86 | 2.59 | 2.68 | 456100 | 2.68 |
| 6/6/2003 | 3.13 | 3.2 | 2.84 | 2.9 | 510800 | 2.9 |
| 6/5/2003 | 2.97 | 3.1 | 2.88 | 3.06 | 519200 | 3.06 |
| 6/4/2003 | 2.82 | 3.03 | 2.76 | 2.92 | 339200 | 2.92 |
| 6/3/2003 | 2.76 | 2.92 | 2.71 | 2.82 | 234200 | 2.82 |
| 6/2/2003 | 2.87 | 3.1 | 2.68 | 2.75 | 755500 | 2.75 |
| 5/30/2003 | 2.59 | 3.03 | 2.55 | 2.96 | 981900 | 2.96 |
| 5/29/2003 | 2.47 | 2.65 | 2.47 | 2.53 | 380900 | 2.53 |
| 5/28/2003 | 2.5 | 2.6 | 2.45 | 2.45 | 346500 | 2.45 |
| 5/27/2003 | 2.39 | 2.53 | 2.35 | 2.51 | 548800 | 2.51 |
| 5/23/2003 | 2.27 | 2.39 | 2.2 | 2.37 | 280700 | 2.37 |
| 5/22/2003 | 2.23 | 2.38 | 2.19 | 2.25 | 219600 | 2.25 |
| 5/21/2003 | 2.16 | 2.24 | 2.15 | 2.22 | 130000 | 2.22 |
| 5/20/2003 | 2.19 | 2.28 | 2.14 | 2.22 | 251400 | 2.22 |
| 5/19/2003 | 2.3 | 2.36 | 2.12 | 2.19 | 515000 | 2.19 |
| 5/16/2003 | 2.25 | 2.48 | 2.25 | 2.38 | 305600 | 2.38 |
| 5/15/2003 | 2.4 | 2.48 | 2.3 | 2.42 | 239400 | 2.42 |
| 5/14/2003 | 2.36 | 2.45 | 2.27 | 2.4 | 343900 | 2.4 |

| | | | | | |
|---|---|---|---|---|---|
| 5/13/2003 | 2.45 | 2.45 | 2.3 | 2.33 | 254300 | 2.33 |
| 5/12/2003 | 2.32 | 2.43 | 2.31 | 2.41 | 196700 | 2.41 |
| 5/9/2003 | 2.31 | 2.4 | 2.31 | 2.38 | 140500 | 2.38 |
| 5/8/2003 | 2.55 | 2.55 | 2.22 | 2.3 | 369900 | 2.3 |
| 5/7/2003 | 2.5 | 2.5 | 2.38 | 2.43 | 369800 | 2.43 |
| 5/6/2003 | 2.51 | 2.62 | 2.38 | 2.5 | 885000 | 2.5 |
| 5/5/2003 | 2.08 | 2.61 | 2.07 | 2.55 | 1961300 | 2.55 |
| 5/2/2003 | 1.95 | 2.1 | 1.9 | 2.05 | 400100 | 2.05 |
| 5/1/2003 | 1.87 | 1.98 | 1.86 | 1.94 | 250700 | 1.94 |
| 4/30/2003 | 1.78 | 1.95 | 1.71 | 1.93 | 949800 | 1.93 |
| 4/29/2003 | 1.87 | 2.1 | 1.87 | 2.1 | 583500 | 2.1 |
| 4/28/2003 | 1.83 | 1.94 | 1.8 | 1.88 | 245000 | 1.88 |
| 4/25/2003 | 1.85 | 1.94 | 1.78 | 1.84 | 216700 | 1.84 |
| 4/24/2003 | 1.85 | 1.94 | 1.82 | 1.86 | 157400 | 1.86 |
| 4/23/2003 | 1.98 | 2 | 1.83 | 1.85 | 308000 | 1.85 |
| 4/22/2003 | 1.65 | 1.99 | 1.62 | 1.96 | 556900 | 1.96 |
| 4/21/2003 | 1.67 | 1.7 | 1.59 | 1.66 | 224800 | 1.66 |
| 4/17/2003 | 1.59 | 1.67 | 1.59 | 1.67 | 201800 | 1.67 |
| 4/16/2003 | 1.67 | 1.68 | 1.58 | 1.61 | 216100 | 1.61 |
| 4/15/2003 | 1.68 | 1.68 | 1.6 | 1.66 | 154300 | 1.66 |
| 4/14/2003 | 1.7 | 1.71 | 1.6 | 1.64 | 148400 | 1.64 |
| 4/11/2003 | 1.67 | 1.68 | 1.57 | 1.66 | 164400 | 1.66 |
| 4/10/2003 | 1.67 | 1.69 | 1.62 | 1.64 | 144900 | 1.64 |
| 4/9/2003 | 1.69 | 1.75 | 1.62 | 1.69 | 234800 | 1.69 |
| 4/8/2003 | 1.7 | 1.75 | 1.65 | 1.68 | 111500 | 1.68 |
| 4/7/2003 | 1.76 | 1.8 | 1.7 | 1.71 | 184400 | 1.71 |
| 4/4/2003 | 1.71 | 1.77 | 1.7 | 1.71 | 157800 | 1.71 |
| 4/3/2003 | 1.76 | 1.8 | 1.72 | 1.73 | 91700 | 1.73 |
| 4/2/2003 | 1.72 | 1.82 | 1.72 | 1.78 | 104900 | 1.78 |
| 4/1/2003 | 1.82 | 1.82 | 1.63 | 1.71 | 92600 | 1.71 |
| 3/31/2003 | 1.6 | 1.85 | 1.6 | 1.71 | 367900 | 1.71 |
| 3/28/2003 | 1.62 | 1.66 | 1.6 | 1.6 | 68400 | 1.6 |
| 3/27/2003 | 1.69 | 1.7 | 1.6 | 1.68 | 153400 | 1.68 |
| 3/26/2003 | 1.78 | 1.78 | 1.69 | 1.71 | 125200 | 1.71 |
| 3/25/2003 | 1.69 | 1.88 | 1.65 | 1.79 | 135200 | 1.79 |
| 3/24/2003 | 1.84 | 1.85 | 1.66 | 1.69 | 160900 | 1.69 |
| 3/21/2003 | 1.92 | 1.94 | 1.85 | 1.87 | 206800 | 1.87 |
| 3/20/2003 | 1.61 | 1.86 | 1.61 | 1.84 | 126000 | 1.84 |
| 3/19/2003 | 1.67 | 1.81 | 1.6 | 1.8 | 135500 | 1.8 |
| 3/18/2003 | 1.69 | 1.86 | 1.63 | 1.7 | 203000 | 1.7 |
| 3/17/2003 | 1.67 | 1.76 | 1.55 | 1.72 | 213800 | 1.72 |
| 3/14/2003 | 1.73 | 1.75 | 1.64 | 1.73 | 214300 | 1.73 |
| 3/13/2003 | 1.46 | 1.73 | 1.45 | 1.67 | 288700 | 1.67 |
| 3/12/2003 | 1.52 | 1.55 | 1.39 | 1.46 | 268100 | 1.46 |
| 3/11/2003 | 1.65 | 1.68 | 1.5 | 1.54 | 217400 | 1.54 |
| 3/10/2003 | 1.81 | 1.82 | 1.6 | 1.66 | 385100 | 1.66 |
| 3/7/2003 | 1.93 | 1.98 | 1.84 | 1.84 | 217800 | 1.84 |
| 3/6/2003 | 1.98 | 2.02 | 1.91 | 1.93 | 151800 | 1.93 |
| 3/5/2003 | 1.91 | 2 | 1.91 | 1.97 | 85900 | 1.97 |
| 3/4/2003 | 1.94 | 2.02 | 1.92 | 1.93 | 144700 | 1.93 |
| 3/3/2003 | 2.02 | 2.05 | 1.91 | 1.94 | 172500 | 1.94 |
| 2/28/2003 | 2.04 | 2.04 | 1.95 | 1.96 | 145200 | 1.96 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/27/2003 | 2 | 2.1 | 1.97 | 2.02 | 282000 | 2.02 |
| 2/26/2003 | 2 | 2.1 | 2 | 2.01 | 98800 | 2.01 |
| 2/25/2003 | 2.07 | 2.08 | 1.94 | 2.05 | 183000 | 2.05 |
| 2/24/2003 | 2.12 | 2.12 | 2.04 | 2.04 | 78100 | 2.04 |
| 2/21/2003 | 2.11 | 2.12 | 2.04 | 2.12 | 115400 | 2.12 |
| 2/20/2003 | 2.08 | 2.11 | 2.05 | 2.11 | 59300 | 2.11 |
| 2/19/2003 | 2.13 | 2.14 | 2.06 | 2.06 | 137300 | 2.06 |
| 2/18/2003 | 2.1 | 2.18 | 2.07 | 2.14 | 201200 | 2.14 |
| 2/14/2003 | 2.07 | 2.12 | 2.02 | 2.12 | 202700 | 2.12 |
| 2/13/2003 | 2.02 | 2.09 | 2.01 | 2.04 | 263700 | 2.04 |
| 2/12/2003 | 2.02 | 2.09 | 2.01 | 2.05 | 276100 | 2.05 |
| 2/11/2003 | 2.11 | 2.22 | 2.03 | 2.03 | 234300 | 2.03 |
| 2/10/2003 | 2.11 | 2.12 | 2.03 | 2.09 | 180600 | 2.09 |
| 2/7/2003 | 2.18 | 2.2 | 2.1 | 2.1 | 154600 | 2.1 |
| 2/6/2003 | 2.18 | 2.27 | 2.15 | 2.15 | 116900 | 2.15 |
| 2/5/2003 | 2.2 | 2.29 | 2.16 | 2.19 | 169700 | 2.19 |
| 2/4/2003 | 2.17 | 2.2 | 2.15 | 2.18 | 290900 | 2.18 |
| 2/3/2003 | 2.27 | 2.3 | 2.03 | 2.22 | 688100 | 2.22 |
| 1/31/2003 | 2.28 | 2.32 | 2.11 | 2.27 | 318100 | 2.27 |
| 1/30/2003 | 2.56 | 2.6 | 2.3 | 2.45 | 239900 | 2.45 |
| 1/29/2003 | 2.46 | 2.64 | 2.26 | 2.56 | 204800 | 2.56 |
| 1/28/2003 | 2.33 | 2.5 | 2.33 | 2.5 | 185700 | 2.5 |
| 1/27/2003 | 2.39 | 2.43 | 2.3 | 2.35 | 240800 | 2.35 |
| 1/24/2003 | 2.55 | 2.58 | 2.44 | 2.46 | 262200 | 2.46 |
| 1/23/2003 | 2.66 | 2.69 | 2.49 | 2.57 | 225500 | 2.57 |
| 1/22/2003 | 2.71 | 2.73 | 2.56 | 2.57 | 242100 | 2.57 |
| 1/21/2003 | 2.6 | 2.76 | 2.57 | 2.68 | 561100 | 2.68 |
| 1/17/2003 | 2.6 | 2.68 | 2.49 | 2.57 | 380300 | 2.57 |
| 1/16/2003 | 2.6 | 2.75 | 2.6 | 2.68 | 286900 | 2.68 |
| 1/15/2003 | 2.71 | 2.76 | 2.64 | 2.65 | 592100 | 2.65 |
| 1/14/2003 | 2.77 | 2.84 | 2.66 | 2.73 | 458800 | 2.73 |
| 1/13/2003 | 2.53 | 2.8 | 2.48 | 2.72 | 1046900 | 2.72 |
| 1/10/2003 | 2.45 | 2.66 | 2.4 | 2.54 | 526700 | 2.54 |
| 1/9/2003 | 2.44 | 2.6 | 2.27 | 2.5 | 764000 | 2.5 |
| 1/8/2003 | 2.35 | 2.48 | 2.34 | 2.44 | 506200 | 2.44 |
| 1/7/2003 | 2.35 | 2.49 | 2.28 | 2.48 | 788100 | 2.48 |
| 1/6/2003 | 2.18 | 2.31 | 2.15 | 2.26 | 270800 | 2.26 |
| 1/3/2003 | 2.27 | 2.33 | 2.15 | 2.23 | 114100 | 2.23 |
| 1/2/2003 | 2.1 | 2.3 | 2.1 | 2.27 | 212300 | 2.27 |
| 12/31/2002 | 2.12 | 2.28 | 2.03 | 2.05 | 722800 | 2.05 |
| 12/30/2002 | 2.33 | 2.33 | 2.2 | 2.22 | 231500 | 2.22 |
| 12/27/2002 | 2.31 | 2.35 | 2.25 | 2.33 | 229900 | 2.33 |
| 12/26/2002 | 2.26 | 2.4 | 2.25 | 2.32 | 198700 | 2.32 |
| 12/24/2002 | 2.35 | 2.4 | 2.22 | 2.23 | 91100 | 2.23 |
| 12/23/2002 | 2.45 | 2.46 | 2.18 | 2.3 | 364000 | 2.3 |
| 12/20/2002 | 2.57 | 2.83 | 2.35 | 2.43 | 909500 | 2.43 |
| 12/19/2002 | 1.84 | 2.7 | 1.77 | 2.67 | 2096900 | 2.67 |
| 12/18/2002 | 1.99 | 2.02 | 1.78 | 1.81 | 367700 | 1.81 |
| 12/17/2002 | 2.05 | 2.05 | 1.96 | 2 | 209400 | 2 |
| 12/16/2002 | 1.98 | 2.09 | 1.92 | 2.08 | 278000 | 2.08 |
| 12/13/2002 | 2.05 | 2.09 | 1.95 | 2.06 | 287600 | 2.06 |
| 12/12/2002 | 2.1 | 2.11 | 2.01 | 2.08 | 187700 | 2.08 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/11/2002 | 2.12 | 2.14 | 2.05 | 2.05 | 185100 | 2.05 |
| 12/10/2002 | 2.04 | 2.18 | 2.04 | 2.13 | 331400 | 2.13 |
| 12/9/2002 | 2.19 | 2.2 | 2.01 | 2.09 | 458500 | 2.09 |
| 12/6/2002 | 2.14 | 2.35 | 2.14 | 2.27 | 272900 | 2.27 |
| 12/5/2002 | 2.37 | 2.38 | 2.2 | 2.24 | 246700 | 2.24 |
| 12/4/2002 | 2.26 | 2.3 | 2.13 | 2.21 | 279500 | 2.21 |
| 12/3/2002 | 2.37 | 2.39 | 2.21 | 2.3 | 247500 | 2.3 |
| 12/2/2002 | 2.46 | 2.52 | 2.3 | 2.4 | 414000 | 2.4 |
| 11/29/2002 | 2.4 | 2.5 | 2.35 | 2.38 | 138500 | 2.38 |
| 11/27/2002 | 2.36 | 2.51 | 2.34 | 2.48 | 333300 | 2.48 |
| 11/26/2002 | 2.53 | 2.6 | 2.31 | 2.34 | 453100 | 2.34 |
| 11/25/2002 | 2.45 | 2.65 | 2.44 | 2.62 | 533000 | 2.62 |
| 11/22/2002 | 2.3 | 2.53 | 2.1 | 2.41 | 823200 | 2.41 |
| 11/21/2002 | 2.08 | 2.4 | 2.07 | 2.27 | 680400 | 2.27 |
| 11/20/2002 | 2.03 | 2.1 | 1.98 | 2.1 | 331100 | 2.1 |
| 11/19/2002 | 1.99 | 2.06 | 1.99 | 2.04 | 317100 | 2.04 |
| 11/18/2002 | 2.02 | 2.1 | 2.01 | 2.02 | 337700 | 2.02 |
| 11/15/2002 | 2.04 | 2.09 | 1.99 | 2.05 | 233900 | 2.05 |
| 11/14/2002 | 2.04 | 2.13 | 2.02 | 2.08 | 322600 | 2.08 |
| 11/13/2002 | 2.01 | 2.14 | 1.99 | 2.08 | 283500 | 2.08 |
| 11/12/2002 | 1.96 | 2.1 | 1.95 | 2.01 | 183000 | 2.01 |
| 11/11/2002 | 2.06 | 2.08 | 1.94 | 1.95 | 170500 | 1.95 |
| 11/8/2002 | 2.06 | 2.1 | 2 | 2.07 | 203500 | 2.07 |
| 11/7/2002 | 2.16 | 2.19 | 2.06 | 2.13 | 238000 | 2.13 |
| 11/6/2002 | 2.13 | 2.2 | 2.12 | 2.19 | 415800 | 2.19 |
| 11/5/2002 | 2.07 | 2.19 | 1.98 | 2.12 | 215100 | 2.12 |
| 11/4/2002 | 2.3 | 2.31 | 1.97 | 2.07 | 1180000 | 2.07 |
| 11/1/2002 | 1.99 | 2.15 | 1.91 | 2.08 | 328600 | 2.08 |
| 10/31/2002 | 2.05 | 2.19 | 1.9 | 2 | 567600 | 2 |
| 10/30/2002 | 2 | 2.16 | 2 | 2.05 | 385200 | 2.05 |
| 10/29/2002 | 2.29 | 2.3 | 1.9 | 2 | 1050600 | 2 |
| 10/28/2002 | 2.73 | 2.9 | 2.57 | 2.67 | 491500 | 2.67 |
| 10/25/2002 | 2.79 | 2.88 | 2.51 | 2.74 | 411300 | 2.74 |
| 10/24/2002 | 2.73 | 2.97 | 2.68 | 2.81 | 482200 | 2.81 |
| 10/23/2002 | 2.49 | 2.71 | 2.48 | 2.69 | 532600 | 2.69 |
| 10/22/2002 | 2.35 | 2.72 | 2.25 | 2.52 | 641900 | 2.52 |
| 10/21/2002 | 2.18 | 2.46 | 2.1 | 2.38 | 695100 | 2.38 |
| 10/18/2002 | 2.05 | 2.05 | 1.91 | 1.97 | 112100 | 1.97 |
| 10/17/2002 | 2.05 | 2.1 | 1.97 | 2.03 | 241400 | 2.03 |
| 10/16/2002 | 1.95 | 1.96 | 1.85 | 1.88 | 154800 | 1.88 |
| 10/15/2002 | 1.89 | 2.16 | 1.89 | 2.05 | 301300 | 2.05 |
| 10/14/2002 | 1.89 | 1.98 | 1.73 | 1.79 | 168700 | 1.79 |
| 10/11/2002 | 1.94 | 2.1 | 1.8 | 1.91 | 491100 | 1.91 |
| 10/10/2002 | 1.59 | 1.95 | 1.55 | 1.85 | 403300 | 1.85 |
| 10/9/2002 | 1.98 | 1.99 | 1.51 | 1.53 | 351500 | 1.53 |
| 10/8/2002 | 2.03 | 2.1 | 1.9 | 1.95 | 331700 | 1.95 |
| 10/7/2002 | 2.07 | 2.15 | 1.9 | 2.1 | 502000 | 2.1 |
| 10/4/2002 | 2.23 | 2.24 | 2.05 | 2.06 | 235500 | 2.06 |
| 10/3/2002 | 2.3 | 2.38 | 2.13 | 2.15 | 772200 | 2.15 |
| 10/2/2002 | 2.42 | 2.55 | 2.3 | 2.31 | 187200 | 2.31 |
| 10/1/2002 | 2.35 | 2.51 | 2.17 | 2.42 | 381200 | 2.42 |
| 9/30/2002 | 2.5 | 2.52 | 2.25 | 2.32 | 650900 | 2.32 |

| | | | | | |
|---|---|---|---|---|---|
| 9/27/2002 | 2.66 | 2.76 | 2.5 | 2.51 | 410000 | 2.51 |
| 9/26/2002 | 2.88 | 2.9 | 2.68 | 2.83 | 1248100 | 2.83 |
| 9/25/2002 | 2.1 | 2.65 | 2.03 | 2.6 | 732900 | 2.6 |
| 9/24/2002 | 2.19 | 2.21 | 2.02 | 2.08 | 362400 | 2.08 |
| 9/23/2002 | 2.51 | 2.54 | 2.19 | 2.21 | 372600 | 2.21 |
| 9/20/2002 | 2.3 | 2.52 | 2.12 | 2.4 | 650400 | 2.4 |
| 9/19/2002 | 2.27 | 2.45 | 2.15 | 2.2 | 447500 | 2.2 |
| 9/18/2002 | 2.5 | 2.55 | 2.01 | 2.37 | 840600 | 2.37 |
| 9/17/2002 | 2.82 | 2.98 | 2.68 | 2.7 | 367700 | 2.7 |
| 9/16/2002 | 3.09 | 3.19 | 2.63 | 2.71 | 609800 | 2.71 |
| 9/13/2002 | 3.09 | 3.22 | 3.01 | 3.1 | 220100 | 3.1 |
| 9/12/2002 | 3.09 | 3.27 | 3.09 | 3.1 | 338400 | 3.1 |
| 9/11/2002 | 3.2 | 3.43 | 3.16 | 3.21 | 622000 | 3.21 |
| 9/10/2002 | 3.06 | 3.24 | 2.9 | 3.16 | 670300 | 3.16 |
| 9/9/2002 | 3 | 3.05 | 2.94 | 3 | 359900 | 3 |
| 9/6/2002 | 2.92 | 3 | 2.85 | 2.9 | 293700 | 2.9 |
| 9/5/2002 | 2.83 | 3.04 | 2.8 | 2.93 | 393100 | 2.93 |
| 9/4/2002 | 2.95 | 3.04 | 2.77 | 2.89 | 526700 | 2.89 |
| 9/3/2002 | 2.9 | 3.09 | 2.84 | 2.86 | 901700 | 2.86 |
| 8/30/2002 | 2.8 | 3.25 | 2.69 | 3.13 | 1793200 | 3.13 |
| 8/29/2002 | 2.67 | 3.02 | 2.55 | 2.8 | 1004900 | 2.8 |
| 8/28/2002 | 2.99 | 3.11 | 2.61 | 2.71 | 1955500 | 2.71 |
| 8/27/2002 | 3.2 | 3.62 | 3.06 | 3.11 | 5256900 | 3.11 |
| 8/26/2002 | 2.35 | 3.09 | 2.31 | 3.03 | 3884700 | 3.03 |
| 8/23/2002 | 2.35 | 2.4 | 2.15 | 2.16 | 662000 | 2.16 |
| 8/22/2002 | 1.95 | 2.31 | 1.88 | 2.31 | 1202200 | 2.31 |
| 8/21/2002 | 1.42 | 1.95 | 1.4 | 1.84 | 1285700 | 1.84 |
| 8/20/2002 | 1.37 | 1.45 | 1.34 | 1.38 | 212700 | 1.38 |
| 8/19/2002 | 1.32 | 1.4 | 1.29 | 1.37 | 150700 | 1.37 |
| 8/16/2002 | 1.3 | 1.36 | 1.3 | 1.31 | 174100 | 1.31 |
| 8/15/2002 | 1.4 | 1.42 | 1.29 | 1.33 | 157200 | 1.33 |
| 8/14/2002 | 1.25 | 1.42 | 1.25 | 1.42 | 155700 | 1.42 |
| 8/13/2002 | 1.3 | 1.33 | 1.28 | 1.3 | 227000 | 1.3 |
| 8/12/2002 | 1.3 | 1.33 | 1.3 | 1.32 | 219200 | 1.32 |
| 8/9/2002 | 1.38 | 1.41 | 1.27 | 1.31 | 176900 | 1.31 |
| 8/8/2002 | 1.31 | 1.39 | 1.3 | 1.38 | 146400 | 1.38 |
| 8/7/2002 | 1.4 | 1.48 | 1.3 | 1.31 | 190800 | 1.31 |
| 8/6/2002 | 1.28 | 1.35 | 1.25 | 1.35 | 271000 | 1.35 |
| 8/5/2002 | 1.19 | 1.33 | 1.19 | 1.2 | 123300 | 1.2 |
| 8/2/2002 | 1.14 | 1.26 | 1.14 | 1.21 | 160700 | 1.21 |
| 8/1/2002 | 1.19 | 1.22 | 1.15 | 1.17 | 267900 | 1.17 |
| 7/31/2002 | 1.39 | 1.4 | 1.22 | 1.3 | 228000 | 1.3 |
| 7/30/2002 | 1.35 | 1.4 | 1.1 | 1.39 | 508200 | 1.39 |
| 7/29/2002 | 1.51 | 1.55 | 1.3 | 1.31 | 459900 | 1.31 |
| 7/26/2002 | 1.43 | 1.53 | 1.3 | 1.46 | 512000 | 1.46 |
| 7/25/2002 | 1.45 | 1.55 | 1.32 | 1.35 | 182900 | 1.35 |
| 7/24/2002 | 1.26 | 1.59 | 1.25 | 1.45 | 336500 | 1.45 |
| 7/23/2002 | 1.39 | 1.49 | 1.3 | 1.43 | 197000 | 1.43 |
| 7/22/2002 | 1.37 | 1.48 | 1.3 | 1.43 | 247900 | 1.43 |
| 7/19/2002 | 1.53 | 1.56 | 1.45 | 1.45 | 265300 | 1.45 |
| 7/18/2002 | 1.52 | 1.63 | 1.52 | 1.52 | 122400 | 1.52 |
| 7/17/2002 | 1.7 | 1.75 | 1.5 | 1.57 | 219300 | 1.57 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/16/2002 | 1.76 | 1.78 | 1.62 | 1.63 | 179900 | 1.63 |
| 7/15/2002 | 1.73 | 1.81 | 1.57 | 1.75 | 584900 | 1.75 |
| 7/12/2002 | 1.36 | 1.74 | 1.36 | 1.69 | 808300 | 1.69 |
| 7/11/2002 | 1.29 | 1.36 | 1.26 | 1.35 | 219700 | 1.35 |
| 7/10/2002 | 1.27 | 1.35 | 1.26 | 1.29 | 181300 | 1.29 |
| 7/9/2002 | 1.31 | 1.35 | 1.26 | 1.26 | 165400 | 1.26 |
| 7/8/2002 | 1.33 | 1.34 | 1.26 | 1.29 | 193800 | 1.29 |
| 7/5/2002 | 1.34 | 1.42 | 1.25 | 1.33 | 166200 | 1.33 |
| 7/3/2002 | 1.22 | 1.3 | 1.2 | 1.3 | 513900 | 1.3 |
| 7/2/2002 | 1.28 | 1.33 | 1.2 | 1.23 | 524700 | 1.23 |
| 7/1/2002 | 1.35 | 1.4 | 1.26 | 1.27 | 682400 | 1.27 |
| 6/28/2002 | 1.29 | 1.37 | 1.25 | 1.33 | 803000 | 1.33 |
| 6/27/2002 | 1.19 | 1.36 | 1.08 | 1.26 | 1042000 | 1.26 |
| 6/26/2002 | 1.09 | 1.2 | 1.05 | 1.19 | 883000 | 1.19 |
| 6/25/2002 | 1.3 | 1.31 | 1.16 | 1.21 | 978200 | 1.21 |
| 6/24/2002 | 1.25 | 1.29 | 1.1 | 1.25 | 1628500 | 1.25 |
| 6/21/2002 | 1.13 | 1.33 | 0.86 | 1.28 | 13341300 | 1.28 |
| 6/20/2002 | 1.56 | 1.6 | 1.49 | 1.53 | 500500 | 1.53 |
| 6/19/2002 | 1.81 | 1.89 | 1.56 | 1.59 | 1639500 | 1.59 |
| 6/18/2002 | 2 | 2.27 | 1.83 | 1.9 | 1319000 | 1.9 |
| 6/17/2002 | 1.65 | 1.98 | 1.62 | 1.94 | 1082700 | 1.94 |
| 6/14/2002 | 1.57 | 1.66 | 1.42 | 1.65 | 1294700 | 1.65 |
| 6/13/2002 | 2.11 | 2.15 | 1.5 | 1.53 | 2168000 | 1.53 |
| 6/12/2002 | 2.24 | 2.27 | 2.02 | 2.09 | 613600 | 2.09 |
| 6/11/2002 | 2.37 | 2.43 | 2.22 | 2.25 | 476500 | 2.25 |
| 6/10/2002 | 2.54 | 2.56 | 2.37 | 2.37 | 329500 | 2.37 |
| 6/7/2002 | 2.62 | 2.76 | 2.52 | 2.55 | 455600 | 2.55 |
| 6/6/2002 | 2.89 | 2.9 | 2.65 | 2.65 | 390900 | 2.65 |
| 6/5/2002 | 2.82 | 2.88 | 2.76 | 2.87 | 237400 | 2.87 |
| 6/4/2002 | 2.78 | 2.85 | 2.72 | 2.75 | 346600 | 2.75 |
| 6/3/2002 | 2.85 | 2.87 | 2.76 | 2.78 | 322700 | 2.78 |
| 5/31/2002 | 3.11 | 3.12 | 2.82 | 2.84 | 367400 | 2.84 |
| 5/30/2002 | 2.89 | 3.23 | 2.86 | 3.07 | 697200 | 3.07 |
| 5/29/2002 | 2.76 | 2.89 | 2.76 | 2.89 | 253700 | 2.89 |
| 5/28/2002 | 2.82 | 2.82 | 2.74 | 2.79 | 253700 | 2.79 |
| 5/24/2002 | 2.81 | 2.85 | 2.72 | 2.82 | 231300 | 2.82 |
| 5/23/2002 | 2.94 | 2.95 | 2.8 | 2.9 | 315300 | 2.9 |
| 5/22/2002 | 2.78 | 2.93 | 2.75 | 2.93 | 382400 | 2.93 |
| 5/21/2002 | 2.79 | 2.85 | 2.75 | 2.8 | 514100 | 2.8 |
| 5/20/2002 | 2.89 | 2.89 | 2.75 | 2.81 | 284200 | 2.81 |
| 5/17/2002 | 2.94 | 3.06 | 2.82 | 2.89 | 357100 | 2.89 |
| 5/16/2002 | 3.02 | 3.05 | 2.8 | 2.81 | 575300 | 2.81 |
| 5/15/2002 | 2.85 | 3.14 | 2.7 | 3.04 | 1425200 | 3.04 |
| 5/14/2002 | 2.59 | 2.85 | 2.58 | 2.73 | 1220200 | 2.73 |
| 5/13/2002 | 2.53 | 2.64 | 2.33 | 2.4 | 1583700 | 2.4 |
| 5/10/2002 | 2.45 | 2.5 | 2.2 | 2.25 | 771700 | 2.25 |
| 5/9/2002 | 2.62 | 2.65 | 2.38 | 2.43 | 615500 | 2.43 |
| 5/8/2002 | 2.51 | 2.79 | 2.47 | 2.61 | 1537700 | 2.61 |
| 5/7/2002 | 2.58 | 2.64 | 2.17 | 2.33 | 1432800 | 2.33 |
| 5/6/2002 | 3 | 3.04 | 2.55 | 2.55 | 1142500 | 2.55 |
| 5/3/2002 | 3.11 | 3.19 | 2.73 | 2.8 | 1182400 | 2.8 |
| 5/2/2002 | 2.61 | 3.09 | 2.53 | 3 | 2292700 | 3 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/1/2002 | 2.49 | 2.64 | 2.45 | 2.5 | 3006300 | 2.5 |
| 4/30/2002 | 3.01 | 3.1 | 2.35 | 2.4 | 9425800 | 2.4 |
| 4/29/2002 | 5.5 | 5.51 | 4.65 | 4.92 | 2018400 | 4.92 |
| 4/26/2002 | 5.95 | 6.2 | 5.52 | 5.6 | 850700 | 5.6 |
| 4/25/2002 | 6.22 | 6.3 | 5.79 | 5.96 | 1414300 | 5.96 |
| 4/24/2002 | 6.25 | 6.42 | 6.15 | 6.25 | 467300 | 6.25 |
| 4/23/2002 | 6.26 | 6.4 | 6.16 | 6.21 | 581500 | 6.21 |
| 4/22/2002 | 6.25 | 6.46 | 6.22 | 6.25 | 622800 | 6.25 |
| 4/19/2002 | 7.15 | 7.16 | 6.5 | 6.55 | 927500 | 6.55 |
| 4/18/2002 | 7.08 | 7.19 | 6.82 | 7 | 450500 | 7 |
| 4/17/2002 | 6.91 | 7.24 | 6.9 | 7.12 | 672400 | 7.12 |
| 4/16/2002 | 6.56 | 6.93 | 6.41 | 6.89 | 822100 | 6.89 |
| 4/15/2002 | 6.87 | 6.9 | 6.2 | 6.27 | 610100 | 6.27 |
| 4/12/2002 | 6.36 | 6.75 | 6.22 | 6.7 | 658200 | 6.7 |
| 4/11/2002 | 6.04 | 6.22 | 5.93 | 6.19 | 706600 | 6.19 |
| 4/10/2002 | 6.52 | 6.69 | 5.97 | 6.16 | 1486500 | 6.16 |
| 4/9/2002 | 6.7 | 6.95 | 6.4 | 6.43 | 478200 | 6.43 |
| 4/8/2002 | 6.8 | 6.8 | 6.35 | 6.7 | 1042800 | 6.7 |
| 4/5/2002 | 7.18 | 7.39 | 6.8 | 6.8 | 520300 | 6.8 |
| 4/4/2002 | 7.03 | 7.25 | 6.75 | 7.1 | 631700 | 7.1 |
| 4/3/2002 | 7.5 | 7.68 | 6.92 | 7.03 | 1465800 | 7.03 |
| 4/2/2002 | 7.92 | 8 | 7.37 | 7.37 | 1538500 | 7.37 |
| 4/1/2002 | 8.36 | 8.48 | 7.9 | 8.18 | 2045600 | 8.18 |
| 3/28/2002 | 8.3 | 9.35 | 7.76 | 8.48 | 10706800 | 8.48 |
| 3/27/2002 | 7.5 | 8.24 | 7.05 | 8.09 | 2088700 | 8.09 |
| 3/26/2002 | 7.7 | 7.78 | 7.16 | 7.42 | 1042400 | 7.42 |
| 3/25/2002 | 7.93 | 8 | 7.67 | 7.86 | 845100 | 7.86 |
| 3/22/2002 | 8.05 | 8.24 | 7.56 | 8.05 | 1248300 | 8.05 |
| 3/21/2002 | 8.21 | 8.23 | 7.6 | 8.1 | 960700 | 8.1 |
| 3/20/2002 | 8 | 8.44 | 7.95 | 8.2 | 1483200 | 8.2 |
| 3/19/2002 | 7.64 | 8.35 | 7.46 | 8.14 | 2095000 | 8.14 |
| 3/18/2002 | 7.25 | 7.71 | 7.12 | 7.63 | 1785700 | 7.63 |
| 3/15/2002 | 6.58 | 7.05 | 6.5 | 7.02 | 715400 | 7.02 |
| 3/14/2002 | 7 | 7.01 | 6.59 | 6.62 | 616200 | 6.62 |
| 3/13/2002 | 7.2 | 7.25 | 6.76 | 6.88 | 984100 | 6.88 |
| 3/12/2002 | 7.18 | 7.53 | 7.05 | 7.23 | 1067600 | 7.23 |
| 3/11/2002 | 7.7 | 7.9 | 7.24 | 7.55 | 976300 | 7.55 |
| 3/8/2002 | 7.15 | 7.8 | 7.02 | 7.64 | 1707200 | 7.64 |
| 3/7/2002 | 7.15 | 7.15 | 6.71 | 6.9 | 872500 | 6.9 |
| 3/6/2002 | 6.54 | 7.08 | 6.53 | 6.89 | 600800 | 6.89 |
| 3/5/2002 | 6.95 | 7.15 | 6.75 | 6.92 | 834600 | 6.92 |
| 3/4/2002 | 6.55 | 7.03 | 6.41 | 6.84 | 1057400 | 6.84 |
| 3/1/2002 | 5.91 | 6.44 | 5.91 | 6.44 | 653500 | 6.44 |
| 2/28/2002 | 6.27 | 6.3 | 5.86 | 5.91 | 362600 | 5.91 |
| 2/27/2002 | 6.4 | 6.69 | 6.04 | 6.1 | 458100 | 6.1 |
| 2/26/2002 | 6.1 | 6.42 | 5.8 | 6.33 | 649900 | 6.33 |
| 2/25/2002 | 6.07 | 6.15 | 5.9 | 6.11 | 506000 | 6.11 |
| 2/22/2002 | 5.83 | 6.24 | 5.55 | 6.17 | 673000 | 6.17 |
| 2/21/2002 | 5.94 | 6.29 | 5.65 | 5.76 | 741300 | 5.76 |
| 2/20/2002 | 5.73 | 6.13 | 5.48 | 6.13 | 798900 | 6.13 |
| 2/19/2002 | 6.04 | 6.11 | 5.5 | 5.69 | 921200 | 5.69 |
| 2/15/2002 | 6.29 | 6.68 | 6 | 6.14 | 706100 | 6.14 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/14/2002 | 6.64 | 6.73 | 6.21 | 6.31 | 578800 | 6.31 |
| 2/13/2002 | 7.04 | 7.25 | 6.31 | 6.35 | 1145400 | 6.35 |
| 2/12/2002 | 6.39 | 7.11 | 6.25 | 6.84 | 809900 | 6.84 |
| 2/11/2002 | 6.05 | 6.5 | 6 | 6.49 | 946900 | 6.49 |
| 2/8/2002 | 6.07 | 6.22 | 5.82 | 6 | 654200 | 6 |
| 2/7/2002 | 6.01 | 6.28 | 5.71 | 6.06 | 614300 | 6.06 |
| 2/6/2002 | 6.19 | 6.31 | 5.67 | 6 | 909700 | 6 |
| 2/5/2002 | 6.11 | 6.43 | 5.95 | 5.99 | 1225100 | 5.99 |
| 2/4/2002 | 6.81 | 7.05 | 6.26 | 6.32 | 906900 | 6.32 |
| 1/31/2002 | 7.2 | 7.4 | 6.92 | 6.98 | 835900 | 6.98 |
| 1/30/2002 | 7.16 | 7.27 | 6.25 | 7.2 | 1988400 | 7.2 |
| 1/29/2002 | 7.76 | 7.82 | 6.81 | 7.17 | 5157400 | 7.17 |
| 1/28/2002 | 7.15 | 7.27 | 6.8 | 6.92 | 1447100 | 6.92 |
| 1/25/2002 | 7.06 | 7.15 | 6.75 | 6.98 | 1580500 | 6.98 |
| 1/24/2002 | 7.01 | 7.5 | 6.89 | 7.02 | 2439500 | 7.02 |
| 1/23/2002 | 6.26 | 7 | 6.11 | 6.93 | 1997300 | 6.93 |
| 1/22/2002 | 6.5 | 6.51 | 6.23 | 6.29 | 986500 | 6.29 |
| 1/18/2002 | 6.01 | 6.63 | 5.8 | 6.11 | 1736100 | 6.11 |
| 1/17/2002 | 6.96 | 7.13 | 5.97 | 6.23 | 4826600 | 6.23 |
| 1/16/2002 | 7.65 | 7.66 | 6.15 | 6.49 | 6013500 | 6.49 |
| 1/15/2002 | 8.11 | 8.17 | 7.53 | 7.82 | 1119200 | 7.82 |
| 1/14/2002 | 8.2 | 8.25 | 7.8 | 8.15 | 2012800 | 8.15 |
| 1/11/2002 | 8.35 | 8.42 | 7.86 | 8.17 | 1624300 | 8.17 |
| 1/10/2002 | 8.9 | 8.9 | 8.23 | 8.25 | 1244400 | 8.25 |
| 1/9/2002 | 8.7 | 9.12 | 8.42 | 8.7 | 1358800 | 8.7 |
| 1/8/2002 | 8.5 | 8.68 | 8.2 | 8.64 | 835300 | 8.64 |
| 1/7/2002 | 8.57 | 8.77 | 8.3 | 8.39 | 1673300 | 8.39 |
| 1/4/2002 | 9.1 | 9.15 | 8.27 | 8.55 | 2078200 | 8.55 |
| 1/3/2002 | 9.15 | 9.3 | 8.65 | 8.86 | 1549400 | 8.86 |
| 1/2/2002 | 8.5 | 8.93 | 8.4 | 8.9 | 1587000 | 8.9 |
| 12/31/2001 | 8.19 | 8.5 | 8.06 | 8.27 | 1051300 | 8.27 |
| 12/28/2001 | 8.56 | 8.87 | 8.1 | 8.11 | 1956000 | 8.11 |
| 12/27/2001 | 8.05 | 8.6 | 8 | 8.49 | 2501400 | 8.49 |
| 12/26/2001 | 8.13 | 8.47 | 8 | 8.16 | 2125800 | 8.16 |
| 12/24/2001 | 8.28 | 8.28 | 7.81 | 8.06 | 665500 | 8.06 |
| 12/21/2001 | 7.65 | 8.38 | 7.54 | 8.21 | 6841000 | 8.21 |
| 12/20/2001 | 10.44 | 11.63 | 7.26 | 7.48 | 24716300 | 7.48 |
| 12/19/2001 | 11.4 | 11.85 | 10.25 | 10.34 | 2589900 | 10.34 |
| 12/18/2001 | 12.35 | 12.6 | 11.83 | 11.99 | 1779300 | 11.99 |
| 12/17/2001 | 10.55 | 12.02 | 10.15 | 12 | 3273200 | 12 |
| 12/14/2001 | 11.62 | 11.8 | 10.4 | 10.77 | 3013900 | 10.77 |
| 12/13/2001 | 12.05 | 12.4 | 11.53 | 11.6 | 1574100 | 11.6 |
| 12/12/2001 | 12.65 | 12.89 | 12.05 | 12.13 | 1181200 | 12.13 |
| 12/11/2001 | 13.15 | 13.6 | 12.13 | 12.41 | 1959700 | 12.41 |
| 12/10/2001 | 13.15 | 13.45 | 12.28 | 12.95 | 1586400 | 12.95 |
| 12/7/2001 | 14.15 | 14.15 | 13.1 | 13.25 | 2279400 | 13.25 |
| 12/6/2001 | 14.48 | 14.75 | 14.05 | 14.15 | 1992500 | 14.15 |
| 12/5/2001 | 13.37 | 14.75 | 13.27 | 14.11 | 4004400 | 14.11 |
| 12/4/2001 | 11.59 | 13.1 | 11.55 | 13.06 | 1852700 | 13.06 |
| 12/3/2001 | 12.05 | 12.2 | 11.42 | 11.52 | 1009600 | 11.52 |
| 11/30/2001 | 12.9 | 13.3 | 12.01 | 12.06 | 1588000 | 12.06 |
| 11/29/2001 | 12.2 | 12.81 | 11.91 | 12.81 | 1723000 | 12.81 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/28/2001 | 12.89 | 13.11 | 11.6 | 11.95 | 1580600 | 11.95 |
| 11/27/2001 | 13.2 | 13.75 | 12.82 | 13.11 | 1222800 | 13.11 |
| 11/26/2001 | 13.31 | 13.78 | 12.65 | 13.28 | 1261500 | 13.28 |
| 11/23/2001 | 13.1 | 13.45 | 13.05 | 13.21 | 258200 | 13.21 |
| 11/21/2001 | 13.27 | 13.74 | 12.75 | 13.17 | 1306000 | 13.17 |
| 11/20/2001 | 13.01 | 14.34 | 12.76 | 13.37 | 2546700 | 13.37 |
| 11/19/2001 | 13.53 | 13.6 | 12.9 | 13.11 | 1399500 | 13.11 |
| 11/16/2001 | 13.2 | 13.7 | 12.69 | 13.19 | 2196300 | 13.19 |
| 11/15/2001 | 12.87 | 13.99 | 12.33 | 13.5 | 6418500 | 13.5 |
| 11/14/2001 | 11.49 | 13.11 | 10.85 | 13.09 | 9643800 | 13.09 |
| 11/13/2001 | 10.52 | 11.1 | 10.3 | 10.46 | 2651100 | 10.46 |
| 11/12/2001 | 10.55 | 10.69 | 9.24 | 10.15 | 1077400 | 10.15 |
| 11/9/2001 | 10.52 | 10.87 | 10.4 | 10.44 | 1551500 | 10.44 |
| 11/8/2001 | 10.3 | 11.1 | 10.16 | 10.5 | 2831500 | 10.5 |
| 11/7/2001 | 10.35 | 10.95 | 10.05 | 10.15 | 2362600 | 10.15 |
| 11/6/2001 | 10.83 | 10.87 | 10.36 | 10.45 | 1102500 | 10.45 |
| 11/5/2001 | 11 | 11.16 | 10.56 | 10.79 | 1285200 | 10.79 |
| 11/2/2001 | 11.11 | 11.2 | 10.7 | 10.76 | 818800 | 10.76 |
| 11/1/2001 | 11.63 | 11.75 | 10.4 | 11.25 | 1623100 | 11.25 |
| 10/31/2001 | 11.56 | 12.2 | 11.25 | 11.35 | 1513600 | 11.35 |
| 10/30/2001 | 11.77 | 12.43 | 11.03 | 11.33 | 2750400 | 11.33 |
| 10/29/2001 | 11.7 | 12.2 | 11.43 | 11.87 | 3151400 | 11.87 |
| 10/26/2001 | 11.5 | 12.2 | 11.35 | 11.35 | 2188800 | 11.35 |
| 10/25/2001 | 10.54 | 11.5 | 10.25 | 11.37 | 2283300 | 11.37 |
| 10/24/2001 | 10.59 | 11.3 | 10.4 | 10.74 | 3330900 | 10.74 |
| 10/23/2001 | 10.91 | 10.91 | 10.08 | 10.25 | 1638600 | 10.25 |
| 10/22/2001 | 9.25 | 11.08 | 9.24 | 10.51 | 4076600 | 10.51 |
| 10/19/2001 | 8.66 | 9.45 | 8.5 | 9.22 | 1797600 | 9.22 |
| 10/18/2001 | 8.52 | 9.03 | 8.34 | 8.51 | 624000 | 8.51 |
| 10/17/2001 | 8.99 | 9.29 | 8.6 | 8.61 | 1455400 | 8.61 |
| 10/16/2001 | 8.98 | 9.22 | 8.3 | 8.9 | 1208900 | 8.9 |
| 10/15/2001 | 8.27 | 9.08 | 7.92 | 8.95 | 1197800 | 8.95 |
| 10/12/2001 | 8.97 | 9.1 | 8.25 | 8.5 | 1914800 | 8.5 |
| 10/11/2001 | 9.2 | 9.31 | 8.5 | 8.8 | 1466400 | 8.8 |
| 10/10/2001 | 9.36 | 9.56 | 8.47 | 9 | 1983400 | 9 |
| 10/9/2001 | 9.15 | 9.62 | 9 | 9.25 | 1579500 | 9.25 |
| 10/8/2001 | 8.05 | 9.15 | 7.94 | 8.93 | 1387800 | 8.93 |
| 10/5/2001 | 8.4 | 8.45 | 7.85 | 8.14 | 1112100 | 8.14 |
| 10/4/2001 | 8.26 | 8.87 | 8.01 | 8.45 | 2355500 | 8.45 |
| 10/3/2001 | 6.79 | 8.5 | 6.78 | 8.16 | 3080200 | 8.16 |
| 10/2/2001 | 6.83 | 7.06 | 6.8 | 6.85 | 1087200 | 6.85 |
| 10/1/2001 | 7.05 | 7.22 | 6.75 | 6.86 | 665800 | 6.86 |
| 9/28/2001 | 6.63 | 7.19 | 6.62 | 7.19 | 2315400 | 7.19 |
| 9/27/2001 | 6.64 | 6.82 | 5.26 | 6.48 | 2172300 | 6.48 |
| 9/26/2001 | 6.95 | 7.27 | 6.6 | 6.66 | 793400 | 6.66 |
| 9/25/2001 | 7.15 | 7.18 | 6.75 | 6.99 | 697700 | 6.99 |
| 9/24/2001 | 7.14 | 7.24 | 6.7 | 7.13 | 1464900 | 7.13 |
| 9/21/2001 | 6.62 | 7.33 | 6.51 | 6.82 | 1798400 | 6.82 |
| 9/20/2001 | 7.15 | 7.5 | 7 | 7.09 | 1224400 | 7.09 |
| 9/19/2001 | 7.1 | 7.55 | 6.75 | 7.2 | 1612500 | 7.2 |
| 9/18/2001 | 6.24 | 7.22 | 6.24 | 6.98 | 1597300 | 6.98 |
| 9/17/2001 | 6.22 | 7.1 | 6.15 | 6.45 | 1536300 | 6.45 |

| | | | | | |
|---|---|---|---|---|---|
| 9/10/2001 | 7.14 | 7.22 | 6.75 | 7.1 | 1660400 | 7.1 |
| 9/7/2001 | 6.3 | 7.25 | 6.21 | 7.01 | 3282500 | 7.01 |
| 9/6/2001 | 6.13 | 6.48 | 5.9 | 6.38 | 1772500 | 6.38 |
| 9/5/2001 | 6.32 | 6.68 | 5.8 | 6.24 | 3369900 | 6.24 |
| 9/4/2001 | 5.94 | 6.65 | 5.84 | 6.3 | 8678900 | 6.3 |
| 8/31/2001 | 4.02 | 4.23 | 4.01 | 4.17 | 142100 | 4.17 |
| 8/30/2001 | 4.03 | 4.15 | 4 | 4.08 | 254300 | 4.08 |
| 8/29/2001 | 4.39 | 4.45 | 4.04 | 4.11 | 334900 | 4.11 |
| 8/28/2001 | 4.41 | 4.43 | 4.2 | 4.25 | 313000 | 4.25 |
| 8/27/2001 | 4.45 | 4.58 | 4.4 | 4.41 | 228900 | 4.41 |
| 8/24/2001 | 4.35 | 4.67 | 4.21 | 4.43 | 416400 | 4.43 |
| 8/23/2001 | 4.2 | 4.56 | 4.16 | 4.21 | 366600 | 4.21 |
| 8/22/2001 | 4.32 | 4.49 | 3.98 | 4.25 | 640000 | 4.25 |
| 8/21/2001 | 4.51 | 4.65 | 4.25 | 4.35 | 336400 | 4.35 |
| 8/20/2001 | 4.77 | 4.87 | 4.5 | 4.65 | 470800 | 4.65 |
| 8/17/2001 | 5.07 | 5.08 | 4.78 | 4.88 | 421500 | 4.88 |
| 8/16/2001 | 5.67 | 5.67 | 5.01 | 5.14 | 451700 | 5.14 |
| 8/15/2001 | 5.59 | 5.72 | 5.45 | 5.67 | 387700 | 5.67 |
| 8/14/2001 | 6.09 | 6.11 | 5.62 | 5.77 | 384500 | 5.77 |
| 8/13/2001 | 5.85 | 5.97 | 5.46 | 5.9 | 379100 | 5.9 |
| 8/10/2001 | 6.43 | 6.45 | 5.68 | 5.75 | 573700 | 5.75 |
| 8/9/2001 | 6.12 | 6.45 | 6.09 | 6.4 | 882700 | 6.4 |
| 8/8/2001 | 6.3 | 6.39 | 6.05 | 6.33 | 648100 | 6.33 |
| 8/7/2001 | 6.25 | 6.49 | 6.13 | 6.33 | 526900 | 6.33 |
| 8/6/2001 | 6.42 | 6.43 | 6.15 | 6.3 | 318100 | 6.3 |
| 8/3/2001 | 6.45 | 6.6 | 6.2 | 6.44 | 515900 | 6.44 |
| 8/2/2001 | 6.38 | 6.76 | 6.15 | 6.54 | 467200 | 6.54 |
| 8/1/2001 | 6.11 | 6.55 | 5.9 | 6.38 | 1674100 | 6.38 |
| 7/31/2001 | 5.85 | 6.78 | 5.75 | 6.52 | 2364500 | 6.52 |
| 7/30/2001 | 5.49 | 5.89 | 5.45 | 5.85 | 636800 | 5.85 |
| 7/27/2001 | 5.2 | 5.54 | 5.2 | 5.49 | 462600 | 5.49 |
| 7/26/2001 | 5.02 | 5.47 | 4.94 | 5.4 | 422400 | 5.4 |
| 7/25/2001 | 5.65 | 5.93 | 4.9 | 4.9 | 677400 | 4.9 |
| 7/24/2001 | 5.47 | 5.52 | 5.27 | 5.52 | 617000 | 5.52 |
| 7/23/2001 | 5.4 | 5.85 | 5.25 | 5.46 | 540000 | 5.46 |
| 7/20/2001 | 5.39 | 5.68 | 5.17 | 5.44 | 456400 | 5.44 |
| 7/19/2001 | 5.74 | 5.74 | 5.37 | 5.51 | 569300 | 5.51 |
| 7/18/2001 | 4.87 | 5.74 | 4.87 | 5.6 | 1205000 | 5.6 |
| 7/17/2001 | 4.87 | 5.06 | 4.7 | 5.05 | 344500 | 5.05 |
| 7/16/2001 | 5.03 | 5.18 | 4.86 | 5 | 417100 | 5 |
| 7/13/2001 | 4.92 | 5.06 | 4.87 | 5.01 | 293600 | 5.01 |
| 7/12/2001 | 5.02 | 5.2 | 4.95 | 4.95 | 768500 | 4.95 |
| 7/11/2001 | 4.62 | 4.84 | 4.61 | 4.84 | 411600 | 4.84 |
| 7/10/2001 | 4.72 | 4.9 | 4.63 | 4.7 | 466000 | 4.7 |
| 7/9/2001 | 4.88 | 4.97 | 4.67 | 4.77 | 317200 | 4.77 |
| 7/6/2001 | 4.96 | 4.98 | 4.78 | 4.85 | 511300 | 4.85 |
| 7/5/2001 | 5.26 | 5.26 | 5 | 5 | 705300 | 5 |
| 7/3/2001 | 5.4 | 5.55 | 5.35 | 5.45 | 642900 | 5.45 |
| 7/2/2001 | 5.31 | 5.83 | 5.29 | 5.71 | 2161200 | 5.71 |
| 6/29/2001 | 4.35 | 6.2 | 4.05 | 6.12 | 5786200 | 6.12 |
| 6/28/2001 | 3.68 | 3.85 | 3.52 | 3.72 | 584600 | 3.72 |
| 6/27/2001 | 3.64 | 3.71 | 3.44 | 3.51 | 865300 | 3.51 |

| | | | | | |
|---|---|---|---|---|---|
| 6/26/2001 | 3.8 | 3.83 | 3.5 | 3.6 | 1053200 | 3.6 |
| 6/25/2001 | 3.8 | 3.91 | 3.7 | 3.78 | 828700 | 3.78 |
| 6/22/2001 | 4.03 | 4.2 | 3.9 | 3.91 | 1442900 | 3.91 |
| 6/21/2001 | 3.84 | 4.08 | 3.8 | 4.01 | 1232800 | 4.01 |
| 6/20/2001 | 3.79 | 4.25 | 3.58 | 3.77 | 1179900 | 3.77 |
| 6/19/2001 | 4.75 | 4.88 | 3.7 | 4.06 | 1523500 | 4.06 |
| 6/18/2001 | 5.35 | 5.35 | 4.37 | 4.45 | 965200 | 4.45 |
| 6/15/2001 | 5.16 | 5.7 | 5.11 | 5.53 | 968000 | 5.53 |
| 6/14/2001 | 5.87 | 5.93 | 5.24 | 5.25 | 739400 | 5.25 |
| 6/13/2001 | 6.23 | 6.24 | 5.75 | 5.98 | 722000 | 5.98 |
| 6/12/2001 | 5.52 | 6.19 | 5.24 | 6.09 | 979200 | 6.09 |
| 6/11/2001 | 5.82 | 5.89 | 5.3 | 5.48 | 752300 | 5.48 |
| 6/8/2001 | 6.2 | 6.21 | 5.81 | 5.84 | 440100 | 5.84 |
| 6/7/2001 | 5.78 | 6.45 | 5.75 | 6.16 | 954600 | 6.16 |
| 6/6/2001 | 5.84 | 5.85 | 5.61 | 5.85 | 260000 | 5.85 |
| 6/5/2001 | 5.85 | 5.89 | 5.6 | 5.88 | 464800 | 5.88 |
| 6/4/2001 | 5.99 | 6 | 5.68 | 5.81 | 341300 | 5.81 |
| 6/1/2001 | 5.94 | 6.06 | 5.65 | 5.84 | 537300 | 5.84 |