MORGAN, LEWIS & BOCKIUS LLP
  John H. Hemann (Bar No. 165823)
  Michael J. Lawson (Bar No. 66547)
  Sheila A. Jambekar (Bar No. 239101)
One Market
Spear Street Tower
San Francisco, CA 94105
Tel:  (415) 442-1000
Fax:  (415) 442-1001

ERNST & YOUNG LLP
  Bruce M. Cormier
  Joel E. Bonner (Bar No. 105492)
1225 Connecticut Avenue, NW
Washington, D.C. 20036
Tel: (202) 327-7603
Fax: (202) 327-7601

Attorneys for Defendant
ERNST & YOUNG LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ADRIAN MONGELI, Individually, And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TERAYON COMMUNICATIONS SYSTEMS, INC., ZAKI RAKIB, JERRY D. CHASE, MARK A. RICHMAN, EDWARD LOPEZ, RAY FRITZ, CAROL LUSTENADER, MATTHEW MILLER, SHLOMO RAKIB, DOUG SABELLA, CHRISTOPHER SCHAEPE, MARK SLAVEN, LEWIS SOLOMON, HOWARD W. SPEAKS, ARTHUR T. TAYLOR, DAVID WOODROW, and ERNST & YOUNG LLP,<br><br>Defendants. | Case No. 3-06-CV-03936 MJJ<br><br>**CLASS ACTION**<br><br>**APPENDIX OF AUTHORITIES AVAILABLE ONLY ON ELECTRONIC DATABASES IN SUPPORT OF ERNST & YOUNG LLP'S MOTION TO DISMISS**<br><br>Hearing Date:  June 26, 2007<br>Time:  9:30 a.m.<br>Dept.:  Courtroom 11<br>Judge:  Hon. Martin J. Jenkins<br>Action Filed:  June 23, 2006 |

1    Defendant Ernst & Young LLP respectfully submits this Appendix of Cases Available

2  Only On Electronic Databases Authorities in support of its Motion to Dismiss Amended Class

3  Action Complaint.

4  **CASES**                                                                                    **EXHIBIT**

5  *Business Objects S.A. Sec. Litig.*, *In re*, No. C 04-2401 MJJ,
   2005 U.S. Dist. LEXIS 20215 (N.D. Cal. Jul. 27, 2005)............................................A
6
   *Coble v. Broadvision, Inc.*, No. C 01-01969 CRB,
7  2002 U.S. Dist. LEXIS 17495 (N.D. Cal. Sept. 11, 2002) ........................................B

8  *Ditech Comms. Corp. Sec. Litig.*, *In re*, No. C 05-02406 JSW,
   2006 U.S. Dist. LEXIS 58978 (N.D. Cal. Aug. 10, 2006)..........................................C
9
   *Invision Techs., Inc. Sec. Litig.*, *In re*, No. C 04-03181 MJJ,
10 2006 U.S. Dist. LEXIS 76458 (N.D. Cal. Aug. 31, 2006).........................................D

11 *Med/Waste, Inc. Sec. Litig.*, *In re*, No. 99-1684-CIV-GOLD,
   2000 U.S. Dist. LEXIS 22505 (S.D. Fla. Aug. 30, 2000)..........................................E
12
   *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ,
13 2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sept. 23, 2005).........................................F

14 *Network Assoc., Inc. II Sec. Litig.*, *In re* No. C 00-4849 MJJ,
   2003 U.S. Dist. LEXIS 14442 (N.D. Cal. Mar. 25, 2003)..........................................G
15
   *Shurkin v. Golden State Vintners, Inc.*, No. C 04-03434 MJJ,
16 2006 U.S. Dist. LEXIS 94900 (N.D. Cal. Dec. 30, 2006)/..........................................H

17 *Svezzese v. Duratek, Inc.*, No. MJG-01-1830,
   2002 U.S. Dist. LEXIS 20967 (D. Md. Apr. 30, 2002)...............................................I
18
   *Teachers' Ret. Sys. v. Hunter*, No. 05-1988,
19 2007 WL 509787 (4th Cir. Feb. 20, 2007) ...........................................................J

20 *Wu Group v. Synopsys, Inc.*, No. C 04-3580 MJJ,
   2005 U.S. Dist. LEXIS 42351 (N.D. Cal. Aug. 10, 2005) ........................................K
21

22 Dated: March 23, 2007                          MORGAN, LEWIS & BOCKIUS LLP

23

24                                               By ____/S/_____
25                                                  John Hemann
                                                    Attorneys for Defendant
26                                                  ERNST & YOUNG LLP

27

28

# EXHIBIT A

LEXSEE



Cited
As of: Mar 08, 2007

**In re BUSINESS OBJECTS S.A. SECURITIES LITIGATION, This Document
Relates To: ALL ACTIONS**

**No. C 04-2401 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2005 U.S. Dist. LEXIS 20215**

**July 27, 2005, Decided
July 27, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a corporation and its officers, moved to dismiss a federal securities fraud class action brought against them by plaintiffs, purchasers of the corporation's stock. The corporation and the officers moved to dismiss the consolidated class action complaint with prejudice under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C.S. § 78u-4, and pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** In considering whether the private securities fraud complaint could survive dismissal under Fed. R. Civ. P. 12(b)(6), the court had to determine whether particular facts in the complaint, taken as a whole, raised a strong inference that the corporation and the officers intentionally or with deliberate recklessness made false or misleading statements to investors. The court found it appropriate to dismiss the purchasers' securities fraud claims under § 10(b) (15 U.S.C.S. § 78j(b)) of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, because: (1) the purchasers failed to describe confidential witnesses with a sufficient degree of specificity in the amended complaint; (2) the purchasers failed to show that the corporation recognized revenue in violation of Generally Accepted Accounting

Principles; and (3) stock sales by one of the officers were not sufficiently suspicious to raise an inference of scienter. Thus, because the purchasers' allegations as a whole failed to give rise to a strong inference of deliberate recklessness, the Private Securities Litigation Reform Act of 1995, 15 U.S.C.S. § 78u-4, supported dismissal.

**OUTCOME:** The court granted the motion to dismiss with leave to amend.

**CORE TERMS:** scienter, confidential, integration, accounting, misleading, motion to dismiss, misrepresentation, particularity, stock, securities fraud, press release, recklessness, acquisition, deliberate, insider, analyst, earning, Exchange Act, particularized, specificity, suspicious, heightened, announced, inflated, omission, totality, causation, falsity, disclosure, Securities Litigation Reform Act

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals*

Page 1

  

*> Failures to State Claims*
[HN1] A court may dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under an adequate theory. When deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to plaintiff. Moreover, a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] In the context of a motion to dismiss, review is limited to the contents in the complaint. When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. Where such a conversion takes place, all parties must be given an opportunity to present all material made pertinent to such a motion by Fed. R. Civ. P. 56. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] Where a plaintiff fails to attach to the complaint documents referred to in it, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support plaintiff's claim. Thus, the district court may consider the full texts of documents that the complaint only quotes in part. That rule precludes the plaintiffs from surviving a Fed. R. Civ. P. 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Registration Requirements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN4] Section 10(b) (15 U.S.C.S. § 78j(b)) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe. 15 U.S.C.S. § 78j(b).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN5] See 17 C.F.R. § 240.10b-5.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] To be actionable under § 10(b) (15 U.S.C.S. § 78j(b)) of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. Additionally, as in all actions alleging fraud, plaintiffs must state with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b).

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > General Overview*
[HN7] Section 20(a) (15 U.S.C.S. § 78t(a)) of the Securities Exchange Act of 1934 (Act) provides derivative liability for those who control others found to

  

be primarily liable under the Act. Where a plaintiff asserts a § 20(a) claim based on an underlying violation of § 10(b) (15 U.S.C.S. § 78j(b)) of the Act, the pleading requirements for both violations are the same.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN8] In 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C.S. § 78u-4, to provide protections to discourage frivolous securities litigation. The PSLRA strengthened the pleading requirements of Fed. R. Civ. P. 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C.S. § 78u-4(b)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN9] The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C.S. § 78u-4, has heightened the pleading threshold for causes of action brought under § 10(b) (15 U.S.C.S. § 78j(b)) of the Securities Exchange Act of 1934 and Rule 10b-5, 17 C.F.R. § 240.10b-5. Specifically, the PSLRA imposes strict requirements for pleading scienter. A complaint under the PSLRA must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2). The United States Court of Appeals for the Ninth Circuit, in interpreting the PSLRA, has held that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court

must dismiss the complaint. 15 U.S.C.S. § 78u-4(b)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN10] Fed. R. Civ. P. 8 requires that a plaintiff provide a short and plain statement describing why the plaintiff is entitled to relief. The United States District Court for the Northern District of California joins the approach of other courts in the district and attempts to "glean the complaint," focusing on those statements that are in bold and italicized.

*Criminal Law & Procedure > Accusatory Instruments > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN11] In order to support their claims under the Private Securities Litigation Reform Act of 1995, 15 U.S.C.S. § 78u-4, the plaintiffs must first specify a statement alleged to have been misleading. 15 U.S.C.S. § 78u-4(b)(1). Additionally, in order to avoid having their action dismissed, the plaintiffs must plead with particularity either the alleged misleading statements or scienter. The United States Court of Appeals for the Ninth Circuit has articulated the rule as follows: because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, the court has incorporated the dual pleading requirements of 15 U.S.C.S. § 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Fed. R. Civ. P. 12(b)(6), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference that misleading statements were knowingly or with deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6).

*Civil Procedure > Pleading & Practice > Pleadings >*





*Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities*
*Litigation > General Overview*
[HN12] The U.S. Court of Appeals for the Ninth Circuit has warned against the use of unnamed sources and stated that it is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim. Instead, to meet that particularity requirement for personal sources of information, the Ninth Circuit has applied the U.S. Court of Appeals for the Second Circuit's standard that personal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. When plaintiffs rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. In a case where the plaintiffs had numbered each confidential witness, described his or her job description and responsibilities, and in some instances, provided the witnesses' exact title and to which executive the witnessed reported, the Ninth Circuit found that the specificity of the plaintiffs' descriptions was sufficient to met the requirements for confidential witnesses under the Private Securities Litigation Reform Act of 1995, 15 U.S.C.S. § 78u-4.

*Securities Law > Additional Offerings & the Securities*
*Exchange Act of 1934 > Issuer Recordkeeping &*
*Reporting > General Overview*
*Securities Law > Liability > Private Securities*
*Litigation > General Overview*
[HN13] It is generally accepted that allegations of violations of Generally Accepted Accounting Practices (GAAP) or Securities and Exchange Commission regulations, without more do not establish scienter. Rather, to plead fraudulent intent based on GAAP violations, the plaintiffs must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent.

*Securities Law > Additional Offerings & the Securities*
*Exchange Act of 1934 > Issuer Recordkeeping &*
*Reporting > General Overview*
*Securities Law > Liability > Private Securities*
*Litigation > General Overview*

[HN14] With accounting fraud, the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles.

*Securities Law > Liability > Private Securities*
*Litigation > General Overview*
[HN15] Generally, stock sale allegations cannot raise an inference of scienter unless the plaintiffs allege specific facts showing that the sales were dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information. Among the relevant factors for a court to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.

*Civil Procedure > Pleading & Practice > Pleadings >*
*Heightened Pleading Requirements > Fraud Claims*
[HN16] In the context of a claim of securities fraud, a showing of temporal proximity, without more, is insufficient to satisfy Fed. R. Civ. P. 9(b).

*Securities Law > Liability > Private Securities*
*Litigation > General Overview*
[HN17] The allegations must be considered in their totality in determining whether plaintiffs have met the standard under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C.S. § 78u-4. Where a securities fraud complaint requires a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant, and often irrelevant allegations, the spirit and letter of the PSLRA support dismissal.

*Securities Law > Liability > Private Securities*
*Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of*
*1934 Actions > Implied Private Rights of Action >*
*Deceptive & Manipulative Devices*
[HN18] The United States Supreme Court has clarified that alleging that a misrepresentation caused an inflated purchase price does not, without more, demonstrate loss causation. To touch upon an economic loss is insufficient; the plaintiffs must demonstrate an actual causal connection between the defendant's material





misrepresentation and the economic loss suffered. That holding reversed the United States Court of Appeals for the Ninth Circuit's jurisprudence on the subject which held that a plaintiff can satisfy the loss causation requirement simply by alleging that a security's price at the time of purchase was inflated due to the misrepresentation.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Dismissals > General Overview*
[HN19] Leave to amend under <u>Fed. R. Civ. P. 15</u> should be liberally granted. Dismissal with prejudice and without leave to amend is not appropriate unless it is clear that the complaint could not be saved by amendment.

**COUNSEL:** [*1] For Mark Kaufman, individually and on behalf of all others similarly situated, Plaintiff: Kim E. Levy, Peter E. Seidman, Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Jeff S. Westerman, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA; Nadeem Faruqi, Faruqi & Faruqi, New York, NY.

For City of Pontiac Policemen's and Firemen's Retirement System, Plaintiff: Brian O. O'Mara, William S. Lerach, David W. Mitchell, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA.

For Business Objects S.A., Bernard Liautaud, John Olsen, Jim Tolonen, Defendants: Alyson Nicole Dinsmore, Peri Nielsen, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Claudia N. Main, Wilson Sonsini Goodrich & Rosati, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

### INTRODUCTION

**ORDER GRANTING DEFENDANTS', <u>12(b)(6)</u> MOTION TO DISMISS**

Before the Court is Business Objects, Bernard Liautaud, James Tolonen, and John Olsen's ("Defendants") Motion to Dismiss a federal securities

fraud action brought against them by a class consisting of all purchasers of Business Objects' stock ("Plaintiffs") between April 23, 2003 and [*2] April 29, 2004 (the "Class Period"). Defendants seek an Order dismissing the Consolidated Class Action Complaint ("Complaint") with prejudice under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and pursuant to <u>Federal Rule of Civil Procedure 12(b)(6)</u>. For the following reasons, Defendants' motion is **GRANTED** with leave to amend.

### FACTUAL ALLEGATIONS

This motion arises from an Amended Complaint filed against all Defendants alleging securities fraud in violation of <u>section 10(b)</u> and <u>20(a)</u> of the Securities Exchange Act. The allegations of Plaintiffs' complaint relate to Business Objects' announcement on April 29, 2004, which disclosed its financial results for the first quarter of 2004 and its forecast its returns for the June 2004 quarter. In 2003, Business Objects enjoyed revenue growth, reporting revenue of $ 118.5 million, $ 129 million and $ 129.1 million for the first three quarters of 2003, respectively. On December 11, 2003, Business Objects announced it had completed its acquisition of Crystal Decisions, Inc., a private Canadian company also in the business intelligence [*3] market.

On February 8, 2004, Business Objects reported revenue of $ 184.2 million for the December 2003 quarter. The same day Business Objects reported its results, it also projected revenue of $ 208 to $ 218 million and earnings per share ("EPS") of $ 0.03 to $ 0.09 (GAAP) and $ 0.10 to $ 0.16 (non-GAAP) for the March 2004 quarter. On April 29, 2004, Business Objects reported its financial results for the March 2004 quarter. Business Objects earned revenue of $ 217 million and EPS of $ 0.04 (GAAP) and $ 0.10 (non-GAAP). In the same release, Business Objects also gave guidance for its June 2004 quarter in the range of $ 220 to $ 225 million, which was weaker than securities analysts had anticipated. Several securities analysts expressed disappointment with Business Objects' June 2004 guidance and lowered their own forecast in response.

On April 30, 2004, the day the analyst reports were issued, Business Objects stock price declined from $ 28.58 to $ 21.92. Business Objects ended up reporting revenue of $ 222.2 million for the June 2004 quarter.

On May 4, 2004, Business Objects filed its quarterly





report on Form 10-Q for the March 2004 quarter. In the Form 10-Q, Business Objects [*4] disclosed that the SEC had commenced an informal inquiry into its backlog practices. The 10-Q stated, "[w]hile we believe our practices are proper and in accordance with generally accepted accounting principles in the United States, we can give no assurance as to the outcome of this inquiry." Three months later, Business Objects disclosed that it had received a "Wells" notice n1 from the SEC and that it believed the SEC's inquiry related to the fact that Business Objects "does not disclose its backlog of unshipped orders."

> n1 A "Wells" notice refers to the notice provided by the SEC when a decision has been made to recommend to the Commission that a civil action be initiated against an issuer.

## LEGAL STANDARDS

### A. Rule 12(b)(6)

[HN1] A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for either lack of a cognizable legal theory or the pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).* [*5] When deciding upon a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to FRCP 12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to plaintiff. *Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).* Moreover, a complaint should not be dismissed unless a plaintiff could prove no set of facts in support of his claim that would entitle him to relief. *Id.*

[HN2] In the context of a motion to dismiss, review is limited to the contents in the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).* When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. Where such a conversion takes place, all parties must be given an opportunity to present all material made pertinent to such a motion by Rule 56. *In re Pacific Gateway Exchange, Inc. Sec. Lit., 169 F. Supp. 2d 1160, 1164 (N.D. Cal. 2001); see also Fed. R. Civ. P.*

12(b) [*6] . However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).*

[HN3] Where a plaintiff fails to attach to the complaint documents referred to in it, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support plaintiff's claim. *See Pacific Gateway Exchange, 169 F. Supp. 2d at 1164; Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).* Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stac Electronics Sec. Lit., 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).* This rule precludes the plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc., 146 F.3d 699, 705 (9th Cir. 1998).*

### B. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange [*7] Act ("Exchange Act") provides, in part, that [HN4] it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce

> [HN5] (a) To employ any device, scheme, or artifice to defraud.
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

  

17 C.F.R. § 240.10b-5

[HN6] To be actionable under section 10(b) and Rule 10b-5, a plaintiff must allege: 1) a misrepresentation or omission; 2) of material fact; 3) made with scienter; 4) on which the plaintiff justifiably relied; 5) [*8] that proximately caused the alleged loss. *See Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)*. Additionally, as in all actions alleging fraud, plaintiffs must state with particularity the circumstances constituting fraud. FED. R. CIV. P. 9(b).

**C. Section 20(a)**

[HN7] Section 20(a) of the Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Secs. Lit., 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002)*. Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**D. Private Securities Litigation Reform Act**

[HN8] In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the pleading requirements of Rules 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason [*9] or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

[HN9] The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. A complaint under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc., 183 F.3d 970, 974 (9th Cir. 1999)*. If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(1). [*10]

**ANALYSIS**

**A. Rule 8**

Defendants argue that the complaint does not meet the requirements of Rule 8 of the Federal Rules Civil Procedure because of the "puzzle-style" nature of the Plaintiffs' allegations. Rule 8 [HN10] requires that a plaintiff provide a "short and plain statement" describing why the plaintiff is "entitled to relief." The Court notes that the complaint often quotes the entire text of public documents and rarely gives an indication as to which statements are being challenged and why. However, the Court declines to take the drastic step of dismissal based on the form of the pleading. Instead, the Court joins the approach of other courts in this district and will attempt to "glean the complaint," focusing on those statements that are in bold and italicized. *See In re Northpoint Communications Group, Inc., 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001); In re Cornerstone Propane Partners, L.P. Securities Litigation, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005)*.

**B. Falsity and Scienter**

[HN11] In order to support their claims under the PLSRA, Plaintiffs must first specify a "statement [*11] alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, in order to avoid having their action dismissed, Plaintiffs must "plead with particularity either the alleged misleading statements or scienter[.]" *In re Fritz Cos. Secs. Litig., 282 F. Supp. 2d 1105, 1112 (N.D. Cal 2003)*. The Ninth Circuit has articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must





determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors. Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a strong inference that misleading statements were knowingly or [with] deliberate recklessness made to investors, [*12] a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (citations and internal quotation marks omitted).

Plaintiffs allegations rely primarily upon 1) Defendants' statements regarding the purported successful integration of Crystal Decisions, and 2) Defendants' improper recognition of revenue in financial statements. To satisfy the necessary scienter requirement, Plaintiffs rely upon confidential witness statements, stock sales, an SEC investigation, and the temporal proximity between Defendants' alleged misrepresentations and the disclosure of the truth.

**1. Crystal Decisions Integration**

Plaintiffs allege that Defendants made several material misrepresentations regarding the acquisition and integration of Crystal Decisions. However, while Plaintiffs' complaint contains pages of text from Defendants' press releases and analyst calls, Plaintiffs quote only two allegedly false statements in their briefing to the Court. First, on July 18, 2003, Defendants issued a press release discussing the complimentary natures of the merging companies' product lines and its ability to "capitalize [*13] on significant growth opportunities resulting from complementary products." n2 Plaintiffs also note Defendant Liautaud's statement on October 23 that "[o]ur management had been working closely with counterparts from Crystal Decisions in a disciplined process to develop integration plans that can be implemented on closing." Plaintiffs also note that on October 23, 2003, Defendants' press release stressed that Enterprise 6 was the absolute key to Business Objects growth, and, according to Plaintiffs, highlighted that the integration of Crystal Decisions was progressing smoothly. On December 11, 2003, January 8, 2004, and

February 5, 2004, Plaintiffs allege that Defendants issued press releases stating that the integration of Crystal Dynamics had progressed smoothly and that Business Objects would achieve significant growth based on the companies' complementary product lines. Plaintiffs argue that each of the press releases was false because Defendants knew that serious integration problems with the companies' product lines existed, including the incompatibility of Enterprise 6, and that it had plans to replace the product with Crystal Enterprise.

n2 At oral argument, Plaintiffs indicated that they no longer rely on this statement in pressing their complaint.

[*14]

Defendants argue that Plaintiffs have not alleged facts demonstrating that the press releases or Defendant Liautaud's statement were false when made. Defendants note that the integration effort involving Crystal Decisions did not begin until December 11, 2003, and therefore the Court must only look to statements made after that time. Defendants assert that only two statements could possibly support Plaintiffs' claim: 1) the January 8, 2004 announcement that the two companies' sales, marketing, professional services, alliances, technical support organizations, and websites "are now one"; and 2) the February 5, 2004 press release in which Defendant Liautaud said he was "pleased" with the progress of the integration efforts to date.

Plaintiffs respond that the Amended Complaint adequately details the manner in which Defendants made material representations regarding the acquisition and integration of Crystal Decisions. Plaintiffs rely almost exclusively on the testimony of its three confidential witnesses. Initially, the Amended Complaint states that a former Business Objects Senior Director of Customer Technical Support, who worked at the company during the Class Period, knew that [*15] customer orders were being delayed and cancelled because of product integration problems between Crystal Decisions and Business Objects. The Amended Complaint also states that a former Telecommunications Analyst Project Manager who worked at Crystal Decisions confirmed that when the acquisition of the two companies was announced, teams from the two companies were not allowed to integrate or even share information. Additionally, the Amended Complaint states that a

  

former Vice President of Product Strategy of Business Objects stated that product coordination and product overlap became an important issue for the integrated company.

[HN12] The Ninth Circuit has warned against the use of unnamed sources and stated that "[i]t is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." *Silicon Graphics*, 183 F.3d at 985. "Instead, to meet this particularity requirement for personal sources of information, this circuit has applied the Second Circuit's standard that personal sources of information relied upon in a complaint should be described in the complaint [*16] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Systems, Inc. Sec. Litig.*, 397 F.3d 704, 711 (9th Cir. 2005) (internal quotation marks and citations omitted) (*amended and superseded on denial of rehearing by* 411 F.3d 1006 (9th Cir. 2005)). "When plaintiffs rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *see also Silicon Graphics*, 183 F.3d at 985 (stating that the complaint should include "adequate corroborating details").

In *Daou Systems*, the plaintiffs had numbered each confidential witness, described his or her job description and responsibilities, and in some instances, provided the witnesses' exact title and to which executive the witnessed reported. 397 F.3d at 711. The *Daou Systems* court found that the specificity of the plaintiffs' descriptions was sufficient [*17] to meet the PSLRA's requirements for confidential witnesses. *Id* at 712.

Here, the Court finds that the Amended Complaint has failed to describe the confidential witnesses with a sufficient degree of specificity. Indeed, unlike in *Daou Systems*, the Amended Complaint provides no more than the job title of the confidential witnesses. For example, plaintiffs state the exact job title of their first confidential witness -- the Senior Director of Customer Technical Support -- but fail to provide any other detail regarding his or her job description and responsibilities. *See Northpoint*, 184 F. Supp. 2d at 1000 (finding the confidential-witness statements insufficient where the

description of the confidential witnesses did not provide their job duties and how the witnesses learned of the information alleged in the complaint). Plaintiff treats the other two confidential witnesses in a similar manner. Moreover, besides the statements of these three confidential witnesses, Plaintiffs have offered the Court no corroborating evidence, such as internal documents or public filings, to support their assertions of falsity.

However, even if, *assuming arguendo* [*18] , the Court found that Plaintiffs had described the confidential witnesses with sufficient specificity, the witness statements are long on speculation, but short on relevant detail. The witnesses' conclusory statements include phrases such as "product integration problems" and "customer confusion," but offer no insight into the pervasiveness of such problems. Furthermore, the witnesses statements offer no detail regarding how the witnesses learned of the facts in their statements or how, if at all, Defendants knew about such facts. In short, these allegations are not pled with sufficient specificity.

### 2. Financial Statements

Plaintiffs allege that during the Class Period, Defendants improperly recognized revenue in violation of Generally Accepted Accounting Principles ("GAAP") and other accounting standards, which made Business Objects' financial statements false and misleading. In support of these allegations, Plaintiffs rely primarily upon a confidential witness statement and the SEC's formal ongoing investigation into Business Objects' accounting principles. Defendants contend that Plaintiffs have failed to adequately allege that their economic losses were caused by the allegedly [*19] false statements, and in any event, Plaintiffs have also failed to allege with particularity that Business Objects recognized revenue improperly on account of these practices.

Plaintiffs rely almost exclusively upon an unspecified former Senior Director's statement that the Vice President of Business Objects Alliance Group admitted that some sales were not recorded in the quarter in which they were made. Plaintiffs also allege that, in another case, "an employee" met with "defendant" and Chief Operating Officer John Olsen to insist that an IBM order be shipped before the end of the quarter, rather than in the following quarter, and that Business Objects ended up making the shipment by the end of the quarter but did not recognize the revenue until the following quarter.





Defendants respond that the former Senior Director's account lacks particularized details regarding the alleged accounting violations. [HN13] It is generally accepted that allegations of violations of GAAP or SEC regulations, without more do not establish scienter. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994). Rather, to plead fraudulent intent based on GAAP violations, plaintiffs [*20] must allege facts showing that 1) specific accounting decisions were improper, and 2) defendants knew specific facts at the time that rendered their accounting determinations fraudulent. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390-91 (9th Cir. 2002). Plaintiffs have not met this standard.

The Senior Director's statement that "some sales were not recorded in the quarter in which they were made" is vague and conclusory. The Court is left to speculate as to the date, sales quantity, and other relevant details regarding the transaction. Plaintiffs allegation regarding the IBM order suffers from the same flaw. The allegation is unsupported by facts showing any specifics regarding the transaction, for example, how this employee learned whether revenue was recognized on the IBM order, when the revenue was recognized, and whether the revenue recognition was improper. *See Northpoint*, 184 F. Supp. 2d at 998 [HN14] ("With accounting fraud, however, the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles. More is needed."). Furthermore, [*21] Plaintiffs fail to plead that Defendants had any knowledge of Business Objects' accounting practices, or that such practices were improper. In sum, such generic allegations of accounting fraud fall woefully short of sufficiently pleading scienter with respect to Defendants' practice of recognizing revenue.

Moreover, the Court is not persuaded that Plaintiffs' improper revenue allegations are further evidenced by the SEC's formal investigation into Business Objects' accounting practices. Plaintiffs assertion that the SEC's investigation "highlights the risk" that Business Objects has improperly recognized revenue is problematic. Certainly, the existence of a "risk" that Business Objects has committed GAAP violations, without more, is insufficient to raise a "strong inference" of scienter. Plaintiffs have offered no case authority to the contrary.

### 3. Stock Sales

Plaintiffs also rely on stock sales by Defendant Liautaud to support their allegations of scienter. [HN15] Generally, stock sale allegations cannot raise an inference of scienter unless Plaintiffs allege specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to [*22] maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986. Among the relevant factors for a court to consider are: 1) the amount and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

Liautaud sold over $ 6 million of stock during the class period, roughly 9.7% of his total stockholdings. Liautaud's sales occurred soon after the Business Objects's quarterly earnings reports. In light of the *Silicon Graphics* factors, these sales are not sufficiently suspicious to raise an inference of scienter. To be certain, the fact that Liataud sold roughly 9.7% of his total stockholdings is not particularly powerful evidence of fraud. *See Ronconi*, 253 F.3d at 435 (suggesting that sales of 10-17% of holdings was not suspicious). Moreover, the timing of the stock sales are not overly suspicious and Plaintiffs have failed to explain how these sales, each of which occurred after Business Objects announced earnings results, could raise an inference of fraudulent intent. Additionally, any inference of scienter is further [*23] negated by the fact that neither Defendant Tolonen nor Defendant Olsen sold any shares during the Class Period. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (finding that insider sales did not support an inference of fraud when "only [one defendant] and not other insiders sold during the class period, and the sales by [the one defendant] were only a small part of his total holdings"). Therefore, the Court finds that Liautaud's stock sales do not support an inference of scienter.

### 4. Proximity Between False Statements and Disclosure of the Truth

Plaintiffs argue that the close proximity between Defendants' misrepresentations and the disclosure of the truth helps bolster a strong inference of scienter. Here, Plaintiffs allege that Defendants' statements in October 2003 through December 2003 regarding the integration of Crystal Decisions were revealed to be fundamentally incorrect and misleading in Business Objects' April 29,

Page 10

  

2004 press release. Plaintiffs' argument fails, as an initial matter, because as previously noted, Plaintiffs' have not sufficiently alleged that Business Objects' April 29, 2004 press release was false or misleading. [*24] Moreover, [HN16] a showing of "temporal proximity . . . without more, is insufficient to satisfy Rule 9(b)." *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999); *see also Ronconi*, 253 F.3d at 437 (holding that "the five week period between the optimistic statements and the below-expectations earning report is not enough to sustain the complaint."). n3

> n3 Plaintiffs' argument that scienter may also be inferred because Defendants' allegedly fraudulent conduct concerned Business Objects' core business is similarly unpersuasive. *See In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003) (rejecting the notion that a strong inference of scienter can be presumed from allegations that relate to a company's core operations).

**D. Allegations as a Whole**

The Court must consider whether the totality of the Complaint's allegations, even though individually lacking, create a strong inference that the individual Defendants acted with deliberate [*25] or conscious recklessness. *84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) [HN17] (holding that the allegations must be considered in their totality in determining whether plaintiffs have met the PSLRA standard). To satisfy the Ninth Circuit's interpretation of the PSLRA, Plaintiffs' allegations must give rise to a strong inference of deliberate recklessness, "provid[ing] a list of all relevant circumstances in great detail." *Silicon Graphics*, 183 F.3d at 974. The complaint here does no such thing. Even after considering the totality of Plaintiffs' allegations, the Court finds that Plaintiffs' complaint, as present written, is filled with imprecision and falls woefully short of the *Silicon Graphics* standard. Plaintiffs have failed to allege particularized facts that could lead the Court to infer that Defendants knowingly misrepresented the details of Crystal Decision's integration or Business Objects' revenue reports. Therefore, where, as here, a securities fraud complaint

"requires a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant and [*26] often irrelevant allegations," the spirit and letter of the PSLRA support dismissal. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998). n4

> N4 Since Plaintiffs have not met the PSLRA pleading standard, the Court does not need to decide whether Defendants' allegedly false statements fall within the safe harbor provision under 15 U.S.C. § 78u-5(c)(1)(A) or (B).

**E. Loss Causation**

In *Dura Pharmaceuticals, Inc. v. Broudo*, 161 L. Ed. 2d 577, 125 S.Ct. 1627 (2005), [HN18] the Supreme Court clarified that alleging that a misrepresentation caused an inflated purchase price does not, without more, demonstrate loss causation. To "touch upon" an economic loss is insufficient; plaintiffs must demonstrate an actual causal connection between the defendant's material misrepresentation and the economic loss suffered. *Id. at 1633*. This holding reversed the Ninth Circuit's jurisprudence on the subject which held that a plaintiff can satisfy the loss causation [*27] requirement simply by alleging that a security's price at the time of purchase was inflated due to the misrepresentation.

Here, the complaint simply alleges that "Plaintiffs and the class have suffered damages in that, in reliance on the integrity of the market, they paid inflated prices for Business Objects publically traded securities." Plaintiffs have not alleged a proximate, causal connection between the alleged misrepresentation and the subsequent decline in their stock. Therefore, as in *Dura*, Plaintiffs' allegations regarding loss causation are insufficient.

**F. Rule 20(a) Liability**

Section 20(a) of the Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Secs. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*





Here, Plaintiffs assert that the individual Defendants are liable under this section because of an underlying violation of section 10(b). However, because Plaintiffs have failed to adequately [*28] plead the underlying 10b-5 violation, the section 20(a) claims must be dismissed as well.

**G. Dismissal Without Prejudice**

[HN19] Leave to amend under Federal Rule of Civil Procedure 15 should be liberally granted. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment." *Eminence Capital v. Aspeon Inc., 316 F.3d 1048, 1053 (9th Cir. 2003)* (error to refuse leave to amend in a securities fraud case to allow plaintiff to plead scienter). Here, it is possible that Plaintiffs could remedy their significant pleading defects in an amended complaint by adding detailed factual support for their allegations of false or misleading statements, and demonstrating that Defendants had the requisite scienter

at the time the statements were made. Accordingly, the Court dismisses the Amended Complaint without prejudice. The Plaintiffs should file an amended complaint within thirty (30) days from the date of this Order.

**CONCLUSION**

After consideration of the Amended Complaint in light of the heightened pleading standards of the PSLRA and the requirements [*29] of Federal Rule of Civil Procedure 12(b)(6), the Court **GRANTS** Defendants' motion to dismiss with leave to amend.

**IT IS SO ORDERED.**

Dated: July 27, 2005

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE





**EXHIBIT B**

LEXSEE



Positive
As of: Mar 08, 2007

**BERNARD COBLE, et al., Plaintiffs, v. BROADVISION INC., et al., Defendants.**

**No. C 01-01969 CRB**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2002 U.S. Dist. LEXIS 17495; Fed. Sec. L. Rep. (CCH) P92,238**

**September 11, 2002, Decided**
**September 11, 2002, Filed; September 11, 2002, Entered in Civil Docket**

**DISPOSITION:** [*1] Defendants' motion to dismiss the federal claims GRANTED without leave to amend.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a consolidated class action, plaintiffs sued defendants, a corporation, its president, its chief financial officer, and its board of directors, alleging violations of the Private Securities Litigation Reform Act (PSLRA) based upon false and misleading statements. Defendants moved to dismiss.

**OVERVIEW:** After announcing pro-forma earnings per share and optimistic statements in a press release, the corporation issued another press release disclosing that it would revise its previously released unaudited financial results to include approximately $ 4 million in additional expenses. Plaintiffs alleged that defendants made false and misleading statements in the first press release and defendants were aware of the corporation's difficulties. The court determined that plaintiffs failed to sufficiently allege the pleading requirements of the PSLRA. Plaintiffs' allegations did not support a strong inference of scienter, since (1) the alleged motives of defendants were weak, (2) the allegations did not reasonably support an inference that the president was aware of the additional expenses, (3) there was no allegation that defendants attempted to hide the missing expenses from

their auditors, (4) defendants corrected the financials, and (5) the safe harbor applied to projections made in a conference call.

**OUTCOME:** The court granted defendants' motion to dismiss.

**CORE TERMS:** scienter, forward-looking, projection, per share, earnings, safe harbor, audit, pled, compliant, announced, covenants, press release, motive, motion to dismiss, former employee, pro forma, misleading, marketing, headcount, particularity, cautionary, channel, announcement, actual knowledge, recklessness, lay-offs, warning, false and misleading, operating expenses, stuffing

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN1] The Private Securities Litigation Reform Act

Page 1

  

Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 3 of 13

2002 U.S. Dist. LEXIS 17495, *1; Fed. Sec. L. Rep. (CCH) P92,238

raises the pleading standards for private securities fraud plaintiffs. In addition to complying with Fed. R. Civ. P. 9(b), the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, to state with particularity all facts on which that belief is formed. 15 U.S.C.S. § 78u-4(b)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN2] The Private Securities Litigation Reform Act requires a plaintiff at the pleading stage to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2). This requirement means that plaintiffs must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. To plead in great detail means a plaintiff must provide a list of all relevant circumstances in great detail.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Torts > Negligence > Standards of Care > Reasonable Care > Recognition of Risk*
[HN3] The Private Securities Litigation Reform Act does not define the required scienter, including the level of recklessness, that must be shown to constitute a § 10(b) violation. The Ninth Circuit has held, however, that "recklessness" in the § 10(b) context is a form of intentional conduct. It may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. Thus, in order to plead a strong inference of recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN4] On a motion to dismiss a court must accept a plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs. When a court is determining whether plaintiffs have pled a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. The court should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN5] A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made. This duty of disclosure is known as the "duty to correct."

*Business & Corporate Law > Distributorships & Franchises > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN6] Channel stuffing is defined as the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply. A number of courts have held that "channel stuffing" gives rise to a "very weak" inference of scienter--if any at all--in § 10(b) actions because there are a number of legitimate reasons for attempting to achieve sales earlier.

*Securities Law > Liability > Disclosures > Forward Looking Statements*
*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN7] Under the safe harbor a defendant cannot be held liable for a forward-looking statement that is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement. 15 U.S.C.S. § 78u-5(c)(1)(A). A forward-looking statement means, among other things, a statement containing a projection of revenues, income (including income loss), earnings and a statement of the plans and objectives of

  

Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 4 of 13

2002 U.S. Dist. LEXIS 17495, *1; Fed. Sec. L. Rep. (CCH) P92,238

management, and a statement of future economic performance. 15 U.S.C.S. § 78u-5(i)(1)(A)-(C).

*Securities Law > Liability > Disclosures > Forward Looking Statements*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN8] With respect to oral forward-looking statements, the safe harbor applies if the oral forward-looking statement is accompanied by a cautionary statement that provides that the particular oral statement is forward-looking and that the actual results might differ materially from those projected, and that information about the risks is contained in a readily available written document. 15 U.S.C.S. § 78u-5(c)(2).

*Securities Law > Liability > Disclosures > Forward Looking Statements*
*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN9] The safe harbor applies if the oral forward-looking statement is accompanied by a cautionary statement-(i) that the particular oral statement is a forward-looking statement; and (ii) that the actual results might differ materially from those projected in the forward-looking statement. 15 U.S.C.S. § 78u-5(c)(2).

*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN10] Where projections are protected by the safe harbor, these claims may survive defendants' motion to dismiss only if plaintiffs have pled facts to show that the defendants had actual knowledge that they were false at the time they were made. 15 U.S.C.S. § 78u-5(c)(1)(B).

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN11] To the extent that plaintiffs rely upon allegations of false forward-looking statements, plaintiffs must plead, in great detail, all the facts forming the basis of their belief that defendants made the forward-looking statements with actual knowledge that they were false.

**COUNSEL:** For Bernard Coble, Plaintiff: Anthony J. Bolognese, Bolognese & Associates LLC, Philadelphia, PA. Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA. Ex Kano S. Sams, II,

Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA. John K. Grant, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA. Laurence D. King, Kaplan Fox & Kilsheimer LLP, San Francisco, CA. Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA. Robert N. Kaplan, Kaplan Kilsheimer & Fox LLP, New York, NY. William S. Lerach, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For Sparta Group of Chicago, LP, Plaintiff: Elizabeth P. Lin, Weiss & Yourman, Los Angeles, CA.

For Don S. Strong, Plaintiff: A. Daniel Woska, Woska & Hasbrook, Oklahoma City, OK. Marc A. Topaz, Schiffrin & Barroway, Bala Cynwyd, PA. William B. Federman, Dreier Baritz & Federman, Oklahoma City, OK.

For Ben Parnes, Plaintiff: Michael S. Egan, Bernstein Liebhard & Lifshitz, New York, NY.

For William Greene, Plaintiff: Jonathan M. Stein, Cauley Geller Bowman & Coates LLP, Boca Raton, [*2] FL.

For Michael Beilush, Plaintiff: Jill Manning, Kirby McInerney & Squire LLP, Novato, CA.

For Nassir F. Marrouche, Plaintiff: Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA. Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD. Francis A. Bottini, Jr., Wolf Haldenstein Adler Freeman & Herz, San Diego, CA.

For Iris Hsu, Plaintiff: Marc S. Henzel, Law Offices of Marc S. Henzel, Philadelphia, PA.

For Benjamin Greenfield, Plaintiff: Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA. Patrice L. Bishop, Stull, Stull & Brody, Los Angeles, CA.

For Michelle Vaughan, Plaintiff: Leo W. Desmond, Law Offices of Leo W. Desmond, West Palm Beach, FL.

For Broadvision Inc., Pehong Chen, Randall C. Bolten, Defendants: Grant P. Fondo, Cooley Godward LLP, Palo Alto, CA.

**JUDGES:** CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE.





Case 4:06-cv-03936-CW     Document 45-3     Filed 03/23/2007     Page 5 of 13

2002 U.S. Dist. LEXIS 17495, *2; Fed. Sec. L. Rep. (CCH) P92,238

**OPINION BY:** CHARLES R. BREYER

**OPINION:**

### MEMORANDUM AND ORDER

This is a Private Securities Litigation Reform Act ("PSLRA") consolidated class action. Now pending before the Court is defendants' motion to dismiss the Second Amended Consolidated Complaint. After carefully considering the papers filed by the parties, and [*3] having had the benefit of oral argument, the Court GRANTS the motion to dismiss the federal claims for the reasons stated below.

### BACKGROUND

Broadvision is a software company that designs and sells software that enables companies to conduct electronic commerce and related services via the Internet. On January 25, 2001, Broadvision announced its financial results for the fourth quarter of 2000 ("4Q 2000") and the 2000 fiscal year ("FY 2000"), both of which ended on December 31, 2000. The Company reported, among other things, that pro-forma earnings per share for 4Q 2000 were $ 0.02 while earnings per share for FY 2000 were $ 0.13. Second Amended Consolidated Complaint ("SAC") P38. The press release announcing the financial results included the following statement from Broadvision's Chief Executive Officer ("CEO") Dr. Pehong Chen:

> Q4 2000 was BroadVision's eleventh consecutive quarter of profitability, on a pro-forma basis. Our aggressive growth and enhanced presence in global markets did result in higher than anticipated expense levels in Q4, but we feel good about the market and believe we are well positioned for continued success.

Id. P38. That same day [*4] BroadVision hosted a conference call for analysts, media representatives and BroadVision investors. During the call Chen made several statements, including optimistic statements such as "we are very excited about the opportunities that lay before us, and we believe we have put in--the pieces to take advantage of these opportunities," and "we firmly believe BroadVision is currently very well positioned not just to survive in this challenging environment, but to thrive and emerge even a stronger player when this

economic downturn is over." Id. P39.

On April 2, 2001, BroadVision issued a press release disclosing that it would revise its previously released unaudited financial results for 4Q 2000 to include approximately $ 4 million in additional expenses, reducing the Company's pro forma earnings per share by one half, from .02 per share to .01 per share, and reducing pro forma earnings per share for FY 2000 from $ 0.13 to $ 0.12. The stock price declined after the announcement.

### PROCEDURAL HISTORY

A little more than two weeks after BroadVision announced the revision, the first of ten securities fraud class actions were initiated in this District. The Court consolidated the [*5] cases and appointed lead plaintiff who subsequently filed a Consolidated Class Action Complaint. The Complaint alleged BroadVision, Pehong Chen, its Chairman of the Board, CEO and President, and Randall C. Bolten, its Chief Financial Officer ("CFO") and Executive Vice-President, made false and misleading statements on January 25, 2001. In particular, the Complaint alleged defendants were aware of the additional $ 4 million in expenses when the FY 2000 and Q4 2000 results were initially released. Plaintiffs also alleged that other optimistic statements and projections made by defendants on January 25, 2001 were false and misleading because defendants were aware the Company was facing significant difficulties.

The Court granted defendants' motion to dismiss on the ground that plaintiffs had not alleged facts sufficient to satisfy the pleading requirements of the PSLRA. At oral argument plaintiffs repeatedly stated that they had additional information which was not pled in the complaint. Accordingly, the Court granted plaintiffs leave to amend and advised them that they must include all information they want the Court to consider in the amended complaint.

Plaintiffs subsequently filed [*6] the amended complaint. In addition to restating their original claims, they have added BroadVision's Board of Directors as defendants, as well as state law claims for breach of fiduciary duty. Defendants have again moved to dismiss on various grounds. Because the Court did not issue a written opinion after it granted the original motion to dismiss, this Memorandum and Order addresses the arguments made by plaintiffs in opposition to both motions.





Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 6 of 13

2002 U.S. Dist. LEXIS 17495, *6; Fed. Sec. L. Rep. (CCH) P92,238

LEGAL STANDARD

[HN1] The PSLRA raised the "pleading standards for private securities fraud plaintiffs." In Re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999); see also Desaigoudar v. Meyercord, 223 F.3d 1020, 1021 (9th Cir. 2000) ("The PSLRA . . . modified the liberal, notice pleading standard found in the Federal Rules of Civil Procedure," such that the courts "now examine a securities fraud complaint to determine whether the plaintiff has complied with the more stringent pleading standards of the PSLRA."); Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 979 (9th Cir. 1999) (characterizing the pleading requirements of the PSLRA as "rigorous"). In addition [*7] to complying with Federal Rule of Civil Procedure 9(b), "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u4(b)(1).

[HN2] The PSLRA also requires a plaintiff at the pleading stage "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This requirement means that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." Silicon Graphics, 183 F.3d at 973. To plead in great detail means a plaintiff "must provide a list of all relevant circumstances in great detail." Id. at 984.

[HN3] The PSLRA does not define the required scienter, including the level of recklessness, that must be shown to constitute a 10(b) violation. The Ninth Circuit has held, [*8] however, that "recklessness" in the section 10(b) context is a form of intentional conduct. See Silicon Graphics, 183 F.3d at 977. It "'may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Howard v. Everex Systems, 228 F.3d 1057, 1063 (9th Cir. 2000) (quoting Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc). Thus, in order to plead a strong inference of recklessness, "plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." Silicon Graphics, 183 F.3d at 974.

[HN4] On a motion to dismiss a court must accept a plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs. See id. at 983. When a court is determining whether plaintiffs have pled a strong inference of scienter, "the court must consider *all* reasonable [*9] inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. Visx, Inc., 298 F.3d 893, 897 (9th Cir. 2002). The Court "should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." Id.

DISCUSSION

A. The 4Q 2000 and FY 2000 Results

Plaintiffs' primary complaint is that defendants' January 25, 2001 announcement of the 4Q 2000 and FY 2000 results was false and misleading because at that time defendants knew an additional $ 4 million in expenses were not included in the results. Defendants contend this allegation fails as a matter of law because plaintiffs have not pled facts that give rise to a strong inference of scienter, that is, a strong inference that Chen, Bolten, or anyone at BroadVision was aware of, or recklessly disregarded, the additional expenses at the time the Q4 2000 results were initially released.

1. The original complaint

In defense of their original consolidated complaint, plaintiffs argued that the [*10] "significance" of the misstatement supports an inference of scienter; the missed expenses cut pro forma earnings per share in half from $ .02 to $ .01. While this fact supports some inference of scienter, it does not support a strong inference when considered in context. The previous quarter (Q3 2000) had pro forma earnings per share of $ .05. Without the additional $ 4 million in expenses the earnings per share still dropped significantly, in fact, more significantly than the drop caused by the April 2, 2001 revision. There is less of an incentive to hide expenses when even if one includes the expenses the earnings per share decrease significantly. Moreover, the

Page 5

  

Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 7 of 13

2002 U.S. Dist. LEXIS 17495, *10; Fed. Sec. L. Rep. (CCH) P92,238

additional $ 4 million in expenses was on revenue of $ 136.9 million.

The case upon which plaintiffs rely, Marksman Partners v. Chantal Pharm Corp., 927 F. Supp. 1297, 1314 (C.D. Cal. 1996), is distinguishable. There the court found a strong inference of scienter based on several facts, including that the allegedly overstated revenues constituted a significant portion of Chantal's total revenues. Id. at 1314. There is no similar allegation here. The other facts that persuaded the Marksman [*11] court were that "the allegedly misleading financial and other public statements bore defendants' imprimatur," one of the defendants divested herself of a substantial portion of her shares at a considerable profit during the class period, and the company "completed a substantial private placement of its stock following the rise in Chantal's stock value, which was allegedly precipitated by the fraudulent disclosures." Id. None of these additional facts, or similar facts, are alleged here.

Plaintiffs also contended the expenses were "missed" at a time when defendants, and in particular Bolton, were "carefully scrutinizing" the Company's expenses. The only "specifics" plaintiffs offered to support this conclusory statement were that according to an ex-employee "in December 2000, the Company started reducing its headcount and implemented dramatic cost controls including slashing funds for corporate events and travel in order to reduce operating expenses." Complaint P19. This "specific," however, is not specific at all; what were the dramatic cost controls and what does "slashing" funds mean? Adjectives are not substitutes for allegations of fact. Given the conclusory nature of this [*12] allegation, it does not support an inference that Bolten, Chen, or anyone else at BroadVision was aware on January 25, 2001 of the $ 4 million in additional expenses.

In sum, the only facts pled in the original consolidated complaint which support an inference of scienter are the facts of the error itself and the lack of a public explanation for how the error occurred. This inference of scienter is not strong. It is particularly not strong given that Chen did not sell any shares during this period and Bolton sold only a small percentage of his shares (1.8%). While each received end-of-the-year bonuses ($ 25,000 and $ 45,000), the small amount of the bonuses coupled with the fact that the expenses were eventually disclosed negates an inference of scienter.

Plaintiffs did not proffer any theory as to why defendants would make these false statements if they did not personally profit from them.

2. The SAC

Plaintiffs have added a plethora of allegations to support scienter. See SAC PP46-56.

a. Motive

Plaintiffs argue that defendants had a motive to deliberately understate expenses. SAC P47. They allege defendants understated expenses

> in order to announce a profitable [*13] quarter for 4Q 2000 and keep from falling out of compliance with its financial covenants with a commercial lender. . . . In 4Q 2000, having already missed forecasts for the Company due to increased expenses, defendants were reluctant to disclose that the Company's expenses in fact were even higher than that disclosed, so as to appear solidly profitable. Moreover, by withholding additional Company expenses, defendants were able to stay in compliance with its financial covenants with a commercial lender requiring the Company to maintain certain performance. By March 31, 2001, within only about two months of issuing their January 25, 2001 financial results, BroadVision fell out of compliance with its financial covenants due to its net operating loss for the three months then ended.

Id.

These alleged motives are weak. First, given that pro forma earnings dropped from $ .05 per share to $ .02 per share even before the restatement, defendants had little motive to intentionally withhold $ 4 million in expenses so that earnings per share would not be $ .01 for the quarter. If defendants were motivated to give a false impression of profitability, why did they not withhold more [*14] than $ 4 million so that earnings per share would not drop at all, or only very little?

The SAC also lacks sufficient specificity to support a





Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 8 of 13

2002 U.S. Dist. LEXIS 17495, *14; Fed. Sec. L. Rep. (CCH) P92,238

motive regarding the loan covenants. Plaintiffs do not identify the covenants (or even the lender) or how withholding $ 4 million in expenses would cause BroadVision to violate those covenants. Nor does it explain why BroadVision fell out of compliance with those covenants in March 2001--before the restatement. In other words, plaintiffs do not plead any facts that suggest the loan covenants are related to the understatement of expenses.

### b. Knowledge of missing expenses

Plaintiffs make new allegations to support their claim that defendants Bolton and Chen knew about the additional $ 4 million in expenses.

First, "according to a former employee of the Company, based on his discussion with a member of upper management," in the fall of 2000 Bolton himself conducted an internal audit of expenses because "'numbers were not adding up and approximately $ 4 million was missing from the company.'" SAC P48. Plaintiffs allege further that defendants accounted for the $ 4 million, but that in January BroadVision's independent accountant determined [*15] that BroadVision had really misplaced $ 8 million. Id. "According to another former employee of the Company, based on a senior management source at BroadVision, BroadVision had deferred recording such expenses in order to make its 4Q00 financial results 'look better.'" SAC P49.

These allegations suggest, at best, that Bolton looked into expenses and satisfied himself that all expenses were accounted for. They do not reasonably support an inference that Bolton was aware of an additional $ 4 million in expenses. Indeed, they reasonably support the contrary inference: why would Bolton conduct an internal audit to discover additional expenses which would have to be reported against revenue, and then report only some of those expenses?

Moreover, the allegations do not even reasonably support an inference that Bolton in fact conducted an internal audit and uncovered $ 4 million in expenses. The allegation is based on an unnamed source who spoke to an unidentified member of "upper management" at some unspecified time. Plaintiffs do not plead any details to suggest that this unspecified member of upper management would have personal knowledge of Bolton conducting such an audit. Plaintiffs' [*16] claim that the

independent auditor subsequently discovered that there were actually originally $ 8 million in missing expenses is also wholly unsupported by any allegations as to the basis for this claim. Such a bald assertion does not create more than a minimal inference of scienter.

### c. Deviation from past practice

Plaintiffs also allege that in years prior to the close of FY 2000, BroadVision would obtain an audit report from its auditors prior to announcing its financial results for the fourth quarter and fiscal year. "However, on January 25, 2001, BroadVision purportedly announced its results for 4Q00 and fiscal 2000 before Arthur Anderson certified that it had completed its audit on March 30, 2001." SAC P50. Plaintiffs make this allegation based on Arthur Anderson's certificate dated March 30, 2001 attached to BroadVision's Form 10K filed April 2, 2001. Id. n.3. Defendants contend that the certification date relates to the date the audit field work is completed, not the date the certified audit is provided to the client. Thus, in previous years, the field work was completed before the announcement, but BroadVision did not have completed audits. There is no evidence [*17] one way or the other before the Court; thus, the allegation supports an inference that things were done differently in January 2001. However, it only supports, at best, a slight inference of scienter since there is no allegation that defendants attempted to hide the missing expenses from their auditors. By announcing the results before receipt of the certified audit results, defendants could only hope to delay the disclosure of the additional expenses. Plaintiffs do not make any persuasive allegations as to why defendants would want to do so.

### d. The new CFO

Plaintiffs claim defendants unsuccessfully attempted to hire a new CFO to replace Bolton in January 2001. "The new CFO was hired--and chose not to accept the position--prior to the issuance of false financial results for BroadVision, and this strongly suggests that defendants knew, or were consciously reckless in not knowing, that the Company's internal financial controls, in fact, were unreliable and its financial results announced on January 25, 2001 were false." SAC P51. The Court disagrees. Plaintiffs imply that the new CFO chose not to join BroadVision because he learned of the false financials. Such an inference is [*18] unreasonable, or at least, there are many other far more reasonable inferences to be drawn from that fact. In their written opposition plaintiffs





Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 9 of 13

2002 U.S. Dist. LEXIS 17495, *18; Fed. Sec. L. Rep. (CCH) P92,238

say something different: "The temporal proximity between BroadVision's attempts to hire a new CFO and BroadVision's announcement of false financial results for 4Q 2000 and FY 2000 is circumstantial evidence that defendants were aware that there were problems with BroadVision's financial controls or financial results." Plaintiffs' Opposition at 19. Again, any inference of scienter is slight. As plaintiffs acknowledge, Bolton remained as CFO throughout the class period and there is no allegation that BroadVision continued looking for a new CFO after January 2001. In any event, there are many reasons BroadVision may have been searching for a new CFO.

### e. "View Into 2001" marketing event

Plaintiffs contend that of the $ 4 million in additional expenses omitted from the January 2001 announcement of financial results, over $ 2 million was related to an early December 2000 marketing event titled "View Into 2001." Plaintiffs cite an unnamed source, a Marketing Department employee laid off in February 2001, who claims that as early as mid-December [*19] 2000, "employees in the Marketing Department were already discussing the fact that BroadVision's 4Q 2000 revenues were false in part because $ 2 million associated with the 'View Into 2001' marketing/public relations event was being hidden." The source claims Chen "learned through a meeting with marketing personnel that the marketing event went over budget by $ 2 million during the first or second week of January, 2001, prior to issuing the Company's false financial results on January 25, 2001." SAC P52.

Again, plaintiffs fail to provide detail sufficient to support an inference that the unnamed source would actually know if Chen was told in a marketing meeting about additional, unaccounted for expenses. See In re Northpoint Communications Group, Inc., Sec. Litig., 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001) ("Significantly, the complaint does not discuss what the specific duties of these individuals were, or how they came to learn of the information they provide in the complaint."). The SAC is silent as to what this unnamed source's allegation is based upon. As a result, the allegation is entitled to little weight. See Silicon Graphics, 183 F.3d at 984. [*20]

### f. Hewlett-Packard royalty

Plaintiffs again allege that another $ 750,000 of the omitted $ 4 million was related to royalty due to

Hewlett-Packard on the sale of the jointly developed InfoExhange portal product. "Due to the importance of BroadVision's business relationship with HP, defendants Chen and Bolton closely scrutinized HP's transactions with BroadVision, and knew, or should have known, about these expenses." SAC P53. This allegation does not support a strong inference of scienter; plaintiffs do not allege any persuasive facts that suggest defendants could not have been unaware of the omission of the royalty expense.

### g. Summary

In sum, the complaint lacks sufficient detail and particularity to give rise to a strong inference of scienter. See Silicon Graphics, 183 F.3d at 984. While some of the allegations may support some inference of scienter or deliberate recklessness, the complaint taken as a whole, does not, on balance, support a strong inference that defendants Bolton and Chen knew, or recklessly should have known, that the financials announced on January 25, 2001 omitted $ 4 million in expenses.

Plaintiffs' reliance on In re Mercator Software, Inc. Sec. Litig., 161 F. Supp. 2d 143 (D. Conn. 2001) [*21] is unpersuasive. First, it was decided under Second Circuit law which, the court acknowledged, "is considered by some to now have the most lenient or 'plaintiff friendly' pleading requirements among the circuits." Id. at 148. Because the Court does not have a copy of the Mercator complaint it does not know whether the complaint would satisfy the more rigorous standards of the Ninth Circuit.

Second, the facts of Mercator are different from those alleged here. Financials for two quarters had to be restated and the magnitude of the restatements was greater than that here. Id. at 149. The Vice President of Finance and Administration was fired the day the restatements were announced, and the new Chief Financial Officer resigned that same day. Id. at 150. The Vice President of Finance was overheard to say on four or five occasions during a two-month period that "it doesn't look good," with regard to reporting earnings, and he was involved in a dramatic increase in a number of closed door meeting in the Controller's Office. Id. at 149. Moreover, the expenses that were not originally reported "were either fixed or [*22] were recurring, normal operating expenses, tied directly to sales and, thus, where there was a dramatic increase in later quarter revenues, there should have been an attendant increase in expenses." Id. at 150.





### 3. The duty to correct

In their opposition to the first motion to dismiss, plaintiffs argued that even if defendants were not aware of the additional $ 4 million in expenses on January 25, 2001, they had a duty to correct their statements as to the Q4 2000 and FY 2000 results as soon as they learned about the erroneously excluded expenses.

[HN5] A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made. See In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1431 (3rd Cir. 1997) ("the error, albeit an honest one, was one that had to do with information available at the time [the statement] was made and that the error in the information was subsequently discovered"); see also Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995) (a company has a duty to correct a prior statement [*23] within a reasonable time when the "company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not"). This duty of disclosure is known as the "duty to correct." See Burlington Coat, 114 F.3d at 1431; Stransky, 51 F.3d at 1331. Defendants arguably had a duty to correct the Q4 2000 and FY 2000 results when they learned of the additional expenses.

The problem with plaintiffs' theory, however, is that defendants did correct the financials. Plaintiffs' auditors signed the audit report on March 30, a Friday, and defendants issued their press release after the close of the market on April 2, the following Monday. Plaintiffs do not cite any cases that suggest this was an unreasonable delay.

### B. Channel Stuffing

The SAC includes new allegations regarding "channel stuffing." Plaintiffs allege that "according to a former employee of BroadVision familiar with channel partner accounts, in an effort to increase revenues, BroadVision persuaded its partners, including Hewlett-Packard, . . . to take products without having sold them to end users." SAC P58. [*24] Further, BroadVision's Senior Vice President of Worldwide Channels, Gino Padua "was engaged in 'creative' revenue deals, and would even openly complain that he was having 'revenue recognition problems.'" Id. Plaintiffs

allege further that "Chen and Bolten, through meetings and discussions with Padua, were aware of these revenue deals" and that if revenue had been correctly accounted for, BroadVision would have actually suffered a pro forma loss instead of a profit. SAC P57.

These allegations do not give rise to a strong inference of scienter. As a court in this District has noted:

> [HN6] Channel stuffing is defined as the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as distributors no longer make orders while depleting their excess supply. . . . A number of courts have held that "channel stuffing" gives rise to a "very weak" inference of scienter--if any at all--in § 10(b) actions because there are 'a number of legitimate reasons for attempting to achieve sales earlier.'

In re Ramp Networks, Inc. Securities, 201 F. Supp. 2d 1051, 1077 (N.D. Cal. 2002); see also In re Splash Technology Holdings, Inc. Securities Litig., 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) [*25] ("This Circuit has rejected 'channel stuffing' claims.") (citations and quotations omitted). The mere fact that BroadVision sold products to Hewlett-Packard which Hewlett-Packard had not already sold to end users is wholly insufficient to support a strong inference, or even anything more than a weak inference, of scienter.

The allegations as to "creative revenue deals" are too vague and non-specific to support any reasonable inference in favor of plaintiffs.

### C. The Projections

Plaintiffs also base their complaint on the projections made by defendants in the January 25 conference call. In particular, Bolton projected 1Q 2001 revenue to be essentially flat with 4Q 2000, at a range of $ 137 million to $ 140 million, and he stated that the Company expected revenue for FY 2001 to be in the range of $ 600 to $ 630 million. SAC P60. Plaintiffs claim these projections were false and misleading when made. Defendants move to dismiss these claims on the ground the projections are protected by the safe harbor provisions of the PSLRA and, in any event, plaintiffs have not





Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 11 of 13

2002 U.S. Dist. LEXIS 17495, *25; Fed. Sec. L. Rep. (CCH) P92,238

alleged facts that show the statements were false when made and/or scienter.

[HN7] Under the safe harbor a defendant [*26] cannot be held liable for a forward-looking statement that is identified as a forward-looking statement and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." 15 U.S.C. § 78u-5(c)(1)(A). A forward-looking statement means, among other things, "a statement containing a projection of revenues, income (including income loss), earnings . . ." and "a statement of the plans and objectives of management," and "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(C). The above projections are clearly forward-looking statements.

Moreover, [HN8] with respect to oral forward-looking statements, which the above projections were, the safe harbor applies if the oral forward-looking statement is accompanied by a cautionary statement that provides that the particular oral statement is forward-looking and that the actual results might differ materially from those projected, and that information about the risks is contained in a readily available written document. 15 U.S.C. § 78u-5(c)(2). [*27]

At the beginning of the conference call in which the projections were announced, defendants made the following statement:

> During the course of this conference call, BroadVision may make forward-looking statements. These are subject to various important factors including, without limitation, changes in the market, the competitive environment, and macroeconomic conditions. Additional information on potential factors that could affect the company's financial results from time to time is included in the company's prospectus, Forms 10-K and 1-Q, and other documents filed with the SEC.

Thus, section 78u-5(c)(2) applies.

Plaintiffs argue that the safe harbor does not apply to the projections because the cautionary language was not paired with any particular statement in the conference call, and, in particular, with the projections. The literal language of the safe harbor supports this argument. It provides that [HN9] the safe harbor applies if "the oral forward-looking statement is accompanied by a cautionary statement-(i) that the particular oral statement is a forward-looking statement; and (ii) that the actual results might differ materially from those projected in the [*28] forward-looking statement." 15 U.S.C. § 78u-5(c)(2) (emphasis added). The use of the word "particular" seems to exclude the use of boilerplate warnings at the beginning of conference calls. BroadVision's "warning" did not identify any particular statement as forward-looking; instead, BroadVision simply stated that during the conference call it "may" make forward-looking statements.

Defendants respond that the use of the word "particular" was meant to limit the safe harbor to particular forward-looking statements made during the oral presentation. In Wenger v. Lumisys, 2 F. Supp. 2d 1231, 1242 (N.D. Cal. 1998), the court considered this very issue. Based on the legislative history, and the absurdity of requiring a company to identify every forward-looking statement as such every time one is made, and repeating the warning with every forward-looking statement, the court held that a cautionary warning at the beginning of a conference call is sufficient. The Court is persuaded by the Wenger court's reasoning and plaintiff does not cite any cases which have declined to apply the safe harbor in such a situation. Accordingly, the Court concludes [*29] that the projections are protected by the safe harbor.

[HN10] Since the projections are protected by the safe harbor, these claims may survive defendants' motion to dismiss only if plaintiffs have pled facts to show that defendants had actual knowledge that they were false at the time they were made. See 15 U.S.C. § 78u-5(c)(1)(B). As will be discussed below, the SAC does not include any such allegations pled with the required particularity.

First, plaintiffs allege that "according to a former BroadVision employee, a colleague informed him in later December 2000/early January 2001 that BroadVision was estimating sales/revenue for fiscal 2001 to be approximately $ 200 million annually--50% less than the sales BroadVision achieved in fiscal 2000." SAC P61. This allegation is wholly insufficient to give rise to an inference of actual knowledge. Plaintiffs do not allege any facts that suggest that the "colleague" would be in a position to know about defendants' estimates.





Case 4:06-cv-03936-CW     Document 45-3     Filed 03/23/2007     Page 12 of 13

2002 U.S. Dist. LEXIS 17495, *29; Fed. Sec. L. Rep. (CCH) P92,238

Next, they allege defendants knew that new customer demand was non-existent, that sales managers were not hitting their numbers, and that numerous BroadVision partners and customers had already [*30] announced they were facing a slowdown. SAC PP63-65. At a sales meeting held in January 2001, management and employees expressed concern about the lack of new business, and lay-offs were discussed. Indeed, in February, 2001, BroadVision laid off or terminated approximately 250 employees. SAC P66. Again, the SAC lacks sufficient detail to create a strong inference that defendants *actually knew* their projections were false. See Splash II, 160 F. Supp. 2d at 1069 [HN11] ("To the extent that [plaintiffs] rely upon allegations of false forward-looking statements, . . . plaintiffs must plead, 'in great detail,' 'all the facts' forming the basis of their belief that defendants made the forward-looking statements with actual knowledge that they were false.").

Plaintiffs also allege that "defendants had real-time information as to the Company's sales performance and prospects using Salesforce.com, a website through which BroadVision employees updated their sales information each week." Thus, argues plaintiffs, defendants knew or were reckless in not knowing that sales had plummeted and there were few deals in the pipeline. Once again plaintiffs offer no details: what did the [*31] reports on Salesforce.com say and when did they reflect that there were no sales? How often did defendants Bolton and Chen access the reports, if ever? See Silicon Graphics, 183 F.3d at 985 ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."). "In the absence of such specifics, [the Court] cannot ascertain whether there is any basis for the allegations that the officers had actual . . . knowledge of [BroadVision's] problems that would cause their optimistic representations to the contrary to be consciously misleading. In other words, in the absence of such specifics, [the Court] cannot determine whether there is any basis for alleging that the officers knew that their statements were false at the time they were made--a required element in pleading fraud." Id. The other allegations concerning defendants "actual knowledge" that the projections were false similarly lack sufficient particularity to give rise to a strong inference of scienter.

D. Other Statements

Plaintiffs challenge several [*32] other statements in the January 25, 2001 press release and conference call.

1. Version 6

The January 25, 2001 press release stated that: "BroadVision One-To-One Enterprise Version 6 will be one of the only J2EE technology compatible e-business solution suites to also deliver comprehensive e-business applications, content management, personalization, analytics and wireless support from a single vendor." SAC P38. In the conference call that followed the press release, Chen stated that "we entered into a strategic alliance with Accenture to jointly market and sell--implement our J2EE-compliant product . . . ."). SAC P39 (emphasis in SAC). Plaintiffs contend that at the time Chen made the statement, he knew that Version 6.0 was not J2EE compliant. SAC PP76-82.

Plaintiffs have pled sufficient facts to demonstrate that Version 6.0 was not J2EE compliant and that Chen knew it was not compliant. The press release, however, represented that Version 6.0 was J2EE compatible, not that it was J2EE compliant. Plaintiffs admit it was J2EE compatible. SAC P81. Thus, the issue is whether Chen's conference call "our J2EE-compliant product" statement is actionable. While plaintiffs are entitled [*33] to an inference that Chen knew the statement was false in light of the obvious falseness of the statement, the plaintiffs have not pled sufficient particularized facts to give rise to a strong inference that Chen made the "J2EE-compliant" comment with scienter, that is, that it was anything more than a misstatement. Despite the product's importance to BroadVision's business (according to plaintiffs), plaintiffs cannot identify any other time when anyone at BroadVision, including Chen, represented that the product was J2EE compliant. Given the lack of any other misstatements, it is equally--if not more--likely that the misstatement was inadvertent, as it is that it was intentional. Plaintiffs have accordingly not pled facts giving rise to a strong inference of scienter. See Vixs, 298 F.3d at 897.

2. Headcount statements

During the conference call Bolton stated that "we expect a slight increase in the average headcount during Q1 of '01, we also expect the resulting increase in compensation cost will be offset by lower other costs in Q4." SAC P74. Plaintiffs claim the statement was knowingly false and that it was important because "it

  

Case 4:06-cv-03936-CW    Document 45-3    Filed 03/23/2007    Page 13 of 13

2002 U.S. Dist. LEXIS 17495, *33; Fed. Sec. L. Rep. (CCH) P92,238

indicated that [*34] BroadVision, unlike its competitors, would be continuing to hire workers to meet increased demand." SAC P74. They allege that at a mid-January meeting, attended by Chen and Bolton, BroadVision management discussed lay-offs and that, in fact, on or about February 6, 8 and 28, 2001, BroadVision terminated between 250 and 400 of its 2,412 employees. SAC P75. They also claim that BroadVision implemented a hiring freeze in December/January 2001. SAC P75.

These allegations give rise to an inference of scienter given the temporal proximity to the statement and the lay-offs. They do not, however, give rise to a strong inference of scienter. First, no inference is warranted from the statement about the hiring freeze because plaintiffs do not provide any specifics. Once again plaintiffs merely allege that a "former employee" said there was a hiring freeze without any specifics; they do not even allege the "former employee" was an employee at the time of the alleged freeze, or how he or she would have knowledge of such a freeze.

Second, the statement as to the discussion at the January Sales Kickoff Meeting is also entitled to little weight because plaintiffs do not even allege that the "former [*35] employee," who apparently advised plaintiffs that lay offs were discussed at the meeting, attended the meeting, let alone other details that suggest the allegation is reliable. SAC P75.

Third, the allegation as to BroadVision instructing employees in mid-February not to discuss the recent lay-offs is unaccompanied by any details, including the basis for the allegation.

Finally, and most importantly, Bolton did not represent that BroadVision would increase its staffing, as one analyst reported; instead, he stated that BroadVision expected an increase in average headcount. At oral argument on the first motion to dismiss plaintiffs' counsel admitted that a company could fire workers and still see an increase in average headcount. Transcript of Feb. 22,

2002 Hearing at 8. Moreover, the statement was made in the context of a statement about operating expenses. Bolton was projecting operating expenses to be flat with 4Q 2000, even though the Company was expecting a slight increase in average headcount.

### D. Statements about BroadVision's Business Condition and Outlook

Finally, plaintiffs allege that Chen made additional false statements on January 25, 2001, including that BroadVision [*36] has a "very, very, significant pipeline for customers." The allegations of scienter as to these statements are the same as those for the projections and they fail to sufficiently allege a strong inference of scienter for the same reasons.

### CONCLUSION

For the foregoing reasons, plaintiffs have failed, again, to plead facts giving rise to a strong inference of scienter. As this case has been pending for more than a year and the Court has already granted plaintiffs leave to amend once before, and as the court specifically advised plaintiffs to include in their amended complaint "everything that you have that establishes scienter," defendants' motion to dismiss the federal claims is GRANTED without leave to amend. The Court declines to exercise supplemental jurisdiction of the new state law claims and instead hereby dismisses those claims without prejudice. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 98 L. Ed. 2d 720, 108 S. Ct. 614 n.7 (1988).

IT IS SO ORDERED.

Dated: September 11, 2002

/s/

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE

  

**EXHIBIT C**

LEXSEE



Analysis
As of: Mar 08, 2007

**In re DITECH COMMUNICATIONS CORP. SECURITIES LITIGATION. This
Document Relates To: ALL ACTIONS.**

**No. C 05-02406 JSW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2006 U.S. Dist. LEXIS 58978; Fed. Sec. L. Rep. (CCH) P93,928**

**August 10, 2006, Decided
August 10, 2006, Filed**

**PRIOR HISTORY:** In re Ditech Communs. Corp. Secs. Litig., 2005 U.S. Dist. LEXIS 40963 (N.D. Cal., Dec. 19, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion to dismiss the complaint filed by lead plaintiffs in their action, brought individually and on behalf of all other persons who purchased or otherwise acquired the common stock of defendant corporation, pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

**OVERVIEW:** Defendants asserted that plaintiffs failed to meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA). Plaintiffs alleged that throughout the class period, defendants publicly made misrepresentations concerning orders and a merger. The court noted that the PSLRA required that plaintiffs had to state with particularity facts that gave rise to a strong inference that defendants acted with the required state of mind. The court found that plaintiffs had failed to plead falsity with respect to the alleged misrepresentations as to the orders and as to the merger. The court noted that the PSLRA also required a plaintiff to allege particular facts that gave rise to a strong inference that defendant made false or misleading statements either intentionally or with deliberate recklessness. The court held that the relatively low percentage of stocks that were sold by defendant corporate officers during the class period was not suspicious enough to raise a strong inference of scienter. The fact that the complaint failed to allege that the remaining corporate insiders sold a large portion of their stocks further defeated any inference of scienter.

**OUTCOME:** The court granted defendants' motion to dismiss without prejudice.

**CORE TERMS:** stock, scienter, merger, customer, insider, trading, misleading, particularity, suspicious, announced, judicial notice, misrepresentation, vice-president, dramatically, falsity, motion to dismiss, confidence, publicly, investors, delivery, Securities Exchange Act, recklessness, deliberate, selling, lawsuits, senior, heightened, strategic, smooth

**LexisNexis(R) Headnotes**

Page 1

  

Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 3 of 11

2006 U.S. Dist. LEXIS 58978, *; Fed. Sec. L. Rep. (CCH) P93,928

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN1] Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe. 15 U.S.C.S. § 78j(b).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN2] See 17 C.F.R. § 240.10b-5.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*

[HN3] To plead a claim under § 10(b), 15 U.S.C.S. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*

[HN4] Where a plaintiff asserts a § 20(a) claim based on an underlying violation of § 10(b), the pleading requirements for both violations are the same.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > Group Pleading Doctrine*

[HN5] The Private Securities Litigation Reform Act requires that the plaintiff state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*

*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN6] A complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with actual knowledge that the statement was false or misleading. This is often accomplished by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN7] Under the Private Securities Litigation Reform Act, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. To determine whether a plaintiff has pled a strong inference of scienter, however, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. The court should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter. Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. The court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice.

*Evidence > Judicial Notice > Adjudicative Facts > General Overview*

[HN8] A court may properly take judicial notice of Securities and Exchange Commission filings and documents expressly referenced in a complaint.

*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN9] The Private Securities Litigation Reform Act requires that plaintiffs allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement was





Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 4 of 11

2006 U.S. Dist. LEXIS 58978, *; Fed. Sec. L. Rep. (CCH) P93,928

false or misleading, and if those allegations are made on information and belief, all facts on which that belief is formed.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN10] The Private Securities Litigation Reform Act requires a plaintiff to allege particular facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C.S. § 78u-4(b)(2). Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is proper. Moreover, to determine whether a plaintiff has pled a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN11] Although unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information. Thus, courts consider the following factors in determining whether stock sales by inside officers or directors provide sufficient evidence of scienter: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.

**COUNSEL:** [*1] For Richard Jaffe, Individually And On Behalf Of All Others Similarly Situated, Plaintiff: Jeff S. Westerman, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For Young Kim, Plaintiff: Christopher T. Heffelfinger, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA.

For Casey Group, Plaintiff: Karen T. Rogers, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For Ditech Communications Corp, Timothy K. Montgomery, William J. Tamblyn, Defendants: William S. Freeman, Elizabeth P. Lin, Cooley Godward LLP, Palo Alto, CA.

For Casey Group, Movant: Karen T. Rogers, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION:**

**ORDER GRANTING MOTION TO DISMISS WITHOUT PREJUDICE**

Lead plaintiffs Jack Casey, Tonio Dahmen, George Innocenti, Shengli Duan and Norbert P. Czub (collectively "Plaintiffs") bring this action individually and on behalf of all other persons who purchased or otherwise acquired the common stock of defendant Ditech Communications Corporation, which subsequently changed its name to Ditech Networks, Inc., ("Ditech"), between August 24, 2004 and May 26, 2005 (the [*2] "Class Period"), n1 pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

> n1 The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

Now before the Court is the motion to dismiss the Amended Class Action Complaint ("ACAC" or "Complaint") filed by defendants Ditech, Timothy K. Montgomery ("Montgomery"), and William J. Tamblyn ("Tamblyn") (collectively "Defendants"). Defendants move to dismiss asserting that Plaintiffs fail to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Defendants further assert that allowing amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice. Having carefully reviewed the parties' papers, considered [*3] their arguments and relevant legal authority, and having had the benefit of





Case 4:06-cv-03936-CW     Document 45-4     Filed 03/23/2007     Page 5 of 11

2006 U.S. Dist. LEXIS 58978, *3; Fed. Sec. L. Rep. (CCH) P93,928

oral argument, the Court hereby GRANTS Defendants' motion to dismiss with leave to amend.

## FACTUAL BACKGROUND

Ditech is a publicly traded company and is based in California. Ditech designs and markets telecommunications equipment. (ACAC, P 2.)

Defendant Timothy K. Montgomery was for all relevant periods Ditech's Chief Executive Officer. (*Id.*, P 14.) Defendant William J. Tamblyn was for all relevant periods Ditech's Chief Financial Officer. (*Id.*, P 15.) Montgomery sold 225,000 shares of Ditech common stock during the class period for proceeds of $ 4,491,900 and Tamblyn sold 25,000 shares of common stock during the class period for proceeds of $ 614,142. (*Id.*, PP 14, 15.)

### Voice Quality Assurance Orders

Plaintiffs allege that during the Class Period, Defendants represented that they received two orders totaling over five million dollars for Voice Quality Assurance ("VQA") from new customers in Asia. (*Id.*, PP 4(a), 29.) VQA is a Ditech technology that enhances the clarity of wireless telephone calls. Ditech announced that it had "secured" two large orders for its VQA solutions [*4] by two new customers in Asia. (*Id.*, P 29.) If these orders had been realized, they would have raised Ditech's second quarter revenue to $ 29,253,000, or by seventeen percent. (*Id.*, P 4(a).) Plaintiffs allege that "[t]he purported customers were not obligated to, and, as it turned out, did not purchase the services." (*Id.*, P 4(a).)

On a conference call with analysts and investors held on August 24, 2004, Montgomery stated: "Although we don't know yet precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of $ 5 million already in Q2, you can see the beginning of a trend line that gives us real confidence in our VQA business." (*Id.*, P 30.) Plaintiffs allege this statement made was false because the VQA orders were not "secured;" the new clients had the right to change their minds about the orders and Defendants lacked any basis to express "real confidence" in its VQA business. (*Id.*, P 34.)

Plaintiffs further allege that "the truth about the purported VQA orders" began to emerge when Ditech announced on November 3, 2004, that these orders had

not yet shipped. "Defendants, however, maintained that this was merely a 'delay' and that they [*5] still expected the orders to ship." (*Id.*, P 5.) Montgomery stated in a press release issued on November 3, 2004: "Although our revenues were 67% higher than the same quarter last year we did not achieve our revenue goal. . . . The revenue shortfall was the result of two factors. First, we experienced a delay in shipping a major VQA order in the quarter to an Asian customer. We are taking steps to facilitate the smooth delivery of this order in the second half of this year." (*Id.*, P 35.) During a conference call later that day, Montgomery stated: "In August, we announced that we'd secured orders in excess of $ 5 million from customers in Asia. During the Q1 conference call, we indicated that we thought we would ship $ 2 to $ 3 million in VQA in the second quarter. Due to management changes within the largest of these firms, subsequent to booking the order, the delivery schedule changed. The customer has now reconfirmed the new shipping schedule and we're taking steps to ensure smooth delivery of these orders in the second half of this fiscal year." (*Id.*, P 36.)

Plaintiffs allege that Montgomery reiterated that the VQA issue was one of timing and that the Company did not [*6] lose the transactions when he stated: "Not trying to be too granular here, but the issue of VQA is not a matter of losing transactions, it's a matter of delays. Delays associated with the magnitude of the opportunities and the, shall we say, the magnitude of the competitive landscape." (*Id.*, P 36.)

On November 18, 2004, on a conference call, Tamblyn reassured investors regarding the VQA orders: "The order [to an Asian customer] remains valid and we are taking steps to facilitate the smooth delivery of this order in the second half of the fiscal year." (*Id.*, P 38.)

As support for Plaintiffs' contention that Defendants' representations regarding the VQA orders from the Asian customers were false when made, Plaintiffs point to the following statement made by Montgomer during a conference call held on November 3, 2004: "I'm happy to say that I don't have a loss report associated with VQA. I have a delay report that suggests there are other things we need to do to win the business." However, this statement was made in response to a question regarding Ditech's *domestic* VQA trials. (North Decl., Ex. B.)

### Nextel-Sprint Merger

Page 4

  

Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 6 of 11

2006 U.S. Dist. LEXIS 58978, *6; Fed. Sec. L. Rep. (CCH) P93,928

On December 15, 2004, Nextel announced [*7] a merger with Sprint. (ACAC, PP 4(b), 39.) Before the merger, Nextel represented 42% of Ditech's business. (*Id.*, P 4(b).) Plaintiffs allege that Defendants "represented that the merger should not be of concern to Ditech investors and that it was 'quite good' for the Company." (*Id.*, PP 4(b), 42.) Defendants made this alleged statement on February 17, 2005. (*Id.*, P 42.) Plaintiffs further allege that Defendants knew or recklessly disregarded that the merger posed a serious threat to Ditech's business. (*Id.*, P 43.)

On a conference call on February 17, 2005, Montgomery stated: "The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end." (*Id.*, P 42.) On May 26, 2005, Ditech revealed the "truth" about the Nextel-Sprint merger. (*Id.*, P 6.)

### Scienter Allegations

Plaintiffs allege that during the Class Period, Montgomery sold 25,000 shares of Ditech [*8] stock every two weeks between August 26, 2004 and December 16, 2004 at prices between $ 26.10 and $ 15.28, amounting to a total of 225,000 shares for $ 4,491,900. (*Id.*, P 58.) The 225,000 shares were less than 13 percent of Montgomery's stock holdings at that time. (North Decl., Ex. O.) Plaintiffs allege that Montgomery did not sell any stock between August and December 2003, but does not allege what stocks, if any, Montgomery sold between December 2003 and August 2004. (ACAC, P 60.) Based on documents filed with the SEC, Montgomery sold a total of 320,000 shares of Ditech stocks for $ 6,715,917 during April through July 2004, the four months before the Class Period began. (North Decl., Ex. I.) During this period, Montgomery sold 25,000 shares approximately every two weeks, plus an additional 120,000 shares in late June 2004. (*Id.*)

Plaintiffs allege Tamblyn sold 25,000 shares of Ditech stock on October 4, 2004 at prices between $ 24.56 and $ 24.66, amounting to a total of $ 614,142. (ACAC, P 58.) The 25,000 shares were just over 3 percent of Tamblyn's stock holdings at that time. (North Decl., Ex. O.) Plaintiffs allege that Tamblyn did not sell any shares in October 2003, [*9] but does not allege what stocks, if any, Tamblyn sold between October 2003 and October 2004, or after October 2004. (ACAC, P 60.)

Plaintiffs also allege that during the Class Period non-defendant Ditech insiders, Vice-President of Worldwide Sales, James Grady, sold 27,500 shares for $ 626,315, Vice-President of Operations, Lowell Trangsrud, sold 20,000 shares for $ 470,500, and Director, David Sugishita, sold 22,500 shares for $ 516,158. (ACAC, P 58.) The aggregate of sales by insiders identified in the Complaint amount to nine percent of the total holdings by the identified insiders, and only seven percent of the combined holdings of all Ditech directors and executive officers. (North Decl., Ex. O.) The aggregate sales by Montgomery and Tamblyn, the only individual defendants, amount to seven percent of the holdings by the officers and directors identified in the Complaint and less than six percent of all Ditech executive officers and directors' holdings. (*Id.*)

### ANALYSIS

Plaintiffs allege that throughout the Class Period Defendants publicly made misrepresentations concerning VQA orders and the Sprint-Nextel merger. [HN1] Section 10(b) of the Securities Exchange Act provides, [*10] in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

[HN2] Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
>
> (c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or

Page 5



Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 7 of 11

2006 U.S. Dist. LEXIS 58978, *10; Fed. Sec. L. Rep. (CCH) P93,928

sale of any security. _17 C.F.R. § 240.10b-5._

[HN3] To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged [*11] loss. _Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)._ Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. _Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b)._

Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. _See In re Ramp Networks, Inc. Secs. Litig., 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002)._ [HN4] Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. _Id._

**A. Applicable Pleading Standards: Private Securities Litigation Reform Act.**

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. _15 U.S.C. § 78u-4(b)._ The PSLRA requires [*12] that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." _15 U.S.C. § 78u-4(b)(1)(B)._ Furthermore, [HN5] the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." _15 U.S.C. § 78u-4(b)(2)._

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight." _In re Silicon Graphics, Inc. Sec. Lit., 183 F.3d 970, 988 (9th Cir. 1999)._ "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity _and_ scienter." _Fischer_

_v. Vantive Corp.(In re Vantive Corp. Secs. Litig.), 283 F.3d 1079, 1084 (9th Cir. 2002)_ (citing _Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)_) (emphasis added). "Thus [HN6] the complaint must allege [*13] that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading.'" _Id. at 1085_ (citing _15 U.S.C. § 78u-5(c)(1)(B)(i)_). This is often accomplished "by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants." _Yourish v. California Amplifier, 191 F.3d 983, 993 (9th Cir. 1999)_ (quoting _Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1549 (9th Cir. 1991)_ (en banc)); _see also id._ at 994 (discussing insufficiency of plaintiffs' allegations with regard to the non-disclosure of confidential non-public information).

[HN7] Under the PSLRA, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. _Silicon Graphics, 183 F.3d at 983._ To determine whether a plaintiff has pled a strong inference of scienter, however, "the court must consider all reasonable inferences to be drawn [*14] from the allegations, including inferences unfavorable to the plaintiffs." _Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002)._ The Court "should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." _Id._ "Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss." _In re Northpoint Communs. Group, Inc., Secs. Litig. & Consol. Cases, 221 F. Supp. 2d 1090, 1094 (N.D. Cal. 2002)._

Finally, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice. _Northpoint II, 221 F. Supp. 2d at 1094; see also Silicon Graphics, 183 F.3d at 986._

**B. Request for Judicial Notice.**

Defendants request that the Court take judicial notice





Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 8 of 11

2006 U.S. Dist. LEXIS 58978, *14; Fed. Sec. L. Rep. (CCH) P93,928

of Ditech's press releases, SEC filings, transcripts of [*15] Ditech's Earnings Release Conference calls, and Ditech's historical stock prices, all of which are referenced in the Complaint, are publicly filed documents, or are otherwise the proper subject of judicial notice. Plaintiffs do not dispute the accuracy of the documents attached to the request, and the requested documents are the types of documents of which this Court properly may take judicial notice. *See, e.g.,* [HN8] *In re Calpine Corp. Secs. Litig., 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)* (court "may properly take judicial notice of SEC filings and documents expressly referenced" in a complaint); *see also Plevy v. Haggerty, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998); In re Copper Mountain Sec. Lit., 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004)* (information about the stock price of publicly traded companies is a proper subject of judicial notice). Accordingly, the Court GRANTS Defendants' requests.

## C. Plaintiffs Fail To Plead Sufficient Facts to Demonstrate Falsity.

[HN9] The PSLRA requires that Plaintiffs allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement [*16] was false or misleading, and if those allegations are made on information and belief, all facts on which that belief is formed. *See 15 U.S.C. § 78u-4(b)(1)(B); see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1134 (9th Cir. 2004).* Plaintiffs allege that Defendants made two types of alleged false misrepresentations regarding: (1) Defendants' VQA orders and (2) the Nextel-Sprint merger. Plaintiffs fail to meet this standard with respect to either type of alleged misrepresentation.

### 1. VQA Orders.

Plaintiffs allege that Defendants misrepresented that Ditech had received two orders worth over five million dollars from two new customers in Asia. (ACAC, P 4(a).) In a press release issued on August 24, 2004, Ditech announced it had "secured orders to deploy its [VQA] solutions with two new customers in Asia. . . . totaling in excess of five million dollars." (*Id.,* P 29.) On a conference call later that day, Montgomery stated: "Although we don't know yet precisely where Q2 VQA revenues will be, given our Q4 revenues and orders in excess of $ 5 million already in Q2, you can see the [*17]

beginning of a trend line that gives us real confidence in our VQA business." (*Id.,* P 30.) Plaintiffs contend these statements were false because the orders were not "secured." According to Plaintiffs, the new clients had the right to change their minds about the orders and were not obligated to purchase the services under these orders. (*Id.,* PP 4(a), 34.) However, Plaintiffs merely allege in a conclusory fashion that the customers had a contractual right to change their mind. They fail to allege any facts, let alone with facts with particularity, to support a belief that these customers actually had a contractual right to change their mind. n2 *See 15 U.S.C. § 78u-4(b)(1)(B).* That the customers, in fact, had not purchased the services under these orders as of the date Plaintiffs filed this Complaint does not provide support for Plaintiffs' claims, but rather, is merely an example of pleading "fraud by hindsight," which is prohibited by the PSLRA. *See Silicon Graphics, 183 F.3d at 988.* n3 Thus, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the VQA orders. [*18]

n2 In opposition to Defendants' motion and in support of Plaintiffs' contention that Defendants' representations regarding the VQA orders from the Asian customers were false when made, Plaintiffs point to a statement made by Montgomery during a conference call on November 3, 2004: "I'm happy to say that I don't have a loss report associated with VQA. I have a delay report that suggests there are other things we need to do to win the business." (Opp. at 9.) However, this statement was made in response to a question regarding Ditech's *domestic* VQA trials, and thus, does not assist Plaintiffs. (North Decl., Ex. B.)

n3 Plaintiffs further allege that these statements are false because Defendants "lacked any basis to express 'real confidence' in Ditech's VQA business," (ACAC, P 34(c)), presumably because the orders were not "secured." This basis for alleging falsity fails for the same reason; Plaintiffs fail to allege any facts which would support drawing an inference that these orders were doubtful or illusory, let alone facts with particularity. *See 15 U.S.C. § 78u-4(b)(1)(B).*

[*19]





Case 4:06-cv-03936-CW    Document 45-4    Filed 03/23/2007    Page 9 of 11

2006 U.S. Dist. LEXIS 58978, *19; Fed. Sec. L. Rep. (CCH) P93,928

## 2. Nextel-Sprint Merger.

Plaintiffs allege that Defendants misrepresented that the then proposed merger between Sprint and Nextel, which was announced in December 2004, should not be of concern to investors and would be "quite good" for Ditech. (ACAC, P 4(b).) Specifically, Plaintiffs allege that on February 17, 2005, Montgomery stated on a conference call: "The Nextel-Sprint merger is actually, we think, quite good for us in that the key strategic people on the technical side are actually going to be the Nextel players, and this is what we've seen publicly announced. So we think that's positive, but we also have an account team calling on Sprint directly in Kansas City, which we're hopeful the 2 points lead to the right end." (*Id.*, P 42.) Plaintiffs have not alleged any material non-public information known by Defendants at the time this statement was made which would have rendered this statement false, such as that the key strategic technical people in the merged company were not going to be from Nextel or that Defendants had other information at that time demonstrating it was likely the merger was going to cause Ditech to lose Nextel's business. Plaintiffs thus fail [*20] to allege any facts, let alone with facts with particularity, to support a belief that the positive statement regarding the merger was false and that Ditech knew it was false at the time it was made. *See* 15 U.S.C. § 78u-4(b)(1)(B). Accordingly, the Court concludes that Plaintiffs fail to sufficiently allege falsity with respect to the alleged misrepresentations as to the Nextel-Sprint merger.

## D. Plaintiffs fail to Plead Sufficient Facts to Demonstrate Scienter.

[HN10] The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2). Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the court must consider all reasonable [*21] inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

Plaintiffs rely on Montgomery's and Tamblyn's stock sales to support their scienter allegations. [HN11] "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, . . . insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal quotations and citations omitted). Thus, courts consider the following factors in determining whether stock sales by inside officers or directors provide sufficient evidence of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.; see also Ronconi*, 253 F.3d at 435.

In *Silicon Graphics*, the Ninth Circuit held that selling between 6.9 and 7.7 percent was a relatively small portion and thus not unusual or suspicious. *Silicon Graphics*, 183 F.3d at 987. [*22] The court found that the 43.6 percent sold by one senior vice-president of the company did not give rise to a strong inference of deliberate recklessness because: (1) he only sold only 20,000 stocks; (2) the amount was only 5 percent of the stocks sales with which the plaintiff was concerned; (3) the senior vice-president had only been with the company for one year and had no significant trading history for purposes of comparison; and (4) the other officers sold relatively insignificant portions of their holdings. *Id.* The court further held that the 73.3 percent sold by another senior vice-president was insufficient to allege scienter based on the circumstances of that case, including that he was forbidden to sell stocks before the class period and he did not make any of the allegedly misleading statements. *Id.* at 987-88.

In *Ronconi*, the court held that selling 10 and 17 percent of the insiders' respective stock holdings was not suspicious. *Ronconi*, 253 F.3d at 435 (noting that 10 and 17 percent was "just above the 7.7 percent and 6.9 percent [that the court] held not to be suspicious in *Silicon Graphics*"). Even when an officer sold [*23] 98 percent of her stock during the class period, the *Ronconi* court found such evidence insufficient to demonstrate scienter because the plaintiffs failed to allege sufficient trading history from which the court could conclude "that her trading was dramatically out of line with prior trading practices" and because the rest of the corporate insiders did not sell significant portions of their stock holdings.





2006 U.S. Dist. LEXIS 58978, *23; Fed. Sec. L. Rep. (CCH) P93,928

*Id.* at 436 (quotations omitted); *see also Copper Mountain,* 311 F. Supp. 2d at 875 (finding sales of between 17 and 21 percent not suspicious enough to raise a strong inference of scienter); *In re FVC.COM Sec. Lit.,* 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (finding sale of 13.3 percent of defendants' stocks was "not suspicious and in fact suggests that defendants were not aware at the time of their stock sales that the . . . press releases contained false information").

During the Class Period, Montgomery sold 225,000 shares, at a rate of 25,000 every two weeks, for a total price of $ 4,491,900, which was 12.7 percent of his stock holdings at that time. (ACAC, P 58; North Decl., Ex. O.) During the previous four months, Montgomery [*24] sold 320,000 shares, at a rate of 25,000 approximately every two weeks, plus an additional 120,000 shares in late June 2004, for a total of $ 6,715,917. (North Decl., Ex. I.) During the Class Period, Tamblyn sold 25,000 shares for a total price of $ 614,142, which was 3.1 percent of his stock holdings at that time. (ACAC, P 58.; North Decl., Ex. O.) n4 Considered together, the stock sales by Montgomery and Tamblyn amounted to 9.7 percent of their combined holdings during the Class Period. (*Id.*) Their stock sales during the Class Period amounted to 7.1 percent of the total holdings by the insiders identified in the Complaint, and less than 5.8 percent of the total holdings by all Ditech directors and executive officers as a group. (North Decl., Ex. O.)

n4  Notably, neither Montgomery nor Tamblyn sold any Ditech stocks during the Class Period *after* the allegedly false statement regarding the Nextel-Sprint merger was made on February 17, 2005.

The relatively low percentage of stocks sold by Montgomery and [*25] Tamblyn during the Class Period is not suspicious enough to raise a strong inference of scienter. *See Ronconi,* 253 F.3d at 435; *Silicon Graphics,* 183 F.3d at 987; *Copper Mountain,* 311 F. Supp. 2d at 875; *FVC.COM,* 136 F. Supp. 2d at 1039. Moreover, given that Montgomery sold more stocks during the four months preceding the Class Period, his sales during the Class Period were not "dramatically out of line with prior trading practices." *See Vantive,* 283 F.3d at 1092 (holding that where defendants' stock sales in the preceding seven months exceeded the sales during the class period, their stock sales were "hardly . . . dramatically out of line with

prior trading practices").

Finally, the fact that the Complaint fails to allege that the remaining corporate insiders sold a large portion of their Ditech stocks further defeats any inference of scienter. *See Ronconi,* 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required . . . where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of [*26] the company's affairs were known to be false when made."). n5

n5  Plaintiffs' reliance on *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1232 (9th Cir. 2004) and In *re Qwest Communications Int'l Sec. Lit.,* 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) to support their showing of scienter is misplaced. In *Nursing Home,* the chief executive officer sold more than 29 million shares for almost $ 900 million in less than ten days, which amounted to only 2.1 percent of his holdings. The court noted that this stock sale presented a "novel situation: few others could sell $ 900 million worth of stock and only sell 2.1% of their holdings." *Nursing Home,* 380 F.3d at 1232. Thus, the court held that "where stock sales result in a truly *astronomical* figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings. *Id.* (emphasis added). Moreover, the court found it significant that the officer had not sold any shares in the previous five years. *Id.* Here, the $ 4.5 million Montgomery sold in stock does not compare to the $ 900 million the court found astronomical. Nor were Montgomery's Class Period sales highly inconsistent with his prior trading history considering that he sold $ 6.7 million in stock in the four months before the Class Period began.

In *Qwest Communications,* the court concluded that the inference which could be reasonably drawn from an officer selling seven percent of her stocks for $ 410,000 in one day was "fairly weak." *Qwest Communications,* 396 F. Supp. 2d at 1196. It was the sales from the remaining corporate defendants, which included sales worth over $ 200 million and $ 1.5 billion, that the court found supported a strong inference of scienter. *Id.*





2006 U.S. Dist. LEXIS 58978, *26; Fed. Sec. L. Rep. (CCH) P93,928

[*27]

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. This ruling is without prejudice to Plaintiff filing an amended complaint. Plaintiffs shall file any amended complaint within thirty days of the date of this Order. If Plaintiffs do not file an amended complaint within thirty days, this case shall be dismissed. If an amended complaint is filed, Defendants shall either file an answer or move to dismiss within twenty days of service of the amended complaint.

**IT IS SO ORDERED.**

Dated: August 10, 2006

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE




# EXHIBIT D

LEXSEE



Analysis
As of: Mar 08, 2007

**IN RE INVISION TECHNOLOGIES, INC. SECURITIES LITIGATION**

**No. C04-03181 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2006 U.S. Dist. LEXIS 76458**

**August 31, 2006, Decided**

**PRIOR HISTORY:** In re Invision Techs., Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 12166 (N.D. Cal., Jan. 21, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion to dismiss a private securities fraud action pursuant to Fed. R. Civ. P. 12(b)(6), and lead plaintiffs opposed the motion. Plaintiffs alleged that defendants committed securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78j(b); Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10-5; and § 20(a) of the Exchange Act.

**OVERVIEW:** Plaintiffs alleged that defendants committed securities fraud during a merger acquisition. Plaintiffs asserted that statements contained in the merger agreement constituted an independent, public reaffirmation of those merger statements. Defendants argued that plaintiffs failed to plead scienter with the requisite specificity under the Private Securities Litigation Reform Act (PSLRA). The court granted defendants' motion to dismiss. Four factors were relevant to whether a motion for leave to amend pleadings should be denied: undue delay, bad faith or dilatory motive, futility of amendment, and prejudice to the opposing party. In a previous dismissal order, the court identified several deficiencies in plaintiffs' complaint and granted

plaintiffs the opportunity to cure the deficiencies through amendment. Very little had changed substantively in the amended complaint. Because plaintiffs had failed to cure the scienter deficiencies identified in the previous order despite being offered the opportunity to do so, amendment appeared futile.

**OUTCOME:** The court granted defendants' motion to dismiss, and the complaint was dismissed without leave to amend.

**CORE TERMS:** merger agreement, scienter, misleading, misstatement, motion to dismiss, merger, Exchange Act, securities fraud, press release, omission, particularity, recklessness, conscious, contemporaneous, falsity, detect, cure, statements contained, facts giving rise, state of mind, misrepresentation, forward-looking, collectively, affirmation, regulations, deliberate, heightened, misconduct, motive, pleading requirement

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] A court may dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) if a plaintiff pleads insufficient facts under an adequate theory. When deciding a motion to

Page 1

  

dismiss pursuant to Rule 12(b)(6), a court must take all of the material allegations in the plaintiffs complaint as true, and construe them in the light most favorable to the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
*Civil Procedure > Summary Judgment > General Overview*

[HN2] In the context of a motion to dismiss, review is limited to the contents of the complaint. When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. This rule precludes plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*

[HN3] Fed. R. Civ. P. 8(a) only requires a short and plain statement of the claim showing that the pleader is entitled to relief. Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. In the securities fraud context however, the pleading requirements are more stringent.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*

[HN4] Under § 10(b) it is unlawful to use or employ in connection with the purchase or sale of any security

registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities Exchange Commission may prescribe. 15 U.S.C.S. § 78j(b). Rule 10b-5, promulgated under § 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. The elements of a Rule 10b-5 violation are: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*

[HN5] In order to state a claim under § 10(b), 15 U.S.C.S. § 78j(b), a complaint must overcome several pleading barriers. First, when alleging fraud, Fed. R. Civ. P. 9(b) requires plaintiffs to state with particularity the circumstances constituting the fraud. To meet the heightened pleading requirements of Rule 9(b), a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading.

*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN6] A plaintiff must overcome the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA). Congress enacted the PSLRA in 1995 to provide protections to discourage frivolous securities litigation. Under the PSLRA, complaints alleging misrepresentations or omissions, must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15

Page 2

  

U.S.C.S. § 78u-4(b)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN7] The Private Securities Litigation Reform Act (PSLRA) imposed heightened requirements for pleading scienter. Under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2). The United States Court of Appeals for the Ninth Circuit, in interpreting the PSLRA, has held that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN8] Even if a plaintiff overcomes the falsity and scienter pleading barriers, the Private Securities Litigation Reform Act's Safe Harbor provision provides that a securities fraud claim may not lie with respect to a statement that is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C.S. § 78u-5(c)(1)(A)(I). A person may be held liable if the forward-looking statement is made with actual knowledge that the statement was false or misleading. 15 U.S.C.S. § 78u-5(c)(1)(B).

*Business & Corporate Law > Mergers & Acquisitions > Mergers > General Overview*
[HN9] Merger statements must be analyzed in context.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN10] The Private Securities Litigation Reform Act provides that a complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2). To have acted with the required state of mind, defendant must have either acted intentionally or with deliberate recklessness. Recklessness only satisfies scienter under § 10(b), 15 U.S.C.S. § 78j(b), to the extent that it reflects some degree of intentional or conscious misconduct. Therefore, a plaintiff must plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness. A reasonable inference is not enough. A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview*
[HN11] A district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN12] The Private Securities Litigation Reform Act requires the pleading of specific, contemporaneous facts creating a strong inference of scienter.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*
[HN13] A corporation acts through its employees, and the finding of corporate liability under § 10(b), 15 U.S.C.S. § 78j(b), requires the finding of scienter on the part of at least one individual defendant responsible for the misstatements.

**COUNSEL:** [*1] For Regis Engelken, individually and on behalf of all others similarly situated, Plaintiff: Robert S. Green, LEAD ATTORNEY, Green Welling LLP, San Francisco, CA; Marc A. Topaz, Richard A. Maniskas, Tamara Skvirsky, Schiffrin & Barroway, LLP, Radnor, PA; Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA.

For Glazer Funds, Plaintiff: Peter Arthur Binkow, LEAD ATTORNEY, Michael M. Goldberg, Glancy Binkow & Goldberg LLP, Los Angeles, CA.





For Giovanni Lanzara, Defendant: Catherine Duden-Kevane, Susan Samuels Muck, Fenwick & West LLP, San Francisco, CA; Songmee L. Connolly, Emmett C. Standton, Fenwick & West LLP, Mountain View, CA; Tanya Herrera, Stein & Lubin, San Francisco, CA.

For Sergio Magistri, Ross Mulholland, Defendants: Catherine Duden-Kevane, Jennifer Corinne Bretan, Susan Samuels Muck, Fenwick & West LLP, San Francisco, CA; Songmee L. Connolly, Emmett C. Standton, Fenwick & West LLP, Mountain View, CA; Tanya Herrera, Stein & Lubin, San Francisco, CA.

For Glazer Funds, Movant: Lionel Z. Glancy, LEAD ATTORNEY, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA; Jeffrey S. Abraham, Abraham, Fruchter & Twersky, LLP, New York, NY; Susan G. Kupfer, [*2] Glancy & Bickow, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

#### INTRODUCTION

Before the Court is Defendants' Motion to Dismiss the Second Amended Consolidated Complaint. n1 Defendants InVision Technologies, Inc. ("InVision"), Sergio Magistri ("Magistri"), and Ross Mulholland's ("Mulholland") (collectively "Defendants") move to dismiss this private securities fraud action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Lead Plaintiffs Glazer Capital Management, LP and Glazer Offshore Fund, Ltd. ("Plaintiffs") oppose the motion. After careful consideration of the arguments of counsel and the papers submitted, the Court GRANTS Defendants' Motion to Dismiss without leave to amend.

n1 Docket No. 84, Filed March 27, 2006.

#### FACTUAL BACKGROUND

### A. Factual Background

InVision manufactures and supplies computer tomography based detection products used in aviation security. [*3] Plaintiffs represent a purported class of all purchasers of InVision securities between March 15, 2004 and July 30, 2004 (the "Class Period"). Plaintiffs allege that Defendants committed securities fraud in violation of section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 of the Securities and Exchange Commission ("SEC"), and section 20(a) of the Exchange Act. Defendants Magistri and Mulholland (collectively the "Individual Defendants") were employed at InVision during the class period. Defendant Magistri served as the President and Chief Executive Officer of InVision during the class period. Defendant Mulholland served as InVision's Chief Financial Officer during that time.

On March 15, 2004, InVision issued a press release announcing that it was merging with the General Electric Company ("GE") (the "March 15 Announcement") for $ 50.00 per share. On that same day, InVision filed its Form 10-K for the fiscal year 2003 (the "2003 10-K") and attached a copy of the merger agreement with GE (the "Merger Agreement") to the filing.

Several weeks later, on July 30, 2004, InVision issued a press release indicating that the merger might be delayed pursuant [*4] to discussions with the U.S. Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") concerning possible violations of the Foreign Corrupt Practices Act ("FCPA") (the "July 30 Announcement"). The investigation concerned allegedly improper payments by InVision employees to foreign officials in exchange for government contracts. On that day, InVision's share price fell from $ 49.66 to $ 43.27 share.

On December 6, 2004, InVision and GE completed the merger for $ 50.00 per share along the same terms originally announced. On that same day, InVision issued a press release announcing that it had entered into a settlement with the DOJ and the SEC resolving the FCPA investigation. On February 14, 2005, the SEC issued an order adopting Defendants' settlement offer which required Defendants to pay disgorgement penalties and to alter their business practices (the "SEC Order").

### B. Procedural Background



Plaintiffs originally filed this action on August 4, 2004. Plaintiffs amended their complaint on March 25, 2005. On January 23, 2006, the Court granted Defendants' motion to dismiss the amended complaint, but granted Plaintiffs leave to amend to cure the [*5] deficiencies highlighted by the Court. n2 In that order, the Court stated, "In order to meet the scienter pleading requirement, Plaintiffs must plead facts showing that Defendants knew that each statement was untrue...at the time they were made... Plaintiffs must therefore plead specific, contemporaneous facts specifying that as of March 15, 2004, the date of the Merger Announcement, Defendants knew that statements made therein were false or misleading. Plaintiffs have failed to do so in the Complaint before the Court." The Court also cautioned Plaintiffs that their allegations failed to meet the falsity pleading requirement.

n2 Docket No. 77, Filed January 23, 2006.

On February 22, 2006, Plaintiffs filed a second amended consolidated complaint ("SACC"). Subsequently, Defendants filed the instant motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**LEGAL STANDARD**

[HN1] A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) if a plaintiff [*6] pleads insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir. 1984). When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must take all of the material allegations in the plaintiffs complaint as true, and construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995).

[HN2] In the context of a motion to dismiss, review is limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 385 (9th Cir. 1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc.*

*v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which [*7] complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange,* 169 F. Supp. 2d at 1164; *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stac Electronics Sec. Lit.,* 89 F.3d 1399, 1405 n.4 (1996), *cert. denied,* 520 U.S. 1103, 117 S. Ct. 1105, 137 L. Ed. 2d 308 (1997). This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.,* 146 F.3d 699, 705 (9th Cir. 1998).

[HN3] Rule 8(a) of the Federal Rules of Civil Procedure only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants or the [*8] charges against them. *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1257 (N.D. Cal. 2000). In the securities fraud context however, the pleading requirements are more stringent.

**1. Securities Fraud Under § 10(b) of the Exchange Act and SEC Rule 10b-5**

Plaintiffs have alleged securities fraud in violation of section 10(b) and SEC Rule 10b-5. [HN4] Under section 10(b) it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates [*9] or would operate as a fraud or deceit upon any





person, in connection with the purchase or sale of any security. *17 C.F.R. § 240.10b-5*. The elements of a Rule 10b-5 violation are: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. *See Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)*.

[HN5] In order to state a claim under *section 10(b)*, a complaint must overcome several pleading barriers. First, when alleging fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires plaintiffs to state with particularity the circumstances constituting the fraud. To meet the heightened pleading requirements of Rule 9(b), a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547-49 (9th Cir. 1994)*.

Next, [HN6] a plaintiff must overcome the heightened pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"). [*10] Congress enacted the PSLRA in 1995 to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). Under the PSLRA, complaints alleging misrepresentations or omissions, must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1)*.

Additionally, [HN7] the PSLRA imposed heightened requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*. The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc., 183 F.3d 970, 974 (9th Cir. 1999)*. [*11] If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See 15 U.S.C. § 78u-4(b)(1)*.

[HN8] Even if a plaintiff overcomes the falsity and

scienter pleading barriers, the PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with respect to a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i)*. A person may be held liable if the forward-looking statement is made with "actual knowledge ... that the statement was false or misleading." *15 U.S.C. § 78u-5(c)(1)(B); No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003); but see In re Seebeyond Technologies Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1164-65 (C.D. Cal. 2003)* (disagreeing with the analysis in *America West* and finding [*12] that a defendant is immune from liability if it satisfies either *15 U.S.C. § 78u-5(c)(1)(A)* or (B)).

## ANALYSIS

Plaintiffs cite three alleged misstatements by Defendants, all of which appeared in the March 15, 2004 Merger Agreement, which was included as an attachment to the 2003 10-K filed that same day. As an initial matter, Plaintiffs' premise that statements contained in a merger agreement that has been attached as an exhibit to a public filing, necessarily constitutes an independent, public reaffirmation of those merger statements, is dubious. [HN9] "[S]tatements must be analyzed in context." *In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1414 (9th Cir. 1994)*. It is ambiguous, at best, whether Defendants intended, by the act of including a copy of the merger agreement as an attachment to an SEC filing, to affirmatively re-assert to the public every statement contained within that agreement as of the date of its inclusion. n3 This is especially true given that the statements within the merger agreement were made for an entirely different purpose, namely, to memorialize the private merger agreement between InVision and [*13] GE and were made at an earlier date; the assertions contained therein were more likely directed toward InVision's merger partner GE at the close of the merger negotiations, rather than at the public in general at the time of the SEC filing. Nonetheless, the Court turns to the alleged misstatements identified by Plaintiffs.

n3 Plaintiffs cite *Sheehan v. Little Switzerland, Inc., 136 F. Supp. 2d 301, 305 (D.Del.,2001)*, for the proposition that statements





contained within documents which accompany public filings should be interpreted as affirmative representations on the part of the filer. In *Sheehan*, it was alleged that defendants failed to disclose material information about the expiration of a "firm financing commitment" from their investment bankers. *Sheehan* is distinguishable from the instant case in that the alleged misstatements appeared independently in a press release issued by the defendants. The *Sheehan* court noted that the defendants merely "repeated the alleged misstatements in various SEC filings by attaching a copy of the merger agreement." *Id.* In the instant case we have no such independent assertion of the alleged misstatements through a press release. All of the statements alleged to have been misleading are located solely in the attached Merger Agreement. As this Court noted above, it is ambiguous as to whether the act of attaching a document to a public filing constitutes a public affirmation of the statements contained therein. Unlike *Sheehan*, where the defendants first asserted the misleading statements in a press release, there is no such obvious indication of on the part of Defendants to publically represent the contents of the Merger Agreement.

[*14]

Plaintiffs first cite section 3.8(a) of the Merger Agreement (the "Compliance Statement"), in which Defendants stated:

> The Company and its Subsidiaries are (and since January 1, 2002 have been) in compliance in all material respects with all laws (including common law), statutes, ordinances, codes, rules, regulations, decrees and orders of Governmental Authorities (collectively, "Laws") applicable to the Company or any of its Subsidiaries, any of their properties or other assets or any of their businesses or operations (including those Laws related to Export Control Requirements and improper payments).

> March 15, 2004 Merger Agreement § 3.8(a), Motion, Ex. C (emphasis added).

Plaintiffs assert that this statement was false or misleading because InVision allegedly violated the FCPA on three separate occasions, and was therefore "not in compliance in all material respects with all laws." Plaintiffs also argue that this statement was false because Defendants allegedly "failed to maintain internal controls as required by Section 13(b) of the Exchange Act." (Complaint P29).

In the second statement alleged to be false, located in section 3.5(d) of the Merger Agreement, [*15] Defendants stated that "[t]he Company is in compliance in all material respects with the provisions of Section 13(b) of the Exchange Act." (March 15, 2004 Merger Agreement § 3.5(d), Motion, Ex. Q. Plaintiffs allege that this statement was materially misleading because Defendants "books and records did not accurately and fairly reflect its transaction and the dispositions of its assets." (Complaint P31).

Finally, Plaintiffs allege that section 3.5(d) of the Merger Agreement was materially false. In that section, Defendants stated:

> Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the company or any of its Subsidiaries, has (I) used any corporate or other funds for unlawful contributions, payments, gifts or entertainment, or made any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds in violation of Section 30A of the Exchange act.

> March 15, 2004 Merger Agreement § 3.5(d), Motion, Ex. C

Plaintiffs assert that this statement was false because, as described [*16] above, Defendants allegedly violated the FCPA.

### 1. Falsity

Defendants contend that Plaintiffs misconstrue the scope of the Compliance Statement in the Merger Agreement. In that statement, Defendants assert that, "[t]he Company...is...in compliance in all material

Page 7





respects with all laws." Plaintiffs read this statement as an unconditional affirmation of compliance with all laws, including violations existing at the time of which Defendants were unaware. Defendants contend that this fragment of section 3.8 must be read in context to establish its true meaning. The remainder of the paragraph states that, "[s]ince January 1, 2002, neither the Company nor any of its Subsidiaries has received written notice to the effect that a Governmental Authority claimed or alleged that the Company or any of its Subsidiaries was not in compliance in a material respect with any Law applicable to the Company or any of its Subsidiaries, any of their material properties or other assets or any of their business or operations..." March 15, 2004 Merger Agreement § 3.8(a), Motion, Ex. C. Defendants argue that this subsequent language indicates that the original representation, despite its broad [*17] language, encompassed only *known* compliance violations. The Court finds this argument persuasive. For obvious reasons it would have been impossible for Defendants to have disclosed violations that they were not aware of. As a matter of logic it makes little sense to read Defendants' statement as affirming the non-existence unknown violations. Interpreted within the context of the subsequent language, Defendants' statement must be read as containing an implied "knowledge" qualification. Therefore, in order for this statement to be false, Plaintiffs must plead specific contemporaneous facts indicating that Defendants *knew* that they were not in compliance with the law - e.g. that they knew InVision had violated the FCPA or that Defendants *knew* that their internal controls were insufficient for the purposes of Section 13(b). Plaintiffs have plead no specific allegations indicating that Defendants knew of facts at the time that this statement was made such that it would render this statement false.

## 2. Scienter

Defendants next argue that Plaintiffs have failed to plead scienter with the requisite specificity. [HN10] The PSLRA provides that a complaint must "state with [*18] particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To have acted with the required state of mind, defendant must have either acted intentionally or with "deliberate recklessness." *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1014-15 (9th Cir.2005). "Recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of

intentional or conscious misconduct." *In re Silicon Graphics*, 183 F.3d at 977; see also *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir.2002) (stating that in order to allege a strong inference of deliberate recklessness, a plaintiff must state "facts that come closer to demonstrating intent, as opposed to mere motive and opportunity") (citations omitted). Therefore, a plaintiff must "plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *In re Silicon Graphics*, 183 F.3d at 979. A reasonable inference is not enough. *Id. at 974*. A complaint merely alleging [*19] that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.*

Plaintiffs must therefore plead specific facts indicating that Magistri and Mulholland had knowledge of the falsity of the above statements, and made such misstatements intentionally, or recklessly with "some degree of intention at or conscious misconduct." n4 The Complaint contains the following allegations in support of an inference of scienter on the part of Magistri and Mulholland: 1) that InVision "had a limited number of customers" suggesting that it "it is reasonable to conclude that the Defendants were aware of the details of every transaction involving these customers" 2) that "InVision authorized the payment of bribes"; 3) that "senior executives" had to approve these payments; 4) that "InVision was aware of the high probability" that their employees would use the payment as bribes; 5) that Magistri knew details about InVisions' projects in the countries where the improper payments allegedly occurred; 6) that Magistri and Mulholland signed SOX certifications indicating that InVision had procedures in place capable of detecting violations; 7) that GE was allegedly able to detect the improper [*20] payment within a few weeks while conducting due diligence for the merger, and finally 8) that Magistri and Mulholland stood to benefit from the merger financially. (Complaint at PP37, 38, 40, 42-51, 54, 61). Plaintiffs essentially argue that given the relatively small number of InVision customers, Defendants' affirmation that they had access to financial reporting mechanisms, and the fact that GE was able to discover the improper payments after only a few weeks of due diligence, taken together, these allegations create a strong inference of contemporaneous knowledge on the part of Magistri and Mulholland about the overseas payments. The Court does not agree.

Page 8

  

n4 As an initial matter, the Court notes that Plaintiffs do not plead facts indicating that Mulholland signed the Merger Agreement or was involved in its preparation. "Plaintiffs must allege facts tying each of the alleged misstatements and omissions to each of the Defendants," *In re Immune Response Securities Litigation*, 375 F. Supp. 2d 983, 1031 (S.D.Cal.,2005) Accordingly, Plaintiffs fail to state a claim against Mulholland for statements made in the merger agreement.

[*21]

There are several problems with Plaintiffs' scienter allegations. The fact that InVision had controls in place to detect financial and accounting irregularities does not imply that these controls were also designed to detect violations of unrelated federal regulations, such as the FCPA. Even if the Court assumes that Defendants were in receipt of some financial information through InVision's formal control mechanisms, it cannot infer that these mechanisms would have also alerted

Defendants to the improper payments. Moreover, Plaintiffs' own pleadings undermine this line of argument. The Complaint states that "InVision...failed to maintain intern controls as required by...the Exchange Act...InVision had an internal controls problem...they lacked even basic internal controls to make sure the company complied with the law." (Complaint P 29, internal quotations omitted). In other words, Plaintiffs allege that InVisions' internal controls were insufficient to detect violations of the law. Since [HN11] "[t]he district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs" the Court must infer that it would have been [*22] unlikely that InVision's internal controls would have alerted Defendants to any FCPA violations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).

Additionally, Plaintiffs borrow heavily from the February 14, 2005 SEC Order in formulating their scienter allegations. This is problematic since the SEC Order simply alleges scienter in a conclusory fashion. For example, the SEC order states, "[a]t the time of the payment, based on the information provided to the Regional Sales Manager and the Senior Executive, InVision was aware of a high probability that the distributor intended to use part of the funds it received

from InVision to pay for foreign travel and other benefits for airport officials." (Muck Decl, Exh. I, § A). Similarly, referencing the SEC order, Plaintiffs allege that "InVision was aware of the high probability that the sales agent intend to use part of the commission to make gifts..." (Complaint at 45). The SEC order provides no other information to support this conclusion; Plaintiffs' complaint does little more than reference this language and rely on its assertions. As described above, the PSLRA does not permit conclusory allegations of scienter. [*23] [HN12] The PSLRA requires the pleading of specific, contemporaneous facts creating a strong inference of scienter, and Plaintiffs cannot meet this burden simply by referencing the conclusory statements of others. To permit this would essentially vitiate the PSLRA pleading requirement.

Moreover, the SEC Order does not even mention Defendants Magistri or Mulholland by name, leaving the Court to speculate about precisely to whom the knowledge allegations apply. The SEC statements indicate at best that *somebody* at InVision was aware of the probability of an improper payment; not necessarily those individuals who authored the statements at issue here. n5 Plaintiffs fail to link the allegations of knowledge from the SEC Order to Defendants Magistri or Mulholland. The SEC order simply attributes knowledge to "InVision", and the Ninth Circuit "has rejected the concept of 'collective scienter' for the purposes of establishing fraud" on the part of a corporation. *In re Apple Computer, Inc.*, 243 F. Supp. 2d 1012, 1023 (ND. Cal. 2002); *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-6 (9th Cir. 1995). [HN13] A corporation acts through its employees, and the finding [*24] of corporate liability under 10(b) requires the finding of scienter on the part of at least one individual defendant responsible for the misstatements. *Chubb*, 54 F.3d 1424 at 1435-36 ("Corporate scienter relies heavily on the awareness of the directors and officers, who...are necessarily aware...of the danger of misleading buyers and sellers.") Since Plaintiffs allege no facts specifically indicating that Magistri or Mulholland knew that the statements were false at the time they were made, the Court finds that Plaintiffs have failed to meet their scienter pleading burden under the PSLRA.

n5 The Complaint alleges that the improper payments took place overseas, in the Philippines, Thailand, and China, far away from InVision's





headquarters in the United States.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss. "Four factors relevant to whether a motion for leave to amend pleadings should be denied: undue delay, bad faith or dilatory motive, futility [*25] of amendment, and prejudice to the opposing party." *United States v. Webb*, 655 F.2d 977, 980 (9th Cir.1981). In its previous dismissal order, the Court identified several deficiencies in Plaintiffs' complaint and granted Plaintiffs the opportunity to cure these deficiencies through amendment. Very little has changed substantively in the amended complaint. Because Plaintiffs have failed to cure the scienter deficiencies identified in the previous order despite being offered the opportunity to do so, amendment appears futile. Accordingly, the complaint is dismissed **WITHOUT LEAVE TO AMEND.** n6 The Clerk of the Court is instructed to close the file.

---

n6 On August 21, 2006, Plaintiffs submitted a letter brief requesting leave to amend in light of an August 15, 2006 SEC complaint filed against former Senior Vice President of Sales and Market for Invision, David Pillor ("Pillor"). (Doc. No. 101) The Court has reviewed the letter and the attached complaint, and finds that it does not address the prime deficiency in the pleading-namely, the absence of specific allegations indicating that the individual who made the alleged misstatement, here Magistri, had the requisite scienter and knew that the statement was false at the time that he made it. The proposed allegations solely concern Pillor, and do nothing to cure Plaintiffs' pleading deficiency. Accordingly, the Court finds that granting Plaintiffs leave to amend the complaint to add these additional allegations would not cure the identified deficiencies, and are thus futile. *Webb*, 655 F.2d 980.

[*26]

**IT IS SO ORDERED.**

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

Dated: August 31, 2006

  

# EXHIBIT E

LEXSEE



Positive
As of: Mar 08, 2007

## IN RE MED/WASTE, INC., SECURITIES LITIGATION

### CASE NO. 99-1684-CIV-GOLD Consolidated With: 99-1957-CIV-GOLD, 99-2018-CIV-GOLD, 99-2029-CIV-GOLD

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION

### 2000 U.S. Dist. LEXIS 22505

### August 30, 2000, Decided
### August 30, 2000, Filed

**DISPOSITION:** Defendants' Motion for Hearing on Motion to Dismiss Consolidated Amended Class Action Complaint denied. Defendants' Motion to Dismiss granted. Plaintiffs' Consolidated Amended Class Action Complaint dismissed without prejudice as against Defendants Med/Waste, Elkin, and Wallace.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff stock owners brought an action against defendants, moving defendants and others, for purported violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. §§ 78j(b), 78t(a), and 17 C.F.R. § 240.10b-5. The moving defendants, a company, a chairman of the board, and a former chief financial officer, moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), and 15 U.S.C.S. § 78u-4(b).

**OVERVIEW:** The owners claimed that defendants issued false and misleading financial statements misstating the actual results of the company's operations and earnings. The court held that the owners pled fraud with the particularity required to withstand a motion to dismiss. As to whether the owners adequately pled the requisite scienter, the complaint lacked specific facts demonstrating fraudulent intent on the part of the moving defendants. The owners simply failed to allege facts suggesting that the moving defendants knew or were extremely reckless as to whether the company's quarterly reports were accurate at the time the statements were issued. The complaint revealed no allegations of red flags, warning signs, or other events from which the court could have drawn a strong inference of extreme recklessness by the moving defendants. Nowhere did the complaint provide facts showing what each of the moving defendants knew or how and when they knew it. The mere allegation that the chairman and the officer had access to the company's internal information (even unfettered access) and a motive and opportunity to commit securities fraud was an inadequate basis for scienter.

**OUTCOME:** The moving defendants' motion to dismiss was granted. The complaint was dismissed without prejudice as against the moving defendants.

**CORE TERMS:** scienter, per share, quarterly, particularity, stock, accounting, falsity, recklessness, misleading, earnings, restatement, acquisition, reckless, flags, red, motion to dismiss, omission, Reform Act, first quarter, fiscal year, announced, material fact, motive, securities fraud, prior year, magnitude, false and misleading, restated, state of mind, misstatement

  

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] For the purpose of a motion to dismiss, a complaint is construed in the light most favorable to a plaintiff, and all facts alleged by the plaintiff are accepted as true.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN2] A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff can prove no set of facts which would entitle him to relief. The court should ignore those allegations that contain no more than opinions or legal conclusions.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3] In determining whether to grant a Fed. R. Civ. P. 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.

*Civil Procedure > Dismissals > General Overview*
*Evidence > Judicial Notice > Adjudicative Facts > Public Records*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN4] When considering a motion to dismiss in a securities fraud case, a court may take judicial notice of relevant public documents required to be filed with the Securities and Exchange Commission that are actually filed.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN5] Section 10(b) of the Securities Exchange Act, 15 U.S.C.S. § 78j(b), makes it unlawful for any person to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN6] 17 C.F.R. § 240.10b-5 (Rule 10b-5) prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. To successfully state a securities fraud claim under Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN7] In order to survive a motion to dismiss, plaintiffs' claim of fraud under 17 C.F.R. § 240.10b-5 must satisfy the requirements of Fed. R. Civ. P. 9(b), which requires that the circumstances constituting fraud be stated with particularity. Rule 9(b) will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the plaintiffs; and what the defendant obtained as a consequence of the fraud.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of*





*1934 Actions > Express Liabilities > Misleading Statements > General Overview*

[HN8] The Private Securities Litigation Reform Act of 1995, Pub. L. No. 194-67, 109 Stat. 743, codified at 15 U.S.C.S. § 78u-4(b), establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the court must dismiss the action. 15 U.S.C.S. § 78u-4(b)(3). Section 78u-4(b) imposes two requirements. First, a plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. § 78u-4(b)(1). This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, and thus is even more specific than the Fed. R. Civ. P. 9(b) standard.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*

[HN9] See 15 U.S.C.S. § 78u-4(b)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*

[HN10] Under the second requirement of 15 U.S.C.S. § 78u-4(b), a would-be plaintiff, for each alleged misrepresentation, must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. § 78u-4(b)(2).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN11] A complaint alleging with particularity that a defendant acted with a severely reckless state of mind suffices to state a claim for civil liability under § 10(b) of the Securities Exchange Act, 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5. Severe recklessness is defined as limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from

the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. While averments of motive and opportunity to commit fraud may be relevant to a showing of severe recklessness, such allegations, without more, are not sufficient to demonstrate the requisite scienter.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*

[HN12] See 15 U.S.C.S. § 78u-4(b)(2).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Group Published Information*

[HN13] Under the group pleading doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the management of the corporation.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

[HN14] In a securities fraud action, where plaintiffs contend that defendants had access to contrary facts, they must specifically identify the reports or statements containing the information.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*

[HN15] In a securities fraud action, the failure to equate record profits with misconduct does not suggest extreme recklessness.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping &*





Reporting > General Overview
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN16] In a securities fraud action, allegations that a company's financial statements were grossly overstated and that the falsity resulted from failure to comply with the Generally Accepted Accounting Principles, taken singly or together, do not support an inference of scienter. Indeed, to allow the magnitude of a misstatement or its falsity to satisfy the scienter requirement would ignore the reality that scienter and falsity are distinct elements of a § 10(b) of the Securities Exchange Act, 15 U.S.C.S. § 78j(b), claim.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*
[HN17] In a securities fraud action, allegations that defendants violated the Generally Accepted Accounting Principles and that defendants had motive and opportunity to commit fraud is insufficient to plead scienter.

*Civil Procedure > Class Actions > Voluntary Dismissals*
*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > General Overview*
[HN18] It is axiomatic that there can be no controlling person liability under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78t(a), when the allegedly controlled person has no liability.

**COUNSEL:** [*1] For STEVE SAARINEN, plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL. Jules Brody, Stull Stull & Brody, New York, NY. Marvin L. Frank, Rabin & Peckel, New York, NY. Joseph H. Weiss, Weiss & Yourman, New York, NY.

For DAVID BLAHAUVIETZ, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL. Fred Taylor Isquith, Wolf Haldenstein Alder Freeman & Herz, New York, NY. Scott Rhead Shepherd, Cauley & Geller, Boca Raton, FL. Juden Justice Reed, Schubert & Reed, San Francisco, CA.

For GARY LEE, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL. Fred Taylor Isquith, Wolf Haldenstein Alder Freeman & Herz, New York, NY. Scott Rhead Shepherd, Cauley & Geller, Boca Raton, FL. Juden Justice Reed, Schubert & Reed, San Francisco, CA.

For MICHAEL LEE MITTANCK, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL. Fred Taylor Isquith, Wolf Haldenstein Alder Freeman & Herz, New York, NY. Scott Rhead Shepherd, Cauley & Geller, Boca Raton, FL. Juden Justice Reed, Schubert & Reed, San Francisco, CA.

For [*2] DONALD K. JONES, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL. Fred Taylor Isquith, Wolf Haldenstein Alder Freeman & Herz, New York, NY. Scott Rhead Shepherd, Cauley & Geller, Boca Raton, FL. Juden Justice Reed, Schubert & Reed, San Francisco, CA.

For HAROLD AVRON, on behalf of themselves and all others similarly situated, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL.

For ANDRE PAPPAS, on behalf of himself and all others similarly situated, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL.

For ALICE TRICE, individually and on behalf of all others similarly situated, consolidated plaintiff: Leo Wassner Desmond, West Palm Beach, FL.

For GEORGE KVIDERA, consolidated plaintiff: Michael J. Pucillo, Wendy Hope Zoberman, Burt & Pucillo, West Palm Beach, FL.





For MED/WASTE, INC, defendant: Michael George Shannon, Todd R. Legon, Wallace Bauman Legon Fodiman & Shannon, Miami, FL.

For DANIEL A. STAUBER, defendant, MICHAEL D. ELKIN, defendant: Michael George Shannon, Todd R. Legon, Wallace Bauman Legon Fodiman [*3] & Shannon, Miami, FL.

For MILTON J. WALLACE, defendant, RICHARD GREEN, defendant: Michael George Shannon, Todd R. Legon, Wallace Bauman Legon Fodiman & Shannon, Miami, FL.

**JUDGES:** ALAN S. GOLD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ALAN S. GOLD

**OPINION:**

CONSOLIDATED ACTION

**ORDER**

THIS MATTER is before the Court on a Motion to Dismiss by Defendants, Med/Waste, Inc. ("Med/Waste" or "the Company"); Michael D. Elkin ("Elkin"); and Milton J. Wallace n1 ("Wallace") (collectively "Defendants"). n2 Defendants argue that dismissal of Plaintiffs' Consolidated Amended Class Action Complaint is appropriate pursuant to Fed. R. Civ. P. 12(b)(6)and 9(b), and 15 U.S.C. § 78u-4(b). For the reasons set forth more fully below, the Court agrees with Defendant and this action is dismissed without prejudice.

N1 Defendant Wallace has been Chairman of the Board of the Company since June 1993. He is also a member of the Company's Executive Committee and a senior member of a law firm that serves as counsel to the Company. Defendant Elkin served as Med/Waste's Chief Financial Officer until his resignation on January 5, 1999.

[*4]

n2 Also named in the Complaint are Daniel Stauber ("Stauber"), Med/Waste's President and Chief Executive Officer from December 1991

until March 1998, and member of the Executive Committee; and Richard Green ("Green"), who served as President and Chief Executive Officer of Diabetes Support Systems, Inc., and as Chairman of Med/Waste's Audit Committee. The Motion to Dismiss has not been filed on behalf of Defendants Stauber and Green. Accordingly, the Court does not address whether Plaintiffs have sufficiently pleaded a cause of action against those defendants.

**I. Facts**

*A. Background*

Plaintiffs bring this action against Med/Waste and certain of its officers and directors for purported violations of 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of all persons who purchased Med/Waste's common stock during the period from May 5, 1998 through and including June 3, 1999 ("the class period").

Accepting all well-pled facts [*5] in the Complaint as true, the Court assumes the following facts: Defendant Med/Waste was a publicly held company that was traded on the NASDAQ national market system. Med/Waste provides medical waste management services in the Eastern United States to more than 20,000 health care facilities. Beginning in 1998, Med/Waste began an ambitious campaign of acquiring other medical waste management servicing firms. The majority of the acquisitions were accomplished by using Med/Waste stock as consideration for the acquisitions. By using its stock as currency for acquisitions, Med/Waste was able to acquire other companies that were generating revenue and earnings without having to make significant cash payments. Plaintiffs allege that the Company's policy of using its stock for acquisitions provided incentive for management to report positive revenue gains and earnings in an effort to prop up Med/Waste stock and reduce the number of shares to be conveyed in the various acquisitions.

At the root of Plaintiffs' securities fraud action lies Plaintiffs' claims that Defendants issued false and misleading financial statements misstating the actual results of Med/Waste's operations and earnings per [*6] share in each of the quarterly reports issued for the first





three quarters of the 1998 fiscal year. Plaintiffs further allege that had Generally Accepted Accounting Principles ("GAAP") been followed, Med/Waste would have reported losses for each of those quarters. Med/Waste has since acknowledged that the first three quarterly reports for 1998 were false, and the Company has restated its results of operations for each such quarter.

*B.   Facts   Pled   Specifying   Fraudulent Misrepresentations and Scienter*

In support of its claim for securities fraud, Plaintiffs allege the following materially false and misleading statements regarding its results of operations:

> On May 5, 1998, the Company announced its results of operations for the first quarter of the 1998 fiscal year which ended March 31, 1998. First quarter revenues were reported at $ 6.2 million, an increase of 133% over the first quarter of 1997. Operating profits reportedly improved 545% to $ 843,146. Net income from continuing operations was $ 433,643, or about $ .08 per share compared to $ 69,947, or $ .03 per share for the same quarter of the prior year. By reason of acquisitions, the Company's shares outstanding had [*7] more than doubled from the prior year, and at the end of the first quarter stood at 4,862,629 shares, more than twice the share amount outstanding a year earlier.

Consolidated Amended Class Action Complaint, *P25.*

> On August 13, 1998, Med/Waste reported "record second quarter revenues." On that date, the Company announced results of operations for the second quarter ended June 30, 1998. Revenues for the quarter were $ 6,061,929, a 161% increase over the second quarter of 1997. Earnings reportedly grew by an even greater percentage. According to the Company's release, net income from continuing operations rose 252% to $ 357,804, from $ 101,685 in the second quarter of the prior year. However, since the Company now had 5,146,130 shares outstanding (as

opposed to 2,317,628 on June 30, 1997), earnings per share increased only to $ .05 per share from $ .03 per share. For the year to date, net income was approximately $ 919,000 or $ .12 per share. According to the release, this was an increase of 436% over the first half of the prior year.

Consolidated Amended Class Action Complaint, P29.

> On November 5, 1998, Med/Waste again announced record revenues for [*8] the third quarter ending September 30, 1998. Revenues for the quarter were reported to be $ 8,389,733, a 251% increase over the third quarter of the prior year. Net income for the quarter was $ 362,038, or $ .05 per share. While the dollar amount of earnings for the third quarter of the 1998 fiscal year was only slightly less than the third quarter of 1997, there were 7,512,489 shares outstanding as of September 30, 1998, almost $ 2 million more than the third quarter of the prior year. For the year to date, the Company's revenues through the first three quarters were $ 20,656,106 and net income was reported at $ 1,152,083, or $ .17 per share. It now appeared that the Company would not meet earnings estimates for the year. Only later would the market learn that these quarterly reports were all false and that the Company had no positive earnings through the third quarter of 1998.

Consolidated Amended Class Action Complaint, P34.

Plaintiff maintains that each of the published quarterly results of operations for 1998 described above was false and misleading, and that the false financial reports resulted from Defendants' improper revenue recognition, the failure to accrue or properly [*9] record certain costs and allowances, and the improper deferral of costs of sales during each of the first three quarters of 1998. Indeed, as the investing public would later learn, Med/Waste actually lost money in the first three quarters of 1998. The restated figures reveal that Med/Waste lost $ 5,159,228 through the first three quarters of 1998, rather than recognizing a profit of $ 1,958,383 as

  

originally reported.

### C. Events Signaling Close of Class Period

On January 5, 1999, Med/Waste suddenly announced the appointment of a new Chief Financial Officer. George Mas was appointed to the positions of Vice President of Finance and Chief Financial Officer. With respect to the Company's former Chief Financial Officer during 1998, Michael Elkin, the Company simply announced that he had "resigned to pursue other interests." The Company also announced the addition of three new Board members.

In addition, on March 8, 1999, Med/Waste disclosed that it had hired an investment banker to explore alternatives for the Company and that the Company had determined that it may be necessary for Med/Waste to restate its results for the previous year. Three months later, on June 3, 1999, the Company [*10] issued an announcement that it expected to lose $ 9.3 million for the 1998 fiscal year. The release also disclosed that the Company had retained independent legal counsel to conduct an investigation into its 1998 accounting practices. The Company voluntarily removed its stock from trading on the NASDAQ market.

The Company filed Amended Quarterly Reports for the first three quarters of the 1998 fiscal year on August 17, 1999. The Amended Quarterly Report for the first quarter of 1998 disclosed that the Company's revenues were $ 6,082,786, rather than $ 6,204,440 as previously reported. In addition, the Amended Report provided that cost and expenses for the first quarter of 1998 had been more than $ 7.1 million dollars as opposed to the $ 5.2 million that Med/Waste had originally reported. Plaintiff claims that this was due to the fact that the Company improperly deferred expenses and failed to report losses from operations on a timely basis. The recalculations led to a significant reduction in net income, shareholders' equity, and a per share loss of $ .21 instead of a profit of $ .10 per share as had been previously reported.

The Company's Amended Quarterly Report for the Second [*11] Quarter disclosed that the Company's revenues for the second quarter had been $ 5,598,304, as opposed to the $ 6,610,929 previously reported. Like the first quarter amendments, the original second quarter report grossly understated operating costs and expenses. The result of the restated second quarter report also led to a per share loss and a large reduction in shareholder equity.

The Amended Quarterly Report for the Third Quarter yielded similar results as the Amendments for the first two quarterly reports for 1998. Costs and expenses had been understated, losses rather than profit occurred, and shareholders suffered a per share loss. The Report also acknowledged that as early as the first quarter of 1999, the Company had determined that the financial information released in the quarterly reports had misstated actual results of operation and that some of the Company's top managers resigned or were terminated as a result.

For the nine months ending on September 30, 1998, the restated quarterly reports reveal that the Company's true results of operations showed revenues of $ 18,471,767 rather than the originally reported $ 20,656,106 and that costs and expenses had been understated [*12] by $ 4.5 million.

### II. Motion to Dismiss Standard

[HN1] For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. See Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). It is well-settled that [HN2] a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The Court should ignore those allegations that contain no more than opinions or legal conclusions. See South Florida Water Management Dist. v. Montalvo, 84 F.3d 402, 409 n.10 (11th Cir.1996).

[HN3] In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account. [HN4] When considering a motion to dismiss in a securities fraud case, a court may take [*13] judicial notice of relevant public documents required to be filed with the S.E.C. that are actually filed. See Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999). n3 Thus, the Court shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed, including S.E.C. filings. See Malin v. Ivax

 

Corp., 17 F. Supp. 2d 1345, 1352 (S.D.Fla. 1998).

n3 Nevertheless, Plaintiffs have failed to attach any of the public documents that they reference in the Complaint to the Complaint.

### III. Standard for Pleading Violations of Section 10(b) and 20(a)

In this Complaint, Plaintiffs argue that Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (hereinafter "Section 10(b)"), and 17 C.F.R. § 240.10b-5 (hereinafter "Rule 10b-5"), by making false statements regarding the financial status of Med/Waste. [*14]

#### A. Section 10(b) and Rule 10b-5

Section 10(b) [HN5] makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [S.E.C.] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 [HN6] prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. See 17 C.F.R. § 240.10b-5. To successfully state a securities fraud claim under Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. See Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997).

#### B. Federal Rule of Civil Procedure 9(b)

[HN7] In order to survive a motion to dismiss, Plaintiffs' claim of fraud under Rule 10b-5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b) [*15] , which requires that the "circumstances constituting fraud . . . be stated with particularity." See, e.g., Gross v. Medaphis Corp., 977 F. Supp. 1463, 1470 (N.D. Ga.1997). The Rule will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the

plaintiffs; and what the defendant "obtained as a consequence of the fraud." Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1369 (11th Cir.), reh'g denied, 116 F.3d 1495 (11th Cir. 1997).

#### C. Heightened Pleading Requirements under the Reform Act

Furthermore, [HN8] the Private Securities Litigation Reform Act of 1995, Pub.L. No. 194-67, 109 Stat. 743, codified at 15 U.S.C. § 78u-4(b) (hereinafter "Reform Act"), establishes heightened pleadings requirements for certain private securities actions. If these additional requirements are not met, the Court must dismiss the action. 15 U.S.C. § 78u-4(b)(3). Section 78u-4(b) [*16] imposes two requirements. First, the plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. 15 U.S.C. § 78u-4(b)(1). n4 This provision requires pleading with particularity all facts upon which the plaintiff is basing the fraud allegation, and thus is even more specific than the Rule 9(b) standard. See Malin, 17 F. Supp. 2d at 1361.

n4 Section 78u-4(b)(1) states:

[HN9] In any private action arising under this title in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

  

[*17]

[HN10] Second, the would-be plaintiff, for each alleged misrepresentation, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). n5 The Eleventh Circuit recently reenforced the applicability of the "severe recklessness" standard after the enactment of the Reform Act, holding that [HN11] a "complaint alleging with particularity that a defendant acted with a severely reckless state of mind suffices to state a claim for civil liability under § 10(b) and Rule 10b-5." Bryant, 187 F.3d at 1283. The Court defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. at 1282. The Court also stated that while averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such [*18] allegations, without more, are not sufficient to demonstrate the requisite scienter." Id. at 1285.

n5 Section 78u-4(b)(2), Required State of Mind, states:

[HN12] In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

## IV. Analysis of Plaintiffs' Allegations on Section 10(b) and Rule 10b-5 Claims

Plaintiffs' Complaint alleges that Defendants made false and materially misleading statements of material fact with scienter upon which Plaintiffs relied, and which reliance proximately caused Plaintiffs' injury. Plaintiffs

also maintain that they have stated with particularity the circumstances constituting fraud and scienter as required by Fed.R.Civ.P. 9(b) [*19] and the Reform Act. Defendants, on the other hand, contend that Plaintiffs have done no more than allege that Defendants failed to follow GAAP when they published Med/Waste's 10Qs for the first three quarters of 1998 and that Defendants had motive and opportunity to maintain a high stock price to facilitate mergers and acquisitions.

After reviewing Plaintiffs' Complaint, the Court rejects Defendants' arguments that Plaintiffs have failed to adequately plead fraud. The Complaint sets forth in detail and with particularity each statement alleged to be false, the specific quarterly reports containing such statements, when the statements were made, why the statements were false, and what Defendants stood to gain in making the false statements. n6 See In re Sunbeam Securities Litigation, 89 F. Supp. 2d 1326 (S.D. Fla. 1999). In addition, the Complaint alleges that Med/Waste itself has admitted that the financial statements for the three quarterly reports of the 1998 fiscal year were false and required restatement. Accordingly, the Court holds that Plaintiffs have pleaded fraud with the particularity required to withstand a motion to dismiss.

n6 Although Plaintiffs' Complaint fails to attribute the alleged fraudulent statements to any one particular Defendant or individual, Plaintiffs' fraud allegations do not fail for lack of particularity. [HN13] Under the group pleading doctrine, allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in the management of the corporation. See Sunbeam, 89 F. Supp. 2d at 1340-41. Accordingly, Plaintiffs need only allege that each of the individual Defendants, due to their high ranking positions with Med/Waste, were directly involved in controlling the content of information released by Med/Waste. Plaintiffs have satisfied this burden. The Court notes, however, that the group pleading doctrine may not be utilized to satisfy the Reform Act's scienter pleading requirements. See id. at 1341. Rather, the Act requires that a complaint state with particularity facts that give rise to an inference that *each separate* defendant acted with scienter. See id.





[*20]

The Court turns now to the closer issue of whether Plaintiffs have adequately pled that Med/Waste and Defendants Elkin and Wallace acted with the requisite scienter as required by the Reform Act. Plaintiffs maintain that the totality of facts in the Complaint give rise to a strong inference of extremely reckless if not knowing conduct. Plaintiffs' Complaint makes the following allegations pertaining to scienter: that as a result of Defendants' failure to follow GAAP, Med/Waste issued false and misleading statements on the results of operations during the first three quarters of 1998 by improperly recognizing revenue and deferring expenses; that the individual Defendants had access to the Company's internally generated statements of revenues and expenses and the underlying documentation for the figures; that Defendants had motive and opportunity to artificially inflate Med/Waste's stock prices in light of Med/Waste's acquisition program of acquiring other companies with stock instead of cash; that Defendants failed to timely disclose key management changes; and that the sheer magnitude of the restatements suggest extreme recklessness if not knowledge of the falsity of the statements. [*21] Nevertheless, after reviewing the Complaint in its entirety, the Court concludes that these facts do not satisfy the heightened pleading requirements under the Reform Act and are insufficient to show that Defendants either knew or were extremely reckless regarding the falsity of the Company's statements *at the time* the statements were made.

First, as to Defendant Wallace, Plaintiffs simply allege that he has been Chairman of the Board of the Company since 1993, that he is a member of the Company's Executive Committee, and that he is a senior member of the law firm that serves as counsel to the Company. In addition, Plaintiff alleges that Defendant Wallace, like all the other individual Defendants, had access to Med/Waste's internally generated financial documents.

Such conclusory allegations, without more, are insufficient as a matter of law to withstand a motion to dismiss. See Sunbeam, 89 F. Supp. 2d at 1341 (allegations that certain individual defendants were members of the operating or audit committees of a corporation that issued false and misleading reports were insufficient to raise inference of extreme recklessness);

Kennilworth Partners, L.P. v. Cendant Corp., 59 F. Supp. 2d 417 (D.N.J. 1999) [*22] (fact of membership on board is not sufficient to infer scienter against board members, absent some more specific allegation linking the position to their knowledge); Duncan v. Pencer, 1996 U.S. Dist. LEXIS 401, 1996 WL 19043 (S.D.N.Y. 1996) (allegations that defendants held senior management positions, had access to inside information, and therefore must have known of falsity is insufficient to plead scienter; otherwise plaintiffs could plead scienter by simply listing job titles in complaint). There is a complete lack of any particularized facts pertaining to Defendant Wallace's involvement in the Company's day-to-day activities or in the making of the false financial statements. Nor are there any other facts that give rise to a strong inference that Defendant Wallace acted with scienter. This is the type of conclusory pleading that the Reform Act was intended to preclude.

Similarly, Plaintiffs have failed to satisfy the scienter requirement for Defendant Elkin as well. In addition to the same general and conclusory allegations Plaintiffs make against Defendant Wallace and the other individual Defendants, Plaintiffs allege that Defendant Elkin served as Chief Financial Officer, and thus had primary [*23] responsibility for preparation of the false financial statements issued by Med/Waste. As such, Plaintiffs contend that Defendant Elkin cannot take the position that he was ignorant of the underlying accounting violations when it was his job to ensure that the financial statements complied with GAAP. In support of their position, Plaintiffs direct the Court's attention to the Sunbeam case, wherein the Honorable Donald M. Middlebrooks concluded that allegations that a defendant was the Controller of a company that issued false statements, that the Controller was responsible for monitoring the Company's accounting practices, and was privy to information revealing the falsity of the statements, was sufficient to show that the Controller had knowledge of or was reckless in not knowing the falsity of the statements.

The facts in the instant case, however, are clearly distinguishable and less compelling than those in the Sunbeam litigation. In that case, in addition to alleging that the Sunbeam's Controller was responsible for monitoring the company's accounting practices and was privy to information that revealed the falsity of the company's statements, Plaintiffs "painstakingly [*24] detailed" the problems in Sunbeam's accounting control

Page 10





program that the Controller oversaw and described several "red flags" that the Controller either "consciously ignored or recklessly disregarded." For example, Plaintiffs in that case described instances in which the Controller was directly confronted with concerns over the company's suspect financial statements and magazine articles containing public allegations of accounting impropriety during the class period. In addition, the Complaint contained allegations describing the key role the Controller played in the Company's day-to-day operation and his "intimate involvement" with the fraudulent accounting and operations of the Company.

In contrast, Plaintiffs in the instant case have not pled that Defendant Elkin was privy to *specific* information that revealed that the three quarterly reports for the 1998 fiscal year were false and misleading at the time they were issued. See Novak v. Kasaks, 216 F.3d 300, 2000 WL 796300 (2d Cir. 2000) [HN14] (where plaintiffs contend defendants had access to contrary facts, they must specifically identify reports or statements containing the information); San Leandro Emergency Medical Group Profit Sharing Plan v. Phillip Morris Co., Inc., et al., 75 F.3d 801, 812 [*25] (general claim that defendants had access to confidential reports revealing decline in sales is not sufficient to survive motion to dismiss). The Complaint contains no allegations detailing "red flags" n7 that alerted Defendant to accounting irregularities, instances when Defendant Elkin was confronted with concerns over the veracity of the Company's financial statements, or other suspicious circumstances or events that suggest that Defendant Elkin must have known of the falsity of the statements when made. Nor does the Complaint contain any specific facts pertaining to Defendant Elkin's day to day control over the accounting practices at Med/Waste. While Plaintiffs' Complaint may amply set forth facts suggesting that Defendant Elkin was negligent, grossly negligent, or even reckless for ineffective monitoring of Med/Waste's accounting programs or failing, to ensure compliance with GAAP, Plaintiffs have not pled facts showing that the false statements in the quarterly reports represented an extreme departure from the standards of ordinary care that presented such a danger of misleading the public that Defendant Elkin knew about it or that it was so obvious that he must have known about [*26] it.

n7 Plaintiffs contend that Med/Waste's record profits reported in the first three quarters of 1998

were aberrational and should be considered red flags. Nevertheless, the Court is not persuaded. [HN15] Failure to equate record profits with misconduct does not suggest extreme recklessness. See Novak, 216 F.3d 300, 2000 WL 796300 at *8 (failure to investigate or suspect wrongdoing when dramatic increase in profitability occurs is not necessarily reckless); Chill v. General Electric Co., 101 F.3d 263, 270 (2d Cir. 1996) (failure to equate record profits with misconduct cannot be said to be reckless); Reiger v. Altris Software, Inc., 1999 U.S. Dist. LEXIS 7949, 1999 WL 540893 (S.D. Cal. 1999) (substantial increases in revenue or variation in other figures from year to year do not constitute "red flags" sufficient to create strong inference of recklessness).

In support of their claim that the totality of facts raises a strong inference of scienter on the part of the Defendants, Plaintiffs rely substantially [*27] on their allegations that Defendants clearly failed to comply with GAAP n8 in compiling the quarterly report figures and on the sheer magnitude of the resulting misstatements. This argument is unpersuasive. [HN16] Allegations that the Company's financial statements were grossly overstated and that the falsity resulted from failure to comply with GAAP, taken singly or together, do not support inference of scienter. See In re Paracelsus Corp. Securities Litigation, 61 F. Supp. 2d 591 (S.D. Tex. 1998) (allegations that company admitted overstatement of income, revenue, and earnings in contravention of GAAP, that accounting errors required a restatement of figures, and that announcement of need to restate income was made just two months after company engaged in merger for stock did not raise inference of scienter); Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255-56 (even allegations of serious departures from GAAP are not alone sufficient to allege scienter); See In re Credit Acceptance Corp. Securities Litigation, 50 F. Supp. 2d 662 (E.D. Mich. 1999) (magnitude of restatement not as important absent other factors demonstrating fraud since restatements are common [*28] and often the aftermath of "negligence at most."); Reiger, 1999 U.S. Dist. LEXIS 7949, 1999 WL 540893 at *8 (cannot plead scienter by alleging that statements were profoundly false); Duncan, 1996 U.S. Dist. LEXIS 401, 1996 WL 19043 at *10 (even allegations of gross violations of GAAP, in the absence of other allegations of fraudulent intent, are

Page 11

  

insufficient to plead scienter); Stevelman v. Alias Research, Inc., 174 F.3d 79 (2d Cir. 1999) (company's disregard of GAAP and industry standards in its financial reporting, resignation of key personnel, revelation that company was changing accounting policy, and restatement of previous reported earnings was insufficient to plead strong inference of scienter). Indeed, to allow the magnitude of a misstatement or its falsity to satisfy the scienter requirement would ignore the reality that scienter and falsity are distinct elements of a Section 10(b) claim. See Duncan, 1996 U.S. Dist. LEXIS 401, 1996 WL 19043 at *10. n9 That Defendants revised and restated Med/Waste's previously reported financial figures, even to a great extent, provides no indication how or when Defendants became aware of the falsity of the original statements.

n8 Plaintiffs do not, however, allege with any particularity what GAAP principles were violated. Rather, Plaintiffs simply allege that the financial misstatements were the result of improper revenue recognition and the inappropriate deferral of costs.

[*29]

n9 While it is true that dicta in several cases suggests that failure to follow GAAP and the magnitude of a financial restatement or revision may support an inference of extreme recklessness, the complaints in each of those cases plead additional facts, circumstances, or "red flags" from which strong inference of knowledge or extreme recklessness could be inferred. See Rehm, 954 F. Supp. at 1256 (magnitude of restatement *combined* with defendant's careful statements and reassurances mitigating the seriousness of the financial problems only weeks before need to correct information announced); Sunbeam, 89 F. Supp. 2d at 1331-1344 (plaintiffs plead several "red flags" alerting defendants to overstatements); In re Oxford Health Plans, Inc. Securities Litigation, 51 F. Supp. 2d 290 (S.D.N.Y. 1999) (plaintiffs survive motion to dismiss by alleging failure to comply with GAAP and numerous facts constituting obvious "red flags" or warning signs that something was amiss).

Stripped to its essentials, Plaintiffs' argument is that Med/Waste disclosed [*30] through its restatements what it should have discovered and disclosed in the original quarterly reports. This allegation, however, does not support an inference of scienter; rather, it is classic "fraud by hindsight." See Stevelman, 174 F.3d at 84. Nor can Plaintiffs' general and conclusory allegations of motive and opportunity save Plaintiffs' Complaint. See Malin, 17 F. Supp. 2d at 1360 [HN17] (allegations that defendants violated GAAP and that defendants had motive and opportunity to commit fraud is insufficient to plead scienter). Defendants have made no allegation that either Defendant Wallace or Elkin benefitted personally from the alleged fraud or sold any stock n10 while the stock was artificially inflated, and Plaintiffs provide no facts to back up the claim regarding Defendants' incentive to artificially inflate Med/Waste's stock to further its acquisition program.

n10 Plaintiffs do allege that Defendant Green, a director and Chairman of Med/Waste's Audit Committee, personally benefitted by selling all of his common shares during a high point of the class period. Nevertheless, Defendant Green has not joined in the Motion to Dismiss and the Court does not address whether Plaintiffs have sufficiently pled a cause of action against him. Moreover, Plaintiffs have made no similar allegations that any other individual Defendant engaged in any unusual personal stock sales or transactions. See Credit Acceptance, 50 F. Supp. 2d at 677 (that certain key directors and officers did not sell any shares undermines suggestion that defendants engaged in fraud); Stevelman, 174 F.3d at 85 (allegation that only one director engaged in unusual trading does not suggest strong inference of scienter because only one defendant in corporate entity benefitted); See In re Comshare, Inc. Sec. Litig., 1997 U.S. Dist. LEXIS 17262, 1997 WL 1091468 at *10 (CEO and CFO would have been essential participants in any scheme, thus their having sold no stock undermines any suggestion of knowledge on the part of defendants due to other sales).

[*31]

### V. Conclusion

Plaintiffs' Complaint lacks specific facts





demonstrating fraudulent intent on the part of Defendants. Plaintiffs have simply failed to allege facts suggesting that Defendants knew or were extremely reckless as to whether Med/Waste's quarterly reports for 1998 were accurate *at the time the statements were issued.* The Complaint reveals no allegations of "red flags," warning signs, or other events from which the Court can draw a strong inference of extreme recklessness by Defendants. Nowhere does the Complaint provides facts showing what each of the Defendants knew or how and when they knew it. The mere allegation that individual Defendants had access to the Company's internal information (even unfettered access) and a motive and opportunity to commit securities fraud is an inadequate basis for scienter. See Comshare, 1997 U.S. Dist. LEXIS 17262, 1997 WL 1091468 at *8.

In light of the Court's conclusion that Plaintiffs have failed to plead particular facts giving rise to a strong inference of scienter on the part of the Defendants, the Court need not address Plaintiffs' claims for controlling person liability under Section 20(a) of the Securities Exchange Act of 1934. [*32] See Brown v. Enstar Group, Inc., 84 F.3d 393, 396-97 (11th Cir. 1996)

[HN18] (it is axiomatic that there can be no controlling person liability when the allegedly controlled person has no liability). For all the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion for Hearing on Motion to Dismiss the Consolidated Amended Class Action Complaint [D.E. 27] is DENIED. It is further

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss [D.E. 20] is GRANTED. Plaintiffs' Consolidated Amended Class Action Complaint is DISMISSED WITHOUT PREJUDICE as against Defendants Med/Waste, Elkin, and Wallace. Plaintiffs shall have twenty (20) days from the date stamped on the Order in which to serve a second amended complaint in compliance with the Reform Act's pleading requirements.

**DONE AND ORDERED** in Chambers in Miami, Florida this 30 day of August, 2000.

ALAN S. GOLD

UNITED STATES DISTRICT JUDGE

  

**EXHIBIT F**

LEXSEE



Cited
As of: Mar 08, 2007

**THOMAS O. MORGAN, ET AL., Plaintiffs, v. AXT, INC. and MORRIS S. YOUNG, Defendants.**

**No. C 04-4362 MJJ, No.C05-5106MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2005 U.S. Dist. LEXIS 42346**

**September 21, 2005, Decided**
**September 23, 2005, Filed**

**CORE TERMS:** customer, scienter, misleading, press release, stock, specification, disclosure, testing, judicial notice, announcing, falsity, announced, particularity, accounting, motion to dismiss, pled, particularized, quarterly report, confidential, reaffirming, substrate, investor, shipment, false and misleading, stock price, knowingly, omission, per share, puffery, tester

**COUNSEL:** [*1]  For City of Harper Woods Employees Retirement System, Individually and on Behalf of all others Similarly Situated, Plaintiff: Lionel Z. Glancy, Peter A. Binkow, Mark L. Labaton, Glancy Binkow & Goldberg LLP, Los Angeles, CA.

For Thomas O Morgan, Plaintiff: Elizabeth P. Lin, Karen T. Rogers, Cheryl Ann Williams, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For Behm Plaintiffs Group, Plaintiff: Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA.

For AXT, Inc, Morris S. Young, Defendants: David Banie, David A. Priebe, DLA Piper Rudnick Gray Cary US LLP, East Palo Alto, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

**ORDER      DISMISSING      PLAINTIFF'S COMPLAINT WITHOUT PREJUDICE**

**INTRODUCTION**

Before the Court is Defendants' motion to dismiss this private securities fraud action. Plaintiff Thomas O. Morgan ("Plaintiff"), n1 representing a purported class of all purchasers of AXT, Inc., stock between February 6, 2001, and April 27, 2004, opposes the motion. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss, but **GRANTS** Plaintiff leave to amend.

         n1 In an Order dated February 2, 2005, the Court granted Plaintiff Morgan's motion for appointment as lead plaintiff.

[*2]

**FACTUAL BACKGROUND**

**A. Background**

Page 1





Defendant AXT, Inc.'s ("AXT" or the "Company") is a publicly-traded company that manufactures semiconductor parts, known as substrates, used by a variety of electronic products including wireless and fiber optic telecommuncations, lasers, light emitting diodes, satellite solar cells, and consumer electronics such as cell phones. AXT sells compound semiconductor non-silicon substrates manufactured from gallium arsenide, indium phosphide, and germanium. AXT employs its proprietary Vertical Gradient Freeze method for manufacturing the non-silicon substrates. During the period of time at issue in the instant lawsuit (February 6, 2001, through April 27, 2004 (the "Class Period")), AXT also produced and sold light-emitting diodes ("LEDs") and vertical cavity surface emitting laser chips through its opto-electronic division. AXT sold its products to original equipment manufacturers ("OEMs"). The particular testing required and characteristics of those AXT products were determined by the OEMs. Defendant Dr. Morris S. Young ("Defendant Young") served as the Company's CEO and Chairman of the Board during the Class Period.

On February 6, 2001, AXT [*3] issued a press release reporting the Company's strong commitment to its customers and touting AXT's customers' confidence in AXT. The press release referenced the Company's "supply of high quality substrates" and reported that AXT was "pleased to support [its] strategic customers' substrate requirements for the year and believe[d] that the value of the contracts under th[e] [Supply Guarantee Program] is a good indicator of [AXT's] ability to deliver continued revenue and profit expansion." (Complaint ("Comp."), P 31.)

On February 26, 2001, the Company filed its annual report for FY 2000 on Form 10-K with the SEC. The 10-K stated: "We believe that our success is partially due to our manufacturing efficiency and high product yields and we continually emphasize quality and process control throughout our manufacturing operations." The 10-K also explained that AXT's policy was to recognize revenue when its products were shipped to the customer as long as, *inter alia*, there are no customer acceptance requirements and no remaining significant obligations. (*Id.*, P 32.)

On April 25, 2001, AXT issued a press release announcing its financial results for the first quarter of [*4] 2001. The Company reported that revenue was up a record $ 40.1 million and that net income was up $ 5

million. In the press release, AXT expressed its belief that its products' "strong engineering design and development capability allows [AXT] to tailor [its] standard products to meet customer specific requirements and gives [AXT] competitive advantages." (Comp., P 33.) On May 3, 2001, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the first quarter of 2001.

On July 25, 2001, AXT issued a press release announcing its financial results for the second quarter of 2001. The Company reported that revenue reached a record $ 41.3 million and that net income was up $ 5.2 million. On August 1, 2001, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the second quarter of 2001.

On October 24, 2001, AXT issued a press release announcing its financial results for the third quarter of 2001. The Company announced that reported net losses for the quarter but stated that "strategic research and development investments are positioning AXT [*5] well for continued leadership" and that the Company's "VFG gallium arsenide and indium phosphide substrates continue to offer superior features for manufacturers of high quality electronic and opto-electronic devices." The press release went on to say that AXT "believe[s] that [it] remain[s] the world leader in providing both products." (Comp., P 38.) On November 7, 2001, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the third quarter of 2001.

On February 6, 2002, AXT issued a press release announcing its financial results for the fourth quarter of 2001 and for FY 2001. The Company again reported that its specialized substrates "continue to offer superior features for manufacturers of high quality electronic and opto-electronic devices" and that the Company "expect[ed] an increasing number of key customers to recognize the superiority of [AXT's] technology in the future." (*Id.*, P 40.) On March 26, 2002, AXT filed its Form 10-K annual report with the SEC, reaffirming the Company's previously announced financial results for the fourth quarter and for FY 2001, and including the same description [*6] of AXT's revenue recognition policy described in its FY 2000 annual report.

On April 24, 2002, AXT issued a press release





announcing its financial results for the first quarter of 2002. The Company reported net losses for the quarter but stated that its reputation for LED quality, value, and delivery was growing. On May 3, 2002, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the first quarter of 2002.

On July 24, 2002, AXT issued a press release announcing its financial results for the second quarter of 2002. The Company reported that revenue increased 14 % and stated, "We are particularly pleased with the growth of our LED division, which has recorded double digit revenue growth for the past three quarters, efficiently increased manufacturing capacity to sustain this growth, improved growth margins, and approached overall profitability." On August 15, 2002, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the second quarter of 2002. Defendant Young also filed a certification pursuant to the Sarbanes-Oxley Act that the "information [*7] contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

On October 23, 2002, AXT issued a press release announcing its financial results for the third quarter of 2002. The Company reported that "AXT will continue to benefit from the strength of our technology." (Comp., P 48.) On November 12, 2002, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the third quarter of 2002. The Form 10-Q also stated that, "Based on their evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are effective."

On February 5, 2003, AXT issued a press release announcing its financial results for the fourth quarter of 2002 and for FY 2002. On March 21, 2003, AXT filed its Form 10-K annual report with the SEC. In the 10-K, the Company stated, "the lives of our substrate products are relatively long and accordingly, obsolescence has historically not been a significant factor." The Company again described its revenue recognition policy, as it had in its 2000 and 2001 annual reports. [*8] The 10-K also contained a certification, pursuant to the requirements of the Sarbanes-Oxley Act, averring that the report "does not contain any untrue statement of material fact or omit to state a material fact" and that the financial statements"

fairly present in all material respects the financial condition" of the Company.

On April 23, 2003, AXT issued a press release announcing its financial results for the first quarter of 2003. The Company reported net losses for the quarter. On May 9, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the first quarter of 2003. The 10-Q reported certified that the Company's "disclosure controls and procedures are effective."

On July 23, 2003, AXT issued a press release announcing its financial results for the second quarter of 2004. The Company reported net losses. On August 12, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the second quarter of 2003. The 10-Q again contained a certification regarding disclosure controls and procedures as the May 10-Q had.

On October 22, 2003, AXT [*9] issued a press release announcing its financial results for the third quarter of 2003. The Company again reported net losses. On November 13, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the third quarter of 2003, and containing certifications regarding the Company's disclosure controls and procedures.

On February 4, 2004, AXT issued a press release announcing its financial results for the fourth quarter of 2003 and for FY 2003. On March 29, 2004, AXT filed its Form 10-K annual report with the SEC. The 10-K certified that the Company's disclosure controls and procedures were effective and that the report contained no "untrue statement[s] of material fact" and did not "omit to state a material fact" and that the financial statements" fairly present in all material respects the financial condition" of the Company.

On April 27, 2004, AXT issued a press release revealing that the "first quarter's financial review and verification process ha[d] been delayed due to an investigation by AXT's Audit Committee of certain product testing practices and policies." (Comp., P 64.) The next day, AXT stock [*10] dropped by 13.64%. A day later, AXT's stock dropped further, by nearly 23%, to close at $ 2.20 per share.





On May 24, 2004, AXT filed its quarterly report on Form 10-Q with the SEC, announcing that AXT had "not followed requirements for testing of products and provision of testing data and information relating to customer requirements for certain shipments made over the past several years." The 10-Q reported that AXT then increased its reserve for sales returns by $ 745,000, and recorded a $ 2.1 million charge for obsolete inventory manufactured in the previous two and three years because the specifications of its products differed from customer orders. AXT also announced that it had reassigned its CEO and Chairman of the Board, Defendant Young to head up AXT's China unit, and had replaced the Company's independent auditor, PriceWaterhouseCoopers ("PwC"). (Comp., PP 65-68, 70.) Plaintiff Morgan subsequently filed the instant lawsuit, n2 claiming that he and other members of the proposed class who purchased shares of AXT stock between February 6, 2001, and April 27, 2004, were injured because they bought AXT stock at artificially-inflated prices which plummeted when the Company disclosed [*11] to the public the internal investigation into its practices.

---

n2 Two separate lawsuits were brought by investors in AXT stock against AXT and Defendant Young: (1) *City of Harper Woods Employees Retirement Sys. v. AXT, Inc.*, 04-04362 MJJ, filed on October 15, 2004; and (2) *Robertson v. AXT, Inc.*, 04-05106 MJJ, filed on December 2, 2004. In its February 2, 2005, Order, the Court granted Plaintiff Morgan's motion to consolidate the lawsuits.

---

**B. The Complaint**

In his Consolidated Complaint for Violations of the Federal Securities Laws (hereinafter, the "Complaint"), Plaintiff alleges that AXT and Defendant Young, AXT's former Chairman and Chief Executive Officer, violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. According to Plaintiff, during the Class Period, Defendants knowingly shipped products [*12] that did not conform to customer testing requirements or specifications. Plaintiff alleges that

Defendants failed to properly account for products that were defective or could not be sold by improperly recognizing revenue on those sales even though Defendants knew the products would be returned and failing to accrue adequate reserves. Plaintiff claims that Defendants violated the securities laws by knowingly issuing false or misleading statements about AXT's reserves, revenue, and income (hereinafter, the "financial statements"), and by knowingly issuing false or misleading statements touting the quality of AXT's products and AXT's ability to meet customer requirements (hereinafter, the "quality statements").

In his Complaint, Plaintiff alleges that his claims are supported by the statements of three confidential witnesses -- a Quality Technician who used to work for AXT, a former AXT Corporate Vice President, and a former tester of returned AXT products. n3 The former Quality Technician allegedly confirmed that the Company knowingly shipped to customers products that did not meet customer specifications, that the Company was aware that the products would be returned, and that almost [*13] every shipment was, in fact, returned. Specifically, the technician said that when AXT conducted specification checks on its LED wafers for wavelength, luminosity, vision, and current, the wafers never met all the specifications. The former tester of returned AXT products allegedly confirmed that the passivation layer (the top protective layer) on AXT's LEDs was consistently weak, making the LEDs easily and irreparably damaged. The tester allegedly said that AXT knew this was a problem and lacked adequate product testing equipment. The former Corporate Vice President allegedly confirmed that AXT failed to perform full testing of its products and lacked the right equipment for testing. (Comp., PP 78-80.)

---

n3 In his Complaint, Plaintiff does not allege that the third confidential witness -- the tester of returned AXT products -- was ever an AXT employee. In his opposition to the instant motion, however, Plaintiff describes this witness as a former AXT employee.

---

Plaintiff alleges that during the Class Period, Defendants [*14] reported that one of the Company's larger customers, Agilent, had canceled its orders with AXT because AXT was shipping products that did not conform to Agilent's specifications. Defendants

  

characterized the shipping of out-of-spec products as a one-time event even though, according to Plaintiff, AXT had shipped products that did not meet customer specifications to many of its customers. (*Id.*, P 86.)

On May 20, 2005, Defendants filed the instant motion to dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that Plaintiff has failed to plead his allegations with sufficient particularity.

## LEGAL STANDARD

### A. Federal Rules of Civil Procedure

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the pleading of insufficient facts under an adequate theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). When deciding upon a motion to dismiss pursuant to Rule 12(b)(6), a court must take all of [*15] the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

In the context of a motion to dismiss, review is limited to the contents in the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange*, 169 F. Supp. 2d at 1164; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) [*16] (overruled on other grounds). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See Anderson v. Clow (In re Stac Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 n.4 (1996), *cert denied*, 520 U.S. 1103, 117 S. Ct. 1105, 137 L. Ed. 2d 308 (1997). This rule precludes plaintiffs "from surviving

a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. [*17] To meet the heightened pleading requirements of Rule 9(b), the Ninth Circuit has held that a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.)*, 42 F.3d 1541, 1547-49 (9th Cir. 1994).

In the securities context, the pleading requirements are even more stringent.

### B. Private Securities Litigation Reform Act

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the already-heightened pleading requirements of Rule 9(b). Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) [*18] .

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The





Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc., 183 F.3d 970, 974 (9th Cir. 1999)*. If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(1).

The PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with respect to a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause [*19] actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(1). However, a person may be held liable if the forward-looking statement is made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003)*; *but see In re Seebeyond Technologies Corp. Sec. Litig., 266 F. Supp. 2d 1150, 1164-65 (C.D. Cal. 2003)* (disagreeing with the analysis in *America West* and finding that a defendant is immune from liability if it satisfies either 15 U.S.C. § 78u-5(c)(1)(A) or (B)).

## ANALYSIS

### I. Request For Judicial Notice

As a threshold matter, the Court addresses Defendants' request that the Court take judicial notice of thirteen separate documents, eleven of which are expressly referenced in Plaintiff's Complaint and two of which are not. Plaintiff does not object to Defendants' request.

### A. Documents Referenced in Complaint

Defendants ask the Court to [*20] judicially notice the following documents incorporated by reference in Plaintiff's Complaint: AXT's 10-Ks for the fiscal years ended December 31, 2000, December 31, 2002, and December 31, 2003; five AXT press releases, respectively dated February 6, 2002, October 23, 2002, February 5, 2003, April 23, 2003, and February 4, 2004; AXT's 10-Qs for the quarters ended June 30, 2003, and September 30, 2003; and AXT's Current Report on SEC Form 8-K, filed on June 24, 2004. These documents are attached to the Declaration of David Banie as Exhibits A-K.

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994)*.

Here, each of the documents described above is [*21] explicitly incorporated by reference in Plaintiff's Complaint. (*See* Complaint, PP 32, 40, 48, 50, 51, 54, 57, 59, 60, 61, 71.) Moreover, the documents are press releases and SEC filings, both of which are judicially noticeable in this context. *See In re Homestore.com, Inc. Sec. Litig., 347 F. Supp. 2d 814, 817 (N.D. Cal. 2004)* (the court may take judicial notice of press releases); *In re Calpine Corp. Secs. Litig., 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003)* (the court may take judicial notice of public filings). Accordingly, the Court **GRANTS** Defendants' request and takes judicial notice of Exhibits A-K to the Banie Declaration.

### B. Documents Not Referenced in Complaint

#### 1. Exhibit L -- SEC Form 4 filed by Defendant Young

Defendants ask the Court to take judicial notice of SEC Forms 4 filed on behalf of Defendant Young. These documents are attached to the Banie Declaration as Exhibit L. "In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss. . . ." *Calpine, 288 F. Supp. 2d at 1076*. The SEC Forms 4 at issue here are publicly-available documents filed [*22] with the SEC. Accordingly, the Court takes judicial notice of the documents attached as Exhibit L to the Banie Declaration. n4

> n4 Defendants also contend that Exhibit L should be judicially noticed for two other independent reasons. First, the Complaint references Defendant Young's sale of 200,000 shares of AXT stock during the Class Period.





According to Defendants, this is information that Plaintiff could only have obtained from reviewing Young's Forms 4, such that the documents are incorporated by implicit reference in the Complaint and should be judicially noticed. Second, the Forms 4 are central to Plaintiff's allegation that Defendant Young's Class Period stock sales are probative of scienter, and should be judicially noticed on that ground. Having already determined that the Forms 4 should be judicially noticed on the ground that they are public documents, the Court declines to address Defendants' separate grounds for judicial notice.

**2. Exhibit M -- AXT's Closing Stock Prices From February 6, 2001, Through  [*23]  April 29, 2004**

Defendants also urge the Court to take judicial notice of documents reflecting AXT's closing stock prices during the Class Period. These documents are attached to the Banie Declaration as Exhibit M. In the context of a motion to dismiss a securities private fraud action, a court may take judicial notice of a company's public stock prices. _Homestore.com, 347 F. Supp. 2d at 816_. Accordingly, the Court takes judicial notice of these documents.

**II. Motion to Dismiss**

Defendants contend that Plaintiff's Complaint should be dismissed because Plaintiff fails to satisfy the heightened pleading requirements under the PSLRA, fails to state a claim under Rule 12(b)(6), and fails to plead fraud with the particularity required by Rule 9(b). The Court examines Plaintiff's two claims separately.

**A. Plaintiff's First Cause of Action -- Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

Section 10(b) of the Securities Exchange Act (the "Act") provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so [*24] registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice

to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. _See Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999)_. A complaint must "specify each statement alleged to have [*25] been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(2). As discussed above, in order to avoid having the action dismissed, a plaintiff must "plead with particularity both falsity and scienter." _Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)_. The Ninth Circuit, in _Ronconi_, articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.' Where pleadings are not [*26] sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).





*Id.* (citations and internal quotation marks omitted).

Here, Plaintiff alleges that statements or omissions attributable to Defendant AXT and Defendant Young were false and misleading and that Defendants knew the statements were false and misleading at the time the statements were made. The statements at issue can be separated into two general categories: (1) statements touting the quality of AXT's products and the Company's ability to meet customer specifications; and (2) AXT's financial statements. With respect to both categories of statements, Defendants contend that Plaintiff has failed to plead the falsity of the statements with sufficient particularity and has failed to plead facts that, if true, would raise a strong inference that Defendants acted with scienter. Additionally, Defendants assert that Plaintiff has failed to adequately plead loss causation pursuant to the Supreme Court's recent holding [*27] in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

## 1. FALSITY and SCIENTER

### a. Quality Statements

Plaintiff alleges that Defendants made false or misleading statements regarding the quality of its products throughout the Class Period. Specifically, Plaintiff takes issue with the statements contained in various press releases issued between February 6, 2001, and April 27, 2004, in which Defendants reported that its products were of high quality, incorporated strong engineering design, had competitive advantage, contained superior features, and met customers' specific requirements. To support his claim that the quality statements were knowingly false or misleading, Plaintiff relies on AXT's May 24, 2004, press release disclosing that the Company had "not followed requirements for testing of products and provision of testing data and information relating to customer requirements for certain shipments made over the past several years," and on the Company's subsequent decisions to reassign its CEO, to increase its reserve for sales returns by $ 745,000, and to record a $ 2.1 million charge for obsolete inventory manufactured in the prior two [*28] and three years. Plaintiff construes AXT's May 2004 statements and conduct as an admission by Defendants that the quality statements were knowingly false when made. Plaintiff also relies on the statements of the former AXT Quality Technician, the former AXT Corporate Vice President, and the former tester of returned AXT products

(collectively, the "witnesses") to support falsity and scienter. Finally, Plaintiff claims that the fact that Agilent, one of AXT's customers, canceled its orders for AXT substrates during the Class Period corroborates the witness statements and Plaintiff's claims that the quality statements were knowingly false.

Defendants contend that the product quality statements were, at most, mere puffery, and are not actionable. In the alternative, Defendants argue that Plaintiff has not pled sufficiently particularized facts that the statements were false or misleading when made nor has Plaintiff pled facts that raise a strong inference of scienter. The Court addresses each of Defendants' arguments in turn.

### i. Puffery

"General statements of optimism and 'puffing' about a company or product are not actionable." *In re Foundry Networks, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18200, [*29] *47 (N.D. Cal. Aug. 29, 2003) (citation omitted). "Vague, amorphous statements, like 'soft forecasts' which are 'mere puffery,' are inactionable because reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions." *Id.* (citation omitted). "No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors." *Id.* (citing *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002)). In *Foundry Networks*, at issue was the company's statement that its "business remains on track." The court held that the statement was inactionable puffery because the statement was merely a very general statement of optimism about the company's financial prospects, something that reasonable investors would not rely on when making investment decisions. In *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F. 3d 920 (9th Cir. 2003) ("*America West*"), however, the Ninth Circuit found statements at issue were not inactionable puffery. Specifically, [*30] the court held that "[a] reasonable investor would find significant the information regarding a company's deferred maintenance costs, unsafe maintenance practices, and possible sanction" because "a reasonable investor would consider the potential effects of each of these facts on the overall economic health of the company as 'significantly altering' the 'total mix' of information made available." *Id. at 935; see also*





*Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003) (statement that company was the "'premier provider of high-speed DSL services in the Northeast corridor' . . . is much more than mere puffery; it is a statement of [the company's] present status and capabilities, and connotes that [the company] is comparatively superior")).

The lion's share of the statements at issue here appear to more closely resemble the statements at issue in *America West* or *Scritchfield* than those at issue in *Foundry Networks.* For example, statements touting the superiority of AXT's specific products, such as the October 24, 2001, press release described in paragraph 38 of the Complaint, in which AXT reported that the Company's "VGF gallium [*31] arsenide and indium phosphide substrates continue to offer superior features for manufacturers of high quality electronic and opto-electronic devices" are far less generalized than the statements the *Foundry Networks* court determined were inactionable. Such statements strike the Court as information that an investor would consider when making investment decisions. However, to make such a determination would require the Court to make factual findings which, at this stage in the litigation, would not be appropriate. Accordingly, the Court finds that whether the quality statements at issue here are actionable as material statements is a question for another day.

**ii. Falsity and Scienter Not Sufficiently Pled**

Assuming, *arguendo*, that the quality statements at issue were not mere puffery and are actionable as material statements or omissions, the Court now turns to the question of whether Plaintiff has alleged sufficiently particularized facts to support his claim that the quality statements were false or misleading, and whether Plaintiff has alleged facts that raise a strong inference of scienter, to survive Defendants' motion to dismiss.

Plaintiff primarily relies on [*32] AXT's post-Class Period (May 2004) disclosure and the statements of three confidential witnesses to support his claim that the product quality statements were false or misleading and that Defendants knew those statements were false and misleading when made. Plaintiff also alleges that Agilent's cancellation of its order of AXT products during the Class Period supports his claims of falsity and scienter. Additionally, Plaintiff alleges that Defendant Young's sale of stock during the Class Period supports an strong inference of scienter. For the following reasons,

the Court finds that the facts, as pled, are insufficiently particularized to support Plaintiff's claim that the quality statements violated federal securities laws.

**(a) Witness Statements n5**

> n5 For purposes of this analysis, the Court assumes that the witnesses' purported statements are true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to Plaintiff.

According to Plaintiff, the former Quality [*33] Technician allegedly confirmed that the Company knowingly shipped to customers products that did not meet customer specifications, that the Company was aware that the products would be returned, and that almost every shipment was, in fact, returned. Specifically, the technician said that when AXT conducted specification checks on its wafers for various criteria, the wafers never met all the specifications. The former tester of returned AXT products allegedly confirmed that the passivation layer (the top protective layer) on AXT's LEDs was consistently weak, making the LEDs easily and irreparably damaged. The tester allegedly said that AXT knew this was a problem and lacked adequate product testing equipment. The former Corporate Vice President allegedly confirmed that AXT failed to perform full testing of its products and lacked the right equipment for testing. (Comp., PP 78-80.) These statements, as currently pled, are insufficient to satisfy create a sufficient factual predicate for Plaintiff's claims under the PSLRA. First, Plaintiffs' Complaint fails to explain how any of the witnesses would have personal and firsthand knowledge of the facts they allege to be true. *See In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, [*34] (9th Cir. 2005) (confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). For example, Plaintiff does not explain the job responsibilities of the Quality Technician and how he or she would know about the number or proportion of returns of AXT's products. Second, the Complaint fails to point to any specific data to support the witnesses' contentions that AXT's products were being returned. Third, the Complaint does not sufficiently describe the timing of the witnesses' observations and conclusions. Finally, assuming, as the Court must, that the witnesses'

Page 9

  

statements are true and AXT's products were consistently not being tested, did not meet customer specifications, and were regularly being returned to the Company, the Complaint alleges no facts that would allow the Court to infer that Defendants were aware of these facts. The Complaint does not allege any process by which upper management, presumably in charge of issuing or approving press releases, would have been aware of product returns or testing practices at the manufacturing level, much less how [*35] each of these particular confidential witnesses was connected with Defendants such that they had contemporaneous knowledge of what AXT and Defendant Young knew. Accordingly, the witness statements are insufficient, as currently pled, to support falsity and scienter here.

### (b) AXT's Post-Class Period Statements and Conduct

Plaintiff contends that AXT's May 24, 2004, disclosure notifying the public that AXT had "not followed requirements for testing of products and provision of testing data and information relating to customer requirements for certain shipments made over the past several years" supports his contention that the quality statements issued during the Class Period were false and misleading and that Defendants were aware the statements were false and misleading. The Court disagrees.

The May 2004 disclosure does not say that every shipment of every AXT product was non-conforming such that it can be considered an admission that AXT's Class Period statements regarding the quality of its products are rendered false and misleading. Even if the May 2004 statement admits that some of AXT's products did not conform to customer specifications, the statements at issue could [*36] still have been true in that the Company only claimed that its products were competitive and that its products' design was strong. Moreover, even assuming the statements were false or misleading, the post-Class Period disclosure does not raise a strong inference of scienter here. The fact that the Company admitted, after the Class Period, that it had failed to follow testing requirements on "certain shipments," is insufficient to raise a strong inference that Defendants knew, at the time the quality statements were made, that the statements were false or misleading.

### (c) Agilent Cancels Orders

Plaintiff alleges that during the Class Period, Defendants disclosed that one of AXT's larger customers, Agilent, had canceled its orders for AXT products because AXT was shipping products that did not conform to Agilent's specifications. Plaintiff contends that this corroborates his contention (and the confidential witness statements) that AXT was aware that it was shipping non-conforming products to its customers such that the statements it issued during the Class Period regarding the quality of its products and its competitive position in the marketplace were knowingly false and misleading. [*37] Plaintiff also contends that Defendants were aware that the problems with the Agilent shipments were not unique such that its statement to the contrary was false and misleading. Plaintiff has failed to allege any facts that support a finding that Defendants knew that the non-conforming Agilent shipments were part of a widespread quality problem with AXT products. Accordingly, the Court finds that the fact that Agilent canceled its orders with AXT is insufficient to demonstrate that the quality statements were knowingly false when made.

### (d) Defendant Young's Stock Sales

Plaintiff also relies on the stock sales of Defendant Young as an indication of Defendants' scienter with respect to the quality statements. Generally, stock sale allegations cannot raise an inference of scienter unless the plaintiff alleges specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics, 183 F.3d at 986.* Among the relevant factors for a court to consider are: 1) the amount and percentage of shares sold by insiders; 2) the timing of the [*38] sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

Here, Plaintiff alleges that Defendant Young sold a total of more than 200,000 shares of his personally-held AXT stock during the Class Period for gross proceeds of approximately $ 2.2 million. (Comp. at P 91.) Plaintiff alleges no facts about the dates, prices per share, or sizes of each of Defendant Young's Class Period sales. Plaintiff also fails to allege that Defendant Young's sales over the time period in question were inconsistent with his prior trading history. In light of the three factors above, Defendant Young's Class Period sale of stock, as alleged, is not sufficiently suspicious, without more, to raise a





strong inference of scienter.

**(e) Plaintiff's Allegations as a Whole**

The Court must consider whether the totality of Plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that Defendants issued allegedly false or misleading statements touting the quality of AXT's products with deliberate recklessness, if not actual knowledge. *Lipton, 284 F.3d at 1038*. Here, the sum is no greater than its parts. Plaintiff [*39] has failed to allege particularized facts that could lead the Court to infer that Defendants intentionally, or with deliberate recklessness, misrepresented the quality of AXT's products and its strategic position as compared with other manufacturers of similar products. Because Plaintiff's first cause of action "lacks sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA," it must be dismissed. *Silicon Graphics, 183 F.3d at 984*.

**b. Financial Statements**

Plaintiff alleges that during the Class Period, Defendants knowingly issued financial statements that overstated revenue, growth margins, and earnings in violation of GAAP, rendering the statements false and misleading under the Securities and Exchange Act. Specifically, Plaintiff contends that the financial statements were knowingly false or misleading in light of: (1) the Company's stated revenue recognition policy requiring that AXT not recognize revenue where there is a customer acceptance requirement or remaining significant obligation; (2) AXT's failure to accrue adequate reserves; and (3) AXT's failure to take a timely charge for inventory [*40] obsolescence. Plaintiff also challenges the qualitative statements regarding internal and disclosure controls contained in the Sarbanes-Oxley certifications accompanying AXT's quarterly filings (beginning in April 2002). In support of these allegations, Plaintiff again relies primarily upon the Company's May 2004 disclosure and its subsequent decisions to increase its reserves, charge for inventory obsolescence, and reassign its CEO. Plaintiff also again relies on the confidential witness statements, Agilent's decision to cancel its order, and Defendant Young's stock sales. Defendants argue that Plaintiff has failed to allege a particularized factual basis for his claim that the financial statements released during the Class Period were false and involved an improper recognition of revenue, or that Plaintiff has alleged facts raising a strong inference that

Defendants acted with the requisite scienter. The Court agrees.

It is generally accepted that standing alone, allegations of GAAP violations do not establish scienter. *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1426 (9th Cir. 1994)*. Rather, to plead fraudulent intent based on GAAP violations, plaintiffs [*41] must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent. *DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390-91 (9th Cir. 2002)*. Plaintiff has not met this standard. As discussed *supra*, Plaintiff only alleges that Defendants *must have been* aware that its products were flawed and were being shipped to customers anyway based on the vague representations of three confidential witnesses who do not describe the basis for their knowledge, the time period of the general awareness that this practice was occurring, any contact with AXT's upper management (or specifically, those making the accounting and revenue recognition decisions), or any specific transactions on which revenue was knowingly improperly recorded. *See Northpoint, 184 F. Supp. 2d at 998* ("With accounting fraud, . . . the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles. More is needed.") Plaintiff has failed to allege [*42] that particular accounting decisions were improper or facts that support a strong inference that Defendants were aware of facts that rendered their accounting decisions fraudulent. In sum, Plaintiff's generic allegations of accounting fraud fall short of sufficiently pleading scienter with respect to Defendants' practice of recognizing revenue.

The other factors upon which Plaintiff relies to support his claim that AXT's financial statements were false or misleading are also insufficiently pled. The Court examines these in turn.

**i. AXT's Post-Class Period Statements and Conduct**

Plaintiff claims that AXT's post-Class Period decisions to take a $ 745,000 reserve, to take a $ 2.1 million write-off, and to reassign its CEO and promote its CFO to the top spot at the Company, demonstrate that the Company's financial statements, issued during the Class Period, were false when made and that Defendants knew





they were false. The Court disagrees. These allegations are not pled with the requisite particularity. Plaintiff contends that AXT's post-Class Period decisions suggest that the Company should have increased its reserve for returns by $ 745,000 *during* the Class Period and that [*43] the Company's failure to do so renders the financial statements false. Plaintiff alleges no contemporaneous facts to support that contention other than the post-Class Period decision to increase the reserves. This is a classic example of pleading fraud by hindsight, which is exactly what Congress intended to eliminate with its adoption of the PSLRA. *See Silicon Graphics*, 183 F. 3d at 988; *Acito v. IMCERA Group*, 47 F. 3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.") Similarly, AXT's decision to write off $ 2.1 million for inventory obsolescence after the close of the Class Period does not necessarily read back on what the Company should have done, but did not do, during the Class Period, or on the falsity of the Company's financial statements during that period. A "pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when [the] plaintiffs think the write-down should have occurred." *In re PETsMART, Inc. Secs. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999). [*44] Plaintiff fails to do so here. Additionally, AXT's decision to reassign Defendant Young to head up the Company's China Operations does not support an inference of scienter here. Management changes "are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions." *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005). Plaintiff has not alleged sufficiently particularized facts with respect to Young's reassignment to support his claim that the financial statements were false when made.

Plaintiff also contends that the Sarbanes-Oxley certifications signed by Defendant Young and filed with the SEC were false when made. Again, the Court finds that Plaintiff has not alleged particularized facts to support his claim that Defendant Young's averments that he had examined the Company's internal disclosure controls and believed they were adequate, were false.

### ii. Witness Statements n6

n6 For purposes of this analysis, the Court assumes that the witnesses' purported statements are true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to Plaintiff.

[*45]

As discussed above, the confidential witness statements relied on by Plaintiff here are insufficient, as currently pled, to support falsity or scienter. The Complaint fails to allege how the witnesses would have known what accounting effect, if any, product returns would have on the Company's financial statements, or how Defendants would have known that the financial statements it released were false or misleading in light of the alleged product returns. *See Juniper Networks, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4025, at *8 (N.D. Cal. Mar. 11, 2004) (allegations of false financial forecasts are insufficient where plaintiffs failed to "plead specific facts demonstrating how the problems being experienced translated into the need for Juniper to alter or reduce its publicly issued projections"). Accordingly, the confidential witness statements, as currently pled, are insufficient to support falsity and scienter with respect to the financial statements.

### iii. Agilent Cancels Order

Plaintiff contends that AXT's announcement, during the Class Period, that Agilent had canceled its orders due to AXT's failure to provide products that met Agilent's specifications [*46] supports his claim that the financial statements were false when made and that Defendants knew the statements were false. While the Agilent order withdrawal suggests that AXT was not *always* shipping products that conformed to customer specifications, Plaintiff fails to allege sufficiently particularized facts that support his claim that this meant that the financial statements were false or that Defendants knew they were false.

### iv. Defendant Young's Stock Sales

As discussed *supra*, Plaintiff fails to allege sufficient details regarding Defendant Young's sales of stock during the Class Period that would support the falsity of the financial statements and Defendants' scienter with respect thereto.

### v. Plaintiff's Allegations as a Whole





As explained above, the Court must consider whether the totality of Plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that Defendants issued allegedly false or misleading financial statements with deliberate recklessness, if not actual knowledge. *Lipton, 284 F.3d at 1038*. Here, again, the sum is no greater than its parts. *See In re Nash Finch Co. Secs. Litig., 323 F. Supp. 2d 956, 964 & n.9 (D. Minn. 2004)* [*47] ("The Court finds the collective minutia offered here adds up to nothing. Just as two plus two will never equal five, these allegations -- whether considered apart or together -- do not add up to a strong inference of scienter.") n7

n7 At oral argument, Plaintiff alerted the Court to the recent holding in *In re Omnivision Technologies, Inc., 2005 U.S. Dist. LEXIS 16009, *1 (N.D. Cal. July 29, 2005)*. The Court finds that that case, distinguishable on its facts, does not alter the Court's conclusions here. In *Omnivision*, it was undisputed that the company's financial statements contained errors. This is not the case here. Additionally, in that case, the plaintiff alleged facts supporting a finding that the individual defendants, executives of the company in question, sold personal shares of the company's stock dramatically out of line with their trading history. That the *Omnivision* court found that the plaintiff's complaint survived the defendants' motion to dismiss, despite the PSLRA's heightened pleading standard, does not mandate the same result here.

[*48]

## 2. Loss Causation

In *Dura Pharmaceuticals*, the Supreme Court clarified that alleging that a misrepresentation caused an inflated purchase price does not, without more, demonstrate loss causation. To "touch upon" an economic loss is insufficient; plaintiffs must demonstrate an actual causal connection between the defendant's alleged material misrepresentation and the economic loss suffered. *125 S. Ct. at 1633*. This holding reversed the Ninth Circuit's jurisprudence on the subject, pursuant to which a plaintiff could satisfy the loss causation requirement simply by alleging that stock price was inflated due to the alleged misrepresentation.

Here, the Complaint simply states that because AXT's stock prices dropped significantly after the Company disclosed its internal investigation, Plaintiff, and other AXT shareholders who purchased stock during the Class Period, lost money. However, Plaintiff has not alleged a proximate, causal connection between the alleged misrepresentations contained in AXT's press releases and financial statements and the consequent decline in AXT stock. Because other factors may have affected the Company's stock price during the Class [*49] Period, Plaintiff must allege more than just that the alleged misrepresentations inflated the stock price. *See id.* This is particularly true here where the AXT stock price fluctuated significantly during the Class Period, at some points dropping lower than the price of the stock after the April 27, 2004, disclosure regarding the Company's internal investigation. n8 This suggests that the stock price was, indeed, affected by factors other than Defendants' alleged false or misleading statements. Accordingly, the Court finds, in light of *Dura*, that Plaintiff's allegations regarding loss causation are insufficient. Plaintiff's contention that the *Daou* case mandates the contrary result is specious. In that case, the Ninth Circuit found that loss causation was sufficiently pled but specifically held that because the complaint disclosed that the price of the company's stock had declined, during the class period, from $ 34.375 per share to $ 18.50 per share, before any corrective disclosure was issued, any loss suffered between those figures could "not be considered causally related to Daou's allegedly fraudulent accounting methods because before the revelations began . . ., the [*50] true nature of Daou's financial condition had not yet been disclosed." *411 F.3d at 1026-27*. Likewise, AXT's stock price dipped below the price to which it ultimately fell after the April 2004 disclosure, thus rendering Plaintiff's attempt to causally link the alleged false statements with his (and other purported class members') financial loss insufficiently pled.

n8 On April 29, 2004, AXT's stock price dropped to $ 2.20 per share. Although the price had, at various points during the Class Period, been as high as $ 40 per share, there was a substantial period of time during the Class Period in which AXT's stock price dropped below $ 2 per share.

  

## B. Plaintiff's Second Cause of Action -- Violation of Section 20(a)

Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Secs. Litig.,* 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff [*51] asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *Id.* "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir. 1999).

Here, Plaintiff alleges that Defendant Young acted as a controlling person of AXT within the meaning of Section 20(a) of the Act and is liable thereunder for the conduct alleged. Plaintiff claims that by virtue of Defendant Young's position as CEO and Chairman of the Board of the Company, he was responsible for preparing and disseminating AXT's public releases and had the power and the authority to cause the Company to engage in the wrongful conduct complained of. Defendants argue that Plaintiff's Section 20(a) cause of action fails because Plaintiff has failed to state a cause of action pursuant to Section 10(b). The Court agrees. Because Plaintiff has failed to adequately plead the underlying 10(b) violation, as discussed *supra,* Plaintiff's Section 20(a) claim must also be dismissed.

## CONCLUSION

For the foregoing reasons, [*52] the Court **GRANTS** Defendants' Motion to Dismiss without prejudice. Plaintiff must file an amended complaint within thirty days of the date of this Order.

This Order terminates docket entry nos. 24 and 25.

**IT IS SO ORDERED.**

Dated: September 21, 2005

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

  

# EXHIBIT G

LEXSEE



Caution
As of: Mar 08, 2007

In re NETWORK ASSOCIATES, INC. II SECURITIES LITIGATION

No. C 00-4849 MJJ

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

2003 U.S. Dist. LEXIS 14442

March 25, 2003, Decided
March 25, 2003, Filed

**PRIOR HISTORY:** Armour v. Network Assocs., 171 F.
Supp. 2d 1044, 2001 U.S. Dist. LEXIS 7566 (N.D. Cal.,
2001)

**DISPOSITION:** [*1] Defendants' motions to dismiss
granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Lead plaintiff retirement
system, along with other related class action plaintiffs,
brought securities fraud claims against defendants, a
company and its officers. The company and its officer's
moved to dismiss the complaint pursuant to Fed. R. Civ.
P. 12(b)(6) and the Private Securities Litigation Reform
Act of 1995 (Reform Act), 15 U.S.C.S. § 78u-4, inter
alia.

**OVERVIEW:** The basis for the alleged securities fraud
violations was twofold. First, the retirement system
asserted that, throughout the class period, defendants
orchestrated and actively participated in improper
accounting practices. Second, the retirement system
claimed that, during the class period, defendants
disseminated false and misleading statements concerning
the company's operation and its future prospects. The
court held that the ambiguous nature with which certain
confidential witnesses and the basis of their knowledge

were described did not comport with the heightened
pleading standards under the Reform Act. Thus, even
assuming the actual assertion made by the confidential
witnesses were pled with sufficient particularity, the court
would still be required to grant the motion to dismiss. For
the sake of completeness, the court briefly addressed the
allegations of accounting fraud. The mere fact that the
company restated its financials for certain years was not
enough to create the necessary strong inference of
scienter. Nor was it sufficient to allege the documents
evidencing the inaccurate financial statements were
approved and signed by company officers.

**OUTCOME:** The company and the officers' motions
were granted.

**CORE TERMS:** confidential, scienter, restatement,
network, stock, accounting, particularity, announced,
fiscal, distributor, pled, customer, com, reseller, motion
to dismiss, notice, indirectly, spin-off, end-user, investor,
omission, vendors, false and misleading, inquiry notice,
full refund, consolidated, discovery, briefing, new class,
common stock

**LexisNexis(R) Headnotes**





*Evidence > Judicial Notice > General Overview*
[HN1] Judicial notice is appropriate for Securities and Exchange Commission filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Fed. R. Evid. 201(b).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] The court may also consider documents outside the scope of the pleadings in support of a Fed. R. Civ. P. 12(b)(6) motion to dismiss if the documents are referenced in plaintiff's complaint, are "central" to a plaintiff's claim, and whose authenticity are not at issue. Therefore, to the extent that any such documents are necessary to a court's determination of this matter, they will be considered.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN3] A Fed. R. Civ. P. 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. Dismissal of an action pursuant to Fed. R. Civ. P. 12(b)(6) is appropriate only where it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A court will dismiss the complaint or any claim in it without leave to amend only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN4] In determining a motion to dismiss, a court must assume all factual allegations to be true and must construe them in the light most favorable to the non-moving party. However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. Further, a court need not accept as true allegations that contradict facts that have been judicially noticed or by exhibit attached to a complaint.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN5] In cases alleging violations of securities laws, motions to dismiss are subject to stricter standards because whether a statement or omission is misleading to potential investors requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact. Thus, only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN6] Allegations of fraud must satisfy the requirements of Fed. R. Civ. P. 9(b) to survive a motion to dismiss. Rule 9(b) provides that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. The intent of Rule 9(b) is to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN7] Fed. R. Civ. P. 9(b) applies to actions brought under the federal securities laws. To comport with Rule 9(b), a complaint must allege the time, place and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and also set forth the "circumstances indicating falseness" or the manner in which the representations or omissions at issue were false and misleading. Thus, plaintiffs must provide an explanation as to how an alleged statement or omission was false or misleading when made.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings >*

  

*Rule Application & Interpretation*

[HN8] The heightened pleading standard of Fed. R. Civ. P. 9(b) is not an invitation to disregard the requirement of simplicity, directness, and clarity of Federal Rule of Civil Procedure 8. Every plaintiff filing a complaint in a federal district court must also prepare his complaint in conformity with Rule 8, which requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief and that each averment of a pleading shall be simple, concise and direct. Fed. R. Civ. P. 8(a), (e).

*Civil Procedure > Class Actions > Prerequisites > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*

[HN9] To survive a motion to dismiss, a complaint alleging fraud must meet the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995 (Reform Act), 15 U.S.C.S. § 78u-4, in which Congress clarified and strengthened the particularity requirements of Fed. R. Civ. P. 9(b) as applied in the context of federal securities class action lawsuits. Congress enacted the Reform Act to end the practice of pleading "fraud by hindsight."

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN10] The Private Securities Litigation Reform Act of 1995, specifically 15 U.S.C.S. § 78u-4(b)(1)(B), requires that a complaint in a securities fraud action specify each false and misleading statement and why each statement is false and misleading. If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts upon which the belief is formed. It is not sufficient for a plaintiff's pleading to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate the plaintiff's claim.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Scienter > Knowledge*

*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN11] Moreover, a complaint must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2). Finally, if the alleged materially false statement or omission is a "forward looking statement," the required level of scienter is actual knowledge and not recklessness. 15 U.S.C.S. § 78u-5(c). A complaint that fails to comply with any of these requirements must be dismissed. 15 U.S.C.S. § 78u-4(b)(3)(A).

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN12] Claims instituted pursuant to Section 10(b), 15 U.S.C.S. § 78j, and Rule 10b-5, must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN13] Every circuit to address the issue of when "discovery" of the facts underlying the claim is deemed to have occurred has held that inquiry notice is the appropriate standard. Although the United States Court of Appeals for the Ninth Circuit has not formally decided the issue, it has indicated that, if it were to adopt an inquiry notice standard, it would adopt the standard outlined by the Tenth Circuit: Inquiry notice triggers an investor's duty to exercise reasonable diligence and the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud. Given the United States Court of Appeals for the Ninth Circuit's comments, as well as the adoption of an inquiry notice standard in several other circuits, the court will apply the standard outlined to the matter currently before the court.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*

[HN14] See Fed. R. Civ. P. 15(c)(2).





*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN15] An amendment adding a party plaintiff relates back to the original pleading only when there is an identity of interests between the original and newly proposed plaintiff.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN16] A party seeking to amend must also show that (1) the original complaint gives a defendant adequate notice of the claims of a newly proposed plaintiff, and (2) relation back does not unfairly prejudice the defendant.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN17] The United States Supreme Court has identified four criteria which must be met in order for an amendment naming an additional party to relate back to the filing of the original pleading pursuant to Fed. R. Civ. P. 15(c): (1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN18] Relation back is only allowed for a mistake in identity, not liability.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN19] Under the Private Securities Litigation Reform Act of 1995, 15 U.S.C.S. § 78u-4, a private securities plaintiff must state with particularity all facts that give rise to a strong inference of the required state of mind. In order to create a strong inference of the required state of mind, a plaintiff must state with particularity facts demonstrating deliberate recklessness. In order to plead with particularity, a plaintiff must provide all the facts forming the basis of her belief in great detail.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN20] See 15 U.S.C.S. § 78j(b).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN21] See 17 C.F.R. § 240.10b-5.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN22] See 15 U.S.C.S. § 78t.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > GAAP & GAAS*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Federal Jurisdiction*
[HN23] Generally Accepted Accounting Practices (GAAP) are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. As such, recognition of revenues in violation of GAAP can constitute a false or misleading statement of material fact that gives rise to an action for securities fraud. However, the failure to follow GAAP is not, in and of itself, sufficient to establish a violation of the Exchange Act of 1934.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN24] To plead financial fraud for improper revenue recognition, a plaintiff must allege particular transactions where revenues were improperly recorded, including the names of customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.

*Criminal Law & Procedure > Scienter > Recklessness*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*





[HN25] In the securities fraud context, scienter is a mental state embracing intent to deceive, manipulate or defraud. Scienter may be established in a number of ways, employing both direct and circumstantial evidence. One way to establish scienter is to show motive and opportunity. Another is to provide evidence of reckless or deliberate behavior.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*
[HN26] In order to create a strong inference of scienter in the securities fraud context, a plaintiff must state with particularity facts demonstrating deliberate recklessness. In evaluating whether a plaintiff has pled facts giving rise to a strong inference of fraudulent intent, a court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN27] It is not sufficient for a plaintiff to allege that documents evidencing the inaccurate financial statements were approved and signed by company officers. A plaintiff must show that the signing of these statements is "highly unreasonable" and constitutes an extreme departure from standards of ordinary care.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN28] In determining when the sale of stock is suspicious or unusual in the context of insider trading, courts consider: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales are consistent with an insider's prior trading history.

**COUNSEL:** For ILENE ARMOUR, Plaintiff: Patrick J. Coughlin, Milberg Weiss Bershad Hynes & Lerach LLP,

San Francisco, CA.

For ILENE ARMOUR, Plaintiff: William S. Lerach, Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, Plaintiff: Robert S. Gans, Bernstein Litowitz Berger & Grossman LLP, San Diego, CA.

For RAYMOND E. MORALES, Plaintiff: Alan R. Plutzik, Kathryn A. Schofield, Bramson Plutzik Mahler & Birkhaeuser LLP, Walnut Creek, CA.

For NETWORK ASSOCIATES, INC., WILLIAM L. LARSON, defendants: Boris Feldman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For NETWORK ASSOCIATES, INC., defendant: Nina F. Locker, Ellen H. Solomon, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For WILLIAM L. LARSON, defendant: Paul H. Goldstein, Morrison & Foerster, Palo Alto, CA.

For WILLIAM L. LARSON, defendant: Darryl P. Rains, Morrison & Foerster LLP, Melvin R. Goldman, Morrison & Foerster, San Francisco, CA.

For PRABHAT K. GOYAL, defendant: Jeffrey B. Rudman, Hale and Dorr, Mary Jo Johnson, Halle and Dorr LLP, Boston, MA.

For PRABHAT K. GOYAL, defendant: [*2] Stephen S. Mayne, Elizabeth A. Frohlich, Steefel Levitt & Weiss, San Francisco, CA.

For TERRY DAVIS, defendant: Daniel H. Bookin, O'Melveny & Myers LLP, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

    ORDER    GRANTING    DEFENDANTS'
MOTIONS TO DISMISS



## INTRODUCTION

Before the Court are four motions to dismiss Teachers' Retirement System of Louisiana's ("Plaintiff" or "Lead Plaintiff") first amended consolidated complaint ("FACC") in the above-entitled class action. The motions are brought by Network Associates, Inc. ("NAI" or the "Company), n1 William L. Larson ("Larson"), Prabhat K. Goyal ("Goyal"), and Terry Davis ("Davis") n2 pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4, which added Section 21D to the Security Exchange Act of 1934 ("Exchange Act"). This motion requires the Court to determine whether Plaintiff's allegations meet the heightened pleading standard of the Reform Act. Having considered the briefing in this matter n3 and listened to arguments from the parties, the Court **GRANTS** Defendants' [*3] motions.

n1 For the purpose of this motion, NAI does not challenge the allegations pertaining solely to the Company's restatement of its 1999 and 2000 financials. *See* NAI Motion at 2:15-19. Thus, these claims remain despite the outcome of this motion.

n2 For ease of reference, the Court will refer to Larson, Goyal, and Davis collectively as the "Individual Defendants." Moreover, the Court will further refer to both NAI and the Individual Defendants collectively as "Defendants."

n3 [HN1] Judicial notice is appropriate for SEC filings, press releases, and accounting rules as they are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b); *see, e.g., Plevy v. Haggerty,* 38 F. Supp.2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of SEC filings, press releases, analysts' reports, news articles, and stock prices); *Urbanek v. United States,* 731 F.2d 870, 873 n.3 (Fed. Cir. 1984) (taking judicial notice of accounting handbook). [HN2] The Court may also consider documents outside the scope of the pleadings in support of a Rule 12(b)(6) motion to dismiss if the documents are referenced in plaintiff's complaint, are "central" to plaintiff's claim, and whose authenticity are not at issue. *See Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001) (finding that courts may consider documents which are not physically attached to the plaintiff's complaint if their authenticity is not contested and the complaint necessarily relies on them). Therefore, to the extent that any such documents are necessary to the Court's determination of this matter, they will be considered.

[*4]

## FACTUAL BACKGROUND

This matter involves eleven related class actions that have been consolidated for resolution before this Court n4 and captioned *In re Network Associates, Inc. II Securities Litigation.*

n4 The following cases have been consolidated with *Armour v. Network Assoc., Inc.,* the low-numbered lawsuit against NAI: *Wendell v. Network Assoc., Inc.,* C 01-0007; *Lukoff v. Network Assoc., Inc.,* C 01-0008; *Rizzuti v. Network Assoc., Inc.,* C 01-0860; *McDougal v. Network Assoc., Inc.,* C 01-0861; *539, Inc. v. Network Assoc., Inc.,* C 01-0599; *Novakovic v. Network Assoc., Inc.,* C 01-0831; *Iowa Bakers v. Network Assoc., Inc.,* C 01-0856; *Denigris v. Network Assoc., Inc.,* C 01-20170; *Lam v. Network Assoc., Inc.,* C 01-20183; *Morales v. Network Assoc., Inc.,* C 01-1575.

## I. PARTIES

### A. The Class and Lead Plaintiff

The Class consists of all persons who purchased NAI common stock on the open market between April 15, 1999 and December 26, 2000 (the "Class [*5] Period"). n5 Lead Plaintiff is a public pension fund system organized for the benefit of current and retired teachers of the State of Louisiana. Plaintiff purchased 645,400 shares of NAI common stock during the class period and suffered damages as a result of Defendants' alleged securities laws violations. FACC P 13.

n5 Excluded from the Class are





"[Defendants]; members of the families of each of the Individual Defendants; any parent, subsidiary, affiliate, partner, officer, executive or director of [Defendants]; any entity in which any such excluded person has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity." FACC P 20.

### B. Defendants

#### 1. The Company

NAI is engaged in the business of manufacturing and marketing a variety of network security and network management products. *Id.* P 26. The Company's two flagship products are its McAfee anti-virus software and Sniffer network fault and performance management software product [*6] lines. *Id.*

NAI derives its revenue from (1) product licenses and (2) support and service. *Id.* P 27. The Company's licensing revenue includes income from product licenses marketed indirectly through distributers and resellers, and directly to end-users located around the world. *Id.* Throughout the Class Period, product revenue accounted for approximately 70% of the Company's total revenue, while support and service revenue accounted for approximately 30% of the Company's revenue. *Id.* The majority of its revenue is derived from sales to end-users through intermediaries, including distributors and resellers. *Id.* P 28. n6 Ingram Micro is the Company's largest distributor, accounting for more than 20% of NAI's revenue during the Class Period. *Id.* n7

> n6 NAI also markets its products to end-users through its North American Direct Sales Force and International Sales Force. FACC P 28.

> n7 No other customer accounted for more than 10% of the Company's total revenue during the Class Period. FACC P 28.

[*7]

#### 2. Individual Defendants

Larson joined NAI in 1993. He served as the Company CEO and Chairman throughout the Class Period. The company announced Larson's termination on

December 26, 2000. *Id.* P 15(a).

Goyal joined NAI in 1996. *Id.* P 16(a). He served as the Company's CFO and Vice President of Financial Administration throughout the Class Period and was terminated in January 2001. *Id.* P 16(a), (o).

Davis joined NAI in 1998 as Director of Taxes, Corporate Controller, and Senior Vice President of Finance. In January 2001, he was named CFO of the Company, a position he held until April 2001. He continued as Controller and Senior Vice President of Finance until February 2002, when he left the Company. *Id.* P 18(a). n8

> n8 The FACC also alleges misconduct by Peter Watkins, NAI's COO and President. *Id.* P 17. However, Plaintiff voluntarily dismissed all claims against Watkins pursuant to Rule 41 of the Federal Rules of Civil Procedure.

## II. ALLEGATIONS

The basis for the alleged Exchange [*8] Act violations is twofold. First, Plaintiff asserts that, throughout the Class Period, Defendants orchestrated and actively participated in the following improper accounting practices in violation of Generally Accepted Accounting Principals ("GAAP"): (1) recognizing "made orders" (*i.e.*, orders placed by distributors in the last hours of a quarter, with the understanding that the distributors would return the product in the subsequent quarter for a full refund) (*id.* PP 3, 50-62); (2) recognizing revenue based upon receipt of non-binding and revokable "letters of intent" from customers to purchase the Company's products (*id.* PP 3, 63-72); (3) recognizing revenue from sales to resellers without deducting cash rebates promised to the reseller in "side agreements" equal to as much as 50% of the contract amount (*id.* PP 3, 63-72); (4) "backdating revenue" (*i.e.*, holding quarters open for as much as three weeks for the purpose of allowing revenue to be recognized from sales completed after the end of the quarter (*id.* PP 3, 73-77); (5) recognizing revenue from the shipment of defective products to customers, without accruing sufficient reserves for product returns ( [*9] *id.* PP 3, 78-86); and (6) recognizing revenue from "parking goods" for other





vendors (*i.e.,* improperly recognizing revenues from substantial fees extracted from other vendors in exchange for NAI agreeing to issue purchase orders for products that it had no intention of purchasing). *Id.* PP 3, 87-89. Second, Plaintiff contends that, during the Class Period, Defendants disseminated false and misleading statements concerning NAI's operation and its future prospects. *Id.* PP 5-8, 104-138.

According to Plaintiff, the Individual Defendants orchestrated and directed the fraudulent scheme to artificially inflate the Company's net revenue and income during the Class Period through improper accounting practices mentioned above. *Id.* PP 15, 16, 18, 106, 109, 112, 116, 120, 125, 131, 138. To effectively conceal these improper revenue recognition practices, Larson and Goyal allegedly directed Davis to hide millions of dollars in marketing and sales expenses, rebate payments to distributors, and increases in sales return reserves in the Company's tax reserve account. *Id.* PP 4, 15, 16. At the behest of Larson and Goyal, Davis also allegedly made false entries to the Company's [*10] general ledgers and tax accounts. *Id.* P 17.

Plaintiff contends that the Individual Defendants engaged in such conduct for the purpose of profiting from the McAfee.com initial public offering ("IPO") in December 1999. *Id.* PP 9, 15, 16, 168. In fiscal year ("FY") 1999, one month prior to the McAfee IPO, the Company granted Larson, Goyal (and former Defendant Watkins) options to purchase a total of 1,440,000 shares of McAfee.com common stock at an exercise price of $ 3.67 per share. n9 *Id.* PP 168. During the Class Period Larson's stock was valued at more than $ 25 million and Goyal's stock was valued at more than $ 11 million. *Id.* PP 15, 16. After the successful completion of the McAfee.com IPO, the Individual Defendants allegedly attempted to spin-off the Company's McAfee division in FY2000. *Id.* P 170. n10

---

n9 Larson was given the right to acquire 900,000 shares or 25% of the total option stock granted. Goyal was given the opportunity to purchase 360,000 shares or 10.3% of the total option stock granted. *See* FACC PP 15, 16, 168.

n10 To this end, Plaintiff alleges that the Defendants directed the Company to divide into four divisions in an effort to isolate and highlight McAfee's financial performance. FACC P 170.

[*11]

According to Plaintiff, the scheme began to unravel when, in late September 2000, NAI executives, including Larson and Goyal, met with executives of Ingram Micro. *Id.* P 140. At that meeting, Ingram Micro allegedly informed Defendants that it would not accept made orders during the fourth quarter of 2000 and would exercise its rights to return all of the made orders placed during the third quarter the same fiscal year. *Id.* P 141. Thereafter, one of NAI's executives, Chris Peterson ("Peterson"), purportedly exclaimed "I don't know what we're going to do" for the fourth quarter of FY2000. Then, on September 30, 2000, before the fourth quarter began, Peterson allegedly told his staff during a conference call that NAI would "not hit its numbers" for the fourth quarter. *Id.* P 141.

However, according to Plaintiff, NAI was unable to sustain the scheme and on December 26, 2000, it announced a net loss of $ 130 to $ 140 million on revenues of only $ 55 to $ 65 million for the fourth quarter of FY2000 -- far short of the expected $ 47 million in earnings on revenues of $ 242 million. *Id.* P 144. Furthermore, the Company announced that for FY2000 it expected to report consolidated [*12] revenue in the range of $ 742 to $ 752 million and a net loss of between $ 84 and $ 94 million. *Id.* The Company explained its revised expectations by pointing to a shortfall in sales due to an accounting change that affected the way the Company recorded sales (*i.e.,* a change in the Company's revenue recognition policies). Specifically, the Company announced it would no longer recognize sales of products to the Company's distributors, prior to the distributors' sale of the product to the end-user. *Id.* The Company also announced that it was replacing Larson and Goyal (as well as former Defendant Watkins). *Id.* P 149.

On December 27, 2000, the day after the Company's disclosure, the price of NAI's common stock closed at $ 4.56 per share-a 60% decline from the prior day's close and an 87% decline from its Class Period high of $ 37.19 per share. *Id.* P 9. Three days after the disclosure, on December 29, 2000, Plaintiff filed a class action complaint ("original complaint"). On September 24, 2001, Plaintiff filed a Consolidated Complaint ("CC"). *Id.* P 9. Subsequently, Defendants (with the exception of Davis who was not yet a party to the action) filed their





first motion [*13] to dismiss.

On April 25, 2002, before the Court decided Defendants' first motion to dismiss, the Company announced that it had discovered "accounting inaccuracies in its 1999 and 2000 financial statements requiring the restatement" of those financial results. *Id.* P 159. On May 17, 2002, the Company announced that it would restate its financials for fiscal years 1998, 1999, and 2000. *Id.* P 162. Then, on June 28, 2002, the Company filed with the SEC reports on Form 10Q/A and 10-KA to restate its statement of operations, statement of cash flows, and balance sheets for the fiscal years 1998, 1999 and 2000. *Id.* P 165. The restatements revealed that NAI concealed more than $ 65 million in reductions to net revenue and more than $ 24 million in operating expenses, thereby overstating the Company's reported net income by more than $ 28 million throughout the Class period. *Id.* P 5.

Plaintiff filed its FACC on September 30, 2002. The Court now considers Defendants' most recent motions to dismiss.

**LEGAL STANDARD**

**I. RULE 12(b)(6)**

[HN3] A *Rule 12(b)(6)* motion to dismiss tests the legal sufficiency of the claims asserted in the complaint. *Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337 (9th Cir. 1996).* [*14] Dismissal of an action pursuant to *Rule 12(b)(6)* is appropriate only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1482 (9th Cir. 1991).* The Court will dismiss the complaint or any claim in it without leave to amend only if "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987).*

[HN4] In determining a motion to dismiss, the Court must assume all factual allegations to be true and must construe them in the light most favorable to the non-moving party. *See North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 580 (9th Cir. 1983).* However, the Court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations. *See Western Mining Council v. Watt, 643 F.2d 618, 624*

*(9th Cir. 1981).* Further, the Court need not accept as true allegations that contradict facts that have been judicially noticed or by exhibit attached [*15] to a complaint. *See Sprewell v. Golden State Warriors, 266 F.3d 979, 988-89 (9th Cir. 2001).*

[HN5] In cases alleging violations of securities laws, motions to dismiss are subject to stricter standards because whether a statement or omission is misleading to potential investors "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact." *Fecht v. The Price Co., 70 F.3d 1078, 1080 (9th Cir. 1995)* (internal citations omitted). Thus, "only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Id. at 1081.*

**II. PLEADING STANDARDS**

**A. Rule 9(b)**

[HN6] Allegations of fraud must satisfy the requirements of *Federal Rule of Civil Procedure 9(b)* to survive a motion to dismiss. *Rule 9(b)* provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other [*16] condition of mind of a person may be averred generally." The intent of *Rule 9(b)* is to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs. *See Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).*

[HN7] *Rule 9(b)* applies to actions brought under the federal securities laws. *See Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1544 (9th Cir. 1994)*(en banc). To comport with *Rule 9(b)*, the complaint must allege the time, place and content of the alleged fraudulent representation or omission; the identity of the person engaged in the fraud; and also set forth the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions at issue] were false and misleading." *Id. at 1547-48.* Thus, plaintiffs must provide an explanation as to how an alleged statement or omission was false or misleading when made. *See id. at 1548.*

[HN8] The heightened pleading standard of *Rule*

Page 9

  

9(b) is not an invitation to disregard the requirement of simplicity, directness, and clarity of Federal Rule of Civil Procedure 8. See McHenry v. Renne, 84 F.3d 1172, 1178 (9th Cir. 1996). [*17] Every plaintiff filing a complaint in a federal district court must also prepare his complaint in conformity with Rule 8, which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief and that "each averment of a pleading shall be simple, concise and direct." See Fed. R. Civ. Pro. 8(a), (e).

### B. Private Securities Litigation Reform Act ("Reform Act")

[HN9] To survive a motion to dismiss, a complaint alleging fraud must meet the heightened pleading standards set forth in the Reform Act, in which Congress clarified and strengthened the particularity requirements of Rule 9(b) as applied in the context of federal securities class action lawsuits. See Zeid v. Kimberley, 973 F. Supp. 910, 914 (N.D. Cal. 1997), Congress enacted the Reform Act to end the practice of pleading "fraud by hindsight." In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999).

[HN10] The Reform Act requires that a complaint in a securities fraud action specify each false and misleading statement and why each statement is false and misleading. See 15 U.S.C. § 78u-4(b)(1)(B). [*18] If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts upon which the belief is formed. See id. It is not sufficient for a plaintiff's pleading to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate the plaintiff's claim. See Heliotrope General, Inc. v. Ford Motor Co., 189 F.3d 971, 979 (9th Cir. 1999)

[HN11] Moreover, the complaint must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. See 15 U.S.C. § 78u-4(b)(2). Finally, if the alleged materially false statement or omission is a "forward looking statement," the required level of scienter is actual knowledge and not recklessness. See 15 U.S.C. § 78u-5(c). A complaint that fails to comply with any of these requirements must be dismissed. See 15 U.S.C. § 78u-4(b)(3)(A).

**ANALYSIS n11**

N11 The Individual Defendants generally join NAI's motion. However, both Larson and Goyal submit additional briefing on the issue of scienter, and Davis submits additional briefing on the statute of limitations issue.

[*19]

## I. STATUTE OF LIMITATIONS

Before addressing the substance of the complaint, the Court must determine if any of the claims are time barred. [HN12] Claims instituted pursuant to Section 10(b) and Rule 10b-5, "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis, & Petigrow v. Gilbertson, 501 U.S. 350, 364, 115 L. Ed. 2d 321, 111 S. Ct. 2773 (1991).

### A. Expansion of the Class Period

### 1. One Year Limitations Period

Since Lampf, [HN13] every circuit to address the issue of when "discovery" of the facts underlying the claim is deemed to have occurred has held that inquiry notice is the appropriate standard. See Berry v. Valence Technology, Inc., 175 F.3d 699, 703-704 (9th Cir. 1999) (holding that a magazine article questioning the general viability of a company was not sufficient to put investors on notice of the specific possibility of fraud). Although the Ninth Circuit has not formally decided the issue, it has indicated that, if it were to adopt an inquiry notice standard, it would adopt the standard outlined by the Tenth Circuit in Sterlin v. Biomune Systems, 154 F.3d 1191 (10th Cir. 1998); [*20] "In Sterlin's formulation, 'inquiry notice ... triggers an investor's duty to exercise reasonable diligence and ... the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.'" See Berry at 704 (citing Sterlin, 154 F.3d at 1201). Given the Ninth Circuit's comments in Berry, as well as the adoption of an inquiry notice standard in several other circuits, the Court will apply the standard outlined in Sterlin to the matter currently before the Court.

In this case, NAI challenges the expansion of the Class Period backwards from July 19, 2000 to April 15,

Page 10

  

1999 under the one year statute of limitations. It contends that Plaintiff "discovered" the facts underlying the claim as of December 29, 2000--the date Plaintiff filed its original complaint. NAI Motion at 7:8-8:22. Yet, this complaint was based solely on NAI's announcement, on December 26, 2000, of a net loss of $ 130 to $ 140 million for the *fourth quarter of FY 2000*. FACC at P 144. At that point, Plaintiff was only on notice that there might have been some revenue recognition improprieties [*21] during the original Class Period--July 19 to December 26, 2000. The December 2000 announcement cannot be considered inquiry notice that such improprieties dated back to April 15, 1999--the beginning of the current Class Period. *See Berry*, 175 F.3d at 705 (the event must be "sufficient to 'excite inquiry' into the possibility of fraudulent conduct"). It was not until April 25, 2002, when NAI announced that it would be restating it financials for 1999 and 2000, that Plaintiff was put on notice that such improprieties might stretch back as far as April 15, 1999. Moreover, in this case, there is no gap between notice and discovery because the latter announcement was made in the midst of the current litigation. Therefore, the expanded portion of the Class Period falls squarely within the statutory time frame.

**2. Three Year Limitations Period and Relation Back**

**a) Claims**

Moreover, NAI contends that any claims relating to statements made in NAI's Form 10-K for FY 1998 ("1998 10-K")(dated April 15, 1999) are time barred because the document was released more than three years prior to the filing of Plaintiff's FACC on September 30, 2002. *See Lampf*, 501 U.S. at 364. [*22] Plaintiff counters that such claims relate back to the claims asserted in it's CC, n12 filed on September 24, 2001.

n12 It is actually unclear from Plaintiff's papers whether it is arguing that the claims relate back to the CC or the original complaint filed in December 2000. However, for purposes of Plaintiff's relation back argument, the new claims need only relate back to the CC.

[HN14] Rule 15(c)(2) of the Federal Rules of Civil Procedure provides: "An amendment of a pleading relates back to the original pleading when ... the claim or defense

asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading ...." Rule 15(c) is liberally applied (*E.E. French & Sons, Inc. v. General Portland*, 885 F.2d 1392, 1396 (9th Cir. 1989)); "the basic inquiry is whether the opposing party has been put on notice about the claim or defense raised by the amended pleading." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982).

Here, [*23] Plaintiff's CC and FACC consist of nearly identical causes of action based on a similar set of operative facts. The primary difference between the two pleadings is temporal rather than substantive; Plaintiff simply expands the Class Period backwards based on NAI's restatement of its financials for 1998, 1999, and 2000. Even NAI admits that there is a "strong nexus between the allegations contained in the [CC and the FACC]." NAI Motion at 8:9-10. Therefore, all of the claims in the FACC, including those based on 1998 10-K, relate back the CC--filed on September 24, 2001--and are well within the three-year statute of limitations.

**b) New Class Members**

NAI also argues that the new class members do not share sufficiently similar interest with the members of the original class. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996) [HN15] (an amendment adding a party plaintiff relates back to the original pleading only when "there is an identity of interests between the original and newly proposed plaintiff"). n13 Specifically, they contend that (1) members of the original plaintiff class will seek to secure for themselves a higher percentage of any recovery [*24] for Defendants' alleged fraud, and (2) because the new class members purchased the stock at a higher average price than the original class members, there will be conflicting views about whether the purported inflation in NAI's stock price (and therefore class damages) should be calculated on an absolute or percentage basis. See Supplemental Brief at 3:6-23. These arguments fail for the following reasons.

n13 [HN16] The party seeking to amend must also show that (1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff, and (2) relation back does not unfairly prejudice the defendant. *In re Syntex Corp. Sec. Litig.*, 95 F.3d at 935. However, these additional factors are uncontested in this instance.

  

First, the claims of the new class members are based on the same underlying allegations as the original class members (*i.e.*, fraudulent accounting practices and misleading statements). More importantly, all of the claims are based on the same December 2000 [*25] disclosure and subsequent stock drop. *Compare Syntex, 95 F.3d at 935* ("the claims of the proposed plaintiffs are different because [they] bought stock at different values *and after different disclosures and statements were made by Defendants and analysts*") (emphasis added). In other words, the claims of the new class members are not based on the fallout from the financial restatements for 1998-2000. Therefore, the Court finds that the new class members share sufficiently similar interests with the original class members to allow relation back claims relating to NAI's 1998 10-K. n14

> n14 NIA also points out that the Court did not reexamine whether the Teachers' Retirement System of Louisiana is the appropriate lead plaintiff. *See* NAI's Supplemental Brief at 4:6-5:4. However, because the parties stipulated to Plaintiff's filing an amended complaint, the Court was never properly presented with this issue. Therefore, if Plaintiff wishes to challenge the adequacy of the current Lead Plaintiff, it may do so through a formal motion.

[*26]

**B. Defendant Davis**

Defendant Davis, who is named as a defendant for the first time in FACC, submits additional briefing with respect to the statute of limitations issue. He contends that (1) all claims arising before September 30, 1999 are time barred; (2) and that Plaintiff fails to meet the standard for relation back under <u>Rule 15(c)</u>. *See generally* Davis Reply. The parties agree that the resolution of both of these issues turns on a determination of whether the claims against Davis relate back to the CC.

[HN17] The Supreme Court has identified four criteria which must be met in order for an amendment naming an additional party to relate back to the filing of the original pleading pursuant to <u>rule 15(c)</u>:

(1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must be fulfilled within the prescribed limitations period.

*Schiavone v. Fortune,* 477 U.S. 21, 29, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986). [*27]

Here, there is no question that Plaintiff knew about Davis when it filed its CC. In fact, the CC specifically mentions Davis: "Goyal and ... Davis met with the CEO of Ramp Networks, Mahesh Veerina. During this meeting Veerina asked Goyal if Ramp Networks could ship $ 2 million in product to [NAI], which [NAI] could return to Ramp during the next quarter for a full refund." *Id.* P 13(g). [HN18] Relation back is only allowed for a mistake in identity, not liability. *See Louisiana-Pacific Corp. v. ASARCO, Inc.,* 5 F.3d 431, 434 (9th Cir. 1993); *see also Powers v. Graff,* 148 F.3d 1223, 1228 (11th Cir. 1998) (plaintiff sued company for securities fraud; the court rejected plaintiff's attempt to amend to add the officers and directors of the company after the statute of limitations had run because plaintiff knew the identities of the officers and directors when the original complaint was filed). Because Plaintiff knew Davis' identity when the CC was filed, the claims against him in the FACC cannot relate back.

Therefore, the claims against Davis arising prior to September 30, 1999 are barred by Lampf's three year limitations period, and the claims arising [*28] during the original class period (July 19, to December 26, 2000) are barred by the one year limitations period. However, those claims arising after September 30, 1999 but before July 19, 2000 fall within the limitations period and are not barred.

**II. PLEADING REQUIREMENT UNDER THE REFORM ACT**

[HN19] Under the <u>Reform Act</u>, a private securities plaintiff must "state with particularity all facts that give

Page 12

  
™ LexisNexis™    ™ LexisNexis™    ™ LexisNexis™

rise to a 'strong inference' of the required state of mind." *In re Silicon Graphics Inc. Sec. Litig.* 183 F.3d 970, 983 (9th Cir. 1999) (emphasis added); *see also* 15 U.S.C. § 78u-4(b)(2). "In order to create a strong inference of the required state of mind, [a plaintiff] must state with particularity facts demonstrating deliberate recklessness. In order to plead 'with particularity,' [a plaintiff] must provide all the facts forming the basis of her belief in great detail." *Id.* n15

n15 Plaintiff does not profess to have personal knowledge of the allegations it asserts; hence, the FACC is presumed to be pled on "information and belief." *See In re Autodesk, Inc. Sec. Litig.* 132 F. Supp.2d 833, 839 (N.D. Cal. 2000) ("allegations of misrepresentation not made on personal knowledge are presumed to have been made on information and belief").

[*29]

Plaintiff contends that Defendants made "false and misleading statements" and engaged in "deceptive practices" in violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), n16 and Securities and Exchange Commission ("Exchange Commission") Rule 10b-5, 17 C.F.R. § 240.10b-5. n17 FACC PP 175-181. n18

n16 [HN20] Section 10(b) of the Exchange Act provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance incontravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

n17 [HN21] Exchange Commission Rule 10b-5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any

untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

[*30]

n18 Plaintiff also contends that the Individual Defendants violated Rule 20(a) of the Exchange Act, 15 U.S.C. 78t(a), because they directly or indirectly controlled NAI and "had the power and authority to cause the Company to engage" in the alleged "wrongful conduct." *See* FACC PP 181-183 (there are two paragraphs labeled 181). [HN22] Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." In order to plead a claim under 20(a), the plaintiff must allege "(1) that a 'primary violation' of Rule 10b-5 or other provision was committed and (2) that each defendant 'directly or indirectly' controlled the violator." *See In re Cylink Secs. Litig.* 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001). The Individual Defendants do not contest that they were in control of NAI during the Class Period.

[*31]

### A. Pleading with Particularity

### 1. False Statements

On April 25, 2002, NAI announced that it had discovered "accounting inaccuracies in its 1999 and 2000 financial statements requiring the restatement" of those financial results. *Id.* P 159. The Company reported that it was "conducting an internal investigation under the





direction of the Audit Committee of its Board of Directors to determine the scope and magnitude of these inaccuracies." *Id.* On May 17, 2002, the Company announced that its Audit Committee had completed its internal investigation and as a result the Company would be forced to restate its statement of operations and balance sheet for fiscal years 1998, 1999 and 2000. *Id.* P 162.

On or about June 28, 2002, the Company filed with the SEC reports on Form 10Q/A and 10-KA to restate its statement of operations, statement of cash flow, and balance sheet for fiscal years 1998, 1999, and 2000. The Company announced in a press release that the restatements reflected "the findings of the Company's internal accounting investigations conducted under the direction of [NAI's] Audit Committee." *Id.* P 165. Specifically, the Company's restatement revealed that [*32] NAI concealed more than $ 65 million in reductions to net revenue and more than $ 24 million in operating expenses, thereby overstating the Company's reported net income by more than $ 28 million throughout the Class Period. FACC P 5; *see also* FACC PP 34-38 (detailing the results of the restatements). n19

n19 Plaintiff also offers confidential witness accounts which, according to Plaintiff, provide detail concerning the Company's falsified financial results. *See* FACC PP 39-49. These accounts state that the Individual Defendants acted purposefully to hide expenses and reductions in revenue, even going so far as to falsify financial results. However, these confidential witness accounts are not pled with sufficient particularity (*see* analysis below).

Defendants do not--nor could they--contest that these allegations are pled with sufficient particularly; the restatements are public record. However, it cannot be assumed, based solely on these restatements, that Defendants engaged in all of the fraudulent [*33] revenue recognition practices alleged by Plaintiff. These allegations must be analyzed separately.

**2. Improper Revenue Recognition Practices**

**a) Confidential Witnesses**

Aside from the financial restatements, Plaintiff's claims of specific accounting fraud are based solely on the accounts of confidential witnesses. However, these accounts fall short of pleading standard mandated by the Reform Act.

To begin, Plaintiff fails to offer any specific information about the nature of the confidential witnesses' employment with the Company or the basis of these witnesses' knowledge. Plaintiff simply lists the confidential witness by job title (*i.e.,* "A former Regional Manager") and then proceeds to recite the witnesses' account. For example, the FACC states: "A former Vice President of Managed Services stated that during the Class Period, Larson would hold 'high-level Business Review' meetings in the final week of each quarter, attended by the Individual Defendants, and if the Company was short of its forecasted revenues, defendant Larson would direct the sales force to enter into 'bogus deals' with Ingram Micro ...." FACC P 51. This account does not state, with any specificity, [*34] facts relating to the nature and scope of the witnesses' position with the company, *e.g.,* (1) how long did he/she work for the Company; (2) what did his/her position entail; (3) in which division of the Company did he/she work; (4) to whom did he/she report? Nor does it describe how the confidential witness became privy to such information--did he/she attend the meetings in question or did a third-party inform him/her of Larson's alleged statements? Other confidential witness testimony is described in a similarly vague fashion. n20 Confidential witness accounts of this nature are insufficient to support a claim under the Reform Act. *See* In re Northpoint Communications Group, Inc. Sec. Litig., 184 F. Supp.2d 991, 1000 (N.D. Cal. 2001) (granting a motion to dismiss where "the complaint [did] not discuss what the specific duties of [the] individuals were or how they came to learn of the information they provide in the complaint"); *see also* Berger v. Ludwick, 2000 U.S. Dist. LEXIS 12756, 2000 WL 1262646 at *5-7 (N.D. Cal. 2000) (listing the names of the former employees and their experiences does not meet "the particularity or the strong inference requirements of the [Reform [*35] Act] and [Silicon Graphics] in order to make a sustainable cause of action"); Coble v. Broadvision, Inc., 2002 U.S. Dist. LEXIS 17495, 2002 WL 31093589 at *6 (N.D. Cal. 2002) (finding allegations silent as to the basis of the witnesses' knowledge are "entitled to little weight").

n20 In another example, the FACC states: "A





former Inside Sales Representative and a former Regional Manager explained that as a general rule, the Company's sales force was required to obtain purchase orders from the end-users and place those orders with resellers, which in turn would place a purchase order with the Company." FACC P 64. Further, the FACC provides: "A former Vice President of Manager Services explained in detail that Defendants caused the Company to improperly recognize revenues reflecting substantial fees extracted from other vendors in exchange for [NAI] agreeing to issue purchase orders for products that [NAI] had no intention of purchasing." *Id.* P 87. Again, Plaintiff offers no specific information about these witnesses or the basis of their knowledge.

[*36]

Moreover, Plaintiff does not distinguish between and among confidential witnesses (*i.e.,* confidential witness 1, confidential witness 2, etc.), so that the Court can determine which confidential witness is alleging which facts. *Compare, e.g., Northpoint Communications Group* (refers to confidential witnesses by job title and specific number); *Autodesk* (same). Rather, Plaintiff simply refers to each confidential witness by job title only (*i.e.,* "a former District Account Manager"). Thus, it is unclear, for example, whether the "former District Account Manager" referenced in paragraph 15(h) is the same person as the "former District Account Manager" discussed in paragraphs 16(j), 50, and 50-56 (total of 15 references). *See also* FACC PP 15(g), 15(k), 63, 65-66, 71-73, 76 (fourteen references to "a former Corporate Controller" and "a former Controller"); FACC PP 15(j), 16(h), 64, 71-72, 75, 78, 81-84, 86 (thirteen references to "a former Regional Manager").

In sum, the ambiguous nature with which the confidential witnesses and the basis of their knowledge are described does not comport with the heightened pleading standards under the <u>Reform Act</u>. Thus, even assuming [*37] the actual assertion made by the confidential witnesses are pled with sufficient particularity, the Court would still be required to grant the motion to dismiss based on the above analysis above. However, for the sake of completeness, the Court will briefly address Plaintiff's allegations of accounting fraud.

**b) Specific Revenue Recognition Practices Alleged**

to be Improper

[HN23] GAAP are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. *See <u>Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1304 (C.D. Cal. 1996).</u>* As such, recognition of revenues in violation of GAAP can constitute a false or misleading statement of material fact that gives rise to an action for securities fraud. *See generally id.* However, the failure to follow GAAP is not, in and of itself, sufficient to establish a violation of the <u>Exchange Act</u>. *See <u>Dannenberg v. PaineWebber Inc. (In re Software Toolworks Sec. Litig.), 50 F.3d 615, 627-28 (9th Cir. 1994).</u>*

[HN24] To plead financial fraud for improper revenue recognition, Plaintiff must allege "particular transactions where revenues were improperly recorded, including the names of [*38] customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions." In re Oak Technology Sec. Litig., 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168 at *8 (N.D. Cal. 1997); *see also <u>In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)</u>*(stating that the plaintiffs should provide "such basic details as the approximate amount by which revenues and earnings were overstated ... the products involved in the contingent transactions ... the dates of any of the transactions ... or ... the identities of any of the customers or [company] employees involved in the transactions") (internal citation and quotation omitted).

Here, Plaintiff alleges Defendant engaged in six forms of revenue recognition which it asserts violate GAAP and establish, for pleading purposes, affirmative fraud: (1) recognizing "made orders" (*i.e.,* orders placed by distributors in the last hours of a quarter, with the understanding that the distributors would return the products in the subsequent quarter for a full refund) (*see id.* PP 3, 50-62); (2) recognizing revenue based upon receipt of non-binding and revokable [*39] "letters of intent" from customers to purchase the Company's products (*id.* PP 3, 63-72); (3) recognizing revenue from sales to resellers without deducting cash rebates promised to the reseller in "side agreements" equal to as much as 50% of the contract amount (*id.* PP 3, 63-72); (4) "backdating revenue" (*i.e.,* holding quarters open for as much as three weeks for the purpose of allowing revenue to be recognized from sales completed after the end of the





quarter (*id.* PP 3, 73-77); (5) recognizing revenue from the shipment of defective products to customers, without accruing sufficient reserves for product returns (*id.* PP 3, 78-86); and (6) recognizing revenue from "parking goods" for other vendors (*i.e.,* improperly recognizing revenues from substantial fees extracted from other vendors in exchange for NAI agreeing to issue purchase orders for products that it had no intention of purchasing). *Id.* PP 3, 87-89. The Court will address each of these allegations in turn.

**Made Orders.** In its FACC, Plaintiff alleges: "At the end of each quarter during the Class Period, Larson ... directed defendant Goyal to arrange for the Company's largest distributor, Ingram [*40] Micro, to issue purchase orders for hundreds of Network Associates' products in the last hours of the quarter, in an effort to meet revenue and earnings targets, and with the knowledge that Ingram Micro would return these products for a full refund in the following quarter." *Id.* P 15(h). NAI argues that Plaintiff's claims are not sufficient to state a claim for improper revenue recognition. n21

n21 NAI does not, however, argue that such allegations are pled with insufficient detail.

First, NAI contends that these claims cannot be considered sufficiently particularized because they are internally inconsistent. Throughout the FACC, Plaintiff offers several confidential witness accounts describing the magnitude of the alleged made order scheme in general terms which are not exactly consistent with on another. *See, e.g., id.* PP 51 ("'bogus orders' typically consisted of hundreds of purchase orders from Ingram Micro that together represented as much as $ 50,000,000-$ 75,000,000 in quarterly revenue"); 53 (NAI [*41] "would receive five to ten 'big invoices' from Ingram Micro for 'Made Orders' commutatively worth in excess of $ 10,000,000"). However, NAI offers no support for the proposition that all confidential witnesses have to state the exact same facts. More importantly, Plaintiff does offer some concrete examples of situations in which made orders were placed. *See, e.g., id.* PP 54 (describing a specific made order in the third quarter of 1999 involving Ingram Micro and McBride & Associates); 57 (describing in detail a made order in the third quarter of 2000 involving Ingram Micro). Thus, Plaintiff's claims with regard to made orders are pled with sufficient particularly.

However, NAI also points to the fact that Plaintiff never actually alleges that Ingram Micro returned *all* of the made orders it allegedly placed. *Id.* PP 54, 59, 60. Moreover, even assuming all of the goods were returned, the proper inquiry, in terms of determining whether NAI improperly recognized revenue, is whether the Company's reserves were sufficient to cover such returns. The FACC is silent on this point and thus inadequate. *See Ree v. Pinckert,* No. C 99-0562 MMC at 15 (N.D. Cal. 2000) ("even if plaintiffs [*42] showed that the 'deals' involved rights of return, plaintiffs fail to allege with specificity that defendant did not properly reserve for returns").

**Letters of Intent and Side Agreements.** The FACC states that "throughout the Class Period, the company recognized revenue on agreements with end-users that were based on contingent, non-binding and revokable Letters of Intent." *Id.* P 63. The FACC further states that "the Company recognized the full amount of the purchase order in revenue, despite the fact that as much as 50% of this revenue would be rebated to the seller in the subsequent quarter." *Id.* P 68.

However, the FACC overwhelmingly discusses letters of intent and side agreements in general terms. *See, e.g., id.* PP 66 ("a former Inside Sales Representative, a former Corporate Account Manager and a former Account Executive confirmed that the use of the Letters of Intent to recognize revenue was so common at [NAI] that the Company developed its own Letter of Intent 'template' to provide as a substitute for a binding and enforceable end-user purchase order") 70 ("throughout the Class Period, the Individual Defendants instructed [NAI's] sales manages to enter [*43] orders based on Letters of Intent from end users ..."). In fact, Plaintiff offers only one example of a single customer issuing a revocable letter of intent: "A former Regional Account Manager identified Compuware as one of the Company's resellers that issued Letters of Intent." *Id.* P 65. However, even this example does not offer any specific information about the transactions (*e.g.,* dates and terms of the transaction). This is inadequate under the Reform Act. *See* Oak Technology, 1997 U.S. Dist. LEXIS 18503, 1997 WL 448168 at *8.

**Backdating Revenue (*i.e.,* Holding Quarters Open).** Plaintiff further contends that "the Company improperly recognized revenue in a particular quarter, even though the actual sales were not completed and the





prerequisite for revenue recognition in conformity with GAAP had not been satisfied until the subsequent quarter." FACC P 73.

Although most of the claims relating to backdating are stated general, Plaintiff does offer specific examples of when and how long the second and third quarters of FY2000 were held open. For example, the FACC states: "The second quarter of fiscal 2000 was held open until at least 10:00 a.m. on the first day of the third quarter [*44] of fiscal 2000 ...." Id. P 76. The same paragraph also states that "the third quarter of fiscal 2000 was kept open until as late as, if not later than, October 6, 2000, despite the fact that the Company publically reported to investors that the third quarter of fiscal 2000 had closed on September 30, 2000." However, Plaintiff fails to make any allegations relating to specific transactions that occurred during these periods. Thus, these claims are also insufficient to state a claim under the pleading requirements of the Reform Act.

**Defective Products.** Plaintiff alleges that "the Company inflated its revenues throughout fiscal 2000 by selling the E100 product to customers that the defendants knew was defective and would be returned." Id. P 78. NAI challenges the sufficiency of this claim on the ground that Plaintiff does not provide any detail to support such an allegation. NAI Motion at 18:20-19:10. In its FACC, Plaintiff alleges that: (1) the E100 was defective (id. PP 79-80); (2) Defendants knew about the problem and anticipated returns (id. PP 81-82, 85); (3) Defendants continued to push the product (id. PP 83-84); and (4) that hundreds of E100s were returned [*45] (id. PP 85-86). However, Plaintiff does not offer any details about specific transactions involving E100s (i.e., who purchased the product; how many units were purchased; and what the terms of the agreements were?). Therefore, Plaintiff fails to state a claim based on the sale of the allegedly defective E100 product.

**Parking Goods.** Finally, Plaintiff alleges that "the Company improperly recognized revenues reflecting substantial fees extracted from other vendors in exchange for [NAI's] agreeing to issue purchase orders for products that [it] had no intention of purchasing." Id. P 87. For example, Plaintiff alleges that, in August 2000, a third party called Ramp Networks and asked NAI whether it could ship $ 2 million in product to NAI, which NAI could return the following quarter for a full refund. Id. at P 87. Plaintiff contends that Goyal assented to the

request, but demanded a fee of $ 500,000 to park the inventory. Id. at 89. This, according to Plaintiff, is a violation of GAAP. However, even assuming Goyal's actions represent a GAAP violation, the $ 500,000 allegedly received represents less than 0.21% of NAI's third quarter 2000 revenues of $ 226.2 [*46] million. This amount is immaterial and therefore insufficient to state a claim under the Exchange Act. See Greebel v. FTP Software, Inc. 194 F.3d 185, 206 (1st Cir. 1999) ("at best, plaintiffs' additional evidence supports an inference that [the company] improperly recognized from $ 416,000 to $ 1.55 million in revenue in the third quarter of 1995. Because [the company] reported overall revenue during the quarter of $ 37.1 million, these transactions do not support a strong inference of scienter."). Thus, Plaintiff also fails to state a claim for improper revenue recognition in this regard.

In sum, Plaintiff has failed to state a claim with regard to any of the alleged fraudulent accounting practices.

## B. Scienter

[HN25] Scienter is a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). Scienter may be established in a number of ways, employing both direct and circumstantial evidence. See Provenz v. Miller, 95 F.3d 1376, 1388 (9th Cir. 1996). One way to establish scienter is to show motive and opportunity. See In re Wells Fargo Sec. Litig., 12 F.3d 922, 931 (9th Cir. 1993). [*47] Another is to provide evidence of reckless or deliberate behavior. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569-70 (9th Cir. 1990)

As previously mentioned, [HN26] "in order to create a strong inference of [scienter, a plaintiff] must state with particularity facts demonstrating deliberate recklessness." Silicon Graphics, 183 F.3d at 983. In evaluating whether a plaintiff has pled facts giving rise to a strong inference of fraudulent intent, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." See Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002). n22

n22 Both Larson and Goyal submit additional briefing on the issue of scienter.

Page 17

 

Plaintiff argues that scienter is demonstrated by: (1) the financial restatements for fiscal years 1998, 1999, and 2000 (FACC P 167); (2) the Individual Defendants' motivation to profit from the McAfee.com IPO (*id.* PP 168-169); and [*48] (3) the Individual Defendants' attempt to spin-off the Company's MacAfee division (*id.* PP 170-172). n23 The Court will address each of these contentions in turn.

n23 Plaintiff also argues that scienter is illustrated through the accounts of the confidential witnesses. However, the Court has already determined that these claims are not pled with the requisite specificity.

### 1. Financial Restatements n24

n24 NAI "concedes ... the sufficiency of plaintiff's section 10(b) claims arising from the tax restatement ...." NAI Reply at 9, n.5.

The Individual Defendants do not--nor could they--contest that they were control persons within the meaning of section 20(a) of the Exchange Act; each of them held high level positions within the Company. n25 *See* In re Adaptive Broadband Sec. Litig., 2002 U.S. Dist. LEXIS 5887, 2002 WL 989478, *19 (N.D. Cal. 2002) [*49] ("the fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage" to state a claim that a defendant was a control person under section 20(a) of the Exchange Act). Nor can they contest the materiality of the financial restatements.

n25 Larson was the CEO and Board Chairman, Goyal was the CFO and Vice President of Financial Administration, and Davis held a number of high-level finance positions with the Company. FACC P 15-17.

However, the mere fact that NAI restated its financials for these years is not enough to create the necessary strong inference of scienter. *See* Northpoint Communications Group, 184 F. Supp.2d at 998 ("with accounting fraud ... the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles. More is needed.") (citing In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994)); [*50] *see also* In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 2002 U.S. Dist. LEXIS 23853 at *11 (N.D. Cal. 2002) ("the restatement of earnings that resulted, in part, because of these alleged GAAP violations do not raise a strong inference of scienter because there are no particularized allegations suggesting Defendants knew of these violations"). Nor [HN27] is it sufficient for Plaintiff to allege the documents evidencing the inaccurate financial statements were approved and signed by defendants Larson and Goyal" and approved by defendant Davis (*see, e.g.,* FACC PP 115, 115, 130). Plaintiff must show that the signing of these statements was "highly unreasonable" and constituted "an extreme departure from standards of ordinary care ...." Hollinger, 914 F.2d at 1570. Plaintiff's allegations fail to meet this standard; thus, the Court cannot find that the Individual Defendants acted with the requisite scienter. n26

n26 In *In re McKesson HBOC, Inc., Securities Litigation*, 126 F. Supp.2d 1248 (N.D. Cal. 2000), plaintiff's scienter allegations regarding the former executives passed muster, not only because there was a series of earnings restatements, but also because the complaint alleged admissions by the company that the former executives had knowingly participated in the improper inflation of revenues. *Id.* at 1273-6. In *McKesson,* the allegations were supported by the accounts of confidential witnesses, which the court found to be sufficiently detailed. *See id.* at 1271. In this case, the accounts of confidential witnesses are not pled with sufficient particularity.

[*51]

### 2. McAfee.com IPO

Plaintiff also argues that the "Individual Defendants' scienter is ... evidenced by their motivation to profit from the McAfee.com IPO ...." FACC P 168. In support of this contention, Plaintiff points to the fact that, in FY 1999, months prior to the McAfee IPO, the Company granted Larson, Goyal (and former Defendant Watkins) options





to purchase a total of 1,440,000 shares of McAfee.com common stock at an exercise price of $ 3.67 per share. n27 *Id.* PP 168. During the Class Period Larson's stock was valued at more than $ 25 million and Goyal's stock was valued at more than $ 11 million. *Id.* PP 15(n), 16(n).

> n27 Larson was given the right to acquire 900,000 shares or 25% of the total options granted; Goyal was given the opportunity to purchase 360,000 shares or 10.3% of the total options granted. *See* FAC PP 15(n), 16(n), 168. There are no allegation that Davis was ever given any stock options.

[HN28] In determining when the sale of stock is suspicious or unusual in the context of [*52] insider trading, Courts consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). Here, there are no allegations in the FACC that Goyal or Larson sold any stock during the Class Period or on any other occasion. However, in its motion, NAI admits that Larson sold 300,000 shares of stock in 1999 (15.5% of his total exercisable holdings), and another 300,000 shares in 2000 (14.5% of his total exercisable holdings).

Here, Larson's sale of a relatively small percentage of his stock is not sufficient to raise suspicion. *See id.* (CEO's sale of 10% and 17% of stock not suspicious). In addition, there are no allegations that these sales were out of line with Larson's previous stock activity. In fact, the sales themselves are consistent from year-to-year. *See In re Nike, Inc. Sec. Litig.*, 181 F. Supp.2d 1160, 1169 (D. Ore. 2002) (stock sales "not out of line with prior practices" not suspicious). Therefore, the McAfee.com IPO and related stock options do not indicate scienter on

[*53] the part of the Individual Defendants.

### 3. McAfee Spin-Off

Plaintiff also contends that the Individual Defendants directed the Company to divide into four divisions in an effort to isolate and highlight McAfee's financial performance. FACC P 170. However, Plaintiff does not offer any additional evidence that the Company actually intended to spin-off the McAfee division or how such a spin-off would be profitable to the Individual Defendants. n28 Thus, Plaintiff's allegation relating to the alleged spin-off of the McAfee division is not sufficient to state a claim that the Individual Defendants acted with the requisite mind state.

> n28 Plaintiff contends that the Individual Defendants wanted to duplicate their success with the McAfee.com IPO. *See* FACC P 170. However, there is no indication that the Individual Defendants were granted any stock options related to this alleged spin-off of the McAfee division.

### CONCLUSION

For the reasons stated above, Defendants' motions are **GRANTED**. The only [*54] claims that remain are those against NAI based on the financial restatements for fiscal years 1998, 1999, and 2000.

**IT IS SO ORDERED.**

Dated: March 25, 2003

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE





# EXHIBIT H

LEXSEE



Analysis
As of: Mar 08, 2007

**ISRAEL SHURKIN, On Behalf of Himself and All Others Similarly Situated, Plaintiff, v. GOLDEN STATE VINTNERS INC., JEFFREY J. BROWN, JEFFREY B. O'NEILL ACQUISITION CO., LLC, and HANK UBEROI, Defendants.**

No. C04-03434 MJJ

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2006 U.S. Dist. LEXIS 94900**

**December 30, 2006, Decided**
**December 30, 2006, Filed**

**PRIOR HISTORY:** Shurkin v. Golden State Vintners, Inc., 2005 U.S. Dist. LEXIS 39301 (N.D. Cal., Aug. 10, 2005)

**CORE TERMS:** per share, press release, proxy, misleading, stock, scienter, investors, merger, shareholder, projections, reverse split, omission, stockholder, customer, acquisition, stock split, efendants, falsity, deliberately, bottling, misrepresentation, suspended, improved, bid, judicial notice, proxy statement, write-down, trading, earnings, bidding

**COUNSEL:** [*1] For Israel Shurkin, on behalf of himself and all others similarly situated, Plaintiff: Dennis J. Herman, LEAD ATTORNEY, Darren J. Robbins, William S. Lerach, Willow E. Radcliffe, Tricia Lynn McCormick, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.

For Golden State Vintners Inc, Defendant: Dylan B. Carp, LEAD ATTORNEY, Kirkpatrick & Lockhart Preston Gates Ellis LLP, San Francisco, CA.; Jonathan M. Cohen, LEAD ATTORNEY, Winston & Strawn LLP, San Francisco, CA.; William N. Hebert, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Palo Alto, CA.

For Jeffrey J. Brown, Defendant: C. Brandon Wisoff, LEAD ATTORNEY, Farella Braun and Martel LLP, San Francisco, CA.;

For Jeffrey B. O'Neill, O'Neill Acquisition Co. LLC, Defendants: Christine R. Chobot, Jonathan C. Dickey, Michael B. Smith, Paul J. Collins, Gibson, Dunn & Crutcher LLP, Palo Alto, CA.

For John G. Kelleher, Defendant: C. Brandon Wisoff, LEAD ATTORNEY, Farella Braun and Martel LLP, San Francisco, CA.

For Hank Uberoi, Defendant: Steven Sherr, LEAD ATTORNEY, Howard, Rice, Nemerovski, Canady, Falk, San Francisco, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:** [*2]

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE**

Page 1





Pending before the Court are: (1) Defendants Golden State Vintners, Inc. ("GSV" or "the Company"), Jeffrey J. Brown, Jeffrey B. O'Neill, John G. Kelleher and O'Neill Acquisition Co., LLC's ("the O'Neill Group" or "OAC") Motion to Dismiss (Doc. #40); and (2) Defendant Frank Uberoi's Motion to Dismiss (Doc. # 39) n1 Plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws. Plaintiff Israel Shurkin has filed Oppositions to both Motions, to which Defendants filed Replies. For the following reasons, the Court **GRANTS** Defendants' Motions and dismisses Plaintiff's Amended Complaint **WITHOUT PREJUDICE.**

n1 For the purposes of judicial economy, the Court addresses both motions in this Order.

# I. BACKGROUND

## A. The Parties

Plaintiff brings this lawsuit on behalf of himself and as class representative for a purported class of all purchasers of GSV stock between December 23, 2003 and April 23, 2004, asserting [*3] claims against Defendants for violations of sections 10(b), 20A, and 20(a) of the Securities and Exchange Act of 1934 ("the Act"), and Rule 10-5 promulgated thereunder. Simply stated, Plaintiff alleges that Defendants employed a scheme to take GSV private at an artificially deflated price by misleading investors about the Company, and when that scheme was derailed by The Wine Group's ("TWG") competing acquisition offer, concealed the ensuing bidding war for control of GSV. (Amend. Compl. P 2.)

Defendant Jeffrey Brown was chairman of GSV's Board of Directors from April 1995, until TWG purchased GSV in July 2005. Defendant Jeffrey O'Neill was President, CEO, and a director of GSV prior to its sale to TWG. Defendant John Kelleher was GSV's CFO and Secretary prior to its sale to TWG. Defendant O'Neill Group is a California limited liability company that Defendant O'Neill organized. The associates/members of the O'Neill Group include Mr. O'Neill, Paul Violich, Peter Sterling, Peter Mullin, Scott Seligman, Doug Bratton, William Hallman, and Defendant Hank Uberoi.

## B. The Amended Complaint

Plaintiff's Amended Complaint alleges as follows:

### 1. Factual Background

Prior to July [*4] 2004, Golden State Vinters, Inc. ("GSV") was a California-based vintner and supplier of bulk wines, wine processing and storage services, and case goods, doing business through out the country. (*Id.* P 2.) Particularly, GSV sold alcoholic beverages and related products in five operating segments: bulk wines, case goods, wine grapes, brandy, and ready-to-drink ("RTD") beverages. (*Id.* P26.) Based on its quarterly and annual. SEC filings, GSV traditionally earned most of its income in the first half of its fiscal year, with 40 percent or more of its sales typically coming in the second quarter, which ended on December 31<st>. (*Id.* P28.)

According to Plaintiff, since GSV went public in 1998, GSV "appeared to be mired in a consistent downward sales trend, as exemplified by the decline in its second quarter revenues from $ 53.6 million in 2000, to just $ 31.1 million by 2003." (*Id.* P30.) Correspondingly, the price of GSV's stock declined from its 1998 initial public offering price of $ 17 per share, to $ 2 per share by FY03. (*Id.* P31.)

In 1999, GSV hired an investment bank, AH&H, to evaluate a potential merger or sale of the Company. (*Id.* P 32.) But it did not identify [*5] any credible interest in GSV and failed to generate any firm proposals. (*Id.*) Although GSV received additional inquiries from prospective merger partners, GSV indicated that none of the inquiries resulted in any viable merger or acquisition proposals. (*Id.*)

Thereafter, in late 2002, GSV began investigating the "full range of strategic alternatives available to the Company." (*Id.* P33.) Toward this end, in January and February 2003, GSV received and evaluated memoranda from outside counsel detailing the available alternatives. (*Id.*) Later, on March 3 and 4, 2003, GSV's Board, including Mr. O'Neill and Mr. Brown, met to discuss GSV's strategic options. (*Id.*) According to the December 23 Proxy, in light of the financial burdens of maintaining GSV's public company status, coupled with the continued challenges that GSV faced in the marketplace, the Board "generally concurred that a going private transaction might be a desirable strategic alternative to consider further, provided one could be proposed and effected at a





price and on terms fair to all of [GSV's] stockholders." (*Id.*) The Board therefore instructed management to explore the feasibility and fairness [*6] of a going-private transaction. (*Id.*) GSV's Board met again on June 9 and 10, 2003, and discussed the financial burdens and competitive disadvantage of being a public company. Based on such factors, including "the lack of interest in any third party in a merger or acquisition," the Board requested that GSV's management propose a going-private transaction. (*Id.* P34.)

On July 15, 2003, GSV prepared a confidential term sheet outlining plans to take the Company private in a reverse 5,900 to 1 stock split, coupled with a $ 3.25 per share payment to holders of fractional interests. (*Id.* P35.) The following month, a special committee of outside directors hired AH&H to render a fairness opinion for the proposed going-private transaction. (*Id.* P39.) At this time, GSV's management provided AH&H with certain non-public financial projections on which to base their analysis of the fairness of the $ 3.25 per share price, including projected FY04 earnings of $ 2.7 million, based on $ 1.7 million in second quarter earnings and $ 1.1 million in combined third and fourth quarter loss. (*Id.*) According to Plaintiff, "Defendants deliberately caused AH&H's opinions to be prepared [*7] *before* [GSV]'s second quarter began, because they knew that any increased revenues earned during that quarter would require them to raise the acquisition price in the reverse split transaction above the $ 3.25 per share the Company could afford." (*Id.*) Further, Plaintiff alleges that "Defendants did not thereafter ask AH&H to update its opinion, even after second quarter revenues began coming in at increased levels that rendered the financial projections on which AH&H had based its opinion inaccurate and unreliable." (*Id.*)

On September 9, 2003, AH&H delivered its fairness opinion to GSV, wherein it opined that the $ 3.25 per share going private transaction was fair to GSV's shareholders. (*Id.* P40.) In response, and upon the Special Committee's recommendation, GSV's Board approved the transaction. (*Id.*) The following day, on September 12, 2003, GSV issued a press release announcing the going-private transaction. (*Id.*) On that date, the $ 3.25 per share cash consideration represented a 56.3 percent premium over the $ 2.08 closing price of GSV's common stock on September 11, 2003 - the last day of trading prior to the announcement. (*Id.* P41.) On September 15, 2003 - [*8] the first day of trading following the

announcement - GSV's stock price spiked, rising from $ 2.08 to $ 3.00 per share on greatly-increased trading volume. (*Id.* P42.)

On November 15, 2003, GSV published its initial proxy statement for the reverse stock split transaction, wherein GSV explained the mechanics of the transaction, the reasons prompting the transaction, and why it was fair to the stockholders. (*Id.* P43.) In particular, the initial proxy stated that one of the reasons for the transaction was the lack of any viable alternatives, including the lack of any potential merger or acquisition partner with an interest in acquiring GSV, and the Company's Class A shareholder's lack of interest in increasing their investment in GSV. (*Id.*) GSV subsequently amended the proxy on December 2, 9, and 16, 2003, before it became effective on December 23, 2003. (*Id.* P44.)

**2. Defendants' Alleged Scheme To Defraud**

According to Plaintiff, "[f]rom mid-2002 through 2003, as efforts to privatize the Company escalated, [D]efendants repeatedly tried to deflate the value of its ready to drink ("RTD") business, including a $ 10 million high speed bottling line that had been [*9] purchased and installed at [GSV's] Reedley facility in the fourth quarter of 2001." (*Id.* P45.) Particularly, Plaintiff alleges that, based on statements from former GSV employees who worked in the RTD line, "O'Neill and other members of senior management deliberately ignored numerous opportunities to expand that business, and then intentionally overstated a write-down taken in 3Q03 based on the loss of two customers and the purported lack of new customers for the high-speed bottling line." (*Id.* P46.) Plaintiff alleges that "Defendants used the loss of business from these two customers to write off $ 8 million of [GSV]'s investment in the bottling line in the third quarter of fiscal year 2003," which, in turn, caused GSV to report a FY03 net loss of $ 4.3 million. (*Id.* PP46-47.) Plaintiff alleges that, according to Confidential Witness 1 ("CW1"), the write-down was overstated, and did not accurately reflect the loss GSV incurred when it lost the business from its two largest customers because there were many additional customers eager to use the bottling line at the time the write-down was taken. n2 (*Id.* P47.) Plaintiff also alleges that based on statements from [*10] Confidential Witness 2 ("CW2"), GSV failed to pursue leads for new customers and failed to pursue other profitable business opportunities. (*Id.* PP48-51.) Additionally, Plaintiff alleges that Confidential Witness 5





("CW5") stated that, "based on the information s/he learned from working in the accounting department for more than five years, s/he came to believe that O'Neill and Kelleher 'did things to deflate [GSV's] stock price' to support their buyout attempt, including by writing off the value of the RTD bottling line." (*Id.* P52.) Particularly, Plaintiff alleges that CW5 said that despite the availability of other customers ready to provide business for the RTD line, GSV declined to pursue these business prospects. (*Id.*)

n2 The AC relies on accounts by several Confidential Witnesses ("CW"). CW1 worked as a financial analyst and accountant for GSV and TWG from 2002 to 2004 and reported to the GSV treasurer and corporate controller who both reported to Kelleher. CW2 worked as a former business development manager in GSV's case goods and RTD lines from mid 2002 to early 2003 and reported to the Vice President of Operations, who reported to O'Neill. CW3 was an inventory controller and distribution coordinator in the government compliance department for the RTD division from 2001 through early 2002 and reported to the Vice President of RTD operations and the plant manager. CW4 was an accountant in GSV's government compliance department in 2002 and reported to the corporate controller and vice president. CW5 was a GSV accounting supervisor from about 2001 to 2004. CW6 was the general manager of the RTD division in 2002 and early 2003 and reported to the Vice President of Operations who reported directly to O'Neill. Finally, CW7 was an accounting manager from about 2002 to 2004 and reported to the corporate controller.

[*11]

Plaintiff also alleges that according to the confidential witnesses, GSV deliberately reduced the amount of business from its existing customers by slowing down production and lowering production numbers, even in the face of a high product demand. (*Id.* P53.) Plaintiff alleges that GSV also understated these production numbers in its report to the federal Bureau of Alcohol Tobacco and Firearms ("ATF"). He claims "[t]hrough these and similar manipulations spanning a period of 18 months or more, [D]efendants succeeded in

driving down the value of [GSV] and keeping it artificially low by the time they first sought to take [GSV] private, at a price of just $ 3.25 per share." (*Id.* at P 57.)

**a. Defendants' Alleged Hiding 'of GSV's 2Q04 Financial Turnaround and Subsequent Bidding War**

According to Plaintiff, just before Defendants were to implement their plan to privatize GSV at the artificially-deflated value, GSV's "core" business, namely its bulk wine and case goods sales, suddenly increased. (*Id.* P58.) Further, Plaintiff alleges that because this increase in sales had occurred immediately after the crush season in September, and before the holiday season, [*12] it was apparent at the time the December 23 Proxy became effective that the financial projections on which AH&H had based its fairness opinion were outdated and unreliable. (*Id.*) Particularly, Plaintiff claims that "[j]ust by comparing the actual results for the first half of FY04 with the projected results for the second half of the year, it was abundantly clear that [GSV] was going to far exceed the projections for its financial performance on which the fairness of the $ 3.25 reverse split price was premised[.]" (*Id.* P61.) However, Plaintiff alleges that because Defendants knew that disclosing GSV's improved performance would undermine their plan to take the Company private at $ 3.25 per share, Defendants deliberately failed to update their projections or the fairness opinion in the December Proxy. (*Id.* P64.) In this way, Plaintiff alleges that Defendants sought to conceal GSV's financial turn-around from shareholders, and to further their scheme to take control of GSV at an artificially-reduced price. (*Id.*) However, according to Plaintiff, Defendants' scheme was frustrated when TWG offered to buy GSV for $ 5 per share on January 7, 2004 - two weeks after the [*13] December 23 Proxy was issued. (*Id.* P65.) Plaintiff alleges that, in response, Defendants attempted to out-bid TWG. (*Id.*)

**3. False and Misleading Statements During the Class Period**

Plaintiff alleges the following statements and/or omissions by Defendants were false and misleading.

**a. The December 23, 2003 Proxy Statement**

Plaintiff alleges that the December 23 Proxy was prepared by or under the direction of Mr. O'Neill and Mr. Kelleher, was signed by Mr. Brown on behalf of GSV,

Page 4

  

and became effective on December 23, 2003 - the first day of the Class Period. (*Id.* P66.) The December 23 Proxy described Defendants' plans to privatize GSV through the reverse-split transaction, summarized the mechanics of the transaction, and advised investors that GSV recommended approval of the transaction. (*Id.*) According to Plaintiff, the December 23 Proxy was materially false and misleading at the time it was issued because: "(1) the value of [GSV]'s assets, as reflected therein, was deliberately understated as the result of the improper write-down of the Reedley [RTD] bottling line; (2) the December Proxy included 2004 financial projections that they knew were no longer [*14] valid; and (3) there was no basis for the opinion that the $ 3.25 per share price to be paid in the reverse split transaction was fair to unaffiliated shareholders, because that conclusion was based on the financial data and projections that [D]efendants knew were outdated and invalid." (*Id.* P67.) Plaintiff alleges that shareholders who sold shares following issuance of the December 23 Proxy based on the above information, were misled, and incurred damages as a result.

### b. January 20, 2004 Press Release

On January 20, 2004, GSV issued a press release, wherein it indicated that it had indefinitely suspended the going-private proposal described in the December 30, 2003 Proxy Statement. (*Id.* at P 94.) The Press Release further stated that, "[t]he Company's Board of Directors has determined that in light of recently improved business and market conditions it is in the best interest of stockholders to suspend the proposal in order to provide more time to fully evaluate current conditions and the potential implications for stockholder value." (*Id.*) The Press Release caused a significant increase in the volume of trading activity of GSV's common stock, with during 220,000 [*15] shares sold during the two trading days following the Press Release. Plaintiff alleges that the Press Release was false and misleading because "[t]he reverse slit was suspended as a result of The Wine Group's offer and O'Neill's competing bid, and *not* because business conditions had recently improved." (*Id.* at P96.) Additionally, Plaintiff claims that the Press Release was false and misleading because it characterized the action as merely a "suspension" of the reverse split, and did not disclose Defendants' true reason for the action, which was to allow the Company to analyze the undisclosed third-party offer, and to provide time for O'Neill to put together his competing bid and buy the undervalued shares from the unaffiliated investors. (*Id.* at P97.) Plaintiff alleges that "[t]he statement in the [P]ress [R]elease that Citigroup Global Markets [] had 'been retained to advise the Company in connection with its alternatives" was similarly misleading, because it failed to disclose that, in reality, Citigroup had been retained specifically to evaluate the third party offer for the Company, and weeks before the [D]efendants seized on improved business conditions [*16] as the purported reason for suspending the reverse split transaction." (*Id.*)

### c. The 2004 10-Q Report

On February 18, 2004, GSV filed its Form 10-Q with the SEC. (*Id.* at P 108.) The Form 10-Q reported that the value of GSV's property, plant, and equipment had declined to $ 56.236 million by the end of the second quarter. (*Id.* at 109.) The only statement in the Form 10-Q regarding the reverse split transaction or any pending merger or acquisition activities was:

> On September 12, 2003, we announced that our Board of Directors had approved a 1 for 5,900 reverse split of each of out shares of Class A and Class B common stock with the intention to take us private. On January 20, 2004, we announced that we had indefinitely suspended, until further notice, the going private proposal described in out definitive proxy statement dated December 30, 2003. As more fully described in the proxy, the proposal called for a 1 for 5,900 reverse split of the Company's Class A and Class B common stock at a price of $ 3.25 per share. The Company's Board of Directors determined that in light of recently improved business and market conditions it was in the best interest of stockholders [*17] to suspend the proposal in order to provide more time to fully evaluate current conditions and the potential implications for stockholder value. Citigroup Global Markets Inc. has been retained to advise the Company in connection with its alternatives.

> The Annual Meeting of the Stockholders was held on February 5, 2004 as planned. The stockholders approved the election of directors and the




ratification of Deloitte & Touche LLP as the Company's independent auditors. The vote on the reverse stock split was indefinitely suspended until further notice as described above.

(*Id.* at P110.) Plaintiff alleges that "[t]he proposals made by and bidding war between The Wine Group and the O'Neill Group were not revealed in the 2004 Form 10-Q or any other prior or contemporaneous public disclosure of information." (*Id.* at P111.) He claims that the February Form 10-Q was materially false and misleading at the time it was issued because it continued to under-report the value of GSV's assets by reflecting the improper write-down of its high-speed bottling facility, it misled investors as to the true reasons for the suspension of the reverse split transaction, and because it misleadingly [*18] characterized it as a "suspension" rather than a "cancellation" of that transaction. (*Id.* at P112.) Additionally, Plaintiff alleges that the Form 10-Q misled investors because it failed to disclose the existence of the competing proposals by the O'Neill Group and TWG to acquire the Company, or that the bidding war had continued to escalate, inflating the value of the Company. (*Id.* at P113.)

**d. The February 24, 2004 and March 8, 2004 Press Releases**

On February 24, 2004, GSV issued a press release indicating that it had received two proposals to acquire the Company, including one from the O'Neill Group. (*Id.* at P 116.) The February 24 Press Release also explained that GSV's Board of Directors had been in discussions with the potential acquirers regarding the proposals, and was going to continue to evaluate the proposals, as well as other alternatives available to GSV. (*Id.*) Following the February 24 Press Release trading volumes in GSV stock rose, and the stock price increased from $ 4.75 per share to $ 5.27 per share, before closing at $ 4.90 per share. (*Id.* at P117.)

Subsequently, on March 8, 2004, GSV issued a press release announcing that it had entered [*19] into a merger agreement with the O'Neill Group. (*Id.* at P118.) The Press Release stated that, under the terms of the agreement, each outstanding share of GSV's Class A and Class B Common Stock was entitled to receive merger consideration of $ 6.85 per share. (*Id.*) Following the issuance of the March 8 Press Release, the price of GSV's

stock rose from $ 6.42 per share, to $ 6.76 per share. (*Id.* at P 119.)

Plaintiff alleges that both press releases are false and misleading because "[n]either the February 24, 2004 or March 8, 2004 [P]ress [R]eleases, nor any other contemporaneous public statements, fully disclosed the extent of the bidding war then being waged over control of the Company." (*Id.* at P120.) Specifically, Plaintiff charges that "[t]he [R]eleases did not identify The Wine Group as the competitive bidder, did not disclose the dates or amounts of the prior bids, and did not otherwise reveal the potential for further price increases as a result of the hotly contested bidding war that had erupted between the Company's management and one of its well-capitalized competitors." (*Id.*) Instead, Plaintiff alleges that "based on the public statements through [*20] March 8, 2004, investors had been told only that: (i) plans to take the Company private for $ 3.25 per share had been put on hold on January 20, 2004 due to recently improved business conditions; (ii) two proposals to acquire the Company, including one from O'Neill, had been made around February 24, 2004; and (iii) the Company had agreed to O'Neill's proposal, at a price of $ 6.85 per share." (*Id.*)

**4. The Bidding War Between TWG and OAC**

According to Plaintiff, on January 7, 2004, TWG-GSV's competitor-offered to buy the Company for $ 5 per share. (*Id.* at P65.) Plaintiff alleges that immediately after TWG's made its offer, O'Neill formed OAC to outbid TWG for GSV. (*Id.* at P 103) According to Plaintiff, two members of OAC - Uberoi and Bratton - began buying GSV shares on the open market that they had agreed to contribute to OAC to further OAC's efforts to outbid TWG. n3 (*Id.* at P 104).

> n3 Between January 7, 2004 and January 21, 2004, Uberoi increased his GSV holdings by approximately 36 percent. (*Id.* at P 105.) Bratton, on the other hand, did not hold any shares prior to this time.

[*21]

On January 25, 2004 OAC offered to buy GSV for $ 6 per share, which it raised to $ 6.10 per share by February 24, 2004. (*Id.* at P 113-115.) At the time it raised its offer to $ 6.10, OAC held 52.7% of the





outstanding shares of GSV Class B common stock. n4 (*Id.* at P 115.) On March 8, 2004, GSV announced it entered into a merger agreement with OAC that would be completed in June 2004. (*Id.* at P 118.)

          n4 GSV Class A common stock was not publicly traded.

TWG responded with another offer of $ 7.25 per share. (*Id.* at P 124.) Two days later, GSV formally notified OAC of the offer and on March 17, 2004, TWG disclosed in a press release that TWG was also attempting to acquire GSV. (*Id.*) At this time GSV notified OAC that the Company was prepared to terminate the OAC merger agreement in favor or TWG's bid. (*Id.*) On March 22, 2004, OAC matched TWG's $ 7.25 offer, and the next day GSV authorized the execution of a revised merger agreement with OAC. (*Id.* at P126.) On March 24, 2004, GSV issued [*22] a press release announcing that the Company would continue with the OAC merger and TWG issued a press release announcing it was withdrawing its bid. (*Id.* at P 127-28.) On March 25, 2004, the price of GSV's stock dropped from $ 7.40 per share to $ 7.17 per share, on an increased volume of 100,900 shares. (*Id.* at P129.)

On April 4, 2004, TWG reemerged in the bidding process and offered GSV $ 7.75 per share. (*Id.* at P130.) On April 9, 2004, GSV issued a press release announcing that it had received an offer from TWG to acquire GSV for $ 7.75 per share. (*Id.* at P130.) Following the Release, the price of GSV stock rose from $ 7.21 per share, to $ 7.76 per share. (*Id.* at P131.) On April 13, 2004, OAC increased its offer to $ 7.80 per share. (*Id.* at P132.) GSV issued a Release indicating that it had amended the Merger Agreement with OAC to reflect the new offer. (*Id.* at P132.) On April 16, 2004, TWG increased its bid to $ 8.25 per share. (*Id.* at P133.) GSV issued a Press Release announcing that it had received a new buyout offer from TWG to acquire the Company at $ 8.25 per share, which the Board determined was superior to the Merger Agreement with OAC. ( [*23] *Id.*)

Plaintiff claims that on April 22, 2004, O'Neill gained control of the Reedley facilities, including the high-speed bottling line "through a series of transaction and agreement involving [TWG], SBIC, Brown and others." (*Id.* at P 134.) According to Plaintiff, "[i]mmediately after that agreement was reached, O'Neill

caused the O'Neill group to drop out of the bidding war for [GSV], and [GSV] signed a merger agreement with [TWG]." (*Id.*)

Following announcement of the agreement, the price of GSV stock fell from $ 8.45 per share - the Class Period high - on April 22, 2004, to close at $ 8.19 per share on April 23, 2004. (*Id* at P 135.) Thereafter, GSV's stock continued to trade at between $ 8.15 and $ 8.25 per share until the merger with TWG was completed on July 14, 2004. (*Id.*) The merger closed on July 14, 2005, with the payment of $ 8.25 per share to GSV's non-affiliated stockholders. (*Id* at P 138.)

## C. Procedural History - Defendants' First Motion to Dismiss

Plaintiff filed his original Complaint on August 19, 2004. On August 10, 2005, the Court granted Defendants' Motion to Dismiss the Complaint. Specifically, as to Plaintiff's First Cause [*24] of Action for violation of section 10(b) and Rule 10b-5, the Court found that Plaintiff failed to plead falsity with sufficient particularity or facts supporting a strong inference of scienter. With respect to the December 2003 Proxy, the Court found that Plaintiff had not sufficiently pled that the $ 3.25 per share opinion was objectively false or misleading. Particularly, the Court rejected Plaintiff's argument that certain later-revealed facts supported Plaintiff's falsity allegation. The Court further agreed with Defendants that Plaintiff had failed to plead facts raising a strong inference that any defendant acted with scienter in issuing the December Proxy. Accordingly, the Court held that Plaintiff's allegation that the fairness opinion was false and misleading was subject to dismissal under the Private Securities Litigation Reform Act.

With respect to Plaintiff's allegation that Defendants' stated reasons for the reverse stock split proposal (that the company would save more than $ 900,000 a year in reporting-related expenses) were misleading, the Court found Plaintiff's allegations as to falsity and scienter insufficient. Reviewing Plaintiff's Complaint, the Court found that [*25] he had failed to allege facts to support the allegation that, in December 2003, Defendants' plan was to artificially deflate the value of GSV so that they could purchase the Company at a reduced price and benefit from the Company's increased earnings..

Next, the Court analyzed Plaintiff's allegation that Defendants' failure to disclose the January 7, 2004





third-party offer from the TWG to buy GSV for a minimum $ 5 per share was false and misleading. Plaintiff alleged that the third-party offer thwarted Defendants' attempts to take the Company private and that Defendants concealed the offer from the public so they could modify their plan to acquire the Company in a management-led buyout. Defendants argued that Plaintiff had not pled the falsity of this omission with sufficient detail. Particularly, they asserted that, absent allegations that Defendants owed Plaintiff a duty to disclose the offer, Defendants' silence was not misleading. The Court agreed, finding that because Plaintiff did not allege that Defendants ever represented to the public that no merger or acquisition was imminent, Defendants had no duty to disclose the offer. Accordingly, the Court dismissed the claim to the [*26] extent it was premised on Defendants' purported failure to disclose the January 7, 2004 offer.

Next, the Court evaluated the sufficiency of Plaintiff's allegations regarding GSV's January 20 Press Release. Plaintiff alleged that Defendants misled shareholders when they explained in the January 20 Press Release that the Company was suspending the going-private scheme due to "recently improved business and market conditions." According to Plaintiff, Defendants actually suspended the reverse stock split scheme because their plans to take the Company private for $ 3.25 per share were being foiled by the third-party offer from the TWG and they wanted to delay the selling process long enough to ensure that OAC could come up with the premium offer. The Court found that Plaintiff failed to plead any facts that Defendants suggested in their January 20 Press Release that no merger or acquisition was imminent, or that any reason provided for the suspension of the going-private scheme was untrue. Accordingly, the Court held that Plaintiff failed to satisfy the pleading requirements of the PSLRA with respect to his allegation that the January 20 Press Release was designed to mislead.

As to Plaintiff's [*27] Second Cause of Action for violation of § 20(a) of the Securities and Exchange Act, the Court held that because Plaintiff failed to plead an underlying 10(b) violation, his section 20(a) claim failed as a matter of law.

Finally, the Court granted Defendants' Motion with respect to Plaintiff's Third Cause of Action for insider trading in violation of section 20A against Defendant OAC. Plaintiff had alleged that OAC engaged in illegal insider trading during the class period because members of the OAC - Uberoi and Bratton - bought 176,580 shares of GSV stock on the open market after TWG made its $ 5.00 per share offer, but before the public knew about the offer. The Court dismissed the claim on the ground that Plaintiff failed to adequately plead a predicate section 10(b) violation, and because Plaintiff had failed to plead the link between Defendant O'Neill and purchasers Uberoi and Bratton.

The Court granted Plaintiff's request for leave to amend to cure these deficiencies. On September 23, 2005, Plaintiff filed the Amended Complaint. n5

> n5 In the Amended Complaint, Plaintiff named Uberoi as a defendant and re-alleged his three claims in his initial Complaint.

[*28]

### D. Claims in the Amended Complaint

In his Amended Complaint, Plaintiff alleges that because GSV falsely reported information with respect to the Company's financial condition, performance, growth, operations, and current and future business prospects, the price of GSV common stock was deflated during the class period. Consequently, Plaintiff asserts a Section 10(b) violation against Defendants GSV, Brown, O'Neill, and Kelleher; Sections 20A and 10(b) violations against Defendants O'Neill, Uberoi, and OAC; and Section 20(a) violation against Defendants Golden State, Brown, O'Neill, Kelleher, and the O'Neill Group.

Defendants now move to dismiss the Amended Complaint on the ground that Plaintiff has failed to plead fraud with the required particularity or to state a claim upon which this Court may grant relief.

### II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)*. Because the focus of a 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. [*29] *See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002)*. Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory





or failed to allege sufficient facts under a cognizable legal theory. *See SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 782 (9th Cir. 1996); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). Further, dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of a claim. *See Abramson v. Brownstein*, 897 F.2d 389, 391 (9th Cir. 1990). In considering a 12(b)(6) motion, the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

## III. DISCUSSION

### A. Requests for Judicial Notice

As a threshold matter, the Court considers Defendants' request for judicial notice. Federal Rule of Evidence 201 [*30] allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

Defendants request that the Court take judicial notice of various documents GSV filed with the SEC, including a Form 10-K/A for Fiscal Year Ended June 30, 2003; a Form 10-K/A for Fiscal Year Ended June 30, 200; a Form 10-K for Fiscal Year Ended June 30, 1999; and a Form 10-Q for quarterly period September 30, 2003. Defendants assert the documents are matters of public record whose contents are explicitly relied on in the Amended Complaint. Defendant Uberoi also requests the Court take judicial notice of several documents filed with the SEC, including Schedule 13D of O'Neill, Paul Violech, Uberoi, Sterling Management Trust, Peter Mullin, Scott Seligman, Doug [*31] Bratton and William Hallman, filed with the SEC on February 26, 2004; Amended Schedule 13D of O'Neill, Violich, Uberoid, Sterling Management Trust, Mullin, Seligman, Bratton and Hallman, filed with the SEC on March 17, 2004; and Schedule 13G of Uberoi, filed with the SEC on January

23, 2004.

Plaintiff opposes both requests. Plaintiff objects insofar as Defendants seek to have the Court take judicial notice of the *truth or accuracy* of the documents. Plaintiff acknowledges that the Court may take judicial notice of documents upon which the complaint necessarily relies and the authenticity of which is not disputed and of documents generally known within the community whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Nonetheless, Plaintiff argues the Court should not take judicial notice of some of the documents.

"In a securities action, a court may take judicial notice of public filings when adjudicating a motion to dismiss...." *In re Calpine Corp. Secs. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003). Accordingly, the Court [*32] takes judicial notice of these documents, not for the truth of the statements contained therein, but for the fact that these documents that were publicly-filed and for the fact that the statements made therein were made to the public on the dates specified.

### A. Plaintiff's First Cause of Action Against GSV, Brown, O'Neill, and Kelleher for Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Relatedly, Rule 10b-5 makes it unlawful for any person to use interstate commerce

> (a) to employ any device, scheme, or artifice to defraud;

> (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; [*33] or

> (c) to engage in any act, practice, or course





of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

For a claim under § 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Concomitantly, as indicated above, pursuant to Federal Rule 9(b), to survive dismissal, Plaintiff must plead both the falsity and scienter elements with particularity. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). As the Ninth Circuit explained:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive [*34] dismissal under Rule 12(b)(6), [the court] must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.' Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

*Id.* (citations and internal quotation marks omitted).

Furthermore, in 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-469, 104th Conf., 1st Sess. at 32 (1995) (Nov. 28, 1995). The PSLRA strengthened the pleading requirements of Rules 8(a) and 9(b). Actions based on allegations of material misstatements or omissions under the PSLRA must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [*35] the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA also heightened the pleading threshold, for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. A complaint under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. § 78u-4(b)(1).

In the Amended Complaint Plaintiff alleges four statements attributable to Defendants were false and misleading [*36] and that Defendants knew the statements were false or misleading at the time they were made. Plaintiff alleges: (1) in the December 23, 2003 Proxy Statement, Defendants materially understated the value of the RTD business based on false claims that it had no customers, Defendants materially understated financial projections, Defendants misstated that the $3.25 per share price for the reverse split price was fair to shareholders, and Defendants failed to update the proxy information; (2) in the January 20, 2004 Press Release, Defendants mislead investors about reasons for the suspension of the reverse stock split; (3) in the Second Quarter 2004 Form 10-Q Report, Defendants continued to mislead investors about GSV's value by delaying disclosure of the bidding war between TWG and OAC; and (4) in the February 24, 2004 and March 8, 2004 Press Releases, Defendants continued to mislead investors about GSV's value by failing to disclose material facts relating to TWG and OAC's competing bids. The Court will examine each of these in turn.

### 1. December 23, 2003 Proxy Statement





As in Plaintiff's initial Complaint, in the Amended Complaint Plaintiff alleges that GSV's December 23 Proxy [*37] Statement undervalued GSV's financial outlook by falsely assuring shareholders that $ 3.25 per share was a fair price in the going-private transaction. Plaintiff alleges that when the proxy was disseminated, Defendants knew the GSV was on track to earn revenues that exceeded its annual projected earnings. Plaintiff also alleges Defendants engaged in a write-down scheme of the RTD bottling line which caused AH&H to underestimate GSV's potential revenues and value. Consequently, Plaintiffs assert that Defendants misrepresented to shareholders that $ 3.25 per share was a fair buy-out price with respect to the going private transaction.

In their Motion, Defendants argue that Plaintiff's allegations with respect to the December Proxy are insufficient to meet the pleading requirement of the PLSRA. Defendants also assert Plaintiff's allegations do not raise a strong inference of scienter. The Court agrees on both grounds.

#### a. Falsity of the Fairness Opinion

A representation in a proxy statement that a proposed plan of action is "fair, from a financial point of view, to the shareholders" is a statement of opinion. *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000). [*38] To plead the falsity of a statement of opinion, a plaintiff must "plead with particularity why the statement of opinion was objectively and subjectively false." *Id.* A fairness opinion is "objectively false" if the subject matter of the opinion is not, in fact, fair, and is "subjectively false" if the speaker does not, in fact, believe the subject matter of the opinion to be fair. *Id.*

As detailed above, Plaintiff alleges that the December 23, 2003 Proxy undervalued GSV's existing and prospective financial condition by falsely assuring investors that $ 3.25 per share was a fair price in the going-private scheme based on financial projections and a fairness opinion that Defendants purportedly knew were outdated and unreliable (AC at PP58-89.) According to Plaintiff, by the time the Proxy became effective, Defendants were aware that GSV was on track to report revenue and earnings for the second quarter and fiscal year that substantially exceeded the revenue and earnings projected in the Proxy. (AC PP59-64, 74-80.) Thus, Plaintiff argues that "[b]ecause [D]efendants knew the $

3.25/share fairness opinion and the financial projections on which it was based both lacked a reasonable [*39] basis at the time the Proxy was issued, the Proxy was both objectively and subjectively false." (Opp. at 9.)

In support of its claim, Plaintiff proffers the following allegations. Plaintiff alleges that the majority of GSV's revenues came from bulk wine and case goods sales, the majority of which took place in the second quarter. Based in part on statements from CW3 - an inventory controller and distribution coordinator in GSV's RTD division - Plaintiff alleges that GSV typically increased its second quarter case goods production so it could ship products by the end of October in anticipation of increased holiday sales. (AC P29.) Because GSV's second quarter production was font-loaded, Plaintiff alleges that "it is reasonable to infer that most of [GSV's] 2Q04 sales had already taken place and product had been shipped well before December 23, 2003, when the December Proxy became effective." (AC P77.) Plaintiff thus advances that "it is plain that the dramatic increase in second quarter sales occurred long before the Proxy was issued on December 23." (Opp. at 7.)

In the same vein, Plaintiff alleges that, in light of the dramatic increase in second quarter revenues, the financial [*40] projections in the Proxy were unreliable. According to Plaintiff, by the end of 2Q04, GSV had earned $ 6.1 million, which was more than double the $ 2.7 million that the December Proxy stated would be earned in the entire fiscal year. (AC P78.) Plaintiff alleges that, although GSV had experiences losses in 3Q03 and 4Q02, those losses were the result of one-time events, not recurring seasonal losses. (AC P79.) Thus, Plaintiff claims that these losses did not provide an accurate prediction of GSV's anticipated results from operations in the second half of 2004. (*Id.*)

Relying on the foregoing allegations, Plaintiff asserts that "it was misleading for [GSV's] Proxy to publish the out-of-date financial projections, or rely on AH&H's fairness opinion that $ 3.25/share was a fair price that was in the best interest of [GSV's] unaffiliated shareholders, knowing it was based on out-of-date financial projections." Further, Plaintiff argues that because the fairness opinion and the Proxy indicated that AH&H based its assessment on currently available estimates and judgments of future financial projections, "the logical conclusion of a reader of the Proxy would be that the fairness opinion [*41] was not updated after





September 11 because nothing had changed and no update was necessary." (Opp. at 8.) Plaintiff charges that, in failing to update the financial projections or the fairness opinion, or otherwise alert investors that the information was outdated and incorrect, Defendants acted fraudulently: (*Id.*)

As in their prior Motion to Dismiss, Defendants again attack the sufficiency of Plaintiff's allegations, arguing that Plaintiff has failed to plead facts to support his allegations that the statement in the Proxy that the $ 3.25 per share was a fair price for shareholders was false. For the reasons that follow, the Court agrees with Defendants.

To a large extent, Plaintiff's allegations in his Amended Complaint with respect to the falsity of the fairness statement in the Proxy suffer from the same deficiencies as those in his initial Complaint. First, the fact that GSV "ramped up" production in the initial half of the second quarter so that the bulk of its earnings occurred during this time does not give rise to a strong inference that the statement in the Proxy that $ 3.25 was a fair price was false. Particularly, as Defendants note, Plaintiff's allegation that, during [*42] his employment CW3 witnessed GSV ramp up production, does not support the inference that GSV also increased production during the second quarter of FY04. In fact, Plaintiff concedes that CW3's employment ended before the Class Period and thus, CW3 lacks any personal knowledge as to the GSV's production activity during the 2Q04 that is at issue here.

Second, although GSV's second quarter earnings exceeded the initial projections, as Defendants point out, GSV's first half FY04 did not conclude until December 31, 2003, and GSV's actual second quarter results were not published until GSV filed its February 18, 2004 10-Q. Thus, *at the time AH&H issued its fairness opinion and at the time GSV issued its proxy,* GSV's second quarter performance had not concluded nor had its precise earnings been finalized. Moreover, as Plaintiff recognizes, GSV's 1Q04 earnings were lower than GSV anticipated. Given the unavailability of finalized second quarter figures, and the lower than expected earnings in the preceding first quarter, the Court finds that Plaintiff's allegations that the initial indications of higher than expected profits in the second quarter are insufficient to support Plaintiff's [*43] claim that the fairness statement in the Proxy was false or misleading.

### b. Improper Write-Down of the RTD Bottling Line

In his Amended Complaint, Plaintiff alleges that the December Proxy materially understated the value of GSV's property, plant, and equipment because it was based on an inflated $ 8 million write-down of the Reedley bottling line in 3Q03. Plaintiff alleges that "the write-down was not caused by [GSV's] claimed 'inability to locate new customers,' but was instead part of [D]efendants' overall scheme to defraud the Company's unaffiliated shareholders by artificially devaluing [GSV] and its assets and diminishing its actual and anticipated financial projections." (AC P71.) According to Plaintiff, former GSV insiders have stated that Defendants "deliberately ignored or sabotaged efforts to enter into new contracts with new customers who expressed strong interest in using the RTD bottling line, even in the face of repeated inquiries from [GSV's] own sales personnel." (*Id.*) Additionally, Plaintiff alleges that "Defendants misled investors by undervaluing the value of its assets in violation of generally accepted accounting principles," and "materially [*44] understated its 3Q03 and FY03 financial performance, as well as its value under the comparable company, liquidation, and discounted cash flow analyses performed by AH&H." (*Id.*) Further, the Amended Complaint alleges that "[t]he December Proxy, and the FY03 Form 10-K incorporated therein by reference, also misrepresented the business prospects for the Reedley bottling line by falsely claiming that there was insufficient business to support the investment the Company had made in the line when, in fact, [D]efendants had deliberately ignored and refused to follow up on numerous inquiries from potential customers that would have allowed them to expand operations on the line[.]" (AC P72.)

Plaintiff claims the CW statements support these allegations, in that they indicate that "O'Neill and other members of the senior management deliberately ignored numerous opportunities to expand [the RTD business], and then intentionally overstated a write-down taken in 3Q03 based on the loss of two customers and the purported lack of new customers for the high-speed bottling line." (AC P46.) The Court has reviewed the allegations based on Plaintiff's CW accounts and agrees with Defendants [*45] that the allegations lack particularized detail to support each witness's basis of knowledge. At most CW1, 2, 3, 5, and 6 offer their own assessment of the business decisions that GSV's directors





made with respect to the RTD line. As Defendants correctly point out, none of the CWs indicate that he/she had first-hand knowledge about Defendants' decisions regarding pursuing potential business ventures and customers. Further, while the Confidential Witnesses may speculate that Defendants' underlying objective was to decrease the value GSV's shares by inhibiting the performance of the RTD line, none of the witnesses indicates that they were instructed by any Defendant to take such action or that any Defendant revealed such a motive. The fact that the CWs may be critical of Defendants' business decisions with respect to the RTD line based on their appraisal of the write-down and GSV's attempt to expand its customer base do not provide the level of particularity that would support an inference that Defendants deliberately understated the value of GSV' assets by fraudulently writing-down the value of the RTD line. The Court therefore finds that Plaintiff has failed to meet the heightened [*46] pleading requirement with respect to this statement.

### c. Scienter

Defendants contend that the Plaintiff has not raised a strong inference of scienter on behalf of any defendant. Defendants also assert that none of the CWs, whose accounts Plaintiff relies onto to establish the strong inference, have ever spoken directly to O'Neill or Kelleher. Plaintiffs counter that the aforementioned facts demonstrate a strong inference of scienter because they indicate GSV had undergone a substantial financial turnaround prior to the issuance of the December 23 Proxy Statement, which Defendants purposefully ignored.

The PSLRA requires securities fraud plaintiffs to plead "in great detail" that each defendant participated in making false or misleading statements of present or historical fact with either (1) actual knowledge that a statement being made is false, or (2) intentional recklessness to the truth of a statement at the time it is made. *In re Silicon Graphics,* 183 F.3d at 977. Such plaintiffs must allege facts that give rise to a "strong inference" of at least deliberate recklessness. *Id.* at 974. To satisfy the "strong inference" requirement, the Complaint [*47] must contain particularized "'allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.'" *In re Read-Rite Corp. Secs. Litig.,* 335 F.3d

843, 846 (9th Cir. 2003) (citing *Ronconi,* 253 F.3d at 432).

Even assuming, *arguendo,* Plaintiffs pled falsity with sufficient particularity, Plaintiff has not pled facts that give rise to a strong inference of scienter. Although Plaintiff asserts in conclusory fashion that Defendants knew the $ 3.25 per share price in the December 23 Proxy was incorrect because of GSV's alleged financial turnaround, Plaintiff has not pled specific statements or conditions that demonstrate Defendants knew the information provided in the December 23 Proxy was false or that Defendants deliberately disregarded the truth about GSV's financial status when the December Proxy was released.

Furthermore, as for the CW accounts, at best Plaintiff makes allegations that several GSV employees disagreed with the business decisions and financial reports of GSV upper management. The AC does not establish that the three [*48] CWs who were still working at GSV when Defendants decided on a reverse stock split and later released the December 23 Proxy Statement had any direct contact whatsoever with Defendants. Thus, not only do these allegations fail to establish that GSV was undergoing a substantial turn-around prior to or at the time the December Proxy Statement was released, they also fail to establish that statements in the December 23 Proxy Statement were false or that the officers who provided AH&H with information pertaining to the RTD write-down or the December Proxy. Statement knew it to be false or were deliberately reckless in providing the information. *See, e.g., In re CornerStone Propane Partners, L.P. Sec. Litig.,* 355 F. Supp. 2d at 1084 (N.D. Cal. 2005).

### 2. January 20, 2004 Press Release

Next, Defendants urge the Court to dismiss any claim based on the January 20 Press Release. In the Amended Complaint, Plaintiff alleges that the January 20 Press Release was false and misleading because: (1) "it characterized the action as a mere 'suspension' of the reverse split"; (2) "failed to disclose [D]efendants' true reasons for the action: to provide time for the Company to [*49] analyze the undisclosed third party offer and to provide time for O'Neill to put together his competing bid and snap up the undervalued shares in the Company from unsuspecting unaffiliated investors"; and (3) "[t]he statement in the press release that Citigroup Global Markets Inc. [] had 'been retained to advise the Company

Page 13





in connection with its alternatives' was similarly misleading because it failed to disclose that, in reality, Citigroup had been retained specifically to evaluate the third party offer for the Company, and weeks before [D]efendants seized on improved business conditions as the purported reason for suspending the reverse split transaction." In their Motion, Defendants assert that Plaintiff had failed to adequately allege the falsity of these statements or scienter.

### a. Falsity

Defendants attack Plaintiff's allegations on two bases. First, they argue that the January 20 Press Release "did not merely advise investors that business conditions had improved; it expressly told investors it was considering strategic alternatives other than the going private transaction that had been suspended." Morever, the Press Release expressly indicated that GSV had hired [*50] an investment banker "to advise the Company in connection with its alternatives." Thus, Defendants argue that the Press Release adequately apprised the public of the status of the going-private transaction and the reasons for its suspension. Defendants therefore assert that Plaintiff has no basis to argue that a more complete disclosure was needed to prevent the December Proxy from being misleading.

They further argue that "the statement in the December 23 proxy - that one reason for the reverse split transaction was that there had been no expression of interest in acquiring the [C]ompany - became irrelevant when GSV announced on the January 20 Press Release that the reverse split transaction was *not* going forward and that other alternatives, which might be more favorable to stockholders in light of recently improved business and market conditions, were being considered with the assistance of an investment banker."

Second, Defendants argue that, as the Court held in its prior Order, GSV did not have any duty to disclose the third party offers. Specifically, they argue that the January 20 Press Release did not state or intimate that no merger was imminent or that GSV had received [*51] no expressions of interest as of January 20. Nor did the Release state that conditions were the same as those discussed in the December 23 Proxy. Defendants also argue that Press Release put the public on notice that GSV was considering other alternatives to the reverse stock split transaction.

Plaintiff responds that "[b]y affirmatively setting forth purported reasons for the indefinite suspension of the reverse split, [D]efendants had a duty to make their disclosure complete - they could not mislead investors into believing that the reverse split was tabled merely as a result of changing business conditions when, in fact, the transaction had been cancelled so that [GSV] could evaluate the two competing offers to take control of the Company, including one led by management." (Opposition. at 18.) With respect to the Court's prior holding, Plaintiff argues that he has cured the defects that formed the basis of the Court's dismissal. Particularly, Plaintiff states that he has alleged that Defendants repeatedly suggested to the public that no merger or acquisition was in the works because there was no interest in GSV from any potential merger or acquisition partner or any existing [*52] members of management or Class A shareholders, and cites PP 32-34, 43-44, and 98 of the Amended Complaint in support.

"To be actionable under the securities laws, an omission must be misleading." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). As the Court noted in its prior Order, "[a]n omission is not misleading unless it 'affirmatively creates an impression of a state of affairs that differs in a material way from the one that actually exists.'" (Order, at 18:7-9 (quoting *Brody*, 280 F.3d at 1006).

In *Brody*, the defendant THC's board announced its plan to buy back $ 25 million worth of shares from stockholders in August 1996. *Id.* at 998-99. In February 1997, a third party, Vencor, subsequently made a written offer to the THC board to purchase THC at a greater price per share. *Id.* at 999. In March 1997, THC issued a press release describing the progress and extent of its stock repurchase program, but the press release did not mention [*53] Vencor's purchase offer or any other company's interest in purchasing THC. *Id.* While the plaintiffs argued that the THC misled investors by not disclosing Vencor's purchase offer, the Ninth Circuit found that the public was not misled because THC never conveyed to the public that a merger or acquisition would not occur. *Id.* at 1006-07.

Similarly, in the instant case, although Defendants did not disclose that GSV had received competing merger





bids in the January 20 Press Release, Defendants' statements regarding the status of the going private transaction did not mislead investors because Defendants never indicated that a merger or acquisition would not occur. Thus, Defendants did not have a duty to disclose the expressions of interest, and their failure to do so was not misleading.

Plaintiff, however, argues that this case is distinguishable from *Brody* because the Amended Complaint alleges that "[D]efendants *repeatedly* 'suggested to the public that no merger or acquisition was in the works' because there was absolutely no interest in the Company from any potential merger or acquisition partner or any existing members of management or Class A shareholders" [*54] in the December Proxy. (Opp. at 19, citing AC PP 32-34, 43-44, 98).) Because Defendants did not cancel the December Proxy in light of the new possible merger developments, the December Proxy Statement remained effective, and, as such, Defendants had a duty to correct or make complete any inaccurate or misleading statements it contained. n6 But Plaintiff has failed to explain how this "omission," in light of the 'other information contained in the Press Release, was misleading.

> n6 The Court has reviewed the cases to which Plaintiff cites and finds each inapposite.

The January 20 Press Release does not endorse the statements made in the December Proxy Statement. The January 20 Press Release, as cited in the AC, states:

> Golden State Vintners, Inc... today announced that it has indefinitely suspending, until further notice, the going private proposal described in the Company's definitive proxy statement dated December 30, 2003. As more fully described in the proxy, the proposal calls for a 1 to 5,900 reverse [*55] split of the Company's Class A and Class B common stock at a price of $ 3.25 per share. *The Company's Board of Directors has determined that in light of recently improved business and market conditions it is in the best interest of stockholders to suspend the proposal in order to provide more time to fully evaluate current*

> *conditions and the potential implications for stockholder value. Citigroup Global Markets Inc. has been retained to advise the Company in connection with its alternatives.*

> The Annual Meeting of the Stockholders is scheduled to be held on February 5, 2004, which will be held as planned. The stockholders will be asked to consider the items specified in the proxy statement regarding the election of directors and the ratification of Deloitte & Touche LLP as the Company's independent auditors. *The vote on the reverse stock split has been indefinitely suspended until further notice.*

(AC at P 94.) The January 20 Press Release did not suggest that the GSV was not considering a merger or acquisition but, rather, put the public on notice that the Company's status with respect to the going private transaction had changed as a result of "recently [*56] improved business and market conditions" and, consequently, information contained in the December Proxy Statement was no longer fully up to date. Thus, the Court finds Plaintiff has not sufficiently pled falsity with respect to the January 20 Press Release.

Plaintiff also alleges that the January 20 Press Release was misleading because the reverse stock split transaction had been canceled, rather than merely suspended, as indicated in the Release. (AC P 97.) According to Plaintiff, "[b]y merely 'suspending' the transaction, [D]efendants did *not* withdraw the December Proxy, nor did they alert investors that the statements contained therein, including their opinion that the $ 3.25 share price was fair, were no longer reliable." (Opp. at 21.) Thus, Plaintiff asserts that "[a]bsent an express cancellation of the transaction, the Proxy remained effective, and [D]efendants were under a continuing duty to correct any inaccurate or misleading statements contained therein." (*Id.*)

As Defendants point out, Plaintiff does not appear to be arguing that describing the transaction as "indefinitely suspended" was itself a misrepresentation. Instead, Plaintiff's theory is that, [*57] by not expressly cancelling the transaction, Defendants allowed the December Proxy to remain effective, thereby misleading





investors into believing that they could still rely on the financial projections and $ 3.25 fairness valuation in the Proxy. The Court has considered Plaintiff's argument and finds that it lacks merit. Although Plaintiff attacks Defendants' word choice in the January 20 Press Release, his theory that Defendants' failure to use the phrase "indefinitely suspended", as opposed to "cancelled" mislead investors into believing that the projections and fairness opinion in the December Proxy were still controlling, ignores the other information in the January 20 release indicating that the reverse stock split transaction would not be going froward "until further notice"; that the Company would be re-evaluating the current and business conditions to assess their implications for stockholder value; and that GSV had retained Citigroup to advise GSV in connection with its alternatives. This information thus gave context to the phrase "indefinitely suspended" and clearly advised the public that the transaction would not be proceeding. Moreover, as Defendant correctly points [*58] out, the phrase "indefinitely suspended" was accurate, in that, until GSV received and analyzed the offers to acquire the Company, Defendants could not have known whether reverse stock split transaction might be revived on amended terms. Based on these considerations, the Court finds that Plaintiff has failed to plead sufficient facts demonstrating that Defendants' characterization of the going private transaction as "indefinitely suspended" was false or misleading. This statement therefore cannot support Plaintiff's claim.

**b. Scienter**

Additionally, Defendants assert that Plaintiff failed to plead facts that support a strong inference of scienter on the part of each of the Defendants. In his Amended Complaint, Plaintiff alleges that "[a]s their contemporaneous actions illustrate, [D]efendants [] did not view [TWG's] offer on January 7, 2004 as anything less than a bona fide statement of intention to take over the Company for $ 5.00 per share." (AC P 100.) Plaintiff alleges that, GSV's reaction to TWG's offer, including the formation of a special committee and the hiring of outside legal and financial advisors to assist its evaluation of the offer, and Kelleher and O'Neill's [*59] act of instructing CW7 to perform extensive due diligence of GSV's business operations and to compile GSV's financial information, which was later provided to TWG's counsel, demonstrate that Defendants' considered TWG's offer to be legitimate. (AC P101.) Additionally, Plaintiff

alleges that Defendant O'Neill's "immediate announcement of his intention to mount a competing offer for the Company, his formation of a group to carry out that intent, and the substantial purchases by members of his group [Uberoi and Bratton] before the suspension of the reverse stock split transaction was announced further demonstrate that the January 7, 2004 offer was viewed as a legitimate proposal that was far superior to the reverse split transaction." (AC P102.) In short, Plaintiff alleges that Defendants' failure to disclose TWG's serious and legitimate offer in the January 20 Release raises the inference that they deliberately suppressed the information while O'Neill, through Bratton and Uberoi, amassed enough control to make a counter offer. (Plaintiff's Opp., 23:15-19.)

Defendants assert these allegations are not sufficient. First, that Defendants purportedly compiled GSV financial information [*60] for TWG does not establish scienter because such practices are typical of pre-merger, confidential due diligence efforts. Defendants also assert Plaintiff failed to plead facts showing that they were aware of any purchases by Uberoi and Bratton n7 at or prior to the time of the January 20 Press Release, or that the purchases were so out of line with prior purchases as to raise an inference of impropriety. Therefore, according to Defendants, such allegations relating to Uberoi and Bratton's purchases do not show scienter.

n7 Bratton is not a named party in this action.

Plaintiff counters that his allegations that Defendants had actual knowledge of TWG and OAC's offers yet failed to include such information in the January 20 Press Release are sufficient to plead scienter. Plaintiff contends that even if the financial information Defendants provided to TWG was part of standard pre-merger practice, Defendants still misled investors: typical pre-merger activity does not legitimize providing the public with misinformation. [*61] Next Plaintiff contends the Amended Complaint adequately alleges Defendants were aware of Uberoi' s and Bratton's stock purchases based on material nonpublic information because the two stockholders pledged their shares to OAC to aid it in the bid war. The Court agrees with Defendants that Plaintiff's allegations fall short of adequately alleging scienter.

As to the GSV financial information Defendants





provided to TWG, the Court reiterates its finding that GSV did not mislead the public by failing to disclose the bid war. Further, the Court finds the allegations concerning Defendants' behavior, in light of potential per-merger negotiatons, do not sufficiently allege nor support an inference of scienter.

As to Uberoi's and Bratton's stock purchases that were allegedly pledged GSV to OAC for the bidding war, considering Uberoi's and Bratton's previous stock purchases, Plaintiff has failed to plead facts showing that their purchases between January 7 and January 21 were abnormal, with respect to either amount or motivation. Although the Amended Complaint alleges Bratton did not own any shares in the company until December 29, 2003, and that Uberoi increased his holdings by 34% with his [*62] January purchase, Plaintiff does not connect the purchase to the allegedly false statements in the January 20 Press Release. n8 Equally likely, Uberoi and Bratton purchased their shares based on information revealed in the December Proxy, indicating a $ 3.25 per share reverse stock split. Plaintiff's only allegation trying to connect the stock purchases with the January 20 Press Release is OAC's Schedule 13D, which was filed on February 26, 2004, more than a month after Uberoi and Bratton purchased the shares at issue. Thus, the Court finds Plaintiff failed to adequately allege scienter.

n8 The allegation that Bratton first purchased GSV stock on December 29, 2003 and that Uberoi already owned GSV stock (*See* Amend. Compl. P 105) cuts against Plaintiff's allegations that their purchases were part of O'Neill's scheme to outbid TWG given that TWG did not express interest in GSV until January 7, 2004.

## 2. February 18, 2004 10-Q, February 24 and March 8, 2004 Press Releases

Plaintiff alleges the February 18, 2004 Form [*63] 10-Q and the February 23 and March 8 Press Releases were false and misleading because such documents failed to reveal the bidding war between TWG and OAC or failed to reveal the full extent of the bidding war between TWG and OAC. Because Defendants had full knowledge of the bid war, according to Plaintiff, Defendants either intentionally or recklessly disregarding the misleading information contained in the February Form 10-Q as well as the February 23 and March 8 Press Releases.

Defendants, however, argue Plaintiff does not have standing to assert such a claim.

### a. Standing

Defendants claim Plaintiff does not have standing to assert securities claims based on alleged misrepresentations or omissions as they relate to the February 18 Form 10-Q, the February 24 Press Release, or the March 8 Press Release because Plaintiff sold all of his GSV shares as of January 21, 2004. Plaintiff, on the other hand, asserts that the fact that the lead plaintiff sold his shares prior to subsequent misleading statements does not prevent him from asserting claims for later misrepresentations and omissions for the share class. Instead, according to Plaintiff, he may represent a class of plaintiffs [*64] during the entire period of the alleged wrongdoing, regardless of the timing of his individual sale, because Defendants misrepresentations occurred as part of an ongoing scheme. The Court agrees with Defendants.

Federal courts may only exercise jurisdiction over justiciable "cases" or "controversies." U.S. Const. art. III, § 2. As an aspect of justiciability, standing "is a threshold question." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). In a securities case, strict standing requirements are important to prevent potential vexatious litigation. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739-41, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975). "[T]he plaintiff class for purposes of a private damage action under § 10(b) and rule 10b-5 [is] limited to *actual* purchasers and sellers of securities." *Id. at 730* (emphasis added). Potential plaintiffs, i.e, potential buyers and sellers, do not have standing to assert a 10(b) or 10b-5 claim. *See id. at 738*. Conduct for which a shareholder asserts a section 10(b) claim must occur before the purchase or sale of securities. *Binder*, 184 F.3d at 1066; *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1487 (9th Cir. 1991). [*65]

In a class action suit, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy requirement with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974). A plaintiff, however, cannot "circumvent the standing requirement simply because the plaintiff files his suit in a class action." *In re Bank of Boston Corp., Inc.*, 762 F. Supp. 1525, 1531 (D. Mass. 1991); *see also Brown*, 650 F.2d





760, 771 (5th Cir. 1981). "[W]here a named class representative may properly pursue a claim, courts have strictly limited the class period to the period for which that named representative has standing." *In re Bank of Boston*, 762 F. Supp. 1525, 1531 (D. Mass. 1991); *see, e.g., In re General Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1126 (D. Del. 1988); *Adair v. Sorenson*, 134 F.R.D. 13, 16 (D. Mass. 1991) ("[Plaintiff's] standing ... must be based upon the injury suffered by [plaintiff], not any injury suffered by unidentified class member, and [*66] the [c]ourt must limit the claims accordingly.").

The Court finds *In re General Motors*, a case to which Defendants cite, on point. In *In re General Motors*, plaintiff shareholders filed a class action claim under Rule 10b-5 against General Motors ("GM") and several GM directors, alleging material misstatements and omissions. 694 F. Supp. at 1121. The lead plaintiff there sold all of his GM stock based on the alleged misstatements and omissions by November 20, 1986. *Id.* at 1126. Nonetheless, the lead plaintiff asserted the Rule 10b-5 claim on behalf of shareholders purchasing the stock from the summer of 1986 to December 1, 1986. *Id.* The court held the lead plaintiff did not have standing to assert misrepresentations and omissions on behalf of the class that occurred after November 20, 1986, the day on which he sold the last of his GM stock. *Id.* The court stated:

A court must assess standing to sue based upon the standing of the lead plaintiffs and not upon the standing of the unidentified class members. *Warth v. Seldin*, 422 U.S. 490, 502, 45 L. Ed. 2d 343, 95 S.Ct. 2197 (1975). As the United States Supreme Court stated, [*67]

Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can thus demonstrate the requisite

case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class."

*Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494, 38 L. Ed. 2d 674, 94 S. Ct. 669 (1974)).

****

Plaintiffs herein must allege injuries resulting from reliance upon defendants' material misstatements or omissions. No reliance can be established for events occurring after the purchase or sale of stock. Any injuries sustained by the named plaintiff necessarily resulted from events occurring prior to his last purchase on November 20, 1986. No action may be brought on behalf of unidentified members of the proposed class who made stock purchases after November 20, 1986 and were injured by misstatements or failure to disclose occurring after November 20, 1986. Plaintiffs have no standing to assert class claims based upon events after November 20, 1986.

[*68]

*Id.* at 1126-27.

The Northern District of California seemingly agrees. In *In re VeriSign, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 10439 (N.D. Cal. 2005). Judge Ware stated that, while a lead plaintiff can assert claims on behalf of a class of plaintiffs similarly situated, he must first establish standing in his own right. *In re VeriSign*, 2005 U.S. Dist. LEXIS 10439, at *16-17. Because the court found that the lead plaintiffs had standing to assert their claims--that *they* suffered losses traceable to defendants' conduct and that they sought damages to redress *their* losses--the court found that lead plaintiffs could represent the class. n9 *Id.; see also Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598, 605 (N.D. Cal. 1991).





n9 Plaintiff relies on myriad cases to assert he does have standing based on an on-going scheme. Specifically, Plaintiff cites to *Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975)*; *Harmsen v. Smith, 693 F.2d 932, 942-44 (9th Cir. 1982)*; *Alfus v. Pyramid Technology Corp., 764 F. Supp. 598*. The Court finds none of these cases diapositive as to the issue of standing. Blackie does not address the issue of standing but rather the issue of class certification. *See Blackie, 524 F. 891*. In *Harmsen*, the plaintiffs had standing to assert section 10(b) claims for wrongdoing that occurred after plaintiffs purchased shares because they alleged conspiracy claims, in which the defendants were liable to plaintiffs for all damages that occurred during the period of the conspiracy. *693 F.2d 942-44*. In *Alfus*, the court there also recognizes that "[i]ndividuals who purchase prior to the performance of such allegedly fraudulent acts lack standing to complain about later misleading statements 'as they neither purchased or sold shares in reliance upon the alleged misrepresentation or concealment.'" *764 F.Supp. at 605* (quoting *Williams v. Sinclair, 529 F.2d 1383, 1389 (9th Cir. 1975)*). The Court finds the other cases to which Plaintiff cites also inapposite.

Further, to the extent Plaintiff alleges the misrepresentations and omissions are part of an ongoing scheme, the Court notes Plaintiff has not adequately pled a claim based on the December Proxy or the January 20 Press Release, which contain the scheme misrepresentations that occurred prior to Plaintiff's stock sale.

[*69]

Here, Plaintiff sold all his shares of GSV stock by January 21, 2004. Plaintiff, therefore, cannot show that he was harmed by the misrepresentations and omissions he alleges against Defendants after January 21, 2004 because he did not purchase or sell GSV stock after January 21, 2004. As a result, Plaintiff does not have standing to assert claims for misrepresentations or omissions that occurred after that date. Because Plaintiff is limited in the claims he asserts for the class to the period for which he has standing, Plaintiff cannot assert 10b or Rule 10b-5 claims with respect to the February Form 10-Q, the February 24 Press Release, or the March

8 Press Release.

**B. Plaintiff's Second Cause of Action Against O'Neill, Uberoi, O'Neill Group-Violations of 20A, 10b and 10b-5**

In the AC, Plaintiff alleges insider trading against Defendants O'Neill, Uberoi, and OAC. Specifically, the AC asserts that Uberoi purchased GSV stock for the benefit of OAC while he was in possession of material, nonpublic information that O'Neill had given him. Defendants assert that Plaintiff's claim is deficient because Plaintiff fails to plead the requisite detail of insider trading liability, Plaintiff [*70] fails to plead a strong inference of scienter as required by the PSLRA, and Plantiff fails to plead the requisite underlying facts to support a claim under Section 20A. The Court agrees with Defendants.

**1. Section 10(b) and Rule 10b-5 Liability: Tipper-Tippee Liability**

Defendants allege that Plaintiff's insider trading claims against Uberoi, O'Neill, and OAC lack the basic facts needed to assert such a claim. Specifically, Defendants contend Plaintiff failed to adequately plead tipper-tippee liability with sufficient detail in order to support his claim. Plaintiff argues, however, that he sufficiently plead his insider trading claims under both a classical and a misappropriation theory.

**a. Classical Theory**

Under the classical theory, "[section] 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan, 521 U.S. 642, 651-52, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997)*. "Trading on such information qualifies as a 'deceptive device' under [section] 10(b) ... because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those [*71] insiders who have obtained confidential information by reason of their position with that corporation.'" *Id. at 652*. Under this theory, "'a person violates Rule 10b-5 by buying or selling securities on the basis of material nonpublic information if (1) he owes a fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation whose shares he trades, and thus owes a fiduciary duty to the corporation's shareholders; or (3) he is a tippee who received his information from an insider





of the corporation and knows, or should know, that the insider breached a fiduciary duty in disclosing the information to him." *SEC v. Clark,* 915 F.2d 439, 443 (9th Cir. 1990); *see also Chiarella v. United States,* 445 U.S. 222, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980); *Dirks v. SEC,* 463 U.S. 646, 103 S. Ct. 3255, 77 L. Ed. 2d 911 (1983).

Plaintiff does not sufficiently plead insider trading under a classical theory against any of the defendants. With respect to O'Neill and OAC, Plaintiff does not plead that O'Neill or OAC traded securities on the basis of material inside information. Although Plaintiff alleges that Uberoi bought the securities for OAC, Plaintiff does not [*72] plead that Uberoi was a member of OAC at the time he bought the securities, nor does he sufficiently allege Uberoi bought the stock based on the material, nonpublic information he supposedly received from O'Neill; Plaintiff fails to distinguish Uberoi's January 20, 2004 stock purchase from his other stock purchases.

Furthermore, as to Uberoi, Plaintiff contends Uberoi is liable as a tippee under the classical theory because he asserts in a blanket statement that "Uberoi received confidential information from an insider of the corporation (O'Neill and the O'Neill Group *vis-a-vis* O'Neill) in breach of their fiduciary obligations." (Plaintiff's Opposition to Uberoi's Motion to Dismiss, at 5:23-24.) Nonetheless, while Plaintiff alleges that Uberoi received information regarding the TWG offer from O'Neill and that Uberoi knew the information had not been publicly disclosed, he does not allege sufficient detail to establish that he knew or should have known that O'Neill breached a fiduciary duty in disclosing the information. Plaintiff's Amended Complaint requires the Court to make inferences based on other facts alleged that when he made his stock purchase Uberoi was, or should have [*73] been, aware that O'Neill was the president and CEO of GSV and breached a fiduciary duty in disclosing information to him. The Court need not indulge such unwarranted inferences. *See In re Verifone Sec. Lit.,* 11 F.3d 865, 868 (9th Cir. 1993).

**b. Misappropriation Theory.**

A person can also be found liable for insider trading based on a misappropriation theory. *O'Hagan,* 521 U.S. at 652. "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violations [section] 10(b) and Rule 10b-5, when he misappropriates confidential

information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* "[A] fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id.* "[T]he misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information" *Id.* at 652-53. Further, "the misappropriation [*74] theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but the source of the information." *Id.*

Although Plaintiff makes a blanket assertion that O'Neill tipped Uberoi, providing him with the details of TWG's offer, and Uberoi purchased GSV stock based on this tip, Plaintiff himself admits "the timing and circumstances surrounding the trades coupled with O'Neill's (and his associates') attempt to acquire [GSV] *compel the conclusion* that O'Neill and [OAC] conveyed material confidential information to ... Uberoi and the other members of [OAC] upon which they traded." (Plaintiff's Opposition to Defendants Motion to Dismiss, at 29:18-21 (emphasis added).) Plaintiff does not specify when Uberoi received the tip, or what material nonpublic information O'Neill gave Uberoi. Moreover, Plaintiff does not plead any facts indicating a relationship between Uberoi and O'Neill at the time the purchase was made. Instead, the AC requires the Court to infer such details based on other facts Plaintiff alleged. Again, a court need not indulge unwarranted inferences in determining whether a plaintiff has adequately [*75] pled a necessary element. *In re Verifone Sec. Lit.,* 11 F.3d at 868 (9th Cir. 1993). Thus, the Court finds such pleading deficient.

As for Plaintiff's claim of tippee liability against Uberoi, Plaintiff's claim is equally lacking. Plaintiff's allegations are only blanket assertions that Uberoi bought his stock based on information he received from O'Neill regarding TWG's offer. Plaintiff does assert when O'Neill allegedly tipped Uberoi or that Uberoi actually purchased the stock because he received the tip. In fact, Plaintiff states that O'Neill tipped Uberoi *and/or* another who purchased shares on or about the same date and that the tip, if Uberoi even received the tip, may have occurred after he purchased his shares. Accordingly, the Court finds Plaintiff has not adequately pled liability under a misappropriation theory.





### 2. Section 10(b) and Rule 10b-5 Liability: Scienter

Defendant Uberoi contends Plaintiff also failed to adequately plead scienter under the heightened pleading requirements of the PSLRA. Plaintiff counters that he pled Uberois' knowledge or recklessness with respect to his tippee liability with specificity, that Uberoi's purchases [*76] constitute unusual and suspicious trading sufficient to constitute scienter, and that Uberoi had the motive to trade based on material nonpublic information.

Even if Plaintiff's tipper-tippee allegations against Uberoi sufficed, the Court finds the pleadings deficient with respect to scienter. Plaintiff has failed to plead sufficient detail to claim scienter with respect Uberoi's purchase of GSV's stock. Plaintiff's conclusory allegations that Uberoi purchased the stock based on inside information with knowledge or at least reckless disregard are not supported because Plaintiff fails to distinguish Uberoi's January 20, 2004 purchase from his prior purchases of nearly two-thirds of the rest of his holdings. As to motive, even though Plaintiff asserts that Uberoi intended to contribute his stock to OAC so that OAC could purchase GSV, Plaintiff's allegations are lacking to the extent they do not allege Uberoi was even a member of OAC at the time or that Uberoi had in fact spoken to O'Neill prior to the stock purchase. Consequently, the Court finds Plaintiff did not adequately plead scienter with respect to Uberoi.

### 3. Section 20A Liability

Section 20A of the Securities Exchange [*77] Act prohibits sales by any person who trades in securities while in possession of material nonpublic information. Insider trading claims under Section 20A "require a predicate violation of a securities law, contemporaneous trading of a defendant and plaintiff, and a profit gain or loss." *Howard v. Hui*, 2001 U.S. Dist. LEXIS 15443, at *19 (N.D. Cal. Sept. 13, 2001). Because Plaintiff failed to sufficiently plead the predicate violations of the securities laws against Defendants, Plaintiff's Section 20A claim fails.

### C. Plaintiff's Third Cause of Action Against Defendants Against Defendants GSV, Brown, O'Neill, Kelleher, and O'Neill Group--Violation of Section 20(a)

Section 20(a) of the Act provides derivative liability

for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Secs. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.* "In order a claim for liability under section 20(a), plaintiffs must alleged (1) that a "primary violation" [*78] of Rule 10b-5 or other provision was committed and (2) that each defendant 'directly or indirectly' controlled the violator." *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001); *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Because Plaintiff failed to adequately assert the underlying Section 10(b) violations, the Court must also dismiss the Plaintiff's Section 20(a) claim.

### D. Dismissal With Prejudice

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment." *Eminence Capital v. Aspeon Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Here, Plaintiff has already amended his complaint once. In doing so, Plaintiff failed to cure the deficiencies of his claims under the heightened pleading standards of the PSLRA. Although Plaintiff adds a new Defendant and asserts his claims based on new misrepresentations and omissions, the Court finds Plaintiff does not have standing to make these new allegations. The Court notes, however, that Plaintiff may be able to name other class members that [*79] have standing to assert the claims with respect to the February Form 10-Q, and the February 24 and March 8 Press Releases. Accordingly, the Court **DISMISSES** Plaintiff's Amended Complaint with leave to amend.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss in its entirety, **WITHOUT PREJUDICE.**

Plaintiff must file any Second Amended Complaint within 30 days of the filing date of this Order.

### IT IS SO ORDERED.

Dated: December 30, 2006

MARTIN J. JENKINS





2006 U.S. Dist. LEXIS 94900, *79

UNITED STATES DISTRICT JUDGE

  

# EXHIBIT I

LEXSEE



Positive
As of: Mar 08, 2007

**MICHAEL J. SVEZZESE, JR., Individually and On Behalf of All Others Similarly Situated, Plaintiffs vs. DURATEK, INC., f/n/a GTS DURATEK, ROBERT E. PRINCE and ROBERT F. SHAWVER, Defendants**

**CIVIL ACTION NO. MJG-01-1830**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**2002 U.S. Dist. LEXIS 20967; Fed. Sec. L. Rep. (CCH) P92,218**

**April 30, 2002, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Svezzese v. Duratek, Inc., 2003 U.S. App. LEXIS 11647 (4th Cir. Md., June 12, 2003)

**DISPOSITION:** [*1] Defendants' motion to dismiss first amended complaint granted. Plaintiff's motion for leave to file notice of supplemental authority in further support of plaintiff's opposition to defendants' motion to dismiss granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investor, individually and on behalf of all others similarly situated, sued defendant company, and its executive officers, for securities fraud. Defendants moved to dismiss the first amended complaint. The investor moved for leave to file a notice of supplemental authority in further support of the investor's opposition to defendants' motion to dismiss.

**OVERVIEW:** The investor claimed that the company did not sufficiently compare its actual costs of contractual performance with its estimates of total costs, and that this failure caused the company to fail to adjust its accounting to reflect the fact that actual costs were much greater than estimated. These accounting errors resulted in overstatements of revenues in press releases and Security and Exchange Commission (SEC) filings. As to the claim under §10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, the court held that failures to observe generally accepted accounting principles (GAAP), and other guidelines, standing alone, did not satisfy the Private Securities Litigation Reform Act's heightened pleading standards. Scienter required more than a misapplication of accounting principles. Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, were not sufficient to state a securities fraud claim. Finally, violations of internal policies, absent allegations of knowledge and disregard of such red flags regarding deficient internal controls, were not sufficient to raise a strong inference of scienter.

**OUTCOME:** The motion to dismiss the first amended complaint was granted. The motion for leave to file a notice of supplemental authority was granted.

**CORE TERMS:** scienter, accounting, motive, restatement, fraudulent intent, magnitude, commit fraud, estimate, reckless, press release, simplicity, deficient, sufficient to raise, motion to dismiss, securities fraud, particularity, conscious, omission, audit, method of accounting, unprocessed, materially, processing, quarterly, estimated, earning, circumstantial evidence, facts giving rise, facts sufficient, cause of action

  

Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 3 of 11

2002 U.S. Dist. LEXIS 20967, *1; Fed. Sec. L. Rep. (CCH) P92,218

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is a means of testing the legal sufficiency of a complaint. The question is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief. The court, when deciding a motion to dismiss, must consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. The court must further disregard the contrary allegations of the opposing party. However, a complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not sufficient to support the claim presented.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] To survive a motion to dismiss, a plaintiff must have alleged facts that show that he is entitled to relief on his substantive causes of action.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN3] To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)(5) of the Securities and Exchange Commission, a plaintiff must allege that: (1) the defendant made a false statement or omission of material fact; (2) the statement or omission was made with scienter, a mental state embracing an intent to deceive, manipulate or defraud; (3) the plaintiff's reliance upon the statement was justifiable; and (4) the statement was the proximate cause of the plaintiff's damages. Actions filed under Section 10(b) and Rule 10(b)(5), being fraud claims, must satisfy the dictates of Fed. R. Civ. P. 9(b) which requires that all averments of fraud or mistake must be stated with particularity. A plaintiff must also comply with the pleading requirements of the Private Securities Litigation Reform Act (PSLRA)

which tightened the requirements for pleading scienter in securities fraud actions. The PSLRA standard is higher than that imposed under Fed. R. Civ. P. 9(b) which allows malice, intent, knowledge, and other condition of mind of a person to be averred generally. Under the PSLRA, a plaintiff must state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind, for each alleged misrepresentation or omission. 15 U.S.C.S. § 78u-4(b)(2).

*Evidence > Relevance > Circumstantial & Direct Evidence*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN4] For purposes of determining what pleaded facts are sufficient to give rise to a "strong inference" of scienter under the Private Securities Litigation Reform Act, the United States Court of Appeals for the Second Circuit holds that a plaintiff may plead scienter by alleging specific facts that either: (1) constitute circumstantial evidence of conscious or reckless behavior; or (2) establish a motive to commit fraud and an opportunity to do so. Under the first prong of the standard, a plaintiff may plead scienter by alleging facts that constitute circumstantial evidence of conscious or reckless behavior. Securities laws generally define recklessness as an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Thus, in this context, recklessness is viewed as a lesser form of intent, rather than a greater degree of ordinary negligence. Mere negligence is insufficient to support liability.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN5] On a fraud claim under the Private Securities Litigation Reform Act, the burden placed upon the plaintiff is great. The plaintiff's allegations must have a substantial factual basis in order to create a strong





Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 4 of 11

2002 U.S. Dist. LEXIS 20967, *1; Fed. Sec. L. Rep. (CCH) P92,218

inference that the defendant acted with the required mental state. Of course, these factual allegations must be true to provide the basis for a cause of action. A cause of action does not lie when the complaint rests on mischaracterization of the events at issue.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Accounting Irregularities*
[HN6] A company's failures to observe generally accepted accounting principle (GAAP) and other accounting guidelines, standing alone, are not enough to satisfy the Private Securities Litigation Reform Act's heightened pleading standards. Scienter requires more than a misapplication of accounting principles, and allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim. GAAP violations are probative of scienter if other circumstances are pleaded evidencing a fraudulent intent. When combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN7] On a fraud claim under the Private Securities Litigation Reform Act, simplicity of generally accepted accounting principles cannot, alone, raise a strong inference of scienter, but can only do so when combined with other allegations evincing fraudulent intent.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Private Securities*

*Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Accountants & Auditors*
[HN8] While internal policies are relevant to scienter in a securities fraud claim, to the extent that they correspond to violations of generally accepted accounting principles (GAAP) and GAAS, or that they indicate an auditor's awareness of problems in corporate finances, such allegations cannot, without accompanying allegations of fraudulent intent, be sufficient to raise a strong inference of scienter. Indeed, this factor by itself is not particularly compelling where the violations of internal policies are not materially different from the deviations from GAAP.

*Criminal Law & Procedure > Scienter > Knowledge*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN9] In a securities fraud case, violations of internal accounting policies can be probative of scienter.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN10] In a securities fraud case, under the second prong of the United States Court of Appeals for the Second Circuit's scienter standard, a plaintiff may plead scienter by establishing a motive to commit fraud and an opportunity to do so. In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Opportunity may be established by showing that the defendant had the means and likely prospect of achieving the concrete benefits desired by the means alleged.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
[HN11] The failure to state a claim for a primary securities fraud violation precludes a finding of control

  

Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 5 of 11

2002 U.S. Dist. LEXIS 20967, *1; Fed. Sec. L. Rep. (CCH) P92,218

person liability.

**COUNSEL:** For MICHAEL J. SVEZZESE, JR., plaintiff: Charles J Piven, Law Offices of Charles J Piven PA, Baltimore, MD USA. Glen DeValerio, Jeffrey Block, Michael G Lange, Nazanin Nancy Ghabai, Berman DeValerio Pease Tabacco Burt and Pucillo LLP, Boston, MA USA. Patrick J. Egan, Law Office PH, Philadelphia, PA USA.

For LOUISIANA SCHOOL EMPLOYEE RETIREMENT SYSTEM, plaintiff: Charles J Piven, Law Offices of Charles J Piven PA, Baltimore, MD USA.

For DURATEK, INC., ROBERT E. PRINCE, ROBERT F. SHAWVER, defendants: Mark D. Gately, Steven F Barley, Hogan and Hartson LLP, Baltimore, MD USA.

**JUDGES:** Marvin J. Garbis, United States District Judge.

**OPINION BY:** Marvin J. Garbis

**OPINION:**

MEMORANDUM AND ORDER

The Court has before it the Motion of Defendants to Dismiss the First Amended Complaint, the Motion for Leave for Plaintiff to File Notice of Supplemental Authority in Further Support of Plaintiff's Opposition to Defendants' Motion to Dismiss, and the materials submitted by the [*2] parties relating thereto. The Court finds that a hearing is unnecessary to resolve this matter.

I. BACKGROUND n1

n1 The facts are stated herein as alleged in the Amended Complaint.

Defendant Duratek, Inc. ("Duratek") provides services related to radioactive waste management, including transportation, storage, processing and disposal for government and commercial customers. Am. Compl. P19, 29. Duratek's stock is traded on the NASDAQ. Id. at P137. Defendant Robert E. Prince is Duratek's Chief Executive Officer and President, and Defendant Robert F. Shawver is Duratek's Chief Financial Officer and Executive Vice President. Id. at P20-21.

Plaintiff Michael J. Svezzese, Jr. ("Plaintiff"), a Duratek shareholder, filed the instant lawsuit individually and on behalf of all others similarly situated, on June 22, 2001. Plaintiff's two count Amended Complaint arises out of Duratek's press release announcement on March 14, 2001 that "significantly greater than budgeted burial and transportation costs were [*3] incurred in its commercial waste processing operations" and that these additional costs would require adjustments to the company's financial results for the fourth quarter and fiscal year of 2000 and the first quarter of 2001. Id. at P98. In that press release, Duratek stated that it had begun a comprehensive review of its commercial waste processing operations and would postpone its release of year 2000 financial results until the review was completed. Id.

On April 18, 2001, Duratek issued a press release announcing the fourth quarter and year 2000 financial results. Id. at P102. The press release also stated that the company was revising previously reported financial results for the first three quarters of 2000 and its consolidated financial results for 1999. Duratek's news release explained that the principal reason for the revisions to the 2000 financials was to "reflect the reconciliation of unprocessed waste to revenues and costs" for the relevant periods due to the fact that "full reconciliations of quarterly inventories of unprocessed waste were not performed at each quarter end in 2000." Id.

For accounting purposes, Duratek utilized the "percentage-of-completion" [*4] ("POC") method for recording revenues, costs and profits associated with long-term contracts, which comprise the majority of Duratek's revenue. Id. at P42-47. The POC method allows Duratek to record revenue as it performs a contract. n2 Id. at P44. Using this method, Duratek is to first estimate the total costs of performing a contract. Then, as it performs the contract, it is to periodically compare accrued actual costs to its estimate of total costs. The comparison is to yield an estimate of the amount of the contract that has been performed and, accordingly, the amount of revenue that has been earned and may be recorded on the company's books. Id.

n2 In contrast, under the completion method of accounting, the entity does not record any revenue until the entire contract is performed, at which time the entire revenue derived is recorded

Page 4

 LexisNexis™      LexisNexis™     LexisNexis™

Case 4:06-cv-03936-CW     Document 45-10     Filed 03/23/2007     Page 6 of 11

2002 U.S. Dist. LEXIS 20967, *4; Fed. Sec. L. Rep. (CCH) P92,218

at once. Id. at P43.

Accounting guidelines issued by the American Institute of Certified Public Accountants state that the POC method is the preferred method [*5] of accounting for long-term contracts as long as the entity is able to make reasonably dependable estimates of contract costs and progress toward completion of the contract. Id. at P121.

Plaintiff asserts that Duratek did not sufficiently compare its actual costs of contractual performance with its estimates of total costs, that this failure in turn caused Duratek to fail to adjust its accounting to reflect the fact that actual costs were much greater than had been estimated, and that these accounting errors resulted in overstatements of revenues in press releases and SEC filings. Id. at P4-5. Plaintiff alleges that the errors were caused by Defendants' "materially deficient" internal controls used to track actual costs and compare them to estimated costs. Id. at P115, 48, 81. Thus, Plaintiff asserts that although information concerning the actual costs was available, Defendants did not reconcile quarterly inventories of unprocessed waste with deferred revenue and operating costs at any time during the first three quarters of 2000. Id. at P4, 48-49. As a result, Duratek's profits, net income and earnings per share were materially overstated. Id. at P5, 10, 86, [*6] 93, 106, 117.

For example, as calculated from Duratek's original and amended quarterly reports during the first three quarters of 2000, the Amended Complaint alleges the following: n3

For the three months Ended March 31, 2000:

|  | As Reported | As Restated | Difference |
| --- | --- | --- | --- |
| Revenue | $ 41,102 | $ 41,013 | $ 89 |
| Gross Profit | $ 9,630 | $ 9,161 | $ 469 |
| Income from Operations | $ 2,945 | $ 2,212 | $ 733 |

For the three months Ended June 30, 2000:

|  | As Reported | As Restated | Difference |
| --- | --- | --- | --- |
| Revenue | $ 52,772 | $ 50,908 | $ 1,864 |
| Gross Profit | $ 15,122 | $ 11,871 | $ 3,251 |
| Income from Operations | $ 6,885 | $ 3,481 | $ 3,404 |

For the three months Ended September 30, 2000:

|  | As Reported | As Restated | Difference |
| --- | --- | --- | --- |
| Revenue | $ 73,856 | $ 71,009 | $ 2,847 |
| Gross Profit | $ 19,933 | $ 17,376 | $ 2,557 |

  

Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 7 of 11

2002 U.S. Dist. LEXIS 20967, *6; Fed. Sec. L. Rep. (CCH) P92,218

|  | As Reported | As Restated | Difference |
|---|---|---|---|
| Income from Operations | $ 8,774 | $ 5,781 | $ 2,993 |

Am. Compl. P107.

n3 The Court does not cite to the charts in the Amended Complaint in their entirety; rather the Court includes a sampling of the figures therein to give examples of the monetary differentials involved. See Am. Compl. P107.

[*7]

Plaintiffs advance the following claims:

Count I: Violation of Section 10(b) of the Securities Act of 1934 and Rule 10-b(5) promulgated thereunder; and,

Count II: Violation of Section 20(a) of the Exchange Act.

The parties are before the Court on Defendant's Motion to Dismiss Plaintiff's First Amended Complaint.

II. LEGAL STANDARD

[HN1] A motion to dismiss under Rule 12(b)(6) is a means of testing the legal sufficiency of a complaint. "The question is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the Complaint states any valid claim for relief." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 336 (2d ed. 1987). The Court, when deciding a motion to dismiss, must consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); Jenkins v. McKeithen, 395 U.S. 411, 421-22, 23 L. Ed. 2d 404, 89 S. Ct. 1843 (1969). The Court must further disregard the contrary allegations of the opposing party. See A.S. Abell Co. v. Chell, 412 F.2d 712, 715 (4th Cir. 1969). [*8] However, a complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not

sufficient to support the claim presented.

III. DISCUSSION

A. Liability under Section 10(b) and Rule 10b-5

[HN2] "To survive a motion to dismiss, Plaintiffs must have alleged facts that show that they are entitled to relief on their substantive causes of action." See In re Criimi Mae, Inc. Sec. Litig., 94 F. Supp.2d 652, 656 (D.Md. 2000). [HN3] To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b(5) of the Securities and Exchange Commission, Plaintiff must allege that: 1) the Defendants made a false statement or omission of material fact; 2) the statement or omission was made with scienter, a "mental state embracing an intent to deceive, manipulate or defraud;" 3) Plaintiff's reliance upon the statement was justifiable; and, 4) the statement was the proximate cause of the Plaintiff's damages. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976) (emphasis added). See Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999). [*9] Actions filed under Section 10(b) and Rule 10b(5), being fraud claims, must satisfy the dictates of Rule 9(b) which requires that "all averments of fraud or mistake must be stated with particularity." Fed.R.Civ.P. 9(b).

Plaintiffs must also comply with the pleading requirements of the Private Securities Litigation Reform Act (hereinafter "PSLRA") which tightened the requirements for pleading scienter in securities fraud actions. In re Manugistics Group, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 22524, No. S98-1881, 1999 WL 1209509 (D.Md.). The PSLRA standard is higher than that imposed under Rule 9(b) which allows "malice, intent, knowledge, and other condition of mind of a person. . . [to] be averred generally." Fed.R.Civ.P. 9(b). See In re Criimi Mae, 94 F. Supp.2d at 656; In re Manugistics Group, Inc., 1999 U.S. Dist. LEXIS 22524, [WL] at *1. Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind," for each alleged misrepresentation or omission. 15 U.S.C. §

  

Case 4:06-cv-03936-CW     Document 45-10     Filed 03/23/2007     Page 8 of 11

2002 U.S. Dist. LEXIS 20967, *9; Fed. Sec. L. Rep. (CCH) P92,218

78u-4(b)(2) (emphasis added).

The PSLRA does not define what pleaded facts are sufficient [*10] to give rise to a "strong inference" of scienter, and there is widespread disagreement among the circuits as to what a plaintiff must state to plead scienter under the PSLRA. See In re Criimi Mae, 94 F. Supp.2d at 658-59 (discussing interpretations of the PSLRA's "strong inference" requirement in various circuits); In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp.2d 620, 628-29 (E.D.Va. 2000) (discussing differing interpretations of the PSLRA's "strong inference" requirement). The question arose in Phillips v. LCI; however, the Fourth Circuit did not reach the issue because it found that the plaintiff stockholders "failed to allege facts sufficient to meet even the most lenient standard possible under the PSLRA, the two-pronged Second Circuit test." 190 F.3d at 621.

[HN4] The Second Circuit test, articulated in In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993), provides that a plaintiff may plead scienter by alleging specific facts that either: 1) constitute circumstantial evidence of conscious or reckless behavior, or 2) establish a motive to commit fraud and an opportunity to do so. Like the [*11] Phillips Court, this Court need not interpret the meaning of the PSLRA's "strong inference" requirement because Plaintiff's claims are insufficient to meet the most lenient standard possible under the PSLRA, the Second Circuit's scienter test.

B. Scienter

1. Conscious or Reckless Behavior

Under the first prong of the Second Circuit's standard, a plaintiff may plead scienter by alleging facts that constitute circumstantial evidence of conscious or reckless behavior. "Securities laws generally define recklessness as an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" Phillips, 190 F.3d at 621, quoting Hoffman v. Eastabrook & Co., 587 F.2d 509, 517 (1st Cir. 1978). Thus, in this context, recklessness is viewed as a lesser form of intent, rather than a greater degree of ordinary negligence. See In re Criimi Mae, 94 F. Supp.2d at 660. Mere negligence is insufficient to support liability. See Phillips, 190 F.2d at 621, [*12] citing Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 215, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).

[HN5] The burden placed upon Plaintiff is great. Plaintiff's allegations must have "a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required mental state." Phillips, 190 F.3d at 621 (citations omitted). "Of course, [these] factual allegations must be true to provide the basis for a cause of action." Phillips, 190 F.3d at 615. A cause of action does not lie when "the complaint rests on mischaracterizations" of the events at issue. Id.

Plaintiff asserts that the following allegations, taken as a whole, are sufficient to establish a strong inference that Defendants' conduct was reckless:

a. The GAAP violations;

b. The simplicity of the accounting rules violated;

c. The deficiency of Duratek's internal controls;

d. The magnitude of the restatement.

a. The GAAP Violations

Plaintiff acknowledges that [HN6] failures to observe GAAP and other accounting guidelines, standing alone, are not enough to satisfy the PSLRA's heightened pleading standards. Pl. Opp. p. 12. [*13] Scienter "requires more than a misapplication of accounting principles," and "allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." Chill v. General Elec. Co., 101 F.3d 263, 270 (2nd Cir. 1996). See also In re Peritus Software Servs., Inc., 52 F. Supp.2d 211, 223-24 (D.Mass. 1999) (finding GAAP violations probative of scienter if other circumstances are pleaded evidencing fraudulent intent); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1313 (C.D.Cal. 1996) (holding that "when combined with other circumstances suggesting fraudulent intent . . . allegations of improper accounting may support a strong inference of scienter"). Thus, the alleged GAAP violations can only raise a strong inference of scienter if Plaintiff's other allegations evince fraudulent intent.

b. The Simplicity of the Accounting Rules Violated





Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 9 of 11

2002 U.S. Dist. LEXIS 20967, *13; Fed. Sec. L. Rep. (CCH) P92,218

Plaintiff asserts that the simplicity of the accounting rules violated, the POC method of accounting, creates an inference of scienter. Plaintiff cites to MicroStrategy Inc. Sec. Litig., 115 F. Supp.2d 620, 638 (E.D.Va. 2000), [*14] which states that "if the GAAP rules and [internal] accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard." It should be noted that MicroStrategy was a case involving allegations of insider trading, not present here, which are highly probative of motive. As with Plaintiff's allegations of violations of accounting principles (discussed above), the case law holds that [HN7] simplicity of the principles cannot, alone, raise a strong inference of scienter, but can only do so when combined with other allegations evincing fraudulent intent. See e.g. Id.; In re Telxon Corp. Sec. Litig., 133 F. Supp.2d 1010, 1030-31 (N.D.Ohio 2000).

Additionally, it should be noted that Plaintiff does not cite to any authority for the proposition that POC accounting principles are simple. c.f., In re Boeing Sec. Litig., 40 F. Supp.2d 1160 (W.D.Wash. 1998) (POC accounting principles not described as simple).

c. The Deficiency of Duratek's internal controls

Plaintiff asserts [*15] that Duratek's "materially deficient" internal controls, used to track actual costs and compare them to estimated costs, supports a strong inference that Defendants acted with scienter. Plaintiff cites a number of cases for this proposition; however, a review of the cases cited indicates that they contain allegations of pervasive, ongoing deficiencies in the internal controls that were known to the defendant companies before the alleged fraud at issue occurred. For example, In re Ikon Office Solutions, Inc. Sec. Litig., 66 F.Supp2d 622, 631 (E.D.Pa. 1999), cited to by Plaintiff, involved a situation where various internal memoranda and an audit raised "numerous red flags evidencing that the Company's internal controls were grossly deficient and that the financial data being generated by its financial reporting mechanism was so pervasively inaccurate and unreliable that reliance on that information for financial statement purposes was precluded by GAAP and GAAS;" information which was allegedly disregarded by Defendant. In Ikon, the

Plaintiffs stress that [Defendant's] internal

audits gave it a deep understanding of the existence and significance of these [*16] problems . . . and they allege facts suggesting that [Defendant] had knowledge that the problems it identified in 1996 persisted up to the time the unqualified audit statement was issued. This is supported by plaintiffs' claims that the same items [Defendant] had highlighted as problematic in 1996 were the source of many of the charges in 1998. In short, plaintiffs' allegations regarding [Defendant's] knowledge of the failure of internal controls and the significance of those problems are relevant claims of scienter.

Id.

Such allegations of Defendant's knowledge of "pervasive economic problems throughout the company's internal controls" are simply not present in the instant case. Id. at 630. [HN8] While, of course, "internal policies are relevant to scienter to the extent that they correspond to violations of GAAP and GAAS or that they indicate an auditor's awareness of problems in corporate finances," such allegations cannot, without accompanying allegations of fraudulent intent, be sufficient to raise a strong inference of scienter. Id. at 631. Indeed, one of the cases relied on by Plaintiff states that "this factor by itself is not [*17] particularly compelling where the violations of internal policies are not materially different from the deviations from GAAP." Gelfer v. Pegasystems, Inc., 96 F. Supp.2d 10, 17 (D.Mass.,2000).

The Court should also note that most of the cases cited by Plaintiffs also include other allegations which strongly give rise to an inference of scienter on their own, such as insider trading. See e.g. Provenz v. Miller, 102 F.3d 1478 (9th Cir. 1996).

In sum, while there are cases in which [HN9] violations of internal policies can be probative of scienter, absent allegations of knowledge and disregard of such "red flags" on Defendant's part or some other allegations evincing fraudulent intent, allegations regarding deficient internal controls are not sufficient to raise a strong inference of scienter in the instant case.

d. The magnitude of the restatement





Plaintiff asserts that the sheer magnitude of the overstatements in this case is strongly suggestive of scienter and, at the very least, adds to the inference when considered alongside his other allegations.

Although Duratek's restatements of net income were material, they are not of the nature that would [*18] give rise to a strong inference that they resulted from fraud. n4 They were, for example, far less severe than the restatements made in cases relied upon by Plaintiff. In In re MicroStrategy, the misstatements at issue reported that the company was earning millions of dollars in profits each quarter, when in fact it was losing millions per quarter. MicroStrategy, 115 F. Supp.2d at 624-25. In total, the false financial statements in MicroStrategy took a company that lost $ 36.8 million over nearly a two year period and falsely presented it as a company that earned profits of $ 18.9 million over that period. Id. The MicroStrategy court found that the misstatements were "breathtaking" and constituted a "night-and-day" difference. Id. at 636-37.

n4 See infra Section I, page 5 for numerical examples.

Similarly, the restatements in In re Telxon Corp., also cited by Plaintiff, were of similar magnitude. In Telxon, among the restatements were 200% downward [*19] adjustments of earnings for two separate quarters. Telxon, 133 F. Supp.2d at 1015. Over $ 18 million in profits were eliminated by the restatements, "effectively eliminating all profits and growth Telxon publicly claimed to be experiencing for the past three years." Id.

In contrast, Duratek's financial statements did not disguise a failing company or wipe out years' worth of reported profits. Even after being restated, Duratek's financials showed a profit during each of the three quarters at issue. The Court finds that the restatements made by Duratek were simply not of a magnitude sufficient to raise an inference of scienter.

In sum, although Plaintiff alleges that Defendants violated simple GAAP principles, as well as internal policy, resulting in restatements of a material magnitude, these allegations, taken as a whole, are insufficient to raise a strong presumption of scienter.

2. Motive and Opportunity

[HN10] Under the second prong of the Second Circuit's scienter standard, plaintiffs may plead scienter by establishing a motive to commit fraud and an opportunity to do so. "In order to demonstrate motive, a plaintiff must show 'concrete benefits that could [*20] be realized by one or more of the false statements and wrongful non-disclosures alleged.'" Phillips, 190 F.3d at 621, quoting Shields v. Citytrust Bancorp, Inc. 25 F.3d 1124, 1130 (2d Cir. 1994). Opportunity may be established by showing that Defendants had "the means and likely prospect of achieving [the] concrete benefits [desired] by the means alleged." In re Criimi Mae, 94 F.Supp.at 660, quoting Shields, 25 F.3d at 1130.

Without doubt, Defendants, holding positions of authority with Duratek, had the opportunity to commit fraudulent acts. See Phillips, 190 F.3d at 621 (holding that Defendant, as Chairman and CEO of company had opportunity to cause artificial depression in price of stock); In re Criimi Mae, 94 F. Supp.2d at 660 (holding that officers of company had opportunity to commit fraud given their positions of power and authority in company). At issue is whether Plaintiff has pled facts sufficient to establish that Defendants had a motive to commit fraud.

However, the Amended Complaint does not plead motive. Plaintiff asserts in his Opposition that he is "not required [*21] to plead motive in order to demonstrate the requisite fraudulent intent." Pl. Opp. p. 24. Therefore, Plaintiff does not allege scienter by pleading a motive to commit fraud and an opportunity to do so.

In sum, Plaintiff fails to "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind," for the alleged fraud. 15 U.S.C. § 78u-4(b)(2). Accordingly, Count I of the Amended Complaint shall be dismissed. n5

n5 The Court has reviewed Aldridge v. A.T. Cross Corp. 284 F.3d 72, 2002 U.S. App. LEXIS 4401, No. 01-1989, 2002 WL 407887 (1st Cir. 2002), which Plaintiff filed as "supplemental authority in further support" of his Opposition. The Court finds that Aldridge does not compel a different result from that reached here.

B. Section 20(a) Control Person Liability

Plaintiff argues that Defendants are subject to control

Page 9





Case 4:06-cv-03936-CW    Document 45-10    Filed 03/23/2007    Page 11 of 11

2002 U.S. Dist. LEXIS 20967, *21; Fed. Sec. L. Rep. (CCH) P92,218

person liability under Section 20(a) of the Exchange Act; however, [HN11] their failure to state a claim for a primary securities fraud [*22] violation precludes a finding of control person liability. See In re Criimi Mae, 94 F. Supp.2d at 662; In re Cyromedical Sciences, Inc. Sec. Litig., 884 F. Supp. 1001, 1011 (D.Md. 1995). Accordingly, Count II of the Amended Complaint shall be dismissed.

## IV. CONCLUSION

For the foregoing reasons:

1. The Motion of Defendants to Dismiss the First Amended Complaint IS GRANTED.

2. The Motion for Leave for Plaintiff to File Notice of Supplemental Authority in Further Support of Plaintiff's Opposition to Defendants' Motion to Dismiss IS GRANTED.

3. Judgment shall be entered by separate Order.

SO ORDERED this 30th day of April, 2002.

Marvin J. Garbis

United States District Judge

  

**EXHIBIT J**

2007 WL 509787
--- F.3d ---
(Cite as: 2007 WL 509787 (4th Cir.(N.C.)))

Only the Westlaw citation is currently available.

United States Court of Appeals,
Fourth Circuit.

**TEACHERS' RETIREMENT SYSTEM OF
LOUISIANA, Plaintiff-Appellant,
and**
**Barry Schoenfeld, Individually and on behalf of
all others similarly situated;**
**Schoenfeld Group; Bernardinelli Group, Carmine
Bernardanelli, Joseph M. Hansen
and Frances C. Hunt being referred to as
Bernardinelli Group; Gary Sandler;
Rochelle Sandler; Judy A. Smith; William H.
Dail; Louisiana School Employee
Retirement System, Plaintiffs,**
v.
**Fred Neal HUNTER; Cynthia B. Merrell; Dolph
W. Von Arx; Charles Swoboda; Walter
Robb; John W. Palmour; Cree, Incorporated;
Calvin H. Carter, Jr.; James E.
Dykes, Defendants-Appellees.**

**No. 05-1988.**

Argued Sept. 20, 2006.
Decided Feb. 20, 2007.

Background: Investors brought class action against
corporation and its current officers alleging fraud in
violation of federal securities laws. The United
States District Court for the Middle District of
North Carolina, Frank W. Bullock, Jr., J.,
dismissed action. Investors appealed.

Holdings: The Court of Appeals, Niemeyer,
Circuit Judge, held that: (1) facts alleged in
complaint were consistent with performance of
publicly disclosed supply contract; (2) investors did
not plead facts sufficient to permit reasonable belief
that purchaser held right of return; (3) investors did
not advance sufficient facts to show how former
chief executive officer (CEO) of corporation could
have had any access to information of corporation
during relevant time period; (4) PSLRA's stringent
requirements for pleading misleading statements or
omissions by corporation were not satisfied; (5)
statements of confidential source indicated that he
was not familiar with research and development
contract between corporations; (6) facts alleged were

just as consistent with corporation having taken risk
in hope of securing profits in high-technology
industry; (7) corporation's writing down of goodwill
in subsequent annual report was not probative of
investors' allegation that corporation engaged in
"round-tripping" transaction; and (8) investors did
not show that trades by corporate officers were made
at time consistent with knowing or reckless fraud.

Affirmed.

Shedd, Circuit Judge, filed dissenting opinion.

**[1] Federal Civil Procedure    1828**
170Ak1828
Under the scheme of notice pleading and broad
discovery, consideration of a motion to dismiss for
failure to state a claim must account for the
possibility that a noticed claim could become legally
sufficient if the necessary facts were to be developed
during   discovery.   Fed.Rules   Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[2] Securities Regulation    60.18**
349Bk60.18
In purporting to allege claims under § 10(b) and
Rule 10b-5, a plaintiff is required to allege that: (1)
the defendant made a false statement or omission of
material fact (2) with scienter (3) upon which the
plaintiff justifiably relied (4) that proximately
caused the plaintiff's damages. Securities Exchange
Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17
C.F.R. § 240.10b-5.

**[3] Securities Regulation    60.51**
349Bk60.51
"Upon information and belief" formulaic set of
allegations as to why statements were misleading
were not sufficient to support reasonable belief that
statements were in fact misleading, as required to
state federal securities fraud claim under PSLRA,
although complaint adequately specified statements
alleged to have been misleading and reasons why
they were misleading.  Securities Exchange Act of
1934, § 10(b), 15 U.S.C.A. § 78j(b); Private
Securities Litigation Reform Act of 1995, §
21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. §
240.10b-5.

**[4] Securities Regulation    60.51**
349Bk60.51

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Page 286

In order to satisfy the heightened requirements for pleading misrepresentations or omissions in a federal securities fraud case subject to the PSLRA, plaintiffs must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) all facts on which that belief is formed with particularity when an allegation regarding such a statement is based on information and belief. Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1).

**[5] Securities Regulation     60.51**
349Bk60.51
Under the PSLRA, a court must ascertain on a motion to dismiss for failure to state a claim whether the complaint states sufficient facts to permit a reasonable person to find that the defendant made a false or misleading statement. Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1).

**[6] Securities Regulation     60.51**
349Bk60.51
Under the PSLRA, if a plaintiff does not allege all facts but does allege sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading, a court should deny motion to dismiss for failure to state a claim as to the "misrepresentation" element of a federal securities fraud claim. Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1).

**[7] Securities Regulation     60.51**
349Bk60.51
Under the PSLRA, a case-by-case assessment of the complaint as a whole is made when determining whether sufficient facts have been alleged to support a reasonable belief in the allegation that the defendant's statement was misleading; a court considers the number and level of detail of the facts, the plausibility and coherence of the facts, whether sources of the facts are disclosed and the apparent reliability of those sources, and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading. Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1).

**[8] Securities Regulation     60.51**
349Bk60.51

Under the PSLRA, when the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or, in the alternative, provide other evidence to support their allegations. Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1).

**[9] Securities Regulation     60.51**
349Bk60.51
PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied on claim that corporation exercised control over other corporation and caused other corporation to purchase unneeded crystals from corporation in "channel stuffing" scheme, as required for federal securities fraud claim, where facts alleged in complaint were consistent with performance of publicly disclosed supply contract, and familial relationship between managing officers from those corporations, and their meeting periodically to negotiate and supervise agreements, did not raise inference that corporation somehow forced other corporation to enter supply contract. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[10] Securities Regulation     60.51**
349Bk60.51
PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied on claim that corporation improperly booked sales of silicon carbide crystals to purchaser, as required for federal securities fraud claim, where investors did not plead facts sufficient to permit reasonable belief that purchaser held right of return or that corporation had to adjust its revenues due to any returns of crystals from purchaser. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[11] Securities Regulation     60.51**
349Bk60.51
Investors did not advance sufficient facts to show how former chief executive officer (CEO) of defendant corporation could have had any access to



information of corporation during relevant time period, and therefore PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied by allegations of former CEO, where former CEO no longer worked for corporation during relevant time period, he did not perform work under employment contract with corporation that was contemporaneous with allegations, and current CEO did not communicate with former CEO regarding corporation's operations, despite their familial relationship. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[12] Securities Regulation    60.51**
349Bk60.51
PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied on claim that corporation intentionally overpaid for its investment in other corporation as part of "round-trip" transaction, as required for federal securities fraud claim, where other corporation's shares were trading above price paid for shares when deal was made, agreement provided neutral formula that established price if other corporation's shares dropped substantially by closing date, and price did drop by closing date. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[13] Securities Regulation    60.51**
349Bk60.51
PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied on claim that corporation did not provide promised research and development work for other corporation, as required for

federal securities fraud claim that was based upon "round-trip" transaction, where statements of confidential source indicated that he was not familiar with research and development contract between corporations. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[14] Securities Regulation    60.51**
349Bk60.51
PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied on claim that corporation fraudulently overpaid for other corporation or neglected to conduct research and development on particular product as part of "round-trip" transaction with other corporation's former parent, as required for federal securities fraud claim; although corporation wrote down value of other corporation's goodwill and was unable to develop technology in timely fashion, reciprocal contract was not per se fraudulent and facts were just as consistent with corporation having taken risk in hope of securing profits in high-technology industry. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[15] Securities Regulation    60.51**
349Bk60.51
Defendant corporation's writing down of goodwill in subsequent annual report, albeit in the aggregate without breaking down which investments were overvalued and by what amounts, was not probative of investors' allegation that corporation engaged in "round-tripping" transaction, and thus PSLRA's stringent requirements for pleading misleading statements or omissions by corporation were not satisfied by such allegations on federal securities claim that corporation fraudulently overpaid for other corporation or neglected to conduct research and development on particular product as required by reciprocal contract with other corporation's former parent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(1), 15 U.S.C.A. § 78u-4(b)(1); 17 C.F.R. § 240.10b-5.

**[16] Securities Regulation    60.51**
349Bk60.51
Any inferences that could have been drawn from facts demonstrating that corporate officers had fairly intimate knowledge of various relevant transactions were immaterial to issue of whether officers acted with scienter, for purpose of claim subject to PSLRA alleging fraud in violation of federal securities laws, where officers' statements or omissions about those transactions were not misleading. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities



Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[17] Securities Regulation    60.45(1)**
349Bk60.45(1)
A securities fraud claim under § 10b of the Exchange Act and Rule 10b-5 thereunder must allege that the defendant made the misleading statement or omission intentionally or with "severe recklessness" regarding the danger of deceiving the plaintiff; a showing of mere negligence will not suffice. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[18] Securities Regulation    60.51**
349Bk60.51
To allege a securities fraud claim against individual defendants under the PSLRA, a plaintiff must allege facts that support a "strong inference" that each defendant acted with at least recklessness in making the false statement. Private Securities Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[19] Securities Regulation    60.51**
349Bk60.51
To allege a securities fraud claim under the PSLRA if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents. Private Securities Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[20] Securities Regulation    60.45(1)**
349Bk60.45(1)
Under the PSLRA, insider trading can imply scienter only if the timing and amount of a defendant's trading were unusual or suspicious. Private Securities Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C.A. § 78u-4(b)(2).

**[21] Securities Regulation    60.45(1)**
349Bk60.45(1)
Investors did not show that trades by corporate officers were made at time consistent with knowing or reckless fraud, for purpose of claim subject to PSLRA alleging fraud in violation of federal securities laws, where officers had not timed their sales to profit from any particular disclosures, officers' sales generally occurred at prices that were

not especially high for class period, officers' trading patterns outside of class period had not been provided to permit comparison with their trades within class period, and investors' allegations about trading related to allegedly fraudulent scheme that lasted some 46 months, which was exceedingly long putative class period. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(2), 15 U.S.C.A. § 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[22] Securities Regulation    60.47**
349Bk60.47
Investors did not adequately allege loss causation on their federal securities fraud claim subject to PSLRA, by documenting $4.11 drop in price of corporation's stock that followed publicity of former officer's lawsuit against corporation, since former officer's prior complaint did not contain any allegations relating to "round-trip" transactions about which investors subsequently complained. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(4), 15 U.S.C.A. § 78u-4(b)(4); 17 C.F.R. § 240.10b-5.

**[23] Securities Regulation    60.51**
349Bk60.51
Because the PSLRA explicitly requires that the plaintiff prove loss causation, the general rules of pleading require that the plaintiff also plead it in his complaint. Private Securities Litigation Reform Act of 1995, § 21D(b)(4), 15 U.S.C.A. § 78u-4(b)(4).

**[24] Securities Regulation    60.51**
349Bk60.51
Under the PSLRA, a plaintiff purporting to allege a securities fraud claim must not only prove loss causation, i.e., that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages, but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. Private Securities Litigation Reform Act of 1995, § 21D(b)(4), 15 U.S.C.A. § 78u-4(b)(4).

**[25] Securities Regulation    60.47**
349Bk60.47
Investors did not adequately allege loss causation on their federal securities fraud claim subject to PSLRA, by documenting $4.11 drop in price of

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



corporation's stock that followed publicity of former officer's lawsuit against corporation, since investors' subsequent allegations about reciprocal contract already had been disclosed in public filings; drop in corporation's share price more logically occurred because market feared that lawsuit launched by founder and former CEO of corporation portended period of instability and discord that could have disrupted corporation's operations, and loss on that basis was not actionable. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 21D(b)(4), 15 U.S.C.A. § 78u-4(b)(4); 17 C.F.R. § 240.10b-5.

**[26] Securities Regulation    60.47**
349Bk60.47
In a federal securities fraud case, a plaintiff can successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss; in such a case, a plaintiff does not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of fraud that caused plaintiffs' loss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[27] Securities Regulation    60.51**
349Bk60.51
Provision of Sarbanes-Oxley Act, which mandated that corporate officers forfeit bonuses and profits if corporation is required to prepare accounting restatement due to issuer's misconduct, was not implicated by investors' allegations that defendant corporation wrote down goodwill in subsequent annual report in aggregate without breaking down which investments were overvalued and by what amounts, since corporation had not issued any accounting restatement and complaint did not adequately allege that any restatement was required. Sarbanes-Oxley Act of 2002, § 304, 15 U.S.C.A. § 7243.

Richard Ara Harpootlian, Columbia, South Carolina, for Appellant. Bruce C. Vanyo, Katten, Muchin & Rosenman, L.L.P., Los Angeles, California, for Appellees. Jay W. Eisenhofer, John C. Kairis, Sidney S. Liebesman, Grant & Eisenhofer, P.A., Wilmington, Delaware, for Appellant. Carl N. Patterson, Jr., Donald H. Tucker, Jr., Smith, Anderson, Blount, Dorsett,

Mitchell & Jernigan, L.L.P., Raleigh, North Carolina; Lyle Roberts, Paul Chalmers, Nicholas I. Porritt, Ilana Kramer, Wilson, Sonsini, Goodrich & Rosati, Reston, Virginia, for Appellees.

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge WILKINSON joined. Judge SHEDD wrote a dissenting opinion.

NIEMEYER, Circuit Judge.

**\*1** The district court dismissed plaintiffs' 168-page securities-fraud class-action complaint brought against Cree, Inc., a high-technology business in Durham, North Carolina, [FN1] which purported to allege claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaint claims that Cree made misleading statements about its business transactions with six companies over a period of almost four years, which were discovered when a former officer sued the company in June 2003. Relying on Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, the district court held that the complaint failed to allege facts sufficient to support the plaintiffs' claims that Cree's statements were misleading. The court also concluded that the plaintiffs did not sufficiently allege that the statements were made with the requisite scienter or that plaintiffs' losses were caused by the misrepresentations and omissions of which they complained.

Applying the Private Securities Litigation Reform Act and Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) to plaintiffs' complaint de novo, we affirm, concluding that plaintiffs are complaining only about market risks, not particularized securities fraud.

I

On June 12, 2003, Eric Hunter, co-founder and CEO of Cree, Inc., from 1987 to 1994, and his wife filed suit against Cree, F. Neal Hunter (Eric Hunter's brother and co-founder of Cree, as well as its CEO from 1994 to 2001 and chairman of the board thereafter), and other officers, alleging

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



violations of state and federal securities laws, defamation, and intentional infliction of emotional distress. Eric Hunter also sought a preliminary injunction against Cree and Neal Hunter to prevent alleged personal harassment that appeared to have attended an ongoing family fight. News of the lawsuit caused the price of Cree's stock to fall the next day from $22.21 to $18.10.

Although Eric Hunter promptly settled his suit in August 2003, the allegations in his complaint quickly spawned numerous class actions by purchasers of Cree stock who alleged securities fraud during a period beginning on August 12, 1999, when Cree filed an annual report on SEC Form 10-K, and ending on June 13, 2003, the day after Eric Hunter filed his suit, purportedly revealing the truth of Cree's fraud during the previous years. The cases were consolidated in the Middle District of North Carolina, and Teachers' Retirement System of Louisiana was named the lead plaintiff. In a consolidated class action complaint, Teachers' Retirement System and the other plaintiffs (collectively, "plaintiffs") sought certification of a class of all purchasers of Cree's common stock during the period from August 12, 1999 to June 13, 2003. The consolidated class action complaint named Cree, as well as six of the corporation's officers and directors, F. Neal Hunter, Cynthia B. Merrell, Dolph W. Von Arx, Charles Swoboda, Walter L. Robb, and John W. Palmour, as defendants (often hereafter referred to collectively as "Cree").

**\*2** Count I of the consolidated class action complaint alleged that Cree violated § 10(b) of the Securities Exchange Act ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which prohibits making false or misleading statements in connection with the sale of securities. Count II claimed that the individual defendants violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which assigns joint and several liability to a person who controls another who violates a securities regulation. The district court granted the defendants' motion to dismiss that complaint for failing both to plead fraud with particularity and to plead facts supporting a strong inference that Cree acted with scienter. See In re Cree, Inc. Sec. Litig., 333 F.Supp.2d 461, 474-75 (M.D.N.C.2004).

In response, the plaintiffs filed the first amended consolidated class action complaint (hereafter, "the complaint"), at issue in this appeal. The complaint bolstered the allegations made in the original consolidated class action complaint and named two more Cree directors as defendants, Calvin H. Carter and James E. Dykes. Additionally, the complaint added Counts III, IV, and V. Count III alleged that the individual defendants engaged in insider trading, in violation of § 20A of the Exchange Act, 15 U.S.C. § 78t-1(a). Count IV claimed that the individual defendants are personally liable under § 18 of the Exchange Act, 15 U.S.C. § 78r(a), for making misleading statements. Count V claimed that Neal Hunter, Swoboda, and Merrell violated § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, which requires CEOs and CFOs to reimburse their corporations for bonuses and other compensation if the corporation is required to prepare an accounting restatement due to misconduct.

Each of the counts relies on allegations that Cree misrepresented a series of its transactions with six other companies over a period of 46 months in an effort to artificially inflate the price of its stock. The complaint alleges that Cree engaged in a "channel-stuffing" scheme with Charles & Colvard ("C & C"), by which Cree forced C & C to purchase silicon carbide crystals far in excess of C & C's need and then booked the unqualified revenue from the sales of these crystals even though C & C held an undisclosed right to return the crystals later on. It also alleges that Cree improperly booked revenue from a research and development agreement with C & C and a sale of equipment to C & C, because these transactions were a sham.

The complaint further alleges that Cree engaged in "round-trip" transactions with five other companies, Microvision, Inc., Spectrian, Inc., World Theatre, Inc., Xemod, Inc., and Lighthouse, Inc. "Round-tripping" typically refers to reciprocal agreements, involving the same products or services, that lack economic substance but permit the parties to book revenue to improve their financial statements. The putative pattern of these deals as alleged in the complaint was that Cree would intentionally overpay for an investment in the stock of the other company in exchange for the other company's agreement to purchase bogus R & D services from Cree.

**\*3** Although Cree disclosed aspects of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



transactions in its public filings, the plaintiffs' complaint alleges that the true nature of the transactions became known only when Eric Hunter filed his action against Cree, his brother, and other officers of Cree in June 2003. The complaint alleges that what was learned in June 2003 differed from what Cree had disclosed publicly and that the public disclosures were materially misleading.

Cree filed a motion to dismiss plaintiffs' amended class-action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion in its entirety, finding that the complaint's impressive length did not portend similarly impressive substance. The court concluded first that "plaintiffs adequately identif[ied] the statements [of Cree] they believe[d] to be false and the reasons why they believe[d] them to be false, but fail[ed] to state with particularity facts supporting a strong inference of fraud." Second, the district court concluded that plaintiffs did not adequately plead that the defendants acted with the requisite scienter because the complaint neither identified misleading statements or omissions nor alleged sufficient circumstantial evidence of scienter. Finally, the court found that "plaintiffs ... failed to demonstrate a direct relationship between their losses and the alleged misrepresentations and have failed, therefore, to establish the required element of loss causation."

Having dismissed the first count alleging a claim under § 10(b) and Rule 10b-5, the court also dismissed plaintiffs' claims under §§ 20(a) and 20A of the Exchange Act because these claims depended upon the liability alleged in the first count. Similarly, the court dismissed plaintiffs' claim pursuant to § 18 of the Exchange Act because plaintiffs failed to plead facts showing that Cree made false statements. Finally, the court dismissed plaintiffs' claim under § 304 of the Sarbanes-Oxley Act because plaintiffs did not allege that Cree was required to issue any restatement of its financial reports.

From the district court's final order dismissing the complaint with prejudice, the plaintiffs filed this appeal, challenging each of the district court's grounds for dismissal and seeking either the reinstatement of their complaint or leave to amend it. Cree urges us to affirm the district court's order or, in the alternative, to find that the complaint was barred by the applicable statute of limitations. Cree argues that in a securities fraud case such as this, the limitations period began to run when a reasonable investor would have "inquiry notice" of potential fraud, citing Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir.1993).

## II

The district court dismissed the plaintiffs' class-action complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104-67, 109 Stat. 737 (the "PSLRA"). Because the district court's order ruled on the legal sufficiency of the complaint, we review that order de novo. See Jordan v. Alternative Res. Corp., 458 F.3d 332, 338 (4th Cir.2006).

*4 Ordinarily, the legal sufficiency of a complaint under Rule 12(b)(6) is determined by whether the complaint states a claim upon which relief can be granted in light of the pleading requirements of Rules 8 and 9, as well as the larger design of the Federal Rules. This design provides for simplicity in pleading that intends to give little more than notice to the defendant of the plaintiff's claims and that defers until after discovery any challenge to those claims insofar as they rely on facts. Of course, the issue of whether the plaintiff is pursuing a claim upon which relief can be granted is a purely legal question that can be determined at virtually any stage of the federal process--in the beginning, under Rule 12(b)(6); after the pleadings have been filed, under Rule 12(c); after discovery, under Rule 56; or after the plaintiff has presented his case at trial, under Rules 50(a) or 52. When the issue of whether a complaint states a claim upon which relief can be granted is raised by a Rule 12(b)(6) motion and is dependent on the development of facts, however, the jurisprudence of Rule 12(b)(6) requires postponement of any final determination of the issue.

[1] More precisely, under this scheme of notice pleading and broad discovery, consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery. As the Supreme Court has characterized this approach to Rule 12(b)(6) motions:

Given the Federal Rules' simplified standard for

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal quotation marks and citation omitted) (emphasis added). Of course, when the matters alleged in the complaint are taken as true and the complaint still fails to state a claim upon which relief can be granted, it will be dismissed at the outset, under Rule 12(b)(6). See Jordan, 458 F.3d at 338.

Some have criticized this design of federal procedure as encouraging the filing of frivolous suits that have little hope of success and are designed to harass the defendant. The Supreme Court in Swierkiewicz considered the defendant's similar argument that "allowing lawsuits based on conclusory allegations of discrimination to go forward will burden the courts and encourage disgruntled employees to bring unsubstantiated suits." 534 U.S. at 514, 122 S.Ct. 992. The Supreme Court responded:

Whatever the practical merits of this argument, the Federal Rules do not contain a heightened pleading standard for employment discrimination suits. A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation. Furthermore, Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits. Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*5 Id. at 514-15, 122 S.Ct. 992 (internal quotation marks and citations omitted).

To address just the type of argument that the defendant advanced in Swierkiewicz, the Federal Rules of Civil Procedure require particularized pleadings in specific types of cases, including those alleging fraud. Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The reasons that have been given for applying this heightened pleading standard in fraud cases are numerous and continue to be debated. See generally

5A Charles Alan Wright & Arthur M. Miller, Federal Practice and Procedure § 1296 (3d ed.2004). But one repeatedly given reason is summarized as follows:

[S]ome federal courts have expressed the view that allegations of fraud or mistake frequently are advanced only for their nuisance or settlement value and with little hope that they will be successful on the merits; indeed, there actually may be little or no incentive to secure the adjudication of the claim in some instances. Thus, unfounded fraud claims should be identified and disposed of early.

Id. at 37. Professors Wright and Miller also note, with particular relevance to the case before us, that this justification for Rule 9(b) encapsulates the goal of sorting out at an early stage "strike suits" in the securities field. Id. at 45-47.

Yet, the inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA. As the Committee of Conference that reported the PSLRA noted, "[Rule 9(b) ] has not prevented abuse of the securities laws by private litigants. Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits." H.R.Rep. No. 104-369, at 41 (1995) (Conf.Rep.), reprinted in 1995 U.S.C.C.A.N. 730, 740. The Committee of Conference stated that it was reacting to testimony on the need to establish "uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits," and therefore intended "to strengthen existing pleading requirements." Id. Thus, the PSLRA was enacted in response to evidence presented to the Committee that

abusive practices committed in private securities litigation include ... the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action.

* * *

This legislation implements needed procedural protections to discourage frivolous litigation.

Id. at 730-31.

The PSLRA provides that in pleading a material misrepresentation or omission, in violation of §

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



10(b) of the Exchange Act and Rule 10b-5, and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead facts. Cf. Fed.R.Civ.P. 8(a)(2) (providing that a pleading generally need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" (emphasis added)). Thus, in alleging misrepresentations or omissions under the PSLRA, a complaint must include "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphasis added). And in alleging scienter, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2) (emphasis added). The PSLRA also directs that any complaint not meeting the pleading requirements be dismissed. Id. § 78u-4(b)(3)(A), and that during the pendency of any motion to dismiss, discovery be stayed, subject to exceptions, id. § 78u-4(b)(3)(B).

*6 Thus, while the Federal Rules generally allow a court, in ruling on a motion to dismiss under Rule 12(b)(6), to take into account any set of facts that could be proved consistent with the allegations of the complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission. 15 U.S.C. § 78u-4(b)(1). The Act also requires a plaintiff to plead sufficient facts to raise a strong inference of scienter. Id. § 78u-4(b)(2). Of course, the other elements of a securities fraud claim would be analyzed under the traditional pleading scheme of Rules 8 and 9, since Congress only addressed misrepresentations and scienter in § 78u-4(b).

[2] In purporting to allege claims under § 10(b) and Rule 10b-5, the plaintiffs were required to allege that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." [FN2]

Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 208 (4th Cir.1994). In dismissing the plaintiffs' complaint, the district court held the complaint to be wanting as to elements (1) (misrepresentation or omission), (2) (scienter), and (4) (loss causation). Thus, with respect to elements (1) and (2), we will apply the pleading standard created by the PSLRA, and with respect to element (4)--that the misrepresentation caused the plaintiffs' loss--we will apply the general pleading standards of Rules 8 and 9, as applicable to any fraud claim.

III

[3] In dismissing the plaintiffs' complaint, the district court concluded first that the complaint failed to satisfy § 78u-4(b)(1)'s heightened requirements for pleading misrepresentations or omissions. While it found that the complaint adequately specified the allegedly misleading statements and the reasons why they were misleading, it concluded that, with respect to every single statement, the complaint fell short of alleging facts sufficient to support the plaintiffs' information and belief that the statements were misleading, as required by § 78u-4(b)(1).

[4] Section 78u-4(b)(1) provides:
In any private action arising under this chapter in which the plaintiff alleges that the defendant--
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
*7 15 U.S.C. § 78u-4(b)(1) (emphasis added). Thus, plaintiffs must allege: (1) each misleading statement; (2) the reasons each statement was misleading; and (3) when an allegation regarding such a statement is based on information and belief, "with particularity all facts on which that belief is formed."

[5] The "all facts" requirement is imposed for several reasons. First and most obviously, it is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



included to determine the legal sufficiency of the complaint under Rule 12(b)(6). Under Rule 12(b)(6), a complaint is legally sufficient if it "state[s] a claim upon which relief can be granted." As explained above, under the generally applicable notice pleading rules, this standard requires the court to ask whether any conceivable set of facts could be proved consistent with the complaint's allegations that would permit relief to be granted. See Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992. The PSLRA's "all facts" standard, however, changes the relevant set of facts for alleging misrepresentations and omissions to those alleged in the complaint. Under the PSLRA, therefore, our inquiry becomes whether, if those facts alleged in the complaint are true, relief could be granted on the plaintiffs' claim. Stated another way, we must ascertain whether the complaint states sufficient facts to permit a reasonable person to find that the plaintiff satisfied this element of his claim--that the defendant made a false or misleading statement.

[6] If the plaintiff fails to allege all facts but does allege sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element. See, e.g., Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.2000); see also Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir.2006) (endorsing Novak's standard); California Pub. Employees' Retirement Sys. v. Chubb Corp., 394 F.3d 126, 146 (3d Cir.2004) (same); Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1099 (10th Cir.2003) (same). This construction of § 78u-4(b)(1) logically follows from the inquiry required by Rule 12(b)(6), which tests only the legal sufficiency of the complaint.

In interpreting § 78u-4(b)(1)'s "all facts" standard in the context of a Rule 12(b)(6) motion to require a pleading of "sufficient facts," we do not read the "all facts" standard out of the statute. It remains relevant to other aspects of the court's supervision of securities fraud class action litigation. For example, the court must be able to determine whether some discovery will be permitted, despite the general bar against discovery pending motions to dismiss. See 15 U.S.C. § 78u-4(b)(3)(B). Having the assurance that all facts upon which the plaintiffs' belief is based could be relevant in making this decision. The court might be similarly assisted in

supervising the preservation of evidence "relevant to the allegations" under § 78u-4(b)(3)(C). And of course, at the conclusion of every lawsuit covered by the PSLRA, the court must make specific findings as to the parties' compliance with Federal Rule of Civil Procedure 11(b) as it applies to "any complaint, responsive pleading, or dispositive motion." See id. § 78u-4(c)(2) (emphasis added).

*8 Reading § 78u-4(b)(1) to require the pleading of all facts which support a plaintiff's belief on the sanction of dismissal authorized by § 78u-4(b)(3)(A) could theoretically lead to some harsh results in the management of discovery and PSLRA litigation in general. See Novak, 216 F.3d at 314 (discussing these possibilities). But since Rule 12(b)(6) focuses on whether the complaint states a claim upon which relief "can be granted," we need only determine in the circumstances before us whether plaintiffs' complaint alleges sufficient facts upon which a reasonable belief can be formed that Cree's representations or omissions were misleading.

[7][8] Determining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole. We will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading. See Adams, 340 F.3d at 1102-03; Chubb Corp., 394 F.3d at 147-55. When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources "with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged' or in the alternative provide other evidence to support their allegations." Tellabs, Inc., 437 F.3d at 596 (quoting Novak, 216 F.3d at 314).

The complaint at issue here adequately specifies the statements alleged to have been misleading and the reasons why they were misleading. Indeed, it identifies no less than 48 statements publicly made over nearly four years regarding Cree's transactions. But after each misleading statement, the complaint simply repeats a formulaic set of allegations why, upon "information and belief," the statement was misleading. The facts alleged in support of these



formulaic reasons fail to support a reasonable belief that the statements were in fact misleading, and therefore we conclude that the complaint fails to satisfy the PSLRA and Rule 12(b)(6)'s requirement that the complaint shall state with particularity sufficient facts on which a reasonable belief can be formed. This becomes clear when we consider the facts supporting the allegations about each transaction.

### A. C & C Crystal Supply Agreement, R & D Agreement, and Equipment Sale

[9] In multiple public filings from 1997 to 2002, Cree disclosed two agreements entered into with Charles & Colvard ("C & C"), a company founded in 1995 by Eric Hunter and then managed by his brother, Jeff Hunter. One agreement was a long-term supply agreement, dated June 6, 1997, in which C & C agreed to purchase half of its requirements for silicon carbide crystals from Cree during each calendar quarter. Cree, in turn, agreed to supply specific quantities and colors of crystals exclusively to C & C. The agreement also provided that if C & C would order more crystals than Cree had a capacity to produce, C & C would have the right either to reduce the quantity of its order or to purchase crystal-growing equipment from Cree. If C & C opted to purchase equipment, Cree would construct the equipment on its premises to produce the additional crystals for C & C, and C & C would become obligated to purchase at least six months' output from the new equipment. After the equipment was fully depreciated, C & C would be required to transfer title to the equipment to Cree.

\*9 Under the second agreement, entered into at the same time as the crystal supply agreement, C & C agreed to pay Cree for research and development of colorless silicon carbide crystals. As amended in 1998, this agreement required C & C to pay Cree for R & D efforts at a level totaling $2.88 million annually for four years. In an amendment in May 1999, however, the parties lowered the level of R & D to $1.44 million annually.

For fiscal year 1999, Cree reported booking $11.4 million in revenue from the agreements, and in fiscal year 2000, $16.2 million. These sales were boosted by C & C's exercise of its option to purchase equipment in May 1999 for Cree's production of more silicon carbide crystals. As

disclosed that month, this decision triggered C & C's contractual obligation to purchase the output of the new equipment over the next two years. C & C's payments during these years constituted a substantial portion of Cree's revenue for the relevant periods. For instance, sales of silicon carbide crystal materials to C & C for the second half of the calendar year 1999 represented 35% of Cree's revenue for the period.

In late 1999, C & C's fortunes began to take a downward turn, and C & C's need for silicon carbide crystals thereafter steadily declined. Cree disclosed in its January 3, 2000 SEC registration statement that C & C's sales were slow and inventory had grown, and Cree acknowledged that "a substantial portion of [its] revenue has come from large purchases by a small number of customers," of which C & C was one. Cree reported that it "anticipate[d] that sales to [C & C] will decrease in calendar 2000" and that Cree "agreed that [C & C] could reschedule approximately one-half of its purchase commitments from the first half of calendar 2000 to the second half of the year." In April 2000, Cree disclosed in its quarterly report that, due to C & C's anemic sales and high inventory, "We anticipate that overall sales to [C & C] will decrease to less than 10 percent of our revenue for the fourth quarter of fiscal 2000, and will continue to decline as a percentage of revenue through the first half of 2001." Likewise, in February 2001, Cree's quarterly report stated, "We anticipate little or no revenue from the gemstone business over the next several quarters as [C & C] balance[s] their inventory levels. C & C sales made up approximately 5% of total revenue during the second quarter of fiscal 2001." By May 2001, Cree reported that it had made no sales to C & C in the third quarter of 2001 and expected "little to no revenue" from C & C in the several upcoming quarters. Because C & C's weakening sales hindered its ability to pay for Cree's crystals, Cree repurchased the crystal-growing equipment that it had constructed and sold to C & C, financing the purchase by giving C & C a $5 million credit against C & C's future crystal purchases. C & C disclosed this equipment sale in its own April 2000 quarterly report.

Plaintiffs' complaint alleges that Cree's disclosures were false or misleading because Cree's arrangement with C & C was a "channel-stuffing"

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



scheme, by which Cree "exerted actual control over C & C" in their business dealings and caused "C & C to purchase SiC [silicon carbide] materials in excess of its demand for such materials, knowing that such purchases were leading to excessive inventory buildup" and which signaled "growth in recurring business that did not exist." The complaint also alleges that Cree overstated its revenues by booking "payments by C & C for SiC material which C & C had a right to reject and return." The complaint alleges that Cree overstated its revenues by "book[ing] payments from C & C for Cree's R & D work as revenue when Cree never conducted such R & D work." Finally, the complaint alleges that Cree fraudulently "booked revenues from the sale of equipment to C & C, and booked that transaction as a sale to C & C followed by Cree's repurchase of the equipment when no such sale and repurchase had occurred."

*10 The complaint, however, completely fails to include facts sufficient to permit a reasonable belief that Cree exercised any control over C & C and caused C & C to purchase unneeded crystals in a "channel stuffing" scheme. Far from impeaching the truth of Cree's public disclosures, the facts alleged in the complaint are consistent with the performance of the publicly disclosed supply contract, which obligated C & C to purchase certain outputs of crystals. The complaint alleges testimony of a former Cree process engineer who observed Cree selling consistent quantities of silicon carbide crystals to C & C during 2000--precisely what the publicly disclosed supply contract called for. It also includes the statement of a confidential source, an undisclosed former C & C director of technology, who stated that "C & C spent money like 'drunken sailors' by regularly writing checks to Cree for $200,000-$300,000." This, too, is indicative of C & C's actual payments to Cree pursuant to the contract. To the extent that the complaint alleges that Cree somehow forced C & C to enter the supply contract, the facts are even more wanting. The complaint's only support of this claim is that managing officers from the two companies were related and met periodically to negotiate and supervise the agreements. It is impossible to infer from this that the publicly disclosed agreements were fraudulent.

[10] To plead facts sufficient to permit a reasonable belief that Cree improperly booked sales

of silicon carbide crystals to C & C, the complaint depends on the existence of a right of C & C to return the crystals. The complaint works under the assumption that Cree would not have been entitled to book the sales if C & C had purchased the crystals on the condition that they could be rejected and returned. Even if this assumption were correct, the complaint fails to provide facts from which a reasonable person could conclude that C & C held any such right of return. Moreover, the complaint fails to suggest that Cree ever had to adjust its revenues due to any returns of crystals from C & C. If such a right of return had existed and the purchases were a sham, one would expect that C & C would have exercised the right of return, requiring Cree to adjust its books. Yet, no such scenario is even suggested in the complaint.

[11] Instead, the complaint relies on two personal sources who alleged that Cree concealed C & C's right of return--Eric Hunter and an unidentified former Cree process engineer. First, Eric Hunter's statement cannot reasonably be taken to support such an agreement because his service as a Cree officer ended in 1994--three years before the class period began--and the complaint provides no basis for his assertions about the Cree-C & C agreements. While Eric Hunter was under contract as a Cree employee during the class period, the complaint states that Eric Hunter never actually performed work under the contract. Nor does the bare fact that Eric Hunter is the brother of Neal Hunter help because the complaint does not allege that Neal Hunter ever communicated with Eric Hunter regarding Cree's operations. To the contrary, Eric Hunter's personal complaint filed against Cree in June 2003, which the plaintiffs incorporated in their complaint, alleged that Neal Hunter and other Cree officials harassed, threatened, intimidated, and defamed Eric Hunter and his family. The complaint's allegations based on Eric Hunter's statement do not, in short, support a reasonable belief that Cree afforded C & C a secret right to return silicon carbide crystals.

*11 The complaint's second source alleging a secret right of return is a "former Cree process engineer who worked as the lead engineer on and manager of the C & C product line" from mid-2000 to mid-2001. This source stated that in his last few months of his employment (i.e., early 2001), C & C began rejecting large quantities of crystals. He claimed that "the rejected products were kept in C &

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



C's facilities to create justification as to why Cree was not required to create a reserve or take a charge for the purportedly rejected and nonconforming goods." But these facts are not meaningful in light of the settled, publicly disclosed history. By early 2001, Cree's sales to C & C had slowed to a trickle; Cree reported booking no revenue from sales to C & C in January to March 2001 and expected "little to no revenue" in the subsequent quarters. Thus, even if this source correctly recalls C & C rejecting large shipments of silicon carbide crystals from Cree, he is simply wrong regarding Cree's revenue recognition methods. Cree booked no sales to C & C during this time.

Finally, this leaves the complaint's allegations that Cree improperly booked revenue for R & D that it never performed and that Cree improperly accounted for the crystal-growing equipment transaction. Again, these allegations rest entirely upon Eric Hunter's assertions. As discussed above, the complaint advances insufficient facts to show how Eric Hunter could have had any access to this information and therefore fails to satisfy PSLRA's stringent requirements for pleading misleading statements or omissions.

B. Microvision Investment and R & D Agreement

[12] In its 1999 annual report, Cree reported that in May 1999, it purchased $4.5 million of the stock of Microvision, Inc., a Washington corporation. At the same time, Microvision agreed to pay Cree $2.6 million for research and development on light-emitting diodes.

In its quarterly report of April 2000, Cree reported that on March 17, 2000, it purchased an additional 250,000 shares of Microvision, when Microvision stock was trading at $63.75. The stock purchase agreement contemplated a closing on April 13, 2000, and provided for a revision of the purchase price to $50 per share if Microvision's share price dropped substantially by that date. Because Microvision's shares in fact traded at $36.88 at the closing date, Cree paid Microvision $50 per share ($12.5 million), in accordance with the agreement. Microvision's quarterly report of March 30, 2000, discloses that, at that time, Microvision also entered into an identical stock purchase agreement with General Electric.

In its April 2000 quarterly report, Cree also disclosed that Cree and Microvision had amended their prior R & D contract, bringing its total value to $12.6 million over two years. In its 2000 annual report, Cree stated that it would apply this funding from Microvision to reduce Cree's R & D expenses over fiscal years 2000, 2001, and 2002.

*12 Also in its 2000 annual report, Cree disclosed that in June 2000, it sold 162,200 of its Microvision shares, realizing a $3.6 million gain. Microvision's shares, however, steadily declined in value thereafter, and Cree ultimately sold the remainder of the stock in December 2002 for $1.8 million.

Plaintiffs' complaint alleges that Cree misrepresented what, in reality, were meaningless "round-trip" transactions with Microvision, entered into only for purposes of creating "sham" income. The complaint alleges that Cree intentionally overpaid in making its $12.5 million investment in Microvision, paying $50 per share when Microvision's shares traded at $36.88. The complaint alleges that Cree made this overpayment in exchange for Microvision's return of the money in payments for "sham" R & D work, which neither company intended Cree to actually perform. The complaint further alleges that rather than using the payments for R & D to perform research beneficial to Microvision, "Cree simply continued doing the very same research it had been doing in the ordinary course of business." The alleged goal of the Microvision deal was to reduce Cree's R & D costs and thereby overstate its net income.

A typical "round-tripping" scheme involves parties entering into reciprocal contracts to exchange similar amounts of money for similar services. See, e.g., In re Homestore.com, Inc. Sec. Litig., 252 F.Supp.2d 1018, 1024-25 (C.D.Cal.2003) (describing the bartering of like services to artificially inflate revenues). Such transactions can be improper because the parties book revenues even though the transactions "wash out" without any economic substance. But the basis for alleging "round-tripping" does not exist when either of the transactions have economic substance because those transactions would not wash out. The mere existence of reciprocal dealing does not suggest "round-tripping." Indeed, it is a common, legitimate, and perhaps useful business practice for one company to invest in the stock of a second company with which

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



it is entering into a major contract for products or services.

The plaintiffs do not allege the usual "round-tripping" exchange of like services. Instead, their theory is that Cree paid an extra amount of money for Microvision's stock beyond its market value, and that Microvision returned that excess amount in the disguise of a payment for R & D work that Cree did not actually perform. This allegation of round-tripping is plausible, however, only if both transactions involve this same excess amount of payment and otherwise lack economic substance. If either transaction has economic substance, the transactions cannot be a wash, and there would be no artificial inflation of revenue. Thus, the complaint must allege facts sufficient to support a reasonable belief that both legs of the round-tripping were a sham, washing each other out. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[I]f the claim is one that simply makes no economic sense--[the plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary").

*13 The complaint fails adequately to allege facts supporting the conclusion that either leg of Cree's "round-trip" transactions with Microvision lacked economic substance. As to Cree's intentional overpayment, plaintiffs rely solely on the fact that Cree paid $50.00 per share when Microvision's shares were trading at $36.88 on the deal's closing date. The public filings about this transaction show, however, that Cree's agreement to invest in Microvision was signed when Microvision's shares were trading at $63.75. Moreover, the agreement provided a neutral formula that established a purchase price of $50.00 if Microvision's share price dropped substantially by the closing date. Because Microvision's share price in fact dropped, the agreement operated to fix the price at $50.00 per share. It is note-worthy that Microvision's quarterly report of March 30, 2000, shows that Microvision also entered into an identical stock-sale agreement with General Electric. These facts do not support a reasonable belief that Cree intentionally overpaid for its investment in Microvision.

[13] As for the second leg of this alleged "round-trip"--that Cree provided no R & D for Microvision's payments--the complaint relies on

statements from two confidential sources besides Eric Hunter. An unnamed former Microvision project manager who purportedly had "personal knowledge of the contract between Cree and Microvision" stated that the R & D contract "made no mention of the development of improvements in blue and green laser devices for mobile handsets" and that "the contract did not contain any milestones or deadlines for the development of any products." But the actual contract belies these statements, providing that "Cree will undertake ... the development of blue and green LEDs and LDs useful in scanned beam display systems." Additionally, the contract lays out specific program goals and deadlines. Given this source's evident lack of familiarity with the R & D contract, the facts he stated cannot support the complaint's assertion that Cree performed no R & D work.

Plaintiffs' second basis for impugning the R & D contract was statements from a confidential former Microvision R & D director, who stated that his position gave him knowledge of Microvision's "internal and external research projects." But the complaint also states that Microvision and Cree officials denied that director access to information about the R & D agreement. Thus, this source's only firsthand testimony is that he did not know whether Cree performed R & D work. Yet, plaintiffs argue that these allegations support the belief that Cree in fact performed no other R & D work for Microvision. Fraud is not a reasonable inference to be drawn from the statements of this source.

C. UltraRF Acquisition and Spectrian R & D Agreement

[14] The complaint also alleged a "round-tripping" arrangement with Spectrian. In a January 2001 SEC filing, Cree disclosed that in December 2000, it had acquired UltraRF, a division of Spectrian located in Sunnyvale, California, for $100 million. UltraRF was engaged in the design and manufacturing of transistors and laterally diffused metal oxide semiconductors ("LDMOS"). At the same time, Cree also announced that Spectrian agreed to pay Cree $2.4 million for the further development of LDMOS devices for Spectrian and to purchase from Cree $58 million of UltraRF/Cree products over a period of two years. In March 2001, Cree amended its January filing, reporting that it



had allocated $81.6 million of its purchase price for UltraRF to goodwill.

*14 As it turned out, UltraRF/Cree reported better-than-expected revenues in fiscal 2001 of $19.2 million, of which about 90% came from its sales to Spectrian. Cree's May 2001 quarterly report spoke of UltraRF with cautious optimism: "In the long term, UltraRF's success will depend on the rate at which we diversify our Spectrian-concentrated business.... We believe that LDMOS product line will enable growth of our products to customers other than Spectrian." During the first quarter of fiscal 2002, Cree announced that the high level of sales from its UltraRF operations continued, reporting another $9.6 million in revenue.

Cree, however, began to have trouble developing a newer LDMOS device, dubbed "LDMOS-8," which Spectrian required. In its February 2002 quarterly report, Cree announced that the companies had modified the supply agreement in October 2001 to push back Spectrian's purchases to the two subsequent quarters and give Spectrian a $2.1 million credit if UltraRF/Cree did not meet specified development goals. In a March 12, 2002 press release, Cree announced that it expected to complete the LDMOS-8 development and to deliver it during the fourth quarter of fiscal 2002. But it also stated that the delays prompted Cree to consider writing down UltraRF's goodwill in a one-time charge of $60 to $77 million. Cree's May 2002 quarterly report disclosed that the companies again modified the supply agreement to extend it by six months and reduce Spectrian's total purchase commitment to $54.8 million, subject to further reduction if Cree did not complete the development of the LDMOS-8 technology. The quarterly report also disclosed that Cree wrote down the entirety of UltraRF's goodwill in March 2002, having determined that its value was fully impaired.

During the course of a July 30, 2002 conference call, the defendants Merrell and Swoboda stated that Cree had achieved important development milestones in the LDMOS devices and expected testing to be completed by September 2002. But Cree's annual statement, filed August 19, 2002, was less optimistic and simply stated, "If we are unable to complete the full product qualification process and ramp up production of our recently released LDMOS-8 products adequately, Spectrian may

reduce the amount it purchases during the applicable quarter under the agreement."

The next quarterly report dated October 29, 2002, disclosed that UltraRF/Cree's sales to Spectrian in that quarter totaled only $190,000. It also disclosed that the amended supply agreement "permits Spectrian to significantly reduce its purchase obligations if we were not able to complete our qualification of our LDMOS-8 products prior to the end of the first quarter of fiscal 2003 and for each subsequent month until those parts are qualified."

Finally, in Cree's January 31, 2003 quarterly report, Cree disclosed that the LDMOS-8 development delays caused Spectrian to cancel the supply agreement with a final $5 million payment in late 2002, as the agreement allowed.

*15 Plaintiffs' complaint alleges that the truth of the matter was that Cree engaged in "round-tripping" with Spectrian and that Cree "intentionally overpaid for UltraRF with the understanding that the overpayment would be returned to Cree as revenues under the Supply Agreement." The complaint further alleges that Cree's disclosures were misleading because they failed to disclose that "prior to the acquisition, Cree knew it did not have the ability to perform the R & D contemplated in Cree's agreements" and that "Cree never performed the R & D work required under its agreements with Spectrian."

The fact that Cree ultimately had to write down the value of UltraRF's goodwill or was unable to develop the LDMOS-8 technology in a timely fashion does not mean that Cree fraudulently overpaid for UltraRF or neglected to conduct LDMOS-8 research and development. These facts are just as consistent with Cree having taken a risk in the hope of securing profits, and it is well known that the risks are great in high-technology industries, such as Cree's. A failed venture, standing alone, does not permit a reasonable inference of fraud.

The complaint's primary basis for this allegation is the fact that the purchase price exceeded UltraRF's book value by about five times, forcing Cree to allocate approximately $81.6 million of the acquisition price to goodwill. While this fact, standing alone, might signal that Cree made an investment that carried great risk, and indeed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



potential for reward, it does not suggest an excessive price, much less a fraudulent price. A "fair" acquisition price depends on a wide variety of factors, including market value, dividends, earning prospects, the nature of the enterprise, and "any other facts ... which throw any light on future prospects." See Viacom Int'l, Inc. v. Icahn, 946 F.2d 998, 1000-01 (2d Cir.1991).

Most telling is the fact that the complaint is devoid of particular facts that speak to a fraudulent valuation of UltraRF at the time it was acquired. It relies on conclusory and hardly probative statements by four confidential sources besides Eric Hunter. For example, a Cree technician asserted that "it was well-known within Cree that they had overpaid for a company with dim prospects," but the complaint does not tie this "well-known" sentiment to any particular date or persons. In hindsight, Cree employees likely regretted the UltraRF acquisition, but this does not mean Cree knew ex ante that the investment would sour. Also, a former employee in Cree's IT department asserted that Cree was " 'very aggressive' in cutting deals for Cree" and "would 'move the line' when necessary." This vague statement also provides no particularized fact that supports the belief that Cree intentionally overpaid for UltraRF. A former assistant to the president of Spectrian's UltraRF division asserted that UltraRF had no "saleable" products and that "the division would be worth its total value in facilities and infrastructure or between $5 million and $10 million." The complaint does not say, however, how this person would know this information or would have expertise in valuing a business. Moreover, his assessment appears to be contradicted in the complaint by the fact that UltraRF, after being acquired by Cree, did sell approximately $30 million of products to Spectrian. Whether Spectrian found the products useful is immaterial; for Cree's purposes, these were bona fide sales because "real products were shipped to [a] real customer[ ] who then paid with real money." In re Bristol-Myers Squibb Sec. Litig., 312 F.Supp.2d 549, 566 (S.D.N.Y.2004).

*16 The complaint also fails to support the allegations of the second leg of the alleged round-trip with Spectrian--the "sham" product sales and R & D agreement. The complaint's basic problem is that the facts it alleges do not contradict Cree's public disclosures. Cree and Spectrian disclosed that

Spectrian committed to purchase certain levels of UltraRF products, which is precisely what happened. The complaint assigns a sinister motive to the deal, in light of UltraRF's ultimate failure, but, as we noted above, there are no facts to support this claim or belief. To be sure, reciprocal contracts without more are not per se fraudulent.

In an attempt to cure their deficient pleading, plaintiffs' complaint alleges that Cree concealed what it knew upon entering the agreements with Spectrian in December 2000--that UltraRF/Cree would be able neither to develop the LDMOS technology nor to attempt to develop it. The complaint proffers just one confidential source to support this allegation, a Spectrian vice president of operations who stated baldly, "Cree never performed any real R & D for Spectrian," and who called Cree's R & D work "smoke and mirrors." The complaint does not allege facts to support how this source would know that UltraRF/Cree performed no "real" R & D work for Spectrian. Moreover, even this source's observations, if they were in fact observations, do not support the conclusory allegation that Cree knew, when it entered into the R & D agreement, that it could not perform it.

In short, the complaint fails to plead with particularity facts that Cree made any misleading disclosures with respect to the Spectrian transactions.

### D. WTI, Xemod, and Lighthouse Investments and R & D Agreements

[15] Plaintiffs' complaint also alleges, in far less detail, that Cree entered into undisclosed "round-tripping" arrangements with three other technology firms--World Theatre, Inc. ("WTI"), Xemod, Inc., and Lighthouse, Inc. The pattern alleged was that Cree overpaid for investments in those firms in exchange for the firm's promises to pay Cree for R & D services with the knowledge that Cree would not actually perform the services.

With respect to the WTI arrangement, Cree filed a preliminary proxy on SEC Form PRE 14A in September 2000, which disclosed that in April 2000, Cree had invested $5 million in WTI. In the definitive proxy statement filed three weeks later, Cree disclosed that in late 2000, WTI entered into a

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



four-year development agreement with Cree and that WTI had exercised its option to terminate that agreement in March 2001. In Cree's 2003 annual statement, filed in September 2003, Cree disclosed that it had taken several write-downs of its WTI investment, recognizing its value to be impaired. These write-downs occurred in the fourth quarter of fiscal 2001 in the amount of $750,000, in the second quarter of fiscal 2002 in the amount of $2.1 million, and in the fourth quarter of fiscal 2002 in the amount of $2.1 million.

\*17 Plaintiffs' complaint alleges that Cree knowingly overpaid for its investment in WTI and hid this fact by failing to disclose the write-downs until September 2003, over a year later. The complaint does not, however, make any allegations regarding the legitimacy of the development agreement that existed briefly between the companies.

With respect to Xemod, Cree announced in a press release on September 20, 2000, that it had invested $11.3 million in Xemod, a privately-held developer and maker of amplifier components for wireless communications. At some point, Cree also invested in an affiliate of Lighthouse, Inc., though the record contains no specific disclosure by Cree of the Lighthouse investment. Cree's 2003 annual statement, however, filed in September 2003, disclosed a series of write-downs that Cree took on its investments in Xemod and Lighthouse. In the fourth quarter of 2001, Cree took a write-down of $2.4 million on Xemod and $1.4 million on Lighthouse; in the second quarter of fiscal 2002, Cree took an $8.4 million write-down on Xemod and $1.8 million on Lighthouse; and in the fourth quarter of 2002, it took a $3.4 million write-down on Lighthouse. Cree's 2003 annual statement further disclosed that Cree had completed R & D agreements with Xemod and Lighthouse in the recent past. Under these agreements, the two companies paid Cree $500,000 in 2001, $3.5 million in 2002, and $5.2 million in 2003.

Plaintiffs' complaint alleges that Cree intentionally overpaid for its investments in Xemod and Lighthouse in exchange for those companies returning the funds to Cree for "sham" R & D work. The complaint also alleges misrepresentations in that Cree did not disclose the existence of the investments or the development agreements until

September 2003, even though some were executed as early as 2000. The record shows, however, that Cree did in fact disclose the write-downs on investments and developments with WTI, Xemod, and Lighthouse before 2003. Cree's annual reports in 2001 and 2002 described its write-downs on privately-held investments and R & D revenues in the aggregate. Cree's 2001 annual report disclosed that it took a $4.6 million write-down in the fourth quarter of fiscal 2001 "to establish a reserve for investments made in private companies that was considered to be other than temporary impairment to value." Cree's 2002 annual report discloses that it recorded a $20.4 million write-down on its privately held investments due to their impaired value. Cree explains that these disclosures related to the transactions about which the plaintiffs complain in their complaint.

The complaint alleges no documentary or personal source to support the allegation that Cree intentionally overpaid for these investments or failed to perform R & D pursuant to the agreements. It simply engages in pleading fraud by hindsight, noting that Cree had to write down these investments in fiscal years 2000, 2001, and 2002, and that Cree did not report these write-downs until it filed its 2003 annual report. Previous public filings of Cree, however, did report the write-downs, albeit in the aggregate, without breaking down which investments were overvalued and by what amounts. Even if Cree's choice of reporting method was improper accounting, which the complaint does not specifically allege, this method of reporting is not probative of plaintiffs' allegation of "round-tripping."

\*18 In sum, we affirm the district court's dismissal of the complaint on the ground that it fails to state with sufficient particularity facts needed to support the allegations that Cree made misleading statements.

IV

[16][17] For the second element of a securities fraud claim under § 10b of the Exchange Act and Rule 10b-5 thereunder, a plaintiff must allege that the defendant made the misleading statement or omission intentionally or with "severe recklessness" regarding the danger of deceiving the plaintiff. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



F.3d 338, 343-44 (4th Cir.2003). A showing of mere negligence will not suffice. Id.

[18][19] The PSLRA significantly strengthens the requirement for pleading this scienter. Whereas Federal Rule of Civil Procedure 9(b) allowed a person's state of mind to "be averred generally," the PSLRA provides:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). Thus, to allege a securities fraud claim against individual defendants, a plaintiff must allege facts that support a "strong inference" that each defendant acted with at least recklessness in making the false statement. See Tellabs, Inc., 437 F.3d at 602-03; Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363-67 (5th Cir.2004). And if the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents. See Tellabs, Inc., 437 F.3d at 602-03; Southland Sec. Corp., 365 F.3d at 363-67.

The district court held that if the plaintiffs' allegations were true, the complaint may have sufficiently alleged scienter through a series of attenuated inferences based on the positions that individuals held in Cree. But it concluded that any more probing scienter inquiry was rendered moot by its conclusion that the complaint failed to plead that the defendants made any misleading statement or omission. Because no misleading statement or omission was sufficiently alleged, the defendants could not have made misrepresentations or omissions intentionally or with sufficient recklessness.

We agree with this conclusion. While the complaint does allege facts that demonstrate that at least defendants Neal Hunter, Merrell, and Swoboda had fairly intimate knowledge of the various relevant transactions, any inferences that could be drawn from the facts are immaterial because the statements or omissions about those transactions

were not misleading.

[20][21] In addition, other facts stated in the complaint are too circumstantial to give rise to a "strong inference" that the defendants acted with scienter. The complaint suggests that the defendants artificially inflated Cree's share price in order to profit from personal sales of Cree stock. But insider trading can imply scienter only if the timing and amount of a defendant's trading were "unusual or suspicious." See, e.g., In re PEC Solutions, Inc. Sec. Litig., 418 F.3d at 390; Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir.2001). The complaint falls far short of showing that the trades were made at a time consistent with knowing or reckless fraud. The complaint does not allege that defendants timed their sales to profit from any particular disclosures, and defendants' sales generally occurred at prices that were not especially high for the class period. See Ronconi, 253 F.3d at 435 (finding defendants' sales did not suggest "knowing falsehood" when sales were made at prices well below the stock's high point). Thus, for example, while Cree's shares reached a high of $198 per share during the class period, over 75% of Neal Hunter's trades within the class period occurred when Cree's shares traded below $30 per share. Additionally, the complaint does not provide defendants' trading patterns outside the class period to permit comparison with their trades within the class period. See id. at 436 (faulting plaintiff for stating defendants' trading history for only seven months before class period).

*19 The complaint does emphasize the number of shares that the defendants traded within the class period in relation to their total holdings of Cree stock. Specifically, the complaint alleges that Neal Hunter, Merrell, and Swoboda sold 92%, 100%, and 82%, respectively, of their Cree stock during the class period. But this allegation is unremarkable without taking into account the defendants' vested stock options. Cree argues, for example, that because Merrell held some 369,200 vested stock options at the end of the class period, her trading within the class period would have to appear much less significant. In any event, the complaint does not provide the facts sufficient to generate the required "strong inference."

In addition, plaintiffs' allegations about trading relate to an exceedingly long putative class period. The allegedly fraudulent scheme lasted some 46

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



months (from August 12, 1999, to June 12, 2003). By way of comparison, the Ninth Circuit has considered a class period of just 15 months "unusually long." See In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092-93 (9th Cir.2002). Alleging such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades. Indeed, the lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim.

V

[22] Finally, the district court relied on plaintiffs' failure adequately to allege loss causation, the fourth element of a securities fraud claim under § 10b and Rule 10b-5. As we have held, a plaintiff must allege and prove that the defendant's misrepresentations proximately caused the plaintiff's economic loss--in this case, the diminution of the value of their shares. See Hillson, 42 F.3d at 208.

[23] Loss causation is not one of the elements with respect to which the PSLRA imposes a more stringent pleading requirement. But the Act does explicitly state that a plaintiff must prove loss causation in that the defendants' material misrepresentations or omissions caused the drop in the stock's value. As the PSLRA provides:

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4). Because the PSLRA explicitly requires that the plaintiff prove loss causation, the general rules of pleading require that the plaintiff also plead it in his complaint. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("our holding about plaintiffs' need to prove proximate causation in economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to allege these requirements").

Neither the PSLRA nor the Supreme Court has established whether loss causation is a sufficient part of an "averment of fraud" to fall within the requirements of Federal Rule of Civil Procedure 9(b). A strong case can be made that because loss

causation is among the "circumstances constituting fraud for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity." See Dura Pharm., 544 U.S. at 343-44, 125 S.Ct. 1627 (comparing § 78u-4(b)(4) to a common law action for deceit which requires that a plaintiff "show not only that he had known the truth he would not have acted but also that he suffered actual economic loss"); Miller v. Asensio & Co., Inc., 364 F.3d 223, 231-32 (4th Cir.2004) (explaining loss causation to require a showing that "defendant's misrepresentation was a substantial cause of the loss by showing 'a direct or proximate relationship between the loss and the misrepresentation.' " (quoting Gasner v. Bd. of Supervisors, 103 F.3d 351, 360 (4th Cir.1996))). Moreover, the Supreme Court has not ruled out a holding that Rule 9(b) governs a pleading of loss causation. See Dura Pharm., 544 U.S. at 346, 125 S.Ct. 1627.

*20 Even in the absence of an explicit holding, the Dura Pharmaceuticals Court concluded that a plaintiff does not state a claim upon which relief can be granted--even under the relaxed pleading requirements of Rule 8(a)--by simply alleging that the plaintiff purchased defendant's stock at an "artificially inflated purchase price" and thereby sustained damages. Id. at 347, 125 S.Ct. 1627. The Court required something more, stating:

We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about the harm of the very sort that the [PSLRA] seek[s] to avoid.

Id. at 347, 125 S.Ct. 1627 (citations omitted). A failure to recognize that loss causation be specifically alleged and demonstrated by the allegations of the complaint would

permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence. Such a rule would tend to transform a private securities action into a partial downside insurance policy.



Id. at 347-48, 125 S.Ct. 1627 (internal quotation marks and citations omitted).

[24] Accordingly, we conclude that a plaintiff purporting to allege a securities fraud claim must not only prove loss causation--that the material misrepresentations or omissions alleged actually caused the loss for which the plaintiff seeks damages--but he must also plead it with sufficient specificity to enable the court to evaluate whether the necessary causal link exists. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir.2005).

The complaint in this case outlines a theory of loss causation, identifying the plaintiffs' loss as the $4.11 drop in the price of Cree's stock that followed publicity of Eric Hunter's lawsuit against Cree in June 2003. According to plaintiffs, Hunter's complaint finally revealed the "true facts" of Cree's fraudulent schemes over the years, causing the market to reduce its valuation of Cree's shares. But this theory must fail for various reasons. First, Eric Hunter's 2003 complaint contained no allegations relating to the "round-trip" transactions with Microvision, Spectrian, WTI, Xemod, or Lighthouse, about which he now complains. Because Hunter's 2003 complaint did not reveal the "true facts" of these transactions, the 2003 revelations could not have caused the plaintiffs' loss. While plaintiffs respond that "the market would have construed Hunter's allegations [in his 2003 complaint] broadly since Cree had previously denied it engaged in round tripping," the problem remains that Hunter's 2003 complaint is devoid even of general allegations of round-tripping. We thus agree with the district court's dismissal for lack of pleading loss causation with respect to Cree's dealings with Microvision, Spectrian, WTI, Xemod, and Lighthouse.

*21 [25] Second, with respect to Cree's dealings with C & C, plaintiffs' theory of loss causation suffers from a different but no less fatal flaw. Eric Hunter's 2003 complaint did contain allegations relating to C & C, accusing Cree and Neal Hunter of:

(d) Entering into an undisclosed and long-term requirements contract with Jeff Hunter, Chairman of [C & C] Corporation ... which required [C & C] to accept shipments of silicon carbide crystals ... far in excess of market demand, in order to

artificially increase the operating and income of Cree by approximately forty percent or more, and artificially increased the per share value of Cree stock.

(e) Misleading investors and the [SEC] by purchasing in excess of $4.0 million worth of equipment from [C & C] in which Cree already held a beneficial interest, with the understanding that [C & C]'s Chairman would restrict use and allocation of the proceeds to payments under the long-term requirements contract, thereby disguising [C & C]'s severe cashflow deficit and forced inventory surplus of silicon carbide crystals.

The problem with plaintiffs' theory on the C & C transactions is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline. Cree's May 1999 quarterly filing with the SEC included a copy of its supply contract with C & C, which obligated C & C to purchase set amounts of silicon carbide crystals. Likewise, C & C's April 2000 quarterly report and Cree's 2000 annual report disclosed that Cree agreed to repurchase crystal-growing equipment for $5 million and apply that amount as a credit to C & C for future crystal purchases. Disclosure of these facts by Eric Hunter in his 2003 complaint could not therefore have caused Cree's stock price to decline. As the district court explained, "Eric Hunter's complaint discloses nothing new, but merely attributes an improper purpose to the previously disclosed facts."

[26] To allege loss causation in this case, plaintiffs would have to allege that the market reacted to new facts disclosed in June 2003 that revealed Cree's previous representations to have been fraudulent. [FN3] Because no such facts were disclosed, the drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.

The plaintiffs argue in the alternative that they should at least be granted leave to amend their complaint in light of the Supreme Court's decision in Dura Pharmaceuticals, 544 U.S. 336, 125 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



1627, 161 L.Ed.2d 577 (2005). The Supreme Court decided Dura Pharmaceuticals in April 2005, after plaintiffs had filed their complaint and before the district court granted Cree's motion to dismiss. As noted above, however, we do not understand Dura Pharmaceuticals to have changed the standard for pleading loss causation. Even before Congress enacted PSLRA, plaintiffs were required to allege that the defendant's misrepresentation caused him actual loss. See Harnett v. Billman, 800 F.2d 1308, 1315-16 (4th Cir.1986). And our discussion in Miller v. Asensio & Co., 364 F.3d at 232-33, decided months before plaintiffs filed their complaint, aligns well with the Supreme Court's decision in Dura Pharmaceuticals, requiring a plaintiff to show a causal link between the defendant's misrepresentation and the decline in the stock value.

*22 We can find no basis for concluding that Dura Pharmaceuticals provides plaintiffs with a cure for the deficient allegations of loss causation in their complaint. The information that Eric Hunter's complaint revealed to the world on June 12, 2003, were historical facts that plaintiffs could not change. The plaintiffs have, therefore, demonstrated no reason why we should permit them leave to amend their complaint.

For all of these reasons, we affirm the district court's order dismissing plaintiffs' claim under § 10(b) of the Exchange Act and Rule 10b-5 for failure to state a claim for which relief can be granted.

### VI

The district court dismissed plaintiffs' four other causes of action as essentially dependent upon plaintiffs' success in alleging a claim under § 10(b) of the Exchange Act and Rule 10b-5. Count II alleges a claim under § 20(a) of the Exchange Act, which imposes liability on each person who "controls any person liable under any provision of this chapter." 15 U.S.C. § 78t(a). Count III is based on § 20A of the Exchange Act, which provides a private right of action against one who engaged in insider trading. Id. § 78t-1(a). Count IV brings a claim under § 18 of the Exchange Act which holds a person, who makes a misleading statement in an SEC filing, liable to one who detrimentally relied on that misstatement. Id. §

78r(a). Each of these counts requires a predicate allegation of a violation of law. Because, as we explained above, the complaint fails to allege that Cree made any misleading statement or omission in violation of § 10(b) and Rule 10b-5, we affirm the district court's dismissal of these claims.

[27] Plaintiffs' final claim arises under § 304 of the Sarbanes-Oxley Act, which mandates that corporate officers forfeit bonuses and profits if the corporation is "required to prepare an accounting restatement" due to the issuer's "misconduct." 15 U.S.C. § 7243. While Cree has not, to date, issued any accounting restatement that could provide a basis for this claim, plaintiffs argue that § 304 is not dependent upon a restatement having actually been issued, but upon one being "required." They note that the complaint alleges numerous GAAP violations which "require" Cree to issue restatements.

Even if this were the case, for the reasons we rejected the complaint's § 10(b) and Rule 10b-5 claim, we conclude that the complaint does not adequately allege that any restatement is required.

In addition, plaintiffs have not presented a convincing analysis that § 304 provides private litigants with a cause of action, although we do not now reach that issue. See Ormet Corp. v. Ohio Power Co., 98 F.3d 799, 805 (4th Cir.1996) (noting this court's "presumption that if a statute does not expressly create a private cause of action, one does not exist").

### VII

Because we uphold the district court's dismissal of plaintiffs' complaint in its entirety, we have no cause to pass upon Cree's argument that plaintiffs' claim is barred by the applicable statute of limitations.

### VIII

*23 This case boils down to the continuing fallout from an intra-Hunter-family dispute. In June 2003, Eric Hunter, a former officer of Cree, sued his brother Neal Hunter, an officer of Cree, purportedly over dissatisfaction in the way Cree was being operated. With Eric Hunter's filing of that action, the price of Cree shares dropped over $4 per share.



For this temporary drop in the price of Cree's stock, the plaintiffs in this case filed their complaint, attributing the drop to the way Cree was run during the four years prior to June 2003. While plaintiffs point to some reciprocal business dealings and high risk investments with six different companies during that period, the transactions were disclosed in public filings over the years, and the plaintiffs have not been able to point to facts supporting a reasonable belief that the disclosures were misleading.

The district court properly dismissed this case as one of the type that Congress sought to eliminate by enacting the PSLRA. The PSLRA's requirements that were applied in this case are not technical pleading rules by which unwary plaintiffs can be trapped; they go to the heart of separating claims based simply on market risks from claims based on actual fraud. The district court correctly concluded that this case fell into the former class of claims.

As an epilogue, it appears that the market reached the same conclusion regarding plaintiffs' allegations. The record shows that although Cree's share price dropped from $22.21 to $18.10 the day after Eric Hunter filed his complaint on June 12, 2003, and then dropped to a low of $11.84 in August 2003, the price recovered quickly, trading above $18.00 by the end of 2003, and at $22.00 or higher for most of 2004.

We affirm the judgment of the district court.

AFFIRMED.

SHEDD, Circuit Judge, dissenting:

The district court dismissed the 170-page First Amended Consolidated Class Action Complaint ("Complaint") of Teachers' Retirement System of Louisiana ("TRSL"), which named as defendants Cree, Inc. and several of its managers (collectively, "Cree") in a complicated securities fraud action, holding that the Complaint failed to plead facts sufficient to support a cause of action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. In reaching its conclusion, the district court interpreted and applied the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104-67, 109 Stat. 737. In my view, the factual allegations in the Complaint satisfy the heightened pleading requirements of the PSLRA as well as the ordinary pleading requirements that apply to any action for fraud, as provided in Rules 8 and 9 of the Federal Rules of Civil Procedure. Accordingly, I would reverse the decision of the district court and remand this case for further proceedings consistent with this opinion.

I

We review de novo the decision of the district court to grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir.2006). A court should grant a Rule 12(b)(6) motion only if "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir.1999). [FN1]

**\*24** Generally speaking, the majority opinion correctly summarizes the law of securities fraud. To plead a prima facie case, one must allege: (1) a false statement or omission of material fact by the defendant, (2) scienter, (3) reasonable reliance by the plaintiff, and (4) loss causation. Hillson Partners L.P. v. Adage, Inc., 42 F.3d 204, 208 (4th Cir.1994). However, in contrast to an ordinary action for fraud, a securities fraud action must meet the heightened standards imposed by the PSLRA when pleading the first two of these four elements. 15 U.S.C. § 78u-4(a)(1). When pleading the final two elements of securities fraud, a plaintiff must simply satisfy the generally applicable requirements of Rules 8 and 9 of the Federal Rules of Civil Procedure.

As the majority notes, the district court dismissed the Complaint for three reasons: (1) failure to plead with particularity all facts giving rise to the belief that a false statement or omission of material fact occurred, (2) failure to plead with particularity facts giving rise to a strong inference of scienter, and (3) failure to adequately plead loss causation. [FN2] The majority approach to testing the adequacy of the Complaint examines in isolation each individual suspect transaction in order to ascertain whether the elements of securities fraud have been adequately pled with respect to each one. [FN3] However, this approach ignores the fact that this case revolves

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2007 WL 509787
(Cite as: 2007 WL 509787, *24 (4th Cir.(N.C.)))

around a single securities fraud action against a single company, Cree.

Therefore, the Complaint does not--and need not--allege an action for securities fraud with respect to all six companies with which Cree dealt. Instead, the Complaint alleges a single cause of action for securities fraud, as evidenced by many transactions with multiple companies. If even one of these transactions is pled adequately enough to meet the pleading requirements under the PSLRA and Rules 8 and 9, the cause of action must survive the motion to dismiss. Moreover, if the totality of Cree's actions reveals a larger picture of fraud sufficient to meet the necessary pleading requirements, this case must advance beyond the current stage of the proceedings. In my opinion, the C & C transactions alone, especially when viewed in conjunction with the numerous other transactions as a whole, permit a reasonable inference of fraud that requires denial of Cree's motion to dismiss.

## II
### A.

To plead a material misrepresentation or omission of material fact under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). TRSL has alleged a multitude of misleading statements by Cree. The Complaint plainly specifies each of these statements under the heading, "Defendants' False and Misleading Statements During the Class Period." J.A. 1007. The statements include 23 SEC filings, 22 press releases, two conference calls, and one news article. Therefore, the Complaint clearly meets the first prong of this element by specifying each statement believed to be misleading.

*25 Further, the Complaint gives adequate reasons why each of the statements is misleading. TRSL has alleged that Cree was involved in numerous activities to inflate its revenue artificially. These fraudulent schemes, known as "channel stuffing" and "round-tripping," involved a series of sham deals in which Cree, in collusion with insiders at other companies, would exchange goods or services

subject to either secret rights of return or secret agreements that excused Cree's non-performance. [FN4] Cree included or referenced the favorable portions of these agreements in its SEC filings, press releases, conference calls, and the news article. However, the secret portions of the agreements, which rendered the agreements futile, were, of course, omitted. Thus, Cree's public representations about these agreements were misleading because they made material omissions--i.e., the secret "handshake" deals that vitiated any substance the contracts otherwise appeared to retain. [FN5]

Finally, it is important to note that all of TRSL's allegations regarding Cree and its transactions are made on information and belief; thus, I agree with the majority that the Complaint must state at least "sufficient facts to support a reasonable belief in the allegation" that the material omissions were misleading. Maj. Op. ----. TRSL has alleged sufficient facts to support such a reasonable belief by basing many of its allegations on information obtained from a lawsuit filed by Eric Hunter, one of Cree's co-founders. The day before the class period closed, Eric Hunter filed suit against Cree, alleging, inter alia, securities fraud. In his complaint, Eric Hunter alleged that Cree had engaged "in a series of undisclosed corporate activities, including but not limited to" the following: (1) Cree's public filings omitted material facts in connection with stock offerings and (2) Cree entered into an undisclosed requirements contract with C & C that amounted to channel stuffing and round-tripping. [FN6] J.A. 672. Eric Hunter is the brother of Neal Hunter, Cree's chairman during the class period. Eric Hunter is also the brother of Jeff Hunter, C & C's chairman during the class period. In addition to being a co-founder of Cree, Eric Hunter was Cree's CEO until 1994, and during the class period, he was a paid consultant for Cree. [FN7] Eric Hunter's statements and his close professional and familial relationship to the allegedly fraudulent actors certainly support a reasonable belief that the omissions in Cree's public statements were misleading.

Though Eric Hunter's allegations alone would likely suffice to satisfy the particularity requirements that the PSLRA imposes on allegations made under information and belief, TRSL identifies numerous other sources who attest to the fraudulent, secret

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



agreements between Cree and other companies. The majority refers to these individuals as "confidential sources." Maj. Op. ----. [FN8] In addressing these confidential sources, the majority adopts the analysis of the Seventh Circuit in Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir.2006). The Tellabs court held that a complaint which relies on confidential sources must allege facts sufficient " 'to support the probability that a person in the position occupied by the source would possess the information alleged.' " Id. at 596 (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir.2000)).

**\*26** I would resolve the issues surrounding unnamed sources differently because the approach adopted by the majority does not inhere in the plain language of the PSLRA. The plain language of the PSLRA does not subject unnamed sources to higher scrutiny than other averments made upon information and belief. Accordingly, in my view, a complaint must simply identify unnamed sources "with particularity," as required by the plain language of the PSLRA, which might include the source's job title and years of employment, or possibly, other facts sufficient to support a reasonable belief that the plaintiff did not merely invent sources. The purpose of the PSLRA's particularity requirement is to prevent the fabrication of information, not to weigh its reliability or credibility. [FN9] For example, a personal aide or administrative assistant to the CEO could plausibly overhear a pertinent piece of information that may later form the basis for a securities fraud action, notwithstanding his job title. Accordingly, I believe that both Eric Hunter and the numerous unnamed sources listed in the Complaint provide sufficient particularity to form a reasonable basis for believing that the disclosed contracts made materially misleading omissions.

### B.

To plead adequately the scienter element of a securities fraud action, a complaint must allege "with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2). We have noted that scienter may be pled by allegations that amount to severe recklessness. Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 344 (4th Cir.2003). In Ottmann, we rejected a categorical approach that

would require a pleading to allege motive and opportunity in order to satisfy the heightened scienter pleading standards under the PSLRA. Id. at 345. Instead, we adopted a case-specific approach, which requires courts to "examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter." Id.

Based on a reading of the Complaint as a whole, I believe it adequately pleads scienter. Assuming the truth of the material misrepresentation allegations, the individuals named as defendants certainly would have known about the secret agreements between Cree and various other companies. Aside from the personal wealth that Cree management allegedly gained from the channel stuffing and round-tripping agreements, [FN10] the mere fact that individual executives and directors were the people actively entering into fraudulent agreements to inflate Cree's revenues supports a strong inference of scienter. The material omissions from Cree's public statements could not have occurred without the agents of the company knowingly facilitating the fraudulent transactions. Accordingly, a strong inference of scienter is supported under the facts alleged in the Complaint as a whole.

### C.

Finally, the Complaint must adequately allege loss causation, which is not subject to any heightened pleading requirement under the PSLRA. I agree with the majority that the Supreme Court in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), expressly refused to decide whether loss causation must meet the ordinary pleading requirements of Rule 8 or the heightened pleading requirements for fraud under Rule 9. Instead, the Court "assume[d], at least for argument's sake," that the ordinary requirements of Rule 8 applied. Id. at 346, 125 S.Ct. 1627. Following the example of the Court in Broudo, I analyze the allegations of loss causation in the Complaint under the ordinary Rule 8 "short and plain statement" requirement.

**\*27** The Complaint alleges loss causation by referencing the precipitous decline in stock value upon the filing of Eric Hunter's lawsuit against Cree. Though Eric Hunter's complaint specifically referenced only the secret agreements with C & C, it



clearly stated that Cree had engaged in a "series of undisclosed ... violation[s] of the federal securities ... laws, including but not limited to" the agreements with C & C. J.A. 672. Eric Hunter's complaint contradicted, or at least called into question, Cree's prior denials of round-tripping. When the information in Eric Hunter's complaint became public knowledge, Cree's stock price dropped by nearly 20%. Under the normal pleading standards of Rule 8, a reasonable inference of loss causation plainly exists under these facts. I simply cannot envision a more direct and proximate causal link than an insider's disclosure of fraud that causes a sudden and severe drop in stock price. [FN11] These facts, which are assumed to be true for purposes of my review, plainly give rise to a reasonable inference of loss causation.

### III

Accordingly, I would reverse the district court and remand for further proceedings. [FN12]

FN1. Founded in 1987, Cree is a major innovator and manufacturer of silicon carbide-based products, including semiconductors, transistors, and light-emitting diodes, which are used in a variety of products such as digital cameras and wireless telephones.

FN2. Breaking down these elements further, the Supreme Court recently stated: In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements include: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," see Basic [Inc. v. Levinson, 485 U.S. 224, 248-49, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ] (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in the absence); (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted).

FN3. We acknowledge the possibility that a plaintiff could successfully allege loss causation by pleading that a previously concealed risk materialized, causing the plaintiff's loss. In such a case, the plaintiffs would not need to identify a public disclosure that corrected the previous, misleading disclosure because the news of the materialized risk would itself be the revelation of fraud that caused plaintiffs' loss. See, e.g., In re Parmalat Sec. Litig., 375 F.Supp.2d 278, 305-07 (S.D.N.Y.2005) (accepting plaintiffs' allegations of loss causation where news that Parmalat could not service its debt revealed that previous disclosures concealed the company's true position and caused the share price to tumble). But the plaintiffs have not alleged that any previously concealed risk materialized in June 2003, causing their loss.

FN1. With the exception of requiring a strong inference of scienter, the PSLRA does not change our normal standard of review for a 12(b)(6) motion. For the most part, the PSLRA simply modifies the quantum of information that must be included in a complaint. Accordingly, for purposes of my analysis, I assume the truth of all well-pleaded allegations in the Complaint, and I draw all reasonable factual inferences in favor of TRSL.

FN2. This is a fraud-on-the-market case; thus, investor reliance upon publicized market prices is presumed. Basic, Inc. v. Levinson, 485 U.S. 224, 246-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

FN3. This approach is substantially the same as the one employed by the district court, which, like the majority, divided its opinion into sections titled according to the companies that Cree dealt with: i.e., C & C, Microvision, Spectrian, WTI, Xemod, and Lighthouse.

FN4. An example is Cree's alleged channel stuffing agreement with C & C. C & C would "purchase" silicon carbide crystals from Cree, subject to a secret right of return. C & C would then exercise its secret right of return and "reject" shipments of crystals. However, instead of actually returning the crystals to Cree, C & C would store the crystals at its facilities, thereby allowing Cree to avoid accounting for reserves or charges for its returned products. Thus, this agreement allowed Cree to create the appearance of permanent sales and profits that were, in fact, illusory. Cree allegedly entered

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



into similarly illusory "exchanges" with Microvision, Spectrian, and others.

FN5. Both the district court and the majority seem to miss the crux of TRSL's argument on this point. Simply because a contract is publicly disclosed and appears to be legitimate does not prevent it from being materially misleading. The secret agreements between Cree and the other companies caused the publicly disclosed contracts to appear to be something that they were not. These omissions are what rendered the public statements materially misleading.

FN6. Though Eric Hunter's complaint never used the words "channel stuffing" or "round-tripping," it alleged facts sufficient to reasonably infer such schemes.

FN7. The fact that Eric Hunter performed no work in his capacity as a consultant only underscores the continuation of his "insider" status with Cree, despite the fact that he was no longer an executive in the company. Only someone with close personal ties to a corporation would receive a salary in exchange for no substantial work.

FN8. I question if the characterization as "confidential" is particularly useful in this context, where the sources are readily discernable by Cree. These sources are confidential only in that they are not specifically named; however, TRSL identified them by title and the years they were employed by various companies. Though their names do not appear in the Complaint, a modest inquiry by Cree would likely establish who they are. These so-called confidential sources cited by TRSL are numerous, and they certainly provide sufficient facts to form a reasonable belief that Cree's public statements were misleading. For example, TRSL identifies a former Cree process engineer employed during the class period; this source learned from a top manager at Cree that a secret deal existed between Cree and C & C, which required C & C to accept shipments of crystals far in excess of its needs. TRSL also reveals a former C & C director and vice president of marketing, who claimed that C & C was simply "feeding Cree" and spending money like "drunken sailors" because of the close familial relationship between the directors of Cree and C & C. Many more examples of such unnamed sources are presented in the Complaint.

FN9. Like the district court, the majority weighs the credibility of various unnamed sources and discredits them because their recollections conflict with publicly available information. However, assessing a 12(b)(6) motion requires that we refrain from weighing evidence and assume all facts in favor of the plaintiff. This is particularly relevant in the current case, where the crux of TRSL's claim is that Cree falsified publicly available information.

FN10. I do not rely on the timing or substance of stock trades in finding a strong inference of scienter. Rather, scienter may be directly shown by the nature of the fraudulent acts at issue here-- intentionally omitting salient details from otherwise publicly disclosed contracts.

FN11. I note that this case is distinguishable from Dura because the corrective disclosure in Dura was much more tenuously connected to the allegations made in Broudo's complaint. The corrective disclosure in Dura--a company press release--simply stated that earnings would be diminished because of reduced drug sales. Id. at 339, 125 S.Ct. 1627. However, the primary misrepresentations that Broudo allegedly relied upon related to the pending approval of an asthmatic spray device by the Federal Drug Administration. To the contrary, in the case before us, the corrective disclosure was a lawsuit filed by an insider that revealed secret fraudulent agreements; the misrepresentations that TRSL relied upon were public disclosures that failed to mention these secret agreements. Thus, compared to Dura, this case has a much closer nexus between the corrective disclosure and the misrepresentations relied upon by TRSL.

FN12. Because the district court disposed of TRSL's other claims based on its dismissal of the securities fraud claim, I would remand for further proceedings on these claims as well.

2007 WL 509787 (4th Cir.(N.C.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**EXHIBIT K**

LEXSEE



Cited
As of: Mar 08, 2007

**THE WU GROUP, ET AL, Plaintiffs, v. SYNOPSYS, INC., et al., Defendants.**

**No. C 04-3580 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA**

**2005 U.S. Dist. LEXIS 42351**

**August 10, 2005, Decided**
**August 10, 2005, Filed**

**CORE TERMS:** supervisor, license, customer, misleading, stock, per share, scienter, earnings, particularity, forward-looking, projections, press release, time-based, purported, forecast, motion to dismiss, securities fraud, omission, falsity, suspicious, analyst, pled, recklessness, deliberate, heightened, spreadsheet, materially, projected, perpetual, safe harbor

**COUNSEL:** [*1] For Hemanth Kanekal, individually and on behalf of all others similarly situated, Plaintiff: Robert S. Green, Green Welling LLP, San Francisco, CA; Marc A. Topaz, Richard A. Maniskas, Schiffrin & Barroway. LLP, Radnor, PA.

For The Wu Group, Plaintiff: Benjamin James Sweet, Heather M. Tashman, Michael K. Yarnoff, Schiffrin & Barroway, LLP, Radnor, PA; Robert S. Green, Green Welling LLP, San Francisco, CA.

For Synopsys, Inc., Defendant: Meredith K. Kotler, Wilson, Sonsini, Goodrich & Rosati, P.C., New York, NY; Mark Thomas Oakes, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Jack I, Siegal.

For Aart De Geus, Steven K. Shevick, Vicki Andrews, Defendants: Mark Thomas Oakes, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA; Jack I, Siegal.

For Richard T. Rowley, Defendant: Jack I, Siegal.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

**ORDER DISMISSING PLAINTIFFS' COMPLAINT WITHOUT PREJUDICE**

**INTRODUCTION**

Before the Court is Defendants' motion to dismiss this private securities fraud action. Plaintiffs Yeushyr Wu, Robert Wiederhold, Hosein Naaseh-Sahry, and Thomas Ratcliffe, individually and on behalf of the Sara Eastwood [*2] Family Trust (collectively, the "Wu Group"), representing a purported class of all purchasers of Synopsys, Inc., stock between December 23, 2003 and August 18, 2004, oppose the motion. Also before the Court is Defendants' Rule 11 motion for sanctions. Oral argument on Defendants' motions was heard on August 2, 2005. At that hearing, the Court ordered the parties to submit supplemental briefing related to Defendants' motion for sanctions. Supplemental briefing has now been filed and the Court has carefully read and considered all the papers submitted. For the following

Page 1

  

reasons, the Court **GRANTS** Defendants' motion to dismiss without prejudice and **DENIES** Defendants' motion for sanctions.

## FACTUAL BACKGROUND

### A. Background

Defendant Synopsys, Inc. (hereinafter, "Synopsys" or the "Company"), headquartered in Mountain View, California, manufactures electronic design automation ("EDA") software, which is used to design complex integrated circuits ("ICs") and systems-on-chips ("SoCs") in the global semiconductor and electronic industries. Defendant Aart J. de Geus is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Synopsys. Defendant [*3] Steven K. Shevick is the Company's Chief Financial Officer ("CFO") and Senior Vice President of Finance. Defendant Vicki L. Andrews was Senior Vice President of Worldwide Sales at Synopsys, Inc. during the relevant time period. n1 Synopsys sells three types of licenses for its EDA software: (1) technology subscription licenses ("TSLs"), which provide particular and unspecified future technology for a finite period; (2) perpetual licenses, which provide particular technology for as long as the customer renews maintenance (which is purchased separately) plus 20 years; and (3) term licenses, which provide particular technology for a finite period. Customer support, referred to as "maintenance," is included (or bundled) with TSLs but must be purchased separately for perpetual and term licenses. Synopsys recognizes revenue up front for sales of perpetual licenses and for those term licenses for which at least 75% of the license fee is due within one year of shipment. This is referred to as "upfront license revenue." Synopsys recognizes revenue over time for sales of TSLs, for term licenses for which less than 75% of the license fee is due within one year, and for maintenance sold in connection [*4] with perpetual and term licenses. This type of revenue is referred to as "time-based license revenue." Synopsys performed a stock split in September 2003.

n1 In their original complaint, Plaintiffs named Richard T. Rowley, who served as Vice President, Corporate Controller, and Treasurer of Synopsys during the relevant time period, as a Defendant but did not name Vicki Andrews. In the operative Consolidated Amended Class Action Complaint, however, Plaintiffs appear to

have dropped Mr. Rowley as a Defendant (although his name remains in the pleading's caption) and to have added Ms. Andrews. In their opposition to Defendants' motion, Plaintiffs' caption page lists Ms. Andrews, and not Mr. Rowley, as a Defendant.

In its 10-K filing for fiscal year ("FY") 2003, n2 Synopsys reported substantial revenue growth, but noted that the semiconductor industry had experienced its "steepest and longest downturn of the past 20 years" from 2000 through 2002. (2003 Form 10-K at 18.) In the 10-K, Synopsys advised that despite a [*5] "moderate recovery in 2003," its customers "have remained cautious," and that it was not "yet clear when improved demand" would cause customers to increase spending. (*Id.* at 19.) In FY 2003, the proportion of revenue Synopsys earned from time-based revenue sources increased markedly. Time-based and upfront license revenue constituted 67% and 33%, respectively, of software license revenues in FY 2003, as compared to 60% and 40%, respectively, in FY 2002.

n2 Synopsys' fiscal year begins on November 1.

On December 3, 2003, Synopsys issued a press release providing financial projections for FY 2004. The Company projected revenue of $ 1.2 -- $ 1.25 billion and earnings of $ 1.50 to $ 1.60 per share. The press release expressly cautioned that the projections were "forward-looking" and that the actual financial results could differ materially due to a number of enumerated factors, including continued or increased weakness in the semiconductor or electronic systems industries; lower-than-anticipated research and [*6] development spending by customers; lower-than-anticipated or delayed purchases of the Company's products; and competition. (Declaration of Jack I. Siegal ("Siegal Decl."), Ex. B at 6-7.) The December 3, 2003, press release also provided financial projections for FY 2005. The Company reported that for FY 2005, it expected $ 1.4 billion in revenue, *pro forma* earnings of more than $ 1.90 per share, and GAAP earnings of more than $ 1.50 per share.

In a conference call with analysts that same day, Defendant Shevick reiterated the guidance provided in the press release and explained upcoming changes to the





Company's revenue model. (Siegal Decl., Ex. I.) He said that beginning in FY 2004, Synopsys would shift the license mix in favor of renewable (i.e. time-based) licenses but would maintain the current 75/25% balance between orders with time-based revenue recognition and orders with upfront revenue. He explained that the Company would do this through the use of TSLs, a license that has attributes of both time-based and perpetual licenses. He reported that the Company expected that perpetual licenses for the year would account for less than 10% of the license orders and renewable licenses [*7] would account for more than 90% of the orders. At the beginning of the analyst call, the operator noted as follows:

> During the course of this conference call, Synopsys may make predictions, estimates and other forward-looking statements regarding the Company. While these statements represent the best current judgment about the Company's future performance[,] the actual performance is subject to significant risks and uncertainties that could cause actual results to differ materially from those that may be projected. In addition to any risks that may be highlighted during the conference call, important factors that could cause the Company's actual results to differ materially from those that may be projected in this conference call are described in the most recent 10-K and 10-Q reports of Synopsys on file with the Securities and Exchange Commission.

On December 16, 2003, Defendant de Geus sold 212,500 n3 personal shares of Synopsys stock at $ 34.33 per share. The same day, Defendant Andrews sold 88,785 personal shares of Synopsys stock at $ 33.07 per share. Defendants de Geus and Andrews reaped more than $ 10 million from their sales. According to Plaintiffs, the sales [*8] were "dramatically out of line with these defendants' prior trading practice and were impeccably timed to reap the maximum benefit while Synopsys common stock traded at or near its highest price during calendar year 2003 and the Class Period." (Complaint at P 62.) However, in May 2003 and in June 2002, Defendant Andrews had sold 58,060 shares and 50,000 shares, respectively. Defendant de Geus' sale included the exercise and sale of 162,000 options that were scheduled

to expire in April 2004.

> n3 Defendants contend that de Geus actually sold 212,000 shares, not 212,500 shares.

In a December 19, 2003, interview on CNN, Defendant de Geus said:

> . . . One of the things that makes Synopsis stand out as a software company is actually how stable the model has been. One of the reasons it's so stable is because instead of just selling software, [we] sell subscriptions. Just like, you know, "Time" magazine or "Newsweek," we recognize the revenue over the time of the subscription, which is typically three years [*9] in our case. And that makes for a very solid and predictable business.
>
> * * *
>
> And one of the pieces of news that people don't fully appreciate yet is we're entering the fiscal year with 60 percent of the revenue in hand and about 80 percent for the first quarter. So that takes a lot of risk off investors.

In a February 23, 2004 press release, Synopsys announced that for the first quarter ("Q1") of 2004, the Company had met or exceeded the prior guidance. (Siegal Decl., Ex. C at 1-2.) The Company also provided guidance for Q2 04 and revised (i.e. lowered) the previous guidance for FY 2004. (Id. at 2-3.) The release expressly cautioned that the projections were "forward-looking" and that actual results could differ materially due to various factors, including, but not limited to, the same factors listed in the December 3, 2003, release. (Id. at 8-9.) In a conference call with analysts that same day, Defendant Shevick reported that the Company had lost some business in the first quarter of 2004 because the Company was "hanging tough on pricing," but that that business was regained in Q2. (Siegal Decl., Ex. J at 9.) At the beginning of that call, the operator gave a "forward-looking" [*10] caveat like the one given in the December 3, 2003, analyst call. (Id. at 1.)





On May 19, 2004, Synopsys issued a press release announcing the financial results for Q2 04, which again met the prior guidance. (Siegal Decl., Ex. D at 1-2.) In the press release, the Company provided guidance for Q3 04 and again revised (i.e. lowered) the forecast for FY 2004. (*Id.* at 2-3.) Synopsys again cautioned that the projections were "forward-looking" and that actual results could differ materially due to, *inter alia*, customers' continued budgetary caution; lower-than-expected customer spending or design starts; lower-than-expected or delayed purchasing; and competition. (*Id.* at 8-9.) In a conference call with securities analysts held later that day, Defendants de Geus and Shevick reiterated the Company's guidance for Q3 04 and for FY 2004. (Siegal Decl., Ex. K.) In response to a question about whether de Geus was more positive about the environment than he had been in the February conference call, Defendant de Geus said, "Bottom line, yes." At the beginning of that call, the operator gave a "forward-looking" caveat like the one given in the December 3, 2003, and February 23, 2004, analyst [*11] calls.

On Monday, August 2, 2004, Synopsys announced -- for the first time in its history -- preliminary quarterly results lower than those forecast: revenue was expected to be $ 279-283 million (rather than the $ 300-320 million projected), and non-GAAP earnings were expected to be $ .31 -- $ .34 per share (rather than the $ .35 -- $ .40 per share projected). (Siegal Decl., Ex. E.) The press release explained that the results were "primarily due to lower-than-expected bookings during the quarter, and to delays in certain customer purchasing decisions near the end of the quarter." (*Id.*) The release advised that in the upcoming August 18, 2004, earnings release, the Company would provide revised projections for FY 2004 and FY 2005.

Following the August 2, 2004, press release, the price of Synopsys common stock dropped by 16.8% to close at $ 21.05 per share.

On August 18, 2004, Synopsys reported its results for Q3 04. (Siegal Decl., Ex. F at 1-2.) Revenue was reported at $ 281.7 million -- 6.1% less than forecast. (*Id.* at 1.) Non-GAAP earnings were $ .33 per share -- 5.1% less than forecast. (*Id.* at 2.) This was the first time that Synopsys had not met its guidance. Synopsys [*12] also revised its projections for FY 2004 and FY 2005. For FY 2004, the Company was now forecasting total revenue of $ 1.08 -- $ 1.11 billion and earnings of $ 1.01 -- $ 1.05

per share. The Company had previously forecast $ 1.17 billion and $ 1.35 per share. For FY 2005, the Company was now forecasting revenue of about $ 940 million and earnings of $ .28-.38 per share. Previous guidance had forecast $ 1.29 billion in revenues and earnings per share of $ 1.60.

Following the August 18, 2004, earnings release, the price of Synopsys shares dropped by another $ 6.63 per share -- a 31.16% drop -- to close at $ 14.65 per share on August 19, 2004.

## B. The Complaint

On August 25, 2004, Plaintiffs filed the instant lawsuit. In their Consolidated Amended Class Action Complaint (hereinafter, the "Complaint"), Plaintiffs allege that between December 3, 2003, and August 18, 2004 (the "Class Period"), Defendants Synopsys, de Geus, Shevick, and Andrews (collectively, "Defendants") engaged in conduct that violated §§ 10 and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Specifically, Plaintiffs allege that Defendants made false or misleading statements, [*13] or withheld material information, about Synopsys' financial prospects in: (1) the December 3, 2003, February 23, 2004, and May 19, 2004 press releases; (2) the December 3, 2003, and May 19, 2003, analyst conference calls; and (3) a December 19, 2004, CNN interview. Plaintiffs allege that Defendants knew by late 2003 that the Company was losing "valuable sales contracts" due to customer discontent with the Company's increased emphasis on time-based licenses -- which required customers to pay up-front -- and would inevitably experience a resulting "material revenue shortfall," rendering the Company unable to meet its "lofty" projections. According to Plaintiffs, Defendants failed to disclose, in the press releases, conference calls, and CNN interview, that they knew that Synopsys' time-based licensing efforts were not succeeding due to customer dissatisfaction with the scheme. Plaintiffs allege that the statements made in the press releases, conference calls, and CNN interview, about the Company's positive financial outlook were false and misleading in light of what Defendants knew about the inevitable downturn.

In support of their allegations that Defendants de Geus, Shevick, and Andrews [*14] (the "Individual Defendants") knew or recklessly disregarded the false and misleading nature of their statements regarding

Page 4





Synopsys' financial prospects (and were aware that Synopsys would not meet its financial projections for FY 2004 and FY 2005), Plaintiffs rely on statements allegedly made by a former supervisor ("Supervisor") of the Company's Sales and Operations Department, and on statements allegedly made by two former sales support administrators ("SA 1" and "SA 2"). n4 According to Plaintiffs, Supervisor stated that during Q1 04, his/her bosses (who indirectly reported to Defendant Andrews) "made a choice to ignore" Supervisor's concerns about material contract losses as represented in a spreadsheet Supervisor had created documenting information relevant to each of Synopsys' North American contracts. (Complaint at PP 42-43.) Supervisor also allegedly stated that beginning in 2003, Synopsys customers were becoming angry both with the Company's shifting and increasingly confusing licensing arrangements and its practice of unbundling maintenance from licenses, and that Defendants were aware of the customer dissatisfaction and did nothing to alleviate it. According to Plaintiffs, [*15] SA 1 and SA 2 corroborate Supervisor's statements. Both SA 1 and SA 2 allegedly confirmed that the trend from upfront licenses to time-based licenses was very confusing to customers. According to SA 1, the unbundling of maintenance from certain licenses angered customers. According to SA 2, Synopsys was indifferent to customer dissatisfaction about the changed license scheme.

> n4 In their separate motion for sanctions, Defendants contend that they have identified all three anonymous sources relied upon by Plaintiffs and have confirmed, with all three, that none of the statements or sentiments attributed to Supervisor, SA 1, or SA 2 were ever made.

Also in support of their scienter allegations, Plaintiffs point to Defendants de Geus' and Andrews' respective sales of their personal shares of Synopsys common stock in December 2003. n5

> n5 Plaintiffs do not allege a cause of action for insider trading against Defendants de Geus and Andrews, but allege the unusual stock sales only as evidence of scienter.

[*16]

Plaintiffs allege that Defendants made false or misleading material statements to, and/or omitted material information from, the investing public in an effort to artificially inflate the price of Synopsys stock. Plaintiffs allege that Synopsys stock was, in fact, artificially inflated and that they were injured by Defendants' conduct when they bought shares of the Company's stock at those artificially-inflated prices during the Class Period. At the end of the Class Period, on August 18, 2004, when Synopsys reported its lower-than-expected financial results for the quarter and revised (downward) its expectations for FY 2004 and FY 2005, the Company's stock dropped and shares of Synopsys stock held by Plaintiffs, purchased during the Class Period, depreciated significantly. Thus, they filed this private securities fraud action.

On March 25, 2005, Defendants filed the instant motion to dismiss pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and _Rules 9(b)_ and _12(b)(6)_ of the Federal Rules of Civil Procedure, on the grounds that Plaintiffs have failed to plead their allegations with sufficient particularity. Defendants [*17] also filed a _Rule 11_ motion for sanctions.

## LEGAL STANDARD

### A. Federal Rules of Civil Procedure

A court may dismiss a complaint pursuant to _Federal Rule of Civil Procedure 12(b)(6)_ for the pleading of insufficient facts under an adequate theory. _Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984)_. When deciding upon a motion to dismiss pursuant to _Rule 12(b)(6)_, a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to the plaintiff. _Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995)_.

In the context of a motion to dismiss, review is limited to the contents in the complaint. _Allarcom Pay Television, Ltd. v. General Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995)_. When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered [*18] as part of the motion to dismiss. _See Hal Roach Studios, Inc. v. Richard Feiner & Co., 896 F.2d 1542,_

Page 5

 

1555 n.19 (9th Cir. 1989). Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange*, 169 F. Supp. 2d 1160, 1164; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (1996), *cert denied*, 520 U.S. 1103, 117 S. Ct. 1105, 137 L. Ed. 2d 308 (1997). This rule precludes plaintiffs "from surviving a *Rule 12(b)(6)* motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998).

*Rule 8(a)* of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that [*19] the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)* are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, *Rule 9(b)* requires the plaintiff to state with particularity the circumstances constituting fraud. To meet the heightened pleading requirements of *Rule 9(b)*, the Ninth Circuit has held that a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994).

In the securities context, the pleading requirements are even more stringent.

**B. Private Securities Litigation Reform Act**

In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th [*20] Cong., 1st Sess. at 32 (Nov. 28, 1995). The PSLRA strengthened the already-heightened pleading requirements of *Rule 9(b)*. Under the PSLRA, actions based on allegations of material misstatements or omissions must "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The PSLRA also heightened the pleading threshold for causes of action brought under Section 10(b) and Rule 10b-5. Specifically, the PSLRA imposed strict requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct. [*21] " *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th Cir. 1999). If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion by the defendant, the court must dismiss complaint. *See* 15 U.S.C. § 78u-4(b)(1).

The PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with respect to a statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(I). However, a person may be held liable if the forward-looking statement is made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003); *but see In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1164-65 (C.D. Cal. 2003) (disagreeing with the analysis in *America West* [*22] and finding that a defendant is immune from liability if it satisfies either 15 U.S.C. § 78u-5(c)(1)(A) or (B)).

**ANALYSIS**

**I. Motion to Dismiss**

Defendants contend that Plaintiffs' Complaint should be dismissed because Plaintiffs fail to satisfy the heightened pleading requirements under the PSLRA, fail to state a claim under Rule 12(b)(6), and fail to plead fraud with the particularity required by Rule 9(b). The

Page 6





Court examines Plaintiffs' claims separately.

### A. Plaintiff's First Cause of Action -- Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act (the "Act") provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce: (a) to employ any device, scheme, or artifice [*23] to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss. See Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999). A complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(2). As discussed above, in order to [*24] avoid having the action dismissed, a plaintiff must "plead with particularity both falsity and scienter." Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001). The Ninth Circuit, in Ronconi, articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. In considering whether a private

securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.' Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or [with] deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6).

Id. (citations and internal quotation marks omitted). [*25]

Here, Plaintiffs allege that several statements or omissions attributable to Defendants were false and misleading and that Defendants knew the statements were false and misleading at the time the statements were made. Defendants contend that Plaintiffs have failed to plead the falsity of Defendants' statements with sufficient particularity and have failed to plead facts that, if true, would raise a strong inference that Defendants acted with scienter. Defendants also argue that because each of the allegedly misleading statements was "forward-looking," they are protected by the Safe Harbor provision of the PSLRA.

### 1. Falsity

Plaintiffs' claims that Defendants' statements regarding the Company's favorable financial prospects were false or misleading rely on the purported statements of Supervisor, SA 1, and SA 2 (collectively, the "witnesses"). Defendants contend that the Complaint does not plead sufficient facts to raise a strong inference that Defendants made false or misleading statements to investors. n6 The Court agrees.

> n6 For purposes of this analysis, the Court assumes that the witnesses' purported statements are true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to Plaintiffs. The Court will take up Defendants' contention that the purported statements were manufactured in the context of

  

assessing Defendants' motion for sanctions. (*See* discussion, *infra*.)

[*26]

### a. Witness Statements About Loss of Contracts

According to Plaintiffs, Supervisor supposedly said that in late 2003 and continuing through the first part of 2004, the Company's contract data, which Supervisor allegedly organized into a spreadsheet, indicated that Synopsys was losing contracts. Supervisor also is purported to have said that the contract data he or she saw made it "obvious" that the Company would not meet its financial projections for FY 2004. These statements, as pled, are insufficient to satisfy the PSLRA's pleading requirements.

First, Plaintiffs' Complaint fails to point to any specific contract data on which Supervisor allegedly based his or her contention that Synopsys was losing contracts. The Complaint refers to a spreadsheet containing sales data that was allegedly created by Supervisor, but makes no reference to specific data contained therein. Specifically, the Complaint fails to identify which contracts were lost, when the contracts were lost, and how much the lost contracts were worth. This omission is fatal. *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations of reports relied on by insiders, [*27] without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA"); *see also Silicon Graphics*, 183 F.3d at 985 ("a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability"); *In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002).

Second, Supervisor's purported conclusion that the contract data, which, as discussed above, was not described in sufficient detail in the Complaint, made it "obvious" that the Company was on a downward trajectory and would not meet guidance for FY 2004, is unsupported by adequate facts. Again, the Complaint does not sufficiently describe the data which allegedly formed the basis for Supervisor's purported conclusion, nor does the Complaint explain the timing of the conclusion or even how the alleged contract losses represented by the spreadsheet would have affected Synposys' future revenue and earnings. *See Juniper Networks, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4025, at *8 (N.D. Cal. Mar. 11, 2004) [*28] (allegations of false financial forecasts insufficient where plaintiffs failed to "plead specific facts demonstrating how the problems being experienced translated into the need for Juniper to alter or reduce its publicly issued projections").

### b. Witness Statements About Loss of Customers

Similarly, the witnesses' statements regarding Synposys' loss of customers are insufficiently pled. First, the Complaint does not describe which customers Synposys lost or when and how those alleged losses affected projected revenue or earnings. Second, the conclusions allegedly drawn by Supervisor and SA 1 and SA 2 regarding the reasons that Synopsys was supposedly losing customers are insufficiently pled. The Complaint does not state that the witnesses had any contact with customers or that they spoke with customers about dissatisfaction with the shifting licensing scheme, the unbundling of maintenance from the license arrangements, or the Company's inflexibility on pricing. These statements, as pled, are insufficient to provide a factual basis for Plaintiffs' claims.

--

Plaintiffs' contention that Defendants' statements, during the Class Period, regarding the Company's [*29] favorable financial prospects were false or misleading relies on Supervisor's, SA 1 's, and SA 2's statements about Synopsys' loss of contracts and customers. Because that factual basis is not pled with sufficient particularity, the Court finds that Plaintiffs have not adequately pled the falsity or misleading nature of Defendants' statements regarding the Company's financial outlook.

### 2. Scienter

Plaintiffs' claims that Defendants acted intentionally or with deliberate recklessness similarly rely, nearly exclusively, on the purported statements of Supervisor, SA 1, and SA 2. Plaintiffs also point to Defendants de Geus' and Andrews' allegedly unusual stock sales on December 16, 2003, to support scienter here. Defendants contend that the Complaint does not plead sufficient facts to raise a strong inference that Defendants intentionally, or with deliberate recklessness, made false or misleading statements to investors. Again, the Court agrees. n7





n7 The Court notes that it necessarily follows that because Plaintiffs have failed to adequately plead the falsity of the statements made by Defendants during the Class Period, Plaintiffs have also failed to plead that Defendants knew their statements were false when made. *See Vantive*, 283 F. 3d at 1091. In any event, the Court finds that Plaintiffs' Complaint fails to plead sufficient facts that give rise to a "strong inference" that Defendants acted with the requisite scienter here.

[*30]

### a. Witness Statements

According to the Complaint, Supervisor purportedly said that Defendant Andrews reviewed the Company's sales data, in the form of the spreadsheet prepared by Supervisor, and was thus aware that Synopsys was losing contracts. However, Supervisor's statement about what Defendant Andrews saw and knew appears to be based more on speculation or assumption than on actual knowledge. Supervisor's relationship to Defendant Andrews was quite attenuated -- Supervisor reported to Becky Dunn who reported to Angela Molzahn who reported to Brad Roberts who reported "directly" to Defendant Andrews. (Complaint at P 38.) Plaintiffs do not allege that Supervisor had any direct contact with Defendant Andrews at all. Supervisor's statement that Dunn, Molzahn, Roberts, and Andrews, who had "a lot of interaction," "reviewed sales and revenue sales figures collectively as a group" is not supported by sufficient facts. (*Id.*) Moreover, Supervisor's baseless conclusion that because "Dunn, Roberts, the legal department, the finance department, and 'a lot of other people' had access to and reviewed [his or her] spreadsheet on a 'regular basis,'" (Complaint at P 42), Defendant [*31] Andrews must have also seen it, is too vague to satisfy the PSLRA's heightened pleading requirements regarding scienter.

The Complaint also suggests that SA 1 and SA 2 said that Defendant Andrews and others prepared inflated internal financial forecasts, suggesting that Defendant Andrews had the requisite knowledge of the falsity of the statements issued about Synopsys' financial prospects. However, again, Plaintiffs provide no detail about when these reports were created, what the reports said, or how SA 1 and SA 2 were aware of the existence and the

content of such reports. Accordingly, Plaintiffs' Complaint is deficient.

### b. Defendants' Stock Sales

Plaintiffs also rely on the stock sales of Defendants de Geus and Andrews allegedly as an indication of Defendants' scienter. n8 Generally, stock sale allegations cannot raise an inference of scienter unless Plaintiffs allege specific facts showing that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986. Among the relevant factors for a court to consider are: 1) the amount [*32] and percentage of shares sold by insiders; 2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading history. *Id.*

n8 Notably, Plaintiffs do not allege any suspicious stock sales by Defendant Shevick.

Defendant de Geus sold 210,000 shares of Synopsys stock on December 16, 2003, at $ 34.33 per share for gross proceeds of approximately $ 7,103,875. (Complaint at P 83.) Defendant Andrews sold 88,785 shares at $ 33.07 per share on December 16, 2003. (Complaint at P 84.) Plaintiffs assert that Mr. De Geus sold approximately 27 % of his holdings and that Ms. Andrews sold approximately 93 % of her holdings that day. Defendants point out, however, that Plaintiffs' percentage calculations do not account for unexercised stock options. After factoring in unexercised stock options, Defendants contend that de Geus' sales on December 16, 2003, accounted for approximately 6 % of his Synopsys holdings, and Andrews' sales on December 16, 2003, accounted for approximately 38 % of [*33] her holdings.

In light of the three factors above, these sales are not sufficiently suspicious, without more, to raise an inference of scienter. Mr. de Geus sold a relatively low percentage of his shares just after the end of a quarter. *See Ronconi*, 253 F.3d at 435. Moreover, de Geus' sale included the exercise and sale of 162,000 options that were scheduled to expire in April 2004. The sale of stock at or near the scheduled expiration of options is "perfectly reasonable" and is not suspicious. *See, e.g., Campbell v. Lexmark Int'l Inc.*, 234 F. Supp. 2d 680, 687 (E.D. Ky. 2002).





Ms. Andrews sold more shares, proportionally, than de Geus, but a sale of 38 % of one's shares is not necessarily suspicious. This is particularly true here where Defendant Andrews also exercised 6,015 options on December 16, 2003, and held those shares. Also, Defendant Andrews sold a similar number of split-adjusted shares seven months before the allegedly suspicious sale. Such conduct suggests that Andrews' December 16, 2003, sale of stock was not suspicious. Moreover, Defendants de Geus' and Andrews' stock sales did not occur at a particularly suspicious time, such [*34] as immediately before a negative earnings release. *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998). In fact, they occurred only 13 days into the Class Period, long before most of the challenged statements were made. Accordingly, the Court finds that the December 16, 2003, stock sales do not, alone, provide sufficient indication of scienter here to satisfy the PSLRA's heightened pleading requirements.

### 3. Plaintiffs' Allegations As a Whole

The Court must consider whether the totality of Plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that Defendants made the allegedly false or misleading statements with deliberate recklessness, if not actual knowledge. *Lipton, 284 F.3d at 1038*. Here, the sum is no greater than its parts. Plaintiffs have failed to provide necessary detail regarding any corporate insider's knowledge or access to adverse information. Indeed, Plaintiffs have failed to provide detail as to the existence of any adverse information. The Complaint gives no information about sales numbers at any time during, before or after the Class Period. Weak hints that [*35] because the Individual Defendants were directors of Synopsys they would have access to all corporate information, including sales data indicating a downward turn that Plaintiffs claim existed but have not described in any detail, is insufficient. Even coupled with the fact that Defendants de Geus and Andrews sold stock during the Class Period, Plaintiffs' Complaint is still clearly deficient. Plaintiffs have failed to allege any factual basis, let alone "particular facts giving rise to a strong inference" that Defendants had the requisite state of mind.

In sum, Plaintiffs have failed to allege particularized facts that could lead the Court to infer that Defendants intentionally, or with deliberate recklessness, misrepresented Synopsys' financial prospects. Because

Plaintiffs' first cause of action "lacks sufficient detail and foundation necessary to meet either the particularity or strong inference requirements of the PSLRA," it must be dismissed. *Silicon Graphics*, 183 F.3d at 984.

### 4. Safe Harbor

Having determined that Plaintiffs' Complaint does not satisfy the particularity requirements of the PSLRA, the Court need not address Defendants' contention that [*36] Plaintiffs' claim are not actionable because the statements Plaintiffs attack were forward-looking and fall within the PSLRA's safe harbor provision. The Court additionally notes that in the context of a 12(b)(6) motion, it is too early in the litigation to reach a conclusion on whether the cautionary statements included in the earnings releases at issue are sufficiently meaningful to invoke the safe harbor provision. *See, e.g., Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004).

### II. Plaintiff's Second Cause of Action -- Violation of Section 20(a)

Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Secs. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *Id.* "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999). [*37]

Here, Plaintiffs allege that Defendants de Geus, Shevick, and Andrews acted as controlling persons of Synopsys within the meaning of Section 20(a) of the Act and are liable thereunder for the conduct alleged. Plaintiffs claim that by reason of the Individual Defendants' positions as officers and/or directors of the Company, they were responsible for preparing and disseminating Synopsys' public releases, and had the power and authority to cause the Company to engage in the wrongful conduct complained of. Defendant argues that Plaintiffs' Section 20(a) cause of action fails because Plaintiffs have failed to state a cause of action pursuant to Section 10(b). The Court agrees. Because Plaintiffs have failed to adequately plead the underlying 10(b) violation, as discussed *supra*, Plaintiffs' Section 20(a) claim must

Page 10





also be dismissed.

## II. Dismissal With or Without Prejudice -- Defendants' Motion For Sanctions

Plaintiffs requests, in the event that the Court finds that the Complaint is not pled with sufficient particularity, that the Court give Plaintiffs the opportunity to amend their Complaint to remedy any pleading deficiencies. Leave to amend under Federal Rule of Civil Procedure 15 [*38] is liberally granted. "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment." *Eminence Capital v. Aspeon Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (error to refuse leave to amend in a securities fraud case to allow plaintiff to plead scienter).

Defendants urge the Court, in their concurrently-filed motion for sanctions, to deny Plaintiffs leave to amend as a sanction. Defendants contend that Plaintiffs misrepresented their putative sources of information, and manufactured the statements alleged to have been made that support their Complaint. Accordingly, Defendants argue, Plaintiffs should be precluded from further amending their Complaint as a sanction.

Rule 11 provides, in relevant part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -- . . . the allegations and other factual contentions have evidentiary support.

A [*39] court may impose sanctions on any party, attorney, or law firm that violates Rule 11(b) or is responsible for the violation. FED. R. CIV. P. 11(c)(1)(A). The "central purpose of Rule 11 is to deter baseless filings in District Court and thus . . . streamline the administration and procedure of the federal courts. . . . Although the rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy . . . any interpretation must give effect to the Rule's central goal of deterrence." *Cooter & Gell v. Hartmarx*

*Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). By requiring certification that a pleading's allegations and factual contentions have evidentiary support, Rule 11 requires, *inter alia*, that counsel not misrepresent to the court the results of the investigation into the plaintiff's factual allegations. *See, e.g., Zatko v. Rowland*, 835 F. Supp. 1174, 1181-82 (N.D. Cal. 1993) (sanctioning *pro se* plaintiff under Rule 11 for filing complaint containing untrue factual allegations and material misrepresentations). Rule 11 permits the award of either monetary or non-monetary sanctions, [*40] including dismissal of a complaint. *See, e.g., Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991).

Here, Defendants' motion for sanctions, and the accompanying declarations from the witnesses upon whose statements Plaintiffs rely, raise serious questions about the accuracy of the statements and opinions Plaintiffs attribute to Supervisor, SA 1, and SA 2 in their Complaint. However, in their opposition to the motion, and in supplemental briefing, Plaintiffs vehemently contend that the statements were made as described in the Complaint and provide the declaration of their lead investigator, who avers that the witnesses' statements were given, as described, and were freely given. Therefore, it is not clear, on the current record before the Court, that Plaintiffs or their counsel intended, in bad faith, to mislead the Court. Moreover, whether the statements were made is essentially a credibility question. Rule 11 sanctions are not appropriate in that context. *See In re Applied Micro Circuits Corp. Secs. Litig.*, 2002 U.S. Dist. LEXIS 22403, No. 01-CV-0649 K (AJB), Order (S.D. Cal. Oct 3, 2002). For these reasons, the Court declines to order the relief requested by Defendants at [*41] this juncture. Accordingly, Defendants' motion for sanctions is **DENIED**. The Court's dismissal of Plaintiffs' Complaint, as described herein, is without prejudice. n9

> n9 The Court also **DENIES** Plaintiffs' responsive request to sanction Defendants for filing a motion for sanctions. The Court does not find that Defendants' motion was frivolous.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss without prejudice and **DENIES** Defendants' motion for sanctions. Plaintiffs must file an amended complaint within thirty days of the

Page 11

  

date of this Order.

    This Order terminates docket entry nos. 33 and 36.

**IT IS SO ORDERED.**

Dated: August 10, 2005

    MARTIN J. JENKINS

    UNITED STATES DISTRICT JUDGE



