**BRAUN LAW GROUP, P.C.**
Michael D. Braun (167413)
12400 Wilshire Blvd., Ste. 920
Los Angeles, CA 90025
Tel: 310.442.7755
Fax: 310.442.7756

**Liaison Counsel for Lead Plaintiff and the Class**

**KAHN GAUTHIER SWICK, LLC**
Kim E. Miller (178370)
12 E. 41st St., Ste. 1200
New York, New York 10017
Tel: 212.696.3730
Fax: 504.455.1498

**Lead Counsel for Lead Plaintiff and the Class**

**KAHN GAUTHIER SWICK, LLC**
Lewis S. Kahn
650 Poydras Street, Ste 2150
New Orleans, LA 70130
Tel: 504.455.1400
Fax: 504.455.1498

**Lead Counsel**

**SAXENA WHITE. P.A.**
Maya Saxena
Joe White
2424 N. Federal Highway, Ste. 2150
Boca Raton, FL 33431
Tel: 561.394.3399
Fax: 561.394.3382

**Lead Counsel**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Adrian G. Mongeli, Individually And On Behalf of All Others Similarly Situated,<br><br>                                  Lead Plaintiff,<br><br>            vs.<br><br>TERAYON COMMUNICATION SYSTEMS, INC., JERRY D. CHASE, RAY FRITZ, EDWARD LOPEZ, CAROL LUSTENADER, MATTHEW MILLER, ZAKI RAKIB, SHLOMO RAKIB, MARK A. RICHMAN, CHRISTOPHER SCHAEPE, MARK SLAVEN, LEWIS SOLOMON, HOWARD W. SPEAKS, ARTHUR T. TAYLOR, DAVID WOODROW, DOUG SABELLA and ERNST & YOUNG, LLP<br><br>                                  Defendants. | Civil Docket No. 3-06-CV-3936 MJJ<br><br>DECLARATION OF KIM E. MILLER IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF TERAYON COMMUNICATION SYSTEMS AND INDIVIDUAL DEFENDANTS TO DISMISS AMENDED CLASS ACTION COMPLAINT<br><br><br><br><br><br>DATE:  July 24, 2007<br>TIME:  9:30 A.M.<br>CTRM:  11, 9th Floor |

1    I, Kim E. Miller, hereby declare as follows:

2    1.    I am member of the law firm of Kahn Gauthier Swick, LLC.

3    2.    I submit this Declaration, together with the attached exhibits, in further support

4    of the Opposition to the Motion of Terayon Communication Systems and Individual

5    Defendants to Dismiss Amended Class Action Complaint.  I am fully familiar with the facts set

     forth herein.

6    3.    Attached hereto as Exhibit A is a Chart regarding stock trends during three

7    phases of fraud.

8    4.    Attached hereto as Exhibit B is a true and correct copy of a January 24, 2005

9    article available at Globes online.

10    5.    Attached hereto as Exhibit C are Actionable Statements in the Complaint, in

11    context, that were identified by Defendants' Exhibit A as Puffery or protected by the Safe

12    Harbor.

13    6.    Attached hereto as Exhibit D is a true and correct copy of a Yahoo.Finance

14    stock chart reflecting the prices for Company shares between October 18, 2005 and November

15    8, 2005.

16    7.    Attached hereto as Exhibit E is a true and correct copy of a Yahoo.Finance stock

17    chart reflecting the prices for Company shares between January 9, 2006 and January 17, 2006.

18    8.    Attached hereto as Exhibit F is a true and correct copy of a Yahoo.Finance stock

19    chart reflecting the prices for Company shares between March 1, 2006 and March 2, 2006.

20

21    I declare under penalty of perjury under the laws of the State of New York that the

22    foregoing facts are true and correct.

23

24    Executed this 23rd day of April, 2007.

25

26    _____/s/ Kim E. Miller_____
     Kim E. Miller

DECLARATION OF KIM E. MILLER IN SUPPORT OF MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO MOTION OF TERAYON COMMUNICATION
SYSTEMS AND INDIVIDUAL DEFENDANTS TO DISMISS AMENDED CLASS
ACTION COMPLAINT [**CIVIL DOCKET  NO. 3-06-CV-3936 MJJ -** 2]
4258/001/183017.1



|  | I |  | I |  |
|---|---|---|---|---|
| PHASE I | I | PHASE II | I | PHASE III |
| Transition | I | Restructuring | I | Resolution |

PHASE I ("TRANSITION") -- Defendants sought to restore credibility after being accused of prior stock fraud and illegal insider trading and after witnessing a dramatic decline in the price of Company shares. Defendants informed the market that the Company could not continue to operate as expected and that it was transitioning into a commodities-based products Company. At the end of phase I, the stock was flat. While retiring their own debt in phase I had improved the balance sheet, defendants believed they would be able to sell more securities and raise more money and therefore the Rakib brothers did not yet sell shares.

PHASE II ("RESTRUCTURING"): During phase II, by March 14, 2003, defendants announce a new restructuring plan that eventually became defendants' focus on its CTMS and digital video sales. By concentrating on CMTS and digital video in early phase II, defendants were able to increase revenues from $22.3M (reported at 1Q:03) to $42M (by 1Q:04). Defendants reported record Digital Video Sales in 2Q:04 and 3Q:04. By the end of phase II, defendants recognized that their scheme to artificially-inflate the stock price was not working as

well as it had in phase I, where shares rallied from $4.00 to $14.00/share. During phase II, shares only railed from $2.00 to $8.00/share – 43% lower than its previous trading high. This phase is also marked by upheaval of management as senior managers fled.

Phase III ("RESOLUTION/ BAIL OUT"): During phase III, CMTS is abandoned, and revenues fall back below $30 million, *e.g.*, 4Q:04 ($29.4M). By this point, the Company appeared to be reliant on a single product with limited growth potential. Defendants began to reveal serious control weakness and control deficiencies [*see* 4Q:04 10K, 1Q:05 10-Q, 2Q:05 10-Q]. At that time, however, defendants stated that weaknesses were remediated. During phase III, E&Y resigned on August 27, 2005 before the disclosures concerning the accounting problems, complete lack of controls, and the need for extensive Restatements began to be disclosed. Also during phase III, the Rakib brothers each sold 150,000 shares at $3.50/share. Between mid-2004 and March 2006, Company stock only traded above $3.50 on a handful of days.

13 of 19 DOCUMENTS

Copyright 2005 Globes Publisher Itonut (1983) Ltd.
All Rights Reserved
Globes [online] - Israel's Business Arena

January 24, 2005 Monday

**LENGTH:** 212 words

**HEADLINE:** Terayon chair Zaki Rakib buys Israel's most expensive house;
The home in Herzliya Pituah was sold for $22 million by Austrian businessman Martin Schlaff.

**BYLINE:** Golan Hazani - "Yediot Ahronot"

**BODY:**
The "Yediot Ahronot" Hebrew daily reports that Israel's most expensive house was sold for over $22 million. Austrian-Jewish businessman Martin Schlaff, one of the owners of the casino in Jericho, sold the luxury house, located on Galei Techelet St. in Herzliya Pituah, to Vivian and Zaki Rakib, among the founders and owners of Terayon Communications Systems (Nasdaq: TERN).

Schlaff is considered a confidant of a number of Israeli prime ministers, including Prime Minister Ariel Sharon, as well as leading figures in the Palestinian Authority. He bought the land for the house in the 1990s from the Canadian embassy in Israel for $6.5 million. The house took five years to build. The garden is on a cliff overlooking the sea. The house itself occupies one dunam (0.25 acres), with a seawater pool nearby. The house is equipped with the most modern electronic devices, and also has an atomic bomb shelter.

The house was put on the market over eighteen months ago, but Schlaff was unable to obtain the price he wanted. The Weissglas-Almagor law firm represented the sellers, Adv. Arieh Hagai represented the buyers, and Adv. Yaakov Bardugo advised both parties.

Published by Globes [online]- www.globes.co.il - on January 24, 2005

www.globes.co.il

**LOAD-DATE:** February 1, 2005

# <u>KEY</u>

 Statements provided in Appendix A to Defendant's Motion to Dismiss:  Non-Actionable Statements of Puffery or Corporate Optimism

 Statements provided in Appendix B to Defendant's Motion to Dismiss:  Forward-Looking Statements & Accompanying Cautionary Language

 Statements which appear in both Appendix A And Appendix B to Defendant's Motion to Dismiss

1    59.    Ernst & Young's statements contained in the Company's SEC filings during the

2    Class Period were each materially false and misleading when made for the following reasons,

3    among others:

4        *    Terayon's financial statements and operational reports were *not* true, accurate or

5            reliable.  To the contrary, the value of Terayon's net income, earnings per share,

6            results, and shareholders' equity had been materially overstated and its loss

7            contingencies materially understated.

8        *    Ernst & Young had certified Terayon's financial statements as being GAAP

9            compliant when they were not.  In truth, in violation of GAAP, defendants failed to

10           make proper and timely adjustments to Terayon's stated reports.  As a result, the

11           Company's profitability was materially overstated and costs and expenses

12           understated.

13       *    Terayon's internal financial accounting and disclosure controls were grossly

14           inadequate an ineffective and had not been properly tested by Ernst & Young, so as

15           to prevent material misrepresentation of the Company's financial results and

16           conditions.

17       *    Terayon's internal control deficiencies were material and pervasive, and had not been

18           corrected by management at any time during the Class Period.  Ernst & Young failed

19           to refute defendants' denials and omissions during the Class Period, as a means of

20           explaining away the obvious material internal control deficiencies.

21                       **Defendants' Materially False and Misleading**
                         **Statements Made During the Class Period**

22

23                              *June 28, 2001 Press Release*

24    60.    On June 28, 2001, the inception of the Class Period, Terayon published a release

25    announcing preliminary results for the second quarter ended June 30, 2001, which provides, in part,

26    as follows:

27

28

                                        15

1    *Terayon expects to report total revenues in the range of $62 to $65 million.*

2    Excluding a $30 to $40 million charge, *the company expects a preliminary pro*
3    *forma loss for the second quarter of 2001 in the range of $0.38 to $0.40 per*
     *share....*

4    *July 24, 2001 Press Release*

5        61.    On July 24, 2001, Terayon published a release announcing results for the second

6    quarter ended June 30, 2001. In addition to providing more financial information about the

7    Company, this release also quoted defendant Zaki Rakib, in part, as follows:

8        *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
         *broadband access systems, today reported revenues of $65.7 million. Excluding a*
9        *charge of $28.7 million for inventory related reserves and vendor cancellation*
         *charges the pro forma net loss was $25.8 million, or $0.38 per share, for the*
10       *second quarter ended June 30, 2001....*

11       *Revenues for the second quarter of 2001 sequentially grew 22% to $65.7 million,*
         *up from $54.0 million in the first quarter of 2001. Pro forma net loss in the first*
12       *quarter of 2001 was $29.3 million, or $0.43 per share.*

13       "Given the challenging economic conditions, *we are very pleased with our results*
         *for the second quarter of 2001, and we are also optimistic about the quarter*
14       *ahead,*" said Zaki Rakib, chief executive officer of Terayon. [Emphasis added.]

15       *Form 10-Q for Second Quarter 2001*

16       62.    On or about August 14, 2001, defendants filed with the SEC the Company's Form

17   10-Q for the quarter ended June 30, 2001 ("2Q:01 Form 10-Q"), signed by defendant Fritz. In

18   addition to making substantially similar statements concerning the Company's operations as were

19   contained in the June 28, 2001 and July 24, 2001 releases, the 2Q:01 Form 10-Q also stated, in part,

20   the following:

21       *The accompanying consolidated financial statements have been prepared in*
         *accordance with generally accepted accounting principles for interim financial*
22       *information .... In the opinion of management, all adjustments (consisting*
         *primarily of normal recurring accruals) necessary for a fair presentation of the*
23       *financial statements at June 30, 2001 and for the three months and six months*
         *ended June 30, 2001 and 2000 have been included.* [Emphasis added.]

24

25       63.    The Company's 2Q:01 Form 10-Q also reported Terayon's "Liquidity and Capital

26   Resources," in part, as follows:

27       *At June 30, 2001, we had approximately $250.9 million in cash and cash*
         *equivalents, $143.1 million in short-term investments and a $2.5 million revolving*
28       *line of credit. ...*

                                    16

1    *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes due in*
2    *August 2007, resulting in net proceeds to us of approximately $484.5 million. The*
     *notes are our general unsecured obligation and are subordinated in right of*
3    *payment to all of our existing and future senior indebtedness and to all of the*
     *liabilities of our subsidiaries.* The Convertible Notes are convertible into shares of
4    our common stock at a conversion price of $84.01 per share at any time on or after
     October 24, 2000 through maturity, unless previously redeemed or repurchased.
5    Interest is payable semiannually. *Debt issuance costs related to the notes were*
     *approximately $15.5 million.*

6    In February 2001, we repurchased approximately $195.6 million of the Convertible
     Subordinated Notes for $68.5 million in cash, resulting in a pretax extraordinary gain
7    of approximately $121.5 million. *In addition, in July and August 2001, we*
     *repurchased approximately $104.3 million of the Convertible Subordinated Notes*
8    *for $45.0 million in cash, resulting in a pretax extraordinary gain of*
     *approximately $56.5 million.* [Emphasis added.]
9

10        64.      The statements contained in Terayon's June 28, 2001 and July 24, 2001 release and

11   those statements contained in the Company's 2Q:01 Form 10-Q, referenced above, were each

12   materially false and misleading when made, and were known by defendants to be false at that time

13   or were recklessly disregarded as such. for the following reasons, among others:

14        (a)      At all times during the Class Period, Terayon's financial statements and operational

15   reports were *not* true, accurate or reliable.  In fact, Terayon's net income, earnings per share,

16   reported results, and shareholders' equity had been materially overstated and its loss contingencies

17   understated;

18        (b)      At all times during the Class Period, unbeknownst to investors, the Individual

19   Defendants had certified Terayon's financial statements as being GAAP compliant despite the fact

20   that in truth the Company's profitability was materially overstated and costs and expenses

21   understated, as a result of defendants' failure to make true disclosures regarding the Company's

22   convertible note offering, and defendants' failure to make proper and timely adjustments to

23   Terayon's stated financial reports;

24        (c)      Throughout the Class Period, Terayon did not have adequate systems of internal

25   operational or financial controls, and the Company's financial results or operational reports were *not*

26   true, accurate or reliable.  In truth, Terayon's internal financial accounting and disclosure controls

27   were not adequate nor effective and failed to prevent material fraud in the presentation of the

28   Company's financial results and condition;

17

1    (d)    Throughout the Class Period, the Company's financial statements and reports were
2    *not* prepared in accordance with GAAP and SEC rules;

3    (e)    The Company did not properly account for deferred revenue and related cost of
4    goods sold. For example, the Company did not sufficiently evaluate its video products and
5    improperly accounted for them in accordance with the revenue recognition criteria in SAB 104
6    when revenue should have been accounted for in accordance with the software revenue recognition
7    principles under SOP 97-2 – which requires the Company to establish vendor specific objective
8    evidence of fair value for each element within a multiple-element arrangement;

9    (f)    In at least 2003, 2004, and 2005 the Company improperly recognized revenue for
10   transactions where the Company did not properly apply SAB 101, as amended by SAB 104. The
11   Company improperly recognized a deferred revenue liability and a deferred cost of goods sold asset,
12   thereby overstating assets and liabilities, and during the Restatement determined that deferred
13   revenues and deferred cost of goods should not be recognized for these transactions. As a result, the
14   Company adjusted deferred revenues by $1.6 million, $1.0 million and $0.9 million for the years
15   ended 2003 and 2004 and the first two quarters of 2005, respectively, and adjusted deferred cost of
16   goods sold by $0.9 million, $0.3 million, and $0.6 million for the years ended 2003 and 2004 and
17   for the first two quarters of 2005;

18   (g)    The Company did not account for a significant transaction whereby it developed a
19   broadcast platform based on its DM 6400 product to sell to its customer Thomson Broadcast. As a
20   result, revenue was improperly and prematurely recognized in violation of SOP 97-2, and in
21   violation of SOP 81-1, which sets forth criteria for completed contract recognition. As a result, $7.8
22   million of revenue previously recognized in 2004 and $1.8 million related to direct development
23   costs previously recognized from the fourth quarter of 2003 through the second quarter of 2005
24   were also deferred and ultimately recognized in the quarter ended December 31, 2005;

25   (h)    The Company made improper allowances for doubtful accounts until at least 2004;

26   (i)    The Company did not effectively monitor and adjust reserves related to its
27   restructuring charges during the Class Period. The Company also over accrued reserves related to
28   legal fees, taxes and other liabilities owed to third-party vendors;

18

1    (j)    The Company did not have adequate internal control over financial reporting,
2  including: (i) insufficient controls related to identification, capture, and timely communication of
3  financially significant information between certain parts of the organization and the accounting and
4  finance department to enable accounting for transactions in a complete and timely manner; (ii) lack
5  of sufficient personnel with technical accounting expertise in the accounting and finance department
6  and inadequate review and approval procedures to prepare external financial statements in
7  accordance with GAAP; (iii) failure to properly recognize revenue in accordance with GAAP,
8  including revenue recognized in accordance with the following principles: Statement of Position
9  ("SOP") 97-2, "Software Revenue Recognition;" Staff Accounting Bulletin ("SAB") No. 101,
10  "Revenue Recognition," as amended by SAB 104; "Accounting for Performance of Construction
11  Type and Certain Production-Type Contracts" (SOP 81-1); and Financial Accounting Standards
12  Board, Emerging Issues Task Force (EITF) 00-21, "Accounting for Revenue Arrangements with
13  Multiple Deliverables; (iv) improper use of estimates, including monitoring and adjustment
14  balances related to certain accruals and reserves, including allowance for doubtful accounts, legal
15  charges, license fees, restructuring charges, taxes, warranty obligations and fixed assets; (v) lack of
16  sufficient analysis and documentation of the application of GAAP; and (vi) ineffective controls over
17  the documentation, authorization and review of manual journal entries and ineffective controls to
18  ensure the accuracy and completeness of certain general ledger account reconciliations conducted in
19  connection with period end financial reporting; and

20    (k)    The Company's Convertible Subordinated Notes contained several imbedded
21  derivatives. First, the Notes contain a contingent put where in the event of any default by the
22  Company, the Trustee or holders of at least 25% of the principal amount of the Notes outstanding
23  may declare all unpaid principal and interest to be due and immediately payable. In fact, this
24  provision was triggered and the Company was forced to pay off the entire principal amount for a
25  total of $65.6 million in the quarter ending March 31, 2006. This provision was not disclosed to
26  investors and was affirmatively concealed from them from the beginning of the Class Period until a
27  California newspaper revealed the truth in January of 2006, shortly before the end of the Class
28  Period. Two additional embedded derivatives – an investor conversion option and a liquidated

19

1   damages provision – did not comply with SFAS 133, which requires that an embedded derivative

2   must be separated from its host contract (i.e., the Notes) and accounted for as a stand-alone

3   derivative if the economic characteristics and risks of the embedded derivative would not be

4   considered clearly and closely related to the host contract.

5                              *October 23, 2001 Press Release*

6          65.    On October 23, 2001, Terayon published a release announcing results for the third

7   quarter ended September 30, 2001. In addition to providing financial information about the

8   Company, this release also quoted defendant Zaki Rakib, in part, as follows:

9          *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
           *broadband access systems, today reported revenues of $79.6 million. Excluding a*
10         *charge of $6.4 million for inventory related reserves and vendor cancellation charges,*
           *the pro forma net loss was $21.2 million, or $0.31 per share, for the third quarter*
11         *ended September 30, 2001 .... Revenues for the third quarter of 2001 grew to $79.6*
           *million, up from $65.7 million in the second quarter of 2001. Pro forma net loss in*
12         *the second quarter 2001, excluding a charge of $28.7 million for inventory related*
           *reserves and vendor cancellation charges, was $25.8 million, or $0.38 per share.*

13

14                                        ***

15         "Given the challenging economic conditions, *we are very pleased with our*
           *achievements and results in the third quarter of 2001*," said **Zaki Rakib**, chief
16         executive officer of Terayon. [Emphasis added.]

17                          *Form 10-Q for Third Quarter 2001*

18         66.    On or about November 14, 2001, defendants filed with the SEC the Company's

19   3Q:01 Form 10-Q for the quarter ended September 30, 2001 ("3Q:01 Form 10-Q"), signed by

20   defendant Lustenader. In addition to making substantially similar statements concerning the

21   Company's operations as were contained in Terayon's October 23, 2001 release, the 3Q:01 Form

22   10-Q also stated, in part, the following:

23         *The accompanying consolidated financial statements have been prepared in*
           *accordance with generally accepted accounting principles for interim financial*
24         *information .... In the opinion of management, all adjustments (consisting*
           *primarily of normal recurring accruals) necessary for a fair presentation of the*
25         *financial statements at September 30, 2001 and for the three months and nine*
           *months ended September 30, 2001 and 2000 have been included.*
26         [Emphasis added.]

27         67.    The Company's 3Q:01 Form 10-Q also reported Terayon's Liquidity and Capital

28   Resources, in part, as follows:

                                         20

1    *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes due in
2    August 2007, resulting in net proceeds to us of approximately $484.5 million. The
     notes are our general unsecured obligation and are subordinated in right of
3    payment to all of our existing and future senior indebtedness and to all of the
     liabilities of our subsidiaries.* The Convertible Notes are convertible into shares of
4    our common stock at a conversion price of $84.01 per share at any time on or after
     October 24, 2000 through maturity, unless previously redeemed or repurchased.
5    Interest is payable semiannually. *Debt issuance costs related to the notes were
     approximately $15.5 million.*

6    *In February 2001, we repurchased approximately $195.6 million of the
7    Convertible Subordinated Notes for $68.5 million in cash, resulting in a pretax
     extraordinary gain of approximately $121.5 million.* In addition, in July and August
8    2001, we repurchased approximately $104.3 million of the Convertible Subordinated
     Notes for $45.0 million in cash, resulting in an extraordinary gain of approximately
9    $51.8 million. [Emphasis added.]

10       68.    The statements contained in Terayon's October 23, 2001 release and those statements

11   contained in the Company's 3Q:01 Form 10-Q, referenced above, were each materially false and

12   misleading when made and were known by defendants to be false at that time or were recklessly

13   disregarded as such, for the reasons stated herein in ¶ 64.

14                          *January 28, 2002 Press Release*

15       69.    On January 28, 2002, Terayon published a release announcing results for the fourth

16   quarter and full year ended December 31, 2001.  In addition to announcing revenues of $279 million

17   for the year, this release stated, in part, the following:

18       *Terayon Communication Systems, Inc. (Nasdaq: TERN), the world's second
         largest provider of cable broadband modems and headends, today reported
19       revenues of $80.2 million for the fourth quarter 2001, an increase of 27% from
         $62.9 million for the fourth quarter 2000.*

20                          *    *    *

21       *For the full fiscal year, revenues were $279.5 million, down 18% compared to
22       $339.5 million for the previous year.* Excluding $33.5 million in special charges
         related to inventory reserves and vendor cancellation exposures, *the pro forma loss
23       in fiscal year 2001 was $86.1 million or $1.26 per share, compared to a full year
         2000 pro forma loss of $15.5 million or $0.25 per share.*

24                          *    *    *

25       At the end of December 2001, cash and short-term investments were $334 million.
26       *The convertible debt outstanding at the end of December 2001 was $174 million
         down from $500 million as of December 2000.* The net cash position (cash less long
27       term debt) improved to $160 million compared to $62 million at the end of 2000.
         [Emphasis added.]
28

                                    21

1    70.    The Company's January 28, 2002 release also quoted defendant Zaki Rakib, in part,

2    as follows:

3    "**The key to success in 2001 was focus**," said Dr. Zaki Rakib, Terayon CEO. "We
     focused on strengthening our financial position while continuing to invest in

4    technology. Terayon realized a return on its efforts when the S-CDMA technology
     was included in the completed DOCSIS™ 2.0 specification issued in December

5    2001. This opened a new window of opportunity for us in the U.S. market. Eight of
     the top nine U.S. MSOs are currently in different stages of testing our new TJ 615

6    DOCSIS 2.0-based modem and one of the top three already has indicated its intent to
     deploy the modem shortly." [Emphasis added.]

7

8    *2001 10-K*

9    71.    On or about April 1, 2002, defendants filed with the SEC the Company's 2001 Form

10   10-K for the year ended December 31, 2001, signed by defendants Zaki Rakib, Lustenader, Shlomo

11   Rakib, Schaepe, and Solomon.  In addition to making substantially similar statements concerning

12   the Company's operations as were contained in Terayon's January 28, 2002 release, the Company's

13   2001 Form 10-K also contained statements attesting to the "Critical Accounting Policies" that were

14   purported to then be in place at Terayon, in part, as follows:

15   **Critical Accounting Policies**

16   We consider certain accounting policies related to revenue recognition, bad debt
     reserves, inventory reserves, impairment of long-lived assets, warranty returns and

17   contingencies to be critical policies due to the estimation processes involved in each.

18   *    *    *

19   **Revenue Recognition**. We recognize revenue in accordance with SEC Staff
     Accounting Bulletin No. 101, Revenue Recognition in Financial Statements (SAB

20   101), as amended by SAB 101A and 101B. SAB 101 requires that four basic criteria
     must be met before revenue can be recognized: (1) persuasive evidence of an

21   arrangement exists; (2) delivery has occurred or services rendered; (3) the selling
     price is fixed and determinable; and (4) collectibility is reasonably assured.

22   Determination of criteria (4) is based on management's judgments regarding the
     collectibility of the selling price. Should changes in conditions cause management to

23   determine these criteria are not met for certain future transactions, revenue
     recognized for any reporting period could be adversely affected.

24   *    *    *

25   **Revenue Recognition**

26   The Company sells its products directly to broadband access service providers,
     system resellers and distributors and recognizes revenue upon shipment to the

27   customer when title is transferred. *Revenues related to product sales are generally*

28   *recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery*

22

1  *has occurred or services have been rendered, (3) the seller's price to the buyer is*
2  *fixed or determinable, and (4) collectibility is reasonably assured. The Company's*
   *existing agreements with its system resellers and distributors do not contain price*
   *protection provisions and do not grant return rights beyond those provided by the*
3  *Company's standard warranty.*  [Emphasis added.]

4       72.    The Company's 2001 Form 10-K also reported on Terayon's Liquidity and Capital

5  Resources, in part, as follows:

6       At December 31, 2001, we had approximately $100.3 million in cash and cash
        equivalents and $233.6 million in short-term investments.
7

8       *In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of*
        *approximately $484.4 million. The Notes are our general unsecured obligation*
9       *and are subordinated in right of payment to all of our existing and future senior*
        *indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
10      convertible into shares of our common stock at a conversion price of $84.01 per
        share at any time on or after October 24, 2000 through maturity, unless previously
11      redeemed or repurchased. Interest is payable semiannually. *Debt issuance costs*
        *related to the Notes were approximately $15.6 million.*
12

13      *In 2001, we repurchased approximately $325.9 million of the Notes for $113.4*
        *million in cash and $17.9 million in stock, resulting in an extraordinary gain of*
14      *approximately $185.3 million* net of $9.3 million of previously unamortized debt
        issuance costs. [Emphasis added.]
15

16                      *January 28, 2002 Ernst & Young Report*

17      73.    For full year 2001, Ernst & Young charged the Company over $500,000 in audit fees.

18  In return for payment of these fees, Ernst & Young provided an audit of the Company's reported

19  year-end financial results.  After completing that review at year end 2001, Ernst & Young provided

20  a report, dated January 28, 2002, to the Board of Directors and Stockholders of the Company that

21  stated, in part, as follows:

22      *We have audited the accompanying consolidated balance sheets of Terayon*
        *Communication Systems, Inc. as of December 31, 2001 and 2000, and the related*
23      *consolidated statements of operations, stockholders' equity, and cash flows for*
        *each of the three years in the period ended December 31, 2001.... Our*
24      *responsibility is to express an opinion on these financial statements and schedule*
        *based on our audits.*
25
        *We conducted our audits in accordance with auditing standards generally accepted*
26      *in the United States.... In our opinion, the consolidated financial statements*
        *referred to above present fairly, in all material respects, the consolidated financial*
27      *position of Terayon Communication Systems, Inc. at December 31, 2001 and 2000,*

28

1  *and the consolidated results of its operations and its cash flows for each of the*
2  *three years in the period ended December 31, 2001, in conformity with accounting principles generally accepted in the United States.* [Emphasis added.]

3  74.    The statements made by defendants and contained in the Company's January 28,

4  2002 press release and in the 2001 Form 10-K, were each materially false and misleading and were

5  know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons

6  stated herein in ¶ 64.

7  *April 29, 2002 Press Release and Conference Call*

8  75.    On April 29, 2002, Terayon published a release announcing results for the first

9  quarter ended March 31, 2002. This release provided financial information about the Company, in

10  part, as follows:

11  *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of broadband access systems, today reported revenues of $57.2 million for the first*
12  *quarter 2002, an increase of 6% from $54.0 million for the first quarter 2001. The pro forma net loss for the first quarter 2002 was $3.9 million or $0.05 per share,*
13  *compared to a pro forma net loss of $29.3 million or $0.43 per share for the same period in 2001.*

14  * * *

15  *The GAAP net loss for the first quarter 2002 was $4.1 million or $0.06 per share,*
16  *compared to $508.2 million or $7.53 per share for the same period in 2001. Gross margin in the first quarter of 2002 was 45%. Excluding the benefit of reversing*
17  *$11.4 million in inventory reserves and vendor cancellation charges, the gross margin was 25%.* [Emphasis added.]

18

19  76.    The Company's April 29, 2002 release also quoted defendant Zaki Rakib, in part, as

20  follows:

21  *"Given the current economic environment, we are pleased with these results.*
   However, revenues for the telecom business were significantly below our
22  expectations due to continued weakness in telecom capital spending. In addition,
   revenues for the cable business were lower than expected due to the inability to ship
23  all of the cable modems on order for shipment during the quarter. The combination
   of these factors resulted in lower total revenues than expected for the quarter," said
24  Terayon's CEO Dr. Zaki Rakib. *"Despite these challenges, we were pleased with the progress we made this quarter in DOCSIS CMTS sales, which accounted for*
25  *approximately $8 million in revenues."* [Emphasis added.]

26  77.    Later the same day, on April 29, 2002, defendants also conducted a conference call

27  for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

28  defendants reiterated the same or substantially similar material false and misleading statements

24

1  concerning Terayon's revenues, earnings, gross margins and projected growth, as had been made

2  previously and contained in the Company's press release and its prior SEC filings. These

3  statements were false and misleading and failed to disclose that defendants had purposely failed to

4  report the Company's financial results in conformity with GAAP and SEC rules. These statements

5  were also false and misleading for the reasons set forth at ¶ 64.

6                          *Form 10-Q for First Quarter of 2002*

7          78.     On or about May 15, 2002, defendants filed with the SEC the Company's Form 10-Q

8  for the quarter ended March 31, 2002 ("1Q:02 Form 10-Q"), signed by defendant Lustenader. In

9  addition to making substantially similar statements concerning the Company's finances and

10 operations as had been made in the April 29, 2002 press release and conference call, the 1Q:02

11 Form 10-Q also stated, in part, the following:

12         *The accompanying consolidated financial statements have been prepared in*
           *accordance with generally accepted accounting principles in the United States for*
13         *interim financial information and in accordance with the instructions to Form 10-*
           *Q and Article 10 of Regulation S-X.... In the opinion of management, all*
14         *adjustments (consisting of normal recurring adjustments) necessary for a fair*
           *presentation of the financial statements at March 31, 2002 and for the three*
15         *months ended March 31, 2002 and 2001 have been included.* [Emphasis added.]

16         79.     The Company's 1Q:02 Form 10-Q also contained additional statements regarding

17 Terayon's critical accounting policies – including its revenue recognition policies – in part, as

18 follows:

19         **Revenue Recognition**

20         The Company sells its products directly to broadband access service providers,
           system resellers and distributors and recognizes revenue upon shipment to the
21         customer when title is transferred. *Revenues related to product sales are generally*
           *recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery*
22         *has occurred or services have been rendered, (3) the seller's price to the buyer is*
           *fixed or determinable, and (4) collectibility is reasonably assured. The Company's*
23         *existing agreements with its system resellers and distributors do not contain price*
           *protection provisions and do not grant return rights beyond those provided by the*
24         *Company's standard warranty*. [Emphasis added.]

25         80.     The statements made by defendants and contained in the Company's April 29, 2002

26 press release, those statements made by defendants during the quarterly conference call, and those

27 statements contained in Terayon's 1Q:02 Form 10-Q, were each materially false and misleading and

28

                                          25

1    were know by defendants to be false at that time, or were recklessly disregarded as such, for the

2    reasons stated herein in ¶ 64.

3    <u>July 29, 2002 Press Release and Conference Call</u>

4    81.    On July 29, 2002, Terayon published a release announcing results for the second

5    quarter ended June 30, 2002. This release provided financial and operational information about the

6    Company, in part, as follows:

7    *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
*broadband solutions, today reported revenues of $22.4 million for the second*
8    *quarter 2002*, a decrease of 66% from $65.7 million for the second quarter 2001.
For the six months ended June 30, 2002, revenues were $79.6 million, a decrease of
9    33% from $119.7 million for the same period 2001. *The pro forma net loss for the*
*second quarter 2002 was $28.3 million or $0.39 per share, compared to a pro*
10   *forma net loss of $54.5 million or $0.81 per share for the same period 2001.* The
pro forma net loss for the six months ended June 30, 2002 was $32.2 million or
11   $0.44 per share, compared to a pro forma net loss of $83.8 million or $1.24 for the
same period 2001.

12

                  \*   \*   \*

13

14   In the second quarter, the gain resulting from the retirement of debt was $33.3
million, and the write down of investments totaled $4.5 million. In addition, in the
15   second quarter 2002, Terayon recorded a $4.0 million charge related to the
impairment of goodwill and other intangible assets. *The GAAP net loss for the*
16   *second quarter 2002 was $3.7 million or $0.05 per share, compared to $62.5*
*million or $0.93 per share for the same period 2001.*

17   *The GAAP net loss for the six months ended June 30, 2002 was $7.8 million or*
*$0.11 per share, compared to $570.7 million or $8.45 per share for the same period*
18   *2001.* [Emphasis added.]

19   82.    The Company's July 29, 2002 release again quoted defendant Zaki Rakib, in part, as

20   follows:

21   Terayon's CEO **Zaki Rakib** said, *"Our revenues reflect the challenge of*
*transitioning from proprietary to standards-based products during a period of*
22   *difficult market conditions. While disappointed by the short-term outlook, we are*
*encouraged by the growing demand for DOCSIS 2.0-based products.* In the
23   previous quarter and during this quarter we have and will be fulfilling orders for our
DOCSIS 2.0-based modems from three of the top four U.S. MSOs. The early
24   adoption of DOCSIS 2.0 benefits Terayon given our leadership in its
implementation." [Emphasis added.]

25   83.    The Company's July 29, 2001 release also noted:

26

27   *Terayon expects revenues in the third quarter to be in the range of $15 to $25*
*million and the pro forma net loss to be in the range of $0.35 to $0.39 per share.*

28

26

1   *For the full year, Terayon expects revenues, excluding Imedia Semiconductor, to*
2   *be in the range of $110 to $130 million, and the pro forma per share loss to be in*
    *the range of $1.15 to $1.41 per share.* Terayon plans to fund Imedia at a cost of
3   approximately $5 to $6 million per quarter.

4   *Through aligning company resources to its strategic areas and to market*
    *conditions, Terayon will be able to achieve a reduction in its operating expenses in*
5   *the near term.* With the exclusion of Imedia Semiconductor, Terayon expects
    operating expenses to be below $20 million in the first quarter, 2003. [Emphasis
6   added.]

7   84.    Later the same day, on July 29, 2002, defendants also conducted a conference call for

8   analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

9   defendants reiterated the same or substantially similar material false and misleading statements

10  concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

11  contained in the Company's press releases and SEC filings. These statements too were false and

12  misleading for the reasons set forth at ¶ 64.

13                  *Form 10-Q for Second Quarter of 2002*

14  85.    On or about July 29, 2002, defendants filed with the SEC the Company's Form 10-Q

15  for the quarter ended June 30, 2002 ("2Q:02 Form 10-Q"), signed by defendant Lustenader. In

16  addition to making substantially similar statements concerning the Company's operations as were

17  contained in Terayon's July 29, 2002 release, the 2Q:02 Form 10-Q also stated, in part, the

18  following:

19      *The accompanying condensed consolidated financial statements have been*
        *prepared in accordance with generally accepted accounting principles in the*
20      *United States for interim financial information and in accordance with the*
        *instructions to Form 10-Q and Article 10 of Regulation S-X.… In the opinion of*
21      *management, all adjustments (consisting of normal recurring adjustments)*
        *necessary for a fair presentation of the financial statements at June 30, 2002 and*
22      *for the three and six months ended June 30, 2002 and 2001 have been included.*
        [Emphasis added.]
23

24  86.    The 2Q:02 Form 10-Q reported the Company's critical accounting policies –

25  including its revenue recognition policies – in part, as follows:

26  **Revenue Recognition**

27      The Company sells its products directly to broadband access service providers,
        system resellers and distributors and recognizes revenue upon shipment to the
28      customer when title is transferred. *Revenues related to product sales are generally*

                                    27

1  *recognized when: (1) persuasive evidence that an arrangement exists, (2) delivery*
2  *has occurred or services have been rendered, (3) the seller's price to the buyer is*
   *fixed or determinable, and (4) collectibility is reasonably assured. The Company's*
3  *existing agreements with its system resellers and distributors do not contain price*
   *protection provisions and do not grant return rights beyond those provided by the*
4  *Company's standard warranty.* [Emphasis added.]

5       87.    Regarding the Company's 5% Convertible Subordinated Notes, the 2Q:02 Form 10-

6  Q stated, in part, the following:

7  **Convertible Subordinated Notes**

8  *In the first six months of 2001, the Company repurchased approximately $195.6*
   *million of its Convertible Subordinated Notes (Notes) for $68.5 million in cash,*
9  *resulting in a gain of approximately $121.5 million*, net of related unamortized
   issuance costs of $5.6 million. In April 2002, the Company adopted SFAS No. 145
10 and determined that the extinguishment of its debt did not meet the criteria of an
   extraordinary item as set forth in SFAS No. 145. Accordingly, the Company will
11 now report its gain from retirement of its Notes in its results of operations. All prior
   periods will reflect the adoption of SFAS No. 145. *In the first six months of 2002,*
12 *the Company repurchased approximately $74 million of its Notes for $39.2 million*
   *in cash, resulting in a gain included in operations of approximately $33.3 million*
13 net of related unamortized issuance costs of $1.5 million. [Emphasis added.]

14      88.    The statements made by defendants and contained in the Company's July 29, 2002

15 press release, those statements made by defendants during the quarterly conference call, and those

16 statements contained in Terayon's 2Q:02 Form 10-Q, were each materially false and misleading and

17 were know by defendants to be false at that time, or were recklessly disregarded as such, for the

18 reasons stated herein in ¶ 64.

19         *October 28, 2002 Press Release and Conference Call*

20      89.    On October 28, 2002, Terayon published a release announcing results for the third

21 quarter ended September 30, 2002. This release provided financial and operational information

22 about the Company, in part, as follows:

23 *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
   *broadband solutions, today reported revenues of $24.5 million for the third quarter*
24 *2002,* a decrease of 69% from $79.6 million for the third quarter 2001. For the nine
   months ended September 30, 2002, revenues were $104.1 million, a decrease of 48%
25 from $199.3 million for the same period 2001.

26 ///

27 ///

28 ///

28

1                                      *    *    *

2      In the third quarter of 2002, Terayon retired $35.1 million of debt, resulting in a gain
       of $15.8 million.
3

4      *The GAAP net loss for the third quarter 2002 was $16.0 million or $0.22 per
       share, compared to net income of $13.1 million or $0.19 per share for the same
5      period 2001.* The GAAP net loss for the nine months ended September 30, 2002 was
       $23.7 million or $0.33 per share, compared to a net loss of $557.6 million or $8.23
6      per share for the same period 2001. [Emphasis added.]

7      90.     The Company's October 28, 2002 release again quoted defendant Zaki Rakib, in part,

8    as follows:

9      *"We're encouraged by the progress we made during the third quarter in
       transitioning from a leading manufacturer of proprietary cable broadband
10     solutions to a leader in standards-based offerings,"* said **Zaki Rakib**, Terayon's
       CEO. "During the quarter, we made significant progress with the top U.S. MSOs.
11     Four of the top six are currently deploying our DOCSIS 2.0 based TJ 615 and TJ 715
       cable modems. Though the telecommunications industry remains challenging, we
12     believe that the growing deployments of our DOCSIS 2.0-based modems, combined
       with our expanded relationships with the top MSOs, should present opportunities for
13     our DOCSIS 2.0-based CMTS." [Emphasis added.]

14     91.     Later the same day, on October 28, 2002, defendants also conducted a conference

15   call for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

16   defendants reiterated the same or substantially similar material false and misleading statements

17   concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

18   contained in the Company's press releases and SEC filings. These statements too were false and

19   misleading and failed to disclose that defendants had not reported  the Company's financial results

20   in conformity with GAAP and SEC rules.

21                              *Form 10-Q for Third Quarter 2002*

22     92.     On or about November 15, 2002, defendants filed with the SEC the Company's Form

23   10-Q for the quarter ended September 30, 2002 ("3Q:02 Form 10-Q"), signed by defendant

24   Lustenader. In addition to making substantially similar statements concerning the Company's

25   operations as were contained in Terayon's October 28, 2002 relelase, the 3Q:02 Form 10-Q also

26   stated, in part, the following:

27     *The accompanying condensed consolidated financial statements have been
       prepared in accordance with generally accepted accounting principles in the
28     United States for interim financial information .... In the opinion of management,*

                                            29

1   *all adjustments (consisting of normal recurring adjustments) necessary for a fair*
2   *presentation of the financial statements at September 30, 2002 and for the three*
    *and nine months ended September 30, 2002 and 2001 have been included.*
3   [Emphasis added.]

4       93.     The 3Q:02 Form 10-Q also reported the Company's critical accounting policies –

5   including its revenue recognition policies – in part, as follows:

6       **Revenues.** We sell our products directly to broadband service providers, and to a
        lesser extent, resellers and integrators. *Revenues related to product sales are*
7       *generally recognized when: (1) persuasive evidence that an arrangement exists, (2)*
        *delivery has occurred or services rendered, (3) the selling price is fixed or*
8       *determinable, and (4) collectibility is reasonably assured. A provision is made for*
        *estimated product returns as product shipments are made. Our existing*
9       *agreements typically do not grant return rights beyond those provided by the*
        *warranty.* [Emphasis added.]
10

11      94.     Regarding the Company's 5% Convertible Subordinated Notes, the 3Q:02 Form 10-

12  Q also stated, in part, the following:

13  **Convertible Subordinated Notes**

14      *In the three and nine months ended September 30, 2001, the Company*
        *repurchased approximately $104.3 million and $299.9 million, respectively, of*
15      *Convertible Subordinated Notes (Notes) for $45.0 million and $113.4 million,*
        *respectively, in cash, resulting in a gain of approximately $51.8 million and $173.3*
16      *million, respectively,* net of related unamortized issuance costs and accrued taxes of
        $7.5 million and $13.2 million. respectively. In April 2002, the Company adopted
17      SFAS No. 145 and determined that the extinguishment of its debt did not meet the
        criteria of an extraordinary item as set forth in SFAS No. 145. Accordingly, the
18      Company is now reporting its gain from retirement of its Notes in its results of
        operations. All prior periods reflect the adoption of SFAS No. 145.
19
        *In the first three and nine months of 2002, the Company repurchased*
20      *approximately $35.1 million and $109.1 million, respectively, of Notes for $18.4*
        *million and $57.6 million, respectively, in cash, resulting in a gain included in*
21      *operations of approximately $15.8 million and $49.1 million, respectively,* net of
        related unamortized issuance costs of $0.9 million and $2.4 million, respectively.
22      [Emphasis added.]

23      95.     The 3Q:02 Form 10-Q also contained statements that attested to the purported

24  adequacy of the Company's controls and procedures, in part, as follows:

25      Within the 90 days prior to the date of filing this Quarterly Report on Form 10-Q, *we*
        *carried out an evaluation, under the supervision and with the participation of*
26      *management, including the Chief Executive Officer and the Chief Financial*
        *Officer, of the effectiveness of the design and operation of our disclosure controls*
27      *and procedures pursuant to Exchange Act Rule 13a-14. Based upon that*
        *evaluation, the Chief Executive Officer and the Chief Financial Officer concluded*
28      *that our disclosure controls and procedures are effective in timely alerting them to*

                                        30

1    *material information relating to us (including its consolidated subsidiaries) which*
2    *is required to be included in our periodic SEC filings.*.  [Emphasis added.]

3    <u>*Certifications of Form 10-Q for Third Quarter of 2002*</u>

4    96.    The 3Q:02 Form 10-Q also contained Certifications by defendants Lustenader and

5    Zaki Rakib that certified, in part, as follows:

6    *Based on my knowledge, this quarterly report does not contain any untrue*
     *statement of a material fact or omit to state a material fact necessary to make the*
7    *statements made, in light of the circumstances under which such statements were*
     *made, not misleading with respect to the period covered by this quarterly report;*
8

9    *Based on my knowledge, the financial statements, and other financial information*
     *included in this quarterly report, fairly present in all material respects the*
10   *financial condition, results of operations and cash flows of the registrant as of,*
     *and for, the periods presented in this quarterly report;*
11

12                            *   *   *

13   [The registrant's other certifying officers and I] *evaluated the effectiveness of the*
     *registrant's disclosure controls and procedures as of a date within 90 days prior to*
14   *the filing date of this quarterly report (11/14/02); and... presented in this quarterly*
     *report our conclusions about the effectiveness of the disclosure controls and*
15   *procedures based on our evaluation as of the Evaluation Date;*

16                            *   *   *

17   [The registrant's other certifying officers and I have disclosed] *all significant*
     *deficiencies in the design or operation of internal controls which could adversely*
18   *affect the registrant's ability to record, process, summarize and report financial*
     *data and have identified for the registrant's auditors any material weaknesses in*
19   *internal controls; and b) any fraud, whether or not material, that involves*
     *management or other employees who have a significant role in the registrant's*
20   *internal controls...*

21   97.    In connection with the 3Q:02 Form 10-Q, defendants Lustenader and Zaki Rakib also

22   provided certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the

23   Sarbanes-Oxley Act of 2002 ("SOX") that *"the information contained in the Report fairly*

24   *presents, in all material respects, the financial condition and results of operations of the*

25   *Company."* [Emphasis added].

26   98.    The statements made by defendants and contained in the Company's October 28,

27   2002 press release, those statements made by defendants during the quarterly conference call, and

28   those statements contained in Terayon's 3Q:02 Form 10-Q, were each materially false and

31

1    misleading and were know by defendants to be false at that time, or were recklessly disregarded as

2    such, for the reasons stated herein in ¶ 64.

3                                      *January 30, 2003 Release*

4        99.    On January 30, 2003, Terayon published a release announcing results for the fourth

5    quarter and full year ended December 31, 2002. This release stated, in part, the following:

6        *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
         *broadband solutions, today reported revenues of $25.3 million for the fourth*
7        *quarter 2002, a decrease of 68% from $80.2 million for the same period 2001. For*
         *the 12 months ended December 31, 2002, revenues were $129.4 million,* a decrease
8        of 54% from $279.5 million for the same period 2001.

9
         *The net loss for the fourth quarter 2002 was $20.5 million or $0.28 per share,*
10       *compared to a net loss of $6.2 million or $0.09 per share for the same period 2001.*
         The net loss for the 12 months ended December 31, 2002 was $44.2 million or $0.61
11       per share, compared to a net loss of $563.8 million, or $8.25 per share for the same
         period 2001.
12
                                           *    *    *
13
         *During the fourth quarter of 2002, Terayon made additional progress in aligning*
14       *the company's operating expenses with current market conditions.* Operating
         expenses for the fourth quarter 2002 were $18.9 million, excluding Imedia
15       Semiconductor. This is ahead of the company's stated goal of reducing expenses
         below $20 million, excluding Imedia Semiconductor, in the first quarter of 2003.
16       [Emphasis added.]

17       100.    The Company's January 30, 2003 release also quoted defendant Zaki Rakib, in part,

18   as follows:

19       Commenting on Terayon's accomplishments during the year, Terayon's CEO, Zaki
         Rakib said, *"We met many of our key strategic goals during 2002,* including: (1)
20       achieving DOCSIS™ 2.0 certification and qualification for our cable modems and
         CMTS; (2) increasing sales of data products to the top U.S. MSOs, as evidenced by
21       sales to divisions of Adelphia, Comcast, Cox and Time Warner Cable; (3) ramping
         up volume production of our DOCSIS 2.0 products; (4) cost-reducing our products,
22       in particular our cable modems; (5) maintaining our leadership position in digital
         video with our CherryPicker; (6) strengthening Imedia Semiconductor's position as a
23       broadband silicon provider; and (7) *maintaining a strong balance sheet: during*
         *2002,* despite a challenging economy and significant investments in research and
24       development, our net cash position (cash and equivalents minus the face value of
         convertible debt) decreased by $18.3 million. Our ending cash and equivalents on
25       hand is $206.5 million and the face value of convertible debt is $65.1 million."
         [Emphasis added.]
26
27       101.    Later the same day, on January 30, 2003, defendants also conducted a conference call

28   for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

                                              32

1   defendants reiterated the same or substantially similar material false and misleading statements

2   concerning Terayon's revenues, earnings, and gross margins, as had been made previously and

3   contained in the Company's press releases and SEC filings. These statements were false and

4   misleading for the reasons set forth at ¶ 64.

5                               *Abrupt Resignation of Defendant Lustenader*

6        102.    On February 26, 2003, defendants announced that Lustenader had resigned as Chief

7   Financial Officer of the Company, and was being replaced by Arthur T. Taylor. At the time of her

8   resignation, defendants led the market to believe that there was no disagreement over the

9   Company's financial reporting, and that defendant Lustenader had left Terayon "to pursue other

10   interests."

11                   *Restructuring in 2003: Plant Closings and Layoffs*

12        103.    On March 14, 2003, defendants published a release announcing that the Company

13   was undergoing a complete restructuring designed to rationalize products and staff and reduce costs.

14   At that time, defendants published a release that quoted defendant Zaki Rakib and that stated, in

15   part, the following:

16           Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of
          broadband solutions, today announced a *worldwide restructuring designed to reduce*

17           *its operating costs, improve efficiencies and re-align resources to focus on its core*
          *product offerings for the world's leading cable operators. Measures implemented*

18           *include a reduction in force of approximately 100 employees, or 20 percent of the*
          *workforce, and the closure of certain remote facilities. Terayon anticipates*

19           *realizing approximately $12 million to $15 million in annualized savings from*
          *these actions, combined with related operational savings including curtailment of*

20           *certain program and discretionary expenses. The company expects to record total*
          *charges in the range of approximately $4 million to $5 million associated with the*

21           *realignment and the writedown of certain related assets in the quarter ending*
          *March 31, 2003.*

22           *"We are committed to achieving profitability and are taking the necessary steps to*

23           *facilitate reaching this key milestone,"* said **Zaki Rakib**, Terayon's CEO. "We have
          identified areas of our operations to streamline and consolidate, while retaining the

24           key resources to deliver upon the commitments we have made to our customers and
          to continue investing strategically for the future. *We are encouraged by the strong*

25           *interest customers are showing in Terayon's data, video and voice product lines*
          *and are looking to generate positive momentum in the coming quarters."*

26           [Emphasis added.]

27

28

*2002 Form 10-K*

1

2      104.    On or about March 27, 2003, defendants filed with the SEC the Company's 2002

3   Form 10-K for the year ended December 31, 2002, signed by defendants Zaki Rakib, Taylor,

4   Shlomo Rakib, Schaepe, Solomon and Woodrow.  In addition to making substantially similar

5   statements concerning the Company's operations as were contained in the Company's January 30,

6   2003 and March 14, 2003 releases, the 2002 Form 10-K also described Terayon's Critical

7   Accounting Policies, in part, as follows:

8      **Critical Accounting Policies**

9      We consider certain accounting policies related to revenue recognition, bad debt
        reserves, inventory valuation, impairment of long-lived assets, warranty returns,
10      restructuring, accounting for share based compensation and contingencies to be
        critical policies due to the estimation processes involved in each. *We discuss each of*
11      *our critical accounting policies, in addition to certain less significant accounting*
        *policies, with senior members of management and the audit committee, as*
12      *appropriate.*

13
        **Use of Estimates.** The preparation of the consolidated financial statements and
14      related disclosures in conformity with accounting principles generally accepted in the
        United States requires us to establish accounting policies that contain estimates and
15      assumptions that affect the amounts reported in the consolidated financial statements
        and accompanying notes. *On an on-going basis, we evaluate our estimates,*
16      *including those related to product returns, bad debts, inventories, investments,*
        *intangible assets and contingencies and litigation. We base our estimates on*
17      *historical experience and on various other assumptions that are believed to be*
        *reasonable under the circumstances, the results of which form the basis for*
18      *making judgments about the carrying values of assets and liabilities that are not*
        *readily apparent from other sources.* These policies include:
19
        -      *revenue recognition;*
20
              the allowance for doubtful accounts, which impacts revenue;
21
        -      the valuation of exposures associated with the contract manufacturing operations and
22
              estimating future warranty costs, which impact cost of goods sold and gross margins;
23
              and
24
        -      *the valuation of certain long-lived assets, especially goodwill and other purchased*
25
              *intangible assets, which has resulted in impairment, which impacts operating*
26
              *expenses.*
27

28
                                          34

1    We have other equally important accounting policies and practices which may not
2    require us to make significant estimates or assumptions. Despite our intention to
     establish accurate estimates and assumptions, actual results could differ from those
3    estimates under different assumptions or conditions.

4    **Revenue Recognition.** We recognize revenue in accordance with SEC Staff
     Accounting Bulletin No. 101, Revenue Recognition in Financial Statements (SAB
5    101), as amended by *SAB 101A and 101B. SAB 101 requires that four basic*
     *criteria must be met before revenue can be recognized: (1) persuasive evidence of*
6    *an arrangement exists; (2) delivery has occurred or services rendered; (3) the*
     *selling price is fixed and determinable; and (4) collectibility is reasonably assured.*
7    *Determination of criteria (4) is based on management's judgments regarding the*
     *collectibility of the selling price.* Should there be changes to management's
8    judgments, revenue recognized for any reporting period could be adversely affected.
     [Emphasis added.]

9        105.    Regarding the Company's 5% Convertible Subordinated Notes, the 2002 Form 10-K

10   stated, in part, the following:

11   **Convertible Subordinated Notes**

12       *In July 2000, the Company issued $500 million of 5% Convertible Subordinated*
         *Notes due in August 2007 (Convertible Notes) resulting in net proceeds to the*
13       *Company of approximately $484.4 million.* The Convertible Notes are the
         Company's general unsecured obligation and are subordinated in right of payment to
14       all existing and future senior indebtedness and to all of the liabilities of the
         Company's subsidiaries. The Convertible Notes are convertible into shares of the
15       Company's common stock at a conversion price of $84.01 per share at any time on or
         after October 24, 2000 through maturity, unless previously redeemed or repurchased.
16       The Company may redeem some or all of the Convertible Notes at any time on or
         after October 24, 2000 and before August 7, 2003 at a redemption price of $1,000 per
17       $1,000 principal amount of the Convertible Notes, plus accrued and unpaid interest,
         if any, if the closing price of the Company's stock exceeds 150% of the conversion
18       price, or $126.01 for at least 20 trading days within a period of 30 consecutive
         trading days ending on the trading day prior to the date of mailing of the redemption
19       notice. The Company will also make an additional payment of $193.55 per $1,000
         principal amount of Convertible Notes, less the amount of any interest actually paid
20       on the Convertible Notes before the date of redemption. The Company may redeem
         the Convertible Notes at any time on or after August 7, 2003 at specified prices plus
21       accrued and unpaid interest. Interest is payable semi-annually. *Debt issuance costs*
         *related to the Convertible Notes were approximately $15.6 million and are*
22       *amortized over seven years. At December 31, 2002 amortization of debt issuance*
         *costs totaled $14.2 million.*

23

24       *In 2001, the Company repurchased approximately $325.9 million of Convertible*
         *Notes for $113.4 million in cash and $17.9 million in stock, resulting in a gain of*
25       *approximately $185.3 million,* net of related unamortized issuance costs of $9.3
         million. In 2002, the Company repurchased approximately $109.1 million of
26       Convertible Notes for $57.6 million in cash, resulting in a gain of approximately
         $49.1 million, net of related unamortized issuance costs of $2.4 million.

27

28

                                            35

1                                            *    *    *

2      Approximately $65.1 million of Convertible Notes were outstanding at December
       31, 2002. [Emphasis added.]
3

4      106.    The Company's 2002 Form 10-K also reported Terayon's Liquidity and Capital

5  Resources, in part, as follows:

6      At December 31, 2002, we had approximately $117.1 million in cash and cash
       equivalents and $89.4 million in short-term investments. *At December 31, 2001, we*
7      *had approximately $100.3 million in cash and cash equivalents and $233.6 million*
       *in short-term investments.*
8

9      *In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of*
       *approximately $484.4 million.* The Notes are our general unsecured obligation and
10     are subordinated in right of payment to all of our existing and future senior
       indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible
11     into shares of our common stock at a conversion price of $84.01 per share at any
       time on or after October 24, 2000 through maturity, unless previously redeemed or
12     repurchased. Interest is payable semi-annually. *Debt issuance costs related to the*
       *Notes were approximately $15.6 million.*
13

14     *Through December 31, 2002, we had repurchased approximately $434.9 million of*
       *the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain*
15     *on early retirement of debt of approximately $234.4 million* net of related
       unamortized issuance costs of $11.6 million. [Emphasis added.]
16

17     107.    The Company's 2002 Form 10-K also contained statements that purported to attest to

18  the adequacy of Terayon's controls and procedures, in part, as follows:

19     (a) Evaluation of disclosure controls and procedures. Our Chief Executive Officer
       and our Chief Financial Officer, after evaluating the effectiveness of the company's
20     "disclosure controls and procedures" (as defined in the Securities Exchange Act of
       1934 Rules 13a-14(c) and 15-d-14(c)) as of a date (Evaluation Date) within 90 days
21     before the filing date of this annual report, have concluded that as of the Evaluation
       Date, *our disclosure controls and procedures were adequate and designed to*
22     *ensure that material information relating to us and our consolidated subsidiaries*
       *would be made known to them by others within those entities.*
23

24     (b)Changes in internal controls. There were no significant changes in our internal
       controls or to our knowledge, in other factors that could significantly affect our
25     disclosure controls and procedures subsequent to the Evaluation Date. [Emphasis
       added.]
26

27     108.    The Company's 2002 Form 10-K also contained SOX Certifications signed by

28  defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part that

                                              36

1   *"the information contained in the Report fairly presents, in all material respects, the financial*

2   *condition and results of operations of the Company at the dates and for the periods indicated."*

3                      *January 24, 2003 Ernst & Young Report*

4          109.    For full year 2002, Ernst & Young charged the Company over $610,000 for audit

5   related fees. After completing that review at year end 2002, Ernst & Young provided its report,

6   dated January 24, 2003, to the Board of Directors and Stockholders of the Company. The Report

7   read in part as follows:

8          *We have audited the accompanying consolidated balance sheets of Terayon*
           *Communication Systems, Inc. as of December 31, 2002 and 2001, and the related*
9          *consolidated statements of operations, stockholders' equity, and cash flows for*
           *each of the three years in the period ended December 31, 2002.... Our*
10         *responsibility is to express an opinion on these financial statements and schedule*
           *based on our audits.*
11

12         *We conducted our audits in accordance with auditing standards generally accepted*
           *in the United States.... We believe that our audits provide a reasonable basis for*
13         *our opinion.*

14         *In our opinion, the consolidated financial statements referred to above present*
           *fairly, in all material respects, the consolidated financial position of Terayon*
15         *Communication Systems, Inc. at December 31, 2002 and 2001, and the*
           *consolidated results of its operations and its cash flows for each of the three years*
16         *in the period ended December 31, 2002, in conformity with accounting principles*
           *generally accepted in the United States.*
17         [Emphasis added.]

18         110.    The statements made by defendants and contained in the Company's January 30,

19   2003 press release, those statements made by defendants during the quarterly conference call, and

20   those statements contained in Terayon's 2002 Form 10-K, were each materially false and misleading

21   and were know by defendants to be false at that time, or were recklessly disregarded as such, for the

22   reasons stated herein in ¶ 64.

23                 *April 29, 2003 Press Release and Conference Call re:1Q:03 Results*

24         111.    On April 29, 2003, Terayon published a release announcing results for the quarter

25   ended March 31, 2003. This release provided financial and operational information about the

26   Company, in part, as follows:

27

28

                                        37

1    **Terayon Reports First Quarter 2003 Financial Results**

2        *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading supplier of*
         *broadband solutions, today reported revenues of $22.3 million for the first quarter*
3        *2003,* a decrease of 61% from $57.2 million for the first quarter 2002. The net loss
         for the first quarter was $24.0 million or $0.33 per share, compared to a net loss of
4        $4.1 million or $0.06 per share for the same period in 2002. These results include the
         impact of a restructuring charge of $3.2 million, or $0.04 per share, associated with
5        the workforce reduction announced in March 2003.

6                                          *   *   *

7        *Terayon took several steps during the first quarter to accelerate its path to*
         *profitability.* These included a workforce reduction and further realignment of the
8        company's operating expenses with current market conditions. [Emphasis added.]

9        112.    The Company's April 29, 2003 release also quoted defendant Zaki Rakib, in part, as

10   follows:

11       *"Identifying areas to streamline and further consolidation of operations to meet*
         *our financial goals, while still investing strategically for the future, remain key*
12       *objectives for Terayon in 2003,"* said **Rakib**.

13       *"Despite difficult market conditions, we came within our previously announced*
         *revenue target range for the first quarter,"* said **Zaki Rakib**, Terayon's CEO. "Like
14       other equipment providers serving the cable industry, Terayon is experiencing a
         challenging and uncertain spending environment in 2003. *However, we are*
15       *encouraged by the growing orders for our DOCSIS 2.0* (Data Over Cable Service
         Interface Specification) cable modems and that four of the top five U.S. cable
16       operators are in various stages of testing or conducting field trials of our DOCSIS 2.0
         CMTS (Cable Modem Termination System)." [Emphasis added.]
17

18       113.    Later the same day, on April 29, 2003, defendants also conducted a conference call

19   for analysts and investors, hosted by defendants Lustenader and Zaki Rakib. During this call,

20   defendants reiterated the same or substantially similar material false and misleading statements

21   concerning Terayon's revenues, earnings, and gross margins as had been made previously and

22   contained in the Company's press releases and SEC filings. These statements were false and

23   misleading for the reasons set forth at ¶ 64.

24                        *Form 10-Q for First Quarter 2003*

25       114.    On or about May 15, 2003, defendants filed with the SEC the Company's Form 10-Q

26   for the quarter ended March 31, 2003 ("1Q:03 Form 10-Q"), signed by defendant Taylor. In

27   addition to making substantially similar statements concerning the Company's operations as had

28   been made by defendants previously, the 1Q:03 Form 10-Q also stated, in part, the following:

                                             38

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1    *The accompanying condensed consolidated financial statements have been*
     *prepared in accordance with generally accepted accounting principles in the*
2    *United States for interim financial information and in accordance with the*
     *instructions to Form 10-Q and Article 10 of Regulation S-X. ... In the opinion of*
3    *management, all adjustments (consisting of normal recurring adjustments)*
     *necessary for a fair presentation of the financial statements at March 31, 2003 and*
4    *for the three months ended March 31, 2003 and 2002 have been included.*
     [Emphasis added.]
5

6        115.    The Company's 1Q:03 Form 10-Q also reported Terayon's Liquidity and Capital

7    Resources, in part, as follows:

8        At September 30, 2003, we had approximately $42.4 million in cash and cash
         equivalents and $107.0 million in short-term investments. *As of September 30, 2003,*
9        *we had approximately $68.4 million of long-term obligations, principally relating*
         *to our 5% Convertible Subordinated Notes.*
10

11       *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes, or*
         *Notes, due in August 2007, resulting in net proceeds to us of approximately $484.4*
12       *million. The Notes are our general unsecured obligation and are subordinated in*
         *right of payment to all of our existing and future senior indebtedness and to all of*
13       *the liabilities of our subsidiaries.* The Notes are convertible into shares of our
         common stock at a conversion price of $84.01 per share at any time on or after
14       October 24, 2000 through maturity, unless previously redeemed or repurchased.
         Interest is payable semi-annually. *Debt issuance costs related to the Notes were*
15       *approximately $15.6 million.*

16
         *Through September 30, 2003, we had repurchased approximately $434.9 million*
17       *of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a*
         *gain on early retirement of debt of approximately $234.4* million net of related
18       unamortized issuance costs of $11.6 million. We did not repurchase any Notes
         during the first nine months of 2003. [Emphasis added.]
19

20       116.    The 1Q:03 Form 10-Q also contained statements that reported the adequacy and

21   sufficiency of the Company's Controls and Procedures, in part, as follows:

22       Within the 90 days prior to the date of filing this Quarterly Report on Form 10-Q, we
         carried out an evaluation, under the supervision and with the participation of
23       management, including the Chief Executive Officer and the Chief Financial Officer,
         of the effectiveness of the design and operation of our disclosure controls and
24       procedures pursuant to Exchange Act Rule 13a-14. *Based upon that evaluation, the*
         *Chief Executive Officer and the Chief Financial Officer concluded that our*
25       *disclosure controls and procedures are effective in timely alerting them to material*
         *information relating to us (including its consolidated subsidiaries) which is*
26       *required to be included in our periodic SEC filings. Subsequent to the date of that*
         *evaluation, there have been no significant changes in our internal controls or in*
27       *other factors that could significantly affect internal controls, nor were any*
         *corrective actions required with regard to significant deficiencies and material*
28       *weaknesses.*  [Emphasis added.]

                                          39

1        SOX Certifications Regarding First Quarter 2003

2        117.    The Company's 1Q:03 Form 10-Q also contained SOX Certifications signed by

3    defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "*the*

4    *information contained in the Report fairly presents, in all material respects, the financial*

5    *condition and results of operations of the Company at the dates and for the periods indicated.*"

6    [Emphasis added.]

7        118.    The statements made by defendants and contained in the Company's April 29, 2003

8    press release, those statements made by defendants during the quarterly conference call, and those

9    statements contained in Terayon's 1Q:03 Form 10-Q, were each materially false and misleading and

10   were know by defendants to be false at that time, or were recklessly disregarded as such, for the

11   reasons stated herein in ¶ 64.

12       *July 30, 2003 Press Release and Conference Call re: 2Q:03 Results*

13       119.    On July 30, 2003, Terayon published a release announcing results for the second

14   quarter ended June 30, 2003. This release provided financial and operational information about the

15   Company, in part, as follows:

16   **Terayon Reports Second Quarter 2003 Financial Results**

17       Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of
     broadband solutions, *today announced financial results in line with its previously-*
18   *raised guidance for the second quarter ended June 30, 2003.*

19
         *Revenues for the second quarter of 2003 were $30.6 million, an increase of 37%*
20   *compared to $22.4 million for the second quarter of 2002, and an increase of 37%*
     *from $22.3 million for the first quarter of 2003.* Net loss for the second quarter of
21   2003 was $13.1 million, or $0.18 per share, compared to a net loss of $3.7 million, or
     $0.05 per share, for the second quarter of 2002, and a net loss of $24.0 million, or
22   $0.33 per share, for the first quarter of 2003. [Emphasis added.]

23       120.    The Company's July 30, 2003 release also quoted defendant Zaki Rakib, in part, as

24   follows:

25       *"We are pleased with our progress this quarter and the continued positive*
     *momentum we are seeing with cable operator interest in our DOCSIS 2.0*
26   *solutions,"* said **Zaki Rakib**, Terayon's Chief Executive Officer. "In addition, we
     believe we are well positioned to capitalize on our DOCSIS 2.0 and digital video
27   leadership positions as the cable industry works to meet the bandwidth management
     challenges presented by the expected growth of High Definition TV (HDTV), Video
28

                                            40

1   on Demand, and new IP based services required to compete against telecom and
2   satellite offerings. *Going into the second half of 2003, we remain focused on
    achieving sustainable profitability through growing revenues, improving margins*
3   *via product cost reductions, and prudent operating expense management.*"
    [Emphasis added.]

4       121.    Later the same day, on July 30, 2003, defendants also conducted a conference call for

5   analysts and investors, hosted by defendants Taylor and Zaki Rakib. During this call, defendants

6   reiterated the same or substantially similar material false and misleading statements concerning

7   Terayon's revenues, earnings, and gross margins as had been made previously and contained in the

8   Company's press release and prior SEC filings. In addition, during this call, defendant Rakib also

9   stated, in part, the following:

10      ZAKI RAKIB, CEO, TERAYON COMMUNICATIONS SYSTEMS: Thanks Art.
        As you may have noted from our press release this afternoon, *our revenues and loss*
11      *per share for Q2, we're in line with the ranges we pre-announced on July third,*
        *and were better than the guidance we provided on our last earnings call. We are*
12      *pleased with our progress in the second quarter, and believe we are generating*
        *increased momentum going into the second half of this year....* [Emphasis added.]
13

14      122.    Also, during the July 30, 2003 conference call, defendant Taylor also stated, in part,

15  the following:

16      ARTHUR TAYLOR: Thank you Zaki. I would like to present the financial highlights
        for the second quarter an outline our revenue and loss per share expectations in the
17      third quarter. *Looking at the second quarter P&L we reported $30.6m in net*
        *revenues, which was within the range we provided in our press release of July 3rd.*
18      *As we noted in our press release, revenues came in higher than the anticipated*
        *range of $24m-$28m we provided in our last earnings call due primarily to the*
19      *following three reasons.*

20                                      *    *    *

21
        *Moving down the balance sheet, total current liabilities declined by $1.7m to*
22      *$56.2m as of June 30th due in part to the reduction in the previously mentioned*
        *vendor cancellation charges.* As of June 30th the vendor cancellation liability on the
23      balance sheet stood at $6.5m. We ended the quarter with 404 employees compared to
        406 employees as at March 31st. Over the next two quarters we anticipate this
24      number will increase slightly to support the anticipated growth in CMTS deployment
        and in completion of important milestones on our product development roadmaps.
25                                      *    *    *

26      *We are targeting revenues for Q3 to be in the range of $33.0m to $36.0m.* We have
27      factored in the absence of the Telco Mini Flex revenue stream due to our sale of the
        product line early this month, as well substantially lower demand for our Legacy
28      SCMA products. The net loss per share is anticipated to be in the range of 14 cents to

                                           41

1   16 cents per share, based on 74.5m average shares outstanding. *We are targeting to*
2   *end the quarter with approximately $144m to $147m in cash and equivalence and*
    *re anticipating no change in the amount of debt on our balance sheet.* [Emphasis
3   added.]

4              *Form 10-Q for Second Quarter 2003*

5       123.    On or about August 14, 2003, defendants filed with the SEC the Company's Form

6   10-Q for the quarter ended June 30, 2003 ("2Q:03 Form 10-Q"), signed by defendant Taylor and

7   certified by defendants Taylor and Zaki Rakib. In addition to making substantially similar

8   statements concerning the Company's operations as were contained in Terayon's July 30, 2003

9   release, the 2Q:03 Form 10-Q also reported the Company's critical accounting policies, in part, as

10  follows:

11          *The accompanying condensed consolidated financial statements have been*
            *prepared in accordance with generally accepted accounting principles in the*
12          *United States for interim financial information and in accordance with the*
            *instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of*
13          *management, all adjustments (consisting of normal recurring adjustments)*
            *necessary for a fair presentation of the financial statements at June 30, 2003 and*
14          *for the three and six months ended June 30, 2003 and 2002 have been included.*
            [Emphasis added.]
15

16      124.    The Company's 2Q:03 Form 10-Q also reported Terayon's Liquidity and Capital

17  Resources, in part, as follows:

18          At June 30, 2003, we had approximately $68.5 million in cash and cash equivalents
            and $93.4 million in short-term investments. *As of June 30, 2003, we had*
19          *approximately $69.0 million of long-term obligations.*

20
            *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes*
21          *(Notes) due in August 2007, resulting in net proceeds to us of approximately*
            *$484.4 million.* The Notes are our general unsecured obligation and are subordinated
22          in right of payment to all of our existing and future senior indebtedness and to all of
            the liabilities of our subsidiaries. The Notes are convertible into shares of our
23          common stock at a conversion price of $84.01 per share at any time on or after
            October 24, 2000 through maturity, unless previously redeemed or repurchased.
24          Interest is payable semi-annually. *Debt issuance costs related to the Notes were*
            *approximately $15.6 million.*
25
            *Through June 30, 2003, we had repurchased approximately $434.9 million of the*
26          *Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on*
            *early retirement of debt of approximately $234.4 million net of related*
27          *unamortized issuance costs of $11.6 million.* We did not repurchase any Notes
            during the first six months of 2003. [Emphasis added.]
28

                                      42

1    125.    The Company's 2Q:03 Form 10-Q also contained statements that purported to attest

2    to the adequacy of Terayon's controls and procedures, in part, as follows:

3    As of the end of the period covered by report, we carried out an evaluation, under the
     supervision and with the participation of our Chief Executive Officer and Chief
4    Financial Officer, of the effectiveness of the design and operation of our disclosure
     controls and procedures. *Based on this evaluation, our Chief Executive Officer and*
5    *Chief Financial Officer concluded that our disclosure controls and procedures are*
     *effective in timely alerting them to material information this report.*
6
     *There has been no change in our internal controls over financial reporting that*
7    *occurred during our most recent fiscal quarter* that has materially affected or is
     reasonably likely to materially affect our internal controls over financial reporting.
8    [Emphasis added.]

9                    *SOX Certifications Regarding Second Quarter 2003*

10   126.    The Company's 2Q:03 Form 10-Q also contained SOX Certifications signed by

11   defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "*the*

12   *information contained in the Report fairly presents, in all material respects, the financial*

13   *condition and results of operations of the Company at the dates and for the periods indicated.*"

14   [Emphasis added.]

15   127.    The statements made by defendants and contained in the Company's July 30, 2003

16   press release, those statements made by defendants during the quarterly conference call, and those

17   statements contained in Terayon's 2Q:03 Form 10-Q, were each materially false and misleading and

18   were know by defendants to be false at that time, or were recklessly disregarded as such, for the

19   reasons stated herein in ¶ 64.

20                    *October 7, 2003 Announcement of Shelf Registration*

21   128.    Attempting to take further advantage of the artificial inflation in the price of Terayon

22   stock caused by defendants' publication of materially false and misleading statements about the

23   Company, on October 7, 2003, defendants announced that Terayon would file with the SEC a Shelf

24   Registration Statement in connection with the planned sale of at least $125 million in Company

25   securities. This shelf registration would allow the Company, from time to time, to sell Terayon

26   stock on an expedited basis.

27

28

                                                43

1

*October 7, 2004 Revenue Update Regarding 3Q:03*

2      129.   Also, on October 7, 2003, defendants announced purported consensus beating

3 financial results for 3Q:03. This release stated, in part, the following;

4     ***Terayon Provides Update on Better Than Expected Third Quarter Financial***
***Performance***

5

6     *Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of*
*broadband solutions, today announced it expects revenues for its third quarter*
*ending September 30, 2003 to be in the range of $37 million to $38 million. Net*

7     *loss per share for the quarter is now expected to be in the range of $0.10 to $0.12.*
Included in the expected net loss per share is approximately $0.02 of non-recurring

8     gain resulting from the reversal of a liability from a previously acquired company,
and the Company's previously announced sale of its telco Miniplex product line and

9     related inventory.

10     *This revised guidance compares favorably with previously provided estimates by*
*the Company that revenues for the third quarter would be in the range of $33*

11     *million to $36 million, and that the net loss per share would be in the range of*
*$0.14 to $0.16,* including an expected $0.01 non-recurring gain from the Miniplex

12     transaction.

13     *In its second quarter ending June 30, 2003, Terayon reported net revenues of*
*$30.6 million and a net loss per share of $0.18.*

14

15     *"Our better than expected revenue performance for the third quarter stems*
*primarily from higher unit shipments of our DOCSIS 2.0 CMTS (Cable Modem*
*Termination System), stronger sales of our video headend product line, and higher*

16     *than anticipated sales of our legacy S-CDMA products, partially offset by*
*somewhat lower than expected DOCSIS 2.0 modem sales,"* said Zaki Rakib,

17     Terayon's CEO. "We are particularly pleased with the growing customer
acknowledgement of the economic and performance advantages of our DOCSIS 2.0

18     BW CMTS, as evidenced by the revenue growth we have seen over the last three
quarters. *Our better than anticipated net loss performance for the quarter is*

19     *attributable to higher sales, a favorable product mix resulting in higher gross*
*margin, and lower operating expenses due to continued cost containment efforts."*

20     [Emphasis added.]

21

*October 22, 2003 Press Release and Conference Call re: Results for 3Q:03*

22     130.   On October 22, 2003, Terayon published a release announcing results for the third

23 quarter ended September 30, 2003. This release provided financial information about the Company,

24 in part, as follows:

25     **Terayon Reports Third Quarter 2003 Financial Results**

26     Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading innovator of
intelligent broadband access, *today announced financial results in line with its*

27     *previously-raised guidance for the third quarter ended September 30, 2003.*

28

44

1   *Revenues for the third quarter of 2003 were $37.6 million, an increase of 54%*
2   *compared to $24.5 million for the third quarter of 2002, and an increase of 23%*
    *from $30.6 million for the second quarter of 2003.* Net loss for the third quarter of
3   2003 was $7.2 million, or $0.10 per share, which compares to a net loss of $16.0
    million, or $0.22 per share, for the third quarter of 2002 and a net loss of $13.1
4   million, or $0.18 per share, for the second quarter of 2003.

5                                *    *    *

6   *Included in non-operating income for the third quarter of 2003 is a non-recurring*
    *gain of approximately $1.3 million, or $0.02 per share,* due to the sale of the
7   Company's telco Miniplex product line and the reversal of a liability related to an
    overseas government R&D grant. [Emphasis added.]
8

9       131.    The Company's October 22, 2003 release also quoted defendant Zaki Rakib, in part,

10  as follows:

11      *"We are pleased with our performance this quarter, as cable operators continue to*
        *validate the economic and performance advantages of our DOCSIS 2.0 and digital*
12      *video solutions in the face of increasing competition from telecom and satellite*
        *offerings,"* said Zaki Rakib, Terayon's Chief Executive Officer. "The growing need
13      for cable operators to offer competitive services such as high-speed data access, High
        Definition TV (HDTV), and Video on Demand creates bandwidth management
14      challenges that they are addressing using Terayon solutions such as the DOCSIS 2.0
        BW CMTS, DOCSIS 2.0 cable modems, and the DM 6400 Network CherryPicker.
15      *We are encouraged by an improving trend in cable operator capital spending and*
        *believe that we are well positioned for revenue growth in the fourth quarter due to*
16      *our industry leading solutions and our continued focus on operational execution."*
        [Emphasis added.]
17

18      132.    Later the same day, on October 22, 2003, defendants also conducted a conference

19  call for analysts and investors, hosted by defendants Taylor and Zaki Rakib. During this call,

20  defendants reiterated the same or substantially similar material false and misleading statements

21  concerning Terayon's revenues, earnings, and gross margins as had been made previously and

22  contained in the Company's press releases and SEC filings. In addition, during this call, defendant

23  Rakib also stated, in part, the following:

24      *I am pleased to report that our revenues and loss per share were better than the*
        *guidance we provided during our last earnings call, and we are in line with the*
25      *ranges we pre-announced at October 7. Versus Q2 we grew revenues 23%*
        *sequentially, increased our gross margins, reduced our operating expenses, and*
26      *continued to manage the balance sheet closely. I am pleased with our overall*
        *execution and the progress we are making towards achieving profitability.* We are
27      seeing improved capital spending by key cable operators for CMTS equipment and
        digital video management systems, due in part to increase competition from Telco
28      and satellite companies. This competition is accelerating the roll out of new cable-

                                           45

1   based services, including video-on-demand, high-definition TV, voice-over IP, and

2   higher rates for high speed data subscribers. Since these new offerings require both
    more bandwidth and bandwidth management, many cable operators are looking to

3   vendors such as Terayon to provide the solutions to help them grow revenue, reduce
    subscriber churn, and lower their total cost of ownership. *We believe we are very*

4   *well positioned to assist cable operators successfully addressing these critical*
    *objectives due to DOCSIS 2.0 and digital video leadership position.*

5

                                    *   *   *

6

7   *Looking forward, we are very encouraged by the improved market conditions and*
    *the favorable industry dynamics going into the fourth quarter.* We believe the
    cable operators will increasingly compete against the telecom and satellite companies

8   with more service offerings and increased throughput, which we think bodes very
    well for both DOCSIS 2.0 and digital video management system adoption rates into

9   2004. We also believe we strengthened our ability to capitalize on the increasing
    numbers of opportunities made through the investments made in people, processes, and

10  systems over the past three quarters. *We believe that our value proposition is*
    *resonating with our customers and our ability to deliver upon those promises*

11  *continues to improve. We feel we are well positioned to meet the growing needs of*
    *our customers and to have that reflected in improving financial performance in*

12  *the quarters ahead.* [Emphasis added.]

13      133.    During the October 22, 2003 conference call, defendant Taylor stated, in part, the

14  following:

15      ARTHUR TAYLOR: Thank you Zaki. I would like to present the financial
        highlights for the third quarter and outline our revenue and loss per share

16      expectations for the fourth quarter. *Looking at the third quarter P&L, we reported*
        *$37.6m in net revenues, which was within the range we provided in our press*

17      *release of October 7. As we noted in our press release, revenues came in higher*
        *than the anticipated range of $33-36m we reported in our last earnings call due*

18      *primarily to the following three reasons.* First, our DOCSIS CMTS business was
        stronger than expected due to increased demand in Japan and North America as Zaki

19      outlined earlier. Second, sales of our digital video head-end product line were higher
        than expected due to increased demand coming largely from both escalating MSO

20      rollout of HDTV offerings, VOD, and digital ad insertion, coupled with our own
        overall improved sales execution. The third reason our revenues exceeded our

21      original target was higher than anticipated sales from our legacy S-CDMA product
        lines. Total S-CDMA revenues were approximately $1.3m, which was much higher

22      than expected. As we have aligned the Company's focus and resources behind
        extending our DOCSIS 2.0 leadership division, we expect sales of proprietary

23      products to be minimal going forward. Partially offsetting the higher than expected
        performance was lower, DOCSIS 2.0 modem revenues due in part to lower than

24      expected unit sales overseas combined with the slower than expected ramp in unit
        orders from certain U.S. based MSO's. We believe this latter issue is now resolving

25      itself and we are anticipating stronger cable modem revenue growth in Q4.
        [Emphasis added.]

26

27

28

                                        46

1    *November 6, 2003 Release Regarding Defendants' Intention*
2                    *to Sell Shares in Registered Offering*

3    134.    Attempting to take further advantage of the artificial inflation in the price of Terayon

4    shares caused by defendants' publication of false and materially misleading information, on

5    November 6, 2003, Terayon published a release announcing defendants' intention to sell 10.8

6    million shares of equity to the public in a registered offering.[1]  Gross proceeds from this sale were

7    expected to be at least $75.0 million – not including a 15% over-subscription allotment.

8                        *Form 10-Q for Third Quarter 2003*

9    135.    On or about November 10, 2003, defendants filed with the SEC the Company's Form

10    10-Q for the quarter ended September 30, 2003 ("3Q:03 Form 10-Q"), signed by defendant Taylor

11    and certified by defendants Taylor and Zaki Rakib.  In addition to making substantially similar

12    statements concerning the Company's operations as were contained in Terayon's October 22, 2003

13    release and conference call, the Company's 3Q:03 Form 10-Q also stated, in part, the following:

14    *The accompanying condensed consolidated financial statements have been*
       *prepared in accordance with generally accepted accounting principles in the*
15    *United States for interim financial information and in accordance with the*
       *instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of*
16    *management, all adjustments (consisting of normal recurring adjustments)*
       *necessary for a fair presentation of the financial statements at September 30, 2003*
17    *and for the three and nine months ended September 30, 2003 and 2002 have been*
       *included.*  [Emphasis added.]
18

19    136.    The Company's 3Q:03 Form 10-Q reported Terayon's Liquidity and Capital

20    Resources, in part, as follows:

21    At September 30, 2003, we had approximately $42.4 million in cash and cash
       equivalents and $107.0 million in short-term investments. *As of September 30, 2003,*
22    *we had approximately $68.4 million of long-term obligations, principally relating*
       *to our 5% Convertible Subordinated Notes.*
23
       *In July 2000, we issued $500 million of 5% Convertible Subordinated Notes, or*
24    *Notes, due in August 2007, resulting in net proceeds to us of approximately $484.4*
       *million.* The Notes are our general unsecured obligation and are subordinated in right
25    of payment to all of our existing and future senior indebtedness and to all of the

26    ―――――――――――――――――――

27    [1]  On November 14, 2003, as a result of an unfavorable reception by the institutional
       investment community, this offering was withdrawn.  At that time, however, defendant Zaki Rakib
28    stated that the withdrawal was not expected to adversely impact the Company because Terayon was
       "fortunate to be in a position where [it does] not need additional funds for operations."

                                            47

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1    liabilities of our subsidiaries. The Notes are convertible into shares of our common
2    stock at a conversion price of $84.01 per share at any time on or after October 24,
     2000 through maturity, unless previously redeemed or repurchased. Interest is
3    payable semi-annually. *Debt issuance costs related to the Notes were approximately
     $15.6 million.*

4
5    *Through September 30, 2003, we had repurchased approximately $434.9 million
     of the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a
6    gain on early retirement of debt of approximately $234.4 million net of related
     unamortized issuance costs of $11.6 million.* We did not repurchase any Notes
7    during the first nine months of 2003. [Emphasis added.]

8        137.    The Company's 3Q:03 Form 10-Q also contained statements that attested to the

9    adequacy of Terayon's purported controls and procedures. In this regard, the 3Q:03 Form 10-Q

10   stated, in part, the following:

11       As of the end of the period covered by report, we carried out an evaluation, under the
         supervision and with the participation of our Chief Executive Officer and Chief
12       Financial Officer, of the effectiveness of the design and operation of our disclosure
         controls and procedures. *Based on this evaluation, our Chief Executive Officer and
13       Chief Financial Officer concluded that our disclosure controls and procedures are
         effective in timely alerting them to material information required to be presented
14       in this report.* [Emphasis added.]

15                        *SOX Certifications Regarding First Quarter 2003*

16       138.    The Company's 3Q:03 Form 10-Q also contained SOX Certifications signed by

17   defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, "*the

18   information contained in the Report fairly presents, in all material respects, the financial

19   condition and results of operations of the Company at the dates and for the periods indicated.*"

20   [Emphasis added.]

21       139.    The statements made by defendants and contained in the Company's October 7, 2003

22   and October 22, 2003 press releases, those statements made by defendants during the quarterly

23   conference call, and those statements contained in Terayon's 3Q:03 Form 10-Q, were each

24   materially false and misleading and were know by defendants to be false at that time, or were

25   recklessly disregarded as such, for the reasons stated herein in ¶ 64.

26   ///

27   ///

28   ///

                                          48

1

*January 27, 2004 Release and Conference Call re FY:03*

2    140.    On January 27, 2004, Terayon published a release announcing results for the quarter

3    ended December 31, 2003.  This release provided financial information about the Company, in part,

4    as follows:

5    **Terayon Reports Fourth Quarter and Full Year 2003 Results**
     **And Announces Restructuring to Enhance Path to Profitability**

6

7    Terayon Communication Systems, Inc. (Nasdaq: TERN), the leading innovator of
     intelligent broadband access, *today announced financial results in line with its*
8    *previous guidance for the fourth quarter and year ended December 31, 2003.*

9    *Revenue for the fourth quarter of 2003 was $43.0 million, a 70% increase*
     *compared to $25.3 million for the same quarter a year ago, and a 14% increase*
10   *compared to $37.6 million for the third quarter of 2003.* Revenue for the twelve
     months ended December 31, 2003 was $133.5 million, a 3% increase compared to
11   $129.4 million for the twelve months ended December 31, 2002.

12
     *Net loss for the fourth quarter of 2003 was $6.0 million, or $0.08 per share,*
13   *compared to a net loss of $20.5 million, or $0.28 per share, for the same quarter a*
     *year ago and a net loss of $7.2 million, or $0.10 per share, for the third quarter of*
14   *2003.* Net loss for the twelve months ended December 31, 2003 was $50.4 million,
     or $0.68 per share, compared to a net loss for the twelve months ended December 31,
15   2002 of $44.2 million, or $0.61 per share.  [Emphasis added.]

16   141.    The January 27, 2004 release also quoted defendant Zaki Rakib, in part, as follows:

17   *"2003 was a critical year of transition and milestone achievements for Terayon,"*
     said **Zaki Rakib,** Terayon's Chief Executive Officer. *"We successfully completed*
18   *the company migration from proprietary, baseline access products to standards-*
     *based and intelligent access products that lead the market, enabling broadband*
19   *providers to deliver faster speeds and new services like voice and video*
     *conferencing through more economical, efficient networks.* Further, we have begun
20   to execute on our plan to expand the market applicability of intelligent access
     products as evidenced by our selection by FOX Network for its broadcast high
21   definition distribution system for its affiliates nationwide beginning in 2004."

22                                    *    *    *

23   "Cable operators are responding to customer needs and competitive pressures by
24   offering more bandwidth-intensive services such as faster high-speed data access,
     voice over the Internet (VoIP), HDTV, and Video on Demand in response to
25   consumer and enterprise requirements and increasing competition from telecom and
     satellite operators," continued **Rakib.** *"Our goals for 2004 include: (1) capitalizing*
26   *on our technology leadership and the opportunities created by these favorable*
     *market conditions to increase share across our CMTS, Subscriber and Digital*
27   *Video businesses, (2) leveraging our best-of-breed digital video processing product*

28

                                        49

1    *line into other vertical markets including satellite, broadcast and telecom, and (3)
2    achieving sustainable profitability through a combination of revenue growth,
     operational efficiencies, expense management, and strategic partnerships."*

3                                    *   *   *

4
5    "*As we announced in December 2003, we are targeting profitability beginning in
     the second quarter of 2004. The steps we are taking now provide us with a clearer
6    path towards this objective by lowering our breakeven revenue point, re-
     sequencing our R&D pipeline to better align with customer timing requirements,
7    and improving our overall efficiency by streamlining the organization and
     bolstering core processes,*" said **Doug Sabella**, Terayon's Chief Operating Officer.
8    "Now that we have introduced our CableLabs-certified, low cost IM6130 modem
     chip into production and established market acceptance of our Terayon BW 3000
9    DOCSIS 2.0-qualified CMTS product line, we are able to free up and re-deploy
     certain engineering and technical resources. We remain committed to our position as
10   technology leader and innovator in the broadband access space, and to our reputation
     for unparalleled customer service and support." [Emphasis added.]

11       142.    The January 27, 2004 release also reported the Company's Restructuring Activities

12   that purportedly had recently taken place at the Company, including, the following:

13       **Restructuring Activities**

14       Terayon today announced its plans to reduce operating expenses and realign
         resources during the first quarter of 2004. This action is designed to advance the
15       company towards sustainable profitability while retaining the resources necessary to
         drive innovation to capitalize on the growing market need for intelligent broadband
16       access solutions. Related actions include: (1) a reduction in workforce of
         approximately 17%, or 70 employees, (2) the consolidation of certain facilities, (3)
17       the write-down of related facility assets, and (4) a reduction in targeted areas of
         discretionary spending. The effect of these actions is expected to yield annualized
18       operating savings of approximately $10 million to $12 million. Terayon expects to
         record a charge of approximately $5 million to $7 million in the quarter ending
19       March 31, 2004 as a result of these actions.

20                                *2003 Form 10-K*

21       143.    On or about March 15, 2004, defendants filed with the SEC the Company's 2003

22   Form 10-K for fourth quarter and fiscal year ended December 31, 2003, signed by defendants Zaki

23   Rakib, Taylor, Shlomo Rakib, Solomon, Woodrow, and Slaven. In addition to making substantially

24   similar statements concerning the Company's operations as had been announced by defendants on

25   January 27, 2004, the 2003 Form 10-K also contained additional statements attesting to the critical

26   accounting policies that were purported to then be in place at Terayon, including its revenue

27   recognition policies, in part, as follows:

28

                                        50

**Critical Accounting Policies**

We consider certain accounting policies related to our use of estimates, revenue recognition, bad debt reserves, inventory valuation, impairment of long-lived assets, warranty returns, restructuring, income taxes and contingencies. We discuss each of our critical accounting policies, in addition to certain less significant accounting policies, with senior members of management and the audit committee, as appropriate.

**Use of Estimates.** The preparation of the consolidated financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to establish accounting policies that contain estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. *We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources*. These policies include:

- *revenue recognition*;

- the allowance for doubtful accounts, which impacts revenue;

- the valuation of exposures associated with the contract manufacturing operations and estimating future warranty costs, which impact cost of good sold and gross margins; and

- *the valuation of certain long-lived assets, especially goodwill and other purchased intangible assets, which has resulted in impairment, which impacts operating expenses*.

\*　\*　\*

**Revenue Recognition.** We recognize revenue in accordance with SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" (SAB 101), as amended by *SAB 101A and 101B and updated by SAB 104. SAB 101 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services rendered; (3) the selling price is fixed and determinable; and (4) collectibility is reasonably assured. Determination of criteria (4) is based on management's judgments regarding the collectibility of the selling price*. Should there be changes to management's judgments, revenue recognized for any reporting period could be adversely affected.

\*　\*　\*

Revenue arrangements with resellers are generally recognized when product is shipped to the resellers as we generally do not grant return rights beyond those provided by the warranty. [Emphasis added.]

51

1    144.    The Company's 2003 Form 10-K also reported Terayon's Liquidity and Capital

2    Resources, in part, as follows:

3    *At December 31, 2003, we had approximately $30.2 million in cash and cash
     equivalents and $108.5 million in short-term investments.*

4

5                                    *    *    *

6    *In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of
     approximately $484.4 million.* The Notes are our general unsecured obligation and
     are subordinated in right of payment to all of our existing and future senior

7    indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible
     into shares of our common stock at a conversion price of $84.01 per share at any

8    time on or after October 24, 2000 through maturity, unless previously redeemed or
     repurchased. Interest is payable semi-annually. *Debt issuance costs related to the*

9    *Notes were approximately $15.6 million.*

10   *Through December 31, 2003, we had repurchased approximately $434.9 million of
     the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain*

11   *on early retirement of debt of approximately $234.4 million net of related
     unamortized issuance costs of $11.6 million.* No Notes were repurchased in 2003.

12   [Emphasis added.]

13   145.    Regarding the Company's 5% Convertible Subordinated Notes, the Form 2003 10-K

14   stated, in part, the following:

15   **Convertible Subordinated Notes**

16   *In July 2000, the Company issued $500 million of 5% Convertible Subordinated
     Notes (Notes) due in August 2007 resulting in net proceeds to the Company of*

17   *approximately $484.4 million.* The Notes are the Company's general unsecured
     obligation and are subordinated in right of payment to all existing and future senior

18   indebtedness and to all of the liabilities of the Company's subsidiaries. The Notes are
     convertible into shares of the Company's common stock at a conversion price of

19   $84.01 per share at any time on or after October 24, 2000 unless
     previously redeemed or repurchased. The Company could have redeemed some or all

20   of the Notes at any time on or after October 24, 2000 and before August 7, 2003 at a
     redemption price of $1,000 per $1,000 principal amount of the Notes, plus accrued

21   and unpaid interest, if any, if the closing price of the Company's stock exceeded
     150% of the conversion price, or $126.01 for at least 20 trading days within a period

22   of 30 consecutive trading days ending on the trading day prior to the date of mailing
     of the redemption notice. The Company would also make an additional payment of

23   $193.55 per $1,000 principal amount of the Notes, less the amount of any interest
     actually paid on the Notes before the date of redemption. The Company may redeem

24   the Notes at any time on or after August 7, 2003 at specified prices plus accrued and
     unpaid interest. Interest is payable semi-annually. *Debt issuance costs related to the*

25   *Notes were approximately $15.6 million and are amortized over seven years. At
     December 31, 2003, amortization of debt issuance costs totaled $14.5 million.*

26
     *In 2002, the Company repurchased approximately $109.1 million of the Notes for*

27   *$57.6 million in cash, resulting in a gain of approximately $49.1 million, net of
     related unamortized issuance costs of $2.4 million. In 2001, the Company*

28   *repurchased approximately $325.9 million of the Notes for $113.4 million in cash*

                                        52

1    *and $17.9 million in stock, resulting in a gain of approximately $185.3 million, net
of related unamortized issuance costs of $9.3 million.* The Company did not
2    repurchase any Notes during 2003.  [Emphasis added.]

3        146.    The Company's 2003 Form 10-K also contained statements that purported to attest to

4  the adequacy of Terayon's controls and procedures, in part, as follows:

5    As of the end of the period covered by this Annual Report on Form 10-K, the
Company carried out an evaluation, under the supervision and with the participation
6    of the Company's Disclosure Committee and the Company's management, including
the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of
7    the design and operation of the Company's disclosure controls and procedures
pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b); and whether any change
8    has occurred in the Company's internal control over financial reporting pursuant to
Exchange Act Rules 13a-15(d) and 15d-15(d). *Based upon that evaluation, the
9    Chief Executive Officer and the Chief Financial Officer concluded that the
Company's disclosure controls and procedures are effective in timely alerting them
10    to material information relating to the Company (including its consolidated
subsidiaries) required to be included in the Company's periodic Securities and
11    Exchange Commission filings; and that no change in the Company's internal
control over financial reporting occurred during the Company's most recent fiscal
12    quarter that materially affected, or is reasonably likely to materially affect, the
Company's internal control over financial reporting.* [Emphasis added.]
13

14                *SOX Certifications Regarding 2003 Form 10-K*

15        147.    The Company's Form 10-K for 2003 also contained SOX Certifications signed by

16  defendants Taylor and Zaki Rakib and filed with the SEC.  These Certifications stated, in part, "*the*

17  *information contained in the Report fairly presents, in all material respects, the financial*

18  *condition and results of operations of the Company at the dates and for the periods indicated.*"

19  [Emphasis added.]

20                *January 23, 2004 Ernst & Young Report*

21        148.    For full year 2003, Ernst & Young charged the Company over $500,000 for audit

22  related fees.  After completing that review at year end 2003, Ernst & Young provided a report to the

23  Board of Directors and Stockholders of the Company that stated, in part, as follows:

24    *We have audited the accompanying consolidated balance sheets of Terayon
Communication Systems, Inc. as of December 31, 2003 and 2002, and the related
25    consolidated statements of operations, stockholders' equity, and cash flows for
each of the three years in the period ended December 31, 2003....We conducted
26    our audits in accordance with auditing standards generally accepted in the United
States. Those standards require that we plan and perform the audit to obtain
27    reasonable assurance about whether the financial statements are free of material
misstatement....We believe that our audits provide a reasonable basis for our
28    opinion.*

1    *In our opinion, the consolidated financial statements referred to above present
2    fairly, in all material respects, the consolidated financial position of Terayon
     Communication Systems, Inc. at December 31, 2003 and 2002, and the
3    consolidated results of its operations and its cash flows for each of the three years
     in the period ended December 31, 2003, in conformity with accounting principles
4    generally accepted in the United States....*

5    149.    The statements made by defendants and contained in the Company's December 8,

6    2003 and January 14, 2004 press releases, those statements made by defendants during the quarterly

7    conference call, and those statements contained in Terayon's 2003 Form 10-K, were each materially

8    false and misleading and were know by defendants to be false at that time, or were recklessly

9    disregarded as such, for the reasons stated herein in ¶ 64.

10    *April 29, 2004 Release and Conference Call Regarding Results for 1Q:04*

11    150.    On April 29, 2004, Terayon published a release announcing results for the quarter

12    ended March 31, 2004.  This release provided financial information about the Company, in part, as

13    follows:

14    Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of
      broadband access, delivery and management solutions, *today reported financial*
15    *results in line with prior guidance for the quarter ended March 31, 2004.*

16    *Revenues for the first quarter of 2004 were $41.2 million, an increase of 85%*
      *compared to $22.3 million for the first quarter of 2003, and a decrease of 4% from*
17    *$43.0 million for the fourth quarter of 2003. Net loss for the first quarter of 2004*
      *was $10.2 million, or $0.14 per share, which compares to a net loss of $24.0*
18    *million, or $0.33 per share, for the first quarter of 2003 and a net loss of $6.0*
      *million, or $0.08 per share, for the fourth quarter of 2003.* The results for the first
19    quarter of 2004 include a charge of $3.4 million, or $0.05 per share, related to
      restructuring activities and related asset write-offs. The results for the fourth quarter
20    of 2003 include a non-operating gain of $0.01 per share related to a favorable
      litigation settlement.  [Emphasis added.]
21

22    151.    The Company's April 29, 2004 release also quoted defendant Zaki Rakib, in part, as

23    follows:

24    *"We are pleased with the performance of our digital video solutions and subscriber*
      *product lines, which had higher than anticipated sales for the quarter. While our*
25    *CMTS sales in North America were also strong, they were offset by weaker CMTS*
      *sales in Asia as several customers extended their original deployment timeframes,"*
26    said Zaki Rakib, Terayon's Chief Executive Officer. "Important milestones for us
      during the quarter include: (i) the introduction of our award-winning Terayon BP
27    5100-HD broadcast platform, and its adoption by FOX Broadcasting Company to
      power their HDTV delivery system; (ii) a record number of shipments of our TJ 700
28    family of DOCSIS 2.0-certified modems, which we believe will further solidify our

                                         54

1   position as number two worldwide cable modem supplier as first reported by Kinetic
2   Strategies for the fourth quarter of 2003; and (iii) surpassing the 2,500 unit shipment
    mark for DOCSIS 2.0 CMTS line cards since our qualification by CableLabs in
3   December 2002. *Going forward, we believe having the only proven end-to-end
    DOCSIS 2.0 solution and the best-of-breed digital video processing product line
4   positions us to capitalize on the accelerating growth of new, bandwidth-intensive
    service offerings such as HDTV, VOD, VoIP and commercial services."* [Emphasis
5   added.]

6   152.    The Company's April 29, 2004 release also provided an update on the Company's

7   purported Restructuring Activities, in part, as follows:

8   **Restructuring Activities**

9   The first quarter 2004 restructuring activities announced by Terayon on January 27,
    2004 have extended into the second quarter of 2004. During the first quarter of 2004
10  Terayon recognized a $3.4 million charge related to first quarter restructuring
    activities, as compared to the original estimated charge of $5 million to $7 million.
11  During the second quarter of 2004 Terayon expects to record an additional charge of
    approximately $1.5 million to $2.0 million related to the completion of these
12  restructuring activities. The cumulative effect of the actions taken over the first and
    second quarters of 2004 is expected to yield annualized operating savings of
13  approximately $10 million beginning in the second quarter of 2004.

14  *For the second quarter of 2004, Terayon expects to report revenues in the range of
    $42 million to $46 million and anticipates a net loss in the range of $0.02 to $0.04
15  per share, excluding the effects of the estimated $1.5 million to $2.0 million
    charge.* Including the effects of the estimated charge, the net loss is expected to be in
16  the range of $0.04 to $0.07 per share.   [Emphasis added.]

17  153.    Later the same day, on April 29, 2004, defendants also conducted a conference call

18  for analysts and investors, hosted by defendants Taylor and Zaki Rakib.  During this call, defendants

19  reiterated the same or substantially similar material false and misleading statements concerning

20  Terayon's revenues, earnings, gross margins and projected growth, as had been made previously and

21  contained in the Company's press releases and SEC filings.  In addition, during this call, defendant

22  Rakib also stated, in part, the following:

23  **ZAKI RAKIB**, CEO, TERAYON COMMUNICATION SYSTEMS: Hello. Thank
    you for joining us. *I'm pleased to report that our financial results for the first-
24  quarter were in line with our previous guidance. Art will provide additional details
    on these results later in the call. I would like to begin by highlighting the progress
25  that we made over the last few quarters toward achieving sustainable profitability.*
    First, we have been able to grow revenues across all three of our businesses
26  compared to first quarter of last year driven by the introduction of our DOCSIS 2.0
    qualified product CMTS, growing our market share in cable modem from the number
27  five vendor worldwide a year ago to the number two position today, and capitalizing
    on the increased demand for digital video band width management and ad-insertion
28  solutions with cable and satellite operators and most recently extending these

55

1    offerings into the broadcast sector. Secondly, we have been able to improve gross
     margins over the past year through improved product mix, transitioning to lower cost
2    manufacturing environments and implementing product cost reduction programs.

3    *While not there yet, we believe we are closing in our the target gross model as Art
     will outline for you later.* Finally over the last year we have taken strong measures to
4    lower our operating expenses through head count reductions, resequencing of
     engineering programs, facility consolidations and other cost containment efforts. Our
5    Q1 R&D and SG&A expenses are down 18% compared to Q1 of last year. *Revenues
     are up 85%.*
6
     *We are pleased with the improving trend in our performance over the past year
7    and anticipate making significant progress in Q2 towards achieving sustainable
     profitability.* We continue focusing on tight execution and extending our market
8    leadership through innovations and unparalleled customer service.

9                                    *   *   *

10   *In summary, I am pleased with the progress made over the past year in improving
11   our operating performance and bringing innovation to the marketplace.* We are
     excited about the opportunities we believe are opening up to us for through the
12   market dynamics being experienced by the cable, Teleco, and satellite providers. We
     continue to focus our efforts on execution to ensure that we're able to capitalize on
13   these opportunities and drive towards sustainable profitability. With that, I would
     like to turn the call over to Art who will review the our first-quarter financial results
14   in detail. [Emphasis added.]

15       154.    Also, during the April 29, 2004 conference call, defendant Taylor also stated, in part,

16   the following:

17       ART TAYLOR: Thank you Zaki. I would like to present our financial highlights for
         the first-quarter and follow-up with our revenue and loss per share expectations for
18       the second-quarter of 2004. *Today we reported net revenues of 41.2 million for the
         first quarter in line with our previous guidance. This is also is an 85% increase
19       compared to the 22.3 million in net revenues for the same quarter last year and a
         4% sequential decrease from the 43 million posted in Q4 last year.*
20
21                                   *   *   *

22       *Moving down the balance sheet, total current liabilities decreased by 7.2 million to
         48.2 million versus the prior quarter due mainly for payments for inventory
23       purchases.* We ended the quarter with 367 employees compared to 423 as of the end
         of December. As previously discussed, we eliminated approximately 60 positions
24       during the quarter, which was partially offset by head count additions reflecting the
         increased emphasis that we are placing this area in 2004...
25       [Emphasis added.]

26

27

28

                                         56

1

*Form 10-Q for First Quarter 2004*

2      155.    On or about May 10, 2004, defendants filed with the SEC the Company's Form 10-Q

3   for the quarter ended March 31, 2004 ("1Q:04 Form 10-Q"), signed by defendant Taylor and

4   certified by defendants Taylor and Zaki Rakib.  In addition to making substantially similar

5   statements concerning the Company's operations as were contained in Terayon's April 29, 2004

6   release, the Company's the 1Q:04 Form 10-Q also stated, in part, the following:

7           *The accompanying condensed consolidated financial statements have been*
            *prepared in accordance with generally accepted accounting principles in the*
8           *United States for interim financial information and in accordance with the*
            *instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of*
9           *management, all adjustments (consisting of normal recurring adjustments)*
            *necessary for a fair presentation of the financial statements at March 31, 2004 and*
10          *for the three months ended March 31, 2004 and 2003 have been included.*
            [Emphasis added.]
11

12      The Company's 1Q:04 Form 10-Q also contained statements attesting to Terayon's
        Liquidity and Capital Resources that were purported to exist at that time.
13

14  **Liquidity and Capital Resources**

15      At March 31, 2004, we had approximately $76.1 million in cash and cash equivalents
        and $47.2 million in short-term investments.
16

17                              *    *    *

18          *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of*
            *approximately $484.4 million.* The Notes are a general unsecured obligation and are
19          subordinated in right of payment to all of our existing and future senior indebtedness
            and to all of the liabilities of our subsidiaries. The Notes are convertible into shares
20          of our common stock at a conversion price of $84.01 per share at any time on or after
            October 24, 2000 through maturity, unless previously redeemed or repurchased.
21          Interest is payable semi-annually. *Debt issuance costs related to the Notes were*
            *approximately $15.6 million.*
22

23          *Through March 31, 2004, we had repurchased approximately $434.9 million of*
            *the Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain*
24          *on early retirement of debt of approximately $234.4 million* net of related
            unamortized issuance costs of $11.6 million. [Emphasis added.]
25

26      156.    The Company's 1Q:04 Form 10-Q also contained statements that purported to attest

27   to the adequacy of Terayon's controls and procedures, as  follows:

28

                                        57

### ITEM 4. CONTROLS AND PROCEDURES

As of the end of the period covered by report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. *Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective in timely alerting them to material information required to be presented in this report.*

*There has been no change in our internal controls over financial reporting that occurred during our most recent fiscal quarter that has materially affected or is reasonably likely to materially affect our internal controls over financial reporting.* [Emphasis added.]

#### *SOX Certifications Regarding First Quarter 2004*

157.    The Company's 1Q:04 Form 10-Q also contained SOX Certifications signed by defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, *"the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated."* [Emphasis added.]

158.    The statements made by defendants and contained in the Company's April 29, 2004 press release, those statements made by defendants during the quarterly conference call, and those statements contained in Terayon's 1Q:04 Form 10-Q, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

#### *Resignation of Zaki Rakib*

159.    On May 27 2004, Terayon announced the resignation of defendant Zaki Rakib as CEO of the Company, effective August 31, 2004, as well as the expansion of the Board of Directors to include defendant Speaks. Upon the effectiveness of this resignation, defendant Zaki Rakib was appointed Chairman of the Board of Directors of Terayon, replacing Shlomo Rakib in that capacity. Defendant Shlomo Rakib continued to serve as President, Chief Technology Officer, and a member of the Board of Directors. At that time, defendants also characterized Zaki Rakib's resignation as being for "family reasons," and he was quoted in the Company's release as follows:

58

1  "*For the past 10 years, I have dedicated my time, my energy and my focus to
2  Terayon, in large part at the expense of attention to my family. I feel now is the
   time to reverse the order of my priorities,*" said Dr. Rakib. "*I have led Terayon
3  through its phenomenal growth phase and through its survival of the
   telecommunication industry's recession to where it is now – back on the path to
4  growth. I pass to my successor the helm of a strong organization with a healthy
   balance sheet;* an organization recognized for its leadership in digital video, and
5  pioneering efforts in high-speed cable data. Terayon's leadership position in many
   product areas, combined with its technology assets can deliver on promises to
6  customers and shareholders." [Emphasis added.]

7          *June 14, 2004 Announcement of Retirement of Defendant Sabella as COO*

8          160.    On June 14, 2004, defendant Sabella also announced his retirement as Chief

9  Operation Officer of the Company, effective July 16, 2004.  While defendant Sabella had served as

10 COO of the Company since July 2003, according to the Company's release, his sudden and

11 unscheduled departure from the Company had occurred so that he too could "pursue other interests."

12          *July 26, 2004 Releases and Conference Call Regarding Results for 2Q:04,*
                        *Resignation of CFO Arthur Taylor*
13

14         161.    On July 26, 2004, Terayon published a release announcing results for the quarter

15 ended June 30, 2004.  This release provided financial information about the Company, in part, as

16 follows:

17         Terayon Communication Systems, Inc. (Nasdaq: TERN), a leading provider of
           broadband access, delivery and management platforms, *today reported financial*
18         *results in line with previous guidance for the quarter ended June 30, 2004.*

19         *Revenues for the second quarter of 2004 were $42.8 million, an increase of 40%*
           *compared to $30.6 million for the second quarter of 2003, and an increase of 4%*
20         *from $41.2 million for the first quarter of 2004. Net loss for the second quarter of*
           *2004 was $4.9 million, or $0.06 per share, which compares favorably to a net loss*
21         *of $13.1 million, or $0.18 per share, for the second quarter of 2003 and a net loss*
           *of $10.2 million, or $0.14 per share,* for the first quarter of 2004. The results for the
22         second quarter of 2004 include a charge of $3.6 million, or $0.04 per share, related to
           restructuring activities and executive separation payments.  The results for the first
23         quarter of 2004 included a charge of $3.4 million, or $0.05 per share, related to
           restructuring activities and related asset write-offs. [Emphasis added.]
24

25         162.    The Company's July 26, 2004 release also quoted defendant Zaki Rakib, in part, as

26 follows:

27         "*We are pleased with the record sales of our Digital Video Solutions product line,*
           *and the strong sales performance of our Subscriber product line,*" said Zaki Rakib,
28         Terayon's Chief Executive Officer.  "Our video business is benefiting from the

                                                59

1  increased number of HDTV offerings by cable and satellite operators, combined with
2  growing demand for the Terayon CherryPicker's unique digital ad insertion
   capabilities. While our CMTS sales were weaker than expected due to slower than
3  anticipated deployments from existing customers - particularly in Asia and to a lesser
   degree in Europe – combined with increased competition, *we believe recent actions*
4  *we've undertaken will enable us to improve our sales execution and win new*
   *business in these regions."*

5

                                    *  *  *

6
7  "Today we've also announced that Jerry Chase is joining Terayon as its new
   CEO. *We believe that under Jerry, Terayon is well positioned to capitalize on its*
8  *leadership in digital video solutions and on our one year plus industry leadership*
   *in delivering the only end to end DOCSIS 2.0 solutions as cable operators*
9  *accelerate the roll out of advanced services to their customers,"* said Rakib. "In my
   new role as Chairman of the Board, I look forward to assisting Terayon achieve its
   mission of bringing the power of broadband to anyone, anywhere, at any time."
10 [Emphasis added.]

11     163.    The Company's July 26, 2004 release also provided a Management Update, in part,

12 as follows:

13     **Management Updates**

14 In a separate press release today, Terayon announced the appointment of Jerry D.
   Chase as Chief Executive Officer.
15
   Today, Terayon also announced the resignation of Arthur T. Taylor from his role as
16 Senior Vice President, CFO. Taylor is leaving to assume the role of CFO of a larger,
   publicly traded company. Edward Lopez, Terayon's Senior Vice President, General
17 Counsel since 1999, has been appointed acting CFO. Terayon has begun a search for
   Taylor's successor.
18
19     164.    Later the same day, on July 26, 2004, defendants also conducted a conference call for

20 analysts and investors, hosted by defendants Taylor and Zaki Rakib. During this call, defendants

21 reiterated the same or substantially similar material false and misleading statements concerning

22 Terayon's revenues, earnings, and gross margins as had been made previously and contained in the

23 Company's press releases and SEC filings. In addition, during this call, defendant Rakib also stated,

24 in part, the following:

25     **ZAKI RAKIB**, CEO, TERAYON COMMUNICATION SYSTEMS: Good
   afternoon everyone and thank you for joining us. Today we are reporting financial
26 results for the second quarter that are in-line with our previous guidance. *Revenues*
   *were $42.8 million and the reported loss per share is 6 cents. As you will note our*
27 *loss per share excluding restructuring and special charges was 2 cents, which was*
   *at the favorable end of the 2 to 4 cent guidance range we targeted on our last*
28 *earnings call. It also is a substantial improvement over Q1's 9 cent loss per share*

                                    60

1    *performance on a comparable basis*. Art will provide additional details on the
2    financials later on the call.

          *    *    *

3
4    *In summary, I am pleased with the progress made over the past quarter and in
     bringing innovation to the marketplace*. We continue to monitor the opportunit-ies
     we believe are opening up for us through the market dynamics being experienced by
5    the cable, telco, satellite providers and broadcasters. *We continue to focus our
     efforts on execution to ensure we are able to capitalize on these opportunities and
6    drive towards sustainable profitability*. [Emphasis added.]

7        165.    Also, during the July 26, 2004 conference call, defendant Taylor also stated, in part,

8    the following:

9        ARTHUR TAYLOR: I would like now to present our financial highlights for the
         second quarter ....
10
         Today we reported net revenues of 42.8 million for the second quarter, in line with
11       our previous guidance. This is a 40 percent increase compared to the 30.6 million in
         net revenues recorded for the same quarter last year, and a 4 percent sequential
12       increase from the 41.2 million posted in Q1. [Emphasis added.]

13                          *Form 10-Q for Second Quarter 2004*

14       166.    On or about July 27, 2004, defendants filed with the SEC the Company's Form 10-Q

15   for the quarter ended June 30, 2004 ("2Q:04 Form 10-Q"), signed by defendant Taylor and certified

16   by defendants Taylor and Zaki Rakib. In addition to making substantially similar statements

17   concerning the Company's operations as were contained in Terayon's July 26, 2004 release, the

18   2Q:04 Form 10-Q also stated, in part, the following:

19       *The accompanying condensed consolidated financial statements have been
         prepared in accordance with generally accepted accounting principles in the
20       United States for interim financial information and in accordance with the
         instructions to Form 10-Q and Article 10 of Regulation S-X.... In the opinion of
21       management, all adjustments (consisting of normal recurring adjustments)
         necessary for a fair presentation of the financial statements at June 30, 2004 and
22       for the three and six months ended June 30, 2004 and 2003 have been included.*

23                          *    *    *

24       **Critical Accounting Policies**

25       *There have been no material change to any of our critical accounting policies and
         estimates* as disclosed in our annual report on Form 10-K for the year ended
26       December 31, 2003. [Emphasis added.]

27

28

                                    61

1    167.    The Company's 2Q:04 Form 10-Q also reported Terayon's Liquidity and Capital

2   Resources, in part, as follows:

3       At June 30, 2004, we had approximately $47.8 million in cash and cash equivalents
        and $68.5 million in short-term investments.
4
                                    *    *    *
5
6       *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of
        approximately $484.4 million. The Notes are a general unsecured obligation and
7       are subordinated in right of payment to all of our existing and future senior
        indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
8       convertible into shares of our common stock at a conversion price of $84.01 per
        share at any time on or after October 24, 2000 through maturity, unless previously
9       redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs
        related to the Notes were approximately $15.5 million.*

10      *Through June 30, 2004, we had repurchased approximately $434.9 million of the
        Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on
11      early retirement of debt of approximately $234.4 million net of related
        unamortized issuance costs of $11.6 million.* We did not repurchase any Notes in
12      2003 or 2004. [Emphasis added.]

13      168.    The Company's 2Q:04 Form 10-Q also contained statements that purported to attest

14   to the adequacy of Terayon's controls and procedures. In this regard, the 2Q:04 Form 10-Q stated,

15   in part, the following:

16      As of the end of the period covered by report, we carried out an evaluation, under the
        supervision and with the participation of our Chief Executive Officer and Chief
17      Financial Officer, of the effectiveness of the design and operation of our disclosure
        controls and procedures. *Based on this evaluation, our Chief Executive Officer and
18      Chief Financial Officer concluded that our disclosure controls and procedures are
        effective in timely alerting them to material information required to be presented
19      in this report.*

20      *There has been no change in our internal controls over financial reporting that
        occurred during our most recent fiscal quarter* that has materially affected or is
21      reasonably likely to materially affect our internal controls over financial reporting.
        [Emphasis added.]
22

23                  *SOX Certifications for Second Quarter of 2004 by Taylor and Zaki Rakib*

24      169.    The Company's 2Q:04 Form 10-Q also contained SOX Certifications signed by

25   defendants Taylor and Zaki Rakib and filed with the SEC. These Certifications stated, in part, *"the*

26   *information contained in the Report fairly presents, in all material respects, the financial*

27   *condition and results of operations of the Company at the dates and for the periods indicated."*

28   [Emphasis added.]

1    170.    The statements made by defendants and contained in the Company's May 27, 2004

2    and July 26, 2004 press releases, those statements made by defendants during the quarterly

3    conference call, and those statements contained in Terayon's 2Q:04 Form 10-Q, were each

4    materially false and misleading and were know by defendants to be false at that time, or were

5    recklessly disregarded as such, for the reasons stated herein in ¶ 64.

6    _Press Release and Conference Call Regarding "Record" Third Quarter 2004 Results_

7    171.    On October 28, 2004, Terayon published a release announcing results for the quarter

8    ended September 30, 2004. This release provided financial information about the Company, in part,

9    as follows:

10   ***Revenues for the third quarter of 2004 were $37.2 million, down 1% from $37.6
     million in the third quarter of 2003, and down 13% from $42.8 million in the***
11   ***second quarter of 2004.*** Net loss for the third quarter of 2004 was $13.5 million, or
     $0.18 per share, as compared to a net loss of $7.2 million, or $0.10 per share, in the
12   third quarter of 2003, and a net loss of $4.9 million, or $0.06 per share, in the second
     quarter of 2004. The results for the third quarter of 2004 include an inventory charge
13   of $7.3 million, or $0.10 per share, primarily related to a write-down of excess
     CMTS inventory, and a charge of $1.4 million, or $0.02 per share, related to an
14   executive separation payment. The results for the second quarter of 2004 included an
     inventory benefit of $0.8 million, or $0.01 per share, related to the sale of previously
15   reserved inventory, and a charge of $3.6 million, or $0.04 per share, related to
     restructuring activities and executive separation payments.
16

17   The Digital Video Solutions product line had revenues of $10.8 million in the third
     quarter of 2004, compared to $4.6 million in the third quarter of 2003 and $7.5
18   million in the second quarter of 2004. The Subscriber product line had revenues of
     $19.8 million in the third quarter of 2004, compared to $16.2 million in the third
19   quarter of 2003 and $25.0 million in the second quarter of 2004. The CMTS product
     line had revenues of $6.6 million in the third quarter of 2004, compared to $16.8
20   million in the third quarter of 2003 and $10.3 million in the second quarter of 2004.
     [Emphasis added].
21

22   172.    The Company's October 28, 2004 release also quoted defendant Chase, in part, as

23   follows:

24   ***"We are very pleased with our second consecutive quarter of record revenues in
     our Digital Video Solutions product line and the continued strong sales***
25   ***performance of our Subscriber product line,"*** said **Jerry Chase**, CEO, Terayon.
     "Important milestones for us during the quarter include: (i) the debut of the Terayon
26   BP 5100 as the enabling technology behind Fox Broadcasting Company's launch of
     high definition broadcasts of National Football League games, and (ii) the Euro-
27   DOCSIS 2.0 certification of the Terayon TJ721X cable modem, which delivers
     another level of assurance to cable operators seeking to build more efficient networks
28   that meet regional specifications. In contrast to those strong performances, we are

                                         63

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
CASE NO.: 3-06-CV-03936 MJJ
\\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1  disappointed by our weak CMTS sales, which reflect slower deployments by existing
2  customers and our ongoing challenge in winning new accounts."

3                                  *    *    *

4  "Despite Terayon's undisputed technology leadership in the DOCSIS 2.0 CMTS
   market, we have been unable to successfully translate that into a profitable CMTS
5  market leadership position," said Chase. "After careful evaluation of Terayon's
   overall product portfolio and strategy, we have decided to cease further investment in
6  our CMTS product line and halt development on future hardware upgrades.[2] We
   intend to work with existing customers to create agreeable support plans and
7  minimize disruption."

8  "*These changes do not alter our vision for the company,*" said **Chase**. "Terayon
9  continues to provide broadband solutions for video, voice and data through its
   existing Digital Video and Subscriber product lines, and *we will leverage our head-
10 end intellectual property through our advanced technology group as market
   opportunities arise in the future.*"

11 "As we look to future quarters, we see significant growth opportunities in our Digital
12 Video Solutions product line driven by increased HDTV offerings and the move
   from analog to digital content. In addition, we are seeing increased interest in more
13 strategic applications of our digital video technology such as on-screen branding and
   customer-relevant digital ad insertion," continued Chase. "Our Subscriber product
14 line should benefit from the accelerating rollout of VoIP services by cable operators
   as well as the continuing need to find new bandwidth within existing networks. We
15 anticipate that our market leadership position and strong business models across both
   product lines will position us well to leverage these compelling market dynamics,
16 which offer a significant growth opportunity and an accelerated path to profitability
   going forward." [Emphasis added.]

17                      *10-Q for Third Quarter 2004*

18      173.    On or about November 15, 2004, defendants filed with the SEC the Company's Form

19 10-Q for the quarter ended September 30, 2004 ("3Q:04 Form 10-Q"), signed and/or certified by

20 defendants Chase and Lopez. In addition to making substantially similar statements concerning the

21

22      [2] By contrast, on November 18, 2004, it was reported that worldwide CMTS revenue was up
23 an astounding 3% from 2Q04 to 3Q04, "triggered by a huge surge in cable IAD uptake," and "lifted
   by strong performances from Cisco Systems and Motorola in all regions, especially North America,"
24 according to Infonetics Research Cable Aggregation Hardware quarterly market share and forecast
   report. According to this source, at that time, the worldwide CMTS market was projected to be
25 $673 million in 2007. The major drivers were more bandwidth for consumers and businesses and
26 new packet telephone services. According to Michael Howard, principal analyst of Infonetics
   Research and lead author of Cable Aggregation Hardware, "Cable broadband subscriber growth in
27 North America continues unabated, with all major MSOs showing healthy single-digit quarterly
   subscriber growth this year... MSOs are maintaining a competitive advantage, despite the
28 momentum growing behind DSL..."

                                      64

1   Company's operations as had been made by defendants previously, the Company's 3Q:04 Form 10-

2   Q also stated, in part, the following:

3       *The accompanying condensed consolidated financial statements have been
        prepared in accordance with U.S. generally accepted accounting principles for*
4       *interim financial information and in accordance with the instructions to Form 10-
        Q and Article 10 of Regulation S-X.... In the opinion of management, all*
5       *adjustments (consisting of normal recurring adjustments) necessary for a fair
        presentation of the financial statements at September 30, 2004 and for the three*
6       *and nine months ended September 30, 2004 and 2003 have been included.*
        [Emphasis added.]
7

8       174.    The Company's 3Q:04 Form 10-Q also contained additional statements attesting to

9   the "Critical Accounting Policies" that were purported to then be in place at Terayon, as follows:

10      **Critical Accounting Policies**

11      *There have been no material change to any of our critical accounting policies and
        estimates as disclosed in our annual report on Form 10-K* for the year ended
12      December 31, 2003. [Emphasis added.]

13      175.    The Company's 3Q:04 Form 10-Q also contained statements attesting to Terayon's

14  Liquidity and Capital Resources that was purported to exist at that time, in part, as follows:

15      At September 30, 2004, we had approximately $64.1 million in cash and cash
        equivalents and $47.8 million in short-term investments.
16

17                          *    *    *

18      *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of
        approximately $484.4 million. The Notes are a general unsecured obligation and*
19      *are subordinated in right of payment to all of our existing and future senior
        indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
20      convertible into shares of our common stock at a conversion price of $84.01 per
        share at any time on or after October 24, 2000 through maturity, unless previously
21      redeemed or repurchased. Interest is payable semi-annually. Debt issuance costs
        related to the Notes were approximately $15.5 million. [Emphasis added].
22

23      176.    The Company's 3Q:04 Form 10-Q also contained statements that purported to attest

24  to the adequacy of Terayon's controls and procedures. *While the 3Q:04 Form 10-Q did*

25  *acknowledge "a deficiency" in the Company's communications protocols, it also reported that*

26  *this problem had been substantially remedied and that, following a review of the Board of*

27  *Directors, the Company's internal controls and procedures were reasonably adequate.*

28

                                    65

1    177.    As evidence of this, the 3Q:04 Form 10-Q also stated, in part, the following:

2    As of the end of the period covered by this report, we carried out an evaluation,
     under the supervision and with the participation of our Chief Executive Officer and
3    Chief Financial Officer, of the effectiveness of the design and operation of our
     disclosure controls and procedures. Based on this evaluation, our Chief Executive
4    Officer and Chief Financial Officer identified *a deficiency in our disclosure controls
     and procedures as of September 30, 2004, due to an inadequacy of communication
5    between certain parts of the organization and the finance department.* In
     connection with the review of our financial statements for the third quarter of 2004,
6    Ernst & Young LLP, our independent registered public accountants, advised our
     Audit Committee that they considered this deficiency to be a material weakness
7    under standards established by the Public Company Accounting Oversight Board.
     *This material weakness related to an accrual of severance for an executive officer
8    in an incorrect reporting period, which Ernst & Young LLP believed to be related
     to the inadequacy of communication between certain parts of the organization and
9    the finance department.* The accrual is reflected in the condensed consolidated
     financial statements for the three and nine month period ended September 30, 2004.
10

11   Under the direction of our Audit Committee and with the participation of our senior
     management, *we have taken steps designed to strengthen our disclosure controls
12   and procedures and internal controls to address the material weakness identified
     by Ernst and Young. We have, on an immediate basis, taken steps to improve our
13   internal controls and our control environment. We have implemented steps to
     ensure that senior members of our finance department review all press releases
14   before they are released and all resignations of executive staff are communicated
     promptly to senior members of our finance department.* We will continue to
15   monitor the communication channels between our senior management and our
     finance department and will take prompt action, as necessary, to further strengthen
16   our disclosure controls and procedures and internal controls to comply with
     Sarbanes-Oxley compliance procedures. Moreover, we will continue our efforts to
17   identify, assess and correct any additional material weaknesses in our internal
     controls.
18

19   *We believe the corrective steps taken to improve our disclosure controls and
     procedures and internal controls described above have enabled our Chief
20   Executive Officer and Chief Financial Officer to conclude that our disclosure
     controls and procedures are now effective in timely alerting them to material
21   information required to be included in this Quarterly Report on Form 10-Q for the
     quarter ended September 30, 2004.*
22

23                                    *    *    *

24   **We intend to review and evaluate the design and effectiveness of our disclosure
     controls and procedures on an ongoing basis** and to improve our controls and
25   procedures over time and to correct any deficiencies that we may discover in the
     future. Our goal is to ensure that our senior management has timely access to all
26   material financial and non-financial information concerning our business. While *we
     believe the present design of our disclosure controls and procedures is effective* to
27   achieve our goal, future events affecting our business may cause us to significantly
     modify our disclosure controls and procedures.  [Emphasis added.]
28

                                          66

1    178.    The statements concerning the Company's controls and procedures were also

2    critically important to investors as a result of the related-party nature of a material amount of the

3    Company's revenues. Accordingly, the Company's 3Q:04 Form 10-Q described these related party

4    transactions, in part, as follows:

5    **Related Party Transactions**

6    Lewis Solomon, a member of the Company's Board of Directors and a member of
     the Company's Nominating and Governance Committee and Compensation
7    Committee, is also a member of the Board of Directors of Harmonic, Inc.
     (Harmonic). Harmonic is an authorized, non-exclusive reseller of certain of the
8    Company's video products. For the three and nine months ended September 30,
     2004, related party revenue included $1.5 million and $4.9 million, respectively, of
9    revenue from Harmonic. For the three and nine months ended September 30, 2003,
     related party revenue included $0.5 million and $1.5 million, respectively, of revenue
10   from Harmonic.

11
     Alek Krstajic, a member of the Company's Board of Directors, was the Senior Vice
12   President of Interactive Services, Sales and Product Development for Rogers
     Communications, Inc. (Rogers) until January 2003. Beginning April 1, 2003, the
13   Company no longer recognized revenues related to Rogers as related party revenue
     because Rogers was no longer considered to be a related party. For the first quarter of
14   2003, the Company recognized $1.4 million of Rogers's related party revenue, net of
     amortization of co-marketing expense.
15
16   In the nine months ended September 30, 2004, the Company paid Mr. Krstajic
     $30,000 for consulting services provided to the Company.
17
18   In December 2001, the Company entered into a co-marketing arrangement with
     Rogers to promote the Company's brand its products. The Company paid $0.9
19   million to Rogers, and recorded this amount as other current assets. In July 2002, the
     Company began amortizing this prepaid asset and charging it against revenue in
20   accordance with the Emerging Issues Task Force 01-09, "Accounting for
     Consideration given by a Vendor to a Customer or Reseller in Connection with the
21   Purchase or Promotion of the Vendor's Products." Amounts charged against
     revenues in the three and nine months ended September 30, 2003, totaled
22   approximately $1.4 million and $4.2 million, respectively. This asset was fully
     amortized during 2003.
23
24   Cost of related party revenues in the Company's consolidated statements of
     operations consists of direct and indirect costs. Accounts receivable from Harmonic
25   totaled approximately $0.7 million at September 30, 2004. None of the related parties
     is a supplier to the Company.
26
27
28
                                             67

1

*Certifications for Third Quarter 2004*

2    179.    The Company's 3Q:04 Form 10-Q also contained SOX Certifications signed by

3    defendants Chase and Lopez and filed with the SEC. These Certifications stated, in part, "*the*

4    *information contained in the Report fairly presents, in all material respects, the financial*

5    *condition and results of operations of the Company at the dates and for the periods indicated.*"

6    [Emphasis added.]

7    180.    The 3Q:04 Form 10-Q also contained additional Certifications by defendants Chase

8    and Lopez that certified, in part, as follows:

9      *Based on my knowledge, this quarterly report does not contain any untrue*
       *statement of a material fact or omit to state a material fact necessary to make the*
10     *statements made, in light of the circumstances under which such statements were*
       *made, not misleading with respect to the period covered by this quarterly report;*
11
       *Based on my knowledge, the financial statements, and other financial information*
12     *included in this quarterly report, fairly present in all material respects the*
       *financial condition, results of operations and cash flows of the registrant as of,*
13     *and for, the periods presented in this quarterly report;*

14
                            *    *    *
15
       [The registrant's other certifying officers and I] *evaluated the effectiveness of the*
16     *registrant's disclosure controls and procedures as of a date within 90 days prior to*
       *the filing date of this quarterly report (11/14/02); and… presented in this quarterly*
17     *report our conclusions about the effectiveness of the disclosure controls and*
       *procedures based on our evaluation as of the Evaluation Date;*
18
19                          *    *    *

20     [The registrant's other certifying officers and I have disclosed] *all significant*
       *deficiencies in the design or operation of internal controls which could adversely*
21     *affect the registrant's ability to record, process, summarize and report financial*
       *data and have identified for the registrant's auditors any material weaknesses in*
22     *internal controls; and b) any fraud, whether or not material, that involves*
       *management or other employees who have a significant role in the registrant's*
23     *internal controls…*

24    181.    The statements contained in Terayon's October 28, 2004 release and those statements

25    contained in the Company's 3Q:04 Form 10-Q, referenced above, were each materially false and

26    misleading when made, and were known by defendants to be false at that time or were recklessly

27    disregarded as such thereby, for the reasons stated herein, in ¶ 64.

28

68

1    _February 9, 2005 Release and Conference Call Regarding Results for 4Q and FY 2004_

2        182.    On February 9, 2005, Terayon published a release announcing results for the fourth

3    quarter and full year ended December 31, 2004. This release announced very strong financial and

4    operational results with purported digital video revenue growth of more than 100% year-over-year.

5    In addition, this release also stated, in part, the following:

6        *Revenue for the fourth quarter of 2004 was $29.4 million, down 32% compared to
         $43.0 million for the same quarter a year ago, and a 21% decrease compared to*
7        *the $37.2 million for the third quarter 2004.* Revenue for the 12 months ended
         December 31, 2004 was $150.5 million, a 12.7% increase compared to $133.5
8        million for the 12 months ended December 31, 2003.

9        *Net loss for the fourth quarter of 2004 was $7.9 million, or $0.10 per share,
         compared to a net loss of $6.0 million, or $0.08 per share, for the same quarter a*
10       *year ago, and a net loss of $13.5 million, or $0.18 per share, for the third quarter
         of 2004.* Net loss for the 12 months ended December 31, 2004 was $36.5 million, or
11       $0.48 per share, compared to a net loss for the 12 months ended December 31, 2003
         of $50.4 million, or $0.68 per share. [Emphasis added.]

12

13       183.    Commenting on these purported strong financial results, defendants Chase and

14   Richman were quoted in this release, as follows:

15       "Our fourth quarter results reflect our decision to focus Terayon on our digital video
         network applications and home access solutions and to cease investment in future
16       development of our CMTS products. *The strong performance of our digital video
         products during the fourth quarter and 2004 clearly shows why we have moved*
17       *video to the center of our corporate strategy,*" said Jerry Chase, Terayon's Chief
         Executive Officer. "We took big steps in 2004 to strengthen our leadership in digital
18       video networking by working with customers to accelerate their evolution to all-
         digital networks, expanding the market applicability for our solutions, and launching
19       new and innovative products and functionality. Those actions resulted in a *strong
         financial performance in the fourth quarter and 2004* for digital video
20       networking."

21                                      *    *    *

22       "*Our restructuring activities and increased focus on cost management in 2004 will
         greatly benefit the company as we drive operations to positive net income*", said
23       Mark Richman, Terayon's Chief Financial Officer. "By focusing our capital and
         human resources on our growth market – digital video networking applications – we
24       expect to deliver profitable top line growth to achieve net income profits and
         positive cash flow generation." [Emphasis added.]

25

26   ///

27   ///

28   ///

                                        69

1    184.    Later the same day, on February 9, 2005, defendants also conducted a conference call

2    for analysts and investors, hosted by defendants Richman and Chase. During this call, defendant

3    Chase stated, in part, the following:

4    **JERRY CHASE**, CEO, TERAYON COMMUNICATION SYSTEMS: Hello,
everyone, and thank you for joining us for the Terayon Q4 and full 2004 earnings

5    conference call. I've now been with Terayon for about five months, and Mark, our
CFO, has been here for just a little over two months. During that short period of time

6    *we have begun to make many changes that will enable us to accentuate and build
on our strengths, move out of product lines in which we were underperforming*

7    *and put the Company on a track towards better financial performance.*

8    *I've shared with many people why I came to Terayon. I believe it had a unique
position and opportunity to be a part of the growing video market, and my belief is*

9    *stronger today than ever.* We believe that the proliferation of video applications will
correlate closely to how consumers and businesses have adopted mobile phones.

10    These video applications will be delivered across any network to any device at any
time, instant access.

11

12    During my call last October, we discussed the product evaluation criteria we are
using to evaluate sustainable, profitable corporate growth. They are, we must be the

13    market leader or a very strong influential player in the markets in which we compete.
Our customer base must be diversified buying now and have an ongoing plan to buy

14    from us, and also we must have the cost structure to grow earnings faster than sales.
*Our 2004 performance and several Q4 actions have put Terayon in a stronger*

15    *position on these three criteria and position us well for the path to sustainable*
*profitability.*

16

17                                    *    *    *

18    **JERRY CHASE**: ...I'm optimistic about Terayon's ability to focus and deliver
favorably against our strategy and business model. It's a great time to be involved in

19    digital video and it truly will change how we communicate, entertain and stay
informed. Mark and I look forward to providing you with updates on our progress as

20    we transition Terayon to a digital video networking company.

21    185.    During this call, defendant Richman also stated, in part, the following:

22    **MARK RICHMAN**: Thank you, Jerry. *I am very pleased to announce we've met or
exceeded all previously announced guidance as it relates to our P&L performance*

23    *objectives. Starting with our top line, today we reported net revenues of 29.4
million for the fourth quarter, a 32 percent decrease from the 43 million recorded*

24    *in the fourth quarter 2003 and down 21 percent sequentially from 37.2 million
reported in third quarter 2004. However, for the full year of 2004 we reported*

25    *150.5 million in revenues, a 12.7 percent increase compared to 133.5 million for
the 12 months ended December 2003.*

26

27    *The quarter over quarter decline in revenues is primarily attributable to reduction
in revenue from legacy product lines,* including CMTS equipment sales. Legacy

28

70

1   product revenues declined to 3 million for the fourth quarter of 2004, down from
2   20.5 million in the fourth quarter of 2003 and compared to 7.6 million in the third
    quarter of 2004.

3                    *    *    *

4   Including severance and separation charges, net loss for the fourth quarter was 7.9
5   million or $.10 per share as compared to a net loss of 6 million or $.08 per share in
    the fourth quarter of 2003 and a net loss of 13.5 million or $.18 per share in the third
6   quarter of 2004. Excluding these charges, net loss for the quarter was 5.2 million or
    $.07 per share. Net loss for the year was 36.5 million or $.48 per share compared to a
7   loss of 50.4 million or $.68 per share in the 12 months ended December 31, 2003.
    [Emphasis added.]

8       186.    The statements contained in the February 9, 2005 release and conference call

9   regarding results for the Fourth Quarter and Fiscal Year 2004 were materially false and misleading

10  for the reasons set forth in ¶ 64.

11                    *2004 Form 10-K*

12      187.    On or about March 8, 2005, defendants filed with the SEC the Company's 2004

13  Form 10-K for the fourth quarter and full year ended December 31, 2004, certified by defendants

14  Chase and Richman, and signed by defendants Chase, Richman, Zaki Rakib, Shlomo Rakib,

15  Solomon, Krstajic, Woodrow, Slaven, Miller and Speaks.  In addition to making statements

16  substantially similar to those that had been made by defendants previously, concerning the

17  Company's financial and operational results, the 2004 Form 10-K also stated, in part, the following:

18  **Net Loss Per Share**

19  Basic and diluted net loss per share was computed using the weighted average
20  number of common shares outstanding. Options, warrants, restricted stock, and
    convertible debt were not included in the computation of diluted net loss per share
    because the effect would be anti-dilutive.

21
    Shares used in the calculation of basic and diluted net loss per share are as follows
22  (in thousands, except per share data):

23

24

25

26  ///

27  ///

28  ///

                                        71

|  | **Years Ended December 31,** | | |
| --- | --- | --- | --- |
|  | **2004** | **2003** | **2002** |
| Net Loss | $ (36,531) | $ (50,353) | $ (44,213) |
| Shares used in computing basic and diluted net loss per share | 75,861 | 74,212 | 72,803 |
| Basic and diluted net loss per share | $    (0.48) | $    (0.68) | $    (0.61) |

188.    Providing more "color" on the Company's revenues, the 2004 Form 10-K also reported Terayon's purported Revenue Recognition accounting policies, in part, as follows:

**Revenue Recognition**

The Company recognizes revenue in accordance with SEC Staff Accounting Bulletin (SAB) No. 104 "Revenue Recognition" ("SAB 104"). *SAB 104 requires that four basic criteria must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services were rendered; (3) the selling price is fixed or determinable; and (4) collectibility is reasonably assured.* [Emphasis added.]

189.    The Company's 2004 Form 10-K also contained statements attesting to Terayon's Liquidity and Capital Resources that was purported to exist at that time, in part, as follows:

At December 31, 2004, we had approximately $43.2 million in cash and cash equivalents and $54.5 million in short-term investments.

*      *      *

*In July 2000, we issued $500 million of Notes, resulting in net proceeds to us of approximately $484.4 million.* The Notes are our general unsecured obligation and are subordinated in right of payment to all of our existing and future senior indebtedness and to all of the liabilities of our subsidiaries. The Notes are convertible into shares of our common stock at a conversion price of $84.01 per share at any time on or after October 24, 2000 through maturity on August 2007, unless previously redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs related to the Notes were approximately $15.6 million.* [Emphasis added.]

190.    In addition to the foregoing, the Company's 2004 Form 10-K also contained statements that attested to the purported adequacy of Terayon's controls and procedures. While the 2004 Form 10-K did again acknowledge minor defects in certain communications protocols, the 2004 Form 10-K also reported that this problem had been substantially remediated and that,

72

1    following a review of the Board of Directors, the Company's internal controls and procedures were

2    reasonably adequate.  As evidence of this, the 2004 Form 10-K also stated, in part, the following:

3    *We maintain disclosure controls and procedures that are designed to ensure that*
     *information required to be disclosed in our reports under the Securities Exchange*
4    *Act of 1934, as amended (Exchange Act), is recorded, processed, summarized and*
     *reported within the time periods specified in the Securities and Exchange*
5    *Commission's (SEC) rules and forms, and that such information is accumulated*
     *and communicated to management, including our Chief Executive Officer (CEO)*
6    *and Chief Financial Officer (CFO), as appropriate, to allow timely decisions*
     *regarding required disclosure....*

7                                    *   *   *

8    As disclosed in our Quarterly Report on Form 10-Q for the period ended September
9    30, 2004, in connection with the preparation of that report, we determined that, due
     to a deficiency in communication of financially significant information between
10   certain parts of our organization and the finance department, our disclosure controls
     and procedures and internal controls over financial reporting were not effective.
11   Particularly in the third quarter of 2004, the finance department did not review our
     press release and communication of information to our finance department regarding
12   the resignation of an executive was not timely, which resulted in adjustments to the
     internal accounting for the executive's termination benefits. *As previously disclosed,*
13   *under the direction of our Audit Committee and with the participation of our*
     *senior management, we took steps to ensure that senior members of our finance*
14   *department review all press releases before they are released and undertook to*
     *enhance the communication between our senior management and our finance*
15   *department to further strengthen our controls.*

16   *In connection with our review of our disclosure controls and procedures as of*
     *December 31, 2004, we determined that the controls implemented to enhance*
17   *communication between our senior management and our finance department*
     *lacked sufficient documentation to permit verification of their operation.* As a
18   result, as discussed below in Management's Report on Internal Control over
     Financial Reporting, we have concluded that the aforementioned deficiency
19   represents a material weakness in internal control over financial reporting as of
     December 31, 2004.

20
     In connection with our review of our disclosure controls and procedures as of
21   December 31, 2004, we determined that procedures related to controls over the
     preparation and review of the Annual Report on Form 10-K were not effective, for
22   the following reasons. *In the latter part of 2004 and in early 2005, key persons*
     *involved in the preparation and review of our periodic reports under the Exchange*
23   *Act including the Controller and Assistant Controller responsible for SEC*
     *reporting departed the Company and we retained consultants to participate in the*
24   *preparation of our Annual Report. This resulted in providing an initial draft of the*
     *financial statements and footnotes included in our Annual Report to our*
25   *independent registered public accountants that did not provide adequate*
     *disclosures in the accompanying notes in accordance with GAAP.* We have
26   concluded that this deficiency represents a material weakness in internal control over
     financial reporting as of December 31, 2004.

27

28

                                        73

*Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, in light of the deficiencies described above, our management, including our CEO and CFO, concluded that our disclosure controls and procedures as of December 31, 2004 were not effective.*

\*    \*    \*

**Changes in internal control over financial reporting.**

*Other than as described above in the third paragraph of Evaluation of Disclosure Controls and Procedures, there has been no change in our internal control over financial reporting during our most recently completed fiscal quarter* that has materially affected or is likely to materially affect our internal control over financial reporting.

**Remediation Steps to Address Material Weaknesses.**

Subsequent to year end, we are taking the following steps to remediate the deficiencies in our disclosure controls and procedures and material weaknesses in our internal control over financial reporting identified above:

***Documentation of Internal Communication with Our Finance Department.*** We implemented procedures to document review of press releases and other financially significant communications in accordance with the policy that we implemented in connection with preparation of our Quarterly Report on Form 10-Q for the period ended September 30, 2004.
Additional Experienced Finance Personnel. We are taking the following steps to address our need for additional experienced finance personnel and to improve our controls over financial reporting:

> (i)    a commitment to promptly hire a permanent Vice President of Finance/controller;

> (ii)    hiring into our finance department an additional person with SEC reporting experience;

> (iii)    increasing staffing in the finance department;

> (iv)    developing procedures to train new employees and/or consultants in the finance department on our disclosure procedures and controls, our company and our actions in the previous reporting periods; and

> (v)    improving the review process that occurs prior to providing the initial draft of the periodic report to our independent auditors for review. [Emphasis added.]

191.    The statements concerning the Company's controls and procedures were also important to investors as a result of the related-party nature of a material amount of the Company's revenues. Accordingly, again the Company's 2004 Form 10-K described these related party transactions, in part, as follows:

74

**Related Party Transactions**

During the years ended December 31, 2004, 2003 and 2002, the Company recognized revenue of $9.9 million, $4.7 million and $9.1 million, respectively in connection with product shipments made to related parties. Related party revenues in 2004 were from Harmonic, Inc. (Harmonic). Related party revenues in 2003 and 2002 included revenues from Harmonic and Rogers Communications, Inc. (Rogers). Lewis Solomon, a member the Company's board of directors, is a member of the board of directors of Harmonic. All revenues attributable to Harmonic were included in related party revenues in 2004 and 2003. Alek Krstajic, another member of our board of directors, was the Senior Vice President of Interactive Services, Sales and Product Development for Rogers until January 2003. Effective in April 2003, Rogers was no longer a related party to us. Consequently, revenues attributable to Rogers are only classified as related party revenues in the first quarter of 2003. Neither of these related parties are a supplier to the Company.

Cost of related party product revenues in the Company's consolidated statements of operations consists of direct and indirect product costs. Accounts receivable from Rogers and Harmonic totaled approximately $3.1 million and $0.6 million at December 31, 2004 and 2003, respectively.

In December 2001, the Company entered into co-marketing arrangements with Shaw Communications, Inc. (Shaw) and Rogers. The Company paid $7.5 million to Shaw and $0.9 million to Rogers, and recorded these amounts as other current assets. In July 2002, the Company began amortizing these prepaid assets and charging them against related party revenues in accordance with EITF 01-09, "Accounting for Consideration given by a Vendor to a Customer or Reseller in Connection with the Purchase or Promotion of the Vendor's Products." The Company charged $1.4 million per quarter of the amortization of these assets against total revenues through December 31, 2003. Amounts charged against total revenues in the year ended December 31, 2002 and December 31, 2003, totaled approximately $2.8 million and $5.6 million, respectively. Of the co-marketing amortization charged to total revenues, $0.15 million and $0.3 million were charged to related party revenues in the year ended 2003 and 2002, respectively. No further amounts of these co-marketing arrangements are included in other current assets at December 31, 2003 and no further amortization occurred in 2004.

In October 2002, the Company incurred a marketing expense of $150,000 for Team Honor, an organization that supports a professional sailing team. One of the Company's Board members, Alek Krstajic is the founder and President of Team Honor.

### Certifications Regarding 2004 10-K

192.    To further assure investors as to the purported accuracy and completeness of the Company's financial and operational reports, as well to further assure investors as to the adequacy of the Company's financial controls and operational procedures, the Company's 2004 Form 10-K also contained certifications by defendants Chase and Richman that certified, in part, as follows:

> *Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the*

75

1    *statements made, in light of the circumstances under which such statements were*
2    *made, not misleading with respect to the period covered by this quarterly report;*

3    *Based on my knowledge, the financial statements, and other financial information*
    *included in this quarterly report, fairly present in all material respects the*
    *financial condition, results of operations and cash flows of the registrant as of,*
4    *and for, the periods presented in this quarterly report;*

5    *    *    *

6    [The registrant's other certifying officers and I] *evaluated the effectiveness of the*
    *registrant's disclosure controls and procedures as of a date within 90 days prior to*
7    *the filing date of this quarterly report (11/14/02); and… presented in this quarterly*
    *report our conclusions about the effectiveness of the disclosure controls and*
8    *procedures based on our evaluation as of the Evaluation Date;*

9    *    *    *

10    [The registrant's other certifying officers and I have disclosed] all significant
    deficiencies in the design or operation of internal controls which could adversely
11    affect the registrant's ability to record, process, summarize and report financial data
    and have identified for the registrant's auditors any material weaknesses in internal
12    controls; and b) any fraud, whether or not material, that involves management or
    other employees who have a significant role in the registrant's internal controls…
13

14    193.    The Company's 2004 Form 10-K also contained SOX Certifications signed by

15    defendants Richman and Chase and filed with the SEC. These Certifications stated, in part, *"the*

16    *information contained in the Report fairly presents, in all material respects, the financial*

17    *condition and results of operations of the Company at the dates and for the periods indicated."*

18    194.    In addition to the foregoing, the 2004 Form 10-K also contained a report by Ernst &

19    Young, the Company's Independent Auditors that stated, in part, the following:

20    *We have audited the accompanying consolidated balance sheets of Terayon*
    *Communication Systems, Inc. as of December 31, 2004 and 2003, and the related*
21    *consolidated statements of operations, stockholders' equity, and cash flows for*
    *each of the three years in the period ended December 31, 2004….*
22

23    *We conducted our audits in accordance with the standards of the Public Company*
    *Accounting Oversight Board (United States)…. An audit also includes assessing*
24    *the accounting principles used and significant estimates made by management, as*
    *well as evaluating the overall financial statement presentation. We believe that our*
25    *audits provide a reasonable basis for our opinion.*

26    *In our opinion, the consolidated financial statements referred to above present*
27    *fairly, in all material respects, the consolidated financial position of Terayon*
    *Communication Systems, Inc. at December 31, 2004 and 2003, and the*
28    *consolidated results of its operations and its cash flows for each of the three years*

76

1  *in the period ended December 31, 2004, in conformity with U.S. generally accepted*
2  *accounting principles....*

3  We also have audited, in accordance with the standards of the Public Company
   Accounting Oversight Board (United States), the effectiveness of Terayon
4  Communication Systems, Inc.'s internal control over financial reporting as of
   December 31, 2004, based on criteria established in Internal Control — Integrated
5  Framework issued by the Committee of Sponsoring Organizations of the Treadway
   Commission and *our report dated March 14, 2005 expressed an unqualified*
6  *opinion on management's assessment and an adverse opinion on the effectiveness*
   *of internal control over financial reporting.*
7
                              *    *    *
8
9  **Report of Independent Registered Public Accounting Firm on Internal Control over**
   **Financial Reporting**

10
11 We have audited management's assessment, included in Management's Report on
   Internal Control Over Financial Reporting in Item 9a, that Terayon Communication
12 Systems, Inc ("Terayon") did not maintain effective internal control over financial
   reporting as of December 31, 2004 because of the effect of the material weaknesses
13 described in management's assessment, based on criteria established in Internal
   Control — Integrated Framework issued by the Committee of Sponsoring
14 Organizations of the Treadway Commission (the "COSO" criteria). Terayon's
   management is responsible for maintaining effective internal control over financial
15 reporting and for its assessment of the effectiveness of internal control over financial
   reporting. *Our responsibility is to express an opinion on management's assessment*
16 *and an opinion on the effectiveness of the company's internal control over*
   *financial reporting based on our audit.*

17 We conducted our audit in accordance with the standards of the Public Company
   Accounting Oversight Board (United States). *Those standards require that we plan*
18 *and perform the audit to obtain reasonable assurance about whether effective*
   *internal control over financial reporting was maintained in all material respects.*
19 Our audit included obtaining an understanding of internal control over financial
   reporting, evaluating management's assessment, testing and evaluating the design
20 and operating effectiveness of internal control, and performing such other procedures
   as we considered necessary in the circumstances. *We believe that our audit provides*
21 *a reasonable basis for our opinion.*

22
   A company's internal control over financial reporting is a process designed to
23 provide reasonable assurance regarding the reliability of financial reporting and the
   preparation of financial statements for external purposes in accordance with
24 generally accepted accounting principles. A company's internal control over financial
   reporting includes those policies and procedures that (1) pertain to the maintenance
25 of records that, in reasonable detail, accurately and fairly reflect the transactions and
   dispositions of the assets of the company; (2) provide reasonable assurance that
26 transactions are recorded as necessary to permit preparation of financial statements in
   accordance with generally accepted accounting principles, and that receipts and
27 expenditures of the company are being made only in accordance with authorizations
   of management and directors of the company; and (3) provide reasonable assurance
28 regarding prevention or timely detection of unauthorized acquisition, use, or

                                     77

1    disposition of the company's assets that could have a material effect on the financial
2    statements.

* * *

3
4    *In our opinion, management's assessment that Terayon Communication Systems,*
     *Inc. did not maintain effective internal control over financial reporting as of*
5    *December 31, 2004 is fairly stated, in all material respects, based on the COSO*
     *control criteria.* Also, in our opinion, because of the effect of the material
6    weaknesses described above on the achievement of the objectives of the control
     criteria, Terayon Communication Systems, Inc. has not maintained effective internal
7    control over financial reporting as of December 31, 2004, based on the COSO
     control criteria. [Emphasis added.]

8        195.    The statements made by defendants and contained in Terayon's 2004 Form 10-K,

9    were materially false and misleading and were know by defendants to be false at that time, or were

10   recklessly disregarded as such, for the reasons stated herein in ¶ 64. In addition, the statements

11   made by Ernst & Young and contained in the Company's 10-K were also materially false and

12   misleading for, among other reasons, the following:

13       a.    At all times during the Class Period, Terayon's financial statements and

14   operational reports were *not* true accurate or reliable. In truth, Ernst & Young knew or recklessly

15   disregarded that reported results, expenses, and cost accounting were materially false and

16   misleading, and Terayon's, net income, earnings per share and shareholders equity had been

17   materially overstated and its loss contingencies understated;

18       b.    At all times during the relevant period, unbeknownst to investors, Ernst &

19   Young had certified Terayon's financial statements as being GAAP compliant despite the fact that

20   the Company's profitability was materially overstated and costs and expenses understated, as a

21   result of defendants' failure to make proper and timely adjustments to Terayon's stated reports;

22       c.    Throughout the Class Period, it was not true that Terayon contained adequate

23   systems of internal operational or financial controls, such that the Company's financial results or

24   operational reports were true, accurate or reliable. As investors ultimately learned, Terayon's

25   internal financial accounting and disclosure controls were not adequate or effective and they had not

26   been properly tested or retested by the Ernst & Young, so as to prevent material fraud in the

27   presentation of the Company's financial results and condition; and

28

78

1    d. Terayon's internal control deficiencies were material and pervasive, and they

2 had not been adequately corrected or overridden by management at any time during the Class

3 Period. Accordingly, it was further false and misleading that Ernst & Young failed to respond to the

4 Company's denials and omissions, made time after time, by the Individual Defendants, during the

5 Class Period, as a means of explaining away the obvious material control deficiencies and

6 procedural weaknesses.

7  <u>May 3, 2005 Press Release and Conference Call Regarding "Record" 1Q:05 Results</u>

8   196. On May 3, 2005, Terayon published a release announcing purported "record" setting

9 results for the first quarter ended March 31, 2005. This release reported, in part, the following

10 financial information about the Company:

11   **Digital Video Applications Revenue Grows to a Record $13 Million for the**
   **Quarter, Increasing for the Fourth Consecutive Quarter**

12

13      * * *

14   ***Revenue for the first quarter of 2005 was $26.4 million, a 10% decrease compared***
   ***to $29.4 million for the fourth quarter of 2004*** and down 36% compared to $41.2

15   million for the first quarter of 2004.

16      * * *

17   Net loss for the first quarter of 2005 narrowed to $2.6 million, or $0.03 per share,
   compared to a net loss of $7.9 million, or $0.10 per share, for the fourth quarter of

18   2004 and a net loss of $10.2 million, or $0.14 per share, for the first quarter of 2004.

19   197. This release also quoted defendants Chase and Richman, in part, as follows:

20   ***"We are pleased with our first quarter results and our progress in moving digital***
   ***video to the center of our corporate strategy,"*** said **Jerry Chase**, Terayon Chief

21   Executive Officer. "Our performance and momentum in digital video applications
   reflect the market's growing need for real-time video stream management as

22   companies migrate to all-digital networks. ***As we maintain our focus on***
   ***transitioning the company, our first quarter results confirm the market acceptance***

23   ***and unique position of Terayon's digital video solutions."***

24      * * *

25   ***"Our first quarter actions enhanced our market leadership in digital video and***
   ***enabled us to better manage the costs of our home access products,"*** **Chase** said.

26   "CherryPicker's enabling technologies such as ad insertion and logo overlay,
   improve the ability for our customers to generate advertising revenues by increasing

27   the competitiveness of digital video as a preferred method of branding, entertaining,
   communicating and informing."

28

79

1              *   *   *

2    "*Our focus and resources are clearly aligned to drive our strength*—digital video
     networking applications—and we expect to continue to deliver top line growth that
3    will achieve net income profits and positive cash flow," said Mark Richman, Terayon
     Chief Financial Officer. "*Our restructuring activities and increased focus on
4    operational cost management in 2005 support this drive to net income.*"
     [Emphasis added.]

5

6         198.    Later the same day, on May 3, 2005, defendants also conducted a conference call for

7    analysts and investors, hosted by defendants Richman and Chase. During this call, defendant Chase

8    stated, in part, the following:

9        **JERRY CHASE,** CEO, TERAYON COMMUNICATION SYSTEMS: Thanks,
         Mark. Hello, everyone, and thank you for joining us for Terayon's Q1 2005 earnings
10       conference call. *As you can see from our earnings press release issued earlier
         today, Terayon had a good first quarter, showing notable progress in moving
11       digital video to the center of our corporate strategy. In addition, we took important
         steps toward sustainable profitability.* Let's begin our update with digital video
12       applications.

13              *   *   *

14       *While there is much work to be done, we are pleased with our progress during the
         first quarter.* A strong second quarter pipeline indicates continued growth as we
15       remain focused on driving to sustainable profits and positive cash flow. To do this,
         we will continue to invest in digital video, to strengthen our current cable market
16       leadership position, and grow across associated vertical markets like satellite,
         broadcast and Telco. We'll build on our market-leading digital video applications,
17       particularly in the area of advertising. We'll expand our strong video partner program
         to integrate our solutions into new types of video systems and markets, and we'll
18       manage our home access business to re-establish profitable growth and cash
         contributions. *By executing on these objectives, we expect to continue healthy
19       improvements.* [Emphasis added.]

20        199.    During this call, defendant Richman also stated, in part, the following:

21       **MARK RICHMAN:** Thank you, Jerry. *I am very pleased to announce that we have
         met or exceeded all previously-announced financial guidance for the first quarter
22       of 2005. We report net revenues of $26.4 million down from $29.4 million in the
         fourth quarter of 2004.* Most importantly, we grew our digital video revenue in the
23       first quarter of 2005 to our record $13 million, despite capital expenditure patterns
         that often experience reduced Q4 to Q1 CapEx activity. In addition, we launched the
24       7600G, and while we did not ship or record revenues in the first quarter, demand for
         the 7600G should support continued revenue growth beginning in the second quarter
25       2005.

26   ///

27   ///

28   ///

                                      80

1                                            *   *   *

2       *Our net loss in the first quarter of 2005 was $2.6 million or $0.03 per share,
        compared to $7.9 million or $0.10 per share in the fourth quarter of 2004.*
3       Excluding the previously mentioned benefits of a reversal of warranty reserves and
        bad debt recoveries, we would have recorded a net loss of approximately $3.7
4       million or $0.05 a share, which we believe is a better indicator of our current period
        performance. *This still compares favorably to our previously-announced guidance
5       of a loss from $3 to $6 million.* [Emphasis added.]

6           200.    As a direct result of the statements made or published by defendants, the following

7       day, May 4, 2005, *MarketWatch.com* reported that Terayon shares soared.  According to this report,

8       shares of Terayon rose 17%, to $3.22 per share, in afternoon trading Wednesday after the Company

9       posted overnight a narrower-than-expected first-quarter loss. The perceived improvement in its

10      performance prompted brokerage Merriman Curhan Ford & Co. to upgrade the Company to "Buy"

11      from "Neutral," citing optimism over the value, growth and earnings power of its digital video unit.

12      The Thomson First Call average estimate was for a loss of four cents a share on revenues of $27.9

13      million.

14                                   *10-Q for First Quarter 2005*

15          201.    On or about May 10, 2005, defendants filed with the SEC the Company's Form 10-Q

16      for the quarter ended March 31, 2005 ("1Q:05 Form 10-Q"), signed by defendant Richman and

17      certified by defendants Richman and Case.  In addition to making substantially similar statements

18      concerning the Company's procedures and its financial operations as had been made by defendants

19      previously, the 1Q:05 Form 10-Q also stated, in part, the following:

20          The accompanying condensed consolidated financial statements have been prepared
            in accordance with U.S. generally accepted accounting principles for interim
21          financial information and in accordance with the instructions to Form 10-Q and
            Article 10 of Regulation S-X…. *In the opinion of management, all adjustments
22          (consisting of normal recurring adjustments) necessary for a fair presentation of
            the condensed consolidated financial statements at March 31, 2005 and for the
23          three months ended March 31, 2005 and 2004 have been included.* [Emphasis
            added.]

24

25          202.    The Company's 1Q:05 Form 10-Q also reported Terayon's Liquidity and Capital

26      Resources, in part, as follows:

27          At March 31, 2005, we had approximately $30.6 million in unrestricted cash and
            cash equivalents and $69.2 million in short-term investments.

28

                                                 81

1   *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of*
2   *approximately $484.4 million. The Notes are a general unsecured obligation and*
    *are subordinated in right of payment to all of our existing and future senior*
3   *indebtedness and to all of the liabilities of our subsidiaries.* The Notes are
    convertible into shares of our common stock at a conversion price of $84.01 per
4   share at any time on or after October 24, 2000 through maturity, unless previously
    redeemed or repurchased. Interest is payable semi-annually. *Debt issuance costs*
5   *related to the Notes were approximately $15.6 million.* The Notes mature in August
    2007.

6   Through March 31, 2005, we had repurchased approximately $434.9 million of the
    Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on
7   early retirement of debt of approximately $234.4 million net of related unamortized
    issuance costs of $11.6 million in prior periods. No Notes were repurchased in 2003,
8   2004, or 2005. [Emphasis added.]

9       203.    In addition to the foregoing, the Company's 1Q:05 Form 10-Q also contained

10  statements that attested to the purported sufficiency of Terayon's controls and procedures. While

11  the 1Q:05 Form 10-Q did again acknowledge certain defects in the Company's communications

12  protocols, the 1Q:05 Form 10-Q also reported that these problems had been substantially resolved

13  and that, following a review of the Board of Directors, the Company's internal controls and

14  procedures were reasonably adequate. As evidence of this, the 1Q:05 Form 10-Q also stated, in

15  part, the following:

16      Under the supervision and with the participation of our senior management,
        including our CEO and CFO, we conducted an evaluation of the effectiveness of the
17      design and operation of our disclosure controls and procedures as of March 31, 2005.
        *Based on that evaluation, as of the date of the evaluation, our management,*
18      *including our CEO and CFO, concluded that our disclosure controls and*
        *procedures were not effective as of March 31, 2005 because of the material*
19      *weakness described below. We have already implemented, and will continue to*
        *implement, corrective actions with respect to this material weakness, as further*
20      *described below.*

21                              *   *   *

22      As part of the evaluation of our disclosure controls and procedures as of March 31,
        2005, we determined that we have remediated the material weakness related to our
23      procedures and controls over the preparation and review of our consolidated financial
        statements and accompanying footnote disclosures contained in this Quarterly Report
24      on Form 10-Q. *The insufficient controls, which were originally identified during*
        *the preparation of the Annual Report on Form 10-K, included a lack of sufficient*
25      *personnel with technical accounting expertise in our finance department and*
        *inadequate review and approval procedures to prepare external financial*
26      *statements in accordance with GAAP. As a result of the new procedures and*
        *controls we implemented for the preparation and review of this Quarterly Report*
27      *on Form 10-Q and the remediation steps described below, we believe we have*

28

                                        82

1  *remediated this material weakness*. Senior management will continue to monitor the
technical accounting expertise of finance personnel staff closely to ensure that
2  adequate review and approval of our financial statements is maintained.

3

4  As part of the same evaluation, we determined, however, that we have not completed
implementation of the changes we believe are required to remediate the previously
5  reported material weakness related to the inadequacy of communication between our
senior management and the finance department. During their review of our interim
6  financial results for the three months ended March 31, 2005, our independent
registered public accounting firm identified two significant adjustments to our
7  financial statements as part of their quarterly review procedures. These two
adjustments were the result of the continued lack of communication within the
8  Company with regards to certain severance obligations and our policy for the
allowance for doubtful accounts. *These two adjustments were corrected prior to the*
9  *issuance of our financial statement for the three months ended March 31, 2005.*
[Emphasis added.]

10    204.    In addition to the foregoing, the 1Q:05 Form 10-Q also contained a series of

11  statements that purported to attest to the fact that the Company had *already* remediated the control

12  weaknesses and other problems that were then adversely impacting the Company, including that:

13    **Remediation Steps**

14  During the quarter ended March 31, 2005 and through to the date of the filing of this
Form 10-Q, and in response to the material weaknesses identified as of December 31,
15  2004, we implemented the following steps to remediate the deficiencies in our
disclosure controls and procedures and material weaknesses in our internal control
16  over financial reporting.

17      (i) Established procedures to document the review of press releases to
account for transactions in a complete and timely manner;
18
      (ii) Engaged the former Assistant Controller, who has significant SEC
19  reporting experience, to serve as our Controller, in part to supervise our financial
reporting to ensure compliance with SEC requirements;
20
      (iii) Promoted our Consolidations Reporting Manager to Director of
21  Accounting to provide greater individual management of all accounting functions;
and
22
      (iv) Improved our internal process of drafting and reviewing periodic reports
23  by implementing additional management and external legal counsel review prior to
their submission to our independent registered public accounting firm.
24
25  Moreover, we intend to implement the following additional remediation steps to
address the material weakness related to the inadequacy of communication between
26  our senior management and the finance department;

27

28

83

1    (i)  Continue to monitor the communication channels between our senior
2    management and our finance department and take prompt action, as necessary, to
     further strengthen these communication channels;

3         (ii)  Increase staffing in the finance department;

4         (iii)  Re-allocate duties to persons within the finance organization to
5    maximize their skills and experience;

6         (iv)  Implement training procedures for new employees and/or consultants in
     the finance department on our disclosure procedures and controls, our Company and
7    our actions in previous reporting periods; and

8         (v)  Take steps to ensure that our senior management has timely access to all
     material financial and non-financial information concerning our business.

9    **Changes in internal control over financial reporting.**

10   *Other than as described above, there has been no change in our internal control*
     *over financial reporting during our most recently completed fiscal quarter that has*
11   *materially affected or is likely to materially affect our internal control over financial*
     *reporting.* [Emphasis added.]
12

13        205.    Again, the statements concerning the Company's controls and procedures was also

14   critically important to investors as a result of the related-party nature of a material amount of the

15   Company's revenues. Accordingly, the Company's 1Q:05 Form 10-Q described these related party

16   transactions, in part, as follows:

17        **Related Party Transactions**

18        Lewis Solomon, a member of the Company's Board of Directors is also a member of
     the Board of Directors of Harmonic, Inc. (Harmonic). Harmonic is an authorized,
19   non-exclusive reseller of certain of the Company's video products. For the three
     months ended March 31, 2005 and March 31, 2004, related party revenue from
20   Harmonic was $8.8 million and $0.7 million, respectively.

21        Cost of related party revenues in the Company's consolidated statements of
     operations consists of direct and indirect costs. Accounts receivable from Harmonic
22   totaled approximately $6.4 million at March 31, 2005. Harmonic is not a supplier to
     the Company.
23

24              *SOX Certifications for 1Q:05 Form 10-Q*

25        206.    The 1Q:05 Form 10-Q also contained SOX signed by defendants Chase and Richman

26   and filed with the SEC. These Certifications stated, in part, *"the information contained in the*

27   *Report fairly presents, in all material respects, the financial condition and results of operations*

28   *of the Company at the dates and for the periods indicated."* [Emphasis added.]

84

1    207.    The statements made by defendants and contained in the Company's May 3, 2005

2    press release, those statements made by defendants during the quarterly conference call, and those

3    statements contained in Terayon's 1Q:05 Form 10-Q, were each materially false and misleading and

4    were know by defendants to be false at that time, or were recklessly disregarded as such, for the

5    reasons stated herein in ¶ 64.

6        *July 28, 2005 Release and Conference Call Announcing Results for 2Q:05*

7    208.    On July 28, 2005, Terayon published a release announcing results for the second

8    quarter ended June 30, 2005 – the fifth purported consecutive quarter of increasing revenues. This

9    release reported quarterly financial information about the Company, in part, as follows:

10   **Terayon Reports Second Quarter 2005 Results; Digital Video Applications
     Revenue Grows to a Record $17.3 Million for the Quarter, Increasing for the**
11   **Fifth Consecutive Quarter**

12

13   *Revenue for the second quarter of 2005 was $29.5 million, a 12% increase
     compared to $26.4 million for the first quarter of 2005* and down 31% compared to
     $42.8 million for the second quarter of 2004.

14                                *    *    *

15

16   *Net loss for the second quarter of 2005 was $508,000, or $0.01 per share,
     compared to a net loss of $2.6 million, or $0.03 per share, for the first quarter of
17   2005 and a net loss of $4.9 million,* or $0.06 per share, for the second quarter of
     2004.

18   209.    Commenting on the purported strength and financial operations of the Company, the

19   July 28, 2005 release also quoted defendants Chase and Richman, in part, as follows:

20   *"Second quarter results indicate solid progress in moving digital video to the
     center of our corporate strategy,"* said **Jerry Chase**, Terayon Chief Executive
21   Officer. *"The second quarter marks the fifth consecutive quarter of record revenue
     for our digital video solutions. We believe this is due to Terayon's unique ability to*
22   *address fundamental changes occurring in the market."*

23                                *    *    *

24   *"Our digital video revenue growth coupled with reduced operating expenses
     positions us closer to our goal of profitability,"* said **Mark Richman**, Terayon Chief
25   Financial Officer. "Our focus remains on execution to drive revenues and asset and
     expense management to drive net income profitability." [Emphasis added.]

26   ///

27   ///

28   ///

85

1    210.    Later the same day, defendants also conducted a conference call for analysts and

2    investors, hosted by defendants Richman and Chase. During this call, defendant Chase stated, in

3    part, the following:

4    **JERRY CHASE**, CEO, TERAYON COMMUNICATION SYSTEMS: Thank you,
     Mark, and hello everyone. Thank you for joining us for the call. Earlier this

5    afternoon, we released our second quarter results. I am pleased with the ongoing
     progress we are making towards executing on a unique market position that is

6    driving us towards profitability. We are fortunate that market factors continue to
     trend in our direction. We have become a solid player in real time digital video

7    networking applications and our product quality across our video and home access
     product lines remain high. *Terayon has achieved a number of milestones this past*

8    *quarter, including video revenues were up for the fifth straight quarter to 17.3*
     *million, giving us the best video quarter we've ever had. We are cash flow positive*

9    *for the second consecutive quarter, indicative of an increased focus on asset and*
     *expense management, and customer diversification continues to improve each*

10   *quarter.*

11                                    *    *    *

12   With the market trends moving toward what we do best, coupled with a steady focus
     on strengthening customer relationships, broadening customer diversity, delivering

13   new product innovations and building a stronger partner channel, *Terayon has made*
     *steady and solid progress against our digital video goals this past quarter.*

14                                    *    *    *

15   *The second quarter has been a good one for us and we are confident in our ability*

16   *to continue this progress.* Market trends continue to shift toward what Terayon does
     best and we are in a great position to capture the opportunity. The initial phase of

17   Comcast digital simulcast projects has generated not only sales but also strengthened
     our relationship with them. We are winning new customers and expanding our

18   business within our current base. We expect all these trends will continue over the
     long run as the job of building revenue producing all digital networks is at the

19   beginning of the cycle. We do expect a small fall-off in demand in the third quarter
     as our customers absorb what they have bought and now must implement. This is a

20   timing issue, not a demand issue. We expect orders from Comcast to be lower in the
     third quarter. However, it will be offset slightly through sales to other MSOs which

21   also diversify their customer base. *We are winning market share and expect that*
     *trend to continue in the third quarter despite the projected small decline in*

22   *revenue.*

23                                    *    *    *

24   **JERRY CHASE**: *Thank you, Mark. Our second quarter results certainly indicate*
     *the effectiveness of our plan and execution to date. I am optimistic about our*

25   *ability to maintain its focus and deliver favorably against our business plan.* Our
     customers have honored us by making us a vendor in high standing and our products

26   earned high marks for their excellent performance in quality. While there's always
     more to be done, Mark and I look forward to providing you with updates on our

27   progress as we continue to transition Terayon to a digital video company. [Emphasis
     added.]

28

                                         86

1    211.    During this call, defendant Richman also stated, in part, the following:

2    **MARK RICHMAN:** Thank you, Jerry. *I am very pleased to announce that we have*
     *met or exceeded all previously announced financial guidance for the second*
3    *quarter of 2005 and reporting second quarter revenues of 29.5 million, we have*
     *returned to top line growth, up from 26.4 million in the first quarter of 2005.* Most
4    *importantly, we grew our digital video revenue in the second quarter of 2005 to a*
     *record 17.3 million, up from 13 million in the first quarter.* This growth was in
5    large part attributable to market acceptance of our CP 7600G edge decoder that
     contributed 6.6 million of revenues in Q2. The CP 7600G revenue contribution
6    exceeded expectations reflecting the growing trend of building out all digital
     networks.
7
                            *    *    *
8
     *Our net loss in the second quarter was near break-even at half a million dollars, or*
9    *$0.01 per share compared to a loss of 2.6 million or $0.03 per share in the first*
     *quarter of 2005.*
10
                            *    *    *
11
     As a final comment and as we will shortly announce in an SEC 8-K filing, *we were*
12   *recently advised by Ernst and Young that it resigned as the Company's*
     *independent registered public accounting firm effective upon the completion of*
13   *services related to the review of the Company's interim financial statements for the*
     *quarter ending September 30th, 2004. While we consider this development to be*
14   *unfortunate, we understand that Terayon and other companies are losing the*
     *services of a Big 4 accounting firm.* We are immediately working to resolve this
15   issue and our audit committee and management have commenced the search for a
     new, independent registered public accountant. *This development will not impact*
16   *our market opportunities and will not diminish the confidence and optimism that*
     *we have with regard to our business prospects. I would like to thank you for*
17   *listening and will now turn the call back to Jerry.* [Emphasis added.]

18   212.    The statements made in the July 28, 2005 release and conference call were false and

19   misleading for the reasons set forth at ¶ 64. The statement in the conference call that "Terayon and

20   other companies are losing the services of a Big 4 accounting firm" is also false and misleading

21   because it implies that the reason for the departure of Ernst & Young is not related to Terayon's

22   massive accounting irregularities, GAAP violations, and the like, but rather simply stems from the

23   fact that the "Big 4" cannot service Terayon and other companies.

24                *August 1, 2005 8-K Regarding Sudden Resignation of Ernst & Young*

25   213.    On August 1, 2005, defendants filed with the SEC pursuant to Form 8-K, a report

26   announcing that Terayon had retained a new Independent Auditor. Of critical importance to

27   investors, at that time, this report stated that the *selection of its new auditors did not result from*

28

                                        87

1   *any disagreement or problem with its prior auditors, Ernst & Young.* The Company's August 1,

2   2005 form 8-K, signed by Defendant Richman, stated, in substantial part, the following:

3       **Item 4.01. Changes in Registrant's Certifying Accountant.**

4       On July 26, 2005, Terayon Communication Systems, Inc. (the "Company"), was
        advised by Ernst & Young LLP ("Ernst & Young") that Ernst & Young will resign as
5       the Company's independent registered public accounting firm following the earlier of
        the completion of services related to the review of the Company's interim financial
6       statements for the quarter ending September 30, 2005 or the filing due date of that
        quarterly report.

7
        *The reports of Ernst & Young on the Company's financial statements as of and*
8       *for the years ended December 31, 2004 and 2003 did not contain an adverse*
        *opinion or a disclaimer of opinion and were not qualified or modified as to*
9       *uncertainty, audit scope, or accounting principles.*

10
        *In connection with the audits of the Company's most recent two years ended*
11      *December 31, 2004 and 2003 and in the subsequent interim period, there were no*
        *disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K) between*
12      *Ernst & Young and the Company on any matter of accounting principles or*
        *practices, financial statement disclosure, or auditing scope and procedures, that, if*
13      *not resolved to the satisfaction of Ernst & Young, would have caused Ernst &*
        *Young to make reference to the subject matter of the disagreement in connection*
14      *with its reports on the Company's financial statements for such years.*

15
        *During the years ended December 31, 2004 and 2003, and through July 26, 2005,*
16      *there were no "reportable events" as described in Item 304(a)(1)(v) of Regulation*
        *S-K, other than the two material weaknesses disclosed in the Company's Form 10-*
17      *K filed on March 15, 2005 and as described below:*

18
        First, management identified a material weakness due to insufficient controls related
19      to the identification, capture, and timely communication of financially significant
        information between certain parts of the organization and the finance department to
20      enable the finance department to account for transactions in a complete and timely
        manner. As a result of this material weakness, management recorded an adjustment
21      in the quarter ended September 30, 2004 to record termination benefits paid to a
        former executive.

22
23      Second, management also identified a material weakness for insufficient controls
        related to the preparation and review of the annual consolidated financial statements
24      and accompanying footnote disclosures. The insufficient controls include a lack of
        sufficient personnel with technical accounting expertise in the finance department
25      and inadequate review and approval procedures to prepare external financial
        statements in accordance with generally accepted accounting principles (GAAP). As
26      a result of this material weakness, management made substantial revisions to its 2004
        annual consolidated financial statements and footnote disclosures before they were
27      issued.

28
                                        88

1    *Ernst & Young did not seek the Company's consent to its resignation. As a result,*
2    *the Company's audit committee did not recommend or approve the resignation of*
     *Ernst & Young.*

3    The Company has provided Ernst & Young with a copy of the foregoing disclosures
     and requested that Ernst & Young furnish a letter to the Securities and Exchange
4    Commission stating whether or not Ernst & Young agrees with the above statements.
     Ernst & Young furnished such a letter, dated August 1, 2005, a copy of which is
5    attached hereto as Exhibit 16.1.

6
     The Company's audit committee has commenced the process of selecting an
7    independent registered public accounting firm to replace Ernst & Young.
     [Emphasis added.]
8

9    214.    Also attached to the Company's September 28, 2005 Form 8-K was an August 1,

10   2005 letter from Ernst & Young to the SEC (Office of Chief Accountant), that stated the following:

11   *We have read Item 4.01 of Form 8-K dated July 26, 2005, of Terayon*
     *Communication Systems, Inc. and are in agreement with the statements contained*
12   *in paragraphs 1 through 6 and the first sentence of paragraph 7 on page 2 therein.*
     *We have no basis to agree or disagree with other statements of the registrant*
13   *contained therein.*

14   *Regarding the registrant's statements concerning the lack of internal control to*
     *prepare financial statements, included in paragraphs 4 through 6 on page 2*
15   *therein, we had considered such matters in determining the nature, timing and*
     *extent of procedures performed in our audit of the registrant's 2004 financial*
16   *statements.*  [Emphasis added.]

17                          *Form 10-Q for Second Quarter 2005*

18   215.    On or about August 9, 2005, defendants filed with the SEC the Company's Form 10-

19   Q for the quarter ended June 30, 2005 ("2Q:05 Form 10-Q"), signed by defendant Richman and

20   certified by defendants Richman and Case.  In addition to making substantially similar statements

21   concerning the Company operations and its financial operations as had been made by defendants

22   previously, the 2Q:05 Form 10-Q also stated, in part, the following:

23   **2.    Summary of Significant Accounting Policies**

24   **Basis of Presentation**

25   The accompanying condensed consolidated financial statements have been prepared
     in accordance with U.S. generally accepted accounting principles for interim
26   financial information and in accordance with the instructions to Form 10-Q and
     Article 10 of Regulation S-X.... *In the opinion of management, all adjustments*
27   *(consisting of normal recurring adjustments) necessary for a fair presentation of*

28

                                         89
     AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS
     CASE NO.: 3-06-CV-03936 MJJ
     \\Fileserver\shareddocs\BLG\TERAYON\PLD-WPD\Amended Complaint.wpd

1    *the condensed consolidated financial statements at June 30, 2005 and for the three*
2    *and six months ended June 30, 2005 and 2004 have been included.* [Emphasis
      added.]

3    216.    The Company's 2Q:05 Form 10-Q also reported Terayon's Liquidity and Capital
4    Resources, in part, as follows:

5    At June 30, 2005, we had approximately $38.6 million in unrestricted cash and cash
      equivalents and $66.4 million in short-term investments.
6
7    *In July 2000, we issued $500.0 million of Notes, resulting in net proceeds to us of*
      *approximately $484.4 million.* The Notes are a general unsecured obligation and are
      subordinated in right of payment to all of our existing and future senior indebtedness
8    and to all of the liabilities of our subsidiaries. The Notes are convertible into shares
      of our common stock at a conversion price of $84.01 per share at any time on or after
9    October 24, 2000 through maturity, unless previously redeemed or repurchased.
      Interest is payable semi-annually. *Debt issuance costs related to the Notes were*
10   *approximately $15.6 million.* The Notes mature in August 2007.

11   *Through June 30, 2005, we had repurchased approximately $434.9 million of the*
      *Notes for $171.0 million in cash and $17.9 million in stock, resulting in a gain on*
12   *early retirement of debt of approximately $234.4 million* net of related unamortized
      issuance costs of $11.6 million in prior periods. No Notes were repurchased in 2003,
13   2004, or 2005. [Emphasis added.]

14   217.    The Company's 1Q:05 Form 10-Q also contained statements that attested to the
15   purported adequacy of Terayon's controls and procedures. While the 1Q:05 Form 10-Q did
16   acknowledge certain minor defects in its communications protocols, the 1Q:05 Form 10-Q also
17   reported that these problems had been substantially remedied and that, following a review of the
18   Board of Directors, the Company's internal controls and procedures continued to be reasonably
19   adequate. As evidence of this, the 1Q:05 Form 10-Q also stated, in part, the following:

20   *Under the supervision and with the participation of our senior management,*
      *including our CEO and CFO, we conducted an evaluation of the effectiveness of*
21   *the design and operation of our disclosure controls and procedures as of June 30,*
      *2005. Based on that evaluation, as of the date of the evaluation, our management,*
22   *including our CEO and CFO, concluded that our disclosure controls and*
      *procedures were effective as of June 30, 2005.*
23
                                    *    *    *
24
      *As part of the evaluation of our disclosure controls and procedures as of June 30,*
25   *2005, we determined that we have remediated the material weakness related to our*
      *procedures and controls over the preparation and review of our consolidated*
26   *financial statements and accompanying footnote disclosures contained in this*
      *Quarterly Report on Form 10-Q.* The insufficient controls, which were originally
27   identified during the preparation of the Annual Report on Form 10-K, included a lack
      of sufficient personnel with technical accounting expertise in our finance department
28   and inadequate review and approval procedures to prepare external financial

                                        90

1    statements in accordance with GAAP. *As a result of the new procedures and*
2    *controls we implemented for the preparation and review of this Quarterly Report*
     *on Form 10-Q and the remediation steps described below, we believe we have*
3    *remediated this material weakness.* Senior management will continue to monitor the
     technical accounting expertise of finance personnel staff closely to ensure that
4    adequate review and approval of our financial statements is maintained.

5    During their review of our interim financial results for the three months ended March
     31, 2005, our independent registered public accounting firm identified two
6    significant adjustments to our financial statements as part of their quarterly review
     procedures. These two adjustments were the result of the continued lack of
7    communication within the Company with regards to certain severance obligations
     and our policy for the allowance for doubtful accounts. These two adjustments were
8    corrected prior to the issuance of our financial statements for the three months ended
     March 31, 2005. *As part of an evaluation we conducted at June 30, 2005, we*
9    *determined, however, that we have completed implementation of the changes we*
     *believe are required to remediate the previously reported material weakness related*
10   *to the inadequacy of communication between our senior management and the*
     *finance department, which caused these two adjustments.*
11
     **Remediation Steps**
12
     During the quarter ended June 30, 2005 and through to the date of the filing of this
13   Form 10-Q, and in response to the material weaknesses identified as of December 31,
     2004 and March 31, 2005, we implemented the following steps to remediate the
14   deficiencies in our disclosure controls and procedures and material weaknesses in our
     internal control over financial reporting.
15

16          (i)     Established procedures to document the review of press releases to
     account for transactions in a complete and timely manner;
17
            (ii)    Engaged the former Assistant Controller, who has significant SEC
18   reporting experience, to serve as our Controller, in part to supervise our financial
     reporting to ensure compliance with SEC requirements;
19
            (iii)   Promoted our Consolidations Reporting Manager to Director of
20   Accounting to provide greater individual management of all accounting functions;
     and
21
            (iv)    Improved our internal process of drafting and reviewing periodic
22   reports by implementing additional management and external legal counsel review
     prior to their submission to our independent registered public accounting firm.
23

24   Moreover, we implemented the following additional remediation steps to address the
     material weakness related to the inadequacy of communication between our senior
25   management and the finance department;

26          (i)     Continue to monitor the communication channels between our senior
27   management and our finance department and take prompt action, as necessary, to
     further strengthen these communication channels;
28

                                            91

1        (ii)    Increase staffing in the finance department;

2        (iii)    Re-allocate duties to persons within the finance organization to

3 maximize their skills and experience;

4        (iv)    Implement training procedures for new employees and/or consultants in the finance department on our disclosure procedures and controls, our Company

5 and our actions in previous reporting periods; and

6        (v)    Take steps to ensure that our senior management has timely access to all material financial and non-financial information concerning our business.

7

8 Changes in internal control over financial reporting. Other than as described above, there has been no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected or is likely to

9 materially affect our internal control over financial reporting. [Emphasis added.]

10     218.    Again the statements concerning the Company's controls and procedures were of

11 critical important to investors, as a result of the related-party nature of a material amount of the

12 Company's revenues. Accordingly, the Company's 1Q:05 Form 10-Q again described these related

13 party transactions, in part, as follows:

14 **Related Party Transactions**

15 Lewis Solomon, a member of the Company's Board of Directors is also a member of the Board of Directors of Harmonic, Inc. (Harmonic). Harmonic is an authorized,

16 non-exclusive reseller of certain of the Company's video products. For the six months ended June 30, 2005 and June 30, 2004, related party revenue from

17 Harmonic was $13.7 million and $3.4 million, respectively.

18

19 Cost of related party revenues in the Company's consolidated statements of operations consists of direct and indirect costs. Accounts receivable from Harmonic

20 totaled approximately $2.3 million at June 30, 2005. Harmonic is not a supplier to the Company.

21          *SOX Certifications for Form 10-Q for First Quarter 2005*

22     219.    The 1Q:05 Form 10-Q also contained SOX Certifications signed by defendants

23 Chase and Richman, and filed with the SEC. These Certifications stated, in part "*the information*

24 *contained in the Report fairly presents, in all material respects, the financial condition and*

25 *results of operations of the Company at the dates and for the periods indicated.*" [Emphasis

26 added.]

27

28

92

1    220.    The statements made by defendants contained in Terayon's 2Q:05 Form 10-Q and its

2    August 1, 2005 Form 8-K, were each materially false and misleading and were know by defendants

3    to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶ 64.

4    *September 27, 2005 8-K re: Change of Independent Auditor*

5    221.    On September 27, 2005, defendants filed with the SEC pursuant to Form 8-K, in

6    part, the following statement regarding the change of Terayon's independent auditors:

7    **Item 4.01. Changes in Registrant's Certifying Accountant.**

8           (a)    As previously disclosed by Terayon Communication Systems, Inc.
      (the "Company") in its Current Report on Form 8-K filed on August 1, 2005, the
9     Company's former independent registered public accounting firm, Ernst & Young
      LLP, ("Ernst & Young") informed the Company that it would resign as the
10    Company's independent registered public accounting firm effective upon the earlier
      of completion of services related to the review of the Company's interim financial
11    statements for the quarter ending September 30, 2005 or the filing due date of that
      quarterly report. Ernst & Young did not seek the Company's consent to its
12    resignation. As a result, the Company's Audit Committee did not recommend or
      approve the resignation of Ernst & Young.
13

14           On August 9, 2005, the Company filed its Quarterly Report on Form 10-Q for
      the quarter ended June 30 2005. Ernst & Young served as the Company's
15    independent registered public accounting firm in reviewing the Company's interim
      financial statements for the quarter ended June 30, 2005 for purposes of that
16    quarterly report.

17           On September 21, 2005, the Audit Committee of the Board of Directors of
      the Company engaged Stonefield Josephson, Inc. ("Stonefield Josephson") as the
18    Company's new independent registered public accounting firm to audit the
      Company's financial statements for the fiscal year ended December 31, 2005, and to
19    perform certain procedures related to the financial statements to be included in the
      Company's quarterly reports on Form 10-Q. Effective as of such date, Ernst &
20    Young resigned as the Company's independent registered public accounting firm.

21    *The reports of Ernst & Young on the Company's financial statements as of and*
      *for the years ended December 31, 2004 and 2003 did not contain an adverse*
22    *opinion or a disclaimer of opinion and were not qualified or modified as to*
      *uncertainty, audit scope, or accounting principles.*
23
      *In connection with the audits of the Company's most recent two years ended*
24    *December 31, 2004 and 2003 and in the subsequent interim periods, there were no*
      *disagreements (as described under Item 304(a)(1)(iv) of Regulation S-K) between*
25    *Ernst & Young and the Company on any matter of accounting principles or*
      *practices, financial statement disclosure, or auditing scope and procedures, that, if*
26    *not resolved to the satisfaction of Ernst & Young, would have caused Ernst &*
      *Young to make reference to the subject matter of the disagreement in connection*
27    *with its reports on the Company's financial statements for such years.*

28

1
2
3

*During the years ended December 31, 2004 and 2003, and through September 21, 2005, there were no "reportable events" as described in Item 304(a)(1)(v) of Regulation S-K, other than the two material weaknesses disclosed in the Company's Annual Report* on Form 10-K filed on March 15, 2005 and as described below:

4

\* \* \*

5
6
7

*The Company has provided Ernst & Young with a copy of the foregoing disclosures* and requested that Ernst & Young furnish a letter to the Securities and Exchange Commission stating whether or not Ernst & Young agrees with the above statements. Ernst & Young furnished such a letter, dated September 23, 2005, a copy of which is attached hereto as Exhibit 16.1.

8
9
10
11
12
13

     (b)     On September 21, 2005, the Audit Committee of the Board of Directors of the Company engaged Stonefield Josephson as the Company's new independent registered public accounting firm to audit the Company's financial statements for the fiscal year ended December 31, 2005, and to perform certain procedures related to the financial statements to be included in the Company's quarterly reports on Form 10-Q. The Company did not consult Stonefield Josephson on any matter or event described in Item 304(a)(2)(i) or (ii) of Regulation S-K during the Company's two most recent fiscal years and through September 21, 2005, the effective date of the Company's engagement of Stonefield Josephson. [Emphasis added.]

14

222.    Also attached to the Company's September 28, 2005 Form 8-K was a September 23,

15

2005 letter from Ernst & Young to the SEC, that stated, in relevant part:

16
17
18

We have read Item 4.01 of Form 8-K dated September 21, 2005, of Terayon Communication Systems, Inc. and are in agreement with the statements contained in the first and second sentences of paragraph 1, the second sentence of paragraphs 2 and 3, and paragraphs 4 through 8 on page 2 therein. *We have no basis to agree or disagree with other statements of the registrant contained therein.*

19
20
21

*Regarding the registrant's statements concerning the lack of internal control to prepare financial statements, included in paragraphs 6 through 8 on page 2 therein, we had considered such matters in determining the nature, timing and extent of procedures performed in our audit of the registrant's 2004 financial statements.* [Emphasis added.]

22

<u>September 30, 2005 Release re: Change in Independent Auditor</u>

23

223.    On September 30, 2005, defendants published a release announcing that Terayon had

24

retained a new independent auditor. This release stated that its new auditors were an "excellent fit,"

25

and again defendants implied that this change was *not the result of any disagreement or problem*

26

*with its prior auditors, Ernst & Young.* Accordingly, as evidence of this, the Company's

27

September 30, 2005 release stated, in substantial part, the following:

28

94

1    **Terayon Signs New Independent Auditor**

2    Terayon Communication Systems, Inc. (NASDAQ:TERN), a leading provider of
     digital video networking applications and home access solutions, today announced
3    that it engaged Stonefield Josephson, Inc., a Santa Monica-based accounting firm
     with Bay Area offices, as the company's new independent auditor effective
4    September 21, 2005.

5
     "Through our extensive search for an external audit firm with strong SEC experience,
6    we identified and signed Stonefield Josephson, which precisely meets our auditing
     requirements," said Mark Richman, Terayon Chief Financial Officer. "Their full
7    range of audit services and Sarbanes-Oxley experience make them an excellent fit for
     Terayon."
8
     Stonefield Josephson will immediately take over responsibilities as the external
9    auditor beginning with the review of the Company's third quarter fiscal calendar.

10       224.    The statements made by defendants and contained in the Company's September 30,

11   2005 press release, those statements made by defendants during the investor conferences, and those

12   statements contained in Terayon's Form 8-K, referenced above, were each materially false and

13   misleading and were know by defendants to be false at that time, or were recklessly disregarded as

14   such, for the reasons stated herein in ¶ 64.

15      **DEFENDANTS CONTINUE TO MAKE FALSE AND MISLEADING STATEMENTS**
        **EVEN AFTER THE TRUTH SLOWLY BEGINS TO EMERGE**
16

17       225.    Only weeks after Terayon replaced its auditors, on November 7, 2005, defendants

18   published a release announcing that the Company would delay the announcement and filing of its

19   third quarter financial results.  At the same time, defendants also announced that certain revenues

20   from "a customer" *may have been recognized improperly and in violation of the Company's stated*

21   *revenue recognition policies.*

22       226.    In this regard, the Company's November 7, 2005 release stated, in part, the

23   following:

24       **Terayon Announces Accounting Review and Delay in Release of Third Quarter**
         **2005 Results**
25

26       Terayon Communication Systems, Inc. (NASDAQ: TERN), a leading provider of
         digital video networking applications and home access solutions, *today announced*
27       *that it is reviewing the recognition of revenue for certain transactions during prior*
         *periods. Terayon initiated the review after determining that certain revenues*
28       *recognized in the second half of fiscal year 2004 from a customer may have been*

                                          95

1    *recorded in incorrect periods. The revenue matters under examination relate to the*
2    *timing of revenue recognition and may result in a restatement of prior period*
     *financials.*

3

4    Pending completion of the accounting review, the filing of Terayon's Form 10-Q for
     the third quarter of fiscal year 2005 will be delayed, and this delay will extend
5    beyond the Form 10-Q's filing deadline of November 9, 2005. Terayon also will
     delay the filing of its third quarter 2005 earnings release and conference call,
6    originally scheduled for November 8, 2005.

7    *The accounting review includes an examination of whether a restatement of prior*
     *period financial statements may be required as it relates to the customer*
8    *transactions in question, in addition to an examination of Terayon's revenue*
     *recognition policies and practices for current and past periods and an examination*
9    *of Terayon's internal control over financial reporting as it relates to these items.*
     There can be no assurance that Terayon or its independent auditors will not identify
10   additional issues or other considerations in connection with the current review, and
     that these issues or considerations will not require further adjustments to the
11   company's prior financial results for one or more prior fiscal years or quarters.

12   *"We are committed to accurate and transparent financial reporting and are taking*
     *this matter very seriously," said Jerry Chase, CEO, Terayon. "I want to emphasize*
13   *that our cash position and market leadership remain strong and are not affected*
     *by the accounting issues under review.* We remain focused on executing on our
14   strategies and continuing to expand our product innovations to strengthen the overall
     position of the company."

15
     Terayon and the Audit Committee of Terayon's Board of Directors are working
16   closely with the company's independent auditors in connection with the accounting
     review. In addition, the Audit Committee has decided to conduct an independent
17   inquiry into the circumstances relating to the accounting treatment of certain of the
     transactions at issue with the assistance of independent legal counsel. The timing and
18   possible outcome of the Audit Committee's inquiry cannot be predicted at this time.
     [Emphasis added.]
19

20       227.    The November 7, 2006 release was false and misleading when made because it

21   continued to conceal the true, adverse facts – known but concealed by defendants – that the

22   Company's financial problems were not limited to issues regarding the improper recording of

23   revenue relating to a single customer for two quarters in 2004 but rather sweeping issues relating to

24   a need to restate the financials for nearly the entire Class Period and massive, overarching internal

25   control problems.

26       228.    As a result of defendants' failure to file the Company's quarterly Form 10-Q report,

27   with the SEC within the prescribed time, on November 22, 2006, Terayon announced that it had

28   received a letter from the Nasdaq Stock Market notifying the Company that Terayon's stock was

1  subject of delisting (for violation of Rule 4310(c)(14), that requires the timely filing of periodic

2  reports with the SEC). Also, as a result of defendants' failures to make a timely Form 10-Q filing

3  with the SEC, Terayon's trading symbol was changed to "TERNE" from "TERN," on or about

4  November 21, 2005.

5       229.    The Company's November 22, 2005 release also stated, in part, the following:

6       Terayon announced on November 7, 2005 its delay in filing the Form 10-Q as the
        company is reviewing the recognition of revenue for certain transactions during prior
7       periods. Terayon initiated the review after determining that certain revenues
        recognized in the second half of fiscal year 2004 from a customer may have been
8       recorded in incorrect periods. The revenue matters under examination relate to the
        timing of revenue recognition and may result in a restatement of prior period
9       financials. Terayon cannot determine at this time when the investigation will be
        completed, but the company intends to file its Form 10-Q for the third quarter of
10      2005 as soon as practicable following the conclusion of the investigation. The SEC
        has informed Terayon that it has initiated an informal inquiry into the matters
11      discussed in the November 7, 2005 press release. Terayon intends to cooperate fully
        with the SEC's inquiry.

12

13      230.    On January 10 2006, defendants published a release that provided a purported

14  "update" on the Company's continuing accounting review, also announcing that Terayon had

15  received a letter from the Nasdaq stating that the Commission had already began investigating:

16      **Terayon Provides Update on Accounting Review**

17      Company Also Receives Letter from NASDAQ Regarding its 2005 Shareholder
        Meeting

18

19      Terayon Communication Systems, Inc. (NASDAQ: TERNE), a leading provider of
        digital video networking applications and home access solutions, announced on
20      November 7, 2005 that the filing of its Form 10-Q for the third quarter of 2005
        would be delayed and that it had commenced an accounting review after determining
21      that certain revenues recognized in the second half of fiscal year 2004 may have been
        recorded in incorrect periods. The delayed filing of Terayon's Form 10-Q for the
22      third quarter of 2005 caused Terayon to be in violation of NASDAQ Marketplace
        Rule 4310(c)(14), which requires the timely filing of periodic reports with the U.S.
23      Securities and Exchange Commission (SEC). While steady progress has been made,
        Terayon cannot determine at this time when the accounting review will be
24      completed. The company intends to file its Form 10-Q for the third quarter of 2005
        as soon as practicable following the conclusion of the accounting review.

25

26      *In addition, as a result of the delay in the filing of its Form 10-Q for the quarterly
        period ended September 30, 2005, Terayon is not in compliance with its obligation*
27      *under the Indenture with respect to Terayon's 5% Convertible Subordinated Notes
        due 2007 (Notes) to file with the SEC and the trustee of the Notes (Trustee) all*
28      *reports, information and other documents required pursuant to Sections 13 or*

                                            97

*15(d) of the Securities Exchange Act of 1934. If holders of at least 25% in aggregate principal amount of the Notes outstanding provide written notice to the Trustee or to Terayon and the Trustee of a default based on Terayon's failure to file its Form 10-Q Report for the quarterly period ended September 30, 2005 and such default is not cured within 60 days of such notice, an event of default will occur and the Trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding may accelerate the maturity of the Notes and declare the entire principal amount of the Notes, together with all accrued and unpaid interest thereon, to be due and payable immediately. The Notes currently outstanding have an aggregate principal amount of $65 million. The company ended 2005 with $101 million of Cash and cash equivalents plus Short-term investments.* [Emphasis added].

231.    The Company's January 10, 2006 release also provided a purported "Update" on Terayon's trading status on the Nasdaq, in part, as follows:

**NASDAQ Update**

Terayon also announced today that it received a letter from The Nasdaq Stock Market (NASDAQ), dated January 4, 2006, notifying the company that its common stock is subject to delisting based on its failure to satisfy NASDAQ Marketplace Rules 4350(e) and 4350(g), which required the company to solicit proxies and hold an annual meeting of shareholders before December 31, 2005. Terayon held its 2004 annual shareholder meeting in December 2004 and the company's 2005 annual shareholder meeting was originally planned for December 2005. However, Terayon was unable to hold its 2005 annual shareholder meeting due in part to its ongoing accounting review.

As previously disclosed on November 22, 2005, Terayon received a letter from NASDAQ, dated November 17, 2005, stating that as a result of Terayon's failure to timely file its Form 10-Q for the third quarter of 2005 with the SEC, Terayon's common stock is subject to delisting from the NASDAQ National Market. In response to the November 17, 2005 letter, Terayon requested a hearing with a NASDAQ Listing Qualifications Panel which automatically stayed the delisting action pending the issuance of a written decision from the Panel. Terayon presented its plan to evidence compliance with all NASDAQ listing criteria at a hearing before the Panel on December 15, 2005. Terayon has not yet received a determination from the Panel as a result of the hearing.

In NASDAQ's January 4, 2006 letter, Terayon was informed that the Panel will consider the company's failure to comply with NASDAQ's proxy solicitation and annual meeting requirements in rendering its decision regarding the continued listing of Terayon's common stock. Terayon discussed the proxy solicitation and annual meeting deficiencies with the Panel at the hearing on December 15, 2005 and plans to submit additional materials for the Panel's review with respect to those issues by the January 11, 2006 deadline. There can be no assurance that the Panel will grant the company's request for the continued listing of its common stock on the NASDAQ.

1    232.    The same day, January 10, 2006, the *San Jose Business Journal* reported that

2    defendants had warned of a possible $65 million bond default. According to this report, the

3    Company had stated that the delays in filing its financials may put it in default on $65 million in

4    bonds. As a result of this default, the Company's **5% Convertible Subordinated Notes due in**

5    **2007 become immediately payable if holders of at least 25% of the aggregate principal amount**

6    **of the bonds provide written notice of a default that isn't cured within 60 days. Days later, on**

7    **January 13, 2006, Terayon was served with notice of default from holders of over 25% of the**

8    **outstanding Convertible Subordinated Notes.**

9    233.    On January 26, 2006, defendants announced yet another purported "restructuring" –

10    this time as a "pure play digital video company." That day, Terayon published another release that

11    stated, in part, the following:

12    **Terayon Restructures to Pure-Play Digital Video Company**

13    Terayon Communication Systems, Inc. (NASDAQ: TERNE), a leading provider of
      video localization-on-demand solutions, today announced a restructuring to focus the
14    company's strategy solely on its digital video applications and reduce its overall cost
      structure as a pure-play video business.

15

16    *"Our decision to concentrate solely on digital video applications enables us to
      laser-focus the company on a growing market for real-time network digital video*
17    *processing and expand our applications and services,"* said **Jerry Chase,** Terayon,
      CEO. "Network operators worldwide in cable, satellite, telco and mobile, understand
18    that they must customize digital video programming services and advertising
      tobecome more relevant to their individual customers. The move to customizing
19    content delivered the instant before viewing creates substantial opportunity for
      Terayon, particularly in the area of digital video advertising, as it builds on our
20    existing core competencies and market leadership. Localizing services and
      advertising plays strongly to the core strength exhibited in our award winning
21    CherryPicker® product line."

22
      As part of the company's move to a pure-play video business, Terayon is reviewing
23    strategic alternatives for its Home Access Solutions product line including the
      opportunity to monetize its current investment in working capital. As part of the
24    restructuring, Terayon expects to record charges of approximately $0.6 million for
      employee related costs in addition to other restructuring costs, the majority of which
25    are expected to occur in the first quarter of 2006.

26    **Chase** continued, *"We are now structured to take advantage of what we do best.* By
      focusing on digital video, we expect to drive our strategic goals of increased market
27    penetration and improved financial performance. With the savings we obtain from
      the restructuring, we intend to allocate additional resources for digital video software
28    application development to pursue new revenue-generating video opportunities.

99

1  Through our focus and partnerships with key industry players and existing customer
2  relationships in the cable, satellite and telco markets, *Terayon is well positioned for
   success."* [Emphasis added.]

3     234.    The January 26, 2006 release was false and misleading because the restructuring

4  move did not make the Company "well positioned for success" but was actually a last-ditch effort to

5  spin a very negative situation quickly enveloping all aspects of the company – from financials, to

6  internal controls, to performance and results – in a positive light despite the true fact that defendants

7  well knew that massive financial and accounting improprieties were severely undermining the

8  Company and its ability to function prospectively, and a massive restatement was both unavoidable

9  and imminent.

10                        **THE TRUE FINANCIAL AND OPERATIONAL**
                   **CONDITION OF TERAYON IS BELATEDLY DISCLOSED**
11

12     235.    On March 1, 2006, the last day of the Class Period, defendants finally revealed to

13  investors the secret truth behind that Company's reported purported successes: still more financial

14  and accounting improprieties!  That day, defendants published a release announcing that the Audit

15  Committee of the Board of Directors of the Company had revealed that defendants artificially

16  inflated the Company's financial results in the prior periods and it concluded that *Terayon's*

17  *consolidated financial statements for the year ended December 31, 2004 and the first two*

18  *quarters of 2005 should no longer be relied upon and would be restated*.  This release stated, in

19  part, the following:

20     **Terayon Announces Expected Restatement of Prior Periods**

21     Terayon Communication Systems, Inc. (NASDAQ: TERNE) today announced that
       the Audit Committee of the Board of Directors has concluded that the Company's
22     consolidated financial statements for the year ended December 31, 2004 and for the
       four quarters of 2004 and the first two quarters of 2005 should no longer be relied
23     upon and will be restated.  This conclusion was based in part on the final results of
       the previously announced Audit Committee inquiry.  The inquiry focused on the
24     circumstances surrounding the timing of revenue recognition in the second half of
       2004 from a customer of the Company ….
25                                    *   *   *
26     The Company has also reviewed its revenue recognition policies relating to the
       recognition of the sales of software and other products bundled with post customer
27     service contracts and has considered the guidance under SOP 97-2, Financial
       Accounting Standards Board Technical Bulletin 90-1, "Accounting for Separately
28

                                    100

**TERAYON PRICES  OCTOBER 18, 2005—NOVEMBER 8, 2005**

| <u>Date</u> | <u>Open</u> | <u>High</u> | <u>Low</u> | <u>Close</u> | <u>Volume</u> |
|---|---|---|---|---|---|
| 8-Nov-05 | $2.37 | $2.37 | $2.17 | $2.25 | 2,538,400 |
| 7-Nov-05 | $2.40 | $2.61 | $2.36 | $2.57 | 903,400 |
| 4-Nov-05 | $2.58 | $2.62 | $2.36 | $2.36 | 666,100 |
| 3-Nov-05 | $2.60 | $2.66 | $2.53 | $2.59 | 497,900 |
| 2-Nov-05 | $2.59 | $2.59 | $2.53 | $2.58 | 406,700 |
| 1-Nov-05 | $2.67 | $2.68 | $2.53 | $2.57 | 696,300 |
| 31-Oct-05 | $2.59 | $2.69 | $2.57 | $2.69 | 748,700 |
| 28-Oct-05 | $2.39 | $2.65 | $2.38 | $2.65 | 1,592,400 |
| 27-Oct-05 | $2.66 | $2.66 | $2.38 | $2.39 | 2,135,600 |
| 26-Oct-05 | $2.95 | $2.95 | $2.55 | $2.64 | 1,572,100 |
| 25-Oct-05 | $2.93 | $2.95 | $2.74 | $2.94 | 882,200 |
| 24-Oct-05 | $3.05 | $3.10 | $2.89 | $2.95 | 828,800 |
| 21-Oct-05 | $3.14 | $3.20 | $3.03 | $3.05 | 552,100 |
| 20-Oct-05 | $3.27 | $3.33 | $3.14 | $3.14 | 237,600 |
| 19-Oct-05 | $3.20 | $3.29 | $3.00 | $3.26 | 819,200 |
| 18-Oct-05 | $3.47 | $3.50 | $3.22 | $3.22 | 792,900 |

SOURCE:  Yahoo Finance

**TERAYON PRICES  JANUARY 9, 2006—JANUARY 17, 2006**

| Date | Open | High | Low | Close | Volume |
|------|------|------|-----|-------|--------|
| 17-Jan-06 | $1.87 | $1.92 | $1.63 | $1.75 | 2,152,300 |
| 13-Jan-06 | $1.99 | $1.99 | $1.86 | $1.91 | 2,421,300 |
| 12-Jan-06 | $2.00 | $2.01 | $1.94 | $1.97 | 568,800 |
| 11-Jan-06 | $2.00 | $2.05 | $1.83 | $2.00 | 2,454,700 |
| 10-Jan-06 | $2.10 | $2.13 | $2.02 | $2.06 | 713,100 |
| 9-Jan-06 | $2.07 | $2.13 | $2.07 | $2.13 | 232,900 |

SOURCE:  Yahoo Finance

**TERAYON PRICES  MARCH 1, 2006—MARCH 2, 2006**

| <u>Date</u> | <u>Open</u> | <u>High</u> | <u>Low</u> | <u>Close</u> | <u>Volume</u> |
|---|---|---|---|---|---|
| 2-Mar-06 | $2.25 | $2.61 | $2.16 | $2.33 | 4,873,200 |
| 1-Mar-06 | $2.66 | $2.82 | $2.66 | $2.70 | 641,100 |

SOURCE:  Yahoo Finance