MORGAN, LEWIS & BOCKIUS LLP
   John H. Hemann (Bar No. 165823)
   Michael J. Lawson (Bar No. 66547)
   Sheila A. Jambekar (Bar No. 239101)
One Market
Spear Street Tower
San Francisco, CA 94105
Tel:  (415) 442-1000
Fax:  (415) 442-1001

ERNST & YOUNG LLP
   Bruce M. Cormier
   Joel E. Bonner (Bar No. 105492)
1225 Connecticut Avenue, NW
Washington, D.C. 20036
Tel:  (202) 327-7603
Fax:  (202) 327-7601

Attorneys for Defendant
ERNST & YOUNG LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ADRIAN MONGELI, Individually, And On Behalf Of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>vs.<br><br>TERAYON COMMUNICATIONS SYSTEMS, INC., ZAKI RAKIB, JERRY D. CHASE, MARK A. RICHMAN, EDWARD LOPEZ, RAY FRITZ, CAROL LUSTENADER, MATTHEW MILLER, SHLOMO RAKIB, DOUG SABELLA, CHRISTOPHER SCHAEPE, MARK SLAVEN, LEWIS SOLOMON, HOWARD W. SPEAKS, ARTHUR T. TAYLOR, DAVID WOODROW, and ERNST & YOUNG LLP,<br><br>          Defendants. | Case No. 3-06-CV-03936 MJJ<br><br>**CLASS ACTION**<br><br>**APPENDIX OF AUTHORITIES AVAILABLE ONLY ON ELECTRONIC DATABASES IN SUPPORT OF ERNST & YOUNG LLP'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Hearing Date:  July 24, 2007<br>Time:  9:30 a.m.<br>Dept.:  Courtroom 11<br>Judge:  Hon. Martin J. Jenkins<br>Action Filed:  June 23, 2006 |

1      Defendant Ernst & Young LLP respectfully submits this Appendix of Cases Available

2   Only On Electronic Databases in support of its Reply. Attached as exhibits hereto are those cases

3   available only on electronic databases cited in support of Ernst & Young LLP's Reply, which

4   were not already submitted in the Appendix of Cases Available Only On Electronic Databases

5   submitted in support of Ernst & Young LLP's Motion to Dismiss.

6   **CASES**                                                                      **EXHIBIT**

7   *In re First Merchants Acceptance Corporation Securities Litigation*,
8      No. 97 C 271517760, *2 (N.D. Ill. Nov. 4, 1998) ................................................. A

9   *In re Fleming Companies Inc. Sec. Litig.*,
       2004 U.S. Dist. LEXIS 26488 (N.D. Tex. June 11, 2004)...................................... B

10  *In re Paincare Sec. Litig.*,
11     2007 WL 1229703 *8 (M.D. Fla. Apr. 25, 2007) .................................................. C

12  *In re Transcrypt Int'l Sec. Litig.*,
       4:98CV3099, 1999 U.S. Dist. LEXIS 17540, *25 (D. Neb. Nov. 4, 1999)........................... D

13

14  Dated: June 6, 2007                          MORGAN, LEWIS & BOCKIUS LLP

15

16                                               By _____/S/_____

17                                                  John Hemann
                                                    Attorneys for Defendant
18                                                  ERNST & YOUNG LLP

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

In re First Merchants Acceptance Corp. Securities Litigation
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
In re FIRST MERCHANTS ACCEPTANCE
CORPORATION SECURITIES LITIGATION
No. 97 C 2715.

Nov. 4, 1998.

### MEMORANDUM OPINION AND ORDER
COAR, District J.
*1 This is a consolidated securities action on behalf of all purchasers of the publicly traded securities of First Merchants Acceptance Corporation ("First Merchants"), seeking remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act") and Illinois state law. Before this court are defendant Deloitte & Touche LLP's ("Deloitte") and defendants Marcy Shockey, Solomon Weisgal and Stowe Wyant's (collectively, the "Audit Committee Defendants") motions to dismiss the First Amended Consolidated Class Action Complaint ("first amended complaint" or "complaint"). Deloitte seeks dismissal of all the claims against it including alleged violations of Section 11 of the Securities Act, 15 U.S.C. § 77k (Counts I and II); alleged violations of Section 10(b) of the Exchange Act and Rule 10b-5 of the SEC (Count IV); common law fraud (Count VI); the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII); and negligent misrepresentation (Count VIII). The Audit Committee defendants seek to dismiss the claims against them under Section 11 of the Securities Act (Counts I and II) and Section 15 of the Securities Act, 15 U.S.C. § 77o (Count III). For the reasons set forth below, Deloitte's motion is GRANTED in part and DENIED in part and the Audit Committee Defendants' motion is DENIED.

### I. Motion to Dismiss Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure does not test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim for which relief may be granted. *Pickrel v. City of Springfield, Ill.,* 45 F.3d 1115 (7th Cir.1995) . A plaintiff fails to state a claim upon which relief may be granted only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Leahy v. Board of Trustees of Community College Dist., No. 508,* 912 F.2d 917, 921 (7th Cir.1990) (quoting *Conley v. Gibson,* 355 U.S. 41, 44-45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). For purposes of this motion, the court must take all of the well-pleaded factual allegations in the First Amended Complaint as true, and construe them in the light most favorable to the plaintiffs. *Richmond v. Nationwide Cassel, L .P.,* 52 F.3d 640, 644 (7th Cir.1995). In accordance with this principle, the factual Background which follows assumes the factual accuracy of the allegations in the First Amended Complaint, without using qualifying terms such as "allegedly," but should not be understood as representing factual findings by this court. *See Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1191 (N.D.Ill.1997) (Aspen, J.).

### II. Background

First Merchants is a specialty finance company in the business of buying and servicing sub-prime automobile loans. The finance contracts purchased by First Merchants were primarily in the credit market for high risk or "sub-prime" borrowers. This market includes borrowers trying to establish their credit, previously bankrupt borrowers trying the re-establish their credit as well as borrowers who desire longer payment terms. (First Am. Cplt. ¶ 2, hereinafter, "¶ __.") Plaintiffs include purchasers of First Merchants stock and subordinated reset notes in both public offerings and in the aftermarket

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

from September 23, 1994 through April 16, 1997 (the "class period"). (¶ 1, 12.)

**\*2** During the class period, First Merchants followed an aggressive growth policy, taking on longer term, higher risk contracts, without a corresponding increase in its allowance for credit losses. (*E.g.* ¶¶ 43, 61, 64, 67.) On April 16 and 17, 1997, First Merchants announced that reported net income in its financial statements was overstated by approximately $28 million. (¶ 6.) As a result of the Company's announcement, the market price of First Merchants' common stock and reset notes declined significantly. (*Id.*) On July 11, 1997, First Merchants filed a bankruptcy petition revealing that its net worth had in fact been overstated by approximately $90 million. (¶ 7.)

Deloitte was First Merchants' auditor and certified its financial statements throughout the class period. ( ¶ 5.) Each of the Audit Committee defendants were directors and members of the Audit Committee, and defendant Weisgal was the Chairperson of the Audit Committee. (¶¶ 18-21.) Plaintiffs allege that throughout the class period, First Merchants, through the individual defendants including the Audit Committee defendants, issued false and misleading financial statements and press releases which grossly inflated First Merchants' income and assets by failing to recognize huge uncollectible loan costs as required by Generally Accepted Accounting Principles ("GAAP"), and by representing that First Merchants followed " conservative" accounting practices. ( ¶ 3.)

Plaintiffs allege several false and misleading statements made by the individual defendants, including the Audit Committee defendants, and certified by Deloitte. Specifically, plaintiffs allege that each 10-K form filed with the SEC during the class period misrepresented that the financial statements had "been prepared in conformity with generally accepted accounting principles and reporting practices," and misrepresented that Deloitte had audited First Merchants' annual financial statements "in accordance with generally accepted auditing standards" ("GAAS"). (¶¶ 29, 30.) [FN1]

FN1. While plaintiffs have alleged a number of additional misrepresentations contained in press releases, 10-Q Forms and Annual Reports, this statement of facts refers only to alleged misrepresentations by Deloitte or the Audit Committee defendants.

*The 1994 Registration Statement*

On September 23, 1994, First Merchants filed a stock registration statement with the SEC for an initial public offering of 1,460,000 shares of common stock. The 1994 Stock Registration Statement was signed by Audit Committee defendants Shockey and Wyant, among others. (¶ 32.) The 1994 Stock Registration Statement and prospectus contained First Merchants' financial statements certified by Deloitte for the years ending May 31, 1992, 1993 and 1994. (¶ 33.) The 1994 Stock Registration Statement and the prospectus falsely represented First Merchants' procedure regarding repossession of collateral, causing inflation of reported earnings. (¶ 35.) In addition, the 1994 Registration Statement and the financial statements incorporated therein falsely understated the allowance for bad debts by disregarding the fact that higher risk loans were being purchased leading to increased rates of defaults, and by violating the Company's charge-off policy through extensions of time for payment for delinquent accounts. (¶ 36.) The 1994 Registration Statement and financial statements also falsely stated that the financial statements were prepared in accordance with GAAP and that Deloitte's audit was prepared in accordance with GAAS. (¶ __ .)

*The 1995 Note Registration Statement, 1995 10-K and 1995 Secondary Offering Registration Statement*

**\*3** On February 7, 1995, First Merchants filed an amended Registration Statement for the sale of subordinated reset notes (the "1995 Note Registration Statement"). The 1995 Note Registration Statement was signed by Audit Committee defendants Shockey, Weisgal and Wyant, among others. (¶ 40.) Attached to the 1995

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Note Registration Statement were the same false and misleading financial statements as attached to the 1994 Registration Statement. (¶ 41.)

On August 29, 1995, First Merchants filed with the SEC a Form 10-K for the year ending May 31, 1995. Audit Committee defendants Shockey, Weisgal and Wyant signed the 1995 10-K. (¶ 47.) The 1995 10-K contained an Auditors' Report signed by Deloitte stating that it had audited the Company's financial statements as of May 31, 1994 and 1995. (¶ 51.) The 1995 10-K and attached financial statements falsely overstated net earnings and understated the loan loss allowance and failed to follow First Merchants' procedures for establishing loan losses and repossessing collateral. The financial statements and Auditors' Report also falsely stated that the financial statements were prepared in accordance with GAAP and the audit conducted in accordance with GAAS. (¶¶ 50-51.)

On October 2, 1995, First Merchants filed with the SEC an amended Registration Statement for a secondary offering of common stock ("Secondary Offering Registration Statement"). (¶ 54.) The Secondary Offering Registration Statement was signed by all of the Audit Committee defendants, among others. (*Id.*) The audited financial statements contained in the Secondary Offering Registration Statement and prospectus for the period ended May 31, 1995, were the same false and misleading financial statements filed with the1995 10-K. (¶ 55.) The 1995 stock prospectus also contained the false and misleading auditor's report filed with the 1995 10-K. (¶ 59.)

*The Second 1995 10-K, 1996 Note Registration Statement and 1996 10-K*

On April 1, 1996, First Merchants filed a Form 10-K for the fiscal year ended December 31, 1995 (the "Second 1995 10-K").[FN2] The Second 1995 10-K and the financial statements attached thereto misrepresented First Merchants' true earnings by understating the allowance for loan losses and by failing to follow published procedures for repossession of collateral and to make appropriate adjustments to the allowance for credit losses. (¶

64.) The Second 1995 10-K also contained an Auditors' Report signed by Deloitte falsely stating that the financial statements were prepared in accordance with GAAP and that its audit was conducted in accordance with GAAS. (¶ 65.)

> FN2. In December 1995, the Company announced that it was changing from a May 31 year-end to a December 31 year-end, which is why it filed two Form 10-Ks for 1995. (¶ 60.)

On October 29, 1996, First Merchants filed with the SEC a Registration Statement for a sale of 9.5% subordinated reset notes ("1996 Note Registration Statement"), signed by the Audit Committee defendants, among others. (¶ 75.) The 1996 Note Registration Statement and prospectus contained financial statements audited by Deloitte for the two-year period ended December 31, 1995 (May 31, 1994, May 31, 1995 and December 31, 1995), and an .auditors' report falsely stating that the financial statements were prepared in accordance with GAAP and that its audit was conducted in accordance with GAAS. (¶ 76, 78.) The financial statements contained the same false and misleading statements as those filed with the two 1995 10-Ks. (*Id.*) The 1996 Note Registration Statement was further false and misleading because, at the time of the 1996 Note Offering, First Merchants was technically insolvent-the cash available to operate its business was less than $2 million and the Company's finance receivables and its principal assets were under-reserved and overvalued by approximately $28 million. (¶ 79.)

*4 On February 4, 1997, Deloitte furnished a letter to the Audit Committee reflecting "reportable conditions" at First Merchants "relating to significant deficiencies in the design or operation of the internal control structure that ... could adversely affect the Company's ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements." (¶ 82.) Despite this recognition and its warning to the Company, Deloitte nonetheless certified the 1996 financial statements and Form 10-K filed with the SEC on March 28, 1997 (the "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

1996 10-K"). The 1996 10-K also contained an auditor's report signed by Deloitte falsely stating that the financial statements were prepared in accordance with GAAP and the audit was conducted in accordance with GAAS. (¶ 86.) In fact, less than a month after the 1996 10-K was filed, the Company's newly hired Chief Financial Officer, Norman Smagley ("Smagley"), began to raise questions about the veracity of the financial statements certified by Deloitte, forcing a public announcement that the 1996 financial statements overstated income by at least $3.5 million. (¶ 6.) A few months later, it was revealed that First Merchants' net worth was in fact overstated by approximately $90 million. (¶ 7.)

*GAAP and GAAS Violations*

Plaintiffs allege that First Merchants' accounting practices violated several accounting principles and provisions of GAAP, including:
(a) The principle that "[a] finance company should maintain a reasonable allowance for credit losses applicable to all categories of receivables through periodic charges to operating expenses" (American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide, Audits of Finance Companies ¶ 2.04);
(b) The principle that all "estimated loss[es] from a loss contingency ... shall be accrued by a charge to income" (Financial Accounting Standards Board ("FASB") Statement of Standards, Accounting for Contingencies. Statement of Financial Accounting Standards No. 5, ¶ 8);
(c) The principle that financial reporting should provide information that is useful to present to [sic] potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);
(d) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);
(e) The principle that financial reporting should provide information about an enterprise's financial

performance during a period. Investors and creditors often use historical financial information to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);
**\*5** (f) The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59);
(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 79); and
(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

(¶ 94.)

Deloitte certified that First Merchants' financial statements were prepared in accordance with the standards set forth above. In doing so, Plaintiffs allege that Deloitte violated several principles of GAAS. The following allegations pertain to the GAAS principles allegedly violated:
GAAS requires that an audit report state whether a company's financial statements are presented in conformity with GAAP, AU § 110.01. (¶ 97.)
GAAS requires that an auditor is required to qualify its opinion if there is any doubt about a company's ability to proceed as a going concern. AU §§ 341.02, 341.03. (¶ 99.)
GAAS provides that an inability to obtain sufficient competent evidential matter constitutes a restriction on the scope of the audit which requires and auditor to qualify or disclaim an opinion. AU § 508.17. (¶ 100.)
"GAAS requires that an audit be adequately planned and assistants be properly supervised. AU § 150.02. Audit planning involves developing an overall strategy for the conduct and scope of the audit. AU § 311.03. In planning an audit, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

auditor is required to obtain a knowledge of the entity's business, its organization and operating characteristics (AU § 311.07) so that the auditor can identify areas that need special attention. AU § 311.06. The auditor must design the audit to provide reasonable assurance of detecting errors and irregularities (intentional misstatements) that are material to the financial statements. AU § 316.05." (¶¶ 103, 105.)

"GAAS requires that the efforts of assistants be directed and supervised to assure that the objectives of the audit are accomplished. AU § 311.10. GAAS requires that the work performed by each assistant be reviewed and evaluated to determine whether the audit results are consistent with the conclusions expressed in the auditor's reports. AU § 311.13." (¶ 104.)

"The auditor must perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. AU § 319.02. The auditor must document his understanding of the entity's internal control structure elements in order to plan the audit. § 319.26." (¶¶ 105-06.)

*Red Flag Allegations*

**\*6** Within a few weeks after his arrival in mid-March 1997, Smagley noted errors in the financial statements certified by Deloitte, leading to the Company's April 16 and 17, 1997, disclosures. ( ¶ 6.) Plaintiffs allege that Deloitte, like Smagley, should have seen the "writing on the wall" with respect to First Merchants' improper accounting practices, and that Deloitte knowingly or recklessly disregarded its auditing obligations in certifying First Merchants' financial statements. (¶ 96, 102.) Plaintiffs point to several "red flags" Deloitte ignored or recklessly disregarded:
(a) The bad debt write-offs for First Merchants' loans rose from $7.6 million in 1995 to $26.6 million in 1996, a 220 percent increase. But First Merchants' bad debt reserves increased by only 20 percent between 1995 and 1996.
(b) Dramatic increases in the rate of delinquencies approaching the 90 day write-off limit should also

have served as a red flag to Deloitte. For example, the number of loans which were unpaid for more than 61 days in 1996 was more that [sic] 500 percent greater than in 1995. But again, the 1996 bad debt reserves were increased by only 20 percent.
(c) Similarly, the dollar value of loans more than 61 days overdue increased by 39 times for year end May 31, 1995 over the comparable period in 1994. Yet the 1995 loan loss reserves were increased by only three time over the same period in the prior year.
(d) The dollar value of loans more than 61 days overdue increased by 21 time for the six months ended November 30, 1994 over the comparable period in 1993. Yet the November 30, 1994 loan loss reserves were only 2.75 times greater than what they had been a year earlier.
(e) Between May 31 and December 31, 1995, the number of accounts 61 days or more overdue rose by over 200 contracts to 257 and between December 31, 1995 and June 30, 1996 the number almost doubled to 494; however, this was not reflected by an increase in the reserves.
(f) During the class period there were significant increases in the term of the notes First Merchants was buying. For example the average length of the notes went from 48 months during 1994 to 55 months as of December 31, 1996 reflecting borrowers less able to repay their loans. This increase should have been reflected by increases in the loan loss reserves but was not.
(g) The dollar value of loans more than 61 days overdue increased enormously during certain periods without corresponding increases in the loans over 91 days overdue which had to be charged off. While the delinquencies between 61 and 90 days was 21 times greater in the six months ended November 31[sic], 1994 than in the comparable period of 1993, the dollar value of loans which the Company charged off increased less than three times. While the dollar value of loans more than 61 days overdue increased by 39 times for year end May 31, 1995 over the comparable period in 1994, the dollar value of loans which the Company charged off increased less than nine times. These anomalies should have served as red flags for the Deloitte to carefully review First Merchants records to see if these numbers were being manipulated to hide loans which actually

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

became more than 91 days delinquent or, more improbably, whether there was simply a surge of payments as delinquent loans approached their 91st day of non-payment.

*7 (¶ 102.)

### III. Analysis

#### A. Pleading Requirements Under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).

"Rule 9(b) requires that 'the circumstances constituting fraud ... be stated with particularity." ' *In re Healthcare Compare Corp, Securities Litigation,* 75 F.3d 276, 281 (7th Cir.1996). Thus, a securities fraud plaintiff must plead "in detail" the facts surrounding fraud, i.e., "the who, what, when, where, and how: the first paragraph of any newspaper story." *Dileo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). "This requirement has three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." *Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1195 (N.D.Ill.1997).

The PSLRA amends the 1934 Act to raise pleading standards in securities fraud cases to a more rigorous level, such that the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). While the PSLRA does not contain a specific scienter requirement for § 10(b) fraud claims, it is generally recognized that the appropriate standard for alleging scienter under the PSLRA is the Second Circuit standard which requires a plaintiff "to allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

Defendants argue, however, that the PSLRA created a pleading standard even more stringent than that

enunciated by the Second Circuit and that mere allegations of recklessness no longer suffice to plead scienter under § 10(b). Courts in this District have uniformly rejected this argument. holding that recklessness is still sufficient under § 10(b). *See Miller v. Material Sciences Corporation,* 9 F.Supp.2d 925, 927 (N.D.Ill.1998) (Gettleman, J.); *Fugman v. Aprogenex, Inc.,* 961 F.Supp. at 1195; *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1252 (N.D.Ill.1997) (Moran, J.); *see also In re Health Management Securities Litigation,* 970 F.Supp. 192, 200 (E.D.N.Y.1997) (finding argument that recklessness no longer suffices to plead scienter unpersuasive). While the Seventh Circuit has yet to address the question of whether the PSLRA completely displaced case law regarding pleading standards in private securities law, this court agrees with the other courts in this District who have held that the " § 78u-4(b)(2) adopts the Second Circuit standard but declines to bind courts to the Second Circuit's interpretation of its standard." *Rehm,* 954 F.Supp. at 1252 (Moran, J.); *Fugman,* 961 F.Supp. at 1195 (citing *Rehm* ).

#### B. Section 10(b) and Rule 10b-5 Allegations.

Count IV of the First Amended Complaint alleges that Deloitte violated § 10(b) of the 1934 Act and Rule 10b-5. "SEC Rule 10b-5, promulgated under Section 10(b) of the Securities Exchange Act of 1934, prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. " 17 C.F.R. § 240.10b-5. To state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re Healthcare Compare Corp.,* 75 F.3d at 280 (citing *Stransky v. Cummins Engine Co.,* 51 F.3d 1329 (7th Cir.1995)). In this motion to dismiss, Deloitte challenges the sufficiency of plaintiffs' misrepresentation and scienter allegations.[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN3. Deloitte also argues that because the first amended complaint is pled on information and belief, it fails in its entirety or at least fails to allege fraud with particularity. The court rejects this argument. The complaint sets forth detailed allegations of fraud and alleges substantially more than "rumor or hunch." *See Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683-84 (7th Cir.1992). The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint. *STI Classic Fund v. Bollinger Indus., Inc.,* 1996 WL 885802 at *2 (N.D.Tex.1996) ("[t]he actual contents of the books and records and the [defendant's] knowledge thereof are peculiarly within the Movants' knowledge and control, thereby warranting some relaxation in the application of Rule 9(b)").

### 1. Misrepresentations

**\*8** In challenging the specificity of Plaintiffs' misrepresentation allegations, Deloitte primarily contends that the "what," "why" and "how" of the allegations are lacking. Deloitte's challenges are directed at the sufficiency of the GAAP and GAAS allegations. Plaintiffs allege that Deloitte falsely stated that the financial statements were prepared in accordance with GAAP and audited in accordance with GAAS, Deloitte asserts that the complaint fails to allege with particularity *why* its audit reports were misleading; *what* was materially misstated in the financial statements; and *how* the financial statements and Deloitte's audit of those statements violated GAAP and GAAS. The court finds that the allegations in the complaint contain sufficient detail to satisfy each of these elements.

Deloitte's contention that plaintiffs fail to sufficiently allege *why* each of the audit reports was misleading is unpersuasive. The complaint expressly alleges that each of Deloitte's audit reports filed in conjunction with the 10-K Forms and Registration Statements was misleading because Deloitte's opinion that the financial statements were prepared in accordance with GAAP

and audited in accordance with GAAS was false. An outside auditor can be liable for stating its opinion on a company's financial statements if that opinion is false and misleading. *Cashman v. Coopers & Lybrand,* 877 F.Supp. 425, 431 (N.D.Ill.1995) (Castillo, J.) (an accountant "may be held primarily liable for certifying or issuing reports on ... financial statements if those reports contain materially misleading statements or omissions" relied upon and incorporated into a prospectus) (citing *DiLeo,* 901 F.2d at 627). Further, the complaint sufficiently states why the financial statements contained materially misleading statements: "the financial statements ... misrepresented First Merchants' true earnings by understating the allowance for loan losses and by failing to follow published procedures for repossession of collateral and to make appropriate adjustments to the allowance for credit losses." (*See e.g.* ¶ 33, 47, 63, 64.)

Similarly, the allegations detail *what* was materially misstated in the financial statements-the Company's true earnings and net worth. Deloitte complains that the first amended complaint fails to state the precise amount of the overstatement of earnings in each of the audited financial statements; which loans were not properly written off; and which collateral was not repossessed according to proper procedures, etc. The court agrees that this information is noticeably absent from the complaint and that, in order to prove its allegations, plaintiffs will be required to fill in these details. However, given that most of this information is in the hands of defendants, the court finds that plaintiffs have satisfied their burden at this stage of the litigation. *See DiVittorio v. Equidayne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2nd Cir.1987) (requirements of Rule 9(b) are to be relaxed where the facts are "peculiarly within the adverse parties' knowledge"). Indeed, the true amounts of First Merchant's reserves, income and net worth cannot be determined without a re-audit of the Company's financial records-records in the hands of defendants and obtainable through discovery.

**\*9** Moreover, several courts have held that a complaint need not describe each single specific transaction in detail nor allege the precise amount

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

of overstatement on a period by period basis. *See Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997) ("[i]t is not fatal to the complaint that it does not describe in detail a single specific transaction"); *SEC v. Feminella,* 947 F.Supp. 722, 733 (S.D.N.Y.1996) ("Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter") (quotations omitted); *Klein v. King,* 1990 WL 61950 at * 11 (N.D.Cal.1990) (holding that plaintiff was not required to plead the precise dollar amount of the overstatement of earnings in order to state a claim under Rule 10b-5). In *Feminella,* the court rejected the defendant's argument that the complaint failed to satisfy Rule 9(b) because the SEC had not alleged the dates or amounts of payments, the manner of payments or the total value of payments, finding that "the Complaint provides defendant with fair notice of the SEC's claims, enabling him to prepare a reasonable defense." 947 F.Supp. at 733. The court agrees that Rule 9(b) does not require that plaintiffs state the precise dollar amount that earnings and net worth were overstated for each of the financial statements audited and certified by Deloitte. The complaint sufficiently alleges which portions of the financial statements were overstated (net worth and earnings) and which portions understated (loss reserves), such that Deloitte can prepare a reasonable defense to the allegations.

Deloitte finally argues that the misrepresentation allegations fail to state *how* the financial statements and audit reports violated GAAP and GAAS. The GAAP and GAAS allegations are set forth in substantial detail in the complaint and in the background portion of the court's opinion. Deloitte argues that several of the principles cited in the complaint are not GAAP principles. This goes not to the specificity of the allegations, but to whether Plaintiffs can prove a violation of GAAP or GAAS sufficient to satisfy the scienter requirement. At this stage, the court finds the specificity of the accounting principle violations more than sufficient to satisfy Rule 9(b)-the allegations cite the specific principle violated and how they were violated.

Finally, the court finds that the policy considerations behind requiring specificity for fraud allegations are met-the complaint plainly contains

enough detail to satisfy the court that this is not a fishing expedition and to provide Deloitte with copious notice of the allegations against it. Moreover, the allegations in the complaint are not akin to a "smear campaign" damaging Deloitte's reputation without sufficient facts to back up the allegations. The court accordingly finds sufficient detail in the allegations to conclude that Plaintiffs have pled misrepresentation with particularity.

### 2. Scienter

"[O]nly persons who act with an intent to deceive or manipulate Rule 10b-5" may be found liable under Rule 10b-5. *Securities and Exchange Commission v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998). " Reckless disregard of the truth counts as intent for this purpose." *Id.* Under the PSLRA/Second Circuit pleading requirement, a plaintiff may demonstrate a "strong inference" of fraud "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128. While the court finds that Plaintiff has failed to establish a sufficient motive to demonstrate "motive and opportunity," [FN4] plaintiffs have alleged "strong circumstantial evidence of conscious misbehavior or recklessness."

> FN4. The only allegations related to motive pertain to Deloitte's alleged acceptance of a fee too low to justify a careful audit in order to obtain more business in the sub-prime auto lending industry. This Circuit has repeatedly rejected such allegations, recognizing that an accounting firm's "greatest asset is its reputation for honesty, followed closely by its reputation for careful work." *Robin v. Arthur Young & Company,* 915 F.2d 1120, 1127 (7th Cir.1990) (quoting *DiLeo,* 901 F.2d at 629). Because Plaintiffs' sole allegation of motive is insufficient under the law and is based on economic irrationality, Plaintiffs fail to meet the 2nd Circuit motive and opportunity test.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 9

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**\*10** Recklessness in a securities fraud action against an accountant is defined as "highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (citations and quotation omitted). An allegation of recklessness against outside auditors "requires more than a misapplication of accounting principles," a plaintiff must allege that " the accounting practices amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* (quotations and citations omitted); *Rehm,* 954 F.Supp. at 1255.

Moreover, Deloitte correctly points out that, while a "company's overstatement of revenues in violation of GAAP can constitute a false or misleading statement of material fact necessary to establish securities fraud under Section 10(b) and Rule 10b-5 violation," *Clark v. TRO Learning, Inc.,* 1998 WL 292382, *2 (N.D.Ill.1998), a plaintiff cannot show scienter merely by stating that a defendant violated GAAP. *See, e.g., Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1020-21 (5th Cir.1996); *In re Software Toolworks,* 50 F.3d 615, 627-28 (9th Cir.1994), *cert. denied,* 516 U.S. 907, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995); *In re World of Wonders Securities Litigation,* 35 F.3d 1407, 1426 (9th Cir.1994), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995) *and cert. denied,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995); *Malone v. Microdyne Corp.,* 26 F.3d 471, 479 (4th Cir.1994); *Health Management,* 970 F.Supp. at 203; *Rehm,* 954 F.Supp. at 1256; *Duncan v. Pencer,* 1996 WL 19043 at * 10 (S.D.N.Y.1996). However, "[a]lthough it is true that a violation of GAAP will generally will not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *Marksman Partners,*

*L.P.,* 927 F.Supp. 1297, 1313 (C.D.Cal.1996).

"Other circumstances suggesting fraudulent intent" can include the presence of "red flags" or warning signs that the financial reports are fraudulent, as well as the magnitude of the fraud alleged. *Miller,* 9 F.Supp.2d at 928 ("[d]eliberately ignoring "red flags " such as those alleged here can constitute the sort of recklessness necessary to support § 10(b) liability "); *Rehm,* 954 F.Supp. at 1256 ("[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy"); *In re Health Management,* 970 F.Supp. at 203 (finding that allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent); *In re Leslie Fay Companies,* 835 F.Supp. at 175 ("in cases where small accounting errors only ripple through the corporate books, a court may conclude ... that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b 5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may determine that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading").

**\*11** With these principles in mind, the court finds that Plaintiffs have offered sufficient facts to survive a motion to dismiss on the issue of scienter. Although plaintiffs' allegations may be difficult to prove at trial, at this stage, plaintiffs have alleged specific facts which give rise to a strong inference that Deloitte deliberately ignored various warning signs, constituting the recklessness necessary to support § 10(b) liability. *See Miller,* 9 F.Supp.2d at 928.

Plaintiffs allege not only violations of GAAP and GAAS, but that Deloitte deliberately ignored several red flags in the financial statements which would have exposed the fraud.[FN5] Moreover, the complaint contains allegations that the final Form 10-K filed with the SEC overstated First Merchants' net worth by approximately $90 million dollars. The magnitude of the fraud combined with the allegation that First Merchants' new Chief Financial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Officer almost immediately discovered the discrepancies in the financial statements, suggests a deliberate ignorance on the part of Deloitte. Thus, the allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the "red flags" together support an inference that Deloitte's audit "amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful." Accordingly, Deloitte's motion to dismiss Count IV is denied.

> FN5. Deloitte argues that the fact that it fulfilled its duty to report weaknesses in the financial statement absolves it of liability. The question before the court, however, is whether the complaint sufficiently alleges that Deloitte made misrepresentations of material fact by stating that the financial statements were prepared in accordance with GAAP and whether those representations were made with scienter. The fact that Deloitte reported weaknesses in the financial statements yet certified those same financial statements less than two months later supports, rather than detracts from the allegations of recklessness. In the same vein, Deloitte contends that the complaint fails to state how it ignored the alleged red flags or that it did not consider those red flags in its audits. In other words, Deloitte argues that the complaint should be dismissed because Deloitte might have properly considered the warning signs in its audit of the financial statements. The specifics of Deloitte's audit are, however, precisely "the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint." *In re Leslie Fay,* 835 F.Supp. at 174.

### C. Section 11 Allegations

Both Deloitte and the Audit Committee members seek a dismissal of the Section 11 claims (Counts I and II). Section 11 imposes civil liability on persons preparing and signing materially misleading

registration statements. 15 U.S.C. § 77k(a)(1998). A registration statement is materially misleading if it contains an untrue statement of material fact or if it omits a material fact necessary to prevent the statement from being misleading. *Id.* Any person who purchases a registered security is entitled to sue under this section. *Id.* "Section 11 imposes 'a stringent standard of liability on the parties who play a direct role in a registered offering." ' *Nationsmart Corp. v. Thaman,* 130 F.3d 314-15 (8th Cir.1997) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)). "To establish a prima facie § 11 claim, a plaintiff need show only that he bought the security and that there was a material misstatement or omission. Scienter is not required for establishing liability under this section." *Id.* Indeed, "the liability of the issuer of a materially misleading registration statement is 'virtually absolute, even for innocent misstatements." ' *Id.* (quoting *Herman & MacLean,* 459 U.S. at 382, 103 S.Ct. at 687).

Deloitte and the Audit Committee defendants pose two challenges to Plaintiffs' § 11 claims. First, they contend that the allegations fail to plead a material misstatement with sufficient particularity. Plaintiffs counter that Rule 9(b) particularity is not required for § 11 claims, citing authority from other circuit and district courts. Defendants cite *Sears v. Likens,* 912 F.2d 889, 892-93 (7th Cir.1990), which applied Rule 9(b) to a §§ 11 and 15 claims in support of their argument. The court agrees with Plaintiffs, however, that the court in *Sears* was not asked to, nor did it. determine whether Rule 9(b) properly applied to § 11 claims, which do not require scienter for liability. In a persuasive opinion, the court in *Nationsmart* rejected the argument that Rule 9(b) pleading requirements applied to a § 11 claim. First, the court noted that the complaint, like the complaint in this case, expressly disavowed any claim of fraud in connection with the § 11 claims. Accordingly, decisions holding that claims " grounded in fraud" are subject to Rule 9(b) pleading requirements were inapplicable.[FN6] 130 F.3d at 315. The same rationale applies in this case-Counts I and II of the amended complaint expressly disavow the fraud claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 11

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN6. The court questions the soundness of these decisions in light of the "virtually absolute" liability imposed on issuers of materially misleading registration statements. Plaintiffs' point that the reasoning in these cases requires the dismissal of 1933 Act claims every time the 1934 Act claims fail to satisfy Rule 9(b) is well taken. It is illogical to require plaintiffs to plead more than they would have to prove to succeed on a § 11 claim standing alone.

**\*12** Second, the *Nationsmart* court reasoned that "a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure." *Id.* This court agrees that, because § 11 does not require proof of fraud for recovery, Rule 9(b)'s pleading requirements are inapplicable.

In any event, because the court has ruled that the fraud allegations do satisfy the requirements of Rule 9(b) and the PSLRA, defendants' arguments are moot.[FN7]

FN7. The Audit Committee defendants further argue that the complaint fails to allege that they made any specific misrepresentations. Liability under § 11, however, includes anyone who signed the registration statement, or anyone who was a director (or person performing similar functions) of the issuer at the time of filing. 15 U.S.C. § 77k (a)(1) & (2). The complaint expressly alleges that Schockey and Wyant signed the 1994 Registration Statement (¶¶ 32, 116), and that all of the Audit Committee members signed the 1996 Note Registration Statement. (¶¶ 75, 126.) Further, the complaint alleges that all of the Audit Committee defendants, including Weisgal, were directors of First Merchants throughout the class period. (¶ 19.)

Finally, both Deloitte and the Audit Committee defendants argue that Plaintiffs have failed to sufficiently plead standing under § 11. The court finds that Plaintiffs have sufficiently alleged that certain Plaintiffs and Class Members purchased securities in the 1994 stock offering and that certain Plaintiffs and Class Members purchased in the 1996 reset note offering. (*See* ¶¶ 32, 119, 75, 129.) These allegations meet the pleading requirements for a § 11 claim. *Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. at 687. Accordingly, Deloitte's and the Audit Committee defendants' motions to dismiss Counts I and II are denied.

D. Section 15 Allegations

Count III of the first amended complaint alleges that the Audit Committee defendants are liable under Section 15, 15 U.S.C. § 77o, as control persons of First Merchants with respect to both the 1994 common stock offering and the 1996 subordinated reset note offering. Section 15 provides, in relevant part:
Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under section[ ] 77k ... of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...

15 U.S.C. § 77o (1998).

The Audit Committee defendants argue that Count III should be dismissed because Plaintiffs have failed to allege liability under § 11 and because they are not "control persons" under the statute. Given the court's ruling that the complaint states a § 11 claim against the Audit Committee defendants, the first argument is without merit.

Control person liability is determined under a two-prong test. "First, the "control person" needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability-even if not exercised-to control the specific tansaction or activity that is alleged to give rise to liability." *Donohue v. Consolodated Operating & Production Corp.*, 30 F.3d 907, 911-12 (7th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 12

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Cir.1994). Plaintiffs have alleged that:

Each of these Defendants was a control person of the Company with respect to the Offerings referred to in Counts I and II above by virtue of, among other things, his or her stock ownership and/or position as a senior executive officer and/or director of the Company and had the power and influence, and exercised the same, to control the contents of the Company's Registrations Statements, Prospectuses... Each of these Defendants was provided with copies of the Company's filings, reports, press releases and other public statements alleged herein to be false and misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Moreover, each of these Defendants was a participant in the Section 11 violations alleged in Counts I and II above, based on their having signed the Registration Statements or having otherwise participated in the process which allowed the Offerings to be successfully completed.

*13 (¶ 135.) Thus, Plaintiffs have alleged both that the Audit Committee defendants exercised general control over the contents of the Company's public representations and had the ability to control the specific misrepresentations in the Registration Statements, prospectuses and financial statements. The court finds these allegations sufficient to meet the general pleading requirements under Rule 8(a)(2) of the Federal Rules of Civil Procedure. *See Nationsmart,* 130 F.3d at 315; *Goldsmith v. Technology Solutions Compnay,* 1993 WL 150035 (N.D.Ill.1993) (noting that liability of the defendants under Section 15 is wholly dependent on their alleged liability under Section 11).[FN8] Defendants' motion to dismiss Count III is denied.

FN8. The Audit Committee defendants cite *Bomarko, Inc. v. Hemodynamics,* 848 F.Supp. 1335 (W.D.Mich.1993), for the contention that outside directors who are also members of the audit committee are not necessarily controlling persons. The decision in *Bomarko,* was rendered pursuant to a motion for summary judgment, however, not a motion to dismiss. Indeed, the court relied on the

deposition testimony of the defendants in concluding that they were not controlling persons. 848 F.Supp. at 1340. On summary judgment, plaintiffs may very well be unable to provide sufficient evidence to support its allegation that the Audit Committee defendants were controlling persons. At this time, however, Plaintiffs' allegations suffice to withstand a motion to dismiss.

E. State Law Claims

Finally, Deloitte seeks dismissal of the various state law claims against it including common law fraud, violation of the Illinois Consumer Fraud Act and negligent misrepresentation (Counts VI-VIII). The court will address each of these claims in turn.

1. Common Law Fraud and Negligent Misrepresentation

Claims for common law fraud and negligent misrepresentation require a showing of actual reliance. *Board of Education v. A.C. & S. Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989) ; *City of Chicago v. Michigan Beach Housing Cooperative,* 297 Ill.App.3d 317, 323, 231 Ill.Dec. 508, 696 N.E.2d 804, 809 (1st Dist.1998) (the torts of negligent and fraudulent misrepresentation differ only in the mental state element-both require action taken in justifiable reliance on the truth of the statement); *Morse v. Abbott Laboratories,* 756 F.Supp. 1108, 1112 (N.D.Ill.1991).

Plaintiffs argue that they need not allege direct reliance in order to sustain their common law fraud claim, but should be able to assert fraud on the market. The court disagrees. "Plaintiffs' contention that they should be able to proceed on the common law fraud claim based on a 'fraud-on-the-market' theory, without proof of *individual* reliance, is ... without merit." *In re Soybean Futures Litigation,* 892 F.Supp. 1025, 1030 (N.D.Ill.1995). Plaintiff has not cited, nor has the court found, "any Illinois precedent indicating that Illinois common law recognizes a claim for fraud or negligent misrepresentation that does not plead actual direct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

reliance." *Gilford Partners v. Sensormatic Electronics Corp.,* 1997 WL 757495 at *12 (N.D.Ill.1997) (Manning, J.); *Morse,* 756 F.Supp. at 1112.[FN9]

> FN9. Plaintiffs cite *Hartmann v. Prudential Insurance Co., of America,* 9 F.3d 1207 (7th Cir.1993) to support their contention that actual reliance need not be pled. However, "Hartmann should be limited to its unusual facts and reasoning: plaintiffs, who would have been beneficiaries to their deceased father's life insurance policy were it not for the misrepresentations made to the father by his insurance agent, need not have relied on the misrepresentations; their father relied on the misrepresentations and they were consequently harmed. (Citation omitted) Moreover, the foregoing is merely dictum, because the court did not allow plaintiffs to recover under their fraud theory." *Caplan v. International Fidelity Insurance Co.,* 902 F.Supp. 170, 174 (N.D.Ill.1995).

Because Plaintiffs have failed to plead direct, individual reliance on the alleged misrepresentations, their fraud and negligent misrepresentation claims cannot stand. *See Ventre v. Datronic Rental Corp.,* 1996 WL 681279 (N.D.Ill.1996) (Coar, J.) ("[i]n cases such as this one where a class action has not been certified, each individual plaintiff must plead that he or she relied upon the misrepresentation"). Accordingly, Counts VI and VIII are dismissed.

### 2. The Illinois Consumer Fraud and Deceptive Business Practices Act

**\*14** Deloitte argues for the dismissal of the Consumer Fraud Act claims on two grounds. First, Deloitte argues that accountants should be exempt from the Consumer Fraud Act, and second, that Plaintiffs have failed to allege fraud with particularity. Deloitte's second argument is easily dispensed with in light the court's finding that the

fraud allegations in the complaint satisfy Rule 9(b)'s pleading requirements.

Nor does Deloitte's first argument find any support in the case law. The parties do not dispute that securities transactions are subject to the Consumer Fraud Act. *See Lyne v. Arthur Andersen & Co.,* 772 F.Supp. 1064, 1068 (N.D.Ill.1991). Deloitte argues, however, that like lawyers and doctors, accountants should not be subject to liability under the Act. Deloitte cites a number of cases exempting doctors and lawyers from the Act and reasons that all " regulated professions" including accounting, should be exempt.

The court finds no authority to support Deloitte's position. Indeed, the only direct authority cited rejects the argument that the Consumer Fraud Act does not apply to accountants who perform accounting services in connection with securities offerings. *Lyne,* 772 F.Supp. 1064, 1068 (N.D.Hl.1991). While noting, in dicta, the stringent policing of the legal and medical professions, the court found no "indication that Illinois courts would consider accountants to be immune from the provisions of the Consumer Fraud Act." *Id.* Likewise, Deloitte has not provided, and the court has not found, any additional evidence indicating a willingness on the part of Illinois courts to exempt accountants from the Act. The court therefore declines Deloitte's invitation to extend exemptions under the Illinois Consumer Fraud Act. Accordingly, Deloitte's motion to dismiss Count VII is denied.

### IV. Conclusion

For the foregoing reasons, Deloitte's motion to dismiss Counts VI and VIII is granted and its motion to dismiss Counts I, II, IV, and VII is denied, Shockey, Weisgal and Wyant's motion to dismiss Counts I-III is denied.

N.D.Ill.,1998.
In re First Merchants Acceptance Corp. Securities Litigation
Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 14

Not Reported in F.Supp.2d, 1998 WL 781118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT B**
**Part 1**

LEXSEE 2004 U.S. DIST. LEXIS 26488



Caution
As of: Jun 05, 2007

**IN RE: FLEMING COMPANIES INC. SECURITIES & DERIVATIVE LITIGATION, THIS DOCUMENT RELATES TO ALL CASES**

**CIVIL ACTION NO. 5-03-MD-1530 (TJW), MDL-1530**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS**

*2004 U.S. Dist. LEXIS 26488*

**June 10, 2004, Decided**

**SUBSEQUENT HISTORY:** Transferred by *In re Fleming Cos. Inc. Secs. & Derivative Litig.*, 2005 U.S. Dist. LEXIS 10674 (J.P.M.L., Apr. 20, 2005)

**PRIOR HISTORY:** *In re Fleming Cos. Secs. & Derivative Litig.*, 269 F. Supp. 2d 1374, 2003 U.S. Dist. LEXIS 11029 (J.P.M.L., 2003)

**DISPOSITION:** [*1] Defendants' Motions to Dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors sued defendants, chief executive, accounting, and financial officers (CEO, CAO, CFO), two executive vice-presidents, auditor, and investment bankers, alleging claims under §§ 10(b), 20(a) of the Securities Exchange Act of 1934 (SEA), *15 U.S.C.S. §§ 78j(b), 78t(a)*, and *§§ 11, 12* of the Securities Act of 1933, *15 U.S.C.S. §§ 77k, 77l*. Defendants moved to dismiss.

**OVERVIEW:** The investors alleged that the executives instituted a practice wherein the company's retail and wholesale divisions improperly deducted amounts payable from vendors' invoices, without any expectation that the vendors would approve the deductions, and the company's deduction reserves were woefully inadequate.

The investors also alleged that the same store sales growth figures were inflated. As to the SEA issues, the court concluded that the investors pled specific facts to support a strong inference of at least recklessness as against the CEO, CFO, CAO. As to the CFO, the investors cited not only documentary evidence and same store sales reports with particular facts as to their contents, who prepared them, and who received them, but also cited inside sources (who observed much of the alleged accounting manipulations and the involvement of defendants) to support the allegations as to the reports and their contents and defendants and their knowledge. As to the CAO, the complaint alleged that he received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was aware of the magnitude and invalidity of massive deductions taken by the company.

**OUTCOME:** The court denied the auditor's motion, granted on VP's motion, and granted the remaining defendants' motions in part and denied the motions in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,*

  

**Demurrers, & Objections > Failures to State Claims**
**Civil Procedure > Dismissals > Involuntary Dismissals**
**> Failures to State Claims**
[HN1] *Fed. R. Civ. P. 12(b)(6)* provides for dismissal of a complaint for failure to state a claim upon which relief can be granted.

**Civil Procedure > Pleading & Practice > Defenses,**
**Demurrers, & Objections > Failures to State Claims**
[HN2] A court may only dismiss a complaint under *Fed. R. Civ. P. 12(b)(6)* when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. The court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. A plaintiff need only allege, not prove, sufficient facts to survive a motion to dismiss. Conclusory allegations, however, or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under Rule 12(b)(6). The court may consider the totality of the allegations in the complaint in their entirety.

**Civil Procedure > Pleading & Practice > Pleadings >**
**Heightened Pleading Requirements > Fraud Claims**
**Civil Procedure > Class Actions > Voluntary Dismissals**
**Securities Law > Liability > Securities Exchange Act of**
**1934 Actions > Implied Private Rights of Action >**
**Heightened Pleading Requirements**
[HN3] Courts apply *Fed. R. Civ. P. 12(b)(6)* principles to motions to dismiss in securities class action cases, but it must be remembered that a securities cause of action deals primarily with very fact-specific inquiries. Notwithstanding that the cases are fact-specific, a district court evaluating a motion under Rule 12(b)(6) must consider the strict pleading requirements of *Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act in a securities fraud case.

**Civil Procedure > Pleading & Practice > Pleadings >**
**Heightened Pleading Requirements > Fraud Claims**
[HN4] *Fed. R. Civ. P. 9(b)* states that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity, but that malice, intent, knowledge, and other condition of mind of a person may be averred generally.

**Civil Procedure > Pleading & Practice > Pleadings >**

**Heightened Pleading Requirements > Fraud Claims**
**Securities Law > Liability > Private Securities**
**Litigation > General Overview**
[HN5] *Fed. R. Civ. P. 9(b)* applies to private securities fraud claims under the Private Securities Litigation Reform Act (PSLRA). The United States Court of Appeals for the Fifth Circuit has held that the particularity requirement of *Fed. R. Civ. P. 9(b)* sets the same standard required by the PSLRA.

**Civil Procedure > Pleading & Practice > Pleadings >**
**Heightened Pleading Requirements > General Overview**
[HN6] It is settled in the Fifth Circuit that *Fed. R. Civ. P. 9(b)* requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.

**Civil Procedure > Pleading & Practice > Pleadings >**
**Heightened Pleading Requirements > Fraud Claims**
**Securities Law > Liability > Private Securities**
**Litigation > General Overview**
[HN7] The express provisions of the Private Securities Litigation Reform Act augment the *Fed. R. Civ. P. 9(b)* requirements in several respects. The effect is to require plaintiffs to particularize the allegations of fraud so that individual defendants are given fair notice of the claims against them as well as their alleged roles in the fraudulent conduct.

**Securities Law > Liability > Private Securities**
**Litigation > General Overview**
[HN8] See *15 U.S.C.S. § 78u-4(b)(1)*-(2).

**Civil Procedure > Pleading & Practice > Pleadings >**
**Heightened Pleading Requirements > Fraud Claims**
**Securities Law > Liability > Private Securities**
**Litigation > General Overview**
**Securities Law > Liability > Securities Exchange Act of**
**1934 Actions > Implied Private Rights of Action >**
**Heightened Pleading Requirements**
[HN9] The requirements of the Private Securities Litigation Reform Act are onerous. The statute was not, however, enacted to raise the pleading burdens under *Fed. R. Civ. P. 9(b)* and *15 U.S.C.S. § 78u-4(b)(1)* to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or

  

2004 U.S. Dist. LEXIS 26488, *1

inflated settlement, must be routinely dismissed on *Fed. R. Civ. P. 9(b)* and *Fed. R. Civ. P. 12(b)(6)* motions. A securities fraud plaintiff need not allege all facts that may be related to his claims -- such a requirement is impossible at the pleading stage because usually only the defendants know all the facts related to the alleged fraud. Therefore, the particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession. Finally, the totality of the complaint determines whether a claim has been pled with particularity.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN10] Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful for any person to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. *15 U.S.C.S. § 78j(b).*

*Criminal Law & Procedure > Criminal Offenses > Fraud > Fraud Against the Government > False Statements > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN11] S.E.C. Rule 10b-5 states that it is unlawful for any person, directly or indirectly, to employ any device, scheme, or artifice to defraud; to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. *17 C.F.R. § 240.10b-5.*

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
[HN12] The intersection of *Fed. R. Civ. P. 9(b),* the Private Securities Litigation Reform Act (PSLRA) and the elements of a claim under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b),* and S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5,* yields a result which requires a plaintiff to allege, in connection with the purchase or sale of securities, the following: (1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent. In addition, if an allegation is made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief. This is the who, what, when, where, and how required under *Fed. R. Civ. P. 9(b)* and the PSLRA.

*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN13] Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b),* and S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5,* require that a defendant make a material misstatement or omission.

*Securities Law > Liability > Disclosures > Forward Looking Statements*
*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN14] With regard to misstatements, the Private Securities Litigation Reform Act establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with actual knowledge that the statement was false and misleading. A statement is forward looking if it is (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure,

  

2004 U.S. Dist. LEXIS 26488, *1

or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Securities and Exchange Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer. *15 U.S.C.S. § 78u-5(i)(1)(A).*

*Securities Law > Liability > Disclosures > Forward Looking Statements*
*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN15] The safe harbor of the Private Securities Litigation Reform Act protects individuals and corporations from liability for forward-looking statements that prove false if the statement is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement or where the forward-looking statement is immaterial. *15 U.S.C.S. § 78u-5(c)(1)(A)(I)* and (ii). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with actual knowledge that it was false or misleading. *15 U.S.C.S. § 78u-5(c)(1)(B).* The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

*Governments > Courts > Judicial Precedents*
*Securities Law > Liability > Disclosures > Bespeaks Caution Doctrine*
*Securities Law > Liability > Private Securities Litigation > Safe Harbor Provisions*
[HN16] There is a judicially created equivalent to the Private Securities Litigation Reform Act's safe harbor provision, the bespeaks caution doctrine, which operates similarly, protecting statements in the nature of projections that are accompanied by meaningful

cautionary statements and specific warnings of the risks involved, so as to bespeak caution to investors that actual results may differ, thereby shielding the statements from § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*, liability. The United States Court of Appeals for the Fifth Circuit has rejected the application of the bespeaks caution doctrine as a per se bar to liability. Under Fifth Circuit precedent, cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, materiality is not judged in the abstract, but in light of the surrounding circumstances. The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis is one that a reasonable investor would consider significant in making the decision to invest, such that it alters the total mix of information available about the proposed investment.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN17] In the securities fraud context, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. Vague, loose optimistic allegations that amount to little more than corporate cheerleading are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.

*Criminal Law & Procedure > Discovery & Inspection > Discovery by Defendant > Informants*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN18] In the securities fraud context, if allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity sufficient facts to support that belief. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named, provided they are described generally in the

 ™ **LexisNexis**™      ™ **LexisNexis**™      ™ **LexisNexis**™

complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. In that situation, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN19] Securities fraud claims are, of course, fraud claims. The requirement is that a company officer or agent acted with a culpable mental state. To that end, scienter is a mental state embracing intent to deceive, manipulate, or defraud. The Private Securities Litigation Reform Act did not alter the substantive scienter requirement for claims brought under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, and S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*. The court must consider cumulatively any evidence of scienter pleaded by the plaintiffs. Therefore, the court must consider whether all facts and circumstances taken together are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN20] Under the Private Securities Litigation Reform Act, it is not enough to particularize false statements or fraudulent omissions made by a corporate defendant plaintiffs must also particularize intent allegations raising a strong inference of scienter. For securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts that, assumed to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted with the required mental state.

*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action >*

*Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*
[HN21] In the securities fraud context, a plaintiff can demonstrate scienter with allegations of conscious misconduct or severe recklessness. Severe recklessness includes those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN22] Securities fraud complaints typically suffice to state a claim based on recklessness when the plaintiffs have specifically alleged the defendants' knowledge of facts or access to information contradicting their public statements or have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud. Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts relating to the corporation. In addition, courts have found sufficient allegations when the plaintiffs have alleged specific and detailed allegations about the defendants' violation of Generally Accepted Accounting Principles, as well as other alleged misstatements regarding the company's earnings and technical problems which when viewed in their entirety-supported the claim.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Evidence > Inferences & Presumptions > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*

  

[HN23] Due to the fact that there will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter will suffice to withstand dismissal of securities claims. The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it. Thus, the requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud (2) engaged in deliberately illegal behavior (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > Forms*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > GAAP & GAAS*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*

[HN24] A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the Securities and Exchange Commission that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, makes a statement and may be liable as a primary violator under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, for making a false statement. A misrepresentation alone is not enough, as the mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Duty to Disclose*

[HN25] S.E.C. Rule 10b-5, *17 C.F.R. § 240.10b-5*, does not impose on a corporation an affirmative duty to disclose all nonpublic material information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. The duty to disclose only arises if the person is in a position of trust. One instance where a duty to disclose is imposed by law on corporations, is when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that there is a duty to make it complete and accurate. The United States Court of Appeals for the Fifth Circuit has held that under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything. In addition, the defendants have a duty under Rule 10b-5 to correct statements if those statements become materially misleading in light of subsequent events.

*Securities Law > Liability > RICO Actions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*

[HN26] While allegations of motive and opportunity alone are insufficient to satisfy the pleading requirements of the Private Securities Litigation Reform Act, appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter. Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations of motive and opportunity in and of themselves fail. Thus, some motives, particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter.

*Securities Law > Liability > Private Securities Litigation > Group Pleading Doctrine*
*Securities Law > Liability > RICO Actions > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Group Published*

  

**Information**

[HN27] The United States Court of Appeals for the Fifth Circuit has held that the group pleading doctrine does not apply in cases under the Private Securities Litigation Reform Act.

***Business & Corporate Law > Corporations > General Overview***
***Securities Law > Liability > RICO Actions > General Overview***

[HN28] Under the Private Securities Litigation Reform Act, officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement.

***Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview***

[HN29] See *15 U.S.C.S. § 78t(a).*

***Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview***

[HN30] Since § 20(a) of the Securities Act of 1934, *15 U.S.C.S. § 78t(a),* is a secondary liability provision, it is necessary that a primary violation be established before liability under § 20(a) arises.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview***
***Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview***

[HN31] Controlling person liability under § 20(a) of the Securities Act of 1934, *15 U.S.C.S. § 78t(a),* is not subject to the heightened pleading requirements of *Fed. R. Civ. P. 9(b),* but is instead governed by *Fed. R. Civ. P.*

*8.* Rule 8 is a simplified notice pleading standard that applies to all civil actions, with limited exceptions, and requires merely a statement that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***
***Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices***

[HN32] In the context of securities fraud, an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients. A plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. However, the United States Court of Appeals for the Fifth Circuit has expressly declined to adopt as a standard the threshold requirement in every case that the plaintiffs must provide report titles, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information.

***Evidence > Documentary Evidence > General Overview***
***Securities Law > Liability > Private Securities Litigation > General Overview***

[HN33] A complaint can satisfy the Private Securities Litigation Reform Act by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs.

***Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices***

[HN34] Analysts and investors rely on facts in making investment decisions, not vague expressions of corporate optimism or competitive strengths. The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial.

***Securities Law > Additional Offerings & the Securities***





*Exchange Act of 1934 > Issuer Recordkeeping & Reporting > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Accountants & Auditors*
[HN35] With regard to sufficiently alleging scienter against auditors, courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an auditor performed a reckless or fraudulent audit: (1) red flags regarding accounting matters, (2) restated financial statements, (3) an auditor's failure to obtain sufficient support for account balances, and (4) an auditor's failure to follow-up on known accounting errors. The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct. Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circumstances surrounding the restatement. A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of Generally Accepted Accounting Principles violations requiring the restatement, and the simplicity of the accounting principles that were violated.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Issuer Recordkeeping & Reporting > GAAP & GAAS*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Accountants & Auditors*
[HN36] Mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in a § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, action against an accounting firm. The plaintiffs must link such allegations of violations of GAAP and/or Generally Accepted Auditing Standards with fraudulent intent by showing that the firm deliberately misrepresented material fact or acted with reckless disregard about accuracy of its audits or reports. When the defendant is an auditor, allegations that the audit was conducted negligently and allegations

that the defendant lacked adequate internal controls are also routinely found insufficient. On the other hand, courts appear willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN37] See *15 U.S.C.S. § 78u-4(b)(4)*.

*Securities Law > Liability > Private Securities Litigation > General Overview*
[HN38] In the context of the Private Securities Litigation Reform Act, the necessary element of causation includes both loss causation and transaction causation. Transaction causation, similar to but-for causation, is another way of describing reliance and is satisfied by allegations that the misrepresentations or omissions induced the plaintiff to make the investment. On the other hand, loss causation is satisfied by allegations that the plaintiff would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss.

*Civil Procedure > Dismissals > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN39] At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation, not whether they can prove it. The Private Securities Litigation Reform Act does not affect causation pleadings; thus the allegations must only meet the traditional fair notice standards. To adequately plead loss causation and survive a motion to dismiss, the plaintiffs need only allege facts which show that the defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and the plaintiffs suffered a loss.

  

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN40] In considering whether the plaintiff has stated a claim under § 20 of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78t(a)*, the court must determine whether the plaintiff has pled facts sufficient to establish that a defendant was in control of the primary violators. Control is defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. § 240.12(b)-2(f).

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN41] Under the control person doctrine, officers and directors may be found liable even if they did not make a representation themselves or play a significant role in the preparation of a misrepresentation. However, controlling person liability requires more than merely identifying a defendant's place in the hierarchy of the company or his job title and cannot hinge solely upon a defendant's position or title. A person should be presumed to be a controlling person if they occupy a status or position that ordinarily bestows authority to control the primary violator generally, or specifically with respect to the matter or affairs that produced the Securities Act violation. The United States Court of Appeals for the Fifth Circuit has provided the possible alternative or overlapping bases: day-to-day control of the corporation operations; knowledge of the underlying primary violation by the controlled person; or facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies.

*Antitrust & Trade Law > Sherman Act > Claims*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
[HN42] *Fed. R. Civ. P. 9(b)* and *15 U.S.C.S. § 78u-4(b)(2)* do not apply to control person claims. The plaintiffs are not required to plead facts supporting every element of a prima facie case, but must only provide the defendants fair notice of the plaintiffs' claims and the grounds upon which they rest.

*Securities Law > Liability > Secondary Liability > Controlling Persons > Elements of Proof*
[HN43] Controlling persons of a controlled entity are subject to liability as a controlling person even where the controlled entity is not joined as long as there are sufficient allegations of primary violations of the securities laws by the controlled person as an element of the action.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN44] Securities Act of 1933 claims do not require a plaintiff to plead or prove fraudulent conduct and the plaintiffs expressly disavow all allegations of fraud or scheme. Therefore, the heightened pleading standards of *Fed. R. Civ. P. 9(b)* do not apply. Notice pleading under *Fed. R. Civ. P. 8* is all that is required to properly state Securities Act of 1933 claims.

*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*
[HN45] Section 11 of the Securities Act of 1933 imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading and grants standing to sue to any person acquiring such security. *15 U.S.C.S. § 77k(a)*. Section 11 imposes a stringent standard of liability on the parties who play a direct role in a registered offering. A plaintiff who purchased a security issued pursuant to a registration statements need only show a material misstatement or omission to establish his prima facie case. The plaintiffs do not have to allege knowingly or intentionally false statements in registration statement because § 11 claims do not sound in fraud. Section 11 does not require a plaintiff to plead or prove scienter. Congressional policy underlying § 11 was to create liability regardless of fault. If there is a material misstatement or omission in the registration statement, the buyer may sue the issuer, underwriter, or signor of the registration statement.

  

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*

[HN46] The United States Court of Appeals for the Fifth Circuit interprets the operative language of § 11 of the Securities Act of 1933, *15 U.S.C.S. § 77k*, to allow suits to be brought by direct buyers on the day an offering closes, as well as subsequent purchasers who can trace their securities to the challenged registration statement. To establish standing, the plaintiffs must allege facts to show that all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement. Where there have been multiple offerings of the same type of securities, plaintiffs do not satisfy their tracing burden by showing they probably bought stock issued pursuant to the allegedly false registration statement.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Defenses > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*

[HN47] Under § 11 of the Securities Act of 1933, an expert has an affirmative defense if it shall sustain the burden of proof that after reasonable investigation it had reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statement therein not misleading. *15 U.S.C.S. § 77k(b)*.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*

[HN48] A defendant may be shielded from § 11 of the Securities Act of 1933 liability if the defendant reasonably, and without actual knowledge of any inaccuracies, relies on parts of a registration statement purporting to be made on the authority of an expert. *15 U.S.C.S. § 77k(b)(3)(C)*. Expertised portions of a registration statement and prospectus include those, such as financial statements, that have been examined, reported upon and audited by independent auditors. An underwriter may rely on expertised portions of a

registration statement or prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. The fact-specific determination of the reasonableness of a defendant's investigation or of his reliance on the opinion of an expert is not a question properly resolved on a motion to dismiss unless the affirmative defense clearly appears on the face of the complaint.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*

[HN49] Section 12(a)(2) of the Securities Act of 1933, *15 U.S.C.S. § 77l(a)(2)*, imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact. A seller is one who either passes title of the securities to the buyer or one who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. To count as solicitation, the seller must, at a minimum, directly communicate with the buyer. An issuer may be liable only if the plaintiff can allege and prove that an issuer's role was not the usual one, that it went farther and became the vendor's agent. Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show.

*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*

[HN50] Section 12(a) of the Securities Act of 1933, *15 U.S.C.S. § 77l(a)*, does not require a plaintiff to prove scienter and the pleadings need only satisfy the liberal pleading requirements of *Fed. R. Civ. P. 8*.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Definitions > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN51] The Securities Act of 1933 Act requires plaintiffs to bring claims under § 11, *15 U.S.C.S. § 77k*, or *§ 12(a)(2)*, *15 U.S.C.S. § 77l(a)(2)*, within one year after the discovery of the untrue statement or the omission, or

 

after such discovery should have been made by the exercise of reasonable diligence. *15 U.S.C.S. § 77m.* The Sarbanes-Oxley Act does not extend the limitations period for the Securities Act of 1933 claims to two years. The plain language of the Sarbanes-Oxley Act states that the extended limitations period applies to a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance as defined in § 3(a)(47) of the Securities Exchange Act of 1934. The courts have rejected the argument that the Sarbanes-Oxley limitations period applies to Securities Act of 1933 claims. Instead, the applicable limitations period to these claims is one year after the plaintiffs were put on inquiry notice of their claims as required by *15 U.S.C.S. § 77m.*

*Civil Procedure > Dismissals > General Overview*
*Securities Law > Initial Public Offerings & the Securities Act of 1933 > Statutes of Limitations*
[HN52] The inquiry notice may be determined as a matter of law. Where the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN53] The explicit language of *Fed. R. Civ. P. 15(c)(3)* states that an amendment adding a new defendant relates back only if, among other things, the new defendant knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. The rule does not protect plaintiffs who knew of the late-named party at all times but failed to include that party in the original filing.

*Civil Procedure > Justiciability > Standing > Personal Stake*
*Constitutional Law > The Judiciary > Case or Controversy > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Definitions*
[HN54] The point of Article III standing and the more specific statutory standing concept is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases "securities" as

that term is defined by the Securities Act of 1933 issued pursuant to a particular registration statement.

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN55] Purchasers of one type of security have standing to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement.

*Civil Procedure > Justiciability > Standing > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*
[HN56] In the Fifth Circuit, aftermarket purchasers who can trace their purchase to the challenged registration statement have standing to bring a § 11 of the Securities Act of 1933, *15 U.S.C.S. § 77k,* claim.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN57] Section 12(a)(2) of the Securities Act of 1933 provides that a person who offers or sells a security by means of a prospectus or oral communication that contains a materially false statement or that omits to state certain material facts shall be liable to any person purchasing such security from him. *15 U.S.C.S. § 77l(a).* A § 12(a)(2) seller is either (1) the person who actually passes title to the buyer, or (2) the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN58] In the context of § 12(a)(2) of the Securities Act of 1933, *15 U.S.C.S. § 77l(a),* the United States Court of Appeals for the Fifth Circuit has held that to count as solicitation, the seller must, at a minimum, directly communicate with the buyer. An issuer is liable under § 12(a)(2) only if the plaintiff can allege and prove that an

  

issuer's role was not the usual one; that it went farther and became a vendor's agent. This is because virtually all issuers promote their securities in some fashion, either by preparing prospectuses or conducting road shows.

*Civil Procedure > Justiciability > Standing > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN59] Section 12(a)(2) of the Securities Act of 1933, *15 U.S.C.S. § 77l(a)(2)*, liability is narrow. Standing exists under § 12(a)(2) when a plaintiff can plead and prove that a seller actually passed title to a buyer.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN60] Section 12(a)(2) of the Securities Act of 1933, *15 U.S.C.S. § 77l(a)(2)*, only permits a purchaser to recover against his direct seller.

**COUNSEL:** For In re: Fleming Companies, Inc., Securities & Derivative Litigation, Plaintiff: Samuel Franklin Baxter, Attorney at Law, Marshall, TX.

For Named Plaintiffs, Plaintiff: Steven W Pepich, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA.

For In re: Fleming Companies, Inc., Securities & Derivative Litigation Defendants, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX; Randall Mark Foret, Secore & Waller, Dallas, TX; Stephen Cass Weiland, Patton Boggs, Dallas, TX.

For Thomas. Dahlen, Defendant: David Alan Stephan, McManemin & Smith, Dallas, TX.

For Morgan Stanley & Co. Incorporated, Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Wachovia Securities, Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher &

Bartlett, New York, NY; Nicholas [*2] Even, Haynes and Boone, Dallas, TX.

For Deutsche Bank Securities Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Lehman Brothers Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Mark D Shapiro, Defendant: Terence J Hart, Munsch Hardt Kopf & Harr, Dallas, TX.

For Deloitte & Touche, Defendant: Keefe Michael Bernstein, Akin Gump etal, Dallas, TX.

For Alice M Peterson, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Carlos M Hernandez, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Robert S Hamada, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Carol B Hallett, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal [*3] LLP, Dallas, TX.

For Archie R Dykes, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Kenneth M Duberstein, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Herbert M Baum, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

  

For Stephen. Davis, Defendant: Jim L Flegle, Loewinsohn & Flegle, Dallas, TX.

For Terry Slater, Defendant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; T Brent Walker, Cauley Bowman Carney & Williams, Little Rock, Ar; J Allen Carney, Cauley Bowman Carney & Williams, Little Rock, Ar; Marcus Bozeman, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, Little Rock, Ar.

For Neal J Rider, Defendant: Stephen Cass Weiland, Patton Boggs, Dallas, TX.

For Anthony Colarich, Movant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, Little Rock, Ar.

For Raheela Zaman, Movant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, [*4] Little Rock, Ar.

**JUDGES:** T. JOHN WARD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** T. JOHN WARD

**OPINION:**

### MEMORANDUM OPINION AND ORDER

**I. INTRODUCTION**

This private securities class action case relates to Fleming Companies, Inc. ("Fleming"). Fleming, at one time the second largest food distributor in the United States, first foreshadowed problems on July 30, 2002. The problems continued, culminating in a formal SEC investigation into Fleming's accounting practices. A series of class actions followed, which were consolidated. In April 2003, the company declared bankruptcy and announced its need to make a massive restatement of its earnings for 2001 and 2002. The company has yet to make any restatements of its earnings. An MDL proceeding ensued, and the cases were all transferred to this court for pre-trial handling. The court has appointed a

lead plaintiff and set a briefing schedule. The plaintiffs filed their Third Amended Consolidated Class Action Complaint ("TAC"). The defendants have moved to dismiss the TAC on various grounds. The court held an oral hearing on the matter and, after considering the motions, responses, the [*5] arguments, and the applicable law, is of the opinion that the following order should issue.

**II. FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

The facts are stated in the light most favorable to the plaintiffs as alleged in the TAC. *Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996).* Fleming is a wholesale distributor of groceries. A wholesaler like Fleming purchases groceries from vendors and sells them to supermarkets and grocery stores. During the 1990s, Fleming struggled, due in part to its sharp business practices with its customers. Fleming's earnings steadily declined from 1995 through 1998, culminating in the termination of CEO Robert Smith in July, 1998.

In November 30, 1998, Fleming appointed Mark Hansen as CEO and Chairman of the Board. A week later, Fleming announced a "Strategic Plan to Improve Performance." One part of the plan was to improve the performance of Fleming's retail segment. Although Fleming had historically been a grocery wholesaler, the company identified a retail segment of price impact supermarkets as a potential growth opportunity. A price impact supermarket is a sort of "no frills" approach to selling groceries. Price impact [*6] supermarkets typically cost less to build and operate, lack amenities such as delis, and, ultimately, pass the savings along to customers in the form of lower prices. Hansen told shareholders at an annual meeting that Fleming would make a stronger and more focused push on retailing than ever before.

Throughout 1999, 2000, and 2001, Fleming made various statements concerning its strategic plan to analysts and investors. Fleming stated in a January 2000, press release that it attributed revenue growth to its emphasis on Food4Less price impact stores and expected future retail growth on a "same store" basis. To illustrate, Fleming expected that sales in retail stores 1, 2, and 3 would increase over the numbers realized by those stores in the preceding year. The court notes that same store sales comparison is important because it allows analysts

  

and investors to evaluate the actual internal growth of the company, unclouded by acquisitions or divestitures.

Throughout 2000, Fleming indicated that its focus would be on price impact stores, at the expense of conventional stores. Fleming began to divest its conventional stores and, by May, 2001, represented that it had sold all of its conventional [*7] stores. During that same time period, Fleming reported earnings growth, attributed in part to the success of its retail strategy. Also during this time period, Fleming and certain officers made public statements touting the success of its retail strategy. One Fleming press release stated, for instance, that Fleming's reported 36% net earning increase for the fourth quarter of 2001 "validated our strategic initiatives" relating to price impact supermarkets. (TAC, P 82). Fleming's 10K for 2000 also promoted this retail strategy.

Throughout the first half of 2001, analysts reacted favorably to Fleming's strategy. Bear, Steams & Co., Deutsche Banc Alex. Brown, and UBS Warburg all issued reports commenting favorably on Fleming's retail operations focus. (TAC, P 86-88). Additional analysts responded favorably throughout the balance of 2001 and into the first half of 2002. (TAC, PP 89-92).

All was not well inside Fleming, however. The plaintiffs allege that Fleming used accounting manipulations to inflate its earnings numbers for 2001 and 2002. The details of this scheme are discussed in more detail below; however, for present purposes, it is sufficient to note that the plaintiffs allege [*8] first that Fleming executives instituted a practice wherein Fleming's retail and wholesale divisions would arbitrarily and improperly deduct amounts payable from vendors' invoices, without cause and with no expectation that the vendors would approve the deduction. At the same time, although Fleming would reserve for a portion of those deductions, the reserves were often woefully inadequate to cover the amount of deductions. This practice had the effect of inflating the quarterly and yearly earnings reported by the company in press releases, SEC quarterly and annual reports, and Registration Statements filed in March and June 2002, for public offerings of securities.

The second significant area of numbers manipulations that the plaintiffs attack is the company's reporting of same store sales growth. The plaintiffs allege that certain Fleming executives instituted a practice whereby the reported same store sales figures were inflated. These inflated numbers led the investing public

to assume that Fleming's retail strategic plan was growing. The plaintiffs allege that the true same store sales figures, had they been revealed, would have shown that Fleming's retail segment was suffering [*9] and that its price impact format was not successful.

In July 2002, despite the company's statements concerning the success of its business strategy, Fleming began to foreshadow problems in its retail segment. On July 30, 2002, Fleming issued a press release which indicated it was evaluating strategic alternatives to its retail segment, and in particular, its price impact retail stores. The company stated that comparable store sales declined 4.7 percent. At the same time, according to the plaintiffs, Fleming overstated its wholesale earnings and masked the extent of retail losses to cushion any decline in stock value. Although Fleming reiterated its prior earnings forecasts, analysts began to doubt the validity of those numbers. J.P. Morgan analyst Stephen Chick, for instance, cut Fleming from "market perform" to "market underperform." An article in Supermarket News observed that Fleming's announcement concerning alternatives to its retail segment "appears to have caught most analysts by surprise." (TAC, P 272).

On September 4, 2002, the Dow Jones Newswire released an article on Fleming which disclosed customer dissatisfaction with certain of Fleming's price impact retail stores, [*10] inventory problems in those stores, and Fleming's practice of taking large vendor deductions to increase the company's cash flow. Although the article noted that the company was not alone in this practice, some of Fleming's unidentified customers said they had stopped shipping to Fleming because of the practice and one such customer, referring to Fleming, noted that "when it comes to deductions, they're off the scale compared to other customers." On September 5, 2002, the Wall Street Journal published the expose' released by the Newswire the day before.

Fleming responded to the September 5, 2002 article by holding a conference call that day with analysts. The company's CFO, Neal Rider, stated on the conference call that Fleming's vendor deductions were "appropriately reserved for" and Fleming's CEO stated that "we have absolutely no issues with how we treated deductions, we reserve against deductions, and we certainly don't assume 100% collection." (TAC, P 282). In the same conference call, the officers stated that Fleming's financial condition was solid and that the deductions were an ordinary part of





the business, and were an industry-accepted practice. Indeed, according to Rider, [*11] "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that's risen to the level that we are at an impasse today." (TAC, P 289). The plaintiffs contend that these statements were false.

The stock market reacted adversely to the September 4 and 5 articles. On September 3, 2002, Fleming stock was trading at $ 9.31 per share. By September 5, the stock closed at $ 6.92 per share, a decline of 26%. According to the plaintiffs, even though the stock price declined significantly, the statements by Fleming's executives cushioned the fall of the stock because those statements represented that the deductions that might reach "impasse" were minimal and that the deductions in any event were an industry standard practice and were properly accounted for. (TAC, PP 295-296).

On September 24, 2002, Fleming announced the divestiture of its price impact stores. Thereafter, on October 23, 2002, Fleming announced its third quarter earnings, confirmed its decision to divest its price impact stores, and suggested that its relationship with its largest customer, Kmart, might be in jeopardy because of Kmart's bankruptcy [*12] proceedings and reorganization.

On November 13, 2002, Fleming announced that the SEC had commenced an informal investigation into Fleming's accounting practices. In particular, the SEC's investigation focused on Fleming's vendor trade practices and the company's calculation of comparable store sales in its discontinued retail operations. Following Fleming's January 23, 2003, announcement of a $ 190 million loss in retail operations for 2002, and its announcement of the loss of the Kmart contract in February 2003, Fleming's CFO insisted that the notion that Fleming would seek bankruptcy protection was "ludicrous." On February 25, 2003, the SEC reclassified its investigation as a formal one.

In February and March, 2003, Fleming's credit ratings were downgraded. On March 3, 2003, Fleming announced the resignation of its CEO. Contrary to the previous representations of Fleming's CFO and unable to secure alternate sources of financing, Fleming announced on April 1, 2003, that it had filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

On April 17, 2003, Fleming announced that it would restate its 2001 annual and quarterly financial statements and 2002 [*13] quarterly financial statements previously filed with the Securities and Exchange Commission and that it would revise its previously announced 2002 fourth quarter and annual financial results. The Fleming press release stated in part that "the Company expects that the related restatements of the results for the full-year 2001 and the first three quarters of 2002 will reduce the pre-tax financial results from continuing operations for such periods by an aggregate amount of not more than $ 85 million." According to the press release, the restatements "mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts." (TAC, P 322). Finally, the press release stated that Fleming's "fourth quarter 2002 pre-tax loss from continuing operations will be increased by expenses totaling not more than $ 80 million as a result of a number of factors, including increased vendor payback rates, the Kmart contract cancellation and corrections identified as a result of the Audit and Compliance Committee's independent investigation." (TAC, P 322). Fleming subsequently announced it would restate its 2000 annual financial statements. To date, Fleming [*14] has not actually made its restatements.

These securities fraud cases raise the same issues involved in the SEC investigation and the announced restatements. The claims in this case may be divided into two categories: those brought under the 1934 Act and those brought under the 1933 Act. As will be seen, different standards apply to each.

In their 1934 Act claims, brought under *section 10* and *Rule 10b(5)* promulgated thereunder, the plaintiffs complain of the conduct of five individual defendants. These defendants are referred to in this opinion either by individual name or collectively as the 1934 Act Individual Defendants. The 1934 Act Individual Defendants include the following past or present company officers: Mark Hansen, Fleming's Chief Executive Officer ("CEO"), Neal J. Rider, Fleming's Chief Financial Officer ("CFO"), Mark D. Shapiro, Fleming's Chief Accounting Officer ("CAO"), Thomas Dahlen, a Fleming Executive Vice-President and head of Fleming's Retail Division, and E. Stephen Davis, a Fleming Executive Vice-President and head of Fleming's Wholesale Division. The plaintiffs have also asserted securities fraud claims under the 1934 Act against Deloitte and Touche ("D&T"), [*15] Fleming's outside

  

auditor. The basis for the plaintiffs' fraud claims against D&T is that D&T conducted its audits while ignoring several "red flags" that D&T should have investigated and, by failing to do so, acted with severe recklessness sufficient to warrant liability under *section 10*.

In their 1933 Act claims, brought under *sections 11 and 12(a)(2)* of that act, the plaintiffs complain of the conduct of several additional individuals, namely the outside directors and any other executive who signed the Company's Registration Statements filed with the SEC in March 2002 and June 2002. These individuals are referred to in this opinion as the 1933 Act Individual Defendants. The 1993 Act Individual Defendants include the following chief officers, directors and general counsel: Mark Hansen, Neal J. Rider, Mark D. Shapiro, Herbert M. Baum, Kenneth M. Duberstein, Archie R. Dukes, Carol B. Hallett, Robert S. Hamada, Alice M. Peterson, Edward C. Joulian, III, Guy A. Osborn and Carlos M. Hernandez. Also, the plaintiffs join as defendants to their 1933 Act claims the various underwriters involved in the June 2002 offering. These defendants are referred to herein as the Underwriter Defendants. [*16] D&T is also joined as a defendant to the 1933 Act claims. The court will sometimes refer to the defendants to the 1933 Act claims collectively as the 1933 Act Defendants. The court now turns to a discussion of the applicable legal standards, followed by a discussion of securities law, and, finally, to the analysis of the myriad issues raised by the motions to dismiss.

## III. STANDARDS FOR MOTIONS TO DISMISS IN SECURITIES LITIGATION

### A. Rule 12(b)(6)

The court begins with bedrock.[HN1] *Federal Rule of Civil Procedure 12(b)(6)* provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. [HN2] A court may only dismiss a complaint under *Rule 12(b)(6)* when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Jones v. M.L. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)*. The court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. [*17] *Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002); Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)*. A plaintiff

need only allege, not prove, sufficient facts to survive a motion to dismiss. *Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999)*. Conclusory allegations, however, or legal conclusions masquerading as factual conclusions will not suffice to prevent dismissal under *Rule 12(b)(6)*. *S. Christian Leadership Conference v. Supreme Court of State of La., 252 F.3d 781, 786 (5th Cir. 2001)*. The court may consider the totality of the allegations in the complaint in their entirety. *Haack v. Max Internet Communications, Inc., 2002 U.S. Dist. LEXIS 5652, 2002 WL 511514, at *5 (N.D. Tex. April 2, 2002)*.

[HN3] Courts apply *Rule 12(b)(6)* principles to motions to dismiss in securities class action cases, but it must be remembered that a securities cause of action deals primarily with very fact-specific inquiries. [*18] *2002 U.S. Dist. LEXIS 5652, [WL] at *3* (citing *Basic Incorporated v. Levinson, 485 U.S. 224, 240, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988))*. Notwithstanding that the cases are fact-specific, a district court evaluating a motion under *Rule 12(b)(6)* must consider the strict pleading requirements of *Rule 9(b)* and the Private Securities Litigation Reform Act ("PSLRA") in a securities fraud case.

### B. Rule 9(b)

[HN4] *Rule 9(b)* states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b)*. [HN5] *Rule 9(b)* applies to private securities fraud claims under the PSLRA. *Abrams, 292 F.3d at 430*. The Fifth Circuit has held that the particularity requirement of *Rule 9(b)* sets "the same standard" required by the PSLRA. *ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 349 (5th Cir. 2002)*. [HN6] It is settled in this circuit that *Rule 9(b)* requires the plaintiff "to specify the statements contended to be fraudulent, identify [*19] the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen, 267 F.3d 400, 412 (5th Cir. 2001)*.

### C. PSLRA

[HN7] The express provisions of the PSLRA augment the *Rule 9(b)* requirements in several respects. The effect is to require plaintiffs to particularize the allegations of fraud so that individual defendants are





given fair notice of the claims against them as well as their alleged roles in the fraudulent conduct. *ABC Arbitrage, 291 F.3d at 349 n.6.* The PSLRA provides in relevant part:

[HN8] In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts [*20] on which that belief is formed.

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)-(2).*

[HN9] The requirements of the statute are onerous. The statute was not, however, enacted to raise the pleading burdens under *Rule 9(b)* and *§ 78u-4(b)(1)* to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on *Rule 9(b)* and *12(b)(6)* motions. *ABC Arbitrage, 291 F.3d at 348.* A securities fraud plaintiff need not allege all facts that may be related to his claims-such a requirement is impossible at the pleading stage because usually only the defendants know all the facts related to the alleged fraud. *Id.* Therefore, the particularity rules should not be interpreted to require [*21] the pleading of facts which, because of the lack of

discovery, are in defendants' exclusive possession. *Id.* Finally, the totality of the complaint determines whether a claim has been pled with particularity. *Goldstein v. MCI Worldcom, 340 F.3d 238, 246-47 (5th Cir. 2003).*

### D. Section 10(b) and Rule 10b-5

In the TAC, plaintiffs seek class certification for a class on behalf of all persons who purchased or acquired the publicly traded equity and debt securities of Fleming between May 9, 2001, and February 25, 2003, inclusive, including those who purchased or acquired such Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement or the June 17, 2002 Registration Statement. The private rights of action involved with respect to the securities fraud claims alleged in the TAC flow from alleged violations of *sections 10(b)* and *20(a)* of the 34 Act and *Rule 10b-5* of the SEC, promulgated pursuant to the 1934 Act. The court now examines those provisions.

[HN10] *Section 10(b)* provides that it is unlawful for any person "to use or employ, in connection with the purchase or sale of any security . [*22] . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b).* [HN11] *Rule 10b-5* states that it is unlawful for any person, directly or indirectly, "to employ any device, scheme, or artifice to defraud; to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5.*

[HN12] The intersection of *Rule 9(b)*, the PSLRA and the elements of a claim under *section 10(b)* and *Rule 10b-5* yields a result which requires a plaintiff to allege, in connection with the purchase or sale of securities, the following:

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;





(3) state when and [*23] where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*ABC Arbitrage, 291 F.3d at 350; Nathenson, 267 F.3d at 406-07.* In addition, if an allegation is made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief. *ABC Arbitrage, 291 F.3d at 350.* This is the who, what, when, where, and how required under *Rule 9(b)* and the PSLRA. *Id.*

[HN13] *Section 10(b)* and *Rule 10b-5* require that the defendant make a material misstatement or omission. [HN14] With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge . . . that the statement was false and misleading." A statement is forward looking if it is [*24]

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included

pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer. . . .

*15 U.S.C. § 78u-5(i)(1)(A).* [HN15] The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important [*25] factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *15 U.S.C. § 78u-5(c)(1)(A)(i)* and *(ii)*. Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." *15 U.S.C. § 78u-5(c)(1)(B).* The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

[HN16] There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, which "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to bespeak caution' to investors that actual results may differ, thereby shielding the statements from *section 10(b)* and *Rule 10b-5* liability." [*26] *In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002)*(quoting *Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999))*. The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins, 20 F.3d 160, 162 (5th Cir. 1994).* Under Fifth Circuit precedent, "cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, . . . materiality is not judged in the abstract, but in light of the surrounding

 

circumstances." *Id. at 167-68* (citing *Krim v. BancTexas Group, 989 F.2d 1435, 1448-49 (5th Cir. 1993))*. "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.' " [*27] *Id. at 168* (citing *Krim, 989 F.2d at 1445*).

In a similar vein, [HN17] vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Enron, 235 F. Supp. 2d at 576.* "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are puffery,' projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001)* (citing *Krim, 989 F.2d at 1446*).

[HN18] If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity sufficient facts to support that belief. *ABC Arbitrage, 291 F.3d at 353.* The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or [*28] misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named, provided they are described generally in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *Id.* In that situation, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. *Id.* Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id.*

In *ABC Arbitrage*, the Fifth Circuit found instances where the allegations as to confidential sources had been both adequately and inadequately pleaded. The court found that "allegations concerning a conversation

between a high ranking [Company] official' who was a top executive of [the Company]'" and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the [*29] standard for pleadings based on information and belief in that "this executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *Id. at 357.*

On the other hand, with regard to allegations that the company had understated its losses, the court held insufficient certain allegations that the source of the information was consultations and interviews with "Swiss, Thai, and Indonesian business journalists, employees of Deutsche Telecom and other Alcatel customers throughout the world, trade union officials, and Telecom analysts" in the course of counsel's investigation. *Id. at 358.* These allegations, according to the court, had not been pleaded with sufficient particularity to withstand the requirements of the PSLRA.

[HN19] Securities fraud claims are, of course, *fraud* claims. The requirement is that a company officer [*30] or agent acted with a culpable mental state. To that end, "scienter" is a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).* The PSLRA did not alter the substantive scienter requirement for claims brought under *section 10(b)* and *Rule 10b-5. Nathenson, 267 F.3d at 408.* The court must consider cumulatively any evidence of scienter pleaded by the plaintiffs. *Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994).* Therefore, the court must consider whether all facts and circumstances "taken together" are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.

[HN20] Under the PSLRA, it is "not enough to particularize false statements or fraudulent omissions made by a corporate defendant . . . plaintiffs must also particularize intent allegations raising a strong inference of scienter." *Goldstein, 340 F.3d at 238.* "For securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts

  

that, assumed [*31] to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted" with the required mental state. *In re Electronic Data Systems Corp. Sec. & ERISA Litig., 298 F. Supp. 2d 544 at 556, 2004 WL 52088, at *8 (E.D. Tex. 2004)*(quoting *Coates v. Heartland Wireless Communications, Inc., 100 F. Supp. 2d 417, 422 (N.D. Tex. 2000))*.

[HN21] A plaintiff can demonstrate scienter with allegations of conscious misconduct or severe recklessness. *Abrams, 292 F.3d at 439*. Severe recklessness includes "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams, 292 F.3d at 430*; *Tuchman, 14 F.3d at 1067*. Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. [*32] *In re Triton Energy Ltd. Secs. Litig., 2001 U.S. Dist. LEXIS 5920, 2001WL 872019, at *10 (E.D. Tex. Mar. 30, 2001)*; *see also Abrams, 292 F.3d at 436* (stating an allegation of actual knowledge is not required to withstand a motion to dismiss).

[HN22] Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" or have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *Abrams, 292 F.3d at 432-33*; *ABC Arbitrage, 291 F.3d at 351-54*; *Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)*. Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts relating to the corporation. *Kalnit v. Eichler, 264 F.3d 131, 138 (2nd Cir. 2001)*. In addition, courts have found sufficient allegations when plaintiffs have alleged "specific and detailed allegations about defendants' [*33] violation of GAAP, as well as other alleged misstatements regarding the company's earnings and technical problems [which] when viewed in their entirety-supported the claim." *Haack, 2002 U.S. Dist. LEXIS 5652, 2002 WL 511514, at *7*.

[HN23] Due to the fact that there will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter will suffice to withstand dismissal of the securities claims. *Goldstein, 340 F.3d at 246*; *Nathenson, 267 F.3d at 424-25*; *Novak, 216 F.3d at 307*. The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11*. But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. *Abrams, 292 F.3d at 432*. At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it. [*34] *Tuchman, 14 F.3d at 1067*. Thus, the requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud (2) engaged in deliberately illegal behavior (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Novak, 216 F.3d at 311*.

[HN24] A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, "makes" a statement and may be liable as a primary violator under *section 10(b)* for making a false statement. *In re Enron Corp. Securities, Derivative & ERISA Litig., 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003)*. A misrepresentation alone is not enough, as the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. [*35] *Abrams, 292 F.3d at 433*. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. *Id.* When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11*.

[HN25] *Rule 10b-5* does not impose on a corporation an affirmative duty to disclose all nonpublic material

  

**EXHIBIT B**
**Part 2**

information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. *SEC v. Fox, 855 F.2d 247, 252 (5th Cir. 1988)*. The duty to disclose only arises if the person is in a position of trust. *Id.* One instance where a duty to disclose is imposed by law on corporations, is when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that there is a duty to make it complete and accurate. [*36] *Rubinstein, 20 F.3d at 170*. The Fifth Circuit has held that "under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'" *Id.* In addition, the defendants "have a duty under Rule 10b-5 to correct statements if those statements become materially misleading in light of subsequent events." *Id. at 170 n.41*.

[HN26] While allegations of motive and opportunity alone are insufficient to satisfy the pleading requirements of the PSLRA, appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter. *Nathenson, 267 F.3d at 412*. Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations of motive and opportunity in and of themselves fail. *Abrams, 292 F.3d at 434* (dismissing motive and opportunity allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices); *see also* [*37] *Tuchman, 14 F.3d at 1068-69*. Thus, some "motives," particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter.

Much of the parties' briefing is devoted to the issue of the group pleading or group publication doctrine. After the plaintiffs filed the TAC and after oral argument was held on the motions to dismiss, the Fifth Circuit held in *Southland Securities Corporation v. Inspire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004)*, that [HN27] the group pleading doctrine did not apply in cases under the PSLRA. The effect of that case is to clarify the pleadings requirements in securities fraud cases which, as this one does, rely on press releases and SEC documents that are not attributable to any one person, but instead are published by the company itself. n1 The court will thus examine the ramifications of the Fifth Circuit's recent holding by providing an overview of the group publishing doctrine, followed by a discussion

of *Southland*. The court will then apply *Southland* and the additional requirements discussed above to the allegations of the TAC.

---

n1 The Ninth and Tenth Circuits have continued to apply the group pleading doctrine following the passage of the PSLRA. *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065-66 (9th Cir. 2000); Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997)*. The First Circuit has yet to decide the issue. *In re Cabletron Systems, Inc., 311 F.3d 11, 40 (1st Cir. 2002)*.

[*38]

The group pleading or "group publishing" doctrine was a creation of the courts. The doctrine permitted "plaintiffs to rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company.'" *Southland, 365 F.3d at 363* (quoting *In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999)*(quoting in turn *In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998)))*. "Instead of being required to plead that a particular defendant actually made, authored, or approved an offending statement in a corporate communication, the group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland, 365 F.3d at 363*. Under the doctrine as it existed before the PSLRA, a plaintiff in a securities fraud case did not need to allege any facts demonstrating an individual defendant's participation in [*39] the particular communication containing the misstatements or omission where the defendants were "insiders or affiliates" of the company. *Id.*

The TAC in this case relies heavily on press releases and filings with the SEC. The vast majority of the plaintiffs' complaint is devoted to establishing (1) that *Fleming* understated its earnings in 2001 and 2002 (2) that *Fleming* disclosed those statements of its earnings in the company's press releases, 10Q Forms, 10K Forms, and Registration Statements. Under *Southland*, these are the types of documents one ordinarily would expect to

  

see associated with group pleading because the information contained in the forms is generally the result of a collaborative effort on the part of the officers and agents of the company.

The plaintiffs have represented repeatedly that they do not rely on the group pleadings doctrine. This is a smart move because *Southland* has now explicitly held that they may not. But saying one is not relying on the group pleading doctrine only advances the issue part of the way. This case is about the overstatement of a company's earnings, and the representations concerning those overstatements are found largely [*40] in corporate documents that are the product of collaborative preparation efforts. *Southland* is clear that [HN28] under the PSLRA:

> corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement.

*Southland, 365 F.3d at 365.*

Under this language, to the extent the plaintiffs are relying on representations of Fleming's earnings in press releases or SEC filings, it is not enough to plead that *Fleming* said or did something because the plaintiffs here do not sue Fleming. [*41] They sue individual defendants. As a result, the court must examine the TAC and determine whether the plaintiffs have alleged (1) that any or all of the 1934 Act Individual Defendants signed a corporate document containing a misrepresentation or (2)

particular factual allegations explaining an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement. *Id.*

### E. Section 20(a) controlling person liability

The previous discussion addressed liability for primary violations of the 1934 Act. *Section 20(a)* provides a basis for additional liability and states that [HN29] "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)* [*42] . [HN30] Since *section 20(a)* is a secondary liability provision, it is necessary that a primary violation be established before liability under *section 20(a)* arises. *ABC Arbitrage, 291 F.3d at 348 n.57.* [HN31] Controlling person liability under *section 20(a)* is not subject to the heightened pleading requirements of *Rule 9(b)*, but is instead governed by *Rule 8. In re Enron Corp. Sec., Derivative & ERISA Litig., 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *12-13 (S.D. Tex. 2003). Rule 8* is a "simplified notice pleading standard" that "applies to all civil actions, with limited exceptions," and requires merely a statement that "gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002).*

### IV. DISCUSSION

#### A. Analysis of the 1934 Act Issues

The court now addresses the various arguments made by the 1934 Act Defendants in the light of the standards set forth above. The 1934 Act Defendants filed a joint motion to dismiss, and each filed his own separate motion to dismiss to address issues peculiar to that [*43] defendant. The court will first detail the alleged fraud itself; then the court will address the 1934 Act Defendants' arguments as presented in their joint brief and will address the individual arguments, to the extent necessary, after considering those positions common to the group.





In the TAC, Lead Plaintiff Jackson Capital Management alleges a scheme by the 1934 Act Individual Defendants to inflate the price of Fleming securities and defraud the investing public. The TAC alleges that Fleming's external auditors, D&T, had knowledge of the fraud and/or was severely reckless with regard to the fraud and made materially false and misleading statements to the public. The TAC alleges that these 1934 Act Individual Defendants personally perpetrated the fraud.

Many of the plaintiffs' allegations come from information provided by four inside sources ("Sources") who allegedly observed much of the alleged accounting manipulations and the involvement of each of the 1934 Act Individual Defendants and D&T. According to the TAC, Sources 1 and 4 were financial analyst managers in Fleming's retail segment. Sources 2 and 3 were chief accountants for two of Fleming's principal wholesale divisions. [*44] Source 1 was employed at Fleming from the fall of 2001 to the summer of 2002. Source 4 was employed at Fleming from the summer of 2001 to early 2002. Source 2 was employed at Fleming from the 1980s to 2002 and served as a chief accountant for a wholesale division in 2001 and 2002. Source 3 was employed at Fleming as a chief accountant for a wholesale division from 2001 through 2002.

Because the TAC relies heavily on the Sources, it is important to understand the information alleged to be possessed by them. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen, Rider, Shapiro, Dahlen, and Davis. (TAC, P 95). The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." (TAC, P 96).

The TAC alleges that starting in July [*45] of 2001 through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to Defendants Hansen and Rider, and electronic copies were provided to Defendant Dahlen." (TAC, P 122). The TAC alleges that from early 2001 through the class period, Sources 2 and 3 had access to company-wide financial information and frequently communicated with one another about accounting issues that affected the various divisions. (TAC, P 144).

The court now turns to the specific allegations of fraud. It is helpful to recall, as the court noted in the factual background section of this opinion, that Fleming's press releases, and SEC filings made various statements concerning the company's earnings and the success of Fleming's retail operations strategies. As is true in any fraud claim, the plaintiffs' complaint is that the defendants made certain statements with knowledge of information to the contrary. Bearing this in mind, the court now examines the allegations contained in the TAC.

The TAC alleges that Source 1 prepared earnings analyses prior to the closing [*46] of the books for the various reporting periods and that the CFO for the retail segment "directed that a new revenue or margin number, which they supplied, be substituted for the original number in the analysis, while providing no basis or back-up documentation for the change." (TAC, P 98). Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] n2 received." (TAC, P 98).

> n2 The position of retail CFO during the class period was filled initially by John Simrell and later Tim Otte. Since the two men are not being sued individually the use of their individual names is unnecessary.

The TAC further alleges that Source 1 was required by the retail CFO to reduce accounts payable by a specified amount in order to account' for deductions' that Fleming planned to claim from as-yet-unidentified vendors, for as-yet-unidentified products." (TAC, P 99). The TAC alleges that the standard industry practice was to propose deductions to [*47] vendors for return of merchandise, adjustments for incorrect quantities invoiced, adjustments for incorrect pricing, and adjustments pursuant to written contractual arrangements, i.e., co-operative advertising agreements and volume discount agreements. (TAC, P 99). The TAC alleges that

 LexisNexis™     LexisNexis™     LexisNexis™

according to Source 1, "Fleming did not follow standard industry practice" in that they "did not propose deductions." Fleming unilaterally took them without authorization from the vendors and that "there was no basis for concluding that the vendors would accept the improper and baseless deductions." (TAC, P 100). The TAC alleges that the deductions "had already been accrued by Fleming's accounting department by the time Source 1 was told to change [the earnings analyses], even though the vendor, the product, and the basis for the deduction had not yet been identified." (TAC, P 101).

The plaintiffs also allege that accrual of these unauthorized, improper, and unsustainable deductions was directed by Dahlen and the retail CFO; and that the retail CFO often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, [*48] would be likely to accept deductions. (TAC, P 101). According to the TAC, Source 1 stated that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." (TAC, P 102). Each financial analyst manager had a deduction worksheet, which was reviewed by higher-level executives. The TAC alleges that "by June 2002, Source 1 was emailing Source 1's deduction worksheets to Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "even after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction." (TAC, P 103). The TAC alleges that "Hansen and Dahlen directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $ 3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." (TAC, P 104). Further, the TAC alleges that "Fleming didn't correct its financial statements to reflect any such repayments [of the deductions], nor did the Company stop taking the improper deductions. [*49] " (TAC, P 105).

The TAC alleges that the 1934 Act Individual Defendants and specifically Hansen attended Monday meetings where the handling of deductions and margins would be discussed. (TAC, P 106). The executives allegedly reviewed documents showing that sales in Fleming's retail segment were flat or declining, and that there was a difference between publicly reported margins and internally calculated margins. (TAC, P 106). Further Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by Dahlen. (TAC, P 107). According to Sources 1 and 4 Hansen, Rider, Shapiro, and Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. (TAC, P 108).

With regard to D&T, the TAC alleges that Source 1 provided back-up for these accrued deductions at D&T's request, but that D&T "never asked Source 1 any questions about the deductions that they were supposedly examining." (TAC, P 109). The TAC alleges that the retail CFO hired D&T [*50] to validate deductions claimed by Fleming retail and that Source 1 provided information to D&T about the deductions. (TAC, P 110). The TAC alleges that both Fleming wholesale and retail took deductions from vendors on the same product resulting in a double accrual of deductions on the books for a single product. (TAC, P 112). In addition, the TAC alleges that when Fleming's wholesale group secured a contract with Kmart at thin margins, "the retail segment booked more and more deductions in order to prop up company-wide margins" and "even accrued large disputed deductions on its purchases from Fleming's wholesale segment." (TAC, P 114). The TAC alleges that there was a strong "push for unauthorized, improper, and unsustainable deductions in Fleming's retail segment reflecting serious company-wide problems."

The TAC alleges that any reserves kept in the event that the deductions were reversed were inadequate and were eventually done away with in order to increase earnings. (TAC, PP 283-285). Specifically, according to Source 3 Fleming's policy was to reserve against only 50% of claimed deductions, but that the wholesale management frequently reversed the reserves to increase earnings. [*51] (TAC, P 283). Further, according to Source 3, the accounting managers were told by the wholesale managers at the direction of Fleming's corporate management to stop taking reserves in the second quarter of 2002. (TAC, PP 284-285).

The plaintiffs also contend that the 1934 Act Individual Defendants misrepresented the company's same store sales data. According to Sources 1 and 4, the



TAC alleges that "Fleming manipulated its same store' sales data to show increases in same-store sales." (TAC, P 115). Specifically, "Fleming's financial analyst managers tracked the real same store sales data" that consistently showed "large declines in same-store sales." (TAC, P 117). However, the TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide the adverse sales trend" by rejecting the data from the financial analysts and "changing the composition of the population of stores which constituted the Company's same stores.'" (TAC, P 118).

Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year same store' revenues, [*52] in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a same store' comparison as is commonly understood in the retail industry." (TAC, P 118). The TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." (TAC, P 128). The TAC alleges that "according to Source 1, in November 2001, Fleming's retail financial analyst managers expressed concern to [the retail CFO] that Fleming's retail segment was over-reporting the strength of its sales, especially its comparable store' sales," but that the retail CFO told them "not to raise concerns, or they would lose their jobs." (TAC, P 119).

Further, the TAC alleges that "according to Sources 1 and 4, beginning in 2001 and continuing into 2002, Fleming [*53] also inflated its same store and/or comparable store sales figures by including certain sales, referred to as red tag' sales." n3 (TAC, P 120). The TAC alleges that "even though red tag sales were not made through any Fleming retail store, Fleming would falsely attribute ! the revenue from these sales to the retail stores included in its same store and/or comparable store analyses, thereby inflating the total amount of same store and/or comparable store sales." (TAC, P 120). The TAC alleges that when Source 4 was first given "red tag" sales numbers by the retail CFO and asked what they were, the

retail CFO answered: "You don't want to know." (TAC, P 125).

> n3 "Red tag" sales are one-time transactions in which Fleming purchased and immediately sold large lots of a commodity which had been located for Fleming by a broker.

In addition, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming-at the direction of Dahlen and the retail CFO-reduced the previously reported [*54] same store sales for the year 2000 fiscal year by subtracting $ 1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $ 4.7 million in red tag sales. (TAC, P 120). The plaintiffs allege that same store sales information was also misstated by a process called diverting. n4 (TAC, P 123). According to Source 4, Fleming included this revenue in "same store" sales figures despite its not being attributable to any of the retail stores. (TAC, P 123). The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. The TAC alleges that the "total same store and/or comparable store figure for 2001 was falsely inflated, and the growth for the same store or comparable store figure was also falsely inflated [whereby] the market was misled about growth in same store sales." (TAC, P 120).

> n4 "Diverting" is a practice where the retail operations purchase product and resell it at a higher price to another company but where the retail operations do not take possession of the product or sell it through a particular store.

[*55]

The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "hard copies of these reports were given directly to defendants Hansen and Rider, and electronic copies were provided to defendant Dahlen." (TAC, P 122). The TAC alleges that Hansen received special sales reports giving even more current information than Sources 1 and 4

  

received showing the declining sales trends. (TAC, P 131). In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report-including defendants Hansen, Rider, and Dahlen-that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." (TAC, P 124). Source 4's reports in 2002 also listed same store sales separately in each of Fleming retail's seven regions showing that overall same store sales were declining in almost all of the company's regions, [*56] some at up to 20% over the course of a year. (TAC, P 127). In addition, Hansen and Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. (TAC, PP 459, 462). Also, Hansen, Shapiro, Rider, and Davis received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. (TAC, P 459).

The TAC alleges that the actual sales trends clearly showed that the price-impact format was not working according to Source 4. (TAC, P 132). Specifically, between July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. (TAC, P 133). Using data that had been available to Hansen, Rider, and Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. (TAC, P 133). The TAC alleges that it was apparent [*57] in 2001 and 2002 from reports provided to defendant Hansen that newly-purchased stores were performing poorly and routinely were not meeting the revenue and earnings projections prepared by Source 4 with information provided to him that were used to justify the purchases. (TAC, P 134). The TAC alleges that "with the knowledge and direction of the 1934 Act Individual Defendants, Fleming continued to purchase retail stores based on unrealistic projections in order to create the fiction of a new source of revenue to hide the decline in the Company's sales." (TAC, PP 134, 135).

The plaintiffs allege that defendants Hansen and Dahlen received daily retail store performance reports

from the financial analyst managers showing that sales and earnings were declining, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, P 455). In addition, Hansen, Rider, Shapiro, Dahlen, and Davis received weekly, monthly and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, P 456). Also, the TAC [*58] specifically alleges that Hansen, Rider, Shapiro, Dahlen, and Davis attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. (TAC, P 457). According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. (TAC, P 460)

In addition to the vendor deductions and the same store sales issues, the TAC alleges that according to Sources 1 and 4 "Fleming often reported normal[, recurring] operating expenses as strategic plan charges' or other one time charges even when the expenses were not related to Fleming's strategic plan" despite the "financial analyst managers stating in meetings with management that the charges in question were recurring" thereby "increasing its reported margins and falsely suggesting to analysts and investors that the expenses would not recur in future reporting periods." (TAC, P 136).

The above discussion has related [*59] generally to the company's retail operations. The TAC also alleges that Fleming "engaged in a series of manipulations during the Class Period [in its wholesale segment] involving improper inflation of revenues and earnings; the accrual of unauthorized, improper, and unsustainable vendor deductions; a scheme to obtain unearned promotional funds through the use of nonexistent stores; the improper failure to recognize inventory losses; and the improper classification of prior-year expenses." (TAC, P 137).

According to Source 4, Fleming "inflated its earnings by booking losses to discontinued operations' when the losses were in fact attributable to continuing operations" thereby "overstating the earnings of its continuing operations and burying the losses in the presumably less

  

important discontinued operations' category." (TAC, PP 138, 139). Specifically, following a September 24, 2002 press release announcing the divestment of its price-impact Food4Less and Rainbow Foods Stores these stores were "treated as discontinuing operations, while the limited-assortment Yes!Less stores were [still treated as] continuing operations." (TAC, PP 138, 139). According to Source 4, "Yes!Less would [*60] sell its excess inventory to the price-impact stores at full price" and the "price-impact stores would then resell the excess inventory to . . . another retailer[] at a fifty percent markdown." (TAC, P 139). "In this way, the discontinued' price-impact stores assumed the excess-inventory losses of the continuing' Yes!Less stores" thereby overstating the earnings for continuing operations. (TAC, P 139).

According to the plaintiffs, beginning at least as early as 2000 and continuing through the Class Period, Fleming manipulated its wholesale earnings through a scheme whereby the company's internal controls were weakened and the company's upper management, including defendants Hansen and Davis, put pressure on the divisional staff to meet budgeted targets by any means necessary. (TAC, P 140). In early 2001, the company centralized its accounting operations and terminated divisional accounting managers and clerks. Essentially, the plaintiffs contend that management put pressure on its staff to meet targets even though those goals were unrealistic. (TAC, P 146, 148).

According to Source 3, the accountants routinely discussed among themselves the Company's financial condition in both [*61] the wholesale and retail divisions based on their access to actual results showing large losses and "that Fleming's publicly disseminated rosy consolidated financial statements were completely contrary to reality." (TAC, P 151). These accountants even asked their directors where the publicly claimed profits were coming from, but received no valid or plausible response. (TAC, P 151). The TAC alleges that after December 2001 these accountants "routinely discussed the fact that Fleming was a sinking ship that eventually would have to declare bankruptcy." (TAC, P 151).

The TAC alleges that "one of Fleming wholesale's most pervasive methods of inflating its earnings was to take unauthorized, improper, and unsustainable deductions from accounts payable to vendors." (TAC, P 156). "According to Sources 2 and 3, Fleming's division officers directed accounting managers to recognize unauthorized, improper, and unsustainable deductions from vendors' invoices in order to enable the divisions to meet their targets" that eventually "increased in a snowball effect from period to period." (TAC, P 157). The TAC further alleges that "upon determining the amount of the division's shortfall to the forecast, [*62] the division staff would fax to the [accounting] managers sufficient unauthorized, improper, and unsustainable deductions, backdated to the financial period closing date, to make up the shortfall." (TAC, P 158).

According to Sources 2 and 3, Fleming maintained a "Vendor Compliance Manual" that was "an open checkbook' that authorized division accountants to impose deductions for any reason that" was used by the divisions, "especially those that struggled to meet their targets." (TAC, P 159). In one situation Fleming allegedly took an $ 800 deduction from a vendor because the truck was late making its delivery. The "deduction documents" sent to vendors "did not identify any specific vendor invoices that were the subject of the deduction" and one vendor said " it would take four months to figure out why Fleming took the deduction, and another four months to get it back.'" (TAC, PP 160, 161). The TAC alleges that once the "deduction documents" were prepared, the deduction would be accrued even though in most cases Fleming ended up reinstating all or almost all of the amount deducted from a vendor's invoice. (TAC, PP 161, 163).

According to Source 3, at one point in July 2002, the disputed [*63] deductions totaled about $ 100 million at the corporate level in addition to $ 20 million at the divisional level in the wholesale segment. (TAC, P 167). The TAC alleges that even though the deductions inevitably would have to be remitted to vendors and the accrual reversed, the deductions nevertheless were accrued because they created the illusion of present earnings. (TAC, P 167). "According to Sources 2 and 3, in order to compensate for the adverse earnings consequences caused by writing checks to vendors to cover amounts improperly deducted, Fleming would initiate another round of unauthorized, improper, and unsustainable deductions" leading to "a vicious cycle which continually served to falsely inflate current earnings . . . eventually resulting in a huge charge to earnings." (TAC, P 166).

  

The TAC includes excerpts from a September 5, 2002 *Wall Street Journal* article in its allegations detailing complaints from various vendors about the large deductions taken by Fleming being unjustified. (TAC, PP 171-174, 177-179). These articles include claims by former Fleming executives and employees that the disputed deductions amounted to $ 100 million during the middle of 2001, that [*64] the Fleming managers took the deductions at the direction of upper management, that Fleming took deductions for items it never actually put into distribution due to the cancellation of orders, and that executives resigned after disagreeing with Fleming about its practices. (TAC, PP 173, 177, 178).

The plaintiffs allege a variety of other accounting improprieties. According to Source 3, Fleming inflated earnings by booking sales and earnings to a fictitious store in order to earn promotional discounts from vendors and then failing to reverse the fictitious earnings. (TAC, PP 180-192). Also, Fleming, at the direction of defendant Shapiro, did not recognize a $ 1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. (TAC, PP 193-199). Fleming recognized an inventory surplus of $ 6.2 million and booked it to income even though it was due to inventory that actually belonged to one of Fleming's customers and should have been offset by a liability. (TAC, P 200).

Hansen, Shapiro, Rider, and Davis received regular reports showing the revenue, cost, and margin numbers for the wholesale segment [*65] and were well aware of the magnitude and invalidity of massive deductions taken by Fleming. (TAC, P 458). According to the plaintiffs, Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, defendants Hansen, Rider, Shapiro, and Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. (TAC, P 461).

As can be seen, the gist of the plaintiffs' complaint is that the 1934 Act Individual Defendants made false statements concerning Fleming's earnings with knowledge of contrary information and/or reckless disregard for the truth of those earnings statements. The TAC alleges that the 1934 Act Individual Defendants had the motive to make materially false and misleading

statements. (TAC, P 468). Specifically, the TAC alleges that the defendants made the materially false and misleading statements in order to facilitate Fleming's offering which netted $ 170 million in exchange for stock, $ 200 million in exchange for senior notes, and a $ 975 million in new credit facilities. (TAC, P 468). [*66] In addition, the plaintiffs allege that the defendants had the motive to manipulate earnings since their bonuses were tied directly to reporting certain targeted earnings which were met in 2001 as a result of the manipulations. (TAC, P 469).

### 1. Group Pleading

The 1934 Act Individual Defendants contend that the TAC should be dismissed because the plaintiffs impermissibly rely on group pleading when they make allegations against the 1934 Act Individual Defendants as a whole and against Fleming. The plaintiffs respond that both parties have used the shorthand reference to the defendants in their pleadings and that allegations in the TAC against the 1934 Act Individual Defendants are as to each and everyone of them individually. The plaintiffs contend that the only paragraphs that arguably rely on group pleading concern the allegations that press releases were false and misleading and that the 1934 Act Individual Defendants knew of their falsity. The plaintiffs argue that there is a reasonable basis for believing that the individuals knew of their falsity based on the rest of the allegations in the TAC. Further, the plaintiffs contend that the viability of the group pleading [*67] doctrine after the enactment of the PSLRA is an open issue in this judicial district and the Fifth Circuit. Finally, the plaintiffs respond that the TAC makes adequate allegations against the individuals by name as well.

The Fifth Circuit's recent decision in *Southland*, discussed above, disposes of many of these issues. First, the court rejects the plaintiffs' argument to the extent it relies on the supposed potential "viability" of the doctrine in this circuit. The doctrine now has no viability at all. The court will not permit the use of such shorthand references to "defendants" to meet the particularity requirements of the PSLRA. This notwithstanding, the court observes that the plaintiffs do make substantial allegations that particular defendants were identified in press releases and conference calls with analysts. Likewise, the plaintiffs note, when appropriate, the signatories to the various SEC filings. No party has suggested that further repleading is necessary at this

  

stage; accordingly, the court will consider the TAC as it stands under the decision in *Southland*.

### 2. Failure to Adequately Identify the Source of their "Information and Belief"

The 1934 [*68] Act Individual Defendants next contend that the TAC should be dismissed because the plaintiffs have not adequately identified the source of the allegations that are not based on the plaintiffs' personal knowledge. In addition, these defendants contend that no inference of fraud is raised without an adequate showing of the foundation of the Sources' information and its reliability. The defendants argue that the TAC fails to describe the details concerning how, when, and where any of the Sources acquired their information.

The plaintiffs respond by stating that even though they did not disclose the names, they provided information about the Sources' job positions to support the probability that those persons would possess the information pleaded to support the allegations, as well as used information that predated their employment to know that the misrepresentations had been ongoing. The plaintiffs respond further by stating that these Sources have personal knowledge of the events, meetings, and internal reports that evidence the misrepresentations and personal knowledge that the defendants attended the meetings and reviewed the documents and reports.

Applying the standards announced [*69] in *ABC Arbitrage*, the court finds that the plaintiffs have sufficiently identified the Sources who provided the information for their allegations. Although the TAC does not name the Sources, it discloses specific information about the positions held by the Sources, the time period in which they worked for the Company, and their job responsibilities. The TAC also discusses how the Sources received the information underlying the allegations and to whom the information was forwarded. Based on the particularity with which the allegations discuss the Sources themselves and the specifics regarding how the Sources acquired the information and knowledge underlying the allegations, the court holds that the allegations in the TAC are adequately pleaded to support the probability that the Sources would possess the information pleaded that support the allegations of false or misleading statements by the defendants.

### 3. Failure to Plead Fraud with Particularity

The 1934 Act Individual Defendants raise several issues with respect to whether the plaintiffs have sufficiently pleaded fraud with particularity. First, the defendants attack the pleading as it relates to financial reports, [*70] reports on retail stores, and Monday meetings. The defendants argue that the TAC does not allege specifically how the Sources know that the 1934 Act Individual Defendants knew about the improper earnings manipulations or knew what was being discussed at the Monday meetings. In addition, the defendants contend that there are no allegations that show that the 1934 Act Individual Defendants knew that the vendor deductions, same store sales analysis and improper classification of recurring expenses in the retail segment were improper.

The plaintiffs respond by arguing that the defendants are merely pointing to isolated paragraphs but that the totality of the complaint is what is determinative. With regard to the financial reports, reports on retail stores, and Monday meetings, the plaintiffs posit that the Sources prepared the financial reports with the manipulations as directed by defendants Dahlen and Hansen and known to the other 1934 Act Individual Defendants, prepared charts of retail store sales growth at the request of Hansen, and that the charts and manipulations were discussed at the Monday meetings.

Although documentary evidence, such as internal reports, may be the basis underlying [*71] the allegations in the TAC of false and misleading statements, [HN32] an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Abrams, 292 F.3d at 432* (stating that plaintiffs did not point to any particular reports or information-available to the defendants before the announced financial restatements-that are contrary to the restatements and that it would be easier to infer that they had received such reports if information were given about who generated the reports, when they were reviewed, how defendants responded, etc.). Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients. *Id.* A plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. *ABC Arbitrage, 291 F.3d at 356*. However, the Fifth Circuit has expressly declined to adopt as a standard the threshold requirement in every case that the plaintiffs must provide report titles,

 

when they were prepared, who prepared [*72] them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information. *Id. at 355.*

[HN33] A complaint can satisfy the PSLRA by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs. *ABC Arbitrage, 291 F.3d at 352.* In this case, the plaintiffs have satisfied the pleading requirements by providing not only a sufficient factual basis for the internal reports, but also a sufficient factual basis for the information contained in the reports by virtue of the allegations concerning the Sources discussed above. The allegations contain numerous references to reports as outlined above, but in each instance the allegations contain sufficient factual information concerning the reports as required by *ABC Arbitrage* and/or are based upon information provided by the Sources. Therefore, the allegations in the complaint concerning internal reports are adequately pleaded.

Likewise, the allegations concerning the defendants and the Monday meetings are based on factual allegations provided by the Sources. The factual allegations in the TAC concerning the Sources [*73] support the belief that the Sources would possess the information about the Monday meetings. As discussed in *ABC Arbitrage*, as long as the factual basis concerning the Sources is adequate, the plaintiffs' allegations of false or misleading statements based on information provided by the Sources are adequate to satisfy the heightened pleading standards.

The court now considers whether the plaintiffs have sufficiently attributed any misrepresentation of fact to any particular 1934 Act Individual Defendant in light of the *Southland* decision. The court will address Fleming's statements concerning its earnings, followed by the same store sales reporting, and conclude with a discussion of the defendants' arguments concerning puffery, materiality and forward-looking statements. At the outset, the court agrees with the plaintiffs that Fleming's need to restate its earnings makes the plaintiffs' burden to demonstrate the falsity of particular earnings statements easier to discharge. The company made a public announcement that its earnings needed to be restated and that the restatement of its earnings for 2001 and 2002 would approximate $ 85 million, or 79% of Fleming's reported earnings [*74] for the time period at issue. At this point, the court is not addressing the scienter requirement;

rather, the court is addressing whether the plaintiffs have sufficiently pleaded with particularity the falsity of the statements that any individual defendant made about Fleming's 2001 and 2002 earnings. The magnitude alone of the forecasted restatement is a testament to its materiality. And, although the court is not at this point addressing scienter, the size of the restatement shall figure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter.

The earnings statements made in the May 29, 2001, August 24, 2001, and November 15, 2001 Form 10Qs filed with the SEC are pleaded with sufficient particularity as against defendant Neal Rider, who signed the Form 10Qs for 2001 Q1 and Q2. They are also sufficient as against defendant Mark Shapiro, who signed the Form 10Q for Q3 of 2001. The plaintiffs have not alleged how any person other than Rider or Shapiro contributed to any specific portions of the Form 10Qs. Therefore, the claims based on the Form 10Qs are limited to defendant Rider and Shapiro, as they signed the forms.

As to the [*75] March 6, 2002 Form 10K filed with the SEC reporting year end financial information, the statements of earnings contained therein are pleaded with sufficient particularity as to defendants Hansen, Rider and Shapiro. (TAC, PP 204, 210, 217, 229). The company's earnings as reported in the Registration Statement filed in anticipation of the March 2002 Note Offering, which incorporated the Form 10K from 2001 is also pleaded with particularity as to defendants Hansen, Rider and Shapiro.

With respect to the 2001 earnings reports set forth above, the plaintiffs have adequately alleged why the statements are false. The plaintiffs have alleged that Fleming itself has announced that its 2001 earnings information is false, and materially so. In the court's opinion, the announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false. There is no reasonable argument that could be made that the proposed restatement, even though it has not yet occurred, is anything other than a material one. Consequently, as to the 2001 earnings information, the court is persuaded that the plaintiffs have sufficiently alleged the who, what, why, [*76] where, when, and how required by *Rule 9(b)* as against the defendants included above.

The court now turns to the 2002 earnings information. First, the plaintiff has pleaded with

  

sufficient particularity the statements contained in Fleming's Form 10Q filed with the SEC on May 17, 2002 (TAC, P 245) and signed by defendant Shapiro. Second, defendant Rider's statements made in the conference call following the release of the 1Q 2002 results that "our EBITDA, for continuing operations was $ 32.6 million for 4.87 percent of sales" is also sufficiently pleaded with particularity. (TAC, P 244). Third, the earnings reported in the June 2002 Registration Statement which, in turn, incorporated the company's financial results included in the 2001 10K filed with the SEC and signed by defendants Hanson, Rider and Shapiro is sufficiently pleaded with particularity. Fourth, the earnings reported in the August 27, 2002 Form 10Q filed with the SEC and signed by defendant Shapiro are pleaded with sufficient particularity. Fifth, with respect to reserves, defendant Rider's statements on the September 5, 2002 conference call with analysts that "everything would be appropriately reserved for, correct" and [*77] that "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that risen to the level that we are at an impasse today" are sufficiently pleaded with particularity. Sixth, the court finds that the earnings reported in the company's amended 10Qs and 10K filed with the SEC on October 16, 2002 for Q1 and Q2 of 2002 of FY 2001 and signed and/or certified by Shapiro, Hansen and Rider are pleaded with particularity. Seventh, the court holds that the representations of earnings contained in Fleming's 10Q for the third quarter of 2002 have been pleaded with particularity. That form was signed by Shapiro and certified by Hansen and Rider. Finally, the court holds that the statements by Shapiro in the January 23, 2003 conference call are pleaded with sufficient particularity. (TAC, P 311).

As to defendant Stephen Davis, the plaintiffs do not allege that Davis personally made any particular oral false statements or signed any of the press releases or SEC forms which contained the alleged misstated earnings. n5 Consequently, the court examines whether there are any "particular factual allegations explaining [*78] an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement." The closest that the plaintiffs come is "during that same period, Fleming's wholesale president-defendant Stephen Davis-with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants, also utilized a variety of techniques,

including the accrual of unauthorized, improper and unsustainable deductions from accounts payable due to vendors, to inflate earnings in violation of accepted accounting practices." (TAC, P 14). But the plaintiffs' allegation that Davis performed accounting "manipulations" or violated accounting standards or that he did so with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants falls far short of alleging specific facts that Davis prepared any portion of a Fleming report or that, even if he did, that he did so with the knowledge or reckless disregard for the truth that the federal securities laws require to maintain a fraud claim. As such, the court dismisses the primary liability claims asserted against defendant [*79] Stephen Davis under *section 10*. The TAC is also silent as to specific allegations that Davis possessed the power or authority to control the operations of the company in general or had specific control over the activity upon which the primary violation is predicated. *McNamara v. Bre-X Minerals, Ltd., 46 F. Supp. 2d 628, 638 (E.D. Tex. 1999)*. The court therefore dismisses the controlling person claims against him as well.

n5 The TAC alleges that ". . . Hansen, Rider, Shapiro, Dahlen, and Davis made public statements claiming that Fleming's retail segment was growing." (TAC, P 456). The plaintiffs, however, point to no particular statement made by Davis, making it impossible to gauge whether the remaining requirements of the PSLRA have been satisfied. This allegation is, therefore, equivalent to no allegation at all.

The court now turns to a discussion of the statements claimed to be corporate puffing, nonmaterial, or forward-looking. The statements primarily under attack by the 1934 Act Defendants [*80] include: (1) statements regarding a "culture of thrift" or cost savings in light of the existence of the Fleming Air Force (2) statements regarding Fleming's overvalued retail stores (3) statements regarding Fleming not having a liquidity problem (4) Fleming's artificially inflated earnings in the October 23, 2002 press release and (5) Fleming's artificially inflated earnings in the January 23, 2003 press release. Because the motion to dismiss could be read, however, to challenge a broader range of statements (Joint Motion to Dismiss, p. 18 "moreover, many of the

  

alleged statements are either not material, or they are not false and misleading."), the court has endeavored to examine all of the alleged statements to assess their materiality and falsity.

The "culture of thrift" statement is not actionable. The plaintiffs argue that a statement that Fleming instituted "a culture of thrift" was misleading in light of their use of jets to fly home on the weekends and that one of the Sources knew that the executives had not instituted this culture. This statement is simply too general to constitute a material misstatement as required under *Rule 10b-5*. [*81] It is more in the nature of a corporate statement concerning a competitive strength of the company. As the defendants correctly observe, the courts have consistently held that [HN34] analysts and investors rely on *facts* in making investment decisions, not vague expressions of corporate optimism or competitive strengths. *Rosenzweig v. Azurix Corp., 332 F.3d 854, 869-70 (5th Cir. 2003).* "The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Id. at 869.* The TAC does not contain any allegations as to why the statement is rendered false by the allegations concerning the Fleming Air Force. Therefore, the statement is not actionable.

The next statement involves a January 14, 2003, press release where Fleming announced that it was marking down the "realizable value" of its retail stores by $ 116 million. The press release stated that "the company will record a non-cash charge of approximately $ 116 million to discontinued operations in the fourth quarter, to adjust the carrying value of the retail assets to their estimated net realizable value. [*82] " The plaintiffs contend that this is a material misstatement in that this write-down did not result in the assets being adjusted "to their estimated net realizable value." The plaintiffs point to a subsequent press release from April 17, 2003, in which the Company announced "an additional impairment charge to discontinued operations of approximately $ 90 million related to retail store operations held for sale, due to a reduction in the net realizable value of such operations." Further, plaintiffs allege that the 1934 Act Individual Defendants, specifically Hansen, Rider, and Dahlen, received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores. In the second half of 2002, Source 4

prepared a report charting the trends in sales for newly-opened price-impact stores showing that the sales for a typical Fleming store declined consistently after opening, and never increased. The plaintiffs conclude that these allegations show that the net realizable value after the January 2003 write down was a material misrepresentation that the 1934 Act Defendants knew was false.

These allegations are not sufficient to [*83] make the statement actionable. The allegations do not provide enough information to show that the defendants knew even within a reasonable estimate the actual amount of the net realizable value. Measuring the net realizable value of a group of assets is not an exact science. The April, 2003, write-down easily could have been the result of the defendants being too optimistic in January of 2003 about how much a willing purchaser would pay for the assets or the result of subsequent events in the economy or operations. More to the point, the allegations revolve around the knowledge of the defendants in 2002, but does not address the knowledge of the defendants at the time of the first write-down. As such, the court holds that this statement is not actionable.

The third statement that the 1934 Act Defendants specifically contend is not adequately pleaded is a statement in a January 23, 2003 conference call in which an unidentified officer of the company stated in response to a question suggesting that the Company was having liquidity problems that "no [we are not dipping lower and lower versus the loan covenants,] . . . three of the four covenants, we are consistently-have ample room [*84] underneath those covenants. The one covenant that we keep bumping up against, at least over the past few quarters, is debt-to-EBITDA." The question posed specifically addressed the loan covenants and Fleming's ability to meet the loan covenants. The plaintiffs do not provide any specific allegations, other than the Company's eventual bankruptcy on April 1, 2003, to show that the defendant knew the statement was false when it was made and that the Company did not have ample room underneath the three covenants. Therefore, the plaintiffs' allegations are not sufficient to make the statement actionable. n6

n6 As noted above, the court has carefully examined the totality of the allegations in the





TAC to assess whether the claimed statements are actionable misrepresentations. The court will detail some of these statements below, but the parties should assume that if the court has not specifically held a statement to be (a) a material misrepresentation that is (b) pleaded with sufficient particularity, then the court has concluded that the statement is not actionable under *Rule 10b-5*.

The following statements are either too vague to be actionable or are forward-looking statements protected by the safe-harbor provision of the PSLRA: the statement attributed to defendant Hansen in the October 24, 2001 press release that "our price impact formats, with their high volumes and low operating costs, are a great fit with our distribution strategy" (TAC, P 215); the statements in the November 5, 2001 DSN Retailing Today article attributed to Hansen that the value retailing market represents an opportunity for expansion with "significant growth potential," and that the "formats have received overwhelming customer response" (TAC, PP 219-20); the statements in the Form 10K attributed to the signatories of the 10K that "our price impact supermarkets offer name-brand food and consumable goods at significantly lower prices than conventional format retail store operators because of the many low-cost features of our stores" and "we expect to be able to grow our price impact supermarket operations while incurring lower capital expenditures" (TAC, P 229); the statements attributed to defendant Dahlen in the April 16, 2002 press release concerning Fleming's "excitement" about the acquisition of seven new retail stores in the Dallas market (TAC, P 236-37); the statements in the May 7, 2002 press release attributed to defendant Hansen concerning Fleming's "outstanding start to 2002" and the company's "keenly focused" strategies (TAC P 239); the statements attributed to Hansen in the conference call following the release of the first quarter 2002 results that "we are very pleased about that and feel good about the customer acceptance" and that he was "almost giddy [about] the progress we are making in this area" (TAC, P 244); the statements quoted from the June 2002 Registration Statement concerning the successful price impact retail format (TAC, P

250); the company's ability to secure favorable terms and volume discounts on its purchases (TAC, PP 254-56); and the statement attributed to Rider in the second conference call concerning "closing of the gap" (TAC, P 266). Although these statements may have evidentiary significance in the trial of this case, they are not actionable misrepresentations in the context of a *Rule 10b-5* claim.

[*85]

The next two statements concern the allegations that the defendants overstated Fleming's wholesale earnings in an October 23, 2002 press release and January 23, 2003 press release. (TAC, P 312-313). The defendants contend that the allegations are conclusory and refer to the entire press release quoted in its entirety in a previous paragraph. The defendants are correct, in that plaintiffs cannot simply recite portions of publicly disclosed documents and summarily allege that they are false and misleading. *BMC Software, 183 F. Supp. 2d at 886*. With respect to the October 23, 2002 press release, the plaintiffs do not allege who the earnings information is attributed to; therefore, they have not satisfied *Southland*. As to the January 2003, press release, the allegations specifically attribute the statements only to defendant Shapiro; accordingly the court holds that the statements are only pleaded with sufficient particularity as to that defendant.

The plaintiffs' allegations, moreover, specifically state that "in the October 23, 2002, press release and in the conference call, the 1934 Act defendants overstated Fleming's wholesale earnings" and "in the . . . January 23, 2003 press [*86] release[] . . ., the 1934 Act Individual defendants again knowingly or recklessly overstated Fleming's earnings by failing to account for the manipulations described in this Complaint." The bullet items listed below the allegations are the links to the previous allegations supporting why the statements as to earnings were false. Looking at the totality of the TAC and its allegations concerning the ongoing use of various manipulations and overstatement of earnings throughout the Class Period up until the announced restatements in April of 2003, the court finds the allegations sufficient. Therefore, the court finds that the plaintiffs' allegations are sufficient to plead with particularity the material misstatements and why they are false and misleading with respect to the January 2003 press release.

  

### 4. Failure to Adequately Plead Scienter

The 1934 Act Individual Defendants and D&T also contend that plaintiffs failed to adequately plead allegations giving rise to a strong inference of scienter as to each defendant. The plaintiffs respond by stating that they have adequately pleaded scienter against each of the 1934 Act Individual Defendants by alleging not only motive and [*87] opportunity, the close involvement of the individual defendants with the operations of Fleming, the violation of GAAP, and the magnitude of the fraud; but also the plaintiffs allege direct evidence of scienter by pointing to individual defendants and alleging that they directed manipulations resulting in misrepresentations on numerous occasions and knew about discrepancies in financial information and either made misstatements or omissions about the information or failed to correct previous misrepresentations or omissions.

The plaintiffs contend that they have adequately pleaded scienter against D&T by alleging red flags, numerous violations of the accounting and auditing standards, GAAP and GAAS, the simplicity of the accounting principles violated, the relative ease with which the fraud could have been detected, the magnitude of the restatement, and motive and opportunity. With the above standards as to pleading allegations of a strong inference of scienter in mind, the court now turns to the allegations as to each defendant.

Mark Hansen was Chief Executive Officer of Fleming from November 1998 until March 3, 2003. Hansen contends that the allegations of scienter against him are [*88] insufficient. Hansen contends that Fleming's deduction practices have not been shown with particularity to be fraudulent and thus the allegations are not sufficient to show scienter. Also, Hansen contends that the TAC does not state with particularity that he had the information or knew of the information with regard to allegedly fraudulent deductions and accounting practices, only that he must have known about them. In addition, Hansen contends that the TAC does not specifically state what was in the reports and comparisons available to him. Finally, Hansen states that the TAC includes impermissible general allegations against the defendants as a whole that is foreclosed due to the fact that the group pleading doctrine is no longer followed after the enactment of the PSLRA.

The plaintiffs urge that Hansen himself publicly touted Fleming's strategic plan, portrayed himself as knowledgeable concerning Fleming's earnings, sales, and operations, and represented to the market that earnings and sales were growing. The plaintiffs further contend that the deduction practices were fraudulent in that they went beyond industry practices, were done without vendor permission, and were improper [*89] and baseless. Specifically, the plaintiffs point to statements by Source 1 that deductions were taken and accrued to increase earnings before Fleming had even identified the vendor, the product, and the basis for the deduction. The plaintiffs argue that these allegations give rise to a strong inference that the deductions were not a legitimate cost reduction, but were instead accounting manipulations.

Additionally, plaintiffs point out that Source 1 personally participated in the delivery of reports showing revenue, cost, and margins in both the wholesale and retail segments to Hansen that showed the true financial picture for Fleming. The plaintiffs contend that the Sources give direct evidence that defendant Hansen was provided information showing that Fleming's internally-reported earnings were substantially different from Fleming's publicly-reported earnings. Also, the plaintiffs contend that Hansen's presence at Monday meetings where there were reports showing the discrepancies and discussions about the deduction practices supports a strong inference of scienter.

The plaintiffs thus attempt to allege a strong inference of scienter with regard to Hansen with numerous allegations [*90] that he knew of accounting manipulations, received reports showing the actual numbers, and made statements or signed filings containing representations that conflicted with the information that he knew about or recklessly disregarded. With regard to receiving reports of financial information and attending meetings where the manipulations and financial information were discussed the TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen. According to Source 1, Hansen received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. Also, the TAC alleges that the general ledger was published during the Class Period

 LexisNexis™     LexisNexis™

to Hansen.

Source 4 also contributed to the allegations related to Hansen. Starting in July of 2001 and continuing through the class period, Source 4 "was responsible [*91] for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to Hansen. At the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report -- including Hansen -- that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining.

According to Sources 1 and 4, Hansen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Further, Hansen received special daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he made public statements claiming that Fleming's retail segment was growing. In July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. Using data that had been available to Hansen prior to July 2002, Source 4's chart demonstrated that [*92] the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. In addition, Hansen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

With regard to Hansen's personal participation in the manipulations, the TAC alleges that "Hansen . . . directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $ 3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors" resulting in only $ 78,000 of the deductions being accepted. Thus, under the plaintiffs' theory and allegations, Hansen personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and

participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. [*93]

Hansen cites two Fifth Circuit cases that he contends support his motion to dismiss: *Goldstein v. MCI Worldcom* and *Abrams v. Baker Hughes Inc.* In *Goldstein*, the court held that the plaintiffs' circumstantial evidence relating to the timing of accounts receivable write-offs, the magnitude of the write-offs, the defendants' close involvement in the day-to-day operation and management of the company, and the defendants' positions in the company and alleged decision-making roles in writing off uncollectible accounts failed to sufficiently connect the defendants to support a strong inference of scienter. *340 F.3d at 248-54.* In *Abrams*, the court held that the plaintiffs' circumstantial evidence relating to the defendants' receipt of financial reports that apprised them of the company's true financial status, the company's violations of GAAP, the defendants' desire to raise money and protect their incentive compensation, and the timing of the resignation of certain accounting department employees was insufficient to demonstrate a strong inference of scienter. [*94] *292 F.3d at 431-35.*

These decisions notwithstanding, the allegations against Hansen taken as a whole sufficiently allege a strong inference of scienter. The allegations in the TAC include not only circumstantial evidence similar to that discussed in the cases above, but also direct evidence of Hansen's knowledge of and involvement in the scheme, In addition, the weakness of the allegations as to internal reports discussed by the Fifth Circuit in the two cases discussed above is not present in this case.

In *Abrams*, the Fifth Circuit held that "an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *292 F.3d at 432* (quoted in *Goldstein, 340 F.3d at 253-54*). The court went on to state that "such allegations must have corroborating details regarding the contents of allegedly contrary reports of their authors and recipients." *Id.* Here, the allegations are supported by Sources who worked in the Company's accounting department and not only prepared some of the reports discussed at the request of the defendants, [*95] but also delivered them to the defendants. Other allegations state that the Sources saw reports that were prepared by other accounting managers, knew the contents of the reports,

  

and knew that the reports were forwarded to the defendants.

In *ABC Arbitrage* the Fifth Circuit held that plaintiffs could satisfy the reports "standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them." *291 F.3d at 356* (quoting *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72, 73 (2d Cir. 2001))*. Further, the court held that the allegations as to Monthly Management Reports in the case met the standard because they identified the reports as "being prepared monthly by each subsidiary's controller's office and transmitted to the defendants at the beginning of each month to convey information about the Telecom sector at each subsidiary by comparing actual results to budgeted numbers." *Id. at 357*. The allegations in this case are sufficiently similar and satisfy the standard as well.

In addition, these Sources had knowledge of the manipulations that resulted in the actual numbers in the reports being [*96] different from those reported to the public. The defendants contend that allegations where the Sources themselves were not actually involved in the events, but claim to have knowledge of the events are insufficient. The court in *ABC Arbitrage* noted that if the documentary evidence does not provide an adequate basis for believing that the defendants' statements or omissions are false, then the plaintiffs can satisfy their pleading burden with allegations from confidential sources as long as the sources described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *291 F.3d at 353*. Here, the allegations as to the documentary evidence and the Sources are sufficient to give rise to a strong inference of at least severe recklessness as to Hansen.

Neal Rider was the Chief Financial Officer of Fleming from January 2000 to February 2003. Rider contends that the allegations in the TAC against him are insufficient to give rise to a strong inference of scienter because they do not show what specific information was allegedly provided to him, why that information was false and misleading, or how he [*97] knew the information was false or that he acted with severe recklessness.

The plaintiffs respond by stating that Rider had access to all of the same information and reports alleged by the Sources. In addition, Source 4 specifically states that Rider personally approved the manipulation of same-store sales data, such that the data did not even

compare sales for the same stores. The TAC also alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Rider. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment."

Rider also allegedly received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. The TAC alleges that starting in July of 2001 and continuing through the [*98] class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to . . . Defendant Rider." In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report-including Defendant Rider-that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by defendant Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence."

Further, the TAC alleges that Rider received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and [*99] the lack of success of the retail stores yet, he made public statements claiming that Fleming's retail segment was growing. According to Sources 1 and 4, Rider received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Using data that had been available to Rider prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and

 

never increased showing the ineffectiveness of the price-impact format.

Finally, the TAC specifically alleges that Rider attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC specifically alleges that Rider received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. The TAC alleges that Rider participated in meetings with the financial analyst managers, the retail CFO, [*100] and Dahlen where internal cost and margin numbers were reviewed and, therefore, Rider either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

Rider cites *In re Capstead Mortgage Corp. Sec. Litig.* to support his contention that the allegations are insufficient to support a strong inference of scienter. *258 F. Supp. 2d 533 (N.D. Tex. 2003)*. In that case the plaintiffs attempted to show knowing misconduct by alleging that senior officers and directors had access to and control over internal corporate data and other non-public information (specifically monthly reports on the company's intranet and monthly management reports) which contradicted their positive representations about the company's mortgage servicing operation. *Id. at 564-65.* The plaintiffs did not specifically identify any particular internal documents containing the alleged adverse information, the contents of such adverse or negative information, when the internal document containing the negative or adverse information was prepared, by whom it was prepared, or to whom it was directed. [*101] *Id. at 565.* The court stated that plaintiffs must allege facts which demonstrate that at the time defendants made representations regarding projected earnings and dividends, defendants knew or were severely reckless in not knowing information that adversely impacted the earnings. *Id.* The court specifically held that allegations the defendants were aware of the adverse information were insufficient due to the fact that the plaintiffs had not cited any documentary evidence or personal sources to establish the basis for this belief. *Id.* In this case, by contrast, the plaintiffs have not only cited documentary evidence and reports with particular facts as to their contents, who prepared them,

and who received them, but the plaintiffs have also cited the Sources to support the allegations as to the reports and their contents and defendants and their knowledge. The court holds that the TAC pleads specific facts to support a strong inference of at least severe recklessness as against Rider.

Mark Shapiro was Senior Vice President of Finance and Control and Chief Accounting Officer from at least 2001 to February 2003, at which time he was appointed Chief Financial [*102] Officer and served until late April 2003. Shapiro contends that the allegations are insufficient to allege a strong inference of scienter. Shapiro contends that a majority of the allegations are not specific to him but to the management in general and that when Shapiro is specifically mentioned the TAC does not provide facts from which one could conclude that Shapiro knew any particular statement to be inaccurate when made. Further, Shapiro contends that the allegations that he had reports that showed variances and discrepancies are not specific enough and that allegations concerning the Monday meetings do not state when he was there or what was discussed at them.

The plaintiffs argue that Shapiro received the reports and information showing discrepancies between internal financial information and publicly-reported numbers and the deduction practices and participated in Monday meetings where flat or declining retail sales, variances between public and internal finances, and deduction practices were discussed. Further, the plaintiffs allege that Shapiro had a central role in the intentional weakening of Fleming's accounting practices, the linchpin of the manipulation scheme, when all [*103] divisional accounting operations were centralized in Oklahoma City and managed by unqualified division reports. This, the plaintiffs contend, allowed the company to put tight reigns on the manipulations and oversee them.

In addition, plaintiffs contend that Sources 2 and 3 have knowledge of Shapiro's knowledge of and participation in a scheme to defraud vendors to obtain unearned promotional funds to inflate its earnings. The plaintiffs allege that Shapiro directly participated in inventory manipulations to inflate earnings and shift losses from continuing operations to discontinued operations.

The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product

  

category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Shapiro. According to Sources 1 and 4, Shapiro received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. The TAC also alleges that Shapiro [*104] participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Shapiro either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. The TAC specifically alleges that Shapiro attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

Under the allegations of the TAC, Shapiro received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. Also, the TAC alleges that Fleming, at the direction of Shapiro, did not recognize a $1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. The TAC further alleges that "Source 1 saw reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale [*105] segment." The TAC alleges that Shapiro received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. On balance, and reading the complaint as a whole, the court is persuaded that the allegations raise a strong inference of at least severe recklessness against Shapiro.

Thomas Dahlen was Executive Vice President and President, Retail and Marketing for Fleming in April 2001, and resigned effective December 31, 2002. Dahlen contends that the allegations are insufficient to support a strong inference of scienter. The court disagrees. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Dahlen. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance [*106] in comparison with the wholesale segment."

In addition, Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] received." The TAC further alleges that "accrual of these unauthorized, improper, and unsustainable deductions was directed by Defendant Dahlen [and the retail CFO; and that the retail CFO] often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions." In the TAC Source 1 alleges that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." The TAC alleges that "by June 2002, Source 1 was emailing Source 1's deduction worksheets to Defendant Dahlen [and the retail CFO] with a frequency of three to five times a week" [*107] and that "even after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction."

The TAC alleges that "Defendant Dahlen directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." Further, Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by defendant Dahlen. According to Sources 1 and 4, Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002.

  

# EXHIBIT B
# Part 3

The TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide adverse sales trend" by rejecting the data from the financial analysts and changing the composition of the population [*108] of stores which constituted the Company's same stores.'" Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a same store' comparison as is commonly understood in the retail industry." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." Further, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming -- at the direction of Dahlen and [the retail CFO] -- reduced the previously reported same store sales for the year 2000 fiscal year by subtracting [*109] $ 1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $ 4.7 million in red tag sales." The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report -- including Defendant Dahlen -- that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "electronic copies were provided to defendant Dahlen." Using data that had been available to Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never [*110] increased showing the ineffectiveness of the price-impact format. The TAC specifically alleges that Dahlen received

weekly, monthly, and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, as well as, received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he either made or failed to correct misrepresentations claiming that Fleming's retail segment was growing.

Also, the TAC specifically alleges that Dahlen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC alleges that defendants Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

The TAC includes allegations [*111] that Dahlen made false and misleading public statements about Fleming's financial results, the health of the company, its prospects for growth, and the true nature and extent of the fraud, as well as, disclose false financial information and made public statements that were false, misleading, and in conflict with the information that the Sources had personally communicated to him. According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. The court finds that the allegations are sufficient to support a strong inference of scienter as to Dahlen. The allegations are specific as to the information that Dahlen possessed and his participation in the accounting manipulations.

D&T was the outside auditor for Fleming beginning in at least 1994 and throughout the Class Period. Defendant D&T contends that the plaintiffs failed to adequately allege scienter with respect to claims under *section 10(b)* of material misrepresentations involving D&T's issuance of its allegedly false and misleading 2001 audit opinion and quarterly [*112] Review Reports. D&T contends that the TAC is not sufficiently detailed and argues that the plaintiffs' alternative pleading that D&T either "knew" or "should have known" is not

 

sufficient to show recklessness. Specifically, D&T states that the plaintiffs do not allege that the specific vendor deductions actually tested were fraudulent. Further, D&T points to the TAC's allegations that the fraud was concealed by Fleming and its employees from D&T and states that these allegations undercut the plaintiffs' scienter allegations as to D&T. Also, D&T contends that motive and opportunity alone do not suffice for an inference of scienter. Finally, D&T argues that it is not liable as an aider and a better under *Central Bank.*

The plaintiffs respond by stating that the following facts establish a strong inference of scienter: (1) numerous red flags existed that should have alerted D&T of Fleming's fraud, (2) the magnitude of the restatement was significant, (3) violations of Generally Accepted Accounting Principles ("GAAP") were repetitive and over several fiscal years, (4) the accounting principles violated were relatively simple, (5) D&T failed to obtain sufficient evidentiary support [*113] for account balances in violation of Generally Accepted Auditing Standards ("GAAS"), (6) D&T failed to follow-up on known accounting errors in violation of GAAS, (7) the fraudulent vendor deduction scheme could have been identified with relative ease, and (8) D&T had a financial motive to engage in fraudulent or reckless conduct. The plaintiffs contend that the totality of these allegations in the TAC in light of the restatement give rise to a strong inference of scienter.

More specifically, the plaintiffs contend that the following sixteen red flags existed during the Class Period that should have alerted D&T that Fleming was artificially inflating its financial results: (1) a decline in net income for the years 1995-2000 that gave Fleming an incentive to manipulate its financial results, (2) self-imposed pressure by Fleming by setting aggressive earnings targets and unrealistic forecasts, (3) the gutting of Fleming's accounting staff and weakening of internal controls and centralization of accounting at the company's headquarters, (4) making non-accountant division presidents responsible for the financial reporting functions, (5) shortening of the monthly closing period and increased [*114] time pressure, (6) entering into large long-term contract with tight profit margins, (7) improper lengthening of the amortization period for long-term assets to reduce expense and increase income, (8) overstatement of inventory at one of the divisions by $ 1 million, (9) the remitting of payments by Fleming during the time of the 2001 audit field work to vendors

who refused to accept deductions, (10) increase in the vendor deduction account to $ 120 million, (11) the elimination of the reserve against vendor deductions (12) the tying of executive bonuses to targeted earnings and the achievement of those earnings and payment of bonuses equaling 200% of the base salaries in 2001, (13) the findings of Ernst & Young of Fleming's excess price charges to its customers and demand by the auditor to be transferred away from Fleming when Fleming would not correct the overcharges, (14) the pending of lawsuits for overcharging customers, (15) Fleming's debit memos for vendor deductions did not identify the vendor invoices from which the deductions were taken, (16) the reporting by both the wholesale and retail segments of vendor deductions from the same product resulting in double accruals. [*115]

The plaintiffs state that with regard to testing, the allegations need only state that the auditor failed to test the items altogether, or inadequately tested items by selecting an insufficient sample size, or adequately tested items but turned a blind eye to errors that were discovered. The plaintiffs contend that "should have known" allegations are sufficient and that even though Fleming provided allegedly false information there was no basis or backup documentation supporting the information and that if D&T had sought backup in accordance with auditing procedures it would have learned of the falsity. The plaintiffs further contend that motive and opportunity can add weight to the scienter calculus and that D&T's consulting work and corresponding fees amounting to two times the audit fees is sufficient motive. Finally, the plaintiffs state that D&T is not alleged to be an aider and a better, but instead is liable as a primary violator upon the false statements contained in the audit opinion and review reports. n7

n7 D&T also attacks the standing of one of the lead plaintiffs with respect to plaintiffs' *section 10(b)* claims. D&T contends that the Lead Plaintiff, Jackson Capital, does not have standing to assert *section 10(b)* claims on behalf of a putative class including purchasers of Fleming bonds because Jackson Capital pleads that it purchased only Fleming common stock. The plaintiffs respond by stating that a stockholder plaintiff may press bondholder claims so long as both arose out of the same scheme to defraud. The

  
™ LexisNexis™     ™ LexisNexis™     ™ LexisNexis™

court finds D&T's argument unpersuasive and rejects it. At the pleading stage, Lead Plaintiff Jackson Capital has standing to assert a *section 10(b)* claim on behalf of purchasers of all securities against a defendant who makes "any untrue statement of material fact in connection with the purchase or sale of *any security*" because the various purchasers' claims arise out of the same material misstatements. *17 C.F.R. § 240.10b-5* (emphasis added). As discussed *infra* at pages 83-85, under *section 11 of the 1933 Act*, standing is limited to those purchasers who purchase securities pursuant to a specific registration statement containing a material misstatement because the claim arises out of that particular registration statement and the misrepresentations made within it. *See In re Paracelsus Corp., 6 F. Supp. 2d 626 (S.D. Tex. 1998).*

[*116]

[HN35] With regard to sufficiently alleging scienter against auditors, courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an auditor performed a reckless or fraudulent audit: 1) red flags regarding accounting matters, 2) restated financial statements, 3) an auditor's failure to obtain sufficient support for account balances, and 4) an auditor's failure to follow-up on known accounting errors. *In re Enron, 235 F. Supp. 2d at 677-79, 706-07.* The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct. *Id.* Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circumstances surrounding the restatement. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11.* A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the accounting [*117] principles that were violated. *Id.*

Likewise, [HN36] mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in a *section 10(b)* action against an accounting firm. *Abrams, 292 F.3d at 430, See*

*also Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994)*("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud"); *Umsted v. Andersen LLP, 2003 U.S. Dist. LEXIS 1250, 2003 WL 222621, at *3 (N.D. Tex. Jan. 28, 2003)*(noting that there is a judicial consensus that mere general allegations of violations of GAAP and/or GAAS are insufficient to state a claim for securities fraud). The plaintiffs must link such allegations of violations of GAAP and/or GAAS with fraudulent intent by showing that the firm deliberately misrepresented material fact or acted with reckless disregard about accuracy of its audits or reports. [*118] *Abrams, 292 F.3d at 430; Novak, 216 F.3d at 308.*

Recent cases provide insight about circumstances under which allegations of financial restatements and/or GAAP or GAAS violations, under the totality of circumstances, may constitute important factors in evaluating whether scienter has been adequately pleaded. Some of the factors recent courts have frequently addressed include: (a) the nature, size, and scope of GAAP violations; (b) the magnitude and frequency of restatements; and (c) whether the allegations of GAAP violations and/or restatements are accompanied by allegations of insider trading. Securities Litigation Update, SJ014 ALI-ABA 505, 516 (2003). In addition, in cases where the auditor is the defendant, courts look for "red flags" that should have put the auditor on notice of the company's financial improprieties. *Id.; see also, e.g., Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001).*

When the defendant is an auditor, allegations that the audit was conducted negligently and allegations that the defendant lacked adequate internal controls are also routinely found insufficient. On the other hand, courts appear [*119] willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing. Securities Litigation Update, SJ014 ALI-ABA 505, 516 (2003).

For example, in *In re Ikon Office Solutions, Inc. Securities Litigation*, the court found the plaintiff properly pleaded scienter by alleging defendant (1)

  

violated auditing principles and (2) had notes in its accounting file regarding an audit committee meeting which specifically referred to one employee "cooking the books." *66 F. Supp. 2d 622, 629-34 (E.D. Pa. 1999)*. In *In re Health Management, Inc. Sec. Litig.*, the court denied an auditor's motion to dismiss where plaintiff pleaded violations of GAAP/GAAS coupled with red flags of suspicious inventory shipments, and an analyst's letter alerting the auditor to inflated accounts receivables. [*120] *970 F. Supp. 192, 202-03 (E.D.N.Y. 1997)*. In *Carley Capital Group v. Deloitte & Touche, L.L.P.*, the court denied an auditor's motion to dismiss, finding plaintiffs adequately pleaded scienter by alleging violations of GAAS coupled with the auditor's unrestricted access to financially records, heavy involvement in management and highly suspicious revenue manipulations that would have "put prudent auditors on notice." *27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998)*. The court concluded that alleged violations of accounting principles "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Id.*

Recently, in *In re Worldcom, Inc. Sec. Litig.* the court held the pleadings of scienter sufficient as to an outside auditing firm and denied its motion to dismiss. *2003 U.S. Dist. LEXIS 10863, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)*. The court noted that the auditor had unlimited access to the company's books and records [*121] and an obligation to review and evaluate those records in order to form an opinion regarding the company's financial statements. The court discussed the obligations of an outside auditor as follows:

> Independent auditors [have unlimited access to the client's books and records and] are charged with obtaining and evaluating evidence concerning the assertions made in their client's financial statements. Auditors are not entitled to allow representations from a company's management to substitute for the auditing procedures that are necessary to provide a reasonable basis for forming an opinion regarding the financial statements that are the subject of the audit. In auditing the financial statements, an auditor may consider as evidence all books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations and reconciliations. The underlying accounting data should be considered when forming an opinion as to the financial statements. Professional auditors are required to act diligently and in good faith, and to apply a professional skepticism to their evaluation of [*122] evidence. An auditor should conduct the audit objectively, thoroughly and carefully. Before certifying financial statements, an auditor should have an understanding of the factors that may have a significant effect on the financial statements.

*2003 U.S. Dist. LEXIS 10863, [WL] at *3-4*. The court further noted that the defendant's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs. The court noted that had the auditor reviewed the company's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. Additionally, the court pointed to the fact that the complaint identified the steps the auditor should have taken and failed to take, and the fraud it would have discovered if it had taken those steps. In that case, the defendants pointed to the subsequent indictments and guilty pleas of former company executives showing that the company's senior management had lied to and concealed the falsification of the books from the auditors as evidence that the defendants lacked scienter. The court rejected [*123] the argument noting that the auditor would have uncovered the fraud perpetrated by the company if it had conducted the review it was required to do before issuing its audit opinions and that the auditor's audit opinions included in the company's year-end financial statements materially misrepresented the company's financial state.

In this case, the court finds that the TAC in its totality sufficiently alleges scienter as to D&T. To begin with, the TAC includes allegations substantial allegations

  

of motive and opportunity. Specifically, the TAC alleges that D&T served continuously as the company's auditor from at least 1994 through the class period. During that time D&T personnel were present at the company's headquarters frequently throughout the year and had continual access to and knowledge of Fleming's private and confidential corporate, financial, and business information giving D&T thorough knowledge of all aspects of Fleming's financial history, accounting practices, internal controls, and business operations.

Additionally, the TAC's allegations that D&T had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that [*124] of its auditing fees are sufficient to support an inference of scienter as well. *Nathenson, 267 F.3d at 412* (holding that motive and opportunity to commit fraud may be facts that add to the scienter calculus); *see also In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 at 345, 2004 WL 763890, at *20-21 (S.D.N.Y. 2004)*(finding motive allegations sufficient where the auditor generated consulting fees of six times its auditing fees and noting that an auditor may take on "a vested interested in the performance and profitability" of its client, and consequently "weaken[] its ability to rely on its reputation in countering as irrational' allegations that it participated in a client's fraud")(quoting *In re MicroStrategy, Inc. Secs. Litig., 115 F. Supp. 2d 620, 655 (E.D. Va. 2000)*). Courts have been especially ready to find motive pleading adequate to survive dismissal in cases where the auditing company plays a dual rule n8 with respect to the client. *Id. at 20* (collecting cases).

> n8 In 2001 Fleming paid D&T $ 1,800,000 in consulting fees; $ 400,000 in attestation services and $ 1,000,000 in auditing fees.

[*125]

The allegations surrounding D&T's failure to uncover the lack of internal controls and accounting manipulations are also pleaded sufficiently to give rise to a strong inference of scienter. Specifically, as to the lack of internal controls, the TAC alleges that during the latter part of 2001 the company terminated the controllers, the accounts receivable and accounts payable managers, and clerks from each division and centralized its accounting operations at the company's headquarters. Further, the

TAC alleges that the company terminated its divisional internal audit staff and outsourced the function to Ernst & Young. Subsequently, the lone E&Y internal auditor allegedly demanded a transfer to another client after learning of the company's widespread improprieties. The TAC alleges that these conditions -- inadequate staffing of accounting personnel, the absence of documentation supporting transactions, journal entries, and lack of any internal auditing of operations -- required D&T to expand the extent of procedures applied as required by GAAS (AU § 312). n9

> n9 In planning an audit, an auditor must assess the audit risk by looking at the various risks at issue in each audit, such as inherent risk and control risk, to assess the extent and scope of the audit.

[*126]

With regard to the accounting manipulations, the TAC alleges that the Company accrued large amounts of unauthorized vendor deductions that D&T failed to discover during its audit and review procedures. The TAC alleges that the company violated GAAP by reducing both its accounts payable and cost of goods sold by the amount of the vendor deductions even before the vendor had received the debit memorandum and approved the deduction in contravention of FASB Statement No. 5. n10 The accrual of these vendor deductions resulted in earnings being overstated by up to $ 120 million at any one time during 2001 and 2002 amounting to more than 10% of the accounts payable during the class period and resulting in a material reduction of accounts payable that obligated D&T to audit their validity.

> n10 In accounting for contingencies, contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.

The TAC alleges that, according to [*127] Source 3, D&T received copies of the debit memorandums in its audit packages, but never requested the invoices for which the debit memorandums were issued and never

  

asked any questions, requested supporting documents, or sought verification of any documents or entry in contravention of GAAS (AU §§ 326 and 330). n11 The TAC alleges that if D&T during its interim reviews starting in mid-2001 had compared the magnitude of the dollar amount of vendor deductions issued during the fiscal quarter with the magnitude of the dollar amount of vendor deductions issued during the comparable prior period's quarter and during the immediate proceeding quarter in accordance with GAAS (AU § 722) n12, then D&T would have learned of the huge dollar amount of unauthorized, improper, and unsustainable deductions.

n11 Evidential matter from independent sources outside an entity provides greater assurance of reliability than that secured solely within the entity. The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly. In the examination of accounts payable, for example, alternative procedures [to sending written confirmation requests] may include examination of subsequent cash disbursements, correspondence from third parties, or other records to provide evidence for the completeness assertion.

[*128]

n12 During a review of interim financial information an auditor should compare interim financial information with comparable information for the immediately preceding interim period and for corresponding previous periods.

The TAC alleges that although the Company created debit memorandums supporting the deduction amounts, the debit memorandums did not include vendor invoice numbers that would allow the tracking of the deductions to the relevant invoice in an attempt to determine its validity. The TAC posits that had D&T adequately tested the debit memorandums in accordance with GAAS (AU § 150) n13 to determine their validity by inspecting vendor correspondence, examining signed vendor contracts, and inspecting the vendor statements, D&T would have learned that the claimed deductions were after-the-fact

and after-delivery de facto unsubstantiated deductions disputed by the vendors. Additionally, the TAC alleges that letters from irate vendors disputing large deductions such as Agrilink Foods Inc., Kellogg Co., Unilever PLC, Oil-Dri, Solo Cup Co. were readily available for review by D&T in [*129] the vendor correspondence files. Further, the TAC alleges that the Company's reserve against doubtful deductions to accounts payable was at all times either insufficient to cover the extent of the disputed deductions or reversed to eliminate any reserve for the deductions.

n13 Standard of Field Work No. 3 requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations.

With the amount of the deductions allegedly increasing to, at one point, upwards of $ 120 million, D&T's failure to test the legitimacy of the vendor deductions and the reserve account exceed an inference of negligence. Finally, the company's announcement in April of 2003 of a restatement of earnings of $ 85 million due to accounting irregularities accounting for 79% of the company's reported earnings for the time period at issue adds to and supports the allegations of a material misrepresentation in the company's financial statements and an inference of scienter. [*130] *In re MicroStrategy, 115 F. Supp. 2d at 652* (holding that the magnitude of the restatement and the simplicity of the GAAP principles violated in the case and the ease with which the violations could be detected suggest a deliberate ignorance on the auditor's part and support an inference of scienter). Therefore, the court finds that the totality of the allegations of scienter in the TAC sufficiently support a strong inference of scienter as to D&T. As a result, D&T's motion to dismiss the 1934 Act claims is denied.

### 5. *Failure to Adequately Plead Loss Causation*

The 1934 Act Defendants contend that the plaintiffs have failed to adequately plead loss causation. The defendants do not dispute that the plaintiffs have adequately pleaded transaction causation through the allegations of price inflation, but the defendants contend that the plaintiffs have failed to allege that the fraudulent conduct was in some reasonably direct way responsible for the loss caused by the decline in the price of their

  

securities. The "loss causation" provision in the PSLRA provides that

> [HN37] In any private action arising under this chapter, the plaintiff shall have the burden [*131] of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

*15 U.S.C. § 78u-4(b)(4).* At trial, the plaintiffs will be required to show that the untruth was in some reasonably direct, or proximate, way responsible for their loss. *Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981).* [HN38] The necessary element of causation includes both "loss causation" and "transaction causation." *Coates, 26 F. Supp. 2d 910 at 922.* Transaction causation, similar to "but for" causation, is another way of describing reliance and is satisfied by allegations that the "misrepresentations or omissions induced [the plaintiff] to make the investment." *Id.* On the other hand, loss causation is satisfied by allegations that the plaintiff "would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss." *Id.*

[HN39] At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation, not whether they can prove it. [*132] *Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 626 (N.D. Tex. 1998).* The PSLRA does not affect causation pleadings, thus the allegations must only meet the traditional "fair notice" standards. *Id.* To adequately plead loss causation and survive a motion to dismiss, "plaintiffs need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *Id.*

In this case, the plaintiffs' allegations outline the alleged misrepresentations and omissions leading up to the stock decline that caused the stock to be artificially inflated. Next, the allegations discuss in detail the sequence of events starting with Fleming's first press release on July 30, 2002, that caused the stock price to

fall from $ 16.18 to 10.81, and the subsequent stair step decline in the price of the stock following the release of negative information from the company and articles in the financial news culminating with the SEC's upgrading [*133] of its investigation to formal on February 25, 2003, after which the price fell from $ 2.97 to $ 1.85, and the filing of bankruptcy in April of 2003. (TAC, PP 6-12). As in *Coates,* the plaintiffs allege tremendous drops in stock price in the days after the "truth" was revealed. *26 F. Supp. 2d at 922.* The court in *Coates* noted that even if the plaintiffs may not ultimately be able to prove that the decline resulted from the announcements, the foregoing allegations are adequate to demonstrate loss causation. *Id.*

### 6. Failure to State a Claim for Controlling Person Liability

The defendants contend that the TAC does not state a claim for liability under *section 20(a) of the 1934 Exchange Act.* Specifically, defendants contend that plaintiffs have not alleged that any of the 1934 Act Individual Defendants, in their positions as officers of the Company, controlled any of the other 1934 Act Defendants such that liability under *section 20(a)* could exist for other individuals' primary violations. In addition, the defendants contend that plaintiffs have failed to adequately plead the necessary control to establish *section 20(a)* liability for the actions of [*134] Fleming. Finally, the defendants contend that the failure to allege the existence of underlying violations of *section 10(b)* and *Rule 10b-5* by either Fleming or any of the 1934 Act Defendants negates any claim for controlling person liability.

*Section 20(a)* provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

  

*15 U.S.C. 78t(a)*. Since *section 20(a)* is a secondary liability provision, it is necessary that a primary violation be established before liability under *section 20* arises. *ABC Arbitrage, 291 F.3d at 348 n.57*. [HN40] In considering whether the plaintiff has stated a claim under *section 20*, the court must determine whether the plaintiff has pled facts sufficient to establish that a defendant was in control of the primary violators. [*135] Control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *17 C.F.R. § 240.12b-2(f); see G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 957 (5th Cir. 1981)*.

[HN41] Under the control person doctrine, officers and directors may be found liable even if they did not make a representation themselves or play a significant role in the preparation of a misrepresentation. *In re Enron, 235 F. Supp. 2d at 594-96; G.A. Thompson & Co., 636 F.2d at 958* (holding that a plaintiff need not demonstrate "actual participation" in the underlying fraudulent transaction). However, controlling person liability requires more than merely identifying a defendant's place in the hierarchy of the company or his job title and cannot hinge solely upon a defendant's position or title. *Id. at 621; Dennis v. General Imaging Inc., 918 F.2d 496, 509-510 (5th Cir. 1990)*. "[A] person should be presumed to be a controlling person . . . if they occupy a status or position that [*136] ordinarily bestows authority to control the primary violator generally, or specifically with respect to the matter or affairs that produced the Securities Act violation.'" *In re Enron, 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *18* (quoting Loftus C. Carson, II, *The Liability of Controlling Persons Under the Federal Securities Acts, 72 Notre Dame L. Rev. 263, 281-83(1997)*). In various cases the Fifth Circuit has provided the possible alternative or overlapping bases: day-to-day control of the corporation operations; knowledge of the underlying primary violation by the controlled person; or facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies. *Id.; see G.A. Thompson & Co., 636 F.2d at 958* (holding that in determining whether a plaintiff has made a *prima facie* showing of "control," a plaintiff must plead facts indicating that the defendant "had the requisite power to directly or indirectly control or influence corporate policy"); [*137] *McNamara, 46 F. Supp. 2d at 638*

(stating that although it has not been explicitly addressed by the Fifth Circuit, it does not appear that a plaintiff must establish that the defendant "actually participated in the general, day-to-day control [of the general affairs of the company]").

[HN42] *Federal Rule of Civil Procedure 9(b)* and *15 U.S.C. § 78u-4(b)(2)* do not apply to control person claims. *In re Enron, 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *42-45*. The plaintiffs are not required to plead facts supporting every element of a prima facie case, but must only provide the defendants fair notice of the plaintiffs' claims and the grounds upon which they rest. *Id.* [HN43] Controlling persons of a controlled entity are subject to liability as a controlling person even where the controlled entity is not joined as long as there are sufficient allegations of primary violations by the controlled person as an element of the action. *SEC v. Savoy, 190 U.S. App. D.C. 252, 587 F.2d 1149, 1170 n.47 (D.C. Cir. 1978)*. At this stage, the court has concluded that the plaintiffs have pleaded sufficient [*138] facts under the PSLRA to survive the motions to dismiss as to certain primary violations alleged against the defendants Hansen, Rider, Shapiro and Dahlen. The court will, at this stage, deny the motions to dismiss on the grounds that the plaintiffs have sufficiently pleaded controlling person liability as against these named defendants. This concludes the court's discussion of the issues related to the 1934 Act claims.

### B. Analysis of the 1933 Act Issues

The court now turns to the 1933 Act claims. These claims arise from offerings of Fleming securities to the public by means of two allegedly material false and misleading Registration Statements in March and June of 2002. The first, a March 2002, exchange offering involved the issuance of $ 400 million of 10 5/8% Series D Senior Subordinated Notes in exchange for all outstanding Series B and Series C notes. The second, a June 2002, offering involved the sale of 8 million shares of common stock at $ 19.40 per share and $ 200 million of 9 1/4% Senior Notes from a previous shelf offering that allowed for the delayed or continuous sale of up to $ 600 million of debt or common stock or some combination thereof over a two-year [*139] period. The plaintiffs allege that the FY01 financial statements used in both offerings were materially false and misleading and that Fleming acknowledged later the FY01 financial statements were false and need to be restated. In addition,

  

the plaintiffs allege that the registration statements contained materially false and misleading statements regarding Flemings' current and historical business and operating conditions and that D&T falsely represented that its audit had been conducted in conformity with GAAS and that the statements fairly presented Fleming's financial condition. The plaintiffs n14 brought actions against the 1933 Act Individual Defendants, the Underwriters, and D&T.

> n14 The "1933 Act Plaintiffs" include: Massachusetts State Carpenters Pension Fund ("MSCPF"), Massachusetts State Guaranteed Annuity Fund ("MSGAF"), Alaska Electrical Pension Fund ("Alaska Fund"), Anthony Colarich, David Dickey, Joel Feliciano, Raheela Zaman and Terry Slater.

[*140] [HN44] The 1933 Act claims do not require a plaintiff to plead or prove fraudulent conduct and the plaintiffs expressly disavow all allegations of fraud or scheme. Therefore, the heightened pleading standards of *Federal Rule of Civil Procedure 9(b)* do not apply. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363 (5th Cir. 2001).* Notice pleading under *Rule 8* is all that is required to properly state 1933 Act claims. *In re Enron, 235 F. Supp. 2d at 596.* That said, the court now turns to a discussion of liability under the 1933 Act. Specifically, these plaintiffs assert claims under *sections 11* and *12(a)(2)* of that act.

[HN45] *Section 11* imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading and grants standing to sue to any person acquiring such security. *15 U.S.C. § 77k(a).* *Section 11* imposes a stringent standard of liability on the parties who play a direct role in a registered offering. [*141] *Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983).* A plaintiff who purchased a security issued pursuant to a registration statements need only show a material misstatement or omission to establish his *prima facie* case. *Id. at 382.* The plaintiffs do not have to allege knowingly or intentionally false statements in registration statement because *section 11* claims do not sound in fraud. *Schlotzsky's, 238 F.3d at 369.* *Section 11* does not require a plaintiff to plead or prove scienter. *Id.*

Congressional policy underlying *section 11* was to create liability regardless of fault. *Id.* If there is a material misstatement or omission in the registration statement, the buyer may sue the issuer, underwriter, or signor of the registration statement.

[HN46] The Fifth Circuit interprets the operative language of *section 11* to allow suits to be brought by direct buyers on the day an offering closes, as well as subsequent purchasers who can trace their securities to the challenged registration statement. [*142] *Rosenzweig, 332 F.3d at 872-73.* To establish standing, the plaintiffs must allege facts to show that all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement.*Krim v. pcOrder.com, Inc., 210 F.R.D. 581 (W.D. Tex. 2002).* Where there have been multiple offerings of the same type of securities, plaintiffs do not satisfy their tracing burden by showing they probably bought stock issued pursuant to the allegedly false registration statement.*Id. at 586.*

[HN47] Under *section 11* an expert has an affirmative defense if it shall sustain the burden of proof that after reasonable investigation it had reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statement therein not misleading. *15 U.S.C. § 77k(b).* [HN48] A defendant may be shielded from *section 11* liability if the defendant [*143] reasonably, and without actual knowledge of any inaccuracies, relies on parts of a registration statement "purporting to be made on the authority of an expert." *15 U.S.C. § 77k(b)(3)(C).* Expertised portions of a registration statement and prospectus include those, such as financial statements, that have been examined, reported upon and audited by independent auditors. *In re Enron, 235 F. Supp. 2d at 598.* An underwriter may rely on expertised portions of a registration statement or prospectus, such as financial statements certified by an accountant, unless it had reasonable grounds to believe the statements were untrue. *Id. at 613.* The fact-specific determination of the reasonableness of a defendant's investigation or of his reliance on the opinion of an expert is not a question properly resolved on a motion to dismiss unless the affirmative defense clearly appears on the face of the complaint.*In re Enron, 258 F. Supp. 2d at 639.*

  

[HN49] *Section 12(a)(2)* imposes liability on a person who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact. [*144] *Lewis v. Fresne, 252 F.3d 352, 357 (5th Cir. 2001)*. A seller is one who either passes title of the securities to the buyer or one who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. *Pinter v. Dahl, 486 U.S. 622, 647, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988)*. To count as solicitation, the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig, 332 F.3d at 871*. An issuer may be liable only if the plaintiff can allege and prove that an issuer's role was not the usual one, that it went farther and became the vendor's agent. *Id.* Virtually all issuers routinely promote a new issue, if only in the form of preparing a prospectus and conducting a road show. *Lone Star Ladies, 238 F.3d at 370*. [HN50] *Section 12(a)* does not require a plaintiff to prove scienter either and the pleadings need only satisfy the liberal pleading requirements of *Rule 8 of the Federal Rules of Civil Procedure.* [*145] *In re Enron, 235 F. Supp. 2d at 596*.

As several of the 1933 Act Defendants raise limitations arguments, the court addresses in general the applicable limitations period. [HN51] The 1933 Act requires plaintiffs to bring claims under *section 11* or *12(a)(2)* "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." *15 U.S.C. § 77m*. The Sarbanes-Oxley Act does not extend the limitations period for the 1933 Act claims to two years. The plain language of the Sarbanes-Oxley Act states that the extended limitations period applies "to a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance . . . as defined in section 3(a)(47) of the Securities Exchange Act of 1934." The courts have rejected the argument that the Sarbanes-Oxley limitations period applies to 1933 Act claims. *In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003)*; [*146] *Friedman v. Rayovac Corp., 295 F. Supp. 2d 957, 974-75 (W.D. Wis. 2003)*. Instead, the applicable limitations period to these claims is one year after the plaintiffs were put on inquiry notice of their claims as required by *Section 77m of the 1933 Act*.

It is well-settled [HN52] the inquiry notice may be determined as a matter of law. *Jensen v. Snellings, 841 F.2d 600, 607 (5th Cir. 1988)*(affirming a dismissal where record revealed that the plaintiffs had notice of claims); *Rahr v. Grant Thornton LLP, 142 F. Supp. 2d 793, 796 (N.D. Tex. 2000)*. In this regard, one court has observed that "where . . . the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate. . . ." *LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003)*.

In this case, the plaintiffs plead that Fleming issued a press release on July 30, 2002, announcing that its retail segment was suffering from declining prices (TAC, [*147] P 264). The plaintiffs also allege that on July 31, 2002, analysts downgraded Fleming's investment rating and questioned its reported per-share earnings (TAC, P 270-71). Finally, most importantly, the plaintiffs allege that the Wall Street Journal published an article on September 5, 2002, that revealed Fleming's practice of taking unauthorized, improper, and unsustainable deductions from vendor's invoices. (TAC, P 281). As a matter of law, the plaintiffs' own allegations reveal that, at the latest, the plaintiffs' were on inquiry notice of their claims by September 5, 2002, the date of the Wall Street Journal article exposing the practice of vendor deductions. Thus, limitations expired on the 1933 Act claims September 5, 2003, one year later. Against this backdrop, the court examines the various limitations arguments.

The 1933 Act Individual Defendants and D&T assert that the plaintiffs' claim against them relating to the March 2002 offering of 10.625% Notes is time-barred. In their response, the plaintiffs appear to concede that Terry Slater is the only plaintiff with standing to assert a *section 11* claim relating to the March 2002 Registration Statement because he is the only named [*148] plaintiff to have obtained notes in an offer made pursuant to that statement. The plaintiffs argue that Terry Slater filed a lawsuit in Oklahoma state court on November 14, 2002, within the limitations period. But, what the plaintiffs fail to appreciate is that Slater did not sue the *1933 Act Individual Defendants or D&T* in that case. Slater's case joined only the Fleming Companies, Hansen, Rider, and Dahlen. Slater failed to join the 1933 Act Individual Defendants and D&T until September 12, 2003, more than one year after limitations commenced. Therefore,

  

the claims against the 1933 Act Individual Defendants and D&T are time-barred unless saved by an exception, which, as the court will explain, they are not.

*Rule 15(c)(3)*, governing the relation back of pleadings, does not apply. [HN53] The explicit language of the rule states that an amendment adding a new defendant relates back only if, among other things, the new defendant "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." The rule does not protect plaintiffs who "knew of the late-named party at all times but failed to include that [*149] party in the original filing." *In re Xchange Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 15909, 2002 WL 1969661, at *4 (D. Mass. Aug. 26, 2002)*. In this case, the identities of the 1933 Act Individual Defendants and D&T were readily ascertainable. All of the Individual Defendants (save and except Hernandez) actually signed the March 2002 Registration statement, and D&T's role as the auditor was plain from the face of the statement. (*See, e.g.,* March Registration Statement, p. 106, identifying independent auditor as D&T). And, even with respect to Hernandez, the plaintiffs here make no argument that they were mistaken as to his identity or that it was not readily ascertainable. The court grants the 1933 Act Individual Defendants' and D&T's motions to dismiss the plaintiffs' claims under the 1933 Act relating to the March 2002 offering because they are barred by the applicable one-year statute of limitations. Resolution of the limitations question makes it unnecessary to consider the 1933 Act Individual Defendants' and D&T's alternative argument that the March 2002 exchange offer is exempt from the provisions of *section 11*.

The 1933 Act Individual Defendants, Defendant [*150] D&T, and the Underwriter Defendants (collectively, "1933 Act Defendants") also contend that the *section 11* claim should be dismissed because the claims based on the June 2002 offering are time barred. The 1933 Act Defendants urge, with respect to the June 2002 offering, that the plaintiffs' claims relating to the purchase of 9.25% Notes are barred because one of the original plaintiffs, MSCPF, did not purchase notes in the offering and plaintiff Alaska Fund, which did purchase notes in that offering, was not joined as a party-plaintiff until September 12, 2003, after limitations had expired. The court disagrees.

The linchpin of the 1933 Act Defendants' argument

is that MSCPF lacked standing to pursue claims on behalf of the note purchasers when it filed its February 20, 2003, complaint because it only purchased stock. It is not disputed that MSCPF filed suit within the limitations period and its pleading, on behalf of a class, alleging violations of federal law in connection with the sale of "Fleming Securities" issued in or traceable to the June 2002 Offering, placed the defendants named therein plainly on notice of these claims. There is authority that suggests that a *class representative* [*151] who purchased stocks can represent purchasers of debt instruments in the same lawsuit. *In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 445 (S.D. Tex. 2002)*(noting "there is no requirement that the claims of all plaintiffs and class members must be identical"); *Endo v. Albertine, 147 F.R.D. 164, 167 (N.D. Ill. 1993)*("[A] class of plaintiffs who purchased different types of securities may properly be certified with a representative party who only purchased one type of security."); *In re Saxon Sec. Litig., 1984 U.S. Dist. LEXIS 19223, 1984 WL 2399, at *7 (S.D.N.Y. Feb. 23, 1984)*(holding that "debenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct").

The 1933 Act Defendants contend these cases are distinguishable, and these parties say that the cases concerned the propriety of class representation under *Rule 23*, not jurisdictional standing. The 1933 Act Defendants point to the holding in *In re Paracelsus Corp., 6 F. Supp. 2d 626 (S.D. Tex. 1998)*, where the court held that purchasers of stock issued pursuant to one registration statement [*152] did not have standing to sue on behalf of purchasers of notes issued out of a companion statement. It is true that *Paracelsus* addressed the concept of standing and dismissed, on standing grounds, the claims of plaintiffs who had not purchased bonds issued pursuant to the registration statement at issue. In that case, however, the two types of securities were issued pursuant to separate registration statements. The claims of the note purchasers had to be linked under *section 11* to the registration statement pursuant to which the company issued the notes. Otherwise, the statutory requirements of *section 11* failed.

[HN54] The point of Article III standing and the more specific statutory standing concept addressed in *Paracelsus* is to ensure that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases "securities" as that term is defined by

 

the Act issued pursuant to a particular registration statement. In this case, it is not disputed that the stocks and the notes were issued pursuant to a single registration statement, nor is it disputed that MSCPF bought securities issued pursuant to the registration statement. MSCPF had in February [*153] 2003, and continues to have a personal stake in the outcome of the case sufficient to warrant Article III standing on the *section 11* claims.

Contrary to the 1933 Act Defendants' argument, the case law holds that [HN55] purchasers of one type of security have *standing* to sue on behalf of purchasers of other types of security issued pursuant to a single registration statement. The court in *In re Worldcom, Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 4240, 2004 WL 555697, at *6-7 (S.D.N.Y. March 19, 2004)*, recently rejected a similar argument when it held that purchasers of one type of debt security (domestic) had standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant to the same registration statement). Similarly, the court in *In re MobileMedia Secs. Litig., 28 F. Supp. 2d 901, 911 (D.N.J. 1998)* was faced with an argument that stock purchasers lacked standing to represent the interests of note purchasers and held that the plaintiffs had "sufficiently alleged individual cognizable injuries pursuant to *section 11* and *section 12(a)(2)*" to confer standing. [*154] The court therefore rejects the argument that *section 11* claims related to notes issued pursuant to the June 2002 Registration Statement are barred by the statute of limitations. Resolution of this question in this manner renders it unnecessary to consider the plaintiffs' alternative arguments that *American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 551, 38 L. Ed. 2d 713, 94 S. Ct. 756 (1974)* applies to this case to toll limitations until the addition of Alaska Fund to this case in the September, 2003 or that *Rule 15* permits the relation back of Alaska Fund's claims to the date of MSCPF's February 2003 complaint.

The 1933 Act Defendants also argue that aftermarket purchasers of Fleming's common stock cannot "trace" their purchases to the June 2002 Registration Statement, and therefore, *section 11* claims asserted on their behalf should be dismissed. [HN56] In the Fifth Circuit, aftermarket purchasers who can trace their purchase to the challenged registration statement have standing to bring a *section 11* claim. *Rosenzweig, 332 F.3d at 873.* Bearing in mind that the case is still in the pleading stage, the court rejects the 1933 Act Defendants' argument.

Here, [*155] the TAC specifically alleges that "Plaintiffs and the other members of the Subclasses purchased the Fleming Securities that were issued pursuant and traceable to the March and June 2002 Registration Statements." (TAC, P 509). The plaintiffs have sufficiently pleaded *section 11* standing with their allegation that the members of the class purchased the securities that were "issued pursuant and traceable to" the pertinent registration statements. Whether and to what extent the plaintiffs will be able to *prove* tracing is a different question and is one which, in any event, is not susceptible to decision in the current posture of this case.

The 1933 Act Individual Defendants and D&T also contend that the plaintiffs' *section 12(a)(2)* claims should be dismissed because they are not "sellers" of securities. [HN57] *Section 12(a)(2)* provides that a person who "offers or sells" a security by means of a prospectus or oral communication that contains a materially false statement or that omits to state certain material facts shall be liable to any person purchasing such security from him. *15 U.S.C. § 77l(a).* A *section 12(a)(2)* "seller" is either (1) the person who actually passes [*156] title to the buyer, or (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter, 486 U.S. at 647.*

The March and June 2002 offerings were firm commitment underwritings. As such, investors purchased securities not from Fleming, but from the underwriters or broker-dealers who purchased from the underwriters. Consequently, as a matter of law, the 1933 Act Individual Defendants and D&T cannot be sellers under the title-passing definition adopted by the Supreme Court.

As to the second definition, the plaintiffs allege in conclusory fashion that each defendant named in Count V "solicited and/or was a substantial factor in the purchase by plaintiffs of securities in the offerings." (TAC, P 517). What is required under *Pinter* is that the named defendant "successfully solicit" the purchase. To that end, the court agrees with the defendants that solicitation is a legal term of art and that conclusory allegations in a pleading or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. [*157] *Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993).*

The Fifth Circuit has narrowly circumscribed the scope of *section 12(a)(2)* liability under the second *Pinter*

  

definition. [HN58] The court has held that to count as "solicitation," the seller must, at a minimum, directly communicate with the buyer. *Rosenzweig, 332 F.3d at 871*. An issuer, like Fleming (and, by extension, its directors and its auditor), is liable under *section 12(a)(2)* only if the plaintiff can allege and prove "that an issuer's role was not the usual one; that it went farther and became a vendor's agent." *Id.* (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363, 370 (5th Cir. 2001)*). This is because virtually all issuers promote their securities in some fashion, either by preparing prospectuses or conducting road shows. *Lone Star Ladies, 238 F.3d at 370*. The TAC is bereft of allegations that the 1933 Act Individual Defendants or D&T directly communicated with the purchasers of the securities or assumed the unusual role of the vendors' agents. The plaintiffs have failed to allege sufficient facts to prevent [*158] dismissal of the *section 12(a)(2)* claims against the 1933 Act Individual Defendants and D&T, and the court grants the motion to dismiss those claims.

The Underwriter Defendants are named as defendants under *sections 11* and *12(a)(2)* of the 1933 Act with respect to their role in the June 2002 Offering. Most of their arguments have been addressed previously; however, they make a separate, distinct argument which they assert entitles them to a dismissal of all of the 1933 Act claims against them. According to the Underwriter Defendants, they were entitled to rely on the accuracy of Fleming's financial statements because those statements were "expertised."

As noted above, *section 11 of the 1933 Act* contains a safe harbor from liability for underwriters who reasonably rely upon "expertised" portions of a registration statement. *15 U.S.C. § 77k(b)(3)(C)*. Likewise, underwriters are shielded from liability for a claim under *section 12(a)(2)* if they rely on the "expertised" portions of an offering prospectus. *In re Worlds of Wonder Sec. Litig., 814 F. Supp. 850, 867-68 (N.D. Cal. 1993), aff'd in relevant part, 35 F.3d 1407 (9th Cir. 1994)* [*159] . Unfortunately for the Underwriter Defendants, this question is generally not proper for resolution by a motion to dismiss, because the underwriter bears the burden of proof to show that it had no reason to believe and did not believe that the expertised portions of the registration statement were untrue. *In re Enron Corp. Sec. Derivative & ERISA Litig., 258 F. Supp. 2d 576 (S.D. Tex. 2003); Griffin v. PaineWebber, Inc., 84 F. Supp. 2d 508, 512-13 (S.D.N.Y.*

*2000); In re Chambers Development Sec. Litig., 848 F. Supp. 602, 624 (W.D. Pa. 1994)*. The court rejects the Underwriter Defendants' argument that their entitlement to this affirmative defense is apparent from the face of the TAC and therefore denies the Underwriter Defendants' motion to dismiss the 1933 Act claims leveled against them.

Finally, the Underwriter Defendants assert that the plaintiffs have not sufficiently alleged standing to pursue their *section 12(a)(2)* claim against them. As noted, [HN59] *section 12(a)(2)* liability is narrow. Standing exists under *section 12(a)(2)* and *Pinter* when a plaintiff can plead and prove that a seller actually passed title to a buyer. The [*160] Underwriter Defendants argue that the TAC fails to allege that the plaintiffs acquired title in their securities from the Underwriter Defendants, such that the first definition of "seller" under *Pinter* is satisfied.

The TAC alleges that "the Underwriter Defendants offered for sale and sold the securities purchased by plaintiffs and the members of the Subclass. . . ." (TAC, P 516). This allegation is susceptible to two constructions: the first is that the Underwriter Defendants offered for sale and sold the securities *directly to* the plaintiffs; the second is that the Underwriter Defendants offered for sale and sold the securities *first to another* who *then* sold to the plaintiffs. As [HN60] *section 12(a)(2)* only permits a purchaser to recover against his direct seller, the court agrees with the Underwriter Defendants that the plaintiffs have not sufficiently alleged *section 12(a)(2)* standing with this allegation. Nor have the plaintiffs sufficiently articulated how or if they had direct communication with the Underwriter Defendants such that they satisfy the second *Pinter* definition. It may be, however, that the plaintiffs are able to satisfy these requirements. They are [*161] granted leave to do so within ten (10) days after the date of the entry of this opinion if they can. The court has canvassed the remaining arguments in support of the various motions to dismiss and, to the extent they have not been specifically addressed in this opinion, they are now rejected.

## V. CONCLUSION

In accordance with the above opinion and for the reasons more fully expressed herein the court **ORDERS** that the following motions be disposed of as indicated below:


™ LexisNexis™    ™ LexisNexis™    ™ LexisNexis™

2004 U.S. Dist. LEXIS 26488, *161

. Defendant Mark D. Shapiro's Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 15) **GRANTED IN PART AND DENIED IN PART**

. Defendant E. Stephen Davis' Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof (Docket # 16) **GRANTED**

. 1934 Act Defendants' Joint Motion to Dismiss Pursuant to *Rules 9(b)* and *12(b)(6)* and the Private Securities Litigation Reform Act of 1995 and Memorandum of Law in Support (Docket # 17) **GRANTED IN PART AND DENIED IN PART**

. Defendant Neal Rider's Supplemental Motion to Dismiss Pursuant to *Rules 9(b)* and *12(b)(6)* and the Private Securities Litigation [*162] Reform Act of 1995 and Memorandum of Law in Support (Docket # 18) **GRANTED IN PART AND DENIED IN PART**

. Defendant Thomas Dahlen's Individual Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Brief in Support (Docket # 19) **GRANTED IN PART AND DENIED IN PART**

. Motion to Dismiss Third Consolidated Amended Class Action Complaint and Brief in Support Thereof of Defendant Mark Hansen (Docket # 20) **GRANTED IN PART AND DENIED IN PART**

. Motion to Dismiss of Defendants Lehman Brothers Inc., Deutsche Bank Securities Inc., Wachovia Securities, Inc., and Morgan Stanley & Co. Incorporated (Docket # 21) **GRANTED IN PART AND DENIED IN PART**

. Defendant Deloitte & Touche LLP's Motion to Dismiss and Supporting Brief (Docket # 22) **DENIED**

. 1933 Act Individual Defendants' Motion to Dismiss Plaintiffs' Third Consolidated Amended Class Action Complaint and Supporting Brief (Docket # 25) **GRANTED IN PART AND DENIED IN PART**

So **ORDERED** and **SIGNED** this 10th day of June, 2004.

T. JOHN WARD

UNITED STATES DISTRICT JUDGE

  

**EXHIBIT C**

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
(Cite as: Slip Copy)

In re Paincare Holdings Securities Litigation
M.D.Fla.,2007.
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.
In re PAINCARE HOLDINGS SECURITIES
LITIGATION.
**Lead No. 6:06-cv-362-Orl-28DAB.**
**Member Nos. 6:06-cv-363-Orl-28DAB,**
**6:06-cv-373-Orl-28DAB,**
**6:06-cv-374-Orl-28DAB,**
**6:06-cv-379-Orl-28DAB,**
**6:06-cv-396-Orl-28DAB,**
**6:06-cv-417-Orl-28DAB,**
**6:06-cv-490-Orl-28DAB,**
**6:06-cv-512-Orl-28DAB,**
**6:06-cv-587-Orl-28DAB,**
**6:06-cv-676-Orl-28DAB.**

April 25, 2007.

Eric Landau, Shawn Harpen, McDermott, Will &
Emery, LLP, Irvine, CA, Bruce J. Berman,
Mcdermott, Will & Emery, LLP, Miami, FL, for
Paincare Holdings Securities Litigation.

**ORDER**
JOHN ANTOON II, United States District Judge.
**\*1** This case is before the Court on Defendants'
Motion to Dismiss Consolidated Class Action
Complaint (Doc. No. 70) filed October 20, 2006.
The United States Magistrate Judge has submitted a
report recommending that the motion be granted.

After an independent *de novo* review of the record
in this matter, and consideration of the objections
filed by the Lead Plaintiff and the Defendants' Brief
in Opposition to Plaintiff's objections, the Court
agrees entirely with the findings of fact and
conclusions of law in the Report and
Recommendation. Therefore, it is **ORDERED** as
follows:

1. That the Report and Recommendation filed
March 26, 2007 (Doc. No. 101) is **ADOPTED** and
**CONFIRMED** and made a part of this Order.

2. The motion to dismiss (Doc. 70) is **GRANTED.**

3. Plaintiff is granted leave to amend its complaint
consistent with the analysis of the Report and
Recommendation. The amended complaint shall be
filed no later than May 23, 2007.

4. Plaintiff's request for oral argument (Doc. 103) is
**DENIED.**

**DONE** and **ORDERED.**

**Report And Recommendation**
DAVID A. BAKER, United States Magistrate
Judge.
TO THE UNITED STATES DISTRICT COURT

This cause came on for consideration with oral
argument on the following motion filed herein:
**MOTION:  MOTION  TO  DISMISS
CONSOLIDATED   CLASS   ACTION
COMPLAINT (Doc. No. 70)**
**FILED: October 20, 2006**
**THEREON** it is **RECOMMENDED** that the
motion be **GRANTED.**

*Background*

This is a putative securities fraud class action
seeking relief against PainCare Holdings, Inc.
(herein "PainCare" or "the Company") and
individual corporate officers and directors (CEO
Randy Lubinsky and CFO Mark Szporka). The
matter comes before the Court on motion by
Defendants to dismiss the Consolidated Amended
Complaint (Doc. No. 65) (herein "CAC") for failure
to state a claim upon which relief can be granted,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 2

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

pursuant to Rules9(b) and 12(b)(6), Fed.R.Civ.P., and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. In addition to their brief, Defendants have filed a Request for Judicial Notice and accompanying exhibits (Doc. No. 72). Lead Plaintiff [FN1] has filed responsive memoranda to the motion to dismiss and the request for judicial notice (Doc. Nos.79, 80), and Defendants were permitted to file a reply brief (Doc. No. 83). As is more specifically set forth below, upon consideration of the allegations of the CAC, the submissions of the parties, and oral argument by counsel, the Court finds that Plaintiff has not sufficiently pled its claims as to these Defendants and accordingly recommends the motion to dismiss be granted.

> FN1. This case has been pled as a class action, though it has yet to be certified as one. Accordingly the Court refers to " Plaintiff" throughout this Report, as at present there is only the Lead Plaintiff, The Employees' Retirement System of the Government of the Virgin Islands.

### The Allegations of the Complaint

For purposes of a motion to dismiss, the Court looks to the facts as alleged by Plaintiff.

Plaintiff purchased the common stock of PainCare during the Class Period. [FN2] CAC at ¶ 11. PainCare is a Florida corporation which, through its subsidiaries, provides pain relief solutions as a specialized, professional health services organization. CAC at ¶ 12. At all relevant times, Randy Lubinsky was CEO and Mark Szporka was CFO of PainCare. Both were also members of the Company's Board of Directors. CAC at ¶¶ 13, 14.

> FN2. Defined as March 24, 2003 through March 15, 2006.

**\*2** Prior to and during the Class Period, PainCare pursued an aggressive growth strategy in which it sought to acquire physician practices and surgical centers in order to "ultimately position PainCare as

the world leader in pain management, minimally invasive spine surgery and orthopedic rehabilitation ..." CAC at ¶ ¶ 25-27. During the Class Period, the Company completed 22 acquisitions with an aggregate price of over $80 million, using a combination of stock and cash (See ¶¶ 34, 36, 39, 44, 45, 46, 52, 55, 56, 57, 61, 71, 76, 77, 83, 84, 88, 89, 90, 95, 96 & 97).

### The Claimed Fraud

Plaintiff alleges that PainCare's reported financial results before and during the Class Period were not presented fairly and in accordance with Generally Accepted Accounting Principles ("GAAP") in that the Company's "reported expenses were materially **understated** during the Class Period, and reported net income was materially **overstated** during the Class Period." CAC at ¶ 3 (emphasis original). Plaintiff asserts that by causing PainCare to issue false financial statements, Defendants enabled the Company to 1) acquire at least twenty companies using artificially inflated common stock and cash received from private placements and credit facilities as consideration; 2) enter into private placement deals whereby the Company received over $33 million in gross proceeds; 3) establish a $30 million credit facility on more favorable terms than it would have secured "if the truth were known" ; and 4) complete a public offering of 8 million shares of its common stock whereby it reaped approximately $15.2 million in gross proceeds. CAC at ¶ 4.

The investing public "remained unaware of the accounting improprieties" until an announcement on March 15, 2006, by PainCare that, following discussions with the SEC, it intended to restate its financial results for the years 2000 through 2004, and for the first three quarters of 2005. (CAC at ¶ ¶ 5, 99-100.) In a Form 8-K filed the same day, PainCare identified three matters of questionable accounting under discussion with the SEC staff:

(a) its existing stock option plans for both employees and non-employees;

(b) practice and surgery center acquisitions,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

including values recorded for acquired intangible assets and calculation of the consideration; and

(c) expenses relating to derivative financial instruments issued in connection with several private placements. (See CAC at ¶ 100).

On June 1, 2006, PainCare issued restated financial results that lowered net income by approximately $12.7 million for 2003; $7.2 million for 2004; and $16.3 million for the first three quarters of 2005 (*Id.* at ¶ 5, see also ¶ 102),[FN3] and acknowledged " there is an ineffective control environment over the Company's financial reporting." (¶ 104). In response to the announcement, the Company's stock fell $0.36 per share or 13%, to close on March 16, 2006 at $2.50 per share on unusually heavy trading volume. During the next three trading days, shares of the Company's stock continued to fall, reaching as low as $1.41 on March 21, 2006. (*Id.* at¶ 6).

> FN3. This is a combined loss. The CAC alleges that net income, as originally reported, was $2,273,178 for the first quarter in 2005, and restated net income for that quarter was $(27,763,632). In the second quarter of 2005, the restated net income increased from $3,364,190 to $11,110,828. The restated net income also increased in the third quarter of 2005-from $3,473,897 to $9,368,869. (CAC at ¶ 102).

**\*3** The CAC asserts that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 and that Lubinsky and Szporka are also liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

### *Standard of Review*

On a motion to dismiss, this Court accepts as true all well-pleaded allegations of the Consolidated Class Action Complaint, and construes all reasonable inferences therein in the light most favorable to the plaintiff. *Ziemba v. Cascade Int'l,*

*Inc.,* 256 F.3d 1194, 1198 n. 2 (11th Cir.2001) ( *citing Byrant v. Avado Brands, Inc.,* 187 F.3d 1271, 1273 n. 1 (11th Cir.1999). While the general rule mandates a court limit its inquiry to the four corners of the complaint when ruling on a motion to dismiss, an exception is granted in securities fraud cases to allow a court to take judicial notice (for the purposes of determining what statements the documents contain and not to prove the truth of the documents contents) of relevant public documents required to be filed with the Securities and Exchange Commission ("SEC"), and actually filed. *In re Sunterra Corp. Sec. Litig.,* 199 F.Supp.2d 1308, 1319 (M.D.Fla.2002) (*quoting Bryant,* 187 F.3d at 1278).

Ordinarily, the standard provides that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In order to survive a motion to dismiss in a securities fraud case, however, a plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity. *In re: Recoton Corp. Sec. Litig.,* 358 F.Supp.2d 1130, 1138 (M.D.Fla.2005). A plaintiff satisfies Rule 9(b)'s particularity requirement for fraud when the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Id.* (*quoting Ziemba,* 256 F.3d at 1202) (*itself quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997)). "A sufficient level of factual support for a[10b] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when, where, and how: the first paragraph of any newspaper story.' " *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir.2006) (internal citations omitted).

In    addition    to    the    particularity    pleading

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

requirements required of the plaintiff under Rule 9(b), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b), further heightens the pleading burden by requiring that the complaint contain: (1) factual specificity as to the alleged misleading or omitted statements [FN4] and (2) particular facts raising a "strong inference" that a defendant acted with "the required state of mind." [FN5] Failure to meet either of these provisions mandates the dismissal of the Complaint on the motion by any defendant.[FN6]

>    FN4. Section 78u-4(b)(1) states: In any private action arising under this title in which the plaintiff alleges that the defendant-(A) made an untrue statement of a material fact; or (B) omitted to state a material fact in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

>    FN5. Section 78(u-4(b)(2) states: In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

>    FN6. The PSLRA mandates that "in any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78y-4(b)(3)(A).

**\*4** With respect to the "required state of mind," this

Court has noted that:
The Eleventh Circuit has held that scienter is satisfied by a showing that the defendant had "an intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." *Bryant,* 187 F.3d at 1282-83. Severe recklessness is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* at 1282 n. 18 (*quoting McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989)). While averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285. Further, the Eleventh Circuit has recently clarified that "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th Cir.2004).

*In re Recoton,* 358 F.Supp.2d 1130 at 1139.

In addition to pleading fraud with particularity and scienter sufficiently, Plaintiff also has the burden under the Exchange Act of showing that the misrepresentations alleged "caused the loss for which plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). As stated in *Recoton:*
As explained by the Eleventh Circuit, "loss causation describes 'the link between the defendant's misconduct and the plaintiff's economic loss.' " *Robbins,* 116 F.3d at 1447 (*quoting Rousseff v. E.F. Hutton Co.,* 843 F.2d 1326, 1329 n. 2 (11th Cir.1988)). A plaintiff ultimately proves loss causation by showing "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (citation and internal quotation omitted). Although a "plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury," the plaintiff "must show that the misrepresentation touches upon the reason for the investment's decline in value." *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

(internal quotations omitted). Allegations of artificial price inflation alone do not satisfy the loss causation requirement. *Id.* at 1448.

358 F.Supp.2d at 1152.

### *Analysis*

Defendants assert that the CAC must be dismissed because it does not meet the standard for pleading securities fraud as a matter of law in that: 1) Plaintiff does not identify the misrepresentations with sufficient particularity; 2) the allegations of scienter are inadequate; and 3) Plaintiff has failed to properly plead causation.

### The alleged misrepresentations

As set forth above, the circumstances constituting the fraud must be plead with particularity. Here, Plaintiff appears to allege, in essence, that because the financial statements for the years 2000 through the first three quarters of 2005 were restated, therefore the 15 or so public filings and 50 press releases issued during that time period were erroneous and thus, fraudulent misrepresentations. The Court rejects this whole-cloth approach as inconsistent with the required "who, what, when, where, and how" of Rule 9(b).

*5 In its brief, Plaintiff asserts that it has provided the level of specificity required, citing to Allegation 98 of the CAC, which states:
PainCare's financial statements (a) improperly accounted for certain derivative financial instruments related to shares of PainCare's common stock issued to Midsummer Investments, Islandia, and Laurus in connection with private placement transactions; (b) improperly accounted for physician practice and surgery center acquisitions, including the values recorded for tangible and intangible assets and the calculation of the consideration paid for such acquisitions; and (c) improperly accounted for PainCare's stock option grants to employees and non-employees.

This allegation, however, does not satisfy the standard of pleading "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *In re Recoton,* 358 F.Supp.2d at 1138 (*quoting Ziemba,* 256 F.3d at 1202) (*itself quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997)). The allegation is not "precise" about which financial statement or statements contain the offending accounting, nor about where in that particular financial statement or statements the matters can be found. Nor does the allegation speak to the manner in which Plaintiff was misled. Rather, if anything, the allegation purports to *summarize* and interpret all of the financial statements collectively, as being inconsistent with the latter restatements, and therefore misrepresentations. This does not satisfy the standard of pleading that the misstatements (whatever they were) were untrue statements of material fact, made with scienter.

Although Plaintiff is more specific in relying on the various GAAP violations pled (CAC at ¶¶ 106-167), Defendant correctly notes that the CAC merely expounds on the accounting treatments described in the restated financials instead of identifying *exactly* which statements it contends are fraudulent and why they are fraudulent. In memoranda, Plaintiff also contends: "In addition, the Complaint states that the Individual Defendants' Sarbanes-Oxley certifications, and other statements pertaining to PainCare's internal controls, were false and misleading because: (a) the financial statements violated GAAP and materially overstated net income and understated operating expenses and (b) there were material weaknesses in the Company's internal controls distorting its true financial condition. (¶¶ 29, 30, 32, 37, 40, 41, 51, 54, 63, 69, 74, 80, 86 & 92)." (Doc. No. 79 at 9). But the allegations referenced by Plaintiff fail to allege that at the time the certifications were filed, the individual Defendants knew of the accounting error or the weaknesses in the Company's controls, and thus the statements were knowingly false when

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

made.

*6 It appears to this Court that Plaintiff has merely substituted a recitation of alleged *evidence* of inaccurate statements for a cogent *pleading* of the alleged fraud. Indeed, the Court cannot tell whether Plaintiff is alleging that each and every press release or earning statement is itself a separate claim of fraud or whether Plaintiff is asserting some grand, overall scheme of ongoing deception. Considering that Plaintiff does not allege that the Company failed to set forth its method of accounting, but rather, that the method of accounting disclosed was later determined to be the wrong method, the importance of identifying the "misrepresentation" with specificity cannot be overstated. Compare *Bay v. Palmisano,* 2002 WL 31415713 (E.D.La., Oct.24, 2002) (where defendant "repeatedly and precisely disclosed to investors its method for recognizing revenue" even if accounting methods violated GAAP, plaintiff failed to allege sufficient facts to support a reasonable belief that financial statements were false and misleading.) Identification of the specific claim is essential in that Plaintiff must also show the manner in which the misrepresentation misled Plaintiff and what the Defendant obtained as a consequence of the alleged fraud. Absent such specificity, the Complaint cannot stand.

### Scienter

As set forth above, in this circuit, scienter is satisfied by a showing that the defendant had "an intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." *Bryant,* 187 F.3d at 1282-83. Severe recklessness is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* at 1282 n. 18 (*quoting McDonald v. Alan Bush Brokerage Co..* 863 F.2d 809, 814 (11th Cir.1989)); *see also Garfield, supra.* While averments of motive and

opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285-6.

As noted at argument and in Plaintiff's papers, Plaintiff contends that the Court can infer scienter for present purposes in that: 1) the Company restated *all* of its earnings; 2) the Company, at all relevant times, was in acquisition mode; 3) the Company's alleged explanation for restating its financials (that it was due to "evolving" GAAP interpretations) was false; and 4) the individual Defendants' positions with the Company shows that they had access to Company information and "knew or should have known" that the Company was engaging in improper accounting. The Court is not persuaded.

Plaintiff relies on *Zuckerman v. Smart Choice Automotive Group, Inc.,* 2000 WL 33996254 (M.D.Fla.2000) for support of its contention that the magnitude of accounting misstatements is indicative of severe recklessness. The case at bar, however, is far different from the *Zuckerman* case. In *Zuckerman,* the earnings discrepancy arose following a "systematic practice of falsifying customer information submitted to the Company's credit review and approval division" which included forging documents; recording down payments as having been paid that were not, in fact, paid; and misrepresenting the true cost of vehicles. *Id.* Moreover, there were allegations that the CFO failed to report that a subsidiary had been sold, and another subsidiary was falsely reported to have engaged in revenue producing activities when, in fact, this subsidiary had no operations. Thus, *Zuckerman* involved a failure to disclose known misdeeds and a purposeful withholding or misstating of known information. By contrast, here there are no such allegations of corporate wrongdoing and cover-up. No smoking guns are alleged, no corporate conspiracy is pled.

*7 This is a relatively simple financial restatement case. Unlike *Zuckerman,* the corporate statements of public record set forth in the request for judicial notice in this case show that PainCare at all relevant times *disclosed* its method of accounting in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 7

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

financial statements it issued and consistently used the same disclosed method of accounting, prior to the restatement. Moreover, the Company, in compliance with the applicable rules and regulations, employed outside auditors during the Class Period and the auditors *certified* the financial statements, which included the since withdrawn accounting methodology. To the extent the flawed methodology is the misrepresentation sued upon, it was set forth and disclosed to the world. The fact that the accounting error, when discovered and corrected by Defendant, resulted in a massive restatement of earnings does not serve as an indicium of fraud under these circumstances; because the disclosed methodology was used consistently, the restatement necessarily affected all of the prior financial statements. While it is true, generally, that the magnitude and significance of a restatement of revenue plays a role in determining scienter, *In re Microstrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620 (E.D.Va.2000), an inference of fraud is not contingent upon the loss of a particular dollar amount, and a mistake, even a large mistake, is not converted into fraud merely upon the reaching of a certain financial threshold. While the impact of the error here was significant, absent any other indicia of fraud (discussed below), the size of the loss alone is insufficient to establish scienter.

Nor is the Court convinced that the fact that the business was in acquisition mode shows scienter. As noted by Defendant at argument, there is no allegation that the assets the Company acquired were inappropriate acquisitions or were undervalued. Indeed, the Court is hard-pressed to see the damage done to shareholders by the alleged fruits of the wrongdoing, as pled: "Defendants, by causing PainCare to issue false financial statements, enabled the Company to (I) acquire at least twenty companies using artificially inflated common stock and cash received from private placements and credit facilities as consideration; (ii) enter into private placement deals whereby the Company received over $33 million in gross proceeds; (iii) establish a $30 million credit facility on more favorable terms than it would have secured if the truth were known; and (iv) complete a public offering of 8 million shares of its common stock

whereby it reaped approximately $15.2 million in gross proceeds." CAC at ¶ 4.[FN7] Again, this is not a case where insider trading or other corporate raiding is alleged.

> FN7. Of course, this is not to condone purchasing assets with artificially inflated stock; rather, the observation is that, if truly reflects a scheme by the Defendants, the injury is not to the corporate shareholders, who acquired an ostensibly valuable asset.

Indeed, as pointed out by Defendant, the CAC is notable for what it *does not* allege. There is no allegation that the Company lied to or misled its accountants. There is no confidential informant, suppressed internal memorandum, or allegations of clandestine "cooking of the books." No conspiracy to withhold known contrary information is alleged. In short, there is nothing to indicate that the restatement, massive though it was, was due to anything more than an accounting error. To the extent Plaintiff points to the violations of GAAP, such violations are themselves insufficient to show scienter. *In re Sunterra,* 199 F.Supp.2d at 1333; *see also Garfield, supra.* Moreover, the Court is not persuaded by the alleged "falsity" of the reason provided by Defendant for the restatement. Plaintiff alleges no facts (as opposed to bald conclusions) sufficient to support an inference that the Company's disclosed reason for the restatement (that it was due to "evolving" GAAP interpretations) was a pretext. Even if Plaintiff is correct in that the GAAP principles were *not* evolving, Plaintiff pleads nothing to support an inference that the Company's stated belief to the contrary was anything other than merely wrong. [FN8] This is especially true, given the fact that the accounting methodology was always publicly disclosed, the methodology was used for years without incident, and outside auditors reviewed and certified the financial statements. *Compare Andropolis v. Red Robin Gourmet Burgers, Inc.,* 2007 WL 8729 (D.Colo. Jan.2, 2007) (granting motion to dismiss, noting, among other things, " Plaintiff does not allege the existence of a single written document showing that Red Robin was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 8

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

actually aware that it was utilizing improper accounting procedures that threatened the financial viability of the company; nor does Plaintiff allege sufficient facts to show that Red Robin's accounting failures were so obvious as to support an inference that the Company harbored an intent to artificially inflate its financial forecast.")

> FN8. Indeed, the Company points out that the results of the restatement were not one-sided, and as a result of the restatement, the Company's net income actually *increased* for the quarter ending June 30, 2005, and for the quarter ending September 30, 2005 (CAC at ¶ 102). Plaintiff offers no explanation for why a company intent on fraud would continue to use a methodology that significantly *understated* net income for a six month period of time.

**\*8** Finally, scienter must be pled against *each* defendant. *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th Cir.2004). The allegations against the CFO and CEO are that the officers had a motive to defraud (as their bonuses were tied to Company performance) and, as experienced businessmen with access to the financial records, they knew "or should have known" that the Company was engaging in improper accounting. Absent from the CAC, however, are any allegations as to *how* or *why* the officers should have known. [FN9] Indeed, considering that there is no allegation of insider trading or other unreported improprieties or red flags, there is nothing to transform this case into anything other than, at most, negligence or corporate mismanagement. In this circuit, fecklessness is not recklessness.

> FN9. At argument, the Court noted that the Company's original outside auditors certified the financial statements and did not catch the error, yet are not defendants here. Plaintiff's counsel downplayed the auditor's responsibility, noting that: "Any auditor can miss it." If the professionals hired to inspect and certify a publicly

traded company's financials can "miss" an accounting error alleged to be blatant and obvious, the inference, absent any allegations of conspiracy or wrongdoing, can only be that the error was not so obvious after all.

Taken together and construing all reasonable inferences in Plaintiff's favor, [FN10] this complaint fails to set forth sufficient allegations of severe recklessness, essential to plead scienter.

> FN10. Although not determinative here, as the Court finds the allegations, as pled, fail to support any inference (let alone a strong inference) of fraud, the United States Supreme Court has recently granted a petition for writ of certiorari in *Tellabs Inc. v. Makor Issues & Rights Ltd. v. Tellabs, Inc.,* 437 F.3d 588 (7th Cir.2006), *cert. granted,* --- U.S. ----, 127 S.Ct. 853, 166 L.Ed.2d 681 (2007), to address the question of how courts should weigh competing inferences in securities litigation under PSLRA.

### Causation

As set forth above, Plaintiff also has the burden of alleging that the misrepresentations caused the loss or decline in value. A federal securities fraud claim is actionable "only where [ ] plaintiffs adequately allege and prove the traditional elements of causation and loss." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Judge Whittemore sets forth the applicable standard:

'[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.' *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir.2005) (internal quotations and citation omitted)....

In *Dura,* the U.S. Supreme Court held that loss causation may not be established by simply alleging

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1229703 (M.D.Fla.)
**(Cite as: Slip Copy)**

a stock was purchased at an artificially inflated price. *Dura Pharms., Inc.,* 125 S.Ct. at 1631-32, 1634. Rather, to sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop. *Id.* at 1634 (motion to dismiss granted based on plaintiffs' failure to plead loss causation where plaintiffs failed to allege that stock prices fell after 'the truth became known').

*In re Teco Energy, Inc. Securities Litigation,* 2006 WL 845161, *2 (M.D.Fla. March 30, 2006).

The Court agrees with the Defendants that loss causation has not been adequately pled, but not for the reasons raised. While the CAC, read as a whole, alleges that the Company's stock price dropped over several days "when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market" (CAC at ¶ 174), it is not apparent that the CAC, fairly read, adequately identifies the prior misrepresentations and fraudulent conduct, as discussed above. In a case such as this, based solely on the aftermath of a financial restatement, the Court cannot fairly evaluate the alleged *effect* of certain misrepresentations, unless it is precisely known what those representations where. In that respect, the hindsight pleading approach adopted by Plaintiff renders an analysis of loss causation impossible. The CAC should be dismissed.

### Individual Defendants

*9 As this Court finds that Plaintiff has failed to properly allege a cause of action under Section 10(b) or Rule 10b-5 as to the Company, it follows that a cause of action for "control person" liability under Section 20(a) of the Exchange Act for the same alleged conduct has not been adequately pled against Szporka or Lubinsky. *See Garfield, supra.*

### Conclusion

For the reasons set forth above, the complaint does not meet the applicable pleading requirements and cannot stand. Although the Court has doubts that, on these facts, Plaintiff will be able to meet these standards consistent with the above analysis, in keeping with the usual liberal practice of allowing amendment, Plaintiff should be allowed another opportunity to assert, if it can, in *specific* fashion, its claim against Defendants, bearing in mind the above findings. The Court **respectfully recommends** that the Court grant the motion to dismiss, with leave to amend.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 26, 2007.

M.D.Fla.,2007.
In re Paincare Holdings Securities Litigation
Slip Copy, 2007 WL 1229703 (M.D.Fla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT D**

LEXSEE



Cited
As of: Jun 06, 2007

**In re TRANSCRYPT INTERNATIONAL SECURITIES LITIGATION (This Document Relates to all Cases)**

**4:98CV3099**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

**1999 U.S. Dist. LEXIS 17540**

**November 4, 1999, Decided**
**November 4, 1999, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant accountants moved, pursuant to Fed. R. Civ. P. 12(b)(6), seeking dismissal of plaintiff's class action suit alleging securities fraud in violation of 15 U.S.C.S. § 77k, 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5, resulting from defendant's certification of financial statements.

**OVERVIEW:** Plaintiffs sued defendant-accountants and defendant-corporation, alleging securities violations under 15 U.S.C.S. § 77k, 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5, on the basis of strict liability, negligence, and lack of due diligence, not fraud. Plaintiffs claimed that defendant-accountants caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in defendant corporation's initial public offering registration statement, which misrepresented or failed to disclose certain facts. Defendant-accountants moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim because the complaint did not allege that defendants made any misrepresentations of material fact in the registration statement and could not be liable unless they were identified in the statement. The court dismissed plaintiffs' claims against defendant that were not made with scienter, and denied motion for claims which plaintiffs pleaded with sufficient particularity.

**OUTCOME:** Motion to dismiss granted in part and denied in part; granted to the extent that counts were dismissed to the extent the plaintiffs sought to hold defendants liable under for statements other than defendants' audit opinion on 1996 financial statements, and denied in all other respects.

**CORE TERMS:** audit, stock, registration statement, offering, scienter, auditor, motion to dismiss, false and misleading, misstatement, misleading, omission, pleaded, accountant, recklessness, announced, aiding and abetting, Securities Act, Exchange Act, per share, specificity, quarterly, securities fraud, market price, trace, oral argument, restated, material fact, misrepresentations, misbehavior, conscious

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] Pursuant to Fed. R. Civ. P. 12(b)(6), a motion to dismiss a complaint should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.

  

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2] In resolving motions to dismiss under Fed. R. Civ. P. 12(b)(6), all well pleaded allegations in the complaint must be taken as true. Furthermore, the complaint and all reasonable inferences arising therefrom must be weighed in favor of the plaintiff.

*Securities Law > Liability > Remedies > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*
[HN3] Section 11 of the 1933 Securities Act, 15 U.S.C.S. § 77k, provides for recovery of damages from certain issuers of registered securities when a purchaser relies on false or misleading information in a registration statement.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN4] A claim under 15 U.S.C.S. § 77k does not require proof of reliance, causation, or scienter, but only materiality and damages.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN5] The only two elements of a claim under 15 U.S.C.S. § 77k are a material misstatement or omission in a registration statement, and damages.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN6] The general rule is that an auditor or accountant cannot be held liable under 15 U.S.C.S. § 77k for any misleading statements in a corporation's registration statement unless the registration statement identities that auditor or accountant as having prepared or certified the statement.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN7] 15 U.S.C.S. § 77k permits an action against an accountant based on material misstatements or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN8] See 15 U.S.C.S. § 77k(c).

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > General Overview*
[HN9] Although it is true that a security's market price usually serves as a good starting point in determining value, under certain circumstances, the market price may not adequately reflect the security's value.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN10] 15 U.S.C.S. § 78j(b) makes it unlawful for any person to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities Exchange Commission may prescribe.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN11] Securities Exchange Commission Rule 10b-5 makes it unlawful to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. 17 C.F.R. § 240.10b-5.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Standing*
[HN12] Standing under 15 U.S.C.S. § 78j(b) and Securities Exchange Commission Rule 10b-5, 17 C.F.R.§





240.10b-5, requires a showing of misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; causation, often analyzed in terms of materiality and reliance; damages; and fraudulent activity occurring in connection with the purchase and sale of a security.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN13] A fact is material under 15 U.S.C.S. § 78j(b) and 17 C.F.R. § 240.10b-5 if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN14] Claims under Rule 10b-5 are governed by Rule 9(b) of the Federal Rules of Civil Procedure, which means that they must be pleaded with particularity.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN15] Fed. R. Civ. P. 9(b) deters the use of securities fraud complaints as a pretext for fishing expeditions, it protects against damage to professional reputations resulting from allegations of moral turpitude, and it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN16] A securities fraud plaintiff must plead in detail the facts surrounding fraud.

*Civil Procedure > Pleading & Practice > Pleadings >*

*Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN17] Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy Fed. R. Civ. P. 9(b).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN18] The Private Securities Litigation Reform Act of 1995 (PSLRA) amends the Exchange Act, further enhancing the pleading requirements of a securities fraud claim. The Exchange Act now requires that when a plaintiff charges a defendant with making untrue statements or omissions of material fact, the complaint shall specify each statement alleged to have been misleading. 15 U.S.C.S. § 78u-4(h)(1).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN19] If a claim of securities fraud involves multiple defending parties, a claimant usually may not group all wrongdoers together in a single set of allegations. Rather, the claimant is required to make specific and separate allegations against each defendant. Therefore, an allegation that misrepresentations were made at the direction, under the supervision, or with the knowledge and consent of all defendants will fail because it does not promote the purposes of Fed. R. Civ. P. 9(b), to provide fair notice and to lessen the number of meritless fraud claims.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN20] The Supreme Court has held that common-law principles cannot be used to interpret 15 U.S.C.S. § 78j(b) and that aiding and abetting claims are not within the scope of that section.

*Securities Law > Liability > Securities Exchange Act of*





*1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN21] A defendant must actually make a false or misleading statement in order to be held liable under 15 U.S.C.S. § 78j(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under 15 U.S.C.S. § 78j(b).

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN22] Under 15 U.S.C.S. § 78j(b) and 17 C.F.R. § 240.10b-5, a plaintiff is required to prove that the defendant, in effectuating an allegedly fraudulent sale, acted with scienter.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Securities Law > Liability > Private Securities Litigation > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN23] The Private Securities Litigation Reform Act of 1995 heightened the requirement for pleading scienter to the level used by the Second Circuit: Plaintiff's must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C.S. § 78u-4(b)(2).

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Criminal Law & Procedure > Scienter > Knowledge*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN24] The scienter needed in connection with securities fraud is intent to deceive, manipulate, or defraud, or knowing misconduct.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN25] As a pleading requirement for securities fraud, a plaintiff must either allege facts to show that defendants had both motive and opportunity to commit fraud or

allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN26] Scienter is not explicitly required by the statutory text, but it is an acknowledged essential element of a 15 U.S.C.S. § 78j(b) or 17 C.F.R. § 240.10b-5 claim.

*Criminal Law & Procedure > Scienter > Knowledge*
*Criminal Law & Procedure > Scienter > Recklessness*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN27] Scienter may be established by proof of knowing or intentional practices to deceive, manipulate, or defraud. Negligence is not sufficient, but the majority rule is that recklessness also satisfies the scienter requirement.

*Criminal Law & Procedure > Scienter > Recklessness*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
[HN28] If a defendant states untrue facts with reckless disregard for their truth or falsity, there is scienter.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Express Liabilities > Misleading Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Accountants & Auditors*
[HN29] While it is true that the mere fact that a company's financial reporting was inaccurate does not establish scienter, the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors. The more serious the error, the less believable are defendants protests that they were completely unaware of the company's true financial status and the stronger is the inference that defendants must have known about the discrepancy.

COUNSEL: [*1] For GABRIEL FISCHBARG, plaintiff: David W. Rowe, KINSEY, RIDENOUR LAW

  

FIRM, Lincoln, NE. William S. Lerach, Alan Schulman, David R. Boyd, MILBERG, WEISS LAW FIRM, San Diego, CA. Lionel Z. Glancy, GLANCY LAW FIRM, Los Angeles, CA. Edward Toptani, TOPTANI LAW FIRM, New York, NY. Randall Steinmeyer, Randall H. Steinmeyer, REINHARDT & ANDERSON LAW FIRM, St. Paul. MN. Steven J. Toll, Kristopher A. Kinkade, COHEN, MILSTEIN LAW FIRM, Seattle, WA. Robert I. Harwood, Daniella Quitt, WECHSLER, HARWOOD LAW FIRM, New York, NY. Thomas F. Hoarty, Jr., BYAM, HOARTY LAW FIRM, Omaha, NE. Reed R. Kathrein, Jeffrey W. Lawrence, MILBERG, WEISS LAW FIRM, San Francisco, CA. Robert M. Roseman, SPECTOR & ROSEMAN, PC, Philadelphia, PA. Shawn M. Hays, SHAWN M. HAYS LAW FIRM, San Diego, CA. Jonathan Schwartz, WECHSLER, HARWOOD LAW FIRM, New York, NY.

For LARRY DORNAN, STEVEN SWOBODA, plaintiffs: David W. Rowe, KINSEY, RIDENOUR LAW FIRM, Lincoln, NE. William S. Lerach, David R Boyd, MILBERG, WEISS LAW FIRM, San Diego, CA. Randall Steinmeyer, REINHARDT & ANDERSON LAW FIRM, St. Paul. MN. Steven J. Toll, Kristopher A. Kinkade, COHEN, MILSTEIN LAW FIRM, Seattle, WA. Robert I. Harwood, Daniella Quitt, WECHSLER, [*2] HARWOOD LAW FIRM, New York, NY. WECHSLER, HARWOOD LAW FIRM, New York, NY. Thomas F. Hoarty, Jr., BYAM, HOARTY LAW FIRM, Omaha, NE. Reed R. Kathrein, Jeffrey W. Lawrence, MILBERG, WEISS LAW FIRM, San Francisco, CA. Robert M. Roseman, SPECTOR & ROSEMAN, PC, Philadelphia, PA. Jonathan Schwartz, WECHSLER, HARWOOD LAW FIRM, New York, NY.

For TRANSCRYPT INTERNATIONAL. INC, JEFFERY L. FULLER, JOHN T. CONNOR, defendants: Timothy R. Engler, HARDING, SHULTZ LAW FIRM, Lincoln, NE. Thomas J. McDermott, Jr., MANATT, PHELPS LAW FIRM, Los Angeles, CA.

For PRICEWATERHOUSECOOPERS, LLP, defendant: Bartholomew L McLeay, Kathleen M Quinn, Pamela B. Griffin, Richard P. Jeffries, KUTAK, ROCK LAW FIRM, Omaha, NE. Robert J. Kopecky, John F. Hartmann, KIRKLAND, ELLIS LAW FIRM, Chicago, IL.

For MICHAEL P. WALLACE, JOEL K. YOUNG, C. ERIC BAUMANN, defendants: Timothy R. Engler,

HARDING, SHULTZ LAW FIRM, Lincoln, NE. Thomas A. Zaccaro, MANATT, PHELPS LAW FIRM, Los Angeles, CA.

**JUDGES:** Warren K. Urbom, United States Senior District Judge.

**OPINION BY:** Warren K. Urbom

**OPINION:**

MEMORANDUM AND ORDER ON DEFENDANT COOPERS' MOTION TO DISMISS, THE DEFENDANTS' APPEALS FROM THE MAGISTRATE JUDGE'S ORDER, AND THE PLAINTIFF'S [*3] MOTION FOR ORAL ARGUMENT

This is a securities action filed by the plaintiffs, purchasers of publicly traded stock of Transcrypt International, Inc. ("Transcrypt"). The plaintiffs filed a consolidated amended class action complaint ("complaint"), filing 59, against Transcrypt, some of Transcrypt's officers and directors, and Transcrypt's former auditor, PriceWaterhouseCoopers LLP (formerly Coopers & Lybrand LLP) ("Coopers"). The plaintiffs allege violations of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Defendant Coopers has filed a motion to dismiss, filing 95. For the reasons set forth below, I shall grant in part and deny in part Coopers' motion to dismiss. I shall also deny the defendants' statements of appeal from the magistrate judge's order and the plaintiffs' motion for oral argument.

### I. STANDARD OF REVIEW

[HN1] Pursuant to Rule 12(b)(6), "a motion to dismiss a complaint should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986)* (citing *Thomas W. Garland, Inc. v. City of St. Louis, 596 F.2d 784, 787* [*4] (8th Cir.), cert. denied, [HN2] *444 U.S. 899, 62 L. Ed. 2d 135, 100 S. Ct. 208 (1979)); Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984).* In resolving such motions, all well pleaded allegations in the complaint must be taken as true. Furthermore, the complaint and all reasonable inferences arising therefrom must be weighed in favor of the plaintiff. *Morton, 793 F.2d at 187.* In light of these





principles, I shall set forth the facts in the background section of this order as if the allegations in the plaintiffs' complaint are factual, not always using qualifying terms such as "allegedly." However, the facts set forth in the background section of this order should not be construed as factual findings of the court.

## II. BACKGROUND

Transcript is a company that develops information security products which prevent unauthorized access to voice and data communications. By mid-1996 the encryption side of Transcript's business was in serious decline, and the individual defendants were greatly concerned that this decline threatened not only the future of the company, but also their individual investments in the company. Transcript needed investment capital to survive. [*5]

In order to raise capital, Transcript decided to sell stock in the company to the public through an initial public offering ("IPO"). According to the plaintiffs, Transcript had to present itself as a fast-growing company with a strong product and a bright future in order to get the public interested in Transcript's stock at the IPO. In order to do this, the plaintiffs claim that the defendants had to falsify Transcript's financial statements in the IPO prospectus and registration statement. After all, the company was running out of cash, which had declined from $ 2.1 million on December 31, 1994, to $ 291,000 on December 31, 1995, to an overdraft of $ 154,000 on September 30, 1996.

In preparation for its IPO, Transcript needed a firm of certified public accountants to certify the financial statements contained in their registration statement. Coopers had been Transcript's outside auditor since 1992, and Transcript retained Coopers to provide certification for Transcript's financial statements necessary for its IPO.

In January of 1997, Transcript carried out an IPO with a price of $ 8 per share, raising approximately $ 20 million in capital. During the first half of 1997, Transcript's [*6] stock traded between $ 6 and $ 12 per share. In April of 1997, the company announced a "record" first quarter, and in July of 1997, it announced "record" results for its second quarter of 1997. Also in July of 1997, Transcript completed the acquisition of another company, E.F. Johnson Company, and thereafter highlighted to analysts the benefits of this acquisition.

Then, in October of 1997, Transcript made a second offering of stock to the public, raising another $ 56 million.

Transcript continued to make favorable statements about its future prospects through the end of 1997, and the price of Transcript's stock traded as high as $ 23-5/8 per share to $ 27-1/4 per share between late November of 1997 and early January of 1998. However, in February of 1998, Transcript's stock price began to decline to the $ 20 range as rumors surfaced questioning the reliability of the company's past financial results and its future prospects. On March 5, 1998, Transcript issued a press release in which it responded to these rumors by stating that it knew of no factual basis that would account for these rumors. Transcript's stock continued to trade at $ 17 to $ 20 per share through March 27, 1998. [*7]

On March 27, 1998, before the market opened, Transcript announced that it would not file its annual report on Form 10-K with the Securities and Exchange Commission ("SEC") on March 31, 1998, (the due date) since the audit being conducted by its outside accountants, Coopers, had not been completed. Transcript's stock price decreased 40% on March 27, 1998, falling to $ 9-7/8 per share. Then, on April 21, 1998, Transcript announced that the SEC had "issued a formal order of investigation relating to the company." On April 24, 1998, Coopers resigned as Transcript's independent auditor. Upon resigning as Transcript's auditor, Coopers withdrew its audit opinions on Transcript's 1995 and 1996 financial statements, despite the fact that Coopers had previously issued unqualified audit opinions for those same years. On April 27, 1998, Transcript announced that Coopers had resigned as the company's auditor and that NASDAQ had temporarily halted trading in the company's stock. On May 5, 1998, Transcript announced that its reported financial results for 1996 and 1997 would indeed have to be restated. On July 29, 1998, Transcript restated its 1996 and 1997 financial results. In the midst of these [*8] events, Transcript's stock dropped below the initial share price at Transcript's IPO.

The named plaintiffs purchased Transcript stock between January 22, 1997, and April 24, 1998, ("the class period"). The plaintiffs claim that the defendants violated the Securities Act and the Exchange Act through a fraudulent scheme and course of business that operated as a fraud and deceit on purchasers of Transcript stock. The





plaintiffs claim that Transcrypt, its corporate insiders, and its controlling shareholders repeatedly misrepresented the status of Transcrypt's product, its revenue, and the prospects for the company throughout the class period. The plaintiffs claim that Coopers, Transcrypt's auditor, knew or recklessly disregarded that the company was booking phony sales, improperly recognizing revenue, and maintaining inadequate reserves for product returns and warranty expenses.

Of the six counts in the plaintiffs' complaint, only three of them, Counts I, III, and V, relate to Coopers. In its motion to dismiss, Coopers claims that Counts I, III, and V fail to state a claim against it. Coopers also argues that the plaintiffs' complaint should be dismissed for violating Rule 8 of the Federal [*9] Rules of Civil Procedure.

### III. ANALYSIS

A. Coopers' Motion to Dismiss

1. Count I

In Count I of their complaint, the plaintiffs claim that Coopers violated § 11 of the Securities Act, 15 U.S.C. § 77k, by certifying false financial statements in Transcrypt's IPO. This claim is based on principles of strict liability, negligence, and lack of due diligence, not fraud. Specifically, the plaintiffs claim that Coopers caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the IPO registration statement, which misrepresented or failed to disclose certain facts.

[HN3] "Section 11 of the 1933 Securities Act provides for recovery of damages from certain issuers of registered securities when a purchaser relies on false or misleading information in a registration statement." Alpern v. Utilicorp United, Inc., 84 F.3d 1525, 1541 (8th Cir. 1996) (citations omitted). [HN4] "A claim under § 11 does not require proof of reliance, causation, or scienter, but only materiality and damages." Id. (citation omitted). [HN5] Thus, the only two elements of a claim [*10] under § 11 are (1) a material misstatement or omission in a registration statement, and (2) damages. Id.

Coopers' first argument with respect to Count I is that the plaintiffs have failed to state a claim because the complaint does not allege that Coopers made any misrepresentations of material fact in Transcrypt's IPO registration statement. [HN6] The general rule is that an auditor or accountant, such as Coopers, cannot be held liable under § 11 for any misleading statements in a corporation's registration statement unless the registration statement identities that auditor or accountant as having prepared or certified the statement. See Monroe v. Hughes, 31 F.3d 772, 774 (9th Cir. 1994) ("Section [HN7] 11 of the 1933 Act permits an action against an accountant based on material misstatements or omissions in a registration statement, but only as to those portions of the statement that purport to have been prepared or certified by the accountant.") (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 386 n.22, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)).

Transcrypt's prospectus, which constitutes part of Transcrypt's 1997 IPO registration statement, states in relevant part:

> The financial [*11] statements as of December 31, 1994 and 1995 and for each of the three years in the period ended December 31, 1995 included in this Prospectus have been audited by Coopers & Lybrand LLP, independent auditors, as stated in their report, which is included herein, and have been so included in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

Index of Evidence in Support of Coopers' Motion to Dismiss at 53.

In addition, the plaintiffs claim that upon resigning as Transcrypt's accountants and auditors, Coopers stated:

> [Coopers] advised [Transcrypt] that their reports with respect to the consolidated financial statements of Transcrypt and subsidiaries as of and for the years ended December 31, 1995 and 1996 are withdrawn. Transcrypt is in the process of retaining new accountants. Until such time as [Transcrypt] retains new independent auditors and new auditors' reports are issued, [Transcrypt's] previously issued financial statements should not be relied upon.





Complaint, filing 59, P93.

Although it is clear that at least part of Transcrypt's 1997 IPO registration statement identifies Coopers as having [*12] either prepared or certified Transcrypt's financial statements for the periods ending December 31, 1994, and 1995, Coopers argues that the plaintiffs have not alleged any factual basis for claiming that there were any material misrepresentations or omissions with respect to these financial statements. Coopers argues that even though it withdrew its 1995 report, as it turned out, the financial statements of 1995 did not have to be restated. Thus, according to Coopers, the 1995 financial statements must have been correct, and Count I of the plaintiffs' complaint should be dismissed.

I am not persuaded by this argument. First, I must construe the plaintiffs' allegations in a light most favorable to the plaintiffs, not the defendants. The allegations are that Coopers is identified in Transcrypt's IPO registration statement as having certified Transcrypt's 1995 financial statements. Thereafter, Coopers withdrew its audit opinion with respect to Transcrypt's 1995 financial statements, stating that it should not be relied upon. Viewing these allegations in a light most favorable to the plaintiffs, a reasonable factfinder could infer that Coopers must have made a material misstatement or [*13] omission in the registration statement with respect to Transcrypt's 1995 financial statements, otherwise Coopers would not have withdrawn its audit opinion and would not have announced that its opinion should not be relied upon. Moreover, there is no evidence before me at this time, and I cannot state at this point in the litigation that there is no set of facts under which the plaintiff can prevail under Count I. Thus, I find that the plaintiffs sufficiently pleaded that Coopers made a material misstatement or omission in Transcrypt's IPO registration statement, at least with respect to Transcrypt's 1995 financial statements.

Coopers also seeks a limited ruling to the effect that it cannot be held liable under Count I for any misstatements or omissions with respect to the 1996 quarterly results in the IPO registration statement because the IPO registration statement does not identify Coopers as having prepared or certified those results. This argument is persuasive, but there is still one problem. I do not have the entire IPO registration statement before me

at this time. Therefore, I cannot be sure that there is nothing in the registration statement that suggests that Coopers either [*14] prepared or certified Transcrypt's 1996 quarterly results. I shall not make a limited ruling at this time with respect to whether Coopers can be held liable under Count I for any misstatements or omissions regarding Transcrypt's 1996 quarterly results since I do not have sufficient evidence before me. However, I shall note that unless the plaintiffs can point to a place in Transcrypt's 1997 IPO registration statement that identifies Coopers as having either prepared or certified Transcrypt's 1996 quarterly results, the plaintiffs will not be able to pursue recovery under Count I based on those 1996 quarterly results.

Coopers' final argument with respect to Count I is that the plaintiffs cannot satisfy the damages element of their § 11 claim because the price of Transcrypt's stock on the day this action was filed was higher than the price at which the shares were offered in the IPO. In other words, Coopers claims that because the price of Transcrypt's stock at the filing of the first class action lawsuit on March 31, 1998, was greater than the price of the stock at the time of the IPO, the plaintiffs cannot claim IPO-related damages under § 11.

[HN8] The plaintiffs respond to this argument [*15] by pointing to § 11(e), which states:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and 1) the value thereof as of the time such suit was brought, or 2) the price at which such security shall have been disposed of in the market before suit . . .

15 U.S.C. § 77k(c).

The plaintiffs emphasize that the damages under § 11 are determined by reference to the value of the stock on the date the first suit was filed, not the market price. See McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995) (recognizing that "the value of a security may not be equivalent to its market price"). The plaintiffs argue that the price of Transcrypt's stock on the day this case was first filed, March 31, 1998,



was not a reliable indicator of Transcript's stock value because the true state of affairs had not yet been disclosed, and the market price at the time this suit was filed was artificially inflated due to the defendants' alleged [*16] fraud.

I agree with the plaintiffs' argument. [HN9] Although it is true that a security's market price usually "serves as a good starting point in determining value," "under certain circumstances, the market price may not adequately reflect the security's value." McMahan, 65 F.3d at 1049. Transcript's stock has dropped well below the $ 8.00 IPO price since the alleged fraudulent activities of some of the defendants have been revealed. The question of whether the value of Transcript's stock at the time this case was filed was lower than the $ 8.00 IPO price is a question of fact that cannot be answered at this time. Thus, the plaintiffs' have adequately alleged the second element of a § 11 claim. I shall deny Coopers' motion to dismiss Count I.

2. Count III

In Count III of their complaint, the plaintiffs claim that Coopers violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, by making false and misleading statements. [HN10] Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance [*17] in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). [HN11] SEC Rule 10b-5 makes it unlawful "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. The Eighth Circuit has described claims brought pursuant to § 10(b) and Rule 10b-5 as follows:

> [HN12] Standing under § 10(b) and Rule 10b-5 requires a showing of (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security. [Citations omitted]. [HN13] A fact is material if it is substantially likely "that the disclosure of

the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [Citations omitted].

[HN14] Alpern v. Utilicorp United, Inc., 84 F.3d 1525, 1533-34 (8th Cir. 1996).

Claims under Rule [*18] 10b-5 are governed by Rule 9(b) of the Federal Rules of Civil Procedure, which means that they must be pleaded with particularity. See [HN15] Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir. 1997). Rule 9(b) deters the use of securities fraud complaints "as a pretext for fishing expeditions," "it protects against damage to professional reputations resulting from allegations of moral turpitude[,]" and "it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense." Id. [HN16] "Thus, a securities fraud plaintiff must plead 'in detail' the facts surrounding fraud, i.e., 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" In re First Merchants Acceptance Corp. Securities Litigation, 1998 U.S. Dist. LEXIS 17760, 1998 WL 781118 (N.D. Ill. 1998) (quoting [HN17] Dileo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). "'Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule.'" Gateway 2000, 122 F.3d at 549 (citation omitted). [HN18] Additionally, the Private Securities Litigation Reform Act of 1995 [*19] (PSLRA) amends the Exchange Act, further enhancing the pleading requirements of a securities fraud claim. The Exchange Act now requires that when a plaintiff charges a defendant with making untrue statements or omissions of material fact, "the complaint shall specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(h)(1).

Coopers argues that the plaintiffs have specifically identified only one allegedly false and misleading statement made by Coopers, which is Coopers' February 3, 1997, audit opinion on Transcript's 1996 financial statements. Coopers' Memorandum at 12 (citing Complaint, filing 59, PP121 and 124). By making this argument, Coopers' essentially concedes that the plaintiffs have pleaded at least one allegedly false and misleading statement with specificity. I shall accept Coopers' concession that the plaintiffs sufficiently





pleaded that Coopers' February 3, 1997, audit opinion on Transcrypt's 1996 financial statements was a false and misleading statement, and I shall assume that this statement satisfies the requirements of Rule 9(b) and the PSLRA. Thus, at least part of Count III shall survive Coopers' argument that Count III [*20] has not been pleaded with specificity.

Aside from this one specific allegation, however, Coopers argues that the plaintiffs have not specifically alleged any other false or misleading statements made by Coopers. In other words, Coopers argues that Count III of the plaintiffs' complaint, alleging violations of § 10(b) and Rule 10b-5, must stand or fall based only on Coopers' audit opinion on Transcrypt's 1996 financial statements. This is so, according to Coopers, because the plaintiffs have failed to allege with specificity any other false or misleading statements made by Coopers.

I agree with Coopers' argument. The complaint identifies numerous press releases, earnings announcements, quarterly reports to shareholders, and other false and misleading statements made during the class period, but it does not specifically allege that Coopers made any of these statements. The general rule is as follows:

[HN19] If a claim involves multiple defending parties, a claimant usually may not group all wrongdoers together in a single set of allegations. Rather, the claimant is required to make specific and separate allegations against each defendant. Therefore, an allegation that misrepresentations [*21] were made "at the direction, under the supervision, or with the knowledge and consent of all defendants" will fail because it does not promote the purposes of Rule 9(b), to provide fair notice and to lessen the number of meritless fraud claims.

2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 9.03[1][f] (3d ed. 1999) (internal footnotes omitted).

Most of the allegations of false and misleading statements in the plaintiffs' complaint are not specifically directed at Coopers. Thus, I shall dismiss the plaintiffs' complaint with respect to those allegations of false and

misleading statements that are not specifically attributed to Coopers. However, I shall not dismiss Count III against Coopers in its entirety, since Coopers has essentially acknowledged that at least one false and misleading statement was pleaded with specificity, that being Coopers' audit opinion of Transcrypt's 1996 financial statements. n1

n1 The plaintiffs argue that they also specifically alleged that Coopers' audit opinion regarding Transcrypt's 1995 financial statements contained false and misleading statements. However, as will be explained later in this memorandum, the plaintiffs have not sufficiently alleged scienter with respect to Coopers' audit opinion regarding Transcrypt's 1995 financial statements. Therefore, I shall dismiss Count III with respect to Coopers' audit opinion on Transcrypt's 1995 financial statements. I did not dismiss Count I with respect to the 1995 financial statements because scienter was not required to maintain a claim under Count I. Also, the plaintiffs request in their brief that if Coopers' motion to dismiss is granted in any respect that they be given the opportunity to file an amended complaint. However, I shall not make a decision at this time as to whether the plaintiffs may file an amended complaint. If the plaintiffs wish to file an amended complaint, they should make such a request by filing the proper motion, giving the defendants an opportunity to respond.

[*22]

Coopers also argues that it cannot be held liable under Count III for its alleged role in "aiding and abetting" the misleading statements of others. In Shapiro v. Cantor, 123 F.3d 717 (2d Cir. 1997), the Second Circuit analyzed a case where the plaintiffs tried to hold certain defendants liable for being "in complicity" with the principal defendants. The Second Circuit rejected this "aiding and abetting" theory, stating that under the Supreme Court's decision in Central Bank v. First Interstate Bank, 511 U.S. 164, 128 L. Ed. 2d 119, 114 S. Ct. 1439 (1994), "secondary liability for 'aiding and abetting' no longer is a basis for a § 10(b) claim." Shapiro, 123 F.3d at 720 (citation omitted). [HN20] "The Supreme Court held that common-law principles could not be used to interpret § 10 and that aiding and abetting




claims are not within the scope of § 10(b)." Id. The Shapiro court cited with approval a district court case that found, [HN21] "If Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter [*23] how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." Id. (quoting In re MTC Elec. Techs. Shareholders Litig., 898 F. Supp. 974, 987 (E.D.N.Y. 1995)). I agree with Coopers' argument and the authority cited above. Coopers' shall not be held liable under Count III for allegedly "aiding and abetting" others who may have made misstatements.

Coopers' final argument with respect to Count III is that the plaintiffs have failed to allege that Coopers acted with scienter. The Second Circuit has led the way in interpreting the PSLRA and specifically addressing the scienter requirement for claims under § 10(b) and Rule 10b-5. In Press v. Chemical Inv. Services Corp., 166 F.3d 529, 537-38 (2d. Cir. 1999), the Second Circuit stated:

> [HN22] Under Section 10(b) and Rule 10b-5, a plaintiff is required to prove that the defendant, in effectuating an allegedly fraudulent sale, acted with scienter. See [HN23] Securities and Exch. Comm'n v. First Jersey Secs., Inc., 101 F.3d 1450, 1467. The Private Securities Litigation Reform Act of 1995 heightened the requirement for pleading scienter to the level used by the Second [*24] Circuit: Plaintiff's must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" 15 U.S.C. § 78u-4(b)(2). [HN24] The scienter needed in connection with securities fraud is intent "to deceive, manipulate, or defraud," or knowing misconduct. [HN25] First Jersey Secs., Inc., 101 F.3d at 1467. As a pleading requirement, a plaintiff must either (a) allege facts to show that "defendants had both motive and opportunity to commit fraud" or (b) allege facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp., Inc., 25 F.3d

1124, 1128 (2d Cir. 1994); see also Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996).

Press, 166 F.3d at 537-38.

The Eighth Circuit has stated:

> [HN26] Scienter is not explicitly required by the statutory text, but it is an acknowledged essential element of a § 10(b) or Rule 10b-5 claim. See [HN27] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S. Ct. 1375, 1380-81, 47 L. Ed. 2d 668 (1976); Harris, 787 F.2d 355, 362. [*25] Scienter may be established by proof of knowing or intentional practices to deceive, manipulate, or defraud. Harris, 787 F.2d at 362. Negligence is not sufficient, Hochfelder, 425 U.S. at 215, 96 S. Ct. at 1391, but this circuit follows the majority rule that recklessness also satisfies the scienter requirement. [HN28] Van Dyke v. Coburn Enterprises, Inc., 873 F.2d 1094, 1100 (8th Cir. 1989). If the defendants "stated untrue facts with reckless disregard for their truth or falsity," there is scienter. Id.

Alpern v. Utilicorp United, Inc., 84 F.3d 1525, 1533-34 (8th Cir. 1996).

In this case the plaintiffs have sufficiently pleaded scienter with respect to Coopers' audit opinion on Transcrypt's 1996 financial statements because the plaintiffs have alleged specific facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." First and foremost, the plaintiffs claim that Coopers issued a "clean" audit opinion with respect to Transcrypt's 1996 financial statements. This "clean" audit opinion is cast into doubt by the fact that Coopers later withdrew its audit report on Transcrypt's [*26] 1996 financial statements, and the fact that Transcrypt's accounts receivable which were originally reported to be $ 4.2 million as of December 31, 1996, have now been restated to less than $ 1.3 million. If these numbers were 10% or 15% off, this might be characterized only as mere negligence. But when a company's accounts receivable is found to be 70% lower than what the auditor originally stated it to be, this raises a strong inference of conscious misbehavior or recklessness on the part of the auditor. One district court faced with a large discrepancy stated:

> [HN29] While it is true that the mere fact

Page 11

  

that a company's financial reporting was inaccurate does not establish scienter, . . . the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors. In re Leslie Fay Companies, Inc. Securities Lit., 835 F. Supp. 167, 175 (S.D.N.Y. 1993) (rejecting independent auditor's motion to dismiss where allegations of large accounting errors gave rise to inference of scienter). The more serious the error, the less believable are defendants protests that they were completely unaware of [the company's] [*27] true financial status and the stronger is the inference that defendants must have known about the discrepancy.

Rehm v. Eagle Finance Corp., 954 F. Supp. 1246, 1256 (N.D.Ill. 1997) (internal citations omitted).

In addition to this large discrepancy, the plaintiffs also allege that Coopers either knew of or recklessly disregarded Transcrypt's violations of generally accepted accounting principles (GAAP), and that Coopers either knowingly or recklessly conducted its audit in violation of generally accepted auditing standards (GAAS), thereby leading to the false and misleading 1996 audit opinion. Specifically, the plaintiffs claim that Transcrypt's registration statements for its IPO and October 1997 offering both represented that Transcrypt's revenues "are recorded when products are shipped or services are rendered." Complaint, filing 59, P104. Despite this assertion, however, the plaintiffs claim that there were "red flags" that should have alerted Coopers to the fact that Transcrypt was not following this standard accounting method. For example, the plaintiffs allege that Transcrypt recorded $ 240,000 in revenue in November of 1996, based on a contract dated [*28] December 31, 1996, for engineering services which did not occur until 1997. It should be clearly obvious to even a beginning accountant or auditor that a contract to perform services that is dated December 31, 1996, should not be recorded as revenue in November of 1996. This constitutes a specific allegation that Coopers was reckless with respect to its 1996 audit opinion for failing to identify Transcrypt's "loose" accounting practices.

The plaintiffs have also alleged numerous violations of GAAS by Coopers. For example, GAAS requires that an auditor must qualify or disclaim its audit opinion if it is unable to obtain sufficient evidential matter to support its opinion. The plaintiffs claim that Coopers violated this principle because Coopers failed to obtain direct evidence in connection with the revenue Transcrypt recognized under a "quick ship" program begun in 1996 in which Transcrypt recognized revenue based on oral orders from government agencies, even though the government's commitment to make the purchase was not perfected at the time. Another example of how Coopers allegedly violated this GAAS principle was that Coopers failed to obtain sufficient evidential matter in connection [*29] with Transcrypt's recording of revenues where it granted customers the explicit right to return the products. In addition to these specific allegations, the plaintiffs put forth numerous other alleged violations of GAAS by Coopers. See Complaint, filing 59, PP128-136. I shall not restate all of the alleged violations of GAAS listed in the complaint. It is sufficient to note that the complaint lists even more alleged violations than the two stated above.

In sum, the plaintiffs have specifically alleged "red flag" GAAP violations by Transcrypt and numerous GAAS violations by Coopers. The plaintiffs have also alleged that there was an extremely large discrepancy in Transcrypt's 1996 accounts receivable as audited by Coopers and as restated by a subsequent audit, the magnitude of which suggests more than mere negligence. I am satisfied that the plaintiffs have sufficiently pleaded scienter with respect to Coopers' audit opinion of Transcrypt's 1996 financial statements by alleging specific facts that "constitute a strong inference of conscious misbehavior or recklessness" on the part of Coopers. Thus, Coopers' motion to dismiss shall be denied with respect to the plaintiffs' allegation [*30] relating to Transcrypt's 1996 financial statements. The plaintiffs' complaint is inadequate, however, with respect to allegations of scienter as to Coopers' audit opinion of Transcrypt's 1995 financial statements. While the plaintiffs have sufficient alleged in Count I that Coopers made material misstatements with respect to Transcrypt's 1995 financial statements, the plaintiffs have not alleged that those misstatements were made with recklessness as required by Count III. As such, Count III of the plaintiffs' complaint shall stand or fall based on the allegations relating to Transcrypt's 1996 financial statements.

3. Count V





In Count V of their complaint, the plaintiffs claim that Coopers violated § 11 of the Securities Act, 15 U.S.C. § 77k, by certifying false financial statements in Transcrypt's second public offering of stock. Coopers' only argument with respect to this claim is that the plaintiffs lack standing to raise a § 11 claim concerning Transcrypt's second offering because no lead plaintiff purchased Transcrypt securities in the second offering. In essence, Coopers argues that the plaintiffs should be required to plead specifically that they [*31] purchased Transcrypt shares during the second offering or else face dismissal of this claim.

Count V is not based on fraud, and it is not based on § 10(b) of the Exchange Act. Therefore, the plaintiffs are not required to plead this claim with specificity. All of the plaintiffs, except Larry Doman, allege that they purchased at least some of their shares of Transcrypt stock either during or after the second offering, which was in October of 1997. Although all of the plaintiffs have not alleged that they actually purchased their shares at the second offering, if they can prove that some of the shares they purchased were sold at the second offering, then they have standing to pursue a claim under § 11 as long as they can trace the purchase of their shares back to the October 1997 offering. See Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1999 WL 651947 *4 (9th Cir. 1999) (discussing the ability of stock purchasers to recover under § 11 even though they may not have actually purchased their securities at the offering at issue, as long as they can trace their shares back to the offering where the allegedly misleading registration statement was made). In this case there were two [*32] public offerings, one in January of 1997 and one in October of 1997. If the plaintiffs can trace their shares back to the October 1997 offering and prove the elements of their § 11 claim, then they will be able to recover under Count V. If the plaintiffs cannot trace their shares back to the October 1997 offering, they will not be able to recover under Count V. Whether the plaintiffs can trace their shares back to the October 1997 offering is a factual question that I shall not resolve at this time. I shall deny Coopers' motion to dismiss Count V in part without prejudice to Coopers later raising the argument that the plaintiffs cannot provide evidence that their stock shares are traceable to the October 1997 offering. However, I shall grant Coopers' motion to dismiss Count V in part because it is clear from the face of the complaint that plaintiff Larry Doman will not be able to recover under Count V, because the only shares he claims to have purchased were purchased prior to October of 1997, and therefore will not be traceable to the October 1997 offering.

### 4. Rule 8 of the Federal Rules of Civil Procedure

Coopers argues that the plaintiffs' complaint violates Rule 8 of the [*33] Federal Rules of Civil Procedure because it is not a "short plain statement." This is a complex securities fraud case involving numerous counts, numerous parties, two public offerings, numerous SEC filings, and numerous false and misleading public statements. Moreover, the defendants' alleged fraud and other misconduct spanned 15 months, and in some cases had to be alleged with specificity. Although the complaint probably could have been shorter and more concise, I do not find that it should be dismissed for violating Rule 8 of the Federal Rules of Civil Procedure.

### B. Statements of Appeal from Magistrate Judge's Order

The defendants have filed appeals from the magistrate judge's April 9, 1999, order. See filings 77 and 80. In his April 9, 1999, order, the magistrate judge denied the defendants' motions to stay discovery in a related state court action. Without expressing an opinion on the magistrate judge's reasoning or analysis, I shall deny the defendants' statements of appeal. The gist of the defendants' argument in favor of a stay in the state court action was that discovery in the state court action should be stayed until all motions to dismiss were resolved. This order [*34] resolves the only pending motion to dismiss of which I am aware. Therefore, I shall deny the defendants' statements of appeal as moot.

### C. Plaintiffs' Motion for Oral Argument

The plaintiffs have filed a motion requesting oral argument on Coopers' motion to dismiss. The plaintiffs suggest that given the complexities of this case, oral arguments would be helpful to me in deciding Coopers' motion to dismiss. The parties have submitted well-written briefs in support of and in opposition to Coopers' motion to dismiss, and they have explained their positions well. Therefore, I shall deny the plaintiffs' motion.

**IT IS ORDERED** that

1. defendant Coopers' motion to dismiss, filing 95, is granted in part and denied in





1999 U.S. Dist. LEXIS 17540, *34

part; it is granted to the extent that (1) Count III is dismissed against Coopers to the extent the plaintiffs seek to hold Coopers liable under that count for statements other than Coopers' audit opinion on Transcrypt's 1996 financial statements, and (2) Count V is dismissed against Coopers only with respect to plaintiff Larry Doman; in all other respects Coopers' motion to dismiss is denied;

2. the defendants' statements of appeal from the magistrate [*35] judge's order, filings 77 and 80, are denied; and

3. the plaintiffs' motion for oral argument, filing 100, is denied.

Dated November 4, 1999.

BY THE COURT

Warren K. Urbom

United States Senior District Judge



