BRAUN LAW GROUP, P.C.
Michael D. Braun (167413)
12304 Santa Monica Boulevard, Suite 109
Los Angeles, California 90025
Tel: 310.422.7755
Fax: 310.442.7756
*Liaison Counsel*

SAXENA WHITE, P.A.
Maya S. Saxena
Joseph E. White, III
2424 North Federal Highway, Suite 2150
Boca Raton, Florida 33431
Tel: 561.394.3399
*Co-Lead Counsel for Lead Plaintiff and the Class*

KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn (*pro hac vice*)
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Tel: 504.455.1400
Fax: 504.455.1498

- and -

KAHN GAUTHIER SWICK, LLC
Kim E. Miller (178370)
12 East 41st Street, Suite 1200
New York, New York 10017
Tel: 212.696.3730
Fax: 504.455.1498
*Co-Lead Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN G. MONGELI, Individually And On Behalf of All Others Similarly Situated, <br><br> Lead Plaintiff, <br><br> vs. <br><br> TERAYON COMMUNICATION SYSTEMS, INC., JERRY D. CHASE, RAY FRITZ, EDWARD LOPEZ, CAROL LUSTENADER, MATTHEW MILLER, ZAKI RAKIB, SHLOMO RAKIB, MARK A. RICHMAN, CHRISTOPHER SCHAEPE, MARK SLAVEN, LEWIS SOLOMON, HOWARD W. SPEAKS, ARTHUR T. TAYLOR, DAVID WOODROW, DOUG SABELLA and ERNST & YOUNG, LLP <br><br> Defendants. | Civil Docket No. 4:06-cv-03936-CW <br><br> **NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND EXPENSES** <br><br> Date:          September 18, 2008 <br> Time:          2:00 p.m. <br> Courtroom:   2 <br> Judge:         Hon. Claudia A. Wilken |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

MOTION AND NOTICE OF MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND EXPENSES ............................................................................................................... 1

I.      PROCEDURAL BACKGROUND AND SUMMARY OF FACTS ...................... 2

II.     STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS .......... 7

III.    A BALANCING OF THE FAIRNESS FACTORS TIPS HEAVILY IN FAVOR OF FINDING THE SETTLEMENT FAIR, ADEQUATE, AND REASONABLE ........................................................................................ 8

        A.  Strength of Lead Plaintiff's case; risk, expense, complexity, and likely duration of further litigation ........................................... 8

        B.  Stage of the proceedings; procedure by which the settlement was reached ................................................................................ 11

        C.  Risk of obtaining and maintaining class action status throughout the trial ..................................................................................... 11

        D.  Amount offered in settlement ............................................... 12

        E.  The experience and views of Lead Counsel ........................... 13

        F.  Reactions of Class Members ................................................. 13

IV.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT ................... 14

V.      AWARD OF ATTORNEYS' FEES AND EXPENSES ...................................... 15

        A.  Legal standards governing the award of attorneys' fees in common fund cases support the requested award .............................. 15

            1.  A reasonable percentage of the fund recovered is the appropriate method for awarding attorneys' fees in common fund cases ....................................................................... 16

            2.  A requested fee of 33⅓ percent of the common fund, with interest, is reasonable ........................................................ 17

i

B.  An award of a 33⅓ percent fee in this case is justified ................................. 17

   1.  The contingent nature of the fee and the financial burden
       carried by Lead Counsel ................................................................. 18

   2.  The result achieved ........................................................................ 19

   3.  The skill required and the quality of the work ................................ 20

   4.  The customary fee .......................................................................... 20

   5.  A 33⅓ percent fee award, with interest, is within the range of
       fees awarded in similar complex class action litigation ...................... 21

C.  A lodestar cross-check also favors the award of a 33⅓ percent fee ................ 22

VI.   LEAD COUNSEL'S EXPENSES ARE REASONABLE AND
      INCURRED TO ACHIEVE THE BENEFIT OBTAINED ................................. 23

VII.  LEAD PLAINTIFF IS ENTITLED TO REIMBURSEMENT OF
      REASONABLE COSTS AND EXPENSES ........................................... 24

VIII. CONCLUSION ................................................................................ 24

ii

# TABLE OF AUTHORITIES

## CASES

*Asher v. Baxter Int'l, Inc.*, 505 F.3d 736 (7th Cir. 2007) ..................................................12

*Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534 (S.D. Fla. 1988) .............................19

*Blum v. Stenson*, 465 U.S. 886 (1984)...............................................................16, 20

*Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885) .............................................16

*Churchill Vill., L.L.C. v. GE*, 361 F.3d 566 (9th Cir. 2004)...........................................14

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)...........................7-8 n.4

*Craft v. County of San Bernardino*, No. 05-00359, 2008 U.S. Dist. LEXIS 27527
    (C.D. Cal. Apr. 1, 2008) ...........................................................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .............................11

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ...............................................13

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980) ...........................11, 13

*Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003)...........................................18

*Gottlieb v. Wiles*, 150 F.R.D. 174 (D. Colo. 1993) ................................................23-24

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ...........................................8, 11

*Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994).......................................................23

*Hensley v. Eckerhart*, 461 U.S. 424 (1983).............................................................19

*Hughes v. Microsoft Corp.*, 98-1646C, 2001 U.S. Dist. LEXIS 5976
    (W.D. Wash. Mar. 26, 2001) .....................................................................8, 13

*In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989).................................16

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396 (E.D.N.Y. 1985) .................10

*In re Ahold NV Sec. and Erisa Litig.*, 461 F. Supp. 2d 383 (D.Md. 2006).......................17

*In re Apple Comp. Sec. Litig.*, No. C-84-20148(A), 1991 U.S. Dist. LEXIS 15608
    (N.D. Cal. Sept. 6, 1991) .........................................................................10

*In re Arm Fin. Grp., Inc.*, No. 3:99CV-539-H, 2006 U.S. Dist. LEXIS 63528
    (W.D. Ky. Aug. 31, 2006) .........................................................................21

*In re Blech Sec. Litig*, No. 94-7696, 2002 U.S. Dist. LEXIS 23170 (S.D.N.Y. Dec. 4, 2002).....22

*In re Cardinal Health, Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007)...........................17

*In re Cendant Corp. Sec. Litig.*, 264 F.3d 201 (3d Cir. 2001)..........................................17

*In re Charter Commc'ns, Inc., Sec. Litig.*, MDL No. 1506, 2005 U.S. Dist. LEXIS 14772
    (E.D. Mo. June 30, 2005) .......................................................................................20

*In re CMS Energy Sec. Litig.*, No. 02-CV-72004-DT, 2006 U.S. Dist. LEXIS 41459
    (E.D. Mich. June 21, 2006) ..................................................................................12

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992).........................................21, 23

*In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303 (C.D. Cal. 1977)..............20

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 05-civ-10240,
    2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007)....................................17

*In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627
    (C.D. Cal. June 10, 2005) ...............................................................................18, 20

*In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13555
    (C.D. Cal. June 10, 2005) ...............................................................10, 21, 22-23

*In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166 (E.D. Pa. 2000)...........................9, 18

*In re Immune Response Sec. Litig.*, 497 F.Supp. 2d 1166 (S.D. Cal. 2007)..........8, 9, 11, 12

*In re Impac Mtg. Holdings, Inc.*, No. SACV-06-00031, 2008 U.S. Dist. LEXIS 44644
    (S.D. Cal. May 19, 2008).....................................................................................20

*In re Infospace, Inc.*, 330 F. Supp.2d 1203 (W.D. Wash. 2004)..................................24

*In re Interpublic Sec. Litig.*, No. Civ. 6527, 2004 U.S. Dist. LEXIS 21429
    (S.D.N.Y. Oct. 27, 2004)......................................................................................23

*In re Mfrs. Life Ins. Co. Premium Litig.*, MDL No. 1109, 1998 U.S. Dist. LEXIS 23217
    (S.D. Cal. Dec. 21, 1998) .................................................................................9, 14

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733 (S.D.N.Y. 1994)..........24

*In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090 E (M), 1990 U.S. Dist. LEXIS 15488
    (S.D. Cal. Aug. 30, 1990).................................................................................20-21

*In re Med. X- Ray Film Antitrust Litig.*, No. 93-5904, 1998 U.S. Dist. LEXIS 14888
    (E.D.N.Y. Aug. 7, 1998).......................................................................................22

*In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362 (N.D. Cal. 1996)..................23

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) .....................8, 9, 11, 21

*In re Mikohn Gaming Corporation Sec. Litig.*, No. 05-01410 (D. Nev. June 12, 2007)...............21

*In re Omnivision Techs., Inc.*, No. 04-2297, 2007 U.S. Dist. LEXIS 95615
    (N.D. Cal. Dec. 6, 2007)*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ..12, 13

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995).................................................7

*In re Portal Software, Inc, Sec, Litig.*, No. 03-5138, 2007 U.S. Dist. LEXIS 88886
    (N.D. Cal. Nov. 26, 2007) ....................................................................8

*In re Ravisent, Inc. Sec. Litig.*, No. 00-civ-1014, 2005 U.S. Dist. LEXIS 6680
    (E.D. Pa. Apr. 19, 2005) ...............................................................19, 22

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) .....................................17, 18

*In re Safety Components Int'l, Inc.*, 166 F. Supp. 2d 72 (D.N.J. 2001)............................19, 22

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999)........................................9

*In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2001 U.S. Dist. LEXIS 20160
    (E.D. Pa. Dec. 6, 2001) ....................................................................22

*In re Veeco, Inc. Sec. Litig.*, 05-MDL-01695, 2007 U.S. Dist. LEXIS 85554
    (S.D.N.Y. Nov. 7, 2007)...................................................................17

*In re Veritas Software Corp. Sec. Litig.*, No. 03-0283, 2005 U.S. Dist. LEXIS 30880
    (N.D. Cal. Nov. 15, 2005) .................................................................10

*In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985)...............................11

*In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) .............16, 17, 18

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986).........................................................21

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)....................................................11

*Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976) ..............................................................18

*Maley v. Global Techs. Corp.*, 186 F. Supp. 2d 358, 360 (S.D.N.Y. 2002)..........................19, 22

*McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43 (3d Cir. 1987).....................................21

*Milstein v. Huck*, 600 F. Supp. 254 (E.D.N.Y. 1984)...................................................10

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)................9, 13

*Neuberger v. Shapiro*, 110 F. Supp. 2d 373 (E.D. Pa. 2000) .........................................22

*Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615 (9th Cir. 1982) .........................*passim*

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989).............................16, 22

*Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist. LEXIS 23595
    (N.D. Ill. Sept. 14, 1984) ..................................................................21

*Robbins v. Kroger Props.*, 116 F.3d 1441 (11th Cir. 1997) ...........................................10

*Rodriguez v. West Publ. Corp.*, No. CV05-3222 R, 2007 U.S. Dist. LEXIS 74767

v

(C.D. Cal. Sept. 10, 2007) ............................................................................ 14

*Schnall* v. *Annuity & Life Re*, 02 CV 2133 (D. Conn. Jan. 21, 2005) ............................................. 21

*Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006) ........................................... 20

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ........................... 16

*Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 U.S. Dist. LEXIS 26903
    (E.D. Pa. April 11, 2007) ..................................................................................... 21

*Stanley v. Safeskin Corp.*, No. 99-CV-454, 2000 U.S. Dist. LEXIS 14100
    (S.D. Cal. Sept. 18, 2000) .................................................................................... 20

*Steiner v. Am. Broad Co.*, No. 05-55773, 2007 U.S. App. LEXIS 21061
    (9th Cir. Aug. 9, 2007) ......................................................................................... 22

*Strougo v. Bassini*, 258 F. Supp. 2d 254 (S.D.N.Y. 2003) ....................................... 10, 22

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) ................................................. 21

*Thornberry v. Delta Air Lines*, 676 F.2d 1240 (9th Cir. 1982) .................................... 24

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993) ...................................... 8

*Trustees v. Greenough*, 105 U.S. 527 (1882) ................................................................ 16

*Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437 (9th Cir. 1989) ................ 8

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ..................................... 8

*Vincent v. Hughes Air W., Inc.*, 557 F.2d 759 (9th Cir. 1977) .......................................... 16

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ................................. 16, 17, 22

*Whiting v. Applied Signal Tech.*, No. 06-15454, 2008 U.S. App. LEXIS 11982
    (9th Cir. June 5, 2008) ...................................................................................... 18-19

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) .......................................................... 7

## STATUTES
15 U.S.C. § 78u-4(a)(4) .................................................................................... 24
15 U.S.C. § 78u-4(a)(6) .................................................................................... 21
15 U.S.C. § 78u-4(b)(3)(B) ............................................................................. 2, 11

## FEDERAL RULES
Fed. R. Civ. Proc. 9(b) ....................................................................................... 2
Fed. R. Civ. Proc. 23 .......................................................................................... 2
Fed. R. Civ. Proc. 23(a) .................................................................................... 12
Fed. R. Civ. Proc. 23(e) ..................................................................................... 1
Fed. R. Civ. Proc. 23(e)(2) ................................................................................ 8

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

## OTHER AUTHORITY

Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There from Here*, 74 Tul. L. Rev. 1809 (June 2000) ............................... 16

Mongeli v. Terayon, No.  06-03936; Mot/Mem Settle/Atty Fee

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that, pursuant to the Court's Order of April 14, 2008, on September 18, 2008, at 2:00 p.m., or as soon thereafter as counsel may be heard, at the United States Courthouse (1301 Clay Street, Oakland, California 94612-5212) before United States District Judge Claudia A. Wilken:  Lead Plaintiff Adrian Mongeli ("Lead Plaintiff") moves for final approval of settlement of this class action and award of attorneys' fees and expenses.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND AWARD OF
## ATTORNEYS' FEES AND EXPENSES

Lead Plaintiff respectfully submits this memorandum in support of the settlement of this class action for $2,730,000, the award of 33⅓ percent of the common fund as attorneys' fees, with interest, and for the reimbursement of expenses.  The settlement was reached as the result of arm's-length negotiations conducted after extensive review and analysis of the case by both sides, and the settlement satisfies Fed. R. Civ. Proc. 23(e), which requires that a settlement be fair, adequate, and reasonable.

Lead Counsel conducted a wide-ranging investigation of Terayon Communication Systems, Inc. ("Terayon" or "Company").[2]  Outside investigators were engaged to contact and interview numerous witnesses, including former employees and other persons with knowledge. Lead Counsel prepared and filed a detailed consolidated amended class action complaint, and Defendants filed their motions to dismiss and Lead Plaintiff filed two oppositions.  The motions

---

[1]    This motion is based on the Memorandum of Points and Authorities in Support of Final Approval of Settlement and the Award of Attorneys' Fees and Expenses; the Stipulation of Settlement dated as of February 19, 2008 ("Stipulation"); declaration of the Claims Administrator (*see* attached Declaration of Jason Zuena and Rec. Doc. no. 107); declaration of Lead Plaintiff; fee declarations submitted by Lead Counsel and Liaison Counsel; all other pleadings and matters of record; and additional evidence or argument as may be presented at the hearing.  This Motion and Memorandum of Points and Authorities incorporates by reference the definitions in the Stipulation, and all terms used shall have the same meanings.

[2]    Defendants named in this action are Terayon, Ernst & Young ("E&Y"), and Individual Defendants (Zaki Rakib, Jerry D. Chase, Mark A. Richman, Edward Lopez, Ray Fritz, Carol Lustenader, Matthew Miller, Shlomo Rakib, Doug Sabella, Christopher Schaepe, Mark Slaven, Lewis Solomon, Howard W. Speaks, Arthur T. Taylor and David Woodrow) (collectively, "Defendants").

1

to dismiss were fully briefed and pending before this Court when the parties negotiated a settlement. In light of the factual circumstances and legal issues surrounding this litigation, the amount obtained in settlement now versus the risks inherent in recovering nothing after protracted litigation weighs strongly in favor of settlement.

Absent settlement, the risks of continued litigation faced by Plaintiff and the class include: meeting the heightened pleading standards in securities fraud actions and surviving the motions to dismiss; certifying the Class under Fed. R. Civ. Proc. 23; engaging in an expensive and time-consuming discovery battle with Defendants; surviving summary judgment; and, ultimately proving all elements of the claims advanced, including scienter, loss causation, and damages. Of course, even if Lead Plaintiff and the Class won at trial and received a damages award (which would involve a battle of the experts concerning the complex issues surrounding causation and damages), the risk of potential appeals could further delay any recovery for the Class, possibly for years. And, the Company's ability to pay a substantial judgment, if one were ultimately entered by the Court after protracted and expensive litigation, is also uncertain.

## I.    PROCEDURAL BACKGROUND AND SUMMARY OF FACTS

The initial complaint in this action was filed by I.B.L. Investments, Ltd. ("IBL) on June 23, 2006. Both IBL and Lead Plaintiff filed competing motions for lead plaintiff on September 11, 2006. IBL withdrew its motion on September 22, 2006. On November 8, 2006, the Court appointed Adrian Mongeli as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act ("PSLRA"). The Court approved Lead Plaintiff's selection of Co-Lead Counsel, the law firms of Kahn Gauthier Swick, LLC and Saxena White, P.A. (collectively, "Lead Counsel").

In light of the high pleading requirements of Fed. R. Civ. Proc. 9(b) and the PSLRA -- which also, pursuant to 15 U.S.C. § 78u-4(b)(3)(B), automatically stays formal discovery while a motion to dismiss is pending -- Lead Counsel conducted an extensive informal factual investigation, which included the hiring of experienced outside investigators and an intensive effort to locate key witnesses, including former employees and third parties familiar with the events alleged and persons named in the complaint. Lead Counsel also extensively researched

2

all legal issues involved in the claims alleged, then prepared and filed an Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") on January 8, 2007.

The Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5, on behalf of a class of those who purchased Terayon securities between June 28, 2001 and March 1, 2006 ("Class Period"). As alleged, during the Class Period, Defendants issued materially false and misleading positive statements and omissions regarding consolidated financial statements for the years ended December 31, 2003, 2002, and 2000 and for the quarters of 2003, 2002, and 2000. Defendants' representations concerning the Company's financial condition, purported record-setting income, growth, results, profitability and the like which were published in press releases, stated in conference calls or at investor conferences, and/or filed in quarterly or annual reports with the U.S. Securities and Exchange Commission, were materially false and misleading. Plaintiff alleges, as Defendants knew or recklessly disregarded throughout that time, Terayon's reported financial results and growth were attributable to improper accounting practices -- including improper revenue recognition -- which resulted in a significant and material overstatement of the Company's revenues. When the truth was finally revealed, it was learned that: (1) Terayon's reported financial results were attributable to improper accounting practices; (2) several Individual Defendants engaged in improper insider stock sales; (3) Terayon's internal accounting controls were flawed; and, (4) Terayon's outside auditor, Defendant E&Y, ignored purported "red flags" during the Class Period.

In March 2007, Defendants filed two separate motions to dismiss the Complaint. Lead Plaintiff filed an opposition on April 23, 2007 to the motion to dismiss of the Company and the Individual Defendants, and filed an opposition on May 7, 2007 to the motion to dismiss of E&Y. The Company and the Individual Defendants filed their reply brief on May 23, 2007 and E&Y filed their reply brief on June 6, 2007.

In the motions to dismiss, Defendants pressed numerous arguments. The Company and Individual Defendants challenged, among other things, whether the Complaint adequately pled materially false and misleading statements, whether the Complaint pled loss causation, whether any false or misleading statements simply constituted mere puffery, and whether any false or

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

misleading statements could be considered forward looking as to be immune under the PSLRA's safe harbor provision.  E&Y challenged the adequacy of the allegations of internal control deficiencies and insider stock sales.

In opposition, Lead Plaintiff argued that courts have recognized that extensive restatements of financial results render those prior statements materially false and misleading when made.  Defendants ultimately restated financial results for various interim and annual financial periods going back as far as 2000.  As to loss causation, Lead Plaintiff asserted that the Complaint is replete with numerous allegations detailing the causal connection between defendants' misrepresentations and class members' economic loss (*e.g.*, Complaint ¶¶ 247-253; 225-234).  There are at least three partial disclosures alleged during the Class Period, sufficient to counter any arguments of a failure to demonstrate loss causation.[3]  Moreover, Lead Plaintiff contended that the puffery defense or the argument that the safe harbor provision provides immunity constitute factual determinations not appropriate at the motion to dismiss stage.  Additionally, Plaintiff argued, these statements are actionable when viewed in their full context, rather than isolated into snippets as defendants attempted to do.

Defendants also vigorously challenged whether the Complaint sufficiently alleged a strong inference of scienter.  Defendants focused on whether the Complaint adequately alleged particularized facts giving rise to a strong inference of scienter.  The Company and Individual Defendants contended that simply alleging a restatement, the Individual Defendants' respective positions within the Company, personnel and auditor changes during the Class Period, and citing Sarbanes-Oxley certifications were all insufficient to meet the scienter standard.  The Company

---

[3]    The first partial disclosure occurred on November 7, 2005, (Complaint ¶ 225) when defendants issued a release announcing the Company would delay its third quarter financials and may have recognized revenue from a single customer in violation of generally accepted accounting principles ("GAAP").  The next day, shares of Terayon stock trade lower from the prior day's close.  The second partial disclosure occurred on January 10, 2006, when the Company announced that Terayon had received a letter from the NASDAQ regarding the Company's delisting and that the Company was in violation of its Indenture agreement with respect to the Notes and that default could require immediate payment. (Complaint ¶ 230).  Shares traded declined 24% from January 9, 2006 to January 17, 2006, as the significance of the information was digested by the market.  The third disclosure, the Restatements, occurred on March 1, 2006.  Shares traded from lower the day after the Restatements.

4

and Individual Defendants also challenged the allegations of insider trading. E&Y's primary argument focused on whether alleged violations of Generally Accepted Accounting Principles ("GAAP") or a restatement were sufficient to create a strong inference of scienter.

The Complaint alleges numerous indicia of scienter, including the SEC's investigation of the Company, its delisting, and an earlier securities fraud settlement for $15 million in a case involving insider trading allegations against various insiders who sold a total of 180,000 shares. Furthermore, Defendants Zaki and Shlomo Rakib alone sold 300,000 shares of Company stock during the Class Period. Additional facts alleged in the Complaint that support a strong inference of scienter included: an extensive restatement of financial results for nearly all of the interim and annual financial periods during the Class Period; numerous violations of GAAP; a complete lack of internal controls; suspicious insider sales amounting to nearly $4 million; the resignation of E&Y and various high-level Company executives; statements from a former employee from the Company's accounting department who indicated, among other things, that goods were "received but not invoiced," that E&Y "was not clean on this stuff," that the Company "knew there were other issues -- bigger problems with revenue recognition" than a single customer, and that there were specific GAAP violations involving various customers, such as Verilink, RNI, and Thomson; and, signing by various defendants of Sarbanes-Oxley certifications that numerous false and misleading financial reports "fairly present...the financial condition of the Company."

The parties prepared to argue the motions to dismiss scheduled for Tuesday, July 24, 2007, but the hearing was vacated by a Friday, July 20, 2007 Notice of the Clerk and eventually reset to October 25, 2007. In the interim, settlement negotiations ensued, beginning in September 2007. A number of discussions were conducted between Lead Counsel and counsel for the Company and Individual Defendants, and Lead Counsel and E&Y. During the settlement process, Lead Counsel focused on the issues critical to the outcome of this case, the risks associated with continuing the litigation, the likelihood of obtaining strong evidence in support of the claims, defeating summary judgment after discovery, and, if successful on the motion for summary judgment, the substantial risk, expense, and length of time to prosecute this action

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

through trial and the inevitable subsequent appeals. Lead Counsel also considered the substantial monetary benefit provided by the Settlement in light of the potential of obtaining absolutely no recovery for the Class. Even if Lead Plaintiff were to successfully litigate the action to verdict, a judgment in excess of the amount of the Settlement might force Terayon into bankruptcy or obstruct any purported mergers, and the Class might recover even less than the amount negotiated or not recover at all. Co-Lead Counsel are actively engaged in a number of complex federal civil actions, particularly the litigation of securities class actions. Lead Counsel believes that its firms' attorneys' reputations for being unafraid to zealously carry a meritorious case through trial and potential appeals inured to the benefit of the Class and provided a strong bargaining position to engage in meaningful settlement negotiations with Defendants, even under the difficult and challenging circumstances presented here.

The parties eventually arrived at a compromise months after negotiations began and agreed in principle to settle this case, prior to the Court's decision on the motions to dismiss. The parties entered into a Stipulation of Settlement on February 19, 2008 and, on February 28, 2008, the parties filed a joint motion for preliminary approval of class action settlement.

On April 3, 2008, the Court held a hearing on the preliminary approval of settlement. The Court ordered approximately twelve substantive and typographical changes to the Preliminary Approval Order, Notice of Pendency ("Notice"), and Summary Notice. For instance, the Court ordered that the Preliminary Approval Order should explain in more detail the efforts made to contact Class Members; that the Preliminary Approval Order state that the Notice would be issued over an internet newswire service, and that Lead Counsel submit a Declaration of the Settlement Administrator indicating which websites had picked up the Notice; that Lead Counsel submit and file with the Court earlier than previously provided in the moving papers an affidavit that the Notice had been issued; that the Plan of Allocation in the Notice be reworded in clearer language; and, that the Final Fairness Hearing be set for September 18, 2008. The Court also requested that in order to make the Plan of Allocation more transparent, e.g., examples should be provided as to how the allocation calculations would be performed.

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

Lead Counsel implemented the Court's modifications and re-submitted the documents on April 7, 2008. A telephonic preliminary approval hearing followed, and on April 9, 2008, the Court ordered five additional changes to the Preliminary Approval Order, Notice of Pendency, and Summary Notice, incorporating finalized dates and times. The Court also ordered further changes in the Plan of Allocation to attempt to clarify the distribution. Lead Counsel made the necessary changes that were consistent with the Stipulation and submitted the documents to the Court on April 10, 2008. Lead Counsel explained to the Court in a letter accompanying the documents why certain changes requested were not included in the revised versions. On April 14, 2008 the Court issued the order preliminarily approving the Settlement.

Pursuant to the Court's Order of April 14, 2008 preliminarily approving the settlement, the Notice was mailed to over 28,000 potential Class Members beginning on April 28, 2008. The Notice, among other things, informed Class Members of the terms of the Settlement and that Lead Counsel would seek an award of attorneys' fees in an amount no greater than one-third of the Settlement Fund and reimbursement of expenses incurred in connection with the prosecution of this Litigation, not to exceed $100,000. The Garden City Group, Inc. ("Claims Administrator") also posted the Notice on its website. In addition, a summary notice was published in *Investor's Business Daily* and issued over *PR Newswire* on April 28, 2008. The last day for members of the Class to file objections to any aspect of the settlement was August 28, 2008. As of the date of the filing of the instant motion, there have been no objections to the proposed settlement, proposed final judgment, Plan of Allocation, or the award of attorneys' fees of one-third of the Settlement Fund and reimbursement of expenses.

## II.    STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS

It is well-established that "voluntary conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). The law has always favored compromise, *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995), and recognizes that the

7

essence of a settlement agreement is the "yielding of absolutes and an abandoning of highest hopes." *Officers for Justice*, 688 F.2d at 624.[4]

Any class action settlement must be "fair, reasonable, and adequate." Fed. R. Civ. Proc. 23(e)(2). To satisfy this requirement, the Ninth Circuit utilizes a balancing approach, taking into consideration "some or all" of the following factors ("Fairness Factors"):

> (1) strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) amount of the settlement; (5) extent of discovery completed and the stage of stage of the proceedings; (6) experience and views of counsel; (7) presence of a governmental participant; and, (8) reaction of class members to the proposed settlement.

*Officers for Justice*, 688 F.2d at 625; *accord, In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). These factors are only illustrative and, indeed, at least one court in this District has added two additional factors for consideration: procedure by which the settlement was arrived at and the role taken by the lead plaintiff in the settlement process. *In re Portal Software, Inc. Sec, Litig.*, No. 03-5138, 2007 U.S. Dist. LEXIS 88886, at *7 (N.D. Cal. Nov. 26, 2007).

The Ninth Circuit has mandated that in reviewing the Fairness Factors, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit ***must be limited*** to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties[.]" *Officers for Justice*, 688 F.2d at 625; *Hanlon*, 150 F.3d at 1027. To effect this goal, a presumption of fairness arises in class action settlements. *In re Immune Response Sec. Litig.*,

---

[4]    Courts are generally deferential "to the private consensual decision of the parties" because of the "strong judicial policy that favors settlement, particularly where complex class action litigation is concerned[.]" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "[T]here is an overriding public interest in settling and quieting litigation," and this is "particularly true" in class action suits. *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976); *Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989).

497 F.Supp. 2d 1166, 1171 (S.D. Cal. 2007); *Hughes v. Microsoft Corp.*, 98-1646C, 2001 U.S. Dist. LEXIS 5976, at *21 (W.D. Wash. Mar. 26, 2001).

**III.    A BALANCING OF THE FAIRNESS FACTORS TIPS HEAVILY IN FAVOR OF FINDING THE SETTLEMENT FAIR, ADEQUATE, AND REASONABLE**

**A. Strength of Lead Plaintiff's case; risk, expense, complexity, and duration of further litigation**

To determine whether the proposed settlement is fair, reasonable, and adequate, the Court balances the continuing risks of litigation against the benefits afforded to Class members. *Mega Fin.*, 213 F.3d at 458. In other words, "it has been held proper to take the bird in hand instead of a prospective flock in the bush." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004). The balance here weighs heavily in support of approval of the settlement and unquestionably outweighs another distinct possibility: zero recovery for the Class.

Courts are ever mindful of the fact that securities class action litigation "is notably difficult and notoriously uncertain." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA"); *In re Mfrs. Life Ins. Co. Premium Litig.*, MDL No. 1109, 1998 U.S. Dist. LEXIS 23217, at *17 (S.D. Cal. Dec. 21, 1998). In this case, Lead Plaintiff is required to prove: (1) a misrepresentation or omission of a material fact; (2) reliance; (3) scienter; and, (4) causation and damages. *Immune Response*, 497 F.Supp. 2d at 1171.

Lead Plaintiff deems the claims asserted in this litigation to be meritorious and the evidence adduced to date supports the claims.[5] Lead Plaintiff is also confident of succeeding in

---

[5]    As in every complex securities case of this kind, Lead Plaintiff and the Class faced significant obstacles to recovery, both with respect to liability and damages. Among the many key issues about which the Settling Parties do not agree are: (1) whether any of the Defendants violated the securities laws or otherwise engaged in any wrongdoing; (2) whether the statements and/or omissions made by Defendants were materially false or misleading; (3) whether Defendants had the requisite state of mind; (4) the extent (if any) that various facts alleged by the Lead Plaintiff influenced the trading prices of Terayon's publicly-traded securities during the relevant period; (5) the method for determining whether Terayon's publicly-traded securities were artificially inflated during the relevant period; (6) the amount (if any) of such inflation; (7) whether the Complaint could pass muster under the pleading requirements of

9

this suit, but this confidence must be tempered by the numerous uncertainties associated with moving forward with the litigation. Even if Lead Plaintiff successfully maneuvered through the motions to dismiss, the case remained in jeopardy with potential motions for summary judgment looming, a jury trial, and subsequent appeals by both sides of any final judgment. It would be "imprudent to presume ultimate success at trial and thereafter."[6] *In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13555, at *25-*26 (C.D. Cal. June 10, 2005) (collecting cases where the court rejected settlement and the ultimate recovery to plaintiffs turned out to be lower than that in the proposed settlement).

Lead Plaintiff also recognizes the potential length of continued prosecution and the imposition of great expense and cost to the Class through the discovery, pre-trial, trial, and appeals process. *See In re Veritas Software Corp. Sec. Litig.*, No. 03-0283, 2005 U.S. Dist. LEXIS 30880, at *15 (N.D. Cal. Nov. 15, 2005); *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984) ("[t]he expense and possible duration of the litigation should be considered in evaluating the reasonableness of settlement."). The mounting of a vigorous defense would necessarily increase the costs of litigation for Lead Plaintiff. Moreover, a full trial would require the services of a number of attorneys for Lead Plaintiff, encompassing many months of preparation and incurring costs to fully prepare and litigate this case. Delay through the completion of the appeals process could force Class Members to wait potentially for years to finally see any recovery, further reducing the present value of an immediate settlement. *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 260-61 (S.D.N.Y. 2003) ("Even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation and trial, the passage of time would introduce yet more risks in terms of appeals and possible changes in the law and would in light of the time value of money, make future recoveries less

---

the PSLRA and Fed. R. Civ. Proc. 9(b); and, (8) the amount of damages (if any) that could be recovered at trial.

[6]     *See, e.g., In re Apple Comp. Sec. Litig.*, No. C-84-20148(A), 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) (jury returned a verdict for plaintiffs, with damages potentially exceeding $100 million, but the court overturned the verdict on a motion for j.n.o.v.); *Robbins v. Kroger Props.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing securities action with prejudice).

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

valuable than this current recovery."); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985) ("[M]uch of the value of a settlement lies in the ability to make funds available promptly.")

In addition, both sides would more than likely engage the services of multiple experts, including forensic accountants and economists, to assist in preparation of the case and in damages calculations. Such expert evaluations are based not only on stock price history but on other more elusive factors, including corporate asset value, cash flow, income and growth prospects for the future, industry and economic trends, the quality of management, the nature and amount of liabilities, and many other variables. At trial, Lead Plaintiff would likely have faced a motion *in limine* by Defendants to preclude the experts, their testimony, and their valuation models. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants' experts could also likely contend that all losses experienced by members of the Class were due to factors completely unrelated to any actionable conduct. *See In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) (discussing the "battle of experts" and the damages evaluations normally undertaken in a securities suit).

### B. Stage of the proceedings; procedure by which the settlement was reached

Stage of the proceedings is one factor to consider in determining the fairness, reasonableness, and adequacy of settlement. *Mego Fin.*, 213 F.3d at 459; *Hanlon*, 150 F.3d at 1026; *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980). Although formal discovery was stayed pursuant to 15 U.S.C. § 78u-4(b)(3)(B), Lead Counsel conducted an extensive and on-going investigation prior to filing the Complaint, during the pendency of the motions to dismiss, and through settlement; actively scoured through documents available in the public domain regarding the Company; contacted former employees of the Company and other persons with knowledge; thoroughly researched the law on the complex issues inherently involved in securities litigation; and, subsequently opposed the motions to dismiss filed by Defendants. *See Immune Response*, 497 F. Supp. 2d at 1174. As the Ninth Circuit has indicated, in class action settlements, "formal discovery is not a necessary ticket to the bargaining table

where the parties have sufficient information to make an informed decision about settlement."
*Mego Fin.*, 213 F.3d at 459 (citation omitted). Indeed, the issues in dispute had been fully
briefed as the parties submitted motions to dismiss, oppositions, and replies. Lead Counsel had a
comprehensive understanding of the legal risks of the case.

**C. Risk of obtaining and maintaining class action status throughout the trial**

There is a risk of obtaining (and maintaining) class action status. If the Court were to
deny certification of all or a portion of the Class, members of the putative Class risk being
excluded from this litigation. *In re Omnivision Techs., Inc.*, No. 04-2297, 2007 U.S. Dist.
LEXIS 95615, at *19 (N.D. Cal. Dec. 6, 2007) ("If the Court were to refuse certification, the
unrepresented potential plaintiffs would likely lose their chance at recovery entirely. Even if the
Court were to certify the class, there is no guarantee the certification would survive through trial,
as Defendants might have sought decertification or modification of the class."). Moreover, there
is only one lead plaintiff in this case for a lengthy Class Period which creates risk here in light of
the commonality, typicality and adequacy factors that must be analyzed under Fed. R. Civ. Proc.
23(a). Class certification is not guaranteed. *See, for example, Asher v. Baxter Int'l, Inc.*, 505
F.3d 736, 741 (7th Cir. 2007) (noting that the district court denied class certification three times);
*In re CMS Energy Sec. Litig.*, No. 02-CV-72004-DT, 2006 U.S. Dist. LEXIS 41459, at *4 (E.D.
Mich. June 21, 2006) (denying class certification as to a subset of securities purchasers). Here,
however, the Settling Parties have included all Class members who purchased publicly-traded
securities of Terayon during the Class Period. The settlement neither delves into nor creates
discrete subsets that could, if relevant, be excluded from obtaining recovery in this litigation.

That the Class Period is five years poses another risk to Class members. Defendants
could seek to restrict the length of the Class Period, thereby reducing the total number of
members of the Class that could recover for the actionable conduct. *Immune Response*, 497 F.
Supp. 2d at 1172 (noting that in a case covering a two-year class period, "[t]he Court also
recognizes that the issues of scienter and causation are complex and difficult to establish at
trial."). The settlement offsets these inherent problems by conferring an immediate and
substantial benefit to the Class.

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

### D. Amount offered in settlement

Under the Proposed Settlement, Defendants have agreed to pay $2,730,000 in cash. *See* Stipulation of Settlement at § IV.2.1. Given the complexities of this litigation and the continued risks to the Settling Parties if they proceed to trial, the settlement represents a reasonable resolution of this action and eliminates the risk that the Class might not otherwise recover.

Lead Counsel, working with a damages consultant, estimated potential damages in this case to be approximately $13 million for 51 million damaged shares. The settlement represents approximately a 21% recovery of the full, estimated damages amount. Although Lead Plaintiff contends that the aggregate damages would be higher than the actual settlement amount, such a result assumes that all significant liability and damage issues would have been resolved in favor of the Class. In any event, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628; *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

### E. The Experience and Views of Counsel

Lead Counsel's recommendation of settlement should be given a presumption of reasonableness. *Omnivision Techs.*, 2007 U.S. Dist. LEXIS 95615, at *23 (citing *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). The presumption of reasonableness is fully warranted here because the settlement is the product of arm's-length negotiations. *Hughes*, 2001 U.S. Dist. LEXIS 5976, at *17; *Ellis*, 87 F.R.D. at 18 ("the fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

Lead Counsel all have significant experience in securities and other complex class action litigation and have negotiated other class action settlements throughout the country. It is Lead Counsel's informed opinion that given the risks and uncertainties inherent in securities class action litigation, the proposed settlement is fair, reasonable, and adequate, and in the best interests of the Class. *See Nat'l Rural Telecom.*, 221 F.R.D. at 528 ("Great weight is accorded to

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."). This factor thus weighs in favor of approval of the settlement.

### F. Reactions of Class Members

Notice was mailed to over 28,000 potential Class Members. To date, no objections to any terms of the settlement, including the fees and expenses, have been submitted. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Id.*, at 529. After receiving notice of the proposed settlement, the Class in this action has been nearly silent. By any standard, the lack of objection of the Class members favors approval of the settlement.[7]

## IV. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

As set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must have submitted a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of expenses, the Settlement Fund will be distributed according to the Plan of Allocation, *see* Rec. Doc. no. 105-1 at 13-20. Pursuant to the Plan of Allocation, an Authorized Claimant's Recognized Claim will be calculated as follows:

**The Allocation below is based on the following price declines:**

| | |
|---|---|
| November 7, 2005 Closing Price: | $2.57 |
| November 8, 2005 Closing Price: | $2.25 |
| November 8, 2005 Price Decline: | $0.32 |
| | |
| January 10, 2006 Closing Price: | $2.06 |
| January 11, 2006 Closing Price: | $2.00 |
| January 11, 2006 Price Decline: | $0.06 |
| | |
| March 1, 2006 Closing Price: | $2.70 |

---

[7] *See, e.g., Churchill Vill., L.L.C. v. GE*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices sent); *Rodriguez v. West Publ. Corp.*, No. CV05-3222 R, 2007 U.S. Dist. LEXIS 74767, at *33 (C.D. Cal. Sept. 10, 2007) (54 objections out of 376,000 notices); *Mfrs Life*, 1998 U.S. Dist. LEXIS 23217, at *23 ("miniscule number of objectors is another factor favoring approval").

14

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

March 2, 2006 Closing Price:      $2.33
March 2, 2006 Price Decline:      $0.37

Each of the dates in the Plan of Allocation was selected based on disclosures of the alleged fraud, with the November 2005 dates covering the first partial disclosure, the January 2006 dates covering the second partial disclosure, and the March 2006 dates covering the final disclosure. The amounts in the plan are based on the price changes on these dates, and takes into consideration whether and when class members held, purchased, or sold their Terayon securities in order to fairly divide and distribute the settlement proceeds among the Class members. Thus, the Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement.

## V.    AWARD OF ATTORNEYS' FEES AND EXPENSES

The amount that Lead Counsel requests as attorneys' fees is limited to 33⅓ percent of the Settlement Fund.  It is respectfully submitted that such a fee is fair and reasonable and reflects the market rate.  The Notice informed Class Members that Lead Counsel would seek no greater than this amount.  Lead Counsel undertook this case on a wholly-contingent basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of the Litigation and funds were made available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails. In addition to advancing litigation expenses and paying overhead, Lead Counsel faced the possibility of no recovery.  Lead Counsel undertook to act for Lead Plaintiff in this matter aware that they would be compensated only by obtaining a successful result. The benefits conferred on Lead Plaintiff and the Class by this settlement are particularly noteworthy in that a Settlement Fund worth $2,730,000 was obtained for the Class.

### A.  Legal standards governing the award of attorneys' fees in common fund cases support the requested award

This case was vigorously litigated from its inception.  Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding Terayon, conducted an in-depth

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

investigation, interviewed numerous former Terayon employees and others with knowledge, and prepared a detailed amended consolidated complaint. Lead Plaintiff vigorously defended Defendants' motion to dismiss and engaged in extensive informal discovery. Lead Counsel analyzed the Company's SEC filings, reviewed the Company's press releases, worked with a team of investigators, and contacted former employees in order to ascertain the merits of the Litigation and to determine the relative strengths and weaknesses of the asserted claims. Lead Counsel also conducted an analysis of damages, thoroughly researched the law pertinent to the claims and defenses asserted, and engaged in ongoing communications with Lead Plaintiff. The Settling Parties entered into the Stipulation despite diametrically opposed views on the merits. A settlement was reached only after an extensive months-long negotiation process.

### 1. A reasonable percentage of the fund recovered is the appropriate method for awarding attorneys' fees in common fund cases

It has long been recognized in equity that "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). The purpose of this doctrine is to avoid unjust enrichment so that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Wash. Public Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*"). This rule, known as the common fund doctrine, is firmly rooted in American case law. *See, e.g., Trustees v. Greenough*, 105 U.S. 527 (1882); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885). Under the common fund doctrine a reasonable fee may be based "on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984).

In this Circuit, the district court has discretion to award fees in common fund cases based on either the lodestar/multiplier method or the percentage-of-the-fund method.[8] *WPPSS*, 19 F.3d

---

[8]    The rationale for compensating counsel in common fund cases on a percentage basis is sound. First, it is consistent with the practice in the private marketplace where contingent fee attorneys are customarily compensated by a percentage of the recovery. Second, it more closely aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum possible recovery

16

at 1296. In *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990); and, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002), the Ninth Circuit expressly approved the use of the percentage method in common fund cases. For their efforts in creating a common fund for the benefit of the Class, Lead Counsel seek a percentage of the fund recovered as attorneys' fees. "[T]he primary basis of the fee award remains the percentage method." *Vizcaino*, 290 F.3d at 1050. *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method"); *Craft v. County of San Bernardino*, No. 05-00359, 2008 U.S. Dist. LEXIS 27527, at *25 (C.D. Cal. Apr. 1, 2008) (noting that a lodestar cross-check is not required in the Ninth Circuit). In view of the extensive amount of work performed in this matter, the result obtained, and the risks and financial commitment of Lead Counsel, an award of 33⅓ percent of the recovery, with interest, obtained for the Class is appropriate. Supporting authority for the percentage method is overwhelming.

### 2. A requested fee of 33⅓ percent of the common fund, with interest, is reasonable

The guiding principle in this Circuit is that a fee award be "'reasonable under the circumstances.'" *WPPSS*, 19 F.3d at 1296 (citation and emphasis omitted). Lead Plaintiff entered into a retention agreement with Lead Counsel, which detailed that Lead Counsel would seek a contingency fee of 33⅓ percent. "[Courts] should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel. …This presumption will

---

in the shortest amount of time. The percentage method of awarding fees is the only method of fee awards that is consistent with class members' due process rights. Charles Silver, *Class Actions in the Gulf South Symposium: Due Process and the Lodestar Method: You Can't Get There from Here*, 74 Tul. L. Rev. 1809 (June 2000). Third, use of the percentage method decreases the burden imposed on the court by eliminating a full-blown, detailed and time consuming "lodestar" analysis. *In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989).

17

ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-a-vis its lawyers." *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).[9]

### B. An award of a 33⅓ percent fee in this case is justified

Lead Counsel submit that, as the factors discussed below demonstrate, an attorneys' fee award of 33⅓ percent of the common fund, with interest, is reasonable under the circumstances of this case. Courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and, (8) comparison with counsel's lodestar. *In re Heritage Bond Litig..*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627, at *26 (C.D. Cal. June 10, 2005) (citing cases); *but see Rite Aid*, 396 F.3d at 307 ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method").

### 1. The contingent nature of the fee and the financial burden carried by Lead Counsel

Determination of a fair fee must include consideration of the contingent nature of the fee:

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See* Richard Posner, *Economic Analysis of Law* §21.9, at 534-35 (3d ed. 1986). Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*WPPSS*, 19 F.3d at 1299. Uncertainty of ultimate recovery is highly relevant in determining an appropriate fee. *Id.*, at 1300; *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*,

---

[9]    *See also In re Cardinal Health, Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 757-59 (S.D. Ohio 2007) (according presumption of reasonableness to ex ante fee agreements); *In re Veeco, Inc. Sec. Litig.*, 05-MDL-01695, 2007 U.S. Dist. LEXIS 85554, at *25-*26 (S.D.N.Y. Nov. 7, 2007) (utilizing the presumption on public policy grounds); *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 05-civ-10240, 2007 U.S. Dist. LEXIS 57918, *49-*50 (S.D.N.Y. July 27, 2007) (accepting the use of the percentage method as the method for determining fees because that is what the lead plaintiff's agreement was with lead counsel) (discussing *In re Worldcom, Sec. Litig.*, 388 F. Supp. 2d at 319, 353 (S.D.N.Y. 2005) and citing *In re Global Crossing Sec. & ERISA Litig*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004)); *In re Ahold NV Sec. and Erisa Litig.*, 461 F. Supp. 2d 383 (D.Md. 2006).

540 F.2d 102, 117 (3d Cir. 1976); *Heritage Bond*, 2005 U.S. Dist. LEXIS 13627, at *44 ("The risks assumed by Class Counsel, particularly the risk of non-payment or reimbursement of expenses, is a factor in determining counsel's proper fee award."). More recent post-PSLRA rulings make it clear that the possibility of no recovery (and hence no fee) has increased exponentially. *See, for example, Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003) (affirming dismissal with prejudice of securities fraud class action complaint against Bernard Ebbers and WorldCom arising out of a massive securities fraud that resulted in a $685 million write-off of accounts receivable, for which Ebbers was later convicted). Courts have specifically noted that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *Ikon*, 194 F.R.D. at 194; *Whiting v. Applied Signal Tech.*, No. 06-15454, 2008 U.S. App. LEXIS 11982, at *1 (9th Cir. June 5, 2008) ("We consider whether plaintiffs adequately pled a claim of securities fraud--something that is much harder now than in days gone by."). It is beyond question that, from the outset, Lead Plaintiff, the Class, and Lead Counsel faced a wave of significant legal hurdles. Sharply contested and unsettled issues of both fact and law predominated and, in the face of the real possibility of no recovery for the Class, Lead Counsel achieved a result that fully supports the fee requested. Any outcome for the Class and the consequent reimbursement of fees and expenses has always been at risk, completely contingent upon the result achieved, and this Court's discretion in making a fee award. Lead Counsel have incurred substantial expense and received no compensation during the course of this action, knowing that if the litigation efforts failed, no fee would be generated.

### 2. The result achieved

Courts have consistently recognized that the result achieved is an important factor to be considered in making a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 547-48 (S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

A Settlement Fund of $2,730,000 in cash has been obtained through the efforts of Lead Counsel without the necessity and risk of trial and appeals. In *In re Safety Components Int'l, Inc.*,

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

166 F. Supp. 2d 72, 76, 98-99 (D.N.J. 2001), for example, the court awarded fees of one-third of a common fund even where the settlement was reached before any motions to dismiss were filed, before class certification, and before any formal discovery. *See also In re Ravisent, Inc. Sec. Litig.*, No. 00-civ-1014, 2005 U.S. Dist. LEXIS 6680, at *6 (E.D. Pa. Apr. 19, 2005) (fees of one-third of settlement fund granted after plaintiffs survived one motion to dismiss, but before any depositions were taken); *Maley v. Global Techs. Corp.*, 186 F. Supp. 2d 358, 360, 367-68 (S.D.N.Y. 2002) (noting that motions to dismiss had been fully briefed, as in this case, and settlement negotiations ensued while those motions were *sub judice*, and awarding one-third of settlement fund in attorney's fees). The final settlement amount attained, moreover, only came about through arms-length negotiations between Lead Counsel and defense counsel. In view of the economic and legal obstacles to a potential recovery in this case, the settlement achieved is an excellent result for the Class.

### 3.    The skill required and the quality of the work

The successful prosecution of these complex claims required the participation of highly skilled and specialized attorneys. *Heritage Bond*, 2005 U.S. Dist. LEXIS 13627, at *38 ("The experience of counsel is also a factor in determining the appropriate fee award."). From the outset, Lead Counsel engaged in a concerted effort to obtain the maximum recovery for the Class. Lead Counsel demonstrated that, notwithstanding the barriers erected by the PSLRA, they would develop the evidence to support a convincing case. Subsequently, Lead Counsel negotiated a settlement to benefit the Class. The skill demonstrated by Lead Counsel supports the requested fee.

The quality of opposing counsel is also important in evaluating the quality of the work undertaken by plaintiffs' counsel. *See, e.g., In re Charter Commc'ns, Inc., Sec. Litig.*, MDL No. 1506, 2005 U.S. Dist. LEXIS 14772, at *53 (E.D. Mo. June 30, 2005); *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977). Lead Counsel was opposed in this

litigation by counsel from globally-recognized law firms with noted securities law practices and impeccable reputations for vigorous advocacy of their clients' interests.[10]

### 4. The customary fee

If this action was not a class action, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery. *Blum*, 465 U.S. at 904 ("In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers."); *In re M.D.C. Holdings Sec. Litig.*, No. CV 89-0090 E (M), 1990 U.S. Dist. LEXIS 15488, at *22 (S.D. Cal. Aug. 30, 1990) ("In private contingent litigation, fee contracts have traditionally ranged between 30% and 40% of the total recovery.").[11] Thus, the requested fee is well within the range of the customary contingent fee in the private marketplace. *See In re Arm Fin. Grp., Inc.*, No. 3:99CV-539-H, 2006 U.S. Dist. LEXIS 63528, at *20-*21 (W.D. Ky. Aug. 31, 2006) (awarding up to as much as 40% of a $4.1 million common fund settlement in a PSLRA case).

### 5. A 33⅓ percent fee award, with interest, is within the range of fees awarded in similar complex class action litigation

The "object in awarding a reasonable attorneys' fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible. In other words, the object is to simulate the market." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). The fee requested here is in line with the going market

---

[10]    *See, e.g., Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040 (9th Cir. 2006) (affirming dismissal of a securities fraud case in which Latham & Watkins represented an individual defendant); *In re Impac Mtg. Holdings, Inc.*, No. SACV-06-00031, 2008 U.S. Dist. LEXIS 44644 (S.D. Cal. May 19, 2008) (dismissing securities fraud case against defendants, represented by Latham & Watkins); *Stanley v. Safeskin Corp.*, No. 99-CV-454, 2000 U.S. Dist. LEXIS 14100 (S.D. Cal. Sept. 18, 2000) (dismissing securities fraud case against defendants, some of whom were represented by Morgan, Lewis & Bockius).

[11]    *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, at *40-*41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the client. The more the recovery, the more the fee. The percentages agreed on vary, with one-third being particularly common."); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986) (40% contractual award if case went to trial); *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 48 (3d Cir. 1987) (33⅓ percent contingent fee held reasonable).

rates in contingent fee matters and support the requested fee. The relevant factors support the requested 33⅓ percent fee, with interest, as allowed by statute.[12]

As sampling of other cases confirm the reasonableness of the requested fee:

- *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005) (upholding award of one-third of $7.25 million settlement fund in securities class action);
- *Mego Fin.*, 213 F.3d at 463 (award of 33⅓ percent of $1.725 million settlement);
- *In re Mikohn Gaming Corporation Sec. Litig.*, No. 05-01410, (D. Nev. June 12, 2007) (awarding 33⅓ percent of $2.8 million settlement);
- *Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 U.S. Dist. LEXIS 26903, at *43 (E.D. Pa. April 11, 2007) (awarding one-third of $750,000 settlement);
- *Heritage Bond*, 2005 U.S. Dist. LEXIS 13555, at *74 (awarding one-third of $27,783,000 settlement fund);
- *Schnall* v. *Annuity & Life Re*, 02 CV 2133, (D. Conn. Jan. 21, 2005) (awarding 33⅓ percent of $16.5 million settlement fund) (electronic order);
- *Ravisent*, 2005 U.S. Dist. LEXIS 6680, at *6 (fees of one-third of settlement fund granted);
- *Strougo*, 258 F. Supp. 2d at 262 (awarding one-third of a $1.5 million settlement and citing cases awarding one-third in securities suits);
- *In re Blech Sec. Litig*, No. 94-7696, 2002 U.S. Dist. LEXIS 23170, at *5 (S.D.N.Y. Dec. 4, 2002) (awarding 33⅓ percent of fund, plus expenses, and noting that this percentage is consistent with awards made in similar cases)
- *Maley*, 186 F. Supp. 2d at 367-68 (awarding one-third of settlement fund);
- *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2001 U.S. Dist. LEXIS 20160, at *10 (E.D. Pa. Dec. 6, 2001) (awarding 33% in attorney's fees);
- *Safety Components*, 166 F. Supp. 2d at 76 (awarding fees of one-third of a $4.5 million common fund);
- *Neuberger v. Shapiro*, 110 F. Supp. 2d 373, 386 (E.D. Pa. 2000) (approving 33⅓ percent of a $ 4,325,000 settlement fund); and,
- *In re Med. X- Ray Film Antitrust Litig.*, No. 93-5904, 1998 U.S. Dist. LEXIS 14888, at *20 (E.D.N.Y. Aug. 7, 1998) (awarding 33⅓ percent of settlement fund; such an award is "well within the range accepted by courts in [the Second Circuit]").

### C. A lodestar cross-check also favors the award of a 33⅓ percent fee

The requested fee percentage is also reasonable when compared to the lodestar, which "calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with

---

[12]    The PSLRA provides that the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6).

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

the representation." *Paul, Johson*, 886 F.2d at 272. The lodestar is calculated by multiplying the reasonable hours expended by a reasonable hourly rate. *Vizcaino*, 142 F. Supp. 2d at 1302. Courts may enhance the lodestar with a multiplier to arrive at a reasonable fee, *id.*, with a multiplier ranging from one to four typically applied. The lodestar cross check here confirms that the ex ante fee negotiated between Lead Plaintiff and Lead Counsel is reasonable and should be approved. Lead Counsel's request for an award 33⅓ percent of the recovery of $2,730,000 totals $909,909, plus interest. Lead Plaintiff's counsel have an aggregate of 1,158.19 hours totaling $560,961.25. *See* Declarations Lead Counsel and Liaison Counsel. The requested fee award represents a multiplier of 1.62, which renders the requested fee amount (with a lodestar cross-check) reasonable. For example, in *Steiner v. Am. Broad Co.*, No. 05-55773, 2007 U.S. App. LEXIS 21061, at **7-**8 (9th Cir. Aug. 9, 2007), the Ninth Circuit approved a multiplier of 6.85. *See also, Vizcaino*, 290 F.3d at 1051 (approving a multiplier of 3.65); *Heritage Bond*, 2005 U.S. Dist. LEXIS 13555, at *71 (noting that an average multiplier in common fund cases is 4.35) (citation omitted); *In re Interpublic Sec. Litig.*, No. Civ. 6527, 2004 U.S. Dist. LEXIS 21429, at *12 (S.D.N.Y. Oct. 27, 2004) (awarding multiplier amounting to 3.96; noting multiplier between 3 and 4.5 common in securities cases). Here, Lead Counsel seek notably what is less than the common multiplier in securities cases. The modest requested fee, therefore, is reasonable, whether the fee is calculated as a percentage of the fund or calculated pursuant to the lodestar method.

## VI.    LEAD COUNSEL'S EXPENSES ARE REASONABLE AND INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Counsel incurred expenses in an aggregate amount of $44,821.88 in prosecuting the litigation. The appropriate analysis to apply in deciding which expenses are compensable in a common fund case is whether the particular costs are of the type typically billed by attorneys to paying clients in the marketplace. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that 'would normally be charged to a fee paying client.'") (citation omitted). *See also In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996). The categories of expenses for

23

which counsel seek reimbursement are the type of expenses routinely charged to hourly paying clients and, therefore, should be reimbursed out of the common fund.

A significant component of these expenses is the reasonable cost of Lead Plaintiff's damages consultant and investigators. These experts and consultants assisted greatly in this litigation, among other things, in locating witnesses, many of whom were interviewed and provided valuable information relating to key issues in the case. These experts, consultants, and investigators were indispensable because without their involvement, Lead Plaintiff could not have properly prosecuted this case.

Expenses also include the actual costs charged for Lexis and Westlaw. It is standard practice for attorneys to use these services to assist them in researching legal and factual issues and reimbursement is proper. Indeed, courts recognize that these tools create efficiencies in litigation and, ultimately, save clients and the class money. *See Cont'l Ill.*, 962 F.2d at 570. In approving expenses for computerized research, the court in *Gottlieb v. Wiles*, 150 F.R.D. 174, 186 (D. Colo. 1993), underscored the time-saving attributes of computerized research as a reason reimbursement should be encouraged. The court also noted that fee-paying clients reimburse counsel for computerized legal and factual research. *Id.*

In addition, Lead Counsel were required to travel in connection with this action and thus incurred the related costs of transportation, lodging, and meals. The expenses in this category are reasonable, and are properly charged against the fund created. *See Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1244 (9th Cir. 1982); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp. 733, 746 (S.D.N.Y. 1994). Photocopying costs are also customarily reimbursed in common fund cases. *See McDonnell Douglas*, 842 F. Supp. at 746.

## VII.    LEAD PLAINTIFF IS ENTITLED TO REIMBURSEMENT OF REASONABLE COSTS AND EXPENSES

The Notice expressly stated that Lead Counsel would request reimbursement for out-of-pocket expenses up to the requested amount, "which may include approximately $3000 for

24

reimbursement for the lead plaintiff's time and expenses."[13]    Congress acknowledged reimbursement to a class representative in 15 U.S.C. § 78u-4(a)(4), noting: "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  Lead Plaintiff, a software developer who normally charges a $125 per hour consulting fee, has incurred approximately $2,341.67 in costs and expenses to monitor and supervise this litigation, as noted in his attached declaration.  Mr. Mongeli, who volunteered for the role as Lead Plaintiff for the benefit of the Class, was actively involved in overseeing this litigation and overseeing Lead Counsel, and devoted approximately 18.73 hours from his schedule during this litigation.  *See* Declaration of Adrian Mongeli.

**VIII.  CONCLUSION**

This settlement is fair, adequate, and reasonable given the presence of skilled counsel for the Settling Parties, the complexity of the facts and legal questions at issue, the possibility of substantial expense of this litigation if continued to trial and on appeal, the risks attendant to prevailing fully on the merits, the present benefit of recovery to the Class, and the arm's-length negotiations.  For the reasons discussed herein, Lead Plaintiff respectfully moves for the final approval of the settlement and plan of allocation.

Furthermore, Lead Counsel respectfully move for the award of 33⅓ percent of the Settlement Fund, with interest, the award of expenses, and the award of reasonable costs and expenses to Lead Plaintiff.

DATED:    September 4, 2008            Respectfully submitted,

                                      BRAUN LAW GROUP, P.C.


                                      /s/  Michael D. Braun
                                      Michael D. Braun (167413)

---

[13]    *See, e.g., In re Infospace, Inc.*, 330 F. Supp.2d 1203, 1216 (W.D. Wash. 2004) (awarding $5,000 to one lead plaintiff and $6,600 to another as reimbursement for the costs and expenses they incurred).

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

12304 Santa Monica Boulevard, Suite 109
Los Angeles, California 90025
Tel: 310.422.7755
Fax: 310.442.7756
*Liaison Counsel*

KAHN GAUTHIER SWICK, LLC
Lewis S. Kahn (*pro hac vice*)
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Tel: 504.455.1400
Fax: 504.455.1498

- and -

KAHN GAUTHIER SWICK, LLC
Kim E. Miller (178370)
12 East 41st Street, Suite 1200
New York, New York 10017
Tel: 212.696.3730
Fax: 504.455.1498
*Co-Lead Counsel for Lead Plaintiff
and the Class*

SAXENA WHITE, P.A.
Maya S. Saxena
Joseph E. White, III
2424 North Federal Highway, Suite 2150
Boca Raton, Florida 33431
Tel: 561.394.3399
*Co-Lead Counsel for Lead Plaintiff
and the Class*

## DECLARATION

I, Joseph E. White, declare under penalty of perjury that the facts in the foregoing are true and correct. Executed this 4th day of September, 2008 at Boca Raton, Florida.

/s/ Joseph E. White

## CERTIFICATE OF SERVICE

26

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee

1

2      I HEREBY CERTIFY that on September 4, 2008, I filed this document on the Court's

3  CM/ECF system, and the system will serve all counsel who have obtained valid ECF user names

4  and passwords.

5                                                    _____/s/ Michael D. Braun_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mongeli v. Terayon, No. 06-03936; Mot/Mem Settle/Atty Fee